IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

M.D., by her next friend, Sarah R. Stukenberg, )
D.I., by his next friend, Nancy G. Pofahl, )
Z.H., by his next friend, Carla B. Morrison, )
S.A., by her next friend, Javier E. Solis, )
A.M., by her next friend, Jennifer Talley, )
J.S., by his next friend, Anna J. Ricker, )
K.E., by her next friend, John W. Cliff, Jr., )
D.P., by her next friend, Karen J. Langsley, and )
T.C., by his next friend, Paul Swacina, )
individually and on behalf of all others similarly )
situated, )
  )
  )
     Plaintiffs, )
  )
     v. )     CASE NO. _____
  )
RICK PERRY, in his official capacity as )
     Governor of the State of Texas, )
THOMAS SUEHS, in his official capacity as )
     Executive Commissioner of the Health )
     and Human Services Commission of the )
     State of Texas, and )
ANNE HEILIGENSTEIN, in her official )
     capacity as Commissioner of the )
     Department of Family and Protective )
     Services of the State of Texas, )
  )
     Defendants. )

**PLAINTIFFS' ORIGINAL COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND REQUEST FOR CLASS ACTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 5

PARTIES ............................................................................................................................ 5

    A.    Named Plaintiffs ................................................................................................ 5

          M.D. .............................................................................................................. 5

          D.I. ................................................................................................................ 8

          Z.H. ............................................................................................................ 10

          S.A. ............................................................................................................ 13

          A.M. ........................................................................................................... 15

          J.S. ............................................................................................................. 19

          K.E. ........................................................................................................... 21

          D.P. ........................................................................................................... 23

          T.C. ........................................................................................................... 27

          Named Plaintiffs, Collectively ................................................................. 30

    B.    Next Friends .................................................................................................... 31

    C.    Defendants ..................................................................................................... 33

CLASS ACTION ALLEGATIONS ................................................................................ 35

FACTUAL ALLEGATIONS .......................................................................................... 37

    A.    The Structure Of The Texas Foster Care System ...................................... 37

    B.    Defendants Are Causing Harm And Risk Of Harm To Plaintiff Children, Who Are In The Permanent Managing Conservatorship Of The State. .................................................................................................... 41

          1.    Defendants Frequently Move Plaintiff Children From Placement To Placement, Causing Them Harm ....................... 41

          2.    Defendants Make Inappropriate Use Of Congregate Placements, Harming Plaintiff Children .................................. 44

3.    Defendants Utilize A Category Of Congregate Foster Care Placements That Is Particularly Harmful to Children .............................. 47

4.    Plaintiff Children Suffer Abuse And Neglect In State Custody ................................................................................. 49

5.    Plaintiff Children Are Denied Necessary Services While In State Custody ........................................................................ 52

6.    Plaintiff Children Are Frequently And Unnecessarily Separated From Their Siblings And Denied Visits With Their Families ......................................................................... 53

7.    Defendants Harm Plaintiff Children By Leaving Them To Languish In Care Without A Permanent Family And Age Out Of Foster Care Ill-Prepared For Independent Adult Life .................. 55

C.    The Harms Suffered By Plaintiff Children Result From Defendants' Failure To Properly Manage The DFPS Foster Care System ................................................................................ 58

1.    Defendants Mismanage The Texas Foster Care System By Failing To Maintain A Caseworker Staff Of Sufficient Size And Capacity To Perform The Tasks Critical To Plaintiff Children's Safety, Permanency, And Well-Being .................................... 59

2.    Defendants Mismanage The Texas Foster Care System By Failing To Focus Resources On Permanency Planning For Plaintiff Children, Causing Them To Languish In Foster Care Until They Age Out ...................................................... 62

3.    Defendants Mismanage The Texas Foster Care System By Failing To Create An Adequate Number And Array Of Placements And Services, Subjecting Plaintiff Children To Unstable And Inappropriately Restrictive Placements, Far From Family And Community ............................................... 64

4.    Defendants Mismanage The Texas Foster Care System By Failing To Adequately Oversee Substitute Care, Placing Plaintiff Children At Risk Of Harm .......................................... 69

a.    Defendants Fail To Ensure That Caseworkers Conduct Frequent And Quality Visits With Plaintiff Children ................................................................. 70

b.    For Children In Private Care, DFPS's Contract Management Arm Fails To Ensure That Children Are Safe From Harm ................................................. 72

iii

c.      For Children In Private Care, DFPS's Licensing
        Arm Fails To Provide Adequate Oversight To
        Ensure Plaintiff Children's Safety ................................................. 75

COUNT I ........................................................................................................................79

COUNT II .......................................................................................................................80

COUNT III ......................................................................................................................81

PRAYER FOR RELIEF ..................................................................................................81

## INTRODUCTION

1.      This is a civil rights class action on behalf of the approximately 12,000 children who have the misfortune of being in the long-term foster care – the Permanent Managing Conservatorship ("PMC") – of the State of Texas.  Far too many children in the state's PMC – are subjected to immeasurable and permanent harm, and are deprived of the opportunity for a safe childhood, all while under the state's care and protection.

2.      Every year, thousands of Texas children are brought into the custody of the Department of Family and Protective Services ("DFPS" or the "Department") after being abused or neglected in their homes.  This custody, called "substitute care" in Texas, is intended to be temporary, lasting only until a child can either safely be returned home or placed with another permanent family.  The state is required to make efforts to achieve one of these outcomes within the first year that a child is in custody.  If the state is not able to achieve reunification or other permanency within that time, the child is placed in the state's PMC.

3.      Once children enter the state's PMC, DFPS makes little effort to find them permanent homes.  Instead, these children remain in state custody for many years, and many are abused while in the state's custody.  In 2009, 6,400 children – over one-quarter of all children in Texas's PMC – had been in foster care for more than three years.  As of May 2010, roughly 500 children had been in Texas state custody for more than *ten* years.  These children languish in state care even though, as of August 2010, nearly three-quarters of children in the state's PMC were legally free for adoption.  Each year, far too many children leave the state's PMC only when they turn eighteen and "age out."

4.      While children are in its custody, the state is legally obligated to provide them with care and services that meet their individual needs and ensure their safety and well-being, and to find

for them the least restrictive, most family-like placements appropriate to their needs.  However, Defendants fail to meet these obligations.  The placements, treatment, and services that Texas provides to its wards are inadequate, and these inadequacies are only compounded once children enter the state's PMC.

5.      Many children in the state's PMC are moved from placement to placement, with little effective planning and with disregard for the emotional harm that these disruptions cause.  As of 2009, children in the state's PMC who had been in DFPS custody for more than three years had been in an average of *eleven* placements.

6.      Children in the state's PMC are placed in large group or "congregate" settings almost twice as frequently as other children in Texas state custody.  In particular, Defendants place many PMC children in "Foster Group Homes," a type of placement for seven to twelve children, without professional staff, that often provides care falling far short of professional standards.

7.      Too many Plaintiff Children are placed in restrictive Residential Treatment Centers ("RTCs") and remain there longer than appropriate.  As of March 31, 2010, three-quarters of the children in such RTCs in Texas were in the state's PMC – even though the children in PMC comprised fewer than half of all children in the state's custody on that date.  Some of these facilities provide sub-standard care and are harmful to Plaintiff Children.  Moreover, these RTCs are largely concentrated in one area of the state, which means many children who are placed in them suffer the further emotional trauma of being uprooted from their home communities.

8.      In the words of the Permanent Judicial Commission for Children, Youth and Families of the Supreme Court of Texas (the "Children's Commission"), Plaintiff Children "are essentially 'stuck' and only a small number of them will ever achieve true permanency."

9.      These and other harms to Plaintiff Children are caused by a number of significant

2

deficiencies in the Texas foster care system, including at least the following:

    a. DFPS is severely understaffed, suffers from high staff turnover, and is so poorly managed that little actual planning takes place for children once the state takes PMC. Overburdened caseworkers often fail to ensure that children are safe and that they receive needed services while they are in foster care.

    b. DFPS caseworkers fail to develop and implement appropriate permanency plans for children. Even though over half of all children entering PMC each year are under the age of seven, DFPS deems many children in the state's PMC to be "unadoptable" and makes little effort to find them a permanent and loving home.

    c. Defendants fail to ensure that there is an adequate range of placements and services that meet the needs of children across the state. This uneven distribution means that many placements disrupt because they are inappropriate or unsupported; it also means that many Plaintiff Children are, by necessity, placed at great distances from their home communities.

    d. The Department's oversight of the providers who care for the state's foster children is inadequate: DFPS caseworkers do not regularly visit children in their placements to assure their safety and well-being; the Department does not adequately manage its contracts to ensure that professional standards are met by the private care providers operating homes and institutions where the majority of children in the state's PMC are placed; and the Department inadequately investigates reports of maltreatment in care, and imposes insufficient remedial measures and sanctions even when maltreatment is discovered, creating a continuing risk of harm to children under the state's protection.

10. Defendants have long been aware of these and other deficiencies of the Texas foster care system, yet have failed to effectively address them – leaving many thousands of children to be harmed while in the state's care.

11. Texas received a failing grade in a 2002 federal audit of its foster care program, and performed even *worse* on certain key measures in a second federal audit in 2008.

12. In 2004, Texas's Comptroller released a report on the state's foster children entitled *Forgotten Children*. The Comptroller called on Governor Perry to establish a "Crisis Management Team" to deal with the problems. Around that time, several reports repeated a Texas judge's statement that children in the state's PMC were "the children that even God has forgotten."

13.     In 2006, the Comptroller again urged Governor Perry to take action, noting that in Fiscal Year ("FY") 2005 a child in foster care in Texas was statistically four times more likely to die than a child in the state's general population.

14.     In 2008, the federal government fined Texas $4 million for not seeing to it that children in state custody received the number of monthly visits by conservatorship caseworkers that are required by federal child welfare performance standards.   As DFPS Commissioner Anne Heiligenstein recently noted, the state escaped paying this fine "not because the feds decided we were right and they were wrong . . . but because they made some computation errors in other states."

15.     In January 2010, Commissioner Heiligenstein commented: "When we talked with children, particularly the teenagers in foster care . . . they are very clear about what we have done wrong: we have taken them very far from their homes, separated them from their siblings, disrupted their care and/or moved them to a new foster placement too often."

16.     In December 2010, the Texas Adoption Review Committee found that the Texas foster care system "is sometimes doing more harm to our children than good."

17.     Children in Texas's PMC will continue to be harmed, and their constitutional rights will continue to be violated, unless and until fundamental changes are made to this damaging system. Defendants are knowingly failing to discharge their constitutional and statutory obligations to ensure the safety, permanency, and well-being of the children in the Plaintiff Class, exposing them instead to harm and risk of harm through the very system that is charged with protecting them.  All members of the Plaintiff Class seek declaratory and injunctive relief to remedy these violations of their legal rights, and to prevent Defendants from continuing to put them at risk of harm.

18.     This class action lawsuit is the collective cry of Texas's forgotten children, now demanding to be remembered.

## JURISDICTION AND VENUE

19.     This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

20.     Venue is proper here, pursuant to 28 U.S.C. § 1391(b), because a substantial portion of the events or omissions giving rise to the claims occurred in this District, in that:

    a.  Named Plaintiffs M.D. and T.C. are legal residents of this Division and entered DFPS custody in this Division;

    b.  Named Plaintiff D.I. is a legal resident of this District and, along with Named Plaintiff S.A., entered DFPS custody in this District;

    c.  at minimum, Named Plaintiffs M.D., D.I., S.A., J.S., K.E., D.P., and T.C. have been, at times, placed in this District; and

    d.  Named Plaintiff D.I. is currently placed in this District.

## PARTIES

**A.     Named Plaintiffs**

### M.D.

21.     M.D. is a fourteen-year-old girl from Corpus Christi, in Nueces County.  M.D. was originally brought into state custody at age eight, placed with relatives, and then again brought back into state custody at age ten.  Over the four years that M.D. has most recently been in the care of the state, DFPS has repeatedly failed in its obligation to provide for her safety and well-being.  Instead of providing her with services and therapy to address the maltreatment that caused her removal from her parents and the abuse she suffered while living in a DFPS-selected placement, DFPS has compounded that trauma by placing her for years in inappropriate institutions; failing to provide her with critically-needed mental health evaluations and services;

overmedicating her with powerful psychotropic medications; failing to seek and secure an appropriate permanent home for her; and subjecting her to numerous and frequent placement moves that have prevented her from establishing lasting relationships with caregivers, therapists, or even other children.

22.     When M.D. was eight years old, DFPS removed her from her parents due to neglect by her mother and abandonment by her father.  After nine months in the state's custody, DFPS placed M.D. in conservatorship with her aunt and uncle.  However, when M.D. was ten years old, DFPS removed her from this home, because her cousin sexually assaulted her while she was under the aunt and uncle's conservatorship.

23.     After removing M.D. from her relatives' home, DFPS moved the ten-year-old child through three foster placements over the next six months.  Eventually, DFPS placed M.D. in a foster home in Dallas, over 400 miles from her home community.

24.     Toward the end of 2007, DFPS moved M.D., still only ten years old, to an institution, an RTC in Victoria.  After three months in this facility, M.D. became suicidal.  She stayed there for almost two and a half years, steadily deteriorating both emotionally and psychologically.  During this time, DFPS assumed PMC of the child.

25.     From the RTC, DFPS sent M.D. to an acute care facility just outside of Houston, without making any permanent plans for her.  After two months, DFPS moved M.D. 300 miles away to yet another RTC in Denton.

26.     While at that RTC, M.D. and another young child left the facility and walked to a nearby retail establishment where M.D. was raped.  After the rape, DFPS did not provide M.D. with any special counseling, even though M.D. was so traumatized that she had started cutting herself. Instead, RTC staff chastised M.D. for leaving the facility.  In the midst of the emotional turmoil

6

resulting from the assault, DFPS sent M.D. to a juvenile detention center after a disturbance at the RTC.

27.      During the four years that M.D. has been in foster care, DFPS has moved her through at least seven different foster placements, as well as hospitalizations.  For much of this time, this young child has been kept in institutions of one kind or another – RTCs, psychiatric centers, and detention facilities.   With such an existence, M.D. has been unable to form any lasting relationships.

28.      M.D. is currently placed in an austere, restrictive short-term therapeutic placement in San Antonio.  M.D. has no privileges of any kind.  She has no visitors.  She cannot have any toiletries.  She is warehoused and alone.   Her DFPS caseworker has said that M.D. will be transitioning from this facility to another RTC.

29.      As M.D. has moved through the foster care system, she has been given numerous psychotropic medications.  These drugs have been used as a chemical substitute for the care, counseling, and permanent placement in a family that DFPS is obligated to seek and secure for her.  M.D. is now diagnosed with bipolar disorder and depression.

30.      While M.D. is nominally in the eighth grade, she has been placed in a number of schools attached to the institutions where she was placed.  In those schools, she has been advanced from one grade to the next based on her age.   Her true academic progress has been constantly interrupted by her placement in a series of far-flung facilities.

31.      Although DFPS knew early on that M.D.'s parents were not capable of parenting her, and in fact had removed her from their care in 2005, it was not until July 2010, more than three years after she was brought into foster care for the second time, that M.D. was freed for adoption.

32.      Despite the fact that M.D. has consistently asked to be adopted, DFPS has continually

7

failed to seek and secure a permanent family for this lonely child.  At the age of fourteen, M.D. faces the prospect that she will age out of care after four more years of being shuffled around the state from institution to institution.

33.     Defendants have violated M.D.'s constitutional rights by failing to protect from her from harm while in their care; failing to provide adequate supervision over her foster care placements; subjecting her to frequent moves across the state far from her home community; failing to arrange for adequate therapy to address the trauma she has suffered both before and while in DFPS custody; subjecting her to unnecessary psychotropic medications; keeping her for long periods in institutions; and failing for years to identify or plan for an appropriate permanent placement.

### D.I.

34.     D.I. is a nine-year-old boy from Houston, in Harris County, who came into the Permanent Managing Conservatorship of the state in August 2010.  DFPS has failed to keep this young boy safe while in its custody, instead placing him in one foster home that could not meet his needs and in another where he was sexually abused.  DFPS has failed to provide D.I. with adequate counseling to address either the trauma he suffered at home or while in foster care, instead allowing him to be administered powerful psychotropic medications.   Additionally, the Department has failed to take timely and appropriate steps to identify a permanent home for this boy.

35.     DFPS first became involved with D.I. and his mother in July 2007, when D.I. was five years old.  The boy's mother had a serious drug addiction and did not feed D.I. at home, leaving the young boy to cook for himself and scrounge in dumpsters for food. D.I.'s father, who did not live with them, knew of the mother's neglect, but was himself an alcoholic and drug addict.

