UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D.; bnf STUKENBERG, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. C-11-84 |
| | § | |
| RICK PERRY, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

On this day came on to be considered Defendants' Rule 12(b)(1) Motion to Dismiss.  (D.E. 43.)  For the reasons stated herein, Defendants' Rule 12(b)(1) Motion to Dismiss is DENIED.  (D.E. 43.)

**I.      Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), as Plaintiffs bring claims under 42 U.S.C. § 1983. (D.E. 1 at 9.)

**II.      Factual and Procedural Background**

Plaintiffs filed this civil rights action in this Court on March 29, 2011, naming as defendants Rick Perry (Governor of Texas), Thomas Suehs (Executive Commissioner of the Texas Health and Human Services Commission), and Anne Heiligenstein (Commissioner of the Texas Department of Family and Protective Services).  (D.E. 1.) The Court subsequent certified this lawsuit as a class action, consisting of "[a]ll children who are now and all those who will be in the Permanent Managing Conservatorship [('PMC')] of the Texas Department of Family and Protective Services [('DFPS')]." (D.E. 49 at 34.)  Plaintiffs seek injunctive and declaratory relief to remedy what they claim is Defendants' operation of the Texas foster care system in violation of certain

federal constitutional mandates.[1]  As explained in the Court's Order on class certification, Plaintiffs complain that children within PMC custody are subjected to a variety of harms (such as repeated placements, over-medication, abuse, neglect, and deprivation of familial relationships with siblings) due to deficiencies in the Texas foster care system. (D.E. 49 at 1-2.)  Plaintiffs claim that they are "brought into state custody because they were abused and neglected at home, but then are left to languish for years, too many of them suffering further abuse and neglect while the state does little to seek and secure permanent homes for them."  (D.E. 15 at 7.)  Plaintiffs bring suit under 42 U.S.C. § 1983, and claim violations of substantive and procedural due process, along with certain rights of familial association, derived from the First, Ninth, and Fourteenth Amendments to the U.S. Constitution. (D.E. 1 at 83-85.)

On May 24, 2011, Defendants filed their Rule 12(b)(1) Motion to Dismiss, contending that this lawsuit "would effectively require the Court to takeover and administer Texas' foster care system despite the fact that regular and competent oversight of Texas' foster children has already been entrusted to the Texas district courts by the Texas Legislature."   As such, they request that this Court abstain from exercising jurisdiction over this action pursuant to the Younger and Burford doctrines,[2] so that "each of the named Plaintiffs [can] seek the individualized relief he or she desires in the Texas courts."  (D.E. 43 at 10.)  Plaintiffs responded on June 14, 2011.  (D.E. 55.)

---

[1] For example, Plaintiffs request a permanent injunction "[r]equiring Defendants to ensure that all children in the plaintiff class are assigned DFPS workers whose overall caseloads do not exceed the caseload standards established by the Child Welfare League of America and the Council on Accreditation;" "[r]equiring that all substitute care placements be licensed or verified according to state law;" "[p]rohibiting Defendants from placing Plaintiff Children in foster homes, foster group homes, emergency shelters, group residential operations, or residential treatment centers that do not meet the standards for such homes or facilities set by the Child Welfare League of America and the Council on Accreditation;" and "[r]equiring Defendants to ensure that their practices and procedures for monitoring and oversight of privately operated placement facilities protect the safety of Plaintiff Children."  (D.E. 1 at 86.)
[2] Younger v. Harris, 401 U.S. 37 (1971) and Burford v. Sun Oil Co., 319 U.S. 315 (1943).

### III.    Discussion

#### A.    Standard of Review

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject matter jurisdiction.[3]  Where a Rule 12(b)(1) motion to dismiss is filed, "[a] trial court may find that subject matter jurisdiction is lacking based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Randall D. Wolcott, M.D., P.A. v. Sebelius, 635 F.3d 757, 762 (5th Cir. 2011).[4]

#### B.    Younger Abstention

##### 1.    Background

Federal courts have a "virtually unflagging obligation" to exercise jurisdiction granted to them.  Deakins v. Monaghan, 484 U.S. 193, 203 (1988) (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 817 (1976)).  Certain doctrines, however, require abstention in "extraordinary circumstances."  Deakins, 484

---

[3] There is some dispute as to whether a Younger or Burford abstention argument should be raised under Rule 12(b)(1) or Rule 12(b)(6).  The Fifth Circuit has explained, "[f]ederal courts do not abstain on Younger grounds because they lack jurisdiction; rather, Younger abstention reflects a court's prudential decision not to exercise [equity] jurisdiction which it in fact possesses."  Weekly v. Morrow, 204 F.3d 613, 614-15 (5th Cir. 2000) (internal quotation marks omitted).  Nevertheless, Younger abstention is "often raised through a Rule 12(b)(1) motion," 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, § 1350 at 96–100, and the parties do not dispute Defendants' use of Rule 12(b)(1) in this context.  This is also consistent with recent practice in this District.  See Shipula v. Tex. Dep't of Fam. & Protective Servs., 2011 WL 1882521, at *7 (S.D. Tex. May 17, 2011) (addressing Younger abstention doctrine under Rule 12(b)(1)).  Courts also favor Rule 12(b)(1) when evaluating Burford abstention.  See, e.g., High Peak Partners, LLC v. Bd. of Supervisors of Prince George Cty., 2008 WL 1733605, at *3 (E.D. Va. Apr. 14, 2008); Hanlin Group, Inc. v. Power Authority of State of New York, 703 F. Supp. 305, 306 (S.D.N.Y. 1989) ("This motion is granted pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that this Court refuses jurisdiction over this action pursuant to the Burford abstention doctrine.").  This Court will therefore evaluate both arguments under Rule 12(b)(1).

[4] Defendants have submitted voluminous exhibits with their Motion (as have Plaintiffs with their response).  As such, the Court understands Defendants to make a "factual" rather than "facial" attack to jurisdiction.  See, e.g., Shipula, 2011 WL 1882521, at *3 ("A facial attack happens when a defendant files a Rule 12(b)(1) motion without accompanying evidence. In a facial attack, allegations in the complaint are taken as true. If it is a factual attack, the Court may consider any evidence (affidavits, testimony, documents, etc.) submitted by the parties that is relevant to the issue of jurisdiction.") (citations omitted).

