```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
                 CORPUS CHRISTI DIVISION




M.D., ET AL.,                    )      CASE NO:  2:11-CV-84
                                 )
            Plaintiffs,          )          CIVIL
                                 )
     vs.                         )    Corpus Christi, Texas
                                 )
GOVERNOR RICK PERRY, ET AL.,     )  Thursday, January 24, 2013
                                 )  ( 8:25 a.m. to 10:14 a.m.)
            Defendants.          )  (10:25 a.m. to 11:53 a.m.)
```

```
               CONTINUED CLASS CERTIFICATION HEARING

             BEFORE THE HONORABLE JANIS GRAHAM JACK,
                  UNITED STATES DISTRICT JUDGE



Appearances:              See next page

Case Manager:             Linda Smith

Court Recorder:           Arlene Benavidez

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988
```

**Proceedings recorded by electronic sound recording;
transcript produced by transcription service.**

2

**APPEARANCES FOR:**


Plaintiffs:                    MARCIA ROBINSON LOWRY, ESQ.
                               PHILIP BARBER, ESQ.
                               CHRISTINA WILSON, ESQ.
                               Children's Rights
                               330 Seventh Ave., 4th Floor
                               New York, NY 10001

                               PAUL YETTER, ESQ.
                               Yetter Coleman
                               909 Fannin, Suite 3600
                               Houston, TX 77010

Defendants:                    ANDREW B. STEPHENS, ESQ.
                               MARC RIETVELT, ESQ.
                               THOMAS A. ALBRIGHT, ESQ.
                               Office of the Attorney General
                               P.O. Box 12548
                               Capitol Station
                               Austin, TX 78711

3

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| AUDREY DECKINGA | 16 | | | |

| PLAINTIFFS' EXHIBITS | | RECEIVED |
|---|---|---|
| 7 | | 6 |
| 323 | | 22 |

ARGUMENT

| | |
|---|---|
| BY MR. YETTER | 91 / 145 |
| BY MR. ALBRIGHT | 123 |

4

1     **Corpus Christi, Texas; Thursday, January 24, 2013; 8:25 a.m.**

2                          **(Call to Order)**

3          **THE CLERK:**  All rise.

4          **THE COURT:**  Thank you.  You may be seated.

5          Ready?

6          **MR. ALBRIGHT:**  I'm ready, your Honor.

7          **THE COURT:**  All right.

8          **MS. LOWRY:**  Your Honor, there is a matter that's left

9     over from yesterday --

10         **THE COURT:**  Sure.

11         **MS. LOWRY:**  -- just raised with the State, and that

12    is with regard to the Richard Klarberg testimony.

13         **THE COURT:**  Yes.

14         **MS. LOWRY:**  He is -- we can arrange it for tomorrow

15    at 11:00 o'clock local time.  That would mean interrupting the

16    State's case, and I'm asking the Court's permission.  We then

17    have to test to make sure the connections work, but we have a

18    facility in New York that can do that.

19         **THE COURT:**  Did you check with our systems people to

20    make sure it was compatible?

21         **MS. LOWRY:**  She -- Ms. Thompson said that the people

22    in New York would have to talk to her, but I first wanted to

23    make sure the witness would be available --

24         **THE COURT:**  Okay.

25         **MS. LOWRY:**  -- and I just found that out.  So --

5

1          **THE COURT:**  Any problem, Mr. Albright, with that?

2          **MR. ALBRIGHT:**  May I just ask Counsel one quick

3    question?

4      **(Pause; counsel conferred off the record)**

5          **MR. ALBRIGHT:**  Your Honor -- and I think the reason

6    for this will become clear in just a moment -- if it would help

7    things, we'll withdraw our objection to the affidavit, and

8    maybe that --

9          **THE COURT:**  Would that help?

10          **MR. ALBRIGHT:**  -- speeds up --

11          **THE COURT:**  They said they were satisfied with the

12   affidavit.

13          **MS. LOWRY:**  We do, your Honor.

14          **MR. ALBRIGHT:**  So, if we withdraw the affidavit -- I

15   mean the objection to the affidavit?

16          **THE COURT:**  What -- what number is that, the

17   plaintiff's affidavit, plaintiff's number what?

18          **MS. WILSON:**  Seven.  Seven.

19          **MR. YETTER:**  I'm sure it is Plaintiff's 7, your

20   Honor.  That's what I'm told, and, in fact, I have it right

21   here, and it's Plaintiff's 7.

22      **(Pause)**

23          **THE COURT:**  Ms. Smith?

24          **THE CLERK:**  Yes, your Honor.

25          **THE COURT:**  After I pulled this -- oh, here it is.

6

1    Thank you.

2            Plaintiff's 7?

3            **MR. YETTER:**  Yes, your Honor.

4            **THE COURT:**  It's admitted.

5        **(Plaintiffs' Exhibit Number 7 was received in evidence)**

6            **THE COURT:**  You know, I've still got down here that I

7    didn't -- okay; 109 you did not end up offering because the

8    witness testified about it, right?

9            **MR. YETTER:**  I think your ruling was that the witness

10   already testified about it.

11           **THE COURT:**  And 407?  Same --

12           **MR. YETTER:**  I believe that's -- that was the other

13   document that Mr. Liebgott testified about.  Both documents, we

14   offered them, and I think you said he just testified about

15   them, so --

16           **THE COURT:**  He just put it into evidence by his

17   testimony, right?

18           **MR. YETTER:**  Right.  Yes.

19           **THE COURT:**  So, I didn't do 407.  Seven is admitted.

20           **MR. YETTER:**  Do you want a copy, your Honor?  I have

21   a copy here I could give to your --

22           **THE COURT:**  Okay.  Ready?

23           **MR. ALBRIGHT:**  Yes, your Honor.  One other

24   housekeeping matter.

25           **THE COURT:**  I'm ready.

1          **MR. ALBRIGHT:**  Defendants --

2          **THE COURT:**  I'm good with (indiscernible).

3          **MR. ALBRIGHT:**  Defendants' Exhibit Numbers 54 and 55,

4  which your Honor has admitted into evidence, are --

5          **THE COURT:**  Right.

6          **MR. ALBRIGHT:**  -- they are CPS case files for a

7  couple of children.

8          **THE COURT:**  You know what?  I didn't admit -- oh,

9  Plaintiff's.  Wait a minute.

10          **MR. ALBRIGHT:**  I'm sorry; Defendants' Exhibit.

11  I'm --

12          **THE COURT:**  Now I'm looking for that.

13      **(Pause)**

14          Okay.  Defendants' -- go ahead -- 55 and --

15          **MR. ALBRIGHT:**  And 54, your Honor.  They contain

16  confidential information about children in this case, and

17  pursuant to the Court's protective order we're asking that

18  those two exhibits be sealed.

19          **MR. YETTER:**  We have no object -- no objection, your

20  Honor.

21          **THE COURT:**  Then those will be sealed.

22          **MR. ALBRIGHT:**  Well, yes, your Honor, Counsel reminds

23  me that some of the plaintiff's exhibits contain children's

24  confidential information.  I had asked plaintiffs to be mindful

25  of the protective order and hope that by the end of this

1    proceeding they'll let you know which ones of their exhibits

2    they need to request be sealed in order to preserve the

3    confidentiality of those children.

4         **THE COURT:**  I think it is 25 -- Plaintiff's Exhibit

5    25, 26, 27, 28, 29, 31, 32, 33, 34, at least off hand I can

6    see.  And then I expect the plaintiffs to go through -- is

7    that -- is that correct so far?

8         **MR. YETTER:**  Your Honor, we will go through it and

9    give you a list of what needs to be sealed.

10        **THE COURT:**  But right off the hand I can -- off hand

11   I can see that 27, 28, 29, 31, 32, 33, and 34 should be sealed.

12        **MR. YETTER:**  I have made a note of that already,

13   Judge, and we'll get you a complete list, hopefully by noon,

14   but by the end of the day for sure.

15        **MR. ALBRIGHT:**  Good.  Well, your Honor, with that

16   business wrapped up, the defendants rest.

17        **THE COURT:**  Ready to go.  All right.

18        Do you all want to do closing arguments by brief or

19   do you want to do it in person?

20        **MR. ALBRIGHT:**  Well, your Honor, we're prepared to do

21   it in person now while everything is fresh.

22        **THE COURT:**  You tell me, and then I'll let you do

23   supplemental in writing.

24        **MS. LOWRY:**  That would be perfect, your Honor.

25        **THE COURT:**  Would that -- that be all right?

1          **MS. LOWRY:**  Yes.

2          **MR. YETTER:**  So, Judge, since we're ending a little

3   bit sooner than we expected, can you just give us a five-minute

4   break and we can kind of organize --

5          **THE COURT:**  There's no time for that.  Yeah, that's

6   fine.

7       **(Laughter)**

8          Ten minutes?

9          **MR. YETTER:**  Yes.

10         **THE COURT:**  Okay.  Thanks.

11         **MR. YETTER:**  That would be good.  Thank you.

12      **(A recess was taken from 8:31 a.m. until 8:37 a.m.;**

13   **parties present)**

14      **(Pause; the Court confers off the record)**

15         **THE COURT:**  Okay.  That's fine.  Perfect.

16         Are you all ready?

17         **MR. YETTER:**  Your Honor, on behalf of the plaintiffs,

18   Paul Yetter, again.  Plaintiffs move to -- for -- in rebuttal

19   or to reopen the evidence.  There is one witness that we'd like

20   to call, adversely, from the State, who we expected them to

21   call, because she has basically been their corporate

22   representative, Ms. Deckinga, and we would like to put her on

23   as an adverse witness to complete the hearing.

24         **MR. ALBRIGHT:**  Your Honor, we -- we resist that.

25   They have not listed Ms. Deckinga on their witness list, and

1   they've rested, we've rested.  We believe the evidence is

2   closed, and we oppose it.  We think the record's complete, we

3   wouldn't have rested if we didn't, and we oppose their effort

4   to call as an adverse witness an undesignated witness.

5           **MR. YETTER:**  Your Honor, Ms. Deckinga, as their

6   corporate representative, provided information to the Court

7   throughout the hearing, at the Court's request, but we have not

8   had a chance to test any of that, and some of the -- there are

9   some very important points that she, as the assistant

10  commissioner, can provide to the Court, and we think the record

11  is not complete.  In fact, yesterday we rested subject to the

12  evidence from Mr. Klarberg, which was resolved this morning,

13  but, your Honor, we don't think we have rested completely, and

14  we'd like to either reopen the evidence or use this as

15  rebuttal.  We have just one witness, and that's Ms. Deckinga,

16  that we'd like to put on adversely.

17          None of the State witnesses are at our control, your

18  Honor, so we didn't know who they were going to bring or when

19  they were going to bring them, so we presented it by

20  deposition, and she has now been -- sat through the whole

21  hearing as their corporate representative, she is the highest

22  ranking DFPS executive that they have presented, and we would

23  like to present not only more evidence from the State, but

24  there is one, in particular, document that we'd like to prove

25  up that we need to do through a State's witness.

1          **THE COURT:**  So, how long a time would it take?

2          **MR. YETTER:**  Your Honor, that one document shouldn't

3   take very long, but I'd like -- I think perhaps an hour.

4          **THE COURT:**  To prove up a document?

5          **MR. YETTER:**  No; no, your Honor, for the whole

6   examination.  The document should be relatively short.

7          **THE COURT:**  And you didn't designate her, or anybody,

8   actually, from CPS, did you?

9          **MR. YETTER:**  We designated them by deposition, your

10  Honor, because they're not within our control, so we could not

11  designate them to testify live because we couldn't make them

12  come here.

13         **MR. ALBRIGHT:**  Your Honor, may I respond to that?

14  They did not designate Ms. Deckinga at all, and they didn't

15  even choose to take her deposition.  She is here as our

16  corporate rep; yes, she is, but we oppose this effort at this

17  point.  They had an opportunity to put their case on; they

18  rested; we rested; let's just test the merits of their

19  certification on the record before the Court.

20         **MR. YETTER:**  Your Honor, this hearing was supposed to

21  last for four days.  It's the State's prerogative if they want

22  to put on no witnesses.  But, your Honor, there was one witness

23  that we could not put on by deposition because we didn't depose

24  her, Ms. Deckinga.  She has been their corporate rep.  And we'd

25  like to take a very small amount of the Court's time to make

12

1    the -- as best as we can, to complete the record.  There are

2    some important State documents that she can testify about that

3    we'd like to get in front of the Court or at least let the

4    Court consider.

5              MR. ALBRIGHT:  Your Honor, may I respond to that

6    again?

7              THE COURT:  It's going to be the same thing.  I'm

8    just --

9              MR. ALBRIGHT:  Well --

10             THE COURT:  -- not sure why they didn't designate,

11   and I know that they realize they're not in a good position

12   right now, which is why you rested quickly.

13             MR. ALBRIGHT:  Yes, your Honor.  And -- and my fear

14   is --

15             THE COURT:  Uh --

16             MR. ALBRIGHT:  -- that in that one hour, are they

17   going to open up things and innuendo and argument and

18   suggestion that, once again, we've got to call rebuttal to the

19   rebuttal depending on what they do?  It's just -- the whole

20   "rest, rest, it's closed" is there for a purpose.  And we've

21   made a tactical decision to rest at this point, reasonably

22   confident that because they didn't designate her as a potential

23   adverse witness that we were home free.  And we've made that

24   decision --

25             THE COURT:  And you haven't had time -- I assume that

1   you haven't prepared her for testimony at all.

2           **MR. ALBRIGHT:**  No, your Honor.

3           **MR. YETTER:**  She -- your Honor, she was listed on

4   their witness list.  That was --

5           **THE COURT:**  Well --

6           **MR. YETTER:**  That was -- that is inaccurate that

7   they -- that they have -- that they did not anticipate she

8   could be a witness, because they listed -- the State listed her

9   as a witness for this hearing.

10          **THE COURT:**  Well, I don't know; usually you just

11  throw in everybody you think that might have some relevant

12  knowledge and don't necessarily plan to call them.  So --

13          **MR. ALBRIGHT:**  Your Honor, if I had known she was

14  going to be called, I'd have been working with her and talking

15  to her instead of eating blackened cod at the Waterfront Café

16  last night.

17          **THE COURT:**  Oh, I'm sorry.

18      **(Laughter)**

19          **MR. ALBRIGHT:**  It wasn't that good.

20          **THE COURT:**  No.  I could have steered you better.

21      **(Laughter)**

22          **MR. YETTER:**  Your Honor, if the State actually

23  represents that they were not -- she has not been prepared as a

24  witness before last night when the State maybe decided to rest

25  without calling any witnesses, that's one thing.  But I do

1    believe, and I may be mistaken, and I'll take the State's

2    representation, that she was brought here to be a witness.  And

3    I believe she was prepared for that; perhaps not last night,

4    but she was prepared for that.  And, your Honor, this is --

5    this is, obviously, a very important hearing to everybody

6    involved.  She is --

7              **THE COURT:**  I agree with you about that, and that's

8    the only thing I'm weighing, is your lack of, you know, giving

9    me any evidence to do this and the need to protect the

10   children, too, which I think everybody has the same -- the same

11   goals.  You know, I think the State of Texas is as committed to

12   protecting children as anybody, but how they go about it is a

13   difference of opinion.

14             **MR. ALBRIGHT:**  Your Honor, may I just add one more

15   thing?

16             **THE COURT:**  Yes.

17             **MR. ALBRIGHT:**  I'm an officer of the Court.  I tell

18   you Audrey Deckinga has been my witness designated if and only

19   if we did not -- if we needed to call her.  We made the

20   determination; we didn't.  I have not prepared Audrey Deckinga

21   to testify in this case. Maybe some people would say, "Well,

22   you should have done it before you got here."  My assessment

23   was:  Let's see what their evidence is --

24             **THE COURT:**  Well, you designated her, and you get to

25   decide whether to put her on, prepare her, or not put her on.

1          **MR. ALBRIGHT:**  And I have not prepared her.

2          **MR. YETTER:**  Your Honor, it's certainly within the

3   Court's discretion in this hearing to allow the evidence to be

4   opened, reopened, in a very narrow way.  We're not talking

5   about putting on lots of other witnesses.  This is the highest-

6   ranking DFPS executive.

7          **THE COURT:**  And these are exhibits that you have

8   not -- that are not in the record?

9          **MR. YETTER:**  One is disputed that we need to prove up

10  that has been objected to.  All of --

11         **THE COURT:**  What exhibit is that?

12         **MR. YETTER:**  That is --

13     **(Pause; voices and whispers off the record)**

14         -- Plaintiff's 323.

15         **THE COURT:**  Do you know what that is?

16         **MR. ALBRIGHT:**  I don't, your Honor.

17     **(Pause; voices and whispers off the record)**

18         **MR. ALBRIGHT:**  I now know what the document is, and

19  we still state our objection.  I haven't prepared --

20         **THE COURT:**  What is it?

21         **MR. ALBRIGHT:**  It's the review of -- I'm told it's

22  something called the "review of the adoption committee."

23         **MR. YETTER:**  I can give you --

24         **MR. ALBRIGHT:**  And actually, your Honor, they've

25  interrogated, I believe it was Gail Gonzalez, extensively about

Deckinga - Direct / By Mr. Yetter                         16

1    the document, and I think they've actually submitted deposition

2    testimony on it.  And if they thought they needed Audrey

3    Deckinga in addition to Gail Gonzalez on that exhibit, they

4    should have done it.  I haven't prepared her.  And I am worried

5    that, you know, it's the -- it's the crack; you open the door,

6    the camel's nose is under the tent.

7              **THE COURT:**  I understand that, but the purpose of the

8    hearing is not necessarily legal maneuvering, but to make sure

9    that I have the information I need to make a decision.  And

10   I'll give you 20 minutes.

11             **MR. YETTER:**  Twenty.  Yes, your Honor.

12             **THE COURT:**  So, we get to visit after all.

13             **MS. DECKINGA:**  Yes.

14             **THE COURT:**  About something besides grandchildren.

15             Would you administer the oath?

16             **AUDREY DECKINGA, PLAINTIFFS' WITNESS, SWORN**

17                        **DIRECT EXAMINATION**

18   BY MR. YETTER:

19   Q    Good morning, Ms. Deckinga.

20   A    Good morning.

21   Q    Introduce yourself, if you wouldn't mind, again, for the

22   Court, please.

23   A    My name is Audrey Deckinga.  I'm the --

24   Q    And you are?

25   A    -- Assistant Commissioner for CPS.

1           **THE COURT:**  You're what?

2           **THE WITNESS:**  I'm the Assistant Commissioner --

3           **THE COURT:**  Assistant.

4           **THE WITNESS:**  -- for CPS.

5           **THE COURT:**  Can you spell your last name, please?

6           **THE WITNESS:**  I will.  D-E-C-K-I-N-G-A.

7           **THE COURT:**  Thank you.

8   **BY MR. YETTER:**

9   Q    And as the Assistant Commissioner of DFPS, you are

10  basically the highest ranking DFPS executive that has been

11  involved in this proceeding, this lawsuit proceeding this week,

12  true?

13  A    True.

14          **THE COURT:**  Well, here in the courtroom.

15          **MR. YETTER:**  In the courtroom, yes.

16          **THE COURT:**  I'm sure there have been other people

17  involved.

18  **BY MR. YETTER:**

19  Q    And as the Assistant Commissioner, you are one of the top

20  DFPS executives throughout the whole agency, true?

21  A    True.

22  Q    And, as such, you have been involved in -- and you have

23  been the Assistant Commissioner for the past now almost four

24  years.

25  A    That is correct.

Deckinga - Direct / By Mr. Yetter                    18

1  Q     Since March, 2009, true?

2  A     True.

3  Q     And, as such, you've been involved in various efforts to

4  reform the Child Welfare System in the state of Texas, haven't

5  you?

6  A     Yes.

7  Q     And in connection with that you have been involved with

8  legislative fact finding and commissions, true?

9  A     I have certainly been involved with presentations to the

10  legislature.

11  Q     In fact, you were involved -- you were one of the subject

12  matter experts that the Adoption Review Committee called upon

13  when they were doing their -- they were carrying out the orders

14  of the legislature and the governor to review the Texas Child

15  Welfare system, right?

16  A     I appeared before the Adoption Review Committee on -- on

17  one occasion at their request, yes.

18  Q     And that committee was created in 2009 by the legislature

19  and the Governor, who signed the bill, and directed to review

20  the DFPS agency, right?

21  A     The scope of the review was -- I don't believe was quite

22  that broad, to review the agency, but they did have a mission

23  statement; they did have a charge that was given them for this

24  committee, yes.

25  Q     And their charge was to do an, quote, "extensive review of

1   the foster care system to identify obstacles that impede the

2   department's ability to find a permanent placement for foster

3   children," in part, right?

4   A    That is part of the department's mission and scope, but it

5   is not the entire.

6   Q    Fair enough.  And the committee was also directed by the

7   legislature and the Governor to create a written report, true?

8   A    True.

9   Q    And you have seen that written report, which is aptly

10  titled the Report of the Adoption Review Committee, have you

11  not?

12  A    I have seen it; I have probably read it, yeah, maybe a

13  year ago.

14  Q    All right.  So, let's put Plaintiff's 323 on the overhead.

15          THE COURT:  Has it been admitted?

16          MR. YETTER:  I'm going to offer it as -- after she

17  identifies it.

18          THE COURT:  Okay.  Hold on.

19      (Pause)

20          THE COURT:  It's not going to go on the overhead

21  before it's admitted.

22          MR. YETTER:  Can she -- can you see anything on your

23  screen, Ms. Deckinga?

24          THE WITNESS:  No, I can't, but if I'm going to look

25  at the screen --

Deckinga - Direct / By Mr. Yetter                    20

1          **THE COURT:**  You need glasses?

2          **THE WITNESS:**  -- I will need my glasses --

3          **MR. YETTER:**  Your Honor, I --

4          **THE WITNESS:**  -- if I may go get them.

5          **MR. YETTER:**  -- have a copy if I could put it --

6          **THE COURT:**  Wait; let somebody bring them to you.

7          **THE WITNESS:**  Okay.

8          **THE COURT:**  Do you see them there?  Okay.

9          **THE WITNESS:**  Thank you.

10     **(Pause)**

11         **MR. YETTER:**  Your Honor, can you let us put it on her

12   screen so that she can see the first page?

13         **THE COURT:**  I don't think it works that way.  I think

14   you have to put it on the overhead document.

15         **MR. YETTER:**  Oh, sure.

16         **THE COURT:**  Yeah.  And then line it up based on your

17   screen.

18         **MR. YETTER:**  I can't see it on any of these screens,

19   Judge.

20         **THE COURT:**  Have you switched it over to --

21         **MR. YETTER:**  There it is.  I have it.

22         **THE COURT:**  -- the overhead document?

23         **MR. YETTER:**  Yep.

24         **THE COURT:**  You've got it?

25         **MR. YETTER:**  I have it.

1  **BY MR. YETTER:**

2  Q    Now, Ms. Deckinga, can you see -- some of this has my

3  handwriting.  I'm going to just move it down so that my

4  handwriting is not on it.  Can you see a copy of Plaintiff's

5  Exhibit 323?

6  A    I see a -- I see the front page of the report of the

7  Adoption Review Committee.

8  Q    And is that the -- thank you very much.  Is that the

9  report that you saw after it came out in December of 2010 that

10 was the result of the committee's work pursuant to the

11 legislative and Governor -- Governor's directive?

