IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| M.D., by her next friend Sarah R. Stukenberg, *et al.*, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| | ) **CASE NO. 2:11-cv-00084** |
| v. | ) ) |
| RICK PERRY, in his official capacity as Governor of the State of Texas, *et al.*, | ) ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

Table of Authorities ................................................................................... iv

I.  Plaintiffs' Legal Burden is to Show the Rule 23 Prerequisites Are Satisfied, Not to Prove the Merits .................................................................................... 3

    A.  *Amgen* Emphasized That Merits Assessments Are Prohibited ........................................ 3

    B.  *Wal-Mart* Recognized That Common Policies Establish Commonality ......................... 4

    C.  In *M.D.*, the Fifth Circuit Provided a Roadmap That Plaintiffs Have Followed .............. 6

II.  The Evidence Shows That the Relevant Rule 23 Requirements Are Satisfied...................... 7

    A.  The General Class Should Be Certified ........................................................... 8

        1.  The State Admits That Excessive Caseloads Are a Systemic Problem ...................... 8

        2.  High Caseloads Constitutionally Injure All Children in the General Class.............. 13

        3.  The Rule 23 Requirements Are Satisfied for the General Class............................... 17

    B.  The Basic Care GRO Subclass Should Be Certified ...................................... 20

        1.  Texas Improperly Houses Basic-Level Children in General Residential Operations 21

        2.  Placing Basic-Needs Children in General Residential Operations Constitutionally Injures All Children in the Basic Care GRO Subclass .............................................. 22

        3.  The Rule 23 Requirements Are Satisfied for the Basic Care GRO Subclass ............ 23

    C.  The Foster Group Home Subclass Should Be Certified ................................................. 25

        1.  All Children in the Foster Group Home Subclass Are Placed in Residences with Unsuitable Standards .............................................................................. 25

        2.  Foster Group Homes Constitutionally Injure All Children in the Foster Group Home Subclass.............................................................................................. 26

        3.  The Rule 23 Requirements Are Satisfied for the Foster Group Home Subclass ....... 28

    D.  The Unverified Kinship Subclass Should Be Certified ................................................. 29

        1.  All Children in the Unverified Kinship Class Are Subject to Insufficient Oversight and Receive Inadequate Financial Support ............................................... 30

        2.  The Lack of Verification Constitutionally Injures All Children in the Unverified Kinship Subclass ............................................................................... 32

3.  The Rule 23 Requirements Are Satisfied for the Unverified Kinship Subclass........ 33

E.  The Licensed Foster Care Subclass Should Be Certified ................................................ 35

1.  All Children in the Licensed Foster Care Subclass Are Placed in Residences
Which Are Inadequately Monitored and Overseen ................................................. 35

a.  The State's Monitoring and Oversight Practices Are Insufficient...................... 35

b.  Inadequate Monitoring and Oversight Constitutionally Injure All Children in
the Licensed Foster Care Subclass........................................................................ 38

2.  All Children in the Licensed Foster Care Subclass Are Subjected to an Inadequate
Placement Array........................................................................................................ 39

a.  The State Admits That Its Placement Array Is Inadequate................................. 39

b.  The Inadequate Placement Array Constitutionally Injures All Children in the
Licensed Foster Care Subclass.......................................................................... 42

3.  The Rule 23 Requirements Are Satisfied for the Licensed Foster Care Subclass..... 43

III. Defendants Have Failed to Show That Certification Is Improper ......................................... 46

A.  Defendants Failed to Rebut Plaintiffs' Evidence............................................................ 46

B.  No Defense Precludes Certification.................................................................................. 48

1.  The Standard Applicable to Substantive Due Process Claims Does Not Bar
Certification ............................................................................................................... 48

2.  The Cost of Implementing Injunctive Relief Is Not a Valid Defense....................... 49

IV. This Case Fits Within the Extensive Body of Civil Rights Class Action Caselaw .............. 50

V.  Conclusion ............................................................................................................................. 53

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ...................................................................... 2, 3, 4, 8

*Baby Neal ex rel. Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994) ............................................................................ 51

*Brooklyn Center for Independence of the Disabled v. Bloomberg*,
    287 F.R.D. 240 (S.D.N.Y. 2012) .................................................................. 53

*Brown v. Plata*,
    131 S. Ct. 1910 (2011) ................................................................................. 51

*Castano v. American Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ......................................................................... 46

*Connor B. ex rel. Vigurs v. Patrick*,
    272 F.R.D. 288 (D. Mass. 2011) ............................................................ 13, 52

*Cruz v. Beto*,
    405 U.S. 319 (1972) ..................................................................................... 51

*D.G. ex rel. Strickland v. Yarbrough*,
    278 F.R.D. 635 (N.D. Okla. 2011) .................................................. 13, 18, 19, 52

*D.L. v. District of Columbia*,
    277 F.R.D. 38 (D.D.C. 2011) ......................................................................... 7

*Dukes v. Wal-Mart Stores, Inc.*,
    222 F.R.D. 137 (N.D. Cal. 2004) ................................................................. 47

*Edelman v. Jordan*,
    415 U.S. 651 (1974) ..................................................................................... 50

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ....................................................................................... 4

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ....................................................................................... 48

*Floyd v. City of New York*,
    283 F.R.D. 153 (S.D.N.Y. 2012) .................................................................. 48

*Gates v. Collier*,
    501 F.2d 1291 (5th Cir. 1974) ..................................................................... 50

*Gray v. Hearst Communications, Inc.,*
    444 F. App'x 698 (4th Cir. 2011) ............................................................................. 5

*Heartland Payment Systems, Inc. Customer Data Security Breach Litigation, In re,*
    851 F. Supp. 2d 1040 (S.D. Tex. 2012) ................................................................... 18

*Hernandez ex rel. Hernandez v. Texas Department of Protective & Regulatory Services,*
    380 F.3d 872 (5th Cir. 2004) ................................................................................... 48

*Holt v. Sarver,*
    309 F. Supp. 362 (E.D. Ark. 1970) ......................................................................... 50

*Kenny A. ex rel. Winn v. Perdue,*
    No. 1:02-cv-1686, 2004 WL 5503780 (N.D. Ga. Dec. 13, 2004) ............... 10, 49, 52

*Kincade v. General Tire & Rubber Co.,*
    635 F.2d 501 (5th Cir. 1981) ................................................................................... 51

*Lane v. Kitzhaber,*
    283 F.R.D. 587 (D. Or. 2012) ................................................................................. 52

*LaShawn A. ex rel. Moore v. Dixon,*
    762 F. Supp. 959 (D.D.C. 1991) ................................................................. 19, 45, 48, 49

*LaShawn A. ex rel. Moore v. Kelly,*
    990 F.2d 1319 (D.C. Cir. 1993) ............................................................................... 19

*Lee vs. Washington,*
    390 U.S. 333 (1968) ................................................................................................. 51

*M.D. ex rel. Stukenberg v. Perry,*
    675 F.3d 832 (5th Cir. 2012) .......................................................................... passim

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ................................................................................................. 20

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    672 F.3d 482 (7th Cir. 2012) ..................................................................................... 5

*Milliken v. Bradley,*
    433 U.S. 267 (1977) ................................................................................................. 50

*Monreal v. Potter,*
    367 F.3d 1224 (10th Cir. 2004) ............................................................................... 45

*Morrow v. Washington,*
    277 F.R.D. 172 (E.D. Tex. 2011) ............................................................................ 45

*Nelson v. Heyne*,
    491 F.2d 352 (7th Cir. 1974) ................................................................ 51

*Newman v. Alabama*,
    522 F.2d 71 (5th Cir. 1975) .................................................................. 50

*Quern v. Jordan*,
    440 U.S. 332 (1979)............................................................................. 50

*Roberts v. Mentzer*,
    382 F. App'x 158 (3d Cir. 2010) .......................................................... 20

*Ross v. RBS Citizens, N.A.*,
    667 F.3d 900 (7th Cir. 2012) .................................................................. 5

*Smith v. Sullivan*,
    611 F.2d 1039 (5th Cir. 1980) .............................................................. 50

*Wal-Mart v. Dukes*,
    131 S. Ct. 2541 (2011)................................................................. passim

*Wyatt v. Aderholt*,
    503 F.2d 1305 (5th Cir. 1974) .............................................................. 51

*Wyatt v. Stickney*,
    334 F.Supp. 1341 (M.D. Ala. 1971) ..................................................... 51

*Youngberg v. Romeo*,
    457 U.S. 307 (1982)............................................................................. 48

*Youngblood v. Family Dollar Stores, Inc.*,
    No. 09 Civ. 3176, 2011 WL 4597555 (S.D.N.Y. Oct. 4, 2011) ............... 5

**Statutes**

40 Texas Administrative Code § 748.43..................................................... 20

40 Texas Administrative Code § 748.61..................................................... 20

40 Texas Administrative Code § 749.103.............................................. 25, 26

40 Texas Administrative Code § 749.105.............................................. 25, 26

40 Texas Administrative Code § 749.2447................................................. 30

40 Texas Administrative Code § 749.2801................................................. 31

40 Texas Administrative Code § 749.2813................................................. 31

40 Texas Administrative Code § 749.43.................................................................. 25, 26, 31

40 Texas Administrative Code § 749.931................................................................ 25, 26

40 Texas Administrative Code § 749.933................................................................ 25, 26

42 United States Code § 675.............................................................................. 21

Texas Family Code § 264.751 .......................................................................... 29

Texas Government Code § 531.001..................................................................... 10

Texas Government Code § 531.048..................................................................... 10

Texas Human Resources Code § 42.002 ......................................................... 20, 25

**Other Authorities**

7A Charles Alan Wright & Arthur R. Miller,
   *Federal Practice and Procedure* (1st ed. 1972) ......................................... 51

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,
   84 N.Y.U. L. Rev. 97 (2009) ........................................................................ 4

**Rules**

Federal Rule of Civil Procedure 23 ............................................................... passim

Federal Rule of Civil Procedure 23 Advisory Committee's Note ........................... 4, 8

Plaintiffs bring this case on behalf of the thousands of children in Texas's permanent custody who suffer harm and the risk of harm every day from the State's failure to remedy structural deficiencies in its child welfare system. In accordance with the Fifth Circuit's instructions, Plaintiffs have focused their claims around six of these structural deficiencies, each tied to the General Class or a discrete Subclass of Plaintiff Children. At the class certification hearing in January 2013, Plaintiffs presented this Court with evidence that each of these structural failings creates a common risk of harm to all members of the General Class and each Subclass, and that each can be cured with a single injunction benefitting all General Class or Subclass members. As a result, Plaintiffs have affirmatively demonstrated their compliance with all requirements of Federal Rules of Civil Procedure 23(a) and (b). Plaintiffs now ask that the Court certify the proposed General Class and Subclasses.

The majority of this post-hearing brief sets forth the evidence that Plaintiffs have presented on the key issues of commonality and the suitability of injunctive relief. As an initial matter, however, Plaintiffs seek to clarify their burden of proof. Defendants have repeatedly argued that no class should be certified because Plaintiffs have not yet proven their claims on the merits. However, Plaintiffs are not required to do so at the class certification stage. The caselaw was already clear before the hearing that while class certification analysis may involve some overlap with the merits, this "preliminary inquiry" is limited to issues necessary "to determine the propriety of certification." *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551-52, 2552 n.6 (2011). In a decision that came out after the hearing, on February 27, 2013, the Supreme Court erased any doubt about the limited authority a district court possesses to inquire into the merits for class certification purposes. This decision, *Amgen Inc. v. Connecticut Retirement Plans & Trust*

*Funds*, 133 S. Ct. 1184, 1191, 1194-95 (2013), makes clear that Plaintiffs' burden is only to show that the elements of Rule 23 are satisfied, not to prove the merits of their claims.

Plaintiffs have ably met this burden.  For instance, consider the claim asserted (on behalf of the proposed General Class) that the State employs an insufficient number of caseworkers, resulting in high caseloads.  Plaintiffs obviously do not have to prove exactly what those caseloads are.  Instead, the key to certification is that Plaintiffs show that a class proceeding would have the capacity to "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (internal quotation marks omitted).  The claim asserted by the General Class certainly meets this standard. If Plaintiffs are right that caseloads are too high to protect children – as, in fact, Defendants have admitted they are – then all children in the Permanent Managing Conservatorship ("PMC") of the State have suffered a constitutional deprivation; if, ultimately, their proof on caseloads is inadequate, then the claim of all children in the proposed General Class will fail.  This same up-or-down result applies to each of the structural deficiencies that Plaintiffs identify for all of the proposed Subclasses.  *Amgen*, which fits squarely within the Supreme Court's prior class action jurisprudence, simply makes it even more apparent that, based on the evidentiary record presented to this Court at the close of the January hearing, Plaintiffs' challenges to structural deficiencies in the Texas foster care system warrant certification.  Hewing closely to the Fifth Circuit's roadmap for certification, Plaintiffs' claims are premised on the precise systemic deficiencies that the Fifth Circuit identified as amenable to classwide treatment, *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 848 n.7 (5th Cir. 2012), and the claims of all children in the General Class and in each of the Subclasses "will prevail or fail in unison," *Amgen*, 133 S. Ct. at 1191.  In any event, as detailed below, Plaintiffs have offered substantial evidence on the merits for each of their claims.

Plaintiffs' primary objective in this post-hearing brief is to summarize for the Court's benefit the extensive evidentiary proof supporting certification of the proposed General Class and each proposed Subclass.  This summary makes clear that Plaintiffs have shown by a preponderance of the evidence that all of the Rule 23 certification requirements have been met. Moreover, because the State failed to offer any rebuttal evidence at the hearing, Plaintiffs' evidence of harmful common policies and practices in Defendants' operation of the Texas foster care system is essentially undisputed.  Without any countervailing evidence offered by the State, the Court can be confident that the evidentiary record readily supports the conclusion that, whether they are ultimately meritorious or not, the claims of all children in the proposed General Class and each of the Subclasses stand or fall together.

