# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | |
|---|---|
| M.D., by her next friend, Sarah R. Stukenberg, <br> D.I., by his next friend, Nancy G. Pofahl, <br> Z.H., by his next friend, Carla B. Morrison, <br> S.A., by her next friend, Javier E. Solis, <br> A.M., by her next friend, Jennifer Talley, <br> J.S., H.V., and P.O., by their next friend, Anna <br> J. Ricker, <br> K.E., by her next friend, John W. Cliff, Jr., <br> S.R., M.R., and J.R., by their next friend, <br> Bobbie M. Young, and <br> L.H., C. H., and S.S., by their next friend Estela <br> C. Vasquez, and <br> A.R., by her next friend Tom McKenzie, <br> individually and on behalf of all others similarly <br> situated, <br><br>        **Plaintiffs,** <br><br>        **v.** <br><br> **RICK PERRY**, in his official capacity as <br>     Governor of the State of Texas, <br> **KYLE JANEK**, in his official capacity as <br>     Executive Commissioner of the Health <br>     and Human Services Commission of the <br>     State of Texas, and <br> **JOHN J. SPECIA, JR.**, in his official capacity <br>     as Commissioner of the Department of <br>     Family and Protective Services of the <br>     State of Texas, <br><br>        **Defendants.** | **CASE NO. 2:11-cv-00084** |

## PLAINTIFFS' CORRECTED FOURTH AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND REQUEST FOR CLASS ACTION

TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

JURISDICTION AND VENUE ..........................................................................................3

PARTIES ................................................................................................................................3

    A.    Named Plaintiffs .........................................................................................3

    B.    Defendants ...................................................................................................6

CLASS DEFINITIONS .......................................................................................................7

COUNT I: SUBSTANTIVE DUE PROCESS UNDER THE U.S. CONSTITUTION .................9

    A.    Structural Deficiencies That Harm All Putative Members of the General Class ................................................................................................9

    B.    Structural Deficiencies that Harm All Putative Members of the Licensed Foster Care Subclass ................................................................11

    C.    Structural Deficiencies That Harm All Putative Members of the Foster Group Home Subclass ..................................................................17

    D.    Structural Deficiencies That Harm All Putative Members of the Basic Care GRO Subclass ......................................................................18

    E.    Structural Deficiencies That Harm All Putative Members of the Unverified Kinship Subclass .................................................................19

COUNT II: FIRST, NINTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION ................................................................................................................20

CLASS ACTION ALLEGATIONS .................................................................................22

PRAYER FOR RELIEF ....................................................................................................31

## INTRODUCTION

1.       The entire foster care system in Texas is administered by the Department of Family and Protective Services ("DFPS").  Within DFPS, the Child Protective Services Division ("CPS") is required to investigate reports of child abuse and neglect.  When CPS determines that a child has been maltreated and that he is not safe in his own home, CPS removes the child and petitions the appropriate court for Temporary Managing Conservatorship ("TMC") of the child.  If the court grants TMC, DFPS is required to provide a temporary placement and to try to reunify the child with his family, if it is safe and appropriate to do so, or to try to place the child with a new, permanent family.  DFPS may retain TMC of a child for up to one year (or 18 months with court approval).  After that time, if the child has not been reunited with his birth family or provided with some other permanent family, the child is formally placed into the Permanent Managing Conservatorship ("PMC") of the State.  The children who are now or will be in the PMC of the State are the sole focus of this lawsuit.

2.       Already vulnerable from having suffered the abuse or neglect that brought them into the foster care system in the first place, children in the PMC of the State are at risk of further maltreatment while in the State's care because of structural deficiencies in the Texas foster care system.  For example, children whose caseworkers carry excessive caseloads suffer longer stays in State custody, placements that are not suited to their needs, frequent moves from one placement to another, and maltreatment and a higher risk of maltreatment in care.

3.       Once children enter the State's PMC, the likelihood that they exit from State custody and into a permanent home drops off markedly.  The average length of stay for children who were in the State's PMC at the end of August 2011 was more than three years.  These children languish in State care even though, as of July 2011, more than half of the children in the State's PMC

1

were legally free for adoption. Each year, far too many children leave the State's PMC only when they turn 18 and "age out." In state Fiscal Year 2011, 1202 children in the State's PMC aged out, or 17.5 percent of all children who exited the State's PMC in 2011.

4.     Further, while the State retains legal responsibility for each child in its conservatorship, Texas relies heavily on private child placing agencies who contract with the State to provide foster care for these children. As of March 31, 2011, 82 percent of the children in the State's PMC who were in foster family homes, and 98 percent of the children in the State's PMC who were in foster group homes, were in homes administered by private child placing agencies.

5.     Approximately one-third of children in the custody of Texas and one-quarter of all children in PMC were placed in unverified[1] and unreimbursed "kinship" care with relatives as of August 31, 2011. The State's failure to require verification of all kinship placements, and its failure to provide foster care payments for children in unverified kinship homes, deprives all children who are or will be in such placements of the safety and well-being to which they are entitled.

6.     Texas policies and practices result in structural deficiencies that put all children who are or will be in the State's PMC at an unacceptable risk of harm, including abuse and neglect, while in care. Among other deficiencies, Texas employs an insufficient number of caseworkers; has an insufficient number, geographic distribution, and array of placement options; and fails to monitor and enforce compliance with the licensing standards for its foster care placements. Additionally, Texas places a significant percentage of the children in its PMC in unlicensed kinship placements and inappropriate group care settings that do not meet accepted professional

---

[1] In Texas, "verification" is the term used for the formal approval of foster parents by child placing agencies, including CPS. In other states and in the applicable professional standards, this process is commonly known as "licensing."

standards. Collectively, these structural deficiencies lead to grim consequences: children in the State's PMC suffer maltreatment at an unacceptable rate, are subjected to frequent and repeated moves among placements, and too often are separated from their siblings and home communities.

## JURISDICTION AND VENUE

7.  Because this action is brought pursuant to 42 U.S.C. § 1983, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

8.  Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b), because a substantial portion of the events or omissions giving rise to the claims occurred in this district, in that:

   a.  Named Plaintiff M.D. is a legal resident of this Division and entered Department of Family and Protective Services custody in this Division;

   b.  Named Plaintiffs D.I., S.R., M.R., J.R., L.H., C.H., and S.S. are legal residents of this District and, along with Named Plaintiff S.A., entered DFPS custody in this District;

   c.  Named Plaintiffs M.D., D.I., S.A., J.S., K.E., S.R., M.R., J.R., L.H., and C.H. have been, at times, placed in this District; and

   d.  Named Plaintiffs S.A., L.H., C.H., and S.S. are currently placed in this District.

