UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


M.D., ET AL.,                    )        CASE NO:  2:11-CV-0084
                                )
            Plaintiffs,         )             CIVIL
                                )
     vs.                        )       Corpus Christi, Texas
                                )
GOVERNOR RICK PERRY, ET AL.,    )       Friday, December 12, 2014
                                )       (10:34 a.m. to 12:01 p.m.)
            Defendants.         )


CROSS EXAMINATION OF JOHN SPECIA
DURING TRIAL - DAY 10

BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE


Appearances:               See Next Page

Court Recorder:            Angel Mireles / Arlene Rodriguez

Case Manager:              Arlene Rodriguez / Linda Smith

Transcriber:               Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, TX 78480-8668
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**


Plaintiffs:               R. PAUL YETTER, ESQ.
                          Yetter, Coleman, LLP
                          909 Fannin, Suite 3600
                          Houston, TX 77010

                          SARAH BARTOSZ, ESQ.
                          Children's Rights
                          330 Seventh Avenue
                          Fourth Floor
                          New York, NY 10001

Defendants:               THOMAS A. ALBRIGHT, ESQ.
                          Office of the Attorney General
                          General Litigation Division
                          P. O. Box 12548
                          Capital Station
                          Austin, TX 78711-2548

3

## INDEX

| DEFENDANTS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN SPECIA | | 4 | | |

| PLAINTIFFS' EXHIBITS | RECEIVED |
|---|---|
| 1988 | 58 |
| 1966 | 67 |

1    **Corpus Christi, Texas; Friday, December 12, 2014; 10:34 a.m.**

2        **(Partial transcript; Cross Examination of John Specia)**

3            **THE COURT:**  Go ahead, Mr. Yetter.

4        **MR. YETTER:**  I'm making a mess --

5    **(Pause)**

6            **THE COURT:**  That took another three minutes.

7    **(Laughter)**

8                        **CROSS EXAMINATION**

9    **BY MR. YETTER:**

10   Q    Good morning, Commissioner, Paul Yetter.  We have never

11   met but -- oh, we may have met actually during the --

12   A    I think we've met somewhere along the line.

13   Q    Yes, I think we -- yes, we did, we actually met and I

14   apologize.

15           So I'd like to cover a number of topics and I'm going

16   to try to be as efficient as I can be, try to be as clear as I

17   can be, and you can be as concise as hopefully you can be as

18   well.

19   A    I will try to do that.

20   Q    Now you are commissioner of the DFPS today.  You happen to

21   be the seventh commissioner of the department since 2004.

22           Did you realize that?

23   A    That does not surprise me.  I hadn't counted them all out.

24   Q    All right.  Let's go back --

25   A    I've known them all but, yeah, I'm sure that's true.

1   Q    I want to quickly go -- 10 years ago in 2004, Thomas

2   Chapman was the commissioner.

3          You knew Thomas Chapman or you at least knew of him,

4   didn't you?

5   A    Yes.

6   Q    And he resigned because there was a -- shortly after a

7   report about deficiencies in the Adult Protective Services

8   Program came out.

9          Do you recall that?

10  A    No.

11  Q    Two thousand four, Ben Delgado was put in as the interim.

12  He was only there for a brief time.

13         Do you remember Ben Delgado?

14  A    No.

15  Q    Cary Cockrell (phonetic) was there for three years, from

16  2005 to 2007.

17         Do you remember Commissioner Cockrell?

18  A    Yes, I do.

19  Q    And he was -- he retired shortly after the department took

20  all the children from the El Dorado Ranch of the Fundamentalist

21  LDS group.

22         Do you recall that?

23  A    Yes.

24  Q    And in 2008 Ben Delgado came back.

25         Do you remember that time?

Specia - Cross / By Mr. Yetter                                6

1    A    I don't know Ben Delgado.

2    Q    From 2008 to 2011, it was Ann Haligensteen (phonetic).

3         Do you remember that?

4    A    Yes.

5    Q    And after three years she quit in a surprise retirement,

6    did she not?

7    A    Yes.

8    Q    She was pushing for reform.  She was the one that started

9    foster care redesign?

10   A    Yes.

11   Q    Then Howard Baldwin was there for a little less than a

12   year.  He was a lawyer out of the AG's office, was he not?

13   A    Actually, he was retired and he had taken over the

14   insurance agency for the state.  He was not -- and he ran the

15   child support division at some point in the past but I don't

16   think he was with the AG's office.

17   Q    He was at one time.  He resigned just weeks after that

18   scandal with that little girl Tameron Claphee (phonetic) in

19   Abilene, Region Two, remember that?

20   A    Yes.

21   Q    And now you were appointed to succeed Howard Baldwin and

22   you have just finished and congratulations on just finishing

23   the second year.

24   A    Yes.

25   Q    So of the last six commissioners none of them lasted

Specia - Cross / By Mr. Yetter                 7

```
 1    longer than three years.

 2              Did you know that?

 3    A    I thought it was four?  Didn't you say that Cary Cockrell

 4    was there four?

 5    Q    Cary Cockrell --

 6    A    Or Ann, one or the other?

 7    Q    -- I think he was there for three but maybe he was there

 8    for four.

 9    A    Okay.

10    Q    Now you have a -- you have a big organization, 12,000

11    employees, do you not?

12    A    Yes.

13    Q    Of that group, 8,000, two-thirds, are in the Child

14    Protective Services area I think you've testified?

15    A    Yes.

16    Q    It is -- it is a state run system if you know what I'm

17    talking about?

18    A    Yes.

19    Q    That means all the handbook and the policies and the rules

20    come out of the DFPS chief offices in Austin, don't they?

21    A    Yes.

22    Q    You have one handbook for all 11 regions around the state,

23    do you not?

24    A    Yes.

25    Q    You have one technology system evidently called Impact for
```

1  all 11 regions around the state, do you not?

2  A    Yes.

3  Q    All the counties are subject to the same handbook, and

4  policies, and rules, true?

5  A    Yes.

6  Q    All the counties are subject to the same reporting systems

7  and common technology system, right?

8  A    The regions are.  There's no separate reporting from

9  counties but the regions are.

10 Q    All the counties within the regions --

11 A    Sure.

12 Q    -- have to do the same reporting.

13       You said your budget was 2.6 billion --

14 A    Yes.

15 Q    -- in the last -- I just want to make it clear.  That's a

16 two year budget?

17 A    Oh, yes, absolutely.

18 Q    So it's 1.3 billion per year, right?

19 A    Yes.

20 Q    Now among every organization that you've ever worked in

21 has its own culture does it not, Commissioner?

22 A    Say that again?

23 Q    Every organization you've ever been involved in has its

24 own culture --

25 A    Yes.

1  Q    -- does it not?  And if you wanted to have a good well

2  working child welfare system you'd want it to always be acting

3  in the best interests of children, wouldn't you?

4  A    Yes.

5  Q    In other words, put politics, put internal scuffles, that

6  sort of thing, set it to the side and always make decisions in

7  the best interest of the children?

8  A    Yes.

9  Q    Make sure you don't ignore problems?

10 A    Sure.

11 Q    Make sure you don't hide any crisis, true?

12 A    Yes.

13 Q    Avoid making excuses?

14 A    Correct.

15 Q    Now I want to talk about some of the -- what I believe

16 might well be a crisis, at least some of it, and that has to do

17 with this system that we have in our state is very largely

18 privatized, isn't it?

19 A    Yes.

20 Q    And the Court's heard all the details.  Foster care

21 redesign is a step to even add another layer of privatization

22 to our system that is already very largely privatized, isn't

23 it?

24 A    It is another layer but I believe it increases

25 accountability.

1    Q    I'm not going to argue about what it does but basically

2    you're putting another set of private providers to do the

3    management of that bigger subset of private providers, true?

4    A    Yes.

5    Q    Okay.  Now the -- one of the problems that we have in our

6    state that the Department has had for some period of time is

7    that it has not been much of an enforcer of its rules and

8    policies, has it?

9    A    I'm going to have to have specific examples of that.

10   Q    Sure.  I'm going to say -- I'm going to ask you this.

11        It's taken a very cautious approach to enforcing

12   instances -- a violation of abuse and neglect in violation of

13   its standards, hasn't it, cautious?

14   A    Deliberate perhaps, okay.

15   Q    Okay.  I used the word "cautious."  There are a lot of

16   things that the Department can do when one of these private

17   providers either allows a child to be abused or neglected or

18   violates standards?  There's a number of different actions this

19   department can take, can't it?

20   A    Yes.

21   Q    One of the actions called Voluntary Actions by an

22   Operation is basically the department saying to the private

23   agency, "Please fix this problem yourself," right?

24   A    I'm not aware of that one.

25   Q    Okay.  Then we also can have a monetary action.  You can

1   penalize them an amount of money, true?

2   A    Yes.

3   Q    And then you can have a corrective action which is

4   basically saying, "I'm warning you.  You have to do X, Y, or

5   there's going to be bad consequences."

6   A    That's correct.

7   Q    And then you could have actually something that has real

8   teeth to it called an Adverse Action which means, "I'm taking

9   your permit away.  I'm revoking it.  I'm not going to let you

10  have a permit or I'm going to suspend your permit"?

11  A    Yes.

12  Q    That's an adverse action.  And the problem -- the reason I

13  said "cautious" is because the Department, whenever one of

14  these private providers is found, actually found, to have

15  allowed abuse and neglect to happen to a child victim, the

16  Department almost never takes an adverse action against the

17  private provider, does it?

18  A    Give me some specifics on that one.

19  Q    I'll give you a very specific one, so.

20          **THE COURT:**  Well, for instance, I asked your

21  licensing department if they'd ever revoked a license and since

22  -- and since 2010, one has been revoked and that was where

23  there were several --

24          **MR. YETTER:**  Four deaths.

25          **THE COURT:** Four deaths --

1          **THE WITNESS:**  Okay.

2          **THE COURT:**  -- and that was Daystar.

3          **MR. YETTER:**  Correct.

4          **THE COURT:**  And that's the only one that's ever been

5     revoked in that period of time from what I understood from the

6     testimony.

7          **MR. YETTER:**  Sunset, it -- that's exactly right, your

8     Honor.

9     **BY MR. YETTER:**

10    Q    Sunset looked at this issue, did it not, Commissioner?

11    A    Yes.

12    Q    And let's go to Defendant's Exhibit Number 119.  This is

13    the Sunset Commission report four months ago, August of 2014,

14    and let's go to page 90, and let's go to the bottom box in the

15    corner.

16         Commissioner, you've seen this before.  I know the

17    Sunset report is very important to you but here it is in fiscal

18    year 2013, this is when -- this is the -- this was from 2012 to

19    2013, right, Commissioner?

20    A    That's what it says.

21    Q    And then CCL, that is Child Care Licensing, true?

22    A    Yes.

23    Q    So that involves both daycare and residential care.  The

24    day -- the residential care will be for the foster children,

25    true?

1   A    Yes.

2   Q    Okay.  There's 10,000 facilities all across our state --

3   A    Can I see the --

4            **THE COURT:**  What, sir?

5            **THE WITNESS:**  What does the footnote say on it, at

6   the top?

7            **MR. YETTER:**  Let's see.

8            **THE COURT:**  Four.

9            **MR. YETTER:**  Footnote Four -- good question. I don't

10  actually know what Footnote Four says on that.

11           **THE COURT:**  It probably explains what the fiscal year

12  is but --

13  Q    So fiscal year for you would be --

14           **THE COURT:**  Do you -- do you have that on an exhibit?

