UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


M.D., ET AL.,                    )        CASE NO:  2:11-CV-0084
                                )
            Plaintiffs,         )           CIVIL
                                )
      vs.                       )        Corpus Christi, Texas
                                )
GOVERNOR RICK PERRY, ET AL.,    )    Tuesday, December 2, 2014
                                )    (2:28 p.m. to 3:20 p.m.)
            Defendants.         )    (3:43 p.m. to 4:37 p.m.)


DIRECT EXAMINATION OF PAUL MORRIS
DURING TRIAL - DAY 2


BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE


Appearances:              See Next Page

Court Recorder:           Arlene Rodriguez

Case Manager:             Linda Smith

Court Security Office:    Adrian Perez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Plaintiffs:                    R. PAUL YETTER, ESQ.
                               Yetter, Coleman, LLP
                               909 Fannin, Suite 3600
                               Houston, TX 77010

                               MARCIA ROBINSON LOWRY, ESQ.
                               Children's Rights
                               330 Seventh Avenue
                               Fourth Floor
                               New York, NY 10001

Defendants:                    THOMAS A. ALBRIGHT, ESQ.
                               Office of the Attorney General
                               General Litigation Division
                               P. O. Box 12548
                               Capital Station
                               Austin, TX 78711-2548

<u>INDEX</u>

| <u>PLAINTIFFS' WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
| --- | --- | --- | --- | --- |
| PAUL MORRIS | 4 | | | |

1   **Corpus Christi, Texas; Tuesday, December 2, 2014; 2:28:05 p.m.**

2       **(Partial transcript; Direct Examination of Paul Morris)**

3           **MR. YETTER:**  On behalf of the Plaintiffs, your Honor,

4   we will call another DFPS executive, Paul Morris, who is over

5   the Licensing group.  So Ms. Black was over the CPS and

6   Mr. Morris is over Licensing.

7           **THE COURT:**  All right.

8           **PAUL MORRIS, PLAINTIFFS' WITNESS, SWORN**

9       **(Pause)**

10                  **DIRECT EXAMINATION**

11  **BY MR. YETTER:**

12  Q    Well, good afternoon, sir.  Would you introduce yourself

13  to the Court please?

14  A    Good afternoon, I'm Paul Morris.  I'm the Assistant

15  Commissioner for Child Care Licensing for the Department of

16  Family and Protective Services.

17  Q    Thank you.  Let me go through that a little bit slower,

18  Mr. Morris.  So we just heard from Ms. Black.  Were you in the

19  courtroom for her testimony?

20  A    Yes, I was.

21  Q    And she is the Assistant Commissioner for CPS, Child

22  Protective Services, true?

23  A    Yes, she is.

24  Q    And you are the Assistant Commissioner for Child Care

25  Licensing?

Morris - Direct / By Mr. Yetter                    5

1  A    That's correct, yes, sir.

2  Q    Which includes Residential Child Care Licensing?

3  A    It does, yes.

4  Q    And you have been deposed in this case, have you not, sir,

5  given testimony under oath?

6  A    Yes, I have.

7  Q    You have been the Assistant Commissioner now for about a

8  year and a half, have you not; at least in an interim position

9  and then permanent?

10 A    That's correct.

11 Q    Okay.  So you were first in an interim position in July of

12 2013 and then you became permanent about a year ago in the late

13 fall of 2013?

14 A    I became the permanent Assistant Commissioner for Child

15 Care Licensing on October 1st of that year.

16 Q    2013?

17            **THE COURT:**  Of what?

18            **MR. YETTER:**  2013.  A year ago.

19            **THE COURT:**  Thank you.

20            **MR. YETTER:**  In October, a year.

21 **BY MR. YETTER:**

22 Q    Your background is financial, is it not, sir?

23 A    That is a part of my background, yes, sir.

24 Q    Let me just start it then.  Your education is in

25 financial, is it not, sir?

1   A    I have a Bachelor's in Accounting from the University of

2   Texas at Austin, yes, sir.

3   Q    And you then took the test to become a Certified Public

4   Accountant?

5   A    I did.

6   Q    You are not a specialist in childhood, child welfare, or

7   any specialist in that regard by education?

8   A    I do not have an education in early childhood development

9   or in --

10  Q    Anything like that?

11  A    No, sir.

12  Q    The first time you came to the Department of Family and

13  Protective Services was about six years ago?

14  A    I believe it was August 1st of 2005, if I'm not mistaken.

15  Q    2005.  Okay.  Maybe I got that wrong.  I thought you were

16  in Internal Audit at least by 2008.

17  A    I'm sorry, yes, let me correct that.  The years seem to

18  roll by.

19  Q    Years past; the years go by quickly.

20  A    I apologize, your Honor.

21  Q    Okay.  So you've been with the DFPS for about six years?

22  A    Yes.

23  Q    And you started in a financial position in Internal

24  Audits?

25  A    More internal control and oversight.

Morris - Direct / By Mr. Yetter                    7

1    Q    Fair enough.

2    A    Not so much financial.

3    Q    And then a few years later you were elevated to this

4    position of Assistant Commissioner of Child Care Licensing.

5    And in Licensing, it obviously covers licensing but also some -

6    - the Department's investigative functions?

7    A    That's correct.  I would just add one correction, or one

8    addition.  Between my tenure as the Internal Audit Director and

9    becoming the Assistant Commissioner, I served as the Deputy

10   Chief Financial Officer for six or seven months, --

11   Q    Fair enough.

12   A    -- beginning in January of 2013.

13   Q    Okay.  So you had a kind of controller's position and then

14   you were in a financial position.  And then about a year and a

15   half ago you became more of an operational position with

16   Licensing and Investigations?

17   A    That's accurate, yes, sir.

18   Q    One of the groups that reports to you is this Residential

19   Child Care Licensing.  I'm pausing on that because we're going

20   to talk a little bit about it.  You guys call that RCCL?

21   A    Yes, sir.  I may also refer to it as RC, --

22   Q    Fine.

23   A    -- if that's okay.

24   Q    And that involves investigations of incidents for foster

25   children in a variety of settings, true?

Morris - Direct / By Mr. Yetter                    8

1   A    That is one of their functions, yes, sir.

2   Q    And you also are head of a group that's called the

3   Performance Management Unit, PMU?

4   A    No, sir.  Actually, the Division Administrator for the

5   Performance Management Unit reports directly to me as one of my

6   direct reports.

7   Q    Okay.  So that's -- and that's also under your umbrella,

8   the PMU, the Performance Management Unit.  Those are important

9   units aren't they?

10  A    Yes, they are.

11  Q    Okay.  Now, the -- I'm going to just call it the Licensing

12  group, this Residential Licensing group -- Residential Child

13  Care Licensing group is important because these inspectors are

14  supposed to check and accurately investigate instances of

15  alleged abuse or neglect of children, right?

16  A    Correct.  And care situations, yes.

17  Q    Your inspectors are important because they're supposed to

18  ensure that the facilities that these children are in are safe

19  and up to standard, right?

20  A    Yes.

21  Q    And so these investigations, they cover things like

22  reports of physical abuse?

23  A    That is correct.

24  Q    Sexual abuse?

25  A    Yes, sir.

1    Q    Neglect?

2    A    Neglectful supervision, yes, sir.

3    Q    Yes.  And all of these are harmful to the children, are

4    they not?

5    A    Yes, all three of those things would be harmful to

6    children, yes, sir.

7    Q    Children, whether they are in TMC or PMC, correct?

8    A    Temporary Managing Conservatorship or Permanent Managing

9    Conservatorship?  Yes.

10   Q    And one of the important reasons you do an investigation

11   is that so it doesn't happen again, that alleged abuse, right?

12   A    That is one of the desired outcomes.  I would say, more

13   accurately, you do the investigation to determine the facts and

14   reduce risks to children in care.

15   Q    You can come up -- just generally, in an investigation the

16   way you guys do it, you can come up with at least three

17   outcomes.  You can decide that it actually probably happened,

18   true?

19   A    Yes.  I believe you're referring to the reason to believe

20   outcome.

21   Q    I am indeed.  And reason to believe is a bad thing.  When

22   you have an alleged abuse and you find that there is a reason

23   to believe, the preponderance of the evidence shows that there

24   was abuse, neglect, or exploitation, you've got to do a lot of

25   things to make sure that you investigate it, follow up, fix it,

1    true?

2    A    Correct.

3    Q    Second thing you could find -- or, among the three things

4    you could find is, well, I don't think -- we don't think

5    anything happened; that the preponderance of the evidence shows

6    that there was no abuse, neglect, or exploitation.  You call

7    that ruled out?

8    A    Yes.

9    Q    So you can either find there is a reason to believe or you

10   can rule it out.  And then there is a third category.  And

11   they're both important, obviously, to get right, true?

12   A    That is correct.  You want to make sure you're accurate.

13   Q    And the third category is like the head scratcher, I don't

14   know; which you call unable to determine?

15   A    Yes.  We refer to those as UTD.

16   Q    UTD.  And that means you couldn't make a finding because

17   you were unable to gather enough facts; that the investigator

18   and the supervisor of the investigator concluded that there is

19   not a preponderance of the evidence either way to reason to

20   believe or ruled out.  You couldn't conclude either way?

21   A    Correct.

22   Q    Now those are all important because if you make a mistake

23   on a ruled out, when abuse actually did happen, the perpetrator

24   could stay in the -- the child victim could stay in a home

25   where there is a perpetrator where bad things had happened,

1   right?

2   A     That is a possibility, yes.

3   Q     And when you do this UTD, I don't know, the head

4   scratcher, unable to determine, and you do it wrong, again, if

5   there -- actually something happened, in fact, then a child

6   victim could be at risk in the future?

7   A     That is correct.

8   Q     These investigations have to be professional, true?

9   A     That is true.

10  Q     They have to be thorough?

11  A     We want them to be thorough and accurate.

12  Q     They have to be accurate.  Thank you.

13        They have to be reliable, don't they?

14  A     We need to be able to rely on their work, yes, sir.

15  Q     Because these children, you know, the State is responsible

16  for their physical, emotional, and psychological well being,

17  true?

18  A     The State is responsible for their well being, yes, sir.

19  Q     Now, if your investigators don't do a good job because

20  they're too busy, that's a bad thing isn't it?

21  A      If they do a bad job for any reason that's something that

22  we need to look into.

23  Q     I agree with that.  And it's certainly a bad thing if they

24  don't do a good job, if they don't make a reliable

25  investigation because they're too busy, isn't it?  That's a bad

1   thing?

2   A    Yes, it would be.

3   Q    Now, in the last several years, the number of children

4   that your investigative group is responsible for, your

5   investigators and your inspectors, has gone up hasn't it?

6   A    I believe it has, yes.

7   Q    It has gone up because the State is growing and because --

8   actually, this is one of the things, your Honor, that you

9   brought up yesterday, there are undocumented immigrants coming

10   into Texas, true?

11   A    That is one of the populations that we deal with.

12   Specifically, I think you may be referring to ORR, or basically

13   undocumented children who may be coming into the country

14   without being accompanied by an adult.

15   Q    Sure.  In fact, you have found this year, in 2014, there

16   was a sharp increase in the number of unaccompanied minor

17   children crossing the border and entering the Texas foster care

18   system, wasn't there?

19   A    That is correct.  Yes, sir.

20   Q    And when you made a request for more funding -- and I'm

21   looking at Plaintiffs' Exhibit 898.  It's in evidence, your

22   Honor.  It hasn't been objected to.  Let me just first go to

23   the top.  Let's blow up the top.  This is a proposal.  You're

24   asking for more money, are you not, sir?

25   A    Yes, we are.

1  Q    It is dated -- this has a date on it, due by March 7th,

2  2014, does it not?

3  A    That's when the initial first drafts of these were due.

4  That's correct.

5  Q    Let's go into the text and it has an executive sponsor.

6  Right there toward the middle.  Right there.

7  A    Yes.

8  Q    Perfect.  Do you see on the bottom right-hand corner; do

9  you see your name as the executive sponsor, Paul Morris?

10 That's you, is it not?

11 A    That is correct.

12 Q    And then there is a name here in the box for number two,

13 Jean Shaw.  She works for you, does she not, in the

14 investigative area?

15 A    Ms. Shaw is my direct report as the Director of Field for

16 Residential Licensing, yes.

17 Q    And you were asking for more money because there was a

18 significant and dramatic increase in caseload wasn't there?

19 A    We were asking for more resources and additional staff to

20 do many things, but that is one of the things that I believe we

21 noted in the exceptional item.

22 Q    Let's go to Page 2 and the top paragraph that has the one

23 and the two in it.  Just that one piece.  Perfect.  "RCCL

24 staff"; that's that Residential Child Care Licensing group.

25 That's yours, isn't it?

1   A    Yes, it is.

2   Q    "Staff experienced a 96 percent increase -- "  This is in

3   March of this year, 2014.  " -- in the average monthly caseload

4   between fiscal year 2013 and the first three months of fiscal

5   year 2014."  That's a true statement, isn't it?  Ninety six

6   percent increase in the caseload?

7   A    Actually, that 96 percent increase was actually an error

8   that we noted later.

9   Q    Okay.  So it's not a true statement.

10  A    There was a change --

11  Q    What is the increase?

12  A    I want to say that the average monthly caseload right now

13  is right around 18 or 19 cases per worker in this division.

14  Q    Well, I see the numbers there that say the caseload went

15  from 9.2 to 18, right?

