UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


M.D., ET AL.,                    )        CASE NO:  2:11-CV-0084
                                 )
            Plaintiffs,          )            CIVIL
                                 )
     vs.                         )        Corpus Christi, Texas
                                 )
GOVERNOR RICK PERRY, ET AL.,     )    Wednesday, December 3, 2014
                                 )      (3:59 p.m. to 5:28 p.m.)
            Defendants.          )
_____


DIRECT EXAMINATION OF VIOLA MILLER
DURING TRIAL - DAY 3


BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE


Appearances:              See Next Page

Court Recorder:           Arlene Rodriguez

Case Manager:             Linda Smith

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Plaintiffs:                 R. PAUL YETTER, ESQ.
                            Yetter Coleman, LLP
                            909 Fannin, Suite 3600
                            Houston, TX 77010

                            MARCIA ROBINSON LOWRY, ESQ.
                            CHRISTINA WILSON, ESQ.
                            SARAH BARTOSZ, ESQ.
                            Children's Rights
                            330 Seventh Avenue
                            Fourth Floor
                            New York, NY 10001


Defendants:                 THOMAS A. ALBRIGHT, ESQ.
                            ANDREW BOWMAN STEPHENS, ESQ.
                            MARC RIETVELT, ESQ.
                            Office of the Attorney General
                            General Litigation Division
                            P. O. Box 12548
                            Capital Station
                            Austin, TX 78711-2548

3

## INDEX

| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DR. VIOLA MILLER | 4 | | | |

| PLAINTIFFS' EXHIBIT | | | | RECEIVED |
|---|---|---|---|---|
| 2037 | | | | 6 |

1    **Corpus Christi, Texas; Wednesday, December 3, 2014; 3:59 p.m.**

2     **(Partial transcript; Direct Examination of Dr. Viola Miller)**

3              **THE CLERK:**  All rise.

4              **THE COURT:**  Be seated.  Would you -- let's see.  Call

5    your next witness.

6              **MR. YETTER:**  Your Honor, on behalf of the Plaintiff

7    children, we call Dr. Viola Miller.

8              **THE COURT:**  Thank you.

9              **MR. YETTER:**  She is, as the Court probably knows,

10   she's our ninth witness for today.  We've made lots of

11   progress.

12             **THE CLERK:**  Please raise your right hand.

13            **DR. VIOLA MILLER, PLAINTIFFS' WITNESS, SWORN**

14            **MR. YETTER:**  May it please the Court.

15                        **DIRECT EXAMINATION**

16   BY MR. YETTER:

17   Q    Good afternoon.

18   A    Good afternoon.

19   Q    Would you please re-introduce yourself to the Court,

20   please?

21   A    My name is Viola Miller.

22   Q    Dr. Miller, the last time you were here was two years ago

23   I believe, was it not?

24   A    That's correct.

25   Q    And you did testify at the class certification hearing?

```
                    Miller - Direct / By Mr. Yetter            5
```

1   A    Yes, I did.

2   Q    We're going to go through your background only at a high

3   level both for the record and just to kind of refresh the

4   Court.

5              MR. YETTER:  Your Honor, I have --

6              THE COURT:  Have you got her CV and the --

7              MR. YETTER:  I do.  We're going to --

8              THE COURT:  -- and the report?

9              MR. YETTER:  We will offer -- first offer her report,

10  Plaintiffs' 2037.  And the CV, which I've taken out separately,

11  your Honor, is Appendix A to her report.  And I can provide the

12  Court with a copy of the CV if you'd like -- her resume.

13             THE COURT:  Yes.

14             MR. ALBRIGHT:  And your Honor, we --

15             THE COURT:  Is it attached?

16             MR. YETTER:  It is Appendix A but I've take it out so

17  that you can look at the CV separately.

18             THE COURT:  No, no.  It goes as an exhibit.

19             MR. YETTER:  It is --

20             THE COURT:  If you take it out, it's not numbered.

21             MR. YETTER:  It is part of Exhibit 2037.

22             MR. ALBRIGHT:  Your Honor, for the record, we object

23  to Plaintiffs' Exhibit Number 2037, the report, on the basis

24  that it's hearsay.

25             THE COURT:  Thank you.

1          **MR. ALBRIGHT:**  And a proper foundation for an

2  exception to the hearsay rule has not been established.

3          **THE COURT:**  Thank you.  I'm going to go ahead and

4  admit it just like I'm going to do with your expert reports and

5  CV's.

6          **MR. ALBRIGHT:**  I know.  Just keeping the record on

7  it, Judge.

8          **THE COURT:**  I appreciate it.  2037 is admitted.

9      **(Plaintiffs' Exhibit Number 2037 was received in evidence)**

10         **THE COURT:**  Is this the doctor that interviewed the

11  children individually?

12         **MR. YETTER:**  No.  That -- we have a psychologist --

13         **THE COURT:**  Okay.

14         **MR. YETTER:**  -- and a social worker that both did

15  that.

16         **THE COURT:**  Okay.

17         **MR. YETTER:**  And I'm going to hand this to you.

18  (indiscernible), your Honor, I have paper clipped the CV if

19  you'd like to turn to that.

20  **BY MR. YETTER:**

21  Q   Dr. Miller, let's frame kind of who you are and what your

22  testimony is today.  What is your expertise?

23  A   I was the Chief Executive Officer of two different child

24  welfare agencies.  One in Kentucky, one in Tennessee.  During

25  the time in both states, we went through major child welfare

1    reform initiatives.

2    Q    And for how many years have you been involved in child

3    welfare issues on behalf of the state or in private consulting?

4    A    Well, I've been -- I've worked with children and families

5    for over 40 years.

6    Q    Are you here -- do you believe that you have an expertise

7    over those 40 years of experience in your education and your

8    professional occupation, have an expertise in child welfare

9    system matters?

10   A    Absolutely.

11   Q    So let's take a step back and get a little bit more of

12   your background.  Where do you live today, ma'am?

13   A    I live in Nashville, Tennessee.

14   Q    Dr. Miller, the last time you were here, you were anxious

15   about the birth of a -- your first grandchild?

16   A    That's correct.

17   Q    I'm assuming that happened and it was uneventful.

18   A    Yes, it happened, and it was uneventful.  And she is a

19   little red head and she's almost two years old.  And she lives

20   into both of those stereotypes.

21   Q    That's great.  And do you enjoy being a grandmother?

22   A    It's the most wonderful thing that's ever happened to me.

23   Q    You've told your --

24            THE COURT:  It's another chance.

25            THE WITNESS:  It is.  It really is.  And she's pretty

Miller - Direct / By Mr. Yetter                           8

1   crazy about her grandma, too.

2   **BY MR. YETTER:**

3   Q    Okay.

4            **THE COURT:**  I have a red head, too.  Seven year olds.

5            **THE WITNESS:**  Mine is a red head, too.

6   Q    All right.  So, now let's move to your education if we

7   could.  Just -- let's just briefly give us an overview of your

8   degrees and the institutions that you studied at.

9   A    My undergraduate degree was from Northwest --

10           **THE COURT:**  Okay.  Wait a minute.  I don't want to do

11  this.  That's why I admitted all these things so we could cut

12  to the chase.

13           **MR. YETTER:**  All right.

14           **THE COURT:**  And save her breath.

15  **BY MR. YETTER:**

16  Q    Let's just go to the punch line, then.  Your Ph.D. is in

17  what specialty?

18  A    Special education, severe (indiscernible) disabled

19  children.

20  Q    Now, professionally, have you been working in the child

21  welfare system profession for most of these past 40 years?

22  A    I've been working with families and children the last 15

23  years of my career before I retired.  Eight years in Kentucky,

24  I was the secretary of the Cabinet for Families and Children in

25  the Paul Patent (phonetic) administration.  And --

1   Q    Let's -- let me stop you there.

2   A    Okay.

3   Q    What years were those?

4   A    They were from 1996 to 2003.

5   Q    Okay.

6   A    Or 1995 to 2003.

7   Q    And as the secretary on the Cabinet for Families and

8   Children, what was your primary responsibility?

9   A    That -- the Cabinet for Families and Children was a

10  comprehensive human service agency.  And we had, of course,

11  public child welfare was one of our largest area.  We had TANF

12  -- Temporary Assistance for Needy Families.  We had Medicaid

13  eligibility.  We had disabilities determination.  And we had

14  the SNAP program.  Back then it was food stamps.

15  Q    So just focusing on where we are today, was one of the

16  programs child protective services --

17  A    That's correct.

18  Q    -- that you were responsible for?

19  A    That's correct.

20  Q    Very same system -- program that we're talking about here

21  in this case?

22  A    Right.  A very similar structure.

23       **MR. ALBRIGHT:**  Objection.  Your Honor?  Can I object

24  to leading?  The very same system as Texas, I object it's

25  leading and vague and ambiguous.

1   **BY MR. YETTER:**

2   Q    How would you --

3           **THE COURT:**  Well, that's sustained.

4   Q    How would you compare the -- that system, that child

5   protective services system in Kentucky that you were

6   responsible for, for those eight years, in general as a system,

7   to the system here in Texas?

8   A    Well, we -- in Kentucky, we had about seventy-five hundred

9   children in care and we had a budget of slightly less than a

10  billion dollars.

11  Q    Were you on the cabinet in the executive branch of the --

12  A    Yes, I reported --

13  Q    -- state government?

14  A    -- directly to the Governor.

15  Q    That was Kentucky?

16  A    That's correct.

17  Q    And you were -- I interrupted you and you were about to

18  move to your next similar position.  I believe it was in

19  Tennessee.  And tell us what your title was there.

20  A    That's correct.  My title there was Commissioner of the

21  Department for Children Services.

22  Q    And if you were eight years in Kentucky, how many years

23  were you in Tennessee?

24  A    I was seven years there.

25  Q    And as the Commissioner in the Department of -- well, what

1   was the Department of Children's Services in Tennessee at the

2   time?

3   A    That was exclusively a child welfare agency.

4   Q    And as a system, how would you compare the system -- the

5   Department of Children Services in Tennessee to what we are

6   talking about here, the Department of Family and Protective

7   Services here in Texas?

8   A    Well, the Department for Family and Protective Services in

9   Texas has a number of other units and their child protective

10  service is a unit under that.  In Tennessee, we were a free

11  standing department.

12  Q    And were you focused on foster children in Tennessee?

13  A    We did foster -- we did foster care, adoption.  We did

14  investigations.  We also had a multiple response system that

15  was a part of -- and we called that part of the agency was --

16  was for us, CPS.  The nomenclature is a little bit different

17  than Texas.  We were -- that -- just our investigations and

18  multiple response systems, that was our child protective

19  service piece and then our foster care adopt was our permanency

20  piece.

