UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| M.D., ET AL., | ) | CASE NO:  2:11-CV-0084 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| GOVERNOR RICK PERRY, ET AL., | ) | Wednesday, December 10, 2014 |
| | ) | (8:43 a.m. to 9:50 a.m.) |
| Defendants. | ) | (9:53 a.m. to 9:54 a.m.) |


CROSS AND RECROSS EXAMINATION OF JEAN SHAW
DURING TRIAL - DAY 8


BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE



Appearances:                See Next Page

Court Recorder:             Arlene Rodriguez

Case Manager:               Linda Smith

Transcriber:                Exceptional Reporting Services, Inc.
                            P.O. Box 18668
                            Corpus Christi, TX 78480-8668
                            361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR:</u>


Plaintiffs:                    R. PAUL YETTER, ESQ.
                               Yetter, Coleman, LLP
                               909 Fannin, Suite 3600
                               Houston, TX 77010

                               MARCIA ROBINSON LOWRY, ESQ.
                               CHRISTINA WILSON, ESQ.
                               SARAH BARTOSZ, ESQ.
                               Children's Rights
                               330 Seventh Avenue
                               Fourth Floor
                               New York, NY 10001


Defendants:                    THOMAS A. ALBRIGHT, ESQ.
                               ANDREW BOWMAN STEPHENS, ESQ.
                               MARC RIETVELT, ESQ.
                               Office of the Attorney General
                               General Litigation Division
                               P. O. Box 12548
                               Capital Station
                               Austin, TX 78711-2548

3

<u>INDEX</u>

| <u>DEFENDANTS' WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| JEAN SHAW | | 4 | | 63 |

| <u>PLAINTIFFS' EXHIBIT</u> | | | | <u>RECEIVED</u> |
|---|---|---|---|---|
| 1706 | | | | 58 |

1    **Corpus Christi, Texas; Wednesday, December 10, 2014; 8:43 a.m.**

2            **(Partial examination of testimony of Jean Shaw)**

3                       **CROSS EXAMINATION**

4    BY MR. YETTER:

5    Q    Good morning, Ms. Shaw.  My name is Paul Yetter.  I

6    represent the Plaintiff children.

7            You've been in court for a few days, I take it?

8    A    I have.

9    Q    You are the director of residential care.  You report to

10   Paul Morris.  You were here for his testimony?

11   A    I was not.

12   Q    Now, he testified about a number of the issues that you

13   testified about here today and I'm going to go over some of

14   them, but let's just get some parameters.

15           You, in your role as director, you're ultimately

16   responsible for the residential childcare licensing staff and

17   their work across the state, aren't you?

18   A    Yes.

19   Q    Now, but your boss, Paul Morris, is the guy that -- he's

20   in charge of the whole group, right?

21           **MR. YETTER:**  Let's go to 811, I believe, is the org

22   chart, your Honor, so we can frame where we're at.

23           So let's -- stop.  First let's blow up the CPS side.

24           And, your Honor, we've spent a fair bit of time on

25   the CPS side.

1    BY MR. YETTER:

2    Q    And Lisa Black is the head, true?

3    A    Yes.

4    Q    And you're not on that side?

5    A    I am not.

6            MR. YETTER:  Okay.  Now, let's take that off and

7    let's blow up now -- there you go.

8    Q    This is the residential licensing side.  It's called

9    childcare -- I shouldn't say residential licensing, it's

10   childcare licensing side, right?

11   A    Correct.

12   Q    And you are in that group.  There's Paul Morris at the top

13   and there is -- there you go, you're right there underneath him

14   for residential, Ms. Shaw, for residential childcare licensing,

15   true?

16   A    Correct.

17   Q    So you are looking at the facilities that, among others,

18   that private CPAs have out in our communities around the

19   street.  You agree, true?

20   A    Yes.

21   Q    And you have a group of investigators who go out and you

22   also have a quality assurance group that the Court's heard

23   about, that is this PMU group, right?

24   A    PMU is not under residential licensing.  PMU is under

25   childcare licensing.

Shaw - Cross / By Mr. Yetter                           6

1  Q    Okay.  It's within Paul Morris's area, childcare

2  licensing, it is a sister group to your residential childcare

3  licensing?

4           THE COURT:  You mean daycare licensing?

5           THE WITNESS:  There's -- we have daycare licensing,

6  residential licensing under Paul's performance management unit

7  and policy and operations.

8           MR. YETTER:  So let's highlight another name,

9  your Honor.

10 BY MR. YETTER:

11 Q    William Wright, underneath you, that's the PMU group?

12 A    That is correct.

13 Q    So you and William Wright -- he's no longer in that --

14 he's no longer head of that group right now, is he?

15 A    That's correct.

16 Q    Okay.  You guys are peers but you work together from time

17 to time?

18 A    Yes.

19 Q    Okay.  So let's turn to what you learned in 2014 about the

20 reliability of at least some of the investigations that were

21 coming out of your group --

22           THE COURT:  I've got to go back to this.

23           MR. YETTER:  Sure.

24           Let's put that back up.

25           THE COURT:  In the Levelland thing the attorney ad

1    litem went out and called these factors to the attention of the

2    facility.  It was clear that she was going to do something

3    about it next complaint.  So then they had time to clean up.

4    You sent somebody out.  And then you ruled out that it

5    happened.  Right?

6              **THE WITNESS:**  I'm not sure if the attorney informed

7    them of any concerns or not.

8              **THE COURT:**  She said she did.

9              **MR. YETTER:**  She did.

10             **THE WITNESS:**  Okay.

11   **BY MR. YETTER:**

12   Q    Did you actually ask the attorney for her opinion about

13   what happened?  Did you call, did the investigator call the

14   attorney and say what did you see?

15             **THE COURT:**  I think we just figure out why there's

16   such a high percentage of ruled outs.

17             You never talked to the attorney?  Nobody, no

18   investigator talked to the attorney?

19             **THE WITNESS:**  I don't recall that contact now.  I

20   don't believe they did.

21             **MR. YETTER:**  Okay --

22             **THE COURT:**  I think she said nobody --

23             **MR. YETTER:**  Nobody --

24             **THE COURT:**  -- contacted her.

25             **MR. YETTER:**  I'm going to circle back to that --

Shaw - Cross / By Mr. Yetter                          8

1              **THE COURT:**  Sorry, I interrupted you --

2              **MR. YETTER:**  -- because I have more to --

3              **THE COURT:**  -- go ahead.

4              **MR. YETTER:**  -- talk about that, your Honor.

5    **BY MR. YETTER:**

6    Q    Okay.  Then let's talk first about the investigations,

7    because this is -- you learned this before the Levelland thing

8    came up, before that investigation, you learned in January of

9    2014 that there was a problem.  I want to give the Court a full

10   picture of what happened.

11             In December of 2013 you asked for the study, didn't

12   you?

13   A    I think it was before December of 2013.  It took a while

14   for them to review the cases.

15   Q    Sometime late 2013 you said I want you to review the

16   reason to believe and unable to determine cases for physical

17   abuse for that entire 12-month period, right?

18   A    I did not ask them to review the reason to believe.  They

19   reviewed the unable to determines for physical abuse.

20   Q    But for some reason they gathered 85 cases and some of

21   them were reason to believe and some of them were UTD.  Is that

22   what you asked them to do?

23   A    I asked them to focus on the unable to determines.

24   Q    Let's just put this in front of us, Plaintiffs'

25   Exhibit 1129, so we have -- so you know where I'm going and

1    let's just blow up the top.

2              All right, so some time in late 2013 you tell this

3    two-man group, two-person group in PMU, I want you to look at

4    the UTD findings for a 12-month period, right?

5    A    For physical abuse, yes.

6    Q    For physical abuse.  So you has -- you kind of narrowed it

7    down.  You looked at a certain timeframe and it was just about

8    fiscal year 2013, wasn't it?

9    A    Fairly close, yes.

10   Q    Okay.  So your fiscal year ends in August, and I think you

11   ended this one in July, but it's almost exactly fiscal year

12   2013 for the whole 12 months and you said just physical abuse

13   and then you told them just UTDs, right?

14   A    Yes.

15   Q    And of all of those investigations, they only had 48 UTDs,

16   right?

17   A    For physical abuse.

18   Q    And you wouldn't doubt it's the information that shows

19   that there's like -- for physical abuse.  Excuse me.  There's

20   like 2,000 investigations per year that Residential Licensing

21   does.  That's about right, isn't it?

22   A    That's correct.

23   Q    So out of 2,000, there was only 48 for physical abuse and

24   you have your two-man -- your two-person team look at all 48,

25   do you not?

Shaw - Cross / By Mr. Yetter                                    10

1   A     Yes.

2   Q     And it takes them 30 days, 60 days, whatever it takes,

3   right?

4   A     Yes.

5   Q     They come back and they give you a report, which they --

6   which we have here that's Plaintiffs' Exhibit 1129, and it was

7   probably very concerning to you, was it not?

