UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


M.D., ET AL.,                    )        CASE NO:  2:11-CV-0084
                                 )
            Plaintiffs,          )              CIVIL
                                 )
      vs.                        )        Corpus Christi, Texas
                                 )
GOVERNOR RICK PERRY, ET AL.,     )    Thursday, December 4, 2014
                                 )    (4:04 p.m. to 4:53 p.m.)
            Defendants.          )
_____

DIRECT EXAMINATION OF CHRISTINA MARTIN
DURING TRIAL - DAY 4


BEFORE THE HONORABLE JANIS GRAHAM JACK,
UNITED STATES DISTRICT JUDGE


Appearances:              See Next Page

Court Recorder:           Arlene Rodriguez

Case Manager:             Linda Smith

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

<u>APPEARANCES FOR:</u>

Plaintiffs:                    R. PAUL YETTER, ESQ.
                               Yetter Coleman, LLP
                               909 Fannin, Suite 3600
                               Houston, TX 77010

                               MARCIA ROBINSON LOWRY, ESQ.
                               CHRISTINA WILSON, ESQ.
                               SARAH BARTOSZ, ESQ.
                               Children's Rights
                               330 Seventh Avenue
                               Fourth Floor
                               New York, NY 10001

Defendants:                    THOMAS A. ALBRIGHT, ESQ.
                               ANDREW BOWMAN STEPHENS, ESQ.
                               MARC RIETVELT, ESQ.
                               Office of the Attorney General
                               General Litigation Division
                               P. O. Box 12548
                               Capital Station
                               Austin, TX 78711-2548

<u>INDEX</u>

| <u>PLAINTIFFS' WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| CHRISTINA RAWLS-MARTIN | 4 | | | |

1    **Corpus Christi, Texas; Thursday, December 4, 2014; 4:04 p.m.**

2              **(Partial testimony of Christina Rawls-Martin)**

3         **THE COURT:**  Call your next witness.

4         **MR. YETTER:**  Your Honor, on behalf of the Plaintiff

5    children, we would call a DFPS council executive, Christina

6    Martin.

7         **(Pause)**

8         **MR. YETTER:**  And -- excuse me, your Honor.  She had

9    been in the courtroom a minute ago and --

10        **MR. SPEAKER:**  She's getting somebody to get her.

11        **(Pause)**

12        **THE COURT:**  Would you administer the oath, please?

13   And watch your step up the incline.  No, no.  I meant, just be

14   careful when you go up --

15        **MS. RAWLS-MARTIN:**  Oh.

16        **THE COURT:**  -- because there's an incline that is

17   hard to see.

18        **MS. RAWLS-MARTIN:**  Okay, Thank you, your Honor.

19        **THE CLERK:**  Please raise your right hand.

20      **CHRISTINA RAWLS-MARTIN, PLAINTIFFS' WITNESS, SWORN**

21        **MR. YETTER:**  May it please the Court.

22                       **DIRECT EXAMINATION**

23   BY MR. YETTER:

24   Q    Ma'am, would you introduce yourself, please, for us?

25   A    My name is Christina Rawls-Martin.

1  Q    Ms. Martin -- are you okay if I call you Ms. Martin or

2  would you -- Rawls-Martin?

3  A    Yes.  Mrs. Martin -- Ms. Martin.

4  Q    Ms. -- Mrs. Martin.

5  A    Christina.

6  Q    I'll use Mrs. Martin.

7  A    Okay.

8  Q    You are currently connected with the Department of Family

9  and Protective Services because you serve on its council, do

10 you not?

11 A    Yes.  I serve on the advisory council.

12 Q    There is a council that sits above Commissioner Specia,

13 correct?

14 A    No.  Not --

15          THE COURT:  Well, you -- did you hire him?

16          MR. YETTER:  No.

17          THE WITNESS:  Did I?

18          THE COURT:  Yes.

19          THE WITNESS:  No.

20          THE COURT:  The council?

21          MR. YETTER:  No.  The council is -- there's a --

22 there is a DFPS council.

23          THE COURT:  Okay.

24          MR. YETTER:  To which Commissioner Specia has a

25 dotted line reporting.

1          **THE WITNESS:**  Which is actually lateral.

2          **MR. YETTER:**  Okay.

3          **THE COURT:**  A lateral?

4          **THE WITNESS:**  It's lateral.

5    **BY MR. YETTER:**

6    Q    Let's --

7    A    We are not above the Commissioner.

8    Q    Let's -- let --

9          **THE COURT:**  What is your -- okay.

10   A    Okay.  I'm sorry.

11   Q    I'm sorry.  Let me go ahead and show the exhibit.

12   A    Okay.

13   Q    We have a chart.  You know which chart I'm talking about?

14   A    Yes.

15   Q    Plaintiffs' Exhibit 811.

16   A    Oh, excuse me.  Yes.

17   Q    You've seen that chart before?

18   A    Yes.

19   Q    And there is the Department of --

20   A    Yes.

21   Q    This is a document that the state puts out.  It's dated --

22   this particular one is dated February of 2014.  Commissioner

23   Specia is there in the box at the top?

24   A    Yes.

25   Q    Is the Department of Family and Protective Services --

                    Rawls-Martin - Direct / By Mr. Yetter                7

1    there is a box to the left.  That is the DFPS council?

