United States District Court
Southern District of Texas
**ENTERED**
January 09, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D.; bnf STUKENBERG, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:11-CV-84 |
| | § | |
| GREG  ABBOTT, *et al*, | § | |
| | § | |
| Defendants. | § | |

**INTERIM ORDER REGARDING SPECIAL MASTERS' RECOMMENDATIONS**

Before the Court are the Special Masters' Recommendations (docket entry #471)(the "Recommendations") prepared at the Court's direction by Kevin Ryan and Francis McGovern (the "Special Masters") , the Objections filed by the State of Texas ( the "State" or "DFPS"), and the Responses filed by the Plaintiffs. At the outset, the Court acknowledges the tireless and extraordinary work of the Special Masters in preparing the Recommendations and expresses gratitude for their service. The Court commends all parties to the litigation for their cooperation with the Special Masters. In particular, the State of Texas is acknowledged for its many efforts to furnish information, studies and data to the Special Masters. The Court is unable to enter a final order as further explained herein and therefore enters this interim order.

**I. Initial Statement**

The Court is aware of the numerous concerns expressed by the public regarding children in temporary managing conservatorship ("TMC") and recognizes that more may be done to place these children back with their families. This class-action suit deals only with the children in permanent managing conservatorship ("PMC"), who are those children who have transitioned after 12 to 18 months from temporary managing conservatorship into permanent managing conservatorship. The history of PMC children is outlined in the Memorandum Opinion and

Verdict of the Court entered December 17, 2015. (D.E. #368) (the "2015 Order"). A final order cannot be entered because all required information is not yet available nor have measures to correct previous constitutional deficiencies found by the Court been implemented as discussed below. Further studies and consultations between the Special Masters, the Court, and the State are necessary before a final order can be entered.

## II. Background and Procedural History

Plaintiffs are minor children in the Permanent Management Conservatorship ("PMC") of the Texas Department of Family and Protective Services ("DFPS").  Plaintiffs filed suit through their next friends on March 29, 2011, seeking injunctive relief against Rick Perry, Governor of Texas; Thomas Suehs, Executive Commissioner of the Texas Health and Human Services Commission;[1] and Anne Heiligenstein, Commissioner of DFPS (collectively "Defendants"), in their official capacities.[2]  (D.E. 1).  Shortly thereafter, Plaintiffs filed a Motion for Class Certification.  The Court granted their motion, holding that the requirements of Fed. R. Civ. P. 23 had been met.  (D.E. 49).

Defendants filed an interlocutory appeal of the class certification to the Fifth Circuit Court of Appeals pursuant to Fed. R. Civ. P. 23(f).  (D.E. 63).  While the appeal was pending, the Supreme Court decided *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  In light of *Wal-Mart*, the Fifth Circuit vacated the class certification order and remanded the case.  *M.D. ex rel. Stukenberg v. Perry* (*M.D. I*), 675 F.3d 832 (5th Cir. 2012).  Plaintiffs filed a second Motion for Class Certification in October 2012.  (D.E. 160).  After a three-day hearing in January 2013, the Court found that the requirements of Fed. R. Civ. P. 23(a), as explained in *Wal-Mart*, were

---

[1] The Health and Human Services Commission oversees and administers the agencies in Texas's Health and Human Services system, which includes DFPS.  *See* Tex. Gov't Code Ann. § 531.0055.
[2] Greg Abbott has since replaced Perry as Governor of Texas, Charles Smith has since replaced Kyle Janek who replaced Suehs as Executive Commissioner of the Health and Human Services Commission, and Henry Whitman, Jr. has replaced  John J. Specia, Jr., who replaced Heiligenstein as Commissioner of DFPS.

satisfied.  The Court certified a General Class and three subclasses on August 27, 2013.  *M.D. v. Perry* (*M.D. II*), 294 F.R.D. 7 (S.D. Tex. 2013).  The certified classes are defined as follows:

    a.  General Class: all children now, or in the future, in the Permanent Managing Conservatorship of the State of Texas;

    b.  Licensed Foster Care Subclass: all members of the General Class who are now or will be in a licensed or verified foster care placement, excluding verified kinship placements;

    c.  Foster Group Home Subclass: all members of the General Class who are now or will be in a foster group home; and

    d.  Basic Care General Residential Operation Subclass: all members of the General Class who are now or will be in a general residential operation and who are or will be receiving solely non-emergency, basic childcare services.

*Id*. at 67.  The Court denied certification of a fourth subclass for children in unverified kinship placements because it lacked adequate representation.  *Id*. at 63.  Defendants filed an untimely Petition for Permission to Appeal the Class Certification Order, which the Fifth Circuit dismissed on November 19, 2013.  *M.D. ex rel. Stukenberg v. Perry*, 547 F. App'x 543 (5th Cir. 2013).

The Court entered its Memorandum Opinion and Verdict of the Court on December 17, 2015. (D.E. #368) (the "2015 Order"). The State of Texas appealed the Court's Original Order and requested a stay pending appeal. This Court denied the State's request for a stay pending appeal. On March 21, 2016, The Fifth Circuit Court of Appeals also denied a stay pending appeal. The parties did not agree on a special master and therefore, on March 21, 2016, the Court held a hearing to appoint a Special Master. On that same date the Court entered its Appointment Order (D.E. #379) naming co-Special Masters Francis McGovern and Kevin Ryan pursuant to

Rule 53, F.R.Civ.P. Thereafter, the Court conducted numerous telephonic status conferences with counsel for Plaintiffs, the State of Texas, and the Special Masters. On November 4, 2016, the Special Masters filed their Report and Recommendations (docket #471)(the "Recommendations").

