# Implementation Plan

**_M.D. v. Abbott_, Civil Action No. 2:11-CV-84**

**Submitted by Special Master Kevin M. Ryan, December 4, 2017**

The Court's goal for this Implementation Plan is to provide children in the Permanent Managing Conservatorship (PMC) of Texas with the constitutional minimum standards of personal security and safe living conditions so that they are free from unreasonable risk of harm, both physical and emotional. In December 2015, the United States District Court for the Southern District of Texas concluded in the matter _M.D. v. Abbott_, Civil Action No. 2:11-CV-84, that Plaintiff foster children "have proven, by a preponderance of the evidence, that DFPS's policies and practices amount to structural deficiencies that cause an unreasonable risk of harm to all class and subclass members." Although Texas on numerous occasions declined to recognize a constitutional right of these children to be free from an unreasonable risk of harm, the Court appointed the Special Masters to work with the parties to "present the Court with an Implementation Plan to reform Texas's foster care system." The Special Masters assembled a team and subsequently reviewed hundreds of thousands of pages of documents in this matter, including the entire trial record and exhibits (including more than 300,000 pages of children's records).

The Special Masters met with the parties on numerous occasions to discuss the Court's goals and the parties' perspectives for improving the Texas child welfare system, and in November 2016 the Special Masters submitted a set of recommendations to the Court.  In January 2017, the Court issued an Interim Order, directing the Special Masters "to continue to work with DFPS to help DFPS create and implement plans" to address the deficiencies described in the December 2015 Memorandum Opinion and Verdict of the Court as well as the recommendations filed by the Special Masters in November 2016. In numerous instances noted in this Implementation Plan, Texas declined to implement policy changes or develop implementation plans.

The Special Masters retained experts at the University of Texas-Austin to conduct two workload studies (Appendices B and C). In addition, the Special Masters and team members conducted two case record reviews, as described in this Implementation Plan: one focused on the accuracy of PMC children's placement move data, and a second focused on children's photographs; the consistency of healthcare, dental and mental healthcare information in children's records; and the characterization of sexual victimization and aggression in children's electronic case records. As described later in this Implementation Plan, the Special Masters visited Foster Group Home caregivers in Texas counties to discuss the families' awake-night supervision plans, and also visited congregate care facilities to understand the agency's placement, visitation and medical consent protocols.  The Special Masters requested numerous documents and information from DFPS, which informed this Implementation Plan. Those documents and information are listed in Appendix A.   This Implementation Plan results from this work and represents the Special Masters' final report to the Court.

The numbered policies that follow are offered to ensure that PMC children are free from unreasonable risk of harm as stated in the Court's goals of December 2015 and January 2017. These policies apply to all previously determined classes of PMC children in this matter.

### PMC Child-Caseworker Visitation

1. Effective immediately, DFPS shall ensure that monthly face-to-face visits between caseworkers and children in the PMC class occur as required. The caseworkers' visits with children in the PMC class must include time with the child separate from the caregiver(s) and other children, if the child is verbal.  Effective immediately, DFPS shall ensure that caseworkers document monthly, private meetings with each verbal, PMC child in their care unless the reason for noncompliance is fully documented in the child's electronic case record.

2. Effective immediately, DFPS shall ensure adequate training on its child visitation policies to all caseworkers responsible for visiting children in the PMC class.

3. Effective immediately, DFPS shall track caseworker-child visits and report quarterly to the monitor(s) on the number of caseworker-child visits required and the percent and

number that occurred. DFPS shall report for all referenced visits whether they involved face-to-face time with the child separate from the caregiver(s) and other children, if the child is verbal.

4. Effective immediately, DFPS shall ensure caseworkers who conduct visits with PMC children follow the agency's contact guidelines, which they must document in the child's electronic case record based on monthly visits with a child.  The guidelines must require caseworkers, at least, to complete an assessment of the child's safety, including an assessment of the placement; a confirmation that the child was interviewed individually, separately and privately from the caregiver and other children, if the child is verbal; a discussion of the form(s) of discipline being used in the placement; and a documented review of the child's medical, mental health, dental and educational progress and needs.

Former PMC youth testified at trial that their visits with caseworkers often were not private. The Court wrote extensively in its December 2015 Opinion about children who infrequently, or never, saw some of their CVS caseworkers. The Special Masters reviewed the case files included in the record of this matter. Those records frequently did not indicate whether CVS caseworkers met with children monthly and privately. The Special Masters asked DFPS where and how the agency tracks whether visits with children are privately conducted. DFPS advised the Special Masters "there is no specific location in the IMPACT record where caseworkers must confirm that a child was interviewed in private or separately."  (See Appendix D, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 24, 2017.)

The study of I See You Workers[a] undertaken by the University of Texas-Austin to inform the Special Masters' recommendations to the Court (Appendix B), concluded that 22 percent of assigned secondary I See You workers missed the monthly visit with the child.  DFPS' aggregate visitation data does not indicate how many, if any, of these visits were privately conducted. Despite the Court's December 2015 Opinion, DFPS still does not have a way to track how many caseworkers' visits with children are private each month.

---

[a] DFPS recently renamed the position Local Permanency Specialist. This Implementation Plan retains the title used at trial.

**PMC Children's Records**

In the December 2015 Opinion, the Court included among its findings the following:

The problems of inadequate and incomplete caseworker documentation are considerably magnified by the way in which DFPS maintains foster children's case files. Children's records are not kept in a single location nor are they consistently maintained in chronological order. (See D.E. 343 at 1; see generally DX 120 (filed under seal)). Some of the children's files are kept electronically on DFPS's IMPACT casework system. Other children's files are maintained entirely in External paper files. (D.E. 343 at 1-2; supra p. 80-81 nn.25 & 26). Additionally, records relating to abuse and neglect investigations of children in foster care are kept separately by RCCL in the CLASS database. (See supra p. 141 n.43). Although CVS caseworkers have access to the CLASS database, CLASS files are not merged with IMPACT files and it is unclear whether CVS caseworkers are trained, let alone have the time, to check whether children newly transferred to their caseloads have CLASS files. (See D.E. 343 at 2). Thus, not only are foster children's case files shockingly long (358,102 pages of case files for the 20 children for whom the Court has records), they are incredibly disorganized.

Further, inherent problems with DFPS's outdated IMPACT system further impede caseworkers' ability to review important electronic case file information. According to The Stephen Group, IMPACT "is not in sync with current versions of forms that are used [by caseworkers] and forces arbitrary workarounds and repetitive entry of data." (PX 1993 at 15). This results in "delays and considerable frustration among caseworkers and can mean that those accessing the system might not have immediate availability to the most recent updates in a particular case." Id. This creates opportunities for important safety-related tasks to "fall through the cracks," especially when cases are transferred between workers. See id. It is unclear how easily CPS caseworkers can access their foster children's RCCL files, and how often they do so when receiving new files. What is clear is that caseworkers' continuously fail to maintain complete, timely, and accurate documentation. The resulting widespread neglect of important tasks relating to the safety and well-being of PMC children is indicative of a system where caseworkers' workloads are unmanageable.

And the Court further determined:

> DFPS paperwork and electronic filing system, including IMPACT, CLASS, and the External files, must become more efficient. Each child should have a readily accessible and organized case file, comprised of all records pertaining to that child. The Court was routinely frustrated at the disorganization, duplication, and inconsistency in the foster children's case files. Caseworkers should be able to spend more than 26% of their time with foster children.

As the Court found in the December 2015 Opinion, DFPS maintains PMC children's records among numerous electronic and paper files, stored in different locations and maintained by distinct custodians. As the Court determined, the trial record, including exhibits, revealed evidence of children's records missing information, containing incomplete information and reflecting information that was inconsistent with information in other files. The Special Masters' examination of these case records among the trial exhibits, and other children's records as described below, confirmed that PMC children's records are currently stored in different locations with different custodians. These records are:

A. The STAR Health Passport is an electronic record maintained by DFPS's healthcare vendor, Superior HealthPlan.  The passport allows users to view service utilization for medical, dental, behavioral and mental health care.  The passport includes information tabs, including a medical history tab. The passport can log health history, service dates, medical events, allergies, immunizations and diagnoses.  The passport is not compatible with, or linked to, the IMPACT system, described below. The passport does not currently have the functionality for uploading most documents, such as birth certificates, medical, dental, developmental and psychological evaluations, or the capacity to store these documents. Superior HealthPlan staff and clinical providers can enter information into the passport, but not DFPS staff or caregivers.  The passport is viewable by Superior HealthPlan staff, DFPS caseworkers, foster care agency providers, medical consenters (foster parents), health providers and Court Appointed Special Advocates (CASAs).

B.  IMPACT is the main electronic data system administered by DFPS. IMPACT is not compatible with, or linked to, the passport described above. IMPACT has the capacity to include, among other things, caseworkers' notes, child abuse and neglect history, placement history, a child's photograph, investigative history, service dates, court orders, medical event dates, dental event dates and assessments. As described below, the Special Masters observed in a random sample audit of PMC children's files that IMPACT frequently contained less health-related information than the passport.  IMPACT does not currently have the functionality for uploading most documents, such as birth certificates, school records, legal documents, medical, dental, developmental and psychological evaluations or the capacity to store these documents. DFPS staff have access to relevant information in IMPACT; Attorneys *ad litem* do not. DFPS implemented Case Connection in September 2014, which is a web-based program that gives CASA staff and volunteers access to a child's IMPACT-based case information.  Through Case Connection, CASAs can view certain placement, healthcare, education, permanency and demographic information.

C.  CLASS (the Child Care Licensing Automation Support System) which tracks inspection and investigative work in PMC's children's licensed residential placements, among other settings.  An allegation of child abuse or neglect involving a PMC child while in a licensed residential setting can be linked to the child's history page in IMPACT.

D.  Because IMPACT and the STAR Health Passport cannot store most documents, PMC children's medical, dental, developmental and psychological assessments, and children's birth certificates, must be separately maintained in paper files when DFPS acquires them. These files are in different locations.  Paper records may be housed by the caregiver (i.e. the foster parent) at the child's placement or at the offices of the agency supervising the placement.  The primary CVS worker also typically stores a paper record, including the child's birth certificate, in her DFPS office. Medical/service providers may also keep children's records at their places of business.

E.  Education records are located in at least two places. The name of the child's school, the school year and the enrollment/discharge date(s), can be located in the IMPACT

personal detail tab.  Information about the child's educational needs can be tracked in the educational portfolio section of IMPACT. A separate paper-based system, often called the Green Binder, is intended to contain the PMC child's complete educational information, including report cards, progress notes, classification for specialized services and school enrollment history, and is supposed to follow a child from placement to placement.  When a Green Binder exists, it is maintained by the child's placement provider.

F. Foster and adoptive home screenings and evaluations for PMC children are frequently kept in paper files maintained by the community agency that supervises the child's placement.

On May 4, 2017, Special Master Kevin Ryan and John Ducoff, a member of the Special Master team, met with DFPS leadership to discuss DFPS's child welfare record keeping systems and to test those record keeping systems by examining the electronic files of 21 children in the PMC class, selected randomly, by Mr. Ryan from among the 10,551 children identified by DFPS as being in the PMC class on March 31, 2017. The STAR Health Passport contained more information about children's medical and mental health care, including procedure dates, types of procedures and diagnoses, but the information in the STAR Health Passport and IMPACT did not align nearly half the time.  Of the 21 randomly selected PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the dates of the child's last medical examination listed in IMPACT mirrored, or closely approximated, the dates of the child's last medical examination in the Health Passport in 11 cases, and differed in 10 cases.[b]

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, 14 children had a current (within one year) photo in their IMPACT case record; two children had a photo that was slightly overdue for updating in their IMPACT case record (by two and three weeks at the time of the review); and five children did not have a recent photo in their IMPACT case record.

All of the children had a verified Social Security Number in their IMPACT case file.

---

[b] Mr. Ryan shared the results of the audit with DFPS through counsel and solicited feedback before finalizing and sharing the findings with the Court.

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the IMPACT system contained no uploaded medical records, dental records, educational records or mental health records. DFPS said those records may be in the possession of the primary CVS worker, or may not be in DFPS's possession, but instead held by the caregiver, or the providers.

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the IMPACT system recorded that 16 children had a recent (within 6 months) dental examination, two children appeared slightly overdue for a dental examination (by two weeks) and three children did not have a timely dental examination listed. The examinations were not included in the IMPACT system.

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the IMPACT system recorded that 17 children had a timely medical examination and four children did not have a timely medical examination listed. The examinations were not included in the IMPACT system.

In addition to the IMPACT system, Mr. Ryan and Mr. Ducoff also reviewed children's records in the Star Health Passport system. In general, Mr. Ryan and Mr. Ducoff observed that the STAR Health Passport often contained more information about children's medical and mental health care, including procedure dates, procedure types and diagnoses. However, the 21 passports did not include copies of medical examinations, ER visit reports, hospitalization documents or dental examinations, even when those events were indicated.

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the STAR Health Passport recorded that 15 children had a current dental examination, five children did not and one child appeared to be slightly overdue for a dental examination (within ten days).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the Health Passport recorded that 20 children had a timely medical examination and one child was overdue for a medical examination.

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the Health Passport and/or the IMPACT system reflected that 11 children had a psychological assessment of some type within the past three years. The records were unclear or information was absent for seven children, and two children were infants. The psychological assessment documents were not included in IMPACT or the Health Passport.

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the dates of the child's last medical examination listed in IMPACT mirrored, or closely approximated, the dates of the child's last medical examination in the Health Passport in 11 cases, and differed in 10 cases.

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the dates of the child's last dental examination listed in IMPACT mirrored, or closely approximated, the dates of the child's last dental examination in the Health Passport in 11 cases, and differed in 10 cases.

In February and March 2017, Mr. Ryan and Deborah Fowler, a member of the Special Master team, visited the residences of eight randomly selected Foster Group Home caregivers in Texas. The Foster Group Home caregivers each knew that the children's education records were contained in a Green Binder, which followed the child from placement to placement.  In two instances, caregivers said the Green Binder was housed in the offices of the community agency assigned to monitor the Foster Group Home and was not available for inspection during the visit. In six instances, the Green Binder was in the home of the Foster Group Home caregiver and contained the child's educational records, including enrollment information, report cards and information on learning disabilities and accommodations. Mr. Ryan visited a randomly selected Residential Treatment Center in Harris County in March 2017, and was advised that some of the children did have Green Binders on site, including their education information, and others did not.

The Court's Order of January 2017, included in Section V.B.:

> The Special Masters are ordered to work with DFPS to create and submit to the Court a plan for a comprehensive central databank for PMC children. The databank shall include: 1. Medical records;

2. Dental records; 3. Mental health records; 4. School records; 5. Court records; 6. Caseworker notes; and 7. Placement evaluations.

In an effort to comply with the Court's Order, the Special Masters asked DFPS to provide a draft plan to achieve the Court's goals.  DFPS declined to share a draft plan, replying "Not applicable. Texas is not developing such a plan." (See Appendix D, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 24, 2017.)

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of a child's medical records are included and available in an identified health section of a child's case file in IMPACT. DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system." (See Appendix D, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 24, 2017.)

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of a child's dental records are included and available in an identified health section of a child's case file in IMPACT.  DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system." (See Appendix D, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 24, 2017.)

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of a child's mental health records are included and available in an identified health section of a child's case file in IMPACT. DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system." (See Appendix D, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 24, 2017.)

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of a child's educational records are included and available in an identified education section of a child's case file in

IMPACT. DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system." (See Appendix D, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 24, 2017.)

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of the court records pertaining to a child's case are included and available in an identified legal section of a child's case file in IMPACT. DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system." DFPS continues to maintain it is not developing such a plan. (See Appendix D, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 24, 2017.)

1. Within four months of the Court's Final Order, DFPS shall submit to the Court a plan for an integrated computer system, with specific timeframes, that contains each PMC child's complete records, including but not limited to a complete migration of all medical, dental, educational, placement recommendations, court records, mental health and caseworker records.  The mental health, dental and medical information shall include all visits to the provider with detailed examinations, diagnoses, test results, immunizations, medications (including the reasons for each), history of abuse, treatment plans, and any other information necessary for the safety of the children. DFPS shall have this system fully functional within one year of the Final Order date.

2. The DFPS plan shall ensure that DFPS caseworkers and supervisors serving PMC children, as well as CASA staff and volunteers, and any public or private staff assigned to oversee PMC children's care, have access to an integrated, current, complete and accurate case record for PMC children on their caseloads, consistent with prevailing state and federal law, including, for example, the child's current legal status and permanency goal; the child's Transition Plan (where applicable); the child's placement information and all safety-related and licensure/verification information about the child's placement, including investigation and inspection reports, enforcement actions and internal reviews conducted by CPAs; the child's historic and current caseworker(s)

and supervisor(s), with corresponding contact information; the child's complete medical, dental, educational and mental health information and records.

**Current PMC Child Photograph**

Consistent with the Court's goals in the December 2015 Order, DFPS improved its electronic case management system, IMPACT, to include a location for a child's photograph to be uploaded.  As of the Special Masters' case record review in May 2017, DFPS had not ensured that the electronic case record of each child in the PMC class included a child's photograph that is not more than one year old.

1. Effective immediately, the electronic case record of each child in the PMC class must include the child's photograph that is not more than one year old, except as provided in paragraph three, below.

2. Effective immediately, when a child enters the PMC class, DFPS shall ensure that a photograph is taken of the child within 48 hours and uploaded into the child's electronic case record promptly. DFPS shall ensure the date of the photograph is recorded in the child's case record.

3. Effective immediately, with respect to all PMC children under the age of three years, DFPS shall ensure that photographs are taken and uploaded to the child's IMPACT case record at least semi-annually, and the date of the photograph must be recorded in the child's case record.

4. Effective immediately, DFPS shall ensure adequate training to all caseworkers on how to use the appropriate technology to photograph a child and upload the photograph to the child's electronic case record.

**Screening and Investigating Reports of Abuse/Neglect Regarding PMC Children**

1. Effective immediately, DFPS shall ensure that it maintains a statewide, 24-hour hotline accessible by PMC children in DFPS custody system to report abuse and neglect. The

hotline shall receive, screen and assign for investigation reports of maltreatment of children in the PMC class.

2. DFPS shall ensure that child abuse and neglect investigations involving children in the PMC class are commenced and completed on time consistent with the Court's Final Order, and conducted thoroughly and appropriately pursuant to current policy and regulation. The monitor(s) shall periodically review the statewide system for appropriately receiving, screening and investigating reports of abuse and neglect involving children in the PMC class to ensure those investigations of all reports are commenced and completed on time consistent with the Court's Final Order and conducted thoroughly and appropriately pursuant to current policy and regulation.

3. In order to ensure that PMC children have access to the 24-hour hotline to report abuse and neglect, within 30 days of the Court's Final Order, DFPS shall either require all foster homes and therapeutic foster homes housing PMC children to maintain a landline phone accessible to the child in the home, with the toll-free hotline number appended to the landline or, in the alternative, DFPS shall present an alternative plan to the Court within 30 days of the Court's Final Order to ensure PMC children have access to the hotline to report abuse and neglect.

4. Effective May 2018, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child on child sexual abuse.

5. Effective immediately, DFPS shall ensure that investigations of abuse and neglect of PMC children while they are in licensed placements are conducted by staff whose caseload is exclusively focused on child maltreatment investigations.

6. Effective March 2018, and ongoing thereafter, DFPS shall ensure the central case record of every child in the PMC class includes documentation confirming the method(s) discussed with the child for notifying DFPS if the child needs to report abuse or neglect. For children who are verbal, the documentation must include the date the reporting methods were discussed with the child and confirmation of their level of understanding. The discussion with the child must occur within 48 hours of entering any new placement.

7.  Within 60 days of the Court's Final Order, all calls to the DFPS 24-hour hotline shall be recorded. All recorded calls shall be stored for at least two years using a call recording system. Recordings shall be made available to the monitor(s) for monitoring and verification purposes.

8.  Effective March 2018, and ongoing thereafter, DFPS shall ensure that a well-trained, experienced and qualified supervisor reviews and approves all screening decisions at the 24-hour hotline involving children in the PMC class. The monitors will conduct routine audits of screened-out reports involving children in the PMC class to confirm that DFPS conducted a complete review of the available record (including past intake reports involving the child and the placement) and due consideration was given to the risks to children when determining whether to assign a matter for investigation.

9.  Effective March 2018, DFPS shall ensure that all abuse and neglect referrals to the 24-hour hotline regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.

10. Effective March 2018 and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)

11. Effective March 2018 and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)

12. Effective March 2018 and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the

alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.

13. Effective March 2018 and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.

14. Effective March 2018 and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.

15. Effective March 2018, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record.   If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

16. Effective March 2018 and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Final Order.  Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

The trial record includes multiple pieces of testimonial evidence describing children's inability to reach out for help.  The former foster children testified that they were unable to tell a caseworker about abuse because the abuser (often the caregiver) was present.  (D.E. 324, Page 64 Lines 3-16, Page 64 Line 22-Page 65 Line 15; D.E. 325, Page 169 Lines 14-25).  PV testified she did not know who to trust, so she stayed quiet.  (D.E. 324, Page 200 Lines 3-17).  When PV did try to report abuse to a caseworker, nothing ever came of it.  (D.E. 324, Page 200 Lines 3-17).  KS ("KS") testified that at one of his placements he could not make a phone call without

getting permission.  (D.E. 325, Page 169 Lines 14-24).  KS testified he never had the opportunity to report his sexual abuse because someone was constantly monitoring his access to the outside world.  (D.E. 325, Page 169 Lines 14-25).  KS also testified that he did not know there was a number he could call and that if there was such a number, he would not have had access to it.  (D.E. 325, Page 176 Lines 8-17).   Additionally, the next friends of named plaintiffs described those children's frustrations with not having a way to reach out.  *See* (D.E. 324, Page 224 Line 22-Page 226 Line 21 and D.E. 327, Page 188 Line 22-Page 189 Line 11).

The Court's December 2015 Opinion required that "[f]oster children must be allowed telephone access to reach out to" the 24-hour, toll-free child abuse and neglect hotline.  The Court's January 2017 Order concluded that "[a]ll foster homes, foster group homes, and therapeutic foster homes housing PMC children should be required to maintain a landline phone accessible to the child in the home, with the toll-free hotline number appended to the landline."  The Court's goals grew from findings, detailed in the December 2015 Opinion that children were subject to serious physical and sexual abuse that was not reported to the DFPS toll-free, 24-hour child abuse and neglect hotline, known as Statewide Intake.

Consistent with the Court's orders in this matter, the Special Masters requested that DFPS provide a draft policy and/or regulation to require that Child Placement Agency (CPA) residential providers maintain a landline phone that connects directly to the DFPS toll-free, 24-hour screening hotline. DFPS originally responded on March 8, 2017 that the request from the Special Masters was "Not applicable. DFPS neither has nor will be developing such a policy or regulation." (See Appendix E, DFPS Responses to Special Masters' Questions, emailed from Audrey Carmical, Esq., on behalf of DFPS on March 8, 2017.)

During a status hearing before the Court in March 2017, DFPS stated and the Court recorded in its March 17, 2017 Order, "DFPS agreed to examine the possibility of requiring a landline phone accessible to the children in each foster home."  DFPS subsequently advised the Special Masters in April 2017 that DFPS was still "considering the feasibility and utility of requiring a landline phone in each foster home." (See Appendix H, DFPS Responses to Special Masters' Questions, emailed from Audrey Carmical, Esq., on behalf of DFPS on May 12, 2017.)  Despite the Court's orders in this matter, DFPS also reports "it does not have a means of tracking which PMC

children are placed in care with access to a phone to report abuse and neglect." (See Appendix F, DFPS Responses to Special Master Questions, emailed from Audrey Carmical, Esq. on behalf of DFPS on September 21, 2017.)

**PMC Youths' Preparation for Independence**

1. Effective immediately, DFPS shall ensure and document that all youth in the PMC class, aged 16 or older, receive copies of their birth certificate, social security card, and all other documents that law or policy entitles them to receive upon turning 16.

2. Effective immediately, DFPS shall ensure and document that all youth in the PMC class, prior to aging out of care, receive copies of their birth certificate, social security card, and all other documents that law or policy entitles them to receive. DFPS must document an acknowledgment of receipt, along with a short description of the youth's plan for safekeeping the documents, signed by the youth and their caseworker in the electronic case record prior to the youth aging out of care.

3. Effective within three months of the Court's Final Order and ongoing thereafter, DFPS shall identify all PMC youth aged 14 and older who have not yet received the following DFPS independent living preparation services: the life skills assessment, a Circles of Support (COS) or Transition Plan Meeting (TPM), and a recently updated (within six months for youth 16 and older and one year for youth 14 and older) transition plan. DFPS shall ensure that all PMC youth who have been identified immediately above, receive these services and that the PMC youth's transition plan is developed.

4. Effective June 2018, DFPS shall ensure all 14 and 15 year-old youth in the PMC class receive DFPS' Preparation for Adult Living (PAL) services.

5. Effective June 2018, DFPS shall ensure that if a PMC youth's disability is a barrier to participation in PAL services or supports, appropriate accommodations shall be identified that allow the youth to meaningfully participate, and DFPS shall document any accommodations in the child's electronic case record.

6.  Effective June 2018, DFPS shall ensure PMC youth receive a life-skills assessment within 45 days of turning 14, and are reassessed annually, and that the results of these assessments are documented and available in the child's electronic case record.

7.  Effective June 2018, DFPS shall ensure that PMC youth receive DFPS's Circles of Support (COS) or Transition Planning Meeting (TPM) within 45 days of turning 14 years old, and then receive either COS or TPM in conjunction with the child's permanency planning meeting every four months, until the youth ages out or attains permanency. The purpose of such meetings is to develop a youth's transition plan with an eye toward building skills to support a youth's specific strengths and address needs in preparation for independence.

8.  Effective March 2018, DFPS shall ensure that primary caseworkers assigned to PMC children develop a plan, in consultation with the child's Attorney *ad litem*, to facilitate the sealing or expungement of any eligible criminal or juvenile records for offenses for which the youth was adjudicated or convicted prior to the youth aging out of care. DFPS shall ensure the efforts to do so are documented in the child's electronic case record.

9.  Effective March 2018, DFPS shall ensure that the caseworker puts a plan in place prior to a PMC youth turning 18 years of age, documented in the case record, detailing how the youth will access benefits the youth is eligible to receive once they leave DFPS care, including the DFPS transitional living allowance, Social Security Disability Insurance benefits, the DFPS aftercare room and board assistance, and DFPS's Education and Training Vouchers.

10. Effective June 2018, DFPS shall ensure driver's education classes are provided to all PMC youth who are old enough to receive a learner's permit and choose to take driver's education.

