IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., )<br>)<br>    Plaintiffs, )<br>v. )<br>)<br>GREG ABBOTT, in his official capacity )<br>as Governor of the State of Texas, et al., )<br>)<br>    Defendants. ) | Civil Action No. 2:11-CV-00084 |

**PLAINTIFFS' COMMENTS REGARDING
SPECIAL MASTER IMPLEMENTATION PLAN**

While Plaintiffs have no objections to the Implementation Plan (Dec. 4, 2017) filed by Special Master Kevin Ryan, Plaintiffs respectfully submit comments on three subjects covered in the Plan: Caseworkers; Placement Array; and Final Report of the federal Child and Family Service Review.

**I.      Caseloads**

This section is organized into four sections that discuss: (A) recent State admissions regarding caseloads; (B) funding DFPS sought versus how much was allocated; (C) DFPS target caseloads for conservatorship workers; and (D) the absence of any legislative mandate to cut caseloads.

      **A.      Need for an Adequately Funded Agency**

Defendants have made numerous admissions recently that underscore the Court's finding that "excessive caseloads and overburdened caseworkers cause an unreasonable risk of harm to PMC children." Mem. Op. & Verdict at 186 (Dec 17, 2015) (Dkt. #368). These admissions add to our prior submission of State admissions. *See* Resp. to Defendants' Objections to Special Master Recommendations (Dkt. #484).

In late 2016, in advance of the 85th Legislative Session, Commissioner Whitman noted the crisis. More funding is needed, he said, to address "a crisis in the making for the past decade or more." Whitman Letter to Hon. Jane Nelson, Chair, Senate Finance Committee (Oct. 27, 2016) (App. A). "A glaring cause of this crisis is that our workers are outnumbered by the opponent — child abuse and neglect." *Id*. As a result, he referenced his submission of the agency's Legislative Appropriations Request for FY2018-19, in which the agency sought a "significant increase in workers." *Id*. As his letter continued, "Texas children cannot wait for the next biennium to begin." *Id*. It referenced discussions with the Governor, Lieutenant Governor, and Speaker of the House in which each admitted that staffing needs could not wait for the session—they had to be taken up "on an urgent basis to address the most critical needs." *Id*.

The Commissioner laid out a need for emergency funding to hire "additional staff to help stave off future crises" (seeking 829 more FTE positions, with 105 for conservatorship positions), as well as funding for a pay increase, because "bringing in new staff is just one component of ensuring child safety." *Id.* The agency must continue efforts to retain our caseworkers," adding that the agency's prior efforts to retain workers "will not end the high turnover at CPS." *Id*. at 2.

In a later letter to the Governor's office and Director of the State's Legislative Budget Board, Commissioner Whitman reiterated that it was important not to "lose sight of the increasing needs in other stages of service where CPS is stretched," in requesting emergency funding for the additional 105 conservatorship workers. Whitman Letter to DeBery at 2 (Nov. 22, 2016) (App. B).

Separately, in his opening Administrator's Statement with DFPS's legislative request, the Commissioner emphasized that the funding request "addresses the critical and unprecedented issues facing the protective services system," and underscored the need to adequately fund the agency's work:

> To be successful, this agency must have the resources to fortify and improve the child welfare system and provide young parents with resources to build safe and healthy homes.

Legislative Appropriations Request, Submitted to Office of Governor, Budget Division & Legislative Budget Board at 1, 3 (Sept. 6, 2016) ("LAR for FY2018-19) (excerpts at App. C).[1] Referencing estimates of future population growth, the Commissioner reiterated: "To effectively deliver services, DFPS must increase current service levels and take bold steps to begin to become the protector that all Texans deserve." *Id.* at 9. He concluded by referencing the agency's longstanding problems and the critical need to correct them:

> DFPS affects not only the protection of vulnerable Texans today, but whether or not many of our children have any real chance for a successful future. With population growth and the increasing complexities of society, the challenges for this agency are daunting – but they can be met with continued unwavering support and leadership from our Legislature. We will do our part, with my pledge that the era of business as usual at this agency has ended.

