**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| M.D., by her next friend, Sarah R. | § | |
| Stukenberg, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 2:11-CV-00084 |
| | § | |
| GREG ABBOTT, in his official capacity | § | |
| as Governor of the State of Texas, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANTS' OBJECTIONS TO SPECIAL MASTER'S
IMPLEMENTATION PLAN**

Introduction

After spending two years and $1,457,124.46 taxpayer dollars, the Special Master failed to deliver concrete and realistic recommendations to improve Texas's foster care system. In fact, his Implementation Plan would cause immediate harm by placing a cap on the number of children currently in certain foster homes and prohibiting entirely the use of others. Families would be forced to decide which children—including those placed with grandparents, aunts, uncles, and other relatives—to uproot from their current homes, communities, friends, and schools. Grandparents would have to choose among their grandchildren, aunts and uncles among their nieces and nephews.

Beyond the actual harm caused by the Plan, the Plan does not improve the real-world operations of the system. Really, the Plan is not a plan at all. It is a series of unfunded mandates and directives with no guidance on how Texas should reach the sometimes vague and often impossible objectives. The Plan ignores—and even contradicts—the positive changes already

occurring as a result of new legislation and agency initiatives. The Plan would bog case workers down with administrative box-checking rather than keeping them focused on providing care to the children. And, after all the state resources spent by the Special Master, the Plan would require Texas to develop its own plans to address certain issues that the Special Master could not figure out.

Texas is continually improving its foster care system. Just this last session, the Legislature increased funding for the foster care system by $508.5 million in All Funds and $399.9 million in General Revenue Funds from the 2016–17 biennial base and expanded the community-based care model that changes how services are delivered. Texas should be allowed to operate and modify its system as needed and without interference from a court-appointed Special Master. Now three years after the trial in this case concluded, and two years after the Court's findings, the failure of the Plan once again highlights the complexity of the issues, particularly in light of the competing demands for finite resources. Responsibility for determining policy priorities and implementing best practices lies with the legislative and executive branches of government. Future decision-makers must have the flexibility to adapt as needs change. They should not have their options bound by the stale opinions of one Special Master. Texas objects.

## Objections

Defendants make the following objections to the Special Master's Implementation Plan (the "Plan"), filed December 4, 2017 (Doc. 546). These objections are organized by general objections that apply to the entire Plan, objections that apply to common problems with many of the items in the Plan (i.e., cluster objections), and additional more specific objections.

1. Defendants object to the Plan in its entirety on the bases that:

a. Any injunctive remedy is improper because the Court's underlying findings of class-wide constitutional violations are unsupported by reliable expert testimony or other competent, admissible evidence. The Court wholly rejected the expert testimony of the only expert Plaintiffs offered to prove their claims on a class-wide basis. The remaining anecdotal experiences of the relatively few children that Plaintiffs selected to testify do not constitute class-wide evidence, cannot support class-wide liability, and do not justify class-wide remedies.

b. The findings of constitutional violations in the Court's December 17, 2015, Memorandum Opinion (Doc. 368) are too vague to permit the remedies proposed in the Plan to be precisely tailored to cure those purported constitutional violations. As a result, there is a complete disconnect between the Court's liability finding and the putative remedies in the Plan. The items in the Plan do not correspond to the harm Plaintiffs alleged and the Court found (albeit on insufficient evidence) nor do they derive from any recognized Fourteenth Amendment substantive due process right. Salient examples:

--There was no testimony whatsoever that any child in PMC (much less *all* children in the class) ever suffered any harm for lack of access to a home-based landline, and yet the Special Master has recommended installation of landlines system-wide.[1] What *proven* constitutional injury do landlines remedy?

--There was no testimony, expert or otherwise, as to whether a caseworker caseload of a certain level within the Texas foster care system violated the Fourteenth Amendment. (As a result, the Court candidly admitted not knowing where to draw

---

[1] Plan, p. 13, item 3.

the constitutional line on caseloads. (Doc. 368, at 164.)) Yet, the Special Master, relying *solely* on an internal study that set *a* number at 14 children per caseworker— with no suggestion at all that the number was based on compliance with constitutional obligations, as opposed to best practices or some other constitutionally-irrelevant standard--recommended a range of 14-17 children.[2] There was no evidence whatsoever that any child (much less all children in the class) whose caseworker has a caseload of 18 or more children suffered a constitutional injury. What *proven* constitutional injury does a caseload cap of 17 children remedy?

--There was no testimony whatsoever that having a child's files exist in part electronically and in part in hard copy, as opposed to a single electronic file, harmed a single child (much less *all* children in the class) or that having records stored in the current manner in any way lessens a caseworker's knowledge of a child's information. Yet, the Special Master has recommended a complete and extraordinarily expensive overhaul of DFPS' computer system, an existing system that in the eyes of the Executive Branch is already fully compliant with federal standards,[3] to combine all records in a single electronic file system. What *proven* constitutional injury does a fully integrated computer system remedy?

--The only testimony offered about risk of harm in foster group homes was limited to homes with more than six children (and as to those, Plaintiffs' expert candidly admitted she did not even attempt to analyze an unbiased sample). There was no testimony whatsoever that any child in a foster group home with six or fewer

---

[2] Plan, p. 25, item 1.
[3] Plan, p. 11, item 1.

children (much less all children in the class) ever suffered harm due to the number of children in the home. Yet, the Special Master has recommended the immediate (and hugely disruptive and harmful) closure of all foster group homes without regard to the number of children in the home.[4] What *proven* constitutional injury does that remedy? And, with respect to facility population, the Special Master's Plan goes beyond the claim of the Foster Group Home subclass and reaches children in kinship care, a class the Court refused to certify. Despite the statistically invalid evidence, which was limited *solely* to a "not-unbiased" subset of foster group homes, the Special Master has also recommended that *non-foster group homes*, such as kinship homes, be limited to six children.[5] There was no evidence whatsoever that any child in a kinship home with more than six children (much less *all* such children in the non-certified class) ever suffered harm due to the number of children in the home. What *proven* constitutional injury is remedied by disrupting those kinship placements for children and breaking up siblings and families?

--There was no testimony that allowing a caseworker supervisor also to carry a caseload of any size somehow subjected any child (much less *all* in the class) to a constitutional injury, yet the Special Master has recommended that supervisors be prohibited from also serving as caseworkers for children.[6] What *proven* constitutional injury is remedied by that unsupported prohibition? Likewise, there was no evidence whatsoever that at a certain level a supervisor to caseworker ratio

---

[4] Plan, p. 52, item 1.
[5] Plan, p. 53, item 2.
[6] Plan, p. 29, item 2.

*Defendants' Objections to Special Master's Implementation Plan*                     Page 5

(any ratio) subjects any child (much less *all* in the class) children to harm in violation of the Fourteenth Amendment. The Special Master nevertheless has recommended a mandatory ratio of seven to one.[7] What *proven* constitutional injury does that mandatory ratio remedy?

--The trial of this case had nothing to do with the maintenance of children's medical records or with the quantity and quality of developmental assessments for children. There was no testimony that any child (much less *all* children in the class) suffered constitutional injuries as a result of the maintenance of medical records or the lack of assessments in addition to the many DFPS already does. Yet the Special Master has recommended expensive and unnecessary changes to the Health Passport and additional developmental assessments.[8] What *proven* constitutional injuries would those additional requirements remedy?

