United States District Court
Southern District of Texas

**ENTERED**

January 19, 2018

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D.; bnf STUKENBERG, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:11-CV-84 |
| | § | |
| GREG  ABBOTT, *in his official capacity* | § | |
| *as Governor of the State of Texas* | § | |
| and | § | |
| CHARLES SMITH, *in his official capacity* | § | |
| *as Executive Commissioner of the Health* | § | |
| *and Human Services Commission of the* | § | |
| *State of Texas* | § | |
| and | § | |
| HENRY WHITMAN JR., *in his official* | § | |
| *capacity as Commissioner of the Department* | § | |
| *of Family and Protective Services of the State* | § | |
| *of Texas* | § | |
| | § | |
| Defendants. | § | |

## FINAL ORDER

The Court's post-trial Memorandum Opinion and Verdict ("December 2015 Order") found the State of Texas (the "State," "Texas," or "DFPS")[1] failed to protect foster children in its Permanent Managing Conservatorship ("PMC") from an unreasonable risk of harm.  (D.E. 368, Page 255).  The Court's December 2015 Order is hereby incorporated by reference in its entirety. The Court identified several specific areas as constitutionally deficient.  (D.E. 368, Pages 248-54).  The Court ordered Texas to "establish and implement policies and procedures to ensure that Texas's PMC foster children are free from an unreasonable risk of harm."  (D.E. 368, Page

---

[1] Greg Abbott has since replaced Rick Perry as Governor of Texas, Charles Smith has since replaced Kyle Janek who replaced Suehs as Executive Commissioner of the Health and Human Services Commission, and Henry Whitman, Jr. has replaced John J. Specia, Jr., who replaced Heiligenstein as Commissioner of DFPS.

245).[2]  It also ordered the State to "immediately stop placing PMC foster children in unsafe placements, which include Foster Group Homes that lack 24-hour awake-night supervision." (D.E. 368, Page 245).  Two years and one legislative session later, the foster care system of Texas remains broken.  The Court appointed Special Masters to develop an Implementation Plan (the "Plan") that would provide PMC children "with the constitutional minimum standards of personal security and safe living conditions so that they are free from unreasonable risk of harm, both physical and emotional."  (D.E. 546, Page 1).

## I.    PROCEDURAL HISTORY

The pre-trial history of this case is outlined in the Court's December 2015 Order.  That order was not final, as the Court was not in possession of sufficient information to do so.  (D.E. 368, Page 245).  Defendants appealed the Court's December 2015 Order and requested a stay pending appeal, which this Court denied.  (D.E. 370; D.E. 371).  The Fifth Circuit also denied a stay pending appeal.  *M.D. ex rel. Stukenberg v. Abbott*, No. 16-40023 (5th Cir. Mar. 21, 2016). Defendants subsequently voluntarily dismissed the appeal.  *M.D. ex rel. Stukenberg v. Abbott*, No. 16-40023 (5th Cir. Apr. 5, 2016).

On March 21, 2016, the Court appointed Kevin Ryan and Francis McGovern as Special Masters to address the specific areas of constitutional deficiency identified in the Court's December 2015 Order.  (D.E. 379).  Defendants sought a writ of mandamus directing the Court to vacate the appointment of the Special Masters, which the Fifth Circuit denied.  *M.D. ex rel. Stukenberg v. Abbott*, No. 16-40482 (5th Cir. July 7, 2016).  The Special Masters assembled a team and subsequently reviewed hundreds of thousands of pages of documents and met with the parties on numerous occasions over twenty-one months.  (D.E. 546, Page 1).  On November 4,

---

[2] The State of Texas continues to refuse to recognize it has a constitutional duty to protect PMC children from unreasonable risk of harm.  *See, e.g.*, (D.E. 556-1, Page 2 ¶ 8) ("DFPS operates a constitutionally sound system . . . .").

2016, the Special Masters filed a set of recommendations responsive to the Court's December 2015 Order.  (D.E. 471).  On January 9, 2017, the Court issued an interim order adopting the recommendations made by the Special Masters in November 2016.  (D.E. 500).  The Court determined that a final order could not be entered at that time, as additional information was still required.  (D.E. 500, Page 2).  The Court ordered the Special Masters to work with DFPS to create policies to address the Special Masters' prior recommendations.  (D.E. 500, Page 13).

The Court ordered the Special Masters to conduct a workload study of I See You workers[3] and of Residential Child Care Licensing ("RCCL")[4] investigators and inspectors.  (D.E. 500, Pages 22-23).  The Special Masters retained experts at the University of Texas-Austin to conduct the two studies.  (D.E. 546, Page 100-111; D.E. 546-1).  On December 4, 2017, the Special Master,[5] after twenty-one months of careful study and with no input from the State except providing information requested, filed a list of policies responsive to the Court's December 2015 and January 2017 Orders.[6]  (D.E. 546).

Following the fifteen days the Court allowed for objections, Plaintiffs filed no objections and Defendants filed general and specific objections that will be addressed separately below.  *See* (D.E. 555; D.E. 556).  In numerous instances, the State refused to participate in drafting

---

[3] "I See You workers' main responsibility, as indicated in the position title, is 'seeing the child' in her placement every month to confirm that she 'is still there.'"  (D.E. 368, Page 171 (quoting D.E. 305, Pages 61-63)); *see infra* at III.K.  DFPS recently renamed the position "Local Permanency Specialist."  This Order retains the title used at trial.

[4] Since the entry of the Court's December 2015 Order, the licensing aspects of RCCL have been separated from DFPS's administrative control.  Licensing inspectors and the Centralized Background Check Unit ("CBCU") were moved to a new regulatory division within the Texas Health and Human Services Commission ("HHSC").  However, the investigators who conduct investigations of alleged abuse and neglect in childcare operations remain under DFPS's control as part of CPS.  Accordingly, the Court enters relief against the State of Texas to ensure PMC children are free from an unreasonable risk of harm.  For consistency, this Order uses the same name used at trial, "RCCL."

[5] On November 21, 2017, the parties agreed that Francis McGovern would serve as a mediator in this case and his appointment as a Special Master was terminated.  (D.E. 544).

[6] On December 15, 2017, Texas Lawyers for Children filed an amicus brief in support of Plaintiffs.  (D.E. 554).  Although well-written and presented, this would have better served the children as a pre-trial brief, so the Court could have evaluated the evidence in the brief after thorough examination by the parties.  The Court has not relied on the amicus brief in reaching any of its conclusions.

corrective policies.  *See* (D.E. 546, Pages 10-11, 16, 21, 25, 41, 43, 47); *infra* at III.  The State has taken minimal steps to aid the Special Masters in crafting corrective policies, limiting their participation to providing requested information.  Further, the State has completely ignored the Court's December 2015 Order to "establish and implement policies and procedures to ensure that Texas's PMC foster children are free from an unreasonable risk of harm."  (D.E. 368, Page 245).[7]  The Court adopts the Special Master's policy recommendations as orders of the Court, as specified herein.

## II.   DEFENDANTS' GENERAL OBJECTIONS TO SPECIAL MASTER'S POLICY RECOMMENDATIONS

Defendants organize their Objections into General Objections that apply to the entire plan (D.E. 556, Pages 2-10 ¶ 1), "Cluster" Objections that apply to particular sets of Items (D.E. 556, Page 10 ¶ 2-Page 19 ¶ 3), and Specific Objections (D.E. 556, Pages 19-44).  The Court addresses the General and Cluster Objections in this section.  Most of the Defendants' Specific Objections are chiefly factual in nature and are addressed *infra* at III.  Many of the "specific" objections raised by Defendants merely repeat the Defendants' General Objections and repetitious specific objections are not separately addressed beyond this section.

---

[7] In its order denying Defendants' application for a stay of the December 2015 Order, the Fifth Circuit held that the only appealable portion of this Court's order was the prohibition on unsafe placements.  *M.D. v. Abbot*, No. 16-40023, slip op. at 4 (5th Cir. Mar. 21, 2016).  However, the Fifth Circuit observed that orders appointing special masters or requiring preparation and submission of remedial plans are not generally appealable.  *Id.* at 4 & n. 3 (citing cases).

## A.    General Objections

### 1.    Lack of Reliable Evidence

#### a.    Objection

Defendants object to the entirety of the Plan on the basis that there is no expert or otherwise admissible evidence of any class-wide constitutional violations. (D.E. 556, Page 2, ¶ 1(a)).  They therefore argue that class-wide remedies are inappropriate.  *Id.*

#### b.    Ruling on Objection

This Objection is an attempt to relitigate the merits of the action, which were addressed in the Court's December 2015 Order, of which all findings of fact and conclusion of law are incorporated herein.  It is therefore OVERRULED.

### 2.    Vagueness of Constitutional Violations

#### a.    Objection

Defendants object that the constitutional violations identified by the Court "are too vague to permit the remedies proposed in the Plan to be precisely tailored to cure those purported constitutional violations."  (D.E. 556, Page 3 ¶ 1(b)).

#### b.    Ruling on Objection

Defendants appear to argue that the constitutional right to be free from unreasonable risk of harm is too "vague" to permit a remedy, but "every right, when withheld, must have a remedy, and every injury its proper redress."  *Marbury v. Madison*, 5 U.S. 137, 147 (1803).  Defendants correctly note that injunctive relief must be narrowly tailored to redress the violations found. (D.E. 556, Page 8); *see Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1159 (5th Cir. 2006).  But "it is well-settled that, under the fourteenth amendment, a court may require remedial measures that the Constitution does not of its own force initially require.  Injunctive relief need not be

confined to an order to cease an illegal practice." *Ruiz v. Estelle*, 679 F. 2d 1115, 1155-56 (5th Cir. 1982) (citations omitted), *amended in part, reh'g denied in part on other grounds,* 688 F.2d 266 (5th Cir. 1982) (per curiam).  Here, to give but one example, the Court did not hold that the Constitution requires that all foster children nationwide must have access to a landline phone. *See infra* at III.D.3.   Rather, the Court found that Texas's overall foster care system has unconstitutionally exposed PMC children to an unreasonable risk of harm, and that providing PMC children access to a phone is a necessary "measure[] that safeguard[s] against recurrence" of that constitutional violation.  *See Ruiz*, 679 F. 2d at 1156.  The other relief ordered by the Court is likewise aimed at remedying the fact that Texas's foster care system *as a whole* exposes PMC children to an unreasonable risk of harm.  *See Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986).  Defendants' objections on this ground are OVERRULED.

### 3.    Constitutional Standard

#### a.    Objection

Defendants object that foster children have no substantive due process right to be "free from unreasonable risk of harm," and that the Special Master therefore erred in basing his Plan on this standard.   (D.E. 556, Pages 7-8, ¶ 1(c)).

#### b.    Ruling on Objection

In its December 2015 Order, the Court found Plaintiffs had a right to be free from an unreasonable risk of harm.  (D.E. 368, Page 15); *see also Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 849, 857, 859 (5th Cir. 2012) (noting that a state has a constitutional duty to care for foster children); *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F. 3d 872, 881 (5th Cir. 2004) (explaining that "the risk of severe physical abuse to a foster child's bodily integrity" is a legal injury); *K.H. ex rel. Murphy v.*

*Morgan*, 914 F. 2d 846, 851 (7th Cir. 1990) ("[T]he Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically.") (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)).  As Defendants admit, this Objection is merely an attack on the constitutional standard enunciated in the Court's December 2015 Order.  (D.E. 556, Page 8 n. 12).  The Court hereby incorporates the reasoning and findings from its December 2015 Order by reference and Defendants' Objection is OVERRRULED.

### 4.     Overbreadth of Remedies

#### a.     Objection

Defendants object that the Plan's proposed remedies are premised on a subjective standard based on the Special Master's conception of "best practices" rather than a constitutional standard, and that the proposed remedies are therefore overbroad.  (D.E. 556, Page 8 ¶ 1(d)).

#### b.     Ruling on Objection

This Objection repackages General Objection 3.  It is true that "best practices do not establish constitutional minima."  *See Romano v. City of San Marcos*, 2017 WL 3996427, at *6 (W.D. Tex. Sept. 11, 2017) (internal quotation marks omitted) (quoting *Brown v. Timmerman-Cooper*, 2013 WL 430262, at *4 (S.D. Ohio Feb. 4, 2013)).  But the Special Master did not use a "best practices" standard, he used the constitutional standard enunciated in this Court's December 2015 Order, that foster children have the right to be free from unreasonable risk of harm.  *See* (D.E. 546, Page 1).  The Court finds that the remedies adopted by this Order are necessary to protect foster children from unreasonable risk of harm.  *See Ruiz*, 679 F.2d at 1156. This Objection is OVERRULED.

### 5.     Intrusiveness of Remedies

#### a.     Objection

Defendants object that the Special Master failed to demonstrate the proposed remedies are the least intrusive into the administration of DFPS.  (D.E. 556, Page 8, ¶ 1(e)).

#### b.     Ruling on Objection

Defendants fail to cite any authority for their contention that injunctive relief must always be the least intrusive alternative.  This requirement is present in the prison conditions context, but the requirement there is explicitly prescribed by the Prison Litigation Reform Act.  *See* 18 U.S.C. § 3626(a)(2); *see also Ruiz*, 679 F. 2d at 1145 (recognizing federal judicial policy of "minimum intrusion" into administration of state prisons).  Even so, the Court has tailored its remedies to intrude as little as possible into the State's legitimate affairs; the remedies intrude only to the extent that the Court finds they are necessary to cure the constitutional violations identified.  *See Ruiz*, 679 F.2d at 1156; *Stone v. City and Cnty. of San Francisco*, 968 F. 2d 850, 861 (9th Cir. 1992) ("[F]ederal courts should always seek to minimize interference with legitimate state activities in tailoring remedies.").  This Objection is OVERRULED.

### 6.     Recognition of Texas's Efforts

#### a.     Objection

Defendants object that the Plan "creates the decidedly false impression that Defendants are doing little for foster care children."  (D.E. 556, Page 9 ¶ 1(f)).  Defendants seek recognition of the actions taken in this area by DFPS and the Texas Legislature and claim that the Master failed to take their efforts into account.  (D.E. 556, Page 9 ¶ 1(f)).

### b.  Ruling on Objection

Many of the steps taken by the Texas Legislature and the Defendants are indeed admirable.  In fact, the Special Master's plan recognizes multiple steps taken by the state.  *E.g.*, (D.E. 546, Pages 12, 35 n. e, 37, 53-54).  However, policies not practiced are of no value, and voluntary conduct of a defendant after the beginning of a suit cannot deprive a court of the power to order relief.  *See Ruiz*, 679 F. 2d at 1160; (D.E. 500, Page 11); *cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000).  Nor have Defendants' actions cured the constitutional violations identified in this Court's December 2015 Order.  The Objection is OVERRULED.

### 7.  Ineffectiveness of Remedies

### a.  Objection

Defendants object that there is no evidence the proposed remedies will cure the class-wide constitutional violations.  (D.E. 556, Page 9 ¶ 1(e)).

### b.  Ruling on Objection

The Court has concluded, based on the evidence in the record, that the remedies prescribed above will substantially cure the class-wide constitutional violations.  *Ruiz*, 679 F.2d at 1156.  Furthermore, "[a]n inability to guarantee complete relief for a constitutional violation . . . does not justify withholding a remedy altogether."  *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1910 (2016).  The Objection is OVERRULED.

### 8. Violation of Appointment Order

#### a. Objection

Defendants object that the Appointment Order for the Special Master (D.E. 379) violates Fed. R. Civ. P. 53 and that the Plan, as a product of the improper appointment, is therefore invalid.  (D.E. 556, Page 9 ¶ 1(h)).

#### b. Ruling on Objection

This Objection attempts to relitigate the appointment of the Special Master.  The Court hereby incorporates its findings and reasoning from its Appointment Order.  (D.E. 379).  The highly complicated factual details and administrative problems inherent in crafting an injunction are "post-trial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  Fed. R. Civ. Pro. 53(a)(1)(C).  Any argument that it is inappropriate for a court to employ a Special Master to help craft a remedial plan is meritless. *See, e.g.*, *Morgan v. McDonough*, 540 F. 2d 527, 533 (1st Cir. 1976) ("Masters have been used extensively to formulate plans and recommendations . . . ."); *United States v. Tex. Ed. Agency*, 532 F.2d 380, 399 (5th Cir. 1976) (suggesting appointment of special master to draft desegregation plan), *vacated on other grounds by Austin Ind. Sch. Dist. v. United States*, 429 U.S. 990 (1976).  The Court reviewed the Special Master's Plan *de novo* and made all changes it thought necessary.  *See* Fed. R. Civ. Pro. 53(f)(3)-(4).  The Court discusses in detail similar issues regarding its appointment of a Monitor under this same rule in Section IV below.  The Objection is OVERRULED.

### 9.      Appropriateness of Injunctive Relief Respecting the Class as a Whole

#### a.      Objection

Defendants object that the remedies violate Fed. R. Civ. P. 23(b)(2). (D.E. 556, Page 9 ¶ 1(i)).

#### b.      Ruling on Objection

The Supreme Court has clarified that certification of a class for injunctive relief is only appropriate where "a single injunction . . . would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).  Injunctive relief is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).  Defendants object that the Plan does not satisfy this standard, but provide no explanation or authority supporting their contention.  This claim is without merit. "'[R]elief to each member of the class,' does not require that the relief to each member of the class be identical, only that it be beneficial."   *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 97 (2d Cir. 2015) (quoting *Dukes*, 564 U.S. at 360) (alteration in original).  The injunctive relief is crafted to benefit each class member.  To the extent this Objection is an attempt to re-litigate the class certification, the Court has previously determined the requirements of Rule 23(b)(2) are met.  (D.E. 213, Pages 62-63, 81, 88, 94).  The findings of the Court in its Order Granting Class Certification are hereby incorporated by reference.  Accordingly, this objection is OVERRULED.

10.     **Plaintiffs' Compliance with Fed. R. Civ. P. 23**

a.     **Objection**

Defendants argue that Plaintiffs were not entitled to class certification because they failed to show commonality, typicality, and the existence of an appropriate class-wide remedy.  (D.E. 556, Page 9 ¶ 1(j)).  They therefore object to the granting of class-wide relief.

b.     **Ruling on Objection**

Defendants' attempt to relitigate their failure to timely appeal the class certification order of August 27, 2013 must fail.  (D.E. 213; D.E. 228).  The Court has ruled on class certification and the findings of the Court are hereby incorporated by reference.  (D.E. 213).  Defendants' Objection is moot.

11.     **Propriety of the Plan's Descriptions of Testimony, Documents, and Prior Rulings**

a.     **Objection**

Defendants object that the Plan's "descriptions or characterizations" of the record and rulings in this case are outside the scope of the Appointment Order, are hearsay, and are not the best evidence of what is in the record.  (D.E. 556, Page 10 ¶ 1(k)).

b.     **Ruling on Objection**

The Court does not rely on any of the "descriptions or characterizations" complained of by the Defendants in this Objection.  The Court is aware of the contents of the record and of its own rulings.  This Objection is OVERRULED.

12.     **Receivership**

a.     **Objection**

Defendants object that the Plan has no specified end date, violates Rule 65, and creates a *de facto* receivership.  (D.E. 556, Page 10 ¶ 1(l)).

b.       **Ruling on Objection**

Defendants offer neither authority nor argument in support of their claim that the Plan creates a "*de facto* receivership," but merely invoke the word "receiver" to challenge the Court's appointment of a monitor.   Receivers are generally court agents who handle property.  *See, e.g.*, *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012).   However, this Order gives the Monitor no power whatsoever to dispose of Defendants' property.   The Court extensively discusses the appropriateness of appointing a Monitor *infra* at IV.   Defendants' receivership argument is meritless.[8]

This Order now contains an end date for the injunctive relief.  *See infra* at IV.  The Court has limited the Monitor's authority as required by *Ruiz v. Estelle*.  *Compare* 679 F. 2d at 1162, *with infra* at IV.12.  To the extent the Defendants' Objection is not satisfied by these changes to the Plan, the Objection is OVERRULED.

B.       **Cluster Objections**

1.       **Orders Must Be Remedial**

a.       **Objection**

Defendants object that the Plan addresses policies and practices already in place, and that orders "must be remedial in nature and must address a violation that is as-yet un-remedied." (D.E. 556, Page 10 ¶ 2(a)).

b.       **Ruling on Objection**

The Court reiterates that policies not practiced are of no value.  *See Ruiz*, 679 F. 2d at 1160; (D.E. 500, Page 11).   The State of Texas has failed to act upon twenty years of studies conducted or commissioned by the State. (D.E. 500, Page 12).   In particular, it had a completely

---

[8] Although the Court's order does not impose a receivership, federal courts do have the power to impose receiverships when it is "the only reasonable alternative to noncompliance . . . ."  *See Morgan v. McDonough*, 540 F. 2d 527, 533 (1st Cir. 1976), *cited with approval in Miller v. Carson*, 563 F. 2d 741, 753 (5th Cir. 1977).

inadequate response to two internal studies finding error rates of 64.6% and 75%, respectively, in its investigations of abuse and negligent supervision.  (D.E. 368, Pages 201-04).  Consequently, this Court concludes that "unless directed otherwise by some authority, the studies and testing will continue, no remediation will occur and the dangerous condition[s] will continue to exist." *Cf. Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 834 (D.N.J. 2003), *aff'd* 399 F. 3d 248 (3d Cir. 2005).  Throughout this litigation the State of Texas has not only insisted it has not violated the Constitution but refuses to even recognize these children's most basic constitutional right to be free from unreasonable risk of harm.  (D.E. 556, Pages 3-8; D.E. 556-1, Page 2).  The State displayed a troubling unwillingness to follow the order of the Court in developing remedial policies and failed to make significant progress towards remedying the constitutional violations subsequent to the Court's December 2015 Order.  (D.E. 368, Page 245).  Additionally, voluntary conduct of a defendant after the beginning of a suit cannot deprive a court of the power to order relief.  *Cf. Friends of the Earth*, 528 U.S. at 189.  This Objection is OVERRULED.

### 2.      Orders May Not Command Defendants to Obey the Law

#### a.      Objection

Defendants object to policy recommendations requiring them to obey state or federal law, or to follow DFPS policy. (D.E. 556, Pages 10-11 ¶ 2(a)-(b). They argue that orders merely requiring a defendant to "obey the law" violate the specificity requirement of Federal Rule of Civil Procedure 65(d).  (D.E. 556, Pages 10-11 ¶ 2(a)-(b) (quoting *Meyer v. Brown & Root Constr. Co.*, 661 F. 2d 369, 373 (5th Cir. 1981)).

### b.      Ruling on Objection

"An injunction must simply be framed so that those enjoined will know what conduct the court has prohibited."  *Meyer*, 661 F.2d at 373 (citing *Int'l Longshoremen's Assoc. v. Phila. Marine Trade Assoc.*, 389 U.S. 64, 76 (1967)).  Defendants are correct that "[a] general injunction which in essence orders a defendant to obey the law is not permitted."  *Id.*  However, "[i]njunctions are problematic when they order a defendant to obey the law but do not simultaneously indicate what law the defendant needs to obey"; injunctions ordering a defendant to obey a specific law are permissible.  *See In re Rodriguez*, 695 F.3d 360, 369 (5th Cir. 2012) (citing *Meyer*, 661 F.2d at 373).  Furthermore, this Order cites current law and DFPS policies for context rather than content.  *See Scott v. Schedler*, 826 F. 3d 207, 211-14 (5th Cir. 2016).  All of the actions which Defendants are required to take are spelled out within the four corners of this document.[9]  To the extent this clarification does not satisfy Defendants' Objection, it is OVERRULED.

### 3.      Requirement that Defendants Create Policies

### a.      Objection

Defendants object that the orders requiring them to create and implement new policy fail to define the new policies or the standard they are to be designed to meet.  (D.E. 556, Pages 11-12 ¶ 2(b)).

### b.      Ruling on Objection

Each Item cited by Defendants in this Objection states the minimum contents of the policy which DFPS is ordered to follow.  The "standard" the new policy is designed to meet is

---

[9] For example, Item 12 of Section D requires DFPS to "complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake."  The phrase "in accordance with DFPS policies and administrative rules" merely observes that this is a standard which DFPS itself has already promulgated (but does not follow); it does not add or detract anything from the Defendants' obligations under the Order.

therefore irrelevant to Defendants' ability to comply with these Items, but the Court observes that the standard motivating all of its relief is that Texas's foster children have the constitutional right to be free from an unreasonable risk of harm.  (D.E. 368, Page 15); *see supra* at II.A.3.b. Defendants' Objection is OVERRULED.

### 4.      Requirement that Defendants Submit Remedial Plans

#### a.      Objection

Defendants object that orders requiring them to submit remedial plans impermissibly shift Plaintiffs' burden of proof on remedies to Defendants.  (D.E. 556, Page 12 ¶ 2(c)).

#### b.      Ruling on Objection

Defendants cite no authority for the proposition that courts may not order defendants to submit remedial plans.   In fact, "[o]rders to responsible public officials to prepare and submit plans for remedying constitutional violations are not uncommon."   *Inmates of Allegheny Cnty. Jail v. Wecht*, 754 F. 2d 120, 128 n. 5 (3d Cir. 1985) (citing cases). Plaintiffs carried their burden of proof at trial, and the Court finds the remedies are necessary to cure the constitutional deficiencies.  In each Item requiring submission of a plan, the Court has identified the constitutionally mandated minimum reforms the plans must include. Further, the Court overruled this same objection in its January 2017 Order and the Court hereby incorporates its reasoning by reference.   (D.E. 500, Page 12).   This Objection is OVERRULED.

