**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| M.D., by her next friend, Sarah R. Stukenberg, *et al.,* individually and on behalf of all others similarly situated, | § § § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | CIVIL ACTION NO. 2:11 CV-00084 |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.,* | § § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANTS' OPPOSED MOTION TO STAY INJUNCTION PENDING APPEAL**

---

Defendants respectfully request the Court to stay its Final Order entered on January 19, 2018, during the pendency of the appeal. (Doc. 559, ("Injunction")). A stay is necessary because Defendants are likely to prevail on the merits of the appeal and will suffer irreparable harm as the Court's Injunction invades Texas's sovereign right to administer foster care to children in the state. Indeed, the Court's award of injunctive relief, largely adopting the unsupported work of an appointed special master working under a defective referral, encroaches upon terrain that is rightfully in the province of the legislature, *see Horne v. Flores*, 557 U.S. 433, 448 (2009) ("[I]nstitutional reform injunctions often raise sensitive federalism concerns. Such litigation commonly involves areas of core state responsibility . . . ."), and would commit this Court to an open-ended oversight of a complex foster care system.

1

The Court's underlying findings of class-wide constitutional violations are unsupported by reliable expert testimony or other competent, admissible evidence. The Court wholly rejected the expert testimony of the only expert Plaintiffs offered to prove their claims on a class-wide basis. The remaining anecdotal experiences of the relatively few children that Plaintiffs selected to testify do not constitute class-wide evidence, cannot support class-wide liability, and do not justify class-wide remedies. The class-wide finding is also erroneous because Plaintiffs failed to prove with competent evidence compliance with the commonality and typicality requirements of Fed. R. Civ. P. 23(a) and the uniformity requirement of Rule 23(b). The Court thus erroneously determined that the members of the class and sub-classes have suffered the same constitutional harm. Further, the remedy the Court has imposed fails to comply with the well-established requirement that injunctions in class actions cure the alleged wrong with a single stroke. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (finding that the class members claims must depend upon a "common contention" of "such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 841 (5th Cir. 2012) (holding that the district court "failed to describe how a finding that Texas fails to maintain a caseworker staff that performs 'properly' will resolve an issue that is 'central to the validity of each one of the [class member's] claims in one stroke") (quoting *Wal-Mart*, 131 S. Ct. at 2551). Defendants are also likely to succeed on the merits of the appeal because the Court's conclusion

that the foster care system creates an unreasonable risk of harm to the class members is unsupported by the law.  Finally, the Court's permanent injunction is overly broad, vague and thus void as result of the many vague terms and ambiguities identified in Defendant's Objections to Special Master's Implementation Plan (Doc. 556).  The Court should grant this motion and stay the Injunction until such time as the Fifth Circuit has ruled on the merits of the appeal.

This case has been pending since 2011.  The case was tried in December 2014, more than three years ago.  The Court found liability a year later in December 2015.  More than two additional years have passed before the Court issued the Injunction.  Despite this protracted chronology, much of Injunction is now to be "effective immediately."  Other parts impose short deadlines that cannot reasonably be met.  As a result, Defendants respectfully request this Court to rule on this motion immediately and to suspend enforcement of the Injunction pending the resolution of the appeal.  *See* FED. R. CIV. P. 62(c).

<u>**ARGUMENT & AUTHORITIES**</u>

Defendants request a stay pending appeal of the Injunction.  Federal Rule of Civil Procedure 62 permits the trial court, in its discretion, to suspend an injunction during the pendency of an appeal.  Courts typically consider four factors in evaluating a request for a stay pending appeal:  (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant will be irreparably harmed if the stay is not granted; (3) whether a stay will substantially harm the other parties; and (4) whether the stay serves the public interest. *See Planned Parenthood of*

*Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013).  A party seeking such a stay need only present a "substantial case on the merits," as opposed to a likelihood of success on the merits, where—as here—"a serious legal question is involved and . . . the balance of equities weighs heavily in favor of granting the stay." *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983) (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981)).

