# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 18, 2018

Lyle W. Cayce
Clerk

No. 18-40057

---

M. D., by next friend Sarah R. Stukenberg; Z. H., by next friend Carla B.
Morrison; S. A., by next friend Javier Solis; A. M., by next friend Jennifer
Talley; J. S., by next friend Anna J. Ricker; H. V., by next friend Anna J.
Ricker; L. H., by next friend Estela C. Vasquez; C. H., by next friend Estela
C. Vasquez; A. R., by next friend Tom McKenzie, individually and on behalf
of all other similarly situated,

        Plaintiffs - Appellees

v.

GREG ABBOTT, in his official capacity as Governor of the State of Texas;
COURTNEY PHILLIPS, in her official capacity as Executive Commissioner
of the Health and Human Services Commission of Texas; HENRY
WHITMAN, JR., in his official capacity as Commissioner of the Department
of Family and Protective Services of the State of Texas,

        Defendants - Appellants

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

       Plaintiffs, a certified class of minor children in the Permanent Managing
Conservatorship of the Department of Family Protective Services ("DFPS") in
Texas, filed suit under 42 U.S.C. § 1983 seeking injunctive relief against the
Governor of Texas, the Executive Commissioner of the Texas Health and

No. 18-40057

Human Services Commission, and the Commissioner of DFPS (collectively "the State"). They allege that the State's maintenance of its foster care system exposes them to a serious risk of abuse, neglect, and harm to their physical and psychological well-being. The district court held that the State's policies and practices violated plaintiffs' constitutional right to be free from an unreasonable risk of harm, and granted plaintiffs a permanent injunction requiring sweeping changes to Texas's foster care system. The State appeals both the liability determination and the injunctive order. For the reasons stated below, we AFFIRM in part, REVERSE in part, VACATE, and REMAND for modification of the injunction.

## I.    Facts and Proceedings

The Texas Department of Family and Protective Services[1] is responsible for roughly 29,000 children. When DFPS's Child Protective Services ("CPS") division determines that it is not safe for a child to remain with his legal guardian as a result of abuse and/or neglect, CPS petitions the court to remove the child to the Temporary Management Conservatorship ("TMC"). TMC is intended to be a nonpermanent custody arrangement. CPS places the TMC child with a relative or a certified caregiver while CPS attempts to reunify the child with his legal guardian, permanently place him with a relative, or arrange for him to be adopted. There are approximately 17,000 children in TMC, which lasts for one year unless the court extends it by six months. If CPS cannot achieve permanency[2] for the child at the end of the TMC period, the child enters the Permanent Managing Conservatorship ("PMC"). There are approximately 12,000 children in PMC.

---

[1] DFPS is overseen by Texas's Health and Human Services Commission. *See* Tex. Gov't Code Ann. § 531.0055.

[2] "Permanency" is the term used to refer to a child's exiting from DFPS care into an appropriate, permanent setting. It is the ultimate goal for children in State custody.

No. 18-40057

Many things change when a child is moved to PMC. As a general matter, PMC children get less attention from their caseworkers and other advocates than do TMC children. For example, according to requirements set by the state legislature, PMC children are entitled to fewer permanency review hearings, planning meetings, and status hearings per year. TMC children receive four service plan reviews in their first year, but PMC children receive only two reviews per year. Unlike TMC children, PMC children are not entitled to an attorney *ad litem*, and they are far less likely to have Court Appointed Special Advocate ("CASA") volunteers. As one state court-commissioned report put it, "[t]hough the State's responsibility for the child's life and well-being does not change—and arguably increases—the attention paid to the child's cases diminishes drastically." There is a sense among CPS staff that when a child transitions into PMC, "the clock stops ticking."

Children receive one of four "service level" designations upon entering state custody—Basic, Moderate, Specialized, or Intense—based on their physical and psychological needs. Placements must be licensed to care for children at specific service levels. DFPS has access to a variety of placement settings, though it directly manages only about 10% of them. The remaining 90% are managed by private child-placing agencies ("CPAs") contracting with the State. Relevant placement setting options, listed from least to most restrictive, include: 1) foster family homes that contain 1 to 6 children; 2) foster group homes that contain 7 to 12 children ("FGHs"); 3) general residential operations that contain 13 or more children ("GROs"); and 4) residential treatment centers ("RTCs"), which provide therapeutic treatment for children with more severe emotional or mental-health issues.

It is DFPS policy to find the most appropriate placement for foster children and to try to keep children in their home counties. Policy also specifies that children should be placed with their siblings whenever possible and in

No. 18-40057

family-like settings as opposed to group homes if it is feasible and in the child's best interest. Because of practical limitations on placement availability, roughly 40% of children are placed "out of region."[3] Approximately 64.7% of sibling groups are placed together. Just under 14% of PMC children under 12 are placed in FGHs, GROs, or RCLs. DFPS does not have a policy against mixing children of different ages, sexes, and service levels in FGHs, though girls and boys may not share the same bedroom.

Primary conservatorship caseworkers ("CVS caseworkers" or "caseworkers") are a foster child's most important point of contact within DFPS, and they are critical to the provision of safety for foster children. CVS caseworkers are responsible for, among other things, assessing children's placement needs, finding appropriate placement, monitoring the children to make sure they are safe, ensuring that they receive needed services, developing and implementing permanency plans, attending court hearings and plan meetings, updating the children's medical records, and conducting monthly face-to-face visits with the children and their foster families.[4] Given caseworkers' sweeping responsibilities, the Child Welfare League of America ("CWLA") recommends that they carry a caseload that includes no more than 12 to 15 children.[5] DFPS does not place any limits on the number of cases CVS caseworkers can carry. As of June 2014, nearly half of CVS caseworkers carried caseloads of 21 children or more, 22% carried caseloads of 26 or more, and nearly 10% carried caseloads of 31 children or more.[6] Caseworkers report that

---

[3] "Out of region" generally means outside of the child's home county.

[4] CVS caseworkers' caseloads include both TMC and PMC children.

[5] The Texas legislature recognizes the CWLA guidelines as a relevant, but not binding, benchmark. See Tex. Gov't Code Ann. § 531.001(5).

[6] There is reason to doubt that these calculations capture the full scale of the caseload burden. The problems associated with the DFPS-provided data is discussed more fully in Section IV, infra.

No. 18-40057

they are overworked, and DFPS experiences a high rate of caseworker turnover.

Because placement availability is limited, it is often impracticable for caseworkers to make their monthly face-to-face visits with their children. DFPS often uses secondary workers to fill this gap. In some cases, when caseworkers are too busy or too far away, secondary "I See You" ("ISY") workers will take on the home visits. Caseworkers then rely on ISY workers' notes in case planning. ISY workers typically carry a large caseload, and their responsibilities are significantly more limited than are those of primary caseworkers. They are not required to follow up on a child's needs, and they are not involved in any aspect of a child's permanency plan outside of providing relevant information to the child's primary caseworker. ISY workers' primary responsibility is to see the child and confirm that the child "is still there." Testimony at trial strongly suggests that ISY visits are perfunctory and that the information they generate from the foster child is often superficial and unhelpful. Children do not feel comfortable sharing their problems with their revolving roster of ISY workers, who often fail to meet with them in private as required by DFPS policy.

With respect to recordkeeping, DFPS's methods are shockingly haphazard and inefficient. A significant portion of children's records are kept in DFPS's electronic IMPACT casework system. Data on abuse and neglect investigations are maintained by the Residential Child Care Licensing ("RCCL") division in its CLASS database. Caseworkers have access to CLASS, but the data is not merged with IMPACT files. RCCL allows CPAs to keep their own records. Medical records and related information is accessible via the STAR Health Passport, which is not synced with IMPACT, though IMPACT is supposed to include children's comprehensive medical information. Neither IMPACT nor STAR can "store" many requisite documents electronically, so

No. 18-40057

documents such as medical assessments and birth certificates are maintained in paper files. Some children's files are maintained entirely in paper form, and casefiles are often inordinately long.[7]

The task of inspecting, investigating, and licensing placements is managed by RCCL. The Performance Management Unit ("PMU") is responsible for internal quality control for all of DFPS, including RCCL. RCCL investigates any reports of neglect and abuse. When RCCL investigates an allegation, it ascribes one of four outcomes upon completion: 1) Reason to Believe ("RTB"); 2) Ruled Out ("RO"); 3) Unable to Determine ("UTD")[8]; or 4) Administrative Closure.[9] Two PMU studies of a random sample of UTD dispositions revealed a high rate of disposition errors.

RCCL investigates incidents of child-on-child abuse, but does not formally track or aggregate those statistics; rather, it labels child-on-child incident investigations "negligent supervision" cases. The only place RCCL records a child's history of abusing other children is in the perpetrating child's individual casefile. This means that this information is not easily accessible to caseworkers when they are evaluating whether a placement is appropriate for one of their children.[10] It also means that incidents of child-on-child abuse are

---

[7] The district court noted that the records for the 20 children it had access to totaled over 350,000 pages. Case file length is also inconsistent. For example, J.S.'s case file was 40,000 pages long, but the case files for an eight-sibling group comprised a total of 16,500 pages.

[8] UTD is a final disposition and does not mandate RCCL follow-up.

[9] RTB and RO dispositions mean a "preponderance of the evidence" indicates abuse did or did not occur. "Administrative Closure" means "The operation is not subject to regulation; or the allegations do not meet the definition of abuse, neglect, or exploitation."

[10] Essentially, this information is not "searchable" for a caseworker. As a result, caseworkers may miss it. For example, named plaintiff D.I. was placed in a home with a 16-year-old boy who had sexually abused a young boy several years earlier; D.I. was ultimately sexually abused by this same 16-year-old boy. The boy's abuse history was not accessible to D.I.'s caseworker, and thus it was overlooked when making the placement decision.

6

No. 18-40057

not included in the abuse rate/data DFPS provides to the federal government or the data that was provided to the district court.

Children "age out" of foster care when they reach the age of 18. Roughly 1,300–1,400 foster children "age-out" of the foster system annually. Of these, approximately 25–30% go back into extended foster care. Another small percentage with intellectual and developmental disabilities go into the guardianship of a separate program not maintained by DFPS. The rest, presumably, though it's not clear from the record, find a permanent living arrangement, make use of shelters and other non-profit programs for youths aging-out of foster care, or end up homeless. DFPS offers independent living classes to foster children over the age of 16, though DFPS apparently does not know what percentage of children actually utilize the program.

Plaintiffs, minor children in the PMC, filed suit through next friends in March 2011, alleging that the State violated their substantive rights under the Due Process Clause of the Fourteenth Amendment. They sought injunctive relief against the Governor of Texas, the Executive Commissioner of the Texas Health and Human Services Commission, and the Commissioner of DFPS. The district court granted their motion for class certification under Federal Rule of Civil Procedure 23. Following the Supreme Court's opinion in *Walmart v. Dukes*, 564 U.S. 338 (2011), this court vacated and remanded the certification. *M.D. ex rel. Stukenberg v. Perry (M.D. I)*, 675 F.3d 832 (5th Cir. 2012). After a three-day hearing, the district court concluded that the requirements of Rule 23(a) had been met, and certified a general class—all children now, or in the future, in the PMC in Texas—and three subclasses: 1) Licensed Foster Care

No. 18-40057

Subclass ("LFC")[11]; 2) FGH subclass; and 3) Basic care GRO subclass[12]. The State's interlocutory appeal of the certification order was dismissed as untimely. *M.D. ex rel. Stukenberg v. Perry*, 547 F. App'x 543 (5th Cir. 2013).

Following a two-week bench trial, the conscientious district court issued its liability opinion in December 2015. The district court ultimately found that DFPS's policies and practices with respect to caseloads, monitoring and oversight, placement array, and foster group homes violated plaintiffs' substantive due process rights. It ordered the State to "establish and implement policies and procedures to ensure . . . PMC foster children are free from an unreasonable risk of harm" and enjoined DFPS from placing children in FGHs that lack 24-hour awake-night supervision.

Over the course of the trial, the court heard from twenty-eight fact witnesses: 1) six next friends and attorneys *ad litem*, who have roughly 80 years of experience in the child welfare system between them and who have dealt extensively with PMC children and CVS caseworkers; 2) five former PMC foster children; 3) a non-profit leader who runs a shelter and transitional living program for youths aging-out of foster care in Texas and who has personally fostered 65 children over the last 16 years; 4) two former CVS caseworkers; and 5) 14 current DFPS officers[13]. The district court also heard testimony from twelve expert witnesses proffered by the plaintiffs and the State. It gave various weight to the experts' testimony according to the district court's credibility determinations. Ultimately, the district court disregarded the testimony of two proffered experts in their entirety as unreliable.

---

[11] LFC includes all members of the General Class in licensed or verified foster care placements, excluding verified kinship placements.

[12] The Basic Care GRO subclass was later decertified as without adequate representatives.

[13] Some of these officers have since left the agency.

No. 18-40057

The court considered several reports detailing both independent and internal reviews of the Texas foster care system, including multiple reports that were commissioned by DFPS itself. The reports date back to 2004, and several of them reference earlier agency reviews and internal audits, most notably a report authored by the Governor's Committee to Promote Adoption ("GCPA") in 1996. Additionally, the district court considered national child welfare standards provided by the CWLA and the Council on Accreditation, and Child and Family Service Reviews ("CFSR") performed by the United States Department of Health and Human Services.

This court denied the State a stay pending appeal. The district court appointed Special Masters to address specific constitutional shortcomings at DFPS, and this court denied defendants' petition for writ of mandamus requesting the court vacate the appointment. The Special Masters studied DFPS and its policies for nearly two years and submitted a final list of findings and recommendations to the district court. The district court entered a final order granting plaintiffs a permanent injunction in January 2018 and appointed a Special Monitor.

The State appealed, and this court granted an administrative stay of the injunction, which was converted to a stay pending appeal by our panel on March 21. The State raises three primary objections to the district court's liability determination and the injunctive order: 1) the district court erred in concluding that DFPS policies affecting the PMC class violate plaintiffs' substantive due process right and, as such, plaintiffs are not entitled to injunctive relief; 2) the district court abused its discretion in certifying the general class and various subclasses; and 3) the scope of the district court's injunction is improper.

No. 18-40057

## II.   Standard of Review

Following a bench trial, this court reviews the district court's conclusions
of law de novo and its factual findings for clear error. *Cerda v. 2004–EQR1
L.L.C.*, 612 F.3d 781, 786 (5th Cir. 2010). "The predicate findings of a
substantial risk of serious harm and officials' deliberate indifference to the risk
are factual findings reviewed for clear error." *Ball v. LeBlanc*, 792 F.3d 584,
592 (5th Cir. 2015); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004); *cf. Farmer
v. Brennan*, 511 U.S. 825, 842 (1994).[14] Such findings are erroneous only if
"[they are] without substantial evidence to support [them], the court
misinterpreted the effect of the evidence, or this court is convinced that the
findings are against the preponderance of credible testimony." *Ball*, 792 F.3d
at 592 (quoting *Petrohawk Props., L.P. v. Chesapeake La., L.P.*, 689 F.3d 380,
388 (5th Cir. 2012)). Whether the facts as found establish a violation of the Due
Process Clause is a "legal conclusion based on factual inferences" subject to de
novo review. *See Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir. 1990).

The district court's decision to certify a class is reviewed for abuse of
discretion. *Yates v. Collier*, 868 F. 3d 354, 359 (5th Cir. 2017). This court
recognizes "the essentially factual basis of the certification inquiry and [] the
district court's inherent power to manage and control pending litigation." *M.D.
I*, 675 F.3d at 836. "Nonetheless, this broad discretion must operate 'within the
framework of Rule 23,' and we 'review *de novo* whether the district court

_____

[14] The State insists that the deliberate indifference finding is subject to de novo review.
This contention is contradicted by Supreme Court and Fifth Circuit precedent. Certainly, we
review the district court's conclusions regarding the legal significance of the facts de novo.
*See Barrett v. United States*, 51 F.3d 475, 478 (5th Cir. 1995). But this court has made clear
that deliberate indifference is a factual finding reviewed only for clear error. *See, e.g., Ball*,
793 F. 3d at 592; *Gates*, 376 F.3d at 333.

10

No. 18-40057

applied the correct legal standards.'" *Yates*, 868 F.3d at 360 (quoting *M.D. I*, 675 F.3d at 836).[15]

This court reviews the district court's grant of a permanent injunction for abuse of discretion. *Ball*, 792 F.3d at 598. The district court abuses its discretion if it "(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction[,] (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 254 (5th Cir. 2014) (internal quotation omitted).

## III.   Governing Law

We begin with an overview of the legal framework for evaluating plaintiffs' claims. In order to state a claim for a substantive due process violation under § 1983, the plaintiffs must demonstrate: 1) they were deprived of a cognizable constitutional right, *see Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006); 2) the State acted with "deliberate indifference" to the protected right, *see Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F. 3d 872, 880 (5th Cir. 2004); and 3) the policies or practices complained of were the direct cause of the constitutional deprivation, *see Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

---

[15] We note that the State failed to timely appeal the final class certification order. *See M.D. ex rel. Stukenberg v. Perry*, 547 F. App'x 543 (5th Cir. 2013). Consequently, this court granted the plaintiffs' motion to dismiss the State's petition for permission to appeal as untimely. *See id.* Nonetheless, because an interlocutory appeal is permissive rather than mandatory, the State retains the right to challenge the class certification following the ultimate disposition of the case on the merits. *Cf. Hamilton Plaintiffs v. Williams Plantiffs*, 147 F.3d 367, 381 (5th Cir. 1998); *see also Yamamoto v. Omiya*, 564 F.2d 1319, 1325 n.11 (9th Cir. 1977). Our liability findings, however, will essentially dispose of the question of whether the classes were properly certified in the first instance, and will obviate the need for a lengthy analysis of the certification issue.

No. 18-40057

1. *The Substantive Due Process Right*

As a general matter, the State is under no affirmative obligation to protect its citizens from private harm. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). The Supreme Court has recognized, however, that when the State assumes certain custodial roles with respect to an individual, it creates a "special relationship" that imparts to the State a limited duty to provide for that person's safety and general well-being. *See id.* As the Court explained:

> The rationale for [these protections] is simple enough: when the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 200 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1976)). The Court has found that a special relationship exists between the State and prisoners, *Gamble*, 429 U.S. at 103–04, involuntarily-committed mental patients, *Youngberg*, 457 U.S. at 315–16, and suspected criminals injured in the course of being apprehended by police, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

In *DeShaney,* the Supreme Court found that no "special relationship" existed between the State and a child who had been placed in the temporary custody of a local hospital by an emergency court order. *See DeShaney*, 489 U.S. at 192–203. But, in holding that the State had no affirmative duty to intervene on the child's behalf, the Court highlighted that "the harms [the child] suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor." *Id.* at 201. It qualified that, "[h]ad the State by the affirmative exercise of its power

12

No. 18-40057

removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id*. at 201 n.9.[16]

Following *DeShaney*, the Fifth Circuit held that a "special relationship" exists between the State and children when the State "remove[s] them from their natural home and place[s] them under state supervision." *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990).[17] Having taken custody of a child, the State "assume[s] the responsibility to provide for constitutionally adequate care." *Id*.; *see also Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 856 (5th Cir. 2012); *Hernandez*, 380 F. 3d at 880.

This court has defined the substantive due process right enjoyed by children in the custody of the State's foster care system as a right to "personal security and reasonably safe living conditions." *Hernandez*, 380 F.3d at 880.[18]

---

[16] It noted that "several Courts of Appeals have held, by analogy to *Gamble* and *Youngberg*, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents." *DeShaney*, 489 U.S. at 201 n.9 (citing *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141–42 (2d Cir. 1981); *Taylor ex. Rel. Walker v. Ledbetter*, 818 F.2d 791, 794–97 (11th Cir. 1987) (en banc)). Ultimately, the Court declined to express an opinion on "the validity of this analogy," as that precise question was not before it. *DeShaney*, 489 U.S. at 201, n.9.

