United States District Court
Southern District of Texas
**ENTERED**
November 20, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D.; bnf STUKENBERG, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:11-CV-84 |
| | § | |
| GREG ABBOTT, *et al*, | § | |
| | § | |
| Defendants. | § | |

**<u>ORDER</u>**

Consistent with the Fifth Circuit's October 18, 2018 Opinion (hereinafter referred to as the "Opinion"), the Court enters the following Orders. All findings of fact and conclusions of law in this Court's 2015 Memorandum Opinion and Verdict, (D.E. 368), and January 2018 Order, (D.E. 559), are hereby adopted and incorporated by reference, excluding reversed or remanded findings of fact and conclusions of law.

**PROCEDURAL HISTORY**

The procedural history of this case is adequately described in this Court's December 17, 2015 Memorandum Opinion and Verdict and January 2018 Order. Subsequent to the January 2018 Order, Defendants applied for a stay and appealed. The Fifth Circuit granted an administrative stay of the injunction, which was converted to a stay pending appeal on March 21, 2018. On October 18, 2018, the Fifth Circuit affirmed in part, reversed in part, and remanded for modification consistent with the Opinion. *See generally*, *M. D. by Stukenberg v. Abbott*, 907 F.3d 237 (5th Cir. 2018). The Fifth Circuit held this matter in abeyance for 60 days pending the disposition of the remand proceedings. (D.E. 601, att. 1). Upon the request of the Court, both parties submitted briefs addressing issues on remand and proposed remedies. (D.E. 603; D.E. 604).

**INJUNCTION**

The Court therefore ENJOINS the Defendants from placing children in permanent management conservatorship ("PMC") in placements that create an unreasonable risk of serious harm.[1]  The Defendants SHALL implement the remedies herein to ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm.

## **Validated Orders**

The Opinion validated the following remedies in aid of injunctive relief.  *M. D. by Stukenberg*, 907 F.3d at 273-83.

Therefore, it is ORDERED that:

1. Within 60 days, the Texas Department of Family Protective Services ("DFPS") shall ensure statewide implementation of the CPS Professional Development ("CPD") training model, which DFPS began to implement in November 2015.

2. Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.

3. DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.

4. Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.

---

[1] The Opinion included psychological harm in its definition of serious harm.  *M. D. by Stukenberg,* 907 F.3d at 250 ("We agree that plaintiffs' substantive right to 'personal security and reasonably safe living conditions' includes the very limited right to be free from severe psychological abuse and emotional trauma—both of which are often inextricably related to some form of physical mistreatment or deprivation.").

5.  Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)

6.  Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)

7.  Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.

8.  Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.

9.  Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.

10. Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

11. Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

12. Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL")[2] investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.

13. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.

14. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.

15. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.

16. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.

17. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

18. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.

19. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

20. Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring

---

[2] As a result of legislation passed during the 2017 session of the Texas Legislature, the investigation responsibilities remain with DFPS, which is now a stand-alone agency. The licensing and regulatory responsibilities transferred to the Texas Health and Human Services Commission. *See* H. B. 5, 85th Leg. (Tx. 2017); S.B. 11, 85th Leg. (Tx. 2017).

by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

21. Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.

22. Effective immediately, RCCL, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements. During inspections, RCCL, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.

23. Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.

24. Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.

25. Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.

26. Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.

27. Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.

28. Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.

29. Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.

30. Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.

31. Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.

32. Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.

33. Within four months of this Order, DFPS shall submit to the Court a plan for an integrated computer system, with specific timeframes, that contains each PMC child's complete records, including but not limited to a complete migration of all medical, dental, educational, placement recommendations, court records, mental health and caseworker records. The mental health, dental and medical information shall include all visits to the provider with detailed examinations, diagnoses, test results, immunizations, medications (including the reasons for each), history of abuse, treatment plans, and any other information necessary for the safety of the children. DFPS shall have this system fully functional within one year of the Order date.

