IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

M.D., b/n/f Sarah R. Stukenberg, et al.,  )
                                  )
        Plaintiffs,                   )
                                   )
v.                                     )
                                   )     Civil Action No. 2:11-CV-00084
GREG ABBOTT, in his official capacity  )
as Governor of the State of Texas, et al.,  )
                                   )
        Defendants.            )

**PLAINTIFFS' MOTION TO SHOW CAUSE WHY
DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT**

The ink on the Fifth Circuit's mandate is barely dry, and defendants already have failed to timely comply with key remedial orders. As concerning, the State just admitted that it made misrepresentations here and in the Fifth Circuit about its supervision of group facilities. Indeed, the State's admission contradicts two factual statements that defendants have made repeatedly. First, they falsely testified at trial that they keep 24-hour awake-night supervision of *all* group facilities, like general residential operations and residential treatment centers, housing 12+ children. Second, the State falsely told the Court and court of appeals that it *is* complying with the Order requiring 24-hour awake-night supervision in all foster group homes and cottage homes (the later-used name to describe this category of placement) housing 7-12 children.

To this day, defendants have not corrected or explained their misrepresentations. It is not clear how long they have known that their prior statements were false. What is clear is that their assurances were untrue and that, to this day, defendants remain out of compliance with the Order requiring 24/7 awake-night supervision in group facilities housing more than six children.

Of course, the power of contempt should not be invoked lightly. Here, these are critical failures to comply with court orders, along with refusals to correct material, false statements. The

situation justifies compelling defendants to show cause why they should not be held in contempt

and sanctioned. These are not trivial lapses. The remedial orders are to ensure a minimum floor of

safety for children in the State's permanent custody. Innocent lives are at stake.

Consequently, plaintiffs respectfully request an order directing defendants to show cause

why they should not be held in contempt on the following grounds:

- Failure to comply with the Order requiring defendants within 60 days after issuance of the Fifth Circuit's mandate to provide detailed proposals for the required workload studies as to conservatorship caseworkers and RCCL investigators, Dkt. 606 at 8, 13 (Nov. 20, 2018);[1] and

- Failure to comply with the Order requiring defendants to provide 24-hour awake-night supervision in all placements housing more than six children.[2] *Id*. at 12.

Additionally, plaintiffs seek an order directing defendants to show cause why they should not be

held in contempt or sanctioned on the following ground:

- Failure to promptly correct and explain their prior factual misrepresentations regarding the State's 24-hour awake-night supervision in facilities housing more than six children, including testimony at trial, such as by its then Assistant Commissioner of Child Protective Services Lisa Black, as well as statements after trial in filings with the Court and Fifth Circuit.

This motion is made and based on these grounds, the pleadings, papers, records, and files in this

action, court minutes, and evidence and testimony to be presented at the hearing of this motion.

---

[1] Plaintiffs are aware that as this motion was being prepared for filing, defendants submitted a proposed workload study methodology. *See* Dkt. 694 (Oct. 18, 2019). Plaintiffs await the Monitors' and Court's assessment of the sufficiency of this untimely submission.

[2] As the Court is aware, since 2007 Texas licensed a placement category known as foster group homes. Foster group homes are licensed to provide residential care for between 7-12 foster children. In 2017, Texas stopped licensing new foster group homes (though they allowed the existing ones to remain in operation). In their place, the State has now renamed the placement as "cottage homes." TEX. HUM RES. C., Chap. 42. This Court expanded its 24-hour awake-night supervision injunction to all licensed foster care placements of more than six children, regardless of the name of the placement. Although defendants argued that it was error for the Court to do so, the Fifth Circuit affirmed this Court's decision. *M.D. v. Abbott*, 929 F.3d 272, 276-77 (5th Cir. 2019) ("*Stukenberg II*").

## GOVERNING LAW

Federal courts "are not reduced to issuing injunctions against state officers and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). "Once issued, an injunction may be enforced." *Id*. Courts "have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Indeed, "the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *Gompers v. Buck's Stove & Range Co*., 221 U.S. 418, 450 (1911).

The contempt power is recognized by statute. "A court of the United States shall have the power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; . . . (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. §401 (1988). As such, the Supreme Court repeatedly has recognized federal courts' authority to impose civil contempt sanctions. *See, e.g*., *Hicks v. Feiock*, 485 U.S. 624, 632 (1988); *Shillitani*, 384 U.S. at 370-71; *Gompers*, 221 U.S. at 441. A district court also has "inherent authority" to sanction parties for "a full range of litigation abuses." *Chambers v. NASCO, Inc*., 501 U.S. 32, 46 (1991). This inherent authority derives from "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id*. at 43 (cite omitted).

