UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D.; bnf STUKENBERG, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:11-CV-0084 |
| | § | |
| GREG ABBOTT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

On November 5th, 2019 the Court held a hearing for Defendant GREG ABBOTT, in his

official capacity as Governor of the State of Texas, COURTNEY PHILLIPS, in her official

capacity as Executive Commissioner of the Department of Family and Protective Services of the

State of Texas, and TREVOR WOODRUFF[1], in his official capacity as Acting Commissioner of

the Department of Family and Protective Services of the State of Texas, to Show Cause Why They

Should not be Held in Contempt. (D.E. 695). The Court hereby holds the Defendants in contempt

for failure to comply with the Court's Order affirmed by the 5th Circuit's Mandate on July 30,

2019, and effective the same day, as quoted below:

> **"The Defendants shall immediately cease placing PMC children in placements
> housing more than 6 children, inclusive of all foster, biological, and adoptive
> children, that lack continuous 24-hour awake-night supervision. The
> continuous 24-hour awake-night supervision shall be designed to alleviate any
> unreasonable risk of serious harm."** (D.E. 606, p. 12).

For this failure, the Court imposes a fine of $50,000.00 a day beginning Friday,

November 8, 2019, continuing for seven business days until November 20, 2019, when the

fine shall increase to $100,000.00 dollars a day payable to the Clerk of Court at:

---

[1] Mr. Woodruff appeared at the November 5th Hearing as Acting Commissioner. Therefore, the Court substitutes
him as named party.

Clerk, U.S. District Court
Attn: Finance
1133 N. Shoreline Blvd., Ste. 208
Corpus Christi, TX 78401[2]

Further, The Defendants are to be fined until they follow and satisfy the Court's Order.

## I.       Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II.      Factual and Procedural History

The procedural history of this case is adequately described in this Court's December 17,

2015 Memorandum Opinion and Verdict, January 2018 Order, and November 2018 Order.  (D.E.

368; D.E. 559; D.E. 606).  Subsequent to the November 2018 Order, Defendants appealed to the

Fifth Circuit.   (D.E. 607).    On July 30, 2019, the Fifth Circuit remanded the Order for

implementation, affirming in part and modifying in part the remedial orders of this Court. *See*

*generally, M.D. v. Abbott*, No. 18-40057 (5th Cir. 2019).  On October 18, 2019, the Plaintiffs filed

a motion to show cause why defendants should not be held in contempt for failure to comply with

certain Court orders.  (D.E. 695).  The Court granted this motion.  (D.E. 697).  A hearing on the

matter was then held on November 5th, 2019.

## III.     Findings of Fact and Conclusions of Law

### A. *Legal Standards for Civil Contempt*

The elements of civil contempt are "(1) that a court order was in effect, and (2) that the

order required certain conduct by the respondent, and (3) that the respondent failed to comply with

the court's order."  In re Bradley, 588 F.3d 254, 264 (5th Cir. 2009).  "The power to punish for

contempt is an inherent power of the federal courts and . . . it includes the power to punish

---

[2] "A coercive, nonpunitive fine payable to the clerk of the court is an appropriate tool in civil contempt cases."

violations of their own orders." Id. "Contempt is committed only if a person violates a court order requiring in specific and definite language that a person do or refrain from doing an act." *Martin v. Trinity Industries, Inc.*, 959 F.2d 45, 47 (5th Cir. 1992).

If the Court finds a violation of its orders, it can issue a civil contempt sanction. "The district court has broad discretion in the assessment of damages in a civil contempt proceeding." *Am. Airlines, Inc*, 228 F.3d at 585 (internal quotation marks and citations omitted). The Court takes into account (1) "the character and magnitude of the harm threatened by the continued contumacy," (2) "the probable effectiveness of [the] suggested sanction in bringing about the result desired," and (3) "the amount of [the party in contempt's] financial resources and the consequent seriousness of the burden to that particular defendant." *See United Mine Workers of Am.*, 330 U.S. at 303-04, 67 S. Ct. 677.

### B. Failure to Provide 24-Hour Awake-Night Supervision

In this case, it is clear that: (1) a court order was in effect, (2) the order required certain conduct, and (3) the Defendants failed to comply with this court order. The Court finds that Defendants are to be held in contempt.

#### 1. 24-Hour Awake Night Supervision Order Is in Effect

There is no dispute that this Court's order was in effect when the Fifth Circuit issued the mandate on July 30, 2019 and was to be implemented the same day, ***immediately*** per this Court's order. *See Generally M.D. v. Abbott*, No. 18-40057, p.3-5 (5th Cir. July 30, 2019). Therefore, the first element of civil contempt is satisfied.

