IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § § § | |
| Plaintiffs, | § | |
| v. | § § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, et al., | § § § | |
| Defendants. | § § | |

**The Court Monitors' Supplemental Update to the Court on Remedial Orders A7 and A8 Regarding 24-Hour Awake-Night Supervision in Placements with Six or More Children and Report on Visits to Cottage Home Campuses**

**BACKGROUND**

On November 4, 2019 the Court Monitors (Monitors) filed an update with the Court related to the State's compliance with the following remedial orders from section A of the Court's modified injunction:

> 7. The Defendants shall immediately cease placing PMC children housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.
>
> 8. Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.

*M. D. by Stukenberg v. Abbott*, No. 2:11-CV-84, 2019 WL 5842946 (S.D. Tex. Nov. 20, 2018) (footnote omitted). On November 5, 2019, after granting Plaintiffs' Motion to Show Cause, the Court held a hearing and subsequently issued an order finding Defendants in contempt for failure to comply with awake-night provision of the modified injunction. *M.D. by Stukenberg v. Abbott*, No. 2:11-CV-84 slip op. (S.D. Tex. Nov. 7, 2019).

In addition to sanctioning the State, the Court ordered the State to certify compliance with the Court's order by sending agency staff to conduct unannounced visits during overnight hours to all licensed placements required to have awake-night supervision. The Court required the certification for each placement to include a detailed description of:

1. The name of the placement;
2. The address of the placement;
3. The placement identification number;
4. The total population on the date of the visit, including any caregiver's biological and adoptive children, and any private placement children;
5. The names and number of PMC children in the placement on the date of the visit;
6. A detailed description of how the awake-night supervision is being provided, including the number of staff providing awake-night supervision and how many children each night staff person is responsible for supervising;
7. The names, titles, and contact information of placement staff and caregivers interviewed.

*Id*. at 19. The certification also was required to include the name and title of the staff conducting the visit, the time of the visit, and the name(s) of the staff providing awake-night supervision. *Id*. Once the visits and certifications were complete, the Court required them to be transmitted to the Monitors along with the State's certification that the State is providing continuous 24-hour awake-night supervision in the operation of all licensed placements housing more than six children, inclusive of all foster, biological, and adoptive children. *Id*.

The order also enjoined the State from moving any PMC child from their current placement as a result of enforcement of the requirement for awake-night supervision, unless application was made through the Monitors prior to the discharge. *Id*. at 20.

**BOLES CHILDREN'S HOME REFUSAL TO PROVIDE AWAKE-NIGHT SUPERVISION**

On November 7, 2019, Audrey Carmical, General Counsel for the Department of Family and Protective Services (DFPS), alerted the Monitors that one of the program administrators of a Cottage Home campus, Boles Children's Home, Inc. (Boles), was refusing to comply with the awake-night provision, and intended to discharge two PMC youth, who are siblings, from the placement. The Monitors discussed with Ms. Carmical options that could be offered to Boles that would avoid disrupting the children's placement.

On November 9, 2019, Ms. Carmical advised the Monitors that DFPS had offered the administrator of Boles several options in an attempt to gain his compliance with the awake-night provision. He continued to refuse. Ms. Carmical outlined DFPS's efforts to work with Boles to find a solution, and e-mailed a copy of the letter that the program administrator sent to the agency on November 8, 2019, outlining his opposition to providing awake-night supervision.

The letter from the program administrator, Joel Derrough, cites as his reasons for refusing to comply:

- That it conflicts with the normalcy policy included in the Minimum Standards for General Residential Operations (GROs), which requires GROs to apply a "reasonable and prudent parent" standard;
- That it would be disruptive to home life and "could potentially be very disturbing to kids and to employees that currently live in the home," and is "unnecessary and downright weird"; and
- That having an awake person in the house at night would be traumatizing to children.

Letter from Joel Derrough, Executive Director, Arms of Hope – Boles Children's Home Campus (November 8, 2019), attached as Exhibit 1.

