**Exhibit A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D.; STUKENERG, et al, | § | |
| | § | |
|    Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 2:11-CV-84 |
| | § | |
| GREG ABBOTT, et al, | § | |
| | § | |
|    Defendants. | § | |
| | § | |

## DECLARATION OF RAND HARRIS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

1. "My name is Rand Harris. I am of sound mind, over the age of 18 years, have never been convicted of a felony or crime involving moral turpitude, am in all ways competent to testify on the matters stated herein, have personal knowledge of the facts contained in this Declaration, and confirm that those facts are true and correct.

2. I am the Associate Commissioner of Compliance, Coordination and Strategy at the Department of Family and Protective Services (DFPS). I have held this position at DFPS since December 2019. Before that, I was the Chief of Staff of DFPS for three years. I have been employed by DFPS for six years.

3. Starting in January, the Governor began addressing what is now known as the COVID-19 pandemic. The Governor's actions have continued through the present day with actions that include:
   a. activating the State Medical Operations Center and all state emergency response agencies to implement existing statewide preparedness and response plans;
   b. declaring a State of Disaster for all Texas counties due to the imminent threat posed;
   c. activating the Texas National Guard and deploying three brigades to assist health professionals and emergency responders on the front line;
   d. requesting a presidential declaration of a major disaster;
   e. directing DSHS to declare a Public Health Disaster; and

1

    f.  issuing a series of executive orders in accordance with federal guidelines to mitigate the spread of COVID-19 in Texas.

4. In addition to its regular operations, DFPS has had to address several issues that have arisen as a result of the COVID-19 pandemic, including:
   a. providing parent-child and sibling visits in a safe way to ensure children and families remain connected;
   b. providing services (such as therapy, OT, and PT) to children and families who need interventions without unnecessary exposure to the virus;
   c. keeping the DFPS work force safe while still ensuring the safety of children in DFPS system;
   d. maintaining placement capacity despite placements' fears of exposure when accepting new children into facilities;
   e. working with the provider community to address logistics of child-caseworker virtual visits and virtual parent-child visits;
   f. developing processes and protocols for contract monitoring and oversight through electronic means;
   g. working with the placement community for emerging issues such as lack of day care, school closures, lack of personal protective equipment (PPE), and fears of exposure from visitors to campus;
   h. having daily meetings with executive leadership, daily regional director calls, communications with courts and other government agencies; and
   i. revising internal policies and researching best practices.

5. Child welfare systems across the country are facing significant challenges during the COVID-19 pandemic. In addition to the required changes enumerated above, DFPS providers are reporting increased difficulty in maintaining staff and continuing to care for children. Several providers have ceased accepting new placements. Implementing heightened monitoring in accordance with the Court's order will necessitate time to educate providers and roll out the changes in a deliberate fashion, which is a challenge to balance with the COVID-19 related issues facing the State.

6. DFPS has been working toward compliance with the Court's March 18, 2020 order. This includes creating a data set consisting of five years of historical data, establishing a model to run the historical data and producing a list of providers that will be subject to Heightened Monitoring as defined in the March 18, 2020 Order.
   a. DFPS has begun the creation of a data set of providers with a Reason to Believe finding in a case of abuse or neglect, a violation of Minimum Standards, or a violation of contract requirements.
   b. Concerning contract violations, DFPS has historically maintained contract violations for each operation in individual narrative reports maintained in a contractor specific file.  Since 2017, however, DFPS Contracts division has been making improvements to track in a more systematic way the number and general nature of contract violations.  For example, upon deployment of System of

Contract Operation and Reporting (SCOR) in 2017, DFPS began to track in SCOR violations resulting from annual monitoring. DFPS has compiled three years of centralized data from these monitorings. However, in order to run five years of data through the model to identify providers with a pattern, DFPS would need to manually compile contract data that is not in SCOR for past years.

   c. DFPS estimates that even without the COVID-19 pandemic, it would take a minimum of six weeks to compile the data set, run the model, and establish a list of providers for Heightened Monitoring. During the COVID-19 pandemic, compilation will require more time.

