# *M.D. ex rel Stukenberg v. Abbott*
No. 2:11-cv-84

FIRST COURT MONITORS' REPORT 2020

Deborah Fowler and Kevin Ryan
Court Monitors
June 16, 2020

# Table of Contents

Introduction & Executive Summary                                                                      10

I.    Demographics of Children in PMC Care                                                            43

   A.    Age and Gender                                                                               43

   B.    Living Arrangements and Length of Time in Care                                              45

   C.    Level of Care                                                                                47

II.   Overview of State Data and Data Systems Challenges                                             48

   A.    Fragmented Data Systems                                                                      48

   B.    Limited functionality                                                                       51

   C.    Limited VPN Capacity and Barriers to Accessing Information                                  55

III.  Screening, Intake and Investigation of Maltreatment in Care Allegations                       55

   A.    Remedial Order Three                                                                         56

      1.    Background                                                                                56

      2.    RCCI's Secondary Screening of Allegations of Abuse or Neglect                            58

      3.    RCCI's Investigation of Allegations of Abuse or Neglect                                  60

      4.    Statewide Intake Performance                                                             61

      5.    DFPS Intake Screening and Maltreatment in Care Investigations                            66

      6.    Remedial Order Three Summary                                                             99

   B.    Timeliness of RCCI Investigations: Remedial Orders Five through Eleven; Sixteen and
   Eighteen                                                                                          100

      1.    Background                                                                               101

      2.    Monitors' Data and Information Request and Production                                    102

      3.    Remedial Orders Five through Eleven; Sixteen; and Eighteen Performance Validation
      (DFPS)                                                                                         106

      4.    Summary                                                                                  120

   C.    Remedial Order A-Six                                                                        122

      1.    Background                                                                               122

      2.    Summary                                                                                  131

   D.    Remedial Order B-Five                                                                       131

      1.    Background                                                                               131

      2.    Remedial Order B-Five Performance Validation:                                            134

      3.    Review of the State's Case Reads                                                         136

| | | | |
|---|---|---|---|
| | 4. | Summary | 140 |
| E. | | Remedial Order Thirty-Seven | 140 |
| | 1. | Background | 140 |
| | 2. | Monitors' Data and Information Request and State's Production | 142 |
| | 3. | Remedial Order Thirty-Seven Performance Validation | 146 |
| | 4. | Summary | 155 |
| IV. | | Organizational Capacity | 155 |
| A. | | Remedial Order One: CPS Professional Development Training | 155 |
| | 1. | Background | 156 |
| | 2. | Remedial Order One Performance Validation | 158 |
| | 3. | Summary | 161 |
| B. | | Remedial Order Two: Graduated Caseloads | 161 |
| | 1. | Background | 162 |
| | 2. | The State's Initial Report to the Monitors Regarding Compliance | 162 |
| | 3. | Remedial Order Two Graduated Caseloads Results and Performance Validation: | 164 |
| | 4. | Summary of Performance Validation | 167 |
| C. | | Remedial Orders Thirty-Five, A-One, A-Two, A-Three, and A-Four: CVS Caseloads | 168 |
| | 1. | Background | 169 |
| | 2. | Data and Information Request and Production | 170 |
| | 3. | Remedial Orders 35 and A-Four: CVS Caseloads | 172 |
| | 4. | Summary | 177 |
| D. | | Remedial Orders B-One, B-Two, B-Three, & B-Four | 177 |
| | 1. | Background | 178 |
| | 2. | The Monitors' Data and Information Requests and the State's Production | 179 |
| | 3. | Remedial Orders B-Two, B-Three, and B-Four: Performance Validation | 184 |
| | 4. | Summary | 197 |
| V. | | Preventing Child-on-Child Sexual Aggression | 197 |
| A. | | Remedial Order Thirty-Two: Policy Creation & Training of Staff Responsible for Making Determinations | 199 |
| | 1. | Background | 199 |
| | 2. | The State's Initial Report to the Monitors Regarding Compliance | 201 |
| | 3. | Monitors' Data and Information Request and the State's Production | 201 |

4.      Remedial Order Thirty-Two Performance Validation                202

B.      Remedial Orders Twenty-Three, Twenty-Eight, Twenty-Four, and Thirty: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression                203

1.      Background                204

2.      Remedial Orders Twenty-Three, Twenty-Four, Twenty-Eight and, Thirty Performance Validation                209

3.      Summary                216

C.      Remedial Order Four: Caseworker and Caregiver Training on Child Sexual Abuse    216

1.      Background                216

2.      Remedial Order Four: Caseworker and Caregiver Sexual Abuse Training Performance Validation                222

D.      Remedial Orders Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Nine & Thirty-One: Caregiver Notification                226

1.      Background                226

2.      Remedial Orders Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Nine & Thirty-One Performance Validation                232

Summary                245

E.      Remedial Orders A-Seven and A-Eight: Awake-Night Supervision                246

1.      Background                246

2.      Remedial Orders A-Seven and A-Eight Performance Validation                251

3.      Summary                259

VI.     Regulatory Monitoring & Oversight of Licensed Placements                260

A.      Remedial Order Twenty-Two: Consideration of Abuse or Neglect/Corporal Punishment & Obligation to Report Suspected Abuse or Neglect                260

1.      Background                260

2.      Remedial Order Twenty-Two Performance Validation                266

3.      Failure to Report Methodology                269

4.      Review of the State's Data                269

5.      Summary                271

B.      Remedial Orders Twelve through Nineteen: Timeliness of Minimum Standards Investigations                272

1.      Background                272

2.      Remedial Orders Twelve through Nineteen Performance Validation (HHSC)    276

3.      Summary                286

C.    Remedial Order Twenty: Heightened Monitoring   287

1.    Background   287

2.    Remedial Order Twenty: Performance Validation Results   302

3.    Summary   317

D.    Remedial Order Twenty-One: Revocation of Licenses   318

1.    Background   318

2.    Summary   339

VII.    Child Fatalities   339

A.    The Court's Order of February 21, 2020   339

1.    Defendants' Data and Information Production   340

VIII.    Glossary   357

IX.    List of Appendices   361

# List of Tables

Table 1: Exits from PMC by Exit Outcome, September 1, 2019 to November 30, 2019 ..........47
Table 2: Authorized Level of Care for Children in PMC as of November 30, 2019...................47
Table 3: Top 5 Counties of Removal, aka "Legal Counties" for Children in PMC on November 30, 2019.................................................................................................................................48
Table 4: Allegation Type Assigned by SWI ...........................................................................75
Table 5: Remedial Order 10 Investigation Completion Performance as Reported in DFPS Case Read Reports October 1, 2019 to November 30, 2019 .........................................................115
Table 6: Time from Caseworker's Receipt of the Home History Review to Staffing...............148
Table 7: Timeline of Staffing between Caseworker and Supervisor for HHRs Completed within Forty-Eight Hours ................................................................................................................148
Table 8: Fifteenth Day Graduated Caseload Compliance September-November 2019 ............166
Table 9: Number of Children on Caseload on November 30, 2019 for Caseworkers Subject to Graduated Caseloads September-November 2019 ...................................................................167
Table 10: CVS Caseworkers Managing At Least One PMC Child, January 31, 2020..............173
Table 11: CVS Caseworkers Managing At Least 1 PMC Child, January 31, 2020 Total Number of Children Assigned ...........................................................................................................174
Table 12: Number of Inspectors, Average Caseloads, and Caseload Range, November 2019 through January 2020...........................................................................................................186
Table 13: RCCL Caseload Averages and Ranges for November 2019 through January 2020 and Number of Inspectors by County............................................................................................187
Table 14: Number of RCCL Supervisors and Number of Inspectors and Cases Supervised, November 2019 through January 2020....................................................................................188
Table 15: Number of Cases per RCCL Inspector, January 2020..............................................188
Table 16: Caseload Average and Range for RCCI Investigators, November 2019 through January 2020.....................................................................................................................................191
Table 17: Number of RCCI Supervisors and Number of Primary Investigators and Cases Supervised, November 2019 through January 2020 ................................................................192
Table 18: Number of RCCI Supervisors Overseeing Investigators and Percent Carrying a Caseload, November 2019 through January 2020 ...................................................................192
Table 19: Number of Cases per RCCI Investigator, January 2020..........................................193
Table 20: Number of Cases for Non-Investigators and Supervisors Serving as Primary in a RCCI Investigation, January 2020 ..................................................................................................193
Table 21: Individual RCCI Supervisors, Investigators and Cases Supervised, and Number of Investigations Handled as Primary Investigator, January 2020...............................................194
Table 22: RCCI Units, Unit Location, Number of Staff Working as Primary Investigators and Number of Cases in Unit, January 2020 ...............................................................................195
Table 23: Mean Number of Placements by Sexual Indicator Type, June 2019 through February 2020 (n=17,244) ................................................................................................................198
Table 24: Number of Placements for PMC Children by Sexual Indicator Type, June 2019 through February 2020 (n=17,244)....................................................................................................198

5

Table 25: Number and Percent of PMC Children with an Indicator for Sexual Victimization, Sexual Behavior, or Sexual Aggression, June 2019 through February 2020 (*n=39,255*).........211
Table 26:  Percent of Children in PMC at Both the Start and End of the Quarter with an Indicator for Sexual Victimization or Sexual Aggression, June 2019 through February 2020 (*n=28,272 records*) ....................................................................................................................................211
Table 27: Reasons Provided by the State for Not Notifying Direct Caregiver.........................234
Table 28:  Number of Months Placement was Visited at Least Once by DFPS During the Months of December, January, and/or February ....................................................................................252
Table 29:  Who Makes the Decision to Report to the Hotline if Abuse or Neglect Occurs: Cottage Homes ....................................................................................................................................270
Table 30: Who Makes Decision to Report to the Hotline if ....................................................271
Table 31: Priority of RCCL Investigations .............................................................................278
Table 32 Below: ....................................................................................................................288
Table 33: Five Small GROs with Highest RTB Rates, September 30, 2014 through March 31, 2020.....................................................................................................................................303
Table 34: Five Medium GROs with Highest RTB Rates, September 30, 2014 through March 31, 2020.....................................................................................................................................303
Table 35: Five Large GROs with Highest RTB Rates, September 30, 2014 through March 31, 2020.....................................................................................................................................304
Table 36: Five Small CPAs with Highest RTB Rates, September 30, 2014 through March 31, 2020.....................................................................................................................................304
Table 37: Five Medium CPAs with Highest RTB Rates, September 30, 2014 through March 31, 2020.....................................................................................................................................305
Table 38: Five Large CPAs with Highest RTB Rates, September 30, 2014 through March 31, 2020.....................................................................................................................................305
Table 39:  Five CPAs without Capacity Information with Highest RTB Numbers, September 30, 2014 through March 31, 2020...............................................................................................306
Table 40: Five Small GROs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020...............................................................................................307
Table 41: Five Medium GROs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020...............................................................................................307
Table 42: Five Large GROs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020...............................................................................................308
Table 43: Five Small CPAs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020...............................................................................................308
Table 44: Five Medium CPAs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020...............................................................................................309
Table 45: Five Large CPAs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020...............................................................................................309
Table 46: Five CPAs without Capacity Information with Highest Number of Deficiencies Cited, September 30, 2014 through March 31, 2020.........................................................................310
Table 47: Voluntary and Involuntary Enforcement Actions, September 30, 2014 through March 31, 2020.................................................................................................................................310

Table 48: Voluntary and Involuntary Enforcement Actions by Operation Type, September 30, 2014 through March 31, 2020.................................................................................................311

Table 49: Length of Corrective Action in Days by Action Type, September 30, 2014 through March 31, 2020 .........................................................................................................................311

Table 50: Risk Level Assigned to Operation when Enforcement Recommendation Made, September 30, 2014 through March 31, 2020..........................................................................312

# Table of Figures

Figure 1: Age of Children in PMC on November 30, 2019 ........................................................ 43
Figure 2: Living Arrangements of Children in PMC on November 30, 2019 ........................... 45
Figure 3: Length of Stay in Care of Children in PMC on November 30, 2019 ......................... 46
Figure 4: Texas SWI Call Volume by Month ........................................................................... 63
Figure 5: Texas SWI Abandoned Call Rates by Queue Time ................................................... 64
Figure 6: RCCI Rate of Downgrades from August 1, 2019 to December 31, 2019 ................... 69
Figure 7: Allegation Types for Intakes Involving PMC Children ............................................ 70
Figure 8: Alleged Perpetrators in RCCI Investigations Involving PMC Children in Licensed
Placements ............................................................................................................................... 71
Figure 9: Reason to Believe Findings in Closed RCCI Investigations Involving PMC Children in
Licensed Placements ................................................................................................................ 71
Figure 10: Monitors' Assessment of RCCI Secondary Screening Decision Not to Investigate as
Abuse, Neglect or Exploitation between ................................................................................. 74
Figure 11: Initiation of Investigations within Twenty-Four Hours in Priority One Investigations
.............................................................................................................................................. 110
Figure 12: Initiations of Investigations within Seventy-Two Hours in Priority Two Investigations
.............................................................................................................................................. 111
Figure 13: Face-to-Face Contact within Twenty-Four Hours with All Alleged Child Victims in
Priority One Investigations ................................................................................................... 112
Figure 14: Face-to-Face Contact within Seventy-Two Hours with All Alleged Child Victims in
Priority Two Investigations ................................................................................................... 113
Figure 15: Completion of Priority One and Two Investigations within Thirty Days ............... 114
Figure 16: Completion and Submission of Documentation on the Same Day the Investigation was
Completed in Priority One and Two Investigations ................................................................ 118
Figure 17: Notification Letter Sent to Referent within Five Days of Investigation Closure in
Priority One and Two Investigations ..................................................................................... 119
Figure 18: Notification Letter Sent to Provider within Five Days of Investigation Closure in
Priority One and Two Investigations ..................................................................................... 120
Figure 19: Child Interview: Ever Heard of Foster Care Bill of Rights by Age Group for Cottage
Homes and GRO/RTC ........................................................................................................... 126
Figure 20: Child Interview: Know/Heard of Ombudsman Cottage Homes and GRO/RTC ..... 127
Figure 21: Child Interview: Ever Call ANE Hotline GRO/RTC ............................................ 128
Figure 22: Timing of Investigator Notification to Caseworker (in hours) ............................... 136
Figure 23: Timeliness of Home History Review Completion ................................................. 147
Figure 24: Caseworkers Hired by Work Region September 1, 2018 through September 30, 2019
(Percentage) .......................................................................................................................... 159
Figure 25: Number of RCCL Inspectors and Supervisors, November 2019 through January 2020
.............................................................................................................................................. 185
Figure 26: Number of RCCL Cases, November 2019 through January 2020 .......................... 186
Figure 27: RCCL Staffing Needs by County based on Staffing and Caseloads, ..................... 189

Figure 28: Number and Type of RCCI Staff, November 2019 through January 2020.............. 190

Figure 29: Number of RCCI Investigations and Victims Associated with those Investigations, November 2019 through January 2020 ..................................................................................... 190

Figure 30: Children in PMC August to November 2019 and Number Matching to Direct Caregiver Notification Data .................................................................................................................... 234

Figure 31: Common Application in IMPACT with Children's History of Sexual Victimization ................................................................................................................................................ 241

Figure 32: Five-year retrospective reports completed prior to or on the same day as investigation initiation, October 7, 2019 to January 31, 2020 ..................................................................... 267

Figure 33: Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations ....................................................................................................................... 279

Figure 34: Completion of Priority One and Two Investigations within Thirty Days ............... 280

Figure 35: Completion of Priority Three, Four, and Five Investigations within Sixty Days of Intake .................................................................................................................................... 281

Figure 36: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations .................................................................. 282

Figure 37: Completion and Submission of Documentation within Sixty Days of Intake in Priority Three, Four, and Five Investigations ....................................................................................... 283

Figure 38: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations ................................................................................................................. 284

Figure 39: Notification Letters Sent within Sixty Days of Intake in Priority Three, Four, and Five Investigations ......................................................................................................................... 285

## Introduction & Executive Summary

This is the Monitors' first comprehensive report to the United States District Court ("Court") in *M.D. by Stukenberg v. Abbott* following the issuance of the mandate by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") to implement the Court's remedial orders.[1] The Plaintiffs are a certified class of children in the Permanent Managing Conservatorship ("PMC") of the Texas Department of Family and Protective Services ("DFPS") who sought injunctive relief against the State of Texas. At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and Human Services Commission ("HHSC"), and is now an independent state agency reporting directly to the Governor.[2] Following a bench trial in 2014, the Court published a Memorandum Opinion and Verdict in December 2015 finding that Texas had failed to protect PMC children from an unreasonable risk of harm.[3] The Court issued a Final Order on January 15, 2018, and following issuance of a stay, the Fifth Circuit in part adopted, in part reversed and in part modified the remedial orders, and remanded to the Court, which issued a modified Order on November 20, 2018.[4] The Fifth Circuit in part adopted, in part reversed and in part modified the Court's Order and issued its Judgment as Mandate on July 31, 2019.[5] The Court's November 20, 2018 Order, as modified by the Fifth Circuit on July 8, 2019,[6] specifies numerous remedial orders to implement the Court's injunction as detailed below, and charges the Monitors "to assess and report on Defendants' compliance with the terms of this Order."[7] The Court specified, in part:

> The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. In order to avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary.

> The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant

---

[1] *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626.

[2] The 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent state agency reporting directly to the Governor. Act of May 30, 2017, 85th Leg., R.S.

[3] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[4] *Id.*

[5] *M.D. ex rel. Stukenberg,* 929 F.3d at 277; J. (5th Cir. 2019), ECF No. 626.

[6] *M.D. ex rel. Stukenberg*, 929 F.3d at 277.

[7] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 16 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

to this Order and report on Defendants' compliance in implementing the terms of this Order. The Monitors shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order.

The Monitors shall provide a written report to the Court every six months. The Monitors' reports shall set forth whether the Defendants have met the requirements of this Order. In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.[8]

To prepare this report, the Monitors and their team ("the monitoring team") undertook a comprehensive set of activities to validate the State's performance. The Monitors conferred in person, by phone and by video-conference numerous times, separately, with the parties and their counsel between August 2019 and April 2020. The Monitors requested data and information from both the Texas Department of Family and Protective Services ("DFPS") and the Texas Health and Human Services Commission ("HHSC") to validate the agencies' compliance with the Court's remedial orders, as detailed in various sections of this report. The monitoring team examined tens of thousands of documents and records, including data files; children's case records, both electronic and paper; investigations; critical incidents; child fatality reports; medical examiner reports; restraint log entries; videos of critical incidents; witness statements; interviews; policies; resource materials such as handbooks; plans; guidelines and field guidance; child abuse, neglect or exploitation referrals to Statewide Intake ("SWI"), including E-Reports and recorded phone calls; awake-night certifications; and an array of employee and caregiver human resources and training records and certifications.

The Monitors' ten months of investigation, analysis, interviews and site visits lead to the conclusion that more than two years after the Court issued its Final Order, the Texas child welfare system continues to expose children in permanent managing conservatorship ("PMC") to an unreasonable risk of serious harm. In the Court's December 17, 2015 Order finding the State had violated the constitutional rights of the PMC Class, the Court found:

Texas's foster care system is broken, and it has been that way for decades. It is broken for all stakeholders, including DFPS employees who are tasked with impossible workloads. Most importantly, though, it is broken for Texas's PMC children, who almost uniformly leave State custody more damaged than when they entered.[9]

---

[8] *Id.* at 17.
[9] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

The Court concluded its January 19, 2018 Final Order, which appointed Kevin Ryan and Deborah Fowler as Monitors, by noting that "[i]n its December 2015 Order, the Court found Texas' foster care system was broken.  Over two-years later, the system remains broken and DFPS has demonstrated an unwillingness to take tangible steps to fix the broken system."[10]  In October 2018, the 5th Circuit identified "three critical problems with DFPS's policies and practices regarding monitoring and oversight. First, deficient investigatory practices have yielded a high error rate in abuse investigations. Second, DFPS does not centrally track instances of child-on-child abuse. Lastly, RCCL maintains inadequate enforcement policies."[11] Those critical problems, and more, persist. This report reveals and documents the extent of the problems associated with the State's failure to comply with the Court's orders, validated by the 5th Circuit, which are intended to protect children from an unreasonable risk of serious harm.

*SUMMARY OF THE MONITORS' FINDINGS*

The Court's Final Order enjoins the State "from placing children in the permanent managing conservatorship ("PMC") in placements that create an unreasonable risk of serious harm.  The Defendants SHALL implement the remedies herein to ensure that Texas' PMC foster children are free from an unreasonable risk of serious harm."[12]

Although the State represented to the Monitors in September 2019 that, with few exceptions, Texas was compliant with the Court's remedial orders, the Monitors discovered otherwise: the results in some instances surfaced substantial threats to children's safety. As detailed in this report and taken together, the Monitors' investigative analysis and findings reveal a disjointed and dangerous child protection system, inefficiently and unsafely divided between two state agencies, where harm to children is at critical times overlooked, ignored, or forgotten. Callers to the State's hotline, by the thousands, abandon their efforts after waiting for someone to answer their calls. The State's oversight of children's placements is in numerous instances lethargic and ineffective. Operations with long, troubled histories of standards violations and child abuse allegations remain open and are permitted to care for vulnerable children, some of whom are then hurt. The prevalence of physical restraints and injuries to children in some facilities is simply shocking, as are the numerous instances where DFPS staff document that the agency does not know where children are placed.

The same unit in DFPS tasked to investigate child abuse, neglect or exploitation of PMC children in licensed placements is also empowered to unilaterally decide not to investigate and does so often and inappropriately in contravention of the Texas Administrative Code. When investigations do occur, the Monitors found numerous examples where they languish for months or even years with no activity. The delays impede fact-finding and accountability for child safety, as memories fade, witnesses disappear and records go missing. As a result, the State then Rules

---

[10] *Id.*
[11] *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 265 (5th Cir. 2018).
[12] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 2 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

Out allegations time and again, not because children have not been abused or neglected, but because of the State's own negligence in its investigative responsibilities. Texas's overdue, incomplete and, at times, incompetent investigations of child abuse or neglect betray the State's special relationship with, and responsibility to children, placing them at risk of future harm by perpetrators whose maltreatment of children goes unchecked. Serial alleged perpetrators move, with impunity over years, from one facility to another. The problem is systemic and enduring: hundreds of investigations into child abuse, neglect or exploitation are presently in backlog, overdue for completion as children's safety hangs in the balance. The Monitors' investigation revealed instances in which additional children continued to be abused while open investigations in the same placements remain pending; in one case, when the backlog was finally cleared and multiple cases of shocking physical abuse were substantiated within just a few months of each other, the State finally moved to close the facility.

These failures are documented throughout this report; many are evident in the short, tragic lives of three PMC children who died between February and May 2020.

K.C. (September 1, 2005 – February 9, 2020).  K.C. was living in a residential treatment center ("RTC") when she collapsed and died in the middle of the night. RTC staff waited thirty-seven minutes before calling 911 after K.C. collapsed, because direct care staff believed they needed permission from administrators to make that call.  Medical records describe K.C. as obese, at a height of 5'3" and weighing just under 300 pounds.  The cause of K.C.'s death was determined to be a pulmonary embolism associated with a deep venous thrombosis in her right calf.

Five days prior to her death, the RTC where K.C. lived was placed on probation by HHSC's Residential Child Care Licensing ("RCCL") division after the facility had been cited more than sixty times for minimum standards violations between February 2017, and December 2019. RCCL had previously recommended the RTC be placed under Evaluation in June of 2019, but it stopped the corrective action after the RTC leadership pledged to submit a voluntary plan to address the problems RCCL raised.  Among other minimum standards, the RTC had been cited for violations related to failure to appropriately report and document serious incidents.  Similarly, DFPS contract monitoring staff in FY 2017 and again in 2019 found violations related to medication logs and records, listing errors that indicated children may not have received the correct dosage of medication and that medication records were not updated appropriately.

Of the ten children interviewed as of the writing of this report, seven told the investigator that K.C. had complained of leg pain in the weeks leading up to her death, but that her complaints were not taken seriously.  Though only two of eleven staff interviewed said that they were aware of K.C. complaining of leg pain, and the investigation notes in CLASS appear to discount the reports given by the children, the Monitors found documentation in daily progress notes completed by the RTC that explicitly refer to K.C.'s complaints of pain in her right calf, dating back to January 19, 2020.  In fact, pain in K.C.'s right calf was documented on similar daily progress forms for January 21st, January 22nd, January 23rd, and January 24, 2020.  Yet, K.C. did not receive medical attention for her persistent calf pain.

During a site visit to the RTC, the Monitors interviewed one of the direct caregivers who completed these forms (the other staff person was no longer working for the RTC). She remembered documenting K.C.'s complaints of leg pain, remembered that other staff did not seem to take them seriously, and said she had been moved to a different area of the facility and was no longer responsible for K.C.'s daily progress notes after January 24, 2020. As of the writing of this report, that staff person has not yet been interviewed by investigators with DFPS's Residential Child Care Investigations unit ("RCCI") and DFPS's documented investigation makes no reference to these documents, though they are among those provided to the Monitors by DFPS in response to the Court's February 21, 2020 order.

A.B. (June 9, 2016 – April 12, 2020):  A.B. and a sibling were in the care of a fictive kin provider. In the month prior to A.B.'s death, there were multiple referrals to the SWI hotline alleging concerns for the child's safety, sparking two abuse investigations, neither of which resulted in the removal of the child from the placement. As a result of the second report, the child was evaluated by a pediatrician at a hospital clinic that provides forensic child abuse evaluations, and the doctor expressed concerns for "non-accidental trauma" based on the child's bruising and injuries.

When questioned by the child's caseworker or investigators, the caregivers blamed A.B.'s injuries on rough play between the children, or the children's birth parents, with whom the children had unsupervised contact. Two of the reports to SWI were made by people who claimed to have witnessed the caregivers treat the children roughly or hit them. In one of these reports, made on March 17, 2020, the reporter said the caregiver's domestic partner "beats [the children] really bad." However, because the children had been seen earlier that month as a result of a different, previous report and investigation, the investigator merged the new report with the existing investigation and did not make face-to-face contact with the child.

The children's caseworker visited the placement on March 27, 2020 and observed a bump in the middle of A.B.'s forehead. The caseworker questioned the caregiver's domestic partner about the injury, but he said he had not even noticed it. The caseworker asked about scratches on A.B.'s face and they were blamed on A.B.'s long nails.  The caseworker reported speaking privately to A.B. and the child blamed the injuries on a fall.

During the same visit, the caseworker also emphasized to the caregiver that the children needed to attend daycare regularly. The daycare staff had numerous concerns related to changes in A.B.'s demeanor after A.B. was placed in the fictive kinship provider's home, and also complained of the child's sporadic attendance and bruises and injuries.  On April 9, 2020, the caseworker had received a text and photograph from the daycare center of A.B.'s eye, which was swollen shut. The caseworker had been told by the caregiver that A.B.'s eye was swollen due to allergies, and the caseworker repeated this in response to the text from the daycare. No one from the daycare was interviewed prior to A.B.'s death.

The next morning, the caregiver reported having found A.B. on the floor unconscious, with blood discharging from his ear. The child was taken to the hospital where he later died. In the investigation following his death, DFPS interviewed a witness who described numerous injuries to A.B. over the previous two months, including a hip injury, a black eye and facial bruising. This witness also repeated an account from another witness who overheard the domestic partner hit A.B. on the day the child's hip was hurt. The investigation is still pending.

C.G. (December 29, 2005 – April 26, 2020): C.G. hanged herself in the bathroom of the emergency shelter where she was placed by DFPS after being discharged from a psychiatric hospital on March 4, 2020. C.G.'s treatment plan, signed on April 4, 2020 by her caseworker, shelter staff, the shelter's clinical social worker and C.G., indicates that C.G. was supposed to be on a safety plan due to her risk for self-harm that required her to be "monitored by staff at all times." However, video clips from the facility viewed by the Monitors shows that on the night she killed herself, C.G. entered the bathroom by herself and remained in the bathroom for thirty minutes before a staff person opened the door and found her.

C.G.'s seven-year passage through foster care was marked by increasing psychological distress and harm. She had been placed in a psychiatric hospital three times during 2019 and 2020, each time for suicidal behavior and risk of self-harm. When C.G. was discharged on March 4, 2020, after her last hospitalization, she was prescribed at least three psychotropic medications for anxiety and depression.

The emergency shelter where C.G. died has a troubled history, marked by a high number of minimum standards deficiencies and nine investigations of abuse and neglect resulting in an RTB between September 30, 2014 and March 31, 2020. Though C.G. saw a clinical social worker at the shelter, her last meeting with the social worker was on April 2, 2020 – 24 days prior to her death – and she had only one meeting with a psychiatrist, which was conducted virtually because of the shelter's remote location in a rural county.

Her visits with the clinical social worker reveal a child who consistently presented as overwhelmed, tearful, "on edge," and upset by the fighting among other residents at the shelter. When she expressed stress and anxiety as a result of the shelter environment on March 13, 2020, C.G. was provided an MP3 player to help manage her anxiety. On March 18, 2020, a Child and Adolescent Needs and Strengths Assessment (CANS) Evaluation indicated she was an "Overall suicide Risk" and "require[d]" a same day safety plan, and further recommended a full assessment for suicide risk.

At her last visit with the clinical social worker on April 2, 2020, C.G. appeared resigned and sad, and spoke of diminished contact with her family because of a new policy that eliminated phone calls after work hours. The day before her death, shelter staff took her MP3 player away from C.G. as a disciplinary consequence. Immediately preceding her entry to the bathroom, C.G. was scolded and brought to tears by a staff person for going into the staff person's purse to look for a hair tie.

15

A. <u>The Monitors' review shows the State is not in compliance with the Court's remedial orders.</u>

The Monitors' analysis, as detailed in this report, shows non-compliance across many of the Court's remedial orders.

B. <u>The Monitors' analysis of the State's performance with respect to Remedial Order Three suggests the State's failure to comply with the Court's order related to appropriately screening, receiving, and investigating child maltreatment in care continues to put PMC children at an unreasonable risk of serious harm.</u>

The Monitors found lapses at every step of this process, from a high rate of abandoned calls to SWI's child abuse and neglect hotline (18% of all calls are abandoned), to a high rate (33% of cases reviewed by the Monitors) of inappropriate downgrades of reports of abuse or neglect. The State uses a standard for investigating abuse or neglect for children in licensed foster care that creates a higher threshold for investigation for children in the State's care than for other children.

Of reports that are investigated, the Monitors' review of cases found substantial deficiencies in almost 29% of the investigations, which were often so cursory, or so elongated and riddled with gaps, that the Monitors could not reach a conclusion regarding the result. The downgrades and deficiencies in child abuse or neglect investigations allow perpetrators to move between General Residential Operations ("GROs") and Child Placing Agencies ("CPAs"), even when they leave due to behavior resulting in an investigation. The Monitors discovered several examples of this problem during their work.

One example results from an on-site visit to an RTC made by the Monitors. One of the children interviewed by the monitoring team during the Monitors' visit became visibly upset during the interview and said he did not want staff to know that he had told the monitoring team anything because he would get in trouble; however, the youth then reported that "staff hit them and beat on them every day for no reason." When RCCI arrived to interview the youth in response to a call to SWI made by the Monitors, the RCCI investigator noticed the youth was wearing broken glasses and his right temple and cheek appeared to be red and discolored. The child reported to the investigator that a staff person slapped him multiple times during a restraint, breaking his glasses. The incident was investigated and the abuse meted out by the perpetrator was substantiated. This staff person had been investigated for abuse or neglect more than twenty times over a more than fifteen year career spanning at least two GROs. This was the seventh time just since 2016 that this perpetrator had been investigated for slapping or punching a child; all of those investigations ruled out abuse. A 2003 investigation into allegations that this staff person, while working at another facility, had thrown a child on the floor and placed him in a "neck hold" until the child turned blue in the face, resulted in a finding of Unable to Determine, meaning the abuse could not be ruled out. A second UTD resulted from a 2016 investigation of this perpetrator in a case in which a child's arm was broken during a restraint.

A.B.'s case also illustrates problems associated with deficiencies in investigations of child maltreatment.  In the month preceding his death, four calls were made to the SWI hotline reporting concerns related to maltreatment. The two earliest calls were merged into a single case, and then the case was downgraded by RCCI from a Priority One to a Priority Two. The last call to SWI was also coded as a Priority Two investigation, though the reporter alleged witnessing the caregiver "beat[] [the children] really bad."  One of the investigations resulted in a forensic child abuse evaluation which expressed concerns for "non-accidental trauma."  A.B's daycare staff expressed concerns to the child's caseworker for changes in behavior and injuries they observed, but were never interviewed during the investigations. A.B.'s caseworker observed injuries that were documented in the child's electronic record. Yet, two investigations into alleged maltreatment resulted in no change in A.B.'s placement.  In one, the investigator decided not to even make face-to-face contact with A.B. and instead merged the new investigation with an existing case, missing a crucial obligation to observe and speak with the child.

The current investigation into K.C.'s death also reveals gaps.  The State's investigatory records indicate that RCCI appears poised to discount interviews with seven of ten children at the RTC who said that K.C. complained repeatedly of leg pain prior to her death, without the RTC taking steps to have her examined by a doctor.  Yet, the records produced by the State to the Monitors document K.C.'s leg pain repeatedly.  Four months after her death, the staff who documented K.C.'s leg pain still has not been interviewed by investigators.

The Monitors' review of the State's performance for remedial orders related to caseworker notification of referrals to SWI for abuse or neglect – an important child safety backstop – also showed significant gaps in compliance. The Monitors' analysis for Remedial Order B-Five showed that when the State initiated an investigation, children's caseworkers were at times not being notified at all, and at other times were notified well outside the required timeframe. Caseworkers were not notified in 23% of cases reviewed by the Monitors and were notified more than seventy-two hours after the referral to SWI in another 27% of cases.  These failures prevent caseworkers from knowing about a risk of harm to children that would prompt them to check on children to ensure safety pending the investigation.

For cases downgraded by RCCI after an abuse or neglect report is made to SWI, the Monitors' review found that the State completed a review of the foster home's history of abuse and neglect investigations and minimum standards violations in the majority of cases reviewed. However, the Monitors discovered caseworkers and their supervisors reviewed the information with an eye toward the child's safety in just over half of the cases that should have been reviewed, and many of those (44%) were not reviewed within the forty-eight hour timeframe required by Remedial Order Thirty-Seven.  Even when caseworkers and supervisors reviewed foster home histories, the Monitors found disturbing examples that overlooked obvious child safety concerns.

In one such case, the caseworker and supervisor reviewed the history of the home and saw no safety concerns.  Yet, the call to SWI involved an allegation that the child and the child's sibling had been observed with unexplained bruises and injuries, and that the children were afraid and

emotional when questioned about the injuries. The home history review showed thirteen previous investigations of this foster home dating back to 2006, twelve of which alleged the children were being physically abused, and six of those reported injuries similar to those observed on the child in this case. Two additional SWI referrals had not been investigated but included similar allegations and injuries. The foster home had relinquished its license in 2015 due to a pending investigation, and it reopened two months later. Yet, the staffing notes indicate that the caseworker and supervisor saw no need to take any action related to the children who were currently in the care of the foster parents.

C.   The State's bifurcated approach to oversight of PMC children in care and data management contributes to risk of harm for PMC children, and limits the State's ability to provide data and information necessary to evaluate compliance with the Court's orders.

The State's bifurcated approach to oversight of children's placements, with DFPS responsible for investigating reports of abuse, neglect or exploitation and HHSC-Residential Child Care Licensing ("RCCL") responsible for licensing oversight and monitoring of minimum standards, has created a disjointed, inefficient system in which gaps between the two conspire to create risk of harm. This is evident at the most basic level in the State's data keeping. With DFPS using one system (IMPACT) for abuse and neglect investigations and HHSC using a different system (CLASS) for licensing monitoring and oversight, and no bridge between the two, there are innumerable opportunities for critical information to slip through the gaps between the two databases. While the IMPACT system is child-centered, the CLASS system is operation-centered, making any attempt to match information between the two an enduring challenge. The barriers encountered by the Monitors in simple attempts to gain a clear understanding of patterns of child maltreatment and contract and policy violations across foster care placements revealed the State is not in the habit of using this data for this purpose.

In fact, the State was at times completely unable to provide the Monitors with data necessary to validate compliance with the Court's orders and took extensive periods to provide it in others. For example, HHSC could not disaggregate data related to RCCL investigations of alleged minimum standards violations to identify those that pertain only to the PMC class. DFPS was not able to produce data relevant to validating compliance with graduated caseload standards for new caseworkers. And both agencies indicated that because the Court's definition of heightened monitoring for Remedial Order Twenty required information related to abuse and neglect findings, policy violations and contract violations, it would take six weeks just to compile the data needed to conduct the analysis identifying the operations that should be subject to heightened monitoring.

This fragmentation creates inefficiencies between the two agencies, consuming limited investigator time and making it more difficult to track investigation histories about children and perpetrators. A lack of uniform identifiers between the two computer systems inhibits the ability to identify patterns in child maltreatment, and contract and policy violations. Because IMPACT and CLASS use different identifiers for operations, it is difficult to unify information between the

18

two systems to create a single dataset of child maltreatment and minimum standards deficiencies. These gaps hinder the ability to track allegations made against the same perpetrator or involving the same child victim.

Another data failure revealed by the State's certifications of awake-night monitoring is unrelated to the bifurcation of the system, but it shows significant data gaps that creates an unreasonable risk of serious harm.  In 31% of the State's certifications of unannounced, on-site visits by DFPS staff to document awake-night supervision at licensed and verified placements, the list of children that DFPS staff brought to the visit did not match the children in the operation's care on the date visited.  In some cases, the operation could not account for the missing children.

D. The Monitors' analysis of compliance with remedial orders intended to address high caseloads suggests that the State's limited organizational capacity contributes to risk of maltreatment for PMC children.

While the Court's orders related to the agreed caseload guidelines were not yet in effect in the months for which the Monitors analyzed data, the baseline analysis shows that only 49% of CVS caseworkers had caseloads that would have fallen within the guideline of fourteen to seventeen cases.  The Monitors' analysis of caseloads for new caseworkers showed that, if the caseload guidelines had been in effect, almost 41% of new caseworkers would have had caseloads exceeding the graduated caseload standard.

Of HHSC-RCCL inspectors, had the guidelines been in effect in the month reviewed, only 41% would have had caseloads falling within the guidelines, and of DFPS-RCCI investigators, 54% would have had caseloads within the guidelines. High caseloads affect the State's ability to comply with remedial orders related to timeliness of investigations and inspections. The Monitors case record reviews revealed:

- 26% of Priority One abuse and neglect investigations are not initiated timely; and 26% did not timely initiate face-to-face contact with alleged victims.
- 16% of Priority Two abuse and neglect investigations are not initiated timely; 18% did not timely initiate face-to-face contact with alleged victims.
- 79% of Priority One and Priority Two investigations were not completed timely; only 2% had an approved extension and were completed within the extension timeframe.
- While RCCL inspections and investigations were completed within 30 days in the majority (95%) of cases reviewed, only 59% of investigations of minimum standards violations were timely initiated with face-to-face contact with an alleged victim.

DFPS leadership reported a significant backlog of investigations of child abuse or neglect, with more than 500 cases "delinquent" (45 days or older) on April 5, 2020, even after the State had initiated a project to clear backlogged cases in November 2019.  The consequences of these lapses for children are serious. For example, the Monitors identified ten separate allegations of physical abuse against a single perpetrator at different facilities in Texas between March 2015 and February 2020. Six of those allegations surfaced since September 2019, and in numerous

19

instances, long periods of inactivity plagued those investigations, allowing the perpetrator to continue to hurt children, unchecked by the State's lethargic investigations and undetected by its weak, bifurcated approach to oversight.

E. The Monitors' analysis of remedial orders related to licensing and oversight suggest the State's failure to comply with the Court's remedial orders places children at risk of harm due to the failure to appropriately identify and address clear indicators of safety concerns.

Despite data and information showing child care operations across Texas with high rates of substantiated child abuse or neglect and medium-high or high minimum standards violations, the Monitors discovered that DFPS and HHSC-RCCL rarely take meaningful contract or licensing enforcement action. RCCL is not complying with Remedial Order Twenty-Two, which requires a review of an operation's abuse and neglect findings and compliance history related to corporal punishment prior to all inspections. That order directs RCCL to consider these violations during its routine monitoring and investigation of standards violations. The Monitors' case record review showed only 28% of reviewed inspections and investigations documented the required review. Of the ninety-two operations reviewed by the Monitors, records for 29% did not show a single review had been completed prior to inspections or investigations.

Though the Monitors did not receive data from the State in time to evaluate compliance with the Court's orders related to Remedial Order Twenty's requirements for heightened monitoring of operations showing a pattern of contract or policy violations, the Monitors analyzed child abuse or neglect investigations resulting in a "Reason to Believe" finding (RTB) and RCCL citations for minimum standards deficiencies. The Monitors found RCCL issued more than 30,000 citations for a minimum standards violation between September 30, 2014 and March 31, 2020, more than half of which were for standards weighted medium-high or high for child safety. Yet, during the same time period, RCCL placed only twenty operations on probation, suspended a license once, and though the agency issued "intent to revoke" letters to six placements, the agency has not yet revoked a single license.

After RCCL notified the Monitors that it was issuing intent to revoke letters to two operations in compliance with Remedial Order Twenty-One, the Monitors reviewed the letters and the underlying RTBs to assess RCCL's precedential threshold for enforcement. One of the operations, Children's Hope – Lubbock, had been the subject of repeated placement suspensions and contract enforcement actions by DFPS before RCCL took action. The Monitors' review of RTB findings for the period between September 30, 2014 and March 31, 2020 shows that this RTC had forty-nine substantiated allegations (RTBs) for abuse or neglect. In the intent to revoke letter, RCCL indicated that it was basing its decision, in part, on an RTB abuse finding in which two staff beat a child for misbehavior. A staff person interviewed during the investigation who witnessed the incident said the staffs' behavior was "nothing like they were trained to do" and that the victim was "messed up" and "spitting up blood" as a result of being hit by staff.

The intent to revoke letter for the other GRO – North Fork Educational Center – referred to seven abuse or neglect investigations resulting in an RTB. A review of these seven investigations revealed a series of horrific cases in which staff physically abused children resulting in observable injury. In most cases, the abuse was captured on video. Several of these investigations described staff physically attacking or provoking youth, with the last describing an incident in which a staff person attacked a youth who refused to pick up a toy, breaking the child's leg. Two of these investigations were referred to SWI in late 2017, but the investigations were not completed until 2019. RCCL had placed the GRO on probation one month prior to issuing the letter notifying the operation of its intent to revoke its license, the only enforcement action RCCL had ever taken against the operation prior to notification of its intent to revoke.

The Monitors did not find any documents related to contract monitoring or enforcement actions by DFPS prior to the decision to terminate the agency's contract with North Fork in late February 2020. The Monitors' review of three years of contract enforcement documentation indicates DFPS is also slow to take meaningful contractual enforcement action, having cancelled contracts for only four operations during the period reviewed.  While DFPS suspended placement of children to fourteen operations during the three-year period, the suspension was lifted in part or in full for eight of those. Since the Monitors' work began on July 31, 2019, DFPS has notified the Monitors of its decision to end contracts with the two operations discussed above, and two additional RTCs: A Children's Hope campus in Levelland, and an RTC that had informed DFPS caseworkers for three children that it was placing the children on a bus back to their home county, unsupervised, after growing frustrated with their behavior.

The State's inert oversight was equally evident in the last placement for both K.C. and C.G. before their deaths earlier this year. The RTC where K.C. lived had a history of minimum standards violations implicating child safety, and it had been placed on probation just days before K.C. died. RCCL had placed the RTC on Evaluation in June of 2019, but it stopped the corrective action because the RTC's administration informed RCCL they would submit a voluntary plan addressing the concerns that RCCL had identified. The RTC had also been the subject of contract monitoring actions by DFPS in 2017 and again in 2019. In 2017, DFPS's contract monitoring staff found problems associated with children being scheduled for psychiatric appointments required by treatment plans, as well as problems associated with documentation of administration of prescribed medications and failure to administer prescribed medications.  Though the agency agreed to take corrective action, DFPS found similar problems in 2019.  Despite the RTC's significant safety concerns regarding children's healthcare, and a history of RTBs, DFPS did not take any contract enforcement action aside from requiring the RTC to correct the problems found during contract monitoring.

Similarly, the Monitors' review of minimum standards deficiencies showed that between September 30, 2014 and March 31, 2020, the emergency shelter where C.G. died had the third highest rate of minimum standards violations ranked high or medium high across Texas, compared to all other GROs that had a standards violation during that period. During this period, the RCCL risk level associated with inspections and investigation for the shelter never rose above

medium, and by the time of C.G.'s death, RCCL had dropped the shelter's risk level back down to medium-low. When the shelter was determined to be at its highest risk level – medium -- RCCL placed it under Evaluation, but only after it had failed to successfully complete a voluntary plan of action.

The shelter had nine RTB findings during the same period, yet the Monitors could not find any evidence of DFPS having taken any action either through contract monitoring or enforcement for the shelter. Putting aside the high rates of violations of minimum standards and significant number of RTBs, the decision to place a child with significant mental health needs, with a recent history of repeated hospitalizations related to self-harm and suicide attempts, in a shelter in rural Texas, was an affirmative act by DFPS that placed C.G. at an unreasonable risk of serious harm. Access to mental health care for C.G. was clearly an issue, with only one visit with a psychiatrist conducted virtually during her almost two-month stay at the shelter and her last visit with a clinical social working having occurred more than three weeks prior to her suicide.

F. <u>The State's failure to comply with remedial orders associated with preventing sexual abuse leaves children at an unreasonable risk of serious harm and suggests the State may be prioritizing identification of victims and aggressors, but not prevention of sexual abuse.</u>

While the State has developed a policy and training required by Remedial Order Thirty-Two related to child-on-child sexual abuse, a review of the policy and training by an expert in child sexual abuse prevention revealed concerns related to both. After the Monitors shared the consultant's report with the State, the State responded that it could consider implementing some of the recommended changes, but objected that the consultant's evaluation "mischaracterizes the trainings and materials as being developed to guide understanding of child-on-child sexual abuse *prevention*" and noted "these trainings and materials are primarily focused on *identification and reporting* of sexual abuse, including child-on-child sexual abuse." The State indicated that the focus on identification and reporting was consistent with the Court's orders, suggesting that prevention of child sexual abuse was beyond what was required.

The Monitors' review of the remedial orders related to identifying children who were victims of sexual abuse or had a history of sexual aggression also showed problems with compliance. Though the State has created data fields within IMPACT to capture information related to child sexual aggression or behavior problems and victimization, it is not clear that the State is taking affirmative steps to appropriately identify children whose electronic records should be updated to include this information. Approximately 9% of children's files reviewed during on-site monitoring visits to GROs revealed a history of victimization or aggression, yet these children's electronic files did not include the appropriate indicator.

Similarly, the Monitors' case record review for children flagged by the state with an indicator for a history of sexual victimization showed that of the approximately 8% of PMC children identified as a victim, all of the cases involved children who had been sexually abused prior to entering care. Yet, the Monitors' review of abuse and neglect investigation records for cases alleging neglectful

supervision showed that one-third of all the intakes for neglectful supervision involved reports of sexual contact between children in care, suggesting a gap exists in flagging children's IMPACT files when they are victims of child-on-child sexual aggression in care.

Even when children are appropriately identified by the State, every method of validating performance for the remedial orders related to caregiver notification of child sexual aggression or victimization revealed lapses. Gaps are particularly acute for children who may be identified by DFPS but whose placement does not change. Of direct caregivers interviewed by the Monitors, only 57% indicated they received notice from the GRO when a child had been identified as having a history of sexual aggression, and 50% indicated they received notice when a child had been identified as having a history of sexual abuse.

The State's own reports and self-reports of non-compliance by operations revealed lapses in awake-night supervision for children despite Remedial Order A-Seven and A-Eight. Seven operations reported non-compliance to the State at some point between October 2019 and January 2020.  Six certifications sent by DFPS to the Monitors indicated that DFPS staff suspected the facility awake-night staff had been sleeping or appeared drowsy when DFPS arrived, and four indicated DFPS staff observed or were advised that awake-night staff left their assigned unit, leaving children unsupervised. A number of certifications called into question the quality of supervision provided during night-time hours.

One of the most disturbing reports documented by DFPS during its own unannounced awake-night visits described encountering an awake-night staff person at one operation who, surprised by the unannounced visit, stood up and had his belt and pants undone.  The same awake-night staff person had previously been investigated after a report to SWI alleging that he was inappropriately touching himself around children in care, though the allegation was not substantiated by the investigation. The call to SWI by DFPS staff for the awake-night incident resulted in an RCCL minimum standards investigation, and did not result in a citation for a minimum standards violation, though the DFPS staff person said the awake-night staff was "really 'thrown off' by their entering the home" and said she "got the impression that he was masturbating as they walked in." After the Monitors provided the parties with a draft of this report, the State notified the Monitors that DFPS sent the operation a "removal of staff" letter in February 2020.

While the monitoring team did find awake-night staff at the four GROs where unannounced night-time visits were made by the Monitors, during one visit, the monitoring team encountered a staff person who appeared to have been sleeping.  During another visit, a riot broke out and the monitoring staff were left alone in a wing of the facility with more than twenty children, leading RCCL to cite the GRO for violating standards related to staff-to-youth ratios.

Despite the State's assurance that children are advised of their rights and of resources for help each time their placement changes, children still do not report knowing about the foster care ombudsman ("FCO"), an important advocate for children who need help. Of the children interviewed by the monitoring team during on-site visits, 71% reported they had not heard of or

23

did not know of the FCO. Forty percent of the children interviewed by the monitoring team reported they were not aware of the child abuse and neglect hotline. Many of the Monitors' visits to placements revealed that even for children who knew who to call for help, access to a phone was limited.

*SUMMARY OF FINDINGS BY REMEDIAL ORDER*

A.  Section III.  Screening, Intake, And Investigation Of Maltreatment In Care Allegations

**Remedial Order Three:** *DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

- **Receiving Allegations:** Between August 1, 2019 and January 31, 2020, SWI received 372,897 calls. During the period analyzed, 18% of all SWI calls (65,786) were abandoned by the caller. Calls to SWI on weekends, at nights, or in the early mornings had shorter queue times and lower than average abandoned call rates; on average, one of the highest times of abandoned calls to the abuse hotline occurred during weekday afternoons. Of the calls to SWI placed on Monday or Friday between 3:00 p.m. and 5:00 p.m. and routed to the abuse hotline, 40% (7,023 out of 17,577) were abandoned. When a call is routed to the abuse queue, it is much more likely to be abandoned than when routed to the Law Enforcement queue; 22% of calls (60,218 out of 234,270) to the abuse queue were abandoned whereas 3% of calls (1,123 out of 36,208) to the law enforcement hotline were abandoned. One-fifth (13,411) of all abandoned calls occurred before the caller finished navigating the automated system and one-third (22,771) of the calls were abandoned before the caller had been waiting on the queue for a minute.  Another one-third (23,851) of abandoned calls occurred after one to five minutes in the call queue and the final one-third (19,164) occurred after the caller had been on the call queue for over five minutes. Of the calls on a queue for between one and five minutes (67,995), over one-third (23,851) were abandoned. Many callers, however, waited much longer before hanging up.  In the six months examined, 8,338 calls (39%) were abandoned after the caller waited for ten minutes or more.

- **Screening Allegations:** The Monitors reviewed 329 of 590 referrals prioritized by SWI for an abuse or neglect investigation between July 1, 2019 and October 31, 2019.  These 329 intake reports included 174 that SWI assigned for child abuse or neglect investigations, which were then downgraded by RCCI during secondary screening. Of those 174 intakes, the Monitors concluded that RCCI inappropriately downgraded fifty-seven intake reports (33%) to Priority None. Those reports contained allegations that warranted investigation for child abuse or neglect under the Texas Administrative Code. These reports are detailed in the Appendix 3.1. RCCI's inappropriate downgrades of

24

referrals represent a significant, systemic failure that increases the risk of serious harm to children. When referrals are not investigated as child abuse, neglect or exploitation, but instead are relegated to a regulatory investigation, alleged perpetrators can continue perpetrating, even when there is a minimum standards violation identified by RCCL. The Monitors have discovered precisely this circumstance in preparation of this report, including fact patterns where perpetrators identified in the context of minimum standards violations were able to secure employment at other CPAs and GROs because their culpability had not been established as part of a child abuse, neglect or exploitation investigation.

- **Investigating Allegations:** Of the 261 RCCI investigations DFPS completed between August 1, 2019 and November 30, 2019, RCCI Ruled Out 243 (93%), administratively closed eight (3%), substantiated as RTB nine (3%) and closed as Unable to Determine one (0%). Of the 261 RCCI investigations DFPS completed involving PMC children during the review period, the Monitors reviewed a total sample of 133 investigations, including 122 cases where RCCI "Ruled Out" all allegations. Of these 122 investigations, the Monitors identified thirty-five (28.6%) investigations Ruled Out between August 1, 2019 and November 30, 2019, which had substantial deficiencies (24) and/or were inappropriately resolved by RCCI (11). In eleven of the thirty-five investigations where the Monitors disagreed with the agency's final disposition to Rule Out abuse or neglect, the Monitors concluded that at least one of the allegations was supported by a preponderance of the evidence in the investigation and, therefore, should have been substantiated with a disposition of Reason to Believe. In twenty-four of the thirty-five investigations where the Monitors disagreed with the agency's final disposition to rule out abuse or neglect, the Monitors could not determine whether DFPS's final disposition was appropriate due to deficiencies in the investigation. The cases are detailed in the Appendix 3.2.

**Remedial Order Five:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

- For validation of orders measuring the timeliness of various aspects of RCCI investigations, the monitoring team reviewed all RCCI investigations that were opened by the State in October and November 2019.
- The Monitors found that of 184 investigations reviewed, nineteen were assigned Priority One, requiring that DFPS initiate the investigation within twenty-four hours of intake.
- Sixty-eight percent (thirteen) of Priority One investigations were initiated within twenty-four hours of intake through face-to-face contact with all alleged child victims;
- Twenty-six percent (five) of Priority One investigations were not initiated timely; and
- Five percent (one) of Priority One investigations were initiated through another approved method.

**Remedial Order Six:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

- Eighty-one percent (133) of Priority Two investigations were initiated within seventy-two hours of intake through face-to-face contact with all alleged child victims;
- Sixteen percent (twenty-seven) of Priority Two investigations were not initiated timely; and
- Three percent (five) of Priority Two investigations were initiated through another approved method or had an extension to face-to-face contact.

**Remedial Order Seven:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

- Sixty-eight percent (thirteen) of Priority One investigations included initial face-to-face contact with all alleged victims within twenty-four hours of intake;
- Twenty-six percent (five) of Priority One investigations did not have timely face-to-face contact with all alleged victims; and
- Five percent (one) of Priority One investigations, had an approved exception to face-to-face contact.

**Remedial Order Eight:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

- Eighty-one percent (133) of Priority Two investigations included initial face-to-face contact with all alleged victims within seventy-two hours of intake;
- Eighteen percent (twenty-nine) of Priority Two investigations did not have timely face-to-face contact with all alleged victims; and
- Two percent (three) of Priority Two investigations either had an approved extension to face-to-face contact or were not timely due to other circumstances.

**Remedial Order Nine:** *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

- DFPS was unable to track and report in its data reports to the Monitors if and when face-to-face contact was made with all alleged child victims within an investigation. As noted

above, the agency's method of tracking and reporting the information required in this order (and in other orders) includes the submission of case read reports that measure and report investigation initiation and face-to-face contact with alleged child victims.

**Remedial Order Ten:** *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

- Of the 184 Priority One and Priority Two investigations reviewed, the Monitors found that 79% (146) were not completed within thirty days. Nineteen percent (thirty-five) of investigations were documented as completed within thirty days of intake and 2% (three) had approved extensions and were completed within the extension timeframe.
- While 11% (twenty-one) had approved extensions, only three of those were completed within the approved timeframe allotted by the extension; nine were not completed within the allotted extension timeframe; and in nine others, the Monitors were unable to determine whether the investigation was completed within the extension timeframe either because the investigation was still open at the time of review (seven) or there were documentation deficiencies regarding the length of the extension (two).
- Overall, there were 501 investigations that were overdue by at least 45 days as of April 5th, 2020.

**Remedial Order Eleven:** *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked.*

- DFPS does not report on the timeliness of investigation completion by relying on an IMPACT or CLASS report, but instead must rely on "case read" reports.
- DFPS data submitted in association with closed and open investigations do not provide the Monitors with a list of investigations that includes an indicator of timeliness as defined by Remedial Orders Ten and Eleven. DFPS submitted a list of extensions approved during the October 1 to November 30, 2019 period in its file with opened and closed investigations. The file included twenty-three extensions and listed the dates the extensions were approved; the reasons for the extensions; and the number of additional days approved by each of the extensions. The file did not list the intake start date, the original due date or the new due date, to allow for efficient verification of the extension data and timeliness of investigation closure. All but one of the extensions in the list appear to apply to investigations that began prior to October 1, 2019. DFPS stated it cannot provide extension information as a part of the investigations report data as requested by the Monitors because there can be multiple extensions related to one investigation. DFPS stated it will continue to report investigation extensions separately within its RCCI investigations data report, providing the investigation stage identification number. The

27

Monitors will then need to use this information as a cross reference between the list of pending investigations and the list of investigation extensions.

**Remedial Order Sixteen:**[13] *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

- Sixty-six percent (eighty) of investigations included evidence that documentation was completed and submitted on the same day the investigation was completed;
- Thirty-one percent (thirty-seven) of investigations did not include evidence that documentation was completed and submitted timely; and
- Three percent (three) of investigations were categorized as unknown due to missing documentation.

**Remedial Order Eighteen:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

**Notification to Referent:**
- Seventy-eight percent (ninety-four) of investigations included evidence that notification letters to referent(s) were mailed within five days of investigation closure;
- Eight percent (ten) of investigations did not have timely notification letters to referent(s);
- Seven percent (eight) of investigations documented that notification letters to referent(s) occurred prior to investigation closure;
- Four percent (five) of investigations were unknown due to pending supervisor approval at the time of review; and
- Three percent (three) of investigations were unknown due to documentation deficiencies.

**Notification to Provider:**

- Sixty-five percent (seventy-eight) of investigations included evidence that notification letters to provider(s) were mailed within five days of investigation closure;
- Twenty-nine percent (thirty-five) of investigations did not have timely notification to provider(s);
- Four percent (five) of investigations were categorized as unknown due to pending supervisor approval at the time of review; and
- Two percent (two) of investigations were categorized as unknown due to documentation deficiencies.

**Remedial Order A-Six:** *Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating*

---

[13] Remedial Orders Sixteen and Eighteen are applied to both DFPS and HHSC; HHSC performance associated with these two orders are reported below in the summary for Section VI.

*to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

- Based on the Monitors' analysis, a majority of the 164 youths interviewed do not know who or what the Foster Care Ombudsman (FCO) is or how to contact that office to make a complaint. Additionally, of the youth interviewed who were asked (117), most (70 interviewees, or 60%) were aware of the Hotline, but of children asked during the interviews about the protocol for using the phone (38), most indicated they are unable to make calls twenty-four-hours a day and free from observation.

- Forty-two of the 101 children (42%) interviewed by the Monitors in Cottage Homes indicated they were aware of the Foster Care Bill of Rights. Thirty-six of the sixty-three children (57%) interviewed by the monitoring team in other types of GROs (which include three residential treatment centers (RTCs)) indicated they were aware of the Foster Care Bill of Rights.[14] Even when a child was aware of the FCO, they did not always know how to contact the FCO. For example, of the 101 youths interviewed in cottage homes, thirty (30%) were aware of the FCO, and twenty-three (23%) knew how to reach the FCO. And, of the sixty-three youths interviewed in other types of GROs/RTCs, only fifteen (24%) were aware of the FCO, and only eight youths (13%) actually knew how to reach the FCO.

**Remedial Order B-Five:** *Effective immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

- The Monitors reviewed 115 RCCI abuse and neglect investigations from December 2019 to assess the timeliness of caseworker notification when one of the children on their caseloads was the subject of an abuse or neglect investigation. The Monitors found that caseworker notification occurred within twenty-four to forty-eight hours of intake for 49% of children in the sample. Another 2% of the cases showed caseworker notification within forty-eight and seventy-two hours of the intake. Investigators notified thirty-one caseworkers (27%) more than seventy-two hours from intake, and investigators did not notify twenty-six caseworkers (23%).

---

[14] The monitoring team's review for a signed Foster Care Bill of Rights in the child files was added to the questions included in the review tool after the Cottage Home visits and the visit to Hector Garza were completed. Based on a review of seventy-seven children's files in the last three GROs visited (two of which were RTCs), sixty-four of the seventy-seven (83%) youths' files reviewed during site visits in GRO/RTCs contained a signed Foster Care Bill of Rights.

In the State's case reads, DFPS identified 1,282 caseworkers whom the State said required notification of a child maltreatment investigation involving one of the children on their caseloads. The State reported that, of those 1,282 caseworkers:

- 710 caseworkers (55%) were notified within priority time frames;
- 371 caseworkers (29%) were notified outside of priority time frames, though the State did not specify how far outside the time frame notification;
- 199 caseworkers (16%) were not notified; and
- Two (<1%) were notified after the initiation time frame because the alleged victim was added after initiation

**Remedial Order Thirty-Seven:** *Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.*

- The policy adopted by DFPS to implement the order fails to adopt the timeline set out by the order, which requires notification and review of the home's history within forty-eight hours of DFPS receiving the referral. The State completed forty-four of the sixty-two Home History Reviews ("HHR") (71%) in the cases reviewed by the monitoring team. Of the eighteen cases in which the HHR was not completed by the State, the Monitors determined five (27.8%) of these cases had a documented reason for exclusion.
- Of the forty-four completed HHR cases, twelve (27.2%) had HHRs completed within forty-eight hours of the SWI referral, consistent with Remedial Order Thirty-Seven. Of the twelve cases with timely HHRs, caseworkers documented a staffing with their supervisor within twenty-four hours twice (16.7%); within forty-eight hours twice (16.7%); and within seventy-two hours once (8.3%).  Five cases (41.7%) showed no evidence of a staffing.
- A review of IMPACT indicated that the caseworkers and supervisors reviewed the HHR in twenty-seven cases of the forty-four cases (61%) with an HHR and staffing notes in IMPACT indicate that the caseworker and supervisor took some action to ensure the child's safety in fourteen of those cases (52%).  However, the Monitors' qualitative review of HHRs and staffing notes raised concerns about cases in which the caseworker and supervisor took no action.

B. Section IV.  Organizational Capacity

**Remedial Order One:** *Within 60 days, the Texas Department of Family Protective Services ("DFPS") shall ensure statewide implementation of the CPS Professional Development ("CPD") training model, which DFPS began to implement in November 2015.*

- Almost all caseworkers hired between September 1, 2018 and September 30, 2019 started and completed some CPD training. While most completed within the expected time frames, 22% of those caseworkers with a training cohort start date of September 2019 or later completed the training earlier than the CPD training model timeframe.

- Similarly, of the caseworkers for whom the Monitors had both a training cohort start date and a hire date, 15% were newly hired with a training cohort start date that fell prior to their hire date, calling into question whether they completed the full CPD training program. The average length of training for these caseworkers was significantly shorter than the average for those caseworkers who started and finished training with their cohort.

- For caseworkers who were included in the sample for which the Monitors could crossmatch training and data, approximately 14% were newly hired staff who appear to have become case assignable prior to their completion of CPD training.

**Remedial Order Two:** *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

DFPS did not provide data to the Monitors to validate the average daily caseload for workers, which is necessary to validate performance for Remedial Order Two.

Using point-in-time caseload data provided by DFPS, and approximations of average caseloads by county calculated by the monitoring team, the Monitors determined of the seventy-one caseworkers subject to graduated caseloads between September 1, 2019 and November 30, 2019, twenty-two caseworkers (31%) had caseloads in excess of the graduated caseload standard on the fifteenth day after those caseworkers became eligible to carry cases and were therefore, out of compliance with Remedial Order Two on the fifteenth day.

- Using point-in-time caseload data provided by DFPS, and approximations of average caseloads by county calculated by the monitoring team, the Monitors determined of the seventy-one DFPS caseworkers subject to graduated caseloads between September 1, 2019 and November 30, 2019, four caseworkers (5.6%) had caseloads in excess of the graduated caseload standard on the forty-fifth day after the caseworkers were eligible to carry cases and were therefore out of compliance with Remedial Order Two.

**Remedial Order Thirty-Five:** *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the*

*DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

**Remedial Order A-Two:** *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

**Remedial Order A-Three:** *Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly.*

**Remedial Order A-Four:** *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General Class.* [The Court subsequently changed the effective date of this order to February 15, 2020.]

- The Court approved an arrangement that relieved DFPS of the responsibility for completing a workload study pursuant to Remedial Orders A-One and A-Two. The parties agreed to, and the Court approved, a workload standard of fourteen to seventeen children per CVS worker, pursuant to Remedial Order A-Three. DFPS provided the Monitors monthly point-in-time caseload data, detailed consistently with Remedial Order Thirty-Five.

- 

- Although Remedial Order A-Four did not become effective until after the date used for the Monitors' caseload analysis in this report, the analysis showed that <u>as of January 31, 2020, 698 of 1,418 CVS caseworkers (49.2%) had primary caseloads within or below the standard of seventeen children per worker.</u>

- <u>As of January 31, 2020, most CVS caseworkers managing at least one PMC child's case (720 of 1418, or 50.8%) were assigned to serve more than seventeen children.</u>

**Remedial Orders B-One:** *Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

**Remedial Order B-Two:** *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

**Remedial Order B-Three:** *Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

**Remedial Order B-Four:** *Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators, or successor staff.*

- Caseload data provided by HHSC showed that on January 1, 2020, ninety-two RCCL inspectors carried a total of 1,854 cases or "tasks." Of the ninety-two inspectors, fifty-four (59%) had caseloads above seventeen tasks.

- Caseload data provided by DFPS showed that on December 31, 2019, forty-three RCCI investigators and twelve non-investigators and supervisors carried a total of 1,011 cases. Of the forty-three investigators, twenty (46.5%) had a caseload of more than seventeen investigations.

C.  Section V.  Preventing Sexual Abuse and Child Sexual Aggression

**Policy Creation and Training of Staff Responsible for Making Determinations**

**Remedial Order Thirty-Two:** *Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

**Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression**

**Remedial Order Twenty-Three:** *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order Twenty-Four:** *Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order Twenty-Eight:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order Thirty:** *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

- The State has created policy related to what constitutes child-on-child sexual abuse, and training modules for staff tasked with implementing the policy. Praesidium, a consultant retained by the Monitors to evaluate the policy and training modules, expressed concerns for child safety and made recommendations related to both the policy and training. After being provided with the report prepared by Praesidium, the State indicated that it could consider making some of the recommended changes but objected to the report's focus on preventing child sexual abuse, noting that the policy and training instead focuses on identification and reporting of sexual abuse.

- The State has created pages within its IMPACT data system that allow DFPS to record information related to sexual victimization, sexual aggression, or a sexual behavior problem in a child's electronic case record. The Monitors will continue to assess whether DFPS is able to document and produce data for PMC children in its care who have a flag in IMPACT for a history of sexual victimization, aggression, or behavior problems.

- Remedial Orders Twenty-Four and Thirty require DFPS to document "in each child's records all confirmed allegations" of sexual victimization and abuse involving the child

34

as the aggressor. The Monitors' on-site review of children's files documented that 9% do not include the proper designation in IMPACT. In addition, a quarter-by-quarter analysis of the identification data do not indicate notable change in the percentage of PMC children the State identified with an IMPACT flag for sexual abuse, aggression, or behavioral problems.

**Caseworker and Caregiver Training on Child Sexual Abuse**

**Remedial Order Four:** *Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

**Remedial Order Twenty-Five:** *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

**Remedial Order Twenty-Six:** *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order Twenty-Seven:** *Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

**Remedial Order Twenty-Nine:** *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order Thirty-One:** *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

- Each method of validating performance for the Remedial Orders related to caregiver notification revealed gaps in notification. The crossmatch of data for the mass notification undertaken by the State in response to the Court's November 5, 2019 order showed 5% (53 of 1025) of children identified who did not match to the list of caregivers notified.

- Gaps in notification exist between CPS and Program Administrators, and between Program Administrators and direct care staff. While Program Administrators interviewed by the Monitors during unannounced visits indicated that they alert direct caregivers or their staff when they receive notification from the State that a child is a victim of sexual abuse or is identified with an indicator for sexual aggression, only 57% of direct caregivers interviewed indicated that they received notice when a child had been identified as sexually aggressive, and 50% indicated they received notice when a child had been identified as having a history of sexual abuse. This suggests that the information may not

make it to the direct care staff who are engaged in protecting children's safety on a daily basis.

- A gap in notification exists for children identified in IMPACT records as having a history of abuse or aggression, but whose placement does not change. The State uses the Common Application and Placement Summary Attachment A as the primary method of notifying caregivers. However, these forms are generated only when children move to a new placement.  When a child is identified without their placement changing, notification does not always appear to take place.   In addition, the Monitors review of case records in IMPACT revealed that these forms are not provided to psychiatric hospitals when children are admitted for care, because these settings are not considered placements.

- Even for children who have a change in placement after being identified, information about their history of sexual abuse or sexual aggression is not always added to the Common Application and Placement Summary (or Attachment A). Additionally, the Monitors' on-site reviews of children's files revealed that, quite often, one or both of these forms are missing from a child's file altogether, even for children who appear on the list generated by the State of children with a history of sexual aggression or victimization.

- The State implemented the child sexual abuse training requirement from Remedial Order Four by providing a Child Sexual Aggression course and a pre-service training for new caseworkers. With respect to the Child Sexual Aggression component of the required training, 98.5% of caseworkers active on September 30, 2019 and 98.9% of caseworkers active on November 30, 2019 completed the training. As of April 30, 2020, DFPS had not provided completion dates for pre-service child sexual abuse trainings for all of its caseworkers serving PMC children. The Monitors, therefore, cannot validate that all caseworkers completed the full child sexual abuse training required by Remedial Order Four.

- The State does not maintain a list of all caregivers serving DFPS children or their training completion, and, therefore, the Monitors cannot validate that all caregivers completed the full child sexual abuse training required by Remedial Order Four.  During the Monitors' site visits to twenty-five campuses across twenty-three operations between October 14, 2019 and February 26, 2020, the monitoring team assessed sexual abuse training completion by reviewing the files for 288 caregivers and confirmed that 249 caregiver files (86%) contained certifications for completion of child sexual abuse training.

**Awake-Night Supervision**

**Remedial Order A-Seven:** *The Defendants shall immediately cease placing PMC children in licensed foster care (LFC) placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

**Remedial Order A-Eight:** *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.*

- The State's own certifications and the self-reports made by placements indicate ongoing issues related to awake-night supervision.  While the monitoring team did find awake-night staff at all GROs visited, issues arose. For example, during one visit, the awake-night staff in one house appeared to be sleeping, and during another, a riot broke out and the monitoring staff were left alone in a wing with more than twenty children.

D.  Section VI.  Regulatory Monitoring and Oversight of Licensed Placements

**Remedial Order Twenty-Two:** *Effective immediately, RCCL, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements. During inspections, RCCL, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

- The Monitors' case record review revealed only 28% of all inspections reviewed by the Monitors (220 of 787) associated with an investigation of a minimum standards violation contained a completed five-year retrospective report; 29% of the operations reviewed (twenty-two of ninety-two) had **no** five-year retrospective reports in CLASS. Only 7% of the operations (six of ninety-two) had a five-year retrospective report for all (100%) of the investigations or inspections conducted during the period under review.

- RCCL rarely completes the five-year retrospective review prior to or on the same day as the RCCL inspection, making it impossible for the information to be considering during the inspection, as required by Remedial Order Twenty-Two. Interviews with inspectors confirmed that 40% (16 of 40) understood the purpose or the process for compiling and using the information required by the extended compliance history review.

- Between July 31, 2019 and March 20, 2020, HHSC issued twenty citations for failure to report abuse or neglect: one has been overturned, two have requested an administrative review and one is pending as of May 1, 2020. The monitoring team's on-site interviews with caregivers revealed that many are not aware of the policy and legal requirements related to reporting abuse or neglect, and most indicated that they would not call SWI themselves if they became aware of abuse or neglect. Instead, they would tell a supervisor at the operation

**Timeliness of Minimum Standards Investigations**

**Remedial Order Twelve:** *Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

- HHSC reported one Priority One minimum standards investigation with an intake date between August 1, 2019 and December 31, 2019. This investigation did not include face-to-face contact with an alleged child victim within twenty-four hours.

**Remedial Order Thirteen:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

- HHSC reported 628 Priority Two minimum standards investigations with an intake date between August 1, 2019 and December 31, 2019. Fifty-nine percent (59%) (369) of investigations included first face-to-face contact with an alleged child victim within three days of intake.

**Remedial Order Fourteen:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

- HHSC reported 629 Priority One and Priority Two minimum standards investigations with an intake date between August 1, 2019 and December 31, 2019; HHSC completed 95% (598) of investigations within thirty days of intake.[15]

**Remedial Order Fifteen:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

- HHSC reported 1,602 Priority Three, Four, and Five minimum standards investigations with an intake date between August 1, 2019 and December 30, 2019; HHSC completed ninety-six percent (1,537) of the investigations within sixty days of intake.[16]

**Remedial Order Sixteen:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

---

[15] HSSC data included reasons for twenty-two extensions for Priority One and Two investigations during this time period; the file does not include additional information about the length of the extensions or new due dates.
[16] HHSC data included reasons for thirty-four extensions for Priority Three, Four, and Five investigations during this time period; the file does not include additional information about the length of the extensions or new due dates.

- HHSC reported 629 Priority One (1) and Priority Two (628) completed minimum standards investigations with an intake date between August 1, 2019 and December 31, 2019; in 96% (603) of the investigations, the documentation was completed on the same day the investigation was completed.

**Remedial Order Seventeen:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

- HHSC reported completion of 1,602 Priority Three (1,158), Priority Four (11), and Priority Five (433) minimum standards investigations with intake dates between August 1, 2019 and December 15, 2019; in 96% (1,518) of the 1,602 investigations, HHSC completed documentation within sixty days of the intake date.

**Remedial Order Eighteen:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

- HHSC reported completion of 629 Priority One (1) and Two (628) minimum standards investigations with intake dates between August 1, 2019 and December 31, 2019; 77% (482) of the investigations included notification to the referent and provider within five days of completion of the standards investigation.

**Remedial Order Nineteen:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

- HHSC reported 1,602 Priority Three (1,158), Four (11) and Five (433) minimum standards investigations with intake dates during the period August 1, 2019 and December 31, 2019; of the 1,602 investigations, 79% (1,266) investigations included notification to the referent and provider within sixty days of intake.


**Heightened Monitoring**

**Remedial Order Twenty:** *Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.*

39

- Despite a significant number of small, medium, and large GROs and CPAs that have a high rate of RTBs and minimum standards violations, little meaningful enforcement action is taken by RCCL.  Between September 30, 2014 and March 31, 2020, RCCL placed thirty-nine operations on evaluation and twenty were placed on probation. Seventy-one were placed on a voluntary plan of action. Though six operations were issued a letter of intent to revoke, RCCL did not revoke any licenses during this period. A case study of four operations with a high rate of RTBs and minimum standards violations shows the inconsistent nature of RCCLs risk analysis and enforcement scheme.

- The information that the Monitors received from DFPS similarly indicates little formal enforcement action taken by the division of the agency that oversees contracts.

**Revocation of Licenses**

**Remedial Order 21:** *Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.*

a.

- While the State did not issue a single license revocation in the five years preceding September 30, 2019 (the date of the Monitors' first data and information request), RCCL has notified two operations of its intent to revoke their license since December 2019.  One of those facilities, Children's Hope – Lubbock, was allowed to voluntarily relinquish its license after requesting an administrative review of the decision. The other facility, North Fork Educational Center, has requested an administrative review of the decision, and the review is pending. A third facility, one of the Children's Hope campuses in Levelland, Texas, has also voluntarily relinquished its license.

E.   Section VII.  Child Fatalities

After learning through the Monitors of the death of a child in the PMC General Class, the Court Ordered on February 21, 2020: *Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

DFPS has notified the Monitors that eleven children in the PMC General Class died between July 31, 2019 and April 30, 2020. The Monitors reviewed the children's case records, including healthcare records, and investigative records. Three children's deaths raise serious concerns about the care and supervision provided by DFPS, discussed above.

**SCOPE OF THE MONITORS' WORK**

To assess compliance with multiple remedial orders, the monitoring team conducted unannounced site visits across twenty Texas counties at twenty-three of 299 GRO campuses,[17] including three RTCs. The monitoring team made unannounced overnight visits to four of 299 GROs to assess compliance with the Court's awake-night supervision order and interviewed seventeen awake-night staff. The State submitted and the monitoring team sorted and analyzed 471 awake-night certifications and 222 awake-night policies developed by Operations licensed by HHSC and under contract with DFPS to serve PMC children.

During unannounced daytime visits to GROs, the monitoring team interviewed twenty-five program administrators, as well as 158 caregivers.[18] The monitoring team interviewed 169 PMC children selected by the Monitors during these site visits.[19] During these visits, the monitoring team examined 272 PMC children's files and 301 caregiver records.

To begin to validate the accuracy of the State's data with respect to workloads and graduated caseloads, the monitoring team interviewed seventy-five of 1,418 CVS caseworkers who were assigned at least one PMC child, twenty-four of sixty-two RCCI investigators and forty of eighty-five inspectors with RCCL. The monitoring team also analyzed 780 of 1,418 caseworkers' training records.

The monitoring team analyzed data from DFPS's SWI related to 372,897 calls placed to SWI from August 1, 2019 to January 31, 2020 and conducted an announced site visit to SWI facilitated by DFPS. The monitoring team undertook an independent assessment of the appropriateness of the State's screening decisions with respect to 329 of 590 referrals prioritized by SWI for an abuse or neglect investigation between July 1, 2019 and October 31, 2019. As part of this assessment of the 329 referrals, the monitoring team listened to recordings of the original referral calls in all instances when the report was made by phone.

In addition, the Monitors examined the State's compliance with multiple remedial orders by examining the timeliness for all of the 184 RCCI child abuse, neglect or exploitations investigations opened in October and November 2019 involving a PMC child. The monitoring

---

[17] Data reflects all licensed General Residential Operations in the State of Texas. Out-of-state operations are not included. Not every licensed operation serves PMC children. *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Search for Residential (24 hour) Operation, available at*
https://www.dfps.state.tx.us/child_care/search_texas_child_care/ppFacilitySearchResidential.asp.

[18] Not all staff were asked or answered every question in the interview tool. Some questions were added after early visits were made, particularly to Cottage Home campuses. For that reason, analysis of interview results for caregivers does not always include all 158 staff who participated in the interviews. When results are discussed, the number of staff who answered the questions will be identified.

[19] Not all children answered every question in the interview tool; some opted to end the interview early or skip questions, which the monitoring team indicated they could do. Similarly, some interview questions were added after some on-site visits had been completed, as the monitoring team worked to refine interview tools. For that reason, discussion of the analysis of children's interview responses may not always include all 169 children interviewed. Where results of these interviews are discussed, the number of children who answered the questions analyzed will be indicated.

team also reviewed records for 376 of 783 children and assessed the contents of the Placement Summary Form[20] and Common Application.[21]

In addition, the monitoring team examined 133 of 261 investigations completed by RCCI between August 1, 2019 and November 30, 2019, into alleged maltreatment of PMC children and youth while they were in DFPS custody and assessed the appropriateness of RCCI's investigations and outcomes. The monitoring team also reviewed 118 of 200 intakes to SWI in December 2019 involving allegations of abuse, neglect or exploitation of a PMC child, to assess the timeliness of DFPS's notification to the child's caseworker, and an additional sixty-two of seventy-two referrals to SWI involving PMC children in verified foster homes, downgraded by RCCI in December 2019 or January 2020.

The monitoring team reviewed electronic records for ninety-seven licensed operations to assess compliance with remedial orders related to HHSC oversight.  Prior to on-site visits, the

---

[20]According to DFPS policy, before moving the child or youth from the current caregiver, the caseworker must review the completed Placement Summary:

> The purpose of this form is to enhance continuity of care for the child by documenting what the current caregiver knows about the child. If the child is leaving a contracted placement, the caregiver must complete the form before the child's discharge. If the child is leaving a kinship caregiver home, the caseworker should ask the kinship caregiver to complete the form; however, if the kinship caregiver does not complete the form, then the caseworker must complete it. The caseworker must: discuss the content of Form 2279 Placement Summary with the current caregiver and the child or youth; document the information discussed in the form; and get the signatures of the child or youth and the current caregiver.

TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Child Protective Services Handbook* § 4121.3.

[21]

> The Common Application plays a critical role in the placement process. Every piece of information contained in the common application informs the prospective placement about the child and provides them with the information necessary to determine how the child might adjust to and be successful in the placement. This document provides the prospective caregiver with important information about the child's emotional and social needs, such as: the child's ability to interact with peers and adults; the child's ability to respond to redirections, rules, and consequences; information about the child's strengths and interests, which helps the prospective caregiver determine if they can provide for those needs and build upon those strengths; and information about the child's family and connections. It is essential to the placement process, and more importantly, to the child, that the information in the common application be current and accurate. Some suggestions for creating a comprehensive and informative common application: Update the common application before any placement change. Describe the child's behavior using objective terminology. Be specific about behaviors and history, providing information about timeframes for the behaviors. Take time to describe the child's positive characteristics and strengths.

TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Placement Process Resource Guide*, 1, 6 (Apr. 2020).

monitoring team analyzed electronic records related to inspections, minimum standards violations, and enforcement actions for each of the twenty-three campuses visited.  In addition, the Monitors analyzed data for more than 14,000 RCCL inspections conducted between September 30, 2014 and March 31, 2020, leading to over 30,000 citations for minimum standards violations. The Monitors also analyzed data for more than 10,000 investigations of abuse or neglect for the same period.

The Monitors examined hundreds of records in connection with the deaths of eleven PMC children who died between July 31, 2019 and April 30, 2020, as discussed in this report. With respect to the fatality of one child detailed in Section VII of this report, the monitoring team interviewed children, staff and administrators at the facility where the child died, and reviewed records on site.

### I.  DEMOGRAPHICS OF CHILDREN IN PMC CARE

According to DFPS data, there were 10,933 children in PMC status as of November 30, 2019.[22] During the quarter between September 1 and November 20, 2019, 1,656 children entered PMC and 2,129 children exited PMC. Therefore, DFPS cared for 13,062 PMC children during the quarter.

A.  Age and Gender

As of November 30, 2019, 38% of children with PMC status were age zero to six years old (4,153); 24% were seven to eleven years old (2,585); and 38% were twelve to seventeen years (4,195).

**Figure 1: Age of Children in PMC on November 30, 2019**

*n=10,933*

---

[22] The analysis in this section is based on DFPS data production of children in Permanent Managing Conservatorship (PMC) during Texas fiscal year 2020 Quarter 1, September 1, 2019 to November 30, 2019.



The population is almost equally split between genders —48% of children were female and 52% male.[23]

## B.  Living Arrangements and Length of Time in Care

Based upon information provided by DFPS, 81% of children in PMC on November 30, 2019 lived in family settings (8,901 children), including relatives or fictive kin (2,831 children or 26%) as well as adoptive homes (464 children or 4%); and 15% (1616) of children in PMC lived in congregate care. Of the children in PMC on November 30, 2019, 45% (4,965) of them were in care for one to two years; 27% (2,928) were in care for more than three years; and 5% (599) were in care for less than one year.[24]

**Figure 2: Living Arrangements of Children in PMC on November 30, 2019[25]**



*n= 10,933*

---

[23] The State did not provide race or ethnicity fields in the cohort data submission through November 30, 2019.

[24] The Monitors based these categories on information provided by DFPS on April 17, 2020.  TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Living Arrangement Categories* (Apr. 17, 2020) (on file with the Monitors).

[25] The "Other" living arrangement category pools together the "Other" (2%), "Runaway" (1%), "Incarcerated" (<1%), "Own-home/Non-Custodial Care" (<1%), "Independent Living" (<1%), and "Data Entry Error" (<1%) living arrangement types.

**Figure 3: Length of Stay in Care of Children in PMC on November 30, 2019**



*n= 10,933*

Children exited from PMC status through adoption by relatives; reunification with family; having custody transferred to relatives; or by aging out of care. Of the 2,129 children who exited PMC care during the quarter, the most frequent reason for exit was due to adoption by relatives. The breakdown is as follows: almost three quarters (1,569 or 74%) were adopted by relatives; 12% (254) of children had custody transferred to a relative; and 11% (243) of children who exited PMC were emancipated—or aged out—of foster care. Finally, a small number (fifty-nine or 3%) were reunified with their families.

**Table 1: Exits from PMC by Exit Outcome, September 1, 2019 to November 30, 2019[26]**

| Exit Outcome | Frequency | Percent |
|---|---|---|
| Adoption | 1,569 | 74% |
| Custody to Relative | 254 | 12% |
| Emancipation | 243 | 11% |
| Reunification | 59 | 3% |
| Other | 4 | 0% |
| **Total** | **2,129** | **100.0%** |

C.  Level of Care

Over half (6,243 or 57%) of children with PMC status on November 30, 2019 were in a basic authorized level of care. For the remaining 4,690 PMC children, 1,766 (16%) were in a specialized level of care; 1,637 (15%) were in a moderate level of care; and 471 (4%) were in an intense level of care. The data include 752 PMC children with no authorized level of care recorded.

**Table 2: Authorized Level of Care for Children in PMC as of November 30, 2019**

| Authorized Level of Care | Frequency | Percent |
|---|---|---|
| Basic | 6,243 | 57% |
| Specialized | 1,766 | 16% |
| Moderate | 1,637 | 15% |
| No Authorized Level of Care Recorded | 752 | 7% |
| Intense | 471 | 4% |
| Treatment Foster Care | 39 | 0% |
| Psychiatric Transition | 22 | 0% |
| Intense Plus | 3 | 0% |
| **Total** | **10933** | **100%** |

---

[26] The term "fictive kin" refers to the care of a child by family friends with a longstanding and significant relationship with the child and family. PCA refers to Permanency Care Assistance benefits, which are available to kinship families and children who meet the eligibility requirements.

*Geographic Location*

The county of removal for 44% (4,790) of children with PMC status on November 30, 2019 (4,790 children or 44%) was in five Texas counties: Harris, Bexar, Dallas, Tarrant, and Bell.[27]

**Table 3: Top 5 Counties of Removal, aka "Legal Counties" for Children in PMC on November 30, 2019[28]**

| Legal County | Frequency | Percent |
|---|---|---|
| Harris | 1,525 | 14% |
| Bexar | 1,421 | 13% |
| Dallas | 1,069 | 10% |
| Tarrant | 483 | 4% |

## II. OVERVIEW OF STATE DATA AND DATA SYSTEMS CHALLENGES

The Monitors faced many challenges related to the State's data and its data systems. This section describes these challenges, their potential impact on children and staff, and on the State's performance associated with the Court's remedial orders.

### A. Fragmented Data Systems

DFPS and HHSC share responsibility for the well-being of children who are in the care of the State's child welfare system through abuse, neglect, or exploitation investigations and regulation of licensed facilities which are the subject of several remedial orders. The agencies, however, use different data systems to track investigations and related information about children in care and their caregivers. DFPS uses a case management system called the Information Management for Protection of Adult & Children in Texas system, ("IMPACT"), as well as a records management system called the Child Care Licensing and Automation Support System, ("CLASS"); HHSC uses CLASS only. Responsibility for investigating potential maltreatment in care or risk of harm to children changes between agencies depending in part on the nature of the allegations and underlying facts.[29]

Deficiencies in the data systems used by DFPS and HHSC prevent the agencies from having access to aggregate real-time data and information critical to child safety, including – as discussed in this report – certain children's placements; staff caseloads and training; the timeliness of child abuse or neglect investigations; and caregiver training for sexual abuse, among other areas.

---

[27] *See* Appendix 1.1 and Appendix 1.2 for a complete description of child age groups by county and child lengths of stay by county.

[28] These are the counties with jurisdiction over the child's removal case. DFPS describes these counties as the "legal" counties in the IMPACT data that the Monitors received.

[29] *See infra* Section III of this report for a discussion of the agencies' divided responsibilities for investigating potential child maltreatment in care or risk of harm to children.

These gaps added extensively to the time and staffing required by the monitoring team to validate the agency's performance under these remedial orders.

IMPACT and CLASS were designed separately and for different purposes. The data systems reflect differences in policy, procedures, and practices related to child maltreatment investigations conducted by DFPS and inspections and minimum standards investigations conducted by HHSC, despite the fact that both involve critical child safety interests. As a result, the identifiers and variable names in each data system are distinct.[30] RCCI investigators, who work for DFPS, are required to move back and forth between both systems to complete tasks associated with child maltreatment investigations, and at times are required to enter the same data twice.[31] This fragmentation of data collection and reporting across the two systems consumes limited investigator time and makes it more difficult to track investigation histories about children and facilities.

The data as provided by DFPS and HHSC makes it very difficult to match and connect the records of facilities from both agencies. For example, the lack of uniform identifiers between the two agencies inhibits the ability to identify patterns of child maltreatment, and contract and policy violations as required by Remedial Order Twenty. Matching data across Child Placing Agencies (CPAs) is also challenging. CLASS generates an operation number and a contract number, while IMPACT generates a resource ID and a contract number. None of these numbers match across the two systems. Anchor Family Services, Inc., for example, has an operation number of 1681008-13171 in CLASS and a resource ID in IMPACT of 26090098. Contract numbers do not match because at the start of Fiscal Year 2019, HHSC implemented a new contracting system that changed the contract numbering conventions.[32] In addition, CLASS and IMPACT do not share a unique ID number that identifies individual foster homes and residential facilities across the two

---

[30] In CLASS, for example, the field that indicates the calendar day an investigator finished each required part of an investigation is called Date Investigation Completed. In IMPACT, the same status is recorded in a variable called Date Approval Submitted to Supervisor. CLASS records the closing date of an investigation as Date Case Closed while in IMPACT the same status is recorded as the Date Supervisor Approved.

[31] For example, the business flow process described by DFPS is as follows for child protective investigations:

> [A]n intake is documented in IMPACT.  When all needed action in the intake has been taken, it is closed and, if a decision is to pursue an investigation, an investigation stage is opened.  When all essential investigative tasks are completed, the investigation is documented as complete in CLASS and IMPACT. After the investigation is completed in CLASS, it is submitted to the supervisor in IMPACT. After the supervisor reviews and approves, the investigation stage is closed.

TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Response to Monitors' Questions related to Remedial Order Three Data* (Feb. 3, 2020) (on file with the Monitors).

[32] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (attaching DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

systems. Within IMPACT, furthermore, the most common identifier, the resource ID, is referred to by different names in different tables within the application.[33]

In response to the Monitors' questions about identifying facilities, DFPS noted that "some organizations have multiple facilities (e.g., have both a residential treatment center and an emergency shelter) or do business as (DBA) under another name so two names may represent the same facility entered differently or it may represent two different facilities operated by the same organization."[34] These differences are prohibitive to efforts to create a unified dataset of child maltreatment and minimum standards investigations related to a single organization or a single facility.

There are significant data problems regarding children in care. In response to the Monitors' request for data and information, for example, HHSC reported it is unable to disaggregate its data on referrals and investigations to identify those that pertain to PMC children only.[35] The legal status of a child in foster care is recorded in IMPACT. CLASS does not contain this information and the data provided to the Monitors by HHSC does not include the name of the children associated with its referrals.[36]

As a result, for validation of agency performance associated with Remedial Orders Twelve to Nineteen, the monitoring team examined the data for all of the HHSC investigations during the time period between July 31, 2019 and December 31, 2019 because HHSC cannot use CLASS to distinguish those that involved at least one PMC child from those that did not.[37] This added extensively to the time required by the monitoring team to validate the agencies' compliance. To identify the investigations in which a PMC child was an alleged victim of abuse, neglect or exploitation requires shifting between the IMPACT and CLASS systems after locating child identifiers in IMPACT to use in searches. Similarly, as a result of the bifurcated system used to process and store data associated with referrals to SWI, the State is unable to provide the Monitors with a unified dataset of all referrals of abuse or neglect in which a PMC child is the subject. Instead, both agencies separate listings depending on how the original intake was screened.[38]

---

[33] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS. ET AL., *DFPS HHSC Operation ID Cross-walk* (May 21, 2020) (on file with the Monitors).

[34] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Response to Monitors' Questions related to Remedial Order Three Data* (Feb. 3, 2020) (on file with the Monitors).

[35] For a complete discussion of the HHSC response regarding this information, *see infra* Section III (discussing screening, intake, and investigation of maltreatment in care allegations) and Section VI.B. (discussing Remedial Orders Twelve to Nineteen).

[36] *Id.* For a complete discussion of the HHSC response regarding this information, *see infra* Section III (discussing screening, intake, and investigation of maltreatment in care allegations) and Section VI.B. (discussing Remedial Orders Twelve through Nineteen).

[37] *See* TEX. HEALTH & HUMAN SERVS. COMM'N, *Data Response Chart* (Dec. 5, 2019) (on file with the Monitors) (stating that HHSC "is operations-centric not child-centric" and as a result cannot provide PMC identifiers of children involved in HHSC referrals); Email from Corey Kintzer, Assoc. Dir. of Litig. Dep't, Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:48 EST) (on file with the Monitors) (including HHSC Response to Monitors' Feb. 21, 2020 Data and Information Request and stating that HHSC cannot provide investigation information specific to PMC children).

[38] For a complete discussion of information provided by the State about referrals, *see infra* Section III.

The challenges of tracking alleged perpetrators and child victims between systems hinders efforts to ensure child safety. Even when not confirmed, multiple reports of child maltreatment involving an alleged perpetrator at a CPA or a GRO, such as those described in this report, may be predictive of future substantiated reports and, therefore, could be used to identify the need for intervention.[39] In addition, children who are the subject of multiple reports may have special needs that are not being addressed or treated or other traits that increase their risk of harm.[40]

Another critical data problem affecting child safety surfaced through the monitoring team's review of DFPS's awake-night certifications, as described in this report, pursuant to Remedial Orders A-Seven and A-Eight. In ninety-one certifications reviewed by the Monitors, DFPS staff noted the census sheet that DFPS brought to a facility visit did not accurately reflect the children who were currently in the facility, including thirteen times in subsequent visits to the same facility. In some, children were on the DFPS list, but were not present at the placement. In others, PMC children resided in the placement but were not on the DFPS list. Some certification notes indicated that DFPS and the facility could not account for the difference or determine the location of children who were not present, despite the DFPS census indicating they should be.

Fragmentation within DFPS also hinders the State's performance associated with the remedial orders and the Monitors' ability to analyze performance. For example, the Monitors requested a list of staff subject to the graduated caseloads policy in order to assess performance related to Remedial Order Two. Production of this data requires DFPS to conduct a match between the Center for Learning and Organizational Excellence (CLOE), the DFPS training division, and Data and Decision Support (DDS).[41] DFPS analytic staff conducted this match for the Monitors; this analysis is not routinely produced for DFPS leadership to facilitate monitoring of its graduated caseloads policy or the State's performance associated with the Court's remedial order.

B. Limited functionality

Efforts to report on performance associated with the remedial orders have been hindered by limited functionality within IMPACT and CLASS. The examples below demonstrate the limits of the State's child welfare data systems. As noted below and in the Appendices, the State had to add or indicated it will have to add enhancements to be able to report on and comply with the remedial orders.

---

[39] *See* Hyunil Kim et al., *Cumulative Prevalence of Onset and Recurrence of Child Maltreatment Reports*, 58 J. OF THE AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY, no. 12, Dec. 2019 at 1175 – 1183; Hannah M. Holbrook & James J. Hudziak, *Risk factors that predict longitudinal patterns of substantiated and unsubstantiated maltreatment reports,* 99 CHILD ABUSE AND NEGLECT: THE INT'L J., Jan. 2020; L. Anthony Loman, *Families Frequently Encountered by Child Protection Servs.* 3 (2006).

[40] Kim et al., *supra* note 39; Holbrook et al., *supra* note 39; Loman, *supra* note 39.

[41] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (attaching DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

Remedial Order One requires the State to ensure the implementation of the CPS Professional Development "CPD" training model, which requires all caseworkers to complete CPD training prior to becoming case assignable. At present, DFPS is unable to provide actual training start and completion dates. An assigned training cohort start date and an anticipated training completion date are provided by DFPS after it performs a data match with the Center for Learning and Organizational Excellence (CLOE).[42]

Remedial Orders Two and Thirty-Five require DFPS to report on the caseloads of workers carrying one or more PMC cases.  Due to the business cycle for loading data into the data warehouse, the minimum time in which DFPS can produce aggregate reports on caseloads is thirty days from the last day of the month that is being monitored.  This occurs because data are uploaded to the data warehouse once a month with a month lag between the end date of the month and the upload of the data.[43] To report graduated caseloads for newly hired CVS caseworkers statewide, the State requires forty-five days.[44]

Remedial Orders Ten and Eleven require commencement and completion of child maltreatment investigations within thirty days, as well as tracking and reporting of extensions.  DFPS reported that it could not track the timeliness of investigations electronically via data due to deficiencies in the IMPACT database.[45] This is in part because of the forty-five-day lag in loading data into the data warehouse and because some aspects of the timeliness of investigations are only apparent by reading investigation notes.[46]

Remedial Order Four requires all caseworkers and caregivers to be trained to recognize and report the sexual abuse of children.  At present, DFPS does not have a system that tracks this training in the aggregate for caregivers.[47] DFPS is currently evaluating the feasibility of providing this training to caregivers through the external Learning Management System, which would

---

[42] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RO1.1 CPD Completion as of September 30, 2019 to November 15, 2019* (Jan. 15, 2020) (amended by CLOE) (on file with the Monitors).

[43] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request)

[44] *Id.*

[45] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors); Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[46] DFPS explained these issues in telephone meetings with monitoring team members on March 9, 2020 and January 7, 2020.

[47] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request). For further discussion of DFPS's challenges reporting on training of caseworkers, *see infra* Section V (discussing the incomplete reporting by DFPS of caseworker sex abuse training).

streamline and largely automate training completion reports. DFPS notes that taking this approach may require additional funding and other resources.[48]

Remedial Orders Five, Six, Seven, Eight and Ten address the timeliness of various aspects of maltreatment in care investigations.  Investigators and supervisors would need to know the date and time of intakes and initial face-to-face contacts with all children in an investigation to assess their own performance.  However, neither IMPACT nor CLASS records the date and time of contact for each child for investigations involving multiple alleged child victims. According to DFPS, enhancements to IMPACT and training of workers to enter these data are in process.[49]

Remedial Orders Nine and Eleven require DFPS to track and report on the timeliness of face-to-face contacts and completing investigations when responding to maltreatment in care reports involving PMC children. In addition to the lack of time stamps for contact with all alleged child victims, the forty-five-day lag in reporting on metrics suggests that it is also challenging for DFPS to evaluate agency performance in real time. For approved extensions, DFPS reported the agency cannot provide the Monitors with extensions as part of the list of investigations because each investigation can have multiple extensions and different timeframes and reasons for each extension.[50]  As a result, DFPS provided the list of extensions to the Monitors on a separate tab and provided the investigation stage ID on both tabs so the Monitors could cross-match the two tabs. While these data allowed the Monitors to assess the extensions, it does not appear that DFPS can track multiple extensions in the aggregate to allow for the ongoing updating of due dates and timely completion of investigations. This may contribute to the numerous examples of overdue investigations, without an approved exception, identified by the Monitors and discussed in Sections III and IV and Appendix 3.2.

Remedial Order Thirteen requires children to be observed or interviewed within seventy-two hours of intake and therefore, assessment requires HHSC to record timestamps to determine if children were observed or interviewed within seventy-two hours. HHSC, however, only records timestamps in Priority One investigations, not in Priority Two investigations that are the subject of Remedial Order Thirteen.[51]

Assessment of performance under Remedial Order Eighteen requires that the dates and manner of notification to referents and providers in certain child maltreatment investigations be recorded. For DFPS reporting, the date and manner of notification by caseworkers of investigation results

---

[48] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[49] For a fuller discussion of IMPACT enhancements and functionality updates, *see infra* Section III.

[50] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[51] TEX. HEALTH & HUMAN SERVS. COMM'N, *Data Production Chart in Response to Monitors' Sept. 30, 2019 Data and Information Request* (Dec. 6, 2019) (on file with the Monitors). The Monitors note that Priority One investigations at HHSC are very rare. Priority Two investigations implicate serious child safety issues and are far more prevalent.

was not part of IMPACT data; this functionality was added after the issuance of the remedial orders. Similarly, Remedial Orders Thirty-Seven and B-Five require that dates and manner of notification to caseworkers and their supervisors be recorded. This functionality was added to IMPACT as of December 19, 2019, although reporting on the data cannot commence until after the DFPS IT data team builds the needed data warehouse tables and the Data Decision Support unit builds the corresponding report.[52] The State anticipates that it will be able to report dates and manner of notification to caseworkers and their supervisors by July 15, 2020.[53]

Remedial Order Twenty requires the State to report on any enforcement or corrective action taken as the result of an allegation.  Neither IMPACT nor CLASS contain an extractable field regarding any enforcement or corrective action taken as a result of the allegation, so the State had nothing to provide.[54] Remedial Order Twenty also requires the State to identify, track, and address concerns at facilities that show a pattern of contract or policy violations.  The steps in identifying a pattern include reviewing data for the rate of contract and standards violations, with a rate calculated using the number of violations divided by the operation's capacity. HHSC is unable to provide capacity information for all CPAs: these agencies accounted for over 50% of the deficiencies cited in residential childcare operations between September 30, 2014 and March 31, 2020.[55]

Remedial Order B-Four requires the State to establish internal guidelines for caseload ranges, which allow inspectors and investigators to safely manage their workloads. DFPS is able to provide the number of RCCI investigations assigned to primary investigators.  As part of a case closure project, some RCCI investigations have been assigned to investigators who are part of the DFPS Child Protection Investigations division but do not report through the RCCI chain of command.[56]  To ensure RCCI investigations assigned to these staff are counted under the RCCI program, DFPS designates RCCI staff as the primary investigator even though they are not acting in that capacity. Caseload analysis, therefore, may not accurately reflect investigator workloads because of limitations to tracking investigations in IMPACT.[57]

---

[52] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *IMPACT Enhancement Reference Doc 1.28.20* (Jan. 28, 2020) (on file with the Monitors).

[53] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[54] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[55] Email from Corey Kintzer, Assoc. Dir. of Legal Servs. Div., Health & Human Servs. Comm'n to Deborah Fowler, Monitor (May 5, 2020, 17:17 EST) (on file with the Monitors) (including HHSC response to Monitors' Feb. 21, 2020 Data & Information Request).

[56] Email from Nancy Arrigona, Director of Research, Monitoring Team to Jane Burstain, Chief Data & Analytics Officer, Dep't of Family & Protective Servs. (Apr. 14, 2020, 16:02 EST) (on file with the Monitors) (including questions to DFPS concerning RCCI Investigator caseload data).

[57] Email from Jane Burstain, Chief Data & Analytics Officer, Texas Dep't of Family & Protective Servs. to Deborah Fowler (Apr. 24, 2020, 15:22 EST) (on file with the Monitors) (including DFPS response to questions sent by the Monitoring Team on Apr. 14, 2020).

There are other limits to the State's data systems.  The systems do not have a way to distinguish between missing data and data that are not applicable.  This makes interpreting blank cells in reports to the Monitors challenging in some instances. The list of placement types and living arrangements provided by DFPS is complex and contains many categories that are not fully defined, making it challenging to efficiently report characteristics of PMC children and remedial order metrics by common placement types such as kinship homes, foster homes, and congregate care. Due to the database systems in use currently, tracking investigation histories by child, perpetrator or facility across the two data platforms is complicated and inefficient.

While the State has made enhancements, large and small, to expand IMPACT's functionality, which may improve the tracking of information prospectively,[58] these steps do not fully resolve many of the problems identified above.

C.  Limited VPN Capacity and Barriers to Accessing Information

The difficulties experienced by the monitoring team accessing information using the State's databases are consistent with post-trial findings made by the Court in 2015.[59]  Monitoring team members routinely experienced delays when moving between screens within both IMPACT and CLASS. Access to information about investigations requires a reviewer to move through multiple screens in two different systems, which substantially increases the time needed to review investigative history. To compound this issue, the electronic connections to IMPACT and CLASS were routinely disrupted, forcing monitoring team members to log back into the systems repeatedly in a single day and resulting in periods of time where the monitoring team members repeatedly tried but could not log into the systems.[60]

Inconsistent access to reports also hampered the work of the Monitors and extended the amount of time required for the monitoring team to validate performance. The CLASS database has the ability to produce a Compliance and Sampling Report. This is a standard, pre-programmed report that allows the user to view the compliance history of a facility for a chosen time frame. When the Monitors requested access, HHSC, which manages the CLASS database, made changes to ensure the report was accessible for the monitoring team through CLASS. However, thereafter, the report again became inaccessible; as a result, the Monitors must make additional requests to HHSC to produce these reports.  In other instances, data fields that are available in one investigation are unavailable in other investigations.

III.    SCREENING, INTAKE AND INVESTIGATION OF MALTREATMENT IN CARE ALLEGATIONS

---

[58] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *IMPACT Enhancements and Defects Status 10.25.19* (Oct. 25, 2019) (on file with the Monitors).

[59] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015) (explaining inherent problems with DFPS's outdated IMPACT system impede caseworkers' ability to review important electronic case file information, resulting in delays and frustration among caseworkers).

[60] For example, for a period of two days between February 5, 2020 and February 7, 2020, two members of the monitoring team attempting to perform review of investigations and referrals could not access IMPACT 2.0.

## A. Remedial Order Three

Remedial Order Three: *DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

To assess the State's performance with respect to Remedial Order Three, the Monitors gathered and reviewed a wide range of data relating to the safety of PMC children for analysis and qualitative review. This section discusses the monitoring team's assessment and review of the statewide system for appropriately receiving, screening, and investigating reports of abuse, neglect, and exploitation involving PMC children at several points, including referrals to SWI; the screening of those reports to determine whether they should be investigated for child abuse, neglect or exploitation; and investigations of child maltreatment allegations.

### 1. Background

Under Texas law any person who believes that a child, a person 65-years-old or older, an adult with a substantial impairment, or anyone receiving services from select providers has been the victim of abuse, neglect, or exploitation must report it to DFPS.[61] SWI is the unit within DFPS that operates the Texas Abuse Hotline, which is responsible for receiving reports of abuse, neglect, and exploitation and referring them to the appropriate program for investigation.[62]

---

[61] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Statewide Intake Policy and Procedures* § 1110, *available at* https://www.dfps.state.tx.us/handbooks/SWI_Procedures/default.asp [hereinafter *SWI Policy and Procedures*] (citing TEX. FAMILY CODE §261.101, TEX. HUMAN RES. CODE §48.051, and 40 TEX. ADMIN. CODE, Ch. 711).

[62] *SWI Policy and Procedures* § 1000. SWI receives allegations of:

> Abuse or neglect of children by a person responsible for a child's care, custody, or welfare.
>
> Abuse or neglect of children in child-care operations.
>
> Abuse, neglect, or exploitation of:
>
> A person age 65 or older.
>
> An adult with a substantial impairment, **or** an emancipated minor with a substantial impairment by:
>
> A caretaker.
>
> A family member.
>
> An individual who has an ongoing relationship with the person.

Because of the broad scope of SWI's charter, SWI's first responsibility is to receive and evaluate the information provided by each reporter to determine whether the allegations meet any of the statutory definitions of abuse or neglect that govern the specified programs.[63] Based on that evaluation, SWI will either route the report to the appropriate program or, if the report does not rise to that level for any program, make a referral.[64] Reports that are not intakes of abuse, neglect, or exploitation are documented and classified as one of the following: Special Request (Administrative); Case-Related Special Request; or Information and Referral ("I&R").

When SWI makes a determination that the report involves a child who is under eighteen years of age in a licensed child-care operation that provides twenty-four hour care, SWI is required to refer the report to RCCI[65] to investigate the allegations.[66] For all other allegations of abuse, neglect or exploitation of a child, SWI will refer the report to DFPS's Child Protective Services (CPS) division, such as when the alleged perpetrator is a person who is responsible for the child's care, custody, or welfare, a member of the child's household, or school personnel.[67] CPS investigates allegations of abuse, neglect and exploitation of PMC children placed in unlicensed or unverified settings, such as kinship homes. If the report involves a child in a child care operation and SWI determines that the allegations do not rise to the level of abuse, neglect, or exploitation, but may involve a violation of licensing rules, SWI is required to refer the report to RCCL, which is located within HHSC, for a determination about whether the report demonstrates a violation of the minimum regulatory standards applicable to those programs.

For reports involving children in child care operations, SWI is charged to classify the intake based on the types of allegations included in the report. SWI has provided guidance for its workers that summarizes the statutory and regulatory definitions of abuse, neglect, and exploitation in seven

---

Abuse, neglect, and exploitation of individuals receiving services (adults and children) from certain providers as provided for in Human Resources Code §48.251(a)(9) and the Texas Family Code 261.404(a).

*SWI Policy and Procedures* § 1000.  SWI operates 24/7/365, *id.*, and receives reports by telephone, website, facsimile, mail, and in-person.  *Id.* § 2110.

[63] *Id.* § 2120.

[64] *Id.;* see also *id.* § 2220 ("If the information received at SWI does not meet the statutory definitions under which CPS, APS In-Home, APS Provider Investigations, or CCL are authorized to investigate, the information cannot be taken as an intake.")

[65] Effective September 1, 2017 the responsibility for oversight and regulation of child-care operations, which had resided with Residential Child Care Licensing within DFPS, was transferred to the Health and Human Services Commission.  The responsibility to investigate allegations of abuse, neglect or exploitation within those settings, however, remained with DFPS.  *Act of May 30, 2015*, 84th Leg., R.S. (SB 200); *Act of May 30, 2017*, 85th Leg., R.S. (SB 11).  DFPS created the Residential Child Care Investigations (CCI) unit as part of a new, independent Investigations Division to investigate those allegations.  It appears that some of the terminology in DFPS's policy manual has not yet been updated to reflect those changes.  *See, e.g.*, *SWI Policy and Procedures* § 5000 ("When information regarding a CCL operation meets the statutory definition of abuse, neglect, or exploitation, the intake specialist generates an intake for CCL . . . .").

[66] *SWI Policy and Procedures* § 5000.

[67] *SWI Policy and Procedures* § 4000; *see also SWI Policy and Procedures* § 4100.

categories:  Emotional Abuse, Exploitation, Medical Neglect, Neglectful Supervision, Physical Abuse, Physical Neglect, and Sexual Abuse.[68] SWI is also required to classify each such report as either a Priority One or a Priority Two matter "based on the severity and immediacy of alleged harm to children."[69] Priority One reports are those that allege:

- A child's death, regardless of whether there are any allegations of abuse or neglect contributing to the death of the child; or
- An immediate threat of serious physical or emotional harm or death of a child caused by abuse or neglect.[70]

All reports that allege abuse, neglect, or exploitation that do not meet Priority One criteria are classified as Priority Two.[71] RCCI is required to initiate Priority One investigations within twenty-four hours of intake, and Priority Two investigations within seventy-two hours.[72]

2.  RCCI's Secondary Screening of Allegations of Abuse or Neglect

SWI's determinations about whether a report rises to the level of abuse, neglect, or exploitation, and the appropriate priority, are not final. DFPS policy requires RCCI staff to conduct a secondary review of those questions for allegations involving children in licensed placements. During this secondary review, RCCI can unilaterally confirm or override any of the elements of SWI's determination.[73] DFPS reports that RCCI screened out 3,179 of 5,588 (56.9%) SWI intakes in 2019.[74]

RCCI's secondary review of SWI's determination may include additional contact with the original reporter, though not with the alleged child victims, and is focused on whether the report

---

[68] *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RCCL Intake Guidelines* (summarizing TEX. FAMILY CODE § 261.401 and TEX. ADMIN. CODE §§ 745.8555, 745.8557, and 745.8559).

[69] *SWI Policy and Procedures* § 5220.

[70] *SWI Policy and Procedures* § 5221.

[71] *SWI Policy and Procedures* § 5222.

[72] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Child Care Investigations Handbook* § 6361, *available at* https://www.dfps.state.tx.us/handbooks/CCI/default.asp [hereinafter *Child Care Investigations*].

[73] *Child Care Investigations* § 6220. That section provides:

> All intake reports require an evaluation to determine:
> (a) whether the information involves allegations of abuse or neglect;
> (b) whether the information involves possible violations of the statute, administrative rules, or minimum standards; (c) the immediate safety of children;
> (d) the degree of risk to children;
> (e) whether the operation is subject to a Licensing investigation; and
> (f) the appropriate Licensing priority.

*Id.*

[74] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations (RCCI): Intakes Screened Out*, *available at* https://www.dfps.state.tx.us/About_DFPS/Data_Book/Child_Protective_Investigations/Child_Care_Investigations/RCCI_Intakes_Screened_Out.asp (visited June 13, 2020).

should be investigated for abuse, neglect or exploitation by RCCI, investigated as non-abuse or neglect by RCCL, or closed without an investigation.[75] Non-abuse or neglect investigations by licensing staff at RCCL, ordinarily known as minimum standards investigations, can be classified as Priority One, Two, Three, Four or Five.[76] The RCCI secondary review also reassesses the original priority assigned by SWI. DFPS's Child Care Investigations Handbook states an intake report may be closed if RCCI determines it "clearly reflects" no abuse, neglect, or violation of minimum regulatory standards; reflects that another DFPS division or investigative agency has jurisdiction; or has already been addressed in a closed investigation.[77]

When the information within a referral to SWI is insufficient to determine whether or not there are safety threats to the child, the Texas Administrative Code supports concluding that cases should be investigated for abuse, neglect or exploitation. In relevant part, the Texas Administrative Code states that:

> DFPS staff must complete a thorough investigation if DFPS obtains information indicating that:
>
> (A) there are safety threats to the child because of abuse or neglect;
> (B) risk of abuse or neglect is indicated; or
> (C) based on information in the report and any initial contacts, it is impossible to determine whether or not there are safety threats to the child because of abuse or neglect or whether risk of abuse or neglect is indicated.[78]

However, the DFPS Child Care Licensing Policy and Procedures Handbook section for 'Downgrading an Abuse or Neglect Report' appears to conflict with the Texas Administrative Code's direction to resolve uncertainty in favor of investigation. The Handbook states that RCCI may downgrade an abuse or neglect report when the information in the report: "1) suggest a minimum standard was violated, but not that a child was abused or neglected; 2) or indicates that there is some risk to children, but the information is too vague to determine that a child was abused or neglected."[79]

DFPS asserted to the Monitors that the Texas Administrative Code and the Child Care Licensing Policy and Procedures Handbook are not in conflict because the Code does not apply to allegations of child maltreatment in licensed placements investigated by RCCI.[80] According to

---

[75] *Child Care Investigations* § 6221.  Investigations of abuse or neglect include, in addition to allegations of abuse or neglect, child fatalities and allegations of exploitation in some circumstances. *Child Care Investigations* § 6221.1.
[76] *See generally Child Care Investigations* § 6222.
[77] *Child Care Investigations* § 6221.5.
[78] TEX. ADMIN. CODE § 700.507 (e)(1)(A)-(C).
[79] *Child Care Investigations* §6242.2. The Monitors encountered several such cases during their review.
[80] Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan, Monitor (Mar. 11, 2020, 18:09 EST) (on file with the Monitors) ("Child Care Investigations (CCI) policy is not in conflict with the Texas Administrative Code (TAC) rule you mention as that rule applies solely to Child Protective Investigations (CPI).  For the purpose of CCI intakes, if the information is too vague or general, contact may occur with the reporter or other individuals in order to obtain clarifying information, as outlined in the Prioritization Guidelines.")

DFPS, the language in the Code requiring ambiguity to be resolved in favor of a child abuse, neglect or exploitation investigation pertains to all other investigations, including with respect to children not in DFPS's custody, but not to children in the custody of the State in licensed placements. In fact, DFPS's Handbook resolves uncertainty in the opposite direction for children in licensed settings: it authorizes RCCI through its secondary screening process to downgrade SWI assignments despite the presence of discernible "risk to children," if the reported allegations are "too vague to determine that a child was abused or neglected," even after the collection of additional collateral information as part of the secondary review process. In effect, the State's policy imposes a higher threshold for investigating the abuse, neglect and exploitation of PMC children in licensed placements, and as a result, RCCI inappropriately screens out allegations for abuse, neglect or exploitation investigations, placing children in the PMC class at risk of harm, as detailed in this Section of the report.[81]

3. RCCI's Investigation of Allegations of Abuse or Neglect

All reports that RCCI determines will be investigated as abuse, neglect or exploitation are assigned to an RCCI investigator.[82] The RCCI investigator is required to assess the immediate safety of involved children,[83] to evaluate the risk to the children during the investigation,[84] and to initiate the investigation timely based on the assigned priority – twenty-four hours for Priority One and seventy-two hours for Priority Two.[85] The RCCI investigator is required to conduct interviews of children and collateral witnesses,[86] to collect evidence,[87] and to complete the investigation within thirty days for both Priority One and Priority Two cases.[88] RCCI's possible findings include:

> Reason to Believe ("RTB") – A preponderance of evidence indicates that abuse, neglect, or exploitation occurred. If the disposition for any allegation is Reason to Believe, the overall case disposition is Reason to Believe.
>
> Ruled Out ("R/O") – A preponderance of evidence indicates that abuse, neglect, or exploitation did not occur. If the dispositions for all allegations are Ruled Out, the overall case disposition is Ruled Out.

---

[81] For example, in one case reviewed by the Monitors, an RCCI staff person submitted a report to SWI following an investigation they performed at a GRO facility on August 2, 2019.  A ten-year-old girl had stated to the reporter that a fight occurred between her and another resident, and staff allowed the fight to continue. There were also general concerns reported about inappropriate discipline, without injury. In downgrading this intake to Priority None, RCCI cited to § 6242.2 of the Handbook as one of its reasons for disposing of the case without investigating. *See* Appendix 3.1 for additional examples.

[82] *Child Care Investigations* § 6242.

[83] *Child Care Investigations* § 6330.

[84] *Child Care Investigations* § 6340.

[85] *Child Care Investigations* § 6412.1.

[86] *Child Care Investigations* § 6420.

[87] *Child Care Investigations* § 6440.

[88] *Child Care Investigations* § 6610.

Unable to Determine ("UTD") – A determination could not be made because of an inability to gather enough facts. The investigator concludes that:

- there is not a preponderance of the evidence that abuse or neglect occurred; but
- it is not reasonable to conclude that abuse or neglect did not occur.

If the disposition for any allegation is Unable to Determine and there is no allegation assigned a disposition of Reason to Believe, the overall case disposition is Unable to Determine.

Administrative Closure (ADM) – The operation is not subject to regulation; or the allegations do not meet the definition of abuse, neglect, or exploitation. If the dispositions for all allegations are Administrative Closure, the overall disposition is Administrative Closure.[89]

On September 9, 2019, DFPS reported to the Monitors with respect to Remedial Order Three:

DFPS policies and practices are in compliance with this order, and the RCCI July 2019 report, which DFPS provided to the monitors on September 5, 2019, provides data concerning PMC investigation initiation, face-to-face contact with victims, timely investigation completion, notifications to primary caseworker, and notifications to the reporter. Unless otherwise directed by the court/monitors, the Department's compliance with all elements of this order will be addressed separately within other responsive materials the Department has provided, as this order has no prescribed deadline and the language necessarily encompasses several other orders.

4. Statewide Intake Performance

b. Background

On February 21, 2020, the Court ordered the State to provide the Monitors by February 26, 2020, and continuing thereafter until further order of the Court, the records of all SWI calls made, the specific times of all calls made to SWI, and the wait time for each SWI call including, but not limited to, dropped and unanswered SWI calls.[90]

---

[89] *Child Care Investigations* § 6622.3.

[90] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-CV-84, slip. op. at 2 (S.D. Tex. Feb. 20, 2020), ECF No. 811 (ordering that starting February 26, 2020 and continuing thereafter in twenty-four hour increments until further order of the Court, the Defendants are to provide the Monitors with records of all Statewide Intake hotline calls made and the wait time for each call including, but not limited to, dropped and unanswered calls, and including the specific times of these calls to the Statewide Intake hotline).

The Court entered the Order after learning that one of the Monitors, Deborah Fowler, attempted to report an allegation of abuse to SWI after interviewing children during a monitoring visit at an RTC; and that upon calling the hotline, the Monitor was placed on hold for twenty-five minutes before she ended the call, subsequently calling in a second time to make the intended report upon her return to Austin later that night. The monitoring team's visit to the RTC began with an awake-night walk through on February 19, 2020, at approximately 11:45 p.m. During the subsequent day-time visits, the Monitors interviewed several children who complained of inappropriate restraints.[91] The children reported being required to hold their arms over their heads with their arms crossed, causing their heads to be forced forward and resulting in difficulty breathing and a report of at least one child passing out.[92] The program director at the RTC confirmed that the restraint described by the children is not an approved restraint.[93] The Monitors also interviewed children who reported physical abuse in the form of slaps and punches by the staff; one child complained of being slammed against a wall by a staff person, resulting in a prolonged headache. Additionally, the Monitors observed and reported very little evidence of medical treatment for the children other than psychotropic drugs.[94] Ms. Fowler was attempting to report an outcry of child abuse or neglect to the SWI hotline when she experienced the extensive hold time at SWI.[95]

In compliance with the Court's order, on February 26, 2020, the State produced data files containing monthly SWI call records between August 1, 2019 and February 26, 2020 of all hotline calls made; the specific times of these calls to the hotline; and the wait time for each call, including, but not limited to, dropped and unanswered calls.[96]

Calls to SWI are answered by an automated system that asks the caller a series of questions in order to determine the way the call is routed.[97] These questions include a caller's language preference; whether the caller is asking about the status of a case; or whether the caller wants to learn more about online reporting.[98] Depending upon the answers to these questions, the call is routed to one of twenty-two "call queues."[99] If an SWI staff member is not immediately available, the caller waits on the queue.[100] If a caller hangs up before an SWI staff member answers the call,

---

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.* at 2-3.

[95] *Id.* During the course of monitoring activities between July 31, 2019 and April 30, 2019, the Monitors made eighteen calls to SWI due to their observations during field visits to placement facilities.

[96] The data files provided by the State utilized in this section of the report are: (1) export_0819.csv; (2) export_0919.csv; (3) export_1019.csv; (4) export_1119.csv; (5) export_1219.csv; and (6) export_0120.csv, provided to Monitors February 26, 2020 (on file with the Monitors). Additionally, the State provided the Monitors with a Data Dictionary defining each data element. TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *SWI Calls Raw Data Report – Data Dictionary* (Feb. 26, 2020) (on file with the Monitors).

[97] *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

[98] *Id.*

[99] *Id.*

[100] *See* TEX. DEP'T. OF FAMILY & PROTECTIVE SERVS., *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors).

the call is categorized as "abandoned."[101] If an SWI staff member speaks with the caller, the call is categorized as "handled." The automated system records the date and time that each call starts and ends; the call queue to which the call is routed; whether the call is handled or abandoned; the time the caller waits after being routed to a queue before speaking with an SWI staff member; and other information.[102]

c. Statewide Intake Call Center Performance Analysis

  i. Methodology

The Monitors analyzed SWI's Avaya call data related to the 372,897 calls made to SWI from August 1, 2019 to January 31, 2020.  The analysis examined the distribution of calls by month, weekday, hour and call queue, the prevalence of abandoned calls, and the amount of time callers wait before the call is answered by a staff person.

*Volume of Calls to SWI*

On average, the SWI data recorded over 62,000 calls a month.  These include calls from the public as well as calls and transfers within SWI. Call volume rose from August 2019 to October 2019 and then fell in November 2019 and December 2019 before climbing in January 2020.

**Figure 4: Texas SWI Call Volume by Month**

---

[101] *Id.*

[102] Tex. Dep't. of Family & Protective Servs., *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors); Tex. Dep't of Family & Protective Servs., *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).



*Abandoned Calls*

During the period analyzed, 18% (65,786) of calls were abandoned. One-fifth (13,411) of all abandoned calls occurred before the caller finished navigating the automated system and one-third (22,771) of the calls were abandoned before the caller had been waiting on the queue for a minute.  Another one-third (23,851) of abandoned calls occurred after one to five minutes in the call queue and the final one-third (19,164) after the caller had been on the call queue for over five minutes. Of the calls on a queue for between one and five minutes (67,995), over one-third (23,851) were abandoned. Many callers, however, waited much longer before hanging up.  In the six months examined, 8,338 calls (39%) were abandoned after the caller waited for ten minutes or more.[103]

**Figure 5: Texas SWI Abandoned Call Rates by Queue Time**

---

[103] The Monitors were not able to verify whether callers who abandoned calls contacted SWI again.



*Abandoned Calls by Call Queue*

About two-thirds of all calls were routed to the abuse hotline queue.  The most common three queues were the abuse hotline; calls from law enforcement; and calls from intake staff to their supervisors. Those three queues account for 87% (323,810) of all calls in the SWI data.[104]  Only 3% (1,123) of the 36,208 calls from law enforcement were abandoned. In contrast, 22% (51,409) of 234,270 calls to the abuse hotline were abandoned. On the law enforcement queue, 82% (29,827) of calls were handled or abandoned in the first minute and 97% (34,952) in the first five minutes. In contrast, only 36% (85,492) of calls to the abuse hotline were handled or abandoned in the first minute and 58% (137,037) in the first five minutes.

*Abandoned Calls by Day and Time of Call*

Calls to SWI on weekends, at night, or in the early morning have shorter queue times and lower than average abandoned call rates. For example, of the 26,193 calls during the six-month period that were placed on Saturdays, 9% of calls (2,304) were abandoned.  In contrast, abandoned call rates routed to the abuse hotline during weekday afternoons were much higher than average.  Of the 17,577 calls to SWI that were placed on Monday or Friday between 3:00 p.m. and 5:00 p.m.

[104] The supervisor queue is the queue intake staff call to speak with a supervisor/acting supervisor/worker.  TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RO3_03-13-20 Response FINAL* (Mar. 30, 2020) (responding to Monitors' Information Request under Remedial Order Three regarding Screening and SWI Call Center Data) (on file with Monitors).

and routed to the abuse hotline, 40% of calls (7,023) were abandoned. Over half of those calls, 56%, (9,907) were handled or abandoned after ten minutes on the call queue.

5.  DFPS Intake Screening and Maltreatment in Care Investigations

a.  Data and Information Request and Production

i.  Monitors' Data and Information Request

To validate the State's performance with respect to appropriately screening referrals for child maltreatment associated with Remedial Order Three, the Monitors requested from the State, on an on-going monthly basis, a list of all referrals received through SWI via phone call, website, fax, regular mail, or any other manner in which the referent expresses concern about child maltreatment regarding children in the PMC General Class, regardless of placement type.[105] The Monitors requested inclusion of relevant data points about the child and the placement, including where the child is placed at the time of the referral to SWI; licensure status; and whether the referral was sent for an investigation. The Monitors also requested key data points about the referrals including the date of the referral; the disposition of the report by SWI (where referred, whether it was classified as an intake or I/R, and the priority assigned); the disposition of the report by the office/division to which it is referred (RCCI, RCCL etc.), including whether it was referred for an abuse or neglect investigation or a minimum standards investigation; the priority assigned to the investigation; and any other information about how the State addressed or planned to address the referral.[106]

To validate the State's performance with respect to appropriately investigating child maltreatment in care associated with Remedial Order Three, the Monitors requested from the State, on an ongoing basis, a list of all investigations involving any child in the PMC General Class initiated and/or closed between July 31, 2019 and September 30, 2019, with the first report due November 15, 2019 and then through regular quarterly reporting thereafter. The Monitors requested key information about the investigations including the date and time of intake; allegations; alleged victims in the PMC Class; investigator; and PMC child placement, among other requested fields relevant to Remedial Order Three and other remedial orders.[107]

---

[105]Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (including Monitors' Sept. 30, 2019 Data & Information Request) (on file with the Monitors).

[106] *Id.*

[107] The Monitors' request included: intake stage ID number; investigation stage ID number; person ID (for all alleged PMC victims); county where maltreatment is alleged; most recent investigator name and ID; date and time investigation stage started; program conducting investigation; child's placement type at intake; placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; the relationships of the alleged perpetrator(s) to the child-victims. For closed investigations, the Monitors' request included: date the investigation is completed; date documentation is completed and submitted to the supervisor; the status of all

ii. DFPS Data and Information Production

For purposes of data related to SWI, the State—DFPS and HHSC together or separately—has been unable to provide the Monitors with a unified list of all referrals to SWI involving PMC children as an apparent result of a bifurcated system for processing and storing data associated with referrals to SWI.[108] In response to the Monitors' request to the State for data about referrals to SWI, the Monitors received separate data files from both DFPS and HHSC.  DFPS produced monthly data for all referrals to SWI in which a PMC child was an alleged victim and SWI staff determined that the referral involved abuse or neglect allegations; HHSC produced monthly data for all referrals overall to SWI that were not screened as abuse or neglect, meaning the referrals were administratively closed, referred for an RCCL minimum standards investigation or otherwise. Among those referrals, some were originally screened in by SWI as abuse or neglect but were later downgraded by RCCI and subsequently referred to RCCL.

HHSC cannot distinguish between PMC and non-PMC child-related referrals in its data. HHSC's data includes all referrals for that period and does not identify PMC children because, as the agency reported to the Monitors, "[t]he agency is operations-centric not child centric. CLASS does not contain the PMC identifier of children involved in a referral [or investigation]; the PMC identifier is only associated with referrals of abuse or neglect in IMPACT."[109] Thus, the majority of the 7,333 referrals included in the data reported by HHSC from July 31, 2019 through November 30, 2019 do not include the name of the child or children associated with the referral. Moreover, for the limited data where the name of a child is identified, PMC status is not distinguished. In addition, the Monitors were also able to discern that HHSC data related to referrals is not limited to children who are in DFPS custody.

HHSC and DFPS each produced different referral files for this reporting period. The first productions included the data covering July 31, 2019 through September 30, 2019, and both agencies subsequently produced monthly data on an ongoing basis.[110] For the monthly files, the Monitors requested the production on a fifteen-day lag but have received it on a forty-five-day

---

allegations involving all PMC children; overall investigation disposition; the reason(s) for all approved extensions to the investigation completion date/time (when applicable); the date any notification letters are sent to parents, providers and/or referents. *See also* Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors).

[108] *See also* Section II.

[109] TEX. HEALTH & HUMAN SERVS. COMM'N, *Data Production Chart* at 5-6 (Dec. 6, 2019) (responding to Monitors' Sept. 30, 2019 Data and Information Request).

[110] HHSC produced the following files: (1) RO.15-19.1 Referrals for July 31-September 30, 2019 data produced December 6, 2019; (2) Referrals for October 2019  data produced December 6, 2019, (3) Referrals for November 2019 data produced January 15, 2020.; (4) Referrals for December 2019 data produced February 18, 2020.  DFPS produced the following files: (1) RO3.1 RCI Intakes July 31-September 30 2019 – Nov-15-19 - 96364; (2) RO 3.1 RCI and CPI Intakes Oct 2019 – Dec 16-19 – 96558; (3) RO3.1 RCI and CPI Intakes Nov 2019 – Jan 15-20 – 96876; and (4) RO3.1 RCI and CPI Intakes Dec 2019 – Feb-18-20 – 96906.  DFPS originally produced files with children in licensed placements only but subsequently provided data for PMC children residing in licensed and unlicensed placements. The Monitors reviewed data related to CCI only for this report.

lag. DFPS stated that the production timeframe is "based on the regular business cycle for loading data in the data warehouse tables which are what is used for ongoing reporting."[111]

In response to the Monitors' request for data reporting on closed maltreatment in care investigations, DFPS has produced two semi-quarterly files for closed investigations for this reporting period and ongoing.[112]   The files separately reported on investigations conducted through RCCI and Child Protective Investigations ("CPI").[113]

b.   Overview of Allegations in Referrals and Investigations for Maltreatment in Care

The Monitors analyzed data about maltreatment in care allegations for PMC children using: (1) RCCI intakes pertaining to PMC children in licensed facilities received from August 1, 2019 to December 31, 2019;[114] (2) RCCI Investigations pertaining to PMC children in licensed facilities opened from August 1, 2019 to November 30, 2019; and (3) RCCI Investigations pertaining to PMC children in licensed facilities closed between August 1, 2019 and November 30, 2019. Analysis of one intake may include one or more children and one or more allegation for each child.

i.   Intakes for PMC children

From August 1, 2019 to December 31, 2019, DFPS reported 935 unique intakes for PMC children in licensed placements that were coded as abuse or neglect by SWI intake staff and then sent to RCCI where a secondary screening occurred to determine whether to proceed with an abuse or neglect investigation by RCCI.[115] As discussed above, the State is unable to report on the total number of referrals that are received by SWI pertaining to PMC children because of its bifurcated reporting system for such information and documentation process, as described in Section II of this report.[116]

---

[111] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[112] The reports included (1) RO3.2 RCI closed INV in Aug and Sept 2019 – Nov-15-19 – 95605; (2) RO3.2 RCI Investigations Oct-Nov 2019 – Jan-15-20 – 96882;(3) RO3.2 RCCI Investigations Oct-Nov 2019 – Jan-15-20 – 96882 – 2-3-20 Updated w/Class Inv Number. DFPS provided quarterly reports for CPI investigations in January 2020 and ongoing. The State produced its investigation reports on a slightly altered schedule due to norming the data production schedule with the State's fiscal year calendar as agreed by the Monitors. The State's limitations for reporting on the data associated with this request related to Remedial Orders Five through Eleven, Sixteen and Eighteen are included in Section III.C. discussing those orders.

[113] CPI is charged, in part, with investigating allegations of abuse, neglect or exploitation of children in the PMC General Class in unlicensed placements such as kinship foster homes.

[114] These data files included RO3.1 RCI Intakes July 31- Sept 30 2019 - Nov15-19 – 96364, RO3.1 RCI and CPI Intakes Oct 2019 - Dec 16-19 – 96558, RO3.1 RCI and CPI Intakes Nov 2019 - Jan 15-20 – 96876, RO3.1 RCI and CPI Intakes Dec 2019 - Feb-18-20 – 96906.

[115] These data files included RO3.1 RCI Intakes July 31- Sept 30 2019 - Nov15-19 – 96364, RO3.1 RCI and CPI Intakes Oct 2019 - Dec 16-19 – 96558, RO3.1 RCI and CPI Intakes Nov 2019 - Jan 15-20 – 96876, RO3.1 RCI and CPI Intakes Dec 2019 - Feb-18-20 – 96906.

[116] TEX. HEALTH & HUMAN SERVS. COMM'N, *Data Production Chart* at 5-6 (Dec. 6, 2019) (responding to Monitors' Sept. 30, 2019 Data and Information Request).

During the secondary screening, RCCI downgraded 414 of 935 intakes (44%) to Priority None (PN); meaning that at secondary screening, RCCI assigned the intake as a Priority None and determined that it would not conduct an abuse or neglect investigation. In addition, RCCI downgraded 88 of 935 intakes (9%) from Priority One investigations to Priority Two investigations.

**Figure 6: RCCI Rate of Downgrades from August 1, 2019 to December 31, 2019**



ii.  Intake Rates and Types of Abuse or Neglect Allegations

DFPS reported that 935 unique intakes by SWI involving 1,144 PMC children in licensed placements between August 1, 2019 and December 31, 2019 contained 1,250 allegations of child abuse, neglect or exploitation. Among those 1,250 allegations, neglectful supervision was the most common allegation type at 52%, affecting 648 children; physical abuse allegations constituted 29% of allegations, affecting 367 children; and sexual abuse allegations constituted 9% of all allegations, affecting 115 children.[117] The data may underrepresent the prevalence of alleged sexual abuse victimization among PMC children due to the nature of neglectful supervision allegations. The DFPS data do not identify the type of harm underlying neglectful supervision allegations; however, independent review by the Monitors found that one-third of intakes between August 1, 2019 and December 31, 2019, with allegations of neglectful

---

[117] If a child was the subject of the same type of allegation in two separate intakes, they would be double counted in the numbers in this sentence.

supervision involved reports of sexual contact between at least two children in a GRO or foster home.

**Figure 7: Allegation Types for Intakes Involving PMC Children in Licensed Placements Aug. 1, 2019 to December 31, 2019**



iii. Perpetrators of Maltreatment in Care in Investigations involving PMC Children in Licensed Placements

RCCI opened 264 new investigations involving at least one PMC child between August 1, 2019 and October 31, 2019. Foster parents and institutional staff accounted for three-quarters of the alleged perpetrators.[118] Institutional staff accounted for 211 (39%) of the alleged perpetrators; foster parents accounted for 196 (36%) of the alleged perpetrators; relative/household members accounted for twenty-five (5%); parents/guardians accounted for twelve (2%); service providers accounted for ten (2%); and the perpetrator was unknown, not listed, or listed as other for eighty-

---

[118]The 264 investigations involved 537 allegations.  In the data the Monitors received, each allegation has a perpetrator category, but not a unique identifier for each perpetrator.  As a result, it is possible that a small number of perpetrators may be counted more than once, but the Monitors do not believe this would have a significant impact on the data presented here.

three (15%) of the alleged perpetrators. An investigation can have multiple perpetrators, so the number of alleged perpetrators is larger than the number of investigations.

**Figure 8: Alleged Perpetrators in RCCI Investigations Involving PMC Children in Licensed Placements**



Source: CCI open investigations, Aug. 1 - Oct. 31, 2019 investigations data
n=537 perpetrators in 264 investigations

#### iv. Maltreatment in Care Investigation Substantiation (RTB) Rates

RCCI closed 261 investigations for maltreatment of a PMC child in licensed placements between August 1, 2019 and November 30, 2019, and 3.4% of the investigations resulted in substantiations of the allegations. In contrast, in CPI investigations of unlicensed homes involving a PMC child that were completed between September 1, 2019 and November 30, 2019, the substantiation rate was 14.7%.[119]

**Figure 9: Reason to Believe Findings in Closed RCCI Investigations Involving PMC Children in Licensed Placements**

---

[119] RO3.2 CPI Investigations Q1 FY20 – Jan-15-20 96790. Investigations may involve more than one child. DFPS reported CPI Investigation data to the Monitors starting with September 1, 2019.



c. Remedial Order Three: Screening and Intake Performance Validation

i. Methodology

To evaluate DFPS's performance associated with Remedial Order Three and assess the appropriateness of screening of referrals of abuse, neglect or exploitation involving PMC children in licensed placements, the monitoring team conducted a qualitative review of a random sample of 329 of 590 referrals made to SWI and assigned to RCCI for an investigation between July 31, 2019 and October 31, 2019. The Monitors derived the sample from two data reports provided by DFPS.[120]

The first data set from DFPS contained referrals to SWI between July 31, 2019 and September 30, 2019.[121] For the two-month period, DPFS identified 379 intakes involving PMC children in licensed placements that were assigned to RCCI for investigation, of which the Monitors reviewed

---

[120] This review was conducted using a sample with a 95% confidence level based upon DFPS SWI intake data for July 31, 2019 through October 31, 2019 and then manually reviewed by the monitoring team to analyze the underlying allegations. The sample of 329 intakes included 171 cases with a neglectful supervision allegation; of the 171, fifty-seven of those cases involved sexual contact between two children in care as the underlying event. For this reporting period, the Monitors' sample was based upon on the referrals received from the State that identified PMC children in the General Class; the referral information provided by HHSC during this reporting period from July 31, 2019 through November 30, 2020 included 7,333 referrals and did not include child-identifying information in the majority of referrals, thereby requiring the Monitors to independently identify the children involved in the referral and then whether those children were in PMC status. To evaluate the State's screening determinations for the total sample of 329 intakes, the Monitors designed a review tool for the case record review. To support consistency in scoring, both inter-rater reliability and secondary reviews were tested and used.
[121] RO3.1 RCI Intakes July 31- Sept 30 2019 - Nov-15-19 – 96364.

a random sample of 192 reports using a 95% confidence level and a 5% margin of error. The second data set contained reports made to SWI that were assigned to RCCI between October 1, 2019 and October 31, 2019.[122] DFPS identified 211 intakes made to SWI and assigned to RCCI in October 2019, of which the monitoring team reviewed a random sample of 137 reports using a 95% confidence level and 5% margin of error. The sample for the months of August and September 2019 was stratified to proportionally reflect DFPS's screening determinations for these two months. In compliance with the directive in Remedial Order Three to take "into account at all times the child's safety needs," the Monitors enriched the sample of intakes that were assigned Priority None (PN)[123] in October 2019, which were, therefore, never investigated by the State for child abuse or neglect.[124]

## ii. Remedial Order Three Intake Screening Validation Results

The Monitors' qualitative review focused on whether RCCI appropriately screened a sample of intake reports made to SWI and assigned to RCCI between July 31, 2019 and October 31, 2019. All of the selected 329 (of 590) reports reviewed by the monitoring team were assessed by SWI as requiring Priority One or Two investigations for child abuse, neglect or exploitation by RCCI. Of these 329 intakes, 155 (47%) were assessed by SWI as presenting allegations of abuse, neglect or exploitation of a PMC child in a licensed placement and assigned a priority for investigation, then confirmed at a secondary screening by RCCI as presenting allegations of abuse, neglect or exploitation before being investigated.[125] Twelve (8%) of these 155 intakes were classified by DFPS as Priority One investigations, indicating that the allegations concerned an immediate threat to the health or safety of a foster child(ren). DFPS classified the other 143 intakes (92%) as Priority Two investigations, determining that the abuse or neglect allegations did not appear to place the child at immediate risk of serious physical or emotional harm as a result of the allegations.

The remaining 174 (53%) of the 329 intakes reviewed by the monitoring team were downgraded to PN by RCCI during secondary screening and were not assigned for an abuse, neglect or exploitation investigation.[126] Of the 174 intakes that were downgraded by RCCI, eighteen (10%)

---

[122] RO3.1 RCI and CPI Intakes Oct 2019 - Dec 16-19 – 96558. The CPI data is reported in this file, as well; the Monitors reviewed the CCI information only for purposes of this review.

[123] An intake is assigned Priority None (PN) when CCI determines that the intake report does not contain an allegation of abuse or neglect.

[124] Of the 137 intakes contained in the October 2019 sample, eighty-one (59%) intakes were assigned a PN disposition and fifty-six (41%) intakes were assigned to be investigated as abuse and neglect. A proportional sample would have included fifty-eight (42%) intakes that were assigned a PN disposition and seventy-nine (58%) intakes that were assigned to be investigated as abuse or neglect. As the Monitors did not find any cases where RCCI's decision to proceed to an investigation of alleged abuse, neglect or exploitation of a PMC child was inappropriate, the Monitors' will focus future validation efforts on screen-outs, where the Monitors identified numerous inappropriate determinations.

[125] After adjusting for the October 2019 sampling of PN intakes, a proportional sample for the three-month period would show that 54% (178 of 329) of DFPS intakes are assigned to abuse and neglect investigations.

[126] Due to the over-sampling of PN intakes in the October 2019 sample, the Monitors' sample over-represents the number of intakes DFPS did not assign to abuse, neglect or exploitation investigations between October 1, 2019 and October 31, 2019. After adjusting for the October 2019 over-sampling of PN intakes, a proportional sample for the

were initially classified as Priority One by SWI and the other 155 (90%) were originally classified as Priority Two by SWI.

Within the Monitors' sample of 174 intakes that RCCI downgraded at a secondary screening, the Monitors determined that RCCI inappropriately downgraded fifty-seven intake reports (33%), which contained allegations that warranted investigation for abuse or neglect to ensure the safety and well-being of a PMC child(ren).[127] Thus, in those fifty-seven cases, summarized in Appendix 3.1, the Monitors agree with the original SWI determination to assign the intakes for abuse or neglect investigations and disagree with the RCCI final determination not to investigate.

RCCI's inappropriate downgrades of referrals represent a significant, systemic failure that increases the risk of serious harm to children. When referrals are not investigated as child abuse, neglect or exploitation, but instead are relegated to a regulatory investigation, alleged perpetrators can continue perpetrating, even when there is a minimum standards violation identified by RCCL. The Monitors have discovered precisely this circumstance in preparation of this report, including fact patterns where perpetrators identified in the context of minimum standards violations were able to secure employment at other CPAs and GROs because their culpability had not been established as part of a child abuse, neglect or exploitation investigation.

**Figure 10: Monitors' Assessment of RCCI Secondary Screening Decision Not to Investigate as Abuse, Neglect or Exploitation between July 31, 2019 and October 31, 2019**
*n=174*



---

three-month period would show that 46% (151 of 329) of DFPS intakes are not assigned to abuse and neglect investigations.

[127] These fifty-seven cases are detailed in Appendix 3.1.

Of these fifty-seven intakes, SWI had classified eight as Priority One investigations and the other forty-nine reports as Priority Two investigations. The majority (60%) of these fifty-seven intakes were coded by SWI as Neglectful Supervision, with the next largest allegation type being Physical Abuse, reflecting 30% of intakes, as detailed in the Table below.

### Table 4: Allegation Type Assigned by SWI

*n=57*

| Allegation | No. of Intakes | % |
|---|---|---|
| Neglectful Supervision[128] | 34 | 60% |
| Physical Abuse | 17 | 30% |
| Medical Neglect | 3 | 5% |
| Physical Neglect | 2 | 3% |
| Sex Abuse | 1 | 2% |
| **Total** | 57 | **100%** |

RCCI documented the following reasons for screening these intakes as non-abuse or neglect: forty (70%) intakes were documented as "Doesn't appear to involve abuse, neglect, or risk;" eleven (19%) were documented as "Other agency/out of state;"[129] and six (11%) were documented as "Closed and reclassified."[130] RCCI documented comments, including policy, to support its closure reason. Among the fifty-seven intakes, the Monitors identified that the following were routinely cited by RCCI to support its downgrade decision not to investigate:

- In 32% (eighteen) of the downgrades with which the Monitors disagreed, RCCI referenced the policy category which states: "A non-abuse or neglect intake report is classified as a Priority 2 investigation in CLASS, if the report does not contain an allegation of abuse or neglect, but does concern . . . a significant supervision problem."[131] These intakes were downgraded despite the presence of facts in the allegations that met the threshold for neglectful supervision as defined in the Texas Administrative Code.[132]

- In 23% (thirteen) of the downgrades with which the Monitors disagreed, RCCI referenced the policy category which states: "A non-abuse or neglect intake report is classified as a

---

[128] One intake coded with the allegation type of Neglectful Supervision was also coded as Emotional Abuse.

[129] According to DFPS, the closure reason "Other agency/out of state" is used when the intake is outside its jurisdiction and must be handled by another authorized entity. One of the eleven intakes coded as "Other agency/out of state" was assigned to law enforcement. It appears this intake should have been investigated by DFPS in addition to law enforcement. It is not clear to the Monitors why the other ten intakes were coded with this closure reason as the intakes all appear to fall within DFPS's jurisdiction.

[130] According to DFPS, the closure reason "Closed and Reclassified" is used when the allegations warrant follow-up by a different DFPS program area than the one originally identified. To qualify as Closed and Reclassified, the report must be re-entered as a report for another DFPS division. It appears CCI assigned this closure reason as these intakes were assigned to non-abuse or neglect investigations within HHSC.

[131] *Child Care Investigations* § 6222.2.

[132] 40 Tex. Admin. Code § 745.8557.

Priority 2 investigation in CLASS, if the report does not contain an allegation of abuse or neglect, but does concern inappropriate discipline [or an] inappropriate physical restraint."[133] These intakes included allegations of physical abuse (i.e.: hitting, shoving, inappropriate physical restraints) by facility staff and foster parents toward children and youth, some of which included reports of injuries to the child. In several of these instances, the RCCI documentation suggested that the threshold used by staff incorrectly required that the child sustain injuries and/or that those injuries result in "substantial harm" to the child even though the appropriate standard in the Texas Administrative Code defines physical abuse as:  "Any act such as striking, shoving, shaking, or hitting a child, whether intended as discipline or not, by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves."[134]

Inappropriate Downgrades by RCCI of Neglectful Supervision Allegations

Among the fifty-seven referrals with which the Monitors disagreed, the Monitors' review identified a prevalent theme around the downgrades involving inadequate supervision in sixteen (28%) of those that involved neglectful supervision allegations. Prior to the inappropriate downgrade by RCCI to PN, SWI had coded fifteen of these intakes as Neglectful Supervision and one as Physical Abuse. The monitoring team's review determined that these sixteen intakes contain allegations that meet the Texas Administrative Code definition of Neglectful Supervision yet these referrals were screened out without adequate consideration or interrogation of staff or foster parent behavior. RCCI eliminated the possibility of an abuse, neglect or exploitation finding of neglectful supervision, by downgrading the reports to HHSC's regulatory minimum standards investigations. In some of these cases, RCCI appears to have based their downgrade on the behavior of children at the time of the incident and then determined the behavior was not serious (i.e.: consensual sexual conduct or self-harming that is not suicidal) without consideration of the action or lack of action by caregivers to prevent the incident, even when the behavior caused or may have caused harm.[135]

---

[133] *Child Care Investigations* § 6222.2.

[134] 40 TEX. ADMIN. CODE § 745.8557(1).

[135] Sixteen intakes contain allegations that meet Texas Administrative Code definitions of abuse/neglect and fit this theme. The following are some of the categories of maltreatment these cases fall under:
- Unreasonable failure to act: Failure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation, by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child. 40 TEX. ADMIN. CODE § 745.8559(1).
- Other neglect: Any other act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child. 40 TEX. ADMIN. CODE § 745.8559.
- Sexual conduct - failure to prevent: Failure to make reasonable effort to prevent sexual conduct to a child, by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves. 40 TEX. ADMIN. CODE §745.8557(7).

Of the sixteen downgrades, eight include allegations of children engaged in physical altercations, often severe in nature. Seven of eight intake allegations document injuries to a child and three of these intakes document children receiving medical care at the hospital. Injuries referenced in these referrals include a concussion, broken nose and black eyes.[136] To support the downgrade, RCCI often stated that staff responded appropriately to fights (i.e. intervened to break up fights and then sought medical care for a child) without conducting a full investigation.   There is less evidence of sufficient inquiry by RCCI into what caregivers were doing or failed to do prior to a fight to prevent altercation and injuries.

The remaining six downgrades include allegations related to children engaged in sexual contact. Two of the six cases involve children thirteen years of age and younger. As discussed below, RCCI's documentation in these downgrade determinations is less focused on the adequacy of adult supervision at the time children engaged in sexual conduct and frequently focused on its perception that the sexual conduct did not contain coercion or force.   For example, a reporter stated that a 14-year-old male child said that his foster brother pulls his pants down in front of him, "shakes his ass" in the child's face and punches him in "his private parts." The reporter said the child told his foster parent and that, in response, the foster parent told the foster brother to stop but did nothing more. The reporter said that sometimes the foster children are left alone when the foster parents go to the store. At those times, the reporter said, the foster brother shakes his backside and tells the alleged victim, "come on and f**k me." Even after the child told the foster parents what happened, the foster parents reportedly still left the children at home alone. RCCI downgraded the original SWI assignment from a Priority Two neglect investigation for Neglectful Supervision and transferred the matter to RCCL for a minimum standards investigation. RCCI wrote that the allegation:

> Doesn't appear to involve abuse, neglect or risk. The intake was staffed by RCCL and HHSC and the case was agreed to be downgraded to HHSC non-abuse and neglect and will be assessed for risk by HHSC and evaluated for any monitoring concerns. Per LPPH 6242.2, an intake can be downgraded to a non-abuse case when the information in the report indicates that the child was not abused or neglected. Per the intake, all the children are ages 14-15 and are all male. The intake reports of a child acting inappropriately, however there is no reports of the child using any force, threats, or coercion. The children are reporting their concerns to the foster mother and she is verbalizing the other child to stop. The intake also states the children are left home alone, however they are all older and in age and the concerns for being left home alone are not severe. The intake was staffed by RCCI Supervisor and HHSC Supervisor and the case was agreed to be downgraded

---

[136] The presence of these injuries is not required to investigate child abuse, neglect or exploitation, but the details demonstrate the severity of the physical altercation, which raises larger concerns around supervision.

> to HHSC non-abuse and neglect and will be assessed for risk by
> HHSC and evaluated for any monitoring concerns.

The downgrade was inappropriate because the allegations meet the criteria for an abuse and neglect investigation based upon:

> "Failure to make reasonable effort to prevent sexual conduct to a child," by "someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves";[137]
> "Failure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation," again "by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child";[138]
> "Placing a child in or failing to remove the child from a situation in which a reasonable member of that profession, reasonable caregiver, or reasonable person should know exposes the child to the risk of sexual conduct," by "a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child.[139]

The reporter alleged repeated sexual acts by another youth in the home that were not safely addressed by the foster parents who continued to leave the alleged victim alone with the foster brother whose conduct was potentially harmful to both children. During the subsequent minimum standards investigation, RCCL interviewed five collateral witnesses who confirmed the youth were being left alone for about 30 minute(s) to an hour. Leaving the children unsupervised violated the children's service plan, which specified "the children cannot be left unsupervised without a caregiver," despite RCCI's written conclusion in its downgrade determination that the age of the youth justified leaving them home alone without supervision. RCCL cited the home for not following the supervision plan for two of the youth, "allowing a frequent visitor to have unsupervised access without a background check." The matter was treated as a violation of standards and there was no finding of child neglect.

<u>Inappropriate Downgrades by RCCI of Physical Abuse Allegations</u>

---

[137] 40 Tex. Admin. Code § 745.8557(7).
[138] 40 Tex. Admin. Code § 745.8559(1).
[139] 40 Tex. Admin. Code § 745.8559(7).

Fifteen of the fifty-seven inappropriate downgrades involve allegations of physical abuse of children and youth placed in foster homes and GROs.[140]  Prior to the downgrade by RCCI, SWI had coded fourteen of these intakes as Physical Abuse and one as Neglectful Supervision.  Based upon the reported allegations, these intakes meet the standard of physical abuse as defined in the Texas Administrative Code which defines physical abuse as: "Any act such as striking, shoving, shaking, or hitting a child, whether intended as discipline or not, by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves."[141] Of the fifteen physical abuse downgrades, seven feature allegations of forceful/inappropriate restraints used by staff, some of which resulted in injuries to children.

For example, a seventeen-year-old male victim called SWI with staff from the Foster Care Ombudsman's Office. The youth stated that staff restrained him improperly and allegedly pushed him into his room where they tried to pull his hands behind his back while stretching him as far as possible. The youth reported staff put a mat on the youth's upper chest, then pushed between the esophagus and chest and held him for 15-25 minutes. The youth reported this occurred with one staff person holding the child's arms and the other pushing the mat on the child's throat, which allegedly caused a bruise on his right shoulder.  The seventeen-year old received medical attention from the nurse on site. RCCI downgraded the investigation, writing:

> Other Agency/Out-of-State. Due to additional calls made.  Rep states OV did not report trouble breathing during restraint. Per LPPH 6222.2 intake does not contain allegations of A/N. Allegations pertain to inappropriate restraint.  OV did not report trouble breathing during restraint.  Intake will be addressed in standards inv.

The downgrade was inappropriate. The allegation of excessive force being used against a youth during a restraint meets the threshold for a physical abuse investigation based upon: "Physical Abuse: Any act such as striking, shoving, shaking, or hitting a child, whether intended as discipline or not, by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves."[142] A subsequent RCCL minimum standards investigation included interviews with, among others, the victim, two additional residents and four staff members. Video from the facility was viewed but the incident was alleged to have taken place in a bedroom where no cameras are located. RCCL determined "No minimum standards deficiencies as it pertains to this investigation."

---

[140] As detailed in the Table above, seventeen of the fifty-seven inappropriate downgrades involved initial allegations of physical abuse; however, two of those intakes appeared to meet the definitions of neglectful supervision and emotional harm, as opposed to these fifteen that should have been investigated for physical abuse.

[141] 40 TEX. ADMIN. CODE § 745.8557(1).

[142] Id.

In another intake downgraded by RCCI, a DFPS staff person reported that a fifteen-year-old male hurt his shoulder when a facility staff person performed a restraint in an attempt to keep the youth from attacking another youth and "threw him against the wall and his feet went off of the ground." The alleged victim stated staff treated the injury by "just putting ice on it so it wouldn't be swollen." The youth showed the reporter his shoulder and no marks were seen. The youth further reported that he believed the staff person "did it on purpose and didn't even try to restrain him." RCCI wrote that the allegation is:

> Closed and reclassified. Per LPPH 6222.2, this intake report does not contain an allegation of abuse or neglect, but does concern inappropriate discipline. Child reported that staff threw him against the wall and that his shoulder was hurt but no other injuries were observed. Staff was trying to prevent him from attacking another child. The incident does not rise to the level of abuse and neglect and will be investigated for a possible standard violation.

RCCI's downgrade was inappropriate. The allegation that the youth was injured when a staff member threw him against the wall meets the threshold for a physical abuse investigation based upon "Physical Abuse: Any act such as striking, shoving, shaking, or hitting a child, whether intended as discipline or not, by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves."[143]

In another case, a school counselor reported that a thirteen-year-old female was grabbed by the arm and physically pulled off of the couch by her foster mother resulting in two bruises that were observed by the counselor to be about two to three inches long on her forearm and one bruise slightly bigger near her elbow. The youth also stated that she hurt her ankle during the incident. The reporter repeated that the child alleged the foster mother did not give the youth any food because she refused to wash her hands on three successive days. The youth did eat meals at school. RCCI downgraded the intake to a minimum standards investigation, writing,

> Other Agency/Out-of-State. Due to add'l calls made. Injuries did not result in substantial harm to child.  Per LPPH 6222.2 intake does not contain allegations of A/N. Rep indicated bruises were quarter size on forearm and by elbow. Injuries did not result in substantial harm to the child. Injuries are non-vital area of the body. Intake will be addressed as inappropriate discipline in standards investigation.

---

[143] 40 TEX. ADMIN. CODE § 745.8557(1).

Allegations that the 13-year-old was injured and bruised by the foster parent, and did not get fed by the foster mother for three consecutive days, meet the threshold for both a physical abuse investigation and a physical neglect investigation based upon:

> Failure to meet basic needs: "Failure to provide a child with food, clothing, and shelter necessary to sustain the life or health of the child," by "a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child";[144]
> Physical Abuse: "Any act such as striking, shoving, shaking, or hitting a child, whether intended as discipline or not," by "someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves."[145]

A subsequent RCCL minimum standards investigation found: "Based on the information gathered through face to face interviews, phone interviews and documentation there are no concerns to minimum standards found at this time."

In another inappropriate downgrade, a CASA worker reported that a fifteen-year-old non-verbal youth with severe autism who uses a communication device, and is on one-to-one supervision, was grabbed on the arm forcefully by a staff person at the child's school and was observed to cry and express she was in pain. It is unknown if the youth sustained any bruising from being grabbed, but it was reported that the offending staff person was suspended from work following this incident. RCCI downgraded the intake, writing,

> Doesn't appear to involve abuse, neglect, or risk. Per LPPH 6222.2, a report that does not contain an allegation of abuse or neglect, but does concern inappropriate disciple can be investigated as a non-abuse case.

The allegation that a staff person forcefully grabbed a non-verbal, vulnerable child who appeared to experience pain meets the threshold for a physical abuse investigation based upon: "Physical Abuse: Any act such as striking, shoving, shaking, or hitting a child, whether intended as discipline or not, by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves."[146] RCCL included this as part of an already-open minimum standards investigation. As part of the investigation, a witness at the RTC provided written examples of inappropriate and excessive discipline used by the identified staff person, writing, "I have always felt uneasy about how [he] interacts with the kids, even when I first began at [the school]." The witness provided examples

---

[144] 40 Tex. Admin. Code § 745.8559(6).
[145] 40 Tex. Admin. Code § 745.8557(1).
[146] *Id.*

of this staff person pinching children, twisting their arms behind their backs, and having an "aggressive tone." RCCL did not find a violation with respect to physical aggression but determined that the identified staff person "has spoken to children in a manner which has been characterized as yelling and causing the children to be fearful of him."[147] Because the staff person was not substantiated as a perpetrator with a disposition of RTB in an abuse investigation, he was permitted to continue to work at the school. As of April 30, 2020, he is the focus of a more recent child abuse investigation opened by RCCI on February 27, 2020. That investigation involves allegations of that he pushed and inappropriately restrained an 11-year-old boy with special needs at the school. The reporter stated that the restraint was unnecessary as the child was not a threat to himself or others.

Inappropriate Downgrades by RCCI Regarding Sexual Contact

In six of the fifty-seven inappropriate downgrades that contain allegations of children engaged in sexual contact, RCCI's downgrade reasoning was based upon the perception that the contact between the children did not include "any force, threats, or coercion," even though this is not a required element of negligent supervision. For four of these six intakes, RCCI wrote in its downgrade: "The intake reports of a child acting inappropriately, however there is no report of the child using any force, threats, or coercion." For the other two intakes, RCCI indicated that the allegations reveal the sexual contact was consensual.  It is unclear how RCCI determined if these incidents were consensual without interviewing the children. One of the six cases involves a child the State has identified as a victim of sexual abuse. The other child involved in this case is not designated by the State as a victim of sexual abuse; however, the monitoring team discovered her documented history includes sexual abuse and sexualized behaviors. An additional case also includes a child who has a documented history of sexual abuse.

In the absence of an abuse or neglect investigation, it is unclear whether staff or foster parents adequately supervised children and took appropriate steps to protect children. These six intakes contain allegations that meet Texas Administrative Code definitions of abuse/neglect based upon the following categories:

> Sexual conduct - failure to prevent: "Failure to make reasonable effort to prevent sexual conduct to a child," by "someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves."[148]
> Unreasonable failure to act: "Failure to take an action that a reasonable member of that profession, reasonable caregiver, or

---

[147] It is also relevant to this allegation that in its discussion of the substantive due process rights of the PMC children, the Fifth Circuit stated, "egregious intrusions on a child's emotional well-being - such as, for example, persistent threats of bodily harm or aggressive verbal bullying - are constitutionally cognizable." *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 251 (2018).

[148] 40 TEX. ADMIN. CODE § 745.8557(7).

reasonable person should take in the same situation," by "a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child."[149]

Failure to protect - sexual conduct: "Placing a child in or failing to remove the child from a situation in which a reasonable member of that profession, reasonable caregiver, or reasonable person should know exposes the child to the risk of sexual conduct," by "a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child."[150]

For example, a reporter stated that eleven-, nine- and eight-year old boys placed at an RTC were left unsupervised by staff.  The three boys reportedly built a blanket fort that obscured the staff person's line of sight. The boys went inside the fort and engaged in sexually inappropriate behavior, including kissing, undressing, touching of one another's genitals, and one child climbing on top of another.  The eleven-year-old boy could be seen on camera climbing on top of the eight-year-old, and the eight-year-old then exposed himself to the eleven-year old. This conduct took place over the course of three and a half hours. RCCI downgraded the original SWI assignment for a Priority Two neglect investigation for Neglectful Supervision and transferred the matter to RCCL for a minimum standards investigation. RCCI wrote in the record that the allegation:

> Doesn't appear to involve abuse, neglect, or risk. Per LPPH 6222.2, a report that does not contain an allegation of abuse or neglect, but does concern for supervision that can be investigated as a non-abuse case. Incident described three children exhibiting sexualized behaviors with no force/cohesion, does not rise to the level of abuse.

The downgrade was inappropriate under the Texas Administrative Code. The allegations meet the threshold for a neglectful supervision investigation based upon:

> Sexual conduct - failure to prevent: "Failure to make reasonable effort to prevent sexual conduct to a child," by "someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves;"[151]

> Unreasonable failure to act: "Failure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation," by "a person

---

[149] 40 TEX. ADMIN. CODE § 745.8559(1).
[150] 40 TEX. ADMIN. CODE § 745.8559(7).
[151] 40 TEX. ADMIN. CODE § 745.8557(7).

working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child;"[152]

Neglect: Any "act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child."[153]

RCCL later concluded by a preponderance of evidence that the supervising staff person (who admitted the lapse) failed to provide "a level of supervision necessary to ensure the safety and well-being resulting in the children having the opportunity to kiss, expos[e] their genitals, and hav[e] inappropriate conversations." The matter was treated as a violation of standards and there was no finding of child neglect.

*Inappropriate RCCI Downgrades that Minimize the Risk of Harm to Suicidal Children*

In six of the fifty-seven inappropriate downgrades that include allegations related to children self-harming, SWI coded five as Neglectful Supervision and one as Medical Neglect. RCCI's downgrade for these six intakes included language that minimized the severity of the child's self-harming (i.e. stressing lack of injuries; labeling the behavior as attention-seeking or not suicidal). However, the intake allegations raise serious concerns about the severity of these children's self-harming behavior and the adequacy of supervision at the time of these incidents. Further, given the severity of some of these children's mental health needs and repeated attempts to self-harm, an investigation is necessary to discern if caregivers knew (or should have known) that children should have been subject to heightened supervision at the time of self-harming.

For example, a reporter from an in-patient facility called SWI and indicated that a 15-year-old female was hospitalized due to self-harm and a suicide attempt.[154] The child had found a piece of metal at school and attempted to harm herself.[155] When staff saw the child self-harming, they intervened. The child reportedly became upset and aggressive, and law enforcement was contacted. EMS was also contacted to assess the child and transfer her to the psychiatric hospital. According to IMPACT records, the child was not under any heightened supervision at the time of the incident despite seven previous hospitalizations for self-harm. Although RCCI documented serious concerns about the level of supervision for the child,[156] RCCI conferred with HHSC and downgraded the intake, writing:

---

[152] 40 Tex. Admin. Code § 745.8559(1).
[153] 40 Tex. Admin. Code § 745.8559.
[154] The reporter stated the youth also relayed having sexual relations with numerous men up to 28 years old; and that she was sexually involved with a19-year-old man at the time.
[155] The Monitors reviewed photos of the child's injuries, which were extensive.
[156] The Monitors discovered numerous instances where children with a history of suicide attempts or ideation were placed by DFPS in situations with unsafe levels of supervision and support. The most tragic example is detailed in Section VII *infra* involving the death in April 2020 of C.G.

[N]ot enough information to indicate staff was neglectful in any way. There was nothing noted in the intake that staff failed to intervene or that they didn't respond to the crisis when identified. There was no information that [child] was having sex with any males at the facility or had access to them. The information is related to her behavior and actions prior to be [sic] placed at [the RTC] on 10/24.  It was agreed the intake would be sent to HHSC to evaluate possible minimum standards violations regarding the incident . . . Doesn't appear to involve abuse, neglect, or risk. Per LPPH 6242.2, a supervisor or designee may downgrade an abuse or neglect intake report received by Statewide Intake (SWI) to a non abuse or neglect report when the information in the report suggests that a minimum standard was violated, but not that a child was abused or neglected or indicates that there is some risk to children, but the information is too vague to determine that a child was abused or neglected.

There were numerous indications before the child's placement at this facility, initiated three days prior to the self-harm event, that she needed extra precautions and heightened supervision to keep her safe, based on the seven previous hospitalizations for self-harm. The issue is not only whether individual staff persons at the facility knew the child needed heightened supervision, but also whether the administrators and operators of the RTC knew or should have known about the child's heightened needs and unique vulnerability. The monitoring team found in the youth's Placement Application of May 6, 2019:

Youth continues to: commit self-harming acts, express a will to commit suicide, report that she will run away . . . .

. . .

She refuses to return to her placement at [GRO]. She has stated that she will kill herself if she has to go back there. Youth needs a treatment plan that includes therapy at a minimum 3x per week.  At this time, it is my believe [sic] that Youth will only be safe in a locked down facility with constant supervision and optimal psychiatric care.

The allegation meets the threshold for a neglectful supervision investigation based on Texas Administrative Code provisions:

Unreasonable action: "Taking an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should not take in the same situation," by "a person working under the

85

auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child;"[157]

Neglect: Any "act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child."[158]

In another downgrade, a reporter said that a 15-year-old foster child living at an RTC who takes psychotropic medication placed the cord to her headphones around her neck during the overnight shift of August 23-24, 2019. The child did not report any injuries from the action and was transported to the hospital. The child said that she wanted to kill herself at the time of the incident; however, she reported to the hospital staff that she did not intend to hurt herself, but just felt as if no one cared for her. RCCI downgraded the intake to a minimum standards investigation, documenting:

> Doesn't appear to involve abuse, neglect, or risk . . . .  Per LPPH 6242.2, an intake can be downgraded to a non-abuse case when the information in the report indicates that the child was not abused or neglected. Per the intake the child placed a cord around her neck however no injuries were observed, and staff transported her to the hospital for treatment where she was cleared to return back to the facility. The child later reported her intentions were not to commit suicide therefore this was not an attempted to suicide. The intake was staffed by RCCI Supervisor and HHSC Supervisor and the case was agreed to be downgraded to a P2 HHSC non-abuse and neglect and will be assessed for risk by HHSC and evaluated for any monitoring concerns.

This intake was received at SWI on August 24, 2019.  The monitoring team reviewed the child's records and found that on August 5, 2019 the child had engaged in a self-harming incident that led to hospitalization, after which a safety plan was created. The child's records do not detail the plan. On August 21, 2019, the child's record documents the child was placed on "3-day precaution" due to concerning statements about self-harming. The intake downgraded by RCCI refers to an incident that occurred within this "3-day precaution."  The youth's service plan documented that she "must be monitored with visual and auditory surveillance."  It appears the child was subject to a safety plan, a 3-day precaution and heightened monitoring, but it is unclear if supervision was neglectful, or conformed with increased supervision requirements at the time of the suicide attempt. The allegations meet the threshold for a neglectful supervision investigation based upon:

---

[157] 40 TEX. ADMIN. CODE § 745.8559(2).
[158] 40 TEX. ADMIN. CODE § 745.8559.

> Unreasonable failure to act: "Failure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation," by "a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child;"[159]
>
> Other neglect: Any "act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child."[160]

An RCCL minimum standards investigation determined "that there was not a preponderance of evidence to prove the facility inappropriately supervised a child in care. no [sic] minimum standard violations will be cited at this time." On September 1, 2019, after RCCI had downgraded the intake, the child self-harmed again and was hospitalized for the third time in twenty-eight days. The child did not return to the facility after this incident.  The child's repeated ability to self-harm during this period raises serious concerns about neglectful supervision and failure to attend to the child's safety needs.

Of these fifty-seven inappropriately downgraded intakes, forty-six (79%) were referred to HHSC and assigned for investigation as potential violations of minimum standards and twelve (21%) were closed, resulting in no further action taken by the State.

d.  Remedial Order Three: Maltreatment in Care Investigations

i.  Methodology

To validate DFPS's performance associated with Remedial Order Three and the appropriateness of RCCI investigations of alleged maltreatment of PMC children, the monitoring team conducted qualitative reviews on a random sample of RCCI investigations closed between August 1, 2019 and November 30, 2019.[161] Of the 261 RCCI investigations DFPS completed between August 1,

---

[159] 40 TEX. ADMIN. CODE § 745.8559(1).

[160] 40 TEX. ADMIN. CODE § 745.8559.

[161] To evaluate dispositional results for the investigations included in the sample, the Monitors designed a review tool for the case record review. To support consistency in scoring, both inter-rater reliability and secondary reviews were tested and used.  The sample was drawn from quarterly reports provided to the Monitors by DFPS during the reporting period, including RO3.2 RCI Closed INV in Aug and Sept 2019 – Nov-15-19 – 95605 (Nov. 15, 2019) (on file with the Monitors) and RO3.2 RCI Investigations Oct-Nov 2019 – Jan-15-20 – 96882 – 2-3-20 with CLASS INV number (Feb. 3, 2020) (closed Investigations tab) (on file with the Monitors). In the first report for the period August 1, 2019 through September 30, 2019, there were 110 investigations closed by RCCI, of which the Monitors reviewed a random sample of eighty-six investigations using a 95% confidence level. RO3.2 RCI Closed INV in Aug and Sept 2019 – Nov-15-19 – 95605 (Nov. 15, 2019) (on file with the Monitors). The second quarterly report showed that between October 1, 2019 and November 30, 2019, 151 investigations involving PMC children were closed by CCI, of which the Monitors reviewed a random sample of forty-seven investigations using a confidence level of 90%. There were 207 investigation rows in the file submitted to the Monitors, and the Monitors identified 151 unique Case

2019 and November 30, 2019, RCCI Ruled Out 243 (93%), administratively closed eight (3%), substantiated as RTB nine (3%) and closed as Unable to Determine one (0%). Of the 261 RCCI investigations DFPS completed involving PMC children during the review period, the Monitors reviewed a total sample of 133 investigations.

Overview of RCCI Maltreatment in Care Investigations

Of the 133 (of 261) RCCI investigations analyzed by the monitoring team, six (4.5%) resulted in a finding of RTB, substantiating abuse, neglect or exploitation. The Monitors concurred with the State's investigative conclusions to substantiate the allegation with an RTB.[162] Four of the investigations (3%) were administratively closed and one resulted in a finding of Unable to Determine; the Monitors concurred with those findings. The Monitors found that of the 122 investigations where RCCI Ruled Out all the allegations, RCCI did so appropriately in 87 cases (71.3%); inappropriately in eleven cases (9.1%);[163] and conducted investigations with such substantial deficiencies in twenty-four cases (19.7%) that the Monitors were prevented from reaching a conclusion. To appropriately reach a final disposition in these investigations, additional information would have been required to determine whether children were abused or neglected. Many of these RCCI child abuse or neglect investigations were deficient because of long gaps in investigative activity and substantial delays in completion. This remains a serious problem at DFPS, as discussed in Section IV, below, describing the RCCI investigative backlog. The Monitors' summaries of these investigations are located in Appendix 3.2. In sum, the Monitors identified 35 cases (28.7%) among a sample of 122 investigations that were Ruled Out by RCCI between August 1, 2019 and November 30, 2019 which had substantial deficiencies or were inappropriately resolved by RCCI.

Inappropriate RCCI Rule Outs and Deficient Investigations for Physical Abuse

In one of the investigations reviewed by the monitoring team, a child suffered a sprained elbow in May 2019 due to a restraint allegedly administered by a direct staff person ("B") at an RTC, who had been the subject of several investigations regarding improper restraints within the previous two years. The child reported his arm was bent so far up his back that he heard it pop. The first medical diagnosis was an elbow fracture, but a specialist subsequently diagnosed the child with an elbow sprain. As a result of the discrepancy in diagnoses, the case was submitted to the State's Forensics Child Abuse Team, where a consultant doctor offered the opinion that the

---

IDs. Some investigations appeared twice where the investigations included more than one PMC child as the alleged victim. The data dictionary in the file defines Closed Investigations as "All alleged victims in an RCI investigation closed Oct-Nov 2019 where the alleged victim had a legal status of PMC at the time of intake." RO3.2 RCI Investigations Oct-Nov 2019 – Jan-15-20 – 96882 – 2-3-20 with CLASS INV number (Feb. 3, 2020) (closed Investigations tab) (on file with the Monitors).

[162] One of these investigations included allegations that were substantiated by DFPS, and is therefore listed among the cohort of RTB findings. The Monitors identified an additional allegation that warranted a disposition of RTB.

[163] DFPS included one of these cases in its submission of Closed cases with a disposition of Ruled Out which was also the status at the time of the Monitors' review; subsequently, on May 29, 2020, nearly one year after the investigation commenced, the disposition was changed to Unable to Determine.

injury indicated the restraint involved a fair degree of force. There were no corroborating witnesses and the restraint was conducted without an observer. Although RCCI noted concerns that B used unnecessary force to maintain the restraint and placed the child at risk of injury, RCCI inappropriately Ruled Out the allegations citing there was insufficient evidence to allow for a conclusion of "intentional harm." The investigation exceeded thirty days without explanation or an approved extension. The investigation took nearly four months to complete; the intake was received on May 13, 2019 and the investigation was completed on September 10, 2019.  The Monitors concluded there was a preponderance of evidence to support the allegation of Physical Abuse.[164]

While the above investigation was open, B was forbidden from restraining residents and was subsequently placed on administrative leave and then terminated at the conclusion of the investigation. After termination, B remained eligible to work directly at other operations, and has continued to do so. The Monitors identified ten separate allegations of physical abuse against B at different facilities in Texas between March 2015 and February 2020.[165] Six of these incidents

---

[164] 40 TEX. ADMIN. CODE § 745.8557(1).

[165] **1.** In the first intake from March 2015, a child placed at an RTC reported that B punched her in the eye.  The child said that she was acting up that night and hit B while B was trying to restrain another child. The child said that B then punched her, which caused swelling to her left eye. Police were called during the incident and the child was placed in handcuffs for a few minutes but no one was arrested. During the investigation, another resident stated she witnessed B punching and kicking the child, calling her a "stupid bitch." The investigation was closed because B no longer worked at the facility, despite observations of physical injury to the child by at least one witness. **2.** In a second intake from June 15, 2017 at a different RTC, a child alleged that B put the child against the wall, grabbed the child's nose and the back of the child's head, and hit his fist against the child's fist, causing pain to the child. Four collateral children were interviewed and they all denied the use of physical discipline at the facility. One child who was reported to have witnessed the altercation denied doing so, and eight witnesses, including four staff, described the complaining victim as untruthful. Investigators noted, "All staff and children interviewed stated [B] was strict with the residents especially when they were non-compliant, but denied ever seeing him inappropriately discipline any children at the facility," and noted B "was no longer employed at the facility at the time of the investigation; investigator states that multiple attempts were made to interview him to no avail… Based on information gathered during the course of the investigation, there was no evidence to support that [the child] was inappropriately disciplined by [B]. The allegations of Physical Abuse could not be substantiated and were ruled out." **3.** In a third intake from a third RTC on January 30, 2019, a fourteen-year-old child reported she became upset and attempted to leave the room when B and another staff person put her in a hold on the floor with her hands out and their knees on her neck. The child said the staff let her up and then again bent her back on the bed and twisted her arm. The child said B and the other staff person let her go and then grabbed her hair and hit her head on the floor. B told RCCI the child had attempted to choke herself with a curtain and he intervened to prevent her from self-harming. B denied using an improper restraint, putting his knee in the child's neck, twisting the child's arm, causing the child to hit her head, or punching the child's hands. B reported the child did not sustain any injuries. Three children, the executive director and two staff reported no concerns regarding the child being improperly restrained or physically disciplined. RCCI noted, "[d]uring the course of this investigation, the operation surrendered its license and all children were removed. Due to children no longer being placed at the operation, the staff members were no longer present which made additional collateral interviews difficult to obtain." RCCI investigators Ruled Out the allegation on March 25, 2020 after the facility surrendered its license. **4.** In a fourth intake from September 13, 2019 at a fourth RTC, a DFPS caseworker said that after a youth threw or knocked over a dresser, B hit the child in his chest, grabbed the child and threw him against the wall. The child sustained a bruise on his leg from hitting the wall and a bruise on his arm, allegedly from where he was grabbed. There is reportedly camera coverage of this incident. The child was taken to an urgent medical care center and prescribed pain medication. The investigation sat inactive from September 17, 2019 through March 12, 2020. RCCI

did not interview the child victim, B or staff witnesses before Ruling Out the allegations on March 20, 2020 after B no longer worked at the facility. (B's employment was terminated by this RTC in December 2019). **5.** In a fifth intake from the same RTC as the one listed above in the fourth example, a child disclosed that he became upset and stabbed B with a hanger. He stated that B then pushed him to the ground on his back and choked him with both of his hands. The child stated that he could breathe and did not lose consciousness. B's employment was terminated the following month. The investigation sat inactive from November 19, 2019 until March 11, 2020. RCCI Ruled Out the allegations on March 20, 2020 without ever interviewing B, or relevant child and staff witnesses. **6.** In a sixth intake from the same RTC listed in the fourth and fifth examples directly above, a child made an outcry that B physically abused him by placing his hands around the child's neck, causing bruises. The child said B threw him onto and off a bunk bed in a room, which did not have a camera. The child reported B denied him food and hit with open hands. RCCI interviewed another child, identified by the alleged victim as a witness, who denied observing the incident or any physical discipline by B. The RCCI investigator did not observe visible injuries to the child and wrote, "It should be noted that there are no incident reports or EBI reports on file involving the allege perpetrator [B]... It is noted there are incident reports documented by other staff members." RCCI interviewed B who denied any inappropriate discipline, or the use of any restraints of the alleged child victim. RCCI interviewed four children and staff who denied witnessing or having any knowledge of the alleged victim being physically disciplined by B. They each "denied any deprived of food or access to the restroom. All denied any concerns with supervision and any knowledge of residents threatening to stab or hit [the child] with a belt." RCCI interviewed the child's CVS caseworker who said the child "has history being verbally aggressive with staff." The CVS caseworker said she had no concerns about inappropriate discipline. RCCI Ruled Out the allegation on January 29, 2020, after B's employment had been terminated. **7.** In a seventh intake – this one from a fifth RTC – dated December 7, 2019, a Local Permanency Specialist was completing Awake Night Supervision Monitoring at midnight and was notified that a child was missing from the facility. The police were contacted and they located the child walking back to the facility with food. The child made an outcry that he left the facility from time to time due to problems with other boys and staff. He stated that about a week and a half earlier, B "body slammed" him to the ground. The child reported that B also yanked him out of the van that day for no reason and without a verbal prompt. The child indicated that he has been telling his caseworker that he does not want to be at the facility. The LPS worker asked the child if he was hurt after being yanked out of the van. He reported that his elbow was hurting but denied any other injuries. The investigation remains open as of April 30, 2020. **8.** In an eighth intake on December 29, 2019, involving B at the same RTC listed in the seventh example directly above, a reporter stated that a seventeen-year-old youth and B got into an argument about the youth not showering, which escalated and the child spit in B's face. The reporter said B retaliated by hitting the child in the mouth, leaving a "laceration" on the inside of his lower lip. B denied hitting the youth and reported only touching the youth to administer a two-person restraint. B also denied causing the youth's lip to bleed, which B attributed to the youth hitting his head against the wall and the floor. RCCI interviewed two children and they denied observing B hit, punch, or use physical discipline on the youth. They noticed the youth was upset during the day of the incident for not being in touch with his family on Christmas, but did not witness any altercations between B and the youth. RCCI interviewed the administrator, RTC case manager, a therapist, and the youth's CVS caseworker who reported no concerns regarding B hitting, punching, and using physical discipline on any other child at the operation. RCCI Ruled Out the allegations on January 24, 2020, approximately one month before a new intake involving B at this same facility was reported. **9.** In a ninth intake on February 28, 2020, from the same RTC listed in the seventh and eighth examples directly above, a child complained that linear bruising to his eye resulted from B restraining him and allowing other youth to hit and kick the youth while he was on the ground. A witness corroborated this account during an unrelated meeting, and stated that he "felt bad about this" because "they were holding [the child] down and letting kids kick [him] in the face" and "didn't have to do him like that."  Following that disclosure, the RTC took B "off shift." The RCCI investigator documented that B and another staff person placed the youth in a restraint after he became aggressive. During the restraint, it was alleged other residents kicked the youth, who said B and another staff person brought him to a more secluded area where B punched the youth. RCCI interviewed the residents who were identified as having kicked the alleged victim and both denied it. All children interviewed by RCCI denied seeing B punch the youth in the face. However, one child said the victim was slammed to the floor and another said the boy sustained the bruise to his eye when he fell to the ground. A staff witness said the restraint was inappropriate because it was face down. Further, he added, B continued to maintain the victim in a hold when other

allegedly occurred after May 13, 2019, the date of the restraint allegation in the Monitors' sample. These six subsequent intakes alleging physical abuse by B occurred between September 2019 and February 2020. Five of the six allegations alleging physical abuse by B were Ruled Out, and one was pending as of April 30, 2020. There is no evidence in any of the 2019 and 2020 investigations that RCCI was aware of, or took into account, all of the separate allegations against B at different facilities between March 2015 and February 2020, though the investigation stemming from the February 2020 referral appears to include reference to six of the previous ten allegations.

In another investigation reviewed by the monitoring team involving physical abuse, SWI received three intakes which were all linked together because they involved related allegations of physical neglect and physical abuse of both TMC and PMC children. The first report alleged that two staff members subjected children to physical discipline by slapping them in the face. The reporter also alleged children in care were not being fed appropriately and as a result, were losing weight. The second report alleged that due to dehydration, a child placed at the facility had seizures and fainted; when the alleged victim reported to a staff member that he had a seizure, the staff member did not believe him and told him to stop faking seizures, which was linked to this investigation but treated as a minimum standards investigation.[166] The third report, from a DFPS employee, stated that a child found a cockroach on his pizza.

The allegations related to substantial weight loss were Ruled Out due to the investigator's conclusion that the issue pertained to the quality of the food noting: "[t]he operation is monitored by the Health Department and concerns will be shared with HHSC Inspector to monitor." There are concerns, however, with the quality and thoroughness of the investigation related to allegations of physical abuse (slapping) of a resident by a direct care staff.  During the alleged victim's interview, the youth maintained his allegation of being slapped by the staff person. The youth stated that during a restraint by a staff person, the alleged perpetrator was called in for assistance, and subsequently slapped the youth. The staff person who performed the restraint was not interviewed during the investigation.  The youth also reported that the alleged perpetrator had slapped three other residents. Only one of these three other residents was interviewed, and, in the interview with the one resident, the investigator did not question the youth about whether he had been slapped by the direct care staff or had any other concerning incidents with the staff person. The investigation did interview the alleged perpetrator, who denied slapping the alleged victim or using any form of physical discipline. The alleged perpetrator was not questioned about the use of physical discipline or slapping with the other three residents. Other staff were interviewed and denied any knowledge of the alleged perpetrator slapping the alleged

---

residents began kicking the youth. RCCI noted the administrator had enough concerns to relieve B of his duties during the course of this investigation. The RCCI investigator noted B was involved in "five previous cases for physical abuse due to improper restraints," but noted these were all Ruled Out. The Operation Administrator indicated B has had at least five safety plans in the last seven months, due to allegations of Physical Abuse – EBI/restraints. RCCI consulted with the Forensics Assessment Center network, which confirmed that the injury could have been sustained from a kick or a punch to the eye. RCCI Ruled Out the allegations on April 7, 2020. B's employment was subsequently terminated by the facility.

[166] This alleged victim was in TMC status and was screened as a minimum standards violation

victim. However, two staff reported previous investigations related to the alleged perpetrator and slapping children. Finally, one staff person reported that the alleged perpetrator had been observed "cussing" in the presence of the children. In conclusion, as to the allegation that children were being slapped in the face, the investigation as to physical abuse was compromised and substantially deficient.[167]

There were six other abuse or neglect investigations open at this facility concurrent to this report, and multiple minimum standards investigations, which were not considered in the investigation. The operation had two recent Reason to Believe findings and an extensive history of investigations for both minimum standard violations and abuse or neglect allegations. The facility subsequently relinquished its license and DFPS removed all children from the facility in 2020.

Inappropriate RCCI Rule Outs Related to the Supervision and Care of Children

---

[167] In another investigation reviewed by the monitoring team regarding the same RTC, a reporter complained of neglectful supervision and physical abuse of a thirteen-year-old child after observing multiple injuries on the child's body, including a bruise on his stomach that was reportedly caused from a fight with another child in care; a mark on his shoulder and forearm reportedly caused when an RTC employee grabbed the alleged victim and bent his arm back; and bruising on the child's back reportedly caused when an unknown perpetrator punched and poked the child. The reporter sent photos and texts depicting the injuries. The alleged victim reported that another child in care threw a football and hit the alleged victim in the head breaking his glasses and that the glasses were still not repaired as of the date of the report. The reporter stated the alleged victim seemed scared of photos being taken of the injuries due to fear of retaliation. It is unknown if the child was seen by a nurse after being hit. This was the second investigation completed regarding bruising to the same child; the prior investigation was dated May 19, 2019 and was Ruled Out.

The operation did not document children's injuries and, in this instance, did not provide incident reports to the RCCI investigator as requested. A former operations staff member reported there is a particular staff person who sits and watches the children hit each other with knotted towels; the alleged victim stated the other children hit him with knotted towels and caused bruising, but this allegation was not investigated further by RCCI. A witness informed RCCI they were concerned that the child has lost between thirty and forty pounds; the monitoring team found a previous allegation that children at the facility were losing weight due to improper meals, as described in the example above. RCCI did not address these allegations.

There was no activity in this investigation between July 26, 2019 and September 8, 2019. The RCCI investigator resigned, and the case was reassigned on September 8, 2019, but the child victim had been removed from the facility on August 23, 2019, and the new investigator noted, "Due to the time frame, it was difficult to gain additional information about [the alleged victim]. He was discharged on 8/23/2019." The allegations of neglectful supervision and physical abuse should have been substantiated as RTB. The Monitors found sufficient evidence to support findings of Other Abuse and Unreasonable Failure to Act against operation staff due to the staff person's corroboration of the alleged victim's report that staff allowed the children to hit each other; and that the alleged victim had a significant amount of bruising that staff were unable to explain with no documentation of the incidents causing the bruising. As noted above, there were six other abuse and neglect investigations open concurrent to this report, and multiple minimum standards investigations, which were not documented as considered in the investigation. The operation had two recent Reason to Believe findings and an extensive history of investigations for both minimum standard violations and abuse and neglect allegations. The facility subsequently relinquished its license and DFPS removed all children from the facility in 2020.

The monitoring team assessed an investigation in which nursing staff for a ten-year-old non-verbal, medically fragile child in care who requires a tracheostomy tube and ventilator reported that when nurses arrived for their daytime shift, they found the child "heaving and having respiratory retractions," a result of the fact that the foster parent set the child's heart rate monitor too low and had not added distilled water in the child's ventilator for twelve hours. One nurse also reported there were times when the child did not have necessary medication, including over-the-counter medications. The nurse expressed concerns that the foster parents claimed they only received partial medical supplies when they had received all medical supplies. Subsequent reports to SWI indicated two nurses quit and the nursing agency discharged the child victim from care because the agency was concerned that the foster parent's actions created risk for the child and liability for the agency. Four referrals were made to SWI within a few days regarding the same or similar allegations made by two visiting nurses and a DFPS worker,[168] but RCCI interviewed only two of the reporters. RCCI did not interview other medical staff for the child, nor the child's CVS caseworker. A nurse making a referral stated that the foster parent told her that the heart rate monitor kept sounding and waking them up at night, which is why the foster parent set it so low. The investigation was not completed timely and no extensions were approved. The investigation took over one year to be completed and approved: the intake occurred on August 6, 2018 and the supervisor approved the case for closure on September 17, 2019. RCCI inappropriately Ruled Out the allegation of Medical Neglect, which the Monitors found should have been substantiated against the foster parent as there was sufficient evidence to support the allegations of Medical Neglect for failing to obtain medical care,[169] including three separate nurses' accounts of the foster parent's failure to follow through with medical care for the child that caused or may cause substantial physical injury to the child.

As of May 31, 2020, this foster home has a twelve-year-old child placed in the home who is in PMC status. The child's Common Placement Application indicates that she has severe health conditions requiring specialized treatment. The child cannot walk without wheelchair assistance; is prone to seizures; and is non-verbal.

The monitoring team evaluated another investigation that emanated from a report that an adult male was inappropriately touching children in a foster home. Six children who were placed in the home at different times made similar allegations; namely, that a man came into their room with a covering on his head and touched them inappropriately. The allegations came to light through various sources including interviews with the alleged victims, the alleged victims' therapists, and the alleged victims' DFPS caseworkers. The RCCI investigation found many of the children placed in this foster home were young children with a history of abuse and trauma, identified to have a specialized level of need. Many of the same children were prescribed psychotropic medication. The children's allegations were attributed to their medication, histories of mental health issues, trauma and hospitalizations. The children were often told they were "hallucinating."

---

[168] One nurse made two separate referrals (one by phone and one by E-report) after the RCCI investigator interviewed her pursuant to the first referral by another nurse caring the child.
[169] 40 TEX. ADMIN. CODE § 745.8559(5).

The investigation documents that children who had no contact with each other and who were placed in the foster home at different times that did not overlap reported the same "hallucination."

Two separate DFPS caseworkers removed two alleged victims who were placed in the foster home because of these concerns, but there was not documentation that the RCCI investigator in this investigation ever spoke to either of the workers. All the children were removed from the home approximately two weeks into the RCCI investigation; however, approximately four months later in November 2019, two brothers who are both eight years old (at ten months apart) were placed in the home. Both siblings are identified as autistic with limited verbal abilities, and muscular dystrophy. The children's records note that the older sibling has the ability to give short answers in conversation but that the younger sibling is not able to engage in conversation. In March 2020, DFPS placed a nineteen-year old and her six-month-old child in this home, as well.

The RCCI investigator inappropriately Ruled Out the allegations and documented, "HHSC will however be made aware of concerns involving a reoccurring pattern mentioned by children of hearing voices and seeing things while in the [family's] foster home. HHSC will also be made aware of concerns with the [foster family's] sons and the respite care provided." The monitoring team did not find documentation of any evidence of subsequent monitoring. The facts support the substantiation of the allegations against the foster parent for neglect, specifically: Failure to Prevent Sexual Conduct to a Child;[170] and Other abuse[171] due to the substantially similar allegations made by at least six children in care and the corroboration of their stories to various authority figures, including DFPS caseworkers and therapists.

<u>Inappropriate RCCI Rule Outs Related to the Placement and Oversight of Children</u>

The monitoring team evaluated RCCI's Rule Out in an investigation that emanated from multiple reports by hospital medical staff, facility staff, and a law enforcement officer. Those reporters alleged that when a fourteen-year-old child in care returned to the facility after curfew, making suicidal statements, she was taken to the hospital and stated she had been raped by a seventeen-year-old resident at the same facility the day prior. She said she wanted to harm herself as a result of the alleged rape. It was alleged that both of the children in care ran away and the assault occurred in an abandoned building.

This facility maintains a "hands-off" or "no touch" policy with the residents and its doors are unlocked, allowing residents to leave at any time. The staff are instructed to encourage residents not to leave, but that if residents leave, staff are instructed to report them missing to the police, DFPS, and SWI, and the children are permitted to return. The investigation found that the fourteen-year-old alleged rape victim had a history of suicidal ideations and the seventeen-year-old had a history of demonstrating sexually aggressive behavior. There were various neglectful supervision investigations at this facility as a result of facility oversight policies that allegedly left

---

[170] 40 TEX. ADMIN. CODE § 745.8557(7).
[171] 40 TEX. ADMIN. CODE § 745.8557.

94

children at risk of harm in the two years prior to this report. This RCCI investigation took seven months to complete. An extension was approved but the investigation was not completed within the extension timeframe. The Monitors found the facts supported a substantiated finding of neglect[172] against the CPA owner/operator/administrator for placing a child with suicidal ideations in a facility that does not have the ability to closely monitor the child's actions; and for placing a child who is designated as having sexually aggressive behavior in a facility that does not have the ability to closely monitor their actions with other residents.[173]

In another investigation, a GRO employee reported that a thirteen-year-old boy with a history of sexually related behavior had inappropriate sexual contact with his eighteen-year-old male roommate, who has low intellectual functioning and delayed language skills. The inappropriate sexual contact was discovered when a staff person conducting rounds at night discovered and observed the thirteen-year-old on top of the eighteen-year-old in a bed in their shared room. The monitoring team discovered that the thirteen-year-old child's Level of Care was identified as "Intense" in his Common Application due to high-risk behaviors. He had been discovered engaging in sexual activity with children previously at a different facility, and he had been a victim of sexual abuse in the past. The eighteen-year-old youth's Common Application documented that the youth is autistic, has significant intellectual disabilities, and his level of functioning is "minimal," including delayed language skills and an age equivalency "very indicative of a four year old." It was also noted that the older youth has aggressive, and at times violent, behavior that has resulted in injuries to himself and others. HHSC minimum standards permit a child in care to share a room with an adult in care only under certain closely prescribed circumstances; these include a requirement that the age difference is less than two-years between the child and the adult and require that a "professional level service provider" determines "there are no risks to either of the individuals after assessing their behaviors," including "any past history of sexual trauma or sexually appropriate behavior."[174] In this instance, in addition to documented sexual behavior issues of the thirteen-year-old and significant vulnerabilities of the eighteen-year-old, there was a five-year age difference between the two individuals, well above the two-year difference permitted by the regulation. Neither the thirteen-year-old child victim's CVS worker nor his therapist was interviewed during the course of the investigation.

The RCCI investigation took over four months to complete. No extension was approved, and no explanation for the delay was documented: the intake was received on April 25, 2019 and the

---

[172] 40 TEX. ADMIN. CODE § 745.8559(3) ("Placing a child in or failing to remove him from a situation that a reasonable member of that profession, reasonable caregiver, or reasonable person should realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities.").

[173] 40 TEX. ADMIN. CODE § 745.8553(3) (defining a person who works "under the auspices of an operation" to include "a director, owner, operator, or administrator on an operation").

[174] 26 TEX. ADMIN. CODE § 748.1937 (stating that an adult in care may be placed as a roommate with a child only where a professional level service provider determines there are no risks to either of them after assessing: "(A) Their behaviors; (B) Their compatibility with each other; (C) Their respective relationships; (D) Any past history of sexual trauma or sexually inappropriate behavior; and (E) Appropriateness;" ensuring "[t]he assessment and approval by the professional level service provider is documented and dated in the child's record;" and when "[t]heir age difference is less than two years").

investigation was completed on August 30, 2019. The Monitors found that the evidence supported a finding of child neglect under the Texas Administrative Code[175] regarding the operation's failure to adhere to regulatory requirements for placement of a child and adult as roommates, including age requirements and an assessment of prescribed risk factors, thereby causing substantial emotional harm.[176]

Substantially Deficient RCCI Investigations

In addition to the inappropriately Ruled Out investigations, the Monitors found substantial deficiencies in twenty-three additional investigations. For example, the administrator of a GRO reported children were not supervised adequately, resulting in a fifteen-year-old alleged victim attempting suicide by cutting herself while in the shower. The youth sustained a serious injury to her leg and wrist, requiring fifty stitches. The monitoring team learned that the child had been at the facility for only six days prior to the reported incident and her Level of Care was "Intense." The fifteen-year-old victim reported she consumed "Lysol" or "Fabuloso" the day before the reported attempted suicide, but the investigation did not clarify whether this occurred while the child was doing chores under staff supervision or if the residents had access to cleaning solution otherwise.

The RCCI investigator did not discern whether the cleaning supplies were properly stored and locked. Other residents reported that staff members remained in the office, looking at their cell phones rather than supervising the residents; this allegation was not resolved in the investigation. One resident reported witnessing a child-on-child sexual assault and stated, "staff didn't do anything to protect [the alleged victim], they just moved her to a different room." The investigator did not follow up on this allegation.

There were a number of allegations regarding a lack of supervision at this operation in the two years prior to this reported incident. The operation was cited for inadequate supervision during overnight hours in September 2017; and there was an allegation that resulted in an RTB disposition for Neglectful Supervision in August 2017 when a staff member left children unattended while she took another resident off-campus for an unauthorized visit.

This investigation was not completed timely; no extension was approved. There was an eight-month delay in investigative work, and it took RCCI approximately ten months to complete the investigation. The intake was received on September 27, 2018 and the investigation was completed on August 1, 2019. The RCCI investigator never interviewed an alleged perpetrator (staff member) who was on duty at the time of the reported incident. Witnesses who were

---

[175] 40 TEX. ADMIN. CODE § 745.8559(8) (defining neglect to include "[a] violation of any law, rule, or minimum standard that causes substantial emotional harm or substantial physical injury to a child"); 26 TEX. ADMIN. CODE § 748.1937 (requiring that there are less than two years of age between an adult and child placed together as roommates, among other considerations, including "any past history of sexual trauma or sexually inappropriate behavior").

[176] 40 TEX. ADMIN. CODE § 745.8553(3) (defining a person who works "under the auspices of an operation" to include "a director, owner, operator, or administrator on an operation"); 26 TEX. ADMIN. CODE § 748.1937.

interviewed did not recall details of the reported incident because of the substantial passage of time between the incident and the interview. RCCI never fully explored other issues raised by residents during the course of the investigation to determine whether neglect under the Texas Administrative Code was evident.[177]

In another investigation with substantial deficiencies, a CPA employee reported that two alleged victims were subjected to inappropriate behaviors by the foster parents. A fifteen-year-old girl disclosed to the reporter that her foster mother subjected a six-year-old girl in the same foster home to corporal punishment with a wooden spoon or backscratcher. The fifteen-year-old reported that the foster father's birth daughter does not visit the home due to previous sexual abuse by the foster father. The CPA closed this foster home in 2011 after allegations of maltreatment were confirmed. At that time, the foster mother was cited for harsh and unusual punishment of a two-year-old child for grabbing him by the wrist and forcefully placing him in a chair. The CPA documented its concern about the foster mother's rigid approach and treatment of children, as well as her ability to follow minimum standards and the operation's policies and procedures.

The intake reviewed by the monitoring team was received on June 6, 2018 and assigned to an RCCI investigator within proper timeframes, but the children were not interviewed until almost one month after the intake, on July 2, 2018. The investigation was reassigned to another investigator almost one year later with substantial gaps in investigative activity. The RCCI interviews, especially with the alleged child victims, did not adequately address the allegations. The report of physical abuse of the younger alleged victim should have been explored thoroughly considering the older alleged victim reported that she witnessed the foster mother discipline the younger child by hitting her with an object. A respite home provider and the CPA case manager stated that the younger child made outcries that the foster mother hit her with a belt. Key collaterals were not interviewed, specifically the children's CASA volunteers, therapists, and school personnel. The investigation was submitted for supervisor approval on August 2, 2019 but was rejected due to missing interviews with principal and collateral witnesses. The case was Ruled Out and closed on September 3, 2019 despite these deficiencies. The CPA decided to close the home again due to this report, combined with the foster parent's prior history with the CPA.

In another investigation, two reporters, one a supervisory employee at an operation and one a law enforcement officer, reported that a child was inappropriately restrained by a staff member and sustained injuries including a black eye, a laceration across her nose, small scratches on both arms, and a bruise on her arm. The monitoring team identified a prior physical abuse allegation involving the same alleged perpetrator where a child sustained minor abrasions while trying to get free from a restraint. The investigator Ruled Out the allegations without obtaining any additional information from the first reporter, a supervisory staff person, about the restraint, such as whether it was necessary based on the child's behavior and whether it was done appropriately.

---

[177] 40 TEX. ADMIN. CODE § 745.8559.

RCCI did not interview the doctor who examined the alleged victim at the hospital nor the responding police officer.

The monitoring team observed similar deficiencies in an investigation that emanated from a report to SWI from the Foster Care Ombudsman's office, alleging that a facility staff member did not provide adequate supervision and as a result, child-on-child sexual aggression occurred among four teenagers. The report indicated that two staff persons coached the alleged victims not to make outcries of abuse. The first alleged victim stated another child attempted to rape him, that he told staff, and staff did nothing after being notified. The second alleged victim stated two youth raped him. The service plan for one of those two youth noted he had poor boundaries and was at risk of acting out sexually. The other youth had two juvenile referrals for indecency with child-sexual contact and a history of sexualized behaviors, but his treatment plan did not indicate high-risk behavior. The two alleged victims who made outcries were forensically interviewed. During the first alleged victim's interview, he stated that another child tried to touch him; denied any other incidents of inappropriate touching; and reported that a staff person asked him not to tell and took him to Sonic. The second alleged victim denied any sexual contact and made false statements during the interview (for example, the documentation noted that he stated that he had a child but he did not).

The third youth made no outcries of abuse and denied the allegations. The fourth youth (one of those alleged to have perpetrated the rape) refused to be interviewed. Both staff persons who were identified as alleged perpetrators denied that they witnessed residents engaging in sexualized behaviors and denied coaching the residents against making abuse outcries. Administrative staff at the facility denied any issues with the alleged staff person perpetrators. The operation administrators minimized the incidents, which were reported and attributed them to "boy play." Three collateral residents were interviewed: two residents stated they witnessed other residents being sexually inappropriate with each other, but the third resident made no outcries. A former staff member disclosed to RCCI that one of the administrative staff changed incident reports to minimize concerns of residents acting out sexually and said that residents are taken on outings as an incentive not to disclose information during investigations. A law enforcement officer expressed concern because he receives many reports of sexual assaults at the facility.

In the two years prior to this referral, there were five neglectful supervision allegations reported at the same facility; one of the allegations was for neglectful supervision by the same staff identified in this report and involved child-on-child sexual activity, which was also Ruled Out. While initial interviews resulted in denials, interviews with some of the youth were delayed by almost one year after the intake was received by SWI. By the time the additional interviews were attempted, one youth had turned eighteen-years-old, was no longer in care and refused to be interviewed. The risk assessment was not completed until May 2019, over one year after the alleged incident occurred and at that point, most of the identified youth had left the facility. Because of the delay between the initiation of the investigation, follow-up, and completion of the investigation, it is difficult to determine if other collateral sources could have been identified. By the time they were interviewed by RCCI, many of the parties did not recall the details of the

events and therefore, the investigator could not reconcile the conflicting information obtained. The investigation was initiated by RCCI in April 2018. One extension was approved on May 15, 2018. No further investigative activity occurred for nine months until February 19, 2019 and as a result, the investigation was compromised and substantially deficient.

6.   Remedial Order Three Summary

- Receiving Allegations: Between August 1, 2019 and January 31, 2020, SWI received 372,897 calls, for an average of over 62,000 calls recorded by SWI per month. During the period analyzed, 18% of all SWI calls (65,786) were abandoned by the caller. Calls to SWI on weekends, at nights, or in the early morning had shorter queue times and lower than average abandoned call rates; on average, one of the highest times of abandoned calls to the abuse hotline occurred during weekday afternoons. Of the calls to SWI placed on Monday or Friday between 3:00 p.m. and 5:00 p.m. and routed to the abuse hotline, 40% (7,023 out of 17,577) were abandoned. When a call is routed to the abuse queue, it is much more likely to be abandoned than when routed to the Law Enforcement queue; 22% of calls (60,218 out of 234,270) to the abuse queue were abandoned whereas 3% of calls (1,123 out of 36,208) to the law enforcement hotline were abandoned. One-fifth (13,411) of all abandoned calls occurred before the caller finished navigating the automated system and one-third (22,771) of the calls were abandoned before the caller had been waiting on the queue for a minute.  Another one-third (23,851) of abandoned calls occurred after one to five minutes in the call queue and the final one-third (19,164) after the caller had been on the call queue for over five minutes. Of the calls on a queue for between one and five minutes (67,995), over one-third (23,851) were abandoned. Many callers, however, waited much longer before hanging up.  In the six months examined, 8,338 calls (39%) were abandoned after the caller waited for ten minutes or more.

- Screening Allegations: The Monitors' review of 329 intake reports included 174 that SWI assigned for child abuse or neglect investigations, which were then downgraded by RCCI during secondary screening. Of those 174 intakes, the Monitors concluded that RCCI inappropriately downgraded fifty-seven intake reports (33%). Those reports contained allegations that warranted investigation for child abuse or neglect under the Texas Administrative Code.

- Investigating Allegations: Out of 133 RCCI investigations reviewed by the Monitors, RCCI Ruled Out all allegations in 122 cases; of these 122 investigations, the Monitors concurred with the State's decision in 87 cases (71.3%). The Monitors identified thirty-five (28.6%) investigations Ruled Out between August 1, 2019 and November 30, 2019, which had substantial deficiencies or were inappropriately resolved by RCCI. In eleven of the thirty-five investigations where the Monitors disagreed with the agency's final disposition to Rule Out abuse or neglect, the Monitors concluded that at least one of the allegations was supported by a preponderance of the evidence in the investigation and, therefore, should have been substantiated with a disposition of Reason to Believe. In

twenty-four of the thirty-five investigations where the Monitors disagreed with the agency's final disposition to rule out abuse or neglect, the Monitors could not determine whether DFPS's final disposition was appropriate due to deficiencies in the investigation.

B. Timeliness of RCCI Investigations: Remedial Orders Five through Eleven; Sixteen and Eighteen

Remedial Order Five: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

Remedial Order Six: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

Remedial Order Seven*: Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

Remedial Order Eight: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

Remedial Order Nine*: Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

Remedial Order Ten: *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Remedial Order Eleven: *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Remedial Order Sixteen*: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

Remedial Order Eighteen*: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

## 1. Background

In 2017, the 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent state agency reporting directly to the Governor.[178] The regulatory functions of CCL, including inspections and investigations of minimum standards violations, were reorganized into HHSC. Responsibility for child abuse, neglect and exploitation investigations remained within DFPS, including investigation of maltreatment in child care settings, which include residential and day care settings. These investigations had been the responsibility of CCL at the time of the Court's Memorandum Opinion and Verdict. DFPS created RCCI as part of a new, independent Investigations Division rather than consolidate these investigations into the CPS investigation department.

DFPS Investigations Division Field Communication #008 discusses policy and procedures for face-to-face initiations in investigations with multiple alleged child victims.[179] Effective May 1, 2019, the policy instructs DFPS staff to initiate investigations through face-to-face contact with all alleged child victims and to document all contacts in CLASS; this replaced the prior policy which permitted investigation initiation through face-to-face contact with only one alleged child victim. The 2019 policy modified the permissible extensions and exceptions to face-to-face contact requirements and required supervisor approval.[180]

---

[178] *Act of May 30, 2017*, 85th Leg., R.S.

[179] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Investigations Division Field Communication #008* (Mar. 11, 2019) (on file with the Monitors).

[180] The policy states that a supervisor may approve an extension for making face-to-face contact with all alleged victims cannot be made when: the alleged victims' whereabouts are unknown; the alleged victim(s) no longer live in Texas; Child Protective Investigator, law enforcement officer, or a children's advocacy center has already interviewed the alleged victims about the same allegations prior to the intake report being received; and, if the forensic interview cannot take place within the initiation timeframe, the RCCI will make face-to-face contact with all alleged victims within the initiation timeframes (24 or 72 hours depending on priority.) The policy states that an

DFPS Investigations Division Field Communication #010, effective June 19, 2019, addresses approval and documentation of extensions to investigation timeframes in the IMPACT database.[181] The policy states that extensions may only be approved for seven, fourteen, or twenty-one days due to functionality limitations in IMPACT 2.0.[182]

DFPS Investigation Division Field Communication #007, effective April 1, 2019, states that DFPS is responsible for finalizing and mailing all notification letters to abuse and neglect reporters instead of HHSC.[183]

On September 9, 2019, DFPS reported to the Monitors:

- Regarding Remedial Orders Five, Six, Seven, Eight, and Sixteen: "DFPS policies and practices are in compliance with this order;"
- Regarding Remedial Orders Nine and Eleven: "DFPS is in compliance with this order;" and
- Regarding Remedial Order Ten: "DFPS policies are in compliance with this order; however, current practices must be further refined to ensure they consistently align with policy."

2. Monitors' Data and Information Request and Production

   i. Monitors' Data and Information Request

To validate the State's performance associated with Remedial Orders Five through Eleven, Sixteen and Eighteen, the Monitors requested from the State key data and information for all

---

exception to making face-to-face contact with the alleged victims may be granted by the supervisor if: the alleged victims are deceased; the alleged victims' whereabouts were unknown during the entire course of the investigation; and, other circumstances beyond the investigator's control prevent the interview or observation from taking place within the initiation time frame. *Id.*

[181] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Investigations Division Field Communication #010* (June 19, 2019), (on file with the Monitors).

[182] The policy states that:

> An extension is approved only when an investigation cannot be completed because of circumstances beyond the investigator's control. A supervisor may extend the timeframe for completion if: medical information is still needed; an autopsy report has not been received; law enforcement reports have not been received; or an interview with the alleged perpetrator or other principal source involved in the investigator has been delayed due to circumstances beyond the investigator's control.

*Id.*

[183] TEX. DEP'T OF FAMILY; & PROTECTIVE SERVS., *Investigation Division Field Communication #007* (Apr. 1, 2019) (on file with the Monitors).

investigations conducted by RCCI regarding any child in the PMC General Class initiated between July 31, 2019 and September 30, 2019 in a report due November 15, 2019, and then regular quarterly reporting from the State thereafter.[184]   The Monitors requested:

> For all investigations, including all those conducted by CCI, CCL, CPI etc. regarding any child in the PMC General Class initiated between July 31, 2019 and September 30, 2019, identify in a report due November 15, 2019: the manner of initiation (action taken that triggered the start of the investigation); the county where the maltreatment is alleged; the date/time of face to face contact with the alleged victim(s) (as applicable) noting any and all untimely face to face contacts and the reason for any approved extensions to the face to face contact timeframe; the relationship(s) of the alleged perpetrator(s) to the alleged child-victim(s); the child's placement type at the time of the alleged maltreatment; the placement/provider identification number; the referral identification number; the investigation identification number; and the name and identification number of the assigned investigator. Provide the date/time the investigation was launched and, if applicable, completed; the date documentation of completion was entered in IMPACT; the reason for all approved extensions to the investigation completion date/time (when applicable); the date the completed investigation was submitted to the supervisor for approval; the date the supervisor approved the investigation; the disposition of each allegation; the overall disposition of the investigation; and the date of any notification letters to parents, providers, and/or referents. Report quarterly thereafter.[185]

---

[184] *Monitors' Data & Information Request* (Sept. 30, 2019). The State produced RCCI investigation reports on a slightly altered schedule due to norming the data production schedule with the State's fiscal year calendar.

[185] *Id*. On October 28, 2019, the Monitors responded to DFPS, further stating: "With respect to Remedial Orders 3, 5-10, 12-19 and B-5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors confirm that DFPS is to provide the following information and data from ALL investigations opened during the period involving any child in PMC General Class: Intake stage ID number; Investigation stage ID number; Person ID (for all alleged PMC victims); County where maltreatment is alleged; Most recent investigator name and ID; Date and time investigation stage started; Program conducting investigation; Child's placement type at intake; Placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; the relationships of the alleged perpetrator(s) to the child-victims. With respect to the Remedial Orders 3, 5-10, 12-19 and B-5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors confirm that DFPS is to provide the following information and data from ALL investigations closed during the period involving any child in the PMC General Class: Intake stage ID number; Investigation stage ID number; Person ID(for all alleged PMC victims); County where maltreatment is alleged; Most recent investigator name and ID; Date and time investigation stage started; Program conducting investigation; Date the investigation completed; Date documentation is completed and submitted to the supervisor; the status of all allegations involving all PMC children; overall investigation disposition; the reason(s) for all approved extensions to the investigation completion date/time (when

ii. DFPS Data and Information Production

In response to the Monitors' request for data, the State notified the Monitors that it could not provide some of the requested data relevant to its performance for these orders. The State subsequently produced quarterly data reports reflecting those limitations.[186] For Remedial Orders Five through Nine, which require data about investigation initiation timeframe and face-to-face contact with all alleged child victims, the State reported that it could provide the date for its first face-to-face contact with an alleged child victim, but not the time it occurred; and moreover, that it was unable to provide data about face-to-face contact with each additional alleged child-victim for investigations involving multiple alleged victims.[187] Additionally, the State notified the Monitors that it was unable to provide the requested data on approved extensions for face-to-face contact with alleged child-victims during this reporting period.[188] DFPS stated that its inability to comprehensively report face-to-face contact data was due to lack of functionality in IMPACT and that new functionality will allow for reporting of the requested compliance data going forward.[189]

---

applicable); the date any notification letters are sent to parents, providers, and and/or referents. With respect to Remedial Orders 3, 5-10, 12-19 and B-5(Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors requested data and information to determine for the court which active investigations are overdue for completion. DFPS wrote in the DFPS Proposal that "Due to an IMPACT 2.0 issue, which the DFPS IT division is addressing, DFPS is currently unable to report on timeframes for extensions or timely completion [of investigations]," which the monitors will report to the Court." Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors).

[186] The four sets of files produced are as follows: (1) RO3.2 RCI [CCI] Investigations July 31 – Sept 30 2019 – Nov-15-19 – 96114; (2) RO3.2 RCI [CCI] Investigations Oct-Nov 2019 – Jan-15-20 – 96882; (3) RO 3.2 RCI [CCI] Investigations Oct-Nov 2019- Jan-15-20 – 96882 – 2-3-20 Updated w/ Class Inv Number; (4) RO3.2 RCI [CCI] Investigations Q2 FY20 – Apr-15-20 – 98263.

[187] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request, and stating that "a separate listing report will be provided from a case read regarding initiation, face-to-face contact including exceptions"); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data Dictionary for Reports due 11.15.19* (on file with the Monitors) (stating that DFPS cannot provide "Time of any contact; Date and time of face-to-face contact with all alleged victims; Exceptions to timely FTF contact")

[188] The Monitors note that the State more frequently uses the term "exceptions" when referencing face-to-face policies; the Monitors have referenced and requested information about "extensions" per the Court's order. On October 25, 2019 in its "Impact Enhancements and Defects Status" document to the Monitors, the State noted that data fields would be added to include exceptions and extensions to face-to-face contact with victim(s). TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *IMPACT Enhancements and Defects Status 10.25.19* (Oct. 25, 2019) (on file with the Monitors).

[189] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data Dictionary for Reports due 11.15.19* (on file with the Monitors); Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request). The State anticipated reporting the time stamp for face-to-face contact with each alleged child-victim by April 15, 2020 and on approved extensions (or exceptions) to face-to-face contact by July 15, 2020. The Monitors reviewed the April 15, 2020 data and found that the data field has been added to the April data production and, thus far, in most cases the State was unable to report the date and timestamp for face-to-face contact with each alleged victim, as this field was blank or had a timestamp of 12:00:00

For the data requested by the Monitors associated with Remedial Orders Ten and Eleven, the State identified additional limitations to its data reporting capacity. Until IMPACT functionality could be improved, DFPS stated it could not report on the timeframe for investigation extensions, including multiple extensions, or whether the investigation was completed within approved extension timeframes.[190] Instead, DFPS initially provided a separate list of approved extensions and the reasons for the approved extensions but did not include the length of time of the extensions.[191] DFPS's reporting on extensions to investigations is addressed more fully below in the discussion of Remedial Orders Ten and Eleven, which require DFPS to track and report on investigation completion and extensions.

Finally, for Remedial Order Eighteen, which requires the State to notify both the referent and the provider within five days of investigation closure, the State did not include in its first quarterly report to the Monitors the date it sent notification letters to providers; this information was included in the subsequent report on January 15, 2020. DFPS has indicated the data will be included going forward.[192]

In lieu of the data requested by the Monitors to allow for independent validation of performance under the corresponding remedial orders, DFPS instead provided three sets of case read reports.[193]

_____

am; the Monitors also noted that investigations involving multiple alleged victims had the same date and timestamp listed for each alleged victim. The State noted in the Data Dictionary attached to the file:

> This functionality rolled out in IMPACT on 12-19-19 so any contacts made prior to 12-19-19 will likely be blank. Blank cells can indicate that face-to-face contact has been made but not documented in this specific field, has not yet been made or can reflect a case has been or will be administratively closed in which case face-to-face contact is not required. If the timestamp is 12:00:00, it generally means that there was no timestamp entered. To the extent a contact was not made within the 24/72 hour timeframe, there may have been an exception but data reporting on exceptions will not be available until Q3 FY 20.

TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data file RO3.2 RCI Investigations Q2 FY 20 - Apr-15-20- 98263* (Apr. 15, 2020) (on file with the Monitors).

[190] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data Dictionary for Reports due 11.15.19* (on file with the Monitors).

[191] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RO11.1 RCI (CCI) INV [Investigations] extensions Q4 FY 19 – 11-15-19 -96507* (Nov. 15, 2019) (on file with the Monitors).

[192] DFPS originally stated that it could not report on notification to providers as "that is the responsibility of HHSC, not DFPS" but that it would provide the date in future reports. *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data Dictionary for Reports due 11.15.19* (on file with the Monitors).

[193] DFPS provided case read reports for Residential Child Care Investigations on November 15, 2019; January 29, 2020; and on April 15, 2020. This discussion focuses on the January 29, 2020 submissions, which included three cohorts of investigations with time periods described by DFPS as follows: (1) Closed Cohort: Investigations reviewed were received from 7/31/2019 – 11/30/2019 and closed between 10/1/2019 and 11/30/2019. A total of 102 investigations were reviewed; (2) Non-Cohort: All investigations reviewed were started before 7/31/2019 and were

Subsequently, it also submitted an addendum report to correct a methodology error in its reporting about investigation initiation.[194] The reports were offered by DFPS as its method for reporting timeliness of initiation; timeliness of face-to-face contact with all alleged child victims; timeliness of investigations; and notification to reporter.[195] Additionally, in April 2020, DFPS provided data and information about the surveys for the investigations included in the case read reports.[196]

3.  Remedial Orders Five through Eleven; Sixteen; and Eighteen Performance Validation (DFPS)

---

closed from 10/01/2019 through 11/30/2019. A total of 66 investigations were reviewed; and, (3) Open Cohort: Investigations reviewed were received from 10/01/19 – 11/30/2019 and were still open at the time of this review. A total of 138 investigations were reviewed. TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Non-Cohort Investigations Received July 31, 2019 and Closed July 31 - September 30, 2019, DFPS 1-11* (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Closed Cohort Investigations Received July 31, 2019 – November 2019 and Closed October 2019 – November 2019, DFPS 1-11* (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Open Cohort Investigations October 2019 – November 2019* (provided Jan. 30, 2020) (on file with the Monitors).

[194] After reviewing the case read reports that DFPS submitted to the Monitors to report on investigation performance, the Monitors requested clarification about why the reports used a methodology to measure initiation that was not consistent with the DFPS policy that specifically requires initiation through face-to-face contact with all alleged child victims in cases involving multiple children. DFPS responded to the Monitors' question by producing new case read reports that measured initiation using the correct policy and updated methodology. DFPS stated: "Historically, CCI interpreted policy to mean that investigation initiation is met by making face-to-face contact with the alleged victim, unless an exception is granted. While all alleged victims should be observed or interviewed within the required time frames, in these case reads, CCI determined that the investigation initiation was met when contact was made with at least one alleged victim, or by other means if an exception to the face-to-face contact with the alleged victim was granted. The case reading measured timely contact with all alleged victims as a separate measure. The CCI Quality Assurance Team (QAT) has reevaluated data in the November 2019 and January 2020 case read reports for compliance with investigation initiation time frames based on strict interpretation of CCI Policy and Field Communication #008. The results of the CCI QAT's reevaluation is in the attached addendums, in which investigations are only credited for timely initiation if all alleged victims were interviewed. Future case read reports will do the same." Email from Tara Olah, Dir. of Implementation & Strategy, Tex. Dep't of Family & Protective Servs. to Kevin Ryan, Monitor (Apr. 3, 2020, 13:46 EST) (on file with the Monitors) (including DFPS Response to Monitors' question regarding DFPS case reads performance measurement for initiation with alleged victims). Thus, DFPS provided to the Monitors an addendum report, reflecting the same time-periods as the initial reports: TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Addendum to the Residential Child Care Investigations Cohort and Non-Cohort Reports*. In the Addendum report, DFPS explains that "[w]hile the new policies have not been officially updated in the CCI Handbook, a Field Communication was disseminated to field staff delineating changes to face-to-face contact with victims and documenting exceptions." *Id.* It further states that some of the cases it evaluated during this time period were opened in 2018 and early 2019. *Id.*

[195] DFPS stated that it reports on timeliness of notification to referents through quarterly CCI case read reports; and also reports the date of notification to referents to the Monitors through the quarterly Remedial Order 3.2 CCI investigations report. *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *IMPACT Enhancements Reference Doc 1.28.20* (on file with the Monitors).

[196] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Oct-Nov FCL RCI Case Review Survey Data* (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Q2-FCL RCI Case Review Survey Data* (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Sept FCL RCI Case Review Survey Data* (on file with the Monitors).

106

a.  Methodology

The State reported its performance through case reads because it was unable to report on these orders from its IMPACT system. The tool that DFPS used for its case reads to self-evaluate several of these remedial orders did not record specific data, such as the date and time of face-to-face contacts for each child in investigations; the dates of investigation completions; the dates, durations, and approvers of extensions; dates of transfers to RCCL inspectors; or the dates of notifications to various parties. Instead, case readers recorded whether the case file indicated in their assessment compliance with remedial orders.  As a result, the case read information supplied by DFPS could not be used by the Monitors to compare data recorded in the Monitors' case reads for these orders or to the electronic data, and prevented the Monitors from verifying that the case readers correctly recorded whether practice in the investigation complied with remedial orders.[197]

For validation of orders measuring the timeliness of various aspects of RCCI investigations, the monitoring team reviewed all RCCI investigations that were opened by the State in October and November 2019.[198] Based upon the data provided by DFPS, there were 188 RCCI investigations opened during this time period. The monitoring team reviewed all records in CLASS and IMPACT to validate performance and confirmed that four of the investigations were administratively closed without investigation.[199] The monitoring team reviewed the remaining 184 investigations for compliance with the Court's orders relating to timeliness of RCCI Investigations using the methodologies described below, by Order.

- Remedial Order Five: To measure initiation in Priority One Investigations within twenty-four hours, the Monitors reviewed the intake date and time in CLASS; and the initiation date, time, and method of initiation in CLASS to determine whether the investigation was

---

[197] Moreover, related to orders requiring timely initiation through face-to-face contact with all alleged child victims, after reviewing the DFPS case read submissions, the Monitors identified that DFPS used a methodology to measure initiation that was not consistent with DFPS policy. It counted a case as properly initiated so long as it showed face-to-face contact with one alleged child victim, rather than with all alleged child victims in an investigation.  In response, DFPS produced an addendum to its original case read reports using the correct methodology, which reported slightly lower compliance in Remedial Orders Five (94%) and Six (87%).  Within the same addendum, DFPS also conducted a subsequent review, which the agency refers to as "assessment of current review findings" for Remedial Order Six, which then reported a higher compliance rate of 90%.

[198] To identify investigations opened in October or November 2019, the Monitors used the "intake start date" column from three merged RO3.1 CCI Intakes data files from July 31, 2019 through November 30, 2019 and the "Date Investigation Completed in CLASS column" from the RO 3.2 CCI Investigations data file for October 1, 2019 to November 30, 2019. If the "intake start date" was unavailable, the Monitors used the "date investigation initiated" column to determine if the investigation was opened in October or November 2019. To confirm the investigation aligned with the intake, the Monitors matched the intake stage ID in the RO3.2 data files with the intake IDs listed in the RO3.1 RCI intakes data files. The source files included: open investigations and closed investigations from RO3.2 RCI [CCI] Investigations Oct - Nov 2019 - Jan-15-20- 96882 -2-3-20 updated with CLASS INV. number; RO3.1 RCI [CCI] Intakes July 31 - Sept 30 2019 - 96364, RO3.1 RCI and CPI Intakes Oct 2019 - Dec 16-19 – 96558; RO3.1 RCI [CCI] and CPI Intakes Nov 2019 - Jan 15-20 - 96876.

[199] Three investigations were administratively closed due to lack of RCCI jurisdiction; one investigation was administratively closed as the program director at the facility confirmed that the alleged victims were residents and the allegations had already been investigated.

initiated through face-to-face contact with each alleged child victim within twenty-four hours of intake.

- Remedial Order Six: To measure initiation in Priority Two Investigations within seventy-two hours, the monitoring team reviewed the intake date and time in CLASS; and the initiation date, time, and method of initiation in CLASS to determine whether the investigation was initiated through face-to-face contact with each alleged victim within seventy-two hours of intake.

- Remedial Order Seven: To measure face-to-face contact with all alleged victims in Priority One investigations within twenty-four hours, the monitoring team calculated performance using the intake date and time in CLASS; and the date and time of face-to-face contact with each alleged victim in CLASS.

- Remedial Order Eight: To measure face-to-face contact with all alleged victims in Priority Two investigations within seventy-two hours, the monitoring team calculated performance using the intake date and time in CLASS and the date and time of face-to-face contact with each alleged victim in CLASS.[200]

- Remedial Order Nine: The monitoring team reviewed DFPS tracking and reporting of investigations that were not initiated on time through face-to-face contact, factoring in approved extensions and exceptions to face-to-face contact by checking the CLASS contact notes for face-to-face extensions (and exceptions per DFPS policy) approved by supervisors. The results associated with extensions and exceptions as stated in DFPS policy are included in the discussion of face-to-face performance as reported in Remedial Orders Seven and Eight.

- Remedial Order Ten: To measure completion of Priority One and Priority Two investigations within thirty days, the monitoring team calculated compliance using the intake date in CLASS and the "investigation complete" date in IMPACT consistent with the methodology identified in the DFPS case read submissions to the Monitors.[201] In addition, for this Order, the Monitors calculated performance on investigation completion using the data provided by DFPS, which is reported separately below.

- Remedial Order Eleven: The monitoring team measured approved extensions to investigations by reviewing the Supervisor Extension Approval section in CLASS and

---

[200] The Monitors note that face-to-face contact was verified using all alleged child victims in the "intake persons" list for the investigation.

[201] According to the DFPS case read report methodology related to Remedial Order Ten, "[i]nvestigation complete within 30 days is measured by the number of days between the intake receipt date and the date entered as complete in IMPACT. An investigation is considered completed timely if it is completed within 30 days or it is completed after 30 days, but there is an extension(s) for good cause and it is completed within the approved extension timeframe." TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Remedial Order Ten Case Read Report* (on file with the Monitors).

CLASS contact notes.[202]

- Remedial Order Sixteen: To measure timely completion and submission of documentation in Priority One and Priority Two investigations, the monitoring team reviewed the "documentation was submitted to supervisor date" in IMPACT; the "documentation complete" date in CLASS; and the "investigation complete" date in IMPACT.

- Remedial Order Eighteen: To measure timeliness of notification letters to referent and provider(s) in Priority One and Priority Two investigations, the monitoring team calculated compliance using the date of "supervisor approval" in IMPACT and the "notification to reporter" and "notification to provider" dates in CLASS.

b.  Remedial Order Five: Initiation within Twenty-Four Hours in Priority One Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

The Monitors found that of 184 investigations reviewed, nineteen were assigned Priority One, requiring that DFPS initiate the investigation within twenty-four hours of intake.  DFPS initiated 68% (13) of Priority One investigations with face-to-face contact with each alleged child victim(s) within twenty-four hours.[203]

Of the remaining investigations, one was approved by the supervisor for initiation through interviews with the caregivers, as the alleged child victim was deceased. There was no documentation to support that the remaining five investigations (26%) were initiated within twenty-four hours through face-to-face contact with each alleged victim or initiated through an alternative approved method under DFPS initiation policy.

---

[202] In a few cases, the length of an extension was not clearly documented in CLASS but additional details were documented on the Impact Contact Summary page.  In those instances, the Monitors used the additional information from IMPACT about the date of the extension if it provided missing information.

[203] The case read reports submitted by DFPS on January 29, 2020 divide RCCI investigations into three categories for reporting purposes depending upon when an investigation was opened and/or closed. DFPS does not report on monthly cohorts as the Monitors do in their validation of October and November 2019 investigative timeliness performance. While all of the cases included in these DFPS case reads were either opened and/or closed in October or November 2019, the results do not include all of such cases as discussed in conjunction with Remedial Order Ten. For Remedial Order Five, DFPS reported that the total number of Priority One investigations initiated timely was 94% (twenty-nine of thirty-one). *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *JAN RCCI Addendum to Cohort and Non-Cohort Reports Issued 1-29-2020* (Mar. 16, 2020) (on file with the Monitors).

**Figure 11: Initiation of Investigations within Twenty-Four Hours in Priority One Investigations**



*The percentage totals 99% due to rounding.

c. Remedial Order Six: Initiation within Seventy-Two Hours in Priority Two Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

There were 165 Priority Two investigations requiring DFPS initiation within seventy-two hours of intake. The Monitors found that 81% (133) of Priority Two investigations were initiated within seventy-two hours of intake through face-to-face contact with each alleged victim; and 3% (five) of investigations were initiated within seventy-two hours of intake through an alternative method after supervisory approval or with an approved extension to face-to-face contact.[204]

---

[204] With respect to Remedial Order Six, DFPS reported three different performance rates for this group of investigations. First, on January 29, 2020, when it reported to the Monitors using face-to-face contact with one child as its methodology for initiation, DFPS reported that 97% (242 of 249) of Priority Two investigations were initiated timely. Subsequently, when DFPS resubmitted reports with the correct methodology requiring face-to-face contact with all alleged child victims, DFPS reported that 87% (216 of 249) of Priority Two investigations were initiated within seventy-two hours for the three categories of cases depending on open and closure dates. In that same Addendum, DFPS reported yet a third performance rate of 94% (225 of 249). In doing so, DFPS stated that through a subsequent, closer review of contacts in CLASS, DFPS identified that some additional children were observed or interviewed timely; however, according to DFPS, due to limited, late or incorrect documentation these contacts were not initially identified by reviewers. *See* Tex. Dep't of Family & Protective Servs., *JAN RCCI Addendum to Cohort and Non-Cohort Reports Issued 1-29-2020* (Mar. 16, 2020) (on file with the Monitors).

Sixteen percent (27) of the investigations were not initiated within seventy-two hours through face-to-face contact with each alleged victim nor were they initiated through an alternative approved method under DFPS initiation policy in that time period.

**Figure 12: Initiations of Investigations within Seventy-Two Hours in Priority Two Investigations**



**d.** Remedial Order Seven: Timeliness of initial face-to-face contact with the alleged victims in Priority One Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

Of the nineteen Priority One investigations, the Monitors found that 68% (thirteen) of the investigations included initial face-to-face contact with the alleged child victim(s) within twenty-four hours.[205] An additional investigation had documentation of an approved exception[206] to face-to-face contact since the child was deceased.

---

[205] In its January 29, 2020 case read submissions, DFPS reported that in 95% (41 of 43) of all Priority One investigations, it observed or interviewed all alleged child victims within twenty-four hours of intake. TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *JAN RCCI Addendum to Cohort and Non-Cohort Reports Issued 1-29-2020* (Mar. 16, 2020) (on file with the Monitors).

[206] The Monitors reviewed extensions and exceptions to initial face-to-face contact according to DFPS policy regarding extensions and exceptions to face-to-face contact as stated in TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Investigations Division Field Communication #008* (Mar. 11, 2019) (on file with the Monitors), which

The documentation does not support that the remaining five investigations (26%) included face-to-face contact with each alleged victim within twenty-four hours of intake. In fact, in one investigation, the record showed that DFPS completed face-to-face contact with one of the alleged victims twenty-two days after intake.

**Figure 13: Face-to-Face Contact within Twenty-Four Hours with All Alleged Child Victims in Priority One Investigations**



e.  Remedial Order Eight: Initial Face-to-Face Contact with All Alleged Victims in Priority Two Investigations within Seventy-Two Hours

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

Of the 165 investigations assigned Priority Two, the Monitors' review showed that 81% of the (133) investigations included initial face-to-face contact with the alleged child victim(s) within seventy-two hours of intake.[207] In two other investigations, an approved extension was

---

became effective May 1, 2019. This policy was used because it was in effect at the time the investigations were initiated.

[207] In its January 29, 2020 case read submissions, DFPS reported that in 90% (318 of 355) of all Priority Two investigations, it observed or interviewed all alleged child victims within seventy-two hours. Tex. Dep't of Family & Protective Servs., *JAN RCCI Addendum to Cohort and Non-Cohort Reports Issued 1-29-2020* (Mar. 16, 2020) (on file with the Monitors).

documented due to the alleged victims' whereabouts being unknown at the time of investigation and face-to-face contact occurred within the extension deadline for both of those investigations.[208]

The documentation does not support that the remaining twenty-nine investigations (18%) included face-to-face contact with each alleged victim within seventy-two hours.[209]  Finally, in one additional investigation, the record documented that DFPS requested a courtesy interview due to the children living in another state, and face-to-face contact was not timely.

**Figure 14*: Face-to-Face Contact within Seventy-Two Hours with All Alleged Child Victims in Priority Two Investigations***



f.   Remedial Order Nine

> *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

For Remedial Order Nine, the Monitors report on the initiation of all investigations through face-to-face contact above in the discussion associated with Remedial Orders Five through Eight, including all authorized and approved extensions to the deadline. As discussed above, DFPS was unable to track and report to the Monitors if and when face-to-face contact was made with all

---

[208] The Monitors' review indicated that the two extensions, while documented with supervisory approval, did not conform to DFPS policy in Field Communication #008 because they were not documented in CLASS as contacts labeled "Face to Face Contact with Victim Extension."
[209] In one investigation, the victim was living out of state and face-to-face contact did not occur. This was counted as non-compliant because there was no documentation of a courtesy interview request.

alleged child victims within an investigation.[210]  As noted above, the agency's method of reporting the information required in this order (and others) includes individual case reads that measure and report investigation initiation and face-to-face contact with alleged child victims.

g.  Remedial Order Ten: Completion of Priority One and Priority Two Investigations within Thirty Days

*Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Of the 184 Priority One and Priority Two investigations reviewed, the Monitors found that 79% (146) were not completed within thirty days. Nineteen percent (thirty-five) of investigations were documented as completed within thirty days of intake and 2% (three) had approved extensions and were completed within the extension timeframe.

While 11% (twenty-one) had approved extensions, as noted above, only three of those were completed within the approved timeframe allotted by the extension; nine were not completed within the allotted extension timeframe; and in nine others, the Monitors were unable to determine whether the investigation was completed within the extension timeframe either because the investigation was still open at the time of review (seven) or there were documentation deficiencies regarding the length of the extension (two).

**Figure 15: Completion of Priority One and Two Investigations within Thirty Days**

---

[210] *See supra* Section III.C.2 (discussing DFPS response to data requests on face-to-face contact with multiple alleged victims).



*DFPS case read results for Investigation Completion*

From its case reads, the State reported that 27.1% (76 of 280) of investigations were completed within 30 days of intakes, as illustrated in the table below.[211]

**Table 5: Remedial Order 10 Investigation Completion Performance as Reported in DFPS Case Read Reports October 1, 2019 to November 30, 2019[212]**

| DFPS Named Cohort | Num. | Den. | Performance |
|---|---|---|---|
| Closed cohort investigations | 50 | 76 | 65.8% |
| Non-cohort investigations | 9 | 66 | 13.6% |
| Open cohort investigations | 17 | 138 | 12.3% |
| **Total** | 76 | 280 | 27.1% |

---

[211] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Non-Cohort Investigations Received Before July 31, 2019 and Closed October 2019 – November 2019* (Jan. 29, 2020) (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Closed Cohort Investigations Received July 31, 2019 - November 2019 and Closed October 2019 - November 2019* (Jan. 29, 2020) (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Open Cohort Investigations received October 2019 to November 2019*, 1-10 (Jan. 29, 2020) (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *JAN RCCI Addendum to Cohort and Non-Cohort Reports Issued 1-29-2020* (Mar. 16, 2020) (on file with the Monitors).

[212] The cases included in the case reads for this time period were either opened or closed during October and November. *See id.* They do not include all cases opened in October and November as reviewed and reported on by the Monitors.

The State's case read methodology removed twenty-six cases from the review because they had been reviewed as open cases in the July 31, 2019 to September 30, 2019 case read review, creating another layer of complexity for tracking and reporting performance.

In the back-up data DFPS provided on case reads, there are critical data missing related to investigations such as completion date and information about extensions.

DFPS explained that the Monitors cannot use data submitted on the agency's closed and open investigations to verify the DFPS's case read reports.[213] DFPS said that this occurs because the case read process begins prior to the date that the data are extracted and finish after the data are extracted.[214] The status of the investigations in the case reads submissions may be different at the time the case is read when compared to the time the data are extracted by DFPS for the Monitors. DFPS also noted that another reason the case read reports cannot be replicated is because there is information gleaned from reading the file that is not reflected in the quantitative data.[215]

h.   Remedial Order Eleven: DFPS Track and Report Requirement

*Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

The Monitors reviewed data and information provided by DFPS in association with Remedial Order Eleven, which requires DFPS to track and report all investigations that are not completed on time. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

The DFPS data submitted in association with closed and open investigations do not provide the Monitors with a list of investigations that includes an indicator of timeliness as defined by Remedial Orders Ten and Eleven. DFPS submitted a list of extensions approved between October 1, 2019 and November 30, 2019. The file included twenty-three extensions and listed the dates the extensions were approved; the reasons for the extensions; and the number of additional days approved by each of the extensions. The file did not list the intake start date, the original due date, or the new due date, to allow for efficient verification of the extension data and timeliness of

---

[213] DFPS and the monitoring team discussed case reads and investigations on conference calls that took place on January 7, 2020, January 28, 2020 and March 9, 2020.
[214] *Id.*
[215] *Id.*

investigation closure. All but one of the extensions in the list appear to apply to investigations that began prior to October 1, 2019.

DFPS advised the Monitors that the agency implemented new IMPACT functionality and in the report for RCCI Investigations opened between October 1, 2019 and November 30, 2019, DFPS reported the reason and length of extensions separate from investigations, but did not report whether the investigation was completed within the approved extension timeframe.[216]

DFPS stated it cannot provide extension information as a part of the investigations report data as requested by the Monitors because there can be multiple extensions related to one investigation.[217] DFPS stated it will continue to report investigation extensions separately within its RCCI investigations data report, providing the investigation stage identification number on both the investigations and extensions tabs.[218]  The Monitors will then need to use this information as a cross-reference between the list of pending investigations and the list of investigation extensions.

As discussed above, DFPS does not report on the timeliness of investigation completion by relying on an IMPACT or CLASS report, but instead must rely on case read reports. For data necessary for validation of investigation completion, DFPS indicated in its case read reports that the proper methodology for validation requires the use of the date of investigation completion from IMPACT.[219] In its data, DFPS provided the Monitors with the date the investigation was completed in CLASS; when the Monitors asked for clarification on the different dates provided, DFPS noted that the investigation completion date from IMPACT would be the same date as the "date approval submitted" that it provided to the Monitors in the data production.[220] However, during the Monitors' record review, the Monitors found that the dates did not consistently match.

i.   Remedial Order Sixteen: Timeliness of Completion and Submission of Documentation in Priority One and Priority Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

---

[216] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RO3.2 RCI [CCI] Investigations Oct-Nov 2019 – Jan-15-20 – 96882 – 2-3-20 updated with CLASS INV number* (Feb. 3, 2020) (on file with the Monitors).

[217] *Id.*

[218] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[219] See TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations 7.31.19 – 9.30.19 Cohort Investigations Report Case Read* (Nov. 15, 2019) (on file with the Monitors).

[220] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

117

Of the 120 (out of 184) investigations that were documented as completed at the time of the Monitors' review, 66% (eighty) included evidence that documentation was completed and submitted on the same day that the investigation was completed.[221] Documentation was not completed and submitted on the same day the investigation was completed in 31% (thirty-seven) of the investigations. For the remaining three investigations (3%), the Monitors could not determine performance because of missing documentation in the records for the date submitted or date completed on the supervisor approval form or in the investigation report.

**Figure 16: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations**



j.  Remedial Order Eighteen: Timeliness of Notification Letters to Referent and Provider

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

Of the 120 Priority One and Priority Two investigations that were documented as completed at the time of the Monitors' review, the notification letter to referents was mailed within five days of investigation closure in 78% (ninety-four) of investigations.[222] Of the remaining cases, in 8% (ten) of investigations, notification letters to the referents were not mailed timely; 7% (eight) were

---

[221] In its case read submissions on January 29, 2020, DFPS reported that 64% (107 of 168) of Priority One and Two investigations were submitted on the same day the investigation was complete for the three categories of cases. TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *JAN RCCI Addendum to Cohort and Non-Cohort Reports Issued 1-29-2020* (Mar. 16, 2020) (on file with the Monitors).

[222] In its case read submissions on January 29, 2020, DFPS reported on Remedial Order Eighteen in part as to referents, stating that 81% (162 of 200) of "reporters" were notified within five days of the investigation closing for the three categories of cases The case reads did not include DFPS's performance related to notification to providers. TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *JAN RCCI Addendum to Cohort and Non-Cohort Reports Issued 1-29-2020* (Mar. 16, 2020) (on file with the Monitors).

mailed to the referent prior to supervisor approval. Four percent (five) were unknown due to pending supervisor approval at the time of review, and 3% (3) were unknown due to documentation deficiencies.

The notification letters to providers were mailed within five days of investigation closure in 65% (seventy-eight) of investigations.  The notification letters to providers were not mailed timely in 29% (thirty-five) of investigations. In addition, 4% (five) were unknown due to pending supervisor approval, and 2% (two) were unknown due to documentation deficiencies.

**Figure 17: Notification Letter Sent to Referent within Five Days of Investigation Closure in Priority One and Two Investigations**



**Figure 18: Notification Letter Sent to Provider within Five Days of Investigation Closure in Priority One and Two Investigations**



4. Summary

Remedial Order Five:
- Sixty-eight percent (thirteen) of investigations were initiated within twenty-four hours of intake through face-to-face contact with all alleged child victims;
- Twenty-six percent (five) of investigations were not initiated timely; and
- Five percent (one) was initiated through another approved method.

Remedial Order Six:
- Eighty-one percent (133) of investigations were initiated within seventy-two hours of intake through face-to-face contact with all alleged child victims;
- Sixteen percent (twenty-seven) of investigations were not initiated timely; and
- Three percent (five) of investigations were initiated through another approved method or had an extension to face-to-face contact.

Remedial Order Seven:
- Sixty-eight percent (thirteen) of investigations included initial face-to-face contact with all alleged victims within twenty-four hours of intake;
- Twenty-six percent (five) of investigations did not have timely face-to-face contact with all alleged victims; and
- Five percent, one investigation, had an approved exception to face-to-face contact.

Remedial Order Eight:

- Eighty-one percent (133) of investigations included initial face-to-face contact with all alleged victims within seventy-two hours of intake;
- Eighteen percent (twenty-nine) of investigations did not have timely face-to-face contact with all alleged victims; and
- Two percent (three) of investigations either had an approved extension to face-to-face contact or were not timely due to other circumstances.

Remedial Order Ten:
- Nineteen percent (thirty-five) of investigations were documented as completed within thirty days of intake;
- Seventy-nine percent (146) of investigations were not completed timely; and
- Two percent (three) of investigations had an approved extension and were completed within the extension timeframe.

Remedial Order Sixteen:
- Sixty-six percent (eighty) of investigations included evidence that documentation was completed and submitted on the same day the investigation was completed;
- Thirty-one percent (thirty-seven) of investigations did not include evidence that documentation was completed and submitted timely; and
- Three percent (three) of investigations were categorized as unknown due to missing documentation.

Remedial Order Eighteen (Notification to Referent):
- Seventy-eight percent (ninety-four) of investigations included evidence that notification letters to referent(s) were mailed within five days of investigation closure;
- Eight percent (ten investigations) of investigations did not have timely notification to referent(s);
- Seven percent (eight) of investigations documented that notification letters to referent(s) occurred prior to investigation closure;
- Four percent (five) of investigations were unknown due to pending supervisor approval at the time of review; and
- Three percent (three) of investigations were unknown due to documentation deficiencies.

Remedial Order Eighteen (Notification to Provider):
- Sixty-five percent (seventy-eight) of investigations included evidence that notification letters to provider(s) were mailed within five days of investigation closure;
- Twenty-nine percent (thirty-five) of investigations did not have timely notification to provider(s);
- Four percent (five) of investigations were categorized as unknown due to pending supervisor approval at the time of review; and
- Two percent (two) of investigations were categorized as unknown due to documentation deficiencies.

C.      Remedial Order A-Six

Remedial Order A-Six: *Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect.  In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman.  Upon receipt of this information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

1.  Background

*State Law and DFPS Policy*

Prior to the Fifth Circuit opinion validating this remedial order, CPS had instituted several polices and licensure requirements to promote youths' knowledge of and access to CPS's Abuse/Neglect Hotline (Hotline) and the Foster Care Ombudsman (FCO).  In accordance with Texas law,[223] CPS developed an internal field policy that requires the CPS primary caseworker to provide and review a copy of <u>CPS' Rights of Children and Youth In Foster Care</u> (Foster Care Bill of Rights) orally in the child's primary language and in simple, nontechnical terms no later than seventy-two hours from the date a youth enters CPS care and when "a placement change is made."[224]  If the youth is five years or older, upon completion of the review, the caseworker must have the youth sign and attach the Foster Care Bill of Rights to the Child's Plan of Service.[225]  The child or youth must receive a copy of the Foster Care Bill of Rights, and CPS staff must place a copy in the case file.[226]  The last page of the Foster Care Bill of Rights, page six of six, contains the information on how to contact the Hotline, the FCO, the Office of Consumer Affairs, and Disability Rights Texas:[227]

> As a child or youth in foster care I have the right to:…[m]ake calls, reports, or complaints without being punished, threatened with punishment, or retaliated against; and I have the right to make any of these calls privately and anonymously if I choose and the call

---

[223] TEX. FAMILY CODE ANN. § 263.008(c)(1).

[224] TEX. DEP'T FAMILY & PROTECTIVE SERVS., *Child Protective Servs. Handbook* § 6420 (Oct. 2017), available at https://www.dfps.state.tx.us/handbooks/CPS/default.asp [hereinafter *Child Protective Services Handbook*] *but cf.* 26 TEX. ADMIN. CODE § 748.1103 ("Within seven days after you admit a child into your operation, [facility] must review the child's rights with the child and a child's parent."); TEX. DEP'T FAMILY & PROTECTIVE SERVS., *24-Hour Residential Child Care Requirements – Residential Contracts (RCC)* § 3300.), *available at* https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf [hereinafter *Residential Child Care Contracts*]("*The provider, Caregiver,* **or** *CPS* Caseworker must review the document with the Child and explain the Child's rights.") (emphasis added).

[225] *Child Protective Services Handbook* § 6420.

[226] *Id.*

[227] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *CPS Rights of Children and Youth in Foster Care Form K-908-2530* (Mar. 2020), *available at* http://www.dfps.state.tx.us/site_map/forms.asp

center permits it. Depending on the nature of the complaint, I have
the right to call: The DFPS Texas Abuse/Neglect Hotline at 1-800-
252-5400; The HHSC Ombudsman for Children and Youth
Currently in Foster Care at 1-844-286-0769; The DFPS Office of
Consumer Affairs at 1-800-720-7777; Disability Rights of Texas at
1-800-252-9108

In addition, CPS policy requires caseworkers to provide a copy of the <u>Texas Foster Care</u>
<u>Handbook for Children, Youth & Young Adults</u> to children who enter care after age ten or turn
age ten while in care.  The Texas Foster Care Handbook includes the Foster Care Bill of Rights.
CPS staff are required to document in a contact that the Handbook was provided to the youth but
are not mandated to review the Handbook orally in the child's primary language.[228]

Texas regulations require all residential child-care facilities to display information about the FCO
and ensure that a child is able to contact the FCO's office upon request and privately if the child
wishes to do so.[229]  CPS' residential contracts require facilities to prominently post in a location
visible and easily accessible to children the FCO's sign in both English and Spanish.[230]  DFPS's
residential contracts also require residential facilities to prominently display the Hotline's phone
number, and[231] foster youth must be allowed telephone access to reach out to this twenty four-
hour system, free from observation.[232]

*The State's Initial Report to the Monitors Regarding Compliance*

In the materials provided to the Monitors on September 9, 2019, DFPS stated:

> DFPS policies and practices are in compliance with this order.
> Child Protective Services (CPS) caseworkers provide the CPS
> Rights of Children and Youth in Foster Care document to all
> children and youth in CPS foster care and review the document
> with the child and caregiver within 72 hours of the child coming
> into foster care or experiencing a placement change… In addition
> to being provided with the CPS Rights of Children and Youth in
> Foster Care document upon coming into foster care, children and
> youth also receive this document each time their plan of service is
> updated and each time their placement changes.  For children ages
> 10 and older, CPS caseworkers also provide them with a copy of
> the Texas Foster Care Handbook for Children, Youth & Young
> Adults when they enter foster care or turn age 10 while in foster
> care.  This handbook includes the CPS Rights of Children and
> Youth in Foster Care.

---

[228] *Child Protective Services Handbook* § 6421.
[229] 26 TEX. ADMIN. CODE § 87.305; *see also* TEX. HUMAN RES. CODE § 40.0041(h)
[230] *See Residential Child Care Contracts* §§ 1110, 3300
[231] *Id.*
[232] *Id.*

123

Although the FCO is overseen by the Texas Health and Human Services Commission, DFPS works to ensure youth in foster care know how to access the FCO.  In addition to informing youth about the FCO each time they receive the CPS Rights of Children and Youth in Foster Care document, DFPS informs youth about the FCO in the following ways:

- Posters in licensed childcare facilities
- CASA, attorney ad litems, judges, and other external partners
- DFPS website
- Texas Youth Connection website
- Caseworker conversation with youth
- PAL classes and other discussions with PAL caseworkers
- Youth conferences (e.g., PAL Aging Out Seminars, DFPS Statewide Teen Conference)
- FCO website
- Social media posts (Facebook, Twitter)
- Brochures distributed to youth in foster care
- Partnerships with stakeholder groups (e.g., Supreme Court of Texas Permanent Judicial Commission for Children, Youth, and Families distributed a notice re: the FCO to Texas judges who hear CPS cases)[233]

A footnote to the bullet point related to posters in licensed facilities further explained, "Residential child care contractors must post FCO posters in residential facilities, including GROs and foster homes, which is verified through DFPS contract monitoring."[234]

a. Data and Information Request and Production

i. Monitors' Data and Information Request and State's Production

In order to assess the State's compliance with this remedial order, on September 30, 2019 the Monitors asked DFPS to provide:

> For the period of August 31, 2019 to September 30, 2019, and on a quarterly basis thereafter, provide a list of all reports made by children in the General Class to the Texas Health and Human Services Ombudsman and/or any person(s) designated by the State as the "appropriate point of contact for reporting issues relating to abuse or neglect" and the disposition of those referrals. If the report is received through a point of contact other than the Ombudsman, please so indicate. Identify for each report, the reporting child's name; date of birth; identification number; county; agency responsible for the placement; placement name and identification

---

[233] Tex. Dep't. of Family & Protective Servs., *MD v. Abbott Monitoring Status Update* (Sept. 9, 2019) (on file with the Monitors).
[234] *Id*. at n. 5.

number. If referred for investigation, identify the status of the investigation and the investigation number.[235]

In response, DFPS requested the reporting period shift to align with state fiscal year quarterly reporting cycles, with the first quarterly report being provided to the Monitors by November 15, 2019.[236]  DFPS also indicated that it was unable to provide all the information requested "[t]o the extent that any non-DFPS entities or points of contact maintain reports made by PMC children, these reports are not available to DFPS."[237]

During a phone call with the State on October 24, 2019, the Monitors questioned this statement, and requested the information again, pointing out that the Ombudsman was housed within HHSC, which is a party to this lawsuit.  In addition, the Monitors requested that DFPS, by November 15, 2019, provide a detailed description of how DFPS complies with Remedial Order A Six and what information and data the agency tracks to assess compliance on an ongoing basis.

In response, DFPS indicated that it tracks both when a PMC child reports suspected abuse or neglect to the Office of Consumer Relations and is transferred to SWI and when a PMC child reports suspected abuse/neglect directly to SWI.  DFPS indicated that this information would be included in the monthly Residential Child Care Licensing listing report due to the Monitors on November 15, 2019.  DFPS reiterated again, however, that it does not have access to any reports by PMC children to non-DFPS entities, i.e. the FCO or Disability Rights Texas.

DFPS provided Child Protective Investigation (CPI) and Residential Child Care Investigation (RCI) intakes from July 31 through March 16, 2020, which are not responsive to the Monitors' request.  The intakes reported to the Monitors neither delineate if a report was made by a child in care, nor do they indicate the child's date of birth; county; or agency responsible for the placement.  Without knowing if the child placed the call, the data cannot be used to assist the Monitors in evaluating whether children in care are apprised of the appropriate point of contact for reporting issues.

The State provided the Monitors with "all reports that PMC children made to the [FCO]"[238] from September 2019 through March 2020.  The number of complaints were extraordinarily low; there were four in September 2019, four in October 2019, four for November through December 2019, and six for January through March 2020.

b. Remedial Order A-Six Performance Validation

---

[235] Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).

[236] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *DFPS Monitoring and Oversight – Screening and Investigating ANE Reports, Order 6*, at 2 (Nov. 1, 2019).

[237] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Deborah Fowler and Kevin Ryan, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (responding to Monitors' Sept. 30, 2019 Data & Information Request).

[238] Email from Frances Townsend, Att'y, Litigation Dep't, Tex. Health & Human Servs. Comm'n, to Deborah Fowler, Court Monitor (Oct 30, 2019, 17:31 EST) (on file with the Monitors) (responding to Monitors' Sept. 30, 2019 Data & Information Request).

i. Methodology

DFPS's responses to the Monitors included blanket representations of compliance with Remedial Order A Six, and the data provided by the State was not adequate to support validation. Thus, the Monitors relied on observations during unannounced monitoring visits to licensed foster care facilities across Texas,[239] the information the Monitors received during these visits, face-to-face interviews with and case record reviews of PMC youth in care, and interviews with caregivers.

ii. Results of Analysis of Compliance

*Youth's Knowledge of the Foster Care Bill of Rights*

According to DFPS, CPS caseworkers review the Foster Care Bill of Rights with PMC children each time their placement changes and each time their plan of service is updated.  Yet, of the children who answered this set of questions, only forty-two of the 101 children (42%) interviewed by the Monitors in Cottage Homes indicated they were aware of the Foster Care Bill of Rights. Only thirty-six of the sixty-three children (57%) interviewed by the monitoring team in other types of GROs (which included three residential treatment centers (RTCs)) indicated they were aware of the Foster Care Bill of Rights.[240]  Youth under the age of thirteen were less likely to know about the Foster Care Bill of Rights.

**Figure 19: Child Interview: Ever Heard of Foster Care Bill of Rights by Age Group for Cottage Homes and GRO/RTC**

---

[239] The Monitors visited three residential treatment centers (Hector Garza, Prairie Harbor, and A Fresh Start), one general residential operation (GRO) (St. Jude's), and nineteen cottage home operations, some with multiple campuses, that provide congregate care settings for foster youth.  When data is discussed in this document, the GRO, St. Jude's, is included with the RTC data.

[240] The monitoring team's review for a signed foster care bill of rights in the child files was added to the questions included in the review tool after the Cottage Home visits and the visit to Hector Garza were completed.  Based on a review of seventy-seven children's files in the last three GROs visited (two of which were RTCs), sixty-four of the seventy-seven (83%) youth's files reviewed during site visits in GRO/RTCs contained a signed Foster Care Bill of Rights.



*Youth's Knowledge of the Foster Care Ombudsman*

A majority of children in Cottage Homes and GROs/RTCs had not heard of or did not know of the FCO.  Seventy-two percent of children in Cottage Homes and RTCs (117 of 163) had not heard of or did not know of the FCO.  A greater proportion of children in GRO/RTCs were unaware of the FCO (47 of 62 or 76%) compared to children in Cottage Homes (70 or 101 or 69%).  None of the fourteen youth interviewed at A Fresh Start Treatment Center were aware of the FCO.

**Figure 20: Child Interview: Know/Heard of Ombudsman Cottage Homes and GRO/RTC**



Even when a child was aware of the FCO, they did not always know how to contact the FCO. For example, of the 101 youth interviewed in cottage homes, thirty (30%) were aware of the FCO, and twenty-three (23%) knew how to reach the FCO. And, of the sixty-two youth interviewed in other types of GROs/RTCs, only fifteen (24%) were aware of the FCO, and only eight youth (13%) actually knew how to reach the FCO.

*Youth Knowledge of the Abuse/Neglect Hotline*

A majority of the youth across operation types knew of the Hotline. Of children asked if they had heard of the hotline, 60% (70 of 117) responded that they had heard of the hotline. Children in Cottage Homes were less likely to have heard of the hotline, with 49% (28 of 57) answering that they had, compared to 70% (42 of 60) of children in other GROs/RTCs. However, only six of fourteen youth (43%) interviewed at A Fresh Start Treatment Center were aware of the Hotline. Few youth reported having ever called the hotline: no children in Cottage Homes reported having called the hotline, and only two children interviewed in other GROs/RTCs indicated that they had called.

**Figure 21: Child Interview: Ever Call ANE Hotline GRO/RTC**



*Hotline & Ombudsman Numbers Posted in Unit*

The Monitors also asked caregivers if they knew whether the phone numbers to the Hotline and FCO were posted.[241]  While ten of the eleven (91%) staff interviewed at Hector Garza and all nine staff (100%) interviewed at St. Jude's were aware of the FCO poster, only three of the five caregivers (60%) at A Fresh Start, and even fewer (six of the thirteen, or 46%) interviewed at Prairie Harbor were aware of the poster.  The location of the posters may contribute to the lack of knowledge at both Prairie Harbor and A Fresh Start.

In both locations, the Monitors and their staff observed that, though the signs were posted, they were not clearly visible and easily accessible to children (or adults).  The FCO poster, an 8.5"x11" piece of paper, was taped on the wall next to a desk used by staff at a height of approximately six feet at A Fresh Start Treatment Center.  While the Monitors were able to see the posters at Prairie Harbor, they were unable to read the information on them because of their placement high above the doorways.[242]  The Monitors did not observe any DFPS "Keep Children Safe" posters[243] in the housing units.

---

[241] This question was added to the caregiver interview instrument after the visits to Cottage Homes were completed. Therefore, responses include caregivers at Hector Garza, A Fresh Start Treatment Center, St. Jude's – Bulverde, and Prairie Harbor.

[242] In the photo, the FCO posters are the green and blue posters above the door.  The door was elevated because there was a step down into this room, increasing the height at which the flyers were placed.

[243] DFPS "Keep Children Safe" posters provide information on how to contact the Hotline.



Picture from Prairie Harbor, 2/2020

*Youth Phone Access to Call Hotline or Ombudsman*

Both caregivers and youth at the GROs/RTCs visited by the monitoring team indicated that a phone was available for children to use.  In the thirty-eight youth interviews that included this question,[244] most reported restrictions or conditions to use the phone:

- 50% (nineteen of thirty-eight youth) indicated approval was needed from a caregiver and 3% (1 of 38 youth) indicated the approval needed to come from a supervisor before a call could be made;

- 26% (ten of thirty-eight youth) indicated calls could only be made on specific days or times;

- 16% (six of thirty-eight youth) indicated the phone could only be used to make specific calls (ex: caseworker or family members on an approved list); and

---

[244] This question was added to the interview tool for children after the visits to the Cottage Homes and Hector Garza were completed.  The analysis therefore only includes responses for the last three GROs/RTCs visited.  However, the Monitors shared findings related to the limited access to a phone in Cottage Homes in their Update to the Court on Remedial Orders A7 and A8 Regarding 24-hour Awake-Night Supervision.  Kevin Ryan and Deborah Fowler, Monitors, *Update to the Court on Remedial Orders A7 and A8, M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-0084 (Nov. 4, 2019), ECF No. 711, at 16.

- Only 8% (three of thirty-eight youth) indicated there was free access to the phone.

## 2.  Summary

Based on the Monitors' analysis, a majority of the 164 youth interviewed do not know who or what the Foster Care Ombudsman (FCO) is or how to contact that office to make a complaint. Additionally, most of the 117 youth interviewed were aware of the Hotline, but of children asked during the interviews about the protocol for using the phone (38), most indicated they are unable to make calls twenty-four-hours a day and free from observation.

Forty-two of the 101 children (42%) interviewed by the Monitors in Cottage Homes indicated they were aware of the Foster Care Bill of Rights.  Thirty-six of the sixty-three children (57%) interviewed by the monitoring team in other types of GROs/RTCs indicated they were aware of the Foster Care Bill of Rights.[245]  Even when a child was aware of the FCO, they did not always know how to contact the FCO.  For example, of the 101 youth interviewed in cottage homes, thirty (30%) were aware of the FCO, and twenty-three (23%) knew how to reach the FCO. And, of the sixty-three youth interviewed in other types of GROs/RTCs, only fifteen (24%) were aware of the FCO, and only eight youth (13%) actually knew how to reach the FCO.

During on-site visits, the Monitors observed examples of the FCO posters placed in locations or positions that make it difficult for children and youth to see them.

## D.  Remedial Order B-Five

Remedial Order B-Five: *Effective Immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

## 1.  Background

### a.  DFPS Policies Related to Caseworker Notification

The RCCI Handbook requires a DFPS investigator to notify a child's CPS caseworker if the child is listed as an alleged victim of abuse or neglect or if the child lives in a foster home in which another child is alleged to have been a victim of abuse or neglect.[246]  The RCCI Handbook sets out a process for notification, requiring the investigator (or "designee") to notify the caseworker in an e-mail that includes the child's name, the name of the operation or foster home, the IMPACT

---

[245] The monitoring team's review for a signed foster care bill of rights in the child files was added to the questions included in the review tool after the Cottage Home visits and the visit to Hector Garza were completed.  Based on a review of seventy-seven children's files in the last three GROs visited (two of which were RTCs), sixty-four of the seventy-seven (83%) youth's files reviewed during site visits in GRO/RTCs contained a signed Foster Care Bill of Rights.

[246] *Child Care Investigations* § 6353.

case ID, a statement regarding whether the allegations involve a child's sexually aggressive behavior or child-on-child physical abuse, and whether the child is the alleged victim or is listed as a household member in the intake report.[247]  While the RCCI Handbook does not designate a timeline for notification, the CPS Handbook requires RCCI to notify caseworkers for children in licensed placements of RCCI's receipt of a report of abuse or neglect within twenty-four hours of receiving the report.[248]

If the child is an alleged victim, the RCCI Handbook requires the investigator to attempt ongoing contact after the initial notification, particularly to obtain any information about the child that may provide "insight into the investigation," to share information, including concerns about the child's placement and details related to any child-on-child abuse, and to obtain assistance in acquiring any medical records, if needed.[249]  The handbook also requires the investigator to document any contact with a caseworker in CLASS – including an unsuccessful attempt – "as soon as possible and no later than the following day."[250]

**b.  The State's Initial Report to the Monitors Regarding Compliance**

On September 9, 2019 DFPS cited the handbook sections outlined above and reported:

> DFPS policies and practices are in compliance with this order…The DFPS CCI division promptly communicates allegations of abuse to the child's primary caseworker.  If a child is in the conservatorship of DPFS, the CCI investigator notifies the child's CPS caseworker if the child is listed as an alleged victim of abuse or neglect or the child lives in a foster home where another child is alleged to have been abused or neglected.   The CCI investigator notifies the CPS caseworker via email and includes:

> - the child's name;
> - name of the operations that is the subject of the investigation;
> - name of the foster home, if applicable;
> - the IMPACT case ID number;
> - a statement regarding whether or not the allegations involve sexually aggressive behavior or child-on-child physical abuse; and
> - whether the child is listed as an alleged victim or as a household member in the intake report.[251]

---

[247] *Id*. at § 6353.1.
[248] *Child Protective Services Handbook* § 4221.1
[249] *Id*. at § 6353.2.
[250] *Id*. at § 6353.3.
[251] Tex. Dep't. of Family & Protective Servs., *MD v. Abbott Monitoring Status Update* (Sept. 9, 2019) (on file with the Monitors).

All contacts with a child's CPS caseworker are documented as a contact on the Investigation Conclusion page in the CLASS investigation as soon as possible and not later than the following day.

Compliance demonstrated through the DFPS Statewide Intake division administering the system to receive, screen, and assign for investigation,[252] and DFPS Child Care Investigations in notifying caseworkers via email when an intake is received.  Unless otherwise directed by the court/monitors, DFPS assumes no additional data/reporting is specifically required in response to this order.

c.  Monitor's Data and Information Request and State's Production

   i.  The Monitors' Data and Information Request and the State's Response

In order to assess the State's compliance with this remedial order, the Monitors included the following in their September 30, 2019 data and information request:

Provide a list of all referrals received by DFPS and HHSC between July 31, 2019, and September 30, 2019, via phone call, website, fax, regular mail and any other manner in which the referent expressed concern about child maltreatment regarding any and all PMC children in the General Class, regardless of placement type and licensure status. This list shall include the identification number of the referral; the PMC child identifier(s) linked to the referral; the date of the call/communication; the disposition of the report by Statewide Intake (where referred, whether it was classified as an intake or information and referral, and the priority assigned); **the date and manner of notification to the child's primary caseworker of the allegations;** and the disposition of the report by the office/division to which is referred (CCI, RCCL, CPI, etc.) including whether it was referred for an abuse and neglect investigation, a minimum standards investigation, the priority assigned to the investigation, and any other information with regard to how the State addressed or planned to address the report.  The same data on a monthly basis, thereafter.[253]

---

[252] DFPS also noted that its "Statewide Intake (SWI) operates 24 hours a day, seven days a week, as the centralized point of intake for reporting suspected incidents of abuse, neglect, and exploitation and child care licensing standards violations.  Statewide Intake assesses all reports of abuse, neglect, or exploitation and routes them to the appropriate local office."

[253] Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (emphasis added) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).

ii.  The Monitors' Second Data and Information Request and State's Response

In a subsequent request sent by the Monitors on February 21, 2020, the Monitors noted that DFPS did not provide data for dates and manner of caseworker notification requested previously.[254] Instead, the State provided case read reports related to RCCI investigations. These reports were not linked to individual cases and did not include information on the date of notification.

In addition, in the second data and information request, the Monitors asked that, when the State provides case reads as a method for reporting information, both prospectively and for reports already produced, the agency:

a) provides the investigation IDs for every case evaluated in the case reads;

b) identifies which investigations were included in which case reads; and

c) details how that particular investigation was scored for each evaluated performance standard.[255]

DFPS responded:

> Notification to primary worker is included in the quarterly RCCI case read report.  Date of notification is based on new IMPACT functionality. We anticipate being able to provide information as part of the DDS report once the data warehouse tables are built and functional.  We currently anticipate including the information for Q3 FY 20 reports.[256]

As requested, DFPS provided eight completed associated case read reports for RCCI (discussed below) for Quarter Four, 2019 (provided November 15, 2019), Quarter One, 2020 (provided January 30, 2020) and Quarter Two, 2020 (provided April 15, 2020).  The State also provided a review of survey data and information related to those case reads on April 15, 2020.

2.  Remedial Order B-Five Performance Validation:

a.  Methodology

---

[254] Email from Kevin Ryan, Monitor to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Feb. 21, 2020, 17:54 CST).
[255] Id.
[256] Email from Tara Olah, Director of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 16:49 CST) (on file with the Monitors).

To assess the State's performance with respect to Remedial Order B-Five the monitoring team conducted independent case reads for 118 of 200 abuse, neglect or exploitation SWI intakes between December 1, 2019 and December 31, 2019 involving a PMC child to determine whether the State documented caseworker notification in either CLASS or IMPACT. In addition, the monitoring team reviewed results of the State's case reads and analyzed the methodology underlying the reads.

b. Results of the Monitor's Case Record Review

The monitoring team selected a random sample of abuse and neglect referrals to SWI made during December 2019 for 115 PMC children for this case read.[257] The case read assessed whether the State "promptly communicate[d]" allegations of abuse by evaluating if a contact note in CLASS or IMPACT indicated that an investigator notified the child's caseworker:

- Within 24 hours of intake;
- Within 48 hours of intake;
- Within 72 hours of intake;
- More than 72 hours after intake; or
- Did not occur.[258]

According to the data for the 115 cases the Monitors reviewed, investigators notified the caseworkers for thirty-six children (31%) within twenty-four hours and within forty-eight hours for another twenty children (17%). Investigators notified the caseworkers for two children within seventy-two hours. However, for fifty-seven children (50%), it took the investigator more than seventy-two hours after intake to notify the caseworker when they notified them at all. See Figure 22 below.

---

[257] This sample allowed for a 95/5 confidence interval.
[258] Remedial Order B-Five does not define "prompt." However, as noted, CPS requires caseworker notification within twenty-four hours of RCCI's receipt of a report of abuse or neglect, and Remedial Order Thirty-Seven requires caseworkers to be notified within 48 hours of allegations of abuse that are not referred for an investigation.

**Figure 22: Timing of Investigator Notification to Caseworker (in hours)**



### 3. Review of the State's Case Reads

DFPS reported that the agency conducts case reads for abuse and neglect investigations each quarter in a cohort of open and closed cases, as well as a non-cohort of cases.[259]  In its case reads, DFPS bases the determination of whether investigators "promptly communicated" allegations of abuse to caseworkers on whether "notification is provided to the caseworker prior to initiation or within a reasonable timeframe after initiation."[260]  In testing for a "reasonable timeframe after initiation," DFPS asks whether investigators notified caseworkers for alleged victims within twenty-four and seventy-two hours of intake for Priority One and Priority Two investigations, respectively.

---

[259] Non-cohort refers to cases in which intake was received by SWI prior to the mandate issued by the Fifth Circuit on July 31, 2019 and closed during the period of review. Open cohort refers to cases where an intake was received by SWI after July 31, 2019 and the case was still open during the period of the review, and a closed cohort refers to cases where an intake was received by SWI after July 31, 2019 and the case was closed during the period of the review.

[260] *See, e.g.*, TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Non-Cohort Investigations Received Before July 31, 2019 and Closed October 2019 – November 2019, DFPS 1-11*, at 3 (Jan. 29, 2020) (on file with the Monitors).

If investigators notified caseworkers outside of the initiation timeframe, the DFPS case read does not indicate how long investigators took to communicate allegations of abuse to caseworkers. The State's survey tool does not test dates, but instead offers DFPS reviewers a choice of answers: "within priority time frames, outside priority time frames, or notification was not sent." Despite the CPS Handbook's clear directive to RCCI that investigators notify caseworkers within twenty-four hours of receiving a report of abuse or neglect (without reference to priority level), the State did not provide an explanation for testing for notification based on priority level.

Below is a summary for each of the DFPS case reads from the fourth quarter FY 2019 and the first two quarters of FY 2020. Though results vary, DFPS determined that the highest rate at which investigators notified caseworkers within priority time frames across all the case reads was 69%, leaving a substantial number of investigations for which the investigator notified the caseworker at some point beyond the agency's priority-based timeframe for initiating an investigation. This finding by the State is well beyond the CPS Handbook's requirement that investigators notify caseworkers within twenty-four hours of receiving a report of abuse or neglect regardless of priority assigned.

*DFPS Case Reviews Quarter Four FY 2019*

The State reviewed 143 open and closed cohort cases for the period reviewed. DFPS found that four cases did not meet the notification criteria.[261] DFPS determined 195 caseworkers required notification across the remaining 139 cases. Furthermore, RCCI initiated two of the 139 investigations as Priority One and 130 as Priority Two. DFPS reported that, of the 195 caseworkers:

- 135 (69%) were notified within priority time frames;
- Thirty-six (18%) were notified outside priority time frames;
- Twenty-three (12%) were not notified; and
- One (1%) was notified after the initiation time frame because the alleged victim was added after initiation.[262]

Among the State's non-cohort of eighty-nine closed cases for the period reviewed, DFPS found two cases did not meet the criteria for review. DFPS analyzed eighty-seven investigations and found 144 caseworkers required notification. RCCI initiated eight of the eighty-seven investigations as a Priority One and seventy-nine as a Priority Two. The State reported that, of the 144 caseworkers:

---

[261] DFPS initially includes all cases meeting criteria for the time period being reviewed, and upon further review, removes cases from inclusion in the analysis for several reasons including: to prevent duplication of data, because they have been administratively closed, because there were no PMC children in the investigation, or because investigations were merged.

[262] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Cohort Investigations Received July 31-September 30, 2019, DFPS 1-13* (Nov. 15, 2019) (on file with the Monitors).

- Seventy-nine (55%) were notified within priority time frames;
- Thirty-five (24%) were notified outside priority time frames;
- Twenty-nine (20%) were not notified; and
- One (1%) was notified after the initiation time frame because the alleged victim was added after initiation.[263]

*DFPS Case Reviews Quarter 1 FY 2020*

The State reviewed sixty-six non-cohort cases and determined ninety-five caseworkers required notification.  RCCI initiated seven of the sixty-six investigations as Priority One and fifty-nine as Priority Two.  The State reported that, of the ninety-five caseworkers:

- Thirty-nine (41%) were notified within priority time frames;
- Thirty-five (37%) were notified outside priority time frames; and
- Twenty-one (22%) were not notified.[264]

Among the cohort of 107 closed cases for the period reviewed, DFPS found thirty-one cases did not meet the criteria for review.[265]  DFPS analyzed seventy-six investigations and found 114 caseworkers required notification.  RCCI initiated eleven of the seventy-six investigations as a Priority One and sixty-five as a Priority Two.  The State reported that, of the 114 caseworkers:

- Seventy-eight (68%) were notified within priority time frames;
- Twenty-eight (25%) were notified outside the priority time frames; and
- Eight (7%) were not notified.[266]

In the cohort of 169 open cases for the period reviewed, DFPS found thirty-one cases did not meet the criteria.[267]   DFPS analyzed 138 investigations and found 189 caseworkers required

---

[263] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Non-Cohort Investigations Received July 31, 2019 and Closed July 31 - September 30, 2019, DFPS 1-11* (Nov. 15, 2019) (on file with the Monitors).

[264] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Non-Cohort Investigations Received July 31, 2019 – November 2019 and Closed October 2019 – November 2019, DFPS 1-11* (Jan. 29, 2020) (on file with the Monitors).

[265] DFPS excluded five cases for not meeting criteria and an additional twenty-six cases that had already been reviewed as open-cohort cases in the previous review *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Closed Cohort Investigations Received July 31, 2019 – November 2019 and Closed October 2019 – November 2019, DFPS 1-11*, at 5 (Jan. 29, 2020) (on file with the Monitors).

[266] *Id.* at 4.

[267] Of the thirty-one investigations eliminated from the review, twenty-eight were eliminated to prevent duplication because the investigation was completed and these cases were reviewed as closed cohort cases; one investigation did not have any children in PMC at the time of intake; one investigation was read as an open cohort case in the previous review and was still open at the time of this review; and one investigation on the open list was merged as the allegations and AV were the same.  *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Open Cohort Investigations Received October-November, DFPS 1-10*, at 4 (Jan. 29, 2020) (on file with the Monitors).

notification.  RCCI initiated thirteen of the 138 investigations as Priority One and 125 as Priority Two.  The State reported that, of the 189 caseworkers:

- 124 (66%) were notified within priority time frames;
- Twenty-nine (15%) were notified outside of priority time frames; and
- Thirty-six (19%) had not been notified at the time of the review.[268]

*DFPS Case Reviews Quarter 2 FY 2020*

In the 161 non-cohort closed cases for the period reviewed, DFPS found one case did not meet the criteria.  DFPS analyzed 160 investigations and found 225 caseworkers required notification. RCCI initiated three of the 160 investigations as Priority One and 157 as Priority Two.  The State reported that, of the 225 caseworkers:

- Sixty-three (28%) were notified within priority time frames;
- 121 (54%) were notified outside of priority time frames; and
- Forty-one (18%) were not notified. [269]

In the cohort of 238 closed cases included for the period reviewed, DFPS found eleven cases did not meet the criteria.  DFPS analyzed 100 of the remaining 227 cases[270] and found 141 caseworkers required notification.  RCCI initiated twelve of the 100 investigations as Priority One and eighty-eight as Priority Two.  The State reported that, of the 141 caseworkers:

- Ninety-six (68%) were notified within priority time frames;
- Forty-three (31%) were notified outside of priority time frames; and
- Two (1%) were not notified.[271]

In the cohort of 230 open cases included for the period reviewed, DFPS found ninety-six cases did not meet the case read criteria.[272]  DFPS analyzed 134 investigations which were still open at the time of DSPS' review and found 179 caseworkers required notification.  RCCI initiated eleven of the 134 investigations as Priority One and 123 as Priority Two.  The State reported that, of the 179 caseworkers:

---

[268] *Id.*

[269] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Non-Cohort Investigations Received Before July 31, 2019 Closed in Fiscal Year 2020, Quarter 2* (Apr. 2015) (on file with the Monitors).

[270] To prevent duplication, DFPS did not review 127 investigations that were already reviewed as open-cohort cases in the previous case read.  *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Closed Investigations Received After July 31, 2019 and Closed During Fiscal Year 2020, Quarter 2, DFPS 1-11*, at 5 (Apr. 15, 2020) (on file with the Monitors).

[271] *Id.* at 4.

[272] Ninety-three of the open investigations were closed outside of FY2020, Quarter 1 and will be read during the next review period; two investigations did not have any children in PMC at the time of intake; one investigation on the open list was merged as the allegations and alleged victims were the same.  *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Residential Child Care Investigations Open Cohort Investigations Received Fiscal Year 2020, Quarter 2, DFPS 1-10*, at 4 (Apr. 15, 2020) (on file with the Monitors).

- Ninety-six (54%) were notified within priority time frames;
- Forty-four (25%) were notified outside of priority time frames; and
- Thirty-nine (22%) had not been notified at the time of the review.[273]

### 4. Summary

The Monitors reviewed 115 RCCI investigations from December 2019 to assess the timeliness of caseworker notification when one of the children on their caseloads was the subject of an abuse or neglect investigation. The Monitors found that caseworker notification occurred within twenty-four to forty-eight hours of intake for 49% of children in the sample. Another 2% of the cases showed caseworker notification within forty-eight and seventy-two hours of the intake. Investigators notified thirty-one caseworkers (27%) more than seventy-two hours from intake, and investigators did not notify twenty-six caseworkers (23%).

In the State's case reads, DFPS identified 1,282 caseworkers whom the State said required notification of a child maltreatment investigation involving one of the children on their caseloads. The State reported that, of those 1,282 caseworkers:

- 710 caseworkers (55%) were notified within priority time frames;
- 371 caseworkers (29%) were notified outside of priority time frames, though the State did not specify how far outside the time frame notification;
- 199 caseworkers (16%) were not notified; and
- Two (<1%) were notified after the initiation time frame because the alleged victim was added after initiation

### E.    Remedial Order Thirty-Seven

Remedial Order Thirty-Seven: *Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home, assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.*

### 1. Background

### a.    State Law & DFPS Policy

Prior to the Fifth Circuit's validation of the Court's order, the Department's policy required RCCI investigators to provide notice of an abuse or neglect investigation only to the victims' CPS

---

[273] *Id.*

caseworker; there was no requirement that RCCI notify a child's caseworker of an allegation of abuse or neglect RCCI did not investigate.[274]   In October 2019, to comply with Remedial Order Thirty-Seven, DFPS adopted a new policy requiring that, if an abuse or neglect referral involving a child in a licensed placement is downgraded to a Priority Non (PN), the RCCI investigator must notify all CPS caseworkers and supervisors assigned to all the children in the foster home, the regional director's assistant, and the placement team in CPS State Office within forty-eight hours.[275]   The CPS State Office Placement Team is then required to review the foster home's history of compliance with minimum standards and abuse or neglect investigations and write a report detailing the home's history.[276]   When the foster home's history report is complete, the placement team must e-mail the report to each caseworker and supervisor.[277]

Furthermore, the Department's policy requires caseworkers and their supervisors to review the home history report provided by the placement team, assess any concerns for a child's safety or well-being, and document a summary of the report and the assessment of a child's safety or well-being in IMPACT.[278]   The policy also requires the caseworker to file the report in each child's record.[279]

b.   The State's Initial Report to the Monitors Regarding Compliance

At the first meeting with the Monitors on September 9, 2019, the State reported:

> Beginning September 1, 2019, RCCI program specialist will notify the child's caseworker, the caseworker's supervisor, Regional Director Assistant, and the home history review mailbox of all intake reports not referred for investigation.   This is a daily notification.   A detailed implementation plan concerning CPS home history reviews and corresponding tracking and reporting activities will be provided to the Monitors by September 15, 2019.[280]

On September 28, 2019, the State provided the Monitors an implementation plan setting forth timelines for (among other things):  developing the RCCI screener policy; hiring and training RCCI screeners;  hiring and training Quality Assurance ("QA") specialists; hiring and training home history reviewers; hiring and training CPS case readers for QA; developing policy for the

---

[274] *Child Care Investigations* § 6353.
[275] *Child Protective Services Handbook* § 4221.1.
[276] *Id.*
[277] *Id.*
[278] *Id.*
[279] *Id*
[280] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *MD v. Abbott Monitoring Status Update* (Sept. 9, 2019) (on file with the Monitors).

specialized placement unit; developing new IMPACT data fields for notifying CPS worker/supervisor of PN victim and non-victim children in foster home.[281]

## 2.   Monitors' Data and Information Request and State's Production

### a.   The Monitors' First Data and Information Request

In order to assess the State's compliance with this remedial order, the Monitors included the following in their September 30, 2019 Data and Information Request:[282]

- Beginning September 16, 2019 through September 30, 2019 and on a quarterly basis, identify all referrals involving a foster home that were not ultimately referred for a child abuse and neglect investigation by or through Statewide Intake or a secondary review process; the date of the referral; the referral identification number; the child's name(s); the allegations/concern; the placement name and identification number; the county responsible for the child; the date notification of the referral was made to the PMC child's caseworker; and the date notification of the referral was made to the caseworker's supervisor.

- A copy of the DFPS "Prioritization Guideline Handbook" and any other guidelines, policies, and handbooks established to inform the initiation of an investigation.

 DFPS responded to the Monitors request on October 18, 2019, stating: "The details of the investigation will be provided in the listing report for #1 in the monitoring and oversight order (on page 5 of this document)."[283]

The State also indicated:

> Before October 2019, CCI notifications were only provided to victim caseworker/ supervisors. This has been corrected and notifications are now provided to victim and non-victim caseworkers and supervisors.  As of September 28, 2019, notifications are also provided for non-victim caseworkers and supervisors for all PNs, along with the foster home history reviews to enable them to make a determination about continued safety of

---

[281] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Monitoring and Oversight – Screening and Investigating ANE Reports – Home History Reviews* (Sept. 28, 2019) (on file with the Monitors).

[282] Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request); *see also* Letter from Deborah Fowler, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019) (on file with the Monitors).

[283] Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).

their client(s). Pending IMPACT enhancements are needed to track
notification to the child's caseworker and supervisor.[284]

As a result, the Monitors requested DFPS's second report for this provision be made to the
Monitors for the period October 1, 2019 – October 31, 2019, due December 15, 2019, and
thereafter the reporting for this provision will align to Quarter 1 as defined in the DFPS
Proposal.[285]

On January 23, 2020, during a phone call with DFPS, the Monitors requested the agency provide
information regarding the process for conducting and documenting home history reviews (HHR).
As follow up to the phone conversation, on January 28, 2020, DFPS sent an e-mail summarizing
the process and indicating the agency would follow-up by providing more detail in a
PowerPoint.[286]

In the e-mail, DFPS summarized the process as detailed below:

> The Home History Review Team (HHRT) receives assignments of
> PNs from the State Office Placement Team via email. The State
> Office Placement team pulls the PNs from data warehouse report
> INT_07 which lists intakes of abuse/neglect in foster
> family homes that were given a disposition of PN (priority none) by
> RCCI the prior calendar day. NOTE:  PNs are assigned to the HHRT
> on business days.
>
> - Within two business days of notification of the PN, the HHRT
>   sends a report, including citations for non-compliance with
>   residential child care licensing and any
>   abuse/neglect history of  the home,  to  the  caseworker,
>   supervisor, program director, program administrator, regional
>   director, and regional director's assistant for:
>     - Each child currently residing in the home.

---

[284] Email from Andrew Stephens, Ass't Att'y General, Office of Att'y General of Tex. to Kevin Ryan and Deborah
Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including response to Monitors' Sept. 30,
2019 Data & Information Request).

[285] Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y General, Office of Att'y
General of Tex. (Oct. 28, 2019 08:53 CST) (on file with the Monitors) (including Monitor's response to the State's
Data Request Proposal).

[286] Email from Tara Olah, Director of Implementation & Strategy, Tex. Dep't of Family & Protective Servs. to
Deborah Fowler and Kevin Ryan, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews
process, documentation, timeframes) *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Review
Process and Screen Shots* (Jan. 29, 2020) (on file with the Monitors).

- o  Each child who resided in the home at the time of the alleged incident.
- Within seven calendar days of receipt of the report from the HHRT the caseworker must:
  - o  Review the report.
  - o  Discuss the report content with their supervisor.
  - o  Enter a "Home History Review and Staffing" contact/summary on the contact detail page in IMPACT. (NOTE:  A specific contact type was added to the drop down list in IMPACT on 12/19/2019.)
    - ▪  Document the discussion, including decisions made regarding next steps for the placement.
    - ▪  Summarize the content of the report received from the HHRT.[287]

The PowerPoint provided by DFPS to the Monitors on January 29, 2020 described the reason for creating and housing the HHRT in DFPS's State Office as follows:

> The State Office Home History Team (HHRT) was created to review foster home history when there is an allegation of abuse and/or neglect but the case is not investigated by RCCI; it is PN'd. By centralizing and standardizing the process, DFPS can ensure consistency with the review and reporting process thus enabling caseworkers and supervisors to have clear, concise, and detailed information regarding any history a foster parents [sic] may have. The HHRT consists of tenured staff with training in navigating IMPACT and CLASS to review history on a foster home and on foster parents.  The HHRT email notifications to caseworkers and supervisors supplement the notifications from RCCI; they do not replace those notifications.[288]

In addition, on January 29, 2020, DFPS sent the Monitors an update regarding IMPACT enhancements, indicating that, although the Department now reports the date of PN notification

---

[287] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews (process, documentation, timeframes)); *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Review Process and Screen Shots* (Jan. 29, 2020) (on file with the Monitors).

[288] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews (process, documentation, timeframes); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Review Process and Screen Shots* (Jan. 29, 2020) (on file with the Monitors).

to CPS caseworkers and supervisors in IMPACT, the State will be able to provide this data to the Monitors until July 15, 2020.[289]

b.  The Monitors' Second Data and Information Request and the State's Response

The Monitors sent the State an updated data and information production request on February 21, 2020.[290]  The requests related to Remedial Order Thirty- Seven and included:

a.  Need to receive type of facility/operation and facility ID and/or contract ID in order to respond to this RO.

b.  Files need to be submitted in the same structure and with the same field names for all requested time periods.

c.  Provide data indicating when a child changes placement as a result of a home history review.

d.  Provide Abuse and Neglect and Corporal Punishment reports created to help inspectors compile data for the 5 year retrospective reports.

e.  Request data used for case read review of home history reports including copy of the tool, the data from the tool in an excel spreadsheet and the list of children selected (if not included in the data).

The State provided a response to the Monitors on March 24, 2020:[291]

a) We will work with monitors to determine the best operation ID to provide and use that ID across all reports going forward.

b) The intakes report has been standardized and we will continue to submit future reports in the same structure with the same fields names as we did for November and December intakes.

c) We have no way of reporting on whether a child's placement change is the result of a home history review.

---

[289] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews process, documentation, timeframes); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *IMPACT Enhancement Reference Doc 1.28.20* ("[R]eporting on this data element cannot commence until after the IT data team builds the needed data warehouse tables and DDS builds the corresponding report. Date of PN notification to CVS caseworkers and supervisors should be included in the RO3.1 RCI and CPI Intakes report due July 15, 2020. DDS and IT are meeting on January 29, 2020 to confirm.").

[290] Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Feb. 21, 2020, 17:54 CST) (on file with the Monitors) (including Monitors' Feb. 21, 2020 Data & Information Request).

[291] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 16:49 CST) (on file with the Monitors) (responding to Monitors' Feb. 21, 2020 Data & Information Request).

d) We will provide data used for case read review of home history reports including copy of the tool, the data from the tool in an excel spreadsheet and the list of children selected (if not included in the data) with the next quarterly case read report, which is due May 4, 2020.

On March 9, 2020, the Monitors made an additional request to the State for copies of completed HHRs due to an inability to access the location where the State stores the reviews.[292]  The agency provided the Monitors with 310 completed HHRs on March 31, 2020; the first of these reviews completed by the agency was dated September 18, 2019.

3.   Remedial Order Thirty-Seven Performance Validation

a.   Methodology

To assess the State's performance with respect to Remedial Order Thirty-Seven, the Monitors conducted independent case record reviews for a random sample of sixty-two abuse, neglect, or exploitation SWI intakes involving a PMC child between December 1, 2019 and January 31, 2020, that the Department subsequently downgraded to PN.  The case review determined whether caseworker notification and home history review and assessment of child safety and well-being occurred within 48 hours of the referral.  The monitoring team also reviewed the State's case reviews[293] and analyzed the methodology underlying the reads.

b.   Results of the Monitors' Case Record Review

The monitoring team assessed a sample of sixty-two (of seventy-two) SWI referrals involving PMC children, initially assigned for a Priority One or Two investigation and then downgraded by RCCI to PN.[294] The case read assessed for:

1.   Caseworker/supervisor notification of a case downgrade to PN within 48 hours of the SWI referral;
2.   Staffing to review the home history review with their supervisor within the same forty-eight-hour notification requirement; and
3.   Documentation in the child's electronic record reflecting:

   a.   Whether the staffing notes indicated the caseworker and supervisor reviewed the referral history of the home;

---

[292] Email from Deborah Fowler, Monitor, to Tara Olah, Dir. of Implementation & Strategy, Tex. Dep't of Family & Protective Servs. (Mar. 9, 2020, 9:55 EST) (regarding request for additional copies of completed home history reviews).
[293] In response to the September 30, 2019 Data and Information request, DFPS provided the Monitors two Home History Case Read Reviews on February 3, 2020 and May 1, 2020.
[294] It is possible that cases that were not matched to a completed HHR may have been referred to SWI prior to the State's implementation of the HHR review process.  A portion of the case read sample was pulled from December 2019 SWI intakes.  The State implemented the HHR review process on December 17, 2019.

146

    b.  Whether the IMPACT notes indicated there was an assessment of any concerns for the child's safety or well-being; and

    c.  Whether the Monitors' review of the home history review and subsequent staffing revealed concerns related to a failure to appropriately consider the child's safety or well-being.

Of the sixty-two cases reviewed by the monitoring team, forty-four (71%) had a completed Home History Review (HHR).  Of the eighteen cases in which a HHR was not completed by the State, the Monitors determined five of these cases had a documented reason for exclusion in IMPACT leaving the failure to complete a HHR unexplained in the remaining thirteen (21% of the 62 cases reviewed).[295]

iii. Timeliness of HHR and Staffing by Caseworker and Supervisor

The State completed only twelve of the forty-four cases (27%) within forty-eight hours of RCCI downgrading the case to PN.

**Figure 23: Timeliness of Home History Review Completion**



In the forty-four cases in which the HHR was completed after the case was downgraded to PN, the caseworker documented a staffing with their supervisor in IMPACT related to the HHR in twenty-seven (68%).[296] Of these twenty-seven cases, notes in IMPACT indicate that twelve

---

[295] The Monitors found documented reasons to include: an investigation had already taken place; the child was no longer in the home; or the home had no prior history.

[296] Four of the survey responses in the case read did not include this information; these four were excluded from this analysis.

(48%) were staffed with the caseworker's supervisor within twenty-four hours of the HHR being completed.  Two (4.5%) were staffed within forty-eight hours of the HHR being completed.  The caseworker and supervisor staffed the remaining thirteen cases (44%) three or more days after the HHR was completed.

**Table 6: Time from Caseworker's Receipt of the Home History Review to Staffing**

| Timing for Staffing | No. HHR to Staffing | Percent (HHR to Staffing) |
|---|---|---|
| Not Staffed | 17 | 38.6% |
| Staffed Within 24 hours | 12 | 27.3% |
| Within 48 hours | 2 | 4.5% |
| Within 72 hours | 2 | 4.5% |
| More than 72 hours later | 11 | 25.0% |
| **Total** | **44** | **100.0%** |

The Monitors combined the analysis of the HHR timeliness and the analysis of the staffing timeliness to determine if the twelve cases in which the HRR was completed within forty-eight hours of the case being PN'd showed a staffing in IMPACT between the caseworker and supervisor, and if so how soon the staffing occurred after the HHR was completed. The table below illustrates the results of this analysis.

**Table 7: Timeline of Staffing between Caseworker and Supervisor for HHRs Completed within Forty-Eight Hours**

| Timing for Staffing | No. HHR Completed | Percent (HHR completed) |
|---|---|---|
| Within 24 hours | 2 | 16.7% |
| Within 48 hours | 2 | 16.7% |
| Within 72 hours | 1 | 8.3% |
| More than 72 hours later | 2 | 16.7% |
| No Staffing Documented | 5 | 41.7% |
| **Total** | **12** | **100.0%** |

This combined look revealed that in only two of the forty-four cases requiring an HHR (5%), the HHR was completed within forty-eight hours and a staffing was documented within twenty-four

hours of the HHR having been completed.[297] These are the only two cases of those reviewed that could be compliant with the timeline set out in Remedial Order Thirty-Seven.[298]

*Home History Review Documentation*

In addition to reviewing the cases for timeliness, the Monitors also considered whether the home history review included all the information needed for the caseworker and supervisor to adequately assess the safety of the home, and then considered whether the staffing notes in IMPACT indicated the information (if provided) was appropriately considered. Of forty-four cases with a complete HHR, forty-three (98%) included the SWI referral history of the home (or noted that the home did not have one).

The Monitors assessed in CLASS the referrals to SWI documented in the HHR to determine whether the HHR notes regarding the referral were consistent with the notes in CLASS. In the majority of cases with an HHR (37, or 86%), the referral history documented in the HHR was always consistent with CLASS.

The Monitors also evaluated the HHRs for patterns of referrals of abuse or neglect allegations or minimum standards violations implicating serious child safety issues. In nine of forty-four cases (21%) in which an HHR was completed, the HHR showed a pattern of referrals related to the child who was the alleged victim in the PN case. In another twenty-six cases (58%), the HHR showed a pattern of referrals related to other children.

*Caseworker and Supervisor Assessment of Child Safety*

The Monitors reviewed the cases in which caseworkers and supervisors documented a staffing in IMPACT of the HHR to determine how many indicated they took some action to ensure children's safety. The caseworkers and supervisors reviewed the HHR in twenty-seven of the forty-four cases (61%) with an HHR, and staffing notes in IMPACT indicate that the caseworker and supervisor took some action to ensure the child's safety in fourteen of those cases (52%).

For the fourteen cases with a narrative description of action to be taken, five cases (36%) listed requirements for additional safety measures or a safety plan, and four cases (29%) listed a change of placement. An additional six cases indicated an action was indicated in the narrative but no information about the action was provided in the available data or information.

---

[297] This may in part be a reflection of the policy created by DFPS, which does not reflect the timeline set out in Remedial Order Thirty-Seven. The policy requires only that the HHR be completed within two business days of the HHRT receiving the PN, and then gives the caseworker and supervisor a week to enter the staffing in IMPACT.

[298] Whether these two cases comply with the timeline depends on if it took a full 48 hours to complete the HHR (the case review asked if the HHR was completed *within* 48 hours) and if it took a full 24 hours for the case to be staffed after the HHR was completed.

Several of the cases reviewed by the Monitors in which the caseworker and supervisor reviewed the HHR and determined no action was needed were deeply concerning.  For example, SWI received two intakes in one case for a foster home placement for two siblings: the first on January 3, 2020 and the second on January 4, 2020.  The January 3, 2020 intake description in the HHR states:

> The [oldest victim], 11, resides in foster care with his younger brother, age 10.  On 1/3/20, the brother was observed with a whelp on his neck.  He was unable to explain how the injury occurred.  Both children have been seen with black eyes in the past.  Also, both become emotional when questioned and are frightened to speak in front of the foster parents.

The second intake, by the same reporter, was made the next day, and alleged the younger sibling "is very depressed and cries excessively."  The reporter also alleged that both children had had black eyes, and that the younger child had had what looked like a belt bruise on his face/neck.

Both intakes were downgraded to PN by RCCI on January 4, 2020, with a note in CLASS for the second intake explaining, "Based on the information gathered from the CVS Caseworker who observed the child at the same time the alleged whelp was observed, there is nothing to state abuse or neglect occurred.  The CVS caseworker conducts monthly visits with the children who are of an age that they can make an outcry if necessary, which they have not.  The CVS Caseworker denies a whelp was observed on the child today at a family visit."

The HHR for this foster home documents a disturbing pattern of similar allegations, which had been cited in 2010 for corporal punishment:

| Date of Intake | Allegation(s) | Disposition |
| --- | --- | --- |
| 2006 | OV, age 10, reported foster mother choked him for getting written up at the Boys Club.  The child had scratches and abrasions on both sides of his head.  The foster mother reported she grabbed OV by his shirt to keep him from running away. | Ruled Out |
| 2009 | The OV, age 10, reported the foster mother bent his hand back and hurting [sic] his wrist.  The OV was threatening another child with a pencil and the foster mother was attempting to remove the pencil from the child. | Ruled Out |
| 2010 | The OV, age 9, took a cardboard guitar to school.  This angered the foster mother who shoved the OV to the ground by the family stairs.  Also, that the foster mother hits him with her knuckle on his right thigh. | Ruled Out |

| 2010 | The OV, age 12, had a 3 by 4 inch mark on the right side of his cheek.  The child reported that the foster mother caused the injury.  The OV also reported the foster mother has slapped him and hit him in the stomach. | Ruled Out |
|---|---|---|
| 2011 | The OV, age 7, reported the foster mother pulled his arm and she grabs him by the neck and chokes him.  Also, the child reported he is not allowed snacks and he goes to bed hungry. | Ruled Out |
| 2011 | The OV, age 8, reported another child in the home was "humping him."  Both children had their clothes on and both were locked in a bathroom. | Ruled Out |
| 2012 | The OV, age 14, reported the foster mother hit him on several occasions for misbehaving.  Also, that the foster moth hit [him] in the face with a cardboard baseball goal for using all the tape.  It was alleged the foster mother hits the other children as well. | Ruled Out |
| 2012 | The OV, age 9, reported the foster mother is giving him "beat downs" and that he wanted to run away.  The child stated he is tired of having cuts and things on his body. | Ruled Out |
| 2014 | The OV, age 8, reported the foster father punched and kicked him as punishment for misbehaving at school.  The child is fearful when he is in trouble because of what the foster father will do. | Ruled Out |
| 2015 | The OV, age 6, was observed by a CPS worker of having marks and bruises all over his body.  The child also has a big scratch or burn on his earlobe. | Ruled Out |
| 2016 | The OV, age 7, has multiple scratches and bruising to his face.  The child reported the foster mother choked and hit him on the face.  The incident occurred over the weekend. | Ruled Out |
| 2017 | The OV, age 13, had a burn on his face.  The child reported a 6-year-old child in the home put an iron on his face.  The 6-year-old child denied doing this. | Ruled Out |
| 2018 | The OV, age 9, reported the foster mother would grab him by the throat and choke him.  Other children are placed in the home as well. | Ruled Out |

As indicated by the HHR for this foster home, the State also received several intakes that it closed without an investigation.  The allegations in these intakes include:

- In 2010, a call to SWI alleged the OV, age 8, "has a greenish, yellow bruise on the right side of his face. The child did not disclose how it occurred. The foster mother reported the

child fell down at the Boys Club."  The State coded the case as PN because "it did not appear to involve a/n or risk."

- In 2012, a call to SWI alleged, "The OV, age 9, reported he is tired of 'getting beat downs' by the foster mother.  It is worse than a spanking and they occur when the child gets a bad note from school."  Notes in the HHR indicate the State "Closed and Reclassified" this case.

- In 2016, a call to SWI was coded PN. It alleged the OV was "walking around the foster home exposing himself."

The notes in the HHR also indicate:

> This home was initially verified 5/13/02 but relinquished the license 2/6/15 due to non-compliances amid a pending investigation.  The home re-opened 4/1/15 and has remained open since then.  This review reflected the home has been a placement to many children over the years.

Despite what appears to be a disturbing pattern of similar allegations revealed by the HHR, the caseworker and supervisor determined that no action was needed.  The notes for the staffing indicate:

> On January 3, 2020 the caseworker asked [the alleged victim] about the whelp and what occurred.  [The alleged victim] stated he was not aware he had a whelp on his neck and…could not explain how or when the injury occurred. The caseworker observed the whelp on his neck was already in the process of healing.

> On January 3, 2020 the caseworker called the caregiver…to ask if she was aware of any marks on [the alleged victim] and she said no.  The caregiver said [the alleged victim] horseplay [sic] with his brother and the other youth in the home all the time.  The caregiver stated that [the alleged victim] is very rough and she always ask [sic] [the alleged victim] if he has an accident to let her know so she can document what happened.

> The caseworker then called the supervisor…informing her about the incident and provided a photo of the whelp on [the alleged victim's] neck.  The supervisor ask [sic] the caseworker did she speak to the child to verify what occurred? The caseworker told the supervisor that she spoke with the child and the caregiver.

According to the staffing notes, based on this information, the caseworker and supervisor agreed no placement change was needed for the child.

In another case reviewed by the Monitors, SWI received a call after a fourteen-year-old child ran away from a foster home and alleged the foster father threatened him. The January 2, 2020 HHR revealed that the State had cited this foster parent for inappropriate discipline in the past. The HHR indicates that in response to the alleged victim's claim that he burned his clothes when they were not put away, the foster parent acknowledged throwing the child's clothes away. In addition, when law enforcement brought the child back to the home, the foster parent told the police officer, "I'm the baddest mother fucker around and I am as capable of killing as a cop or military personnel." The notes in the HHR state that "[t]his did not appear to be a threat but rather a way to make [the foster parent] appear tough." The HHR does not reflect that the State took any action with regard to the child's placement, but there is a note stating that "[t]here appear to be serious concerns with the home and the disciplinary methods used. Licensing is requiring the CPA to retrain foster father on appropriate discipline." During the review of CLASS, the Monitors found that SWI received a subsequent referral about this foster parent in February 2020 after the foster parent became upset with the alleged victim and "put him out of the car." Law enforcement picked the child up and took him to a shelter.

iv.    The State's Case Reviews

DFPS conducted HHR case reads for the first and second quarters of Fiscal Year (FY) 2020 (September 2019 to November 2019 and December 2019 to February 2020). The reviews were conducted on cases in which an abuse or neglect report was received by SWI on PMC children in foster home placements, and the case was subsequently downgraded to PN. According to the reports, the purpose of the State's case reads was to determine:

- Whether the HHRT completed an HHR within two business days of assignment; and
- Whether the child's caseworker reviewed and assessed it in a staffing with their supervisor to identify any concerns for the child's safety or well-being, and then documented the staffing in the IMPACT system.[299]

The State's case reads did not appropriately test for the timeline required by Remedial Order Thirty-Seven. Rather than identify the number of days between the date the case was downgraded to PN and the date that the HHR was completed and staffed, the State reviewed only whether a home history review was completed within two business days of assignment to the HHRT. Since it takes one business day for the HHRT to receive notice of a case being downgraded to PN, and DFPS policy gives the HHRT two additional business days to complete the home history review, it could take up to three days from the date a report is made to SWI before a home history review

---

[299] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Case Review Results: September – November 2019/Quarter 1 – Federal Fiscal Year 2020* (Feb. 3, 2020) (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Case Review Results: December 2019 – February 2020. Review/Quarter 2 – Federal Fiscal Year 2020* (May 1, 2020) (on file with the Monitors).

is completed.  When a weekend or holiday falls within the timelines, it could take up to six days before the HHR is completed.

Similarly, while the case reviews tested for whether the caseworker documented an HHR staffing with their supervisor in IMPACT, the State's case reviews did not determine if the staffing took place within the timeframe set out in the Court's remedial order (specified in the order as "upon receipt" – which, according to Remedial Order Thirty-Seven, should be within forty-eight hours of the case being referred to SWI).  The State's case reviews did not even test the timeframe that DFPS policy allows for caseworkers to complete the staffing, which is, according to the State's PowerPoint,[300] a week from the date that the caseworker receives the HHR.  In light of the time the State allows the HHRT to complete the review and the time the Agency allows for caseworkers to complete the staffing, the PN downgrade and staffing timeline could span up to two weeks.

*DFPS Case Reviews Quarter 1 Federal FY 2020*

The State reviewed twenty-four intakes received for PMC children in foster care placements that were downgraded to PN and referred to the HHRT.  Of these twenty-four cases reviewed, the State found:

- Twenty-four or 100% of the cases had a HHR completed within two business days of the assignment to the HHRT.
- A staffing between the caseworker and supervisor was documented in twelve (50%) of the twenty-four cases.[301] Of these twelve cases:
  - 100% contained an accurate summary of the home history review.
  - Seven of twelve cases (59%) had an action taken as a result of the HHRT's report. These actions included: implementing additional safety measures, conducting discussions about appropriate discipline techniques with caregivers, having caregivers re-sign discipline policy, and requesting respite care.
  - In three of twelve cases (25%) the children changed placements prior to the caseworker and supervisor receiving the HHRT's.[302]

*DFPS Case Reviews Quarter 2 FY 2020*

The State's second review included twenty PN cases and represented 30% of the total assignments given to the HHRT during the period of review. Of the cases reviewed, the State determined:

---

[300] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews (process, documentation, timeframes); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Review Process and Screen Shots* (Jan. 29, 2020) (on file with the Monitors).

[301] There is a discrepancy in the State's data.  In two places in the report, the State indicates a staffing was documented in IMPACT in twelve of twenty-four (50%), but there is one entry that indicates a staffing was documented in sixteen of twenty-four.

[302] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Case Review Results: September – November 2019/Quarter 1 – Federal Fiscal Year 2020* (Feb. 3, 2020) (on file with the Monitors).

- Eighteen of the twenty cases required an HHR;
- Eighteen or 100% of the HHRs were completed within two business days of the assignment to the HHRT.
- A staffing between the caseworker and supervisor was documented in thirteen (72%) of the eighteen cases.   Of these thirteen cases:
  - Nine (69%) contained an accurate summary of the review completed by the HHRT.
  - Ten cases (77%) reflected an action taken as a result of the HHRT's report. These actions included: putting additional safety measures in place; developing a re-training plan for the foster parent on how to notify the CPA of a serious incident; requesting respite care; and addressing issues in therapy.[303]

4.   Summary

The Monitors cannot validate compliance with Remedial Order Thirty-Seven.  The policy adopted by the Department to implement the order fails to implement the timeline set out by the order, which requires notification of the child's caseworker and caseworker review of the home's history within forty-eight hours. The State completed an HHR forty-four of the sixty-two cases (71%) in reviewed by the monitoring team.  Of the eighteen cases in which the HHR was not completed by the State, the Monitors determined five of these cases had a documented reason for exclusion.

Of the forty-four completed HHR cases, twelve (27.2%) had HHRs completed within forty-eight hours of the SWI referral. Of the twelve cases with timely HHRs, caseworkers documented a staffing with their supervisor within twenty-four hours twice (16.7%); within forty-eight hours twice (16.7%); and within seventy-two hours once (8.3%).  Five cases (41.7%) showed no evidence of a staffing.

A review of IMPACT indicated that the caseworkers and supervisors reviewed the HHR in twenty-seven cases of the forty-four cases (61%) with an HHR, and staffing notes in IMPACT indicate that the caseworker and supervisor took some action to ensure the child's safety in fourteen of those cases (52%).  However, the Monitors' qualitative review of HHRs and staffing notes raised concerns about cases in which the caseworker and supervisor took no action.

## IV.   ORGANIZATIONAL CAPACITY

A.  Remedial Order One: CPS Professional Development Training

Remedial Order One: *Within 60 days, the Texas Department of Family Protective Services ("DFPS") shall ensure statewide implementation of the CPS Professional Development ("CPD") training model, which DFPS began to implement in November 2015.*

---

[303] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Case Review Results: December 2019 – February 2020 Review/Quarter 2 – Federal Fiscal Year 2020* (May 1, 2020) (on file with the Monitors).

1.  Background

a.   The CPD Training Model

DFPS developed the CPD training model as part of the department's "Transformation" process—a system-wide attempt to address problems that posed barriers to permanency and safety for children in care, including the problem of workforce turnover.[304]  One of the stated objectives of Transformation focused on better recruiting, training, and mentoring of caseworkers to "improv[e] the quality and stability of the workforce."[305]  The inclusion of a new caseworker training model was the result of reports finding that then-existing Basic Skills Development (BSD) training did not provide caseworkers with enough hands-on-experience.[306]  In developing CPD, Child Protective Services (CPS) therefore restructured the model to include more field-based training, in an attempt to ensure that caseworkers were given the opportunity to practice and perform critical job functions during training.[307]

The CPD model consists of a mix of classroom-based and field-based training.[308]  If implemented according to the model, each new caseworker is also matched with a mentor.[309]  The model requires newly hired caseworkers to be trained over a twelve to thirteen week period, during which the trainee engages in a mix of classroom-based learning and shadowing their mentor in the field.[310]

CPD anticipates that as the trainee shadows their mentor, they will gradually assume responsibilities for cases on the mentor's caseload, with a supervisor checking in on a weekly basis to assess progress.[311]  Each trainee should receive an "Individualized Training Plan" (ITP) developed by the trainee's mentor, supervisor, the program director, field training director, and CPD trainer.[312]  This plan is intended to serve as a "guide and calendar during the time the employee is in the field."[313]  The plan breaks the training down, with tasks and topics outlined by week.[314]  After week nine, the CPD model anticipates that trainees are "released to the field" and

---

[304] See generally TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., Progress Report to the Sunset Advisory Comm'n: Child Protective Servs. Transformation (2016), available at
https://www.dfps.state.tx.us/About_DFPS/Reports_and_Presentations/CPS/documents/2016/2016-05-05_CPS_Transformation_Progress_Report_Sunset.pdf

[305] Id.; See also Cynthia Osborne, et al, Child Protective Servs. Transformation: Evaluation of CPS Professional Development, 1-53, at 7, (Child & Family Research Partnership 2016), available at
https://childandfamilyresearch.utexas.edu/sites/default/files/CFRPReport_R0110417_CPSTransformation.pdf.

[306] Osborne, at 9.

[307] Id.

[308] Id.

[309] Id. at 10.

[310] Id.

[311] Id.

[312] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 15, 2020, 23:47 CST) (on file with the Monitors).

[313] Id.; See also TEX. DEP'T FAMILY & PROTECTIVE SERVS., Individualized Training Plan/Conference Notes Conservatorship 1-32 at 1 (July 2019) [hereinafter Individualized Training Plan] (Attached as Appendix 4.1).

[314] See Individualized Training Plan, 3-25.

assigned two to three cases.[315]  The trainee will be the primary worker on these cases once they become case assignable.[316]  During training, the model requires the new caseworker to complete tasks outlined in the ITP for these cases under the supervision of their mentor.[317] They should also be observed in the field by their supervisor as they work through these tasks.[318]

The CPD training model anticipates that caseworkers will become case assignable after they have been determined to demonstrate competency in the tasks in which they are trained, generally over the typical twelve to thirteen weeks of training.[319]  According to CPS policy, however, caseworkers should work a graduated caseload for two months before reaching an average caseload, as described in detail below.[320]  During this time, CPD requires new caseworkers to continue to meet informally with their supervisor on a weekly basis and have a formal conference with them once a month.[321]

b.   The State's Initial Report to the Monitors Regarding Compliance

On September 9, 2019, DFPS reported to the Monitors: "The CPD training model has been implemented statewide, and all caseworkers must complete CPD training before they are case assignable.  Unless otherwise directed by the District Court/Monitors, DFPS assumes no data/reporting is specifically required in response to this order."

c.   Monitors' Data and Information Request and the State's Production

In order to assess the State's compliance with this remedial order, the Monitors requested the following data in their September 30, 2019 data and information request:

- A list of all staff hired by DFPS between September 1, 2018 and September 30, 2019, who have or do serve as a primary caseworker for any child in the PMC class and any newly hired staff who are intended to serve in the position of a primary caseworker for any child in the PMC class.  Including the full name; identification number; start date; exit date (if applicable); and assigned work location(s) by county and office.

- A list of all staff trained in the CPD training model between September 1, 2018 and September 30, 2019, with start dates and completion dates (if applicable) identified.

- All staff hired in 2019 who have not been trained in the CPD training model, the plan for those staff to be trained in the CPD training model and the dates by which the training will be completed.

---

[315] *Id*. at 17.
[316] *Id*.
[317] *Id*.
[318] *Id*.
[319] *Id*. at 31.
[320] *Id*.
[321] *Id*.

- The same data on an ongoing, monthly basis.

In its response, DFPS indicated that it would provide the data as requested.  The data that the Monitors received, however, had some limitations:

- The data did not include actual training start and end dates for each caseworker, but rather, the start and end dates for the caseworkers' training cohorts;
- The data included hire dates in only the initial data provided by the state for CVS caseworkers hired between September 1, 2018 and October 31, 2019.  Analysis involving the date of hire was limited to 720 of the 920 staff records provided.
- The cohort dates varied in format;
- Agency separation/termination dates were not provided.[322]

## 2.  Remedial Order One Performance Validation

### a.  Methodology

The analysis for this report is based on the data the Monitors received for CVS caseworkers hired between September 1, 2018 and September 30, 2019.  This data was cross-matched with data provided for graduated caseloads, analyzed and discussed below under Remedial Order Two, to determine whether caseworkers completed training prior to becoming case assignable, as required by the CPD training model.

### b.  Results and Performance Validation

#### i.  Hiring of New Caseworkers

The data provided by the State indicates that, between September 1, 2018 and September 30, 2019, DFPS hired 780 caseworkers, an average of sixty caseworkers hired each month.  Most of those were newly hired, with a small percentage of rehired staff and some who transferred from other divisions within the agency.

---

[322] In response to the Monitors' data and information request sent to the State on February 21, 2020, DFPS clarified:

- For new hires, the training cohort start date is the hiring date; their training end date is the anticipated end date for the cohort if they had not completed training when the data was produced;
- Caseworkers who transfer from another division are only required to complete a portion of CPD training. Therefore, their hire date is their actual start date, rather than the cohort training start date;
- The training end date is provided for staff who completed training.

DFPS also indicated that they would use a consistent format going forward, and it committed to including all the requested data.

An analysis by region shows that, while all regions hired new caseworkers during the period for which the Monitors analyzed data, some hired significantly more caseworkers than others.

**Figure 24: Caseworkers Hired by Work Region September 1, 2018 through September 30, 2019 (Percentage)**



ii. Completion of CPD Training by New Caseworkers

Of the 780 caseworkers DFPS identified as hired between September 1, 2018 and September 30, 2019, twenty-five (3.2%) were not linked to a training start date.  Of those twenty-five, all but three had transferred to a CVS caseworker position from another division within the agency.  The other three CVS caseworkers were rehired into the agency. According to DFPS, these twenty-five caseworkers would only be required to complete a portion of CPD training.[323]

Of the remaining 755 caseworkers linked with a training start date, thirty-six departed the agency before completing CPD training, leaving 719 caseworkers included in the analysis of CPD training completion.  According to the data, caseworkers who were hired and completed training between September 1, 2018 and September 30, 2019 finished training in an average of ninety-one days, consistent with the CPD training model.  Of the 627 caseworkers with a training cohort start date of July 2019 or earlier, 618 (99%) caseworkers completed CPD training by September 30, 2019.[324]

Of the ninety-two caseworkers with a training cohort start date of September 2019 or later, DFPS data indicates that twenty-three (25%) completed training in fewer than ninety days, with seventeen completing in September 2019, and six completing in October 2019.  Although caseworkers who transferred from another division in the agency or were rehired must complete only a portion of the full CPD training of training, only three were transfers or rehires for this cohort start date.  The early completion is unexplained for twenty (21.7%) caseworkers with a training start date of September 2019 or later.

Alignment of Training Start Date & Hire Date

The Monitors analyzed the data to determine whether the training cohort start date identified for caseworkers corresponded with their hire date.  Hire dates and training cohort start dates were available for 652 of the 780 caseworkers hired between September 1, 2018 and September 30, 2019.

Of those 652 caseworkers, 180 (27.6%) had a cohort training start date that was earlier than their hire date, calling into question whether they completed the full CPD training.  Of these 180, nine were rehires, seventy transferred, and three were hired ahead.[325]  However, since ninety-eight (15%) of the caseworkers in this group were new hires, it is unclear whether they completed all of the required CPD training.  Of these ninety-eight new hires whose training cohort start date was before their hire date, the average length of training, using the hire date as the date they

---

[323] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 16:49 CST) (on file with the Monitors).
[324] Of the nine caseworkers who did not complete training, the reasons for not completing included: resigned, transferred to a different position that did not require CPD training, were hired ahead, or had pending final paperwork.
[325] Notes found in the data indicate there is a "hire ahead unit;" however, DFPS did not provide the Monitors with information about this unit or hiring type.

started training, was fifty-two days, significantly shorter than the ninety-one-day average for caseworkers who complete the full CPD training.

### iii. Date New Case Workers Became Case Assignable

The hiring and training data were cross-matched with data showing when caseworkers became case assignable. The total sample between the two datasets included 216 caseworkers. According to DFPS policy discussed above, caseworkers are not case assignable until they have completed CPD training and demonstrated competency.

The Monitors' analysis indicates that, of the 216 caseworkers who became case assignable, forty-two (19.4%) were assigned children's cases prior to their expected training completion date.[326] Seventy-four percent of those who became case assignable before completing training (14.4% of all those that became case assignable) appear to be newly hired, leaving their early case assignment unexplained.

### 3. Summary

Almost all caseworkers who were hired between September 1, 2018 and September 30, 2019 started and completed some CPD training. While most completed within the expected time frames, 22% of those caseworkers with a training cohort start date of September 2019 or later completed the training earlier than the CPD training model timeframe.

Similarly, of the caseworkers for whom the Monitors had both a training cohort start date and a hire date, because 15% were newly hired with a training cohort start date that fell prior to their hire date, it is unclear whether they completed the full CPD training program. The average length of training for these caseworkers was significantly shorter than the average for those caseworkers who started and finished training with their cohort.

For caseworkers who were included in the sample for which the Monitors could cross-match training and data, approximately 14% were newly hired staff who appear to have become case assignable prior to their completion of CPD training.

### B. Remedial Order Two: Graduated Caseloads

Remedial Order Two: *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

---

[326] Analysis based on those with a case assignable date and a training cohort exit date, but without a flag indicating that they had left the agency.

1. Background

a.   DFPS Graduated Caseload Policy

According to its policy, DFPS's newly hired conservatorship caseworkers, or "protégés," may be assigned primary case management responsibility on cases after completion of CPD Training.[327] Once protégé workers complete CPD Training, DFPS policy requires that their case assignments are subject to the graduated caseload standard relevant to Remedial Order Two, which the State calls "Advancing Practice."[328] In the first month following protégé worker eligibility for primary case assignment, per DFPS's policy, the protégé's caseload may not exceed one-third of the average caseload in that worker's county. In the second month of eligibility, the protégé's caseload may not exceed two-thirds of the average caseload in that worker's county. In the third month of eligibility, the protégé is eligible to be assigned a full caseload. To determine average caseload in that worker's county, the State advised the Monitors that DFPS averages the prior three months of caseloads for that worker's county.[329]

The State indicated that during the first month after CPD training, supervisors are required to hold informal weekly conferences with the protégés to discuss various aspects of casework.[330] In its training for supervisors, DFPS instructs supervisors that: "The biggest note about Advancing Practice is that it must be followed with no exceptions."[331]

2.   The State's Initial Report to the Monitors Regarding Compliance

On September 9, 2019, DFPS reported to the Monitors:

> DFPS is in compliance with this order, as the Department currently utilizes graduated caseloads for all newly hired conservatorship caseworkers and any other newly hired staff who have responsibility for primary case management services. Additionally,

---

[327] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Graduated Caseloads Compliance Summary*, at 1 (Nov. 1, 2019) [hereinafter *Graduated Caseloads Compliance Summary*] (on file with the Monitors).  In response to the Monitors' Data and Information Request for graduated caseload policies; field guidance; and information or directives describing to managers and/or supervisors the graduated caseloads policy and schedule, the State produced various documents.  *See id.;* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Supervisor BSD (Basic Skills Development) Information* (Nov. 1, 2019) [hereinafter *Supervisor BSD*] (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *CVS Individualized Training Plan July 19* (Nov. 1, 2019) (on file with the Monitors).

[328] Graduated Caseloads Compliance Summary, at 1.

[329] Graduated Caseloads Compliance Summary, at 1.

[330] Per the DFPS policy, these include the case staffings conducted throughout a case; documenting the monthly contacts and monthly evaluation; and assessment of safety and risk after every contact with the family. Additionally, the State instructs supervisors to avoid assigning the following types of cases to caseworkers during the transition from training to advancing practice: political or sensitive cases, cases that require special handling, cases that involve the death of a child, and cases that involve a serious injury. During the advancing practice time period, the supervisor is also required to: hold informal conferences with the new caseworker each week and hold a formal conference once a month. *See generally Supervisor BSD*.

[331] *Id.*

graduated caseloads will be required of all community-based care catchment areas once the SSC becomes responsible for case management services.

a.  Data and Information Request and Production

i.  Monitors' Data and Information Request and the State's Production

The Monitors requested from the State:

> On an ongoing monthly basis (commencing for the month of October 2019, and due to the monitors by November 15, 2019, and by the 15th of each month thereafter), provide a list of all employees subject to the graduated caseloads during the previous month. Identify the full name; title; identification number; start date; exit date (if applicable); agency name; county; district or region; the name of the supervisor and supervisor identification number; assigned work location(s); and whether they were compliant with the relevant graduated caseload at all times during the month. For any staff whose caseloads exceeded the graduated caseload standard at any time in the previous month, identify the number of days they were not compliant with the graduated caseload standard.[332]

In response to the Monitors' request, DFPS indicated on October 18, 2019, its intention to seek termination of the Court's Order. Specifically, DFPS stated that: "Considering DFPS policies and practices are in substantial compliance with the Court's Order, DFPS proposes to produce the initial report and separately, will request that supervision over the graduated caseloads order be terminated."[333] DFPS also stated in the same correspondence that monthly data would be provided but with two specific limitations. First, DFPS indicated that it does not have the capacity to provide the data within the requested time period; rather, it requires a forty-five day timeframe or "lag" to calculate and process the request after the month ends (i.e., October data can be provided on December 15th and so on).[334]

---

[332] Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request); *see also* Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors).

[333] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (attaching DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).

[334] *Id.* Because a forty-five day lag impedes the Monitors' ability to complete timely verification of compliance with Remedial Order Two on behalf of the Court, the Monitors did not agree to this proposed timeframe. DFPS confirmed more recently that it remains unable to process the data in a timeframe that is less than forty-five days. *See* Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (attaching DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

Second, DFPS informed the Monitors that it does not have the current capacity to report on the total number of days during the prior month that caseworker caseloads are not compliant with the graduated caseload standard.[335] Instead, DFPS provided to the Monitors compliance data on the fifteenth and forty-fifth days after caseworker eligibility for primary case assignment. The agency stated more recently that it is unlikely that it can report on the daily compliance data for graduated caseloads in the near term but that it will keep the Monitors apprised of its progress.[336] Although DFPS's policy establishes graduated caseloads for new workers based on the average caseload size in the worker's assigned county, rather than a statewide standard, DFPS indicated that it has not previously compared average daily caseloads for the county to which the worker is assigned.[337]

3.  Remedial Order Two Graduated Caseloads Results and Performance Validation:

a.  Methodology

The monitoring team evaluated the State's compliance with Remedial Order Two through analysis of DFPS data[338] and began to evaluate the accuracy of the State's caseload data through interviews of caseworkers subject to graduated caseloads, which will be discussed in detail in the Monitor's next report to the Court.[339] Although DFPS's graduated caseload standard during the

---

[335] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (attaching DFPS Information and Data Request Proposal in response to the Monitors' Sept. 30, 2019 Data and Information request).

[336] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020 17:49 EST) (attaching DFPS response to Feb. 21, 2020 Data and Information Request). The Monitors did not receive the October 2019 data as initially requested; the State reported a problem to the Monitors about its data extraction for graduated caseloads. The Monitors eventually received all graduated caseload data for September through November 2019 when the State resubmitted the data on January 15, 2020 after a correction in its process. In this reporting period, DFPS produced four data files in response to the Monitors' request for a list of CVS caseworkers subject to graduated caseloads on the following dates: (1) file produced on November 15, 2019 reporting September 2019 data; (2) file produced on January 15, 2020 reporting September-November 2019 data; (3) file produced on February 18, 2020 reporting October-December 2019 data, and (4) file produced on March 16, 2020 reporting January 2020 data.

[337] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (attaching DFPS response to Monitors' February 21, 2020 Data & Information Request update). ("Providing the caseload on each day and comparing to a threshold for each day requires complex coding. We will research how and when we can provide the requested information."). Because of the agency's policy with a variable standard by county based on average caseloads within that county throughout the month, the data the Monitors requested is necessary for validation of the State's performance under Remedial Order Two during the period at issue.

[338] These two files were named, respectively: *RO2.4 CVS Caseworkers Subject to Graduated Caseloads Sept-Nov 2019*, received by the Monitors Jan. 16, 2020; and *RO2.1 CVS Caseloads as of 11-30-2019*, received by the Monitors Jan. 2, 2020.

[339] The monitoring team interviewed on April 22, 2020 a sample of twenty caseworkers assigned to fifteen counties across the state who were hired into a CVS caseworker position in November 2019 and became subject to graduated caseloads between March 2, 2020 and April 21, 2020. All twenty of the caseworkers in the sample had the job title CPS CVS Specialist I. The monitoring team reviewed with the workers case assignment detail reports dated April 20, 2020 generated from the DFPS Insight system. The individual caseloads of the sample of caseworkers interviewed

period September 1, 2019 through November 30, 2019, was a function of the average daily caseloads for workers in a given county by month, DFPS did not provide that underlying data to the Monitors. The Monitors instead verified the calculation of dates using the data the State submitted for two points-in-time: the fifteenth and forty-fifth day after each caseworker became eligible to carry cases; the calculation of the percent of average county caseloads on the fifteenth and forty-fifth day; and the number of caseworkers who are over the allotted caseload limit on the fifteenth and forty-fifth day.[340]

b.  Remedial Order Two: Performance Validation Results

The monitoring team identified seventy-one unique caseworkers subject to graduated caseloads between September 1, 2019 and November 30, 2019. Most of the caseworkers subject to graduated caseloads had the job title CPS CVS Specialist I (sixty-three of seventy-one or 88.7%). The other workers subject to graduated caseloads had the job titles CPS CVS Specialist II (two of seventy-one or 2.8%), III (three of seventy-one or 4.2%), or IV (three of seventy-one or 4.2%).

On the fifteenth day after eligibility to carry a case, DFPS policy states that caseloads for new caseworkers should not exceed one-third of the average caseload for the county where the worker is employed.[341] Of the seventy-one caseworkers subject to graduated caseloads, twenty-two caseworkers (31%) had caseloads above 33% of the average caseload[342] in that county on the

---

ranged from three to seventeen children. The new, generally applicable, internal caseload standard guidelines are applicable to the graduated caseloads of this sample of workers. Fourteen of the caseworkers were in the first month of eligibility to be assigned a case and should not have a caseload that exceeds six children. Six of the workers were in the second month of case assignability and should not have a caseload that exceeds twelve children. A total of six caseworkers (30%) had caseloads that exceeded the new caseload guidance; five workers in the first month and one worker in the second month of case assignability. The monitoring team will compare the results of the interviews of these caseworkers with the monthly caseload data to be submitted by DFPS in June 2020 to confirm the accuracy of the graduated caseload data collected during the caseworker interviews.

[340] The monitoring team also verified that all caseworkers subject to graduated caseloads were included in the separate listing provided by DFPS of all caseworkers as of November 30, 2019. This verification was performed using DFPS file RO2.1 CVS Caseloads as of 11-30-2019, received by Monitors Jan. 2, 2020. DFPS provided the fifteenth day and forty-fifth day average daily caseloads for forty-three different dates because caseworkers became eligible to carry cases at many different times, depending on when the caseworker completed CPD Training. The State did not provide child-level caseload information on each of the forty-three different dates on which various individual caseworkers were eligible for case assignment for fifteen and forty-five days. DFPS could not provide daily caseload data to verify the average caseloads in each county for the month, as DFPS policy requires. To fully verify the fifteenth and forty-fifth days of eligibility average daily caseloads, the monitoring team would need child-level caseload data for each of those days, which DFPS did not provide. Based upon the data currently available, the monitoring team used the monthly caseload data as a benchmark for whether the average caseloads in the graduated caseload data appear accurate.  For example, if the average caseload in Lisa County, Texas was twenty on December 31, 2019 and then rose to twenty-four on January 31, 2020, the monitoring team would use that to flag that a data point was problematic if DFPS data then indicated in its graduated caseload report that on January 10, 2020, the average caseload in Lisa County was only fifteen. For more information on the Monitors' validation methodology, *see* Appendix 4.2, Additional Information on Graduated Caseloads Methodology.

[341] *Graduated Caseloads Compliance Summary*, at 1.

[342] As calculated by the Monitors using DFPS point-in-time, monthly caseload data because the agency did not generate daily caseload data as requested by the Monitors.

fifteenth day after those caseworkers became eligible to carry cases and were therefore out of compliance with Remedial Order Two on the fifteenth day.

Under the new caseload guidelines agreed upon between the parties, effective February 16, 2020, the generally applicable, internal caseload standard to serve as guidance to supervisors is fourteen to seventeen children per caseworker.[343] Therefore, going forward, the graduated caseload standard for new caseworkers in their first month of case assignments will be six children (one-third of seventeen children). Had the new caseload guidance, which will be operative for the Monitor's next report to the Court, been in effect between September 1, 2019 and November 30, 2019, the State's compliance for caseworkers subject to graduated caseloads would decline to 40.8% in their first month of case assignment.

**Table 8: Fifteenth Day Graduated Caseload Compliance September-November 2019**

| Category | Frequency | Percent |
|---|---|---|
| Caseworkers with less than or equal to 33% of daily county caseload average on 15th Day (compliant) | 49 | 69.0% |
| Caseworkers with more than 33% of daily county caseload average on 15th day (non-compliant) | 22 | **31.0%** |
| Total | 71 | 100.0% |

Of the seventy-one caseworkers subject to graduated caseloads, the monitoring team identified four caseworkers (5.6%) with caseloads above 66% or two-thirds of the average caseload on the forty-fifth day after the caseworkers were eligible to carry cases. Under the new caseloads agreed upon between the parties, effective February 16, 2020, the graduated caseload standard on the forty-fifth day is two-thirds of seventeen children (i.e. twelve children). Had the new caseload guidance, which will be operative for the Monitor's next report to the Court, been in effect between September 1, 2019 and November 30, 2019, the State's compliance for caseworkers subject to graduated caseloads on the forty-fifth day would decline to 21.1%.

The monitoring team compared the list of caseworkers subject to graduated caseloads with the data provided by the State listing caseloads for all CVS caseworkers as of November 30, 2019.[344] As of November 30, 2019, eight of the seventy-one caseworkers subject to graduated caseloads

---

[343] *See* Section IV.(C)(1) *infra*; Order Regarding Workload Studies in the November 20, 2018 Order at 1-2, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-CV-84, slip. op. (S.D. Tex. Dec. 17, 2019), ECF 772 [hereinafter *Workload Studies Order*] ( "Defendants' deadline to ensure that the generally applicable, internal caseload standards are utilized to serve as guidance for supervisors who are handling caseload distribution and that Defendants' hiring goals for all staff are informed by the generally applicable, internal caseload standards, as set forth in the November 20, 2018 order, is extended 60 days from the date of this Order.")

[344] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RO2.1 CVS Caseloads as of 11 30 2019* (Jan. 2, 2020) (on file with the Monitors). November 30, 2019 is not the exact day of fifteenth or forty-fifth day of eligibility for any of the workers subject to graduated caseloads in the data file the monitoring team analyzed, so on November 30, 2019 some workers were still subject to graduated caseloads and some were not.

(11.3%) were assigned eighteen to twenty-five children (including PMC children, TMC children, and children with all other legal statuses). These caseworkers' caseloads would have been over the fourteen to seventeen child per caseworker guideline had it been effective as of that date; moreover, six out of seventy-one caseworkers subject to graduated caseloads (8.5%) were assigned eighteen to twenty-five PMC and/or TMC children.

**Table 9: Number of Children on Caseload on November 30, 2019 for Caseworkers Subject to Graduated Caseloads September-November 2019**

| Children on Caseload | No. Caseworkers (All children on caseload) | Percent (All children on caseload) | No. Caseworkers (PMC & TMC only) | Percent (PMC & TMC only) |
|---|---|---|---|---|
| 1 to 10 | 38 | 53.5% | 40 | 56.3% |
| 11 to 13 | 13 | 18.3% | 15 | 21.1% |
| 14 | 5 | 7.0% | 3 | 4.2% |
| 15 | 1 | 1.4% | 6 | 8.5% |
| 16 | 5 | 7.0% | 0 | 0.0% |
| 17 | 1 | 1.4% | 1 | 1.4% |
| 18 to 20 | 4 | 5.6% | 4 | 5.6% |
| 21 to 25 | 4 | 5.6% | 2 | 2.8% |
| **Total** | **71** | **100.0%** | **71** | **100.0%** |

4. Summary of Performance Validation

- DFPS did not provide data to the Monitors to validate the average daily caseload for workers, which is necessary to validate performance for Remedial Order Two.[345]
- Using point-in-time caseload data provided by DFPS, and approximations of average caseloads by county calculated by the monitoring team, the Monitors determined of the seventy-one caseworkers subject to graduated caseloads between September 1, 2019, and November 30, 2019, twenty-two caseworkers (31%) had caseloads in excess of the graduated caseload standard on the fifteenth day after those caseworkers became eligible to carry cases and were therefore, out of compliance with Remedial Order Two on the fifteenth day.

---

[345] To fully verify the fifteenth and forty-fifth days of average daily caseloads, the Monitors should review child-level caseload data for each of those days, which DFPS did not provide. Based upon the data currently available, the monitoring team used monthly, point-in-time caseload data as a benchmark for whether the average caseloads in the graduated caseload data appear accurate. For example, if the average caseload in Lisa County, Texas was twenty on December 31, 2019 and then rose to twenty-four on January 31, 2020, the monitoring team would use that to flag that a data point was problematic if DFPS data then indicated in its graduated caseload report that on January 10, 2020, the average caseload in Lisa County was only fifteen.

- Using point-in-time caseload data provided by DFPS, and approximations of average caseloads by county calculated by the monitoring team, the Monitors determined of the seventy-one DFPS caseworkers subject to graduated caseloads between September 1, 2019 and November 30, 2019, four caseworkers (5.6%) had caseloads in excess of the graduated caseload standard on the forty-fifth day after the caseworkers were eligible to carry cases and were therefore out of compliance with Remedial Order Two.

C. Remedial Orders Thirty-Five, A-One, A-Two, A-Three, and A-Four: CVS Caseloads

Remedial Order Thirty-Five: *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS' reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

Remedial Order A-One: *Within 60 days of the Court's Order, DFPS, in consultation with and supervision of the Monitors, shall propose a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

Remedial Order A-Two: *Within 120 days of the Court's Order, DFPS shall present the completed workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which the determination is based, for the establishment of appropriate guidelines for caseload ranges.*

Remedial A-Three: *Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time.*

168

*Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be pro-rated accordingly.*

Remedial Order A-Four: *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class.* [The Court modified the effective date of this Remedial Order to February 15, 2020.[346]]

1.  Background

On December 16, 2019, the parties submitted an agreed motion requesting that the Court approve an arrangement in which, in lieu of conducting workload studies pursuant to Remedial Orders A-One, A-Two, B-One and B-Two, DFPS and HHSC would use as a guideline:

- 14-17 children per conservatorship caseworker, for the purpose of satisfying State obligations within Remedial Orders A-Two, A-Three and A-Four;
- 14-17 investigations per DFPS CCI investigator, for the purpose of satisfying State obligations within Remedial Orders B-Two, B-Three and B-Four; and
- 14-17 tasks per RCCL inspector, for the purpose of satisfying State obligations within Remedial Orders B-Two, B-Three and B-Four.

The Court approved the parties' arrangement on December 17, 2019 and relieved the State of its obligations to complete workload studies:

> It is ordered in lieu of performing the workload study obligations set forth in the November 20, 2018 order, Defendants will establish as guidelines for the determination of generally applicable internal caseload and investigation standards the following: (1) 14-17 children per caseworker for DFPS conservatorship caseworker caseloads; (2) 14-17 investigations per DFPS CCI investigator; and (3) 14-17 total tasks, which include operations, investigations referred from DFPS, minimum standard investigations, and agency homes sampling, per HHSC RCCL inspector. The guidelines described above shall not be used or interpreted as a "caseload cap" or an "enforced caseload range." *See M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 274-81, n.45 (5th Cir. 2018).
>
> Defendants will use these guidelines to satisfy the requirements in the November 20, 2018 order, which require DFPS and HHSC to establish generally applicable internal caseload standards. *See* Doc.

---

[346] *Workload Studies Order*, at 1-2.

606, Order, at 9-10, ¶¶3-4; 13-14, ¶¶3-4.

The parties' arrangement eliminates the necessity for the workload studies and releases Defendants from any obligation to conduct such studies, as set forth in the November 20, 2018 order. *See* Doc. 606, Order, at 8-9, ¶¶1-2; 13 ¶¶1-2. Defendants' deadline to establish internal caseload standards, as set forth in the November 20, 2018 order, is extended 30 days from the date of this Order. *See* Doc. 606, Order, at 9, ¶3; 13 ¶3. Additionally, Defendants' deadline to ensure that the generally applicable, internal caseload standards are utilized to serve as guidance for supervisors who are handling caseload distribution and that Defendants' hiring goals for all staff are informed by the generally applicable, internal caseload standards, as set forth in the November 20, 2018 order, is extended 60 days from the date of this Order. *See* Doc. 606, Order, at 10, ¶4; 14, ¶4. Defendants' use and implementation of these guidelines will remain subject to supervision by the Monitors and approval of the Court, as explained in the November 20, 2018 order. *See* Doc. 606, Order, at 9-10, ¶¶3-4; 13-14, ¶¶3-4. This order does not expand the November 20, 2018 order or impose any additional obligations on Defendants.[347]

DFPS has provided point-in-time caseload data monthly to the Monitors, with a time lag of thirty to forty-five days. The last point-in-time caseload data submitted by DFPS prior to the cut-off for validation in this report was submitted on March 4, 2020 and reflected the point-in-time caseloads for January 31, 2020, fifteen days before the effective date of Remedial Order A-Four.

HHSC and DFPS submitted to the Monitors on January 16, 2020 the draft CVS, RCCI and RCCL Workload Standards/Guidance consistent with Remedial Orders A-Three and B-Three,[348] and the Monitors provided feedback to the agencies on February 4, 2020.[349] The State provided the Monitors copies of the final guidance, communications and training materials "administered to staff concerning caseloads," and stated, "these caseload standards are now being utilized to guide supervisors handling caseload distribution and inform DFPS's hiring goals."[350]

2. Data and Information Request and Production

---

[347] *Id.*

[348] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Child Care Investigations Generally Applicable Internal Caseload Guidelines* (Jan. 16, 2020); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *CPS Generally Applicable Internal Caseload Standards* (Jan. 16, 2020).

[349] Email from Kevin Ryan, Monitor to Dep't of Family & Protective Servs. (Feb. 4, 2020, 13:36 EST) (on file with the Monitors).

[350] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Feb. 18, 2020, 21:41 EST) (on file with the Monitors).

a.   The Monitors' September 30, 2019 Data and Information Request

In order to assess the State's compliance with Remedial Order Thirty-Five, the Monitors requested that DFPS:

> Provide a report by November 15, 2019 and on a monthly basis thereafter, with caseloads for all staff, including supervisors, who provide primary case management services to any child in the PMC class, with name of employer (public or, as evolves, private), and indicate whether full-time or part-time. The report will be a point in time caseload for November 1 and is due by November 15, then for December 1, 2019 due by December 15, 2019, and monthly thereafter. The reports must include all staff who provide case management services to children in the PMC General Class and their caseloads; the number and percent of staff with caseloads within, below and over the DFPS guideline once established, by office, by county, by agency (if private) and statewide; the identification number and location of all individual staff and the number of PMC children and, if any, TMC children to whom they provide case management; include caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions. Identify all staff subject to a graduated caseload. Provide individual fields for every type of case that the worker carries, including those outside the child welfare domain, if any. Identify for each staff all non-case carrying work, such as   IV-E eligibility determinations, that impacts their capacity. Identify all secondary assignments for each staff. Identify at the bottom of the report the total number of supervisors carrying a case.[351]

b.   The Monitors' October 28, 2019 Data and Information Request

The Monitors wrote to the State and requested DFPS list "by staff member, the names and identification numbers of all children assigned to all staff, including supervisors, who provide primary case management services to any child in the PMC class."[352]

c.   DFPS Data and Information Production

---

[351] Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 5:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request in attachment)

[352] Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors).

For the purposes of this report, DFPS provided caseload information to the Monitors for January 31, 2020 on March 4, 2020.[353] The information includes a DFPS spreadsheet listing all caseload carrying staff and details for the caseloads they carried; a list compiled by DFPS of the average number of children assigned in each of the 125 counties, based on workers who carried at least one PMC child in their caseload on January 31, 2020; and a spreadsheet listing 26,257 children with their legal status.[354] In advance of the monitoring team's interviews with fifty-five CVS caseworkers, selected by the Monitors, in Austin, Dallas and Houston, DFPS provided caseload information from the State's INSIGHT[355] reporting tool for each identified worker for a date selected by the Monitors.

3.   Remedial Orders 35 and A-Four: CVS Caseloads

Remedial Order Thirty-Five: *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS' reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

Remedial Order A-Four: *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class.* (The Court modified the effective date of this Remedial Order to February 15, 2020.)[356]

a.   Methodology

---

[353] This is the last point-in-time caseload submission by DFPS prior to April 1, 2020, the cut-off date for caseload data validation within this report.

[354] The columns in this spreadsheet included the worker ID, worker name, county, region, unit ID, child ID, child name, and type of service.

[355] DFPS describes Insight as a tool to "manage critical case tasks and deadlines." TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Impact Modernization*, *available at*
https://www.dfps.state.tx.us/Doing_Business/IMPACT_Modernization/default.asp.

[356] *Workload Studies Order*, at 1-2.

The Monitors cross-checked DFPS's multiple electronically-submitted data sets and found the number of children assigned to each worker in the listing table added to the number of children in the caseload table. To analyze CVS caseloads, the Monitors used the total number of children assigned to each CPS CVS Specialist (I-V).[357] The monitoring team also independently replicated the county caseload averages produced by Texas. The monitoring team initiated field-based caseload validation by interviewing fifty-five CVS caseworkers, selected by the Monitors, about their caseloads in February and March 2020 in Austin, Dallas and Houston.[358] Additional caseworker interviews will continue throughout the summer and fall, and the Monitors will present to the Court an analysis of caseworker interviews in the next report to the Court.

b.   Remedial Order Thirty-Five and Remedial Order A-Four: Performance Validation Results

As of January 31, 2020, DFPS reported 1,418 CVS caseworkers managed at least one PMC child's case. Remedial Order A-Four became effective fifteen days after this point-in-time caseload count, requiring DFPS to ensure that the caseload standard of fourteen to seventeen children is "utilized to serve as guidance for supervisors who are handling caseload distribution" and is used to inform "hiring goals for all staff."  As of January 31, 2020, most CVS caseworkers managing at least one PMC child's case (720 of 1418) were assigned to serve more than seventeen children.

**Table 10: CVS Caseworkers Managing At Least One PMC Child, January 31, 2020**

---

[357] CVS Specialists I, II, III, IV, V staff accounted for 1,418 staff or 96.9 percent of all the staff listed by DFPS carrying at least one PMC child's case. For caseload calculations, the Monitors included Possessory Conservatorship cases that Texas excluded from their caseload count (this impacted seven workers). For this report, the Monitors eliminated from the analysis staff with other titles because they account for a relatively small number of staff (45) carrying a small number of PMC children. Staff with eight other titles accounted for the remaining 45 staff (3.1%) percent of all the staff listed. Of the 45 staff, 29 held titles of CVS Supervisor I or II. Going forward, the Monitors will include all supervisors carrying at least one PMC case in reporting to the Court for Remedial Orders Thirty-Five and A-Four. The State advised the Monitors that "the supervisor to staff ratio for CVS is 1:7." Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors).  Therefore, when assessing the workloads of supervisors who carry at least one PMC child's case, the Monitors will assign a weight of 14.29% for each supervised caseworker (100% - a full workload - divided by seven) and 5.88% (100% - a full workload - divided by the agreed-upon standard of seventeen cases) for each PMC/TMC child managed directly by the supervisor. So, for example, a supervisor who supervises six caseworkers is dedicated 85.74% of the time to supervision (six workers x 14.29%). If that supervisor also serves as the primary case manager for one child, an additional 5.88% weight is added to their workload, yielding 91.62% of a workload, which is below the supervisor's 100% availability and within the standard. If the supervisor supervises six caseworkers and serves as the primary case manager for four children, an additional 23.52% weight (5.88% x four) is added to their workload of six supervision assignments (85.74% + 23.52%) yielding 109.26% of a caseload, which is greater than 100 percent of their availability.

[358] The monitoring team interviewed sixteen caseworkers individually, in person, in Austin on February 15, 2020; nineteen caseworkers individually, in person, in Dallas on March 4, 2020; and twenty caseworkers individually from Houston via video-conference on March 25, 2020. In these initial interviews, the monitoring team asked DFPS to provide in advance a caseload report from DFPS's Insight system for each individual interviewee corresponding to a near, previous date. The monitoring team then reviewed the records with the caseworker, discussing each listed child by name and other work assignments, if any, and observed whether the caseworker's workload matched the DFPS records. This work remains ongoing and will be presented to the Court in the Monitors' next report.

| Job Title | Total Workers | Workers Assigned 17 or Fewer Children | Percent Workers Serving 17 or Fewer Children |
|---|---|---|---|
| CPS CVS SPEC I | 180 | 101 | 56.1% |
| CPS CVS SPEC II | 255 | 130 | 51.0% |
| CPS CVS SPEC III | 447 | 226 | 50.6% |
| CPS CVS SPEC IV | 479 | 215 | 44.9% |
| CPS CVS SPEC V | 57 | 26 | 45.6% |
| **Statewide Total** | **1418** | **698** | **49.2%** |

Of the 1,418 CVS caseworkers who carried at least one PMC child on January 31, 2020, 225 (16%) carried eighteen to twenty children on their caseloads. Two hundred and eighty-four workers (20%) carried twenty-one to twenty-five children on their caseloads. The remaining 211 workers (15%) carried more than twenty-five children on their caseloads, with eighty-four (6% of all workers) carrying more than thirty children on their caseloads. Over one-third (495 workers, 35%) of CPS CVS SPEC II, III, and IV workers carried twenty-one children or more on their caseloads on January 31, 2020.

**Table 11: CVS Caseworkers Managing At Least 1 PMC Child, January 31, 2020 Total Number of Children Assigned**

| Job Title | 17 or fewer children | 18 to 20 children | 21 to 25 children | 26 to 30 children | 31+ children | Total |
|---|---|---|---|---|---|---|
| CPS CVS SPEC I | 101 | 27 | 29 | 17 | 6 | 180 |
| CPS CVS SPEC II | 130 | 39 | 49 | 18 | 19 | 255 |
| CPS CVS SPEC III | 226 | 66 | 96 | 36 | 23 | 447 |
| CPS CVS SPEC IV | 215 | 77 | 101 | 50 | 36 | 479 |
| CPS CVS SPEC V | 26 | 16 | 9 | 6 | 0 | 57 |
| **Statewide Total** | **698** | **225** | **284** | **127** | **84** | **1418** |

Remedial Order Thirty-Five requires that "[c]aseloads for staff…who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly." In order to assess caseloads accurately pursuant to Remedial Orders Thirty-Five and A-Four going forward, CVS caseworkers' secondary assignments must be weighted into the analysis. The Monitors' examination of the January 31, 2020 CVS caseload data identified 3,473 secondary assignments among 1,418 CVS workers. After the State advised the Monitors on February 28, 2020 that "[i]n most cases, the duties performed by CVS workers providing courtesy supervision are brief and not extensive,"[359] the Monitors requested "the data/data reports DFPS is using for this

---

[359] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Feb. 28, 2020, 22:54 EST) (attaching information) (on file with the Monitors).

analysis."[360] DFPS reported it does "not have a way of tracking aggregate data on time spent on secondary assignments."[361]

The Monitors' review of caseload data for fifty-five individual caseworkers interviewed in February and March 2020 identified 123 secondary assignments among them,[362] which included an array of responsibilities. The descriptions of the work varied by county, as did the type of secondary assignment, from courtesy supervision of a child's case to primary management of a prospective foster family home study. In interviews with the monitoring team, most caseworkers (forty-two workers of fifty-five interviewed) described their secondary assignments as involving

---

[360] Email from Kevin Ryan, Monitor, to Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (Mar. 2, 2020, 11:04 EST) (on file with the Monitors).

[361] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (Mar. 16, 2020, 22:53 EST) (on file with the Monitors). Although IMPACT includes a drop-down option for caseworkers to indicate "Estimated Time with Client(s)," the Monitors' review of numerous IMPACT records shows that workers infrequently utilize this option. Moreover, even if caseworkers used the option more often, DFPS cannot compile the information into a data report. DFPS did offer that:

> Although we cannot presently track aggregate data on time spent on secondary assignments, we have the average number of days secondary assignments remain on a CVS caseworker or supervisor's workload. Statewide, average timeframes for all secondary assignments for all SUB stages are as follows: CVS caseworker (86 days) and CVS supervisor (187 days). Since most conservatorship stages are open 12-18 months at a minimum, average timeframes for all secondary assignments for all SUB stages are considerably shorter than the average substitute care case time.

*Id.*

[362] DFPS may give conservatorship (CVS) caseworkers secondary assignments, in addition to their primary assignments, that require them to provide courtesy supervision. Under DFPS policy, courtesy supervision is required when:

- A parent resides outside of the child's legal region.
- A child or youth in conservatorship is placed outside of the region that has legal jurisdiction and is residing with a parent.
- A child or youth is placed in an adoptive home outside of the region that has legal jurisdiction. An adoption preparation worker is assigned as secondary.
- A child or youth is placed in Texas from another state.
- A child or youth is residing in a General Residential Operation for children with intellectual disabilities.
- A child or youth is placed in an intermediate care facility for individuals with intellectual disabilities.
- A child or youth is placed in a nursing home…
- CVS caseworkers may also be assigned secondary when children or youth have been removed from their custodian by Child Protective Investigation, and the case has not yet been transferred to conservatorship. In general, cases are transferred to CVS after the Adversary Hearing.

Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Feb. 28, 2020, 22:54pm EST) (on file with the Monitors).

extensive, ongoing casework. Eighty-four of the 123 (68.3%) secondary assignments required courtesy case supervision. DFPS policy requires courtesy caseworkers to:

visit the parent (or the parent and the child, if residing together), within 15 calendar days of being assigned secondary in IMPACT;

- conduct well planned monthly visits to assess progress in achieving service plan goals;

- ensure services identified in the service plans and any court orders are set up and provided for the parent and the child;

- report any unmet needs to the primary case worker;

- discuss the child's permanency plan with the child or youth and parent during every visit, to assess progress being made to achieve that goal;

- document: any face-to-face contact with the child on the same day of the contact and enter the completed narrative no later than seven calendar days from the contact; all other contacts as soon as possible, but no later than seven calendar days;

- communicate, at least monthly either verbally or via email, with the child or youth's primary caseworker to provide information to assist in completing service plans and court reports; and

- participate in and assist the primary caseworker with coordinating Permanency Planning Meetings.[363]

Ten of the secondary assignments (8.1%), all in Houston, involved Foster Adoptive Home Development ("FAD"), which DFPS describes as:

- Helping recruit foster and adoptive families.

- Training foster and adoptive parents on caring for abused and neglected children and working with the child welfare system.

- Verifying (licenses) foster and adoptive families for children in state care.  This includes tracking the requirements they must complete, completing home studies, and determining if applicants are appropriate to be a [sic] verified foster or adoptive families.

- Giving ongoing support and case management services to foster and adoptive parents.

- Making regular home visits to foster or adoptive homes to meet with families to monitor and support the home.

- Making sure foster or adoptive homes meets state licensing standards (Minimum Standards for Child-Placing Agencies).

- Helping match adoptive families with children waiting for adoption.

---

[363] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Child Protective Services Handbook* § 6314.11.

- Helping adoptive families with the adoption process and participating in adoption consummation hearings and adoption events like National Adoption Day.

- Being the child's caseworker when a child is placed with a DFPS adoptive family.

- Going to court hearings and various other meetings on children in foster or adoptive homes.[364]

The monitoring team reviewed the IMPACT records for the secondary assignments identified among the fifty-five interviewed caseworkers, as well as the secondary assignment dates and the list of tasks performed by the secondary worker. In light of the State's inability to track and aggregate the amount of time that caseworkers expend on secondary assignments, the Monitors' examined the secondary assignment data described in this section. Going forward, the Monitors will report to the Court secondary assignments by a CVS caseworker and show them as equal to 0.50 percent of a primary case assignment. So, for example, given that CVS staff may serve as the primary caseworker for up to seventeen children within the approved standard, each of those seventeen children's cases will be weighted 5.88 percent of a full caseload. Going forward, secondary assignments will be reported and weighted as equal to one-half of a primary case assignment, or 2.94 percent.[365]

4. Summary

The Court approved an arrangement that relieved DFPS of the responsibility for completing a workload study pursuant to Remedial Orders A-One and A-Two. The parties agreed to, and the Court approved, a workload standard of fourteen to seventeen children per CVS worker, pursuant to Remedial Order A-Three. DFPS provided the Monitors monthly point-in-time caseload data, detailed consistent with Remedial Order Thirty-Five. Although Remedial Order A-Four did not become effective until after the date used for the Monitors' caseload analysis in this report, the analysis showed that as of January 31, 2020, 698 of 1,418 CVS caseworkers (49.2%) had primary caseloads within or below the standard of seventeen children per worker.

D. Remedial Orders B-One, B-Two, B-Three, & B-Four

Remedial Order B-One: *Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL*

---

[364] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *What is the Foster Adoptive Home Development (FAD) program?*, *available at* https://www.dfps.state.tx.us/Jobs/CPS/fad.asp.

[365] As the Monitors continue to conduct individual caseworker interviews and data analysis of secondary assignments, if new information comes to light to support increasing or decreasing the secondary case assignment weight, the Monitors will report the analysis to the Court and the parties.

*inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

Remedial Order B-Two *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

Remedial Order B-Three: *Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

Remedial Order B-Four: *Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage, are utilized to serve as guidance for supervisors who are handling caseload distribution, and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators or successor staff.*

1. Background

The agreed motion includes provisions for DFPS and HHSC guidelines for RCCI and RCCL staff, in addition to CVS caseworkers:

- Fourteen to Seventeen investigations per DFPS CCI investigator, for the purpose of satisfying State obligations within Remedial Orders B-Two, B-Three, and B-Four; and
- Fourteen to Seventeen tasks per RCCL inspector, for the purpose of satisfying State obligations within Remedial Orders B-Two, B-Three, and B-Four.[366]

The Court approved an extension until February 17, 2020 for establishing internal guidance for supervisors who administer caseload distribution.[367]

---

[366] *Id.*
[367] *Id.*

2.  The Monitors' Data and Information Requests and the State's Production

In order to assess the State's compliance with this remedial order, the Monitors requested the following data from DFPS and HHSC in their September 30, 2019 data and information request:

> Provide a report with caseloads for staff, including any supervisors, and any other staff who conduct investigations involving any PMC child. The report will be a point in time caseload for November 1, 2019 and is due by November 15, 2019; then for December 1, 2019 due by December 15, 2019; and so forth monthly thereafter. The reports must include all staff who investigate maltreatment involving any child in the PMC class, and detail their caseloads; the number and percent of staff with caseloads within, below and over the relevant guideline once established, by office, by county, and statewide; the identification number and location of all individual staff; include caseloads for staff, as defined above, who spend part-time in investigative functions and part-time in other functions and so note. Identify all staff subject to a graduated caseload and so note. Provide individual fields for every type of case that the staff carries. Identify for each staff all non-case carrying work that impacts capacity. Identify by total at the bottom of the report the total number of supervisors carrying a case. Identify all secondary assignments for each staff. The report shall include the number of investigations assigned to each worker and identify each investigation by number. The report shall identify the number of children involved in each investigation and provide the identification number for each child linked to an identified investigation; the supervisor name and identification number; title of investigating staff; and the county location of investigating staff.[368]

In its response, DFPS indicated:

> For RCCI, DFPS will provide a monthly listing report of all staff assigned primary case management of at least one RCCI investigation with the number of investigations assigned on the last day of the month and number of alleged victims assigned, staff ID, job title, staff supervisor name and ID and unit with a summary of total number of supervisors carrying a case.
>
> DFPS will provide a listing of all alleged victims in the investigations along with the child's PID.RCCI does not use graduated caseloads.  Also, at this time, DFPS is unable to provide data concerning secondary assignments due to IMPACT 2.0 issues, which the DFPS IT division is addressing.

---

[368]  Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).

CPI investigations in unlicensed placements of children in the PMC General Class represents an extremely small percentage of overall CPI investigations (0.3% of all CPI investigations).  DFPS will provide information related to CPI caseloads generally for FY 19 and for September 2019, pursuant to existing reports, which will give an overall picture of average CPI investigator caseloads.[369]

On November 15, 2020, HHSC responded it would provide a list of RCCL inspectors whose caseloads involve evaluation of an operation's compliance with minimum standards to ensure the safety of children.[370] In the Monitors' data and information request dated February 21, 2020, the Monitors sought clarification related to data the State provided in response to the September 30, 2019 data and information request, and identified missing elements in the data provided by both agencies.

For data provided by DFPS for RCCI investigators, the Monitors noted:

Data provided do not include office or county location -- unit number is provided. If data continue to include only unit number monitors will need a spreadsheet with unit number, county, and region in order to fully identify location.  No information was provided on non-case carrying work for staff included.

The number of alleged victims in the caseload sheet does not match the number of alleged victims on the victim case data sheet.  There is no way to match the victim data provided to the investigators/investigations.

The employee ID and Supervisor ID number are not the same unique ID.  Provide employee IDs for supervisors so that data may be matched.[371]

For data provided by HHSC related to RCCL inspectors, the Monitors noted:

Data provided include "inv" and "fac" assignments, but no information is provided on other elements of the workload for staff included.  Request clarification for which elements of the workload are included in "inv" and "fac."

No supervisor is included as being the sole/primary investigator on a case/assignment. If supervisors are conducting investigations, they should be included in the file as well as their number of investigations and facility assignments.

---

[369] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).

[370] Email from Frances Townsend, Att'y, Litigation Dep't, Health & Human Servs. Comm'n to Deborah Fowler, Monitor (Nov. 15, 2019, 18:02 EST) (on file with the Monitors) (responding to Monitors' Sept. 30, 2019 Data & Information Request).

[371] Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Feb. 21, 2020, 17:54 EST) (on file with the Monitors) (including Feb. 21, 2020 Data & Information Request).

> Employee hire date is a number, not a date.  Changing the format for the field does not result in an actual realistic date.  Please review and correct.[372]

In addition, the Monitors requested the following clarification and information:

> Data the agencies provided is not consistent with the required reporting timeframe or data retrieval date.  Data HHSC provided includes November, December and January - each pulled as of the first of the month, and data DFPS provided includes the months of September, October and November- each pulled as of the last day of the month.  We need data for September forward for both agencies, pulled as of the same date.
>
> DFPS to clarify if supervisors/managers with an investigation caseload are the sole/primary worker on these cases in addition to supervising other investigations, or whether these caseloads indicate secondary support to investigation staff they are supervising.
>
> HHSC to provide information on all workload elements including operations assigned, A/N investigations transferred from DFPS, Non-A/N investigations assigned, and agency homes sampling inspections assigned.

Both agencies were also requested to provide supervisor job titles in future data submissions.[373] On March 24, 2020, DFPS responded:

> A supervisor may have investigations on their caseload for the following reasons:
>
> > The supervisor was recently promoted from an investigator position and the case(s) transferred with them.
> >
> > The investigations were part of an abandoned caseload and putting them on the supervisor's caseload ensures the investigations are not lost while awaiting reassignment.
> >
> > The investigations are being worked by a Special or Master Investigator and keeping the investigation on the supervisor's caseload allows for the Special or Master Investigator to work the case while the investigation is still captured in our data.

DFPS also indicated that the job title of any supervisor assigned primary to an RCCI investigation was already provided.[374]

---

[372] *Id*.

[373] *Id*

[374] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 16:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

The same day, HHSC responded:

> HHSC data is provided as of the 1st day of the month or the first working day of the month.
>
> HHSC caseload data cannot be pulled prior for the months of September or October.
> HHSC caseload data is only available at a point in time on the date the report is run.
> Caseload report was updated Feb 2020 to include breakdown of Abuse, Neglect, and Exploitation (ANE) and Non-ANE investigations, agency home sampling inspections, and assigned operations.
>
> Supervisor staff will be added to the report.[375]

In April, the Monitors discovered problems with the data provided by DFPS. Among other issues, RCCI investigators who appeared in some months as having a caseload did not appear in other months to have a caseload. Some RCCI staff were included as supervisors in data for one month, but not in other months, and an entire unit was missing from the December 2019 data. In response, DFPS noted, "Creating the report pursuant to the monitors' specifications required new and complex coding as the monitor's [sic] request is not aligned with the agency's normal business process for reporting on caseloads."[376] The Monitors scheduled a call with DFPS, and after discussing the problems, DFPS provided corrected caseload data for December 2019 on April 24, 2020.[377]

c.  The State's Guidance to Staff Related to Caseload Guidelines

On February 18, 2020, the State sent the Monitors guidance they developed for HHSC and DFPS staff related to the caseload guidelines.[378] In addition to providing the internal workload standards that each agency developed, both agencies provided training materials used to familiarize staff with the new workload standards.[379]According to the workload standards and training materials

---

[375] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2019, 17:48 EST) (on file with the Monitors) (including HHSC response to Monitors' Feb. 21, 2020 Data & Information Request).

[376] Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Apr. 13, 2020 17:37 CST).

[377] Email from Jane Burstain, Chief Data & Analytics Officer, Dep't of Family & Protective Servs. to Deborah Fowler, Monitor (Apr. 24, 2020 15:22 CST) (on file with the Monitors).

[378] Email from Tara Olah, Dir. of Information & Strategy, Tex. Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Feb. 18, 2020, 20:41 EST) (including DFPS response regarding comments on the CVS, CCI and CCL Draft Workload Standards/Guidance) (on file with the Monitors).

[379] TEX. HEALTH & HUMAN SERVS. COMM'N, *Residential Child Care Licensing Workload Standards* (Feb. 2020) (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Generally Applicable Caseload Standards: Guidelines for Residential Child Care Investigations* (Jan. 2020) [hereinafter *Caseload Guidelines for RCCI*] (on file with the Monitors); TEX. HEALTH & HUMAN SERVS. COMM'N, *RCCL Workload Assignment Guidelines*, (Feb. 2020) [hereinafter *RCCL Workload Assignment Guidelines*] (on file with the Monitors); TEX. DEP'T OF FAMILY &

created by HHSC, RCCL includes four primary tasks as part of a caseload standard total. Those tasks are:

- Assigned Operations;
- Abuse/Neglect (A/N) investigations transferred from DFPS for completion;
- Assigned Non- A/N investigations assigned; and
- Assigned Agency homes sampling inspections.[380]

There are also tasks that, according to HHSC's training materials, are not included in the workload calculation for RCCL inspectors:

- Intakes being reviewed for investigation progression
- Agency homes sampling inspections awaiting assignment
- Individual to do items
- Open investigations awaiting closure due to a requested administrative review[381]

While RCCL utilizes a "round robin"[382] model for distributing cases to investigators/inspectors, the Commission takes several factors into consideration as part of the case allocation process. Considerations include:

- Travel – as measured by distance and time;
- Complexity of the operation – capacity of placement, type of placement, length of time in operation, compliance history;
- Experience of the worker – length of time, familiarity with investigations;
- Language barriers; and
- Distribution of types of workload tasks – balancing volume by type of task, provide equitable distribution of remaining tasks.[383]

In training materials DFPS prepared for RCCI supervisors and program administrators, the agency describes the caseload guidelines as a set of recommendations intended to, among other things, "promote equity across workloads."[384] In describing an "equitable workload," DFPS notes "[a]n equitable workload does not mean each investigator carries the exact same number of investigations. Instead, emphasis is placed on the efforts needed to complete a set of investigations assigned."[385] DFPS notes that RCCI has traditionally assigned investigations using a "round-robin" method in which investigations are assigned in an "orderly, predictable sequence."[386]

---

PROTECTIVE SERVS., *Generally Applicable Caseload Standards: An Introduction to Caseload Guidelines for Residential Child Care Investigations*, (Feb. 2020) (on file with the Monitors).

[380] *RCCL Workload Assignment Guidelines*, at 3.

[381] *Id*. at 5 (stating that "the…items are considered job functions and may be associated with workload tasks; however, they are **not** included in the definition of an inspector's workload").

[382] *Id*. at 19 (defining the "round robin" method as assigning investigations "in an alternating manner to achieve rotation of assignment across all inspectors," and requiring the use of the "round robin" approach "within each unit or across multiple units")

[383] *Id*. at 8.

[384] *Caseload Guidelines for RCCI*, at 6.

[385] *Id*. at 7.

[386] *Id*. at 12.

DFPS notes that using this traditional approach, "There is little or no consideration regarding the nature or complexity of the new investigation, of an investigator's current workload, or the workload of other investigators in the unit."[387]   DFPS encourages supervisors to "consider" a "modified round-robin" approach in which they consider:

Making assignment decisions based on a review and assessment of the new investigation;

- Evaluating the impact of the new investigation on the overall workload for each investigator and whether the assignment will promote workload equity;
- Considering the tenure of the investigator; and
- Skipping over the investigator who is 'next in line,' as appropriate.[388]

Using this modified method, DFPS indicates RCCI supervisors should take into account: complexity of the investigation, language barriers, travel, and tenure and skillset of the investigator.[389] In addition to the internal workload standards and training materials DFPS created for RCCI, DFPS issued a field communication to its staff on February 12, 2020, describing resources available to support the "case-ranges and equitable workloads.[390]

3.   Remedial Orders B-Two, B-Three, and B-Four: Performance Validation

a.   Methodology

Though Remedial Orders B-Two through B-Four became effective after the most recent point-in-time caseload data analyzed by the Monitors, the Monitors analyzed data for RCCI and RCCL for three months (November 2019, December 2019, and January 2020) to establish caseload trends and next analyzed point-in-time caseloads for January 2020 to provide a baseline representation of the State's current caseload assignments when measured against the guidelines.[391]   The monitoring team conducted interviews with forty (of eighty-five) RCCL inspectors and with twenty-four (of sixty-two) RCCI investigators to verify the accuracy of caseload reports through field-based caseload validation.

b.   Remedial Orders B-Two, B-Three, and B-Four: Performance Validation Results

Caseload data was provided to the Monitors by both DFPS and HHSC beginning in November 2019.  DFPS provided point-in-time data for RCCI investigator and supervisor caseloads as of the last day of the month.[392] HHSC provided point-in-time data for RCCL inspector caseloads as of the first day of the month. In order to validate the caseload data provided by both agencies, the

---

[387] *Id*.
[388] *Id*. at 13.
[389] *Id*. at 14.
[390] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Field Communication #020* (Feb. 12, 2020). (on file with the Monitors)
[391] Analysis of RCCL and RCCI caseloads for the months of November, December, and January is based on point-in-time data provided by the State.  DFPS provided data for RCCI caseloads on the last day of each month; HHSC provided data on the first day of each month.
[392] Data provided by DFPS do not appear to include caseloads for special and master investigators or staff working in the complex investigation unit.

monitoring team conducted field interviews with forty randomly selected RCCL inspectors and twenty-four randomly selected RCCI investigators on April 6 - 8, 2020 via videoconference.[393] Inspectors and investigators were selected for regions with the highest numbers of inspectors or investigators as of March 2020.[394] The inspectors' and investigators' supervisors also participated in the interviews.

i.  RCCL Caseload Analysis

*Inspector, Supervisor and Caseload Trends Across Three Months of Data*

The number of RCCL inspectors and supervisors changed little over the three months of data analyzed by the Monitors, with ninety-two to ninety-three inspectors and twenty-one to twenty-two supervisors working for RCCL during these months.

**Figure 25:  Number of RCCL Inspectors and Supervisors, November 2019 through January 2020**



The total number of cases or "tasks" carried by RCCL inspectors across these three months fluctuated with 1,838 cases assigned in November 2019, 2,013 assigned in December 2019, and 1,854 assigned in January 2020.

---

[393] For purposes of the interviews and data validation, the monitoring team asked the State to provide caseload reports from CLASS and Insight to the monitoring team as of April 1, 2020 (RCCL) or March 31, 2020 (RCCI) in advance of the interviews. The inspectors and investigators were also asked to have these caseload reports with them during the interviews.  During the interviews, the inspectors and investigators were asked questions to validate the information in the CLASS and Insight reports.

[394] For RCCL inspectors, interviewees were selected from Regions Three, Six, Seven and Eight.  For RCCI investigators, interviewees were selected from Regions Three, Four, Six, and Seven.

**Figure 26:  Number of RCCL Cases, November 2019 through January 2020**



The average caseload for RCCL inspectors ranged from twenty to twenty-two cases between November 2019 and January 2020.  The average lowest number of cases (or "tasks") for these eighty-eight inspectors during this three-month period was seventeen and the average highest number of cases was twenty-four; however, some inspectors had caseloads as low as one and as high as forty-five.

**Table 12: Number of Inspectors, Average Caseloads, and Caseload Range, November 2019 through January 2020**

| Caseload Average and Range, RCCL Inspectors, November 2019 to January 2020 | | | | |
|---|---|---|---|---|
| Month | Number of Inspectors | Average Caseload | Caseload Range | |
| | | | Low | High |
| November | 92 | 20 | 1 | 40 |
| December | 93 | 22 | 6 | 44 |
| January | 92 | 20 | 1 | 45 |

RCCL has twenty-one offices in counties across Texas.  A review of the average caseload lows and highs across three months by the county in which each of the twenty-one RCCL offices are based shows a great deal of variation, with inspectors in some offices carrying significantly higher caseloads than others.

**Table 13: RCCL Caseload Averages and Ranges for November 2019 through January 2020 and Number of Inspectors by County**

| County | Inspectors | Average Low | Low Range | Average High | High Range |
|--------|-----------|-------------|-----------|--------------|------------|
| Angelina | 2 | 13 | 10-17 | 19 | 17-22 |
| Bell | 2 | 21 | 21-22 | 27 | 25-29 |
| Bexar | 17 | 12 | 6-20 | 16 | 9-24 |
| Brazos | 1 | 22 | | 27 | |
| Burnet | 1 | 16 | | 26 | |
| Dallas | 3 | 19 | 16-24 | 26 | 22-28 |
| Denton | 1 | 26 | | 34 | |
| El Paso | 2 | 8 | 8-9 | 15 | 11-19 |
| Harris | 24 | 19 | 1-39 | 27 | 1-45 |
| Hidalgo | 5 | 10 | 7-14 | 13 | 11-15 |
| Jefferson | 1 | 28 | | 30 | |
| Lubbock | 3 | 17 | 9-30 | 19 | 11-33 |
| McLennan | 3 | 17 | 11-21 | 25 | 23-26 |
| Nueces | 5 | 12 | 7-18 | 17 | 12-22 |
| Potter | 2 | 14 | 11-17 | 17 | 13-21 |
| Smith | 3 | 20 | 18-22 | 27 | 25-30 |
| Tarrant | 9 | 19 | 10-33 | 30 | 25-33 |
| Taylor | 3 | 29 | 22-36 | 34 | 27-44 |
| Travis | 7 | 19 | 9-29 | 28 | 22-38 |
| Victoria | 1 | 14 | | 15 | |
| Wichita | 1 | 30 | | 33 | |

RCCL inspectors' caseloads are almost evenly split between "tasks" (facility inspection v. investigation of minimum standards) across all three months, with minimum standards investigations making up from 39% to 45% of caseloads during the three-month period.

RCCL supervisors are not expected to be case-carrying; they are primarily responsible for providing oversight and support to inspectors.[395]  Supervisors may provide assistance with cases, as needed, staff cases with their employees, review findings, and approve completed cases.[396] Across the three months of data analyzed, supervisors oversaw between two to eight inspectors on as many as 137 cases in a month, with an average of eighty-eight to ninety-two cases being supervised by each in this three-month period.

**Table 14: Number of RCCL Supervisors and Number of Inspectors and Cases Supervised, November 2019 through January 2020**

| Month | No. of Supervisors | Inspectors Supervised | No. of Cases Supervising | |
| --- | --- | --- | --- | --- |
| | | | Average | Range |
| November | 21 | 2 to 8 | 88 | 41 to 137 |
| December | 22 | 2 to 6 | 92 | 52 to 135 |
| January | 22 | 2 to 6 | 84 | 48 to 133 |

*Point-in-Time Caseload Analysis for Inspectors: January 2020*

Ninety-two RCCL inspectors carried a total of 1,854 cases on January 1, 2020.  Although Remedial Order B-Four was not yet in effect, the caseload distribution among RCCL inspectors offers a baseline for performance. Of these ninety-two RCCL inspectors, fifty-four (59%) had caseloads above seventeen cases or "tasks", the top of the guideline range, on January 1, 2020. Twenty-seven inspectors (29%) had caseloads below the caseload guidelines that later took effect, and eleven inspectors (12%) had a caseload that fell within the guidelines.

**Table 15: Number of Cases per RCCL Inspector, January 2020**

| No. of Cases on Caseload | No. of Staff | Percent (Staff) |
| --- | --- | --- |
| 1 – 13 | 27 | 29.3% |
| **14 - 17** | 11 | 12.0% |
| 18 – 20 | 8 | 8.7% |
| 21 – 25 | 19 | 20.7% |
| 26 – 30 | 16 | 17.4% |
| 30 or more | 11 | 12.0% |
| **Total Inspectors** | **92** | **100%** |

---

[395] *See RCCL Workload Assignment Guidelines*, at 7 (specifying that workload tasks cannot be assigned to a supervisor unless the "remaining actions" are the supervisor's primary job to complete).
[396] *Caseload Guidelines for RCCI*.

If the guidelines had been in effect on January 1, 2020, using the top of the caseload guideline of seventeen cases, fourteen RCCL offices (67%) did not have enough staff to meet the caseload guideline, with only two offices (Bexar and Hidalgo) having more staff than needed to maintain caseloads at seventeen or fewer cases per inspector, and five offices being adequately staffed to maintain cases at this level.  Of the fourteen RCCL offices that did not have enough staff, nine (43% of the total units) would have needed one additional inspector, and five (24%) would have needed between two and eight inspectors.  Statewide, an additional thirty-one inspectors would have been needed in January to meet the top of the caseload guideline of seventeen cases.

**Figure 27: RCCL Staffing Needs by County based on Staffing and Caseloads, January 2020**



*RCCL Caseload Verification*

The monitoring team conducted independent interviews with forty (of eighty-five) RCCL inspectors. For each interview, the monitoring team asked the inspector to review the CLASS list showing their caseload and answer questions related to the accuracy of the information on the list. Of the forty inspectors interviewed, thirty-two (80%) indicated that the list showing on the CLASS caseload list was accurate.  Six (15%) of the remaining eight inspectors indicated that the CLASS caseload list included cases that were no longer on their caseload and two (5%) stated that they had cases on their caseload that were not included on the log. When asked about secondary assignments, twenty-seven (67%) RCCL inspectors indicated that they had secondary assignments on their caseloads, though RCCL did not report secondary assignments in the data provided to the Monitors.  These inspectors described secondary assignments as consisting of courtesy interviews and visits.

ii. RCCI Caseload Analysis

*Investigator, Case, and Caseload Trends Across Three Months of Data*

DFPS provided data to the Monitors showing several different types of RCCI staff with investigative caseloads: investigators, non-investigators, and supervisors. The number of investigators, non-investigators, and supervisors varied across November 2019, December 2019, and January 2020.

**Figure 28: Number and Type of RCCI Staff, November 2019 through January 2020**



The number of cases and alleged victims increased between November 2019 and January 2020, with a low of 921 cases involving 1,510 alleged victims in November 2019 to a high of 1,011 cases involving 1,783 alleged victims in January 2020.[397]

**Figure 29: Number of RCCI Investigations and Victims Associated with those Investigations, November 2019 through January 2020**

---

[397] Each case may involve more than one alleged victim, and each alleged victim may be involved in more than one case.



Each month, caseloads for RCCI investigators ranged from one to sixty-two cases; average caseloads per month ranged from a high of twenty-two cases in November to a low of nineteen in December.

**Table 16: Caseload Average and Range for RCCI Investigators, November 2019 through January 2020**

| Caseload Range and Average for RCCI Investigators, November 2019 to January 2020 | | | |
|---|---|---|---|
| Month | Caseload Low | Caseload High | Average |
| November 19 | 4 | 58 | 22 |
| December 19 | 1 | 56 | 19 |
| January 20 | 1 | 62 | 20 |

Caseloads for non-investigators and supervisors working as a primary investigator on an RCCI investigation ranged from one to fifty-five investigations.  Average caseloads per month for these staff ranged from a high of sixteen cases in November 2019 to a low of eleven in December 2019.

RCCI supervisors' responsibilities include conducting staffings with investigators to provide feedback and guidance related to their investigations, routinely reviewing documentation and processes, mentoring all staff with additional focus on new hires, reviewing investigation findings, and approving completed cases.[398]  RCCI supervisors also participate in investigation site visits as a means of assisting and evaluating investigator performance.  RCCI supervisors are

---

[398] *Caseload Guidelines for RCCI.*

responsible for supervising and managing staff who are not yet case assignable, those who are not working as a primary investigator on an RCCI case during the month, and/or those who are not assigned to investigations.

For the three months included in the Monitor's review, RCCI supervisors were responsible for overseeing staff serving as primary investigators on as many as 249 investigations involving as many as 411 victims.  The number of supervisors for RCCI investigators remained constant over the period, despite the increase in staff who served as primary investigators in RCCI investigations.

**Table 17: Number of RCCI Supervisors and Number of Primary Investigators and Cases Supervised,  November 2019 through January 2020**

| Month | Number of Supervisors | Investigators Supervised | Number Cases Supervising | | Number of Victims Associated with Cases Supervised | |
|---|---|---|---|---|---|---|
| | | | Average | Range | Average | Range |
| November | 11 | 2 to 6 | 84 | 23 to 249 | 137 | 30 to 411 |
| December | 12 | 1 to 10 | 83 | 10 to 246 | 135 | 13 to 406 |
| January | 12 | 1 to 10 | 84 | 7 to 228 | 149 | 10 to 391 |

Across all three months, at least half of the ten supervisors[399] responsible for overseeing the work of RCCI investigators were also shown in the data produced by DFPS as serving as the primary investigator on a case.[400]

**Table 18: Number of RCCI Supervisors Overseeing Investigators and Percent Carrying a Caseload, November 2019 through January 2020**

| Month | Number of Supervisors | Number of Supervisors Carrying a Caseload | Percent of Supervisors Carrying a Caseload |
|---|---|---|---|
| November | 10 | 7 | 70% |
| December | 10 | 5 | 50% |
| January | 10 | 6 | 60% |

*Point-in-Time Caseload Analysis: January 2020*

---

[399] The other two supervisors on RCCI staff were responsible for supervising non-investigators.

[400] DFPS indicated that this may occur when:  temporarily pending assignment of the case to an investigator; staff working cases leave the agency (abandoned cases) a higher than normal number of cases are being investigated, or supervisors are needed to work delinquent/backlogged cases. In addition, during field interviews, RCCI staff and supervisors also indicated that while these cases may be "assigned" to the supervisor in IMPACT, they may actually be investigated by staff other than the RCCI supervisor to whom they are assigned.  While a non-supervisory staff member of the unit performs the investigative casework, the supervisors retain the cases on their reports to maintain timely tracking of the investigation process.  Most of these cases, according to those interviewed, were part of the "backlog" project.

Point-in-time caseload data provided on December 31, 2019[401] indicate that forty-three investigators carried a total of 856 cases. Of these forty-three investigators, if the guidelines had been in effect, twenty (46.5%) would have had caseloads above the fourteen to seventeen case guidelines; eleven of these twenty (25% of the 43) carried a caseload of more than thirty cases. Three investigators (7%) would have had caseloads within the guideline of fourteen to seventeen cases, and twenty (46.5%) would have had a caseload below the guideline range.

**Table 19: Number of Cases per RCCI Investigator, January 2020**

| No. Investigations on Caseload | No. Investigators | Percent (Staff) |
|---|---|---|
| 1 – 13 | 20 | 46.5% |
| 14 – 17 | 3 | 7.0% |
| 18 – 20 | 5 | 11.6% |
| 21 – 25 | 1 | 2.3% |
| 26 – 30 | 3 | 7.0% |
| 30 or more | 11 | 25.6% |
| **Total Staff** | **43** | **100.0%** |

According to the caseload data provided by DFPS, five investigators (12%) were assigned a total of eight secondary cases for the month of January. The average primary caseload for these five investigators on December 31, 2020 was sixteen cases. Twelve non-investigators and supervisors served as the primary on 141 RCCI investigations. Ten (75%) were carrying 17 or fewer cases.

**Table 20: Number of Cases for Non-Investigators and Supervisors Serving as Primary in a RCCI Investigation, January 2020**

| No. Cases on Caseload | No. Non-Investigators | Percent (Staff) |
|---|---|---|
| 1 – 13 | 9 | 75.0% |
| 14 – 17 | 1 | 8.3% |
| 18 – 20 | 1 | 8.3% |
| 30 or more | 1 | 8.3% |
| **Total Staff** | **12** | **100%** |

RCCI supervisors responsible for overseeing the work of investigators, in January, were also assigned as the primary investigator in one or more cases. Table 21 below shows, for the ten supervisors, the number of investigators they were supervising and the number of cases that were assigned to the supervisor as the primary investigator.[402]

---

[401] DFPS provides point-in-time caseload data on the last day of the month.
[402] Assuming the supervisor is not actually serving as the primary investigator, as several supervisors and investigators indicated during field interviews, the primary investigations do still add to the total number of investigations being supervised by the supervisor.

**Table 21: Individual RCCI Supervisors, Investigators and Cases Supervised, and Number of Investigations Handled as Primary Investigator, January 2020**

| Supervisor | Number of Investigators Supervised | Number of Investigations for Staff Supervised | Number of Investigations Handled as Primary |
|---|---|---|---|
| 1 | 1 | 28 | 2 |
| 2 | 1 | 7 | 0 |
| 3 | 4 | 32 | 0 |
| 4 | 5 | 19 | 1 |
| 5 | 5 | 133 | 18 |
| 6 | 5 | 228 | 55 |
| 7 | 5 | 67 | 0 |
| 8 | 6 | 63 | 13 |
| 9 | 6 | 148 | 0 |
| 10 | 10 | 179 | 14 |

RCCI divides its staff among "units," some of which have more than one office location. DFPS uses a unit-based round-robin model for distributing both primary cases and secondary assignments.[403] DFPS has indicated that the agency is unable to provide a work location for RCCI investigators, supervisors, and non-investigator staff working as a primary investigator in an RCCI investigation. While investigators are assigned to "units," DFPS explained to the Monitors that investigators may be assigned cases in an area of the state outside the city or region where the unit is based.[404]

The Table below demonstrates the workloads by unit location.

---

[403] *Caseload Guidelines for RCCI.*

[404] Email from Jane Burstain, Chief Data & Analytical Officer, Dep't of Family & Protective Servs. (May 18, 2020, 20:26 EST) (on file with the Monitors) (regarding meeting invite to discuss Residential Child Care Investigation (RCCI) caseloads). According to DFPS:

> For CCI's purposes a unit is a group of individuals, with similar job functions who report to one supervisor who is responsible for managing and overseeing the work produced each unit member. CCI does try to house unit staff and its supervisor in the same region or office, whenever possible. However, due to the program's size, and the limited number of positions, it isn't always feasible or efficient to house all unit members in the same region or office.   We provided the offices in which each unit is housed but it will not necessarily be reflective of the area in which they cover cases.   Staff generally work cases in the region where they are housed and we have at least one staff person housed in each of the 11 regions.  There are circumstances, however, where staff may work investigations in a different region as part of the backlog project or at times when a child care operation may be in a different region, but is geographically closer to an investigator across regional lines.

*Id.*

194

**Table 22: RCCI Units, Unit Location, Number of Staff Working as Primary Investigators and Number of Cases in Unit, January 2020**

| RCCI Unit | RCCI Unit | Staff Working as Primary Investigator | Number of Cases, January 2020 |
|---|---|---|---|
| 0 | Unit Created for Budgetary Purposes- no location provided | 1 | 1 |
| 5 | Houston | 5 | 228 |
| 6 | El Paso and San Antonio | 2 | 45 |
| 8 | San Antonio | 4 | 100 |
| 13 | Dallas and Arlington | 6 | 75 |
| 16 | Amarillo, Lubbock, Odessa, and Abilene | 5 | 67 |
| 24 | Edinburg and Corpus Christi | 6 | 20 |
| 25 | Houston | 5 | 148 |
| 26 | Austin, Waco, Temple | 4 | 32 |
| 29 | State Office Unit | 2 | 69 |
| 33 | Dallas and Arlington | 6 | 151 |
| 40 | Houston and Conroe | 1 | 7 |
| 41 | Orange, Dallas, Tyler, and Houston | 2 | 30 |
| 3D | Complex Investigation Unit- no location provided | 6 | 38 |

The lack of a primary location for investigation work conducted makes it impossible to accurately estimate the number of investigators needed to achieve investigation caseloads within the guideline of fourteen to seventeen per investigator.[405]

*RCCI Caseload Verification*

---

[405] When the Monitors asked DFPS to suggest how to determine the number of staff needed to meet the caseload guidelines, the agency responded with the following options: "Option 1: Take the total number of investigations and divide by the total number of caseworkers; Option 2: Average the caseloads of all caseworkers; Option 3: Take the total number of investigations and divide by 17 (the upper limit of the caseload guidelines) and subtract the total number of caseworkers already working cases."  Email from Jane Burstain, Chief Data & Analytics Officer, Dep't of Family & Protective Servs., to Deborah Fowler, Monitor (Apr. 24, 2020, 15:22 PM CST).  However, the interviews with investigators and the need to shift cases between workers as part of the "backlog project," discussed herein, clearly indicate that some investigators have higher caseloads than others. Each of the options described would obscure that reality.

The monitoring team conducted independent individual interviews with twenty-four of sixty-two RCCI investigators and five RCCI supervisors. For each interview, the monitoring team asked the investigator to review the INSIGHT list showing their caseload and answer questions related to the accuracy of the information on the list. Of the twenty-four investigators interviewed, seventeen (71%) indicated that the cases showing on the INSIGHT list was accurate. Of the remaining seven investigators, five (21%) indicated that the INSIGHT caseload list included cases that were no longer on their caseloads and two (8%) said that they had cases on their caseload that were not included on the log.

Eighteen of the twenty-four investigators (75%) interviewed said that they were also carrying secondary assignments, and said that these assignments included courtesy interviews, forensic interviews, and work on CPS companion cases.

*Backlog Project*

All RCCI supervisors interviewed by the monitoring team carried a caseload in addition to supervising investigators.  Three of the five RCCI supervisors interviewed (60%) had between three and nine cases on their INSIGHT caseload report, while 40% (two) had between twenty-five and thirty cases.  The average number of cases per RCCI Supervisor was fifteen.

The interviewed supervisors indicated that the majority of the cases on their caseload reports were cases that were part of a backlog project. They described the backlog project to the monitoring team as an effort in which cases older than forty-five days were prioritized for completion and closure. Over the course of these interviews, RCCI supervisors shared that this form of addressing backlogged cases had been an informal practice since 2018. The most recent backlog effort began in November of 2019.

As a result of the interviews, the Monitors asked DFPS to explain the backlog project as part of a scheduled call between the State and Monitors on April 9, 2020. During the call, DFPS explained that the backlog project started in November 2019 to address the high numbers of delinquent cases, and that it was originally anticipated to last until April 2019.  At the start of the backlog project, DFPS identified twenty "resources," or staff, across the state to assist with the closing of delinquent cases. They included special and master investigators, staff normally assigned to DFPS's complex investigation's unit, and investigators with low caseloads.  Staff still in training (but not yet case assignable) were also tasked by DFPS to assist with the project in a secondary capacity, though DFPS listed the case on their caseload as though they were the primary investigator. DFPS also noted during the call that twenty new investigators had been hired in September 2019.

After the call, DFPS informed the Monitors:

> There were 554 cases that were over 45 days on February 29th . . . as of April 5th, the number was 501.  The more recent number comes from a weekly report that pulls patterns and trends from the INSIGHT data (see example below).  The Associate Commissioner

and the Director of RCCI review this report every week and use it to discuss with RCCI leadership the current status and trends. Additional caseworkers and supervisors can use INSIGHT reports to manage their workloads and [coming] deadlines.

Closures are still not where we would like them. Although the new investigators hired in September, 2019 increased RCCI's case carrying capacity by nearly sixty percent, those caseworkers have only recently become case assignable. It is our hope that as they get up to speed some of the lag will decrease.[406]

During the call, DFPS indicated the backlog was the result of a significant increase in the number of investigations opened in 2019. The agency provided the Monitors with a chart which showed 1,873 cases opened in 2018 and 2,595 cases opened in 2019, an almost 39% increase between 2018 and 2019.[407] The same chart continued to show an increase in opened cases into January and February of 2020, showing cases opened in January 2020 up 30% from cases opened in January 2019 and cases opened in February 2020 up 83% over cases opened in February 2019.[408] The Monitors asked the agency whether the increase that began in 2018 was part of a trend that started in 2017, when RCCL and RCCI divided responsibility for investigations as described in Section III of this report. DFPS responded that the number of opened cases in 2017 was 2,399, indicating a significant reduction in investigations in 2018 and a much more modest increase in the number of opened investigations between 2017 and 2019.[409]

4. Summary

Caseload data provided by HHSC showed that on January 1, 2020, ninety-two RCCL inspectors carried a total of 1,854 cases or "tasks." Of the ninety-two inspectors, fifty-four (59%) had caseloads above seventeen tasks. Caseload data provided by DFPS showed that on December 31, 2020, forty-three RCCI investigators and twelve non-investigators and supervisors carried a total of 1,011 cases. Of the forty-three investigators, twenty (46.5%) had more than seventeen investigations. Of non-investigators and supervisors, ten of the twelve (75%) carried caseloads within or below the guideline.

## V.   PREVENTING CHILD-ON-CHILD SEXUAL AGGRESSION

---

[406]Email from Rand Harris, Assoc. Comm'r for Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Apr. 09, 2020, 19:32 EST) (on file with the Monitors) (regarding RCCI backlog plan update).

[407] Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (Apr. 10, 2020, 8:47 EST) (on file with the Monitors) (regarding RCCI Backlog Plan Update).

[408] *Id.*

[409] Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (Apr. 10, 2020, 9:33 EST) (on file with the Monitors) (regarding RCCI Backlog Plan Update).

This section of the report discusses the remedial orders related to identifying, documenting, and notifying caregivers of a child's history of sexual abuse, sexual aggression, or sexual behavior problems and preventing child-on-child sexual abuse.

DFPS[410] identified 1,164 children with a confirmed history of sexual abuse, an indicator for sexual aggression, or a sexual behavior problem as of November 30, 2019. Most of these children (476 or 41%) reside in foster homes, but the State placed more than 384 (33%) in General Residential Operations (GROs).[411]

The State changes placements for children flagged in IMPACT for a history of sexual abuse, sexual aggression, or sexual behavior problems more frequently than for children whose IMPACT records do not contain the flag(s). For children in placement between June 1, 2019, and February 29, 2020, confirmed victims of sexual abuse and children with an indicator for sexual aggression experienced, on average, 2.2 placements while children with no identified sexual characteristic experienced, on average, 1.8.

**Table 23: Mean Number of Placements by Sexual Indicator Type, June 2019 through February 2020** (*n=17,244*)

| Sexual Characteristic Type | Mean Number of Placements |
|---|---|
| No Sexual Indicator in IMPACT | 1.84 |
| Confirmed Sexual Victims | 2.20 |
| Sexual Aggression Indicator | 2.23 |

Changes in placement occurred most frequently for children with an indicator for sexual aggression, with 16% (thirty-nine of 242) having four or more placements during the period between June 1, 2019 and February 29, 2020 compared to 13% (450 of 1,444) of confirmed victims of sexual abuse and only 6 % (925 of 15,898) of children with no identified sexual characteristic.

**Table 24:  Number of Placements for PMC Children by Sexual Indicator Type, June 2019 through February 2020** (*n=17,244*)

| Number of Placements | Victim of Sex Abuse | Sexual Aggression | No Sexual Characteristic |
|---|---|---|---|

---

[410] Based on the data produced by the State for the first quarter of fiscal year 2020, end of the quarter.  Does not include children with a confirmed history of sex trafficking.  Children may have been identified in more than one of the sexual characteristic categories.

[411] By way of comparison, the State placed 13% of children (1,232 of 9,769) with no confirmed history of sexual abuse, indicator for sexual aggression or sexual behavior problem in GROs and placed 53% of these children (5,130 of 9,769) in foster homes.

| | Number Victims | Percent Victims | Number Victims | Percent Victims | Number Victims | Percent Victims |
|---|---|---|---|---|---|---|
| One Placement | 442 | 39.0% | 79 | 33.0% | 6,949 | 44.0% |
| Two or Three Placements | 552 | 48.0% | 124 | 51.0% | 8,024 | 50.0% |
| Four or Six Placements | 442 | 11.0% | 33 | 14.0% | 769 | 5.0% |
| Seven or More Placements | 28 | 2.0% | 6 | 2.0% | 156 | 1.0% |

A. Remedial Order Thirty-Two: Policy Creation & Training of Staff Responsible for Making Determinations

Remedial Order Thirty-Two: *Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

1. Background

a. DFPS Policy and Training Materials

i. DFPS Child Sexual Aggression Resource Guide

In October 2016, DFPS published a twenty-five-page Child Sexual Aggression Resource Guide (Resource Guide or Guide), revised in May 2019.[412] The CPS Handbook incorporates the Guide by reference, stating:

> CPS and SSCC providing case management staff must follow the Resource Guide procedures when working with the following:
>
> - Children who have sexually aggressive behavior.
> - Children who have sexual behavior problems.
> - Victims of sexual aggression.[413]

The Resource Guide contains more information about practices, requirements, and definitions of terms. The Resource Guide focuses on how to "identify current behavior; document and

---

[412] TEXAS DEP'T. OF FAMILY & PROTECTIVE SERVS., *Child Sexual Aggression Resource Guide* (2019), *available at* https://www.dfps.state.tx.us/handbooks/CPS/Resource_Guides/Child_Sexual_Aggression_Resource_Guide.pdf [hereinafter *Child Sexual Aggression Resource Guide*] (attached as Appendix 5.1.) The differences between the 2016 and 2019 guides do not appear to be substantive but were required by legislative changes to the structure of DFPS and HHSC, and by changes in the way that sexual aggression is flagged in IMPACT.

[413] *Child Protective Services Handbook* § 6241.11

communicate that behavior with caregivers and others; and differentiate between appropriate and aggressive behaviors."[414] The Guide also indicates that it "provides Program Administrators with the information needed to identify a child with sexually aggressive behavior in IMPACT."[415]

The Resource Guide sets out definitions of a sexual behavior problem and sexually aggressive behavior, and it includes a "Sexual Behavior Chart" that defines typical sexual development, sexual behavior problems, and sexually aggressive behavior based on a child's age.[416] The Guide contains an additional chart setting out CPS protocols for children who exhibit sexually aggressive behaviors, distinguishing between the following circumstances in describing protocol:

- Child with sexually aggressive behavior comes into conservatorship;
- RCCL investigation of a child placed in a contracted placement;
- CPS investigation of a kinship home.[417]

The chart describing CPS protocols also includes information related to appropriate steps caseworkers must take to document "sexual aggression" or "sexual behavior problem" characteristics in IMPACT and the steps required before placing a child with a sexual behavior problem or who exhibits sexual aggression.[418] The Guide also describes a protocol for caseworkers and kinship development workers for children residing in kinship placements.[419] Finally, the Guide describes a protocol for including information in IMPACT for a child who is a victim of child-on-child sexual aggression.[420]

The last sections of the Resource Guide describe the interventions that should be provided to children with sexual behavior problems or sexually aggressive behavior, setting out "immediate goals" that focus on safety and protection from abuse and describing "appropriate treatment goals."[421]   The Guide provides suggested caregiver and adult responses to children with sexually aggressive behavior and recommends "specific house rules" for the child.[422] The Resource Guide includes cursory information describing treatment options, services, and supports for victims in a short, half-page description.[423]

ii.  Training Materials

---

[414] *Child Sexual Aggression Resource Guide*, at 1.
[415] *Id.*
[416] *Id.* at 4-5. (using the following age ranges in distinguishing between these categories: Preschool: Less than four years of age; Young children: ages 4-6; School-aged: 7-12; Teens: ages 13-17).
[417] *Id.* at 9-11.
[418] *Id.* at 16.
[419] *Id.* at 17-18.
[420] *Id.* at 23.
[421] *Id.* at 20-22.
[422] *Id.* at 22-23.
[423] *Id.* at 23-24.

On September 30, 2019, the Monitors requested (as detailed below) a copy of DFPS's current sexual abuse training materials.[424] DFPS provided four training modules used to train caseworkers, investigators, supervisors, program directors, and program administrators in the policy set out in the Resource Guide.  The modules follow the charts included in the Guide that describe the different categories of sexual behavior and the protocol based on the type of placement.  The four modules cover: Categories of Sexual Behavior; Child with Sexually Aggressive Behavior Entering Conservatorship; CPS Actions When There is a Residential Child Care Investigation (RCCI) Involving a Child in CPS Conservatorship; and Child Sexual Aggression Discovered in an Investigation of a Kinship Placement.

In addition to setting out the policy described in the Resource Guide, the four modules describe the process of determining whether the child's behavior falls within the different sexual behavior categories.  The Guide provides step-by-step instructions regarding how to follow protocol when a child enters DFPS conservatorship, when RCCI investigates allegations, and when a child is in a kinship placement.

2.  The State's Initial Report to the Monitors Regarding Compliance

On September 9, 2019, DFPS reported:

> DFPS policy and Child Sexual Aggression Resource Guide, which is incorporated by reference in the CPS Handbook, comprise CPS' policy and what constitutes child-on-child sexual abuse. Staff responsible for making the determinations on what constitutes child on child sexual abuse, including CPS and CCI caseworkers, must complete the Child Sexual Aggression computer-based training (CSA training) before they are case assignable. Supervisors, program directors, and program administrators are also required to complete the CSA training. Unless otherwise directed by the court/monitors, DFPS assumes no data/reporting is specifically required in response to this order.[425]

3.  Monitors' Data and Information Request and the State's Production

The Monitors' September 30, 2019 data and information request included the following for both Remedial Order Four and Remedial Order Thirty-Two: "Provide a copy of current sexual abuse training materials . . . and, if changes or updates are made, provide updated materials on a

---

[424] Email from Deborah Fowler, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of the Att'y Gen. of Tex. (Sept. 30, 2019, 16:14 CST).
[425] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *MD v. Abbott Monitoring Status Update* (Sept. 9, 2019) (on file with the Monitors).

quarterly basis thereafter."[426] The Monitors' request specifically noted, "Consistent with the Court's order, training is required to include information about how to recognize and report sexual abuse, including child-on-child abuse."[427]

The State responded by producing training modules on November 1, 2019.[428] In its response to the Monitors request, the State also indicated that: Sexual abuse policy, training requirement[s] and training materials have been developed. Considering DFPS policies and practices are consistent with the Court's order, DFPS proposes to produce the initial report and separately will request that supervision over these orders [Orders Four and Thirty-Two] be terminated."[429]

4.  Remedial Order Thirty-Two Performance Validation

a.  Methodology

To validate the State's compliance with the Court's order for creating "a clear policy on what constitutes child-on-child sexual abuse," the Monitors contracted with Praesidium, a Texas-based consulting firm that works with organizations to prevent the sexual abuse of children.[430] Praesidium analyzed the Resource Guide, as well as all training modules the State sent related to training for caregivers and caseworkers.  Praesidium reviewed the content of the Resource Guide with special focus on content related to child sexual abuse prevention and provided a written report to the Monitors.[431]

b.  Results of Performance Validation

There is substantial overlap in content between the Resource Guide and the training modules reviewed by Praesidium; the training modules are designed to teach trainees the policy described in the Resource Guide. Praesidium provided numerous recommendations to strengthen the Guide and training, as well as to reduce children's risk of harm. For example, Praesidium found that the policy includes behavior indicative of sexual aggression that the guide currently characterized as a sexual behavior problem.[432]  Praesidium suggested moving the behavior description to the section in the policy outlining sexually aggressive behavior.[433]

---

[426] Email from Deborah Fowler, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of the Att'y Gen. of Tex. (Sept. 30, 2019, 16:14 CST) (on file with the Monitors).

[427] *Id.*

[428] The State produced training materials provided during CPD. *See infra* Section V.(D).

[429] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (submitting DFPS Information and Data Request Proposal in response to Monitors' Sept. 30, 2019 Data & Information Request).

[430] For more information about Praesidium see https://website.praesidiuminc.com/wp/.

[431] Praesidium, *A Review of DFPS Training Curriculum and Resources* (Mar. 20, 2020) (on file with the Monitors) (attached as Appendix 5.2).

[432] *Id.* at 5.

[433] *Id.* at 5.

Praesidium also expressed concern regarding whether the training modules were sufficient to appropriately prepare investigators, CPS supervisors, and program administrators or directors to prevent or appropriately respond to child-on-child sexual aggression.[434]   Praesidium notes, "While the Sexual Behavior Chart is a helpful reference tool, these modules do not specifically guide the learner through complex case studies to test a learner's awareness and understanding of sexualized behavior among children to then help these individuals make real-time, informative responses for ensuring ongoing safety."[435]

c.   State's Response to Praesidium Recommendations

The Monitors sent the Praesidium report to DFPS and asked the agency to provide a response to the report's recommendations.  DFPS provided a response to the Monitors on May 15, 2020.[436]

In its response, DFPS lists a number of the report's recommendations that it indicates the agency "can consider operationalizing," but the department objects that Praesidium's Scope of Work "mischaracterizes the trainings and materials as being developed to guide understanding of child-on-child sexual abuse *prevention*, as these trainings and materials are primarily focused on *identification and reporting* of sexual abuse, including child-on-child sexual abuse."[437] DFPS noted that the "focus on identification and reporting is consistent with the Court's orders."[438]

d. Summary

The State has created policy related to what constitutes child-on-child sexual abuse, and training modules for staff tasked with implementing the policy.  Praesidium, a consultant retained by the Monitors to evaluate the policy and training modules, expressed concerns for child safety and made recommendations related to both the policy and training.  After being provided with the report prepared by Praesidium, the State indicated that it could consider making some of the recommended changes, but objected to the report's focus on preventing child sexual abuse, noting that the policy and training instead focuses on identification and reporting of sexual abuse.

B.   Remedial Orders Twenty-Three, Twenty-Eight, Twenty-Four, and Thirty: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression

Four remedial orders issued by the Court relate to tracking and documenting sexual abuse and child-on-child sexual aggression:

---

[434] *Id*. at 5.

[435] Id. at 8.

[436] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Deborah Fowler, Monitor (May 15, 2020, 15:52 CST) (including DFPS response to Praesidium report) (attached as Appendix 5.3).

[437] *Id. at* 1.

[438] *Id*.

**Remedial Order Twenty-Three:** *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order Twenty-Eight:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order Twenty-Four***: Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order Thirty:** *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

1. Background

a. DFPS Policy

In December 2019, DFPS created a "Job Aid" for DFPS staff that instructs staff on documenting a child's history of sexual abuse in IMPACT.[439] The Job Aid guides IMPACT users through the process of documenting this information on the newly created sexual victimization history page.[440] The Job Aid notes that sexual victimization history is located on the newly created IMPACT page only for "confirmed victims" and emphasizes "[i]t is important to distinguish the difference between confirmed and unconfirmed victims."[441] Per the Job Aid, a child is a "confirmed victim" if one of the following is present in the child's history:

- Reason to Believe (RTB) Sexual Abuse finding by DFPS CPI or RCCI, even if the perpetrator is unknown.
- Designation as a confirmed sex trafficking victim, per the Human Trafficking Page in IMPACT.
- Confirmed by DFPS as a victim of Child Sexual Aggression.
- Criminal conviction for a charge related to sexual abuse of a child.
- Information from another state welfare system – confirmed allegation (equivalent of RTB).
- RCCL Standards Investigations in which victimization is substantiated.[442]

---

[439] TEXAS DEP'T. OF FAMILY & PROTECTIVE SERVS., *Child Victimization History in IMPACT 2.0 Job Aid* (Dec. 19, 2019) (on file with the Monitors), attached as Appendix 5.4.

[440] *Id.*

[441] *Id.* at 5.

[442] *Id.*

For the second subcategory of victimization, allegations related to trafficking will be considered "confirmed" as defined on the Trafficking page in Impact 2.0: "A trafficking event is confirmed when evidence supports the conclusion that the child or youth has been trafficked. Note: The supporting evidence must be more than just an allegation or suspicion and does not have to be a direct outcry from the child or youth."[443]

For sexual victimization, the Job Aid defines an "unconfirmed victim" as identified "through other information suggesting victimization history including, but not limited to:

- Designation as a suspected Human trafficking victim, per the Human Trafficking Page in IMPACT.
- Information from another state welfare system – unconfirmed (the allegation was neither ruled out nor substantiated).
- RCCL Standards Investigation in which victimization is alleged or information is gathered, and the allegation was neither ruled out nor substantiated.
- DFPS CPI or RCCI investigations in which victimization is alleged or information is gathered, and the allegation was neither ruled out nor substantiated.
- Incidents (not under DFPS jurisdiction) that are being investigated by another entity.
- Incidents (not under DFPS jurisdiction) that are not successfully prosecuted."[444]

While the Job Aid instructs users that a child's sexual victimization history page should only indicate sexual victimization if it has been confirmed,[445] it does instruct users to include "any relevant information regarding previous unconfirmed findings that are important for the caregiver to know" (emphasis in original) under the "Additional Relevant Information" header on the IMPACT sexual victimization history page.[446]

The Job Aid indicates that information included in the IMPACT page for sexual victimization history will automatically pre-fill into the Common Application and the Placement Summary.[447] For that reason, the Job Aid notes, "it is important that the information captured on this page is accurate and current."[448]

---

[443] In addition, "[a] trafficking event is suspected-unconfirmed when specific information regarding the child or youth and the surrounding circumstances creates a reasonable belief that the child or youth has been trafficked. Note: A runaway episode, in and of itself, does not equal to suspected-unconfirmed." TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Tracking Human Trafficking Job Aid*, 1, 28 (Feb. 18, 2019).

[444] TEX. DEP'T. OF FAMILY & PROTECTIVE SERVS., *Child Victimization History in IMPACT 2.0 Job Aid* 1, 6 (Dec. 19, 2019) (on file with the Monitors).

[445] *Id*. at 5 (instructing users to "select the yes radio button when a child has any **confirmed** sexual victimization history").

[446] *Id*. at 8 (omitting guidance regarding making a determination about whether information is "relevant" or not).

[447] *Id*. at 3.

[448] *Id*.

The Resource Guide requires the CVS program administrator to document a child as sexually aggressive in IMPACT in certain instances.[449]  Unlike the Job Aid requirements for documenting sexual abuse, the Resource Guide does not distinguish between "confirmed" and "unconfirmed" incidents of sexual behavior problems or aggression in documenting those issues in a child's IMPACT record.

According to the Guide, once a program administrator determines a child meets the definition of sexually aggressive, the following information is documented in IMPACT:

- The victim's name and personal identification number, if it is known.  If it is not known, the relationship of the victim to the child and any additional identifying information.
- The IMPACT case number for the investigation of the child's behavior.
- A description of the behavior.
- The date of the incident. [450]

If the victim is also in foster care, the Resource Guide requires the following to be documented in IMPACT in the "special handling" box:

- The name of the personal identification number for the sexually aggressive child.
- A description of the incident.
- The aggressor's relationship to the victim.
- The date of the incident. [451]

The CPS Handbook also reflects that, if a child is identified as having sexually aggressive behavior, the behavior must be documented in the child's case record and the child's Placement Summary.[452]  The Handbook notes that, in Community-Based Care (CBC) catchment areas, the Single Source Continuum Contractor (SSCC), is contractually responsible for informing a caregiver of a child's history of sexual aggression, sexual behavior problems, or sexual victimization.[453]

There is little information in the Resource Guide related to documenting a sexual behavior problem. In the definition for sexual behavior problem, the Resource Guide simply states, "[m]ark the sexual behavior problem characteristic on the person detail page if a child meets the criteria outlined in the sexual behavior chart.  Once the CPS caseworker identifies this as a characteristic, there will be no end-date, as a child will always have a history of this behavior."[454]

---

[449] *Child Sexual Aggression Resource Guide*, at 9.
[450] *Id*.
[451] *Id*. at 10.
[452] *Child Protective Services Handbook* §6241.11.
[453] *Id*.
[454] *Child Sexual Aggression Resource Guide*, at 4.

b.  State's Report to the Monitors regarding Compliance

In the State's September 9, 2019 report to the Monitors, DFPS indicated that the department added information related to child sexual aggression and sexual behavior problems to IMPACT in December 2016.  According to its report, DFPS later implemented a sexual aggression and sexual behavior page in IMPACT in April 2019 to simplify identification for caseworkers.  DFPS reported that the IMPACT enhancements allowed this information to be automatically documented in a child's electronic record (also referred to as the "Common Application").[455] The State's changes to IMPACT did not include information related to sexual victimization. The State's September 9, 2019 report identified this as <u>the only</u> remedial order with which the State was not already complying.

DFPS indicated that it was in the process of updating IMPACT to include all information related to sexual aggression and sexual victimization history on a single page and that caseworkers and supervisors would be able to designate a child as sexually abused on this page. DFPS further indicated that this page would be a required attachment ("Attachment A") to the Placement Summary form and must be provided to placements when a child is relocated to a new home or GRO.

The State reported:

> CPS complies with the Court's child sexual aggression and sexual victimization orders, with the exception of Order #23, which requires an IMPACT profile characteristic option to designate PMC and TMC children as sexually abused.  For the reasons noted herein, the Department's implementation of this order has necessarily been delayed.  However, DFPS anticipates coming into compliance with Order #23 by November 17, 2019.   DFPS estimates approximately 500 hours of labor are required to conduct all appropriate activities, including developing detailed technical requirements, design, development, testing, and deployment.  Once the IT enhancement is deployed, DFPS staff will invite the court-appointed monitors to participate in an IMPACT demo on the required functionality.[456]

---

[455] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *MD v. Abbott Monitoring Status Update* (Sept. 9, 2019) (on file with the Monitors).
[456] *Id.*

The State later changed the timeline for its anticipated compliance with Remedial Order Twenty-Three prompting the Monitors to file a memo with the Court on October 28, 2019, related to the delay in complying with this order.[457]

c.  Data and Information Request and Production

In the September 30, 2019 data and information request to the State, the Monitors requested the following:

- <u>Remedial Order Twenty-Three</u>: Provide confirmation by November 15, 2019 that the DFPS electronic case records include a profile characteristic option for caseworkers or supervisors to designate whether any PMC or TMC child is confirmed to have been "sexually abused" by an adult or another youth.  Provide all instructions workers receive regarding when to check the profile characteristic box.

- <u>Remedial Order Twenty-Four</u>: Provide a list of all children who are confirmed victims of sexual abuse as of November 15, 2019.  Update same quarterly.  The list should include the child's identification number; date of birth; current placement; placement type; provider identification number; date of placement; removal date.

- <u>Remedial Order Twenty-Eight</u>: Provide a current list of children whose electronic case record documents "child sexual aggression" and/or "sexual behavior problem" through the profile characteristic option (and on a quarterly basis thereafter).  Include the child's identification number; date of birth; current placement; placement by type; provider identification number; date of placement; removal date; and when the profile characteristic option was selected.  Provide an updated list quarterly.

d.  DFPS Data and Information Production

In response to the requests for Remedial Order Twenty-Three, the State responded:

Required IMPACT enhancements are scheduled to deploy 12.19.19.[458]  Meanwhile, CPS has implemented an interim, manual solution requiring documentation in the placement summary form.

For the requests related to Remedial Orders Twenty-Four and Twenty-Eight, the State indicated that it would include this information in the list of PMC children provided to the Monitors on a quarterly basis, beginning November 1, 2019. In its first quarterly production of data listing all

---

[457] *Monitors' Memorandum to the Court on Remedial Order 23*, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (Oct. 28, 2019), ECF 702.

[458] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Oct. 25, 2019, 6:21 EST) (on file with the Monitors) (responding to questions raised related to IMPACT enhancements and defect resolutions).

PMC children, DFPS identified children for sexual victimization history or trafficking based only upon a "CPS or Licensing (Residential Childcare or Day Care) investigation where the child had a confirmed Sexual Abuse (SXAB) and/or Sex Trafficking allegation."[459] Beginning on January 15, 2020, DFPS indicated that the file included an indicator based upon a confirmed allegation for sexual abuse in IMPACT.

2. Remedial Orders Twenty-Three, Twenty-Four, Twenty-Eight and, Thirty Performance Validation

i. Methodology

The Monitors analyzed compliance with these remedial orders through several methods:

- A review of IMPACT: The Monitors reviewed IMPACT to determine whether it had been updated to allow for the information about child sexual aggression and victimization to be recorded. (Remedial Orders Twenty-Three and Twenty-Eight)

- Analysis of data for trends in identification: The Monitors analyzed data the State provided for children in PMC in the fourth quarter of 2019 through the second quarter of 2020 to determine if the number of children the State identified as victims of sexual abuse or with an indicator for sexual aggression changed.

- The inclusion of questions in a case read: To determine if the State documented the information in IMPACT records, the Monitors included questions in a case read of the electronic records of 376 sampled children the State identified as having a history of victimization or with an indicator for sexual aggression.

- On-site review of children's files: The Monitors and their team reviewed case files for 272 children (every PMC child on each campus) during visits to Cottage Homes, GROs, and RTCs on twenty-three campuses across twenty-one distinct operations in Texas. The tool the Monitors used to document the file reviews included questions focused on whether a child's file included information related to sexual aggression or victimization.

- Data Review of Sexual Victimization History: To validate performance associated with Remedial Order Twenty-Four, the Monitors conducted an audit of the data produced by the State which identified all PMC children who DFPS had identified as confirmed victims of sexual abuse as of the first quarter of the 2020 fiscal year.[460] Using a 90% confidence level with a 10% margin of error, the monitoring team created a random sample of sixty-

---

[459] This explanation is provided in the listing data of all PMC Children. *See, e.g.,* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Inj.6 Placements for Children in PMC Q4 FY19 -Nov-15-19 – 96035* (on file with the Monitors). This data file provided by DFPS does not include, for example, a child who experienced victimization by another child while in care as the underlying harm in a neglectful supervision case; whereas, in IMPACT, that would be considered a "confirmed" allegation and should be included going forward.

[460] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RO. Inj. – List of Children in PMC Q1 FY 20 – Jan 15-20* (Jan. 15, 2020).

four children out of the 931 PMC children that DFPS identified as confirmed victims of sexual abuse. For the children in the sample, the Monitors accessed the child's records in IMPACT 2.0 and confirmed whether or not the child's Sexual Victimization History page was positively identified with "Yes" to the question "Does this child/youth have a confirmed history of sexual victimization" and reviewed the contents of the confirmed allegations for type.[461] The Monitors also reviewed the records of the fifteen children listed in the data who were identified by the State as confirmed victims of sex trafficking to assess whether or not the State had positively identified each child as a sex trafficking victim in Impact 2.0 and review the contents for reason of confirmation. The Monitors included this population of children in their review as sex trafficking victims are a sub-set of children with confirmed allegations of sexual victimization.[462] (Remedial Orders Twenty-Three and Twenty-Four)

ii. Results of Performance Validation

*Review of Impact*

The Monitors' review of IMPACT confirms that the data system includes fields intended to capture information related to child sexual aggression or sexual behavior problems. The State launched the IMPACT page used to document sexual victimization on December 19, 2019. Consistent with Remedial Orders Twenty-Three and Twenty-Eight, the State also created profile characteristics for both sexual aggression and victimization in IMPACT.

*Analysis of data for trends in identification for Sexual Victimization and Sexually Related Behavior*

The Monitors compared data for the fourth quarter of 2019 (the first dataset provided by the State after the Fifth Circuit's mandate issued) to the first and second quarters of 2020 to determine if the number of children that DFPS identified as having a confirmed history of sexual aggression, a sexual behavior problem or victimization increased as the State worked to comply with the Court's orders.

The data shows very slight, statistically insignificant changes over the three quarters for children the State identified as having either a confirmed history for sexual victimization, with an indicator for a sexual behavior problem or for sexual aggression. The number of children the State identified with an indicator for sexual aggression increased by fifteen between the last quarter of 2019 and the second quarter of 2020; children identified with an indicator for a sexual behavior problem decreased; and, the number of children identified in the data as confirmed victims of

---

[461] The Sexual Victimization History page is the IMPACT characteristic feature that the State implemented in compliance with Remedial Order Twenty-Three.
[462] Category two of DFPS's definition of confirmed sexual abuse victim states: Designation as a confirmed sex trafficking victim, per the Human Trafficking Page in IMPACT.

sexual abuse declined from 966 to 939 (however, the percentage of PMC children identified  as confirmed victims of sexual abuse increased slightly).[463]

**Table 25: Number and Percent of PMC Children with an Indicator for Sexual Victimization, Sexual Behavior, or Sexual Aggression, June 2019 through February 2020** (*n=39,255*)

| Quarter | PMC Children | Sexual Victimization | | Sexual Behavior Problem | | Sexual Aggression | |
|---|---|---|---|---|---|---|---|
| | Number PMC Children | Number Victims | Percent Victims | Number Sexual Behavior | Percent Sexual Behavior | Number Sexual Aggression | Percent Sexual Aggression |
| Quarter 4, 2019 | 13,414 | 966 | 7.2% | 475 | 3.5% | 205 | 1.5% |
| Quarter 1, 2020 | 13,062 | 931 | 7.1% | 476 | 3.6% | 215 | 1.6% |
| Quarter 2, 2020 | 12,779 | 939 | 7.3% | 472 | 3.7% | 220 | 1.7% |

The percent of children in the quarter identified as victims of sex abuse or with an indicator for a sexual behavior problem or sexual aggression may be impacted by the number of children newly added to PMC and identified with a characteristic and those with a characteristic leaving PMC. An analysis of children in PMC at  the beginning and end of the quarters, shows that the percent of children identified as having an indicator for sexual aggression remained at 2% in all quarters while the percent of children identified in the data as having a confirmed history of sexual victimization remained at 8% in all quarters though some increase would be expected, particularly because the definition of children identified as sexual abuse victims in the DFPS data expanded between the last quarter of 2019 and the first quarter of 2020 to include all confirmed allegations.

**Table 26:  Percent of Children in PMC at Both the Start and End of the Quarter with an Indicator for Sexual Victimization or Sexual Aggression, June 2019 through February 2020** (*n=28,272 records*)

| Quarter | Children in PMC at Both Start and End of Quarter | Percent Sexual Victim | Percent Sexual Aggression |
|---|---|---|---|
| Quarter 4, 2019 | 9,404 | 8.0% | 2.0% |
| Quarter 1, 2020 | 9,325 | 8.0% | 2.0% |
| Quarter 2, 2020 | 9,543 | 8.0% | 2.0% |

*Case Reads*

---

[463] The Monitors considered the frequency of children entering PMC in analyzing these trends; of children entering PMC in Quarter 4, 2019, Quarter 1, 2020 and Quarter 2, 2020 approximately 4% each quarter were identified as victims of sexual abuse and approximately 1% each quarter were identified as having a history of sexual aggression.

To validate DFPS's performance associated with Remedial Orders Twenty-Four and Twenty-Eight, the Monitors conducted two case record reviews in IMPACT for a random sample of children identified as having positive characteristic identifiers for sexual abuse victimization or sexual aggression. The Monitors selected the children from the data provided by DFPS for the first quarter of fiscal year 2020, representing September 1, 2019 through November 30, 2019 for a sample size of 376 (of 783) PMC children. The sample included 320 confirmed victims of sexual abuse; forty-eight children identified with sexual aggression; and eight with positive indicators for both sexual victimization and sexual aggression.[464]

The Monitors selected one portion of the sample by reading the files for 161 of 270 children who experienced a placement change during the quarter. The Monitors selected the second portion of the sample by reading the files of 215 of 513 children whose placement did not change after the State added information related to victimization or aggression to their IMPACT electronic record. All case reads included questions testing compliance with all of the remedial orders related to identification and documentation of a child's history of sexual aggression or sexual abuse, including those requiring the State to provide this information to caregivers, as discussed below.

In order to test whether the State documented information related to a child's history of aggression or victimization in their electronic records, the tool included questions asking whether the child's IMPACT record includes information on the sexual victimization history page or child sexual aggression page.

- Of the 328 (of 654) PMC children included in the case read, whom the State identified as having a confirmed history of sexual abuse, 313 IMPACT records (95%) included information on the sexual victimization history page.

- Of the fifty-six (of 129) children included in the case read whom the State flagged as having an indicator for sexual aggression, fifty-five IMPACT records (98%) included information on the child sexual aggression page.

The Monitors' case reads are consistent with the State's representation that it produces lists of children who have an active positive identifier for sexual aggression or a history sexual victimization by pulling the data from the information on the sexual victimization and aggression pages created in IMPACT.

*On-site review of children's files*

Proper documentation of children's status for sexual victimization of sexually related behaviors in IMPACT requires that CPS staff carefully review children's records and external files.  CPS

---

[464] Cases for children with both sexual victimization and aggression were reviewed for each of their identified characteristics.

cannot accurately populate the IMPACT pages in a child's record with the appropriate information if staff do not closely review all of the records related to a child's history.

The monitoring team reviewed on-site files for PMC children residing in the placement at the time of a monitoring visit. The Monitors included questions in a review tool it developed for use during visits to placements to ensure IMPACT records accurately reflect child sexual victimization or aggression. The tool allows the monitoring team to review the files to capture information indicating whether the child has a confirmed history of sexual abuse or aggression.

The Monitors cross-referenced lists indicating children with a sexual abuse or aggression characteristic against the census of PMC children at the placements during the time of their visit. If children residing in the placement were on the prepared lists, the Monitors documented whether they found information related to the child's history as a victim or aggressor in the child's on-site file.

The monitoring team visited twenty-three[465] campuses and reviewed 272 PMC children's on-site files between October 2019 and the end of February 2020. One child's file (less than 1% of the 272) included confirmed information related to sexual aggression, though the State did not positively identify this child with an indicator for sexual aggression in its list of PMC children. Twenty-four children's files (9% of the 272) included information related to a confirmed history of sexual abuse,[466] though they were not included in the State's list of children flagged in IMPACT as having a history of sexual abuse. In total, twenty-five (9%) children's on-site files and IMPACT records indicated a failure to flag children as victims of sexual abuse or sexual aggressors.

In April 2020, the Monitors reviewed the records of these children in IMPACT to determine whether the State updated the records to include information related to sexual aggression or victimization. The Monitors confirmed that the State updated IMPACT records related to a history of sexual abuse for eleven (44%) of the twenty-five children. The State had moved six of these children to a new placement since the Monitors' visit. The other five children remained in the same placement. However, as of April 30, 2020, the State had not updated the IMPACT record for the child whose on-site file indicated a history of sexual aggression.

The Monitors also reviewed IMPACT to evaluate the consistency of children's electronic records related to the sexual victimization and aggression indicators and revealed examples of children whose IMPACT records (and lack of a flag) deviated from information found elsewhere in IMPACT. For example, a child identified during the Monitors' on-site file review as a victim of sexual abuse still did not have information included in IMPACT on the sexual victimization page. However, an older Common Application found during the IMPACT review included information

---

[465] Twenty-one operations were visited; two operations had two campuses.
[466] Another twenty-seven files included information related to suspected abuse; however, it is not clear that these children would appear on the list of children flagged by the State because of DFPS policy related to documentation of confirmed versus unconfirmed incidents.

describing the child's sexual abuse by another foster youth at a previous RTC placement.  An older Common Application for another child, whose IMPACT records the State updated to indicate a history of sexual victimization since the Monitor's on-site file review, included the information related to victimization, but also noted that the child had engaged in "inappropriate sexual behavior" with a five-year-old cousin.  However, the State did not update the information related to sexual aggression or a sexual behavior problem on the appropriate page in IMPACT.

Another child the Monitors identified as having a history of victimization during the on-site file review still did not have information on the sexual victimization history page in IMPACT.  However, a May 2019 Common Application included information indicating that she had made an outcry of sexual abuse involving her younger brother's biological father that DFPS "ruled out." Years later, her younger sister made an outcry involving the same perpetrator, and law enforcement issued a warrant for his arrest.  This information did not appear even as an unconfirmed allegation on the child's IMPACT sexual victimization page.

In perhaps the most disturbing example, the IMPACT record for another child identified during the Monitor's on-site file reviews as a victim of sexual abuse still did not have information included on the sexual victimization history page or the history of trafficking page. However, a Common Application in IMPACT indicated that the youth had admitted to being trafficked as a young teenager (she was 15 years-old when she acknowledged this history), in part, to support a substance abuse problem.  However, the DFPS notes in the Common Application indicated that, because the youth claimed that the "prostitution was done by her own free will and she wasn't forced into it…[,] there is not a suspicion that she is a victim of sex trafficking."

While automating the process for including a history of sexual abuse or aggression may ensure information is more consistently included in a child's Common Application and Placement Summary, it is not clear that, given examples like these, the State is using existing information in the child's case file to update the appropriate IMPACT pages.  If the page is not updated, there is no guarantee that even when information appears in an older Common Application that it will continue to be shared with caregivers.

*Data Review of Sexual Victimization History for Remedial Order Twenty-Four*

Of the sixty-four records reviewed by the monitoring team in the statistically significant sample drawn from the DFPS data, the Monitors confirmed that 97% of the children's records included a positive identification of child sexual victimization in Impact 2.0.[467]  The review identified two children for whom there was no positive indicator flagged. One child without an indicator had "Additional Relevant Information" listed on the IMPACT sexual victimization history page, which documented that an investigation into the child's outcry of sexual abuse resulted in a disposition of Unable to Determine, reportedly due to a lack of sufficient evidence. For the second

---

[467] Using a 90% confidence level with a 10% margin of error, the monitoring team created a random sample of sixty-four children out of the 931 PMC children that DFPS identified as confirmed victims of sexual abuse in the first quarter of 2020.

child whose record was missing the confirmed sex abuse victim indicator, there was no information or narrative on the child's Sexual Victimization History page in IMPACT.[468]

For the sixty-two children who were indicated as confirmed sexual abuse victims by DFPS in IMPACT 2.0 and reviewed by the Monitors, the record documented that the confirmed allegations were all based upon sexual abuse that occurred prior to the child's entrance into foster care that resulted in an RTB disposition by CPI. For most of these children, the record identified the abuser as a family member or someone known to the family. None of the children reviewed in the sample were confirmed as sexual abuse victims through category three of the State's definition of confirmed allegations of sexual abuse—which would be associated with a confirmed allegation due to abuse by another child while in care. As noted in Section III of this report, the Monitors found that one-third of intakes that include allegations of neglectful supervision for PMC children involved reports of sexual contact between at least two children in a GRO or foster home.[469] Where these allegations involve child-on-child sexual contact, DFPS has determined a child should be designated as a "confirmed" victim if the other child is designated as an aggressor during the course of the investigation of the alleged neglectful supervision. Therefore, it is significant that the Monitors' review of data from DFPS identifying children with confirmed allegations of sexual victimization in IMPACT 2.0 included only abuse that occurred prior to entrance into care.

The State categorizes sex trafficking victimization history within a sub-set of children who have confirmed history of sexual victimization under certain circumstances.[470] Due to its inclusion as a subcategory of confirmed sexual abuse allegations for purposes of Remedial Orders Twenty-Three and Twenty-four, the Monitors also reviewed this data to confirm the children identified by DFPS with a confirmed history of sex trafficking victimization. For the fifteen children identified by the State as victims of sex trafficking as of the first quarter of 2020, the Monitors found that 80% (12 of 15)[471] of the children's records included identification of sexual victimization as trafficking victims in Impact 2.0. For three children, the Monitors found no identification or documentation on the child's trafficking or sexual victimization history page despite the identification of those children as victims in the data provided by DFPS for that quarter and the presence of an RTB for exploitation based on sex trafficking.[472] Of the twelve children with documentation of exploitation, nine were identified as victims based on trafficking event/s that occurred prior to the child entering foster care and three were sex trafficked while AWOL in foster care.[473]

---

[468] It appears this child was not marked as a sexual abuse victim due to the child's name being changed at adoption.

[469] *See supra* Section III.(A)(5).

[470] Category two of DFPS's definition of confirmed sexual abuse victim states: Designation as a confirmed sex trafficking victim, per the Human Trafficking page in IMPACT.

[471] One child had two profiles in IMPACT. One profile appropriately designated the child as a sexual abuse victim while the other did not. It appears that the profile that does not designate the child as a sexual abuse victim is the child's primary record, reflecting recent placement history and contacts by caseworker.

[472] One of the three children aged out of DFPS custody in September 2019. The Monitors included this youth in the sample as she signed herself back into care and is currently placed at an RTC.

[473] The Monitors also noted any trends among children the State identified as victims of sex trafficking. The data showed a slight decline in the number of children identified as trafficking victims from the fourth quarter of 2019 (20 victims) to the second quarter of 2020 (15 victims).

3.  Summary

The State has created pages within its IMPACT data system that allow DFPS to record information related to sexual victimization, sexual aggression, or a sexual behavior problem in a child's electronic case record.  The Monitors will continue to assess whether DFPS is able to document and produce data for PMC children in its care who have confirmed allegations of sexual abuse or sexually related behavior and whether those children have a corresponding flag in IMPACT as required by the associated remedial orders.

Remedial Orders Twenty-Four and Thirty require DFPS to document "in each child's records all confirmed allegations" of sexual victimization and abuse involving the child as the aggressor. The Monitors' on-site review of children's files documented that 9% do not include the proper designation in IMPACT.[474]  In addition, a quarter-by-quarter analysis of the identification data do not indicate notable change in the percentage of PMC children the State identified with an IMPACT flag for sexual abuse, aggression, or behavioral problems. Finally, as discussed in Section III, sexual related behaviors between children form the basis of one-third of neglectful supervision allegations for PMC children in care; however, in the Monitors' sample, they did not encounter examples of children whose confirmed allegations were due to child-on-child abuse endured while in care.

C.  Remedial Order Four: Caseworker and Caregiver Training on Child Sexual Abuse

Remedial Order Four directs the State to ensure that the State trains those who interact extensively with PMC children, namely caseworkers and caregivers, to identify and report child sexual abuse, including child-on-child sexual abuse:

Remedial Order Four: *Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

1.  Background

a.  Policy

The Texas Family Code requires the adoption of "standards for persons who investigate suspected child abuse or neglect at the state or local level," which "must provide for a minimum number of hours of annual professional training for interviewers and investigators of suspected child abuse or neglect."[475]  The implementing regulations provide that each such person must receive at least twenty hours of training each year, including information pertaining to abuse and neglect as defined by Texas statute and regulation (which includes sexual abuse) and law-enforcement style-

---

[474] IMPACT records for eleven of these fifty children were later updated by DFPS to include information related to sexual victimization.
[475] TEX. FAMILY CODE § 261.310 (2017).

training regarding the investigative process.[476] The Monitors are unaware of any statutory or regulatory requirement to train specifically on child sexual abuse. Applicable regulations provide that DFPS can offer, require, and fund training, but do not specify any particular topics that have to be included.[477]

DFPS's 2020 Child and Family Services Plan, which is required as a condition of receiving federal funding,[478] nonetheless indicates that DFPS offers a "comprehensive Child Protective Services/Child Protective Investigations (CPS/CPI) training program" for caseworkers in all "major stages of service" including Investigations, Family Based Safety Services, and Conservatorship that "provides staff with values and skills necessary for their roles at each stage of their CPS/CPI career."[479] DFPS also has developed an online training entitled "Recognizing and Reporting Child Sexual Abuse: A Training for Caregivers."[480]

Foster parents are required to complete pre-service training and annual training thereafter.[481] Pre-service training must include training "to recognize and report sexual abuse, including abuse of a child by another child," which must be repeated annually.[482] GRO employees are required to complete pre-service training and annual training thereafter.[483] Pre-service training must include "[m]easures to prevent, identify, treat, and report suspected occurrences of child abuse (including sexual abuse), neglect, and exploitation."[484] GRO employees must also complete annual training that includes several mandatory topics, none of which focus on child sexual abuse.[485] However, annual training may include "supervision and safety practices for children in care."[486]

b.   The Monitors' Data and Information Request and the State's Production

To validate the State's performance with respect to Remedial Order Four, the Monitors requested:

- Due to the Monitors by November 15, 2019 and on a quarterly basis thereafter, provide a list that includes the date of completion of sexual abuse training for all caseworkers and caregivers (including the name and identification number of the caseworkers; and the names, identification numbers, and addresses of the caregivers) assigned to serve children

---

[476] 40 TEX. ADMIN. CODE § 700.519.

[477] *See generally* 40 TEX. ADMIN. CODE §§ 702.601 – 702.621.

[478] CHILDREN'S BUREAU: AN OFFICE OF THE ADMIN. FOR CHILDREN & FAMILIES, *State & Tribal Child and Family Servs. Plan*, *available at* https://www.acf.hhs.gov/cb/programs/state-tribal-cfsp.

[479], THE STATE OF TEXAS, *Child & Fam. Servs. Plan Final Report Fiscal Years 2015-2019 & Child & Fam. Serv. Plan Fiscal Years 2020-2024* at §7(iv)*, available at* https://www.dfps.state.tx.us/About_DFPS/Title_IV-B_State_Plan/2015-2019_State_Plan/Target_Plans_Training_Plan_Part_I.pdf (visited May 19, 2020).

[480] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Recognizing and Reporting Child Sexual Abuse for Caregivers Training* (Nov. 15, 2019), *available at* http://www.dfps.state.tx.us/Training/Child_Sexual_Abuse_for_Caregivers/index.html (last updated 2019).

[481] 26 TEX. ADMIN. CODE § 749.863 (pre-service training); 26 TEX. ADMIN. CODE § 749.931 (annual training).

[482] *Child Protective Services Handbook*, §§ 7330, 7521

[483] 26 TEX. ADMIN. CODE § 748.863 (pre-service training); 26 TEX. ADMIN. CODE § 748.931 (annual training).

[484] *Id.* at § 748.881.

[485] *Id.* at § 749.931.

[486] *Id.* at § 748.943.

in the PMC class as of September 30, 2019. For quarterly reporting beginning with February 15, 2020 report, include all caseworkers and caregivers assigned to serve children in the preceding period. Consistent with the Court's order, training is required to include information about how to recognize and report sexual abuse training, including child-on-child abuse. For ongoing quarterly reporting, provide a list that includes the date of completion of sexual abuse training for all caseworkers and caregivers (including the name and identification number of the caseworkers; and the names, identification numbers and addresses of the caregivers) assigned to serve children in the PMC class as of the last date of the quarter.[487]

- Provide a copy of current sexual abuse training materials referenced above and, if changes or updates are made, provide updated materials on a quarterly basis thereafter.

c.  DFPS Data and Information Production for Caseworker and Caregiver Sexual Abuse Training

In response to the Monitors' data and information request related to Remedial Order Four, DFPS initially stated:

> "Sexual abuse policy, training requirement[s] and training materials have been developed. Considering DFPS policies and practices are consistent with the

---

[487] The Monitors requested inclusion of the name and identification number of the caseworkers; and the names, identification numbers, and addresses of the caregivers for the first report and regular quarterly reporting. Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request); *see also* Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors). In response to the October 18, 2019 proposal provided by DFPS in response to the Monitors' Data and Information Request, the Monitors stated:

> With respect to Remedial Orders 4 and 32 (Sexual Abuse Training), discussed on page 7 of the DFPS Proposal, the monitors have carefully reviewed the email from Tara Olah dated October 25, 2019, on behalf of DFPS proposing to provide the monitors with "attestations from operations serving PMC children, certifying that their caregivers serving PMC children have received the mandated training. In addition, operations will provide quarterly reports to DFPS that include the following data for caregivers serving PMC children: date caregiver completed Sexual Abuse training; caregiver name; caregiver ID number; and caregiver address. DFPS will aggregate these quarterly reports and submit them to the monitors. The first quarterly report will be submitted to the monitors by December 1, 2019." The monitors request that the operation attestations list all of the names of caregivers serving PMC children who completed the mandated training, and all of the names of the caregivers serving PMC children who did not complete the mandated training as of the date of attestation.

*Id.*

Court's order, DFPS proposes to produce the initial report and separately will request that supervision over these orders be terminated."[488]

The agency, as of May 31, 2020, has not sought termination of Court supervision.

As to caseworker training, DFPS indicated that it would provide a list of all CVS caseworkers who completed a computer-based training on recognizing and documenting problematic sexual behavior and sexual abuse, including child-on-child sexual abuse with the caseworker's name and identification number.[489] During this reporting period, DFPS then provided two semi-quarterly files in response to the Monitors' request for a list with the date of completion of sexual abuse training by all caseworkers assigned to serve children in the PMC class (on November 15, 2019 and February 17, 2020, respectively). The files were entitled "CVS Caseworker CSA Training as of 11-7-9" and "CVS Caseworker completion of Sex Abuse Training Q1 FY 20," respectively.

The Monitors originally understood that these files contained the dates of completion for sex abuse training associated with Remedial Order Four as requested by the Monitors.[490] After analyzing the information and the training curricula provided by DFPS, the Monitors sought confirmation about the training dates provided by the State. DFPS then clarified that it had provided completion dates for computer-based Child Sexual Aggression Training, which is only one component of the training required pursuant to Remedial Order Four.[491]   Although the Monitors requested from the State on September 30, 2019 a list with the dates of completion of sexual abuse training for all caseworkers and caregivers assigned to serve children in the PMC class, DFPS did not inform the Monitors until April 30, 2020, that it intended to rely on the training it provided new caseworkers hired prior to November 2015 to satisfy Remedial Order

---

[488] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS Information and Data Request Proposal, in response to Monitors' Sept. 30, 2019 Data & Information Request).

[489] *Id.*

[490] In the data file produced November 15, 2019 (which does not include a data dictionary), the spreadsheet notes: "NOTE: Date Course Taken represents the most recent time, through November 7, 2019, in which the employee completed one of the CSA courses. If the employee completed both courses, the later date will be given. A blank in this column indicates that the employee has no record of having completed either course." In the data file produced February 17, 2020, the data dictionary defines "Date Course Taken" as "The most recent date that the employee completed one of the sexual abuse training courses. If the employee completed more than one course, the later date is given."

[491] DFPS indicated that the training dates included are for either a course entitled Child Sexual Aggression – Course #0003632; or a subsequent updated version entitled Child Sexual Aggression FY19 – Course #0003805. Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Megan Annitto, Monitoring Team (Apr. 6, 2020, 18:11 EST) (on file with the Monitors) (including response to Questions about RO 4 Caseworker Files); Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Megan Annitto (Apr. 30, 2020, 12:44 EST) (on file with the Monitors) (including DFPS Response to Questions about RO 4 Caseworker Files). Both caseworker data files include all DFPS caseworkers, which includes those serving children in PMC but does not distinguish them separately. *See* RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 -96402 (Nov. 15, 2019) (on file with the Monitors); RO.4 CVS Caseworker completion of Sex Abuse Training Q1 FY20 – 2-17-20 – 96784 (Feb. 17, 2020) (on file with the Monitors).

Four. The State indicated that its new caseworker training requires completion of two separate courses, which covered the required training.

All CVS caseworkers are required to complete the computer-based Child Sexual Aggression training course about which DFPS reported in its production files. DFPS reported that, depending upon when caseworkers are hired, they also complete a separate course about child sexual abuse: caseworkers hired after November 2015 receive training during CPD, entitled Child Protective Services Professional Development Core Competencies Training for Sexual Abuse; and caseworkers hired prior to November 15, 2015, according to DFPS, received training on recognizing and reporting child sexual abuse during BSD.[492] DFPS has not produced data to support that all of its caseworkers completed sexual abuse training contained in the CPD and BSD curricula.

In response to the Monitors' request related to caregiver training information, DFPS informed the Monitors in correspondence on October 18, 2019 that the "CSA CBT [computer-based training] for agency CPA and GRO caregivers is on the DFPS public website and DFPS has no way to track completion."[493] DFPS reported that it planned to direct "agency CPA and GRO providers to ensure licensed caregivers are trained, which DFPS monitors through routine contract monitoring activities."[494] Therefore, the agency cannot independently track whether all caregivers have completed child sexual abuse training.

As an alternative, DFPS stated that it directed the operations serving PMC children to ensure licensed caregivers are trained and report to the State on whether caregivers completed the training; the State produced the operations' reports quarterly to the Monitors.[495] As a result of the State's inability to provide the aggregate information requested by the Monitors, the Monitors cannot determine whether all DFPS caregivers are listed in the materials the State produced; and the Monitors cannot confirm whether  all caregivers serving PMC children have completed child sexual abuse training.

DFPS divided its reporting on caregiver child sexual abuse training completion into three separate categories. All categories of files were produced first on November 15, 2019 and again on February 18, 2020 and are described below.

---

[492] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Megan Annitto, Monitoring Team (Apr. 30, 2020, 12:44 EST) (on file with the Monitors) (including DFPS Response to Questions about RO 4 Caseworker Files).
[493] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).
[494] *Id.*
[495] *Id.*

In November, the State produced an electronic folder labeled "CPA Certifications and Compliance Spreadsheets," which includes 273 separate files of attestations.[496] About half of the files provided are certifications for an individual agency, wherein the contractor certifies that: child sexual abuse training is required for caregivers; a copy of the training certificate documenting completion of child sexual abuse training will remain in each caregiver's file; the training is required on an annual basis; and certifying that all applicable persons have completed the training unless otherwise noted in the agency's "Recognizing and Reporting Child Sexual Abuse Training Report." The other half of the files are logs of caregivers and training completion dates from each individual agency. DFPS produced a file log listing 135 individual agencies' names that provided attestations.[497] There is not an aggregate report listing each caregiver by name and child sexual abuse training completion date.

The State produced an electronic folder labeled "CPS as a CPA Certifications and Compliance Spreadsheets." The folder includes ten separate certification forms by region, as defined by DFPS.[498] The State also provided a spreadsheet that lists caregivers, completion dates, and other information in twelve tabs divided by regions; representing approximately 705 foster homes in all regions.[499]

The State produced an electronic folder labeled "GRO Compliance Spreadsheets" which includes 415 separate files of attestations from individual GROs. About half of the files are certifications for each GRO and half are the logs of caregivers with their child sexual abuse training completion dates for each GRO. Finally, the State provided a spreadsheet that lists the names and contract number or procurement number for 234 GROs that provided attestations which reflected caregivers completed child sexual abuse training.[500] The Monitors reviewed and analyzed all of the information, but cannot validate that these logs and attestations reflect all or most caregivers.

In the second reporting cycle in February 2020, DFPS again provided to the Monitors files from various operations and facilities attesting that caregivers at the facilities completed child sexual abuse training as described above. DFPS did not produce an aggregate report listing all caregivers and their child sexual abuse training completion date.  DFPS provided 138 attestation files from various operations in a folder entitled, "CPA Compliance Spreadsheets;" two spreadsheets for

---

[496] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *CPA Certifications and Compliance* (Nov. 15, 2019) (on file with the Monitors).

[497] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *September 2019 Reporting Period CPA Caregiver Training Log 11 15 19* (Nov. 15, 2019) (on file with the Monitors).

[498] Regions One and Two are combined into one certification statement, as are Regions Nine and Ten. The Certification Statement, signed by each agency's administrator, certifies that the administrator understands caregiver training is required; all foster parents must complete it; a copy of the training certificate documenting completion must kept in the family's file; the training is required on an annual basis by all applicable caregivers; and certifying that the above statements are true and correct to the best of the administrator's knowledge and all applicable persons have completed the training unless otherwise noted in the agency's Recognizing and Reporting Child Sexual Abuse Training Report.

[499] While there are only ten regions, Regions Six-A and Six-B are reported on separate tabs within the spreadsheet, bringing the total number of tabs on the spreadsheet to eleven.

[500] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *September 2019 Reporting Period GRO Caregiver Training log 11 15 19* (Nov. 15, 2019) (on file with the Monitors).

CPA Sexual Abuse Caregiver training; and 168 attestation files from various operations in a folder entitled "GRO Compliance Spreadsheets."

Finally, in response to the Monitors' request for all course materials related to child sexual abuse training in association with Remedial Order Four, on November 15, 2019 DFPS produced course materials for Child Sexual Aggression training, comprised of four modules; Child Protective Services Professional Development Core Competencies Training for Sexual Abuse; and Recognizing and Reporting Child Sexual Abuse for Caregivers Training.[501] DFPS later produced, on April 30, 2020, the BSD training materials that were used for caseworkers hired prior to November, 2015 in response to the Monitors request for clarification about its compliance plan for Remedial Order Four.[502]

### 2.   Remedial Order Four: Caseworker and Caregiver Sexual Abuse Training Performance Validation

#### a.   Caseworker Training

##### i.   Methodology

The methodology for validation of Remedial Order Four on caseworker training included data analysis and caseworker interviews. Due to the gap in training data described above, the Monitors cannot validate that all caseworkers completed the full child sexual abuse training required by Remedial Order Four. Therefore, the Monitors analyzed the data files produced by the State as to Child Sexual Aggression training to analyze that portion of performance associated with the Court's Order on caseworker child sexual abuse training completion. In addition, the Monitors completed independent verification of the data through interviews with caseworkers to verify completion of sexual abuse training. The Monitors subsequently cross-matched the child sexual aggression training completion date(s) the worker provided in the interview with the data file produced by the State with child sexual aggression training dates.[503]

---

[501] Child Sexual Aggression Training Modules (1) Categories of Sexual Behavior; (2) Child with Sexually Aggressive Behavior Entering Conservatorship; (3) CPS Actions When There is a Residential Child Care Investigation; and (4) Child Sexual Aggression Discovered in an Investigation of a Kinship Placement; and Child Protective Services Professional Development Core Competencies Training for Sexual Abuse.

[502] DFPS provided six files of BSD Sexual Abuse Training materials used for caseworker general sexual abuse training from 2010 to 2015. TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *BSD Sexual Abuse Training* (on file with the Monitors).

[503] The Monitors interviewed seventy-five of 1,418 DFPS caseworkers.  The Monitors randomly selected the CVS caseworkers. All caseworkers reported they completed child sexual aggression training. Out of the seventy-five caseworkers interviewed, fifty-two out of fifty-three caseworkers (98%) who were required to complete both CPD training and child sexual aggression training reported completing both trainings. Four of the child sexual aggression training completion dates out of the fifty-five (7.3%) provided by the workers during interviews did not align with the data reporting completion dates. One worker's child sexual aggression training completion date listed in the data report was August 21, 2019, but the worker reported August 19, 2019 as their training completion date. Three other workers had child sexual aggression training dates listed in the data report in 2016 and 2017, but in interviews reported more recent training completion dates in February, 2020, which is after the most recent point-in-time data

ii.  Caseworker Training Performance Validation Results

Based upon information from DFPS, the Monitors understand that completion of sexual abuse training includes completion of either the CPD Core Competencies Training for Sexual Abuse or relevant training under BSD, depending upon when a caseworker was hired; and four modules of Child Sexual Aggression computer-based training.[504] The State did not provide comprehensive data for all CVS caseworkers with respect to the BSD or CPD components. From the data provided, the Monitors determined that as of November 7, 2019, there were 2,151 individual caseworkers active on September 30, 2019; of those workers, 98.5% (2,119) completed the four modules of child sexual aggression computer-based training. For the thirty-two caseworkers (1.5%) who did not complete any of the child sexual aggression training modules, the State did not provide additional information.[505]

DFPS also reported that as of November 30, 2019, 98.9% (2,174) of all 2,207 caseworkers had completed the four modules of child sexual aggression training; thirty-three caseworkers lacked an associated completion date.[506]

b.  Caregiver Child Sexual Abuse Training

The State provided more than 1,000 separate data files from its various operations attesting that caregivers completed child sexual abuse training.[507] The State did not produce an aggregate report showing all its caregivers completed child sexual abuse training and the date of completion. Because of the format of the data produced, the Monitors are unable to verify that all caregivers have completed child sexual abuse training.

i.  Caregiver Training Validation Methodology

The methodology for validation of Remedial Order Four as to caregiver training included caregiver field verification. The Monitors completed independent verification activities through

---

report the State provided to the Monitors associated with Remedial Order Four; therefore, the Monitors cannot confirm if the completion date reported by the workers in interviews is accurate.

[504] Completion of either (1) Child Sexual Aggression – Course #0003632 or (2) Child Sexual Aggression FY19 – Course #0003805.

[505] Tex. Dep't of Family & Protective Servs., *RO 4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 -96402* (Nov. 15, 2019) (on file with the Monitors).

[506] Tex. Dep't of Family & Protective Servs., *RO .4 CVS Caseworker completion of Sex Abuse Training Q1 FY20 – 2-17-20 – 96784* (Feb. 17, 2020) (on file with the Monitors). The reasons provided by DFPS were that the individual was: (1) Still in training as of November 30, 2019 (twenty-four caseworkers); (2) Took training as a stipend student. When stipend students are hired as caseworkers, they get a new employee ID. The employee ID listed is their caseworker ID which is why the training is not associated with that ID (six caseworkers); (3) completed course on January 24, 2020 (one caseworker); (4) Left agency after November 30, 2019 (one caseworker); (5) Left the agency (one caseworker).

[507] The State provided 1007 separate data files.

site visits to operations. The Monitors assessed training completion for 288 caregivers through twenty-three site visits, which included employee file reviews.[508] The caregiver training was considered complete if the certification was contained in the employee file.

ii.  Caregiver Interview and File Review Validation Results

Between October 14, 2019 and February 26, 2020, the monitoring team conducted file reviews for 288 caregivers located at twenty-three cottage home campuses (nineteen sites) and four Group Residential Operations. Out of 288 caregivers, 86% (249) had completed the training.

A breakdown by venue is provided below.

*Cottage Homes*

For cottage homes, 85% of caregivers had completed the training. The monitoring team's visits to the cottage homes were conducted from October 14, 2019 to November 3, 2019. The Monitors and their staff visited nineteen cottage home campuses.[509] During those visits, the Monitors reviewed the files of 205 employees to verify completion of Recognizing and Reporting Child Sexual Abuse for Caregivers training.[510] Of the 205 cottage homes' employee file reviews, 85% contained a certification of child sexual abuse training completion. For the remaining 15% (thirty employees), there was no certification of child sexual abuse training completion in their employee file.[511]

*Group Residential Operations*

Hector Garza Group Residential Treatment Center

Between December 1, 2019 and December 5, 2019, the Monitors conducted a site visit at Hector Garza Treatment Center in San Antonio and reviewed seventeen employee files for verification of child sexual abuse training completion. Of the seventeen employees, 59% or ten employee files contained certification for child sexual abuse training completion.[512]

---

[508] The Monitors also interviewed certain employees during each visit; however, reporting is based upon file review and certification.

[509] *See Monitors' Supplemental Update*, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (Nov. 18, 2019), ECF No. 740, at 7-8 (listing the specific cottage homes where the Monitors conducted site visits).

[510] The Monitors conducted 205 employee file reviews and 120 interviews with caregivers at the cottage home site visits. For each caregiver interviewed at the cottage homes, the employee file was also reviewed.

[511] One caregiver who was interviewed was not aware of completing child sexual abuse training, but when the Monitors reviewed the caregiver's employee file, certification of child sexual abuse training completion was discovered.

[512] Compliance with RO4 was validated by file review only at Hector Garza.

St. Jude's Ranch for Children

Between January 27, 2020 and January 29, 2020, the Monitors conducted a site visit at St. Jude's Ranch for Children in Bulverde. The Monitors reviewed a random sample of twenty-four employee files. All twenty-four employee files or 100%, contained certification for child sexual abuse training completion.[513]

A Fresh Start Treatment Center

Between February 18 and February 20, 2020, the Monitors conducted a site visit at A Fresh Start Treatment Center. The Monitors reviewed a random sample of twenty employee files and 95% or nineteen files contained certification for child sexual abuse training completion.[514]

Prairie Harbor Residential Treatment Center

Between February 23 and February 26, 2020, the Monitors completed a site visit at Prairie Harbor Residential Treatment Center. The Monitors reviewed a random sample of twenty-two employee files. Of the twenty-two employee file reviews, 95% or twenty-one files contained certification for child sexual abuse training completion.[515]

c.   Summary of Caseworker and Caregiver Training Performance Validation

The State implemented the child sexual abuse training requirement from Remedial Order Four by providing a Child Sexual Aggression course and a pre-service training for new caseworkers. With respect to the Child Sexual Aggression component of the required training, 98.5% of caseworkers active on September 30, 2019 and 98.9% of caseworkers active on November 30, 2019 completed the training.  As of April 30, 2020, DFPS had not provided completion dates for pre-service child sexual abuse trainings for all of its caseworkers serving PMC children.  The Monitors therefore cannot validate that all caseworkers completed the full child sexual abuse training required by Remedial Order Four.

The State does not maintain a list of all caregivers serving DFPS children or their training completion, and, therefore, the Monitors cannot validate that all caregivers completed the full child sexual abuse training required by Remedial Order Four.  During the Monitors' site visits to twenty-three campuses across twenty-one operations between October 14, 2019 and February 26,

---

[513] Compliance with RO4 was validated by file review only at St. Jude's Ranch.

[514] The Monitors also interviewed five caregivers at a Fresh Start Treatment Center who were required to complete the child sexual abuse training. Four out of the five caregivers interviewed responded affirmatively when asked if they completed child sexual abuse training. One caregiver did not know whether they had completed child sexual abuse training.

[515] The Monitors also interviewed thirteen caregivers at Prairie Harbor RTC. Of the thirteen caregivers interviewed, six said they did not complete child sexual abuse training or did not know whether they had completed child sexual abuse training.

2020, the monitoring team assessed sexual abuse training completion by reviewing the files for 288 caregivers and confirmed that 249 caregiver files (86%) contained certifications for completion of child sexual abuse training.

D.  Remedial Orders Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Nine & Thirty-One: Caregiver Notification

Three remedial orders speak directly to caregiver notification of child sexual aggression or victimization:

> Remedial Order Twenty-Five*: Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

> Remedial Order Twenty-Seven: *Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

> Remedial Order Thirty-One: *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

Two additional remedial orders speak to caregiver notification indirectly, by requiring the State to document child sexual aggression or victimization in forms DFPS policy mandates staff to provide to caregivers before or upon a child's placement:

> Remedial Order Twenty-Six: *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application.*

> Remedial Order Twenty-Nine: *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form and common application.*

1.  Background

a.  DFPS Policy

Though the Monitors are not aware of a DFPS policy that directs caregiver notification upon identification of a child as a victim of sexual abuse, the Child Sexual Aggression Resource Guide includes directions related to caregiver notification for children identified as sexually aggressive. According to the Resource Guide, once a child is identified as sexually aggressive, the program administrator must notify the following people of the decision and the rationale:

- Removal worker;
- Removal Supervisor;
- CVS program director;
- CVS supervisor;
- CVS Caseworker;
- SSCC staff member (if applicable). [516]

After notifying the people listed above, when a child has already been placed and the placement is not aware of the child's sexual aggression, the Guide requires the removal worker to "IMMEDIATELY notif[y] the placement about the child's behavior" (emphasis in original) and to document the notification in IMPACT.[517]  The protocol outlined in the Guide also requires the removal supervisor to ensure that a staffing contact is entered in IMPACT by the removal worker, indicating that the placement was notified.[518]  In addition, if the child has not been placed, the Resource Guide requires the removal caseworker to update the child's application for placement (Common Application and Placement Summary prior to submitting documentation to the Centralized Placement Unit or Residential Treatment Placement Coordinator. [519]

The Common Application and the Placement Summary serve similar purposes: they are forms that DFPS uses to transmit information about a foster child's history to placements and caregivers. DFPS policy requires the Common Application to be given to providers "at or before placement."[520]  The form describes the purpose of the application for placement is "to provide information to the placement team and prospective caregivers about a child" and directs that it is used "when the child is in need of a placement."[521]  The form directs the caseworker to fill it out, attach any documentation, and send it to the Regional Placement Team.[522] It includes the following information about the child: [523]

- Trauma History (including sexual abuse);
- Trafficking History;
- Health Care Summary;
- Substance Use or Abuse;
- Youth who are Pregnant or Parenting;
- Risk Behavior;
- Sexualized Behavior;

---

[516] *Child Sexual Aggression Resource Guide*, at 10.
[517] *Id*. at 11.
[518] *Id*.
[519] *Id*. at 10.
[520] TEX. DEP'T. OF FAMILY & PROTECTIVE SERVS., *24-Hour Residential Child Care Requirements* § 1510 at 19 (2020), *available at*
https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf.
[521] TEX. DEP'T FAMILY & PROTECTIVE SERVS., Common Application K-902-2087 (Jan. 2020), available at https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/forms.asp.
[522] *Id*.
[523] *Id*.

- Education;
- Preparation for Adult Living;
- Juvenile Justice Involvement;
- Family History; and
- Placement History.

While DFPS intends the Common Application to be given to a prospective placement prior to the placement, the Placement Summary is to be given upon placement. The Placement Summary form is used "to transfer information from one caregiver to another."[524] According to the CPS Handbook, the Placement Summary must be completed before a child or youth can be moved from a placement, in order to "document[t] what the current caregiver knows about the child."[525] The handbook specifies that the caseworker should discuss this form with the new placement when the child is placed.[526] The caseworker and caregiver are required to sign the form to acknowledge that they have discussed it, and the new caregiver must be provided with a copy.[527]

b.  State's Initial Report to the Monitors

In the agency's report to the Monitors on September 9, 2019, DFPS indicated the agency was in the process of updating IMPACT to include all information related to sexual aggression and victimization history on a single page, and that "[t]his page will be printable and will be a required attachment to the placement summary form."[528]

DFPS further indicated that the agency would perform a case read to determine if the Common Application and Placement Summary were being updated. DFPS said:

> CPS is developing a Survey Monkey case reading tool to enable staff to monitor, evaluate and report on the Department's compliance with various components of the District Court's child sexual aggression and sexual victimization orders. The first quarterly case read report should be available in November 2019. Case readers will evaluate whether the State:
>
> - documented all confirmed allegations of sexual abuse (in which the child is the victim or aggressor), in the child's records, in accordance with policy;
> - apprised caregivers of confirmed allegations of sexual abuse (in which the child is victim or aggressor) at each present and subsequent placement;
> - documented all information about sexual abuse (child sexual aggression and sexual victimization) in the child's placement summary form and common application; and

---

[524] Tex. Dep't of Family & Protective Servs., *Placement Summary*, *available at* https://www.dfps.state.tx.us/site_map/forms.asp.

[525] *Child Protective Services Handbook* § 4121.3.

[526] *Id*. at § 4133.

[527] *Id*.

[528] Tex. Dep't of Family & Protective Servs., *M.D. v Abbott Monitoring Status Update* (Sept. 9, 2019) (on file with the Monitors).

- selected the appropriate "sexual abuse," "child sexual aggression," and "sexual behavior problem" IMPACT profile characteristic options."

c.  Monitors' First Data and Information Request

In an effort to assess whether the State notified caregivers of confirmed allegations of sexual aggression and victimization, the Monitors requested the following information related to direct and indirect caregiver notification:

- <u>Remedial Orders Twenty-Five and Twenty-Seven</u>:  For the period July 31 to September 30, 2019, and quarterly thereafter, provide a list of all placements for every child identified as a sexual abuse victim.  Include the child's identification number; date of birth; the child's current placement; placement type; provider identification number; date of placements; removal date; date the profile characteristic option was selected; the date all placements during the quarter commenced; the date the placement caregivers were notified of confirmed allegations of sexual abuse involving the PMC child; and whether all of the child's placement summary forms and common applications for placement during the period included all information about the child's sexual abuse.

- <u>Remedial Orders Twenty-Nine and Thirty-One</u>: For the period July 31, 2019 to September 30, 2019, and quarterly thereafter, provide a list of all placements for every child identified with sexual aggression and/or a sexual behavior problem.  Include the child's identification number; date of birth; the child's current placement; placement type; provider identification number; date of placement; removal date; date the profile characteristic option was selected; the date all placements during the quarter commenced; and the date the placement caregivers were notified of confirmed allegations of sexual abuse involving the PMC child as the aggressor.

d.  State's Production for First Data and Information Request

In the agency's October 18, 2019 response to the Monitors' request for data related to these remedial orders, DFPS indicated that the State would provide the information as part of the quarterly data listing all children in the class, and it would also provide the caretaker notification information to the Monitors via the results of a case read:

> The list of children (and placements)…will be included in the PMC list provided in response to the remedial order (see page 1 of this document).  A separate case read report will include the date on which caregivers were notified of confirmed allegations of sexual abuse involving the PMC child as the aggressor and whether the child's placement summary form and common application

included information about the child's sexual aggression or sexual behavior problem.[529]

### iii. The Court's Order of November 5, 2019

On October 18, 2019, the Plaintiffs filed a Motion to Show Cause asking the Court to direct the State to show cause why Defendants should not be held in contempt for failing to timely comply with the Court's orders related to workload studies for caseworkers and investigators, and Remedial Order A Seven (discussed below) related to Twenty-Four-Hour awake night supervision for licensed placements housing more than six children. Plaintiffs later supplemented their motion to include the State's failure to implement an option to designate a child as sexually abused in the child's electronic case record.[530] On November 5, 2019, the Court held a hearing on the Motion to Show Cause filed by Plaintiffs.

After the hearing, the Court ordered:

> DFPS shall provide the Monitors with a complete list of identified sexually aggressive PMC children and identified PMC sexually abused children with a corresponding list of each assigned caregiver. Further, DFPS shall verify to the Monitors that each caregiver has been notified of this status.[531]

In response, the State certified that it notified caregivers of all children with a finding of Reason to Believe for sexual abuse or sex trafficking as a victim or perpetrator and of any child or youth who had a characteristic of child sexual aggression.[532] The State certified that it contacted caregivers between November 6, 2019 and November 8, 2019.

On November 8, 2019, DFPS provided the Monitors with certification regarding the caregiver notification that included, by region, the caregiver notified, the child for whom notification was given, the location of the child at the time of the notification, and the caseworker providing the notification. In addition to the certification data, the State provided copies of the procedures and emails developed for the notification including expected deadlines and recommended language.[533]

---

[529] Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Deborah Fowler and Kevin Ryan, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).

[530] Suppl. Pls.' Mot. to Show Cause, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (Nov. 1, 2019), ECF 710, at 1.

[531] Am. Order, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (Nov. 6, 2019), ECF 718, at 1.

[532] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Deborah Fowler and Kevin Ryan, Monitors (Nov. 8, 2019, 16:59 PM CST) (on file with the Monitors).

[533] *Id.* (attached as Excel Spreadsheet to e-mail).

e.    The Monitors' Second Data and Information Request

In the Monitors' data and information request dated February 21, 2020, the Monitors sought clarification related to the data that the State could provide on an ongoing basis for direct caregiver notification. The Monitors first noted that the data provided in response to the Court's November 5, 2019 order was the point in time data for children in PMC as of the end of the fourth quarter of fiscal year 2019 (August 31, 2019).  The Monitors also noted to the State, "Files provided for caregiver notification do not include the date the person was contacted, how they were contacted, the role of the person contacted or for what type of behavior/victimization (notification for sexual victimization and sexual aggression combined in a single file)."[534]

The State responded:

> The date on which caregivers were notified of confirmed allegations of sexual abuse is based on new IMPACT functionality, and we can include that information as part of the quarterly PMC child listings once the data warehouse tables with the new data have been built and are functional.
>
> Whether the child's placement summary form and common application included information about the child's sexual abuse is provided in the quarterly child sexual history case read report. How the caregiver was contacted, the role of the person contacted and for what type of behavior/victimization are data elements that have not heretofore been requested and are not tracked/capable of being reported on.

The Monitors requested clarification from DFPS on April 17, 2020, regarding the State's ability to retrieve information related to caregiver notification into data reports.

The State responded:[535]

> We remain on schedule to begin reporting on the date Attachment A was provided to the child's caregiver(s) in Quarter 3. One clarification – the reportable IMPACT data field only captures the date Attachment A was provided to the child's new caregiver(s) at placement change, as this data field is tied to placement and is only populated during a placement change (it is located on a Placement

---

[534] Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y General, Office of Att'y Gen. of Tex. (Feb. 21, 2020, 17:54 CST) (on file with the Monitors) (including Monitors' Feb. 21, 2020 Data & Information Request).

[535] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Megan Annitto, Monitoring Team (Apr. 21, 2020 22:43 EST) (on file with the Monitors) (including DFPS response to questions regarding its ability to retrieve information related to caregiver's notification into data reports).

page caseworkers only access/document in at placement change). At present, we do not have the ability to report on the date Attachment A was provided to the caregiver during an open placement. For children already in/remaining in their placement at the time a new incident occurs or is reported, caregiver notification is provided based on CPS' notification policy, and a new Attachment A is provided to the caregiver and uploaded into OneCase. However, there is not a specific contact that identifies that Attachment A was provided. Notwithstanding, if the child is staying in the same placement, the caregiver would be aware of the incident, would be part of the investigation, and most likely would be the one who reported it. If the caregiver was the perpetrator, the child would be moved and the information would be included in the Attachment A provided to the child's next caregiver and documented on the Placement page.

On April 24, 2020, the DFPS confirmed that information included in the sexual victimization and the sexual aggression pages in IMPACT pre-populates the Common Application and Attachment A to the Placement Summary.

2. Remedial Orders Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Nine & Thirty-One Performance Validation

a. Methodology

i. Direct Caregiver Notification: Remedial Orders Twenty-Five, Twenty-Seven, & Thirty-One

The Monitors used several different methods to determine compliance with the remedial orders directing immediate caregiver notification:

- A cross-match of data provided by the State: The Monitors cross-matched data the State provided for PMC children with a sexual aggression or victimization flag with data provided for the caregiver notification the Court ordered on November 5, 2019.

- On-site interviews: In order to determine if the State shared appropriate information, the Monitors included questions related to caregiver notification in program administrator and caregiver interview tools used during site visits.

- The inclusion of questions on one of two case reads: The Monitors included questions testing for caregiver notification on an independent case review for children who the State identified as having a history of sexual victimization or with an indicator for aggression, but no placement change immediately following identification.

ii. Indirect Caregiver Notification: Remedial Orders Twenty-Six & Twenty-Nine

For Remedial Orders Twenty-Six and Twenty-Nine, requiring inclusion of information related to child sexual aggression or victimization in the Placement Summary and Common Application, the Monitors analyzed compliance by:

- A review of the State's case reads: The State conducts quarterly case reads to determine compliance with these remedial orders. The Monitors reviewed the first two case reads the State submitted and analyzed their methodology.

- Conducting case reads: The Monitors conducted an independent case review to determine whether IMPACT included an updated Common Application and Placement Summary (Attachment A) for a sample of children the State identified as having either a history of sexual victimization or with an indicator for sexual aggression.

- On-site interviews: The interview tools the Monitors used during on-site visits included questions for program administrators related to the State's provision of the Placement Summary and Common Application for children placed in their care.

- On-site review of children's files: The Monitors conducted on-site child file reviews to determine whether the file included an updated Common Application and Placement Summary for the child.

b. Results of Performance Validation

i. Direct Caregiver Notification: Remedial Orders Twenty-Five, Twenty-Seven & Thirty-One

*Cross-match of data*

As of May 31, 2020, the only datasets the Monitors received and could use to verify compliance with the direct caregiver notification orders are the data the State produced on November 8, 2019 certifying that the Department notified caregivers pursuant to the Court's November 5, 2019 order. The Monitors cross-matched this data with data the State produced for PMC children who had a flag for sexual aggression or as a victim of sexual abuse. The Monitors' analysis compared the listing of PMC children included in the caregiver notification data to the data the State produced for PMC children with a sexual characteristic flag at the end of the fourth quarter of fiscal year 2019 and the beginning of the first quarter of fiscal year 2020 (August 2019 through November 2019).

The Monitors cross-match of the data showed the following:

- Of the 11,442 children in PMC from August 2019 through November 2019, 1,025 (9%) had a sexual characteristic flag that required caregiver notification.

233

- Of these 1,025 children, 972 matched to the list for caregiver notification data, leaving fifty-three children (5%) with sexual characteristic flags that were not also on the caregiver notification list.

- Of the 972 children whose names appeared on both lists, the State notified caregivers for 918 (89.5% of the 1,025 children with sexual characteristic flags), leaving another fifty-four for whom the State did not provide notification.

**Figure 30: Children in PMC August to November 2019 and Number Matching to Direct Caregiver Notification Data**



Of the fifty-four children with flags who were also on the caregiver notification list, but for whom a notification was not made, the two most common reasons cited by the State were that the child had run away or had been adopted.

**Table 27: Reasons Provided by the State for Not Notifying Direct Caregiver**

| Reason Given for Not Notifying Caregiver | Number Reason | Percent Reason |
|---|---|---|
| Runaway | 16 | 29% |
| Adopted | 11 | 20% |
| No longer in care | 7 | 13% |
| Dismissed | 3 | 5% |

| | | |
|---|---|---|
| Trial Independence | 3 | 5% |
| Case closed | 2 | 4% |
| No reason given | 2 | 4% |
| Unauthorized | 2 | 4% |
| Monitored return | 1 | 2% |
| Caregiver not reached | 1 | 2% |
| Child watch | 1 | 2% |
| Deceased | 1 | 2% |
| SIL | 1 | 2% |
| TYC | 1 | 2% |
| Inappropriately marked | 1 | 2% |
| Independent living | 1 | 2% |
| **Total** | **54** | **100%** |

*On-Site Interviews with Program Administrators and Caregivers*

Visits to placements by the Monitors included interviews with both staff and children. The Monitors interviewed direct caregivers and program administrators. The Monitors asked all direct caregivers interviewed at each campus if they were notified when a child in their care had a history of sexual aggression or sexual victimization.

The Monitors added questions directly related to caregiver notification to the tool for interviews with program administrators in January of 2020, prior to the visits to St. Jude's, A Fresh Start, and Prairie Harbor.[536] In the five interviews of program administrators on these three campuses, all of the program administrators indicated that, if they are notified of a child's history of sexual abuse or aggression, they notify direct caregivers of the child's history. When asked how they notify staff, two (40% of five) indicated that they notify them verbally, one (20% of five) indicated they provide written notification to direct caregivers, and two (40% of five) indicated they provide notification via a child's safety plan.

Visits to placements included 155 interviews with direct caregivers who answered questions related to notification of sexual abuse or sexual aggression history. Of these, eighty-eight (approximately 57%) indicated that they are notified if a child is identified as sexually aggressive and seventy-seven (approximately 50%) indicated that they are notified if child is a victim of sexual abuse. For both sexual abuse and sexual aggression history, the majority of direct caregivers indicated that they were verbally notified.

---

[536] These questions were added based on conversations between the monitoring team and program administrators while conducting field work, who often complained of the quality of information received regarding a child's history prior to placement.

The Monitors expanded the interview tools to include questions for caregivers to answer whether they were *currently* supervising a child identified as having a history of sexual abuse or aggression. Of those who answered, seven out of eighteen (approximately 39%) said they were supervising a child with a history of sexual aggression, and thirteen out of twenty-seven (48%) said they were supervising a child who had a history of sexual abuse. More than a quarter (26%) of caregivers indicated that they did not know whether they were supervising a child who was a victim of sexual abuse.

*The Monitors' Case Read*

As discussed in the analysis of the State's performance for Remedial Orders Twenty-Four and Thirty above, the Monitors accessed IMPACT records for children identified during file reviews at on-site visits as having a history of sexual abuse or aggression to determine whether the State updated their IMPACT records to include this information following the Monitors' visit. This review showed the State had updated records for eleven children.

Of these eleven children, IMPACT or OneCase showed caregiver notification for only five. The State changed the placement for six of the eleven children, and the State included the date of the caregiver notification in IMPACT on the placement page for five of these six. The State did not change the placement for five children with an updated IMPACT record, and OneCase included a record indicating that the State notified the caregiver in that placement of the updated sexual abuse history.

During their review assessing IMPACT information updates, the Monitors discovered that for the most part, when caregiver notification was lacking the child had not experienced a placement change. Thus, the Monitors added a second case read to assess caregiver notification in the records of the 215 children for whom the State updated information related to sexual victimization or aggression to IMPACT but did not make a placement change for those children during that period.[537]

Of the 215 (of 513) PMC children included in the Monitors' second case read, the State identified 203 as having a history of sexual victimization and twelve as having a history of sexual aggression.[538] Of the 203 children identified as having a history of sexual victimization, the State included information on the history of sexual victimization page in IMPACT for 191. Of these 191 PMC children, the Monitors verified caregiver notification for only forty-eight (25%).[539]

---

[537] This is the same case read discussed for Remedial Orders Twenty-Four and Thirty and Remedial Orders Twenty-Six and Twenty-Nine.

[538] Very few children with an indicator for sexual aggression qualified for the case read as children without a placement change.

[539] The State indicated the date the Department staff provided Attachment A of the Placement Summary to the caregiver for forty-seven of the forty-eight children in the "placement discussion" page in IMPACT. For the remaining child, Department staff uploaded Attachment A to OneCase to document caregiver notification.

For the twelve children included in the case read for whom the State provided updated information related to a history of sexual aggression in IMPACT but did not provide a placement change, the Monitors located caregiver notification dates for two (17%) in the "placement discussion" page.

ii.  Indirect Caregiver Notification: Remedial Orders Twenty-Six and Twenty-Nine

*DFPS Case Reads*

The Monitors reviewed three DFPS case reviews produced by the State for this report. The first involved a limited case read of files for thirty-one children and was produced to the Monitors on December 2, 2019.[540] DFPS provided results for the second case read of 231 PMC children's IMPACT records to the Monitors on February 3, 2020.[541] DFPS also provided the results for a third case read of 399 PMC children's IMPACT records to the Monitors on May 1, 2020.[542]  The State conducted the first two case reads for the first quarter of fiscal year 2020, before it completed the IMPACT modifications discussed above. The State conducted the third case read for the second quarter of fiscal year 2020, after the IMPACT modifications were functional.

This section of this report discusses only the results from the second and third case reads because the State selected such a small sample size for the first case read conducted to validate compliance with the Remedial Order.[543]  The State performed these case reads on a sample of cases that included children who entered PMC or experienced a placement change during the month of the review and whose case file included either a history of sexual aggression, a Reason to Believe finding for sexual abuse or sex trafficking as a victim or an alleged perpetrator, or for whom DFPS policy assigned a removal reason of sexual abuse or sex trafficking risk.[544]

By limiting the samples to children who entered PMC or experienced a placement change during the month of the review, DFPS could not capture information for children whose caregivers should have been notified of newly discovered sexual abuse or aggression but whose placement

---

[540] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Child Sexual History Case Review Results Report: Partial Read for Quarter 1 – Federal Fiscal Year 2020* (Dec. 12, 2019) (on file with the Monitors).

[541] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Child Sexual History Case Review Results Second Case Read for Quarter 1; October and November 2019– Federal Fiscal Year 2020* (Feb. 3, 2020) (on file with the Monitors). Though the State indicated the sample consisted of 231 cases, the questions related to the common application include 123 victims of abuse, and 52 aggressors or sexual behavior problems.  The placement summary notification questions include 140 victims, and 57 aggressors/sexual behavior problems.  The placement summary completeness questions include 65 victims, and 29 aggressors/sexual behavior problems.

[542] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Child Sexual History Case Review Results Third Case Read for Quarter 2 – Federal Fiscal Year 2020* (May 1, 2020) (on file with the Monitors).  Though the State indicated the sample consisted of 399 cases, the questions related to the common application include 201 victims of abuse, and 106 aggressors or sexual behavioral problem.  The placement summary notification questions include 232 victims, and 111 aggressors/sexual behavior problems.  The placement summary completeness questions include 124 victims and 106 aggressors/sexual behavior problems.

[543] The first case read included only thirty-one children in the sample.

[544] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS*., Child Sexual History Case Review Results Report: Partial Read for Quarter 1 – Federal Fiscal Year 2020* (Dec. 12, 2019) (on file with the Monitors).

did not change.  While these case reviews may serve to indicate whether the State updates the Common Application and Placement Summary with the appropriate sexual abuse or aggression history prior to a making a change in a child's placement, they do not provide an accurate assessment of comprehensive caregiver notification.

*Results for the State's Second Case Read*

The State's second case read revealed that the Common Application contained "all known information" in only eighty-five of the 123 files reviewed (69%) for children the State determined to have a history of sexual victimization.[545]   In another seventeen cases (14%), the Common Application included "some but not all" of the information,[546] and twenty-one cases (17%) did not contain the pertinent information in the Common Application.[547]

The State's second case read results were better for children with a history of sexual aggression or a sexual behavior problem.  In forty-five of the fifty-two cases reviewed (86%), DFPS reported that the Common Application contained "all known information" regarding the child's history of sexual aggression or sexual behavior problem.[548] In another four cases (8%), the Common Application included "some but not all" of this information,[549] and in three cases (6%) none of the information was included.[550]

The State's second case read revealed that it was less likely to include information in the Placement Summary related to sexual victimization, aggression, or behavior problem.[551]   The case review indicated that DFPS included "all known information" related to the child's history of sexual victimization in the Placement Summary in only thirty-seven of sixty-five cases reviewed (57%).  Another fifteen cases (23%) included "some but not all" of the information, and thirteen cases (20%) contained none of the information.[552]  DFPS confirmed that seventeen of twenty-nine case reviews (59%) for children with a history of sexual aggression or sexual behavior problems included "all known information" in the Placement Summary.[553]  The case read indicated that four cases (14%) included "some but not all" of the known information related

---

[545] Tex. Dep't of Family & Protective Servs., *Child Sexual History Case Review Results Second Case Read for Quarter 1; October and November 2019 – Federal Fiscal Year 2020*, at 1-2 (Feb. 3, 2020) (on file with the Monitors).
[546] *Id.* (describing this as cases in which "the Quality Assurance Specialist identified other relevant information in the child's case record that was not incorporated").
[547] *Id.* at 2.
[548] *Id*.
[549] *Id*. (demonstrating that since IMPACT updates were added in April 2019, so that information on the child sexual aggression page prepopulates the Common Application, there is some indication of the gaps that occur even after the process is automated)
[550] *Id.*
[551] *Id*. at 3.  The Monitors' staff had great difficulty finding a Placement Summary for *any* of the case reads they conducted.  It is unclear whether DFPS relied on IMPACT for finding this information, or whether the information was in an external file for the child.  The instructions for DFPS staff conducting the case reads included a note that information regarding the Placement Summary "can be found in the case file or through verification from the caregiver directly."  *Id.*
[552] *Id.* at 4.
[553] *Id*. at 6.

238

to history of sexual aggression or a behavior problem, and in eight cases (27%), the Placement Summary did not include any of the information.[554]

The DFPS case reads also attempt to determine if Department staff provided the Placement Summary to the caregiver.  Reviewers test for this "either by seeing the copy of the signed Placement Summary…or by speaking with the caregiver in a joint call with the caseworker during which the caregiver confirms he or she received the child's [Placement Summary] and was aware of the child's…history."[555]  Based on the  Placement Summary caregiver notification verification methods, the State could not appropriately verify it provided  histories of child sexual abuse in seventy-five of 140 cases (54%).[556]  In addition, reviewers could not verify that Department staff provided the Placement Summary to the caregiver in twenty-nine of fifty-seven cases (51%) for children with a history of sexual aggression or sexual behavior problem.[557]

The case read summaries do not break out results based on which method of confirmation the reviewer relied on; validating this information via a joint call with the caseworker and caregiver calls into question the accuracy of the results.

It is also worth noting that DFPS did not take the next step in analyzing the answers for the Placement Summary by examining the sexual victimization information alongside the Placement Summary contents.  The results indicate that the State provided caregivers a history of sexual victimization in the Placement Summary for sixty-five children, but only thirty-seven Placement Summaries contained complete information related to the child's history of sexual abuse. Similarly, the State's review reported that caregivers received a copy of the Placement Summary reflecting a child's history of sexual aggression or sexual behavior problem in twenty-eight case reviews, but only seventeen Placement Summaries included all known information about the a child's related information.[558]   The Monitors cannot confirm that the State provided comprehensive pertinent information about a child's sexual aggression or sexual behavior problem through analysis of the Department's notice delivery and confirmation method.

*The State's Third Case Read Results*

---

[554] *Id*.

[555] *Id*. at 3.

[556] *Id*.

[557] *Id*. at 5.

[558] *Id*. The State indicates that in most of the cases in which they were not able to verify the caregiver received the Placement Summary, they were notified of the child's history through other methods.  The case read indicates this was verified by speaking with caregivers, reviewing documentation signed by caregivers, or reviewing monthly narratives in IMPACT.  The "other notification methods" that the reviewers identified were: caregiver being told verbally, caregiver receiving another form that included the information, or the caregiver receiving the Common Application.  In discussing these alternate methods for determining caregiver notification, the State indicates that if the caregiver had not received any notice, the reviewer "worked with the caseworker to provide the caregivers with updated information" to the caregiver.  This shows the problems associated with relying on these documents as the primary method for caregiver notification. *Id.*

The State reported it improved caregiver notification rates for children with a history of sexual victimization in its third case read. This case read indicated that the State included "all known information" in the Common Application related to histories of sexual victimization for 176 of the 201 children sample (88%).[559] "Some but not all" of the information was included in another eighteen (9%), and in seven (3%) of the cases reviewed, the Common Application did not include any of the information.

For children included in the case read who had a history of sexual aggression (106), "all known information" was included in the Common Application in ninety-one cases (86%), according to DFPS. "Some but not all" information was included in the Common Application in another eleven (10%), and four cases (4%) did not include any information. DFPS concluded its results also improved for information found in the Placement Summaries reviewed. In ninety-six of 124 cases (77%) reviewed by DFPS for children who were victims of sexual abuse, the Placement Summary included "all known information." In twenty-two cases (18%), DFPS said the Placement Summary contained "some but not all" information, and in six cases (5%), the agency reported the Placement Summary did not contain any information related to the child's victimization. For children with a history of sexual aggression or a sexual behavior problem, in ninety-one of 106 cases reviewed (86%), the Placement Summary contained "all known information." In eleven cases (10%), the Placement Summary contained "some but not all" information, and in four cases (4%), it did not contain any information about the child's history of aggression or a sexual behavior problem.

The DFPS reviewers showed results similar to the second case read when testing for whether the Placement Summary was provided to caregivers. Reviewers could not confirm that the Placement Summary was given to caregivers in 108 out of 232 cases (47%) in which the child had a history of sexual victimization. DFPS's reviewers could not confirm the caregiver received the Placement Summary for children having a history of sexual aggression or a sexual behavior problem in fifty-two out of 111 cases reviewed (47%).

Reading the results of DFPS's internal case reads together, the Placement Summary was provided to caregivers for children with a history of victimization in 124 cases but included "all known information" in ninety-six. Similarly, the Placement Summary contained all information for children with a history of sexual aggression in ninety-one cases, but it was provided to caregivers in only fifty-nine.

*The Monitors' Case Reads*

The Monitors' staff conducted two independent case reads to assess the State's performance. The first case read was conducted for a random sample of 161 PMC children with a sexual victimization or sexual aggression flag included in the data provided by the State for the first

---

[559] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Child Sexual History Case Review Results Third Case Read for Quarter 2 – Federal Fiscal Year 2020* (May 1, 2020) (on file with the Monitors).

quarter of fiscal year 2020. This case read included only children who had a change of placement during the first quarter, similar to the State's case read, except that it did not also include children who had entered PMC during the quarter. The second case read was conducted for a random sample in the first quarter of fiscal year 2020 of 215 PMC children who <u>did not</u> have a placement change.

*Children with a Placement Change*

The Monitors' first case read for direct and indirect caregiver notification included a review of records for 125 of 228 children with a sexual victimization flag, (including eight who had both sexual victimization and sexual aggression flags), and forty-four children who had a history of sexual aggression. Of the 125 children who were identified by the State as having a history of sexual victimization, the Monitors determined 106 had an up-to-date Common Application in their IMPACT electronic records.  Four had no Common Application in their record, and fifteen had an outdated Common Application in their record.

Of the 106 children with an up-to-date Common Application in IMPACT, seventy-nine included information about the child's history of sexual abuse.[560] Of the children with an outdated Common Application in IMPACT, thirteen included some information about a child's history of sexual abuse.  In total, of the 125 children included in the case read with a history of sexual victimization, ninety-two (74%) had a Common Application in IMPACT that included some information related to the child's history of sexual abuse; twenty-nine (23%) had a Common Application that did not have any information included, and four (3%) did not have a Common Application in IMPACT.

**Figure 31: Common Application in IMPACT with Children's History of Sexual Victimization**

---

[560] The Monitors did not test, as the State did, for whether the Common Application had "all known" or "some but not all" information in the Common Application.  The Monitors will add this assessment for the next report to the Court.



As was true of the State's case reads, results were better for children identified by the State as having a history of sexual aggression.[561]  Of the forty-four children included in the case read, all had a Common Application in IMPACT: forty-two had up-to-date Common Applications, and two had outdated Common Applications.  Of the forty-two children with an up-to-date Common Application in IMPACT, forty-one included information about their history of sexual aggression in the form and one did not include any information related to the child's history of aggression. Both of the outdated Common Applications included information about the child's history of sexual aggression.  In total, of the forty-four children included in the case read who had a history of sexual aggression, forty-three (98%) had a Common Application in IMPACT that included information about the child's history of sexual aggression.

The Monitors rarely found a Placement Summary in IMPACT, or any information indicating that the Placement Summary had been provided to the child's placement.  For 125 children flagged on the State's list for a history of sexual abuse, the monitoring team found a Placement Summary in only three (2%) of the IMPACT records reviewed.  The monitoring team found a Placement Summary in IMPACT for only one (2%) of forty-four children with a history of sexual aggression.

_Children Without a Placement Change_

In order to determine whether caregivers are being notified when a child is identified as having a history of aggression or victimization and the child's placement does not change, the Monitors

---

[561] The difference between results for victims and aggressors may be explained by the State's automated process that pre-populates the Common Application (and now "Attachment A" of the Placement Summary).  This was functional for children with a history of sexual aggression beginning in April 2019, but was not yet functional for identified victims for the sample of children included in this case read.

and their staff conducted a second case read of 215 (of 513) PMC children's records: twelve children whose IMPACT records were updated to include a sexual aggression flag while still in a placement,[562] and 203 children whose IMPACT records were updated to include a history of sexual victimization but whose placement had not changed.

Of the 203 children who were identified by the State as having a history of sexual victimization, 114 (56%) had a Common Application in their IMPACT electronic records that corresponded to the placement the child was in at the time they were identified.  Of these 114 children, the files for ninety-five (83%) included some information about the child's history of sexual abuse, and nineteen (17%) did not include any information related to sexual abuse. For eighty-nine children (44%), no Common Application was found corresponding to the placement they were in at the time that they were identified. Coupled with the nineteen children whose Common Application was in IMPACT but did not include the information, the Monitors identified 108 children (53%) whose caregivers at the point of identification may not have had information related to the child's history of victimization.

Of the ninety-five children with a Common Application in IMPACT that included information related to their history of sexual abuse, eighty-two children were confirmed victims; for four children (4%) the information in the Common Application indicated the child was a suspected victim.  For nine children the monitor's staff could not determine whether the child was a confirmed or suspected victim.

Results were worse for children identified by the State as having a history of sexual aggression. Of the twelve children included in the Monitors' case read, eight (67%) had a Common Application in IMPACT that corresponded to the placement they were in at the point of identification.  Of these eight children, only two (25%) included some information about their history of sexual aggression in the form.  Thus, ten of the twelve (83%) children's caregivers at the point of identification may not have had notice of the child's history of sexual aggression.

In some of these cases, the failure to include the information in the Common Application related to the child's sexual aggression was surprising: for example, one child had been moved into the placement after having completed sex offender treatment for engaging in sexually aggressive behavior with siblings.  Also of concern, for children who had been moved into a psychiatric hospital, notes in IMPACT indicate that the Common Application and Placement Summary were not provided because "placement paperwork is not required prior to being admitted to a hospital." Yet for one of these children, the flag for sexual aggression had been added because of inappropriate behavior between the child and another patient in a previous psychiatric hospitalization.

DFPS reported a mass notification of caregivers, as ordered by the Court on November 5, 2019. The Monitors conducted a match of the children in the case read sample to the caregiver

---

[562] The sample was small because there are fewer children with a history of sexual aggression and they change placements more often.

notification data and found that 79% (169 of 215) had a record of caregiver notification. This illustrates the problems associated with caregiver notification for children without a placement change, where the State's primary method of notification relies on paperwork provided upon a change in placement.  It also reveals a gap for children admitted to psychiatric hospitals, which do not require submission of a Common Application or Placement Summary prior to or upon admission.

*On-Site Child File Reviews*

Ensuring the information is included in the Common Application and Placement Summary is of no consequence if that information is not then actually provided to the child's placement.  During on-site reviews of PMC children's files, the Monitors documented whether they found the Common Application and Placement Summary in the child's file.  As discussed above, 272 files for PMC children were reviewed in twenty-three placements: 145 files for children in Cottage Homes and 127 files for children in another type of GRO, three of which were RTCs.

Overall, 218 of the 272 files reviewed (80%) included a copy of the Common Application. However, there were dramatic differences between the files reviewed for children in cottage homes and the other types of GROs visited later.  During visits to Cottage Homes, the Common Application was found in ninety-eight of 145 (67%) of the files reviewed; however, in other GROs visited, the Common Application was found in 120 of 127 files reviewed (94%).

In addition, these forms were often quite dated: the mean "age" of the Common Applications that were found in the files was 758 days for Cottage Homes and 277 days for other GROs.  Though this in part reflects how long the child had been in the placement, in many instances the Common Application was dated well in advance of the child's placement, calling into question whether these forms are being updated prior to each placement.  Of all 218 files reviewed that included a Common Application, 133 (61%) were dated within a month of the child's placement.  Seventy-two of the 218 files (33%) were completed more than a month prior to the child's placement.

Across all GRO types visited, the monitoring team found the Placement Summary less often.  A copy of the Placement Summary was found in ninety-three of all 272 files (34%) reviewed.[563] The files for children in Cottage Homes included a Placement Summary in forty-eight of 145 files reviewed (33%), compared to forty-five of 127 files reviewed (35%) in the other GROs.

Finding both the Common Application and Placement Summary in a file was atypical: only seventy-five of all children's files reviewed (28%) included both documents; thirty-six files (13%) included neither the Common Application nor the Placement Summary. Again, this was more common for Cottage Homes: of the 145 files reviewed for children in Cottage Homes, thirty-

---

[563] Three of the survey tools used to document information during file reviews were missing information related to the placement summary.

three (23%) did not contain either document, compared to three of 127 (2%) child files reviewed in other GROs.

During each visit, the list of PMC children residing in the facility was cross-checked with the lists of PMC children identified by the State as having either a history of sexual abuse or sexual aggression.   These children's files were reviewed for any information related to their history of aggression or victimization.

Two children who had a flag for sexual aggression and twenty-six children with a flag for a history of sexual abuse were living at one of the placements visited by the Monitors.  Of the two children with a sexual aggression flag, the Monitors found information related to the child's sexual aggression in the file for only one child.  The file for the other child, who was in one of the Cottage Homes visited, did not include either a Common Application or Placement Summary.  Of the twenty-six children with a flag for a history of sexual abuse, the Monitors found information related to their history of sexual abuse in the file for nineteen children (73%).

Summary

Each method of validating performance for the Remedial Orders related to caregiver notification revealed gaps in notification. The cross-match of data for the mass notification undertaken by the State in response to the Court's November 5, 2019 order showed 5% (53 of 1025) of children identified who did not match to the list of caregivers notified.

Gaps in notification exist between CPS and Program Administrators, and between Program Administrators and direct care staff.  While Program Administrators interviewed by the Monitors during unannounced visits indicated that they alert direct caregivers on their staff when they receive notification from the State that a child is a victim of sexual abuse or is identified with an indicator for sexual aggression, only 57% of direct caregivers interviewed indicated that they received notice when a child had been identified as sexually aggressive, and 50% indicated they received notice when a child had been identified as having a history of sexual abuse.  This suggests that the information may not make it to the direct care staff who are engaged in protecting children's safety on a daily basis.

A gap in notification exists for children identified in IMPACT records as having a history of abuse or aggression, but whose placement does not change.  The State uses the Common Application and Placement Summary Attachment A as the primary method of notifying caregivers.  However, these forms are generated only when children move to a new placement.  When a child is identified without their placement changing, notification does not always appear to take place. In addition, the Monitors review of case records in IMPACT revealed that these forms are not provided to psychiatric hospitals when children are admitted for care, because these settings are not considered placements.

Even for children who have a change in placement after being identified, information about their history of sexual abuse or sexual aggression is not always added to the Common Application and Placement Summary (or Attachment A).   Additionally, the Monitors' on-site reviews of

children's files revealed that, quite often, one or both of these forms are missing from a child's file altogether, even for children who appear on the list generated by the State of children with a history of sexual aggression or victimization.

The State implemented the child sexual abuse training requirement from Remedial Order Four by providing a Child Sexual Aggression course and a pre-service training for new caseworkers. With respect to the Child Sexual Aggression component of the required training, 98.5% of caseworkers active on September 30, 2019 and 98.9% of caseworkers active on November 30, 2019 completed the training.  As of April 30, 2020, DFPS had not provided completion dates for pre-service child sexual abuse trainings for all of its caseworkers serving PMC children.  The Monitors therefore cannot validate that all caseworkers completed the full child sexual abuse training required by Remedial Order Four. (Remedial Four)

The State does not maintain a list of all caregivers serving DFPS children or their training completion, and, therefore, the Monitors cannot validate that all caregivers completed the full child sexual abuse training required by Remedial Order Four.  During the Monitors' site visits to twenty-five campuses across twenty-one operations between October 14, 2019 and February 26, 2020, the monitoring team assessed sexual abuse training completion by reviewing the files for 288 caregivers and confirmed that 249 caregiver files (86%) contained certifications for completion of child sexual abuse training. (Remedial Order Four)

E.  Remedial Orders A-Seven and A-Eight: Awake-Night Supervision

Remedial Order A-Seven: *The Defendants shall immediately cease placing PMC children housing more than 6 children, inclusive of all foster, biological, and adoptive children, in licensed foster care (LFC) placements that lack continuous 24-hour awaken-night supervision.  The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

Remedial Order A-Eight: *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.*

1.  Background

a.  DFPS and HHSC Policy

As discussed in detail in the Court Monitors' Update to the Court on Remedial Orders A-Seven and A-Eight, filed November 4, 2019, neither DFPS nor HHSC required licensed placements housing more than six children to provide 24-hour continuous supervision prior to the Fifth

Circuit's opinion validating these remedial orders.[564] On July 31, 2019 (the date that the Fifth Circuit's mandate was issued) DFPS modified its agreements with SSCCs and its own child-specific contracts with residential providers to require facilities housing more than six children to provide Twenty-Four-Hour awake-night supervision.[565] On September 1, 2019, the agency issued Addendum #6 to their General Residential Operations requiring the provision of 24-Hour Continuous Supervision.[566] These contractual modifications and amendments also required providers to immediately report any instances of non-compliance to the agency.[567]

b.   The State's Initial Report to the Monitors Regarding Compliance

In their September 9, 2019 report the Monitors, the State reported the following:

> DFPS has achieved substantial compliance with Order #7. In July 2019, the DFPS Contracts division directed, through a unilateral contract amendment, that all applicable contractors, SSCC subcontractors, and DFPS applicants for residential care contract immediately comply with the 24-hour awake supervision requirements and certify their compliance.  The Contract division is verifying contractors' compliance by reviewing all supervision policies and procedures, providing technical assistance as needed, requiring contactors to immediately self-report any episodes of non-compliance, and verifying ongoing compliance through regular contract monitoring procedures. The Contracts division will provide quarterly update and verification reports to the Monitors, which will include a combination of providers self-reporting episodes of noncompliance and non-compliance identified through standard contract monitoring activities.

c.   Monitor's Data and Information Request

In the September 30, 2019 data and information request, the Monitors requested the following:

---

[564] *Monitors' Update to the Court on Remedial Orders A7 and A8*, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (Nov. 4, 2019), ECF No. 711.

[565] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Single Source Continuum Contract, Exhibit D: Change Log Version 4.0* (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Unilateral Contract Amendment for Child Specific Contracts* (on file with the Monitors).

[566] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Addenda to Open Enrollment HHS0000158 for General Residential Operations*, Addenda 6, Item 11, 1-33, 10 (Sept. 1, 2019), *available at* https://apps.hhs.texas.gov/PCS/HHS0000158/.(last visited May 26, 2020),

[567] *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *24-Hour Residential Child Care Requirements –Residential Contracts (RCC)* § 1115, *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/4000-inspections#4141. (last visited May 26, 2020)

- Provide a current list of all licensed placements housing more than 6 children, including all foster, biological, and adoptive children as of September 30, 2019, due November 1, 2019, and quarterly thereafter.  Identify the placements by name; identification number; county; address and responsible agency.
- Provide a detailed update and verification concerning the State's provision of continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children by November 1, 2019 and on a quarterly basis thereafter.  Identify the dates the 24-hour awake-night plans were implemented for each placement.  Identify all reports that an LFC placement is out of compliance, the date of the report, and who made the report.
- Provide a certification to the Court through the Monitors that the State is providing continuous 24-hour awake-night supervision in the operation of all LFC placements that house more than 6 children, inclusive of all foster, biological and adoptive placements.
- Provide a list of any placements that have discharged children to avoid providing 24-hour awaken-night supervision per the Court's remedial order, including any reasons cited for discharging children other than compliance.

*The Court's November 7, 2019 Contempt Order*

As discussed above, on November 5, 2019 the Court held a show-cause hearing related to the State's compliance with the remedial orders requiring awake-night supervision.  The Court found the State in contempt and ordered:[568]

> Defendants must send agency staff during the overnight hours, unannounced to all licensed placements required to have 24-hour awake-night supervision to witness, document, and certify that the placement is in compliance with the Court's remedial order. Such certification must include a detailed description of:

1. The name of the placement;
2. The address of the placement;
3. The placement identification number;
4. The total population on the date of the visit, including any caregivers' biological and adoptive children, and any private placement children;
5. The names and number of PMC children in the placement on the date of the visit;
6. A detailed description of how the awake-night supervision is being provided, including the number of staff providing awake-night supervision and how many children each night staff person is responsible for supervising;
7. The names, titles, and contact information of placement staff and caregivers interviewed.[569]

In response, as discussed more fully in the Monitors' Supplemental Update to the Court filed November 18, 2019, the State provided 215 certifications for GROs and eleven certifications for

---

[568] *M.D. ex rel. Stukenberg v. Abbott*, 418 F. Supp. 3d 169, 180-81 (S.D. Tex. 2019).
[569] *Id.*

foster family homes.  One Cottage Home campus – Boles Children's Home – initially refused to provide Twenty-Four-Hour awake-night supervision and indicated that, if the operation was required to provide awake-night supervision, it would discharge two PMC youth living on the campus. The Court scheduled a hearing on November 19, 2019 to address Boles Children's Home's refusal to comply with the order.

In the Monitors' Supplemental Update to the Court on Remedial Orders A-Seven and A-Eight,[570] the Monitors noted that certifications appeared to be missing for some facilities that DFPS had identified as facilities housing six or more children. The Monitors signaled in the Supplemental Update that they would follow up to assess whether the State provided certifications for all placements required by the Court's order to have awake-night supervision.[571]

*The Court's February 21, 2020 Order*

During a telephonic hearing on February 21, 2020, the Court discussed the Monitors' recent unannounced night-time visit to an RTC during which the staff in one of the houses on the campus did not answer the door for approximately fifteen minutes. That, and witness accounts from children at the facility, led the Monitors to believe the awake-night staff person was sleeping. As a result, the Court issued an order requiring the State to submit to the Court, from July 31, 2019 through February 21, 2020, the following information:

- The full names of each and every DFPS employee who visited each relevant facility;
- The dates of these employee visits;
- The specific place of visits of these employees;
- The specific hour of the day when the employees visited;
- The length of each employee visit; and
- The full names of each and every facility staff member identified as an awake night supervisor.

The Court required the State to submit the information no later than February 26, 2020.

Consequently, the State sent an e-mail to the Monitors on February 26, 2020 that included links to SharePoint files containing the certifications.  In that e-mail, the State also asserted:

> Since November 2019, DFPS has conducted monthly unannounced overnight visits to LFC placements for which awake-night supervision of children and youth in PMC is required.  During December 2019 and January 2020, DFPS staff visited all LFC placements required to have awake-night supervision.  For a majority of LFC placements visited in December 2019 and January

---

[570] *Monitors' Supplemental Update*, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-00084 (Nov. 18, 2019), ECF 740, at 8.

[571] *Id*. at 5.

2020, DFPS staff immediately verified that the facilities had awake night supervision. As a result, during February 2020, DFPS staff conducted targeted overnight visits of facilities that appeared to require technical assistance or other support to comply with the Court's order. Recently, DFPS hired additional staff dedicated to conducting ongoing monitoring of LFC placements to ensure 24-hour awake-night supervision; these staff will begin conducting overnight visits in March 2020.[572]

On March 23, 2020, and again on April 29, 2020, the Monitors emailed the State asking for policies for twenty-six placements that DFPS had not yet provided, or an explanation for why they were not required to have a policy. Similarly, on April 29, 2020, the Monitors asked DFPS about certifications for thirty-one placements that the State had not yet provided or an explanation as to why certification was unnecessary.

The State responded, providing an additional sixteen policies and ten certifications. Of the remaining policies that the State did not provide, DFPS indicated:

- Three placements were closed or inactive;
- Three were placements that DFPS does not contract with;
- One policy was provided in September 2019 under a different name;
- One placement had surrendered its license;
- One placement did not have a PMC child in its care.

Of the remaining certifications that the State did not provide, DFPS indicated:

- Eight placements had not had a PMC child in their care since November 2019;
- Five placements were closed or inactive;
- Three placements had only TMC children in their care;
- Three placements were visited by DFPS in March and April, but the certifications had not yet been provided to the Monitors because they are provided quarterly.
- Two placements did not have any PMC children residing in them.

In a follow up email on May 12, 2020, the agency provided two additional policies and information on two other placements indicating no PMC children had been placed at these locations since November 2019.[573] The agency also informed the Monitors that the practice of verifying awake policies is "no longer our focus."[574] "Since November 2019, DFPS has verified

---

[572] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (Feb. 26, 2020, 11:35 CST) (pertaining to Awake Night Certifications)

[573] Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler, Monitor (May 12, 2020, 15:35 CST) (pertaining to Awake Night Certifications).

[574] *Id.*

awake night supervision by conducting monthly unannounced overnight visits to contracted LFC placement for which awake-night supervision of children and youth in PMC is required."[575]

2.  Remedial Orders A-Seven and A-Eight Performance Validation

a.  Methodology

The Monitors used several methods to verify the State's compliance with these remedial orders, including:

- <u>A review of awake-night policies</u>: The Monitors reviewed awake-night policies to determine whether, in keeping with Remedial Order A7, the policies were "designed to alleviate unreasonable risk of harm."

- <u>A review of the certifications and self-reports of violations provided by the State</u>: The Monitors cross-matched the certification with the list of placements with six or more children with at least one PMC child.  The Monitors also reviewed the certifications and placements' self-reports of violations.

- <u>A review of self-reports of non-compliance</u>: The Monitors reviewed self-reports of non-compliance made by placements to DFPS to determine whether the State subsequently certified their compliance.

- <u>Unannounced night-time visits to four GROs to verify awake-night supervision</u>: After the Court's November 5, 2019 hearing, the Monitors added a night-time unannounced visit to on-site monitoring and created a tool to capture information during the night-time monitoring visit.

b.  Results of Performance Validation

i.  Review of Awake-Night Policies

Remedial Order A-Seven specifies, "The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm."  The Monitors reviewed and compared the awake-night policies provided by the State to determine whether they were sufficient to protect children from unreasonable risk of harm. The Monitors reviewed over 220 awake-night policy documents; some polices covered operations with multiple campuses, some duplicate policies were provided, and some were for locations which had closed or had not served a PMC child since November 2019.

Policy content varied in specificity.  Some were very detailed, while others simply stated that operations provided awake-night supervision without further explanation.  Some operations

---

[575] *Id.*

outline their policy over several pages and include information about where awake-night staff are positioned, how often rooms are checked, and what information is required to be documented during room checks. However, others simply state, in a single sentence, that it is the operation's policy to provide Twenty-Four-Hour awake-night supervision, without including any information about how supervision is provided.

While 95% of the policies for 188 operations reviewed indicated that awake-night staff would be on-site,[576] 123 (65%) of the policies associated with these operations reviewed required awake staff to conduct room checks, and 20% (37 of 188) specified where staff would be positioned to ensure appropriate supervision. Placements that reported using regular room checks as part of their awake-night supervision varied in the frequency with which checks were to be made:

- Every 15 minutes:   53%
- Every 30 minutes:   12%
- Every 10 minutes:   5%
- Every hour:         5%
- Every 20 minutes:   3%

Of the 123 operations that require room checks, 41% (51 of 123) indicated in their policies that documentation of those checks would be kept.

Forty-two (22%) of the 188 operations' policies reviewed included some form of electronic monitoring. Policies incorporating electronic monitoring reported several different types of monitoring, including alarms, audio, video, and motion detectors. Most policies incorporated more than one of these. While ten (24% of 42) of these policies included only alarms, and sixteen (38% of 42) relied on video or audio/video, eleven (26% of 42) used alarms in conjunction with audio/video, and/or motion detectors.[577]

ii.  Review of Certifications Provided by the State

The Monitors reviewed the first set of certifications provided by the State in November 2019 for the Supplemental Update filed with the Court on November 18, 2019. Since then, DFPS has provided the Monitors with certifications for ongoing unannounced awake-night visits to placements housing six or more children (in which at least one PMC child resided) for the months of December 2019, and January and February 2020. As of May 1, 2020, DFPS provided documentation for 172 visits in December, 80 visits in January, and 29 visits in February. Some placements were visited during these three months more than once:

**Table 28:  Number of Months Placement was Visited at Least Once by DFPS During the Months of December, January, and/or February**

---

[576] Six Cottage Home policies indicated capacity would not exceed 6 children.
[577] Four policies indicated the use of electronic monitoring but provided no detail.

| Number of Months with a Visit | Number of Placements | Percent of Placements |
|---|---|---|
| 0 Months | 19 | 10.1% |
| 1 Month | 91 | 48.4% |
| 2 Months | 63 | 33.5% |
| 3 Months | 15 | 8.0% |
| **Total** | **188** | **100.0%** |

Of the nineteen placements that did not receive a late-night visit during these months, all but one either had a visit in November or had no PMC youth during this time period.

DFPS also provided documentation of late-night visits to foster family homes housing more than six youth (formerly Foster Group Homes), with six certifications for December, one in January, and five for February. The certifications discussed, here, are the 293 December, January, and February certifications for the GROs and these foster family homes.

The Monitors' review of the GRO certifications revealed several concerns.

- Six certifications indicating that DFPS staff suspected the facility awake-night staff had been sleeping or appeared drowsy when DFPS staff arrived.
- Four certifications indicating DFPS staff observed or were advised that awake-night staff left their assigned unit, leaving the children unsupervised.
- Certifications that included notations indicating staff were working overtime, with some staff reporting they had been awake all day; in one instance, the staff admitted to dozing off at night.
- At least five certifications documenting the inability of DFPS staff to gain access, resulting in a return trip.

The Monitors' review of the certifications also revealed concerns related to the quality of supervision, including:

- At least two certifications documenting failure to comply with the required staff-to-youth ratio.
- Certifications indicating staff had not documented room checks as required by the facility's awake-night policy, and one instance in which the staff had pre-populated the room check document for the night.
- Documentation of instances in which awake-night staff are present in the facility but do not conduct frequent room checks (one example involved room checks every two hours), or do not conduct *any* room checks during the night.
- Six certifications noting facility staff did not have a listing of the children they were supervising and, in some of these cases, could not name the children they were assigned to supervise.

253

- Notes for a visit to one placement indicating that the alarm on the door of a child with a history of sexual aggression was not working and that the awake-night staff checked rooms only three times each night.
- 13 certifications documented PMC children who were supposed to be in the facility visited were on runaway status at the time of the visit.

Another problem revealed by the certifications: in ninety-one certifications (31%), DFPS staff noted the census sheet that DFPS brought to the visit did not accurately reflect the children who were currently in the facility, including thirteen times in subsequent visits to the same facility. In some, children were on the DFPS list but were not present at the placement. In others, PMC children who were not on the DFPS list were in the placement. Some certification notes indicated that DFPS and the facility could not account for the difference or determine the location of children that were not present, despite the DFPS census indicating they should be. For example:

- In one placement visited,[578] DFPS had seven PMC children on their census list for the visit. Of those seven, two children on the DFPS census were not at the placement, and DFPS notes simply refer to their "last known" placement prior to the one visited, one with a June 2019 placement date and the other with a July 2019 placement date. Of the remaining five, four had run away the night before DFPS visited, and one had been discharged. Three children, two of whom were in PMC, were not on DFPS's census but in the placement and listed in the notes for the certification as "newly placed."

- The notes for another visit[579] indicate, "The four PMC Children listed under this resource ID are actually at the Bridge Emergency Shelter...Program Administrator of La Puerta, spoke with us and reported that their administration decided to move the four…children from the TEP Bridge Emergency Shelter (La Puerta) to the Bridge Emergency Shelter about 3 weeks ago."

- In another placement, notes indicate: "Children [K.G.] and [J.L.] were not at the facility. The placement staff said the children were discharged but could not provide when and why they were discharged."

- Notes for another visit[580] simply indicate "not at placement, no record" for three of the children on the DFPS census list.

- Notes for another visit,[581] made at 1:16 a.m. in the morning, indicate "Caseworkers proceeded to next bedroom, which was bedroom five, [caregiver] stated this bedroom

---

[578] TEX. DEP'T. OF FAMILY & PROTECTIVE SERVS., *Certification of Awake Night Supervision: ACH Child and Family Services EM – Fort Worth* (Dec. 5, 2019) (on file with the Monitors).

[579] TEX. DEP'T. OF FAMILY & PROTECTIVE SERVS., *Certification of Awake Night Supervision: Bridge Emergency Shelter – La Puerta* (Dec. 7, 2019) (on file with the Monitors).

[580] TEX. DEP'T. OF FAMILY & PROTECTIVE SERVS., *Certification of Awake Night Supervision: Roy Maas Youth Alternative GRO – San Antonio* (Dec. 12, 2019) (on file with the Monitors).

[581] TEX. DEP'T. OF FAMILY & PROTECTIVE SERVS., *Certification of Awake Night Supervision: Sunny Glen Children's (Jack's Home) – San Benito* (Dec. 8, 2019) (on file with the Monitors).

belonged to [A.T.S.]. Caseworker…observed the bed was empty, she checked the closet, which was filled with clothing items. Caseworker…informed [caregiver] that the bedroom was empty in which [caregiver] then proceeded to recheck the bedroom and all other bedrooms in the home. [Caregiver] was observed to be nervous, and shortly after checking all bedrooms and not finding [A.T.S], [caregiver] apologized and stated she remembered he left on Friday for a weekend visit with his family that was approved recently during the Thanksgiving Holiday. Caseworker…requested the information of the primary worker for [A.T.S]…[caregiver] was unable to provide this information; however, informed caseworkers that it could be provided to them on a later date."  And, "Caseworkers proceeded to bedroom seven which belonged to [I.M], no one was in the bedroom. Ms. Fuentes restated that [I.M] was in the hospital visiting a friend."

- Notes for another placement[582] indicate, "When asked by worker about a missing child on the home's roster, [the caregiver] was not able to provide information on whether one of the children had run away or been discharged."

One of the most disturbing notes on a certification form indicated that, when DFPS staff entered a placement for the unannounced night visit, the awake-night staff person "stood up from the desk and has [sic] his belt and pants undone."[583]  The awake-night staff person told DFPS staff to leave and made them show him their badges through the window before he allowed them to re-enter.

DFPS staff reported this incident to SWI on January 28, 2020, four days after the awake-night visit took place.  After a cursory Priority 3 investigation by RCCL, no standard was found to have been violated nor any citation issued.  The case was closed on March 3, 2020, despite one of the DFPS staff (interviewed the same day the investigation closed) who was part of the awake-night visit informing the RCCL investigator that the awake-night staff person "was really 'thrown off' by their entering the home," was "clearly rattled by the visit," and that "she got the impression that he was masturbating as they walked in." After the Monitors provided the parties with a draft of this report, the State notified the Monitors that DFPS sent the operation a "removal of staff" letter in February 2020.

The same awake-night staff person had been the subject of a Priority-2 abuse and neglect investigation in September 2019 for "inappropriately touching himself around children in care."[584]  The SWI allegation narrative for that incident states:

> Resident of the Care Shelter reported to [staff] that [a youth] began to openly masturbate in the open in his room roughly two or three nights ago.  They were poor historians on the precise date and time.

---

[582] Tex. Dep't. of Family & Protective Servs., *Certification of Awake Night Supervision: East Texas Open Door* (Jan. 17, 2020) (on file with the Monitors).

[583] Tex. Dep't. of Family & Protective Servs., *Certification of Awake Night Supervision: Youth and Family Enrichment Center – Tyler* (Jan. 24, 2020) (on file with the Monitors).

[584] DFPS shared information with the Monitors about this incident and the previous investigation in late February, during a call related to problems in other GROs.

> The residents indicated [the awake-night staff person] was seen as stopping and watching the boy while he masturbated before retreating to the Staff Restroom to masturbate himself.

The CLASS notes for the risk assessment conducted in conjunction with this investigation indicate, "During the last two years the facility received a citation for supervision, specifically staff sleeping on shift and staff allowing a child…to check on another child in the shower which led to inappropriate behavior between the children." Despite interviews that appeared to confirm the event, abuse and neglect was "ruled out," and the case was closed on February 4, 2020, almost five months after intake. According to the notes in CLASS, when the program administrator called and expressed concern for the staff person not being able to work his awake-night shift on October 10, 2019, before the investigation was completed and even before a risk assessment was done, the RCCI investigator "advised [the administrator] that based on the information received the department no longer has concerns for [the awake-night staff person] being alone with the children in care." On January 30, 2020, the investigation was transferred to RCCL. No citation was issued; the following (and the last) contact notes in CLASS simply indicate that when it was transferred, "Relevant standards were entered, and marked as compliant."

There was also a call to SWI on December 10, 2019 related to an awake-night visit to the other of the two campuses managed by this operation.[585] This intake indicates that when DFPS staff arrived at one of the houses for the awake-night visit, a youth answered the door and there wasn't a staff person present. After being opened as an RCCL standards investigation, the case was upgraded to an abuse and neglect investigation on December 19, 2019. This investigation resulted in an RTB finding for neglect on March 16, 2020. The awake-staff who were supposed to be on shift the night of the DFPS staff visit were fired; consequently, CLASS notes indicate that RCCL determined "no risk-based follow up inspection is required."

iii. Self-Reports of Non-Compliance

In addition to conducting unannounced visits, DFPS requires placements to self-report violations of the awake-night supervision order. In February 2020, the agency reported to the Monitors that seven GROs had been out of compliance at some point. The facilities that reported non-compliance (and the date they made the report) are:

- Roy Maas Youth Alternatives (Two Locations) (October 2019)
- Cherokee Home for Children (November 6, 2019)
- Pleasant Hills Children's Home (November 6, 2019)
- Positive Steps Inc. (November 6, 2019)
- High Plains Children's Home (November 7, 2019)
- Bluebonnet Youth Ranch (November 19, 2019)
- High Frontier Residential Treatment Center (December 24, 2019)

---

[585] Both campuses are located in Tyler. The Monitors did not receive an awake-night certification form for the December 10, 2019 visit.

- Elijah's House (January 22, 2020)

Roy Maas Youth Alternatives (Roy Maas – Two locations) and Bluebonnet Youth Ranch reported being out-of-compliance for more than one day in the months they reported a violation: Bluebonnet reported being out of compliance for five consecutive days from November 14-18. Bluebonnet indicated that they did not realize a child in their care had transitioned from TMC to PMC, requiring them to provide awake-night supervision. Roy Maas reported being out of compliance thirteen days at one facility and twelve days at another facility in October.  They reported staff shortages, as well as staff calling in sick, as the primary reasons for being in violation.

The State subsequently conducted unannounced visits and certified compliance for all of these placements.

iv.  Monitors' Awake-Night Visits to GROs

After the Court issued its order in November 2019, the Monitors added a night-time walk through and interview with awake-night staff to the monitoring team's on-site monitoring visits.  Between December 2019 and the end of February 2020, the Monitors conducted unannounced visits to four GROs, three of which were RTCs. The placements visited (and date of the visit) were:

- Hector Garza Residential Treatment Center (December 5, 2019)
- St. Jude's Ranch for Children – Bulverde (January 26, 2020)
- A Fresh Start Treatment Center (February 18, 2020)
- Prairie Harbor Residential Treatment Center (February 23, 2020)[586]

The Monitors interviewed a total of seventeen awake-night staff. The total number of awake night staff interviewed at each GRO varied because the operations ranged in size.

During the interview, the Monitors asked staff about both the number of children they were supervising that night and the highest number of children they had been responsible for supervising at night over the last six months. Ten (59% of 17) of staff interviewed indicated that they were responsible for supervising ten or fewer children on the night of the visit, while seven (41% of 17) were supervising from eleven to fifteen children.

Of the staff interviewed, nine (53% of 17) indicated that the highest number of children they had supervised at night over the last six months was between eleven and seventeen.

---

[586] For summaries of the monitoring team's visits to these four GROs, *see* Appendix 5.5.a Hector Garza; Appendix 5.5.b St. Jude's-Bulverde; Appendix 5.5.c A Fresh Start; and Appendix 5.5.d Prairie Harbor.

When asked if there were enough staff to cover the needed awake-night positions, sixteen (94% of 17) answered "yes."  The total number of awake-night staff at each on the night visited was:

- Hector Garza:            Five staff
- St. Jude's:               Four staff
- A Fresh Start:          Three staff
- Prairie Harbor:        Five staff

During the interviews, the Monitors asked awake-night staff how the operation covered shortages if a staff person called in sick or could not make their shift.  Most staff fifteen of those interviewed (88%) indicated that personnel from other shifts covered shortages.  Only three staff indicated availability of "on call" staff to cover shortages; two indicated that children could be moved to maintain ratios.

The Monitors also asked staff about the frequency of visual checks of children's rooms. All staff interviewed indicated that they were required to visually check children in their rooms.  The most common frequency for visual checks was every fifteen to twenty minutes as reported by seven of seventeen (41%) the staff interviewed. However, five (29%) staff indicated they conducted visual checks only every thirty minutes. If staff are unable to make their scheduled room check because they are addressing something that has come up with a child, staff interviewed indicated that they call "bridge" or "floating" staff from other floors or locations, or that they conduct the check as soon as they are able.  Five (29%) staff indicated that they had never encountered this problem.

Almost all staff interviewed (94%) said that they document room checks.  Most use a paper log, sometimes referred to as a "rounds sheet" or "headcount sheet."  In one placement, staff also used a "tool" or wand that they pressed against an electronic button on the wall in the child's room to document the room check electronically (however, later interviews at this site revealed the wands often do not work).

The Monitors asked staff how children get their attention if they need something in the middle of the night.  Unlike the cottage homes, where children often needed to set off an alarm on their door to get a staff person's attention at night, alarms are not used in the GROs visited.  Eleven (65%) of staff indicated that a child is able to simply leave their room and ask for what they need.  However, three (18%) indicated that children knock on their room wall or door or call out to staff from their door rather than being allowed to exit.

The night of the monitoring visits, ten (59%) staff interviewed had a child on "safety precautions" or "line of sight" supervision.  The Monitors witnessed children sleeping in hallways and living areas, and the interviews confirmed that this is often how staff maintain "light of sight":

- Child sleeps in dayroom or living area:        35% (six of seventeen)
- Child sleeps in hall:                                    29% (five of seventeen)

One staff interviewed indicated that they maintain line of sight by sitting in the child's room while the child sleeps, and twelve percent indicated they simply conduct more frequent room checks. The Monitors also asked staff how they receive and relay information with daytime staff regarding the children they supervise. Most staff receive and relay information verbally when their shift changes.

Though the four facilities all had staff who were supposed to remain awake overnight, during the Monitors' visit to A Fresh Start Treatment Center, when a Monitor knocked on the door of one of the two housing units on the campus, it took approximately 15 minutes for the awake-night staff to open the door.  During interviews, youth living in that house indicated that the awake-night staff frequently slept and that they could hear him snoring at night.  In the other housing unit, awake-night staff were present and awake. Although they indicated that they document room checks, documentation was not being kept that night.

In addition, though Hector Garza had awake-night staff present on both wings of each floor, two of the monitoring staff were on one of the floors housing boys when a riot started on the wing across the hallway during the Monitors' visit.  Two monitoring staff were left alone by Hector Garza staff on a locked wing with twenty-one youth while awake-night staff from that wing went across the hall to help quell the disruption.[587] During interviews with youth – and confirmed by a review of files at the facility – disruptions are a common nighttime occurrence at Hector Garza. The facility was cited by RCCL for being out-of-ratio on the night of the visit as a result of a report to SWI made by the monitoring staff.

3.  Summary

The State's own certifications and placement self-reports indicate ongoing issues related to awake-night supervision.  While the Monitors and their staff did find awake-night staff at all GROs visited, during one visit the awake-night staff in one house appeared to be sleeping and during another, a riot broke out and monitoring staff were left alone on a wing with more than twenty children.

Each method of validating performance for the Remedial Orders related to caregiver notification revealed gaps in notification. The cross-match of data for the mass notification undertaken by the State in response to the Court's November 5, 2019 order showed 5% (53 of 1025) of children identified who did not match to the list of caregivers notified.

Gaps in notification exist between CPS and Program Administrators, and between Program Administrators and direct care staff.  While Program Administrators interviewed by the Monitors during unannounced visits indicated that they alert direct caregivers on their staff when they

---

[587] For more details describing these events, *see* Appendix 5.5.a Hector Garza; Appendix 5.5.b St. Jude's-Bulverde; Appendix 5.5.c A Fresh Start; and Appendix 5.5.d Prairie Harbor.

receive notification from the State that a child is a victim of sexual abuse or is identified with an indicator for sexual aggression, only 57% of direct caregivers interviewed indicated that they received notice when a child had been identified as sexually aggressive, and 50% indicated they received notice when a child had been identified as having a history of sexual abuse.  This suggests that the information may not make it to the direct care staff who are engaged in protecting children's safety on a daily basis.

A gap in notification exists for children identified in IMPACT records as having a history of abuse or aggression, but whose placement does not change.  The State uses the Common Application and Placement Summary Attachment A as the primary method of notifying caregivers.  However, these forms are generated only when children move to a new placement.  When a child is identified without their placement changing, notification does not always appear to take place.   In addition, the Monitors review of case records in IMPACT revealed that these forms are not provided to psychiatric hospitals when children are admitted for care, because these settings are not considered placements.

Even for children who have a change in placement after being identified, information about their history of sexual abuse or sexual aggression is not always added to the Common Application and Placement Summary (or Attachment A).  Additionally, the Monitors' on-site reviews of children's files revealed that, quite often, one or both of these forms are missing from a child's file altogether, even for children who appear on the list generated by the State of children with a history of sexual aggression or victimization.

## VI.   REGULATORY MONITORING & OVERSIGHT OF LICENSED PLACEMENTS

A.  Remedial Order Twenty-Two: Consideration of Abuse or Neglect/Corporal Punishment & Obligation to Report Suspected Abuse or Neglect

Remedial Order Twenty-Two: *Effective immediately, RCCL, and any successor entity charged with inspections of childcare placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements. During inspections, RCCL, and any successor entity charged with inspections of childcare placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of childcare placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

1.  Background

a.  Extended Compliance History Review

Prior to the Court's Order, HHSC only required licensing inspectors to conduct a general review of an operation's compliance history as one component of the information reviewed prior to

application, initial, or monitoring inspections.[588]  Remedial Order Twenty-Two directs inspectors to conduct a more extensive five-year review, with a targeted focus on abuse or neglect and corporal punishment.  The Order also requires licensing inspectors to conduct these reviews before any placement inspection without narrowing its application by reference to a particular inspection type.

HHSC has not adopted a formal policy related to the extended compliance history review five-year retrospective report.  However, on November 22, 2019, HHSC-RCCL issued Field Communication #271 ("Field Communication") explaining the requirements for an Expanded Compliance History Review.[589]  In the Field Communication HHSC acknowledges that the Expanded Compliance History Review ("five-year retrospective report") is instrumental in the assessment of both past and current risk presented by an operation.[590]  The Field Communication explains, "Being familiar with allegations and patterns of citations lends itself to more informed decision making."[591]  This report will help inspectors identify prior citations for corporal punishment or abuse or neglect finding, so that a more detailed review can be completed to assess risk.[592]

The Field Communication requires inspectors to begin conducting the five-year retrospective report after December 1, 2019, at which point licensing inspectors must conduct the extended compliance history review in addition to, and not in place of, the current compliance history review required by section 4141 of the Twenty-Four-Hour Residential Child Care Requirements.[593]  The Field Communication references two reports prepared at the beginning of each month by HHSC to assist investigators in compiling needed information for completing the five-year retrospective report: the *Abuse or Neglect Report* (abuse or neglect intakes and abuse or neglect confirmed findings) and the *Corporal Punishment Report* (citations issued for corporal punishment).[594]  If a finding of abuse or neglect or a violation of minimum standards related to corporal punishment is discovered, the inspector and/or investigator must construct an overall assessment of the information and determine any additional steps needed in order to mitigate risk.[595]  The assessment is intended to identify any patterns relating to investigations and allegations, and must specify if allegations include a child under the age of six.[596]  After an

---

[588] *See* TEX. HEALTH & HUMAN SERVS. COMM'N, *Child Care Licensing Policy and Procedures Handbook* § 4141, *available at*
https://hhs.texas.gov/laws-regulations/handbooks/cclpph/4000-inspections#4141 (referring to the compliance history "as documented in CLASS," which allows a user to create a two-year compliance history report as one of the standard reports that the database compiles).

[589] TEX. HEALTH & HUMAN SERVS. COMM'N, *Child Care Licensing Field Communication #271* (Nov. 22, 2019) (on file with the Monitors).

[590] *Id*. at 2.

[591] *Id*. at 3.

[592] *Id*.

[593] *Id*. at 2.

[594] *Id*. at 3.

[595] *Id*. at 4.

[596] *Id*.

inspection or investigation, a second summary is required which should include the additional tasks completed at the operation related to the review of data, which minimized risk.[597]

b.  Failure to Report Abuse or Neglect

The Texas Family Code mandates immediate reporting to SWI by "a person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect."[598]   The statute requires professionals[599] to make a report not later than the forty-eighth hour after they first suspect abuse or neglect.[600]   The state statute also deems it a Class A misdemeanor if a person or professional knowingly fails to make a report of abuse or neglect and

---

[597] TEX. HEALTH & HUMAN SERVS. COMM'N, *Child Care Licensing Field Communication #271* (Nov. 22, 2019) (on file with the Monitors). An attachment to the Field Communication provides RCCL investigators with an example of a completed extended compliance history report:

> Inspection #244567 5 year extended history review as of October 25, 2019: - 35 intakes - 12 abuse or neglect investigations, with one confirmed finding of physical abuse with an unknown alleged perpetrator - 2 citations issued for corporal punishment.  The CPA has one office and fewer than 20 homes. Each of the investigations related to corporal punishment or abuse/neglect involved children under the age of 6. Compliance history for the last two years does not show any recent allegations or concerns related to either physical abuse or corporal punishment. The operation has not been placed on corrective or adverse action in the previous 5 years. The Rogers home was involved in two of the investigations (#2226520 and 2176802) and the Davis home had deficiencies related to corporal punishment (#2399299). As a result, during my inspection of The Plains CPA, I focused part of my review on the Rogers and Davis homes. I reviewed the CLASS record and verified that the agency closed the Rogers home (the home was the subject of two investigations in the past 5 years). I reviewed the follow-up information in CLASS for the two violations of corporal punishment related to the Davis home. The follow-up information states that the CPA reviewed appropriate discipline with the Davis foster parents and had the foster parents re-sign the CPA's discipline policy. Additionally, I reviewed documentation of the CPA's most recent quarterly visit in the Davis home. No concerns were noted by the CPA at the quarterly visit.

*Id.*, Attachment A.
[598] TEX. FAMILY CODE § 261.101(a).
[599] "Professional" is defined as:

> Professional means an individual who is licensed or certified by the state or who is an employee of a facility licensed, certified, or operated by the state and who, in the normal course of official duties or duties for which a license or certification is required, has direct contact with children.  The term includes teachers, nurses, doctors, day-care employees, employees of a clinic or health care facility that provides reproductive services, juvenile probation officers, and juvenile detention or correctional officers.

*Id.* at §261.101(b).
[600] *Id.*

a state jail felony if the professional's failure to report was an attempt to conceal the abuse or neglect.[601]

State regulation also requires General Residential Operations (GROs) and Child Placing Agencies (CPAs) to report specific information within given timeframes to HHSC Child Care Licensing:

- within two hours of a child dying in care;
- as soon as the entity becomes aware of abuse, neglect or exploitation; and
- within 24 hours after a reasonable person would conclude that substantial physical injury or critical illness needs treatment by a medical professional.[602]

c.  The State's Initial Report to the Monitors Regarding Compliance

In their initial report to the Monitors on September 9, 2019, HHSC indicated:

> With regards to referring an operation's failure to report suspected child abuse or neglect to DFPS, HHSC-RCCL is generating and sending a daily report to the DFPS contracts inbox regarding an operation's failure to report abuse or neglect…The report contains the operation number and details about the deficiency, including the description and the date of deficiency.

> With regards to considering all referrals of, and in addition all confirmed findings of corporal punishment, HHSC-RCCL has policies in place in CCLPPH 4141 regarding information Licensing staff must review prior to inspecting an operation.  HHSC-RCCL also has a Compliance History Report that inspectors can run at any time to view all deficiencies at an operation within a specified time period.

> With regards to considering all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment, HHSC-RCCL respectfully requests clarification about the timeframe in which the inspectors should consider all referrals of and confirmed findings of child abuse/neglect and corporal punishment occurring in facilities.

> HHSC respectfully requests clarification about how to document that the inspectors have considered all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in facilities.

---

[601] *Id.* at §261.109.
[602] 26 TEX. ADMIN. CODE §§ 748.303(a), 749.503(a).

Possibilities include:

- Adding a check box to the inspection form to indicate this information was considered.
- Requiring in policy that inspectors review the Compliance History Report prior to inspecting an operation.

In response, after conferring with the Court, on October 7, 2019 the Monitors advised HHSC:

> [W]ith respect to HHSC's Request for Clarification for Remedial Order 22, the Court directs with respect to the look-back period for considering all referrals of, and in addition, all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment, RCCL inspectors should assess the previous 5 years. With respect to the request for clarification about how to document that the inspectors have considered these referrals and findings, a check box is insufficient. The Court directs the agency to have inspectors document in CLASS (1) the number of referrals of child abuse/neglect; (2) the number of confirmed findings of child abuse/neglect; (3) the number of confirmed findings of corporal punishment; and (4) a narrative description of how this data and information was considered.

d.  The Monitors' Data and Information Request and the State's Production

In order to assess the State's compliance with this remedial order, the Monitors included the following in their September 30, 2019 data and information request:

Starting July 31, 2019 through September 30, 2019, and updated quarterly thereafter, provide:

For each item below include the name of the placement; identification number; county; contact information; and the agency responsible.

1)   All reports RCCL has sent or sends to DFPS related to failure to report abuse or neglect.

2)   All notifications DFPS has sent or sends to placements regarding violations and corrective action or contract terminations related to failure to report abuse or neglect.

3)   Reports of punishments used on a PMC youth that are prohibited by TAC 749.1953 or 749.1957, disaggregated by type of punishment, reason for punishment, and placement.

On November 15, 2019, in response to the Monitors September 30, 2019 request, HHSC responded that the information would be provided, with the exception of the reason for punishment, which HHSC said it does not capture in CLASS.[603]

In a subsequent request on February 21, 2020, the Monitors identified several deficiencies in the State's response to the September 30, 2019 request.[604]   The Monitors noted that the 5-year retrospective data files provided by HHSC included all deficiencies cited, not just those for corporal punishment (those involving 26 TAC §§749.1953 or 749.1957).[605]   The Monitors noted that the information provided by the State was presented by organization, not by child, and did not indicate the type of corporal punishment or reason for punishment.  The data also did not include county and contract information for the operations cited.[606]   The Monitors also detailed concerns related to the data for failure to report abuse or neglect, specifically that the data allowed only for identifying operations cited for failing to report, and the majority of the automatic daily email reports provided in Outlook included blank spreadsheets.

In addition to the deficiencies, the Monitors requested the below revisions and additions:

1) Data related to completion and agency review of compliance for the use/completion of the extended compliance history review;

2) Data on all inspections, investigations, assessments and monitoring of residential child care operations and agency homes quarterly (see RO 20.2 and 20.5);

3) Copy of policy regarding documentation of five-year chronology and review in CLASS.

4) All deficiencies citied involving corporal punishment, other forms of prohibited punishment, failure to report, and failure to report within required timeframes; and

5) A monthly report with data rather than receiving the automatically generated daily emails. The monthly report should include the information included in the daily emails for agencies failing to report abuse or neglect.  In addition, the report should include the number of days with no failure to report notifications.

In response, HHSC indicated that, until it implements Information Technology automation changes, HHSC is unable to provide data regarding the review of compliance history: "At this time, documentation regarding the review of an operation's five-5 year compliance history is manual and cannot be reported."[607]

---

[603] Email from Frances Townsend, Att'y, Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Nov. 15, 2019, 18:02 EST) (on file with the Monitors) (including HHSC response to Monitors' Sept. 30, 2019 Data & Information Request).

[604] Email from Kevin Ryan, Court Monitor to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Texas (Feb. 21, 2020, 17:54 CST) (on file with the Monitors) (including Feb. 21, 2020 Data & Information Request).

[605] Id.

[606] Id.

[607] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2019, 17:48 EST) (on file with the Monitors) (including HHSC response to Monitors' Feb. 21, 2020, Data & Information Request).

2.   Remedial Order Twenty-Two Performance Validation

a.   Five-year retrospective Methodology

To assess the State's performance with respect to Remedial Order Twenty-Two's five-year retrospective requirements, the monitoring team conducted a case record review using a survey tool to test for completion of the extended compliance history review prior to an onsite investigation/inspection and to assess the extended compliance history review for compliance with the required content identified in the remedial order.   The Monitors also conducted interviews with forty of eighty-five RCCL investigators on April 6-8, 2020 to assess their understanding of the purpose and documentation requirements of the five-year retrospective report.

b.   Results of the Monitor's Case Read

The monitoring team selected a sample of operations (CPAs and GROs) with the highest number of referrals to RCCL for investigations of minimum standards violations between July 31, 2019 and December 31, 2019, and included in the case read those facilities with a referral to SWI for a minimum standards violation between October 7, 2019 (the date the Court provided a response to the State's request for clarification) and January 31, 2020.   This resulted in a sample of ninety-two of 393 operations with 787 minimum standards investigations analyzed.

For the period of the Monitors' review, October 7, 2019 – January 31, 2020:

- 28% of the non-abuse and neglect investigations (220 of 787) contained a completed five-year retrospective report related to the investigation.
- 29% of the operations (twenty-two of ninety-two) had no five-year retrospective reports in CLASS.
- 7% of the operations (six of ninety-two) had a five-year retrospective report for all (100%) of the investigations or inspections conducted during the period under review.

Since the State did not direct RCCL inspectors to begin conducting the five-year retrospective report until December 1, 2019, the monitoring team also completed an analysis of compliance for the periods between December 1, 2019 and January 31, 2020 for nineteen operations.   The analysis showed no difference in the percentage of inspections associated with minimum standards investigations that contained a completed five-year retrospective report (28%).   Even though the overall percentage of completed five-year retrospective reports did not change from the Monitors' full case read sample, the December 2019 through January 2020 data did show an 8% decrease in operations (4 of 19, or 21%) with no five-year retrospective reports, and a 9% increase in operations (3 of 19, or 16%) that had a five-year retrospective report for all of the investigations conducted during the period.

Remedial Order Twenty-Two requires the five-year retrospective report to be considered "**during inspections**" (emphasis added). In evaluating the timeline for completion of the five-year retrospective report (prior to or on the same day of the initiation of the investigation/inspection), the Monitors reviewed 205 five-year retrospective reports for fifty-eight operations. In evaluating the qualitative information included in the five-year retrospective reports (abuse or neglect intakes, abuse or neglect confirmed findings, citations for corporal punishment, and an assessment of trends to mitigate risk), the Monitors reviewed 270 five-year retrospective reports.

The Monitors' review showed 118 of the 205 (58%) five-year retrospective reports were completed by the RCCL inspector prior to or on the same day of the initiation of the investigation between October 7, 2019 and January 31, 2020.

**Figure 32: Five-year retrospective reports completed prior to or on the same day as investigation initiation, October 7, 2019 to January 31, 2020**



An evaluation of the content of the 270 extended compliance history reviews revealed that most of the reports contained the required quantitative data:

- 94% (254 of 270) contained the number of referrals of child abuse/neglect cases;
- 97% (261 of 270) contained the number of confirmed findings of child abuse/neglect cases; and
- 97% (261 of 270) contained the number of confirmed of corporal punishment citations.

267

Although the extended compliance history reviews contained the data elements required by the remedial order, the Monitors' case reviews revealed concerns related to the content of the information and the failure of the investigators to include "a narrative description of how this data and information was considered," as directed by the Court, and communicated to the State by the Monitors on October 7, 2019.[608]  Inspectors failed to provide a narrative description of how they considered referrals for, or a confirmed finding of, abuse or neglect or a confirmed finding of corporal punishment in 213 of 270 (79%) of the extended compliance history reviews.

Although not a direct question considered during the case read, the Monitors observed that the State inconsistently updated and copied the documentation of the quantitative data required in the extended compliance history review from previously completed retrospectives reports. For example, an inspector copied the following information verbatim from the previous inspector's assessment:

> My investigation follow-up:
>
> During the interviews with the children, children in the investigation were asked about being physically disciplined. None of the children state they are being physically disciplined at Sheltering Harbour. In addition, staff deny any physical discipline taken place at their operation. No patterns were identified.

In another example, even though there had been three confirmed findings of physical abuse with an unknown alleged perpetrator at the operation, the assessment indicated:

> Reasons for visit to operation regarding concerns to children in care requiring medical attention after being involved in a physical altercation. Zero deficiencies during inspection with no concerns. No concerns to corporal punishment or abuse/neglect.

c.   RCCL Inspector Interviews

The monitoring team interviewed RCCL inspectors to gather information regarding the extended compliance history review and process.  Interviews were conducted with forty of eighty-five RCCL inspectors from Regions Three (Dallas), Six (Houston), Seven (Austin) and Eight (San Antonio) and their program directors. The interviews included questions about what specific steps the inspectors take and what information they use to develop an extended compliance history review.  Seventy percent of the inspectors (28 of the 40) said they utilized a common report (which RCCL pre-compiles for each operation) to develop the quantitative portions of the five-year retrospective report.  Twelve of the forty (30%) RCCL inspectors reported utilizing alternative processes or sources to compile this portion of the five-year retrospective report.

---

[608] Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 7, 2019, 10:22 EST) (on file with the Monitors) (regarding DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).

Sixty percent (24 of the 40) of the inspectors interviewed reported using the quantitative information included in the reports to inform their understanding of trends and patterns for the operation.  Only two of the twenty-four (8%) inspectors, however, made direct reference to the narrative when asked to describe the process for compiling the reports.  Sixteen of the forty (40%) inspectors interviewed were unable to articulate how they are expected to use the quantitative information in the report.[609]

3.   Failure to Report Methodology

To assess the State's performance with respect to Remedial Order Twenty-Two, the Monitors and their staff analyzed data provided by the State in response to their data and information requests for citations related to failure to report abuse or neglect.  The monitoring team reviewed the CLASS records for each citation.  During on-site visits, the Monitoring team also interviewed caregivers related to reporting abuse or neglect to SWI.

4.   Review of the State's Data

The data produced to the Monitors by the State indicates that between July 31, 2019 and March 20, 2020, HHSC issued twenty citations for failure to report abuse or neglect: one has been overturned, two have requested an administrative review, and one is pending.[610]  Only two of the cases involved PMC children.    It appears that in at least five of twenty (25%) cases the entity was cited not for failure to report, but for *delayed* reporting where a staff member or administrator from the facility,  or the foster parent or CPA ultimately called the abuse or neglect allegation into SWI, but called well after they were aware of the incident.  Some examples of the delayed reporting:

- Alleged sexual contact between two foster care youth where one touched the other on the buttocks and kissed him on the lips.  The foster mother contacted her agency several days after the incident but did not contact SWI for six days.
- Children in care were reportedly touching each other inappropriately at night when the foster parents were asleep.  When the foster mother was made aware of what was occurring, she looked for guidance from the agency, but she did not make a report to SWI for approximately two weeks.
- The foster parent became aware that a fourteen-year-old in her home left without permission and was allegedly raped by a twenty-three-year-old man.  She reported the incident to the agency the next day.  The agency informed her to call SWI, which she did not do for another two days.[611]
- A child confided to a therapist that she was fearful of returning to the unit of a licensed facility because a patient was reportedly raped on the unit.  The therapist did not report

---

[609] One interviewee, in fact, indicated that there is no requirement to document information in a narrative, and said that the retrieval of the information was "merely for their knowledge."

[610] Data related to this analysis was produced on May 5, 2020 as relayed and entitled by email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (May 5, 2020, 17:17 EST) (on file with the Monitors); *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RO.22.1 7.31.2020-3.31. 2020 Rep. ANE. To. DFPS. B 5.5.2020* (on file with the Monitors).

[611] This was one of the PMC children.

the allegation.  Five days later, however, the child spoke to the risk manager who reported the incident.

The Monitors could not discern why HHSC either did not cite for failure to report to SWI or why the agency overturned its original finding of failure to report in two other cases:

- The staff-driver of a van, upset that youth were not wearing their seatbelt, reportedly hit the break hard, to intentionally force children to fall forward.  One youth suffered bruising and a black eye.  A second staff member in the van who witnessed the incident called the operation's supervisor the next day to report the incident.  HHSC cited the operation for failing to tell the child's caseworker, but not for failing to call SWI.
- An operation employee reported a staff person to the administrator for pinning one child to the ground, grabbing a six-year-old child by the arm and dragging him, and grabbing and dragging an eight-year-old child out of a van.  Although the facility administrator agreed the repeated actions of the staff member may have been inappropriate and unnecessary, the administrator did not report the incidents because he/she did not believe the information met the definition of abuse.  HHSC originally cited the facility for failure to report.  The administrator appealed the decision and HHSC overturned its finding of failure to report based on the administrator's claim that he did not believe the incident met the definition of abuse or neglect.

a.   On-Site Interviews with Caregivers

During on-site monitoring visits, the monitoring team interviewed 157 caregivers and asked questions related to recognizing and reporting abuse or neglect.
At all of the GROs visited (Cottage Homes and other GROs/RTCs), 58% of direct care staff (90 of 156) indicated they are more likely to inform a supervisor if a youth makes an outcry or they suspect a youth is being abused or neglected than they are to call SWI and make the report themselves.  According to the interview data, a majority of the caregivers would inform their supervisor and/or upper-management personnel and allow them to make or determine whether to make a report to SWI.

**Table 29:  Who Makes the Decision to Report to the Hotline if Abuse or Neglect Occurs: Cottage Homes**

| Decision Maker | No. Caregivers | Percent (Caregivers) |
|---|---|---|
| Self | 47 | 39.8%[612] |
| Program Administrator/Supervisor | 71 | 60.2% |
| **Total** | **118** | **100.0%** |

---

[612] One direct care staff from the Cottage Homes did not respond to this question.

**Table 30: Who Makes Decision to Report to the Hotline if
Abuse or Neglect Occurs: GROs**

| Decision Maker | No. Caregivers | Percent (Caregivers) |
|---|---|---|
| Self | 14 | 36.8% |
| Program Administrator/Supervisor | 19 | 50.0% |
| Other | 5 | 13.2% |
| **Total** | **38** | **100.0%** |

When asked what they would do if they learned of the most extreme example included in the Monitors' interview tool, *i.e.* sexually related behavior between a youth and another staff member, the majority of the direct caregivers at the non-Cottage Home GROs[613] told the monitoring team they would tell a supervisor (twenty eight of thirty-eight staff).[614] Only sixteen of thirty-eight (42%) answered that they would call SWI. Ten of the thirty-eight (26%) indicated that they were aware of suspicions or allegations of abuse or neglect that were not reported to SWI.[615]

5. Summary

The Monitors' case record review revealed:

Only 28% of inspections associated with an investigation of a minimum standards violation contained a completed five-year retrospective report, and 29% of the operations (twenty-two of ninety-two) had **no** five-year retrospective reports in CLASS. Only 7% of the operations (six of ninety-two) had a five-year retrospective report for all (100%) of the investigations or inspections conducted during the period under review.

RCCL rarely completes the five-year retrospective review prior to or on the same day as the RCCL inspection, making it impossible for the information to be considering during the inspection, as required by Remedial Order Twenty-Two. Interviews with inspectors confirmed that 40% (16 of 40) understood the purpose or the process for compiling and using the information required by the extended compliance history review.

Between July 31, 2019 and March 20, 2020, HHSC issued twenty citations for failure to report abuse or neglect: one has been overturned, two have requested an administrative review and one is pending as of May 1, 2020. The monitoring team's on-site interviews with caregivers revealed that many are not aware of the policy and legal requirements related to reporting abuse or neglect,

---

[613]*See* Appendix 5.5.a Hector Garza; Appendix 5.5.b St. Jude's-Bulverde; Appendix 5.5.c A Fresh Start; and Appendix 5.5.d Prairie Harbor.

[614] The interview question allowed caregivers to identify all individuals they would notify if a child discloses a sexual relationship with staff. Of the twenty-eight caregivers who would tell a supervisor, fourteen of the caregivers also indicated that they would call SWI.

[615] Only one of the 117 caregivers interviewed, two caregivers did not respond, in cottage homes was aware of suspicions of allegations of abuse or neglect that was not reported to SWI.

and most indicated that they would not call SWI themselves if they became aware of abuse or neglect.  Instead, they would tell a supervisor at the operation.

B.  Remedial Orders Twelve through Nineteen: Timeliness of Minimum Standards Investigations

Remedial Order Twelve: *Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

Remedial Order Thirteen: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

Remedial Order Fourteen: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

Remedial Order Fifteen: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

Remedial Order Sixteen: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

Remedial Order Seventeen: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

Remedial Order Eighteen: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

Remedial Order Nineteen: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

1.  Background

HHSC is responsible for regulating child-care and child-placing activities in Texas and for creating and enforcing minimum standards. Each set of minimum standards is based on a particular chapter of the Health and Human Services title of the Texas Administrative Code; Title

26 Chapter 749 sets forth the minimum standards for CPAs, including those that serve PMC children.[616] The minimum standards establish basic requirements to protect the health and safety of children in care and are weighted by HHSC based on the agency's assessment of the risk that a violation of that standard presents to children. RCCL is responsible for inspecting CPAs for compliance with these minimum standards and investigating reports of standards violations.

These investigations by RCCL, ordinarily known as minimum standards investigations, are classified as Priority One, Two, Three, Four or Five.[617] Priority One investigations involve "Violation[s] of the law or minimum standards that pose an immediate risk to children."[618] Priority Two investigations involve "Injury or serious mistreatment of a child,"[619] "Serious Accidental injury" to the child,[620] "Serious safety or health hazards,"[621] or "Serious supervision problems," such as a "report of a violation . . . that may pose a risk of substantial harm to children in care."[622] Priority Three investigations involve reports of illegal operations where care is being provided to children "by a residential care operation that does not have a permit, may be subject to regulation, and there are no other allegations,"[623] or reports of a minor violation of law or standards that involves "low risk to children."[624] Priority Five investigations are assigned to the CPA for self-investigation or an RCCL "desk-audit" because of the low level of risk to children presented by the report.[625] A Priority 5 investigation may be re-classified as a Priority 4 investigation when it requires an inspection.[626]

HHSC policy allows for initiation of investigations through a variety of methods that do not include observing or interviewing any children, in contrast with DFPS, which requires its investigators to have face-to-face contact with all alleged child victims. HHSC policy permits, but does not require, an RCCL investigator to initiate a Priority One, Two or Three investigation by face-to-face contact with a child involved.[627] The only circumstances where face-to-face contact with the alleged victim is required in RCCL investigations is for Priority One or Priority Two investigations where the child is alleged to have a serious injury.[628] In that instance, HHSC instructs the RCCL investigator to initiate the investigation by making face-to-face contact with

---

[616] *See generally* 26 TEX. ADMIN. CODE §§ 749.1 - 749.4267.

[617] *See generally* TEX. HEALTH & HUMAN SERVS. COMM'N, *Child Care Licensing Policy and Procedures Handbook* § 6240 (2020) *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/6000-investigations#6240 [hereinafter *Child Care Licensing Policy and Procedures*].

[618] *Id.*

[619] *Id.* (defining this category to include "a report that a child in care sustained a serious injury as a result of discipline, punishment, physical restraint, or other type of mistreatment prohibited by minimum standards").

[620] *Id.*

[621] *Id.*

[622] *Id.*

[623] *Id.*

[624] *Id.*

[625] *Id.*

[626] *Id.* A Priority Five investigation is re-classified as a Priority Four investigation in CLASS when one of the following types of investigations requires an inspection: an unregulated operation with no other allegations (DC only); a CPA internal investigation; or a desk review.

[627] *Child Care Licensing Policy and Procedures* § 6413.

[628] *Id.*

the child, "adhering to the appropriate initiation time frame so that the child's injuries (or lack of injuries) can be photographed in a timely fashion."[629] Otherwise, HHSC policy permits the RCCL investigator to initiate the investigation through other means such as face-to-face contact with an adult involved in the allegation; face to face contact with a significant collateral source; or through an unannounced inspection.[630] HHSC policy states that whenever possible, the RCCL investigator must observe and interview all children directly involved in the incident in person; however, the language does not require it. It also does not dictate a timeframe nor does the policy require the investigator to document and report why they did not observe or interview the child.[631]

The policy counts the "initiation" as "the first contact the investigator makes that yields new and pertinent information related to the allegations described in the intake report. Initiation is not necessarily the first contact the investigator makes. To qualify as the initiation of the investigation, the contact must result in the investigator obtaining new or pertinent information."[632]

HHSC policy requires Priority One investigations to be initiated within twenty-four hours of the intake.[633] Priority Two investigations must, by HHSC policy, be initiated within five days of receipt of intake at SWI or local licensing office,[634] in contrast with DFPS policy, which requires Priority Two investigations to be initiated within 72 hours of intake. The HHSC policy is also in conflict with Remedial Order Thirteen.

Following the separation of DFPS and HHSC in 2017, the agencies' responsibilities for investigations divided. After reviewing the State's data and information, the Monitors conferred with the Court to ensure the correct interpretation of "successor staff" where referenced in the remedial orders. The Monitors communicated to the State that Remedial Orders Twelve, Thirteen and Fourteen apply to RCCL as the "successor staff" identified in these remedial orders.[635] Counsel for HHSC responded:

> HHSC and DFPS are two distinct agencies with delineated responsibilities. We have always interpreted ROs 12, 13 and 14 as pertaining to DFPS because RCCL conducts minimum standards

---

[629] Id.
[630] Id. § 6413.1.
[631] Id. § 6421.
[632] Id. § 6411.
[633] Id. § 6412.1.
[634] Id. § 6412.2.
[635] Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. et al. (Feb. 21, 2020, 17:41 EST) (on file with the Monitors) (regarding Remedial Orders 12, 13 and 14).  That email provided:

> Dear Counsel, Deborah Fowler and I have conferred with Judge Jack and want to ensure a shared understanding between the parties that, in light of DFPS's and HHSC's reorganization, the references in Remedial Orders 12, 13 and 14 to "successor staff" apply to CCL, not CCI. If the provisions were to refer to CCI, which they do not, they would simply replicate three earlier Remedial Orders that already require the same measure of timeliness from CCI.

Id.

investigations, not abuse/neglect investigations. The term "successor staff" would only pertain to DFPS unless HHSC later inherited those responsibilities.[636]

HHSC's position that "successor staff" in Remedial Orders Twelve, Thirteen and Fourteen applies to DFPS's RCCI investigators, and not to RCCL investigators, would mean that the Court and the Fifth Circuit intended Remedial Order Twelve to be fully redundant of Remedial Order Seven (which already applies to RCCI investigations); intended Remedial Order Thirteen to be fully redundant of Remedial Order Eight (which already applies to RCCI investigations); and intended Remedial Order Fourteen to be fully redundant of Remedial Order Ten (which already applies to RCCI investigation). Furthermore, HHSC's position would mean that the Court and the Fifth Circuit intended to order remedial relief for the timely completion of HHSC's lower-priority investigations through Remedial Order Fifteen, which HHSC does not dispute, but not to HHSC's higher priority investigations, which involve immediate or substantial risks of harm to children, through Remedial Order Fourteen. This is not consistent with the Fifth Circuit's Opinions or the Court's Order.[637]

a. Monitors Data and Information Request and Production

i. Monitors Data and Information Request

To validate the State's performance with respect to Remedial Orders Twelve through Nineteen, the Monitors requested from the State key data points for all investigations conducted by RCCL regarding any child in the PMC General Class initiated between July 31, 2019 and September 30, 2019, in a report due November 15, 2019, and then regular quarterly reporting from the State thereafter.[638]

---

[636] Email from Corey D. Kintzer, Assoc. Dir., Litig. Dep't, Legal Servs. Div., Health & Human Servs. Comm'n, to Kevin Ryan and Deborah Fowler, Monitors (Feb. 27, 2020, 10:08 EST) (on file with the Monitors).

[637] The Fifth Circuit discussed in depth the risks presented for PMC children when the facilities the State licenses to provide care for children are not properly regulated, stating that RCCL's general enforcement practices are "problematic." *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 267 (5th Cir. 2018). In its discussion of high rates of repeat violations and deficiencies at licensed facilities, the Fifth Circuit lamented that it is "painfully obvious" that paired with high error rates in child abuse investigations, "inadequate enforcement policies place children at substantial risk of serious harm." *Id*. The Fifth Circuit also noted that there have been consistent reports flagging "inadequate oversight in licensing and enforcement as a critical problem area." *Id*. at 267. Because of these deficiencies, the Fifth Circuit held that the District Court's injunction provisions, including those discussed above, were "reasonably targeted toward remedying the identified issues." *Id* at 276. In 2015, this Court also noted the central role of competent regulatory action, observing that RCCL is "failing its licensing and inspecting duties" and concluded that "DFPS's insufficient oversight of its licensed foster care facilities has caused harm and an unreasonable risk of harm to LFC children*." M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684, 802-804 (S.D. Tex. 2015).

[638] *Monitors' Data and Information Request* (Sept. 30, 2019) (on file with the Monitors). The Monitors requested certain identifying information to support validation, including: Intake stage ID number; Investigation stage ID number; Person ID (for all alleged PMC victims); County where maltreatment is alleged; Most recent investigator name and ID; Date and time investigation stage started; Program conducting investigation; Child's placement type at intake; Placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered

ii. DFPS Data and Information Production

HHSC produced data files for RCCL investigations and advised the Monitors of the information that it could not provide; in some instances, HHSC described the reasons for its inability to produce the information. HHSC indicated that it cannot distinguish between PMC and non-PMC child-related investigations in its data production; therefore, the data does not include the PMC child identifier(s) linked to the referrals or investigations as requested by the Monitors because, according to HHSC: "[t]he agency is operations-centric not child centric. CLASS does not contain the PMC identifier of children involved in a referral [or investigation]; the PMC identifier is only associated with referrals of abuse or neglect in IMPACT."[639] HHSC also stated that it could not provide the following requested data fields as to RCCL investigations:

- the time of the first face-to-face contact with an alleged victim, noting any and all untimely face-to-face contacts and the reason for any approved extensions to the face to face contact timeframe;
- the relationship(s) of the alleged perpetrator(s) to the alleged child-victim(s);
- the date the completed investigation was submitted to the supervisor for approval;
- the date the supervisor approved the investigation;
- the disposition of each allegation; the overall disposition of the investigation; and
- the date of any notification letters to parents.[640]

In addition, HHSC did not provide the date and time of face-to-face contact with all alleged child victims in cases that involve multiple alleged victims; rather, it provided only the first face-to-face contact date with an alleged child victim in cases where such contact occurred.

2.   Remedial Orders Twelve through Nineteen Performance Validation (HHSC)

a.   Methodology

To validate the timeliness of the State's performance associated with Remedial Orders Twelve through Nineteen, the Monitors assessed all 2,231 completed minimum standards investigations with an intake date between August 1, 2019 through December 31, 2019.[641] Because HHSC reported it does not have the capacity to distinguish which investigations involve PMC children, and produced to the monitors all of its minimum standards investigations in the period, the

---

the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; the relationships of the alleged perpetrator(s) to the child-victims.  *Id.*

[639] *Memorandum from Tex. Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors*, at 5-6 (Dec. 6, 2019) (on file with the Monitors) (responding to the Monitors' Sept. 30, 2019 Data and Information Request).

[640] *Id.*

[641] The data files were provided by HHSC on May 5, 2020 and named by the agency RO.15-19.2 9.30.2014-3.31.2020 RCCL.Inspec 5.5.2020.

Monitors evaluated all RCCL investigations included in the data HHSC produced with intake dates between August 1 and December 31, 2019.[642]  The investigations fell into the priority levels described in Table 31 below.

- Remedial Order Twelve: To measure timeliness of HHSC's face-to-face contact with alleged child victims in Priority One investigations, the Monitors calculated compliance using the data fields for intake date and "first face-to-face contact with victim date."

- Remedial Order Thirteen: The "face-to-face contact with victim date" provided by HHSC includes only a date, not a time-of-day timestamp for Priority Two investigations. To estimate compliance, the Monitors used a standard of three calendar days to approximate compliance. The calculation is based upon the intake date and the date of the first face-to-face contact with the child victim.[643]

- Remedial Order Fourteen: To measure timely completion of Priority One and Priority Two investigations, the Monitors used the intake date and the date the investigation was completed.

- Remedial Order Fifteen: To measure timely completion of Priority Three, Priority Four, and Priority Five investigations, the Monitors calculated compliance using the intake date and the date the investigation was completed.

- Remedial Order Sixteen: To measure timeliness of completing and submitting documentation in Priority One and Priority Two investigations, the Monitors calculated compliance using the date the investigation was completed and the date documentation was completed.

- Remedial Order Seventeen: To measure timeliness of completing and submitting documentation in Priority Three, Priority Four, and Priority Five investigations, the Monitors calculated compliance using the intake date and the date the documentation was completed.

- Remedial Order Eighteen: To measure timeliness of mailing notification letters to the referents and providers in Priority One and Two investigations, the Monitors calculated compliance using the date the investigation was completed; the date of notification to the reporter; and the date of notification to the provider. To be compliant with this Order,

---

[642] The Monitors' validation included a manual audit of the investigations data. To do so, the monitoring team identified a sample of investigations with a 90% confidence interval to confirm the relevant dates provided by the State for investigations between August 1, 2019 and December 31, 2019 and found that the dates viewed manually in the CLASS system matched the dates appearing in the data produced by HHSC.

[643] Because the data only include face-to-face information for one victim in the field entitled "first face-to-face contact with victim date," the data provided do not allow the Monitors to validate performance for all alleged child victims for investigations that involve multiple alleged child victims.

HHSC must have notified both the referent and the provider within five days of completing the investigation. If either the referent or the provider was notified more than five days after the investigation was completed or was not notified at all, the investigation was counted as non-compliant.[644]

- Remedial Order Nineteen: To measure timeliness of mailing notification letters to referents and providers in Priority Three, Priority Four, and Priority Five investigations, the Monitors calculated compliance using the fields for intake date; date of notification to reporter; and date of notification to provider. To be compliant, HHSC must have notified both the referent and the provider within sixty days of the intake date. If either the referent or the provider was notified after more than sixty days or were not notified at all, the investigation was counted as non-compliant. Where cells in the date of notification fields were empty, it was assumed that notification had not occurred when calculating performance.

**Table 31: Priority of RCCL Investigations**

| Aug 1, 2019 to Dec. 31, 2019 Source: HHSC RO12-RO19 data | | |
|---|---|---|
| Priority | Number | Percent |
| Priority One | 1 | 0% |
| Priority Two | 628 | 28% |
| Priority Three | 1158 | 52% |
| Priority Four | 11 | 0% |
| Priority Five | 433 | 19% |
| **Total** | **2231** | **100%** |

b. Remedial Order Twelve: Timeliness of Observations or Interviews with Alleged Child Victims in Priority One Investigations

*Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

HHSC reported one Priority One investigation with an intake date between August 1, 2019 and December 31, 2019. The data field provided by HHSC for the first face-to-face contact with the alleged child victim is blank. The data indicate the investigators initiated the investigation through face-to-face contact with an individual other than the child thirty hours and forty-six

---

[644] Where the HHSC data featured cells in the date of notification fields that were empty, the Monitors assumed that notification had not occurred when calculating performance.

minutes after intake; therefore, this investigation did not include face-to-face contact with an alleged child victim within twenty-four hours.

While HHSC did not identify whether the children who are the subject of the investigations were in PMC status, the Monitors independently verified that this Priority One investigation involved a PMC child.[645]

c.   Remedial Order 13: Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake*

HHSC reported 628 Priority Two investigations with an intake date between August 1, 2019 and December 31, 2019. HHSC's data submissions did not include time stamps for face-to-face contact with the victims in Priority 2 investigations; therefore, the monitoring team used calendar days to approximate compliance with Remedial Order Thirteen.[646] Using this methodology, 59% (369) of investigations included first face-to-face contact with an alleged child victim within three days of intake.[647]

**Figure 33: Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations**

---

[645] The Monitors independently verified the child's PMC status using the State's IMPACT database.

[646] For example, if the intake date was August 1, 2019 and the face-to-face contact with victim date was August 4, 2019, the Monitors calculate three days between intake and initiation—though in theory the intake could have happened at 11:59pm on August 1 and initiation on 12:01am on August 4, meaning that the total time was 48 hours, two minutes.  Alternatively, the intake could have happened at 12:01am on August 1 and the face-to-face contact with victim at 11:59pm on August 4th, meaning that it took 95 hours, 58 minutes.

[647] One investigation had a first face-to-face contact with the victim date listed in the data as three days *prior* to intake and was counted as non-compliant.



d. Remedial Order Fourteen: Completion of Priority One and Two Investigations within Thirty Days

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

HHSC reported 629 Priority One and Priority Two investigations with an intake date between August 1, 2019 and December 31, 2019, one of which was a Priority One investigation. During this period, HHSC completed 95% (598) of investigations within thirty days of intake.[648]

**Figure 34: Completion of Priority One and Two Investigations within Thirty Days**

---

[648] HHSC data included reasons for twenty-two extensions for Priority One and Two investigations during this time period; the file does not include additional information about the length of the extensions or new due dates.



e. Remedial Order Fifteen: Completion of Priority Three, Four, and Five Investigations within Sixty Days of Intake

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

HHSC reported 1,602 Priority Three, Four, and Five minimum standards investigations with an intake date between August 1, 2019 and December 30, 2019. The priorities of investigations broke down as follows: Priority Three (1,158); Priority Four (11); and Priority Five (433) investigations. During this period, HHSC completed ninety-six percent (1,537) of investigations within sixty days of intake.[649]

**Figure 35: Completion of Priority Three, Four, and Five Investigations within Sixty Days of Intake**

---

[649] HHSC data included reasons for 34 extensions for Priority Three, Four, and Five investigations during this time period; the file does not include additional information about the length of the extensions or new due dates.



f.  Remedial Order Sixteen: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

HHSC reported 629 Priority One (1) and Priority Two (628) completed investigations with an intake date between August 1, 2019 and December 31, 2019. During this period, in 96% (603) of the investigations, the documentation was completed on the same day the investigation was completed.

**Figure 36: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations**

282



g. Remedial Order Seventeen: Completion and Submission of Documentation within Sixty Days of Intake in Priority Three, Four, and Five Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

HHSC reported completion of 1,602 Priority Three (1,158), Priority Four (11), and Priority Five (433) investigations with intake dates between August 1, 2019 and December 15, 2019. During this period, HHSC completed documentation within sixty days of the intake date in 96% (1,518) of the 1,602 investigations.

**Figure 37: Completion and Submission of Documentation within Sixty Days of Intake in Priority Three, Four, and Five Investigations**



h. Remedial Order Eighteen: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

HHSC reported completion of 629 Priority One (1) and Two (628) minimum standards investigations with intake dates between August 1, 2019 and December 31, 2019. Of those 629 investigations, 77% (482) of investigations included notification to the referent and provider within five days of completion of the standards investigation.

**Figure 38: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations**



i. Remedial Order Nineteen: Notification Letters Sent within Sixty Days of Intake in Priority Three, Four, and Five Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

HHSC reported 1,602 Priority Three (1,158), Four (11) and Five (433) minimum standards investigations with intake dates during the period August 1, 2019 and December 31, 2019. Of the 1,602 investigations, 79% (1,266) investigations included notification to the referent and provider within sixty days of intake.

**Figure 39: Notification Letters Sent within Sixty Days of Intake in Priority Three, Four, and Five Investigations**



3. Summary

- Remedial Order Twelve: HHSC reported one Priority One investigation with an intake date between August 1, 2019 and December 31, 2019. This investigation did not include face-to-face contact with an alleged child victim within twenty-four hours.

- Remedial Order Thirteen: HHSC reported 628 Priority Two investigations with an intake date between August 1, 2019 and December 31, 2019. Fifty-nine percent (59%) (369) of investigations included first face-to-face contact with an alleged child victim within three days of intake.

- Remedial Order Fourteen: HHSC reported 629 Priority One and Priority Two investigations with an intake date between August 1, 2019 and December 31, 2019; HHSC completed 95% (598) of investigations within thirty days of intake.[650]

- Remedial Order Fifteen: HHSC reported 1,602 Priority Three, Four, and Five minimum standards investigations with an intake date between August 1, 2019 and December 30, 2019; HHSC completed ninety-six percent (1,537) of the investigations within sixty days of intake.[651]

---

[650] HSSC data included reasons for twenty-two extensions for Priority One and Two investigations during this time period; the file does not include additional information about the length of the extensions or new due dates.
[651] HHSC data included reasons for thirty-four extensions for Priority Three, Four, and Five investigations during this time period; the file does not include additional information about the length of the extensions or new due dates.

- Remedial Order Sixteen: HHSC reported 629 Priority One (1) and Priority Two (628) completed investigations with an intake date between August 1, 2019 and December 31, 2019; in 96% (603) of the investigations, the documentation was completed on the same day the investigation was completed.

- Remedial Order Seventeen: HHSC reported completion of 1,602 Priority Three (1,158), Priority Four (11), and Priority Five (433) investigations with intake dates between August 1, 2019 and December 15, 2019; in 96% (1,518) of the 1,602 investigations, HHSC completed documentation within sixty days of the intake date.

- Remedial Order Eighteen: HHSC reported completion of 629 Priority One (1) and Two (628) minimum standards investigations with intake dates between August 1, 2019 and December 31, 2019; 77% (482) of the investigations included notification to the referent and provider within five days of completion of the standards investigation.

- Remedial Order Nineteen: HHSC reported 1,602 Priority Three (1,158), Four (11) and Five (433) minimum standards investigations with intake dates during the period August 1, 2019 and December 31, 2019; of the 1,602 investigations, 79% (1,266) investigations included notification to the referent and provider within sixty days of intake.

C. Remedial Order Twenty: Heightened Monitoring

Remedial Order Twenty: *Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions, and, as appropriate, other remedial actions under DFPS' enforcement framework.*

1. Background

The Monitors detailed DFPS and HHSC policies related to enforcement in The Court Monitors' Update to the Court Regarding Remedial Order Twenty, filed with the Court on March 3, 2020.[652] When a licensed placement violates minimum standards, the State can take action either through HHSC RCCL's regulatory authority related to the placements' licenses or through DFPS's authority to enforce its contract with the placement.[653]

---

[652] *The Monitors' Report to the Court Regarding Remedial Order 20*, ECF 832 [hereinafter *The Monitors' Report Regarding Remedial Order 20*].

[653] *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Contractor Noncompliance and Contract Remedies, Contracting Policies Handbook, available at* https://www.dfps.state.tx.us/Doing_Business/Contract_Handbook/Chapter_4/4-07 noncompliance_and_remedies.asp; 26 TEX. ADMIN. CODE § 745.8600 – 745.8613.

a.  RCCL Enforcement Policy

RCCL's enforcement options include:

- Corrective Action, which today includes only probation, but prior to September 2019 also included "evaluation."
- Adverse Action, which takes some action on an operation's license, and includes adverse amendment, denial, revocation, and involuntary or emergency suspension.
- Judicial Actions; and
- Monetary Actions (administrative penalties). [654]

RCCL considers several factors when determining whether to impose an enforcement action, and which action to take.  Enforcement action decisions depend on:

- The severity of the deficiency;
- Whether the deficiency has been repeated;
- Whether the deficiency can be corrected;
- How quickly the correction can be made;
- Whether the operation demonstrates the "responsibility and ability to maintain compliance with minimum standards, rules, and laws";
- Whether conditions must be imposed to avoid further deficiencies;
- Compliance history; and
- Degree and/or immediacy of danger posed to the health or safety of children. [655]

HHSC published the following table to describe how RCCL determines which action to take once a decision is made to take some enforcement action:[656]

**Table 32 Below:**

---

[654] An operation may also undertake a voluntary plan of action.  RCCL may also offer technical assistance rather than take formal enforcement action.
[655] 26 TEX. ADMIN. CODE §745.8607.
[656] TEX. HEALTH & HUMAN SERVS. COMM'N, *CCL Enforcement Actions*, *available at* https://hhs.texas.gov/doing-business-hhs/provider-portals/protective-services-providers/child-care-licensing/ccl-enforcement-actions

| Enforcement Action | What is the capability of the governing body or permit holder? | Limitation on Using This Enforcement Action? | Can risk be mitigated while the operation continues to operate? |
|---|---|---|---|
| **Plan of Action** | The governing body or permit holder has demonstrated all of the following: the ability to identify risk; accepts responsibility for correcting deficiencies;<br>• willingness to comply; and<br>• a history of maintaining corrections for ongoing compliance. | Yes. Licensing may only offer a Plan of Action as an enforcement action if the operation does not have history of a POA within the previous 12 months for similar deficiencies. | Yes, by following the agreed upon plan to improve compliance. |
| **Probation** | The governing body or permit holder has repeatedly demonstrated the inability to:<br>1. identify risk; and/or<br>2. make the necessary changes to address underlying issues to reduce risk.<br>a3. In addition, the governing body or permit holder is willing and able to make necessary corrections, with intervention from Licensing. | No. The operation may or may not have had previous enforcement actions. | Yes, by following conditions Licensing has imposed. |
| **Adverse Amendment** | The governing body or permit holder is willing and able to abide by restrictions and conditions placed on the permit. | No. The operation may or may not have had previous enforcement actions. | Yes, if the operation abides by the restrictions or conditions placed on the permit. |
| **Denial and Revocation** | The governing body or permit holder has repeatedly demonstrated the inability to:<br>• identify risk; and/or<br>• make the necessary changes to address underlying issues to reduce risk. | No. The operation may or may not have had previous enforcement actions. | No. Children will be at risk of harm if the operation is allowed to operate or continue to operate. |

289

b.  DFPS Contract Enforcement Policy

DFPS also incorporates language about most minimum standards, particularly those related to health and safety, into the contracts it executes with providers.[657]  Contract monitoring by DFPS may focus on three different review types: programmatic, administrative, or fiscal.[658]  Contract monitoring may be targeted or comprehensive and may consist of an on-site or a desk review.[659]  Contracts are monitored through complaints and a risk management process.[660]  Complaints may be made by a DFPS client, employee, a contractor's employee, a community stakeholder, or another state agency.[661]

According to the agency's policy, the following risk factors are monitored for client service contracts by the division tasked with oversight:

1.  Contractor growth;
2.  Organizational changes;
3.  Client safety;
4.  Service delivery and quality;
5.  Resource management; and
6.  Internal controls.[662]

The agency uses a risk assessment tool to determine which contracts it will include in annual Specialized Monitoring Plans (SMPs).[663]  Monitoring plans are developed and conducted for the identified contractors during each fiscal year and completed by the end of the calendar year.

The State requires certain contracts to have "enhanced" monitoring, described as "an increased level of monitoring, beyond risk based monitoring."[664]  Enhanced monitoring is required for contracts with a total cost of over $10 million that also meet the following characteristics:

---

[657] *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Comparison of Minimum Standards, Residential Contract Requirements, and Service Level Indicators*, *available at* https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/comparison.asp

[658] *Id.*

[659] *Id.*

[660] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Contract Monitoring, Contracting Policies Handbook*, *available at* https://www.dfps.state.tx.us/Doing_Business/Contract_Handbook/Chapter_5/5-01-contract_monitoring.asp

[661] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Review Reason: Risk Based, Enhanced, Complaint, Follow-up, Contracting Policies Handbook*, *available at* https://www.dfps.state.tx.us/Doing_Business/Contract_Handbook/Chapter_5/5-03-review-reason.asp

[662] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Policy 4.6 Risk Management* (Aug. 1, 2019).

[663] *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Review Reason: Risk Based, Enhanced, Complaint, Follow-Up*, *available at* https://www.dfps.state.tx.us/Doing_Business/Contract_Handbook/Chapter_5/5-03-review-reason.asp

[664] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Review Reason: Risk Based, Enhanced, Follow-up, Contracting Policies Handbook*, *available at* https://www.dfps.state.tx.us/Doing_Business/Contract_Handbook/Chapter_5/5-03-review-reason.asp

- A client services contractor is responsible for decisions impacting the safety and protection of DFPS clients;
- DFPS could be negatively impacted by a contractor's failure or delay in performance;
- The contract is complex (DFPS gives the example of a contractor responsible for a "network of subcontractors"); and
- There is a heightened risk of loss, fraud, waste or abuse.[665]

When DFPS contract staff determine that a contractor has failed to live up to its obligations, DFPS may respond by requiring a corrective action plan or may opt to implement a contractual remedy. In cases in which the contractual violation poses a significant harm or risk of harm to children, the agency may impose additional reporting requirements or may take action to reduce the services or dollars associated with the contract.  Contractual remedies include:

- disallowances or collection of improper payments;
- a suspension of referrals or placements;
- removal of specific services from the contract provisions;
- suspension of payment;
- placing the contractor on vendor hold; or
- a reduction of the contract amount. [666]

DFPS may terminate a contract for convenience or for cause.[667]  DFPS may terminate for cause "when attempts to assist a contractor failing to perform or make progress have been ineffective."[668] DFPS may terminate when contract agency staff determine the contractor is unable to perform, make progress, or has breached the contract in any way.[669]  This includes circumstances in which the contractor submits falsified documents, fraudulent billings, or fails to disclose contracting information when required.[670]

c.  The State's Initial Report to the Monitors

In the agency's September 9, 2019 report to the Monitors, HHSC stated that the agency would implement this remedial order by following the existing policy framework set out in the Texas Administrative Code and agency policy.  However, HHSC requested clarification regarding interpretation of the language of the order:

> HHSC-RCCL respectfully requests clarification on the following issues in order to comply with its aspects of this injunction:

---

[665] *Id.*

[666] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Policy 4.7 Contractor Noncompliance and Contract Remedies* (July 1, 2013).

[667] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Contract Termination, Contracting Policies Handbook*, *available at* https://www.dfps.state.tx.us/Doing_Business/Contract_Handbook/Chapter_6/6-01-termination.asp

[668] *Id.*

[669] *Id.*

[670] *Id.*

- How to define a pattern of minimum standards violations;
- The timeframe requested to determine a pattern of minimum standards violations; and
- The definition of "heightened monitoring."

With such clarification, HHSC-RCCL can develop protocols to identify, to track and to address facilities with patterns of minimum standards violations.[671]

DFPS reported:

> DFPS practices are in compliance with this order. If DFPS identifies a decrease in a contractor's performance, DFPS may begin with initiating a technical resolution process during which issues, barriers and potential solutions are identified. If issues persist, the DFPS Contracts division may refer the contractor for review in a Facility Intervention Team Staffing with HHSC RCCL, RCCI and CPS. This staffing is intended to comprehensively identify possible root causes and coordinate responses from program and contracts divisions, as appropriate.[672]

On October 7, 2019, the Monitors advised both RCCL and DFPS that the Court had reviewed their initial reports to related to Remedial Order Twenty and instructed:

> With respect to HHSC's Request for Clarification for Remedial Order 20, the Court directs the State to propose a specific and detailed definition of "pattern" using a retrospective analysis of nothing fewer than 5 years. With respect to heightened monitoring, the Court directs the State to propose a detailed definition of heightened monitoring that moves beyond the existing oversight and enforcement framework.[673]

d. Data and Information Request and Production

i. Monitors' Data and Information Request

The Monitors requested the following in their September 30, 2019 Data and Information request with respect to Remedial Order Twenty:

---

[671] TEX. HEALTH & HUMAN SERVS. COMM'N, *M.D. v. Abbott HHSC Monitor Notebook* (Sept. 9, 2019) (on file with the Monitors).
[672] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *MD v. Abbott Monitoring Status Update* (Sept. 9, 2019) (on file with the Monitors).
[673] Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Texas (Oct. 7, 2019, 10:22 EST) (on file with the Monitors) (regarding DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).

1) A detailed description of how RCCL defines a pattern of contract or policy violations. Provide the policy or protocol, if any, used to instruct decisions about whether a pattern of contract or policy violations exists for child care placement facilities.

2) A list of all licensed placements, excluding agency foster homes, inspected over the last three years, starting from September 30, 2016 through September 30, 2019. The list should identify whether the inspection was announced or unannounced; all deficiencies cited during the inspection; any follow up inspections and the results of those inspections; any enforcement taken (including warning letters) as a result of a cited deficiency; the placement/provider name and identification number and county; agency responsible for the placement; number of beds; and name of the facility.  Include the CLASS Risk Review Enforcement Recommendations, and, if an alternative to the recommended enforcement was chosen, the reason for the alternative.

3) For the same time period, all requests by an operation for Licensing to review a policy, and the results of the request.

4) For the same time period, all risk analyses performed pursuant to the process described in section 4800 et seq. of the HHSC Child Care Licensing Policy and Procedures Handbook, and any action taken as a result of the analysis.

5) For the same time period, a list of all agency foster homes inspected. The list should indicate the date of the inspection(s); whether the home was inspected due to random sampling or because some other event triggered the inspection; whether the inspection was announced or unannounced; any deficiencies cited as a result of the inspection; any immediate hazards reported; and any enforcement action taken by the CPA or RCCL. The list should include the placement/provider name; the unique foster home identification number; the date the home was opened; the date the home was closed (if applicable); contact information for the home; the home's county; and the agency responsible for the foster home, with contact information for the agency.

6) For the same time period, all documentation of monitoring plans or corrective actions taken by the State (either by DFPS or RCCL) as a result of heightened contract or licensing monitoring or enforcement.

7) For the same time period, a list of all child care placements that includes any and all allegations of contract violations, policy violations, minimum standards violations, or abuse and neglect, including the nature of the allegation and specific standard, policies, or contractual provisions allegedly violated; whether the allegation was substantiated; and any enforcement or corrective action taken.

8) Starting July 31, 2019 through September 30, 2019, and on a quarterly basis thereafter, a report that includes a list of all restraints and/or Emergency Behavior Interventions (EBI) disaggregated by placement. The report shall include placement/provider name, identification number, county, contact information, and, if a foster home, the agency responsible; type of restraint or EBI; date of incident; reason for restraint or EBI; name of

293

child(ren) involved, along with identification number, date of birth, and race/ethnicity/gender of the child. Identify all situations in which the child sustained an injury and all situations in which the child required medical attention as a result of the restraint or EBI.

9) Provide a copy of DFPS shell contracts and contract amendments for each type of residential placement facility for FY 2018 and FY 2019.

## ii. DFPS and HHSC First Data and Information Production

DFPS responded to the Monitors request on October 18, 2019, stating:

a) DFPS will respond to the portions of request one concerning contract violations;

b) DFPS will respond to the portions of request six concerning heightened contract monitoring; and

c) DFPS will respond to the portion of request seven concerning contract violations by LFC placements.

HHSC responded to the Monitors request on November 15, 2019, stating:

a) For request two, HHSC cannot provide the agency responsible for placement because CLASS does not contain placement information about children.

b) For request three, HHSC cannot provide all requests by an operation for Licensing to review a policy, and the results of that request because RCCL does not have a process in place to track when an operations requests licensing to review an operation's policy.

c) For request five, HHSC cannot provide any enforcement action taken by the CPA or RCCL since RCCL does not require a CPA to report to CCL any actions the CPA takes on a foster home.

d) For request seven, HHSC cannot provide contract violations or policy violations since RCCL does not track contract or policy violations.

e) For request eight, HHSC cannot provide the name of child(ren) involved, along with identification number, date of birth, and race/ethnicity/gender of the child since aggregate reports collected do not have this information; all situations in which the child sustained an injury and all situations in which the child required medical attention as a result of the restraint or EBI since RCCL does not require operations to report each instance of an EBI;

and the reason for punishment, and placement since RCCL does not capture the reason for punishment in the CLASS system.[674]

Both agencies sent the Monitors their proposed definitions for "pattern" and "heightened monitoring" on November 1, 2019.

### iii. The Monitors' Second Data and Information Request

On February 21, 2020, the Monitors sent a second data and information request, which sought the below revisions and additions:

1) Extend all data requested to include five years of data (September 30,2014 to September 30,2019);

2) Provide data on all inspections, investigations, assessments, and monitoring of residential child care operations and agency homes quarterly;

3) Identify investigations linked to inspections in inspections and deficiencies data provided within required timeframes.

### iv. DFPS and HHSC Second Data and Information Production

DFPS and HHSC responded to the Monitor's request by indicating that the additional years of data would be provided and on-going reports of all inspections, investigations, assessments, and monitoring of residential child care operations and agency homes would be provided quarterly. The State requested six weeks in order to provide the additional two years of historical data.  Five years of historical data (September 30, 2014 – September 30, 2019) and two quarters of inspections, investigations, assessments, and monitoring of residential child care operations and agency homes (October 1, 2019 – March 31, 2020) was provided by HHSC on May 14, 2020 and by DFPS on May 22, 2020.

### v. The Court's Orders Related to Definitions of "Pattern" and "Heightened Monitoring"

The Monitors shared the agencies' proposed definitions of "pattern" and "heightened monitoring" with the Court on January 31, 2020.  On February 4, 2020, the Court instructed the Monitors to send alternative proposed definitions to the State for feedback.  During a telephonic hearing on February 12, 2020, the Court ordered the State to provide feedback on the Monitors' proposed

---

[674] TEX. HEALTH & HUMAN SERVS. COMM'N, *Data Production Chart in Response to September 30th Data and Information Request* (Nov. 15, 2019) (on file with Monitors)

definitions and methodology by February 19, 2020.[675]  The agencies provided written feedback to the Monitors via e-mail on February 19, 2020.[676]

In a subsequent telephonic hearing on February 21, 2020, the Court ordered the Monitors to provide their proposed definition and methodology to the Court by noon on Friday, February 28, 2020.[677]  After a telephone conversation with the State on February 27, 2020, during which the State provided feedback on an amended proposal the Monitors shared with the State, the Monitors provided their proposed definition and methodology to the Court, along with the State's written feedback to the amended proposed definitions.  The Court asked the Monitors to file a report setting out the agencies proposed frameworks and the reasons the Monitors recommended an alternative, unified framework, which the Monitors filed on March 3, 2020.[678]

*The Court's March 18, 2020 Order Adopting the Monitors' Recommended Definitions*[679]

On March 18, 2020, the Court entered an order adopting the definitions proposed by the Monitors. The Order set out the following as definitions of pattern and heightened monitoring:

**Pattern:**

A pattern is defined as a high rate of contract and standards violations for at least three of the last five years.

Steps in identifying the pattern:

1. Each agency shall review data for the rate of contract and standards violations, including confirmed findings of abuse and neglect, for the last five years.  The rate is calculated using the number of violations divided by the operation's capacity multiplied by 10 (Number of contract or standards violations/capacity X 10).
2. For each of the last five years, compare the operation's rate of violations to the combined rate of violations for all operations of similar size (small, medium, or large) and service type (basic general residential operation, residential treatment center, child placing agency, and independent foster family and group homes).
3. If the operation's rate of violations rated medium, medium-high, or high is above the combined rate of violations rated medium, medium-high, or high for operations of similar size and service type for three of the last five years, then there is a pattern of violations.

---

[675] Order, ECF 801.
[676] Email from Rand Harris, Assoc. Comm'r for Compliance, Coordination & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Feb. 19, 2020, 11:38 EST) (on file with the Monitors) (regarding heightened monitoring); Email from Tarryn Lam, Att'y, Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Feb. 19, 2020, 11:31 EST) (on file with the Monitors) (regarding heightened monitoring).
[677] Order at 4, ECF 811.
[678] *The Monitors' Report Regarding Remedial Order 20.*
[679] Order at 1-2, ECF 837.

4. Each agency shall inform the other of all operations identified as having a pattern of deficiencies.

Operation Size:

Small operations: Those with a capacity of 20 or fewer children or, for CPAs, 20 or fewer open foster homes;
Medium operations: Those with a capacity of 21-50 children or 21- 50 open foster homes; and
Large operations: Those with a capacity of more than 50 children or more than 50 open foster homes.

Operation Service Type: Basic General Residential Operation

General Residential Operation – Residential Treatment Center
Child Placing Agency
Independent Foster Family and Group Homes

**Heightened Monitoring**

When an operation is identified for heightened monitoring, a Facility Intervention Team Staffing (FITS) is scheduled within 5 days.  The intervention team is made up of staff from, at least, RCCL, DFPS CCI, DFPS Contracts, and CPS.

During the FITS, the team will review:

- Any trends for the operation identified as a result of the five-year retrospective analysis
- Any monitoring plans or corrective or enforcement actions for the operation in the last 5 years;
- Any risk analyses conducted by RCCL or DFPS for the operation in the last 5 years.

If the review reveals events that implicate an ongoing concern for the health and safety of children, the intervention team will develop a safety plan and temporarily suspend placements until all concerns for children's health and safety have been addressed.  This must be documented in CLASS.

The FITS team is responsible for developing a heightened monitoring plan that:

- Outlines a coordinated response from RCCL & DFPS, including a list of staff from both agencies who will serve on the heightened monitoring team for the operation;
- Describes a detailed and specific plan addressing:

297

- The pattern of policy violations that led to heightened monitoring;
- Any barriers to compliance identified during a review of previous corrective or enforcement actions or risk analyses;
- Any technical assistance needed by the operation from FPS, RCCL, or a third party; and
- The steps the operation must take to satisfy the plan.

While an operation is on heightened monitoring, RCCL and DFPS will share responsibility for at least weekly unannounced visits to the operation, and any placements of PMC children must be directly approved by the Associate Commissioner of CPS.

The heightened monitoring plan will remain in place for at least one year and until:

- the operation satisfies the conditions of the plan;
- at least six months of successive unannounced visits indicating the operation is in compliance with the standards and contract requirements that led to heightened monitoring; and
- the operation is not out of compliance on any medium-high or high weighted licensing standards.

After the operation is released from the plan, DFPS and RCCL will coordinate to make at least three unannounced visits in the three months following the release from the plan, and the heightened monitoring team will continue to track intake data for the operation for six months to ensure it does not lose progress made during monitoring.

If the operation does not come into compliance with the plan during the heightened monitoring period, DFPS and RCCL will identify one or more of the following penalties:

- suspension of placements;
- imposition of fines;
- suspension or revocation of the facility or CPA's license; and/or
- termination of the contract.

The heightened monitoring plan, unannounced visits associated with the plan, and progress toward meeting the plan must all be documented in CLASS.  Caseworkers for PMC children in operations under heightened monitoring must be made aware of the monitoring.

*The Court's March 29, 2020 Order Temporarily Suspending "In Person" Elements of Heightened Monitoring*

After the Court issued its March 18, 2020 Order, Texas, like the rest of the nation, began grappling with the COVID-19 pandemic.  Consequently, the Court issued an order on March 29, 2020 temporarily suspending the "in person" elements of the heightened monitoring definition adopted in the Court's March 18, 2020 order.[680]   The Court ordered the State to advise it of alternative means the State will employ to substantially comply with the March 18, 2020 order by April 1, 2020.[681]

The State submitted its response to the Court on April 1, 2020,[682] and the Court scheduled a telephonic hearing for April 3, 2020.  The Court entered an order on April 3, 2020 requiring the Defendants to provide additional information related to the response filed by the State on April 1, 2020:

> The Court ORDERS Defendants to provide the Monitors and the Plaintiffs cost estimates and other relevant information to implement heightened monitoring for foster care facilities including detailed estimates for reconfiguration of CLASS, consistent with the Court's Order of March 18th, 2020.  A cost breakdown itemizing hours, expenses, and HHSC and DFPS's requests for its staff to implement heightened monitoring must be included.  This information must be submitted no later than 5:00PM, April 10, 2020.

> Further, in conjunction with the March 18th, 2020 Order, the Court ORDERS Defendants to provide the Monitors no later than June 5th, 2020, a list of operations that must comply with the March 18th Order regarding heightened monitoring.  The Court acknowledges that HHSC and DFPS will have information on data sets for patterns and other relevant information for heightened monitoring by May 22, 2020.  If Defendants need more time to comply with the March 18th Order, Defendants must notify the Court and the Monitors, and a telephone hearing will be scheduled.[683]

vi.  The State's Responses to the Court's Orders

On April 1, 2020, DFPS and HHSC filed declarations with the Court from agency leadership describing how they intended to comply with the order in light of the suspension of the "in person" requirements of heightened monitoring due to the COVID-19 crisis.[684]  Both agencies cited agency-

---

[680] Order, ECF 838.
[681] *Id.*
[682] *Defs.' Resp. to Ct.'s Req. for Information*, ECF 840.
[683] *Id.* at 3.
[684] *Id.*

wide capacity challenges as a result of the pandemic.[685] DFPS and HHSC indicated that these capacity challenges would make implementing the heightened monitoring plan outlined in the Court's March 18, 2020 order difficult, despite the Court's suspension of the "in person" elements.[686]

Some of the challenges highlighted by the agencies in compiling the data necessary to identify a five-year pattern are the same challenges the Monitors identify in Section II of this report (Data System Challenges). For example, DFPS notes that it has had to create a "data set of providers with a Reason to Believe finding in a case of abuse or neglect, a violation of Minimum Standards, or a violation of contract requirements." This requires it to pull data from at least three different databases – CLASS, IMPACT, and SCOR (the database used to track contract enforcement). DFPS estimated that even without the pandemic, because it would need to "manually compile" contract data that is not in the SCOR database, it would take a minimum of six weeks just to compile the data set, run the model, and establish the list of providers subject to heightened monitoring.[687]

Once operations are identified, DFPS and HHSC both estimate that a significant number of additional staff will be needed to engage in the heightened monitoring recommended by the Monitors and adopted by the Court's order.[688] In addition, DFPS indicates that it will need additional CPS staff "to monitor children without placements due to increased placement suspensions."[689] Under the Court's heightened monitoring definition, placements suspensions are triggered only if the FITS "reveals events that implicate an ongoing concern for the health and safety of children."  This response seems to anticipate that a high number of the operations subject to heightened monitoring under the Court's definition are likely to have ongoing health and safety concerns, and that the new heightened monitoring requirements will require the agency to deviate from existing practice by requiring that placements be suspended in operations with ongoing concerns.

DFPS also noted that the same language in the Court's definition – which then requires that a safety plan remain in place for the operation identified as having ongoing concerns, until "all concerns for children's health and safety have been addressed" – would necessitate hiring more

---

[685] *Defs.' Resp. to Ct.'s Req. for Information*, ECF 840-1, ECF 840-2.

[686] For example, in his declaration, Rand Harris stated, "Implementing heightened monitoring in accordance with the Court's order will necessitate time to educate providers and roll out the changes in a deliberate fashion, which is a challenge to balance with the COVID-19 related issues facing the State."  *Def's Resp.*, ECF 840-1 at 2:5.  In her declaration, Jean Shaw stated, "Because of the COVID-19 pandemic, HHSC Child Care Regulation (CCR) staff is spread thin across the state, focused on addressing COVID-19 issues.  CCR is making its best efforts to allocate resources towards implementing the definitions for "pattern" and "heightened monitoring" that were issued on March 18, 2020, while ensuring that resources are not pulled away from other activities necessary to ensure child safety." *Defs.' Resp.*, ECF 840-2 at 2:4-5.

[687] *Defs.' Resp.*, ECF 840-1 at 2-3:6(b-c).  This estimate provided the basis for the timeline set by the Court in the April 3rd order.

[688] *Defs.' Resp.*, ECF 840-1 at 3-4:7; *Defs.' Resp.*, ECF 840-2 at 3:10 (estimating RCCL would need an additional 64 FTEs).

[689] *Defs.' Resp.*, ECF 840-1 at 4:7(b)(5).

staff because it would mean "DFPS cannot merely mitigate and address risk but would be required to meet the threshold of all safety concerns having been addressed prior to lifting a suspension or safety plan."[690]

In addition to an additional sixty-four FTEs that RCCL estimates it will need for the FITS and monitoring required for heightened monitoring of troubled operations, the agency noted that because "the CLASS system is not configured to handle the expectations…Child Care Regulation (CCR) estimates that enhancements to CLASS would cost $2 million to overcome its limited ability to document the heightened monitoring plan, unannounced visits associated with the plan, and progress towards satisfying the plan.  Manual processes would be required to be used in the interim but would limit CCR's ability to track and report on heightened monitoring efforts."[691]

Both agencies provided a more detailed and combined cost estimate in the April 10, 2020 response to the Court's April 3, 2020 Order. The two agencies predict that they will need 170.5 FTEs – 106.5 for DFPS and 64 for RCCL – to fully staff the work required to appropriately implement the Heightened Monitoring requirement.[692]  DFPS's projected staff needs include "[a]dditional FTEs…to assess contacts to SWI…resulting from increased monitoring visits."  DFPS explained, "Increased visits by mandatory reporters generally results in increased intakes."[693]

Finally, in addition to the CLASS enhancements that were included in the April 1, 2020 response from RCCL, the April 10, 2020 response includes IMPACT enhancements that DFPS indicates will need to "support casework and documentation," including "updates to an existing interface between IMPACT and CLASS to send and receive data on facilities on [heightened monitoring] status."[694]  According to the agencies' combined cost estimate, the total cost to implement the heightened monitoring plan will be more than seventeen million dollars.[695]

---

[690] It is important to note that the Court's language requires a suspension on *new* placements.  Thus, the requirements related to ensuring safety that DFPS complains of are requirements that would apply to facilities that are still housing children.

[691] *Defs.' Resp.*, ECF 840-2 at 3.

[692] Email from Kimberly Gdula, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Aaron Finch, Senior Staff Att'y, Children's Rights (Apr. 10, 2020, 16:36 EST) (on file with the Monitors) (including DFPS and HHSC heightened monitoring cost estimate submission); *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., ET AL., *FCL Heightened Monitoring Cost Estimate* (Apr. 10, 2020).

[693] *Id.*

[694] *Id.* at 5-6.

[695] *Id.*  In developing this cost analysis, the State relied on a preliminary data analysis provided to the agencies by the Monitors during discussion of the proposed definitions.  This analysis included only three years of data, and was missing components of the pattern definition; it was intended as a point of reference to help guide the discussion. DFPS noted in their April 10, 2020 response that the analysis did not include contract enforcement actions, and suggests that doing so will add another twenty operations to the list.  This serves again as an example of the fractured approach the agencies take to enforcement: in a system in which both entities are in regular communication regarding minimum standard violations, contract violations, and abuse and neglect investigations, one would expect these lists to overlap.

vii.  Remedial Order Twenty: Performance Validation

e.  Methodology

Due to the timing of the State's production of the data that is necessary to inform the "pattern" analysis adopted by the Court's order made, the Monitors will analyze the data and produce lists of facilities to match to those that the Court ordered the State to produce on June 5, 2020 in future reporting.[696]   In this report, the Monitor's analyzed the available data to demonstrate how the State's current monitoring, oversight, and enforcement systems function today.

2.  Remedial Order Twenty: Performance Validation Results

The Monitors undertook a baseline analysis of the State's current enforcement scheme by analyzing the data provided by DFPS and HHSC in response to data and information requests related to Remedial Order Twenty, in this analysis, the Monitors determined how often, between September 30, 2014 and March 31, 2020, RCCL cited operations for violations of minimum standards; found an RTB related to an abuse and neglect investigation, and faced some kind of enforcement action either through DFPS's authority as a contractor or RCCL's authority as a licensor.

*Operations with RTB Rates that are Higher than the State Average Rate for Similarly-Sized Operations*

The Monitors analyzed data provided by DFPS for abuse and neglect investigations that resulted in an RTB finding between September 30, 2014 and March 31, 2020.  During that time period, DFPS initiated 10,132 investigations involving 29,423 allegations of abuse or neglect for children in licensed operations.  Of the more than 10,000 investigations, 506 resulted in an RTB, with some resulting in more than one RTB finding.  In total, these investigations resulted in 1,109 RTB findings.

The Monitors used the size categories set out in the Court's definition of "pattern," *supra*, (small, medium, large)[697] to determine an average RTB finding rate across all operations (GROs and CPAs) the State investigated for an abuse or neglect and compared operations' RTB finding rates to the statewide finding rate for similarly sized operations.[698]   The finding rate is expressed as the

---

[696] HHSC produced the data needed for the five-year analysis of RCCL monitoring and enforcement action on May 18, 2020.  DFPS provided data to the Monitors through access to a SharePoint file on May 22, 2020; the Monitors will engage with DFPS staff and leadership about this recent data production to facilitate comprehensive future reporting.

[697] The Monitors did not have capacity information for 115 CPAs that were investigated for abuse or neglect during this period.  This information is needed in order to validate the State's list of facilities subject to heightened monitoring for the Monitor's next report.

[698] The rate was determined by dividing the total number of RTBs for the time period by the operation's capacity, and multiplying by ten to standardize.

number of RTBs for every ten beds of capacity for GROs and the number of RTBs for every ten foster homes for CPAs.

The statewide RTB rate for small GROs that had an abuse or neglect investigation during the period between September 30, 2014 and March 31, 2020 was .42 for every ten beds of capacity. The Monitors determined that of the eighty-six small GROs in Texas, sixty-one (71%) had an RTB rate during that time period that was equal to or lower than the statewide rate; twenty-five GROs (29%) had an RTB rate that was higher than the statewide rate for small GROs.    Eleven of these twenty-five small GROs had an RTB rate two or more times the state RTB rate.  The table below highlights the five small GROs with the highest RTB rates for the period between September 30, 2014 and March 31, 2020.[699]

**Table 33: Five Small GROs with Highest RTB Rates, September 30, 2014 through March 31, 2020**

| Small GROs | | | State Rate=0.42 |
|---|---|---|---|
| Operation Name | Capacity | RTBs | RTB Rate |
| VisionQuest Residential | 16 | 4 | 2.50 |
| Connections Inc. Emergency Shelter | 15 | 4 | 2.67 |
| Autistic Treatment Center | 14 | 4 | 2.86 |
| The Pillar of Progression for the Youth | 13 | 6 | 4.62 |
| ACH Child and Family Services Emergency Shelter | 20 | 12 | 6.00 |

The statewide RTB rate for medium GROs for the period between September 30, 2014 and March 31, 2020 was 0.73 for every ten beds of capacity. The Monitors determined that of the ninety-nine medium-sized GROs in Texas, eighty (81%) had an RTB rate during that time period that was equal to or lower than the statewide rate; nineteen medium-sized GROs (19%) had an RTB rate that was higher than the state  RTB rate for similarly sized GROs.  Eleven of these nineteen medium-sized GROs had an RTB rate two or more times higher than the state RTB rate.  The table below indicates the five medium-sized GROs with the highest RTB rates for this time period.

**Table 34: Five Medium GROs with Highest RTB Rates, September 30, 2014 through March 31, 2020**

| Medium GROs | | | State Rate=0.73 |
|---|---|---|---|
| Operation Name | Capacity | RTBs | RTB Rate |
| Carter's Kids Residential Treatment Center | 30 | 10 | 3.33 |
| North Fork Educational Center | 40 | 15 | 3.75 |

---

[699] The tables that include all GROs and CPAs with a rate that exceeds the state rate are included in Appendix 6.1.a GROs Over State RTB Rate, Appendix 6.1.b CPAs Over State RTB Rate, and Appendix 6.1.c CPAs without Capacity Information RTB.

| Galveston Multicultural Institute | 32 | 20 | 6.25 |
| Children's Hope Residential Services Inc – Lubbock | 40 | 49 | 12.25 |
| Children's Hope Residential Services Inc- West | 48 | 59 | 12.29 |

The statewide RTB rate for large GROs for the period between September 30, 2014 and March 31, 2020 was 0.12 for every ten beds of capacity.  Of the ninety-three large GROs that had an RTB during the period analyzed, sixty-two (67%) had an RTB rate equal to or lower than the state rate, while thirty-one (33%) had an RTB rate higher than the state rate.  Twenty-two of these thirty-one large GROs had an RTB rate that was two or more times higher than the state rate.  The five large GROs with the highest RTB rates are included in the table below.

**Table 35: Five Large GROs with Highest RTB Rates, September 30, 2014 through March 31, 2020**

| Large GROs | | | State Rate=0.12 |
| Operation Name | Capacity | RTBs | RTB Rate |
| --- | --- | --- | --- |
| Youth and Family Enrichment Centers, Inc. | 54 | 6 | 1.11 |
| Willow Bend Center | 52 | 7 | 1.35 |
| Azleway Valley View | 68 | 12 | 1.76 |
| Arrow's Endeavor Place | 67 | 13 | 1.94 |
| Pathways 3H Youth Ranch | 60 | 12 | 2.00 |

The Monitors also calculated the RTB rates for CPAs for which they had capacity information.  However, the Monitors did not have capacity information for 115 of the total 354 CPAs the State investigated for an allegation of abuse or neglect between September 30, 2014 and March 31, 2020.  Investigations for seventy-three of these 115 CPAs did not result in an RTB finding.

The statewide RTB rate for small CPAs was 0.90 RTBs for every ten CPA foster homes for the period analyzed.  The Monitors determined that of the seventy small CPAs with an RTB finding, forty-nine (70%) had an RTB rate equal to or lower than the state rate, and twenty-one (30%) had an RTB rate higher than the state rate.  Eleven of the twenty-one small CPAs with an RTB rate exceeding the state rate was two or more times the state rate.  The table below includes the five CPAs with the highest rates.

**Table 36: Five Small CPAs with Highest RTB Rates, September 30, 2014 through March 31, 2020**

| Small CPAs | | | State Rate=0.90 |
| Operation Name | Capacity | RTBs | RTB Rate |
| --- | --- | --- | --- |
| Children's Hope Residential Services, Inc. – CPA | 18 | 6 | 3.33 |
| Angels Crossing | 19 | 7 | 3.68 |
| The Payton Foundation | 2 | 1 | 5.00 |
| Azleway Children's Services | 20 | 10 | 5.00 |
| Hope Rising | 8 | 12 | 15.00 |

The statewide RTB rate for medium-sized CPAs was 0.55 for every ten CPA foster homes.  The Monitors determined that of the 100 medium-sized operations with an RTB during the period analyzed, seventy-one (71%) had an RTB rate equal to or lower than the state rate, and twenty-nine (29%) had an RTB rate higher than the state rate.  Twenty of the twenty-nine medium-sized CPAs with an RTB rate higher than the state rate had an RTB rate two or more times the state rate. The five medium-sized CPAs with the highest RTB rates during the period analyzed are included in the table below.

**Table 37: Five Medium CPAs with Highest RTB Rates, September 30, 2014 through March 31, 2020**

| Medium CPAs | | | State Rate=0.55 |
|---|---|---|---|
| Operation Name | Capacity | RTBs | RTB Rates |
| Lutheran Social Services of the South, Inc. | 30 | 6 | 2.00 |
| Heart to Heart Family Services | 27 | 6 | 2.22 |
| Good Hearts Youth & Family Services | 39 | 12 | 3.08 |
| America's Angels Inc. | 30 | 13 | 4.33 |
| Caring Hearts For Children | 23 | 28 | 12.17 |

The statewide average RTB rate for large CPAs for the period between September 30, 2014 and March 31, 2020 was 0.05 for every ten CPA foster homes. Of the sixty-nine large CPAs, twenty-nine (42%) had an RTB rate equal to or lower than the state rate, while forty large CPAs (58%) had a rate higher than the state rate.  Thirty-five of these had an RTB rate two or more times the state rate.  The table below highlights the five large CPAs with the highest RTB rates.

**Table 38: Five Large CPAs with Highest RTB Rates, September 30, 2014 through March 31, 2020**

| Large CPAs | | | State Rate=0.05 |
|---|---|---|---|
| Operation Name | Capacity | RTBs | RTB Rates |
| Lutheran Social Services of the South, Inc. | 55 | 4 | 0.73 |
| Family Link Treatment Services, Inc. | 127 | 10 | 0.79 |
| Arrow Child and Family Ministries of Texas | 64 | 6 | 0.94 |
| Texas Foster Care and Adoption Services | 83 | 11 | 1.33 |
| Azleway Inc. | 52 | 7 | 1.35 |

Of the CPAs for which the Monitors do not have capacity information, the five with the highest number of RTBs are in the table below.

**Table 39:  Five CPAs without Capacity Information with Highest RTB Numbers, September 30, 2014 through March 31, 2020**

| Operation Name | RTBs |
|---|---|
| DBA Caring Family Network | 7 |
| J. Elohim Inc. | 8 |
| Kingdom Kids Child Placing Agency | 10 |
| Bair Foundation – El Paso | 12 |
| Jameson Center | 12 |

*Operations with Deficiencies Higher than the State Average Rate of Deficiencies for Similarly-Sized Operations*

The Monitors next analyzed data provided by HHSC for RCCL citations issued to operations for violations of minimum standards for the period between September 30, 2019 and March 31, 2020. RCCL frequently issues citations for minimum standards violations.  Between September 30, 2019 and March 31, 2020, RCCL cited 856 operations (GROs and CPAs) 30,021 times for a violation of a minimum standard.  The total number of citations per operation over this time period ranged from a low of one to a high of 264.  The mean number of citations per operation for the time period analyzed was thirty-five, and the median was twenty-one.

Considering only citations for deficiencies rated medium-high or high, of the 30,021 total citations, RCCL weighted 7,363 (25%) high and 9,623 (32%) medium-high.  The total number of high or medium-high citations per operation ranged from a low of zero to a high of 154.  The mean number of citations per operation was just under twenty, and the median was ten.

Using the same methodology used to calculate RTB rates, the Monitors calculated a citation rate for high and medium-high standards violations for operations based on the size category set out in the Court's order and compared those rates to the state high and medium-high citation rate for similarly-sized operations.  The statewide medium-high and high citation rate for the 147 small GROs for the period analyzed was 8.88 citations per ten beds.  Ninety-six of the small GROs (65%) had a citation rate equal to or lower than the state rate, and fifty-one (35%) had a rate higher than the state rate.

Twenty-two small GROs (15% of 147) had a citation rate for medium-high and high standards violations two or more times higher than the state rate.  The table below includes the five small GROs with the highest citation rates for the period between September 30, 2014 and March 31, 2020.[700]

---

[700] Tables with all GROs and CPAs with a rate that exceeded the state rate are included in Appendix 6.2.a GROs Over State Deficiencies Rate, Appendix 6.2.b CPAs Over State Rate for High MedHigh Cites, Appendix 6.2.c CPAs with no Capacity Deficiencies.

**Table 40: Five Small GROs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020**

| Small GROs | | | | State Rate=8.88 |
| --- | --- | --- | --- | --- |
| Operation Name | Capacity | Total Citations | Med-High/High Citations | Med-High/High Citation Rate |
| George Gervin Youth Center | 16 | 94 | 53 | 33.13 |
| The Care Cottage | 20 | 118 | 71 | 35.50 |
| VisionQuest Residential | 16 | 146 | 59 | 36.88 |
| Connections Inc Emergency Shelter | 15 | 109 | 60 | 40.00 |
| Nothing Just Happens Inc. | 8 | 55 | 37 | 46.25 |

The statewide medium-high and high citation rate for medium-sized operations was 7.85 citations per ten beds.  Sixty-seven of the 108 medium-sized GROs (62%) had a citation rate equal to or lower than the state rate, and forty-one (38%) had a citation rate higher than the state rate.  The table below highlights the five medium-sized GROs with the highest rates for high and medium-high citations.

**Table 41: Five Medium GROs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020**

| Medium GROs | | | | State Rate=7.85 |
| --- | --- | --- | --- | --- |
| Operation Name | Capacity | Total Citations | Med-High/High Citations | Med-High/High Citation Rate |
| A Fresh Start Treatment Center | 30 | 154 | 79 | 26.33 |
| Hands of Healing | 33 | 167 | 98 | 29.70 |
| Carter's Kids Residential Treatment Center | 30 | 184 | 110 | 36.67 |
| Williams House | 32 | 182 | 143 | 44.69 |
| Whataburger Center for Children and Youth | 30 | 198 | 140 | 46.67 |

The statewide citation rate for high and medium-high minimum standards violations for large GROs was 2.06 citations per ten beds.  Of the 101 large GROs that received a citation for a high and/or medium high deficiency violation between September 30, 2014 and March 31, 2020, 59 (58%) had a citation rate that was equal to or lower than the state rate.  Forty-two large GROs (42%) had a citation rate that was higher than the state rate, and twenty-seven had a citation rate that was two or more times higher than the state rate.  The five large GROs with the highest citation rates for high and medium high standards violations are included in the table below.

**Table 42: Five Large GROs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020**

| Large GROs | | | | State Rate=2.06 |
|---|---|---|---|---|
| Operation Name | Capacity | Total Citations | Med-High/High Citations | Med-High/High Citation Rate |
| Houston Serenity Place Inc. | 67 | 139 | 83 | 12.39 |
| New Life Children's Treatment Center | 80 | 165 | 109 | 13.63 |
| Arrow's Endeavor Place | 67 | 130 | 97 | 14.48 |
| Five Oaks Achievement Center | 55 | 178 | 132 | 24.00 |
| Willow Bend Center | 52 | 187 | 135 | 25.96 |

The Monitors also calculated the citation rates for CPAs for which they had capacity information. However, the Monitors did not have capacity information for 217 of the total 482 CPAs the State cited for a minimum standards violation it weighted high or medium high between September 30, 2014 and March 31, 2020. RCCL investigated fifty-two of these 217 CPAs for a minimum standards violation but did not issue a single citation for a high or medium-high standard.

The statewide citation rate for a medium-high or high standards violation for small CPAs was 14.98 citations for every ten of the CPA's foster homes for the period analyzed. The Monitors determined that fifty-seven of the ninety-one small CPAs (63%) that received a citation for a medium-high or high standards violation between September 30, 2014 and March 31, 2020 had a citation rate equal to or lower than the state rate, and thirty-four (37%) had a citation rate higher than the state rate. Thirteen of the thirty-four small CPAs (33%) with a citation rate exceeding the state rate had a citation rate two or more times the state rate. The table below includes the five CPAs with the highest rates.

**Table 43: Five Small CPAs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020**

| Small CPAs | | | | State Rate=14.98 |
|---|---|---|---|---|
| Operation Name | Capacity | Total Citations | Med-High/High Citations | Med-High/High Citation Rate |
| Angel Wings Family Services, Inc. | 17 | 175 | 70 | 41.18 |
| The Burke Foundation Child Placing Agency (Branch 3) | 10 | 89 | 46 | 46.00 |
| The Burke Foundation Child Placing Agency (Branch 1) | 7 | 74 | 36 | 51.43 |
| The Payton Foundation | 2 | 23 | 18 | 90.00 |
| Circles of Care | 4 | 77 | 40 | 100.00 |

The statewide citation rate for medium-sized CPAs with citations for minimum standards violations weighted high or medium-high was 8.46 for every ten foster homes. Of the 103 medium-sized CPAs with a standards violation weighted high or medium-high during the period of September 30, 2014 through March 31, 2020, sixty-seven (65%) had a citation rate that was equal to or lower than the state citation rate. Thirty-six medium-sized CPAs had a citation rate that was higher than the state rate, with seventeen CPAs having a rate two or more times the state rate. The five medium-sized CPAs with the highest citation rates are included in the table below.

**Table 44: Five Medium CPAs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020**

| Medium CPAs | | | | State Rate=8.46 |
|---|---|---|---|---|
| Operation Name | Capacity | Total Citations | Med-High/High Citations | Med-High/High Citation Rate |
| Therapeutic Family Life | 32 | 149 | 89 | 27.81 |
| The Grandberry Intervention Foundation (TGIF) | 22 | 138 | 66 | 30.00 |
| Assuring Love Child Placement Agency | 21 | 129 | 63 | 30.00 |
| Benchmark Family Services | 25 | 149 | 92 | 36.80 |
| Benchmark Family Services (Branch 3) | 22 | 264 | 154 | 70.00 |

The statewide citation rate for large CPAs with citations for minimum standards violations weighted high or medium-high was .86 for every ten foster homes. Of the sixty-nine large CPAs with a standards violation weighted high or medium-high during the period of September 30, 2014 through March 31, 2020, sixteen (23%) had a citation rate that was equal to or lower than the state citation rate. Fifty-three large CPAs had a citation rate that was higher than the state rate, with forty-two CPAs (61%) having a rate two or more times the state rate. The five medium-sized CPAs with the highest citation rates are included in the table below.

**Table 45: Five Large CPAs with Highest High & Medium-High Citation Rates, September 30, 2014 through March 31, 2020**

| Large CPAs | | | | State Rate=0.86 |
|---|---|---|---|---|
| Operation Name | Capacity | Total Citations | Med-High/High Citations | Med-High/High Citation Rate |
| The Giocosa Foundation | 84 | 121 | 80 | 9.52 |
| Family Link Treatment Services Inc. | 127 | 176 | 123 | 9.69 |
| Passage of Youth Family Center | 51 | 86 | 50 | 9.80 |
| Texas Foster Care and Adoption Services | 83 | 137 | 100 | 12.05 |

| Azleway Inc | 52 | 166 | 101 | 19.42 |
|---|---|---|---|---|

For the CPAs that the Monitors for which the Monitors do not have capacity information, the five with the highest number of RTBs are in the table below.

**Table 46: Five CPAs without Capacity Information with Highest Number of Deficiencies Cited, September 30, 2014 through March 31, 2020**

| Operation Name | Med-High/High Deficiencies Cited |
|---|---|
| Trinity Foster Care | 58 |
| Circles of Care | 65 |
| Strawberry Creek Services | 79 |
| J. Elohim Inc. | 83 |
| Jameson Center | 124 |

*RCCL Enforcement Action for Operations with Minimum Standards Violations or RTBs*

Despite finding a very high number of minimum standards violations among licensed operations, RCCL took little enforcement action beyond issuing a citation.  The most common enforcement action for the period between September 30, 2014 through March 31, 2020 was a monetary penalty. Despite the high number of citations issued, the State assessed a monetary penalty only 438 times. The State rarely applied any meaningful enforcement and oversight beyond a monetary penalty. The agency placed seventy-one operations on a voluntary plan of action during this period, thirty-nine under an evaluation, and only twenty operations on probation.

**Table 47: Voluntary and Involuntary Enforcement Actions, September 30, 2014 through March 31, 2020**

| Type of Enforcement | Frequency | Percent |
|---|---|---|
| Adverse Action - Denial | 9 | 1.5% |
| Adverse Action - Involuntary Suspension | 1 | 0.2% |
| Adverse Action - Revocation | 6 | 1.0% |
| Corrective Action - Evaluation | 39 | 6.7% |
| Corrective Action - Probation | 20 | 3.4% |
| Monetary Penalty | 438 | 75.0% |
| Plan of Action | 71 | 12.2% |
| **Total** | **584** | **100.0%** |

The table below breaks the enforcement actions out between CPAs and GROs/RTCs.

**Table 48: Voluntary and Involuntary Enforcement Actions by Operation Type, September 30, 2014 through March 31, 2020**

| Type of Enforcement Action | Operation Type | | | | Total |
|---|---|---|---|---|---|
| | CPA | GRO | RTC | Indep. Foster Family/Group Home | |
| Adverse Action - Denial | 2 | 3 | 4 | 0 | 9 |
| Adverse Action - Involuntary Suspension | 0 | 0 | 1 | 0 | 1 |
| Adverse Action - Revocation[701] | 2 | 1 | 3 | 0 | 6 |
| Corrective Action - Evaluation | 16 | 10 | 13 | 0 | 39 |
| Corrective Action - Probation | 7 | 5 | 8 | 0 | 20 |
| Monetary Penalty | 279 | 105 | 52 | 2 | 438 |
| Plan of Action | 32 | 21 | 17 | 1 | 71 |
| **Total** | **338** | **145** | **98** | **3** | **584** |

Few operations the State placed on a voluntary plan of action, under evaluation, or on probation, stayed under this heightened monitoring plan for long. The median length of a plan of action and evaluation was approximately six months. The median length of time for the twenty operations placed on probation during this five-and-a-half year period was less than a year.

**Table 49: Length of Corrective Action in Days by Action Type, September 30, 2014 through March 31, 2020**

| Type of Enforcement Action | Mean | Median | Minimum | Maximum |
|---|---|---|---|---|
| Corrective Action - Evaluation | 181.81 | 181 | 3 | 562 |
| Corrective Action - Probation | 291.06 | 319 | 127 | 365 |
| Plan of Action | 145.50 | 181 | 10 | 213 |

*Recommended Enforcement Actions and Risk Levels Associated with Operations*

The Monitors also analyzed data provided by HHSC for the recommended enforcement recommendations made by inspectors between September 30, 2014 and March 31, 2020.[702] The

---

[701] The six operations included in this category received a letter of intent to revoke the operation's license, but of the six that have been issued a letter of intent to revoke, no licenses have actually been revoked. One operation, North Fork, discussed in the next section of this report, is pursuing an administrative review of the intent to revoke and that action is still pending. For a full list of operations subject to some enforcement action by RCCL between September 30, 2014 and March 31, 2020, see Appendix 6.3.

[702] Whether and when to take enforcement action is left to the discretion of RCCL. *See* TEX. HEALTH & HUMAN SERVS COMM'N, *Child Care Licensing Policy and Procedures Handbook* §7110, *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/7000-voluntary-actions-enforcement-actions#7110.

According to the agency's administrative rules, decisions to recommend or impose enforcement actions are based on: the severity of the deficiency; whether the deficiency has been repeated; whether the deficiency can be corrected; how quickly a correction can be made; whether the operation demonstrates the ability to maintain compliance with

Monitors matched these enforcement recommendations to the 14,328 RCCL inspections or minimum standards investigations associated with the 30,021 minimum standards deficiencies cited.  Of these inspections or investigations, the inspector made some enforcement recommendation in 10,969 (77%) instances.  The most common enforcement recommendations were "Follow-up No Inspection" (5,557 or 50%) and "No Recommendation" (3,136 or 29%).  A follow-up inspection was recommended in 2,003 of these inspections or investigations (18%), and an expedited inspection was recommended in 293 (3%) instances. In 3,359 inspections or investigations that resulted in a deficiency, there was no associated enforcement recommendation.[703]

RCCL also issued an additional 1,948 enforcement recommendations during this time period which are not associated with an inspection or investigation resulting in a citation, totaling 14,313 enforcement recommendations over the five-and-a-half year period.    Enforcement recommendations in CLASS are tied to the type, number, weight, and repetition of violations over the course of an operation's two-year compliance history.[704] The range of options that CLASS generates is based on these factors, which policy suggests are rooted in an analysis of risk.

The Monitors received data showing the risk level assigned to the operation by RCCL at the time of each of the 14,313 enforcement recommendations.[705] Between September 30, 2014 and March 31, 2020, the highest risk level assigned to an operation was "medium-high," and only one operation was determined to have a medium-high risk level.

**Table 50: Risk Level Assigned to Operation when Enforcement Recommendation Made, September 30, 2014 through March 31, 2020**

| Risk Level | Number of Recommendations | Percent of Recommendations |
|---|---|---|
| Low Risk | 12,680 | 88.6% |
| Medium-Low Risk | 1371 | 9.6% |

---

minimum standards; whether conditions must be imposed to avoid further deficiencies; compliance history; and the degree and/or immediacy of danger or threat of danger posed to the health or safety of children. 26 TEX. ADMIN. CODE § 745.8607.

[703]  While a deficiency may be corrected at inspection, HHSC policy allows this only if licensing staff determine that the operation has the ability to correct it at the time of inspection and no follow-up is needed to further evaluate compliance.  TEX. HEALTH & HUMAN SERVS. COMM'N, *Child Care Licensing Policy and Procedures Handbook* § 4155, *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/4000-inspections#4155.  In making that decision, the inspector is also required to consider the risk to children, the scope and severity of the deficiency, the time and expense needed to cure it, the provider's compliance history and willingness to comply and the action taken by the operation to comply.  *Id.*  For deficiencies that cannot be cured during an inspection, policy requires licensing staff to follow up to determine that the deficiency was corrected.  *Id.* at § 4310.  How soon licensing must follow up is dictated by the severity of the deficiency.  *Id.*  Whether follow up requires another inspection is left to the discretion of the inspector and RCCL staff.  *Id.* at §§ 4311-12.

[704] *Id.* at §§ 4510-11.

[705] RCCL may undertake a risk analysis as part of an inspection or investigation of a minimum standards violation and is required to provide DFPS with a risk analysis for each abuse and neglect investigation.  *Id.* at §§ 4800 - 40.

| | | |
|---|---|---|
| Medium Risk | 261 | 1.8% |
| Medium-High Risk | 1 | 0.0% |
| High Risk | 0 | 0.0% |
| **Total** | **14,313** | **100.0%** |

To gain a better understanding of the interplay between citations for minimum standards violations, RTB findings in abuse and neglect investigations, and RCCL risk levels and enforcement actions, the Monitors chose four operations[706] for case studies and analyzed alignment between their RCCL risk level, recommended enforcement actions, and actual enforcement actions with deficiencies cited and RTB findings for the period between September 30, 2014 and March 31, 2020.

<u>Williams House</u>[707]

**Low Risk**

Williams House is an emergency shelter in rural Texas, with a licensed capacity of thirty children. From October 17, 2014 through August of 2016, the State assigned Williams House a risk level of low.  During this period, the shelter had sixty-one citations for a violation of minimum standards and was investigated 130 times for an allegation of abuse or neglect.  On June 24, 2016, one of these investigations resulted in an RTB for an allegation of medical neglect.  The most serious enforcement action recommended by RCCL during this time period was a follow-up inspection.

**Medium-Low Risk**

Williams House moved from low risk to medium-low risk on August 25, 2016 and stayed at this risk level until April 2017.  During this period, the shelter had thirty citations for a violation of minimum standards and twenty-eight investigations of an abuse or neglect allegation, resulting in three RTBs for negligent supervision on October 19, 2016.  Despite these three RTBs, the agency remained "medium-low risk" until April 2017.  The most serious enforcement recommendation by RCCL during this time period was a voluntary plan of action.

**Medium Risk**

Williams House moved from medium-low to medium risk on April 4, 2017 and remained at this risk level until July 2018.  According to HHSC's enforcement data, the shelter was placed on a

---

[706] Operations were randomly selected from those meeting the following criteria: operations that during the time period had an abuse or neglect allegation investigated, a minimum standards deficiency cited, an enforcement recommendation and action, had a minimum standards deficiency citation rate for high and medium high standards that was higher than the state rate, and operations whose last enforcement action was in 2019 or 2020. For timelines showing RCCL enforcement recommendations, RTBs, deficiencies cited, enforcement actions taken, and risk levels for Williams House, Angel Wings, Children's Hope – West, and Hands of Healing, *see* Appendix 6.4.

[707] Williams House was the placement of the child identified as C.G. at the time of her death, as detailed in Section VII *infra.*

voluntary plan of action on June 2, 2017 which lasted for approximately one month.[708]  One month later, the shelter was placed on evaluation, which lasted just under six months, ending January 31, 2018.

During this time period, the State cited the operation for thirty-two violations of a minimum standard and performed thirty-five investigations for allegations of abuse or neglect, resulting in four RTBs for negligent supervision and physical abuse on June 20, 2017, July 18, 2017, and January 30, 2018 (the day before the operation's evaluation ended).

**Medium-Low Risk**

Williams House moved back down to a medium-low risk level on July 27, 2018, despite its recent RTB findings, and it remained at this risk level until April of 2019.  During this time period, the shelter had thirteen citations for minimum standards violations, and nineteen investigations of alleged abuse or neglect.  The most serious enforcement recommendation made was an expedited inspection.

**Low Risk**

The shelter moved back down to a low risk level on April 15, 2019 and remained at this risk level until July of 2019.  During this time period, the State issued the shelter ten citations for violations of minimum standards and performed thirty-two investigations of abuse or neglect allegations. The most serious enforcement recommendation was for a follow-up with no inspection.  However, the agency issued a monetary penalty on June 11, 2019.

**Medium-Low Risk**

Williams House moved back to a risk level of medium-low on July 6, 2019, where it remained through March of 2020.  During this time period, the shelter had thirty-six citations for a minimum standards violation, and nineteen investigation for alleged abuse or neglect, one of which resulted in an RTB for physical abuse on January 15, 2020.  The most serious enforcement recommendation was a voluntary plan of action.  The operation was placed under a voluntary plan of action on December 4, 2019.

<u>Angel Wings</u>

Some operations were placed on and off corrective action multiple times between September 30, 2014 and March 31, 2020, with no change in risk level.  For example, Angel Wings Family Services, Inc. (Angel Wings), one of the small CPAs with the highest rates of medium-high or

---

[708] Notes in CLASS indicate the start date for the plan of action, which the notes indicate was not successfully completed, was January 1, 2017.  However, this was a note on the evaluation page; the Monitors did not find any other information related to this plan of action in CLASS. The date included here is based on enforcement action data provided by HHSC.

high minimum standards violations, was placed on a voluntary plan of action on November 20, 2015. The plan of action lasted slightly over three months. The agency then placed Angel Wings on another voluntary plan of action on May 1, 2016 for just over three months and issued a monetary penalty on June 29, 2016. On October 17, 2016, the operation was placed on evaluation, which lasted just over six months. Then, on June 8, 2017, the agency placed Angel Wings on probation for a year and issued a monetary penalty on August 7, 2018. Most recently, Angel Wings was placed under a voluntary plan of action for the third time on May 3, 2019.

Throughout the course of this period, the risk level associated with the operation was low. Over the five-and-a-half year period, the agency received 175 citations for violations of minimum standards, seventy of which were for standards weighted high or medium-high. Angel Wings was investigated twenty-two times for abuse or neglect allegations, resulting in one RTB for negligent supervision on December 14, 2015, during its first voluntary plan of action.

Children's Hope – West

Other operations with very high rates of RTBs and citations for high or medium high standards violations appear to experience low RCCL enforcement actions. The agency placed Children's Hope – West, a GRO in rural Texas with a capacity of 48 children, under evaluation from April 10, 2014 through October 4, 2014. The agency later placed the operation under a voluntary plan of action on April 20, 2015, which lasted until July 20, 2015. Between September 30, 2014 and March 31, 2020, Children's Hope – West had a risk level of low, despite ninety-nine minimum standards violations, of which sixty-eight were weighted high or medium-high. Most shocking, during this time period the campus had 472 investigations of abuse or neglect, of which fifty-nine resulted in an RTB for negligent supervision or physical abuse. Follow-up with Inspection was the most serious enforcement recommendation from RCCL was an evaluation.[709]

Hands of Healing

Hands of Healing is a GRO with a licensed capacity of thirty-three children. Hands of Healing, much like Williams House, moved through several risk levels between September 30, 2014 and March 31, 2020.

**Low Risk**

---

[709] DFPS did take contract enforcement action against this campus of Children's Hope, by removing children from the facility in early 2016. *See* Appendix 6.5.a for a description of DFPS's contractual enforcement actions against Children's Hope campuses. This campus is still closed, though RCCL has not taken any action on its license. Since the closure of this campus, Children's Hope has opened another RTC in Levelland. RCCL granted the license for that campus in late 2019, and it is open and has children in its care despite the operation's poor record of maintaining a safe environment for children.

In October 2014, Hands of Healing was considered low risk, without a change in risk level until June 2016. During this period, the GRO had eighty citations for minimum standards violations and seventy-six investigations of allegations of abuse or neglect, one of which resulted in an RTB for physical abuse. The most serious enforcement recommendation during this period was a plan of action. The agency placed the GRO under a voluntary plan of action on May 16, 2016, and the operation remained on the plan of action until August 16, 2016.

**Medium-Low Risk**

On June 13, 2016, the agency determined Hands of Healing medium-low risk, and it remained at this risk level until October 2017. During this period, the agency issued fifteen citations for minimum standards violations and investigated the GRO four times for alleged abuse or neglect. These investigations resulted in three RTBs findings for negligent supervision on June 24, 2016. More than four months later, on November 8, 2016, the agency placed the operation on probation and did not released it from this status until September 16, 2017.

**Medium Risk**

On October 4, 2017, Hands of Healing moved to a medium risk level, where it remained until July 2019. During this period, the agency issued sixty-three citations for minimum standards violations and investigated the GRO ninety-six times for alleged abuse or neglect. The most serious action recommended by RCCL was an evaluation. However, the agency placed the operation under a voluntary plan of action from April 2, 2018 through October 1, 2018. The agency then placed the GRO on evaluation from November 7, 2018 through March 14, 2019.

**Medium-Low Risk**

The operation moved back down to medium-low risk on July 26, 2019. Since then, Hands of Healing has had six citations for a minimum standards violation and has been investigated eight times for abuse or neglect, resulting in three RTBs for negligent supervision and physical abuse. The agency made the most recent RTB finding on December 10, 2019. The most serious RCCL enforcement recommendation since July 26, 2019 was for expedited inspection.

*DFPS Contract Enforcement*

The information the Monitors received from DFPS on November 1, 2019 in response to their September 30, 2019 data and information request included letters from the agency taking some form of formal enforcement action related to a contract with an operation.[710] From September 30, 2016 through September 30, 2019 (the time period covered by the monitors first data and information request for Remedial Order Twenty), based on these letters, DFPS appears to have

---

[710] The Monitors also received information related to operations subject to contract monitoring. In some cases, through that process, the operation received technical assistance intended to correct a problem identified during the monitoring process.

required six operations to submit a "Plan of Correction" related to contract violations, with one operation (Embracing Destiny) required to submit a plan more than once. DFPS suspended placement of children to fourteen operations during the time period covered, with two operations (Five Oaks and Arrow Child & Family) appearing to have had placements suspended more than once during that time period. Of the fourteen operations for which placements were suspended, eight had a lift or partial lift of the suspension during the time period. DFPS cancelled its contract with four operations during this three-year period.

DFPS notified the Monitors of four contracts that it terminated after monitoring began. DFPS ended contracts with two Children's Hope locations and with North Fork Educational Center, discussed below, in Remedial Order Twenty-One. DFPS also notified the Monitors in early March that it was terminating its contract with High Frontier Residential Treatment Center after the agency learned that the administrator of the program, who had grown frustrated with three youth placed in the facility, called their caseworkers and told them that the children's needs were beyond what the operation could provide, and that the children were being put on buses back to their home counties, without any staff member to supervise them. RCCI investigated the incident and found an RTB for neglectful supervision.

The Monitors also received a spreadsheet on May 22, 2019 from DFPS titled "Incentives and Remedies" that appears to be tied to SCOR, the database used to manage the agency's contracts. However, without more information from the agency the Monitors cannot tell what information is included on the spreadsheet. The Monitors will include more information related to contract enforcement in their next report.

3.  Summary

a.  Despite a significant number of small, medium, and large GROs and CPAs that have a high rate of RTBs and minimum standards violations, little meaningful enforcement action is taken by RCCL. Between September 30, 2014 and March 31, 2020, RCCL placed thirty-nine operations on evaluation and twenty were placed on probation. Seventy-one were placed on a voluntary plan of action. Though six operations were issued a letter of intent to revoke, RCCL did not revoke any licenses during this period. A case study of four operations with a high rate of RTBs and minimum standards violations shows the inconsistent nature of RCCLs risk analysis and enforcement scheme.

b.  The information that the Monitors received from DFPS similarly indicates little formal enforcement action taken by the division of the agency that oversees contracts. During the three years for which DFPS has provided information to the Monitors (September 30, 2016 through September 30, 2019), DFPS appears to have suspended placements at fourteen operations, and later lifted the placement suspension in eight of those. DFPS appears to have cancelled only four contracts during this period, though it has terminated four contracts since monitoring began.

D.  Remedial Order Twenty-One: Revocation of Licenses

Remedial Order Twenty-One: Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class

1.  Background

a.  Statutory Authority and HHSC Policy

According to Texas statute, the Texas Administrative Code, and HHSC policy, RCCL has the authority to suspend or revoke a license if an operation fails to comply with the law, administrative rules, minimum standards, or "the specific terms of the permit."[711]  An operation may continue to operate pending an appeal of a license revocation, unless continuing to do so would pose a risk to children's health or safety.[712]

HHSC policy allows RCCL to take enforcement action if abuse, neglect or exploitation has occurred at an operation or if the operation has:

- A single serious deficiency or a pattern of deficiencies in meeting the minimum standards, administrative rules, or Chapter Forty-Two of the Texas Human Resources Code; or
- Several deficiencies that create an endangering situation.[713]

HHSC's regulations and polices allow it to revoke a license if:

- The operation is ineligible for corrective action;
- Licensing cannot address the risk by taking corrective action or another type of adverse action;
- A background check result or a finding of abuse or neglect makes the permit holder ineligible for a permit; or
- Revocation is otherwise necessary to address the issue that triggered enforcement action.[714]

*The State's Initial Report to the Monitors Regarding Compliance*

In their September 9, 2019 report to the Monitors,[715] HHSC outlined "existing policy" as follows:

---

[711] TEX. HUMAN RES. CODE § 42.072; 26 TEX. ADMIN. CODE § 745.8649; TEX. HEALTH & HUMAN SERVS. COMM'N, *Handbook: Child Care Licensing Policy and Procedures* §7600, *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/7000-voluntary-actions-enforcement-actions#7600

[712] *Id.* at § 42.072(e).

[713] *Id.* at § 7710.

[714] *Id.* at § 7624; 26 TEX. ADMIN. CODE § 745.8654.

[715] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *MD v. Abbott Monitoring Status Update* (Sept. 9, 2019) (on file with the Monitors).

> HHSC – RCCL interprets this injunction as authorizing HHSC – RCCL to revoke or to suspend a foster home's verification to protect children in the PMC class.

> HHSC – RCCL, however, does not possess such a statutory authority.   Instead a Child Placing Agency (CPA) issues a verification for a foster home.   The CPA possesses the statutory authority to suspend or revoke the foster home's verification.   HHSC – RCCL does issue licenses to CPAs.   Currently, HHSC – RCCL could revoke or suspend the CPA's license if the CPA fails to follow minimum standards with respect to its verifications or management of foster homes.

HHSC then described what it proposed for "implementation" of this remedial order:

> To meet the intent and spirit of HHSC – RCCL's interpretation of this injunction, HHSC – RCCL recommends proposing two new Texas Administrative Code (TAC) rules and six amendments to current TAC Rules.   These changes would allow HHSC – RCCL to require a CPA to close a foster home under certain circumstances, including when a foster parent refuses to allow staff to inspect or investigate the foster home; a foster parent that sexually abuses a child; a foster parent that physically abuses or neglects a child under certain circumstances; any two findings of abuse or neglect in a foster home; or within two years, the same foster home has three minimum standard violations of the same nature (related to safe sleep, discipline and punishment, or supervision) over three different investigations.   The proposed rules would also require CPA staff to evaluate and document in quarterly supervised visits with the foster home whether the foster home met any of the reasons for closure.[716]

In reporting compliance, HHSC asked the Court for clarification:

> HHSC – RCCL respectfully request clarification on the proposed new and revised rules to ensure that they fulfill the intent of this injunction.[717]

The State included the proposed rules with the information it provided to the Monitors.

---

[716] *Id.*
[717] *Id.*

The Monitors conferred with the Court and, on October 7, 2019, sent an e-mail to the State advising:

> With respect to HHSC's Request for Clarification for Remedial Order 21, the Court determines that the State's proposal too narrowly construes Remedial Order 21 and is not consistent with the language of the injunction.[718]

b. Monitors' Data and Information Requests and State's Productions

i. Monitors' First Data and Information Request

In the Monitors' September 30, 2019 data and information request,[719] the Monitors requested the following:

> Provide the number of placement licenses that have been revoked by the State over the last five years through September 30, 2019 and reasons for revocation.
>
> Going forward, provide the names of placements under consideration for revocation or suspension, prior to a final decision, including the reason(s) for such consideration.  Immediately upon suspension or revocation of a license, provide the name of the placement; identification number; county; contact information; the agency responsible; and reasons for revocation or suspension.

HHSC responded by providing information about the number of applications for a license that the State denied; there were no license revocations for any placement (foster home, CPA, or GRO) in the five years preceding September 30, 2019. The agency later notified the Monitors via e-mail of two GROs to which the agency gave notice of an intent to revoke, discussed below.[720]

ii. The Monitors' Email Regarding HHSC's Response to the Court's October 7, 2019 Directive

---

[718] Email from Kevin Ryan, Monitor to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 7, 2019, 10:22 EST) (on file with the Monitors)

[719] Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).

[720] Email from Deborah Fowler, Court Monitor to Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n (Apr. 8, 2020, 11:17 EST) (on file with the Monitors) (regarding Responses to State's Request and an Alternative Proposed Rule for RO 2).

On April 8, 2020, the Monitors sent an email to HHSC asking whether, in light of the Court's response on October 7, 2019, it was working toward an alternative proposed rule or policy.[721] HHSC responded on April 9, 2020:

> HHSC has decided to move away from using a new rule to effectuate the provisions of RO 21, which we understand to be self-executing. Instead, HHSC is taking a more streamlined approach by complying directly. During all home visits, inspectors assess for various risk factors. If any child safety concerns are identified that cannot be mitigated, staff will fill out a separate form, outlining concerns. For example, if an inspector was completing a sampling visit or investigation inspection at a home and observed concerns, they would submit a form. In addition, with the new heightened monitoring definition, HHSC's presence in Child Placement Agencies (CPAs) and homes the CPAs verify will also increase significantly. Staff will fill out a form anytime there is a safety concern observed in a home that could warrant closure, regardless of whether the visit is related to heightened monitoring or as part of regular monitoring or investigative activities. These operations will then be staffed and considered for closure. If warranted, HHSC will close the home through the CPA and work with DFPS to prevent future placements of children in the home. [722]

On April 9, 2020, the Monitors responded via email, asking whether HHSC had an example to illustrate the way the new policy worked in practice.[723] The agency responded that it did not have any examples to offer because the new policy had not yet been fully implemented.[724] The agency stated:

> CCR originally had a plan to implement procedures this month. That plan included additional home visits based solely on a heightened monitoring-type model. For that plan, the sole purpose of those additional visits would be to conduct reviews for potential closure. However, the new heightened monitoring definition would increase visits such that it did not make sense to have a plan

---

[721] *Id.*

[722] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Apr. 9, 2020, 13:57 EST) (on file with the Monitors) (regarding Responses to State's Request and an Alternative Proposed Rule for RO 21).

[723] Email from Deborah Fowler, Monitor, to Corey Kintzer, Assoc. Director, Legal Servs. Div. Health & Human Servs. Comm'n (Apr. 9, 2020 14:00 EST) (on file with the Monitors) (regarding Responses to State's Request and an Alternative Proposed Rule for RO 21).

[724] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Apr. 13, 2020 17:59 EST) (on file with the Monitors) (regarding Responses to State's Request and an Alternative Proposed Rule for RO 21).

that included another wave of increased visits.  Therefore, we had to go back and retool, including reworking training on this process.[725]

HHSC advised the Monitors it planned a full rollout of the new process by May 1, 2020.  The agency attached a draft version of the form that it indicated RCCL inspectors will use for recommending closure.[726]

c.  Remedial Order Twenty-One Performance Validation

i.  Methodology

The Monitors reviewed all documents and information submitted by the State in response to the Monitors' data and information requests.  There were no license revocations for any placement (foster home, CPA, or GRO) in the five-year period preceding September 30, 2019.[727]  Until the

---

[725] *Id*.

[726] *Id.*

[727] On May 22, 2020, the Monitors received data from the State as a result of the Court's orders related to Remedial Order Twenty, discussed in the last section.  In this data, seven operations (Daystar Residential, Galveston Multicultural Institute, Kingdom Kids CPA, Wings of Refuge CPA, North Fork Educational Center, and Children's Hope-Lubbock) were identified as having been subject to a revocation enforcement action by RCCL at some point after September 30, 2014.  The Monitors e-mailed HHSC to ask why they were not notified of these revocations in response to the data and information requests for Remedial Order Twenty-One, as they had been notified for Children's Hope Residential Services – Lubbock, and North Fork Educational Center.  Email from Deborah Fowler, Monitor, to Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n (May 28, 2020, 15:14 CST).  HHSC responded that "the original data request did not include information specific to intent to revoke.  Data was requested on licenses that were revoked during the timeframe."  Email from Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n to Deborah Fowler, Monitor (June 1, 2020, 08:46 CST).  In response to specific questions about the revocation of Daystar Residential (which closed in 2011) and Kingdom Kids CPA, HHSC indicated that the revocation for Daystar Residential was "finalized in 2019 as part of a clean-up effort to close out operations that were not operating" and that Kingdom Kids CPA "has not been operating since October 2019.  The operation requested an administrative review on the revocation, which is currently in progress and is expected to be completed by 6/2/2020."  Email from Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n to Deborah Fowler, Monitor (June 1, 2020, 08:46 CST).  The Monitors asked why they were not at least notified of the letter of intent to revoke the license for Kingdom Kids CPA, which was sent December 6, 2019, just prior to the letter of intent to revoke sent to North Fork Educational Center.  Email from Deborah Fowler, Monitor, to Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n (June 1, 2020, 11:51 CST).  HHSC responded, "the reason you all were not notified of the letter of intent is because they did not have any PMC children placed through the CPA at the time HHSC issued the letter of intent.  In addition, DFPS had already terminated their contract with Kingdom Kids.  Therefore, that information didn't fall within our response criteria at the time."  Email from Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n to Deborah Fowler, Monitor (June 1, 2020, 15:12 CST).  The Monitors reviewed the letter of intent to revoke for Kingdom Kids CPA in CLASS, which was sent to the operation on December 6, 2019 and indicated that RCCL's decision to revoke the operation's license was based on a child fatality that occurred in December 2018, the investigation of which led to the discovery that children in care had been subjected to sexual abuse by the son of the foster parent.  Letter from Toni Cantu, District Dir., Residential Child Care Licensing, Health & Human Servs. Comm'n to Michelle Williams, Controlling Person, Kingdom Kids Child Placing Agency (Dec. 6, 2019) (on file with the Monitors).  Though an administrative review was requested, the decision to revoke was upheld on June 2, 2020.  The Monitors also reviewed the letter of intent to revoke for Galveston Multicultural Institute, which was sent on October 31, 2018, and indicated the decision to revoke the operation's license was based on the "likely fatality" of two foster children assumed to have drowned, and serious medical

State acts on the process identified in the agency's April 9, 2019 response and described above, the Monitors do not have information to validate performance under Remedial Order Twenty-One as it relates to agency foster homes.

In December 2019[728] and February 2020,[729] HHSC notified the Monitors of its intent to revoke the licenses of two operations: Children's Hope – Lubbock, and North Fork Educational Center.  The Monitors reviewed information related to the notice of intent to revoke for these two GROs.

   ii. Remedial Order Twenty-One Performance Validation Results

In response to the Monitors' request that the State notify them of placements it was considering for license suspension or revocation, HHSC emailed notice of two pending revocations to the Monitors:

> **Children's Hope Residential Services – Lubbock** (Children's Hope – Lubbock): On December 19, 2019, HHSC notified the Monitors that it was considering a license revocation for Children's Hope.

> **North Fork Educational Center** (North Fork): on February 27, 2020, in response to an e-mail from the Monitors, HHSC indicated that it intended to submit an "intent to revoke" letter to North Fork the next day.

*Children's Hope – Lubbock*

Children's Hope – Lubbock was an RTC licensed to treat children who have emotional disorders, an intellectual disability, or a pervasive developmental disorder. The State licensed the operation in 2013 for a capacity of forty children aged five through seventeen years old.

On December 19, 2019, the Monitors received an email from HHSC advising:[730]

> As part of our ongoing reporting requirements, and pursuant to Remedial Order 21, HHSC's RCCL is considering a license

---

concerns for other children who did not drown but who did not receive medical attention after a near-drowning incident.  Letter from Amber Krause, Dir. of Residential Licensing, Health & Human Servs. Comm'n, to Vivian Putney, Controlling Person, Galveston Multicultural Institute (Oct. 31, 2018).   The operation requested an administrative review of the decision, which still appears to be pending.

[728] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Dec. 19, 2019, 13:47 EST) (on file with the Monitors) (regarding Potential License Revocation - RO 21).

[729] TEX. HEALTH & HUMAN SERVS. COMM'N, *Letter of Intent to Revoke North Folk's License* (Feb. 27, 2020), attached as Appendix 6.6.

[730] Email from Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Dec. 19, 2019, 13:47 EST) (regarding Potential License Revocation - RO 21).

revocation of Children's Hope Residential Services Inc – Lubbock, Operation #1423046.

The reasons for this potential revocation are, following a RCCL finding of abuse of a child in Children's Hope's care in October 2019, RCCL determined that between 12/19/2018 and 12/13/2019, this facility received investigations and inspections resulting in 28 citations. Those citations include patterns of deficiencies in the areas of discipline and punishment (5 citations), physical site (5 citations), ratio (3 citations), and emergency behavior interventions (3 citations).

The Monitors responded, asking the following questions:

Can you…give us a sense of the timeline for revoking their license? How soon would that happen? If it were to happen, what process is the agency going through to make a determination? How soon would children be moved?[731]

On December 21, 2019, HHSC emailed what it described as a "formal response" to the Monitors, attached as a letter.[732] The letter responded to the questions as follows:

The timeline question is complex. Much depends on decisions made throughout the due process procedures. I'll walk you through that process here.

On December 19, 2019, HHSC issued a notice of intent to revoke licensure to Children's Hope. The effect of this action puts Children's Hope on notice that HHSC plans to revoke its license, but the operation has a right to due process. Pursuant to 40 TAC §745.8806, Children's Hope has 15 calendar days after receiving the notice of intent to revoke to request an administrative review. If HHSC does not receive a request, the right for an administrative review is waived.

---

[731] Email from Deborah Fowler, Monitor, to Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n (Dec. 19, 2019, 14:51 EST) (on file with the Monitors) (regarding Potential License Revocation - RO 21).

[732] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Dec. 23, 2019, 15:21 EST) (on file with the Monitors) (regarding Potential License Revocation - RO 21 and including formal response attachment regarding the potential closure of Children's Hope); *See also* Letter from Darla Shaw, Asst. Comm'r, Health & Human Servs. Comm'n, Residential Child Care Licensing, to Deborah Fowler, Court Monitor (Dec. 21, 2019) (on file with the Monitors) (regarding Children's Hope closure).

For RCCL, due process consists of an informal administrative review. As further described in 40 TAC §745.8815, there are various timeframes during which certain activities can be conducted, which makes pinpointing an exact timeframe for revocation impossible. However, if Children's Hope does not request due process, we will issue the revocation letter in 15 calendar days after it received the revocation. If the operation does request due process, then HHSC will not issue the revocation letter until due process is complete if the decision is upheld.

After the operation receives the results of its administrative review, the operation can have the matter heard in front of State Office Administrative Hearing (SOAH). Further complicating the timeframe question, if the operation requests records, then the process slows down pending the record redaction process. Some cases can take from six months to a year to make it in front of SOAH.

In response to your final question, our understanding is that all DFPS children have been moved from the operation as of December 16, 2019.

*The Court's February 21, 2020 Order*

The Monitors shared HHSC's notification of the revocation with the Court, as well as the enforcement history for Children's Hope.  On February 21, 2020, after a hearing during which the Monitors and the State discussed the Children's Hope closure, the Court ordered the Defendants

to provide detailed information on why the Children's Hope Facility located in Lubbock, TX was originally closed in 2016, why it was then re-opened in December 2016, and closed again in December 2019.  The Defendants shall provide and submit all this information to the Monitors no later than 12:00 PM on Wednesday February 26, 2020.[733]

The Defendants submitted this information to the Monitors on February 26, 2020.[734] The document describes the State's history of contracting with Children's Hope and its enforcement activities, beginning in 2013 and lasting through December 2019.[735]

---

[733] Order at 1 (Feb. 1. 2020), ECF 811.  The Court also ordered the State to explain why Hector Garza was still open, despite the Monitors' visit to the facility and subsequent reports to the State regarding their extensive concerns, based on the visit. For the Monitors' Hector Garza summary, *see* Appendix 6.5.b.

[734] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Children's Hope Report in Response to the Court's February 21, 2019 Order* (Feb. 26, 2020), attached as Appendix 6.5.a.

[735] *Id.*

As discussed in the Monitors' Update to the Court Regarding Remedial Order 20, filed March 3, 2020,[736] Children's Hope – Lubbock, and two other campuses operated by Children's Hope in Levelland, Texas, have been the focus of DFPS and RCCL enforcement actions dating back to at least 2014. This history is discussed in detail in that Update, and includes previous closure of Children's Hope – Lubbock (executed through DFPS contract enforcement action, not RCCL enforcement) for an "egregious and ongoing pattern of safety and minimum standards violations."[737] DFPS then made a subsequent decision to allow the operation to reopen the closed campuses a short time later.[738] Within two years of being permitted to reopen, Children's Hope – Lubbock was placed under Evaluation by RCCL.[739] RCCL found it successfully completed the Evaluation in June 2019, just six months before the agency sent the intent to revoke notice on December 19, 2019.[740]

*RTB Referred to in RCCL's Email to the Monitors*

A review of CLASS revealed that HHSC's notice of intent to revoke the license of Children's Hope – Lubbock was based, in part, on an abuse and neglect investigation that resulted in a Reason To Believe (RTB) finding for a referral made to SWI on August 26, 2019.

The RTB resulted from the investigation of an incident in which a youth was allegedly non-compliant, reportedly hit a staff person, and then was attacked by two staff. The child had injuries to his face and neck as a result of the incident. RCCI's RTB findings include the description of the incident as it was relayed to the investigator by a third staff person who entered the room as it was taking place:

> [C] was the third staff in the room. She stated [a child] was sitting on the couch going to sleep when [the victim] came up to him and was pointed [sic] his finger in his face. [The victim] claimed he was going to pick a fight. She stated [the victim] began to bounce a basketball, hit the walls and skylights. [Staff 1] told him to stop and he refused. [C.] stated [Staff 1] asked him several time to stop bouncing the ball. [Staff 1] asked him for the ball and he would not give it up. [Staff 2] was working a different unit (Integrity Unit) and came to the Faith unit. [C] stated [another] (resident) jumped up out of his bed and was getting ready to go fight to protect the female staff. [C] stated she tried to prevent him from leaving his room by verbally redirecting him. She stated when they walked into the commons they did not see a containment. She stated what they saw was [Staff 1] and [Staff 2] beating on [the victim]. She stated

---

[736] *The Monitors' Update to the Court Regarding Remedial Order 20*, at 13 (Mar. 3, 2020), ECF 832.
[737] *Id.*
[738] *Id.*
[739] *Id.*
[740] *Id.*

they were physically fighting.  She stated they were on each side of [the victim]. She stated they are large ladies and she tried to pull them off [the victim]. She stated the fight progressed to the couch.  She stated this was not a containment and does not feel like they tried to contain him.  She stated [the other resident] was trying to help. [The other resident] reached over and was holding [the victim's] arms up as he was pulling [Staff 1] and [another child's] hair.  [C] stated she tried to pick up [Staff 2] or push her back.  [The other child] pushed [the victim's] arms up to force him to let go of the staff's hair.  She stated everything happened so fast but on the camera's [sic] it was going to look like a staff was beating on a kid.  She stated their actions were nothing like they were trained to do.  [The victim] got up and was spitting up blood due to them hitting him in the face.  She stated [the victim] was messed up from them hitting him.   [C] stated she was not sure who hit whom first, but it appeared they were just beating up [the victim].  [A child] came to her and stated that [the victim] did not hit them first and he was just defending himself.

*RCCL's Settlement with Children's Hope*

The summary compiled by the State in response to the Court's February 21, 2020 order noted that, after the State notified the Monitors of RCCL's notice to Children's Hope of the agency's intent to revoke its license, Children's Hope requested an administrative review of the decision.[741]

On February 27, 2020, in the same e-mail RCCL sent to the Monitors notifying them of the agency's intent to revoke North Fork's license, RCCL stated:

> In addition, I want to follow up on the outcome of our intent to revoke Children's Hope – Lubbock's license.  Attached please find an agreement RCCL entered into with Children's Hope – Lubbock… [s]igned by all parties today, the agreement states Children's Hope – Lubbock will voluntarily relinquish its license at that location and will not open another child care operation for five years.  In return, RCCL will withdraw the intent to revoke the license of this operation.[742]

---

[741] *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Children's Hope Report in Response to the Court's February 21, 2019 Order* at 7 (Feb. 26, 2020), attached as Appendix 6.5.a.

[742] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Feb. 27, 2020, 18:54 EST) (on file with the Monitors) (regarding North Fork and attaching the agreement RCCL entered into with Children's Hope - Lubbock).

The State attached the Settlement Agreement to the e-mail.[743]

*Voluntary Relinquishment: Children's Hope – Levelland (Washington Campus)*

On May 20, 2020, DFPS notified the Monitors that one of the Children's Hope campuses in Levelland, Texas had decided to terminate their contract with DFPS.[744]  When asked for the reason for the decision, DFPS responded:

> [T]he contractor reached out after DFPS further increased scrutiny of the operation and indicated they would like to voluntarily terminate their contract.  The contract is worded in terms of DFPS taking the termination action for convenience, which we are doing.[745]

The Monitors subsequently asked RCCL whether any action would be taken with respect to the license for this facility.  RCCL responded that the agency was "not planning any action…as they have informed RCCL that they will relinquish their license once all the children are moved."[746]

A review of CLASS for this operation shows that the operation relinquished its license on May 26, 2020.

North Fork Educational Center

North Fork Educational Center is an RTC in Wylie, Texas licensed to provide treatment for children who have emotional disorders, intellectual disabilities, and pervasive development disorders.  The State issued the operation a permit in 2010 for a capacity of forty children aged 4 through 17 years old.

RCCL placed North Fork on probation on January 10, 2020 after being cited for, among other things:

- Corporal punishment;
- Subjecting a child to abusive or profane language;

---

[743] *Settlement Agreement between the Tex. Health & Human Servs. Comm'n and Children's Hope*, attached as Appendix 6.7.

[744] Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (May 20, 2020 18:44 EST) (on file with the Monitors) (regarding Children's Hope - Levelland campuses terminating its contract with DFPS).

[745] Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs., to Deborah Fowler and Kevin Ryan, Monitors (May 22, 2020 11:48 EST) (on file with the Monitors) (regarding Children's Hope - Levelland campuses terminating its contract with DFPS).

[746] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (May 22, 2020 13:48 EST) (on file with the Monitors) (regarding Children's Hope - Levelland campuses terminating its contract with DFPS).

- Violating a child's right to be free from abuse, neglect, and exploitation;
- Violating the standard requiring a caregiver to use minimal force necessary in a short personal restraint;
- EBI implementation; and
- A child's right to be disciplined in a way that is appropriate to their age, maturity, and developmental level.

The letter notifying North Fork of RCCL's decision to place it on probation "is based on a repetition and pattern of deficiencies in the areas of emergency behavior intervention, discipline and children's rights: In addition to the deficiencies issued that have been confirmed instances of the violation of children's right to be free from abuse and neglect."[747]   None of the eight listed conditions (six of which have a condition date of January 21, 2020) are shown as having been met.

On February 27, 2020, the Monitors received an email notifying them of RCCL's intent to revoke the license of this facility in response to the following inquiry from the Monitors:

> When I spoke to Audrey [Carmical] earlier today about our visit to Prairie Harbor, she mentioned that DFPS had decided to end its contract with North Fork RTC.  She mentioned that she believes that licensing is looking at enforcement action for that facility, as well.
>
> Kevin [Ryan] and I are interested to learn more about what CCL is planning in terms of enforcement and the reasons for the decisions for North Fork.[748]

HHSC responded:

> Yes, RCCL is taking action against North Fork.  I am attaching a draft intent to revoke letter…that RCCL plans to submit to the operation tomorrow.  The letter details the reasoning behind the revocation.  Also attached is an investigation history.[749]

The letter of intent to revoke, attached to the email sent to the Monitors, stated that HHSC had placed North Fork on probation on January 10, 2020 due to four separate findings of physical

---

[747] TEX. HEALTH & HUMAN SERVS. COMM'N, *Letter of Intent to Place North Folk on Probation* (Jan. 10, 2020), attached as Appendix 6.8.
[748] Email from Deborah Fowler, Monitor to Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n (Feb. 27, 2020, 17:02 EST) (regarding North Fork enforcement action).
[749] Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Feb. 27, 2020, 18:54 EST) (on file with the Monitors) (regarding North Fork and including the draft letter of intent to revoke which detailed the reasoning behind the license revocation).

abuse and a "related patterns of deficiencies."[750] The letter indicated that, since the meeting between RCCL and North Fork to discuss the probation conditions, there had been three additional RTB findings, all arising from what the letter characterized as physical abuse related to emergency behavior restraints and/or inappropriate discipline measures.   The letter listed these three new findings of abuse, and also noted that, between February 10, 2019 and February 10, 2020, the operation had "received investigations and inspections resulting in 32 deficiencies."[751]

In the email to the Monitors, HHSC attached seven notification letters regarding standards violations and citations related to the seven abuse and neglect investigations that resulted in an RTB finding.   In addition to reviewing the letters, the Monitors reviewed the notes in CLASS for each of these seven investigations.   A summary of each is detailed below.

*Notice Letter dated February 25, 2019*

SWI received this investigation on August 29, 2017, and the State linked it to an investigation involving a second victim reported the previous day.   Both children alleged that staff were physically abusing them.   Child 1 named three staff – [E, G, and B] – as staff who hit and "cussed out" youth at North Fork.   Child 1 was noted to have "severe ADHD" in the SWI notes.

Child 2 made allegations against [B], the investigator observed this child to have a black eye during the face-to-face interview with the alleged victim.   Child 2 alleged [B] punched him in the eye during a restraint.

The investigation progressed in this case until October 2017, after which there was no more activity in the case until May 16, 2018.   After that, there was another three-month pause with no contacts until August 24, 2018.   The State reassigned the case to a new investigator on December 3, 2018. The State finally conducted a risk assessment in the case on December 7, 2018, more than a year after the call to SWI. The State conducted the "final staffing" on December 10, 2018, but contacts continued in the investigation.   RCCI reassigned the case for a second time sometime between December 30, 2018 and the date of the supervisor approval for the disposition and closure in February 2019.

A review of the IMPACT record for the investigation shows that four different supervisors rejected it for closure four times: December 18, 2017; March 8, 2018; November 13, 2018; and December 18, 2018.   RCCI supervisors rejected the case closure twice for incomplete documentation, once to merge the case with another, and the final time because the "preponderance of the evidence does not support the disposition."   It was finally approved on February 13, 2019, almost eighteen months after the call to SWI.

---

[750] TEX. HEALTH & HUMAN SERVS. COMM'N, *Letter of Intent to Revoke North Fork* (Feb. 27, 2020), attached as Appendix 6.6.
[751] *Id*. at 2-3.

The State found the RTB for the allegations involving Child 2 and the alleged perpetrator [B], and Ruled Out (R/O) the allegation made by Child 1 against [E, G, and B]. The difference between the decision for Child 1 and Child 2 appears to be based on the investigator's observation of Child 2's injuries and video footage that shows the events that preceded the restraint resulting in the injury, even though the restraint occurred off-camera.

A collateral child also indicated that "he was abused and hit all the time" by the same three staff [E, G, and B] that Child 1 reported as abusive, but the notes in the explanation of the disposition for Child 1 indicate that there "were no witnesses to corroborate" Child 1's "vague statements" of being physically abused by these three staff. They also indicate that "all collateral staff…deny that [Child 1] has made any outcries of abuse," yet notes in CLASS indicate both the child's counselor and teacher reported that he made an outcry to them of abuse. All of the alleged perpetrators denied the abuse, and, in addition to noting that Child 1 had a history of aggression, hostility and self-harming behaviors (likely the very behaviors that he was sent to the RTC to receive treatment for, and completely irrelevant to an investigation into alleged abuse), the notes for Child 1 in this investigation indicate that he "has also been known to fabricate narratives in a manipulative manner to work toward his advantage."

The last notation in CLASS indicates that HHSC determined on February 25, 2019 that a risk-based follow up was not needed because the perpetrator, [B], was no longer employed at the facility. Both alleged victims aged out of care over the course of this investigation.

The findings letter notified North Fork of two citations issued for two minimum standards violations associated with this abuse and neglect investigation.

*Notice Letter dated March 8, 2019*

SWI received a call on October 17, 2017 indicating that the reporter observed the victim with a black eye and "other minor injuries." The other injuries included bruising around the child's right temple area, right cheekbone, and a blue eyelid. According to the reporter, the victim said the injuries were the result of a restraint by [G] (one of the other staff members named in the investigation discussed above).

The State documented contact notes in CLASS through November 28, 2017, when the case was reassigned to another investigator. RCCI did not enter any further notes until February 8, 2018, when the case was reassigned through the "Dallas Backlog Assignment."

RCCI finally completed a risk assessment on January 29, 2019, a little over fifteen months after intake. The same day, notes entered in CLASS describe the video footage of the incident:

> Direct Care Staff [G] was propped against the kitchen island monitoring residents. [The victim] was sitting in a chair desk (school desk) against a wall, adjacent from [G]. [The victim]

pressed the thermostat control that was affixed to the wall next to him. [G] approached [the victim], leaned over and pointed his finger towards [the victim] and threatened by stating "stop messing with that, I promise you that I'm about to tear your ass up!" [G] then moved [the victim] by pushing him in the chair to an adjacent wall, next to a commercial mop bucket.

As [G] walked away, [the victim] flipped over the mop bucket causing water to spill onto the floor. [The victim] remained in the chair and didn't attempt to get up. [G] removed his jacket, picked up items from the same desk that [the victim] was sitting at and walked away. Moments later, [the victim] suddenly stood up, picked up the desk and threw it onto the floor.

[Staff 2] approached [the victim] and attempted but was unable to stop him from throwing the chair to the floor. At that moment, [Staff 2] stood next to [the victim] as [G] aggressively approached [the victim] from his blindside and struck him [the victim] on the left side of his face with a left forearm. Both individuals slipped on the water and fell to the floor.

At no time did the footage captured [sic] [the victim] being physically aggressive towards staff or other residents that would have justified [G] striking [the victim] with an elbow to the face.

RCCI continued to enter contacts in CLASS and conducted the final staffing on February 13, 2019, almost sixteen months after SWI received the call. On March 8, 2019, a notation in CLASS indicates RCCL determined there was no need for a risk-based follow-up inspection because [G] had been fired.

The findings letter notified North Fork of two citations related to standards violations arising from this abuse and neglect investigation.

The Monitors' review of CLASS shows two previous investigations involving [G], including one in 2013 for a different GRO. In the 2013 investigation, [G] allegedly caused injuries to the child's face (a swollen right eye and lip) during a restraint. This case was originally staffed with a Program Manager and approved to be disposed with an RTB finding, but a supervisor reviewed the decision and changed the disposition to "rule out."

*Notice Letter dated September 13, 2019*

SWI received a call by the victim's teacher on December 18, 2018 alleging the victim had a black eye due to an incident four days earlier during which a staff person – [C] – "slapped food out of

[the victim's] hand and slapped [the victim] in the face." The reporter alleged that, after this happened, two staff members "were holding [the victim] back so he wouldn't get aggressive and they took [the victim] into the bathroom away from cameras where another staff member got into his face and called him a 'big ass kid.' [The victim] punched a tissue dispenser in the bathroom." At that point, according to the notes for the SWI call, the gold chain necklace of another staff member involved – [A] – broke and [A] called the victim a "son of a bitch" and "punched [the victim's] eye 3 times." The SWI notes indicate that [C] no longer worked at the facility, but [A] was, in fact, still employed there.

Notes in CLASS on January 7, 2019 describe video footage of the events up to the point that staff pushed the victim into the bathroom:

> Kitchen surveillance shows 8 residents and staff [A] and [C] in the kitchen. [The victim] is standing in front of the table, near the refrigerator talking to [A]. [The victim] points to the refrigerator. More discussion occurs between the two. [A] proceeds to take a plate that is sitting on the table in front of [the victim]. [The victim] goes to the refrigerator to retrieve another plate and sits. Discussion occurs between [C] and [the victim]. [C] is seen coming from around the kitchen counter, [the victim] stands holding the plate. [C] knocks the plate from [the victim's] hand. [The victim] and [C] begin to bump chests. [Staff J] walks into the kitchen. [C] pushes [the victim] back into the hall. A struggle ensues between the two, as [J] attempts to get between the two. [C] is seen trying to push [the victim's] head down and pushing him in the face. [A] walks to the altercation and walks away.

> Bathroom surveillance shows [C] coming towards [the victim] after the push and pushing [the victim] in the face. [The victim's] glasses come off. [C] is trying to push [the victim's] head down. [J] is able to get between the two and body positions [the victim] into the bathroom. [The victim] is trying to hit [C] over [J]. [C] is blocking the hits and trying to grab [the victim's] hands. [A] comes to the hallway to assist, then walks away, as [J] has [the victim] posted on the back door. [The victim] is visibly upset and trying to get away. As [J] puts [the victim] into the restroom [C] walks out of the hall. [A] is seen going into the restroom. [C] walks back towards the restroom and is seen turning on the light switch, and walks away. [A] is seen at the doorway 30 seconds later.

Notes in CLASS indicate that [C] called the investigator in the case on February 6, 2019 and asked when he would be allowed to return to work. The notes indicate the RCCI investigator asked "why he lost control and what will keep him from losing his cool again." [C] answered that he "allowed

his emotions to get the best of him.  It was not in his character and he would never allow that to happen again…in the future he will step outside of the house and take 5 to cool off."

Notes in CLASS indicate that the case was approved by the supervisor and submitted on June 3, 2019.  However, the following note was entered in CLASS on August 1, 2019:

> On 7/18, Ms. Toni Cantu, HHSC PA, advised she received a complaint from Aaryce Hayes, Policy Specialist Disability Rights Texas, who was concerned about finding on [this case].  The case was Ruled Out for PHAB.  It involved 3 alleged perpetrators, [A, C, and J].

RCCI changed the decision to RTB for [C] based on the video footage, but the agency upheld the R/O finding for [A] and [J].  The State sent the new notification letter on August 27, 2019 and closed the case on September 9, 2019, almost nine months after SWI received the referral.

The notification letter describes four minimum standards violations and informed North Fork that the State would issue citations for each.

The Monitors reviewed CLASS and found an investigation alleging [C] slammed a child to the ground with a disposition of R/O. The Monitors located three other North Fork investigations involving [A] as a perpetrator: one in which a ten year-old child alleged [A] picked him up and slammed him against a desk; another in which a child alleged [A] punched him on the shoulder and shoved him against the wall by his neck; and another in which a restraint involving several staff caused an injury to the child's arm. The State issued a disposition of R/O and closed all three investigations.

*Notice Letter dated December 20, 2019*

On October 17, 2019, a reporter alleged to SWI the victim had an abrasion on the left side of his neck and back and a red abrasion on his left arm, the result of a "pushing match" with a staff member, [D], who pushed the victim against the dresser and onto a bed.  During the face-to-face interview with the victim, the youth indicated that [D] "picked him up and threw him across the room" and that he hit the corner of the dresser, causing the injuries.  The youth reported being taken to the emergency room for his injuries.

CLASS notes for a staffing in the case on October 23, 2019 indicate that the staff member involved "is currently on suspension and will be fired," and that "all collaterals agreed with [the victim's] side of the incident."  A note made on December 5, 2019 indicates there was no video of the incident because it occurred in the child's bedroom.

A case staffing note for December 6, 2019 indicates "The case was staffed with the supervisor via telephone regarding the preponderance since the injuries were observed. I was instructed to type the case up as a Rule Out with citations. The preponderance will be re-written to reflect an RTB."

A CLASS contact note for December 9, 2019 indicates that the investigator's supervisor rejected the case for closure, stating "After reviewing this case, it will need to be an RTB for PHAB due to the interviews you conducted, injury observed, and documents received." It listed a series of tasks to be completed by December 11, 2019. The investigator submitted the case again to the supervisor on December 14, 2019 and was closed two days later.

On February 3, 2020, notes in CLASS indicate HHSC conducted a risk-based follow-up and noted "no further risk to children at this operation as related to this investigation at this time."

The notification letter described four minimum standards violations and informed the facility that the State would issue citations for each. The letter also describes technical assistance provided by RCCL related to the violations.

*Notice Letter dated January 28, 2020*

SWI received a referral on August 18, 2019. Notes in CLASS for the referral indicate the victim sustained a one-inch scratch on the right side of his face due to an incident during which a staff person – [B][752] – pushed him. When [B] pushed the victim, his watch scratched the victim's face, causing it to bleed.

CLASS contact notes indicate that on August 21, 2019, the investigator staffed the case with his supervisor and they determined there was no need for a safety plan because [B] had been fired. The same day, the State added notes related to video footage of the incident to CLASS:

> It was noted there was discussion of what residents were having for lunch and it was observed that [B] placed several hot pockets in the microwave. It was observed once the children saw lunch was hot pockets several children moved to the kitchen to take a hot pocket, and [B] began to yell and curse at the children stating he asked them before if they wanted lunch and majority said no. [B] used language like "I asked you motherfuckers if you all wanted lunch and you stated no." It was observed that [the victim] walked toward the kitchen and the lunch was pretty much gone and [B] was sitting down. It was noted words were exchanged and [the victim] walked towards the back room and it was not hearable what [the victim] said. [The victim] was in the back room with staff and [B] got up and followed [the victim] towards to back room [sic] which is a

---

[752] This is not the same "B.B." involved in the incident outlined in the February 25, 2019 notice letter.

staff room where there are washer and dryers in the room. It was noted [B] pushed the door and another staff member to get to [the victim], shoved [the victim] outside the scope of the cameras. It was noted several staff members attempted to break up [B] and [the victim] as they were holding on to each other toggling back and forth. It was noted [B] was finally pushed out of the back door of that staff room and the incident ended.

On November 20, 2019, the State reassigned the case to a special investigator who completed a risk assessment on December 4, 2019. The special investigator completed the investigation on December 22, 2019, but the agency did not notify the reporter until January 15, 2020. The State notified the provider two weeks later on January 29, 2020. On February 10, 2020, CLASS notes indicate RCCL conducted a risk-based follow-up inspection and determined "no further risk to children at this operation related to this investigation at this time."

The notification letter described three minimum standards violations and informed North Fork that the State would issue citations for each. The letter also described the technical assistance provided by RCCL related to the violations.

The Monitors' review of CLASS revealed that [B] was the focus of two previous investigations for another GRO in 2013- one with an Unable to Determine disposition alleging he "body slammed" a youth to the wall and berated and cussed at the victim and the other with a R/O disposition alleging he hit a youth in the head two times during a restraint.

*Notice Letter dated January 28, 2020*

RCCL/I sent a second notice letter to North Fork on January 28, 2020 for the investigation of a referral made to SWI on August 12, 2019. SWI included two incidents in their notes. During one incident, the victim said a staff member – [T] – kicked him and stomped on his head. During another incident, the victim said [T] kicked him, hit him in the head with a broom stick, and hit him "upside the head" with keys. During a face-to-face interview, the investigator observed a bruise on the youth's face. The youth indicated that [T] caused the bruise when he "threw him down hard, causing his head [to] hit the floor."

A CLASS contact for August 12, 2019 indicates a safety plan was not needed because the facility fired [T]. The investigator interviewed the facility administrator the same day, during which he revealed he reviewed the video for the second incident reported to SWI. He indicated that the video showed [T] kicking and hitting the victim with the broom stick. The facility administrator stated that [T] did not hit the victim "too hard but [that] it was inappropriate," and [T] would be terminated as a result.

CLASS contact notes for September 4, 2019 described the video:

[The victim] is seen at the top of the video, sitting at a desk away from the other youth…[T] is seen walking toward the back door with a broom and dustpan.  The back door is just behind [the victim].  As [T] approaches, [the victim] leans out of the desk in an attempt to grab something.  [T] sees this…[T] kicks his legs at [the victim's] arms, which causes [the victim] to jump back.  [T] says "who told you to touch it?" [The victim] says "Sorry"…[T] hits [the victim] over the head with the top of the broom.  [The victim] said "Ow."  [T] said "Don't do that again."  [T] sat the broom next to the door, turned to [the victim] and said "Who told you to touch it, so I can write you up."  [The victim] said "Why did you hit me with the broom?"  [T] said "Why did you touch it?"

Though there was no video for the other incidents the victim described during his interview, or for the other incident, interviews with collateral children and staff described [T] as aggressive with youth.

The final staffing notes entered into CLASS on December 5, 2019 indicate that the investigator emailed a staffing form to the supervisor, "including the draft preponderance of the evidence that supports a [sic] R/O disposition.  There was a recommended citation."

A CLASS contact note entered on January 9, 2020 indicates the investigator's supervisor rejected approval "due to it meeting the qualifications for an RTB."  On January 10, 2020, the State updated the case in IMPACT with RTB findings and resubmitted.

The final note in CLASS entered on February 10, 2020 indicates that RCCL conducted a risk-based follow-up and determined "no further risks to children at this operation as related to this investigation at this time."

The notification letter described three minimum standards violations and reviewed technical assistance provided by RCCL related to each.

*Notice Letter dated February 2, 2020*

SWI received a call on July 4, 2019 indicating the victim was taken to the emergency room the day before for a "leg deformity/left femur fracture" related to a restraint.  According to the reporter, the staff member, [F] restrained the victim after the youth threw something on the ground.  According to the SWI intake notes, the victim and [F] fell onto the bed during the restraint, the victim cried out in pain, and [F] stopped the restraint and got off the victim.  The two staff who transported the youth to the hospital witnessed the restraint.

RCCI interviewed a hospital staff member the same day, who reported being told that "it was [the victim's] fault as the staff redirected him several times but he refused to listen and he was

restrained…he was cursing at staff and also pushed the staff."  RCCI also interviewed the facility administrator the same day, who stated he viewed the video and determined that the restraint was not appropriate but was a "take down."  The administrator further indicated that [F] lied on his incident report (the child was never aggressive) and that [F] would be terminated.

CLASS contact notes for July 15, 2019 indicate that law enforcement would file criminal charges against [F].  Notes related to this case continue in CLASS through July until an interim staffing July 23, 2019.

The State reassigned the case to a special investigator on November 20, 2019.  The investigator finally reviewed the video of the incident on January 3, 2020, six months following the call to SWI.  The notes in CLASS describe the video footage:

> Video footage of the incident shows [the victim] walking into the kitchen area from where the bedrooms are located as [F] follows behind.  While walking, [F] is heard giving [the victim] an directive [sic] to pick up what appears to be a toy on the floor in the kitchen area.  [The victim] responds that he was not going to pick up the toy.  [F]  rushes [the victim] from behind, placing his right arm around [the victim's] neck, and takes him down onto a mattress on the floor next to a wall.  [The victim] lands onto his stomach as [F] is on top of him.  Other staff members and supervisors direct other residents to go to their room.  While on the mattress, [the victim] lets out a scream and starts crying as [F] is giving directives for [the victim] to pick up the item on the floor.  [The victim] cries out yes in response to picking up the item as [F] is still on top of him.  [F] shifts his body up a little and [the victim] begins to scream and cries out "you hurt me."  [The victim] is told to hush as [F] continues to speak with [the victim].  Through his cries, [the victim] refers to his left leg and observed to be in pain by tapping his hand on the mattress as [F] is on [the victim's] left side with his body still position [sic] on [the victim's] back.  [F] then moves to [the victim's] right side, as [F] is transitioning to the right side, [the victim] begins to scream.  [F] then begins to check [the victim's] left upper thigh and [the victim] begins to scream.  As [the victim] is still crying and tapping his left hand against the mattress, he reports that he felt his leg pop and that he cannot feel his leg.  [F] releases [the victim] from the containment and lay [sic] next to [the victim] trying to console him.  [F], other staff members, and supervisors assess [the victim's] injury.  Staff then attempt to have [the victim] stand; [the victim] is unable to stand and starts to scream as staff help him to lay back onto the mattress.  EMS is called and then arrives to transport [the victim] to the hospital.

338

The State completed the investigation on January 12, 2020, more than six months after SWI received an intake for this incident.  The agency notified the reporter of the RTB finding on January 15, 2020 and notified the provider on February 3, 2020.

CLASS notes indicate RCCL conducted a risk-based follow-up inspection on February 10, 2020 and found "no further risk to children at this operation related to this investigation at this time."

The notification letter outlined four minimum standards violations and technical assistance provided by RCCL associated with each.

The Monitors reviewed CLASS and found a 2002 investigation of another GRO listing [F] as the perpetrator, alleging [F] "body slammed" a child against a wall and that the child had bruises.  The State issued a citation for an unrelated standards violation.

2.  Summary

a.  While the State did not issue a single license revocation in the five years preceding September 30, 2019 (the date of the Monitors' first data and information request), RCCL has notified two operations of its intent to revoke their license since December 2019.  One of those facilities, Children's Hope – Lubbock, was allowed to voluntarily relinquish its license after requesting an administrative review of the decision.  The other facility, North Fork Educational Center, has requested an administrative review of the decision, and the review is pending.  A third facility, one of the Children's Hope campuses in Levelland, Texas, has also voluntarily relinquished its license.

## VII.   CHILD FATALITIES

A.  The Court's Order of February 21, 2020

After learning through the Monitors of the death of a fourteen-year-old in the PMC General Class, the Court Ordered on February 21, 2020:

> *Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

1.   Defendants' Data and Information Production

DFPS notified the Monitors that eleven children in the PMC General Class died between July 31, 2019 and April 30, 2020. The Monitors reviewed the children's case records, including healthcare records, and investigative records. The Monitors requested additional medical or investigative records when necessary to understand fully the circumstances surrounding the children's deaths. In one instance involving an allegation of caregiver abuse in connection with a child's death in congregate care, the monitoring team visited the placement where the child died, interviewed caregivers and roommates of the victim and reviewed records on site.  The on-site record review did not reveal any records that had not previously been shared with the Monitors.

The Monitors' review of the record in connection with three of these children's deaths – K.C., A.B., and C.G. revealed numerous, missed opportunities by the Texas child welfare system to protect the children and revealed substantial gaps in care that exposed these children to risks of serious harm.

a.   Children with Severe Medical Conditions

Five children with severe medical conditions in the PMC General Class died between July 31, 2019 and April 30, 2020, and there is no maltreatment finding, or investigation pending, in connection with their deaths.

D.R., Born January 30, 2003; Died November 11, 2019
D.R. was diagnosed with cerebral palsy, severe seizure disorder, contractures and obstructive sleep apnea. D.R. received round-the-clock nursing. In May 2017, D.R.'s treating doctor confirmed the child's "medical conditions are irreversible and lend themselves to poor prognosis for treatment and life expectancy." There is extensive medical information in the child's case records.

T.D., Born December 16, 2004; Died December 27, 2019
T.D. had quadriplegic cerebral disorder, ataxia brain damage and nose system disorder. T.D. was bedridden, used a feeding tube and had round-the-clock nursing care in the licensed foster home where T.D. resided for 5 years. The foster parents observed the child's condition worsening in early December and called Emergency Medical Services. T.D. was brought to the hospital and underwent emergency surgery for necrotic tissue inside the intestines.  T.D. was placed on a ventilator following surgery and never recovered.  T.D. was removed from the ventilator and died soon thereafter.

Z.B., Born May 15,2015; Died January 2, 2020
Z.B. was diagnosed with Hemophagocytic Lymphocytosis, which medical records indicate was a terminal illness. Z.B. was bedridden, used a feeding tube and was in a vegetative state at the time of death.  Z.B. suffered severe brain damage after lapsing into a coma earlier in the year as the disease worsened and was in hospice care at the time of death. There is extensive medical information in the files documenting Z.B.'s medical decline, leading to death.

J.S., Born September 3, 2014; Died February 13, 2020

J.S. suffered severe injuries in her birth home prior to placement in foster care, including numerous fractures and severe brain trauma. J.S. resided in the home of licensed foster parents since November 2017, during which time J.S. was bedridden, suffered severe seizures, used a feeding tube, required round-the-clock medical care and had a VP shunt. J.S. was receiving hospice care at the time of death.

D.D., Born May 16, 2017; Died February 10, 2020

D.D. suffered from Methylmalonic acidemia, a metabolic disorder that prevented the child's body from breaking down proteins and fats. D.D.'s condition was terminal. On January 30, 2020, shortly before D.D.'s death, DFPS substantiated child maltreatment against the child's licensed foster mother for Neglectful Supervision for excessively leaving the child alone with nurses. D.D. was in the hospital in a pediatric Intensive Care Unit at the time of death.

b.  Child Who Died Out of State

A sixth child in the PMC General Class with no known medical history died while residing with a pre-adoptive caregiver in a California kinship placement.

G.B., Born September 15, 2017; Died November 27, 2019

G.B. was in an Interstate Compact on the Placement of Children (ICPC) kinship home in California since 2018. DFPS records indicate G.B. died at a daycare program during naptime. The child was resting in a Pack N' Play, and when other children roused, G.B. did not. DFPS did not investigate the death because it does not involve an allegation of child maltreatment in Texas. DFPS referred the fatality report to California's daycare licensing agency.

c.  Child Deaths Under Investigation

Five children in the PMC General Class died between July 31, 2019 and April 30, 2020, and DFPS is investigating alleged maltreatment in connection with their deaths.

L.B., Born March 28, 2018; Died November 20, 2019

L.B. suffered from Pierre Robbins syndrome and hypoglycemia. L.B. used a feeding tube and tracheal tube to support eating and breathing and received round-the-clock nursing care. The record indicates the child's tracheal tube may have come undone (the child reportedly pulled at it frequently) while the child was temporarily unsupervised, according to the licensed foster mother, which may have contributed to the child losing consciousness. Preliminary autopsy results indicated no signs of trauma or abuse and final results are pending. As of April 30, 2020, both the final autopsy results and the DFPS investigation into the child's death remain pending.

K.C., Born September 1, 2005; Died February 9, 2020

K.C. was living at Prairie Harbor, an RTC when she died after collapsing in the middle of the night on February 9, 2020. K.C.'s last well-child physical exam was October 29, 2019, soon after being placed at Prairie Harbor, where she died. Medical records from this visit and others in the child's file indicate that K.C. was obese; she was approximately 5'3" and weighed just under 300 pounds. At the time of her death, K.C. was prescribed three medications associated with a mental health diagnosis and was also taking birth control pills to regulate her menstrual cycle. During her stay at the residential treatment center, medical records show routine doctor visits but no serious health issues.

The RTC is divided into two separate housing units: "A House," where K.C. lived, and "B House," which is a short walk across the campus. Children share rooms, with as many as three children in a room. Daytime and nighttime staff are divided between A House and B House, with most staff almost exclusively assigned to one house or the other and having little interaction with children in the house to which they are not assigned. The houses themselves are divided into two sides by common living and dining areas between groups of bedrooms on the opposite halves of each house. Staff are assigned to supervise children by bedroom, with different staff assigned to each side of the A House and B House. Night staff arrive at 9:00 pm, after most of the children have gone to bed and are required to conduct room checks every ten minutes in both houses, by walking into bedrooms and shining a flashlight to check children in their beds.

RCCL placed Prairie Harbor on probation five days prior to K.C.'s death after having been cited more than 60 times for minimum standards violations between February 2017 and December 2019.[753] The probation notification letter lists standards violations related to restraints, inappropriate discipline, failure to appropriately supervise children, and problems maintaining appropriate staff-to-child ratios. Violations also included at least one failure to make a serious incident report to CCL within 24 hours of a child's injury or illness warranting treatment by a medical professional or hospitalization, and violations of minimum standards related to failures by direct care staff to appropriately report and document serious incidents.[754] CLASS indicates that CCL placed the RTC under Evaluation in June of 2019, but the corrective action was stopped because RCCL "met with the agency and agreed that [RCCL] would not move forward with the corrective action" because the RTC would instead "submit a plan that will address concerns identified in the meeting."[755]

In addition to RCCL corrective action, the RTC had also been subject to contract monitoring actions by DFPS in 2017 and again in 2019. In 2017, DFPS's contract monitoring staff found problems associated with children missing psychiatric appointments required by treatment plans, as well as problems associated with documentation of administration of prescribed medications

---

[753] Letter from Tex. Health & Human Servs. Comm'n to Alexandria Pritchard, Executive Dir., Prairie Harbor LLC (Feb. 4, 2020), attached as Appendix 7.1.
[754] *Id.* at 9.
[755] TEX. HEALTH & HUMAN SERVS. COMM'N, *Residential Child Care Licensing, CLASS Database Page: Provider Corrective Action Plan Supervisory Decision and Provider Acknowledgement, Prairie Harbor LLC* (June 6, 2019).

and failure to appropriately administer prescribed medications.[756] Though the agency agreed to corrective actions, DFPS found similar problems in 2019.[757] The violations documented in the monitoring report include a number of problems associated with documentation of therapy visits, and medication logs and records, and describes errors indicating children may not have received the correct dosage of medication and that medication records were not updated when a child's doctor changed their medication dosage.[758]

*RCCI Interviews and Notes Related to the Events Surrounding K.C.'s Death*

As of May 22, 2020, RCCI had conducted in-person interviews with eleven staff and one facility administrator about the events surrounding K.C.'s death. Ten children had also been interviewed in person.

Four RTC staff were involved in the events surrounding K.C.'s death:

- Staff One: had been working at the RTC as night staff for a little over two months when K.C. died.
- Staff Two: an experienced night staff person, assigned to supervise K.C.'s bedroom, re-hired approximately seven months prior to K.C.'s death after having previously worked at the RTC.
- Staff Three: a night supervisor who had worked at the RTC for a little over five years.
- Staff Four: a lead residential counselor, who had worked at the RTC for over a year at the time of K.C.'s death. While Staff 4 usually worked during the day, she was at the facility overnight two out of four days of her "four-on, four-off" shift.[759]

Staff One was supervising K.C. on the night she died. Staff One was normally assigned to the other side of A House; but that night, at approximately 10:20 p.m., Staff 2 asked Staff 1 to cover for her while she walked to B House to pick up paperwork.

According to Staff One, K.C. awoke a little after 10:30 p.m. on February 8, 2020 and got up to use the restroom. Staff 1 noticed that K.C. limped when she walked to the restroom but assumed that it was because her leg was asleep. Shortly after K.C. entered the restroom at approximately 10:35 p.m., Staff One heard the child fall. Staff One entered the restroom and found K.C. on her back on the floor and immediately tried to call Staff Two who did not answer.

---

[756] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Fiscal Year 2017 Residential Child Care Program Contract Monitoring Report Prairie Harbor LLC* (July 17, 2017) (on file with the Monitors).

[757] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Fiscal Year 2019 Residential Child Care Final Contract Monitoring Report Prairie Harbor LLC* (Oct. 30, 2019) (on file with the Monitors).

[758] *Id*. at 5-7.

[759] The information that describes the night of K.C.'s death is based on the Monitors' review of investigation notes and documents uploaded to OneCase, and of audio recordings of interviews with 12 staff (including the four who were involved in decisions surrounding K.C.'s care that night) and 10 children.

At that point, three other children entered the bathroom and helped pull K.C. into a sitting position. Staff One asked K.C. if she hit her head. K.C. said she had not but was complaining of leg pain. The other children then confirmed that her leg had been bothering her. Staff One noticed K.C. was breathing very heavily and started talking to her to try to get her to breathe properly. K.C. sat up briefly with the help of Staff One and the other children, but immediately laid back down.

After establishing K.C. had not hit her head and was responsive and talking, Staff One next tried to call her supervisor (Staff Three) at 10:38 p.m. However, Staff 3 was "in ratio" at B House because of short staffing and did not immediately answer because she was doing rounds, checking on children. Staff Three returned Staff One's call at 10:45 p.m. (approximately 10 minutes after K.C. collapsed). K.C.'s condition had continued to deteriorate and she was no longer conscious, though Staff One reported she was still breathing and had a pulse.

Staff One told Staff Three what had happened; Staff Three said they would most likely have to take K.C. to the emergency room. She told Staff One that she would walk over to A House, but first had to get another staff person to cover the children she was responsible for in B House. Staff Three arrived at A House at approximately 10:50 p.m. (15 minutes after K.C. collapsed). When Staff Three arrived, K.C. was unresponsive but, according to Staff One, was still breathing and had a pulse. Staff Two had also walked back to A House. Staff Three asked Staff 1 to go to B House to get Staff Four. Staff One left to walk to B House.

When Staff One returned to A House with Staff Four, Staff Three was calling facility administrators because she believed she needed to get permission to take K.C. to the hospital or to call 911. Staff Four tried to get K.C. to wake up, first by putting a wet paper towel on her face, and next by waving alcohol wipes under K.C.'s nose. K.C. opened her eyes and when Staff Four asked if she was okay, K.C. said "yes, I'm going to get up, I'm going to get up" but then closed her eyes again. K.C. then started to squirm on the ground, moan, and pass gas or soil herself.

After Staff Three made a series of calls to "get permission" to call 911, during which she said she was told that they should take K.C. to the hospital themselves rather than call 911, Staff Four took the phone and explained that they would not be able to take the child to the hospital themselves because of her size and condition. Staff Four told Staff Three to call 911 at 11:08 p.m., more than 30 minutes after K.C. had collapsed. K.C. had turned on her right side and was making noises, which then stopped. Staff One tried to find a pulse in her neck but could not find one. Staff One noticed her body had gotten cold and she was foaming at the mouth.

The paramedics arrived at approximately 11:15 p.m. After attempting CPR, they transported K.C. to the hospital where she was pronounced dead shortly after arriving.

Notes from a preliminary autopsy report entered in CLASS on February 10, 2020 indicated that the "internal examination disclosed a pulmonary embolism in the lungs." Notes in CLASS related to a February 13, 2020 phone interview with the treating physician at the hospital indicate that the doctor confirmed that when K.C. arrived at the hospital, she had already died. He advised DFPS

he could not say that K.C. would have survived had she arrived at the hospital sooner because "blood clots are very difficult to take care of."

*RCCI Interviews and Notes Related to Protocol in an Emergency*

Staff interviewed by RCCI were inconsistent in their answers when asked whether they need permission to call 911 if a child is seriously ill or injured. Staff indicated this was the first time something this serious had happened. Staff One reported that the RTC procedure was that if a child hit their head, the child had to be taken to the emergency room. She indicated that when that happens, they notify the supervisor, and the supervisor has to notify someone with a higher level of authority to let them know they are taking a child to the hospital. During training, she was reportedly told to tell a supervisor if an emergency took place, and the supervisor would handle it. While she had never been told that she absolutely could not call 911, Staff One said she was trained to tell her supervisor and was scared to call 911 because she was afraid that she would get into trouble.

Staff Three said that the night that K.C. died, she first tried to call facility administrators as she walked from B House to A House. She also said that because she generally worked in B House, she did not know K.C. well enough to know how big she was and did not realize how bad things were until she got to A House. She said that the facility administrators never told her not to call 911, and that there was no policy that staff must seek permission prior to calling 911.

The facility administrator told investigators that if a child falls and hits their head or a "vital area" the staff person is to see if they are responsive, check to see if they hit their head, and then get them to the ER as quickly as possible. The administrator said staff are instructed to check to see if the child is responsive and breathing – and if the child is not, to immediately call 911. But, the administrator said, the staff person should first call their supervisor "right off the bat" and the supervisor would come to the scene and between the two of them, 911 would be called.

Another staff person said that if a "major incident" was to occur – someone was unconscious, not breathing, bleeding to death – they would call 911. He acknowledged that according to their CPR training, calling 911 was the first thing they were told to do. Another staff person said that they were trained to call "admin" but acknowledged that given the circumstances, she would have just called 911. According to her, while their CPR training does not require them to call a supervisor, once you are "on the floor" you are told "admin" has to be called before a child is taken to the hospital.

Another staff person indicated that they are to call 911 if a child is bleeding, says they can't breathe or are non-responsive. He noted that "you probably have to report it to the supervisor" but said that if the child is non-responsive, he would call 911 first. Whether you "need permission" depends on the severity of the injury. If the child is bleeding or non-responsive, he said staff can call without approval. Another said that if there is a medical emergency – for example, a child passes

out – they must make sure the child is breathing and if they are, they then must call for help from another staff person or supervisor.  He said that staff do not need permission prior to calling 911.

CLASS notes for the investigation indicate that on February 12, 2020, the RTC revised its emergency medical response plan to clarify that if a life-threatening medical emergency has been confirmed, staff should "immediately call 911" prior to calling the shift supervisor.

*RCCI Interviews and Notes Related to K.C.'s Complaints of Leg Pain*

Of the ten children interviewed by RCCI, six lived in A House when K.C. died.  The other four children lived in B House.  Of the ten, seven children indicated that K.C. had complained of leg pain in the days leading up to her death. K.C.'s roommate said she had been complaining of leg pain for about two or three weeks prior to her death and that she was limping.

Another child confirmed K.C. complained of leg pain and speculated that perhaps her leg "gave out" and that's why she fell.  This child said staff heard her complain of leg pain and the staff gave her Ibuprofen for it.  Another child said she heard K.C. tell staff that her leg hurt and ask for medication for the pain.  According to this child, K.C. complained about it "basically every day" and staff did not do anything.  Another child said K.C.'s right leg was bothering her and K.C. told staff but nobody listened to her.  This child also said she heard K.C. report her leg pain to staff.  Another child said K.C. complained to everyone about her leg pain and walked around saying, "Oh my God, my leg hurts."

Of the three children interviewed who did not know of K.C. complaining of leg pain, two lived in B House and said they did not spend much time around K.C.  The third child lived in A House but was not on the same side of the house where K.C. lived and said she did not spend much time with K.C.

Of the eleven direct care staff interviewed, five worked in A House, five worked in B House, and one said she worked in both A House and B House because the facility was consistently short staffed.  Only two staff indicated they were aware of K.C. complaining of leg pain or saw her walk with a limp. One of these, Staff One, saw her walk with a limp the night of her death but said she was not aware of K.C. complaining of leg pain prior to that night.[760]

The other staff person who indicated she was aware of K.C.'s leg pain said that K.C. was "dragging her leg around" and that everyone saw this.  However, she noted that K.C. would have "good days and bad days" with her leg; some days K.C. would limp, some days she would not, and this led people to believe that perhaps K.C. might be "faking."  This staff person said "everyone in A House" knew about K.C.'s leg pain and that one staff person had submitted paperwork related to

---

[760] Staff One also told both the RCCI investigator and the law enforcement officer who interviewed her that after she completed her serious incident report the night that K.C. died, she was told by Staff 3 that a facility administrator wanted her to take the word "limp" out of the report.  She refused to do so.  However, when Staff 3 and the facility administrator were interviewed, they denied this.

K.C.'s complaint.  One of the children interviewed said that when a child complained, staff might not send them to the doctor right away, that staff had to see something physically wrong with them before they would send them to the doctor. She explained that this was because in the past, children had run away when being transported for a medical appointment.

Another staff said the only time he heard K.C. complain of foot or leg pain was after she kicked a door in December.  However, he said, when staff offered to take her to the doctor, she refused to go. An unsigned Medical Examination Form from the RTC, dated December 21, 2019, describes "leg pain from kicking door."[761]  Another form, signed by the same staff person who reported this during the interview, is a "Refusal Form" with the same date and appears to indicate by K.C.'s signature that she refused a trip to the ER but does not include any other information. There were three other Refusal Forms in K.C.'s medical records from the RTC – one for a vision checkup,[762] and two for a self-inflicted injury when K.C. hit herself on the head, for which K.C. refused medical treatment and (according to the forms) said she did not hurt herself badly.

CLASS notes indicate the RCCI investigator interviewed K.C.'s Local Permanency Specialist (formerly called an "I See You" worker) on February 27, 2020. The Permanency Specialist reported having seen K.C. on February 3, 2020. She was not aware of K.C. complaining of leg pain or discomfort, though she recalled an incident in January when K.C. was "standing on the side of her foot" and "had an awkward walk." The RTC nurse was standing nearby and asked K.C. what was wrong.  K.C., according to the specialist, "responded nothing was wrong and then preceded [sic] to walk away normally and did not appear to be walking funny anymore."

Both staff and children interviewed by RCCI described the same protocol for reporting an injury or illness. All said when a child reports something to staff, the staff person fills out an "injury/illness" form and gives it to their supervisor. The supervisor is then responsible for reviewing it and bringing the child to the nurse, who assesses whether the child can be treated on-site or needs to go to urgent care or the doctor. The nurse is only on-site during the day; if a child complains at night and the issue is serious, staff are to take the child to urgent care. During his interview, the facility administrator said that he reads incident reports every day, and that he did not remember reading any incident reports for K.C. indicating she complained of leg pain.  The records produced by the RTC to RCCI (and subsequently provided to the Monitors) do not include any illness/injury forms related to leg pain for K.C., aside from those associated with the December 21, 2019 incident discussed above.

*Conflict Between Investigator Staffing Notes in CLASS and the Monitors' Review of Records & Interviews with Staff*

---

[761] The Daily Progress Notes in K.C.'s RTC records for December 21, 2019 indicated that K.C. "had a behavior" and a serious incident involving physical aggression.

[762] On this form, the signature line for K.C. indicates "refused to sign."  During the child interviews, another child complained of having missed two vision appointments, once because there was a party that staff did not want her to miss and a second time because they did not have transportation to take her to the appointment.

The RCCI investigator's notes in CLASS for a staffing with an RCCI supervisor on April 2, 2020 state:

> In regards to [K.C's] leg pain, children in care indicate [K.C.] would verbalize she was having leg pain, however, the staff members interviewed denied knowing about any leg pain. [One staff person] worked the dayshift and spent the day with [K.C.]. [This staff person] denied witnessing [K.C.] walking with a limp or reporting her leg hurt.   Permanency Specialist…indicated she witnessed [K.C.] walking funny and she asked Nurse…to check [K.C.]  [K.C.] denied there was anything wrong with her leg and proceeded to walk correctly.  Therapist…also had recent contact with [K.C.] and denied witnessing her walk with a limp or complain of leg pain.

The FACN was consulted and reinforced the ER Physician's concern of the delay in medical care.  The FACN requested to see the Final Autopsy report and the consult will remain open.

Though there is a note in CLASS dated February 12, 2020 for "External Documentation" that indicated the Investigator reviewed K.C.'s medical records, incident/behavior reports, service plan, and daily notes, under the heading "The following information was established:" nothing is written.

The Monitors conducted a site visit in late February 2020, after the Court was made aware of this child's death.  Prior to the site visit, the monitoring team reviewed the records from the RTC, provided by DFPS. While there are no medical records or "injury/illness" forms for K.C. that reference leg pain aside from the December 21, 2019 incident, three forms included in the child's progress notes clearly document leg pain.  The first, dated January 19, 2020, is a "Night Shift Daily Progress Note" with the following in the narrative section:

> Client was asleep in room upon arrival.  Client awoke at 9:15 pm and said her leg was hurting, gave her water and she went back to bed.  Woke up again at 1:40 am complain [sic] of pain in her right leg (calf area) and was limping when she walked.  Tossed and turned most of the night until 2:45 am.  Was give [sic] some Ibuprofen [sic].  Client slept the rest of the night.[763]

The Monitors were not able to interview the staff person who entered this information because she no longer worked at the RTC and did not respond to phone calls.

---

[763] *Prairie Harbor, Night Shift Daily Progress Note* Jan. 19, 2020, attached as Appendix 7.2.

Another form, titled "Daily Health Check," and dated January 21, 2020, under a silhouette of a human form in the middle of the page (used to document scrapes, birthmarks, bruises, scratches, deformities, piercings, lice, lesions, rashes, scars, tattoos, and prosthesis), notes in the comments "Right leg hurt" and indicates, with an arrow to the right calf on the human figure, "Hurt."[764]  This form is attached to the back of Daily Progress Note forms.  The same staff person completed the Daily Health Check and made the same notation with the arrow pointing to the right calf on the figure on the form, with a notation indicating "Hurt" on January 22, 2020, January 23, 2020, and January 24, 2020.

The Monitoring Team interviewed the staff person who made these notations. She remembered K.C. complaining of leg pain and confirmed noting it on the forms.  At the time that she documented K.C.'s leg pain, she was assigned to K.C. as direct care staff.  But she was moved to another area of the house.[765]  According to this staff person, when K.C. complained to other staff about the pain, they did not appear to take her complaint seriously.[766]  Staff Three, also interviewed by the monitoring team, reported that she filled out an "FYI" for K.C.'s leg pain in mid-January.[767]

The monitoring team interviewed the director of the RTC. He indicated that the protocol for the RTC was for staff to complete the Daily Progress Notes and the Night Shift Daily Progress Notes and provide them to their supervisors, who are then required to provide them to the facility administrators.  If the forms indicated a need for medical attention, an "illness/injury" form would be completed and the child would be assessed by the nurse.  The facility administrator interviewed by the monitoring team confirmed that this is the protocol, as did the direct care staff interviewed.

Three of the PMC youth interviewed by the monitoring team had also been interviewed by RCCI and reported K.C. complained of leg pain to other children and staff.  They were consistent in their interviews with the monitoring team.  In addition, another child interviewed by the monitoring team who had not been interviewed by RCCI as of May 15, 2020, said that K.C. complained of leg pain.

The monitoring team interviewed seven direct care staff, including the four who were with K.C. the night of her death.  Staff interviews were consistent with RCCI interviews, with the exception that Staff Three mentioned K.C.'s leg pain during the monitoring team interview but did not when RCCI interviewed her.

---

[764] *Prairie Harbor, Daily Health Check*, attached to Daily Progress Note Jan. 21, 2020, attached as Appendix 7.3. This was the first Daily Progress form completed by this staff person after the night shift staff indicated leg pain on January 19, 2020.  The Daily Progress form completed for January 20, 2020 was signed by a different staff person, and the January 20, 2020 Night Shift Daily Progress form was not signed by the same staff person who signed the January 19, 2020 Night Shift Daily Progress form.  Staff 3 began signing Night Shift Daily Progress forms on January 21, 2020.

[765] This is consistent with K.C.'s records; the January 25, 2020 Daily Progress Notes were signed by a different staff member.

[766] The staff person said that they told K.C. that she "hadn't complained when she worked out earlier," which the staff understood to mean that K.C.'s complaint was not to be taken seriously.

[767] Though the first document found in the files was filled out by nighttime staff, it was signed by a different staff person.  The Monitors did not find a form with this staff person's signature in K.C.'s records.

*Medical Examiner's Report*

CLASS notes indicate RCCI reviewed the medical examiner's final report on May 12, 2020. K.C.'s autopsy was performed on February 10, 2020.  The autopsy findings regarding cause of death: pulmonary thromboembolism due to deep venous thrombosis.[768]

The notes indicate:

> The pulmonary vascular tree is occluded by a saddle embolism which extends down to the second order branches from the main pulmonary artery.  Associated with this is a deep venous thrombosis in the right calf.  The left deep venous vasculature is free of clot.[769]

The investigation remained pending as of May 22, 2020.

### T.M., Born October 27, 2013; Died March 15, 2020

T.M. was non-verbal and relied on a tracheal tube to support breathing. The child's caregivers reported T.M. suffered a respiratory event that prompted the child's licensed foster parents to call 911 and request emergency medical aid. At the time, the child's pulse oximeter, an electronic device that measures the saturation of oxygen carried in the blood, indicated T.M. was experiencing hypoxemia and the child's breathing was shallow. The foster father reported he performed a sternum rub and bagged the child for oxygen support. The child was brought to the hospital and treating physicians observed multiple brain bleeds, some bruising on the left neck, left ear, possibly both sides of the nose, both sides of forearms, and on and under chin. T.M. also had a spinal fracture, and evidence of possible strangulation. The treating physicians expressed concern for potential abuse. T.M.'s foster parents denied causing the child's injuries. As of April 30, 2020, both the final autopsy results and the DFPS investigation into the child's death remain pending.

### A.B., Born June 9, 2016; Died April 12, 2020

In the month prior to A.B.'s death, there were multiple referrals to SWI alleging physical abuse and concerns for the three-year-old child's safety. Those referrals sparked two investigations for abuse and neglect, neither of which caused DFPS to remove the child from the placement. A.B. was found unresponsive on the floor of his foster home, bleeding from his ear, with injuries suspicious for physical abuse.

On March 7, 2020, a caller reported allegations to SWI that on this day the kinship caregiver had allowed A.B. and a sibling unsupervised visitation with the children's birth mother and stated this is against court orders. The reporter stated that the birth mother had not returned the children to

---

[768] FORT BEND MEDICAL EXAMINER, *Autopsy Report* (Feb. 10, 2020), attached as Appendix 7.4.
[769] *Id.*

the kinship home within the agreed timeframe and the current location of the children is unknown. The child's birth father also visited with the children, during which time he observed bruises on A.B. The reporter indicated the birth father made accusations that A.B. and a sibling in the same placement "had scratches and bruises on them and he believes they are being abused." The reporter indicated having "no concerns of physical abuse" in regards to the caregivers and, in reference to the alleged bruises and scratches, stated that the children are "active little boys" and recently the "youngest one hit the oldest one with a TV remote." An SWI screener coded the call as Information and Referral, and later merged the referral into a maltreatment investigation that emanated from a second call to SWI, also on March 7, 2020.

In the second referral, another reporter indicated that A.B. and a sibling were in the unsupervised care of their birth father, who does not want to return the children to the kin placement because, reportedly, the caregiver's domestic partner had been hitting the children, leaving bruises on A.B.'s chest and back. The reporter stated that the birth father is not allowed to have unsupervised contact with children. The SWI screener assigned the report Priority One on March 7, 2020. However, the referral was then downgraded to a Priority Two maltreatment investigation on March 9, 2020.

The assigned investigator was advised by his supervisor that A.B.'s primary caseworker must visit the kinship placement because the investigator was getting another case assigned to him that day, requiring a different field visit. The supervisor advised "if the injuries came from [the caregiver's domestic partner] like the Intake states, they can safety plan him [sic] out of the home." The assigned investigator also documented that there are "concerns [that] the placement has broken down; either the child was injured at the guardians home or the guardian allowed the parents to have unsupervised access and were injured by the parents."

The caseworker visited the caregiver's home on March 8, 2020, and reportedly questioned the caregiver and his domestic partner regarding bruises on A.B.'s neck and body. The caregivers responded that they were unaware of bruising on A.B. The record indicates the child's birth mother sent a photo of a bruise/cut on A.B.'s lip to the caseworker, who instructed the caregiver to bring the child that day to a hospital-based center where a pediatrician-led diagnostic team provides medical and forensic evaluations for alleged victims of child abuse. Both caregivers reported that A.B.'s lip was injured by A.B.'s sibling, who reportedly hit A.B. in the mouth with a remote control device, and by A.B. running into a safety gate, causing a cut underneath A.B.'s lip. The caseworker reportedly reminded the caregivers to report all injuries timely, which the caseworker noted in the record had been relayed to the caregivers previously in February after A.B. suffered a leg injury.

The hospital team evaluated A.B. on March 8, 2020 and noted bruising to the right side of the child's neck, abrasions to the lower chest and the upper lip. Trauma specialists were consulted and the emergency department doctor's final notes stated, "there were concerns for non-accidental trauma." The kinship caregiver indicated the bruises appeared after A.B. returned from visits with the child's birth parents.

On March 10, 2020, the assigned maltreatment investigator made initial face-to-face contact with A.B. and sibling at the kinship home as well as interviewed the caregiver and his domestic partner. The investigator reported no concerns related to the children's appearance and demeanor. There is no documentation related to whether the investigator reviewed the children's bodies for any marks

or bruises. In response to the investigator's questions about the referral allegations, the caregiver responded that "he allowed the boys to go with [birth mother] without supervision and they learned the hard way that this was not a good idea. [The caregiver] stated that the [birth] parents were the ones who saw the marks and reported them to CPS as abuse. [Caregiver] stated that [A.B.] is pretty clumsy and often falls and runs into things. [The caregiver] stated that the boys also play rough with each other and when they saw the pictures they denied ever seeing them before the boys had left. [The caregiver] stated that when the boys came back the marks were present."

Later on the day of March 10, 2020, the investigator had a safety staffing with his supervisor where he informed her that both children had been seen at a hospital and a safety plan was in place that stated the birth parents were not allowed any contact with the children.   The investigator documented that "the home was observed to be appropriate for the children…[and he] had no concerns for the boys at this time."

A.B.'s daycare staff reportedly had numerous concerns about changes to A.B.'s demeanor after being placed in the kinship home in January 2020, as well as the child's sporadic attendance and bruises and injuries, but no one at the daycare center was interviewed prior to the child's death.

A third referral to SWI occurred on March 11, 2020 by an E-Report, in which a referent alleged to have witnessed the caregiver's domestic partner grab A.B.'s arm when the child asked for a drink before finishing a slice of pizza. The reporter stated, "It was obvious that [the caregiver's domestic partner] was the discipline person in the home" and was unsure if the foster parents "have good discipline or parenting skills." The reporter also alleged the caregiver allowed the children's birth mother to have unsupervised visitation with the children. The referral was coded Information and Referral.

In a fourth report to SWI on March 17, 2020, which was coded for a Priority Two maltreatment investigation,[770] a different reporter alleged to have witnessed the caregivers hit the children and reported that the caregiver's domestic partner "beats [the children] really bad." The reporter indicated approximately one week earlier, the caregiver's domestic partner "busted" A.B.'s lip and punched A.B.'s sibling (1 year old) in the chest. The reporter alleged pervasive substance abuse by the caregivers.

The investigator did not go to the home despite the March 17, 2020 referral. The investigator wrote that A.B. had already been seen as part of the March 7, 2020 investigation and planned to merge the investigations. The investigator documented unsuccessful efforts to reach A.B.'s caseworker and the referent on March 17, 2020,[771] and then next met with the investigation's supervisor on April 7, 2020 for a "15-day case review."   The review documented that A.B.'s "guardians are appropriate and children have been seen by" a hospital team. The investigator also requested an extension on the case, and on April 8, 2020, the supervisor approved a 21-day extension.

---

[770] The intake report was initially assigned by SWI for a Priority One maltreatment investigation; however, CCI downgraded the intake report to Priority Two citing "[s]everal reports with the same allegations."
[771] The investigator documented that the number provided for the reporter was a wrong number.

The caseworker reportedly visited the kinship placement on March 27, 2020.[772] During the visit, the caseworker "immediately" observed a bump in the middle of A.B.'s forehead. The child's case record indicates the caseworker questioned the caregiver's domestic partner at the home about the bump on A.B.'s head. The domestic partner said he had not noticed it and did not know where it came from. A.B. also presented with scratches on the side of the face, which the caregiver's domestic partner said resulted from A.B.'s long nails. A.B. showed the caseworker a scratch on the wrist as well. The caseworker noted that A.B. did not seem happy and did not smile.

The caseworker reportedly spoke privately with A.B. who said the child fell outside and hit the ground and the floor on the head. The caseworker asked the caregiver's domestic partner how often the children are attending daycare and he responded that he kept the children home all week. The caseworker documented that she reiterated to the domestic partner the children must attend daycare, at least the fourth reference to this instruction in the record, and all injuries need to be reported to her. The caseworker then called the kinship caregiver, who was not at home during the visit. He said he did not know about the bump but disputed A.B.'s account, saying it was not true because the couple did not let the children outside around other children. Worker then stated that unexplained injuries would not be acceptable. Worker also stressed that the children need to attend daycare and if they do not attend due to being sick the caregiver must notify her. She observed that A.B. is "changing" and "doesn't seem as lively as he has been in the past" and socialization with other children at daycare is important.  The caregiver stated that his domestic partner is no longer working due to the coronavirus.

In case notes recorded on April 10, 2020, the caseworker reported she received a text message on April 6, 2020 from the caregiver, "Woke up this morning and [A.B.'s] eye was swollen, [A.B.] did not fall or have an accident its [sic] just puffy." The caseworker recorded that she replied by text, "What are u giving [A.B.] for allergies? Is [A.B.] rubbing it? Are sure there's nothing in it? See if u can get some otc." The caregiver replied, "A.B. is constantly rubbing [A.B.'s] eyes, I will ask the pharmacist what I should get…and I will let you know what they recommend."

In case notes recorded on April 10, 2020, the caseworker noted she received a text message from the caregiver on April 7, 2020, "I apologize for the late text, [A.B.] didnt [sic] make it to daycare today… appointment was set for 10, but [A.B.] didnt get back there till 10 45 and it was 1pm when we back home. They will be there the rest of the week without fail. Will send notes on the therapy and new weekly schedule..."

In case notes recorded on April 10, 2020, the caseworker indicated she received a text and photograph of A.B. on April 9, 2020 from the daycare center. The caseworker responded to the daycare center stating that A.B.'s eye was swollen shut and was taking an allergy medication. At 9 p.m. on April 9, 2020, the caregiver texted the caseworker noting A.B. "seems to be like out of it … gets tired easily... also been having accidents more often like [A.B.] just can't get to the rr. I want to take [A.B.] to the doctor to make sure nothing wrong. I don't think the ER is necessary but I'm going to call [A.B.'s] primary doctor to see if I can get a quick appointment." The caseworker

---

[772] The record originally showed the visit was documented on March 20, 2020, which is impossible if the visit occurred on March 27, 2020. The visit was subsequently re-entered into IMPACT on April 12, 2020.

reported she did not receive the text message until the next morning at 8 a.m., near the time A.B. was discovered on the floor.

Following A.B.'s death, the child's sibling was removed from the placement. A DFPS investigator interviewed the child's birth mother who admitted the kinship caregiver had allowed her, and the children's birth father, unsupervised visits with the children, and she also complained that she had sent DFPS photographs of A.B.'s injuries and nothing was done to keep the child safe.

A DFPS investigator interviewed a witness who described numerous injuries to A.B. over the previous two months, including a hip injury, a black eye and facial bruising, for which the witness said the caregiver provided varying and inconsistent explanations. The witness described excessive alcohol consumption by the caregiver's domestic partner and repeated another witness' account of overhearing the domestic partner hit A.B. on a day the child's hip was hurt. Police officers found marijuana and hemp at the placement after A.B.'s death as part of their separate, open investigation.

The caregiver reported his domestic partner was the last person to see A.B. before the child was discovered the next morning on the floor in severe distress with blood discharging from the child's ear. As of May 15, 2020, the police investigation and the DFPS investigation into A.B.'s death remain open.

C.G., Born December 29, 2005; Died April 26, 2020

Fourteen-year-old C.G. reportedly hanged herself in the bathroom of a shelter where she was placed by DFPS following her discharge from a psychiatric hospital on March 4, 2020.[773] The Monitors reviewed all of the child's treatment and placement records provided by the State and viewed more than forty video clips,[774] which recorded activity from the shelter on the night C.G. died. The Monitors repeatedly requested,[775] and ultimately obtained, from DFPS a copy of C.G.'s

---

[773] The troubled history of this facility, Williams House, is discussed at greater length in Section VI of this report.

[774] The initial video clips provided by DFPS to the Monitors omitted approximately fifteen minutes of footage. The Monitors emailed the agency, "[t]he C.G. video . . . appears incomplete. The video clips stop at 20:25:28 and picks up again at 20:41:07. The investigation indicates video from 20:26:00 to 20:41:09 is relevant. Can you advise when you will make that available to us?" Email from Kevin Ryan, Monitor to Tara Olah, Dir. of Strategy & Implementation, Dep't of Family & Protective Servs. (May 6, 2020, 19:22 EST) (on file with the Monitors). DFPS provided all the requested footage and noted "[i]t appears there were two videos labeled 2025. The one uploaded to SharePoint was only 24 seconds long. We have uploaded the second video." Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan, Monitor (May 7, 2020 15:10 EST) (on file with the Monitors).

[775] On May 5, 2020, the Monitors requested that DFPS "please provide us with all of the child's medical, pharmacological and mental/behavioral health records from February 13, 2020 to April 26, 2020, and the child's complete records/files from her last placement." Email from Kevin Ryan, Monitor to Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (May 5, 2020, 13:23 EST) (on file with the Monitors). DFPS provided some of the requested information on May 12, 2020 and May 19, 2020, but the submission was incomplete. The Monitors inquired again on May 24, 2020, requesting DFPS "[p]lease advise when you are going to upload the complete records from C.G.'s placement." Email from Kevin Ryan, Monitor (May 24, 2020, 16:11 EST) (on file with the Monitors). DFPS responded, "We are working with field staff to determine whether there are any additional documents beyond what we provided to you on 5.12.20 and 5.19.20. We should be able to confirm this by COB today." Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (May

treatment plan at the shelter, signed by shelter staff, the shelter's clinical social worker and C.G. The plan indicates the document was provided to all signatories, as well as C.G.'s CVS caseworker and DFPS supervisor, on April 4, 2020. The form includes a checked box indicating "Risk for Self-Harm" with a notation, "Due to [C.G.'s] history of self-harming behavior, she is on a safety plan and will be monitored by staff at all times."[776] That did not happen. The videos show that C.G. entered the bathroom by herself and remained alone for thirty minutes before staff unlocked the door and discovered her.[777] The videos show a staff person knocking on the door to the bathroom after C.G. was in the bathroom for eighteen minutes. Although there is no audio available from the video recordings on the night of C.G.'s death, a staff member stated that when she knocked on the bathroom door, C.G. said she was okay and the staff member told her she had five more minutes in the bathroom. Twelve minutes later, the staff member returned, unlocked the door and discovered her.

C.G.'s seven-year passage through foster care was marked by increasing psychological distress and harm. Her first diagnosis, given within six weeks of foster care placement, progressed from an adjustment disorder in December 2012 to Post-Traumatic Stress Disorder in January 2013 to a Major Depressive Disorder episode, recurrent and severe, in September 2019 and ultimately included Bipolar Disorder as of March 25, 2020.  Each of her three hospitalizations, all during 2019 and 2020, was precipitated by suicidal behavior and self-harm risk.

At the time of C.G.'s discharge from the psychiatric hospital on March 4, 2020, she was prescribed at least three psychotropic medications for anxiety and depression. C.G. told the caseworker transporting her to the shelter that she had been placed at the psychiatric hospital for three weeks in February and March 2020 "for cutting herself and making an outcry that she would rather be dead than alive."

DFPS moved C.G. from the hospital - a highly structured and clinically expert environment - to a shelter with a troubled regulatory history that did not provide adequate mental health care or

---

26, 2020, 07:33 EST) (on file with the Monitors). On May 27, 2020, DFPS informed the Monitors that the agency had "provided [the Monitors] with all records from [the shelter]." Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (May 27, 2020, 16:46 EST) (on file with the Monitors). The Monitors believed that representation was inaccurate, based on the monitoring team's review of the case, which suggested a treatment plan existed at the shelter, and it may have included important information about the level of supervision required for C.G. As a result, the Monitors again asked DFPS for the information. "The records the State has provided refer to a treatment plan at [the shelter] for this child and describe some of the contents of that plan. We have not found that treatment plan among the documents the State provided, nor another document that contains the information described in the reference materials. Please advise if that document exists and, if so, please provide it." Email from Kevin Ryan, Monitor (May 27, 2020, 16:12 EST) (on file with the Monitors). On May 28, 2020, DFPS provided the treatment plan to the Monitors. The treatment plan evidences that DFPS and the shelter staff knew about, and agreed to, a plan to monitor C.G. "by staff at all times," due to her high risk for suicide.

[776] *Single Child's Plan of Service (Provider Version) Child Protective Servs., for C.G., Date of Participation March 18, 2020* (provided to the parties on Apr. 3, 2020) (on file with the Monitors).

[777] Investigation Videos provided by DFPS for the investigation related to C.G.'s death (on file with the Monitors).

supervision.[778] The shelter had received the third highest number of cited standards deficiencies among all GROs in Texas over the past five years[779]

C.G. saw a clinical social worker at the shelter two days after her discharge from the hospital, and five more times: on March 9, 13, 20, 23 and April 2, 2020. Those session notes reveal a child who consistently presented as overwhelmed, tearful, "on edge," and upset by the fighting among other residents at the shelter and unwanted advances from one of the residents. When she expressed stress and anxiety as a result of the shelter environment on March 13, 2020, C.G. was provided an MP3 player to help manage her anxiety. Between that date and March 30, 2020, C.G.'s MP3 player, cards, ball, and cell phone were stolen. By the time of C.G.'s final meeting with the clinical social worker on April 2, 2020, she discussed a new shelter policy that eliminated phone calls after work hours, which meant she would have much less contact with her family. C.G. appeared resigned and sad. She did not see the clinical social worker again and died twenty-four days later.

C.G. underwent a Child and Adolescent Needs and Strengths (CANS) Evaluation on March 18, 2020, fourteen days into her stay, which noted she was "Overall Suicidal Risk," and "requires" a same day safety plan, and further recommended a full assessment for suicide risk.

Twenty-one days into her stay at the shelter, C.G. participated virtually in her only meeting with a psychiatrist while at the shelter. The psychiatrist documented "anxiety triggers: loud noises, people arguing" and prescribed four psychotropic medication changes. The form used by the psychiatrist appears to have auto-populated a need for staff to observe the youth every 15 minutes around the clock. Under "Short Term Goals," the psychiatrist wrote: "I do not feel pt requires a specific level of observation, but the document is requiring a response to be [sic] allow finalization." The form also includes a statement, which is a part of the electronic signature the psychiatrist provided on March 25, 2020 at 6:31 p.m.: "Based on the information presented from the facility and obtained from the interactive audio/visual telecommunications assessment, the patient is determined to meet medical and psychiatric necessity criteria and the patient would benefit from admission to inpatient level of care."

The day before her death, shelter staff took an MP3 player away from C.G. as a disciplinary matter, and on the day of her death, immediately preceding her entry to the bathroom, she was scolded and brought to tears by a staff person for going into the staff's purse to look for something.

---

[778] The shelter is located in a very rural county in Texas, rated as having very few mental health professionals. See TEX. DEP'T OF STATE HEALTH SERVS., *Health Professional Shortage Areas, Mental HPSA Map*, *available at* https://txdshs.maps.arcgis.com/apps/MapSeries/index.html?appid=49655b85eb5d4cd4b637aafc74467aa4 (showing Lampasas County designated as a high needs geographic region and having a score of 12 on a scale of 0 to 25, placing it in the lowest category of scoring for availability of mental health professionals).

[779] This ranking holds whether the analysis is among all deficiencies or only those weighted by RCCL medium high/high.

## VIII.   GLOSSARY

### ACRONYMS and TERMS

| ACRONYM | NAME | PURPOSE |
|---|---|---|
| ADM | Administrative Closure | The operation is not subject to regulation; or the allegations do not meet the definition of abuse, neglect or exploitation. If the dispositions for all allegations are Administrative Closure, the overall disposition is Administrative Closure. |
| ARIF | Administrative Review of Investigation Findings | |
| CAC | Child Advocacy Center | The CAC conducts forensic interviews of the child in question or of any alleged child victims. |
| CANS | Child and Adolescent Needs and Strength Assessment | An evidence-based, trauma-informed, developmentally appropriate assessment and communication tool that helps decision-making, drives service planning, facilitates quality improvement, and allows for outcomes monitoring. |
| CASE READ | | The term describes assessment work that involves accessing and reading case information located in CLASS and/or IMPACT to validate the State's performance in association with the Court's orders. |
| CBC | Community-Based Care Model (Formerly FCR) | A community-based approach to providing foster care and case management services, by contracting with a single contractor that is responsible for finding Substitute Care living arrangements and providing children a full continuum of services. A community-based approach to providing foster care and case management services, by contracting with a single contractor that is responsible for finding Substitute Care living arrangements and providing children a full continuum of services |
| CBT | Computer Based Training | Training provided via online curricula. |
| CBCU | HHSC Centralized Background Check Unit | |
| CFSR | Child and Family Service Review | A federal and state collaborative administered by the Children's Bureau. It is designed to ensure that state child welfare systems provide quality services to children and families.  Following a |

357

| | | review, states develop program improvement plans (PIPs) and then put them into practice. |
|---|---|---|
| CLASS | Child Care Licensing Automation Support System | A case-management computer application used by HHSC/DFPS licensing staff and is the system of record for many licensing activities, including non-abuse/neglect investigations. |
| COS | DFPS Contract Oversight and Support Division | A division within the Office of the Deputy Commissioner charged with building and maintaining DFPS's contracting framework to support informed processes and activities that safeguard against unethical behaviors, manage contracting risks, and focus on integrity and compliance. |
| CPA | Child Placing Agency | DFPS contracted agency that currently has statutory authority to issue, suspend, or revoke "foster home verification." Perform quarterly visits, etc. |
| CPD | CPS Professional Development Training | Training required for newly hired caseworkers. |
| CPS | Child Protective Services | |
| CQI | Continuous Quality Improvement | Process that provides continual data and information collection and analysis used for the early identification of lead agency problems and areas of possible contract non-compliance |
| CSA | Child Sexual Aggression | Term used for certain youth displaying sexually aggressive behaviors |
| CVS | Conservatorship Caseworkers | Caseworker's responsible for monitoring the care of children under CPS conservatorship. |
| DDS | DFPS Data and Decision Support | |
| DSI | Office of Data & System Improvement | On office under the Deputy Commissioner of DFPS that was put in place to build an infrastructure and environment that ensures effective coordination, communication, and consistency around data reporting |
| EBI | Emergency Behavior Intervention | An intervention used in an emergency situation, including personal restraint, mechanical restraint, emergency medication, and seclusion. |
| FCO | Foster Care Ombudsman | |

| FK | Fictive Kin | The term "fictive kin" refers to the care of a child by family friends with a longstanding and significant relationship with the child and family. |
|---|---|---|
| FRC | Foster Care Redesign | |
| GRO | General Residential Operations | |
| IMPACT | Information Management for Protection of Adult & Children in Texas | The case-management computer application used by DFPS staff.   IMPACT is the statewide automated child welfare information system (SACWIS) for Texas.   IMPACT is the system of record for all DFPS abuse/neglect investigations. |
| ICPC | Interstate Compact on the Placement of Children | Established to ensure that when children are paced out of state they receive protection and services they would be provided in their home state. |
| ISP | Individual Service Plan | A treatment meeting usually held at the child's placement to see how the child is progressing. |
| LMS | Learning Management System | Learning Management System module to improve tracking, assessment and analysis of the CPS Professional Development process. |
| MLS | Minimum Sufficient Level of Care | The minimum level of care a youth needs for residential care. |
| PCA | Permanency Care Assistance | Benefits available to kinship families and children who meet the eligibility requirements. |
| PMC | Permanent Management Conservatorship | A judge appoints a person to be legally responsible for a child (other than a parent), including DFPS, foster parent, or a relative. |
| RCCI (CCI) | Residential Child Care Investigations | The division within DFPS responsible for investigating ANE of youth in residential care |
| RCCL (CCL) | Residential Child Care Licensing | Division at HHSC responsible for licensing residential facilities, setting standard for operation of residential facilities, audit compliance and conducting investigations for standards violations. |
| RTB | Reason to Believe | A finding in an ANE investigation that means a preponderance of evidence indicates that abuse, neglect or exploitation occurred. |
| RTC | Residential Treatment Center | Facilities that provide specialized residential treatment care. |

| TARE | Texas Adoption Resource Exchange | |
|------|----------------------------------|---|
| TIC | Trauma Informed Care Training | Child-centered, strengths-based instruction that considers the unique culture, experiences and beliefs of the Child. |
| TMC | Temporary Managing Conservatorship | |
| SSCC | Single Source Continuum Contractor | The single contracted entity in a geographic area responsible for finding foster homes or other living arrangements for children in state care and providing a full continuum of services including case management. |
| SWI | Statewide Intake Division | Centralized point of intake for child abuse and neglect, abuse, neglect or exploitation of people age 65 or older or adults with disabilities, clients served by DSHS or DADS employees in State Hospitals or State Supported Living Centers, and children in licensed child-care facilities or treatment centers for the entire State of Texas. |
| SXAB | Sexual Abuse Policy | DFPS policy on what constitutes child-on-child sexual abuse. |

## IX.   LIST OF APPENDICES

**Section I.**

Appendix 1.1 Age Range of Children in PMC on November 30, 2019 by Legal County
Appendix 1.2. Length of Stay of Children in PMC on November 30, 2019 By Legal County

**Section III: Screening, Intake and Investigation of Maltreatment in Care Allegations**

**Remedial Order Three:**
Appendix 3.1 Intake Screening Results Summaries
Appendix 3.2 Maltreatment in Care Summaries

**Section IV: Organizational Capacity**

**Remedial Order One:**
Appendix 4.1 Tex. Dep't Family & Protective Servs, Individualized Training
Plan/Conference Notes Conservatorship

**Remedial Order Two:**
Appendix 4.2 Additional Information on Graduated Caseloads Methodology

**Section V: Preventing Child-on-Child Sexual Abuse**

**Remedial Order Thirty-Two:**
Appendix 5.1  Child Sexual Aggression Resource Guide 2019.
Appendix 5.2  Praesidium, A Review of DFPS Training Curriculum and Resources.
Appendix 5.3 DFPS Response to Praesidium Report

**Remedial Orders Twenty-Three, Twenty-Eight, Twenty-Four, Thirty**

Appendix 5.4 Child Victimization History in IMPACT 2.0 Job Aid

**Section VI: Regulatory Monitoring & Oversight of Licensed Placements**
**Remedial Orders A-Seven, A-Eight**

Appendix   5.5.a  Hector Garza
5.5.b  St. Jude's- Bulverde
5.5.c  A Fresh Start
5.5.d  Prairie Harbor

**Section VI: Regulatory Monitoring & Oversight of Licensed Placements**
**Remedial Order Twenty**

Appendix 6.1.a  GROs Over State RTB Rate
          6.1.b. CPAs Over State RTB Rate.
          6.1.c.  CPAs without Capacity Information-RTB

Appendix 6.2.a. GROs Over State Deficiencies Rate
          6.2.b  CPAs Over State Rate for High MedHigh Cites
          6.2.c  CPAs with no Capacity Deficiencies

Appendix 6.3  Enforcement Actions

Appendix  6.4  Case Study Operations Timelines.

Appendix 6.5.a   Tex. Dep't of Family & Protective Servs, Children's Hope Report in Response to the Court's Order.
          6.5.b  Hector Garza Report to the Court.

Appendix 6.6  HHSC Letter of Intent to Revoke North Folk's License, February 27, 2020.

Appendix 6.7   Settlement Agreement between the Health and Human Services Commission RCCL and Children's Hope.

Appendix 6.8  HHSC Letter of Intent to North Folk Probation, January 10, 2020.

**Child Fatality:  Section VII**

Appendix 7.1 Letter from HHSC to Alexandria Pritchard, Exec_Prairie Harbor.
Appendix 7.2 Prairie Harbor Night Shift Daily Progress Note, January 19, 2020.
Appendix 7.3 Prairie Harbor Daily Health Check attached to Daily Progress Note, January 21, 2020.
Appendix 7.4 Fort Bend Medical Examiner, Autopsy report, February 10, 2020.