**Program Facility Background: Hector Garza Residential Treatment Center**

Monitors' Visit to Hector Garza Residential Treatment Center ID# 959366

**Description of Facility and Night Time Supervision:**

**Facility Description:**

Hector Garza Residential Treatment Center ("Hector Garza") is located at 620 E Afton Oaks Blvd in San Antonio, TX.  Hector Garza is a four-story building that is licensed to serve up to 139 male and female residents between the ages of ten to seventeen.  Hector Garza is licensed to serve children with an emotional disturbance and also to provide transitional living services.

**Overall Minimum Standards Compliance**

The Monitors reviewed Hector Garza's standards compliance history from May 1, 2018 to May 1, 2020, revealing that the State evaluated 1,312 standards for compliance. HHSC-RCCL issued fifty-nine citations and provided 120 instances of Technical Assistance (TA).  Some of the more concerning citations and TA included:

- Twenty-six citations for inappropriate restraints of children and fifty-three instances of related TA;
- Five citations for inappropriate discipline of children and twenty-five instances of related TA; and
- Twelve citations for neglectful supervision of children and twenty-five instances of related TA.

**RTB for Abuse or Neglect**

Over the last five years, Hector Garza has had four RTBs for abuse or neglect:

- One involving a staff who had "consensual sex"[1] with a resident while the resident was on a home pass.
- One involving neglectful supervision in which a child attempted suicide in a hygiene closet.
- One involving a child who swallowed batteries and had to be admitted to the hospital due to a lack of staff supervision.
- One involving neglectful supervision in which a child committed suicide by hanging herself.

---

[1] Children in custody do not have the capacity to consent to sex with a staff person. The Monitors are quoting the State's investigative findings, but dispute its appropriateness.

**Corrective Action**

RCCL placed Hector Garza on probation in June of 2016 due to citations issued in investigations dating back to 2014. However, the probation was overturned on administrative review and the facility was instead placed under evaluation. The evaluation period lasted for approximately six months, from August 25, 2016 through February 17, 2017. The conditions the facility was required to meet during the evaluation were focused on ensuring appropriate staff supervision of youth.

**Restraints**

Hector Garza consistently reports to the State a high incidence of restraining children. Child restraints have increased at Hector Garza over the past three years:

- **2017**:  2,189 restraints reported
- **2018**:  2,211 restraints reported
- **2019:**  2,624 restraints reported

The facility had the second highest restraint rate of licensed placements in 2017 and 2018, and the third highest restraint rate in 2019.

**Monitoring Visit Description**

<u>Awake-Night Walk Through</u>

The monitoring team conducted a five-day on-site visit to Hector Garza in December 2019. The monitoring team , which on the first night consisted of Monitor Ms. Fowler and three monitoring team members, arrived for the unannounced nighttime awake-night visit at 11:45 p.m. and rang a bell located by the front door, to which there was no response. The monitoring team made multiple attempts to call the number posted at the door for night-time access, to no avail. After waiting at the front door for approximately fifteen minutes, two Hector Garza staff members, escorting a female youth, exited the elevator into the lobby area. One of the staff members came to the door and granted the monitoring team access. The staff person who opened the door introduced himself as a night-shift supervisor and immediately indicated Hector Garcia was short-staffed for the night and had "some things going on" causing them to be short staffed. Hector Garza staff escorted the monitoring team to the elevator where they split into two groups.

Team A went to the 2nd floor Courage wing and observed two staff members sitting at a folding table centrally located positioned in the hallway where youth bedrooms are located. Staff reported that the wing was at capacity with thirty female youth present.

Staff were completing paperwork on each child, including what staff called "skin checks" (bedroom checks for youth) and behavior issues, which were documented on the night-time log and shared with the staff on the next shift. Team A observed four female children sleeping in the hallway on

mattresses. Two of the children were sleeping on bare mattresses on the floor. Staff said that so because they were on close supervision due to safety issues. It was difficult to walk through the hallway because of the mattresses.