Over the next twelve months, the boy acted out in school, and DFPS received several reports of the mother's neglectful supervision and physical and medical neglect of D.I., but all were ruled out after investigation by DFPS staff and administrators.

36.     After D.I. ran away from home in July 2008 at age six, DFPS again investigated, and this time decided to leave the child in the home under a safety plan which provided services to D.I. and his mother.   This plan proved unsuccessful, and in late February 2009, the Department brought D.I. into state custody.

37.     DFPS first placed D.I. with a relative who had five children of her own.   For the first three months that he was with this relative – but still in DFPS custody – DFPS did not arrange for D.I. to receive any therapy to address the extreme neglect he had suffered.   Eventually, the relative expressed to DFPS that she could not manage the behaviors of this unsocialized child.

38.     In June 2010, when D.I. was eight, DFPS moved him to a foster home, where just one foster parent cared for five children and adolescents, some of whom had histories of acting out sexually.   In this inadequately supervised placement, D.I. was sexually abused by three older boys on more than one occasion.   DFPS did not close this foster home after learning of the abuse.

39.     DFPS removed D.I. from this home and placed him in another foster home.   Although D.I. had recently been sexually abused by older boys, DFPS selected a foster home which housed at least five other boys.   Again, there was a single foster parent to care for all of the children in the home.   D.I. remained in this placement for just ten days.

40.     During this time, D.I. was admitted to a psychiatric hospital, where he was reevaluated by a new doctor and therapist and diagnosed with Attention Deficit Hyperactivity Disorder, Reactive Attachment Disorder, and Oppositional Defiant Disorder.   D.I. was prescribed multiple psychotropic medications.   D.I. continues to be given these medications, which make him

9

extremely lethargic and unable to focus.

41.     In August 2010, DFPS took Permanent Managing Conservatorship of D.I.  Within weeks of taking PMC, in September 2010, DFPS moved D.I. to a new foster home.  Although the foster parent initially said that she was interested in adopting, she has since stated that she will not adopt D.I.  DFPS subsequently placed three girls who have been sexually abused in the same home.  D.I. remains in that home.

42.     D.I.'s academic progress has suffered during his time in foster care, due to his moves and overmedication.  DFPS has failed to provide D.I. with sufficient therapy to address the sexual abuse he suffered in its custody.

43.     Although D.I. is legally free for adoption, DFPS has failed to take timely action to provide this child with the services and supports he needs to address his behavioral and mental health issues and ensure that he can become part of a safe and nurturing family.

44.     Defendants have violated D.I.'s constitutional rights by placing him in a foster home where he was sexually abused; failing to arrange for adequate therapy to address the trauma he has suffered both before and while in foster care; subjecting him to the overuse of psychotropic medications; moving this young boy from placement to placement; and failing to take action to ensure that D.I. can leave foster care to a permanent and loving family.

**Z.H.**

45.     Z.H. is a ten-year-old boy from San Antonio, in Bexar County.  Z.H. is the oldest of three boys, born of the same mother but each with a different father.

46.     Z.H. and his youngest brother were removed from their mother's home and brought into foster care by DFPS in February 2009.  The youngest brother, who was an infant when the boys were removed, was placed with foster parents who are now in the process of adopting him.

DFPS took legal custody of the middle brother in March 2009, leaving him with his father with whom he had been living.  Z.H., however, has been shuffled by DFPS from one placement to another, often many hundreds of miles from his home.  DFPS has failed to provide Z.H. adequate services, instead consenting to his medication with powerful psychotropics.  DFPS has failed to seek and secure a permanent home for this child, instead leaving him to languish in institutions.

47.      Prior to entering foster care, Z.H. had been physically abused and neglected by his alcoholic and drug-abusing mother and sexually molested by men she brought home.  Because of this serious maltreatment, Z.H. was in immediate need of services and therapy as soon as he entered care.  DFPS provided neither, but instead allowed this child to be prescribed powerful drugs to control the symptoms of his trauma.  DFPS placed Z.H., without his brothers, in a privately run emergency shelter in Kerrville, licensed to hold twenty children from birth through seventeen years old.  Z.H. was nine years old at the time.  While Z.H. was at the shelter his prescriptions ran out, but the shelter operator did not refill them or inform Z.H.'s DFPS caseworker.

48.      In March of 2009, DFPS moved Z.H. from the Kerrville shelter to a therapeutic foster home.  Shortly after arriving at the home, however, he was admitted to a hospital in San Antonio offering acute care for emotionally and behaviorally troubled children.

49.      Z.H.'s condition deteriorated markedly at this facility.  His eyes became sunken, with the pupils dilated and large dark circles beneath them.  He appeared largely disconnected from his surroundings.  He somehow acquired a gash on his left cheek which was not stitched, and which left Z.H. with a scar that only now is beginning to fade.

50.      At this facility, the slight eight-year-old was given a cocktail of eight psychotropic medications.  These drugs had powerful side effects:  Z.H. became aggressive and agitated; was

prone to abrupt and spontaneous movements; and was unable to control the movement of his tongue.  These symptoms were so powerful that on at least one occasion (in May, 2009), hospital staff gave Z.H. emergency injections of Benadryl and Cogentin – a medication designed to treat the symptoms of Parkinson's disease – in an attempt to control them.

51.     The San Antonio hospital discharged Z.H. in June 2009.  Because DFPS had made no other plan for him, Z.H. was taken to an emergency shelter in Lometa, more than 100 miles away.  The shelter staff saw that Z.H. was medically unstable, and they had him admitted to a hospital in nearby Lampasas.  The next day, he was transferred to a hospital in Belton, about 60 miles away.

52.     The records of the Belton hospital note that Z.H. arrived overmedicated and on a stretcher, and that he required heavy stimulation just to keep his eyes open.  Z.H. remained at the Belton facility, first in its hospital and then in its affiliated RTC, for an extended period of time.

53.     Z.H. is now in an RTC designed to house 26 boys from ages seven to thirteen, in Nacogdoches, about 300 miles from his home community of San Antonio.  Of the two years he has been in DFPS's care, Z.H. has spent all but a few months in institutions.  Z.H. entered the state's PMC in July 2010.  He is now ten years old.

54.     DFPS has failed to take appropriate steps to seek and obtain a permanent family for Z.H., and did not begin to take steps to have him freed for adoption until early 2011 – when Z.H.'s mother was arrested for murder.

55.     Although Z.H. is in the state's PMC, DFPS has failed to develop and implement an appropriate plan for him to grow up in a safe and nurturing family.  DFPS has done little to ameliorate the severe damage Z.H. suffered in his mother's home but has instead compounded that damage by shuffling him from one institution to another, where his primary "treatment" has

been powerful psychotropic drugs. These drugs have, at times, made it difficult if not impossible for him to effectively participate in the little therapy he has been offered.

56.     Defendants have violated Z.H.'s constitutional rights by subjecting him to institutionalization and to over-medication; subjecting him to frequent placement moves; placing him far from his home community; failing for too long to arrange for adequate therapy to address the trauma he has suffered; failing to allow him reasonable contact with his siblings; failing to develop and implement an appropriate plan for him; and failing to take timely action to seek and secure a permanent family for him.

**S.A.**

57.     S.A. is a fourteen-year-old girl who entered Texas foster care in November 2001, when she was five years old. She has been in the PMC of the state since October 2002, and she is legally free for adoption. Since she came into state custody nine years ago, DFPS has moved S.A. through at least 24 placements. She has endured 21 moves since becoming a permanent ward of the state, often to distant parts of the state. Despite the state's obligations to provide appropriate services and treatment for her and to secure a permanent placement, S.A. remains in foster care, having spent more than six of her nine years in state custody in institutional placements.

58.     S.A. was taken into foster care when her grandmother, who had formally adopted the child in Florida, was detained on outstanding warrants while crossing the border from Mexico with her boyfriend, a registered sex offender, and S.A. S.A. came into DFPS custody in Brownsville, Cameron County, in DFPS Region 11.

59.     DFPS initially placed S.A. in a foster home. Over the next nine months, DFPS moved S.A. between multiple foster homes, hospitals, and an emergency shelter, before sending her, at

the age of six, to an RTC in Victoria, Texas, in DFPS Region 8.  While in this RTC, S.A. was legally freed for adoption.  However, DFPS failed to take necessary steps to seek and secure an adoptive home for her.

60.     When S.A. was discharged from the RTC, DFPS moved her to another congregate facility.  This was S.A.'s longest placement, which she entered at age seven and where she remained for more than three years until she was ten years old.  At one point S.A. was moved to the facility's General Residential Operation ("GRO"), which provided less treatment than the RTC, but after only one month she was returned to the RTC.  Despite the fact that a court ordered that S.A. be moved to a less restrictive placement, DFPS found no alternative, more appropriate or more home-like placement for her.

61.     In April 2007, DFPS moved S.A. to a therapeutic foster home, but this placement lasted only two days.  DFPS then placed her in another therapeutic foster home which lasted only two weeks.  Over the course of the next four years, DFPS cycled S.A. through a series of therapeutic foster homes, RTCs, GROs, and hospitalizations.  These placements have been across the state, in at least four of DFPS's eleven regions.

62.     S.A. is currently at an RTC in Kerr County, six hours from Brownsville.

63.     When she was first brought into state custody, S.A. presented no acute emotional problems or mental illness.  During her years in foster care, however, her behavior has deteriorated, and she is now described by DFPS as needing a placement that is "experienced in working with anxiety and grief/loss issues."  She is currently on multiple medications prescribed for schizophrenia and clinical depression.

64.     S.A.'s frequent moves from one placement to another have been accompanied in most instances by a change of therapist, as well as by transfers from one school to another, limiting

her therapeutic and educational progress.

65.     S.A.'s case has been transferred from one DFPS caseworker to another – twelve in total. In fact, S.A. had one caseworker for just one month.

66.     In nine years of state custody, DFPS has not developed an individualized adoption recruitment plan nor made any specialized efforts to find a permanent home for this child.

67.     Defendants have failed to provide S.A. with any place in the State of Texas that she can call home.  Defendants have violated S.A.'s constitutional rights by failing to develop and implement an appropriate plan for her; subjecting her to frequent moves; placing her far from the community where her case is managed; failing to protect her from emotional harm while in care; failing to identify an appropriate permanent placement for her; and failing to arrange for adequate therapy to address the trauma caused her by the lack of stability in her placements and relationships, instead subjecting her to overmedication to mask her behavioral symptoms.

**A.M.**

68.     A.M. is a thirteen-year-old girl from Canton, in Van Zandt County who has been in foster care since July 2004 and is in the PMC of the State of Texas.  While A.M. has been in its custody, DFPS has separated her from her sisters, shuffled her from one placement to another, placed her in inappropriate foster homes, and left her for years in an institution.  DFPS has failed to provide A.M. with therapy necessary to deal with the traumas she has experienced and instead has subjected her to powerful psychotropic medications.  Although she is legally free for adoption, DFPS has failed to seek and secure a permanent adoptive home for A.M.  She remains in a temporary foster home with no adoptive prospects.

69.     When A.M. was only six years old, she watched a violent physical fight among her mother, her mother's then-boyfriend, and an ex-boyfriend.  A.M. called the police, and DFPS

removed the girl and her sisters.

70.    A.M. has three younger half-sisters.  DFPS placed the oldest of the three with paternal relatives in Van Zandt County, who have maintained sporadic contact with A.M.

71.    The youngest was not born until A.M. was ten years old and already in the PMC of DFPS.  DFPS removed that infant from her mother at birth and placed her in a foster home where A.M. was allowed to visit only once.  This sister was soon adopted by a paternal uncle, who has maintained no contact with the mother's side of the family.

72.    A.M.'s middle sister, only a baby when the girls were removed from home, went with A.M. into DFPS custody.  DFPS first placed A.M. and her sister in a nearby foster home, where they had no contact with extended family.  After only a few months, the elderly foster parents told DFPS that they could not handle caring for the baby, and DFPS moved the girls to another foster home.

73.    This next foster home was also in Van Zandt County.  The girls' great-grandmother was allowed to visit only at public places.  After a few months, those visits stopped, and the foster parents no longer even returned calls from A.M.'s great-grandmother.  The foster mother's adult son, who had a drug problem, had moved back home with his girlfriend, and the two would often fight in front of the children.  At this home, A.M. was forced to drink vinegar and to run laps in the summer heat as punishment.  A.M. disclosed this treatment, and DFPS removed the girls after almost one year in this placement, but did not close the foster home.

74.    DFPS placed the sisters in another purportedly therapeutic foster home.  Although this home was considered pre-adoptive, DFPS did no individualized screening to ensure that this was a proper placement for A.M.;  instead, the parents received official approval to operate a foster home only hours before learning that A.M. and her sister would be sent there.  A.M.'s DFPS

16

caseworker at that time promised repeatedly that A.M. would not be separated from her sister.

75.     After A.M. and her sister had lived for more than a year and a half in this home, the foster parents agreed to adopt only the toddler.  DFPS did not inform A.M. of this decision or otherwise prepare her.  Instead, one day when A.M. was nine or ten years old, the foster father took A.M. for a drive and announced to the fourth grader that her little sister was being adopted by the family, but that A.M. was not.  A.M. began acting out in school, and was eventually sent to a psychiatric hospital in McKinney, in Collin County.

76.     After approximately one month in the hospital, in January 2007, A.M.'s DFPS caseworker, who had promised never to separate the sisters, collected A.M.'s possessions and picked A.M. up from the hospital.  The DFPS caseworker drove A.M. more than 300 miles to a self-described "long-term care facility" located in Boerne, Kendall County, outside of San Antonio.  There, A.M. lived in one of several cottages, each of which housed sixteen children.

77.     In her sparsely furnished room at the Boerne facility, A.M. was allowed to display only one personal photograph.  The bathrooms were kept locked, and A.M. was required to ask permission if she needed to use one.

78.     Not long after A.M. arrived at that facility, she began to suffer from tremors and shaking of her extremities due to one of the psychotropic medications prescribed for her.  A.M. had previously been prescribed this medication, and explained to staff at the new placement that she reacted badly to it, but she was given the drug anyway.  A.M.'s reaction to the medication was so severe that she had to be hospitalized for approximately one week while she was weaned from the drug.

79.     At the facility in Boerne, A.M. suffered injuries to her face and arms from being restrained on a concrete floor.  She was administered several psychotropic medications every

morning by a staff member who would apologize as she gave the child the drugs.   The medications made A.M. vague and inattentive until about one in the afternoon.   The staff member who was designated as A.M.'s counselor or therapist starting in mid-2010 was provided no information by DFPS about A.M.'s history, including the circumstances of A.M.'s removal from home.

80.     While in this facility, A.M. was placed far from her home, and eight hours from her great-grandmother.   Even when her great-grandmother was able to visit, A.M. was permitted to leave the facility campus for only a few hours.

81.     While A.M. was at this placement far from the DFPS Region where her case was being managed, her DFPS case was reassigned five times and no DFPS worker ever visited A.M. After three years at the institution, in late January 2011, DFPS instructed A.M.'s counselor at the Boerne placement to prepare the child to be moved within the week to a new foster home.   A.M. had one telephone conversation with the mother at the foster home prior to being moved.   In early February 2011, DFPS moved A.M. to a foster home in Smith County.

82.     Defendants have violated A.M.'s constitutional rights by failing to develop and implement an appropriate plan for her; failing to protect her from harm while in care; placing her in homes and facilities that are not appropriate for her needs; failing to arrange for reasonable contact with her sisters or other family members; placing her far from her home community; allowing her to be heavily and unnecessarily medicated; isolating her in a congregate setting for years without any effort to find her a less restrictive placement; and failing to develop and implement a plan to enable A.M. to leave DFPS custody and grow up in a permanent home.

**J.S.**

83.     J.S. is a nine-year-old boy from Morton, in Cochran County, about an hour west of Lubbock.  Since J.S. came into state custody, he has spent his time institutionalized at two different RTCs, in a group home, and in a series of foster homes.  Many of these placements have been hundreds of miles from his home community.  DFPS has failed to take the necessary steps to ensure that J.S. will be raised in a permanent family, and has also failed to ensure that he receives the services he needs to address the trauma he has suffered.  Instead, DFPS has consented to his treatment with powerful psychotropic drugs.