U.S. at 203.  One such abstention doctrine originates from the Supreme Court's decision in Younger v. Harris.  In Younger, the Supreme Court reversed a district court decision enjoining a state district attorney (Younger) from prosecuting Harris under the California Criminal Syndicalism Act (which Harris claimed ran afoul of certain constitutional rights) because that injunction violated a "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances."  Younger v. Harris, 401 U.S. 37, 39-41 (1971).  As the Supreme Court has subsequently explained, Younger abstention "is reinforced by . . . an aspect of federalism which we have described as 'the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'  Central to Younger was the recognition that ours is a system in which 'the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.'"  Huffman v. Pursue, Ltd., 420 U.S. 592, 601 (1975) (quoting Younger, 401 U.S. at 43-45).

The Fifth Circuit has noted that, "[a]lthough Younger abstention originally applied only to criminal prosecutions, it also applies when certain civil proceedings are pending, if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government."  Health Net, Inc. v. Wooley, 534 F.3d 487, 494 (5th Cir. 2008) (citations omitted).  Abstention under Younger v. Harris "is generally deemed appropriate [when]

assumption of jurisdiction by a federal court would interfere with pending state proceedings, whether of a criminal, civil, or even administrative character." <u>Louisiana Debating and Literary Ass'n v. City of New Orleans</u>, 42 F.3d 1483, 1490 (5th Cir. 1995). In determining whether <u>Younger</u> abstention is warranted, courts apply a three factor test derived from <u>Middlesex County Ethics Commission v. Garden State Bar Association</u>, 457 U.S. 423, 432 (1982).  The <u>Middlesex</u> factors are: "(1) the dispute must involve an 'ongoing state judicial proceeding,' (2) an important state interest in the subject matter of the proceeding must be implicated, and (3) the state proceedings must afford an adequate opportunity to raise constitutional challenges." <u>Texas Ass'n of Business v. Earle</u>, 388 F.3d 515, 519 (5th Cir. 2004) (citing <u>Wightman v. Tex. Supreme Ct.</u>, 84 F.3d 188, 189 (5th Cir. 1996)); <u>see</u> <u>Middlesex</u>, 457 U.S. at 432.  "When these requirements are met, the federal district court has no choice but to dismiss the federal action; it may not abstain, nor may it stay the federal action pending resolution of the state proceedings." <u>Nall v. Stringer</u>, 4 F.3d 989, 1993 WL 360771, at *3 (5th Cir. 1993).  "[A] district court's decision to abstain [is reviewed] for abuse of discretion, provided that the elements for <u>Younger</u> abstention are present." <u>Earle</u>, 388 F.3d at 518.

Defendants contend that <u>Younger</u> abstention is appropriate here.  In essence, they argue that Texas district courts exercise continuing jurisdiction over each child in foster care, and this federal class action would interfere with that jurisdiction.  Defendants also cite relevant precedents to have applied <u>Younger</u> in similar contexts, and contend that the <u>Middlesex</u> factors are satisfied.  (D.E. 43.)  In response, Plaintiffs point out that Texas receives federal funding and submits to federal oversight; as such, this case does not offend principles of comity and federalism.  They also contend that none of the

Middlesex factors are satisfied, and that numerous precedents around the nation support rejection of Younger abstention in the context of cases challenging state foster care systems.  (D.E. 55.)

The Court begins with a review of the Middlesex factors, then turns to relevant precedent and other arguments the parties raise.

### 2.    Middlesex Factors

The parties dispute whether the Middlesex factors are satisfied, thus warranting Younger abstention.  Defendants contend that all three factors are satisfied; Plaintiffs contend that none are.  The Court addresses each in turn.

### a.    First Middlesex Factor

### i.    Ongoing State Judicial Proceeding

The first consideration under Middlesex is whether the dispute involves an "ongoing state judicial proceeding."  Earle, 388 F.3d at 519.  "State judicial proceedings" generally include criminal, civil, and "administrative proceedings that are 'judicial' in nature."  Id. at 520.

In support of their position on this point, Defendants describe in detail the legal procedures governing foster care in Texas, which themselves are not in dispute.  In essence, the Texas district court to which a child's suit affecting the parent child relationship ("SAPCR") is assigned has a "continuing statutory duty to oversee" the child's case.  (D.E. 43 at 10 (citing Tex. Fam. Code §§ 101.032; 155.001(a); 161.001 et seq.; 262.001 et seq.; 263.001 et seq.; 264.001 et seq.).)  This oversight begins with a hearing, held within 14 days after a child is removed from his parent's custody, and once a child is placed with DFPS, a "service plan" for the child is developed, with a goal of

finding a permanent placement for the child.  The court must review that plan.  (D.E. 43 at 11 (citing Tex. Fam. Code §§ 263.304 - .305; 263.101; 263.105(a); 263.105(b); 263.102; 263.106.))  DFPS also prepares a "permanency plan" for each child, and the district court reviews DFPS's "permanency progress reports" in relation to the permanency plan at regular intervals.  (D.E. 43 at 11 (citing Tex. Fam. Code §§ 263.3025; 263.304; 263.305; 263.306; 40 Tex. Admin. Code §§ 700.1202; 700.1205).). If parental rights to a child are terminated, and DFPS is named as the child's managing conservator, the court holds placement reviews every six months until the child is adopted or reaches adulthood.  Persons interested in the child's welfare are provided notice, and the child must also attend the hearing, unless excused.  (D.E. 43 at 11-12 (citing Tex. Fam. Code §§ 263.501(a), (b), (d), (f).)  Placement review reports are prepared by DFPS and filed with the court prior to the hearing.  This report reviews the placement, considers its appropriateness, addresses other services, and makes other findings.  At the hearing, the court must decide whether the child's placement is safe and appropriate to the child's needs, whether the child is receiving needed services, adoption issues, and other considerations.  Appeals of district court decisions are allowed in certain circumstances. (D.E. 43 at 13-14 (citing Tex. Fam. Code §§ 263.502(a), (c); 263.503; § 201.015; In re Tex. Dep't of Fam. & Protective Servs., Relator, 255 S.W.3d 613 (Tex. 2008); In re Cochran, 151 S.W.3d 275 (Tex. App. – Texarkana 2004).)  Thus, Defendants conclude that Texas courts "have authority over a child's SAPCR from the moment the suit is filed until the child is either adopted or becomes an adult.  Within that authority, the court reviews the child's special needs and circumstances, listens to any requests of the child's caseworker, attorney *ad litem*, or other person with an interest in the child, and

speaks directly to the child to ascertain what is in his or her best interests." (D.E. 43 at 14.) Defendants also point to certain standing orders adopted in some Texas counties to address cases in which DFPS is a child's conservator. These standing orders prescribe certain procedures to be followed under particular circumstances, such as a change in a child's level of care, prescription of new medications, and other significant events. (D.E. 43 at 15-16; see also D.E. 43-2 (Bexar County Standing Order); D.E. 43-3, 43-4 (Travis County Standing Order); D.E. 43-5 (Nueces County Standing Order).) In light of these procedures, Defendants conclude that this lawsuit implicates ongoing state judicial proceedings.