12 A    I assume so.

13 Q    And, in fact, at the back they list the subject matter

14 experts that they consulted on page 23, and do you see your

15 name listed second on that?

16 A    I do.

17 Q    And is this -- then, can you confirm that Exhibit 323 is,

18 in fact, the report of the committee, the commission -- of the

19 committee, excuse me -- to whom you participated in part as a

20 subject matter expert?

21 A    I can confirm that the front page and the Appendix A

22 appears to be the same as the committee report.

23      **MR. YETTER:**  All right.  Your Honor, I can give her

24 the whole document if you'd like, but I'd offer 323 as a public

25 record under 803(8).

1          **MR. ALBRIGHT:**  No objection to the document in its

2    entirety, your Honor.

3          **THE COURT:**  Three twenty-three is admitted.

4       **(Plaintiffs' Exhibit Number 323 was received in evidence)**

5          **MR. YETTER:**  Now, also, your Honor, may we put

6    this -- put this on the screen so we could go -- cover a couple

7    of pages?  Let's --

8          **THE COURT:**  Do you want it switched over to your

9    laptop?

10         **MR. YETTER:**  Yes, your Honor, to this table.

11      **(Pause)**

12   BY MR. YETTER:

13   Q    There we go.  All right.  Let's go to -- let's go to the

14   recommendations, which are on -- some of your recommendations,

15   which are on page nine of 31.  Do you see that, Ms. Deckinga?

16   A    I do.

17   Q    Let's go to the very first one, which is "findings," and

18   let's blow up that first paragraph, the first bullet under

19   "findings."  And what it says, if you could follow along with

20   me:

21             "CPS caseworkers carry extremely high caseloads,

22             often twice what is deemed best practice."

23             Do you see that?

24   A    I do.

25   Q    Now, this committee was put together at the legislature

1   and Governor's request that included lots of different

2   constituencies, including a representative of the DFPS, right?

3   A    Yes.  The representative of DFPS was an ex officio member.

4   Q    And as an ex officio member, it was Gail Gonzalez.

5   A    That is accurate.

6   Q    One of your colleagues.  She reports to you.

7   A    She reports to me.

8   Q    And of that committee, which had eight people, she was one

9   of the eight.  She was a ex officio member, right?

10  A    I don't know how many people were on the committee.

11  Q    Now, what the finding of the committee, in addition to the

12  extremely high caseloads, is that those extremely high

13  caseloads, and I'm quoting:

14           "This contributes to high turnover rates and reduces

15           positive outcomes for children."

16           Do you see that?

17  A    I do.

18  Q    And you read that at the time, in 2010, did you not?

19  A    Correct.

20  Q    Concluding:

21           "Children have a better chance of achieving

22           permanency quickly if they have only one caseworker

23           during their stay in foster care."

24           Right?

25  A    That is what it says in the report.

1    Q    Now, those are the findings.  Let's go to the next page to

2    the first recommendation, which is page ten.

3              **THE COURT:**  What year was this?

4              **MR. YETTER:**  Two thousand ten, your Honor.  This came

5    out in December of 2010, a little more than two years ago.

6    **BY MR. YETTER:**

7    Q    All right.  Let's blow up the first recommendation bullet.

8    And, again, this relates to caseloads, and if you read along

9    with me, Ms. Deckinga:  "Reduced CPS caseloads."  That's the

10   first recommendation of the 2010 report of the Adoption Review

11   Committee, true?

12   A    True.

13   Q    "And establish an innovative management system to measure

14   and improve outcomes."

15              Now, they have an asterisk.  Do you see that?

16   A    Uh-huh.

17   Q    All right.  Let's go to the very bottom of this first page

18   of recommendations and blow up that little part that has the

19   asterisk.  What the asterisk says is:  "Also recommended by

20   GCPA 1996 report."

21              Do you see that?

22   A    I do.

23   Q    Now, the fact is this wasn't the first committee created

24   by the legislature and Governor to review the foster care

25   system in Texas, right?

Deckinga - Direct / By Mr. Yetter                    25

1   A    I think the first -- it is true that there has been

2   another committee to review a piece of the Texas foster care

3   system in Texas.

4   Q    And that committee, in 1996, was called the Governor's

5   Committee to Promote Adoption, right?

6   A    That is accurate.  They were focused exclusively on

7   adoptions, not on foster care.

8   Q    That recommendation in 2010, which was 14 years later, was

9   also --

10          THE COURT:  What is it?  Governor's Committee to

11  what?

12          MR. YETTER:  Governor's Committee to Promote

13  Adoption.

14          THE COURT:  Thank you.

15          MR. YETTER:  GCPA.

16  BY MR. YETTER:

17  Q    And that very same recommendation was made 14 years

18  earlier, right?

19  A    That is accurate.

20  Q    Okay.  And, in fact, let's go back to page two, which is

21  the -- this is the first recommendation that was made 14 years

22  earlier; it was made again in 2010; page two is the chairman's

23  letter.  Let's look at that last big full paragraph.  And what

24  the chairman says -- this is the very front of the report, and

25  it says -- let's look -- can you make that a little bit bigger?

1          Okay.  What it says is -- let's look at that -- let's

2    look at that middle sentence:

3              "Many of our recommendations" --

4              Let's just highlight that as we go along.

5              -- "are, sadly, ones that have been made in prior

6              years, including in a report with a similarly charged

7              1996 Governor's Committee to Promote Adoption."

8              Do you read -- do you see that?

9    A    I see that.

10   Q    Okay.  And you can confirm for us, based on your position

11   at the DFPS, that, in fact, reducing caseloads has been a

12   recommendation of at least two committees, one in 1996 and one

13   in 2010, right?

14   A    That is correct.

15   Q    Since 2010, when this committee found that the DFPS

16   caseloads were extremely high, have caseloads for DFPS workers,

17   and specifically substitute care workers, have they gone up or

18   down?

19   A    So, since 2010, I believe that there has been an increase

20   in the caseloads for conservatorship workers.

21   Q    All right.  In fact, it was added -- in two thousand --

22   from 2009 to 2010, they went up, caseloads.

23   A    Correct.

24   Q    Two thousand ten to 2011 they went up, caseloads?

25   A    Correct.

1    Q    Two thousand eleven to 2012 they went up, caseloads?

2    A    Actually, I'm not sure of that.

3    Q    So, from -- from the report of extremely high caseloads in

4    2010, they're even higher today, are they not, Ms. Deckinga?

5    A    It is not my word that they were extremely high, and so I

6    can't agree to that.  What I can say is that the caseloads for

7    conservatorship workers have increased since then.

8    Q    Now, let's go to Plaintiff's Exhibit 287.

9          **MR. ALBRIGHT:**  Excuse me, your Honor.  I thought we

10   were limiting it to Plaintiff's Exhibit 323 on a limited --

11          **THE COURT:**  No, I'll just -- I gave him 20 minutes.

12          **MR. ALBRIGHT:**  Oh.  Okay.  I'm sorry.

13          **THE COURT:**  Whatever he can do in 20 minutes.

14          **MR. YETTER:**  I'm -- I'm working, Judge.  And, for

15   what it's worth, your Honor, I'm going to try to just give you

16   evidence that you haven't specifically heard that I think is

17   very important for this hearing.

18   **BY MR. YETTER:**

19   Q    So, this is Plaintiff's Exhibit 287.  This is -- let's

20   blow it up.  This is -- I believe this is in evidence, your

21   Honor.  This is a DFPS document.

22          **THE COURT:**  Two -- sorry, what's the number again?

23          **MR. YETTER:**  Two eight seven.

24          **THE COURT:**  Yes.

25   **BY MR. YETTER:**

1  Q    This is a DFPS document.  Ms. Deckinga, I want you to help

2  us interpret it.  There is a -- this is "Daily Caseload Counts

3  of Caseworkers Assigned to Children in PMC," right?

4  A    Correct.

5  Q    So, you know for this particular litigation this would be

6  a particularly useful count of casework -- caseloads, right,

7  because this is PMC?

8  A    Correct.

9  Q    True?  All right.  And this is as of two dates in August

10 of 2011 and then about a year later in June of 2012, so it's

11 about seven months ago, some of this information, true?

12 A    True.

13 Q    Let's go to that June of 2012, the most recent

14 information, and let's look at one line, and that's the "sub"

15 line.  And that means "substitute care," right?  That's the

16 caseworkers that are focused not on investigating, not on

17 kinship, but on substitute care.

18 A    Correct.

19 Q    Right?  And that's the bulk of the caseworkers by far.

20 A    That is the bulk of the caseworkers on this report.

21 Q    Well, and this report is talking about daily caseloads

22 for, presumably, PMC caseworkers, right?

23        THE COURT:  I'm sorry; say -- what did you say?  The

24 bulk of the caseworkers are what?

25        MR. YETTER:  This is the bulk -- this is the bulk of

1    the casework, I believe she said, on this report, your Honor,

2    and I was pointing out that these are the PMC -- the

3    caseworkers that have PMC children.  Right?

4              **THE WITNESS:**  Correct.

5              **MR. YETTER:**  True?

6              **THE WITNESS:**  Right.

7    **BY MR. YETTER:**

8    Q    Now, go across that line, and the total caseworkers as of

9    June 2012 that have PMC children, this chart says 1,153 --

10   A    Uh-huh.

11   Q    -- does it not?

12   A    Uh-huh.

13             **THE COURT:**  On August of 2011.

14             **MR. YETTER:**  June of 2012, your Honor.  That's that

15   top --

16             **THE COURT:**  Oh, I'm sorry.  I looked at the first

17   number.

18             **MR. YETTER:**  Yeah, the top category would be June of

19   2012, and that whole row is June of 2012.  One thousand fifty-

20   three -- I'm sorry; 1,153.

21   **BY MR. YETTER:**

22   Q    So, it's not 1,500 caseworkers like the information that

23   we got in the court yesterday, right?

24             **THE COURT:**  Well, I kind of, in my mind anyway,

25   deducted a fourth off of that anyway.

1          **MR. YETTER:**  I just -- we're -- one --

2          **THE COURT:**  Which is -- takes it about to that.

3    BY MR. YETTER:

4    Q    So, now let's --

5          **THE COURT:**  I mean, if I was comparing, because I

6    figured if there's 25 percent turnover, then 25 percent of

7    those workers don't have that many cases.

8          **MR. YETTER:**  Now --

9          **THE COURT:**  I don't know if that's an incorrect

10   extrapolation, but -- you know, I'm taking away from your 20

11   minutes --

12         **MR. YETTER:**  That's okay, your Honor.

13         **THE COURT:**  -- and you're getting stressed.

14   BY MR. YETTER:

15   Q    We are trying to figure this out as well, because the fact

16   is, Ms. Deckinga, the DFPS doesn't keep a child caseload count

17   for its caseworkers, does it?

18   A    We count our caseloads not by children but by the way the

19   legislative budget board has required us to do so.

20   Q    Ms. Deckinga --

21   A    And --

22         **THE COURT:**  Which is, what, by stages?

23         **THE WITNESS:**  Which is by stages.

24         **THE COURT:**  Okay.

25   //

1   **BY MR. YETTER:**

2   Q    So -- so, DFPS does not keep a count by children of

3   caseload for its caseworkers for PMC children or TMC children,

4   does it?

5   A    Uh --

6   Q    By children.

7   A    So, the -- the way --

8   Q    Does it or doesn't it?

9   A    We do not count caseloads --

10  Q    Thank you.  All right.

11  A    -- specifically by children.

12  Q    So, let's look at this one chart.  This is about seven

13  months ago.  And let's look where most of the PMC caseworkers

14  are.  At the top it says:  "worker category," and then it says

15  "daily caseload" at the top, and you see the first column says

16  "less than ten," then it goes up in increments of ten to 15, 16

17  to 20, et cetera.  Do you see that?

18  A    I do.

19  Q    You can confirm for us, just by looking at it, that the

20  bulk of the caseworkers fall within the 21 caseload to 50

21  caseload, right?

22  A    That's accurate.

23  Q    That's where 290, 245, and 217 PMC caseworkers are, true?

24  A    Ooh.  I'm sorry.  Say that again, please?

25  Q    Okay.  You see the -- you see the columns for 21 to 30

1  caseload, 31 to 40 caseload, and 41 to 50 caseload.

2  A     I do.

3  Q     Okay.  I've done the math.

4  A     Okay.

5  Q     Seventy-four percent --

6  A     Okay.

7  Q     -- of the caseworkers for PMC children, at least according

8  to this chart, fall within -- have more than 20 children -- or

9  caseload during this timeframe, as of June 2012.

10          **THE COURT:**  Is this based on stages, these numbers --

11          **THE WITNESS:**  Yes.

12          **THE COURT:**  -- or are they children?

13          **THE WITNESS:**  This is based on stages, your Honor.

14          **THE COURT:**  So, those actual numbers, when they say

15  74 percent have more than 20 cases, that's 20 stages.

16          **THE WITNESS:**  Yes, your Honor.

17          **THE COURT:**  And we don't know how many children it

18  is.

19          **THE WITNESS:**  Correct.  There could be

20  conservatorship sub care and adoption stages for many of these

21  children.

22          **THE COURT:**  Do we have numbers on how many stages

23  each child would have in a year?

24          **THE WITNESS:**  Uh -- I assume that we could break that

25  down for you.  I don't have that with me, your Honor.

 1   **BY MR. YETTER:**

 2   Q    Now, in two thousand --

 3              **THE COURT:**  Do you have a guess, an educated guess?

 4              **THE WITNESS:**  Many of the children in permanent

 5   managing conservatorship do have a plan of adoption, and so

 6   many of them would have at some point both a conservatorship

 7   and adoption stage simultaneously.  So --

 8              **THE COURT:**  So, that's what a stage is, how far

 9   they're along in the process?

10              **THE WITNESS:**  Yes, and what -- what the work is

11   required on that.  Absolutely.  That is why you see some

12   investigators who have -- you know, you see a few from other --

13   from other worker categories who have them, so there are, you

14   know, people who have helped out or, as we are progressing the

15   case through the system there are two -- two stages open.  We

16   can have an investigation and a conservatorship,

17   conservatorship and adoption --

18              **THE COURT:**  And all of those are stages?

19              **THE WITNESS:**  -- et cetera.  Those are stages, your

20   Honor.

21              **THE COURT:**  So, each child that's in permanent

22   conservatorship should have a plan for adoption?

23              **THE WITNESS:**  Not each.  Not each.  But there are

24   some children in adoption whose plan -- I mean some children in

25   permanent managing conservatorship with parental rights

1    terminated who we would have -- who would -- we would -- who

2    would have a permanency plan of adoption and would have an open

3    adoption stage.

4              **THE COURT:**  Do you know, from your -- all of your

5    work around the country for this, in these issues, is this the

6    way to keep count?

7              **MS. LOWRY:**  No, your Honor.  It --

8              **THE COURT:**  Is this unusual?

9              **MS. LOWRY:**  This is -- I've never seen it; because

10   workers -- because managers --

11             **THE COURT:**  It seems like kind of a smoke-and-mirrors

12   kind of thing.

13             **MS. LOWRY:**  Your Honor, that's correct.

14             **THE COURT:**  So, we can't -- so, my problem is I don't

15   know how I can certify anything based on these kind of figures.

16             **MS. LOWRY:**  Your Honor, I think, if I may -- I don't

17   want to cut in to my colleague's time, but that we have -- your

18   Honor doesn't have to reach the merits at this point.

19             **THE COURT:**  Well, I have to certify, if --

20             **MS. LOWRY:**  Yes, your Honor.

21             **THE COURT:**  That's what you want me to do, and I have

22   to base it on a rigorous examination.

23             **MS. LOWRY:**  Yes, your Honor.  But we have written and

24   presented enough evidence, including the admissions of a wide

25   range of --

1          **THE COURT:**  That their caseload is twice the national

2    average.

3          **MS. LOWRY:**  That's --

4          **THE COURT:**  Or twice good practices.

5          **MS. LOWRY:**  And it is over (indiscernible) allowing

6    good practice.  And, so, what we need from this hearing, what I

7    think is well within the scope of this hearing, is for your

8    Honor to certify, because it's not like we haven't raised a

9    serious question here, and it's a common question.  The whole

10   purpose of the certification is to allow us to do the digging

11   in some of which might be a case record review, which, as the

12   Court has --

13         **THE COURT:**  But I don't understand why that wasn't

14   done before the hearing, I guess.  I mean, how long have you

15   all had for this?  And I never limited your discovery to

16   certification issues only, because you usually do merit-based

17   discovery and certification discovery.

18         **MS. LOWRY:**  Well, your Honor, our case record review

19   was cut off at the defendant's request and with the Court's

20   order once the Circuit came down with its decision, and that

21   was something that was going to be very, very revealing.  And

22   we reread the Circuit's decision to say:  Have we given you

23   enough -- beyond pleadings, Circuit clearly said it's not

24   sufficient just to plead -- have we given you enough to raise

25   an inference that we're entitled to go further?  And that, your

1  Honor, is what we think we've done, and that's, your Honor, all

2  that we think we could do at this stage, and we believe that

3  we've made a case to get to the next stage.  But we understood

4  the Court's ruling cutting off the case record review as

5  saying:  Well, that's burdensome, and I'm not going to let you

6  do it.  But, your Honor, it makes perfect sense; until the

7  class is certified and the Circuit has told me, I've got to

8  rethink whether or not the class is certified.  So, that's the

9  stage we thought we were in and that we needed to raise a

10 preponderance of the evidence.  And, your Honor, we presented

11 not conclusive numbers, because of the strange way that the

12 State has of keeping their caseloads, but we've tried every

13 which way --

14         **THE COURT:**  I understand.  I understand.  I just find

15 it very confusing.

16         **MS. LOWRY:**  Your Honor, so do we.

17         **MR. YETTER:**  So do we.

18         **MS. LOWRY:**  So do we.  And we don't see how an agency

19 can manage --

20         **THE COURT:**  Where --

21         **MS. LOWRY:**  -- without knowing.

22         **THE COURT:**  -- but you said that it was sort of a

23 legislative imperative to keep the numbers this way.  Where

24 does that come from?

25         **THE WITNESS:**  We work with the legislative budget

1   board, and our legislative budget board analyst has requested

2   that we count them this way.  And, so, it was a series --

3          **THE COURT:**  Why?

4          **THE WITNESS:**  I don't know, your Honor.

5          **THE COURT:**  More money per -- maybe it's that they're

6   thinking more money -- easier to get money per event than -- or

7   stage than --

8          **THE WITNESS:**  I honestly don't know.  We have kept it

9   this way for quite -- for quite a while.

10          **THE COURT:**  How long; do you know?

11          **THE WITNESS:**  I don't know, but it's been --

12   certainly when we started -- when the legislature gave us an

13   enormous, you know, amount of money and funding to do CPS

14   reform, we made a lot of changes and additions, and --

15          **THE COURT:**  When did that happen?

16          **THE WITNESS:**  -- I think this was one of them.  In

17   2005 they gave us 2,500 new workers, and I believe it was at

18   that point that we started looking at:  How do we count

19   caseloads?  And -- and, so, it was a negotiation between the

20   legislative budget board and our oversight agency, which counts

21   the cases, and that's how they -- that's what they came out

22   with.  And then 2007, again the legislature gave us a lot of

23   additional funding to continue CPS reform.

24          **THE COURT:**  So, out of the 2,500 in 2005, were they

25   all caseworkers?

Deckinga - Direct / By Mr. Yetter                38

 1            THE WITNESS:  They were functional units.  And it was

 2    focused --

 3            THE COURT:  Oh, I hate this talk.

 4            THE WITNESS:  I know.

 5        (Laughter)

 6            So, they -- we had --

 7            THE COURT:  Not dysfunctional.

 8            THE WITNESS:  No, not dysfunctional.

 9            THE COURT:  Okay.

10            THE WITNESS:  They were functional, with a one-to-

11    five ratio of caseworker to supervisor.  It was much

12    investigations and support staff, and then in 2007 they gave us

13    another 1,300 -- was it 1,300?  Thirty-eight hundred all

14    together, for both direct delivery -- the vast, vast majority

15    was direct delivery.

16            THE COURT:  Okay.  Then, why did the problem still

17    exist?

18            THE WITNESS:  We have made --

19            THE COURT:  I mean, at the -- everyone would have to

20    admit that it's got problems.

21            THE WITNESS:  We have -- we --

22            THE COURT:  And there may not be any more problems

23    than any other place.  But it's -- you know, it has

24    historically had problems.

25            THE WITNESS:  We have made significant progress since

1    2005 in many, many areas.  We also live -- and I could go

2    through them, but I'm trying not to take too much of their time

3    either.  We're, like, number seven in the nation in adoptions.

4    We adopt more children than any other state, and we get more

5    funding from the federal government because of the numbers of

6    children that we adopt.  We have made -- our caseloads since

7    2005 have gone down; our turnover since 2005 has gone down; we

8    are headed in the right direction.  We hit 2009, which was the

9    recession, and that -- that, you know, -- that was an anomaly

10   year for us.  We --

11           **THE COURT:**  Two thousand seven?

12           **THE WITNESS:**  Two thousand nine.

13           **THE COURT:**  Two thousand nine?

14           **THE WITNESS:**  With the recession and the budget

15   and -- and all that.  But we have made enormous progress.  And

16   the legislature, when we go to them and ask, we have real

17   advocates in the legislature.  We're going generally in the

18   right direction on most things.

19           **THE COURT:**  I guess I'm -- if -- all that's -- I

20   understand all that, and the new workers and the new funding

21   and -- but why is caseload increasing since the studies?

22           **THE WITNESS:**  We --

23           **THE COURT:**  Since '96, since 2010?

24           **THE WITNESS:**  We have had in this state an 18-percent

25   increase in the child population in Texas.

Deckinga - Direct / By Mr. Yetter                          40

1              **THE COURT:**  Okay.

2              **THE WITNESS:**  So, nationally we have had -- there has

3    been a two-percent increase.  We have a million more children

4    in Texas over the last decade.  And, then, we have a high

5    poverty rate.  We have an increase --

6              **THE COURT:**  Slow down.

7              **THE WITNESS:**  I'm sorry.

8              **THE COURT:**  I'm not taking this out of his time.

9              **THE WITNESS:**  Okay.

10             **THE COURT:**  One million more children in the last

11   decade.

12             **THE WITNESS:**  Yes.  And poverty is associated with

13   abuse, neglect.  It --

14             **THE COURT:**  Of course.

15             **THE WITNESS:**  It -- okay.  I don't have to --

16             **THE COURT:**  There's frustration and --

17             **THE WITNESS:**  -- talk about that.

18             **THE COURT:**  For the record, though, it's --

19             **THE WITNESS:**  Okay.  So -- so, if a -- you know,

20   particularly neglect.  If you can't -- if a woman has to go out

21   to work and can't afford daycare and leaves her younger

22   children in --

23             **THE COURT:**  To take care of each other.

24             **THE WITNESS:**  -- in the care of the older children,

25   that's -- that's a real problem, and that -- that can certainly

Deckinga - Direct / By Mr. Yetter                              41

1    lead to bad outcomes.  And we have had a 40-percent increase in

2    poverty over the last decade.  So, there are a lot of reasons

3    why --

4              THE COURT:  Okay.  I want to just make sure that the

5    poverty level -- the cutoff has not changed.