Ultimately, the evidentiary record before the Court shows that Plaintiffs assert exactly the types of claims that Rule 23(b)(2) was designed to remedy.  Their constitutional claims target readily identifiable policies and practices in the State's operation of its foster care system that deprive children of their constitutional right to adequate care.  Such contentions fit squarely in a long line of civil rights and foster care class actions vindicating the rights of plaintiffs in the custody of the State.

## I.     Plaintiffs' Legal Burden is to Show the Rule 23 Prerequisites Are Satisfied, Not to Prove the Merits

### A.     *Amgen* Emphasized That Merits Assessments Are Prohibited

*Amgen* emphasized the limitations on a district court's inquiry into the merits when conducting a class certification analysis.  Although it was a 23(b)(3) fraud-on-the-market case, the *Amgen* decision provides important guidance as to the analysis needed to meet the requirements of Rule 23 in any class action.  Clarifying any doubt left by *Wal-Mart*, the *Amgen* Court observed:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores, Inc. v. Dukes*, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

133 S. Ct. at 1194-95 (citation omitted).

Indeed, not only should a court avoid "free-ranging merits inquiries" at the certification stage, "a district court has no '"authority to conduct a preliminary inquiry into the merits of a suit"' at class certification unless it is necessary 'to determine the propriety of certification.'" *Id.* (quoting *Wal-Mart*, 131 S.Ct. at 2552 n.6 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974))). Furthermore, "an evaluation of the probable outcome on the merits is not properly part of the certification decision." *Id.* (quoting Fed. R. Civ. P. 23 Advisory Committee's Note).

Here, the State's constant refrain has been that Plaintiffs should have proven the merits at this early stage, just as the defendants in *Amgen* sought to "put the cart before the horse." *Id.* at 1191. The Supreme Court's most recent decision forecloses the State's plea. As *Amgen* makes clear, to obtain certification, plaintiffs need not establish that they "will win the fray." *Id.*

### B.   *Wal-Mart* Recognized That Common Policies Establish Commonality

Contrary to Defendants' proposed merits evaluation, the Supreme Court in *Wal-Mart* emphasized that "[w]hat matters to class certification" is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). In that Title VII employment discrimination case, an evidentiary inquiry concerning whether the prerequisites of Rule 23 had been satisfied was necessary because "respondents wish[ed] to sue about literally millions of employment decisions at once." *Id.* at 2552. The Court explained that "[w]ithout some glue holding the alleged *reasons* for all those

4

decisions together, it [would] be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.*

The *Wal-Mart* Court underlined that the "conceptual gap" could have been "bridged" and an evidentiary assessment foreclosed if the plaintiffs had alleged an "express corporate policy against the advancement of women." *Id.* at 2548. But the absence of a companywide policy defeated commonality: "Because respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, we have concluded that they have not established the existence of any common question." *Id.* at 2556-57.

Since *Wal-Mart*, courts have continued to certify classes challenging generally applicable policies or practices. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488-89, 492 (7th Cir. 2012) (commonality was satisfied based upon the defendant's "implementing [of] a uniform policy" applicable to all class members, even though the policies permitted a "measure of discretion" in managerial decisions at the individual level); *Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 701-02 (4th Cir. 2011) ("Here, unlike *Wal-Mart*, there is no dispute that a uniform . . . obligation . . . exists or that [it] applies to all plaintiffs."). Courts recognize that liability in such cases does not turn upon individualized inquiries, such as the subjective intent of the decisionmaker in employment law cases. *See, e.g.*, *Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909 (7th Cir. 2012) (distinguishing *Wal-Mart* and certifying class of approximately 1100 employees where plaintiffs challenged employers' unofficial policy of violating wage laws and their claim "require[d] no proof of individual discriminatory intent"); *Youngblood v. Family Dollar Stores, Inc.*, No. 09 Civ. 3176, 2011 WL 4597555, at *4 (S.D.N.Y. Oct. 4, 2011) ("Unlike the claims in *Wal-Mart*, Plaintiffs' [New York Labor Law] claims do not

require an examination of the subjective intent behind millions of individual employment decisions; rather the crux of this case is whether the company-wide policies, as implemented, violated Plaintiffs' statutory rights." (internal quotation marks omitted)).

**C.    In *M.D.*, the Fifth Circuit Provided a Roadmap That Plaintiffs Have Followed**

In the wake of the Supreme Court's opinion in *Wal-Mart*, the Fifth Circuit remanded this case for the district court to determine, upon a "rigorous analysis" of all pleaded claims and defenses, whether Plaintiffs had proven the Rule 23 factors with respect to their claims. *M.D.*, 675 F.3d at 848. The Fifth Circuit provided a clear roadmap for certification of a pared-down General Class and Subclasses targeting specific agency policies or practices.

After observing in *M.D.* that the Original Complaint aggregated multiple systemic deficiencies into a "super-claim," precluding classwide resolution and classwide relief, *id.* at 844, the Fifth Circuit nevertheless noted that "some of the proposed class's *sub-claims* could potentially be certified under Rule 23(b)(2)," *id.* at 846 (emphasis added). The Circuit Court asserted that "the class claims could conceivably be based on an allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency, such as insufficient staffing," as long as classwide declaratory or injunctive relief is appropriate. *Id.* at 847-48. It further explained, "[a]ction or inaction is directed to a class . . . even if it has taken effect or is threatened only as to one or a few of the members of the class, provided it is based on grounds which have general application to the class." *Id.* (internal quotation marks omitted).

Rejecting the State's contention that class treatment would be infeasible, the Fifth Circuit identified several structural deficiencies upon which classwide claims could be predicated:

> Indeed, it is not clear how several of the State's alleged failures, such as its failure to (1) maintain sufficient licensing standards for its placements, (2) maintain an

adequate number and array of placements, or (3) employ a sufficient number of caseworkers, can be considered "day-to-day, case-by-case operational failures."

*Id.* at 848 n.7.

Tracking the Fifth Circuit's opinion, Plaintiffs' Third Amended Complaint proposes a General Class and several discrete Subclasses.  On behalf of the proposed General Class and Subclasses, Plaintiffs assert basic, common deficiencies in State policies and practices that impact all children in each proposed Class or Subclass uniformly.  The General Class challenges the insufficient number of caseworkers, the Basic Care GRO Subclass challenges the inappropriately restrictive placements, the Foster Group Home and Unverified Kinship Subclasses challenge insufficient licensing standards, and the Licensed Foster Care Subclass challenges the inadequate placement array and poor enforcement of licensing standards.

The claims generate common questions – applicable as to the General Class and each Subclass in its entirety – of whether the specific "systemic deficiencies" threaten to deprive all members of their constitutional rights to adequate care.  *Cf. D.L. v. District of Columbia*, 277 F.R.D. 38, 46 (D.D.C. 2011) (finding commonality satisfied by a common injury from "'systemic failures' within defendants' education system").  Consistent with *Wal-Mart*, these structural deficiencies serve as the "glue" uniting the claims of the General Class and Subclasses, facilitating classwide adjudication.

## II.   The Evidence Shows That the Relevant Rule 23 Requirements Are Satisfied

Plaintiffs have shown by a preponderance of the evidence that the Rule 23 certification requirements have been met.  The record confirms that "a classwide proceeding [will] generate common *answers* apt to drive the resolution of the litigation," *Wal-Mart*, 131 S.Ct. at 2551 (internal quotation marks omitted), and that classwide relief is appropriate.  While some of the evidence may be intertwined with the merits, "an evaluation of the probable outcome on the

7

merits is not properly part of the certification decision." *Amgen*, 133 S. Ct. at 1195 (quoting Fed. R. Civ. P. 23 Advisory Committee's Note).

### A.    The General Class Should Be Certified

Plaintiffs propose a General Class consisting of all children who are now or will be in the PMC of the Department of Family and Protective Services ("DFPS").  The claim common to all putative General Class members is that State policies and practices burden caseworkers with excessive caseloads that prevent them from overseeing the safety and basic service needs of the putative class member children for whom they are responsible.  Classwide adjudication is appropriate because the General Class's claims "depend upon [this] common contention" that is "capable of classwide resolution."  *Wal-Mart*, 131 S. Ct. at 2551; *M.D.*, 675 F.3d at 838, 840. The evidentiary summary below focuses on commonality, but the record shows that all Rule 23 requirements have been satisfied.

### 1.    The State Admits That Excessive Caseloads Are a Systemic Problem

By the State's own admission, high caseloads are an ongoing problem that impacts all children in care, including those in the proposed General Class.

In 2010, a report by the Adoption Review Committee (created by the State Legislature and the Governor) noted that conservatorship "caseworkers carry extremely high caseloads" that are "often *twice* what is deemed best practice."  Report of the Adoption Review Committee To the Governor, Lieutenant Governor, Speaker of the House of Representatives, House Committee on Human Services, and Senate Committee on Health and Human Services, Dec. 2010, Pls.' Ex. ("PX") 323, at PLTF0019506 (emphasis added).  The report further observed that "[m]any of [its] recommendations are, sadly, ones that have been made in prior years." *Id.* at PLTF0019499; *see also* Class Certification Hr'g Tr. ("Hr'g Tr.") 1/24/13 (Deckinga) at 24:7-26:14 (acknowledging that at least two committees, spanning fourteen years, have recommended

reducing caseloads in their reports to the Legislature and the Governor).  That same year, the

State found that another 210 conservatorship caseworkers would be required to bring the

caseload down to 24.9 and thereby enable "meaningful" visits with children.[1]  What Should CPS

Caseloads Look Like, July 2010, PX 234, at DFPS002413315, DFPS002413318.

The following chart depicts rising caseloads for conservatorship workers, the State's

"target" caseload for those workers, and the standards of the Child Welfare League of America

("CWLA") and the Council on Accreditation ("COA"):[2]



DFPS 2009 Data Book, PX 69,[3] at DFPS000566006; DFPS 2010 Data Book, PX 70, at

DFPS000566279; DFPS 2011 Data Book, PX 325, at PLTF0062183; 10/1/12 DFPS Rider 25:

---

[1] By the State's own estimates, the cost of adding new caseworkers to meet the target caseload of
24.9 would be $13 million the first year and $15 million the following year, PX 234, at
DFPS002413319—a far cry from any multibillion-dollar back-of-the-envelope figure suggested
at the hearing, *see* Hr'g Tr. 1/22/13, at 197:9-212:9.
[2] These two organizations are the professional standards-setting bodies for child welfare in
America.  Hr'g Tr. 1/22/13 (Miller) at 180:19-181:2.  In addition, the COA is "the leading
accreditor of public and private organizations providing child welfare services in the United
States and Canada."  Affirmation by Richard Klarberg, Sept. 23, 2012, PX 7, at 2.

Foster Care Redesign, Defs.' Ex. ("DX") 50, at DFPS005158106; PX 234, at DFPS002413318; Hr'g Tr. 1/22/13 (Miller) at 180:19-181:2.

It is difficult to ascertain the precise meaning of the State's data since Texas calculates caseloads in an unusual manner, using "stages" rather than children or families.[4]   Additionally, DFPS includes caseworkers on extended leave in its tally of caseloads.  McCall 8/21/12 Dep. Tr. at 40:7-41:5.  More discovery is needed to interpret the State's figures.[5]

However, regardless of the precise figure, "caseloads in Texas . . . are certainly out of compliance with national standards."  Hr'g Tr. 1/22/13 (Miller) at 183:6-7.  The CWLA has set caseload standards of twelve to fifteen children, and the COA has set caseload standards of eight to eighteen children, "depending on the severity of the needs of the child[ren]."[6]   *Id.* at 180:19-181:2.  However, the Adoption Review Committee reported a conservatorship caseload of "30-

---

[3] Where, as here, the cited exhibit is too voluminous to be filed electronically as one document, Plaintiffs have filed only the cited pages.

[4] Both the COA and the CWLA express their caseload standards in numbers of children per worker.  Hr'g Tr. 1/22/13 (Miller) at 180:23-181:2, 181:13-182:14, 183:24-184:2; *see also* CWLA: Standards of Excellence for Foster Family Care Services (1995), DX 58, § 3.48. According to testimony, DFPS's manner of calculating caseloads using "stages" was negotiated between the Legislature and the oversight agency for DFPS, Hr'g Tr. 1/24/13 (Deckinga) at 36:22-37:23, but apparently without regard to the usage in professional standards.

[5] During the hearing, the State suggested two different sets of numbers from which the Court could calculate the average number of children per caseworker, without offering any supporting testimony.  *See* Hr'g Tr. 1/23/13 (Stephens) at 175:19-176:25, 272:5-15.  Plaintiffs had never before been provided this information, and it is impossible to assess without back-up documentation.

[6] Texas law requires that the Commissioner of Health and Human Services "ensure" that caseload standards adopted by DPFS "are consistent with existing professional standards."  Tex. Gov't Code § 531.048(b)(3) (2011); *see also* Tex. Gov't Code § 531.001(5) (2011), PX 375 (defining "[p]rofessional caseload standards" as standards established "by management studies . . . or by an authority or association, including the Child Welfare League of America").  Standards established by the CWLA and COA "form a reliable basis for evaluating the performance of a state's child welfare system."  *Kenny A. ex rel. Winn v. Perdue*, No. 1:02-cv-1686, 2004 WL 5503780, at *12 (N.D. Ga. Dec. 13, 2004).  Texas law leaves the Commissioner the option of whether to set caseload standards. Tex. Gov't Code § 531.048(a) (2011).  No Commissioner has chosen to do so.