## PARTIES

**A.    Named Plaintiffs**

9.  M.D. is a sixteen-year-old girl from Corpus Christi, in Nueces County, who is in the Permanent Managing Conservatorship of the State of Texas. She is currently in a residential treatment center ("RTC") in New Ulm, in Austin County, about four hours from her hometown. M.D. appears by her next friend, Sarah R. Stukenberg. Ms. Stukenberg is suited to represent M.D.'s best interests in this case.

10.  D.I. is an eleven-year-old boy from Houston, in Harris County. At the time that Plaintiffs

filed their Motion for Class Certification (Dkt. No. 160), D.I. was in the Permanent Managing Conservatorship of the State of Texas and resided in a family foster home. D.I. appears by his next friend, Nancy Pofahl. Ms. Pofahl is suited to represent his best interests in this case.

11.     Z.H. is a twelve-year-old boy from San Antonio, in Bexar County, who is in the Permanent Managing Conservatorship of the State of Texas. He currently resides in an RTC in Nacogdoches, about 300 miles from his home community of San Antonio. Z.H. appears by his next friend, Carla B. Morrison. Ms. Morrison is suited to represent his best interests in this case.

12.     S.A. is a sixteen-year-old girl who came into DFPS custody in Brownsville, in Cameron County. S.A. currently resides in an RTC in Harris County, six hours from Brownsville. S.A. is in the Permanent Managing Conservatorship of the State of Texas. S.A. appears by her next friend, Javier E. Solis. Mr. Solis is suited to represent her best interests in this case.

13.     A.M. is a fifteen-year-old girl from Canton, in Van Zandt County, who is in the Permanent Managing Conservatorship of the State of Texas. A.M. currently resides in an RTC in McClennan County, almost three hours from her home community in Canton. A.M. appears by her next friend, Jennifer Talley. Ms. Talley is suited to represent her best interests in this case.

14.     J.S. is a ten-year-old boy from Morton, in Cochran County, who is in the Permanent Managing Conservatorship of the State of Texas. He currently resides in an RTC in Goldthwaite, approximately 325 miles from Morton. J.S. appears by his next friend, Anna J. Ricker. Ms. Ricker is suited to represent his best interests in this case.

15.     H.V. is a thirteen-year-old boy from Levelland, in Hockley County, who is in the Permanent Managing Conservatorship of the State of Texas. H.V. is in a foster group home in Lubbock. H.V. appears by his next friend Anna J. Ricker. Ms. Ricker is suited to represent his

best interests in this case.

16.      P.O. is a nine-year-old boy from Levelland, in Hockley County, who is in the Permanent Managing Conservatorship of the State of Texas.  P.O. is in a kinship placement with his grandparents.  P.O. appears by his next friend Anna J. Ricker.  Ms. Ricker is suited to represent his best interests in this case.

17.      K.E. is a seventeen-year-old girl from Odessa, in Ector County, who is in the Permanent Managing Conservatorship of the State of Texas.  K.E. is currently residing in an RTC in San Antonio, in Bexar County, more than five hours from Odessa.  K.E. appears by her next friend John W. Cliff, Jr.  Mr. Cliff is suited to represent her best interests in this case.

18.      S.R. is a seven-year-old girl from Houston, in Harris County. At the time of the hearing on Plaintiffs' Motion for Class Certification, S.R. was in the Permanent Managing Conservatorship of the State of Texas and was living with her aunt in an unverified kinship placement in Houston.  S.R. appears by her next friend, Bonnie M. Young.  Ms Young is suited to represent her best interests in this case.

19.      M.R. is a six-year-old boy from Houston, in Harris County.  At the time of the hearing on Plaintiffs' Motion for Class Certification, M.R. was in the Permanent Managing Conservatorship of the State of Texas and was living with his aunt in an unverified kinship placement in Houston. M.R. appears by his next friend, Bobbie M. Young.  Ms Young is suited to represent his best interests in this case.

20.      J.R. is a three-year-old girl from Houston, in Harris County.  At the time of the hearing on Plaintiffs' Motion for Class Certification, J.R. was in the Permanent Managing Conservatorship of the State of Texas and was living with her aunt in an unverified kinship placement in Houston.  J.R. appears by her next friend, Bonnie M. Young.  Ms. Young is suited

to represent her best interests in this case.

21.  L.H. is a fourteen-year-old girl from Cameron County, who is in the Permanent Managing Conservatorship of Texas.  She is currently living in a basic care general residential operation ("GRO") in San Benito, in Cameron County.  L.H. appears by her next friend, Estela C. Vasquez.  Ms. Vasquez is suited to represent her best interests in this case.

22.  C.H. is a ten-year-old girl from Cameron County, who is in the Permanent Managing Conservatorship of Texas.  She is currently living in a basic care general residential operation in San Benito, in Cameron County.  L.H. appears by her next friend, Estela C. Vasquez.  Ms. Vasquez is suited to represent her best interests in this case.

23.  S.S. is a 15-year-old girl from Cameron County, who is in the Permanent Managing Conservatorship of Texas.  She is currently living with a relative in an unverified kinship placement in Cameron County.  S.S. appears by her next friend, Estela C. Vasquez.  Ms. Vasquez is suited to represent her best interests in this case.

24.  A.R. is an eighteen-month-old girl from Tarrant County, who is in the Permanent Managing Conservatorship of Texas.  She is currently living with her uncle in an unverified kinship placement in Tarrant County.  A.R. appears by her next friend, Tom McKenzie. Mr. McKenzie is suited to represent her best interests in this case.

**B.    Defendants**

25.  Defendant RICK PERRY is the Governor of Texas, and is sued in his official capacity. He is responsible for ensuring that all Texas agencies comply with applicable federal and state law, and he oversees and directs the activities of the Texas Health and Human Services Commission and the Department of Family and Protective Services, pursuant to the Texas Constitution Article IV Sections 1 and 10, and to the Texas Government Code Title 4, Chapter 531.  His business address is Office of the Governor, State Insurance Building, 1100 San Jacinto

6

Boulevard, Austin, Texas 78701.

26. Defendant KYLE JANEK is the Executive Commissioner of the Texas Health and Human Services Commission, and is sued in his official capacity. Pursuant to Texas Government Code Section 531.0055 *et seq*., the Executive Commissioner has broad policy and rule-making authority for the commission and its constituent agencies, including DFPS. Executive Commissioner Janek reports to the Governor, Rick Perry, and serves at his pleasure. Defendant Janek's business address is Texas Health and Human Services Commission, Brown-Heatly Building, 4900 North Lamar Boulevard, 7th Floor, Austin, Texas 78751.