15           **MR. YETTER:**  It's on another page, your Honor, and I

16  don't have that page right handy.

17           **THE WITNESS:**  That's okay.  I'm just -- I'd like to

18  know what the footnote is but okay.

19           **MR. YETTER:**  I think it must have to do with that

20  fiscal year.  That would be September 1, 2012 to August 31,

21  2013.

22           **THE WITNESS:**  Okay.

23  **BY MR. YETTER:**

24  Q    Residential child care:  10,000 regulated facilities.

25  That would be family -- foster family homes, foster group

1   homes, RTCs, other GROs, correct?

2   A    Yes.

3   Q    All across our state, 10,286.  During that entire 12

4   months you had 4,000 inspections.

5             We heard a lot of testimony about people that go out

6   and inspect, right?

7   A    Yes.

8   Q    You had 5,160 investigations.  Now that could be an

9   investigation of abuse and neglect or an investigation of

10  nonabuse and neglect, true?

11  A    Yes.

12  Q    So we know because we got the statistics from the

13  licensing people that there were almost exactly 2,000 abuse and

14  neglect investigations in fiscal year 2013.

15            Do you remember that testimony --

16  A    Yes.

17  Q    -- from Jean Shaw?

18            So there must have been about 3,000 nonabuse or

19  standard investigations, if you do the math.

20            Does that sound about right?  If there were 2,000

21  abuse investigations --

22  A    I'll trust your math.

23  Q    Okay.  So you have standard violations, 6,000 standard

24  violations.

25            Now the next two boxes I want to focus on:

1   Corrective actions, just to remind the Court, that's their

2   warning, you better do something different or something really

3   bad is going to happen to you, right?

4   A    Yes.

5   Q    Out of 10,000 facilities across our state, 12 months, 11

6   regions, plus Harris County, 12 corrective actions by the

7   Department -- this is in the Sunset Commission Report, right?

8   A    Yes.

9   Q    And adverse actions.  That's the one that has teeth.

10  That's says, "I'm denying your permit.  I'm revoking your

11  permit.  I'm suspending your permit."

12        How many in that 12 months, Commissioner, did the

13  state have?

14  A    This document says one.

15  Q    You don't doubt the accuracy of the Sunset Commission

16  Report, do you?

17  A    No, I do not.

18  Q    Okay.  The problem with that -- this is it creates repeat

19  violators, doesn't it, Commissioner?

20  A    I'm not sure that you could draw that conclusion from

21  this.

22  Q    Okay.  Well, the Sunset Commission did.

23  A    Okay.

24  Q    Let's go to page 92 and blow up the top paragraph.  Okay.

25  One -- Repeat Violations.

1              Do you remember this section now?

2   A    Yes.

3   Q    One consequence of a more relaxed regulatory environment

4   and that's what they were calling Texas, right?

5   A    Yes.

6   Q    A relaxed regulatory environment -- can be seen in a high

7   incident -- incidence of repeat violations that can result when

8   regulated entities perceive that they will be not held

9   accountable for ignoring the state's requirements.

10              That's a bad thing, isn't it, Commissioner?

11  A    Yes.

12  Q    One of the things, going down, not to read all but to kind

13  of just cut to the chase --

14  A    And --

15  Q    -- one of the things they say here is most of the repeat

16  violations occurred on the highest risk standards.

17              That's a very bad thing, isn't it?

18  A    On mostly associated with criminal history check

19  requirements.  That is a problem that we're addressing in this

20  LAR, the --

21  Q    That's a terrible thing, isn't it?

22  A    Most of the repeat --

23  Q    You could have people with criminal records that no one's

24  checking on --

25  A    That's not --

1  Q    -- and then you don't penalize them and they do it again,

2  and again, and again.

3  A    Okay.  That's not true.

4  Q    Okay.  Now --

5  A    Can I explain that?

6           **THE COURT:**  Yes.

7           **THE WITNESS:**  We have -- this is a problem because of

8  the way we capture this data.  We have almost, as I believe,

9  about 100 percent compliance on checking criminal backgrounds

10 when people start at a facility.  There's a requirement to do

11 it yearly.  Where the violations are occurring is people aren't

12 hitting that year.  It may be 11 months.  It may be 12 months.

13 We monitor this.  We get penalized by the federal government

14 for this.  So we are completely changing the way this is going

15 to happen and I've got part of my LAR on that specifically.  I

16 consider that to be a high risk violation but it's focused on

17 criminal history checks and we were -- we've got the solution

18 on that one.

19 **BY MR. YETTER**

20 Q    Okay.  You know that criminal history check, that's a

21 standard, isn't it, that's a standard?  You've got to do that.

22 You've got to follow that rule, true?

23 A    Most of these repeat violations occur on the highest risk

24 standard mostly associated with criminal history check

25 requirements.

Specia - Cross / By Mr. Yetter                           18

1  Q    Okay.  But we also have instances of abuse and neglect,

2  don't we?

3  A    We may but that sentence --

4  Q    Commissioner -- just a minute, Commissioner.

5  A    -- talks primarily about --

6  Q    Let's take this instance off.  Let's go back to page 90

7  and blow up that box, 90 at the bottom.

8         That box of adverse actions of one in an entire 12

9  months.  It doesn't just cover standards violations, does it?

10 A    I don't think so.

11 Q    No.  It covers instances where you actually do validate

12 that there's abuse and neglect of a poor child, true?

13 A    I don't know what that adverse action was for so I don't

14 know.

15 Q    Okay.  "Now the problem is going slow on enforcing

16 regulations designed to protect children from safety risks out

17 of concern that some providers may have trouble meeting such

18 protective standards is essentially to accept a level of risk

19 to children simply because the state needs providers regardless

20 of their quality," true?

21 A    May I see the quote, please?

22 Q    Well, sure, page 99.  Here's the findings.  Let's blow up

23 -- if we blow up the title real quick and a little bit farther

24 down, the next one, there you go.

25         "Cautious approach to enforcement."  It's in the

1    second paragraph underneath that; that paragraph right there,

2    the second sentence.  However -- we can read the first one.

3             "The desire for a lighter enforcement hand may stem

4    from concerns that a strong enforcement approach could harm

5    child care providers and ultimately affect the affordability of

6    daycare and the availability of foster care for abused and

7    neglected children.  However, to go slow in enforcing

8    regulations designed to protect children from safety risks out

9    of concern that some providers may have trouble meeting such

10   protective standards is essentially to accept a level of risk

11   to children simply because the state needs providers regardless

12   of their quality."

13            Did I read that correctly?

14   A    This -- the focus of -- yes, you did.  The focus on this

15   --

16   Q    Do you agree with that statement, Commissioner?

17   A    I agree with the statement and --

18   Q    Okay.

19   A    -- it focuses on child care providers.  The vast majority

20   of those are child care providers, day care centers, and I also

21   agreed with this and we're going to change this but my response

22   to --

23   Q    Commissioner, I'm really going to try to be efficient and

24   I'm going to ask you questions as best as I can yes or no.  I

25   know you've got lots of explanations but we have a limited time

1  together and I'm going to try to move through some things.

2  Okay?

3  A    I just want to see what you're asking me.

4  Q    Sure, I have no problem with that.

5          Now, I talked about a crisis.  Obviously if you've

6  only given one adverse action over an entire 12 months

7  something's not working right, is it?

8  A    I think we need to be better at enforcement.  I also know

9  that many facilities close down.

10  Q    Something is -- something's not working right, is it,

11  Commissioner?

12  A    We are going to address that issue and we are going to do

13  what Sunset told us to do.

14  Q    Now one of the things that is not working right is that

15  the investigative arm of the State of Texas almost never

16  substantiates a claim of abuse and neglect; isn't that true?

17  A    I saw those statistics and I understand what those

18  statistics are.

19  Q    And were they shocking to you that in the last two fiscal

20  years the State of Texas validated, substantiated, somewhere

21  between three and four percent of all of the abuse and neglect

22  reports in our state?  Did that shock you?

23  A    Okay.  It doesn't shock me until I look at what the other

24  states are doing and review the information.  It is an issue --

25          THE COURT:  What are the other states doing?

1          **THE WITNESS:**  I don't know.  I will -- your Honor,

2   I've learned things here and I'm going to go back and take a

3   look at that.  That's an issue I want to look at, what the

4   other states do, and I want to look at the UTD category.  That

5   was an issue raised in Sunset for the investigations.  That's

6   an issue I need to look at.

7          **THE COURT:**  I guess it's surprising.  I mean surely

8   you've had those statistics for some time.

9          **THE WITNESS:**  Your Honor, I have truckloads of

10  statistics.

11         **THE COURT:**  But this is a very important statistic.

12         **THE WITNESS:**  And I understand that completely.

13         **THE COURT:**  To not substantiate a right to believe,

14  whatever that acronym is --

15         **MR. YETTER:**  RTB.

16         **THE COURT:**  -- just a report made by an attorney who

17  -- an eyewitness, and never even to listen to her, ask her

18  about it, is just absolutely stunning to me and that such a low

19  percentage is just not -- and all we heard was from one of the

20  state's witnesses that that was a very low number.

21  **BY MR. YETTER:**

22  Q    And she was concerned by it.  You heard Pat Wilson

23  yesterday say it concerned her, true?

24  A    I'm concerned and --

25  Q    Okay.

1  A    -- I'm going to look into the matter and I'm going to look

2  specifically into the Levelland matter.

3  Q    Now there's nothing in your LAR about the fact -- what you

4  sent to the legislator -- about the fact that the state

5  validates a tiny fraction of all reported abuse and neglect

6  against children in our foster care system, is there?

7  A    I don't think so.

8  Q    Okay.  Now you also saw and I suspect you were shocked

9  that the rank and file when we saw them in the investigative

10  group thinks that without -- with no autopsy, no RTB, -- do you

11  remember that?

12  A    There was one worker in 2010.

13  Q    And you --

14  A    So it's one person said that.

15  Q    And you don't give that much credence?

16  A    That's an e-mail from one worker.

17  Q    Now were you shocked --

18            **THE COURT:**  Well, actually it turned out to be true.

19            **THE WITNESS:**  Well, okay.

20            **THE COURT:**  I'm sorry.  Since 2010, that is true.

21  The only thing ever closed down was because of four deaths in

22  one place.  So the point she was making was made to me also and

23  very serious.

24  //

25  //

1   Q    Now weren't you also concerned when you saw some of your

2   executives that are not in the licensing group debating

3   internally about whether findings by the licensing group in

4   child deaths actually should be RTB fatal?

5        Weren't you concerned about that?

6   A    I want to make sure that every RTB finding --

7   Q    Well, were you concerned about it?

8   A    I -- the --

9   Q    That these nonlicensing people are debating --

10  A    The discussion --

11  Q    -- about whether it should RTB fatal where these children

12  died in the hands of their caregivers or RTB nonfatal.

13       Weren't you kind of concerned, like what are they

14  doing in there?

15  A    They were discussing how to determine whether it was the

16  right -- it was RTB either way and we count it as an RTB.

17  Q    Well, RTB fatals are a big deal.

18  A    Did the RTB cause the death --

19       THE COURT:  Wait a minute, let him finish.

20       THE WITNESS:  Did the RTB cause --

21       MR. YETTER:  Sorry, sorry.

22       THE COURT:  Stop it.  Just like I told Mr. Albright.

23       MR. YETTER:  You're right, your Honor.

24       THE WITNESS:  Did the RTB cause the death of the

25  child or was there child abuse and neglect and the child died?