16  A    That's correct.

17  Q    That would be --

18       THE COURT:  So is that whole sentence wrong?

19       THE WITNESS:  Yes, the whole sentence is incorrect.

20  And the reason -- there is actually a reason for that, your

21  Honor.

22       THE COURT:  What's the reason?

23       THE WITNESS:  Well, what happened during the year

24  that I was coming up to speed with it in Child Care Licensing,

25  there was actually a change in how that measure was calculated.

Morris - Direct / By Mr. Yetter                    15

1    And that change in the calculation measure, it escaped me.  I

2    did not catch that, so it made it into this first draft as

3    being a 96 percent increase, from 9.2 to 18.  In specific,

4    basically we've taken the average monthly case load -- this was

5    for all staff together.

6              THE COURT:  Uh-huh.

7              THE WITNESS:  And, as it has been explained to me,

8    what we did was -- or, the caseload is now calculated, broken

9    out for inspectors and investigators.

10   **BY MR. YETTER:**

11   Q    Okay.  So you're now saying that you're breaking out the

12   caseload from inspectors to investigators in 2014, right?

13   A    Correct.

14   Q    And so that caseload should go down, right?

15   A    Well, the caseload for investigators still remains at

16   around 18 to 19 percent, if I recall.

17   Q    So if I can -- You're a numbers guy?

18   A    Uh-huh.

19   Q    But if you're telling me that the caseload, combined, in

20   2013 is nine, that's nine cases per investigator or inspector,

21   right?  True?

22   A    True.

23   Q    And then in 2014 it's double and you're breaking them

24   apart; that math doesn't work.

25   A    No, it doesn't.

1  Q    Okay.  Now, another thing that kind of makes me wonder

2  about what you just said is that not only did you say that

3  there had been this big increase, but you gave two reasons for

4  the big increase, didn't you?

5  A    Yes, we did, in this draft.

6  Q    So if the first sentence is wrong, is number one and

7  number two wrong too?

8  A    Well, I would say that when we say the first sentence is

9  an increase and then the number of serious incidents in

10 Residential Child Care Operations that I think would be one of

11 the things that would be attributable, or would attribute to an

12 increase in caseloads if we saw it.

13 Q    Okay.  Is number one --

14 A    And we did, in fact, see --

15 Q    -- that you've got listed there; is it accurate?

16       **THE COURT:**  He just said is that true or not true;

17 number one?

18 Q    Is it true or not true?

19 A    Yes, it is true.

20 Q    Okay.  So, whatever the monthly caseload is, number one

21 says you had an "increase in serious incidents in Residential

22 Child Care Operations."  That's for the children, right.  It

23 increased in serious incidents, which resulted in an increase

24 in investigations, true?  That is true?  That's in 2014, right?

25 A    Now, I'm -- you're referring to?

Morris - Direct / By Mr. Yetter                    17

1   Q    Number one.  You see where we highlighted it?

2   A    Yes.

3   Q    Okay.  Number two -- you say that's true, right; number

4   one is true?

5   A    Yes.  There was an increase in the number of serious

6   incidents in Residential Child Care Operations.

7   Q    Okay.  Number two says a "sharp increase in the number of

8   unaccompanied minor children crossing the border."  True?

9   A    That was true.  There was a sharp increase.

10  Q    "Which has created a dramatic increase in the number of

11  licensed operations that serve these children."  True?

12  A    That's true.

13  Q    "As well as a dramatic increase in the capacity of the

14  licensed operations that serve these children."  True?

15  A    There was in increase, yes.

16  Q    This says "dramatic."

17  A    Well then --

18  Q    Right?

19       (No audible response)

20       Okay.

21  A    A pretty large increase in facilities, yes.

22  Q    So the bottom line --

23            THE COURT:  Did you change that in the final draft?

24            THE WITNESS:  Actually, this point, your Honor, was

25  going to -- it will be removed from the support for the

1    exceptional item.  It won't leave the agency and it's not one

2    of the things that we're going to refer to, but we still feel

3    like the need for additional staff within Residential Child

4    Care Licensing is there.

5    **BY MR. YETTER:**

6    Q    Okay.  So some of this is true, some of it's not true, and

7    what have you done with the proposal?

8              **THE COURT:**  Was that supplied to you by the State?

9              **MR. YETTER:**  Yes, absolutely, Judge.  This is --

10             **THE COURT:**  Have they given you a corrected one or

11   said it wasn't true?

12             **MR. YETTER:**  No.  In fact, he has been deposed about

13   this.

14             **MR. ALBRIGHT:**  Your Honor, they thoroughly deposed

15   him on this.  And for him to say that it has never been made

16   clear to them is not correct.

17             **THE COURT:**  Oh, he said the same thing on the

18   deposition?

19             **MR. ALBRIGHT:**  Yes, he corrected it in his

20   deposition.

21             **THE COURT:**  Okay.

22             **MR. ALBRIGHT:**  And that's a misrepresentation.

23             **MR. YETTER:**  Okay.  I disagree.

24             **THE COURT:**  Then it's all cleared up.

25             **MR. YETTER:**  Okay.  I disagree, your Honor.

1            THE COURT:  Okay.

2            MR. YETTER:  But the point is --

3            THE COURT:  He didn't say that in his deposition?

4            MR. YETTER:  No.  At least not that I read, your

5    Honor.

6            THE COURT:  Do you remember saying it?

7            THE WITNESS:  Yes, ma'am, I did.  I actually refer to

8    it in the deposition.  Ms. --

9            MR. YETTER:  What did you -- what are you talking

10   about now?  I'm sorry, I didn't -- maybe I'm missing what

11   you're saying you cleared up.

12           THE COURT:  That exhibit.

13           THE WITNESS:  Certainly.  Let me --

14           THE COURT:  Did you tell him it was not correct?

15           THE WITNESS:  Yes, I explained to him in the

16   deposition and when I was speaking with the attorneys that this

17   was a mistake that we had made.  Part of the issue was that --

18   BY MR. YETTER:

19   Q    Which was the mistake you're talking about?

20   A    I'm talking about the 96 percent increase in the average

21   monthly caseload.

22   Q    Okay.  But you said number one and --

23   A    As I recall, in the deposition I believe I said that was

24   one of the things that we noted in error.

25   Q    You did, but you said number one and two is correct --

1   were correct.

2   A     Well, we have seen an increase in the number of serious

3   incidents in Residential Child Care Operations.  That's one of

4   the things that we want to address.  We have seen a sharp

5   increase in the number of unaccompanied minor children --

6   Q     But now you're telling the Judge --

7   A     -- crossing the border.

8   Q     -- you're going to take this out.  That's not what you

9   said in your deposition.

10  A     Sir, all I can tell you is that we made a mistake on the

11  exceptional item when we supported it with the 96 percent

12  increase in the caseload.  When we noted that error, I made

13  sure to notify my --

14  Q     Okay.  I'll grant you --

15  A     -- Chief Financial Officer.

16  Q     I'll grant you.

17  A     But I think that it's clear that we have seen an increase

18  in the number of unaccompanied children.

19  Q     I will grant you that you did say that you had split out

20  the inspectors and the investigators.  I didn't understand how

21  it made any sense that you would go up if you actually split

22  the average between the investigators and the inspectors.  So

23  if investigators now have 18, how many do inspectors have, like

24  one?

25  A     No.

1   Q    Well, if you've got, combined, nine for investigators and

2   inspectors, and then you break out investigators and it goes to

3   18, how many do inspectors have?

4   A    Well, part of the reason behind the calculation, if you

5   look at the calculation, it works like this.  We don't just

6   take caseloads, the total number of caseload, and then divide

7   it by the number of staff that we have.  So there are

8   differences there in the staff case assignable.  For instance,

9   your Honor, if we have a brand new caseworker who has not

10  completed their basic skills development; if they have not been

11  there for 12 months or longer, they're not assignable a case.

12  And I believe if you'll look at our FY14 you'll notice that --

13  and you may not be aware of these numbers, but we had, you

14  know, over 25-26 new hires in that fiscal year alone.  Also, if

15  someone has completed their basic skills development course but

16  have been there for, I believe, six months or less, then they

17  would only be assigned -- or, only half of that number of those

18  investigators would be included in the calculation.  Once

19  someone is fully case assignable, that's when the full weight

20  of that worker is included in the calculation.  So we, I

21  believe, have different staff and different levels of being

22  case assignable between inspectors and investigators.  And

23  that's the way I understand the case measure to be different

24  between 9.2 to 18 from one fiscal year to the other.

25  Q    Okay.  I'm sorry.  I tried to follow you.

Morris - Direct / By Mr. Yetter                 22

1   A    And I'm sorry I haven't done the numbers myself and

2   calculated it, but --

3   Q    Yeah.  Yeah.

4        So, what is the caseload for inspectors --

5   A    I understand --

6   Q    -- in 2014?

7   A    I understand the caseload for inspectors to be just under

8   that 18 mark.

9   Q    For inspectors?

10  A    For inspectors, it's not 18.  It's less.

11  Q    And for investigators what is it?

12  A    For investigators, it's around 18 or 19.

13  Q    And for inspectors what is it?

14  A    For inspectors it's less than that.

15  Q    Like what is it?

16  A    I can't recall the number right off hand, but I think for

17  fiscal year 14 it may have been in the range of about 16.

18  Q    Okay.

19  A    I'm sorry, I can't recall that right now.

20  Q    So you had a document that you guys created about nine

21  months ago and you said "in fiscal year 2013 the blended

22  average caseload for inspectors and investigators was 9.2,"

23  right?

24  A    That's the number that was, you know, presented --

25  Q    That's what's in your document and that's what you're

1   saying?

2   A     -- on the dashboard that we used.

3   Q     Okay.  And now you're saying in 2014 the inspector

4   caseload is 18 and the -- I'm sorry, the investigator caseload

5   is 18 and the inspector caseload is 16?

6   A     For FY14.

7   Q     How in the world do you get a combined caseload of nine

8   unless the caseloads went up?

9   A     I apologize.  I didn't crunch those numbers, so I cannot

10  answer that question for you.

11          **THE COURT:**  You're not still doing taxes are you?

12          **THE WITNESS:**  No.

13      **(Laughter)**

14          No, I do not.

15  **BY MR. YETTER:**

16  Q     Okay.  So the fact is that the number of the caseworkers,

17  whether they were investigators or inspectors, in the last two

18  years has gone down, down, down, hasn't it?

19  A     I'm sorry, could you repeat that comment?

20  Q     Sure.  The fact is that the number of investigators and

21  inspectors, together, at the Residential Licensing group has

22  gone down in the last several years, hasn't it?

23  A     The number of staff that we have has decreased.

24  Q     Yes.  So, in fiscal year 2011, the total RCCL caseworkers,

25  that's inspectors and investigators, according to -- I'm going

1  to put Plaintiffs' Exhibit 641, which is, again, in evidence on

2  the short list not objected to.

3           **THE COURT:**  Number what?

4           **MR. YETTER:**  641; Plaintiffs' 641.

5           **THE COURT:**  Thank you.

6  **BY MR. YETTER:**

7  Q    Now let's go to the top in the middle if we could.  And,

8  Mr. Morris, just to familiarize yourself, you know what the

9  dashboards are, the DFPS monthly dashboards?

10 A    This is an old version of the dashboard that we no longer

11 use, yes.

12 Q    Okay.  Fair enough.  But this is as of June 30, 2013.

13 That's the report that you got, right?  You recognize the

14 document, don't you?

15 A    I do recognize the document, yes, sir.

16 Q    Okay.  Let's go to the -- it's a spreadsheet, is it not?

17 A    Yes, it is.

18 Q    Okay.  Let's go to the bottom left-hand corner for the --

19 Line 73, if you can find that.  Line 73.  I think you're going

20 down a little too far.  It's on the first page of the

21 spreadsheet.

22 A    Right there.

23 Q    It is under Child Care Licensing -- RCCL.  Right there

24 that is.  That's it.  Can you highlight that line?  Can you

25 highlight that?  Got it.  Okay.  Do you see that line?

1  A     I do.

2  Q     Average monthly filled RCCL caseworker FTE.  So just to

3  put that in English, that is full time equivalent, people

4  actually filled the -- there's not a vacancy -- of the number

5  of caseworkers.  So that means investigators and inspectors,

6  true?

7  A     That is correct.  Would you --

8  Q     RCCL is that group that we've been talking about, the

9  Licensing group, right?

10  A     That is correct.  Would you please show the header for me

11  so that I can see that line up to the years?

12  Q     Header?

13  A     Is there any way to split the screen for us?

14  Q     Sure.  Which header are you interested in looking at?

15  A     If you'll go to the top of the document so that we can see

16  FY11, FY12; changed it from 12 to 13 and FY13 target?

17  Q     Yeah.  So let's highlight -- woops, go back up again.

18  Let's highlight 11 and 12; those two boxes if you can do that.

19  There you go.  Okay.  So we're on 11 and 12.  Let's go down

20  back -- woops, wait a minute.

21  A     Oh.

22  Q     There you go.  So, for fiscal year 2011, in your group,

23  total investigators and inspectors 123.4.  That's full time

24  equivalent, so there's actually someone that's a .4 in there

25  that's working part time or something like that, right?

1   A    I'm not sure where the .4 comes from.

2   Q    But that's -- I'm reading the number right?

3   A    123 roughly.

4   Q    So 123.4 is for 2011, right?

5   A    Correct.

6   Q    116.5 is for 2012, true?

7   A    That's the number right there in the column, yes it is.

8   Q    That's for fiscal year 2012.

9        Now let's go forward.  Let's go to Plaintiffs'

10  Exhibit 640, which is the next spreadsheet.  It's the same

11  spreadsheet, monthly dashboard, same calculation.  Let's start

12  at the bottom under Residential Child Care.