21  Q    So here, in Texas, the Commissioner of the DFPS is

22  Commissioner Specia (indiscernible)?

23  A    That's correct.

24  Q    And who would have been -- during these eight years in

25  Tennessee, who would have been the equivalent person in the

1   Tennessee Department of Children's Services?

2   A     That was me.

3   Q     And the prior eight years in Kentucky, who would have been

4   the equivalent person to Commissioner Specia in the Kentucky

5   Cabinet for Families and Children?

6   A     That would have been me.

7   Q     Since -- when did you -- when was the last year that you

8   were heading up the Tennessee Children's -- Child Protective

9   Services and related things that you talked about?

10  A     2011 -- January of 2011.

11  Q     In the last three years, what have you professionally been

12  focused on?

13  A     In the last three years, I have been retired and I have --

14  but I have done some consulting work and I've done a bit on

15  foster care review board which has been really fun for me

16  because in my -- when I was working professionally in the area,

17  I couldn't have done that.  And I also spend some of my time --

18  I'm working a great deal with an agency in Nashville.  It's

19  called Renewal House.  I'm on their board and a chairman of

20  their program committee.  And what that agency does, it would

21  work with essentially all child welfare families because it's a

22  facility where addicted mothers can come for treatment and

23  bring their children as an alternative for those children

24  having to go in foster care.  So I've been spending quite a bit

25  of my volunteer time with that agency.

1  Q    Okay.  You said -- well, you said three years ago, you

2  retired?

3  A    That's correct.

4  Q    Okay.  But you're -- you're doing the National House

5  [sic].  What's your position with them?  Your -- you said you

6  were involved

7  A    That was Renewal House.

8  Q    Renewal House.  I'm sorry.  Renewal House in Nashville.

9  A    Yes.  Now, I -- this is volunteer work.  I'm on their

10 board of directors and I chair their program committee.  And --

11 Q    All right.  And professionally you said you've been

12 involved with foster care in certain systems around the

13 country, I believe?

14 A    Yes.  I -- I still have states calling me, offering me a

15 job and I don't want a job.  But what I have done with several

16 other states is try to help them think through how to access

17 the resources that they need.  These are -- these are states

18 that are in the process of trying to reform their systems and

19 they're looking for help -- you know, from around the United

20 States.  And so, I have done some work trying to -- to help

21 them find the resources because I don't want to be their

22 resource.

23 Q    Fair enough.  Now, are you acting in a consulting capacity

24 for those states?

25 A    Essentially, yes.

Miller - Direct / By Mr. Yetter                          14

1   Q    And which states are you talking about?

2   A    I've done some work with Massachusetts.  I've done some

3   work with Oklahoma.  Done -- well, a little bit of work with

4   Illinois but that was different.  They are not -- they are not

5   necessarily in a reform process.  They were in the process,

6   really, of looking at this -- rethinking performance-based

7   contracting which they've had for a while and some other

8   changes in their system, particularly around creating child and

9   family teams.  We really did a lot of work on that in Tennessee

10  and really were quite successful.  And that was the area that I

11  was sort of walk -- talking with them about.

12  Q    So based on your work in Kentucky and then Tennessee and

13  now in Massachusetts, Oklahoma, and Illinois, have you kept

14  current on what the national standards are for child welfare

15  systems here in our country?

16  A    Oh, I certainly think so.

17  Q    And today, do you feel current in your expertise in this

18  area?

19  A    Yes.

20  Q    Now, you've been involved -- let's move to this case.

21  You've been involved -- we've asked you to be involved as a

22  consultant -- consulting expert on our behalf in this

23  litigation for some time, have we not?

24  A    That's correct.  Probably -- about three years or more

25  now.

1   Q    And as part of that, what -- have you been -- what have

2   you been looking at in terms of the structural issues with the

3   Texas foster care system?

4   A    Well, the two primary structural issues that you asked me

5   to look at -- one was caseload, workload issues and the other

6   was placement array.

7   Q    And, again, have you focused on -- just to be clear, have

8   you focused on any particular subgroup of the foster children

9   here in Texas?

10  A    The PMC children.  That's the group of kids that we're

11  concerned about.

12  Q    And in addition to the caseloads and the placement array,

13  are you familiar with the situation with the GRO's here in the

14  state of Texas?

15  A    Yes.  Well, that is, in my opinion, a part of the

16  placement array issue.  But yes, I am.

17  Q    And likewise, is the foster group home as part of the

18  placement array issue --

19  A    Yes, it is.

20  Q    -- in Texas?  Have you come -- and which we will get out

21  shortly -- have you come to conclusions and professional

22  opinions about those areas that you've been asked to look at?

23  A    Yes.

24  Q    Before we get there, I want to talk a little bit about

25  your methodology and that -- what you've reviewed, but in terms

1   of the bulk of testimony that you've reviewed, can you just

2   walk us through at a high level, not individual documents.  But

3   what are the sorts of -- what sources of data have you reviewed

4   in order to form professional opinions here?

5   A    Well, I've reviewed a couple of other expert reports.  I

6   have also reviewed just a multitude of data sets that were

7   available, the DFPS data books, transcripts of --

8   Q    Can I -- can I stop you as you go so we can make a little

9   (indiscernible)?  The data sets that were available?  What --

10  from what source did they come?

11  A    From DFPS.

12  Q    Okay.  Go ahead.  I interrupted you.  Go ahead.

13  A    And I completely lost my train of thought.

14  Q    You said DFPS --

15        **THE COURT:**  You were looking at --

16  **BY MR. YETTER:**

17  Q    You said policy --

18        **THE COURT:**  -- you were saying that all the documents

19  you reviewed.

20        **THE WITNESS:**  Okay.

21  Q    Policy manuals.

22        **THE COURT:**  And you talked about the expert reports.

23        **THE WITNESS:**  Sorry.  I'm getting a little old.  I'm

24  sorry.

25        **THE COURT:**  Expert reports and then DFPS something.

1   **BY MR. YETTER:**

2   Q     You said policy manuals I think is what the one I

3   interrupted.

4   A     Right.  Right.  The policy manual.  And then, of course, I

5   also reviewed the recent -- both internal and external

6   assessments and evaluations that have been done fairly

7   recently.  The Stevens Group Report, the auditor's report, the

8   Sunset Review Commission and that was really in three pieces.

9   The department did a self-study and then there were two pieces

10  of the Sunset -- it's a Sunset Advisory Commission Review.

11  Q     Okay.  You went through that quickly and I'm just going to

12  take a little bit of time so that we are clear.  You said

13  internal and external?

14  A     Right.

15  Q     Let's start with the internal reviews.

16  A     Right.  Some of those were budget documents as well.

17  Q     So, documents submitted to the legislature for funding

18  that it described?

19  A     That's correct.

20  Q     You said there was a self-study.  What was that, that

21  we're talking about?

22  A     That -- the Sunset Review process in Tennessee -- or

23  excuse me -- in Texas as in many states.  We had to do the same

24  thing in Tennessee and in Kentucky, requires that the agency

25  complete a self-study that they then submit to that legislative

1  body and then the legislative body does their assessment and

2  reports.

3  Q    You said this -- so to -- explain what the Sunset Review

4  was that you reviewed?

5  A    That -- that's a legislative process.  Typically, in

6  states -- in the states that I've worked in and have been

7  familiar with, this is not an uncommon process.  Periodically

8  -- and it goes on a cycle.  It can be a three year cycle or a

9  four year cycle or however long.  And the legislature reviews

10 the agencies in state government.  And that's called a Sunset

11 Review process.  And in that process, an agency is very

12 typically asked to do their own self-study of where we are,

13 what we've accomplished, what our issues are, submit that and

14 then there is a -- the -- here, it's called the Sunset Advisory

15 Commission then does their review of the agency and those are

16 -- really, is the basis of the decision about whether -- or at

17 least it was in Kentucky and I don't know what it exactly -- or

18 in Kentucky and Tennessee -- I don't know exactly what it is

19 here.  That's the basis on which the legislature makes the

20 decision about whether or not they are going to continue to

21 fund that agency.

22 Q    Okay.  The Court has heard about the Steven Group Report,

23 but I think we were going to talk a little bit more about it

24 and what was that -- what was that that you reviewed?

25 A    The Steven Group Report really was in -- was two different

1  documents.  And it was very, very lengthy documents.  And they

2  did a -- the department itself asked the Steven Group to come

3  in and do a comprehensive assessment of the agency and to make

4  recommendations for approve -- for change.

5  Q    Did you find that to be fairly carefully done and

6  detailed?

7  A    Yes, I did.  It was -- it was extremely thorough.

8  Q    You mentioned in terms of external reports, did you read

9  what was called the K.C. Report?

10 A    Yes.  That was out of Harris County.  They were looking

11 specifically at the Child Protective Services operation in

12 Harris County.

13 Q    And these internal and external reports, were they all

14 very recent or did they go back for a few years?

15 A    No.  These were -- these were very recent.  They were all

16 within the last couple of years.

17 Q    Okay.  As far back as 2010?

18 A    No.  No.  I think the -- I think 2013.

19 Q    And the Stevens Group --

20 A    I believe I'm right about that.  The Stevens Report was

21 within, I think, the last year, year and a half.

22 Q    So some of these are just months old?  Some of them?

23 A    Well, right.  Right.  Very recent.

24 Q    Now, you just kind of walked through these internal and

25 external reports.  What other sorts of data or information have

1   you reviewed?

2   A    Well, of course, I've listened to the testimony the last

3   few days.

4   Q    Here in trial?

5   A    Here, in trial, which is -- which has been very helpful.

6            **THE COURT:**  Have you been here the whole time?

7            **THE WITNESS:**  Not every hour.

8            **THE COURT:**  Okay.

9            **THE WITNESS:**  But I've been here every day --

10           **THE COURT:**  I did see you from --

11           **THE WITNESS:**  -- at least some hours.

12           **THE COURT:**  -- time to time.

13  **BY MR. YETTER:**

14  Q    In addition to the testimony here in Court, did you review

15  any other testimony?

16  A    Yes.  I reviewed quite a number of depositions.  Probably

17  eight or so depositions from regional leadership around the

18  state, the people who were either the -- the regional director

19  or the program administrator from a number of the different

20  regions.  I think -- probably eight different regions,

21  something like that.