8   A     Yes.

9   Q     Because what we have --

10          **MR. YETTER:**  Let's go to Page 2 of the report --

11  Q     Because --

12          **MR. YETTER:**  Let's go to the last paragraph.

13  Q     Because this was not only 12 months, it was not only all

14  the physical abuse cases in which you got a UTD finding, but it

15  was geographically all around the state, wasn't it?

16  A     I believe so.

17  Q     All regions, all 48 -- that last sentence, "all 48 cases

18  were reviewed and all regions in the state were included."

19          So that means it wasn't just a pocket of

20  investigators that might have been bad or sloppy or overworked,

21  right?

22  A     I wouldn't agree to bad, sloppy, overworked.  I would

23  agree that across the state there was additional work that

24  should have -- that we needed to do.

25  Q     Okay.  So it's a long time period, 12 months,

Shaw - Cross / By Mr. Yetter                    11

1   geographically spread out, physical abuse.  Physical abuse

2   cases don't just go to certain investigators, do they?

3   A    They go to abuse and neglect investigators.

4   Q    Okay.  So those abuse and neglect investigators can be

5   physical abuse, sexual abuse, neglect, negligent supervision,

6   right, all manner?

7   A    Correct.

8   Q    Okay.  So you're concerned because --

9        **MR. YETTER:**  Let's go to the next page at the very

10  top.

11  Q    -- you find out from your initial review that 64 percent

12  are wrong.

13       **MR. YETTER:**  Let's blow that up.

14  Q    Thirty-one of the 48, 64.6 percent, of the reviewed

15  physical abuse allegations were incorrectly determined as UTD,

16  right?

17  A    Yes, that's what PMU found.

18  Q    That was in the first cut and in the first cut that caused

19  you -- that was obviously a very high percentage.  Even they

20  said you want to know what is the reasons for such a high

21  percentage of incorrect UTD findings.  True?

22  A    True.

23  Q    Now, you don't have a certain group of investigators that

24  just do UTD findings, do you?

25  A    That would be impossible.  We don't know --

1   Q    Sure..

2   A    -- the disposition before a case.

3   Q    Some investigators, they're going to have cases that they

4   make a UTD finding on one case and they'll have cases where

5   they make a reason to believe finding on a very few other cases

6   and then lots and lots of cases that they'll make a ruled out

7   finding.  True?  Some investigators.

8   A    Yes, there may be different dispositions.

9   Q    And I'm talking just the same physical people are doing

10  all these findings, right?

11  A    True.

12  Q    Now, the reason why you were concerned is incorrect

13  findings could mean children are at risk, because this is

14  physical abuse, this is actual injury to children, isn't it?

15  A    That is correct.

16  Q    And, in fact, 75 percent --

17          **MR. YETTER:**  Let's go down to the seventh bullet.

18  Q    -- 75 percent of these reports of physical abuse involved

19  actual injury to a child.

20  A    That is correct.

21  Q    In other words, if you're looking at evidence, there is a

22  child with an injury, many of which were serious or critical,

23  right?

24  A    Yes.

25  Q    When you say "yes," that's a pretty significant thing,

1  isn't it?

2  A    Yes.

3  Q    Now, so when I say many of this, you had -- between

4  critical and serious, you had about 42 percent, 41.8 percent --

5  I'm sorry -- 44 percent, 43.8 percent were either critical or

6  serious, weren't they?

7  A    I'm sorry, can you repeat that question?

8  Q    Sure.  Forty-three point eight percent of these injuries

9  were either critical or serious, weren't they?

10 A    That's true.

11 Q    Fifty percent --

12        **MR. YETTER:**  Let's go to the next bullet.

13 Q    -- 50 percent of the ones that required medical attention

14 were doubt -- were found that the investigators came to the

15 wrong conclusion.

16 A    That's what PMU found, yes.

17 Q    Now, the key thing that you're looking at is why are they

18 making bad investigations, aren't you?

19 A    I wanted to look at why they were making incorrect

20 dispositions.

21 Q    Okay.  An incorrect disposition, I call that a bad

22 investigation.  Do you disagree with that?

23 A    Not all --

24 Q    It's an unreliable finding.

25 A    Not all the time.

Shaw - Cross / By Mr. Yetter                          14

1  Q    It's an unreliable finding.  You agree with that, don't

2  you?

3  A    Yes.

4  Q    Okay.  Unreliable findings are bad for investigations,

5  aren't they?

6  A    Yes.

7  Q    Okay.  And you want to look to see is there something in

8  the process, is there something about the children victims,

9  what's going on that they're making unreliable investigations,

10 and you found out, didn't you?

11 A    Yes.

12        **MR. YETTER:**  And let's go to the next bullet.

13 Q    In fact, you found out three things.  One, you said the

14 explanation was not good enough.  In other words, in the paper

15 the investigators didn't make a -- first bullet -- didn't

16 explain their reasoning well enough.  True?

17 A    That's what PMU found, yes.

18 Q    PMU found that.  In other words, they just didn't do a

19 good job papering what they did.

20        Number two, not all the parties were interviewed.

21 Now, that's a physical thing that these investigators were just

22 not doing.  They weren't talking, for example in Levelland,

23 they weren't calling the lawyer that made the report.  They're

24 not interviewing the people that have evidence, right?

25        **MR. ALBRIGHT:**  Your Honor, just for a clearer record

Shaw - Cross / By Mr. Yetter                    15

1   on that, that was a lot of stuff in a single question.

2             **MR. YETTER:**  I'll ask it again.

3             **MR. ALBRIGHT:**  So if she says yes, what does she say

4   yes to?

5   **BY MR. YETTER:**

6   Q    Second point, not all parties were interviewed.  Do you

7   see that?

8   A    Yes.

9   Q    Just like the investigation at Levelland.  No one called

10  the lawyer who make the report.  True?

11  A    True.

12            **THE COURT:**  So, but my concern, this is where you're

13  going obviously, if they're the same investigators doing the

14  ruled outs, why are you not concerned about the ruled outs?

15            **THE WITNESS:**  I think my focus is just on qualify

16  investigations, as well we should include ruled outs as well as

17  reason to believe.

18            **THE COURT:**  Why are you not concerned about the ruled

19  outs?

20            **THE WITNESS:**  I've not done -- I'm not sure I

21  understand your question exactly.

22            **THE COURT:**  If there are the same investigators not

23  interviewing the people --

24            **MR. YETTER:**  Not gathering evidence.

25            **THE COURT:**  -- not gathering all the evidence, why

Shaw - Cross / By Mr. Yetter                    16

1    are you not concerned that those same investigators are

2    improperly examining the ones that turned to be ruled out?

3            **THE WITNESS:**  I think for ruled outs the

4    preponderance is a little more clear cut than it is for a UTD

5    finding, so --

6            **THE COURT:**  I'm sorry, that's ridiculous.  That's

7    just ridiculous.  That's not evidence based.  That's not

8    judgment based.  And that is scary.

9    **BY MR. YETTER:**

10   Q    If you --

11           **THE COURT:**  So go ahead.

12   Q    If you don't interview the people involved, what do you

13   mean there's no evidence on a ruled out?

14   A    (No response)

15   Q    There's no more evidence because you aren't gathering it,

16   you know, are you?

17   A    Not all -- that party was not interviewed in that case,

18   no.

19   Q    Okay.  So it's not just parties that are not interviewed,

20   it's not all -- not all evidence is gathered.  You're not

21   taking pictures of what the situation is, for example.  Right?

22   A    It could be pictures, it could be other things, yes.

23   Q    All kinds of things.  If you don't gather evidence, if you

24   don't talk to relevant witnesses, you don't have the evidence

25   to know what happened, do you?  And that's what they found,

1    right?

2    A    In some of the cases, yes.

3              **THE COURT:**  In 68 percent of the cases, right?

4              **MR. YETTER:**  Sixty-four percent were wrong.

5              **THE COURT:**  Sixty-four percent.

6    **BY MR. YETTER:**

7    Q    And that's why they found it was going wrong, true?

8    A    In PMU, yes.

9    Q    Okay.  Now, you didn't disagree with them because then you

10   did this follow-up, didn't you?

11   A    I did.

12   Q    And you found out --

13             **MR. YETTER:**  Well, let me just finish this one.

14   Let's go to Page 4, before we get to your follow-up, Page 4.

15   Let's go to the bottom bullet and the second -- I'm looking at

16   the second bullet.

17   Q    There's lots of reasons why an unreliable investigation is

18   of great concern, but one of them is that you're missing

19   situations of actual abuse to children, right?

20   A    Yes.

21   Q    Because if you miss a situation of abuse to children, you

22   can't help the victim, right?  If you just miss it, you can't

23   help the victim.  True?

24   A    True.

25   Q    You can't stop the perpetrator, whether it's a staff

1  member or someone else, true?