2    A    Correct.

3    Q    Do you see that box?

4    A    Yes.

5    Q    You are currently the chair -- that's you, Christina

6    Rawls-Martin, that is the chair of the DFPS council?

7    A    Yes.

8    Q    Nine people on the council, all appointed by the Governor?

9    A    Yes.

10   Q    You've been on the council for about five years since

11   2009, have you not?

12   A    Yes.

13   Q    And you were appointed chair about a year ago by Governor

14   Perry?

15   A    Yes.

16   Q    You serve at the -- at least as according to the press

17   release --

18        **THE COURT:**  Do you have to be confirmed, like through

19   the Senate or anything of that?

20        **THE WITNESS:**  The -- yes.  It has to be a

21   confirmation --

22        **THE COURT:**  Okay.

23        **THE WITNESS:**  -- through the Senate to go on but the

24   Governor is the only one that chooses the chairman.

25        **THE COURT:**  Right.  The Governor -- oh, then the

1  Governor chooses the chairman out of the people that have

2  already been --

3          **THE WITNESS:**  The people that have already been.  So

4  I was on for four and a half years before they chose me.

5          **THE COURT:**  So you don't have to be confirmed to be

6  the chair.  You had to be confirmed to be on the committee?

7          **THE WITNESS:**  To be on the committee, correct.

8          **THE COURT:**  Thank you.

9  **BY MR. YETTER:**

10  Q    So one year ago, when Governor Perry appointed you as the

11  chair, he also appointed some new members to the council

12  itself, did he not?

13  A    Yes.

14  Q    And your -- again, as I -- I think the press release said

15  from the Governor's office, you serve at the pleasure of the

16  Governor as the chair?

17  A    Yes.

18  Q    Now the -- by way of background, you are currently

19  retired, aren't you Mrs. Martin?

20  A    Yes.

21  Q    And -- but you retired from a business that you were

22  involved in for some 32 years, I believe?

23  A    Yes.

24  Q    You were in corporate travel?  You owned a business in

25  south Texas in McAllen, I think?

1    A    In McAllen, yes.

2    Q    Called Scotties Tours 'N Travels?

3    A    Yes, I did travel for corporate for (indiscernible).

4    Q    So, basically businesses that did on both sides of the

5    border have a travel agent that --

6    A    Yes.

7    Q    -- arranges their travel?  You also were on the board of

8    -- you were on the board of a Frost Bank, at least down in

9    McAllen?

10   A    Yes.  I'm on the State Advisory Board for McAllen.

11   Q    For McAllen.

12            **THE COURT:**  For -- for what?  What does that mean?

13   For Frost Bank?

14            **THE WITNESS:**  For Frost Bank.

15            **THE COURT:**  Okay.

16   **BY MR. YETTER:**

17   Q    By way of education, you have an associate's degree in law

18   enforcement from a junior college in California?

19   A    Correct.

20   Q    A bachelor's degree in criminology from Sam Houston State

21   in Huntsville, north of Houston?

22   A    Yes.

23   Q    And then you took courses toward the master's in

24   criminology?

25   A    Yes.

Rawls-Martin - Direct / By Mr. Yetter                    10

1  Q    But didn't complete it -- didn't complete the thesis?

2  A    (No response.)

3  Q    In the year since you've -- in the five years that you've

4  been on the council, you have come to understand how the

5  council works, have you not?

6  A    Yes.

7  Q    It plays a very important -- it serves a very important

8  role, true?

9  A    Yes.

10 Q    In fact, it was created by the legislature to assist the

11 Commissioner in developing rules and policies for the

12 Department of Family and Protective Services, true?

13 A    Yes.

14 Q    And (indiscernible) council, it was --

15      THE COURT:  Say that again?  To assist the

16 Commissioner --

17      MR. YETTER:  It was created -- I'm quoting from the

18 statute -- created to assist the Commissioner in developing

19 rules and policies for DFPS.

20      THE COURT:  Is that right?

21      THE WITNESS:  Yes.

22 BY MR. YETTER:

23 Q    And one of the thing --

24 A    Putting emphasis on assist.

25      THE COURT:  Pardon?

1          **THE WITNESS:**  Putting an emphasis on assist.  We're

2     part of a cog, I guess, that has input and we're a group of

3     nine volunteers that have been appointed.  We all have

4     different diverse backgrounds and we put input when the rules

5     come up from, I guess representing the people of Texas.  So --

6          **THE COURT:**  So people just send you suggestions

7     directly?

8          **THE WITNESS:**  We -- sometimes they'll talk to us in

9     our community.  They send them to them.  We have, when we have

10    our council meetings, people can come forward and do public

11    input.  And then, of course, a lot of us have different

12    provisions.  Like I've done Children's Advocacy Center for

13    Starr County for 13 years now.  So we have different input.

14         **THE COURT:**  Uh-huh.