The State filed its Objections to Special Masters Recommendations on November 21, 2016 (docket #479). The Plaintiffs did not object to the Recommendations (see, D.E. #478). On December 8, 2016, Plaintiffs filed their Response to Defendants' Objections to Special Master Recommendations (D.E. #484). The Court conducted a telephone conference on December 21, 2016, to hear discussion and clarification on several issues raised by the responses to the Recommendations. Thereafter, Defendants filed their Advisory on December 29, 2016 (D.E. #492), to which Plaintiffs responded on January 3, 2017 (D.E. #494). An additional Advisory was filed by the Special Masters on January 4, 2017. (D.E. #496)

### III. The State's Recognition of a Broken System

The State objected to every recommendation of the Special Masters. The Court is aware and respects the State's inherent right to protect its legal objections to actions taken by this Court. Moreover, the Court has been made aware through various public statements by State actors that many good-faith attempts are being made to improve services to children in permanent managing conservatorship. Further, the Court is aware that the State has expressed many of the same concerns that were expressed in the Court's Original Order, making it clear that the State has a firm understanding of the dire straits of children in the foster care system. For instance, the Court takes judicial notice[3] that on September 6, 2016, Defendant Commissioner

---

[3] Defendants confirmed in their Advisory (D.E. #492) that the public statements attributed to them and other state officials are quoted accurately in Plaintiff's Response (D.E. #484). The Court notes the State's objection in its Advisory regarding judicial notice. First, Rule 201, Fed.R.Evid., does not prohibit a court from taking judicial notice of legislative facts, it simply does not govern them. See, Advisory Committee Notes to Rule 201. A court can take

Whitman submitted a Legislative Appropriation Request for the next two fiscal years. In his opening Administrator's Statement, he admits the inadequacy of available placements:

> "For a variety of reasons, including population growth, a shift in the needs of children who are entering the foster care system, and ever-increasing health care costs, Texas lacks adequate, high-quality foster care capacity, particularly for highneeds children. Many children suffer from trauma and mental illness, emotional/behavioral health problems, or are medically fragile from what they have experienced. Our system must be strengthened to take special care of these children who through no fault of their own are now the state's responsibility."

--LEGISLATIVE APPROPRIATIONS REQUEST, SUBMITTED TO THE GOVERNOR'S OFFICE OF BUDGET, PLANNING & POLICY & THE LEGISLATIVE BUDGET BOARD, FOR FISCAL YEARS 2018 AND 2019 ("LAR 2018-19"), *Administrator's Statement* at 5 (p. 16/837 of the pdf), available at https://www.dfps.state.tx.us/About DFPS/Financial and Budget Information/LAR/FY18-19/documents/18-19 LAR.pdf.

The Court takes judicial notice[4] that on October 12, 2016, Defendant Governor Abbott, along with Lt. Governor Patrick and Speaker Straus, wrote to Commissioner Whitman complaining of serious problems at DFPS. "We would be remiss if we did not acknowledge that quality capacity should be a high priority. It is unacceptable that children are sleeping in Child Protective Services offices. We also will not tolerate inferior residential foster care operations. The state's residential providers must be held to the highest standards while caring for our most vulnerable or no longer operate in our system." Letter from Gov. Abbott, et al., Oct. 12, 2016, at 2, available at http://gov.texas.gov/files/pressoffice/DFPS Whitman 10122016.pdf.  On October

---

judicial notice of legislative facts without having to satisfy any of the requirements of Rule 201. *Id.*, see also, *U.S. v. Bowers*, 660 F.2d 527,530-31 (5th Cir. 1981)(taking judicial notice that land was property of the federal government under its jurisdiction); *Allison v. Froehike*, 470 F.2d 1123, 1127 (5th Cir. 1972)(taking judicial notice of wildlife information). Second, the fact that a statement of which the Court takes judicial notice was made to the Texas Legislature does not necessarily make it a "legislative fact". Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case." *U.S. v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976). The statements and documents quoted are readily accessible by their citations. Moreover, Defendants' public statements and filings are regarding specific facts of this case and therefore they are adjudicative facts of which the Court can take judicial notice under Rule 201. The statements quoted are not used herein to prove the truth of what was said, but to establish that the statements were publicly made. The Fifth Circuit recognizes judicial notice of public admissions. *See, e.g., In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 177 n.3 (5th Cir. 2011); *Funk v. Stryker, Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *Jackson v. Godwin*, 400 F.2d 529, 536 (5th Cir. 1968).
[4] See, f.n. 3

20, 2016, Defendant Whitman replied to the joint letter from Defendant Abbott, Lt. Governor

Patrick, and Speaker Straus, noting that "CPS has seen an increase in the number of children

without placement." He continued:

> "The result of this capacity issue is that the agency must enter into expensive
> child-specific contracts with providers that are not the best setting for children's
> needs, or have children spend extended time sleeping in CPS offices, hotels, or
> emergency shelters."

--Letter from Commissioner Hank Whitman to Gov. Abbott, et al., Oct. 20, 2016, at 5, available

at http://www.lrl.state.tx.us/scanned/archive/2016/32952.pdf.

Further, the Court takes judicial notice[5] that on October 26, 2016, Commissioner

Whitman testified before the Senate Committee on Finance: "Like face-to-face visits, the

Agency has struggled to find placements for some of our higher needs children." Hearing Before

the Tex. Senate Committee on Finance, 84th Leg. Session Interim, Oct. 26, 2016, at 3:05:42-

3:06:00, available at http://www.senate. state.tx.us/75r/senate /commit/c540/c540.htm.  He further

conceded, "[b]ecause of this, some children have had to spend the night in CPS offices," and he

passionately exclaimed: "This is unacceptable to me." *Id* at 3:05:51-3:05:54.

The Court takes judicial notice[6] that on November 24, 2016, Department of Family &

Protective Services spokesperson Shari Pulliam wrote, "[w]e are desperate for foster parents all

across the state." And "Children are being placed outside the county they are removed from

every day, because we just don't have the foster care placements in their own counties," she

continued.  G. Evans, "Local, State Officials Say Placement Need For Foster Care Rises,"

Longview News-Journal, Nov. 27, 2016 (quoting email received from Ms. Pulliam), available at

https://www.newsjournal.com/news/2016/nov/27/local-state-officials-say-placement-need-for-

foste/. On September 6, 2016, in a Legislative Appropriations Request, Commissioner Whitman

---

[5] See, f.n. 3
[6] See, f.n. 3

conceded that DFPS needs to hire hundreds of additional conservatorship caseworkers. LAR 2018-19, *Administrator's Statement*, at 4 (p. 15/837 of pdf), available at https://www.dfps.state.tx.us/About DFPS/Financial and Budget Information/LAR/FY18-19/documents/18-19 LAR.pdf. He submitted that the additional caseworkers are needed to allow caseworkers to see children "timely" and "more often." *Id*. Unfortunately, his request is still inadequate as it would leave caseloads at a level far in excess of that which is needed to ensure that children do not face an unreasonable risk of harm. *Id*. (noting that if his request for additional funds is fulfilled, average caseloads per worker would be *reduced* to 25.47).