11. Effective immediately, DFPS shall ensure that a plan is in place, and documented in the case record, to provide all PMC youth age 16 and older with safe, stable housing upon exit from care.

12. Effective immediately, DFPS shall ensure that prior to exiting care, each PMC youth age 14 and older is assisted in creating e-mail accounts so that they may receive encrypted copies of personal documents and records, in addition to receiving copies of originals.

In the December 2015 Opinion, the Court found:

> Specia also acknowledged that the "longer children stay in the custody of the state the harder it is for them to achieve a permanent home." (D.E. 299 at 63, 83; *see also* PX 1988 at 9). Thus, another consequence of rotating overburdened caseworkers, which disrupts permanency planning, is that 1300-1400 foster children age out of the system each year. It is widely recognized that foster youths who age out generally experience poorer life outcomes. These youths leave the system with few life skills and little, if any, support. As Burstain wrote before joining DFPS, aging out of care is an outcome DFPS tries to avoid as aged-out youths "have no permanent place to call home and often have a difficult time." (PX 1877 at 36). Burstain reaffirmed this sentiment at trial, saying that children for whom DFPS has failed to find a permanent home and who age out are "likely . . . to be harmed." (D.E. 310 at 55). This is especially true for children who age out while living far from their home communities and support networks, often lacking the resources or ability to return. As of August 2014, approximately 60% of all foster children were placed outside their home county. (DX 183 at 4). Thus, aging out in a foreign community is commonplace. As a result, these children frequently end up homeless, participating in "criminal activities in order to survive, trespassing in vacant homes or stealing or human trafficking, prostitution, those kind of things in order to have a place to stay." (D.E. 307 at 15; *see also* PX 1872 at 4).
>
> Aged out foster youths often experience "serious, and in some cases disabling, physical and mental health care issues" and are likely to suffer from post-traumatic stress disorder ("PTSD") due to "the traumas and frequent moves and transitions experienced in foster care." (PX 1988 at 10). According to Casey Family Programs, former foster youths suffer from PTSD at nearly five times the rate of the general population and nearly twice the rate of United States combat veterans. *Id.* at 57, 71. In addition, aged out foster youths often have significantly lower educational attainment than their peers. *Id.* at 53-55, 58-59. Foster youth in general are "much more likely to be held back than their peers." *Id.* at 54. This is due in part to the frequent school changes, which means they are "often absent for large parts of the school year, lose academic credits due to mid-semester moves, and often have incomplete school records due to missing transcripts." *Id.* at 53-54. Foster children are also significantly overrepresented in special education classes—at a rate of over four times that of the general population—which may be an underestimate. *See id.* at

55. Many do not finish high school. *Id.* at 58. Fewer than 2% of former foster children complete college. *Id.* at 56.

Talley, who previously worked at DFPS as a Preparation for Adult Living coordinator, testified that the 800 former foster youths for whom she provided services, the majority of which were in PMC, were simply being "maintain[ed] in foster care until they aged out." (D.E. 323 at 84-85). Carpenter testified that aged-out children lack independent living skills. (*See* D.E. 307 at 8, 13, 29-30). They do not know how to answer a phone, take or leave a message, cook a meal for themselves, or load a dishwasher. *Id.* They do not know how to fill out a job application, let alone drive a car to get to work. *Id.* at 29-30. According to Carter, none of the Named Plaintiffs who are on the cusp of aging out, or have by now aged out, "have sufficient adaptive living skills that are necessary for even a minimally reasonable chance at a decent" life. (D.E. 326 at 129). None of them were involved in any extracurricular activities at school or had any vocational training or employment experience. *Id.*

DFPS reported that 1,246 youth aged out of care in 2014; 1,180 youth aged out of care in 2015; and 1,250 youth aged out of care in 2016.   Earlier in the Opinion, the Court summarized the testimony of the State expert who oversaw extended foster care for children who age out:

Jenny Hinson ("Hinson") is the Division Administrator for Permanency at CPS. (D.E. 314 at 4). She supervises a team of seven subject matter experts and with them is responsible for developing and administering policies and programs for children in DFPS conservatorship. (*See id.* at 221; DX 259 at 1). She has been in her current position since 2010, but has been at DFPS since 1998. Hinson has worked as a statewide intake specialist, caseworker, supervisor, program director, program administrator, and program specialist. (D.E. 327 at 222-23; DX 259 at 1-2). While Hinson focuses on CPS policies that relate to permanence, she seems to know little about how her policies actually affect permanency. *Id.* at 6-9. For example, she oversees extended foster care for children who age out, but does not know how many children benefit from that program, or the effectiveness of that program. *Id.* at 8-9. Similarly, while she said that independent living classes are offered to all foster children age 16 and up, Hinson does not know how many children attend those classes. She believes that number is fewer than 50 out of the 1300-1400 children who age out annually. (*Id.* at 21-22; *see also* DX 24 at 14

(showing that 1410 youths aged out in 2011); DX 119 at 221
(showing that 1328 youths aged out in 2013)).

### Attorneys *ad Litem* for PMC Children

1. Effective immediately, DFPS shall request the appointment of an Attorney *ad litem* for all PMC children from each court in which a suit is pending in which a PMC child does not have Attorney *ad litem* representation, citing the Court's Final Order.

2. Within 30 days of the Court's Final Order, DFPS shall present a plan to the Court to ensure reimbursement to Attorneys *ad litem* in those courts that do not currently provide Attorneys *ad litem* for PMC children. If DFPS fails to present a plan, DFPS shall reimburse those fees necessary to provide Attorneys *ad litem* in those courts that do not currently provide Attorneys *ad litem* for PMC children.

The Court's January 2017 Order refers to the "loss of liberty" each PMC child experiences by virtue of their removal from home and their assignment to placements.  In the Court's original December 2015 Opinion, Judge Jack observed that "when a child enters PMC, courts often dismiss the child's Attorney *ad litem* and CASA, leaving the child with fewer stable relationships and advocates. (PX 1988 at 15; *see also supra* pp. 7-8)."  Noting in the January 2017 Order that "[m]ost PMC children also do not have an attorney *ad litem*," the Court analyzed the vulnerability of children in the PMC class, the liberty interests at stake, and concluded:

> PMC children are entitled to counsel at every step of their legal journey through the Texas foster care system … The Court can order, at a minimum, that DFPS request *ad litem* appointment from each court in which a suit is pending, citing this Order. Additionally, the Court will consider ordering DFPS to reimburse the *ad litem* attorney's fees to the appointing court. The Special Masters are ordered to work with DFPS to evaluate the efficacy of these options and propose a procedure for the appointment of an attorney *ad litem* for each PMC child within 3 months from the date of this order.

When the Special Masters asked DFPS about these options, the agency replied, "Not applicable. DFPS declines to speculate on a process that is and should be governed by counties and

individual judges." (See Appendix E, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 8, 2017.)

The Special Masters asked DFPS to identify how many PMC children did not have an attorney as of September 2017.  DFPS responded that it "does not track this information." (See Appendix F, DFPS Responses to Special Masters' Questions, emailed from Audrey Carmical, Esq. on behalf of DFPS on September 21, 2017.)

### PMC Children's Health

1. Within 30 days of the Court's Final Order, DFPS shall present the Court with a plan to address and remediate missing and nonexistent medical and mental health care records, consistent with the American Academy of Pediatrics "Fostering Health: Healthcare for Children and Adolescent in Foster Care."

2. DFPS shall institute and incorporate caseworker training (minimally into the Conservatorship Specialty Track) about child health that describes:

    a. The health vulnerabilities of foster youth (pages 1 and 2 of the American Academy of Pediatrics "Fostering Health: Healthcare for Children and Adolescent in Foster Care");

    b. Specifically, how to use child and family visits to obtain and update healthcare information;

    c. The utility of children's electronic case record, for improving the health of foster youth.

3. Effective immediately, DFPS shall make every effort to obtain and make available a child's medical records within 24 hours of the child entering the custody of DFPS. Caseworkers shall document their efforts to obtain and make available children's medical records within 48 hours of children entering DFPS custody;

4. Effective June 2018, DFPS will ensure that every PMC child has a medical home. The medical home is a health care delivery model led by a health care provider to provide comprehensive and continuous medical care and care management to patients with a

goal to obtain positive health outcomes. The medical home shall be obliged (by policy and contract):

    a. To maintain and update all medical fields of the child's central electronic record;

    b. To coordinate care for routine and emergency healthcare needs;

    c. To ensure timely evaluations and assessments for all health needs, including behavioral health (including psychotropic oversight), dental care, and chronic health conditions.

5. Effective June 2018, DFPS shall ensure children in the PMC class receive a specific developmental assessment of at least one of the following screenings within 90 days of each child's birthday:

    &bull; Birth to 10 years: Ages and Stages Questionnaire, Ages and Stages Questionnaire: Second Edition, or the PEDS developmental screening and assessment;

    &bull; 11 years to 21 years: the Pediatric Symptom Checklist (PSC)-35, the Youth Pediatric Symptom Checklist (Y-PSC), the Patient Health Questionnaire-9 (PHQ-9), or the CRAFFT screening test).

Screening results from the developmental assessment, including follow-up/red flag items, shall be inputted into the child's electronic case record within 72 hours;

6. Effective June 2018, DFPS shall ensure the child's central electronic case record has functional internal (red flag) alerts notifying caseworkers of:

    a. Follow up needed;

    b. Assessments/screening required or indicated;

    c. Evaluations required or indicated;

    d. Immunizations required or indicated; and

    e. Appointments missed or cancelled.

7. Effective May 2018, DFPS shall institute a policy that uses the caseworker visits to verify and report on health status by answering and documenting in the PMC child's electronic case record these questions:

    a. Are there outstanding red flag items for this child?

        i. Greater than 20 days?

23

        ii.   Greater than 90 days?

     b.  Has this child visited a healthcare practitioner in the last 90 days?

     c.  Can this child (over 11) name his/her health care needs?

The Court observed in its December 2015 Opinion that "rape, abuse, psychotropic medication and instability are the norm" for PMC children, and many children's records, included as exhibits to the trial, were missing important health information. The children's records include serious concerns of sexual and physical abuse but the records indicate the children were not timely (or ever) examined by doctors to determine if they had been assaulted.  Injuries went untreated. Necessary medical follow-up did not occur. Incomplete and missing healthcare information was a common feature of the records. In its January 2017 Order, the Court directed "the Special Masters to work with DFPS to develop a healthcare plan to address missing or nonexistent healthcare records. The recommended guideline shall be the American Academy of Pediatrics' 'Fostering Health: Healthcare for Children and Adolescents in Foster Care."

**Caseworker Workload**

The Court's December 2015 Opinion discussed at length the harm PMC children faced because of overburdened and frequently replaced caseworkers.  As the Special Masters reported in November 2016, DFPS produced to the Special Masters an Executive Summary of a Work Measurement Study conducted from August 1, 2015, through March 31, 2016, which concluded that CVS caseworkers expended an average of 9.7 hours per month on case profiles most often associated with PMC children, and that these workers had an average of 137.9 hours per month to spend on their casework.  The study's author reported that the study's findings mean that CVS workers have time to serve an average of 14 children each.

The DFPS Workload Study blended "I See You" secondary workers with CVS caseworkers even though "I See You" workers are expected to spend less time on children's cases.  As the Court observed in its January 2017 Order:

          Removing "I See You Workers" from the calculation decreases the
          number of PMC cases a CVS caseworker can physically handle.
          (D.E. 471 at 11.1) Nevertheless, the Court accepts the Work Study

as providing the definitive number of PMC children that a CVS caseworker can physically handle.

After reviewing the study and discussing its conclusions with the DFPS author, the Special Masters asked DFPS to determine how many additional CVS workers would be required to achieve CVS workloads of no more than 14 children per worker.  DFPS declined to do so, replying it was "not feasible" to provide the information.[c] (See Appendix H, Updated response document to Special Masters' Request for Information of 2-10-17, emailed from Audrey Carmical, Esq. on behalf of DFPS on May 12, 2017.)

There was evidence presented in the case of supervisors carrying a caseload, which detracts from their ability to oversee the caseworkers they supervise. Judy Bowman Pitts, Regional Director of Regions 4 and 5, testified that supervisors occasionally have their own caseload and stated a supervisor will help when a caseworker leaves.  (D.E. 327, Page 14 Line 23-Page 16 Lines 17).  A CPS Field Operations Division Briefing also noted that newly promoted supervisors are managing their own remaining cases as well as their new supervisor responsibilities.  (DX 25, Page 2).  The same briefing stated in Lubbock County, when a caseworker leaves and a case only requires documentation to close, the supervisor will be responsible.  (DX 25, Page 3). Further, DFPS supplied data to the Special Masters indicating that on July 31, 2016, 89 supervisors served as the primary caseworker for PMC and TMC children.    Of those 89 supervisors, 83 carried fewer than 14 cases with the highest caseload being between 24 and 27 cases.

For the reasons stated in the Court's January 2017 order:

1. Effective June 2018, DFPS shall ensure that the full-time staff, including supervisors,[d] who provide case management services to children in the PMC class, whether employed by a public or private entity, have a caseload within or below the range of 14 to 17

---

[c] DFPS responded, "DFPS has reviewed, and it is not feasible to provide this information. In addition, DFPS reiterates that there is no evidentiary basis for the caseload limit utilized in this question." (See Appendix H, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on May 12, 2017.)

[d] As stated in the Section on Supervisors below, supervisors who oversee caseworkers serving PMC children shall not directly carry a caseload unless there is a documented emergency requiring the supervisor to do so.

children. Caseloads for staff must be pro-rated for those who are less than full-time. Caseloads for staff who spend part-time in caseload carrying work and part-time in other functions must be pro-rated accordingly. The caseload range for staff with mixed caseloads, for example caseworkers serving both PMC and TMC children, will also be 14 to 17 children's cases, and each TMC child's case will be afforded the same weight in the caseload calculation as a PMC child.

2. Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the monitor(s), on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads.  In addition, DFPS's quarterly reporting shall include the number and percent of staff with caseloads within, below and over the range of 14 to 17 children, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be pro-rated accordingly. The caseload range for staff with mixed caseloads, for example caseworkers serving both PMC and TMC children, shall be 14 to 17 children's cases, and each TMC child is to be afforded the same weight as a PMC child. Reporting will be by office, by county, by agency (if private) and statewide.

3. Effective immediately, DFPS shall commence recruiting, hiring and training staff, and ensuring any private entities that are charged by DFPS to provide case management services to children in the PMC class, do the same, to ensure that staff who provide case management services to children in the PMC class, whether employed by a public or private entity, have a caseload within or below the range of 14 to 17 children.

**Supervisors**

Generally, it appears DFPS supervisors play an important role managing caseworkers, assigning cases, and approving actions in cases. (D.E. 327, Page 14 Lines 8-14). Supervisors participate in permanency roundtables and are responsible for follow-up. (D.E. 328, Page 41 Lines 6-25 and D.E. 328, Page 52 Lines 15-25). Supervisors, along with the caseworker, make the decision of selecting or rejecting placements based on how they feel the placement can meet the needs of the child. (D.E. 328, Page 140 Lines 5-18). According to the CPS Handbook, supervisors have various oversight or monitoring functions, including but not limited to approving billing for a service level lower than the authorized service level, determining a permanency plan in the best interest of the child, approving the initial plan of service and subsequent review, approving less than monthly face to face sibling contact, approving travel, and reviewing home studies for potential adoptive families. (PX 50, Pages 86, 99, 130 and PX 52, Pages 49, 59, 88, 95, 162). The CPS Handbook also outlines when caseworkers must turn to their supervisors to make decisions in various situations such as when problems need to be resolved with a placement, when the caseworker does not agree with the placement choice made by the Centralized Placement Team, when a mother in an open conservatorship case is pregnant, and when information is received regarding the possible location of a missing child. (DX 108, Pages 1486, 1492, 1854, 1946).

The trial included testimony regarding the ratio of supervisors to caseworkers. Colleen McCall ("McCall"), Director of Field Operations, testified that typically a supervisor has six or seven caseworkers. (D.E. 322, Page 59 Lines 24-25 and Page 60 Lines 16-18). Judy Bowman Pitts Regional Director of Regions 4 and 5, testified that a unit is one to seven caseworkers but generally in conservatorship there are about seven caseworkers in a unit. (D.E. 327, Page 14 Lines 16-17). Camille Gilliam, Regional Director of Regions One and Nine, testified she oversees 18 supervisors in Region 1 who were responsible for 114 conservatorship workers, which is a ratio of one supervisor to six and a third (6.333) workers. (D.E. 327, Page 63 Lines 3-10). Mrs. Gilliam also testified in Region Nine there were 12 supervisors who were responsible for 75 conservatorship workers, which is a ratio of one supervisor to six and a quarter (6.25) workers. (D.E. 327, Page 63 Lines 3-10).

Some exhibits also contained evidence relating to the ratio of supervisors to caseworkers. DFPS's presentations and requests to the Texas Legislature discussed the supervisor to caseworker ratio. DFPS's legislative appropriation requests contained requests to reduce the supervisor span of control. The legislative appropriations request for fiscal years 2014 and 2015 indicated the supervisor span of control in conservatorship was seven workers and the requested funding would reduce it to six workers. (PX 885, Page 20; DX 32, Page 20 and DX 33, Page 192). This same ratio is repeated in the exceptional item requests for the same fiscal years. (PX 889, Page 6 and PX 894, Pages 11-12). DFPS's various presentations also contained indications of the ratio of conservatorship supervisors to caseworkers. DFPS's July 1, 2014 presentation to the House Select Committee on Child Protection indicated there were seven caseworkers per supervisor. (DX 200, Page 31). DFPS's January 30, 2013 presentation to the Senate Finance Committee also indicated the current ratio of supervisors to workers for conservatorship was one to seven. (DX 215, Page 24).

Various reports contained documentation of the average supervisor ratio. The Title IV-B 2015-2019 Child and Family Services Plan reported the average supervisor to worker ratio at any point in time is one to six. (DX 77, Page 207). A memorandum from Ms. McCall to Commissioner Specia described units in Region Nine that had between eight and ten caseworkers. (PX 1837, Pages 3-4). Ms. McCall's memorandum also contained a request to bring the supervisor span of control down to six or seven caseworkers per supervisor. (PX 1837, Pages 3-4). The Stephen Group's operational review of CPS found that as of January 2014, there were 2,015 conservatorship workers and 279 conservatorship supervisors, which is a ratio of just over seven workers per supervisor. (PX 1993, Page 47).

The information DFPS provided in response to a request by Representative Dukes and the House Select Committee on Child Protection contained direct counts of caseworkers assigned to conservatorship supervisors in each region. According to this information, conservatorship supervisors in Region One had between five and nine caseworkers assigned to them. (DX 110, Page 87). Region Two had a range of seven to nine caseworkers per supervisor. (DX 110, Page

89).   Region Three had a range of five to ten caseworkers per supervisor.  (DX 110, Pages 95-97).   Regions Four and Five had a range of five to nine caseworkers per supervisor.  (DX 110, Page 101).   Region Six had a range of six to eight caseworkers per supervisor with the majority having seven caseworkers assigned to them.  (DX 110, Page 106).   In the outlying areas of Region 6, the supervisors also had a range of six to eight caseworkers assigned to them with the majority having seven.  (DX 110, Page 111).   In Region Seven, conservatorship supervisors had eight caseworkers assigned to them except one supervisor who only had five caseworkers.  (DX 110, Page 113).   Region Eight supervisors had a range of six to eight conservatorship caseworkers assigned to them.  (DX 110, Pages 122-123).   In Region Nine, conservatorship supervisors were in charge of a range of six to eight caseworkers.  (DX 110, Page 125).   Region Ten conservatorship supervisors had a range of five to seven caseworkers.  (DX 110, Page 127).   In Region 11, conservatorship supervisors were in charge of a range of six to eight caseworkers. (DX 110, Page 131).

In summary, the typical supervisor to caseworker ratio in conservatorship appears to be one to seven.  Based on the statistics provided to Representative Dukes, the fewest caseworkers a supervisor oversaw was five and the maximum was ten.  For comparison purposes, the Child Welfare League of America's standards state one full-time supervisor should supervise no more than five social workers.  (PX 18, Page 28; PX 2114, Page 152 and DX 235, Page 131).

1.  DFPS shall ensure that supervisors who oversee caseworkers managing the cases of children in the PMC class have no more than seven workers assigned to them.  Supervisory workloads must be pro-rated for supervisors who are less than full-time.  Workloads for supervisors who spend part-time in supervisory work and part-time in other functions, which includes carrying a case, must be pro-rated accordingly.

2.  Supervisors who oversee caseworkers serving PMC children shall not directly carry a caseload unless there is a documented emergency requiring the supervisor to do so.

**Worker Retention**

The Court determined in its December 2015 Opinion (pp. 176-178):

> Besides harming foster children in and of itself, DFPS admits, "High caseloads lead to high worker turnover, further exacerbating high caseloads." (PX 877 at 8; *see also* D.E. 300 at 34, 42; D.E. 305 at 36-37, 56; PX 2037 at 12). Dr. Miller calls this the "cycle of crisis." (D.E. 303 at 22-23). Specia admits that the "appropriate workload spread out among the workers . . . will help me keep workers." (D.E. 299 at 82). It is no surprise then that "DFPS has an extraordinary amount of turnover." (D.E. 305 at 55).
>
> The Stephen Group reported that yearly CVS caseworker turnover is 26.7%, and "a major organizational burden." (PX 1993 at 16-17, 76). To compare, turnover for workers comparable to Texas's CVS caseworkers was 14% to 15% in Kentucky and 10% to 12% in Tennessee. (D.E. 303 at 28-29). The Stephen Group also noted that turnover is especially high for new CPS workers, with approximately 28% leaving within the first year, and approximately 43% within the first two years. (PX 1993 at 17-18). Likewise, Black testified that turnover is approximately 38% for first-year caseworkers. (D.E. 300 at 38-39). The Sunset Commission reported, "One out of every six new caseworkers leaves CPS within six months." (DX 119 at 20).
>
> Unmanageable caseloads are the main reason that CVS caseworkers leave. In a survey, 70% of the caseworkers that left listed "Workload" as the first or second reason. (PX 1993 at 306). In a 2009 article, Burstain wrote, "With respect to CVS, historically, a fairly direct relationship exists between caseloads and voluntary turnover." (PX 1871 at 11). In support of that statement, Burstain cited data showing that when "caseloads declined 16 percent from 2006 to 2008 . . . CVS voluntary turnover declined 10 percent." *Id.* Another report found that heavy caseloads "contribute[] to high turnover rates." (PX 1964 at 9). This finding has "remained consistent from year to year." (PX 844 at 5).
>
> This high turnover rate means that one out of every 11 CVS caseworker positions is vacant. (DX 119 at 19). Even when those vacancies are filled, it takes "two years" for a caseworker "to fully be up to speed." (PX 1995 at 159). During their first three months, caseworkers are in training and do not have any cases. (DX 119 at

19). Consequently, while CPS has 1980 primary caseworkers, it needs to hire more than 500 primary caseworkers per year to retain an experienced workforce of only about 1000 who actually close most of the cases. (*See* D.E. 305 at 41; PX 1993 at 16-17). This puts a tremendous strain on the 1000 veteran CVS caseworkers, who are the front line workers for over 29,000 foster children captured in DFPS's figures.

Caseworker turnover has many negative impacts beyond higher caseloads. Black admitted that turnover causes delayed investigations, a lack of continuity in providing services to families and children, a lack of consistent timely visits by caseworkers to children in State custody, and significant costs to the State in terms of recruiting, training, and lost productivity. (D.E. 300 at 34, 42; *see also* DX 119 at 17; PX 1995 at 159). Caseworker turnover also "delays or disrupts services and the case plan" of foster children, (PX 1871 at 2), and hinders permanency planning. (D.E. 312 at 20). Moreover, as the Stephen Group explained, "workplace turnover is endemic and institutional knowledge is stripped from across the agency." (PX 1993 at 17). The high level of turnover at CPS "represents an extraordinary organizational challenge to replace these workers and maintain a consistent level of performance." (PX 1993 at 16). As one audit of DFPS explained, "Numerous transitions in caseworker assignments disrupt momentum toward permanency by forcing children/youth and their families to 'start over' repeatedly with new caseworkers." (PX 1880 at 5).

DFPS provided and the Special Masters reviewed the "CFRP Evaluation, Final Report" from December 2016, an evaluation of DFPS training and turnover from the University of Texas. The report found that DFPS's CPS Professional Development (CPD) training model was having an early, positive impact on new CVS worker attrition.

1. Effective May 2018, DFPS shall ensure statewide implementation of the CPS Professional Development (CPD) training model, which DFPS began to implement in November 2015.

2. Effective May 2018, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.

3. Effective May 2018, DFPS shall ensure that before any new CVS (or private agency) caseworker assumes primary case management responsibility for a full caseload range of 14 to 17 children, they successfully complete a comprehensive training program for new workers and pass a competency examination.

**Secondary Workers**

The Court's December 2015 Opinion found (pages 222-223):

> McCall acknowledged that I See You workers' main responsibility, as indicated in the position title, is "seeing the child" in her placement every month to confirm that she "is still there." (D.E. 305 at 61-63). Although I See You workers are supposed to have "meaningful discussions" with the children they visit, they often just show up at the child's placement, ask "five questions and leave." (D.E. 305 at 65; D.E. 324 at 186). For example, A.M.'s I See You worker, who visited her regularly for more than two years, asked the same 10-12 questions at every visit, and A.M. answered the same way. (See DX 120 at DFPS #828-997 (filed under seal)). According to the I See You worker's notes, A.M. was almost always "fine" and "stable in her current placement" and the worker often noted that "things are going well for [A.M.] at this time." Id. In reality, during much of this time, A.M's level of care was Intense and she was repeatedly restrained by RTC staff.
>
> Secondary workers are also "not required to follow up on any needs identified during the visit beyond communicating those needs to the primary caseworker." (PX 2037 at 57). Nor are they responsible for children's case planning or permanency planning. (D.E. 322 at 127). A foster child's relationship with their secondary worker "is never quality." (D.E. 326 at 88). Their existence— intended as a stopgap—is itself evidence of an understaffed CVS caseworker workforce, as well as DFPS's inadequate placement array. See infra p. 222-23.
>
> Moreover, replacing contact from primary caseworkers with contact from secondary workers inhibits primary caseworkers' ability to form relationships with their foster children. As Burstain explained, a CVS caseworker is often a foster child's "only continuous and stable relationship." (PX 1871 at 1). Given that PMC children have been removed from their home and likely shuttled between placements, CVS caseworkers are one of the few people that foster children look to for support and guidance.