*Id*. at 9.

Later, in public testimony urging the Legislature to fund the agency's request for additional resources, Commissioner Whitman reiterated that DFPS continues to face a caseload crisis. At one hearing, he admitted that he was "shocked" with the situation:

> I was shocked of what they [caseworkers] have to do on a daily basis. . . . Yes, we should be getting there to see these children face-to-face on time. We have to. . . . We are not going to be able to meet those [children] if we do not have the personnel to do it.

---

[1] The entire LAR is here: https://www.dfps.state.tx.us/About_DFPS/Budget_and_Finance/LAR/FY18-19/documents/18-19_LAR.pdf).

Hearing Before Senate Committee on Health & Human Services at 27:20-28, 55 (Feb. 2, 2017).[2] He continued "We are not going to be able to meet those [children] if we do not have the personnel to do it. It's kind of a Catch-22 for them [caseworkers]. Do I spend the time with them? Do I get them services? What do I do? And then, they have to walk away." *Id*. at 28:55-29:03. Minutes later, when asked how many hours a day caseworkers average, he replied, "It could exceed 10, 12 hours." *Id*. at 30:10.

At another legislative hearing, Commissioner Whitman also conceded that agency indifference to reform has been an insurmountable roadblock for "three decades":

> This is a problem that has been going on for three decades. If we keep delaying, we will never get there.

Hearing Before Senate Committee on Finance at 1:51:10 (Jan. 30, 2017).[3]

The next day, in his State of the State Address to the Legislature, the Governor admitted that DFPS faces an immediate crisis in excessive caseloads. Referring to the emergency funding that the Legislature approved in 2016 before the session began, he noted it is "not a lasting solution." State of the State Address (Jan. 31, 2017) (App. D at 3).[4] "We need more workers," he said, "with better training, smarter strategies and real accountability to safeguard our children." *Id*. He emphasized that the agency's immediate crisis threatens the very lives of children:

> The primary goal of government is to keep its citizens safe and secure. That goal is even more important when it comes to our children. . . . Last year, more than 100 children died in our Child Protective System. . . . We were right to inject emergency funding. But that's not a lasting solution. We need more workers, with better training, smarter strategies and real accountability to safeguard our children. . . . Do not underfund this rickety system only to have it come back and haunt you. Do it right. . . . If ever

---

[2] http://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=11650.
[3] http://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=11611.
[4] https://gov.texas.gov/news/post/governor_abbott_delivers_state_of_the_state_address.

> we've had an emergency item, this is it. . . . If you do nothing else this session, cast a vote to save the life of a child.

*Id.* This is, of course, the same "rickety system" that the State defends today in this case.

At the end of the session, the Governor reiterated that agency reform is a matter of life or death in the Executive Order signing the budget passed by the Legislature:

> PROCLAMATION BY THE GOVERNOR . . . : Senate Bill No. 1, the General Appropriations Act, having been duly certified by the Comptroller of Public Accounts pursuant to Article III, Section 49a of the Texas Constitution, has been presented to me for action. I am once again signing a budget that addresses the most pressing challenges faced by our state. This budget funds a life-saving overhaul of Child Protective Services, ensuring children in Texas foster care receive the protection they deserve.

Senate Journal, 85th Legislature – Regular Sess. at 4246 (May 29, 2017) (App. E at 32).[5]

### B. Significant Gaps in Legislative Allocations to DFPS

Despite repeated admissions by the State of the critical need to fully fund agency services – pleading to "not underfund this rickety system" – the amount allocated to DFPS was far less than what it said it needed to meet minimum needs of children under its conservatorship. Beyond its base budget request for FY2018-19, DFPS sought another $1 billion in funding for all CPS services. *See* DFPS's Agency Summary – Conference Committee ("Agency Summary") (App. F). Apparently prepared at the end of the 85th Legislature's Conference Committee, the Agency Summary compares its exceptional budget requests with the actual amounts that the Legislature allocated to each request. The exceptional items DFPS requested were line item requests above and beyond the emergency funding that the Legislature approved in late 2016 to maintain 829 full-time equivalent positions and salary increases for certain DFPS workers.