--There was no testimony whatsoever that any child in PMC (much less *all* children in the class) ever suffered any constitutional injury from a lack of birth certificates, social security cards, independent or adult living preparation services, life skills assessments, Circles of Support, Transition Planning Meetings, expungement of criminal records, access to post-care benefits, driver's education courses, safe stable housing upon exit from care, or encrypted email accounts. Yet the Special Master includes in the Plan affirmative entitlements to, and corresponding obligations by DFPS to provide these things.[9] What *proven* constitutional injuries would those additional requirements remedy?

---

[7] Plan, p. 29, item 1.
[8] Plan, p. 22, *et seq.*, items 1-7.
[9] Plan, pp. 17-18, items 1-12.

--There was no evidence as to any child, much less all children in the class, that having unrelated children more than three years apart in age in the same room, having unrelated children with different service levels in the same room, having children spend a night in office, or having children under two, under six and under twelve years of age reside in non-family-like settings cause a constitutional injury. Yet, the Special Master calls for prohibitions of each of these arrangements.[10] These are not remedies to evidence-based class-wide violations of recognized substantive due process rights.

None of these recommended injunctions remedies a demonstrated class-wide constitutional injury. It is as if the Special Master took the Court's (unsupported) liability finding as *carte blanche* to recommend a wide range of subjectively-determined aspirational and ideal-world possible improvements to foster care, as one might expect to see in the legislative lobbying efforts of a children's advocacy group, rather than correlating specific, demonstrably-effective remedies to specific policies or practices that reliable class-wide evidence proves to be in violation of recognized Fourteenth Amendment substantive due process rights. This overreach and intrusion into state sovereignty by the Special Master is all the more inappropriate as it is in derogation of the Texas Legislature's robust recent foster care legislation.[11]

c.  The Special Master concludes his lead-in comments with the statement: "The numbered policies that follow are offered to ensure that PMC children are *free from unreasonable risk of harm* as stated in the Court's goals of December 2015 and January 2017." (Plan, p. 2, emphasis added.) The Plan therefore is based on an erroneous articulation of the

---

[10] Plan, pp. 43-46, items 1-6.
[11] *See* Attachment A, Declaration of Trevor Woodruff, attaching summaries of 85th Legislative Session.

substantive due process right of children in foster care. As result, the items in the Plan necessarily are not tailored to cure a cognizable violation of foster children's rights under the Constitution. As the Court's opinion [Doc. 368] recognized, foster children have a substantive-due-process right to "personal security and reasonably safe living conditions'; and, to obtain relief under section 1983 on a substantive-due-process claim, a plaintiff must prove 'that the state official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" Mem. Op. pp. 15, 20 (quoting *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880-81 (5th Cir. 2004)). [12] Those standards govern this case. Because the Special Master applied an incorrect constitutional standard, the Plan does not remedy constitutional violations and enforcement of its provisions is not necessary for Defendants to comply with the Constitution.

d. The proposed remedies in the Recommendations Plan are overbroad insofar as they are not narrowly tailored to redress violations of the constitutional duty owed to a child in foster care, but instead seek to implement what the Special Master evidently deems best practices, Master's subjective standard, for which there is no constitutional duty.

e. The Special Master failed to demonstrate that the provisions of the Plan are the least intrusive into the administration of foster care by the Department of Family and Protective Services (DFPS).

---

[12] After citing the standard set forth in *Hernandez,* the Court then stated: "*Put another way*, foster children have the right to be free from an unreasonable risk of harm." Mem. Op., p.15 (Emphasis added.) Defendants repeat their position that the latter "other way" articulation of the applicable standard is legally incorrect and is not the legal equivalent of the standard in *Hernandez*. This false equivalency, if accepted and applied by the Special Master, further renders his recommendations invalid.

f.  Due to its omissions of what Defendants are currently doing in foster care as well as the results of the last session of the Texas Legislature, the Plan creates the decidedly false impression that Defendants are doing little for foster care children. The Special Master knows what current policies and practices are in place. *See* Plan Appendices A, and D through L. He has also been apprised of the accomplishments in the last legislative session and of the Department's Continuous Self-Improvement Plan.[13] Yet, he made no effort to recognize what Defendants are doing, either from a policy or practice standpoint, and failed to create a plan accordingly.

g.  There is no evidence that the proposed remedies will, in fact, cure the alleged class-wide constitutional violations.

h.  The Appointment Order for the Special Masters (Doc. 379) violates Fed. R. Civ. P. 53 for the reasons stated in the objections Defendants made in their Opposed Motion to Stay (Doc. 370) and their Opposed Motion to Revoke Reference to Special Masters (Doc. 389). The Plan is the product of that improper appointment and is thus invalid.

i.  The Plan does not satisfy the Fed. R. Civ. P. 23(b)(2) requirement that final injunctive relief is appropriate respecting the class as a whole.

j.  Insofar as the Plan is made to apply on a class-wide basis for any class herein, its provisions are invalid because Plaintiffs failed to demonstrate compliance with the requirements of Fed. R. Civ. P. 23(a)(2) (commonality), 23(a)(3) (typicality), and 23(b)(2) (existence of appropriate class-wide remedy), both before and after trial. In fact, as to the availability of a class-wide single injunctions, as required by Rule

---

[13] *See* Attachment A, Declaration of Trevor Woodruff, attaching Continuous Self Improvement Plan (the "CSIP"). Without agreeing to the necessity or propriety of the various matters and undertakings listed by numbers in the document, the CSIP sets forth for such areas current processes and new or planned initiatives.

23(b)(2), the Plan itself affirmatively demonstrates *non*-compliance with that very Rule.

k.  Throughout the Plan the Special Master provides descriptions or characterizations of testimony and documents in the evidentiary record and of the Court's prior rulings. These descriptions and characterizations are outside the scope of the Appointment Order, are hearsay, and are not the best evidence of what is in the actual record. Fed. R. Evid. 801-02.

l.  Defendants object that the Plan, if adopted by the Court, is open-ended as to time, fails to meet the requirements of Rule 65, and is tantamount to a de facto receivership for which no lawful showing has been made.

2.  Defendants make the following additional objections that apply to specific clusters of items in the Plan:

a.  In many instances the Plan describes actions that are already being undertaken by DFPS, but are not acknowledged as such in the Plan. It also describes policies DFPS already has in place, but even then, only at a most generic level. Defendants object to these items on the basis that injunctive relief, whether affirmative or prohibitory, must be remedial in nature and must address a violation that is as-yet un-remedied. Affirmatively ordering actions that are already underway and compliance with law and policies that are already in place[14] is not remedial. Further, if adopted as injunctions, these items would do nothing more than state the law and require Defendants to follow it. "Orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement [of Fed. R. Civ. P. 65(d).]" *See* CHARLES ALAN

---

[14] *See* Plan Appendices A, and D through L; CSIP.