### 5.      Vagueness of the Term "Ensure"

#### a.      Objection

Defendants object that the term "ensure" used in many parts of the Plan is impermissibly vague and violates Rule 65's specificity requirement.  If "ensure" imposes a "zero tolerance,"

absolute duty to perform, Defendants object that the order is impossible to perform. (D.E. 556, Page 13 ¶ 2(d)).

### b.        Ruling on Objection

Defendants cite no authority in support of their contention that the term "ensure" is impermissibly vague.  The words of an injunction must "provide explicit standards for those who apply them and give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 63 (1st Cir. 2011) (citations omitted) (internal quotation marks omitted).  Additionally, the term "ensure" does not impose a "zero tolerance" duty to perform as Defendants suggest and even if it did, Defendants have not met their burden of showing impossibility.  *See United States v. Rizzo*, 539 F.2d 458, 465-66 (5th Cir. 1976); *CFTC v. Wellington*, 950 F.2d 1525, 1528 (11th Cir. 1992).  Accordingly, the provisions using the term "ensure" are not impermissibly vague.  Therefore, the Objection is OVERRULED.

### 6.        Vague Terminology Is Unenforceable

#### a.        Objection

Defendants object that various terms used in the Plan violate Rule 65(d) due to their vagueness.  (D.E. 556, Pages 14-17 ¶ 2(f)).

#### b.        Ruling on Objection

The Court altered or provided clarification for any language it determined to be vague; such changes are noted below in the relevant parts of the section laying out the policies.  Where the Court has not made such changes, it has determined that the existing language is sufficiently clear.  This Objection is SUSTAINED IN PART and OVERRULED IN PART.

### 7.     Relief to Non-Class Members

#### a.     Objection

Defendants object that portions of the Plan provide relief to foster children who are not part of the certified class, and that those portions of the Plan are therefore overbroad.  (D.E. 556, Pages 13-14 ¶ 2(e)).

#### b.     Ruling on Objection

The remedy ordered by this Court affects children in the Temporary Managing Conservatorship ("TMC") of DFPS only to the extent necessary to ensure the constitutional violations against PMC children cease.  Only two remedies directly affect TMC children.  First, the Court's requirement that medical records be collected upon intake, *infra* at III.G.1-3, is necessary because all PMC children begin their time in DFPS as TMC children, and if a child's medical records are not acquired immediately, they may be irretrievably lost by the time the child enters PMC.  (D.E. 500, Page 19).  Second, the Court has expanded Section M of the Plan to provide direct relief to both PMC and TMC children in DFPS custody.  *See infra* at III.M.13.b. Where the Order requires DFPS to restructure or develop certain procedures or technology systems, the Court has concluded that attempting to distinguish between PMC and TMC children would be impracticable and could lead to significant confusion.  *See, e.g.*, *infra* at III.J.1 (requiring implementation of new training procedures); III.K.1 (eliminating I See You workers). The Items to which Defendants object provide specific direction as to what is required, and the remedies are necessary to protect PMC children's constitutional rights.  Therefore, Defendants' objection is OVERRULED.

### 8.  Relief Requiring Legislation or Appropriation of Funds

#### a.  Objection

Defendants object that none of the Defendants in this case (the Commissioner of DFPS, the Executive Commissioner of HHSC, and the Governor) have the power to enact laws or appropriate funds, and that therefore any orders requiring the passage of legislation or appropriation of funds are beyond the Defendants' control and improper.  (D.E. 556, Page 17 ¶ 2(g)).

#### b.  Ruling on Objection

It is clearly established that suits against state officials in their official capacities, like the suit here, are no different from a suit against the State itself.  *See, e.g.*, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Ganther v. Ingle*, 75 F. 3d 207, 209 (5th Cir. 1996) ("Federal claims against state employees in their official capacities are the equivalent of suits against the state.").  Since Defendants are state officials in their official capacities, the State of Texas is a Defendant in this case.

As to Defendants' argument about the inappropriateness of relief requiring the appropriation of funds, "a state cannot avoid the obligation of correcting the constitutional violations of its institutions simply by pleading fiscal inability."  *New York State Ass'n for Retarded Children, Inc. v. Carey*, 631 F.2d 162, 165 (2d Cir. 1980) (citing *Dimarzo v. Cahill*, 575 F.2d 16 (1st Cir. 1978); *Welsch v. Likins*, 550 F.2d 1122 (8th Cir. 1977); *Rhem v. Malcolm*, 507 F.2d 333, 341 (2d Cir. 1974)).  It is true that "a federal district court ought not to put itself 'in the difficult position of trying to enforce a direct order . . . to raise and allocate large sums of money, . . . steps traditionally left to appropriate executive and legislative bodies responsible to the voters.'"  *Id.* (quoting *Rhem*, 507 F.2d at 341).  But the Court is not ordering the State to

allocate money.  The Court is ordering the State "to rectify the [constitutional] violations . . . ." *Id.*  The record shows that the Legislature is supportive of DFPS's requests, *see* (D.E. 331, Pages 32-33), and in its last session (according to Defendants), the Legislature increased foster-care funding by almost $1 billion.  (D.E. 556, Page 2).  This same logic applies to the portion of the Objection complaining that Defendants cannot enact legislation.   The Objection is OVERRULED.

### 9.        Impossibility of Compliance

#### a.        Objection

Defendants object that the Plan's timelines are unachievable and that the Plan "shows disregard for implementation science or even rational judgment regarding how to carry out systemic change across a large agency workforce."  (D.E. 556, Pages 17-18 ¶ 2(h)).  Defendants add that even where compliance with a particular recommendation would be possible, compliance with the entire Plan would be "impossible or nearly impossible."  (D.E. 556, Pages 18-19 ¶ 3).

#### b.        Ruling on Objection

Defendants had over two years' notice between the Court's December 2015 Order and this final Order to make progress towards remedying the identified constitutional violations. Indeed, the December 2015 Order commanded the Defendants to "establish and implement policies and procedures" to protect PMC children from unreasonable risk of harm in all the areas specified by the Court in its December 2015 Order, (D.E. 368, Page 245),[10] yet Defendants now insist that this Final Order does not give them enough time to adequately remedy any of the major problems identified with Texas's foster care system.  (D.E. 368, Page 245).  Despite their complaints, Defendants have not presented any evidence that compliance with the remedies

---

[10] *See supra*  p. 4 n. 7.

below would be impossible or prohibitively expensive.  On the contrary, as the Court notes in responding to several of Defendants' Specific Objections, when the Special Master asked the Defendants to propose their own timelines for implementing various proposed forms of relief, Defendants simply refused to respond.  (D.E. 546, Pages 10-11, 113-17); *see infra* at III.

Defendants' arguments that the need for funding makes many of the proposed policies impossible to perform lacks merit.  The evidence related to funding presented at trial indicates that the Legislature has been incredibly responsive to DFPS's requested funds.  *See* (D.E. 331, Pages 32-33).  Defendants state DFPS received nearly $1 billion in additional funding from the Legislature in its last session (D.E. 556, Page 2).  DFPS does not indicate how this money is allocated or present any evidence as to the expense of the remedial policies as falling outside this nearly one billion dollar allocation.   More importantly, "[t]he obligation of the [Defendants] to eliminate existing unconstitutionalities does not depend upon what the Legislature may do . . . or, indeed, upon what the [Defendants] may actually be able to accomplish."  *See Wyatt v. Aderholt*, 503 F. 2d 1305, 1314-15 (5th Cir. 1974) (quoting *Holt v. Sarver*, 309 F. Supp. 362, 385 (E.D. Ark. 1970)).  Accordingly, the Objection is OVERRULED.

Where compliance is impossible, a defendant may raise impossibility as a defense to contempt proceedings.  *United States v. Rylander*, 460 U.S. 752, 757 (1983).  As Defendants declined to take advantage of their opportunities (or rather, their obligation) to work with the Special Master in formulating the Plan, and have failed to offer credible evidence of impossibility, Defendants' objections would be better raised as a defense to a contempt proceeding than as a challenge to the injunctive remedy.  Defendants bear the burden of production on any defense of present impossibility.  *Id*.; *see also Ala. Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979).

## III.    POLICIES AND PROCEDURES

The Court has determined the State of Texas violated PMC children's right to be free from an unreasonable risk of harm.  The Court adopts and ORDERS Defendants to implement the following policies to remediate this violation.  These policies and procedures only apply to PMC children unless specifically noted otherwise.[11]

### A.    PMC Child-Caseworker Visitation

1. Effective immediately, DFPS shall ensure that monthly face-to-face visits between caseworkers and children in the PMC class occur as required.  The caseworkers' visits with children in the PMC class must include time with the child separate from the caregiver(s) and other children, if the child is verbal.  Effective immediately, DFPS shall ensure that caseworkers document monthly, private meetings with each verbal PMC child in their care, unless the reason for noncompliance is fully documented in the child's electronic case record.

2. Effective immediately, DFPS shall ensure adequate[12] training on its child visitation policies for all caseworkers responsible for visiting children in the PMC class.

3. Effective immediately, DFPS shall track caseworker-child visits and report quarterly to the monitor(s) on the number of monthly caseworker-child visits required and the percent and number that occurred.  DFPS shall report for all referenced visits whether they involved face-to-face time with the child separate from the caregiver(s) and other children, if the child is verbal.

4. Effective immediately, DFPS shall ensure caseworkers who conduct visits with PMC children follow the agency's contact guidelines, which they must document in the child's electronic case record based on monthly visits with a child.  The guidelines must require caseworkers, at least, to complete an assessment of the child's safety, including an assessment of the placement; a confirmation that the child was interviewed individually, separately and privately from the caregiver and other children, if the child is verbal; a discussion of the form(s) of discipline being used in the placement; and a documented review of the child's medical, mental health, dental and educational progress and needs.

---

[11] These policies apply to all previously determined classes of PMC children in this matter.  Although the Court did not certify the unverified kinship subclass, PMC children in kinship placements are a part of the certified general class, which includes "all children now, or in the future, in the Permanent Managing Conservatorship of the State of Texas."  (D.E. 213, Page 105).  The Court only grants relief to PMC children in kinship placements in their capacity as members of the General Class; such relief "provide[s] relief to each member of the class."  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

[12] "Adequate" means that the training shall focus on the importance of monthly, face-to-face private meetings with each PMC child, and further include instructions on documentation of non-compliance.

### a.  Objection

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding caseworker visitation caused class-wide constitutional injury, and that all of Items in this section are therefore unjustified.  (D.E. 556, Pages 19-20)

### b.  Ruling on Objection

Former PMC youth testified at trial that their visits with caseworkers often were not private.  (D.E. 327, Pages 188-89; D.E. 307, Page 16).  The Court wrote extensively in its December 2015 Opinion about children who infrequently, or never, saw some of their conservatorship ("CVS") caseworkers.  (D.E. 368, Pages 165-168).  The Special Masters reviewed case files, including those in the record of this matter.  (D.E. 546, Page 3).  Those records frequently did not indicate whether CVS caseworkers met with children monthly and privately.  (D.E. 546, Page 3).  The Special Masters asked DFPS where and how the agency tracks whether visits with children are privately conducted.  (D.E. 546, Page 3).  DFPS advised the Special Masters "there is no specific location in the IMPACT record where caseworkers must confirm that a child was interviewed in private or separately."  (D.E. 546, Pages 3, 113).

The study of I See You Workers undertaken by the University of Texas-Austin to inform the Special Masters' recommendations to the Court, concluded that 22 percent of assigned secondary I See You workers missed the monthly visit with the child.  (D.E. 546, Pages 3, 105-06).  DFPS' aggregate visitation data does not indicate how many, if any, of these visits were privately conducted.  (D.E. 546, Page 3).  Despite the Court's December 2015 Opinion, DFPS still does not have a way to track how many caseworkers' visits with children are private each month.  (D.E. 546, Page 3).

Caseworkers "do not have enough time to do more than cursory monthly home visits" of five minutes.  (D.E. 368, Page 165).  The record revealed that even cursory visits seldom occurred every month, and that a child's case file might contain documentation of visits that never occurred.  *E.g.,* (D.E. 368, Pages 85-86, 104, 150, 168, 178, 180).  Another state official, the Texas Comptroller, concluded in 2004 that DFPS was failing to perform required visits.  (D.E. 386, Page 187).  For example, named plaintiff J.S. was not visited by his primary caseworker at all in the four months following his allegation of having been sexually abused by his roommate.  (D.E. 386, Pages 100-04).  DFPS's policy of requiring monthly visits is not practiced, and is therefore of no value.  *See Ruiz*, 679 F. 2d at 1160; (D.E. 500, Page 11); *supra* at II.B.1.  There is no evidence that Texas has since cured these defects.[13]

Furthermore, former foster children testified at trial that they were unable to report abuse to a caseworker because the abuser (often the caregiver) was present during caseworker visits.  (D.E. 324, Page 64 Lines 3-16, Page 64 Line 22-Page 65 Line 15; D.E. 325, Page 169 Lines 14-25).  The Special Master's finding that DFPS records frequently fail to indicate whether caseworker visits occur privately confirms this testimony.  (D.E. 546, Page 3).

Primary caseworkers are often a foster child's "only continuous and stable relationship."  (PX 1871, Page 1).  CVS caseworkers are among the few people that foster children look to for support and guidance.  (D.E. 326, Page 85).  Children need to feel comfortable telling their problems to their primary caseworker, making trust "highly important."  (D.E. 326, Page 85).  Without consistent, private visits, the requisite trust cannot

---

[13] The I See You Worker study conducted for the Special Master found that I See You workers, who are secondary workers that assist primary caseworkers, missed roughly a quarter of their scheduled visits in June 2017, which offers little hope that primary caseworkers have begun to make all of their monthly visits.  (D.E. 546, Page 105); *see infra* at III.K.1.b.

develop between a foster child and his or her caseworker.  (D.E. 368, Page 179).  When a child's caseworker fails to make regular contact, the "child's feelings of rejection are compounded and lead to feelings of distrust between the child and the 'system.'"  (PX 1988, Page 100).[14]   The Objection is OVERRULED.

## B.    PMC Children's Records

1. Within four months of the Court's Final Order, DFPS shall submit to the Court a plan for an integrated computer system, with specific timeframes, that contains each PMC child's complete records, including but not limited to a complete  migration  of all medical, dental, educational, placement recommendations, court records,  mental health and caseworker records. The mental health, dental and medical information shall include all visits to the provider with detailed examinations, diagnoses, test results, immunizations, medications (including the reasons for each), history of abuse, treatment plans, and  any  other information necessary for the safety of the children.  DFPS shall have this system fully functional within one year of the Final Order date.

2. The DFPS plan shall ensure that DFPS caseworkers and supervisors serving PMC children, as well as CASA staff and volunteers, and any public or private staff assigned to oversee PMC children's care, have access to an integrated, current, complete and accurate case record for PMC children on their caseloads, consistent with  prevailing state and federal law, including, for example, the child's current legal status and permanency goal; the child's Transition Plan (where applicable); the child's placement information and all safety-related and licensure/verification information  about  the child's placement, including investigation and inspection reports, enforcement actions and internal reviews conducted by CPAs[15]; the child's historic and current caseworker(s) and supervisor(s), with corresponding contact information; the child's complete medical, dental, educational and mental health information and records.

### a.    Objections

Defendants object that the phrase "consistent with prevailing state and federal law" in Item 2 is vague.  (D.E. 556, Page 14).

---

[14] For a more in depth discussion of the role and importance of caseworkers, see (D.E. 368, Pages 178-84) and *infra* at III.H.

[15] Child Placing Agencies are private agencies contracted by DFPS to place foster children in homes.  (D.E. 368, Page 256).  CPAs account for 90% of foster placements.  (D.E. 368, Page 229).

Defendants restate their General Objection that implementing this policy within the time frame is impossible and would require legislative approval.  (D.E. 556, Pages 21-23).

Defendants also object that giving external parties access to records will violate confidentiality laws and that the Plan fails to provide solutions to these issues.  (D.E. 556, Pages 22-23).

Defendants object that there is no basis in the record for finding that DFPS's existing recordkeeping systems caused class-wide constitutional injury, and that all of the Items in this section are therefore unjustified.  (D.E. 556, Pages 20-21).

### b.    Ruling on Objections

The phrase "consistent with prevailing state and federal law" in Item 2 is meant only to remind Defendants of their other legal obligations.  Item 2 is not to be read as imposing on Defendants an additional duty to obey confidentiality laws at risk of being held in contempt.  To the extent this clarification does not fully address Defendants' Objection that Item 2 is vague, it is OVERRULED.

The Court readdresses Defendants' logistical Objection to remark that Defendants have known about the Court's concerns with the IMPACT system since the Court identified them over two years ago in its December 2015 Order.  (D.E. 368, Page 249).  Despite this, Defendants have apparently done little to prepare for eventual reforms.  The Special Master asked Defendants to assess and report the time needed to improve IMPACT so that it could store all of a child's medical, dental, mental health, educational, and court records.   (D.E. 546, Pages 10-11).  Defendants' response to each of these inquiries was "[n]ot applicable DFPS is not making such changes to the IMPACT system."  (D.E. 546, Pages 10-11, 116-17).  Similarly, Defendants responded to the Special Master's request for a draft plan to achieve the Court's recordkeeping

goals by stating "[n]ot applicable. Texas is not developing such a plan."  (D.E. 546, Pages 10, 116-117).  Defendants now object, fifteen days after the Plan was filed, that the Plan's timelines for these goals are "impossible."  (D.E  556, Page 21).  Defendants offer no explanation for why they were unable to present the Special Master with the estimate they now present the Court in their Objections, that it could take $10 million and several years to reform IMPACT.  (D.E. 556, Page 22).  Even now, Defendants offer no evidence in support of this estimate.  For these reasons, and the reasons given *supra* at II.B.9, this Objection is OVERRULED.

Defendants claim the Plan will require them to violate state and federal confidentiality laws, but other states have successfully addressed these issues by providing separate access codes to different groups of database users.  *See* (D.E. 500, Pages 13-14).  Item 2 permits Defendants to take the steps necessary to comply with state and federal confidentiality laws. When Defendants submit their plan for implementation of this portion of the order, they may note (with particularity) any laws that are an obstacle to full implementation, what solutions they have considered, and  any alternative means of compliance they believe necessary.  The Court will consider any such obstacles and alternatives then.  In the meantime, Defendants must take whatever steps are necessary to achieve compliance.  The remainder of this Objection boils down to a complaint that implementation will be costly or logistically difficult, and is OVERRULED.

The Court now turns to Defendants' Objection as to basis.  Due to DFPS's burdensome administrative demands, such as filling out paperwork, CVS caseworkers are only able to spend 26% of their time with children.  (PX 1993, Page 10; D.E. 300, Page 24).  At trial, Dr. Viola Miller (who previously headed child welfare agencies in Kentucky and Tennessee) testified CVS caseworkers should spend "at least 40 to 50 percent" of their time working directly with children and families.  (D.E. 302, Pages 6, 42).  Dr. Miller further explained that the combination of

DFPS's excessive caseloads with its administrative burdens meant, "[i]n essence, [foster] children may well not have a caseworker." (D.E. 302, Page 43). DFPS is well aware that its caseworkers often cannot keep up with required documentation when caseloads are high. *See* (PX 1825, Page 2). Lack of documentation was especially problematic when caseworkers left and their cases were redistributed. (D.E. 324, Page 16).

In the December 2015 Opinion, the Court included among its findings the following:

The problems of inadequate and incomplete caseworker documentation are considerably magnified by the way in which DFPS maintains foster children's case files. Children's records are not kept in a single location nor are they consistently maintained in chronological order. (*See* D.E. 343 at 1; *see generally* DX 120 (filed under seal)). Some of the children's files are kept electronically on DFPS's IMPACT casework system. Other children's files are maintained entirely in External paper files. (D.E. 343 at 1-2; *supra* p. 80-81 nn.25 & 26). Additionally, records relating to abuse and neglect investigations of children in foster care are kept separately by RCCL in the CLASS database. (*See supra* p. 141 n.43). Although CVS caseworkers have access to the CLASS database, CLASS files are not merged with IMPACT files and it is unclear whether CVS caseworkers are trained, let alone have the time, to check whether children newly transferred to their caseloads have CLASS files. (*See* D.E. 343 at 2). Thus, not only are foster children's case files shockingly long (358,102 pages of case files for the 20 children for whom the Court has records[16]), they are incredibly disorganized.

Further, inherent problems with DFPS's outdated IMPACT system further impede caseworkers' ability to review important electronic case file information. According to The Stephen Group, IMPACT "is not in sync with current versions of forms that are used [by caseworkers] and forces arbitrary workarounds and repetitive entry of data." (PX 1993 at 15). This results in "delays and considerable frustration among caseworkers and can mean that those accessing the system might not have immediate availability to the most recent updates in a particular case." *Id.* This creates opportunities for important safety-related tasks to "fall through the cracks," especially when cases are transferred between workers. *See id.* It is unclear how easily CPS caseworkers can access their foster children's RCCL files, and how often they do so when receiving new files. What is clear is that caseworkers' continuously fail to maintain complete, timely, and accurate documentation. The resulting widespread neglect of important tasks

---

[16] The Court also noted in its December 2015 order that these records, despite their great length, "contained no CPA investigation files, and there were no IMPACT or RCCL files for multiple children." (D.E. 368, Page 166). Nor did these records include any medical, dental, school, or mental health records. (D.E. 500, Page 13 n. 14).

relating to the safety and well-being of PMC children is indicative of a system where caseworkers' workloads are unmanageable.

(D.E. 368, Pages 168-69).  And the Court further determined:

DFPS paperwork and electronic filing system, including IMPACT, CLASS, and the External files, must become more efficient.  Each child should have a readily accessible and organized case file, comprised of all records pertaining to that child.  The Court was routinely frustrated at the disorganization, duplication, and inconsistency in the foster children's case files.  Caseworkers should be able to spend more than 26% of their time with foster children.

(D.E. 368, Page 249).  In its December 2015 Order, the Court noted it took eleven uninterrupted workweeks to read the twenty foster children's case files that were in evidence in excess of 350,000 pages.  (D.E. 368, Page 166); *see also* (DX 120).  Considering the dangerously high turnover rate, this task must be duplicated numerous times for each child, making it impossible for caseworkers to have enough time to focus on the children.  (D.E. 368, Page 166); *see infra* at III.J.

Even where a caseworker does review the entirety of a child's voluminous records, vital information such as history of abuse may be missing.  For example, the record shows that when DFPS investigated an allegation that J.T. had sexually abused his roommate, the investigator wrote that "[t]here was no mention in the client file of the [earlier] investigation involving J.T. sexually abusing a child in a previous foster home."  (D.E. 304, Pages 51-52).  K.E.'s records included an e-mail from an I See You worker to K.E.'s primary caseworker about an incident where another child in K.E.'s foster placement bloodied K.E.'s nose, but the records contained no record of any follow-up into the incident, or of K.E. ever receiving medical treatment for the injury.  (D.E. 368, Page 135).

Medical and educational records were frequently inadequate.  Z.H.'s educational records were inconsistent with respect to such basic information as what grade he was in for a given

year; K.E.'s records did not reveal whether she ever attended the sixth or eighth grades.  *See* (D.E. 368, Pages 131-32).  S.R. was diagnosed with developmental problems and a court ordered that S.R. receive genetic testing, but S.R.'s records do not indicate whether such testing ever occurred.  (D.E. 368, Page 151).  Five-year-old J.V. was prescribed Focalin for ADHD, but his records do not contain an evaluation justifying that prescription.  (D.E. 368, Page 108).[17]

More general deficiencies were also present in the records reviewed by the Court.  J.V.'s record noted that his therapist thought J.V. might be acting out because he wanted to leave a treatment center and return to his adoptive home, but J.V.'s record does not indicate whether his caseworker ever acted on the therapist's suggestion that the caseworker ask the adoptive mother if that would be possible.  (D.E. 368, Page 124).  The records for an eight-sibling group were shorter than those for a single foster child; the case files included no RCCL files and frequently discussed all eight children at once, "even though they were often placed separately and had different caseworkers, making the files difficult to follow."  (D.E. 368, Page 141).

As the Court found in the December 2015 Opinion, DFPS maintains PMC children's records among numerous electronic and paper files, stored in different locations and maintained by distinct custodians.  (D.E. 368, Page 168; D.E. 546, Page 5).  As the Court determined, the trial record, including exhibits, revealed evidence of children's records missing information, containing incomplete information and reflecting information that was inconsistent with information in other files.  *See* (D.E. 368, Pages 166-69); *see generally* (D.E 368).  The Special Masters' examination of these case records among the trial exhibits, and other children's records

---

[17] The December 2015 Order extensively documented the high number of psychotropic drugs used on PMC children.  *See, e.g.*, (D.E. 368, Pages 70-72, 82, 107, 113, 129-30, 226).  For example, M.D. was prescribed 16 psychotropic drugs while in care, often taking five or six medications at a time.  (D.E. 368, Pages 70-72).  At trial, Commissioner Specia acknowledged that "many stakeholders felt that [foster] children were overmedicated," though he stated that DFPS had significantly reduced usage of psychotropic drugs since 2004.  (D.E. 331, Page 54).  Because caseworkers are medical consenters, the Court anticipates that, with more complete medical records, these occurrences may be more carefully evaluated.

as described below, confirmed that PMC children's records are currently stored in different locations with different custodians. (D.E. 546, Page 5).