## I.   DEFENDANTS HAVE A SUBSTANTIAL LIKELIHOOD OF PREVAILING ON THEIR APPEAL.

The Court is already familiar with Defendants' arguments regarding why class certification was improper[1] as to the certified class and subclasses.  While the Court has already rejected those arguments, Defendants re-urge them.  Plaintiffs failed to prove compliance with the commonality and typicality requirements of Rule 23(a).  And now, with a putative remedy now determined by the Injunction, it is even more clear that all three certified classes fail for failure to meet the requirements of Rule 23(b)(2), as developed in greater detail below.  Defendants respectfully submit that on the threshold determination of improper class certification, they are likely to prevail on their appeal of the Injunction.

Defendants' appeal will present additional independent bases on which the Fifth Circuit will likely find that Plaintiffs' claims fail.  First, any injunctive remedy is improper because the Court's underlying findings of class-wide constitutional violations are unsupported by reliable expert testimony or other competent, admissible evidence.  The Court wholly rejected the expert testimony of the only

---

[1] Opposition to Plaintiffs' Motion for Class Certification (Doc. 163) and Defendants' Post-Trial Brief (Doc. 359)

4

expert Plaintiffs offered to prove their claims on a class-wide basis. The remaining anecdotal experiences of the relatively few children that Plaintiffs selected to testify do not constitute class-wide evidence, cannot support class-wide liability, and do not justify class-wide remedies.

Second, the findings of constitutional violations in the Court's December 17, 2015 Memorandum Opinion (Doc. 368) do not support the remedies in the Injunction and they are not precisely tailored to cure those purported constitutional violations. As a result, there is a complete disconnect between the Court's liability finding and the remedies in the Injunction. As a number of examples demonstrate, this disconnect is pervasive in the Injunction.[2] The items in the Injunction do not

---

[2] There was no testimony whatsoever that any child in PMC (much less all children in the class) ever suffered any harm for lack of access to a home-based landline, and yet the Special Master has recommended installation of landlines system-wide. There was no testimony, expert or otherwise, as to whether a caseworker caseload of a certain level within the Texas foster care system violated the Fourteenth Amendment. (As a result, the Court candidly admitted not knowing where to draw the constitutional line on caseloads. (Doc. 368, at 164.)) There was no evidence whatsoever that any child (much less all children in the class) whose caseworker has a caseload of 18 or more children suffered a constitutional injury. There was no testimony whatsoever that having a child's files exist in part electronically and in part in hard copy, as opposed to a single electronic file, harmed a single child (much less all children in the class). Yet, the Court has ordered a complete and extraordinarily expensive overhaul of DFPS' computer system, an existing system that in the eyes of the Executive Branch is already fully compliant with federal standards, to combine all records in a single electronic file system. The only testimony offered about risk of harm in foster group homes was limited to homes with more than six children. As to those, Plaintiffs' expert candidly admitted she did not even attempt to analyze an unbiased sample). Despite such faulty evidence, the Court has ordered the immediate (and hugely disruptive and harmful) closure of all foster group homes with more than six children. And, with respect to facility population, the Injunction goes beyond the claim of the Foster Group Home subclass. Despite the statistically invalid evidence, which was limited solely to a "not-unbiased" subset of foster group homes, the Court has also recommended that non-foster group homes excluding kinship homes, be limited to six children. There was no evidence whatsoever that any child in such homes with more than six children ever suffered harm due to the number of children in the home. There was no testimony that allowing a caseworker supervisor also to carry a caseload of any size somehow subjected any child (much less all in the class) to a constitutional injury, yet the Court has ordered that supervisors be prohibited from also serving as caseworkers for children. Likewise, there was no evidence whatsoever that at a certain level a supervisor to caseworker ratio (any ratio) subjects any child (much less all in the class) children to harm in violation of the Fourteenth Amendment. The Court nevertheless has recommended a mandatory ratio of seven to one. The trial of this case had nothing to do with the maintenance of children's medical records or with the quantity and quality of

5

correspond to the harm Plaintiffs alleged and the Court found (albeit on insufficient evidence) nor do they derive from any recognized Fourteenth Amendment substantive due process right.  And, as to each there is no evidence that these items of injunctive relief will, in fact, cure the alleged class-wide constitutional violations.