[17] Virtually every other circuit agrees. *See, e.g., Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010); *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010); *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002); *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir. 2000) (en banc); *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993); *Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 891–93 (10th Cir. 1992); *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 476 (6th Cir.); *Taylor*, 818 F.2d at 794–97; *Doe*, 649 F.2d at 141–42 (2d Cir. 1981).

[18] The district court formulated the substantive right as "the right to be free from an unreasonable risk of harm." To the extent that formulation is merely "paraphrasing" the right as articulated in *Hernandez*, it is not inconsistent with this court's precedent. The State contends that the district court's formulation transforms the deliberate indifference culpability standard into a mere negligence standard. As plaintiffs point out, however, the district court's use of the phrase "unreasonable risk of harm" pertains to the definition of the substantive right conferred by the Due Process Clause—not the requisite level of culpability necessary to hold the state liable for violating that right. (explaining that being exposed to

13

No. 18-40057

Though the precise contours of "personal security" and "reasonably safe living conditions" have yet to be fleshed-out at length, it is clear that foster children are, at minimum, entitled to protection from physical abuse and violations of bodily integrity. *See, e.g.*, *id.* at 880–81. This court has not, however, required the State to guarantee the individual's betterment or unconditional stability.[19]

But there is a significant amount of daylight between physical abuse and maximum personal psychological development, optimal treatment, or the most appropriate care. The district court held that the substantive right encompasses a right to protection from psychological abuse.[20] We agree that plaintiffs' substantive right to "personal security and reasonably safe living conditions" includes the very limited right to be free from *severe* psychological abuse and emotional trauma—both of which are often inextricably related to some form of physical mistreatment or deprivation. *See DeShaney*, 489 U.S. at 200; *Youngberg*, 457 U.S. at 317. Indeed, *DeShaney* notes that, in a custodial setting, the State assumes at least "some responsibility" for both an individual's "safety" and his "general well-being." *Deshaney*, 489 U.S. at 199–200. Other courts have recognized that the State's responsibility to protect

---

an unreasonable risk of harm "is the legal injury"). The district court correctly identifies deliberate indifference as the appropriate culpability standard.

[19] *See, e.g.*, *Griffith*, 899 F.2d at 1439 (rejecting the contention that the State has a "responsibility to [] maximize[] [foster children's] personal psychological development"); *Drummond v. Fulton Cty. Dep't of Family and Children's Servs.*, 563 F.2d 1200, 1208–09 (5th Cir. 1977) (stating a child does not have a "right to a stable environment" or a right "not to be moved from home to home," notwithstanding the "significant literature which indicates a traumatic effect of such moves on young children"); *see also Feagley v. Waddill*, 868 F.2d 1437, 1440 (5th Cir. 1989) ("[W]here the state does not provide treatment designed to improve a mentally [handicapped] individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no obligation to grant.").

[20] While we agree that a certain level of psychological harm is cognizable, the district court took this principle too far in the direction of "optimal treatment" and the "right to a stable environment" in some portions of its analysis. The overbroad interpretation of the right is discussed more thoroughly in Section VI, *infra*.

No. 18-40057

foster children's "general well-being" requires it "to take steps to prevent children in state institutions from deteriorating physically or psychologically." *See, e.g.*, *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990).[21]

We stress, however, that there are significant limits on the scope of the right to be free from certain forms of psychological harm. The Fourteenth Amendment does not entitle plaintiffs to receive optimal treatment and services, nor does it afford them the right to be free from any and all psychological harm at the hands of the State. *See, e.g.*, *Griffith*, 899 F.2d at 1439; *Drummond*, 563 F.2d at 1208–09; *Feagley*, 868 F.2d at 1441. Many inherent features of the foster care system, such as the ambulatory nature of children's placements, have negative psychological consequences. Such negative consequences are regrettable, but they are not the type of significant, abuse-related psychological damage the Constitution prohibits. In sum, egregious intrusions on a child's emotional well-being—such as, for example, persistent threats of bodily harm or aggressive verbal bullying—are constitutionally cognizable. Incidental psychological injury that is the natural, if unfortunate, consequence of being a ward of the state does not rise to the level of a substantive due process violation.

---

[21] District courts generally assume a right to be free from both physical and psychological damage. *See, e.g.*, *Yvonne L.*, 959 F. 2d at 892 (noting with approval the language in *K.H.*); *Connor B. ex rel. Vigurs v. Patrick*, 985 F. Supp. 2d 129, 158–59 (D. Mass. 2013) (recognizing that the right to be free from psychological as well as physical deterioration); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1156 (D. Haw. 2006) (stating that the liberty interest protected by the due process clause "encompasses a right to protection from psychological as well as physical abuse"); *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) ("custodial plaintiffs have a substantive due process right to be free from unreasonable and unnecessary intrusions into their emotional well-being"); *B.H. v. Johnson*, 715 F. Supp. 1387, 1395 (N.D. Ill. 1989) (stating the same).

No. 18-40057

2. *Deliberate Indifference*

In order to hold the State liable for violating plaintiffs' substantive due process rights, plaintiffs are required to demonstrate that the State's conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The Supreme Court has explained that the Due Process Clause protects individual citizens from "arbitrary action of government," and that under the "shocks the conscience" standard, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id*. at 845–46 (internal quotations omitted). "While the measure of what is conscience shocking is no calibrated yard stick," *id*. at 847, it is not enough that the conduct "offend[s] some fastidious squeamishness or private sentimentalism." *Rochin v. California*, 342 U.S. 165, 172 (1952). Most recently, the Court reiterated that the "'shocks the conscience' standard is satisfied where the conduct was 'intended to injure in some way unjustifiable by any government interest,' or in some circumstances if it resulted from deliberate indifference." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (quoting *Lewis*, 523 U.S. at 849–50). Furthermore, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849.

"Consistent with [these] principles," this court has required plaintiffs to show that the State "at a minimum acted with deliberate indifference toward the plaintiff." *Hernandez*, 380 F.3d at 880 (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002)).[22] Demonstrating that the State

---

[22] There is some debate between the parties as to whether deliberate indifference is the appropriate standard of culpability in the foster care context. Both raise the possibility that *Youngberg*'s "professional judgment" standard should apply. *See Youngberg*, 457 U.S. at 321–23. Under this standard, the State is liable for decisions that constitute "substantial departure[s] from accepted professional judgment." *Id*. at 323. "The compelling appeal of the argument for the professional judgment standard is that foster children, like involuntarily

16

No. 18-40057

acted with deliberate indifference is "a significantly high burden for plaintiffs to overcome." *Id.* at 882 (citing *Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir. 1998)). "To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety." *Id.* at 880 (citing *Farmer*, 511 U.S. at 837). Stated differently, "the [State] must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [it] must also draw that inference." *Id.* at 881 (quoting *Farmer*, 51 U.S. at 837). This is "a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'" *James v. Harris Cty.*, 577 F.3d 612, 617–18 (5th Cir. 2009) (quoting *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992)). Moreover, the State is not deliberately indifferent to a substantial risk of serious harm if, aware of the risk, it "respond[s] reasonably . . . even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

---

committed patients, are 'entitled to more considerate treatment and conditions' than criminals." *Yvonne L.*, 959 F.2d at 894 (quoting *Youngberg*, 457 U.S. at 321–22). The Tenth Circuit noted, however, that "[a]s applied to a foster care setting, we doubt there is much difference" between the deliberate indifference and the professional judgment standards. *Id.*

The parties' dispute is of no real consequence, as it is settled law in this circuit that the court applies the deliberate indifference culpability standard to allegations that the State violated plaintiffs' substantive due process rights. *See, e.g.*, *Hernandez*, 380 F.3d at 880; *Doe*, 675 F.3d at 863. Nearly every circuit to decide the question also identifies deliberate indifference as the appropriate standard. *See Tamas*, 630 F.3d at 844 (9th Cir.); *James ex rel. James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006); *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 792 (7th Cir. 2003); *Nicini*, 212 F.3d at 810–11 (3d Cir.); *Meador*, 902 F.2d at 476 (6th Cir.); *Taylor*, 818 F. 2d at 794–97 (11th Cir.); *Doe*, 649 F.2d at 141 (2d Cir.). *But see Connor B.*, 774 F.3d at 162–63; *Schwartz v. Booker*, 702 F.3d 573, 583 (10th Cir. 2012). The State also baldly claims—without any case law support—that the "professional judgment standard is a "more stringent test." This panel has found no cases indicating that professional judgment is a higher standard. Indeed, case law universally indicates that the standards are either roughly equal or that professional judgment is a more lenient culpability standard. *See, e.g.*, *Yvonne L.*, 959 F.2d at 894; *Connor B.*, 771 F. Supp. 2d at 162 n. 4. The district court, out of an abundance of caution, analyzed the alleged violations under both the deliberate indifference and the professional judgment standards.

No. 18-40057

Though deliberate indifference is a subjective standard of recklessness focusing on what the State actually knew, rather than what it should have known, *McClendon*, 305 F.3d at 326, "this court has never required state officials to be warned of a *specific* danger." *Hernandez*, 380 F.3d at 881 (emphasis added). "[R]ather, it is enough that the [State] acted or failed to act despite [its] knowledge of a substantial risk of serious harm"—the plaintiffs need not show that the State anticipated the exact form the harm would take. *Id.* This court in *Hernandez* explained: "as a state official may not escape deliberate indifference liability by arguing that the risk of harm arises from a source not contemplated, a defendant also cannot avoid such liability by contending that the particular method of harm, i.e. how the abuse was carried out, was not envisioned." *Id.* at 882. Accordingly, to overcome the culpability standard, the plaintiffs were required to demonstrate only that the State "knew of the underlying facts indicating a sufficiently substantial danger and that [it] did not believe that the risks to which the facts gave rise [were] insubstantial or nonexistent." *Id.* (citing *Rosa H v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659 (5th Cir. 1997)).

The Supreme Court has also explained that the deliberately indifferent state of mind can be inferred "from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *see also Farmer*, 511 U.S. at 842. In other words, if the risk of severe abuse is sufficiently apparent, a court is entitled to find that the State was deliberately indifferent. *See Hernandez*, 380 F.3d at 881. Furthermore, plaintiffs may be protected against future harm not yet realized through a prospective injunction. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (stating that "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them[,]" and "a remedy for unsafe conditions need not await a tragic event"); *see also Hoptowit v.*

18

No. 18-40057

*Spellman*, 753 F.2d 779, 783–84 (9th Cir. 1985) (*Hoptowit II*); *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974).

### 3. *Causation*

In addition to establishing that they were deprived of a constitutional right and that the State acted with the requisite level of culpability, plaintiffs must show that the State is the "'moving force' behind the deprivation." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *see also Piotrowski*, 237 F.3d at 578. "[T]hus[] . . . the entity's 'policy or custom' must have played a part in the violation of federal law." *Graham*, 473 U.S. at 166. This court has cautioned that culpability and causation requirements "must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, [state entity] liability collapses into respondeat superior liability.'" *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 415 (1997)). Causation is, however, an "intensely" fact-bound inquiry. *Morris v. Dearborne*, 181 F.3d 657, 673 (5th Cir. 1999). "Because the district court is better positioned [ . . . ] to decide the issue, our review of the . . . cause determination is deferential." *Brown v. Plata*, 563 U.S. 493, 517 (2011) (internal quotations omitted).

Establishing a "direct causal link between the [State] policy and the constitutional deprivation" is a "high threshold of proof." *Piotrowski*, 237 F.3d at 580. "This connection must be more than a mere 'but for' coupling between cause and effect." *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)). "It follows that each and any policy [or practice] which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional." *Piotrowski*, 237 F.3d at 579–80. Concerned with the distinction between an

No. 18-40057

offending policy and isolated instances of violative conduct by individual bad actors, the court in *Piotrowski* emphasized the need to "disaggregate[]" the policies or customs causing the alleged constitutional deprivation. *See id.* at 581. Neither *Piotrowski* nor this court's related precedent regarding the § 1983 causation requirement, however, suggests a plaintiff is required to demonstrate that a challenged policy or practice is the *exclusive* cause of the constitutional deprivation. *See id.*; *Fraire*, 957 F.2d at 1281; *see also Graham*, 473 U.S. at 166 (noting that the entity's policy or practice "must have *played a part in* the violation of federal law" (emphasis added)).

The district court stated that, with respect to causation, it "[understood] Plaintiffs' argument as saying that each policy and practice does not, on its own, have to result in a constitutional violation." It pointed to this court's opinion in *Alberti v. Klevenhagen* for the proposition that, "[i]n determining the constitutional question, we need not separately weigh each of the challenged institutional practices and conditions, for we instead look to 'the totality of conditions.'" 790 F.2d 1220, 1224 (5th Cir. 1986) (quoting *Ruiz v. Estelle*, 679 F.2d 1115, 1139 (5th Cir.) (*Ruiz VII*), *modified on other grounds*, 688 F.2d 266 (5th Cir.1982); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities."); *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978) (stating that whether punitive isolation is unconstitutional will depend on the conditions of confinement). *Alberti*, *Ruiz*, and the related Supreme Court precedent stand for the logical proposition that, under the Eighth Amendment, the question of whether a particular policy or practice causes a constitutional violation necessarily depends on context—*i.e.*, how that policy or practice is interacting with other prison conditions. A certain condition could amount to a constitutional violation in the Prison A environment, but not in the Prison B environment. *See, e.g.*, *Finney*, 437 U.S. at 686–87.

20

No. 18-40057

Requiring plaintiffs to identify with specificity the policies they allege directly cause constitutional harm is not irreconcilable with the idea that, in assessing the harm caused by a particular policy, the court may consider how other policies or practices exacerbate or ameliorate its effect. In an Eighth Amendment case from the Ninth Circuit, the court explained that, in applying the "totality of conditions" test, courts are not entitled to simply add together a number of conditions, "each of which satisfy Eighth amendment requirements," and then "rely on a vague conclusion that the 'totality of conditions' violates the Eighth Amendment." *Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982) (*Hoptowit I*), overruled on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995). Instead, courts must consider whether each specific condition amounted to cruel and unusual punishment. *See Hoptowit II*, 753 F.2d at 783–84. The court went on, however, to explain that "[e]ach condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions." *Hoptowit I*, 682 F.2d at 1247 (internal quotations omitted). This does not absolve the reviewing court from having to identify individual, deficient conditions. *See id*. It is merely "a recognition that a particular violation may be the result of several contributing factors." *Id*.

In sum, the § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege cause the constitutional violation, and demonstrate a "direct causal link." *See Piotrowski*, 237 F.3d at 580. We do not, however, read our precedent to require the court to consider each policy or practice in a vacuum. The court may properly consider how individual policies or practices interact with one another within the larger system. Though the district court apparently accepted the "totality of conditions" approach, it did address each of the State's specific policies and

21

No. 18-40057

practices on an individual basis. It also considered how the harmful effects of some policies are exacerbated by others. For example, the district court explained that DFPS's refusal to track child-on-child abuse—a policy related to monitoring and oversight—compounded the problem with excessive caseworker workloads.

The State's overarching causation argument essentially boils down to the contention that, since most children are already "damaged" upon entering foster care, it would be nearly impossible to prove that it was the State's policies or practices, rather than their experiences prior to State custody, that inflicted the damage.[23] It seems to argue that there is just no way to quantify how much harm came before custody and how much harm was inflicted while the children were in State care. But the State provides no support for the proposition that in order to prove causation plaintiffs are required to measure with absolute precision how much more damage was done before rather than after children enter the foster system.[24]

First, Plaintiffs do not dispute that many, if not most, children enter the foster care system having already experienced significant physical or emotional trauma that may have a lasting impact on their psychological well-being. It cannot be the case, however, that because a child has experienced

_____

[23] The district court apparently recognized this potential problem, and instructed the plaintiffs at an early stage in the litigation that "somebody is going to have to tell me that they suffer[] more harm than what they had when they got there."

[24] The State also contends that plaintiffs cannot demonstrate causation because they never conducted a full "case read." It is correct that case reads are a common and effective method of analyzing trends among a large representative sample of foster children. The State does not, however, suggest that case reads are required for an accurate finding on causation, and we have found no authority indicating that this method is mandatory. Moreover, the district court's factual findings regarding the abysmal state of PMC children's case files and CPS's recordkeeping habits overwhelmingly support the plaintiffs' contention that a full case read "just was not feasible." The district court itself reviewed 20 case files—all of them incomplete—totaling 358,102 pages. This undertaking took 462 hours. Moreover, given that case files are often woefully fragmentary and scattered across multiple recordkeeping databases, it is unlikely that a case read would have been especially helpful or accurate.

No. 18-40057

some form of abuse before the State intervenes, he is not capable of being *further* harmed by additional abuse or neglect while in foster care. It is illogical to argue that because a child comes in already "damaged" the State cannot be held liable for inflicting further harm that compounds that damage—even if it cannot be measured with mathematical certainty.

Furthermore, there was a wealth of evidence at trial establishing that many children experience some degree of concrete harm *after* entering the State's care. For example, almost all of the named plaintiffs entered the system at a "Basic" level of care. By DFPS's own standards, a "Basic" child is the least "damaged" an intake can be. Most saw their level of care increase markedly over the course of their time in PMC as a result of abuse and continued lack of permanency. Their experiences map the accounts of the former foster children who were presented as fact witnesses at trial and are consistent with testimony from attorneys *ad litem*, former DFPS caseworkers, and experts. Moreover, as noted in Section III(2), *supra*, plaintiffs need not show that every member of the class has actually *been* harmed while in State custody; they need only demonstrate that they face a *risk* of serious harm as a result of the State's policies and that the State was deliberately indifferent to the risk. *See Helling*, 509 U.S. at 33.

Before examining the merits of the plaintiffs' claims with respect to the individually challenged policies, we note globally that the State relies heavily, as it did in the district court, on its performance in a preliminary phase of the Child and Family Services Review ("CFSR") conducted by the federal government in 2014 as evidence that foster children do not face significant safety risks in the State's care. It notes that it outperformed the national standard on 6 of the 7 statewide safety and permanency indicators. But 2 of the 6 indicators in which Texas exceeded the standard do not incorporate any data for PMC children at all—they pertain only to children in TMC. The other

23

No. 18-40057

4 contain both TMC and PMC data. The only indicator that uses exclusively PMC data is the one that the State failed.

Moreover, the CFSR the State cites was preliminary and based entirely on data the State provided to the federal regulators. In preparing its final report, federal regulators conduct an independent, on-site review. The results of that review were significantly less flattering. Texas failed all 7 outcome measures pertaining to child safety, permanency, and well-being, and it failed 4 out of the 7 statewide indicators. The report also noted that the independent review "raised numerous concerns regarding the quality of the state's self-assessment of its case practices and the accuracy of case ratings."

## IV.  DFPS Policies and Practices

Plaintiffs' claims regarding DFPS's policies and practices fall into four overarching categories. Specifically, plaintiffs contend that DFPS's policies and practices with respect to 1) caseload management, 2) monitoring and oversight, 3) placement array, and 4) foster group homes, violate their right to be free from an unreasonable risk of harm while in State custody. We will examine each challenged policy area in turn.

### 1.  *Caseloads: General Class*

DFPS concedes that caseworkers are critical to ensuring children's safety and that "almost every day these caseworkers can make life and death decisions about the children in their care." It also admits that "if [caseworkers] really are too busy" to do their job, it would create a safety risk. Notwithstanding that admission, DFPS does not impose any limit on caseloads, and it has not conducted a workload study to determine how many cases a caseworker can safely manage. Moreover, given the lack of reliable, up-to date-statistics, it is not even clear from the record how many children, on average, caseworkers are responsible for. As the district court lamented,

24

No. 18-40057

"caseworker caseloads are still something of an open question despite years of litigation and weeks of trial."

Nonetheless, even by DFPS's charitable estimates, most caseloads exceed the maximum recommended by professional standards and experts.[25] The CWLA recommends a caseload range of 12 to 15 children, while the Council on Accreditation recommends a range of 8 to 15 children. The most recent, comprehensive count estimates that nearly half of CVS caseworkers carry caseloads of 21 children or more, 22% carry caseloads of 26 children or more, and nearly 10% carry caseloads of 31 children or more. And numbers supplied by DFPS undersell the scope of the problem.