34. The DFPS plan shall ensure that DFPS caseworkers and supervisors serving PMC children, as well as CASA staff and volunteers, and any public or private staff assigned to oversee PMC children's care, have access to an integrated, current, complete and accurate case record for PMC children on their caseloads, consistent with prevailing state and federal law, including, for example, the child's current legal status and permanency goal; the child's Transition Plan (where applicable); the child's placement information and all safety-related and licensure/verification information about the child's placement, including investigation and inspection reports, enforcement actions and internal reviews conducted by CPAs; the child's historic and current caseworker(s) and supervisor(s), with corresponding contact information; the child's complete medical, dental, educational and mental health information and records.[3]

---

[3] The Opinion stated that the Court's order to improve "access to comprehensive medical information, mental health records, and placement history for individual children would assist RCCL in making an informed assessment about abuse allegations," was proper. *M. D. by Stukenberg*, 907 F.3d at 282.  However, it listed two identical provisions as valid. *Id.*  In their filings, both Plaintiffs and Defendants believed that the Opinion intended to validate provisions

35. Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.[4]

36. Within 30 days of the Court's Order, DFPS shall present the Court with a plan to address and remediate missing and nonexistent medical and mental health care records, consistent with the American Academy of Pediatrics "Fostering Health: Healthcare for Children and Adolescent in Foster Care."[5]

37. Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.

## **Modified Orders**

In aid of injunctive relief for the General Class the Court enters the following:

---

granting access to the integrated computer system, rather than a duplicative provision, especially as the Opinion did not address the access provision.  (D.E. 559 at 25; D.E. 604 at 18; D.E. 603 at 6).
[4] The reference to reporting "the number and percent of staff with caseloads within, below and over the range of 14 to 17 children" has been removed from the validated provision per the Opinion.
[5] The Opinion did not address this Provision, however it did explicitly validate the integrated computer system tracking the "mental health, dental and medical information" of all PMC children. *Supra* Provision 33.  Such a system would not be effective for preventing an unreasonable risk of serious harm if medical records were missing or nonexistent.

**A. Remedies Applicable to the General Class**

1. Within 60 days of the Court's Order, DFPS, in consultation with and under supervision of the Monitors, shall propose a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.[6]

DFPS's past practices highlight the need for oversight in conducting a new workload study. "DFPS had not performed a comprehensive workload study in over a decade." *M. D. by Stukenberg*, 907 F.3d at 261. When finally ordered by the Court to perform a workload study, DFPS's study was woefully inadequate:

> DFPS provided the Special Masters with a limited workload survey conducted from August 2015 to March 2016 which purported only to estimate how much time was actually spent on casework during that time period. It made no attempt to quantify how much time caseworkers should be spending on casework or how many cases a caseworker could safely manage. Despite being reprimanded by the district court in 2015 for its inclusion of ["I See You"] workers in its workload estimates, DFPS *again* included ["I See You"] workers in its 2016 study.

*Id.*

By including the "I See You" workers in its study, DFPS improperly elevated the "I See You" workers to a position comparable with the primary caseworkers in DFPS's analysis, a thoroughly inappropriate approach given that "I See You" workers are clearly not equipped to be caseworkers. *Id.* at 274 n. 47. DFPS even created additional non-human workers out of

---

[6] Monitor oversight is also necessary because of DFPS's failure to conduct these workload studies. Except for the incomplete workload study performed from 2015 to 2016, DFPS has not conducted its own workload study in nearly two decades, a fact highlighted by the Sunset Commission in 2014. (D.E. 368 at 193-94). For all prior studies conducted by DFPS, it relied on third parties to perform the actual studies. This was the case with Casey Family Programs, a private third-party who DFPS contracted to perform internal reviews, the Texas Sunset Advisory Commission, a government group outside the DFPS required by the Texas Legislature to issue a report on different Texas agencies, and The Stephen Group, a national consulting firm that DFPS hired to conduct an operational review. (D.E. 23-24). By relying purely on assessments conducted by third parties and failing to ever fully review their own workload internally, DFPS has demonstrated a lack of expertise and resources to properly conduct these studies, thus requiring this Court's reliance on the Monitors' oversight.

overtime.  *Id.* at 257.  Further, the study only estimated how much time was spent on casework and made no attempt to quantify how much time caseworkers should spend on casework, nor how many children a caseworker safely can manage.  *Id.* at 256.  Oversight ensures that DFPS will appropriately conduct this Court-ordered study.

2. Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.

3. Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker.  In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly.