A district court's findings of fact in support of its determination of contempt are reviewed for clear error and its underlying conclusions of law are reviewed de novo. *Petroleos Mexicanos v. Crawford Enterprises, Inc*., 826 F.2d 392, 401 (5th Cir.1987) (cite omitted); *accord United States v. City of Jackson, Miss*., 359 F.3d 727, 731 (5th Cir. 2004). And "special deference" will

be given to a determination that a court makes based on its "years of experience" overseeing the litigation and its familiarity with a defendant's history of obstructing reform. *See Hutto*, 437 U.S. at 687-88 (noting that "the exercise of discretion in this case is entitled to special deference because of the trial judge's years of experience with the problem at hand" and that "taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance"); *see also Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 394 (1992) (O'Connor, J., concurring) (deference to the court's exercise of discretion is "heightened" and "substantial" when it has been "overseeing a large public institution over a long period of time" and "has developed an understanding of the difficulties involved in constructing and managing a jail that an appellate court, even with the best possible briefing, could never hope to match"). Lastly, when a court's orders are necessary to remedy unconstitutional conditions, "the court has an additional basis for the exercise of broad equitable powers." *Spallone v. U.S.*, 493 U.S. 265, 276 (1990) (cite omitted).

The movant for contempt has the burden to show by clear and convincing evidence that a court order was in effect, the order required certain conduct, and the party required to comply failed to do so. *Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009); *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 291 (5th Cir. 2002). Clear and convincing evidence in a civil contempt proceeding is "that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal citation and quotation omitted). If a movant proves a prima facie case that a court order was not complied with, respondent then bears the burden of showing mitigating

circumstances or that the respondent substantially complied with the court's order or made every reasonable effort to comply, such that the court might withhold exercising its contempt power. e *Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987); *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir. 1987).

In using civil contempt to ensure compliance with remedial orders, a court is to consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). Moreover, "while a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable," *Taggart v. Lorenzen,* 139 S. Ct. 1795, 1802 (2019), "civil contempt sanctions may be warranted when a party acts in bad faith." *Id.*; *accord McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-93 (1949) (party's "record of continuing and persistent violations" and "persistent contumacy" justified placing "burden of any uncertainty in the decree ... on shoulders" of contemnor); *McPhaul v. United States*, 364 U.S. 372, 379 (1960) (proof "established a prima facie case of willful failure to comply with the subpoena").

To be sure, a court should use the "least possible power adequate to the end proposed." *Spallone*, 493 U.S. at 276 (cite omitted). But just as prior noncompliance or a "persistent pattern" of misconduct is relevant in recognizing the need for injunctive relief, *e.g., Allee v. Medrano*, 416 U.S. 802, 815 (1974), a court can consider a history of noncompliance in crafting effective sanctions. *See, e.g.*, *Colbert v. Brennan*, 2012 WL 6026132 (E.D. La. 2012) ("serious sanctions are indeed appropriate, given defendants' repeated failure to comply with their discovery obligations and the Orders"); *Hook v. Ariz. Dep't of Corr.*, 107 F.3d 1397, 1404 (9th Cir.) ("defendants consistently violated the injunctions and decree and attempted to change them

without first bringing a motion to modify. . . . The record reflects that the district court could not be assured the defendants would comply with the orders in the absence of a coercive sanction"), *cert. denied*, 522 U.S. 865 (1997); *Glover v. Johnson*, 934 F.2d 703, 715 (6th Cir. 1991) (given a "persistent pattern of obfuscation, hyper-technical objections, delay, and litigation by exhaustion on the part of the defendants to avoid compliance with the letter and the spirit of the district court's orders," contempt sanctions were justified).

And while it is true that in exercising equitable power to enforce its decrees a court will accord "proper respect for the integrity and function of local government institutions," respect is warranted only when the institutions "are ready, willing, and . . . able to remedy the deprivation of constitutional rights themselves." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990). Thus, in *Spallone*, there was no abuse of discretion in contempt sanctions against the City of Yonkers, which failed to enact laws to remedy unconstitutional public housing practices, which it agreed to do under a consent decree. Sanctions were proper "as a means of ensuring compliance" with the trial court's remedial orders because the city was a party to the case and "had been found liable for numerous statutory and constitutional violations, and had been subjected to various elaborate remedial decrees which had been upheld on appeal." 493 U.S. at 276.