#### 2. 24-Hour Awake Night Supervision Required Certain Conduct

There is also no dispute that this Court's order clearly required certain conduct, namely, it directed the Defendants to "immediately cease placing PMC children in placements housing more

than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision." (D.E. 606, p.12). This order could not be more clear, direct, and urgent in its requirements. Throughout this litigation, especially after the July 30, 2019 mandate, not one of the Defendants have ever challenged this order's clarity. There has been no complaint found on the record for the Defendants' lack of ability to comply. But still, even today, they have not yet complied with this clear order. Thus, the second element of civil contempt is satisfied.

### 3. Defendants Have Failed To Comply With This Court's Order

Much like the first two elements of civil contempt, there is simply no dispute that the Defendants have failed to comply with this order. It is clear from the record that Defendants have admitted and confessed that they have not stopped placement of PMC children in facilities that lack continuous 24-hour awake-night supervision. On October 9, 2019, the Defendants confessed in a conference call that *not all placements in Texas housing more than six children have 24-hour awake night supervision and did not have any requirements of 24-hour awake supervision at the time of trial for any PMC placement.* (D.E. 679, pp.8-9). This admission came as a surprise and as a shock to everyone in that conference: the Court, Plaintiffs' counsel, and the Monitors. *Id.* Even at the show cause hearing, Ms. Kristene Blackstone, the associate commissioner for Child Protective Services ("CPS") who replaced Lisa Black, was unable to testify or certify that any GRO had 24-hour awake supervision. (D.E. 724, p.18). She further testified that while she had notified the GROs after the July 2019 mandate issued to propose plans to implement 24-hour awake supervision, she had not verified they had done so. (D.E. 724, p.17). Moreover, the Court-appointed Monitors report that during their unannounced visits to 15 Cottage Home campuses, a form of GRO, across Texas from October 14, 2019 to October 31, 2019, *"Only one of the visited campuses has on-site 24-hour awake-night supervision staff, and that is only in one cottage."*

4

(D.E. 711, p.12). Time and again the Monitors, during their unannounced visits in October 2019, documented consensual and nonconsensual sexual activity in the GROs they investigated *that were without 24-hour awake supervision*. (D.E. 711, p.14) ("Reviews of incident reports and investigations at Cottage Home campuses documented in CLASS reveal that the Jack-and-Jill bathrooms have allowed some children to access rooms at night, with reports of both consensual and non-consensual sexual contact between youth."). Therefore, the third element of civil contempt is clearly satisfied.

i. **Defendants' Misrepresentations Throughout This Case Before This Court and The Fifth Circuit Have Fueled Non-Compliance of This Order – Timeline of Events From Lisa Black's False Testimony To Defendants' Confession That Not All GROs Have 24-Hour Awake-Night Supervision**

Equally significant in Defendants' noncompliance which satisfies the third element of civil contempt, is that throughout this litigation, the Defendants have misrepresented and continually relied on false testimony noting that only a certain type of foster care facilities, foster group homes, did not have 24-hour awake-night supervision at the time of trial, while all other GROs already had this. In their response to the Motion to Show Cause, Defendants alleged that "No one, including either defense or Basic GRO subclass counsel, caught the error and brought it to the attention of the Court" and by noting that the fact that "Ms. Black testified incorrectly first came to light for Defendants when the Court raised it in a telephone conference on October 9, 2019." (D.E. 712, p.10). The Court did indeed first raised the issue of Ms. Black's false testimony on the October 9, 2019 telephone conference. (D.E. 679, pp.7-8). The Court finds, given the timeline of events discussed below, that this statement strains credulity.

**a. Defendants testified at trial that all group facilities except for foster group homes have 24-hour supervision**

On December 2, 2014, Defendants' witness, Lisa Black, then assistant commissioner of CPS, *testified that all group facilities except foster group homes have 24-hour awake-night supervision*. (D.E. 300, pp.60-62). The below is the actual quotation from her testimony:

> **Q** All the other group homes in the State of Texas, 13 and above, have special protections, don't they, for group settings?
> **A** The minimum standards are different.
> **Q** And those group protections in the State of Texas require 24/7 supervision, in other words, caretakers that are awake all the time.
> **A** Yes.
> **Q** It doesn't mean you have to have a caretaker that's awake for 24 hours, but you have to have one caretaker that's awake at any one time, true?
> **A** Yes.
> **Q** And the reason -- that's what all the other group settings in the State of Texas have. But you don't have that for foster group homes, do you, Ms. Black?
> **A** No.
> *Q So you can have 12 children in a foster group home and have the caregivers sound asleep every night of the week, can't you?*
> *A Yes.*
> *Id.* (Emphasis Added).