The Monitors advised Ms. Carmical that the Judge would not grant an exception to awake-night supervision at Boles and asked her to determine whether there are available foster family homes in the same county or a contiguous county, so that if the boys were moved they would be able to remain in their current schools. On November 12, 2019, Ms. Carmical e-mailed the Monitors and indicated that the search for a foster family home in a county close enough to the children's current schools was not successful. She also advised the Monitors that a potential adoptive family had been identified for the children, but that the consideration of the placement was in the early stages and agency staff were proceeding slowly because the oldest child – who had been disappointed when an adoption fell through – was reluctant to consider adoption because of his previous experience. Ms. Carmical formally asked the Monitors to raise with the Court a request for an exception to the awake-night supervision requirement for Boles, pending the agency's exploration of this potential adoptive home.

On November 13, 2019, the Court convened a telephonic hearing, and after discussing these issues with the parties, ordered the State to subpoena the Boles home administrator to appear at a hearing to explain his refusal to comply, which was later set for November 18, 2019.

**Description of Campus**

Boles was one of the last Cottage Home campuses visited by the Monitors and the Monitors' staff, and therefore was not included in the report filed with the Court on November 4, 2019. Located in Quinlan, Texas, Boles is licensed to serve 56 children, ages 4- to 17-years old. There are four cottages on the campus that house children and primary caregivers; during the visit by Monitors' staff they walked through three of these cottages. All three had six bedrooms with shared "Jack-and-Jill" bathrooms. Each bedroom was set up to accommodate two children, and on the day of the visit there was an average of seven children in each cottage, ranging in age from 11- to 18-years old. Some cottages house both boys and girls. At Boles, the primary house parents work three weeks and are off one week of every month. During the week of the month when the primary house parents are off, the children move to a "Grandparents Cottage" where relief staff reside.

Like many of the Cottage Home campuses that the Monitors and their staff visited, rather than provide awake-night supervision, children are monitored at night through the use of alarms. In the Boles cottages, alarms on the children's bedroom doors and windows are armed at night. If a door is opened, the alarm sounds throughout the cottage.

A review of investigations in CLASS for Boles showed that over the last two years, there have been at least two allegations of child-on-child sexual aggression. They were investigated as "neglectful supervision" cases, and neglectful supervision was ruled out. In one of these cases, the notes indicate that the children were able to move between bedrooms, through the "Jack-and-Jill" bathroom, without the house parents hearing them at night because, while the bedroom doors are alarmed, the bathroom doors are not.

**STATE'S CERTIFICATION REGARDING COMPLIANCE WITH 24-HOUR AWAKE-NIGHT PROVISIONS**

With the exception of the Boles Children's Home, the State has certified to the Monitors that all placements required to have 24-hour awake-night supervision were visited and either found to be in compliance, or brought into compliance after the State's unannounced visit. In some cases, the placement is in compliance because staff is being provided by a third-party that is contracting with DFPS for awake-night supervision. DFPS has contracted with BCFS to provide awake-night staff in 15 placements.

DFPS provided to the Monitors the Certifications for each unannounced visit made to licensed placements housing more than six children. The Monitors' staff reviewed certifications for the 215 GROs and 11 foster family homes that the State certified. These certifications showed that the unannounced visits began on November 8, 2019, and were completed on November 11, 2019. According to the certifications, the visits all took place between 11:00 p.m. and 4:00 a.m.

Documentation of an unannounced visit and a certification was sent for each of the licensed placements identified by DFPS as having more than 6 children in their care. The detail in the description of awake-night supervision varies among the certifications. Across the facilities for which the agency provided certifications, the number of staff providing awake-night supervision ranged from 1 to 17. The number of staff did not always appear to correlate to the size of the facility or number of children being supervised. For example, one campus[1] with a total population of 20 children, 1 of whom was a PMC youth, indicated they had one awake-night staff person, while another placement with a total of 9 children, 1 of whom was a PMC youth, indicated they had 5 awake-night staff.