7. DFPS has identified the programmatic requirements to comply with the Court's March 18, 2020 Order and the resources that would be required to implement those requirements. Through detailed cost analysis and requirements gathering activities, DFPS has determined that the following would require additional resources:

   a. **Facility Intervention Team Staffing (FITS)**
      i. When an operation is identified for heightened monitoring, a FITS is required. The FITS team includes Health and Human Services Commission (HHSC) Residential Child Care Licensing ( RCCL), DFPS Child Care Investigations (CCI), DFPS Contracts, and DFPS Child Protective Services (CPS).
      ii. While DFPS is still in the process of identifying the operators that will be subject to heightened monitoring under the definitions adopted in the March 18, 2020 Order, it anticipates the number of weekly FITS meetings that will be required for providers under heightened monitoring will be approximately ten times what DFPS is currently handling. Based on these projections, the following additional full-time equivalent positions (FTEs) will be needed:
         1. Additional CPS FTEs are required to conduct pre- and post-FITS tasks, including research, writing reports, contacting caseworkers, monitoring the facility, and monitoring all associated tasks in the facility's heightened monitoring plan.
         2. Additional CCI FTEs are required to research, analyze, and document abuse/neglect investigation history for each operation and to review operation history after the operation is removed from heightened monitoring.
         3. Additional Residential Contracts FTEs are required to coordinate the increased number of meetings (scheduling, agenda development, and documentation), complete facility research to prepare information at initial review and on-going status meetings, participate in the development of the heightened monitoring plan track the progress or lack thereof, and provide or identify technical assistance for the contractor.

   b. **Response to FITS**
      i. Additional resources are required to perform all functions resulting from the contractor's status on heightened monitoring. This includes:

1. Additional Residential Contracts FTEs (contract managers and management) to conduct weekly visits, monitor the contractors, and document the status in CLASS.
2. Additional Statewide Intake FTEs to assess contacts to SWI as a resulting from increased facility visits (DFPS sees increased intakes any time more people are in and out of a facility even when there are not active safety concerns).
3. Additional CCI FTEs (screeners, investigators, and management) to respond to anticipated increases in reports to SWI resulting from weekly visits conducted by HHSC RCCL, DFPS Residential Contract Managers (RCM), DFPS CCI, and DFPS CPS.
4. Additional infrastructure positions to perform such functions as reporting, contract oversight and support, and technical assistance.
5. Additional CPS staff to monitor children without placements due to increased placement suspensions.
6. Additional director-level staff and new processes to account for the requirement that the Associate Commissioner directly approve any placement of PMC children into an operation on heightened monitoring. This is estimated to require 300 approvals per month and conservatively require 75 hours per month by the division head. Processes will need to be put in place for absorption of many of the Associate Commissioner's duties, as well as a mechanism for 24/7 approvals wherever possible to avoid placement delays when a placement is made in the middle of the night.
7. Resources and the legally required time frame to procure third-party technical assistance should DFPS determine it is needed.

**c. Child Safety Response**

    i. The March 18, 2020 Order requires that if there is an ongoing concern for the health and safety in an operation subject to heightened monitoring there must be a safety plan and temporary placement suspension. While DFPS currently conducts such safety checks, the volume of checks will likely increase under the methodology as will the extent of the checks because the safety plan and placement suspension must remain in place "until *all* concerns for children's health and safety have been addressed in CLASS." (Dkt. 837, p.2, emphasis added). Thus, DFPS cannot merely mitigate and address risk but would be required to meet the threshold of all safety concerns having been addressed prior to lifting a suspension or safety plan.

8. DFPS is continuing to work on implementing the March, 28, 2020 Order and will work with the Court Monitors to develop an implementation process that may include some or all of the following: a triaged focus on the highest-risk providers; a continual review of agency resources for repurposing and additional authority to spend existing appropriations; and an appropriations request in the upcoming biennium.

9.  In implementing the March 18, 2020 Order, DFPS will utilize as necessary alternate measures to substantially comply with the in-person requirements. The alternate means for conducting visits will be established during the creation of a detailed and specific heightened monitoring plan. Specifically, each operation subject to heightened monitoring will be required to identify one or two liaisons who will be responsible for immediately responding to a weekly unannounced text or telephone call and facilitating any necessary video chat or review. The individualized plan must to the greatest extent possible, in light of the technological resources of the individual operator, be established such that DFPS can compel immediate virtual or telephonic access to a record, an area of the facility, a private contact with a child in care, or other information determined necessary to evaluate compliance with the individual plan.

10. I declare under penalty of perjury that the foregoing is true and correct."

EXECUTED on April 1, 2020.

_____
RAND HARRIS
Associate Commissioner Compliance, Coordination and Strategy at the Department of Family and Protective Services