One member of Team A toured the unit with a Hector Garza staff member while the other monitoring team member interviewed the other staff member present. While touring, the staff member explained "skin checks" are completed every 10-15 minutes by shining a flashlight on the children. Staff also utilize an electronic system called Guard 1 to capture each time they enter a bedroom to conduct checks by tapping a wand on a button located on the bathroom door.[2] There were two to three beds in each room. One bedroom had a pile of drywall on the floor; it appeared the wall may have been kicked and the dry wall was torn off the wall.

Team B went to the third floor and were left by the escorting supervisor after he unlocked the door for entry into the Honors Unit. Upon entry to the Honors wing Team B noticed two staff seated in the hallway outside of the youths' bedrooms: one staff at the front end (close to the office) and the second staff at a small table approximately midway down the hall. Staff explained checks are conducted at least every 15 minutes and documented in the night-time log. They also use Guard 1. The unit appeared to be cluttered, dirty and had a lot of trash on the floors. There were twenty-seven boys on the unit, many of whom were awake.

One awake child explained that he had cut his finger on a piece of metal in his room for which he received medical treatment. Another child, who was standing in a doorway directly in front of the second staff seated midway down the hall, complained that staff had threatened to restrain him, provoking him to misbehave. Team B also observed a youth sleeping on a mattress on the floor in the activity room at the far end of the hallway, and two children in one of the dark rooms seated close to one another talking.

Two other youth who were awake and on mattresses in the hallway said the reason they were in the hallway was that their room (302) was "shut down" because it had holes in the walls. Staff said the reason they were in the hallway was because they were on close supervision. Team B found the door to room 302, which was locked. Team B asked Hector Garza staff to open the door. When

 the door was unlocked, Team B observed three bed frames in the room. One metal bed frame had been significantly bent so it sagged in the middle, along with multiple large holes in the walls. Staff explained the room was vacant and the door 

---

would be locked until repairs could be made.

The supervisor returned and escorted Team B to the Valor unit.  Upon entering Valor unit, there were two staff members present, one near the office and one about halfway down the hall seated at a small table.  There were twenty-one youth on the unit and only one youth appeared to be awake. The staff demonstrated knowledge of the room check policy and explained that room checks are conducted and documented in the nighttime logbook at least every fifteen minutes. They also indicated that they use Guard-1.

Team B was preparing to interview the staff on the Valor unit when they heard a disruption on the Honor unit, across the hallway.  Team B could not fully view the activity, but heard a youth yell that he could not breathe.  Shortly afterward, two youth ran out of the Honor unit and jumped over the control room counter into the foyer in an attempt to leave the floor via the elevator.  Staff from the Valor unit left the unit to assist, leaving Team B alone on the Valor unit with twenty-one youth for approximately twenty minutes.  Through a window in the locked door, Team B was able to partially view staff in the foyer tackling one youth to keep him in the area while the other child was being restrained.  From Team B's vantage point, it appeared three staff members forced the youth being restrained into a seated position on the floor with his legs in front of him.  One staff member was laying on the youth's legs.  Another staff was directly behind the youth, holding him at the biceps and pulling his arms directly back.  A third staff member was behind the second staff holding the youth at the forearm/wrist pulling the youth's arms directly back and up as far as they could force them.

As the Honors unit quieted, another disruption erupted on the unit. Staff pulled another youth from the Honors unit through the office area and placed him inside the door of the Valor unit, where Team B was still waiting. Hector Garza staff left again.  The youth was calm and told the monitoring team, "this happens all the time" and the unit was "worse than prison."   He said the other youth were trying to "jump" (attack) him.  The staff escorted him to the gym in order to keep him safe.

Once the Honors unit quieted, staff showed Team B the night-time log book for the unit.  The log book had no checks documented from 12:15 a.m. to 12:57 a.m.  The following morning when the monitoring team requested a copy of the night-time log book, the forty-five minute gap did not exist.

Meanwhile, Team A left the second floor for the fourth floor to observe the Dream and Inspire units.  Team A interviewed one one of the staff present in each unit; the interviews and walk-through were much the same as on the second floor.  Staff indicated that twenty-four children were currently housed on the unit. Five youth were in the hallway on mattresses on the floor and one child was awake.