84.     J.S. and his then sixteen-year-old sister were removed from their mother's home in 2007, along with the sister's own infant child, because of the mother's neglect.  The three children were first placed in basic foster care in Lubbock.  In November 2007, DFPS separated J.S. from his sister and niece and sent him to a residential treatment center in Victoria, more than 500 miles south of Lubbock.  DFPS made this placement change without notifying his attorney *ad litem*, thereby contravening both a state statute and a standing order of the Lubbock court that explicitly require notification in such instances.  J.S., only five years old at the time, was the youngest child at the institution, which also housed some adult mental patients.

85.     The walls of J.S.'s room at the RTC were bare cement block, painted white, and the only furniture was a bed in the middle of the room.  The few clothes he had were not appropriate for the weather.  The five-year-old asked the facility staff to help him get a photograph of his sister, but they did not do so.  On one occasion when his attorney *ad litem* visited him at the RTC, J.S. asked her for a hug, telling her that "they're not allowed to touch you here."

86.     DFPS took permanent managing conservatorship of J.S. while he was at this facility.  Although J.S.'s mother did not comply with her service plan and did not appear to be capable of

appropriately parenting him, DFPS's goal for J.S. remained reunification and so no steps were taken to free him for adoption.  Instead, DFPS arranged for telephone visits with his mother and sister, during which both would repeatedly tell J.S. that he would be coming back to live with the family.  These visits upset J.S., causing him to act out violently.

87.     After a year at the RTC, J.S.'s behavior did not improve.  He was violent toward himself and others.  In November 2008, the court found J.S.'s progress at the RTC unsatisfactory, and ordered that he be transferred closer to home.

88.     DFPS found a placement for him in a foster home in Lubbock.  While at this foster home it became clear that J.S. had been damaged by his year at the RTC.  The child was assessed as requiring specialized services, and he was subsequently moved to a therapeutic foster home in Lubbock.  The parents in this home wanted to adopt J.S., but were told that this was not possible, as he was not freed for adoption.

89.     When a neighbor reported that the foster father had physically abused another foster child in the home, J.S. was removed and placed in a different therapeutic foster home.  After these allegations were found to be without basis, J.S. was returned to the foster parents who had wanted to adopt him.  By this point, however, J.S.'s behaviors had spun further out of control, and he had begun to speak of suicide.  The foster mother thought that she could cope with the behaviors and help J.S.  Instead, DFPS shipped J.S. to an RTC in Denton, some 300 miles from Lubbock.  He is there now.

90.     At this RTC, J.S. attends an on-campus school, where he is frequently restrained and has "multiple daily incidents of aggression."  He is in the second grade.  As of October 2010, J.S. was receiving four psychotropic medications.  He is making little progress in his therapy, which the treatment center provides for one hour each week.

91.     Though he has just turned nine years old, this boy who came into foster care at the age of five has no prospects of leaving.  He cannot go home to his family, but he is not legally free to be adopted by a family that still wants him.  Long periods of institutional care and moves from one placement to another have left him traumatized and violent to himself and others, a condition that is now addressed by frequent restraints and powerful psychotropic medications.

92.     Defendants have violated J.S.'s constitutional rights by failing to provide him the therapy he needs to address the trauma he suffered at home; traumatizing him further by subjecting him to unplanned or ill-planned placement moves, institutionalization, inadequate therapy and the use of powerful psychotropic medications; and failing to take appropriate action to achieve permanency for him.

**K.E.**

93.     K.E. is a sixteen-year-old girl from Odessa, in Ector County.  K.E. was barely eight years old when she was brought into foster care, and, over the nearly eight years she has been in the state's care, DFPS has repeatedly failed in its obligation to provide for her safety and well-being. Instead of providing her services and therapy to deal with the trauma she suffered before entering the state's custody, DFPS has compounded that trauma by consigning her to institutional placements at a young age; subjecting her to numerous, frequent, and far-flung placement moves, thereby preventing her from establishing lasting relationships with caregivers, therapists, or even other children; failing to provide her with effective mental health services; allowing her to be medicated with powerful psychotropic drugs; and failing for years to find her an appropriate permanent home.  As a result of this treatment by DFPS, K.E.'s condition has deteriorated while she has been in care, to the point that she has needed psychiatric hospitalization on at least five occasions.

94.     DFPS removed K.E. from her home because of parental neglect, and placed her initially in a therapeutic foster home, where she remained for a little less than two months.  From there, she was placed in an emergency shelter for almost three months, in violation of state law.  The Department then began shuffling her through a series of placements, primarily congregate settings and institutions.  Most of these were far from her home community, making it difficult for her family to visit or for her caseworker to truly monitor her treatment and safety.

95.     Over the last eight years, DFPS has moved K.E. through at least nineteen different placements, most of them RTCs and emergency shelters.

96.     DFPS has placed K.E. in five different RTCs in the Houston area, over 500 miles from K.E.'s home.  One of the RTCs in which she was placed has had at least 56 confirmed licensing violations in the last two years, including such things as failure to maintain proper fingerprint records of staff, failure to give prescribed medication to children on time, inadequate supervision of children, transporting an unsafe number of children at one time in a van, and serious deficiencies in the physical plant and furniture.

97.     Although RTCs are intended to be temporary treatment programs that address children's emotional and behavioral problems, K.E. has been moved from one to another.  Until her current placement in a therapeutic foster home in Carroll in January 2011, K.E. had not been placed with a family since July 2008.

98.     K.E. has developed emotional and psychological problems while growing up in the state's custody without a permanent home, and is now being given four psychotropic medications concurrently.

99.     While K.E. is nominally in the tenth grade, her true academic level is lower because her frequent moves have made it impossible for her to progress as she should in school.

100.    K.E. is currently placed in a therapeutic foster home in Carroll, in Smith County, more than seven hours drive from her home in Odessa.  Her biological family is unable to visit her in such a distant placement.   K.E. has complained that she is not appropriately cared for in the foster home, and the foster parent has twice requested that she be moved.  Thus far, DFPS has not located a new foster home for K.E., and her caseworker has indicated that she may end up again in an RTC.

101.    K.E. hopes for a relationship with a loving adult, but due to her distant placements and frequent moves, there are virtually no adults with whom she feels close.  Years of placements in institutions far from her home community have left her socially isolated.

102.    DFPS has failed to identify a permanent home for K.E.  This child will likely age out of care after two more years of being shuffled around the state by DFPS, moving from one institution to another in a world she did not make or choose.

103.    Defendants have violated K.E.'s constitutional rights by subjecting her to frequent moves; warehousing her in restrictive institutions; placing her far from her home community; failing to develop and implement an appropriate plan for her care and treatment; failing to arrange for adequate therapy to address the trauma she has suffered both before and while in DFPS custody; consenting to her medication with multiple psychotropic drugs; and failing for years to identify or plan for an appropriate permanent placement.

**D.P.**

104.    D.P. is a sixteen-year-old girl from Lockhart, in Caldwell County.  D.P. was only six years old when she was taken into foster care, and, over the past ten years, DFPS has repeatedly failed in its obligation to provide for her safety and well-being.  Instead of providing her with services and therapy to address the abuse she suffered at the hands of her mother and

grandfather, DFPS has compounded that trauma by failing to provide her with critically needed mental health evaluations and services; allowing her to be overmedicated with powerful psychotropic medications and chemical restraints; separating her from her sisters; and failing to find her an appropriate permanent home.  Moreover, DFPS has subjected this child to at least 28 placement moves, including eight RTCs and eight emergency shelters, thereby preventing her from establishing lasting relationships with caregivers, therapists or even other children.  Most egregiously, DFPS has placed D.P. in inadequately screened foster homes in which she was subjected to additional sexual abuse.

105.   In September 2001 when D.P. was six, DFPS removed her and her then-newborn sister from their home because the baby had tested positive for cocaine.  Later, it was determined that their drug-addicted mother had physically abused and neglected D.P. and had failed to protect her from sexual abuse by her grandfather.  D.P. herself had been exposed to cocaine *in utero*, and subsequently D.P.'s mother had another daughter in 2003 who was also removed at birth because of exposure to the drug.

106.   After removing D.P. from her home, DFPS first put the six-year-old in an emergency shelter for a few days.  DFPS next placed her in one therapeutic foster home and then another; she spent about four months in each of these placements.

107.   Although initially placed together, the sisters were soon moved to separate placements and have since completely lost contact with each other.  Both of D.P.'s sisters have since been adopted, by different families.

108.   In 2002, DFPS returned D.P. to her home for a trial reunification without adequately assessing whether her mother was capable of caring for her and without providing sufficient services to make the reunification successful.  The agency removed D.P. again less than four

months later.  DFPS then sent the young girl to another therapeutic foster home, her third such placement in just over a year.  While she was in this home in 2003, D.P. was freed for adoption and DFPS assumed PMC of the child, then eight years old.

109.    A few months later, DFPS sent D.P., age nine, to an RTC.  DFPS left D.P. in this institution for almost two and a half years.

110.    DFPS eventually moved D.P. in 2006 from that institution into a foster home without ensuring that necessary services would be provided to support the placement.  The placement disrupted after not quite six months when the foster parents were unable to cope with the behaviors of this traumatized child.

111.    In the three and a half years between December 2006 and May 2010, D.P. was moved at least sixteen times.  At least five of these placements were in emergency shelters; in fact, D.P. spent the entire five-month period from October 2007 through February 2008 exclusively in emergency shelters, contrary to Texas law.  At least five other placements were in RTCs, and five more were in juvenile detention centers.  At least one placement was in a psychiatric hospital.  One of the placements was in San Angelo, more than 200 miles from her home.

112.    D.P. was removed from one of the few foster homes in which DFPS briefly placed her during this period because of concerns that she may have been sexually abused by her foster mother.

113.    In May 2010, DFPS sent D.P. to live with an aunt and uncle, who were neither licensed nor overseen by any licensed foster-care agency.  D.P.'s uncle sexually abused her while she was placed in that inadequately-supervised kinship home.

114.    To escape the abuse by her uncle, D.P. ran away and, with nowhere else to go, she found her way back to one of her prior placements.  When that placement alerted DFPS, the

Department sent her to a juvenile detention center for three days.

115. From the juvenile detention center, DFPS next moved D.P. to an emergency shelter for almost one month, before sending her to a psychiatric hospital, where she was prescribed as many as six psychotropic medications concurrently. These drugs have caused her to gain about 30 pounds since the summer of 2010.

116. D.P. was discharged from that psychiatric hospital to an emergency shelter – her seventh shelter placement during her time in the state's PMC. From the shelter, DFPS sent D.P. to an RTC, where she stayed for less than two months.

117. Between late December 2010 and early February 2011, D.P. was hospitalized, then placed in an RTC, and then hospitalized again. This second hospital admission was extended for more than a week past her discharge date simply because DFPS found no place else to put her.

118. On February 2, 2011, DFPS placed D.P. in a foster group home three hours from Lockhart which housed eight or nine other girls. There was very little supervision in this group home and D.P. ran away.

119. In late February 2011, D.P. was again hospitalized. At this hospital, the staff chemically restrained D.P., although this is prohibited by DFPS regulation. D.P. was groggy and struggled to remain awake because of these drugs.

120. Although her behaviors did not change from the beginning of her most recent hospital stay to the end, D.P. was certified by the hospital as "stable" and the hospital told DFPS to move her to a new placement. In March 2011, DFPS placed D.P. in the only setting that would accept her: another RTC more than six hours from her home jurisdiction.

121. Because of D.P.'s frequent moves, some of her school credits have not been properly recorded, a record-keeping error that may force her to repeat a grade. Despite the difficulties

created by such frequent moves, D.P. has always done well in school. However, when she was asked recently to name a favorite academic subject, she replied "I've been to so many schools – what's the point?"

122. All told, DFPS has moved D.P. through at least 33 placements during the seven years she has been in the state's PMC, in addition to her first four placements before entering the state's PMC. With such a peripatetic existence, D.P. has been unable to form any lasting relationships. She has complained that she has no best friend and has no adults to whom she can turn.

123. As D.P.'s caseworker has said to the child's attorney: "For God's sake – she's been in care for ten years and we haven't been able to do anything for her." At sixteen years old, D.P. is likely to remain in care until she ages out at eighteen.

124. Defendants have violated D.P.'s constitutional rights by failing to develop and implement an appropriate plan; failing to protect from her from abuse while in their care; subjecting her to frequent moves; placing her in inappropriately restrictive institutions; placing her far from her home community; failing to arrange for adequate therapy to address the trauma she has suffered both before and while in DFPS custody; subjecting her to overmedication; separating her from her sisters and failing to arrange reasonable contact with them; and failing to identify or plan for an appropriate permanent placement or even to have the Adoptions Unit review her file.

**T.C.**

125. T.C. is a sixteen-year-old boy from Corpus Christi, in Nueces County. He entered Texas foster care when he was eight years old. Over the nearly eight years that he has been in the state's custody, DFPS has moved T.C. through at least twenty placements, many in distant parts of the state. Indeed, T.C. has spent almost five years in state custody in eight different institutions. T.C. remains in foster care without a permanent home, although he has been free for

adoption for more than six years.

126.   T.C. is one of eight children.  He has four older half-siblings and three other brothers.  T.C.'s family has a long history of involvement with the child welfare system dating back to at least 1987.  Three of his half-siblings were found to have been sexually abused.  T.C. had been in foster care at least once before in Ohio when he was just three years old.

127.   DFPS brought T.C. and his three brothers into foster care in April 2003 when his parents were arrested.  T.C. was found to have been physically and sexually abused.

128.   DFPS first put T.C. in a foster home placement that lasted just seven days.  During T.C.'s next two months in state custody, DFPS moved him through two more foster homes before sending him, at just nine years old, to an RTC in Victoria.  He remained there for eleven months.

129.   T.C. was discharged from that RTC May 2004.  Over the next six months, DFPS again moved him through two foster homes and an emergency shelter.  During this time, he entered the PMC of the state and was legally freed for adoption.

130.   T.C. was next placed in what would be the first of seven psychiatric or behavioral hospitals.  The ten-year-old boy remained hospitalized for nine months.  When T.C. was discharged from the hospital in October 2005, DFPS moved T.C. to another RTC and left him there for over a year and half.

131.   Over the course of the next five years, DFPS cycled T.C. through a series of foster homes, RTCs, and hospitalizations.  At one point, DFPS moved T.C. to a relative's home, but this lasted for just one month.  T.C.'s placements have been as far away from his home as San Antonio, Waco, and even Tyler.

132.   One of the RTCs where DFPS placed T.C. in September 2009 had a history of licensing violations including incidents in which staff members beat, choked, cut, and bruised children; a

riot broke out when staffing was insufficient to control the children; and children attempted suicide when staff failed to supervise them.  T.C. remained in this facility for over one year. T.C.'s emotional state distinctly deteriorated while at this RTC.  He was eventually sent to an adult jail for several days because he threw a rock at an administration building.

133.    T.C. is currently in an RTC in Greenville, over 450 miles from his hometown of Corpus Christi.

134.    DFPS has separated T.C. from his three brothers, who were eventually adopted together by a family in Corpus Christi.  He has visited with them or with his half-siblings in years.  One of his brothers would like to reestablish contact with T.C., but that has not occurred as the teenage brothers are placed over 450 miles apart.

135.    The only person with whom T.C. truly has a relationship is his DFPS caseworker.  She has been unable to visit him regularly, if at all, in his last two placements because of the distance.

136.    T.C.'s frequent moves from one placement to another have been accompanied in most instances by a change of therapist, as well as transfers from one school to another, limiting both his treatment and his educational progress.

137.    During T.C.'s years in foster care, his emotional and psychological status has deteriorated.  T.C. has been diagnosed at various times as having ADHD, depression, bipolar disorder, anxiety, and Asperger's syndrome.  T.C. has been placed on several psychotropic medications.

138.    On more than one occasion, T.C. has run away from an RTC and sought to get himself admitted at a hospital.

139.    In nearly eight years of having this child in state custody, DFPS has failed to find T.C. a permanent home with a loving family.  Nor has DFPS prepared T.C. to live on his own if DFPS

ultimately fails to secure a permanent home for him and he ages out of DFPS custody.

140.    Defendants have violated T.C.'s constitutional rights by separating him from his siblings; failing to place him in appropriate homes or placements that meet his needs; failing to develop and implement an appropriate plan for his care; failing to stabilize or support his placements while in their care; subjecting him to frequent moves; placing him far from his home community; failing to arrange for adequate therapy to address the trauma he has suffered while in DFPS custody and before he entered its custody; failing to protect him from emotional harm while in care; failing to identify or plan for a permanent and loving home; and failing to prepare him for independent living in the likely event that he ages out of DFPS's care.

### Named Plaintiffs, Collectively

141.    All of the harms that have been inflicted on the Named Plaintiffs are a direct result of Defendants' operation of an unconstitutional system that they know is harming children.