In response, Plaintiffs first note that the Court's exercise of jurisdiction will not undermine federalism and comity principles, since Texas participates in the federal Title IV-E program,[5] under which it receives federal funds in exchange for submitting its foster care system to federal law and policy. Specifically, under the "2009 State Plan for Title IV-E of the Social Security Act," executed between the U.S. Department of Health and Human Services ("HHS") and Texas, the state elected to subject the administration of its child welfare system to the regulatory and policy oversight of HHS "in exchange for the uncapped flow of federal entitlement dollars under the Title IV-E program." In light of this agreement, the Court's exercise of jurisdiction will not offend notions of comity or federalism, Plaintiffs argue. (D.E. 55 at 8-9.) Plaintiffs further contend that this class action will not interfere with any ongoing state proceedings, as the only ongoing proceedings at issue are SAPCR enforcement proceedings (or placement review hearings), which primarily review DFPS actions in relation to the foster child at issue.

---

[5] This refers to Title IV-E of the Social Security Act, 42 U.S.C. § 670 et seq.

These "periodic state court reviews of executive action . . . are not the sort of ongoing proceedings subject to Younger."  (D.E. 55 at 13.)

The Court does not find that the ongoing state proceedings at issue here satisfy the first Middlesex factor.   The children in this class action have already (or will be) placed in the state PMC.  When DFPS is "named as a child's managing conservator in a final order," further "placement review hearings" are conducted on a regular basis, but such hearings focus on a review of DFPS decisions, such as whether the child's placement is safe, whether it is in the "least restrictive environment," and other issues.  Tex. Fam. Code §§ 263.501; 263.503.  The Supreme Court in New Orleans Public Service, Inc. v. Council of the City of New Orleans, et al., held that Younger abstention does not extend to judicial proceedings that, like those at issue here, are focused solely upon review of executive actions.  The Court explained:

> Although our concern for comity and federalism has led us to expand the protection of Younger beyond state criminal prosecutions, to civil enforcement proceedings, and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions, **it has never been suggested that Younger requires abstention in deference to a state judicial proceeding reviewing legislative or executive action.** Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.

491 U.S. 350, 367-68 (1989) (emphasis added; citations omitted) ("NOPSI"); see also Connor B. ex rel. Vigurs v. Patrick, __ F. Supp. 2d ___, 2011 WL 31343, at *5 (D. Mass. Jan. 4, 2011) ("Where, as here, the state court proceeding is limited to a review of executive action, the Supreme Court has made clear that Younger abstention is inappropriate.").  Further, the Fifth Circuit in Earle explained that while Younger extends beyond criminal proceedings, "[i]t is the criminal law arena where the federal courts'

deference to state courts has been most pronounced.  Other proceedings have been found to be due the same deference **because of analogy to, or nexus with, criminal proceedings**."  Earle, 388 F.3d at 520 (emphasis added; citations omitted).  The ongoing state proceedings here, limited to a review of DFPS actions, are far from the type of "ongoing state judicial proceedings" normally subject to Younger abstention.

### ii.    Interference with Judicial Proceedings

Even if the proceedings at issue here could constitute "ongoing state judicial proceedings," there is no indication that this lawsuit would interfere with those proceedings.  Louisiana Debating and Literary Ass'n, 42 F.3d at 1490.  Defendants contend that any court order granting Plaintiffs' requested relief would unduly interfere with their ongoing state proceedings, in violation of Younger.  Defendants point to the cases of D.P. and S.A., two of the named Plaintiffs, as examples of circumstances in which a federal court injunction would "duplicate and interfere" with the SAPCR courts' ongoing authority in the state court proceedings.  In these cases, Defendants argue that the state courts have "entered orders that are in the best interests of the children whose SAPCRs are before them," and the requested injunctive relief would interfere with those state court decisions.  (D.E. 43 at 29-32.)  Defendants also object to Plaintiffs' request for special expert panels to review certain types of cases, which they state would create "de facto appellate courts" to second guess state court decisions.  Finally, Defendants note that Plaintiffs' requested system-wide relief (reducing caseworker caseloads, establishing certain standards for foster care homes, and other requests) would in effect "control the very decisions that are at the heart of the state court's continuing jurisdiction," and would override the SAPCR courts' decisions.  (D.E. 43 at 32-35.)  Plaintiffs take issue with

Defendants' position that the class action will interfere with a child's individual periodic placement review hearings, as Plaintiffs' goal is to correct "systemic failures of the executive agency" in the foster care context, and seek to compel executive agency officials to operate the system consistent with constitutional obligations.  (D.E. 55 at 13-15.)

The Court concludes that "interference" in the context of <u>Younger</u> is not present here.  As noted elsewhere, Plaintiffs seek broad injunctive and declaratory relief aimed at improving the Texas foster care system as a whole, not to interrupt, alter, or in any other manner change a particular state court placement review decision.  The relief sought is directed against executive branch officials in the DFPS, not the judiciary.   There is no evidence of interference with ongoing state judicial proceedings, warranting abstention.  Many other courts to have considered similar arguments have arrived at the same conclusion.  <u>See, e.g.</u>, <u>Olivia Y. ex rel. Johnson v. Barbour</u>, 351 F. Supp. 2d 543, 570 (S.D. Miss. 2004) ("In the case at bar, the court still would be hard-pressed to conclude that any specific relief plaintiffs seek in this action would necessarily interfere with ongoing youth court proceedings. Or stated another way, it is not apparent that all the relief plaintiffs might request would interfere, either directly or indirectly, with ongoing youth court proceedings."); <u>Dwayne B. v. Grandholm</u>, 2007 WL 1140920, at *5-7 (E.D. Mich. Apr. 17, 2007) ("While it is true that Michigan has in place a juvenile court system that sets out procedures for bringing and maintaining a child under that court's jurisdiction and there may be some ongoing juvenile court proceedings for individual foster care children, this lawsuit does not seek to interfere with any such proceedings. The relief sought here is not directed at the juvenile courts. It is directed at the executive

branch."); Brian A. ex rel. Brooks v. Sundquist, 149 F. Supp. 2d 941, 957 (M.D. Tenn. 2000) ("It is true that Tennessee has in place a system of procedures for bringing and maintaining a child under the jurisdiction of a juvenile court. It is true that there are ongoing and pending state proceedings concerning individual foster children; but nothing about this litigation seeks to interfere with or enjoin those proceedings. Rather, Plaintiffs seek injunctive relief against the Department of Children's Services, not the courts.").