6              THE WITNESS:  I don't believe so, but that's not my

7    field of expertise.  But we have 27 percent of the children in

8    Texas living in poverty.

9              THE COURT:  How -- what percentage?

10             THE WITNESS:  Twenty-seven.

11             THE COURT:  I guess you didn't need to prepare her,

12   Mr. Albright.

13             THE WITNESS:  In addition, what we do, your Honor,

14   is -- is -- you know, every child welfare system is different.

15   And -- and you've heard that all over the place.

16             THE COURT:  Yes.

17             THE WITNESS:  And what we try and do in Texas -- we

18   have a very low rate of removal of children in Texas.  What we

19   do --

20             THE COURT:  From their homes.

21             THE WITNESS:  From their homes.  We serve them in

22   homes as much as we can.  We have doubled the number of

23   children that we serve in homes rather than go to court and

24   remove them, and we offer services there.  And we have -- and

25   we serve them safely there.  So, by the time we get there, what

Deckinga - Direct / By Mr. Yetter                    42

1    we have in our conservatorship and permanent managing

2    conservatorship are kids that we couldn't serve at home.  So,

3    they take longer to provide services, mental health services,

4    in order to get them to permanency.

5               THE COURT:  You know, this is -- has nothing to do

6    with anything, but whatever happened to -- this is --

7               THE WITNESS:  Sure.

8               THE COURT:  -- it's not a Dickensonian question,

9    but -- to orphanages?  Years ago, when I was raised in Fort

10   Worth, there was an orphanage in Itasca that was supported by

11   our church.  It was a beautiful facility.

12              THE WITNESS:  Yes.

13              THE COURT:  Do you remember that?

14              THE WITNESS:  I know it.

15              THE COURT:  And every time I go through Itasca I look

16   for that --

17              THE WITNESS:  Absolutely.

18              THE COURT:  -- that place.  It had cottages and, you

19   know --

20              THE WITNESS:  So, the orphanage --

21              THE COURT:  -- whatever happened to that?

22              THE WITNESS:  We still have them.  Those are the

23   general residential operations.  Those are our basic childcare

24   facilities.

25              THE COURT:  Well, what happened to Itasca?  Do you

Deckinga - Direct / By Mr. Yetter                    43

1   remember that one?

2           THE WITNESS:  I don't know what -- was that the

3   Presbyterian?

4           THE COURT:  It was; Presbyterian.

5           THE WITNESS:  We still have -- we still have a

6   Presbyterian Children's Basic Childcare Institution.  They

7   contract with us, we work with them, we place --

8           THE COURT:  But it's not located in Itasca.

9           THE WITNESS:  I don't know if it is or not, your

10  Honor.

11          THE COURT:  Just curious.  I just wondered what

12  happened.

13          THE WITNESS:  We also have -- those are the faith-

14  based organizations.  Waco Methodist, Texas Baptist,

15  Presbyterian Children's Home; most of them are our general

16  residential operations, the basic childcare institutions.

17          THE COURT:  So, what happens with children who are

18  not of that religion and get put in one of the faith-based

19  places?

20          THE WITNESS:  They are allowed.  They take children

21  of all faiths.

22          THE COURT:  But do they --

23          THE WITNESS:  And then --

24          THE COURT:  -- have mandatory church things and --

25          THE WITNESS:  They do have mandatory church things,

1   most of them.

2              THE COURT:  Okay.

3              THE WITNESS:  When they take our children, we tell

4   them, you know, that they have to honor the religion of the

5   child.  And they work with us on that.  Most of those

6   facilities we have a no-pay contract with them.  We don't even

7   pay --

8              THE COURT:  Okay.

9              THE WITNESS:  -- to place the children there.

10             THE COURT:  Are those decreasing in number?

11             THE WITNESS:  I think that they are some -- that they

12  are changing some of their business model.  So, many of them

13  are getting child placing agencies so that they can also have

14  foster family homes for the children in care.  They take not

15  only our children, but they're a big part of our prevention

16  efforts to keep kids out of our care, because what they do is

17  they can support both the children and the family, like a

18  mother, and take those in so we don't have to remove children.

19             THE COURT:  Well, I remember most of the kids in the

20  Itasca orphanage --

21             THE WITNESS:  Uh-huh.

22             THE COURT:  -- that was supported by the church I

23  went to --

24             THE WITNESS:  Uh-huh.

25             THE COURT:  -- that they were -- that the families

1    were in problems.

2              **THE WITNESS:**  Exactly.

3              **THE COURT:**  And they just -- we need a place to put

4    these children --

5              **THE WITNESS:**  Yes.

6              **THE COURT:**  -- until we can get ourselves together.

7              **THE WITNESS:**  Absolutely.

8              **THE COURT:**  So, they still had parents and people

9    interested.

10             **THE WITNESS:**  And they've changed their business

11   model, so sometimes it's just the children, but sometimes they

12   take the whole family.

13             **THE COURT:**  Uh-huh.  Okay.

14             **THE WITNESS:**  So -- so, that's where they are.

15             **THE COURT:**  Okay.  Back on your time.

16   **BY MR. YETTER:**

17   Q    Ms. Deckinga, obviously, all of those new children to

18   Texas require new resources, don't they?

19   A    Yes, they do.

20   Q    Because --

21             **THE COURT:**  But it's not instantaneous.  You know,

22   these things are just not instantaneous.

23             **MR. YETTER:**  I -- I --

24             **THE COURT:**  Whatever I do or don't do here is not

25   going to help that situation, I don't think.  This is a

1    legislative function.  And it sounds like that legislature

2    actually listens.

3              THE WITNESS:  We have -- we have incredible

4    advocate -- advocates in our legislature.  We have foster and

5    adoptive parents who are legislators.

6              THE COURT:  What -- is there any state that has a

7    higher rate of children living in poverty than Texas?

8              THE WITNESS:  There are some that are similar, so

9    when we were doing the research for foster care redesign that

10   you've heard about here a little bit, we looked at some other

11   states to see what the comparison was, and actually two of the

12   states, Tennessee and Kentucky, do have similar poverty rates.

13   I would imagine some of the Southern states do have --

14             THE COURT:  We always, like I say, rely on

15   Mississippi to go --

16             THE WITNESS:  I know.  Well, there we go.  So, some

17   of the Southern states do have similar -- similar poverty

18   rates.

19             THE COURT:  And Mr. Albright had mentioned about

20   education of the children.

21             THE WITNESS:  Yes.

22             THE COURT:  Tell me where Texas is in that.

23             THE WITNESS:  We are one of the few states that has

24   passed the education outcome in our Child and Family Services

25   review.  But we're not satisfied just with that.  We recognize

Deckinga - Direct / By Mr. Yetter                    47

1   that there is a lot of work to be done, you know, on making

2   sure that our kids graduate, that they -- they get into

3   colleges or schools.  We were, I believe, the first state to

4   get the tuition fee waiver so that our kids who age out of care

5   and kids who are adopted after age 16, they can go to college

6   and trade schools free.  And we -- and our legislature

7   supported that in the nineties, and we were the first state, I

8   believe, to do that.

9           We also have the Supreme Court Children's Commission,

10  the Permanent Judicial Commission for Children, Youth and

11  Families.  I don't know if you're aware of that at all.  Our

12  Supreme Court has a motto:  No child enters or leaves foster

13  care without a judge ruling.  And, so, they have a commission

14  that supports best practices for children in foster care.  They

15  had an 18-month education committee that brought together more

16  than a hundred stakeholders to have recommendations to still

17  improve the system of foster care in Texas.  One of those

18  people was Casey Family Programs that was a real supporter of

19  the education committee, and they have been working nationally

20  to pass a bill, that has just passed, to allow the child

21  welfare agencies to receive all of the education records of

22  children in foster care.  Up until now we couldn't get all of

23  them because of the national FERPA requirements on

24  confidentiality.  So, we think we're going to still improve

25  education.

1          **THE COURT:**  What is the dropout rate in foster

2   children compared to the state average?

3          **THE WITNESS:**  Your Honor, it's higher.  We know that.

4   We know that children in foster care do not graduate, yeah, at

5   the same rate as other children.  We have a national grant

6   right now in Houston, Texas, the TRIO Grant, in which we're

7   working with TEA, Texas Education Association, and Houston ISD

8   to define roles for the now legislatively required foster care

9   liaisons in every -- in every school district.  That is also

10  going to be incredible to do, to have people in the school

11  system that we can go to, one point of contact, to ensure that

12  we get everything we need for children in foster care.

13         **THE COURT:**  Okay.  Back on your time.

14  **BY MR. YETTER:**

15  Q    Ms. Deckinga, the reason why high caseloads for

16  caseworkers is a problem is that it puts child safety at risk,

17  doesn't it?

18  A    There is --

19  Q    Doesn't it?

20  A    Partially.

21  Q    All right.  You've told -- "you," your department, Texas

22  Department of Family and Protective Services -- has told that

23  very statement to the legislature, haven't you?  You know that

24  because you're involved in it.

25  A    The caseloads and caseworkers that we were primarily

1    talking about at that point was investigations.

2    Q    Let's go to Plaintiff's Exhibit 319, and this is a

3    Legislative Appropriations Request, is it not?

4    A    Yes.

5    Q    For August, 2010.  This is around the very same time

6    that -- a little bit before -- when the committee came out with

7    its report, true?

8    A    Yes.

9    Q    And, among other things, this request focused on getting

10   more funds for more caseworkers, right?

11   A    Correct.

12   Q    Let's go to page 117.  This is the last page of a long

13   document.  Or this is one of the last pages of a long document,

14   page one one seven.  And let's --

15        **(Pause)**

16            **THE COURT:**  Is that admitted?

17            **THE WITNESS:**  Yeah.  Yes, your Honor, this -- this

18   319 has been admitted.

19   **BY MR. YETTER:**

20   Q    All right.  Let's go to the bottom.  Let's blow up that

21   one right -- no, no, just the top part if we could.  That's all

22   we're going to focus on.  See if we can read it.  I will read

23   it to you, Ms. Deckinga, if you can see it on your screen.  It

24   talks about the "external and internal factors impacting sub

25   strategy."  And I'm focusing on the last sentence:

1           "If this item is not funded, the already high average

2           daily caseloads per worker would grow."

3           You agree with that; you recall that at the time,

4    don't you, in August 2010?

5    A     Uh-huh.  Yes.

6    Q     "High caseloads cause quality casework to suffer."

7           You agree with that, don't you, Ms. Deckinga?  That's

8    just common sense.

9    A     High caseloads may, yes.

10   Q     Thus -- it doesn't say "may."  It says:  "High caseloads

11   cause quality caseload to suffer."

12          That's just common sense, isn't it?

13   A     This -- high caseloads may cause quality casework to

14   suffer.  I know that it says -- I know that it says here high

15   caseloads cause.  I would say "may."

16   Q     All right.  What else --

17   A     I'm sorry; I just would.

18   Q     What else your department told the legislature is that:

19   "Thus putting children in our system further at risk of harm."

20   True?

21   A     That is what we have in our Legislative Appropriations

22   Request, yes.

23   Q     Now, and conversely, as -- and, in addition, as caseloads

24   increase it puts pressure on the caseworkers, increasing

25   turnover, doesn't it?

1   A    That can be one factor in turnover, yes.

2   Q    Now, conversely, child safety is greatly improved with

3   lower caseloads, isn't it?

4   A    It can be, yes.

5   Q    Let's go to page 15 of the same document, something else

6   that you told the legislature in August 2010.  Let's just blow

7   up the second paragraph.

8          "Client safety is" -- "is" -- doesn't say "maybe";

9          the department said "is" -- "greatly improved with

10         lower caseloads" --

11         True?  You see that?

12  A    I see that.

13  Q

14         -- "that allow workers to spend more time on each

15         case, thus improving the quality of casework, which

16         results in better outcomes for the clients."

17         "Clients" would be children, right?

18  A    Client -- on this, if you'll go to the bottom sentence on

19  that, it says that:

20         "We would need additional direct delivery staff to

21         reach the average daily caseload experienced in

22         fiscal year '09 for these programs, CPS

23         Investigations and APS In-Homes."

24         So, we're talking about CPS investigations, which

25  would be safety of children, and APS In-Homes, which would be

1  safety of adults.

2  Q    So, "clients" here is -- could be either safety of --

3  well, with regard to the CPS, it's children, right?

4  A    It is children prior to coming into the conservatorship of

5  the department.

6  Q    Now, the fact is, at that same time, in the summer of

7  2010, the department did a study of what CPS caseloads should

8  look like, didn't it?

9  A    Could you refresh my memory on that, please?

10 Q    Sure.  Exhibit 234.  This is the summer of 2010.  Let's

11 just blow up the top title and the background.  Keep going down

12 to the background.  Keep going down.  All right.  Now, top

13 title and the background.

14         You were assistant commissioner in July of 2010.

15 A    I was assistant commissioner, yes.

16 Q    The department undertook a project to determine how many

17 caseworkers it would take to do quality investigations and make

18 meaningful monthly visits --

19 A    Uh-huh.

20 Q    -- right?

21 A    Correct.

22 Q    Now, after you did this study of how many caseworkers it

23 would take to do quality investigations and make meaningful

24 monthly visits, you determined in July 2010 that the DFPS did

25 not have enough caseworkers, didn't you?

1  A    Uh-huh.  Correct.

2  Q    And today they still don't have enough caseworkers, do

3  they, to -- so that CPS caseworkers can do quality

4  investigations and make meaningful monthly visits, true?

5  A    The department --

6  Q    Is that true?

7  A    It is -- we can always use more caseworkers.

8  Q    All right.

9  A    Absolutely.

10 Q    In fact, at the time, you calculated how many extra ones

11 you would need.  You did a work measurement time study,

12 actually an update to an earlier one that had been done, right?

13 A    This was not a time study.  We did a 2004 work measurement

14 study.  We made adjustments to it, but it was not a work

15 measurement study.

16 Q    All right.  Let's go to page four and see what you

17 concluded as to the caseworkers for conservatorship

18 caseworkers, at the very top of page four.

19       **MS. SPEAKER:**  Could I have the number again?

20    **(Pause)**

21       **MR. YETTER:**  This is Exhibit 234.

22    **(Pause)**

23       Just blow up the top one where it says:

24 "Conservatorship Stage of Service."

25       **THE WITNESS:**  Uh-huh.

1   **BY MR. YETTER:**

2   Q    And these are caseworkers that would deal with both PMC

3   and TMC children --

4   A    Correct.

5   Q    -- wouldn't they?  All right.  And what you -- what this

6   study that your department did showed that the average daily

7   caseload that you wanted to get to was 24.9, at the very end,

8   average daily caseload, right?

9   A    Correct.

10  Q    But you needed more workers to do that.  Now, let's just

11  highlight the last column and then the second-to-the-last

12  column.  So, the last column is the -- is what you wanted to

13  get to, 24.9, true?

14  A    True.

15  Q    But you needed additional caseworkers per year, about 210

16  all together.

17  A    Uh-huh.

18  Q    A hundred and eighty-one one year and an extra 29 the next

19  year.

20  A    Correct.

21  Q    True?  All right.  Then you -- let's go to the next page.

22  You calculated -- let's just blow up the top; all the way down

23  a little further.  There you go; right there.

24         You calculated how much that would be, and this is

25  what you went to the legislature to try to get, true?

Deckinga - Direct / By Mr. Yetter                    55

1   A     This is not our LAR.  So --

2   Q     This is an internal study that you were trying to figure

3   out how much so that your -- how many extra caseworkers so that

4   your caseworkers could make -- do quality investigations and

5   make meaningful monthly visits, right?

6   A     I would have to see this on our LAR to know if that is

7   actually what we requested.

8   Q     What you were internally trying to figure out is how many

9   caseworkers it would take to do quality investigations and make

10  meaningful monthly visits, true?  With children.

11  A     That is true.

12  Q     And that's what children deserve, isn't it, quality

13  investigations and meaningful monthly visits?

14  A     Absolutely.

15  Q     All right.  So, here you go, on the last page, and you

16  calculate -- you see caseworkers?  There is a line for

17  caseworkers, 181 in that first fiscal year 2012, and then you

18  add another 29, so you get a total of 210 in fiscal year 2013.

19  Let's just highlight that line "caseworker."  Right there.

20  Right?  Do you see that?

21  A     I see it.

22  Q     And, then, internally you have other people staffed, like

23  supervisors, administrative assistants; all together by fiscal

24  year 2013 you're going to have 322 new people, right?

25  A     That was the study.

1  Q    That was your internal study.

2  A    Right.

3  Q    Right?  And that was so that you could do quality

4  investigations and have meaningful visits, and the total

5  cost -- looking at the bottom number, it says method -- bottom

6  chart says "method of finance."  The total cost was going to be

7  shared between the federal government and the general revenue,

8  the State of Texas, true?

9  A    Right.  That's our method of finance.

10 Q    It wasn't going to cost a billion dollars to get enough

11 caseworkers to do quality investigations and meaningful visits,

12 was it?

13 A    When we have eight thousand, eighty-five hundred staff in

14 CPS?

15 Q    It wasn't going to cost a billion dollars to get 210 new

16 caseworkers and associated staff, was it?

17 A    No.  Two hundred and ten (indiscernible).

18 Q    It was going to cost $14 million a year; actually,

19 $13 million in one year and $15 million in the next year,

20 right?

21 A    For 210 staff and functional units, yes.

22 Q    And the DFPS never got that money, did they?

23 A    That was the anomaly year.  That was when the budget was

24 difficult.

25 Q    This was 2010, right?

1   A    This was our two thousand --

2   Q    This was July 2010.

3   A    Right.  That's correct.

4   Q    And the DFPS never got that money, did they?

5   A    I don't know, your Honor.  I don't know.

6   Q    And -- that's okay.  And caseworkers --

7        **(Laughter)**

8            **THE COURT:**  See?

9            **MR. YETTER:**  You're very polite.

10           **THE WITNESS:**  You know --

11           **MR. ALBRIGHT:**  She never called me that.

12       **(Laughter)**

13           **THE WITNESS:**  -- I am just way too used to this.

14           **MR. YETTER:**  And case -- that's okay.

15  **BY MR. YETTER:**

16  Q    And caseloads have continued to go up, haven't they?

17  A    Caseloads have gone up.  Absolutely.

18  Q    And today you still don't have enough caseworkers to do

19  quality investigations and make meaningful monthly visits, do

20  you?

21  A    We have --

22  Q    Do you?

23           **MR. ALBRIGHT:**  Excuse me, your Honor.  She was just

24  about to answer.

25           **MR. YETTER:**  It's a yes or no.  With all due respect

1   to the witness, it's a yes or no question.

2            THE COURT:  Well, only if she can answer it yes or

3   no.

4            MR. YETTER:  Fair enough.

5            THE WITNESS:  We do many quality visits and quality

6   investigations, and we do it through a variety of means.  We do

7   it through overtime; we do it through the assistance of CASA,

8   attorney ad litems, community partners, judges, et cetera.  We

9   recognize that this is our primary responsibility and every

10  biennium we go back to the legislature and we request what we

11  need.  If they are able, they are always responsive to us.  And

12  we will ask again this legislative session for additional

13  staff.  When you have a growing population in your state and a

14  growing poverty rate, it is a continuous improvement process,

15  and the legislature is very supportive of us in this.

16  BY MR. YETTER:

17  Q    Ms. Deckinga, the very next month you gave a speech at a

18  luncheon for the Executive Women in Texas government, didn't

19  you?

20  A    I don't remember when I did that.

21  Q    You do remember the luncheon speech, don't you?

22  A    I remember that I went there and gave a speech, correct.

23  Q    And I'm going to represent to you that it was August 25th,

24  2010.  Does that sound about right?

25  A    I have no reason to dispute that.

Deckinga - Direct / By Mr. Yetter                    59

1  Q    And that is a group of, obviously, women at high levels

2  within the Texas state government, I assume.  Is that true?

3  A    It is women in state government, yes.

4  Q    And you were the keynote speaker.

5  A    Correct.

6  Q    And you talked about a lot of things --

7  A    Uh-huh.

8  Q    -- including your personal background.  You gave some

9  words of advice as well to the audience, didn't you, about

10 career issues?  Right?

11 A    I think I might have, yes.

12 Q    You said, in fact, the most important thing is to choose

13 your boss.  Find someone who has the same mindset and work for

14 him or her.  Remember that?

15 A    I may have.

16 Q    All right.

17 A    That sounds like me.

18 Q    You also talked about your -- the situation at CPS, didn't

19 you?

20 A    I did.

21 Q    You mentioned that the clients of CPS, the children, the

22 foster children in the system, are all involuntary, right?

23 A    In conservatorship, correct.

24 Q    All right.  In other words, they didn't choose to be

25 there.

Deckinga - Direct / By Mr. Yetter                    60

1   A     Correct.

2   Q     Not like a prisoner who's there or a mental health patient

3   who's been committed to a state asylum; children are

4   involuntary, and that's especially tough when the economy is

5   down, isn't it?  You mentioned that as well.

6   A     What is tough when the economy is down?

7   Q     And when the economy is depressed more people and more

8   children need help.

9   A     Absolutely.

10  Q     CPS caseworkers maintain an average of 28 cases.  The

11  recommended number is 13.  That's what you told the audience,

12  isn't it?

13  A     I don't know.  I don't remember.

14  Q     Let me refresh your recollection with an article that --

15           **THE COURT:**  Whoa.

16           **MR. SPEAKER:**  That's not in evidence.  That's not in

17  evidence.

18           **THE COURT:**  Don't do that.

19           **MR. YETTER:**  Oh, I'm sorry.

20           **MR. SPEAKER:**  It's not in evidence.

21       **(Pause)**

22  BY MR. YETTER:

23  Q     All right, Ms. Deckinga.  This is an article from the

24  website for Executive Women in Texas Government.  It's the

25  luncheon of August 25th, 2010.  There is a photograph.  That's

Deckinga - Direct / By Mr. Yetter                        61

1   you in the photograph, isn't it?

2   A    That's me.

3   Q    The title says:  "Audrey Deckinga Dedicated to Helping

4   Children and Families."  And I'm looking at the second

5   paragraph.

6            **MR. ALBRIGHT:**  Your Honor --

7            **MR. YETTER:**  "Audrey mentioned" --

8            **MR. ALBRIGHT:**  -- before we start reading from a

9   document that's not in evidence --

10            **THE COURT:**  Sustained.

11            **MR. ALBRIGHT:**  Thank you, your Honor.

12            **THE COURT:**  Whatever it is.

13   **BY MR. YETTER:**

14   Q    Ms. Deckinga, look at the second paragraph.

15   A    I see it.

16   Q    And I want to see if this --

17            **THE COURT:**  Wait.

18            **MR. ALBRIGHT:**  Same objection.  Are we getting close

19   to contempt?

20            **MR. YETTER:**  I am asking her to see if this refreshes

21   her recollection, which is --

22            **THE COURT:**  You can hold him in contempt, but I'm not

23   going to.

24       **(Laughter)**

25            **MR. ALBRIGHT:**  Okay, Judge.  I was just talking

**EXCEPTIONAL REPORTING SERVICES, INC**

1   about --

2           **MR. YETTER:**  I'd like --

3           **MR. ALBRIGHT:**  -- (indiscernible) statement made.