35 cases/worker in FY2009" and recommended "reduc[ing] caseload to 15-17/worker in compliance with national standards."  PX 323, at PLTF0019510; *see also* Gonzalez 10/27/11 Dep. Tr. at 200:2-11 (testifying that "workers carry high caseloads").  Notably, there is no evidence that the State adjusts caseloads based on the special needs of children, Hr'g Tr. 1/22/13 (Miller) at 186:6-18, even though an estimated 12% of the foster children in Texas have special needs, *see* Children in the TMC or PMC of DFPS by Placement/Removal Region, Facility Type, and Authorized Level of Care of Child, PX 253; Hr'g Tr. 1/23/13 (Warren) at 113:9-114:16, 115:21-117:8.  Plaintiffs' expert Dr. Don Warren testified that, as of June 30, 2012, 93.6% of the children in the General Class had caseworkers whose child-only caseloads, when weighted to account for the additional casework required by special-needs children, exceeded the COA standard.  Hr'g Tr. 1/23/13 (Warren) at 124:4-8.[7]  Moreover, Texas exceeds national standards for supervisor caseloads.  The professionally accepted ratio is one supervisor to five caseworkers, Hr'g Tr. 1/22/13 (Miller) at 226:2-4, but Texas's ratio is one to seven, *id.* at 226:5-8; *see also* McCall 8/21/12 Dep. Tr. at 120:3-122:5.

All children in the General Class are subject to a foster care system with admittedly excessive, and unchecked, caseloads.  Since 2010, by DFPS Assistant Commissioner for CPS Audrey Deckinga's own admission, caseloads have only risen.  Hr'g Tr. 1/24/13 (Deckinga) at 26:15-27:7; *see also* PX 323, at PLTF0019506; PX 234, at DFPS002413315.  According to then-Commissioner Howard C. Baldwin, the average daily caseload per worker in substitute care services was 33.7 in fiscal year 2012—a figure that had increased from 29.5 in 2010 and 32.0 in 2011.  DX 50, at DFPS005158106.  The number of caseworkers has declined in recent years, while the number of children in out-of-home care has increased.  As of January 2012, the

---

[7] Dr. Warren also determined that that 45.5% of caseworkers had weighted child-only caseloads over twenty-nine.  Hr'g Tr. 1/23/13 (Warren) at 123:11-18, 124:1-3.

"average monthly filled FTEs [full-time-equivalent employees]" for conservatorship caseworkers was 1484.2, down 1.7% from state fiscal year 2011.  DFPS Monthly Dashboard: March 2012 Report – data through January 2012, PX 235, at 5.  As of February 29, 2012, the number of children in DFPS conservatorship was 29,869, up from 26,477 as of August 31, 2009.  Total Placements for Children in the Temporary (TMC) or Permanent (PMC) Managing Conservatorship of DFPS, PX 271.  The State's data further shows that 74% of caseworkers assigned to PMC children had between twenty-one and fifty cases on June 30, 2012.  Daily Caseload Counts of Caseworkers Assigned to Children in Permanent Managing Conservatorship (PMC) on 8/31/2011 or on 6/30/2012, PX 287; Hr'g Tr. 1/24/13 (Deckinga) at 31:12-32:9.  As of June 30, 2012, 62% of substitute care workers assigned to children in PMC had a caseload of thirty-one or more, and 13% had a caseload of fifty-one or more.  PX 287.

The experiences of the Named Plaintiffs provide telling examples of high caseloads.  As of June 30, 2012, ten of the fourteen Named Plaintiffs had caseworkers with child-only caseloads of thirty or more.  *See* Children in PMC on June 30, 2012, PX 308 (filed under seal); Total Caseloads of Caseworkers as of June 30, 2012, PX 309 (filed under seal).[8]  The caseworker for S.R., J.R., and M.R. had a caseload of fifty-five on that date.  *See* Hr'g Tr. 1/23/13 (Young) at 234:10-14 (identifying "Keith Lascoe" [*sic*] as caseworker for those children); PX 308 (filed

---

[8] The caseworkers for the Named Plaintiffs as of June 30, 2012 are identified in PX 308.  In turn, PX 309 shows the caseloads of those workers as of that date, expressed in "total stages" and "FSU stages" for each worker.  Plaintiffs' expert Dr. Don Warren testified that subtracting FSU stages from total stages yields what he refers to as "child-only caseloads."  *See* Hr'g Tr. 1/23/13 (Warren) at 107:20-111:6; 124:18-125:20, 127:16-24.   Thus, PX 309 shows a child-only caseload of fifty-five for Keith Lasco (S.R., J.R., and M.R.'s caseworker); a child-only caseload of fifty-four for Zainab Ntaamah (D.I.'s caseworker); a child-only caseload of forty-three for Natasha West (Z.H.'s caseworker); a child-only caseload of thirty-four for Anita Taylor (H.V. and P.O.'s caseworker); a child-only caseload of thirty-three for Jarrod Anderson (K.E.'s caseworker); a child-only caseload of thirty-three for Criselda Medrano (S.A.'s caseworker); and a child-only caseload of thirty for Deirdre Ward (J.S.'s caseworker).

under seal) at DFPS004765909; PX 309 (filed under seal) at DFPS004765965 (showing caseload for Mr. Lasco).

A fundamental structural problem impacting all children in the General Class is that notwithstanding Texas's admittedly excessive caseloads, the State neither pays attention to nor manages the caseload levels.  Deckinga testified that DFPS has never adopted maximum caseload limits for caseworkers.[9]  Hr'g Tr. 1/24/13 (Deckinga) at 71:15-21.  Likewise, Colleen McCall, DFPS's Director of Field Operations for CPS, testified that DFPS "do[es] not have caseload limits."  McCall 7/26/11 Dep. Tr. at 31:12-15; *see also* McCall 8/21/12 Dep. Tr. at 35:16-22, 75:15-24, 77:4-14 (reasoning that when a caseworker has "50, 60, 70, or more cases," she simply expects local supervisors to "find ways to make sure workers are getting all the important things done" and other people to be "jumping in and helping, making sure all the tasks are getting done").  No State policy dictates that any caseload level is too high.  McCall 8/21/12 Dep. Tr. at 37:4-12.

2. <u>High Caseloads Constitutionally Injure All Children in the General Class</u>

All children in the General Class are subject to an imminent risk of deprivation of adequate care and the right to a safe, secure, and suitable placement due to the State's policy and practice of burdening caseworkers with excessively high caseloads.[10]  If exposure to this risk violates substantive due process, then that violation inures to the entire class in the same way.  If,

---

[9] *See supra* n.6.

[10] Courts have emphasized that certification is warranted where a state's policies or practices subject all class members to a risk of imminent harm, even though not every class member has yet been harmed in the same way.  *See, e.g.*, *D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635, 638 (N.D. Okla. 2011) ("[T]he issue here is not what percentage of children have actually suffered abuse while in state custody, but whether and to what extent foster children are at *imminent risk of serious harm*."); *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 295 (D. Mass. 2011) ("[T]he unreasonable *risk* of harm created by these alleged systemic failures within [the child welfare system] and applicable to the entire Plaintiff class is sufficient to satisfy the requirement of commonality.").

by contrast, the risk does not rise to the level of a constitutional violation, then every Plaintiff's claim fails on the merits.

Plaintiffs have proven by a preponderance of the evidence – and, in fact, Defendants have admitted – that excessive caseloads prevent caseworkers from meeting their obligations to oversee the safety and basic service needs of the children in the General Class.  The State has admitted that "[t]he higher the caseload, the harder it is to make the required monthly face-to-face contact with children in foster care and their parents," visits that are crucial to "child safety and quicker permanency."  Legislative Appropriations Request, Volume II for Fiscal Years 2014 and 2015, Aug. 16, 2012, PX 13, at 174; *see also* McCall 8/21/12 Dep. Tr. at 112:10-21. Additionally, "[h]igh caseloads cause quality casework to suffer, thus putting children in [the] system further at risk of harm."  Legislative Appropriations Request, Volume I for Fiscal Years 2012 and 2013, Aug. 16, 2010, PX 319, at PLTF0007109; *see also* McCall 8/21/12 Dep. Tr. at 115:7-16; Email from Shelia Brown to Carrie Lopez re: Unit Update:FYI, Jan. 24, 2012, PX 162; Liebgott 8/15/12 Dep. Tr. at 95:16-25.  Furthermore, high caseloads "result[] in significant child . . . safety issues," Legislative Appropriations Request, Volume I for Fiscal Years 2014 and 2015, Aug. 16, 2012, PX 12, at 19; *see also* Hr'g Tr. 1/24/13 (Deckinga) at 48:15-20 ("partially" agreeing that high caseloads put child safety at risk), as well as bad outcomes, McCall 8/21/12 Dep. Tr. at 110:11-15.  The chairman of the 2010 Adoption Review Committee acknowledged that DFPS "is unable to effectively handle the volume and deeply complex natures of children brought into state care" and that "there is increasing evidence to show that our foster care system is sometimes *doing more harm* to our children than good."  PX 323, at PLTF0019499.

The State also recognizes that high caseloads contribute to high caseworker turnover rates, *id*. at PLTF0019506; *see also* Gonzalez 10/27/11 Dep. Tr. at 200:2-11, and that high

caseworker turnover rates reduce positive outcomes for children, PX 323, at PLTF0019506; *see also* PIP Strategy Summary and TA Plan, Feb. 3, 2012, PX 248, at DFPS002422705; CVS Workgroup Scan Call Minutes, Jan. 13, 2011, PX 182, at DFPS000962329; McCall 8/21/12 Dep. Tr. at 92:5-24, 130:4-16. "High caseloads lead to high worker turnover, further exacerbating high caseloads."  Legislative Appropriations Request, Volume II for Fiscal Years 2012 and 2013, Aug. 16, 2010, PX 320, at PLTF0007562.  DFPS data shows that the top reason for staff quitting was "overworked," and the top suggestion for improving retention was "workload."  PX 323, at PLTF0019527; *see also* PX 12, at 19 ("Protective Services is a stressful job, made even more so when caseloads are high."); PX 319, at PLTF0007007 (same); McCall 8/21/12 Dep. Tr. at 66:7-13, 113:7-12 (noting the "stress" of high caseloads).  In state fiscal year 2011, the turnover rate for conservatorship workers was 23.7%, DFPS's 10/1/2012 Rider 11 Human Resources Management Plan, DX 49, at DFPS005158063, and turnover has increased each year since 2010, Hr'g Tr. 1/24/13 (Deckinga) at 64:7-16.  Turnover for entry-level DFPS caseworkers is the highest, with a rate of just over 37% during the first year.  Hr'g Tr. 1/24/13 (Deckinga) at 63:24-64:6.  Turnover "impair[s] the agency's ability to keep children . . . safe."  PX 319, at PLTF0007005; *see also* McCall 8/21/12 Dep. Tr. at 108:21-109:20.  The persistently high rates of turnover preclude DFPS from meeting the needs of the vulnerable children in the General Class.  *See, e.g.*, DX 49, at DFPS005158067; Hr'g Tr. 1/22/13 (Miller) at 191:8-19 (testifying that manageable caseloads are "the key to keeping our kids safe" and that turnover "creates a very dysfunctional system").

Excessive caseloads subject all children in the General Class to an increased risk of languishing in foster care and experiencing multiple placement moves.  McCall 8/21/12 Dep. Tr. at 130:4-16; Hr'g Tr. 1/22/13 (Miller) at 228:15-18; *see also* Permanency Dashboard, PX 272;

Children in TMC or PMC of DFPS on the Last Day of the Fiscal Year by Age and Length of Time in Care, PX 236; Demographics of Children No Longer in DFPS Responsibility, PX 254 (reflecting that 1202 youth emancipated in state fiscal year 2011); Median Length of Service for Children Adopted, Reunified, or Emancipated, PX 251; Children Legally Free for Adoption for Three or More Years On February 29, 2012, PX 238; Children's Bureau, "Child Welfare Outcomes 2007-2010: Report to Congress," PX 15, at 317-19; AFCARS and State Child and Family Service Review Reports, PX 116; Outcomes for Children Who Emancipated, PX 252; PX 271; Average Number of Placements for Children in DFPS Conservatorship by Living Arrangement Category as of February 29, 2012, PX 276; Texas Child and Family Services Review Data Profile: June 9, 2011, PX 48, at DFPS 545730; Emerson 9/6/12 Dep. Tr. at 100:2-13. In state fiscal year 2011, just 26.7% of children who had been in care for two or more years exited to permanency. PX 235, at 6. That same year, 64.2% of children who had been in foster care for more than three years left foster care to live on their own, without a permanent family. *Id*. As of February 29, 2012, the average number of placements for all PMC children was 4.5, Average Number of Placements for Children in Conservatorship by Time in Care as of February 29, 2012, PX 250; 26% of the children in PMC on that date had experienced five to ten placements and 10% had experienced ten placements or more, PX 271. PMC children ages fourteen to seventeen (30.1% of all PMC children) had an average of 7.1 placements, and PMC children ages ten to thirteen (19.4% of all PMC children) had an average of 4.9 placements. PX 250. In both 2011 and 2012, the children who exited the State's PMC without permanent families had an average of almost nine placements. PX 252.