27. Defendant JOHN J. SPECIA, JR. is the Commissioner of DFPS, and is sued in his official capacity. Pursuant to the Texas Government Code Title 4, Chapter 531, he is responsible for administering properly and efficiently all DFPS child welfare services and programs; providing for the care of the children served by the department; directing the placement of children in appropriate state programs and/or facilities; and assuring that all contracted and other programs and facilities providing child welfare services operate in conformity with constitutional, statutory, and regulatory requirements. Pursuant to Texas Government Code Section 531.0056(a), the Commissioner is appointed by the Executive Commissioner of the Texas Health and Human Services Commission, with the approval of the Governor, and serves at the pleasure of the Executive Commissioner. His business address is Texas Department of Family and Protective Services, 701 West 51st Street, Austin, Texas 78751.

## CLASS DEFINITIONS

28. This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the United States Constitution on behalf of:

   a. a class comprised of all children who are now or will be in the Permanent Managing

Conservatorship of the State of Texas's Department of Family and Protective Services ("General Class");

b. a subclass comprised of all members of the General Class who are now or will be in a licensed or verified foster care placement, except those children now, or in the future, placed in a verified kinship placement, *see* CPS Handbook §§ 4512-4513 ("Licensed Foster Care Subclass");

c. a subclass comprised of all members of the General Class who are now or will be in a foster group home, defined by state law as a facility that is the primary residence of the caregiver(s) and provides 24-hour residential care for seven to 12 children, Tex. Hum. Res. Code § 42.002(5) ("Foster Group Home Subclass");

d. a subclass comprised of all members of the General Class who are now or will be in a general residential operation, defined by state law as a residential child care operation that provides child care for 13 or more children or young adults, Tex. Hum. Res. Code § 42.002(4), 40 Tex. Admin. Code § 748.43(23), and who are or will be receiving solely non-emergency, basic child care services, which the state defines as "[s]ervices that meet a child's basic need for shelter, nutrition, clothing, nurture, socialization and interpersonal skills, care for personal health and hygiene, supervision, education, and service planning," 40 Tex. Admin. Code § 748.61 ("Basic Care GRO Subclass"); and

e. a subclass comprised of all members of the General Class who are or will be in an unverified kinship placement, defined by state policy as a placement with a relative or other person who has a longstanding and significant relationship with the child, but is not verified, licensed, or certified as a foster parent, *see* CPS Handbook §§ 4512-4513

8

("Unverified Kinship Subclass").

## COUNT I: SUBSTANTIVE DUE PROCESS UNDER THE U.S. CONSTITUTION

(Asserted by the Named Plaintiffs on behalf of all Plaintiff Children in the General Class and in every Subclass)

29.     State officials assume affirmative duties under the Fourteenth Amendment to the United States Constitution to protect from harm all children taken into foster care custody, and to provide them appropriate care, treatment, and services through the exercise of accepted professional judgment.

30.     Defendants, in their official capacities, have failed and continue to fail to discharge their affirmative duties because their actions and inactions constitute state policies or practices that substantially depart from accepted professional judgment, practice, and standards as to demonstrate that Defendants did not base their conduct on such a judgment and/or shock the conscience by constituting deliberate indifference to the constitutionally protected rights and liberty and privacy interests of children who are now or will be in the State's PMC.  More specifically, Plaintiffs complain of the following actions and inactions of Defendants that have produced structural deficiencies in the State's foster care system that harm children who are now or will be in the PMC of the State.

## A.     Structural Deficiencies That Harm All Putative Members of the General Class

31.     Texas employs an insufficient number of caseworkers.  Caseworkers are responsible for many of the critical tasks upon which the Plaintiff Children depend: placing children in the least restrictive placements that are safe and meet their needs; regularly visiting children in those placements; ensuring the development and implementation of case plans needed by Plaintiff Children; ensuring children receive needed services; and developing and implementing a permanency plan for each child to ensure that they leave State custody for permanent families

whenever possible.

32.     Professional standards, as promulgated by the Child Welfare League of America, recommend that caseworkers have caseloads that range from 12 to 15 children in order to fulfill their responsibilities.  Standards of Excellence for Family Foster Care Services § 3.48.  Texas state law recognizes that the caseloads of its DFPS caseworkers should be consistent with "professional caseload standards," Tex. Gov't Code § 531.048(b)(3), which are defined to include caseload standards established by the Child Welfare League of America, Tex. Gov't Code § 531.001(5).  Texas employs too few caseworkers to provide General Class members with caseworkers whose caseloads meet professional standards.  The average caseload for DFPS substitute care caseworkers for state Fiscal Year 2011 was 32.0 cases and has been rising for several years.  Indeed, as of August 31, 2011, 55 percent of the caseworkers serving children in the State's PMC had caseloads that exceeded 30 cases, which is substantially above professional standards; and 322 workers, or 24 percent of the caseworkers serving those children, had caseloads of more than 40 cases.

33.     As Defendants have admitted, workers are less able to fulfill their responsibilities and ensure the safety of the children in their care, as required by Texas state policy and professional standards, when they carry excessive caseloads.  For example, children whose workers carry excessive caseloads are harmed by and put at risk of harm by placement decisions made without adequate information.  Excessive caseloads cause children in the State's PMC to experience longer stays in State custody without the opportunity for a permanent family; placements not suited to their needs; frequent and repeated moves from one placement to another; and maltreatment and higher risk of maltreatment in care.  High caseloads also contribute to high employee turnover rates, exacerbating systemic instability.

34. By the actions and inactions of Defendants listed above in ¶¶ 1-6 and 27-31, all Plaintiff Children in the General Class have been harmed and are at continuing risk of harm, including abuse and neglect.

35. Defendants' actions and inactions listed above in ¶¶ 1-6 and 27-31 are a substantial factor leading to and proximate cause of the violation of the constitutionally protected liberty and privacy interests of all Plaintiff Children in the General Class.

36. By the actions and inactions of Defendants listed above in ¶¶ 1-6 and 27-31, all Plaintiff Children in the General Class have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution, including the right to be reasonably safe from harm while in government custody and the right to receive the most appropriate care, treatment, and services determined and provided through the exercise of accepted professional judgment.

**B. Structural Deficiencies that Harm All Putative Members of the Licensed Foster Care Subclass**

37. <u>Texas maintains an insufficient number, geographic distribution, and array of placements</u>. Texas state policy expressly provides that it is preferable that all children be placed in the least restrictive placement appropriate to the needs of a child and that a child be placed in the child's home community with the child's sibling group intact. However, for a long period of time, and with knowledge of widespread structural deficiencies, Defendants have failed to maintain a sufficient number, geographic distribution, and array of foster care placements to meet the reasonably anticipated needs of Plaintiff Children in the Licensed Foster Care Subclass. In a September 2010 report to the legislature, DFPS acknowledged that "[f]inding appropriate placements for children who come into foster care remains difficult because the needs of the children do not always match the number, type, and location of the placement options available."