1   That was a discussion about -- with my new head -- or I guess

2   it was sent to my new head of child safety.

3         I want to make sure every determination, every RTB,

4   every UTD, every rule out is the correct finding based on a

5   quality investigation.

6   **BY MR. YETTER:**

7   Q    Now none of these people are in the licensing group that

8   are talking about this?

9   A    There was one -- there was one e-mail from Dr. Burstain I

10  think.

11  Q    And she's sending it to Lisa Black who's head of CPS,

12  who's not in licensing?

13        **THE COURT:**  So what was her -- what was her business

14  in doing that?

15        **THE WITNESS:**  I have no idea on that one, your Honor.

16        **THE COURT:**  Okay.  Well, that's disturbing too.  All

17  these things going back and forth and I'll tell you this too so

18  you may want to address it.

19        **THE WITNESS:**  Sure.

20        **THE COURT:**  I was disturbed about the testimony of

21  the people you put in charge.

22        **THE WITNESS:**  Okay.

23        **THE COURT:**  Ms. Black and Mr. Morris seemed not to

24  know what was going on and gave conflicting numbers data than

25  the people under them gave.

 1          THE WITNESS:  Yes, your Honor.

 2          THE COURT:  And I was very disturbed about that.

 3          THE WITNESS:  I understand that.

 4          THE COURT:  They didn't seem to know what -- much

 5     about what they were supposed to know about.

 6          THE WITNESS:  I understand that, your Honor.

 7          THE COURT:  So what -- how do you address that?

 8          THE WITNESS:  Well, they're both very new in their

 9     positions and they're still learning.  If I had come here last

10     year, I just took this job two years ago, I couldn't have -- I

11     couldn't have answered the questions.

12          THE COURT:  That's -- that's a concern also.  There

13     seems to be no institutional memory in the whole department,

14     DFPS.  Everybody that -- "Well, I just got this job so I don't

15     know about that study.  I don't know about the last

16     recommendations two years ago that were never met.  I don't

17     know this.  I don't know that" and I find that disturbing in an

18     institution not to have a memory.

19          THE WITNESS:  Your Honor --

20          THE COURT:  And maybe 14 years in the Coast Guard

21     doesn't necessarily qualify you to run a licensing department.

22          THE WITNESS:  There's a lot of institutional memory.

23     My deputy, Jennifer Simms, has been with this agency and she

24     indirectly supervises all those people for about ten years.

25          THE COURT:  But in those two important places --

Specia - Cross / By Mr. Yetter                        26

1              THE WITNESS:  I understand that.

2              THE COURT:  -- there's isn't any institutional

3    memory.

4              THE WITNESS:  I understand that.

5              THE COURT:  They all said, "Oh, I haven't looked at

6    that study.  I wasn't in this job then.  I don't know about all

7    of those PMUs, right, because I wasn't here then."

8              You'd think the first thing anybody would do that

9    took a job was to review what had gone before; that's all I'm

10   saying.

11             THE WITNESS:  I understand.

12             THE COURT:  It may not be a constitutional violation

13   but it's not a very good standard.

14             THE WITNESS:  I understand, ma'am.

15             THE COURT:  Oh, I don't -- I'm sorry to put you in a

16   position like that.

17             THE WITNESS:  No, your Honor, I learned -- there's a

18   reason I sat here for ten days.

19             THE COURT:  I know.

20             THE WITNESS:  I wanted to hear --

21             THE COURT:  And I saw you making notes and I was

22   impressed.

23             THE WITNESS:  I wanted to hear and I will look at

24   problems and challenges in my agency and address them directly.

25             THE COURT:  The only thing that concerns me about you

1   saying that is that if I had seen those statistics, those low

2   statistics about substantiated claim -- child abuse in foster

3   care, I wouldn't have waited until today to say, "I'm going to

4   do something about it."

5           THE WITNESS:  Your Honor, I didn't wait until today.

6           THE COURT:  Okay.

7           THE WITNESS:  I've got stuff going on it already.

8           THE COURT:  Okay, good.

9           THE WITNESS:  I've talked to people but I'm going to

10  do a deliberate approach to it, take a look at it, do quality

11  QA, and figure out what's going on.

12          THE COURT:  And also, he made a misstatement.

13  Mr. Yetter, that was not in all of Texas that was in foster

14  care.  In all of Texas, 26 percent is substantiated or

15  something like that.

16          MR. YETTER:  Yes, correct, correct, yes.

17  BY MR. YETTER:

18  Q    Outside of foster care, you substantiate 25 percent?

19  A    Yes.

20  Q    But inside of foster care, it's 3 to 4 percent?

21  A    Yes.

22  Q    I want to talk about another area that deals with abuse

23  and neglect and other sorts of investigations that you've known

24  about for a while and I want to talk about how you've handled

25  it and whether you've been transparent with your stakeholders,

Specia - Cross / By Mr. Yetter                    28

1    all right, Commissioner?

2    A     (No audible response)

3    Q     I'm focused on the UTD findings.

4    A     Yes.

5    Q     Okay.  You know about that because you learned about that

6    relatively early on did you not?

7    A     I don't think so.

8    Q     Let me get -- let's get a chronology.

9              January 21, according to Paul Morris, the PMU

10   released this UTD report on January 21, 2014.  It's only dated

11   January 2014 but I think he -- if my memory's right, he said

12   January 21.  This is Defendant's Exhibit 1129.

13             You didn't get it right when it --

14             **MR. ALBRIGHT:**  Plaintiffs'.

15             **MR. YETTER:**  I'm sorry, Plaintiffs' exhibit.

16   Q     You did not get it right when it was released, did you,

17   Commissioner?

18   A     No.

19   Q     But at least two months later Mr. Morris actually then did

20   give it to you didn't he when he sent you a memo, right?

21   A     Show me the memo, please.

22   Q     Sure.  Let's go then now to Defendant's 70.

23             Defendant's Exhibit 70.  This is Defendant's 70.

24   There we go, Defendant's 70.

25             Now let's go to page 2.  This is a memo Mr. -- I

1    think you heard Mr. Morris talk about this and let's just blow

2    this up.  It's from him to the commissioner.

3    A    It's dated March 21st, 2014.

4    Q    Okay.  So that'd be two months later.

5    A    More than two months later if it was early January.

6    Q    I think he said it was January 21.

7    A    Okay, fine.

8    Q    So it's two months later.  So then he tells you about it.

9    So he's been thinking about it for two months.  He tells you

10   about it and he gives you this report and he says he's going to

11   do various things, true?

12   A    Yes.

13   Q    One of the things you told him to do was well, let's -- or

14   did it go vice versa, "I want to look at other, not just

15   physical abuse.  I want to look at sexual abuse and negligence

16   of supervision."

17        Who told that to whom?  Did you tell him or did he

18   tell you?

19   A    I think he made that decision before he informed me.

20   Q    Okay, fair enough.  So then you know -- so here you are in

21   March.  So now you've known it as we're sitting here today in

22   December, you've known about this for nine months, true?

23   A    (No audible response)

24   Q    Commissioner?

25   A    Yes.

1   Q    Nine months.

2   A    Eight months actually.

3   Q    Eight months.  You've known about it for eight months and

4   in those eight months you have not told your council, the

5   council for the DFPS, have you?

6   A    No.

7   Q    And if we hadn't told your chair Tina Martin she wouldn't

8   know today as we're sitting here?

9   A    True.

10  Q    And you haven't told anyone at the -- you've told your

11  executives of the licensing group about this UTD issue, haven't

12  you?

13  A    I think they told me about the issue.

14  Q    Okay.  Well, let me -- let's go to page one of the same

15  exhibit.  About two weeks later -- page one of this exhibit,

16  just blow up that top -- on April the 9th about two weeks

17  later, Mr. Morris -- I'm sorry, somehow -- I'm not exactly sure

18  how this goes but you guys have something called DFPS Exec

19  Memos.

20         Do you see that?

21  A    Yes, sir.

22  Q    So somehow this -- this word of the UTD issue goes to the

23  executives of DFPS.

24         Who would that be, you?

25  A    I don't think I'm on this memo.  I see that Jennifer

1   Simms, and Katy Olse (phonetic) and Cheryl Nimmo (phonetic) are

2   on this e-mail.

3   Q    Okay.  So whoever the exec memos are -- whoever those

4   executives -- they get this memo but to your knowledge,

5   Commissioner, you've not shared this information with anyone

6   outside the licensing group?

7   A    I don't think that's true.

8   Q    But you personally.  I've not seen any memo or e-mail --

9   A    Well, Jennifer --

10  Q    I'm just asking you.

11  A    Jennifer Simms is my deputy.

12  Q    Okay.  So you've given it --

13  A    Katy Olse is my chief of staff.

14  Q    So you've given it to two of your fellow DFPS executives?

15  A    I didn't.  Mr. Morris sent those.

16  Q    Okay.  But no one gave it to the council, true?

17  A    That's really not the purpose of the council but, no,

18  nobody gave it to the council.

19  Q    Commissioner, no one gave it to the council.  No one has

20  alerted the federal government that you found more instances of

21  confirmed physical, sexual abuse, and negligent supervision,

22  true?

23  A    I do not know that.

24  Q    You have -- no one has told you that the department has

25  updated the federal government on this, right?

```
 1   A     Correct.

 2   Q     Now one of the purposes -- you said it's not the purpose

 3   of the council.  The council, according to Ms. Martin, the

 4   chair, is the -- is kind of the public's participation in the

 5   department.  It's a group of public citizens, isn't it?

 6   A     Yes.

 7   Q     And they're supposed to give you advice and

 8   recommendations on things that are going on, rules and

 9   policies, true?

10   A     Their role is to review rules and policies and we update

11   them on certain things.  They meet quarterly.  They meet for a

12   fairly short period of time.  So they are not a body I would

13   take a case issue to.  They don't have the right to see

14   confidential information.

15   Q     This UTD issue is a little bit of a crisis, isn't it,

16   Commissioner?

17   A     You know, I --

18   Q     You don't think it is?

19   A     Well, crisis -- yeah, I don't -- if you read the Sunset

20   Commission -- if you treat everything as a crisis, it's a

21   crisis --

22   Q     Commissioner, commissioner, I'm not --

23   A     -- it's a crisis, you can't manage your organization.  It

24   is a problem.

25   Q     Commissioner, I'm not talking about the Sunset Commission.
```

1   I'm talking about the UTD issue.

2   A    I understand that.

3   Q    It's a crisis for you guys, isn't it?

4   A    It's a problem that needs to be addressed.

5   Q    A problem, okay.  You haven't told the Sunset Commission

6   about it, have you?

7   A    I don't know.

8   Q    You didn't tell Stephens Group that was doing an

9   investigation during this whole time about it, did you?

10   A    Again, I don't know.

11   Q    You didn't tell the Casey family group that was doing an

12   investigation throughout this whole time?

13   A    Well, that one it wasn't any complete -- it wasn't related

14   to the Casey -- the Casey review.

15   Q    Well, it involved -- it involved abuse and neglect

16   investigations all across the state including Harris County,

17   didn't it?

18   A    Casey was focused on permanency for children in long-term

19   care.

20   Q    Now if you had told the council you know not only are they

21   a group of concerned citizens like Ms. Martin but there's a

22   former foster child on that council?

23   A    Yes.

24   Q    And she's a very outspoken young woman, isn't she?

25   A    Yes, she is.

1  Q    In fact, let's go to Plaintiffs' Exhibit 1531, and the

2  Court will -- you remember -- just off the top e-mail.  You

3  remember that when she heard Gigi Edwards Bryant is the --

4  A    Okay.  She is no longer on the council.  She was chair of

5  the council.  There's another foster child on the council

6  today.  She, six or eight months ago, was off the council.