13           **MR. ALBRIGHT:**  What line?

14           **MR. YETTER:**  It's on Page 1, Child Care Licensing -

15  Residential.

16           **MR. ALBRIGHT:**  Does it have a line number?

17  **BY MR. YETTER:**

18  Q    The Line Number is 73, again.

19  A    Thank you.  And if you could split that screen at Line

20  Number 71 so the header can remain at the top that would

21  helpful.

22  Q    Okay.  We will try to do that.  Okay.

23  A    Actually, it's already done, so I think we're good there.

24  Q    There you go.  He got it.

25  A    Thank you.

Morris - Direct / By Mr. Yetter                    27

1   Q    There you go.  All right.

2        So we just saw fiscal year 2012 was 116.5.  Do you see

3   that again?

4   A    I do.

5   Q    Okay.  Now we're going forward to bring it to today; at

6   least as close to today as what you've all given us.  And as of

7   July of 2014 -- do you see the number on the -- and I think we

8   can keep going to the right a little bit more.  Can you scroll

9   to the right?  There you go.  Keep scrolling to the right.

10  Okay.  There.

11       So the last column is actually March of 2014.  Because

12  your fiscal year is not a calendar year, it kind of is a little

13  big juggled.  So the last column that you guys gave us on this

14  chart is March of this year, 2014.  And how many filled

15  inspector, investigator, caseworkers did you have in your

16  group?

17  A    March 2014?  That says 88.5, but I don't think that number

18  is correct, sir.

19  Q    So this is another mistake in a DFPS document?

20  A    This is on a dashboard that I don't use, sir.

21  Q    And that number --

22  A    Would you mind going back to the left for me for just a

23  moment please?

24  Q    Sure, I'm happy to go all the way to the left.  Average

25  monthly filled RCCL caseworker FTE.

1  A    Great.  Would you mind going down to Footnote 6 for me for

2  just a moment, sir?  For filled caseworker FTE, it measures

3  FY12 target as the agency cap affordable number of FTE's.

4  Okay.  That helps me out.  Thank you.

5  Q    Okay.  Well, that's Greek to me.

6  A    That didn't answer my question on why we have 88.

7  Q    But what does that tell you, Mr. Morris?

8  A    So there is a certain cap number of FTE's that are

9  authorized for the agency to have hired in the overall grand

10 scheme of things, and that would be the target that we're

11 shooting for.

12 Q    Okay.  Bottom line is as of March of 2014, you were down

13 to 88.5 full time investigators and inspectors, right?

14 A    Okay.

15 Q    Okay.  So you have the sharp increase in children and you

16 have a steadily dropping load of investigators and inspectors

17 and they've got this really important job to investigate

18 allegations of physical, sexual abuse and neglect, true?

19 A    True.

20 Q    And they have to make correct decisions; otherwise,

21 victims can be subject to continued risk and perpetrators could

22 be given more opportunities to cause harm, right?

23 A    Yes, that's --

24 Q    Now, you looked earlier this year -- in 2014, your group

25 looked at how accurate the investigations are being done in the

1  DFPS Licensing area, didn't you?

2  A    Jean Shaw asked for that report, yes.

3  Q    She is your direct report, isn't she?

4  A    She is indeed.

5  Q    And she told you-all about it didn't she?

6  A    When the results came back, Jean and I discussed it, yes.

7  Q    She was probably very concerned because the results were

8  not good were they?

9  A    No, they were not.

10 Q    So here we are.  Let's go to Plaintiffs' Exhibit 1129.  If

11 you can blow up the top.  This is -- at the outset of your

12 testimony, I mentioned that you have a group called the

13 Performance Management Unit.  That's kind of like the Quality

14 Assurance Group?

15 A    That's exactly what it is, a quality assurance function.

16 Q    Okay.  And in Child Care Licensing, that's your group; so,

17 Residential Child Care Licensing would be RCCL.  And here's a

18 report to the Residential Child Care management.  That would be

19 you and Ms. Shaw, true?

20 A    She is a direct report to me and part of my management

21 team, yes, sir.

22 Q    Okay.  So here it is, residential care physical abuse

23 investigations, focus: unable to determine dispositions.  So

24 let's just get a framework here for the Court.  This is not

25 sexual abuse investigations.  This is not neglect

1   investigations.  This is physical abuse neglect investigations,

2   right.  So that subset, true?

3   A    Yes.

4   Q    And this is not findings of ruled out or reason to

5   believe.  This is the findings of I just have no idea, unable

6   to determine?  True?

7   A    These are unable to determine, yes.

8   Q    And so they decided -- your Quality Assurance Group said

9   okay, let's see how accurate those findings are, didn't they?

10  A    That is what Ms. Shaw asked them to look at, yes.

11  Q    And let's go to Page 2.  And the top paragraph, let's just

12  blow that up on background.  A request was made by the

13  leadership -- that would be your calling Ms. Shaw -- to explore

14  whether RC, Residential Child Care, investigators made the

15  correct findings of unable to determine dispositions for

16  physical abuse.  And so you used acronyms.  Unable to determine

17  is UTD.  Physical abuse is PHAB, physical abuse investigations

18  initiated during a 12 month period.  So you took a year.

19  Physical abuse and I don't know -- the finding was I don't

20  know.  True?

21  A    That is correct.

22  Q    And the next paragraph.  Again, to make that finding, you

23  have to basically -- the investigator and the supervisor has to

24  say I just can't -- there's not enough available information to

25  make the decision one way or the other, true?

Morris - Direct / By Mr. Yetter                    31

1   A      Correct.

2   Q      Right.  Let's go to the next paragraph.  Okay.  So in that

3   small subset -- and there are hundreds of investigations that

4   your group does every year, aren't there?

5   A      Yes.

6   Q      Physical, sexual abuse, neglect?

7   A      There are 3,000 investigations that we'll do a year,

8   between --

9   Q      Three thousand?

10  A      -- abuse and non-abuse neglect-type --

11  Q      Okay.

12  A      -- investigations.

13  Q      So here, they took one that they wanted to kind of take

14  like a sample in order to give you reliable information.  And

15  so this sample was from one year, one fiscal year, August 1,

16  2012 to July 31, 2013.  And they had 85 investigations alleging

17  physical abuse at a Child Placing Agency.  That means it's

18  outsourced, right.  That's one of the private company

19  providers, true?

20  A      Child Placing Agency is -- yes, it is the -- it is an

21  organization that works with foster homes.  There are some that

22  we contract with and some that we don't contract with within

23  the agency.  So when you say "outsource," I just want to be

24  accurate.

25  Q      Okay.  So those are the ones that have foster children,

1   including PMC children, true?

2   A     Yes, I believe they do, yes.

3   Q     And General Residential Operations, those are the bigger

4   ones, the institutions, true?

5   A     Yes, more than 12; that's correct.

6   Q     With a disposition of either reason to believe or unable

7   to determine, of those 85 investigations, 48 received a

8   disposition of unable to determine.  And so that's what they

9   looked at.  So they took a sample of all of your investigations

10  to see how accurate they were.  Correct?  So it came down to 48

11  cases and they did them one by one, didn't they?

12  A     Correct.

13  Q     So let's go to the quick overview on the next, Page 3.

14  They found that the high majority of these investigations were

15  wrong, didn't they?

16  A     Incorrect.  They determined as UTD; that's correct.

17  Q     Okay.  That's a bad thing, isn't it?

18  A     That's not a good thing, no, sir.  It's a bad thing.

19  Q     So, quick overview --

20  A     Something we need to correct.

21  Q     Bullet one.  Quick overview.  Thirty-one out of 48,

22  64 percent, of the reviewed physical abuse allegations were

23  incorrectly determined as UTD, right?

24  A     That's correct, yes.

25  Q     Now, that means they should have -- if they had been done

1   right, they would have found that there was actually a reason

2   to believe.  In other words, that the physical abuse actually

3   had happened, or rule it out and exonerate people where it

4   didn't happen, correct?

5   A    Correct.

6   Q    Either mistake is a bad mistake, isn't it?

7   A    Either is a mistake that you don't want to make.  You want

8   to get it right.  Yes, sir.

9   Q    Okay.  So for this sample that you guys took, it was a

10  high percentage.  The next sentence says you're going to

11  analyze why there was such a high percentage of incorrect UTD

12  findings, right?

13  A    That's correct.

14  Q    Now, a bigger problem is that this is not just an

15  investigator's issue, because you have an investigator

16  caseworker, and he makes the initial decision, but then the

17  supervisor has to sign off on it, doesn't he/she?

18  A    That is correct.

19  Q    And so this is two people in the system, the caseworker

20  and the supervisor, coming out wrong 64 percent of the time,

21  right?

22  A    For this sample, that is correct, yes, sir.

23  Q    Okay.  And samples tell you a lot about the whole

24  population, or they can can't they?

25  A    That is very possible that they -- if they've been

Morris - Direct / By Mr. Yetter                                    34

1    selected correctly, yes, they can.

2    Q    Okay.  So, you have -- I'm not going to go through all of

3    these for the Court.  The Court will have this document to

4    review.  But basically they went through all of these and they

5    found -- let's go down to the sixth bullet down -- 11 of the 31

6    incorrect findings should have been reason to believe, right?

7    A    Correct.

8    Q    That's 35 percent of the incorrect findings should have

9    been reason to believe.  That means there was a preponderance

10   of the evidence that indicated that physical abuse occurred,

11   right?

12   A    Correct.

13   Q    Now, this sample was done long after the fact, wasn't it?

14   A    About a year after the --

15   Q    I say "long."  It was done after the fact, wasn't it?

16   A    I believe it was about a year after the fact.

17   Q    Okay.  So, investigations have to be timely, don't they;

18   right?

19   A    Yes, they do.

20   Q    Because if you have physical abuse happening in a home to

21   a child that's under the legal custody of the State of Texas

22   and you don't figure out for a year whether that physical abuse

23   happened, that child has 12 months of being at risk, doesn't he

24   or she?

25   A    Correct.

Morris - Direct / By Mr. Yetter                    35

1    Q     True?

2    A     Yes.

3    Q     So here we are a year later and 11 out of the 31 incorrect

4    ones should have been a reason to believe.  Now, not quite as

5    bad, but just as bad, nine of the 31 should have been ruled

6    out.  So someone should have been able to say, okay, there

7    wasn't a problem here.  There wouldn't have been any suspicion

8    hanging over there head.  And the other 11, the caseworker and

9    the supervisor, it was determined that they didn't have enough

10   information to say what they did to make the unable to

11   determine finding, and they should have gone and looked for

12   more information, right?

13   A     Correct.

14   Q     Now, let's go to the next bullet.  Of the unable to

15   determines, 75 percent involved an injury, an actual injury,

16   right; 36 out of 48, true?

17   A     That's correct, yes.

18   Q     Seventeen of the 48, 35 percent, actually involved an

19   injury that required medical attention; two of which were

20   critical, 19 of which were serious.  True?

21   A     That's correct, yes.

22   Q     All right.  So when you read this you must have said wow,

23   this is a stunningly bad finding that we just made, true?

24   A     Yes, it concerned me.

25   Q     And this was a year ago, because you got this in January

1    2014, didn't you?

2    A    Yes.  It's dated January 2014, and so I believe we

3    received it sometime around that time.

4    Q    Sure.

5    A    In fact, I want to say it was January 21st, if I'm not

6    mistaken.

7    Q    All right.  So the second to the last bullet says "almost

8    all of these unable to determine findings were discussed with a

9    superior."  And yet two-thirds of them were not correctly

10   approved, right.  Some of the things -- the most significant

11   explanations were:  the evidence they found was not enough to

12   be a preponderance, all the parties were not interviewed, not

13   all the evidence was gathered or reached.  Right?

14   A    Correct.

15   Q    Okay.  So this is what the PMU unit sent to you and you

16   said, wow, that's really bad.  And, in fact, your colleague,

17   Ms. Shaw, said I'm going to check it myself, didn't she?

18   A    Yes.

19   Q    And she found it was worse then what even PMU had said,

20   didn't she?

21   A    I would have to look and see what the number was that she

22   determined.  When she say "she found it was worse," I don't

23   recall that she found it was worse.  Can you show me what

24   you're referring to?

25   Q    Happy to.  Plaintiffs' Exhibit 1065.  I'm going to remind

1   you of this, because she made a PowerPoint for you.  She made

2   you a report, a slide deck, didn't she?

3        (No audible response)

4        Well, let's do the whole thing first.  Let's do the big

5   page.  You recognize this, do you not?

6   A    Yes.  This is the summer after Ms. Shaw's read-behind of

7   the cases.

8   Q    Okay.

9   A    And this is actually a read-behind of the cases after they

10  had been read-behind again.

11  Q    Okay.  This was such a significant finding by your PMU

12  unit, this sample that showed that 64 percent of their findings

13  were false, incorrect, you actually did a second review by

14  other employees, didn't you?

15  A    That is correct, we did.

16  Q    And then a third review by your Director?

17  A    Ms. Shaw.

18  Q    Ms. Shaw.  True?

19  A    True.

20  Q    And every one of them verified that it was as bad or worse

21  than what you initially thought, didn't they?

22  A    Well, let me just take a look at this.

23  Q    I can go through the numbers if you'd like.  I'll walk you

24  through it.