22  Q    On day one, Ms. McCall -- Colleen McCall testified for --

23  on behalf of the DFPS and she -- she had some regional

24  director's report to her?  Would you have read those

25  depositions of the regional director?

1   A    Those -- those are the ones that I just was mentioning.   I

2   read those regional directors and I also, of course, read

3   McCall's deposition, Emerson Gonzalez, three of the central

4   office leadership.

5   Q    Now, in addition to all that you've been reviewing, were

6   there other documents that you -- we provided on behalf of the

7   state that you reviewed, like e-mails and things like that from

8   us?

9   A    Oh, yes.   There were a number of e-mails and other forms

10  of correspondence -- memos and things like that.   There were

11  quite a number of those.

12  Q    To what extent did you rely on your personal professional

13  experience in the other systems that you worked and things that

14  -- your experience that you developed?

15  A    That's the expertise I bring to this, are those years of

16  experience of actually on the ground reforming a system.   And

17  when -- you know, as I looked at these documents, then I

18  brought that experience to bear in trying to interpret and

19  understand and formulate opinions around what was going on in

20  Texas.

21  Q    Did you put your opinions and your work into written

22  format and submit a report?

23  A    Yes, I did.

24  Q    And did you do that both for the class certification

25  hearing and for the trial?

1   A    Yes, I did.

2   Q    And the more recent report, just by way of dates or time

3   frame, when was it?

4   A    It was August 11th, I think.

5   Q    Of 2000 --

6   A    Fourteen.

7   Q    Now, have you also tried to understand the state's

8   position, their response to some of the opinions that you've

9   given and that the Plaintiffs' -- positions that we've taken in

10  this case?

11  A    Yes.

12  Q    Let's move to some of your opinions.  Dr. Miller, starting

13  with case workers.  You said one of the primary -- the two --

14  you have two pillars in your opinions.  The caseloads and the

15  placement array, I believe.  Let's start with the caseloads.

16       **MR. ALBRIGHT:**  Your Honor, just for clarification,

17  are we following the same procedure as we discussed before with

18  respect to our ability to lodge an objection at the conclusion

19  of the case and through argument?

20       **THE COURT:**  Okay.

21       **MR. ALBRIGHT:**  I mean, I thought your Honor said

22  basically do your Daubert --

23       **THE COURT:**  Is this in the category of ma'am, that I

24  forgot?

25       **MR. ALBRIGHT:**  Well, I think you basically said just

Miller - Direct / By Mr. Yetter                    23

1    wait and do your Daubert later.

2          THE COURT:  Oh, if you want to take her on voir dire,

3    now, you may.

4          MR. ALBRIGHT:  No.  I thought -- I thought what you

5    had suggested the other day was that in a bench --

6          THE COURT:  What I usually do in a trial to the Court

7    is this -- instead of going through lengthy Daubert hearings or

8    Daubert or however it's pronounced -- the witness gets to

9    testify, you cross examine or take her on voir dire any way you

10   want, and then you make your challenges at the conclusion.  And

11   you have to assume that I know pretty much what's what anyway.

12   I'm pretty good with experts, actually.

13         MR. ALBRIGHT:  All right.  I just wanted to make sure

14   I didn't need to leap to my feet and make a Daubert objection

15   at this point.

16         THE COURT:  Well, I think that you have a -- I'll

17   give you, which I never do, a running -- everybody gets a

18   running Daubert objection.  How about that?  To everybody

19   else's experts.

20         MR. ALBRIGHT:  I'm delighted with that.  Thank you,

21   your Honor.

22         THE COURT:  Okay.

23   BY MR. YETTER:

24   Q    Let's move to that first main area, the caseload area, and

25   start with case workers and how important -- based on your

1   personal experience -- the Judge has heard a lot of testimony

2   about this, but I want to -- if you could, from your personal

3   experience, how important are the primary conservatorship type

4   case workers to the child welfare system?

5   A    Well, that -- that primary case worker, that -- that's our

6   frontline resource.  That's the face the child person.  In a

7   child welfare system, they are absolutely essential -- you

8   know, when we take -- when we remove a child, we're essentially

9   saying to that family we can be a better parent.  We have more

10  to offer.  And it's that case worker that really makes that

11  difference in making certain that, in fact, if we remove a

12  child, we provide that child with something better than what we

13  remove that child from.

14  Q    And we've heard a lot of testimony in the case that the

15  state has elicited that there's all sorts of case workers --

16  different kinds of case workers.  And in the Texas system,

17  which is that essential case worker that you're talking about,

18  what's their name in the Texas system?

19  A    It's a conservatorship worker.  They call them

20  conservatorship workers.

21  Q    And, again, focusing just on PMC workers, is it -- would

22  that be the primary conservatorship worker for the PMC child?

23  A    Yes.

24  Q    That -- we've also heard an acronym.  There's lots of

25  acronyms in the case.  But CVS case worker.  And what would

1   that be?

2   A     Conservatorship, I think.

3   Q     Same thing?

4   A     Yeah.  I think so.

5   Q     Now, how do these children come to the state -- these PMC

6   children.  How -- when they get to that level, what's their, in

7   general, if you can generalize for us, what kind of situation

8   are they in?

9   A     Well, these -- the PMC kids come in through the TMC

10  process.  They enter the state as -- in temporary managing

11  conservatorship.  And that typically lasts for 12 months in

12  Texas.  Sometimes it can be extended up to 18 months.  And then

13  those kids, as a result of a legal action, enter the permanent

14  managing conservatorship of the state of Texas.

15  Q     Let me -- let me ask you a question that I've been

16  wondering about for a long time.  Is there something that you

17  are familiar with in Tennessee or in Kentucky where you

18  designate a child as being a permanent part of the foster care

19  system?

20  A     No.

21  Q     Is there -- are you familiar with other child welfare

22  systems around the country that at some point with a foster

23  child, actually designate them, give them the label of being

24  permanent?

25  A     No.

1   Q    Is that the -- is it --

2   A    No.  Typically what the nomenclature is, is foster care is

3   temporary.  And the goal always is to get that child into a

4   permanent home and out of the system so that is somewhat

5   unusual terminology.

6   Q    So is -- are you familiar with any other system around the

7   country, like Texas, which has after a period of time, 12 or 18

8   months, changes the designation for that foster child from

9   being temporary to being permanent?

10  A    No.

11  Q    Now, you talked about the primary conservatorship case

12  workers being the -- I think you said essential or the bedrock.

13  What sort of responsibilities here in Texas do they have based

14  on your investigation?

15  A    Well, that -- the -- that primary case worker has the

16  responsibility of developing and implementing that case service

17  plan and if the family is still the -- the birth family is

18  still involved, a birth family plan as well -- or parenting

19  plan, although those are not necessarily required for the PMC

20  children.  But they also -- that case worker has that

21  responsibility.  The basic work is safety, permanency, and

22  wellbeing.  So that case worker has the responsibility for

23  seeing that -- ensuring that that child is placed in an

24  environment where we have at least a reasonable assurance that

25  that child is going to be free from harm.  In terms of

1    wellbeing, we have a -- although I consider permanency a very

2    important part of wellbeing -- but because the nomenclature

3    typically breaks them out, I will -- educational issues for

4    children, medical issues, social issues.  Seeing that those are

5    addressed so that that child -- the idea is, if we have to take

6    a kid into custody, we want to keep them as short a period of

7    time as possible.  And during that period of time, we want for

8    them the same thing we want for our own children, and that is

9    that they stay on a path to a successful adulthood, that we not

10   disrupt that developmental process by what we do with children.

11   And those are sort about those wellbeing issues.  And then I

12   think permanency is a singularly most important wellbeing issue

13   and that case worker -- and remember I said before, foster care

14   is temporary.  We always say that -- that permanency begins

15   with a knock on the door.  From the first day we make contact

16   with that child, our obligation is to be moving that child in

17   -- back into his own home or into a permanent alternative if he

18   cannot return to his family.

19   Q    Dr. Miller, I'm going to ask you about a position that the

20   state has articulated at least to Judge Jack that they have --

21   the state has no duty other than to keep a child in its custody

22   -- a PMC child in its custody safe from physical harm.

23              **MR. ALBRIGHT:**  Your Honor?

24   //

25   //

 1   **BY MR. YETTER:**

 2   Q    I'm going to ask you about --

 3              **THE COURT:**  Excuse me.

 4              **MR. ALBRIGHT:**  I object to that.  That's a

 5   mischaracterization of our position and I think it's an

 6   inappropriate question to be talking about our assertions of

 7   the law with this witness.

 8              **THE COURT:**  Okay.  What I understood and the -- the

 9   propositions of the law that were not agreed to by the state --

10   and I asked -- questioned you on the phone about this in the

11   Final Pretrial Conference.  I said do you believe that there is

12   a Constitutional right to be free from unreasonable risk of

13   harm?  And you said no.  The state's position is no.  Right?

14              **MR. ALBRIGHT:**  And I explained that.

15              **THE COURT:**  Okay.  But I mean, you said no.  There is

16   no Constitutional right for that.  It's a contested proposition

17   of law and that's -- that's what I understood you say.  I know

18   that you wanted to say it wasn't open ended but you said it

19   wasn't there.

20              **MR. ALBRIGHT:**  Well, your Honor, I'll read to you the

21   actual proposed conclusion of law.  It very clearly says it's

22   an unfettered, undefined harm, open ended concept of harm.

23              **THE COURT:**  Right.  And you --

24              **MR. ALBRIGHT:**  You know, our position is clear on

25   that.

1          **THE COURT:**  And this -- okay.  It is that you do not

2    agree -- I understand from the -- our conversations of the

3    Final Pretrial Conference that you stated clearly -- and I'll

4    play it back for you if you want her to bring it up -- that the

5    state does not agree that there is a Constitutional right to be

6    free from unreasonable risk of harm, period, right?

7          **MR. ALBRIGHT:**  And I said on an unlimit -- unlimited.

8          **THE COURT:**  Yes?

9          **MR. ALBRIGHT:**  Yes.  I said that.

10         **THE COURT:**  Okay.  So there we are.  That's what

11    their position is.

12         **MR. ALBRIGHT:**  And then my objection is, is it

13    appropriate to interrogate a witness with respect to a legal --

14         **THE COURT:**  With legal conclusions.

15         **MR. YETTER:**  I am -- I'm not asking her about legal

16    conclusions.  I'm asking her as a child welfare professional in

17    this profession, what is the harm that they will -- that they

18    are trying to prevent that child from coming into contact with?

19         **THE COURT:**  Okay.  You can ask that.

20         **MR. YETTER:**  Now --

21         **THE COURT:**  That's not the objection.