2  A     True.

3  Q     And it can happen again to that poor child victim or to

4  other child victims, true?

5  A     I think there's other things in place I can minimize some

6  of those risks.

7  Q     It can happen again, can't it?

8  A     Yes.

9  Q     Now, if you do nothing about that, if you just turn your

10 eyes and just say, well, let's just say these are all okay,

11 that's -- you're not doing your job.  You can't be indifferent

12 to these children, can you?

13 A     No.

14 Q     Now, you said, okay, this concerns me so much that I'm

15 actually going to look at it myself -- but one last thing on

16 this one.  They found that the errors were throughout the whole

17 state, all 12 months, right?

18 A     Yes.

19 Q     Okay.  So let's go -- so you decided you wanted to do it

20 again and I'll bet you were hoping that it wasn't quite as bad

21 as what that two-man PMU unit had found, weren't you?

22 A     I don't think I was hoping that.  The purpose of reviewing

23 it was to assess what we needed to improve to reduce risk to

24 children.

25 Q     Okay.

1   A    There was no hope either way.

2   Q    I want to talk about all the things you did to reduce risk

3   to children.

4        So second thing is you had a second read done by

5   other PMU employees, didn't you?

6   A    Yes.

7   Q    Let's go to Plaintiffs' 1065 -- I want to take one step

8   back.  Your group, Residential Licensing, covers the entire

9   state and investigates, as you know, thousands of claims of

10  abuse a year, doesn't it?

11  A    Yes.

12  Q    If you guys are doing something very badly, very poorly,

13  it affects children all across the state, doesn't it?

14  A    It could.

15  Q    It could affect the integrity of the entire child welfare

16  system in the state of Texas, couldn't it?

17  A    I don't know it could affect the entire child welfare

18  system.

19  Q    Well, it certainly will affect -- it certainly could

20  affect every child that would be subject to abuse that you guys

21  totally missed, wouldn't it?

22  A    (No response)

23  Q    If you don't have good investigations, how do you have a

24  good system, ma'am?

25  A    I think there are other factors in place --

Shaw - Cross / By Mr. Yetter                          20

1    Q    If you don't --

2    A    -- that reduce some of the risks.

3    Q    -- have good investigations, how do you have --

4         **MR. ALBRIGHT:**  Your Honor, may the witness finish?

5    **BY MR. YETTER:**

6    Q    -- a good system?

7         **MR. ALBRIGHT:**  May the witness at least finish --

8         **THE COURT:**  Yes.

9         **MR. ALBRIGHT:**  -- answering?  Whether it's the first

10   of four questions, counting the one she's answering, or not, at

11   least she can finish.

12        **THE COURT:**  If it's possible to answer yes or no,

13   that's what you should be doing.  And your lawyer can get the

14   further explanation on redirect.

15        **THE WITNESS:**  Okay.

16        **THE COURT:**  So listen to the question.

17   **BY MR. YETTER:**

18   Q    If you don't have a good investigative system, you can't

19   have a good system, can you, Mr. Shaw?

20   A    That is true.

21   Q    All right, so you did a second -- you had a second read

22   and you put a PowerPoint, Plaintiffs' Exhibit 1065, what we

23   have on the screen, is what you prepared, isn't it, ma'am?

24   A    That is correct.

25   Q    And it was a series of slides that you put together so

Shaw - Cross / By Mr. Yetter                    21

1    that you could brief Mr. Morris, your boss, isn't it?

2    A     And Commissioner Specia.

3    Q     And Commissioner -- Commissioner Specia saw these same

4    series of slides?

5    A     He did.

6    Q     How many months ago did he see them?

7    A     It would have --

8    Q     Your boss and the Commissioner.

9    A     I believe that meeting occurred in July.

10   Q     So that would be about six months ago.

11   A     Yes.

12   Q     Now -- as your sitting here today I'm talking about.

13         Okay, so six months ago you had the results of what

14   you had done.  So you did a second read, and am I correct that

15   it was a couple -- some other folks in PMU that did the second

16   read?

17   A     That is correct.

18   Q     And then you, yourself, it says director, that's you.

19   Let's just highlight that word director.  You, yourself, did a

20   third read, right?

21   A     That is correct.

22   Q     Let's make sure we understand what happened here.  So you

23   have physical abuse and all of these findings not only have to

24   come from the investigator, but --

25         **MR. YETTER:**  As we saw last -- yesterday, your Honor,

1   from D.I.'s file.

2   **BY MR. YETTER:**

3   Q    -- the supervisor has to sign off on the finding, doesn't

4   he?

5   A    Yes.

6   Q    So this is just not a bunch of mistakes from the

7   investigator, this is a mistake from the investigators and

8   their supervisors, who in almost every single instance signed

9   off on the results, didn't they?

10  A    Yes.

11  Q    Now, in physical abuse all you need to have is the

12  investigator make the finding and the supervisor approve it for

13  it to be found, completed, right?

14  A    Currently or at that point in time?

15  Q    Well, let's talk about at the time.  You only had to have

16  two people, the investigator and the supervisor.

17  A    Correct.

18  Q    At the time you had to have three people for a sexual

19  abuse report, didn't you, the investigator, a supervisor, and a

20  second supervisor, right?

21  A    It would depend on the finding for the sexual abuse case.

22  Q    On a UTD you had to have three, didn't you?

23  A    Yes.

24  Q    Okay.  So you said, you got these results on physical

25  abuse, I actually want to go beyond that, I want to see for UTD

Shaw - Cross / By Mr. Yetter                    23

1    findings, not only physical abuse, but also negligent

2    supervision and sexual abuse reports, true?

3    A    True.

4    Q    So you expanded the sample, which was 12 months, physical

5    abuse, UTD, all across the state, into 12 months, all across

6    the state, physical abuse and negligent supervision and sexual

7    abuse, right?

8    A    Yes.

9    Q    And the results you got were not only the same as what

10   that first group of PMU investigators found, but worse, weren't

11   they?

12   A    I'm not sure.

13   Q    Okay.

14          **THE COURT:**  You're not sure?

15          **THE WITNESS:**  I'm not sure of the question.

16          **THE COURT:**  Did the second review turn out better

17   that the first review?

18          **THE WITNESS:**  I guess I don't understand the context

19   of better.

20          **THE COURT:**  Did you find more mistakes in the second

21   review than you did the first review?

22          **THE WITNESS:**  Well, the second review was expanded,

23   so there were additional allegation types and we did --

24          **THE COURT:**  Okay, was it --

25          **THE WITNESS:**  -- find --

**EXCEPTIONAL REPORTING SERVICES, INC**

1          **THE COURT:**  -- did you find a higher percentage of

2     error in the second review than you did in the first review?

3          **THE WITNESS:**  I haven't looked at it percentagewise,

4     so it's difficult for me to answer, but I did find errors

5     across all three of these --

6          **THE COURT:**  Okay.

7          **THE WITNESS:**  -- all three allegation types.

8     BY MR. YETTER:

9     Q    Okay.  So you knew you were coming here to testify about

10    the UTD issues and you haven't gone back and looked at your own

11    findings here in your PowerPoint that you put together for the

12    Commissioner and Mr. Morris?

13    A    I looked at the findings, but there's not percentages.

14    Q    Let's make a percentage then.  Let's just see if it --

15    obviously, that makes a difference how inaccurate these were,

16    doesn't it, to you?

17    A    I think I identified there was a problem and I worked to

18    correct the problem.

19    Q    Okay.  You know, you cannot identify a problem unless you

20    measure it, right, Ms. Shaw?

21    A    Which is done through this report.

22    Q    And unless you analyze your measurements, like, for

23    example, if you'd gotten -- if it had been 5 percent wrong, you

24    probably wouldn't have been as worried than if it was

25    65 percent wrong, like the first group found, true?

Shaw - Cross / By Mr. Yetter                    25

1   A    I disagree with that --

2   Q    Okay.

3   A    -- any disposition error rate is not acceptable to me.

4   Q    Okay, well, I will agree with you on that.

5            Let's look at how much you found.  So you're the

6   director -- let's just yellow that whole line -- you looked at

7   a total -- let's yellow that number right -- of 44 cases,

8   right?

9   A    For physical abuse.

10  Q    For physical abuse.  We'll take them one at a time.  All

11  of them had been found to be UTD, true?

12  A    Correct.

13  Q    When you looked at it, only 11 of them should have been

14  UTD in your opinion, right?

15  A    That is correct.

16  Q    So if you just do simple math, 44 minus 11, that means 33

17  of them were wrong.  Thirty-three out of 44.  That's 75 percent

18  right on the nose.  True?

19  A    That had a correct -- had an incorrect disposition, yes.

20  Q    That were wrong.  True?  Those -- you found 75 percent

21  error rate in the UTDs for physical abuse all across the state

22  for 12 months, didn't you?