15         **THE WITNESS:**  So when a ruling will come up, all of

16    these people together will help put -- have an input into what

17    the rule is.  We don't create them.

18         **THE COURT:**  So, you have input to the Commissioner

19    but if he comes up with policies and rules that he wants to

20    suggest to the legislature, do they go through you, also?

21         **THE WITNESS:**  Depending on what the policies are.

22    Usually it's the rules that come up.  Like -- for example, how

23    many children that you may be allowed in a daycare center and

24    we'll talk about it and discuss and go through the information

25    and what our feelings are and what we've heard in our

1   community.  And then we will -- the Commissioner will be there.

2   We will get reports on it and then from there he will make --

3   or the group will make the decision.  But we don't make the

4   final decision.  We're part of -- I always consider us as we're

5   the representatives --

6           **THE COURT:**  Of the people.

7           **THE WITNESS:**  -- of the people of Texas.

8           **THE COURT:**  Okay.

9   **BY MR. YETTER:**

10  Q    In fact, one of the nine members has to be a former foster

11  child, true?

12  A    Yes.

13  Q    And today one of the nine members is a former foster

14  child?

15  A    Yes.  Krisa (phonetic).

16  Q    Now, the -- but the purpose of the commission, it was

17  created, according to the statute, to assist the Commissioner

18  not in the day-to-day management of the DFPS, right?

19  A    Correct.

20  Q    But with the rules and policies for the department?

21  A    Yes.

22  Q    And as you said, that's -- the council serves a very

23  important role to help protect the foster children of the state

24  of Texas, doesn't it?

25  A    Yes.

Rawls-Martin - Direct / By Mr. Yetter                           13

1    Q    And in your role in assisting the Commissioner with -- in

2    developing rules and policies, the council is to study and make

3    recommendations to the Commissioner concerning the management

4    and operations of the department, true?

5    A    (No response.)

6    Q    I'll repeat it.  The council is to study and make

7    recommendations to the Commissioner concerning the management

8    and operations of the department?

9    A    Yes.  We make -- we have input on it.  We make

10   recommendations.

11   Q    Including policies and rules?

12   A    More rules than policies.

13   Q    Fair enough.  Your -- we can -- you can explain to me in a

14   minute what the difference is --

15   A    Okay.

16   Q    -- but including policies and rules that govern two

17   things, the delivery of services to persons who are served by

18   the DFPS?

19   A    Yes.

20   Q    And the rights and duties of persons who are served or

21   regulated by the DFPS?

22   A    Yes.

23   Q    So, in terms of PMC children, children within the

24   Permanent Managing Conservatorship of the state of Texas, the

25   council is right there with the Commissioner giving input on

Rawls-Martin - Direct / By Mr. Yetter                    14

1    the rules and policies that affect the delivery of services to

2    these children and affect their rights, true?

3    A    Yes and no.  Now I'm going to sound like the other one.

4    The hard thing is we are an advisory board and, yes, we do have

5    input but we don't make recommendations and policy and start

6    them from scratch and sit with the Commissioner and do it on a

7    day-to-day basis.  I mean, we --

8                 THE COURT:  Do you conduct studies?

9                 THE WITNESS:  We don't conduct studies but studies

10   are brought to us.  We look at the information.  We point out

11   where we think maybe that's not right, maybe it's wrong.  We

12   ask questions.  We get feedback to it.  But I don't -- it's

13   almost like you put too much emphasis -- we don't have that

14   much control.  I don't know another way to say it.  We are an

15   advisory board.

16   BY MR. YETTER:

17   Q    Mrs. Wilson [sic], in fact, even though this council is to

18   study and make recommendations --

19                 THE COURT:  Mrs. Martin?

20   Q    Oh, I'm sorry.

21   A    That's okay.  I knew what you meant.

22   Q    Mrs. Martin, I apologize.  Even though the council is to

23   study and make recommendations, while you've been on the

24   council for the past five years, you've never done a study,

25   true?

1  A    We have never done a study as in the council.

2  Q    And the council --

3  A    No.

4  Q    And the council, in addition to not doing a study, the

5  council has never recommended a new rule or policy to the

6  Commissioner, has it?

7  A    We have never started a rule from scratch and made a

8  recommendation --

9  Q    The --

10  A    -- as in this is our rule and this is what we want to do.

11  Q    Sure.  And the council has never taken any suggestions

12  from those people of the state of Texas and presented it in a

13  proposal to the Commissioner for a new rule or policy, has it?

14  A    Not in a written proposal, but that is pretty much what we

15  do when we get recommendations or suggestions or we hear the

16  information that's coming in.  We share it with the

17  Commissioner and --

18            **THE COURT:**  Is anything in writing?

19            **THE WITNESS:**  The reports to us are in writing.  The

20  minutes of our meeting are in writing.  But do we formally make

21  a proposal to him?  No.