The Court takes judicial notice[7] that on October 26, 2016, Commissioner Whitman admitted to a Senate Committee that "when caseworkers are overworked, mistakes will happen." Hearing Before the Tex. Senate Committee on Finance, 84th Leg. Session Interim, Oct. 26, 2016, at 3:04:15, available at http://www .senate.state.tx. us/75r/senate /commit/c540 /c540.htm. He went on to say that conservatorship caseworkers are "stretched…with increasing need." *Id*. at 3:05:26-3:05:31. He added with detailed emphasis: "I know these caseworkers have a tough job.... The pay is not worth beans.... And, they are overworked. Something has got to give." *Id*. at 3:35:50, 3:36:01-3:36:19.

Further, the Court takes judicial notice[8] that on October 27, Commissioner Whitman wrote to Chair Jane Nelson of the Senate Finance Committee: "A glaring cause of this crisis is that our workers are outnumbered by the opponent –child abuse and neglect." Letter from Commissioner Whitman, Oct. 27, 2016, available at http://www. lrl.state.tx.us /scanned/archive /2016/33026.pdf.  Because "Texas children cannot wait for the next biennium to begin, in recent weeks, Governor Abbott, Lt. Governor Patrick, and Speaker Straus directed me to identify

---

[7] See, f.n. 3
[8] See, f.n. 3

staffing needs necessary on an urgent basis to address the most critical needs. In response, I submitted to you last week a request to hire a portion of those workers now." *Id*. In the same letter, he said "bringing in new staff" was "one component of ensuring child safety," but "I also want to make clear that bringing in new staff is just one component of ensuring child safety. The agency must continue efforts to retain our caseworkers." *Id*. He pointed out that improved program training would help, but "will not end the high turnover at CPS." *Id*. Among other reforms, "providing a salary increase will have a positive impact on retention," which in turn could help save the agency money in the long run. *Id*. (a salary increase "may reduce our staffing exceptional item in the FY2018-19 [LAR]").

The Court takes judicial notice[9] that Commissioner Whitman's letter was consistent with his testimony, given the day before, to the Senate Committee on Finance. He emphasized, among other key points, that there was a turnover emergency at DFPS. Hearing before the Texas Senate Committee on Finance, Oct. 26, 2016, at 4:07:22 - 4:09:12. He acknowledged, in reply to a question from Senator West regarding caseworker turnover, that there is "an emergency in [DFPS] surrounding compensating caseworkers" and that the State has "to do something about that today". *Id*.

The Court takes judicial notice[10] that DFPS's most recent Legislative Appropriations Request reflects that if the agency's request for additional funding is fulfilled, average caseloads per worker would be *reduced* to 25.47. LAR 2018-19, *Administrator's Statement*, at 4 (p. 15/837 of the pdf), available at https://www.dfps.state.tx.us/About DFPS/Financial and Budget Information/LAR/FY18-19/documents/18-19 LAR.pdf.  On April 11, 2016, Defendant Abbott issued an official statement addressing foster care. "The status quo at CPS is unacceptable. Our

---

[9] See, f.n. 3
[10] See, f.n. 3

children are too important to suffer through the challenges they've faced. I've insisted on overhauling a broken system…." Governor Abbott, Press Release, Apr. 11, 2016, available at http://gov.texas.gov/news/press-release/22183.

Further, the Court takes judicial notice[11] that on October 12, 2016, Governor Abbott, Lt. Governor Patrick, and Speaker Straus wrote to Commissioner Whitman. In their letter, in which they addressed numerous systemic deficiencies, they expressed deep "concerns" that children at risk of abuse and neglect are not being seen in a timely manner and that this "exacerbates backlogs throughout the entire system," leaving children in dangerous situations. Letter from Gov. Abbott, et al., Oct. 12, 2016, available at http://gov.texas.gov/files/press-office/DFPS Whitman 10122016.pdf. The letter went on to say: The "increasing number of reports of abuse and neglect are beyond what the agency's current workforce can support," they continued, noting that "additional resources are required ... to protect our children who are in harm's way." *Id*. They directed Whitman to "immediately" undertake numerous actions, including hiring and training more special investigators, and "a strategic hiring and training schedule, which will ensure DFPS is staffing an increased number of the necessary caseworkers to account for the increase in workload and system backlog of serving children and families." *Id*. "Quality capacity should be a high priority," they continued, emphasizing that it is "unacceptable" for children to be sleeping in CPS offices, and that "inferior" residential foster care operations continue to exist. *Id*. Finally, they concluded on a somber note that underlined the urgency of the situation: "We have much work to do; and while we wish we could give you and your team more time to do so, too much is at stake. We must act now." *Id*.

---

[11] See, f.n. 3

The Court takes judicial notice[12] that on October 20, 2016, Defendant Whitman responded by letter to Defendant Abbott, noting the shortage of CVS caseworkers and inadequate placement array: "Texas children remain at risk. This is unacceptable." Letter from Commissioner Whitman, Oct. 20, 2016, at 1, available at http://www.lrl.state.tx.us/scanned/archive /2016/32952.pdf. On October 26, 2016, while Commissioner Whitman was testifying before the Senate Committee on Finance, Senator Kirk Watson asked: "[a]re you going to fight what the Special Masters say you should do?" After some back and forth, Commissioner Whitman answered: "I am personally not going to fight it." Hearing Before the Tex. Senate Committee on Finance, 84th Leg. Session Interim, Oct. 26, 2016, at 4:23:16 - 4:25:10, available at http://www.senate.state.tx.us/75r/senate/commit/c540 /c540.htm. At the hearing, DFPS General Counsel Trevor Woodruff testified that DFPS would attempt to address all the foster care issues "with all due speed." *Id*. at 4:35:00 - 4:36:30. Speaking more generally of the risks children face, he continued: "To this point, Senators, the children of this state are at risk." *Id*. at 3:07:32. For emphasis, he added: "When I walked into the whole system, it stunk bad." *Id*. at 3:31:49. On October 27, 2016, Defendant Whitman wrote to Chair Jane Nelson of the Senate Finance Committee: "I have been on the job as commissioner of DFPS for almost six months. In that time, I have discovered a crisis in the making for the past decade or more." Letter from Commissioner Whitman, Oct. 27, 2016, available at http://www.lrl.state. tx.us/scanned/archive /2016/33026.pdf.