(D.E. 326 at 85). Trust is "highly important" between a foster child and their primary caseworker because children need to feel comfortable telling them their problems. Id. As McCall testified, "especially with emotional harm[,] you need to know . . . the child before you can tell something is wrong." (D.E. 305 at 62). Using secondary workers to shoulder excessive workloads thus hinders primary caseworkers' ability to protect their children. Further, foster children often do not share their problems with secondary workers who they view as "not the real thing," akin to substitute teachers. (D.E. 326 at 88). Dr. Miller explained that workers who have no permanent relationship with a child, such as I See You workers, cannot "win a child's trust in a sufficient way to have the child actually reveal what is happening in the child's life, particularly if the child is being subjected to maltreatment." (PX 2037 at 58). Carter testified that foster children "very rarely" see I See You workers "as somebody that is there to support them" because children "intuitively know that this person is just fulfilling a service or a requirement by looking in on them." Id.

And the Court further observed:

> Cross-state moves also impede primary caseworkers' ability to visit their foster children. As discussed supra, primary caseworkers are foster children's lifelines.  See Section IV.A.  Yet, due to a lack of funding and a lack of time, primary caseworkers 'can't go and meet with [children] face to face' when they are placed out of county or out of region. (D.E. 324 at 22). Thus, foster children are forced to rely on secondary I See You workers. McCall acknowledged at trial that I See You workers were created by DFPS ten years ago at least in part because children were too often being sent far from their home communities and primary caseworkers. (See D.E. 305 at 62). Although secondary workers do not protect foster children from an unreasonable risk of harm, they undoubtedly help Texas represent to the federal government that caseworkers visit children in foster care at least once per month.

The Court ordered the Special Masters in its January 2017 Order "to retain an expert as part of their team to create a workload study of "I See You Workers" to aid the Court in determining whether the "I See You Worker" program should be continued and, if so, in what capacity."  The Special Masters retained the Child and Research Partnership at the University of Texas-Austin,

the LBJ School of Public Affairs, in part because of their existing consultancy, familiarity and collaboration with DFPS in assessing the agency's training programs.

In its CPS Handbook, DFPS identifies the responsibilities of I See You Workers primarily as visitation with the child; assessment of the child's needs and well-being; discussion of the child's permanency plan; communication of the child's service needs with the primary caseworker; collaboration with the primary caseworker on the child's permanency plan; and, where necessary, serving as the child's medical consenter. Although DFPS has charged I See You Workers with assessing PMC children's needs (CPS Handbook, Section 6414) and indicated to the Special Masters that "many of a child's dental records," "mental health records," and "medical records," "are already included, and available to caseworkers, in the Health Passport," DFPS reported to the Special Masters, "I See You workers are not specifically required to access/review a child's Health Passport, and such a review is not necessary for every child," even for the PMC children they are assigned to serve. (See Appendix I, Email from Tara Olah, Esq. on behalf of DFPS on April 3, 2017.) Most I See You Workers told the University of Texas workload study team they did not think it was essential to read a child's psychological assessments, or other assessments, to come up to speed on a child's case. (See Appendix B.) The workload study, attached as Appendix B, contains a number of findings:

- The typical ISY caseworker had a caseload of nearly 44 children each day of the month.
- In June 2017, 98 ISY caseworkers were required to complete, at the median, 21.5 visits with PMC children. The median number of visits completed was actually 16. This reflects a completion rate of 74.4 percent of the monthly face-to-face visits for ISY workers' cases. ISY caseworkers missed visits altogether with slightly more than one-quarter of the PMC children they were responsible to visit. The caseworker with the lowest visit rate completed 23.1 percent of her required visits and the caseworker with the highest visit rate completed 100 percent of her required visits.
- The typical ISY caseworker completed 50 percent of initial face-to-face visits with new children in June. Overall, ISY caseworkers completed between zero and 100 percent of their initial face-to-face visits. Of the 46 ISY caseworkers who had at least 15 days with a

new PMC case in June 2017, 41 percent met with 100 percent of the children on their new cases within 15 days. However, 35 percent of ISY caseworkers with a new case did not complete a single initial face-to-face with those children in June.

- ISY's familiarity with the children they were assigned, with their service needs, including medical care, was often lacking.

- Over 82 percent of ISY caseworkers reported that primary caseworkers do not set a regular schedule for communication. ISY caseworkers also report that CVS caseworkers often do not communicate regularly with the child or the child's caregiver.

1. Within 30 days of the Court's Final Order date, DFPS shall eliminate the use of I See You secondary workers and designate all secondary workers as primary caseworkers.

## Residential Child Care Licensing

In December 2015, the Court ordered, "DFPS must complete a Workload Study to determine the time required for investigators and inspectors to adequately perform their tasks."   In January 2017, the Court found "that DFPS has not commenced, as previously ordered, a workload study of RCCL investigators and inspectors.  Therefore, the Court orders the Special Masters to formulate and institute such a study…" which the Special Masters did by retaining the University of Texas-Austin to undertake an analysis of Residential Child Care Licensing ("RCCL") workloads.[e] (See Appendix C.)

The University of Texas-Austin researchers determined the extent to which RCCL workers met five investigative casework practice standards during a six-month period from January to June 2017, including: initiating the investigation on time, observing or interviewing the alleged victim(s) on time, completing the investigation on time, completing documentation on time, and notifying relevant parties within the required timeframes. For each casework practice

---

[e] Due to recent legislation, the Residential Child Care Licensing (RCCL), including licensing inspectors and the Centralized Background Check Unit (CBCU) were moved under a new Regulatory division within the Health and Human Services Commission (HHSC). Investigators who conduct investigations of alleged abuse and neglect in childcare operations remained at DFPS. The Workload Study was undertaken before these structural changes were implemented.

standard, an RCCL worker is expected to complete the relevant activity within the timeframes determined by each investigation's priority level and type, as described by DFPS policy. For example, RCCL investigators were, at the time of the study, expected to observe or interview the alleged child victim in Priority One child abuse or neglect investigations within five days of intake, and within seven days of intake in a Priority Two child abuse or neglect investigation. To measure the extent to which the RCCL worker met the casework practice standards, CFRP calculated a rate for each RCCL worker.

Performance rates were lower for child abuse and neglect investigations than standards investigations.  RCCL Investigators observed or interviewed the alleged child victim in required time frames just slightly over half of the time. On average, investigators sent notification letters to the reporters and providers of the investigation outcomes on time for approximately nine percent of Priority One and 13 percent of Priority Two abuse and neglect investigations. Investigators completed the required investigative documentation on time 57 percent of the time for Priority One investigations and 59 percent of the time for Priority Two investigations. They initiated, on average, over 90 percent of Priority One and Priority Two abuse and neglect investigations within the required time frames.  They completed investigations within required timeframes 44 percent of the time for Priority One investigations and 45 percent of the time for Priority Two investigations.

RCCL inspectors met the casework practice standards at fairly high rates. These rates ranged from notifying the reporter of the investigation outcome on time for an average of 74 percent of Priority Two standards investigations, to notifying the provider of the outcome for an average of 95 percent of Priority Five standards investigations.

The Workload Study found that, statewide, RCCL investigators had a median average daily caseload of 14 abuse and neglect investigations in the month of June 2017. The median average daily caseload for inspectors was seven standards investigations and 11 operations, and the median average daily caseload for generalists was four abuse and neglect investigations, two standards investigations, and nine operations. However, the study found the allocation of work very uneven:   RCCL abuse and neglect investigative caseloads varied considerably. The

northeast district had half as many RCCL investigators and a much higher median average daily caseload than the other districts. Investigators in the northeast district had median caseloads of 28.4 child abuse and neglect investigations, with a maximum investigative caseload of 48.3 investigations at one time. In contrast, investigators in the northwest district had median caseloads of seven child abuse and neglect investigations, with a maximum investigative caseload of 22 investigations at one time.  (See Appendix C.)

There was little variation in the inspectors' standards investigation caseloads for across the state, with each district showing median caseloads between six and seven standards investigations, and maximum caseloads ranging between nine and 14 matters. Inspectors in the northeast district were responsible for approximately three times as many operations as in the southeast and southwest districts. The northwest average daily caseload of operations was not as high as it was in the northeast, but the median average daily caseload of operations for inspectors in the northwest was approximately double that of the inspectors in the southeast and southwest districts. (See Appendix C.)

Given how RCCL workers of each type reported they spent their time during the study period, the authors at the University of Texas-Austin determined a reasonable investigative caseload for RCCL investigators to be no more than seven investigations.

 Given how RCCL workers of each type reported they spent their time during the study period, the authors at the University of Texas-Austin determined a reasonable investigative caseload for RCCL inspectors to be no more than five investigations.

Given how RCCL workers of each type reported they spent their time during the study period, the authors at the University of Texas-Austin determined a reasonable investigative caseload for RCCL generalists (a small group of staff who perform both investigations and inspections) of five investigations.

The Special Masters recommended in November 2016 that DFPS identify a discrete cohort of staff exclusively assigned to conduct child maltreatment investigations in licensed placements. The Special Masters understand that DFPS has done so pursuant to recent Texas statutory change.

1. Effective May 2018, DFPS shall ensure the staff who investigate allegations of abuse and neglect of children in the PMC class have caseloads of no more than 14 investigations, consistent with the median caseload of investigations found in the Workload Study. Although this is twice the number of investigations the Workload Study concluded was reasonable for child abuse and neglect investigators in light of the amount of time they expend on their cases, 14 investigations shall serve as the top of their workload range.

2. Effective May 2018, DFPS shall ensure that the staff who conduct licensing standards investigations for alleged violations involving children in the PMC class have caseloads of no more than 14 standards investigations, consistent with the maximum caseload of standards investigations found in the Workload Study. Although this is nearly three times the number of standards investigations the Workload Study concluded was reasonable for inspectors in light of the amount of time they expend on their cases, 14 standards investigations shall serve as the top of their workload range. Caseloads for staff shall be pro-rated for those who are less than full-time. Caseloads for staff who spend part-time in investigative work and part-time in other functions must be pro-rated accordingly.

3. By March 2018 and ongoing thereafter, RCCL and any successor entity charged with inspections of child care placements shall confirm that the staff employed at residential treatment centers, group homes and other congregate care settings where PMC children are placed do not have a negative child welfare history, including any investigative findings that they have perpetrated child abuse or neglect.

4. Effective immediately, DFPS shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.

5. Effective immediately, DFPS shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.

6. Effective immediately, DFPS shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.

7. Effective immediately, DFPS shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.

8. Effective immediately, DFPS shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.

9. Effective immediately, DFPS shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

10. Effective immediately, DFPS shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.

11. Effective immediately, DFPS shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

12. Effective March 2018 and ongoing thereafter, DFPS shall publicly post on its website all licensing inspections by RCCL, and/or its successor entity, redacting child identifying information and other information deemed confidential under state and federal law and regulation.  The posted information shall include the full narrative inspection report, the outcome of the inspection, inspection violations and whether RCCL, and/or its successor entity, implemented corrective or adverse action as a result of the violations.  The posted information shall also include all corrective action plans required by RCCL and/or other successive entities and the dates RCCL and/or other successive entities accepted corrective action plans submitted by violating agencies and the status of those corrective action plans.

13. By July 2018, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations.  Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

14. Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.

15. Effective immediately, DFPS, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements. During inspections, DFPS, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When DFPS, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, DFPS, and any successor entity charged with inspections of child care placements, shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.

### Sexual Abuse

In January 2017, the Court directed, "the Special Masters are also ordered to work with DFPS to ensure that a child's case record prominently identifies sexually abused PMC youth. Both the term 'sexually abused' and 'sexually aggressive' should be word searchable in the child's records."

DFPS has not created a profile characteristic for child "sexual abuse" in the electronic case record. DFPS replied to questions from the Special Masters indicating the identification of all PMC children who have been sexually abused "can be pulled and aggregated via a manual

process that requires a case read." (See Appendix L, Email from Audrey Carmical, Esq., on behalf of DFPS on December 1, 2017.)  Responding that, "labeling of victims is inappropriate, stigmatizing, and ultimately unhelpful," DFPS indicated they do not intend to proceed with a profile characteristic for sexual abuse in the child's electronic record.  (See Appendix L, Email from Audrey Carmical, Esq., on behalf of DFPS on December 1, 2017.)  Absent a manual reading of all its PMC children's cases, which number in the many thousands, DFPS leadership cannot track all of the PMC children who have suffered sexual abuse to ensure system-wide those children are receiving appropriate services, including an appropriate placement.

1. Effective March 2018, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate a PMC child as "sexually abused" in the record if the PMC child has been confirmed to be sexually abused by an adult or another youth.

2. Effective March 2018, DFPS shall document in each PMC child's records all confirmed allegations of sexual abuse in which the PMC child is the victim.

3. Effective immediately, all of a PMC child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.

4. Effective immediately, if a PMC child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.

5. Effective immediately, all of the PMC child's caregivers must be apprised of confirmed allegations of sexual abuse of the PMC child at each present and subsequent placement.

The Special Masters conducted a PMC child case record review in May 2017 and verified that DFPS has implemented within the child welfare electronic data system (IMPACT) a profile characteristic option to designate "child sexual aggression" and "sexual behavior problem" when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.

6. Effective immediately, DFPS shall ensure a PMC child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.

7. Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.

8. Effective immediately, DFPS must also document in each PMC child's records all confirmed allegations of sexual abuse involving the PMC child as the aggressor.

9. Effective immediately, all of the PMC child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.

10. Within 90 days of the Court's Final Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse.  Within 6 months of the Court's Final Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.

In December 2015, the Court directed DFPS to "track child-on-child abuse, and categorize it as such."

11. Effective immediately, DFPS shall ensure foster caregivers and other placement providers immediately report all allegations of sexual abuse by a child against another child to the 24-hour hotline established by DFPS to screen referrals of abuse and neglect.

12. Effective March 2018, DFPS shall document, track and report quarterly to the monitor(s) all referrals of child-on-child sexual abuse involving children in the PMC class made to the 24-hour hotline established by DFPS to screen referrals of abuse and neglect. This report shall include all instances when a PMC child is the alleged perpetrator or victim, and all instances where a PMC child resides in the same placement where the reported incident or abuse/neglect occurred.

13. Effective immediately and ongoing thereafter, DFPS shall report quarterly to the monitor(s) and confirm that all reports of child on child sexual abuse involving children in the PMC class that have been referred to the 24-hour hotline have been assigned for investigation for, at minimum, neglectful supervision by the placement caregiver(s).

**PMC Children's Placements**

Based on the Court's extensive findings of fact at trial, the Court included in its December 2015 Opinion a directive for "[t]he Special Master [to] recommend what age ranges of unrelated children are appropriate to be placed in the same room in any residential facility."

The Special Masters asked DFPS to share a draft or final policy and/or regulation that prohibits the placement of unrelated children who are more than three years apart in the same room. DFPS responded that the agency "has no plans to adopt policy or regulation that prohibits the placement of unrelated children who are more than three years apart in the same room." DFPS has still not developed a policy or regulation that prohibits the placement of unrelated children who are more than three years apart in the same room. (See Appendix H, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on May 12, 2017.)

1.  Effective March 2018, DFPS shall implement a policy that requires that no unrelated children more than three years apart in age be placed in the same room. The policy may also establish exceptions, including a thorough and documented assessment that certifies it is in the child's best interest or that no risk of harm would result from placing any unrelated children more than three years apart in the same room. Any exceptions applied under this policy must be approved and documented in the child's electronic record by the DFPS county director.

Based on the Court's extensive findings of fact at trial, the Court in January 2017 ordered "the Special Masters to work with DFPS to ensure that unrelated PMC children with different service levels not be placed in the same room unless a thorough an documented assessment is conducted by DFPS staff certifying that such placement is safe and appropriate for each PMC child." The Special Masters asked DFPS to share a draft or final policy and/or regulation that prohibits the placement of unrelated PMC children with different service levels in the same room unless a thorough and documented assessment is conducted by DFPS staff certifying that such placement is safe and appropriate for each PMC child. DFPS responded that "[a]gency rules (minimum standards) … allow children receiving different types of service to reside in the same room if the provider evaluates the living quarters for each child and ensures there is no

conflict of care with the child's best interests; the arrangement will not adversely impact other children in the room; the number of children in the room is appropriate at all times; caregivers can appropriately supervise all children and the provider can meet the needs of all children in the room."  (See Appendix H, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on May 12, 2017.)

2.  Effective March 2018, DFPS shall implement a policy that requires that no unrelated children with different service levels be placed in the same room.  The policy may also establish exceptions, including a thorough and documented assessment by DFPS that certifies it is in the child's best interest or that no risk of harm would result from placing any unrelated children of different service levels in the same room. Any exceptions applied under this policy must be approved and documented in the child's electronic case record by the county director.

The Special Masters requested DFPS report the number of children in the PMC class who spent a night in a DFPS office, waiting for a placement.  DFPS reported it does not track the number of PMC children who experience a first night sleeping in an office. DFPS begins its tracking on the child's second night.  (See Appendix J, Email from Audrey Carmical, Esq. on behalf of DFPS on August 8, 2017.)

The Special Masters asked how many foster children spent a night in an unlicensed facility, such as a hotel or a caseworker's office in 2016. DFPS reported that from September 2016 through August 2017, 554 children did not have a placement. DFPS reported this information showing the total number of children without a placement broken down by each of these 12 months, with a high of 84 children during May 2017 and a low of 17 children during August 2017. (See Appendix G, Email from Audrey Carmical, Esq. on behalf of DFPS on September 21, 2017.)

3.  Effective immediately, DFPS may not place a child in the PMC class in an office overnight, and must track all instances if it does so, and report the same to the monitor(s) monthly. If, under any circumstance, a child in the PMC class spends the night in an office, DFPS staff must document that fact, and the reason, in an electronically available log maintained by DFPS in each county.  These logs shall be submitted on the first day of every month to a designated senior manager in DFPS'

central office and to the monitor(s).  The designated DFPS senior manager shall review these logs monthly and take immediate follow up action to identify and address problems encountered at the county level with respect to securing minimally adequate, safe placements for children in the PMC class.

Based on the Court's extensive findings of fact at trial, the Court in January 2017 ordered this final Implementation plan "should include a provision that, within 6 months from the date of the final order, all PMC children under two years of age shall be placed in a family-like setting." The Special Masters asked DFPS to share a draft or final policy and/or regulation that all PMC children under two years of age shall be placed in a family-like setting.  The Special Masters invited DFPS to identify exceptions, such as sibling groups of four or more children who cannot otherwise be placed together, treatment and/or medical care, or young children who are placed with a minor parent.  DFPS declined to provide a draft policy and/or regulation, pointing to its existing policies and minimum standards, which do not require that children under two years of age be placed in family-like settings.  (See Appendix H, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on May 12, 2017.)

4.  Within six months of the Court's Final Order, all PMC children under two years of age shall be placed in a family-like setting, including non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may require services provided in a non-family-like placement. All exceptions must be approved by a supervisor and documented in the child's electronic case record.

Based on the Court's extensive findings of fact at trial, the Court in January 2017 ordered this final Implementation Plan should include a provision that, "within 12 months from the date of the final order, all PMC children under six years of age shall be placed in a family-like setting."

5.  Within 12 months of the Court's Final Order, all PMC children under six years of age shall be placed in a family-like setting, including non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may require services provided in a non-family-like placement. All exceptions must be approved by a supervisor and documented in the child's electronic case record.

Based on the Court's extensive findings of fact at trial, the Court in January 2017 ordered this final Implementation plan must include a provision that, "[w]ithin 24 months from the date of the final order, all PMC children under thirteen shall be placed in a family-like setting."

6.  Within 24 months of the Court's Final Order, all PMC children under the age of 13 shall be placed in a family-like setting, including non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require inpatient psychiatric hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may require services provided in a non-family-like placement. All exceptions must be approved by a supervisor and documented in the child's electronic case record.

**DFPS Placement Array**

The trial transcript includes testimony from two defense witnesses (D.E. 328, p. 161, and D.E. 329, p. 161) indicating that DFPS should look to place sexualized children in placements or in homes where the child is the only one in the home.  There is testimony in the record of the sexualization of children due to sexual abuse, causing sexually abused children to become aggressors or perform sexual acts. (D.E. 326, pp. 15-16) In its December 2015 Opinion, the Court included among its goals for this Implementation Plan a directive for DFPS to "track how many placements in its array are designated as single-child homes (including biological and

adopted children), and track how many foster children need single child homes. DFPS shall explain its criteria for determining which children need single-child homes. DFPS shall ensure that all children who need single-child homes are placed in such homes."

The Special Masters asked DFPS to report the soonest date DFPS could begin to track single child homes.  DFPS replied that it "has no plans to track single child homes." (See Appendix E, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 8, 2017.)

The Special Masters asked DFPS what processes it administers to match specific placements to PMC children who, through documented assessment, are determined to need a single child home.  DFPS responded that it "has no such processes" and referred the Special Masters back to its earlier response that it "has no plans to track single child homes." (See Appendix E, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 8, 2017.)

1.  DFPS shall immediately implement a policy that establishes single-child homes as the presumptive placement for all sexualized children, either as the aggressor or the victim. The policy also will allow for exceptions, including: placement in a therapeutic setting for treatment; placement with siblings when the safety of all children involved can be closely monitored and secured; a thorough and documented assessment certifies that it is in the child's best interest to be placed in a home with other children and the safety of all children involved can be closely monitored and secured. Any exceptions applied under this policy must be approved and documented by a senior DFPS manager.

DFPS completed and filed with the Court a Foster Care Needs Assessment, dated January 2017. The Assessment includes on page 43 in Table 5, Column 1, a forecast for the agency's FY17-18 need for foster homes by catchment area. The Special Masters asked DFPS, based on its Foster Care Needs Assessment, to provide a draft plan or plan outline for a 12-month period to develop the placement array needed to address the specific geographic, demographic and service level placement deficits identified in the Assessment.  DPFS responded that while they are "continually working to address placement capacity within the agency" they are "declining to develop such a 12-month plan." (See Appendix E, Updated response document to Special

Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 8, 2017.)

2.  DFPS shall ensure it has at least as many foster home placements for children, by catchment area, by the end of FY 18 as the agency found it requires to meet the needs of children in its January 2017 Foster Care Needs Assessment, Table 5.  DFPS shall report quarterly to the monitor(s) on the available supply of foster homes for children by catchment area as of the last date of the quarter.

3.  By June 2018, DFPS shall complete and submit to the Court an update of its January 2017 Foster Care Needs Assessment, and include:

    o  A review and assessment of the placement needs of sibling groups that are separated into different placements and children who have been identified as sexually aggressive or whose IMPACT records document their having been sexually abused.

    o  Data on the number of foster homes in each county that could be readily designated as single-child homes.

    o  Data on the number of homes in each county available for the placement of sibling groups of various sizes.

    o  An analysis of the number of homes in each county and region that have a deficit or surplus of single-child homes to meet the needs of children from the same counties and regions who are sexually aggressive or have been sexually abused.

    o  An analysis of the number of homes in each county and region that have a deficit or surplus of homes that can meet the placement needs of sibling groups from the same counties and regions or catchment areas.

The Special Masters asked DFPS if the agency can report aggregate data on how many children are placed in foster homes with non-foster or adoptive children. DFPS responded, "DFPS does not have the capability to report aggregate data on how many PMC children are placed in foster homes that contain non-foster or adoptive children, and the [Provider] Portal is not moving forward at this time. DFPS does possess the capability to report the number" of foster children placed in homes with other DFPS foster children at a certain time and date." (See Appendix F,

Responses to Special Master Questions, sent by email from Audrey Carmical, Esq. on behalf of DFPS on September 21, 2017.)  DFPS subsequently reaffirmed, "no additional information will be provided. Agency staff have determined that the aggregate data that can be produced are those referenced in the original response (DFPS foster children placed with other foster children)." (See Appendix K, Email from Audrey Carmical, Esq. on behalf of DFPS on November 4, 2017.)

4. Effective immediately, DFPS shall immediately establish a tracking mechanism to identify how many children are in all placements where a PMC child resides, including foster, biological, non-foster and adoptive children, as well as each placement's licensed capacity. By May 2018, DFPS shall publish this information on its website and update the information quarterly.

5. Effective June 2018, DFPS shall establish and implement a policy that requires a transition plan of no less than two weeks to change a PMC child's placement if the disruption is due to a change in the child's level of care.  The policy shall require a documented assessment to determine if the child should remain in the same placement for an extended period if the assessment determines the child's behavioral or emotional challenges are likely to re-escalate if the placement is changed.

The Special Masters' team conducted a case record review of 50 randomly selected PMC children's cases to confirm that children's individualized files accurately reflected the information contained in the agency's placement moves report.  The Special Masters' team confirmed the aggregate report did accurately reflect the information on placement moves found in PMC children's files.

6. Beginning in June 2018, DFPS shall report to the monitor(s) semi-annually on PMC children's placement moves, and ensure that all such moves, and the reasons for the placement moves, are documented in the child's electronic case record.

**Foster Care Group Homes**

The Court's December 2015 Opinion enjoined DFPS to "immediately stop placing PMC foster children in unsafe placements, which include Foster Group Homes that lack 24-hour awake-

night supervision. Foster Group Homes that immediately require 24-hour awake-night supervision may continue to operate while the Special Masters and the State craft and enforce the Implementation Plan."

To verify the overnight supervision plans submitted to the Special Masters by DFPS with respect to the State's Foster Group Homes, Special Master Ryan and a member of the Special Masters' team, Deborah Fowler, conducted visits with randomly selected Foster Group Home caregivers in their homes. DFPS counsel and staff accompanied Mr. Ryan and Ms. Fowler. All of the visits except one were announced in advance. The visits occurred at staggered times throughout the day.

In the first Foster Group Home visited by Mr. Ryan, on March 1, 2017, eight children resided in the home: three children in the custody of DFPS, ages 10, 9 and 2, and five birth/adopted children, ages 17, 14, 11, 8 and 2. The caregivers had installed a camera system throughout the home, featuring a motion detection system. When there was activity in the home at night, the camera system recorded the movement(s) that it recorded in a log. In addition, the caregivers hired a night nanny to stay in the home overnight while the family slept.

In the second Foster Group Home visited by Mr. Ryan, on March 1, 2017, seven children resided in the home: two boys in the custody of DFPS, ages 4 and 5, and five of the couple's birth children, all girls, ages 13, 9, 7, 5 and 1. The caregivers, a married couple, reported they provided supervision by alternating shifts overnight.  The couple described the arrangement as difficult and looked forward to adopting the boys and closing their home to future placements.