---

[5] http://www.journals.senate.state.tx.us/sjrnl/85r/pdf/85RSJ05-29-F.PDF#page=30).

Of the nearly $1 billion in additional funding that DFPS sought in exceptional line item requests, the Legislature appropriated about a *quarter* of the money sought, according to the Agency Summary. The gap between what DFPS insisted it needed and what it actually received on each request is shockingly wide, as the table below (based on the figures in the Agency Summary) illustrates:

| Line Items Relating to Foster Care from DFPS's LAR for FY 2018-19 | Funds Requested by DFPS | Total Allocated by Legislature |
|---|---|---|
| Maintain Family and Protective Services – Foster Care (Item 1(a) of Summary) | $45.5M | 0 |
| Increased CPS Purchased Services (Item 1(d) of Summary) | $30.9M | $1.2M |
| Adequately Support Foster Care Redesign (Maintain Existing program in Region 3(b)) (Item 1(g) of Summary) | $60.4M | $14.6M |
| Increase CPS Workforce to see Children Timely (Item 2(a) of Summary) | $179.7M | $88M |
| Increase SWI [Statewide Intake] Workforce to Ensure Timely Responses to Intakes (Item 2(c) of Summary) | $11.7M | $1.4M |
| Support CPS Direct Delivery Costs and Critical Operational Supports (Item 2(d) of Summary) | $27M | 0 |
| Expand Foster Care (8 new catchment areas) (Item 4(a) of Summary) | $178.6M | $8.3M (3 catchments) |
| Increase Safety, Permanency and Well-Being for Children and Youth Through Sustaining CPS Transformation and Engaging Community Partners (all of Item 5 of Summary) | $38M | $4.3M |
| Foster Care Legacy Rate Increase (Item 7(a) of Summary) | $196.9M | $85.4M |
| Treatment Foster Care (Item 7(c) of Summary) | $57M | 0 |
| Kinship Care (Item 7(d) of Summary) | $121.3M | $32.5M |
| Increase Funding to Retain High Performing Workforce–CPS Certain Direct Delivery Staff (Item 8(a) of Summary) | $2.3M | 0 |
| **Totals** | **$949.3M** | **$242.2M** |

The gulf between what DFPS says it needs—without regard to most issues in the Court's decision—and what the Legislature gave it underscores how badly underfunded the agency remains today.

### C.      Significant Caseloads Even With More Funding

Even if the Legislature had given DFPS the funding it asked for, it would have reduced conservatorship caseloads, by DFPS's count, only to an average of 25.47 children per worker. *See* LAR FY2018-19 at 533 (App. C). This target estimate is confirmed by the Legislative Budget Board, which projects that the additional funding will reduce average daily caseloads for conservatorship workers from their 26.3 estimate (as of Aug. 31, 2017) to 24.1 in 2018 and 23.1 in 2019. *See* Legislative Budget Board, Child Protective Services: Overview of Funding for the Child Protective Services Program at 13 (Dec. 2017) (App. G at 13).[6] The Budget Board is the Legislature's non-partisan, official scorekeeper. *See* TEX. GOV. CODE CH. 322, *et. seq*.[7]

Moreover, DFPS told the Legislature that even if its appropriations request were fully funded, its target goals – including the goal of getting to 25.47 children/worker – are unsustainable and will not address longstanding regional imbalances in staffing. "Cases per worker would continue to increase above manageable levels – that places more pressure on the system and increases the risks to of children, youth, adults, and their families." LAR FY2018-19 at 533 (App. C). In addition, "DFPS's staffing model, used to estimate caseworker needs to achieve the LLB target, does not address regions significantly over the target because it assumes a statewide average. Also, low attrition rates in certain regions that are maintaining caseload target limits the ability to shift resources to regions at or reaching critical mass." *Id*.

---

[6] http://www.lbb.state.tx.us/Documents/Publications/Presentation/5113_CPS_Critical_SFC_Dec_5_17.pdf.
[7] http://www.lbb.state.tx.us/About_LBB.aspx.