WRIGHT & ARTHUR R. MILLER, 11A FEDERAL PRACTICE & PROCEDURE § 2955 (3d ed.); *Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 373 (5th Cir. 1981) (" A general injunction which in essence orders a defendant to obey the law is not permitted. An injunction must simply be framed so that those enjoined will know what conduct the court has prohibited.").  These objections apply to the entirety of the Plan and, as to express requirements to follow policy, more specifically with respect to each of the following items in the Plan: Page 2 item 1, Page 3 item 4, Page 11 item 2, Page 13 item 2, Page 14, items10-12, Page 15 items 13, 15, Page 22 item 4, Page 23 item 4, Page 31 item 1, and Page 39 items 6-7.

b.  In many instances the Plan calls upon DFPS to create and then implement new policy. The Plan itself does not define new policy nor does it state whether any new policy is to meet a constitutional standard, best practices or some other constitutionally-irrelevant standard. It therefore lacks the specificity requirement of Fed. R. Civ. P. 65(d)(1)(B). Further, if any such new policies are then enforced by injunction, the injunction would do nothing more than state the law and require Defendants to follow it. "Orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement [of Fed. R. Civ. P. 65(d).]" *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 11A FEDERAL PRACTICE & PROCEDURE § 2955 (3d ed.); *Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 373 (5th Cir. 1981) (" A general injunction which in essence orders a defendant to obey the law is not permitted. An injunction must simply be framed so that those enjoined will know what conduct the court has prohibited."). These objections apply to each of the

following items in the Plan: Page 23 item 7, Page 42 item 10, Page 43 item 1, and Page 47, item 1.

c.  In many instances the Plan, created at enormous cost (both monetary and staff resources) to DFPS, calls upon DFPS to submit a plan instead of the Special Master submitting his own proposed remedies as contemplated in the Court's Memorandum Opinion and Appointment Order. Defendants object to these items on the basis that they improperly shift the burden of proof on remedy from the Plaintiffs to the Defendants. The entire progress of this case to date reflects a failure on the part of the Plaintiffs, their counsel, their experts, the Court (to date), and now the Special Master who was directed to do so, to craft and demonstrate the effectiveness of a specific remedy. Defendants have been cooperative and have provided information to the Special Masters on numerous occasions at no small cost in agency staff time, but development of remedies was always the Court's order to the Special Masters, not the Court's (appealable) injunction to the Defendants. It is not Defendants' burden to prove Plaintiffs' remedy. In fact, Defendants have maintained throughout this years-long litigation that no one—Plaintiffs, their experts, the Court, and now the Special Master—has demonstrated a remedy that complies with the requirements of Fed. R. Civ. P. 23(b)(2). That failing is now self-evident and self-proven. Defendants also object on the basis that phrasing a remedy with reference to plans to be submitted by Defendants does not meet the specificity requirement of Fed. R. Civ. P. 65(d)(1)(B). These objections apply generally to the Special Master's observations in the Plan about Defendants not previously submitting remedial plans to him and more specifically with

respect to each of the following items in the Plan: Page 11 items 1-2, Page 21 item 2, and Page 22 item 1.

d.  Many items in the Plan obligate DFPS to "ensure" the performance of various acts, but does not define the term or define what level of monitoring and correction, if any, would satisfy the "ensure" obligation. An injunction using that term would fail to meet the specificity requirement of Fed. R. Civ. P. 65. If the term, via injunction, imposes a "zero tolerance," absolute performance obligation, it is impossible to perform. No organization with thousands of employees can meet such an absolute obligation. The Special Master, despite considerable time and money, offers neither detail on how an absolute "ensure" obligation can be met nor any means to assess whether the obligation has been satisfied. This objection applies to each of the following items in the Plan: Page 2, items 1-2, Page 3 item 4, Page 11 item 2, Page 12 items 2-4 and second item 1, Page 13 items 2-6, Page 14 items 8-9, Page 17 items 1-5, Page 18 items 6-12, Page 21 item 2, Page 22 item 4, Page 23 items 5-6, Page 25 item 1, Page 26 item 3, Page 29 item 1, Page 31 items 1-2, Page 32 item 3, Page 38 items 1-2, 4-5, Page 39 items 6-11, Page 41 items 4 and 6-7, Page 42 items 10-11, Page 48 item 2, and Page 49 item 6.

e.  None of the classes certified by the Court include children in Temporary Managing Conservatorship (TMC), yet the Plan includes items that reach beyond PMC children and include TMC children. These items are clearly overbroad and do not constitute remedies for litigants with standing in this action. This objection applies to each of the following items in the Plan: Page 2 item 3, Page 22 items 1-3, Page 23 item 6, Page 31 item 1, Page 32 item 3, Page 35 item 1, Page 38 items 4-5, Page 39 items 6-12, Page

40 items 13, 15, Page 42 items 7, 11, Page 43 item 1, Page 44 item 2, Page 47 item 1, and Page 48 items 2-3.

f.  Vague terminology renders the Plan unenforceable under Fed. R. Civ. P. 65(d). This objection applies to the specified terms and phrases in the following items in the Plan:

Page 2 item 1— "as required"

Page 2 item 2—"adequate," and "adequate training"

Page 3 item 3—"all referenced visits"

Page 3 item 4— "assessment"

Page 11 item 1--"integrated computer system," "complete migration," and "necessary for the safety of the children"

Page 11 item 2— "consistent with prevailing state and federal law"," and "any public or private staff:

Page 13 item 2— "consistent with the Court's Final Order"

Page 13 item 2—," "pursuant to current policy and regulation," and "periodically"

Page 13 item 6— "confirmation of their level of understanding"

Page 14 item 8— "all screening decisions"

 Page 14 item 9— "referral history," "any concerns for . . . well-being"

Pages 14 and 15, items 10-13, 15— "in accordance with existing DFPS policies and administrative rules"

Page 15 item 15—"complete"

Page 17 items 2-3— "all other documents that law or policy entitles them to receive"

Page 17 item 5— "disability," "appropriate accommodations," "meaningfully participate"

Page 18 item 6— "life skills assessment"

Page 18 item 7— "permanency planning meeting every 4 months"

Page 18 item 8— "eligible . . . records"

Page 18 item 11— "provide"

Page 22 item 1— "address and remediate," "consistent with"

Page 22 item 3— "every effort2(c) – "children's electronic case record"

Page 22 item 3— "every effort," and "make available" Pages 22-23, item 4 - "medical home," "health care delivery model," "led by," "obliged (by policy and contract)," "all medical fields of children's central electronic records," "coordinate," "timely," and "all health needs"," and "care management"

Page 23 item 4(a)— "central electronic record"

Page 23, item 5— "electronic case record"

Page 23, item 6— "central electronic case record," "functional," "needed," "required," and "indicated"

Page 23, item 7— "health status" "electronic case record," "red flag"

Pages 25, 26 items 1-3— "caseload ranges".[15]

Page 26 item 1— "pro-rated accordingly"

Page 26 item 2— "pro-rated accordingly," "by office"

---

[15] The phrase "caseload range" conveys a false impression. Despite the Special Masters' initial statement to the Court "we do not recommend a fixed caseload cap," in the original recommendations (Doc. 471), in the current Plan Special Master Ryan now recommends an injunction for a "caseload within or below the range of 14 to 17." Plan, p. 25 item 1. That is not a range. It is a cap. If adopted by the Court, the Court will be ordering a caseload cap of 17 when there was no evidence whatsoever that all caseloads above that number caused a constitutional injury to any child, much less all children in the class.