These records are:

A.    The STAR Health Passport is an electronic record maintained by DFPS's healthcare vendor, Superior HealthPlan. The passport allows users to view service utilization for medical, dental, behavioral and mental health care. The passport includes information tabs, including a medical history tab. The passport can log health history, service dates, medical events, allergies, immunizations and diagnoses. The passport is not compatible with, or linked to, the IMPACT system, described below. The passport does not currently have the functionality for uploading most documents, such as birth certificates, medical, dental, developmental and psychological evaluations, or the capacity to store these documents. Superior HealthPlan staff and clinical providers can enter information into the passport, but not DFPS staff or caregivers. The passport is viewable by Superior HealthPlan staff, DFPS caseworkers, foster care agency providers, medical consenters (foster parents), health providers and Court Appointed Special Advocates (CASAs).

B.    IMPACT is the main electronic data system administered by DFPS. IMPACT is not compatible with, or linked to, the passport described above.  IMPACT has the capacity to include, among other things, caseworkers' notes, child abuse and neglect history, placement history, a child's photograph, investigative history, service dates, court orders, medical event dates, dental event dates and assessments.  As described below, the Special Masters observed in a random sample audit of PMC children's files that IMPACT frequently contained less health-related information than the passport. IMPACT does not currently have the functionality for uploading most documents, such as birth certificates, school records, legal documents, medical, dental, developmental and psychological evaluations or the capacity to store these documents.  DFPS staff have access to relevant information in IMPACT; Attorneys ad litem do not.  DFPS implemented Case Connection in September 2014, which is a web-based program that gives CASA staff and volunteers access to a child's IMPACT based case information. Through Case Connection, CASAs can view certain placement, healthcare, education, permanency and demographic information.

C.    CLASS (the Child Care Licensing Automation Support System) which tracks inspection and investigative work in PMC's children's licensed residential placements, among other settings.  An allegation of child abuse or neglect involving a PMC child while in a licensed residential setting can be linked to the child's history page in IMPACT.

D.      Because IMPACT and the STAR Health Passport cannot store most documents, PMC children's medical, dental, developmental and psychological assessments, and children's birth certificates, must be separately maintained in paper files when DFPS acquires them.  These files are in different locations.  Paper records may be housed by the caregiver (i.e. foster parent) at the child's placement or at the offices of the agency supervising the placement.  The primary CVS worker also typically stores a paper record, including the child's birth certificate, in her DFPS office.  Medical/service providers may also keep children's records at their places of business.

E.      Education records are located in at least two places.  The name of the child's school, the school year and the enrollment/discharge date(s), can be located in the IMPACT personal detail tab. Information about the child's educational needs can be tracked in the educational portfolio section of IMPACT.  A separate paper-based system, often called the Green Binder, is intended to contain the PMC child's complete educational information, including report cards, progress notes, classification for specialized services and school enrollment history, and is supposed to follow a child from placement to placement.  When a Green Binder exists, it is maintained by the child's placement provider.

F.      Foster and adoptive home screenings and evaluations for PMC children are frequently kept in paper files maintained by the community agency that supervises the child's placement

(D.E. 546, Pages 5-7).

On May 4, 2017, Special Master Kevin Ryan and John Ducoff, a member of the Special Master team, met with DFPS leadership to discuss DFPS's child welfare record keeping systems and to test those record keeping systems by examining the electronic files of 21 children in the PMC class, selected randomly by Mr. Ryan from among the 10,551 children identified by DFPS as being in the PMC class on March 31, 2017.  (D.E. 546, Page 7).  The STAR Health Passport contained more information about children's medical and mental health care, including procedure dates, types of procedures and diagnoses, but the information in the STAR Health Passport and IMPACT did not align nearly half the time.  (D.E. 546, Page 7).  Of the 21 randomly selected PMC children whose electronic case records were reviewed by Mr. Ryan and

Mr. Ducoff, the dates of the child's last medical examination listed in IMPACT mirrored, or closely approximated, the dates of the child's last medical examination in the Health Passport in 11 cases, and differed in 10 cases.[18]  (D.E. 546, Page 7).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, 14 children had a current (within one year) photo in their IMPACT case record; two children had a photo that was slightly overdue for updating in their IMPACT case record (by two and three weeks at the time of the review); and five children did not have a recent photo in their IMPACT case record.  (D.E. 546, Page 7).

All of the children had a verified Social Security Number in their IMPACT case file. (D.E. 546, Page 7).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the IMPACT system contained no uploaded medical records, dental records, educational records or mental health records.  (D.E. 546, Page 8).  DFPS said those records may be in the possession of the primary CVS worker, or may not be in DFPS's possession, but instead held by the caregiver, or the providers.  (D.E. 546, Page 8).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the IMPACT system recorded that 16 children had a recent (within 6 months) dental examination, two children appeared slightly overdue for a dental examination (by two weeks) and three children did not have a timely dental examination listed.  (D.E. 546, Page 8).  The examinations were not included in the IMPACT system.  (D.E. 546, Page 8).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the IMPACT system recorded that 17 children had a timely medical examination

---

[18] Mr. Ryan shared the results of the audit with DFPS through counsel and solicited feedback before finalizing and sharing the findings with the Court.

and four children did not have a timely medical examination listed.  (D.E. 546, Page 8).  The examinations were not included in the IMPACT system.  (D.E. 546, Page 8).

In addition to the IMPACT system, Mr. Ryan and Mr. Ducoff also reviewed children's records in the Star Health Passport system.  (D.E. 546, Page 8).  In general, Mr. Ryan and Mr. Ducoff observed that the STAR Health Passport often contained more information about children's medical and mental health care, including procedure dates, procedure types and diagnoses.  (D.E. 546, Page 8).  However, the 21 passports did not include copies of medical examinations, ER visit reports, hospitalization documents or dental examinations, even when those events were indicated. (D.E. 546, Page 8).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the STAR Health Passport recorded that 15 children had a current dental examination, five children did not and one child appeared to be slightly overdue for a dental examination (within ten days).  (D.E. 546, Page 8).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the Health Passport recorded that 20 children had a timely medical examination and one child was overdue for a medical examination.  (D.E. 546, Page 8).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the Health Passport and/or the IMPACT system reflected that 11 children had a psychological assessment of some type within the past three years.  (D.E. 546, Page 9).  The records were unclear or information was absent for seven children, and two children were infants.  (D.E. 546, Page 9).  The psychological assessment documents were not included in IMPACT or the Health Passport.  (D.E. 546, Page 9).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the dates of the child's last medical examination listed in IMPACT mirrored, or closely approximated, the dates of the child's last medical examination in the Health Passport in 11 cases, and differed in 10 cases.  (D.E. 546, Page 9).

Of the 21 PMC children whose electronic case records were reviewed by Mr. Ryan and Mr. Ducoff, the dates of the child's last dental examination listed in IMPACT mirrored, or closely approximated, the dates of the child's last dental examination in the Health Passport in 11 cases, and differed in 10 cases.  (D.E. 546, Page 9).

Further, in a March 16, 2017 hearing, multiple DFPS officials stated they did not know whether e-filing medical records was a requirement of the State's contracts with medical providers.  (Status Conference, Mar. 16, 2017, at 11:12:05).  Commissioner Whitman told the Court that he would explore making e-filing medical records a contractual requirement.  (Status Conference, Mar. 16, 2017, at 11:17:29).  However, the Special Master subsequently observed this was not happening.  (D.E. 546, Page 5).  The Special Master also discovered, through the I See You worker study, that even when workers were medical consenters, they often did not have access to medical records.  (D.E. 546, Page 34); *see infra* at III.K.

In February and March 2017, Mr. Ryan and Deborah Fowler, a member of the Special Master team, visited the residences of eight randomly selected Foster Group Home caregivers in Texas.  (D.E. 546, Page 9).  The Foster Group Home caregivers each knew that the children's education records were contained in a Green Binder, which followed the child from placement to placement.  (D.E. 546, Page 9).  In two instances, caregivers said the Green Binder was housed in the offices of the community agency assigned to monitor the Foster Group Home and was not available for inspection during the visit.  (D.E. 546, Page 9).  In six instances, the Green Binder

was in the home of the Foster Group Home caregiver and contained the child's educational records, including enrollment information, report cards and information on learning disabilities and accommodations.  (D.E. 546, Page 9).  Mr. Ryan visited a randomly selected Residential Treatment Center in Harris County in March 2017, and was advised that some of the children did have Green Binders on site, including their education information, and others did not.  (D.E. 546, Page 9).

> The Court's Order of January 2017, included in Section V.B.:
>
> The Special Masters are ordered to work with DFPS to create and submit to the Court a plan for a comprehensive central databank for PMC children. The databank shall include: 1. Medical records; 2. Dental records; 3. Mental health records; 4. School records; 5. Court records; 6. Caseworker notes; and 7. Placement evaluations.

(D.E. 500, Page 13).

In an effort to comply with the Court's Order, the Special Masters asked DFPS to provide a draft plan to achieve the Court's goals.  (D.E. 546, Page 10).  DFPS declined to share a draft plan, replying "Not applicable. Texas is not developing such a plan."  (D.E. 546, Pages 116-17).

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of a child's medical records are included and available in an identified health section of a child's case file in IMPACT.  (D.E. 546, Page 10).  DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system."  (D.E. 546, Page 113-15).

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of a child's dental records are included and available in an identified health section of a child's case file in

IMPACT.  (D.E. 546, Page 10).  DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system."  (D.E. 546, Pages 113-15).

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of a child's mental health records are included and available in an identified health section of a child's case file in IMPACT.  (D.E. 546, Page 10).  DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system."  (D.E. 546, Pages 113-15).

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of a child's educational records are included and available in an identified education section of a child's case file in IMPACT.  (D.E. 546, Pages 10-11).  DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system."  (D.E. 546, Pages 115-16).

In an effort to comply with the Court's Order, the Special Masters requested that DFPS assess and report the time needed to improve its IMPACT system so that all of the court records pertaining to a child's case are included and available in an identified legal section of a child's case file in IMPACT.  (D.E. 546, Page 11).  DFPS replied the request was "[n]ot applicable. DFPS is not making such changes to the IMPACT system."  (D.E. 546, Pages 113-15).  DFPS continues to maintain it is not developing such a plan.  (D.E. 546, Page 11, 116-17).

Given the comprehensive record established at trial and the Special Master's findings, Defendants' Objection that this Section is without basis is OVERRULED.

### C.   Current PMC Child Photograph

1. Effective immediately, the electronic case record of each child in the PMC class must include the child's photograph that is not more than one year old, except as provided in paragraph three, below.

2. Effective immediately, when a child enters the PMC class, DFPS shall ensure that a photograph is taken of the child within 48 hours and uploaded into the child's electronic case record promptly.  DFPS shall ensure the date of the photograph is recorded in the child's case record.

3. Effective immediately, with respect to all PMC children under the age of three years, DFPS shall ensure that photographs are taken and uploaded to the child's IMPACT case record at least semi-annually and the date of the photograph must be recorded in the child's case record.

4. Effective immediately, DFPS shall ensure adequate training to all caseworkers on how to use the appropriate technology to photograph a child and upload the photograph to the child's electronic case record.

### a.      Objection

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding child photographs caused class-wide constitutional injury, and that all of the Items in this section are therefore unjustified.  (D.E. 556, Page 23).

### b.      Ruling on Objection

In its December 2015 Order, the Court found the frequency of runaways necessitated the availability of a recent photograph.  (D.E. 368, Page 249 n. 54).  Named plaintiff M.D. had a history of running away from placements, and engaged in drug use and sex work while she was outside DFPS custody.  (D.E. 368, Pages 64-69).  After her final, successful runaway attempt, a national missing children organization informed DFPS that M.D. may have been arrested.  (D.E. 368, Page 68).  The organization provided DFPS with a picture of M.D., but M.D.'s caseworker was unable to positively identify her, because neither her caseworker nor anyone else in the unit had ever met her.  (D.E. 368, Pages 68-69, 249 n. 54).  DFPS did not act on the tip until urged by M.D.'s attorney *ad litem*, who saw the photo and immediately recognized it as being of M.D. (D.E. 368, Pages 68-69).  However, by then two weeks had passed, and M.D. was gone.  (D.E. 368, Pages 68-69).  M.D. has not been seen nor heard from since.  (D.E. 368, Page 69).  The

remedies in this section are necessary in order to prevent repeats stories like M.D.'s from recurring.

Consistent with the Court's goals in the December 2015 Order, DFPS improved its electronic case management system, IMPACT, to include a location for a child's photograph to be uploaded.  (D.E. 546, Page 12).  As of the Special Masters' case record review in May 2017, DFPS had not ensured that the electronic case record of each child in the PMC class included a child's photograph that is not more than one year old.  (D.E. 546, Page 12).  The Court again reiterates that policies not practiced are of no value.  *See Ruiz*, 679 F.2d at 1160; *see supra* at II.B.1.  The Objection is OVERRULED.

### D.   Screening and Investigating Reports of Abuse/Neglect Regarding PMC Children

1.  Effective immediately, DFPS shall ensure that it maintains a statewide, 24-hour hotline accessible by PMC children in DFPS custody to report abuse and neglect. The hotline shall receive, screen and assign for investigation reports of maltreatment of children in the PMC class.

2.  DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Final Order; and conducted taking into account at all times the child's safety needs.  The monitor(s) shall periodically review the statewide system for appropriately receiving, screening and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with Items 9-16 of this Section of the Court's Final Order and conducted taking into account at all times the child's safety needs.[19]

3.  In order to ensure that PMC children have access to the 24-hour hotline to report abuse and neglect, within 30 days of the Court's Final Order, DFPS shall either require all foster homes and therapeutic foster homes housing PMC children to maintain a landline phone accessible to the child in the home, with the toll-free hotline number appended to the landline or, in the alternative, DFPS shall present an alternative plan to the Court within 30 days of the Court's Final Order to ensure PMC children have access to the hotline to report abuse and neglect.

---

[19] Defendants object that the phrase "pursuant to current policy and regulation" in Item 2 is vague. (D.E. 556, Page 14).  The Objection is SUSTAINED.  The Court has modified the language of this Item.

### a.    Objection

Defendants object that requiring phone lines in every home housing a PMC child would require additional funding and is unnecessary.  (D.E. 556, Pages 24-25).

### b.    Ruling on Objection

"[C]onstitutional rights are not, of course, confined to those available at modest cost." *See Ruiz*, 679 F.2d at 1146 ("[I]n considering remedies for unconstitutional deprivation, the cost of one proposed remedy in comparison with the cost of others and the demonstrable need for the remedy should both be considered.").[20]  The Court finds that Item 3 is necessary to protect PMC children from an unreasonable risk of harm.  *See infra* at III.D.16.  Defendants have not provided any evidence of cost despite repeated requests for information by the Special Master and Defendants' representation to the Court that they would look into the feasibility of requiring landline phones in each foster home.  (D.E. 546, Pages 16-17, 118, 128-29; D.E. 521, Page 2). Even so, the cost of landline phones seems trivial compared to the $1 billion in additional funding which DFPS received in the last session of the Texas Legislature.  *See* (D.E. 546, Page 2).  Further, at a March 16, 2017 hearing, the Court suggested to Commissioner Whitman that, as DFPS pays placements a minimum of $1,400 per month, [21] it could make it a requirement that caregivers have landline phones available to PMC children at the caregivers' expense.  (Status Conference, Mar. 16, 2017, at 10:45:50).  Commissioner Whitman replied he would check into the possibility but there is no indication he did.  *Id.*; (D.E. 546, Pages 128-29).

---

[20] Where there is no alternative adequate remedy, "a state cannot avoid the obligation of correcting the constitutional violations of its institutions simply by pleading fiscal inability."  *See New York State Ass'n for Retarded Children, Inc. v. Carey*, 631 F.2d 162, 165 (2d Cir. 1980); *see also supra* at II.B.8-9.

[21] Effective September 2017, the minimum "combined CPA retainage and foster home payment" is $48.47 per day for a Basic level child, with higher payments made for children with higher service levels. 40 Tex. Admin. Code § 700.1753(s).  This comes out to just over $1400 per month for a Basic level child.  CPAs account for 90% of foster placements.  (D.E. 368, Page 9; DX 119, Page 72).

Despite this Court's order that Defendants establish policies to protect children from an unreasonable risk of harm and cooperate with the Special Masters, Defendants responded to the Special Master's request for a draft policy on landline phones by stating "[n]ot applicable. DFPS neither has nor will be developing such a policy or regulation." (D.E. 546, Pages 16, 118). In May 2017, almost two months after their representation to the Court that they would look into the feasibility of a landline phone policy, Defendants informed the Special Master they were still "considering the feasibility and utility of requiring a landline phone in each foster home." (D.E. 546, Pages 16, 128-29). No further information was provided to the Special Master before he filed the Implementation Plan in December 2017. To date, Defendants do not even have a means of tracking which PMC children have access to a phone to report abuse and neglect. (D.E. 546, Pages 16-17). Though the record reflects that DFPS policy requires informing children of the phone number to report abuse, there is no indication that the children can utilize this number. *See* (D.E. 325, Pages 168-69; D.E. 324, Page 200).

The Court is not persuaded that Defendants' proposed alternative of educating PMC children about the option of reporting maltreatment to teachers, nurses, or other "trusted individuals" would be equally effective. (D.E. 556, Page 24). The record indicates that many PMC class members have no trusted figures in their lives. (D.E. 325, Page 170-71); *see also* (D.E. 307, Page 17); *supra* at III.A.4. Moreover, at least in Residential Treatment Centers ("RTCs"),[22] PMC children may attend school at the facility, and thus may not have access to any figures who are not co-workers of their abusers. (D.E. 325, Page 168). The Court finds that a dedicated landline alleviates these issues. This Objection is OVERRULED.

---

[22] Residential Treatment Centers are a subset of General Residence Operations ("GRO"). GROs are facilities caring for more than 12 children for 24 hours a day; RTCs are GROs for children with more serious physical and mental health needs. *See* (D.E. 368, Pages 256).

4. Effective May 2018, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child on child sexual abuse.

5. Effective immediately, DFPS shall ensure that investigations of abuse and neglect of PMC children while they are in licensed placements are conducted by staff whose caseload is exclusively focused on child maltreatment investigations.

6. Effective March 2018, and ongoing thereafter, DFPS shall ensure the central case record of every child in the PMC class includes documentation confirming the method(s) discussed with the child for notifying DFPS if the child needs to report abuse or neglect.  For children who are verbal, the documentation must include the date the reporting methods were discussed with the child and confirmation of their level of understanding.  The discussion with the child must occur within 48 hours of entering any new placement.

7. Within 60 days of the Court's Final Order, all calls to the DFPS 24-hour hotline shall be recorded.  All recorded calls shall be stored for at least two years using a call recording system.  Recordings shall be made available to the monitor(s) for monitoring and verification purposes.

8. Effective March 2018, and ongoing thereafter, DFPS shall ensure that a well-trained, experienced and qualified supervisor reviews and approves all screening decisions at the 24-hour hotline involving children in the PMC class.  The monitors will conduct routine audits of screened-out reports involving children in the PMC class to confirm that DFPS conducted a complete review of the available record (including past intake reports involving the child and the placement) and due consideration was given to the risks to children when determining whether to assign a matter for investigation.

9. Effective March 2018, DFPS shall ensure that all abuse and neglect referrals to the 24-hour hotline regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral.   Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.

10. Effective March 2018 and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)

11. Effective March 2018 and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)

12. Effective March 2018 and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.

13. Effective March 2018 and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.

14. Effective March 2018 and ongoing thereafter, DFPS shall track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.

15. Effective March 2018, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

16. Effective March 2018 and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Final Order.  Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked.  If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

### a.    Objection

Defendants object that there is no basis in the record for finding that class-wide constitutional injury resulted from existing DFPS policies or practices regarding screening and investigation of reports of abuse or neglect, and that all of the Items in this Section are therefore unjustified.  (D.E. 556, Page 23).

b.      **Ruling on Objection**

DFPS's existing systems for reporting abuse and neglect, including its reporting hotline (Statewide Intake), are plainly inadequate.  The trial record includes multiple pieces of testimonial evidence describing children's inability to reach out for help.  The former foster children testified that they were unable to tell a caseworker about abuse because the abuser (often the caregiver) was present.  (D.E. 324, Page 64 Lines 3-16, Page 64 Line 22-Page 65 Line 15; D.E. 325, Page 169 Lines 14-25).  PV testified she did not know who to trust, so she stayed quiet. (D.E. 324, Page 200 Lines 3-17).  When PV did try to report abuse to a caseworker, nothing ever came of it.  (D.E. 324, Page 200 Lines 3- 17).  KS ("KS") testified that at one of his placements he could not make a phone call without getting permission.  (D.E. 325, Page 169 Lines 14-24).  KS testified he never had the opportunity to report his sexual abuse because someone was constantly monitoring his access to the outside world. (D.E. 325, Page 169 Lines 14-25).  KS also testified that he did not know there was a number he could call and that if there was such a number, he would not have had access to it. (D.E. 325, Page 176 Lines 8-17).  Additionally, the next friends of named plaintiffs described those children's frustrations with not having a way to reach out. *See* (D.E. 324, Page 224 Line 22-Page 226 Line 21 and D.E. 327, Page 188 Line 22-Page 189 Line 11).  The December 2015 Order found that these problems are systemic and likely led to an underreporting of abuse.  (D.E. 368, Pages 205-06).

The record indicates that even abuse reported by credible outside sources often goes unaddressed.  For instance, a CASA worker called DFPS's hotline to report that named plaintiff M.D. had bruises all over her body due to physical restraints which had been placed on her by RTC staff, but nothing came of the report.  (D.E. 324, Pages 224-25).  A school nurse called Statewide Intake after visiting named plaintiff L.H. at her foster home and finding L.H. and her

siblings "outside barefoot" "without jackets," appearing dirty and malnourished.  (D.E. 368, Pages 144-45).  Although the intake report also noted that the foster mother's boyfriend was "charged with abusing" L.H., CPS ruled out all allegations of abuse and neglect.  (D.E. 368, Page 145).  One of the more troubling instances was attorney *ad litem* Anna Ricker's ("Ricker") testimony about her experience reporting abuse and neglect in a Levelland facility.  (D.E. 368, Page 204).  Ricker visited a child who was non-verbal, had fingernails that curled forward to touch his fingers, an unexplained "goose-egg" on his forehead, and was clothed in a torn shirt and pants, which he had to hold up with his hand.  (D.E. 368, Page 204).  Ricker visited this facility on numerous occasions, each time finding another child with a black-eye.  (D.E. 368, Page 204).  Ricker twice reported the abuse and neglect at this facility but RCCL Ruled Out the allegation based solely on information provided by staff and children.  (D.E. 368, Page 204).  RCCL never contacted Ricker.  (D.E. 326, Page 212-14).

The Court's December 2015 Opinion required that "[f]oster children must be allowed telephone access to reach out to" the 24-hour, toll-free child abuse and neglect hotline.  (D.E. 368, Page 249).  The Court's January 2017 Order concluded that "[a]ll foster homes, [F]oster [G]roup [H]omes, and therapeutic foster homes housing PMC children should be required to maintain a landline phone accessible to the child in the home, with the toll-free hotline number appended to the landline."  (D.E. 500, Page 14).  The Court's goals grew from findings, detailed in the December 2015 Opinion, that children were subject to serious physical and sexual abuse that was not reported to the DFPS toll-free, 24-hour child abuse and neglect hotline, known as Statewide Intake.  *E.g.*, (D.E. 368, Pages 205-06).

Consistent with the Court's orders in this matter, the Special Masters requested that DFPS provide a draft policy and/or regulation to require that Child Placement Agency[23] ("CPA") residential providers maintain a landline phone that connects directly to the DFPS toll-free, 24-hour screening hotline.  (D.E. 546, Pages 14-15).  DFPS originally responded on March 8, 2017 that the request from the Special Masters was "[n]ot applicable. DFPS neither has nor will be developing such a policy or regulation."  (D.E. 546, Pages 16, 118).

During a status hearing before the Court in March 2017, DFPS stated and the Court recorded in its March 17, 2017 Order, "DFPS agreed to examine the possibility of requiring a landline phone accessible to the children in each foster home."  (D.E. 521, Page 2); *see* (D.E. 546, Page 16); *supra* at III.D.3.  DFPS subsequently advised the Special Masters in May 2017 that DFPS was still "considering the feasibility and utility of requiring a landline phone in each foster home."  (D.E. 546, Pages 16, 128).  Despite the Court's orders in this matter, DFPS also reports "it does not have a means of tracking which PMC children are placed in care with access to a phone to report abuse and neglect."  (D.E. 546, Pages 16-17, 122-23).

For the reasons stated above, the policies are necessary to protect PMC children from an unreasonable risk of harm.  The Objection is OVERRULED.

### E.    PMC Youths' Preparation for Independence

1.  Effective immediately, DFPS shall ensure and document that all youth in the PMC class, aged 16 or older, receive copies of their birth certificate and social security card upon turning 16.[24]

2.  Effective immediately, DFPS shall ensure and document that all youth in the PMC class, prior to aging out of care, receive copies of their birth certificate, social security card, most current high school transcript, copies of their last physical health

---

[23] Child Placing Agencies are private agencies contracted by DFPS to place foster children in homes.  (D.E. 368, Page 256).  CPAs account for 90% of foster placements.  (D.E. 368, Page 229).