The Court erred in issuing the Injunction because it derives from the Special Master's Implementation Plan (the "IP").  The Appointment Order for the Special Masters (Doc. 379), however, violates Fed. R. Civ. P. 53 for the reasons stated in the objections Defendants made in their Opposed Motion to Stay (Doc. 370) and their Opposed Motion to Revoke Reference to Special Masters (Doc. 389).  The Injunction is the product of an improper Appointment Order and is thus invalid.

Further elaboration on the certification failings supports a successful appeal. The class-wide Injunction the Court has entered does not meet the requirements of Rule 23(b)(2).  The Court failed in the certification order even to describe a Rule 23(b)(2)-compliant remedy, much less point to any evidence in support thereof.  Later, at the conclusion of the trial, the Court still did not define a remedy, but instead

---

developmental assessments for children.  There was no testimony that any child (much less all children in the class) suffered constitutional injuries as a result of the maintenance of medical records or the lack of assessments in addition to the many DFPS already does.  Yet the Court has ordered expensive and unnecessary changes to the Health Passport and additional developmental assessments.  There was no testimony whatsoever that any child in PMC (much less all children in the class) ever suffered any constitutional injury from a lack of birth certificates, social security cards, independent or adult living preparation services, life skills assessments, Circles of Support, Transition Planning Meetings, expungement of criminal records, access to post-care benefits, driver's education courses, safe stable housing upon exit from care, or encrypted email accounts.  Yet the Court has ordered affirmative entitlements to, and corresponding obligations by DFPS to provide these things.  There was no evidence as to any child, much less all children in the class, that having unrelated children more than three years apart in age in the same room, having unrelated children with different service levels in the same room, having children spend a night in office, or having children under two, under six and under twelve years of age reside in non-family-like settings cause a constitutional injury.  Yet, the Court orders prohibitions of each of these arrangements.   These are not remedies to evidence-based class-wide violations of recognized substantive due process rights.

referred that issue to the Special Master.  There was no demonstrated remedy in existence at the time of certification, the time of trial and at the time of the Court's class-wide liability finding.  The Court thus never correctly determined that there was a Rule 23(b)-complaint remedy that would cure the individual class members' claims in one stroke. *Wal-Mart*, 131 S. Ct. at 2551; *M.D.*, 675 F.3d at 841.  In deferring its remedial jurisdiction to the Special Master, the Court impermissibly bypassed the difficult questions of what relief is necessary to meet the minimum constitutional requirement and avoided confronting the fact that plaintiffs failed to even ask for, much less prove their entitlement to a remedy that satisfies Rule 23(b)(2).

The United States Supreme Court made clear in *Wal-Mart* that Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." 131 S. Ct. at 2557.  The Court went on to clarify that the Rule "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

Relying on the Supreme Court's reasoning in *Wal-Mart,* in reversing and remanding this Court's first attempt to certify a class, the Fifth Circuit was clear:

> "[W]e find that the Named Plaintiffs must make an 'effort to give content to what it would mean to provide adequate . . . or "appropriate" levels of services' so that 'final injunctive relief may be crafted to 'describe in reasonable detail the acts required."
>
> . . .
>
> Lastly, if the district court decides to certify subclasses, it should specifically identify the applicable requested relief for each of the certified subclass claims."

*M.D.*, 675 F.3d at 848-49 (citations omitted).  Despite the Fifth Circuit's instructions, the original defects that resulted in a reversal of the class certification in *M.D.* still exist with the current certified classes.