The data is problematic for a host of reasons. To begin with, DFPS calculates caseloads in terms of "stages," each representing a segment of a child's care plan, rather than by the number of individual children for whom each caseworker is responsible. This makes it difficult to assess how many children each caseworker actually has. DFPS claims that, by its calculation, caseworkers are responsible for between 17 and 19 children. In calculating caseload distribution, however, DFPS counted secondary workers—who are not primary CVS caseworkers and some of whom never interact with the child face-to-face—as well as part-time caseworkers and non-human workers "created out of overtime." Accordingly, the 17 to 19 estimate is exceedingly generous. Indeed, it is *internally inconsistent*: DFPS represented to the Texas Senate Committee on Finance in 2017 that additional caseworkers and salary increases were necessary to bring the caseload *down* to 26 children per

---

[25] The State objects to the use of professional standards to establish a constitutional violation. Of course, professional standards "do not establish the constitutional minima; rather, they establish goals." *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979). They are, however, a relevant "normative backdrop" against which to evaluate DFPS policies. *See Connor B.*, 985 F. Supp. 2d at 136.

No. 18-40057

caseworker. The Assistant Commissioner of CPS, Lisa Black, stated at trial that she believes caseworkers carry an average caseload of 28.1 children.

Caseload figures reported by neutral outside auditors demonstrate that the numbers presented by the State at trial are artificially low. A report commissioned by the Texas Supreme Court states that "CPS caseworkers are routinely handling around 30 cases," and "[i]n the larger urban jurisdictions, caseworkers are commonly assigned 40-plus cases at a time, and the 'cases' often involve multiple children from the same family." The Adoption Review Committee estimated that caseloads were between 30 and 35 cases per caseworker, "often twice what is deemed best practice." Former DFPS caseworker Beth Miller testified that she routinely carried 40 to 60 cases, "sometimes higher." Her former colleague, Katrina Voelkel, similarly testified that she remembers regularly carrying between 30 and 50 cases. Significantly, caseload averages "do not reflect spikes in caseloads that can occur when a co-worker goes on extended leave or quits." In short, the record amply supports the district court's finding that CVS caseloads are extremely high.

Oversized workloads are also the primary cause of the exceedingly high rate of caseworker turnover. Indeed, the State's own expert on child welfare policy, Dr. Jane Burstain, authored an article in 2009 that stated there was "a fairly direct relationship . . . between caseloads and voluntary turnover." This relationship has "remained consistent from year to year." Over 25% of the roughly 2,000 CVS caseworkers leave CPS annually. More than 25% of caseworkers leave within their first year, and 43% leave within their first two years. And Burstain has said that turnover rates are likely understated, as they do not account for caseworkers who leave their positions for others within the agency. To keep pace with the attrition rate, DFPS has to hire approximately 500 new caseworkers every year just to maintain a full-capacity

No. 18-40057

workforce of 1,000.[26] DFPS struggles to hire and train workers quickly enough to fill all of the available positions. As a result, CPS has a high volume of positions that remain vacant.

Turnover is also an enormous fiscal burden for DFPS. The Sunset Commission estimated in 2014 that the loss of caseworkers over the prior year resulted in a $72.7 million impact to the agency. Experts estimate that retaining even a portion of lost workers for an extra year could save DFPS roughly $25 million. Turnover is not only costly, "[i]t also creates a negative environment that reduces productivity as well as feeds more turnover." Internal DFPS reviews consistently reveal the general sentiment within CPS that management practices are "unfair, unsupportive, bullying, unreasonable, and fear-driven." Agency employees even expressed concern about retaliation for their cooperation with an external review commissioned by the state legislature. Caseworkers feel that agency supervisors are singularly focused on ensuring that caseworkers meet arbitrary metrics rather than assessing whether they are making meaningful progress with their cases and providing quality services. The added stress of keeping up with the requirements of a purely numbers-driven management approach contributes to caseworkers' feelings of hopelessness and frustration and reduces overall productivity. The vicious cycle is never-ending: unmanageable workloads and a caustic work environment lead to high rates of caseworker turnover; turnover further exacerbates caseworker burnout, low morale, and a negative agency culture, which feeds more turnover.

High turnover compounds the workload problem, as caseloads have to be redistributed as caseworkers leave. New caseworkers do not receive a full

---

[26] Only 1,000 caseworkers are fully "up to speed" on their caseload. The remaining 1,000 caseworkers will have been at CPS less than two years.

No. 18-40057

caseload for at least six months after joining CPS. Accordingly, the remaining CVS caseworkers are forced to add additional cases to their already bloated caseloads in the interim. Of the new hires, one out of every six leaves within the first few months, and the process of hiring and training starts anew as DFPS scrambles to fill those slots. This means that DFPS cannot relieve veteran caseworkers of their additional "temporary" workload in a timely manner. New caseworkers that remain after the training process is complete face a daunting learning curve. Again, it took the district court 462 hours—eleven uninterrupted workweeks—just to *read* the 358,102 pages of casefiles for 20 PMC children. Reading the information containing in the casefile is, of course, only the beginning. All in all, DFPS estimates it takes roughly two years for a caseworker to get up to speed on a new case. The high rate of turnover year after year means that this arduous process is duplicated many times over.

The combination of unmanageable caseloads and high caseworker turnover creates a "cycle of crisis" that allows children to "fall through the cracks."[27] A comprehensive agency analysis commissioned by DFPS found that the workload level "is qualitatively reducing CPS caseworkers' ability to keep children safe." This conclusion is unsurprising. A logical result of inconsistent and perfunctory contact with caseworkers is that children don't have material

---

[27] We wish to make clear that we do not question that CVS caseworkers are incredibly selfless, dedicated public servants. Caseworkers demonstrate unwavering commitment to the children in their care on a daily basis, often at great personal cost. We recognize that caseworkers' jobs are often thankless. They are not in it for the money or the recognition—there is too little of either to go around. Caseworkers do this work because they want to make a difference in the lives of society's most vulnerable children. We owe them an immense debt of gratitude. Our discussion of the issues plaguing DFPS is not an indictment of the individual men and women who do the hard work on the ground. The problems at DFPS are systemic. Notwithstanding caseworkers' devotion to their work, DFPS policies and practices with respect to caseload management make it more difficult for caseworkers to do their jobs successfully.

No. 18-40057

access to an advocate when something goes wrong in their placement. Attorneys *ad litem* and former foster children testified that caseworkers were often too busy to answer or return phone calls—even after repeated attempts to reach them. Former foster child Darryl Jackson testified that "it was just hard to get in contact" with his caseworker, "to even have a conversation with her, you know, tell her I needed things." Colleen McCall, the Director of Field Operations at CPS, stated in an Action Memorandum that "[d]ue to the shortage of staff, required caseworker documentation, such as Child Service Plans and documentation of children's medicals and dentals, are not being completed timely, if at all." More than 55% of caseworkers report that "they do not have adequate time during the workday to successfully do their job."

Caseworkers are routinely unable to make regular, face-to-face contact with their children; even when they are able to make visits, the contact is often "cursory." As a result of high caseloads and administrative burdens, both of which are exacerbated by the abysmal state of DFPS's recordkeeping systems, CVS caseworkers spend only 26% of their work hours actually interacting with foster children and families. "[T]his number is clear evidence that the agency is doing more compliance than care." John Specia, the DFPS Commissioner at the time of trial, called this face-time figure "disturbing."

Several named plaintiffs and former foster children testified that they would often go months without seeing their primary caseworker. When caseworkers do manage to visit their foster children in person, the interaction is likely to be extremely brief. As a reference point, one foster parent of seven years reported that caseworkers visiting the home typically spent no more than five minutes with each child. Though caseworkers are required to conduct face-to-face meetings with their children in private, foster children report that they are frequently interviewed in the presence of their caregiver and other children. As a result, reporting issues or abuse—already a difficult and

No. 18-40057

intimidating task for vulnerable children—becomes near-impossible. Under these conditions, it is entirely unsurprising that children struggle to establish meaningful, productive relationships with their caseworkers. Children do not trust their caseworkers to follow-up on problems or to keep them safe.

Moreover, because of turnover, children are cycled through multiple caseworkers.[28] In some cases, children do not even know who their caseworker is. This further inhibits the development of a trusting relationship in which children feel safe communicating their needs or reporting abuse. Former foster child Patricia Virgil, who had a total of 10 caseworkers throughout her seven years in DFPS custody, explained that because her caseworkers changed so frequently, "whenever I had issues in some of the homes, I didn't know who to go to, I didn't know who to trust and so I just—most of the time I just kept my mouth shut." Though she attempted to report being sexually abused at one of her foster homes—apparently through some sort of central DFPS phone line rather than to her absent caseworker—no one from the agency ever followed up on the investigation, and her caseworker never once visited her at that placement.

In many instances, caseworkers lack the time to be thorough when evaluating the safety or appropriateness of a placement on the front-end. This means that important red flags may get overlooked. Even assuming that a "red flag" regarding a placement has been documented, a caseworker would have to navigate tens of thousands of pages of records that are scattered across multiple databases and paper files that are not consistently maintained chronologically in order to stumble upon it. And because records and case files are outdated and woefully incomplete, there is no guarantee the information

---

[28] Children exiting foster care in 2008 after spending three years or more in the PMC had an average of 6.39 caseworkers. There is no evidence that this number has been significantly reduced.

No. 18-40057

caseworkers' need was ever recorded in the first place. Caseworkers do not have the time to perform fundamental aspects of their job; clearly, they do not have the bandwidth to replicate a needle-in-a-haystack search several times over for each individual child every time they have to move him. This limited ability to rigorously evaluate placement choices and permanency plans substantially increases the chance that a child will be exposed to serious safety risks. The risk is further compounded by the fact that DFPS does not centrally track child-on-child abuse and that RCCL investigations have an exceedingly high error rate.

The evidence in the record establishes that the State is deliberately indifferent to the risks posed by its policies and practices toward caseload management. The State is well-aware that caseworkers have unmanageable workloads. It also knows that high caseloads—which are a direct cause of high turnover rates—have a negative impact on PMC children's welfare. Numerous reports, internal audits, and comprehensive studies of the system conducted over several years—including some that were commissioned by DFPS itself— have informed the agency that caseloads are too high and that, as a result, children are at a greater risk of harm. The findings and recommendations have been replicated repeatedly over the past two decades. Every single one of the reports in the record identifies unmanageably high caseloads as one of the most urgent problems DFPS faces and explicitly warns that high caseloads compromise caseworkers' ability to keep children safe.

DFPS has also been cautioned recurrently since 1996 that high turnover rates exacerbate the caseload problem and contribute to the agency's inability to provide quality services to the children and families in its care. The reports themselves acknowledge that they tend to merely reiterate the problems and potential solutions that have been proffered to the agency time and time again.

No. 18-40057

As the Texas Adoption Review Committee lamented,[29] "[s]adly . . . many of the same problems identified in 1996 still exist in the current child welfare system in Texas," and, as a result, "[m]any of our recommendations are, sadly, ones that have been made in prior years."

DFPS has repeatedly acknowledged that high caseloads cause the quality of casework to suffer and put foster children at an increased risk of harm. Legislative appropriations requests regularly state that caseload increases result in "significant" child safety issues. Top DFPS officials, including former Commissioner Specia, admit that there is a causal connection between high caseloads and negative safety outcomes for children. DFPS is also aware that frequent turnover exacerbates the workload problem and further threatens child safety and well-being. The State does not contend that DFPS was unaware of the numerous reports in the record. Indeed, it cites two of them several times in its brief on appeal. Many reports were directly commissioned by the Texas legislature or the judiciary. Commissioner Specia himself was on the policy development team for the 2010 Texas Appleseed Report[30] before he was appointed to lead DFPS.

The State contends that DFPS is actively managing caseloads and making improvements to its workforce. Reasonable steps to cure the problem, even if ultimately ineffective, would negate the district court's finding that the State was deliberately indifferent to the risk of harm. *See Farmer*, 511 U.S. at 844. The State contends that DFPS has taken several steps to address the risks associated with high caseloads, including hiring more caseworkers, employing secondary workers and support staff, and initiating a new program to improve

---

[29] The Texas Adoption Review Committee was created by former Governor Rick Perry to take a "hard look" at the Texas foster care system.

[30] Texas Appleseed is a nonprofit organization with a focus on child-welfare. The 2010 report was commissioned by the Supreme Court of Texas Permanent Judicial Commission for Children, Youth, and Families.

No. 18-40057

caseworker training. Under the circumstances, none of these steps constitute a "reasonable" response to the systemic issues.

The most fundamental problem DFPS faces with respect to addressing the caseload issue is the lack of informative workload data or internal agency caseload standards. McCall—who is the individual tasked with ensuring that CVS caseworkers have manageable caseloads—admitted at trial that she had "no idea what size of child caseload [] conservatorship workers should have in order to do their jobs properly." She conceded that she had never even attempted to count the number of children, on average, that each CVS caseworker is responsible for. Indeed, at the time of trial, DFPS had not performed a comprehensive workload study in *over a decade*. Despite being explicitly informed by the State Auditor's Office in 2009 that the 2004 study was outdated and should be redone, "DFPS did not implement this recommendation and continues to use the 2004 information."

In response to the district court's 2015 liability opinion, DFPS provided the Special Masters with a limited workload survey conducted from August 2015 to March 2016 which purported only to estimate how much time was actually spent on casework during that time period. It made no attempt to quantify how much time caseworkers should be spending on casework or how many cases a caseworker could safely manage. Despite being reprimanded by the district court in 2015 for its inclusion of ISY workers in its workload estimates, DFPS *again* included ISY workers in its 2016 study. The Special Masters extrapolated from the data DFPS provided that an average caseworker has adequate time to manage 14 PMC cases at one time, to the exclusion of TMC cases. When the Special Masters asked DFPS to determine how many additional caseworkers it would need to achieve workloads of 14 children per caseworker, DFPS declined to provide the information, responding that it was "not feasible" to do so.

33

No. 18-40057

The district court was prepared to consider caseload standards promulgated by the agency, but DFPS did not have any. The Special Masters were prepared to work with DFPS to develop standards, but DFPS declined to do so. DFPS's response to inquiries regarding appropriate workload levels is, essentially, that the volume of cases an individual caseworker can shoulder is dependent on a number of different variables, including the complexity of the cases and the caseworker's level of experience. This is undoubtedly true. But the fact that caseworkers' workload capacities will vary, on an individual basis, according to the types of cases a caseworker is assigned does not obviate the need for general guidelines that identify an appropriate caseload range.[31]

The lack of agency standards colors the lens through which we view the steps DFPS claims it has taken toward addressing the caseload management problem. For example, the district court took judicial notice of the fact that the legislature approved DFPS's request for additional caseworkers and salary increases. Considered in a vacuum, asking for more money to hire more people seems logical. But DFPS has included a request for more money to hire caseworkers in every appropriations request it has submitted to the legislature in the past two decades—it is a standard, boilerplate request. And, of course, DFPS has no choice but to continually hire more caseworkers every year. The number of children in DFPS custody is steadily increasing. Moreover, because of turnover, DFPS has to replenish roughly a quarter of its caseworker

_____

[31] We agree with the State that DFPS should be afforded a fair amount of flexibility to vary caseloads on an individual basis based on factors such as case complexity and caseworker experience. For that reason, caseload caps are an ill-advised solution. Again, however, the need for flexibility does not absolve DFPS of the responsibility to determine how many cases, *generally*, an average caseworker is able to safely handle.

34

No. 18-40057

workforce every year in addition to the staff necessary to accommodate the influx of more children.[32]

Simply adding more employees has continually proven ineffectual. High-volume hiring is not a solution. Critically, because of the lack of internal standards, DFPS does not even know how many caseworkers it *actually needs* to reduce the caseloads to safe levels. Without a target number, the agency is hiring blind. Lastly, while DFPS focuses primarily on high-volume hiring to fill the gaps left by the mass exodus of caseworkers every year, it repeatedly fails to address the internal management issues that motivate many caseworkers to leave so quickly after joining CPS. Thus, not only is a portion of DFPS's yearly budget allocated by the state legislature to hire more workers and reduce caseloads effectively wasted, but the underlying problem remains unsolved.

The State points to DFPS's use of secondary workers as evidence that it has made a reasonable effort to alleviate the burden on caseworkers. The district court was entitled to find that the risks associated with overburdened caseworkers were not sufficiently mitigated by these secondary workers, particularly ISY workers.[33] ISY workers are not nearly as intimately involved with an individual child's case as is a primary caseworker. They do not participate in a child's long-term placement plan nor are they required to do any follow up on the child's needs. Many primary caseworkers have never met

---

[32] And DFPS generally requests the bare minimum: money for enough caseworkers to maintain current caseloads and preserve the status quo.

[33] The other secondary workers the State points to are akin to support staff. Most of them have *distinct* roles within DFPS and perform some ancillary duties related to those performed by caseworkers. That DFPS employs a single "developmental disability specialist," for example, may relieve the caseworker of the additional task of being a subject matter expert on certain developmental disabilities, but that single employee is not shouldering an appreciable portion of caseworkers' workloads. Many secondary workers never interact with foster children at all. They are not performing the same functions as caseworkers, and they are an insufficient substitute.

No. 18-40057

a single ISY worker face-to-face. Children will often have a different ISY worker every visit, and their primary responsibility is to make sure that the child "is still there." Current and former foster children testified at trial that ISY workers' visits were rarely private and frequently cursory and superficial. Rarely—if ever—do children establish a meaningful bond with an ISY worker. Moreover, ISY workers typically have 60 to 70 children on their caseload *per month*. Given this caseload volume, it's a wonder ISY workers have time to show up everywhere they need to be on a given day and check an attendance box. It may be the case that ISY workers increase the odds that a foster child will encounter a "live" individual associated with DFPS on a semi-regular basis, but they are by no means an adequate or "reasonable" substitute for primary caseworkers.

The State also cites an initiative called "Transformation" as evidence that it has taken reasonable steps to address the problem associated with excessive caseloads and caseworker burnout. The district court's refusal to credit Transformation as DFPS "action" negating deliberate indifference is entirely understandable. To begin with, Transformation was conveniently rolled out *six weeks* before trial—more than three years after this lawsuit was initiated and almost two decades after the 1996 GCPA report identified turnover and burnout as critical issues plaguing the agency. Unsurprisingly, at the time of trial, DFPS was able to provide the district court only an outline of its general plans for the program and could offer no data whatsoever on actual or even expected impact. Critically, Transformation does not include concrete plans for a comprehensive CVS workload study, nor does it contemplate establishing guidelines with respect to appropriate caseload ranges. Thus, Transformation self-consciously fails to address a fundamental problem plaguing caseload management: the lack of adequate data and standards.

No. 18-40057

While Transformation apparently includes some sort of revamped training programs for new caseworkers, testimony from DFPS personnel intimately involved with the program indicates that the program was still in an embryonic stage.[34] The CFSR final report that was issued a year after the Transformation was initiated noted that "[g]iven the length of time the new training has been in effect, there was limited data and information available" regarding the program's efficacy. It also stated, again after noting "numerous concerns regarding the quality of the state's self-assessment of its case practices and the accuracy of its case ratings," that "[c]rosscutting concerns . . . include continued high rates of caseworker turnover." When pressed by the district court to explain why, when DFPS has had "internal reviews . . . for years that have said the same thing and nothing was ever done," Transformation had suddenly appeared as an alleged magical solution, DFPS was unable to provide a clear explanation.[35] Under the circumstances, the district court's skepticism was entirely warranted.

DFPS's relative lack of responsiveness, which is well documented by the district court, suggests it refuses to address a systemic deficiency in the way it manages its caseworkers. Moreover, while it is aware merely adding more caseworkers won't treat the underlying issue, it wants to be able to point to a

---

[34] We note that the panel gave both parties the opportunity to file additional pleadings, including material regarding any progress DFPS has made toward remedying the district court's concerns. *See M.D. v. Abbott*, 18-40057, Doc. No. 00514395622 (Order dated March 21, 2018). Presumably, the State now has some data regarding Transformation's continued development. Neither party filed any new pleadings. *M.D. v. Abbott*, 18-40057, Doc. No. 00514395622 (Order dated March 21, 2018).