Once the workload study is complete, DFPS shall establish internal guidelines and standards for caseloads.  The Opinion established that "it is reasonable for an injunctive remedy to require the agency to generate reliable data regarding current caseloads and to establish internal guidelines that identify a flexible range of caseloads that the agency determines caseworkers can safely manage."  *M. D. by Stukenberg*, 907 F.3d at 273.  The Opinion explicitly supports this remedy: "the fact that caseworkers' workload capacities will vary, on an individual basis, according to the types of cases a caseworker is assigned does not obviate the need for general guidelines that identify an appropriate caseload range."  *Id*. at 262.  These standards and guidelines would still "strike at the heart of the workload problem" without raising concerns that the Court is using "too blunt a remedy for a complex problem."  *Id*. at 274.  Accordingly, "DFPS

absolutely should determine how many cases, on average, caseworkers are able to safely carry." *Id*. Further DFPS must quantify how much time caseworkers should spend on casework and how many children a caseworker can safely manage. Based on its determination, DFPS should establish generally applicable, internal caseload standards." *Id*. Defendants acknowledge this language in their filing addressing the Opinion. (D.E. 604 at 4).

4. Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class.

5. Within 180 days of this Order, all required monthly face-to-face meetings pursuant DFPS and federal requirements shall be conducted only by primary caseworkers.[7]

DFPS shall ensure all face-to-face meetings with PMC children are conducted by primary caseworkers. Using "I See You" workers for these meetings does not protect PMC children from an unreasonable risk of serious harm as "I See You" workers do not address the actual needs of the children in the General Class:

["I See You" workers] are not required to follow up on a child's needs, and they are not involved in any aspect of a child's permanency plan outside of providing relevant information to the child's primary caseworker. ["I See You"] workers' primary responsibility is to see the child and confirm that the child "is still there."

*See M. D. by Stukenberg*, 907 F.3d at 245.

Further, "I See You" workers do not have the time or capacity to fill the role of primary caseworkers in monthly face-to-face meetings:

---

[7] The Opinion invalidated the provision requiring DFPS to incorporate the "I See You" workers onto the primary team of caseworkers. In doing so, the Opinion acknowledged this Court's distinction between the role of primary and secondary caseworkers, including "I See You" workers, and the fact that these secondary caseworkers were inappropriate substitutes for primary caseworkers. *M. D. by Stukenberg*, 907 F.3d at 274 n. 47.

> [It is] a wonder ["I See You"] workers have time to show up everywhere they need to be on a given day and check an attendance box. It may be the case that ["I See You"] workers increase the odds that a foster child will encounter a "live" individual associated with DFPS on a semi-regular basis, but they are by no means an adequate or "reasonable" substitute for primary caseworkers.

*M. D. by Stukenberg*, 907 F.3d at 263.

The Opinion stated that: "DFPS often uses secondary workers to fill" the gap in primary case worker face-to-face meetings even though "["I See You"] workers typically carry a large caseload, and their responsibilities are significantly more limited than are those of primary caseworkers." *Id.* at 245. Further, the testimony at trial "strongly suggests that ["I See You"] visits are perfunctory and that the information they generate from the foster child is often superficial and unhelpful." *Id.* "Children do not feel comfortable sharing their problems with their revolving roster of ["I See You"] workers who often fail to meet with them in private as required by DFPS policy." *Id.* In summary, the Opinion makes it clear that "I See You" workers cannot substitute as primary caseworkers and cannot provide the type of attention needed for monthly face-to-face meetings or gather the necessary information for these meetings, thereby nullifying the purpose of these meetings under DFPS and federal requirements.

6. Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.

DFPS shall rectify the unclear lines of communication for reporting abuse that arise from the rapid turnover of caseworkers through a child's duration in the foster care system. The

Opinion specifically stated that: "[t]o the extent that the [C]ourt is worried about underreporting, this can be remedied by mandating that caseworkers provide children with the appropriate point of contact for reporting issues." *M. D. by Stukenberg*, 907 F.3d at 279.  Further, the Opinion held that a substantively similar injunctive provision was valid. *Id*.  There is still a concern with underreporting since systemic DFPS issues likely lead to underreporting of abuse, (D.E. 368, at 205-06), accordingly, this remedy is needed to protect the children from an unreasonable risk of serious harm.  By including this injunctive provision, the Court is closely following the process approved by the Opinion while ensuring that clear avenues for reporting abuse are available to these children.