Finally, a court's inherent authority to sanction extends to a failure by lawyer or client to correct prior false statements, as well as to representations that were true when made but that the lawyer or client later realizes were untrue but does nothing to correct. A court "has inherent power to sanction parties that engage in conduct that constitutes fraud on the court or an abuse of the judicial process." *Rainiere v. Microsoft Corp.*, 2016 WL 4626584 (N.D. Tex. 2016) (cite omitted). *Accord Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 337 F.Supp.2d 862, 869 (N.D. Tex. 2004) (imposing sanctions where counsel took no steps to correct witness's false

testimony and "failed to correct the misleading impression" created by counsel statements), *aff'd as modified on other grounds*, 436 F.2d 495 (5th Cir. 2006); *Holmes v. Northrop*, 642 F. App'x 373 (5th Cir. 2016) (no abuse in disqualifying attorney from serving as relator as sanction for ethics violations); *Houston v. C.G. Sec. Servs., Inc.*, 820 F.3d 859 (7th Cir. 2016) (sanctioning counsel and party for "false or, at best, reckless and evasive testimony" by a witness).[3]

## ARGUMENT AND AUTHORITIES

## I.      Failure to Timely Propose Workload Studies

Plaintiffs seek an order directing defendants to show cause why they should not be held in contempt because the evidence is clear and convincing that they have failed to comply with the order to propose workload studies as to conservatorship caseworkers and RCCL investigators within 60 days after issuance of the Fifth Circuit mandate.

In its remedial Order, the Court required defendants to provide detailed proposals within 60 days on two critical subjects:

1. "a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload range"; and

2. "a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges."

---

[3]     *See also* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.03(a) ("A lawyer shall not knowingly make a false statement of material fact or law to a tribunal"); *id.* at 3.03(b) ("If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall make a good faith effort to persuade the client to authorize the lawyer to correct or withdraw the false evidence. If such efforts are unsuccessful, the lawyer shall take reasonable remedial measures, including disclosure of the true facts."); ABA MODEL RULES PROF'L CONDUCT 3.3(a) ("A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.").

Dkt. 606 at 8, 13 (Nov. 20, 2018). The Order became effective when the mandate issued on July 30, 2019. Thus, defendants had until September 28, 2019 to propose detailed workload studies as to conservatorship caseworkers and RCCL investigators.

On October 8, 2019, defendants filed an Advisory acknowledging that they have failed to timely comply with the Order. Dkt. 673 (Oct. 8, 2019). Their excuse for noncompliance only magnified their contempt of the Order. In the Advisory, defendants admit that the only thing they have done in the last ten weeks to comply was to propose the name of a (biased) consultant to do the studies. Their duty under the Order is not to offer up a name or two of possible vendors to do studies; it was to propose detailed protocols for effective workload studies to generate reliable data for determining how many children caseworkers and RCCL investigators can handle safely. Giving the name of an objective, qualified vendor may be a *part* of proposing workload studies, but it is hardly the required full-blown proposal that defendants were ordered to provide for executing these critical court-ordered studies. A proposal for a study necessary requires concrete and careful recommendations about how the study should be conducted, such as by addressing complex methodological questions (*e.g.*, scope of the studies and answers to be gleaned from them; what variables to consider; the nature and type of parameters to be imposed; etc.).

To be sure, even the one thing they did do was utterly contemptuous of the letter and spirit of the Order. In proposing a consultant on August 27, 2019, defendants failed to disclose that he was a defense witness in at least two prior child-welfare lawsuits. On their own, the Monitors discovered that this consultant had been hired by the State to rebut elements of the plaintiff-children's position in these cases, including issues related to workloads. *See* Dkt. 673 at 1-2 and Exh. B. The Monitors quickly and properly rejected a biased consultant to conduct the court-

-8-

ordered workload studies, and so promptly advised the State on August 30, 2019. *See id.* Since

then, defendants have done nothing to comply with the Order.

Meanwhile, in their Advisory, defendants said that they had been having discussions with

the Monitors "over the course of several weeks" about a possible approach that "would eliminate

the necessity of conducting the workload studies," *id.* at 2, apparently by coming up with some

acceptable internal caseload guidelines. These would obviously have to be consistent with the Fifth

Circuit's opinion, which directed that standards must ensure

> a flexible method of distributing caseloads that takes into account the following
> non-exhaustive criteria: the complexity of the cases; travel distances; language
> barriers; and the experience of the caseworker.