What is more egregious is that when Lisa Black made this statement, not one of Defendants' counsel, then-DFPS Commissioner John Specia, or any of the DFPS staff members present in the courtroom sought to correct this false testimony. *Id.* at 23-29, 43, 48. The Court

even had a colloquy with the Commissioner about this issue, yet the false testimony was never corrected. *Id.* at 27-28.

Further the Defendants' attorney Mr. Albright further explained to the Court that "the State has drawn that line at 12" children in regard to 24-hour awake-night supervision. (D.E. 322, p.96). This essentially meant that all relevant foster group homes with 12 or more children did have 24-hour awake-night supervision while foster group homes, homes containing 6-12 children did not have this.

   **b.  After trial, defendants represented to this Court and to the Fifth Circuit that they have complied with the 24-hour awake-night order as to foster group homes and cottage homes, and to an extension, to all relevant foster care facilities**

Ever since this false trial testimony, the Defendants continually relied on and asserted to both this Court and the Fifth Circuit that it now had 24-hour awake-night supervision. The following is an enumeration of these misrepresentations:

### Representations Before This Court After Trial

- On December 29, 2016, the Defendants assured this Court that there were 58 foster group homes with seven or more children, and all but one had 24-hour awake-night supervision in place. *See* (Dkt. 492, p. 2).

- On January 19, 2018, the Defendants before this Court promised that the state is operating foster group homes "with the addition of 24-hour supervision" (D.E. 561, p. 16).

### Representations to the 5th Circuit After Trial

- On February 5, 2018, Defendants represented to the Fifth Circuit that they "obeyed the district court's orders," and neither the Special Masters nor the Court had

"complained at any point before 2018 that Defendants were violating the court's 2015 order." Reply in Support of Mot. For Stay Pending Appeal at 13 (Feb. 5, 2018).

- On February 5, 2018 Defendants promised the Fifth Circuit in their briefs that they "had not disobeyed" the order on 24-hour awake-night supervision (Reply in Support of Mot. For Stay Pending Appeal at 12 (Feb. 5, 2018).

- On January 14, 2019, Defendants again represented to the Fifth Circuit in their brief that they had "complied with the awake-night supervision order." Appellants Suppl. Br. At 15 (Jan 14, 2019).

- On January 12, 2019, again in the same brief discussed directly above, Defendants write that "this Court held that the 'only' immediately effective (and thus appealable) injunction was the order 'precluding placements in foster group homes that lack 24-hour supervision.' In light of that interpretation, Defendants dismissed that appeal *and have since complied with the order requiring awake-night supervision in foster-group homes.*" (Appellants Suppl. Br. At 15 (Jan 14, 2019).

c. **In September and October 2019, Defendants Confess That Not All GROs have 24 hour awake-night supervision.**

On September 9th, 2019, the Monitors learned for the first time that, in addition to the programs that had been known as Foster Group Homes, no additional congregate care placement settings had been required to provide 24-hour awake-night supervision before the July 2019 mandate. (D.E. 711, p.2). This includes all of the General Residential Operations (GROs) – including Residential Treatment Centers (RTCs), a subset of GROs that provide care to children with serious behavioral health needs – to have awake-night supervision prior to the date that the Fifth Circuit

issued its mandate at the end of July 2019 and, apparently, as far back as the time of trial. *Id.* After years of the Defendants' representations, On October 9, 2019, the Defendants confessed in a conference call that ***not all placements in Texas housing more than six children have 24-hour awake night supervision nor were they required to do so at the time of trial.*** (D.E. 679, pp.8-9). Again, this confession was contrary to every single representation that the Defendants have made from the time of trial through September 2019 and caused the Court and the Plaintiffs to rely on these misrepresentations.

ii.     **These False Representations Convinced Both This Court And The Fifth Circuit And Has Enabled Defendants' Non-Compliance**

Because of these false representations about the true nature of the 24-hour awake-night supervision, this Court and the Fifth Circuit was not presented with correct evidence or an accurate depiction of what has been occurring. The following are discussions of how these false statements have affected this Court and the Fifth Circuit's judgment on such an important issue.

**Effect of False Testimony On This Court's Orders: Court Was Never Presented With Evidence That Children In GROs Were Not Protected By 24-Hour Awake-Night Supervision**

Because of Lisa Black's false testimony, and the continued false representations to the Fifth Circuit, this Court was never presented with evidence about the possible dangers to children in larger GROs because of the Defendants' assurance: *all* group facilities except foster group homes have 24-hour awake-night supervision. (D.E. 300, pp.60-62). If children are endangered, as found by this Court, in group of homes containing seven to twelve children such as in foster care group homes, then it is axiomatic that the danger increases the larger the population. Group residential organizations ("GROs") house several hundred children, with one GRO housing 437 children at the time of trial. (D.E. 368, p.9; DX 109 at 1273).