Some certifications note concerns, in addition to those discussed below. At one large facility,[2] housing 174 youth on the date of the visit, 20 of whom are PMC youth, the CPS staff who made the unannounced visit listed several concerns in the description of the awake-night supervision. These concerns included that none of the awake-night staff seemed to know children's names, and when asked, woke the children up to inquire. The CPS staff also raised concerns that when they arrived at one of the dormitories, they "observed no one around" and "when opening the

---

[1] This placement was Garden of Hope, an Emergency Shelter licensed to care for 20 children ages 0 to 17. The
[2] This facility is Pegasus School, Inc. in Lockhart, TX.

4

dormitory door 3 times…no one had cause for alarm to find out who we were." In one dormitory, the awake-night staff did not even seem to know how many children were present in the dorm.

In making its certification, DFPS was careful to note that it could only certify based on the conditions that existed at the time of the unannounced visit, stating:

> *Please note that the certification is point of time based on the unannounced visits which commenced on November 8, 2019 and continued through November 11, 2019…To address future placement changes, DFPS is evaluating how to ensure the 24-hour awake supervision requirement will be met going forward for children in PMC who are placed in licensed placements with more than 6 children, inclusive of all foster, biological, and adoptive children.*

Several facilities that served more than 6 children, including PMC children, on August 31, 2019, according to DFPS data and information, are not among the facilities DFPS certified for overnight supervision in November 2019. The Monitors will request data and information from DFPS to assess the population composition and census of those facilities presently.

**CALLS TO STATEWIDE INTAKE RESULTING FROM UNANNOUNCED VISITS**

During a review of the certifications, the Monitors found two that included descriptions of issues found during the unannounced visits that were subsequently reported to the DFPS child abuse hotline. The Monitors raised this issue with the Court. During the same November 13, 2019 telephonic hearing during which the Court ordered the Boles home operator to appear at a hearing, the Court ordered DFPS to provide the Monitors, by noon the following day, a record and the audio of all the phone calls made to DFPS's child abuse hotline beginning on the first day of DFPS's unannounced visits to all licensed placements required to have 24-hour awake-night supervision and continuing for 24 hours after the last night-time unannounced visit. The Court ordered DFPS to identify the phone calls that it believed were related to the unannounced visits.

By time of the Court's deadline on November 14, 2019, Defendants identified to the monitors 38 phone calls made to DFPS's hotline in the referenced timeframe. DFPS indicated that 2 of the 38 calls were related to the unannounced visits. The Monitors also raised with DFPS an issue and referral not included on their list (Referral 3, below), and in reviewing the 38 hotline calls found another that may be related to the unannounced visits (Referral 4, below).

**Referral 1**

The first DFPS-identified referral involved five concerns during the unannounced visit:

1. A child was observed sleeping alone on a mat less than 6 inches off the floor by himself in "sort of an entryway." He was sleeping in an area with boxes around him stacked to the ceiling, despite the fact that several empty beds were available in the facility. Facility staff reported the boy was separated from the other boys "due to sexual aggression issues."

5

2. Another child was also observed sleeping on the floor; he was upstairs in the facility with a staff member who was observed "partially unclothed," covered up by a blanket in the same room with the child sleeping on the floor. The staff member was also "supposedly sleeping when we first walked upstairs," according to the referent. The staff person who was "supposedly sleeping" according to the referent, was the on-duty, awake-night staff person.

3. Only 13 children were present out of 15; facility staff stated one child was on a weekend visit and another child had run away, but the facility was unable to provide a report number or any information about to whom they reported the runaway episode, though the facility staff claimed to have reported it.

4. Several observed exits were blocked and would have been a fire hazard to children because they resulted in only one accessible exit.