As Team A was completing the last staff interview on the fourth floor, the facility staff received a call on the walkie talkie requesting support on the third floor. Initially, staff on the Inspire unit did

not respond.  The caller requested back up again, and the Inspire staff responded they were not permitted to leave their assigned unit.  A third call requested help, and an Inspire staff finally indicated she had to assist, leaving the Dream unit short-staffed.  Team A then proceeded to the third floor to rejoin the team members who had been left on Valor during the disruption.

When Team A exited the elevators onto the third floor, the Hector Garza staff directed them to remain in the foyer. In the foyer, the monitoring team observed a mat on the floor, where a male child was sitting, and two staff members. The youth was upset. He explained that he had been restrained. He stated, "They did me dirty. Watch the video and see his knee in my back." Team B exited the Valor unit, and the supervisor escorted the full monitoring team to the first floor. While in transit, the supervisor informed the monitoring team that a riot had occurred on Saturday night that required staff to call the police to assist.  The monitoring team departed the facility at 1:15 a.m.

Daytime Tour

The following day, the monitoring team, joined by Monitor Mr. Ryan, completed a daytime tour, during which they observed a flurry of activity to clean and repair the damage the monitoring team saw during the night-time visit.  The Monitors met Hector Garza's compliance officer and other administrative staff.

The first floor of Hector Garza accommodates administrative offices for the program administrator, program director, assistant director, clinical director, accountant, therapist, on-duty nurse, and internal investigator. It also includes the kitchen and cafeteria, an educational space, a gymnasium, and the staff training room. Hector Garza has an outdoor recreation area, but because Hector Garza is a locked facility, the outdoor recreational area is in an internal courtyard.

The three upper levels of the single building house residents; the second floor has one wing for housing youth, while the third and fourth floors each have two wings for housing youth. The secured office area or control room divides the two wings on the third and fourth floors. Youth housing areas include:

- Courage.  Located on the second floor with capacity for thirty female youth. The second floor also accommodates an area designed for a school, but is not currently in use.
- Honor and Valor.  Located on the third floor, Valor has capacity for twenty-four male youth, and Honor has capacity for thirty male youth.
- Dream and Inspire.  Located on the fourth floor. Dream has a capacity for thirty females; Inspire has capacity for twenty-five females.

Each wing contains several bedrooms which sleep up to three youth. The bedrooms are small and sparsely furnished. The beds appeared dilapidated and consisted of an institutional mattress, a pillow, a sheet, and a blanket.  Each bedroom is equipped with a bathroom, which were locked. The staff members are required to unlock the bathroom for the youth. The walls in the bedrooms are

scarred with areas where paint and walls had been heavily scratched.  The interior window panes are scratched.  Each wing includes at least one activity room, but the furnishings and equipment in the activity rooms were limited.

Hector Garza hosts an on-site school located on the first floor of the facility. Educational services are provided by John H. Wood Jr Inspire Academy, a charter school, which uses the JHW-Braination District Residential Learning Model, a primarily computer-based curriculum.

Hector Garza staff work in staggered eight-hour shifts: 7:00 a.m. to 3 p.m.; 3:00 p.m. to 11:00 p.m.; and 11:00 p.m. to 7:00 a.m.

<u>File Reviews and Interviews</u>

Over the four day visit, the monitoring team reviewed:

- Forty-nine PMC child files; and
- Thirty employee files.

And conducted, on site:

- Five awake-night staff interviews;
- Twenty-three PMC child interviews;
- Fifteen staff interviews, inclusive of the night time staff;
- One treatment director interview; and
- One administrator interview.

Overall, youth repeatedly emphasized how much they did not like living at Hector Garza.  Of the operations that the monitoring team visited in advance of this report, this sets Hector Garza apart from the others.  When asked if they liked living at Hector Garza, <u>not a single child</u> reported liking it, when that was presented as an option. Thirteen of the children interviewed (59%) emphatically answered that they did not like it, and nine children reported that it was "okay."  This is the <u>only</u> facility that the monitoring team visited, as of May 2020, where no children reported they liked living there.

As the monitoring team continued the interviews, the reasons became clearer: Forty-three percent (10) of the interviewed children indicated they did not feel physically safe on campus, and ninety-five percent (22) of the children interviewed reported physical fights between children on campus. One hundred percent indicated that there were physical fights between children in their housing units.  Six children reported having been hit by a staff person, and nineteen children reported having been hit by another child. Eighty-one percent of the youth interviewed had been restrained, and many of the youth complained the restraints were painful.