142.    Defendants' actions and inactions with respect to the Named Plaintiffs are part of a systemic pattern of conduct that has caused, and continues to cause, irreparable harm. Defendants have violated and acted with deliberate indifference to and beyond the bounds of professional judgment regarding the Named Plaintiffs' constitutional rights by failing to provide them with appropriate and stable placements; by allowing them to be placed in unnecessarily restrictive placements that do not meet their needs; by failing to ensure that they receive necessary mental health services; by failing to make timely and meaningful casework contacts with them and monitor their progress in foster care in order to ensure their safety and well-being; by failing to provide them with monitoring and services necessary to prevent them from deteriorating physically, psychologically, emotionally, educationally, or otherwise while in state custody; by failing to support their family and community relationships, in particular by not

providing sibling visits and by moving them to distant placements far from their homes; by failing to provide case management and planning in accordance with their individual needs, best interests, and professional standards; and by failing to develop and implement a viable permanency plan that will allow them to leave foster care and secure safe and appropriate permanent homes in accordance with their individual needs, best interests, and professional standards.

**B.      Next Friends**

143.    Named Plaintiff M.D. appears by her next friend, Sarah R. Stukenberg.  Ms. Stukenberg serves as M.D.'s court-appointed attorney *ad litem*, a role she has held on and off since M.D. entered DFPS custody.  She knows M.D. personally and has visited her in several of her foster placements.  Ms. Stukenberg is familiar with the issues regarding M.D.'s foster care custody described here, and is suited to represent M.D.'s best interests in this case.  Ms. Stukenberg is a licensed attorney in the State of Texas, and maintains her principal office in Corpus Christi, Texas.

144.    Named Plaintiff D.I. appears by his next friend, Nancy Pofahl.  Ms. Pofahl serves as D.I.'s court-appointed attorney *ad litem*, a role she has held since December 2009.  She knows D.I. personally, is familiar with the issues regarding his foster care custody described here, and is suited to represent his best interests in this case.  Ms. Pofahl is a licensed attorney in the State of Texas, and maintains her principal office in Houston, Texas.

145.    Named Plaintiff Z.H. appears by his next friend, Carla B. Morrison.  Ms. Morrison serves as Z.H.'s court-appointed attorney *ad litem* and guardian *ad litem*, dual roles she has held since Z.H. entered DFPS custody.  She knows Z.H. personally and has visited him in several of his foster placements.  She is familiar with the issues regarding his foster care custody described here, and is suited to represent his best interests in this case.  Ms. Morrison is a licensed attorney

31

in the State of Texas, and maintains her principal office in San Antonio, Texas.

146.     Named Plaintiff S.A. appears by her next friend, Javier E. Solis.  Mr. Solis serves as S.A.'s court-appointed attorney *ad litem*, a role he has held since S.A. entered DFPS custody. Mr. Solis knows S.A. personally and has visited or spoken to her by telephone in several of her foster placements.  He is familiar with the issues regarding S.A.'s foster care custody described here, and is suited to represent her best interests in this case.  Mr. Solis is a licensed attorney in the State of Texas, and maintains his principal office in Weslaco, Texas.

147.     Named Plaintiff A.M. appears by her next friend, Jennifer Talley.  Ms. Talley is a licensed master social worker who worked for over 21 years with children in the care of the Texas Child Protective Services system.   During the last fifteen of those years, Ms. Talley worked exclusively with the aging out population because she was so concerned by the lack of permanency for foster youth.  While Ms. Talley has not worked directly with A.M., she is very aware of the challenges faced by A.M. as a youth in PMC.  Having learned A.M.'s story, she is concerned about her care and the ability of DFPS to meet her needs.  Ms. Talley is familiar with the issues regarding A.M.'s foster care custody described here, and is suited to represent her best interests in this case.  Ms. Talley currently works as a licensed master social worker in the State of Texas, and maintains her principal residence in Bulverde, Texas.

148.     Named Plaintiff J.S. appears by his next friend, Anna J. Ricker.  Ms. Ricker serves as J.S.'s court-appointed attorney *ad litem*, a role she has held since J.S. entered DFPS custody. She knows J.S. personally, is familiar with the issues regarding his foster care custody described here, and is suited to represent his best interests in this case.  Ms. Ricker is a licensed attorney in the State of Texas, and maintains her principal office in Levelland, Texas.

149.     Named Plaintiff K.E. appears by her next friend John W. Cliff, Jr.  For approximately 25

years, Mr. Cliff has accepted appointments to be a court-appointed attorney *ad litem* for children and for parents in suits involving DFPS and children in foster care. While Mr. Cliff has not worked directly with K.E., he is very aware of the challenges faced by K.E. as a youth in PMC. Having learned K.E.'s story, he is concerned about her care and the ability of DFPS to meet her needs. He has learned the critical details of K.E.'s history in foster care, is familiar with the issues regarding her foster care custody described here, and is suited to represent her best interests in this case. Mr. Cliff is a licensed attorney in the State of Texas, and maintains his principal office in Odessa, Texas.

150. Named Plaintiff D.P. appears by her next friend, Karen J. Langsley. Ms. Langsley serves as D.P.'s court-appointed attorney *ad litem* in Caldwell County. Ms. Langsley knows D.P. personally, and has visited and/or spoken to her by telephone in several of her foster placements. She is familiar with the issues regarding D.P.'s experiences in foster care described here, and is suited to represent her best interests in this case. Ms. Langsley is a licensed attorney in the State of Texas, certified as a specialist in Child Welfare Law, and maintains her principal office in Dripping Springs, Texas.

151. Named Plaintiff T.C. appears by his next friend Paul Swacina. Mr. Swacina serves as T.C.'s volunteer attorney *ad litem*, a role he has held for the last eight months. He knows T.C., is familiar with the issues regarding T.C.'s foster care custody described here, and is suited to represent T.C.'s best interests in this case. Mr. Swacina is a licensed attorney in the State of Texas, and maintains his principal office in Corpus Christi, Texas.

## C. Defendants

152. Defendant RICK PERRY is the Governor of Texas, and is sued in his official capacity. He is responsible for ensuring that all Texas agencies comply with applicable federal and state law, and he oversees and directs the activities of the Texas Health and Human Services

Commission ("HHSC") and the Department of Family and Protective Services, pursuant to the Texas Constitution Article IV Sections 1 and 10, and to the Texas Government Code Title 4, Chapter 531. His business address is Office of the Governor, State Insurance Building, 1100 San Jacinto, Austin, Texas 78701.

153.    Defendant THOMAS SUEHS is the Executive Commissioner of HHSC, and is sued in his official capacity. Pursuant to Texas Government Code Section 531.0055 *et seq*., the Executive Commissioner of HHSC has broad policy- and rule-making authority for HHSC and its constituent agencies, including DFPS. Executive Commissioner Suehs reports to the Governor, Rick Perry, and serves at his pleasure. Defendant Suehs' business address is Texas Health and Human Services Commission, Brown-Heatly Building, 4900 N. Lamar Blvd., 7th Floor, Austin, Texas 78751.

154.    Defendant ANNE HEILIGENSTEIN is the Commissioner of DFPS, and is sued in her official capacity. Pursuant to the Texas Government Code Title 4, Chapter 531, she is responsible for administering properly and efficiently all DFPS child welfare services and programs; providing for the care of the children served by DFPS; directing the placement of children in appropriate state programs and/or facilities; and assuring that all contracted and other programs and facilities providing child welfare services operate in conformity with constitutional, statutory, and regulatory requirements. Pursuant to Texas Government Code Section 531.0056(a), the Commissioner of DFPS is appointed by the Executive Commissioner of HHSC, with the approval of the Governor, and serves at the pleasure of the Executive Commissioner. Her business address is Texas Department of Family and Protective Services, 701 West 51st Street, Austin, Texas 78751.

## CLASS ACTION ALLEGATIONS

155.    This action is properly maintained as a class action pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

156.    The putative Class ("Plaintiff Children") is comprised of all children who are now and all those who will be in the Permanent Managing Conservatorship of DFPS.   Although these children are (and will be) in different living situations – including foster family homes, foster group homes, institutional settings, and with relatives – they are all in out-of-home or "substitute" care, and the State of Texas has been (and will be) Permanent Managing Conservator for all of them.   In 2010, there were approximately 12,000 children in the state's PMC.  The Class is sufficiently numerous as to make joinder impracticable.

157.    The questions of fact and law raised by the Named Plaintiffs' claims are common to all children in the state's PMC, the Class they seek to represent.  Each child in the state's PMC relies on Defendants for child welfare services, and is harmed or put at risk of harm by the systemic and legal deficiencies of Texas's child welfare system.   The claims alleged by the named Plaintiffs and the resultant harms are typical of the claims of each member of the putative Class.

158.    Questions of fact common to the Class include:

    a.  Whether Defendants fail to maintain a caseworker staff of sufficient size and capacity to perform the tasks critical to Plaintiff Children's safety, permanency, and well-being;

    b.  whether Defendants fail to provide timely and appropriate permanency planning and services necessary to ensure that Plaintiff Children are either safely reunited with their families when appropriate or, when they cannot return home, that they are freed for adoption and promptly placed in a permanent home as required by law and by reasonable professional judgment;

    c.  whether Defendants fail to provide sufficient numbers and types of foster care placements necessary to assure Plaintiff Children safe, appropriate, and stable foster care placements;

d.  whether Defendants fail to provide Plaintiff Children with appropriate monitoring and oversight necessary to keep them safe; ensure their well-being; and to prevent them from deteriorating physically, psychologically, or otherwise while in custody as required by law and by reasonable professional judgment;

e.  whether Defendants, by frequently placing Plaintiff Children far from their home communities, fail to provide Plaintiff Children with the supports necessary to maintain appropriate relationships with siblings, parents, and other family members;

f.  whether the actions or inactions of Defendants comprise a pattern or practice of depriving Plaintiff Children of the following, to which they are entitled under the laws of the State of Texas:

   i.  the monitoring by DFPS of contracted substitute care, including that DFPS ensure that such services are provided in accordance with federal law, the laws of the State of Texas, and the rules of the Department of State Health Services and the Texas Commission on Environmental Quality; and

   ii.  placement decisions made by DFPS using "clinical protocols to match a child to the most appropriate placement resource"; and

g.  whether the foregoing actions or inactions of Defendants cause harm and risk of harm to Plaintiff Children.

159.  Questions of law common to the Class include:

a.  whether Defendants' actions and inactions violate Plaintiff Children's rights to be free from harm while in state custody as required by the Substantive Due Process clause of the Fourteenth Amendment to the United States Constitution;

b.  whether Defendants, through their actions and inactions, violate Plaintiff Children's rights to family association under the First, Ninth and Fourteenth Amendments to the United States Constitution; and

c.  whether Defendants' actions and inactions violate Plaintiff Children's procedural rights, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, not to be deprived of a range of state-created legal entitlements.

160.  The Named Plaintiffs will fairly and adequately protect the interests of the Class.

161.  Each Named Plaintiff Child appears by a next friend, and each next friend is sufficiently familiar with the facts of the child's situation to fairly and adequately represent the child's interests in this litigation.

36

162.    Plaintiffs' counsel are:

    a.    attorneys from the firm Canales & Simonson, P.C., a law firm in Corpus Christi;

    b.    attorneys from the firm Haynes and Boone, LLP, an international law firm with Texas offices in Austin, Dallas, Fort Worth, Houston, and San Antonio;

    c.    attorneys from the firm Yetter Coleman LLP, a Texas law firm with offices in Houston and Austin; and

    d.    attorneys from Children's Rights, a non-profit legal organization with its office in New York.

163.    These lawyers have extensive experience litigating complex class action lawsuits in federal court, including substantial experience in child welfare class action institutional reform litigation.  Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action, and have committed sufficient resources to represent the Class.  Plaintiffs' counsel therefore are well-suited to fairly and adequately represent the interests of the Class.

164.    Defendants have acted or failed to act on grounds generally applicable to the Plaintiff Class, necessitating declaratory and injunctive relief for the Class.  Plaintiffs' counsel know of no conflicts among Class members.

## FACTUAL ALLEGATIONS

### A.    The Structure Of The Texas Foster Care System

165.    The Texas foster care system is administered by the state's Department of Family and Protective Services ("DFPS"), a division of the Health and Human Services Commission ("HHSC").  Within DFPS, the division of Child Protective Services ("CPS") is required to investigate reports of child abuse and neglect of children not in foster care.  Then, for those children removed into foster care, it is required to provide temporary placements while taking action to either reunify the child with his family or to place the child with a new permanent family.  Temporary placements are required to be based on individualized assessment of

children's needs, and to be supported by services delivered to meet those needs. These mandates are assigned to a Field Operations arm divided into eleven geographic regions headed by regional directors. The DFPS Commissioner has overarching responsibility for all eleven regions.

166.    When a child is removed from his family due to abuse or neglect, he is placed in substitute care under the Temporary Managing Conservatorship ("TMC") of the state. As conservator, DFPS undertakes the constitutional and statutory duties of ensuring the child's safety, permanency, and well-being.

167.    During the period of TMC, DFPS is required to make reasonable efforts to reunify children with their families if safe and appropriate, or to make timely efforts to legally free them for adoption or find another permanent placement for them. While the child is in the state's TMC, Texas law requires the appointment of an attorney to represent the child's expressed interests and a guardian *ad litem* to protect the child's best interests in the state court proceeding affecting the parent-child relationship.

168.    Under Texas law, TMC lasts for one year, or at most eighteen months. After that time, if the child has not been reunited with his birth family or provided with some other permanent family, he enters the state's Permanent Managing Conservatorship ("PMC"). Once the child is in the state's PMC, that initial legal proceeding is concluded. After entry of that final order, Texas state law provides no mandate that the child continue to be represented as he was in TMC. Thus, a substantial number of children in the state's PMC have no independent adult obligated to represent their expressed or best interests in state court proceedings held twice a year to review DFPS actions.

169.    For each child under the state's conservatorship, a DFPS caseworker is assigned. As

conservator, the state is obligated to set and pursue permanency goals for each child, tasks that are assigned to the DFPS caseworker.  Permanency goals may include the child's reunification with his family or permanent placement with a relative or other suitable individual, either through adoption or the award of PMC to that person.  According to state policy and regulation, these goals are to be concurrently pursued until it proves inappropriate to return the child to his family.  Only if there is a compelling reason why one of these permanency goals is not in the child's best interest may DFPS set the goal of "another planned permanent living arrangement" for the child – in other words, a goal that the child remain in foster care until he reaches adulthood.  DFPS's permanency goals for the child are reflected in a case plan, which must be revised as often as necessary to reflect changes in the case.  At a minimum, DFPS must revise each child's case plan every six months.

170.    As long as a child is in the state's conservatorship, the caseworker is also required to develop and implement a service plan for each child, to ensure the provision of individualized services that meet the child's needs.  Where a foster placement is administered directly by DFPS, the caseworker develops and implements this service plan directly.  In Texas, however, most substitute care is provided by private entities.  By contract, staff employed by the private provider are required to prepare and implement service plans for each child, consistent with permanency planning and permanency goals identified by DFPS.

171.    When DFPS engages a substitute care contractor, the state retains its constitutional and statutory duties to ensure the safety, permanency, and well-being of children placed with that provider.  The private contractors are monitored by the Division of Child Care Licensing ("CCL"), by DFPS's contract management arm, and, in terms of day-to-day observations, by the caseworkers themselves.

172.     As conservator, the state is charged with placing children removed from their homes into appropriate settings that meet their needs.  Approximately one-third of Texas foster children are placed in the unlicensed and unreimbursed substitute care of relatives.  The remainder are in various types of paid "foster care" placements.  DFPS licenses some of these placements directly; others are verified by directly licensed private child placing agencies ("CPAs").

173.     These placements include: emergency shelters, which afford short-term care when children are first removed from their families, or when foster placements unexpectedly disrupt; traditional foster family homes, which care for up to six children; Foster Group Homes ("FGHs"), which are foster family homes that house from seven to as many as twelve children; General Residential Operations ("GROs"), institutions in which staff care for thirteen or more children; and Residential Treatment Centers ("RTCs"), which are a subcategory of GROs that are intended to provide treatment services for children with emotional disorders.

174.     Regardless of the child's placement, DFPS remains ultimately responsible for his safety, health, well-being, education, and permanency.  Yet, once a child crosses the legal threshold from TMC into PMC, all of these needs tend to receive significantly less attention from DFPS.