Defendants note two of the Plaintiffs' Children's court files, D.P. and S.A., as examples of situations where injunctive relief by this Court "would duplicate and interfere with the SAPCR courts' ongoing authority [in] the state court proceedings." (D.E. 43 at 29-32.)   The Court recognizes that the SAPCR courts have conducted detailed reviews of each child's placement and condition since entering foster care, and have "enter[ed] orders that are in the best interests of the children whose SAPCRs are before them."  (D.E. 43 at 31.)  These court files, consisting of Permanency Plan and Permanency Progress Reports, Placement Review Reports, Placement Review Orders, and other documents, evaluate the appropriateness and safety of the child's placement, educational development, medical status, as well as plans for the future.  (D.E. 43-6; D.E. 43-7; D.E. 43-8; D.E. 43-9 (D.P. files); D.E. 43-10 (S.A. files); D.E. 43-11 (K.E. files); D.E. 43-12 (Z.H. files); D.E. 43-13 (D.I. files).)  Upon reviewing these files, however, the Court does not agree with Defendants that this lawsuit would interfere with these ongoing state court proceedings.  As noted earlier, this lawsuit seeks to improve the standards for all children in state foster care and protect foster children's constitutional rights, seeking systemic changes that would improve the foster care system for all children.  Such a lawsuit would ultimately aid the ongoing state proceedings, not interfere

12 / 30

with them.  Moreover, the Court notes that the state reports focus upon the specifics of each child's placement and whether his or her needs are being met; they do not address whether the child's treatment in foster care satisfies constitutional demands, the central concern of this lawsuit.

As this lawsuit focuses on systemic problems and seeks systemic solutions, it would not "duplicate" the individualized reviews that occur in the state courts.[6]  The Court concludes that the first <u>Middlesex</u> factor is not satisfied.

### b.    Second <u>Middlesex</u> Factor

The second <u>Middlesex</u> factor requires that "an important state interest in the subject matter of the proceeding must be implicated."  <u>Earle</u>, 388 F.3d at 519.  In this regard, Defendants argue that "Texas has determined that establishment of a stable, loving home for a child is not only an important governmental interest but a compelling one," and the state's "efforts to protect children from abuse and neglect sufficiently implicate important state interests to justify <u>Younger</u> abstention."  (D.E. 43 at 23-24.) Plaintiffs responds that this suit does not "invade the province of the Texas state courts to enforce state law defining the parent-child relationship," but rather seeks to determine "whether DFPS is administering a system capable of delivering care and protection to the Plaintiff Class of PMC wards consistent with constitutional mandates," a question

---

[6] Defendants also reference Plaintiffs' request for "two special expert panels" to review cases of class members with four or more placements and those who have been in PMC for more than two years, and argue that these expert panels would sit as "*de facto* appellate courts over the state district courts to review, second-guess, and 'correct' the state courts' decisions." (D.E. 43 at 32-33.)  In response, Plaintiffs explain that this requested relief "would occur *within* the executive agency as part of its duty to plan for the children in its custody, and would not involve the courts at all." (D.E. 55 at 14 n.8.)  As such, the Court does not believe that this requested relief raises serious concerns warranting <u>Younger</u> abstention.  More generally, the Court does not believe that Plaintiffs' requested relief would force it to act as an "'appellate' court with the power to override the SAPCR courts' reasoned decisions," as Defendants argue. (D.E. 43 at 34-35.)  This is a mischaracterization of the relief sought, which seeks improvements to the state foster care system and does not lessen the state court's authority in individual cases.

"permeated by federal regulatory oversight and policy."  (D.E. 55 at 15.)  In this regard, Plaintiffs again reference Title IV-E funds.  (Id.)

There can be no real dispute that family relations and care for foster children are important state interests, under the second Middlesex factor.  Moore v. Sims, 442 U.S. 415, 435 (1979) ("Family relations are a traditional area of state concern."); Shipula, 2011 WL 1882521, at *9 ("In the context of a Younger abstention, family relations, child custody and child welfare are important state interests.").  The mere fact that federal oversight also exists does not lessen the importance of this state interest.  Nevertheless, a finding in favor of Defendants on this factor alone is insufficient to warrant Younger abstention.

### c.    Third Middlesex Factor

The final Middlesex factor requires that "the state proceedings . . . afford an adequate opportunity to raise constitutional challenges."  Earle, 388 F.3d at 519.  As to this factor, Defendants argue that the SAPCR court is an adequate forum to hear Plaintiffs' federal claims, as those courts are capable of hearing and resolving constitutional challenges.  (D.E. 43 at 26-27.)  In response, Plaintiffs concede that Texas state courts may consider constitutional issues, but argue that "the placement review hearings for children in PMC address only individual case circumstances and not the systemic failures the Plaintiff Class raises here."  (D.E. 55 at 15-17.)

Although the Court does not doubt the capability of the judges in state court placement review hearings to address and vindicate constitutional rights, it cannot conclude that these hearings represent an "adequate opportunity" to raise the complex constitutional challenges and obtain broad-based injunctive and declaratory relief that

Plaintiffs seek in this class action lawsuit.  State court placement review hearings focus on whether the particular child's needs are being met, not overarching systemic concerns or constitutional violations.  See Tex. Fam. Code § 263.503(a).  Even if Plaintiffs could adequately raise their constitutional claims in state court placement review hearings, there is no indication that they could seek or obtain the type of wide-ranging injunctive and declaratory relief that they desire.  As such, the Court concludes that the Plaintiffs would not have an adequate opportunity to address the systemic problems in the foster care system that they seek to resolve with this lawsuit.[7]

Other courts have likewise concluded that Younger abstention is not warranted in the face of limited state court review hearings.  As the court in Connor B. explained, "[a]lthough Defendants maintain that Plaintiffs in theory can assert federal claims in state juvenile courts, they fail to explain how those courts present an adequate forum for Plaintiffs' claims. In fact, **Massachusetts juvenile courts are tasked with handling difficult questions of family law on an ad-hoc basis, not with crafting broad-based injunctive relief that could potentially revamp an executive agency**. They cannot and do not afford Plaintiffs an adequate opportunity to seek relief for the systemic failures alleged in the complaint. Thus, abstention is inappropriate."  2011 WL 31343, at *10 (emphasis added); see also, e.g., LaShawn A. by Moore v. Kelly, 990 F.2d 1319, 1323