4           **MR. YETTER:**  I'd like you --

5           **THE COURT:**  Don't read the document.

6           **MR. YETTER:**  I won't.

7   **BY MR. YETTER:**

8   Q    I'd like you to read to yourself the second paragraph and

9   see if that refreshes your recollection that what you told the

10  audience on August 25th, 2010, is that CPS caseworkers --

11          **MR. ALBRIGHT:**  Your Honor --

12          **MR. YETTER:**  Read the part where it says --

13          **MR. ALBRIGHT:**  -- he's reading the document.

14          **MR. YETTER:**  -- CPS caseworkers --

15          **THE COURT:**  Sustained.  Move on.  Sustained.

16  **BY MR. YETTER:**

17  Q    One of the things you told the audience is that they

18  are --

19          **THE COURT:**  Okay, wait a minute.

20          **MR. YETTER:**  I'm moving to another topic, but on the

21  same speech, to see if she remembers it.

22          **THE COURT:**  If you're talking about that exhibit, you

23  may not question her from that exhibit.  It's not admitted.

24          **MR. YETTER:**  I am -- I'm not questioning her from the

25  exhibit, your Honor.  I'm asking for her memory of what she

Deckinga - Direct / By Mr. Yetter                          63

1   told the audience.

2             THE COURT:  Do you have any memory of what you told

3   the audience?

4             THE WITNESS:  Your Honor, actually I don't, and I

5   didn't write this article.

6             THE COURT:  Okay.

7             THE WITNESS:  It is somebody else's -- it's somebody

8   else's recollection of what I said.

9             THE COURT:  I know from my own experience sometimes

10  direct quotes are never direct quotes.

11  BY MR. YETTER:

12  Q    Now, the fact is that --

13  A    I didn't write that, nor review it, your Honor.

14  Q    The fact is, Ms. Deckinga, that the high caseloads for

15  DFPS caseworkers is causing high turnover, isn't it?

16  A    It may be one factor.

17  Q    And that high turnover affects the quality of the casework

18  that the caseworkers do, does it not?

19  A    It may be one factor.

20  Q    In fact, the turnover is the highest at the entry level of

21  the DFPS caseworker group, isn't it?

22  A    The -- the turnover in CPS is decreasing, but it is the

23  highest at -- during the first year.

24  Q    In fact, turnover during the first year is almost 40

25  percent, isn't it?

Deckinga - Direct / By Mr. Yetter                          64

1    A     I believe it's 37.

2    Q     Thirty-seven point eight percent, right?

3    A     It's in the 37's, yes.

4    Q     Entry-level CPS caseworkers make up about 21 percent of

5    the DFPS workforce, don't they?

6    A     I would have to see the breakout of that.

7    Q     In 2012, fiscal 2012, turnover actually went up, didn't

8    it?

9    A     In fiscal year '12 it went up, but the trend from 2005 to

10   2012 is down.

11   Q     Well, the trend from 2011 to two thousand -- to 2010 to

12   2011 and 2011 to 2012 is up both years, right?

13   A     Right.  I agree with that, because of the anomaly of 2009.

14   Q     It's up 17 percent in fiscal 2011 and up 19 and a half

15   percent in fiscal 2012, right?

16   A     I haven't done the -- the math on that.

17   Q     The number one reason that DFPS caseworkers are leaving is

18   workload, isn't it?

19   A     I don't believe so.  I don't believe that that is what the

20   State office exit surveys show.

21   Q     Let's go back to Exhibit 323.  This is the committee

22   report on the adoption -- from the Adoption Review Committee,

23   and in the appendix one of the things they focused on are the

24   reasons for quitting, why DFPS caseworkers quit.  This would be

25   page 30 of the document.  This is 323, Plaintiff's 323.

1          Your Honor, could you switch the computer over to us?

2    Let's go to page 31.  I'm sorry; 30.  And this is Appendix D.

3    Let's just blow up the middle boxes, the middle section; no,

4    with the title.

5          All right.  So, this one says:  Reasons for quitting,

6    staying, and suggested improvements.  Do you see that, ma'am?

7    A    I see it.

8    Q    And this is the report in August 2010.  The number one

9    reason for quitting, which is the box to the left:  overworked.

10   Do you see that?

11   A    I see that.

12   Q    That is, somewhere between 40 and 50 percent of the DFPS

13   staff cited that reason for quitting.  Now, if we could pull

14   this down a little bit, at the bottom they have suggestions for

15   improvement.  Just do the bottom -- there you go.  Let's take

16   it off the (indiscernible).  Suggestions for improvement --

17        **(Pause)**

18          Do you see --

19          **THE COURT:**  Do you know the people in Tennessee and

20   Kentucky?

21          **THE WITNESS:**  Actually, I do --

22          **THE COURT:**  Okay.

23          **THE WITNESS:**  -- your Honor.

24   //

25   //

1    BY MR. YETTER:

2    Q    The number one suggestion --

3              THE COURT:  What have they said about the changes in

4    their systems?

5              THE WITNESS:  We really look -- well, first of all,

6    the child welfare world nationally is very small.  So, I

7    certainly have known Dr. Miller's successor in Kentucky, and --

8    and, so, I learned a lot -- you know, we have a lot of

9    conversations.  But when we were envisioning foster care

10   redesign, we really did take a look at where they started from

11   and what their outcomes were, and -- and, so, you know, we

12   looked at things like how close did they get kids to home,

13   how -- how much did they -- what data did they use.  We used

14   the very same person that they used to do the data so that we

15   knew, you know, we were doing apples to apples and make sure we

16   could get --

17             THE COURT:  Uh-huh.

18             THE WITNESS:  -- some of those improvements.  But,

19   truly, our outcomes are already better than theirs in many

20   areas, including monthly face-to-face visits.  And, so, while

21   we can -- we can certainly improve the system and we are always

22   going to do it, and we are willing and -- and we want to

23   improve the system and we want to learn from other people,

24   which is why we went and looked and saw what Tennessee had done

25   in their foster care redesign.  They have lots of good ideas,

Deckinga - Direct / By Mr. Yetter                              67

1    and we have incorporated a lot of those into our foster care

2    redesign.

3              **THE COURT:**  What about Kentucky?

4              **THE WITNESS:**  Kentucky?  They have done a good job on

5    their performance-based contracts, and they have done -- and,

6    so, we're using some of their information.  And what we were

7    able to give them back was our medical services.  We have the

8    only very robust Medicaid system, managed care only for kids in

9    foster care.  And Tennessee -- was it Tennessee or Kentucky?

10   I'm getting them confused now.  Well, it was Pat, so it was

11   Kentucky -- adopted our model, except they didn't do it for

12   just kids in foster care, and now they're wanting to go back

13   and redo it to get it just for kids in foster care, because our

14   outcomes and the system that we've built around them for

15   medical services has been really good.

16             So, I know the child welfare directors of most of the

17   states.

18             **THE COURT:**  I noticed that there was a category for

19   maternity placements.  So, the way I understand it, Medicaid in

20   Texas does not fund any form of birth control.  Is that right?

21             **THE WITNESS:**  Oh, I don't -- this is not my area of

22   expertise, your Honor.

23             **THE COURT:**  Okay.

24             **THE WITNESS:**  I'm sorry.

25             **THE COURT:**  I was just -- just curious.

1                **THE WITNESS:**  Sure.

2                **THE COURT:**  So, you don't have any idea what the

3     policy is for Department of Family Protective Services on

4     reproduction?

5                **THE WITNESS:**  I don't.  We really have our -- our

6     foster children, but we do have some policy on, you know,

7     needing to make sure that children understand, and we do --

8                **THE COURT:**  Abstinence only?  Just -- just curious.

9                **THE WITNESS:**  -- and, you know --

10               **THE COURT:**  I mean, I think that's sort of the

11    official Texas policy, isn't it?

12               **THE WITNESS:**  Well, I don't think we quite have it

13    stated in our policy.

14               **THE COURT:**  Okay.

15               **THE WITNESS:**  But we -- we have a robust system of

16    medical services, and they have a medical home --

17               **THE COURT:**  But is there --

18               **THE WITNESS:**  -- and so we do that.

19               **THE COURT:**  Is there -- and I'm not going to --

20               **THE WITNESS:**  Sure.

21               **THE COURT:**  You don't know whether there is any

22    reproductive protection for children.

23               **THE WITNESS:**  I don't.  I don't know.  I'm sorry.

24               **THE COURT:**  Because the last I saw, the Governor was

25    giving all of those Medicaid contracts to --

1          THE WITNESS:  Right.

2          THE COURT:  -- Catholic organizations.

3          THE WITNESS:  Right.  Right.

4          THE COURT:  Is that right?

5          THE WITNESS:  Well, I assume so.  I know what I read

6  in the paper.

7          THE COURT:  So, just curious.

8          THE WITNESS:  Yeah.

9          THE COURT:  Did you know that?

10          MS. LOWRY:  No, your Honor, I don't know.

11          THE COURT:  Well, were you -- did you look at any of

12  what happens in permanent managing conservatorship for the

13  children that are pregnant?

14          MS. LOWRY:  No, your Honor.  We were hoping --

15          THE COURT:  And what services they were afforded?

16          MS. LOWRY:  We are hoping to get into that at the

17  merit stage of the case when we survive class certification.

18          THE COURT:  Should have expected that answer.

19          MR. YETTER:  Okay.  One last topic here --

20          THE COURT:  Do you know?  Do you all know?

21          MR. YETTER:  Oh, excuse me.

22          MR. ALBRIGHT:  I don't, your Honor.

23          THE COURT:  Okay.

24          MR. YETTER:  One last topic, your Honor, and this is

25  on the same document, page --

Deckinga - Direct / By Mr. Yetter                          70

1          **THE COURT:**  Well, it's just we have such a high teen

2    pregnancy rate.  I didn't know what it was in --

3          **THE WITNESS:**  We do.

4          **THE COURT:**  -- if it was higher in foster care than

5    around the state.

6          **THE WITNESS:**  If I -- if I may, there was just some

7    grants that the federal government let regarding -- that could

8    be used for pregnancy prevention or services for children.  And

9    I know ACYF is really -- Administration for Children Youth and

10   Families is really interested in that.  So -- so, there is some

11   attention to this matter.

12         **THE COURT:**  But if all of the children are covered by

13   Medicaid --

14         **THE WITNESS:**  They are.

15         **THE COURT:**  -- and our Medicaid doesn't provide those

16   services.

17         **THE WITNESS:**  Yeah.

18         **THE COURT:**  It's just --

19         **THE WITNESS:**  I don't --

20         **THE COURT:**  Just a question.

21         **THE WITNESS:**  I don't know, your Honor.

22         **THE COURT:**  Just curious.

23   **BY MR. YETTER:**

24   Q    Ms. Deckinga, one last question on caseloads, and that is,

25   at page 25 of this same document, one of the -- Appendix B to

1    this committee report to the legislature and to the Governor,

2    if you look right in the middle, it says:  "Child Welfare

3    League of America"?

4    A    Yes.

5    Q    Just kind of blow up that little piece.  There you go.

6         And this is a bibliography of resources, data, and

7    reports reviewed for the committee's recommendations.  You're

8    familiar with the CWLA recommended caseload standards, are you

9    not?

10   A    Somewhat, yes.

11   Q    And, likewise, the Committee on Accreditation.  You know

12   that that's another standard-setting organization, do you

13   not --

14   A    Correct.

15   Q    -- with regard to caseloads.  DFPS has never adopted

16   caseload standards, has it?

17   A    Um, recommended caseload standards.

18   Q    Have you got any sort of maximum caseload --

19   A    No.

20   Q    -- limits --

21   A    We don't.

22   Q    -- on your caseworkers?

23   A    No.  We don't.

24   Q    That results in some caseworkers having exceedingly high

25   caseloads, does it not?  For example, we've seen documents in

1   this proceeding where caseload -- caseworkers have caseloads of

2   85 or a hundred in terms of caseload.

3   A    It sometimes -- caseworkers can for short periods of time

4   have that high a caseload, depending on if someone has quit, if

5   it's on -- the casework -- the -- you know, and so there can be

6   combinations of caseloads, but that is not the average or the

7   long-term.

8   Q    To your knowledge, Ms. Deckinga, as the Assistant

9   Commissioner, nothing prevents -- all of these years that

10  you've been involved with the DFPS -- nothing has ever

11  prevented DFPS from putting caseload limits on its caseworkers.

12  Isn't that true?

13  A    For a policy decision like that, I would go to the

14  legislature.  I would not make that in a vacuum.  But --

15          **THE COURT:**  Is there -- does any state have a maximum

16  caseload limit?  It seems to me kind of a dangerous thing.  I

17  was just --

18          **MS. LOWRY:**  Yes, your Honor.

19          **THE COURT:**  Who does?

20          **MS. LOWRY:**  There are several cases under court

21  orders, and then there are several with caseload limits, and

22  there are several states that have unions that have the

23  caseload limits in their contracts, and then there are states

24  that have caseload limits within their policy manual.  And I

25  can't recite them off the top of my head.

1          **THE COURT:**  I guess I was just thinking it seemed to

2  be a dangerous thing to say.

3          **MS. LOWRY:**  Well, your Honor, it --

4          **THE COURT:**  You know, a court order could say no --

5  it's recommended no more than 25 cases because that may be the

6  cutoff for maximum care, for instance, and everything over and

7  above that is substandard care.  But -- just theoretically.

8  But if you don't cover in the short term emergencies and say

9  you can't go, then children might not be served at all.

10          **MS. LOWRY:**  Well, absolutely, your Honor, and I don't

11  know of any state that has those limits that turns a child

12  away.  They can't.  But what --

13          **THE COURT:**  Well, if they've got limits, they're

14  going to be turning somebody away, at least in this -- in this

15  situation.

16          **MS. LOWRY:**  You can't.  You can't do it.  But what

17  instead they use --

18          **THE COURT:**  What --

19          **MS. LOWRY:**  -- these standards for is to adjust, for

20  example, staffing from one office to another or going to the

21  legislature for emergency appropriation if there is an influx

22  of children, as has happened in some systems from time to time.

23  They don't use to say:  Sorry, child, you're number 16 and our

24  caseload is 15.  They use it for management purposes.  And, so,

25  they regularly -- administrators of these systems regularly

1   review the caseloads to see:  Is this region over -- our

2   caseload limit is 15; is this region now going up around 18; do

3   we have to maybe shift some positions, or do we have to go for

4   an emergency appropriation?  They use it for management

5   purposes, not for:  We're not taking any kids for the next

6   three weeks.

7           **THE COURT:**  Okay.  I wanted to ask, too; they said

8   they had a very high adoption rate.

9           **MS. LOWRY:**  I'm sorry, your Honor?  Could you --

10          **THE COURT:**  She testified that there is a very high

11  permanent adoption rate.

12          **MS. LOWRY:**  Oh.  Your Honor, as --

13          **THE COURT:**  So, let me ask this question.

14          **MS. LOWRY:**  Yes.

15          **THE COURT:**  What happens to the children that are

16  born in foster care, to the babies?

17          **THE WITNESS:**  So, we do have the ability when -- when

18  minor children who are in our custody have children, we can

19  take conservatorship of them; we can go to the court and

20  request that if there is a danger.  Sometimes we just keep the

21  mother and daughter together and pay for foster care and

22  expect -- and we don't -- we never -- and we don't take

23  conservatorship of that baby sometimes.  You know, if there is

24  no danger, if the -- if the foster parents are willing to teach

25  that young mother how to raise that child, how to parent that

1    child; so, we have both situations.

2            THE COURT:  Well, are they -- are those children

3    ever -- those newborns ever put up for adoption?

4            THE WITNESS:  Sometimes they are; depending on the

5    individual circumstances --

6            MS. LOWRY:  Your Honor --

7            THE WITNESS:  -- yes.

8            MS. LOWRY:  I'm sorry.  I didn't mean to interrupt

9    you.  Your Honor, there are a very high number -- this case, as

10   the Court is well aware, is only about children in permanent

11   managing conservatorship.  It's not --

12           THE COURT:  Well, so, but I saw a chart yesterday or

13   the day before that had the maternity placement.  And, so,

14   there must be children getting pregnant in permanent managing

15   conservatorship.

16           MS. LOWRY:  Without a doubt.  Without a doubt.

17           THE COURT:  And I just wondered if that -- if those

18   babies increase the adoption placement numbers, just

19   theoretically.

20           MS. LOWRY:  Yes.  Your Honor, I don't know.

21           THE COURT:  Is that possible?

22           THE WITNESS:  Probably not.

23           THE COURT:  Okay.

24           THE WITNESS:  That's probably not where we get -- we

25   actually don't use maternity homes.  It's a licensed category,

1  but we don't contract with them.  We really place children as

2  much as possible, or even mothers, within -- within family

3  settings of foster family homes.

4           THE COURT:  Okay.  But when it's not possible, surely

5  there are those permanent -- those big group things that don't

6  allow babies.  Or are there?

7           THE WITNESS:  Sometimes it's the GRO's, again --

8           THE COURT:  Uh-huh.

9           THE WITNESS:  -- that will do that, the basic

10 childcare institutions that would allow it, like Presbyterian.

11          MS. LOWRY:  And some foster homes will take the

12 mother and the baby.

13          THE WITNESS:  Yes.  Absolutely.

14          MS. LOWRY:  But, your Honor, there are a very large

15 number of children in our class who are children for whom the

16 State has determined adoption is appropriate.  I think it's

17 something like 5,000 children who are waiting for adoption and

18 who are not getting adopted, and, as the Court knows, one of

19 the figures that troubles us a great deal about this is --

20          THE COURT:  So, 5,000?

21          MS. LOWRY:  I think that that's the right number.

22          THE COURT:  Of the class of 12,000 proposed --

23          MS. LOWRY:  Well, who have an adoption plan who are

24 not in an adoptive home.

25          THE COURT:  So, those are two stages automatically,

1    right?  According to their --

2              MS. LOWRY:  Your Honor, we don't know how the stages

3    system works.  We really don't know.  And, obviously, if this

4    case goes forward, we need to know much more about -- because

5    it seems very inconsistent about the --

6              THE COURT:  Just theoretically --

7              THE WITNESS:  Yes.

8              THE COURT:  -- do departments like yours ever welcome

9    court intervention so they get the money automatically?

10             THE WITNESS:  According to the federal guidelines, we

11   actually have to -- oh, the -- does our -- would our department

12   welcome court intervention?

13             THE COURT:  Just theoretically.

14             THE WITNESS:  Okay.  So, theoretically -- actually,

15   can I talk Texas?  In Texas we believe that we have such a

16   wonderful relationship with our legislators and -- and both the

17   legislative branch and the judicial branch with the Supreme

18   Court -- that we think that when we make our needs known to the

19   legislature that they respond.

20             THE COURT:  Well, how come you're still short, then,

21   of caseworkers?

22             THE WITNESS:  Well, I think that what we have is, you

23   know, the growing population --

24             THE COURT:  So you've got a lag time between --

25             THE WITNESS:  A little bit.

1          **THE COURT:**  -- the increase in the children and the

2    increase in the funding.

3          **THE WITNESS:**  Correct.

4          **THE COURT:**  Okay.

5          **MS. LOWRY:**  Your Honor, I misspoke.  It's 7,000

6    children who have -- the State has determined need adoption who

7    are not in adoptive homes.  I misspoke when I gave you the

8    5,000 number.

9          **THE COURT:**  Thank you.

10          **THE WITNESS:**  I do need to respond to that, if I may,

11   your Honor.

12          **THE COURT:**  Yes?

13          **THE WITNESS:**  That is always a changing number.  I

14   can't recall exactly how many children were adopted in Texas

15   last year, but it was over 4,000.  And, so, it is not that --

16          **THE COURT:**  From your department.

17          **THE WITNESS:**  Yes.  So, it is not that there are

18   7,000 children just -- just waiting.  It is that that is a

19   churning number.

20          **MS. LOWRY:**  Yes.  Your Honor, in fact, our statistics

21   show that 58 percent of the children who have a goal of -- in

22   our class -- who have a goal of adoption are waiting for an

23   adoptive home, have not been placed, and -- and we know that

24   one of the other things that marks the system is the number of

25   children who leave the system.

Deckinga - Direct / By Mr. Yetter                    79

1          THE COURT:  Age out.  Who age out.

2          MS. LOWRY:  Yes, exactly, your Honor; age out.

3          THE COURT:  And those never get placed, obviously.

4          MS. LOWRY:  That's right.  Those are children who are

5     just left to wander the street.

6          THE COURT:  So, that was 18 percent or something?

7          MS. LOWRY:  Seventeen.

8          THE COURT:  Seventeen?  Something like --

9          MS. LOWRY:  Exactly, your Honor; 17 percent --

10         THE COURT:  I am listening.

11         MS. LOWRY:  There's no doubt about that, your Honor.

12         THE WITNESS:  Which has also improved since CPS

13    reform started.

14         THE COURT:  So, in your opinion, there is no room for

15    improvement.

16         THE WITNESS:  Mine?  Oh, no, no, no.  I believe that

17    we can improve and we will improve.  Absolutely.

18         THE COURT:  So, there would be no benefit to your

19    department for class certification and with the ultimate goal

20    of getting you more money, I guess.  Wouldn't that be the

21    point?  Besides the revamping?

22         MS. LOWRY:  Yes, your Honor; well --

23         THE COURT:  Fourteen million or so?

24         MS. LOWRY:  Many commissioners have become very

25    friendly to this effort because, your Honor, we don't think

```
                    Deckinga - Direct / By Mr. Yetter              80
```

```
 1   that there are many commissioners, if any, that don't, in fact,

 2   want their system to get better.

 3          THE COURT:  Deep down, that they really say:  Go for

 4   it.

 5          MS. LOWRY:  Some of them do, your Honor.  Some of

 6   them do.

 7       (Laughter)

 8          THE COURT:  Just -- just theoretically.

 9          THE WITNESS:  Uh --

10          THE COURT:  Just saying that.  You don't have to

11   admit under oath on the stand.  Just -- we'll move on.  I was

12   just throwing that out there.

13          MR. YETTER:  Your Honor, I --

14          THE COURT:  It surely wouldn't mean she'd lose her

15   job.

16          MS. LOWRY:  Oh, no, your Honor.  In fact, this works

17   best when there -- a lawsuit, frankly, works best when there is

18   a competent commissioner.  Because if you've got somebody who

19   doesn't know what they're doing, then they -- you need somebody

20   on the other side --

21          THE COURT:  Well, I don't think we have that here.

22          MS. LOWRY:  And --

23          THE COURT:  I mean, I think we have competent

24   commissioners here.

25          MS. LOWRY:  Oh, your Honor, you didn't hear -- I
```

1    didn't speak clearly enough.

2            THE COURT:  You did.

3            MS. LOWRY:  I said this works best when there is a

4    competent, not an incompetent --

5            THE COURT:  No, no.  I got that.

6            MS. LOWRY:  Okay.

7            THE COURT:  Which I think --

8            MS. LOWRY:  Yeah.

9            THE COURT:  -- we have competent here.

10           MS. LOWRY:  Yes.  Yes, your Honor.  I think that's

11   something we can agree on.  Yes.