Plaintiffs' expert Dr. Viola Miller opined that children whose caseworkers are overburdened also are exposed to a heightened risk of maltreatment in care. Hr'g Tr. 1/22/13

(Miller) at 228:15-18.  It is difficult for Plaintiffs to quantify this risk at this stage of the proceeding because (1) Texas does not report abuse in unverified kinship placements as "abuse in foster care," to be included in federal reporting on maltreatment in care, for which the federal Department of Health and Human Services has set an acceptable level; and (2) the State does not report children who are maltreated by other children in care as victims of abuse at all.  Hr'g Tr. 1/22/13 (Miller) at 234:25-235:2, 236:8-24, 238:20-239:11; Hr'g Tr. 1/22/13 (Deckinga) at 239:12-24.  As a result, the actual rate of abuse suffered by all children in PMC is not known, even by Defendants, and the issue will have to be further developed during discovery following class certification.  At this point, what *is* known is that DFPS itself confirmed a total of 623 children as "Designated Victims" of abuse or neglect, *while in the State's PMC*, during state fiscal years 2009-2011—and this number does not include those children who were maltreated by other children in care.  Designated Victims of Abuse/Neglect During FFY2011 While in the PMC of DFPS, PX 303 (filed under seal); Designated Victims of Abuse/Neglect During FFY2010 While in the PMC of DFPS, PX 304 (filed under seal); Designated Victims of Abuse/Neglect During FFY2009 While in the PMC of DFPS, PX 305 (filed under seal).

3. The Rule 23 Requirements Are Satisfied for the General Class

The record confirms that the General Class should be certified pursuant to Rule 23.

The common questions applicable to all members of the General Class include:

- Does the State fail to employ a sufficient number of caseworkers to allow the caseworkers to discharge their affirmative duties to the children in the State's PMC?

- Does the State's failure to employ a sufficient number of caseworkers mean that children in the General Class have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

These questions – both legal and factual – can be resolved with a "yes" or "no" answer as to the entire class based upon Defendants' conduct towards the General Class as a whole; no individualized inquiries are required.

The record shows that all Rule 23(a) requirements have been met for the General Class. Numerosity is satisfied because the General Class consists of approximately 12,000 children. Defs.' App. in Supp. of Br. in Opp'n to Pls.' Mot. for Class Certification and Appointment of Class Counsel, Ex. J, May 16, 2011, PX 2, at APPX 2077.  Likewise, commonality has been met. Typicality is satisfied because the claims of the Named Plaintiffs and the General Class "arise from a similar course of conduct" – Defendants' policy or practice of hiring an inadequate number of caseworkers, resulting in caseloads well above professional standards – "and share the same legal theory."  *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1054 (S.D. Tex. 2012) (internal quotation marks omitted).  So, too, are the Named Plaintiffs exposed to the same risk of constitutional injury shared by the General Class. *See Wal-Mart*, 131 S.Ct. at 2553; *D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635, 639 (N.D. Okla. 2011).  Adequacy of representation is satisfied because the class representatives will fairly and adequately protect the interests of the General Class.  Defendants produced no proof of any conflicts of interest between counsel and the General Class or among the General Class members.[11]

Furthermore, the claim alleged by the General Class is amenable to the sort of targeted and narrow injunction that satisfies Rule 23(b)(2) while remedying the constitutional violation as to all General Class members—an injunction that limits the State's caseworker caseloads.  *See*

---

[11] Typicality and adequacy of representation are likewise satisfied for each Subclass for similar reasons pertinent to the respective policies, practices, legal theories, and Named Plaintiffs of each Subclass.

*Wal-Mart*, 131 S.Ct. at 2557 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (internal quotation marks omitted); *M.D.*, 675 F.3d at 845-46.  Courts in other foster care class actions have deemed such relief appropriate to remedy the imminent risk to children posed by overburdened caseworkers who could not ensure the safety or security of the children they monitor.  *See, e.g.*, *D.G.*, 278 F.R.D. at 639 (holding that the remedy of "an injunction setting limits on caseloads" would be "common to all plaintiffs" alleging risk of harm resulting from inadequate foster care monitoring practices).  The Court may determine the precise contours of that injunctive relief based upon the evidence already submitted and additional evidence to be adduced at trial.  *See LaShawn A. ex rel. Moore v. Dixon*, 762 F. Supp. 959, 998 (D.D.C. 1991) (noting that a forthcoming "relief phase" to discuss potential injunctive remedies was to follow a merits trial where defendants were found liable for violating class members' constitutional rights) *aff'd on other grounds and remanded sub nom. LaShawn A. ex rel. Moore v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993).

Rule 23(c)(1)(B) requires that any certification order list not only the claims, but also the defenses to be resolved on a classwide basis.  Accordingly, any certification order should reflect that:

- The structural deficiency is the State's failure to "employ a sufficient number of caseworkers," *M.D.*, 675 F.3d at 848 n.7, to adequately monitor the well-being and the safety of the members of the General Class.  This structural deficiency has "general application to the class," *id*. at 848 (internal quotation marks omitted).

- The alleged constitutional injury resulting from this uniform policy and practice is the deprivation or imminent risk of deprivation of the General Class members' substantive due process right to adequate care in State custody, which entails the right to a safe, secure, and suitable foster care placement.

19

- The legal claim to be certified is a substantive due process violation under the United States Constitution.  The elements of the substantive due process claim are that:  "(i) defendants acted under color of law; (ii) a protected property or liberty interest was at stake; (iii) the defendants had a duty of care toward the plaintiff; and (iv) a deprivation within the meaning of the due process clause occurred." *Roberts v. Mentzer*, 382 F. App'x 158, 166 (3d Cir. 2010); *see also Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

- The defenses alleged are: (1) Plaintiffs have failed to meet their burden of proof to establish a substantive due process violation, including showing that Defendants' actions meet the relevant culpability standard; (2) the Court lacks subject matter jurisdiction to hear the claims, because of a lack of standing and because the claims are barred by the 11th Amendment, Defs.' Second Am. Answer, ECF No. 161, at 2-6; and (3) the failure to state a claim, *id*. at 4-5.[12]

**B.    The Basic Care GRO Subclass Should Be Certified**

Plaintiffs propose a Basic Care GRO Subclass consisting of all PMC children who are now or will be in a general residential operation, defined by state law as a residential child care operation that provides child care for thirteen or more children or young adults, Tex. Hum. Res. Code § 42.002(4), PX 390; "Minimum Standards for General Residential Operations," Sept. 2010, PX 49, § 748.43(23), and who are or will be receiving solely non-emergency, basic child care services, which the State defines as "[s]ervices that meet a child's basic need for shelter, nutrition, clothing, nurture, socialization and interpersonal skills, care for personal health and hygiene, supervision, education, and service planning," *id*. § 748.61.  While these institutions are licensed to house thirteen or more children, some current general residential operations contract with DFPS to house more than 100 children.  General Residential Operations and Residential Treatment Centers In Operation On May 31, 2012, PX 302.  The claim common to all putative

---

[12] The only defense Defendants raised at the class certification hearing was that Plaintiffs have failed to meet their burden of proof to establish a substantive due process violation.  As explored above, this defense raises no individualized inquiries.  *See supra* § III.A.  Another alleged defense listed in the Second Amended Answer is that the Court should abstain from adjudicating the case and apply *Younger* abstention, Defs.' Second Am. Answer at 4, ECF No. 58, but this defense has been resolved by the Court's previous rejection of the motion to dismiss on that basis.

class members is that children needing only basic child care services should not be housed in non-emergency general residential operations.  Classwide adjudication is appropriate because the Basic Care GRO Subclass's claims "depend upon [this] common contention" that is "capable of classwide resolution."  *Wal-Mart*, 131 S. Ct. at 2551; *M.D.*, 675 F.3d at 838, 840.  The evidentiary summary below focuses on commonality, but the record shows that all Rule 23 requirements have been satisfied.

      1.   <u>Texas Improperly Houses Basic-Level Children in General Residential Operations</u>

Texas routinely uses non-emergency general residential operations to house children who the State itself has determined require only basic child care services.  Children in the TMC or PMC of DFPS Placed in a General Residential Operation on May 31, 2012, PX 299 (filed under seal).  Accepted professional standards and federal law, as well as DFPS's own policies, require children to be placed in the least restrictive, most family-like settings that meet their needs. Child Protective Services Handbook, <u>PX 306</u>, § 4121, App. 4121; 42 U.S.C. § 675(5)(A) (2011); CWLA: Standards of Excellence for Residential Services (2004), <u>DX 57</u>, § 4.24.  General residential operations are designed to address "therapeutic needs," but children with basic service levels who do not have such needs are warehoused in the facilities for the sole reason that "a foster placement [is not] available."  Butler 4/23/12 Dep. Tr. at 180:3-181:5.  Katara Butler, Region 6 Conservatorship Program Director for DFPS, testified that a caseworker would never request a general residential operation over a foster home placement.  *Id.* at 180:23-181:5.

Next Friend Estela Vasquez explained that Named Plaintiffs L.H. and C.H., along with their siblings, were placed in a general residential operation because "the Department said that there was no other place for them in a foster home because most foster families just want smaller sibling groups."  Hr'g Tr. 1/23/12 (Vasquez) at 160:24-161:1.  She asserted that "they should be

in a more home-like environment" rather than the "square box that they're just thrown in" at their current placement.  *Id.* at 168:25-169:2.

Next Friend Anna Ricker recalled her horror upon visiting Named Plaintiff J.S. (whom she recalled as being only six years old at the time) in a former placement at a general residential operation: "He was in . . . a cinderblock room and he's this little boy and he's set in the middle of his little bed. That was all that was in his room, and some clothes that didn't fit.  And he said 'would you please hug me, because they can't touch me here.' And – and I was horrified."  Hr'g Tr. 1/22/13 (Ricker) at 110:8-13.

Dr. Miller testified that basic-service-level children "need to be in a home and they are essentially being denied a family if they're placed in these kinds of facilities."  Hr'g Tr. 1/22/13 (Miller) at 246:16-18.  Gail Gonzalez, DFPS Director of Placement, Foster and Adoptive Home Development and Interstate Compact for Placement of Children, acknowledged that "for most children, the most desirable setting for children to be placed in out of home or out of relative care, would be in a foster family setting," and "foster family settings can have better outcomes for children."  Gonzalez 5/2/12 Dep. Tr. at 31:22-32:11.

A fundamental structural problem impacting all children in the Basic Care GRO Subclass is that the State seems to turn a collective blind eye to its own practice of regularly placing children with basic service levels in these facilities.  *See* Defendants' Responses to Plaintiffs' Fifth Set of Interrogatories, July 30, 2012, PX 427, at 14 (admitting that the State "does not maintain a daily census of children at a GRO").

2.  Placing Basic-Needs Children in General Residential Operations Constitutionally Injures All Children in the Basic Care GRO Subclass

All children in the Basic Care GRO Subclass are subject to an imminent risk of deprivation of adequate care and the right to a suitable placement due to the practice of placing

22

children receiving basic-level services in non-emergency general residential operations.   No basic-level-needs child should ever be placed in a non-emergency general residential operation, and all children in the Basic Care GRO Subclass are constitutionally injured *per se* by this inappropriate institutional placement.

Both Texas policy and federal law require children to be placed in the least restrictive and most family-like setting possible, *supra* § II.B.1, yet all children in the Basic Care GRO Subclass are being institutionalized in facilities, some of which can house in excess of 100 children, not because of their service needs but solely because the State has not recruited or obtained any other placements for them.   The children in the Basic Care GRO Subclass have truly become the State's forgotten children.

Dr. Miller testified that this sort of unnecessary institutionalization injures children.   *See* Hr'g Tr. 1/22/13 (Miller) at 246:15-18.   She further noted that there is "much less likelihood of children being adopted from a congregate care environment or moving to permanency [from] a congregate care environment than if those children are in a foster home." *Id.* at 242:3-6. Moreover, Dr. Miller testified that "mixing ages" and "mixing children with conduct disorders or behavioral issues and children who are basic care children" in congregate care facilities increases the likelihood of abuse. *Id.* at 241:14-22.

3. The Rule 23 Requirements Are Satisfied for the Basic Care GRO Subclass

The record confirms that the Basic Care GRO Subclass should be certified pursuant to Rule 23.

Common questions applicable to all members of the Basic Care GRO Subclass include:

- Does the State's placement of children needing only basic child care services in non-emergency general residential operations deprive them of a reasonably suitable placement?

- Does the State's placement of children needing only basic child care services in non-emergency general residential operations mean that children in the Basic Care GRO Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

These questions of law and fact can be resolved with a "yes" or "no" answer as to the entire Subclass based upon Defendants' conduct alone; no individualized inquiries are required.

Numerosity is satisfied because the Basic Care GRO Subclass consists of nearly 400 children. PX 299 (filed under seal). Commonality, typicality, and adequacy of representation have likewise been met. *See supra* § II.A.3.

Furthermore, the claim alleged by the Basic Care GRO Subclass can be remedied as to all Subclass members through narrow and targeted injunctive relief that satisfies Rule 23(b)(2). *See Wal-Mart*, 131 S.Ct. at 2557; *M.D.*, 675 F.3d at 845-46. For example, the Court could order Defendants to cease placing basic-care children in non-emergency general residential operation placements, and to recruit and obtain more foster homes for them.

The order certifying the Basic Care GRO Subclass should reflect that:

- The structural deficiency is the State's placement of basic-care-needs children in non-emergency general residential operations, which are unsuitable for such children.

- The alleged constitutional injury resulting from these uniform policies and practices is the deprivation or imminent risk of deprivation of the substantive due process right to adequate care in State custody, which entails the right to a reasonably suitable placement.

- The legal claim to be certified is a substantive due process violation under the United States Constitution.

- The defenses alleged are: (1) Plaintiffs have failed to meet their burden of proof to establish a substantive due process violation, including showing that Defendants' actions meet the relevant culpability standard; (2) the Court lacks subject matter jurisdiction to hear the claims, because of a lack of standing and because the claims are barred by the 11th Amendment, Defs.' Second Am. Answer, ECF No. 161, at 2-6; and (3) the failure to state a claim, *id*. at 4-5.