11

More recently, DFPS, in explaining why its foster care system needed to be redesigned, pointed to some of the structural deficiencies in its placement array, including an "[i]mbalance in geographic distribution of services and providers" and an "[i]nsufficient number of residential providers that offer a full continuum of services," resulting in the placement of children outside of their home communities, an increased number of changes in placement, separation from siblings and family, lack of educational continuity, and a fractured support system.

38.     Texas's insufficient placement array leads to the following inappropriate placements:

    a.  The State inappropriately places children in non-therapeutic, non-emergency group care.  Due to the insufficient number and array of foster family homes, the State places children in group care placements when they should be placed in the least restrictive, most family-like settings where their needs can be met.  As of March 31, 2011, approximately 13 percent of children in the State's PMC resided either in foster group homes or were receiving basic child care services in non-emergency general residential operations.  DFPS policy explicitly recognizes that foster group homes and general residential operations are more restrictive placements than foster family homes.

    b.  Children are placed, or are at an unreasonable risk of being placed, far from their home communities.  The unavailability of suitable placements also puts children in placements far from their home communities.  As of February 29, 2012, 6626 children, or 55 percent of the children in the State's PMC, had been placed outside of their home counties, and 2986 children, or 25 percent of the children in the State's PMC, had been placed not only outside of their home counties but also outside of their large multi-county DFPS *Regions*.  In addition to these overall statistics, another

12

manifestation of this structural deficiency in Texas foster care policies and practices is that, as of August 31, 2011, Harris County and its neighboring counties of Brazoria, Fort Bend, and Galveston had 36 of the 85 RTCs operating in the State. In June 2010 legislative testimony, then-Commissioner Anne Heiligenstein recognized that six out of ten children placed in Houston-area RTCs were from other regions across the state. She described the State's network of residential treatment centers as a "scatter-gram" that unnecessarily complicates the lives of already troubled youth.

c. Children are subject to, or are at an unreasonable risk of being subjected to, frequent moves from one placement to another. The unavailability of appropriate foster care placements also subjects children in the Licensed Foster Care Subclass to frequent and repeated moves from one placement to another and to an unreasonable risk of these placement moves. As of August 31, 2011, 35 percent of the children in the State's PMC had been in five or more placements while in State custody.

d. Children are separated from, or are at an unreasonable risk of being separated from, their siblings. Federal and state policy, as well as accepted professional standards, dictate that children be placed with their siblings while in foster care unless there is a therapeutic or safety-related reason to separate them. However, due to the unavailability of suitable placements, siblings in Texas foster care are too often separated for no therapeutic or safety-related reason. As of March 31, 2011, almost two-thirds of the children in the State's PMC were part of sibling groups. Yet only 53.6 percent of these sibling groups were intact—that is, all of the children in the sibling group were placed together. In 26 percent of the sibling groups, *none* of the siblings were placed together.

13

39.     The inadequate number, geographical distribution, and array of placements causes harm to children in the Licensed Foster Care Subclass.  The lack of appropriate placement options causes all children in the Licensed Foster Care Subclass to be placed inappropriately, or to be at an unreasonable risk of being placed inappropriately.  Licensed Foster Care Subclass members are improperly placed in group care settings, thus deprived of the family-like settings mandated both by accepted professional standards and Texas's own policies.  Frequent and/or distant placement moves result in educational discontinuity and a deficient social support system.  It is well-established that each move that a foster child experiences interrupts normal development and adds psychological trauma, with long-term implications for the child's ability to develop healthy interpersonal relationships, good self-esteem, and even a conscience.  Moreover, the health and safety of children placed far from their home communities may not be monitored by anyone with whom the children have a trusting relationship, as it is difficult for family members, court advocates, and even the children's primary DFPS caseworkers to visit distant placements. Further, according to a December 2010 report to the Legislature by the Adoption Review Committee, the members of which were appointed by Governor Perry and then-Executive Commissioner Thomas Suehs, inappropriate sibling placement decisions "hinder and delay a child's path to permanency."  Then-Commissioner Heiligenstein similarly acknowledged in a February 2011 presentation to the Texas House Human Services Committee that sibling separation negatively impacts children's well-being and permanency outcomes.

40.     <u>Texas is deficient in its oversight and monitoring of foster care placements and fails to enforce compliance with its licensing standards</u>.  Texas fails to adequately monitor and oversee the child placing agencies and residential child care facilities that it licenses to take care of the children in foster care because it does not allocate sufficient resources to such oversight and

because it does not enforce compliance with its own licensing standards. Instead of providing sufficient oversight of the safety of the children in their custody, Defendants rely too heavily upon the child placing agencies and residential facilities (almost all of which are private contractors) to "verify" the suitability of the thousands of homes and facilities that they manage and to monitor the safety of the children who reside in them.

41. The Residential Child Care Licensing division ("RCCL") of DFPS is charged with licensing and regulating all child placing agencies and residential child care facilities in Texas. In 2011, those agencies and facilities included approximately 350 child placing agencies (including branch offices), 85 RTCs, and 160 other types of GROs (e.g., group care facilities, including emergency shelters and campus-type settings). Those agencies and facilities were responsible for approximately 8200 children in foster care placements in the State's PMC. RCCL was tasked with overseeing more than 600 operations (which include more than 10,000 individual homes and facilities) with a staff of only 124 caseworkers and 24 supervisors. In state Fiscal Year 2011, RCCL found "deficiencies" in minimum standards of care in about 30 percent of the investigations it conducted at licensed agencies and facilities. The most common of these "deficiencies" involved use of corporal punishment; failure to complete required background checks; and deficiencies in the competency, judgment, and level of supervision of employees and caregivers. In response to these 812 findings of minimum standards deficiencies, Texas initiated only 16 "corrective actions" (13 "evaluations" and three "probations") and took only two "adverse actions" (one permit suspension and one permit denial) against these 600 agencies and facilities.

42. Texas's failure to adequately oversee and monitor its child placing agencies and residential facilities results in an unacceptable risk of harm, including maltreatment for foster

15

children in the State's PMC. Defendants' own data shows that, for the period of October 25, 2010 to October 25, 2011, children in foster care in the State's PMC were abused at an unacceptable rate.

43. Defendants' deficient oversight of its agencies and residential facilities includes Defendants' failure to enforce their own licensing standards and policies designed to ensure the safety and well-being of the children in their custody: For example, in early 2011, DFPS's Child Care Licensing Division's Performance Management Unit issued a report identifying numerous deficiencies in RCCL's oversight and monitoring of the State's residential child care operations. These deficiencies included a failure to do timely or effective follow-up inspections in more than a third of the residential operations with deficiencies that were sampled; an over-reliance on child placing agencies to investigate the foster homes they manage, apparently resulting in increased risk to the children in those homes; and the failure of virtually all of the corrective actions reviewed by the Performance Management Unit to reduce risk to children. In other words, Defendants do not have an adequate system or sufficient resources to ensure or enforce compliance with their own licensing standards, standards ostensibly designed to protect the safety and well-being of children cared for in foster care placements.