7  Q    Well, all right, Ms. Martin said she's still on the

8  council.

9  A    I don't think she did.

10  Q    Okay.  She's the chair of the council, right?

11  A    Ms. Martin's the chair.  Ms. Bryant is the former chair.

12  Q    Okay.  But -- so there's a former foster child on this

13  council and you think if you had -- and it's pretty diligence,

14  this council is, they read the stuff that you give them?

15  A    Ms. Bryant is no longer on the council.  There's another

16  young woman, a very bright young woman, who is a foster or --

17  is on the council.

18  Q    Okay.  The council -- your experience is the council reads

19  the stuff that you give them?

20  A    Yes.

21  Q    Okay.  So if you had actually told this council with this

22  former -- bright, young, former foster child in there, that we

23  have found that 75 percent of this slice of all our abuse and

24  neglect investigations, the UTD slice, are unreliable, do you

25  think she might have been concerned about it?

1   A    That is simply not the kind of information I take to the

2   council.

3   Q    So you just don't --

4   A    The council -- that's not the purpose of the council.

5   Q    You don't think a public body like the council who's

6   supposed to give you advice should know about something like a

7   75 percent error rate?

8   A    This is not the kind of information that I share with the

9   council.

10  Q    Now a good --

11  A    I share completely different information.

12  Q    Commissioner, a good child welfare system doesn't hide

13  problems, does it?

14  A    I agree with that and I don't believe I'm hiding this

15  problem.

16  Q    Well, one of the things --

17  A    And that's the implication.

18  Q    A good child welfare system doesn't ignore issues either,

19  does it, that are problem issues, true?

20  A    I agree.

21  Q    Now one of the things that we've heard a lot of testimony

22  on is situations where one child maltreats another child either

23  physically or sexually, right?

24  A    Yes.

25  Q    And before this lawsuit, before your deposition in

Specia - Cross / By Mr. Yetter                                36

1   September, Commissioner, you had no idea whether the state

2   collected in an aggregate way statistics or incidents of child

3   on child maltreatment, did you?

4   A    Did I say that in my deposition?

5   Q    Yes, you did.

6   A    Then I probably didn't.

7   Q    Okay.  In fact, you said, "I wasn't aware of that."

8   A    Okay, correct then.

9   Q    Okay.  Now it is not just adults that commit abuse on

10  children in the foster care system is it?

11  A    No.

12  Q    You know as a commissioner that child on child abuse or

13  maltreatment is something that can cause tremendous harm to the

14  children, to both children involved?

15  A    Any child abuse can cause harm to children, yes.

16  Q    There's two victims in a child on child maltreatment

17  incident, isn't there?

18  A    I agree.

19  Q    Now you said, "Well, okay, I didn't know we didn't track

20  it but we would find an appropriate way to keep track of it,"

21  right?

22  A    I guess I said that, Mr. Yetter, but I will tell you that

23  that is clearly an issue that after listening to the testimony

24  in this courtroom I'm going to take a look at.  I want to find

25  out what other states do and also how you would use the

1    information.  That's the trick is how do you -- if you track

2    it, how does it help you?  Where does it show up?  Does it

3    label the child?  You know, that issue needs -- I need a hard

4    look at that.  I want to -- I'm going to consult with the

5    Stephens Group on that.

6    Q    Commissioner, are we just --

7              THE COURT:  I was -- I was concerned about -- well,

8    you heard my concerns.

9              THE WITNESS:  I'm concerned.  Your Honor, I'm

10   concerned also and I'm going to -- I've got the Stephens Group.

11   I've got one of the best child welfare consulting organizations

12   that I've continued their contract.

13             THE COURT:  Okay.

14             THE WITNESS:  I'm going to talk with them next week

15   about this.

16   BY MR. YETTER:

17   Q    Commissioner, by the time of your deposition in September,

18   you had been acting commissioner for almost two years -- not

19   acting.  You had been the commissioner of the department for

20   almost two years --

21   A    Yes.

22   Q    -- and abused children is kind of like priority one and

23   it should be at least in any department.

24   A    Safety, permanency, and well-being of all children in the

25   State of Texas is priority one for me.

Specia - Cross / By Mr. Yetter                    38

1   Q    And no one on your staff had every told you that the state

2   does not track abuse that occurs between children in your

3   foster care system?

4   A    You know that's an issue --

5   Q    Is that true?

6   A    -- that I have heard about and --

7   Q    Is that true, Commissioner?

8   A    -- I don't know.  I --

9   Q    No one told you?

10  A    I don't know.

11  Q    Now are we now --

12  A    There's a lot of -- there -- we track thousands of things

13  and I don't know -- I couldn't tell you what we track and what

14  we don't track, that's true.

15  Q    Commissioner, if you don't measure a problem you don't

16  know how big it is, right?

17  A    You've got to define "measure."  Define "measure" and

18  evaluate a problem in order to figure out what you're doing.

19  Q    Fair enough, and if you don't define measure and evaluate

20  a problem you can't fix it, can you?

21  A    That's true.

22  Q    Now a good child welfare system doesn't make excuses when

23  it does things that it shouldn't be doing, right?

24  A    Show me the example you're using on that one.

25  Q    I am.  The placement array situation in our state is

 1  broken, isn't it?

 2  A    The placement array is challenged.

 3  Q    It's a broken system and that's why you're supposedly

 4  redesigning it, right?

 5  A    No.

 6  Q    Okay.

 7  A    Texas is unique and one of the issues and I've given this

 8  a lot of thought -- one of our huge problems in the rural areas

 9  in Texas is the lack of resources:  mental health resources,

10  substance abuse resources, treatment resources.  When I pick

11  foster homes for children in individual counties, I necessarily

12  have to have resources there for the children, particularly if

13  they have specialized problems.  I will tell you that we do not

14  have the capacity in the State of Texas.  We don't have

15  psychiatrists in West Texas or South Texas.  We've got a real

16  issue on the availability of certain resources particularly in

17  the rural area that I think adds to the challenge of an array

18  of services in every county in the state.

19  Q    Thank you, Commissioner.  All right.  Let me -- let's get

20  some basic principles.

21          It harms foster children to not have permanence?

22  A    Absolutely.

23  Q    Children that move frequently have more stability issues

24  and less permanency, true?

25  A    It depends.

1  Q    Okay.  Children that move frequently have more stability

2  and less permanency.

3           You now think that that's a maybe so, maybe not?

4  A    No, it depends on where -- it depends on where they move.

5  Q    Okay.

6  A    A child that goes to --

7  Q    You agree with that as a basic proposition, Commissioner?

8  A    As a general proposition I would agree with that.

9  Q    Okay, as a general proposition; that's what I want to talk

10  about now.

11          It's generally accepted, including in the child

12  welfare field, that children that are moved frequently and have

13  less -- and have more stability issues and less permanency are

14  harmed, true?

15  A    Say that again.

16  Q    Children that move frequently have more stability issues

17  and less permanency.

18          Do you agree with that?

19  A    I think the number --

20  Q    As a general proposition.

21  A    -- of times -- I think children that are moved frequently,

22  that creates challenges to their stability and it really

23  depends on where they're moving to.

24  Q    Well, let me -- I'll just ask you one more time and that

25  results in harm to them, doesn't it?

Specia - Cross / By Mr. Yetter                    41

1   A     It could result in harm to them.

2   Q     Children that are not placed closer to their home can

3   contribute to a child - it can hurt a child getting permanency,

4   right?

5   A     If that was that child's home and if there was family

6   there to support the child, yes.

7   Q     Now one thing you didn't know when we last talked to you

8   in your deposition was whether the number of children that were

9   being moved away from their home communities, outside their

10  county, had gone up or gone down.  You didn't know that?

11  A     I probably did not know that.

12          **MR. ALBRIGHT:**  Your Honor?

13  Q     But you --

14          **MR. ALBRIGHT:**  Excuse me, excuse me.  Your Honor, if

15  we are going to start referring to deposition testimony --

16          **THE COURT:**  Line and page.

17          **MR. ALBRIGHT:**  Please.

18          **MR. YETTER:**  Certainly.

19          **THE COURT:**  Thank you, Mr. Albright.

20          **THE WITNESS:**  And is it possible for me to see it?

21          **MR. YETTER:**  Sure.

22  **BY MR. YETTER:**

23  Q     The question I have now is you now have heard -- sat in

24  the courtroom and you've heard that it has gotten worse, hasn't

25  it?

Specia - Cross / By Mr. Yetter                    42

1   A    I'd like to see my quote that you quoted that I supposedly

2   said.  I want to see what it says.

3   Q    Sure, page 19, lines 19 through 20, at the very bottom --

4   pages 19 through 24, and the real question is, hold on, I have

5   seen that -- you're talking about children out of county.  "I

6   have seen that number.  I see that number fairly often.  I

7   can't give it to you right now.  It varies from county to

8   county and it is a significant concern of mine, children being

9   placed outside their home counties."

10  A    And Mr. Yetter, the question you asked me is not fair

11  coming out of that.  I said I've seen that number.  I see that

12  number fairly often.  I can't give it to you right now.  It

13  doesn't mean I don't know that number.

14  Q    Commissioner, I'm not, this is not a test.

15  A    Well --

16  Q    I'm not trying -- my question was simply you didn't know

17  specifically what it was in your deposition and now you do?

18  A    But that sounds like -- that sounds like I am clueless.

19  Look at what is said there.  I think that --

20  Q    I get that.

21  A    -- that brings context to it --

22  Q    I get it.

23  A    -- optional completeness.

24  Q    I get it, Commissioner.

25          THE COURT:  Okay.  I'm going to -- I'm going to do

Specia - Cross / By Mr. Yetter                    43

1   it.  You've got lawyers.

2              **THE WITNESS:**  Yes, ma'am, you're absolutely correct.

3   You're absolutely correct.

4        **(Laughter)**

5              **THE COURT:**  Just answer the questions.  You've been

6   here, done this.

7              **THE WITNESS:**  Judge, I --

8              **THE COURT:**  Because I know it's frustrating as a

9   witness.

10             **THE WITNESS:**  I greatly apologize.

11             **THE COURT:**  Okay.

12  **BY MR. YETTER:**

13  Q    Okay.  The point is we now know that in 2010 there was 55

14  percent of children put out of their counties and in 2014 it's

15  somewhere between 60 and 64 percent being put -- placed out of

16  their counties, right?

17  A    From what I heard yesterday it's 60 percent.

18  Q    Sixty, but you didn't hear your colleague Gail Gonzalez

19  say 64 percent?

20  A    I don't remember that.  What I heard yesterday and what I

21  remember is 60.

22  Q    All right.

23             **THE COURT:**  I remember 60 also.

24  Q    Now --

25             **THE COURT:**  Ms. Gonzalez, you're right back there.

Specia - Cross / By Mr. Yetter                                  44

1  What did you say?

2         **MS. GONZALEZ:**  Sixty percent.

3         **THE COURT:**  Sixty percent.

4         **MR. YETTER:**  Sixty.  Well then I misheard, I

5  apologize, sixty percent.

6  Q    Now all things being equal.

7         **THE COURT:**  Oh, you know what?  You forgot to ask the

8  commissioner did he want to adopt all the other statements --

9         **THE WITNESS:**  Sure.

10        **THE COURT:**  -- he said while not under oath, adopt

11 those, as his testimony now under oath.