25  A    I think we should when you want to say "bad or worse," so

1   I want you to explain that if you would please.

2   Q    I will.  Okay.  So let's look at the first page.  PHAD.

3            THE COURT:  Well, did any of them say it wasn't as

4   bad as it looked?

5            THE WITNESS:  No.  I don't know.  I don't believe

6   anyone said that it wasn't as bad as it looked.  I believe we

7   said, you know, we have an issue that we need to address here,

8   and so we did.

9   BY MR. YETTER:

10  Q    Okay.  First slide is PHAD.  That's physical abuse.  And

11  then she has a chart.  And so let's just kind of, so the Judge

12  understands what the chart is, you have the first column that

13  says "reader," and you had three people doing this.  You had

14  your PMU team, which was that report that we just went over,

15  true?

16  A    Yes.

17  Q    And then you had a second read, which was within your

18  group, right?  I think they were people that reported to

19  Ms. Shaw.

20  A    They were actually individuals who were part of -- yes --

21  or, risk analysts, I believe; part of PMU.

22  Q    Different group then did the first one?

23  A    Correct, it was a different group.

24  Q    And that's why they called it second read?

25  A    Yes.

1   Q    And then Ms. Shaw actually did it herself; it was that

2   serious?

3   A    Yes.

4   Q    Okay.  So that's who the reader is.

5        And then you have -- so these were only that subset of

6   unable to determine.  So you wanted to find out -- each of

7   these people -- each of these reviews was to find out was that

8   a correct finding or was it wrong and how was it wrong.  So you

9   have four columns.  So the middle column, UTD, is the column

10  that says it was actually correct the time they did it, isn't

11  it?

12  A    So, I would -- this is the way I understand these numbers,

13  and I'm going to explain them if I may.  The PMU team read

14  them.  Of those cases, the 48 UTD cases, 11 should have been

15  RTB, 17 should have been UTD, 11 ruled out, and nine rejected.

16  There is --

17  Q    Okay.  Let me -- I don't mean to stop you, but let me -- I

18  want to kind of take this a piece at a time.  So when the PMU

19  team did it, they found that 17 of these findings were actually

20  okay, that they were correct.  And so that's that third column

21  that says UTD.  Seventeen of the 48 were okay, were correct,

22  were accurate, were reliable.  True?

23  A    Yes.

24  Q    Okay.  But then they found that 31 of the 48 were wrong.

25  And that 31 is made up of 11 that should have been reason to

1   believe, 11 that should have been ruled out, and nine, which

2   they call reject, which means you didn't have enough

3   information to make a UTD finding.   True?

4   A     True.

5   Q     Okay.   That's the PMU.

6   A     More work was needed to be done.

7   Q     Okay.   That's the PMU.

8         Now, the next line is the second read and then the third

9   line is what Ms. Shaw said.   And let's just add up first to see

10  what happens.

11        So, the second line on the second read, they actually said

12  under the UTD column that only nine were correct.   True?

13  A     They said only nine correct, but they said only four of

14  those should have been RTB's.

15  Q     You know, --

16  A     They said --

17  Q     -- a bad investigation is a bad investigation, right?

18  A     Well, you can say --

19  Q     It's either right or wrong.

20  A     -- a bad investigation is a bad investigation, but if you

21  told me that, you know, 11 of those should have been RTB's, and

22  then the person I rely on says, you know what, only four of

23  those should have been UTD's.   Actually, for the additional 20,

24  we needed to do more work, we need to train up our supervisors

25  and inspectors.   So, yes, it's bad that they aren't correct,

Morris - Direct / By Mr. Yetter                    41

1   but --

2   Q    So you just got lucky in that they were incorrect in one

3   way versus the other?

4   A    Uh.

5   Q    But what you have here on your second read is your second

6   read actually found that more of them were wrong, and then your

7   Director actually found that 11 were correct and 33 were wrong.

8   You know what that statistic is; you know what that percentage

9   of wrong findings is?

10  A    Yeah.  Twenty-two out of 33 were wrong; is that what you -

11  -

12  Q    No, no.  Thirty-three out of the 48 were wrong.  I'm

13  sorry.  Thirty-seven out of the 48 were wrong; 75 percent.

14  It's just -- that's just terrible.  That's terrible accuracy,

15  isn't it?

16  A    It needed to be addressed, yes.

17  Q    And it can be wrong one --

18          THE COURT:  Forty-eight were read the first time and

19  then how many were read the second and third time?

20          MR. YETTER:  Forty-eight.  The same -- or, I'm sorry.

21  They went down to 44 --

22          THE COURT:  Forty-four for second and third?

23          MR. YETTER:  Yes.  Forty-four for the second and

24  third.

25  //

1   **BY MR. YETTER:**

2   Q    So, the Director found that 33 of the 44 were wrong, and

3   that's 75 percent, right?

4   A    Okay.  I'm not doing the math in my head, --

5   Q    Are my figures right?

6   A    -- but if you calculate it then I'm going to rely on you.

7   Q    Okay.  Well, let's just take the time.  Add up the number

8   that the Director counted, and that's 44.

9   A    Okay.

10  Q    And she counted only 11 were correct.  So she counted 33

11  wrong.

12  A    Seventy-five percent were --

13  Q    Thirty-three of 44 is 75 percent right on the nose.

14  A    There you go.

15  Q    Okay.  So you go through the rest of these, and you got to

16  the next page, physical abuse, and that's a chart.  She shows

17  her opinion of what's right and wrong.  So, you know, ideally,

18  you have a very high accuracy of your investigative reports,

19  don't you?

20  A    That's --

21  Q    I mean, that's what you're supposed to have, isn't it?

22  A    You should strive for a very accuracy rate, yes.

23  Q    It should all be the same color; the color that they came

24  up with, UTD, right?

25  A    You want it to be correct.

Morris - Direct / By Mr. Yetter                              43

1   Q    Now, the second read and the third read actually went on

2   to other things.  So, slide three is negligent supervision.

3   You guys were so concerned about how inaccurate these were, you

4   started looking at other case files, didn't you?

5   A    That's correct.  We wanted to know about these as well.

6   Q    Negligent supervision.  You looked at 38 cases of

7   negligent supervision, right, that were found to be UTD.  True?

8   A    Correct.

9   Q    And your Director found that 31 of the 38 were wrong.

10  True?

11  A    Uh.

12  Q    She only found seven were right.  So she found 31 of the

13  38 were wrong.

14  A    Seventeen should have been ruled out, two should have been

15  RTB's, and 12 should have been rejected for additional work;

16  that's correct.

17  Q    So, one child --

18  A    So when you say "wrong," --

19  Q    One child that's subject -- when you do an investigation

20  that's wrong, and actually the negligent supervision or

21  physical abuse happened and that child stays in that setting

22  for one day too long, that's bad isn't it?

23  A    You want this to be correct.

24  Q    Do you know what the statistic is on the wrong ones for

25  negligent supervision, according to your Director, Ms. Shaw?

1   81.6 percent wrong.  Do you know that?

2   A    Yes.

3   Q    Okay.  Let's go forward.  They did some more.  So, slide

4   four is her chart.  And slide five, they decided to look at 29

5   cases of incidents of sexual abuse, did they not?

6   A    Yes.

7   Q    And of those 29 cases, both the second read and your

8   Director found that nine were correct and 20 were wrong.

9   Sexual abuse.

10  A    Two should have been RTB, 10 should have been ruled out;

11  they should have been rejected.

12  Q    So, of the rejected, you don't know whether those should

13  be reason to believe or ruled out, by the way, do you?

14  A    Without doing additional work.  At the time of the

15  investigation, --

16  Q    Right.

17  A    -- additional work needed to be done.

18  Q    So that's a terrible result isn't it?  That's 69 --

19  actually, 68.97 percent wrong.

20  A    It needs to be better and we addressed it.

21  Q    Let's go to the next page.  This is the total of all

22  findings; physical abuse, negligent supervision, sexual abuse.

23  111 cases that they looked at.  That's a big sample.  Read them

24  one by one.  They found that 84 -- at least your Director found

25  that 84 of the 111 were incorrect, didn't she?

1    A     Forty should have been ruled out, 36 should have been

2    rejected, and eight should have been RTB's of the findings,

3    yes.

4    Q     Okay.

5         **THE COURT:**  I'm sorry.  Did she find that they were

6    incorrect, eighty-something out of 111?

7         **MR. YETTER:**  Eighty-four out of 111.

8         **THE WITNESS:**  Eighty-four out of 111 is, what, close

9    to 86-85 percent; is that right?

10   **BY MR. YETTER:**

11   Q     75.7 percent --

12   A     I'm sorry.  Thank you.

13   Q     -- wrong.  True?

14   A     Not accurate.

15   Q     Okay.  So she did this sometime shortly after January of

16   2014, didn't she?

17   A     Yes.

18   Q     Have you done a broader study now; have you commissioned a

19   broader study, because you just got a sample of 111 instances,

20   75 percent of which were wrong?  Have you commissioned a broad

21   study of the investigative results in your department to

22   determine if this astounding inaccuracy is endemic in your

23   group?

24   A     We have asked for additional work to be done.  And one of

25   the things, if you'll --

1    Q    Let me stop you there.  When is it going to be done?  It's

2    now December and this was January.

3    A    Right.

4    Q    Has it been done?

5    A    Follow-up report -- or, follow-up reviews of cases were

6    being conducted and they're almost complete.

7    Q    How many cases are we talking about?

8    A    I want to say they looked at a sample of 66, if I'm not

9    mistaken.

10             **THE COURT:**  Sixty-six?

11             **MR. YETTER:**  Sixty-six?  You did 111 and you got a

12   75 percent inaccuracy rate.

13             **THE COURT:**  Well, how many of those little samples do

14   you have to do before you institute some institutional changes?

15             **THE WITNESS:**  Well, and that's exactly what we did,

16   your Honor.

17             **THE COURT:**  Well, why do another study; why do you --

18   what changes have you done?

19             **THE WITNESS:**  Well, we took steps to address this

20   issue and then we --

21             **THE COURT:**  What steps; what have you done?

22             **THE WITNESS:**  Okay.  I don't know if you have the

23   exhibit of the memo that was written for me as a plan to move

24   forward.  And so one of the first things that we did was bring

25   in all of the supervisors.

1          **THE COURT:**  When?

2          **THE WITNESS:**  I want to say it was the end of March;

3   March 30th I believe, if I'm not mistaken, of 2014.  I'd have

4   to go back and see the date.  But that was one of the things we

5   did.  And we went over the seriousness of the cases and we made

6   sure that all the supervisors understood that the accuracy

7   needs to increase, and they need to be very diligent in looking

8   at the work and not simply --

9          **THE COURT:**  Well, what did you do about those

10  licenses for those places where the abuse was occurring, that

11  you had missed a year earlier?

12         **THE WITNESS:**  For all the cases where the UTD was

13  incorrectly found, we actually went out to every one of those

14  and we noted no findings of abuse, no other outcries from

15  children, as I understand it.

16         **THE COURT:**  So you just didn't do anything different

17  with --

18         **THE WITNESS:**  We went back out, yes, ma'am.

19         **THE COURT:**  You didn't change the licenses or do

20  anything about the placement of the children, or recommend to

21  the placement part that they be placed someplace else after the

22  abuse was confirmed?

23         **THE WITNESS:**  As I understand it, the ones that

24  should have been RTB, those cases should have been reopened,

25  and I believe they were actually reopened.  I'll have to double

1   check and see if that was done.

2            THE COURT:  Okay.

3            THE WITNESS:  But the licenses were not revoked for

4   the facilities or the homes where those occurred.

5            THE COURT:  Okay.  And I understand, since you don't

6   track at all abuse of children on children, we're just talking

7   about of children by adults --

8            MR. YETTER:  Correct, your Honor.

9            THE COURT:  -- in these homes; is that right?

10           MR. YETTER:  Correct.

11           THE WITNESS:  I'm not sure if it was all adult on

12  child.  I'm not sure if it was child on child.

13           THE COURT:  Well, there's --

14           MR. YETTER:  Well, some of them could be -- your

15  Honor, negligent supervision could be a Child Placing Agency

16  that improperly supervised children and there was a child on

17  child.  That's the only way it would come up.

18           THE COURT:  Okay.

19           MR. YETTER:  The others would have been by adults;

20  physical abuse and sexual abuse.

21           THE COURT:  Do you know what they were?

22           THE WITNESS:  I don't have the number of what they

23  were, but my understanding was that they could have been -- no,

24  ma'am.  Your Honor, no, I don't know what they were.

25           THE COURT:  Okay.

1         THE WITNESS:  I'm sorry.

2         THE COURT:  Now, I understood you to say, and correct

3  me if I misunderstood this, that you sent people back out to

4  those facilities, where the abuse was then confirmed, or had

5  been confirmed by your readers, and found no further abuse; is

6  that right ?

7         THE WITNESS:  Correct.

8         THE COURT:  So, nothing changed as a result of you

9  being put on notice that a year later you found out the

10  children were actually abused as reported?

11         THE WITNESS:  If there were no further outcries and

12  there is no indication of --

13         THE COURT:  No further outcries?

14         THE WITNESS:  If there are no further outcries and no

15  other intakes --

16         THE COURT:  Who on earth is going to make an outcry

17  if you've done nothing for a year?

18         MR. YETTER:  So, just to make --

19         THE COURT:  You expect them to keep complaining?

20     (No audible response)

21         Oh my goodness.  I think we've just got to take an

22  afternoon break.