22         **MR. ALBRIGHT:**  Correct.

23         **THE COURT:**  That wasn't what he was asking earlier.

24         **MR. ALBRIGHT:**  No.  It's a very different question

25    and it was a misstatement of our position.

1          **THE COURT:**  I didn't think it was a misstatement of

2    the position, but it is --

3          **MR. ALBRIGHT:**  Well, but Judge --

4          **THE COURT:**  -- a question about a legal conclusion

5    and he can't do that.

6          **MR. ALBRIGHT:**  Our position was a duty to -- to

7    personal security and a reasonably safe living conditions is

8    found in 5th Circuit law.  What Mr. Yetter said was a

9    mischaracterization of our position on the duty.

10          **THE COURT:**  Okay.

11          **MR. ALBRIGHT:**  Thank you, your Honor.

12          **THE COURT:**  I think that we're clear that the state

13    of Texas does not recognize a Constitutional right to be free

14    of unreasonable risk of harm because you consider that to be

15    open ended.

16          **MR. ALBRIGHT:**  Exactly.

17          **THE COURT:**  Okay.  We're there.

18          **MR. ALBRIGHT:**  And that the 5th Circuit has never

19    held that in this --

20          **THE COURT:**  That may be but I think other Courts have

21    and I think there's a Supreme Court case on that.

22          **MR. ALBRIGHT:**  I disagree with that on the Supreme

23    Court case, your Honor.

24          **THE COURT:**  All right.  I'm probably overstating it.

25    //

1    **BY MR. YETTER:**

2    Q    Dr. Miller, as a longtime professional in the child

3    welfare system, as a professional that's worked in a child

4    welfare system that's in charge and has custody -- legal

5    custody of children in the system, I want to talk to you about

6    your view of harm to children.  Does it include physical harm

7    to children?

8    A    Yes.

9    Q    Would it include --

10            **THE COURT:**  And he's going to say does it include

11   mental and psychological harm to children?

12            **THE WITNESS:**  Those are much more damaging long term

13   to --

14            **THE COURT:**  Than a slap in the face?

15            **THE WITNESS:**  Absolutely.

16            **THE COURT:**  I think we all know that.

17            **THE WITNESS:**  Physical -- a physical injury heals.

18   It heals by and large.  If you traumatize children, what -- and

19   I almost said when they're very young, but the research has

20   changed dramatically on that, that there are just as many

21   potential dangers from trauma and a lack of stability and

22   continuity for those teenagers that people are now calling

23   emerging adults as in early childhood in terms of neuroscience

24   and brain development and those injuries can last a lifetime.

25   And often do.

1    **BY MR. YETTER:**

2    Q    Based on your work around the country, are you familiar

3    with any other system in the country that doesn't believe that

4    there -- a child welfare system that doesn't believe that their

5    obligation is to keep their children in their custody free from

6    physical, emotional and psychological harm?

7    A    No.

8    Q    Now, permanency --

9    A    And risk of harm.

10   Q    And -- yes.  And risk of that harm, true?

11   A    Absolutely.  If you don't believe that you have an

12   obligation to keep -- I'm probably talking too much, and I

13   apologize --

14              **THE COURT:**  No.

15   A    -- free from the risk of harm, why would you remove them

16   in the first place?

17   Q    Now --

18   A    They're already at risk of harm.

19   Q    If your system is not calculated to move the child to a --

20   to permanency -- to a permanent alternative home or back with

21   their biological parents, would that subject them to a risk of

22   harm in your opinion as a child welfare professional?

23   A    Here's the problem, okay?  These kids are already fragile.

24   They have already been damaged before we ever get them.  And we

25   know that that removal, no matter how carefully we do it, no

1   matter how sensitive we are, that initial removal does damage.

2   It does.  It creates trauma and grief and loss for that child.

3   I don't care how bad the family is.  That child loves that

4   family.  That's -- that's their core.  And when we have to

5   remove them, we're going to create damage.  Now, the worst that

6   -- and I've often said, the worst thing we can do from a -- for

7   a -- to a child is remove them from their home.  The second

8   worst thing is move them again.  And if you've got to get --

9   we've got to provide stability and we've got to have -- and the

10  DFPS policy say this.  I mean, they're very clear that children

11  need to move to permanency as quickly as possible and, you

12  know, those kinds of -- so at some level that is espoused.  But

13  you don't want to keep kids -- states don't make good parents.

14  We just don't.  We're a poor substitute.  And we need to get

15  those -- if we absolutely have to bring the child into the

16  system, then we do the work that needs to be done and get that

17  child either back with their -- as quickly as possible, in as

18  short a period of time as possible, because time is very

19  different from children than it is for us.  We measure time by

20  our age.  At my age, you know, a month is nothing.  It's

21  absolutely nothing, as a percentage of my age.  For children, a

22  month may be a pretty significant period of time in

23  relationship to their age.

24  Q    All right.  So in the Texas system, who is that one worker

25  that has the biggest responsibility in your opinion to help

Miller - Direct / By Mr. Yetter                              34

1   that child, that PMC child, achieve safety, permanency, and

2   wellbeing?

3   A    That's the primary case worker.

4   Q    High caseloads, are they good or bad for primary case

5   workers to do their job?

6   A    They are bad.  They -- if that caseload is too high, that

7   worker -- I don't care how good they are, how committed they

8   are, how caring they are, this work is hard.  It's complex.

9   And they simply cannot get the work done if they have an

10  unmanageable caseload.

11  Q    Have you focused on that specific issue looking in all the

12  documents that Texas has provided us, looking in all the

13  information that you've had available, the depositions and the

14  testimony, have you focused on that issue of high caseloads in

15  Texas?

16  A    Yes.

17  Q    And based on the documents you've seen internally, within

18  Texas, do they acknowledge that they need to have much lower

19  caseloads or do they deny it internally?

20  A     No.  Internally, the documents are pretty clear.  In their

21  budget documents and in the reports that they do, they

22  recognize that workforce issues are one of the issues that are

23  facing the agency and that it's something that needs to be

24  addressed.

25  Q    So, with all that internal information that Texas has

1    about acknowledging that they have high caseloads and it's been

2    damaging, how have you seen the information that you've gotten

3    in the Court, the depositions where some of the top

4    executives --

5                **THE COURT:**  Hold up.

6                **MR. ALBRIGHT:**  I was going to let him hang a question

7    mark at the end of the statement and object on the basis that

8    it's leading.

9                **THE COURT:**  Sustained.

10               **MR. ALBRIGHT:**  Thank you, your Honor.

11   **BY MR. YETTER:**

12   Q    How have you -- have you been -- have you read the

13   testimony of the various Texas officials that seem to suggest

14   that they don't have a problem with high caseloads?

15               **MR. ALBRIGHT:**  Same objection, your Honor.

16   Q    Have you read that testimony?

17               **THE COURT:**  Hold up.

18               **MR. ALBRIGHT:**  And seem to suggest?

19               **THE COURT:**  Sustained.

20   Q    I'll ask -- I'll say it -- have you heard testimony from

21   the high -- the top executives in this case of Texas about

22   whether they say they have high caseloads or not?

23   A    Yes, I have.  And -- and yes -- and no, they don't -- they

24   say that often times, no, our caseloads are okay.  We can do

25   it.  People just do more.  They move in to help.  You know, if

Miller - Direct / By Mr. Yetter                          36

1    -- if the caseloads get too high -- that's not as troubling to

2    me.  It's that nobody knows.  I mean, they don't know what

3    their caseloads are.  Nobody seems to be -- it -- you know,

4    it's like it's a reactive model instead of a proactive model.

5    You know, I remember in Ms. McCall's testimony that it's wait

6    until somebody gets in trouble and then how do we help them

7    rather than figuring out a system -- and that is so

8    demoralizing, I think.  In my professional opinion, I think

9    that's demoralizing to case managers that we don't recognize

10   that this -- there is a volume of work here and it's

11   significant and it's important.  And it's difficult and it's

12   complex.  If we don't recognize that and define it in some way

13   in terms of what is a manageable caseload, and that -- I don't

14   see that anywhere.

15   Q    All right.  Let's -- let's -- we will get to that shortly.

16   Let's focus a little bit more and before we move to that topic

17   of the affects that you've seen in your career of high

18   caseloads.  How does -- how do high caseloads affect the

19   ability of the case workers to do quality work for their

20   children?

21   A    It's not just a matter of doing quality work.  It's a

22   matter of doing the work and then quality comes on top of that.

23   But they have responsibilities -- this whole idea of the way

24   you get the child out of the system quickly is that you do good

25   thorough case planning and case implementation and you track

1    that that work is, in fact, being done and that the child is

2    making progress.  So, when you see that some of those things

3    are not happening, that certainly is an indicator that there

4    are high caseloads.  Placement stability -- and I -- let me

5    take just one -- one second and put -- when I -- as I looked at

6    the caseload, workload issue and the placement issue, those two

7    pieces of the infrastructure are not mutually exclusive.  They

8    feed into each other and create a synergy.  So, one of the

9    things that -- that you want that primary case worker to do is

10   to make the very best choice, placement choice that she can

11   make to that child.  Because remember I said, the worst thing

12   we do is remove them.  Second worst thing is remove them again,

13   is move them again.  And the only way she can do that is if she

14   has the time and the resources to understand and make that best

15   match for that child so that if at all possible you prevent

16   that -- an additional move for those kids.  And you see a real

17   lack -- these -- the -- particularly for these PMC kids.  They

18   just are moved all the time and I -- it makes sense to me from

19   my professional experience that if case workers did have the

20   time and the resources to make those decisions in a way that

21   was more appropriate for children, then they would be making

22   those decisions in ways.  You also see when you have -- and

23   when your caseloads are too high, these incredible lengths of

24   stay.  Well, length of stay is directly related to exits to

25   permanency.  The longer the kid stays in care, the longer he's

1   -- he or she is denied that permanent environment that they so

2   definite -- desperately need if they're going to get on that

3   path to a successful adulthood.

4   Q    Okay.  I want to see if we can kind of take this in little

5   bit chunks so that we can kind of keep it a little bit

6   organized -- a little bit more organized for the Court.  So, I

7   don't -- you said -- I think the first thing you said was the

8   high caseloads not only make it difficult to do quality case

9   work but to do the case work at all?

10  A    That's correct.

11  Q    Now, in your professional opinion based on the systems

12  you've run and the information that you've looked at in Texas,

13  how would that -- if at all, how would that harm the PMC

14  children that that case worker -- that overloaded case worker

15  -- is to protect?