23  A    For the disposition, yes.

24  Q    Now, the original guys had only found a 65 percent error

25  rate.  So you actually found it worse, didn't you?

Shaw - Cross / By Mr. Yetter                    26

1    A    In that comparison, yes.

2    Q    Well, did you do another comparison?

3    A    I didn't focus on breaking out percentages.  Again, I just

4    wanted to move forward to try to correct the problem.

5    Q    Okay.  Let's look at the second read, let's highlight that

6    second line.  So the second read, they actually only found nine

7    of them that were correct, that should have been UTD.  Do you

8    see that?

9    A    I do.

10   Q    So they actually found it was a higher error rate than you

11   did.  So the original one was 65, you were 75, and they were

12   somewhere around 80 percent wrong.  True?

13   A    I never broke out the statistics that way.

14   Q    So you went on and you did others.  You said negligent

15   supervision.  Now, negligent supervision can involve all kinds

16   of harm to children, can't it?

17   A    There is risk for that, yes.

18   Q    Okay.  It could actually involve physical harm to

19   children, couldn't it, where the supervisor is negligently

20   keeping track of the situation?

21   A    Yes.

22   Q    And it could also involve a child-on-child sexual

23   activity, can't it?

24   A    It could.

25   Q    So all of that stuff is kind of lumped together into

Shaw - Cross / By Mr. Yetter                          27

1    negligent supervision, that and other things?

2    A     Correct.

3    Q     It could be children with dirty, ill-fitting clothes with

4    holes on them, that would be negligent supervision, right?

5    A     If it rose to the level of neglect, that could be a

6    standard for an investigation.

7    Q     That would be abuse of children, wouldn't it, making them

8    live in dirty, ill-fitting, raggedy clothes?  That's abuse,

9    isn't it?

10   A     Not in all times, no.

11   Q     Or I should have said neglect.  That's neglect of

12   children, isn't it?

13   A     Not in all examples, no

14   Q     Okay, not in your definition.  Okay.

15         How about making them live in a room --

16         **THE COURT:**  In dirty, ill-fitting clothes, that's

17   not -- that doesn't fall into the Department's neglect?

18         **THE WITNESS:**  Not all the time.  That's why we have

19   our rules and standards that we would do a standards

20   investigation to investigate that.

21   **BY MR. YETTER:**

22   Q     How about making children live in a room that has the

23   stench of urine and has feces smeared on the wall, is that

24   neglect in the Department's definition?

25   A     Yes, it could be.

**EXCEPTIONAL REPORTING SERVICES, INC**

1  Q    All right.  Here we have negligent supervision and this is

2  something that you did and the second readers did and you found

3  31, according to you, 31, you only found seven correct, right?

4  You had 38 cases of negligent supervision, all of them UTD, you

5  found that seven were right.  Am I reading this right?

6  A    Yes.

7  Q    So 31 you found incorrect, true?

8  A    Yes.

9  Q    And that rate, I did the math for you, if 31 out of 38 are

10 wrong, you've got an 81.6 percent error rate in negligent

11 supervision.  True?

12 A    I haven't done the math.

13 Q    I did.  Does that sound about right to you?

14 A    It would.

15 Q    I can give you a calculator if you want to double check

16 me.

17 A    I trust you.

18 Q    Okay.  That's all across the state, 12 months, every

19 region, negligent supervision, true?

20 A    Yes.

21 Q    And then you did sexual abuse, and this is Slide 5, and

22 you looked at 29 cases, of those 29 you found only nine that

23 were correct, so that means 20 out of 29 were wrong, true?

24 A    True.

25 Q    I've done the math.  That means 68.9 percent were wrong,

Shaw - Cross / By Mr. Yetter                    29

1    68.9 percent.  Trust me on that?

2    A    I will trust you on that.

3    Q    Okay.  Then you added it all up.  So you have physical

4    abuse, Slide 7, physical abuse, negligent supervision, and

5    sexual abuse, you looked at 111 UTD findings by these same

6    investigators all across the state, 12 months, you found only

7    27 were correct.  Actually -- correct, right?

8    A    Yes.

9    Q    And the second readers only found 26 that were correct,

10   but I'm just going to use yours.  So that means you got -- you

11   found that 84 out of 111 were wrong and that adds up to a

12   75.7 percent error rate.  True?

13   A    I will trust you on that.

14   Q    Okay.  But you found 84 were wrong, didn't you?

15   A    Yes.

16   Q    You told all this to Mr. Morris and you told all this to

17   the Commissioner in July, didn't you?

18   A    I did.

19   Q    Now, you have not gone back and done a targeted case study

20   on all the ruled outs in the fiscal year 2013, have you?

21   A    I have not.

22   Q    You've not done any sort of statistical study or read,

23   second read on the ruled outs for fiscal year 2013 at all, have

24   you?

25   A    No.

1    Q    Defendants' Exhibit 249 reflects that for fiscal year 2013

2    there were 1,805 ruled out that your group, Residential

3    Licensing, investigated, true?

4    A    True.

5    Q    That's 92.5 percent, right?

6    A    Yes.,

7    Q    And your group, just for the reason to be -- just to make

8    sure, let's just highlight one number, 3.10, 3.1 percent.

9    That -- of all the thousands of investigations that Residential

10   Licensing did in fiscal year 2013, you only found that

11   3 percent were valid.  True?

12   A    True.

13   Q    And in 2014 it was no different.  You had two -- let's

14   highlight the reason to believe.  I'm sorry, ruled out, you

15   had -- you ruled out 1,984 reports of physical abuse, sexual

16   abuse, negligent supervision, and all other sorts of reports

17   that you investigated, true?

18   A    True.

19   Q    You only found in the entire fiscal year, which ended last

20   August, 4 percent were valid.

21   A    True.

22   Q    Now, that means -- that includes the lawyer's report in

23   July of 2014 that you investigated, that includes her report

24   that you ruled out, that you found to be invalid, right?

25   A    That is true.

Shaw - Cross / By Mr. Yetter                                    31

1    Q    Those numbers.

2          So literally in the last two years 4,000 reports of

3    physical abuse, sexual abuse, and negligent supervision have

4    been ruled out by your group, Residential Licensing, true?

5    A    Close to 4,000.

6    Q    Close to 4,000.

7          Now, you did a memo, you guys did -- you did a memo

8    and you had some meetings, didn't you?

9    A    Related to?

10   Q    Related to this terrible revelation that you found, this

11   error rate.

12   A    True.

13   Q    But all of the reports in the past, you're not even

14   looking in that direction, are you?

15   A    We looked at the UTDs.

16   Q    But all the other reports, the ruled outs, you're not even

17   looking in that direction, are you?

18   A    No.

19   Q    And all of the children that are involved in those almost

20   4,000 investigations that you ruled out, you're not looking at

21   them either, are you?  From those investigations.

22   A    I'm not sure what you mean by looking at them.

23   Q    You're not following up with the children that were in

24   those ruled out investigations, are you?

25   A    No, we're not doing additional checks, no.

Shaw - Cross / By Mr. Yetter                     32

1  Q    So let's go to Levelland.  That was in July of 2014, which

2  would have been part of your fiscal year 2014.  True?

3  A    Correct.

4  Q    And within two months, you told us, that you had

5  complaints about the Children's Hope RTC in Levelland, Texas,

6  didn't you?

7  A    We did.

8  Q    Now, you've had lots more complaints than just those two,

9  haven't you?

10 A    I'm not sure how many more, but, yes, we've had more.

11 Q    Well, when you were looking at Children's Hope, if you go

12 on the website, the DFPS website, you can pull up the

13 operational details of all of the facilities in the state,

14 including Children's Hope, can't you?

15 A    Yes.

16 Q    And you can then click to see what the compliance history

17 is, right?

18 A    Yes.

19 Q    And, in fact, I looked and I didn't even -- I did not see

20 the July report of abuse that Ms. Richter, the ad litem

21 attorney, filed on the compliance history.  If it's ruled out,

22 does it show up on the compliance history?

23 A    Yes.

24 Q    Okay.

25 A    Well, there's no deficiencies.  It depends on how you

1  search.  So it's only going to show the deficiencies from

2  operations, so it might not.

3  Q    Okay.  So she makes a report, you investigate it, and you

4  rule it out and then it doesn't show up on the website, unless

5  you didn't find a deficiency, right?

6  A    I believe that's true.

7  Q    Okay.  So someone in the future who has a child there has

8  no idea that this attorney made a report that shows -- and

9  we'll go over what it shows, but some pretty serious stuff.

10 You've read it, haven't you?

11 A    The report?

12 Q    Yes.

13 A    I have.

14 Q    And it's pretty serious, isn't it?

15 A    Yes.

16 Q    But if you look on the website for the Department and you

17 look at Children's Hope it shows that it is still in operation,

18 right?

19 A    Yes.

20 Q    There have been -- there are no conditions on its permit,

21 true?