22            **THE COURT:**  Or a recommendation?

23            **THE WITNESS:**  No.

24            **THE COURT:**  Okay.

25  //

Rawls-Martin - Direct / By Mr. Yetter                16

1  **BY MR. YETTER:**

2  Q    Okay.  So just to be -- so we're clear, the council that

3  represents the state of Texas as to the DFPS, has never done

4  its own study, never made its own recommendation, and never

5  actually made a written proposal to the Commissioner for any

6  specific new DFPS policy or rule, true?

7  A    Not that I can think of, no.

8           **THE COURT:**  Is that -- so that's true what he said?

9           **THE WITNESS:**  So, it's true.  It's -- sorry.

10          **THE COURT:**  Okay.  That's okay.

11          **THE WITNESS:**  It's true.

12          **THE COURT:**  I assume you're not used to doing this?

13          **THE WITNESS:**  No.  I'm kind of lost.  But I'm trying.

14  **BY MR. YETTER:**

15  Q    Now, you know that -- I assume you knew that the four --

16  you were deposed in this case, were you not?

17  A    Yes.

18  Q    And you were deposed just a couple months ago, September

19  23rd, 2014?

20  A    Yes.

21  Q    I assume you knew about this litigation before you were

22  deposed; is that true?

23  A    Yes.

24  Q    Now, I want to ask you about --

25          **THE COURT:**  It's been a while -- what?  Three and a

1    half years?

2              **MR. YETTER:**  2011 I believe, your Honor.  So, about

3    three and a half years ago.

4    **BY MR. YETTER:**

5    Q    I want to talk to you about a few of the policies and

6    rules that are in issue in this case, Mrs. Martin, all right?

7    A    Okay.

8    Q    One of them has to do with investigations.  In your

9    deposition, you learned for the first time that the residential

10   licensing group in the CPS part of the department had learned

11   that they had a significant error rate in a hundred and eleven

12   investigations of abuse.  You knew that -- you learned that for

13   the first time in your deposition, didn't you?

14   A    If I remember correctly -- and I have learned this -- you

15   can shoot it up there and tell me exactly what I did say, but

16   if I remember correctly, I did not -- it came up -- I did not

17   remember seeing that but I did make the comment about we get so

18   much documentation, we -- it didn't light up for me.  So I

19   wasn't real sure.

20             **THE COURT:**  You weren't familiar with it.

21             **THE WITNESS:**  But I can -- I wasn't familiar with it.

22             **THE COURT:**  You could have seen it but --

23             **THE WITNESS:**  I didn't remember offhand.

24             **THE COURT:**  I understand.

25             **THE WITNESS:**  But I don't want to say that I didn't

Rawls-Martin - Direct / By Mr. Yetter                18

1   see it because sometimes I do miss things.

2            **MR. YETTER:**  Sure.

3            **THE COURT:**  Well, yes.  It's in the paperwork.

4            **THE WITNESS:**  Okay.

5            **THE COURT:**  When you were being papered to over.

6            **THE WITNESS:**  Yeah, when I was being papered to

7   death, it may have been in there.

8   **BY MR. YETTER:**

9   Q    Plaintiffs' Exhibit 1129.

10           **MR. YETTER:**  Let's just blow up the top.

11  Q    And see if you get this back in mind.  This was the

12  document that you were shown at your deposition from the --

13           **MR. YETTER:**  Oh, can you go up a little higher?  Just

14  pull it up just a smidgen higher.  There you go.

15  Q    From the Childcare Licensing PMU, the Performance

16  Management Unit -- you know what that is, don't you,

17  Mrs. Martin?

18  A    Yes.

19  Q    You were at one time a liaison with the residential

20  Childcare Licensing Group?

21  A    Actually, I was the liaison for the childcare portion that

22  did daycare --

23  Q    Fair enough, but that's --

24  A    -- more so.  And I believe at my deposition I said that

25  when we get into residential childcare there are some other

1   people on the council that are a little better at it than I am.

2   I don't want to act like I'm an expert because I'm not.

3            THE COURT:  So -- I want to make sure I've got this

4   right.

5            THE WITNESS:  Okay.

6            THE COURT:  The daycare is not foster children?

7            MR. YETTER:  It's --

8            THE COURT:  Those are daycare centers in the

9   community that apply for licensures through Mr. Morris'

10  secretary?

11           MR. YETTER:  Correct.  Correct.

12  BY MR. YETTER:

13  Q    But you know what the licensing group --

14  A    Yes.

15  Q    -- the RCCL does --

16  A    Yes.

17  Q    -- in the DFPS?

18  A    Yes.

19  Q    It's a critically important role, is it not?

20  A    Yes.

21  Q    And know what the PMU is?  That's the quality assurance

22  group, this unit, within the RCCL that double checks on what's

23  going on?

24  A    Correct.

25  Q    Or at least it's supposed to.  Here is the report that you

Rawls-Martin - Direct / By Mr. Yetter                    20

 1  saw.  A report to the residential childcare management.