The Court takes judicial notice[13] that on November 22, 2016, literally the day after Defendants filed their Objections, Defendant Abbott issued a public statement in which he spoke, in no uncertain terms, of the risk that all children in the state's custody face:

---

[12] See, f.n. 3
[13] See, f.n. 3

"Texas children in the child protective system continue to be at risk, and we must not delay providing the critical resources and support that CPS urgently needs."

--Julie Chang, "State Rejects Court-Ordered Proposal to Fix Foster Care System," Austin American-Statesman, Nov. 22, 2016 (quoting Statement of the Governor), available at http://www.mystatesman.com/news/state--regional-govt--politics/state-rejects-court-orderedproposal-fix-foster-care-system/wm5HHnSK92OtAoMevSFbVL/.

The Court recognizes the importance of State intervention in abusive family situations which results in the State assuming custody of children. Yet how much more tragic is it for those same children to be further abused while in State custody. Despite the State's recognition of the problems as recited above, the State objected to every recommendation proposed by the Special Masters.

## IV. The State's Objections to the Recommendations

In the State's Objections to the Recommendations, it reiterates prior arguments previously raised. For instance, the State objects that many of the Recommendations are already in place as policies. However, policies not practiced are insufficient to address the constitutional deficiencies found in the Court's 2015 Order. Even if the State has policies in place which could remedy the constitutional deficiencies, Plaintiffs' claims are not mooted and the Court is not deprived of its remedial power. *See, e.g. Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 189 (2000)("a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."). The burden on a party to show that their voluntary conduct has mooted the case is strict. *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)("the burden which lies on the party asserting mootness "is a heavy one"). The Court cannot rely on the State's representation that it has policies in place because to do so would leave the State free to return to its old ways. *Friends of the Earth*, supra at 189.

The Fifth Circuit Court of Appeals likewise recognizes the heavy burden defendants must carry to establish mootness based on their purported voluntary cessation of illegal conduct. *See, e.g. Pederson v. Louisiana State University*, 213 F.3d 858, 875 (5th Cir. 2000)("We will not second-guess the district court's reasoned judgment by declaring this issue moot when Appellees have failed to demonstrate that their Title IX effective accommodation violations will not recur."); *K.P. v. Le Blanc*, 729 F.3d 427, 438-39 (5th Cir. 2013)(rejecting defendants' contention of no 'ongoing' violation of federal law and finding defendants' challenged action reasonably subject to recurrence). The State's long history of conducting and commissioning studies without any measurable improvement to the well-being of children in foster care belies their argument that they have plans in place to address the constitutional deficiencies found by the Court.

The State generally objects to the Recommendations that DFPS create plans to address constitutional deficiencies as shifting the burden to the State. This objection is overruled. The crux of this case is that the burden has always been on the State to provide constitutional safeguards to children over whom they have custody. The refusal by the State to accept this burden despite over 20 years of studies conducted by the State or commissioned by the State, all of which found these same deficiencies, brought us to this point. DFPS has the burden to protect the children in its care and custody from unreasonable risk of harm. (*See,* 2015 Order at p. 15) For over 20 years all studies conducted or commissioned by DFPS or by other State actors recommended many of the same reforms based on the same deficiencies found by this Court, yet the problems still exist.  The Court's Original Order made it clear that Plaintiffs proved their case as to constitutional deficiencies. All other objections are not yet ripe or are more properly addressed in the Court's final order.

**V. The Special Masters' Recommendations Addressed**

To achieve the results required to correct the constitutional deficiencies in the foster care system and protect foster care children from unreasonable risk of harm, the Special Masters developed a detailed set of recommendations which track the Court's 2015 Order. However, to accomplish these goals, further work is necessary. Therefore the Special Masters are ordered to continue to work with DFPS to help DFPS create and implement plans to do the following:

**A. Monthly Visits**

The Special Masters are ordered to work with DFPS to create policies for monthly in-person visits between Conservatorship ("CVS") caseworkers and PMC children. The visits should include time with the child separate from the caregivers and other children if the child is verbal or can otherwise communicate. The policies should be included in new casework training. The methods and policies shall be developed by the Special Masters following consultation with DFPS, and submitted to the Court within 3 months from the date of this Order.

**B. Creation of a Central Databank**

The Special Masters are ordered to work with DFPS to create and submit to the Court a plan for a comprehensive central databank for PMC children. The databank shall include:

1. Medical records;
2. Dental records;
3. Mental health records;
4. School records;
5. Court records;
6. Caseworker notes; and
7. Placement evaluations.[14]

The databank should be accessible to caseworkers, CASA volunteers, attorney ad litems, foster care parents, and the Special Masters. DFPS objects to the creation of this databank on the

---

[14] After trial and at the direction of the Court, Defendants spent months gathering the information in their Exhibit 120, which contains 358,102 pages for only 20 children, yet there were no medical, dental, school, or mental health records contained in Exhibit 120. (DX 120; 2015 Order at 167).

grounds that it violates attorney-client privilege and other confidentiality laws. However, as noted by the Special Masters, other states have successfully addressed these very issues with central databanks providing separate access codes to each group of people, thereby limiting the data access appropriately. The Special Masters will report the progress of the central databank creation to the Court within three months from the date of this Order. The databank must be logically ordered and also include safety-related reports, licensure verification, and information on investigations. In addition the database shall include photos of the child as recommended by the Special Masters in Section 3 of the Recommendations. The Special Masters shall also work with DFPS to develop a monitoring methodology of this plan once reviewed and approved by the Court.