In the first Foster Group Home visited by Ms. Fowler on February 28, 2017, eight boys, ages 18 and under, resided in the home. Four children were in the custody of DFPS and four were adopted. The foster children were 18, 15, 13 and 11 years old. The 15-year-old reportedly had behavioral challenges, and the caregiver indicated that those challenges had led him to ask for the boy to be moved. A live-in, adult female supported the caregiver in oversight of the home. The family's awake-night supervision plan included an individual who lived in back of the house in a shed just a few feet from the back door. There was also an old RV behind the house, and the caregiver indicated someone else occasionally stayed in the RV. The awake-night

supervisor's home appeared to be a gardening shed. It was new, and it had a light mounted over the door of the type that one can buy at stores like Home Depot. The caregiver indicated the awake-night supervisor typically came home from work around 10:30 pm or 11:00 pm. The caregiver said he and the adult female went to bed around 11:30 pm or midnight, and the awake-night supervisor was said to then stay awake for the rest of the night, performing occasional walk-throughs of the home, until the caregiver rose the next morning.

In the second Foster Group Home visited by Ms. Fowler, on February 28, 2017, nine children resided in the home: three girls in the custody of DFPS, ages 11, 7 and 5, and six adopted children, two boys who were 16 and 10, and four girls who were 10, 7, 6 and 4 years old. The caregivers installed an alarm in the boys' bedroom that beeped if the boys opened their door. The caregivers, a married couple, reported they provided overnight supervision by alternating shifts overnight.

In the third Foster Group Home visited by Ms. Fowler, on March 6, 2017, seven children under the age of 18 resided in the home. One child, a 16 year-old daughter, is adopted. Six of these children were foster youth: 3 girls who were 14, 11 and 9 years old, and 3 boys who were 17, 15 and 10 years old. Of the foster youth in the home, one had a specialized Level of Care designation, and three had moderate Levels of Care designations, indicating heightened needs.

The doors to the bedrooms were connected to an alarm and made a loud noise when opened. The caregivers, a married couple, reported they provided overnight supervision by alternating shifts overnight.  The caregivers also had two adult sons who were members of the household, ages 47 and 18. The caregiver said her live-in 47-year-old adopted son, who is disabled, helped his parents with the awake-night supervision.  It appeared he has an intellectual or developmental disability.  The caregiver pointed out that his role in overnight supervision was limited to getting up if anything happened or required intervention.

In the fourth Foster Group Home visited by Ms. Fowler, on March 7, 2017, seven children under the age of 18 resided in their home. Four were foster youth: two boys ages 8 and 3 years old, and two girls 6 and 5 years old. The couple's three biological children were 16, 14 and 12 years old. The caregivers, a married couple, reported they provided overnight supervision by

alternating shifts overnight. The caregiver's mother was reportedly able to help on occasion when someone was sick or work called away the husband.

In the fifth Foster Group Home visited by Ms. Fowler, on March 7, 2017, three foster children resided in the home, one boy age 1 year old, and two girls, ages 5 and 2 years old. The caregivers, a married couple, also had four birth children who lived in the home: daughters, ages 15, 12, 9 and 6 years old. In order to avoid an awake-night supervision requirement, the caregivers reported that every night one of the foster parents' biological children left the home with an older, adult sibling who maintained a separate residence, and stayed at her house.

In the sixth Foster Group Home visited by Ms. Fowler, on March 8, 2017, seven children resided in the home, only one of whom was a foster child: a 2 year old girl. The caregivers have six young children who they have adopted, and one adult biological son (22 years old) who also lives with them. The caregivers, a married couple, reported they alternated shifts for awake-night supervision. The plan allowed the caregivers approximately 5 to 6 hours of sleep per night, which the wife said was enough for her. Her great grandmother was also reportedly available to help when needed, and their adult son who lived with them also helped when needed.

The Court's January 2017 Opinion requires this Implementation Plan include the elimination of Foster Group Homes as placements for children in the PMC class.  In May 2017, Texas House Bill 7 amended the Human Resources Code (HRC), Chapter 42, and prohibited Licensing from issuing any new permits to Foster Group Homes after August 31, 2017. House Bill 7 allows any Foster Group Home licensed or verified before September 1, 2017, to continue to operate under the law in effect prior to that date, until Licensing develops and implements procedures for conversion to a traditional foster home and relinquishment of the Foster Group Home License.  House Bill 7 also lowered the minimum capacity for General Residential Operations (GRO), a form of congregate care with heightened licensure requirements, from 13 children to 7 children.

1.   Effective immediately and ongoing thereafter, no PMC child may reside in a Foster Group Home placement.

2. Effective immediately and ongoing thereafter, no PMC child may reside in any family-like placement that houses more than six children, inclusive of biological, adoptive, non-foster and foster children. Family-like placements include non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care.

**Foster Care Redesign**

The Court's January 2017 Order held that "as to foster care redesign, the Court orders the Special Masters to work with DFPS to address the capacity of providers across Texas to serve as Single Source Continuum Contractors ("SSCC"); the service array, including the development of foster homes that meet the individualized needs of PMC children; and proposed timelines for staged implementation through the end of fiscal year 2021."  The Special Masters asked DFPS how it assessed the capacity of providers across Texas to serve as SSCC for Foster Care Redesign, including the development of a placement array in each anticipated catchment area. DFPS responded that it relied on an analysis from the University of Chicago determining that an SSCC could only be viable if it had at least 500 child entries annually. "This analysis," DFPS replied, "along with information gathered through a Request for Information, a stakeholder survey and information from the Public Private Partnership helped inform the state's division into the current 17 catchment areas." (See Appendix E, Updated response document to Special Masters' Request for Information, emailed from Audrey Carmical, Esq. on behalf of DFPS on March 8, 2017.)

DFPS most recently reported the Texas Legislature "approved the roll-out of a staged Community Based Care model in a total of five catchment areas (includes current 3b) over the 2018-2019 biennium."  (See Appendix F, DFPS Responses to Special Master Questions, emailed from Audrey Carmical, Esq. on behalf of DFPS on September 21, 2017.) DFPS informed the Special Masters, "Community Based Care (CBC) is replacing and expanding on Foster Care Redesign. Senate Bill 11 of the 85th Legislature requires DFPS to purchase case management and substitute care services from a Single Source Continuum Contractor (SSCC) in a model known as Community Based Care. Substitute care includes both foster care and kinship placements." (See Appendix F, DFPS Responses to Special Master Questions, emailed from Audrey Carmical, Esq. on behalf of DFPS on September 21, 2017.)

On September 19, 2017, DFPS announced the next two catchment areas for Community Based Care will be all of Region Two and Bexar County in Region Eight. DFPS advised,

> We expect to release the Request for Proposals for Region Two this month (September), followed by the Request for Proposals for Bexar County in November. In Region Two and Bexar County, DFPS plans to make this transition in two in stages. In Stage 1, DFPS will transfer paid foster care placement services to the SSCC. DFPS will refer children who are new to care to the SSCC as well as transition children already in paid foster care to the SSCC. Like Foster Care Redesign, CPS and the SSCC will continue to share decision- making. CPS will provide case management services to children and families while partnering with the SSCC to provide paid foster care placement services to children from the catchment area. We anticipated Stage I will last between 12 and 18 months. In Stage Two, the SSCC will begin providing all substitute care placement and case management services. In addition to the responsibilities outlined in Stage I, the SSCC will receive referrals for all children who are new to care and their families. DFPS will phase-in the transfer of other children from the legacy system to CBC. We anticipate it will take 1-2 years to fully shift case management for all children and their families in these catchment areas to the SSCC. Region 3b is estimated to transition into Stage II in April 2018.

> (See Appendix F, DFPS Responses to Special Master Questions, emailed from Audrey Carmical, Esq. on behalf of DFPS on September 21, 2017.)

The Special Masters do not have enough information or data from the implementation of Community Based Care to make a recommendation to the Court.

# Appendix A
### List of Documents and Resources Provided to the Special Masters
### by Texas DFPS, as Titled by DFPS

---

*Document/Resource Title*

1    (Item 06) 86505 Count of Workers Assigned to Children entering PMC

2    1. Casa Portal

3    11. and 12. Job Description CPS CVS Supervisor I

4    13. Caseworker Ratio

5    17. Job Description I See You Workers Spec II-IV

6    18. Children Assigned to I See You Workers on June 30 2016 DRIT 80252

7    19. RCCL Workload Study

8    1CSA_CategoriesofSexualAggressionStoryboard.pdf

9    2. Portal

10   20. and 22. Job Description RCCL Investigator

11   2015 CPS Substitute Care Exec Summary

12   2015 CPS Substitute Care Exec Summary Attachment B

13   2016-10 SDM FSNA for CVS FBSS FAQs

14   21. and 23. Job Description RCCL Inspector

15   2282cx.2016 Contract

16   24 hour plan White 2-23-17

17   24. RCCL Worker Assignments 80128

18   25. Investigations of Maltreatment in Care

19   26. Overview of RCL BSD

20   26. RCCL Training Narrative Response

21   2613 PAL Programmatic Quality Monitoring Tool Life Skills Training Satisfaction Surveys

22      27. RCCL Investigation Details

23      28. RCCL Regulatory Action

24      29. RCCL Investigations QA

25      2CSA_CSAinCVSStoryboard.pdf

26      30. Child-on-Child Sexual Contact Referral

27      31. Placement Needs Assessment

28      32. DFPS Service Levels

29      33. 35 Single Child Homes

30      36. Residential Facilities and Placements

31      37. FCR Helps Grow Capacity

32      39. and 40. Amended-Children in Foster Group Homes on 2016-7-31 All Group Homes ID
        Only

33      4. SSCC Access to IMPACT

34      41. PAL

35      43. CSA

36      44. Emancipating Youth

37      45. Avg Daily Child Count FY16

38      47. Tablet Computers

39      49. Establish an Equivalent Work Experience Qualification Option for CPS

40      4CSA_CSAwithRCCL_Storyboard.pdf

41      5. FCR

42      50. Mentor Handbook

43      51. ESS

44      52. Training

45      53. PMU Rule Out Casereading Plan

46      53. RC Rule Out Casereading 2016 Survey

47      54. Section 7000 EF Revisions 07 25 16 Draft

48      55. FY16 Standard Amendment

49      57. (RCCL proposed rule change)

50      58. Survey

51      59. Placement Portal Best-Case Training

52      5CSA_CSAinKin.pdf

53      60. RCCL Transition Timeframe

54      6CSA_PlacementProtocols.pdf

55      7. CVS Workers with Mixed Caseloads 2016-7-31 DRIT 80253

56      8. CVS Worker Caseload 2016-7-31 DRIT 80254

57      86214 CY2016 PMC Children Call SWI

58      9. and 10. Job Description CPS Conservatorship Worker

59      9010 PAL AC Monitoring Tool Fee for Service

60      9010 PAL Monitoring Tool Fee for Service

61      9040 Fiscal Monitoring Tool

62      ADO ITP Nov 16

63      Adolescent Immunization Schedule 7 through 18 years old 2014.pdf

64      Adult Immunization Schedule Adults 2014.pdf

65      Aging Out Seminar Curriculum Outline.pdf

66      Aging Out Seminar Evaluation.pdf

67      Aging Out Seminar List of Handouts for Youth.pdf

68      Almost 18 2558.pdf

69      American Academy of Pediatrics "Fostering Health:  Healthcare for Children and
        Adolescents in Foster Care"

| 70 | April 2017 FGH List |
| 71 | Attachment A |
| 72 | Attachment B |
| 73 | Attachment to DFPS Memorandum Incidents Involving Child Victimization In Foster Care 07.01.13.pdf |
| 74 | Attachment to DFPS Memorandum re Aging Out Seminar Revisions 11.18.13.pdf |
| 75 | August 2017 FGH List |
| 76 | CANS Resource Guide |
| 77 | Caseload Manageability |
| 78 | Casey Life Skills Assessment |
| 79 | Catch-up Immunization Schedule Ages 4 months to 18 years old.pdf |
| 80 | CCL BGC |
| 81 | CFRP Evaluation_Final Report_121616.pdf |
| 82 | CFSR Item 14 guide instructions.pdf |
| 83 | Child Immunization Schedule Birth to 6 years old 2014.pdf |
| 84 | Child Sexual Aggression Resource Guide |
| 85 | Children and Foster Group Homes as of 2017-03-23 |
| 86 | Children in Homes |
| 87 | Children Without Placement FY17 through July 2017 2 |
| 88 | Childrens Case Files |
| 89 | Circles of Support and Transition Planning |
| 90 | College Tuition and Fee Waiver |
| 91 | Common App Blank |
| 92 | Common Application for Placement of Children in Residential Care |
| 93 | Complaints |

94      Computer Based Training Part II re Serious Incidents Involving Foster Children.pdf

95      Context for 6 and 11

96      Copy of 83120 Data about Children in Subcare January 31 2017 Releasable

97      Copy of 83298 Data about Children in Subcare January 31 2017 (004)

98      Copy of d84414 PMC Children Items 32-35

99      Copy of d84421 PMC INVs CPS Final 053117 (002)

100     Copy of d84422 PMC Kids alleged child child SXAB Items 26 27

101     Copy of Fatalities Children in CVS 2015 (From ft_02cslx)

102     Copy of Fatalities Children in CVS 2016 (From ft_02cslx)

103     Corrective Actions

104     Court Appointed Special Advocates to SSCC Access to IMPACT Information

105     CPA MS for Religious Practice

106     CPAs religious affirmation

107     CPD CVS Competencies Training Day 1

108     CPD CVS Competencies Training Day 2

109     CPD CVS Competencies Training Day 2 Feb 17.pdf

110     CPD CVS Competencies Training Day 3

111     CPD CVS Competencies Training Day 4

112     CPS Fiscal Year 2017 Business Plan

113     CPS History the Search is On

114     CPS Nurse Scope of Work.pdf

115     CPS Overview & Transformation

116     CPS Placement Process Resource Guide

117     CPS Professional Development Core Competencies Training Week 1 Day 1

118     CPS Professional Development Core Competencies Training Week 1 Day 2

119   CPS Professional Development Core Competencies Training Week 1 Day 3

120   CPS Professional Development Core Competencies Training Week 1 Day 4

121   CPS Professional Development Core Competencies Training Week 1 Day 5

122   CPS Professional Development Core Competencies Training Week 2 Day 1

123   CPS Professional Development Core Competencies Training Week 2 Day 2

124   CPS Professional Development Core Competencies Training Week 2 Day 3

125   CPS Professional Development Core Competencies Training Week 2 Day 4

126   CPS Professional Development Core Competencies Training Week 2 Day 5

127   CPS Rights of Children and Youth in Foster Care

128   CPS_Intake_Guidelines.pdf

129   CSA screenshot

130   CVS Caseworker Caseloads

131   CVS Contact Narrative.pdf

132   CVS CW vacancies as of 1_31_17_for Dist.pdf

133   CVS ITP Nov 16

134   CVS required FTE.pdf

135   CVS Required Monthly Contact.pdf

136   CVS Worker Turnover

137   d84421 PMC INVs LIC Final 053117

138   DFPS Accessing Personal Documents for Youth Resource Guide

139   DFPS CCL Website

140   DFPS Child Adolescent Needs and Strengths Assessment (CANS) Web Page

141   DFPS Compensation Assessment and Employee Incentive Review-Appendices-H.L. Whitman 02-23-17

142   DFPS Compensation Assessment and Employee Incentive Review-Cover Letter-H.L. Whitman 02-23-17

143   DFPS Compensation Assessment and Employee Incentive Review-Executive Summary-H.L. Whitman 02-23-17

144   DFPS Compensation Assessment and Employee Incentive Review-Formal Report-H.L. Whitman 02-23-17

145   DFPS Continuous Self Improvement Plan February 2017— CLEAN COPY.pdf

146   DFPS Foster and Licensed Facility Placements Resource Guide

147   DFPS FY2016 human trafficking annual report

148   DFPS Health Passport – A Guide to Medical Services at CPS

149   DFPS HT efforts

150   DFPS Improvement Plan Cover Letter 6 22 16.pdf

151   DFPS Memorandum Incidents Involving Child Victimization in Foster Care 07.01.13.pdf

152   DFPS Memorandum re Aging Out Seminar Revisions 11.18.13.pdf

153   DFPS Placement Process Resource Guide

154   DFPS Requests

155   DFPS Response 10

156   DFPS Response 12

157   DFPS Response 5

158   DFPS Rider 36 Parental Child Safety Placements Study-Final-12-21-16

159   DFPS Rider 9-Human Resources Management Plan-(Final)-Whitmore 06-1-17

160   DFPS Rider 9-Human Resources Management Plan-Memo-Blackmore 05-31-17

161   DFPS Senate Bill 769 Foster Parent Pilot Program Report 2016-Final-12-01-16

162   DFPS Services to Children in Substitute Care Resource Guide

163   DFPS Supporting Kinship Families Report -Final 12-29-16

164   DFPSDatabook2015.pdf

165   Duranstorie Health Care Service Plans.pdf

166   Education and Training Voucher

167     EF Facilitator Guide – FINAL 2016 0729.pdf

168     EF PG Enforcement Frame Final 2016 0727.pdf

169     Employment Preference for Former Foster Youth

170     Enforcement Framework PPT – FINAL.pdf

171     Enforcement Framework RC ACTIVITY.pdf

172     Enforcement Implementation Dates.pdf

173     FACN CPS Memo 10-2016.pdf

174     FACN DFPS Delivers Article.pdf

175     FACN Provider Scope of Work.pdf

176     FACN Resource Guide June2016.pdf

177     FAD ITP Nov 16

178     Family Strengths Photo Activity PV-FSW Core 6 8 16

179     FC231b_CSA Flow Chart.pdf

180     FCCOE_transformation_impact_fn.pdf

181     Field Communication.pdf

182     Field II Service Level Placement Referrals and Pre-placement Visits

183     Field III Locating Families and Cooperation with LE

184     Final 2016 Alliance Conference.pdf

185     Final ISY CVS Safety Summit.pdf

186     Follow-up from 5 3 demo

187     Form 2279

188     Foster Care Center of Excellence Handout.pdf

189     Foster Care Redesign

190     Foster Group Homes

191     FSNA CVS Child Priorities

192     FSNA CVS Family FSNA

193     FSNA CVS Job Aid (1)

194     FSNA FBSS Family

195     FY16 Buckner 9010PAL

196     Grid Items 1 to 4 Kevin Ryan 6.27.16

197     GRO MS for Religious Practice

198     Handling DCL and RCCL Situations Chart.pdf

199     Handling_DCL_and_RCCL_Situations.pdf

200     HB 2725

201     HB 6 Introduced Bill.pdf

202     Health Passport

203     Health Passport Quarterly Reporting

204     HHSC Item 4.pdf

205     Higher Education Information & Resources for Current and Former Foster Youth

206     Home_Tracking.pdf

207     HT All Staff Training

208     Human Trafficking

209     IMPACT Phase 2 – Current Scope – 20170306.pdf

210     Intro to IMPACT and Technology Skills Lab Version 1.2

211     ISY and CPU-Special Master Presentation

212     ISY ITP Nov 16

213     Item 10.docx

214     Item 11

215     Item 12.docx

216     Item 13

217     Item 13.docx

218     Item 14.docx

219     Item 15.pdf

220     Item 16.pdf

221     Item 17

222     Item 17.docx

223     Item 8--Policy sections.docx

224     Item 9.docx

225     J.V. Placement Log

226     July 2017 FGH List

227     June 2017 FGH List

228     K-908-2602 Life Skills Training Observation Template

229     K-908-2614 PAL Programmatic Quality Monitoring Tool Case Mgt and Aftercare

230     K-908-2615 PAL Programmatic Quality Monitoring Tool Life Skills Training

231     K-908-2616 PAL Programmatic Quality Monitoring Tool Case Mgt and Aftercare

232     KIN ITP Nov 16

233     Legal Representation

234     Licensing Policy and Procedures Handbook Excerpts.pdf

235     List of Placement Moves 3-31-17

236     LPPH Safety Plans

237     ManagersOnboardingforNewHireandRehireChecklist.pdf

238     Manual Para Jóvenes Sobre El Cuidado Temporal En Texas

239     Manual_Assignment_Charts.pdf

240     May 2017 FGH List

241     Medicaid Benefits Handout

242     Medical Benefits Section

243     Minimum Standards for SWI hotline and ANE reporting.pdf

244     Module 5 CCL Investigation Workflow.pdf

245     MS for Trafficking

246     Number 6 Blue Phones

247     Nurse Job description FT.pdf

248     NYTD Supporting Info

249     October 2017 FGH List

250     Ombudsman Brochure for Foster Care Youth

251     Ombudsman-for-Children-and-Youth-in-Foster-Care

252     PAL Contract Monitoring Fees

253     PDF of 2016 RC Title IV-E Casereading Survey 3.10.16

254     Person Characteristics

255     Personal Documents

256     Personal Documents Checklist Age 16.pdf

257     Personal Documents Checklist Age 18.pdf

258     Placement Array

259     Placement Listings Report 7-25-17

260     Placement Listings Report 7-27-17

261     Placement Moves SAMPLE (50)

262     Placement Process Resource Guide

263     Placement Service Levels and Sleep Space

264     Plaintiff Children Placement Moves 3-31-17

265     PMU Reads

266     PMU Review of RCCL Investigations March 2016-updated 6.20.16

267     PMU Review of RCCL Investigations March 2016-updated 6.20.16 for CCL Staff

268     PMU Review of Ruled Out Investigations in the Residential Care Program….pdf

269     Policy Changes Highlighted.pdf

270     Preparation for Adult Living

271     Preparing_Youth_for_Life_after_High_School.pdf

272     Primary_Medical_Needs_Resource_Guide.pdf

273     Purpose Field for Med Assessment Tab.pdf

274     Q1-14 CVS All Region Item Outcome

275     Q1-15 CVS All Region Item Outcome

276     Q1-16 CVS All Region Item Outcome

277     Q2-14 CVS All Region Item Outcome

278     Q2-15 CVS All Region Item Outcome

279     Q2-16 CVS All Region Item Outcome Summary

280     Q3-14 CVS All Region Item Outcome

281     Q3-15 CVS All Region Item Outcome

282     Q4-14 CVS All Region Item Outcome

283     Q4-15 CVS All Region Item Outcome

284     Question 13 - DFPS Accessing Personal Documents for Youth Resource Guide.pdf

285     Question 13 - DFPS Residential Child Care Contracting Guide.pdf

286     Question 13 - SHP_2014785A-Clinical-Health-Passport-User-Guide-P-01062015.pdf

287     Question 13 - SHP_2014785B-Non-Clinical-Health-Passport-User-Guide-P-01062015-3.pdf

288     Question 43 Notes.pdf

289     Question 43.pdf

290     RC Rule Out Casereading 2016 Survey

291     RCCL CSA Training_FINAL.pdf

292     RCCL Training Information.pdf

293     RCCL_Intake_Guidelines.pdf

294     Req1_2 Fatalities Children in CVS 2017 Preliminary

295     Residential Child Care Contract excerpt re discipline and notifications.pdf

296     Residential Child Care Contract.pdf

297     Response 8 Summary

298     Rider 15 Minority Child Removal Report-Final-DFPS 10-12-16

299     Rider 37 Collaborative Family Engagement Report-12-01-16

300     Safety Card.pdf

301     Safety_Visit_Resource_Guide.pdf

302     SB 11 Engrossed Bill.pdf

303     SB 206 Youth Parents and Pregnant Youth in DFPS Conservatorship FY16 Report (Final) 01-30-17 (002)

304     sb368 permanency planning family based alternatives-july 2017 (002)

305     SDM TX FSNA Manual

306     sdm-fsna-CPD Training

307     September 2017 FGH List

308     Serious Incidents Involving Foster Children Part 2 Participant Guide.pdf

309     Serious Incidents Involving Foster Children Part 2 Training.pdf

310     Serious Incidents Involving Foster Children Part 2.pdf

311     Serious_Incidents_Involving_Foster_Children_032017.pdf

312     Services for Youth and Young Adults

313     Services to Children in Substitute Care Resource Guide

314     Short Common Application 2087ex.pdf

315     SHP_20163827_THSteps-Informational-Flyer-P-01102017.pdf

316     SHP_20163862-THSteps-New-Member-Flyer-M-EN-ES-01122017.pdf

317     SHP_20173907-Foster-Care-Center-of-Excellence- STCPC Template01172017.pdf

318     Single Child Foster Homes

319     SM Demo Follow Up_narrative_5.11.17.pdf

320     SM Demo Follow-up Narrative 5-11-17

321     SM Demo Follow-up Narrative 5-12-17

322     SM Demo Follow-up Narrative 5-15-17

323     snagit1.png

324     snagit2.png

325     snagit3.png

326     snagit4.png

327     STAR Health – A Guide to Medical Services at CPS

328     STAR Health Member Handbook

329     Statewide Intake Hotline Reports and Investigations 04.10.17.pdf

330     Statewide Needs Assessment

331     Supervision Plans 2-2-17

332     Temporary Housing Assistance

333     Texas Foster Care Handbook for Youth

334     Texas Health Steps Periodicity.pdf

335     Texas Youth Connection (Website and Facebook Page)

336     Texas_Health_Steps_Information_Kinship.pdf

337     THSteps 1 Page Caring for Children in Foster Care in the First 30 Days.pdf

338     Tracking Inappropriate Sexual Behavior

339     Transitional Living

| | |
|---|---|
| 340 | Transitional Living Services Handout |
| 341 | TX Foster Care Needs Assessment.pdf |
| 342 | TX NYTD FY11-15 Data Snapshot 2.8.16 |
| 343 | What assessments does a child receive CHART 2017.pdf |
| 344 | Wilson Medical Assessment Log IMPACT.pdf |
| 345 | Wilson Medical Visits Health Passport.pdf |
| 346 | wilson placement narrative.pdf |
| 347 | WMS Overview |
| 348 | Workload Study Questions |
| 349 | zuniga PMUR.pdf |