### D. Funding Not Tied to Controlling Caseloads

Finally, the Court should note that the Legislature did not mandate that DFPS use the money allocated to cut primary caseworker loads to a specific level. Nor did the Legislature institute reasonable caseload standards or even a mandate to track conservatorship caseworker caseloads on a child-only basis.

## II. Placement Array

This part focuses on three related issues regarding placement array: the adequacy of the array; congregate care; and Foster Care Redesign.

### A. State Admissions Regarding Continued Inadequate Placement Array

Defendants' admissions are consistent with the findings that "DFPS's inadequate array places children far from their home communities, separated from their siblings, and in inappropriate placements," and DFPS's inadequate placement array causes an unreasonable risk of harm" to children in licensed foster care. Mem. Op. at 227.

The State admits that it continues to lack an adequate placement array, with the problem especially acute for high-needs children. In support of more funding for improve the array, DFPS noted:

> For a variety of reasons, including population growth, a shift in the needs of children who are entering the foster care system, and ever-increasing health care costs, Texas lacks adequate, high-quality foster care capacity, particularly for high-needs children. Many children suffer from trauma and mental illness, emotional/behavioral health problems, or are medically fragile from what they have experienced. Our system must be strengthened to take special care of these children who through no fault of their own are now the state's responsibility.

LAR for FY2018-19 at 550 (App. C). Further underlining the need for more funding, the agency added, "DFPS lacks available, high-quality capacity that meets the needs of children in the state's conservatorship." *Id*.

This acknowledgement echoed admissions made by the Commissioner before the session. Referring to testimony he gave to a pre-session emergency hearing before the Senate Finance Committee, he observed:

> As we discussed in the hearing, DFPS still struggles with finding placements for children entering substitute care, especially those with high needs. The result of this capacity issue is that the agency enters into expensive contracts with providers that are not the best setting for children or they end up sleeping in CPS offices, hotels or in a hospital bed until a placement is found. As Governor Abbott, Lt. Governor Patrick and Speaker Straus directed in their letter to me on October 12, 2016 - I will not tolerate inferior operations. Our children deserve nothing less than high quality placements

Whitman Letter to Hon. Jane Nelson, Chair, Senate Finance Committee at 5 (Oct. 27, 2016) (App. A).

In the last session, the Legislature directed DFPS to develop a capacity needs and availability assessment of each type of foster care and kinship placement, and to collaborate with community organizations to identify short-term and long-term goals and strategies to address capacity needs. TEX. FAM. C., Section 264.1261(b) (2017) (as amended by H.B. 1549). The same legislation required that DFPS track "the number of children placed in substitute care, organized by type of placement." TEX. HUMAN RES. C., Section 40.0516(a)(4) (2017) (as amended by H.B. 1549). Despite these directives, key components of the inadequate placement array remain unaddressed, including:

- There was no legislation that restricts placing children of different service levels, or of different ages, in the same room. Mem. Op. at 235.

- There was no mandate to create new placements, as identified in a placement needs assessment. *Id.* at 233, 253.

- There was no legislation that directly addresses tracking or providing for single-child homes. *Id*. at 253.

- There was no legislation that addressed the problem of children being removed from placements where they are succeeding because their level of care has altered. *Id*. at 254.

    B.    **Continued Problems with Congregate Care: Foster Groups Homes, GROs, and New "Cottage Homes"**

As this Court found, foster family homes, which can have up to 6 children, "are the least restrictive, most family-like placement," and "Foster group homes, GROs, and RTCs are progressively more restrictive." Mem. Op. at 10. Several changes in the names and types of placement categories were made. The most significant include the following:

1. <u>Moving children from foster group homes to GROs</u>. Foster group homes, the licensing category that long was used by DFPS to provide residential care for 7-12 children, was eliminated for future placements. But instead of directing that children in foster group homes be moved to family-like settings with fewer children under one roof, the Legislature authorized DFPS to house *more* children in general residential operations (GROs) by reducing the minimum from 12 to 7 children who can be housed in a GRO. *See* TEX. HUMAN RES. C., Section 42.002 (2017) (as amended by H.B. 7). This bears repeating: the Legislature now allows DFPS to place children who would have been put in foster group homes into GROs, a more restrictive, institutionalized setting.