*Defendants' Objections to Special Master's Implementation Plan*                    Page 15

Page 29 item 1— "pro-rated accordingly"

Page 31 item 2— "graduated caseloads"

Page 32 item 3 – "successfully"

Page 35 item 1— "designate all secondary workers as primary caseworkers"

Page 38, item 2— "pro-rated"

Page 38, item 3— "any investigative findings," and "negative child welfare history"," and "congregate care settings"

Page 38, items 4, 5— "alleged child victims"

Page 39, items 6, 7— "consistent with DFPS policy"

Page 39, item 8— "Priority One and Priority Two investigations"

Page 39 item 12— "under state and federal law and regulation"

Page 40 item 13— "concerns," "pattern of contract or policy violations," "address," "subject to," "heightened monitoring," "more frequent," "as appropriate," and "other remedial actions"," and "address"

Page 40, item 14— "shall have the right"

Page 40, item 15— "must consider," "monitor," and "appropriate corrective action"

Page 41 items 1-2, 5— "confirmed allegations of sexual abuse"

Page 41 items 3-5— "confirmed allegations," "all . . . caregivers"

Page 41 item 4— "all information"

Page 41 item 6— "electronic case record," "high risk"

Page 42 item 9— "all . . . caregivers"

Page 42, items 8-9— "confirmed allegations of sexual abuse," and " child's records"

Page 43 item 1— "unrelated," "no risk of harm," "county director"

Page 44 item 2— "unrelated," "no risk of harm," "county director"

Page 44 item 3— "DFPS senior manager"

Page 47 item 1— "DFPS senior manager," and "sexualized children"

Page 49 item 5— "documented assessment"

g.  Plaintiffs have sued the Commissioner of DFPS, the Executive Commissioner of HHSC and the Governor. They have not sued the Texas Legislature or the State of Texas. The actual defendants do not have the power or authority to enact legislation or appropriate funds. To the extent the Plan, if and as ordered, calls for action requiring the passage of legislation, the appropriation of funds, or other measures outside of Defendants' control, they are improper and cannot be enforced against the Defendants. This objection applies to each of the following items in the Plan: Page 11 item 1, Page 11 item 2, Page 14 item 8, Page 17 items 3-4, Page 18 items 6-7, Page 18 item 10, Page 18 item 12, Page 21 items 1-2, Page 22 item 2, Page 22 item 4, Page 23 items 5-7, Page 25 item 1, Page 26 item 2, Page 26 item 3, Page 29 item 1, Page 31 item 2, Page 35 item 1, Page 38 item 1 and 2, Page 39 item 12, Page 40 item 14, Page 41 items 1, 4, Page 42 item 12-13, Page 43 item 1, Page 44 item 2, Page 45 items 4-6, Page 47 item 1, Page 48 item 2, Page 49 item 4, Page 52 item 1, and Page 53 item 2. Further, depending on vagueness of the items, including whether "ensure" imposes an absolute obligation: Page 2 items 1-3, Page 3 item 4, Page 12 items 2-4, Page 13 items 3-4, 6, Page 15 items 14-16, Page 17 items 1-2, 5, and Page 18 items 8-9, 11.

h.  Despite considerable compensation with taxpayer resources for expertise in the operation of child welfare systems, the Special Master fails to offer recommendations that are in any understanding of the term achievable within the recommended timelines.

The plan as a whole shows disregard for implementation science or even rational judgment regarding how to carry out systemic change across a large agency workforce. Defendants specifically note some of these concerns under Objection 3, below, but also note here that the concern applies to 44 of the Master's 98 recommendations and specifically raises this concern with respect to Page 2 items 1-3, Page 3 item 4, Page 11 items 1-2, Page 12 item 2, Page 17 items 3-4, Page 18 items 6-7, 10-11, Page 21 items 1-2, Page 22 items 3-4, Page 23 items 5-7, Page 25 item 1, Page 26 items 2-3, Page 29 item 1, Page 32 item 3, Page 35 item 1, Page 38 items 1, 3, Page 39 item 12, Page 40 item 14, Page 41 items 1, 4, 6, Page 42 items 12-13, Page 43 item 1, Page 44 items 2-3, Page 46 items 5-6, Page 48 item 2, Page 49 item 4, and Page 53 items 1-2.

3. There are many individual recommendations in the plan, which standing on their own would not be insurmountable but, when combined with the many and draconian aspects of the other recommendations, prove impossible or nearly impossible. Defendants specifically note as examples:

- **Documentation**. While one new documentation requirement may be achievable for the state, in particular front line casework staff who are currently busily carrying out their existing responsibilities, the Special Master layers upon 26 explicit documentation requirements that are not part of current practice. Defendants specifically raise this concern with respect to Page 22 item1, Page 3 item 4, Page12 item 2, Page 1313 item 6, Page 14 item 9, Page15 items 14 and 16, Page 17 item 2, Page 18 items 6, 8, and 11, Page 22 items 3 and 4, Page 23 items 5 and 7, Page 29 item 2, Page 41 items 1,4, and 6, Page 42 item 1212, page 45 item 4, Page 46 items 5 and 6, Page 47 item 1, and Page 49 items 4 and 5. Defendants note further that

depending on how the recommendations are interpreted and monitored there may be additional documentation tasks.

- **Monitoring concerns**. It is unclear from the Plan how many of the recommendations will be monitored or enforced but it is likely that the recommendations will require either additional case reading staff or IMPACT modifications. Standing on their own a few of the recommendations that could be monitored using case reading resources could be achieved within existing resources. However, when combined, the sheer act of monitoring and tracking items to demonstrate compliance will prove a sizeable drain on agency resources. Defendants specifically note this concern with respect to Page 2 item 3, Page 15 items 14, 16, Page 26 item 2, Page 31 item 2, Page 42 items 12-13, Page 44 item 3, and Page 48 item 2.

4. While Defendants object to the Plan in its totality, Defendants also wish to raise to the Court's attention below particularly troubling aspects of the Plan. Failure to specifically mention an aspect of the Plan is not agreement on part of the Defendants that the recommendation is supportable, advisable, or achievable. Defendants make the following additional objections to the following specific items in the Plan:

<u>**PMC Child-Caseworker Visitation**</u> (Plan, pp. 2 *et seq*.)

Defendants object to these Plan items as not being tailored to remediate a constitutional violation because no reliable evidence shows that existing DFPS policies or practices regarding caseworker visitation and training for visitation pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendations will eliminate

that purported constitutional harm. The testimony of a few former foster children that they did not see their caseworkers privately and regularly does not establish that all PMC members will likely be harmed by a failure to see their caseworkers privately and regularly.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.,* Plan Appendices A and D; CSIP, at p. 2. Orders requiring the doing of what is already being done are not remedial. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. The recommendation requires immediate reporting on "all referenced visits" between child and caseworker with respect to whether the visits include time speaking to the child in private and any documented exceptions for each quarter. The recommendations appear to require the agency to report on all the thousands of visits that occur each quarter in order to aid the monitoring of the Plan—which will consume staff resources for documentation, full time staff devoted to reading cases for this purposes, and eventually, IMPACT changes—none of which are realistically achievable immediately.