[24] Defendants object that the phrase "all other documents that law or policy entitles them to receive" is impermissibly vague.  (D.E. 556, Page 14).  The Objection is SUSTAINED.  The Court has deleted the language from the Order.

and dental examinations, copies of their immunization record, and copies of identifying information needed for Medicaid.   DFPS   must document an acknowledgment of receipt, along with a short description of the youth's plan for safekeeping the documents, signed by the youth and their caseworker in the electronic case record prior to the youth aging out of care.[25]   Prior to the youth aging out of care, DFPS shall take all reasonable steps, including the filing of an application, to assist the youth in signing up for either Former Foster Care Children's Medicaid[26] or Medicaid for Transitioning Foster Care Youth,[27] and shall document those steps in the child's electronic record.[28]   Each of these programs requires an affirmative act to change from the under-18 Medicaid to the over-18 previous foster care Medicaid.[29]   *See* (D.E. 331, Pages 56-57).

3.   Effective within three months of the Court's Final Order and ongoing thereafter, DFPS shall identify all PMC youth aged 14 and older who have not yet received the following DFPS independent living preparation services: the life skills assessment, a Circles of Support (COS) or Transition Plan Meeting (TPM), and a recently updated (within six months for youth 16 and older and one year for youth 14 and older) transition plan. DFPS shall ensure that all PMC youth who have been identified immediately above, receive these services and that the PMC youth's transition plan is developed.

4.   Effective June 2018, DFPS shall ensure all 14- and 15-year-old youth in the PMC class receive DFPS' Preparation for Adult Living (PAL) services.

5.   Effective June 2018, DFPS shall ensure that if a PMC youth's disability is a barrier to participation in PAL services or supports, appropriate accommodations shall be identified that allow the youth to meaningfully participate, and DFPS shall document any accommodations in the child's electronic case record.

6.   Effective June 2018, DFPS shall ensure PMC youth receive a life-skills assessment within 45 days of turning 14, and are reassessed annually, and that the results of these assessments are documented and available in the child's electronic case record.

7.   Effective June 2018, DFPS shall ensure that PMC youth receive DFPS's Circles of Support (COS) or Transition Planning Meeting (TPM) within 45 days of turning 14 years old, and then receive either COS or TPM in conjunction with the child's

---

[25] Defendants object that the phrase "all other documents that law or policy entitles them to receive" is impermissibly vague.  (D.E. 556, Page 14). The Objection is SUSTAINED.  The Court has altered the language of this Item.
[26] *Health Care: Medicaid for Former Foster Care Children*,
https://yourtexasbenefits.hhsc.texas.gov/programs/health/child/former-foster-care.
[27] *Health Care: Medicaid for Transitioning Foster Youth*,
https://yourtexasbenefits.hhsc.texas.gov/programs/health/child/transitioning-foster-care.
[28] Commissioner Specia testified at trial that DFPS already has a regular practice of assisting youths with this process.  (D.E. 331, Page 57).
[29] Without these programs, foster youths would typically lose medical coverage as soon as they left foster care.  *See* (D.E. 331, Page 56).

permanency planning meeting every four months, until the youth ages out or attains permanency. The purpose of such meetings is to develop a youth's transition plan with an eye toward building skills to support a youth's specific strengths and address needs in preparation for independence.

8. Effective March 2018, DFPS shall ensure that primary caseworkers assigned to PMC children develop a plan, in consultation with the child's attorney *ad litem*, to facilitate the sealing or expungement of any eligible criminal or juvenile records for offenses for which the youth was adjudicated or convicted prior to the youth aging out of care. DFPS shall ensure the efforts to do so are documented in the child's electronic case record.

9. Effective March 2018, DFPS shall ensure that the caseworker puts a plan in place prior to a PMC youth turning 18 years of age, documented in the case record, detailing how the youth will access benefits the youth is eligible to receive once they leave DFPS care, including the DFPS transitional living allowance, Social Security Disability Insurance benefits, the DFPS aftercare room and board assistance, and DFPS's Education and Training Vouchers.

10. Effective June 2018, DFPS shall ensure driver's education classes are provided to all PMC youth who are old enough to receive a learner's permit and choose to take driver's education. DFPS may create exceptions for PMC youths who are not developmentally or medically able to safely participate in driver's education.[30]

### a.      Objection

Defendants object to the logistical challenges of implementing Item 10 and to Item 10 imposing requirements which the Texas Legislature considered but declined to impose. (D.E. 556, Pages 25-26).

### b.      Ruling on Objection

Defendants state that it is "unclear" whether it is possible to procure PMC youths the insurance necessary to participate in the experiential learning portions of driver's education classes, but provided no evidence this is the case. The Court finds this Item necessary to protect PMC children from an unreasonable risk of harm. *See Ruiz*, 679 F. 2d at 1146; *see also infra* at III.E.12.b. Accordingly, Defendants' Objection is OVERRULED.

---

[30] Defendants object to Item 10 on the ground that not all youths old enough to participate in driver's education are developmentally capable of doing so. (D.E. 556, Page 26). This Objection is SUSTAINED. The Court has modified Item 10 accordingly.

11. Effective immediately, DFPS shall ensure that a plan is in place, and documented in the case record, to provide all PMC youth age 16 and older with safe, stable housing upon exit from care.

      **a.**      **Objection**

Defendants object to Item 11 if read to require DFPS to arrange and pay for housing, which would require legislative direction and appropriations.  (D.E. 556, Page 26).  Defendants also state youths may determine where they live upon aging out of care.  (D.E. 556, Page 26).

      **b.**      **Ruling on Objection**

The Court clarifies that Item 11 does not require the State to arrange and pay for housing of PMC youths who age out.  Once youths turn 18, they cease to be members of the PMC class.  Rather, Item 11 requires DFPS to develop and document a plan for each PMC youth to have housing upon aging out—whether this be through DFPS's existing extended foster care program, referral to a shelter, or some other means.  To the extent this clarification does not fully address Defendants' Objection to Item 11, it is OVERRULED.

12. Effective immediately, DFPS shall ensure that prior to exiting care, each PMC youth age 14 and older is assisted in creating e-mail accounts so that they may receive encrypted copies of personal documents and records, in addition to receiving copies of originals.

      **a.**  **Objection**

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding preparation of PMC youth for independence cause class-wide constitutional injury, and that all of the Items in this Section are therefore unjustified.  (D.E. 556, Page 25).

      **b.**  **Ruling on Objection**

In the December 2015 Opinion, the Court found:

Specia also acknowledged that the "longer children stay in the custody of the state the harder it is for them to achieve a permanent home." (D.E. 299 at 63, 83; *see also* PX 1988 at 9).   Thus, another consequence of rotating overburdened caseworkers, which disrupts permanency planning, is that 1[2]00-1400[31] foster children age out of the system each year.   It is widely recognized that foster youths who age out generally experience poorer life outcomes.   These youths leave the system with few life skills and little, if any, support.   As Burstain wrote before joining DFPS, aging out of care is an outcome DFPS tries to avoid as aged out youths "have no permanent place to call home and often have a difficult time." (PX 1877 at 36).   Burstain reaffirmed this sentiment at trial, saying that children for whom DFPS has failed to find a permanent home and who age out are "likely . . . to be harmed." (D.E. 310 at 55).   This is especially true for children who age out while living far from their home communities and support networks, often lacking the resources or ability to return.   As of August 2014, approximately 60% of all foster children were placed outside their home county. (DX 183 at 4).   Thus, aging out in a foreign community is commonplace.   As a result, these children frequently end up homeless, participating in "criminal activities in order to survive, trespassing in vacant homes or stealing or human trafficking, prostitution, those kind of things in order to have a place to stay." (D.E. 307 at 15; *see also* PX 1872 at 4).

Aged out foster youths often experience "serious, and in some cases disabling, physical and mental health care issues" and are likely to suffer from post-traumatic stress disorder ("PTSD") due to "the traumas and frequent moves and transitions experienced in foster care." (PX 1988 at 10).   According to Casey Family Programs, former foster youths suffer from PTSD at nearly five times the rate of the general population and nearly twice the rate of United States combat veterans. *Id.* at 57, 71.   In addition, aged out foster youths often have significantly lower educational attainment than their peers. *Id.* at 53-55, 58-59. Foster youth in general are "much more likely to be held back than their peers." *Id.* at 54.   This is due in part to the frequent school changes, which means they are "often absent for large parts of the school year, lose academic credits due to mid-semester moves, and often have incomplete school records due to missing transcripts." *Id.* at 53-54.   Foster children are also significantly overrepresented in special education classes—at a rate of over four times that of the general population—which may be an underestimate. *See id.* at 55.   Many do not finish high school. *Id.* at 58.   Fewer than 2% of former foster children complete college. *Id.* at 56.[32]

Talley, who previously worked at DFPS as a Preparation for Adult Living coordinator, testified that the 800 former foster youths for whom she provided

---

[31] (D.E. 546, Page 20); *see infra* p. 52.

[32] The Court has continuing concern over foster care children who enter care at a Basic needs level and age out from a residential treatment center on multiple psychotropic drugs, indicative of warehousing children. *See, e.g.*, (D.E. 368, Pages 56, 82, 95-103, 106-28, 146, 150, 225-27; D.E. 325, Pages 21-22, D.E. 323, Pages 97-98; PX 50, Pages 29-30); *see also* (DX 120 at DFPS009030795-96, DFPS009048706, 1 RFP CPS 123302) (filed under seal).

services, the majority of which were in PMC, were simply being "maintain[ed] in foster care until they aged out." (D.E. 323 at 84-85).  [Sandra] Carpenter [of the non-profit organization "Angel Reach"] testified that aged-out children lack independent living skills. (*See* D.E. 307 at 8, 13, 29- 30).  They do not know how to answer a phone, take or leave a message, cook a meal for themselves, or load a dishwasher. *Id.* They do not know how to fill out a job application, let alone drive a car to get to work. *Id.* at 29-30.  According to [Dr. William] Carter, none of the Named Plaintiffs who are on the cusp of aging out, or have by now aged out, "have sufficient adaptive living skills that are necessary for even a minimally reasonable chance at a decent" life.  (D.E. 326 at 129).  None of them were involved in any extracurricular activities at school or had any vocational training or employment experience. *Id.*

(D.E. 368, Pages 184-85).

After trial, DFPS Commissioner Whitman, a Defendant in this case, said in a hearing before the Texas Senate Finance Committee that 27% of youths who age out "end up in the criminal justice system" and "a majority of them will fall into sex trafficking." (D.E. 500, Page 15).  For example, former foster child Kristopher Sharp ("Sharp") testified that after aging out, he lived on the roof of a strip mall in Houston for six months, engaging in sex work to survive.  (D.E. 325, Page 179).  Moreover, this cycle repeats itself: 49% of women who age out of the foster care system are pregnant by age 19 and 70% of those children end up in foster care.  (D.E. 307, Pages 13-14).  Sharp's testimony highlighted a continuing concern of overmedication in residential treatment centers.     *E.g.*, (D.E. 368, Page 56).[33]   For instance, he testified he continued taking psychotropic drugs for Bipolar Disorder, Schizophrenia, and Oppositional Defiant Disorder after aging out, until he visited a psychiatrist, "who told him to stop taking his medications because he did not have those disorders."  *See* (D.E. 368, Page 226).  The Court reiterates its concern that children enter residential treatment centers with basic needs and age

---

[33] "[C]hildren often enter foster care at the Basic service level, are assigned a carousel of overburdened caseworkers, suffer abuse and neglect that is rarely confirmed or treated, are shuttled between placements— often inappropriate for their needs—throughout the State, are migrated through schools at a rate that makes academic achievement impossible, are medicated with psychotropic drugs, and then age out of foster care at the Intense service level, damaged, institutionalized, and unable to succeed as adults."  (D.E. 368, Page 56).

out from residential treatment centers, where they have been given multiple psychotropic drugs. *See* (D.E. 368, Pages 225-27).

DFPS reported that 1,180 youth aged out of care in 2015 and 1,250 youth aged out of care in 2016.  (D.E. 546, Page 20).   Earlier in the Opinion, the Court summarized the testimony of the State expert who oversaw extended foster care for children who age out:

> Jenny Hinson ("Hinson") is the Division Administrator for Permanency at CPS. (D.E. 314 at 4).  She supervises a team of seven subject matter experts and with them is responsible for developing and administering policies and programs for children in DFPS conservatorship.  (*See id.* at 221; DX 259 at 1).  She has been in her current position since 2010, but has been at DFPS since 1998.  Hinson has worked as a statewide intake specialist, caseworker, supervisor, program director, program administrator, and program specialist. (D.E. 327 at 222-23; DX 259 at 1-2).  While Hinson focuses on CPS policies that relate to permanence, she seems to know little about how her policies actually affect permanency.  *Id.* at 6-9.  For example, she oversees extended foster care for children who age out, but does not know how many children benefit from that program, or the effectiveness of that program.  *Id.* at 8-9.  Similarly, while she said that independent living classes are offered to all foster children age 16 and up, Hinson does not know how many children attend those classes. She believes that number is fewer than 50 out of the 1[2]00-1400[34] children who age out annually. (*Id.* at 21-22; *see also* DX 24 at 14 (showing that 1410 youths aged out in 2011); DX 119 at 221 (showing that 1328 youths aged out in 2013)).

(D.E. 368, Pages 35-36).

Texas law and DFPS's own policies require DFPS to prepare foster youths for adulthood.  *See, e.g.*, Tex. Fam. Code Ann. § 264.121 (West); CPS Handbook Section 10111 (requiring foster care providers to provide experiential life skill training through practical activities); CPS Handbook Section 10222 (life skills training).   The record summarized above shows DFPS fails to satisfy those requirements.  The Court reiterates that policies not practiced are of no value.  *See Ruiz*, 679 F.2d at 1160; *see supra* at II.B.9.  The Objection as to basis is OVERRULED.

---

[34] (D.E. 546, Page 20); *see supra*  p. 52.

### F.     Attorneys *ad Litem* for PMC Children

1. Effective immediately, DFPS shall request the appointment of an Attorney *ad litem* for all PMC children from each court in which a suit is pending in which a PMC child does not have Attorney *ad litem* representation, citing the Court's Final Order.

### a.     Objection

Defendants object that the issue of PMC children's entitlement to attorneys *ad litem* was not tried, that the Special Master's recommendation on this issue is erroneous as a matter of law, and that the Special Master has no demonstrated expertise on the issue.  (D.E. 556, Page 27).

### b.     Ruling on Objection

The Court's January 2017 Order refers to the "loss of liberty" each PMC child experiences by virtue of their removal from home and their assignment to placements.  (D.E. 500, Pages 16-19).  In the Court's original December 2015 Opinion, the Court observed that "when a child enters PMC, courts often dismiss the child's Attorney *ad litem* and CASA, leaving the child with fewer stable relationships and advocates.  (PX 1988 at 15; *see also supra* pp. 7-8)."  (D.E. 368, Page 170); *see also* (D.E. 368, Pages 7-8; PX 1988 at 15).  Attorneys *ad litem* set hearings, file pleadings, and, more generally, notify the court when a child needs assistance.  (D.E. 323, Page 68).  Noting in the January 2017 Order that "[m]ost PMC children also do not have an attorney ad litem," the Court analyzed the vulnerability of children in the PMC class, the liberty interests at stake, and concluded:

> PMC children are entitled to counsel at every step of their legal journey through the Texas foster care system . . . .  The Court can order, at a minimum, that DFPS request ad litem appointment from each court in which a suit is pending, citing this Order.  Additionally, the Court will consider ordering DFPS to reimburse the ad litem attorney's fees to the appointing court.  The Special Masters are ordered to work with DFPS to evaluate the efficacy of these options and propose a procedure for the appointment of an attorney ad litem for each PMC child within 3 months from the date of this order.

(D.E. 500, Pages 18-19). When the Special Masters asked DFPS about these options, the agency replied, "Not applicable. DFPS declines to speculate on a process that is and should be governed by counties and individual judges." *See* (D.E. 546, Page 119).

The Special Masters asked DFPS to identify how many PMC children did not have an attorney as of September 2017. (D.E. 546, Page 22). DFPS responded that it "does not track this information." *See* (D.E. 546, Page 124).

The Court's finding that PMC children are entitled to an attorney *ad litem* is consistent with Supreme Court precedent regarding the rights of foster children. In *Parham v. J.R.*, the Supreme Court held that foster children in Georgia were not entitled to adversarial process when the State, acting as their legal guardian, desired to have them committed to a mental hospital. 442 U.S. 584, 617-20 (1979). The *Parham* Court's holding acknowledged that the lack of natural affinity between the State and its foster wards may cause some foster children who were committed to mental hospitals to become "lost in the shuffle," and that a different process may therefore be required for reviewing the continuing need for institutionalization, as opposed to Georgia's initial decision that institutionalization was necessary. *Id.* at 619-20. As this Court stated in its January 2017 Order, PMC children in RTCs "are effectively institutionalized and subject to indefinite confinement without the opportunity for review." (D.E. 500, Page 17). This is precisely the sort of situation in which foster children may be "lost in the shuffle," and the Court finds that an attorney *ad litem* is necessary to protect PMC children's liberties.

Additionally, the *Parham* Court held that the record before it did not allow a challenge to the state-law presumption that Georgia acted in the best interest of its foster children. *Parham*, 442 U.S. at 618. Here, there is copious evidence in the record of DFPS failing to act in the best interests of PMC children—whether through over-medication (D.E. 368, Pages 72, 107, 112-14,

129-30, 226); prioritizing TMC children over PMC children on the ground that PMC children are "stable" (D.E. 323, Pages 37-38, 67-69); or putting DFPS's litigating position in this suit over the welfare of named plaintiff H.V. (D.E. 326, Pages 221-24).  More fundamentally, the Court has already found the State of Texas exposes PMC children to an unreasonable risk of harm; this fact is inconsistent with a presumption that Texas acts in the best interests of PMC children.  *See* (D.E. 368, Page 160).  Many foster children lose their attorney *ad litem* and CASA volunteer when they enter PMC, but the record shows that PMC children have no lesser need for an advocate.  (D.E. 368, Page 170).

For all these reasons, and because the Objection relitigates an issue addressed in the Court's December 2015 Order and its January 2017 Order, the Objection is OVERRULED.

2.  Within 30 days of the Court's Final Order, DFPS shall present a plan to the Court to ensure reimbursement to Attorneys *ad litem* in those courts that do not  currently provide Attorneys *ad litem* for PMC children.  If DFPS fails to present a plan, DFPS shall reimburse those fees necessary to provide Attorneys *ad litem* in those courts that do not currently provide Attorneys *ad litem* for PMC children.

### a.    Objection

Defendants object that requiring DFPS to pay *ad litem* attorneys' fees violates Texas Family Code § 107.015 and would pose ethical issues and conflicts of interest.  (D.E. 556, Page 27).

### b.    Ruling on Objection

Defendants argue that the attorney *ad litem* order violates Texas Family Code § 107.015.  However, by its own terms, § 107.015 is inapplicable, because this Court is not "the court" referenced in § 107.015 and because reimbursement to the attorneys *ad litem* is not being made "under this chapter [Chapter 107 of the Texas Family Code]", but pursuant to this Court's order and the Fourteenth Amendment.  *See* Tex. Fam. Code Ann. § 107.015(c).  DFPS already

had an opportunity (and obligation) to propose its own draft plan, but responded to the Special Master's request for information by saying it "declines to speculate on a process that is and should be governed by counties and individual judges." (D.E. 546, Pages 21-22, 119); *see supra* at III.F.1. Nor does DFPS track how many PMC children have an attorney *ad litem*. (D.E. 546, Pages 22, 124).

Defendants also object on the ground that this Item creates conflicts of interest. However, it is common for appointed counsel to be funded by the governmental entity it faces in litigation. No conflict of interest arises from a state's constitutional duty to effectuate an individual's right to counsel. *Cf. Sanford v. United States*, 2009 WL 2524891, at *3 (E.D.N.Y. Aug. 14, 2009) (rejecting as frivolous criminal defendant's argument that court-appointed attorney had conflict of interest because appointed counsel was paid by the United States). The situation here is akin to federally funded and appointed defense attorneys appearing against the U.S. Attorney's Office or to a county prosecutor appearing in court opposite a public defender or other court-appointed counsel paid through county funds. Accordingly, Defendants' Objection is OVERRULED.

### G.   PMC Children's Health

1. Within 30 days of the Court's Final Order, DFPS shall present the Court with a plan to address and remediate missing and nonexistent medical and mental health care records, consistent with the American Academy of Pediatrics "Fostering Health: Healthcare for Children and Adolescent in Foster Care." (D.E. 488).

2. DFPS shall institute and incorporate caseworker training (minimally into the Conservatorship Specialty Track) about child health that describes:
   a. The health vulnerabilities of foster youth (pages 1 and 2 of the American Academy of Pediatrics "Fostering Health: Healthcare for Children and Adolescent in Foster Care");
   b. Specifically, how to use child and family visits to obtain and update healthcare information;
   c. The utility of children's electronic case record, for improving the health of foster youth.

3. Effective immediately, DFPS shall make every effort to obtain and make available a child's medical records within 24 hours of the child entering the custody of DFPS. Caseworkers shall document their efforts to obtain and make available children's medical records within 48 hours of children entering DFPS custody;

4. Effective June 2018, DFPS will ensure that every PMC child has a medical home. The medical home is a health care delivery model led by a health care provider to provide comprehensive and continuous medical care and care management to patients with a goal to obtain positive health outcomes. The medical home shall be obliged (by policy and contract):
    a. To maintain and update all medical fields of the child's central electronic record;
    b. To coordinate care for routine and emergency healthcare needs;
    c. To ensure timely evaluations and assessments for all health needs, including behavioral health (including psychotropic oversight), dental care, and chronic health conditions.

5. Effective June 2018, DFPS shall ensure children in the PMC class receive a specific developmental assessment of at least one of the following screenings within 90 days of each child's birthday:
    a. Birth to 10 years: Ages and Stages Questionnaire, Ages and Stages Questionnaire: Second Edition, or the PEDS developmental screening and assessment;[35]
    b. 11 years to 21 years: the Pediatric Symptom Checklist (PSC)-35, the Youth Pediatric Symptom Checklist (Y-PSC), the Patient Health Questionnaire-9 (PHQ-9), or the CRAFFT screening test).[36]
    c. If DFPS does not believe any of these tests to be reliable, it may propose its own developmental assessments to the Court within 30 days of the date of this Order.

    Screening results from the developmental assessment, including follow-up/red flag items, shall be inputted into the child's electronic case record within 72 hours;

6. Effective June 2018, DFPS shall ensure the child's central electronic case record has functional internal (red flag) alerts notifying caseworkers of:
    a. Follow up needed;
    b. Assessments/screening required or indicated;
    c. Evaluations required or indicated;
    d. Immunizations required or indicated; and

---

[35] The assessments listed in Item 5(a) are listed among the screenings which have been "validated" by the American Academy of Pediatrics. *See* American Academy of Pediatrics, *Star Center*, https://www.aap.org/en-us/advocacy-and-policy/aap-health-initiatives/Screening/Pages/Screening-Tools.aspx (last visited Jan. 12, 2018).

[36] The assessments listed in Item 5(b) are included in the American Academy of Pediatrics' *Bright Futures Tool and Resource Kit* because of "their accessibility and reliability based on current research." *See* American Academy of Pediatrics, *Bright Futures Tool and Resource Kit*: *Developmental, Behavioral, Psychosocial, Screening, and Assessment Forms*, https://brightfutures.aap.org/materials-and-tools/tool-and-resource-kit/Pages/Developmental-Behavioral-Psychosocial-Screening-and-Assessment-Forms.aspx (last visited Jan. 12, 2018).

     e.   Appointments missed or cancelled.

7.   Effective May 2018, DFPS shall institute a policy that uses the caseworker visits to verify and report on health status by answering and documenting in the PMC child's electronic case record these questions:

     a.   Are there outstanding red flag[37] items for this child?

        i.   Greater than 20 days?

       ii.   Greater than 90 days?

     b.   Has this child visited a healthcare practitioner in the last 90 days?

     c.   Can this child (over 11) name his/her health care needs?

### a.    Objection

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding PMC children's health cause class-wide constitutional injury, and that all of the Items in this Section are therefore unjustified. (D.E. 556, Page 27).

### b.    Ruling on Objection

The Court observed in its December 2015 Opinion that "rape, abuse, psychotropic medication and instability are the norm" for PMC children, and many children's records, included as exhibits to the trial, were missing important health information. (D.E. 368, Page 255). The children's records include serious concerns of sexual and physical abuse but the records indicate the children were not timely (or ever) examined by doctors to determine if they had been assaulted. (D.E. 546, Page 24). Injuries went untreated. (D.E. 546, Page 24; D.E. 368, Pages 109, 133, 135). Necessary medical follow-up did not occur. (D.E. 546, Page 24; D.E. 368, Page 152). Incomplete and missing healthcare information was a common feature of the records. (D.E. 546, Page 24). In its January 2017 Order, the Court directed "the Special Masters to work with DFPS to develop a healthcare plan to address missing or nonexistent healthcare records. The recommended guideline shall be the American Academy of Pediatrics' 'Fostering Health: Healthcare for Children and Adolescents in Foster Care.'" (D.E. 500, Page 19).

---

[37] The term "red flag" in Section G, Item 7 is defined by Section G, Item 6(a)-(e)

The Court *supra* in III.B has discussed the lack of medical, mental, and dental records available in DFPS records.  Even when there are notations of appointments, there are no records of what occurred such as testing, examinations, medications or reasons therefore.  Further, this means that the caseworkers, who serve as medical consenters, do not have information available to evaluate consent.  *See* (D.E. 546, Page 109).  The Objection is OVERRULED.