The Court's inability to craft a remedy stems from its failure to "explain how the determination of [the class's proposed common questions of fact] would 'resolve an issue that is central to the validity of each one of the [individual class member's] claims in one stroke.'" *M.D.*, 675 F.3d at 841 (quoting *Wal-Mart*, 131 S. Ct. at 2551). That failure stems from the Plaintiffs' own failure to prove common facts regarding each child in PMC that could serve as the basis for finding that each and every child in PMC or the two subclasses has been subjected to a constitutional injury, even under the manifestly incorrect "unreasonable risk of harm" standard.  For instance, the Court's liability opinion addressing caseworker caseloads is devoid of any finding or conclusion regarding a resolution of the alleged violation related to caseloads. Instead, the Court finds it "does not need to establish the exact point at which caseloads become so excessive that they will cause an unreasonable risk of harm. . . . *Wherever that point lies*, DFPS has crossed it."  (Doc. 368, at 164 (emphasis added)). Rather than actually crafting a remedy that resolves the caseload problem in "one stroke," the Court referred the issue to a special master to "recommend the point as which caseloads are manageable for full-time and part-time CVS caseworkers, taking into account times of crisis."  (Doc. 368, at 250).  Offering nothing more than a suggestion that this point is one "where children are free from an unreasonable risk of harm," (Doc. 368, at 250), as the Court did here, did not satisfy the requirements

of Rule 23(b)(2).  While the requirement of Rule 23(b)(2) needed to be satisfied at the time of certification, and clearly was not, the subsequent Special Master's Implementation Plan and the Injunction confirm that there is not, in fact, a single-stroke remedy compliant with Rule 23(B)(2).

Further, the Fifth Circuit in *M.D.* left open the question whether the Plaintiffs' class claims were prevented by "dissimilarities within the proposed class" because of their dependence on an "individualized inquiry regarding the harm or risk of harm experienced by each class member from the State's practices . . . ." *M.D.*, 675 F.3d at 843.  Now, after a lengthy trial with 29 fact witnesses, 11 experts, and thousands of exhibits, the evidence clearly establishes that the individual class members' substantive due process claims are incapable of class-wide resolution because each requires an individualized inquiry into whether the Defendants' conduct "shocks the conscience."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) ("[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense.'"); *Hernandez v. Tex. Dep't of Protective and Reg. Servs.,* 380 F.3d 872, 880 (5th Cir. 2004) (referring to the *Lewis* "shock the conscience" standard).

The evidentiary record is replete with evidence that class members' needs vary; that some have siblings who must be considered in placement decisions and others do not; that some class members are placed in familial placements and others are not; and that some may need 24-hour supervision, where others do not.  The dissimilarities among the class members--too many to list in full--demonstrate that a

9

placement in a PMC child's best interests arises from an individualized determination that is based on a number of competing factors reflecting that child's needs.

A stay is also necessary because the Court departed from the legal standard previously applied to children in foster care and created a new one out of whole cloth for determining that the Plaintiffs' substantive due process rights were violated. The Fifth Circuit has observed that a foster child in state custody enjoys a substantive due process "right to personal security and reasonably safe living conditions." *Hernandez*, 380 F.3d at 880.  The Fifth Circuit has repeatedly cautioned lower courts "to resist the temptation to augment the substantive reach of the Fourteenth Amendment."  *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990), *cert. denied* 498 U.S. 1040 (1991).  Yet in holding that "foster children have a Fourteenth Amendment substantive due process right to be free from an unreasonable risk of harm caused by the State," (Doc. 368, at 17, emphasis added), this Court deviated from the Fifth Circuit's prior observation in *Hernandez* and expanded the reach of the Fourteenth Amendment to rights that have never before been recognized in the Fifth Circuit or by the Supreme Court.