[35] We note also that studies found DFPS's approach to policy implementation highly problematic as a general matter. New policies originate from various parts of the agency and often lack adequate implementation instructions or a clear point of authority for overseeing the changes. There is no front-end process to assist employees in evaluating the urgency of implementing the new policy and no back-end process for evaluating its effectiveness. The several layers of new policies implemented since 2004 actually complicate caseworkers' jobs, forcing them to navigate tangled and sometimes inconsistent compliance requirements.

No. 18-40057

nominal fix. DFPS has repeatedly failed to adequately address the known caseload management shortcomings over the last several decades. The district court did not clearly err in concluding that DFPS's response was not reasonable given its knowledge of the extent of the problem and that it was deliberately indifferent.

The State also contests the district court's causation analysis, arguing that the quality and volume of the evidence was insufficient to establish: 1) that high caseloads cause an increased risk of serious harm; and 2) that DFPS caseloads are, in fact, too high. These arguments are disposed of by our lengthy discussion of the caseload management problems and their effects above. There is ample evidence in the record establishing that caseloads are extremely high and that there is a direct causal link between high caseloads and an increased risk of serious harm to foster children.

The State asserts, however, that the district court failed to adequately quantify the risk of harm. But the experiences of the named plaintiffs and testimony from former foster children, caseworkers, attorneys *ad litem*, and experts indicate that abuse is exceedingly common.[36] Several witnesses also testified that because children don't have meaningful, face-to-face access to their caseworkers, abuse frequently goes unreported or uninvestigated. If children face a legitimate risk of being abused in the system as a baseline matter, and this risk is significantly exacerbated by overworked caseworkers, unreliable abuse statistics, and high error rates for abuse investigations, the risk becomes "objectively intolerable." *Farmer*, 511 U.S. at 846.

The district court had a mountain of evidence at its disposal, and it enjoys ample discretion to credit certain evidence and expert testimony. *See,*

---

[36] Moreover, any abuse statistics provided by the State are likely to be artificially low—after all, the rates do not account for the fact that abuse is underreported or for child-on-child abuse.

No. 18-40057

*e.g., James*, 577 F.3d at 619; *Bocanegra v. Vicmar Servs., Inc.,* 320 F.3d 581, 584 (5th Cir. 2003). That a policy or practice of maintaining overburdened caseworkers directly causes all PMC children to be exposed to a serious risk of physical and psychological harm is adequately supported by the facts in the record. Moreover, the principle seems obvious: when workloads exceed caseworker bandwidth, caseworkers are not able to effectively safeguard children's health and well-being. *See Hope*, 536 U.S. at 737. The State's inadequate response in the face of these problems was a violation of its duty to the children in its care.

2.  *Monitoring and Oversight: LFC Subclass*

There are three critical problems with DFPS's policies and practices regarding monitoring and oversight. First, deficient investigatory practices have yielded a high error rate in abuse investigations. Second, DFPS does not centrally track instances of child-on-child abuse. Lastly, RCCL maintains inadequate enforcement policies. All three problems contribute to an increased risk of serious harm to the LFC subclass.

The record establishes that RCCL has an alarmingly high investigatory error rate.[37] In 2014, PMU reviewed a random sample of physical abuse investigations that had occurred between 2012 and 2010 and that resulted in a UTD disposition. It found that 64.6% of the reviewed abuse cases were incorrectly determined to be UTD. Almost all of the dispositions had been reviewed by a superior, but 66.7% had been incorrectly approved. 35.5% of the incorrect UTD dispositions should have been RTB. A second review of a larger random sample of UTD dispositions found the rate of error to be even higher—

---

[37] Again, RCCL investigates any reports of neglect and abuse. The Performance Management Unit ("PMU") is responsible for internal quality control for all of DFPS. Abuse investigations are ascribed one of four outcomes upon completion: 1) Reason to Believe ("RTB"); 2) Ruled Out ("RO"); 3) Unable to Determine ("UTD"); or 4) Administrative Closure.

No. 18-40057

roughly 75%. Many of the incorrect dispositions involved injuries that required medical attention. Despite the fact that RCCL found several substantiated cases of abuse buried in the random sample of UTD dispositions, DFPS took no action to move any of the children, no penalties were enacted, and no licenses were revoked. Children were left in homes and facilities where DFPS knew there was a serious possibility they were being abused. Some of the incorrect UTD dispositions were related to "negligent supervision"—which is often DFPS code for an abuse allegation involving another child. 82% of these negligent supervision UTDs were incorrect.

Nonwithstanding its discovery regarding the UTD determinations, RCCL did not undertake to perform a similar audit of the investigations resulting in an RO or an RTB disposition. The vast majority of RCCL abuse investigations result in an RO disposition. As a comparator, during one expert's tenure as a quality control director for social services in Tennessee, the percentage of investigations resulting in an RO disposition was between 20 and 30% lower than RCCL numbers. The State's own licensing expert admitted that RCCL's very low abuse substantiation rate was concerning and that it "raised questions" for her. The district court found the likelihood was high that RO dispositions suffer from an error rate comparable to the UTD pool. The Director of RCCL claimed that the RO dispositions are probably less worrisome because "preponderance is a little more clear cut than it is for a UTD finding." As the district court correctly pointed out, however, "that explanation does not account for the fact that the investigators in question were failing to interview all of the necessary parties, ask pertinent questions, gather all evidence and key information, and address risks."[38] In other words, the main issue with the

---

[38] The district court also noted that, like CVS caseworkers, RCCL investigators are seriously overburdened. The number of investigators has steadily declined despite the fact that the number of investigations has remained relatively constant. Though the primary

No. 18-40057

investigations was not merely that there was competing evidence or that reports were uncorroborated. Rather, the information gathering process was fundamentally flawed.[39]

Of course, the abuse investigation error statistics capture a problem that plagues the subset of instances in which abuse is actually reported and—at least nominally—investigated. But, again, the evidence in the record indicates that abuse is underreported. Several former foster children testified that they did not know how to report abuse or whom they should tell. Even if children knew whom to call, many are so distrustful of the system that they are unlikely to feel comfortable reporting abuse. Worse yet, reports of abuse may receive only cursory RCCL follow-up, and some are never investigated at all. This means that children could make an abuse outcry and then languish in the offending placement indefinitely. As former foster child Kristopher Sharp explained, "[w]e didn't feel safe in placements and then nothing happened, and so—I mean, why—why would you go through the process of even thinking that something would happen if you were to report something like this?" Under these circumstances, it is unsurprising that many children choose the path of least resistance and stay silent.

The available abuse statistics are further warped by the fact that DFPS does not track child-on-child abuse. If DFPS receives a report that a child has been abused in some way by another foster child, the incident is investigated as "negligent supervision" on the part of the caregiver. This means that there

_____

cause of deficient investigations seems to be a substantial breakdown of the investigatory process at the procedural level, excessive workload is undoubtedly a contributing factor.

[39] Attorney *ad litem* Anna Ricker testified at trial that she twice reported a foster care facility in Levelland, Texas for abuse and neglect after she observed several concerning injuries on her client and other children, many of whom were nonverbal and intellectually disabled. She also reported that the facility was filthy and ill-kept and that her client's personal hygiene was seriously deficient. RCCL ultimately Ruled Out abuse and neglect without even contacting Ricker to follow-up on her observations.

No. 18-40057

is no centralized record that tracks which children in DFPS custody have a history of physical or sexual abuse. The only place this information would potentially be recorded is in the casefile for that individual foster child. If caseworkers want to find out whether a child will be safe from abuse by another child in a particular home or facility, they would have to dig through thousands of pages of individual records to confirm that no one else at that placement has a history of abusing other children. And individual abuse records may be incomplete. For example, named plaintiffs J.S. and D.I. were both sexually abused by other children in their placements who had a history of perpetrating abuse. A later investigation into the individual records for one of the abusers revealed old notations of a previous, similar incident involving that child, but the other's casefile noted only that he had suffered parental abuse before entering DFPS custody. In short, because the pertinent information was inaccessible or entirely unavailable, both J.S. and D.I. were unwittingly placed in foster homes in which there was a high probability that they would be exposed to sexual abuse by another child.

RCCL enforcement practices are also problematic. RCCL issues thousands of citations for violations per year. Of the 6,050 violations cited in 2013, however, only 12 resulted in a corrective action and only one resulted an adverse action. Only one facility has been closed in the last five years—the Daystar Facility, where four children had died. Between 1993 and 2002, there were three deaths due to asphyxiation that resulted from physical restraints. There were numerous reports of physical, sexual, and psychological abuse associated with the facility. But its license was not revoked until 2011, several months after a fourth child's death was ruled a homicide by asphyxiation due to physical restraints.

Daystar is a particularly tragic example. Nevertheless, studies and reports that DFPS was indisputably aware of—the State cites them in its own

42

No. 18-40057

briefing on multiple occasions—stated that its "collaborative" approach to compliance was simply not working. This is evidenced by the fact that there is a very high rate of repeat violations, as licensees do not perceive that they will be held accountable for their malfeasance. Repeat violators are not a new phenomenon. In 2011, PMU found that 65.6% of residential care facilities had been cited for repeat deficiencies. By 2012, that number had leapt to 77.6%. And the collaborative approach can take up to a year or longer to achieve compliance. As a result, children are left in facilities that repeatedly violate standards while the state attempts to "collaborate" with the facility. As the Sunset Commission explained, "to go slow on enforcing regulations designed to protect children from safety risks out of concern that some providers may have trouble meeting such protective standards is essentially to accept a level of risk to the children simply because the state needs providers, regardless of their quality." Most of the repeat violations occurred on the highest-risk standards, such as criminal history check requirements.

The State had knowledge of these problems. Moreover, that high error rates in abuse investigations and inadequate enforcement policies place children at a substantial risk of serious harm seems painfully obvious. *See Hope*, 536 U.S. at 737; *Farmer*, 511 U.S. at 842. Reports regarding RCCL's investigatory shortcomings date back over a decade. These deficiencies have been periodically reiterated to the agency. The Director of RCCL participated in the review of the UTD dispositions. The Assistant Commissioner of CCL confirmed that the error findings were reported all the way up the chain of command to Commissioner Specia. The State has elsewhere relied in part on various reports that include critiques of its enforcement practices throughout the litigation.

Yet DFPS has not done any significant work to improve on these deficiencies. DFPS apparently held a mandatory one-day meeting to impress

43

No. 18-40057

upon its staff the importance of maintaining high standards for investigations, but RCCL policies and procedures apparently remained unchanged. Similarly, reports have consistently flagged inadequate oversight in licensing and enforcement as a critical problem area. But DFPS rarely heeds the advice of risk analysts to impose administrative penalties and ignores recommendations from the internal quality control experts at PMU to revoke licenses at non-compliant facilities.

In short, DFPS is aware of the systemic deficiencies plaguing its monitoring and oversight practices. It also knows that these deficiencies pose a significant safety risk for foster children. Despite this knowledge, DFPS has not taken reasonable steps to cure the problems. Indeed, it is not clear that it has taken any steps at all. The district court correctly found that the State was deliberately indifferent to a substantial risk of serious harm to the LFC subclass as a result of its insufficient monitoring and oversight, and that these deficiencies are a direct cause of the constitutional harm.

3. *Placement Array: LFC Subclass*

The district court noted that, because of what amounted to practical limitations on placement availability, children are frequently placed out of region or are separated from their siblings. Furthermore, children are placed in facilities that are not necessarily appropriate for their service level or needs. Sexually aggressive children are not always placed in single-child homes or highly supervised environments.[40]

---

[40] The State is not constitutionally required to place every child that has been sexualized through abuse or otherwise in a single family home. Indeed, many of them may benefit from a structured GRO environment or from therapeutic treatment at an RCL. To the extent children are being blindly placed with sexually aggressive children that pose a serious risk to their bodily integrity because caseworkers don't have the time or the information they need to make an informed placement decision, the issue is more aptly addressed through DFPS's policies toward caseloads and caseworkers and the failure to flag child-on-child abuse appropriately.

No. 18-40057

Certainly, placing a child in-region, in a placement ideal for his service level and personal needs, or with his siblings when appropriate would be good practice. Plaintiffs have failed to demonstrate, however, that failing to do so in most or all circumstances puts children at a risk of harm serious enough to amount to a deprivation of their substantive due process rights. There is no "responsibility to [] maximize[] [foster children's] personal psychological development," *Griffith*, 899 F.2d at 1439, and children have no "right to a stable environment" or a right "not to be moved from home to home," despite the "significant literature which indicates a traumatic effect of such moves on young children." *Drummond*, 563 F.2d at 1208. Even accepting the district court's—undoubtedly correct—finding that out-of-region placements and suboptimal placement settings can have negative effects on a child's psychological health, those negative effects are not constitutionally cognizable harms. *See, e.g.*, *Feagley*, 868 F.2d at 1441. Unlike severely overburdened caseworkers or inadequate investigations and placement licensing, inadequate placement array does not unacceptably increase the risk that a child will be exposed to serious physical or psychological harm.

Importantly, the availability of foster homes, particularly those that provide the most "home-like," "least-restrictive" environments, is something uniquely out of the State's control. Of course, an increase in funding that would allow DFPS to pay more potential foster families and may improve recruitment efforts, but DFPS cannot force people to volunteer. Regional availability in particular is affected by the population sizes of the counties in that region, the volume of children being removed from their homes in a particular county or region, and the ratio of rural to urban communities. Moreover, as the district court noted in *Connor B.*, "neither bolstering the administrative ranks nor obtaining the requisite number of foster homes will resolve the ongoing

No. 18-40057

placement challenges related to ensuring a child's unique fit with a prospective placement." 985 F. Supp. 2d at 144.

Even if the policies toward its placement array were somehow constitutionally infirm, the district court erred in concluding that the State was deliberately indifferent. Specifically, the State has evinced at least some concerted effort to remedy the problem. "Foster Care Redesign" ("Redesign"), which was initiated in 2010, does away with the "open enrollment" system previously in place with DFPS's private providers. While "open enrollment" essentially allows private providers to run operations wherever they choose, Redesign contracts with Single Source Continuum Contractors which provide a full range of services tailored to meet the needs of a particular geographic area. According to the State, Redesign will allow DFPS more control over the geographic distribution of its placements, and will be responsive to service needs in a specific region.

In finding that Redesign did not suffice to demonstrate that the State responded reasonably to the risk, the district court stated that it was "encouraged by the idea . . . but discouraged by its results." It noted that, at the time of the final order, Redesign was operating in less than 2% of Texas. It is true that Redesign has taken a while to get off the ground, and the pilot contract with the first service provider was unsuccessful. Since then, however, the State has entered into new contracts that have adjusted for some of the issues the State encountered in its pilot roll-out. The legislature recently granted DFPS authorization to expand Redesign to three new regions.

Redesign is still a fairly new and innovative program. But slow roll-out of an unprecedented style of managing private contractors makes sense for a number of reasons. As the plaintiffs themselves noted in their comments regarding the Special Master's Implementation plan, it is difficult to know whether the model—which increases reliance on private contractors—will

46

No. 18-40057

maintain sufficient safeguards. Consequently, slow, measured, implementation with adequate time to assess the program's ability to properly safeguard children's welfare is prudent. Additionally, rolling out the program in stages allows the agency to adapt to provider feedback and improve implementation in other areas.

That Redesign has been met with limited success is of no moment. *Cf. Farmer*, 511 U.S. at 844. Limited placement array is a uniquely complicated problem. The State is thinking creatively and attempting to address the issue with placement distribution. Redesign may not be the answer, but it's hardly what the district court called a "half-baked" attempt to remedy a complex problem.

Accordingly, the district court erred in concluding that inadequate placement array causes constitutionally cognizable harm to the LFC subclass and that the State was deliberately indifferent to a substantial risk of serious harm.

4. *Foster Group Homes: FGH Subclass*

The district court found that a combination of a lack of policies against mixing children of various ages, sexes, and service levels and insufficient oversight rendered FGHs intolerably unsafe. In many cases, FGHs contain more children than traditional foster family homes and could be "hectic." FGHs generally have the same number of caregivers as foster family homes. The district court found that the "most egregious problem" was that FGHs lacked 24-hour awake-night supervision. Essentially, the district court reasoned, FGHs "simultaneously provide[] fewer benefits than foster family homes and fewer safeguards than congregate care facilities."

There are several issues with the district court's analysis. To begin with, there is a critical causal flaw. The district court does not, for example, identify

No. 18-40057

how mixing ages, sexes, and service levels[41] in FGHs is significantly different from doing so in foster family homes—other than that there were more children to keep track of and the ratio of supervisors to children is lower in FGHs. It notes that DFPS allows for young girls and teenage boys to be placed together, but again does not explain how this is different from its policies toward foster family homes, which are not constitutionally defective. Moreover, plaintiffs' expert's analysis was flawed. It focused on the risk present when a number of *unrelated* children are placed together; indeed, this was a key qualifier of her opinion on the risk of harm in FGHs. But the data she used did not indicate whether some of the data on FGH age ranges could be accounted for by the fact that sibling groups were placed together. Notably, it is undisputed that FGHs are a critical placement option for large sibling groups DFPS is attempting to keep together.

DFPS has also remedied what the district court called the "most egregious" problem with FGHs. When the State appealed the district court's initial grant of injunctive relief, this court construed the district court's mandate narrowly to demand DFPS require 24-hour supervision in FGHs and denied the stay. There is no dispute that the State appears to be complying with that mandate. The emphasis on awake-night monitoring indicates that the primary concern is not the "mixing" component; instead, lack of adequate supervision makes the mixing of age, sex, and service levels a less safe practice.

In sum, plaintiffs' have failed to articulate how and to what degree the mixing of children of different ages and service levels—a policy that is constitutionally tolerable in similar circumstances—amplifies the risk of harm

---

[41] Again, to the extent children are being blindly placed with sexually abusive children that pose a serious risk to their bodily integrity because caseworkers don't have the time or the information they need to make an informed placement decision, that issue is more closely related to DFPS's policy toward caseloads and caseworkers, insufficient monitoring and oversight, and the failure to flag child-on-child abuse appropriately.

No. 18-40057

to children absent the corresponding problem regarding supervision. Though there may be risks to combining children with different needs in a single living space, doing so is not *per se* unconstitutional—all states do so in a variety of different settings in a way that avoids violating children's rights. To the extent that the lack of awake-night supervision may have sustained a constitutional claim under the circumstances, the remaining policies and their effects do not cause FGH children an amplified risk of harm sufficient to overcome the threshold hurdle.

## V.  Class Certification

The State devotes half a page in its nearly 100-page brief to its class certification argument. It incorporates by reference its general claim that plaintiffs have failed to demonstrate class-wide harm and thus that the district court abused its discretion in certifying the General and Subclasses. The State does not brief any other Rule 23-specific arguments. While the State mentions in passing "the unavailability of appropriate single-stroke injunctive relief" it references only prior sections in its brief that recount its unrelated objections to the sufficiency of the evidence and the district court's fact-finding. Accordingly, this and other Rule 23-specific arguments are waived for failure to adequately brief them. *See United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989).[42]

---

[42] For example, the State does not contend that the named plaintiffs are no longer viable class representatives. In any case, the district court did not abuse its discretion in determining that the other requirements of Rule 23(b)(2) had been met. Its finding that plaintiffs had satisfied commonality because their claims "depend[ed] upon a common contention . . . that is capable of classwide resolution" is adequately supported by the record. *See M.D. I*, 675 F.3d at 838 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Similarly, there was sufficient evidence establishing the individual plaintiffs' claims were "typical of the class claims." *Dukes*, 564 U.S. at 353 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 (1982)). Lastly, the district court correctly concluded that the named plaintiffs were adequate representatives who would "take an active role in and control the litigation to protect the interests of the absentees." *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002).

No. 18-40057

We understand the State to be primarily arguing that certification was improper because the class members have not been "harmed in essentially the same way." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Because we conclude that the State's policies with respect to caseload management, monitoring, and oversight violate plaintiffs' right to be free from a substantial risk of serious harm on a class-wide basis, we hold that the General Class and the LFC subclass were properly certified. However, the district court erred in concluding that foster group homes violate plaintiffs' due process right and that the FGH subclass suffers class-wide constitutional harm. Accordingly, the FGH subclass must be decertified. Our liability findings obviate the need for further discussion of the class certification issue.