7.  The Defendants shall immediately cease placing[8] PMC children in placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.

8.  Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.

The Opinion narrowly construed the Court's initial grant of injunctive relief and denied the stay of the continuous 24-hour supervision requirement for PMC children placed in a home with 6 or more children. *M. D. by Stukenberg*, 907 F.3d at 270.  In issuing this Order, the Court shall ensure that the continuous 24-hour awake-night supervision stays in place to protect the members of the General Class in placements with a large number of children, and to ensure that the system of continuous 24-hour awake-night supervision is designed and implemented to protect the General Class.

## B.  Remedies Applicable to the Licensed Foster Care Subclass

---

[8] "Placing" and "placement" shall be construed to encompass all existing placements and future placements.

1. Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.

The Monitors shall oversee DFPS's RCCL investigator workload study to ensure DFPS has accurate data when establishing RCCL investigation guidelines and standards. The Opinion stated that "it would be reasonable for the court to require a comprehensive workload study" for RCCL investigators. *M. D. by Stukenberg*, 907 F.3d at 279. DFPS previously failed to comply with an order requiring a RCCL investigator work study. In December 2015, the Court ordered DFPS to complete a "Workload Study to determine the time required for investigators and inspectors to adequately perform their tasks." (D.E. 368, Page 251). In January 2017, the Court found "that DFPS has not commenced, as previously ordered, a workload study of RCCL investigators and inspectors." (D.E. 500, Page 23; D.E. 546, Page 35).

2. Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.

3. Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established

by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.

Maintaining a capable RCCL investigatory arm is vital for protecting the children under DFPS's care. As then RCCL Director Shaw stated: "If you don't have a good investigative system, you can't have a good [child welfare] system." (D.E. 304 at 20). Given the "alarmingly high investigatory error rate" for RCCL investigations, 75%, *M. D. by Stukenberg*, 907 F.3d at 265, it is clear that a "good investigative system" does not currently exists. An injunctive measure is necessary to cure the overburdened RCCL workload. Thus, the Court includes this provision, in order to cure the investigative failure while following the Opinion's guidance.

4. Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators, or successor staff.

RCCL investigators and inspectors are plagued by hiring issues. Therefore, the RCCL workload studies should drive RCCL's hiring guidelines to mitigate its staggering 41.2% yearly turnover rate. (D.E. 368 at 210). Additional issues with these investigations can be traced to hiring, such as variable caseload weights, as can be seen in the northeast district where there is a much higher median of average daily caseloads due to the smaller number of RCCL investigators. (D.E. 546 at 36-37; D.E. 546, app. 13).

Structured changes to DFPS's RCCL hiring goals are particularly needed, as DFPS currently does not base its hiring requests on any quantifiable needs. In the 2016-17 funding request, "DFPS asked for an additional 20 inspectors, 20 investigators, 9 supervisors, 1 program manager, and 1 state office program specialist." (D.E. 368 at 211). However, without a

workload study it is unclear how DFPS developed these numbers.  DFPS claims that staffing

requests would return the workforce to 2009 levels, but returning to 2009 levels would do little

to resolve the unreasonable risk of serious harm facing the General Class due to the growth of

the General Class population under DFPS's care.  Further, simply returning to 2009 staffing

levels would not bring RCCL workloads in line with any imaginable guideline derived from a

reasonable workload study.  These types of blind requests, divorced from any meaningful

metrics, are not an effective method for resolving DFPS's current issues, and an intervention is

necessary to rectify this irrational process.

5.   Effective immediately, DFPS shall ensure that RCCL, or any successor entity, promptly
     communicates allegations of abuse to the child's primary caseworker. In complying with
     this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for
     investigation, reports of maltreatment of children in the General Class, taking into
     account at all times the safety needs of children.