*M.D. v. Abbott*, 907 F.3d 237, 274 (5th Cir. 2018) ("*Stukenberg I*").

Before filing the Advisory on October 8, defendants cut off discussions with the Monitors

about this alternative to conducting workload studies—though the Advisory fails to explain why.

Dkt. 673 at 2. Given this timeline, it appears that defendants never truly intended to go forward

with an agreement in lieu of lengthy studies. What is certain is that defendants had until September

28 to propose detailed workload studies, and they made no efforts whatsoever to do so—other than

offering the name of an obviously biased consultant to do the studies.

Consequently, plaintiffs request an order directing defendants to show cause why they

should not be held in contempt and sanctioned.

## II.   Failure to Comply with 24-hour Awake-Night Supervision Order

Plaintiffs also move for an order directing defendants to show cause why they should not

be held in contempt because the evidence is clear and convincing that they have failed to comply

with the Order to provide "24-hour awake-night supervision" in all placements "housing more than

6 children, inclusive of all foster, biological, and adoptive children." Dkt. 606 at 12. This Order

was originally issued in 2015, Dkt. 368 at 245 (Dec. 17, 2015), and went into effect after the Fifth

Circuit's refusal to stay it. Order, *M.D. v. Abbott*, No. 16-40023 (5th Cir. Mar. 21, 2016). The order was re-affirmed by the Fifth Circuit in October 2018, *Stukenberg I*, 907 F.3d at 270.

In its latest Order, the Court directed that "Defendants shall immediately cease placing PMC children in placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision." Dkt. 606 at 12. The Court also ordered that within 60 days "and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of placements that house more than 6 children, inclusive of all foster, biological, and adoptive children." *Id.*

If there were doubt about the 2015 supervision order, the Court issued a follow-on Order clarifying the injunction. In it, the Court began by noting that its supervision order was "being incorrectly interpreted" by the State. Dkt. 489 at 1 (Dec. 27, 2016). DFPS read the injunction as allowing PMC children "currently in foster care group homes without 24-hour awake-night supervision to remain in said homes and to disallow only future placement of PMC foster children into foster group homes without such 24-hour supervision." As a result, "for over one year PMC as well as [TMC] foster children, have remained in foster group homes without 24-hour awake-night supervision, in contravention to the Court's desired effect of its Injunction." *Id.* at 1-2. So, the Court *again* ordered that "no PMC foster child shall be placed in or remain in any foster group home that does not provide 24-hour awake night supervision." *Id.* at 2.

The reason for the Order is simple: to "ensure that the continuous 24-hour awake-night supervision stays in place to protect the members of the General Class in placements with a large number of children." Dkt. 606 at 12. This protection is critically needed, given the adjudicated fact

that "a litany of harms" occurred in these homes, "including rampant physical and sexual abuse." Final Order, Dkt. 559 at 106 (Jan. 19, 2018).

This rationale for ordering 24-hour awake-night supervision for group placements was upheld by the Fifth Circuit. When the appellate court denied defendants' first motion to stay the 2015 judgment, it observed that there was a "vast" record "supporting the grave problems arising from the lack of 24-hour supervision in foster group homes." Order, *M.D. v. Abbott*, No. 16-40023 (5th Cir. Mar. 21, 2016). The court recognized that the public interest supported denying a stay of the group home orders, as "the safety and rights of vulnerable children are at stake." *Id*. This recognition of the dangers to vulnerable children was central to the appellate court's decisions largely affirming the remedial orders. Even though the appellate court decertified the Foster Group Home Subclass, it stressed the importance of a supervision remedy to address the safety concerns in housing large numbers of children in these placements:

> DFPS has also remedied what the district court called the "most egregious" problem with FGHs. When the State appealed the district court's initial grant of injunctive relief, this court construed the district court's mandate narrowly to demand DFPS require 24-hour supervision in FGHs and denied the stay. . . . The emphasis on awake-night monitoring indicates that the primary concern is not the "mixing" component; instead, lack of adequate supervision makes the mixing of age, sex, and service levels a less safe practice.

*Stukenberg I*, 907 F.3d at 270. The Fifth Circuit reiterated its affirmance of the order as to foster group homes after remand. "In *Stukenberg I*, we recognized that the 24-hour-supervision requirement had remedied the 'most egregious' problem with the foster group homes: a 'lack of adequate supervision.'" *Stukenberg II*, 929 F.3d at 277 (quoting *Stukenberg I*, 907 F.3d at 237).