**Effect of False Testimony On the Fifth Circuit Opinions: The Appeals Court Agreed With The Defendants That They Have Complied When They Actually Have Not**

The Defendants false representations of compliance, in effect convinced the Fifth Circuit. The Fifth Circuit held that:

> "***DFPS has also remedied what the district court called the "most egregious" problem with FGHs***. When the State appealed the district court's initial grant of injunctive relief, this court construed the district court's mandate narrowly to demand DFPS require 24-hour supervision in FGHs and denied the stay. ***There is no dispute that the State appears to be complying with that mandate***." *Md v. Abbott*, 907 F.3d 237, 270 (5th Cir. 2018).

Again, all this time, the Defendants never corrected their prior false statements. These have affected this Court and the Fifth's Circuit's judgments. The Defendants have clearly represented to the Court and have convinced the Fifth Circuit that they have been in compliance with this order when it is now currently apparent that they in fact have not been following this Court's order ever since this Court first construed such an order in December 2015. (D.E. 368, p.236, 245) (this Court ordered the Defendants to "immediately stop placing PMC foster children in unsafe placements, which include foster group homes *that lack 24-hour awake-night supervision*."). As such, this Court finds that all three elements of civil contempt are satisfied, with the third element, noncompliance, aided continuously throughout these years by Defendants' false assertions.

### C. Appropriate Sanctions for Defendants' Contempt Of This Court's Order

Since it is clear and undisputed that the Defendants are in contempt of this order, the Court now determines the appropriate sanction for their contempt. The Court takes into account (1) "the character and magnitude of the harm threatened by the continued contumacy," (2) "the probable effectiveness of [the] suggested sanction in bringing about the result desired," and (3) "the amount

of [the party in contempt's] financial resources and the consequent seriousness of the burden to that particular defendant." *See United Mine Workers of Am.*, 330 U.S. at 303-04, 67 S. Ct. 677.

### 1. The Harm from Noncompliance

Since this order requiring 24-hour awake-night supervision was initially construed, it has been clear that the lack of 24-hour awake-night supervision is "***the most egregious problem***" in the foster system. (D.E. 368, p.236, 245). It is obvious that there is a clear and serious harm that noncompliance is and has posed to PMC children. Indeed, the Court signaled urgency in its first memorandum of law and opinion in 2015 when it ordered the Defendants to "***immediately*** stop placing PMC foster children in unsafe placements, which include foster group homes ***that lack 24-hour awake-night supervision***." *Id.* (emphasis added). Because of Defendants' noncompliance, there is both foreseeable and actual harm that the PMC children are exposed to. These harms are discussed below.

### a. Actual Harms -- The Court and the Fifth Circuit Found That Children Are Exposed To Danger In Facilities That Lack 24-Hour Awake-Night Supervision

The Court has previously found systemic late-night abuses that stemmed from the lack of 24-hour awake-night supervision in foster group homes:

- A witness testified that sexual abuse "is usual rather than unusual" with the abuse often occurring at night when there is no supervision. D.E. 368 at 236; (D.E. 324, p.175).

- A witness detailed how a foster child was "sexually abused almost every night by one of the bigger boys in the home" while the caretakers were asleep on the other side of the house. *Id.* at 236; (D.E. 324, p.172).

- A witness, an individual who lived in six separate foster group homes, testified how he ended up in jail for physically abusing a 2-year old. (D.E. 368, p.237; D.E. 324, p.192-

11

193). One of the children, then-eight-year-old D.I., was repeatedly raped by a 16-year old in a foster group home at night who knew that the caregiver was asleep and had one of the other children serve "as a lookout…when the children engaged in sexual activities" to make sure the foster father did not wake up. (D.E. 368, p.237; PX 185, p.58 (filed under seal)).

- A 14-year-old boy abused his foster parents' biological daughter by 'inserting his finger in the vagina of [the] 4-year-old and making her bleed.' The foster mother 'later reported that two other foster children—18-year-old [mentally handicapped] female, and 13-year-old [mentally handicapped] male also reported being touched by the 14 year old foster child.'" (D.E. 368, p.237;PX 495 at 244, 254 (filed under seal)) (internal citations omitted).

Subsequent to the December 2016 Order, the Special Masters visited eight foster group homes to verify the overnight supervision plans submitted to them by DFPS. The following findings are enumerated:

- In that visit, only one of the homes had any semblance of a functioning plan. (D.E. 559, pp. 107-110; D.E 546, pp. 50-52).

- A married couple running a foster group home reported they informally provided overnight supervision by "alternating shifts overnight." *Id.* at 51.

- One caregiver characterized her role in providing 24-hour awake-night supervision was "limited to getting up if anything happened or required intervention." *Id.* at 51.