5. Insulation was coming down from the ceiling in the kitchen.

Ms. Carmical, counsel for DFPS, advised the monitors on November 15, 2019, that this referral "indicat[ed] a safety threat to the children, and therefore was assessed as an intake regarding abuse or neglect." DFPS originally assessed the referral as a Priority 2 Abuse/Neglect investigation, but then downgraded the referral and decided not to investigate the allegations for possible abuse or neglect. DFPS instead transferred the referral to HHSC for a potential Minimum Standards violation. The Monitors communicated to DFPS on November 16, 2019 the Monitors' view that this downgrade determination was not appropriate.

**Referral 2**

The second DFPS-identified referral included allegations at another facility that "the children's bedrooms are locked from the outside at night. The workers have to use a key to unlock the doors." The referent noted that many staff complained that this was a fire hazard. DFPS originally assessed the referral as a Priority 2 Abuse/Neglect investigation but then downgraded the referral and decided not to investigate the allegations for possible abuse or neglect. DFPS instead transferred the referral to HHSC for a potential Minimum Standards violation. The Monitors communicated to DFPS on November 16, 2019 the Monitors' view that this downgrade determination was not appropriate.

**Referral 3**

Following the Court's November 14, 2019 deadline, the Monitors separately identified a hotline report of another facility with locked bedroom doors, which DFPS had not disclosed to the monitors in its list of 38 calls. The hotline report was found during the review of certifications; one certification included the following in the narrative:

> *One of the bedrooms had a locked deadbolt that the staff had trouble unlocking. Two of the bedrooms were in the dayroom behind and* [sic] *locked door that the staff had trouble opening.*

After reading this certification, the Monitors found the referral in CLASS.

The Monitors asked DFPS why this report was not included in the list of 38 phone calls they provided. Ms. Carmical explained that the report had come into the hotline as an E-Report (not a phone call) and was coded at intake for a Minimum Standards review (not an Abuse and Neglect investigation).

The monitors inquired why this additional report of locked bedroom doors was not assigned for an Abuse and Neglect investigation by DFPS. The hotline intake report mirrored the certification narrative, reading, "During the 24 hour supervision regulation checks conducted by CPS, it was found that 2 bedrooms in the day room were behind locked doors and difficult to lock. One bedroom was locked with a deadbolt."

Ms. Carmical explained in an email dated November 15, 2019, "There was nothing to indicate that there were children locked in the rooms. Therefore, it was assessed as possible standards compliance issue."

On November 15, 2019, Ms. Carmical provided the monitors with "all of the I&Rs related to standards compliance during the same time period" referenced in the Court's November 13, 2019 order in order to give the monitors "the most expansive set of information possible." DFPS identified 5 I&Rs related to standards compliance as "potentially relevant." The monitors are currently reviewing this additional information.

**Referral 4**

Of the 38 phone calls identified by DFPS on November 14, 2019, the monitors identified a referral that may have been prompted by the unannounced overnight visits. At a facility that is not one of those referenced above, a referent alleged an off-duty staff member brought alcohol to the facility in the evening and various other on-duty staff members were drinking in the parking lot, leaving the children unsupervised. DFPS assigned the referral for a Priority 2 Abuse and Neglect investigation and is currently investigating the allegations.

**UPDATE: COTTAGE HOME VISITS**

The first report to the Court, filed on November 4, 2019 included information for all visits to Cottage Home campuses completed by October 31, 2019. The table and information, below, has been updated to include the campuses visited through November 3, 2019, the date of the last visits.