The Monitors observed an environment that was much more like a punitive, juvenile-justice facility atmosphere than a treatment-oriented atmosphere.  Ninety-five percent of the children interviewed reported having been physically searched, and all children interviewed reported having their rooms searched while they were on campus.  Children's rooms had two lines drawn in front of their doors, one inside the room and one just inside the doorway.  The child had to ask staff permission before crossing these lines when they were supposed to be in their rooms.  If they crossed a line without asking or being granted permission, youth said they were punished.

During one interview with the Monitors, a child became agitated and upset about conditions at Hector Garza, and the Monitors asked the treatment director (whose office was next door) if she could come in to help comfort the child.  The treatment director responded that the child's therapist was not on campus that day, and refused to come into the room.  After this exchange, one of the Monitors resorted to going out to the hallway to try to find a staff person at Hector Garza who knew the child to comfort her.

The file reviews and interviews revealed the following patterns or trends:

1) Children tattooing: The Monitors noticed fresh-looking tattoos on two youth; when asked about the tattoos the youth informed they had received them while at Hector Garza.

2) Bullying and Gang recruitment: Youth informed the monitoring team about gang and recruitment activity and instances in which youth take food from others (called "bowskie").

3) Failure to report Abuse and Neglect to SWI:
   a) Grievance forms: Youth informed they write grievances about abuse and neglect allegations, but the facility often takes eight to ten days before they begin to review the grievance.
   b) Inappropriate touching: When children report inappropriate touching or child-on-child sexual activity to staff, the monitors learned the allegations are at times addressed with room changes and not reported to SWI.
   c) Phone access: Youth reported, and staff confirmed, youth are not able to make calls to SWI or the Ombudsman without a staff member present listening to the call.
   d) Review of incident report and documentation: The monitoring team's review revealed that Hector Garza's QA staff review and investigate allegations of abuse and neglect and determine whether an incident should be reported to SWI, versus requiring staff who observe or receive the allegation to call the incident to SWI directly.

4) Lack of Confidence in SWI: Youth reported a lack of confidence in reporting allegations of abuse and neglect because when the State investigates, according to numerous youth, "nothing changes, nothing is done," and "there is no point in calling the Hotline for that reason."

5) Inability to Contact Caseworker: Youth reported that the only time they are permitted to contact their CVS caseworker is during their once per week meeting with their therapist.

6) "Dirty" Restraints: Many youth interviewed reported "dirty" restraints are common and frequent. Youth reported that staff often move them into a room to conduct a restraint where there is no camera. Numerous youth described restraints with "[their] arms pulled straight behind their backs and then lifted."  The youth described restraints that were painful, and several reported being injured during restraints. When the monitoring team reviewed with Hector Garza's assistant administrator the video of the restraint, which had occurred during the monitoring team's awake-night walk through, the assistant administrator agreed the restraint was not appropriate. The monitoring team's review of Hector Garza incident reports involving restraints and medical documentation revealed children's complaints involving shoulder pain or other injuries.

7) Lack of Triggered Reviews: Minimum standards require a triggered review when a child is restrained four times within seven days. File reviews evidenced a number of restraints, but the monitoring team found no triggered reviews. The Monitors reported this to DFPS after the visit.  Hector Garza was later cited for the failure to conduct triggered reviews.

8) Staff Neglect: Youth reported frequent fights between residents, and complained that often, staff do not intervene. One female youth reported that a staff member told her, "If you lived in an apartment together, then there would be no one to intervene."

9) Staff-to-Child Ratio: Staff interviews revealed a practice of holding night staff until day staff ratios are met. Night staff interviews revealed there are typically two staff on each hallway and one nighttime supervisor on each floor, but during the monitoring team's visit, there were only two instead of the required three night supervisors on duty. The program appears to struggle with adequate staffing, according to staff who were interviewed. Understaffing results in staff working double shifts. Even when they are sick, staff reported they are expected to work.

10) Food Complaints: The youth reported, and the staff confirmed, poor food quality.