175.     The Texas Health and Human Services Commission noted in its strategic plan for 2011 to 2015: "The demands of the new cases, with the legal deadlines looming, compete for attention with the demands of children whose legal case has achieved resolution, as the same workforce is serving both these stages of service. Subsequently, an increase in the number of children [a]waiting adoption may occur."

176.     A November 2010 report commissioned by the Texas Supreme Court Commission for Children, Youth and Families noted that the level of scrutiny paid to children's cases "significantly decreases" when the child enters the state's PMC.  The report continued: "Though

the State's responsibility for the child's life and well-being does not change – and arguably increases – the attention paid to the child's case diminishes drastically.  There is often a sense that the 'clock stops ticking' when the child enters Permanent Managing Conservatorship."

**B.    Defendants Are Causing Harm And Risk Of Harm To Plaintiff Children, Who Are In The Permanent Managing Conservatorship Of The State.**

177.    Plaintiff Children in the long-term guardianship of the State of Texas have been doubly traumatized: first by the abuse and neglect that brought them into foster care, and second by their treatment at the hands of their state custodians.  Children enter the state's PMC because the determination has been made that they cannot safely be returned to home and family.  Having taken Plaintiff Children into PMC, Defendants have a constitutional and statutory obligation to ensure their safety, permanency, and well-being.  Contrary to that obligation, Defendants' foster care system inflicts harm on this vulnerable population by (1) creating great instability and inflicting ongoing emotional harm by frequently moving them from one placement to another; (2) placing many of them for long periods in congregate care that cannot provide any permanency; (3) placing them in group placements that do not comport with reasonable professional standards; (4) separating them from siblings, significant family members, and their communities; (5) failing to provide them with necessary mental health services; (6) exposing them to abuse and neglect in care; and (7) leaving them to languish in foster care without planning for a permanent placement for them, until they age out of care unprepared for independent adult life.

**1.    Defendants Frequently Move Plaintiff Children From Placement To Placement, Causing Them Harm**

178.    Having already had their home lives disrupted, children in foster care are particularly vulnerable to being harmed in their mental and emotional health by further moves from one placement to another.

41

179.    DFPS policy acknowledges that children in foster care "have a high need for stability and continuity of care" and accordingly requires that DFPS avoid transferring children from one placement to another unnecessarily.

180.    It is well documented that each move that a foster child experiences interrupts normal development and adds psychological trauma, with long-term implications for the child's ability to develop healthy interpersonal relationships, good self-esteem, and even a conscience. Placement changes force these children to abandon relationships again and again, compounding their already profound sense of loss and abandonment.

181.    Frequent moves also disrupt a child's education.  Research shows that each school change a foster child experiences can result in a loss of four to six months of academic progress. Delays in the transfer of school records – a common by-product of a placement move – impede children's ability to advance with their peers in school.

182.    Children suffering from such trauma and disruption frequently exhibit emotional and behavioral problems that require more focused or intensive services to address and correct.  In many instances, DFPS addresses these emotional and behavioral problems by consenting to have children be prescribed powerful psychotropic drugs.  In FY 2010, such drugs were administered to 13,775 foster children – 30.82% of all children who spent any time in foster care in Texas during that year.

183.    Plaintiff Children are subjected to many harmful placement moves.  According to a report by Texas Appleseed, a public interest law and advocacy organization in Austin, children who in 2008 had been in care for more than three years had experienced an average of *eleven* placements.

184.    Some children experience many more placements during their time in the state's PMC.

In 2009, Plaintiff Children in Houston-area RTCs who had been in care seven to eight years had experienced an average of *19.4* placement moves.

185.   Defendants have long failed to provide stable placements for the children in their custody.  This has been noted in the periodic audits of  DFPS's performance conducted by the Administration of Children and Families ("ACF"), a division of the federal department of Health and Human Services.  ACF conducts these audits, known as Child and Family Services Reviews ("CFSRs"), of all state child welfare systems to assess outcomes achieved for children who receive child welfare services, to identify areas in which systemic improvement is required, and to implement corrective actions.  ACF has conducted two CFSR "rounds" in Texas, the first released in 2002 and the second in 2008.

186.   In 2002, the First Round CFSR found placement stability to be an "Area Needing Improvement" in the Texas system.  In the Program Improvement Plan ("PIP") developed by the state in response to the First Round CFSR, Texas committed to improve this aspect of its foster care system.  However, by the time of the Second Round CFSR in 2008, placement stability for Texas foster children had actually *worsened*.  The Second Round CFSR found that only 20.8% of children who had been in DFPS custody for more than 24 months – all of whom, by definition, were in the state's PMC – had experienced two or fewer placements.  This performance was considerably worse than the national median of 33.9%.  Overall, Texas performed twelfth-worst on placement stability out of the 51 jurisdictions surveyed in the Second Round CFSR.

187.   The frequent moves that Plaintiff Children suffer are the direct result of a system with an overburdened and revolving workforce that does not timely and adequately assess children's needs, Defendants' failure to create and maintain placements adequate to meet the needs of

children in the state's PMC, and a placement matching process that does not take into account the needs of the child or the capacity of a specific placement to meet those needs.

### 2. Defendants Make Inappropriate Use Of Congregate Placements, Harming Plaintiff Children

188.    Defendants fail to take appropriate and adequate measures to ensure compliance with federal law, DFPS policy, and reasonable professional standards, all of which specify that children brought into foster care custody must be placed in the least restrictive, most family-like setting appropriate to their needs.

189.    Congregate care – placement in a group setting – may take a number of forms, both therapeutic and non-therapeutic.  For some children with special therapeutic needs, the care they need may best be administered in an institutional treatment setting.  But, in general, DFPS policy recognizes that congregate care of any kind is more restrictive than a family placement, and should be the placement of last resort.  When congregate care – particularly non-therapeutic care – cannot be avoided, it should be as brief as possible.

190.    Children in congregate care are less likely to achieve permanency of any kind.  In FY 2009, 54% of the children adopted from foster care nationally were adopted by their foster parents.  Because children in congregate care are not in a family setting, their placements deprive them of the very opportunity that produces the majority of public adoptions.

191.    Studies have shown that, compared to children in family foster care, children in even short-term group care spend more time in foster care; are less often placed with siblings over time; are more likely to be re-abused; and are more likely to be placed far from home.  Children in group care are also less likely to overcome problematic sexualized behaviors over time, and are more likely than youth in foster homes to be arrested during the five years after a stay in group care.  Children and youth who spend the majority of their placement time in congregate

settings complete fewer years of school, have poorer school achievement, and have lower educational aspirations than children in more home-like, family-based settings.

192.     Looking particularly at children placed in RTCs and emergency shelters, a 2010 study by Texas Appleseed found that these children are much more likely to have negative outcomes such as remaining in care for longer periods of time, moving between placements frequently, and even remaining in care until they age out.

193.     Texas makes inappropriate use of congregate placements, extending them for too long and moving children from one congregate setting to another.  For instance, the CPS Handbook notes that emergency shelter services are appropriate "only during an emergency constituting an immediate danger to the physical health or safety of the child."  Yet, the federal government found in the state's First Round CFSR that DFPS places children in emergency shelters unnecessarily, noting that for some children shelter placements are "a pattern throughout their foster care history."  In fact, for the years 2007 through 2009, the average length of time a Texas foster child remained in shelters ranged from 36 to 40 days, even though there are only limited exceptions to Texas regulations that cap shelter stays at 30 days and DFPS policy that caps them at fifteen days.  And, if DFPS fails to secure a placement for a child within that limited period, the child is often sent to another shelter.

194.     DFPS places even very young children in congregate placements.  As of March 31, 2010, 563 children *five years old or younger* were in various congregate facilities in Texas.  Studies have shown that institutional care is particularly damaging to young children such as these, causing a variety of harms, including delayed language development; poor mental development and adaptive skills; an increased risk of serious infectious illness; lower rates of adoption; and a greater likelihood of remaining in care.

195.    In 2009, the proportion of foster children age twelve and under in congregate care was higher in Texas than in all but one of the fifteen other largest foster care systems in the country.

196.    Furthermore, children in Texas's PMC are twice as likely to be in congregate placements as are foster children in the state's TMC.  As of March 31, 2010, 2,996 children – 25.2% of the children then in the state's PMC – were in congregate care.  As of that same date, only 12.7% (1,772 children) of the children in the state's TMC were in congregate placements.

197.    In Texas, General Residence Operations ("GROs") house thirteen or more children, and provide only residential care.  As of March 31, 2010, Texas had placed 652 foster children in such non-therapeutic GROs.  Three hundred and eighty-one of those children were in the state's PMC.

198.    Many Plaintiff Children in congregate care are in Residential Treatment Centers ("RTCs"), a sub-category of GROs intended to provide on-site therapeutic treatment services to children with emotional disorders.  As of March 31, 2010, 1,133 children in the state's PMC were placed in RTCs, comprising three-quarters of the population of those institutions.

199.    Too many Plaintiff Children who are placed in RTCs remain there long after such a restrictive and non-family-like placement is appropriate.  Although RTCs are intended to address a child's problems so the child can be moved to a family setting, Plaintiff Children are often moved from one RTC to another.

200.    Some children are erroneously and inappropriately designated as needing high levels of care and these children are or are at risk of being placed in RTCs, being placed far from their homes, and being placed on psychotropic medications.  It is more difficult to identify adoptive homes for these damaged and medicated children, putting them at risk of aging out of care and never finding a permanent family.

201.    Too many of the RTCs with which Defendants contract are overly restrictive, unsafe, austere, and unsanitary.  Defendants too frequently contract with and place children in RTCs that provide substandard care, exposing Plaintiff Children to dangerous facilities which also do not provide Plaintiff Children with needed therapeutic services.

202.    Defendants have failed to control the use of corporal punishment by staff at some RTCs, resulting in serious injuries to foster children.

203.    The excessive and inappropriate use of congregate care for Plaintiff Children by Defendants is the direct result of a system in which the state has failed to develop an appropriate array of placements and supportive services, and DFPS places PMC children in whatever bed in whatever facility will accept them.  DFPS's workforce, which is responsible for each child's well-being, is too overburdened and without the necessary resources to perform tasks critical to Plaintiff Children's permanency and well-being.

    **3.    Defendants Utilize A Category Of Congregate Foster Care Placements That Is Particularly Harmful to Children**

204.    Many Plaintiff Children are placed in another type of congregate placement:  the so-called "Foster Group Home" ("FGH").  These placements have no more support or staff than a regular family foster home, and provide no specialized services different from those available in such a home – with the critical distinction that they house more children.

205.    Under Texas regulations, the number of children in a family foster home is limited to six. Yet, each FGH houses from seven to twelve children in the same private foster home setting. DFPS policy recognizes that these FGHs are "more restrictive than foster-family homes."

206.    Professional standards do not recognize this hybrid form of placement, which is contrary to reasonable professional standards for both family homes and for congregate care.  Texas's FGHs depart from reasonable professional standards with regard to the maximum number of

children in a home, adult to child ratios, requirements for waking supervision, and staff qualifications and training.

207.    In particular, professional standards limit foster family homes to no more than five children, a size far exceeded by the twelve children allowed in a two-parent FGH and the eight children allowed in a single-parent FGH.

208.    In a standard non-therapeutic group home of up to twelve children, professional standards require that at least one caregiver be awake at all times.  There is no such requirement for FGH parents.

209.    Rather than being the "home" setting that their name implies, these congregate placements can often be little more than poorly supervised dormitories.  For example, in one FGH in Region 7, eight children slept together in a room that had originally been a garage. Another in Region 4, licensed to accommodate children with severe behavioral problems, housed as many as twelve foster children at once in a collection of mobile homes converted into bedrooms.

210.    As of March 31, 2010, 1,328 children in the state's PMC were placed in foster group homes.  Plaintiff Children are placed in FGHs about twice as often as children in TMC.

211.    Plaintiff Children are placed in foster group homes and remain there when they should be placed in less restrictive, truly family-like settings.

212.    Defendants' use of foster group homes is the direct result of a system in which placement capacity is inadequate to meet the needs of children in the state's PMC,  and whose workforce is not of sufficient size and capacity to perform tasks critical to Plaintiff Children's permanency and well-being.

**4.      Plaintiff Children Suffer Abuse And Neglect In State Custody**

213.   The purpose of foster care is to protect children who have suffered trauma at home from further maltreatment.   Yet, Plaintiff Children are frequently re-victimized while in DFPS custody, in dangerous and inadequately monitored substitute care placements.

214.   For example, in 2010, the Houston Chronicle reported that "[r]esidential treatment center records reviewed by the Chronicle and [the Texas] Tribune show state investigators confirmed hundreds of violations from mid-2008 through April of this year – at least 250 of them involving abuse, neglect and mistreatment."   Some of these included:

    a.   Workers punched and choked children to get them to behave, and children were subjected to physical beatings;

    b.   Staff, and in one case, a staffer's relative, sexually abused children;

    c.   Workers forced children to undress in order to prevent them from running away; and

    d.   Children who were supposed to be supervised attempted suicide.

215.   Reports of licensing investigations in 2009 to 2010, prepared by CCL, indicate that children in these foster homes and facilities suffered "abuse, neglect and exploitation as defined in Texas Family Code 261.401," such as:

    a.   *Physical Abuse:* Staff intentionally struck and choked child; staff member throttled a child at a RTC; foster parent hit child multiple times with a belt; children were spanked with an object, causing visible injuries; caregiver spanked children with a belt, hand, and stick, leaving multiple bruises; staff slammed a child during a restraint, resulting in a bulging disk in the child's neck;

    b.   *Sexual Abuse:* Staff and foster parents engaged in sexual conduct with children; staff compelled or encouraged children to engage in sexual conduct; and

    c.   *Neglect:* Foster child left alone and unsupervised in foster home for nine hours; foster parent left a feverish 23-month-old child in a crib without attention for 19.5 hours until the child was discovered unresponsive, barely breathing, and having suffered a possible seizure; foster parent left toddler in the care of an eight-year-old child for at least 40 minutes while she shopped; special needs child left unattended at an airport.

216.   Such maltreatment of children in foster care is likely underreported.   Defendants

routinely fail to obtain sufficient information from Plaintiff Children about allegations of abuse or neglect during investigations.  DFPS has documented instances where children were impeded from making allegations of abuse or neglect.  Foster care providers do not always self-report abuse and neglect in care.

217.    The use of restraints is also underreported.  Recognizing that some restraint techniques may be dangerous and, if improperly applied, can even be fatal, Texas law requires that all licensed providers document and report any use of restraints on children in their care.  Yet, in the two years that the law had been in effect, at least 68% of Texas RTCs did not fully comply with its mandate, as the Houston Chronicle reported in December 2010.  DFPS's failure to enforce this reporting mandate puts children at risk.

218.    Even when Defendants have known of incidents of maltreatment, they have left Plaintiff Children at risk.  The troubled history of Daystar, a now-closed RTC near Houston, is just one example.  In 2008 to 2010, there were multiple confirmed incidents of abuse at this facility with a capacity of 141 children.  It was not until a child died after being restrained and the coroner ruled the death a homicide that DFPS shut down the facility.

219.    In particular, in April 2008, staff members encouraged developmentally disabled residents at Daystar to fight one another and rewarded the winners with junk food.  The residents suffered significant injuries, including bruising and marks from biting each other, while staffers laughed and cheered.  The incident was timely reported to CCL, which investigated and confirmed the incident, but no formal action was taken against the RTC.

220.    The following year, in 2009, a Daystar staffer conducted an inappropriate sexual relationship with a mentally-ill sixteen-year-old resident from California who had been placed there. After the girl left the RTC, she notified California authorities, who contacted DFPS in

January 2010.  This allegation, also, prompted a CCL investigation.

221.    It was only on June 11, 2010 – five days after the Houston Chronicle and Texas Tribune had reported the staff-initiated fighting matches from two years earlier – that DFPS stopped sending new children to Daystar and assigned a special monitor to the facility, who remained for approximately three months.

222.    On November 1, 2010, two months after the monitoring period had ended, DFPS informed Daystar that it would be placed on probation for "persistent concerns about the facility and the children in its care," – including a finding of sexual abuse based on the 2009 incident – but it would not be closed.  Four days later, on November 5, 2010, a Texas foster child in PMC died of apparent asphyxiation after being restrainted at Daystar.  He was the fourth child since 1993 to die of asphyxiation at the facility while being restrained by staff.

223.    Daystar continued to receive state funds to provide care for the 24 Texas foster children who lived there until the end of 2010.  Five out-of-state foster children remained in the still-licensed facility until January 7, 2011.  Only then, the day after the November 5 death was ruled a homicide, did DFPS revoke Daystar's license and close the facility based on this history.