---

[7] Defendants also cite Brown v. Jones, 473 F. Supp. 439 (W.D. Tex. 1979) and Shean v. White, 620 F. Supp. 1329 (W.D. Tex. 1985) as examples of cases in which federal courts applied Younger abstention to a Section 1983 lawsuit because the constitutional claims at issue could have been brought in the underlying SAPCR proceeding.  (D.E. 43 at 25-26.)  Plaintiffs in Brown brought suit in federal court to seek injunctive relief with respect to a pending state court proceeding that sought to terminate the plaintiffs' parental rights. The court ultimately found Younger abstention warranted because the plaintiffs' constitutional claims could have been brought in the state court proceeding.  473 F. Supp. at 449-50.  In Shean, parents and their children brought an action alleging violations of constitutional rights resulting from the state's placement of children in foster care.  The court, without any substantial Younger analysis, acknowledged "it is far from clear that abstention is warranted," and that abstention is a "close question," but ultimately concluded it was warranted given the important state interest in domestic relations.  620 F. Supp. at 1332.  These cases were not class actions, nor did they request the sweeping relief sought here.  Neither supports the conclusion that Younger abstention is warranted in the particular circumstances of this case.

(D.C. Cir. 1993) ("The Family Division is required to provide each child in the foster-care system with a review hearing either every six months or every year . . . .  The review hearing . . . is clearly intended merely to reassess periodically the disposition of the child . . . . [T]here was no pending judicial proceeding in the District of Columbia which could have served as an adequate forum for the class of children in this case to present its multifaceted request for broad-based injunctive relief based on the Constitution and on federal and local statutory law."); Brian A., 149 F. Supp. 2d at 957 ("[T]he Court finds that the juvenile courts of Tennessee are not more appropriate vehicles for adjudicating the claims raised in this putative class action.") (internal quotation marks omitted) (citing LaShawn A.); People United for Children, Inc. v. City of New York, 108 F. Supp. 2d 275, 291 (S.D.N.Y. 2000) ("[T]he question of whether there has been abuse and neglect will predominate in child protective proceedings. Therefore, the Court does not believe that the Family Court can adequately consider plaintiffs' claims in the context of a multi-faceted lawsuit challenging a system-wide policy rather than ACS's actions in individual cases. . . . [T]he nature of the proceedings require the court to focus on issues specific to the individual, and not on issues which potentially affect individuals not before the court.").  Consistent with these holdings, one commentator has explained, "[e]ven though all foster children in a plaintiff class are involved in ongoing state dependency court proceedings, federal courts recognize that those dependency proceedings do not provide avenues for the kind of systemic, class-wide relief usually sought in federal civil rights actions."  Erik Pitchal, Children's Constitutional Right to Counsel in Dependency Cases, 15 Temple Political & Civil Rights L. Rev. 663, 680 n.109 (2006).

In sum, this Court concludes that it should not abstain from adjudicating this class-action civil rights litigation based upon the mere possibility that such claims could have been brought in state placement review hearings instead. Abstention in these circumstances would be inappropriate. The Court finds that the <u>Middlesex</u> factors, in particular the first and third considerations, do not warrant abstention. Although foster care (and family relations in general) are important state interests, this alone cannot justify <u>Younger</u> abstention. This conclusion is supported by the weight of authority in this area, to which the Court turns next.

### 3.    Precedents

The parties agree that no Fifth Circuit precedent is directly on point. Instead, Defendants rely primarily upon two circuit court opinions, <u>31 Foster Children v. Bush</u>, 329 F.3d 1255 (11th Cir. 2003) and <u>J.B. ex rel. Hart v. Valdez</u>, 186 F.3d 1280 (10th Cir. 1999), both of which applied <u>Younger</u> abstention in the context of "virtually identical challenges to foster care systems in other states," and found that a federal lawsuit would improperly interfere with ongoing state court proceedings. (D.E. 43 at 18-20.) Defendants also cite <u>Carson v. Heineman</u>, 240 F.R.D. 456 (D. Neb. 2007), which followed the lead of <u>31 Foster Children</u> and <u>J.B.</u> in concluding that <u>Younger</u> abstention was appropriate in a class action brought by Nebraska foster children, challenging inadequacies in that state's system. (D.E. 43 at 20-21.) The "critical element" in each case, according to Defendants, was "whether every child in the system was subject to the state court's ongoing jurisdiction, including bi-annual court review of each child's placement," and the Texas foster care system is nearly identical to those at issue in these cases, as is the relief sought. (D.E. 43 at 21-22.) Plaintiffs respond with numerous other

cases that have rejected <u>Younger</u> abstention in circumstances similar to that before the Court, and also distinguish <u>31 Foster Children</u> and <u>J.B.</u> (D.E. 55 at 17-20.)

Although it is undoubtedly true that every state system and every lawsuit differs in some respects, the overwhelming majority of cases have rejected <u>Younger</u> abstention in similar lawsuits challenging foster care systems, both at the circuit and district court level. For example, in <u>Lashawn A.</u>, the plaintiffs brought a class action lawsuit on behalf of children who were in foster care under the supervision of the District of Columbia Department of Human Services ("DHS"), as well as children who were reported to be abused or neglected but were not yet in DHS custody. The plaintiffs alleged various deficiencies in the DHS system, and claimed constitutional violations. 990 F.2d at 1320-21. On appeal, the D.C. Circuit addressed Defendants' position that the district court should have abstained under <u>Younger</u>. The court found that <u>Younger</u> abstention was not warranted because "there was no pending judicial proceeding in the District of Columbia which could have served as an adequate forum for the class of children in this case to present its multifaceted request for broad-based injunctive relief based on the Constitution and on federal and local statutory law." <u>Id.</u> at 1323. As another example, in <u>L.H. v. Jamieson</u>, the Ninth Circuit considered a class action brought by "juveniles who have been adjudged dependent, neglected, or delinquent by Arizona state courts and who are presently placed in private, child-caring facilities in Arizona," and who sought injunctive relief requiring state officials "to devote additional funding to private agencies that care for children in the state's custody." 643 F.2d 1351, 1352 (9th Cir. 1981). The court specifically noted that the plaintiffs "have been adjudged delinquent or dependent by Arizona state courts. These courts retain jurisdiction over delinquent and dependent

children after an initial placement has been made." Id.   The court, in reversing the district court's application of Younger abstention, explained, "[t]he relief the appellants seek is not similar to the types of relief the Supreme Court has found to be sufficiently disruptive or intrusive as to warrant equitable restraint.   Nor is the appellants' claim capable of being raised as a defense to an ongoing state enforcement action. The district court therefore erred in dismissing action pursuant to Younger." Id. at 1354.