12           THE COURT:  So, we have a stipulated finding of fact.

13       (Laughter)

14           Okay.  Go ahead.

15           MR. YETTER:  Your Honor, I'm -- I am happy to move to

16   a couple other topics that --

17           THE COURT:  So, really, only the Attorney General and

18   the -- would be opposed to it.

19           MR. YETTER:  We can stipulate to that as well, Judge,

20   I think.

21       (Laughter)

22           MS. LOWRY:  Right.  Right.

23           THE COURT:  I'm kidding you, Mr. Albright.

24           MR. ALBRIGHT:  Oh, I know, your Honor, and I was

25   going to let Ms. Leander (phonetic) stipulate --

Deckinga - Direct / By Mr. Yetter                    82

1          **THE COURT:**  I have to tweak you around.

2          **MR. ALBRIGHT:**  -- with Ms. -- with CRI, and they can

3  have all their stipulations they want.

4          **THE COURT:**  You're almost done with your time, even

5  taking out my time.

6          **MR. YETTER:**  All right, your Honor.  I didn't want to

7  push beyond the -- and we very much appreciate the Court

8  exercising its discretion to give us a little bit extra time.

9  So, I am going to --

10          **THE COURT:**  In conclusion.

11          **MR. YETTER:**  In conclusion.  Yes, your Honor.  I did

12  want to just talk about just a couple of other topics other

13  than caseload.

14  **BY MR. YETTER:**

15  Q    One of the things that DFPS has gone to the legislature

16  and told the legislature, Ms. Deckinga, is that finding

17  appropriate placements for children who come into foster care

18  remains difficult -- this is even within the last couple of

19  years -- because the needs of the children do not always match

20  the number, type, and location of the placement options

21  available.  True?

22  A    True.  I absolutely agree.

23  Q    All right.  And that's -- this is -- this is as of

24  September 2010.  That would be after some six years of

25  redesign, at least what the State had announced as childcare --

Deckinga - Direct / By Mr. Yetter                83

1   foster care redesign, true?

2   A    True, although that was not the focus of the CPS reform.

3   Q    The --

4   A    That is the focus of foster care redesign.

5   Q    Let me just go back to caseloads one second just to make a

6   point.  The new foster care redesign --

7   A    Yes.

8   Q    -- that has been announced --

9   A    Yes.

10  Q    -- the one that's current ongoing --

11  A    Yes.

12  Q    -- has nothing to do with caseloads; it's not going to

13  institute standards for caseloads or limits or recommendations,

14  anything like that, right?

15  A    That's correct.

16  Q    It's not seeking more money for caseworkers.  The new,

17  ongoing foster care redesign of the State of Texas is not

18  focused on getting more caseworkers for children, is it?

19  A    No.  It's geographic placement array and performance-based

20  contracts.

21  Q    So, getting back to that, placement array -- oh, one last

22  question on caseworkers and standards.  You understand, don't

23  you, ma'am, Ms. Deckinga, that if the State institutes caseload

24  standards that it is to do that in conformance with

25  professional standards around the country, true?

Deckinga - Direct / By Mr. Yetter                    84

1  A    Would you repeat that, please?

2  Q    Sure.  You understand that by statute if the State

3  institutes caseload standards it is to do so in conformance

4  with professional standards across the country.

5  A    I am unaware of that.  I don't understand that.

6  Q    And, specifically, that some of the standards that we've

7  talked about in this very proceeding, COA and CWLA, I believe.

8  A    I'm sorry.  I don't understand.

9  Q    Well, let's go back to placement.  One of the problems is

10 that some of the facilities, because there is no system across

11 DFPS -- there is no system of allocating facilities

12 geographically around the state where they're needed.  Right?

13 A    Historically, that's accurate.

14 Q    And today there is no system to allocate geographically in

15 place around the state, right?

16 A    There are steps toward that.

17 Q    That's what you're telling us the redesign is, that we

18 hope will do.

19 A    Oh.  No, no, no.  There are other things that we are also

20 doing for the legacy system that will -- that will address

21 that.

22 Q    That is a system-wide issue for DFPS, is it not?

23 A    It is.

24 Q    Just like caseloads is a system-wide issue for DFPS, true?

25 A    Partially.

Deckinga - Direct / By Mr. Yetter                 85

1  Q    All right.  Caseloads affect children around the state, do

2  they not?  High caseloads I should say.

3  A    High caseloads are one factor.

4  Q    That affect child safety, security, and well-being, true?

5  A    Partially.

6  Q    Placement of facilities is another system-wide DFPS factor

7  that affects children, child safety, security, and well-being,

8  true?

9  A    You know, it may.

10  Q    Because moving children away from their home community,

11  for example, is a bad thing for the foster children, isn't it?

12  A    It may be.

13  Q    Separating children from their siblings because of the

14  lack of available facilities can be a bad thing for the

15  children and their safety, security, and well-being, true?

16  A    It can be -- it can certainly not promote the bonding

17  unless other steps are taken to do so.

18  Q    And that's a negative consequence, in your opinion as the

19  assistant commissioner of DFPS, is it not?

20  A    I would certainly like children, if at all possible, to

21  remain -- to remain together, absolutely, like the seven we saw

22  in this case.

23  Q    This issue of placement of foster care facilities and the

24  types, the array of foster care facilities, is something that

25  DFPS is itself trying to deal with on a system-wide basis,

Deckinga - Direct / By Mr. Yetter                          86

1   true?

2   A     We are doing -- we are dealing with this with a myriad of

3   efforts in order to keep children closer to home.

4   Q     And you are dealing with it on a system-wide basis.

5   You're not just trying to do it for Region 8 or Region 1 up in

6   Lubbock or Region 8 in San Antonio; you're trying to do it for

7   the State on a system-wide basis, are you not?

8   A     We have different remedies for this in each area of the

9   state, depending on what the needs and resources are.

10  Q     You're certainly not favoring one region over another, are

11  you, Ms. Deckinga?

12  A     There are some regions that already have adequate

13  resources.

14  Q     So, what you're trying to do is spread out the resources

15  so that they are adequately and equally appropriately arrayed

16  around the state, true?

17  A     No.  That is not what I'm trying to do.  What I am trying

18  to do is to ensure that -- I'm not trying to spread out

19  resources; I'm trying to get new ones in areas in which we need

20  them.  There are some areas that we don't need them.  We have

21  plenty of foster homes in Brownwood, Texas.  We have more than

22  enough residential treatment centers in Houston.  I am not

23  trying to take some of those and plop them in other places.  I

24  am trying to develop more resources and more high-quality

25  resources in the areas that we need them to best meet the

Deckinga - Direct / By Mr. Yetter                    87

1    individual needs of the children and families of Texas.

2    Q    In fact, one of the problems with the array and number of

3    placements is that, for example, in Houston there are -- there

4    is an overabundance of residential treatment centers, right?

5    A    That is not particularly a problem.  If there were an

6    overabundance, that gives us a choice.  What we need to do in

7    Houston is -- is very different than what we need to do in

8    Lubbock.  So, in Houston I don't need to recruit residential

9    treatment centers.  In Lubbock I need to make sure that the

10   children -- or -- that is just an example; that's not a -- it's

11   not a hard and fast.  I need to make sure that there are

12   services, whether it's residential treatment or wraparound

13   services, to meet the needs -- the high needs of the kids

14   there.

15   Q    One of the things that -- now let me change topics.  One

16   of the things that you have been involved with in your career

17   is kinship placements, is it not?

18   A    Correct.

19   Q    And one of the -- and DFPS places children with relatives

20   whenever possible, does it not?

21   A    Whenever safely possible and appropriately, correct.

22   Q    One of the biggest barriers in placing children with

23   relatives is financial assistance, isn't it?

24   A    Actually, it's not.

25   Q    Let's go to a -- in fact, you -- the DFPS put out a

1   document recently called "The Success of the CPS System

2   Reform."  Do you recall that?

3   A     I do.

4   Q     And that is a document that you actually put out just in

5   November of last year, true?

6   A     I don't believe so.

7   Q     And then it came out again in December of last -- 2012.

8   A     Oh, 2012.  I'm sorry.  I was going back to --

9            **THE COURT:**  Okay.  Time's up.

10           **MR. YETTER:**  Uh --

11           **THE COURT:**  I gave you an hour and ten minutes.

12           **MR. YETTER:**  You did, your Honor, and I appreciate

13   the discretion and (indiscernible).

14           **MR. ALBRIGHT:**  No cross, your Honor.

15           **THE COURT:**  Thank you, ma'am.

16           **THE WITNESS:**  Thank you.

17     **(The witness stepped down)**

18           **THE CLERK:**  (indiscernible) need Exhibit 323.

19     **(Pause)**

20           **THE COURT:**  Okay.  So, you want closing now, and then

21   I'm going to do some post -- ask you for some briefs?

22           **MR. YETTER:**  Yes, your Honor.  That's what we'd --

23   that would be acceptable to the plaintiffs.

24           **MR. ALBRIGHT:**  Yeah, that's fine with us, too, Judge.

25   May I just say, on post-hearing briefing --

1          **THE COURT:**  Yours will be responsive.

2          **MR. ALBRIGHT:**  Thank you, your Honor.

3          **THE COURT:**  I'm going to ask them how many days and

4     then give you -- an hour later.

5          **(Laughter)**

6          **MS. LOWRY:**  Your Honor, are we --

7          **MR. ALBRIGHT:**  That may be all I need.

8          **MS. LOWRY:**  Are we going to have a brief recess

9     before the closing?

10         **THE COURT:**  Sure.  How much time do you want?

11         **MS. LOWRY:**  Ten minutes, your Honor, is fine.

12         **THE COURT:**  Okay.  Thank you.

13         How much time do you want for closing arguments?

14         **MS. LOWRY:**  Not a lot, your Honor; maybe 20 minutes?

15         **THE COURT:**  I would like you to focus on the standard

16    I should be using.  I just don't -- clearly, I don't have a

17    clue.

18         **MS. LOWRY:**  Well, I -- I wouldn't say that.

19         **THE COURT:**  I can read *Wal-Mart*, and I can read the

20    Fifth Circuit, and -- that all just says "rigorous," which is

21    what it was before *Wal-Mart*.

22         **MS. LOWRY:**  Yes, it was.

23         **THE COURT:**  Okay?  And I just don't know --

24         **MS. LOWRY:**  Yes, it was.  That's what I -- we plan to

25    address, your Honor.

90

1          **THE COURT:**  I would hope so.  Thank you.

2          **MR. YETTER:**  And, your Honor, we may be more like 30

3  minutes if -- with the Court's permission, I'd like to -- we're

4  going to share closing --

5          **THE COURT:**  You can split it any way you want to.

6          **MR. YETTER:**  Thank you.

7          **THE COURT:**  He's not going to share, though, I can

8  tell you; Mr. Albright.

9      **(Laughter)**

10         Ten minutes.  Thank you.

11         **MS. LOWRY:**  Thank you, your Honor.

12         **THE CLERK:**  All rise.

13     **(A recess was taken from 10:14 a.m. until 10:25 a.m.;**

14  **parties present)**

15         **MR. ALBRIGHT:**  Move again for an instructed verdict,

16  your Honor.

17         **THE COURT:**  Granted.

18     **(Pause)**

19         Do you think they went out the back door?

20     **(Laughter; pause)**

21         **MS. LOWRY:**  Sorry, your Honor.

22         **THE COURT:**  That's all right.

23         Okay, everybody rests and closes.

24         **MR. YETTER:**  Yes, your Honor, Plaintiffs rest and

25  close.

1          **MR. ALBRIGHT:**  Yes, your Honor, Defendants rest.

2          **THE COURT:**  Okay.  Now, how much -- you want about 30

3   minutes you said?

4          **MR. YETTER:**  Yes, your Honor --

5          **THE COURT:**  Go ahead.

6          **MR. YETTER:**  -- I'm going to start and Ms. Lowry will

7   finish on ours.  And we may reserve just about five minutes for

8   rebuttal --

9          **THE COURT:**  All right.

10          **MR. YETTER:**  -- with the Court's permission.

11              **CLOSING ARGUMENT ON BEHALF OF PLAINTIFFS**

12          **BY MR. YETTER:**  May it please the Court.  Your Honor,

13   we do appreciate the Court's attention.  We know that you've

14   been listening very carefully.  This is a difficult area.  The

15   law is changing and this is a factually difficult area.  So I'd

16   like to spend my time talking about our class and four

17   subclasses and laying out what we believe the Fifth Circuit

18   gave as a roadmap in terms of the law, the standards for the

19   Courts to apply.  We think those standards can be easily

20   categorized into three buckets:  whether there is a structural

21   common defect that we're attacking; number two, whether there

22   is a common harm; and then number three, whether there is a

23   resolution that is essentially what the Fifth Circuit said is a

24   one-stroke resolution, an answer to a common structural defect

25   that will resolve an important issue in the case.  Your Honor,

1    we believe for each of our classes and subclasses we've shown a

2    system-wide structural decision, policy, or practice by the

3    State that causes a common harm that can be resolved, we

4    believe, in a single stroke remedy.

5            Starting with the PMC class and that is the class of

6    all children in PMC, the class of 12,000.  We have focused

7    solely on inadequate caseworkers.  The caseworkers have their

8    self -- there's too few caseworkers, meaning that they each

9    have too large of a caseload.  That affects the children.

10   You've heard evidence that it affects the children's safety.

11   The constitutional rights that are at issue are the children's

12   rights to adequate care, safe, secure, and suitable placement.

13   Not enough caseworkers, as the Court has heard, affects their

14   ability for the caseworkers to make sure that the children are

15   safe and that they're in the right facility and that they're

16   not moved around a lot because of the number of caseworkers.

17           What you've heard, your Honor, is that the State, the

18   State of Texas, almost unique in the country, has no caseload

19   standards that we've heard.  The State put no evidence in its

20   brief or in this hearing before the Court.  The evidence that

21   you have seen, much of it from the State, is that -- in fact,

22   the last document you saw from just about two years ago, August

23   of 2010, is that a State committee concluded that the caseloads

24   in this state for caseworkers were extremely high, double the

25   national best practices standard.  Whatever the caseload is,

1   your Honor, and it's been very much of a moving target and it

2   was not clear at the end of this --

3         **THE COURT:**  I finally understood what you wanted me

4   to understand, that whatever, however they calculate it, I take

5   their statements only.

6         **MR. YETTER:**  Yes.

7         **THE COURT:**  And they say this.

8         **MR. YETTER:**  We did the best we could to give you

9   numbers that we felt were appropriate, but the State itself,

10  based on the evidence today, and, yes, we have the burden of

11  proof, but the evidence is unrebutted that the State itself has

12  concluded that those caseloads are approximately twice the best

13  practice standard in the country.  There is --

14        **THE COURT:**  And she said, I understood, since 2010,

15  that study, that they'd gone up.

16        **MR. YETTER:**  And they have gone up.  Exactly,

17  your Honor.

18        **THE COURT:**  I've got it.

19        **MR. YETTER:**  So, we believe for the general PMC class

20  we've identified a structural deficiency, the decision not to

21  have enough caseworkers, that puts all children in the class at

22  the same subjection to a common harm and the harm is the risk

23  that their constitutional rights will be deprived:  safety,

24  security, and a suitable placement.  Those constitutional

25  rights are from the Fifth Circuit and from the United States

1    Supreme Court.

2              **THE COURT:**  Just the children that are represented

3    here, and of course there's going to be a question as to

4    adequacy of those children -- the typicality, I think there's a

5    question, right?  But what they have gone through in foster

6    care is something that's before the Court, is it not?

7              **MR. YETTER:**  It is indeed, your Honor.

8              **THE COURT:**  I mean I didn't hear from those children,

9    but I have it in the pleadings.

10             **MR. YETTER:**  You do, and you heard to some extent

11   from their next friends.

12             But let me distinguish from the named Plaintiffs,

13   your Honor.  They may have suffered some of the worst

14   consequences, we believe, of the risk that all children are at

15   in the DFPS system; but there is a difference, your Honor, from

16   a constitutional standpoint.  Our position is the common

17   harm --

18             **THE COURT:**  I understand, the individualized harm.

19   But those are examples of what happens.

20             **MR. YETTER:**  Exactly, your Honor.

21             **THE COURT:**  That's all I'm saying.

22             **MR. YETTER:**  The common harm, many of the children

23   that have --

24             **THE COURT:**  I can't extrapolate their personal

25   experiences to the entire class, but I saw in Judge Hogan's

1    opinion he really clearly put out what each child -- laid out

2    what each child had gone through that was representative of the

3    class.

4            **MR. YETTER:**  And it is in --

5            **THE COURT:**  And I thought that was compelling.

6            **MR. YETTER:**  And it is part of the record,

7    your Honor.  And we believe that the risk that all children

8    face is being in the very same position potentially because of

9    the structural decision that the State has made.

10           Now, we think there is a one-stroke remedy.  This is

11   what the Fifth Circuit, and to some extent *Wal-Mart*, is focused

12   on.  What's the glue that holds this class together?  The glue

13   is they -- every child, every PMC child, is subject to the same

14   system that has too few caseworkers.  That is the glue.

15           The State is going to say and the State has said in

16   this proceeding, well, we're not -- it's not so bad, they're

17   not too -- it's not too few, we do a good job.  That's a merits

18   question.  But at the trial they are going to try to prove to

19   you --

20           **THE COURT:**  Is that a jury trial?

21           **MR. YETTER:**  Your Honor, because this is --

22           **THE COURT:**  If we get that far.  I'm not saying we

23   are, but --

24           **MR. YETTER:**  Because we're seeking only injunctive

25   relief we think --

96

1          **THE COURT:**  Oh, it's not a jury trial then.

2          **MR. YETTER:**  There's no damages at stake here, so we

3    think this is for the Court, conceivably on a declaratory

4    basis, your Honor, but we think this is a matter for the Court

5    to decide.

6          **THE COURT:**  So there's some impetus for me not to

7    declare a class.

8          **MR. YETTER:**  We don't think you shy away from hard

9    work, your Honor, especially on an important --

10          **THE COURT:**  I never have.

11          **MR. YETTER:**  -- especially an important case like

12    this.

13          But the bottom line is there will be things to fight

14    about in the merits.  They claim that it's not a bad decision

15    not to have caseload limits or recommendations or ranges or

16    whatever all the other states have.  We believe that that falls

17    far short of professional standards.  And even if we were to

18    take their standard of conscious indifference, we believe at

19    trial we could show that as well.  They know, and this is from

20    that report, that they have extremely high caseloads that put

21    children at risk and yet they haven't changed it.  Caseloads

22    continue to go up.

23          So we have proposed a one-stroke remedy, your Honor.

24    And that's something that you, at the end of the day, will

25    fashion.  It's not -- we may ask for it, but you can come up

    1   with different ways of doing it.  All the Fifth Circuit and

    2   *Wal-Mart* say is that there has to be basically a common answer

    3   to the common question.  And here the question is has the

    4   State -- does the State have a policy that puts the children's

    5   constitutional rights at risk by not having any limits on

    6   caseworker loads.  We believe we can prove to you that that's a

    7   constitutional deprivation and that there's an answer, whether

    8   it's a range or a maximum or any sort of enforcement of a

    9   national standard.  That's the one-stroke remedy that we're

   10   asking for.  It doesn't mean the Court has to give that remedy,

   11   but there is a single stroke remedy.

   12           Now, one thing the Fifth Circuit and *Wal-Mart* does

   13   not say is that the one-stroke remedy has to be easy or that it

   14   has to be inexpensive or that it has to be all done at one

   15   time, because many deficiencies structurally may need a remedy

   16   that takes time, that is phased in over time, or it may need a

   17   remedy that actually requires the outlay of additional

   18   resources or it may need a remedy that has different pieces to

   19   it, but there is still one answer to the common question.  And

   20   that's what the Fifth Circuit roadmap laid out for us.

   21           Your Honor, we -- before I move to the subclasses,

   22   the Fifth Circuit and *Wal-Mart* clearly say it's our burden to

   23   present you evidence, you're to do a rigorous analysis and that

   24   part of this analysis does involve the merits.  But no case,

   25   not *Wal-Mart*, not the Fifth Circuit, not any Circuit, has said

1    that the plaintiff certainly in a case like ours has to

2    actually prove that it's right on the merits.  We simply have

3    to present to you essentially a prima facie case.  And now in

4    this hearing the State has put nothing before you.  What we've

5    put before you as the State's evidence and with our own

6    evidence we believe we have more than amply put forward a prima

7    facie case.  That's our burden.  There will be more evidence

8    and more discovery on the merits that the Court will hear.

9            Second -- and I'll go quickly through the four

10   licensed subclasses, because the analysis is -- the four

11   subclasses, the analysis is exactly the same.  We did,

12   following the roadmap of the Fifth Circuit, we looked at

13   Footnote 7 and, of course, one of the things they said was we,

14   the Fifth Circuit, can't see -- we don't agree with the State's

15   argument that not having enough caseworkers is somehow an

16   individualized issue.  That's a structural systemic decision.

17   Likewise, the Fifth Circuit pointed out in Footnote 7 an

18   inadequate array or number of placements, that's a system-wide

19   issue.  That's exactly one piece of our first subclass,

20   licensed foster care, that is, all the children that are

21   essentially not in unverified kinship.

22           We believe there's two basic structural deficiencies

23   that the State has decided, for whatever reason, not out of --

24   we don't believe it's out of malice towards the children, but

25   the State has made a decision over the years such that their

99

1    system, we believe even the State acknowledges, does not have

2    the right number and array of facilities so that children can

3    be placed in the best setting for their needs, close to their

4    home in the least restrictive setting.  In fact, the State

5    today acknowledges that they're trying to change that.  Trying

6    to change the situation is not a defense for the State.  If

7    they have a constitutionally inadequate system then these

8    Plaintiffs, as many Plaintiffs in the class, have the right to

9    challenge it.  They may want to make a change before we get to

10   trial and say it's all fixed now, but simply saying we want to

11   change in the future, we're trying to change, is not a defense,

12   certainly not for class certification.

13          The second major defect is that the licensed foster

14   care subclass has inadequate, as a system, inadequate oversight

15   and monitoring.  You heard the witness yesterday, Ms. Kennedy,

16   who married into the Ken Heustis (phonetic) family that

17   testified yesterday, she talked about the lack of oversight

18   that -- and the evidence, she put in evidence on lack of

19   oversight.  That's a system-wide decision that the State has

20   made.

21          We believe those two defects, inadequate placement

22   array and number, lack of oversight and monitoring, put all

23   children in the licensed foster care subclass to the same risk,

24   the risk (indiscernible) separation, of a safe, secure, and

25   suitable placement and the risk of being separated from family,

1    which we believe is a deprivation of their constitutional right

2    to familial association.

3         Lastly on that subclass, there is a one-stroke

4    remedy, it is not necessarily an instantaneous remedy, but

5    there is a remedy that we believe a common answer to the common

6    problem, and that is more -- a direction to the State to have a

7    constitutionally adequate array and number of placement options

8    for the children.  We believe that that would best be carried

9    out by the Court pursuant to an expert assessment that the

10   Court appoints.  If the Court were to find a constitutional

11   depri -- constitutional violation and the need for a remedy,

12   the Court can appoint an expert that would give a

13   recommendation to the Court for an order that would require

14   constitutional adequate array of placement.  And then,

15   secondly, that the Court can order the State to comply with its

16   own guidelines in this licensed foster care area.  They simply

17   don't have enough people to do it, enough supervisors that are

18   CCL --

19        **THE COURT:**  I don't know if that's part of anything I

20   could do, because a violation of your own policies is not a

21   1983 constitutional violation.  So if it's not a violation

22   aren't I limited to, in a hypothetical remedy, to remedying the

23   constitutional violations?