24

**C.      The Foster Group Home Subclass Should Be Certified**

Plaintiffs propose a Foster Group Home Subclass consisting of all PMC children who are now or will be in a foster group home, defined by state law as a facility that is the primary residence of the caregiver(s) and provides twenty-four-hour residential care for seven to twelve children.      "Minimum Standards for Child-Placing Agencies," Sept. 2010, PX 50, § 749.43(23)(A); Tex. Hum. Res. Code § 42.002(5), PX 390.   As of May 31, 2012, 130 foster group homes then in operation, or 30.2% of all foster group homes, had capacities of ten children or more.   Foster Group Homes In Operation On May 31, 2012, PX 301. All putative class members are deprived of, and are at continuing risk of being deprived of, their substantive due process rights to adequate care in State custody, because if they are placed in foster group homes, they are not cared for with professional staff, waking caregivers, and medical personnel on staff or on call, in violation of accepted professional standards for group living.  Hr'g Tr. 1/22/13 (Miller) at 241:14-23, 244:24-246:2; DX 57, §§ 1.3, 1.5, 1.6; PX 50, §§749.43(23)(A), 749.103, 749.105, 749.931(a), 749.933; Affirmation by Richard Klarberg, Sept. 23, 2012, PX 7, at 2-3, 38. Classwide adjudication is appropriate because the Foster Group Home Subclass's claims "depend upon [this] common contention" that is "capable of classwide resolution."  *Wal-Mart*, 131 S. Ct. at 2551; *M.D.*, 675 F.3d at 838, 840.   The evidentiary summary below focuses on commonality, but the record shows that all Rule 23 requirements have been satisfied.

1.      <u>All Children in the Foster Group Home Subclass Are Placed in Residences with Unsuitable Standards</u>

All children in the Foster Group Home Subclass are impacted by the deficient policies and practices governing foster group homes.  Unlike family foster homes, which are limited to six children, foster group homes house seven to twelve children of varying ages who are often strangers to each other, supervised by one or two foster group home "parents" who, unlike in

25

general residential operations and residential treatment centers, are not staffed in shifts but are responsible for all the children in the foster group home, 365 days per year.  PX 50, § 749.43(23)(A) (defining "foster group home," after 2007, as "the primary residence of the foster parent(s)").   Although foster group homes are in fact group facilities, Texas licenses these placements under the standards for family foster homes.   Thus, foster group homes are not required to meet the standards that govern group care in Texas, which would be more appropriate for these placements.

"Group care requires professional staff, case managers, the full array of services that you would expect in a group environment."  Hr'g Tr. 1/22/13 (Miller) at 244:24-245:1.  CWLA and COA standards for group facilities require professional staff, waking caregivers, and on-call or on-staff medical personnel, DX 57, §§ 1.3, 1.5, 1.6, none of which are required in Texas's foster group homes, *see* PX 50, §§ 749.103, 749.105, 749.933; *see also* Hr'g Tr. 1/22/13 (Miller) at 245:1-9.  The State requires no additional education or training for foster group home caregivers, but nevertheless allows them to care for several more children than family foster parents.  *See* PX 50, §§ 749.43(23)(A), 749.931(a).  Richard Klarberg, the president and CEO of the COA, explained that professional standards do not directly address foster group homes "because we don't believe that there are best practices that go along with a bad practice."  PX 7, at 2-3, 38.

2.    Foster Group Homes Constitutionally Injure All Children in the Foster Group Home Subclass

All children in the Foster Group Home Subclass are subject to an imminent risk of deprivation of adequate care and the right to a safe, secure, and suitable placement due to the absence of trained professional staff, waking caregivers, and on-staff or on-call medical personnel in foster group homes.

26

Dr. Miller opined that the State's refusal to apply group facility standards to foster group homes subjects all children in the Foster Group Home Subclass to constitutional injury.   She observed that foster group homes encompass "a very, very large group of kids to be supervised and loved and cared for in a single family home" and said that she finds their use "scary."  Hr'g Tr. 1/22/13 (Miller) at 245:4-13.   She explained that these minimally-supervised placements expose all children in the Foster Group Home Subclass to heightened risk of child-on-child abuse.   "[S]o many of our children who come into care that have a history or that have been sexually abused don't let us know that," she testified, and "children who have been sexually abused are children who [abuse] other children."  *Id*. at 245:21-246:1.   She added that Texas's practice of mixing ages in congregate facilities increases the risk of such harm.  *Id*. at 241:14-23. Plaintiffs are unable to quantify that risk at this stage because Texas does not separately report the rate of child-on-child abuse.  *Id*. at 234:25-235:2.

Named Plaintiff D.I. provides a chilling example of the vulnerability of children in foster group homes.  On June 5, 2010, at the age of 8, he was placed in a therapeutic foster group home affiliated with the Bair Foundation.  Selected case files for Plaintiff D.I., PX 26 (filed under seal) at DFPS #16453.  According to the State's abuse and neglect intake report, a 16-year-old boy living there reported to the group home's sole caregiver on July 3, 2010, that he had sexually assaulted D.I. and had had sex with a 17-year-old boy who was also living there.  *Id*. at 1 RFP RCCL 00930.  The document states: "On three known occasions during the month of June, there were sexual relations (oral and anal)" between the two older boys and between the 16-year-old and D.I.  *Id*.  "On the first encounter [the 17-year-old] was 'lookout' as the 16yo . . . received oral sex from the 8yo . . . .  On the second encounter [the 17-year-old] was 'lookout' as the 16yo . . . had anal sex with the 8yo . . . .  On the third encounter the 16yo . . . had anal sex with the 8yo

. . . and [the 17-year-old] had anal sex with the 16yo . . . ." *Id.* All children in the Foster Group

Home Subclass are similarly placed with other children of various ages, without the security of

waking caregivers or other protections accorded to residents of group facilities.

           3.    <u>The Rule 23 Requirements Are Satisfied for the Foster Group Home Subclass</u>

The record confirms that the Foster Group Home Subclass should be certified pursuant to

Rule 23.

Common questions applicable to all members of the Foster Group Home Subclass

include:

- Does the State's operation of foster group homes deprive or threaten to deprive Subclass members of adequate care due to the standards by which Defendants operate these facilities, including capacity, staffing of professionals, and waking caregivers?

- Do the State's policies and practices with respect to its operation of foster group homes mean that children in the Foster Group Home Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

These questions – both legal and factual – can be resolved with a "yes" or "no" answer as to the

entire Subclass based upon Defendants' conduct alone; no individualized inquiries are required.

Numerosity is satisfied because the Foster Group Home Subclass consists of

approximately 900 children. Children in the TMC or PMC of DFPS Placed in a Foster Group

Home on May 31, 2012, PX 298 (filed under seal). Commonality, typicality, and adequacy of

representation have likewise been met. *See supra* § II.A.3.

Furthermore, the claim alleged by the Foster Group Home Subclass can be remedied as to

all Subclass members through narrow and targeted injunctive relief that satisfies Rule 23(b)(2).

*Wal-Mart*, 131 S.Ct. at 2557; *M.D.*, 675 F.3d at 845. For example, the Court could order the

State to cease placing children in foster group homes, or to apply the standards for group

facilities, as opposed to family foster home standards, to these foster group homes, including

waking caregivers, trained professional staff, and medical personnel.

The order certifying the Foster Group Home Subclass should reflect that:

- The structural deficiencies are the State's operation of foster group homes without waking caregivers, professional staff, and medical personnel.

- The alleged constitutional injury resulting from these uniform policies and practices is the deprivation or imminent risk of deprivation of the substantive due process right to adequate care in State custody, which entails the right to a safe, secure, and suitable foster care placement.

- The legal claim to be certified is a substantive due process violation under the United States Constitution.

- The defenses alleged are: (1) Plaintiffs have failed to meet their burden of proof to establish a substantive due process violation, including showing that Defendants' actions meet the relevant culpability standard; (2) the Court lacks subject matter jurisdiction to hear the claims, because of a lack of standing and because the claims are barred by the 11th Amendment, Defs.' Second Am. Answer, ECF No. 161, at 2-6; and (3) the failure to state a claim, *id*. at 4-5.

### D. The Unverified Kinship Subclass Should Be Certified

Plaintiffs propose an Unverified Kinship Subclass consisting of all PMC children who are

or will be in an unverified kinship placement, defined by State policy as a placement with a

relative or other person who has a longstanding and significant relationship with the child, but is

not verified, licensed, or certified as a foster parent.  Child Protective Services Handbook §§

4512-13[13]; *see also* Tex. Fam. Code § 264.751(3)(A).  The claim common to all putative

Subclass members is that unverified kinship caregivers receive fundamentally deficient

screening, monitoring, and training, and the children, all of whom are in the custody of the State,

are denied monthly foster care maintenance payments available to children placed with verified

foster parents.  Classwide adjudication is appropriate because the Unverified Kinship Subclass's

claims "depend upon [this] common contention" that is "capable of classwide resolution."

---

[13] *Available at* http://www.dfps.state.tx.us/handbooks/CPS/default.asp.

*Wal-Mart*, 131 S. Ct. at 2551; *M.D.*, 675 F.3d at 838, 840.   The evidentiary summary below

focuses on commonality, but the record shows that all Rule 23 requirements have been satisfied.

        1.      <u>All Children in the Unverified Kinship Class Are Subject to Insufficient</u>
<u>Oversight and Receive Inadequate Financial Support</u>

All children in the Unverified Kinship Subclass are impacted by the deficient policies and

practices governing unverified kinship placements.   DFPS provides insufficient screening,

monitoring, and training for unverified kinship caregivers and deprives children in unverified

placements of the financial support that children in licensed foster care receive.

The only safety measures provided for unverified kinship homes are an initial home

assessment, a State background check, and a central Child Protective Services background check

for each person in the home over the age of 14.   Child Protective Services Handbook §§ 4522-

4525.[14]   FBI fingerprint checks are performed only for potential kinship caregivers who have

lived outside Texas during the prior three years.   *Id*.   Individuals who are frequently present in an

unverified home are not subjected to any background screening.   *See id.*   Unverified kinship

homes receive no additional evaluations beyond the initial checks.   And "unverified kinship

homes have no training requirements."   Email from Stacy Lake to Denise Lange re: Website

Message: Kinship Care Training Requirements, Jan. 11, 2011, <u>PX 186</u>; *see also* Butler 4/23/12

Dep. Tr. at 70:16-18.

By contrast, minimum standards for verified kinship homes and non-relative foster homes

require FBI fingerprint checks, state background checks, and central Child Protective Services

background checks for *all* persons over the age of 14 who live in, are frequently present in, or

frequently visit the home.   <u>PX 50</u>, § 749.2447.   Verified kinship homes and non-relative foster

homes are evaluated for compliance with all minimum standards every two years, *id*. §§

---

[14] *Available at* <u>http://www.dfps.state.tx.us/handbooks/CPS/default.asp</u>.

749.2801, 749.2813, and are subject to oversight by a licensed child placement agency and the State's Residential Child Care Licensing division ("RCCL"), *see id.* §§ 749.43(22)-(23), (describing foster family homes and foster group homes as "under the regulation of a child-placing agency").  Verified kinship caregivers must complete twenty-five to thirty-five hours of initial training and satisfy continuing training requirements.  Lake 9/11/12 Dep. Tr. at 76:2-5, 76:10-77:13.

Children in unverified kinship placements receive substantially less financial support from the State than children in licensed foster care.  Unverified caregivers in Texas can receive one-time "integration payments" of not more than $1000 per child or sibling group and an annual per-child reimbursement of not more than $500.  Kinship Caregiver Agreement, Nov. 2011, PX 406, at 3.  By contrast, the minimum reimbursement for children in verified foster placements varies from $22.15 to $88.62 per child per day, depending upon the child's service level, resulting in an annual payment ranging from $8084.75 to $32,346.30 per child.  FY 13 Residential Childcare Contract, DX 34, at DFPS004766746.  In state fiscal year 2011, the average monthly payment per foster child in a verified placement was $1898.55.  PX 12, at 265.

By way of example, Next Friend Bobbie Young testified that the unverified kinship foster parent for Named Plaintiffs J.R., M.R., and S.R. "has gotten at the most $2,500" altogether, Hr'g Tr. 1/23/13 (Young) at 215:4-5, during the two and a half years she has been their caregiver, CPS Case file for S.T., M.R. and J.R., DX 55 (filed under seal) at 1 RFP CPS 073875 (showing that M.R. and S.R. were moved to the kinship placement (where J.R. already resided) on October 1, 2010).  Deckinga acknowledged that the foster parent would be receiving "about $600" per month, per child, if she were verified.  Hr'g Tr. 1/24/13 (Deckinga) at 216:1-13.

The lack of verification for kinship homes violates professional standards.  *See* CWLA: Standards of Excellence for Family Foster Care Services (1995), DX 58, §§ 3.7-3.11 (CWLA training standards for non-relative foster parents); CWLA Standards of Excellence: Kinship Care Services (2000), DX 56, § 4.24 (CWLA training standards for kinship caregivers); *id*. § 2.35 (CWLA states that "[t]he child welfare agency should have an approval or licensing process for all kinship caregivers providing care of children in state custody" and notes that "[t]he same standards regarding child protection and safety required for unrelated foster parents should apply in the approval/licensing of kinship homes, with flexibility with regard to standards unrelated to child protection and safety.").

> 2.  The Lack of Verification Constitutionally Injures All Children in the Unverified Kinship Subclass

All children in the Unverified Kinship Subclass are subject to an imminent risk of deprivation of adequate care and the right to a safe and secure placement due to the minimal safety measures, lack of training, and very limited funding for unverified kinship homes.