44. By the actions and inactions of Defendants listed above in ¶¶ 1-6, 27-28, and 35-41, all Plaintiff Children in the Licensed Foster Care Subclass have been harmed and are at continuing risk of harm, including abuse and neglect.

45. Defendants' actions and inactions listed above in ¶¶ 1-6, 27-28, and 35-41 are a substantial factor leading to and proximate cause of the violation of the constitutionally protected liberty and privacy interests of all Plaintiff Children in the Licensed Foster Care Subclass.

46. By the actions and inactions of Defendants listed above in ¶¶ 1-6, 27-28, and 35-41, all

Plaintiff Children in the Licensed Foster Care Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution, including the right to be reasonably safe from harm while in government custody and the right to receive the most appropriate care, treatment, and services determined and provided through the exercise of accepted professional judgment.

## C. Structural Deficiencies That Harm All Putative Members of the Foster Group Home Subclass

47. <u>Foster group homes do not conform to accepted professional standards in several significant respects</u>:

    a. Foster group home caregivers have insufficient training and qualifications. The training and qualifications required by Texas for caregivers in foster group homes fall short of those required by accepted professional standards for caregivers in group living facilities. Even though twice as many children may be placed in a Texas foster group home than may be placed in a Texas foster family home, Texas requires no additional training for foster group home caregivers beyond that which is required for foster family home caregivers. Contrary to accepted professional standards, Texas sets no additional educational requirements for foster group home caregivers beyond a GED, a high school diploma, or an illustration of similar knowledge.

    b. Foster group homes have insufficient professionals on staff. Texas does not require caregivers in foster group homes to be professionals, nor does it require that medical professionals be on staff or on call at foster group homes, contrary to accepted professional standards for group living facilities.

    c. Foster group homes do not require waking caregivers. Accepted professional standards require that at least one caregiver be awake at all times in any group care

facility. In Texas, there is no policy or practice requiring at least one caregiver to remain awake at all times in a foster group home.

48.     Defendants' placement of children in foster group homes results in harm and risk of harm to the safety and well-being of the children housed in such facilities.

49.     By the actions and inactions of Defendants listed above in ¶¶ 1-6, 27-28, 35-38, and 45-46, all Plaintiff Children in the Foster Group Home Subclass have been harmed and are at continuing risk of harm, including abuse and neglect.

50.     Defendants' actions and inactions listed above in ¶¶ 1-6, 27-28, 35-38, and 45-46 are a substantial factor leading to and proximate cause of the violation of the constitutionally protected liberty and privacy interests of all Plaintiff Children in the Foster Group Home Subclass.

51.     By the actions and inactions of Defendants listed above in ¶¶ 1-6, 27-28, 35-38, and 45-46, all Plaintiff Children in the Foster Group Home Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution, including the right to be reasonably safe from harm while in government custody and the right to receive care, treatment, and services determined and provided through the exercise of accepted professional judgment.

**D.     Structural Deficiencies That Harm All Putative Members of the Basic Care GRO Subclass**

52.     <u>Texas uses general residential operations to house children who should not be placed in large group living facilities</u>.  Federal law, accepted professional standards, and Texas policy require that children be placed in the least restrictive, most family-like setting that meets their needs.  Accepted professional standards and Texas policy therefore discourage the use of non-emergency group living facilities for children who need only basic child care services because such facilities are not the least restrictive, most family-like setting that meets the needs of these

18

children.  However, Texas routinely places children needing only basic child care services in large group residential facilities known as "GROs" because Texas has no appropriate placements for these children.  Moreover, there are no limits on the numbers of children that can be housed in a GRO, effectively turning some of these GROs into modern-day orphanages, with a capacity of more than a hundred children.

53.     By the actions and inactions of Defendants listed above in ¶¶ 1-6, 27-28, 35-38 and 50, all Plaintiff Children in the Basic Care GRO Subclass have been harmed and are at continued risk of harm, including abuse and neglect.

54.     Defendants' actions and inactions listed above in ¶¶ 1-6, 27-28, 35-38 and 50 are a substantial factor leading to and proximate cause of the violation of the constitutionally protected liberty and privacy interests of all Plaintiff Children in the Basic Care GRO Subclass.

55.     By the actions and inactions of Defendants listed above in ¶¶ 1-6, 27-28, 35-38 and 50, all Plaintiff Children in the Basic Care GRO Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution, including the right to be reasonably safe from harm while in government custody and the right to receive the most appropriate care, treatment, and services determined and provided through the exercise of accepted professional judgment.

**E.     Structural Deficiencies That Harm All Putative Members of the Unverified Kinship Subclass**

56.     <u>Texas fails to require that its kinship homes be licensed or verified</u>.  Under Texas policy and practice, a kinship caregiver for a child in State custody is not required to be licensed or "verified" as a foster parent.  Accepted professional standards require that such kinship homes meet the same standards as a licensed or verified foster home.

57.     <u>Unverified kinship providers do not receive necessary training</u>.  Under Texas policy and

practice, unverified kin providers do not receive the same training for the care of children in State custody that is provided to licensed or verified foster parents. Accepted professional standards recognize that all kin providers should undergo such training for the care of children.

58. <u>Children in unverified kinship care receive insufficient monetary assistance</u>. Under Texas policy and practice, children in unverified kinship placements do not receive the monthly foster care financial support that the State provides to children living with licensed or verified foster parents. Accepted professional standards recognize that all children in State custody in kinship placements should receive foster care financial support to help cover costs for food, clothing, and other necessities.

59. By the actions and inactions of Defendants listed above in ¶¶ 1-6, 27-28, and 54-56, all Plaintiff Children in the Unverified Kinship Subclass have been harmed and are at continuing risk of harm, including abuse and neglect.

60. Defendants' actions and inactions listed above in ¶¶ 1-6, 27-28, and 54-56 are a substantial factor leading to and proximate cause of the violation of the constitutionally protected liberty and privacy interests of all Plaintiff Children in the Unverified Kinship Subclass.

61. By the actions and inactions of Defendants listed above in ¶¶ 1-6, 27-28, and 54-56, all Plaintiff Children in the Unverified Kinship Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution, including the right to be reasonably safe from harm while in government custody and the right to receive care, treatment, and services determined and provided through the exercise of accepted professional judgment.