12        **MR. YETTER:**  Do you want to do that, sir?

13        **THE COURT:**  Do you do that, sir?

14        **THE WITNESS:**  Yes, your Honor, and as an offer to the

15 Court I would do that anyway.

16        **THE COURT:**  I appreciate that but --

17        **THE WITNESS:**  No, I wanted to say it.  I thank you

18 for doing that.

19 **BY MR. YETTER:**

20 Q    There is a capacity issue, isn't there, Commissioner?

21 A    Yes.

22 Q    Now capacity issue meaning the state does not have the

23 capacity, the placements in the counties where the children

24 need them in all cases?  I'm not saying it never has it, I'm

25 just saying in all cases.

Specia - Cross / By Mr. Yetter                    45

1   A    We cannot place children in their home county in every

2   case.

3   Q    Now let's move to foster care redesign.

4        You were the one that made the decision on

5   providence, didn't you?

6   A    Absolutely.

7   Q    And Providence, you had gotten advice from your staff

8   about Providence and it was mixed, wasn't it?

9   A    Mr. Yetter, you need to show that to me because there were

10  memos that were presented prior to me being there.  The

11  selection process was prior to me being there, and I want to

12  know what you're talking about.

13  Q    Fair enough.  Page 194, lines 14 through 18, you said you

14  talked to your senior staff.

15  A    Okay.  Can I see the paragraph above please?

16  Q    Sure, we can blow up lines 5 to line 18.

17       **THE COURT:**  Do you-all -- while you're doing that,

18  did anybody on the Plaintiffs' side find that Footnote Four in

19  that exhibit earlier?

20       **MR. YETTER:**  Oh, I haven't, your Honor.  It's in

21  the --

22       **THE COURT:**  I just wanted it for the Commissioner's

23  benefit in case it changed anything you've said.

24       **MR. YETTER:**  I'm sorry, thank you.

25       **THE WITNESS:**  That says from the top --

1          **MR. YETTER:**  Commissioner, let me just -- let me

2    interrupt you.

3    **BY MR. YETTER:**

4    Q    The Court asked about Footnote Four.  Footnote Four to

5    fiscal year 2013 said, "Illegal and exempted operations are not

6    included in this data."  So like having an illegal daycare,

7    it's an unlicensed daycare.

8    A    That doesn't clarify it but that -- I mean I'd have to go

9    back and look at it but thank you.

10   Q    Okay.  It's on page 96 of the --

11   A    Illegal and -=

12   Q    "Exempted operations" --

13   A    Okay.

14   Q    -- "are not included in this data."

15   A    Okay.  I think that those two questions together, that's

16   what I said, I had mixed advice.

17   Q    Okay.  "I had mixed advice.  Some people wanted to go with

18   Providence and some people did not want to go with Providence."

19   A    That's absolutely true.

20   Q    In fact you got a recommendation from the project group

21   that said don't go with Providence, true?

22   A    Yes.

23   Q    And Providence as we all know has since left.  You only

24   have one outstanding out there, right?

25   A    Mr. Yetter, I did something else after I got that advice.

1  Q    Commissioner, I appreciate that you want to tell me --

2  A    Okay, fine.

3  Q    -- a lot of things.

4  A    That's fine.

5  Q    I'm just trying to move through several -- a number of

6  topics.

7  A    I just --

8  Q    Providence is no longer -- you may have gotten other

9  advice I take it?

10 A    I actually brought Providence in.  I brought their senior

11 management in.  I talked to them.  I got assurances from them.

12 I told them what the concerns were, showed them what the

13 concerns were, and I did make the decision to go forward, but

14 it wasn't -- it was a deliberate process.

15 Q    All right, and they are no longer with you?

16 A    No, they are not.

17 Q    They're no longer the SSCC, true?

18 A    That's absolutely true.

19 Q    Plaintiffs' Exhibit 721, your Honor, I don't -- there's no

20 objection to it.  I don't know if it's been admitted yet.

21         **MR. ALBRIGHT:** What number's that?

22         **MR. YETTER:**  Seven-two-one.

23         **MR. ALBRIGHT:**  Defendant's exhibit?

24         **MR. YETTER:**  Plaintiffs' Exhibit 721.

25         **THE COURT:**  It's admitted previously.

Specia - Cross / By Mr. Yetter                                    48

1        **MR. YETTER:**  Okay, then I want to just make sure it's

2   verified.

3   **BY MR. YETTER:**

4   Q    I want to go back to one document that we talked about a

5   little bit yesterday, Defendant's Exhibit 137, and let just

6   make sure if we can understand what the document reflects,

7   Commissioner, and maybe you can or cannot help us, Defendant's

8   137.

9        Okay.  We talked about this one column.  See the

10  column on the far right?

11  A    Mr. Yetter, I don't think I can help you on this one.  I

12  mean I've seen it --

13  Q    I get it.

14  A    -- but understanding the top part and the footnotes and

15  all of that stuff, I just don't think I can help you on this

16  one.

17  Q    Let me just ask you a couple of questions.

18  A    Sure.

19  Q    So the -- we know what TPR means.  That means --

20  A    Yeah.

21  Q    -- your parental rights have been terminated.

22  A    Yes, sir.

23  Q    Those parents are no longer your parents --

24  A    Right, I know that very well.

25  Q    -- in the eyes of the law.

Specia - Cross / By Mr. Yetter                    49

1        The next column says "Goal Adoption, No Adoption

2   Placement" and I wanted to see if you agree with me on this.

3        Commissioner --

4   A    Well, okay --

5   Q    -- for a foster child in the custody of the State of Texas

6   if the goal is adoption the only way you can get adopted is if

7   your biological parents' rights are terminated, true?

8   A    I don't -- that's true --

9   Q    Okay.  Just take --

10  A    -- but I don't think everybody in there --

11  Q    -- stay with me.  I just want to take it a step at a time.

12  A    Sure, sure.

13  Q    So if you're going to get adopted it's going to be by

14  somebody other than your biological parents because they don't

15  need to adopt you, they're your parents, right?

16  A    That's correct.

17  Q    Okay.  So if you have a column of children that adds up to

18  7,244 in our state and their goal is adoption they've either

19  got to have their rights terminated, TPR, true?

20  A    Yes.

21  Q    Or they're on track to get the parental rights terminated.

22  Otherwise, the goal would not be adoption, true?

23  A    Correct, I think.

24  Q    All right.  Let's move to another topic.

25  A    But that means that there's children -- those are not all

1    PMC kids.  They are PMC kids that are in the process and

2    there's also dual tracks.  You can have a goal of adoption, a

3    goal of reunification.  You have multiple goals when you have

4    children in that category.

5    Q    I get it.  Let's just do -- that's just PMC children.

6    A    The last was not -- I don't think the last one was just

7    PMC children.

8    Q    Okay.  This whole chart is PMC children.

9    A    Okay, then, okay, good.

10   Q    Okay.  So you have 7,244 PMC children whose goal is

11   adoption and they're not in an adoption placement according to

12   the state's chart.

13   A    Okay.

14   Q    As of August 2014, right?

15   A    Yes.

16   Q    Okay.  I want to go to another issue, caseloads.

17           Now caseloads is not a new issue in the State of

18   Texas, is it?

19   A    Tell me what you're talking about.

20   Q    There have been -- the Court has heard testimony of a

21   number of studies and internal reviews and outside consultants

22   that have come in and said, "Here are problems in the foster

23   care system in the State of Texas.  Here's what we think you

24   should do to fix them."  You know about at least some of these.

25   A    I probably -- I probably was involved in most of them.

Specia - Cross / By Mr. Yetter                    51

1   Q    You probably were involved in most of them, okay.

2         There have been countless studies and countless is

3   hyperbolic I know but there have been lots of studies in which

4   the state either internally or some consultant told the state

5   caseloads are too high, you need to lower them, right?

6   A    That's probably true.

7   Q    I want to just focus on one that we haven't spent any time

8   -- it's in evidence but we haven't really spent a lot of time.

9   These studies again and again and again are making the same

10  recommendations at least in part.

11  A    Show me the study.  Show me the recommendation.

12  Q    Sure.  Plaintiffs' 1964, this is four years ago.  Let's

13  just blow this up.

14        You know what the Adoption Review Committee isn't --

15  you know what that is, don't you?

16  A    I've seen that report.

17  Q    You've seen this report.  This is -- this is kind of

18  organized by the state.  It's not specifically DFPS but it's a

19  state agency or a state organization.

20  A    I think it was appointed out of the governor's office.  I

21  think all those -- the way these kind of things normally --

22  they set up a committee by statute and then various -- those

23  people all get like an appointee.

24        Do you know who the appointees were on this one?

25  Q    We'll get to that.

1         So this isn't an outside consultant.  It's not

2   actually an internal DFPS.  This is another state agency or

3   committee that is commenting on the DFPS in December 2010,

4   right?

5   A    It's a -- generally it's a public committee appointed by

6   somebody or a number of people.

7   Q    Let's go -- fair enough.  Let's go to page two.  This is

8   the chairman's letter and let's blow up -- if you can see the

9   very bottom signature and see if you know this person, Matt --

10  A    I do not know that person.

11  Q    -- Matt Kouri's (phonetic) the chairman on behalf of the

12  Texas Adoption Review Committee.

13        Let's blow up the last paragraph.  Well, let's go up

14  to the top paragraph first.

15        In 2009, the legislature and the governor asked the

16  committee to take a hard look at the Texas foster care system

17  and uncover barriers to adoption that existed for Texas' most

18  vulnerable children.

19  A    Yes.

20  Q    Okay.  Now let's go the last paragraph.  There's stuff in-

21  between but this is in evidence.

22        "Our recommendations include several bold steps."  It

23  goes on to say that they think they'll really help.

24        Second sentence, "Many of our recommendations are

25  sadly ones that have been made in prior years including a

Specia - Cross / By Mr. Yetter                           53

1   report by the similarly charged 1996 governor's committee to

2   promote adoption."

3            Do you see that?

4   A    Yes.

5   Q    Let me look at just a couple of the recommendations here.

6   A    Can I see who was on the committee?

7   Q    Let me see if that's in this document.  Yes, page four.

8   Okay.  Take a quick look if you wouldn't mind, Commissioner --

9   A    Sure.

10  Q    -- because I'd like to move on into the document.

11  A    I --

12  Q    Got it?

13  A    -- think I may have met Ann Bradford but I don't know any

14  of those people.

15  Q    Fair enough.  Let's blow up the next -- that one right

16  there.

17           Does any of those names look familiar to you?

18  A    Gail Gonzalez.

19  Q    There you go.  She's testified in this case?

20  A    Yes, she has.

21  Q    Okay.  Now let's go to just a couple of the -- there's

22  lots of recommendations.  Page 13, Priority Action Plan, just

23  that first top and that the title on the first paragraph.

24           "There's a detailed action plan which will be crucial

25  to accomplishing the recommendations of the committee."

1           Do you see that?

2    A    Yes.

3    Q    Okay.  Let's look at the first action plan, the first

4    action in the plan.  "The system.  Internal and external

5    obstacles that impede permanency or adoption, CPS

6    conservatorship caseloads."

7           So those are the primary conservatorship caseworkers,

8    right?

9    A    (No audible response)

10   Q    Conservatorship caseloads, you know what we're talking

11   about?

12   A    Yes, yeah.

13   Q    So it's apples/apples, is reportedly 30 to 35 cases per

14   worker in fiscal year 2009.  See that?