23         THE MARSHAL:  All rise.

24     (Recess taken from 3:20 to 3:43 p.m.)

25  //

Morris - Direct / By Mr. Yetter                          50

1          **THE CLERK:**  All rise.

2      **(Pause)**

3          **THE COURT:**  You can take the stand again please, sir.

4      **(Pause)**

5          Go ahead.

6              **DIRECT EXAMINATION (CONTINUED)**

7    **BY MR. YETTER:**

8    Q    Just to finish up this topic that we were just on before

9    the break, Mr. Morris.  The UTD cases that you found were

10   actually incorrect 75 percent of the time, and the eight among

11   those that were found to actually have sexual abuse, physical

12   abuse, or negligent supervision to have occurred; coming out of

13   that, no licenses for any of these child placement facilities

14   or agencies were suspended were they?

15   A    No licenses were suspended, but we did reply; we did

16   respond to the things that we found.

17   Q    None were revoked?

18   A    None were revoked.

19   Q    No penalties were established on any of these facilities

20   or --

21   A    No.

22   Q    -- the Child Placing Agencies?

23   A    No penalties were established that I recall.

24   Q    These same agencies are taking children today, despite the

25   findings of eight substantiated cases of physical, sexual

1    abuse, and negligent supervision?

2    A    Yes.

3    Q    The same children that were there, that were subject to

4    this abuse, are still in the same facilities, unless you've

5    moved them?

6    A    I believe one may have shut down.

7    Q     In fact, the facility shut down altogether?

8    A    I would have to double check that, but I think that's what

9    I recall is one facility shut down.  But no, we did not revoke

10   any licenses.

11   Q    But the State didn't move any of the children either, did

12   they?

13   A    No.

14   Q    And, what you're telling us is you're doing some other

15   little study of 69 cases?

16        **THE COURT:**  The way I get it, the response to the

17   first two samplings, instead of saying we've got an

18   institutional crisis here, let's do something; they wanted to

19   do another sampling just in case they could up the -- make it

20   look better.

21        **MR. YETTER:**  So the reality is you do --

22        **THE COURT:**  So that's what has been done.

23        **MR. YETTER:**  You had thousands of them --

24        **THE COURT:**  Mr. Albright will straighten it out,

25   but --

1          THE WITNESS:  There are some additional steps that we

2    took, your Honor.

3          MR. YETTER:  You do thousands --

4          THE COURT:  Well, you didn't tell me about them when

5    I asked you.

6          THE WITNESS:  No, ma'am, I didn't.

7          THE COURT:  Why is that?

8          THE WITNESS:  Well, I --

9          THE COURT:  You're just finding out some more things

10   over the break?

11         THE WITNESS:  No, ma'am.  I didn't know if I was

12   supposed to speak up at that time to carry on and give you the

13   rest of the steps that we did.  But there was a pretty robust

14   response to the things that we did after we determined these

15   cases.

16   BY MR. YETTER:

17   Q    Robust?

18   A    Yes.

19   Q    You literally make thousands of investigative findings

20   ever year, don't you?

21   A    Yes.

22   Q    And you did this survey and you found that 75 percent of

23   this group was wrong.  True?

24   A    Correct.

25   Q    And none of the agencies involved were penalized in the

1    slightest, were they?

2    A    That's correct.

3    Q    And so now you're telling us you had a robust response?

4         **THE COURT:**  And none of the children were moved.

5    Q    And none of the children were moved?

6    A    Correct.  None of the children were moved.

7    Q    And children don't -- they don't complain if nobody

8    listens to them, do they?

9    A    You're saying that children don't complain if no one

10   listens to them.  I would say children still complain, so that

11   someone does listen to them.  I can't say that 100 percent of

12   the time the children won't complain if they think no one

13   listens.

14   Q    So you have the -- wouldn't you agree, Mr. Morris, that

15   this had to shake your confidence in literally thousands of

16   investigative findings a year.  True?

17   A    It was a cause of concern for me to take additional steps

18   that we did, in fact, take.

19   Q    And so now you're going to do another little survey?

20   A    There was additional work in that.  No.  I think that

21   you --

22   Q    Hoping it comes out better?

23   A    That's incorrect.

24   Q    Okay.

25   A    That's not just what we did.

1   Q     Now, you have -- have you -- as far as I know, you haven't

2   sent in any sort of request to revamp your agency have you; how

3   you do investigations?

4   A     As in rebuilding the Child Care Licensing or RCC?

5   Q     Absolutely.

6   A     No, we have not done a transformative --

7   Q     Because this survey --

8   A     -- repair, like transformation.

9   Q     This survey could be the tip of the iceberg and you're not

10  even looking underneath the surface of the water.

11  A     In fact, we have looked further.

12  Q     What are you doing, other than this new little survey of

13  69 cases?

14  A     When the results of the report came out, we actually went

15  out to every single one of the homes.  For the 11 that the PMU

16  unit identified should have been RTB, we went out to every

17  single one to determine if there were any children at risk.

18  There weren't.

19        As the remainder of the readings, or the re-reads, were

20  done, we went out and did follow-ups at every one of those

21  facilities as well that were still open.  And every one of

22  those, it was more than just walking in and saying hello.  We

23  went in and did inspections.  We put eyes on the children.  We

24  made sure that the ratio was correct.  We basically did a full

25  inspection of the facility.

1        In addition, we spoke with -- our staff in PMU had a sit

2   down and said, you know what PMU field, we need to look for any

3   sort of trends with any of the providers.  No trends were

4   identified for us.

5        Earlier, I referred to a mandatory all-hands meeting that

6   I called on March 31st, I believe it was, -- March 30th or

7   March 31st -- for all of the supervisors within Child Care

8   Licensing to explain to them the very high standard that we

9   have for investigations in Child Care Licensing.  And I made

10  the expectation very clear the work has to be better, we're

11  going to help you get better, and you're going to get better.

12       We also hired additional staff within our state office.

13  We hired two.  We call them a Program Specialist VI, but it's a

14  higher level staff member that works -- they both work directly

15  for Jean Shaw, giving her additional staff so that we can focus

16  on things like professional development, additional training,

17  working with staff to identify any trends, child safety issues;

18  all of it related to.

19  Q    Is that it?  Is that the robust response that you had?

20  A    That was a lot.  In addition to that, we put in our

21  exceptional item and asked for 20 more investigators, 20 more

22  inspectors, and the support staff for all of those positions as

23  well.

24  Q    So let me just make sure we're all clear.  This wasn't

25  just your decision.  You took it up the chain, didn't you?

Morris - Direct / By Mr. Yetter                    56

1   A    Yes, we did.  It was the decision then that I went to

2   Commissioner Specia.

3   Q    You took it -- you made a presentation in August of 2014,

4   four months ago, to the Commissioner and others about what to

5   do, didn't you?

6   A    A presentation in August?  I would want to go back and

7   look at the date on that memo.  I believe it was sooner than

8   August of 2014.

9          **THE COURT:**  What was the date on the -- when you went

10  to ask for more inspectors because of the --

11         **MR. YETTER:**  That was --

12         **THE COURT:**  Was that connected to this at all?

13         **MR. YETTER:**  No.

14         **THE WITNESS:**  No.

15  **BY MR. YETTER:**

16  Q    That was because they had all the undocumented children

17  that were coming over.

18  A    Well, that's one reason we asked for it.  But, you know,

19  we asked for additional staff so that our licensing staff could

20  do more work related to safety of kids in care.  So, about the

21  time the exceptional item was first drafted and due to finance

22  on March 7th, also we were in the middle of doing the work to

23  determine the safety of the kids for those that were determined

24  they should have been RTB's rather than UTD's.

25  Q    Okay.  The Judge asked a very good question, and I would

1    like to go back to Plaintiffs' 898.  Okay.  Here we are in

2    March.  You've now learned that you have 75 percent inaccuracy

3    rate from this sample.  This is on March 7th, 2014.  Now, this

4    is a request for exceptional item funding worksheet.  You

5    remember that, don't you?

6    A    Yes.

7    Q    Okay.  Let's go to the next page.  And this is the one

8    that you said has all the inaccuracies in that first paragraph

9    about the 96 percent increase.  But number one says:

10              "...an increase in the number of serious incidents in

11              Residential Child Care Operations, which has resulted

12              in an increase in investigations for both inspectors

13              and investigators."

14   Do you see that?

15   A    Yes, I do.

16   Q    Now, are you talking about what you found because all of

17   these findings were inaccurate?  That's the increase.  You have

18   these 11 cases that should have been ruled reason to believe,

19   and that's the serious incidents in Residential Child Care

20   Operations?  That's what you're talking about?

21   A    That was part of them, and there were other incidents as

22   well.

23   Q    Okay.  Now, the fact is you never have sent this proposal

24   in have you?

25   A    You're saying I have never sent this proposal in to who?

1  Q    Yes.

2           **THE COURT:**  Well, you said you were revising it.

3           **MR. YETTER:**  Correct.

4           **THE WITNESS:**  This proposal has been submitted to our

5  Finance Division and it's actually one of the exceptional items

6  that has moved forward and it won't go until the legislative

7  session.

8  **BY MR. YETTER:**

9  Q    In your deposition you said you were "not aware if the

10 funding request had been distributed outside of DFPS."

11 A    That's correct.

12 Q    So it has never gone to anybody, except internally?

13 A    And it is included as part of the exceptional on the list

14 that will move forward into the upcoming legislative session.

15          **THE COURT:**  Okay.  But the point is that hadn't been

16 presented to anybody outside the department?

17          **THE WITNESS:**  Correct.  This was an error.  This was

18 an inaccuracy and I took full accountability for that, but --

19          **THE COURT:**  Well, but that was March.

20          **THE WITNESS:**  -- it stays with internal to the --

21          **THE COURT:**  That was March.  And you said you had all

22 these problems with the investigations, and you still haven't

23 asked for any help from the legislature.

24 //

25 //

Morris - Direct / By Mr. Yetter                          59

1   **BY MR. YETTER:**

2   Q    I mean, we're eight months away from March; no, nine

3   months away from March and you've had -- there have been no

4   extra people, no nothing, right?

5   A    That's correct.

6   Q    And the children are still in the same places, unless

7   somehow the facility is shut down.  True?

8   A    Correct.

9   Q    And nobody has been fined or penalized at all?

10  A    That's correct.

11  Q    True.  But that's your robust response.  And this was

12  approved at the highest levels of DFPS, wasn't it?

13  A    Yes, it was.

14  Q    In fact, you even had your lawyers involved in that

15  meeting, didn't you?

16          **MR. ALBRIGHT:**  Your Honor, is this an attempt to

17  invade the attorney-client privilege?

18          **MR. YETTER:**  I am asking a question that I believe --

19          **THE COURT:**  I didn't hear that.  I'm sorry.

20  **BY MR. YETTER:**

21  Q    You even had your lawyers involved in making this

22  decision, didn't you?

23  A    Please clarify the meeting and the decision that you're

24  saying that we were involved in.

25  Q    Sure.  Your colleague, Jean Shaw, testified that you made

Morris - Direct / By Mr. Yetter                    60

1  a presentation to the Commissioner with her findings in August

2  of 2014, right before she gave a deposition.  You know that,

3  don't you?

4  A    I don't recall it to be August, but yes we did meet with

5  the Commissioner and say, sir, this is what we found.

6  Q    And you had counsel involved in that meeting before you

7  decided what you were going to do.

8  A    Counsel did not decide what we were going to do.  That was

9  my decision to ask for additional staff, and it has been fully

10  supported by the Commissioner.

11  Q    Now, that was in August, right?  But you're telling us

12  that this request that you have in March is where you were

13  asking for the additional people, even before you talked to the

14  Commissioner?

15  A    That's correct.

16  Q    How does that work?

17  A    So the report was done and the study was asked for by Jean

18  Shaw for PMU.  The report was dated January.  At that same

19  time, when the results came out, we were creating exceptional

20  items for the upcoming legislative session and I said, you know

21  what, we need to ask for additional staff, let's put it in this

22  exceptional item.  This was one of the things that I think can

23  support it.

24  Q    Mr. Morris, do you have any idea of how many more dozens

25  and dozens of instances of abuse that actually took place where

1   your investigators ruled it out entirely because they did a

2   poor investigation?

3   A    I'm not aware of any other findings or missed cases at

4   this point.

5   Q    Well, it's because you've only looked at 111 and you made

6   an error in 75 percent of them, right?

7   A    And we had a response to it.

8           **THE COURT:**  Well, plus the other 48.

9           **MR. YETTER:**  Well, the 48 is part of the 111, Judge.

10  So they looked at 111 and they were wrong 75 percent of the

11  time.

12          **THE WITNESS:**  And we addressed it.

13  **BY MR. YETTER:**

14  Q    And you have thousands of investigations that you do every

15  year.

16  A    We have a thousand -- we have about 3,000, actually; a

17  combination of inspections for abuse and neglect and non-abuse

18  and neglect.  That is correct.

19  Q    And the far vast majority of them, your investigators say,

20  nope, I'm ruling it out, no abuse; no physical abuse, no sexual

21  abuse, no negligent supervision, no neglect.  Right?

22  A    I would need to go back and look and see what the

23  percentage of RTB's is.

24  Q    Do you have any idea how many of those thousands that

25  you've just ruled out are flat wrong?

1  A     I'm not aware of any of those that are flat wrong.

2  Q     Because you haven't looked at any more, other than the

3  111, have you?