16  A    Okay.  Children need stability in their lives.  If that --

17  and they need the services that are critical to their

18  wellbeing.  That's a part of that planning and implementation

19  process.  The goal of which always is permanency, is exiting

20  the child from the system.  But doing that in a way that while

21  we have that child we're doing the very best job we can to

22  attend to the needs of that child and see that the child is

23  well taken care of.

24  Q    Are your opinions, in that respect, consistent or

25  inconsistent with what the state has been saying in its

1  internal documents in recent years, about the effect of high

2  caseloads?

3  A    Yes.  I mean, they acknowledge that and that -- that high

4  caseloads can delay permanency, increase length of stay, and

5  prevent children from exiting the system.

6  Q    I'm not going to go through all the documents, but let's

7  just look at a couple.  Plaintiffs' Exhibit 894 which should be

8  on your screen.  The -- can you just go up to the top?

9  A    Wait a second.  Is there any way I can make this larger?

10  Q    Yes.  We're going to go up to the top and you will be

11  able --

12  A    Oh, wonderful.

13  Q    It will be able to -- easier to read.  This is one of the

14  documents that was in your file.  Do you recognize it as a

15  document from the state?

16  A    Yes.

17  Q    Okay.  Now I want -- this is dated February 27, 2013,

18  Texas DFPS.  It's a description of a revised exceptional item

19  request.  This is going to the legislature.  Let's look at the

20  third bullet on the page.  And I want you to tell us if that is

21  consistent.  Let's just read it -- consistent with your opinion

22  or inconsistent.  "High conservatorship caseloads mean it can

23  be more difficult for case workers to do the work necessary to

24  ensure timely permanency for children in foster care."  Do you

25  agree with that or not?

1  A    Absolutely.

2  Q    "The result is that children may spend more time in foster

3  care which is not optimal for the child and is more expensive

4  for the state."  Do you agree with that or not?

5  A    Absolutely.

6  Q    Do you think that creates an unreasonable risk of -- risk

7  of harm to the child, high caseloads?

8  A    I think -- yes, but I think it actually can and often does

9  create real harm --

10 Q    An actual harm?

11 A    -- to children.  An actual harm.

12 Q    All right.  The last sentence -- this relates to being

13 more expensive to the state, "Every additional month a child

14 spends in foster care costs an average of" -- this is according

15 to the state of Texas, eighteen hundred and ninety-eight

16 dollars just for the child's care.  Now, do you have an opinion

17 about that statement?

18 A    Well, yes.  And I -- several years ago in Tennessee, we

19 had someone do an -- we were working very hard on permanency

20 and to reduce the length of stay for our kids.  And we had

21 somebody do a study for us and what he looked at, and his

22 conclusion was if we reduced the length of stay for every child

23 in custody in a year -- every child that was in custody or came

24 (indiscernible) -- if we reduced that length of stay by just

25 one month, we would save thirteen million dollars, one month.

1  Q    Now, do you -- do you think that if the state of Texas

2  reduced its high caseloads that -- and were able to move

3  children to permanency quicker that they would save money?

4  A    Without question.

5  Q    Now, have you seen information -- again, on this high

6  caseload issue, from the Steven Group with regard to how much

7  time these conservatorship workers are able to spend with

8  children and families as opposed to doing paperwork?

9  A    The Stevens -- Steven Group stated that the case workers

10 were spending approximately 26 percent of their time -- only 26

11 percent of their time with children and families and the rest

12 of their time was being spent on administrative tasks, data

13 entry, and travel.

14 Q    Let's go to Plaintiffs' Exhibit 1993 which is the Steven

15 Group.  You read that report and you said it was a lengthy

16 detailed report?

17 A    Yes, I did.

18 Q    Let's go to page ten, April, 2014 and the bottom title and

19 paragraph.  Is this the part of the Steven Group that you were

20 just referring to?

21 A    Yes.

22 Q    "Field staff only spends 26 percent of time with children

23 and family.  Families currently CPS field staff only spends a

24 quarter of its time directly with children and families."  Now,

25 was that a -- when you saw that that -- when you saw that

1    finding, what was your -- did you react to it?  Did you have a

2    reaction to that?

3    A    That's -- I thought that was extremely low.  A very small

4    percentage.

5              THE COURT:  Say that again?

6              THE WITNESS:  I thought that was a very small

7    percentage.  I was, like the Stevens Group folks --

8              THE COURT:  Okay.

9              THE WITNESS:  -- surprised.

10   BY MR. YETTER:

11   Q    Was that -- is that a negative or positive surprise?

12   A    That's a negative.

13   Q    I think you said extremely low.  Can you compare that with

14   the systems that you're -- that you're familiar with?  Do you

15   have some basic idea?

16   A    I -- I would have to estimate and but I think a goal would

17   be that you manage a worker's time so that at least 40 to 50

18   percent of their time is actually in direct work with children

19   and families.  Now, there's no question about it.  There's a

20   great deal of work that in addition to the direct work with

21   children and families that are a part of that case manager's

22   workload in any given period of time.  But you would want to

23   try to keep that to a level where at least 40 to 50 percent of

24   their time was spent with children and families.

25   Q    Now, if case workers -- if the primary conservatorship

Miller - Direct / By Mr. Yetter                    43

1   case workers in the state of Texas are only spending about 26

2   percent of their time with children and their families, do you

3   think those children would be at a risk of the sort of harms

4   that you've been describing to the Court?

5   A    Depends on what the caseload is.

6        **MR. ALBRIGHT:**  Your Honor, I object to that question.

7   He just said 26 percent of conservatorship case worker time,

8   and that's not what the document says.

9        **MR. YETTER:**  Let me rephrase.

10       **MR. ALBRIGHT:**  It's a leading question and it's

11  misleading.

12  **BY MR. YETTER:**

13  Q    If the field staff in the Child Protective Services unit

14  of the DFPS spends only a quarter of its time directly with

15  children and families, do you think that would put the children

16  at a risk of harm if they have high caseloads?

17  A    Yes.

18  Q    And tell us why.  And I should say -- let me amend my

19  question -- at an unreasonable risk of harm?

20  A    Well, if you've -- if you've got 26 kids or more, which a

21  relatively large number of the case workers in Texas do have,

22  26 percent of your time is all that you have to devote to that

23  many different children, you know, I can say unequivocally that

24  that is simply impossible.  That work, it will not happen.  In

25  essence, those children may well not have a case worker.

                    Miller - Direct / By Mr. Yetter                    44

1    Q    Do you believe that a PMC child in the state of Texas that

2    effectively has no primary conservatorship case worker is a

3    safe child?

4    A    No.

5    Q    Is that child, in your opinion, subject to an unreasonable

6    risk of harm?

7    A    Yes.

8    Q    Or suffering actual harm?

9    A    I think probably both of the above.

10   Q    Now, you've talked about the other systems and how you

11   deal -- how you make sure that the -- your case workers that

12   was essential core workers for these children have manageable

13   caseloads.  And you -- you've talked a little bit about their

14   workload, have you not?

15   A    Right.  Right.

16   Q    Do you know what caseload standards are?

17   A    Yes.

18   Q    And can you tell us in the field of child welfare, the

19   professional child welfare, what's the caseload standard?

20   A    Well, there are two different groups that establish the

21   standards.  One is a professional organization and the other

22   one is an accrediting organization.  CWLA is simply a

23   professional organization that has developed standards using

24   experts who do this work all the time to come together to

25   develop what they think is reasonable work.  And they have said

                    EXCEPTIONAL REPORTING SERVICES, INC

Miller - Direct / By Mr. Yetter                    45

1   -- they have suggested these are not --

2   Q    Before we get -- before we get into the details, I just

3   want you to explain what the concept is, caseload standards.

4   A    Oh, I'm sorry.  I didn't -- establishing, just like you

5   would in -- with any other professional body of work,

6   establishing standards around what is a reasonable amount of

7   that work that one person could do, and do well.

8   Q    Now, is the concept -- based on your investigation, is the

9   concept of caseload standards for child welfare professionals

10  completely new to Texas?  Or does Texas recognize --

11  A    No.  They -- they -- their statutes recognize the CWLA

12  professional standards.

13  Q    Let's go to Plaintiffs' Exhibit 96.  And let's go first to

14  the -- the definition of caseload standards.  Now, all right.

15  So, do caseload standards, are they averages or are they

16  minimums and maximums or what are they?

17  A    The standards usually are establishing either a range as

18  with CWLA or a maximum.

19  Q    Okay.  Now, why is the maximum important for child welfare

20  professionals like conservatorship case workers?

21  A    What that does is establish a cap or a ceiling beyond

22  which you don't want to go and -- or you can't go and assume

23  that that worker is able to do the work that needs to be done

24  within the parameters of whatever their job is, what that --

25  how that job has been defined.

1  Q    For a caseload maximum in the child welfare profession,

2  who is -- in your experience, who -- who's protected or

3  benefited by the maximum?

4  A    The children.

5  Q    And how does that protect them?

6  A    Because it provides them with a case worker who has the

7  time available to do the work that needs to be done in safety,

8  permanency, and wellbeing for those children.

9  Q    All right.  So this -- the Texas statute which is

10  Plaintiffs' Exhibit 96 says caseload standards means the

11  minimum and maximum number of cases that an employee can

12  reasonably be expected to perform in a normal work month based

13  on the number of cases handled by or the number of different

14  job functions performed by the employee?  Do you see that?

15  A    Yes.

16  Q    Is that a standard or an unusual sort of definition of

17  caseload standard?

18  A    No.  It looks pretty basic.

19  Q    Something that in the child welfare profession that --

20  that you think is reasonable?

21  A    Right.

22  Q    Now, who sets why they're called professional caseload

23  standards, in your experience?

24  A    The organizations, Child Welfare League of America, and

25  Counsel on Accreditation.

1  Q    Is that, again, something unusual or new to Texas?

2  A    No.

3  Q    Let's go down to professional caseload standards which is

4  definition five.  And in this state, if the Commissioner

5  decides to set standards, what is one of the organizations that

6  he is to -- he is told by state law to look to?

7  A    Child Welfare League of America.

8  Q    Now, is that Child Welfare League of America among child

9  welfare professionals around this country, is it an outlier

10  group?

11  A    No.

12  Q    How is it -- how well accepted or not is it in the -- in

13  this -- in the country?

14  A    Well, it has a large number of members and states can be

15  members and agencies and organizations and I think currently --

16  well, actually 2010 are the last figures that I -- or list that

17  I saw.  But there were 38 states who were members who

18  recognized CWLA and were members of that organization.