22 A    I don't believe there are.

23 Q    There's no corrective action that's been taken, right?

24 A    They were actually on corrective action during that period

25 of time.  They no longer are.

1    Q    Okay.  Well, as of today, because we just looked in the

2    last couple of days, no corrective action and no adverse

3    action, true?

4    A    Today, correct.

5    Q    So let's go to Plaintiffs' Exhibit 2164.

6              MR. YETTER:  Oh, it's got -- can you not show it on

7    the big screen, since it has names in it.

8              THE COURT:  Yes, thank you.

9    BY MR. YETTER:

10   Q    And I want to see the kind of things that are ruled out by

11   the Department.  I want us to talk about the kind of things

12   that are ruled out, the reports that are ruled out by the

13   Department and the thoroughness of your investigations.

14             So here we are, we've got --

15             MR. YETTER:  Let's blow up the top.

16   Q    You've seen this before, you've studied it, have you not,

17   Ms. Shaw?

18   A    (No response)

19   Q    Because you came here to report on it, right?  You studied

20   it?

21   A    I don't see it in this format, but I've seen the intake

22   report.

23   Q    Okay.  It's the same information, is it not?

24   A    It is.

25   Q    Okay.  So here it is, July 27th, 2014.

1          **MR. YETTER:**  That's a Sunday, your Honor.  7:48 p.m.

2          Let's pull that down and let's just -- let's put

3    the -- let's highlight that name, the handwriting.  There's

4    some handwriting there.

5    **BY MR. YETTER:**

6    Q    That's the child involved, J.R., isn't it?

7    A    Yes.

8    Q    Let's go down -- and we've gone through this, so I'm not

9    going to go through all of it, but this is -- you know this

10   involves the victimized child, real quick, is J.R.  He is in an

11   RTC in Levelland that's called Children's Hope.  Right?

12   A    Yes.

13   Q    Now, you've told us that there was another report two

14   months earlier on May the 20th, 2014, right?

15   A    Yes.

16   Q    That was by the same attorney, wasn't it?

17   A    No.

18   Q    Well, Ms. Richter, she told the Court about how her little

19   boy had a big bump on his head, right, that was the report of

20   abuse, the boy had a bump on his head, right?

21   A    Correct.

22          **MR. YETTER:**  In fact, she has a picture of it,

23   your Honor, that's not marked as an exhibit, but we would if

24   the Court's interested.  The boy has a bump on his head right

25   there.

Shaw - Cross / By Mr. Yetter                    36

1   **BY MR. YETTER:**

2   Q    And the claim was also that they were in dirty, ill-

3   fitting clothes, right, in May?

4   A    Yes.

5   Q    And that the facility was not clean, true?

6   A    Yes.

7   Q    And it had an odor on the stench of urine and feces,

8   right?

9   A    Yes.

10  Q    So here it is in May 20 -- May 20 of 2014, you guys

11  investigated, true?

12  A    Yes.

13  Q    And you cleared it.

14  A    We ruled it out.

15  Q    Ruled out.  Two months later another report with many, and

16  more, many of the very same allegations, right?

17  A    Yes.

18  Q    Dirty, ill-fitting, raggedy clothes, holes in them, true?

19  A    Yes.

20  Q    An unsanitary facility, right?

21  A    Yes.

22  Q    Piles of dirt swept up on the floor.

23  A    I don't recall that specific information.

24       **MR. YETTER:**  Okay.  Let's go to Page 2 of 5.  Okay,

25  the bottom two -- you can do the whole thing.

1        There you go.  That's fine.  There you go, perfect.

2   **BY MR. YETTER:**

3   Q    Okay, let's look at the bottom, the second one from the

4   bottom, on Sunday.  So Ms. Richter, the attorney, she comes out

5   on a Friday and then she comes --

6        **MR. YETTER:**  Do that whole, that whole, that whole

7   paragraph.

8   Q    She comes out on a Friday then she comes back on Sunday,

9   two days later.  On Sunday, her return visit, there were piles

10  of swept dirt on the floor.  Does that refresh your

11  recollection?

12  A    Yes.

13  Q    The windows were streaked with grime inside the library,

14  right?

15  A    Yes.

16  Q    There was graffiti in the TV room, true?

17  A    Yes.

18  Q    The outside entrance was littered with empty water bottles

19  and paper.  The inside walls and flooring were dirty.  Right?

20  A    Yes.

21  Q    Same allegation of two months earlier, right?

22  A    Similar.

23  Q    Well, these allegations of being an unsanitary facility

24  are exactly the same as in May, weren't they?

25  A    There were found unsanitary conditions, yes.

Shaw - Cross / By Mr. Yetter                                    38

1    Q    So if you're going a good investigation, wouldn't you go

2    back to some of the prior reports and say, well, let's just see

3    if there's any trends here?

4    A    Yes.

5    Q    Do you know if the investigator even looked at the May

6    report when he came in July and cleared them again?

7    A    It was the same investigator that conducted both

8    investigations.  They should be familiar with it.

9    Q    Good golly, you have the same guy who comes twice for

10   unsanitary conditions and he clears them both times.

11          THE COURT:  Okay, the one that you say is a -- a

12   hurt -- the one's that's first name is an E.

13          THE WITNESS:  Yes.

14          THE COURT:  Did you see -- did anybody see if he had

15   received medical attention for these wounds?

16          THE WITNESS:  I'm sorry, I don't recall that with

17   this documentation.

18          MR. YETTER:  Let's go up to the top.  Let's blow up

19   the top here on that same page, Page 2.

20   BY MR. YETTER:

21   Q    Here he is, this child, E, he's got a black eye and of

22   course the facility told your investigator that he gave himself

23   the black eye.

24   A    The child told us that.

25   Q    Okay, child told you, and you accepted that and that was

 1   that.

 2   A     With interviewing additional people, yes.

 3   Q     And many cuts and bruises and red marks on his face, his

 4   hands, his shoulders and arms, and a black fingernail from his

 5   hand being shut in a door.

 6   A     True.

 7   Q     And you don't remember whether there was any medical

 8   attention to this child?

 9   A     I'm sorry, I don't recall reading that specific

10   information.

11         MR. YETTER:  Okay, let's go back -- one other thing

12   in terms of unsanitary.  Let's go back down to that incident

13   report, the first two paragraphs.

14   BY MR. YETTER:

15   Q     Okay, here it is, the second -- on Friday, July 25th, the

16   place reeks of urine, right?

17   A     Yes.

18   Q     Same as in May, true?

19   A     True.

20   Q     And then the next, going down to the next one it says:

21              "The providers told me that the cleaning lady had

22              quit and they were down to one cleaning lady.  The

23              children wet themselves in their beds and smeared

24              feces on the walls and they could not clean it off.

25              The room (name omitted) -- excuse me, J.R., I

Shaw - Cross / By Mr. Yetter                                40

1              apologize -- reeks horribly of urine."

2              Same situation as in May.

3    A     Correct.

4    Q     And at the end of that investigation, ruled out.

5    A     Yes.

6    Q     Without calling the attorney.

7    A     I don't believe they called her, no.

8    Q     So to your knowledge, the only people -- because you told

9    us that they didn't really -- couldn't really talk much to the

10   children because these children had -- they had elevated needs.

11   A     Some of the children are intellectually disabled.

12   Q     So basically the people they talked to then were the

13   people that ran the facility, I take it.

14   A     Yes.

15   Q     So they don't talk to any third parties, they don't talk

16   to the person making the report, they don't get much

17   information from the children, and they rule it out based on

18   interviewing the people that run the facility that they're

19   investigating?

20   A     As well as the staff that work there directly, yes.

21   Q     Right, they work at the facility that they're

22   investigating.

23   A     Yes.

24   Q     That's Levelland.  And that was all --

25              THE COURT:  Is that a for profit place?

1           THE WITNESS:  I'm sorry?

2           THE COURT:  Is that a for profit place?

3           THE WITNESS:  I believe it's a nonprofit.

4           THE COURT:  Do you know?

5           THE WITNESS:  Not for certain.

6   BY MR. YETTER:

7   Q    And all of -- that is entirely within the current rules of

8   the Department of Family and Protective Services in our state,

9   isn't it, that finding, ruled out?

10  A    Yes.

11          THE COURT:  Well, put that back up there.  I'm still

12  concerned about the no underwear and socks, because the staff's

13  explanation was, is that when the children soiled their

14  underwear they didn't clean it and didn't return it.

15          Did you know that?  Is that not a red flag?

16          THE WITNESS:  That's true, the staff did indicate

17  that and that the children had received, I believe, several new

18  pairs of underwear when we conducted our inspection.

19          THE COURT:  After you got there.

20          THE WITNESS:  Yes.

21          THE COURT:  You know the attorney bought them in May

22  and questioned where they were in July and they said, well, we

23  just threw them out, in effect?