 2  Mr. Morris has already testified.  You know Paul Morris, do you

 3  not?

 4  A    Yes.

 5  Q    It's dated January, 2014, right?

 6  A    Uh-huh; yes.

 7  Q    So when you were deposed, that was some nine months later?

 8  A    Uh-huh; yes.

 9  Q    In September, 2014?  And it's about the residential care

10  physical abuse investigations focused on the unable to

11  determine dispositions?  That's UTD, unable to determine?

12  A    Correct.

13  Q    Do you remember that discussion in your deposition?

14  A    Yes.

15  Q    Now, you said you don't remember.  Maybe you got it in the

16  paperwork but it didn't come to mind?

17  A    Uh-huh.

18  Q    Right?

19  A    Yes.

20  Q    I suspect you've looked into it further since then,

21  haven't you?

22  A    No.

23            THE COURT:  Why not?

24            THE WITNESS:  Wow.  This is really hard to say in

25  front of a lot of people.  Because two days after that I went

1  into treatment for --

2           **THE COURT:**  Never mind.

3           **THE WITNESS:**  Thank you.  So, yes, if on --

4           **THE COURT:**  You didn't have -- just say you didn't

5  have an opportunity.

6           **THE WITNESS:**  It's -- okay.  I did not have an

7  opportunity.  It is on the list of four things that I would

8  like to check into and get much more information on and that I

9  had planned on but I had a medical situation that did not allow

10  me to do that and I apologize.

11  **BY MR. YETTER:**

12  Q    No.  I understand, Mrs. Martin.  This was a very

13  concerning issue when you saw it, wasn't it?

14  A    I was concerned by the statistics of it, yes.

15  Q    Now, what you -- what you may not know -- let me show you

16  Plaintiffs' Exhibit 1065 -- is that there was a follow up study

17  to the one that you saw.  Have you seen the PowerPoint

18  presentation that Jean Shaw -- do you know Jean Shaw at the

19  RCCL who is Paul Morris' -- at least as he described it, his

20  right-hand person?

21  A    Yes.  I know who she is.  Uh-huh.  I know who she is and I

22  have not seen this.

23  Q    And so, you didn't know, even as you're sitting here

24  today, that there was a follow up to that investigation that

25  showed even more instances of inaccuracy in the investigations

Rawls-Martin - Direct / By Mr. Yetter                    22

 1  of abuse and neglect?

 2  A    No.  I have not seen this and I was not at the October

 3  meeting.

 4  Q    There was an October meeting -- the meeting you're talking

 5  about now, is there was a council meeting in October?

 6  A    Correct.  Yes.

 7  Q    Do you know if there was an agenda for the meeting?

 8  A    Yes, I do.  And offhand I cannot tell you what was on that

 9  agenda.

10  Q    Can you --

11         THE COURT:  Who staffs your council?

12         THE WITNESS:  Who staffs my council?  Gwen did.  She

13  is no longer with us.  In fact, that was in September.  So it's

14  somebody by the name of Mary Burgess.  And Mary sent it to me

15  and I went through the packet but I was not at that meeting.

16         THE COURT:  And that's the -- the staff would be

17  funded separately from the department or is that part of the

18  department?

19         THE WITNESS:  No.  It's part of the department.

20         THE COURT:  Okay.  So you're -- the council staff

21  comes from the department, right?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.  Thanks.

24  //

25  //

1   **BY MR. YETTER:**

2   Q    Now, one of the concerns you had, I assume Mrs. Martin, is

3   that if the -- if the investigations into physical abuse are

4   that wrong -- so many of them are in error, that could call

5   into question the investigations a much broader scope of

6   investigations, right?

7   A    Uh-huh; yes.

8   Q    And you know that the numbers that the department presents

9   to various people like the federal government are based on

10  these investigations and which confirm whether there is or

11  isn't actual cases of abuse and neglect, right?

12  A    Yes.

13  Q    And so, if these investigations are fundamentally

14  incorrect -- if the error rate is so high, all the numbers that

15  the state has been giving to the federal government could be

16  wrong, right?

17  A    They could be wrong.  They could be right.  I think part

18  of what bothered me -- or when we talked about at the

19  deposition, somebody said it today -- one of the experts, well,

20  I can't believe those numbers.  Well, maybe there was an error

21  somewhere else.  I don't know.  I really can't make a big

22  opinion on this because I haven't delved into what the original

23  numbers were, where they said that -- they weren't sure they

24  were --

25              **THE COURT:**  It looks like in a 12-month period, in a

1    fiscal year, there were a hundred and eleven.

2              THE WITNESS:  Right.

3              THE COURT:  That were -- could not determine.

4              THE WITNESS:  They could not determine, correct.

5              THE COURT:  Whatever the acronym is.

6              THE WITNESS:  That's right.

7              THE COURT:  And when those were audited in-house two

8    more times they found a 75 percent mistake rate.  And their --

9    in the process of auditing, and then a third time.  And my

10   concern is in the ones they ruled out, if they're the same

11   investigators, 91 percent --

12             THE WITNESS:  Uh-huh.

13             THE COURT:  -- of whatever that global population

14   was, if they're the same investigators, is there a percentage

15   rate in those rule outs, too, if they're wrong, especially

16   after hearing from these former foster students -- children.