### C. Creation of a 24-hour Hotline

The Special Masters shall work with the DFPS to create a plan for a statewide reporting system for PMC children to report allegations of child abuse and neglect to be operated 24 hours per day, 7 days a week. The reporting system should allow PMC children to report abuse, neglect, exploitation, or violation of personal rights, without fear of punishment or retaliation. The Special Masters shall work with DFPS to create plans for screening such calls and, where warranted, investigate thoroughly. The plan should include reporting on investigations and providing for timely closure. Additional policies should be created which require that Child Placement Agency ("CPA") residential providers maintain a landline phone that connects directly to the hotline. All foster homes, foster group homes, and therapeutic foster homes housing PMC children should be required to maintain a landline phone accessible to the child in the home, with the toll-free hotline number appended to the landline.

The plan should further provide for publishing and training all affected individuals on the policies for reporting allegations to the hotline for investigation.  All PMC children must be instructed on the use and location of the landline and/or hotline within two hours of placement in a facility, which training should be documented by the caseworker. The plan and policies should be submitted within 6 months from the date of this Order.

### D.  Recommendations Regarding PMC Children who "Age Out"

The Court takes judicial notice[15] that on October 26, 2016, Defendant Whitman testified about the problems with children aging out of the system: "27% of [children aging out of foster care] end up in the criminal justice system."  Hearing Before the Tex. Senate Committee on Finance, 84th Leg. Session Interim, Oct. 26, 2016, at 4:46, available at http://www.senate.state.tx.us /75r/senate/commit/c540 /c540.htm.  He added his concern was especially great. "Because we know that a lot of these children that age out, that just age out, ... a majority of them will fall into sex trafficking." *Id*. at 4:37:50.

The evidence demonstrates that the system is failing these children. They are simply not prepared to face the world at age 18 when they are in effect "tossed out" of the system. On average, 1300-1400 youth age out of foster care in Texas every year. (D.E. 327 at 222-23; DX 259 at 21-22; *see also* DX 24 at 14 (showing that 1410 youths aged out in 2011); DX 119 at 221 (showing that 1328 youths aged out in 2013)). Studies show that they are at high risk for low educational attainment, poverty, unemployment, early pregnancy, mental illness, and incarceration. (*See, e.g.* Plaintiff's Ex. 1988). The Special Masters are therefore ordered to work with DFPS to establish a plan beginning at age 14 to prepare PMC children with necessary life skills to survive when released from State care.  The plan shall be submitted to the Court within 5 months from the date of this order. The plan shall include making a birth certificate available to

---

[15] See, f.n. 3

each child before they reach age 18, either physically or by an established email account. The birth certificate is an important document which is required for many social services for which the children may be eligible, such as appropriate housing and social security benefits. (*See, e.g.*, 2015 Order at 66; D.E.324, DFPS 009012001-02)  Accordingly, this provision should be effective immediately.

### E. Appointment of an Attorney Ad Litem

Most PMC children do not have a CASA volunteer. (2015 Order at p. 7, PX 1988 at 170) As noted by the State in its Objections, DFPS has no authority over CASA and the non-profit organization does not operate in the entire State of Texas.  Most PMC children also do not have an attorney ad litem. (2015 Order at p. 7; D.E. #299 at 60; D.E. #323 at 68).While the Court recognizes that it cannot order CASA volunteers be provided for each child, the Court can and does find that children within the PMC classification are constitutionally entitled to representation of counsel at each stage of their legal proceedings  and at every court hearing. When a child is initially taken into custody by DFPS, their physical liberty is curtailed. Placement of PMC children results in state custody of the child for years at a time with concomitant loss of physical liberty. The right to counsel exists in civil litigation "where the litigant may lose his physical liberty if he loses the litigation." *Lassiter v. Department of Soc. Servs. Of Durham County, N.C.,* 452 U.S. 18, 25 (1981). "The interest in securing freedom… from bodily restraint lies at the core of the liberty protected by the Due Process Clause." *Turner v. Rogers,* 64 U.S. 431, 445 (2011), citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). There can be no doubt that PMC children's freedom is curtailed. As noted at trial, one judge interviewed for the Texas Appleseed study stated that foster children in PMC are "just like…inmate[s] serving time until they've reached 18." (2015 Order at 171; PX 1988 at 72).

The most egregious loss of liberty occurs when children are placed in Residential Treatment Centers ("RTCs") without judicial proceeding and attendant due process. They are effectively institutionalized and subject to indefinite confinement without the opportunity for review. (2015 Order at p. 225). In fact, PMC children who do not need treatment are often placed in RTCs simply because there is no room for them anywhere else. (2015 Order at p. 224). RTCs are a type of General Residential Operation ("GRO") that provide therapeutic treatment "for children with serious emotional disturbances or mental health issues." (2015 Order at 9-10; PX 1864 at 101; DX 109 at 1273). The most egregious loss of liberty occurs when a child is placed in an RTC where they may be restrained and/or medicated.

In considering the right to counsel in mental health commitment proceedings, the United States Supreme Court recognized that "for the ordinary citizen, commitment to a mental hospital produces 'a massive curtailment of liberty.'" *Vitek v. Jones*, 445 U.S. 480, 491 (1980)(citations omitted). The Court further noted:

> The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual." *Addington v. Texas, supra*, at 425–426, 99 S.Ct., at 1809. See also *Parham v. J. R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979). Also, "[a]mong the historic liberties" protected by the Due Process Clause is the "right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). Compelled treatment in the form of mandatory behavior modification programs, to which the District Court found Jones was exposed in this case, was a proper factor to be weighed by the District Court. Cf. *Addington v. Texas*, *supra*, at 427, 99 S.Ct., at 1810.

- - *Vitek, supra*. At 492.

Much like a mental health proceeding, the State acts in *parens patriae* when it determines placement of PMC children. There can be no doubt that placement of PMC children results in the

child's loss of physical liberty. Despite the fact that a child may originally be placed in foster care to protect the child from harm, the irrefutable fact is that PMC children are in effect in custody and/or institutionalized and their personal freedom is lost or curtailed. The trial record is replete with examples of physical restraint, punishment, and overuse of medications. (DX. 120) Children are frequently placed in RTC's at the urging of foster parents and with the stroke of a caseworker's pen. (DX. 120) Moreover, RTCs, as described above, carry the equivalent stigma of mental institutions for PMC children as that described in *Vitek*.

The right to counsel in civil cases arises not from the Sixth Amendment but rather from the Due Process Clause. The Fourteenth Amendment to the Constitution states that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The threatened loss of liberty through legal proceedings "demands due process protection." *Turner v. Rogers, supra*., citing *Addington v. Texas*, 441 U.S. 418, 425 (1979).