# Appendix A Continued
## List of Policies Provided by Texas DFPS

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 1 | Preventing Sex Trafficking and Strengthening Families Act of 2014 (H.R. 4980) | 113th Congress Public Law 113-183, Title I, Subtitle B, Section 114 | |
| 2 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter M, Division 1, Rule 700.1307 | In what kinds of settings may a child in DFPS conservatorship be placed? |
| 3 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter M, Division 1, Rule 700.1309 | What factors does DFPS consider when selecting the most appropriate living arrangement for a child? |
| 4 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter M, Division 1, Rule 700.1329 | What are DFPS's responsibilities for ensuring appropriate medical care for children in DFPS conservatorship? |
| 5 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter M, Division 1, Rule 700.1331 | What are DFPS's responsibilities relating to discipline of a child in DFPS conservatorship? |
| 6 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter E, Division 1, Rule 700.479 | What are the responsibilities of the DFPS in receiving reports of child abuse or neglect? |
| 7 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter E, Division 1, Rule 700.505 | Priorities for Reports of Abuse and Neglect |
| 8 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter E, Division 1, Rule 700.507 | Response to Allegations of Abuse or Neglect |
| 9 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter E, Division 1, Rule 700.511 | Disposition of the Allegations of Abuse or Neglect |

|    | Policy Source | Policy Reference | Policy Title |
|----|---------------|------------------|--------------|
| 10 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter E, Division 1, Rule 700.519 | Standards for Investigators of Child Abuse |
| 11 | Texas Administrative Code | Title 40, Part 19, Chapter 745, Subchapter D, Division 9, Rule 745.403 | Can I apply for another permit after Licensing denies or revokes my permit? |
| 12 | Texas Administrative Code | Title 40, Part 19, Chapter 745, Subchapter G, Rule 745.911 | In what other circumstances may a person not serve as a controlling person at my operation? |
| 13 | Texas Administrative Code | Title 40, Part 19, Chapter 748, Subchapter C, Division 1, Rule 748.105 | What are the requirements for my personnel policies and procedures? |
| 14 | Texas Administrative Code | Title 40, Part 19, Chapter 748, Subchapter I, Division 1, Rule 748.1201 | May children receiving different types of service live in the same living quarters? |
| 15 | Texas Administrative Code | Title 40, Part 19, Chapter 748, Subchapter I, Division 1, Rule 748.1205 | What information must I document in the child's record at admission? |
| 16 | Texas Administrative Code | Title 40, Part 19, Chapter 748, Subchapter C, Division 1, Rule 748.121 | What abuse and neglect policies must I develop? |
| 17 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter E, Division 1, Rule 748.507 | What general responsibilities do all employees have? |
| 18 | Texas Administrative Code | Title 40, Part 19, Chapter 748, Subchapter F, Division 4, Rule 748.881 | What curriculum components must be included in the general pre-service training? |
| 19 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter H, Division 1, Rule 749.1101 | Who may I admit? |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 20 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter H, Division 1, Rule 749.1107 | What information must I document in the child's record at the time of admission? |
| 21 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter H, Division 3, Rule 749.1151 | What are the medical requirements when I admit a child into care? |
| 22 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter H, Division 3, Rule 749.1153 | What are the dental requirements when I admit a child into care? |
| 23 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter I, Division 1, Rule 749.1301 | What are the requirements for a preliminary service plan? |
| 24 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter I, Division 1, Rule 749.1307 | When must I complete an initial service plan? |
| 25 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter I, Division 1, Rule 749.1309 | What must a child's initial service plan include? |
| 26 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter I, Division 1, Rule 749.1323 | When must I implement a service plan? |
| 27 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter I, Division 2, Rule 749.1331 | How often must I review and update a service plan? |
| 28 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter I, Division 2, Rule 749.1335 | How do I review and update a service plan? |
| 29 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter C, Division 1, Rule 749.135 | What abuse and neglect policies must I develop? |

|   | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 30 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter M, Division 2, Rule 749.2447 | What information must I obtain for the foster home screening? |
| 31 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter M, Division 2, Rule 749.2449 | Whom must I interview when conducting a foster home screening? |
| 32 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter M, Division 3, Rule 749.2471 | What must I do to verify a foster home? |
| 33 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter M, Division 3, Rule 749.2489 | What information must I submit to Licensing about a foster home's verification status? |
| 34 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter M, Division 5, Rule 749.2557 | May a foster home exceed its verified capacity? |
| 35 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter N, Rule 749.2801 | When must I evaluate a foster home for compliance with Licensing rules? |
| 36 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter B, Division 1, Rule 749.43 | What do certain words and terms mean in this chapter? |
| 37 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter D, Division 1, Rule 749.503 | When must I report and document a serious incident? |
| 38 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter E, Division 1, Rule 749.607 | What general responsibilities do all employees and caregivers have? |
| 39 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter F, Division 4, Rule 749.881 | What curriculum components must be included in the general pre-service training? |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 40 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter F, Division 6, Rule 749.944 | What curriculum components must be included in the annual training related to prevention, recognition, and reporting on child abuse and neglect? |
| 41 | Texas Administrative Code | Title 40, Part 19, Chapter 748, Subchapter H, Rule 748.1101(b)(7) | What rights does a child in care have? |
| 42 | Texas Administrative Code | Title 40, Part 19, Chapter 749, Subchapter G, Rule 749.1103(b)(7). | What rights does a child in care have? |
| 43 | Texas Administrative Code | Title 40, Part 19, Chapter 745, Subchapter K | Inspections and Investigations |
| 44 | Texas Administrative Code | Title 40, Part 19, Chapter 700, Subchapter P | Services and Benefits for Transition Planning to a Successful Adulthood |
| 45 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 4430 | Random-Sample Monitoring of CPA Foster Homes |
| 46 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6361 | Time Frames for Initiation |
| 47 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 4131 | Minimum Requirements for Licensed Operations |
| 48 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 4131.2 | Residential Child Care: Team Inspections |
| 49 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 4150.4 | Additional Requirements for Investigation Inspections |
| 50 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 4159 | Handling Resistance or Refusal to allow Inspection |
| 51 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6000 | Investigations |
| 52 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6100 | Overview of Investigations |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 53 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6120 | The Roles of the Investigator and the Monitoring Inspector |
| 54 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6131 | The Role of the Supervisor in All Investigations |
| 55 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6132 | The Role of the Supervisor in an Abuse or Neglect Investigation |
| 56 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6200 | Assessing and Processing Intake Reports |
| 57 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6220 | Assessing an Intake Report for Type of Investigation and Priority |
| 58 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6221 | Assessing an Intake Report for Type of Investigation |
| 59 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6221.1 | Intake Reports to Be Investigated as Abuse and Neglect |
| 60 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6222 | Assessing an Intake Report for Priority |
| 61 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6222.1 | Classifying an Intake Report as a Priority 1 Investigation |
| 62 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6222.2 | Classifying an Intake Report as a Priority 2 Investigation |
| 63 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6222.6 | Choosing the Priority of an Intake Report in CLASS |
| 64 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6222.7 | Changing the Priority of an Investigation in CLASS |
| 65 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6230 | Assessing an Intake Report for Allegation Types |
| 66 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6231 | IMPACT Allegation Types |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 67 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6231.1 | Selecting Allegations of Abuse or Neglect in IMPACT |
| 68 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6232 | CLASS Allegation Types |
| 69 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6232.1 | Selecting Allegations of Violations in CLASS |
| 70 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6232.2 | Allegation Involving a Child Under the Age of 6 (Child-Placing Agency Only) |
| 71 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6240 | Processing Intake Reports in IMPACT and CLASS |
| 72 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6241 | Upgrading a Non Abuse or Neglect Intake Report to an Abuse or Neglect Intake Report |
| 73 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6242 | Investigate, Downgrade, or Close an Abuse or Neglect Intake Report |
| 74 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6242.1 | Changing the Priority of an Abuse or Neglect Intake Report |
| 75 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6242.2 | Downgrading an Abuse or Neglect Intake Report to a Non Abuse or Neglect Intake Report |
| 76 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6243.3 | Closing an Intake Report of Abuse or Neglect |
| 77 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6250 | Reports Received by Licensing Offices |
| 78 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6251.1 | Information to Obtain When Receiving a Report at a Local Licensing Office |
| 79 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6251.4 | Processing the Intake Report |
| 80 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6252 | Referring Reports to Statewide Intake |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 81 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6261 | Identifying New Reporters During an Investigation |
| 82 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6270 | Types of Intake Reports |
| 83 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6271 | Anonymous Intake Reports |
| 84 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6272 | Multiple Intake Reports Received for the Same Operation |
| 85 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6272.1 | Merging and Linking Investigations in IMPACT and CLASS |
| 86 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6275 | Incidents Reported by an Operation, Known as Self-Reports |
| 87 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6280 | Referring a Report of Abuse or Neglect for Investigation When New Allegations Are Received During an Investigation |
| 88 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6300 | Preparing for the Investigation |
| 89 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6310 | Preparing the Investigation in IMPACT and CLASS |
| 90 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6311 | Progressing an Intake Report to an Investigation |
| 91 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6311.1 | Progressing an Intake Report to an Investigation in IMPACT |
| 92 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6311.2 | Progressing an Intake Report to an Investigation in CLASS |
| 93 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6312.1 | Writing the Allegation |
| 94 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6312.2 | Determining Which Minimum Standards to Evaluate |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 95 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6320 | Contacting the Reporter |
| 96 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6330 | Assessing the Immediate Safety of Children |
| 97 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6331 | Evaluating the Need for a Safety Plan |
| 98 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6331.1 | Defining Child Safety |
| 99 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6331.2 | Determining Safety |
| 100 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6332 | Requesting a Safety Plan |
| 101 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6332.1 | Requesting a Safety Plan Outside of an Inspection |
| 102 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6332.2 | Requesting a Safety Plan During an Inspection |
| 103 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6332.3 | Requesting That an Alleged Perpetrator Not Have Contact With Children |
| 104 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6332.5 | Operation Refuses to Develop a Safety Plan |
| 105 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6333 | Approving the Safety Plan |
| 106 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6334 | Notifying the Supervisor and Monitoring Inspector of the Safety Plan (Abuse or Neglect Only) |
| 107 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6335 | Documenting the Safety Plan in CLASS |
| 108 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6336 | Ongoing Evaluation of the Safety Plan |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 109 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6336.1 | Plan Does Not Minimize Safety Threat |
| 110 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6336.2 | Operation Does Not Comply With Safety Plan |
| 111 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6337 | Ending the Safety Plan |
| 112 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6340 | Assessment of Risk During Abuse or Neglect Investigation |
| 113 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6341 | Requesting a Risk Assessment |
| 114 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6342 | Information to Discuss During a Risk Assessment |
| 115 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6342.1 | Reviewing the Operation's Compliance and Investigation History |
| 116 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6342.2 | Reviewing the Alleged Perpetrator's Investigation History |
| 117 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6342.3 | Reviewing the Alleged Victim's Investigation History |
| 118 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6342.4 | Recommending Action |
| 119 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6343 | Documenting the Risk Assessment |
| 120 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6343.1 | Documenting the Recommended Actions |
| 121 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6350 | Notifications Made at Beginning of Investigation |
| 122 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6351 | Notifying and Working With Law Enforcement |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 123 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6351.1 | Procedures for Notifying Law Enforcement |
| 124 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6351.2 | Conducting a Joint Investigation |
| 125 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6351.3 | Documenting Contact With Law Enforcement |
| 126 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6352.1 | Methods of Notifying the Operation |
| 127 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6352.2 | Exceptions to Notifying the Operation |
| 128 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6353.2 | Maintaining Contact With the CPS Caseworker of Alleged Victims |
| 129 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6353.3 | Documenting Contact With the CPS Caseworker |
| 130 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6355 | Requesting Assistance from CPS Special Investigators (Residential Care Only) |
| 131 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6360 | Preparing for the Initiation |
| 132 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6361.2 | Time Frame for Initiating a Priority 2 (P2) Investigation |
| 133 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6400 | Conducting the Investigation |
| 134 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6410 | Initiating the Investigation |
| 135 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6411 | Defining What Constitutes an Initiation |
| 136 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6412 | Methods of Initiation |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 137 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6412.1 | Initiating an Investigation Involving Abuse or Neglect |
| 138 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6412.11 | Exceptions to Initiating by Contact With Alleged Victim |
| 139 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6412.2 | Initiating an Investigation Not Involving Abuse or Neglect |
| 140 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6413 | Documenting the Initiation |
| 141 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6420 | Conducting Interviews |
| 142 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6421.1 | Observing and Interviewing Alleged Victims (Abuse or Neglect Only) |
| 143 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6421.11 | Interview Takes Place Before Receipt of Intake Report |
| 144 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6421.12 | When to Refer an Interview to a Children's Advocacy Center |
| 145 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6421.2 | Observing and Interviewing a Child Related to a Child Care Provider |
| 146 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6421.3 | Notifying Parents, Guardians, or Managing Conservators of Interview With Child |
| 147 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6421.31 | Notifying a Parent of an Alleged Victim |
| 148 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6421.32 | Notifying a Parent of a Child Interviewed as a Collateral Source During an Abuse or Neglect Investigation |
| 149 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6421.4 | Age and Ability Requirements for Observing and Interviewing Children |
| 150 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6422 | Interviewing Adults |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 151 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6422.1 | Interviewing Alleged Perpetrators |
| 152 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6422.2 | Interviewing Principal and Collateral Sources |
| 153 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6430 | Conducting Inspections |
| 154 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6431 | Requirements for Conducting Unannounced Inspections |
| 155 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6431.1 | Inspection Time Frame Priority 1 or Priority 2 Investigations |
| 156 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6432 | Documenting the Observations Made During the Inspection |
| 157 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6440 | Collecting Evidence |
| 158 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6441 | Collecting Evidence Related to Interviews |
| 159 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6441.1 | Conducting and Recording Interviews |
| 160 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6441.2 | Obtaining Written Statements |
| 161 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6441.3 | Maintaining Investigation Notes |
| 162 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6442 | Taking Photographs as Evidence |
| 163 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6443 | Obtaining Written Documents as Evidence |
| 164 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6443.1 | Obtaining Medical Records |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 165 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6443.2 | Obtaining Reports From Law Enforcement |
| 166 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6443.3 | Reviewing Documents From CPS |
| 167 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6443.4 | Obtaining Documents From the Operation |
| 168 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6444 | Maintaining Records of Correspondence |
| 169 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6460 | Interim Staffing With Supervisor |
| 170 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6540 | Investigations Involving Homes Regulated by a Private Child-Placing Agency (CPA) |
| 171 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6541 | Investigations of Abuse or Neglect and Minimum Standards Violations in CPA and CPS Homes Conducted by Licensing |
| 172 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6541.1 | Allegations and Incidents That Must Be Investigated by Licensing |
| 173 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6541.2 | Allegations and Incidents That May Be Investigated by Licensing |
| 174 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6542.1 | Receiving and Assigning the Report |
| 175 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6542.2 | CPA Responsibilities |
| 176 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6542.3 | Licensing Responsibilities |
| 177 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6542.5 | Documentation of Investigations by Child-Placing Agencies |
| 178 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6543 | Agencies Responsible for Investigations in CPA and CPS Homes |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 179 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6600 | Completing the Investigation |
| 180 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6611 | Extending Time Frames for Completing an Investigation |
| 181 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6611.1 | Criteria for Requesting Additional Time to Complete the Investigation |
| 182 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6611.2 | Documenting an Extension |
| 183 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6611.3 | Obtaining an Additional Extension |
| 184 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6620 | Determining the Findings |
| 185 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6622 | Investigations of Possible Abuse or Neglect |
| 186 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6622.1 | Types of Abuse or Neglect |
| 187 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6622.2 | Issuing a Finding of Abuse or Neglect When the Perpetrator Cannot Be Determined |
| 188 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6622.3 | Possible Dispositions |
| 189 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6622.4 | Assigning the Severity to a Reason to Believe Disposition |
| 190 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6622.6 | Allegations Involving Child Sexual Aggression or Child-on-Child Physical Abuse |
| 191 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6630 | Notifying Relevant Parties of the Results of an Investigation |
| 192 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6631 | Notifying the Operation of the Results of an Investigation |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 193 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6631.1 | Completing the Findings Letter or Compliance Evaluation Form |
| 194 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6631.2 | Additional Notification for Abuse or Neglect Investigations |
| 195 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6632 | Notification to the Alleged Perpetrator for an Abuse or Neglect Investigation |
| 196 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6634 | Notification to Monitoring Unit |
| 197 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6635 | Special Notifications for Investigations Involving Children in DFPS Conservatorship |
| 198 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6636 | Notification to Parent of an Alleged Victim of the Results of an Abuse or Neglect Investigation |
| 199 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6700 | Documenting the Investigation |
| 200 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6710 | Documentation in the CLASS and IMPACT Systems |
| 201 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6711 | Documentation of All Investigations |
| 202 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6712 | Additional Documentation for Abuse or Neglect Investigations |
| 203 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6720 | Documentation on the Investigation Conclusion Page in CLASS |
| 204 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6721 | Initiation of Investigation Field |
| 205 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6722 | Observation Made During Inspection Field |
| 206 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6723 | Contact List |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 207 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6724 | Investigation Findings |
| 208 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6724.1 | Findings Involving Child Sexual Aggression |
| 209 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6724.2 | Findings Involving Child-on-Child Physical Abuse |
| 210 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6724.3 | Explanation of Disposition Based on Preponderance |
| 211 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6724.4 | Final Disposition and Summary of Due Process |
| 212 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6725 | Notification Dates |
| 213 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6725.1 | Extension Approval |
| 214 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6730 | Updating the Person Detail Page |
| 215 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6740 | Documentation of Case Notes |
| 216 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6750 | Maintaining an Investigation File |
| 217 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6752 | Investigations Involving Allegations of Abuse or Neglect |
| 218 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6810 | Submitting an Abuse or Neglect Investigation |
| 219 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6820 | Reviewing an Abuse or Neglect Investigation |
| 220 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6830 | Rejecting and Resubmitting an Abuse or Neglect Investigation |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 221 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6831 | Rejecting and Resubmitting the Investigation for Minor Documentation Errors |
| 222 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6832 | Rejecting and Resubmitting the Investigation For Significant Documentation Errors Or Incomplete Investigation Activities |
| 223 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6840 | After an Abuse or Neglect Investigation Is Approved |
| 224 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6900 | Recommending Action as a Result of Investigation Findings |
| 225 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6910 | Conducting a Case Review Before Recommending an Action |
| 226 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6920 | Issues to Consider Before Recommending an Action |
| 227 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6930 | Actions to Take Following the Investigation of a Regulated Operation |
| 228 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6950 | Documentation in CLASS |
| 229 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section Appendix 6000-1 | Time Frames for Investigations |
| 230 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 3222 | How to Determine Whether the Applicant Is Eligible to Apply |
| 231 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 4141 | Preparing for Application, Initial, and Monitoring Inspections |
| 232 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 4441 | Enforcement Team Conferences for Child-Placing Agencies, General Residential Operations, and Residential Treatment Centers |
| 233 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 4500 | Evaluating Risk to Children |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 234 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6210 | Reports Received From Statewide Intake (SWI) |
| 235 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6221.5 | Intake Reports to Be Closed Without an Investigation |
| 236 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6243 | Investigate or Close a Report of Non Abuse or Neglect |
| 237 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6243.1 | Closing a Non Abuse or Neglect Intake Report |
| 238 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6244 | IMPACT and CLASS Options for Changing the Priority, Downgrading, or Closing an Intake Report |
| 239 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6244.1 | IMPACT Options for Changing the Priority, Downgrading, or Closing an Intake Report |
| 240 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6244.2 | CLASS Options for Closing an Intake Report |
| 241 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6271.1 | Evaluating the Factual Basis of an Anonymous Intake Report |
| 242 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6273 | Repeated Reports With No New Allegations |
| 243 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6274 | Report of Incidents That Occurred in the Past |
| 244 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6275.1 | Incidents Self-Reported by Operations That May Not Require an Investigation |
| 245 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6312 | Reviewing the Intake Report Narrative and Determining the Allegations |
| 246 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6352 | Notifying the Operation of an Investigation |
| 247 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6353 | Notifications Involving a Child in the Conservatorship of DFPS (Abuse or Neglect Only) |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 248 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6353.1 | How to Notify the CPS Caseworker |
| 249 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6361.1 | Time Frame for Initiating a Priority 1 (P1) Investigation |
| 250 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 6610 | Time Frames for Completion of the Investigation |
| 251 | Texas DFPS Child Care Licensing Policy and Procedures Handbook | Section 7110 | Circumstances That May Call for Enforcement Action |
| 252 | Texas DFPS CPS Handbook | Section 4135 | Provide the Service Plan and Discuss Services |
| 253 | Texas DFPS CPS Handbook | Section 4136 | Provide Additional Documentation |
| 254 | Texas DFPS CPS Handbook | Section 5231.6 | Providing Records to the Attorney *ad litem* and Guardian *ad litem* |
| 255 | Texas DFPS CPS Handbook | Section 5232.21 | Court Orders for CASAs Seeking Access to a Child or a Child's Records |
| 256 | Texas DFPS CPS Handbook | Section 6133.1 | Documentation and Communication |
| 257 | Texas DFPS CPS Handbook | Section 6133.2 | Documenting Contacts in Substitute Care |
| 258 | Texas DFPS CPS Handbook | Section 6133.21 | Documenting Contacts Using the Contact Details Page |
| 259 | Texas DFPS CPS Handbook | Section 6133.22 | Documenting Monthly Contacts and Visits |
| 260 | Texas DFPS CPS Handbook | Section 6133.23 | Required Narrative Content |
| 261 | Texas DFPS CPS Handbook | Section 6133.24 | Contacts and Visits with the Child, Parent, Kinship, Relatives, and Caregiver |
| 262 | Texas DFPS CPS Handbook | Section 6133.4 | Documenting Health Information |
| 263 | Texas DFPS CPS Handbook | Section 6133.5 | Maintaining the Health, Social, Educational, and Genetic History (HSEGH) Report |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 264 | Texas DFPS CPS Handbook | Section 6133.51 | Education Information |
| 265 | Texas DFPS CPS Handbook | Section 6134 | External Documentation |
| 266 | Texas DFPS CPS Handbook | Section 6411.1 | Federal Requirements |
| 267 | Texas DFPS CPS Handbook | Section 6411.2 | Frequency of Face-to-Face Visits |
| 268 | Texas DFPS CPS Handbook | Section 6412 | Responsibility for Contact Across Regional Lines |
| 269 | Texas DFPS CPS Handbook | Section 6413 | Services to Children and Caregivers Across Regional Lines |
| 270 | Texas DFPS CPS Handbook | Section 6414 | I See You Supervision |
| 271 | Texas DFPS CPS Handbook | Section 6414.1 | I See You Eligibility |
| 272 | Texas DFPS CPS Handbook | Section 6414.2 | Coordination Between I See You and Primary Caseworker |
| 273 | Texas DFPS CPS Handbook | Section 6414.3 | Responsibilities of I See You Caseworker |
| 274 | Texas DFPS CPS Handbook | Section 6414.4 | Responsibilities of the Primary Caseworker When An I See You Caseworker is Assigned to a Child |
| 275 | Texas DFPS CPS Handbook | Section 6414.5 | Transitioning from an I See You Caseworker to a Courtesy Caseworker When the Out of Region Placement is Identified as the Adoptive Home |
| 276 | Texas DFPS CPS Handbook | Section 6414.6 | I See You Waiver |
| 277 | Texas DFPS CPS Handbook | Section 6414.7 | Conducting the Monthly Visit |
| 278 | Texas DFPS CPS Handbook | Section 6414.71 | Assessing the Monthly Visit |
| 279 | Texas DFPS CPS Handbook | Section 6414.72 | Documenting the Monthly Visit |
| 280 | Texas DFPS CPS Handbook | Section 6414.73 | Following Up on Identified Needs |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 281 | Texas DFPS CPS Handbook | Section 6414.74 | Visits Conducted by an Alternate Caseworker |
| 282 | Texas DFPS CPS Handbook | Section 6414.75 | Alternate Caseworker Follow Up |
| 283 | Texas DFPS CPS Handbook | Section 6431.1 | Child and Adolescent Needs and Strengths (CANS) Assessment and Family Strengths and Needs Assessment (FSNA) |
| 284 | Texas DFPS CPS Handbook | Section 11115.2 | Documenting in IMPACT (for identification of medical consenter) |
| 285 | Texas DFPS CPS Handbook | Section 11131 | Being Knowledgeable of Child's Medical Condition |
| 286 | Texas DFPS CPS Handbook | Section 11410 | Arranging for Special Health Care Management Services |
| 287 | Texas DFPS CPS Handbook | Section 11411 | Referring a Child to Medical Professionals and Health |
| 288 | Texas DFPS CPS Handbook | Section 11412 | Working With Children in DFPS Conservatorship Who Have Special Health Care Needs |
| 289 | Texas DFPS CPS Handbook | Section 1520 | Obtaining Certified Birth Certificates and Screen-Printing Birth Records |
| 290 | Texas DFPS CPS Handbook | Section 2132 | Reporting Requirements for DFPS Staff |
| 291 | Texas DFPS CPS Handbook | Section 2140 | Screening an Intake for Investigation |
| 292 | Texas DFPS CPS Handbook | Section 4113 | Gather Information and Recommendations to Select a Placement |
| 293 | Texas DFPS CPS Handbook | Section 4113.6 | Review Additional Information About the Child's Needs |
| 294 | Texas DFPS CPS Handbook | Section 4114 | Required Factors to Consider When Evaluating a Child's Possible Placement |
| 295 | Texas DFPS CPS Handbook | Section 4114.22 | Separating Siblings for Safety Purposes |