Moreover, the Legislature imposed no restriction on placing basic or moderate needs children in GROs, despite the fact that "DFPS's overreliance on GROs effectively institutionalizes children that do not belong in these placements." Mem. Op. at 225. The Legislature amended Section 263.001(a) of the Family Code so that "least restrictive setting" is now decreed, as a matter of state law, to be "a placement for a child that, in comparison to all other available placements, is the most family-like setting." This is true for all children, even those under the age of six. *See* TEX. FAM. C., Section 263.001(d).

By labeling GROs as the "least restrictive" setting, the legislation allows, in fact encourages, DFPS to more widely use such placements.

Of course, these statutory changes were made despite the fact that DFPS "over-relies on GROs," which are "much more restrictive and less family-like than other placements." Mem. Op. at 224. After trial, the Court found that DFPS was "second worst in the nation at placing young children in congregate care." *Id*. at 224-25.

       2.  <u>New "Cottage Homes" placement category</u>. The Legislature created a new placement category it calls "Cottage Homes." A Cottage Home operation contains multiple foster family homes on the same campus, all of which operate under the license of one operator. Notably, the question of overnight awake supervision in Cottage Home operations is not addressed by the legislation.

Especially significant is how many children can be housed on these campuses. Each foster family home on a Cottage Home campus can have up to *8* foster children, and biological children need *not* be counted in this capacity limit. To be precise, as amended, section 42.002 of the Texas Human Resources Code authorizes up to 6 foster children to be housed together, but two later exceptions in the statute allow this limit to be expanded:

- <u>First</u>, according to section 42.0463(2), DFPS may come up with criteria to allow up to *8* foster children in each foster family home in a Cottage Home community. TEX. HUMAN RES. C., Section 42.0463(2) (2017) (as amended by H.B. 7) ("Notwithstanding the limitations established by Section 42.002, the department may (2) issue an exception in accordance with department rules allowing an agency foster home, cottage family home, or specialized child-care home to expand its capacity and care for not more than eight children"). The

legislation does not detail the standards DFPS is to use to decide when an expansion of capacity to 8 children will be allowed or what additional safeguards should be put in place in those instances. But recent DFPS documents make clear that the agency is moving forward with plans to routinely allow placements of up to 8 children, at least on a "temporary" basis, whatever that means. *See* eMemorandum from DFPS Assoc. Commissioner for Child Protective Services to All CPS Field Staff & CPA Providers at 1 (Aug. 21, 2017) (App. H).

•  <u>Second</u>, according to 42.0463(1), DFPS is authorized to come up with criteria so that the caretaker's biological or adoptive children are not counted against the cap of 8 foster children. TEX. HUMAN RES. C., Section 42.0463(1) (2017) (as amended by H.B. 7) ("Notwithstanding the limitations established by Section 42.002, the department may (1) develop, by rule, criteria to determine when it may be appropriate to exclude children who are related to a caretaker in determining a residential child-care facility's total capacity").

In sum, on its face the new legislation authorizes DFPS to put children in Cottage Homes operations where multiple foster family homes can house up to 8 foster children each, along with any number of biological or adoptive children in the same home. Thus, as with GROs, the legislation encourages DFPS to more widely use congregate care placements for all children, regardless of care level or age.