### PMC Children's Records (Plan, pp. 4 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because there is no reliable evidence that DFPS's existing systems for maintaining and accessing PMC children's case records pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that

adopting the Special Master's recommendation will eliminate that purported constitutional harm.[16] The Named Plaintiffs' experiences are not typical of PMC children generally, and the Named Plaintiffs' case files are not typical of PMC children's case files generally.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.,* Plan Appendices A, D and F; CSIP, at p. 2-3. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. The requirement for a "fully functional system" is an unfunded mandate and would be impossible to develop and implement within the time allotted. Developing such a system would be a considerable, years-long undertaking that would require legislative approval and sizeable appropriations to multiple state agencies and business partners, as well as a lengthy procurement and implementation timeline (formal procurement, vendor selection, contract development/execution, system development/testing/implementation). Moreover, the existing procurement process and newly implemented legislation requires agencies to follow specific processes to include reviews and approvals by designated state agencies for IT work completed by a vendor. *See* S.B. 20, (84th R.S.) (outlining new requirements for state contracting, specifically IT contracts which extended the procurement process and S.B. 533 (85th R.S.) (requiring additional steps for state agencies when using vendor services to complete work, in particular the

---

[16] To the contrary, Texas is one of only 11 states with a fully federally-approved automated child welfare system (State's Automated Child Welfare Information System ("SACWIS")). The federal Administration on Children, Youth and Families, Division of State Systems conducts periodic reviews to assess the Texas SACWIS's ongoing compliance with federal regulations. CSIP, n. 12.

performance of certain activities and review and/or approval from the Comptroller, QAT, LBB and other entities as required).

Based on past experience, implementing a complex data exchange with another agency would require: developing a secure transfer mechanism between the two agencies; identifying, requesting, and storing the information for inclusion in IMPACT; modifying IMPACT so users can access the new data; and implementing a minimal reporting capability. In addition to these requirements, the agency would need to identify the number of systems of record. For the five record types identified in the Court's Interim Order, education records are the only type that might be available from a single source (Texas Education Agency). All other record types—medical, dental, mental health, and court records, would likely require multiple exchanges for each record type. For example, court records are not available from a single source, and would require an exchange with each court or their respective third party electronic filing (e-filing) service provider. If an e-filing service provider is used, additional costs to obtain the records would likely be incurred. The overall cost for DFPS to implement a global exchange with known data sources could easily approach $10 million, exclusive of costs incurred by other state agencies/business partners and costs paid to third parties. In addition, this effort would likely require several years to coordinate the large number of exchanges with other agencies, entities and projects.

The Master recommends that external entities be given integrated, current, complete and accurate case record information in a manner that is consistent with prevailing federal and state law. Allowing for external access to be consistent with current law does not alleviate the logistical, operational, or budgetary concerns associated with this recommendation. This recommendation discounts the complexity of the many types of records maintained by Defendants and the configuration of the current case record system, which does not hermetically separate information

to which external parties would not be entitled including but not limited to FBI criminal history information, attorney-client privileged communications, social security numbers, or substance abuse treatment information. To implement the recommendation to allow external access the agency would be required to violate confidentiality laws or vastly restructure its case record system in a manner that is not likely to be achievable in the future and will never address existing records. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

### Current PMC Child Photograph (Plan, p. 12)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.*, Plan Appendices A and D. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

### Screening and Investigating Reports of Abuse/Neglect Regarding PMC Children
#### (Plan, pp. 12 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.*, Plan Appendices A, E, F, H and I; CSIP 5. DFPS already operates a 24-hour abuse and neglect hotline, Statewide Intake, and no reliable evidence shows that DFPS's existing policy or practices regarding reporting abuse or neglect pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's Plan will eliminate that purported constitutional harm. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. Requiring phone lines in every home that houses a PMC child would require funding (and possibly an increase in the foster care daily rate, which would require legislative approval and an appropriation) and additional resources for monitoring/enforcement. It may also prevent unverified kinship placements from becoming verified and may result in placements deciding not to foster. It could also increase placement disruptions - if caregiver refuses to obtain a landline, would DFPS be forced to remove the child? DFPS maintains its current practices are adequate to ensure access. In May, 2017, DFPS mentioned to the Special Master as an alternative to landlines educating foster children/youth about their option to report maltreatment to school teachers, counselors, nurses, CASA staff and volunteers, CPS caseworkers, attorneys ad litem, residential providers' case managers, or relatives. Available data indicates it is far more common for PMC children and youth to report abuse/neglect to these trusted individuals than to call SWI. The items in this category section include several documentation and reporting requirements that collectively would saddle the agency with a

tremendous administrative burden that would detract staff from conducting more essential child welfare activities. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

### PMC Youths' Preparation for Independence (Plan, pp. 17 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices with respect to preparation of PMC youth for independence pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.*, Plan Appendix A; CSIP at pp. 6-7. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. Overall, it would demand major state appropriations and would nonetheless be impossible in large part to implement. Services Starting at Age 14 (requirements 3, 4 and 7) are unfunded mandates that would require a legislative appropriation. Many services are not provided to youth until age 15 or 16. Requiring these services for youth beginning at age 14 would require FTEs for additional PAL staff and funding to contract with additional PAL providers. The Legislature has already addressed which services are appropriate for the population; these recommendations exceed Legislature's actions. Requiring assessments to be conducted as recommended and requiring documentation in IMPACT could be extremely onerous depending

on how they are applied. Regarding, Additional Permanency Planning Meetings (requirement 7) – the legislature adopted in statute authority for DFPS to determine appropriate frequency of these meetings in rule. Recommendation overlooks both statute and rule. Driver's Ed (requirement 10) is an unfunded mandate estimated to cost approximately $1 million general revenue funds, which would require legislative direction and an appropriation. In addition, any experiential learning required of a driver's ed course may require additional insurance requirements for foster parents, kinship caregivers, and providers. It is unclear whether DFPS could require caregivers to carry children on their insurance for this purpose. Many insurance carriers do not cover foster children so it is also unclear whether insurance can be obtained even if foster parents are willing. Requirement also assumes all children who are old enough and choose to take driver's ed are developmentally ready to safely participate in the course. The 85th Texas Legislature considered making driver's ed mandatory, but declined to enact.Safe, Stable Housing (requirement 11), if read to require DFPS to arrange and pay for housing, is an unfunded mandate that would require legislative direction and a substantial appropriation. Also, when youth turn age 18, they may determine where they live, including returning to the home from which they were previously removed, which may not be considered safe or stable. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

### **Attorneys ad Litem for PMC Children** (Plan, pp. 21 *et seq*.)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices with respect to ad litem representation of children in PMC pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows

that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Defendants further object on the basis that this issue was never tried, is without support in the evidentiary record, is erroneous as a matter of law, and pertains to a matter for which the Special Master has no demonstrated expertise.

Defendants further object on the basis that the recommendation contradicts state law making payment of attorney fees a function of counties (Texas Family Code section 107.015) and that any arrangement involving DFPS paying attorney's fees poses ethical questions and likely conflicts of interest.