## H.   Caseworker Workload

1.   Effective June 2018, DFPS shall ensure that the full-time staff, including supervisors,[38] who provide case management services to children in the PMC class, whether employed by a public or private entity, have a caseload within or below the range of 14 to 17 children.  Caseloads for staff must be pro-rated for those who are less than full-time.   Caseloads for staff who spend part-time in caseload carrying work and part-time in other functions must be pro-rated accordingly.   The caseload range for staff with mixed caseloads, for example caseworkers serving both PMC and TMC children, will also be 14 to 17 children's cases, and each TMC child's case will be afforded the same weight in the caseload calculation as a PMC child.

2.   Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015.   Effective immediately, DFPS shall report to the monitor(s), on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time.   Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads.  In addition, DFPS's quarterly reporting shall include the number and percent of staff with caseloads within, below and over the range of 14 to 17 children, by office, by county, by agency (if private) and statewide.  Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management.  Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be pro-rated accordingly.   The caseload range for staff with mixed caseloads, for example caseworkers serving both PMC and TMC children, shall be 14 to 17 children's cases, and each TMC child is to be afforded the same weight as a PMC child.  Reporting will be by office, by county, by agency (if private) and statewide.

3.   Effective immediately, DFPS shall commence recruiting, hiring and training staff, and ensuring any private entities that are charged by DFPS to provide case management services to children in the PMC class do the same, to ensure that staff

---

[38] As stated below in the Section on Supervisors, supervisors who oversee caseworkers serving PMC children shall not directly carry a caseload unless there is a documented emergency requiring the supervisor to do so.

who provide case management services to children in the PMC class, whether employed by a public or private entity, have a caseload within or below the range of 14 to 17 children.

### a.    Objections

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding caseworker workload cause class-wide constitutional injury, and that both of the Items in this Section are therefore unjustified.  (D.E. 556, Page 28).

Defendants object that compliance with this section is impossible because additional funding and hiring authority must be requested from the Legislature.  (D.E. 556, Page 29). Defendants argue it is impossible for DFPS to begin recruiting and hiring immediately because it hires to its cap and would need additional appropriations to hire above the cap.  (D.E. 556, Page 29).

### b.    Ruling on Objections

The Court's December 2015 Opinion discussed at length the harm PMC children faced because of overburdened and frequently replaced caseworkers.  *E.g.,* (D.E. 368, Pages 176-79). A multitude of evidence, including DFPS personnel's own admissions, showed children are harmed when caseworkers are overburdened.  (PX 1966, Page 11; D.E. 311, Page 21; D.E. 299, Page 55-56; D.E. 305, Pages 12-13).   Manageable caseloads allow caseworkers to visit with children and families more often, ensure children are safe, ensure families are getting needed services, and reduce the paperwork load.   (D.E. 368, Page 163; PX1877, Page 10).   When caseloads are unmanageable, PMC children are affected the most and are the first ones to be "pushed to the side."   (D.E. 368, Page 165-66; D.E. 323, Page 37).   The record contains numerous instances of PMC children not having contact with their caseworker for months.  (D.E. 324, 368, Page 166); *see supra* at III.B.

As but one example of the effect overworked caseworkers have, attorney *ad litem* Ricker described how she would call the caseworker, the supervisor, the supervisor's supervisor, and then simply instruct someone in her office to call every hour on the hour until they reached the caseworker.  (D.E. 326, Pages 199-200).  Estella Vasquez ("Vasquez"), another attorney *ad litem*, offered similar testimony about how inaccessible caseworkers are.  (D.E. 327, Pages 189-93).  Vasquez added that caseworkers are supposed to give attorneys *ad litem* case reports ten days in advance of court hearings, but in "the vast majority" of cases, they do not; "[v]ery often" they get the reports on the day of the hearing, making it impossible to review the reports and sometime requiring courts to reset hearings.  (D.E. 327, Pages 191-92).  This delays the provision of important services like counseling to foster children.  (D.E. 327, Pages 192-93).

Despite these facts, DFPS "puts no limits on the caseload size that a conservatorship worker can carry."  (D.E. 305, Pages 25, 27-28).  The Court found regardless of the exact point at which caseloads become so excessive they cause an unreasonable risk of harm, DFPS has crossed it.  (D.E. 368, Page 164).  The record shows that as of July 2014, 31% of CVS caseworkers with at least one PMC child had caseloads of 1-15 children; 26% had caseloads of 16-20 children; 21% had caseloads of 21-25 children; 13% had caseloads of 26-30 children; 6% had caseloads of 31-35 children; and 3% had caseloads of 36 or more children.  (PX 2129).  As a point of reference, 43% of DFPS's caseworkers had caseloads above the most lenient professional standard before the Court.  (D.E. 368, Page 164).  The Court also found the situation is likely worse because DFPS's calculations included workers who were on leave, secondary workers, part-time workers, and fictional workers created out of overtime hours.  (D.E. 368, Page 164).

Even DFPS's own caseworkers agree that they are overworked.  (D.E. 368, Page 165).  Over 55% of DFPS caseworkers agree "they do not have adequate time during the workday to successfully do their job."  (D.E. 368, Page 165; DX 119, Page 21).   Additionally, over half believe DFPS's expectations for their job performance are unreasonable.  (D.E. 368, Page 165; DX 119, Page 21).   Testimony from caseworkers at trial indicated caseloads of between forty and sixty "stages" were typical.  (D.E. 323, Page 34).   Weekly overtime was the rule for caseworkers, not the exception.  (D.E. 368, Page 165; D.E. 323, Pages 34-35).   These caseloads caused caseworkers to experience "[e]xtreme stress, burnout, wearing down [and] anxiety."  (D.E. 368, Page 165; D.E. 323, Page 39).   DFPS caseworkers spend most of their time doing triage and "putting out fires" due to the sizeable caseloads.  (D.E. 368, Page 165; D.E. 323, Page 35-36).

The Stephen Group found that CPS had a "culture of fear where caseworkers are focused more on meeting numbers and checking off boxes than on the quality of service for the children in families under their care."  (D.E. 368, Page 170 (quoting PX 1993, Page 19)).  Texas's Sunset Commission and State Auditor's Office each described CPS's work environment as fear-driven and punitive.  (D.E. 368, Page 170).  As the Court noted in its December 2015 Order, "[i]n such an environment, it is only natural that overextended caseworkers prioritize TMC children who have more deadlines and concretely tracked benchmarks."  (D.E. 368, Page 170).

There was also evidence presented in the case of supervisors carrying a caseload, which detracts from their ability to oversee the caseworkers they supervise.  (D.E. 546, Page 25).  Judy Bowman Pitts, Regional Director of Regions 4 and 5, testified that supervisors occasionally have their own caseload and a supervisor will help when a caseworker leaves. (D.E. 327, Page 14 Line 23-Page 16 Line 17).  A CPS Field Operations Division Briefing also noted that newly promoted

supervisors are managing their own remaining cases as well as their new supervisor responsibilities. (DX 25, Page 2). The same briefing stated in Lubbock County, when a caseworker leaves and a case only requires documentation to close, the supervisor will be responsible. (DX 25, Page 3).  Further, DFPS supplied data to the Special Masters indicating that on July 31, 2016, 89 supervisors served as the primary caseworker for PMC and TMC children. Of those 89 supervisors, 83 carried fewer than 14 cases with the highest caseload being between 24 and 27 cases.  (D.E. 496, Page 2).

As the Special Masters reported in November 2016, DFPS produced to the Special Masters an Executive Summary of a Work Measurement Study, as ordered by the Court in December 2015, conducted from August 1, 2015, through March 31, 2016.  (D.E. 471, Page 5; D.E. 368, Page 250).  This Court-ordered study concluded that CVS caseworkers (including primary caseworkers, I See You workers, and various specialists) expended an average of 9.7 hours per month on case profiles most often associated with PMC children, and that these workers had an average of 137.9 hours per month to spend on their casework, including overtime.  (D.E. 485; D.E. 471, Page 5).  The study's author reported that the study's findings mean that each caseworker (as defined above) has time to serve an average of 14 PMC children each, to the exclusion of TMC children.  (D.E. 493, Page 1; D.E. 471, Page 5).

The study provides that since cases involving TMC children require more time, for each addition to a caseload of a TMC child, PMC caseload is reduced by more than one child.  (D.E. 500, Page 21).  Therefore, if you add one TMC child to a caseworker's load of fourteen PMC children, the caseload must be reduced by more than one child, according to DFPS's own study. As the Court observed in its January 2017 Order:

> Removing "I See You Workers" from the calculation decreases the number of PMC cases a CVS caseworker can physically handle. (D.E. 471 at 11.1)

Nevertheless, the Court accepts the Work Study as providing the definitive number of PMC children that a CVS caseworker can physically handle.

(D.E. 500, Page 21).  It is axiomatic that adding more than 14 children to a caseworker can cause an unreasonable risk of harm to those children.  Nevertheless, the Court allows a total caseload maximum of 14-17 children.  The Court relies on DFPS's own study to determine, with overtime, how many children a caseworker can safely handle.

After reviewing the study and discussing its conclusions with the DFPS author, the Special Masters asked DFPS to determine how many additional CVS workers would be required to achieve CVS workloads of no more than 14 children per worker.  (D.E. 546, Page 25).  DFPS declined to do so, replying it was "not feasible" to provide the information.[39]  (D.E. 546, Page 129).

Further, the Court takes judicial notice that the legislature approved DFPS's request for additional caseworkers and salary increases that the administration hoped would bring the caseload down to 26 children per caseworker.[40]  Hearing Before the Tex. Senate Committee on Finance Part I, 85th Leg. Session, Jan. 30, 2017, at 1:38:59, available at http://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=11611; (D.E. 500, Page 7).  However, the Court also takes judicial notice that Commissioner Whitman testified before the Senate Finance Committee on January 30, 2017 that a $12,000 pay raise had not affected attrition rates.  *Id.* at 1:42:05.  For all of these reasons, and for the reasons stated in the Court's January 2017 Order and December 2015 Order, the Objection as to basis is OVERRULED.

---

[39] DFPS responded, "DFPS has reviewed, and it is not feasible to provide this information.  In addition, DFPS reiterates that there is no evidentiary basis for the caseload limit utilized in this question."  (D.E. 546, Page 129).

[40] The Court took judicial notice of similar statements made to the Texas legislature in its January 2017 Order and the Court's findings concerning the Court's ability to take judicial notice is hereby incorporated by reference.  *See* (D.E. 500, Page 4 n. 3).

Defendants also object that complying with this section during the prescribed timeframe is "impossible." As discussed above, in February 2017, the Special Master asked DFPS how many additional CVS caseworkers would have to be hired to achieve a maximum caseload of 14. (D.E. 546, Pages 25, 129). When DFPS finally responded to this inquiry the following May, it was only to state that it was "not feasible" to provide this information. *Id.* DFPS never updated its response to this query before the Special Master filed the Plan in December 2017. Yet somehow DFPS was able to determine within 15 days of the Plan's filing that achieving a caseload range of 14-17 children by June 2018 was impossible. (D.E. 556, Page 29).

The Court's December 2015 Order ordered the Defendants to "establish and implement policies and procedures to ensure that Texas's PMC foster children are free from an unreasonable risk of harm." (D.E. 368, Page 245).[41] Despite the fact that the December 2015 Order identified DFPS's excessively high caseloads as a major source of unreasonable risk of harm, Defendants have apparently still not taken appropriate steps to prepare to reduce caseloads.[42] *See* (D.E. 368, Pages 250-51). Additionally, this Court's Appointment Order ordered Defendants "to cooperate completely and in good faith with the Special Master[]." (D.E. 379, Page 8). Defendants, having ignored these orders for twenty-five months, are not in a particularly strong position to object to the Master's proposal. The Objection as to impossibility is OVERRULED.

## I.   Supervisors

1. DFPS shall ensure that supervisors who oversee caseworkers managing the cases of children in the PMC class have no more than seven workers assigned to them. Supervisory workloads must be pro-rated for supervisors who are less than full-time.

---

[41] *See supra* p. 4 n. 7.
[42] As the Court observed in its January 2017 Order, DFPS took the inadequate step of requesting additional hiring authority that would allow it to *reduce* caseloads to 25.47. (D.E. 500, Page 7). The inadequacy of this step is reinforced by DFPS's stonewalling of the Special Master on the caseload issue.

Workloads for supervisors who spend part-time in supervisory work and part-time in other functions, which includes carrying a case, must be pro-rated accordingly.

2. Supervisors who oversee caseworkers serving PMC children shall not directly carry a caseload unless there is a documented emergency requiring the supervisor to do so.

### a. Objection

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding caseworker supervisors cause class-wide constitutional harm, and that all of the Items in this Section are therefore unjustified.  (D.E. 556, Page 29).

### b. Ruling on Objection

The Special Master relied on extensive evidence from the trial record in crafting this recommendation.  (D.E. 546, Pages 27-29).   Generally, it appears DFPS supervisors play an important role managing caseworkers, assigning cases, and approving actions in cases. (D.E. 327, Page 14 Lines 8-14).   Supervisors participate in permanency roundtables and are responsible for follow-up.  (D.E. 328, Page 41 Lines 6-25 and D.E. 328, Page 52 Lines 15-25). Supervisors, along with the caseworker, make the decision of selecting or rejecting placements based on how they determine the placement can meet the needs of the child.  (D.E. 328, Page 140 Lines 5-18).   According to the CPS Handbook, supervisors have various oversight or monitoring functions, including but not limited to approving billing for a service level lower than the authorized service level, determining a permanency plan in the best interest of the child, approving the initial plan of service and subsequent review, approving less than monthly face to face sibling contact, approving travel, and reviewing home studies for potential adoptive families. (PX 50, Pages 86, 99, 130; PX 52, Pages 49, 59, 88, 95, 162).   CPS also relies on supervisors to mentor new caseworkers and ensure their continued training.  (PX 1861, Page 37). The CPS Handbook also outlines when caseworkers must turn to their supervisors to make

decisions in various situations such as when problems need to be resolved with a placement, when the caseworker does not agree with the placement choice made by the Centralized Placement Team, when a child in an open conservatorship case is pregnant, and when information is received regarding the possible location of a missing child.  (DX 108, Pages 1486, 1492, 1854, 1946).

DFPS also relies on supervisors to report up the chain of command when their caseworkers have unmanageable caseloads.  *See* (D.E. 368, Page 197).  However, it is clear from the record that supervisors are unable to make this reactive, "squeaky wheel" approach to caseload management work, perhaps due to DFPS's "punitive and unsupportive" work environment.  (D.E. 368, Page 197 (quoting DX 119, Page 30)); *see supra* at III.H.3.b.

The trial included testimony regarding the ratio of supervisors to caseworkers.[43]  Colleen McCall ("McCall"), Director of Field Operations, testified that typically a supervisor has six or seven caseworkers.  (D.E. 322, Page 59 Lines 24-25 and Page 60 Lines 16-18).  Judy Bowman Pitts Regional Director of Regions 4 and 5, testified that a unit is one to seven caseworkers but generally in conservatorship there are about seven caseworkers in a unit.  (D.E. 327, Page 14 Lines 16-17).  Camille Gilliam, Regional Director of Regions One and Nine, testified she oversees 18 supervisors in Region 1 who were responsible for 114 conservatorship workers, which is a ratio of one supervisor to six and a third (6.333) workers.  (D.E. 327, Page 63 Lines 3-10).  Mrs. Gilliam also testified in Region Nine there were 12 supervisors who were responsible for 75 conservatorship workers, which is a ratio of one supervisor to six and a quarter (6.25) workers.  (D.E. 327, Page 63 Lines 3-10).

Some exhibits also contained evidence relating to the ratio of supervisors to caseworkers. DFPS's presentations and requests to the Texas Legislature discussed the supervisor to

---

[43] Notably, DFPS did not include supervisors in its caseworker workload study.  (D.E. 485, Page 2).

caseworker ratio.  DFPS's legislative appropriation requests contained requests to reduce the supervisor span of control.  The legislative appropriations request for fiscal years 2014 and 2015 indicated the supervisor span of control in conservatorship was seven workers and the requested funding would reduce it to six workers.  (PX 885, Page 20; DX 32, Page 20 and DX 33, Page 192).  This same ratio is repeated in the exceptional item requests for the same fiscal years. (PX 889, Page 6 and PX 894, Pages 11-12).  DFPS's various presentations also contained indications of the ratio of conservatorship supervisors to caseworkers.  DFPS's July 1, 2014 presentation to the House Select Committee on Child Protection indicated there were seven caseworkers per supervisor. (DX 200, Page 31).  DFPS's January 30, 2013 presentation to the Senate Finance Committee also indicated the current ratio of supervisors to workers for conservatorship was one to seven.  (DX 215, Page 24).

Various reports contained documentation of the average supervisor ratio.  The Title IV-B 2015- 2019 Child and Family Services Plan reported the average supervisor to worker ratio at any point in time is one to six.   (DX 77, Page 207).   A memorandum from Ms. McCall to Commissioner Specia described units in Region Nine that had between eight and ten caseworkers.  (PX 1837, Pages 3-4).  Ms. McCall's memorandum also contained a request to bring the supervisor span of control down to six or seven caseworkers per supervisor.  (PX 1837, Pages 3-4).  The Stephen Group's operational review of CPS found that as of January 2014, there were 2,015 conservatorship workers and 279 conservatorship supervisors, which is a ratio of just over seven workers per supervisor.  (PX 1993, Page 47).

The information DFPS provided in response to a request by Representative Dukes and the House Select Committee on Child Protection contained direct counts of caseworkers assigned to conservatorship supervisors in each region.   According to this information, conservatorship

supervisors in Region One had between five and nine caseworkers assigned to them.  (DX 110, Page 87).  Region Two had a range of seven to nine caseworkers per supervisor.  (DX 110, Page 89).  Region Three had a range of five to ten caseworkers per supervisor.  (DX 110, Pages 95-97).  Regions Four and Five had a range of five to nine caseworkers per supervisor.  (DX 110, Page 101).  Region Six had a range of six to eight caseworkers per supervisor with the majority having seven caseworkers assigned to them.  (DX 110, Page 106).   In the outlying areas of Region 6, the supervisors also had a range of six to eight caseworkers assigned to them with the majority having seven.  (DX 110, Page 111).  In Region Seven, conservatorship supervisors had eight caseworkers assigned to them except one supervisor who only had five caseworkers.  (DX 110, Page 113).   Region Eight supervisors had a range of six to eight conservatorship caseworkers assigned to them.  (DX 110, Pages 122-123).  In Region Nine, conservatorship supervisors were in charge of a range of six to eight caseworkers.  (DX 110, Page 125).  Region Ten conservatorship supervisors had a range of five to seven caseworkers.  (DX 110, Page 127). In Region 11, conservatorship supervisors were in charge of a range of six to eight caseworkers. (DX 110, Page 131).

In summary, the typical supervisor to caseworker ratio in conservatorship appears to be one to seven.  Based on the statistics provided to Representative Dukes, supervisors oversaw between five and ten caseworkers.  For comparison purposes, the Child Welfare League of America's standards state one full-time supervisor should supervise no more than five social workers.  (PX 18, Page 28; PX 2114, Page 152 and DX 235, Page 131).  All of the testimony at trial as to DFPS's supervisor-to-caseworker ratio included supervisors sometimes having a very significant caseload. (D.E. 546, Page 25; D.E. 496; D.E. 327, Page 14 Line 23-Page 16 Line 17); *see supra* at III.H.3.b.  Despite this, DFPS conducted its caseworker workload study under the

assumption that supervisors would not carry caseloads, because the caseworker workload study did not include supervisors. (D.E. 485, Page 2). Pursuant to DFPS's own caseworker study, then, supervisors should not be carrying a caseload in addition to their other significant duties. *See* (D.E. 485, Page 2); (D.E. 546, Page 25). Accordingly, the record justifies the provisions in this section. The Objection is OVERRULED.

### J.     Worker Retention

1. Effective May 2018, DFPS shall ensure statewide implementation of the CPS Professional Development (CPD) training model, which DFPS began to implement in November 2015.

2. Effective May 2018, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.

3. Effective May 2018, DFPS shall ensure that before any new CVS (or private agency) caseworker assumes primary case management responsibility for a full caseload range of 14 to 17 children, they successfully complete a comprehensive training program for new workers and pass a competency examination.

### a.     Objection

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding worker retention cause class-wide constitutional injury, and that all of the Items in this Section are therefore unjustified. (D.E. 556, Page 30).

### b.     Ruling on Objection

The Court noted in its December 2015 Order that DFPS suffered from a dangerously high turnover rate for caseworkers. (D.E. 368, Page 176-86). The Court determined in its December 2015 Opinion:

> Besides harming foster children in and of itself, DFPS admits, "High caseloads lead to high worker turnover, further exacerbating high caseloads." (PX 877 at 8; see also D.E. 300 at 34, 42; D.E. 305 at 36-37, 56; PX 2037 at 12). Dr. Miller calls this the "cycle of crisis." (D.E. 303 at 22-23). Specia admits that the

"appropriate workload spread out among the workers . . . will help me keep workers." (D.E. 299 at 82).  It is no surprise then that "DFPS has an extraordinary amount of turnover."  (D.E. 305 at 55).

The Stephen Group reported that yearly CVS caseworker turnover is 26.7%, and "a major organizational burden."  (PX 1993 at 16-17, 76).  To compare, turnover for workers comparable to Texas's CVS caseworkers was 14% to 15% in Kentucky and 10% to 12% in Tennessee.  (D.E. 303 at 28-29).  The Stephen Group also noted that turnover is especially high for new CPS workers, with approximately 28% leaving within the first year, and approximately 43% within the first two years.  (PX 1993 at 17-18).  Likewise, Black testified that turnover is approximately 38% for first-year caseworkers. (D.E. 300 at 38-39).  The Sunset Commission reported, "One out of every six new caseworkers leaves CPS within six months." (DX 119 at 20).

Unmanageable caseloads are the main reason that CVS caseworkers leave.  In a survey, 70% of the caseworkers that left listed "Workload" as the first or second reason.  (PX 1993 at 306).  In a 2009 article, Burstain wrote, "With respect to CVS, historically, a fairly direct relationship exists between caseloads and voluntary turnover."  (PX 1871 at 11).  In support of that statement, Burstain cited data showing that when "caseloads declined 16 percent from 2006 to 2008 . . . CVS voluntary turnover declined 10 percent."  *Id.*  Another report found that heavy caseloads "contribute[] to high turnover rates."  (PX 1964 at 9).  This finding has "remained consistent from year to year." (PX 844 at 5).

This high turnover rate means that one out of every 11 CVS caseworker positions is vacant.  (DX 119 at 19).  Even when those vacancies are filled, it takes "two years" for a caseworker "to fully be up to speed."  (PX 1995 at 159).  During their first three months, caseworkers are in training and do not have any cases.  (DX 119 at 19).  Consequently, while CPS has 1980 primary caseworkers, it needs to hire more than 500 primary caseworkers per year to retain an experienced workforce of only about 1000 who actually close most of the cases.  (*See* D.E. 305 at 41; PX 1993 at 16-17).  This puts a tremendous strain on the 1000 veteran CVS caseworkers, who are the front line workers for over 29,000 foster children captured in DFPS's figures.

Caseworker turnover has many negative impacts beyond higher caseloads.  Black admitted that turnover causes delayed investigations, a lack of continuity in providing services to families and children, a lack of consistent timely visits by caseworkers to children in State custody, and significant costs to the State in terms of recruiting, training, and lost productivity.  (D.E. 300 at 34, 42; see also DX 119 at 17; PX 1995 at 159).  Caseworker turnover also "delays or disrupts services and the case plan" of foster children, (PX 1871 at 2), and hinders permanency planning.  (D.E. 312 at 20).  Moreover, as the Stephen Group explained, "workplace turnover is endemic and institutional knowledge is stripped from across the agency."  (PX 1993 at 17).  The high level of turnover at CPS

> "represents an extraordinary organizational challenge to replace these workers and maintain a consistent level of performance."  (PX 1993 at 16).  As one audit of DFPS explained, "Numerous transitions in caseworker assignments disrupt momentum toward permanency by forcing children/youth and their families to 'start over' repeatedly with new caseworkers."  (PX 1880 at 5).

(D.E. 368, Pages 176-78).   DFPS itself stated in its Fiscal Year 2014-15 requests to the Legislature that "[c]aseworker turnover in all programs threatens the well-being and safety of clients."  (D.E. 368, Pages 190-91 (quoting PX 894, Pages 6-7)).

The December 2015 Order described how the revolving door of overburdened caseworkers causes despair, isolation, and helplessness among the foster children themselves. (D.E. 368, Page 178).   Specifically, when a child's caseworker "changes constantly or fails to make regular contact with the child, the child's feelings of rejection are compounded and lead to feelings of distrust between the child and the "system,'" making "it all the more difficult to elicit critical information needed to ensure appropriate care."  (PX 1988, Page 100).   As a result of this high level of turnover, a child exiting foster care in 2008 had an average of 3.87 caseworkers and a child who spent at least three years in the State's PMC had an average of 6.39 caseworkers. (PX 1988, Pages 99-100).

Additionally, the Court found the turnover rate was understated because DFPS only counts how many employees left the agency.  (D.E. 368, Pages 191-92; PX 1871, Page 2). DFPS does not take into account the number of employees who leave their positions for different positions within the agency.  (D.E. 368, Page 191; PX 1871, Page 2).  Despite having over two years to lower dangerously high turnover rates, DFPS's request for salary increases have not lowered attrition rates. *See* Hearing Before the Tex. Senate Committee on Finance Part I, 85th Leg. Session, Jan. 30, 2017, at 1:38:59, 1:42:05, *available at* http://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=11611; (D.E. 500, Page 7).