By impermissibly expanding the scope of the Fourteenth Amendment, the Court departed from *Hernandez* and transformed the right stated therein into one protecting foster children "from an unreasonable risk of harm," which the court recognized as one that "is unlimited."  (Doc. 368, at 16-17)  (citing *R.G. v. Koller*, 415 F. Supp. 2d 1129 (D. Haw. 2006) (creating a right to "protection from psychological .

10

. . abuse"); *Marisol A. by Forbes v. Gulliani*, 929 F. Supp. 662 (S.D.N.Y. 1996) (including "a substantive due process right to be from unreasonable and unnecessary intrusions into their emotional well-being"); *K.H. ex rel. Murphy*, 914 F.2d 846, 851 (7th Cir. 1990) (establishing constitutional obligation "to take steps to prevent children in state institutions from deteriorating physically or psychologically."). The Court's analysis of the Plaintiffs' claims in the context of this new, generic statement of due process rights ("freedom from an unreasonable risk of harm") is defective. Worse, the Court never defines what is "unreasonable" under the new substantive due process right. Nor does the Court offer any explanation of how one objectively determines when a risk moves from being reasonable to unreasonable, what objective factors, if any, are to be considered in making that determination, or whether any other type of predictively-sound framework for analysis governs.[3]   Further, the Court's repeated references to "an unreasonable risk of harm," with no principled definition or substantive analysis is the analytical equivalent of simply invoking the same provision of law, which cannot satisfy commonality under Rule 23(a). Elevating the putative right to such a level of generality does not support commonality. It defeats it. Due to the Court's expansion of substantive due process rights and faulty class-certification analysis based thereon, the resulting class-wide Injunction should fail on appeal.

---

[3] Plaintiffs likewise offered no factors or other means of analysis of the magnitude of risk and determination of the point at which risk becomes unreasonable under the district court's new "unreasonable risk of harm" formulation of the substantive due process duty. Having provided no framework for risk magnitude analysis, Plaintiffs offered only anecdotal experiences of risk by a limited number of the 12,000 children in PMC and not any legally sound evidence of magnitude of risk and certainly not any of such risk at a class-wide level.

Finally, the Injunction contains multiple procedural defects and is so broad that it fails to give the Defendants fair notice of its parameters and is virtually impossible to follow in all factual circumstances that arise in Texas's foster care system. *See,* Defendants' Objections to Special Master's Implementation Plan (Doc. 556).

## II.     The District Court's Injunction Will Cause Irreparable Harm Without a Stay.

A State can experience irreparable harm when an injunction "would frustrate the State's program" and "deprive[] the State of the opportunity to implement its own legislature's decisions." *Moore v. Tangipahoa Parish Sc. Bd.*, 507 F. App'x 389, 399 (5th Cir. 2013). Irreparable harm exists where "the denial of a stay will utterly destroy the status quo," *Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979), and "this harm cannot be undone," *Grutter v. Bollinger*, 247 F.3d 631, 633 (6th Cir. 2001). When there is no mechanism for the State "to recover the compliance costs they will incur if the [injunction] is invalidated on the merits," an injury is irreparable. *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016).

The Court's Injunction will irreparably harm the State's foster-care system and the children it serves for several reasons. The sheer number and scope of the changes is massive, and many deadlines are unrealistically short. Forty-four actions are required immediately, including two that will require the abrupt removal of children from their existing placements. These immediate obligations alone warrant emergency consideration of the stay motion. Further and as detailed in Defendants' Objections to the Implementation Plan [Doc. 556], for many of the nearly 50

12

additional actions with deadlines three, six, or even 12 months away, timely compliance is simply not possible.   For others, DFPS must immediately begin diverting enormous resources away from its core mission of protecting foster children even to have any possibility of completing those actions by the court-imposed deadlines.

Below is a sample of just some of the injunction's draconian provisions and the irreparable harms they will cause.