## VI.   The Remedy

The district court entered an expansive injunction mandating dozens of specific remedial measures. While the district court was entitled to grant the plaintiffs injunctive relief, the injunction is significantly overbroad. Accordingly, we VACATE the injunction and REMAND with instructions to remove the remedial provisions related to placement array and FGHs, and to strike provisions that are not necessary to achieve constitutional compliance.

It is axiomatic that "federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *Horne v. Flores*, 557 U.S. 433, 450 (2009). This responsibility includes, when appropriate, issuing permanent injunctions mandating institutional reform. *See id.* at 448–50. In general, however, institutional reform injunctions are disfavored, as they "often raise sensitive federalism concerns" and they "commonly involve[] areas of core state responsibility." *Id.* at 448. Indeed, a sweeping permanent injunction here "commit[s] this Court to the near-perpetual oversight of an

50

No. 18-40057

already-complex child-welfare regime." *Connor B.*, 985 F. Supp. 2d at 157. An intrusion of this scale should not be taken lightly.[43]

The Supreme Court has explained that remedies fashioned by the federal courts to address constitutional infirmities "must directly address and relate to the constitutional violation itself," and "federal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977). The district court may not, therefore, "order[] relief beyond what [is] minimally required to comport with the Constitution's" prohibition on arbitrary deprivation of plaintiffs' substantive due process right. *Gates*, 501 F.2d at 1303. Accordingly, injunctions must be "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 586 (5th Cir. 2013) (internal quotation omitted).

But "[i]t is well-settled that, under the fourteenth amendment, a court may require remedial measures that the Constitution does not of its own force initially require." *Ruiz VII*, 679 F.2d at 1155. Moreover, an injunctive remedy "does not fail narrow tailoring simply because it will have positive effects beyond the plaintiff class." *Brown v. Plata*, 563 U.S. 493, 531 (2011). Accordingly, if certain mandated provisions are necessary to achieve constitutional compliance, they are not *per se* improper on the basis that they achieve "collateral" benefits not directly related to the appropriately identified systemic defect. *See id.*

While courts are required to afford the State deference in administration of its state systems and "the [first] opportunity to correct [its own] errors," *Lewis v. Casey*, 518 U.S. 343, 362 (1996), these principles are less applicable

---

[43] Nor do we suggest the conscientious district judge took it lightly.

No. 18-40057

where, as here, the State has had ample opportunity to cure the system's deficiencies. The State has been aware of the district court's concerns for several years, and the State cannot claim that the court's mandate was unclear. It has repeatedly refused to work with the court-appointed Special Masters in creating corrective policies and largely ignored the district court's orders that it implement policies and procedures to minimize the risk of harm to the PMC class. Moreover, the State has had a wealth of information at its disposal detailing the structural deficiencies in its foster care system since long before plaintiffs filed this lawsuit, and it has failed to take meaningful remedial action. The district court was entitled to worry about the State's motivation to self-correct and was justified in doubting that it would achieve compliance independently.[44]

We understand the district court's frustration, and we agree remedial action is appropriate. The current injunction, however, goes well beyond what is necessary to achieve constitutional compliance. *Gates*, 501 F.2d at 1303. And it is far from narrowly tailored. *Daniels Health*, 710 F.3d at 586. Many of the injunction provisions fail to address the specific problems giving rise to the constitutional violation. Others, while more closely hewed to the violative practices, aim too high. These provisions may reflect the "best practices" of the child-welfare community or the policy preferences of the district court, but they go far "beyond what [is] minimally required to comport with the Constitution's" prohibition on arbitrary deprivation of plaintiffs' substantive due process right. *Gates*, 501 F.2d at 1303.

For ease of reference, we will discuss the injunction in five "sections." The first two sections will review injunction provisions that are directly related

---

[44] We note also that the State has been granted nearly one-billion dollars in additional DFPS funding. This alleviates many funding-related concerns about the injunction.

No. 18-40057

to the caseload management and the monitoring and oversight violations. Some of these provisions are valid, but many constitute judicial overreach. The next two sections will review provisions that target the alleged placement array and foster group home violations. These provisions must be struck, as we conclude that neither of these alleged deficiencies constitutes a due process violation. The final section will discuss what can be described as "crossover" provisions, which address more than one violation simultaneously or are aimed at remedying other general ailments of the system that the district court identified. Only those crossover provisions narrowly tailored to address the caseload management and monitoring and oversight violations are proper.

**Caseloads**

The primary issue with DFPS's management of its caseworker caseloads is the lack of adequate data and standards. Accordingly, it is reasonable for an injunctive remedy to require the agency to generate reliable data regarding current caseloads and to establish internal guidelines that identify a flexible range of caseloads that the agency determines caseworkers can safely manage. DFPS should hire with the determined caseload range in mind. Additionally, provisions that are calculated to remedy the caseworker turnover problem are generally proper. The following provisions directly address the caseload management violation and are therefore valid:

1. Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the monitor(s), on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's quarterly reporting shall include the number and percent of staff with caseloads within, below and over the

53

No. 18-40057

range of 14 to 17[45] children, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be pro-rated accordingly. The caseload range for staff with mixed caseloads, for example caseworkers serving both PMC and TMC children, shall be 14 to 17 children's cases, and each TMC child is to be afforded the same weight as a PMC child. Reporting will be by office, by county, by agency (if private) and statewide.

2. Effective May 2018, DFPS shall ensure statewide implementation of the CPS Professional Development (CPD) training model, which DFPS began to implement in November 2015.

3. Effective May 2018, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.

One of the most controversial injunction items is the district court's designation of a "caseload cap." Given the lack of internal DFPS standards and the agency's failure to supply the Special Masters with a caseload range it deemed appropriate and safe, the district court essentially adopted national caseload standards and imposed a mandatory caseload range of 14 to 17 children. While caseload caps strike at the heart of the workload problem, we agree with the State that they are too blunt a remedy for a complex problem. They constitute "relief beyond what [is] minimally required" to remedy the constitutional violation. *Gates*, 501 F.2d at 1303

To begin with, caps would only exacerbate DFPS's staffing crisis in the short-term. Setting aside the fact that imposing a ceiling is logistically impossible given the staffing constraints, it would also generate a deluge of

---

[45] For reasons that will be explained more thoroughly below, references to a caseload cap or an enforced caseload range are improper. To the extent otherwise valid provisions reference caseload caps, these caps shall be deleted from those provisions.

No. 18-40057

paperwork and force DFPS to rapidly redistribute cases among its
caseworkers. This would undoubtedly be destabilizing for all of the parties
involved, including the children in DFPS's care. Caps also fail to account for
the fact that two caseloads that each consist of, say, 16 children can generate
vastly different amounts of work. A more flexible method of distributing
caseloads that takes into account the complexity of the cases and the
experience of the caseworker (and taking into consideration, *inter alia*, a long
list of possible factors such as travel distances and language barriers) is, as a
general matter, a sound policy. DFPS absolutely should determine how many
cases, on average, caseworkers are able to safely carry. Based on its
determination, DFPS should establish generally applicable, internal caseload
standards. These standards should serve as a rough guide for supervisors who
are handling caseload distribution, and they should inform DFPS's hiring
goals. But a hard cap on caseloads would completely hamstring DFPS's ability
to approach caseload distribution in a holistic, nuanced way. In short,
mandatory caps are not only an extreme remedy, they are imprecise.

Several other caseload-specific injunction provisions are also improper,
as they either exceed what is required to achieve constitutional compliance or
do not directly address the problems giving rise to the caseload management
violation. Moreover, some provisions would unnecessarily *add* to the volume of
work for which caseworkers are responsible, and would increase the time spent
managing paperwork and compliance and administrative burdens. The
following provisions are invalid:

1. Effective June 2018, DFPS shall ensure that the full-time staff,
   including supervisors, who provide case management services to
   children in the PMC class, whether employed by a public or private
   entity, have a caseload within or below the range of 14 to 17 children.
   Caseloads for staff must be pro-rated for those who are less than full-
   time. Caseloads for staff who spend part-time in caseload carrying
   work and part-time in other functions must be pro-rated accordingly.

55

No. 18-40057

The caseload range for staff with mixed caseloads, for example caseworkers serving both PMC and TMC children, will also be 14 to 17 children's cases, and each TMC child's case will be afforded the same weight in the caseload calculation as a PMC child.

2. Effective immediately, DFPS shall commence recruiting, hiring and training staff, and ensuring any private entities that are charged by DFPS to provide case management services to children in the PMC class do the same, to ensure that staff who provide case management services to children in the PMC class, whether employed by a public or private entity, have a caseload within or below the range of 14 to 17 children.

3. Effective May 2018, DFPS shall ensure that before any new CVS (or private agency) caseworker assumes primary case management responsibility for a full caseload range of 14 to 17 children, they successfully complete a comprehensive training program for new workers and pass a competency examination.

4. Effective immediately, DFPS shall ensure that monthly face-to-face visits between caseworkers and children in the PMC class occur as required. The caseworkers' visits with children in the PMC class must include time with the child separate from the caregiver(s) and other children, if the child is verbal. Effective immediately, DFPS shall ensure that caseworkers document monthly, private meetings with each verbal PMC child in their care, unless the reason for noncompliance is fully documented in the child's electronic case record.

5. Effective immediately, DFPS shall ensure adequate training on its child visitation policies for all caseworkers responsible for visiting children in the PMC class.

6. Effective immediately, DFPS shall track caseworker-child visits and report quarterly to the monitor(s) on the number of monthly caseworker-child visits required and the percent and number that occurred.[46] DFPS shall report for all referenced visits whether they involved face-to-face time with the child separate from the caregiver(s) and other children, if the child is verbal.

7. Effective immediately, DFPS shall ensure caseworkers who conduct visits with PMC children follow the agency's contact guidelines, which they must document in the child's electronic case record based on monthly visits with a child. The guidelines must require caseworkers, at least, to complete an assessment of the child's safety, including an

---

[46] Notably, it appears DFPS already tracks this statistic.

No. 18-40057

assessment of the placement; a confirmation that the child was interviewed individually, separately and privately from the caregiver and other children, if the child is verbal; a discussion of the form(s) of discipline being used in the placement; and a documented review of the child's medical, mental health, dental and educational progress and needs.

8. DFPS shall ensure that supervisors who oversee caseworkers managing the cases of children in the PMC class have no more than seven workers assigned to them. Supervisory workloads must be pro-rated for supervisors who are less than full-time. Workloads for supervisors who spend part-time in supervisory work and part-time in other functions, which includes carrying a case, must be pro-rated accordingly.

9. Supervisors who oversee caseworkers serving PMC children shall not directly carry a caseload unless there is a documented emergency requiring the supervisor to do so.

10. Within 30 days of the Court's Final Order date, DFPS shall eliminate the use of I See You secondary workers and designate all secondary workers as primary caseworkers.[47]

## **Monitoring and Oversight**

Most of the injunction provisions relating exclusively to the monitoring and oversight violation are reasonably targeted toward remedying the identified issues. The following provisions are valid:

1. DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Final Order; and conducted taking into account at all times the child's safety needs. The monitor(s) shall periodically review the statewide system for appropriately receiving, screening and investigating reports of abuse

---

[47] We do not understand the logic of this provision. The district court made clear that secondary workers were inappropriate substitutes for caseworkers because they had significantly less responsibilities and carried large caseloads. Furthermore, it is not clear that all of these workers are equipped to be caseworkers (or even that they want to). It seems somewhat bizarre to force DFPS to absorb all of its secondary caseworkers onto its primary team.

No. 18-40057

and neglect involving children in the PMC class to ensure the
investigations of all reports are commenced and completed on time
consistent with Items 9-16 of this Section of the Court's Final Order
and conducted taking into account at all times the child's safety
needs.

2. Effective May 2018, DFPS shall ensure that all caseworkers and
caregivers are trained to recognize and report sexual abuse, including
child on child sexual abuse.

3. Effective March 2018 and ongoing thereafter, DFPS shall, in
accordance with existing DFPS policies and administrative rules,
initiate Priority One child abuse and neglect investigations involving
children in the PMC class within 24 hours of intake. (A Priority One
is by current policy assigned to an intake in which the children appear
to face a safety threat of abuse or neglect that could result in death or
serious harm.)

4. Effective March 2018 and ongoing thereafter, DFPS shall, in
accordance with existing DFPS policies and administrative rules,
initiate Priority Two child abuse and neglect investigations involving
children in the PMC class within 72 hours of intake. (A Priority Two
is assigned by current policy to any CPS intake in which the children
appear to face a safety threat that could result in substantial harm.)

5. Effective March 2018 and ongoing thereafter, DFPS shall, in
accordance with DFPS policies and administrative rules, complete
required initial face-to-face contact with the alleged child victim(s) in
Priority One child abuse and neglect investigations involving PMC
children as soon as possible but no later than 24 hours after intake.

6. Effective March 2018 and ongoing thereafter, DFPS shall, in
accordance with DFPS policies and administrative rules, complete
required initial face-to-face contact with the alleged child victim(s) in
Priority Two child abuse and neglect investigations involving PMC
children as soon as possible but no later than 72 hours after intake.

7. Effective March 2018 and ongoing thereafter, DFPS shall track and
report all child abuse and neglect investigations that are not initiated
on time with face-to-face contacts with children in the PMC class,
factoring in and reporting to the monitors quarterly on all authorized
and approved extensions to the deadline required for initial face-to-
face contacts for child abuse and neglect investigations.

8. Effective March 2018, DFPS shall, in accordance with DFPS policies
and administrative rules, complete Priority One and Priority Two
child abuse and neglect investigations that involve children in the
PMC class within 30 days of intake, unless an extension has been

No. 18-40057

approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

9. Effective March 2018 and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Final Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

10. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.

11. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.

12. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.

13. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.

14. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.

15. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

16. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.

No. 18-40057

17. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

18. By July 2018, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

19. Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.

20. Effective immediately, RCCL, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements. During inspections, RCCL, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.

21. Effective March 2018, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.

22. Effective March 2018, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.

23. Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.

24. Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual

No. 18-40057

abuse is reflected in the child's placement summary form, and common application for placement.

25. Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.

26. Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.

27. Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.

28. Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.

29. Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.

30. Within 90 days of the Court's Final Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Final Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.

31. Effective March 2018, DFPS shall ensure that all abuse and neglect referrals to the 24-hour hotline[48] regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.

The monitoring and oversight provisions pertaining to the establishment of the 24-hour hotline are in need of revision because they do not address the

---

[48] The injunction provision requiring the establishment of a new 24-hour hotline is invalid for reasons discussed below. It is, however, proper for the district court to require that RCCL promptly communicate allegations of abuse to the child's caseworker.

No. 18-40057

discrete issues underlying the violation: the manner in which RCCL documents and investigates allegations of abuse. To the extent that the court is worried about underreporting, this can be remedied by mandating that caseworkers provide children with the appropriate point of contact for reporting issues. The problem with RCCL follow-up is sufficiently addressed by other valid provisions.

Other hotline-related provisions unnecessarily increase the time spent managing administrative burdens. Mandated RCCL caseload caps are misguided for substantially the same reasons that caseload caps are ill-advised in the primary caseworker context. Again, however, it would be reasonable for the court to require a comprehensive workload study and the establishment of internal guidelines for caseload ranges based on what DFPS determines RCCL investigators can safely manage. Lastly, requiring the State to publish all licensing inspections on its public website is not only unnecessary, but it also implicates confidentiality concerns. Accordingly, the following provisions are invalid:

1. Effective immediately, DFPS shall ensure that it maintains a statewide, 24-hour hotline accessible by PMC children in DFPS custody to report abuse and neglect. The hotline shall receive, screen and assign for investigation reports of maltreatment of children in the PMC class.

2. In order to ensure that PMC children have access to the 24-hour hotline to report abuse and neglect, within 30 days of the Court's Final Order, DFPS shall either require all foster homes and therapeutic foster homes housing PMC children to maintain a landline phone accessible to the child in the home, with the toll-free hotline number appended to the landline or, in the alternative, DFPS shall present an alternative plan to the Court within 30 days of the Court's Final Order to ensure PMC children have access to the hotline to report abuse and neglect.

3. Effective March 2018, and ongoing thereafter, DFPS shall ensure the central case record of every child in the PMC class includes documentation confirming the method(s) discussed with the child for

No. 18-40057

notifying DFPS if the child needs to report abuse or neglect. For children who are verbal, the documentation must include the date the reporting methods were discussed with the child and confirmation of their level of understanding. The discussion with the child must occur within 48 hours of entering any new placement.

4. Within 60 days of the Court's Final Order, all calls to the DFPS 24-hour hotline shall be recorded. All recorded calls shall be stored for at least two years using a call recording system. Recordings shall be made available to the monitor(s) for monitoring and verification purposes.

5. Effective March 2018, and ongoing thereafter, DFPS shall ensure that a well trained, experienced and qualified supervisor reviews and approves all screening decisions at the 24-hour hotline involving children in the PMC class. The monitors will conduct routine audits of screened-out reports involving children in the PMC class to confirm that DFPS conducted a complete review of the available record (including past intake reports involving the child and the placement) and due consideration was given to the risks to children when determining whether to assign a matter for investigation.

6. Effective immediately, DFPS shall ensure foster caregivers and other placement providers immediately report all allegations of sexual abuse by a child against another child to the 24-hour hotline established by DFPS to screen referrals of abuse and neglect.

7. Effective March 2018, DFPS shall document, track and report quarterly to the monitor(s) all referrals of child-on-child sexual abuse involving children in DFPS custody made to the 24-hour hotline established by DFPS to screen referrals of abuse and neglect.

8. Effective immediately and ongoing thereafter, DFPS shall report quarterly to the monitor(s) and confirm that all reports of child on child sexual abuse involving children in DFPS custody that have been referred to the 24-hour hotline have been assigned for investigation for, at minimum, neglectful supervision by the placement caregiver(s).

9. Effective May 2018, the State of Texas shall ensure the staff who investigate allegations of abuse and neglect of children in the PMC class have caseloads of no more than 14 investigations, consistent with the median caseload of investigations found in the Workload Study. Although this is twice the number of investigations the Workload Study concluded was reasonable for child abuse and neglect investigators in light of the amount of time they expend on their cases, 14 investigations shall serve as the top of their workload range.

No. 18-40057

10. Effective immediately, DFPS shall ensure that investigations of abuse and neglect of PMC children while they are in licensed placements are conducted by staff whose caseload is exclusively focused on child maltreatment investigations.

11. Effective May 2018, the State of Texas shall ensure that the staff who conduct licensing standards investigations for alleged violations involving children in the PMC class have caseloads of no more than 14 standards investigations, consistent with the maximum caseload of standards investigations found in the Workload Study. Although this is nearly three times the number of standards investigations the Workload Study concluded was reasonable for inspectors in light of the amount of time they expend on their cases, 14 standards investigations shall serve as the top of their workload range. Caseloads for staff shall be pro-rated for those who are less than full-time. Caseloads for staff who spend part-time in investigative work and part-time in other functions must be pro-rated accordingly.

12. Effective March 2018 and ongoing thereafter, the State of Texas shall publicly post on its website all licensing inspections by RCCL, and/or its successor entity, redacting child identifying information and other information deemed confidential under state and federal law and regulation. The posted information shall include the full narrative inspection report, the outcome of the inspection, inspection violations and whether RCCL, and/or its successor entity, implemented corrective or adverse action as a result of the violations. The posted information shall also include all corrective action plans required by RCCL and/or other successive entities and the dates RCCL and/or other successive entities accepted corrective action plans submitted by violating agencies and the status of those corrective action plans.