At a minimum, a child's primary caseworker shall be informed of any allegations of

abuse as the natural extension of the State's parental surrogacy over the child.   Prompt

notification of the primary caseworker may seem like a simple and obvious requirement, but the

record shows that allegations of abuse are not being routed to the primary caseworker.  The

Opinion took issue with communication provisions that add an additional administrative burden,

*M. D. by Stukenberg*, 907 F.3d at 274, but the primary caseworker should already be responsible

for knowing the details of the children in her care, so ensuring that these allegations are

communicated does not implicate those concerns.   In the case of P.V., it is not clear if her

primary caseworker was ever informed of the sexual abuse she reported to the central DFPS

phone line, as neither the CPA or caseworker followed through with any investigation or report.

*Id.* at 15.

## Orders Appointing Monitors

Pursuant to its inherent authority and Federal Rule of Civil Procedure 53, the Court appoints Monitors to supervise compliance with its decree.

Therefore, it is ORDERED that:

### A.  Monitoring Appointment Provisions in the January 15, 2018 Order[9]

1.  The Court hereby appoints Kevin Ryan and Deborah Fowler as the Monitors of this Order, responsible to assess and report on Defendants' compliance with the terms of this Order. The Monitors shall be responsible solely to the Court but shall work actively with the parties to ensure the effective and prompt implementation of this Order. The Monitors shall proceed with all reasonable diligence and shall commence their duties as quickly as practicable. The Monitors shall serve until the Court determines, upon Defendants' application, that the Monitors are no longer necessary.[10]

2.  Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitors' activities, reports, findings, or recommendations. The retention of the Monitors shall be conducted solely pursuant to the procedures set forth in this Order and shall not be governed by any formal or legal procurement requirements. The Monitors shall have a budget and staff sufficient to allow the Monitors to carry out the responsibilities set forth in this Order, and may contract with such experts or consultants as the Monitors may deem appropriate, in consultation with the Court. The Monitors, and any experts or consultants hired by the Monitors, may initiate and receive ex parte communications with the parties, and with the Court.

3.  The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. In order to avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary.

---

[9] These Provisions were not challenged by the Opinion or by either party in their filings.  *See generally, M. D. by Stukenberg*, 907 F.3d 237; (D.E. 603; D.E. 604).
[10] The Court's previous Order of Appointment, (D.E. 379), on March 21, 2016 naming Kevin Ryan as Special Master is superseded by this Order.

4. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order. The Monitors shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order.

5. The Monitors shall provide a written report to the Court every six months. The Monitors' reports shall set forth whether the Defendants have met the requirements of this Order. In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.

6. The Monitors shall have free and complete access to records maintained by Defendants, its divisions and any successor agencies or divisions, and by its private agency partners. The Monitors shall also have free and complete access to the staff of DFPS; its divisions and any successor agencies or divisions; persons within the executive branch; private agency partners; PMC children in the care of DFPS and of private agencies; and other individuals that the Monitors deem relevant to their work. DFPS shall direct all employees and contract providers to cooperate fully with the Monitors and shall assist the Monitors in gaining free access to other stakeholders in the child welfare system. Defendants shall provide the Monitors with free and, upon request, private access to all individuals within DFPS and persons within the Executive Branch of Texas State government, as the Monitors choose; to assist the Monitors in gaining access to other stakeholders in the child welfare system (including but not limited to the staff of contract agencies); and to provide the Monitors with free access to all documents, data, and premises it deems relevant to their work (including but not limited to documents and data from contract agencies and courts). The Monitors shall respect the confidentiality of all information related to individually identifiable clients, subject to applicable law. Defendants shall take no adverse action against individuals or agencies because they shared information with the Monitors pursuant to this Order.

7. The reports of the Monitors shall be public documents filed with the Court, except that any individually identifying information and any other confidential information protected from disclosure by law shall be redacted or otherwise removed from any public report.

8. The parties shall have access, through the Monitors, to all information made available to the Monitors, subject to the existing confidentiality order in effect in this case. The Monitors may protect the identity of confidential sources of any such information.

9.  The Monitors may periodically meet privately with the Court concerning issues related to this case.

10. Defendants shall deliver to the Monitors all records, reports, data and information within 30 days of the Monitors' request. The Monitors may grant extensions to due dates upon application in writing by the Defendants. If the Monitors decline to grant Defendants an extension, the Monitor shall do so in writing and the Defendants shall either produce the requested records, reports, data and information by the due date or appeal to the Court for an extension.