Despite the clear directive from this Court, affirmed by the Fifth Circuit, for the State to ensure 24-hour awake-night supervision for all placements of 6+ children, and its related duty to provide quarterly updates and verification to the Monitors of compliance, defendants now admit to not complying. In a recent status conference, defendants confirmed that group placements in

Texas housing more than six children—meaning cottage homes, GROs, and RTCs—do *not* all have 24-hour awake-night supervision. *See* Hearing Tr. at 8-9 (Oct. 9, 2019). It appears that the policy of the State of Texas, today and at the time of trial, is that group foster care facilities need *not* continuously supervise children in their care, no matter their number, service needs, or history. Few revelations in this case have been as shocking as this.

Consequently, plaintiffs move this Court for an order directing defendants to show cause why they should not be held in contempt and sanctioned.

## III.   Failure to Correct False Statements Regarding Compliance with Supervision Order

Finally, plaintiffs move for an order directing defendants to show cause why they should not be held in contempt, or sanctioned under the Court's inherent authority, pursuant to Fed. R. Civ. P. 11 or 28 U.S.C. §1927, because the evidence is clear and convincing that they have failed to correct prior fact misrepresentations made in this Court and the court of appeals regarding 24-hour awake-night supervision in group foster-care facilities in the State.

### A.   Defendants testified at trial that all group facilities (except foster group homes) have 24-hour supervision.

Defendants gave testimony at the trial that all group facilities other than Foster Group Homes had 24-hour awake-night supervision. In her testimony on December 2, 2014, Lisa Black, who was then Assistant Commissioner of CPS, testified as follows:

Q: And, Ms. Black, you're not familiar with any other state in the country that has what is called a foster group home between seven children and 12 children, are you?

A: I'm not familiar with any other in the part -- in the nation, no.

Q: Okay. Now, these foster group homes in the -- the State of Texas has decided that these foster group homes -- and these are group homes, aren't they?

A: Yes.

Q: You call them group homes, don't you?

-12-

A:  Yes, sir. . . .

Q:  All the other group homes in the State of Texas, 13 and above, have special protections, don't they, for group settings?

A:  The minimum standards are different.

Q:  *And those group protections in the State of Texas require 24/7 supervision, in other words, caretakers that are awake all the time.*

A:  *Yes.*

Q:  It doesn't mean you have to have a caretaker that's awake for 24 hours, but you have to have one caretaker that's awake at any one time, true?

A:  Yes.

Q:  And the reason -- that's what all the other group settings in the State of Texas have. But you don't have that for foster group homes, do you, Ms. Black?

A:  No.

Q:  So you can have 12 children in a foster group home and have the caregivers sound asleep every night of the week, can't you?

A:  Yes.

Trial Tr. at 60-62 (testimony of Lisa Black) (Dec. 2, 2014) (emph. added).

At the time of this testimony, then Commissioner Specia was in the courtroom. *Id*. at 23-29, 43, 48. Indeed, only a few minutes before Ms. Black testified, the Court had a colloquy with the Commissioner about this issue of inadequate supervision of group homes in Texas. *Id*. at 27-28. The Commissioner offered that the then Assistant Commissioner for Licensing, Paul Morris, could address the safety concerns of the Court. *Id*. at 28. Neither Commissioner Specia nor any other witness of the State sought to correct the false testimony offered regarding 24/7 supervision of *all* group homes in Texas, other than foster group homes.

It was not until October 9, 2019 that defendants admitted that all congregate placements in Texas with more than six children do not have 24-hour awake-night supervision. In addition, and contrary to Ms. Black's testimony, defendants confirmed that at the time of trial the State did not

have 24-hour supervision in general residential operations and residential treatment centers, vital
group facilities that were/are used in Texas. (In 2014, the only other group facilities here were the
hybrid foster group homes, admittedly with no 24-hour supervision.) Here is the State's admission
to the Court about 24/7 supervision of group facilities in Texas in 2014:

> MR. STEVENS: I spoke with someone at DFPS, and the standards, the supervision
> standards that existed at the time of trial are -- for GRO's, RTC's, were based on
> the needs of the children in the facilities and the types of services being provided
> by that facility.
>
> THE COURT: Okay, well, just one simple (indisc.) –
>
> MR. STEVENS: And so it –
>
> THE COURT: -- did they all have 24-hour awake supervision?
>
> MR. STEVENS: *They did not*.

Hearing Tr. at 15 (Oct. 9, 2019) (emph. added).