The Fifth Circuit further affirmed this Court's view of finding systemic late-night abuses, writing the following:

- The Fifth found "***evidence supporting the grave problems arising from the lack of 24-hour supervision in foster group homes.***" *M.D. v. Abbott*, No. 16-40023, p.4 (5th Cir. Mar. 21, 2016) (emphasis added).

- The Fifth Circuit further characterized these placements as "*apparently dangerous*" and that "*where the value of the constitutional rights to be protected far outweigh administrative costs that might be incurred in formulating a remedy, the lower court proceedings...should continue.*" *Id.* at 5 (emphasis added).

It is axiomatic if children are in danger in homes of 7-12 without 24-hour supervision, then the danger only increases with the size of the population without supervision. Examples of current, ongoing harms that the Monitors found from October 14, 2019 to October 31, 2019 to 15 Cottage GROs are enumerated below:

- Out of 15 Cottage Home campuses visited, 14 were without wake night supervision (D.E. 711, p.12) ("Only one of the visited campuses has on-site 24-hour awake-night supervision staff, and that is only in one cottage.").

- "Jack-and-Jill"[3] bathrooms have allowed children to access rooms at night, with multiple reports of consensual and nonconsensual sexual activity in the GROs. *Id.* p.14.

- The current overall design and set up of these facilities "makes safety at night problematic, even with alarmed doors or hallways and other night-time precautions that have been put in place." *Id.* at p.13.

**b. Actual Harms – PMC Children are Presently Endangered in Residential Treatment Centers**

Aside from the actual harms enumerated above, the Court and its monitors have found further present harms to foster children in Residential Treatment Centers. The following are descriptions of these current, ongoing harms:

---

[3] These bathrooms allow youth access to another bedroom by walking through the bathroom.

- One of the campuses the Monitors' visited served as both an RTC and a cottage home which is licensed to place 130 youth. This campus "holds the most risks for children's safety because of its size, the few safeguards that were put in place for night-time supervision, and the condition and design of housing in some areas of the campus." (D.E. 711, p.11). Most egregious is the fact that for the unit that houses youth with intense psychiatric needs, the facility "closely resembles a juvenile detention facility, with the only substantial distinctions being that the cell doors do not lock." *Id.* (*See* Order Exhibit No. 1; Court's Exhibit No. 1)

- Most concerning is that in this specific unit for youth with intense psychiatric needs which is also used for "suicide watch," there is a mural depicting an angel bringing up a child's soul up to heaven. (*See* Order Exhibit No. 1; Court's Exhibit No. 1). When this exhibit was shown to Ms. Blackstone, the associate commissioner for Child Protective Services ("CPS") who replaced Lisa Black, she was unaware of this and other conditions in this RTC nor were her examiners aware. (D.E. 724, pp.23-25). She found them unacceptable. *Id.*

These conditions are prevalent in these residential treatment centers and every single day that the Defendants do not follow this Court's Order, it is obvious that more and more children will continue to suffer under these constitutional violations.

### c. Foreseeable Harms – PMC Children Will Be Endangered in Residential Treatment Centers

The Court also finds that because of Defendants' noncompliance, Residential Treatment Centers become, essentially, a dumping ground of foster children who are restrained and are given multiple sedating medications. (D.E. 325, p.177-78). Now the Court knows that this is the

equivalent of placing a child in a hospital with no supervision on the floor. In trial, the Court received testimony from a witness, a young man who was placed in an RTC, who detailed his untenable experiences in these RTCs:

> **THE COURT:** Were you medicated there?
>
> **THE WITNESS:** Yes, lots of medications. I -- I've
>
> been told that I have lots of things. I was bipolar,
> schizophrenic and ODD, as every foster child does apparently.
>
> **THE COURT:** Has what?
>
> **THE WITNESS:** Every foster child apparently has Oppositional Defiant Disorder, ADHD, a wide number of things that certainly I don't think are true at all and I can be here today and articulate sentences to you and talk about things that have happened to me and these are just remedies to, I don't know, I guess get me to behave.
>
> **THE COURT:** Are you medicated now?
>
> **THE WITNESS:** I am not, no.
>
> **THE COURT:** How long have you been off medication?
>
> **THE WITNESS:** Since I was 19 and I was actually told  to stop taking medications from a psychiatrist in Houston after continuing to see a psychiatrist for at least a year after I aged out.
>
> **THE COURT:** So you must not be having any of those problems?
>
> **THE WITNESS:** I don't think so. I don't think I ever did either.
>
> (D.E. 325, p.177-78).

In addition to this, the Court also found that children were being abused and were bring overly medicated in these RTCs. The following is the exact testimony from Crystal Bentley, another child from the foster care system, on the record:

**THE WITNESS:** Oh, yes, I witnessed a lot of stuff happening to other foster children. A little while after I grew up a little bit more, I ended up in an RTC and I watched a lot of stuff happen to foster kids.