In total, the Monitors and their staff visited 19 Cottage Home placements across Texas, two of which have two campuses, for a total of 21 campuses visited, leaving two Cottage Home campuses unvisited. The total number of interviews and file reviews completed by the Monitors and their staff are as follows:

- 19 Interviews with Program Administrators;

- 106 Interviews with PMC children;
- 119 Interviews with caregivers;
- 205 caregiver file reviews; and
- 145 reviews of children's records.

| Campus Name | Number of Children Licensed to Serve | Age of Children Licensed to Serve | Total Population on Date of Visit | Number of PMC youth | Number of Cottages |
|---|---|---|---|---|---|
| Ben Richey Boy's Ranch | 34 | 0-17 | 16 | 3 | 3 |
| Bluebonnet Youth Ranch | 40 | 0-17 | 10 | 4 | 3 |
| Boles Children's Home | 56 | 4 - 17 | 18 | 2 | 4 |
| Boys & Girls Country of Houston | 88 | 5-17 | 66 | 4 | 11 |
| Boysville | 72 | 5-17 | 24 | 15 | 6 |
| Central Texas Children's Home | 20 | 5-17 | (Not Visited) | 3 | |
| Cherokee Home for Children | 60 | 2-17 | 16 | 1 | 4 |
| Concho Valley Home for Girls | 23 | 0-17 | (Not Visited) | 2 | |
| High Plains Children's Home | 56 | 2-17 | 30 | 18 | 4 |
| Hill Country Youth Ranch (two campuses) | 80 | 5-17 | 84 | 44 | 12 |
| Methodist Children's Home (two campuses) | 258 | 5-18 | 99 | 11 | 13 |
| Pleasant Hills Children's Home | 48 | 0-17 | 36 | 5 | 4 |

8

| Name | Capacity | Age Range | Census | Cottages | Caregivers |
|---|---|---|---|---|---|
| Presbyterian Children's Home | 72 | 5-17 | 25 | 11 | 6 |
| Sherwood-Myrtie Foster Home | 96 | 0-17 | 43 | 11 | 12 |
| South Texas Children's Home | 130 | 0-17 | 40 | 9 | 10 |
| Texas Boys Ranch | 45 | 3-18 | 27 | 13 | 4 |
| The Children's Home (Amarillo) | 72 | 5-17 | 34 | 18 | 7 |
| The Children's Home of Lubbock | 90 | 0-18 | 50 | 6 | 9 |
| Today's Harbor for Children | 88 | 2-17 | 32 | 4 | 9 |
| **TOTAL** | **1,356** | | **650** | **187** | |

The Monitors' interviews with Program Administrators indicated that 36 percent of the total number of cottages on all the visited campuses house more than six children, with some cottages housing as many as 12 children. Forty-four percent of the children and youth interviewed indicated that they shared a room with at least one child, and some children shared a room with two other children.

Of caregivers interviewed, 28 percent supervised children of both genders in a single cottage, and of those, 70 percent reported supervising both children and teens in the same cottage. The greatest age range reported in a mixed-gender cottage was a three-year old child housed in a cottage that also housed an 18-year old. The age range reported by caregivers supervising single-gender cottages was similar, with 70 percent of interviewed caregivers reporting children and teens housed in the same cottage.

The Monitors' first report also discussed problems associated with the lack of information provided to placements. Completed file reviews show that 33 percent of the children's records did not include the Common Application, and 68 percent did not include a Placement Summary form. The report also raised concerns regarding the number of children and youth who indicated that they were not aware of the Foster Care Bill of Rights (FCBR), the Ombudsman, or the

hotline. Completed interviews showed that of the 106 children interviewed, more than 60 percent did not know what the FCBR was, and 69 percent did not know what the Ombudsman was. Forty-nine percent of youth knew of the hotline.

**D. Conclusion**

Many of the same observations and concerns that were raised in the Monitors' report to the Court filed on November 4, 2019 are relevant at the Boles Children's Home, particularly reports related to children being able to enter each other's bedrooms through the "Jack-and-Jill" bathrooms. While the State has certified compliance with the provisions related to 24-hour awake-night supervision for all other placements, the State noted that its certification was based on a "point in time" visit. As a result of the Court-ordered unannounced visits, concerns were identified by DFPS staff at certain facilities about risks of serious harm to children. DFPS should be investigating those allegations for child abuse and neglect, not simply a violation of Minimum Standards.