11) Education: Youth who were not yet enrolled in school were observed cleaning the floors on one of the units. The practice of holding night staff until day staff ratios are met and requiring the lights to remain off until day staff arrive causes the youth to be late to school.

**Complaints Called in to SWI By Monitors and Outcomes**

The Monitors reported eight incidents to SWI, two that the monitoring team witnessed during the site visit, and the rest based on interviews with children during the monitoring visit.  Six of the reports to SWI involved restraints (including the one that monitoring team witnessed during the awake-night walk through).  Three of these involved injuries to children, and two were reported after youth showed the monitoring team scars that they alleged were the result of injuries caused by restraints.

Of the two SWI referrals made by the monitoring team based on what they witnessed during their night-time walk-through, one related to the restraint they witnessed, which appeared painful and did not appear to be in keeping with appropriate protocol.  The second related to youth being left alone on the Valor unit without a staff person present while staff managed the disruption across the hallway.  Two citations were issued by RCCL after these referrals were investigated, one for improper restraint and another for failing to meet the proper child-to-staff ratios on the Valor unit during the disruption across the hall.

<u>Alleged Perpetrator Trends</u>

The Monitors reviewed the histories of four staff members named as alleged perpetrators in the eight cases the monitoring team called into SWI.  A review of the histories of the four staff members revealed thirty-two previous reports[3] where they were identified as alleged perpetrators.  Of those thirty-two reports, three resulted in a citation to the facility for standards violations.  For example:

- Staff 1 (reported to SWI by the Monitors for inappropriate restraint):  This was the eleventh allegation over four-and-a-half years, which included five for inappropriate restraint resulting in two citations for standard violations;

- Staff 2: has six allegations in the past year and a half including five for inappropriate restraint, resulting in one citation for a standards violation;

- Staff 3: has six allegations in just over a year, and none of these have resulted in a citation.

- Staff 4: has seven allegations in the past nine months, including five for inappropriate restraint and two for inappropriate discipline, with one resulting in a citation for a standards violation related to inappropriate restraint.

**Failure to Conduct Triggered Reviews**

After returning from the on-site visit, the monitoring team realized that information requested related to "triggered reviews," requested during the site visit for PMC children who had been restrained, was not provided by Hector Garza.  A triggered review is a process through which a child's treatment providers and service planning team review the circumstances surrounding use of physical restraints on a child, and develop a plan for reducing the need for these interventions.[4]  Triggered reviews are required by HHSC regulations if the same child is personally restrained four times within a seven-day period, more than twelve times within a

---

[3] Multiple perpetrators can be named in one report.
[4] 26 Tex. Admin. Code §748.2907.

thirty-day period, or if the child is restrained more often than the written order or service planning team recommendation allows.[5]

On December 16, 2019, the Monitors e-mailed Hector Garza's program administrator and asked that the information it be sent via e-mail.[6] The administrator responded, and said that under Hector Garza's process, "when a review is triggered it is either addressed through a document we call [a] 'Behavior Contract' or in the following Comprehensive Treatment Plan if it falls within 30 days."[7] The Monitors received what Hector Garza staff asserted were triggered review documents on January 6, 2020 as attachments to an e-mail.[8]

A review of the documents showed that Hector Garza was not engaging in a triggered review process for youth who should have had one. The Monitors e-mailed the State to alert them to the issue, stating:

> We were disappointed to see that [Hector Garza] did not find any documentation of triggered reviews for the youth that, according to [the RTC's] own list of restraints, should have received one. In [the RTC's] response, they note several youth who should have received a triggered review, but for whom they have no documentation. For others, they point to a Behavior Contract or Close Supervision Contract, or to the youth's regular treatment or service plan.

> The use of a Behavior Contract or a Close Supervision Behavior Contract as documentation of a triggered review is clearly inappropriate, at least as those documents are used at Hector Garza. And the service or treatment plan is only appropriate…if it meets the requirements for a triggered review in 748.2907.…The rule clearly anticipates an individualized assessment. It also sets out a framework in which the <u>overuse of EBI is understood to be a failure of the treatment model, not the child's failure</u>.