224.    This child who died at Daystar was one of fifteen who died in DFPS custody in FY 2010 as a result of abuse or neglect.  In the six-year period from 2005 to 2010, 64 children in foster care died due to abuse or neglect – a rate of one child every five-and-a-half weeks.  In FY 2010, a child in foster care in Texas was statistically almost *fifteen times more likely to die of abuse or neglect* than a Texas child not in foster care.

225.    The abuse and neglect suffered by Plaintiff Children in Defendants' foster care system are the direct result of a system in which an overburdened, revolving, and inexperienced workforce does not timely and adequately assess children's needs and does not make timely

quality visits with children; placement capacity is inadequate to meet the needs of children in the state's PMC; and Defendants fail to adequately oversee private providers.

### 5. Plaintiff Children Are Denied Necessary Services While In State Custody

226. Defendants fail to provide adequate mental health services to children in foster care. In the Second Round CFSR, Texas was found to be "not in substantial conformity" with "Well-Being Outcome 3: children receive adequate services to meet their physical and mental health needs."

227. Reviewers determined that DFPS had "made concerted efforts to address the mental health needs of children" in only 68% of the cases reviewed, and the item was therefore rated as an Area Needing Improvement. In its 2007 Statewide Assessment, DFPS noted that "a lack of community resources, a lack of coordination of resources, and inaccessibility to mental health and behavioral health care impede[d] the ability of DFPS" to provide mental health services to the children in its custody. Stakeholders interviewed in the Second Round CFSR also noted "a lack of available behavioral and mental health services for children in foster care."

228. The 2007 Statewide Assessment further noted: "In some areas of the state there are inadequate numbers of medical, dental, and behavioral health providers who are willing to take Medicaid. This is especially true in the rural, remote areas of the state." Furthermore, it noted that families and caseworkers may have to travel far distances to obtain needed services.

229. Defendants continue to fail to ensure that there are sufficient mental health services for Plaintiff Children. In some geographic areas, there are limited numbers of providers, and the providers who are available do not always accept Medicaid or Texas's public insurance. At times, it may take months just to get a psychological assessment. Commissioner Heiligenstein as recently as August 2010 has acknowledged that there continues to be an "imbalance in geographic distribution of services and providers."

230.    In the face of these problems, Defendants fail to match children to placements supported by necessary services.  When children are put in placements that are not supported by sufficient available services, those placements are likely to disrupt.

231.    Services are also lacking for children placed with relatives.  As of March 2010, 2,561 children in the state's PMC – more than a fifth of the Plaintiff Class – were placed in relatives' homes.  In Texas, a kinship care provider is not required to be licensed as a foster parent or verified by a CPA.  Accordingly, these homes do not necessarily meet the standards required for a licensed or verified foster home.  Additionally, DFPS does not provide the training for kin providers that is required for licensed or certified foster parents.

232.    And, although children placed with relatives are still in state custody, DFPS also fails to provide these children with the monthly foster care financial support that the state provides to children living with licensed foster parents – support intended to ensure that those children are provided with adequate food, clothing, and other necessities.

233.    Although some relative caregivers would meet licensing standards, and they and the children in their care would then be entitled to additional services and support, the state has been ineffective at notifying relatives of this option.

234.    DFPS's failure to provide necessary services to Plaintiff Children is the direct result of a system in which service capacity is inadequate to meet the needs of children, and in which DFPS fails to assess the capability of particular placements to meet the needs of children placed there.

### 6.    Plaintiff Children Are Frequently And Unnecessarily Separated From Their Siblings And Denied Visits With Their Families

235.    Federal and state policy and reasonable professional practice dictate that children be placed with their siblings while in foster care unless there is a therapeutic or safety-related reason to separate them.

236.    In a December 2010 report to the Legislature, the Adoption Review Committee – whose members were appointed by Governor Perry and Executive Commissioner Suehs – noted that inappropriate sibling placement decisions "hinder and delay a child's path to permanency." Commissioner Heiligenstein similarly acknowledged in a February 2011 presentation to the Texas House Human Services Committee that sibling separation negatively impacts children's well-being and permanency outcomes.

237.    Many children in DFPS custody are separated from their siblings for no therapeutic or safety reason.  DFPS reported in February 2011 that 18.5% of sibling groups in its custody were not placed together.  In particular, DFPS often separates siblings who are teenagers or members of large sibling groups.

238.    DFPS often fails to ensure that children who have been separated from their siblings are able to maintain relationships with each other.  The Second Round CFSR found that DFPS did not make concerted efforts to promote visitation with siblings.  Although, under DFPS policy, children in foster care are supposed to have at least monthly visits with siblings from whom they are separated, visits were less frequent in nearly half of the cases reviewed.  In fact, in some of the cases reviewed, children had no visits at all with their siblings.

239.    The Second Round CFSR found that DFPS failed to adequately support children's visits with their families, or to consistently support children's connections with family, siblings, school, and community.

240.    Overall, because of poor visitation, Texas failed to meet the Second Round CFSR's "Permanency Outcome 2: the continuity of family relationships and connections is preserved for children."

241.    Defendants' frequent separation of Plaintiff Children from their siblings in care, as well

54

as their failure to provide visits for children with their families where appropriate, are the direct result of a system in which the array of placements is inadequate to meet the needs of children in the state's PMC, and in which an overburdened and revolving workforce does not timely and adequately assess children's needs, does not make timely quality visits with children, and fails to plan appropriately for children's permanent placements in suitable family homes.

### 7. Defendants Harm Plaintiff Children By Leaving Them To Languish In Care Without A Permanent Family And Age Out Of Foster Care Ill-Prepared For Independent Adult Life

242. The longer a child is in care, the more he is at risk of being subjected to all manners of harm. As the Children's Commission noted in 2010: "A permanent living arrangement is important for good development."

243. State regulations and federal law require DFPS to make reasonable efforts to find permanent homes for the children in its care. That includes either reunifying families where appropriate, or taking all necessary steps to seek and secure adoptive or other permanent families for these children.

244. DFPS has failed to meet its legal obligations and has caused harm to the children in the state's PMC by permitting them to languish in foster care. As the Children's Commission noted in 2010: "Historically, once the state has become a child's PMC, DFPS and courts have accepted the PMC status as 'permanent.'"

245. The average length of stay in foster care for children in the state's PMC in FY 2010 was 42.5 months, or more than three-and-a-half years. For those children who aged out of care in FY 2010, the average length of stay was 60.2 months.

246. In FY 2009, 6,400 children then in the state's PMC had been in care for three or more years. In testimony before the Human Services Committee of the Texas House of Representatives, Commissioner Heiligenstein noted that in 2010 about 500 Texas children had

been in foster care for at least *ten years*.

247.    The longer children remain in the state's PMC, the less likely they are to leave to permanent homes.  Of the children who left foster care in 2008 having been in PMC for less than one year, over 79% exited to adoption and only 5% aged out.  In contrast, over 57% of those children who spent three or more years in PMC before exiting that year aged out, and just 30% were adopted.

248.    Defendants have long been aware of their failure to move Plaintiff Children to permanent homes.  In 2007, Texas reported the *sixth worst score in the nation* on the national indicator, "Achieving Permanency For Children And Youth In Foster Care For Long Periods Of Time."

249.    Moreover, on one key component of that national indicator, children "growing up in foster care," the state's performance was considerably worse than the national median in 2007 and further worsened significantly by 2009.

250.    More than 1,300 youths exited the state's PMC in FY 2008 by aging out, having languished in foster care for years.

251.    Sixty-six percent of youth who aged out in FY 2009 had been in foster care for more than three years.

252.    Texas judges who were interviewed for Texas Appleseed's 2010 study almost uniformly expressed dissatisfaction with the resources and services available to help youth who age out of foster care, and most felt that PMC youth were ill-prepared for adulthood.

253.    National studies have shown that children who age out of foster care are more prone to poverty, homelessness, drug abuse, early pregnancy, and mental health problems, and are likely to become involved with the criminal justice system.  A 2005 study of youths who had aged out in several Midwestern states found that 54.4% had one or more mental health disorders; 65%

experienced seven or more school changes; only 84.8% completed high school; only 1.8% completed a bachelor's degree; 33.2% had household incomes below the poverty line; and 33% had no health insurance.

254.    A 2001 study of former foster youths in Texas by the Center for Public Policy Priorities ("CPPP") in Austin reported that 60% of the youth in its sample had a history of unemployment and financial instability after aging out, mostly due to lack of job skills.  As a group, the former foster youths who comprised the sample had been incarcerated at a rate one-and-a-half times higher than the general population of 19 to 29 year olds in Texas.

255.    In a 2010 five-part series, "Broken Children, Broken System," News 8 Austin reported that one in four children who aged out of foster care in Texas has been homeless since turning eighteen, and one in four has been incarcerated.

256.    A youth who was going to turn eighteen in six days reported to Texas Appleseed that she had no idea what she was going to do when she aged out and that her caseworker had not even met with her to tell her what would happen when she aged out of care.

257.    In particular, older youths living in group homes or institutions have great difficulty finding mentors who can guide their transition from foster care into adulthood because most of them have lost critical connections to caring adults.

258.    The fact that many Plaintiff Children leave the state's custody only when they reach the age of majority is the direct result of a system in which an overburdened, revolving, and inexperienced workforce does not timely and adequately assess children's needs, does not make timely quality visits with children, and fails to plan appropriately for children's permanent placements in suitable family homes.

**C.    The Harms Suffered By Plaintiff Children Result From Defendants' Failure To Properly Manage The DFPS Foster Care System**

259.    As described above, Defendants do a poor job of moving Plaintiff Children out of foster care and into permanent homes.  While Plaintiff Children languish in foster care for long periods, DFPS puts children in inadequately supported placements that have not been carefully selected to ensure that they will meet children's individual needs.  Without adequate support, these placements disrupt again and again, each time requiring a move and further dislocation to the already traumatized child.  After such tumult, residential treatment, instead of being a limited and intensive remedy for a child's mental and behavioral problems, becomes a long-term placement of last resort, from which children seldom emerge successfully to a family home in which they can adjust to normal life.  Ultimately, many Plaintiff Children are never provided with a permanent home, but age out only when they reach majority, without the support of family, strong adult models, or even established friendships.

260.    This spiral of harm results from Defendants' failure to address structural and systemic problems in the Texas foster care system that they have known of for years.  Among these structural and systemic problems are:  (1) Defendants' failure to maintain a child welfare workforce adequate to ensure the safety, permanency, and well-being of Plaintiff Children; (2) Defendants' failure to focus resources on permanency planning to ensure that Plaintiff Children leave Defendants' PMC to a permanent home; (3) Defendants' failure to establish an array of placements and services that meet the needs of Plaintiff Children; and (4) Defendants' failure to effectively oversee those who provide care to foster children, including Plaintiff Children.

> **1.      Defendants Mismanage The Texas Foster Care System By Failing To Maintain A Caseworker Staff Of Sufficient Size And Capacity To Perform The Tasks Critical To Plaintiff Children's Safety, Permanency, And Well-Being**

261.    DFPS caseworkers are responsible for conducting critical tasks for Plaintiff Children, including (1) placing Plaintiff Children in the least restrictive placements that are safe and meet the children's needs; (2) regularly visiting Plaintiff Children in their placements; (3) ensuring the development and implementation of case plans that identify the services needed by Plaintiff Children; (4) ensuring that Plaintiff Children receive needed services, particularly those relating to mental health; and (5) developing and implementing a permanency plan for each child, in order to ensure that Plaintiff Children leave foster care to permanent families wherever possible.

262.    However, DFPS operates a system in which caseworkers are overburdened and inexperienced.  This prevents them from having sufficiently frequent and adequate visitation with the children on their caseloads.  Workers fail to engage in necessary work to ensure that Plaintiff Children are in safe and stable placements that meet their needs while in care.  Additionally, those caseworkers fail to ensure that Plaintiff Children leave foster care to permanent homes.

263.    Texas law requires that caseload standards and staffing assignments for DFPS caseworkers be consistent with "professional caseload standards."  DFPS has consistently failed to meet such professional standards.  Texas Appleseed reported that in 2009, "[DFPS] caseworkers were routinely handling around 30 cases, even though the national standards call for between fifteen and seventeen cases per caseworker."  Further, the report found that caseworkers in the state's larger urban areas were commonly assigned *more than 40 cases*, with a "case" frequently involving multiple children.

264.    These high caseloads detract from caseworkers' abilities to fulfill their responsibility to

protect children.  In a 2007 survey, for example, 63.9% of conservatorship caseworkers stated that they were not able to spend enough time with the foster children for whom they were responsible due to excessive caseloads.  In 2008, 61.6% of caseworkers reported that they could not finish all of their work, even when working overtime.  Most of the caseworkers interviewed (57.2%) admitted that they had too many cases to do a good job.

265.    Moreover, although Defendants are obligated to ensure that Plaintiff Children's service plans are effectively implemented, these high caseloads often lead to Defendants' failure to ensure that children receive required services.

266.    In addition, these high caseloads lead to turnover rates among DFPS caseworkers that Texas itself has deemed "excessive."   DFPS's Statewide Placement Quality and Capacity Strategic Plan for FY 2010 to 2014 cited "unacceptably low pay, undesirable working conditions and excessive case loads" as causes of this turnover.  As of August 2010, turnover at DFPS was such that about 30% of new caseworkers left within the first year.

267.    This turnover rate means that it is not uncommon for a child to have four different DFPS caseworkers in a span of eighteen months.  The DFPS caseworkers who do stay often must carry additional cases simply to cover the vacancies left by overwhelmed caseworkers leaving the system, which may lead to even more turnover as those remaining workers also burn-out and leave.

268.    This turnover is reflected in a workforce that is largely of short tenure.  In 2009, 47.3% of caseworkers had fewer than two years of experience.  In 2010, 31.4% of caseworkers had less than *one year* of experience.

269.    Studies show that caseworker turnover drives placement instability, disrupts services to children and foster parents, and significantly hurts children's chances of finding permanent

homes.  Turnover also contributes to children's difficulties in establishing trust and "make[s] it easy for the child's needs to go overlooked."  This is especially problematic for children in the state's PMC, for whom the prospect of family reunification is unlikely and whose caseworkers must have expertise and the time to devote to the intensive task of building new adult connections in order for the child to leave foster care to a permanent home.

270.    In its 2003 PIP, DFPS itself acknowledged that "[e]xpertise for addressing specialized needs of children is under-developed, skill and knowledge for effectively engaging families in the case planning process is inadequate, and lack of a tenured workforce from which to select leadership remains a critical problem."  DFPS further acknowledged that turnover has led to "gaps in contact with children and families, gaps in services, or inadequate follow-up with services previously assessed as needed."

271.    In 2008, the Committee on Health and Human Services of the Texas State Senate declared:  "[DFPS] continues to struggle with increasing caseloads in certain divisions and high caseworker turnover rates, both of which can increase the risk of harm to children involved in the child welfare system."

272.    In addition, DFPS fails to adequately train its caseworkers.  A 2010 report of the Adoption Review Committee found that "recruitment, training, and mentoring of [DFPS] staff has often been inadequate and un-inspiring, contributing to the high burn-out/turnover rate" and noted that these areas "must be a priority" to retain better quality staff and ultimately to achieve better outcomes for children.

273.    Despite Defendants' long awareness of these problems, they continue now.  An Adoption Review Committee report from December 2010 found that "caseworkers carry extremely high caseloads, often twice what is deemed best practice.  This contributes to high turnover rates and

reduces positive outcomes for children."

274.    Under all of these circumstances, the critical work of placement planning and protection that Defendants owe to Plaintiff Children simply does not get done.  The Second Round CFSR found that DFPS failed to effectively individualize services for the children and families it serves.  Stakeholders commented that "high caseworker turnover rates impede the ability of caseworkers to design and implement individualized service plans for families and children and to develop connections to key services available in the community."  Instead of ensuring that children's individual needs are met, children's difficult behaviors and emotional traumas are too often controlled with powerful psychotropic medications instead of with appropriate therapeutic services.

> **2.      Defendants Mismanage The Texas Foster Care System By Failing To Focus Resources On Permanency Planning For Plaintiff Children, Causing Them To Languish In Foster Care Until They Age Out**

275.    As of 2009, the latest date for which such data is available, the federal government found that there were 12,844 children in Texas foster care waiting to be adopted.  The majority of these children are in the PMC of the Department.  This number has increased by more than 50% since 2002, when there were 8,474 waiting children.