One district court within the Fifth Circuit has also rejected Younger abstention in a similar context.  In Olivia Y., plaintiffs brought a lawsuit under Section 1983 "on behalf of Mississippi's abused and neglected children seeking declaratory and injunctive relief to compel [state official] defendants . . . to meet their legal obligations to care for and protect these children."  351 F. Supp. 2d at 546.  Plaintiffs "allege[d] that Mississippi's child welfare system has systematically failed to meet its legal obligation to protect and care for all of the State's abused and neglected children, all as a result of gross mismanagement and underfunding of Mississippi's overburdened child welfare system." Id.  The court recognized that the state youth court's proceedings were ongoing, but ultimately rejected Younger abstention, stating that it would "be hard-pressed to conclude that any specific relief plaintiffs seek in this action would necessarily interfere with ongoing youth court proceedings. Or stated another way, it is not apparent that all the relief plaintiffs might request would interfere, either directly or indirectly, with ongoing youth court proceedings." Id. at 570.  Numerous other district courts around the nation have also rejected Younger abstention, on various grounds.  See, e.g., Connor B., 2011 WL 31343, at *5; Dwayne B., 2007 WL 1140920, at *5-7 (rejecting Younger in part because "[t]he relief sought here is not directed at the juvenile courts. It is directed at the

executive branch," and because "the state juvenile courts are not more appropriate vehicles for adjudicating the claims raised in this class action"); Kenny A. ex rel. Winn v. Perdue, 218 F.R.D. 277, 286 (N.D. Ga. 2003) (declining to abstain under Younger, and explaining in part, "[a]lthough plaintiffs all have periodic reviews before the state juvenile courts, the declaratory and injunctive relief plaintiffs seek is not directed at their review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel. Rather, plaintiffs seek relief directed solely at executive branch defendants to remedy their alleged failures as plaintiffs' custodians."); Brian A., 149 F. Supp. 2d at 957 (Younger abstention inappropriate); People United for Children, Inc., 108 F. Supp. 2d at 290-91 (finding Younger abstention inappropriate because family court child neglect proceedings would not "afford plaintiffs an adequate opportunity to raise their present claims"); Charlie H. v. Whitman, 83 F. Supp. 2d 476, 514 (D.N.J. 2000) (Younger abstention not appropriate); Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662, 688-89 (S.D.N.Y. 1996) ("Because none of the plaintiffs in the instant case are improperly challenging a state court proceeding through the federal courts, the Younger abstention doctrine is inapplicable to the instant case.").[8]

In light of this authority, the Court declines to follow the persuasive precedents upon which Defendants rely, namely 31 Foster Children, J.B., and Carson.  None of these opinions have garnered any support in the Fifth Circuit, and in fact this Court has already declined to follow J.B. and Carson in the context of its class certification decision.  M.D.

---

[8] Defendants recognize this case law, but attempt to distinguish it based upon "the unique nature of the specific state's juvenile court proceedings and authority of those courts to hear constitutional claims." (D.E. 43 at 21 n.2.)  The Court does not find these distinctions persuasive, particularly as courts have found Younger abstention unwarranted even when constitutional claims could have been raised in ongoing state court proceedings.  See, e.g., Dwayne B., 2007 WL 1140920, at *6 (noting that plaintiffs technically could raise constitutional issues in their individual juvenile proceedings); Brian A., 149 F. Supp. 2d at 957 (same).

v. Perry, 2011 WL 217363, at *7 (S.D. Tex. June 2, 2011).[9]  Moreover, in 31 Foster
Children, the court found the first Middlesex factor satisfied in large part because "the
plaintiffs [were] seeking relief that would interfere with the ongoing state dependency
proceedings by placing decisions that are now in the hands of the state courts under the
direction of the federal district court," and the plaintiffs sought to "tak[e] the
responsibility for a state's child dependency proceedings away from state courts and put[]
it under federal court control."  329 F.3d at 1278-79.  As such, the interference with an
ongoing state proceeding was far more present than it is here.[10]  This Court has found that
Plaintiffs seek relief against executive branch officials, and it does not understand
Plaintiffs here to seek interference with state court proceedings in the manner found
problematic in 31 Foster Children.

Ultimately, the Court finds more persuasive the reasoning of those courts that
have declined to abstain based upon Younger abstention than those to the contrary.  This
Court does not believe that Younger abstention is warranted in a federal civil rights class
action brought under Section 1983, seeking large-scale injunctive and declaratory relief
against state executives, to vindicate alleged constitutional violations.  Abstention would
essentially amount to an abdication of this Court's responsibility to serve as a forum for

---

[9] Notably, the court in Carson P. found that the lawsuit would interfere with ongoing state judicial proceedings even though it acknowledged that "[t]he plaintiffs have not requested any specific type of injunctive relief," and "[t]he prayer for relief in their complaint essentially requests the court to enter an order requiring the defendants to cease violating the plaintiffs' constitutional rights and comply with federal statutory requirements."  240 F.R.D. at 524.  The court thus looked to the allegations in the amended complaint. Id. at 525.  This Court disagrees with such a broad, speculative approach to Younger abstention.