24        **MR. YETTER:**  It is, your Honor, and this is how I

25   look at it:  So if the State says, okay, we have a policy of

1    doing all the right things and making sure that all of our

2    licensed foster care facilities --

3          **THE COURT:**  Well, some violations of policies I agree

4    would be constitutional violations, but just a simple violating

5    your own policies is not a constitutional violation.

6          **MR. YETTER:**  We look at it this way, your Honor:

7    They may have a policy, but if they also have a -- make a

8    decision or have a policy not to have enough staff there's no

9    way for them to carry out their policy, then they have made the

10   decision to have a systemic defect that the Court can remedy.

11   It's the same thing with caseworkers.  If you don't have enough

12   supervisors that are monitoring the system there's no way that

13   the policies of keeping children safe and secure and in

14   suitable placement is going to be carried out.

15         We believe that the adequate remedy that the Court

16   could order is you have to have an adequate number of

17   supervisors to enforce your own policies.  Otherwise, your

18   policies are (indiscernible).  You can have all the policies in

19   the world, but if you never enforce them you are running a

20   system that has a constitutional defect, your Honor.  That's

21   our position.

22         Third -- or the second subclass is the foster group

23   home.  And our approach to this is very simple, your Honor.

24   This is somewhat of a unique Texas animal.  Every other state

25   says you need to regulate, we believe, we think the evidence

1   the Court has heard is you need to regulate the foster facility

2   as a foster family home.  That's essentially foster parents in

3   a home, that are smaller, or you regulate as in a group of

4   congregate care homes.  And Texas wants to have this little

5   inside, this little middle group for foster group homes that

6   can take between 7 and 12 children and yet --

7          **THE COURT:**  Did you give -- sorry.  I'm cutting in

8   the middle of your thought, which is horrible, but I have to --

9   my thoughts.  Did you give her the affidavit of the COA guy?

10          **MR. YETTER:**  Yes, yesterday.  This is --

11          **THE COURT:**  She says not.

12          **MR. YETTER:**  This is Mr. Klarberg.  It's Plaintiffs'

13   Number 7.

14          **THE COURT:**  Number 7?

15          **MR. YETTER:**  We still owe your case manager something

16   and she's been good to remind me and I promised I'm going to

17   get it to her, and that's the most recent, 322, I believe,

18   Plaintiffs' Exhibit 322.

19          **THE COURT:**  All right, I'll give you another few

20   minutes, because I messed with your train of thought there.

21          **MR. YETTER:**  Okay.  So this is on the third -- on the

22   subclass foster group homes.  Essentially Texas wants to take

23   this middle in-between, this middle sized foster facility

24   called a foster group home that has between 7 and 12 children,

25   and regulate it or treat it like a foster family home that has

1    one to six.  And we believe national standards, and

2    Mr. Klarberg's group, the Council on Accreditation, says this,

3    there are no national standards for that middle group that

4    Texas has created because that's not a good practice.  That

5    should be regulated as a group congregate facility.  That means

6    they have to have awake care givers, they have to have,

7    depending on the children, certain medical professionals.  They

8    just have to treat it -- you cannot take a group of 12 to --

9    excuse me -- 7 to 12 children, put them in a home and not treat

10   them like a congregate care facility.

11          And that, we believe, is a systemic defect.  Lots of

12   children are subject to this foster group home subclass --

13          **THE COURT:**  You gave me the percentages and I forgot

14   what that was -- or the numbers anyway.

15          **MR. YETTER:**  I don't have the numbers at the top of

16   my head, but I believe that that's something less than

17   20 percent of the total class, your Honor.  The foster group

18   home class is I believe in the -- I can get you that number

19   straightaway.

20          **THE COURT:**  I've got it someplace.

21          **MR. YETTER:**  It's about 1200 children, I believe,

22   your Honor, but I'll get you that number.

23          **THE COURT:**  All right.

24          **MR. YETTER:**  So that group is in a sense in a little

25   no-man's land in terms of regulation, because the State wants

1    to treat larger foster group home facilities as if they were

2    little foster family home placements.  We think there is a

3    simple -- this one is actually a simple remedy that the Court

4    would -- could order, a one-stroke solution, and that is to

5    require the State to treat them and license these foster group

6    homes as group care facilities.  Subject them to the same

7    professional standards as the State -- as professionally

8    recognized for group care facilities.  So stop treating them as

9    little foster facilities and treat them as they are, as group

10   congregate care facilities.

11          THE COURT:  Did you all tell me that is through 7 to

12   12 or 7 to 11 -- through 11?

13          MR. YETTER:  It should be 7 to 12.

14          THE COURT:  Seven to twelve, okay.

15          MR. YETTER:  Okay.  So the three groups, your Honor:

16   the littlest group is one to six, that's a foster family home;

17   the middle group is what Texas calls --

18          THE COURT:  And that includes -- the one to six

19   includes any biological children that the people have.

20          MR. YETTER:  Yes, it does.  It does.

21          THE COURT:  Or whatever.

22          MR. YETTER:  I believe all of these --

23          THE COURT:  I shouldn't say biological, any of their

24   children.

25          MR. YETTER:  Right.  And then the middle group is 7

1   to 12 and then the large group --

2           **THE COURT:**  Also includes their children.

3           **MR. YETTER:**  It does.  And then the large group is 13

4   to a hundred plus.  And those are called -- well, those are

5   group -- group homes within the state.  So there's a simple

6   remedy for that and that is just treat them like congregate

7   care.

8           The third subclass is the GRO, the general

9   residential operations subclass, only focused on the children

10  that have basic needs.  So the general, the GROs are

11  specialized facilities, very large facilities that are

12  designed -- they're essentially the institutions, the modern

13  day orphanages.  They should not be used, as a matter of

14  policy, according to what we believe and professional

15  standards --

16          **THE COURT:**  For basic needs children.

17          **MR. YETTER:**  -- for basic needs children.  That's a

18  very simple one and the remedy is even easier.  We believe

19  these simply should not be used for basic care children and so

20  the practice should stop.

21          The last subclass is the unverified kinship subclass.

22  Our position on this simply, your Honor, is the State treats

23  all of their foster care children according to certain

24  standards by requiring the foster parents to do -- to be --

25          **THE COURT:**  Licensed.

1          **MR. YETTER:**  -- licensed, trained, and funded to a

2     certain extent.  For good reasons, because those parents, those

3     foster parents, need to be able to handle children that have

4     been through significant emotional and to some extent physical

5     trauma.  That training, that licensing, and, importantly, that

6     funding is not given to unverified kinship.  There's a huge

7     slice of the foster -- the PMC class that gets foster parents,

8     as well-meaning as they might be, that are related, that are

9     kin, that are neither licensed nor trained nor funded.  And

10    that's a significant issue, your Honor, and there's -- and

11    they've given -- the State has presented no evidence why that

12    group of foster children, focusing just on the PMC children in

13    unverified kinship, why that group of foster children don't

14    deserve foster parents that are licensed and trained and funded

15    the way that all the other foster children in the PMC class

16    deserve.

17          Your Honor, again, we think this presents these

18    children at risk of being deprived of a safe and secure home

19    and that the one-stroke remedy that the Court could issue is

20    simply requiring the State to treat that group of children that

21    they, whether they're placed with kin or non-relatives, that

22    they have foster parents that have the same -- essentially have

23    the same levels of licensing, training, and have the same

24    financial resources.

25          Your Honor, that, by way of overview, is what we

1    believe is the standards that you're to apply in our class and

2    four subclasses.

3           Thank you.

4           Let me give you a couple of numbers, your Honor.  The

5    foster group home subclass has 909 children in it.  This is as

6    of May of 2012.  The basic care children in the GRO subclass

7    has 385 children in it.  And the unverified kinship subclass

8    has 2903 --

9           **THE COURT:**  Ninety-four.  That's what I wrote down.

10          **MR. YETTER:**  Okay.

11          **THE COURT:**  That's the only number I have, 20,994.

12          **MR. YETTER:**  All right.  Thank you, your Honor.

13          **THE COURT:**  All the rest of the 12,000 are in the

14   larger class?

15          **MS. LOWRY:**  Yes, your Honor, exactly.  And that's an

16   important point, because, as the Court has been aware since we

17   filed --

18          **THE COURT:**  Wait a minute.  Licensed foster care, how

19   many are in that?

20          **MS. LOWRY:**  Licensed foster care -- well, non-

21   verified foster care is about 2800, so it's 4,000 minus 2800.

22          **(Plaintiffs' counsel confer)**

23          **MR. YETTER:**  Your Honor, the licensed foster care --

24          **MS. LOWRY:**  Oh, I'm sorry --

25          **MR. YETTER:**  -- has about --

1          **MS. LOWRY:**  -- I answered the wrong question.

2          **MR. YETTER:**  -- 9,000 children.  I don't -- I'll get

3    you an exact number.  It's about 9,000 children.

4          **THE COURT:**  So all of the 12,000 are in one of these

5    four subclasses.

6          **MS. LOWRY:**  Yes.

7          **THE COURT:**  Okay.

8          **MR. YETTER:**  Yes.

9          **MS. LOWRY:**  No, they're all -- no, they're not.

10         **MR. YETTER:**  There's actually one little sliver that

11   is in verified kinship that is not in any of the subclasses.

12   It's a very small sliver, but it's verified kinship placement,

13   so they're not in any of the subclasses.

14         **THE COURT:**  So they're in the overall class.

15         **MR. YETTER:**  They are in the overall class, yes,

16   ma'am.

17         **MS. LOWRY:**  Those are kids who are basically on their

18   way to being adopted by their relatives, so the State puts them

19   briefly into verified foster care, and then most of those

20   children move out to adoption by their relatives and they leave

21   the system altogether.

22         Your Honor, the Court asked, of course, a very

23   important question and that was don't -- can I enter a remedy

24   if the State isn't following its own policy and the answer to

25   that is no.  There has to be a constitutional violation.  And

1    all of this lawsuit is based on the fact that, (indiscernible)

2    and bottom, children are being harmed and they're being harmed

3    either directly or they are at risk of harm.  These are not --

4    caseloads don't matter if it has no impact on the children.

5    None of these things matter unless they have an impact on

6    children.  And we're in an interesting position because we

7    brought this case, as the Court is well aware, saying children

8    in permanent managing conservatorship of the State of Texas,

9    which is an unusual grouping that Texas has created.  Texas has

10   created this group of youngsters that have crossed the line

11   into basically permanent foster care.  Some of them get out,

12   but the longer they stay in, the less likely they are to get

13   out.

14           **THE COURT:**  Do you know what percentage of the ones

15   that are in PMC have had their parental rights terminated?

16           **MS. LOWRY:**  Two-thirds of the children, I believe.

17   Two-thirds of the children have had parental rights terminated,

18   your Honor, and yet they stay in foster care and --

19           **MR. YETTER:**  Seventy-five percent.

20           **MS. LOWRY:**  Not two-thirds, 75 percent.

21           **THE COURT:**  Three-fourths.

22           **MS. LOWRY:**  Yes.  Yes.

23           And those are the -- some of those children are the

24   17 percent who are leaving the children to emancipation, moving

25   from place to place, often being subject to conditions -- you

1    heard yesterday about what happens in some of the licensed

2    facilities, the uses -- the use of restraints, certainly child-

3    on-child abuse, which the State doesn't collect, and these are

4    children who --

5             **THE COURT:**  Sorry?  They don't --

6             **MS. LOWRY:**  The use of child -- like they use --

7             **THE COURT:**  Child-on-child abuse is not --

8             **MS. LOWRY:**  Child --

9             **THE COURT:**  -- there are no records on that?

10            **MS. LOWRY:**  The State does not collect that

11   information.  The State --

12            **THE COURT:**  Is that true, Mr. Albright?

13            **MR. ALBRIGHT:**  No, it's not, your Honor.

14            **MS. LOWRY:**  We heard testimony on it.

15            **MR. ALBRIGHT:**  Well, but, Judge, I think the

16   testimony was that child-on-child abuse is recorded and I think

17   it's called class or class records, but we do record --

18            **MS. LOWRY:**  Individually.

19            **MR. ALBRIGHT:**  -- and investigate them all.

20            **MS. LOWRY:**  Yes, your Honor, that's correct, but they

21   do not aggregate that.  So we have -- one of the deposition

22   testimony questions --

23            **THE COURT:**  So you have to look at each case file, is

24   what you're saying?

25            **MS. LOWRY:**  That's right.  That's right.

1      **THE COURT:**  So they don't have like -- for the whole

2  system there's not like 10,000 --

3      **MS. LOWRY:**  How many children --

4      **THE COURT:**  -- events occurred this year that were

5  child-on-child.

6      **MS. LOWRY:**  Exactly, how many children were abused by

7  other children, which is a sign of something going on in the

8  system, of course.  The State can't answer that on an aggregate

9  basis.  And, in fact, one of our children, as the Court

10  remembers, was a child who was abused by another child --

11      **THE COURT:**  Who was sexually abused by another child.

12      **MS. LOWRY:**  Who was raped by several children who

13  was, I think, 8 years old when the other children were 16 and

14  who was in a foster group home with these other children, one

15  of whom was a sexual perpetrator who probably had been sexually

16  perpetrated on himself.

17      **THE COURT:**  That's usually what happens.

18      **MS. LOWRY:**  Yes, it is.  And the State nevertheless

19  placed him there.  I'm sure unwittingly, which in itself is a

20  problem, and the child was raped and the investigation was not

21  substantiated because the only time the investigation is

22  substantiated is if the caretaker, if the foster group

23  parent --

24      **THE COURT:**  Witnessed?

25      **MS. LOWRY:**  -- or exercised lack of supervision.  He

1    wasn't awake because sleeping is allowed in a foster group

2    home.  He could be asleep.  Very conscientious person

3    apparently who was asleep.  And the child was sexually abused

4    by these other kids.

5           But if you ask the State how many children have had

6    that happen to them they don't have the aggregate numbers and

7    there is no substantiation of maltreatment because the

8    substantiation is only against the adult.

9           So this is the system in which children --

10   your Honor, I'm sorry, did you want to ask me a question?

11           **THE COURT:**  No, I was just taking a deep breath.

12           **MS. LOWRY:**  Okay, sorry.  This is a system in which

13   children are, in fact, getting harmed and all of them in these

14   groups are at risk of harm.  That's what we said in our initial

15   Complaint.  The Court certified it.  The Fifth Circuit, as the

16   Court is aware, said you've got to break out the pieces.  It's

17   too amorphous and we don't like the remedies either, because

18   some of the remedies don't apply to all of the children and

19   it's too individual.  So when we came back down to this

20   Court --

21           **THE COURT:**  Back down?

22           **MS. LOWRY:**  Excuse me, your Honor.

23           **THE COURT:**  That's all right, I'm kidding.

24           **MS. LOWRY:**  When we came back to this Court we

25   attempted to address it from the other standpoint, which was

1   we're going to start out with how this, in fact, is common.

2   And that's what we considered our burden to be for the Court

3   for this hearing; that is, the Defendants have defended on the

4   ground everything is individual, you can't come up with common

5   remedies, and each child is different, each child gets hurt

6   differently, and we came back and we said no, there are general

7   structural deficiencies.  The Circuit said we're not interested

8   in mismanagement; we're interested in structural deficiencies.

9           And so we reorganized the case around structural

10  deficiencies, all of which, however, lead to the harm that is

11  being inflicted on children and the risk of harm, more

12  importantly, because we don't who is going to get abused

13  tomorrow, so all of these children are at risk of

14  constitutional deprivation.  Not we don't like this policy we

15  prefer that one, constitutional deprivation.  These children

16  have fundamental rights.  Courts all over the country have said

17  that they vary on the scope of those rights they have a right

18  to adequate protection when they're in the custody of the

19  State.

20          **THE COURT:**  Reasonable safety.

21          **MS. LOWRY:**  Yes, your Honor.

22          **THE COURT:**  Reasonably -- reasonable safe

23  environment, I think.

24          **MS. LOWRY:**  Yes, your Honor.

25          **THE COURT:**  Almost everybody agrees on that.

1          **MS. LOWRY:**  Yes.  And the *Youngberg* case, which is

2    kind of the leading case in this area, talks about both

3    protection from both physical harm and from emotional

4    deterioration.  And so the fact that these --

5          **THE COURT:**  I was just also looking at all the

6    medication these children are on, the class representatives,

7    the proposed class representatives.  I mean just tremendous

8    amounts of medication.

9          **MS. LOWRY:**  Yes, there is, your Honor, and in part

10   that's to control the behavior of children who are damaged and

11   inappropriately placed, because you also have in some of the

12   admitted statements the fact that children are not in the kinds

13   of placements that they need because they have been damaged by

14   moving from place to place.

15         With regard to our class --

16         **THE COURT:**  Well, they come into the -- they come

17   into the system damaged and that's --

18         **MS. LOWRY:**  Yes, they do.

19         **THE COURT:**  -- the scary thing.

20         **MS. LOWRY:**  Yes, they do and for some of the

21   children, not all, for some of the children the system makes it

22   worse.  Clearly a child who's been in several placements is not

23   a child who is not going to have his problems compounded.

24         So what -- and that is -- and we divided this up into

25   structural issues and there are structural issues here and

1    that's what resulted in harm.  So what we wanted to presented

2    to the Court in this hearing, and we think we have, is that the

3    structural issues that we broke off here are capable of cross-

4    wide treatment, they are common, they affect children commonly,

5    they don't -- the consequences to the children is not always

6    the same, but they put all children at risk of harm.  And the

7    harms are dire when, in fact, they affect the children.  So --

8             **THE COURT:**  Was it the Hernandez case where the child

9    died in foster care?

10            **MS. LOWRY:**  Yes, your Honor.  One of our witnesses

11   testified, and I think we actually had confirmation of it,

12   that, in fact, she believes that -- Dr. Miller testified that

13   she believes there is under-reporting of maltreatment in care

14   in Texas.

15            Now, your Honor, we can't prove that to you now.  If

16   you will allow us to go to trial we will prove that to you.

17   But we know that, in fact, when the caseloads are too high, we

18   know that when children are seen by workers that they don't

19   know, as is the case regarding senior workers, those are -- and

20   that's a result of the structural deficiency of caseloads --

21   when children are, in fact, in appropriate placement,

22   maltreatment does not get reported.  And what we are seeking in

23   this hearing is to go to the next stage, because to dig out

24   some of that evidence for the Court to show just how badly some

25   children are getting harmed and what needs to be done to

1    address that harm is something that we need broader discovery

2    for.  As the Court is aware, we did have a case record review,

3    we were on our way, and then the State, after the Circuit

4    remanded, asked to have that cut off and it was cut off, and

5    obviously we need to do some much more extensive discovery

6    should the Court certify the class, as we hope you will.

7            But, your Honor, the -- any foster care system is a

8    complex system.  We are now looking at a subgroup of the foster

9    care system.  We're looking at the permanent managing

10   conservatorship, which requires breaking out some of the data.

11   And we are looking at the consequences to children and the risk

12   of harm to children and the State keeps its information in an

13   unusual way and some of this information it doesn't keep at all

14   on an aggregate basis.  So we are going to have our work cut

15   out for us, but what is at stake here, your Honor, as the Court

16   asked, is, in fact, constitutional harm to children, which can

17   be addressed by this Court.

18           As my colleague said --

19           **THE COURT:**  Can you tell me --

20           **MS. LOWRY:**  Please.

21           **THE COURT:**  -- are you going to divide it up like

22   substantive due process and that sort of thing?  I mean --

23           **MS. LOWRY:**  Your Honor, this is all basically

24   substantive due process.  There's also a right to familial

25   association, which I believe we've pleaded as well --

1          **THE COURT:**  Yes.

2          **MS. LOWRY:**  -- but this is all basically substantive

3     due process, and we need to fill in what that exactly means and

4     we need to --

5          **THE COURT:**  Are you going to help me with that now or

6     is that down the road?

7          **MS. LOWRY:**  Well, no, your Honor, there is in our

8     brief --

9          **THE COURT:**  I know it's there.

10         **MS. LOWRY:**  Basically it's right to adequate care,

11    it's the right to freedom from harm, it's the right to

12    protection from the risk of harm when it's a realistic risk of

13    harm.  And there's a line of cases having to do with, for

14    example, fire safety in prisons that says, you know, the

15    prisoners have a right to a prison that is not going to burn

16    up; you don't have to wait till they burn up before you can

17    enforce that right.  So this is a system and that's why it's

18    important for the Court to know that children are staying in

19    care too long, are moving around too much, are leaving the

20    system without harm and which children are clearly at

21    demonstrable risk of harm.

22         But the case law does generally encompass the right

23    to freedom from emotional harm, as well as the obvious right to

24    freedom from physical harm.  That's clear.  But the case law

25    also says that children have a right to freedom from the risk

1    of deprivation of a constitutional right, and there can't be a

2    clearer constitutional right than the right of children in

3    State custody under the State's protection not to be harmed

4    while in the State's custody.

5            So we think that we're on strong constitutional

6    grounds with regard to our substantive due process claim here.

7    And, your Honor, it's not, as the Defendants said in one of

8    their briefs, the right to a number of caseworkers.  That's

9    silly, basically.  It's the right to a system in which they're

10   going to get protected and we've already heard testimony, which

11   is unrefuted, that --

12           **THE COURT:**  How did you get interested in this area?

13   I have to interrupt you to ask.

14           **MS. LOWRY:**  How did I --

15           **THE COURT:**  Yes.  I know you have a long history of

16   this.

17           **MS. LOWRY:**  I do.  Your Honor, I believe that the

18   State should not abuse its citizens and I can't think of any

19   more helpless group of citizens --

20           **THE COURT:**  More vulnerable.

21           **MS. LOWRY:**  -- than children.  And, frankly, when I

22   got into it it made me angry and it makes me angry to this day,

23   because we're seeing -- because the State is paying money --

24   they don't intend to harm these children, but the State and the

25   taxpayers are paying money for a system that does harm these

1    children and it's fixable and we have seen it improve in other

2    systems.  And it's never going to be perfect, but one of the

3    reasons that -- you said it the other day, I don't want to

4    certify something if it's basically going to be useless.  Of

5    course not, but, your Honor, these Court orders can make a

6    difference.  Whether it results in the parties negotiating a

7    settlement rather than risk the Court imposing --

8            **THE COURT:**  Apparently that's mostly what happens,

9    isn't it?

10           **MS. LOWRY:**  That's mostly what happens.  Our case --

11   one of our cases is on trial as we speak in Massachusetts.  But

12   most of the cases settle and they usually settle in the trial

13   after we have developed a record, because we need to lay out

14   for the State -- in many instances we've documented things the

15   State doesn't even know exist because they're not fixing it.

16   Again, no ill motives impugned to the State at all.

17           But it's important for us both to tell your Honor

18   what's wrong and why it's wrong, because it's important for us

19   to be able to document the kinds of remedies -- but we have

20   described and laid out the kinds of specific remedies that we

21   think are going to work here.