Stacy Lake, the Division Administrator for Family Focus at DFPS, testified that the purpose of requiring caregivers in verified homes to satisfy a set of minimum standards – which do not apply to unverified homes – is "[t]o ensure a safe home for children."  Lake 9/11/12 Dep. Tr. at 37:21-38:2.  Dr. Miller opined that she "would certainly think that you're creating a risk when you've got one set of standards for one group of foster parents and another set of standards for another group of foster parents."  Hr'g Tr. 1/22/13 (Miller) at 264:1-4.  A major aspect of this risk remains unquantifiable at this point, however, because Texas does not separately identify abuse that occurs in unverified kinship placements, and does not report such abuse for inclusion in the federal measure of maltreatment in foster care.  *See* Hr'g Tr. 11/22/13 (Miller) at 236:8-24, 238:20-239:24.  Among the Named Plaintiffs, P.O. and his brother were removed from two

different unverified kinship placements in less than two years because of allegations or suspicions of abuse. Selected case files for Plaintiff P.O., PX 33 (filed under seal) at 1 RFP CPS 031087, 031090.

Lake also testified that non-relative foster parents are required to take training both for their own benefit and for the benefit of the children in their care. Lake 9/11/12 Dep. Tr. at 77:7-13. Both the unverified kinship caregivers and the children they care for are deprived of this benefit. PX 186; Butler 4/23/12 Dep. Tr. at 70:16-18. Finally, the lack of monthly foster care maintenance payments to meet children's basic needs further injures all children in the Unverified Kinship Subclass. The purpose of such funding is "[t]o pay for food, clothing, shelter." Lake 9/11/12 Dep. Tr. at 96:10-97:1. An internal DFPS memorandum to the Commissioner acknowledged that "financial assistance to caregivers who provide relative placement to a child in DFPS substitute care results in better outcomes." Memorandum from Andreana Ledesma to the Commissioner re: Relative and Other Designated Caregiver Assistance Program Evaluation, Apr. 30, 2012, PX 297, at DFPS004490558.

        3.    The Rule 23 Requirements Are Satisfied for the Unverified Kinship Subclass

The record confirms that the Unverified Kinship Subclass should be certified pursuant to Rule 23.

Common questions applicable to all members of the Unverified Kinship Subclass include:

- Do the State's policies and practices with respect to licensing and verification of kinship homes place Subclass members at imminent risk of being deprived of adequate care—defined as a safe and secure placement?

- Do the State's policies and practices with respect to the screening, monitoring, and training of unlicensed kinship care providers place Subclass members at imminent risk of being deprived of adequate care—defined as a safe and secure placement?

- Do the State's policies and practices with respect to foster care financial support place Subclass members at imminent risk of being deprived of adequate care—defined as a safe and secure placement?

- Does the State's use of unverified kinship placements mean that children in the Unverified Kinship Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

These questions of law and fact can be resolved with a "yes" or "no" answer as to the entire Subclass based upon Defendants' conduct alone; no individualized inquiries are required.

Numerosity is satisfied because the Unverified Kinship Care Subclass consists of nearly 3000 children.  Statewide Demographics of Children in Kinship Placements For Children Age 0 - 17 At the end of: August 2011, PX 273.  Commonality, typicality, and adequacy of representation have also been met.  *See supra* § II.A.3.

Furthermore, the constitutional injuries alleged by the Unverified Kinship Care Subclass can be remedied as to all Subclass members through narrow and targeted injunctive relief that satisfies Rule 23(b)(2).  *Wal-Mart*, 131 S.Ct. at 2557; *M.D.*, 675 F.3d at 845.  For example, the Court could order Defendants to require that kinship care providers be verified.

The order certifying the Unverified Kinship Subclass should reflect that:

- The structural deficiencies are the State's failures to require that unverified kinship care providers be sufficiently screened, monitored, trained, and funded.

- The alleged constitutional injury resulting from these uniform policies and practices is the deprivation or imminent risk of deprivation of the Subclass members' substantive due process rights to adequate care in State custody, which entails the right to a safe and secure placement.

- The legal claim to be certified is a substantive due process violation under the Fourteenth Amendment to the United States Constitution.

- The defenses alleged are: (1) Plaintiffs have failed to meet their burden of proof to establish a substantive due process violation, including showing that Defendants' actions meet the relevant culpability standard; (2) the Court lacks subject matter jurisdiction to hear the claims, because of a lack of standing and because the

34

claims are barred by the 11th Amendment, Defs.' Second Am. Answer, ECF No. 161, at 2-6; and (3) the failure to state a claim, *id*. at 4-5.

**E.      The Licensed Foster Care Subclass Should Be Certified**

Plaintiffs propose a Licensed Foster Care Subclass consisting of all PMC children who are now or will be in a licensed or verified foster care placement, aside from those PMC children who now or in the future will be placed in a verified kinship placement.   All putative Subclass members bring claims concerning two structural deficiencies: (1) the State's failure to adequately monitor and oversee child placing agencies and residential child care facilities to assure the safety and well-being of the putative Subclass members; and (2) the State's failure to maintain a sufficient number, geographic distribution, and array of foster care placements.   Classwide adjudication is appropriate because the Licensed Foster Care Subclass's claims "depend upon [these] common contention[s]" that are "capable of classwide resolution." *Wal-Mart*, 131 S. Ct. at 2551; *M.D.*, 675 F.3d at 838, 840.  The evidentiary summary below focuses on commonality, but the record shows that all Rule 23 requirements have been satisfied.

1.      <u>All Children in the Licensed Foster Care Subclass Are Placed in Residences Which Are Inadequately Monitored and Overseen</u>

a.      The State's Monitoring and Oversight Practices Are Insufficient

The State's failure to adequately monitor and oversee child placing agencies and residential child care facilities impacts all children in the Licensed Foster Care Subclass.   The State itself has recognized that the monitoring and oversight practices of RCCL, which is charged with licensing and regulating all child placing agencies and residential child care facilities in Texas,  are insufficient.

A fundamental structural problem affecting all children in the Licensed Foster Care Subclass is that because of an increasingly burdensome workload, RCCL is unable to complete the monitoring and oversight for which it is responsible, much less complete it timely and

effectively.  Daryl Chansuthus, "DFPS Residential Child Care Licensing: A Review" (2012), [PX 21](#), at 7-21.  The number of foster care children and licensed residential operations in Texas has either increased or remained stable while the size of the RCCL workforce has substantially decreased.  *Id.* at 7-8.  For example, as the number of full-time-equivalent employees in RCCL decreased by 15% − from 136 in 2009 to only 115.4 at the end of the first quarter of state fiscal year 2012 − the division's responsibilities increased by 20%.  Hr'g Tr. 1/23/13 (Chansuthus) at 279:1-280:18; [PX 21](#), at 7-9; *see also* Monthly Number of Caseworker FTEs Filled for FY 2012, [PX 39](#); [PX 69](#), at DFPS000566059; [PX 70](#), at DFPS000566332; [PX 235](#); Child Care Licensing: Licensed Residential Child Care Operations, Apr. 3, 2012, [PX 244](#); [PX 325](#), at PLTF0062202, PLTF0062239, PLTF0062243.[15]

The overburdened workforce compromises the monitoring and oversight of all children in the Licensed Foster Care Subclass.  As Plaintiffs' expert Daryl Chansuthus found, the State's own reports show that when RCCL identifies deficiencies in an operation's compliance with Minimum Standards, RCCL frequently fails to follow up in a timely or effective manner to ensure those deficiencies are cured.  *See* [PX 21](#), at 9-11.  A January 2011 report by the Performance Management Unit ("PMU") of the Child Care Licensing Division of DFPS[16] showed that follow-up was not completed within timeframes in 35.7% of the cases reviewed and that the "[t]ype of follow-up chosen was not the best method to reduce risk . . . e.g. not making an in-person inspection in the case of health and safety related issues" in 41.5% of the cases reviewed.  Performance Management Unit: CCL Data & Trend Assessment, Jan. 2011, [PX 295](#),

---

[15] Moreover, after analyzing RCCL workload data from 2011, Plaintiffs' expert Daryl Chansuthus determined that "each Region 6 RCCL worker would need 26 days each month in order to complete his or her work, whereas each RCCL worker in Region 3 would have needed 34 days per month to complete the tasks assigned." Hr'g Tr. 1/23/13 (Chansuthus) at 280:19-282:4; *see also* [PX 21](#), at 8.
[16] The Child Care Licensing Division comprises both RCCL and Day Care Licensing.

at DFPS004490505.  Relatedly, PMU's February 2012 report found repeat deficiencies in 77.6%

of the residential operations reviewed; 65.5% of those were at a child safety risk level of "High"

or "Medium High."  Performance Management Unit: CCL Data & Trend Assessment, Feb. 2012,

PX 296, at DFPS004490540.[17]

RCCL's inadequate staffing is reflected in its performance of another critical duty: the

investigation of reports of abuse or neglect of children in licensed facilities.  In state fiscal year

2010, of the 3799 abuse/neglect reports made to RCCL, only 1751 investigations were conducted

(meaning that 54% of the reports were not investigated), and only 2.7% of the investigated

reports were "[v]alidated."   PX 70, at DFPS000566252, DFPS000566343.  In both 2009 and

2011, almost half of the abuse/neglect reports made to RCCL were not investigated.  *See* PX 69,

at DFPS000565978, DFPS000566070; PX 325, at PLTF0062155, PLTF0062250.  Furthermore,

the PMU found numerous problems with the investigations that RCCL *did* conduct.  The unit's

reviews found, among other problems, that investigators' documentation too often did not reflect

whether they had checked operations for compliance with standards requiring background

checks for caregiver staff or whether they had checked the IMPACT database for prior Child

Protective Services history on alleged perpetrators; and failed to reflect adequate assessments of

---

[17] RCCL also inadequately monitors private providers' use of emergency behavior intervention.
In 2010, residential treatment centers reported a total of 15,167 uses of emergency behavior
intervention – which includes personal restraints, seclusion and emergency medication – even
though "28 of 80 facilities failed to report information," as required under their contracts with the
State.  Emergency Behavior Interventions in Residential Child Care: History and Next Steps,
Dec. 3, 2010, PX 183, at DFPS000968407.  In 2009, 148 general residential operations reported
3515 uses of personal restraints on residents, for an average of at least twenty-four restraints per
general residential operation—although forty-three to forty-nine of those 148 general residential
operations failed to submit any of the quarterly reports required under their licenses.  *Id*.  The
State has recognized that emergency behavior intervention has become "the norm" for many
operations, and that operations "seemingly do little to proactively reduce" its use.  *Id*. at
DFPS000968406.

safety risks to children or implementation of safety plans.  *See* PX 21, at 13-14, 20.  The

comments of the PMU reviewers give particular insight into RCCL's deficient investigatory

practice:

- "A non-verbal [severely disabled] child sustained unexplained bruises to vital body area from an unknown source, and no assessment of immediate safety of the victim and other children in care were [*sic*] documented."

- "MDNG [Medical Neglect] was R/O [Ruled Out], but there's no explanation of why the foster parent's failure to seek medical attention for a foster child did not rise to the level of MDNG."

- "There was no documentation to indicate how the operation can mitigate the child's behavior to reduce the frequency and incidents of self harm or EBI [emergency behavior intervention] triggers."

- "None of the collaterals who were reported to have witness[ed] the alleged incident were interviewed except for one person who came later after the incident had occurred."

*Id*. at 19-20 (quoting Child Care Licensing Performance Management Unit, "Performance

Management Unit: Residential Child Care Abuse/Neglect Investigations: Region 3," Sept. 2011,

PX 163, at DFPS000804161, DFPS000804163).  The PMU reviews also found that supervisors

had inappropriately approved and closed 20% of the 2011 investigation cases reviewed.  *See*

PX 21, at 13-14, 20.  As Chansuthus opined, such failures are "to be expected and are highly

likely to continue" until RCCL's inadequate staffing is addressed.  *Id*. at 20.

          b.    Inadequate Monitoring and Oversight Constitutionally Injure All Children in the Licensed Foster Care Subclass

All children in the Licensed Foster Care Subclass are subject to an imminent risk of

deprivation of adequate care and the right to a safe, secure, and suitable placement due to the

State's failure to maintain sufficient oversight and monitoring of its licensed foster care

placements.

Chansuthus concluded that RCCL's monitoring and compliance practices "unnecessarily

put children placed in licensed residential operations at increased risk of harm."  Hr'g Tr.

1/23/13 (Chansuthus) at 297:24-298:6; *see also* PX 21, at 1, 21.  She explained that "RCCL does not have adequate staff to comply with its own policy, . . . to manage its heavy and complex workload, to do quality work and to assure provider compliance with minimum standards." Hr'g Tr. 1/23/13 (Chansuthus) at 297:24-298:6; *see also* PX 21, at 21.  Charlane Bateman, Director of Policy and Program Operations for the Child Care Licensing Division, also recognized that inadequate RCCL staffing levels compromise safety, noting that "the more we are out there, the more we can assure compliance, so if we're out there less, it would be harder to ensure that the operations that aren't doing their job" receive adequate attention.  Bateman 9/12/12 Dep. Tr. at 97:7-20.

The stories of several of the Named Plaintiffs provide examples of the consequences of this inadequate monitoring.  M.D. was raped by a staff member in one licensed facility and subjected to forced sexual activity by a roommate while in another licensed facility.  Selected case files for Plaintiff M.D., PX 27 (filed under seal) at 1 RFP RCCL 00009, 00720-30.  The foster group home in which D.I. was sexually assaulted was a licensed placement.  *See supra* § II.C.2.  Z.H. was admittedly over-medicated while in a licensed placement.  *See* selected case files for Plaintiff Z.H., PX 28 (filed under seal) at DFPS #33580, 33589; Defs.' Original Answer, ECF No. 29, ¶ 50 ("Defendants admit that Z.H. was over-medicated without DFPS' consent . . . .").