## COUNT II: FIRST, NINTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

(Asserted by Named Plaintiffs M.D., D.I., Z.H., S.A., J.S., H.V., A.M., K.E., L.H., and C.H. on

20

behalf of all Plaintiff Children in the Licensed Foster Care Subclass)

62.     Each of the foregoing allegations is incorporated as if fully set forth herein.

63.     A right of family integrity and a right to a permanent family derive from the First Amendment's right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.

64.     The foregoing and following actions and inactions of Defendants Rick Perry, Kyle Janek, and John J. Specia, Jr., in their official capacities, constitute a policy or practice that is such a substantial departure from accepted professional judgment, practice, and standards as to demonstrate that Defendants did not base their conduct on such a judgment and/or shock the conscience by constituting deliberate indifference to the constitutionally protected rights of all Plaintiff Children in the Licensed Foster Care Subclass in the following respects:

65.     <u>Texas fails to maintain a sufficient number, geographic distribution, and array of placements</u>.  For many years and with knowledge of structural deficiencies, Defendants have maintained an insufficient number, geographic distribution, and array of foster care placements to meet the reasonably anticipated needs of Plaintiff Children in the Licensed Foster Care Subclass.

66.     <u>Children are placed far from their home communities</u>.  The lack of suitable placements subjects children to the risk of being placed far from their home communities.  As of February 29, 2012, 6626 children, or 55 percent of all children in the State's PMC, had been placed outside of their home counties, and 2986 children, or 25 percent of children in the State's PMC, had been placed not only outside of their home counties but also outside of their large multi-county DFPS *Regions*.

67.     <u>Sibling groups are separated</u>.  The lack of suitable placements causes siblings to be separated for no therapeutic or safety reason, contrary to federal and state law, Texas's own

policy, and accepted professional standards. As of March 31, 2011, almost two-thirds of the children in the State's PMC were part of sibling groups. Yet only 53.6 percent of these sibling groups were intact, that is, all of the children were placed together. In 26 percent of the sibling groups, *none* of the siblings were placed together.

68.      Distant moves and family separation cause harm. Children moved to locations distant from their home communities are subject to a fractured social support system and erosion of familial connections. It is difficult for any family member to visit far-away placements. Further, sibling separation can "hinder and delay a child's path to permanency," according to a December 2010 report to the Texas legislature by the Adoption Review Committee. Then-Commissioner Heiligenstein reported to the legislature in February 2011 that sibling separation harms children's well-being and permanency outcomes.

69.      As a result of Defendants' conduct, all Plaintiff Children in the Licensed Foster Care Subclass have been and are at further risk of being harmed and deprived of the liberty interests, privacy interests, and associational rights not to be deprived of a family relationship where safe and appropriate, as conferred on them by the First, Ninth, and Fourteenth Amendments to the United States Constitution.

## CLASS ACTION ALLEGATIONS

70.      This action is properly maintained as a class action pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

71.      **As to the General Class of All Plaintiff Children:**

    a.   Numerosity. As of March 31, 2011, there were approximately 12,196 children in the State's Permanent Managing Conservatorship. The General Class is sufficiently numerous as to make joinder impracticable.

22

b. <u>Common Question of Fact</u>.  Determination of the following common question of fact will resolve in one stroke the following issue that is central to the validity of each one of the individual Class member's claims: Do the State's policies and practices regarding the staffing of caseworkers for children in PMC depart from accepted professional judgment, practice, and standards for caseworker caseloads?

c. <u>Common Question of Law</u>.  Determination of the following common question of law will resolve the following legal issue that is central to the validity of each one of the individual Class member's claims: Do the State's policies and practices regarding the staffing of caseworkers for children in PMC mean that children in the General Class have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

d. <u>Typicality</u>.  The claims alleged by the Named Plaintiffs and the resultant harms are typical of the claims of each member of the putative General Class.  Typicality exists because all absent General Class members have been injured, or are at risk of injury, as a result of the same harmful state policies and practices.

e. <u>Adequacy of Representation</u>.  Adequacy of representation exists because the Named Plaintiffs will fairly and adequately protect the interests of the General Class.  There are no conflicts of interest between any of the Named Plaintiffs and the other General Class members.  Moreover, the Named Plaintiffs' proposed Next Friends, who sue on their behalf, are dedicated to the Named Plaintiffs' best interests, familiar with this litigation, and willing and able to pursue this case on behalf of the Named Plaintiffs and the General Class that the Named Plaintiffs seek to represent.

23

72.    **As to the Licensed Foster Care Subclass:**

a.    <u>Numerosity</u>.  As of March 31, 2011, there were approximately 8200 children in the State's Permanent Managing Conservatorship who were in licensed or verified foster care, not including those children who were in verified kinship placements.  The Subclass is sufficiently numerous as to make joinder impracticable.

b.    <u>Common Questions of Fact</u>.  Determination of the following common questions of fact will resolve in one stroke the following issues that are central to the validity of each one of the individual Subclass member's claims:

i.    Does the State fail to maintain an adequate number, geographic distribution, and array of licensed foster care placements to ensure that the needs of the children in the Subclass are met in conformity with accepted professional judgment, practice, and standards?

ii.    Does the State fail to maintain oversight and monitoring of its licensed foster care placements sufficient to ensure compliance with its own licensing standards and accepted professional judgment, practice, and standards?

c.    <u>Common Questions of Law</u>.  Determination of the following common questions of law will resolve the following legal issues that are central to the validity of each one of the individual Subclass member's claims:

i.    Does the State's failure to maintain an adequate number, geographic distribution, and array of licensed foster care placements mean that children in the Licensed Foster Care Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

ii. Does the State's failure to maintain sufficient oversight and monitoring of its licensed foster care placements mean that children in the Licensed Foster Care Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

iii. Does the State's failure to maintain an adequate number, geographic distribution, and array of licensed foster care placements mean that children in the Licensed Foster Care Subclass have been and are at continuing risk of being deprived of the right of family integrity and the right to a permanent family, as conferred on them by the First, Ninth, and Fourteenth Amendments to the United States Constitution?

d. <u>Typicality</u>. The claims alleged by M.D., D.I., Z.H., S.A., J.S., H.V., K.E., A.M., L.H., and C.H. and the resultant harms are typical of the claims of each member of the putative Subclass. Typicality exists because all absent Licensed Foster Care Subclass members have been injured, or are at risk of injury, as a result of the same harmful state policies and practices.

e. <u>Adequacy of Representation</u>. Adequacy of representation exists because M.D., D.I., Z.H., S.A., J.S., H.V., K.E., A.M., L.H. and C.H. will fairly and adequately protect the interests of the Licensed Foster Care Subclass. There are no conflicts of interest between M.D., D.I., Z.H., S.A., J.S., H.V., K.E., A.M., L.H., C.H., and the other Licensed Foster Care Subclass members. Moreover, M.D.'s, D.I.'s, Z.H.'s, S.A.'s, J.S.'s, H.V.'s, K.E.'s, A.M.'s, L.H.'s and C.H.'s proposed Next Friends, who sue on their behalf, are dedicated to M.D.'s, D.I.'s, Z.H.'s, S.A.'s, J.S.'s, H.V.'s, K.E.'s,

A.M.'s, L.H.'s, and C.H.'s best interests, familiar with this litigation, and willing and able to pursue this case on behalf of M.D., D.I., Z.H., S.A., J.S., H.V., K.E., A.M., L.H., C.H., and the Licensed Foster Care Subclass that M.D., D.I., Z.H., S.A., J.S., H.V., K.E., A.M., L.H., and C.H. seek to represent.