15   A    Yes.

16   Q    Okay.  Now we've heard your colleague, Ms. Burstain, she

17   gave us some figures yesterday and the numbers she figured out

18   for fiscal year 2014 and it was 31.1 caseload for CVS.

19          Do you need me to put that up to refresh your memory?

20   A    That's where she's looking in stages of service and not

21   children?

22   Q    Okay.  This is stages.  This is -- this is what she calls

23   caseload.  This is what they call caseload.

24   A    Okay.

25   Q    Okay.  So apples to apples, fiscal year 2009 is almost

1  exactly what fiscal year 2014, today is, and the recommended

2  change for improvement, "Reduce caseload to 15 to 17 [sic]

3  worker in compliance with national standard."  That was the

4  recommendation four years ago by the Governor's Committee on

5  Adoption Review, true?

6  A    I'm not sure it was the governor's committee.  I think it

7  was probably a legislatively created -- I don't know.  I don't

8  know what this was.

9  Q    Fair enough, but that was the recommendation four years

10  ago?

11  A    That was the recommendation and I don't know who -- I

12  don't know where this report went to but go ahead.

13  Q    Okay.  Well, we know it hasn't been followed up on, true?

14  You haven't done that.  You haven't adopted any sort of

15  national standards for caseloads?

16  A    That's correct.

17  Q    Now you also know that high caseloads -- Commissioner,

18  you'd agree that high caseloads have a number of not so good

19  consequences, don't they?

20  A    They can.

21  Q    And one of the things you focused on or at least you are

22  focused on is that they put a burden on the caseworker, true?

23  A high caseload does, it's logical.

24  A    A high workload puts --

25  Q    High workload --

1   A    There's a difference between workload and caseload.   A

2   high workload puts a burden on the worker.

3   Q    Okay.  So you'd agree, wouldn't you, as a basic matter

4   that a high caseload usually means a high workload.  You've got

5   lots of cases to take care of.  You're going to have a lot of

6   work to do, true?

7   A    It absolutely depends on what state of service it is,

8   where the kids are, what kind of work needs to be done, whether

9   they're placed in region or out of region.

10  Q    One of the primary reasons why conservatorship caseworkers

11  quit is high caseloads and high workloads, true?

12  A    It is part of like the top three is what is stated on our

13  exit surveys.

14  Q    Sure.  This same report of the adoption committee, let's

15  go to page 30, and let's go -- let's just blow up the reason --

16  the title.  There you go, "Reasons for Quitting," I'm sorry.

17  Reasons for Quitting and the number one reason from the

18  legislature's adoption review committee that they put in their

19  report was overworked.

20  A    I have absolutely no idea what data they were relying on

21  to put that chart together.

22  Q    You doubt the reliability of the Adoption Review

23  Committee's report?

24  A    Actually, I know something about how these are put

25  together.  I don't think this was a staff committee.  It was

1    just put together, a group of people, and I'm not sure what

2    they had access to.  So I don't know where they got that data.

3    I'd want to know where the data came from.

4    Q    One of the reports that makes almost exactly the same

5    recommendation is the Apple -- the Texas Appleseed Report that

6    came out the same year, 2010, right?

7    A    I'd like to see exactly what the recommendation was.

8    Q    But you know about --

9    A    And I know I was involved -- I was involved in it.  I know

10   that.

11   Q    Sure, and so you're going to be able to confirm for the

12   Court that the Texas Appleseed report was based on careful

13   research and review, wouldn't you agree?

14   A    Appleseed generally does a good job.

15   Q    And you had -- you had an input.  I think at the beginning

16   it said you had -- you vetted the recommendations and you had

17   input into the process.

18   A    That's -- I did not vet the recommendations.  I was on --

19   kind of helping them set up the study.  They're a great

20   organization.  I have no complaints with Appleseed.  They gave

21   me an award last month.

22   Q    Sure, sure, they did.

23   A    But they -- I don't know -- I mean I didn't vet -- I

24   didn't vet that.

25   Q    So -- but you do know -- you can confirm as commissioner

1    that the Appleseed report went to the department, went to the

2    DFPS?

3    A    Absolutely.

4              **MR. YETTER:**  And so, your Honor, we're going to -- we

5    offer again, we're going to reoffer the Appleseed report.  This

6    is Plaintiffs' 1988.

7              One, it's not hearsay at all because it's at a

8    minimum it is notice --

9              **THE COURT:**    Wait, 19 --

10             **MR. YETTER:** 1988.

11             **THE COURT:**  Okay.

12             **MR. YETTER:**  It is notice to the department of

13   recommendations by a respected group in the state about how to

14   fix the foster care system in the -- in our state.

15             **THE COURT:**  Okay.

16             **MR. YETTER:**  Number one --

17             **THE COURT:**  Objection?

18             **MR. ALBRIGHT:**  No objections, your Honor.

19             **THE COURT:**  One, nine, eight, eight is admitted.

20        **(Plaintiffs' Exhibit 1988 was received in evidence)**

21             **MR. YETTER:**  Okay.  I was about ready to go on and

22   on.  I may lose you.

23        **(Laughter)**

24   Q    Okay.  So --

25             **THE COURT:**  I've actually had lawyers though that,

1   you know, when I rule in their favor they can't stop.

2        **(Laughter)**

3   Q    Okay.  So you would agree, would you not, Commissioner,

4   that when -- there's a difference between a child in temporary

5   managing conservatorship and permanent managing

6   conservatorship?

7   A    Yeah.  This is a very important report but it really

8   focuses on the role of courts.

9   Q    You would agree there's a difference --

10  A    Okay.

11  Q    -- between the TMC --

12           **THE COURT:**  Okay, listen.  One more time, this is a

13  question and answer business.

14           **THE WITNESS:**  I'm sorry.  I'm sorry.  I understand

15  that, ma'am.

16           **THE COURT:**  Unless it's you and me.

17           **THE WITNESS:**  Yes, Judge.  Yes, Judge.  I understand

18  that completely.

19           **THE COURT:**  Okay.

20  **BY MR. YETTER:**

21  Q    You'll agree that there's a difference between a child

22  that's in TMC and a child that's in PMC, isn't there?

23  A    Yes, sir.

24  Q    And we've talked -- we've heard a lot of the issues here

25  but one of them is the court hearings or the updates for the

1   TMC child are more frequent than for the PMC child, right?

2   A    They can be.

3   Q    The service plan for TMC is reviewed and modified as

4   needed four times in that first year and then for PMC children

5   it's only twice a year at least by policy, true?

6   A    By policy but it's up to the Court how often those

7   children come back into court.

8   Q    Now one of the things that people that have studied the

9   Texas system, and PMC is a designation that's totally unique to

10  Texas, isn't it?

11          **THE COURT:**  Lights, please.

12  Q    PMC is a designation that is totally unique to Texas.  You

13  haven't seen another state that labels its children in the

14  foster care system as part of the permanent managing

15  conservatorship of the state, right?

16  A    I -- I think that's correct.

17  Q    Okay.  Let's go to page 17.

18          Appleseed looked at this and Appleseed made an

19  observation at the very top paragraph, the carryover paragraph,

20  about what happens to children when they go into TMC and what

21  Appleseed said is the entire tenor of the case changes once

22  children enter PMC.

23          Did you hear -- do you see that, Commissioner?

24  A    Yes.

25  Q    Do you remember hearing the phrase "forgotten children"?

Specia - Cross / By Mr. Yetter                    61

1   A    Yes.

2   Q    I didn't make that up, that was Comptroller Carole Keeton

3   Strayhorn that called her report "The Forgotten Children,"

4   right?  That was ten years ago, wasn't it, Commissioner?

5   A    Her report says what it says.

6   Q    It was ten years ago, wasn't it?

7   A    I think so.

8   Q    And it was titled "Forgotten Children," wasn't it?

9   A    I think so.

10  Q    The entire tenor of the case changes once children enter

11  PMC.  It is as if quote the clock stops ticking and quote the

12  pressure is off since the child is no longer in quote temporary

13  custody of the state because the most pressing legal issue,

14  whether a child will be returned home, has been determined

15  there is a sense that the child has achieved some quote

16  permanency.

17          Do you remember that phrase in the Appleseed report

18  back in 2010?

19  A    I don't remember it.  I can read it.

20  Q    Even the name of the child's status implies stability.

21  The child is now in quote permanent managing conservatorship.

22  Nothing is farther from reality.

23          Now the Appleseed -- did you see where I read?

24  A    Yes.

25  Q    Okay.  The Appleseed report goes on to basically say that

1   even though all the pressure's off and the clock stops ticking

2   these children are not in a permanent placement.  They move

3   from place to place to place.

4   A    There are parts of that that I don't agree with.

5   Q    Now --

6           **THE COURT:**  Okay, but in reality the question was you

7   do agree that the children are not in a permanent placement?

8           **THE WITNESS:**  Yes.  In PMC --

9           **THE COURT:**  Except the label.

10          **THE WITNESS:**  PMC children are in the permanent

11  managing conservatorship of the state which is the same as

12  managing conservatorship of the state.

13          **THE COURT:**  So they're not in a permanent placement?

14          **THE WITNESS:**  They could be.

15  Q    But they -- but the vast overwhelming number of children

16  in PMC do not stay in one place?

17  A    Yes.

18  Q    You know the statistics, Commissioner.  They are moved

19  from place, to place, to place, aren't they?

20  A    The longer a child stays in care the more they move.

21  Q    And Commissioner, the longer a child stays in the custody

22  of the State of Texas the harder it is for that child to be --

23  to be placed permanently; isn't that true?

24  A    Permanency is incredibly important and, yes, I need -- we

25  need to get kids -- kids don't need to age out.

Specia - Cross / By Mr. Yetter                    63

1  Q    The answer's yes.  The longer children stay in the custody

2  of the state the harder it is for them to achieve a permanent

3  home, true?

4  A    That can be true.

5  Q    Well, that is exactly what you said.  It's true or not

6  true, in your opinion?

7  A    I mean there are different cases.

8          THE COURT:  He's talking about typicality.

9          THE WITNESS:  Typicality.  As a general statement, I

10 agree with that.

11 Q    All right.  Now caseloads is one of the things that

12 Appleseed talked about, page 99.

13         MR. ALBRIGHT:  What exhibit are we in?

14         MR. YETTER:  Exhibit 1988, 2010 Appleseed report.

15 Q    Now here is -- let's blow up the first two paragraphs

16 under CVS caseload.  So apples to apples.  We're talking about

17 conservatorship workers, are we not?

18 A    Yes, I think so.

19 Q    Okay.  CVS, that's conservatorship?

20 A    Sure.

21 Q    Okay.  So this is now talking about June 30, 2010.  So

22 that's almost the end of fiscal year 2010, right?

23 A    Yes, September would be the end of the fiscal year I would

24 think.

25 Q    August 31 would be the end of the fiscal year?

Specia - Cross / By Mr. Yetter                    64

1   A    August 31, correct.

2   Q    So it's just two months shy of the end of the fiscal year.

3   CPS reports that the daily caseload average for conservatorship

4   caseworkers throughout the state was 29 children.

5        So it had gone down just a bit from fiscal year 2009,

6   right, based on what we just saw a minute ago, true?

7   A    Yes.

8   Q    Okay.  However -- right in the middle -- however, the

9   recommended caseload per a conservatorship worker is no more

10  than 15 to 16 children, true?

11  A    I want to know what that 247 says, where it comes from.

12  Q    Two forty-seven at the bottom.

13  A    The footnote.

14  Q    Let's blow -- can you -- there you go.  Can we see -- can

15  you read that?