4  A     We did follow up on some additional cases.  I believe we

5  said we would do a 50 percent sample of the abuse and neglect

6  investigations that were done in a certain time period.  That

7  follow-up has indicated to us that the numbers are looking

8  pretty good.  We're still finishing the readings on one of

9  those cases.  And what we're seeing is that the supervisors are

10 beginning to -- or, I'm sorry.  The supervisors are now asking

11 the right questions.  They're looking at the investigations

12 with, you know, a more open eye.  They're asking the correct

13 questions.  And so we have a better feel for the fact --

14         THE COURT:  What questions did you find out were

15 wrong that they were asking?

16         THE WITNESS:  What we did was we did a sample of case

17 readings, and what we specifically looked at was the

18 supervisor's review and the questions that they would be asking

19 relating to those investigations; things related to child

20 safety mostly.  There's also some demographic information that

21 they looked at.  But I would rely on Ms. Shaw to give the

22 details of those -- the follow-up on those case readings, as

23 well as --

24         THE COURT:  Okay.  When you went --

25         THE WITNESS:  -- my current --

1          **THE COURT:**  When you went back to interview -- or, to

2    re-look at the cases that were found believable, when they

3    hadn't been previously, were the children interviewed as well?

4          **THE WITNESS:**  I believe they were.

5          **THE COURT:**  Do you know that?

6          **THE WITNESS:**  If the children were still in care.

7          **THE COURT:**  Do you know if they were interviewed;

8    100 percent sure that they were interviewed?

9          **THE WITNESS:**  I'm not 100 percent sure that the

10   children were interviewed, but I do know that some of the

11   children were no longer in care, ma'am.  So I don't know if the

12   child left --

13         **THE COURT:**  So you didn't -- that was not one of your

14   directives, to go out and find these children and see what they

15   have to say?

16         **THE WITNESS:**  I would have to rely on Ms. Shaw to see

17   if she did that.  I don't recall that being --

18         **THE COURT:**  But you're the guy in charge, aren't you?

19         **THE WITNESS:**  Yes, ma'am.  Yes.

20         **THE COURT:**  And you didn't have that as one of your

21   directives?

22         **THE WITNESS:**  No, your Honor.

23   **BY MR. YETTER:**

24   Q    So one of the things you told us is you brought all of

25   your people together and said do better investigations, right?

1  A    Maybe not quite like that, but we made the expectation

2  clear that their performance needed to improve.

3  Q    Did you train them better?  Did you have like a weeklong

4  training session?  Did you give them any more resources?  Did

5  you --

6  A    We did indeed.

7  Q    You did indeed?

8  A    We did indeed.

9  Q    And what --

10 A    We had that day that we met with them and then we also did

11 an all-staff meeting for all of our staff within Child Care

12 Licensing at the end of the fiscal year.  I want to say it was

13 around the last week of August; maybe the 28th or 29th.

14 Q    This is after you met with the Commissioner?

15 A    I believe it was.

16 Q    And how long did that meeting take?

17 A    It was a weeklong; almost five days I think, five and a

18 half or four days.  I'd have to go back and look.

19 Q    And what did you do in that meeting?

20 A    We addressed many different areas, but one of the areas

21 that we addressed was UTD's and the need to ask the right

22 questions and make sure we're doing solid work.

23 Q    Now, why do you think this is limited just to the times

24 that they come up with UTD?

25 A    I think that was the first place that we looked.  It was

1   one of the things that Ms. Shaw was concerned about and so she

2   asked the question.

3   Q    Now, it could be just as likely that it relates to all the

4   times that you rule out anything happening, right?

5   A    Potentially, yes.

6   Q    And you haven't told them anything about those, have you?

7   A    Well, the thing that we would make sure that they were

8   understanding is that there is a very clear expectation that

9   their casework and their work has to be on point and it has to

10  be very accurate.

11  Q    Now, one of the things that you've never done is try to

12  figure out, on a regular basis, how much work your inspectors

13  and investigators actually can handle during the normal work

14  week, have you?

15  A    We have not yet undertaken a work measurement study if

16  that's what you're referring to.

17  Q    I am.  You don't monitor workload data at all do you?

18  A    I do not have that data.

19  Q    You don't have any workload targets at all do you?

20  A    I don't have a workload target, but we do have a work

21  measurement study that is upcoming, and Licensing will be a

22  part of that.

23  Q    You don't have any formal system for flagging workloads

24  that are too high do you?

25  A    No.

1    Q    You have not asked for a workload study; you, Mr. Morris,

2    has not asked for?

3    A    I have asked for a workload study within Child Care

4    Licensing and we will be up next after APS, Adult Protective

5    Services.

6    Q    I'm sorry, I didn't hear the first part of your answer.

7    A    We have asked for a work --

8    Q    So, when did you ask for it?

9    A    -- measurement study.  We're part of that.

10   Q    After your deposition?

11   A    No.  The decision was made earlier this year.  I want to

12   say in May.  What I'm referring to is the work measurement

13   study that is part of the agency-wide effort.  As Ms. Black had

14   testified, APS is the first one to start off.  My understanding

15   is that Child Care Licensing is the next priority up after they

16   go through one of the work measurement studies to make sure

17   they get the bugs worked out.  And then CPS would be after

18   that.  Now, if that priority still exists, I would -- I think,

19   as an executive team for the agency, we'll go back and re-look

20   at that.

21   Q    Now, you were asked about this in your deposition weren't

22   you?

23   A    Yes.

24   Q    And the question -- and I'll just ask you the question

25   again.  Now, are you saying -- because this was just a couple

1   of months ago, right?

2              **MR. ALBRIGHT:**  Could we get a page and line, your

3   Honor, please?

4              **THE COURT:**  Certainly.

5              **MR. YETTER:**  I'm actually on Page 140, Line 5.

6   **BY MR. YETTER:**

7   Q     And your deposition was in September 2014.

8         And so let me just ask you generally -- in fact, as of

9   just two months ago, you said that a workload study "may be

10  contemplated, yes, in the future," right?

11  A     Yes, I did.

12  Q     You didn't say it was going to be next in line or anything

13  like that?

14  A     No, I did not.

15  Q     So all this happened just in the last two months before

16  trial?

17  A     No, that's not correct.

18  Q     Well, let's look -- you want to look at --

19  A     APS is the first one up for the work measurement study.

20  We'll have to see what happens with that, and if it's

21  appropriate for Child Care Licensing to go next, they will.  If

22  it's more appropriate for Child Protective Services to go next,

23  they will.

24  Q     Okay.  So a minute ago, I thought you said you were next

25  in line.

1  A    Well, that's apparently how the priorities are set.  The

2  priorities may change.

3  Q    Two months ago you said "maybe it will be contemplated in

4  the future," right?

5  A    I believe that's how I answered, yes.

6  Q    "I don't know when that will be conducted," right?

7  A    Correct, yes.  But I also -- I believe I also said in the

8  deposition that it was discussed in May if I'm not mistaken.

9  Q    I think what you said is that you have not sought for a

10  work measurement study to be a priority.

11  A    I have not asked for a specific work measurement study to

12  be done just on Child Care Licensing as an independent effort.

13  Q    Let's be -- I want to be clear.

14  A    Okay.

15  Q    You have not asked for a work study to be any sort of

16  priority for your group have you?

17  A    I have not asked for an independent work measurement study

18  separate from the effort that's going to happen with all of

19  Family and Protective Services.

20  Q    Well, okay.  And I'm sorry, Mr. Morris, because this was

21  all in the same line of questioning.  Let's look at Page 140

22  [sic]-- oh, you have the deposition.  Okay.  The fact is,

23  Mr. Morris, in your deposition you told us that it was not --

24  you thought there were other priorities that were more pressing

25  in your group, didn't you?

1              **MR. ALBRIGHT:**  Can I get a page and line on that one?

2              **MR. YETTER:**  Page 141, Line 13 to Line 18:  "Have you

3     sought to make a work measurement study for Residential Child

4     Care a priority?"  Do you remember your answer?

5     A    I believe, as you said, I think I -- I believe I recall

6     saying that I didn't want to make that a priority at this time.

7     Q    "I had not sought for a work measurement study to be a

8     priority for Residential Child Care.  There are other

9     priorities right now that appear to be more pressing."

10    A    That is correct.

11    Q    Let's move to a different topic about quality assurance

12    that you no longer, apparently, are doing.  All right,

13    Mr. Morris.  You know what I'm talking about?

14    A    If you'll refer to that, I will.

15    Q    Sure.  The PMU, your unit, used to do what they call data

16    and trend assessments, didn't they?

17    A    That is correct.

18    Q    So the PMU unit, that's your Quality Assurance unit; and

19    in 2011 and in 2012, they did a Child Care Licensing data and

20    trend assessment.  Let's look at Plaintiffs' Exhibit 1111.

21    Does this look familiar?  Let's blow that up if we can see that

22    middle part.  Does this look familiar?

23    A    Yes, it does.

24    Q    Mr. Morris, this is from PMU.  This is your Quality

25    Assurance.  It's January 2011.

1    A    This predates my time, but yes.

2    Q    Okay.  This is -- but you know about this because you're

3    the head of this group, are you not?

4    A    It was one of the reports that I learned about recently

5    after the deposition.

6    Q    Okay.  Fair enough.  You've been schooling up a little bit

7    before trial?

8    A    I have.

9    Q    Page 13.  This, your Honor, is some data that you have in

10   the Class Certification Opinion.  The follow-up data right in

11   the middle.  And this is data we presented at the Class

12   Certification Hearing about untimely follow-up.  Do you know

13   what I'm referring to, Mr. Morris?

14   A    Follow-up on deficiencies, I believe.

15   Q    You're exactly right.  So this shows that follow-up was

16   not done within the timeframes for RC, would be your group,

17   Residential Child Care, right?

18   A    RC and DC are both my groups, sir.

19   Q    Both your groups.

20        And follow-up was done -- one-third of the time was done

21   late, if it was done.  Right?

22   A    It was done.

23   Q    But it was done late.

24   A    Not completed within timeframes.

25   Q    So, investigations have to be timely to be effective,

 1  don't they?

 2  A    Investigations should be timely, yes.

 3  Q    And follow-ups on investigations should be timely?

 4  A    It is best when those follow-ups are timely, yes.

 5  Q    The next part says the type of follow-up that you guys

 6  were doing was not the best way to do it.  "The type of follow-

 7  up chosen was not the best method to reduce risk."  Your group

 8  deals with risks to the children, doesn't it?

 9  A    Yes.  And I will just say that this is not a report that I

10  have delved into or spent much time on in my time as the

11  Assistant Commissioner.

12  Q    I'm not surprised, because you guys stopped doing this

13  report after the Class Certification Opinion in 2013.  For

14  example, not making an in-person inspection in the case of

15  health and safety-related issues; for your groups, for the

16  Residential Child Care, 41 percent of the time it was not done

17  using the right approach, correct?

18  A    So the reason these weren't done, --

19  Q    Am I right about --

20  A    -- to reply to your comment.

21  Q    Did I read that right?

22  A    You're reading it correctly here and I can only assume

23  that if this was put into the report by PMU then it's correct.

24  Q    All right.  Let's go to the next year, to Plaintiffs'

25  Exhibit 1074.  This is the same data and trend assessment by

 1   your same group, issued --

 2   A    Actually, it -- and when you say the "same group," let's

 3   be accurate on that if we could.  When I became the Assistant

 4   Commissioner for Child Care Licensing, the elements of PMU,

 5   basically the staff, had been distributed amongst the different

 6   divisions.  One of the very first things I did when I landed in

 7   Child Care Licensing was to put the PMU group back together and

 8   make sure that we hired a division administrator to guide it

 9   and make it better.

10   Q    Good.  Thank you.

11        So this is 2012, the same report for Child Care Licensing

12   data and trend assessment.  Let's go to Page 12.  And there are

13   the same statistics.  Go to the top there.  And this even look

14   worse.  Well, you kind of started doing it backwards.  The

15   follow-up was completed within the timeframes.  So, the prior

16   year, you had said "which was untimely."  This one is "which is

17   timely."  And for Residential Child Care, it was "timely"

18   63 percent of the time, which means it was untimely

19   36.4 percent of the time, right?

20   A    That would be the math, yes.

21   Q    And that is a little bit worse than 2011, isn't it, which

22   you have 35.7 percent untimely?

23   A    That would be the math, yes, sir.

24   Q    Next line says:  "The type of follow-up chosen -- "  This

25   is where you got a little bit better.  " -- was not the best

1   method."  And, again, for the Residential Child Care,

2   22 percent was not using the correct method to reduce risks.

3   True?

4   A     That's what the report says.

5   Q     Now, for some reason, PMU didn't do these reports in 2013,

6   did it?

7   A     No, they did not.

8   Q     And for some reason, PMU did not do this report in early

9   2014 either, did it?

10  A     That is correct.  PMU staff looked at this and it said,

11  you know, the data and trend analysis report.  And this is

12  something that I inquired into, as I'm learning more about PMU,

13  as I'm learning more about the division and my role as the

14  Child Care Licensing Assistant Commissioner.  I said why aren't

15  we doing these?  It was relayed to me by Leslie Reed, the

16  Division Administrator for PMU, that the data and trend reports

17  to PMU seemed like a big conglomeration of data, and just

18  putting data simply down on a report rather than doing more

19  analysis.  They're looking for a better way to look at this

20  data.  They're looking for more ways to ask the question:  What

21  causes this?  And then move forward from there.