19  Q    And do you know whether or not Texas is -- recognizes the

20  Child Welfare League of America?

21  A    They were members in 2010.

22  Q    Now, do you know whether in the state of Texas if the

23  Commissioner or the DFPS says that our case workers should have

24  caseload standards whether he is, under our law, required to

25  look to standards like the Child Welfare League of America?

1    A    This says that they are recommended for establishment so I

2    would assume that that would be something he would look to

3    since it's in statute.

4    Q    The -- we heard -- did you hear testimony on Monday from

5    Ms. McCall that it would be a waste of Texas resources to put a

6    maximum caseload -- to put -- a caseload standards that have a

7    maximum on conservatorship workers?  Did you hear that?

8    A    Yes.

9    Q    And what was -- do you have an opinion about whether what

10   she says is consistent with child welfare standards around the

11   country?

12   A    Here's the thing that I think is so important about this

13   -- this whole issue.  If you have a work force that has

14   manageable workloads, you're not burning up resources on

15   overtime -- or in massive amounts of overtime.  You're not

16   burning up resources on massive amounts of turnover.  And you

17   have the human resources -- those case workers necessary to get

18   your kids exiting from the state custody -- out of custody,

19   reducing that length of stay, then you will save money, I

20   promise you.  That's one of those things you can take to the

21   bank that would not cost you money.  It would save you money.

22   And lots of money.  Not little bits of money.  A great deal of

23   money.

24   Q    You were about to get to, before I interrupted you, some

25   of the professional standards that, for example, the Child

Miller - Direct / By Mr. Yetter                    49

1    Welfare League of America has set for conservatorship type case

2    workers.

3    A    They say eight to 12.

4    Q    And -- and are there other --

5    A    Or have, yeah, in the past.  That --

6    Q    And today, do you know if there are other organizations

7    besides the Child Welfare League of America?

8    A    Yes.  Counsel on Accreditation.

9    Q    And do they also have professional caseload standards that

10   they recommend, a range or a number?

11   A    Yes.  And they've -- they've recently dropped theirs.

12   When the two states that I worked in were going through the

13   accreditation process -- I don't think I mentioned that before

14   -- but both Kentucky and Tennessee, we did take two national

15   accreditation -- and at that time when we were going through

16   their standards, were 12 to 18 or eight to 18.  I can't

17   remember exactly.  Anyway, the ceiling was 18 and then they had

18   a range, that they recommended as the standard.  And I can tell

19   you from going through that experience in both states, what

20   they really measured to was 17.  When they were in both my

21   states, that's what they were looking for, were caseloads that

22   were around that 17 number.

23   Q    When you were in Kentucky and in Tennessee, what was the

24   caseload range that you were -- that you installed within your

25   system?

Miller - Direct / By Mr. Yetter                    50

1    A    The caseload range that I used was 14 to 17.

2    Q    Now, 14 -- you've heard -- we've heard testimony in this

3    case about what -- how they define caseloads here in Texas.

4    Have you heard about stages?

5    A    Yes.

6    Q    Did you do that in Kentucky or Tennessee?

7    A    No, I didn't.

8    Q    What did you count?

9    A    I counted children.

10   Q    And is that, in your experience at least around the

11   country, is counting children caseloads a -- an unusual or the

12   rule in terms of professional child welfare?

13   A    It's pretty standard operating procedure.

14   Q    And these numbers that you've given us --

15   A    I mean, you -- you well -- you may well measure other

16   things but I don't know of any other system that doesn't

17   measure the number of children in a caseload.  I don't know of

18   one.  It may exist.  I don't know.

19   Q    And the numbers that you were just giving us between eight

20   and 17, is that children or is that some other sort of

21   caseload?

22   A    The number I gave you was 14 to 17.

23   Q    Fourteen to 17.

24   A    That -- that's children.

25   Q    And that's children?

1  A    Yes.

2  Q    Now, when you were -- and was that -- what did you

3  consider that range to be?  Was it the maximum minimum?  Was it

4  the optimum?  What -- how did you look at that?

5  A    My cap was 20.  I wanted people to stay as much as

6  possible -- you know, this -- this is a fluid thing.  Kids are

7  coming in.  Kids are exiting the system, being assigned.  So, I

8  wanted a reasonable range where I thought that high quality

9  work could be done.  But I also wanted an absolute maximum that

10  trigger red flags, when we thought okay, we've got to figure

11  out what's going here.  You know, these -- if you don't manage

12  caseloads, they can get out of control on you very quickly and

13  then the work really begins to suffer and the children for whom

14  that work is being done begin to suffer.  So, I not only used a

15  range.  I also used a cap.

16  Q    So, did -- did you or not -- how did you view that range

17  of 14 to 17 in terms of child caseload as to whether it was

18  good practice, best practice, reasonable -- how would you

19  characterize it?

20  A    I thought it provided a reasonable workload where I was in

21  a position to be able to hold those workers accountable for

22  doing the work -- the quality work that needed to be done for

23  our children.  I didn't feel like -- well, I know for a fact

24  they were not fat cats.  They were still very busy.  They had

25  plenty of work to do in the course of their day.  That's the

1   other thing about managing caseloads.  I don't know how you

2   hold your case managers accountable for this extremely critical

3   work that they're doing unless you have and they have some sort

4   of assurance that what it is you're asking them to do is -- is

5   somehow manageable.

6   Q    So we're going to get to workload studies in just a bit.

7   And I want to continue to focus on some of the caseloads you

8   talked about.  Did you believe or do you believe that a

9   caseload maximum -- the ceiling that you talked about at 20

10  where you said it raised red flags in Tennessee, I think you

11  said.  Do you think that that's a best practice sort of ceiling

12  or a desirable ceiling?

13  A    Well, obviously, I think it's a most desirable ceiling

14  because it's the one I used.  But I came to that in a

15  relatively pragmatic sort of way.  I spent a -- when I first

16  went to Tennessee, we had caseloads far in excess of that and

17  our kids were staying far too long in custody and they were

18  being moved too much.  And we weren't doing the kind of

19  permanency planning that needed to be done.  And as I began --

20  and I spent a great deal of time tracking child progress in

21  relationship to -- you know, how is the child moving through

22  the program in the way they should?  And it became -- and in

23  that work, I also looked at the workers' caseloads.  And it

24  just became very obvious to me if I could keep those caseloads

25  below 20, that I could expect that -- to see that child making

1   the kind of progress that I wanted the child to make.  And if

2   those caseloads shot above 20 then I wasn't going to see that

3   kind of progress.  I was going to see kids backing up in the

4   system.  Now, here's another reason why I did the 14 to 17.

5   And, again, it's sort of a pragmatic reason.  We had five

6   workers per supervisor.  If I -- if I was at 14 to 17 and I had

7   one of those workers leave the system, resign, then I had no

8   problem taking that case load and spreading it among the

9   remaining workers so that none of those kids fell through the

10  cracks.  And those left workers still didn't go over the 20.

11  Do you see what I'm saying?  So, that was one of the reasons

12  that I thought it was very important to manage caseloads to

13  that level so that if we had a crisis or if we had somebody

14  leave and, you know, there are crisis situations.  You have a

15  meth lab bust and you suddenly can get in a huge number of

16  children.  People who do drugs seem to have a lot of kids.  And

17  when that happened, we were able to distribute those kids

18  quickly, be responsive to that crisis without throwing our

19  workers into a range where they couldn't get the work done that

20  needed to be done for their kids.

21  Q    Dr. Miller, if 20 -- when you were in Tennessee, if 20

22  raised red flags that your conservatorship case workers could

23  not do the work that the children needed, what is your view

24  about a ceiling of 25?

25          MR. ALBRIGHT:  Objection.

1   A    I think that is bedrock.

2          **MR. ALBRIGHT:**  Excuse me, your Honor?

3   A    I think that's --

4          **MR. ALBRIGHT:**  Can I object for just a moment?

5          **THE COURT:**  Excuse me.

6          **MR. ALBRIGHT:**  I object to the form of the question,

7   what is your --

8          **THE COURT:**  Just hold on.  When he stands up to

9   object, don't answer.

10          **THE WITNESS:**  I'm sorry.

11          **THE COURT:**  That's all right.  You're not a lawyer,

12  but your lawyer should have told you.

13          **MR. ALBRIGHT:**  And so I object to two things about

14  the question.  One is what is your feeling about so I object to

15  the form of the question on that unless we want to get a

16  feeling.  But the second objection is it's unclear; is he

17  asking about 25 in Tennessee or in Texas?

18          **MR. YETTER:**  I'll rephrase, your Honor.

19  **BY MR. YETTER:**

20  Q    Dr. Miller, if you believed, as you've explained to us,

21  that 20 -- a child caseload of 20 raises red flags about

22  whether that case worker can do the work that the child needs

23  to protect the child, what is your opinion about a child

24  caseload of 25?

25          **MR. ALBRIGHT:**  Well, your Honor, again, the same

1    objection.  If we're trying to get an opinion about Texas, I

2    have an enormous objection because this has never been in her

3    expert report.  It's a last minute change because they realized

4    it was a failing position to go with the prior one.  She has

5    never provided a report that says one word, any quantification,

6    any analysis of the number 25 in the state of Texas and I most

7    vehemently object to this line of testimony.

8         **THE COURT:**  Do you have that in your expert report

9    some place?

10         **MR. YETTER:**  Your Honor, I believe she talks about

11   these numbers in her expert report, and I can ask her right

12   now.

13         **THE COURT:**  Well, why don't you go through your

14   report and see where you discuss that, okay?  And that's on

15   Plaintiffs' Exhibit 2037.  Do you have it in front of you?

16         **THE WITNESS:**  Yes, I do.  But I don't think I have

17   the number 25.

18         **MR. ALBRIGHT:**  That's my point, your Honor.

19   **BY MR. YETTER:**

20   Q    Do you have opinions about reasonable caseloads?

21   A    Yes.

22   Q    And what are your opinions about reasonable caseloads for

23   the state of Texas?

24   A    I think that 25 number --

25         **MR. ALBRIGHT:**  Your Honor?  Now, I'm going to object

1   to that because she never expressed in her expert report an

2   opinion as to what --

3          **THE COURT:**  Forget about the 25.  Just tell me what

4   you think is appropriate.  That's in your expert report because

5   I think you -- I think she testified about it before.

6          **MR. ALBRIGHT:**  Your Honor, she never testified to a

7   number.

8          **THE COURT:**  No, she didn't.