24          THE WITNESS:  (No response)

25  //

1   **BY MR. YETTER:**

2   Q    And you -- so then when you show up after the attorney

3   complains and they say, well, here's -- we bought some new

4   underwear and you say, well, then nothing happened back when

5   she made her report.  That's what you're finding, is whether --

6   what happened on the day she made her report, and you ruled it

7   out.

8   A    We did find that it didn't rise to the level of neglect.

9   Q    It did not rise to the level of neglect.

10  A    Yes.

11          **THE COURT:**  Well, I think somebody else may be rising

12  to the level of neglect.

13  **BY MR. YETTER:**

14  Q    Would you have your own children in a facility that reeks

15  of urine, that has feces smeared on the wall, that they're

16  being dressed in old, dirty clothes with holes in them and they

17  basically have no underwear or socks?

18  A    I don't have children, but, no, that would not be

19  acceptable if I did.

20  Q    But for these poor foster children we find in our state

21  there's no neglect and it's ruled out, true?

22  A    True, we ruled it out.

23  Q    Now, I want to talk about another situation about -- so

24  we're -- we've covered your 75 percent error rate and what

25  you're doing or not doing about that and we've covered

1   Levelland, all just within the last six months.  I want to talk

2   about how you keep track of reports of child-on-child sexual

3   activity.  Okay?

4   A    Okay.

5   Q    And whether that creates a tremendous risk in our state

6   for these children.  All right, Ms. Shaw?

7   A    Yes.

8   Q    Now, you know, because you testified about this before,

9   that there is no central way that the State of Texas keeps

10  track of the incidents of child-on-child sexual activity.

11  A    Correct, there's no central way.

12  Q    So you can't, no one in our Department today can say that

13  there are -- how many instances or whether there's a trend or

14  how prevalent it is for child-on-child -- I would like to call

15  it sexual abuse, but I know you have a problem with that.

16  A    I do.

17  Q    Child-on-child abuse in foster group homes across the

18  state.  You can't figure that out because you don't keep that

19  information, right?

20  A    Correct.

21  Q    You can't figure out what that rate is across the state

22  for RTCs either, can you, because you don't keep that

23  information?

24  A    That's correct.

25  Q    Or for family foster homes, true?

Shaw - Cross / By Mr. Yetter                    44

1   A    Correct, we don't track it in an aggregate way.

2   Q    And you don't track it by region either.  You can't say

3   what the rate is for those facilities in Region 1 or Region 6.

4   A    That's true.

5   Q    Now, in 2010, or prior to 2010, the State used to track

6   child-on-child abuse, because there was a box that the case

7   investigator would check, right?

8   A    The investigator could check that if it rose to the level

9   of meeting the definition of abuse.

10  Q    Okay.  That was prior to 2010.  But you stopped in 2010,

11  didn't you?

12  A    Thereabouts.

13  Q    Before 2010 you knew that the State was tracking child-on-

14  child abuse because that was important to keep the children

15  safe, right?

16  A    I don't think that we were tracking it for the purpose of

17  tracking the children.  It was a check box that we used.  We

18  still couldn't tie it into a particular child's name.  We'd

19  have to go back and do an individual search.  We could give you

20  a number, like how many times the box was checked, but other

21  than that it wouldn't give us any information.

22  Q    Okay.  Now, let's talk a little bit about that.

23       So you could actually, before 2010 you could say I

24  want the number of child-on-child abuse incidents for this

25  region of the state, right, because you were tracking it?

Shaw - Cross / By Mr. Yetter                        45

1   A    I couldn't pull it by region, no.

2   Q    You could pull it statewide.

3   A    I could and I also just need to add that that check box is

4   checked by an investigator if the incident for the child rose

5   to the level of abuse.  We didn't have many and it's kind of

6   a -- I wouldn't say a definitive check box that was always

7   checked appropriately.

8   Q    But after 2010 you stopped checking it, checking that box.

9   The agency no longer uses that box, true?

10  A    True.

11  Q    In fact, you called it, it's an outdated box, it is not

12  meant or intended to be used, true?

13  A    I'm not sure when I said that.

14  Q    In your deposition.  You gave several depositions, because

15  you were a corporate rep on a variety of topics in this case,

16  weren't you, Ms. Shaw?

17  A    I did, I did seven.

18  Q    And then on May the 6th, 2014 you gave a deposition, and

19  I'll show it to you if you'd like, that it's an outdated box,

20  it's not meant or intended to be used, right?

21       **MR. ALBRIGHT:**  If we are reading from the deposition,

22  your Honor --

23       **MR. YETTER:**  I'm happy to show it to you, but I just

24  want to see if she remembers.

25       **MR. ALBRIGHT:**  Can we get a page?

Shaw - Cross / By Mr. Yetter                          46

1          **THE COURT:**  He wants a page and line number.

2              **MR. ALBRIGHT:**  I want the page and line numbers.

3              **MR. YETTER:**  Page 108, Lines 10 through 14.

4              **MR. ALBRIGHT:**  108, 10 to 14?

5              **MR. YETTER:**  May 6, 2014 deposition.

6  **BY MR. YETTER:**

7  Q    Would you like to see it or do you remember giving that

8  testimony?

9  A    I remember talking about the topic.  I don't remember what

10  I said specifically.

11  Q    Is that box actually an outdated box nowadays, not meant

12  to be -- not meant or intended to be used?

13  A    True.  Since we don't track children as perpetrators or

14  label them as perpetrators, we don't use that box.

15  Q    In fact, your colleague in PMU, William Wright, said that

16  child-on-child abuse is totally off the radar.  Did you know

17  that?

18  A    I'm not aware what Mr. Wright said in his deposition.

19  Q    So you were in investigations before 2010, weren't you?

20  A    I was in investigations?

21  Q    In the group, Residential Licensing.

22  A    I've been an investigator many times, yes.

23  Q    And you knew that in 2004 there was a big report that came

24  out from the Texas Comptroller, remember that in 2004, Carole

25  Keeton Strayhorn?

1   A    I'm aware of the report.

2   Q    And one of the recommendations in that report is that the

3   State would track child-on-child abuse and report -- that DFPS

4   should track and report all cases involving child-on-child

5   abuse and investigate such complaints thoroughly.  You remember

6   that, don't you?

7   A    I don't remember the recommendations, no.

8   Q    Now, to track it all you would really need or would have

9   to do is just have a box that you would start using again your

10  investigators would check for child-on-child abuse, true?

11  A    I think it would need more clarification than that.

12  Q    But it's certainly doable, because you did in the past,

13  isn't it?

14  A    I believe with some clarification, possibly, yes.

15  Q    And you don't have to call anybody a perpetrator to simply

16  track the number of incidents of child-on-child abuse, do you?

17  A    Certainly we would need clarification on that for our

18  staff, because the way the box is written it was like child-on-

19  child sexual abuse, child-on-child physical abuse, which

20  indicated it rose to the level of abuse.  And I don't believe,

21  since we aren't looking at children as perpetrators, that we

22  would use that box in the context that it is currently.

23  Q    Well, you certainly could fix it, not call anybody a

24  perpetrator, maybe call them both victims, but at least track

25  what's going on, couldn't you, Ms. Shaw?

Shaw - Cross / By Mr. Yetter                    48

1  A    It's possible.

2  Q    Because if you don't know a child's history of child-on-

3  child activity, there is a heightened risk, isn't there?

4  A    (No response)

5  Q    And I put it in quotes, because you said that in your

6  deposition.

7  A    I believe that.

8  Q    Because if -- and there's a heightened risk if these

9  children are of different ages in the home and one of them has

10 a history of sexual activity, true?

11 A    I'm sorry, could you repeat the question?

12 Q    Sure.  And there's a heightened risk if there are children

13 of different ages and the older one has a history of sexual

14 activity, right?

15 A    I think anytime a child with sexual activity history

16 indicates a risk, regardless of the age of the other children.

17          **THE COURT:**  So is there any way to prevent them from

18 being placed together?

19          **THE WITNESS:**  That's really more of a CPS

20 placement --

21          **THE COURT:**  Okay.

22          **THE WITNESS:**  -- question.

23          **THE COURT:**  It doesn't concern you in licensing?

24          **THE WITNESS:**  It does concern us.  We can capture and

25 look at a child's history when we conduct our inspections or

1  investigations to make sure the CPA made an appropriate

2  decision on where to put the child.

3              **THE COURT:**  Do you do that?

4              **THE WITNESS:**  We do.  We do that during the course of

5  our business.

6  **BY MR. YETTER:**

7  Q    So let's look at one example of how these days after two

8  thousand -- from 2010 to today, how you're handling child-on-

9  child abuse situations.

10             This is Plaintiffs' Exhibit 185 and I'd like to go to

11 Page -- this is D.I.'s records, Page 46.  It's a 5,800 --

12 5,789-page stack of records.