17             THE WITNESS:  And that was my -- I think my concern

18   originally when we were talking at the deposition is why were

19   there so many that were undetermined.  And that was the part

20   that I wanted -- why so many mistakes?

21             THE COURT:  Not so many --

22             THE WITNESS:  Were they mistakes?

23             THE COURT:  Not a large number of undetermined.

24             THE WITNESS:  Kind of --

25             THE COURT:  A hundred and eleven out of --

1           THE WITNESS:  Right.

2           THE COURT:  -- you know, and that was a -- I can't

3    remember what the total amount was.

4           MR. YETTER:  I'll give you that figure, your Honor.

5           THE COURT:  Okay.

6           MR. YETTER:  Defendant's Exhibit 249.  Let's put that

7    up right now.

8           THE COURT:  Three thousand was the total.

9           THE WITNESS:  Okay.

10          THE COURT:  So 90 percent of 3,000 were ruled out.

11          MR. YETTER:  Here is --

12          THE WITNESS:  But --

13          MR. YETTER:  Here is the chart, your Honor, that -

14          THE WITNESS:  -- it was the other percentage.

15          MR. YETTER:  -- that counsel provided yesterday I

16   think.  This is residential childcare licensing.

17   BY MR. YETTER:

18   Q    Do you see that, Mrs. Martin?

19   A    Yes.

20   Q    Investigation fiscal year 2013 and fiscal year 2014 and

21   the -- and so the total number in the second column -- that was

22   the total investigations for 2013 was nineteen hundred and

23   fifty-two.  And for 2014 was twenty-one hundred and sixty-one.

24   And the total -- do you see the acronyms there?  UTD is the

25   unable to determine, 86 --

Rawls-Martin - Direct / By Mr. Yetter                    26

1    A     Uh-huh.

2    Q     -- for fiscal year 2013.  And 90 for fiscal year 2014.

3    And then the RTB, do you happen to know what that means?

4    Reason to believe?

5    A     Right.  Correct.

6    Q     Those are the confirmed cases of physical, sexual and --

7    abuse and negligent supervision, right?

8    A     Correct.

9    Q     Those are children that have -- that the internal

10   investigation says they were abused in a state of Texas foster

11   care placement, true?

12   A     Correct.

13   Q     Those are the ones that are the most concerning if you

14   miss them, aren't they?

15   A     Yes.

16   Q     Eighty -- a very small number -- 61.  Out of almost 2,000

17   in 2013 and 87 out of about twenty-one hundred in 2014.  The

18   big number every year, Ms. Martin, is ruled out entirely, isn't

19   it?

20   A     Yes, it is.  The largest number.

21   Q     So, 90 -- in 2013, ninety-two and a half percent, the same

22   investigate -- and these are the -- this is -- there's only one

23   investigation group, isn't there?

24   A     Yes.  For CPS.

25   Q     The same investigators are ruling out 92 percent and

Rawls-Martin - Direct / By Mr. Yetter                27

1   saying nothing happened at all.  They're not saying they're not

2   sure.  They're saying by a preponderance of the evidence,

3   nothing happened, true?  According to this chart?

4   A    According to this chart, yes.

5   Q    And in 2014, just under 92 percent were saying nothing at

6   all happened.  Now -- do you see that number?

7   A    Yes.

8   Q    Now, Mrs. Martin, we are now almost a year after that

9   follow up which was a year after the actual incidents occurred.

10  A    I follow you.

11  Q    So, two years after these incidents occurred, would you

12  believe -- don't you think it would be high time to figure out

13  whether these investigations were properly done?

14  A    I would think that they are probably -- my gut is that

15  they're already looking at that and finding out.

16       **THE COURT:**  They're not.

17  A    And they're not.

18       **THE COURT:**  They're not.

19  **BY MR. YETTER:**

20  Q    They're not -- they're not.

21       **THE COURT:**  I asked the man in charge yesterday,

22  Mr. Morris.

23       **THE WITNESS:**  Okay.

24       **THE COURT:**  And I said why not?  And he said they're

25  still redoing the small subset of --

Rawls-Martin - Direct / By Mr. Yetter                    28

1              THE WITNESS:  The process.

2              THE COURT:  -- unable to determine instead of going

3      forward to determine the others.  It looked to me like they

4      were trying to, one more time, see if they hadn't been -- okay

5      -- if they could salvage this problem.

6              THE WITNESS:  Problem.  Okay.

7      BY MR. YETTER:

8      Q    Doesn't that concern you, Mrs. Martin?

9      A    Yes, that does concern me.

10     Q    Concern you greatly about how these investigations of

11     instances of abuse to children -- physical and sexual abuse to

12     children -- are not being followed up to verify that they were

13     accurately done?