As more fully discussed in the 2015 Order, "[s]tate custody of a child creates a 'special relationship' that triggers substantive due process protections." *Id.* at p. 15. These children are entitled to procedural due process as well. *Lassiter, supra.; Vitek, supra*. The Court is compelled to jealously protect the liberties of Texas' most vulnerable citizens and safeguard their right to be heard when their liberty is placed in jeopardy. DFPS can articulate no rational basis for making it more difficult for a PMC child to receive procedural due process than persons civilly committed.

Accordingly, the Court finds that PMC children are entitled to counsel at every step of their legal journey through the Texas foster care system. Although the Court cannot order DFPS to provide the attorneys, there are at least three options to correct the constitutional deficiency.

The Court can order, at a minimum, that DFPS request ad litem appointment from each court in which a suit is pending, citing this Order. Additionally, the Court will consider ordering DFPS to reimburse the ad litem attorneys' fees to the appointing court. The Special Masters are ordered to work with DFPS to evaluate the efficacy of these options and propose a procedure for the appointment of an attorney ad litem for each PMC child within 3 months from the date of this order.

### F. Healthcare

The Court orders the Special Masters to work with DFPS to develop a healthcare plan to address missing or nonexistent healthcare records. The recommended guideline shall be the American Academy of Pediatrics "Fostering Health: Healthcare for Children and Adolescents in Foster Care". The Court further orders the Special Masters to make certain the healthcare plan requires DFPS to make every effort to make a child's medical records available within 24 hours of entering custody of DFPS. The Court is aware that this affects children initially coming into DFPS who are not yet PMC children. However, every PMC child begins as a TMC child and by the time they are designated as PMC, medical records may no longer be available. Therefore this protection is necessary. The healthcare plan shall be submitted to the Court within 6 months from the date of this order. The Special Masters shall also work with DFPS to develop a monitoring methodology of this plan once reviewed and approved by the Court.

### G. Caseworker Workload

Throughout the history of this case it is evident that no reliable method has been utilized to arrive at the appropriate number of PMC children per caseworker. In the past, DFPS manipulated the numbers to create the illusion of lower caseload. For instance, at trial, the testimony of Dr. Jane Burstain demonstrated that DFPS manipulated data to suppress caseworker

caseload numbers. (2015 Order at 54-55). In arriving at a caseworker caseload number, Dr. Burstain included in her calculation of the number of caseworkers "I See You Workers"[16], Centralized Placement Unit ("CPU") workers (who have no contact with children), part-time workers, and fictional workers "created out of all the overtime," which "are not actually even people." (2015 Order at 55, citing D.E. 310 at 65-69). She arrived at a caseload of 17-19 workers (D.E. 310 at 65).

Actual caseload data indicates a far higher number of PMC children per caseworker. At trial, the testimony of Colleen McCall indicated that there was a case load of 28 children per caseworker. (D.E. 305 at 18). DFPS's most recent Legislative Appropriations Request reflects that if the agency's request for additional funding is fulfilled, average caseloads per worker would be *reduced* to 25.47 children.  LAR 2018-19, *Administrator's Statement*, at 4 (p. 15/837 of the pdf), https://www.dfps.state.tx.us/About DFPS/Financial and Budget Information/LAR/FY18-19/documents/18-19 LAR.pdf.  Yet we know from the State's own Work Study that a CVS caseworker cannot physically accommodate more than 14 PMC children.

In preparing their Recommendations, the Special Masters used DFPS's Executive Summary of a Work Measurement Study (the "Work Study", D.E. 485) ordered by the Court in the 2015 Order and conducted between March 2016 and August 2016. The Work Study calculated that DFPS caseworkers expended an average of 9.7 hours per month on cases associated with PMC children and that those caseworkers had an average of 137.9 hours per month to spend on PMC cases.[17] By dividing the number of available hours by the time required

---

[16] Discussed infra at section I. Of note, "I See You Workers" caseloads are redundant to that of CVS caseworkers.
[17] This number is inclusive of overtime. Without overtime, the average number of hours available is 129.1 (D.E. 485 at 4)

per PMC case, DFPS arrived at an average of 14 PMC children per CVS caseworker.[18] The

Special Masters and the Court concur that this approach is the best method for determining an

appropriate and safe caseload and recommend a maximum range of 14-17 PMC children per

CVS caseworkers who are assigned to the role of serving PMC children and who work full-time

in that role. *See*, Advisory filed by the Special Masters on January 3, 2017, D.E. #493.

 If a caseworker also handles TMC children, the number of PMC children per caseworker

will be reduced because the Work Study indicates that TMC children require more time than

PMC children. The Work Study also blended "I See You Workers" with CVS caseworkers even

though "I See You Workers'" job description and average time spent on case profiles is less than

CVS caseworkers. Removing "I See You Workers" from the calculation decreases the number of

PMC cases a CVS caseworker can physically handle. (D.E. 471 at 11.1) Nevertheless, the Court

accepts the Work Study as providing the definitive number of PMC children that a CVS

caseworker can physically handle.

 The Court orders the Special Masters to work with DFPS to develop a plan with specific

time frames to ensure that PMC caseloads will be reduced to between 14-17 children statewide.

The plan shall include a provision that any PMC caseload above 17 be documented in writing by

the caseworker's supervisor explaining why it is safe. The plan shall be submitted to the Court

within 6 months from the date of this Order. The Special Masters shall also work with DFPS to

develop a monitoring methodology of this plan once reviewed and approved by the Court.

---

[18] DFPS has assured the Special Masters that the study filed with the Court can be interpreted as follows: the term "stages" as it relates to TMC children is equal to "families". Any "stage" when referring to PMC children equals one child.

### H. Caseworker Turnover

The Special Masters are ordered to work with DFPS to create a plan with specific time frames to reduce caseworker turnover per Recommendation 12.1.  The plan shall be submitted to the Court within 6 months from the date of this order. The Special Masters shall also work with DFPS to develop a monitoring methodology of this plan.