|  | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 296 | Texas DFPS CPS Handbook | Section 4121.2 | Prepare the Current and New Caregivers for the Move |
| 297 | Texas DFPS CPS Handbook | Section 4121.3 | Complete the Placement Summary Form |
| 298 | Texas DFPS CPS Handbook | Section 4130 | Actions Required During a Placement Change |
| 299 | Texas DFPS CPS Handbook | Section 4133 | Provide and Discuss the Placement Summary (Form 2279) |
| 300 | Texas DFPS CPS Handbook | Section 4151 | Court-Ordered Placements in Unapproved Facilities |
| 301 | Texas DFPS CPS Handbook | Section 4154 | Placements and Child Safety |
| 302 | Texas DFPS CPS Handbook | Section 4155 | Safety and Related Concerns for Placements |
| 303 | Texas DFPS CPS Handbook | Section 4221 | Abuse and Neglect Investigations of DFPS-Regulated Placements |
| 304 | Texas DFPS CPS Handbook | Section 4221.1 | RCCL Notifying CPS of Alleged Abuse or Neglect |
| 305 | Texas DFPS CPS Handbook | Section 4221.2 | Using Intermittent Alternate Care and Respite During an Abuse and Neglect Investigation by the Child-Placing Agency |
| 306 | Texas DFPS CPS Handbook | Section 4221.3 | CPS Responsibility and Procedure |
| 307 | Texas DFPS CPS Handbook | Section 4221.4 | CPS Protocol During an RCCL Investigation Involving a Child in Conservatorship |
| 308 | Texas DFPS CPS Handbook | Section 4221.5 | How CPS Conducts Safety Checks or Other Safety Measures |
| 309 | Texas DFPS CPS Handbook | Section 4221.6 | CPS Actions When Abuse or Neglect Is Alleged to Have Occurred in a Foster Home |
| 310 | Texas DFPS CPS Handbook | Section 4231 | Facilities Under the Authority of Other State Agencies in General |
| 311 | Texas DFPS CPS Handbook | Section 4231.1 | DFPS's Continuing Responsibilities When a Child in Conservatorship is Placed in a Facility Regulated by Another State Agency |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 312 | Texas DFPS CPS Handbook | Section 4231.2 | Additional Responsibilities Before Placement |
| 313 | Texas DFPS CPS Handbook | Section 4231.3 | Reporting Problems to Other State Agencies |
| 314 | Texas DFPS CPS Handbook | Section 4232 | TJJD and JPD Facilities |
| 315 | Texas DFPS CPS Handbook | Section 4310 | Unauthorized Arrangements By Youth in DFPS Conservatorship |
| 316 | Texas DFPS CPS Handbook | Section 6252 | Permanency Planning Meetings for Youth 14 and Over |
| 317 | Texas DFPS CPS Handbook | Section 6341.26 | Working with Children Who are Sexually Aggressive and Victims of Sexual Aggression |
| 318 | Texas DFPS CPS Handbook | Section 6420 | Rights of Children and Youth in Foster Care |
| 319 | Texas DFPS CPS Handbook | Section 6421 | Texas Foster Care Handbook |
| 320 | Texas DFPS CPS Handbook | Section 6431.11 | Timeline for CANS and FSNA |
| 321 | Texas DFPS CPS Handbook | Section 6431.12 | Using the CANS Assessment for Service Planning |
| 322 | Texas DFPS CPS Handbook | Section 6431.14 | Annually Updating CANS |
| 323 | Texas DFPS CPS Handbook | Section 10000 | Services to Older Youth in Care |
| 324 | Texas DFPS CPS Handbook | Section 10131 | Personal Documents Provided to Youth at Age 16 |
| 325 | Texas DFPS CPS Handbook | Section 11200 | Medical and Dental Services |
| 326 | Texas DFPS CPS Handbook | Section 11211 | Initial Texas Health Steps Medical Checkup |
| 327 | Texas DFPS CPS Handbook | Section 11212 | Initial Texas Health Steps Dental Checkup |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 328 | Texas DFPS CPS Handbook | Section 11213 | Subsequent, Ongoing Texas Health Steps Checkups |
| 329 | Texas DFPS CPS Handbook | Section 11214 | Immunizations |
| 330 | Texas DFPS CPS Handbook | Section 11260 | Documenting Medical and Dental Issues in the Case File |
| 331 | Texas DFPS CPS Handbook | Section 11261 | Documenting Checkups (Medical and Dental) in IMPACT and the Case File |
| 332 | Texas DFPS CPS Handbook | Section 11262 | Documenting Other Health-Related Visits in IMPACT and the Case File |
| 333 | Texas DFPS CPS Handbook | Section 11263 | Completing a Medical History in IMPACT |
| 334 | Texas DFPS CPS Handbook | Section 11264 | Documenting Additional Health-Related Details for the Record |
| 335 | Texas DFPS CPS Handbook | Section Appendix 11211-A | Texas Health Steps – Obtained Through STAR Health or Traditional Medicaid |
| 336 | Texas DFPS CPS Handbook | Section Appendix 4623 | Protocol for RCCL or CPS Investigations Involving Child-on-Child Victimization in Foster Care |
| 337 | Texas DFPS Office of Consumer Affairs Handbook | Section 2300 | Complaints That OCA Accepts for Review |
| 338 | Texas DFPS Office of Consumer Affairs Handbook | Section 2500 | Complaint Intake |
| 339 | Texas DFPS Office of Consumer Affairs Handbook | Section 2510 | Complaints Made Over the Telephone |
| 340 | Texas DFPS Office of Consumer Affairs Handbook | Section 2520 | Written Complaints |
| 341 | Texas DFPS Office of Consumer Affairs Handbook | Section 2530 | Notifying Program Staff |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 342 | Texas DFPS Office of Consumer Affairs Handbook | Section 2540 | Determining the Finding |
| 343 | Texas DFPS Office of Consumer Affairs Handbook | Section 2550 | Closing and Responding to Complaints |
| 344 | Texas DFPS Records Management Group Handbook | Section 1200 | Definition of a DFPS Record |
| 345 | Texas DFPS Records Management Group Handbook | Section 1221 | Contents of a Physical File |
| 346 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 1100 | Legal Basis |
| 347 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 1110 | Legal Requirement to Report |
| 348 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 1111 | Abuse or Neglect of a Child |
| 349 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 1130 | Notification to Law Enforcement |
| 350 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 1260 | Call Recording |
| 351 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2120 | Assessing Reports |
| 352 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2135 | SWI Feedback to Reporter |
| 353 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2324 | Subsequent Information Regarding an Existing DFPS Case |
| 354 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2332.1 | Notifying the Local CPS Office of the Death of a Child |
| 355 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2332.2 | A Child's Death Report for CPS |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 356 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2332.3 | A Child's Death Report for RCCL |
| 357 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2332.4 | A Child's Death Report for DCL |
| 358 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2332.5 | A Child's Death in a Facility Under the Jurisdiction of APS Facility Investigations |
| 359 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2332.6 | A Child's Death in a TYC Placement |
| 360 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2332.7 | A Child's Death in a Nursing Home |
| 361 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2400 | Law Enforcement "Welfare Checks" |
| 362 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2760 | Reports Concerning Law Enforcement |
| 363 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2761 | Reports of Abuse, Neglect, Exploitation, or Death Investigated by Law Enforcement |
| 364 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 2762 | Reports of Abuse or Neglect Perpetrated by Law Enforcement |
| 365 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 3243 | Finding the Current Caseworker on an Open Case |
| 366 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4100 | Definitions |
| 367 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4200 | CPS Intake Assessment Guidelines |
| 368 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4300 | CPS Assessment of Priority and Risk |
| 369 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4400 | Specialized CPS Reports |

|  | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 370 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4481 | Situations That Always Require an "I&R Call Regarding Existing CPS Case" |
| 371 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4482 | Youth in DFPS Conservatorship Has a Baby |
| 372 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4500 | CPS Investigational Jurisdiction |
| 373 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4600 | Incidents, Victims, or Perpetrators Outside Texas |
| 374 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4800 | Casework Related Special Requests |
| 375 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 4930 | Open Service Delivery Stages |
| 376 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5000 | Child Care Licensing (CCL) Division |
| 377 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5220 | CCL Assessment of Priority |
| 378 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5221 | CCL Assessment of Priority 1 |
| 379 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5222 | CCL Assessment of Priority 2 |
| 380 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5230 | CCL Possible Standards Violations: Incidents Not Involving Abuse, Neglect, or Exploitation |
| 381 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5240 | Reports Involving Children in DFPS Conservatorship in a CCL Operation |
| 382 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5400 | Residential Child Care Licensing (RCCL) |
| 383 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5410 | Residential Child-Care Operations That Are Regulated by RCCL |

|  | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 384 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5430 | The Department or Agency which Licenses a Residential Facility Is Unclear |
| 385 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5440 | RCCL Illegal Operations |
| 386 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5450 | Special Situations Involving RCCL Operations |
| 387 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5451 | When the Victim Is 18 or Older |
| 388 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5452 | Assessing Reports of Alleged Sex Offenders in a Foster Home (Active Vs Inactive) |
| 389 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5456 | Law Enforcement Reports Family Violence in RCCL Foster Homes |
| 390 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 5464 | RCCL Assignment and Call Out |
| 391 | Texas DFPS Statewide Intake Policy and Procedures Handbook | Section 7330 | Reports Involving Children in DFPS Conservatorship in a Facility Under the Jurisdiction of Adult Protective Services Facility Investigations |
| 392 | Texas Human Resources Code | Title 2, Subtitle D, Chapter 42, Subchapter A, Section 42.053 | Agency Foster Homes and Agency Foster Group Homes |
| 393 | Texas Human Resources Code | Title 2, Subtitle D, Chapter 42, Subchapter A, Section 42.0535 | Required Information for Verification |
| 394 | Texas Human Resources Code | Title 2, Subtitle D, Chapter 42, Subchapter A, Section 42.002(10) | Definitions |
| 395 | Texas Human Resources Code | Title 2, Subtitle D, Chapter 42, Subchapter C, Section 42.041(b)(2) | Required License |
| 396 | Texas Human Resources Code | Title 2, Subtitle D, Chapter 42, Subchapter C, Section 42.044 | Inspections |

| | Policy Source | Policy Reference | Policy Title |
|---|---|---|---|
| 397 | Texas Human Resources Code | Title 2, Subtitle D, Chapter 42, Subchapter D, Section 42.072 | License, Listing, or Registration Denial, Suspension, or Revocation |
| 398 | Texas Statutes - Family Code | Title 5, Subtitle E, Chapter 261, Subchapter D, Section 261.3016 | Training of Personnel Receiving Reports of Abuse and Neglect |
| 399 | Texas Statutes - Family Code | Title 5, Subtitle E, Chapter 261, Subchapter D, Section 261.310 | Investigation Standards |
| 400 | Texas Statutes - Family Code | Title 5, Subtitle E, Chapter 263, Subchapter A, Section 263.008 | Foster Children's Bill Of Rights |
| 401 | Texas Statutes - Family Code | Title 5, Subtitle E, Chapter 266, Section 266.003 | Medical Services for Child Abuse and Neglect Victims |
| 402 | Texas Statutes - Family Code | Title 5, Subtitle E, Chapter 266, Section 266.006 | Health Passport |
| 403 | Texas Statutes - Family Code | Title 5, Subtitle B, Chapter 153, Subchapter G, Section 153.371(4) | Rights and Duties of Nonparent Appointed as Sole Managing Conservator |
| 404 | Texas Statutes - Family Code | Title 5, Subtitle E, Chapter 261, Subchapter D, Section 261.301(a) | Investigation of Report |
| 405 | Texas Statutes - Family Code | Title 5, Subtitle E, Chapter 261, Subchapter D, Section 261.401(b) | Agency Investigation |
| 406 | Texas Statutes - Family Code | Title 5, Subtitle E, Chapter 264, Subchapter B, Section 264.121 | Transitional Living Services Program |
| 407 | Texas Statutes - Texas Government Code | Title 4, Subtitle I, Chapter 531, Subchapter W | Adverse Licensing, Listing, or Registration Decisions |

# APPENDIX B

Key Findings: Texas Child Protective Services

## *I See You Workload Study*

Submitted by:

Cynthia Osborne, Ph.D.
Director, Child and Family Research Partnership

December 4, 2017

## Authors

*Cynthia Osborne, Ph.D.*
Director, Child and Family Research Partnership
Associate Professor
Lyndon B. Johnson School of Public Affairs
The University of Texas at Austin

*Anna Lipton Galbraith, MPAff*
Senior Research Associate
Child and Family Research Partnership

*Jennifer Huffman, MPAff*
Research Associate
Child and Family Research Partnership

*Hilary Warner, Ph.D.*
Postdoctoral Fellow
Child and Family Research Partnership

## Research Support

*Holly Sexton, M.A.*
Senior Research Associate
Child and Family Research Partnership

*Daniel Tihanyi, MPSA*
Research Associate
Child and Family Research Partnership

*Katherine Mercer*
Research Assistant
Child and Family Research Partnership

*Erika Parks*
Graduate Research Assistant
Child and Family Research Partnership

# KEY FINDINGS

The Special Masters appointed by the United States District Court, Southern District of Texas retained the Child and Family Research Partnership (CFRP) at the University of Texas at Austin to implement a workload study of I See You ("ISY"). ISY caseworkers serve as a liaison between children placed outside their home jurisdiction and their primary conservatorship (CVS) caseworker. The ISY caseworker position was created over a decade ago by DFPS, in part because children were too often being sent far from their home communities. The main responsibilities of the ISY caseworker are to visit the child at least once each month, which is a requirement per federal funding guidelines, and communicate service needs and other information back to the primary caseworker.

Per the Child Protective Services (CPS) Handbook,

> "*ISY* caseworkers are secondary caseworkers for children and youth placed outside the region that has legal jurisdiction. The *ISY* caseworker acts as an extension of the primary caseworker and aids the primary caseworker in ensuring that the child or youth's needs for safety and well-being are being met. The *ISY* caseworker also works to ensure that the child or youth achieves permanency."[.]

In both a December 2015 Opinion and January 2017 Interim Order, Judge Janis Graham Jack concluded evidence at trial raised substantial concerns about the casework quality of ISY caseworkers and tasked the Special Masters to conduct a study of ISY caseworkers.  The three primary research aims of the study are to determine the current caseload of ISY caseworkers and how they spend their time; the extent to which the caseworkers are familiar with the children they visit and are meeting their job responsibilities; and the factors that affect how ISY caseworkers spend their time. CFRP used a variety of data sources in this study, including administrative data from the Texas Department of Family and Protective Services, surveys of ISY workers, and interviews and focus groups with caseworkers.

## I. I SEE YOU WORKER CASELOADS

Using DFPS IMPACT data, CFRP found that in June 2017, on average, 48 percent of each ISY caseworker's caseload was comprised of children in PMC and 52 percent was comprised of children in TMC. Consistent with the proportion of children in TMC and PMC identified in the IMPACT data, caseworkers reported on the ISY Survey that in June 2017, 50 percent of the children on their caseload were in TMC and 50 percent of the children on their caseload were in PMC. CFRP found that, for the sampled children on whom ISY caseworkers reported in the time study, children in PMC were more likely to be placed in RTCs (43%) and children in TMC were more likely to be placed with kin (43%).

To assess ISY caseworkers' average caseload, CFRP measured caseloads using two different methods and found very similar results. First, CFRP measured the average daily caseload using IMPACT records. Average daily caseload refers to the average of the number of cases assigned to an ISY

---

[.] Child Protective Services Handbook. Section 6414, *ISY Supervision*. Updated February 2017. https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_6400.asp#CPS_6414.

caseworker during each calendar day of June 2017. Measuring caseload as an average of each daily caseload is useful because it accounts for the fact that a caseworker may be assigned and unassigned to cases throughout the month. CFRP also used the median of all of the ISY caseworkers' average daily caseloads. The median is a better indicator of the typical ISY caseload than the average because the median is less sensitive to outliers and zero values.

**Table 1: Median Caseload of ISY Caseworkers, June 2017**

| Caseworker | Median of the Average Daily Caseload Recorded in IMPACT | Median Point-in-Time Caseload Self-Reported in Survey |
|---|---|---|
| I See You | 43.9 | 43.0 |

*Source: IMPACT and ISY Survey, N=98 ISY caseworkers.*

The reported median of the caseloads is very consistent across the ISY Survey and IMPACT data sources (shown in Table 1). According to IMPACT records, the median average daily caseload for an ISY caseworker in June 2017 was 43.9 children. According to the survey data, the median point-in-time caseload for ISY caseworkers was 43 during the month of June. The consistency between the average caseload calculated from IMPACT and the self-reported point-in-time study suggests that 43.9 is a reliable estimate of the typical caseload for an ISY caseworker in June 2017. The average daily caseload for ISY caseworkers ranged from a low of 20 children to a high of 87 children in June 2017. However, 80 percent of ISY caseworkers had an average daily caseload between 32 and 64 children.

As an additional point of reference, the number of children with a secondary caseworker assigned to them on June 15, 2017, was 4645 and fluctuated modestly in June, from a high of 4668 to a low of 4596, as assignments began and ended.  This includes all children for whom ISY caseworkers were assigned as secondary caseworkers for the child's substitute care stage.  With respect to only PMC children, there were 2442 PMC children on June 15 who were assigned an ISY worker, fluctuating during the month from a high of 2511 to a low of 2378.

The median ISY caseload differs considerably by region. For example, Table 2 shows that the typical ISY caseworker in Region 4 has a caseload of nearly 66 children, whereas ISY caseworkers in Region 1 have a caseload of approximately 32 children.

**Table 2: Average Daily Caseload of ISY Caseworkers by Region, June 2017**

| Regions | Number of Caseworkers | Median | Minimum | Maximum |
|---|---|---|---|---|
| 1 | 5 | 31.9 | 20.0 | 54.8 |
| 2 | 4 | 38.2 | 33.9 | 46.0 |
| 3 | 17 | 39.1 | 25.8 | 53.1 |
| 4 | 6 | 65.9 | 49.4 | 74.4 |
| 5 | 6 | 55.6 | 40.9 | 75.8 |
| 6 | 22 | 52.6 | 35.9 | 63.6 |
| 7 | 19 | 39.2 | 24.1 | 57.7 |
| 8 | 14 | 40.3 | 32.1 | 45.3 |
| Statewide | 98 | 43.9 | 20.0 | 86.7 |

*Source: DFPS IMPACT data, N=98 ISY caseworkers.*
*Note: Regions 9 and 11 are included in the calculations, but are not displayed in the table because of small sample sizes in the regions.*

## II. I SEE YOU WORKERS' TIME STUDY: MORE TIME NEEDED

CFRP conducted a time study of all current ISY caseworkers. In the time study, each caseworker was asked to report on three randomly selected cases every week, for four consecutive weeks. The selected cases were of children currently in the substitute care stage (SUB) in which the ISY caseworker was assigned as secondary on the stage. For most caseworkers, the three cases were randomly selected from all of the cases assigned to the caseworker during the prior six months (between December 2016 and May 2017) and still assigned as of June 1, 2017. In other words, children in the ISY time study sample had been assigned to the ISY caseworker for no more than six months at the time of the survey. The sampling goal was to have at least 10 cases per caseworker available in case any of the three randomly selected cases were unassigned before the start of the time study (June 1st). 83 of the 98 caseworkers had at least 10 cases available that had been assigned between December 2016 and May 2017. In order to identify an adequate number of cases for the remaining 15 caseworkers, CFRP selected some cases that were assigned as early as August 2016. This selection criteria resulted in a possible pool of 1,467 cases (approximately 15 cases per caseworker). Available cases ranged from as few as 5 to as many as 48 per caseworker. The ISY caseworkers also reported on the first new case assigned to them during the month of June. If multiple children in a sibling group were assigned at the same time, the ISY worker was asked to respond regarding the oldest child in the sibling group. Nineteen of the 92 available newly assigned cases were part of a sibling group (20.7%).

Each week, ISY caseworkers were asked to report a full retrospective on the actual time they spent that week on the casework activities for each selected case, along with time they spent on general (non-case-specific) activities. All available ISY caseworkers participated in the time study. In total, 98 ISY caseworkers reported case-specific activities for 381 cases. One individual did not complete one of the weekly time reports. Several individuals were on leave for an entire week and had no time to report other than leave time. These individuals were not required to submit the time report for the week that they were on leave.[*] The overall response rate for those who were not reported as being on leave for a reported week was 99.7 percent.

Approximately half of the children on an ISY caseworker's caseload are PMC children as compared to children in TMC. The study determined that ISY caseworkers typically spend approximately 93 hours each month on general activities that are not associated with any particular case (e.g., travel or training) and approximately 2.75 hours on each case on their caseload. The amount of time ISY caseworkers spend on a case does not vary based on whether the child is in PMC or TMC, but may vary based on the child's placement and age.

Table 3 presents the median time spent on each case-specific activity for PMC cases that were assigned to ISY caseworkers in June 2017. Table 3 also describes the percentage of PMC cases in the time study for which at least some time was spent on the activity. CFRP examined whether the time

---

[*] Three individuals were on leave for the entirety of week 1 of the study, two were on leave for the entirety of week 2, two were on leave for week the entirety of week 3, and none were on leave for the entirety of week 4. Leave was taken in these instances pursuant to the federal Family and Medical Leave Act.

spent on TMC and PMC cases varied and found that the typical overall time spent on each case did not vary significantly (2.75 hours for both TMC and PMC cases).

*Table 3: Time on PMC Case-Specific Activities*

| Activity | Percent of Selected PMC Cases with at Least Some Time Reported for Activity | Median of Non-Zero Time on Activity (Minutes) |
|---|---|---|
| Documentation | 91.2% | 40.0 Minutes |
| Face-to-Face with Child | 90.6% | 30.0 Minutes |
| Face-to-Face with Caregiver | 85.5% | 30.0 Minutes |
| Follow-up on Case | 70.4% | 30.0 Minutes |
| Reviewing Case Documents | 51.6% | 30.0 Minutes |
| Meetings | 34.0% | 30.0 Minutes |
| Outings | 3.8% | 30.0 Minutes |
| Court | 3.1% | 110.0 Minutes |
| Other | 2.5% | 45.0 Minutes |

*Source: ISY Time Study, N=159 PMC cases.*
*Notes: Median times reported for each activity exclude ISY cases for which no time was listed. Only PMC cases are included Table 3.*

At their current caseloads, to spend the typical (median) amount of time that ISY workers reported spending on their secondary assignments, caseworkers would need to be working between 20 and 190 hours of overtime each month. Again, this finding is based on self-reported information from ISY caseworkers and was not otherwise independently validated.

For approximately 40 percent of the sampled PMC cases, ISY caseworkers indicated they wished they had more time to spend with children and caregivers in face-to-face visits with the children. ISY caseworkers indicated that they would like additional time to follow-up on children's needs for almost one-third of the sampled PMC cases. For the cases for which ISY caseworkers desired more time for face-to-face meeting activities, the median additional time desired was approximately 30 minutes more per child.

## III. MONTHLY FACE-TO-FACE VISIT RATE

To measure the extent to which the ISY caseworkers conducted a monthly face-to-face visit with each child on their caseload, CFRP calculated a monthly visit rate for each ISY caseworker. CFRP divided the number of face-to-face visits documented in IMPACT for each caseworker by the total number of monthly face-to-face visits required of that caseworker (i.e., the total number of children who were on the ISY caseworker's caseload for the entire month of June 2017).

In June 2017, 98 ISY caseworkers were required to complete, at the median, 21.5 visits each with PMC children. The median number of visits completed was actually 16 per worker. This reflects a completion rate of 74.4 percent of the monthly face-to-face visits for ISY workers' cases. ISY caseworkers missed visits altogether with slightly more than one-quarter of the PMC children they were responsible to visit. The median visit rate was slightly higher at 77.8 percent, which was created by calculating the average of each individual ISY caseworker's visit rate and taking the median of that

value, not by using the average number of required visits divided by the average number of visits conducted. The analysis was limited to children in PMC. The caseworker with the lowest visit rate completed 23.1 percent of her required visits and the caseworker with the highest visit rate completed 100 percent of her required visits.

## IV. INITIAL FACE-TO-FACE VISIT RATE

An ISY caseworker must also conduct an initial face-to-face visit with each new child assigned to her caseload within 15 days of being assigned as secondary caseworker on the case. To assess the extent to which ISY caseworkers met this casework practice standard, CFRP divided the number of face-to-face visits on new cases by the number of expected initial face-to-face visits in June 2017. Forty-six ISY caseworkers had a new PMC case assigned to them for at least 15 calendar days in June 2017 (providing the worker sufficient time to meet this standard). Of those caseworkers, the typical caseworker completed 50 percent of initial face-to-face visits with new children. Overall, ISY caseworkers completed between zero and 100 percent of their initial face-to-face visits. Of the 46 ISY caseworkers who had at least 15 days with a new PMC case in June 2017, 41 percent met with 100 percent of the children on their new cases within 15 days. However, 35 percent of ISY caseworkers with a new case did not complete a single initial face-to-face in June.

At their given caseload level, approximately three-fourths of ISY caseworkers are meeting monthly with each child on their caseload, and half made the prescribed initial contact in June with new children assigned to their care. Completion rates for monthly and initial face-to-face visits are based on DFPS administrative data, which do not provide any information about the quality of the visits, or whether the visits are conducted privately. DFPS advised the Special Masters that there is no specific location in the IMPACT record where caseworkers must confirm that a child was interviewed in private or separately.

## V. KNOWLEDGE OF CHILDREN'S CASES

CFRP gathered data on two randomly selected children assigned to 22 ISY caseworkers through a series of interviews conducted in the CPS offices in Lubbock, Austin, Corpus Christi, and San Antonio. The cases were identified to the ISY workers in advance of the meetings to allow the ISY caseworkers time to review their files completely. ISY caseworkers were asked to bring any paper documentation or files pertaining to the children to the interview with them. In each location, the interviews took place over the course of one day, except in Austin where interviews took place over two days. Attorneys were not present for ISY interviews in Lubbock or Austin and were present in Corpus Christi and San Antonio. The questions were shared with DFPS attorneys in advance at their request. CFRP does not know if they shared the questions with the workers since the interviews were approached not as deposition, but as an interview for research.

For 59 percent of children, ISY caseworkers could provide details about the child's education, including grade level, school, subjects that the child enjoys, and the child's specialized educational needs, if applicable.

---

Child Protective Services Handbook. Section 6414, *ISY Supervision*. Updated February 2017.
https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_6400.asp#CPS_6414.

For another 34 percent of children, ISY caseworkers provided incomplete or undetailed information about the child's education.

For six percent of children, the ISY caseworkers could not describe anything about the child's education.

CFRP asked ISY caseworkers whether children had contact with their siblings or parents and found that for 81 percent of children, the ISY caseworker could describe the child's contact with family in detail. For another 17 percent of children, the ISY caseworker provided some incomplete information about the child's contact with siblings or parents and for 2 percent of children, the ISY caseworker could not provide any information on this topic.

CFRP asked ISY caseworkers about their knowledge of children's most recent medical visits and medication. ISY caseworkers provided detailed information about the last medical visit, such as the date of the visit, type of provider and name of provider, for 28 percent of children.

ISY caseworkers provided limited information, such as whether the child is up-to-date on medical and dental visits, for 54 percent of children. ISY caseworkers were not able to provide any information whatsoever about the most recent medical visit for 18 percent of the children.

With regard to medication, ISY caseworkers could describe the medication details, such as type of medication and dosage, for only 24 percent of children and could describe only general medical needs or basic medication types (i.e. describing a medication as an antidepressant but not knowing more) for 35 percent of children. ISY caseworkers reported that 38 percent of the children who they were asked about do not take any medications and for 3 percent of children, the ISY caseworkers were not able to provide any information on the child's medications.

CFRP surveyed all ISY caseworkers to learn what documents they rely upon to come up to speed on a new case, as shown in Figure 1 below. The documents that nearly half of ISY caseworkers reported were essential include psychological assessments and the removal affidavit. The survey results show that ISY caseworkers are less likely to consider educational records, court reports, visitation plans, and home studies when they are coming up to speed on a new case.