**C.  Foster Care Redesign**

1. <u>Only operating in one sub-region</u>. DFPS began Foster Care Redesign in early 2010 as its proffered solution to the State's inadequate placement array. Mem. Op. at 229. Yet at the time of trial, *see id*. at 230, and even today, two years later, Foster Care

Redesign is only actively operated in a part of a single region or "catchment area" of the State. *See* Texas Department of Family and Protective Services, *Community Based Care* (excerpts at App. I).[8] Known as Region 3B, the sub-region is comprised of seven counties in the western/southwestern part of the catchment area, in and around Fort Worth. *See id*; *see also Community Based Catchment Areas* (providing DFPS's color-coded map of the State's 11 catchment areas) (excerpts at App. J).[9]

DFPS's "*History of Foster Care*" reflects its initial failed attempt to operate Foster Care Redesign in Regions 2 and 9, a mostly rural area in North and West Texas, after the Single Source Continuum Contractor for those regions terminated its own contract. *See* DFPS History of Foster Care (excerpts at App. K); Mem. Op. at 231 (summarizing trial evidence regarding DFPS's previous contract with Providence in Regions 2 and 9, the company's termination of the contract after 18 months and over $2 million in losses, and concluding that the Providence experience was an "abject failure").

Inexplicably, the agency continues to represent that it is on the verge of getting a redesign program up and running again in Region 2, which is not accurate. This fall, DFPS told the Legislature that "plans are underway to establish an SSCC in Region 02 (referred to as Region 02C) to begin services in FY 2017." LAR for FY2018-19 at 132 and 427 (App. C). Yet only months earlier, in June 2017, DFPS had cancelled its own solicitation for a SSCC,[10] and the agency's new request for application for Region 2,

---

[8] https://www.dfps.state.tx.us/Child_Protection/Community_Based_Care/ (referred to as "DFPS History of Foster Care").

[9] https://www.dfps.state.tx.us/Child_Protection/Community_Based_Care/documents/CBC_Catchment_Areas.png.

[10] https://www.dfps.state.tx.us/Child_Protection/Community_Based_Care/default.asp.

which was released in October 2017, remains outstanding. *See* Agency Requisition #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 (excerpts at App. L).[11]

B. <u>Limited expansion of Foster Care Redesign</u>. DFPS reported to the Court and Special Masters that the Legislature renamed Foster Care Redesign as "Community Based Care" and approved a "staged" expansion of the program from the one sub-region where it currently operates to five catchment areas (including Region 3B) by the end of the 2018-19 biennium. *See* Implementation Plan at 53 (citing DFPS Responses emailed from Audrey Carmical, Esq. on behalf of DFPS on Sept. 21, 2017) (attached as an appendix to the Plan). That report was only partially complete.

DFPS failed to disclose that in its Legislative Appropriations Request it sought to expand Foster Care Redesign to 8 additional regions (exclusive of Region 3B). *See* LAR for FY 2018-19 at 539 (App. C). Yet, despite the agency's request to move away from a legacy foster care system that its leaders acknowledge is badly broken, the Legislature authorized the expansion of Community Based Care (née Foster Care Redesign) to only three additional regions. *See* DFPS Agency Summary (Item 4(a)) (App. F). DFPS could have disclosed that the Legislature's approval of a five catchment areas by the end of FY2019 included the active program in Region 3B; defunct program in Regions 2 and 9 that has not had a SSCC since mid-2014; and recent legislative authorization to expand to three new regions. Thus, the anticipated expansion encompasses only three extra regions, with the rest of the state to live with the admittedly deficient legacy foster care system.

There are many reasons to be concerned that the proposal to expand Community Based Care, which plans to privatize most caseworker functions, continues to put foster

---

[11] http://esbd.cpa.state.tx.us/bid_show.cfm?bidid=144361 (link provided by DFPS at https://www.dfps.state.tx.us/Child_Protection/Community_Based_Care/default.asp).

children at an unreasonable risk of harm. At the least, it is impossible to know what effects this plan may portend for children—positive or negative. Though it is possible, theoretically, that DFPS's new approach to procuring placements and case management could reduce the risk of unnecessary harm to all those in the State's custody, it is far more likely to increase the risk significantly, given that DFPS, through RCCL, is deficient in holding private providers accountable for delivering safe and appropriate placements. At this point, there is no record on which the Court can conclude that expanding Community Based Care and privatizing case management will rectify longstanding constitutional failings. Judicial monitoring of the State's progress in implementing the new model will be necessary until a sufficient evidentiary record can be evaluated. By anyone's account full implementation of Foster Care Redesign, or Community Based Care, is an uncertain and distant reality. Indeed, even its primary advocate in the Legislature, Senator Schwertner, recognized that the redesign program "is not going to work in every area of the State. It probably won't be in every area of the State." Hearing Before Senate Committee on Health & Human Services at 1:39:50 (Feb. 2, 2017).[12]