### **PMC Children's Health** (Plan, pp. 22 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that Defendants' existing policy or practices regarding PMC children's health pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.,* Appendices A, D, F, and I. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. Overall, these items saddle Defendants with extremely burdensome documentation requirements and IT demands, which overlook state legislative decision-making. The Plan requires staff to not only make "every effort" to obtain medical records in the very busy

twenty-four hours following a removal when they have issues like placement and immediate needs to think about, but also requires them to document their efforts within the next twenty-four hours. The Texas Legislature worked hard to minimize prescriptive documentation requirements and enable caseworkers to spend more time with children and families. These items also require staff or medical providers to document information in all medical fields in IMPACT and to document all screening results including needed follow up. This is an unnecessary requirement for major resources. Medical information can be reviewed and staff and caregivers can follow up as needed without demanding so many resources for documenting in the electronic case record system. These recommendations also amount to an inefficient use of taxpayer resources when the Health Passport exists for same/similar purpose. Both the Legislature (through Appropriations Act and statutory requirements in TFC 266.003) and the Centers for Medicaid Medicare Services (through grant) allocate resources to the development of the Passport. DFPS would be required to reconfigure its IMPACT system to create functionality for inputting screening results, follow-up/red flag alerts, and caseworker health status information. These recommendations in large part will be impossible to complete in the time frames suggested. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

### **Caseworker Caseload** (Plan, pp. 24 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices as to caseworker caseloads pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.,* Appendices A and H, CSIP at pp. 8-12. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. These items are impossible to implement in timeframe required. Legislative appropriations and additional FTE authority are needed for FTEs to lower caseloads and to ensure that employee turnover does not affect caseload numbers. Positions would be needed that are designated to cover caseloads for staff when a worker is out on FMLA or there is turnover in the unit to ensure that caseloads do not go over the cap. This would be contrary to sustaining the child/caseworker relationship as fluctuations in caseload size through increased removals or exits could require transfer of cases between staff.

It is impossible for DFPS to begin recruiting and hiring immediately. DFPS continually hires to its cap and due to allocated appropriations, is not able to hire above the cap. To do so would require emergency appropriation. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

### <u>Supervisors</u> (Plan, pp. 27 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices regarding caseworker supervisors pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

### **Worker Retention** (Plan, pp. 30 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices regarding worker retention pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.*, Plan Appendix A; CSIP at pp. 13-15. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

### **Secondary Workers** (Plan, pp. 32 *et seq.*)

Defendants object to this item as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices regarding the use of I See You workers pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Defendants further object to this item insofar as it is based on Plan Appendix B, Key Findings: Texas Child Protective Services, *I See You Workload Study* (the "Report"), because the Report is inadmissible hearsay and the opinions therein fail to meet both the relevancy and reliability requirements of Fed. R. Evid. 702. The findings are irrelevant because the author has failed to apply a standard based on what is necessary for compliance with the Fourteenth Amendment. The findings are unreliable because the Report fails to establish that the data gathering was done in a statistically valid way and fails to account either for all seasonal impacts

or all reasons why an ISY worker might not conduct a visit. The Report is also inadmissible because the original engagement for its generation was in violation of and outside the scope of the original special master appointment order (Doc. 379), as set forth in Defendants' February 15, 2017, comprehensive objections to the proposed engagement of Dr. Osborne and CFRP (Doc. 510). The Court, in error Defendants contend, struck those objections next day, February 16, and thereafter refused to reinstate them on Defendants' motion for same (Doc. 516).

Defendants further object because of the logistical challenges of implementing the full recommendation. Given the size of Texas and occurrence of placements located far from primary caseworkers, secondary caseworkers enabled primary caseworkers to have more time to spend with children. The prohibition in this item will impose unnecessary additional burdens on caseworkers. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

<u>**Residential Child Care Licensing**</u> (Plan, pp. 35 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that HHSC's existing policy or practices regarding the licensing, inspection, and investigation of foster care facilities pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies, and practices already substantially overlap the items recommended by the Special Master. *See, e.g.*, Plan Appendices A and I; CSIP at pp. 18-21. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants

to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object to this item insofar as it is based on Plan Appendix C, Key Findings: Texas Child Protective Services Workload Studies, RCCL *Workload Study (*the "Report"), because the Report is inadmissible hearsay, and the opinions therein fail to meet both the relevancy and reliability requirements of Fed. R. Evid. 702. The "reasonable caseload" findings are irrelevant because the author has failed to apply a standard based on what is necessary for compliance with the Fourteenth Amendment. The findings are unreliable because the Report acknowledges inconsistencies in the data as gathered, the author does not adequately disclose the methodology for adjustments, fails to account for changing worker responsibilities after September 1, 2017, assumes without justification that June is a representative month both for time and caseloads, is based on a review of only new cases, in which time is front-loaded, fails to justify using median instead of average caseloads, and does not account for the impact on case completion of factors outside the control of RCCL. The Report is also inadmissible because the original engagement for its generation was in violation of and outside the scope of the original special master appointment order (Doc. 379), as set forth in Defendants' February 15, 2017, comprehensive objections to the proposed engagement of Dr. Osborne and CFRP (Doc. 510). The Court, in error Defendants contend, struck those objections the next day, February 16, and thereafter refused to reinstate them on Defendants' motion for same (Doc. 516).

Defendants further object because of the logistical challenges of implementing the full recommendation. The Plan includes a requirement that RCCL inspectors maintain a caseload of no more than 14 investigations for cases involving the PMC class (Plan, item 2). RCCL Investigations are not tracked by a child's legal status; therefore, this could not be accomplished

without applying it to all investigations which is not feasible. This item also requires a workload adjustment for staff with a mixed caseload of investigations and other duties. Following the transformation that occurred on September 1, 2017, parts of RCCL were split between HHSC and DFPS, and the RCCL positions formerly called "generalists" no longer exist. These positions were located in rural areas and had a combined workload of abuse/neglect investigations and inspector workloads. While these positions no longer exist, each inspector has always had a combined workload of operations, standards investigations, and sampling of foster homes. Since inspectors have combined workloads, it is unclear how these workloads should be adjusted to comply with this requirement. Furthermore, these caseload limitations would require RCCL to request additional positions, necessitating further legislative approval and funding.

The Plan prohibits employment of staff with "a negative child welfare history" at certain child care operations (Plan, item 3). RCCL already implements a thorough background check process as prescribed in statute and rule. *See* Tex. Hum. Res. Code Ann. § 42.056 and 40 Tex. Admin. Code Ann. Chapter 745, Subchapter F. hese requirements go far beyond prospective employees and adoptive and foster parents and extend as far as anyone who is 14-years-old or older who regularly or frequently stays or works at a facility or prospective foster or adoptive home. Except for background checks related to kinship homes, any person found to have perpetrated child abuse who has exhausted due process is already automatically barred from employment in these settings based on current rule. On the other hand, persons who have perpetrated child neglect and have exhausted due process currently have a right to request a risk evaluation under current rule. *See* Tex. Hum. Res. Code Ann. §§ 42.0704, 42.0705, 42.071, and 42.0702, and 40 Tex. Admin Code. Ann. §§ 745.657, 745.659 and 745.681-.711 (statutes and rules that provide eligibility for a risk evaluation for specific types of central registry findings, the

consequences for central registry findings and criminal history in general terms, and the risk evaluation process). Of course, a finding of neglect can be as serious as any finding of abuse and could reflect that the person is beyond rehabilitation; a person with such a finding would not get an approved risk evaluation. But "neglect" is defined broadly enough to capture other persons who can be rehabilitated with extra training or a limitation on the person's role at the facility. The administrative law judges who hear cases related to neglect findings are aware of the risk-evaluation process and may take this process into account when making findings of fact in favor of upholding the finding. In short, RCCL believes that eliminating the risk evaluation process for persons with neglect findings would have the unintended consequence of having less safe childcare settings, as fewer sustained neglect findings will result in fewer persons even requiring a risk evaluation and any appropriate requirements or restrictions that may occur under the current rules. Eliminating this risk evaluation process not only conflicts with current rules, but may also pose an issue for the operations that employ them by impacting their staffing ratios. This could affect the ability of child care operations to meet ratio requirements while new staff are employed and trained. Some operations in rural areas have a very limited available staffing pool. Compliance with this requirement could cause some operations to decrease much needed capacity in order to maintain current ratio requirements. Group homes verified by a child placing agency with such individuals may have to close, thereby causing a decrease in capacity for foster homes. There was no evidence that staff who have had risk evaluations pose an unconstitutional risk to children in PMC. Eliminating risk evaluations is unnecessary, unjustified and will harm delivery of foster care to children.