After the January 2017 Order, DFPS received funding to hire additional caseworkers in anticipation of bringing the average caseload down to approximately twenty-six.[44]   *See* (D.E. 500, Pages 6-7); Hearing Before the Tex. Senate Committee on Finance Part I, 85th Leg. Session,       Jan.       30,       2017,       at       1:54:32,       *available       at* http://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=11611.       However,   DFPS provided and the Special Masters reviewed the "CFRP Evaluation, Final Report" from December 2016, an evaluation of DFPS training and turnover from the University of Texas.  (D.E. 546, Page 31).  The report found that DFPS's CPS Professional Development (CPD) training model was having an early, positive impact on new CVS worker attrition.  (D.E. 546, Page 31).  The Objection is OVERRULED.

### K.    Secondary Workers

1. Within 30 days of the Court's Final Order date, DFPS shall eliminate the use of I See You secondary workers and designate all secondary workers as primary caseworkers.

#### a.    Objections

Defendants object to Item 1 to the extent it is based on Plan Appendix B, Key Findings: Texas Child Protective Services, *I See You Workload Study*, because that report is inadmissible, irrelevant, and outside the scope of the Appointment Order.  (D.E. 556, Page 30-31).

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding I See You workers cause class-wide constitutional harm, and that this Item is therefore unjustified.  (D.E. 556, Page 30).

---

[44] Defendants in their Objections indicated turnover rates declined but the data was not detailed or verified sufficiently to use as authority here.  *See* (D.E. 557, Page 13).  Even if the figures are reliable, post-trial remedial measures do not deprive the Court of the power to order relief.  *Cf. Friends of the Earth*, 528 U.S. at 189.

b.       **Ruling on Objections**

The January 2017 Order explicitly authorized the Special Master to retain experts to conduct an I See You worker workload study in order to develop their implementation plan. (D.E. 500, Page 22); *see Alberti v. Klevenhagen*, 660 F. Supp. 605, 610 (S.D. Tex. 1987).  The study was not admitted into evidence or relied on by the Court to establish institutional remedies; it was simply a tool used by the Special Master to craft their implementation plan.  Even if the challenge to the study's reliability were appropriate, Defendants failed to provide any facts that would undermine the study's reliability.  Notably, the authors of the I See You worker study collected data on a total of 98 I See You workers for the time study and interviewed 22 of them for the knowledge study (D.E. 546, Page 104, 106-07).  Finally, information provided by DFPS itself establishes that I See You workers have an average workload of 44 children, and the Court finds this information is sufficient to justify the remedy independent of the study commissioned by the Special Master.  *See* (D.E. 471, Page 6).  Accordingly, the Objection is OVERRULED.

The Court found in its December 2015 Order that I See You Workers generally had only superficial contact with foster children, rarely conducted their visits in private, and did not develop meaningful relationships with foster children.  (D.E. 368, Pages 172-73).  The Court's December 2015 Opinion found:

> McCall acknowledged that I See You workers' main responsibility, as indicated in the position title, is "seeing the child" in her placement every month to confirm that she "is still there."  (D.E. 305 at 61-63).  Although I See You workers are supposed to have "meaningful discussions" with the children they visit, they often just show up at the child's placement, ask "five questions and leave."  (D.E. 305 at 65; D.E. 324 at 186).  For example, A.M.'s I See You worker, who visited her regularly for more than two years, asked the same 10-12 questions at every visit, and A.M. answered the same way. (*See* DX 120 at DFPS #828-997 (filed under seal)).  According to the I See You worker's notes, A.M. was almost always "fine" and "stable in her current placement" and the worker often noted that "things are going well for [A.M.] at this time."  *Id.*  In reality, during much of this

time, A.M's level of care was Intense and she was repeatedly restrained by RTC staff.

Secondary workers are also "not required to follow up on any needs identified during the visit beyond communicating those needs to the primary caseworker." (PX 2037 at 57).   Nor are they responsible for children's case planning or permanency planning.  (D.E. 322 at 127).  A foster child's relationship with their secondary worker "is never quality." (D.E. 326 at 88).  Their existence—intended as a stopgap—is itself evidence of an understaffed CVS caseworker workforce, as well as DFPS's inadequate placement array.  *See infra* p. 222-23.

Moreover, replacing contact from primary caseworkers with contact from secondary workers inhibits primary caseworkers' ability to form relationships with their foster children.  As Burstain explained, a CVS caseworker is often a foster child's "only continuous and stable relationship." (PX 1871 at 1).  Given that PMC children have been removed from their home and likely shuttled between placements, CVS caseworkers are one of the few people that foster children look to for support and guidance.  (D.E. 326 at 85).  Trust is "highly important" between a foster child and their primary caseworker because children need to feel comfortable telling them their problems.  *Id*.  As McCall testified, "especially with emotional harm[,] you need to know . . . the child before you can tell something is wrong." (D.E. 305 at 62).  Using secondary workers to shoulder excessive workloads thus hinders primary caseworkers' ability to protect their children.   Further, foster children often do not share their problems with secondary workers who they view as "not the real thing," akin to substitute teachers.  (D.E. 326 at 88).  Dr. Miller explained that workers who have no permanent relationship with a child, such as I See You workers, cannot "win a child's trust in a sufficient way to have the child actually reveal what is happening in the child's life, particularly if the child is being subjected to maltreatment." (PX 2037 at 58).  Carter testified that foster children "very rarely" see I See You workers "as somebody that is there to support them" because children "intuitively know that this person is just fulfilling a service or a requirement by looking in on them." *Id*.

(D.E. 368, Pages 171-73).  And the Court further observed:

Cross-state moves also impede primary caseworkers' ability to visit their foster children.  As discussed *supra*, primary caseworkers are foster children's lifelines.  *See* Section IV.A.  Yet, due to a lack of funding and a lack of time, primary caseworkers 'can't go and meet with [children] face to face' when they are placed out of county or out of region.  (D.E. 324 at 22).  Thus, foster children are forced to rely on secondary I See You workers.  McCall acknowledged at trial that I See You workers were created by DFPS ten years ago at least in part because children were too often being sent far from their home communities and primary caseworkers.  (See D.E. 305 at 62).  Although secondary workers do not protect foster children from an unreasonable risk of harm, they undoubtedly help Texas

represent to the federal government that caseworkers visit children in foster care at least once per month.

(D.E. 368, Page 222).

The Court also found that I See You workers are insufficient substitutes for primary caseworkers.  (D.E. 368, Page 172).  Attorney *ad litem* Ricker testified that "[she] end[s] up being the I See You Worker" because every time she would check in on a PMC child unannounced, there was something seriously wrong.  (D.E. 326, Page 205).  Dr. Viola Miller, who previously headed child welfare agencies in Kentucky and Tennessee, testified at trial that she was unaware of any other state in the country employing an equivalent of Texas's I See You worker.  (D.E. 303, Page 15).  Texas would lose millions of dollars in federal aid under Title IV-B of the Social Security Act if fewer than 95% of its foster children were visited by a caseworker each month.  S*ee* 42 U.S.C.A. § 624(f)(1); (D.E. 368, Page 223).  However, gamesmanship of the requirements for receiving federal funding is not a sufficient reason to maintain a system of secondary workers which this Court has found to contribute to the unconstitutional conditions in Texas's foster care system.

The Court ordered the Special Masters in its January 2017 Order "to retain an expert as part of their team to create a workload study of "I See You Workers" to aid the Court in determining whether the "I See You Worker" program should be continued and, if so, in what capacity."  (D.E. 500, Page 22).  The Special Masters retained the Child and Research Partnership at the University of Texas-Austin, the LBJ School of Public Affairs, in part because of their existing consultancy, familiarity and collaboration with DFPS in assessing the agency's training programs.  (D.E. 546, Pages 33-34).

In its CPS Handbook, DFPS identifies the responsibilities of I See You Workers primarily as visitation with the child; assessment of the child's needs and well-being; discussion

of the child's permanency plan; communication of the child's service needs with the primary caseworker; collaboration with the primary caseworker on the child's permanency plan; and, where necessary, serving as the child's medical consenter.  (D.E. 546, Pages 34, 109).  Although DFPS has charged I See You Workers with assessing PMC children's needs (CPS Handbook, Section 6414) and indicated to the Special Masters that "many of a child's dental records," "mental health records," and "medical records," "are already included, and available to caseworkers, in the Health Passport," DFPS reported to the Special Masters, "I See You workers are not specifically required to access/review a child's Health Passport, and such a review is not necessary for every child," even for the PMC children they are assigned to serve.  (D.E. 546, Page 132).  Most I See You Workers told the University of Texas workload study team they did not think it was essential to read a child's psychological assessments, or other assessments, to come up to speed on a child's case.  (D.E. 546, Pages 106-08).  The workload study, attached as Appendix B to the Implementation Plan (D.E. 546), contains a number of findings:

> • The typical I See You caseworker had a caseload of nearly 44 children each day of the month.  (D.E. 546, Page 110).
>
> • In June 2017, 98 I See You caseworkers were required to complete, at the median, 21.5 visits with PMC children.  (D.E. 546, Page 110).  The median number of visits completed was actually 16.  (D.E. 546, Page 110).  This reflects a completion rate of 74.4 percent of the monthly face-to-face visits for I See You workers' cases.  (D.E. 546, Page 110).  I See You caseworkers missed visits altogether with slightly more than one quarter of the PMC children they were responsible to visit.  (D.E. 546, Page 110).  The caseworker with the lowest visit rate completed 23.1 percent of her required visits and the caseworker with the highest visit rate completed 100 percent of her required visits.  (D.E. 546, Page 110).
>
> • The typical I See You caseworker completed 50 percent of initial face-to-face visits with new children in June.  (D.E. 546, Page 110).  Overall, I See You caseworkers completed between zero and 100 percent of their initial face-to-face visits.  (D.E. 546, Page 110).  Of the 46 I See You caseworkers who had at least 15 days with a new PMC case in June 2017, 41 percent met with 100 percent of the children on their new cases within 15 days.  (D.E. 546, Page 110).  However,

35 percent of I See You caseworkers with a new case did not complete a single initial face-to-face with those children in June.  (D.E. 546, Page 110).

• I See You caseworkers' familiarity with the children they were assigned, with their service needs, including medical care, was often lacking.  (D.E. 546, Pages 34, 110-11).

• Over 82 percent of I See You caseworkers reported that primary caseworkers do not set a regular schedule for communication.  (D.E. 546, Page 111).  I See You caseworkers also report that CVS caseworkers often do not communicate regularly with the child or the child's caregiver.  (D.E. 546, Page 111).

The I See You Worker study also concluded that 42% of I See You workers reported that primary caseworkers did not respond to emails or phone calls in a timely manner.  (D.E. 546, Page 109).  These are unsurprising statistics, given that the study found that the typical I See You worker has an average caseload of 44 children *per day*.  (D.E. 546, Pages 34, 110).  Testimony at trial also revealed that attorneys *ad litem* are not informed when I See You workers are appointed or make visits and never receive communications from I See You workers.  (D.E. 326, Page 259).  It is apparent from the study that DFPS's policies concerning I See You worker visits are not practiced, and policies not practiced have no value.  *See Ruiz*, 679 F.2d at 1160; *supra* at II.B.1.

I See You workers' lack of knowledge is particularly troubling given that they commonly act as medical consenters for PMC children.  (D.E. 546, Page 34).  Even if this Court were to disregard the Special Master's I See You worker study completely, DFPS included I See You workers in their own caseload study.  (D.E. 485).  The DFPS study demonstrates that all caseworkers, including I See You workers, could only handle 14 PMC cases.  (D.E. 496).  This is particularly disturbing considering each I See You worker has an average caseload of 44 children.[45]  (D.E. 471, Page 6).  Accordingly, the Objection is OVERRULED.

---

[45] Although the December 2015 Order required Defendants to track CVS caseworker caseloads without including secondary workers in their calculations (D.E. 368, page 250 ¶ 1), Defendants decided it would be appropriate to

### L.    Residential Child Care Licensing ("RCCL")[46]

1.    Effective May 2018, the State of Texas[47] shall ensure the staff who investigate allegations of abuse and neglect of children in the PMC class have caseloads of no more than 14 investigations, consistent with the median caseload of investigations found in the Workload Study.  Although this is twice the number of investigations the Workload Study concluded was reasonable for child abuse and neglect investigators in light of the amount of time they expend on their cases, 14 investigations shall serve as the top of their workload range.

2.    Effective May 2018, the State of Texas shall ensure that the staff who conduct licensing standards investigations[48] for alleged violations involving children in the PMC class have caseloads of no more than 14 standards investigations, consistent with the maximum caseload of standards investigations found in the Workload Study.   Although this is nearly three times the number of standards investigations the Workload Study concluded was reasonable for inspectors in light of the amount of time they expend on their cases, 14 standards investigations shall serve as the top of their workload range. Caseloads for staff shall be pro-rated for those who are less than full-time. Caseloads for staff who spend part-time in investigative work and part-time in other functions must be pro-rated accordingly.

4.    Effective immediately, the State of Texas shall ensure RCCL investigators,[49] and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.

5.    Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.

---

include secondary workers in the workload study ordered by the Court.  (D.E. 368, Page 250 ¶ 2).  Since the State thought it was appropriate for the study to blend primary and secondary workers together, the Court likewise concludes that primary and secondary workers can handle similar caseloads.  Furthermore, though the study did not differentiate between TMC and PMC children, the DFPS caseworker study demonstrates that caseworkers spend less time with PMC children than TMC children. (D.E. 485). Whatever the mix of the I See You caseload, it is clearly excessive.

[46] Defendants object that Item 3 of the Plan prohibited DFPS from employing staff with a "negative child welfare history." (D.E. 556, Pages 33-34).  Defendants' Objection is SUSTAINED, and the Item is therefore deleted.  The Plan's numbering of subsequent Items is retained for ease of reference.

[47] Subsequent to the Court's December 2015 Order, RCCL underwent restructuring and the licensing division was reassigned to the HHSC.  The investigators who conduct investigations of alleged abuse and neglect in childcare operations remain under DFPS's control.  Accordingly, the Court enters relief against the State of Texas to ensure the necessary steps are taken to keep PMC children free from an unreasonable risk of harm.  *See supra* p. 3 n. 4.

[48] Standards investigations are investigations into compliance with licensing requirements, rather than into allegations of abuse or negligence resulting in harm to a child.  *See* 40 Tex. Admin. Code § 745.21(28) (listing regulations that establish minimum standards); (D.E. 299, Pages 10, 14).

[49] RCCL investigators are "[s]taff responsible for conducting child abuse and neglect investigations of children who live in residential child care facilities and child-placing agencies licensed by RCCL and conducting investigations to determine if a facility complies with minimum standards." (D.E. 546-1, Page 116).

6.  Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.

7.  Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.

8.  Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.

9.  Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

10. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.

11. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

12. Effective March 2018 and ongoing thereafter, the State of Texas shall publicly post on its website all licensing inspections by RCCL, and/or its successor entity, redacting child identifying information and other information deemed confidential under state and federal law and regulation.  The posted information shall include the full narrative inspection report, the outcome of the inspection, inspection violations and whether RCCL, and/or its successor entity, implemented corrective or adverse action as a result of the violations.   The posted information shall also include all  corrective action plans required by RCCL and/or other successive entities and the dates RCCL and/or other successive entities accepted corrective action plans submitted by violating agencies and the status of those corrective action plans.

  **a.**  **Objection**

Defendants object that the phrase "under state and federal law and regulation" in Item 12 is vague.  (D.E. 556, Page 16).

### b.      Ruling on Objection

Item 12 instructs the Defendants to redact information as required "under state and federal law and regulation" only to remind Defendants of their other legal obligations. Item 12 is not to be read as imposing on Defendants an additional duty to obey confidentiality laws at risk of being held in contempt. To the extent this clarification does not fully address Defendants' Objection to Item 12, it is OVERRULED.

13. By July 2018, RCCL, and/or any successor entity[50] charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

14. Effective immediately, RCCL and/or its successor entity,[51] shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.

### a.      Objection

Defendants object to Item 14 on the basis that RCCL already has the authority to revoke or suspend a license, and that any change to the procedure for doing so would violate licensees' state-law rights to due process. (D.E. 556, Page 36-37).

### b.      Ruling on Objection

In an Advisory, Defendants informed the Court that CPAs have the responsibility for closing homes that they run when it is necessary to do so, and that RCCL (or its successor entity) does not have the authority to do so itself. (D.E. 492, Page 1). Item 14 gives RCCL (or its successor entity) the authority to directly revoke or suspend the licenses of all foster homes,

---

[50] Subsequent to the Court's December 2015 Order, RCCL underwent restructuring and the licensing division was removed from DFPS control and reassigned to the HHSC. In order to ensure the necessary steps are taken to keep PMC children free from an unreasonable risk of harm, the Court orders relief against RCCL or the State entities who assume responsibility for licensing child care facilities.

[51] *See supra* p. 81 n. 50.

including those licensed by a CPA.  *See* (D.E. 311, Page 31).  Given the record established at

trial, the Court is not convinced by Defendants' argument that RCCL is exercising its existing

authority to suspend licenses as "vigorously" as possible.  *See, e.g.*, (D.E. 329, Page 50) (noting

that the only license revoked during RCCL Director Darla Shaw's tenure was that of a placement

where multiple children died); (D.E. 368, Page 208) ("During fiscal year 2013, . . . CCL[52] cited

providers for 6050 violations, but only issued 12 corrective actions and 1 adverse action."); *id.*

("Over the past five years, CCL issued only four adverse actions against residential

operations.").[53]  Even though DFPS has a policy for suspending or revoking the license of a

placement, the evidence shows the policy is not being practiced.  *See Ruiz*, 679 F.2d at 1160;

*supra* at II.B.1.  Further, Item 14 does not displace whatever procedural requirements Texas

imposes on RCCL's decision to suspend or revoke a license, provided that RCCL (or its

successor entity) has authority to directly suspend or revoke the license of any placement.  The

Objection to Item 14 is OVERRULED.

15. Effective immediately, RCCL, and any successor entity[54] charged with inspections
of child care placements, must consider during the placement inspection all
referrals of, and in addition all confirmed findings of, child abuse/neglect and all
confirmed findings of corporal punishment occurring in the placements. During
inspections, RCCL, and any successor entity charged with inspections of child care
placements, must monitor placement agencies' adherence to obligations to report
suspected child abuse/neglect. When RCCL, and any successor entity charged with
inspections of child care placements, discovers a lapse in reporting, it shall refer the
matter to DFPS, which shall immediately investigate to determine appropriate
corrective action, up to and including termination or modification of a contract.[55]

---

[52] At the time of trial, Childcare Licensing ("CCL") was the division of DFPS that contained RCCL.  (D.E. 368, Pages 5-6).

[53] In an email to a coworker, one DFPS employee stated that the "threshold in RCCL" investigations is "no autopsy, no RTB."  (PX 1706, Page 1; D.E. 368, Page 204).  RTB stands for "Reason to Believe," and is the term used by RCCL when it determines that an allegation of neglect or abuse is supported by a preponderance of the evidence. (D.E. 368, Page 256).  For further discussion, of RCCL's lax enforcement strategy, see (D.E. 368, Pages 208, 214).

[54] *See supra* p. 81 n. 50.

[55] Defendants object that Item 15 disrupts the State's allocation of authority between RCCL and DFPS.  (D.E. 556, Page 37).  The Court's Order alters Item 15, as reflected above.  To the extent these changes do not satisfy Defendants' Objection, it is OVERRULED.

### a.     Objections

Defendants object to this section to the extent that is based on Appendix C, Key Findings: Texas Child Protective Services Workload Studies, RCCL *Workload Study*.  (D.E. 556, Pages 32-33).  Defendants argue the workload study is inadmissible hearsay and not relevant.

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding licensing, inspection, and investigation of foster care facilities cause class-wide constitutional injury, and that all of the Items in this Section are therefore unjustified.  (D.E. 556, Page 31-32).

### b.     Ruling on Objections

Defendants' Objection to this Section based on the RCCL workload study is OVERRULED for the same reasons the Court overruled Defendants' similar objection to Item 1 of Section K.  Ninety-six percent of eligible RCCL workers responded to at least one week of the RCCL study.  (D.E. 546-1, Page 49).  Furthermore, it was only necessary for the Special Master to retain an outside expert to conduct this study because DFPS ignored this Court's order to conduct the RCCL workload study.  (D.E. 500, Page 23 & n. 19).[56]  This objection applies to each provision of this section and for the reasons stated is OVERRULED as applied to the entire section.

The Court's December 2015 Order identified serious problems with RCCL, including a staggeringly high rate of erroneous investigation dispositions and a failure to react appropriately to the discovery of those errors.  (D.E. 368, Pages 200-04).  The Performance Management Unit ("PMU") performed internal quality control for RCCL.  (D.E. 368, Page 201).  PMU reviewed 85 physical abuse investigations occurring between August 1, 2012 and July 31, 2013 which resulted in an "Unable to Determine" or "Reason to Believe" disposition.  (D.E. 368, Page 201).

---

[56] *See supra* p. 4 n. 7.

The number of incorrect dispositions was staggering.  Of the "Unable to Determine" dispositions, PMU found 64.6% (31 of 48) were incorrect.  (PX 1129, Page 3).  PMU stated the reasons for incorrect dispositions included that not all parties were interviewed, not all evidence was reached, determination did not meet the definition, and risks were not thoroughly addressed.  (D.E. 368, Pages 201-202).  All but one of the incorrect dispositions was signed by a supervisor.  (D.E. 368, Page 202).  The failure of these investigations is systemic.  (D.E. 368, Page 202).  PMU conducted a second review of all "Unable to Determine" dispositions for cases involving physical abuse, sexual abuse, and negligent supervision over the same period.  (D.E. 368, Page 202).  The director of RCCL also separately reviewed the cases and found that seventy-five percent (75%) of the "Unable to Determine" dispositions were incorrect.  (D.E. 368, Page 202).  A typical error rate for a child welfare system is two or three percent.  (D.E. 303, Pages 49-50).  Despite these horrendous findings, nothing changed.  DFPS did not suspend or revoke licenses, no penalties were levied, and the State did not move any children.  (D.E. 368, Page 202).  The Court found that RCCL "simply doesn't work."  (D.E. 368, Page 202; D.E. 303, Page 51).

The December 2015 Order also discussed RCCL's failure to achieve high levels of compliance in facilities and the high incidence of repeat violations in some of the highest-risk standards.  (D.E. 369, Pages 208-09).  DFPS rarely takes an enforcement action and generally takes collaborative approaches with its licensed facilities.  (D.E. 368, Page 208).  However, these collaborative approaches can take longer for facilities to become compliant while children remain and continue to be placed in the facilities.  (D.E. 368, Page 208).  Further, these efforts have not gained compliance and breed a high incidence of repeat violations in some of the highest-risk standards.  (D.E. 368, Page 209).  DFPS also fails to consistently apply safety

standards leading to children across the state receiving different protections in their placements. (D.E. 368, Page 209).

In December 2015, the Court ordered "DFPS must complete a Workload Study to determine the time required for investigators and inspectors to adequately perform their tasks." (D.E. 368, Page 251).  In January 2017, the Court found "that DFPS has not commenced, as previously ordered, a workload study of RCCL investigators[57] and inspectors.[58]  Therefore, the Court orders the Special Masters to formulate and institute such a study . . ." which the Special Masters did by retaining the University of Texas-Austin to undertake an analysis of Residential Child Care Licensing ("RCCL") workloads.  (D.E. 500, Page 23; D.E. 546, Page 35).

The workload study performed for the Special Masters shed more light on the issues involving RCCL.  The University of Texas-Austin researchers determined the extent to which RCCL workers met five investigative casework practice standards during a six-month period from January to June 2017, including: initiating the investigation on time, observing or interviewing the alleged victim(s) on time, completing the investigation on time, completing documentation on time, and notifying relevant parties within the required timeframes.  (D.E. 546, Page 35).  For each casework practice standard, an RCCL worker is expected to complete the relevant activity within the timeframes determined by each investigation's priority level and type, as described by DFPS policy.  (D.E. 546, Pages 35-36).  For example, RCCL investigators were, at the time of the study, expected to observe or interview the alleged child victim in Priority One[59] child abuse or neglect investigations within five days of intake, and within seven

---

[57] *See supra* p. 79 n. 49.
[58] RCCL inspectors are "[s]taff responsible for monitoring residential child care facilities and child-placing agencies by conducting inspections, providing technical assistance to providers, and processing applications for licenses." (D.E. 546-1, Page 116).
[59] "Priority I reports concern children who appear to face an immediate risk of abuse or neglect that could result in death or serious harm."  40 Tex. Admin. Code. § 700.505(a)(1).

days of intake in a Priority Two[60] child abuse or neglect investigation.  (D.E. 546, Page 36).  To measure the extent to which the RCCL worker met the casework practice standards, CFRP calculated a rate for each RCCL worker.  (D.E. 546, Page 36).

Performance rates were lower for child abuse and neglect investigations than standards investigations.[61]  (D.E. 546, Page 36).  RCCL Investigators observed or interviewed the alleged child victim in required time frames just slightly over half of the time.  (D.E. 546, Page 36).  On average, investigators sent notification letters to the reporters and providers of the investigation outcomes on time for approximately nine percent of Priority One and 13 percent of Priority Two abuse and neglect investigations.  (D.E. 546, Page 36).  Investigators completed the required investigative documentation on time 57 percent of the time for Priority One investigations and 59 percent of the time for Priority Two investigations.  (D.E. 546, Page 36).  They initiated, on average, over 90 percent of Priority One and Priority Two abuse and neglect investigations within the required time frames.  (D.E. 546, Page 36).  They completed investigations within required timeframes 44 percent of the time for Priority One investigations and 45 percent of the time for Priority Two investigations.  (D.E. 546, Page 36).