Immediate harm to children. "Effective immediately," no PMC child may reside (1) in an FGH placement with more than six children, or (2) in any family-like placement (excluding kinship foster care) that houses more than six children (including biological, adopted, and foster children). Declaration, Attachment 1, hereto. Currently, approximately a minimum of 52 children will have to be removed from FGHs and that number could go up if sibling groups are to be kept together. PMC children reside in FGHs with more than six children. Hinson.2. Closing these FGHs will require removing those children and finding them new placements, which may require uprooting them from family, school, and friends. The prohibition on family-like placements with more than six children would likewise subject to displacement a significant number of children who reside in cottage-style foster homes with more than six children, depending on the configuration of the home.

Massive system changes. The injunction requires approximately 100 discrete changes within the next year, many entailing massive operational changes that will impose enormous financial obligations on the State and cannot be achieved by the

Defendants without an appropriation from the legislative branch. Even with appropriations, it is not clear that the recommendations are achievable inasmuch as they lack recognition of competing issues and priorities and the need for measured systemic change as well as full participation from entities not subject to the Court's jurisdiction. Among the most significant are:

1.      Implementing "an integrated computer system" (accessible to all DFPS caseworkers and supervisors, CASA staff and volunteers, and others) containing "each PMC child's complete records, including all medical, dental, educational, legal, caseworker, and medical records (with detailed examinations, diagnoses, test results, immunizations, and medications, etc.). IP 11. No federal or state law requires any such system—and for good reason. Most of these record types will have multiple sources, necessitating complex inter-agency data transfers, and it is unclear how DFPS would force external entities to adopt a compatible system. The court's one-year implementation deadline ignores that such a considerable change would require not only legislative approval but massive appropriations to multiple state agencies and their business partners, plus a lengthy procurement and implementation process. Even if it were possible to accomplish all those preconditions, DFPS estimates that such a system could cost as much as $121 million over five years to the State and healthcare providers.

2.      Imposing unprecedented caseload caps (unsupported by record evidence without any judicial determination of constitutional limits) for CVS caseworkers,

14

IP.25-26, caseworker supervisors, IP.29-30, and RCCL investigators and inspectors, IP.37-38, by June 2018.

3.      Imposing a host of changes on how CVS caseworkers, RCCL investigators, and licensed caregivers are trained, IP.26, 31-32,38-39.

4.      Eliminating ISY workers (now known as Local Permanency Specialists) within 30 days, IP.35.

5.      Imposing numerous restrictions on foster placements, several effective immediately or by March 2018. IP.43-47. This requirement will inhibit ongoing efforts to achieve an optimal placement array, by reducing its numbers due to needless limitations.

6.      Requiring DFPS to provide driver's-education classes to all eligible PMC children, effective June 2018. IP.18. This unfunded mandate does not explain who will provide vehicles and insurance coverage for learners, or who will bear these costs. Moreover, this action bears no relation to the constitutional right to personal security and reasonably safe living conditions.

7.      Ensuring that a plan is in place to provide all PMC youth age 16 or older with "safe, stable housing" when they exit the PMC, effective immediately. IP.18. This is another novel mandate that does not relate to the personal security or safety of foster children while in the State's custody and is unachievable as it overlooks the volition of the young adult who exits from care, in addition to overlooking the need for significant funding.

15

8.      Providing an attorney ad litem for every PMC child. IP.21. This unprecedented, is contrary to State law, is an unfunded mandate that will cost the State millions of dollars annually, and will create a conflict of interest If DFPS is required to pay for attorneys.

9.      Providing a expanded healthcare services that far exceed any possible constitutional minima. IP.22-24.

10.      Mandating supervisory review of all screened out calls to the Statewide Intake hotline despite no evidence or testimony indicating that any calls were screened out, or even assessed, incorrectly.