The injunction provisions aimed specifically at remedying the alleged placement array and foster group home deficiencies must be struck, as the court has determined that neither practice violates plaintiffs' substantive due process rights. The following provisions are invalid:

### **Placement Array**

1. DFPS shall immediately implement a policy that establishes single-child homes as the presumptive placement for all sexualized children, either as the aggressor or the victim. The policy also will allow for exceptions, including: placement in a therapeutic setting for treatment; placement with siblings when the safety of all children

No. 18-40057

involved can be closely monitored and secured; a thorough and documented assessment certifies that it is in the child's best interest to be placed in a home with other children and the safety of all children involved can be closely monitored and secured. Any exceptions applied under this policy must be approved and documented by a senior DFPS manager.

2. DFPS shall ensure it has at least as many foster home placements for children, by catchment area, by the end of FY 18 as the agency found it requires to meet the needs of children in its January 2017 Foster Care Needs Assessment, Table 5. DFPS shall report quarterly to the monitor(s) on the available supply of foster homes for children by catchment area as of the last date of the quarter.

3. By June 2018, DFPS shall complete and submit to the Court an update of its January 2017 Foster Care Needs Assessment, and include:

   a. A review and assessment of the placement needs of sibling groups that are separated into different placements and children who have been identified as sexually aggressive or whose IMPACT records document their having been sexually abused.

   b. Data on the number of foster homes in each county that could be readily designated as single-child homes.

   c. Data on the number of homes in each county available for the placement of sibling groups of various sizes.

   d. An analysis of the number of homes in each county and region that have a deficit or surplus of single-child homes to meet the needs of children from the same counties and regions who are sexually aggressive or have been sexually abused.

   e. An analysis of the number of homes in each county and region that have a deficit or surplus of homes that can meet the placement needs of sibling groups from the same counties and regions or catchment areas.

4. Effective immediately, DFPS shall immediately establish a tracking mechanism to identify how many children are in all placements where a PMC child resides, including foster, biological, non-foster and adoptive children, as well as each placement's licensed capacity. By May 2018, DFPS shall publish this information on its website and update the information quarterly.

5. Effective June 2018, DFPS shall establish and implement a policy that requires a transition plan of no less than two weeks to change a PMC child's placement if the disruption is due to a change in the

No. 18-40057

child's level of care. The policy shall require a documented assessment to determine if the child should remain in the same placement for an extended period if the assessment determines the child's behavioral or emotional challenges are likely to re-escalate if the placement is changed.

6. Beginning in June 2018, DFPS shall report to the monitor(s) semi-annually on PMC children's placement moves, and ensure that all such moves, and the reasons for the placement moves, are documented in the child's electronic case record.

### Foster Group Homes

1. Effective immediately and ongoing thereafter, no PMC child may reside in a Foster Group Home placement.
2. Effective immediately and ongoing thereafter, no PMC child may reside in any family-like placement that houses more than six children, inclusive of biological, adoptive, non-foster and foster children. Family-like placements include non-relative foster care, tribal foster care, and therapeutic foster care.

The remaining injunction provisions are "crossover" provisions, which address multiple violations or which target other alleged DFPS deficiencies. Again, only those crossover provisions that are narrowly tailored to remedy the caseload management and the monitoring and oversight violations are proper. Specifically, the provisions mandating DFPS update and integrate its record-keeping system are relevant to both violations. An improved record-keeping practice will reduce caseworkers' overall workloads. It would also centralize and make accessible data that is critical to making safe placement decisions. Lastly, access to comprehensive medical information, mental health records, and placement history for individual children would assist RCCL in making an informed assessment about abuse allegations. The following provisions are valid:

1. Within four months of the Court's Final Order, DFPS shall submit to the Court a plan for an integrated computer system, with specific timeframes, that contains each PMC child's complete records, including but not limited to a complete migration of all medical,

No. 18-40057

dental, educational, placement recommendations, court records, mental health and caseworker records. The mental health, dental and medical information shall include all visits to the provider with detailed examinations, diagnoses, test results, immunizations, medications (including the reasons for each), history of abuse, treatment plans, and any other information necessary for the safety of the children. DFPS shall have this system fully functional within one year of the Final Order date.

2. Within four months of the Court's Final Order, DFPS shall submit to the Court a plan for an integrated computer system, with specific timeframes, that contains each PMC child's complete records, including but not limited to a complete migration of all medical, dental, educational, placement recommendations, court records, mental health and caseworker records. The mental health, dental and medical information shall include all visits to the provider with detailed examinations, diagnoses, test results, immunizations, medications (including the reasons for each), history of abuse, treatment plans, and any other information necessary for the safety of the children. DFPS shall have this system fully functional within one year of the Final Order date.

The crossover provisions related to placement array and foster group homes must be struck. Additionally, provisions designed to remedy what the district court believed to be additional, related problems with the foster care system are improper. These provisions are not calculated to remedy an identified constitutional violation. They may reflect "best practices" or the personal policy preferences of the district court, but they are not necessary to achieve constitutional compliance. Moreover, many of these provisions only increase caseworkers' administrative burdens. The following provisions are invalid:

1. Effective immediately, the electronic case record of each child in the PMC class must include the child's photograph that is not more than one year old, except as provided in paragraph three, below.
2. Effective immediately, when a child enters the PMC class, DFPS shall ensure that a photograph is taken of the child within 48 hours and uploaded into the child's electronic case record promptly. DFPS shall

No. 18-40057

ensure the date of the photograph is recorded in the child's case record.

3. Effective immediately, with respect to all PMC children under the age of three years, DFPS shall ensure that photographs are taken and uploaded to the child's IMPACT case record at least semi-annually and the date of the photograph must be recorded in the child's case record.

4. Effective immediately, DFPS shall ensure adequate training to all caseworkers on how to use the appropriate technology to photograph a child and upload the photograph to the child's electronic case record.

5. Effective immediately, DFPS shall ensure and document that all youth in the PMC class, aged 16 or older, receive copies of their birth certificate and social security card upon turning 16.

6. Effective immediately, DFPS shall ensure and document that all youth in the PMC class, prior to aging out of care, receive copies of their birth certificate, social security card, most current high school transcript, copies of their last physical health and dental examinations, copies of their immunization record, and copies of identifying information needed for Medicaid. DFPS must document an acknowledgment of receipt, along with a short description of the youth's plan for safekeeping the documents, signed by the youth and their caseworker in the electronic case record prior to the youth aging out of care. Prior to the youth aging out of care, DFPS shall take all reasonable steps, including the filing of an application, to assist the youth in signing up for either Former Foster Care Children's Medicaid or Medicaid for Transitioning Foster Care Youth, and shall document those steps in the child's electronic record. Each of these programs requires an affirmative act to change from the under-18 Medicaid to the over-18 previous foster care Medicaid.

7. Effective within three months of the Court's Final Order and ongoing thereafter, DFPS shall identify all PMC youth aged 14 and older who have not yet received the following DFPS independent living preparation services: the life skills assessment, a Circles of Support (COS) or Transition Plan Meeting (TPM), and a recently updated (within six months for youth 16 and older and one year for youth 14 and older) transition plan. DFPS shall ensure that all PMC youth who have been identified immediately above receive these services and that the PMC youth's transition plan is developed.

8. Effective June 2018, DFPS shall ensure all 14- and 15-year-old youth in the PMC class receive DFPS' Preparation for Adult Living (PAL) services.

No. 18-40057

9. Effective June 2018, DFPS shall ensure that if a PMC youth's disability is a barrier to participation in PAL services or supports, appropriate accommodations shall be identified that allow the youth to meaningfully participate, and DFPS shall document any accommodations in the child's electronic case record.

10. Effective June 2018, DFPS shall ensure PMC youth receive a life-skills assessment within 45 days of turning 14, and are reassessed annually, and that the results of these assessments are documented and available in the child's electronic case record.

11. Effective June 2018, DFPS shall ensure that PMC youth receive DFPS's Circles of Support (COS) or Transition Planning Meeting (TPM) within 45 days of turning 14 years old, and then receive either COS or TPM in conjunction with the child's permanency planning meeting every four months, until the youth ages out or attains permanency. The purpose of such meetings is to develop a youth's transition plan with an eye toward building skills to support a youth's specific strengths and address needs in preparation for independence.

12. Effective March 2018, DFPS shall ensure that primary caseworkers assigned to PMC children develop a plan, in consultation with the child's attorney *ad litem*, to facilitate the sealing or expungement of any eligible criminal or juvenile records for offenses for which the youth was adjudicated or convicted prior to the youth aging out of care. DFPS shall ensure the efforts to do so are documented in the child's electronic case record.

13. Effective March 2018, DFPS shall ensure that the caseworker puts a plan in place prior to a PMC youth turning 18 years of age, documented in the case record, detailing how the youth will access benefits the youth is eligible to receive once they leave DFPS care, including the DFPS transitional living allowance, Social Security Disability Insurance benefits, the DFPS aftercare room and board assistance, and DFPS's Education and Training Vouchers.

14. Effective June 2018, DFPS shall ensure driver's education classes are provided to all PMC youth who are old enough to receive a learner's permit and choose to take driver's education. DFPS may create exceptions for PMC youths who are not developmentally or medically able to safely participate in driver's education.

15. Effective immediately, DFPS shall ensure that prior to exiting care, each PMC youth age 14 and older is assisted in creating e-mail accounts so that they may receive encrypted copies of personal documents and records, in addition to receiving copies of originals.

No. 18-40057

16. Effective immediately, DFPS shall request the appointment of an Attorney *ad litem* for all PMC children from each court in which a suit is pending in which a PMC child does not have Attorney *ad litem* representation, citing the Court's Final Order.

17. Within 30 days of the Court's Final Order, DFPS shall present a plan to the Court to ensure reimbursement to Attorneys *ad litem* in those courts that do not currently provide Attorneys *ad litem* for PMC children. If DFPS fails to present a plan, DFPS shall reimburse those fees necessary to provide Attorneys *ad litem* in those courts that do not currently provide Attorneys *ad litem* for PMC children.

18. DFPS shall institute and incorporate caseworker training (minimally into the Conservatorship Specialty Track) about child health that describes:

  a. The health vulnerabilities of foster youth (pages 1 and 2 of the American Academy of Pediatrics "Fostering Health: Healthcare for Children and Adolescent in Foster Care");

  b. Specifically, how to use child and family visits to obtain and update healthcare information;

  c. The utility of children's electronic case record, for improving the health of foster youth.

19. Effective immediately, DFPS shall make every effort to obtain and make available a child's medical records within 24 hours of the child entering the custody of DFPS. Caseworkers shall document their efforts to obtain and make available children's medical records within 48 hours of children entering DFPS custody.

20. Effective June 2018, DFPS will ensure that every PMC child has a medical home. The medical home is a health care delivery model led by a health care provider to provide comprehensive and continuous medical care and care management to patients with a goal to obtain positive health outcomes. The medical home shall be obliged (by policy and contract):

  a. To maintain and update all medical fields of the child's central electronic record;

  b. To coordinate care for routine and emergency healthcare needs;

  c. To ensure timely evaluations and assessments for all health needs, including behavioral health (including psychotropic oversight), dental care, and chronic health conditions.

21. Effective June 2018, DFPS shall ensure children in the PMC class receive a specific developmental assessment of at least one of the following screenings within 90 days of each child's birthday:

No. 18-40057

    a. Birth to 10 years: Ages and Stages Questionnaire, Ages and Stages Questionnaire: Second Edition, or the PEDS developmental screening and assessment;

    b. 11 years to 21 years: the Pediatric Symptom Checklist (PSC)-35, the Youth Pediatric Symptom Checklist (Y-PSC), the Patient Health Questionnaire-9 (PHQ-9), or the CRAFFT screening test)

    c. If DFPS does not believe any of these tests to be reliable, it may propose its own developmental assessments to the Court within 30 days of the date of this Order. Screening results from the developmental assessment, including follow-up/red flag items, shall be inputted into the child's electronic case record within 72 hours;

22. Effective June 2018, DFPS shall ensure the child's central electronic case record has functional internal (red flag) alerts notifying caseworkers of:

    a. Follow up needed;

    b. Assessments/screening required or indicated;

    c. Evaluations required or indicated;

    d. Immunizations required or indicated; and

    e. Appointments missed or cancelled.

23. Effective May 2018, DFPS shall institute a policy that uses the caseworker visits to verify and report on health status by answering and documenting in the PMC child's electronic case record these questions:

    a. Are there outstanding red flag items for this child?

        i. Greater than 20 days?

        ii. Greater than 90 days?

    b. Has this child visited a healthcare practitioner in the last 90 days?

    c. Can this child (over 11) name his/her health care needs?

24. Effective March 2018, DFPS shall implement a policy that requires that no unrelated children more than three years apart in age be placed in the same room. The policy may also establish exceptions, including a thorough and documented assessment that certifies it is in the child's best interest or that no risk of harm would result from placing any unrelated children more than three years apart in the same room. Any exceptions applied under this policy must be approved and documented in the child's electronic record by the DFPS county director.

No. 18-40057

25. Effective March 2018, DFPS shall implement a policy that requires that no unrelated children with different service levels be placed in the same room. The policy may also establish exceptions, including a thorough and documented assessment by DFPS that certifies it is in the child's best interest or that no risk of harm would result from placing any unrelated children of different service levels in the same room. Any exceptions applied under this policy must be approved and documented in the child's electronic case record by the county director.

26. Effective immediately, DFPS may not place a child in the PMC class in an office overnight, and must track all instances if it does so, and report the same to the monitor(s) monthly. If, under any circumstance, a child in the PMC class spends the night in an office, DFPS staff must document that fact, and the reason, in an electronically available log maintained by DFPS in each county. These logs shall be submitted on the first day of every month to a designated senior manager in DFPS' central office and to the monitor(s). The designated DFPS senior manager shall review these logs monthly and take immediate follow up action to identify and address problems encountered at the county level with respect to securing minimally adequate, safe placements for children in the PMC class.

27. Within six months of the Court's Final Order, all PMC children under two years of age shall be placed in a family-like setting, including non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may require services provided in a non-family-like placement. All exceptions must be approved by a supervisor and documented in the child's electronic case record.

28. Within 12 months of the Court's Final Order, all PMC children under six years of age shall be placed in a family-like setting, including non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may

No. 18-40057

require services provided in a non-family-like placement. All exceptions must be approved by a supervisor and documented in the child's electronic case record.

29. Within 24 months of the Court's Final Order, all PMC children under the age of 13 shall be placed in a family-like setting, including non-relative foster care, tribal foster care, kinship foster care and therapeutic foster care. DFPS may make exceptions to family-based placements for sibling groups of four or more children who cannot otherwise be placed together, children whose individual needs require inpatient psychiatric hospitalization, treatment and/or medical care or young children who are placed with their minor parent in the PMC class and who may require services provided in a non-family-like placement. All exceptions must be approved by a supervisor and documented in the child's electronic case record.

## VII.  Conclusion

For the foregoing reasons, we AFFIRM in part and REVERSE in part the district court's findings on substantive due process liability, and VACATE and REMAND the permanent injunction for modification consistent with this opinion. This is a limited remand. Accordingly, should either party seek appellate review following modification of the injunction by the district court, the appeal will be assigned to this panel. *See United States v. Cessa*, 861 F.3d 121, 143 (5th Cir. 2017) (citing *Wheeler v. City of Columbus*, 686 F.2d 1144, 1154 (5th Cir. 1982)).

No. 18-40057

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring as to Parts I, II, III, IV.1–2, and otherwise dissenting:

The care of our children has long been a concern of society and state, with vivid images of Charles Loring Brace's "orphan trains" shipping children from the streets of New York to the Midwest in the 1850s, to the development of the modern institutions of child welfare. Today, we add another page to that ongoing narrative.

In 2011, PMC children challenged the constitutionality of their conditions, and, after seven years of litigation, received ongoing relief in the form of an injunction, ordering changes to remediate the denial of the children's constitutional rights. The majority disassembles that remedy, scrapping elements it deems superfluous, along the way reversing the district court's liability determinations regarding Licensed Foster Care placement arrays and Foster Group Home policies. I concur in the majority's affirmance of liability as to the general class's claim and the Licensed Foster Care subclass's oversight claim, but cannot join its reversals of the liability rulings regarding the placement-array and the Foster Group Home claims. Nor can I join its disaggregation of the district court's injunction and vacatur of substantial portions of that remedy.

Underlying the doctrinal missteps in the majority's evaluation of liability and remedy is a refusal to abide by the standard of review of the district court, replacing it with an indulgent deference to DFPS. This approach belies the recognition—emphasized by the district court—that DFPS has, for two decades, hobbled the capacity of its caseworkers to care for PMC children and countenanced the abuse, physical endangerment, and permanent psychological debilitation of thousands of children under its care. It is significant that the panel is unanimous in affirming the finding of the district

74

No. 18-40057

court that DFPS was deliberately indifferent to the liberty interests of PMC children. We disagree over the remedial response to these ills.

I begin against the backdrop of an account of one child, which the district court found to be typical of the thousands of PMC children—a factual account that compelled the affirmance of the district court's finding of liability. At fourteen, Texas foster child S.A. "denied that any happy things [had] ever happened to her." At five, S.A. became a ward of the State when her mother was arrested. Four months into foster care, S.A. reported being sexually abused by an older child in her foster home. DFPS sent no agency staff to interview S.A., and there is no record that anyone from the agency followed up with the private company to which it had outsourced the investigation. When she entered permanent conservatorship roughly half a year later, S.A.'s behavior had changed: she was aggressive and self-abusive, and later suicidal. DFPS eventually moved S.A. from her first foster home. Over the coming years she was moved between thirty-three placements, attended sixteen different schools, and was assigned to a "revolving door" of twenty-eight different caseworkers. S.A. was diagnosed with a growing list of mental-health problems, and received therapy for further instances of potential sexual abuse. Her caseworkers failed to update her records, and, as a direct consequence of these failures, S.A. missed at least two possible adoption opportunities—opportunities of which S.A. was aware. At the time, she told a psychologist that she "felt so sad that she no longer wanted to live." On turning eighteen, S.A. "aged out" of foster care. By then, her intellectual functioning had severely deteriorated and she had regressed emotionally, unable to trust others or build relationships. Indeed, S.A. appears to have lost basic elements of her identity and individuality: she could no longer recount a chronology of her life or remember where she had lived. The five-year-old girl DFPS had taken under

its protection left the State's care thirteen years later psychologically scarred, deprived of capacities for citizenship and productive adult life.

S.A.'s experience is typical for PMC children.[1] She is but one of thousands of children DFPS has "shuttled throughout a system where rape, abuse, psychotropic medication and instability are the norm."[2]

## I.

Within DFPS, frontline work with PMC children is primarily delegated to caseworkers. "[C]aseworkers are foster children's lifeline, their connection to everything."[3] Once a child enters permanent conservatorship, courts often dismiss the child's attorney *ad litem* and court-appointed advocates, leaving the DFPS caseworker as the child's sole advocate.[4] Caseworkers' duties include monitoring a foster child's welfare within the foster-care system, intervening to protect the child's interests, and working towards the achievement of permanency. PMC children are dependent upon their caseworkers. As amicus National Association of Social Workers puts it, "[t]he effective caseworker serves as a 'smoke alarm' for the child in care . . . sounding a warning when

---

[1] *M.D. v. Abbott*, 152 F. Supp. 3d 684, 737 (S.D. Tex. 2015) ("S.A.'s experience is 'typical . . . of the entire foster care system in the State of Texas,' especially in the PMC."); *see also* Brief of Disability Rights Texas as Amicus Curiae at 2 ("[B]ased on our experiences representing over 800 PMC children in 46 counties, Plaintiffs' tragic experiences are far too typical.").

[2] *M.D.*, 152 F. Supp. 3d at 828.

[3] *Id.* at 776 (internal quotation marks omitted). As Amicus National Association of Social Workers puts it, "[t]he State's ability to provide the best of care for these children pivots on the effectiveness of its caseworkers who fulfill a critical role in these children's lives and ultimate outcomes." Brief of Nat'l Assoc. of Social Workers & Its Texas Chapter as Amicus Curiae at 5.