11. The Monitors shall submit bills for their compensation and reasonable expenses to the State, as well as file these bills under seal with the Court, on a monthly basis. The State shall approve and issue payment within 30 days of receipt of the monthly bill. If the State disputes a bill, Defendants shall file their objections with the Court no later than 15 days after receiving the bill and/or request additional clarifying information or documentation to the Monitors, with a copy served on Plaintiffs. The Monitors shall have 15 days in which to respond and to provide the additional information and/or documentation requested, with a copy served on Plaintiffs. If within 45 days of presentation of the Monitors' bill there is still a dispute, the parties shall submit the dispute to the Court for resolution. At this time, Plaintiffs, Defendants, and the Monitors shall file a joint statement regarding the disputed payment.

12. The Monitors shall not intervene in the administrative management of either DFPS or any of its units and shall not direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance. The Monitors are not to consider matters that go beyond superintending compliance with this Court's decree.

13. If at any point the Monitor can no longer serve, the Court shall appoint another Monitor, with input and recommendations from the outgoing Monitor.

**B.  Additional Monitoring Appointment Provisions**[11]

1.  Effective immediately, Defendants shall provide the Monitors, their staff and consultants with unrestricted, routine and ongoing remote access to the electronic data information systems used by Defendants to serve children in the PMC class, including CLASS; IMPACT; the Star Health Passport; the system used for tracking referrals and dispositions of abuse and neglect; the system used to track caseloads for staff; any and all successor systems to the foregoing; and the training and guidance necessary for the Monitors, their staff and consultants to review records within these systems. Defendants shall provide the Monitors, their staff and consultants with unrestricted, routine, and

---

[11] These provisions are in addition to the Monitoring Appointment Provisions in the January 2018 Order.

ongoing access to electronic systems used by Defendants to train caseworkers and test their knowledge.[12]

2.  Defendants will immediately supply the Monitors raw data relevant to the 2015-2016 workstudy conducted by DFPS, including but not limited to: the sampling criteria, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. Defendants will supply the Monitors with all available raw data relevant to all previous third-party studies[13] of DFPS.

3.  The Monitors shall provide the Court with a schedule for the hourly compensation of the Monitors, their staff and consultants. The Defendants shall pay the Monitors' compensation, the compensation of the Monitors' staff and consultants and reasonable expenses. Reasonable expenses include, but are not limited to, transcriptions, photocopy fees, electronic document storage fees, teleconference services, travel and attendant expenses, and mail and delivery costs. Reasonable expenses are not included in the Monitors' hourly compensation.  The Monitors may submit an application to the Court to increase the compensation, should circumstances so require.  All parties shall have the right to file with the Court a written objection to the Monitors' compensation schedule within 5 days from submission.

## CONCLUSION

Defendants are ORDERED to cooperate fully with the Monitors to implement each provision without delay and to assist the Monitors in creation of the Monitoring reports.  The Court retains jurisdiction for a period of three years after full compliance as certified by the Monitors.  Either party may apply to the Court during the term of the monitoring to terminate supervision over one or more components of this Order if that party can show full compliance with that component and that further monitoring will not serve a purpose. *Cf. Freeman v. Pitts*, 503 U.S. 467, 489 (1992) ("A federal court in a school desegregation case has the discretion to

---

[12] These requirements are necessary to allow the Monitors to efficiently carry out their duties and much less expensive than continuous round-trip flights to Austin. Previously, the Special Masters were required to travel to Austin and access this data under the direct supervision of DFPS.

[13] Including but not limited to: the 2014 operational review of DFPS and SPC conducted by The Stephen Group; the 2014 report on DFPS waste, duplication and inefficiency by the Texas Sunset Advisory Commission; the 2004 Texas Comptroller Report titled Forgotten Children, all internal reviews and assessments relevant to workloads conducted by the Casey Family Programs; the 2010 DFPS review conducted by the Texas Adoption Review Committee.

order an incremental or partial withdrawal of its supervision and control.").  All monitoring costs are borne by Defendants.

SIGNED and ORDERED this 20th day of November, 2018.

Janis Graham Jack
Senior United States District Judge