### B.     After trial, defendants represented that they were in compliance with the 24-hour awake-night order as to foster group homes and cottage homes.

Since this false trial testimony, defendants repeatedly told the Court and appeals court that
the State had 24-hour awake-night supervision for its foster group homes and cottage homes. We
now know that these statements were false.

In late 2016, defendants assured the Court that there were 58 foster group homes with seven
or more children, and all but *one* had 24-hour awake-night supervision in place. *See* Dkt. 492 at 2
(Dec. 29, 2016). Defendants promised the same in seeking a stay of the final order pending appeal,
saying the State is operating foster group homes "with the addition of 24-hour supervision":

> To begin, a temporary stay pending appeal will cause no harm to Plaintiffs. It has
> been two years since the Court issued its interim order finding purported
> constitutional violations. During that two-year period, the Court allowed state foster
> care system to continue functioning as is, with the addition of 24-hour supervision
> in FGHs. . . . The same policies and procedures that have protected PMC children
> for the last two years will safeguard them while Defendants appeal the district
> court's improper injunction.

-14-

Dkt. 561 at 16 (Jan. 19, 2018).

Defendants repeated this false representation to the Fifth Circuit. They said they "obeyed the district court's orders," and neither the special masters nor the Court had "complained at any point before 2018 that Defendants were violating the court's 2015 order." Reply in Support of Mot. for Stay Pending Appeal at 13 (Feb. 5, 2018). As to 24-hour awake-night supervision in all foster group homes, defendants promised they had not "disobeyed" that order. *Id*. at 12. A year later, defendants again said they "complied with the awake-night supervision order." Appellants' Suppl. Br. at 15 (Jan. 14, 2019). Indeed, they made the representation *twice* in the same brief. *See id*. at 15 ("this Court held that the 'only' immediately effective (and thus appealable) injunction was the order 'precluding placements in foster group homes that lack 24-hour supervision.' In light of that interpretation, Defendants dismissed that appeal and have since complied with the order requiring awake-night supervision in foster-group homes.") (cite omitted).

These false representations of compliance convinced the Fifth Circuit. Indeed, that court noted that there is "no dispute that the State appears to be complying with that mandate." *Stukenberg I*, 907 F.3d at 270. At the time, plaintiffs did/could not challenge the State's repeated statements, but we noted that when the special masters visited eight homes they found that only one had a workable plan for 24/7 awake-night supervision. *See* Appellees' Suppl. Br. at 28-29 (Feb. 4, 2019). But if this evidence and plaintiffs' prior points were overlooked then, they no longer can be, given defendants' new admission that they have not complied. All this time, defendants never corrected their prior false statements here or in the appeals court. To this day, they remain out of compliance with the Order requiring supervision in all congregate facilities housing more than six children.

Consequently, plaintiffs seek an order directing defendants to show cause why they should not be held in contempt and sanctioned.

## PRAYER

For these reasons, plaintiffs respectfully pray that the Court enter an order directing defendants to show cause why they should not be held in contempt and sanctioned for failing to comply with the Court's orders, and falsely stating otherwise, as described above.

Dated: October 18, 2019

Respectfully submitted,

Samantha Bartosz (*pro hac vice*)
Stephen A. Dixon (*pro hac vice*)
Christina Wilson Remlin (*pro hac vice*)
CHILDREN'S RIGHTS
88 Pine Street, Suite 800
New York, New York 10005
(212) 683-2210
(212) 683-4015 (Fax)
sbartosz@childrensrights.org

Marcia Robinson Lowry (*pro hac vice*)
A BETTER CHILDHOOD, INC.
355 Lexington Ave., Floor 16
New York, New York 10011
(646) 795-4456
mlowry@ABetterChildhood.org

/s/ R. Paul Yetter
R. Paul Yetter
State Bar No. 22154200
Dori Kornfeld Goldman
State Bar No. 24041274
Lonny Hoffman
State Bar No. 00784282
YETTER COLEMAN LLP
811 Main St., Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (Fax)
pyetter@yettercoleman.com

Barry F. McNeil
State Bar No. 13829500
HAYNES AND BOONE, LLP
Dallas, Texas 75219
(214) 651-5000
(214) 200-0535 (Fax)
barry.mcneil@haynesboone.com

ATTORNEYS FOR PLAINTIFFS AND THE
GENERAL CLASS AND SUBCLASSES

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of October, 2019, we electronically filed this pleading with the Clerk of Court using the CM/ECF system, through which all counsel have been served.

/s/ R. Paul Yetter
R. Paul Yetter