**THE COURT:** Like what?

**THE WITNESS:** I mean, they were being abused, they were being overly medicated. I mean, that's really a bad problem, especially in RTC's.

(D.E. 324, p.62).

In 2015, RTC capacity was at 3,483 children, while in 2016 it is at 3,362.[4] This Court has found that PMC foster children are indeed currently endangered without 24-hour awake-night supervision, and this Court presently finds that there is also dangerously foreseeable harm in residential treatment centers without 24-hour awake-night supervision. (D.E. 368, p.236, 245). And, again, this prompts this Court's analysis for Defendant's present noncompliance: if children are endangered in group of homes containing seven to twelve children then obviously the danger increases the larger the population. As mentioned earlier, GROs house several hundred children, with one GRO during the trial housing 437 children. (D.E. 368, p.9; DX 109 at 1273). It is doubtful that any parent would tolerate their child to be placed in a hospital on a floor without supervision.

This specific order was so important to remedying the Defendants' constitutional violations and ensuring that foster children would not be harmed by the lack of 24-hour awake-night supervision that this Court followed-up on its initial order with the following orders that serve to even further clarify the order and direct the Defendants into action:

---

[4] Figures obtained from DFPS' 2018 Progress Report. https://www.dfps.state.tx.us/About_DFPS/Title_IV-B_State_Plan/2018_Progress_Report/2018_Title_IV-B_State_Plan_entire_report.pdf

- In December 2016, 355 days after the initial order, this Court issued clarifying orders directing Defendants that "no PMC foster child shall be placed in or remain in any foster group home that does not provide 24-hour awake-night supervision." (D.E. 489, p.2).

- on November 20, 2018, the Court, again, focused on the 24-hour supervision issue and directed the Defendants to "immediately cease placing PMC children in placements housing more than 6 children, *inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision.*" (D.E. 606, p. 12) (emphasis added).

Clearly there is a total disinterest in DFPS to verify any information relevant to this case, and to cooperate with the Court and its Monitors in implementing the remedial orders that the Fifth Circuit has already affirmed. The fact that it took almost 6 years to correct Lisa Black's erroneous and misleading statement is emblematic of the dysfunction of DFPS. This has adversely impacted DFPS' ability to keep the PMC children free from an unreasonable risk of serious harm. Time and again the Monitors, during their unannounced visits in October 2019, documented consensual and nonconsensual sexual activity in the GROs they investigated that were without 24-hour awake supervision. (D.E. 711, p.14). The harm against PMC children is dire, it is obvious, and it is grave. It is near impossible to find anyone in DFPS who has first hand knowledge of everything. These include witnesses offered by the Defendants to respond to these very clear allegations. Because of this, the Court finds that there is a substantial amount of harm done against the children by the Defendant's non-compliance.

## 2. Financial Resources of the Defendant

At the show cause hearing, Mr. Albright noted that they have had about 22,000 hours of work on this matter. (D.E. 724, p.172). Multiplied by even a very low hourly rate of $200.00, this amounts to $4,400,000. Texas has been willing to appropriate money and work to fight mandates requiring them to keep these children safe. (D.E. 683, pp. 1, 18). This high tolerance for cost both demonstrates the necessity of high sanctions to compel compliance and the State's ability to pay those sanctions. Further, while these sanctions may become high, it is within the State's power to immediately comply.

### 3. Effectiveness of Sanctions

The only way for this Court to remedy DFPS's disinterest in compliance is via severe coercive sanctions. When shaping coercive sanctions, the Court takes into account "the character and magnitude of the harm threatened by the continued contumacy," "the probable effectiveness of [the] suggested sanction in bringing about the result desired," and "the amount of [the party in contempt's] financial resources and the consequent seriousness of the burden to that particular defendant." *See United Mine Workers of Am.*, 330 U.S. at 303-04, 67 S. Ct. 677. The severity of the harm is clear, having been recognized as "***the most egregious problem***" in the foster system. (D.E. 368, p.236). If left unaddressed children ***are and will*** be subject to both sexual and physical abuse, an unconscionable reality and a stain on the reputation of the state of Texas as these children's' failed guardian.

### D. The Court's Findings On Appropriate Sanctions

Given the severity and obviousness of the harm on PMC children, the State's complete disinterest in following this order, as well as the financial resources of the Defendants and the effectiveness of sanctions, the Court fines the Defendants $50,000 a day for seven business days until November 20, 2019 and $100,000 a day thereafter.