> And yet, even in cases in which the child's treatment or service plan was revisited within the timeline required for a triggered review, they did not include this information in the treatment or service plan. None of the documents they provided for the youth for whom they could point to something as documentation of a "triggered review"…were individualized and included the information or the level of detail anticipated by 748.2907.

> Perhaps even more concerning, where they point to the Behavior Contract as the documentation of a triggered review, instead of treating overuse of personal restraints as a treatment failure, the Contract holds the youth responsible. These contracts set out a series of consequences or a loss of privileges flowing from a youth's behavior, and require to youth to comply with the terms of the contract to regain those privileges. The

---

[5] 26 Tex. Admin. Code §748.2901.
[6] E-mail from Deborah Fowler, Court Monitor to Sergio Fernandez, Facility Director, Hector Garza Center (December 16, 2019 1:59 PM CST) (on file with Monitors) (Triggered Reviews).
[7] E-mail from Sergio Fernandez, Facility Director, Hector Garza Center to Deborah Fowler (December 19, 2019 3:48 PM CST). (on file with Monitors) (Triggered Reviews).
[8] E-mail from Sergio Fernandez, Sergio Fernandez, Facility Director, Hector Garza Center to Deborah Fowler (January 6, 2020 5:29 PM CST) (on file with Monitors) (Triggered Reviews).

contracts include boilerplate language that says, "If [the youth] becomes a danger to [her]self or others, or engages in severe property damage or AWOL attempts, Safe Crisis Management techniques may be used. **[The youth] will do everything in [her] power to refrain from any involvement in physical interventions."** To the extent that this is a "behavior contract" the implication is that if the youth does not "refrain from" involvement in restraints, they will be punished with an extension of the contract (and thereby an extension of the loss of privileges). This flips the regulatory requirement on its head, placing the burden for reducing physical restraints on the child, not the treatment providers who should be creating "a written plan for reducing the need for emergency behavior intervention."

In essence, what is clear form their attempt to provide documentation of triggered reviews is that <u>these reviews are not taking place at Hector Garza</u>. And in fact, what they are doing is at odds with the regulatory framework for EBI and triggered reviews.[9]

(Emphasis in original). The Monitors uploaded the documentation provided by Hector Garza to the State's SharePoint file. As a result of the Monitors' notification to the State, the issue was reported to SWI. After an investigation, Hector Garza was cited for failing to conduct triggered reviews.

**February 21, 2020 Court Order**

In addition to the reports to SWI, the Monitors spoke with DFPS leadership and counsel aware of their serious concerns for child safety at Hector Garza on December 10, 2019. On January 3, 2020, DFPS notified the Monitors:

> We have been working since the date of our December 10th call regarding the Hector Garza Center. Among the efforts we have undertaken, high level DFPS and HHSC staff, including DFPS Commission Masters, personally visited the facility. We will provide a more in-depth update on our work early next week.[10]

The Monitors responded that day:

> [W]e are particularly concerned about the risk of harm to children at Hector Garza based on our visit last month and as further evidenced by the CLASS report of the serious injury sustained by a child on Christmas day.

> Would you advise us whether DFPS & HHSC have implemented heightened contract & licensing monitoring of Hector Garza pursuant to Remedial Order 20 and, if so, when, and what specifically that has involved to date?

---

[9] E-mail from Deborah Fowler, Court Monitor, to Andrew Stephens, Ass't Att'y Gen., et al (January 8, 2020 2:12 p.m. CST) (on file with the Monitors).
[10] Email from Audrey Carmical, General Counsel, Texas Department of Family and Protective Services to Deborah Fowler, Court Monitor (January 3, 2020, 1:24 p.m. EST) (on file with the Monitors).

In addition, have you suspended placements at Hector Garza and if so, effective when? If not, please advise why you have not.[11]

Later that day, DFPS responded that the State had initiated heightened monitoring of Hector Garza on December 10, 2019, and wrote that "[d]ue to an abundance of caution because of the recent number intakes at Hector Garza, DFPS put a temporary suspension in place today."[12]

On January 27, 2020, the Monitors met directly with the DFPS Commissioner and counsel, and then later that day with leadership and counsel from DFPS, HHSC and the Attorney General's Office, and repeated the Monitors' substantial concerns for child safety at Hector Garza. During the latter meeting, DFPS said it had lifted the suspension on child placements and continued to monitor the facility closely.