276.    In order to ensure that children leave foster care to a permanent home, a well-functioning child welfare system must engage in child-specific permanency planning and adoption recruitment.  But Defendants have failed to develop and effectively deploy the services and resources required to achieve timely permanency for the large and growing number of Texas children who are waiting to be adopted.  A 2010 report by Texas Appleseed found a "lack of urgency to find permanent homes" for children in the state's PMC.

277.    In Texas, the work of finding an adoptive family for a child in foster care is normally performed with the assistance of a specialized Adoption caseworker.  However, Defendants have

created a culture in which many waiting children are treated as "unadoptable."  DFPS fails to assign an Adoption caseworker or to provide adoption services to these children, although many would be easily adoptable if Defendants made efforts.

278.    Children as young as six, seven, or eight years old are often presumed to be too old for adoption.  Similarly, children who have previously been placed in congregate care often fail to receive adoption services.  Defendants routinely create permanency plans that do not even include adoption as a goal for Plaintiff Children who need specialized mental health or medical services.  This happens with even greater frequency to those Plaintiff Children with physical, emotional, or cognitive disabilities.

279.    Only a small fraction of those Plaintiff Children who are freed for adoption are currently listed on Texas Adoption Resource Exchange ("TARE"), a state-run website which helps DFPS find adoptive homes for children.

280.    A 2010 report by the Children's Commission found that: "If a child has been in PMC [and has been free for adoption] for more than two years and is still not in an adoptive home, the adoption plan has *failed* and should be revisited."

281.    The problem of inadequate adoption planning has been long known to Defendants.  The Second Round CFSR found that DFPS made diligent efforts to achieve adoptions in a timely manner in just 42% of the cases reviewed, well below the national requirement of 90%. Defendants acknowledged in their Statewide Assessment that high caseloads and staff turnover cause delays in preparing children for adoption and in the recruitment and selection of adoptive families.

282.    In addition, Defendants have failed to ensure that caseworkers take steps to free Plaintiff Children for adoption.  Federal law requires that states make efforts to free children for adoption

who have been in custody for 15 of the last 22 months unless certain limited exceptions apply. Yet as of August 2010, there were 3,326 children in the state's PMC who were not legally free for adoption.  In FY 2009, 30% of children entering the state's PMC who were not legally free for adoption were under the age of five.

283.    For such children, little effort is given to identifying an alternative permanency plan or securing any permanent placement.   Moreover, DFPS rarely revisits the possibility of reunification with parents or reconsiders whether to make efforts to free the child for adoption, even if it later becomes appropriate.  The 2010 Appleseed report stated that "there is no sense of immediacy to revisit the permanency issue during the PMC phase."

284.    The Second Round CFSR found "Permanency goal for child" to be an Area Needing Improvement because in 27.5% of cases reviewed, DFPS had failed to establish an appropriate permanency goal for the child in a timely manner and/or had not met federal requirements with regard to freeing the child for adoption.

285.    As the Adoption Review Committee found in 2010 that "many of the same problems identified in 1996 still exist in the current child welfare system in Texas. . . . Without strong and swift action, the number of waiting children will continue to increase."  As Texas Appleseed observed in its November 2010 report: "The assumption that some children, particularly older children, are not adoptable must be challenged."

**3.      Defendants Mismanage The Texas Foster Care System By Failing To Create An Adequate Number And Array Of Placements And Services, Subjecting Plaintiff Children To Unstable And Inappropriately Restrictive Placements, Far From Family And Community**

286.    When Texas removes a child from home for his own safety and well-being, the state assumes the responsibility of securing a placement that meets the child's needs.  Defendants, for a long period of time and with knowledge of widespread systemic inadequacies, have failed to

develop a full range of appropriate foster care placements to meet the reasonably anticipated needs of all children in DFPS custody.

287.    In a September 2010 report to the legislature, DFPS acknowledged that "[f]inding appropriate placements for children who come into foster care remains difficult because the needs of the children do not always match the number, type, and location of the placement options available."   Additionally, many providers do not offer placements at different service levels; this too often results in placement moves for children when their needs change.

288.    DFPS policy expressly states that it is preferable that all children – even those with high-level needs – be placed in a foster family home.  Yet, the existing number of foster homes within the DFPS foster care system is grossly inadequate.  Because of this scarcity, children as young as seven, eight, or nine are frequently placed in congregate settings.  In fact, there is a marked increase in the use of congregate placements for children in Texas beginning at those ages.

289.    Defendants recognize that the Texas foster care system has an insufficient number of foster homes.  In May 2010, responding to the fact that the number of children in foster care exceeded expectations by more than 1,000 children, Commissioner Heiligenstein said that Texas "should offer incentives for private child-placing agencies to recruit foster homes where they are most needed."

290.    When placements are scarce, children tend to be placed in the first available rather than the best placement.  This has long been a problem in Texas.  Interviews conducted as part of the First Round CFSR found that: "Stakeholders noted that because of the scarcity of placements, placement decisions tend to be driven by availability rather than by 'appropriateness' as determined through a matching process.  Placements made on the basis of availability are likely to disrupt because they often are not appropriate for the child's needs."

291.    Again, the Second Round CFSR found a "lack of placement stability for children in foster care due primarily to insufficient placement resources."

292.    This problem persists.  In testimony to the Texas House Human Services Committee on June 30, 2010, Commissioner Heiligenstein noted that the lack of community resources causes separation from siblings and family, lack of educational continuity, and a fractured social support system.

293.    Defendants rely inappropriately on certain types of placements, especially congregate placements, because of the insufficient number of available family foster homes.  Thus, for example, DFPS uses emergency shelters for temporary placements when a child's placement disrupts or when no placement is available of the type and in the location needed by the child. The Second Round CFSR noted that this increased shelter use was caused by a "continuing shortage of placements."  Mental health hospitalizations are also sometimes extended beyond the time they are medically necessary because there are no available beds in appropriate placements. In other instances, a child may be discharged from a mental health hospitalization to the non-therapeutic environment of an emergency shelter.

294.    The unavailability of suitable placements also results in children being placed in foster care far from their home communities.  The Dallas Morning News reported that, in May 2010 legislative testimony, Commissioner Heiligenstein acknowledged that under the current system foster children are often placed halfway across the state.  In 2010, the worst instance of this was Region 9 (Midland); in FY 2010, 86% of that region's foster children were placed outside of their home counties and 62% were placed outside of the region.

295.    This problem is particularly pronounced for Plaintiff Children.  As of March 31, 2010, 3,050 children – nearly 26% of all children in the state's PMC – had been placed not only

outside of their home counties, but outside of their large multi-county DFPS regions.   By contrast, just over 10% of those in the state's TMC – 1,433 children – were placed out of region.

296.   In a September 2010 report, DFPS acknowledged that, statewide, the percentage of children placed out of their home regions increases as their need for services increases.  Thus, as of March 31, 2010, 25% of children requiring moderate services were placed out of region, but 42% of children requiring specialized services and fully 62% of children requiring intensive services were placed out of region.

297.   In particular, when an assessment of child's needs indicates that a more restrictive placement would be appropriate, many children are moved far from their home communities because such treatment centers are disproportionately concentrated in one area of the state:  in and around Houston.  As of August 31, 2010, Harris County had 23 of the 79 RTCs operating in the state.  Including the neighboring counties of Brazoria, Fort Bend, and Galveston, there were a total of 34 RTCs in the Houston area.

298.   As a result, in June 2010 legislative testimony, Commissioner Heiligenstein recognized that six out of ten children placed in Houston region RTCs were from other regions across the state.   She described the state's network of RTCs as a "scatter-gram" that unnecessarily complicates the lives of already troubled youth.

299.   Because it is difficult for family members, court advocates, and even the children's primary DFPS caseworkers to visit distant placements, the health and safety of many of these children are not monitored by anyone with whom the children have a trusting relationship.  Rather than taking timely and meaningful action to build the appropriate placement array, Defendants send alternate workers, largely unfamiliar with the cases they are monitoring, to visit children in distant placements and maintain "courtesy supervision" of their cases.

300.    In addition to RTCs, other critical services are not uniformly available to foster children throughout the state.  The Second Round CFSR found that "key resources such as substance abuse and mental health services are insufficient around the state, and there are areas where key services such as placement resources are unavailable or inconsistently available."  Stakeholders identified deficits in the availability of youth placements, transitional services, psychiatric care, and behavioral health care.  They noted that "families in remote areas struggle with transportation and a lack of choice among providers for needed services, especially in the areas of substance abuse and behavioral health."

301.    When children are ready to leave RTCs, there are insufficient community-based services that would enable them to transition to a therapeutic foster home.  As a result, children remain in congregate care longer than is appropriate to their needs because there is nowhere else for them to go.

302.    When children are placed in family foster homes, the foster parents may not be adequately trained to meet the children's needs.  The December 2010 Adoption Review Committee report found that frequent, damaging moves are due in part to inadequate training of foster parents to address the traumas these children have endured.

303.    Additionally, DFPS allows Plaintiff Children to be erroneously and inappropriately designated as needing higher levels of care than they actually require, which often leads to children being placed or remaining longer than is appropriate in restrictive institutional or other foster care settings.  This is driven in part by the fact that providers are compensated at higher levels for providing placements for children designated as needing higher levels of care.

304.    The lack of a sufficient placement array not only causes direct harm to children, but also places unreasonable stress on the foster care system as a whole.  It is well documented that

placement changes disrupt the provision of services, stress foster parents and lead to lower retention rates, take additional caseworker time, and create other administrative costs.

305.    Defendants have failed to build a sufficient service array to meet the needs of Plaintiff Children.  Although in 2002 Texas had a "Service Array" that met the requirements of the First Round CFSR, by the Second Round CFSR, Texas was found to be "not in substantial conformity" with this requirement.

306.    To determine the state's conformity with this systemic factor, three items were assessed in the Second Round CFSR.  The first two items were whether the state had in place "an array of services that assess the strengths and needs of children and families and determine other service needs . . . and help children in foster and adoptive placements achieve permanency," and whether those services were available in all parts of the state.  Both of these items were rated as Areas Needing Improvement.

### 4.    Defendants Mismanage The Texas Foster Care System By Failing To Adequately Oversee Substitute Care, Placing Plaintiff Children At Risk Of Harm

307.    Children removed from their homes are placed either in licensed and paid foster care or in unlicensed and unreimbursed substitute care with relatives.  Licensed foster care may be either administered directly by the state, or operated by private contractors under the state's oversight.

308.    Texas relies on private contractors to provide direct services and placements to the vast majority of its children in substitute care.  As of March 31, 2010, 7,723 children in the state's PMC – 83% of all PMC children who were not placed with relatives – were in placements administered or operated by private contractors.

309.    Any foster care system that relies on private contractors must ensure that those contractors are keeping children safe and meeting their needs.  It is critical that children in all placements receive regular visits by appropriately supervised state caseworkers who have the

time and resources necessary to identify children's needs and address them.  It is also essential that such a system have rigorous contract-monitoring and licensing procedures, and that those functions be performed competently.

310.    Coordination among these three oversight functions – assigned caseworkers, contract monitoring, and licensing – is necessary to ensure the safety and well-being of children.  If any one of these functions is inadequate, or does not apply to the oversight of a particular placement type, children may be placed at risk.

311.    A 2008 study conducted for DFPS by the University of Houston School of Social Work found that the supervision of front-line service provision and the monitoring and licensing functions were "not coordinated in a way or assessed as an entire system to assure that their separate functions work together to promote the permanency, safety and well-being of children in substitute care."

> a.    **Defendants Fail To Ensure That Caseworkers Conduct Frequent And Quality Visits With Plaintiff Children**

312.    In order to promote children's safety, wellbeing, and permanency, caseworkers must routinely have quality visits with each child on their caseload, regardless of placement type.  DFPS acknowledges as much, requiring that a foster child's DFPS caseworker meet "face-to-face . . . at least once a month" with the child, and that the majority of these visits occur in the child's residence.

313.    For children placed in unlicensed relative homes, these caseworker visits are the only oversight available to ensure that children are safe and that their needs are being met.

314.    Defendants have long failed to ensure that caseworkers have visits with Plaintiff Children that are of sufficient frequency and quality.   DFPS failed the caseworker-child visitation requirement in the First Round CFSR and again in the Second Round CFSR.

315.    It is widely acknowledged that DFPS caseworkers still frequently do not make these required monthly visits with the children on their caseloads.  Even when these visits do occur, they are often cursory, sometimes lasting minutes.

316.    In particular, caseworkers often fail to make required visits to Plaintiff Children who have been placed with CPAs, and instead monitor them only by communicating with CPA staff. As a result, some Plaintiff Children go long periods without a single in-person visit from their DFPS caseworker, even though the caseworker is supposed to visit them monthly and is the only person responsible for engaging in permanency planning for the child.

317.    This problem is especially pronounced for Plaintiff Children who have been placed out of their home regions.  In 2005, DFPS established a program under which Plaintiff Children who are placed out of their home regions are paid "courtesy" visits by DFPS "I See You" caseworkers rather than by their assigned caseworkers.   Although DFPS requires these "I See You" caseworkers to access the child's case file and conduct monthly visits with the child, the visits are often cursory and amount to nothing more than a wellness check to verify that DFPS has not lost the child.  In practice, the "I See You" workers are generally unfamiliar with the child's history and needs, and their visits do not ensure that Plaintiff Children are in appropriate placements and receiving needed services, that efforts are being made to implement their permanency goals, or that the children are truly safe.

318.    The "[l]ack of collaboration between caseworkers and 'I See You' workers" was one of the reasons DFPS was rated poorly in ensuring children's wellbeing in the Second Round CFSR. Significantly, the federal evaluators noted that to properly monitor the safety and well-being of foster children and to attain their permanency goals, caseworker visitation must be of sufficient "quality" as well as frequency.

b.   **For Children In Private Care, DFPS's Contract Management Arm Fails To Ensure That Children Are Safe From Harm**

319.   DFPS's second line of defense to monitor the safety and well-being of children in private care is through contract management and oversight.  Here, too, low staffing, high turnover, high caseloads, and loose standards impede the ability of DFPS to effectively monitor the performance of contractors providing residential child care to children in foster care, including Plaintiff Children.

320.   The responsibilities of contract managers include verifying that foster care providers comply with both the standards and requirements of the child protective services division and those of CCL.  These managers are tasked with overseeing a broad range of activities, from verifying that private providers are developing and implementing appropriate service plans for the children in their care to overseeing financial accountability.

321.   As long ago as 1995, the United States Department of Health and Human Services' Office of Inspector General issued a report finding that the predecessor agency to DFPS did "not have an overall system of controls" to ensure that contracting providers were meeting required standards or that state caseworkers were monitoring the status of the children in CPA foster homes.  As a result, the report found, the agency had "no assurance that the quality of care being given to foster children placed by child placing agencies was adequate."

322.   In 2000, the Texas State Auditor's Office, assisted by the federal office that had conducted the earlier review, again reported on Texas's administration of foster care contracts.  Once again, the State Auditor's Office found that there was an "urgent need for improvements in contract monitoring."  The contract administration division suffered from high caseloads and high turnover, with five of nine positions, including the Director, vacant at the time of the audit.  In addition, the Auditor recommended improvement of risk assessment tools used for contract

monitoring, including consideration of the severity of licensing violations.

323.    In April 2007, the State Auditor's Office issued a third critical report, this time noting that the Residential Contracts Division was far smaller and handled vastly more contracts and contract dollars than other contract monitoring divisions in DFPS.  Furthermore, the division still suffered from high turnover, resulting in vacancies and an inexperienced workforce, compounding the already high workload.  These problems were exacerbated by poor training that was not targeted to the issues raised by management of this type of contract.

324.    The 2007 State Auditor's report also noted a weakness in the procedures used by Contract Management to measure whether providers were keeping children safe in care.  In particular, the oversight procedure focused only on *confirmed* allegations of abuse and neglect, rather than accounting for *all* allegations.  The report recommended that DFPS include a performance measure in the contract that would consider a provider's total number of allegations and the full range of dispositions, to recognize the risk presented by a provider with a high number of allegations.  DFPS disagreed that this should be a performance measure.  The contract form in use in FY 2011 contains the same performance measure that the Auditor's office criticized in 2007.

325.    As of March 2011, there were a total of 28 staff, including supervisors, performing all residential child care contract management functions.  Four contract managers were assigned to handle all contracts in Region 6, among which were half the state's RTC contracts.

326.    Accountability to contract management is insufficiently rigorous because DFPS's contract for residential child care is not performance-based:  the standards and goals established in the contract are not effectively tied to contract performance and payment.