[10] In 31 Foster Children, the court rejected plaintiffs' argument that "the requested relief would not interfere because it is directed solely at the Department of Children and Families and not the state courts," explaining that a "case cannot be decided in a vacuum," and the "federal court relief the plaintiffs seek would interfere with the ongoing state dependency hearings, even if it were directed against the Department and state officers, instead of state courts and judges."  329 F.3d at 1279 n.11.  The Court does not share the same concerns.  Even if the relief sought in this suit would have some indirect effect upon state courts, this is not the type of interference found problematic in Younger.

resolution of constitutional claims.  In addition, the Court recognizes that the more general concerns about comity and federalism underlying Younger are lessened in light of the state's submission to federal oversight under the Title IV-E foster care program. As one court has explained, "[t]he Foster Care Program, set forth in Title IV–E of the Social Security Act, 42 U.S.C. § 670 et seq., provides federal matching funds for states that operate foster care plans in compliance with the Act's provisions." Cal. Dep't of Soc. Servs. v. Shalala, 166 F.3d 1019, 1019 (9th Cir. 1999); see 42 U.S.C. § 672.   Under the 2009 State Plan for Title IV-E of the Social Security Act (the "State Plan"), Texas decided that its child welfare system may be subject to oversight by the U.S. Department of Health and Human Services in exchange for federal funding.  In its State Plan, Texas explicitly noted, "[a]s a condition of the receipt of Federal funds under title IV-E of the Social Security Act . . ., the Department of Family and Protective Services submits here a plan for the programs to provide, in appropriate cases, foster care and adoption assistance . . . and **hereby agrees to administer the programs in accordance with the provisions of this plan, title IV-E of the Act, and all applicable Federal regulations and other official issuances of the Department [of Health and Human Services]**."  (D.E. 55-2 at 6 (emphasis added).)    The document itself is over one hundred pages in length, and details how the state plans to comply with federal requirements.  The Governor's Certification notes that the "title IV-E plan is mandatory upon the subdivision/service areas and is in effect throughout the State/Tribal service areas."  (D.E. 55-2; D.E. 55-2 at 117.)  The voluntary submission to such federal oversight greatly lessens the force of any complaints regarding unwarranted federal intrusion on state sovereignty.  See Dwayne B., 2007 WL 1140920, at *5 n.5 ("There are no 'comity' or 'federalism' concerns presented

by this lawsuit because the State of Michigan has voluntarily agreed to federal oversight of its foster care system in exchange for federal funding.").

In light of its review of the Middlesex factors, the persuasive precedents discussed above, and all other considerations, the Court denies Defendants' Motion to Dismiss based upon the Younger abstention doctrine.

### C.      Burford Abstention

#### 1.      Background

In Burford v. Sun Oil Co., the Supreme Court affirmed a district court decision dismissing an action in which the Sun Oil Company challenged a Texas Railroad Commission order granting Burford a permit to drill certain oil wells.  319 U.S. 315, 316-17 (1943).  "The order under consideration [was] part of the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of as thorny a problem as has challenged the ingenuity and wisdom of legislatures."  Id. at 318.  Recognizing the significant state regulatory framework, the Court concluded that federal court abstention was proper.  The Court reasoned:

> The state provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

Burford, 319 U.S. at 333-34.  The Fifth Circuit has recently explained, "Burford abstention applies when a case involves a complex issue of unsettled state law that is better resolved through a state's regulatory scheme."  Moore v. State Farm Fire & Cas.

Co., 556 F.3d 264, 272 (5th Cir. 2009) (citing Burford).  As part of its Burford abstention

analysis, a court should consider five factors:

> (1) whether the cause of action arises under federal or state law; (2)
> whether the case requires inquiry into unsettled issues of state law or into
> local facts; (3) the importance of the state interest involved; (4) the state's
> need for a coherent policy in that area; and (5) the presence of a special
> state forum for judicial review.

Id. (citing Wilson v. Valley Elec. Membership Corp., 8 F.3d 311, 314 (5th Cir. 1993)).

The Supreme Court has stressed "the narrow range of circumstances in which

Burford can justify the dismissal of a federal action."  Quackenbush v. Allstate Ins. Co.,

517 U.S. 706, 726 (1996).  In a recent decision, the Supreme Court in NOPSI distilled its

previous Burford rulings into the following general principle: "[w]here timely and

adequate state-court review is available, a federal court sitting in equity must decline to

interfere with the proceedings or orders of state administrative agencies: (1) when there

are difficult questions of state law bearing on policy problems of substantial public

import whose importance transcends the result in the case then at bar; or (2) where the

exercise of federal review of the question in a case and in similar cases would be

disruptive of state efforts to establish a coherent policy with respect to a matter of

substantial public concern."  NOPSI, 491 U.S. at 361.  The Supreme Court ultimately

rejected application of Burford abstention in NOPSI, stating:

> While Burford is concerned with protecting complex state administrative
> processes from undue federal interference, it does not require abstention
> whenever there exists such a process, or even in all cases where there is a
> "potential for conflict" with state regulatory law or policy.  Here, NOPSI's
> primary claim is that the [New Orleans City] Council is prohibited by
> federal law from refusing to provide reimbursement for FERC-allocated
> wholesale costs.  Unlike a claim that a state agency has misapplied its
> lawful authority or has failed to take into consideration or properly weigh
> relevant state-law factors, federal adjudication of this sort of pre-emption

claim would not disrupt the State's attempt to ensure uniformity in the treatment of an "essentially local problem."

But since, as the facts of this case amply demonstrate, wholesale electricity is not bought and sold within a predominantly local market, it does not demand significant familiarity with, and will not disrupt state resolution of, distinctively local regulatory facts or policies.

491 U.S. at 363-64. In Quackenbush, the Supreme Court further summarized its Burford

jurisprudence as follows:

[T]he power to dismiss under the Burford doctrine . . . derives from the discretion historically enjoyed by courts of equity. . . . [E]xercise of this discretion must reflect "principles of federalism and comity." Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the "independence of state action," that the State's interests are paramount and that a dispute would best be adjudicated in a state forum. This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining "uniformity in the treatment of an 'essentially local problem,'" and retaining local control over "difficult questions of state law bearing on policy problems of substantial public import." This balance only rarely favors abstention, and the power to dismiss recognized in Burford represents an "'**extraordinary and narrow exception** to the duty of the District Court to adjudicate a controversy properly before it.'"

Quackenbush, 517 U.S. at 727-28 (emphasis added; internal citations omitted). The

Court ultimately rejected application of Burford because monetary damages were sought,

not equitable or other discretionary relief. Id. at 731 (confirming that Burford is

applicable "to all cases in which a federal court is asked to provide some form of

discretionary relief."). Thus, NOPSI and Quackenbush demonstrate that Burford

abstention is a very narrow, limited exception, particularly in light of this Court's duty to

adjudicate all cases over which it has jurisdiction, including Section 1983 actions.

2.      **Analysis**

Defendants urge the Court to abstain under <u>Burford</u>, contending that "the Court's exercise of jurisdiction over this claim would disrupt Texas' adoption of policy designed to further improve its foster care system."  (D.E. 43 at 36.)  Defendants rely specifically upon the second application of <u>Burford</u>, which provides, "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies . . . where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." <u>NOPSI</u>, 491 U.S. at 361; <u>see</u> D.E. 43 at 35.