22           But, your Honor, this is, of course, as you're very

23   well aware, you're an Article III Judge, this is I think such a

24   critical area of government and the legislature may be very

25   well intentioned, but -- and I have no reason to believe

1    they're not, but sometimes these children are not a low

2    priority -- or are a low priority, they don't have anybody to

3    lobby for them, the only time anybody ever hears about them is

4    when there's some horrible death and when there's a newspaper

5    splash for a couple of days and then it goes away, and they

6    don't get the number of caseworkers they need, they don't get

7    the number of placements they need, they don't get the

8    oversight.

9         You heard testimony yesterday about the oversight

10   things and that was one of the issues that the Circuit

11   specifically referred to, about the use of these restraints,

12   about the fact that these restraints aren't recorded, that the

13   investigations that the State itself is doing with regard to

14   maltreatment of children, a very concrete area that the State's

15   quality assurance in turn is finding fault with because --

16   perhaps because they don't have enough workers.

17        These are areas that are being neglected because --

18   and that's why these children have to be in court and that's

19   why these children need to ask your Honor to have this case

20   certified, so we can go forward with it and provide the

21   evidence to get -- if we need to, to give to the Court where we

22   ask the Court for a remedy that addresses to common issues that

23   cause the risk of harm to the children that we represent.

24        Texas has done an unusual thing in creating, not only

25   with its foster group homes, which you heard my client talking

1    about, but by creating this permanent managing conservatorship

2    system for children, which for too many children is just the

3    end of the line.  Some children get out at the early stages,

4    but 17 percent of the children who leave every year into

5    emancipation are children who have been there more than four

6    years and too many children have parental rights terminated but

7    do not go on to adoption.  Seven thousand children in the State

8    system are children who the State itself -- we never quarrel

9    with a decision of the State with regard to an individual

10   child.  This is not about individual decisions.  Seven thousand

11   children the State's decided need to be adopted, not adopted.

12   And many of those children are going to wind up as some of your

13   emancipated children who have no families, no homes.

14          This Court has the authority, has the jurisdiction,

15   and has the case law support to certify this class and to allow

16   us to gather the kind of detailed evidence that we need to

17   establish to your Honor the constitutional violations that are

18   going on and ruining the lives of far too many children in

19   Texas.

20          And if you have no further questions -- we are in a

21   strange position, I think, because on our pleadings we asserted

22   a class action and the Court found that it was a proper class

23   action.  Now we've been asked by the Circuit to break it down

24   into pieces, into details, so that it's more specific and more

25   defined.  We've done that.  We have shown that there are common

1    issues with our class and subclasses.  There hasn't been any

2    defense about whether they're common problems.  They are common

3    problems.  The State disagrees with us, of course, about the

4    severity, but --

5            **THE COURT:**  And the constitutionality of the --

6            **MS. LOWRY:**  Well --

7            **THE COURT:**  -- of the problems, I think from their

8    brief.

9            **MS. LOWRY:**  They do, but I think that -- I mean the

10   State will speak for itself on that, but it is clear that the

11   constitution protects children from being harmed and being

12   subject to the risk of harm while it's under the protection of

13   the State and I think the case law is very, very strong on

14   that, your Honor.

15           **THE COURT:**  Well, they certainly have at least

16   minimum the same rights that prisoners have.  Hopefully, one

17   would think, more.

18           **MS. LOWRY:**  And some of the cases do say that we have

19   more than that.  I don't think there's any case that says the

20   reverse.  Some of them --

21           **THE COURT:**  No.

22           **MS. LOWRY:**  -- specifically address it.  And, as you

23   noted, one of Judge Hogan's decisions had a very eloquent

24   passage --

25           **THE COURT:**  Yes.

1      **MS. LOWRY:**  -- about that, a very eloquent and moving

2  passage.

3          So, your Honor, we urge you to let us move forward

4  with this case on behalf of these children whose rights need

5  protection from this Court.  We think we've laid out the case

6  to you and we hope you think so as well.

7          And, your Honor, thank you so much for your attention

8  and for your flexibility in letting us proceed with what you

9  have and we do really appreciate the Court's interest in this

10  matter.  Thank you.

11      **THE COURT:**  Thank you.

12          Mr. Albright?

13          **CLOSING ARGUMENT ON BEHALF OF DEFENDANTS**

14      **BY MR. ALBRIGHT:**  Yes, your Honor.  Let me pick up

15  just where opposing counsel left off.  Thank your Honor for

16  your attention to this matter and it's evident you do listen

17  and listen carefully.

18          Judge, you said that you wanted us to speak to the

19  standard and I thought I'd cover the landscape on that, because

20  I started thinking, well, which standard, and the three that I

21  would like to talk about briefly, Judge, is the constitutional

22  standard, then the professional standard, and then the standard

23  here today for class certification.

24          On the constitutional standard, I don't disagree that

25  we owe duties to these children, but I think the law says it is

1    a duty to keep them free from -- and here is a word you have

2    never heard the Plaintiffs say -- an unreasonable risk of harm.

3    There is a risk of harm walking out the door --

4         **THE COURT:**  I agree that the standard is the

5    entitlement for basic minimum of a placement -- some placement

6    in the PMC program, a place that's reasonably safe.

7         **MR. ALBRIGHT:**  And our position on that, your Honor,

8    is that in order to say something is an unreasonable risk of

9    harm you really have to demonstrate that the bad thing happens

10   and now these similarly situated children are subjected to that

11   same thing and it happens in frequency and for reasons that

12   really do cause risk to these children.

13        And this is a difficult subject to talk about, Judge,

14   because at one level -- and I think you elicited some candid

15   responses -- of course, everyone would like to see improvement.

16   Everyone cares about these issues.  And it's difficult in the

17   arena of children and children's interests to draw distinctions

18   between constitutional requirements and better and more sound

19   rights created under state procedure, state policy, federal

20   statutory law.  But I do think --

21        **THE COURT:**  It's difficult, because you're not

22   entitled, apparently, constitutionally to the perfect family.

23        **MR. ALBRIGHT:**  Exactly, and so what -- and that's why

24   a rigorous analysis is so hard.  And with all due deference and

25   respect to the Plaintiffs --

1          **THE COURT:**  I don't think --

2          **MR. ALBRIGHT:**  -- they --

3          **THE COURT:**  -- I think there's enough case law that

4    says you're not entitled constitutionally to be with your

5    siblings.

6          **MR. ALBRIGHT:**  I think that's right, your Honor,

7    so --

8          **THE COURT:**  Which is a shame.

9          **MR. ALBRIGHT:**  So the -- and, you know, legislatures

10   can address that in a forum where policy and studies and

11   analysis are flushed out and good decisions are made and best

12   practices defined and best practices implemented.  But those

13   are not constitutional issues, your Honor.  We really believe

14   that.  And so let me just stay with the notion of unreasonable.

15         So there's risk in everything and in order to assess

16   whether a risk is unreasonable or not you've got to demonstrate

17   that, look, this happens for this reason and now we've

18   subjected these children to a situation where there is an

19   unreasonable risk that it will happen to them.  And I'll come

20   back to that in a moment, but I just wanted to emphasize that

21   perhaps the State would want to, perhaps the State aspires to

22   keep these children safe from any imaginable harm, but that is

23   not a constitutional obligation.

24         The second standard, your Honor, you heard a lot

25   about COA, you heard a lot about CWLA, but you did not hear

1    that that is generally accepted across this country.  How many

2    states have adopted or been accredited by the COA?  What proof

3    did the Plaintiffs bring you?  Six out of 50?  Did they bring

4    you proof that any state in the United States has adopted the

5    CWLA standards and imposes them and enforces them with their

6    caseload staff?  What proof did they bring you that those

7    standards that are admittedly aspirational best practice goals

8    have actually been generally accepted by the people that

9    actually administer and care for these children?  They've

10   brought you no proof on that, that those are generally accepted

11   standards that govern under these circumstances.

12           And, your Honor, we actually cited the _Braam v._

13   _Washington_ case to your Honor that said -- and it was a foster

14   care case and the ruling was, look, we are not even going to

15   admit CWLA standards into evidence as reflecting generally

16   accepted standards or the standard of conduct because they are

17   aspirational, they are best practices, they are things to be

18   aspired to, but they are not things that are imported into the

19   Fourteenth Amendment of the Constitution.

20           Now, Judge, most importantly, the third standard that

21   I wanted to address to your Honor is what are we about here

22   today.  And before it escapes my mind, as much has in the last

23   few days, when Mr. Yetter said the State has brought you no

24   proof and then he made some statement about --

25           **THE COURT:**  I understand you don't have to put on any

1    proof at all.

2          **MR. ALBRIGHT:**  Okay, it's not our burden, right.

3    Thank you.

4          **THE COURT:**  I try enough criminal cases even to know

5    that.

6          **MR. ALBRIGHT:**  Yeah, I know.  Well, that's -- well,

7    we talked about your Honor's experience with criminal cases

8    when we decided to offer no evidence today.  We understand the

9    burden of proof and we know your Honor does.

10          And in that regard, I've got to say something --

11          **THE COURT:**  And I can tell you this right now, there

12    is nothing in my mind that I'm thinking -- like I always tell

13    the criminal juries, there's nothing I'm saying I wish they had

14    addressed the following.  It's not there.  Don't worry about

15    that.

16          **MR. ALBRIGHT:**  Okay.

17          **THE COURT:**  It stands and falls -- all falls on what

18    they put on.

19          **MR. ALBRIGHT:**  And let me speak for just a moment to

20    the notion of burden of proof.  And, Judge, Marcia Robinson

21    Lowry is to be praised and admired --

22          **THE COURT:**  She's incredible, isn't she?

23          **MR. ALBRIGHT:**  -- for what she does.  I've got to say

24    I'm proud that we were so far down the list it took 25 years to

25    get to Texas, and I think that probably speaks a little bit to

1    the urgency of whether we really do have problems here.

2              However, aside from that, I think we are in a

3    situation where it is time to prove that they can form a class

4    and the burden of proof is on them.  And in determining whether

5    they've met that burden of proof I think your Honor looks at

6    what started yesterday morning -- I mean --

7              **THE COURT:**  Tuesday.

8              **MR. ALBRIGHT:**  -- I've lost track of time, Tuesday,

9    Tuesday morning, and ended just a while ago when Audra Deckinga

10   closed -- and we closed after Audra Deckinga testified to

11   your Honor.  And, frankly, I'm --

12             **THE COURT:**  Can I tell you -- okay, I'm going to tell

13   you what I'm thinking, in case you want to do anything

14   differently.

15             If I make a mistake, I would rather do it in favor of

16   the children than not.  I would rather -- this is what I'm

17   thinking about, not having heard all of the closing

18   arguments -- I'd rather certify a class or a subclass or two

19   subclasses than not.  I am concerned about the future of this

20   type of litigation, first, and I'd like to see what the Supreme

21   Court or the Fifth Circuit has to say, if there's enough

22   evidence here, and I'm not sure they could give me any more

23   evidence at this stage.  These are my concerns.  I wanted to

24   tell you what I'm thinking about.  I'm concerned.

25             I doubt that there's a department in the country that

1    people don't have concerns about, whether it's Court -- a Court

2    oversees it or not.  So -- and I'm worried about not certifying

3    as much as I'm worried about certifying.  Maybe a little bit

4    more I'm in favor of certifying, I have to tell you.

5         **MR. ALBRIGHT:**  I figured.

6         **THE COURT:**  Because of these concerns.  I mean what

7    if I don't and worse things happen, worse case scenarios, that

8    we've got with overworked caseworkers.  And everybody knows how

9    overworked this is, it's ever been a part of the system.  They

10   are so tremendously overworked and they do the best then can.

11   These are good people --

12        **MR. ALBRIGHT:**  And, your Honor --

13        **THE COURT:**  -- sometimes doing an impossible job.

14        **MR. ALBRIGHT:**  And I thought of the next friend, who

15   had a heavy docket, and I thought professionals, even when

16   they're overworked --

17        **THE COURT:**  A hundred and twenty.

18        **MR. ALBRIGHT:**  -- they deliver, they deliver.  And I

19   know -- and maybe it's not right to ask people to work so hard,

20   but I think --

21        **THE COURT:**  I never did that when I was an ad litem,

22   I never did that much.  I mean imagine forming a non-profit to

23   make sure children had Christmas toys.  I thought if I went

24   over and visited them and took them to the mall and took them

25   shopping, you know, and gave them phone numbers, that I was

130

1    doing the best I could.  And I filed a lot of suits, by the

2    way, for terminations before the department was filing

3    automatic terminations, because I'm thinking why are we even

4    thinking about this.  So I'm just giving you that as

5    background.

6              **MR. ALBRIGHT:**  I appreciate that.

7              **THE COURT:**  But I never did, I never did the degree

8    that these people, the commitments and the, you know, cell

9    phones and -- I mean I am so impressed.  And that's another

10   thing about the system, should the system have to rely on all

11   these different -- CASA and the ad litems.  They're not really

12   charged with doing that much.  They do it because nobody else

13   is doing it.  That's what I got from that, so….

14             **MR. ALBRIGHT:**  I understand, your Honor.

15             **THE COURT:**  I'm sorry, Mr. Albright.

16             **MR. ALBRIGHT:**  I don't understand why your Honor

17   would apologize --

18             **THE COURT:**  Okay, well --

19             **MR. ALBRIGHT:**  -- making that observation, Judge.  I

20   appreciate the Court's candor on all of these issues and I

21   think it is difficult.  I started out by saying I respect you

22   and I didn't want to qualify with respectfully disagreeing, so

23   I'll just disagree.  I don't think you can certify these

24   classes.  I do not think they brought you the evidence.  We are

25   39 depositions or 40 depositions into this case.  We are six

1     million documents into this case.  They had 12,000 children to

2     pick from to find children who were actually harmed and bring

3     you that proof and they haven't.  And someone made reference

4     to, well, Judge, it's in the record about harm to these

5     children.  We brought an expert witness and when they did not

6     put on their psychologist who examined these children to come

7     in and testify about harm to these children and, more

8     importantly, the harm to these already damaged children, there

9     is no evidence before this Court that anything we have done,

10    whether it's caseload, array, unverified kinship care, that we

11    have harmed or damaged these children and there is no proof on

12    that.  Why did they not call their expert witness?  They knew

13    they cannot prove that what we have done has damaged even the

14    11 or 12 they were able to select from the group.

15              And in that regard, your Honor, I'm a fiduciary to my

16    clients.  I need to push on procedural issues.  I think when we

17    brief this matter to the Court I think there should be

18    citations and references to the evidentiary record, not to the

19    Court docket.  They have filed a lot of things.  I don't think

20    the Complaint and the allegation in the Complaint are evidence.

21              **THE COURT:**  Actually it is.  In Federal Court it is.

22              **MR. ALBRIGHT:**  Okay.  Disagree, respectfully.  It's

23    not a verified -- well, anyway, Judge, we --

24              **THE COURT:**  It doesn't have to be a verified

25    pleading, but it has to be denied, and I don't recall that the

```
 1   specific allegations were ever denied --

 2            MR. ALBRIGHT:  Well, we have --

 3            THE COURT:  -- because we don't have general denials

 4   in Federal Court.  You have to specifically deny.

 5            MR. ALBRIGHT:  I can go back and look at that,

 6   your Honor.  I don't think we have ever admitted causation.  I

 7   don't think we have denied --

 8            THE COURT:  No, no, no.  I'm not even thinking about

 9   that.  I was thinking about what happened to these specific

10   children.

11            MR. ALBRIGHT:  Right.

12            THE COURT:  Which is not -- neither here nor there at

13   the moment, but it is something to look at when you think what

14   happens to children in PMC.  What's the worst case scenario

15   that can happen to children in a PMC, which is what they're

16   trying to tell me.

17            MR. ALBRIGHT:  And after 39 --

18            THE COURT:  And those things have not been denied,

19   that these children, these things have happened to these

20   children that were selected as class representatives or plead

21   the class representatives.

22            MR. ALBRIGHT:  And where is the evidence that

23   anything that we have done has caused that harm?  And, Judge,

24   if it was there we'd analyze it, we'd look at it, we -- you

25   know, we'd be required to do it.  And we were prepared to
```

1    answer with a highly qualified expert the testimony of their

2    psychologist, and I believe, I could be corrected on this, I

3    think they told your Honor they needed those psychological

4    exams to be able to get their class certified and now they've

5    withdrawn that very witness.  I think that's tantamount to an

6    admission that they really haven't brought you the causation

7    proof.

8               But anyway, back to that point, I really do hope that

9    when we are supporting our case or refuting it, and it's hard,

10   you know, to -- negative --

11              **THE COURT:**  To prove a negative, right, that's it.

12              **MR. ALBRIGHT:**  Whatever that term is.

13              **THE COURT:**  What's your Latin term?  Throw that in

14   too.

15              **MR. ALBRIGHT:**  Well, Judge, I thought ipse dixit and

16   it's --

17              **THE COURT:**  That's it.

18              **MR. ALBRIGHT:**  -- in addressing --

19              **THE COURT:**  I'll have to quote that in my opinion.

20       **(Laughter)**

21              **MR. ALBRIGHT:**  In an original gender probably

22   appropriate way is, you know, because he says it, it's true, or

23   something like that.  I was going to actually fix that because

24   I felt like a couple of the Plaintiffs' experts there might be

25   a gender change appropriate to that.

1          However, I do think, for example, that Daryl

2    Chansuthus, I think that she testified that there really aren't

3    generally accepted standards applicable to case -- I mean to

4    investigative staff caseloads and that it was her opinion, and

5    she really didn't refer to outside judgment on that.  And so I

6    think that's a pretty clear example of ipse dixit.

7          The other one I was going to talk about, which really

8    is appropriate, is -- and I'll mess it up -- but it's the post

9    hoc ergo propter hoc idea.

10         **THE COURT:**  That's even better.

11         **MR. ALBRIGHT:**  Well, Judge, I'm going to give you a

12   version that I understand better, and that is the rooster

13   crows, the sun comes up, are you going to enjoin the rooster

14   from crowing if you don't want the sun to come up.  Simply

15   because something follows it does not infer causation.  And so

16   we hear, and it's so frustrating, well, so-and-so was harmed,

17   so-and-so was in a foster home or a foster group home,

18   therefore, Judge, I guess, Judge, just assume that it was the

19   fact of being in the foster group home that caused that harm.

20   And that's not --

21         **THE COURT:**  Tell me why I wouldn't think that if an

22   8-year-old child is raped by some 16 year olds in a group home

23   where the foster parents are asleep?

24         **MR. ALBRIGHT:**  I don't think there's evidence that

25   that's happened.

1      **THE COURT:**  That was what I was saying, was -- I

2  think that it was in the pleadings.  That was what I was saying

3  you didn't deny all of those individual things.

4      **MR. ALBRIGHT:**  Your Honor, we were prepared -- I

5  think we were prepared and Mr. Rietvelt can correct me on this,

6  I think that involved D.I., who was not in a foster group home,

7  he was in a foster family home, there was no waking caregiver

8  requirement, and he was adopted last year and he's successfully

9  out of the program, so we were able to successfully adopt --

10  excuse me -- adopt him out.  So that's -- okay, anyway,

11  whatever on that.

12      **THE COURT:**  Well, I'm saying you're not denying that

13  it happened.  I don't know where it happened.  It was not in

14  a -- it was in an individual foster home --

15      **MS. LOWRY:**  No, it was in a foster group home,

16  your Honor.

17      **THE COURT:**  Okay, with no waking --

18      **MR. ALBRIGHT:**  What evidence --

19      **THE COURT:**  That was what I understood.

20      **MR. ALBRIGHT:**  Okay.  Your Honor, well, that's

21  fine --

22      **THE COURT:**  Are you denying that that happened?

23      **MR. ALBRIGHT:**  I am not denying that it happened --

24      **THE COURT:**  Okay, that's all I'm saying.

25      **MR. ALBRIGHT:**  -- I think there's a disagreement as

1    to where it happened.  But all I'm saying is --

2            **THE COURT:**  Okay.

3            **MR. ALBRIGHT:**  -- that there's an evidentiary record

4    before your Honor and I think that's what we need to have some

5    fidelity to.

6            So anyway, Judge, back to how we would characterize

7    what is happening here today, and I really -- I'm an advocate

8    and I hope --

9            **THE COURT:**  I appreciate that.

10           **MR. ALBRIGHT:**  -- I can't deny that you recognize

11   that.  But when I hear someone say, after 39 depositions, five

12   expert witnesses who I am quite confident have cost hundreds of

13   thousands of dollars, after 441 Plaintiffs' exhibits, after a

14   couple of days of testimony, long witness lists, it's

15   extraordinary -- and after having heard counsel say Judge,

16   we're ready -- your Honor, you said it, you said are you guys

17   ready for the class certification hearing, do you need anything

18   else, and no one said at that time, well, Judge, we need you to

19   resume the study that is under way because we can't do our

20   class certification without it.  Once again, if they needed it

21   now is not the time, after they realize it's harmful to them,

22   to say, well, please let us have it.  It's just -- it's too

23   late.  This is the --

24           **THE COURT:**  I agree with you about that too.

25           **MR. ALBRIGHT:**  Okay.

1          **THE COURT:** But, you know….

2          **MR. ALBRIGHT:** So, Judge, I try to think of it in

3    simple terms, because my mind works that way sometimes, and a

4    class action is about common claims and I think common is the

5    most important thing to remember in analyzing this.  I think

6    you have to have common harm, I think you have to have a common

7    cause of that harm, and I think you have to have a common

8    solution.  So harm, causation, and solution.

9          And that's why we try them all at once, because the

10   answers to those questions are the same for each child.  And I

11   know -- I don't know if your Honor heard it or saw it the same

12   way as me, and I'm not asking, of course, but when I heard

13   Bobbie Young say that she is okay with placing those children

14   with their aunt in an unverified, unlicensed home where the

15   aunt --

16         **THE COURT:** Unfunded.  That was one of the keys that

17   I picked up from that.

18         **MR. ALBRIGHT:** Unfunded, and she is okay with that.

19         **THE COURT:** She's not okay with that.  I didn't get

20   that.

21         **MR. ALBRIGHT:** Well, Judge, she --

22         **THE COURT:** But that's why we shouldn't be talking

23   like this, but --

24         **MR. ALBRIGHT:** Well, I know --

25         **THE COURT:** -- I didn't think at all she was okay --

1          **MR. ALBRIGHT:**  Well, Judge --

2          **THE COURT:**  -- with the children being in unfunded

3   care.

4          **MR. ALBRIGHT:**  Well, she was at the hearing, she did

5   say she was at the hearing, and she was pushing for the

6   children to be placed with the aunt.

7          **THE COURT:**  And I can understand why they care, they

8   had marks in foster care when your client placed him in another

9   place.

10          **MR. ALBRIGHT:**  Okay.

11          **THE COURT:**  They were physically apparently abused,

12   according to Ms. Young.

13          **MR. ALBRIGHT:**  All I was going to say on that, Judge,

14   and particularly --

15          **THE COURT:**  And that's not safe.