      2.    <u>All Children in the Licensed Foster Care Subclass Are Subjected to an Inadequate Placement Array</u>

      a.    The State Admits That Its Placement Array Is Inadequate

The record contains numerous admissions supporting Plaintiffs' claim that the State's failure to maintain an adequate placement array impacts all children in the Licensed Foster Care Subclass.

All children in the Licensed Foster Care Subclass are subject to a foster care system that admittedly suffers from an "[i]mbalance in geographic distribution of services and providers" and an "[i]nsufficient number of residential providers that offer a full continuum of services." Improving Child/Youth Placement Outcomes: Foster Care Redesign, PX 148, at DFPS000629708; *see also* SB758 Implementation Progress Report: A Report from The Texas Department of Family and Protective Services, Sept. 1, 2010, PX 324, at PLTF0027560; Hr'g Tr. 1/24/13 (Deckinga) at 82:15-22.  The State recognizes that "the geographic distribution of foster care services in Texas is inconsistent with the areas where services are needed" so that "[c]hildren must move to where services are offered."  Improving Child and Youth Placement Outcomes: A System Redesign (Foster Care Redesign), PX 149, at DFPS000630358; *see also* 9/6/12 Emerson Dep. 31:16-32:7.  The foster care system simply "does not encourage providers to establish services where services are needed."  *See* Emersion 9/6/12 Dep. Tr. at 32:2-7.  For example, the State has "more than 50 percent of [its] residential treatment beds in the Houston area instead of having residential treatment beds [dispersed] throughout the state of Texas in all of the regions."  Gonzalez 10/27/11 Dep. Tr. at 166:5-9; *see also* Liebgott 8/15/12 Dep. Tr. at 142:4-144:4 (observing, as the former director of DFPS contractor Youth for Tomorrow, that "there just were an inadequate number of quality beds that could keep the children for the reasons for which they were admitted and help them make the gains they needed to be successfully discharged").

As of February 29, 2012, 6626 children, or 54.7% of all children in the State's PMC, were placed outside of their home counties, and 2986 children, or 24.7% of children in the State's PMC, were placed outside of their multi-county DFPS regions.  Children in DFPS Conservatorship (CVS) Placed In or Out of Legal Region, PX 255.  In addition to such distant

40

placements, Texas foster children in this Subclass are shuffled among numerous placements as the State attempts to find a good fit for them in its inadequate array.  An important measure of this sort of placement instability is the number of children who have two placements or fewer during their time in care.  Texas scored third worst in the country on this measure in federal fiscal year 2010, when only 21% of the State's children in care twenty-four months or longer had two or fewer placements.  Comparison of Texas to other states, DX 45, at 34.  In fact, for each of the federal fiscal years from 2007 through 2010, Texas never scored better than 22.1% on this measure.  Child Welfare Outcomes 2008-2011: Report to Congress, DX 22, at 6.  Dr. Miller has connected such placement instability to the State's inadequate placement array.  Hr'g Tr. 1/22/13 (Miller) at 241:1-5.

By way of example, during her eleven years and four months in care, Named Plaintiff S.A. has experienced at least twenty-seven placements throughout the State.  Selected case files for Plaintiff S.A., PX 32 (filed under seal) at DFPS #48993, 48996, 48999, 49002, 49005, 49008, 49012, 49015, 49018, 49022, 49025, 49029, 49033, 49037, 49041, 49045, 49049, 49053, 49056, 49059, 49063, 49067, 49071, 49075, 49079, 49083, 49087, 49091, 49094; 1 RFP CPS 007956, 007960, 007963.  S.A. attended two different schools for second grade, three different schools for fifth grade, and five different schools for eighth grade.  *Id*. at DFPS #50623-28.  Similarly, K.E. has experienced at least thirty-one placements during her nine years in care.  Selected case files for Plaintiff K.E., PX 31 (filed under seal) at DFPS #44605, 44877, 44880, 44883, 44886, 44889, 44892, 44895, 44898, 44901, 44904, 44907, 44910, 44913, 44916, 44919, 44922, 44926, 44930, 44934, 44938, 44943; 1 RFP CPS 017395, 018757-62.  Her case file repeatedly notes that no appropriate placements were available near her home community.  *Id*. at, *e.g.*, DFPS #44887, 44890, 44943.

b.      The Inadequate Placement Array Constitutionally Injures All
Children in the Licensed Foster Care Subclass

All children in the Licensed Foster Care Subclass are subject to an imminent risk of

deprivation of adequate care and the rights to a safe, secure, and suitable placement and familial

association due to the State's failure to maintain a sufficient number, geographic distribution,

and array of foster care placements.

In its foster care redesign position paper, the State provided a telling "equation" of the

injury to which all children in the Licensed Foster Care Subclass are exposed:

"Current Equation: (Child's Needs) + (Lack of Community Resources) =
Placement Outside of Home Community, Increased Number of Changes in
Placement, Separation from Sibling(s) and Family, Lack of Educational
Continuity, Fractured Social Support System"

PX 148, at DFPS000629709.  DFPS's Legislative Appropriations Request for fiscal years 2014

and 2015 recognized the "poorer outcomes" for children resulting from inadequate placement

array and multiple moves.  PX 12, at 17; *see also* Hr'g Tr. 1/24/13 (Deckinga) at 85:6-12

(acknowledging that inadequate placement array may affect child safety, security, and well-

being); Intensive Practice and Permanency Initiative (IPPI) First Year Results, Apr. 2010, PX 72,

at DFPS000567272 (placement stability is important for permanency); Emerson 9/6/12 Dep. Tr.

at 128:4-11.  Dr. Miller echoed the State's concerns, testifying that inadequate placement array

results in "placement instability and it results in children being placed in congregate care

environments when those children could and should be placed with families, placement out of

region away from the child's home community, and sibling separation."   Hr'g Tr. 1/22/13

(Miller) at 241:6-13.

Familial separation is another common risk for all children in the Licensed Foster Care

Subclass.  The lack of appropriate placements requires children to be "placed outside of their

home communities away from siblings, peers, families, schools, churches and support networks."

PX 149, at DFPS000630358.  As of March 31, 2011, only half of the sibling groups in PMC were intact with all members in the same placement, and more than 25% of the sibling groups in PMC were entirely separated, with no siblings placed together.  PX 2, at APPX 2078.  Dr. Miller noted that "[o]ftentimes for our kids siblings are the only familial relationship they have left," and permanency decreases when sibling groups are separated.  Hr'g Tr. 1/22/13 (Miller) at 242:11-17.  The Adoption Review Committee has acknowledged that "[i]nappropriate placement decisions . . . regarding sibling placements hinder and delay a child's path to permanency." PX 323, at PLTF0019506; *see also* Emerson 9/6/12 Dep. Tr. at 28:23-29:7 (asserting that children have "better outcomes" if they "remain in their home communities").

3. The Rule 23 Requirements Are Satisfied for the Licensed Foster Care Subclass

The record confirms that the Licensed Foster Care Subclass should be certified pursuant to Rule 23.

Common questions applicable to all members of the Licensed Foster Care Subclass's substantive due process claim include:

- Does the State fail to maintain adequate oversight and monitoring of its licensed foster care placements?

- Does the State fail to maintain an adequate number, geographic distribution, and array of licensed foster care placements to ensure that the needs of the children in the Subclass are met?

- Does the State's failure to maintain sufficient oversight and monitoring of its licensed foster care placements mean that children in the Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

- Does the State's failure to maintain an adequate number, geographic distribution, and array of licensed foster care placements mean that children in the Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

43

The common questions applicable to the Licensed Foster Care Subclass's familial association claim include:

- Does the State fail to maintain an adequate number, geographic distribution, and array of licensed foster care placements to ensure that the needs of the children in the Subclass are met?

- Does the State's failure to maintain an adequate number, geographic distribution, and array of licensed foster care placements mean that children in the Subclass have been and are at continuing risk of being deprived of the right of familial integrity and the right to a permanent family, as conferred upon them by the First, Ninth, and Fourteenth Amendments to the United States Constitution?

The answers to these legal and factual questions – whether "yes" or "no" – will resolve the Subclass's constitutional claims in one stroke as to all Subclass members.

Numerosity is satisfied because the Licensed Foster Care Subclass consists of approximately 8000 children. PX 2, at APPX 2077. The record also establishes commonality, typicality, and adequacy of representation. *See supra* § II.A.3.

The claims of the Licensed Foster Care Subclass can be remedied through indivisible relief that inures to the benefit of each member of the Subclass, *see* Fed. R. Civ. P. 23(b)(2), and is not dependent on individual determinations or remedies for individual Subclass members. The fact that this remedy may require additional steps does not render the Subclass inappropriate for certification, so long as any remedy ordered by the Court is one that applies to the Subclass as a whole. *Wal-Mart*, 131 S. Ct. at 2557; *see also M.D.*, 675 F.3d at 848 n. 7 ("[I]t is not clear how several of the State's alleged failures, such as its failure to (1) maintain sufficient licensing standards for its placements, [and] (2) maintain an adequate number and array of placements" . . . can be considered 'day-to-day, case-by-case operational failures.'"). For example, the Court could order Defendants: (1) to maintain constitutionally adequate oversight and monitoring of licensed foster care placements, including timely investigation of abuse and neglect reports, as

defined at trial;[18] and (2) to maintain an adequate number, geographic distribution, and array of placements, as determined by a Court-appointed expert assessment, based upon the evidence of minimal constitutional requirements produced at trial.  The remedies currently proposed need not be the ones that the Court ultimately orders; rather, these are examples of remedies generally applicable to the entire Subclass that the Court could order.  *See Morrow v. Washington*, 277 F.R.D. 172, 198 (E.D. Tex. 2011) ("Plaintiffs are not required to set forth the requested injunction [at class certification] with the specificity required by Rule 65.  Plaintiffs have set forth facts suggesting that Defendants' behavior was generally applicable to the class as a whole, making injunctive relief appropriate.  The precise terms of the injunction need not be decided at this stage, only that the allegations are such that injunctive and declaratory relief are appropriate and that the class is sufficiently cohesive that an injunction can be crafted that meets the specificity requirements of Rule 65(d)." (citing *Monreal v. Potter*, 367 F.3d 1224, 1236 n.11 (10th Cir. 2004))); *cf. LaShawn A. ex rel. Moore v. Dixon*, 762 F. Supp. 959, 998 (D.D.C. 1991) (ordering a conference to discuss "the relief phase" of the case after finding Defendants liable for violating class members' constitutional rights).

The order certifying the Licensed Foster Care Subclass should reflect that:

- The structural deficiencies relevant to the Subclass are the State's failures:  (1) to maintain constitutionally adequate oversight and monitoring of licensed foster care placements; and (2) to maintain an adequate number, geographic distribution, and array of placements.

---

[18] As an example, the Court could order additional staffing so that RCCL would be able to follow its existing policies and enforce its existing regulations, including policies and regulations governing inspections of licensed operations and RCCL follow-up, *see, e.g.*, Licensing Policies and Procedures Handbook, PX 435, §§ 3324, 3341, 4000-4800; policies and regulations governing background checks in licensed operations, *see, e.g.*, *id.* §§ 4150, 4153.2, 5300-5355; and policies and regulations governing investigations of alleged abuse, neglect, and exploitation of children in licensed operations, *see, e.g.*, *id.* §§ 6000-6800, App. 6000-1, 6000-2.

- The alleged constitutional injury resulting from the failure to maintain constitutionally adequate oversight and monitoring is the deprivation or imminent risk of deprivation of adequate care, defined as a safe, secure, and reasonably suitable foster care placement.

- The alleged constitutional injuries resulting from the failure to maintain an adequate number, geographic distribution, and array of placements are:  (1) the deprivation or imminent risk of deprivation of the Subclass members' substantive due process rights to adequate care, defined as a safe, secure, and reasonably suitable foster care placement; and (2) the deprivation or imminent risk of deprivation of the Subclass members' constitutional rights to familial association.

- The legal claims are:  (1) violation of the constitutional right to substantive due process, and (2) violation of the constitutional right to familial association.

- The defenses alleged are: (1) Plaintiffs have failed to meet their burden of proof to establish a substantive due process violation, including showing that Defendants' actions meet the relevant culpability standard; (2) the Court lacks subject matter jurisdiction to hear the claims, because of a lack of standing and because the claims are barred by the 11th Amendment, Defs.' Second Am. Answer, ECF No. 161, at 2-6; and (3) the failure to state a claim, *id.* at 4-5.

## III.   Defendants Have Failed to Show That Certification Is Improper

Notwithstanding Plaintiffs' extensive showing to meet the Rule 23 requirements, the State presented *no* countervailing evidence.  Nor has the State identified any defenses that raised individualized issues, or any legally viable defenses.

### A.   Defendants Failed to Rebut Plaintiffs' Evidence

Although Plaintiffs bear the burden of proving the Rule 23 requirements, this Court can even more readily conclude that certification would be a proper exercise of its "broad discretion," *M.D.*, 675 F.3d at 836 (quoting *McManus v. Fleetwood Enters.*, 320 F.3d 545, 548 (5th Cir. 2003) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996))), because the State introduced no contradictory evidence.  Plaintiffs are unaware of any case in which defendants entirely defaulted in introducing contrary evidence – as the State has done here – and then successfully argued that certification was improper.  Whereas Plaintiffs offered documentary evidence and witness testimony to establish the Rule 23 factors, Defendants offered

no countervailing proof whatsoever to show that the elements, defenses, or requisite proof for any of the claims would prevent the assertion of a common question of law that "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 131 S.Ct. at 2551; *M.D.*, 675 F.3d at 843.