73. **As to the Foster Group Home Subclass**

a. <u>Numerosity</u>. As of March 31, 2011, 1184 children in the State's Permanent Management Conservatorship were placed in foster group homes. The Subclass is sufficiently numerous as to make joinder impracticable.

b. <u>Common Questions of Fact</u>. Determination of the following common questions of fact will resolve in one stroke the following issues that are central to the validity of each one of the individual subclass member's claims:

    i. Do the State's policies and practices with respect to its operation of foster group homes depart from accepted professional judgment, practice, or standards regarding caregiver qualifications and training?

    ii. Do the State's policies and practices with respect to its operation of foster group homes depart from accepted professional judgment, practice, or standards regarding staffing of professionals?

    iii. Do the State's policies and practices with respect to its operation of foster group homes depart from accepted professional judgment, practice, or standards regarding waking caregivers?

c. <u>Common Question of Law</u>. Determination of the following common question of law will resolve the following legal issue that is central to the validity of each one of the individual Subclass member's claims: Do the State's policies and practices with

26

respect to the operation of its foster group homes mean that children in the Foster Group Home Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

d. <u>Typicality</u>.  The claims alleged by H.V. and the resultant harms are typical of the claims of each member of the putative Subclass.  Typicality exists because all absent Foster Group Home Subclass members have been injured, or are at risk of injury, as a result of the same harmful state policies and practices.

e. <u>Adequacy of Representation</u>.  Adequacy of representation exists because H.V. will fairly and adequately protect the interests of the Foster Group Home Subclass.  There are no conflicts of interest between H.V. and the other Foster Group Home Subclass members.  Moreover, H.V.'s proposed Next Friend, who sues on his behalf, is dedicated to H.V.'s best interests, familiar with this litigation, and willing and able to pursue this case on behalf of H.V. and the Foster Group Home Subclass that H.V. seeks to represent.

74.  **As to the Basic Care GRO Subclass:**

a. <u>Numerosity</u>.  As of March 31, 2011, 395 children in the State's Permanent Management Conservatorship were placed in non-emergency general residential operations and receiving only basic child care services.  The Subclass is sufficiently numerous as to make joinder impracticable.

b. <u>Common Question of Fact</u>.  Determination of the following common question of fact will resolve in one stroke an issue that is central to the validity of each one of the individual Subclass member's claims: Does the State's placement of children needing

27

only basic child care services in non-emergency general residential operations depart from accepted professional judgment, practice, or standards?

c. <u>Common Question of Law</u>.  Determination of the following common question of law will resolve the following legal issue that is central to the validity of each one of the individual Subclass member's claims: Does the State's placement of children needing only basic child care services in non-emergency general residential operations mean that children in the Basic Care GRO Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

d. <u>Typicality</u>.  The claims alleged by L.H. and C.H. and the resultant harms are typical of the claims of each member of the putative Subclass.  Typicality exists because all absent Basic Care GRO Subclass members have been injured, or are at risk of injury, as a result of the same harmful state policies and practices**.**

e. <u>Adequacy of Representation</u>.  Adequacy of representation exists because L.H.  and C.H. will fairly and adequately protect the interests of the Basic Care GRO Subclass. There are no conflicts of interest between L.H., C.H., and the other Basic Care GRO Subclass members.  Moreover, L.H. and C.H.'s proposed Next Friend, who sues on their behalf, is dedicated to L.H.'s and C.H.'s best interests, familiar with this litigation, and willing and able to pursue this case on behalf of L.H., C.H., and the Basic Care GRO Subclass that L.H. and C.H. seek to represent.

75. **As to the Unverified Kinship Subclass:**

a. <u>Numerosity</u>.  As of August 31, 2011, 2994 children in the State's Permanent Management Conservatorship were placed in unverified kinship placements.  The

Subclass is sufficiently numerous as to make joinder impracticable.

b. <u>Common Questions of Fact</u>. Determination of the following common questions of fact will resolve in one stroke the following issues that are central to the validity of each one of the individual Subclass member's claims:

    i.    Do the State's policies and practices with respect to the approval process for unverified kinship home placements depart from accepted professional judgment, practice, or standards?

    ii.    Do the State's policies and practices with respect to the training of unverified kinship caregivers depart from accepted professional judgment, practice, or standards?

    iii.    Do the State's policies and practices with respect to financial support for children in State custody who are placed with unverified kinship caregivers depart from accepted professional judgment, practice, or standards?

c. <u>Common Question of Law</u>. Determination of the following common question of law will resolve the following legal issue that is central to the validity of each one of the individual Subclass member's claims: Do the State's policies and practices for the operation of unverified kinship placements mean that children in the Unverified Kinship Subclass have been and are at continuing risk of being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution?

d. <u>Typicality</u>. The claims alleged by P.O., S.R., M.R., J.R., A.R., and S.S. and the resultant harms are typical of the claims of each member of the putative Subclass. Typicality exists because all absent Unverified Kinship Subclass members have been

29

injured, or are at risk of injury, as a result of the same harmful state policies and practices.

e. <u>Adequacy of Representation</u>.  Adequacy of representation exists because P.O., S.R., M.R., J.R., A.R., and S.S. will fairly and adequately protect the interests of the Unverified Kinship Subclass.  There are no conflicts of interest between P.O., S.R., M.R., J.R., A.R., and S.S. and the other Unverified Kinship Subclass members. Moreover, the proposed Next Friends of P.O., S.R., M.R., J.R., A.R., and S.S., who sue on their behalf, are dedicated to their best interests, familiar with this litigation, and willing and able to pursue this case on behalf of P.O., S.R., M.R., J.R., A.R., S.S., and the Unverified Kinship Subclass that they seek to represent.

76.    Each Named Plaintiff appears by a Next Friend, and each Next Friend is sufficiently familiar with the facts of the child's situation to fairly and adequately represent the child's interests in this litigation.

77.    Plaintiffs' counsel are:

a. attorneys from the firm Canales & Simonson, P.C., a law firm in Corpus Christi;

b. attorneys from the firm Haynes and Boone, LLP, an international law firm with Texas offices in Austin, Dallas, Fort Worth, Houston, and San Antonio;

c. attorneys from the firm Yetter Coleman LLP, a Texas law firm with offices in Houston and Austin; and

d. attorneys from Children's Rights, a non-profit advocacy organization with its office in New York.

78.    These lawyers have extensive experience litigating complex class action lawsuits in federal court, including substantial experience in child welfare class action institutional reform litigation.  Plaintiffs' attorneys have committed sufficient resources to represent the General Class and Subclasses.  Plaintiffs' counsel therefore are well suited to fairly and adequately

30

represent the interests of the General Class and the Subclasses.

79. Defendants have acted or failed to act on grounds generally applicable to the General Class and the Subclasses, necessitating declaratory and injunctive relief for the General Class and the Subclasses. Plaintiffs' counsel know of no conflicts among General Class or Subclass members.

## **PRAYER FOR RELIEF**

80. WHEREFORE, the Plaintiff Children respectfully request that this Honorable Court:

    a. Assert jurisdiction over this action;

    b. Order that Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

    c. Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure Defendants' violation of Plaintiff Children's substantive right to be free from harm under the due process clause of the Fourteenth Amendment to the United States Constitution, and Defendants' violation of Plaintiff Children's rights under the First, Ninth and Fourteenth Amendments to the United States Constitution;

    d. Enter a permanent injunction as to all children in the General Class requiring Defendants to ensure that all children in the General Class are assigned DFPS caseworkers whose individual caseloads do not exceed the caseload standards established by the Child Welfare League of America and/or the Council on Accreditation;

    e. Enter a permanent injunction as to all children in the Licensed Foster Care Subclass requiring (1) that an assessment by qualified professionals be conducted to determine (i) the aggregate need of all children in the Subclass for additional placements that will provide the necessary number, geographic distribution, and array of placement options for all children in the Subclass; (ii) the time period during which these placements will be developed; and (iii) the steps necessary to implement these placement options; and (2) Defendants implement the steps determined to be necessary by the foregoing assessment within the time period determined by that assessment.

    f. Enter a permanent injunction as to all children in the Licensed Foster Care Subclass requiring (1) that an assessment by qualified professionals be conducted to determine (i) the resources and processes necessary to ensure that Defendants have the capacity to monitor and enforce compliance with all licensing standards applicable to Defendants' foster care placements; (ii) the time period during which these resources

31

and processes will be developed and implemented; and (iii) the steps necessary to develop and implement these resources and processes; and (2) Defendants implement the steps determined to be necessary by the foregoing assessment within the time period determined by that assessment.

g. Enter a permanent injunction as to all children in the Foster Group Home Subclass requiring that Defendants cease placing children in foster group homes until those foster group homes are operated in compliance with accepted professional standards;

h. Enter a permanent injunction as to all children in the Basic Care GRO Subclass requiring that Defendants cease placing children needing only basic child care services in non-emergency general residential operations;

i. Enter a permanent injunction as to all children in the Unverified Kinship Subclass as follows:

   i. Requiring that kinship homes be licensed or verified in accordance with the same standards used by Defendants to license or verify foster care placements;

   ii. Requiring that kinship caregivers receive the same training for the care of children that is provided by Defendants to licensed and verified foster parents; and

   iii. Requiring that children in kinship homes receive the same monthly foster care financial support that Defendants provide to children living with licensed or verified foster parents;

j. Appoint a Neutral Monitor to oversee the implementation of this order and to issue periodic reports to the Court.

k. Award to Plaintiff Children the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

l. Grant such other and further equitable relief as the Court deems just, necessary, and proper to protect Plaintiff Children from further harm by Defendants.

Dated: May 24, 2013

Respectfully Submitted:

*/s/ Marcia Robinson Lowry*
Marcia Robinson Lowry (*admitted pro hac vice*)
Stephen A. Dixon (*admitted pro hac vice*)
Patrick Almonrode (*admitted pro hac vice*)
Adam Dembrow (*admitted pro hac vice*)
Christina Wilson (*admitted pro hac vice*)
Melissa Cohen (*admitted pro hac vice*)
Adriana T. Luciano (*admitted pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015
*mlowry@childrensrights.org*
*sdixon@childrensrights.org*
*palmonrode@childrensrights.org*
*adembrow@childrensrights.org*
*cwilson@childrensrights.org*
*mcohen@childrensrights.org*
*aluciano@childrensrights.org*

R. Paul Yetter
State Bar No. 22154200
S.D. Tex. Bar No. 3639
Dori Kornfeld Goldman
State Bar No. 24041274
S.D. Tex. Bar No. 591632
Lonny Hoffman
State Bar No. 00784282
S.D. Tex. Bar No. 15688
Christopher D. Porter
State Bar No. 24070437
S.D. Tex. Bar No. 1052367
April L. Farris
State Bar No. 24069702
S.D. Tex. Bar No. 1133331
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
Phone: (713) 632-8000
Facsimile: (713) 632-8002
*pyetter@yettercoleman.com*
*dgoldman@yettercoleman.com*
*lhoffman@yettercoleman.com*
*cporter@yettercoleman.com*
*afarris@yettercoleman.com*

J.A. "Tony" Canales
State Bar No. 03737000
S.D. Tex. Bar No. 1163
Hector Canales
State Bar No. 24005961
S.D. Tex. Bar No. 29396
Patricia C. Bell
State Bar No. 00793455
S.D. Tex. Bar No. 19506
CANALES & SIMONSON, P.C.
2601 Morgan Avenue
Corpus Christi, Texas 78467-5624
Phone: (361) 883-0601
Facsimile: (361) 884-7023
*tonycanales@canalessimonson.com*
*hacanales@canalessimonson.com*
*pmcanales@canalessimonson.com*
Attorneys-in-Charge

Barry F. McNeil
State Bar No. 13829500
S.D. Tex. Bar No. 14914
R. Thaddeus Behrens
State Bar No. 24029440
S.D. Tex. Bar No. 916025
David Dodds
State Bar No. 00790595
S.D. Tex. Bar No. 35024
Amelia J. Cardenas
State Bar No. 24056681
S.D. Tex. (*admitted pro hac vice*)
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Phone: (214) 651-5000
Facsimile: (214) 200-0535
*barry.mcneil@haynesboone.com*
*thad.behrens@haynesboone.com*
*david.dodds@haynesboone.com*
*amelia.cardenas@haynesboone.com*

*Attorneys for Plaintiffs and the Proposed*
*General Class and Subclasses*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of May, 2013, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants, and that I have mailed by United States Postal Service the pleading to all non-CM/ECF participants.


_____*/s/ Christina Wilson*_____
Christina Wilson