16        "Two forty-seven, Child Welfare League of America

17  Recommended Caseload Standards" and it gives their website.

18  A    I understand.  So it's the Child Welfare League of America

19  recommended caseload standards.

20  Q    And that's what Texas Appleseed said were the -- were the

21  recommended caseload, true?

22  A    That's what that says.

23  Q    Now Texas Appleseed, there again, you'd agree with us,

24  they're a pretty darn respected organization, aren't they?

25  A    They're a very good organization.

EXCEPTIONAL REPORTING SERVICES, INC

Specia - Cross / By Mr. Yetter                          65

1   Q    They have nothing but the best interests of the children

2   at heart, right?   There's no -- right, true?

3   A    Absolutely.

4   Q    They have no secret agenda, motive.   They're a nonprofit,

5   true?

6   A    They're an advocacy organization.   They're a great

7   advocacy organization.

8   Q    They're advocating for children that cannot protect

9   themselves, right?

10  A    They're a great organization.

11  Q    The next paragraph -- the first sentence of the next

12  paragraph.

13       "Almost every stakeholder in the foster care system

14  interviewed for this study expressed the belief that

15  conservatorship case -- conservatorship workers are overworked

16  to the point of not being able to do their jobs properly."

17       Then they have a footnote which simply says, "Indeed

18  the only people who disagreed were caseworkers who thought

19  their current caseloads in the thirties were much more

20  manageable than in years past when they had forty or fifty

21  cases."

22  A    That's what it says including the footnote.

23  Q    Now Commissioner, since you sat through the whole trial,

24  did you hear any witness on the stand that wasn't a DFPS

25  executive say anything contrary to what the sentence says there

Specia - Cross / By Mr. Yetter                    66

 1  today?

 2  A     The witnesses said what they said.  I don't remember.  I

 3  don't -- I can't go back and remember all of that.

 4  Q     Every witness that testified --

 5            **THE COURT:**  All those other people you have working

 6  for you could.

 7            **THE WITNESS:**  They probably could.

 8        **(Laughter)**

 9  **BY MR. YETTER:**

10  Q    Now the -- one of the -- there is -- this isn't the only

11  Texas Appleseed Report, is it?  This is 2010.

12  A     Show me another report.  I mean I know about this report.

13  I don't --

14  Q     Sure.  Plaintiffs' Exhibit 1966, and let me just show you

15  the cover to see if you can validate.  It's not in evidence

16  yet, your Honor, and I believe there -- at least there was an

17  objection.  Okay.  Just blow up the inside piece, the title and

18  the inside piece.

19  A     It's a 2007 report.

20  Q     It's September 2007.

21            Can you pull the bottom down just a smidgeon just so

22  we can get the -- there you go, there you go.  Okay.

23            September 2007, Texas Appleseed, Texas Foster Care.

24            Do you recall --

25  A     This one I don't recall.  I just got off the bench and I

Specia - Cross / By Mr. Yetter                    67

1   was trying to build my law practice so 2007 I don't recall that

2   one.

3   Q    You have no doubt that the Texas Appleseed gave this

4   report to the department, do you?

5   A    I wouldn't doubt -- I don't know but I wouldn't doubt that

6   they did.

7           **MR. YETTER:**  Your Honor, we offer again, if nothing

8   else, as notice to the department in September 2007, we offer

9   Plaintiffs' 1966.

10          **MR. ALBRIGHT:**  On that conditional offer, no

11  objection.

12          **THE COURT:**  Admitted.

13      **(Plaintiffs' Exhibit 1966 was received in evidence)**

14          **MR. YETTER:**  Let's go to page six and this -- that

15  first paragraph.

16  Q    You read Comptroller Carole Keeton Strayhorn's report,

17  Forgotten Children, did you not, Commissioner?

18  A    I'm sure I read parts of it.

19  Q    And it reported among other things and that was in 2004;

20  that was 10 years ago, wasn't it?

21  A    I think so.

22          Can you give me the paragraph before that?

23  Q    Sure.  Let's put page five and six up if you can, 2005

24  Reform Efforts.

25  A    Okay.

Specia - Cross / By Mr. Yetter                           68

1    Q    "In April 2004 after a year-long investigation the

2    Comptroller Carol Keeton-Strayhorn released Forgotten

3    Children."

4             Does that give you the context that you wanted?

5    A    That's correct.

6    Q    Okay.

7    A    I mean that's what it says and I have no reason to

8    disagree with that.

9    Q    Okay.  Let's go back to page six and the first paragraph.

10   A    And if you just give me the top of page six too.  There's

11   two lines up there.

12   Q    We just showed you that just a minute -- okay, there you

13   go.

14   A    Oh, I thought you showed me the other part.

15   Q    There you go.  Now Forgotten Children reported among other

16   things -- this is ten years ago - that DFPS:  "Frequently moved

17   children from one caregiver to another."

18             Do you see that, Commissioner?

19   A    Yes.

20   Q    You heard testimony in this trial about DFPS frequently

21   moving children from one caregiver to another, did you not?

22   A    Yes.

23   Q    That the department had heavy caseloads and high

24   caseworker turnover.

25             Do you see that?

1   A     Yes.

2   Q     And you heard testimony in this case that in 2014 heavy

3   caseloads and high caseworker turnover -- you heard testimony

4   about that, didn't you?

5   A     I did.  In certain parts of the state we have heavy

6   caseloads and we have high worker turnover; that also varies in

7   certain parts of the state.

8   Q     Okay.  Next, let's jump down a little bit just to save

9   time.

10           "Potentially dangerous children such as sexual

11   offenders or those with violent criminal records -- and those

12   with violent criminal records -- with others."

13           You've heard situations including the children that

14   are the named plaintiffs here that have been mixed with

15   children with documented sexual activity in their past.

16   A     I've heard the specific testimony in this case.

17   Q     Okay.  Now let's go to page 11.  We all agree -- at the

18   bottom, the bottom paragraph.

19           "Increasing caseloads and inadequate staffing.  We

20   all agree that a well-trained, experienced, and adequately

21   staffed workforce is crucial."  True?

22   A     Yes.

23   Q     "The primary conservatorship caseworker is the foster

24   child's gateway to critical services," isn't it?  Isn't that

25   person?

Specia - Cross / By Mr. Yetter                    70

1   A     The primary caseworker has the responsibility with the

2   Court and there's a bunch of other supports that support the

3   primary worker.

4   Q     See if you agree with that --

5   A     And together they provide the work for the child.

6   Q     I want to see if you agree with the last sentence and this

7   is 2007.

8            "When those caseworkers are inadequately trained, or

9   inexperienced, or overburdened, the system breaks down and

10  children in the system are harmed."   True?

11  A     I don't agree with that.

12  Q     You don't agree with that.   Okay.   Page 22 -- actually,

13  let's go to page 29.   The second paragraph from the bottom.

14           One -- this is -- one of the comptroller's --

15  recommendations in the comptroller's report ten years ago, the

16  Appleseed report says -- there's a number of recommendations.

17  I want to look in the middle, "Keeping sexually abused children

18  separate from other children."

19           You know that it's widely accepted in the child

20  welfare field that sexually abused children have a propensity

21  to act out on other children, right?

22  A     That can happen.

23           **THE COURT:**  Well, isn't that why they accept it as a

24  fact?

25  A     Sexually abused children can act out on other children.

Specia - Cross / By Mr. Yetter                    71

1          **THE COURT:**  Okay.

2    **BY MR. YETTER:**

3    Q    Okay.  That's a risk, isn't it?  It's an obvious known

4    risk, true?

5    A    If we know the child sexually abused that is a risk.

6    Q    Okay.  Now -- and so one of the things -- ten years ago

7    the comptroller said, "The department needs to track and report

8    the number of reports it receives concerning child on child

9    physical and sexual abuse by facility."

10          Do you see that?

11   A    Yes.

12   Q    In other words, she's not just saying label anybody a

13   perpetrator, is she?  That's not what that recommendation says.

14   A    I can see what it says.

15   Q    Okay.  It says track it, including by facility.  So if you

16   happen to know, for example, that there is an RTC in a little

17   town in the panhandle called Leveland that has a history of

18   physical abuse on children, between the children, that you

19   track it so you know there's a problem in that facility, right?

20   A    That's what that says.

21   Q    Okay.  That's a good thing, isn't it?

22   A    I want to look at that issue and I want to see how it'll

23   work and how do we protect children.

24   Q    Ten years later in our state, you know, Commissioner, that

25   your department does not track the number of reports it

1    receives concerning child on child physical and sexual abuse by

2    facility, true?

3    A    It doesn't -- it doesn't do it that way, correct.

4    Q    Now there are -- your department does have caps on the

5    number of child caseloads, don't you?

6    A    I don't know what you're talking about.

7    Q    In certain instances your department has caps on how many

8    children a single caregiver can -- is entitled -- is allowed to

9    take care of, right?

10   A    I believe you're correct but -- I guess -- please say that

11   one more time just so that I understand what you're saying.

12   Q    Sure.  Okay.  Let's just start at a simple level.

13        The department has rules that we have heard are

14   inflexible that for a family foster home there's a cap of six

15   children, true?

16   A    Yes, yes, that's true.

17   Q    So that's because -- it's for the safety and well-being of

18   the children, isn't it?

19   A    Yes.

20   Q    Okay.

21   A    To create a more home like environment and --

22   Q    Okay, well --

23   A    -- there's a -- our basic care foster home goes to six

24   children.

25   Q    And it's an inflexible cap we have been told more than

Specia - Cross / By Mr. Yetter                    73

1  once?

2  A    It is an inflexible cap.

3  Q    Okay.  So that's a child caseload for lack of a better

4  word for foster parents in a family foster home, true, and it's

5  capped at six, right?

6  A    I wouldn't call it a child caseload but our basic foster

7  care homes can only have six children --

8  Q    Okay.

9  A    -- including your own children and adopted children.

10 Q    So actually what the state is saying is for the safety of

11 the children those foster parents cannot be responsible for

12 more than six children in their household caps?

13 A    They cannot be responsible for more than six children in

14 their household total.

15 Q    Capped, okay.  Now if they're infants --

16 A    And I think if the children are younger there's even a

17 tighter cap.

18 Q    You anticipated where I was at.

19        If there are babies then it's capped at two babies to

20 one caregiver, true?

21 A    I believe that's true.

22 Q    Okay.  And if they have medical needs of a certain type

23 it's capped at four children with special medical needs to one

24 caregiver, true?

25 A    I think that's the current status that I –

1  Q    Caps of children that a caregiver can take care of are not

2  unusual in our state, are they?

3  A    The minimum standards say what the minimum standards --

4  which I agree with what you just said.

5  Q    And those are good for the children, aren't they?

6  A    I think they provide protection for children.

7  Q    Okay.  Next to the actual caregiver of a child, the foster

8  parent, next to that caregiver one of the most important adults

9  in foster children's lives to take care of their safety,

10 permanency, and well-being is the conservatorship caseworker;

11 isn't that true?

12 A    It's one of the most important workers in their life.

13 Q    And if you have particularly effective and efficient

14 foster parents they don't get more than six children, do they?

15 A    Unless they become a foster group home.

16 Q    Sure, okay.  That's a different category and then you

17 have --

18 A    It is but that's what --

19 Q    -- slightly different issues.

20 A    Yeah.

21 Q    And somebody could say, "Well, that's inefficient.  I may

22 find foster family parents who could actually take seven or

23 eight and do a great job because they're super efficient," but

24 that's not what the state does.  It puts a cap, right?

25 A    The regulation say exactly what they say.

Specia - Cross / By Mr. Yetter                                   75

1    Q    Okay.

2    A    But I don't call them a cap and the regulations don't

3    either.

4    Q    Now a caseworker -- a caseworker -- for a conservatorship

5    caseworker that gets a cap on the number of children they're

6    responsible for, that's not bad for the caseworker, is it?

7    A    It might be bad for the supervisor or for the kids in

8    care.  I don't think caps are a good thing.  I told you that

9    once before.

10   Q    I know what you said.  I know you believe that, that's the

11   -- that's the department's policy.  It is not going to do caps,

12   right?

13   A    No.

14   Q    It's not going to do national standards, right?

15   A    We're going to --

16   Q    True?

17   A    We are going to deal with the workloads --

18   Q    True?  You're not doing national standards?

19   A    It's -- we do not have regulations -

20          **MR. ALBRIGHT:**  Objection, your Honor.

21   A    -- that enforce --

22          **MR. ALBRIGHT:**  No, excuse me. I want to object to

23   that question unless he defines what the -- what national

24   standards he's talking about.

25          **MR. YETTER:**  Fair enough.

**EXCEPTIONAL REPORTING SERVICES, INC**

Specia - Cross / By Mr. Yetter                    76

1              **MR. ALBRIGHT:**  Objection, vague and ambiguous.

2              **MR. YETTER:**  Fair enough.

3              **THE COURT:**  I think the CWLA or whatever that is --

4     maybe I've got the -- or the IBW or something.

5              **MR. ALBRIGHT:**  CWLA.

6              **MR. YETTER:**  CWLA.

7              **THE COURT:**  They said 15 to 17.

8              **MR. YETTER:**  They did.  Caseloads, we're talking

9     caseloads.  The State of Texas is just where they refuse to

10    adopt national standard caseloads for conservatorship workers,

11    true?

12             **MR. ALBRIGHT:**  Same objection, your Honor.  It's a

13    vague and ambiguous question in all of the issues of the

14    case --

15             **THE COURT:**  Overruled.

16             **MR. ALBRIGHT:**  -- for him to say national standards.

17             **THE COURT:**  Okay, overruled.

18             **THE WITNESS:**  If you're talking about CWLA standards,

19    my understanding is they're under revision right now and we

20    have not --

21    **BY MR. YETTER:**

22    Q    Yes or no, Commissioner?  You didn't adopt CWLA national

23    standards for caseloads?

24    A    We have not.

25    Q    Are you going to adopt any national standards for

1    caseloads?

2    A    We have not to this point.

3    Q    Are you going to adopt any caseload standards?

4    A    I'm going to work on workloads.  I'm going do a work study

5    and figure out how we make sure the workload for workers --

6    Q    Commissioner --

7    A    -- is right.

8    Q    -- work with me.

9    A    Well, don't --

10   Q    Are you going to adopt any caseload standards?

11   A    Okay.  I don't like you yelling at me, that's one thing I

12   don't like.

13   Q    I apologize for that.  Are you going to adopt any caseload

14   standards?

15   A    I don't know what I'm going to do.  I do not have them

16   today.

17   Q    So today, Commissioner, we are just to trust you to do the

18   right thing?  Is that fair?

19   A    You know --

20   Q    With no disrespect, Commissioner, are we just supposed to

21   trust you that you'll figure out the right thing to do on

22   caseloads?

23   A    No, absolutely not.

24   Q    Thank you.

25   A    You need to trust the Sunset Commission.  You need to

1   trust the Stephens Group.  You need to trust my legislative

2   oversight to make me do what is best for the children in the

3   State of Texas.

4   Q    Somebody has to make the department do what's best for the

5   children --

6   A    They do not have --

7   Q    -- on caseload standards.

8   A    That's not true.

9   Q    Okay.

10  A    That is absolutely not true.

11  Q    Okay.  The Casey Family Home referred to you said the

12  single most -- the best thing you could do to fit your system

13  is have a well trained staff that has workloads consistent with

14  national standards.  You know that, don't you?

15          THE COURT:  Did they say that?

16          MR. YETTER:  In 2014.

17          THE WITNESS:  Show me that but I -- I need a well

18  trained staff.

19  Q    That -- just --

20  A     I don't know whether they said anything about caseload

21  standards.

22          THE COURT:  Okay.  Just -- I just wonder if you just

23  -- if you don't know the answer just say you don't know.

24          THE WITNESS: I don't know that.

25          MR. YETTER:  Hold on.

1        **(Pause)**

2   Q    Plaintiffs' 1880, page 17, Casey Family Programs, April

3   20, '14, page 17, Additional Data Summary, Work Force

4   Information.

5             "According to child welfare expert Jess" – do you

6   remember reading this now, Commissioner?

7   A    Yes.

8   Q    Okay.  The quote "The single most important improvement

9   any system can make is to ensure that it has a well trained

10  workforce."

11            You agree with that, don't you?

12  A    I agree with that.

13  Q    "With workloads that meet national standards."

14            Do you agree with that?

15  A    No, I don't agree with that.

16  Q    Okay.  "Without a solid and professional workforce, the

17  child protection system will never improve; that is an absolute

18  rock solid guarantee."

19  A    I absolutely need a solid professional workforce.

20  Q    So -- so here we have Texas Appleseed saying adopt

21  national standards on caseloads.  You have the Casey Family

22  Program saying adopt national standards on workloads.  True?

23  A    I'm not sure.  This is a footnote or something in this

24  report.  This is not a recommendation from them.

25  Q    This is the body of the report.  This is page 17 of the

1   report.

2             THE COURT:  It's a bullet point.  I think they just

3   blew it up.

4             THE WITNESS:  Yeah.

5             THE COURT:  You want to hold it up?

6             THE WITNESS:  It's additional data summary workforce

7   information.  I don't know if that's in the body of the report

8   or in a footnote, I just don't know.

9             MR. YETTER:  It's on page 16 of the report.

10             THE COURT:  Just hold it up, point it out.

11             THE WITNESS:  If you could just --

12             MR. YETTER:  Right there.

13             THE COURT:  That's the body of the report.

14             THE WITNESS:  Okay, okay.

15             THE COURT:  He's just for the -- for the record, he

16   just held up -- Mr. Yetter has held up the page with that

17   paragraph in the middle of the page in the body, not in a

18   footnote.

19             THE WITNESS: Okay.

20             MR. YETTER:  Okay.  A couple of more things before we

21   finish.

22   Q    You agree that high caseloads could -- I'm saying "could"

23   because that's what you said -- have an effect on children,

24   right?

25   A    Mr. Yetter, I think I said high workloads rather than high

1   caseloads.

2   Q    Fair enough.  You agree that conservatorship caseworkers

3   with high workloads could have a bad effect on children, true?

4   A    I think I said that.

5   Q    You also said that what you really believe is that the

6   consequence is more to the worker because the workers work more

7   overtime, right?

8   A    And where did I say that?

9   Q    In your deposition, page 152, lines 1 through 20.

10  A    May I see it, please?

11  Q    Certainly.  Page 152, lines 1 through 20.  So, okay, well,

12  it's really actually not the whole part.  You can read the

13  whole thing but I'm actually looking more at lines 15 through

14  20 -- through 21.

15          Do you think their high caseloads --

16  A    Please let me read it and then I'll answer your question.

17  Q    Sure, yes.

18       **(Pause)**

19  A    Yeah, I said that.

20  Q    Okay.

21  A    I said --

22  Q    Two -- two things.  Let me just verify them.  High

23  caseloads can have a -- could have a consequence, a bad

24  consequence to children, true?

25  A    I said it could.

1  Q    Okay.  Second, but you really believe that the bad

2  consequences is more to the caseworker because the workers work

3  more overtime, true?

4  A    You know that is true.

5  Q    And then --

6  A    I think -- I think workers are incredible.  I think they

7  will sacrifice their family before they -- my workers are

8  pretty incredible.

9  Q    No one in this trial is criticizing the good faith of your

10 conservatorship caseworkers.

11 A    And I appreciate that and I have a lot of faith in my

12 workers.

13 Q    It is also true, at least you agree, Commissioner, that

14 lower workloads will help you retain your good caseworkers,

15 conservatorship caseworkers, true?

16 A    The appropriate workload spread out among the workers in a

17 unit and in a PD's unit will help me keep workers.  They need

18 to feel like they're being treated fairly.  If they have two

19 really hard cases; that's all they need.  If they have twenty

20 really easy cases they can even help the other person.  It's

21 how -- they have to feel that they're treated fairly.

22 Q    What really concerns you -- last question, your Honor, or

23 last brief topic -- what really concerns you are children that

24 are in the system of the -- of the foster care system of our

25 state for more than two years, right?

Specia - Cross / By Mr. Yetter                              83

1   A    There's a lot of things that concern me.  I think the

2   children that are not in the permanent adoptive home and have

3   been in the state's custody for two years, that's something we

4   need to be paying some attention to.

5   Q    Because you're concerned about children who have been in

6   care more than two years because it becomes harder to achieve

7   permanency the longer a child is in foster care, true?

8   A    Yes.

9   Q    Okay.  One last exhibit, Plaintiffs' 567.

10          Did you realize, Commissioner, for these children

11  that have been in the state's custody for more than two years

12  that over 56 percent of the PMC children fall in that category?

13  Did you realize that?

14  A    I've probably seen that statistic.

15  Q    Plaintiffs' 567.  Okay.  Here is -- here is -- this comes

16  from the state, it's as of this summer, July 7th, 2014.  There

17  is a column -- this is all PMC.  See at the bottom you see "PMC

18  Total" on the far left hand -- there you go, let's put that in

19  highlight -- and then you see "Time in Care" and it goes --

20  whether it's one year, one and a half years, two years, and it

21  goes all the way down.

22          Do you see that, Commissioner?

23  A    No, I'm having trouble seeing it, I apologize.

24  Q    Okay.  The far left column.  Let's highlight the time in

25  care, top of the time in care, just that -- there you go.

1    Okay.  That shows the years.

2    A    Yes.  That's average number of placements for children in

3    conservatorship, yeah, got it.

4    Q    Okay.  So we're dividing children by the years in the

5    custody and the number of placements that they have but I'm

6    looking specifically about those poor children that have been

7    in custody for than two years and I want to highlight every --

8    A    Okay.  Where -- that I don't -- that I don't know where

9    you are.

10   Q    Everything from two years down.  Do you see the total of

11   the children just from two years down, 2641 down?

12   A    Okay.

13   Q    No, no, 2641, there you go.

14   A    Yeah.

15   Q    Okay.  That group of children have been in custody for two

16   years or more.  That's the group that you have told us that

17   really concern you because it's harder to achieve permanency

18   the longer a child is in foster care, right?

19   A    It depends on where they're placed.

20   Q    Well, Commissioner, that's not what you said in your

21   deposition.

22   A    Well, show me what said in my deposition.

23   Q    Okay.  Let's go -- let's finish this document.

24        Of all the children in PMC, all 11,700 as of July,

25   I've added these up, 6,590 have been in the system for two

Specia - Cross / By Mr. Yetter                    85

1   years or more; that's 56.2 percent.

2   A     Okay.

3   Q     Does that surprise you, Commissioner?

4   A     I don't think it surprises me if it's numerical.

5            **MR. YETTER:**  Thank you.  Pass the witness, your

6   Honor.

7         **(Requested transcription concluded at 12:01:46 p.m.;**

8   **proceeding continued)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          _January 10, 2015_

                    TONI HUDSON, TRANSCRIBER