22  Q     So you didn't do these reports for the last two years,

23  right?

24  A     Correct.

25  Q     And you haven't -- I'll just represent to you the state

1  hasn't given us any data that would show what happened in 2013

2  and 2014 on these same statistics.  Do you know it off the top

3  of your head --

4  A    I don't know it off the top of my head.

5  Q    -- and could you share it with us?

6  A    But I do know that follow-up on deficiencies is one of the

7  reports that my Field Director has used, that their district

8  directors and regional managers use.  That's one of what they

9  call the magic six reports.

10 Q    Another problem that you guys have been looking into are

11 background checks, aren't you?

12 A    Yes.

13 Q    Those are important aren't they?

14 A    They are indeed.

15 Q    Because if you've got people going to these Child Placing

16 Agencies that have checkered backgrounds, children are at risk

17 aren't they?

18 A    That is absolutely a possibility.

19 Q    And, in fact, the State has been penalized for not doing

20 background checks properly?  True?

21 A    I believe they have been, yes.

22 Q    In fact, the background checks have resulted in fines

23 levied against the DFPS; the State?

24 A    I believe that is the case from the last IV-E audit.  I'm

25 not sure what the fine is though.

1  Q    The fines were in the millions of dollars, weren't they?

2  A    I don't know what the number is, sir.

3  Q    Let's look at Plaintiffs' Exhibit 902.  And here is

4  another proposal; again, a draft.  No one, apparently, has seen

5  this proposal either for more funding for your group.  And it's

6  supposed to be due on March the 7th, 2014, right?

7  A    Correct.

8  Q    Now, again, you're the executive sponsor.  Let's see if we

9  can see that.  There we go.  True?

10 A    That's what it says right there in block four.

11 Q    Okay.  Now, let's pull those down and let's look at that

12 bottom Paragraph Number 7 to see what this one is about.

13 Again, this one that you apparently have never sent to anybody.

14 You're requesting funding for your program to proactively

15 review an operations compliance with background check

16 requirements, right?

17 A    That's incorrect actually when you say that we didn't send

18 it to anyone.  This is one of the exceptional items that we put

19 forth and was discussed with the executive team for DFPS and

20 Commissioner Specia.  This is one of the ones that didn't make

21 the cut.

22         THE COURT:  It did or did not?

23         THE WITNESS:  It did not make the cut and it did not

24 leave the agency, your Honor.

25         THE COURT:  I think that was what he was talking

1   about.

2   **BY MR. YETTER:**

3   Q    Okay.  Let me correct it then.  You wanted to get funding

4   and the DFPS said no we're not going to ask for funding, right?

5   A    We identified this as --

6   Q    You, meaning your group, --

7   A    -- one of the needs.

8   Q    -- wanted to get funding and you were overruled?

9   A    This was one of the things that did not make the priority

10  list.

11  Q    That's a yes?

12  A    That's correct.

13  Q    Okay.  So let's look to see what you were trying to do.

14  And it says:  "A recent Title IV-E audit revealed a number of

15  errors related to background checks."  Do you see where I'm

16  reading?

17  A    I do.

18  Q    That's risky for children isn't it?

19  A    Errors related to background checks are risky to children.

20  Q    That indicated risk to children and resulted in fines

21  against the State.

22       Let's go to the next page.  I'm sorry, two pages more.  On

23  Item Number 8 there's a -- oh, just that box that says "explain

24  factors."  Okay.  This is -- you are explaining why you want

25  this money:

1          "Due to numerous errors -- "  Numerous errors.  " -- in

2          the Title IV-E federal review related to background

3          checks, Texas has been fined millions of dollars."

4          Do you see that?

5   A      Yes, I do.

6   Q      Does that refresh your recollection of how significant the

7   fines are?

8   A      Yes, it does.

9   Q      "There still seems to be numerous errors which could

10  potentially cost Texas additional money in fines."  Right?

11  True?

12  A      Correct.

13  Q      Making mistakes on background checks is a hugely risky

14  thing for children isn't it?

15  A      It is.

16  Q      "Current CCL staffing does not allow CCL -- "  Your group.

17  " -- the opportunity to be proactive."  There is that proactive

18  word again.  You've been -- have you been in court when we've

19  been talking about a reactive management style versus a

20  proactive management approach?

21  A      I know what you're referring to.

22  Q      Okay.  And here you're saying --

23  A      I don't --

24  Q      -- it would be good to be proactive because this is really

25  risk for children.  Right?

1    A    Yes, it would.

2    Q    And you were overruled weren't you?

3    A    For resources for this exceptional item for this effort to

4    continue?  Yes.

5    Q    "Give the CCL the opportunity to be proactive with helping

6    providers come into compliance with background checks before an

7    error occurs."  Right?

8    A    Correct.  So what we currently have in place now, if I

9    may?  Judge Specia and I signed a letter to all providers who

10   are licensed within the State of Texas, and I believe that went

11   out in mid-February, explaining the absolute necessity to do

12   appropriate FBI background checks.  And, in fact, it was

13   something that was going to be required in 2014.  There was not

14   a minimum standard for FBI background checks to be completed.

15   In addition to that, within DFPS, our Contracts area also did

16   proactive checks and worked with providers that we had under

17   contract with DFPS to ensure that their background checks were

18   done timely.  As a result, -- and I checked with Ms. Shaw, she

19   has seen a marginal decrease in the number of background check

20   deficiencies that we've seen in Residential Licensing.

21   Q    Now, the problem that you have is that when you're just

22   telling them do better background checks -- that's what you're

23   telling them, right?

24   A    When we --

25   Q    You're saying do better background checks?

Morris - Direct / By Mr. Yetter                    79

1   A    When we explain to providers that background checks are

2   something that they need to do?  Yes.

3   Q    But you're not having -- you don't have any new staff like

4   you said you needed to help them do the background checks?

5   A    Correct.  The effort that we undertook was out of --

6   Q    And these are important because if foster -- foster

7   parents can be in a situation where they newly commit crimes.

8   You know that don't you?

9   A    Yes.

10  Q    And new adults, like boyfriends, can come into a foster

11  home; or relatives that create risks for these children, right?

12  A    Correct.

13  Q    Prior perpetrators of bad things can come into these

14  homes.  That's why you have to be doing these background

15  checks, right?

16  A    Correct.  We want to check the backgrounds of any adult or

17  any individual over 14 who is in the home.

18  Q    So now children getting to the age of 14 have to be

19  checked?  True?

20  A    Yes.

21  Q    Because then they're getting to be young --

22  A    If they're part of the care ratio, that's correct, sir.

23  Q    There are getting to be youth that you need to check their

24  background, right?

25  A    Correct.

Morris - Direct / By Mr. Yetter                    80

1    Q    But you don't keep track of their background on child-on-

2    child abuse do you?

3    A    We do not track -- well, we do not actively track that

4    within a class.  I believe there is a box to check it, but I

5    don't believe it's accurate.

6    Q    So you could be having teenagers that have a history of

7    sexual predation and you have no idea about it, right?

8    A    Well, define that teenager.  Is it an individual who is in

9    the care ratio for the child?  Is it an individual who is

10   required to have a background check, like a frequent visitor of

11   the home?  If it's -- yeah, I think --

12   Q    A child that --

13   A    -- if you just say any individual who comes in the home

14   who is 14 or over, there is always a possibility for that.  But

15   if they meet the requirement to have a background check then

16   they need to have one.

17   Q    But if they're a foster child and they have a history you

18   don't check it?  You don't even keep track of it?

19   A    I don't believe we do.

20   Q    All right.

21       So you know what a -- let me change to a slightly

22   different topic about your investigations.  You know what a P1

23   and P2 investigation is?

24   A    That's basically the priority.

25   Q    Those are the worst --

1   A    P1's you go out on.

2   Q    -- the investigations of the worst incidents aren't they?

3   A    Correct.

4   Q    So a priority one abuse and neglect investigation is where

5   a child has been killed or there is an immediate threat of

6   serious and physical or emotional harm.  True?

7   A    A child fatality is classified as a P1, yes.

8   Q    A priority two abuse and neglect investigation is where

9   there is an allegation of abuse and neglect, but the child is

10  currently safe or not at an immediate risk of serious physical

11  or emotional harm.  Right?

12  A    I believe that's the correct definition of a priority two.

13  Q    And your investigators do priority one and priority two

14  investigations don't they?

15  A    They do priority one, priority two, and all the other

16  priorities, yes, sir.

17  Q    And a significant percentage, almost 10 percent of those

18  investigations, are rejected by their supervisors as

19  incomplete, right?

20  A    I would have to go back and look at the percentage or the

21  measure.

22  Q    Let's look at Plaintiffs' Exhibit 608.  And this is -- can

23  we go up to the top piece, just the little top piece, so that

24  he can see what it is.  This is from your group is it not?

25  A    Count of RC abuse and neglect investigations for children

1  in DFPS conservatorship that were initiated.  This looks like

2  the title of one of our six reports that are used in the field.

3  Q    This actually came from your lawyers.  It says it is an

4  Updated Ninth Set of Interrogatories, Interrogatory Number One.

5  A    Yeah, that's interesting.  I'm not sure what that is.

6  Q    And let's go down to the bottom right corner and find out

7  what the date is.  August 7th, 2014.

8        Let's go to the bottom left corner and find out what the

9  source of the information is.  You know that the impact

10 database is your big master database, as well as the class data

11 warehouse?

12 A    The impact database is the one that is used primarily by

13 CPS.  The class database is the one that is primarily used by

14 Child Care Licensing, although we do use impact as well for

15 abuse and neglect investigations.

16 Q    So let's go up to your numbers that you provided us during

17 this litigation.  It's in that chart.  And the number I'm going

18 to look at is the investigations.  These are all priority one

19 and priority two.  You can -- you're going to have to move --

20 oh, you're going to have to go a little bit farther to the

21 right -- to the left so we can see the far left column.

22          **MR. SPEAKER:**  That one is just cut off.

23          **MR. YETTER:**  It just got cut off.

24          **MR. SPEAKER:**  On your screen.

25          **MR. YETTER:**  Oh, okay.  Thank you.  Okay.

1   **BY MR. YETTER:**

2   Q    Well, the far left column says priority one and two.  Do

3   you see that?

4   A    I do.

5   Q    And then the next column talks about the total.  There are

6   1500 investigations, true, total.  This is for fiscal year --

7   or, for the year between July of 2013 and June of 2014, right?

8   A    I believe that's what the title said.

9   Q    And then tracking across the bottom, let's highlight the

10  number of investigations rejected by supervisor.  And do you

11  see what that number total is?

12       (No audible response)

13       143 out of 1510, right?  Do you see that?

14  A    I do, yes.

15  Q    Rejected by the supervisor means it was a bad

16  investigation for some reason.  True?

17            **THE COURT:**  Can I -- I want to make sure I wrote this

18  down right.  Forty-eight percent of the roughly 3,000

19  investigations a year are unable to determine?

20            **MR. YETTER:**  Nope.  No, your Honor.

21            **THE COURT:**  What was it?

22            **MR. YETTER:**  So can I clear it up with the witness?

23            **THE COURT:**  Please.

24            **MR. YETTER:**  Okay.

25  //

1   **BY MR. YETTER:**

2   Q    So of the 3,000 investigations, findings are made on all

3   of them basically.  A very small number is unable to determine,

4   right?

5   A    I believe that's correct, yes.

6   Q    And a very small number is reason to believe, right?

7   A    I'm actually not sure what the number of RTB is.

8         **MR. YETTER:**  The vast bulk of these, your Honor, is

9   they rule it out, so they --

10        **THE COURT:**  No reason to believe?

11        **MR. YETTER:**  No reason.  It's called ruled out; no

12  reason to believe.  They only looked at one little group that's

13  unable to determine and found it was, as the Court has heard

14  the evidence, vastly inaccurate.

15        **THE COURT:**  What percentage are unable to determine?

16        **THE WITNESS:**  I don't have that percentage off the

17  top of my head.  I would have to pull that information for you,

18  your Honor.

19        **MR. YETTER:**  It's our understanding it's a small

20  percentage and that the vast majority are ruled out.  And the

21  reason why we --

22        **THE COURT:**  So you haven't done any studies like you

23  did on the unable to determine as to the category of no reason

24  to believe?

25        **MR. YETTER:**  Correct.  I'm sorry.  You should answer

1    the question.

2              **THE WITNESS:**  I don't believe we have looked at that.

3              **THE COURT:**  Why not?

4              **THE WITNESS:**  I'm not sure, your Honor.

5              **MR. YETTER:**  That's the iceberg, Judge.  That's the

6    everything under the water.  It's a huge group of findings

7    that --

8              **THE COURT:**  Does anybody have those numbers; what

9    percentages are reason to believe, no reason to believe?

10             **MR. YETTER:**  We'll check here, your Honor.  I'm sure

11   the State has them.

12             **THE COURT:**  Do you think you've got them,

13   Mr. Albright?

14             **MR. ALBRIGHT:**  Yes, your Honor, we can present the

15   Court with the percentage of investigations in a given year and

16   what percentage are UTD's.

17             **THE COURT:**  That would be great.  Thank you.

18             **MR. ALBRIGHT:**  And I'll just -- off the top of my

19   head I don't know, but I think the 111 for --

20             **THE COURT:**  Maybe even all of them?

21             **MR. ALBRIGHT:**  I think it will probably be 111 out of

22   3,000, roughly.

23             **THE COURT:**  Okay.

24             **MR. ALBRIGHT:**  But we'll confirm that.  Someone

25   please remember that.  We'll confirm that.

1          **THE COURT:**  Thank you.  But I'd like the percentages

2   to all of them if you could; all three categories.

3   **BY MR. YETTER:**

4   Q    Just to close that last topic we were on.  Almost

5   10 percent of the priority one and priority two investigations

6   were rejected by the supervisors as defective in some way?

7   A    Correct.

8   Q    These are very serious investigations, right?

9   A    Absolutely.

10  Q    All right.

11       Now let's go to -- you do some random sampling through

12  your Licensing group don't you?

13  A    Yes, we do.

14  Q    You're supposed to go inspect one quarter of all the

15  agency foster homes every year.  True?

16  A    Correct.

17  Q    You're supposed to inspect them, getting a random sample,

18  aren't you?  This is --

19  A    Correct.  And we want to increase that number to a third.

20          **THE COURT:**  These are not the ones that are privately

21  contracted?

22          **THE WITNESS:**  These are all foster homes, I

23  understand, your Honor.

24          **MR. YETTER:**  These are or these do include the

25  private contract?

Morris - Direct / By Mr. Yetter                    87

1          **THE COURT:**  Both.

2              **MR. YETTER:**  Both.  Yes, your Honor.

3  **BY MR. YETTER:**

4  Q    I actually think these -- aren't these just limited to the

5  private ones, the CPA's that are privately owned?

6  A    No.

7  Q    Oh.

8  A    I believe that includes the homes that are --

9  Q    State owned?

10 A    -- part of CPS and CPA.  That's my understanding.

11 Q    And you're doing --

12 A    I'm sorry.

13 Q    You're doing these random sample inspections so that you

14 can -- for safety for the children, aren't you?

15 A    Yes.

16 Q    And the fact is you're not doing them all are you?

17 A    I have to look at the number to see which ones we haven't

18 conducted.  I believe we are.

19         **THE COURT:**  Well, have you done a fourth for the

20 year?

21         **THE WITNESS:**  I'm sorry your Honor?

22         **THE COURT:**  Have you done a fourth for this year,

23 2014?

24         **THE WITNESS:**  I'll have to go and look, your Honor,

25 to see if I can pull that information.  I would have to go back

1   and see if we're not conducting the full quarter of our

2   samplings.

3   **BY MR. YETTER:**

4   Q    No need to go back and see.  I have an exhibit.

5   Plaintiffs' Exhibit 666.  This is another document.

6       **(Pause)**

7            And this is in evidence.  This is another document --

8   if you can just blow up the chart for us; there you go, thank

9   you -- that the State provided in discovery.  This is on the --

10  these are announced and unannounced random sampling

11  inspections.  Do you see where I'm referring to, Mr. Morris?

12  A    I do, yes.

13  Q    This is for two calendar years, 2012 and 2013.  This is

14  the information that we got from the State and in the way that

15  they provided it.  And so let's -- we have total homes for each

16  year: 14,235 for 2012.  And of that amount, 2,148 got announced

17  inspections and 253 got unannounced inspections, right?

18  A    That's what it says.  Yes, sir.

19  Q    Okay.  You're supposed to be looking at 25 percent every

20  year aren't you?

21  A    We are supposed to do --

22  Q    Twenty-five percent every year.

23  A    -- 25 percent sampling, yes.

24  Q    Okay.  So let's add those two.  Let's highlight the

25  percent announced inspections and the percent unannounced

1   inspections, and let's just add those two.  Well, for 2012

2   first, if we can just put those in yellow.  There you go.

3   Okay.  I'm not going to try to test your math.  You're a

4   numbers guy, but I can give you that number.  It's

5   16.87 percent.  So you're supposed to do 25 percent, and in

6   2012 you did just under 17 percent.

7        Now, let's look for 2013.  Again, you add the numbers up.

8   You come up right almost exactly at 17 percent.

9        So if you're supposed to be doing 25 percent of the homes

10  every year and you're only doing 17 percent; again, you could

11  do the math.  But that's way low isn't it?

12  A    That number is not 25 that we should be doing, and this

13  would make me ask additional questions of Ms. Shaw to

14  understand why the percentage of announced and unannounced

15  inspections in the samplings.

16       **THE COURT:**  Don't you know these things as head of

17  that department?

18       **THE WITNESS:**  Well, this is one of the things that I

19  would, in fact, rely on Ms. Shaw for, your Honor.

20       **THE COURT:**  Rely on her for what?

21       **THE WITNESS:**  To explain to me if I had questions

22  like this.

23       **THE COURT:**  Well, if you don't ever see the numbers

24  and don't ever ask to see them, why would you even ask for an

25  explanation?  I mean, isn't this something you're supposed to

1   be in charge of?

2           **THE WITNESS:**  This is something that I'm in charge

3   of, yes, your Honor.

4   **BY MR. YETTER:**

5   Q    So Mr. Morris, if you do the math, you're doing almost a

6   third fewer inspections than you're supposed to be doing?

7   A    And I would want to know why.

8   Q    So would I.

9   A    I would need to look into this a little bit further.

10  Q    But the numbers say you're doing one-third less than what

11  you're supposed to be doing, true?

12  A    That's what this number says, yes.

13  Q    One more category of inspections, and this is follow-ups.

14  You know what follow-ups are, to make sure an operation is in

15  compliance with the standard that they have been deficient on?

16  A    We follow up on deficiencies to see if they've been

17  corrected.

18  Q    Now, it's obviously really important to find facilities

19  that have problems and deficiencies, isn't it?

20  A    Yes, it is.

21  Q    And if you tell them to fix it, that's important too,

22  isn't it?

23  A    Correct.

24  Q    But if you don't follow up, you're going to have problems

25  aren't you?

1    A    Yes.

2    Q    And it has to be timely, doesn't it?

3    A    It has to be timely, yes.

4    Q    And the rules of your group says it has to be within

5    15 days, doesn't it?

6    A    Yes, it does.

7    Q    And you don't -- a substantial portion of your follow-ups

8    are not timely are they?

9    A    I'm not sure what that number is.  The number of follow-

10   ups is one of the percentages or performance measures that is

11   used by our directors in the field to follow up on.

12   Q    Let's go to Plaintiffs' Exhibit 724.  This is, again,

13   information that the State provided to us.  And this is on

14   these very important follow-ups on facilities that have

15   deficiencies.  So these are facilities that have a problem; a

16   bad thing is somewhere in the facility, right?

17   A    A deficiency in the facility?

18   Q    Yeah.  And you told them --

19   A    A deficiency could --

20   Q    -- they have something deficient.

21   A    It could be any number of things as a deficiency in a

22   facility.  It could be something related to a broken line in

23   the physical plan.  It could be a ratio.  It could be --

24   there's any number of things that we would cite deficiencies

25   for.

1   Q    It's something that has to be fixed?

2   A    It's something that needs to fixed, yes.

3   Q    All right.  So here you have --

4   A    But there are high and low and medium weighted

5   deficiencies.

6   Q    Here you have your same two years, calendar year 2012 and

7   2013.  I want to look at the last two columns.  These are the

8   numbers of standards deficiencies cited for monitoring.  In

9   other words, you had to go back and follow up.  So you can just

10  highlight these two boxes please.  There you go.  So that's the

11  number you're supposed to go follow up on.  And then the last

12  column is the ones you actually did follow up on timely within

13  15 days.  Do you see that?

14  A    Yes.

15  Q    Okay.  It's obviously not -- you didn't do 100 percent did

16  you?

17  A    Not of these deficiencies that you're noting here.

18  Q    In fact, I've done the math and in 2012, 26.4 percent of

19  the deficiencies were not followed up timely.  I can give you a

20  calculator if you want to check it.  But does that math look

21  about right?

22  A    That math looks about right.

23  Q    2013, 24 percent of the deficiencies were not followed up

24  timely in your group.

25  A    Correct.

1    Q    And one last topic.  The PMU --

2    A    Well, that would make me ask the question now:  How timely

3    is it?  Did they miss it by a day or did they miss it by two

4    weeks?  It would make --

5    Q    Let me ask --

6              THE COURT:  Well, this is your department.  Isn't

7    that something you're supposed to know?  I mean, don't you call

8    for these charts to be made?

9              THE WITNESS:  Your Honor, this is one of the

10   performance measures that I rely -- or, that are tracked by our

11   district directors and regional managers in the field.  And

12   that's something that I rely on my directors of --

13             THE COURT:  And they don't ever get to you?

14             THE WITNESS:  My directors of field would notify me

15   if there were issues.  But, again, they would --

16             THE COURT:  Have you ever been notified?

17             THE WITNESS:  I have not been notified that we have

18   significant problems with the deficiencies.  And I feel

19   confident that if we did, Ms. Shaw and Julie Richards, my

20   Director of Field for Daycare, would let me know.  Again, they

21   would look at these --

22             THE COURT:  What exactly do you review as head of

23   this department to see if things are working right?  Clearly

24   not --

25             MR. YETTER:  Timeliness, accuracy, and completion of

1    random sampling.

2              **THE WITNESS:**  To answer your Honor's question, the

3    things that I would look at are the things that are on our new

4    executive dashboard.  I am interested in things like turnover.

5    I am interested in things like caseload.  I do watch things

6    like our budget to make sure that, you know, we're operating

7    within the resources that we have.

8    **BY MR. YETTER:**

9    Q    It's clear, Mr. Morris, that here you are sitting, and

10   we're in court in December 2014, and this data is one or two

11   years old and you're hearing it for the first time, right?

12   A    If it was one or two -- if it was two years old and it was

13   before my tenure, yes, it's probably something that I am

14   hearing for the first time.

15   Q    Well, you were here for 2013, right?

16   A    I was here in July of 2013, yes.

17   Q    So the last topic is your PMU group, your Quality

18   Assurance Group.  And one of the problems that it has is it has

19   no regulatory teeth does it?

20   A    That was a comment that was made by one of our staff and I

21   don't know that I would agree with that, and I don't know that

22   "regulatory teeth" is a direction that I want my PMU unit to

23   go.  What I would rather they do is lean towards collaboration

24   and working with the directors of field directly to ensure that

25   any trends identified, any information noted, is directly

1    reported to them.

2    Q    Well, my question, Mr. Morris, was that your PMU group

3    does not have any regulatory teeth does it?

4    A    No.  That --

5    Q    In other words, it can't enforce the things that, as a QA

6    group, it recommends?

7    A    They can enforce.  They direct report to me, as do the

8    directors of field.

9    Q    So let's look at Plaintiffs' Exhibit 1091.  This is not a

10   new issue to you.  You know what I'm talking about don't you?

11   A    This is part of -- I'm sorry, I can't --

12   Q    Let's blow up that top --

13   A    Thank you.

14   Q    Just that top email.  There you go.  Okay.

15        This is an email from William Wright on July 16th, 2013;

16   about 18 months ago.  Right?

17   A    Yes, it is.

18   Q    And it's PMU.  The subject is PMU feedback.  True?

19   A    Yes, it is.

20   Q    And you know this because you eventually reviewed his

21   feedback didn't you?

22   A    I directed that they do an assessment of PMU to make sure

23   that it was moving in the right direction once we put it

24   together.

25   Q    And his feedback was one reason that you actually then

1  promoted this fellow; William Wright?

2  A    I think a great deal of Mr. Wright.

3  Q    And one of his -- and you felt so much about his

4  recommendations, you promoted him to be one of the top

5  executives of the PMU, didn't you?

6  A    I promoted Mr. Wright.  He actually applied for the job

7  and I hired him as the Division Administrator for the

8  Performance Management Unit.  He was the leader that I gave

9  them to put PMU back together.  That's correct.

10 Q    And one of the things he suggested, he recommended, was

11 that it get regulatory teeth.  True?

12 A    That's an interesting comment, but yes that's one of the

13 things that he said.

14 Q    And now that he is no longer there, you don't think that

15 was such a good suggestion?

16 A    I don't know that regulatory teeth was a good suggestion

17 when he was here.

18 Q    Let's go to Page 6 of Mr. Wright's suggestion.  And,

19 again, it's clear that you thought -- let's go -- it's bullet

20 number five.  You think that this fellow, Mr. Wright, is

21 actually very good don't you?

22 A    I do, yes.

23 Q    And you think that PMU being an independent body, an

24 autonomous group, is important don't you?

25 A    Under the control of state office, absolutely -- well, as

1   a direct report, yes.

2   Q    And he suggested that you should give PMU independent or

3   autonomous, although structured, regulatory teeth in regards to

4   the performance of certain units and/or districts, right?

5   A    That's what he said, yes.

6   Q    So basically you'd have your QA people trying to make the

7   rest of your group better by their independent assessment,

8   true?

9   A    That's what he suggested.

10  Q    And you have not done that have you?

11  A    We have not given them regulatory teeth, no.  What we have

12  done is make sure that PMU, Policy and Operations, and the

13  Performance Development -- or, the Professional Development

14  Division all meet on a monthly basis, and that PMU was elevated

15  to be one of the CCL management team that reports directly to

16  me.  So, in other words, rather than giving them regulatory

17  teeth ensuring that they work closely with their peers so that

18  those individuals working for PMU can speak directly to the

19  district directors and the regional managers who work within

20  Licensing.

21          **MR. YETTER:**  Your Honor, I pass the witness.

22          **THE COURT:**  Thank you.

23      **(Requested transcription concluded at 4:37 p.m.;**

24  **proceeding continued)**

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          January 10, 2015_

TONI HUDSON, TRANSCRIBER