9          **MR. ALBRIGHT:**  And she didn't do it the first time

10  around.  She didn't do it this time around.  And they

11  (indiscernible).

12         **MR. YETTER:**  Yeah, yeah --

13         **THE COURT:**  Is it anywhere -- just show me where it

14  is in the report and where she discussed about it.

15         **MR. YETTER:**  Actually, I gave you my copy of the

16  report, your Honor.

17         **THE COURT:**  Here.

18  **BY MR. YETTER:**

19  Q    Rather than hold things up here.  I'm going to let you

20  move on and then we can come back to this topic.  Dr. Miller,

21  do you believe that client -- did you read Ms. McCall's

22  deposition testimony where she -- about -- her testimony about

23  client safety -- child safety?

24  A    Yes.

25  Q    And its relationship to lower caseloads?

1    A    Yes.

2    Q    And do -- what did she say and do you agree with it or

3    disagree with it?

4    A    She did say that lower caseloads were better for kids and

5    safer for kids.

6    Q    Do you agree with that?

7    A    Yes.

8    Q    Do you believe -- how does -- do you believe -- what -- is

9    there -- in your opinion, is there any causal connection

10   between high caseloads and risk of harm to children?

11   A    Absolutely.

12   Q    And likewise, same question, do you believe that there's

13   any causal connection between lower caseloads within the ranges

14   that you believe to be within professional standards and -- and

15   better outcomes for children?

16   A    Yes.

17   Q    And what is that connection?

18   A    Can I -- can I give -- when we were able to get caseloads

19   down, and it took a while, we were able to reduce the number of

20   kids in the custody of the state from about 8,000 or over 8,000

21   to about fifty-five hundred kids.  And we did that largely --

22   we -- we slightly reduced the number of kids actually coming

23   into the system but the big change was in getting the kids out

24   of the system more quickly by managing the backend of the

25   system.  And in order to do that, you have to have case workers

Miller - Direct / By Mr. Yetter                    58

1   who have reasonable manageable caseloads and then you have to

2   hold them accountable for doing that very important work of

3   getting children to permanency.

4   Q    Have you seen the testimony of -- or did you hear of the

5   testimony of Ms. McCall during the trial that Texas has not

6   established any caseload size parameters?

7   A    That's correct.

8   Q    Did you hear the testimony of Ms. Black yesterday?

9   A    Yes.

10  Q    And she is the head of Child Protective Services in the

11  state of Texas?

12  A    Yes.

13  Q    Did you hear whether -- what she said about whether -- who

14  she had talked to within the state about putting --

15  implementing caseload standards?  Who, if anyone, she talked

16  to?

17  A    I don't remember her saying that she'd talked to anyone.

18  Q    Did she have any discussions to your knowledge with anyone

19  in the state, any of her colleagues or the Commissioner about

20  putting any sort of minimums and maximums on the caseload --

21  the child caseloads?

22  A    If I remember correctly, she said that she had not.

23  Q    Did you hear any testimony from the state of Texas about

24  whether they keep track of or have standards for what caseloads

25  should be?

1    A    No.  They -- well, the -- no.  There was an -- again, the

2    explanation was around crisis management.  You know, it was the

3    squeaky wheel gets the oil.  If somebody gets over -- and I

4    think -- I think Ms. McCall even said, not in her testimony,

5    but in a deposition that if they get to 50 -- the caseloads get

6    to 50, then she expects other people to come in and help them

7    to make sure things get done.  So, no.

8    Q    Did you hear testimony from Ms. Black about maybe doing a

9    workload study?

10   A    Yes.

11   Q    And did you hear any commitment from her on behalf of the

12   state to actually establish any caseload standards under Texas

13   law?

14   A    No.  All I heard her say was that there was a plan to do a

15   workload study.

16   Q    Now, if you have your -- let's go to your report which is

17   Plaintiffs' Exhibit 2037.  And if you have it handy -- I think

18   -- do you have it -- well, let's go --

19   A    Yes.  I have it but --

20   Q    Let's go to --

21   A    Go ahead.  My pages -- numbers are going to be different

22   from yours because I had to have mine done in large print so

23   you may want to just bring it up here.

24   Q    Okay.  Let's go to page 18.  Is this your report, that

25   first page that you saw?

Miller - Direct / By Mr. Yetter                    60

1  A     Yes.

2          **MR. YETTER:**  Let's go to page 18.  Let's blow up that

3  last paragraph.

4  Q    Now, Dr. Miller, you've just been testifying about the

5  maximum that you used in Tennessee and what was that maximum?

6  A     Twenty.

7  Q    And what did that represent to you at the time, that

8  maximum?

9  A     Twenty children.  That was the cap.

10  Q    And at 20 --

11  A     That was the ceiling.

12  Q    -- what did you believe was the issue or the concern?

13  A     That the work would diminish past that point.

14  Q    And, again, the next sentence talks about the caseload

15  range and what range did you use in Tennessee?

16  A     Fourteen to 17.

17  Q    What did you do whenever a caseload reached 20?

18  A     I wanted to know why.  I would check in to see -- and as I

19  said in the report, sometimes the explanation was reasonable

20  and this was going to be a very short term issue.  And because

21  of some things that were going on with the kids, some of the

22  kids were about to exit to adoption or some of the kids on that

23  caseload were actually on a trial home visit that was almost

24  over.  But if -- you know, if there -- if there was not an

25  explanation, then we had to find a solution.  Then we -- you

1   know, this kind of information is so helpful to you to not just

2   diminish caseloads but to let you know where you need to add

3   resources.  Like if I see an area where they're constantly

4   bumping up against that 20, then that says to me they're under

5   resourced.  I've got to get some more case workers in there.

6   Q    In Tennessee when they -- when a case worker's load got to

7   20 children and they were potentially going to get a new child,

8   what would you do?

9   A    Okay.  I didn't control at that.  What I did -- what I

10  received every month was a spreadsheet that had every case

11  worker and every supervisor and their loads on that, and it was

12  broken out by the type of child, the type of issue that -- or

13  the type of case -- I'm sorry -- that they were working.  And I

14  could scan that very quickly because most of our caseloads were

15  under control and I could scan that very quickly to look and

16  see what -- if I had any hotspots.  And if I did -- if I saw

17  anything at that 20 level, then I would get in contact with the

18  regional administrator and say what's going on here?  What's

19  your plan?  What do we need to do?  Have you had a crisis?  Do

20  we need to get some more resources in up there?  So that's sort

21  of how that process worked.

22  Q    And that cap of 20, did you believe that that was a best

23  practice in the child welfare profession?

24  A    It was the -- it was the practice that worked.  So, is

25  that -- yes.  Is that best practice?  Hopefully.

Miller - Direct / By Mr. Yetter                    62

1    Q    In your experience?

2    A    Yes.

3    Q    Now, do you -- have you seen information on the

4    distribution in the state of Texas about children and how many

5    cases -- how many children -- what the caseloads are of the

6    case workers that each of these children have?

7    A    Yes.

8    Q    And has it been -- was it broken down into different

9    pieces, children between -- with case workers between one and

10   15 caseload and higher up?

11   A    I -- I -- I can't remember exactly what that spreadsheet

12   did, in fact, look like.  Do you -- if you have it there, you

13   could put it up.  I can't -- I saw so many different

14   spreadsheets with iterations of workloads, I'm not sure I know

15   exactly which one it is you're referencing.  It was extremely

16   difficult to get child only caseloads.

17   Q    Let's start with page 11 of your report at the bottom.

18   The second sentence --

19   A    Could you please give me some words because my page

20   numbers are not exactly -- oh, you've got it up here.

21   Q    Sure.  It's up on the screen.

22   A    Thank you.

23   Q    The second sentence.

24        MR. YETTER:  Let's just highlight that.

25   Q    "More than 250 case workers or 21 percent of all the case

1    -- conservatorship case workers had 26 or more children

2    assigned to them."  Do you see that?

3    A    Yes, I do.

4    Q    Is that consistent with your memory of the information

5    that you saw?

6    A    Yes.  Yes.

7    Q    Now let's go to Plaintiffs' Exhibit 2051.  And to page

8    111.  Does this chart look familiar to you?

9    A    Yes.

10   Q    PMC children by assigned child caseloads of their primary

11   substitute care and adoption case workers at the end of these

12   fiscal years.  Do you see that?

13   A    Yes.

14   Q    And for fiscal year 2013, do you see those numbers?

15   A    Yes.

16   Q    So for the range one to 15 children, and would you

17   consider that to be a range of one child to 15 within best

18   professional practices?

19   A    Yes.  And the -- those are probably -- they're in training

20   workers.

21   Q    And what -- looking at fiscal year 2013 for the state of

22   Texas, how -- what percentage of the PMC children were within

23   that caseload?

24   A    Twenty-two percent.

25   Q    And going then from 16 to 25?

1    A    Twenty percent.

2    Q    Well, 16 all the way up to 25?

3    A    Twenty percent.

4    Q    Twenty percent.  That's 16 to 20.

5    A    Right.

6    Q    And then 21 to 25 was how much?

7    A    Twenty-seven percent.

8    Q    And then everything over 25, that would be 26 to 30, 31 to

9    35, and over 36.  What was the total of those children?

10   A    It's 31 percent.

11   Q    So --

12   A    And that's actually about 4,000 children if I remember

13   correctly.

14   Q    Just to kind of put frame -- put this -- frame this, those

15   4,000 children -- PMC children -- have case workers that have

16   child caseloads of 26 children or above?

17   A    That's correct.

18   Q    That's the state of Texas?

19   A    Right.

20   Q    And those are -- are those PMC children or all children?

21   A    These are PMC children.

22   Q    How many children was that again?

23   A    It's 4,000 children and it's 228 workers if I remember

24   correctly.

25   Q    Now, in Tennessee after you did -- after you did -- you

1   said you did accreditation, you did reform in the state, did

2   you have children, at least to your knowledge, within your

3   policies and procedures, that had case workers with child

4   caseloads at 25 or above?

5   A    Oh, no.

6   Q    And why not?

7   A    Because that's -- you can't do the work at 25 and above.

8   Q    Would a child in Tennessee, in your opinion, have been at

9   risk of harm if they had a primary conservatorship case worker

10  with a child caseload of more than 25?

11  A    Yes.

12  Q    Your red flag mark, ceiling, was what?

13  A    Twenty.

14  Q    And at 25, would you have any doubt that they'd been at

15  risk of harm?

16  A    No doubt.

17          **MR. ALBRIGHT:**  Your Honor, again, is this limited to

18  Tennessee or are we back into Texas again?  It's not in her

19  report.

20          **THE COURT:**  I thought he was talking about Tennessee.

21          **MR. YETTER:**  I was asking about Tennessee.

22          **MR. ALBRIGHT:**  Okay.  The question wasn't clear.

23  **BY MR. YETTER:**

24  Q    Now, if you had your -- if you could make Texas do best

25  practices in its child welfare system, what range would you

1   have Texas adopt using best practice?

2           **MR. ALBRIGHT:**  Your Honor, I object to that.  Excuse

3   me.  I object to that on the basis --

4           **THE COURT:**  For the same reason?

5           **MR. ALBRIGHT:**  Yeah, well --

6           **MR. YETTER:**  She's testified about this and it's in

7   her report, your Honor.

8           **THE COURT:**  Okay.

9           **MR. ALBRIGHT:**  Okay.

10          **THE COURT:**  You want to -- you want us -- for him to

11  show you?

12          **MR. ALBRIGHT:**  Well, I --

13          **THE COURT:**  I haven't read it because I've just now

14  seen it.

15          **MR. ALBRIGHT:**  I'll tell you what I'm worried about.

16  I'm worried she's going to pop out with the 25 again and then

17  I've lost my objection that it's not in the report if she's

18  going to say that it's 15 to 18 based on CWLA or COA that's in

19  her report and have at it.

20          **MR. YETTER:**  Your Honor, our position is -- is this.

21  That if this was the case about best practices, we would have a

22  range of 14 to 17.  If this was a case about a best practice

23  ceiling, at least this witness would say that ceiling of best

24  practices would be 20.

25          **MR. ALBRIGHT:**  And --

1          **MR. YETTER:**  But our position in this case is that at

2    25 you're beyond best practices.  You're at the point that

3    you --

4          **THE COURT:**  Well, she just said that.

5          **MR. YETTER:**  Yeah, and that's our position in this

6    case.

7          **THE COURT:**  In Tennessee.

8          **MR. ALBRIGHT:**  In Tennessee and --

9          **MR. YETTER:**  And we believe --

10         **THE COURT:**  Because we haven't discussed -- you know,

11   ICU people and this kind of thing and that kind of thing,

12   right?

13         **MR. ALBRIGHT:**  Exactly.  And she never did that in

14   her report.  That's my point, Judge.  This 25 -- when we had

15   opening statement and they popped out with the twenty --

16         **THE COURT:**  We're not talking 25.  I'm not thinking

17   about 25.  Even though they talked about it in opening

18   statements, they wanted me to put a limit at 25 and that's --

19   you know, I don't -- I didn't see whether that was going to

20   happen.  I'm going to make it ten.  How's that?

21         **(Laughter)**

22         **MR. ALBRIGHT:**  Okay.

23         **THE COURT:**  And I'll limit your cases to ten, too.

24   How about that?

25         **(Laughter)**

1          **MR. ALBRIGHT:**  You know, Judge, if you could get rid

2    of one for me, I'd be really happy.

3          **(Laughter)**

4          **THE COURT:**  I wish I could, actually, talk to you-all

5    about that.  But any hope?

6          **MR. ALBRIGHT:**  Are you speaking to me, your Honor?

7    Or are you speaking to both sides?

8          **THE COURT:**  Both sides.

9          **MR. YETTER:**  We've always been ready to talk, your

10   Honor.  This is an important case for the children and we're

11   prepared if the state is prepared to make good faith efforts.

12   But we've gotten nowhere.

13         **MR. ALBRIGHT:**  Your Honor?

14         **THE COURT:**  Is it just that you think you've got the

15   -- you've got the law on your side so you don't have to make

16   any concessions?  Is that it?

17         **MR. ALBRIGHT:**  Well, your Honor, I actually think

18   it's inappropriate and I saw that with all due respect.  I

19   don't think it's appropriate for me to get into our analysis

20   which is a work product shared opinion with my client.

21         **THE COURT:**  No.  It isn't.

22         **MR. ALBRIGHT:**  I think it's what pops out at the end

23   of the day and what popped out is we can't settle it on the

24   basis of any of the general parameters they suggested to us.

25         **THE COURT:**  Because I don't know what their

1    suggestions have been.

2            MR. ALBRIGHT:  And, again, I -- you know, I mean, I

3    think we crossed that bridge when we filed the Pretrial Order

4    and said we need to try our lawsuit.

5            THE COURT:  Okay.  I don't have any problem with

6    trying it.  My time is your time.  It's what I get paid to do.

7            MR. ALBRIGHT:  Me, too.

8            THE COURT:  But I just wondered -- you know, if there

9    was any changes.  I'd be glad to give you time if there are.

10           MR. YETTER:  Getting back to the question I was

11   asking Dr. Miller.

12   BY MR. YETTER:

13   Q    Now, if you could -- in your opinion, what would be the

14   best practice range for child caseloads for the state of Texas,

15   based on everything you know?

16           THE COURT:  That's the objection, right?

17           MR. ALBRIGHT:  That is the objection.  I mean, maybe

18   we can do it by --

19           MR. YETTER:  That's what she's -- that's what she --

20           MR. ALBRIGHT:  -- pointing it out in the report and

21   then --

22           THE COURT:  Is it in her report?

23           MR. YETTER:  I just went -- yes, your Honor.  It's in

24   the report.

25           THE COURT:  Show me.  Read me the report.

1          **MR. YETTER:**  Page 18 of 96.  Let's go to paragraph F

2   first.  Well, the first at the top, paragraph F.  Her

3   professional opinion is the singularly most troubling finding

4   regarding caseloads was the total absence of a ceiling, that

5   point beyond which caseloads would not be considered

6   manageable.  And she goes and talks about a little bit of the

7   testimony.  The next paragraph she says, "The ceiling that I

8   used was 20 children. The caseload range that I managed to was

9   14 to 17.  Anytime a caseload reached 20 --"

10         **THE COURT:**  Okay.  But does she have in her report

11  what she thinks is best practices for Texas for case numbers?

12         **MR. YETTER:**  Well, you Honor, that's what she said --

13         **THE COURT:**  Okay.  Well, that's what she's already

14  said so that's it.

15         **MR. ALBRIGHT:**  About Tennessee.

16         **THE COURT:**  Yes.

17         **MR. YETTER:**  But she was talking about what she was

18  concerned about in Texas.

19         **THE COURT:**  No.  I agree with that.  Wait.  Wait.

20  She can say I think best practices in the entire United States

21  is 14 -- is what I used, 20 case ceiling and preferably 14 to

22  17.  That's what she's testified to.  That's what I assume her

23  to be an expert in.  But nobody is going to tell me about 25, I

24  don't think.  I guess.

25         **MR. YETTER:**  We will argue it, your Honor.

1          **THE COURT:**  Well, you can argue it but I wouldn't

2    know where it comes from.

3          **MR. YETTER:**  Well, this is our position on it, just

4    since we're on this topic.  There -- we know that at some point

5    it becomes so excessive that it reflects an indifference of the

6    state to those case workers whether they can do their job for

7    these children.  We believe that point is at 25.

8          **MR. ALBRIGHT:**  And, your Honor, our position is

9    that's a matter of expert calculation, what is reasonable,

10   what's unreasonable, what's the number.

11         **THE COURT:**  It is.  The --

12         **MR. ALBRIGHT:**  IC (indiscernible).

13         **MR. YETTER:**  It -- it --

14         **THE COURT:**  The law is clear.  It's a matter of

15   professional judgment at the very minimum, not lawyers'

16   judgment.

17         **MR. ALBRIGHT:**  And --

18         **THE COURT:**  I agree.

19         **MR. YETTER:**  Your Honor, we actually -- we believe

20   that at that point, that's a fact finding that the Court is

21   going to make.  And so, what we've provided to the Court is

22   professional standards, a professional judgment by this expert

23   that she believes the best practice ceiling would be 20.  But

24   our position is going to -- our position is, your Honor, that

25   when it goes -- extends beyond that to 25, it is beyond not

 1   just ignoring professional standards --

 2            THE COURT:  I -- you've told me this a hundred times,

 3   at least 25.  We can move on from this.  You know, if I make

 4   this decision that there are Constitutional violations that

 5   arise to that level, I may say 20 but I'm going to certainly

 6   hear the government's experts that -- the state's experts on

 7   what other would be factored into those case workers.  You

 8   know, the ICU workers, this worker, that worker, that -- you

 9   know, that I've heard about that I don't know if Tennessee has.

10   Do -- does Tennessee have --

11            THE WITNESS:  We didn't have ICU's but we had all of

12   and perhaps more than the support network that exist in Texas.

13            THE COURT:  Okay.

14            MR. YETTER:  Why don't you -- let's -- it's a good

15   (indiscernible)

16            THE COURT:  You know what?

17            THE WITNESS:  And may I say one more thing?

18            MR. YETTER:  Sure.

19            THE COURT:  Two minutes worth.

20            MR. ALBRIGHT:  Maybe we could go as a Q & A format?

21            MR. YETTER:  You have two -- you have two --

22            MR. ALBRIGHT:  Maybe we could (indiscernible)

23            THE WITNESS:  Oh, please don't go more minutes.

24   If -- here's the thing.  If that the other structural issue

25   that I know I'll be talking about later.

Miller - Direct / By Mr. Yetter                    73

1          **THE COURT:**  Tomorrow.

2          **MR. YETTER:**  Tomorrow.

3          **THE WITNESS:**  Tomorrow.

4          **THE COURT:**  Definitely.

5          **THE WITNESS:**  If it would -- if that one were

6    resolved, then you don't even need those 72 ICU workers.  Then

7    you've got more primary case workers in the system.  I mean,

8    that's why I said -- when I started, that these things are

9    synergistic.  They work together.  And then if you had the --

10   if you had the resource array, then you'd have best practice

11   with your kids because your primary case workers would be able

12   to do -- would be able to work with their kids and see their

13   kids regularly.  And you'd save 72 staff that could be put into

14   your -- as primary case workers and lower caseloads.

15         **THE COURT:**  Okay.  I think I'll let your -- I promise

16   I'll give your experts the same leeway, okay?  Does that make

17   up for it?

18         **MR. ALBRIGHT:**  It does.  Thank you, your Honor.

19         **THE COURT:**  And we're tired, and it's time to call it

20   a day.  And we'll reconvene tomorrow at 8:00 and take it up

21   from there.

22         **THE CLERK:**  All rise.

23      **(This proceeding was adjourned at 5:28 p.m.)**

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____     \_\_January 10, 2015\_

TONI HUDSON, TRANSCRIBER