13             So you recognize --

14             **MR. YETTER:**  Let's blow up the top.

15 Q    Do you recognize what kind of form this is --

16 A    I do.

17 Q    -- Ms. Shaw?

18             This is something which is DFPS childcare licensing,

19 that's your -- Mr. Morris's group, true?

20 A    True.

21 Q    This is an investigative report.  The operation was Bair

22 Foundation, so it would have been done by Residential

23 Licensing, right, that's a CPA?

24 A    That's correct.

25 Q    Is was a foster group home.  That falls within your area,

Shaw - Cross / By Mr. Yetter                    50

1    doesn't it, foster group homes?

2    A    Yes.

3    Q    Okay, so here we go.  Let's go down and look to see what

4    kind of investigation you had.

5              MR. YETTER:  Blow it up.

6              There you go.

7    Q    And so we have several boxes checked.  Standard law

8    violation, see that?

9    A    Yes.

10   Q    Child-on-child sexual abuse, true?

11   A    Yes.

12   Q    Abuse/neglect/sexual abuse, abuse/neglect/neglectful

13   supervision.  True?

14   A    Those boxes are checked, yes.

15   Q    And then the allegation at the bottom, just to be clear --

16             MR. YETTER:  And we haven't gone over this before,

17   your Honor, that's why I'm doing it.

18   BY MR. YETTER:

19   Q    At the very bottom.  Three children were able to have sex

20   with one another while living at a foster home.  Right?

21   A    Yes.

22             MR. YETTER:  Let's go to Page 53.  Here's a piece of

23   the investigation report and it's the second paragraph to the

24   bottom.  Go all the way down to -- perfect.

25   //

1   Q    Okay.  "I reviewed the client file for J.T."  Now, J.T.

2   was one of the 16-year-old boys that was the initiator of the

3   sexual activity.  Right, Ms. Shaw?

4   A    I'm not familiar with this case.  I don't know.

5   Q    Well, let me ask you if this consistent with your

6   standards then.  This says, third sentence, "I learned that

7   J.T. entered the CPS custody due to sexual abuse by his

8   biological father."  See that?

9   A    I do.

10  Q    You know it's common knowledge in the child welfare world

11  that children that are sexually abused often become abusers

12  themselves, don't they?

13  A    I know there's a risk for that.

14          **THE COURT:**  Not a risk, it happens.  You know that,

15  don't you?

16          **THE WITNESS:**  It does.

17          **THE COURT:**  Okay.

18  **BY MR. YETTER:**

19  Q    Then this investigator said, "In looking through" -- so

20  this -- what we're trying to figure out is if you don't track

21  them, how do you know a child is sexually active so you don't

22  put him with a younger child or put him with any child that

23  would be at risk.  And so here we are, we have an investigator

24  looking at the various, she's looking through all these reams

25  of paper, and says, "I noted," that's what she says, it's

1    Miranda Johnson (phonetic), "I noted no instances of behavior

2    logs or instant reports related to sexual behavior.  I did note

3    instances of verbal and physical aggression."  Do you see that,

4    Ms. Shaw?

5    A    I do.

6    Q    "There was no mention in the client file of the 2007

7    investigation involving J.T. sexually abusing a child in a

8    previous foster home."  So if you're not tracking -- do you see

9    what I just read?

10   A    I do.

11   Q    So if you're not tracking and you actually do an

12   investigation, it may not show up anywhere in the boy's files.

13   A    I think at that time that could be true.  I think we've

14   remedied that situation now.

15   Q    You're not tracking today, are you?

16   A    Not in any aggregate way, no.

17   Q    "No minimum standards concerns were noted for any of these

18   documents."  He's saying, that last sentence, he's saying all

19   the paperwork is in good order, true?

20   A    True.

21   Q    Let's go to the results of your group's investigation,

22   Page 58.  So this guy -- a case manager, the investigator, and

23   then a supervisor approved it.

24        MR. YETTER:  And let's just blow up the top, the

25   heading and the disposition.

1              And I'm not going to go through it all, your Honor,

2    but just again --

3    **BY MR. YETTER:**

4    Q     The disposition:  ruled out.  That means that in the

5    Department's eyes what was alleged didn't occur, right?

6    A     That's not what that's saying.  It's saying that the

7    supervision --

8    Q     No abuse.

9    A     -- by the foster parents did not occur.

10   Q     It's saying there's no negligent supervision.  All the

11   different things that we just started with.  They were looking

12   for a standard law violation, right, you ruled that out, didn't

13   happen?

14   A     What this is telling you is that we didn't find neglectful

15   supervision.  I don't know if deficiencies were found or not.

16   That's not what that sentence tells me.

17   Q     Okay.  It says no neglectful supervision, true?

18   A     True.

19   Q     No abuse and neglect of sexual abuse, right?

20   A     That's not what that tells me there where it refers to

21   neglectful supervision.

22   Q     Well, let's show -- I'll show you.

23            **MR. YETTER:**  Go halfway down and we'll get the whole

24   thing in.

25            No, no, no, no.  Take the whole explanation

Shaw - Cross / By Mr. Yetter                          54

1  (indiscernible)

2          There you go.

3  **BY MR. YETTER:**

4  Q    Okay.  First piece of it is about the caregiver, then they

5  talk about the children.  And the caregiver, of course, was

6  asleep at night when this happened again and again, wasn't he?

7  A    It says he was likely asleep.

8          **MR. YETTER:**  Okay.  Let's go down to the bottom where

9  he talks about, based on the information gathered in the case,

10 he has five -- four paragraphs.  Right there.

11 Q    Okay.  Based on the information gathered in the case,

12 neglectful supervision ruled out.

13 A    That is correct.

14 Q    Based on the information gathered in this case, sexual

15 abuse by one of the 16-year-old boys ruled out.

16 A    Correct.

17 Q    Based on the information gathered in this case, sexual

18 abuse by the other 16-year-old boy, J.T. ruled out.

19 A    Correct.

20 Q    Based on the information gathered in this case,

21 allegations of sexual abuse by the two boys, the two 16-year-

22 old boys on each other ruled out.

23 A    That is true.

24 Q    Okay.  Now, let's look at the very bottom.  Recommended

25 action:  routine monitoring.  Right?

Shaw - Cross / By Mr. Yetter                    55

1   A    That's what it says, yes.

2         **THE COURT:**  I have a question.  I'm going back to the

3   Levelland.  Did you find any standards violations at all?

4         **THE WITNESS:**  No, ma'am, we didn't.

5         **THE COURT:**  Okay.

6         **THE WITNESS:**  We did provide technical assistance,

7   which is a tool that we can give feedback to the operation

8   without citing a deficiency.

9         **THE COURT:**  Okay, but you didn't find any

10  deficiencies?

11        **THE WITNESS:**  No, ma'am.

12        **THE COURT:**  Okay.

13  **BY MR. YETTER:**

14  Q    Now, one of the things you told us -- well, these -- your

15  group, the findings of reason to believe, where you actually --

16  the very small number, 3 or 4 percent, that you validate, these

17  claims of abuse and neglect that you validate, those numbers

18  get used in federal reporting, don't they?

19  A    I believe they do.

20  Q    Now, you validated, after you did the UTD finding, you

21  validated more instances of actual abuse, didn't you?

22  A    Yes.

23  Q    But, to your knowledge, the Department hasn't updated its

24  numbers to the federal government with these additional

25  instances of physical abuse, sexual abuse, or negligent

1   supervision, right?

2   A     I have no idea.

3   Q     To your knowledge, it hasn't been done, has it?

4   A     I don't know if it has or hasn't.  That's not in my area.

5   Q     No one's told you that it's been done, has it -- have

6   they?

7   A     No, no one's told me that.

8   Q     Now, if you -- obviously, if you have more instances of

9   validated abuse and they go in, it's going to change your

10  numbers, isn't it?

11  A     I'm not sure.  That's not my area.  I don't know how the

12  numbers are calculated or what information is entailed in that.

13  Q     But you have not told your boss, Mr. Morris, or Lisa Black

14  over at CPS or the Commissioner, you have not given them any

15  concerns about the validity of the numbers, have you?

16  A     Again that's not my area.  I don't know anything about

17  those numbers.  I would not do that in the normal course of

18  business.

19  Q     I hear what you're telling me, but you now know that there

20  are more instances of abuse than what you all reported

21  previously.  You have not given any concerns to anyone else to

22  try to update the numbers, have you?

23  A     I have not.

24  Q     Now, one of the things that has gone on in the past is

25  some of your investigators have actually been very concerned

1   that there's kind of an institutional bias against a finding of

2   reason to believe.  You know that, don't you?

3   A    I'm not sure what you're referring to.

4   Q    Well, if you make a finding that an abuse claim is -- or

5   abuse and neglect claim is valid, lots of bad things can happen

6   to the CPA, can't it?

7   A    It would depend on the severity of the situation and their

8   compliance history.

9   Q    Sure.  You could stop sending children to that CPA, right?

10  A    I don't have any decisions over placement, but we could

11  look at taking corrective action.

12  Q    You could suspend their license, couldn't you?

13  A    We could.

14  Q    You could do all sorts of things administratively to the

15  CPA to make sure the children are safe, right?

16  A    Yes.

17  Q    But, in fact, --

18        **MR. YETTER:**  Let's go to Plaintiffs' Exhibit 1706.

19  Q    In fact, in 2010 --

20        **MR. YETTER:**  Let's blow up the top.

21  Q    In 2010, right around the time that you stopped tracking

22  child-on-child abuse, here is an email from December 1, 2010.

23  Do you see that --

24        **MR. YETTER:**  Your Honor, we offer it.  This is not --

25  it has not been objected to.  We offer Plaintiffs' 1706.

Shaw - Cross / By Mr. Yetter                          58

1          **MR. ALBRIGHT:**  That's correct, your Honor.  We did

2   not object to that.

3          **THE COURT:**  Plaintiffs' 1706 is admitted.

4      **(Plaintiffs' Exhibit Number 1706 was received in evidence)**

5   **BY MR. YETTER:**

6   Q    And it is about a particular foster home called Noyes

7   Therapeutic Family Life Foster Home.  Do you see that?

8   A    I see that.

9   Q    And Jackie Hubbard and Melanie Cleveland, both part of the

10  investigative staff in your group, are they not?

11  A    No, they're employees of Child Protective Services.

12  Q    Okay.  So let's look to see what -- and let's look to see

13  what they're talking about.  She has in this first paragraph,

14  "I'm asking that you disallow placements," so she's concerned,

15  "We, DFPS RCCL ruled it out."

16          So when she says RCCL, that's your group, isn't it?

17  A    That's correct.

18  Q    That's Residential Licensing.  She wanted to disallow

19  placements to this foster home.  "Remember who you've got

20  working back there and who you had working back there, Karen

21  ruled out the Vicks, Hudson."

22          Karen Hudson, you recognize that name?

23  A    I do.

24  Q    And she is in the -- your group, Residential Licensing,

25  isn't she?

Shaw - Cross / By Mr. Yetter                          59

1   A     She was at one point in time.  She's no longer employed.

2   Q     "That was in the Washington Post a couple of weeks ago

3   about our incompetence for not RTBing, "so RTBing would be

4   reason to believe?

5   A     That's correct.

6   Q     "Yolanda Love and Rolanda Hall, who was trained by Karen

7   Hudson," they both were in your Residential Licensing group,

8   true?

9   A     Yes.

10  Q     "And had never worked any kind of investigation before she

11  left AVO to go to the RCCL position.  AVO hired her off the

12  street and she was there only a short time."

13          **MR. YETTER:**  Let's go to the third -- you could just

14  go down if you want or blow up the third paragraph.

15  Q     "I'm closing one this week that RCCL ruled out as abuse

16  and neglect."  Do you see that?

17  A     Yes.

18  Q     "But my foster mother slapped the kids and called them --

19  and cursed at them and this is the second set of kids who have

20  made this same allegation about her.  This time she admitted to

21  the name calling."  Right?

22  A     Yes.

23  Q     Let's look at the last two sentences.  "RCCL," that's your

24  group, Residential Licensing, "cited us for a couple of things,

25  but RO'd" -- what does that mean?

Shaw - Cross / By Mr. Yetter                          60

1  A    Ruled out.

2  Q    -- "ruled out the abuse and neglect.  I think the

3  threshold in Residential Licensing is no autopsy, no RTB."  Do

4  you see that?

5  A    I do.

6  Q    In other words, if the child's not dead you're not going

7  to get an RTB finding out of Residential Licensing, at least

8  that's what she's saying back in late -- four years ago, late

9  2010, right?

10  A    I see that, yes.

11  Q    Now, your quality group, it's been through a lot of

12  turmoil lately, hasn't it?

13  A    Yes, there's been some turmoil.

14  Q    Because just ten months ago it was down to two people

15  apparently.

16  A    That's correct.

17  Q    But you say now, in the last -- since the UTD findings

18  came out, you're now beefing up the PMU?

19  A    Paul Morris has hired a division administrator and all the

20  positions are filled.

21  Q    But there's no real formal steps for you to identify

22  issues to go to the PMU, is there?

23  A    No, there's not a formalized mechanism for requesting a

24  review by the PMU.

25  Q    It just depends on the recommendation of who has input on

Shaw - Cross / By Mr. Yetter                          61

 1    whether it's implemented, right?  When they come back with a

 2    recommendation, there's no formal process to accept it either,

 3    true?

 4    A    We discuss the recommendations and we talk about what will

 5    be implemented and make those decisions.

 6    Q    But there's no formal process for Residential Licensing to

 7    consider PMU's recommendations, is there?

 8    A    I guess it would depend on your definition of formal

 9    process.

10    Q    I'm actually just going by what you talked about in your

11    deposition.

12    A    Yeah.

13    Q    Is there rules written down about how you're supposed to

14    consider PMU's recommendations?

15    A    There are not.

16    Q    Now, a couple last points.  You said that you go out --

17    Judge Jack asked you do you actually go out and visit homes,

18    individual homes of a CPA and you said you do that on a

19    25 percent per year, is what you said.

20    A    Yes, we conduct samplings of 25 percent of active foster

21    homes each year.

22    Q    And it's random, supposed to be random samplings, right?

23    A    That is correct.

24    Q    Well, Mr. Morris has explained to us that at least in 2011

25    and 2012 the PMU studied those random samplings and said you

1    weren't even going to all 25 percent every year.  Did you know

2    that?

3    A    I'm not aware of that at all or any report about that at

4    all.

5              **MR. YETTER:**  In fact, your Honor, it's in your

6    certification opinion and Mr. Morris testified about it.

7    **BY MR. YETTER:**

8    Q    And he said you're not going to all 25 percent because

9    apparently you guys are too busy.

10   A    I don't agree with that statement.

11   Q    But the reports that PMU used to do on the random

12   inspections, they stopped in 2013 and in 2014.  Did you know

13   that?

14   A    I'm not familiar with what reports you're referring to.

15   Q    Have you ever talked to Mr. Morris about how timely your

16   inspections, these random inspections, are?

17   A    There is not a timelines for random inspections for foster

18   homes.

19   Q    It's supposed to be done every year, annually, 25 percent

20   random, true?

21   A    That is true.

22   Q    So you've got to do it in the year or it's not timely.

23   A    We have met our numbers every year.

24   Q    Okay.

25             **THE COURT:**  I think we had somebody testify that was

Shaw - Recross / By Mr. Yetter                    63

1    not the case.

2             **MR. YETTER:**  Paul Morris, your Honor.

3             **THE COURT:**  The actual director of the whole

4    department.

5             **MR. YETTER:**  Right.

6    BY MR. YETTER:

7    Q    He actually is above PMU, right?

8    A    That's correct.

9    Q    That's his group too, just like yours, it's his group?

10   A    That's correct.

11            **MR. YETTER:**  Yes.  Thank you.

12            Your Honor, I pass the witness.

13        **(Redirect examination from 9:50 a.m. to 9:53 a.m. omitted)**

14            **MR. YETTER:**  Your Honor, I have one last question, if

15   I could.

16            **THE COURT:**  Yes.

17            Lights, please.

18                     **RECROSS EXAMINATION**

19   BY MR. YETTER:

20   Q    Ms. Shaw, I neglected to ask you about Daystar, because

21   Judge Jack asked you specifically about that 4-year-old child

22   that was in this RTC and you started to -- you sounded like you

23   knew about that 4-year-old child.  What is her name?

24   A    I don't know specifically about the child.  I knew about

25   the child had passed away.

Shaw - Recross / By Mr. Yetter                    64

1  Q    Okay, so when the Judge said why is she in that RTC, you

2  didn't specifically know about that child, you were just

3  answering, well, she must have gotten some diagnoses to put her

4  there, right?

5  A    That is correct.

6  Q    So you have no factual knowledge of why that 4-year-old

7  child is in the RTC, Daystar, do you?

8  A    I have no specifics, that's correct.

9  Q    And these other states in that list, do you have any idea

10 whether they track child-on-child incidences of sexually acting

11 out?

12 A    I don't.

13 Q    Whether they call it abuse or perpetrators or anything, do

14 you have any idea whether they track it?

15 A    I don't.

16       **MR. YETTER:**  Thank you.

17       Pass the witness, your Honor.

18       **MR. ALBRIGHT:**  Nothing further of this witness,

19 your Honor.

20       **THE COURT:**  All right, you may stand down.

21    **(Witness excused)**

22    **(Requested transcription concluded at 9:54 a.m.;**

23 **proceeding continued)**

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          January 10, 2015_

                    TONI HUDSON, TRANSCRIBER