14     A    Yes.  That concerns me.

15     Q    Without good investigations, you can't keep children safe,

16     can you?

17             THE COURT:  All right -- I just want to stop just for

18     a minute.

19             MR. YETTER:  Sure.

20             THE COURT:  Because this is a volunteer person --

21             MR. YETTER:  Yes.

22             THE COURT:  -- who's serving on a volunteer board.  I

23     want to make sure that she doesn't -- that she is not -- or is

24     not concerned about being subject to some kind of liability.

25             MR. YETTER:  Fair enough, your Honor.  Go ahead.

```
 1              THE COURT:  And I do this in other hearings, too, and
 2     I'm sorry.  I think I got -- I let you go too far down the line
 3     here.  But if you -- she may want to consult with an attorney.
 4     I don't know if they have any kind of -- you know, on bank
 5     boards they give you corporate -- you know, liability
 6     insurance.
 7              THE WITNESS:  Right.  Correct.
 8              THE COURT:  I bet they don't do anything on state
 9     boards.
10              THE WITNESS:  Not as far as --
11              THE COURT:  And I don't want her to say things that
12     can come back and -- without proper legal advice.  Not that I'm
13     recommending -- not that I'm saying you're in trouble.  I just
14     don't like this line of going, okay?
15              THE WITNESS:  Yes.  No, I -- I kind of agree with
16     that.  I don't want to say anything that I shouldn't say or
17     that's illegal.
18              THE COURT:  Well, you want to tell the truth.
19              THE WITNESS:  And I'm kind of lost --
20              THE COURT:  Yes, you want to --
21              THE WITNESS:  -- on this one part of which I was in
22     the deposition also.
23              THE COURT:  It's okay.  You want to tell the truth
24     but there's no point in sitting and being a volunteer on a
25     board and possibly -- and I'm not saying that you are but
```

1    possibly subjecting yourself to some kind of liability.  Would

2    you like to get legal counsel before you proceed?  And, again,

3    I don't mean to scare you.  I do this all the time.

4               **THE WITNESS:**  Okay.  Would I like to get -- I'm

5    trying to be cooperative so I don't --

6               **THE COURT:**  They're not -- I don't think -- I don't

7    know if they're your counsel or not.  I don't know if

8    representing the state of Texas they represent you or not.

9    Maybe they can tell you.  Do you want to take -- why don't you

10   go over there and visit with them?

11              **THE WITNESS:**  May I?  Thank you.

12              **THE COURT:**  Please.  And just see how you want to

13   proceed.  I mean, it seems like employees are covered.  I don't

14   want to get lay people uncomfortable.

15              **MR. YETTER:**  I understand, your Honor.

16         **(Pause)**

17              **MR. SPEAKER:**  Your Honor, may we step out --

18              **THE COURT:**  Yes, of course.  Mr. Albright, you go

19   with them.

20              **MR. ALBRIGHT:**  I'm going with them.

21              **THE COURT:**  Okay.  We're taking a break.

22              **MR. YETTER:**  Can I take a break, your Honor?

23              **THE COURT:**  Yes, sir.

24         **(Recess taken from 4:32 to 4:49 p.m.)**

25   //

1          **MR. ALBRIGHT:**  Your Honor?  Ms. Martin has asked that

2   this issue be resolved --

3          **THE COURT:**  Before she continues.

4          **MR. ALBRIGHT:**  -- before she continues.

5          **THE COURT:**  That's fine.

6          **MR. ALBRIGHT:**  And she is unwilling to continue at

7   this time.

8          **THE COURT:**  I hope I didn't give her -- make the

9   wrong suggestion but every time somebody heads down -- this is

10  where I get concerned about it.

11         **MR. ALBRIGHT:**  And I would see three options -- one

12  is she doesn't need counsel, doesn't want counsel.  I don't

13  think that's going to be the case.  The A.G. might be able to

14  represent her.

15         **THE COURT:**  But you need to have clearance to do

16  that, I assume.

17         **MR. ALBRIGHT:**  But we need -- and I don't think it

18  can be us.  Or she can get private counsel.  But the bottom

19  line is --

20         **THE COURT:**  I'm hoping that the A.G.'s Office --

21         **MR. ALBRIGHT:**  -- and I'm glad you alerted her.

22         **THE COURT:**  Pardon?

23         **MR. ALBRIGHT:**  I understand the Court raising the

24  point and so I think we're at a point where she really is

25  uncomfortable going forward.

1        **THE COURT:**  Of course.

2        **MR. ALBRIGHT:**  And we'll -- we'll just have to --

3        **THE COURT:**  I hope the A.G. can settle this

4   especially being a volunteer on a state council.

5        **MR. ALBRIGHT:**  We're elevating it to a pay grade

6   above mine.

7        **THE COURT:**  Fine.

8        **MR. ALBRIGHT:**  And we'll have a response for the

9   Court.  But if we don't have that answer now other than --

10        **THE COURT:**  When would you anticipate doing that?

11        **MR. ALBRIGHT:**  I think we can let you know tomorrow.

12        **THE COURT:**  Okay.  So how do you want to proceed now?

13   I'd like to give her that opportunity.

14        **MR. YETTER:**  I understand, your Honor.  We talked

15   outside and I said that I understood their position.  Not that

16   we agree with it.  We'd like to continue with the examination.

17   If she wants to get her private counsel or some arrangement --

18        **THE COURT:**  Or some representation --

19        **MR. YETTER:**  We understand that.

20        **THE COURT:**  -- that somebody is on her side.

21        **MR. YETTER:**  We're certainly -- we understand if the

22   Court wants to recess her testimony at this stage and then

23   we --

24        **THE COURT:**  I'm going to.

25        **MR. YETTER:**  -- we would move on with another

33

1    witness.

2         THE COURT:  And then -- should I call her in and tell

3    her that?

4         MR. ALBRIGHT:  Yes.

5         THE COURT:  Okay.

6         MR. ALBRIGHT:  I think she'd feel comfortable if you

7    told her that.

8         THE COURT:  Okay.

9       (Pause)

10        THE COURT:  So Mr. Yetter disagrees with me?

11        MR. YETTER:  No.  I understand, your Honor.  I do

12   understand.  And it's her prerogative so --

13        THE COURT:  I haven't read her deposition so I don't

14   know that.  I mean, that certainly would probably be admissible

15   but --

16        MR. ALBRIGHT:  Well, we talked about -- we talked

17   about that, but we're unable to resolve that.  She --

18        MR. YETTER:  He offered to use the deposition.  There

19   are things that she didn't have in the deposition that I would

20   like to ask her about.

21        THE COURT:  That -- of course.

22        MR. YETTER:  That we've learned since then.

23        THE COURT:  Has somebody gone to get her?

24        MR. ALBRIGHT:  Yes.  I believe.

25        THE COURT:  She may have gone.

1      **MR. ALBRIGHT:**  Someone exited quickly upon the -- Oh,

2  there she is.

3      **THE COURT:**  And, Ms. Martin, I am sorry.  I hope I

4  didn't scare you or do anything.  It's just that I just hate to

5  see volunteers put in this kind of position.

6      **THE WITNESS:**  No, I appreciate that.

7      **THE COURT:**  And so, what we're going to do is recess

8  your testimony --

9      **THE WITNESS:**  Okay.

10     **THE COURT:**  -- until there's an answer either if you

11 want a private attorney, you can get one.  I just hate for you

12 to spend the money if A.G. should be actually representing you.

13     **THE WITNESS:**  Okay.

14     **THE COURT:**  And can represent to you and to the Court

15 that you're represented.

16     **THE WITNESS:**  Okay.  Great.

17     **THE COURT:**  And they'll have that answer hopefully by

18 8:00 o'clock in the morning.  No, probably by noon at the

19 latest.

20     **MR. ALBRIGHT:**  I'll push as hard as I can, Judge.

21     **THE COURT:**  Don't you think?

22     **MR. ALBRIGHT:**  Yeah.

23     **THE COURT:**  And so, I suggest -- are -- were you

24 staying up here anyway?

25     **THE WITNESS:**  Well, I planned on going home in about

1  two hours back to McAllen but if I'm staying, I'm staying so --

2         **THE COURT:**  Well, if you'd like -- I don't see any

3  reason why you can't go home because I'm not going to use your

4  -- I'm not going to have your testimony until afternoon

5  tomorrow.

6         **THE WITNESS:**  Okay.

7         **THE COURT:**  And I think that they -- as soon as they

8  find out, they can call you and come back up.  And it's about a

9  two -- well, it depends on how fast you drive.

10         **THE WITNESS:**  Yeah.

11         **THE COURT:**  About a two hour drive.

12         **THE WITNESS:**  Okay.

13         **THE COURT:**  And then you can come back or you can

14  come back next week.

15         **THE WITNESS:**  Okay.  We'll figure it out.

16         **THE COURT:**  But we'll figure it out.  The counsel can

17  figure it out.

18         **THE WITNESS:**  Okay.  Great.

19         **THE COURT:**  But I don't want you to lose sleep over

20  this issue.

21         **THE WITNESS:**  No, I won't.

22         **THE COURT:**  Okay.

23         **THE WITNESS:**  Well, I already have.

24         **THE COURT:**  Sorry.

25         **THE WITNESS:**  Okay.  No.  No problem at all.

```
1   Appreciate it and I appreciate you saying something.  And we'll

2   figure it out.

3           THE COURT:  And maybe you can come back next week

4   because it may be -- it's too much to and froing right now.

5           THE WITNESS:  Okay.  Great.

6           THE COURT:  Thank you.

7           MR. ALBRIGHT:  Thank you, Judge.

8       (Witness Excused)

9       (Requested transcription concluded at 4:53 p.m.;

10  proceeding continued)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    _January 8, 2015_


                    TONI HUDSON, TRANSCRIBER