### I. I See You Workers

The "I See You Worker" position was created by DFPS over ten years ago. (2015 Order at 222-23) The position was created "in part because children were too often being sent far from their home communities and primary CVS caseworkers." *Id*. In addition, "I See You Workers" allow the State to represent to the federal government that foster care children are visited at least once a month. *Id.* Without that monthly visitation, the State would lose millions of dollars in federal aid. *Id.* "I See You Workers" have a much larger caseload than primary caseworkers. At the time of trial "I See You Workers" had between 60 and 70 PMC children that they were required to visit each month, in addition to any TMC children. (2015 Order at 174; D.E. 300 at 101) According to the Recommendations, the average caseload for an "I See You Worker" as of June 30, 2015 was 44. (D.E. 471 at p.6).

For the reasons cited in section 13 of the Recommendations and the 2015 Order, the Court orders the Special Masters to retain an expert as part of their team to create a workload study of "I See You Workers" to aid the Court in determining whether the "I See You Worker" program should be continued and, if so, in what capacity. The workload study shall be completed within 9 months of this order.

Further, the Court orders the Special Masters to work with DFPS to develop a contact guide for "I See You Workers" to complete during monthly, private face-to-face contact visits. If

an individual private visit is not possible, the reason must be documents in writing. The guide shall include an assessment of placements, confirmation that the child was being interviewed privately, a discussion of forms of discipline being used, a review of the child's medical, mental health, dental, and educational needs, plus any other staff expectations from DFPS regarding "I See You Workers'" interactions with the PMC children they supervise. The Special Masters shall work with DFPS to ensure all "I See You Workers" use the contact guide within 3 months of approval by the Court and in the planned study. The contact guide shall be submitted to the Court within 5 months from the date of this order.

The Special Masters are also ordered to work with DFPS to formulate a plan that, when a child is assigned an "I See You Worker" or other secondary worker, that person conducts monthly in-person private visits.  In addition the plan should provide that the primary caseworker shall visit the child in person or privately via available technology such as face time, videoconferencing, or any other method available at least quarterly. The Special Masters shall also work with DFPS to develop a monitoring methodology of this plan once reviewed and approved by the Court.  The plan shall be submitted to the Court within 3 months from the date of this order.

### J. Residential Child Care Licensing ("RCCL")

The Court finds that DFPS has not commenced, as previously ordered, a workload study of RCCL investigators and inspectors.[19] Therefore the Court orders the Special Masters to formulate and institute such a study and report to the Court within eight months from the date of this Order. The Special Masters may retain an expert to conduct the study as part of their team.

---

[19] The State informed the Court that it did not deem the study necessary because workloads are adequate and the entire department will be transferred to a separate agency. Whatever the future location of the department, its integral relationship to the safety of PMC children requires that the study proceed. Further, no new compelling information is provided by the State to obviate the need for a study.

The Special Masters are also ordered to work with DFPS to identify a discrete cohort of staff, for example a selection of RCCL staff, who will be exclusively assigned to the work of maltreatment investigations except for remote, rural or substantially less populated areas of the State where exclusive assignment is impractical. In this process the Special Masters will develop and implement protocols for quality control. The specialized staff shall be identified and established within 6 months from the date of this order. The workload study shall be completed within 8 months from the date of this Order.

### K. RCCL Website Creation

The Court orders the Special Masters to work with DFPS for DFPS to create a public website of all licensing inspections conducted by RCCL and/or its successive entities, redacting child identifying information and other information deemed confidential under law and regulation. The website shall contain the full narrative inspection report, the outcome of the inspection, inspection violations and whether RCCL implemented corrective or adverse action as a result of violations identified during inspections. The website will include all corrective action plans required by RCCL and/or other successive entities and the dates RCCL accepts corrective action plans submitted by violating agencies and the status of corrective action plans. The Special Masters are ordered to work with DFPS to expand the array of enforcement actions available to the DFPS for identified violations, including the ability of DFPS to suspend or close such facility.  The Court orders the Special Masters to develop monitoring methodology of this plan once reviewed and approved by the Court. The plan shall be submitted to the Court within 3 months from the date this order is entered.

The Court orders the Special Masters to work with DFPS to develop a plan with specific time frames to expand the array of enforcement actions available to DFPS for identified

violations, including the ability of DFPS to suspend and close foster homes, foster group homes, and therapeutic homes directly, even when verified and maintained by CPAs. The plan shall include a time frame to make public on its website all enforcement actions undertaken by the agency. The plan shall be submitted to the Court within 3 months from the date this order is entered.

### L. Identifying Single Child Homes

The Court orders the Special Masters to work with DFPS to provide the Court with specific time frames to document and track available single child homes. Single child homes are homes with no other birth, adoptive, relative, or non-relative kinship or foster children present. Processes shall be established to match those placements to PMC children who, through documented assessment, are determined to need such a home. This is particularly important in light of the trial testimony that sexually abused children need single child placement homes. The plan shall be submitted to the Court within 3 months from the date this order is entered.

### M. Reporting Sexual Abuse

The Court orders the Special Masters to work with DFPS to immediately require all incidents of sexual abuse committed by a child against another child be reported instanter by all foster caregivers, CPAs, GROs, and RTCs. In addition, the Special Masters shall work with DFPS as a resource to help DFPS develop a 24-hour hotline to be established by DFPS to receive, screen, and refer for investigation reports of child abuse and neglect such as, for example, the hotline run by DFPS statewide intake.  The Special Masters shall work with DFPS as a resource to help DFPS develop a plan to ensure it investigates all reported instances of sexual abuse committed by a child against another child for at least neglect by caregivers

charged with supervising the child and other issues such as negligent placement. These provisions shall be implements within 3 months of the Court's Order.

The Special Masters shall also work with DFPS to ensure that a child's case record prominently identifies TMC and PMC youth with sexually aggressive behavior if the child has sexually abused another child or is at high risk of perpetrating sexual assault. The Special Masters shall do a case record review establishing their own time frame. The Special Masters are also ordered to work with DFPS to ensure that a child's case record prominently identifies a sexually abused PMC youth.  Both the term "sexually abused" and "sexually aggressive" should be word-searchable in the child's records. In addition to being identified, all placements should be informed if a child is sexually aggressive or was sexually abused.

The Court orders the Special Masters to work with DFPS to ensure that all PMC caseworkers receive training on where to find and how to make the designation in PMC children's case records as to sexually aggressive behavior and sexually abused  youth. The Court orders the Special Masters to work with DFPS to create a plan, with specific time frames and activities, informed by Performance Management Unit ("PMU") case record reviews of substantiated and unsubstantiated maltreatment investigations and other data and information, to reduce the incidence of maltreatment of PMC children. The Special Masters shall confer with DFPS and develop a methodology for verification. This plan should include a prohibition by DFPS of placing children designated sexually aggressive or at high risk for perpetrating violence or sexual assault in any foster care placement with other children without appropriate documented assessment concerning the safety of all children in the placement. As part of this plan a documented assessment for every PMC child who has been sexually abused should be completed to determine their needs including whether they need a therapy foster home and, if so,

ensure the child receives appropriate services in a placement matching his or her needs. Further this plan should include public reporting of the number of substantiated allegations of child maltreatment each month for children in the PMC class. The plan shall be submitted to the Court within 6 months from the date of this order.

### N. Monitoring Reports of Abuse and Neglect

The Court orders the Special Masters to work with DFPS to develop a plan with specific time frames to strengthen its monitoring and oversight of PMC children's placements using its full array of contractual tools. This plan shall include a requirement that DFPS include consideration of all incidents of abuse and neglect, and/or corporal punishment occurring in placements at the time of its inspection. The plan shall extend DFPS's monitoring of placement agencies' obligation to report suspected child abuse or neglect to DFPS by including, for example, provisions for an immediate investigation by DFPS to determine the appropriate corrective action up to and including termination or modification of relevant portions of a contract for failure to report. This plan shall include enforcement tools for repeated failure by a placement agency to report suspected child abuse or neglect - at a minimum triggering a review of the contract agency's violations by DFPS senior leadership. The plan shall be submitted to the Court within 6 months from the date of this order.

### O. Placement in Family-like Settings

The Court orders the Special Masters to work with DFPS to insure that unrelated PMC children with different service levels not be placed in the same room unless a thorough and documented assessment is conducted by DFPS staff certifying that such placement is safe and appropriate for each PMC child. This plan should include a provision that, within 6 months from the date of the final order, all PMC children under two years of age shall be placed in a family-

like setting. Within 12 months from the date of the final order all PMC children under six years of age shall be placed in a family-like setting. Within 24 months from the date of the final order all PMC children under the age of thirteen shall be placed in a family-like setting. Acceptable family-like settings include, for example, non-relative foster care, tribal foster care, kinship foster care, and therapeutic foster care. Exceptions to the requirements set out herein include sibling groups of four or more children who cannot otherwise be placed together, children whose individualized needs require inpatient psychiatric hospitalization, treatment and/or medical care, or young children who are placed with their minor parent.  This plan shall include a prohibition of placing unrelated children that are more than three years apart in the same room.

### P. Placement Arrays

The Special Masters are ordered to work with DFPS to create a solution to the lack of appropriate placement arrays. This plan will recognize that DFPS currently does not track single child placements which are critical for sexually abused children. The plan will include a provision requiring DFPS, upon placing a sexually abused child in a setting with other children, to thoroughly document the reason for no single child placement. Further DFPS shall submit to the Special Masters and the Court its 2016 statewide Placement Needs Assessment no later than January 31, 2017. This assessment shall include the number, geographical distribution, and placement types in the DFPS placement array, and the expected needs for PMC children for 2017, by catchment area.[20]

The plan shall include performance targets, with specific time frames including benchmarks strategies to address the need for placements for specialized and often hard to place groups of PMC children such as sibling groups, teenagers, children with developmental

---

[20] A "catchment area" was defined by Special Master Kevin Ryan at the hearing held December 21, 2016, as a "cluster of counties populous enough to move foster care redesign forward." Counsel for the State agreed with this definition.

disabilities and children requiring single child placement. The Special Masters shall address performance targets of DFPS over a 12-month period with a view to expanding placements in foster homes. The plan shall immediately prohibit placement of PMC children in DFPS offices overnight and further prohibit the placement of PMC children in locations not regulated by DFPS or a CPA except kinship placements or where necessary to meet the individualized medical, behavioral, or mental health needs of PMC children.

The plan will include the elimination of foster group homes. The Court's 2015 Order and its clarifying Order entered December 28, 2016 (D.E. 491) required 24-hour awake supervision in foster homes housing more than 6 children. The Special Masters are ordered to verify within two months from the date of this order that all foster care home placements exceeding 6 children (including non-foster children such as biological and adoptive children of the foster parents, or any other child residing in the foster group home) do in fact provide 24-hour awake supervision.

Defendants' Advisory to the Court (D.E. 492) highlights the need for a system to verify and monitor the number of non-foster children living in foster homes in addition to foster children. To date, Defendants rely on the representation of CPAs regarding the number of children in foster group homes and have not independently verified the information provided. (D.E. 492, Advisory at 2) Defendants assert in their Advisory that CPAs report both total capacity and foster care capacity numbers of children yet those numbers are not available nor are they tracked or monitored. (D.E. 492, Advisory at 2-3) thus the actual occupancy of foster homes in the State is not monitored.[21]

Further, as to foster care redesign, the Court orders the Special Masters to work with DFPS to address the capacity of providers across Texas to serve as Single Source Continuum Contractors ("SSCC"); the service array, including the development of foster homes that meet

---

[21] At the time of trial DFPS admitted that these numbers were not tracked by DFPS. (D.E. 315 a 5-7)

the individualized needs of PMC children; and proposed timelines for staged statewide implementation through the end of fiscal year 2021. The plan shall be submitted to the Court within 12 months from the date of this order.

As to placement arrays, the plan shall include the Special Masters working with DFPS to report to the Court semiannually, effective within 6 months from the date of this order, on PMC children's placement moves. Each child's placement move shall be documented as to the reasons for each move.

**V. Conclusion**

Despite the tremendous accomplishments by the parties to date, the Court is not prepared to enter a final order. The Recommendations of the Special Masters are preliminary in nature and require additional information gathering, input, and supervision by the Court. Accordingly, the above findings constitute the Court's Interim Order.

SIGNED and ORDERED this 9th day of January, 2017.

Janis Graham Jack
Senior United States District Judge