*Figure 1: Usefulness of Documents for Coming Up to Speed on a Case*

Percent of ISY Caseworkers Who Find Document "Essential" for Coming Up to Speed on a New Case

| Removal affidavit | Court reports | Psychological assessments | Other assessments of the child | Visitation plans | Educational information | Relative or kinship home study |
|---|---|---|---|---|---|---|
| 44.3% | 26.8% | 46.9% | 18.1% | 29.6% | 25.5% | 34.7% |

*Source: ISY Survey, N= 98 ISY caseworkers.*

## VI. THE ISY WORKER'S COMMUNICATION WITH PRIMARY CASEWORKERS

In addition to conducting a phone conference prior to the ISY caseworker's initial visit with the child, ISY caseworkers are expected to communicate at least monthly with the primary CVS caseworker to provide information to assist with completing service plans and court reports. The primary CVS caseworker is also required to maintain at least monthly contact with the child and caregiver, maintain at least monthly contact with the ISY caseworker to ensure the child's needs are being met, and submit the court report to the ISY caseworker five days before a court hearing and any court orders within five days of the hearing to ensure the child and caregiver are being provided with consistent information. No records of this communication are available in the aggregate IMPACT database.

To provide a better understanding of the quality of communication and collaboration between ISY and CVS caseworkers, CFRP's surveys asked ISY caseworkers a series of questions about their interactions with one another. ISY caseworkers responded to questions about communication and collaboration with the CVS primary caseworkers with whom they work, and CVS caseworkers responded about the ISY caseworkers with whom they work.

Figure 2 shows the percentage of ISY respondents who disagree with certain statements about how their primary caseworkers collaborate on a case. As shown in Figure 2, over 82 percent of ISY caseworkers report that their CVS caseworker does not set a regular schedule for communication.

---

Child Protective Services Handbook. Section 6414.3, *Responsibilities of I See You Caseworker*. Updated February 2017. https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_6400.asp#CPS_6414.3.

Child Protective Services Handbook. Section 6414.4, *Responsibilities of the Primary Caseworker when an I See You Caseworker is Assigned to a Child*. Updated February 2017.

ISY caseworkers also report that CVS caseworkers do not communicate regularly with the child or the child's caregiver. But only 24 percent of ISY caseworkers disagreed with the statement their primary caseworkers are knowledgeable about the child and the child's case.

***Figure 2: ISY Perception of Collaboration with CVS (% who disagree)***



Source: ISY Survey, N=98 ISY caseworkers.

## VII. MEDICAL CONSENTERS

DFPS must designate at least one primary and one backup medical consenter for each child in conservatorship, who, depending on the child's placement, may include the child's caregiver and/or caseworker.  Among their responsibilities, medical consenters must be knowledgeable of the child's medical conditions, history, and needs, participate in the child's medical appointments, provide informed medical consent for psychotropic medications, and ensure the children who are prescribed psychotropic medications attend follow-up appointments with the prescribing provider at least every 90 days. Caseworkers, including both CVS and ISY caseworkers, are typically only designated as medical consenters for children on their caseload who are placed in RTCs and other general residential operations with shift staff.

ISY caseworkers interviewed by the research team identified 9 PMC children for whom they were at least partially responsible for arranging and consenting to the child's medical care. For 7 of those 9 children, the ISY caseworkers reported that additional people were also involved in coordinating the child's medical care, including the primary caseworker, the child's caregiver, and/or the medical coordinators at an RTC.

For 4 of those 9 children, ISY caseworkers provided detailed information about the last medical visit, such as the date of the visit, type of provider and name of provider. The ISY caseworkers provided limited information, such as whether the child is up-to-date on medical and dental visits, for another 4 of the 9 children. ISY caseworkers were not able to provide any information about the most recent medical visit for 1 of the 9 children.

ISY caseworkers could also describe details about children's medication, such as type of medication and dosage, for 5 of the 9 children and could describe only general medical needs or basic medication types for 2 of the 9 children. ISY caseworkers reported that the remaining 2 children

who they were asked about do not take any medications.

## Summary and Conclusion

The typical ISY caseworker has a caseload of nearly 44 children each day of the month. This caseload level varies considerably by region, however, with a low of 32 children on a typical caseload in Region 1 and a high of 66 children on a typical caseload in Region 4. Approximately half of the children on an ISY caseworker's caseload are children in PMC, as compared to TMC.

Based on information reported in the ISY Time Study, ISY caseworkers typically spend approximately 93 hours each month on general activities that are not associated with any particular case (e.g., travel or training), and approximately 2.75 hours on each PMC case on their caseload. If ISY caseworkers typically spent 2.75 hours on each of their 44 cases, and 93 hours on general activities, they must work considerable over time each month.

In June 2017, 98 ISY caseworkers were required to complete, at the median, 21.5 visits with PMC children in June. The median number of visits completed was actually 16. This reflects a completion rate of 74.4 percent of the monthly face-to-face visits for ISY workers' cases. ISY caseworkers missed visits altogether with slightly more than one-quarter of the PMC children they were responsible to visit. The caseworker with the lowest visit rate completed 23.1 percent of her required visits and the caseworker with the highest visit rate completed 100 percent of her required visits.

The typical ISY caseworker completed 50 percent of initial face-to-face visits with new children in June. Overall, ISY caseworkers completed between zero and 100 percent of their initial face-to-face visits. Of the 46 ISY caseworkers who had at least 15 days with a new PMC case in June 2017, 41 percent met with 100 percent of the children on their new cases within 15 days. However, 35 percent of ISY caseworkers with a new case did not complete a single initial face-to-face with those children in June.

Interviewed ISY caseworkers could provide details about children's education, including grade level, school, subjects that the child enjoys, and the child's specialized educational needs, if applicable, 59 percent of the time.

For another 34 percent of children, ISY caseworkers provided incomplete or undetailed information about the child's education, and for 6 percent of children the ISY caseworkers could not describe anything about the child's education.

CFRP asked ISY caseworkers whether children had contact with their siblings or parents and found that for 81 percent of children, the ISY caseworker could describe the child's contact with family in detail. For another 17 percent of children, the ISY caseworker provided incomplete information about the child's contact with siblings or parents and for 2 percent of children, the ISY caseworker could not provide any information on this topic.

CFRP asked ISY caseworkers about their knowledge of children's most recent medical visits and medication. ISY caseworkers provided detailed information about the last medical visit, such as the date of the visit, type of provider and name of provider, for 28 percent of children.

ISY caseworkers provided limited information, such as whether the child is up-to-date on medical and dental visits, for 54 percent of children. ISY caseworkers were not able to provide any information about the most recent medical visit for 18 percent of the children they were asked about.

With regard to medication, ISY caseworkers could describe the medication details, such as type of medication and dosage, for 24 percent of children and could describe only general medical needs or basic medication types (i.e. describing a medication as an antidepressant but not knowing more) for 35 percent of children. ISY caseworkers reported that 38 percent of the children who they were asked about do not take any medications and for 3 percent of children, the ISY caseworkers were not able to provide any information on the child's medications.

Over 82 percent of ISY caseworkers report that their CVS caseworkers do not set a regular schedule for communication. ISY caseworkers also report that CVS caseworkers do not communicate regularly with the child or the child's caregiver. Twenty-three percent of ISY caseworkers disagreed with the statement their primary caseworkers are knowledgeable about the child and the child's case.

# APPENDIX C

**(Filed Simultaneously to the Implementation Plan**

**and Separately Due to Size of the Report)**

# Appendix C: Texas Child Protective Services

## *RCCL Workload Study*

Submitted by:

Cynthia Osborne, Ph.D.

Director, Child and Family Research Partnership

# APPENDIX D

**Response from A. Carmical, March 24, 2017,**

**to the Request from the Special Masters**

**for Information February 10, 2017**

6. Please identify any specific location in the IMPACT record where caseworkers must confirm that a child was interviewed in private or separately.

· There is no specific location in the IMPACT record where caseworkers must confirm that a child was interviewed in private or separately.

· See CPS Handbook[8] sections:

o 6133.1 Documentation and Communication o 6133.2 Documenting Contacts in Substitute Care o 6133.21 Documenting Contacts Using the Contact Details Page o 6133.22 Documenting Monthly Contacts and Visits o 6133.23 Required Narrative Content o 6133.24 Contacts and Visits with the Child, Parent, Kinship, Relatives, and Caregiver · In addition, CFSR case reviewers read cases under the following guidelines to determine if quality face-to-face contacts occurred: o CFSR case reviewers look for information on face-to-face contacts between the caseworker and the child in IMPACT, in the monthly narrative and/or the specific CVS monthly required contact. This review includes determining if part of each face-to-face contact with the child includes private time. During quarterly case briefings with staff and unit trainings, CFSR case reviewers provide information concerning whether the requirement for private visits was met. This information is also provided in the monthly Basic Skills Development for Supervisors training.

o See document titled "CVS required FTE.pdf," included as an attachment in an email dated March 24, 2017, for a screenshot of the contact narrative.

· Finally, DFPS leadership reviews quarterly data concerning face-to-face contacts, including both quantitative data (percentage of face-to-face contacts occurring at least monthly) and qualitative data (percentage of face-to-face contacts occurring in private). The agency consistently exceeds the federal target of 90%.

16. Please identify for us the time needed (if any) by DFPS to improve its IMPACT system so that:

a. All of a child's medical records are included and available in an identified health section of a child's case file in IMPACT;

o Not applicable. DFPS is not making such changes to the IMPACT system. Many of a child's

medical records are already included, and available to caseworkers, in the Health Passport. Caseworkers have access to other medical records in the child's case file. The Court has not ordered DFPS to modify the agency's IMPACT system. DFPS cannot divert resources needed for services to children in care to duplicating existing functionality or modifying the current, constitutionally sound system.

o The child's electronic case record in IMPACT contains a medical tab in which caseworkers document the child's medical appointments. The medical/ mental assessment tab includes the doctor's name, the reason for the medical visit, the date the medical appointment occurred and the findings of the appointment. Further information relating to this page in IMPACT will be demonstrated during the upcoming IMPACT demonstration the Special Masters requested.

b. A child's current photo ("current" as described in the Special Masters' Recommendations of November 2016) is prominently included in the child's file within the IMPACT system;

o Complete - See CPS Handbook Section 6433.5 Maintaining Current Photograph of a Child.

o The child's electronic case record in IMPACT includes a location for a child's photograph to be uploaded into the external documents. Further information relating to this page in IMPACT will be demonstrated during the upcoming IMPACT demonstration the Special Masters requested.

c. All of a child's dental records are included and available in an identified health section of a child's case file in IMPACT;

o Not applicable. DFPS is not making such changes to the IMPACT system. Many of a child's dental records are already included, and available to caseworkers, in the Health Passport. Caseworkers have access to other dental records in the child's case file. The Court has not ordered DFPS to modify the agency's IMPACT system. DFPS cannot divert resources needed for services to children in care to duplicating existing functionality or modifying the current, constitutionally sound system.

o The child's electronic case record in IMPACT contains a medical tab in which caseworkers document the child's medical appointments. The medical/ mental assessment tab includes the doctor's name, the reason for the medical visit, the date the medical appointment occurred and the findings of the appointment. Further information relating to this page in IMPACT will be demonstrated during the upcoming IMPACT demonstration the Special Masters requested.

d. All of a child's mental health records are included and available in an identified health section of a child's case file in IMPACT;

o Not applicable. DFPS is not making such changes to the IMPACT system. Many of a child's mental health records are already included, and available to caseworkers, in the Health Passport. Caseworkers have access to other mental health records in the child's case file. The Court has not ordered DFPS to modify the agency's IMPACT system. DFPS cannot divert resources needed for services to children in care to duplicating existing functionality or modifying the current, constitutionally sound system.

o The child's electronic case record in IMPACT contains a medical tab in which caseworkers document the child's medical appointments. The medical/ mental assessment tab includes the doctor's name, the reason for the medical visit, the date the medical appointment occurred and the findings of the appointment. Further information relating to this page in IMPACT will be demonstrated during the upcoming IMPACT demonstration the Special Masters requested.

e. All of a child's educational records are included and available in an identified education section of a child's case file in IMPACT;

o Not applicable. DFPS is not making such changes to the IMPACT system. A child's educational records are accessible to caseworkers via the child's case file, in particular the child's Education Passport. Once a case closes, all hard copies in the case file are sent for digital storage and uploaded into One Case. The Court has not ordered DFPS to modify the agency's IMPACT system. DFPS cannot divert resources needed for services to children in care to duplicating existing functionality or modifying the current, constitutionally sound system.

o See CPS Handbook section 6133.51 Education Information. The child's school (as well as information when a child is enrolled into a school, is discharged from a school, or begins and ends each school year) is documented in the person detail tab. The child's educational records are maintained in the child's educational portfolio. Further information relating to this page in IMPACT will be demonstrated during the upcoming IMPACT demonstration the Special Masters requested.

f. All of the court records pertaining to a child's case are included and available in an identified legal section of a child's case file in IMPACT;

o Not applicable. DFPS is not making such changes to the IMPACT system. A child's court records are accessible to caseworkers via the child's case file. See response to Question 16(e).

o IMPACT contains a legal page which documents any legal actions and the child's legal status. A box indicates whether a corresponding document is in the child's hard case file. CASA may also upload legal files into Case Connection, which is then able to be uploaded into One Case. Further information relating to this page in IMPACT will be demonstrated

during the upcoming IMPACT demonstration the Special Masters requested.

g. All caseworker notes (from all caseworkers, including primary, ICU and secondary workers) are included and available in an identified case notes section of a child's case file in IMPACT;

o Caseworker notes are already included, and available to caseworkers, in IMPACT. DFPS is not making any changes to IMPACT in this regard. See response to Question 16(e).

o All contacts with the child are documented in the child's case record under the contact narrative. The Special Masters have been provided screenshots of the contact narrative. See response to Question 5. Further information relating to this page in IMPACT will be demonstrated during the upcoming IMPACT demonstration the Special Masters requested.

h. All placement records, including "safety-related reports, licensure verification, and information on investigations" are included and available in IMPACT; and,

o Not applicable. DFPS is not making such changes to the IMPACT system. Placement records are available to caseworkers through existing functionality. See response to Question 16(e).

o The child's placement is included in the child's electronic case file. Any allegation of abuse/neglect involving that child while in a licensed residential child care setting is linked to the child in IMPACT and can be accessed through the child's history. Any investigation involving a child in a Kinship home is in IMPACT. Further information relating to this page in IMPACT will be demonstrated during the upcoming IMPACT demonstration the Special Masters requested.

i. All of a child's placement moves with a reason identified for each move are included in IMPACT with the capacity to report the same information for all PMC children.

o Not applicable. DFPS is not making such changes to the IMPACT system. Placement changes are documented using existing functionality. See response to Question 16(e).

o All placements and placement moves are documented in IMPACT. If a placement move occurs, the reason for the placement move must be documented. Further information relating to this page in IMPACT will be demonstrated during the upcoming IMPACT demonstration the Special Masters requested.

17. Please provide a draft plan to achieve the Court's goals, as described in Section V.B. of the Court's Order of January 2017, addressing each of the elements described above in Request 16 a-i, and ensuring that information and records in children's files in the IMPACT system are accessible to caseworkers, CASA volunteers, attorneys ad litem and foster care parents who are working on PMC children's cases, as well as the Special Masters.

· Not applicable. Texas is not developing such a plan. The Court has not ordered DFPS to modify the agency's IMPACT system. DFPS cannot divert resources needed for services to children in care to duplicating existing functionality or modifying the current, constitutionally sound system.

· CASA Access to Children's IMPACT case files:

o In partnership with Texas CASA and local CASA programs, DFPS developed and implemented Case Connection in September 2014, a web-based application that provides CASA staff and volunteers quick access to a child's electronic case information and improves collaboration between CPS and CASA.

o Case Connection data contains information located in the IMPACT Substitute Care stage, including:

§ Summary page - includes child-specific information, caseworker and supervisor names and contact information;

§ Placement page - includes more detail on child's placement, as well as the ability to pull up the placement history log and common application;

§ Medical/Education page - includes the medical consenter, name of school and status, as well as the ability to pull up the medical/mental assessment log, education log, and medical developmental log;

§ Permanency page – includes child's current permanency goal, all child and family plans of service, visitation plans, and permanency planning meetings; and

§ Demographic page - lists significant people in the child's life with contact information and child-specific characteristics, and that provides the ability to view the legal log and the list of external documents.

o In December 2016, DFPS implemented a number of Case Connection portal enhancements, including a new look and easier page navigation/usage and enhanced ability of CASA to upload documents (e.g., photographs, court documents), to be viewed by both CASA and the CPS caseworker.

· See the following CPS Handbook[17] sections, which relate to providing records and other documentation to caregivers, attorney ad litems and guardian ad litems:

o 4135 Provide the Service Plan and Discuss Services o 4136 Provide Additional Documentation o 5231.6 Providing Records to the Attorney Ad Litem and Guardian Ad Litem o 5232.21 Court Orders for CASAs Seeking Access to a Child or a Child's Records

# APPENDIX E

**Response from A. Carmical, March 8, 2017, to the**

**Request to the Request from the Special Masters for Information**

Please provide a draft policy and/or regulation, which will require that Child Placement Agency ("CPA") residential providers (CPAs, GROs, RTCs) maintain a landline phone that connects directly to the DFPS toll-free, 24- hour screening hotline.

·  Not applicable. DFPS neither has nor will be developing such a policy or regulation. The Court has not ordered DFPS to require CPAs, GROs and RTCs to maintain a landline phone. DFPS does not believe such action will contribute to child safety and believes requiring CPAs, GROs and RTCs to maintain a landline phone could negatively impact placement arrays by burdening existing foster families and potentially discouraging some potential foster families, who would be required to pay for a landline, from fostering children.

·  Any additional responsive information anticipated from CPS in 2-4 weeks.

56. Please tell us the soonest date DFPS can begin to track single child homes pursuant to the Court's order. Single child homes are homes with no other birth, adoptive, relative, or non- relative kinship or foster children present.

· The Court has not ordered DFPS to track single child homes. DFPS has no plans to track single child homes.

57. What processes does DFPS administer to match specific placements to PMC children who, through documented assessment, are determined to need a single child home?

· DFPS has no such processes. See response to Question 56.

79. Based on DFPS' Foster Care Needs Assessment of January 2017, please provide a draft plan or plan outline for a 12-month period to develop the placement array needed to address the specific geographic, demographic and service level placement deficits identified in the Assessment.

· DFPS is continually working to address placement capacity within the agency and drawing upon the support and guidance of the Texas Legislature. DFPS is declining to develop such a 12-month plan.

84. Please outline what DFPS considers the best option or options for appointing an attorney ad  litem for each PMC child.

· Not applicable. DFPS declines to speculate on a process that is and should be governed by counties and individual judges.

# APPENDIX F

**DFPS Responses to Special Master Questions Posed 9-18-2017**

**(A. Carmichal, September 21, 2017)**

Dear Mary Helen,

As noted in our earlier email, the state of Texas is continuing to recover and rebuild from Hurricane Harvey, and the Governor just yesterday extended the state's Disaster Declaration in 60 of our 254 counties. CPS and CCL in particular have been focused on ensuring that clients and staff are safe and able to continue receiving any necessary services or interventions. This is of course in addition to implementing myriad legislation that took effect September 1 of this year and conducting the agency's normal child protection and welfare activities. While we welcome the chance to make any appropriate updates to our responses to the voluminous February 2017 request, this will not be possible in the approximately 3 business days between receipt of your request and this response you are receiving from us today. We will assume you will rely on the point-in-time information we produced over the course of several months earlier in the year unless you indicate otherwise.

**1. In the attached spreadsheet (3rd tab - PMC Listing Kids SXAB Indicator), it appears that DFPS is reporting that during CY16, 150 PMC children were involved in an intake as a victim or perpetrator where child on child sex abuse was investigated. Please confirm, that with similar data, DFPS is able to identify, track and report data on child on child sex abuse investigations involving PMC children.**

We need additional clarification regarding your question. Is the question whether the agency is able to generate a report with similar data on a regular or ongoing basis, or is the question about which data were included in the report we sent? If it is the latter, the footnotes of the cited report indicate that the tab shows PMC children involved in an investigation, as alleged victim or perpetrator, AND had a person characteristic of Sexual Behavior Problem, Sexual Aggression or a Child on Child Sexual Abuse indicator (per Licensing). The Child on Child Sexual Abuse indicator is used for the Licensing program, which in the footnotes, is counted by stage only, not by person. So, while that person in PMC is/was a victim or perpetrator on that LIC stage, may not be the one tied to the indicator. So it is possible that there were 150 PMC children in the cases, but it could be more, and may or may not be the child in the listing. CPS does not specifically utilize the child-on-child abuse indicator and this would not be reportable in an automated fashion.

DFPS could create a report of any PMC children who had an allegation of SXAB, but that would require the creation of a new data report (DRIT), and it is unclear at this point

whether the DRIT would be responsive to your request.

Finally, please be advised that if DFPS is requested to proceed, the creation, running, and testing of this report can take several weeks or longer. DFPS has of course placed a premium on facilitating, fulfilling, and, as necessary, adjusting and re-running the many and complex DRITs occasioned by requests of the Special Masters and Dr. Osborne's team in support of the workload studies. However, this prioritization has caused a waterfall effect of delays to other reports needed for the proper functioning of the agency. The earliest this report can be delivered is mid to late-October.

**2. Please confirm if DFPS has the capability of reporting aggregate data on how many PMC children are placed in foster homes that contain non-foster or adoptive children or the number children placed in homes with other foster children who are not related to them. We understand (please confirm) that DFPS can, through its Provider Website/Placement Portal, identify for each placement the number of children living in a home (both foster and non-foster children). Can DPFS pull aggregate data about the status of children living in foster homes at any point in time?**

DFPS does not have the capability to report aggregate data on how many PMC children are placed in foster homes that contain non-foster or adoptive children, and the Portal is not moving forward at this time. DFPS does possess the capability to report the number of foster children placed in homes with other DFPS foster children at a certain time and date. As to the relationship between foster children, DFPS requires further guidance as to your definition of "related." Would this include step-siblings? Prior connections? Cousins? Blood relations only?

As for the last part of your question, in order to answer it, DFPS seeks clarification on what meant by "the status of children."

**3. Please provide information about the status of the RFP for foster care redesign and the current plan and timeline for foster care redesign implementation. Please include information about how much of the implementation plan has been funded by the Texas legislature.**

The legislature approved roll-out of a staged Community Based Care model in a total of 5 catchment areas (includes current 3b) over the 2018-2019 biennium.

On 9/19/2017, DFPS announced the next two catchment areas for Community Based Care will be all of Region 2 and Bexar County in Region 8. We expect to release the Request for Proposals for Region 2 this month (September), followed by the Request for Proposals for Bexar County in November.

Community Based Care (CBC) is replacing and expanding on Foster Care Redesign. Senate

Bill 11 of the 85th Legislature requires DFPS to purchase case management and substitute care services from a Single Source Continuum Contractor (SSCC) in a model known as Community Based Care. Substitute care includes both foster care and kinship placements.

This effort will transition the Texas foster care system from a "one size fits all" statewide approach to a local, community-based approach to meeting the individual needs of children, youth, and families. Purchasing substitute care and case management services from the provider community allows DFPS to focus on child safety by investigating reports of abuse and neglect, providing family-based safety services, and ensuring quality oversight of foster care.

In Region 2 and Bexar County, we will make this transition in two in stages.

Stage I

In Stage 1, DFPS will transfer paid foster care placement services to the SSCC. DFPS will refer children who are new to care to the SSCC as well as transition children already in paid foster care to the SSCC. Like Foster Care Redesign, CPS and the SSCC will continue to share decision- making. CPS will provide case management services to children and families while partnering

Page **2** of **5**

with the SSCC to provide paid foster care placement services to children from the catchment area. We anticipated Stage I will last between 12 and 18 months.

Stage II

In Stage 2, the SSCC will begin providing all substitute care placement and case management services. In addition to the responsibilities outlined in Stage I, the SSCC will receive referrals for all children who are new to care and their families. DFPS will phase-in the transfer of other children from the legacy system to CBC. We anticipate it will take 1-2 years to fully shift case management for all children and their families in these catchment areas to the SSCC.

Region 3b is estimated to transition into Stage II in April 2018.

**4. Does DFPS have a way to identify how many PMC children are placed in care with access to a phone to report abuse/neglect?**

DFPS does not have a means of tracking which PMC children are placed in care with access to a phone to report abuse and neglect. However, for every PMC child placed in a Residential Childcare licensed operation, there is a requirement to have policies regarding telephone contact with the child's family as well as the right to call to make a report of

abuse or neglect. In addition, as discussed earlier in the year, DFPS has extensive rules, policy, training, and contract requirements that direct foster care providers to allow all children in care telephone access to report abuse or neglect, to speak to their caseworker, or to reach an Omsbudsman.

**5. In what file (of a child's file) would one most likely find the paper copy of a child's doctor visits, including medical, dental, psychiatric, etc.?**

For those records that are held or maintained by CPS, the paper copy would most likely be contained in the designated tab of the file. The paper copy of the case file is divided into separate tabbed sections. There is a section entitled, "Child's Medical/Dental/Mental Health Section" (see DFPS Response 5.pdf on SharePoint.) This section organizes external items that are related to the medical, dental, or mental health of a child. A separate tabbed divider should be used for each child in a sibling group. Below is a list of example items that may be included in the tabbed divider, depending on the nature and course of the case:

- · Medical and Developmental History

- · Physical Examination Reports (annual and other)

- · Dental Examination Reports (annual and other)

- · Mental Health Evaluations

- · Therapeutic Notes

- · Any other forms that are completed and not in IMPACT

**6. For all children who entered the PMC class during CY2015, please provide data on the total number of caseworkers who were assigned to each child. Please identify separately for each child the number of primary and secondary, ISY, caseworkers who were assigned.**

To help better inform this request and provide an estimate of the time required, could we have additional information on the purpose to which it relates? In addition, are individual names required, or could we utilize some other identifier or aggregate numbers or percentages?

**7. Please provide a data summary of the number of PMC children who, during CY2016, were visited by only one caseworker, by only two different caseworkers, by only three different caseworkers and by four or more different caseworkers.**

Same as response in #6.

**8. Please provide all reports (including testimony) DFPS submitted to the Texas**

legislature in the last 12 months. In order of priority, we request that you first send to us all reports related to caseworker turnover if you need time beyond this Thursday to compile all documents responsive to this request.

All reports submitted to the Texas legislature in the past 12 months were either sent via SharePoint as DFPS Response 8.zip, or can be found at: http://www.dfps.state.tx.us/About DFPS/Reports and Presentations/default.asp

(Note that many of the reports likely to be of interest/relevance are under the tab for Agencywide reports or Rider Reports).

**9. Please identify how many PMC children currently do not have an attorney.**

DFPS does not track this information.

**10. DFPS provided data on the total number of fatalities of children in conservatorship during CY15 and CY16, which is summarized in the attached spreadsheet. For a number of these fatalities, there is notation that there is a "Pending Investigation." Can you confirm that this data (which lists all children in the data submitted by DFPS (also attached)) represents the complete list of children in conservatorship who suffered a fatality during CY15 and CY16? Also, please confirm the total number (if any) of child fatality investigations that were not completed and are still pending for each of these calendar years.**

DFPS confirms that the data provided represents the complete list of children in conservatorship who suffered a fatality during CY15 and CY16.

Additionally, there are no pending investigations for either CY15 or CY16. An updated copy of the CY15 and CY16 fatality summary was uploaded to SharePoint as DFPS Response 10.pdf.

**11. Of all calls to the statewide hotline during CY16 that involved PMC children, how many of the calls were initiated or made by PMC children. Of the total number of calls initiated or made by PMC children, how many were forwarded for intake review, how many were assigned as Information & Referral and how many were assigned as case related special request (CRSR)?**

DFPS anticipates that it can report this information. However, because Information & Referrals (I&Rs) are not coded in relation to a specific person, DFPS would not be able to report calls by PMC children that were processed as I&Rs.

Finally, the same advisory found in Response #1 regarding the timeline of delivery and impact to our MRS staff and agency functions applies to this request. MRS estimates that they earliest they could deliver this report by early to mid-October, subject to potential

delays due to unexpected errors or testing.

**12. Please confirm if DFPS is able to pull a sample of PMC children who have a history of sexual abuse (as victims or aggressors).**

DFPS could pull individual instances involving sexual abuse but not a sample per se. In order to provide an estimate of time required to produce responsive information, DFPS requests further clarification. Do you have a specific time period in mind? For CCL, given that children in care have not been validated as perpetrators and given that the indicator related to child-on-child abuse was not available until recently, such a sample may be limited to recent occurrences. For CPS there are data related to sexual abuse prior to coming into conservatorship and PMC but post-PMC, some of the reporting capabilities are limited in terms of child on child abuse. We could potentially look at utilizing the child sexual aggression indicators but this may not capture all of the information you are seeking. Can you clarify?

# APPENDIX G

| | |
|---|---|
| **From:** | Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us> |
| **Sent:** | Thursday, September 21, 2017 6:41 PM |
| **To:** | kevinmichaelryan1967@gmail.com |
| **Cc:** | Mary Helen Cervantes; Catherine Majewski; Olah,Tara (DFPS) |
| **Subject:** | July Request |

Dear Kevin,

In July, you requested the following FY 2017 data. Please see our responses in green below.

1.      The number of TMC and PMC children in DFPS custody who died in FY17 along with their names. In FY 2017, 38 TMC and PMC children died. Their names are provided in a .pdf titled "(Req1_2) Fatalities_Children In CVS 2017_PRELIMINARY," which has been uploaded to the SharePoint folder labeled "July 26 2017 Request."

2.      Of the population in Request 1, how many deaths are currently under investigation for possible maltreatment? Two deaths are currently under investigation for possible maltreatment.  Please include the names of the children whose deaths are still under investigation. Their names are provided in a .pdf titled "(Req1_2) Fatalities_Children In CVS 2017_PRELIMINARY," which has been uploaded to the SharePoint folder labeled "July 26 2017 Request."

3.      The number of TMC and PMC children who spent one night in a hotel or a government office building during FY17. Please see table below. We define children without placement as children who experience two or more consecutive nights under DFPS supervision. Children without placement may stay overnight in CPS offices, child advocacy center offices, CASA offices, hotels, provider cottages or other child care facilities (under DFPS supervision and not admitted to provider's care), and churches.



4.      The number of TMC and PMC who spent two or more consecutive nights in hotels or government office buildings during FY17. Please see response to Question #3.

5.      The number of CVS caseworkers who voluntarily ended their employment with DFPS during FY17 – During FY17, 352 CVS caseworkers voluntarily ended their employment with DFPS.

6.      The number of TMC and PMC children as for the first and last date of FY17 – TMC children:  Please see table below:

1

126

| FY 2017 | TMC Children | PMC Children |
|---|---|---|
| As of 09.01.16 | 19,652 | 10,977 |
| As of 08.31.17 | 21,098 | 10,687 |

Thanks,
Audrey

# APPENDIX H

### Response from A. Carmical, May 12, 2017, to the

### Request from the Special Masters for Information February 10, 2017

18. Please provide a draft policy and/or regulation, which will require that Child Placement Agency ("CPA") residential providers (CPAs, GROs, RTCs) maintain a landline phone that connects directly to the DFPS toll-free, 24- hour screening hotline.

· The Court's order dated March 17, 2017 stated "...DFPS agreed to examine possibility [sic] of requiring a landline phone accessible to the children in each foster care home." In accordance with this order, DFPS is considering the feasibility and utility of requiring a landline phone in each foster care home. Additional information will be forthcoming; however, in the meantime, the following are current policies and practices concerning children reporting maltreatment to the toll-free 24-hour screening hotline.

· Residential Child Care Contract Section 11(F) Children's Rights requires the statewide intake (SWI) phone number to be displayed prominently in all foster care residential facilities and for foster children to be allowed telephone access to reach SWI free from observation.

· See CPS Rights of Children and Youth in Foster Care, which states "As a child or youth in foster care I have the right to:...[m]ake calls, reports, or complaints without being punished, threatened with punishment, or retaliated against; and I have the right to make any of these calls privately and anonymously if I choose and the call center permits it. Depending on the nature of the complaint, I have the right to call: The DFPS Texas Abuse/Neglect Hotline at 1-800-252-5400; The HHSC Ombudsman for Children and Youth Currently in Foster Care at 1-844-286-0769; The DFPS Office of Consumer Affairs at 1-800-720-7777; Disability Rights of Texas at 1-800-252-9108."[18] See also Tex. Fam. Code Ann. §263.008 Foster Children's Bill Of Rights.

· CPS Handbook §6420 Rights of Children and Youth in Foster Care requires CPS staff to provide the CPS Rights of Children and Youth in Foster Care document to all children and youth in CPS foster care and to review the document with the child and caregiver no later than 72 hours after the child comes into foster care or experiences a placement change.

· Children and youth also receive this document each time their plan of service is updated. See CPS Handbook section 6241.22 Child Plan Review.

· See also CPS Handbook section 6421 Texas Foster Care Handbook, which requires CPS staff to provide a copy of Access Granted, the Texas foster care handbook, to children or youth ages 10 and older when they enter foster care or turn age 10 while

in foster care. This handbook includes the CPS Rights of Children and Youth in Foster Care.[19]

· Agency rule concerning the Office of Consumer Affairs states that children and youth under age 18 in DFPS conservatorship may file a complaint with the HHSC Ombudsman for Children and youth in Foster Care (by email, phone, fax, mail) and clarifies that children/youth may also contact the Ombudsman for help reporting abuse/neglect allegations. See 40 Tex. Admin. Code § 702.815.

· A child's right to speak privately and report maltreatment is in agency rules (minimum standards for general residential operations (GROs) and child placing agencies (CPAs)) state: "The following categories include the child's rights that you must adhere to:…[c]omplaints, including the right to make calls, reports, or complaints without interference, coercion, punishment, retaliation, or threats of punishment or retaliation. The child may make these calls, reports, or complaints anonymously. Depending upon the nature of the complaint, the child has the right to call, report, or complain to: (A) The DFPS Texas Abuse/Neglect Hotline at 1-800-252-5400; (B) The HHSC Ombudsman for Children and Youth Currently in Foster Care at 1-844-286- 0769; (C) The DFPS Office of Consumer Affairs at 1-800-720-7777; or (D) Disability Rights of Texas at 1-800-252-9108." See 40 Tex. Admin. Code §§ 748.1101(b)(7) and 749.1103(b)(7).

47. Assuming the number of children in the PMC class on January 31, 2017, and assuming all CVS vacant positions were filled on January 31, 2017, how many additional CVS positions would DFPS need to hire in order to achieve workloads for each CVS worker of no more than 14 children (total, including both TMC and PMC children)? Please provide both a statewide total and breakdowns by county.

· DFPS has reviewed, and it is not feasible to provide this information. In addition, DFPS reiterates that there is no evidentiary basis for the caseload limit utilized in this question.

73. Please share a draft or final policy and/or regulation that prohibits the placement of unrelated PMC children with different service levels in the same room unless a thorough and documented assessment is conducted by DFPS staff certifying that such placement is safe and appropriate for each PMC child.

· Agency rules (minimum standards for GROs) allow children receiving different types of service to reside in the same room if the provider evaluates the living quarters for each child and ensures there is no conflict of care with the children's best interests; the arrangement will not adversely impact other children in the room; the number of children in the room is appropriate at all times; caregivers can appropriately supervise all children and the provider can meet the needs of all children in the room. See 40 Tex. Admin. Code § 748.1201.

· Agency rules (minimum standards for CPAs) require CPAs to ensure the placement meets the child's physical, medical, recreational, educational, and emotional needs. See 40 Tex. Admin. Code § 749.1101.

· For information concerning factors a caseworker must consider when placing a child, see:

o CPS Handbook sections:

§ 4114 Required Factors to Consider When Evaluating a Child's  Possible Placement

§ 4155 Safety and Related Concerns for Placements

o 40 Texas Administrative Code Sections:

§ 700.1309 – What factors does DFPS consider when selecting the  most appropriate living arrangement for a child?

§ 748.1201 – May children receiving different types of service live in  the same living quarters?

§ 700.1307 – In what kinds of settings may a child in DFPS  conservatorship be placed?

o DFPS Placement Process Resource Guide[54] - instructs caseworkers to consider child's age; language; religion; sexual identity; behavioral characteristics; special needs, including medical needs, therapeutic needs, physical, developmental, and recreational needs; ability to function in a family setting; need for supervision or structure; sexually aggressive behavior; potential for victimizing other children; vulnerability to victimization by other children; history of previous placements; attachments in the current placement; and safety from an alleged perpetrator.

[54] Resource guide available online at:

http://www.dfps.state.tx.us/handbooks/CPS/Resource_Guides/Placement_Process_Resource_Guide.pdf

(last accessed April 6, 2017).

_____

74. Please share a draft or final policy and/or regulation that all PMC children under two years of age shall be placed in a family-like setting. Acceptable family-like settings may include, for example, non-relative foster care, tribal foster care, kinship foster care, and therapeutic foster care. Exceptions to the requirements may include sibling groups of four

or more children who cannot otherwise be placed together, treatment and/or medical care, or young children who are placed with their minor parent.

· See response to Question 73.

75. Please share a draft or final policy and/or regulation that prohibits the placement of unrelated children who are more than three years apart in the same room.

· The Court has not ordered DFPS to prohibit the placement of unrelated children who are more than three years apart in the same room. DFPS has no plans to adopt policy or regulation that prohibits the placement per se of unrelated children who are more than three years apart in the same room.

76. How has DFPS assessed the capacity of providers across Texas to serve as Single Source Continuum Contractors ("SSCC") for Foster Care Redesign, including the development of an adequate placement array in each anticipated catchment area?

· Chapin Hall (affiliated with the University of Chicago) performed an analysis of the Foster Care Redesign model and determined that for an SSCC to be viable, a catchment area would have to have at least 500 new entries of children into care on an annual basis. This analysis, along with information gathered through a Request for Information, a stakeholder survey and information from the Public Private Partnership helped inform the state's division into the current 17 catchment areas.

· When determining roll-out sequence, the department analyzes the following information to help inform decisions:

o Geographic location and proximity to existing catchment area(s) o Child data- case mix of children by service level, placement proximity (how many are in the region/county vs. how many are placed out) o Service Capacity- continuum of care and services available in catchment area, number of resource hubs o Client outcomes- how does the catchment compare to the rest of the state on certain performance outcomes? o Level of community/stakeholder investment- collaboration amongst stakeholders, number of child welfare boards, child protection courts, etc. located in the catchment area o Stability of DFPS workforce

# APPENDIX I

**From:** Olah,Tara (DFPS)
**Sent:** Monday, April 3, 2017 9:35 PM
**To:** kevinmryan@aol.com
**Cc:** Woodruff,Trevor A (DFPS) <Trevor.Woodruff@dfps.state.tx.us>; Thomas.Albright@oag.texas.gov; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Fescenmeyer,Megan C (DFPS) <Megan.Fescenmeyer@dfps.state.tx.us>; Ge,Brian (DFPS) <Brian.Ge@dfps.state.tx.us>; Francis McGovern <mcgovern@law.duke.edu>
**Subject:** Information requested during March 29, 2017 teleconference

Kevin,

During a teleconference on March 29, 2017 between DFPS, OAG staff and the Special Masters, you requested the following information. Please see the agency's responses, noted below in red:

- **Landline telephones**
  - Current policies re: landline telephones, PMC children's ability to report maltreatment, and any proposed alternatives to landline telephones – In addition to information provided during the March 29th teleconference between DFPS, OAG staff and the Special Masters, please see the agency's response to Questions 18 and 20 of the document titled "Request to the Texas DFPS from the Special Masters for Information February 10," provided to Special Masters on March 31, 2017 and March 24, 2017, respectively.

- **Single-Child Homes**
  - Current policies re: single-child homes - Information provided during teleconferences on March 29, 2017 and April 3, 2017 between DFPS, OAG staff and the Special Masters.

- **Health Passport**
  - Current policies requiring STAR Health providers to upload documents, as appropriate, to the child's Health Passport - In addition to information provided during the March 29th teleconference between DFPS, OAG staff and the Special Masters, HHSC Legal Division staff confirmed the current STAR Health contract requires the managed care organization (MCO) and providers to update each member's Health Passport with certain listed health information and data, including (among other information) records of each service event with a provider, future scheduled appointments, diagnoses, progress notes, and medication records.
  - See attached document titled "star-health-contract.pdf" for the current STAR Health contract. Sections related to the Health Passport start at Section 8.1.12. In relevant part:
    - Section 8.1.12.2 states:  "The MCO and the Member's Providers, as appropriate, will be responsible for updating each Member's Health Passport with the required medical information. The MCO must contractually require Providers to submit information for the Health Passport."

1

> • Section 8.1.12.3 states:  "Quarterly Forms Review—The MCO must submit this deliverable on a quarterly basis. The report is utilized to show the extent to which Providers are submitting contractually required documents for Texas Health Steps and BH visits."

- **Foster Group Homes – Monthly Report**
  - ○ A monthly foster group home report will be available on the first of every month, with the exception of the April 2017 report, which is delayed as a result of multiple staff being out of the office due to illness. The April report should be available by the end of this week.

- **Private Caseworker Visits – Enforcement Policies**
  - ○ In addition to information provided during the March 29th teleconference between DFPS, OAG staff and the Special Masters, please see the agency's response to Question 1 of the document titled "Request to the Texas DFPS from the Special Masters for Information February 10," provided to Special Masters on March 17, 2017.

- **I See You Workers – Quality Monitoring**
  - ○ In addition to information provided during the March 29th teleconference between DFPS, OAG staff and the Special Masters, please see below:
    - • HHSC Legal Division staff confirmed HHSC can pull data concerning who has accessed a child's Health Passport. However, I See You workers are not specifically required to access/review a child's Health Passport, and such a review is not necessary for every child. Most information contained in the Health Passport can be obtained directly from the child's caregiver, health care provider(s) (when the I See You worker acts as the child's medical consenter) and/or primary caseworker. However, the I See You worker may at times review the Health Passport (e.g., for information concerning compliance with medical and dental exams, to review child's prescription medications, for immunization records to assist with enrolling the child in school).
    - • IMPACT does not track who accessed the child's case file. However, I See You workers are already expected to review the case file. The I See You worker could enter a narrative that they reviewed the file. However, this exercise would merely add a documentation expectation and such documentation would be in the MS Word document narrative. Absent a manual case read, this information would not be easily tracked/reported on.

- **RCCL Enforcement Actions**
  - ○ In addition to information provided during teleconferences on March 29, 2017 and April 3, 2017 between DFPS, OAG staff and the Special Masters, please see the agency's response to Question 54 of the document titled "Request to the Texas DFPS from the Special Masters for Information February 10," provided to Special Masters on March 31, 2017.
  - ○ Agency's ability to revoke individual foster home licenses - DFPS regulates the ability of individual foster family homes to care for foster children in two ways: (1) Child Care Licensing (CCL) regulates the Child-Placing Agency, which oversees the majority of foster family homes, and (2) Child Protective Services (CPS) approves which foster homes to place foster children. CCL does not need the ability to directly license individual foster family homes to ensure safety of foster family homes nor can it do so by statute. CCL has authority to license Child-Placing Agencies (CPAs), which in turn regulate all foster family homes verified by the CPA. Chapter 42 of the Texas Human Resources Code provides CCL its statutory authority to regulate child care. Section 42.002(10) defines an "Agency foster group home" as "a facility that provides care for seven to 12 children for 24 hours a day, is used only by a licensed child-placing agency, and meets department standards." Section 42.041(b)(2) specifically exempts agency foster homes and agency foster group homes from the requirement of a license issued by DFPS. This section requires licenses for child-care facilities and CPAs to operate. Section 42.053(a) states that "An agency foster home or agency foster group home is considered part of the child-placing agency that operates the agency foster home or agency foster group home for purposes of licensing." Subsection (d) of Section 42.053 then provides: "The department shall revoke or suspend the license of a child-placing agency if an agency foster home or agency foster group home operated by the licensed agency fails to comply with [all provisions of Chapter 42 and all department rules and standards that apply]." Sec. 42.0535 lays out the requirements for a CPA to verify a foster family home. DFPS incorporated this statutory framework into agency rule (below), which discusses types of child care operations DFPS regulates.

Figure: 40 TAC §745.37(3)

| (D) Child-Placing Agency (CPA) | A person, agency, or organization other than a parent who places or plans for the placement of a child in an adoptive home or other residential care setting. | License |
| --- | --- | --- |
| (E) Child-Placing Agency Foster Family Home | An operation that provides care for six or fewer children, up to the age of 18 years, under the regulation of a child-placing agency. | Verification (The CPA issues this. A CPA regulates |

2

| | | its own foster family homes.) |
| --- | --- | --- |

- **Child-On-Child Abuse**
  - Current policies requiring providers to immediately report allegations of child-on-child sexual abuse
    - State law, agency rules (minimum standards) and a recent provider notification (see attached email titled "FW: Child Safety") require all facilities and contracted CPAs to immediately report all allegations/incidents of child-on-child sexual abuse.
      - See Texas Family Code Annotated §261.101(a), which states: "A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter." Likewise, §261.103(a) states: "...[A] report shall be made to: (1) any local or state law enforcement agency; (2) the department; or (3) the state agency that operates, licenses, certifies, or registers the facility in which the alleged abuse or neglect occurred."
      - See Texas Family Code Annotated §261.410(b), which states: "An agency that operates, licenses, certifies, or registers a facility shall require a residential child-care facility to report each incident of physical or sexual abuse committed by a child against another child."
      - See 40 Texas Administrative Code §748.303(a) (minimum standards for GROs) and 749.503(a) (minimum standards for CPAs), which direct GROs and CPAs, respectively, to report and document allegations of abuse, neglect, or exploitation of a child; any incident where there are indications that a child in care may have been abused, neglected, or exploited, as well as physical or sexual abuse committed by a child against another child. Reports must be made to DFPS Child Care Licensing and to the child's parents as soon as the GRO/CPA becomes aware of the allegation/incident.

- **Placement Moves**
  - Are we capable of producing management reports on placement moves/stability? - Yes

Tara

3

# APPENDIX J

| | |
|---|---|
| **From:** | Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us> |
| **Sent:** | Tuesday, August 08, 2017 10:34 PM |
| **To:** | Mary Helen Cervantes |
| **Subject:** | RE: Request for information |

Hi Mary Helen,

Thank you (and Kevin) for your patience. Here is what we have at this point (our input in red):

> Would you identify how many and the names of the PMC and TMC children who died while in the custody of DFPS in the 2017 fiscal year? And also in the 2016 fiscal year? And also in the 2015 fiscal year?  How many deaths from each of those years is still under investigation for possible maltreatment?  Please include the names of the children whose deaths are still under investigation.

> We are able to do this for FY15 and FY16. See folder in Sharepoint. Our FY 17 ends 8/31/17. MRS (reporting team) estimates that they can get preliminary data for all of FY 17 out around mid-to-late September 2017. There are yearly cut-offs for when this data is finalized/frozen in our current reporting processes, and the soonest they will get the full/final data produced to internal reviewers would be at the end of January 2018. Generally the numbers are produced externally in February of the year following the FY. The cut-offs the agency established in the past reflect the need for additional time for the fatality investigations due to waiting on autopsies and ME reports/ arrests/etc. I think from your request related to open investigations you may already have a sense of the duration of some of these investigations but if we need to provide more information on that aspect please do let us know.

> Speaking of which, we are still going back and forth regarding whether the exiting reports could be modified to show which if any investigations are still open (as opposed to going case-by-case). Generally for CPS cases if there is a death reason that should mean they have been finalized but I understand you and the Court would need something more definitive. Also note that the blanks for CPS death reason should correspond to those investigations that were conducted by CCL, which would not have a CPS death reason. I think other blanks relate to waiting for LE/ME/etc. but we can confirm as needed. In the meantime, I'll keep working on the open investigations question and update you as soon as possible.

> *The New Yorker* article includes, "Hundreds of children have been sleeping in hotels or emergency shelters, or on air mattresses in government offices, because the state has nowhere else to put them."  The article also says, "In the first seven months of the state's fiscal year, the number of foster children spending two or more consecutive nights in hotels or government office buildings had risen to 314."

> Would you identify the number of PMC/TMC children in the 2017 fiscal year who spent one night in a hotel or a government office building?

1

CPS does not track all or part of the first night given that the amount of time varies considerably. CPS begins tracking the second full night.

Would you identify the number of PMC/TMC children in the 2017 fiscal year who spent two or more consecutive nights in hotels or government office buildings.

See chart in the folder on Sharepoint. Also note that you asked specifically about hotels or government office buildings. However, children without placement stay overnight in CPS offices, child advocacy center offices, CASA offices, hotels, provider cottages or other child care facilities (they are under our supervision and not admitted to the provider's care), and churches.   At this time we do not think we have a reliable count specific to hotels and government office buildings alone but can conduct additional research if needed.

Would you report the number of CVS caseworkers who voluntarily ended their employment with DFPS in the 2017 fiscal year.

Voluntary Terminations so far in FY17 (as of today in our HR system CAPPS) is 266.

MRS (the reporting team) estimates that if needed they could produce preliminary totals for the FY in mid-September and final numbers around the end of November/beginning of December after the year-end refresh of data.

Would you report the number of PMC children and TMC children as of the first and last date of the 2017 fiscal year?

I know we may need additional discussion but we wanted to inquire into whether we can provide Children in PMC/TMC on last day of FY16 instead of first day of FY17.   MRS indicates they have the numbers for the last day of FY16 already available in the data book and/or in data warehouse reports but they would have to do special coding to get the number on the 1st day of FY17. Here's what they have:

Last Day of FY16:
TMC = 19,558
PMC = 10,969

Last Day of FY17 not yet available.
Last Day of June 2017:
TMC = 20,786
PMC = 10,553

We could produce July totals in approximately one week, or if you would rather try to reach the end of the FY the team estimates they could get the numbers run approximately mid-September with the full and final numbers being available after late November and the year-end data refresh (in my layperson's mind this is when they re-run data for any updates that have come in subsequent to the end of the FY). Please let me know your preferences.

Other than the outstanding items noted I think that should cover it but if we have overlooked something please just say the word!

2

# APPENDIX K

**From:**               Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>
**Sent:**               Saturday, November 04, 2017 4:39 PM
**To:**                 Mary Helen Cervantes; kevinmichaelryan1967@gmail.com
**Cc:**                 Albright, Thomas; Woodruff,Trevor A (DFPS); Olah,Tara (DFPS); Ge,Brian (DFPS); Fescenmeyer,Megan C (DFPS); Olah,Tara (DFPS)
**Subject:**          RE: Request for Information

Okay, here is an update for those pieces that remain outstanding. The number references are from the original email below. The time estimates are for when the materials would be sent to you or uploaded in Sharepoint.

1. ETA 11/10-11/15.

2. No additional information will be provided. Agency staff have determined that the aggregate data that can be produced are those referenced in the original response (DFPS foster children placed with other foster children).

6. ETA 11/6-11/8.

7. ETA 11/10-11/15.

11. ETA 11/6-11/8.

Let us know if you show anything else outstanding or if you have questions about what I've provided above. Thanks so much--Audrey

137

# APPENDIX L

**From:** Kevin Ryan <kevinmichaelryan1967@gmail.com>
**Date:** December 2, 2017 at 10:13:04 AM EST
**To:** "Carmical,Audrey (DFPS)" <Audrey.Carmical@dfps.state.tx.us>
**Cc:** Mary Helen Cervantes <mhcervantes@public-catalyst.com>, "Albright, Thomas" <Thomas.Albright@oag.texas.gov>, "Woodruff,Trevor A (DFPS)" <Trevor.Woodruff@dfps.state.tx.us>, "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>, "Ge,Brian (DFPS)" <Brian.Ge@dfps.state.tx.us>, "Fescenmeyer,Megan C (DFPS)" <Megan.Fescenmeyer@dfps.state.tx.us>
**Subject: Re: Request for Information**

Thank you Audrey

Sent from my iPhone

On Dec 1, 2017, at 5:50 PM, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us> wrote:

Dear Kevin,

Please see below for the agency's revised response to Question #1.

**1.  In the attached spreadsheet (3rd tab - PMC Listing Kids SXAB Indicator), it appears that DFPS is reporting that during CY16, 150 PMC children were involved in an intake as a victim or perpetrator where child on child sex abuse was investigated.   Please confirm, that with similar data, DFPS is able to identify, track and report data on child on child sex abuse investigations involving PMC children.**

Yes, DFPS is able to identify, track, and report data on child on child sex abuse investigations involving PMC children. Aggregate data concerning all PMC children identified as sexual aggressors can be pulled using Structured Query Language ("SQL code"). However, data concerning PMC children who are victims of child sexual aggression is not collected in a manner which can be pulled using code. Instead, DFPS records information regarding victimization of child sexual aggression in the special handling section of a child's record, or in other documentation such as the Common Application or case narratives, as appropriate. This data can be pulled and aggregated via a manual process that requires a case read. DFPS and state child welfare stakeholders continue to believe labeling of victims is inappropriate, stigmatizing, and ultimately unhelpful because, as you know, caseworkers and staff make decisions based on each child's individual needs and history, and not on aggregate data concerning the at large population of PMC children.
Thanks,
Audrey