In any event, even if one takes an optimistic view of what Community Based Care and its privatization model can accomplish, the funds allocated to expand and reimagine the program was a fraction of what DFPS insisted was needed to effectively meet the minimum needs of the children under its conservatorship. DFPS asked for $178 million as an extraordinary budget request above its base funding for the biennium to expand Foster Care Redesign to 8 additional regions. *See* DFPS Agency Summary (Item 4(a)) (App. F). This is, on average, about $25 million for each fiscal year for each new region.

---

[12] http://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=11650.

The Legislature allocated only $8.3 million to expand to three new catchment areas, or an average of under $3 million/fiscal year for each new region. *See id*.

Indeed, the Legislature hugely underfunded the one active program in Region 3B. DFPS asked for $60 million as an extraordinary budget request above its base funding for the biennium to support its existing program in Region 3B. The Legislature approved only $14 million. *See* DFPS Agency Summary (Item 1(g)) (App. F).

Finally, yet again, *see* Mem. Op. at 230, DFPS has no timeline or schedule for when foster care reform will cover all or most of the entire state, if ever. Commissioner Whitman has conceded that expansion of the redesigned program "will happen slowly over several years, as only three new catchment areas have been given the green light." *DFPS to Become a Stand-Alone State Agency* (excerpts at App. M).[13] He also could have noted that expansion of the program will depend on finding suitable, willing companies to serve as the SSCC for the three new regions, as well as for Regions 2 and 9 (which have had no SSCC since Providence terminated its contract in 2014). Nevertheless, DFPS continues to represent that it "has developed a statewide plan for implementing Community Based Care." DFPS, *Community Based Care* (under "*Proposed Service Areas*" tab) (excerpts at App. I).

### III. Update Regarding Federal Child and Family Service Review

At trial, the State relied heavily on its performance in the preliminary phase of the third round of the federal Child and Family Services Reviews ("CFSR") to refute that DFPS had shown deliberate indifference toward the basic safety and wellbeing of PMC children. Specifically, the State proffered a federal workbook of state performance that (based on its self-reported data) showed that DFPS had complied with six of the seven

---

[13] https://www.dfps.state.tx.us/About_DFPS/News/2017/2017-05-31-Abbott_Signs_Bills.asp.

statewide data indicators established by the U.S. Department of Health & Human Services to assess agency performance. *See* Mem. Op. at 27; *see also* DX 147; DX 148; Burstain Doc. 330, pp. 202-220; Wilson Report, Doc. 250; Defs' Proposed Findings of Fact, Dkt. #360 at 1-5. The data indicators included in the workbook were based on the State's self-reported data and did not include any federal on-site review, which had not yet taken place. Nevertheless, the State argued strenuously at trial that that its compliance with six of the data indicators in the workbook supposedly proved that it had not acted with deliberate indifference or substantially departed from professional judgment.

Given Defendants' position at trial, the Court may take judicial notice that the U.S. Department of Health and Human Services subsequently did an on-site review in Texas and, in late 2016, published its Final CFSR Report on the State's performance. *See Child & Family Services Review: Texas, Final Report* (2016) (App. N). Unlike the earlier workbook summary of statewide indicators, the findings in the Final Report are based on detailed case reviews, meetings with myriad stakeholders (including agency personnel, foster parents, service providers, and youth), and DFPS's own statewide assessment. *Id.* at 1-2. The Final Report reflects that Texas *failed* to meet almost every standard in the CFSR. Texas failed to meet the standards for every Outcome Measure related to safety, permanency, and wellbeing of children served by the agency. *Id.* at 3-5. The report also assessed the State's performance on seven "systemic factors" and found that DFPS achieved conformity with only three of the seven system performance measures. *Id.* The Final Report's findings with regard to the Outcome Measures includes the following:

- Texas was found *not* to be in substantial conformity with Safety Outcome 1: "Children are, first and foremost, protected from abuse and neglect." *Id.* at 5.

- Texas was found *not* to be in substantial conformity with Safety Outcome 2: "Children are safely maintained in their homes whenever possible and appropriate." *Id*. at 6.

- Texas was found *not* to be in substantial conformity with Permanency Outcome 1: "Children have permanency and stability in their living situations." *Id*. at 7.

- Texas was found *not* to be in substantial conformity with Permanency Outcome 2: "The continuity of family relationships and connections is preserved for children." *Id*. at 7-8.

- Texas was found *not* to be in substantial conformity with Well-Being Outcome 1: "Families have enhanced capacity to provide for their children's needs." *Id*. at 9-10.

- Texas was found *not* to be in substantial conformity with Well-being Outcome 2: "Children receive appropriate services to meet their educational needs." *Id*. at 12.

- Texas was found *not* to be in substantial conformity with Well-being Outcome 3: "Children receive adequate services to meet their physical and mental health needs." *Id*. at 13.

Finally, it bears noting that data quality issues continue to plague the agency. Because the State's performance as reflected in the initial summary was based on "unreliable" self-reported data, the Court found, CFSR performance "does not answer whether Texas's PMC foster children are placed at an unreasonable risk of harm due to either deliberate indifference or a substantial departure from professional judgment." Mem. Op. at 28. The same problems with self-reported data remain. For the third round CFSR, DFPS was approved to conduct its own case record review to find compliance with federal standards and, during the process, HHS "raised numerous concerns regarding the quality of the state's self-assessment of its case practices and the accuracy of case ratings." CFSR Final Report at 3.

**Conclusion**

Children in our State's permanent managing conservatorship face an unreasonable risk of harm in a structurally deficient system, this Court has found, and this harm is a direct result of Texas's collective policies and practices. *See* Mem. Op. at 17, 186, 200, 217, 234, 240, 242. Despite these findings, the State continues to insist in the litigation, here and to the Fifth Circuit, that its system is not broken or in urgent need of repair. This position cannot be squared with the State's ongoing admissions of longstanding systemic problems that plague its foster care system, as well as the public record evidence of which this Court can take judicial notice.

For these reasons, we respectfully submit, the recommendations contained in the Implementation Plan submitted by the Special Master are vital for the Court to adopt and order, so that our State's most vulnerable children are protected as the Constitution requires.

December 19, 2017

Sara Bartosz (*pro hac vice*)
Stephen A. Dixon (*pro hac vice*)
Christina Wilson (*pro hac vice*)
CHILDREN'S RIGHTS
88 Pine Street, Suite 800
New York, New York 10005
(212) 683-2210
 (212) 683-4015 Fax
*sbartosz@childrensrights.org*

Marcia Robinson Lowry (*pro hac vice*)
A BETTER CHILDHOOD, INC.
1095 Hardscrabble Road
Chappaqua, New York 10514
(844)422-2425
*mlowry@ABetterChildhood.org*

Respectfully submitted,

/s/ R. Paul Yetter

R. Paul Yetter
State Bar No. 22154200
S.D. Tex. Bar No. 3639
Dori Kornfeld Goldman
State Bar No. 24041274
Lonny Hoffman
State Bar No. 00784282
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
 (713) 632-8000
 (713) 632-8002 Fax
*pyetter@yettercoleman.com*

Barry F. McNeil
State Bar No. 13829500
S.D. Tex. Bar No. 14914
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
 (214) 651-5000
 (214) 200-0535 Fax
*barry.mcneil@haynesboone.com*

ATTORNEYS FOR PLAINTIFFS AND THE
GENERAL CLASS AND SUBCLASSES

**Certificate of Service**

I certify that on the 19th day of December, 2017, a true and correct copy of the foregoing document was served on all counsel of record using the Court's CM/ECF e-file system.

/s/ R. Paul Yetter