The Plan requires RCCL inspectors to follow certain current policy practices related to completion and documentation of various priority investigations, as well as finalize notification

letters, within certain specified required timeframes. (Plan. items 7, 8, 9, 10, and 11). These policy requirements are already contained in the CCL Policy and Procedure Handbook. RCCL staff are currently trained to follow the timeframes in policy. RCCL has a monthly Quality Assurance (QA) report that all supervisors, program administrators, and directors have access to. The QA report measures timeliness of annual inspections, timeliness of initiating investigations, and timeliness of completing investigations within policy requirements. The QA report also lists any staff who missed any of the above-mentioned timeframes. RCCL managers address any missed timeframes with the identified staff person, identify patterns in the employee's performance, and work with the individual to make needed corrections in compliance with HHSC Human Resource policies. Although RCCL strives for full and timely compliance, it is not realistic or feasible to expect 100% compliance in meeting all timeframes at all times. Factors outside the employee's control may interfere with the ability to achieve time requirements. Current Policy allows for some exceptions to completing investigations under certain circumstances, which acknowledges there are occasions when the required timeframes cannot be met.

The Plan requires RCCL to modify its existing public website by March 2018 to add information not currently included (Plan, item 12). RCCL currently has a robust public website that contains information specific to residential operations. The website provides thorough inspection information, including the specific standards that were evaluated, a full narrative of any deficiencies found, the deadline for the child care operation to correct any deficiencies, and the date RCCL confirmed all corrections were completed. The website also contains a check box indicating if an operation is placed on corrective or adverse action. The website does not currently contain detailed information regarding how the operation made the corrections nor does it contain the full details of what RCCL considers corrective action, which is part of the enforcement

framework. This information is contained elsewhere for DFPS review. The website is intended for public use. DFPS staff do not use the public website to make decisions regarding child placement. DFPS has access to the Child Care Licensing Automation System (CLASS) which includes all of the additional information required by these Items in the Plan. In addition, RCCL and DFPS meet regularly in Facility Intervention Team Staffings (FITS) to discuss child care operations that are struggling or are on corrective action. The modifications necessary to comply with this Item would require technology alterations and additional funding through the legislative process, to add information not necessary for public use, and which could not be completed by the March 2018 deadline.

The Plan requires RCCL to track patterns and address concerns at operations that show a pattern of contract or policy violations (Plan, item 13). RCCL currently tracks patterns and addresses concerns related to minimum standards, which includes, inspecting certain operations more frequently, implementing corrective actions, and utilizing the enforcement framework. RCCL does not have authority to track and correct contract violations. DFPS monitors and addresses contract violations. It is unclear what this Item is intended to require for RCCL as it addresses functions that RCCL already performs routinely or functions that RCCL is not authorized to perform.

The Plan indicates RCCL ". . . shall have the right to directly suspend or revoke the license of a placement . . . ." (Plan, item 14). It is unclear what additional requirement is intended by this item. RCCL currently has the authority to revoke or suspend a license to protect children. This authority is outlined in statute and further clarified in rule. For a suspension or revocation to occur, RCCL staff must follow the statute, rule, and Child Care Licensing policies. Once the intent to revoke or suspend a license is issued, the child care operation has due process rights outlined in

statute and rule. *See* Tex. Hum. Res. Code Ann. §§ 42.0704, 42.0705, 42.071 and 42.072 (statutory authority for license revocation and suspension) and 40 Tex. Admin. Code Ann. Chapter 745, Subchapters L and M. RCCL could not enforce item 14 more vigorously than it currently does without negating a licensee's state law rights to due process. Any change to current enforcement policy and practice would violate state statutes and rules. There was no evidence whatsoever that the existence of state procedural due process subjected all children in licensed foster care to unconstitutional harm.

The Plan requires the "entity charged with inspections of child care placements" to consider certain listed referrals and findings during placement inspections (Plan, item 15). It also requires this same entity to monitor an operation's adherence to certain listed reporting requirements and investigate violations to determine appropriate corrective action. This requirement is not clear and potentially violates state law as worded. DFPS makes child placements and RCCL conducts inspections. State law regulates the role and authority of each agency; therefore, this item cannot be implemented as worded. RCCL does monitor through the inspection and investigation process an operation's adherence to reporting suspected abuse/neglect. If a lapse is found, RCCL works with the operation to make needed corrections through RCCL's enforcement framework. Operations placed on corrective or adverse action for issues or patterns related to not reporting suspected abuse/neglect are shared by RCCL with DFPS. RCCL cannot modify or terminate a contract. The contract is a DFPS requirement and must by modified or terminated by DFPS.

The Plan is deficient insofar as it fails to address these matters and to provide solutions.

### **Sexual Abuse** (Plan, pp. 40 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices regarding the

definition and investigation of sexual abuse and the treatment of PMC children involved in sexual abuse pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.,* Plan Appendices A, F, I, and L; CSIP at pp. 22-23. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. Several of the recommendations have the potential to harm children by labeling and stigmatizing them for the entirety of their stay in care. Specifically: prominently labeling victims; requiring that victimization or sexual aggression/behavior problems be fully documented at all placements and in all forms regardless of the length of time that has elapsed since the event, the child's treatment progress, or how the child identifies. Recommendation 6 requires DFPS to identify children at high risk for perpetrating sexual assault. The Special Master has provided no information on why this is advisable, how it is achievable, and how (or why) rank and file casework staff are to be trained to predict the potential of future assault. To the extent DFPS will be required to make IMPACT modifications to the Common Application and Child's Plan of Service and to retrain staff, additional appropriations will be necessary. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

**PMC Children's Placements** (Plan, pp. 43 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices regarding PMC children placements pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.,* Plan Appendices A and H. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. Recommendations 1 and 2 are impossible to implement in timeframe provided. Also, a "no" risk obligation is unrealistic and unachievable expectation. Further, to implement all of the items in this category DFPS would need substantial new budget appropriations for IT funding and staff resources. Recommendations 4 through 6 are potentially detrimental to children and families due to their inflexibility. They also far exceed the requirements in state or federal law. Because the exceptions permitted are so narrow, implementation may impact permanency for some children who are in the process of transitioning to relatives, being placed in an adoptive placement, for whom no less restrictive placement can be located in proximity to the family. DFPS will need substantial funding to recruit additional family-like placements, particularly for youth between the ages of 6 and 13. . Extraordinary additional resources would be needed for recruitment, training and development of foster homes that accept intense, specialized, treatment services youth. The recommendations would result in DFPS being unable to utilize shelter placements for children in

PMC, thus increasing the likelihood of intermittent sibling disruptions between foster family placements or children being without placements due to a lack of capacity or vacancies in placements. There are many reasons that shelters are used. As examples, a child placement in a kinship home suddenly disrupts and the child requires discharge immediately, a child who was on runaway is located, or there is a gap between a discharge and an opening in a subsequent placement. In those circumstances, a child may be temporarily placed into a shelter until the child can transition to the next placement. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

**<u>DFPS Placement Array</u>** (Plan, pp. 46 *et seq.*)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices regarding the array of foster care placements pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Current law, policies and practices already substantially overlap the items recommended by the Special Master. *See, e.g.,* Plan Appendices A, D, E, and I; CSIP at pp. 24-45. Orders requiring the doing of what is already being done are not remedial. Further, orders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement of Fed. R. Civ. P. 65(d).

Defendants further object because of the logistical challenges of implementing the full recommendation. he expectations for implementation of recommendation 2 are unrealistic. It would require major budget appropriation and resources outside of agency's control. DFPS does engage in recruitment and capacity-building efforts based on capacity needs, but cannot compel

private citizens to become foster parents or providers to open placements. Residents of Texas have the right to choose whether or not they want to serve as foster parents. It is not something that the state can mandate, therefore the ability to "ensure" a certain number of homes in a given area of the state is outside of the department's control. Zoning requirements and natural disasters, such as Hurricane Harvey, also represent examples of issues outside of the agency's control. Requiring a set number of foster homes is an overly simplistic approach to determining capacity. One home, yielding a set number of beds does not translate to the same number of children having placement. The home must have the appropriate skills and be set up to meet the individual needs of the child who requires placement in order to be considered a viable placement option. Recommendation 3 also sets an unreasonable expectation for implementation. It requires data not readily accessible and circumvents requirements of Texas Family Code Section 264.1261. Recommendation 4 also sets an unrealistic expectation for implementation. Immediate implementation is impossible. No funding for this purpose was appropriated during the 2017 session. Additionally, the development of the necessary technology is not feasible immediately and will likely require roughly two years to build and implement. The timeframe for completion of this task is not possible due to the IT system changes and/or manual resources required to accurately collect this information report in aggregate form. The Plan is deficient insofar as it fails to address these matters and to provide solutions.

### **Foster Care Group Homes** (Plan, pp. 49 *et seq*.)

Defendants object to these items as not being tailored to remediate a constitutional violation because no reliable evidence shows that DFPS's existing policy or practices regarding Foster Group Homes, without regard to number, or any other homes with more than six children pose a substantial, class-wide risk of depriving PMC children of personal security and reasonably safe

living conditions, and no reliable evidence shows that adopting the Special Master's recommendation will eliminate that purported constitutional harm.

Forced closure of all Foster Group Homes (FGH) without regard to the number of children in the home, as required by the first item in this category, will cause unnecessary and unjustified disruptions of foster children's placements, both for FGH homes with six or fewer children, as to which there was no evidence whatsoever of constitutional harm, and for FGH homes with greater than six children, as to which there was no reliable class-wide evidence of constitutional harm. The number of unnecessary and unjustified disruptions of *all* children in *all* Foster Group Homes would exceed over 100. They are contrary to good child welfare practice. They will disrupt families and uproot children from stable placements.

Defendants object to this item 2 on the further basis that it contradicts state law (in practical effect, declaring it unconstitutional) with respect to the licensing verification of foster family homes. This item, if enforced, would prohibit any foster home from having more than six children. HB 7, Acts 2017, 85th Leg., R.S., Ch. 317, eff. September 1, 2017, eliminated foster group homes and allowed foster family homes (for the first time) to expand capacity for up to eight children with certain exceptions to be defined by rule. The Legislature is presumed to have considered the competing policy concerns and approaches in place in other states that permit capacity in foster family homes up to eight children, as well as the Court's injunction that foster group homes with more than six children should have 24-hour awake night supervision. The Texas Legislature considered the options and determined that allowing up to eight children in a foster family home was appropriate; the Texas Legislature considered the various possibilities and did not require 24-hour awake night supervision for Texas foster family homes.

Moreover, the Legislature afforded HHSC the authority to promulgate in regulation additional parameters related to foster family homes. Particularly salient here is the Legislature's decision to grandfather existing homes and allow for a well-planned transition to a new regulatory structure. *See* H.B. 7 § 78 (requiring HHSC to development and implement a procedure for transitioning existing foster group homes to another license type; continuing prior law in effect until all foster group homes converted to foster family homes or closed). The Texas Legislature specifically decided it was appropriate to take a measured approach to transitioning away from foster group homes. The Special Master specifically substitutes his judgment on this point, to the detriment of Texas children. In addition, HHSC is in the process of proposing rules related to these exceptions, including a rule that makes such exceptions temporary not permanent, and copies have already been posted in Texas Register. There has been no evidence whatsoever, either individually or on a class-wide basis, that allowing foster family homes to expand (temporarily) to eight children violated the Fourteenth Amendment. Compliance with this item would not only violate state law, and the proposed rules, but would also cause confusion among the relevant public and may interfere with state notice and comment rulemaking.

The Plan includes a requirement that no PMC child may reside in any foster home that houses more than six children (Plan, item 2). There was no evidence whatsoever of risk of harm based on the number of children in *non*-Foster Group Homes, such as kinship homes,[17] yet this second item, if enforced by injunction, would cause an even greater number of unnecessary disruptions than with Foster Group Homes—possible disruptions could be as high as 467 from cottage-style placements and 282 from kinship placements. Interfering with Texas families based solely on their size will not only lead to the disruption of existing kinship placements and approved

---

[17] It is noteworthy that the Court refused to certify a kinship class.

adoptive homes providing safe homes and eventual permanency to children in care, but it may interfere with the associational rights of the very children it purports to protect. At a minimum, it will be traumatic and harmful.

The Plan is deficient insofar as it fails to address these matters and to provide solutions.

## Conclusion

Defendants request that these objections be sustained.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

*/s/ Thomas A. Albright*
THOMAS A. ALBRIGHT
Attorney-in-Charge
Texas Bar No. 00974790
Southern District No. 107013
ANDREW B. STEPHENS
Texas Bar No. 24079396
Southern District No. 1385273
Assistant Attorneys General
Office of the Attorney General
General Litigation Division - 019
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120; (512) 320-0667 FAX

JOSEPH D. HUGHES
Assistant Solicitor General
Texas Bar No. 24007410
Southern District ID# 1022042
Office of the Solicitor General
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1729

TODD LAWRENCE DISHER
Special Counsel for Civil Litigation
Texas Bar No. 24081854
Southern District ID# 2985472
Civil Litigation Division
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266

*ATTORNEYS FOR DEFENDANTS*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2017, a true and correct copy of the foregoing document has been filed in accordance with the Electronic Document Filing System of the Southern District of Texas, thus providing service to all participants.

*/s/ Thomas A. Albright*
THOMAS A. ALBRIGHT
Assistant Attorney General