RCCL inspectors met the casework practice standards at fairly high rates.  These rates ranged from notifying the reporter of the investigation outcome on time for an average of 74 percent of Priority Two standards investigations, to notifying the provider of the outcome for  an average of 95 percent of Priority Five standards investigations.  (D.E. 546, Page 36).

The Workload Study found that, statewide, RCCL investigators had a median average daily caseload of 14 abuse and neglect investigations in the month of June 2017.  (D.E. 546-1, Page 12).  The median average daily caseload for inspectors was seven standards investigations

---

[60] "Priority II reports are all other reports of abuse or neglect that are not assigned a Priority I."  40 Tex. Admin. Code § 700.505(a)(2).
[61] *See supra* p. 79 n. 48.

and 11 operations, and the median average daily caseload for generalists[62] was four abuse and neglect investigations, two standards investigations, and nine operations. (D.E. 546-1, Page 12). However, the study found the allocation of work very uneven: RCCL abuse and neglect investigative caseloads varied considerably. (D.E. 546, Page 36; D.E. 546-1, Page 12). The northeast district had half as many RCCL investigators and a much higher median average daily caseload than the other districts. (D.E. 546, Pages 36-37; D.E. 546-1, Page 13). Investigators in the northeast district had median caseloads of 28.4 child abuse and neglect investigations, with a maximum investigative caseload of 48.3 investigations at one time. (D.E. 546-1, Page 13). In contrast, investigators in the northwest district had median caseloads of seven child abuse and neglect investigations, with a maximum investigative caseload of 22 investigations at one time. (D.E. 546-1, Page 13)

There was little variation in the inspectors' standards investigation caseloads for across the state, with each district showing median caseloads between six and seven standards investigations, and maximum caseloads ranging between nine and 14 matters. (D.E. 546-1, Page 13). Inspectors in the northeast district were responsible for approximately three times as many operations than in the southeast and southwest districts. (D.E. 546-1, Page 13). The northwest average daily caseload of operations was not as high as it was in the northeast, but the median average daily caseload of operations for inspectors in the northwest was approximately double that of the inspectors in the southeast and southwest districts. (D.E. 546-1, Page 13).

Given how RCCL workers of each type reported they spent their time during the study period, the authors at the University of Texas-Austin determined a reasonable investigative caseload for RCCL investigators to be no more than seven investigations. (D.E. 546-1, Page 36).

---

[62] RCCL generalists are "[s]taff responsible for fulfilling both the RCCL inspector and investigator roles." (D.E. 546-1, Page 117). Defendants state in their Objections that these positions no longer exist. (D.E. 556, Page 33).

Given how RCCL workers of each type reported they spent their time during the study period, the authors at the University of Texas-Austin determined a reasonable investigative caseload for RCCL inspectors to be no more than five investigations.  (D.E. 546-1, Page 37).

Given how RCCL workers of each type reported they spent their time during the study period, the authors at the University of Texas-Austin determined a reasonable investigative caseload for RCCL generalists (a small group of staff who perform both investigations and inspections) of five investigations.  (D.E. 546-1, Page 37).

The Special Masters recommended in November 2016 that DFPS identify a discrete cohort of staff exclusively assigned to conduct child maltreatment investigations in licensed placements.  (D.E. 546, Page 37).  The Special Masters reported that DFPS has done so pursuant to recent Texas statutory change.  (D.E. 546, Page 37).

Defendants' Objection that there is no basis for the relief in this Section is OVERRULED.

## M.       Sexual Abuse[63]

1. Effective March 2018, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.

2. Effective March 2018, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.

3. Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.

4. Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.

---

[63] The Court finds that, in order to ensure PMC children are free from an unreasonable risk of harm, it is necessary for all of the relief in Section M to apply to all PMC and TMC children in DFPS custody.  *See infra* at III.M.13.b; *see also supra* at II.B.7.

5.  Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.

6.  Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.

7.   Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.

8.  Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.

9.  Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.

10. Within 90 days of the Court's Final Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse.  Within 6 months of the Court's Final Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.

11.  Effective immediately, DFPS shall ensure foster caregivers and other placement providers immediately report all allegations of sexual abuse by a child against another child to the 24-hour hotline established by DFPS to screen referrals of abuse and neglect.

12.  Effective March 2018, DFPS shall document, track and report quarterly to the monitor(s) all referrals of child-on-child sexual abuse involving children in DFPS custody made to the 24-hour hotline established by DFPS to screen referrals of abuse and neglect.

13. Effective immediately and ongoing thereafter, DFPS shall report quarterly to the monitor(s) and confirm that all reports of child on child sexual abuse involving children in DFPS custody that have been referred to the 24-hour hotline have been assigned for investigation for, at minimum, neglectful supervision by the placement caregiver(s).

### a. Objections

The Court carries forward Defendants' Objection that portions of the Plan provide relief to foster children who are not part of the certified class, and that those portions of the Plan are therefore overbroad.  (D.E. 556, Pages 13-14 ¶ 2(e)).

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding definition and investigation of sexual abuse cause class-wide constitutional injury, and that all of the Items in this Section are therefore unjustified.  (D.E. 556, Pages 37-38).

### b. Ruling on Objections

The Court has amended this Section of the Plan to reach all children in DFPS custody, including TMC children.   The Court is aware that the class before it is solely composed of PMC children. Because TMC and PMC children may reside in the same placement, failure to track the sexual abuse and sexual aggression history of TMC children risks exposing PMC children to sexual aggression or sexual abuse.  *See, e.g.*, PX 591 (filed under seal); PX 598 (filed under seal); (D.E. 328, Page 120) (noting that a child's placement is not typically changed if the child's status changes from TMC to PMC).  The Objection is OVERRULED.

In its December 2015 Order, the Court extensively documented the epidemic of physical and sexual abuse in the Texas foster care system and those findings are incorporated by reference.  *See* (D.E. 368).  At trial, the Court discovered RCCL does not track child-on-child abuse and therefore, there was no centralized, comprehensive data that shows which foster children have a history of physical or sexual abuse.  (D.E. 368, Page 206).  At trial, Plaintiffs' expert, Dr. Miller, explained that tracking child-on-child abuse is critically important regarding

subsequent placements and treatment needs.  (D.E. 303, Page 8).  Multiple witnesses testified at trial that there are always two victims when child-on-child abuse occurs and that sexually abused children often become abusers themselves.  (D.E. 368, Pages 207-08).  The Court found in its December 2015 Order that without tracking this information, no one would be aware of a child's past regarding being either a perpetrator or a victim of child-on-child abuse, making it impossible to assure safe placements.  (D.E. 368, Page 208).

In January 2017, the Court directed "the Special Masters are also ordered to work with DFPS to ensure that a child's case record prominently identifies sexually abused PMC youth. Both the term 'sexually abused' and 'sexually aggressive' should be word searchable in the child's records."  (D.E. 500, Page 26).  DFPS has not created a profile characteristic for child "sexual abuse" in the electronic case record.  (D.E. 546, Page 40).  DFPS replied to questions from the Special Masters indicating the identification of all PMC children who have been sexually abused "can be pulled and aggregated via a manual process that requires a case read." (D.E. 546, Pages 40-41, 132).   Responding that, "labeling of victims is inappropriate, stigmatizing, and ultimately unhelpful," DFPS indicated they do not intend to proceed with a profile characteristic for sexual abuse in the child's electronic record.  (D.E. 546, Pages 41, 138). Absent a manual reading of all its PMC children's cases, which number in the many thousands, DFPS leadership cannot track all of the PMC children who have suffered sexual abuse to ensure system-wide those children are receiving appropriate services, including an appropriate placement.  (D.E. 546, Page 41).

The Special Masters conducted a PMC child case record review in May 2017 and verified that DFPS has implemented within the child welfare electronic data system (IMPACT) a profile characteristic option to designate "child sexual aggression" and "sexual behavior problem" when

a youth has sexually abused another child or is at high risk for perpetrating sexual assault.  (D.E. 546, Page 41).

In its December 2015 Order, the Court ordered DFPS to "track child-on-child abuse, and categorize it as such."  (D.E. 368, Page 252).   Further, DFPS has known about the Court's concern regarding tracking child-on-child sexual abuse since the trial and has not taken sufficient steps to cure the constitutional deficiency found by the Court.  *See* (D.E. 368, Page 208). Instead, DFPS has repeatedly stated it has no plans to track child-on-child sexual abuse and has repeatedly stated to the Special Masters it does not intend implement policies to do so.  (D.E. 368, Page 208; D.E. 546, Pages 40-41).  As the Court found in its December 2015 Order, "DFPS is equipped to track child-on-child abuse, but simply refuses to do so."  (D.E. 368, Page 213). The Objection is OVERRULED.

### N.    PMC Children's Placements

1.  Effective March 2018, DFPS shall implement a policy that requires that no unrelated children more than three years apart in age be placed in the same room.  The policy may also establish exceptions, including a thorough and documented assessment that certifies it is in the child's best interest or that no risk of harm would result from placing any unrelated children more than three years apart in the same room. Any exceptions applied under this policy must be approved and documented in the child's electronic record by the DFPS county director.

2.  Effective March 2018, DFPS shall implement a policy that requires that no unrelated children with different service levels be placed in the same room.  The policy may also establish exceptions, including a thorough and documented assessment by DFPS that certifies it is in the child's best interest or that no risk of harm would result from placing any unrelated children of different service levels in the same room. Any exceptions applied under this policy must be approved and documented in the child's electronic case record by the county director.

3.  Effective immediately, DFPS may not place a child in the PMC class in an office overnight, and must track all instances if it does so, and report the same to the monitor(s) monthly.   If, under any circumstance, a child in the PMC class spends the night in an office, DFPS staff must document that fact, and the reason, in an electronically available log maintained by DFPS in each county.  These logs shall be submitted on the first day of every month to a designated senior manager in

DFPS' central office and to the monitor(s).  The designated DFPS senior manager shall review these logs monthly and take immediate follow up action to identify and address problems encountered at the county level with respect to securing minimally adequate, safe placements for children in the PMC class.

4.  Within six months of the Court's Final Order, all PMC children under two years of age shall be placed in a family-like setting, including non-relative foster care, tribal foster care,[64] kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may require services provided in a non-family-like placement. All exceptions must be approved by a supervisor and documented in the child's electronic case record.

5.  Within 12 months of the Court's Final Order, all PMC children under six years of age shall be placed in a family-like setting, including non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may require services provided in a non-family-like placement. All exceptions must be approved by a supervisor and documented in the child's electronic case record.

6.  Within 24 months of the Court's Final Order, all PMC children under the age of 13 shall be placed in a family-like setting, including non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require inpatient psychiatric hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may require services provided in a non-family-like placement.  All exceptions must be approved by a supervisor and documented in the child's electronic case record.

    a.  **Objections**

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding PMC child placements cause class-wide constitutional injury, and that all of the Items in this Section are therefore unjustified.  (D.E. 556, Page 39).

---

[64] Tribal foster care refers to "a foster home . . . or a comparable facility licensed or approved by . . . an Indian Tribal licensing authority . . . ." *See* 40 Tex. Admin. Code § 700.1307(2) (internal quotation marks omitted).

Defendants also object to the logistical challenges of implementing all the provisions contained in this section.  (D.E. 556, Page 39).  Defendants argue the provisions would require substantial budget appropriations, would be impossible to implement in the timeframe provided, and would impact permanency for children.  (D.E. 556, Page 39).

### b.  Ruling on Objections

The Court's December 2015 Order documented extensive evidence of the harms caused by DFPS's practice of placing unrelated children of different ages and service levels in the same room, particularly sexual and physical abuse.  *See, e.g.*, (D.E. 368, Pages 74, 236-37).  At trial, Plaintiffs' expert Mary Richter testified that a "very high percentage of . . . younger children were being placed with older children" and that "creates more risk."  (D.E. 326, Pages 22-23).  Richter also testified the most significant risk to children's safety in Foster Group Homes is the fact they are unrelated.  (D.E. 326, Page 14).  The instinct which related children have not to harm each other is not present between completely unrelated children.  (D.E. 368, Page 236).  In fact, Defendants' expert on social work, Linda McNall, testified that multiple unrelated children living in one home are exposed to different risks than a similar number of related children living in a single home.  (D.E. 368, Page 51; D.E. 319, Pages 24-25).  However, DFPS does not prohibit teenagers from sharing a bedroom with younger children.  (D.E. 315, Pages 10-11).  On top of this, DFPS allows for young girls and teenage boys to be placed in the same Foster Group Home.  (D.E. 368, Page 235; D.E. 300, Page 63).  Former foster child Sharp testified a boy was sexually abused almost every night by one of the older boys in the home and due to DFPS not regulating the mixing of ages in bedrooms, the abuser and the abused shared a bunkbed.  (D.E. 324, Page 172).  This is just one of the many tragic events documented in the Court's December

2015 Order that resulted from the mixing of children of different ages.  *See, e.g.*, (PX 372; PX 377; PX 406; PX 457; PX 459; PX 502;  PX 2014, Pages 31-36).

Additionally, mixing varying service levels exacerbates these problems.  (D.E. 368, Page 237).  DFPS does not impose any prohibition or limitations on the mixing of children of different service levels.  (D.E. 368, Page 235).  Evidence at trial showed 89% of Foster Group Homes with seven or more foster children had a mix of basic, moderate, specialized, or intense service levels.  (D.E. 326, Page 24).  When service levels are mixed, children's outcomes may be damaged to an unconscionable degree.  (D.E. 368, Page 238; D.E. 326, Page 17).  For instance, placing basic level children in a home with very aggressive or self-injurious children can lead to bullying or otherwise damage the basic level child.  (D.E. 326, Page 17).

Based on the Court's extensive findings of fact at trial, the Court included in its December 2015 Order a directive for "[t]he Special Master [to] recommend what age ranges of unrelated children are appropriate to be placed in the same room in any residential facility." (D.E. 368, Page 252).

The Special Masters asked DFPS to share a draft or final policy and/or regulation that prohibits the placement of unrelated children who are more than three years apart in the same room.  (D.E. 546, Page 43).  DFPS responded that the agency "has no plans to adopt policy or regulation that prohibits the placement of unrelated children who are more than three years apart in the same room."  (D.E. 546, Pages 43, 131).  DFPS has still not developed a policy or regulation that prohibits the placement of unrelated children who are more than three years apart in the same room.  (D.E. 546, Pages 43, 128-31).

Based on the Court's extensive findings of fact at trial, the Court in January 2017 ordered "the Special Masters to work with DFPS to ensure that unrelated PMC children with different

service levels not be placed in the same room unless a thorough and documented assessment is conducted by DFPS staff certifying that such placement is safe and appropriate for each PMC child." (D.E. 500, Page 27). The Special Masters asked DFPS to share a draft or final policy and/or regulation that prohibits the placement of unrelated PMC children with different service levels in the same room unless a thorough and documented assessment is conducted by DFPS staff certifying that such placement is safe and appropriate for each PMC child. (D.E. 546, Page 43). DFPS responded that "[a]gency rules (minimum standards) . . . allow children receiving different types of service to reside in the same room if the provider evaluates the living quarters for each child and ensures there is no conflict of care with the child's best interests; the arrangement will not adversely impact other children in the room; the number of children in the room is appropriate at all times; caregivers can appropriately supervise all children and the provider can meet the needs of all children in the room." (D.E. 546, Pages 43-44, 128-31).

Further, the Court found it is typical for foster children to sleep in CPS offices because there are no available beds. (D.E. 368, Page 219; DX 18, Page 1; PX 1217, Page 5; D.E. 327, Pages 201-02). The Special Masters requested DFPS report the number of children who spent a night in a DFPS office, waiting for a placement. (D.E. 546, Page 44). DFPS reported it does not track the number of PMC children who experience a first night sleeping in an office. (D.E .546, Page 44). DFPS begins its tracking on the child's second night. (D.E. 546, Page 44).

The Special Masters asked DFPS how many foster children spent a night in an unlicensed facility, such as a hotel or a caseworker's office in 2016. (D.E. 546, Page 44). DFPS reported that from September 2016 to August 2017, 554 children did not have a placement. (D.E. 546, Page 44). DFPS reported this information showing the total number of children without a

placement broken down by each of these 12 months, with a high of 84 children during May 2017 and a low of 17 children during August 2017.  (D.E. 546, Page 44).

Based on the Court's extensive findings of fact at trial, the Court in January 2017 ordered the final Implementation Plan "should include a provision that, within 6 months from the date of the final order, all PMC children under two years of age shall be placed in a family-like setting." (D.E. 500, Pages 27-28).  The Special Masters asked DFPS to share a draft or final policy and/or regulation that all PMC children under two years of age shall be placed in a family-like setting. (D.E. 546, Page 45).  The Special Masters invited DFPS to identify exceptions, such as sibling groups of four or more children who cannot otherwise be placed together, treatment and/or medical care, or young children who are placed with a minor parent.  (D.E. 546, Page 45).  DFPS declined to provide a draft policy and/or regulation, pointing to its existing policies and minimum standards, which do not require that children under two years of age be placed in family-like settings.  (D.E. 546, Page 45).

Based on the Court's extensive findings of fact at trial, the Court in January 2017 ordered the final implementation plan should include a provision that, "within 12 months from the date of the final order, all PMC children under six years of age shall be placed in a family-like setting." (D.E. 500, Page 28).

Based on the Court's extensive findings of fact at trial, the Court in January 2017 ordered this final implementation plan must include a provision that, "[w]ithin 24 months from the date of the final order, all PMC children under thirteen shall be placed in a family-like setting."  (D.E. 500, Page 28).

Dr. Miller testified at trial that placing children in the most family-like setting possible "is not only what's best for children, it's absolutely essential if those children are going to be

whole and remain whole." (D.E. 368, Page 224; D.E. 303, Pages 51-52). DFPS policy states when appropriate, placements should be with families as opposed to group care facilities. (D.E. 368, Page 218; PX 50, Page 4). However, the Court reiterates that policies not practiced have no value. *Ruiz*, 679 F.2d at 1160. Accordingly, the Court finds there is sufficient basis in the record and the Objection is OVERRULED.

Defendants were ordered to draft policies and procedures to ensure PMC children are free from an unreasonable risk of harm. (D.E. 368, Page 245). Despite this, Defendants repeatedly refused to provide the Special Master with any sort of policy or regulation concerning any of the provisions in this section. (D.E. 546, Pages 43-45). Defendants repeatedly stated they were not creating such policies or that the current policies did not require such provisions. (D.E. 546, Page 43-45). However, the existence of current policy means nothing if those policies are not being practiced. *See Ruiz*, 679 F.2d at 1160; *supra* at II.B.1. Defendants' Objection repeats their overruled General Objection that the Order requires new appropriations. Accordingly, the Objection is OVERRULED.

### O.   DFPS Placement Array

1.  DFPS shall immediately implement a policy that establishes single-child homes as the presumptive placement for all sexualized children, either as the aggressor or the victim. The policy also will allow for exceptions, including: placement in a therapeutic setting for treatment; placement with siblings when the safety of all children involved can be closely monitored and secured; a thorough and documented assessment certifies that it is in the child's best interest to be placed in a home with other children and the safety of all children involved can be closely monitored and secured. Any exceptions applied under this policy must be approved and documented by a senior DFPS manager.

2.  DFPS shall ensure it has at least as many foster home placements for children, by catchment area,[65] by the end of FY 18 as the agency found it requires to meet the

---

[65] At a December 21, 2016 hearing, the Special Master defined a "catchment area" as a "cluster of counties populous enough to move foster care redesign forward." (D.E. 500, Page 28 n. 20). Counsel for the State agreed with this definition. (D.E. 500, Page 28 n. 20). *Cf.* Tex. Fam. Code Ann. § 264.152 (West) ("'Catchment area' means a geographic service area for providing child protective services that is identified as part of community-based care.").

needs of children in its January 2017 Foster Care Needs Assessment,[66] Table 5. DFPS shall report quarterly to the monitor(s) on the available supply of foster homes for children by catchment area as of the last date of the quarter.

### a.    Objection

Defendants object that compliance with Item 2 depends on factors outside Defendants' control. (D.E. 556, Pages 40-41). Defendants state that the Plan would require major budget appropriations, that DFPS cannot compel people to become foster parents or providers to open placements, and that natural disasters may render compliance impossible. (D.E. 556, Pages 40-41).

### b.    Ruling on Objection

Defendants' Objection to Item 2 largely repeats Defendants' overruled General Objection that the Order requires new appropriations. The Court returns to this Objection to note that while Defendants obviously cannot compel Texans to serve as foster parents, there are numerous steps Defendants can take to expand their placement array, such as greater recruiting efforts or increased incentives for becoming a foster parent. Defendants have known about the Court's concerns regarding the placement array for over two years and the deficiencies persist. In the December 2015 Order, Defendants were ordered to "establish and implement policies and procedures" to remedy the deficiencies. (D.E. 368, Page 245). Despite this, Defendants refused to provide a draft plan to develop the placement array needed to address geographic, demographic, and service level deficits identified in its own foster care needs assessment. (D.E. 546, Page 47). If a natural disaster makes compliance impossible sometime in the future, Defendants may raise the issue with the Court then. Further, both parties' experts (Dr. Viola

---

[66] Foster Care Needs Assessment is the term used by DFPS to describe its analysis of historical foster care placement activity to understand how the system has performed in the past, along with a forecast of foster care placement demand. *See* (D.E. 507-1, Page 4).

Miller, Gail Gonzalez, and Frianita Wilson) testified that sexually aggressive children should be placed in single child placements.  (D.E. 303, Page 8; D.E. 328, Page 161; D.E. 329, Page 161); *see infra* at III.N.6.b.  Plaintiffs' expert, Dr. Viola Miller, testified that sexually abused children should be in single child placements.  (D.E. 303, Page 8).  Considering that DFPS does not track single child placements and has no present intention of doing so, it is inexplicable that DFPS can determine that they do not have such placements and cannot have such placements.  (D.E. 492, Page 4).  This Objection to Item 2 is OVERRULED.

3. By June 2018, DFPS shall complete and submit to the Court an update of its January 2017 Foster Care Needs Assessment, and include:
   a. A review and assessment of the placement needs of sibling groups that  are separated into different placements and children who have been identified as sexually aggressive or whose IMPACT records document their having been sexually abused.
   b. Data on the number of foster homes in each county that could be readily designated as single-child homes.
   c. Data on the number of homes in each county available for the placement of sibling groups of various sizes.
   d. An analysis of the number of homes in each county and region that have a deficit or surplus of single-child homes to meet the needs of children from the same counties and regions who are sexually aggressive or have been sexually abused.
   e. An analysis of the number of homes in each county and region that have a deficit or surplus of homes that can meet the placement needs of sibling groups  from  the same counties and regions or catchment areas.

### a.    Objection

Defendants object that Item 3 "circumvents" the requirements of Texas Family Code Section 264.1261.  (D.E. 556, Page 41).

### b.    Ruling on Objection

Section 264.1261 of the Texas Family Code creates certain reporting requirements regarding DFPS's placement array.  The Court finds that compliance with both this Order and Section 264.1261 would be both possible and reasonable.  Overlap between this Court's Order

and a newly enacted state law is irrelevant.  *See In re Rodriguez*, 695 F.3d 360, 369 (5th Cir. 2012).  Defendants' Objection as to Item 3 is OVERRULED.

4. Effective immediately, DFPS shall immediately establish a tracking mechanism to identify how many children are in all placements where a PMC child resides, including foster, biological, non-foster and adoptive children, as well as each placement's licensed capacity. By May 2018, DFPS shall publish this information on its website and update the information quarterly.

        a.      **Objection**

Defendants object that the timeline for completing Item 4 is impossible.  (D.E. 556, Page 41).

        b.      **Ruling on Objection**

The Court again returns to Defendants' logistical Objection to emphasize that Defendants have known about the Court's concerns with the lack of a tracking system since the Court identified them two years ago in its December 2015 Order.  (D.E. 368, Page 253).  The Court's December 2015 Order ordered that the "State shall establish and implement policies and procedures to ensure that Texas's PMC foster children are free from an unreasonable risk of harm."  (D.E. 368, Page 245).  Further, Defendants rebuffed the Special Master's requests for plans resolving the issue and inquiries into how long an overhaul would take.  (D.E. 546, Pages 47, 113-17).  Defendants now object, fifteen days after the Plan was filed, that the Plan's timelines for these goals are "impossible." (D.E 556, Page 41).  As is the case with Defendants' Objection to the orders on PMC Children's Records, *supra* III.B, their claim of impossibility is not supported by anything other than the Defendants' representation.  For these reasons, and the reasons given *supra* at II.B.9, this Objection is OVERRULED.

5. Effective June 2018, DFPS shall establish and implement a policy that requires a transition plan of no less than two weeks to change a PMC child's placement if the disruption is due to a change in the child's level of care.  The policy shall require a documented assessment to determine if the child should remain in the same

placement for an extended period if the assessment determines the child's behavioral or emotional challenges are likely to re-escalate if the placement is changed.

6. Beginning in June 2018, DFPS shall report to the monitor(s) semi-annually on PMC children's placement moves, and ensure that all such moves, and the reasons for the placement moves, are documented in the child's electronic case record.

### a. Objection

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding placement array cause class-wide constitutional harm, and that all of the Items in this Section are therefore unjustified. (D.E. 556, Page 40).

### b. Ruling on Objection

The Court documented extensively in its December 2015 Order the harms presented by DFPS's inadequate placement array. *See* (D.E. 368). Specifically, the Court found in its December 2015 Order that not placing sexualized children in single-child placements causes an unreasonable risk of harm to PMC children. (D.E. 368, Page 226). The trial transcript includes testimony from two defense witnesses, Gail Gonzalez and Frianita Wilson (D.E. 328, Page 161; D.E. 329, Page 161), indicating that DFPS should look to place sexualized children in placements or in homes where the child is the only one in the home. (D.E. 546, Page 46). There is testimony in the record of the sexualization of children due to sexual abuse, causing sexually abused children to become aggressors or perform sexual acts. (D.E. 326, Pages 15-16). For example, D.I. was repeatedly sexually abused by older boys at his placement yet he was subsequently placed in a foster home with a five year old biological granddaughter with whom he engaged in sexually inappropriate conduct. (D.E. 326, Pages 92-93, Page 110-11). The Court found that DFPS's inadequate placement array prevents sexualized children from being placed appropriately. (D.E. 368, Page 227). In its December 2015 Order, the Court included among its goals for the implementation plan a directive for DFPS to "track how many placements in its

array are designated as single-child homes (including biological and adopted children), and track how many foster children need single child homes. DFPS shall explain its criteria for determining which children need single-child homes. DFPS shall ensure that all children who need single-child homes are placed in such homes." (D.E. 368, Page 253).

The Special Masters asked DFPS to report the soonest date DFPS could begin to track single child homes. (D.E. 546, Page 47). DFPS replied that it "has no plans to track single child homes." (D.E. 546, Pages 47, 118; D.E. 492, Page 4).

The Special Masters asked DFPS what processes it administers to match specific placements to PMC children who, through documented assessment, are determined to need a single child home. (D.E. 546, Page 47). DFPS responded that it "has no such processes" and referred the Special Masters back to its earlier response that it "has no plans to track single child homes." (D.E. 546, Pages 47, 118).

The Court's December 2015 Order documented extensively how DFPS's placement array harms children by forcing them to be placed far from their home communities. (D.E. 368, Page 227). The geographic distribution of services provided by DFPS is imbalanced, meaning capacity and types of placements are more readily available in certain areas of the state but not others. (D.E. 369, Page 218). As a result, thirty-nine percent (39%) of children are placed out of region and sixty percent (60%) are placed out of county. (D.E. 315, Pages 41-42; D.E. 300, Page 101). The inadequate array results in children not being placed with their siblings due to the lack of placement resources. (D.E. 368, Page 219). This directly contravenes established professional standards and Texas's own policy. (D.E. 368, Page 219). The inadequate array also results in children being placed in inappropriate facilities, including overreliance on congregate care facilities. (D.E. 368, Page 219). The evidence in the record found that Texas's percentage

of children twelve and younger who had been in care at least 18 months and were placed in group homes or institutions was almost three times the national average.  (PX 2128, Page 1). Despite this inadequate array, DFPS has repeatedly refused to develop a plan to create a placement array necessary to address these deficiencies.  (D.E. 546, Page 47).

DFPS completed and filed with the Court a Foster Care Needs Assessment, dated January 2017.  (D.E. 507-1).  The Assessment includes on page 43 in Table 5, Column 1, a forecast for the agency's FY17-18 need for foster homes by catchment area.  (D.E. 507-1, Page 43).  The Special Masters asked DFPS, based on its Foster Care Needs Assessment, to provide a draft plan or plan outline for a 12-month period to develop the placement array needed to address the specific geographic, demographic and service level placement deficits identified in the Assessment.  (D.E. 546, Page 47).  DPFS responded that while they are "continually working to address placement capacity within the agency" they are "declining to develop such a 12-month plan."  (D.E. 546, Pages 47, 118).

The Special Masters asked DFPS if the agency can report aggregate data on how many children are placed in foster homes with non-foster or adoptive children.  (D.E. 546, Page 48). DFPS responded, "DFPS does not have the capability to report aggregate data on how many PMC children are placed in foster homes that contain non-foster or adoptive children, and the [Provider] Portal is not moving forward at this time.  (D.E. 546, Page 48).  DFPS does possess the capability to report the number of foster children placed in homes with other DFPS foster children at a certain time and date."  (D.E. 546, Pages 48, 121).  DFPS subsequently reaffirmed, "no additional information will be provided.  Agency staff have determined that the aggregate data that can be produced are those referenced in the original response (DFPS foster children placed with other foster children)."  (D.E. 546, Pages 49, 137).

The Special Masters' team conducted a case record review of 50 randomly selected PMC children's cases to confirm that children's individualized files accurately reflected the information contained in the agency's placement moves report.  (D.E. 546, Page 49).   The Special Masters' team confirmed the aggregate report did accurately reflect the information on placement moves found in PMC children's files.  (D.E. 546, Page 49).

Accordingly, the Objection is OVERRULED.

### P.    Foster Care Group Homes

1.  Effective immediately and ongoing thereafter, no PMC child may reside in a Foster Group Home placement.

#### a.    Objections

Defendants object that Item 1 requires the closure of Foster Group Homes without regard to the number of children in the home.  (D.E. 556, Page 41).

Defendants object that there is no basis in the record for finding that existing DFPS policies or practices regarding Foster Group Homes cause class-wide constitutional injury, and that both of the Items in this Section are therefore unjustified.  (D.E. 556, Page 41).

#### b.    Ruling on Objections

Defendants represented to the Court that existing Foster Group Homes were in the process of being phased out, and the Court is aware that the Texas Legislature has instituted a process to transition all Foster Group Homes to another license type or to close them.  *See* H.B. 7 § 78; (D.E. 410, Page 33).  For the purpose of Item 1, the term "Foster Group Home" does not refer to any placement housing fewer than seven children, inclusive of biological, adoptive, non-foster and foster children.  As properly interpreted, this Item will cause minimal disruption— Defendants state in their objection that there are "over 100" children in "*all* Foster Group Homes," so the number still in Foster Group Homes containing greater than six children must be

still lower.  (D.E. 556, Page 42) (emphasis in original).  To the extent that Defendants maintain their Objection to Item 1 despite this clarification, it is OVERRULED.

The Court's December 2015 Order described a litany of harms caused by Foster Group Homes, including rampant physical and sexual abuse.  *E.g.*, (D.E. 368, Pages 182, 216, 236-37); *see also id.* at 239 (citing further examples from the record).  The December 2015 Order also described how Texas's Foster Group Homes effectively exist outside of any professional standards, because no other state allows such large numbers of unrelated foster children to reside together without more strictly regulating the home as a congregate care facility.  *See* (D.E. 368, Page 233-34).  The Court's December 2015 Order enjoined DFPS to "immediately stop placing PMC foster children in unsafe placements, which include Foster Group Homes that lack 24-hour awake-night supervision.  Foster Group Homes that immediately require 24-hour awake-night supervision may continue to operate while the Special Masters and the State craft and enforce the Implementation Plan."  (D.E. 368, Page 245).  As of December 21, 2016, Texas still maintained 57 foster care group homes that they represented had 24-hour awake-night supervision.  (D.E. 492, Page 2).[67]

To verify the overnight supervision plans submitted to the Special Masters by DFPS with respect to the State's Foster Group Homes, Special Master Kevin Ryan and a member of the Special Masters' team, Deborah Fowler, conducted visits with randomly selected Foster Group Home caregivers in their homes.  (D.E. 546, Page 50).  DFPS counsel and staff accompanied Mr. Ryan and Ms. Fowler.  (D.E. 546, Page 50).  All of the visits except one were announced in

---

[67] Texas advised the Court that there was one additional Foster Group Home with seven or more children, but that none of the children in that home were in the PMC class.  (D.E. 492, Page 2 n. 1).  According to the Advisory, DFPS was working with the caregivers to establish awake-night supervision in that home as well, but had not accomplished it as of the Advisory's filing.  (D.E. 492, Page 2 n. 1).

advance.  (D.E. 546, Page 50).  The visits occurred at staggered times throughout the day.  (D.E. 546, Page 50).

In the first Foster Group Home visited by Mr. Ryan, on March 1, 2017, eight children resided in the home: three children in the custody of DFPS, ages 10, 9 and 2, and five birth/adopted children, ages 17, 14, 11, 8 and 2.  (D.E. 546, Page 50).  The caregivers had installed a camera system throughout the home, featuring a motion detection system.  (D.E. 546, Page 50).  When there was activity in the home at night, the camera system recorded the movement(s) that it recorded in a log.  (D.E. 546, Page 50).  In addition, the caregivers hired a night nanny to stay in the home overnight while the family slept.  (D.E. 546, Page 50).

In the second Foster Group Home visited by Mr. Ryan, on March 1, 2017, seven children resided in the home: two boys in the custody of DFPS, ages 4 and 5, and five of the couple's birth children, all girls, ages 13, 9, 7, 5 and 1.  (D.E. 546, Page 50).  The caregivers, a married couple, reported they provided supervision by alternating shifts overnight.  (D.E. 546, Page 50).  The couple described the arrangement as difficult and looked forward to adopting the boys and closing their home to future placements.  (D.E. 546, Page 50).

In the first Foster Group Home visited by Ms. Fowler on February 28, 2017, eight boys, ages 18 and under, resided in the home.  (D.E. 546, Page 50).  Four children were in the custody of DFPS and four were adopted.  (D.E. 546, Page 50).  The foster children were 18, 15, 13 and 11 years old.  (D.E. 546, Page 50).  The 15-year-old reportedly had behavioral challenges, and the caregiver indicated that those challenges had led him to ask for the boy to be moved.  (D.E. 546, Page 50).  A live-in, adult female supported the caregiver in oversight of the home.  (D.E. 546, Page 50).  The family's awake-night supervision plan included an individual who lived in back of the house in a shed just a few feet from the back door.  There was also an old RV behind

the house, and the caregiver indicated someone else occasionally stayed in the RV.  (D.E. 546, Page 50).  The awake-night supervisor's home appeared to be a gardening shed.  (D.E. 546, Pages 50-51).  It was new, and it had a light mounted over the door of the type that one can buy at stores like Home Depot.  (D.E. 546, Page 51).  The caregiver indicated the awake-night supervisor typically came home from work around 10:30 pm or 11:00 pm.  (D.E. 546, Page 51). The caregiver said he and the adult female went to bed around 11:30 pm or midnight, and the awake-night   supervisor was said to then stay awake for the rest of the night, performing occasional walk-throughs of the home, until the caregiver rose the next morning.  (D.E. 546, Page 51).

In the second Foster Group Home visited by Ms. Fowler, on February 28, 2017, nine children resided in the home: three girls in the custody of DFPS, ages 11, 7 and 5, and six adopted children, two boys who were 16 and 10, and four girls who were 10, 7, 6 and 4 years old.  (D.E. 546, Page 51).  The caregivers installed an alarm in the boys' bedroom that beeped if the boys opened their door.  (D.E. 546, Page 51).  The caregivers, a married couple, reported they provided overnight supervision by alternating shifts overnight.  (D.E. 546, Page 51).

In the third Foster Group Home visited by Ms. Fowler, on March 6, 2017, seven children under the age of 18 resided in the home.  (D.E. 546, Page 51).  One child, a 16 year-old daughter, is adopted.  (D.E. 546, Page 51).  Six of these children were foster youth: 3 girls who were 14, 11 and 9 years old, and 3 boys who were 17, 15 and 10  years old.  (D.E. 546, Page 51).  Of the foster youth in the home, one had a specialized Level of Care designation, and three had moderate Levels of Care designations, indicating heightened needs.  (D.E. 546, Page 51).

The doors to the bedrooms were connected to an alarm and made a loud noise when opened.  (D.E. 546, Page 51).  The caregivers, a married couple, reported they provided

overnight supervision by alternating shifts overnight.  (D.E. 546, Page 51).  The caregivers also had two adult sons who were members of the household, ages 47 and 18.  (D.E. 546, Page 51). The caregiver said her live-in 47-year-old adopted son, who is disabled, helped his parents with the awake-night supervision.  (D.E. 546, Page 51).  It appeared he has an intellectual or developmental disability.  (D.E. 546, Page 51).  The caregiver pointed out that his role in overnight supervision was limited to getting up if anything happened or required intervention. (D.E. 546, Page 510).

In the fourth Foster Group Home visited by Ms. Fowler, on March 7, 2017, seven children under the age of 18 resided in their home.  (D.E. 546, Page 51).  Four were foster youth: two boys ages 8 and 3 years old, and two girls 6 and 5 years old.  (D.E. 546, Page 51).  The couple's three biological children were 16, 14 and 12 years old.  (D.E. 546, Page 510).  The caregivers, a married couple, reported they provided overnight supervision by alternating shifts overnight.  (D.E. 546, Pages 51-52).  The caregiver's mother was reportedly able to help on occasion when someone was sick or the husband worked outside the home.  (D.E. 546, Page 52).

In the fifth Foster Group Home visited by Ms. Fowler, on March 7, 2017, three foster children resided in the home, one boy age 1 year old, and two girls, ages 5 and 2 years old.  (D.E. 546, Page 52).  The caregivers, a married couple, also had four birth children who lived in the home: daughters, ages 15, 12, 9 and 6 years old.  (D.E. 546, Page 52).  In order to avoid an awake-night supervision requirement, the caregivers reported that every night one of the foster parents' biological children left the home with an older, adult sibling who maintained a separate residence, and stayed at her house.  (D.E. 546, Page 52).

In the sixth Foster Group Home visited by Ms. Fowler, on March 8, 2017, seven children resided in the home, only one of whom was a foster child: a 2 year old girl.  (D.E. 546, Page 52).

The caregivers have six young children who they have adopted, and one adult biological son (22 years old) who also lives with them.  (D.E. 546, Page 52).  The caregivers, a married couple, reported they alternated shifts for awake-night supervision.  (D.E. 546, Page 52).  The plan allowed the caregivers approximately 5 to 6 hours of sleep per night, which the wife said was enough for her.  (D.E. 546, Page 52).  Her great grandmother was also reportedly available to help when needed, and their adult son who lived with them also helped when needed.  (D.E. 546, Page 52).

The awake-night supervision plans utilized in these homes invoke the same concerns the Court found concerning overworked caseworkers.  The caregivers in these homes are staying awake throughout all hours of the night rather than bringing in a qualified outside person to provide supervision.  Exhausted caregivers, like overworked caseworkers, provide lower quality care to children.  The actions currently being taken concerning Foster Group Homes do not follow the spirit of the Court's December 2015 Order and do not cure the multitude of harms present in Foster Group Homes.

The Court's January 2017 Opinion requires this Implementation Plan include the elimination of Foster Group Homes as placements for children in the PMC class.  (D.E. 500, Page 29).  In May 2017, Texas House Bill 7 amended the Human  Resources Code  (HRC), Chapter  42, and  prohibited  Licensing  from issuing any new permits to Foster Group Homes after August 31, 2017.  (D.E. 546, Page 52).  House Bill 7 allows any Foster Group Home licensed or verified before September 1, 2017, to continue to operate under the law in effect prior to that date, until Licensing develops and implements procedures for conversion to a traditional foster home and relinquishment of the Foster Group Home License.  (D.E. 546, Page 52).  House Bill 7 also lowered the minimum capacity for General Residential Operations (GRO), a form of

congregate care with heightened licensure requirements, from 13 children to 7 children.  (D.E. 546, Page 52).  The Objection is OVERRULED.

2. Effective immediately and ongoing thereafter, no PMC child may reside in any family-like placement that houses more than six children, inclusive of biological, adoptive, non-foster and foster children.  Family-like placements include non-relative foster care, tribal foster care, and therapeutic foster care.[68]

### a.    Objection

Defendants object that Item 2 contradicts a newly enacted state law allowing foster family homes to have up to 8 children.  (D.E. 556, Page 42-43).

### b.    Ruling on Objection

Defendants' objection to Item 2 is that the Texas Legislature recently enacted a law allowing DFPS to expand the capacity of foster family homes to eight children.  *See* HB 7, Acts 2017, 85th Leg., R.S., Ch. 317, eff. September 1, 2017.  The law cited by Defendants says only that DFPS "may" issue exceptions to the six-child capacity limit, it does not mandate it.  The Court's Order, then, does not require Defendants to violate state law.  Ultimately, however, this Court has the responsibility to take the steps necessary to cure violations of the Constitution.  To the extent HB 7 does conflict with this Court's order, a "[s]tate-law prohibition against compliance with [a] District Court's decree cannot survive the command of the Supremacy Clause of the United States Constitution."  *See Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 695 (1979).  Defendants' Objection to Item 2 is OVERRULED.  For a discussion as to the basis for this relief, *see supra* at III.P.1.

## IV.    MONITORING

Pursuant to its inherent authority and Federal Rule of Civil Procedure 53, the Court appoints Monitors to superintend compliance with its decree.  Remedying the numerous,

---

[68] Defendants' Objection that Item 2 affected kinship placements is SUSTAINED.  (D.E. 556, Pages 43-44).  The Court has deleted the reference to kinship placements.

decades-old problems in Texas's foster-care system is just as complex a task as was the reform of Texas's prison system mandated by *Ruiz v. Estelle*. *See* 679 F. 2d at 1160. "The scope and complexity of the decree" in this case, like that of the decree in *Ruiz*, weigh heavily in favor of appointing a monitor. 679 F. 2d at 1160; *accord Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F. 2d 536, 543 (9th Cir. 1987). "The sheer size" of the Texas foster-care system, like "[t]he sheer size of the Texas prison system[,] could be found to pose special difficulties in implementing a remedial decree." *Ruiz*, 679 F. 2d at 1160 n. 238. Appointment of a monitor in this situation is even more appropriate today than it was when *Ruiz* was decided because Rule 53 has since been amended to explicitly recognize that "[r]eliance on a master is appropriate when a complex decree requires complex policing . . . ." *See* Fed. R. Civ. P. 53 advisory committee's note (citing *Local 28, Sheet Metal Workers' Internat'l Ass'n v. EEOC*, 478 U.S. 421, 481-82 (1986)). Institutional reform of a massive state agency, as the Constitution requires here, is a "posttrial matter[] that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C).

Because the State of Texas has failed to rectify long-standing problems with its foster-care system despite decades of awareness and extensive reports and recommendations by internal and external authorities, this Court concludes that "unless directed otherwise by some authority, the studies and testing will continue, no remediation will occur and the dangerous condition[s] will continue to exist." *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 834 (D.N.J. 2003), *aff'd* 399 F. 3d 248 (3d Cir. 2005); (D.E. 500, Page 12) (discussing Texas's failure to act upon twenty years of studies conducted or commissioned by the State); (D.E. 368, Pages 201-04) (discussing Texas's inadequate response to two internal studies finding error rates of 64.6% and 75%, respectively, in its investigations of abuse and negligent supervision). The

State of Texas's unwillingness to assist the Court in developing a remedy, its continued insistence that it has not violated the Constitution, and its failure to conduct court-ordered workload studies bolster that conclusion.  *See Howe v. City of Akron*, 801 F. 3d 718, 737-38 (6th Cir. 2015); (D.E. 500 at 23); *see also Ruiz*, 679 F. 2d at 1160 (5th Cir. 1982) (citing the Texas Department of Corrections' "failure to acknowledge even 'completely evident' constitutional violations" as one of the considerations justifying the lower court's appointment of a monitor).

Finally, the disconnect between the written policies of DFPS and its actual practices provides another reason why this Court finds appointment of a monitor necessary to ensure compliance with this Order.  *See Ruiz*, 679 F. 2d at 1160; (D.E. 500, Page 11) ("[P]olicies not practiced are insufficient to address the constitutional deficiencies found in the Court's 2015 Order.").

Therefore, it is **ORDERED** that:

1. The Court hereby appoints Kevin Ryan[69] and Deborah Fowler as the Monitors of this Final Order, responsible to assess and report on Defendants' compliance with the terms of this Final Order.  The Monitors shall be responsible solely to the Court but shall work actively with the parties to assure the effective and prompt implementation of this Order.  The Monitors shall proceed with all reasonable diligence and shall commence their duties no later than January 19, 2018.  The Monitors shall serve until the Court determines, upon Defendants' application, that the Monitors are no longer necessary.

2. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitors' activities, reports, findings, or recommendations.  The retention of the Monitors shall be conducted solely pursuant to the procedures set forth in this Order and shall not be governed by any formal or legal procurement requirements.  The Monitors shall have a budget and staff sufficient to allow the Monitors to carry out the responsibilities set forth in this Final Order, and may contract with such experts or consultants as the Monitors may deem appropriate, in consultation with the Court.  The Monitors, and any experts or consultants hired by the Monitors, may initiate and receive ex parte communications with the parties, and with the Court.

---

[69] The Court's previous Order of Appointment (D.E. 379) on March 21, 2016 naming Kevin Ryan as Special Master is superseded by this Order.

3. The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Final Order.  The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary.  In order to avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Final Order.  Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Final Order to the extent the Monitors deem necessary.

4. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Final Order.  The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Final Order and report on Defendants' compliance in implementing the terms of this Final Order.  The Monitors shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Final Order.

5. The Monitors shall provide a written report to the Court every six months.  The Monitors' reports shall set forth whether the Defendants have met the requirements of this Final Order.  In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.

6. The Monitors shall have free and complete access to records maintained by Defendants, its divisions and any successor agencies or divisions, and by its private agency partners.  The Monitors shall also have free and complete access to the staff of DFPS; its divisions and any successor agencies or divisions; persons within the executive branch; private agency partners; PMC children in the care of DFPS and of private agencies; and other individuals that the Monitors deem relevant to their work. DFPS shall direct all employees and contract providers to cooperate fully with the Monitors and shall assist the Monitors in gaining free access to other stakeholders in the child welfare system.  Defendants shall provide the Monitors with free and, upon request, private access to all individuals within DFPS and persons within the Executive Branch of Texas State government, as the Monitors choose; to assist the Monitors in gaining access to other stakeholders in the child welfare system (including but not limited to the staff of contract agencies); and to provide the Monitors with free access to all documents, data, and premises it deems relevant to their work (including but not limited to documents and data from contract agencies and courts).  The Monitors shall respect the confidentiality of all information related to individually identifiable clients, subject to applicable law.  Defendants shall take no adverse action against individuals or agencies because they shared information with the Monitors pursuant to this Final Order.

7.  The reports of the Monitors shall be public documents filed with the Court, except that any individually identifying information and any other confidential information protected from disclosure by law shall be redacted or otherwise removed from any public report.

8.  The parties shall have access, through the Monitors, to all information made available to the Monitors, subject to the existing confidentiality order in effect in this case.  The Monitors may protect the identity of confidential sources of any such information.

9.  The Monitor may periodically meet privately with the Court concerning issues related to this case.

10. Defendants shall deliver to the Monitors all records, reports, data and information within 30 days of the Monitors' request.  The Monitors may grant extensions to due dates upon application in writing by the Defendants.  If the Monitors decline to grant Defendants an extension, the Monitor shall do so in writing and the Defendants shall either produce the requested records, reports, data and information by the due date or appeal to the Court for an extension.

11. The Monitors shall submit bills for their compensation and reasonable expenses to the State, as well as file these bills under seal with the Court, on a monthly basis.  The State shall approve and issue payment within 30 days of receipt of the monthly bill. If the State disputes a bill, Defendants shall file their objections with the Court no later than 15 days after receiving the bill and/or request additional clarifying information or documentation to the Monitors, with a copy served on Plaintiffs.  The Monitors shall have 15 days in which to respond and to provide the additional information and/or documentation requested, with a copy served on Plaintiffs.  If within 45 days of presentation of the Monitors' bill there is still a dispute, the parties shall submit the dispute to the Court for resolution. At this time, Plaintiffs, Defendants, and the Monitors shall file a joint statement regarding the disputed payment.

12. The Monitors shall not intervene in the administrative management of either DFPS or any of its units and shall not direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance.  The Monitors are not to consider matters that go beyond superintending compliance with this Court's decree.

13. If at any point the Monitor can no longer serve, the Court shall appoint another Monitor, with input and recommendations from the outgoing Monitor.

V.      CONCLUSION

In its December 2015 Order, the Court found Texas's foster care system was broken. Over two-years later, the system remains broken and DFPS has demonstrated an unwillingness to take tangible steps to fix the broken system.

The Court **ADOPTS in part** the Special Master's Implementation Plan and all Objections not specifically sustained above are **OVERRULED**.  **The State SHALL implement the policies and procedures herein to ensure that Texas's PMC foster children are free from an unreasonable risk of harm**.

The Court appoints Kevin Ryan and Deborah Fowler to monitor compliance with this order.  The Monitors are **ORDERED** to file compliance reports on each policy outlined in this order due every **SIX MONTHS** with the first report due six months from the date of entry of this order.   DFPS is **ORDERED** to cooperate fully with the Monitors to implement each plan without delay and to assist the Monitors in the creation of monitoring reports.  The Court retains jurisdiction for a period of 3 years after full compliance as certified by the Monitors.  Either party may apply to the Court during the term of monitoring to terminate supervision over one or more components of this Order if that party can show full compliance with that component and that further monitoring will not serve a purpose.  *Cf. Freeman v. Pitts*, 503 U.S. 467, 489 (1992) ("A federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control.").  All monitoring costs are to be borne by Defendants.

SIGNED and ORDERED this 19th day of January, 2018.

_____
Janis Graham Jack
Senior United States District Judge