## III.   A Stay Will Not Substantially Injure Plaintiffs and Serves the Public Interest.

If the stay movant satisfies the first two factors, "the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009). To begin, a temporary stay pending appeal will cause no harm to Plaintiffs. It has been two years since the Court issued its interim order finding purported constitutional violations. During that two-year period, the Court allowed state foster care system to continue functioning as is, with the addition of 24-hour supervision in FGHs. The Court's implicit determination that PMC children faced no imminent risk of serious harm while the special-master process ran its course belies any argument that they face any such risk now. The same policies and procedures that have protected PMC children for the last two years will safeguard them while Defendants appeal the district court's improper injunction.

16

Weighed against Plaintiffs' interests is the public interest. When (as here), the State seeks a stay pending appeal, "its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (*per curiam*) (citing *Nken*, 556 U.S. at 435). The proper expenditure of state funds and implementation of state programs is a matter of public interest. *Hamer v. Brown*, 831 F.2d 1398, 1402 (8th Cir. 1987). The efficient administration of government programs is also in the public interest. *See, e.g.*, *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 381 (1992). Balanced against the negligible risk of future constitutional harm to Plain-tiffs, these public interests weigh solidly in Defendants' favor.

Federalism concerns also strongly favor a stay pending appeal. The district court's takeover of the foster-care system on unsupported findings is an inappropriate incursion into state sovereignty. Instead of providing remedies tailored to redress genuine constitutional violations, it mandates massive reforms of a state institution, with indefinite federal oversight, based on a hodgepodge of anecdotes and bare policy preferences. This impermissibly invades the exclusive province of the Legislature and executive officers. *See Horne v. Flores*, 557 U.S. 433, 448 (2009) ("[I]nstitutional reform injunctions often raise sensitive federalism concerns. Such litigation commonly involves areas of core state responsibility.").

It is not the courts' function to second-guess the policy choices of state officials. *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). As the Supreme Court has admonished:

> Judges . . . have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution,

17

the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. *Id*.

Indeed, there is "no reason to think judges or juries are better qualified than appropriate professionals in" administering an institution. *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982). Judicial review is accordingly "limit[ed]," to prevent "interference by the federal judiciary with the internal operations of these institutions." *Id*. at 322. The presumptive correctness of the decisions of professionals is "necessary to enable institutions of this type—often, unfortunately, overcrowded and understaffed—to continue to function." *Id*. at 324. Given Defendants' strong showing that the district court's findings of class-wide constitutional violations are erroneous, Texas should not be forced to remake its foster care system based on the district court's policy preferences before this Court can decide the appeal on the merits.

## **CONCLUSION**

The Court should grant the motion and stay enforcement of the Injunction pending the resolution of the appeal.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS

18

Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

*/s/ Thomas A. Albright*
THOMAS A. ALBRIGHT
Attorney-in-Charge
Texas Bar No. 00974790
Southern District No. 107013
ANDREW B. STEPHENS
Texas Bar No. 24079396
Southern District No. 1385273
Assistant Attorneys General
Office of the Attorney General
General Litigation Division - 019
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120; (512) 320-0667 FAX


JOSEPH D. HUGHES
Assistant Solicitor General
Texas Bar No. 24007410
Southern District ID# 1022042
Office of the Solicitor General
P.O. Box 12548
Austin, TX 78711-2548
(512) 936-1729
TODD LAWRENCE DISHER
Special Counsel for Civil Litigation
Texas Bar No. 24081854
Southern District ID# 2985472
Civil Litigation Division
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266

*ATTORNEYS FOR DEFENDANTS*

19

## CERTIFICATE OF CONFERENCE

I hereby certify that on this, the 19th day of January 2018, I conferred with Plaintiffs' counsel who advised this motion would be opposed.

 /s/ Thomas A. Albright

THOMAS A. ALBRIGHT
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 19th day of January 2018, a true and correct copy of the foregoing document has been filed with the court's CM/ECF electronic case management system, thus providing service upon all participants.

 /s/ Thomas A. Albright

THOMAS A. ALBRIGHT
Assistant Attorney General