[4] *M.D.*, 152 F. Supp. 3d at 782 ("[W]hen a child enters PMC, courts often dismiss the child's attorney *ad litem* and CASA, leaving the child with fewer stable relationships and advocates. This makes the child's relationship with his or her caseworker that much more important.").

anything is amiss."[5] To be effective, "each caseworker must have the time and resources to devote to each child who forms a part of the caseworker's caseload."[6] According to the Child Welfare League of America (CWLA), the nation's oldest and largest membership-based child welfare organization,[7] a caseworker can handle up to 15 cases effectively—any more compromises the effectiveness of the worker, and the welfare of the children under the worker's care.[8] The Council on Accreditation, another national child-welfare professional organization, similarly recommends that caseloads not exceed 15 children per worker, not as an ideal, but as a minimum necessary protection—protection that our Constitution guarantees.

The record demonstrates that DFPS has undermined caseworkers' abilities to fulfill their duties. DFPS caseworkers handle, on average, 28 children's cases at a time, with caseworkers at the upper end of the distribution handling 40, sometimes 60. More than 55% of DFPS caseworkers lack the time to do their jobs. With primary caseworkers unable to attend to PMC children, DFPS created the role of "I See You" workers, secondary "caseworkers" whose task is to confirm that children are still present at placements.[9] The district court found that the cursory interactions "I See You" workers have with foster children cannot substitute for the sustained and focused care of a primary caseworker. "[C]hildren intuitively know that this person is just fulfilling a

---

[5] Brief of Nat'l Assoc. of Social Workers & Its Texas Chapter as Amicus Curiae at 12.

[6] *Id.* at 14.

[7] *M.D.*, 152 F. Supp. 3d at 701.

[8] Brief of Nat'l Assoc. of Social Workers & Its Texas Chapter as Amicus Curiae at 14–15.

[9] Following trial, DFPS renamed the position "Local Permanency Specialist."

service or a requirement by looking in on them."[10] Indeed, the district court surmised that DFPS's use of "I See You" workers served primarily to boost rates of face-to-face meetings with children, a precondition to the agency receiving millions of dollars in federal funds.[11]

The record demonstrates that casework at DFPS takes place under conditions of administrative chaos. The agency keeps voluminous records for PMC children—so lengthy that, given their caseloads, caseworkers cannot realistically familiarize themselves with them. In preparation for trial, the district court read the case files of twenty PMC children, that is, 70% of a single DFPS caseworker's average caseload: it took the court 462 hours to read these files, 358,102 pages in total. Notwithstanding their length, children's records are in many cases incomplete. They are also "incredibly disorganized,"[12] divided among several uncoordinated digital databases, and numerous paper files, the latter spread across placement homes, placement-agency offices, DFPS caseworker offices, and medical-service provider offices. Often files are inaccurate, for example, including documentation of caseworker visits that never occurred. Buried in this administrative morass, caseworkers spend only 26% of their time directly working with children and families. The balance is devoted to administrative and clerical tasks.

DFPS is also characterized by a dysfunctional institutional culture. Internally, the agency is anything but open to improvement. Caseworkers described management practices as "unfair, unsupportive, bullying, unreasonable, and fear-driven." They do not "feel safe to raise concerns or make

---

[10] *M.D.*, 152 F. Supp. 3d at 783 (internal quotation marks omitted).

[11] If fewer than 95% of foster children are visited by a caseworker, DFPS would not qualify for tens of millions of dollars in federal aid.

[12] *M.D.*, 152 F. Supp. 3d at 781.

No. 18-40057

complaints, fearing retaliation or punishment."[13] The agency lacks a formal system for anonymous complaints. To avoid accountability, caseworkers unnecessarily pass decisions up to supervisors, exacerbating operational paralysis. Where they cannot avoid accountability, caseworkers focus their energy on tasks on which they are more easily judged by superiors, shifting their efforts away from PMC children.[14] Unsurprisingly, DFPS experiences extraordinary turnover among caseworkers. Around 16% of caseworkers leave in their first six months, 25% in their first year, and 43% in their first two years. These figures are likely understatements, only accounting for those caseworkers who leave their jobs but stay within the agency. Turnover drains the agency of institutional memory and strains the agency's budget.[15] More importantly, as DFPS concedes, turnover "threatens the well-being and safety of clients," that is, children. A PMC child has on average 6.39 caseworkers in any three-year period. Many PMC children are unable to identify their caseworker.

For PMC children, DFPS's dysfunction has led to an "epidemic of physical and sexual abuse." Sexual abuse is not merely "too prevalent," it is "the norm." An experienced attorney *ad litem* testified that almost all of the over 150 PMC children she had represented were sexually abused under DFPS care. A former PMC child testified from his experience that "abuse [is] happening all of the time." DFPS caseworkers often do not intervene to prevent abuse, nor to mitigate consequences once abuse has occurred. The agency is unable to isolate potential victims from sexual abusers, particularly in

---

[13] *Id.* at 796-97.

[14] *Id.* at 782 ("[O]verextended caseworkers prioritize TMC children who have more deadlines and concretely tracked benchmarks.").

[15] Caseworker turnover costs Texas $72 million per year.

No. 18-40057

connection with child-on-child abuse, in large part because it does not track sexually abusive children. The agency frequently places PMC children within the same home as potential abusers even where it is clear—and conceded by DFPS officials—that abuse is likely to result. In Foster Group Homes, up to 12 foster children of all ages, genders, and service levels can be indiscriminately mixed, without a requirement of 24-hour supervision. In 64% of these homes, teenaged foster children shared homes, even bedrooms, with far younger children. In such circumstances, abuse is to be expected.[16] Each incident of sexual abuse begins a cascade of harm and suffering, because abuse can "sexualize" victims, increasing the probability that they will become abusers.[17]

DFPS's inability to prevent abuse is exacerbated by its incompetence in responding to incidents once they have occurred. Where DFPS had notice of potential abuse, "children [we]re not timely (or ever) examined by doctors to determine if they had been assaulted. . . . Injuries went untreated. Necessary medical follow-up did not occur." There is evidence that DFPS's response is to dampen the mental and emotional symptoms of trauma. The district court found pervasive administration of psychotropic drugs to PMC children, a marker of a "warehousing" approach to children.[18] In these circumstances,

---

[16] *M.D.*, 152 F. Supp. 3d at 819 ("Carpenter testified that, in foster group homes that mix younger children with older children, sexual abuse 'is usual rather than unusual.' . . . Beyond the examples cited, the record is full of physical abuse, sexual abuse, suicide attempts, and poor supervision at foster group homes.").

[17] *Id.* at 732 ("Expert and fact witnesses for both parties testified that once children are sexually abused, or 'sexualized,' that behavior is ongoing and destructive to themselves as well as to the other children with whom they come in contact.").

[18] The district court voiced "continuing concern over foster care children who enter care at a Basic needs level and age out from a residential treatment center on multiple psychotropic drugs, indicative of warehousing children." Concerns about excessive administration of psychotropic drugs to foster children go back at least to the Texas Comptroller's 2004 report.

PMC children learn not to seek meaningful help from DFPS, because they doubt that anyone will respond to their calls.

Where children have reported abuse or neglect to the agency, investigations are inadequate. The typical error rate for child-welfare agency investigations is 2% to 3%. DFPS's error rate is 75%.[19] That is, three out of every four cases of abuse are erroneously resolved—numbers that push beyond deliberate indifference. DFPS investigators are not encouraged to complete investigations quickly, leaving children in potentially dangerous situations. Staff fail to interview parties, review evidence, or address continuing risks to children. And failed investigations endanger PMC children by leaving them in placements where abuse is ongoing; perpetrators are left to continue abuse within the system with "nothing in their record indicating a risk." As former foster child Kristopher Sharp testified regarding his experience after being sexually abused at a residential treatment center in Denton, Texas, "even if I did get the chance to tell somebody . . . . [n]obody certainly would do anything. I'd have to stay here . . . . We didn't feel safe in placements and then nothing happened and so—I mean, why—why would you go through to the process of even thinking that something would happen if you were to report something like this?" DFPS effectively teaches children that victimization is a tolerable aspect of foster care, not to be redressed, let alone prevented.

Harms inflicted on PMC children "have widespread ripple effects throughout society."[20] Every year, on turning eighteen, around 1,300 to 1,400

---

[19] *M.D.*, 152 F. Supp. 3d at 799.

[20] *See* Brief of Disability Rights Texas as Amicus Curiae at 4 ("The harms suffered—while DFPS was entrusted with the children's protection as the legal 'parent'—cascade, multiply, and manifest long into adulthood. . . . [T]hese harms have a ripple effect throughout the child's life, and how that exacts a steep toll both on the individual and on society.").

No. 18-40057

PMC children age out of foster care. These individuals leave without basic skills to survive, often poorly educated. Though 70% of foster children aspire to attend college, PMC children rarely age out with a high-school diploma,[21] and only 3% will receive a college degree.[22] "Statistically, they are at extreme risk of poverty and homelessness, victimization and criminal involvement, illness, early childbearing, and low educational attainment." Around 27% end up in the criminal-justice system.[23] About one third will be homeless.[24] Once homeless, one out of three will become involved in prostitution.[25] Amicus curiae Disability Rights Texas reports that "the Texas child welfare system is effectively supplying the sex-trafficking industry with current and former foster youth."[26] Among female former-PMC children, 49% become pregnant within a year of aging out; 70% of their children enter the same foster-care system.

This debacle cannot be understood without the parallel chronicle of bureaucratic intransigence, at least two decades old. As early as 1996, the Committee to Promote Adoption, a body assembled by then Governor George W. Bush, concluded that Texas's caseworkers bore excessive caseloads. In 2004, the Texas Comptroller issued a report describing the same problem, as well as the associated risk of child-on-child sexual abuse. In a 2007 follow-up

---

[21] *Id.* at 14.

[22] *Id.*

[23] *Id.* at 8; *M.D. v. Abbott*, 2017 WL 74371, at *8 (S.D. Tex. Jan. 9, 2017) (citing Hearing Before the Tex. Senate Committee on Finance, 84th Leg. Session Interim, Oct. 26, 2016, at 4:37:50).

[24] Brief of Disability Rights Texas as Amicus Curiae at 8.

[25] *Id.*

[26] *Id.* at 7.

study, the non-profit Texas Appleseed Project observed that the caseload problem had become worse, and that, as a result, "children in the system are harmed." In 2009, Governor Rick Perry tasked the Adoption Review Committee with taking a "hard look" at the Texas foster-care system. Reporting back a year later, the Committee observed that "sadly . . . many of the same problems identified in 1996 still exist in the current child welfare system." The Committee noted "increasing evidence that our foster care system is sometimes doing more harm to our children than good." These efforts continued even after the district court's liability determination. In 2016, as the Special Masters worked to develop a remedial plan, Governor Greg Abbott remonstrated against the "unacceptable" status quo, and insisted on an "overhaul" of the "broken system." Together with Lieutenant Governor Dan Patrick, he warned DFPS that "we will not tolerate inferior residential foster care operations."

These efforts yielded few results. During the 2009 to 2013 period caseloads were not reduced—they increased.[27] In place of reform, DFPS doctored statistics to downplay the problem. When asked to report on average caseloads—total cases divided by caseworkers—DFPS included in the denominator not only primary caseworkers, "I See You" workers, and workers on leave, but also "CPU workers who never interact with children" and even imaginary caseworkers "created out of all the overtime that these other caseworkers with such big caseloads were having to put in"—resulting in a lowballed quotient. The agency's resistance did not change with the liability determination. In its December 2015 decision, the district court held that DFPS's treatment of PMC children subjected them to an unreasonable risk of

---

[27] *M.D.*, 152 F. Supp. 3d at 791–92.

harm with deliberate indifference, violating their Fourteenth Amendment rights. The agency became defiant. The district court ordered DFPS to "ensure that all children who need single-child homes are place[d] in such homes," which would require the agency to track such homes. DFPS responded that it "ha[d] no plans to track single child homes." DFPS also "stonewall[ed]" when the court-appointed Special Masters sought recommendations for a remedial plan. The Special Masters sought a timeline for implementing relief—the agency did not respond. When the Special Masters requested input on improving recordkeeping, the agency responded that it "[wa]s not making such changes to the . . . system." Similarly, when the Special Master requested draft plans for PMC-children's landline phone access, DFPS insisted it "neither has nor will be developing such a policy."

It was in this context that the district court had no choice but to proceed to a Final Order, responding to DFPS's resistance with a studied injunction. For twenty years, DFPS had successfully resisted the efforts of a series of State administrations, including three of Texas's longest serving governors, beginning with the tandem of Governor Bush and Bob Bullock, widely considered to be the strongest of Texas's lieutenant governors. The agency ignored the dissatisfaction of its frontline caseworkers and accepted the dysfunctional chaos that characterized its day-to-day operations. That is, DFPS was deliberately indifferent to the ongoing abuse of thousands of children under its care. Only in January of this year, following years of litigation, did Judge Jack order the State to discharge its constitutional duty to protect the thousands of Texas children taken into its custody.

## II.

In place of the discipline imposed by the district court's order, the majority inexplicably affords what it terms a "prudent" and "creative[]"

84

No. 18-40057

bureaucracy the flexibility to set its own course and to proceed at its own pace—ignoring that this is what DFPS has been doing for twenty years—and, Janus-faced, turns away from our unanimous finding of deliberate indifference to the children's constitutional rights. The majority's reversals on the placement-array and Foster Group Home liability determinations, and its vacatur of key provisions in the district court's injunction, not least the imposition of caseload requirements, flout applicable standards of review and sow confusion in our doctrine. It raises the flag of federalism, but flies it upside down. But facts matter. I would affirm the district court's holdings in full.

## A.

The majority errs in reversing the district court's liability finding with respect to DFPS's placement array for the Licensed Foster Care subclass. The majority is correct that, as the district court put it, "[p]laintiffs do not have a constitutional right to be placed in the least restrictive, most family-like placement, or placed with their siblings, or placed close to their home community."[28] PMC children, however, have a right to be free from an unreasonable risk of harm. Where DFPS's placement array generates such a risk, it violates the Fourteenth Amendment. The majority's reversal is no more than a crude inversion of remedy and wrong.

The district court identified a number of deficiencies in DFPS's placement array, which, taken together, subjected children to an unreasonable risk of harm. First, the court found that, due to the geographic imbalance of foster homes, 60% of children were placed outside of their home county. The result was a lack of stability and attachments that harmed children psychologically. Second, the district court found that DFPS's inadequate

---

[28] *Id.* at 808.

placement array resulted in the separation of 35% of siblings, separations widely understood—including by DFPS—to have deleterious emotional and psychological effects. Third, the district court found that DFPS relied upon "congregate care facilities," institutions housing 12 or more children, notwithstanding their "poor developmental outcomes" and lack of safety. Fourth, the district court found that DFPS's placements did not isolate sexually abusive children in single-child homes, effectively enabling child-on-child sexual abuse. Taking these four effects together, the district court determined DFPS's placement array posed an unreasonable risk of harm to PMC children. It found that DFPS had "known about these problems for years," but made no reasonable response. It held DFPS violated the plaintiffs' rights under the Fourteenth Amendment.

The majority reverses, finding that the district court overreached. DFPS's placement array may depart from best practices, the majority finds, but it "does not unacceptably increase the risk that a child will be exposed to serious physical or psychological harm." DFPS has "no responsibility to maximize foster children's personal psychological development." The placement array may be "suboptimal," but its deficiencies do not rise to the level of constitutional harm.

But, again, it is not a question of maximizing PMC children's welfare: it is one of turning back DFPS practices that are collectively and indisputably inflicting injuries on them, injuries found by the district court and described here. The majority's declarations rest on a blinkered apprehension of the facts and a disregard for our standard of review. In the place of the district court's comprehensive factual findings, it isolates discrete policies, and treats them standing alone. For example, it focuses upon DFPS's relocation of children out of their home counties, but fails to grapple with practices of locating young

children in homes where they will live—even share bedrooms—with known sexual abusers, or separating children from siblings, the only family they may have, terming these practices "suboptimal." This is wordplay. By the majority's view, *Swann* was wrongly decided, because children have no constitutional right to free transportation to public schools.[29] In a footnote, the majority offers that sexualized children can be treated in therapeutic environments (not only single-child homes) and that the problem of child-on-child abuse is better addressed via policies towards caseloads. But this discussion is at best misplaced: these arguments are deeply flawed, and, in any event, can only be germane to relief, not liability.

The majority insists that, "[e]ven if the policies . . . were somehow constitutionally infirm," DFPS took "concerted effort to remedy the problem" when it initiated the Foster Care Redesign scheme. The district court found that in the five years that program had been active, it grew to cover 2% of Texas, and a total of 800 children—less than ten percent of the subclass.[30] The district court determined that "[t]he only data available shows that Foster Care Redesign has made Texas's placement array worse." Without identifying any misstep in this fact determination, the majority claims to know better: DFPS's actions are well-considered, allowing "adequate time to assess the program's ability to properly safeguard children's welfare."

"The predicate findings of a substantial risk of serious harm and officials' deliberate indifference to the risk are factual findings reviewed for clear error."[31] Such findings are clearly erroneous only if the court reached them

---

[29] *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 30 (1971).

[30] *M.D. v. Perry*, 294 F.R.D. 7, 38 (S.D. Tex. 2013) ("On August 11, 2011 there were 8,174 children in the Licensed Foster Care Subclass.").

[31] *Ball v. Leblanc*, 792 F.3d 584, 592 (5th Cir. 2015).

No. 18-40057

without substantial evidence, on the basis of a misinterpretation of the effect of the evidence, or if they are against the preponderance of credible testimony.[32] Here, the evidence supports the district court's liability holding as to the placement-array claim, and there is no indication that the district court misinterpreted or made findings contrary to the preponderance of the evidence. As elsewhere, "[t]he district court had a mountain of evidence at its disposal," and so it should "enjoy[] ample discretion to credit certain evidence and expert testimony." The majority instead reverses, substituting its conclusory assertions for the district court's studied findings. This is not clear error review. I would affirm.

## B.

The majority also errs in reversing the district court's liability holding as to DFPS's Foster Group Home (FGH) policies. The district court found that the child-supervisor ratio in FGHs (up to eight children per supervisor) taken together with placement of children in FGHs, lack of training, and lack of 24-hour supervision, contributed to unreasonable risk of harm. Experts testified to the difficulty of a supervisor "monitor[ing] that many kids." High child-supervisor ratios often resulted in medication errors and missed appointments, including court hearings. Former foster children described the inability of FGH caretakers to monitor and attend to children, with the result that "child-on-child physical and sexual abuse is a common thing in the bigger homes."[33] "[T]he record is full of physical abuse, sexual abuse, suicide attempts, and poor supervision at foster group homes."[34] Drawing upon this evidence, the district

---

[32] *Id.*

[33] *M.D.*, 152 F. Supp.3d at 819 (internal quotation marks omitted).

[34] *Id.*

No. 18-40057

court determined that "DFPS's policies and procedures for operating [FGHs] amount to a structural deficiency that causes an unreasonable risk of harm to the FGH Subclass."[35] This finding was well substantiated. The majority reverses on two grounds, both in error.

### 1.

First, the majority identifies a "causal flaw" in the district court's finding, reasoning that, because Texas *foster-family homes* are constitutionally sound, and FGHs do not significantly differ, FGH policies also must be constitutionally sound. The assertion that these two kinds of placement have no relevant differences comes without explanation or basis in the record. Even if it were accurate, it would only matter if the Texas foster-family home offered a standard of constitutional compliance. It does not. The constitutionality of policies specific to foster-family homes was not before this court, it was not addressed by the district court, and it was not briefed by the parties. Indeed, the constitutionality of foster-family home policies is not addressed in the majority's opinion beyond its comparison in a five-word relative clause. Both premises in this sequence are wrong, and so too its conclusion.

### 2.

Second, the majority reverses on the basis of its assertion that FGHs have been fixed. The district court identified the lack of 24-hour supervision as "the most egregious problem" in FGHs,[36] which, taken together with other FGH policies, created risks of child-on-child sexual abuse. In its Liability Order, the district court required DFPS to "immediately stop placing PMC foster children in unsafe placements, which include foster group homes that

---

[35] *Id.* at 819–20.

[36] *Id.* at 818.

lack 24-hour awake-night supervision."[37] Today, the majority finds "no dispute that the State *appears* to be complying" with the district court's order to provide 24-hour supervision in FGHs. It reasons, therefore, that "[t]o the extent that the lack of awake-night supervision may have sustained a constitutional claim under the circumstances, the remaining policies and their effects do not cause FGH children an amplified risk of harm sufficient to overcome the threshold hurdle." The majority thus reverses the district court's liability holding, and decertifies the FGH subclass.

The majority's analysis is doctrinally and factually flawed. It suggests that the "appear[ance]" of post-judgment remedial action eliminates liability. Appearances do not have this effect. Nor does actual remediation. If ongoing constitutional wrongs were eliminated pending the appeal, the issue would be whether the FGH subclass's claim was mooted. This is not what the majority finds. Rather, it reasons that, in light of post-judgment remediation, we must reverse the district court's original finding of liability and decertify the plaintiff subclass. The majority cites no doctrine supporting this counterintuitive proposition—indeed, there is none.

Doctrinal confusion aside, the majority misapprehends the facts, specifically in asserting that there is "no dispute" as to DFPS's compliance with the 24-hour supervision order. Appellees point out that, after the Liability Order, when "the special masters visited eight randomly-selected homes . . . [o]nly one had a workable plan for 24-hour supervision." The district court similarly concluded earlier this year that "[t]he actions currently being taken concerning Foster Group Homes do not follow the spirit of the Court's [Liability] Order, and do not cure the multitude of harms present in Foster

---

[37] *Id.* at 823.

No. 18-40057

Group Homes." The majority ignores these facts. There is no error in the district court's findings, clear or otherwise. I would affirm the district court's decision on this claim.

## C.

Perhaps the most misguided aspect of today's decision is the majority's repudiation of the remedy that the district court constructed to address DFPS's constitutional wrongs.[38] The injunction, the majority holds, "goes well beyond what is necessary to achieve constitutional compliance." This is a conclusion flawed on review of the record, the district court's reasoning, and the operative law. Running through the majority's opinion is the mantra that the district court has "overreach[ed]," intruding into sensitive areas of State policy making. Of course, remedial orders that affect the operation of state governmental institutions are not to be taken lightly. State officials may be generally "better equipped than a single federal judge to make the day-to-day policy . . . and funding choices," and to gather the localized knowledge in support of such decisions.[39] Courts may crowd out political processes and, in so doing, violate principles of federalism and the separation of powers. No one questions these tenets of the constitutional order—but they are not implicated here. It bears mention that federal law is not foreign to the State, rather it *is* the State's law.[40] Here, the district court only ordered what the State failed for years to do—to enforce the law to which the majority concedes the State was

---

[38] Based on its liability determination reversals, the majority vacates all provisions remediating violations based on Foster Group Home policies and the Licensed Foster Care placement array policies. The majority's liability determinations are in error, and so are its decisions to vacate the corresponding remedial provisions.

[39] *Missouri v. Jenkins*, 515 U.S. 70, 131–32 (1995) (Thomas, J., concurring).

[40] *Testa v. Katt*, 330 U.S. 386, 391 (1947) ("[T]he policy of the federal Act is the prevailing policy in every state.").

deliberately indifferent. In fairness, I would add that the Appellants did not discriminate against federal authority: DFPS also failed to reform pursuant to commands of the State's administrations—a failure this court can redress here because the agency denies the constitutional rights of children.

It is beyond dispute that there was no effective political process for the district court to displace. The state agency here defied the efforts of three of Texas's longest serving governors. The challenged conduct flows from systemic and structural defects, and the rights-bearers are children who cannot vote or directly participate in the political process. PMC children, as we describe elsewhere, lack caseworker representatives or other advocates to assert their basic physical and psychological needs—for example, protection from repeated sexual abuse and neglect. In short, DFPS's unconstitutional practices defied political processes, and well-intentioned State administrations have come and gone struggling to impose order on DFPS. At least as early as 1996, DFPS was unmoved by the first of the "twenty years of studies conducted or commissioned *by the State*." The administration of Governor Perry returned to DFPS's problems in 2010, pointing out that the agency had still not fixed the problems identified almost fifteen years earlier. Most recently, the district court noticed the current commissioner's exhortations to reform at DFPS, and his acknowledgments that, as yet, the agency was overwhelmed: "our workers are outnumbered by the opponent—child abuse and neglect."[41] In its Liability Order, the district court observed that the State had appointed its "seventh commissioner since 2004, each of whom was surely ushered in with promises

---

[41] *M.D.*, 2017 WL 74371, at *4 (quoting Letter from Commissioner Whitman, Oct. 27, 2016).

that this time it will be different."[42] More than "[t]wo years and one legislative session" after the liability determination, the constitutional deprivations remained unaddressed. The "foster care system of Texas [was still] broken," but DFPS insisted still that it "operated a constitutionally sound system."

### 1.

On appeal we do not evaluate the district court's choices relative to our conception of the optimal remedy. We review for abuse of discretion, reversing only where the district court has relied on clearly erroneous factual findings, erroneous conclusions of law, or a misapplication of factual or legal conclusions.[43] As with all exercises of equitable power, "the nature of the violation determines the scope of the remedy."[44] While the remedy must be in this sense narrowly tailored—it must fit the violation—the district court otherwise has broad discretion to develop a remedy.[45]

Here, no provision was superfluous to the remedy, the whole of which was narrowly tailored to address DFPS's constitutional violation.[46] In constructing its order, the district court drew upon seven years of methodical work to understand DFPS and the predicaments of thousands of PMC children subject to its authority. The district court reviewed the named plaintiffs' case files, the testimony of 28 fact witnesses (including several former foster children) and 12 expert witnesses, and more than 400 exhibits (totaling over 390,000 pages), and presided over a two-week bench trial. It issued a 255-page

---

[42] *M.D.*, 152 F. Supp. 3d at 828.

[43] *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 254 (5th Cir. 2014).

[44] *Swann*, 402 U.S. at 16.

[45] *Id.* at 15 ("[B]readth and flexibility are inherent in equitable remedies.").

[46] The State gains relief from the injunction by coming into constitutional compliance other circumstances creating a need for relief from any of its provisions.

No. 18-40057

Liability Order on December 17, 2015, and then considered, selected, and appointed two special masters, Professor Francis McGovern of Duke University Law School and Kevin Ryan, a former commissioner of New Jersey's child welfare agency, to develop a plan effectuating the court's order.[47] Over the following months, the Special Masters "review[ed] hundreds of thousands of pages of documents" and met with the parties repeatedly. During this process, DFPS was repeatedly provided opportunity to participate, to deliberate over the appropriate form of the remedy, and to contribute its perspective and insights. It declined these opportunities. The Special Masters submitted their report to the district court on November 4, 2016. The district court then "hear[d] discussion and clarification" of issues raised by the parties, and issued an interim order on January 9, 2017, directing yet further work to inform development of the remedy. The Special Masters accordingly retained experts from the University of Texas at Austin for workload studies regarding "I See You" workers and DFPS investigators. Finally, a year later, on January 19, 2018, the district court issued a 116-page Final Order defining the remedy.

**2.**

The majority pronounces unnecessary the remedy's requirement that a PMC child's caseworker have no more than 14–17 cases at a time ("the caseload requirement"), because "the primary issue with DFPS's management of its caseworker caseloads is the lack of adequate data." It vacates a corresponding requirement for DFPS investigators for similar reasons. It does so without identifying clearly erroneous factual premises, or other abuse of discretion. The record provides ample evidence that the caseload requirement was an essential

---

[47] On November 22, 2017, the parties agreed to appoint Francis McGovern as mediator, terminating his appointment as Special Master.

part of the remedial plan. Although caseloads had been a longstanding problem well known to DFPS, the agency refused to act. As the majority states elsewhere, the record provides "ample evidence" that PMC children do not receive requisite care because their caseworkers' "caseloads are extremely high" and that "there is a direct causal link between high caseloads and an increased risk of serious harm to foster children." DFPS understood the deficiency of its caseloads going back at least to 1996, when the Committee to Promote Adoption identified excessive caseloads. Despite this information, as of January 2017, the problem remained.[48] Not surprisingly, the district court made a factual finding that this trend would continue: "unless directed otherwise . . . studies and testing will continue, no remediation will occur and the dangerous conditions will continue to exist."

Following this reasoning, the district court defined a minimum requirement for caseworker commitments to each PMC child: that no child have a caseworker handling more than 14–17 cases at a time. The district court also ordered DFPS to end the use of "I See You" workers as substitutes for primary caseworkers. The district court's remedial choice to impose the caseload requirement was directly related to a factual finding about how DFPS operated and the need to ensure an end to its history of recalcitrance: "[T]he burden has always been on the State to provide constitutional safeguards to children over whom they have custody. The refusal by the State to accept this burden . . . brought us to this point."[49]

---

[48] The district court explicitly "note[d] the decades of reports aimed at fixing DFPS, and the lack of meaningful attempts at improvement."

[49] *M.D.*, 2017 WL 74371 at *7.

No. 18-40057

The majority acknowledges the agency's intransigence. It concedes that DFPS "had ample opportunity to cure the system's deficiencies . . . . long before plaintiffs filed this law suit," but had nonetheless "failed to take meaningful remedial action." While the majority states as a general matter that, in light of DFPS's conduct, principles of deference to state authority are "less applicable," when it comes to remedial provisions with any teeth—here, the caseload requirement—it demands "[a] more flexible method." Far from identifying clear error, the majority wanders into error itself. It holds that the caseload requirement is "beyond what [is] minimally required to remedy the constitutional violation," reasoning that the district court "essentially adopted national caseload standards." The majority finds that professional standards define best practices, but not constitutional thresholds, and that DFPS may have compelling reasons for failing to conform to them.

The majority errs both in its understanding of these professional standards as well as in its understanding of the basis of the district court's caseload requirement. The professional standards relevant to child-welfare caseloads are not aspirational "goals"; rather, they define the levels of care necessary for the minimal protection of children's interests. While these professional standards do not directly establish constitutional requirements— and the district court did not so find—they provide a frame of reference for evaluating a state agency's practices.[50] This is especially so in Texas, where the Legislature has incorporated professional standards into law. Under Texas

---

[50] *M.D.*, 152 F. Supp. 3d at 701–02 ("A failure to meet CWLA and COA standards is not a *per se* constitutional violation. Professional standards, however, can be evidence for or against a constitutional violation. . . . Courts generally find that while neither standard imposes legal obligations on child welfare agencies, both are reflective of the bar to which child welfare agencies are generally expected to measure up." (internal quotation marks omitted)).

No. 18-40057

law, if DFPS promulgates caseload standards for its caseworkers, the agency must ensure that they are "consistent with existing professional standards," such as those established "by an authority or association, including the Child Welfare League of America."[51] The Child Welfare League of America determined that caseworkers could effectively handle no more than 15 cases: a caseload any larger would compromise the caseworker's ability to protect children's interests. Amicus National Association of Social Workers explains that CWLA's national standard contemplates that caseworkers require time both for administrative responsibilities and to build relationships with each child under their protection, as well as with the adults in the children's lives.[52] In defining a minimum of acceptable care for children, national professional organizations consider that an excessive caseload compromises the worker's ability to follow a child's progress and undermines the possibility of a relationship with the child, both because the caseworker lacks time to spend with the child, and because the child in turn ceases to perceive the caseworker as a trusted advocate.[53] DFPS's response to the Texas statute was to adopt no standards.

More to the point, the remedial order's caseload requirement is consistent with professional standards defining the minimum number of caseworkers necessary, but it does not originate from them. Rather, it derives from DFPS's own estimation of what caseworkers can handle. The Special Masters explained that, after trial, DFPS produced a Work Measurement

---

[51] Texas Gov't Code §§ 531.048, 531.001(5).

[52] Brief of Nat'l Assoc. of Social Workers & Its Texas Chapter as Amicus Curiae at 15–16.

[53] *Id*. at 15–19.

No. 18-40057

Study, which concluded that "DFPS caseworkers expended an average of 9.7 hours per month on case profiles most often associated with PMC children, and that these workers had an average of 137.9 hours per month to spend on their casework." Dividing the average time available (137.9) by the average time per case (9.7), each PMC caseworker could handle a caseload of 14 children.[54] On the basis of the DFPS Study, the Special Masters recommended that the district court order DFPS to implement a caseload standard in the range of 14 to 17 PMC cases per caseworker. The Special Masters explained this conclusion again in a follow-up advisory document submitted to the district court in December 2016:

> DFPS caseworkers had an average of 137.9 hours per month to spend on their casework. . . . [I]t took DFPS caseworkers an average of 9.7 hours per month to work on a PMC case. . . . [D]ividing the average amount of time available to caseworkers per month (137.9 hours) by the average number of hours they used each month to work on a PMC case (9.7 hours) yields the average number of PMC cases that caseworkers have time to serve, based on the amount of time available to them: 14 cases.

The district court repeated this analysis when it adopted the recommendation in its January 2017 Interim Order,[55] and did so again in its January 2018 Final Order:

> The study's author reported that the study's findings mean that each caseworker (as defined above) has time to serve an average of 14 PMC children each. . . . [T]he Court accepts the Work Study as providing the

---

[54] The majority describes this study, but fails to understand it as the basis of the remedy's caseload requirement.

[55] *M.D.*, 2017 WL 74371 at *10.

> definitive number of PMC children that a CVS
> caseworker can physically handle.

As the district court summarized in its Final Order it "relie[d] on DFPS's own study to determine, with overtime, how many children a caseworker can safely handle." The majority ignores these numerous explanations, identifying no clear error in the factual basis for the caseload provision, and no abuse of discretion in the district court's adoption of this provision.[56]

It makes a corresponding error regarding limits for DFPS investigators. In vacating these limits, it reaches its own "appellate finding" that it "would be reasonable for the court to require a comprehensive workload study" for investigators. Indeed, the district court already did so. Pursuant to the court's January 2017 Interim Order, a workload study was conducted by a team of experts from the University of Texas Austin, which had been retained by the Special Masters. This study concluded that the median average caseload for DFPS investigators and inspectors was 14 and 7 cases, respectively,[57] higher than what the experts thought was a reasonable level. The district court's Final Order mandates that investigators and inspectors handle no more than 14 cases at a time. The majority's vacatur of these key remedial provisions is unjustified and inexplicable.

### 3.

The majority removes other provisions from the injunction, without regard to the integrity of the remedial scheme. These include important

---

[56] It bears emphasis that the district court's order imposed a caseload requirement that the Texas legislature would have imposed on DFPS had the agency elected to adopt standards, which it has refused to do. *See supra* note 51 and accompanying text.

[57] To determine the caseload level typical for investigators and inspectors, the Study used the median of workers' average daily caseloads.

Case: 18-40057    Document: 00514688349    Page: 100    Date Filed: 10/18/2018
Case 2:11-cv-00084   Document 601   Filed on 10/18/18 in TXSD   Page 100 of 103

No. 18-40057

institutional changes that the district court found necessary, such as the abolition of the makeshift "I See You" worker role.[58] It also vacates smaller but important practical elements, equally necessary to the overall remedy, such as the requirement that caseworkers meet monthly with their assigned children. Each of these provisions is an element of a remedy with interacting parts, which as a totality redresses the constitutional wrong, itself not a single act but a collection of practices that together inflict injuries on PMC children. The majority's excisions are unexplained, presenting as conclusory generalizations about these individual elements being unduly burdensome or unnecessary.

For example, the majority eliminates the requirement that DFPS include a recent photo of each PMC child within that child's record. The district court imposed the requirement after it determined that DFPS was unable to respond effectively to the frequent incidence of runaways in the absence of photos. More generally, the photo requirement addresses the troubling inability of DFPS caseworkers to recognize the individuals under their care. In vacating this provision, the majority does not pause to consider that it embodies in concrete, practical form the principled demand that Texas children under PMC care be treated as individuals, not administered as things. Treating a child as an individual—protecting his or her identity as an individual—has long been the

_____

[58] The majority "do[es] not understand the logic of this provision." It should have considered the district court's findings regarding the relative capacities of workers in the caseworker and "I See You" worker roles. The district concluded that, not only were "I See You" workers inadequate substitutes for primary caseworkers, but also that DFPS's use of such workers "hinders primary caseworkers' ability to protect their children" by undermining trust between children and agency staff. *M.D.*, 152 F. Supp. 3d at 783. Based on information gathered by the Special Masters, the district court also determined that "all caseworkers . . . could only handle 14 PMC cases." In its Final Order, the district court required that DFPS caseworkers have a caseload within or below the range of 14 to 17 children. Given that the agency's use of "I See You" workers contributed to the constitutional violation, the district court found it necessary to eliminate that role.

concern of human rights conventions,[59] a concern that also lies at the core of the liberty guaranteed in the Fourteenth Amendment.

In another cursory statement, the majority extracts the requirement that PMC children have landline phones accessible in their foster placements. In disposing of the provision, the majority opines that, to the extent underreporting of abuse is a problem, it "can be remedied by mandating that caseworkers provide children with the appropriate point of contact for reporting issues." The imposition of a landline requirement, the majority finds, would unnecessarily burden DFPS with additional administrative work. Here, the majority ignores the record. The district court included this provision as part of the remedial response to PMC children's inability to report abuse during infrequent and often non-private meetings with caseworkers. PMC children had been unable to utilize the existing abuse hotline, and meetings with caseworkers afforded insufficient opportunities to permit communications with advocates at DFPS. It was essential to ensure PMC children's access to personnel in the agency. The district court cited evidence of difficulties faced by PMC children in contacting caseworkers; it also cited evidence of children often lacking access to adult figures who were not co-workers of abusers. The record also shows that "DFPS does not have a means of tracking which PMC children are placed in care with access to a phone to report abuse and neglect." As a result, "children were subject to serious physical and sexual abuse that was not reported to the DFPS toll-free, 24-hour child abuse and neglect hotline." In these circumstances, a dedicated landline was a necessary part of the remedy. As with all other aspects of the injunction,

---

[59] *See* United Nations Convention on the Rights of the Child, arts. 7–8, 19, Nov. 20, 1989, 28 I.L.M. 1448 ("The child . . . shall have the right from birth to a name . . . . States Parties undertake to respect the right of the child to preserve his or her identity").

No. 18-40057

the landline was one part of a whole: "the Court did not hold that the Constitution requires that all foster children nationwide must have access to a landline phone." Recall the 75% error rate in dispositions of reported abuse. The district court found that "Texas's overall foster care system has unconstitutionally exposed PMC children to an unreasonable risk of harm," and that "providing PMC children access to a phone is a necessary 'measure[] that safeguard[s] against recurrence' of that constitutional violation." The provision is a rifle shot at a deserving target. Inability to report facilitates abuse. The presence of a phone is an ever-present warning to abusers, a lifeline to an unprotected child.

The majority's crude vacatur of remedial provisions enervates an injunction carefully constructed in an exhaustive effort spanning years to address the constitutional violation, with remedies fashioned by experts— remedies necessary to respond to the constitutional injury visited upon thousands of children of Texas. These were not, as the majority suggests, the "personal policy preferences" of a federal judge. As the record resoundingly demonstrates, this was a remedy necessary in response to an agency the State has been unable to tame for more than twenty years. DFPS has seized the liberty of children in their formative years then turned them out, unprepared to cope with the world, and argues here that it has not denied the constitutionally secured liberty interest of the children—an argument unanimously rejected today. The majority's pull down of the remedies found necessary by the district court fails to comprehend the injury responded to. I end where I began. Read again the account of foster child S.A. No abuse? There is no judicial activism afoot here, at least not of the able district judge, who only enforced the constitutional rights of PMC children—rights penned for the

No. 18-40057

Court twenty-nine years ago by Chief Justice Rehnquist, from which no Justice dissented.[60] I cannot join.

## III.

I would affirm the district court's determinations on liability and remedy in full.

---

[60] *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."); *id.* at 201 n.9 (describing without holding, that state foster care may implicate the liberty interests and corresponding due process rights of children in state custody). Three Justices dissented, not from the Court's adopted standard, but because they would have had the Court go further, extending constitutional obligations to children beyond the custodial relationship. *Id.* at 203–12 (Brennan, J., dissenting).