The fine shall be paid until the following is done. Defendants must send agency staff during the overnight hours, unannounced to all licensed placements required to have 24-hour awake-night supervision to witness, document, and certify that the placement is in compliance with the Court's remedial order. Such certification must include a detailed description of:

1. The name of the placement;

2. The address of the placement;

3. The placement identification number;

4. The total population on the date of the visit, including any caregivers' biological and adoptive children, and any private placement children;

5. The names and number of PMC children in the placement on the date of the visit;

6. A detailed description of how the awake-night supervision is being provided, including the number of staff providing awake-night supervision and how many children each night staff person is responsible for supervising;

7. The names, titles, and contact information of placement staff and caregivers interviewed.

Each certification must contain the name and title of the agency staff conducting the visit, the time of the visit, and the name of the staff member(s) providing awake-night supervision, and must be signed by the agency staff conducting the inspection and at least one awake-night supervision staff. Once all unannounced visits and certifications are complete, the State must transmit them to the monitors with the certification that the State is providing continuous 24-hour awake-night supervision in the operation of all LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive placements. Further, the State is enjoined from moving any PMC child from their current licensed foster care placement as a result of enforcement of the

Court's requirement for 24-hour awake-night supervision unless application is made to the Court through the Monitors prior to proposed discharge.

### D. Workload Studies

In another example of systemic dysfunction within DFPS as well as the fact that it is almost impossible to find anyone in DFPS that can give first-hand information as to the safety of any PMC child, the agency missed the deadline of this Court's order directing Defendants to submit workload studies on September 28, 2019. The Defendants were ordered to:

> "[P]ropose a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload ranges . . . [including], but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. . . [within] 60 days of the Court's Order . . ." (D.E. 606, p. 8, 13)

The Defendants were to do this in consultation with and under the supervision of the Monitors. *Id.* Defendants had until September 28, 2019 to file their proposal. (D.E. 695, p. 8). To accomplish this, the State issued a Request for Information ("RFI") on February 8, 2019 seeking input from the public regarding the development of workload studies. (Workload Studies Proposal August 2019, p.1). The State alleges that it extended the deadline for responses to the RFI three times and contacted approximately forty institutions to inquire about their lack of response or interest in the project. *Id.* Ultimately, only two respondents without experience in workload studies responded to the RFI and the State determined that they would not be suitable to conduct the mandated studies. *Id.* On August 27, 2019, Defendants proposed to the Court Monitors that Dr. John Fluke would be willing to be retained by Defendants to consult with the Monitors to propose and conduct the workload studies. (D.E. 673, p. 1). Defendants chose a person who, on the record as a defense expert for the state of Rhode Island, testified that he believed,

contrary to this Court and the Fifth Circuit's opinions, that there is no scientific connection between workloads and children's outcomes. In his words:

> "My opinion today is that there's no scientific relationship directly between caseload and outcomes, and that the causal linkages to some of the things that are potentially impacted by caseloads, like issues that are related to workplace conditions, for example, haven't been demonstrated to be causative with respect to outcomes, either." (D.E. 723, Court's Exhibit #1).

The Monitors rejected Dr. Fluke on August 30, 2019, and told Defendants that they would get back in touch with them with an approved entity. (D.E. 673-2). Dr. Fluke was rejected because he was used at least twice as a defense witness in child welfare cases and to rebut the utility of workload studies. *Id.* Defendants noted in an advisory that "[d]iscussions regarding the workload studies proposal have ceased and Defendants now await further guidance from the Court Monitors regarding an approved individual/entity to conduct the workload studies." (D.E. 673, p. 2). After Defendants filed an advisory alleging that they have not received guidance from the Monitors, and after Plaintiffs filed a motion to show cause, Defendants then filed a proposed workload study methodology on October 18, 2019. (D.E. 673; D.E. 695; D.E. 694). The Court, at the hearing, characterized the Defendants' efforts in satisfying the Court's workload study orders as "weak." (D.E. 724, p.131). At the show cause hearing, Defendant's witness, Ms. Tarah Olah, a director at DFPS, *testified that she did not know who recommended Dr. Fluke even though she was on the selection committee and did not do any research as to who might conduct these workload studies*. (D.E. 724, p.112). The following is a direct quotation of her testimony:

THE COURT: Who specifically offered Dr. Fluke?

THE WITNESS: It was a collaborative decision --

THE COURT: Were you part of that collaboration?

THE WITNESS: -- after an unsuccessful and lengthy RFI process.

THE COURT: But you didn't even get an RFI from him.

THE WITNESS: That's correct. We -- we released the RFI in February in 2019 with a original expire date 45 days after and we were --

THE COURT: Did you do any research on who had done these work study programs in the past?

THE WITNESS: Our initial approach was to cast a broad net --

THE COURT: Okay.

THE WITNESS: -- but --

THE COURT: Did you do any research as to who had done these work study programs in the past?

THE WITNESS: I did not personally do that research, Your Honor.

THE COURT: Did anybody that you know of in DFPS do that research?

THE WITNESS: I am not aware of the extent to which staff researched other potential contractors' experience. I just understand that after the unsuccessful --

THE COURT: Okay. *Id.*

However, the Court does not hold the Defendants in contempt for failure to submit the workload studies proposal by the deadline, since, however weak the effort was, it was made. (D.E. 724, p.131); *See Int'l Union v. Bagwell*, 512 U.S. 821, 827 (1994) ("[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience... ")

### E. Sexual Abuse Flags

This systemic dysfunction is further evidenced in the Defendant's disregard for this Court's order regarding electronic sexual abuse flags for PMC children. Defendants were ordered to implement an option within children's profile characteristics allowing caseworkers or supervisors to designate them as "sexually abused." (D.E. 606, p. 5). The Order became effective when the mandate issued on July 30, 2019; therefore, Defendants were required to implement this option by September 28, 2019. (D.E. 626). On September 28, 2019, Defendants estimated that they would implement technology to allow the electronic option by November 17, 2019. (D.E. 702 at 1). On October 18, 2019, Defendants postponed the estimated date for implementing the electronic tracking system until December 19, 2019. *Id.* at 2. Defendants have indicated that they are implementing an interim paper solution with a record that will be included in casefiles. *Id.* at 1. However, the ineffectiveness of paper records is the reason behind the order, with paper records being "often tens of thousands of pages long, unorganized, inconsistent, and contradictory." (D.E. 368, p. 206). Defendant's former commissioner admitted that "children who are known victims of sexual abuse will act out with other children." *Id.* at 213. Mr. Trevor Woodruff, acting DFPS commissioner, noted in the hearing that although they have the capacity to flag sexually aggressive children, they currently do not have the capability to flag sexually abused children because they "took a much more comprehensive approach to documentation of sexual victimization histories."

(D.E. 724, p.155). The Court does not deem this explanation to be satisfactory, noting that the delay in establishing this comprehensive system does not solve the immediate need for a sexual abuse flag for the foster children *today*. *Id.* at pp. 154-155. Failure to identify these children leads to further abuse. Defendants have identified an unsatisfactory reason why their performance was impossible and are continuing to push back implementation of the Court's order.

Additionally, DFPS has failed to notify the caregivers of PMC children that they were victims of sexual assault, and even their witness, Ms. Tarah Olah, a director at DFPS, testified that even though all the caregivers were notified, she has no verification of the record. (D.E. 724, pp.148-149). The Court had ordered DFPS that:

> "[I]t shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth." (D.E. 606, p. 5).

Despite this order, the Monitors have now reported that caregivers who they have interviewed are "absolutely astounded at DFPS" that they were not given information as to whether the children they care for were sexually abused children. (D.E. 718, p.149). The Monitors write:

> "DFPS indicated to the Monitors that children's caregivers are being apprised of confirmed allegations of sexual abuse and/or a child's history of sexual behavior or aggression through the Application for Placement ("Common Application") and Placement Summary forms. These forms, according to DFPS, are provided for all children upon placement. Yet, the Monitors' review of children's records showed these documents were often missing from a child's file. For example, 36 percent of the children's records did not include the Common Application, and 71 percent did not include a Placement Summary form. To find both documents in the file was unusual. In addition, before making the Cottage Home visits, the Monitors cross-referenced a list of PMC children in Cottage Homes with another list of PMC children that DFPS identified as having a flag in IMPACT for sexual behavior problems or sexual aggression. There were three children on both lists. The Monitors were able to review two of the three children's files during visits. The records for one of these children did not include a Placement Summary, and

the Common Application was out-of-date. **No documentation in this child's file identified him as having been flagged by DFPS as having a history of sexual behavior problems or aggression."**

(D.E. 711, p.15).

Ultimately, the Court however does not find the Defendants in contempt for failure to follow this Order, since not enough notice has been given.  (D.E. 724, p.168); See *See Int'l Union v. Bagwell*, 512 U.S. 821, 827 (1994) "[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order...a*nd thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard...*").

**IV. Conclusion**

It is hard to find during the years of this proceeding a single person with DFPS who has firsthand knowledge of anything about these PMC children. For the foregoing reasons, it is ORDERED that Defendants shall be held in civil contempt of Court for violating this Court's order to provide 24-hour awake-night supervision, and that a sanction of $50,000 per day starting Friday November 8, 2019 for seven business days, then $100,000 per day until Defendants are compliant be paid to the Clerk of Court.

SIGNED and ORDERED this 7th day of November, 2019.

Janis Graham Jack
Senior United States District Judge