The Monitors briefed the Court. After a telephonic hearing with the parties on February 21, 2020, the Court ordered the State to provide information to the Monitors explaining "why the Hector Garza facility is still open and accepting foster children in light of the concerning child safety information the Monitors shared with the State following their inspection."[13]

On February 26, 2020, the State provided the Monitors with an explanation that emphasized the following points:

- **Ruled Out Findings in Abuse & Neglect Investigations**: While DFPS acknowledged forty-seven calls to SWI related to abuse or neglect since December 5, 2019 and having opened "approximately 30" abuse and neglect investigations since December 25, 2019, DFPS noted that of the four investigations that had closed, all had been Ruled Out.

- **DFPS Safety Checks**: DFPS conducted daily safety checks between January 26, 2020 and February 4, 2020, and interviewed 95 youth during these safety checks.  According to DFPS, 73% of the youth interviewed reported feeling safe.

- **Quality Improvement Plan**: DFPS Contracts staff asked Hector Garza to submit a Quality Improvement Plan (QIP), which had not yet been finalized by the time DFPS submitted its report to the Monitors.  However, DFPS reported that a "restraint reduction plan" would be part of the QIP.[14]

In summary, DFPS reported:

---

[11] Email from Deborah Fowler, Court Monitor to Audrey Carmical, General Counsel, Department of Family and Protective Services (January 3, 2020, 3:39 p.m. EST) (on file with the Monitors)(Hector Garza).

[12] Email from Tiffany Roper, Deputy Associate Commissioner, Department of Family and Protective Services (January 3, 2020, 9:37 p.m. EST) (Hector Garza Boles Update, Request for Discussion).

[13] M.D. v. Abbott, February 21 Order.

[14] DFPS, Hector Garza write-up, attached in Appendix ___.

Hector Garza is allowed to remain open and accept placements because (1) RCCI investigations revealed no child abuse or neglect; (2) daily safety checks revealed minimal safety and communication concerns and Hector Garza's willingness to address any negative responses; (3) Hector Garza introduced an acceptable Restraint Reduction Plan with observable results; (4) Hector Garza's willingness to continue improving, including working through a DFPS-ordered Quality Improvement Plan; and (5) RCCL investigations over a two-year period resulted in one RTB and 35 deficiencies that have all been addressed through Hector Garza's willingness to make needed changes.[15]

**May 20, 2020 E-Mail from DFPS**

On May 20, 2020, as the Monitors were completing work for this report to the Court, the Monitors received an e-mail from DFPS indicating that Hector Garza would be "phasing out their service to children in DFPS conservatorship."[16]

In response to this e-mail, the Monitors asked whether DFPS took some action that led to this decision.  DFPS responded:

> Contracts and CPS were actively monitoring the Quality Improvement Plan of Hector Garza. After a deliberate and months-long monitoring process, the agency determined that while improvements were being made, their particular model was not the direction DFPS was going long-term. After mutual discussions, both parties agreed to develop a plan to transition children and to end our contractual relationship with one another.[17]

The Monitors asked RCCL whether they intended to take any action with regarding to Hector Garza's license, and RCCL responded:

> With Hector Garza, RCCL is constantly evaluating the situation there. Although there is no corrective action currently planned, RCCL will reevaluate their history for such if we receive a new RTB from DFPS.[18]

---

[15] *Id.*  at 2.
[16] E-mail from Rand Harris, Chief of Staff Department of Family & Protective Service to Deborah Fowler & Kevin Ryan (May 20, 2020. 3:44 pm CST) (on file with the Monitors) (Children's Hope and Hector Garza).
[17] E-mail from Rand Harris, Chief of Staff Department of Family & Protective Service to Deborah Fowler & Kevin Ryan (May 22, 2020, 11:49p.m. CST) (on file with the Monitors)(Children's Hope and Hector Garza).
[18] E-mail from Corey Kintzer, Associate Director Legal Services Division to Deborah Fowler & Kevin Ryan (May 22, 2020, 1:45p.m. CST) (on file with the Monitors)(Children's Hope and Hector).