327.    Additionally, minimum standards set by DFPS for operation of residential child care

place no numerical cap on the caseloads of either CPA caseworkers who manage services to children in foster family placements and FGHs or of Professional Level Service Providers who handle planning and delivery of services to children in GROs and RTCs.   Instead, private contractors are required only to "ensure manageable caseloads."   And, although DFPS has the authority to set contract terms more stringent than those in the regulations, the Department does not do so.   This inexact standard leaves contract management unable to ensure that a provider's caseloads are, in fact, manageable enough to allow staff to meet the needs of children in care.

328.   As recently as FY 2009, contract management continued to report certain "common findings" of poor contractor performance identified during monitoring of residential child care contracts, including:

   a.   "Failure to comply with Residential Child Care Minimum Standards";

   b.   "Failure by CPAs to document approval by the CPS worker for subsequent moves";

   c.   "Failure to provide therapy outside of school hours in order to minimize disruption to school"

   d.   "Failure to address the child's permanency goal in the operation's service or treatment plan [for that child]";

   e.   "Failure to maintain and update the Education Portfolio for each school-age child in care";

   f.   "Failure to document the operation's efforts related to transition services and Preparation for Adult Living (PAL)";

   g.   "Failure to incorporate the child's Individual Education Plan (IEP) or Individual Transition Plan (ITP) into the operation's service or treatment plan [for that child]";

   h.   "Failure to obtain all and/or document all of the required Texas Health Steps Check Ups";

   i.   "Failure to obtain and/or document that a child received a vision screening";

   j.   "Failure to follow up or document follow up recommended by health care providers during Texas Health Steps Check Ups or other health care appointments"; and

   k.   "When children are prescribed psychotropic medications, failure to provide

documentation that a physician evaluated the need for continued treatment with the psychotropic medication(s) at a minimum of every three months."

329. Each of these findings represents conduct of private providers that places Plaintiff Children at risk of harm, and which DFPS's contract management oversight has been inadequate to prevent.

330. The case of the Daystar RTC, described in Paragraphs 218 to 223 above, is a tragic illustration of the failure of contract management to effectively manage a poorly performing provider.   In June 2010, the Director of Residential Contracts notified Daystar that the investigations by CCL had raised "serious concerns" about the "safety and well-being" of children placed with Daystar.   The action taken, however, was not to terminate the contract, suspend it, or even to remove from the facility all children under DFPS's conservatorship – any of which actions would have been permissible under the contract – but only to "suspend[ ] all *new* placements of DFPS children" and install a Service Monitor at the facility.

### c.   For Children In Private Care, DFPS's Licensing Arm Fails To Provide Adequate Oversight To Ensure Plaintiff Children's Safety

331. DFPS, through CCL, its licensing unit, also fails to properly supervise the private entities with which DFPS contracts for the provision of foster care services.

332. CCL is tasked with regularly inspecting CPAs, foster homes, and congregate facilities, and also with investigating any allegations of abuse or neglect of children in foster care and of violations of any licensing standards.

333. In 2010 there were 119 CCL caseworkers statewide charged with overseeing all licensed placements.   These workers conducted 10,473 inspections and 4,696 investigations.   Following these more than 15,000 inspections and investigations, CCL issued fourteen corrective evaluations statewide and put two facilities under corrective probation.

334. CCL fails to adequately supervise licensed placements, leaving children at risk.   In

August 2010, the Texas State Auditor's Office released an audit of five residential child care providers. That audit found that providers did not conduct background checks of staff and foster parents before staff started working and foster homes were opened. As to all five of the CPAs reviewed, the report concluded: "*The provider may be placing children at risk* by not waiting for individuals to clear the background checks prior to their starting work." In two additional instances, the report also found that children might be placed at further risk by the providers' failure to "wait[ ] for the individuals to clear the background checks . . . prior to approving their homes for the placement of children."

335.    In one of those instances, the provider had previously been cited in 2006 for allowing employees to start work before clearing initial background checks, yet the provider was again cited for that same violation in 2008. In another, auditors were unable to determine when foster parents had cleared initial background checks.

336.    These deficiencies are not new. In fact, the four previous annual residential care provider audits from 2006 through 2009 found these same deficiencies in different providers. In some instances, background checks were hundreds of days late. For example, the 2009 audit found that initial background checks for employees ranged from 3 to 739 days late and subsequent employee background checks required after employees had worked for two years were from 3 to 2,381 days – six and one-half *years* – late.

337.    In addition, these audits noted that CPAs failed to document that employees had gone through orientation and pre-service training, behavior intervention training, training on psychotropic medications, and annual in-service training; failed to document CPR and first aid certification; and failed to perform initial and subsequent background checks on subcontractors who had contact with children. The audits also noted staff turnover in one year of up to 143%.

338.    Even where background checks were conducted, a review by the Houston Chronicle and Texas Tribune found that DFPS approved dozens of potential workers, despite arrests ranging from prostitution to assault with a deadly weapon.  For example, the Chronicle reported in December 2008 that CCL wrote to the Daystar RTC approving the hire of a job applicant who had been arrested for aggravated assault with a deadly weapon, concluding that "this person's criminal history does not include a conviction that would prohibit the person from being present in a childcare operation."

339.    CCL routinely gives notice of its inspection visits to foster homes. In 2007, DFPS conducted a survey of foster parents, asking them to comment on monitoring inspections. Several expressed appreciation for the fact that DFPS made appointments to inspect, rather than visiting the foster homes unannounced.

340.    CCL does not keep adequate records of direct care providers who have been determined to be unsatisfactory or even abusive.  Individual foster homes that have been shut down by one CPA are able to obtain verification from another CPA, and to accept new placements from DFPS.

341.    Defendants' investigations of allegations of abuse and neglect are routinely inadequate and ineffective.  CCL investigators frequently fail to obtain sufficient information from Plaintiff Children or to effectively gather and analyze other relevant information during the course of investigations.   Moreover, Plaintiff Children are moved so frequently and to such distant placements that investigations of prior abuse and neglect in care are hampered and ineffective.

342.    As a consequence of inadequate oversight, DFPS places children in inappropriate and sometimes dangerous privately operated homes and facilities, contrary to the exercise of reasonable professional judgment and with deliberate indifference to the potential danger to

children, including Plaintiff Children.

343.    In a case that was widely reported in October, 2010, the operator of a foster group home in Elkhart pleaded guilty to sexually abusing, over the course of thirteen years, as many as nine of the children who DFPS had placed in his care.  CCL investigated his operation on at least three occasions, ruling out the allegations each time.  DFPS continued to place children in the facility even as caseworkers removed those who had alleged abuse.  It was only *after* the foster parent was eventually arrested that a CCL supervisor revisited the matter and issued a report noting "overwhelming evidence" of abuse.

344.    The 2010 death of the child who was improperly restrained at the Daystar RTC is another particularly tragic example of what can happen when DFPS fails to take prompt and effective enforcement action against a private contractor.   The numerous regulatory deficiencies documented at the facility in 2008 and 2009 (along with the "fight club" incident and the finding of sexual abuse described in Paragraphs 218 to 223 above) included at least one other improper use of an emergency restraint and a failure to properly document a staff worker's training in the use of such restraints.  Yet, the child's death illustrates that whatever measures CCL may have taken to correct these violations and to ensure that they did not recur left Plaintiff Children at risk.

* * *

345.    Defendants are charged with responsibility for the safety, well-being, and ultimately, the childhoods of Plaintiff Children, those children unfortunate enough to be in the Permanent Managing Conservatorship of the State of Texas.  Instead of taking all reasonable steps to provide services and treatment for the traumas these children have already suffered and to seek and secure a permanent home for these children, Defendants instead inflict further trauma on

these children by maintaining a child welfare system in which these children's constitutional rights and the entitlements guaranteed by state law are routinely denied. As a direct result of Defendants' actions and inactions, thousands of Texas children are subjected to permanent harm on an ongoing basis, in violation of their legal rights.

## COUNT I

(Substantive Due Process under the United States Constitution)
(Asserted by all Named Plaintiffs and Plaintiff Children)

346.    Each of the foregoing allegations is incorporated as if fully set forth herein.

347.    State officials assume an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm when they take that child into foster care custody.

348.    The foregoing actions and inactions of Defendants Rick Perry, Thomas Suehs, and Anne Heiligenstein, in their official capacities, constitute a failure to meet their affirmative duty to protect from harm all Named Plaintiffs and Plaintiff Children, which is a substantial factor leading to and proximate cause of the violation of the constitutionally protected liberty and privacy interests of all Named Plaintiffs and Plaintiff Children.

349.    The forgoing actions and inactions of Defendants Rick Perry, Thomas Suehs, and Anne Heiligenstein, in their official capacities, constitute a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and Plaintiff Children. As a result, all Named Plaintiffs and class members have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution.

350.    These substantive due process rights include, but are not limited to:

a.  the right to protection from unnecessary harm while in government custody;

b.  the right to a living environment that protects foster children's physical, mental, and emotional safety and well-being;

c.  the right to services necessary to prevent foster children from deteriorating or being harmed physically, psychologically, or otherwise while in government custody, including but not limited to the right to safe and secure foster care placements, appropriate monitoring and supervision, appropriate planning and services directed toward ensuring that the child can leave foster care and grow up in a permanent family, and adequate psychiatric and psychological services;

d.  the right to treatment and care consistent with the purpose of the assumption of custody by DFPS;

e.  the right not to be maintained in custody longer than is necessary to accomplish the purposes to be served by taking the child into custody;

f.  the right to receive care, treatment, and services determined and provided through the exercise of accepted professional judgment; and

g.  the right to be placed in the least restrictive placement according to a foster child's needs.

## <u>COUNT II</u>

(First, Ninth, and Fourteenth Amendments to the United States Constitution)
(Asserted by all Named Plaintiffs and Plaintiff Children)

351.   Each of the foregoing allegations is incorporated as if fully set forth herein.

352.   The foregoing actions and inactions of Defendants Rick Perry, Thomas Suehs, and Anne Heiligenstein, in their official capacities, amount to a policy, pattern, practice, or custom of failure to exercise professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights.  As a result of Defendants' conduct, all Named Plaintiffs and Plaintiff Children have been and are at further risk of being harmed and deprived of the liberty interests, privacy interests, and associational rights not to be deprived of a child-sibling or child-parent family relationship where safe and appropriate, as conferred on them by the First, Ninth, and Fourteenth Amendments to the United States Constitution.

## COUNT III

(Procedural Due Process)
(Asserted by all Named Plaintiffs and Plaintiff Children)

353. Each of the foregoing allegations is incorporated as if fully set forth herein.

354. The actions and inactions of Defendants Rick Perry, Thomas Suehs, and Anne Heiligenstein, in their official capacities, have resulted and are continuing to result in the deprivation of the following state law entitlements to which each Plaintiff child has a constitutionally protected interest:

    a. The rights related to monitoring by DFPS of contracted substitute care, as provided under Texas Family Code Section 264.106(b) and Human Resources Code Section 45.002, including that DFPS ensure that such services are provided in accordance with federal law, the laws of the State of Texas, and the rules of the Department of State Health Services and the Texas Commission on Environmental Quality; and

    b. The right to placement decisions made by DFPS using "clinical protocols to match a child to the most appropriate placement resource," as provided under Texas Family Code Section 264.107(e).

## PRAYER FOR RELIEF

355. WHEREFORE, the Plaintiff Children respectfully request that this Honorable Court:

    a. Assert jurisdiction over this action;

    b. Order that Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

    c. Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

      i. Defendants' violation of Plaintiff Children's substantive right to be free from harm under the due process clause of the Fourteenth Amendment to the United States Constitution;

      ii. Defendants' violation of Plaintiff Children's rights under the First, Ninth and Fourteenth Amendments to the United States Constitution; and

      iii. Defendants' violation of Plaintiff Children's right to procedural due process under the Fourteenth Amendment to the United States Constitution on the basis of state-created liberty and property interests.

d.  Enter a permanent injunction:

i.   Requiring Defendants to ensure that all children in the plaintiff class are assigned DFPS workers whose overall caseloads do not exceed the caseload standards established by the Child Welfare League of America and the Council on Accreditation;

ii.  Requiring Defendants to establish, within DFPS, an administrative accountability structure to ensure that all caseworkers, using professionally accepted case practices, fully identify and address Plaintiff Children's need for:

1.  timely permanency;

2.  placement in the least restrictive, most family-like placements that are suited to their needs;  and

3.  mental health services suited to their needs;

iii.  Requiring Defendants to create, within DFPS, special expert panels to review the cases of all class members who have had more than four placements during their most recent placement episode, to determine whether their service needs are being adequately addressed and, if not, to implement appropriate remedial steps to have those service needs addressed;

iv.  Requiring Defendants to create, within DFPS, special expert panels to review the cases of all class members who have been in the PMC of the state for more than two years to determine whether their need for permanency is being adequately addressed and, if not, to implement appropriate remedial steps to seek and secure permanency for these children;

v.   Requiring that all substitute care placements be licensed or verified according to state law;

vi.  Requiring Defendants to establish a process for ensuring that state standards for foster homes, foster group homes, emergency shelters, group residential operations, and residential treatment centers in which Plaintiff Children are placed are consistent with the standards set by the Child Welfare League of America and the Council on Accreditation and, if they are not, for taking necessary steps to have the state's standards modified;

vii.  Prohibiting Defendants from placing Plaintiff Children in foster homes, foster group homes, emergency shelters, group residential operations, or residential treatment centers that do not meet the standards for such homes or facilities set by the Child Welfare League of America and the Council on Accreditation;

viii.  Requiring Defendants to ensure that their practices and procedures for monitoring and oversight of privately operated placement facilities protect the safety of Plaintiff Children;

82

ix.    Prohibiting DFPS from placing any children in privately operated residential facilities or CPAs not accredited by the Council on Accreditation;

x.    Requiring Defendants to retain experts to conduct an assessment of the placement and service needs of plaintiff class members, taking into account class members' needs for placement in the least restrictive, most family-like setting and for placement in proximity to their families and communities, and establishing a timetable by which additional placements and services will be developed; and

xi.    Requiring that all contracts with private providers contain caseload, services, treatment, and outcome standards consistent with state and federal law, and that DFPS establish a process to ensure that these private providers comply with the provisions of these contracts;

e.    Appoint a Neutral Monitor to oversee the implementation of this order and to issue periodic reports to the Court.

f.    Award to Plaintiff Children the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g.    Grant such other and further equitable relief as the Court deems just, necessary, and proper to protect Plaintiff Children from further harm by Defendants.

DATED: March 29, 2011                Respectfully submitted:

/s/ J.A. "Tony" Canales
J.A. "Tony" Canales
State Bar No. 03737000
S.D. Tex. Bar No. 1163
Hector Canales
State Bar No. 24005961
S.D. Tex. Bar 29396
Patricia C. Bell
State Bar No. 00793455
S.D. Tex. Bar No. 19506
CANALES & SIMONSON, P.C.
2601 Morgan Avenue
Corpus Christi, Texas 78467-5624
Phone: (361) 883-0601
Facsimile: (361) 884-7023
*tonycanales@canalessimonson.com*
*hacanales@canalessimonson.com*
*pmcanales@canalessimonson.com*
Attorneys-in-Charge

Barry F. McNeil
State Bar No. 13829500
S.D. Tex. Bar No. 14914
R. Thaddeus Behrens
State Bar No. 24029440
S.D. Tex. Bar No. 916015
Amelia J. Cardenas
State Bar No. 24056681
*S.D. Tex. pro hac applicant*
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Phone: (214) 651-5000
Facsimile: (214) 200-0535
*barry.mcneil@haynesboone.com*
*thad.behrens@haynesboone.com*
*Amelia.cardenas@haynesboone.com*

R. Paul Yetter
State Bar No. 22154200
S.D. Tex. Bar No. 3639
Dori K. Goldman
State Bar No. 24041274
S.D. Tex. Bar No. 591632
Christopher D. Porter
State Bar No. 24070437
S.D. Tex. Bar No. 1052367
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
Phone: (713) 632-8000
Facsimile: (713) 632-8002
*pyetter@yettercoleman.com*
*dgoldman@yettercoleman.com*
*cporter@yettercoleman.com*

Marcia Robinson Lowry (*pro hac applicant*)
Stephen A. Dixon (*pro hac applicant*)
Olivia Sohmer (*pro hac applicant*)
Jessica Polansky (*pro hac applicant*)
Patrick Almonrode (*pro hac applicant*)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015

84

*mlowry@childrensrights.org*
*sdixon@childrensrights.org*
*osohmer@childrensrights.org*
*jpolansky@childrensrights.org*
*palmonrode@childrensrights.org*
Of Counsel

*Attorneys for Plaintiffs and Proposed Class*