In outlining the measures the state has undertaken to improve the foster care system, Defendants note the establishment of the Supreme Court of Texas Permanent Judicial Commission for Children, Youth, and Families, whose goal is to strengthen courts for children, youth, and families in the Texas child-protection system and improve the permanency and well-being of children.  The Commission seeks to improve child protection courts through training and support.  (D.E. 43 at 36-37.)  Defendants also refer to several legislative initiatives aimed at improving the Texas foster care system, including Senate Bill 6 (passed in 2005), Senate Bill 758 (passed in 2007), Senate Bill 2080 (passed in 2009), and Senate Bill 218 (pending).  (D.E. 43 at 38-41.)  Finally, Defendants note that the Texas Legislature has greatly increased funding of the state's child welfare system over the last several years, due in large part to additional federal funds, and has complied with applicable federal mandates. (D.E. 43 at 42-44.)  In light of these improvements, Defendants contend that a federal injunction would disrupt the

state's comprehensive efforts to establish and reform foster care.   They contend that the <u>Burford</u> factors are met because Plaintiffs' claims are entangled in Texas family law; the case will require the Court to review Texas foster children's records; the state has a strong interest in its foster care system; Texas SAPCR courts have continuing, exclusive jurisdiction over each foster child's proceedings; and Texas has a strong interest in establishing a coherent policy in the area of foster care.  (D.E. 43 at 45.)

In response, Plaintiffs argue that this lawsuit will not "disrupt" the State's efforts to improve its foster care system, and any effort to "establish a coherent policy" with regard to a child welfare system must take into account federal policies as a condition of receiving federal funds.  (D.E. 55 at 22-23.)  Plaintiffs also note that no federal court has abstained under <u>Burford</u> abstention in a lawsuit challenging a state foster care system; in fact, the courts to consider this argument have squarely rejected it.  (D.E. 55 at 22-23.) Finally, analysis of the five <u>Wilson</u> factors reveals no need to abstain under <u>Burford</u>. (D.E. 55 at 24-25.)  Ultimately, any court order obtained in this case would "bolster the state's efforts [to improve the foster care system] by ensuring that they comply with constitutional requirements."  (D.E. 55 at 24.)

As an initial matter, the Court disagrees with Defendants' contention that Texas's self-initiated improvements to the foster care system warrant <u>Burford</u> abstention.  (D.E. 43 at 36.)  While the Court does not doubt the state's intent or desire to improve the system, many of the measures at issue were already in place at the time this suit was filed and have not, at least in Plaintiffs' opinion, sufficiently addressed the alleged systemic problems.  It makes little sense to abstain on the basis that the state is appropriately

addressing problems in the foster care system when this class action lawsuit was brought in the first place to address alleged deficiencies in that very system.

In addition, Defendants do not adequately explain how this lawsuit would "*disrupt* Texas' adoption of policy designed to further improve its foster care system." (D.E. 43 at 36 (emphasis added).)  While Defendants have mentioned several legislative initiatives and other measures undertaken by DFPS to improve the state foster system (D.E. 43-16 – 43-18 (outlining legislative measures affecting state foster care services); D.E. 43-19, 43-20 (reports on use of psychotropic medications by children)[11], they do not demonstrate how this lawsuit, which ultimately seeks similar goals, would interfere with those efforts.  It stands to reason that the state efforts could continue alongside this lawsuit.  Other courts have similarly found this "disruption" argument lacking.  See, e.g., Dwayne B., 2007 WL 1140920, at *8 ("Plaintiff Children's case will not disrupt the state's efforts to create a uniform policy governing children in its foster care system. Rather, it will serve to achieve those efforts in a way that complies with constitutional and federal law.").  In fact, no federal court has applied Burford abstention in the context of a lawsuit challenging a state foster care system.  Rather, the federal courts to have considered the argument have uniformly rejected it.  See, e.g., Dwayne B., 2007 WL 1140920, at *8; Marisol A. by Forbes, 929 F. Supp. at 688; People United for Children, Inc., 108 F. Supp. 2d at 288-89 (declining to abstain under Burford in the context of a lawsuit challenging New York City's child welfare program).

---

[11] With respect to psychotropic drugs, Defendants argue that since 2004, DFPS has been revising protocols for use of these drugs by children in foster care, and they reference statistics demonstrating a decrease in the number of children on psychotropic drugs from 2004 (41.61%) to 2010 (30.82%).  (D.E. 43 at 44; D.E.53 at 2.)  These statistics, however, do not show whether in fact foster children's needs with respect to psychotropic medications are actually being met.  The Court cannot determine from these statistics, for example, whether the medications are being properly prescribed, or whether the children are remaining on the drugs for the necessary amount of time.

Finally, consideration of the <u>Wilson</u> factors further demonstrates that <u>Burford</u> abstention is not appropriate. <u>Wilson</u>, 8 F.3d at 314. This claim arises under federal law, not state law; there are no unsettled issues of state law and any investigation into the facts of children's foster care experiences will focus on compliance with constitutional requirements. The state interest, while important, is also subject to federal oversight (in light of Title IV-E funding) and is therefore a matter of federal concern as well. In this regard, the Court notes that while DFPS has received increased funding over the past several years, the Biennium Reports acknowledge that federal programs (including Title IV-E and other programs under the Social Security Act) have contributed more than half of the total amount appropriated to DFPS in a given year. (D.E. 43-16 at 4 (2006-2007 appropriations to DFPS total $2.1 billion, of which $1.3 billion originate from federal funds.); D.E. 43-17 at 4 (2008-2009 appropriations total $2.6 billion, of which $1.5 billion originate from federal funds); D.E. 43-18 at 4 (2010-2011 appropriations total $2.7 billion, of which $1.6 billion originate from federal funds).) Fourth, the state certainly has a need for a coherent policy in this area, but this alone does not warrant <u>Burford</u> abstention. Fifth, there is no "special state forum for judicial review." Defendants again point to the SAPCR courts, but the Court has already determined that these proceedings do not present an adequate opportunity for this class of Plaintiffs to resolve their constitutional claims and seek system-wide reform.

For these reasons, <u>Burford</u> abstention is improper, and the Court denies Defendants' Motion to Dismiss on this basis.

**IV.      Conclusion**

For the reasons stated above, Defendants' Rule 12(b)(1) Motion to Dismiss is

DENIED.  (D.E. 43.)

SIGNED and ORDERED this 1st day of July, 2011.

Janis Graham Jack
Senior United States District Judge