16          **MR. ALBRIGHT:**  -- and particularly in the arena of

17   unverified kinship care, how can you say that the answer is the

18   same, that every child in unverified kinship care is subjected

19   to the same risk of harm, when the circumstances of who are

20   their relatives, what is the home like.  There is no

21   commonality to unverified kinship care.  There is no way to get

22   there and they brought you no proof on that.  That's the issue

23   that first intrigued me in this case and I guess your first

24   love is your best love, perhaps, and that one I have looked --

25   not that it matters that I have -- but I think that the record

```
 1    before your Honor is absolutely clear that that issue is not
 2    capable of class action common treatment with common injury,
 3    common cause, common solution.
 4            But let me speak to -- again, being linear about
 5    this, I think common harm, common harm to the individual
 6    Plaintiffs, common harm therefore extrapolatable, if that's a
 7    word, to the class.  They brought you no harm of common harm to
 8    these children caused by conduct of DFPS and they have brought
 9    you no evidence that that nonexistent harm at the hands of DFPS
10    is subjected on the balance of the class as well.
11            Common cause, same issue, there is no proof before
12    the Court that any of the things that they claim to be systemic
13    deficiencies has indeed caused harm to the Plaintiffs, as
14    representatives of a potential class, and therefore to the
15    class as a whole.
16            And then on common solution, Judge, it's got to be --
17    first of all, if you really can't define the common harm with a
18    common causation that has affected all of these children, then
19    how do you begin to craft a solution that is constitutionally
20    sound within the boundaries of the constitutional violation and
21    solve the constitutional violation problem?  You have to know
22    "A" and "B" to determine "C."
23            And I'll speak to that now.  In some ways -- I
24    understand caseloads and staffing for RCCL investigations are
25    really, when you boil it down to gravy, as a friend of mine
```

1  would say, they are issues about are we properly staffing at

2  the caseload level with caseworkers or at the investigation

3  level.  And a single stroke of the pen solution to that,

4  they've brought you no proof that can be done or what that

5  solution is.

6          I asked Ms. Chansuthus how many and her answer was a

7  law school exam to say, well, how do you know you're there.

8  And if they wanted to say that your Honor can fix the RCCL

9  problem because of understaffing, I guess my first response

10 would be to look at Footnote 3 of the M.D. Opinion.  Footnote 3

11 of the M.D. Opinion, which is the one where the Fifth Circuit

12 said, you know, there are some things that if you say we're in

13 a system that's just not outright functioning correctly, your

14 recourse is to the legislature.  It's the imminence of the harm

15 as a consequence of that that moves it into the arena of

16 Article III Judge jurisdiction.

17         And so I really do think on the issue of does the

18 State properly fund enough caseworkers is a legislative issue

19 and I think there's -- I'm not pessimistic about that.  And

20 then on the issue of RCCL workers, the common solution that --

21 which needs to be one stroke of the pen, which needs to be

22 final in the sense of a Rule 65(b) injunction, is to do what I

23 would have thought they had done today, and that is to bring in

24 experts or an expert, look at the facts, and figure out what is

25 the solution.  They're just kicking the can down the road and

1    asking someone perhaps like Doll (phonetic) to do it again and

2    that's not a single solution, it's not one stroke, and it's not

3    final and they haven't demonstrated that on that issue.  And

4    then I think a similar analysis applies to caseworkers.

5         So, I don't know, Judge, you know, we briefed this

6    for 98 pages --

7         **THE COURT:**  I know.  It was great.  The briefs have

8    been fantastic from on sides.

9         **MR. ALBRIGHT:**  And so I don't know that I can

10   encapsulate in just a few more minutes what we say in there.  I

11   really do --

12        **THE COURT:**  I know.  I know.  This is just so

13   difficult.  It's so difficult.  And I don't want to be in a

14   position that I roll the dice to decide which way to go.

15        **MR. ALBRIGHT:**  I understand.

16        **THE COURT:**  And if there's a decision to be made I'm

17   going to do it on behalf of the children.  That may be wrong.

18   And I'm also -- not as a legal decision, but is there a future

19   in class action --

20        **MR. ALBRIGHT:**  I think that's --

21        **THE COURT:**  -- besides for front-loading washers.

22   And surely the children deserve that, to be treated in the same

23   fashion by an Article III Judge.

24        But the question is, is there evidence at this stage

25   to certify.

1          **MR. ALBRIGHT:**  I think that's right, Judge, and I

2     think -- I don't think the evidence they've shown is there to

3     support formation of the classes.  I respect your Honor's

4     sentiments and view and attitude about it.  I do think -- and

5     now in a perhaps inappropriate expression of candor, I hoped in

6     this hearing that we would be able to demonstrate that the

7     Plaintiffs did not bring you the glue and that when you saw

8     someone like --

9          **THE COURT:**  They might not have.  They might not

10    have.

11         **MR. ALBRIGHT:**  I know, your Honor, and I'm just

12    letting you know how we felt this would go --

13         **THE COURT:**  I know.

14         **MR. ALBRIGHT:**  -- and I thought that the Plaintiffs

15    would not bring you the glue.  I thought the Plaintiffs would

16    not help you in the rigorous analysis that you have to do.  I

17    still don't think they have laid out what is the substantive

18    constitutional right and what are the elements, what must they

19    show.  And today to persist in not even recognizing that the

20    risk has to be unreasonable, do you think that helps your Honor

21    if you were to accept the idea it's just risk of harm and you

22    write a brief and you --

23         **THE COURT:**  No, I don't think that's the case.

24    Whatever it is, I'm not going to use that standard.  I think

25    they're entitled to a reasonably safe placement.  That's what

1    they get from their managing conservator, which is what they

2    get from their own home or they should.  And children that

3    don't have that in their own homes ought to be someplace else.

4         **MR. ALBRIGHT:**  The second thing that I had hoped to

5    accomplish today, your Honor, is that if you felt that the

6    Fifth Circuit and *Wal-Mart* had tied your hands on certifying a

7    class in this case, that the absence of proof of real harm to

8    these children and then seeing someone like Audra Deckinga at

9    the helm would at least give you some comfort that if you

10   denied these classes --

11        **THE COURT:**  She's fantastic.  She is.

12        **MR. ALBRIGHT:**  -- that if you denied these classes,

13   the children in the custody of the State of Texas are in not

14   perfect but pretty darn good hands.  And so if -- I know it's

15   hard for your Honor personally and I hope that you've come away

16   from this hearing with some sense that --

17        **THE COURT:**  Or no sense at all.

18        **(Laughter)**

19        **MR. ALBRIGHT:**  -- that we're not -- we're really not

20   doing that bad a job and we have good people at the helm.

21        **THE COURT:**  I think you have good people.  I think

22   you have good people.

23        **MR. ALBRIGHT:**  So for those reasons, your Honor --

24        **THE COURT:**  You know policy-wise -- I know your

25   arguments are great, just policy-wise would it not be helpful

1    to the Department to have this.

2            I don't want to go there.  I don't want say I'm doing

3    it.  You know, I'm just saying -- I mean they're scratching to

4    get all the money they can and have the caseworkers just they

5    think are appropriate, just the number of caseworkers they

6    think.

7            **MR. ALBRIGHT:**  Right.

8            **THE COURT:**  And that is the link between these

9    children and good care.  That's all they've got.

10           **MR. ALBRIGHT:**  One last cornball expression for that

11   vis-à-vis the State, and I hope I'm not speaking out of school

12   with my bosses on this, but it's the old saying about you can

13   lead a horse to water, but you can't force it to drink.  And I

14   think we're headed to the water, I think we've been drinking,

15   and I don't know that an injunction would further that purpose

16   in a --

17           **THE COURT:**  I don't either.

18           **MR. ALBRIGHT:**  -- constructive way.

19           **THE COURT:**  I don't either.

20           **MR. ALBRIGHT:**  Thank you, your Honor.

21           **THE COURT:**  I just want to do -- follow the law and

22   do what I think is right.

23           **MR. ALBRIGHT:**  Thank you, your Honor.

24   //

25   //

**REBUTTAL ARGUMENT ON BEHALF OF PLAINTIFFS**

1

2          **BY MR. YETTER:**  Your Honor, neither side has any

3  doubt that this Court is going to do what you believe the law

4  requires, but let me start, this is not our position that the

5  State has certain policies that are broken and that put

6  children in harm.  This is what the State decided.  If there is

7  no -- and I know your Honor's going to read all the exhibits,

8  but if there is no other exhibit that you might want to read

9  sooner rather than later it's Exhibit 323.  This is an

10  exhibit --

11          **THE COURT:**  I just did that.

12          **MR. YETTER:**  Let me just then start this brief

13  rebuttal with quoting from what the committee on review of

14  adoption -- the adoption review committee stated in the

15  chairman's letter, and we wholeheartedly agree with this and

16  this is part of the evidence:

17          There is no question that those empowered to care for

18  these children, foster children, are in most cases well-

19  intentioned, hardworking individuals who have some of the most

20  difficult and complicated jobs.  We couldn't agree more.  At

21  the same time, the system in which they are operating and to

22  which we are challenging is unable to effectively handle the

23  volume and deeply complex natures of children brought into

24  State care.

25          This is what the committee that included the DFPS

1   representative, this is what they decided just two years ago

2   and caseloads have gone up.

3         In fact -- and I'm continuing the quote -- there is

4   increasing evidence to show that our foster care system is

5   sometimes doing more harm to our children than good.

6         This is not our pleading.  This is not the position

7   of the Plaintiffs.  This is the report on the adoption review

8   committee.  It is remarkable, your Honor, I would suggest --

9         **THE COURT:**  It is.

10        **MR. YETTER:**  -- that if we were here -- that if we

11  were here on behalf of a class of inmates from a State-run

12  prison system in this state and we were arguing that there were

13  not enough jailers, that the State could come in and say, well,

14  so what, maybe there's not enough jailers, show us how that

15  might harm you.

16        Your Honor, these caseworkers are the critical link

17  between these children in custody completely involuntarily and

18  at the -- they have no one else to depend on but the State;

19  these caseworkers are the link to a safe, secure, and suitable

20  placement.  And for the State to come in and say we have seen

21  no evidence that it makes any difference how many children a

22  caseworker uses -- I'm sorry --

23        **THE COURT:**  I don't agree with that.

24        **MR. YETTER:**  I apologize, your Honor.

25        **THE COURT:**  No, move on.  I've got that figured out.

1          **MR. YETTER:**  The State also says --

2          **THE COURT:**  That's where common sense comes in.

3          **MR. YETTER:**  Thank you, your Honor.

4          The State also says that our evidence on professional

5     caseload standards, like through the COA and the CWLA, there's

6     no proof that it's generally accepted.  Our brief points out,

7     and this is at Page 14 of our Reply Brief, and the State

8     certainly knows this, that it's not us suggesting that those

9     would be the professional standards, but that state law itself,

10    Texas Government Code Annotated, Section 531.001, Subsection 5,

11    defines professional caseload standards as established by

12    "management studies or by an authority or association,

13    including -- (this is in the statute) -- including the Child

14    Welfare League of America," CWLA.  That's part of the standards

15    that we've talked about in this hearing.

16         **THE COURT:**  And they footnoted that in 323 SCOA --

17         **MR. YETTER:**  Absolutely, your Honor.

18         **THE COURT:**  -- guidelines.  I've got it all.

19         **MR. YETTER:**  So we are here --

20         **THE COURT:**  I'd like to see it black and white again

21    what you all think this hearing showed --

22         **MR. YETTER:**  And we will.

23         **THE COURT:**  -- and what the Defendants think it

24    showed.

25         **MR. YETTER:**  We will, your Honor.

1          In conclusion, we are here challenging a system that

2    we -- that the State of Texas calls permanent managing

3    conservatorship that we -- there's no other state that calls it

4    that.  They take children in and they put them into temporary

5    managing conservatorship and at some point after 12 or

6    18 months they move them into permanent managing

7    conservatorship, your Honor, and what we think the evidence --

8          **THE COURT:**  Twenty-four months, is that what --

9          **MR. YETTER:**  Twelve to 18 months.

10         **THE COURT:**  Twelve to 18 months, okay.

11         **MR. YETTER:**  That once these children are put into

12   this permanent managing conservatorship it actually, in fact,

13   becomes permanent foster care.  And there is no defense that

14   the State has presented that says that they can create a

15   system, which we believe they have, into which they will take

16   wards of the State, these children, and put them in for the

17   rest -- for many of them, for the rest of their childhood.

18         Now, children may not have the right to a perfect

19   home, but they have a right to a safe, secure, and suitable

20   placement.

21         **THE COURT:**  That's why the Department takes them out

22   of their home, because they're in a unreasonably unsafe --

23         **MR. YETTER:**  Exactly, but once the State --

24         **THE COURT:**  -- home.

25         **MR. YETTER:**  -- puts them into the State's custody,

1    those children --

2           **THE COURT:**  They've got to do a little better, is

3    what you're saying.

4           **MR. YETTER:**  They do, exactly, your Honor, and that

5    is why we have been very focused on the Fifth Circuit -- and I

6    hear the State -- the Court's concern about the Fifth Circuit.

7    The Fifth Circuit could very easily have said in its opinion we

8    are not having any more civil rights class actions.

9           **THE COURT:**  It can't do that.

10          **MR. YETTER:**  Maybe they even come close to that,

11   your Honor.  We believe, having read that opinion many times,

12   that what the Fifth Circuit did is actually give a roadmap and

13   we are following it faithfully and we believe if this Court

14   certifies the class and the four subclasses that we have

15   presented, that they faithfully follow the Fifth Circuit

16   roadmap and that they will be upheld by the Fifth Circuit.  The

17   evidence that we have put in is all designed to show that

18   common structure defect --

19          **THE COURT:**  You have more faith than I do.

20          **MR. YETTER:**  I have faith in the Fifth Circuit,

21   your Honor.  I do.

22          **THE COURT:**  I do too.

23          **MR. YETTER:**  I think they want this case -- now, this

24   is me speaking.  I think that opinion says if you are going to

25   certify this case here's how you are going to do it.

1        **THE COURT:**  Bring us your tired and your hungry.

2        **MR. YETTER:**  I'm sorry?  Well, your Honor, they could

3 have written it in a lot of different ways and they didn't.

4 They had three specific instances that they said this makes --

5 these are structural defects around which classes or subclasses

6 can be certified.  And we have taken that to heart and of our

7 five classes and subclasses three of them or four of them go

8 completely around the Fifth Circuit rule.

9        Lastly, your Honor, we have evidence of the effect on

10 these children, their records are in the -- they were

11 unobjected exhibits, they're before the Court, not only in --

12 were they never denied in the pleadings, but the records

13 themselves are before the Court --

14        **THE COURT:**  I have not read the case studies.  I've

15 only read -- I have not read those which you put into evidence.

16        **MR. YETTER:**  But that is --

17        **THE COURT:**  I've not read anything other than 323 and

18 a couple other small exhibits.

19        **MR. YETTER:**  That is all before the Court, despite

20 what the State says.

21        So in conclusion, your Honor, we're not here because

22 this is a good effort, we're here because these children need

23 representation and they need -- they have the right, we think,

24 a constitutional right to proceed as a class to challenge these

25 structural defects.  There's obviously going to be more

1   evidence when we come to trial, but we think we have absolutely

2   satisfied Rule 23 that these children deserve -- they have

3   procedurally and legally proven their right to go to the next

4   step of proceeding as a class and as subclasses to challenge

5   the State's structural defects.

6           Thank you, your Honor.

7           **THE COURT:**  Thank you.

8           Anything else?

9           **MR. ALBRIGHT:**  No, your Honor.  I guess just a

10  briefing schedule, if you want to address that.

11          **THE COURT:**  How much time do you all want to file --

12  I'm going to have the Petitioners then Defendant and then you

13  can each do rebuttals if you want.

14          **MR. YETTER:**  We could do two weeks, your Honor.

15          **THE COURT:**  Two weeks?

16          **MR. YETTER:**  We will do it as quickly as the Court

17  wants --

18          **THE COURT:**  No, I'm not --

19          **MR. YETTER:**  -- but we could do --

20          **THE COURT:**  I'm not in any hurry.

21          **MR. YETTER:**  Okay, three weeks would actually

22  probably be better.

23          **THE COURT:**  You tell me.  If you want 30 days I'll

24  give you 30 days.

25          **MS. LOWRY:**  Let's compromise on three weeks.

1          **MR. YETTER:**  Three weeks would work, Judge.

2          **THE COURT:**  Three weeks from today --

3          **MR. ALBRIGHT:**  And, your Honor --

4          **THE COURT:**  -- Plaintiffs' brief.

5          **MR. ALBRIGHT:**  May I just raise a question as to

6   that?

7          **THE COURT:**  Yes, sir.

8          **MR. ALBRIGHT:**  I do think we need to be referencing a

9   record of transcript --

10          **THE COURT:**  Well, the reason I thought you needed

11   longer is I thought might want a transcript of the proceedings.

12          **MR. YETTER:**  Your Honor, that's a good point.

13          **MR. ALBRIGHT:**  I think we do want it if we're going

14   to reference it.

15          **MR. YETTER:**  That's a good point, your Honor.  So --

16          **THE COURT:**  Well, this is how it works.  You can file

17   for any costs -- you know, what we do is send out her disk with

18   her log notes to a contracted transcriptionist, which is

19   actually cheaper than doing it -- which is why we do this --

20   it's the most efficient way.  It saves, we always tell the

21   jury, anywhere from 80 to 120 thousand dollars per courtroom

22   per year and we have five courtrooms in this Court, all of

23   which are actively used.  So this system is very efficient, but

24   it has some little problems because when you get back the

25   transcript sometimes there are just mistakes.

**EXCEPTIONAL REPORTING SERVICES, INC**

1           **MR. YETTER:**  Well, we had a trial in front of

2   Judge Atlas, a bench trial in front of Judge Atlas last summer

3   and the transcript comes very quickly, but what we did is work

4   with the other side to get it so that we both agreed to correct

5   the mistakes.

6           **THE COURT:**  And what she'll do is check it to

7   original when it comes back for glaring errors and then we

8   expect you all to check as well.  I mean every now and then

9   I've got something like when I ask a defendant, a criminal

10  defendant, do you think you're mentally competent and they

11  almost always say yes and every now and then there will be a

12  misrecorded no and I go right -- you know, as if I do it all

13  completely.  So those are either filed as corrections with the

14  Fifth Circuit or we listen to the recording and figure it out

15  and get it corrected.

16          **MR. YETTER:**  Well, it took us about a month with

17  Judge Atlas to make sure -- it was a long trial, but how long

18  do you think it would take to get the draft?

19          **THE COURT:**  Well, we can file for an accelerated

20  transcript, which costs more.  And she's actually kind of new

21  to this.  I had the same ERO for, I don't know, 10/15 years.

22          Ms Benavidez, do you have an estimate?

23          **COURT RECORDER:**  It will take 30 days --

24          **THE COURT:**  We're not doing daily.

25          **MR. YETTER:**  No, I would think a two week at the

1    earliest and then maybe a couple of weeks to work with the

2    State to make sure it's accurate.

3            **THE COURT:**  All right, let's figure that you get the

4    transcript in 30 days.

5            **MR. YETTER:**  Yes.  And then three weeks from then,

6    your Honor, would be acceptable to us.

7            **THE COURT:**  I'm going to give you 60 days.

8            **MR. YETTER:**  That's fine.  That way --

9            **THE COURT:**  I'm just going to say 60 days from today

10   the Plaintiffs' brief.

11           And you want 20 days after that?

12           **MR. ALBRIGHT:**  Twenty would be fine, your Honor.

13           **THE COURT:**  Twenty days after that for Defendants'

14   brief.

15           Do you all need a written order or are we clear on

16   this?

17           **MR. YETTER:**  We're fine on this, Judge.

18           **MR. ALBRIGHT:**  I think we're fine on it.

19           **THE COURT:**  Okay.  Anything else?

20           **MR. YETTER:**  One last --

21           **THE COURT:**  Ms. Lowry, I'm sorry for your loss.

22           **MS. LOWRY:**  Thank you very much, your Honor, and I

23   really appreciate the courtesy both the State and the Court

24   extended to me.  I appreciate that.

25           **THE COURT:**  Very difficult times for you.  I'm sorry.

1          Anything else?

2          I want to thank you very much for everybody's

3    professionalism.  I mean this is just unbelievable.  I don't

4    know how the assistant director, how you do that full time, and

5    I don't know how you all do this full time.  I just don't.  You

6    must get a lot of exercise and eat right.

7          **MS. LOWRY:**  Your Honor, it's better than not doing

8    it.

9          **THE COURT:**  I appreciate that.  But nonetheless, it

10   has to be and you're just so calm.  I mean I would be not so

11   calm.

12         **MR. YETTER:**  You asked us for a list of Plaintiffs'

13   exhibits that should be sealed, your Honor, and we have it.

14   I'll ready it quickly into the record.

15         **THE COURT:**  All right, let me see if I've got -- hold

16   on.  Let me make sure I've got the right -- go ahead.

17         **MR. YETTER:**  And then --

18         **THE COURT:**  Starting with 27?

19         **MR. YETTER:**  Well, actually it starts a little -- and

20   then I have a copy I can give to your case manager.

21         **THE COURT:**  No, I'm going to do it myself.

22         **MR. YETTER:**  Okay, 6, 25 --

23         **THE COURT:**  Wait, I don't have a 6.  Oh, sorry, I

24   don't have a 6.

25         **MR. YETTER:**  Well, all right, these are the ones that

1    were on the full list and some of them may not be admitted, so

2    then they won't need to be sealed obviously, Judge:  25 --

3              THE COURT:  25 I've got sealed.

4              MR. YETTER:  26.

5              THE COURT:  I've got 25, 26, 27, 28, and 29.

6              MR. YETTER:  Correct.

7              THE COURT:  And 31, 32, 33, and 34.

8              MR. YETTER:  Correct.  42.

9              THE COURT:  I don't --  Okay.

10             MR. YETTER:  168 through 170.

11             THE COURT:  Okay.

12             MR. YETTER:  173.

13             THE COURT:  Okay.

14             MR. YETTER:  175, 199.

15             THE COURT:  Okay.

16             MR. YETTER:  214, 231, 289 through 291.  289 through

17   291.

18             THE COURT:  Okay.

19             MR. YETTER:  298 through 300, 303 through 305.

20             THE COURT:  303 --

21             MR. YETTER:  Through 305.

22             THE COURT:  -- 304 and 305.

23             MR. YETTER:  Okay.

24             THE COURT:  Okay.

25             MR. YETTER:  308 and 309.

1            **THE COURT:**  Okay.  What else?

2            **MR. YETTER:**  That is all of the Plaintiffs' exhibits

3    that need to be sealed.

4            **THE COURT:**  Defendants, do you all have any?

5            **MR. ALBRIGHT:**  Just the two that we previously

6    identified, I think it was --

7        **(Defense counsel confer)**

8            **MR. ALBRIGHT:**  It's 54 and 55.  It was Defendants'

9    Exhibits 54 and 55.

10           **THE COURT:**  I've got that, 54 and 55.

11           **MR. ALBRIGHT:**  Yeah, that's it, your Honor.

12           **THE COURT:**  Got it.

13           Again, thank you all very much for the really careful

14   presentation and all the work that you put into this.

15       **(Counsel thank the Court)**

16           **THE COURT:**  Thank you.

17       **(This proceeding was adjourned at 11:53 a.m.)**

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    March 15, 2013
                Signed                                  Dated



                        *TONI HUDSON, TRANSCRIBER*