The utter absence of any rebuttal evidence further distinguishes this case from *Wal-Mart*, in which rebuttal evidence factored prominently in the Supreme Court's reversal of class certification.  The defendant in *Wal-Mart* "offered its own countervailing statistical and other proof in an effort to defeat Rule 23(a)'s requirements of commonality, typicality, and adequate representation"—proof that both impugned and outweighed the evidence relating to satisfaction of the Rule 23 elements that was produced by the Title VII plaintiffs.  131 S. Ct. at 2549.  The defense evidence and testimony included:

- proof that, contrary to fostering discrimination, "Wal-Mart's announced policy forbids sex discrimination, and the company has penalties for denials of equal opportunity," *id*. at 2545;

- the testimony of the defendant's "own expert economist, Dr. Haworth, who provides both a critique of [Plaintiffs' expert's statistical] analysis and a separate analysis that she performed," *Dukes v. Wal-Mart Stores, Inc*., 222 F.R.D. 137, 154 (N.D. Cal. 2004); and

- "a critique of Plaintiffs' regression analysis and . . . a separate regression analysis of its own" performed for each of Wal-Mart's forty-one regions, *id*. at 155-56.

Here, by contrast, the State has offered no proof to rebut Plaintiffs' evidence that the challenged policies and practices are common and typical, and are capable of resolution by indivisible injunctive relief.  For example, Plaintiffs have presented substantial evidence of excessive caseloads and resulting constitutional injury to all General Class members.  Unlike the defendant in *Wal-Mart*, which critiqued the plaintiffs' regression analysis and provided its own alternative analysis, the State has provided no support for any objections.  As all the evidence

supports certification and Defendants have failed to offer any rebuttal, certification of the General Class and Subclasses is plainly warranted.

**B.  No Defense Precludes Certification**

The two primary defenses suggested during the certification hearing – the standard applicable to substantive due process claims and the cost of complying with any injunctive order – do not impede certification because both turn on common classwide issues, rather than individualized inquiries.

1.  <u>The Standard Applicable to Substantive Due Process Claims Does Not Bar Certification</u>

Defendants argue that certification is improper because the relevant substantive due process standard can be proven only upon an individual plaintiff-by-plaintiff-basis.  Defendants' argument ignores a long line of civil rights cases decided on evidence of classwide patterns and practices.  *See infra* § IV.

Regardless of whether the "deliberate indifference"[19] or "professional judgment"[20] standard applies, no individualized assessments are required because the claims focus on Defendants' common policies and practices in managing a devastatingly deficient foster care system.  *Cf. Floyd v. City of New York*, 283 F.R.D. 153, 173-75 (S.D.N.Y. 2012) (finding 23(b)(2) certification appropriate where defendant New York Police Department's challenged

---

[19] *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (applying the deliberate indifference standard to prisoner claims); *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 885 (5th Cir. 2004) (applying the deliberate indifference standard in a damages action).

[20] *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 321-23 (1982) (applying the professional judgment standard to the substantive due process claim of a mentally handicapped patient); *LaShawn A.*, 762 F. Supp. at 996, 996 n.29 (reasoning that the professional judgment standard should apply to foster children's substantive due process claims in injunctive relief actions since foster children are more like the mentally handicapped plaintiff in *Youngberg* than the prisoner in *Estelle,* and because the plaintiffs did not seek damages—a form of relief that may justify a heightened standard due to the potential for a "chilling effect" on policy makers).

policies "generate[d] from a centralized source," and defendant "employ[ed] a hierarchical supervisory structure to effect and reinforce its department-wide policies"). Liability depends on Defendants' uniform course of conduct toward all General Class or Subclass members, not the individual circumstances of any particular child.[21]

In any event, caselaw confirms that the professional judgment standard applies to foster care class actions seeking injunctive relief for constitutional violations. *See, e.g.*, *LaShawn A.*, 762 F. Supp. at 996; *Kenny A. v. Perdue*, No. 1:02-cv-1686, 2004 WL 5503780, at *3 (N.D. Ga. Dec. 13, 2004).

2.     The Cost of Implementing Injunctive Relief Is Not a Valid Defense

Financial constraint is not a defense to certification or even a valid defense to ultimate liability on the merits. The cost to the State provides no legal basis for denying certification because the defense does not turn on individualized issues or circumstances and goes to none of the Rule 23 factors (nor did Defendants submit any evidence showing how it would). *See M.D.*, 675 F.3d at 840.

Cost is never an adequate justification for denying constitutionally adequate care to persons in state custody. For more than three decades, the Fifth Circuit has recognized that "if the state chooses" to take custody of its citizens, then "it must pay the costs of maintaining" that

---

[21] An excerpt from Defendants' briefing on the issue merely reflects the discredited contention that exposure to risk of harm cannot establish a common constitutional injury:

> How could the Court conclude that it shocks the conscience for a child to be placed with an unverified family member who, for example, is well off, owns her own safe home and has had experience in raising a number of children of her own? The differences for each such child will preclude commonality under *Wal-Mart.*

Defs.' Br. in Opp'n to Pls.' Mot. for Class Certification, ECF No. 163, at 27. Plaintiffs, however, need not prove that all Unverified Kinship Care Subclass members have been placed in unsafe or unsuitable homes in order to assert a substantive due process claim. Common risk of harm suffices. *See supra* §§ II.A.2, II.D.2.

custody "according to fundamental and well-established concepts of constitutional law." *Newman v. Alabama*, 522 F.2d 71, 80 (5th Cir. 1975).  Consistent with this mandate, the Fifth Circuit has expressly rejected as a defense the State's financial inability to implement injunctive relief directed to remedying a systemic constitutional violation.  *Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1974); *Smith v. Sullivan*, 611 F.2d 1039, 1043-44 (5th Cir. 1980).  The Fifth Circuit has expounded that

> [w]here state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature[] have been rejected by the federal courts. . . .

> "Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish.  If [the State] is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States."

*Gates*, 501 F.2d at 1319-20 (quoting *Holt v. Sarver*, 309 F. Supp. 362, 385 (E.D. Ark. 1970)).

The tenet that insufficient funding does not relieve states from constitutional compliance is well established in Supreme Court jurisprudence.  *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) ("[F]ederal courts [can] enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury."); *Edelman v. Jordan*, 415 U.S. 651, 667-68 (1974); *Quern v. Jordan*, 440 U.S. 332, 337 (1979).  Financial limitations simply do not excuse Defendants' failure to maintain a constitutionally adequate foster care system.

## IV.    This Case Fits Within the Extensive Body of Civil Rights Class Action Caselaw

Plaintiffs' claims fit the mold of the traditional civil rights and foster care cases that have thrived through the class action device for nearly half of a century.  Indeed, "[s]ubdivision (b)(2) was added to Rule 23 in 1966 primarily to facilitate the bringing of class actions in

the civil rights area." *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 506 n.6 (5th Cir. 1981) (quoting 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1775 (1st ed. 1972)).

Rule 23's class litigation device has enabled persons in state custody to challenge their conditions of confinement and obtain protection of their most basic civil rights. Originally used in the context of prison litigation, Rule 23 has resulted in such landmark precedents as *Lee v. Washington*, holding that statutes requiring segregation of races in prisons and jails violated the Fourteenth Amendment, 390 U.S. 333 (1968), and *Cruz v. Beto*, establishing that all prisoners are entitled to reasonable opportunities to exercise their religious freedom, 405 U.S. 319 (1972). *See also, e.g.*, *Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974) (holding that individuals in juvenile detention have the right to be free from cruel and unusual punishment). In a case analogous to that here, the Fifth Circuit in *Wyatt v. Aderholt* held that an Alabama mental institution's failure to employ "*qualified staff 'in numbers sufficient to administer adequate treatment'*" violated the rights of the class members. 503 F.2d 1305, 1309-10 (5th Cir. 1974) (emphasis added) (quoting *Wyatt v. Stickney*, 334 F.Supp. 1341, 1343 (M.D. Ala. 1971)). And just two years ago, in *Brown v. Plata*, the Supreme Court affirmed class-wide injunctive relief effectively requiring California to reduce its prison population by more than 30,000 prisoners within two years. 131 S. Ct. 1910, 1945-47 (2011).

Far from breaking new ground, certification of the General Class and Subclasses would bring this Court into line with the numerous other courts that have certified classes of foster children challenging specific policies and practices that threatened to deprive class members of their rights to adequate care. *See, e.g.*, *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 62 (3d Cir. 1994) (reversing the denial of certification of a class alleging, among other structural

51

deficiencies, a "dearth of trained caseworkers"); *Connor B. ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 31 (D. Mass. 2011) (recognizing that certification was warranted where Plaintiffs alleged "deficiencies includ[ing] among other things: excessive caseloads, an insufficient array of foster family homes, inadequate supervision and monitoring of private providers, an incomplete and unevenly distributed array of services, and inadequate caseworker and supervisor training"); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 286 (N.D. Ga. 2003) (certifying a class whose allegations included a failure to "develop[] a sufficient number of foster homes properly screened to ensure the plaintiff children's safety").

*M.D.* left no doubt that these Rule 23(b)(2) actions remain certifiable post-*Wal-Mart*, so long as each proposed class or subclass targets a specific policy or practice that exposes all class or subclass members to the same risk of deprivation of constitutionally adequate care, and is capable of resolution through a class-wide injunction applying to all class or subclass members. While the Fifth Circuit has interpreted *Wal-Mart* to bar certification of amorphous "super-claim[s]" of any stripe, because they fail to "resolve an issue that is central to the validity of each of the [individual class member's claims] in one stroke," *M.D.* acknowledged a clear path to certification of appropriately targeted classes or subclasses.   675 F.3d at 844-45 (alteration in original) (quoting *Wal-Mart*, 131 S.Ct. at 2551).   *M.D.* thus is consistent with the many other post-*Wal-Mart* decisions certifying or upholding the certification of classes asserting civil rights violations based on structural deficiencies applicable to all class members.  *See, e.g.*, *D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635, 646 (N.D. Okla. 2011) (denying post-*Wal-Mart* motion to decertify class of foster children alleging systemic deficiencies); *Lane v. Kitzhaber*, 283 F.R.D. 587, 602 (D. Or. 2012) (certifying 23(b)(2) class of disabled individuals challenging structural deficiencies); *Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 287

F.R.D. 240, 243 (S.D.N.Y. 2012) (certifying 23(b)(2) class of disabled individuals alleging systemic failure in New York City's emergency and disaster planning).

The substantive due process challenges raised by the General Class and Subclasses are paradigmatic of the claims that the Rule 23(b)(2) procedural device has proven invaluable in redressing.  If the General Class and Subclasses are certified, this case will join a long line of civil rights and foster care class actions vindicating the rights of persons in state custody.  The abused and neglected children who are the General Class and Subclass members in this case are at least as vulnerable as the class members in any of these other class actions.

**V.**     **Conclusion**

For the foregoing reasons, and all those discussed in the Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Counsel, the reply in support thereof, and the class certification hearing, Named Plaintiffs respectfully request that the Court certify this action as a class action for all purposes.

Dated: March 25, 2013

Respectfully Submitted:

_/s/ Marcia Robinson Lowry_
Marcia Robinson Lowry (_admitted pro hac vice_)
Stephen A. Dixon (_admitted pro hac vice_)
Patrick Almonrode (_admitted pro hac vice_)
Adam Dembrow (_admitted pro hac vice_)
Christina Wilson (_admitted pro hac vice_)
Melissa Cohen (_admitted pro hac vice_)
Adriana T. Luciano (_admitted pro hac vice_)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
_mlowry@childrensrights.org_
_sdixon@childrensrights.org_
_palmonrode@childrensrights.org_
_adembrow@childrensrights.org_
_cwilson@childrensrights.org_
_mcohen@childrensrights.org_
_aluciano@childrensrights.org_


R. Paul Yetter
State Bar No. 22154200
S.D. Tex. Bar No. 3639
Dori Kornfeld Goldman
State Bar No. 24041274
S.D. Tex. Bar No. 591632
Lonny Hoffman
State Bar No. 00784282
S.D. Tex. Bar No. 15688
Christopher D. Porter
State Bar No. 24070437
S.D. Tex. Bar No. 1052367
April L. Farris
State Bar No. 24069702
S.D. Tex. Bar No. 1133331
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
Phone: (713) 632-8000
Facsimile: (713) 632-8002
_pyetter@yettercoleman.com_
_dgoldman@yettercoleman.com_
_lhoffman@yettercoleman.com_
_cporter@yettercoleman.com_
_afarris@yettercoleman.com_

J.A. "Tony" Canales
State Bar No. 03737000
S.D. Tex. Bar No. 1163
Hector Canales
State Bar No. 24005961
S.D. Tex. Bar No. 29396
Patricia C. Bell
State Bar No. 00793455
S.D. Tex. Bar No. 19506
CANALES & SIMONSON, P.C.
2601 Morgan Avenue
Corpus Christi, Texas 78467-5624
Phone: (361) 883-0601
Facsimile: (361) 884-7023
_tonycanales@canalessimonson.com_
_hacanales@canalessimonson.com_
_pmcanales@canalessimonson.com_
Attorneys-in-Charge


Barry F. McNeil
State Bar No. 13829500
S.D. Tex. Bar No. 14914
R. Thaddeus Behrens
State Bar No. 24029440
S.D. Tex. Bar No. 916025
David Dodds
State Bar No. 00790595
S.D. Tex. Bar No. 35024
Amelia J. Cardenas
State Bar No. 24056681
S.D. Tex. (_admitted pro hac vice_)
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Phone: (214) 651-5000
Facsimile: (214) 200-0535
_barry.mcneil@haynesboone.com_
_thad.behrens@haynesboone.com_
_david.dodds@haynesboone.com_
_amelia.cardenas@haynesboone.com_

_Attorneys for Plaintiffs and the Proposed_
_General Class and Subclasses_

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2013, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants, and that I have mailed by United States Postal Service the pleading to all non-CM/ECF participants.


*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry