# Texas Report: Email Footnote Citations Index

Email Cited in Footnotes 32, 41, 43, 45, 47, 48, 50, 53, 54, 111, 189, 218, 220, 256, 291, 323, 334, 336, 337, 357, and 374................................................................................................................................ 3

Email Cited in Footnote 37, 375, and 607.......................................................................................... 5

Email Cited in Footnotes 45, 187, 190, 237, 284, 333, 335, 369, 429, 488, 493, and 529.................... 7

Email Cited in Footnote 55................................................................................................................ 8

Email Cited in Footnote 56................................................................................................................ 11

Email Cited in Footnotes 57, 377, and 405........................................................................................ 20

Email Cited in Footnote 80 .............................................................................................................. 22

Email Cited in Footnotes 105, 235, 253, 282, 283, 332, 351, 368, 424, 426, 487 and 719.................... 24

Email Cited in Footnotes 107, 185, 285, 332, 352, and 487............................................................... 38

Email Cited in Footnote 194.............................................................................................................. 42

Email Cited in Footnote 238.............................................................................................................. 44

Email Cited in Footnotes 254, 290, 371, 534, 604, and 635............................................................... 46

Email Cited in Footnotes 286, 287,288, 289 and 300......................................................................... 48

Email Cited in Footnote 292.............................................................................................................. 49

Email Cited in Footnote 312.............................................................................................................. 50

Email Cited in Footnote 349 and 378................................................................................................. 58

Email Cited in Footnote 350.............................................................................................................. 64

Email Cited in Footnotes 359 and 362............................................................................................... 72

Email Cited in Footnote 360.............................................................................................................. 76

Email Cited in Footnote 361.............................................................................................................. 80

Email Cited in Footnote 370 and 603................................................................................................. 87

Email Cited in Footnote 376.............................................................................................................. 116

Email Cited in Footnotes 404 and 774............................................................................................... 119

Email Cited in Footnote 406.............................................................................................................. 120

Email Cited in Footnote 407.............................................................................................................. 123

Email Cited in Footnote 409.............................................................................................................. 124

Email Cited in Footnote 436.............................................................................................................. 125

Email Cited in Footnote 458.............................................................................................................. 129

Email Cited in Footnote 491.............................................................................................................. 133

Email Cited in Footnote 532.............................................................................................................. 139

Email Cited in Footnote 535....................................................................................................... 140

Email Cited in Footnote 572....................................................................................................... 141

Email Cited in Footnote 573....................................................................................................... 143

Email Cited in Footnotes 608, 673, and 718.............................................................................. 153

Email Cited in Footnote 610....................................................................................................... 155

Email Cited in Footnote 635....................................................................................................... 158

Email Cited in Footnote 636....................................................................................................... 159

Email Cited in Footnote 676....................................................................................................... 161

Email Cited in Footnote 692....................................................................................................... 179

Email Cited in Footnote 720....................................................................................................... 191

Email Cited in Footnote 722....................................................................................................... 192

Email Cited in Footnote 723....................................................................................................... 194

Email Cited in Footnote 724....................................................................................................... 195

Email Cited in Footnote 727....................................................................................................... 198

Email Cited in Footnotes 728 and 730....................................................................................... 202

Email Cited in Footnote 731....................................................................................................... 204

Email Cited in Footnote 732....................................................................................................... 205

Email Cited in Footnotes 742, 748 and 749................................................................................ 209

Email Cited in Footnote 744....................................................................................................... 251

Email Cited in Footnote 745....................................................................................................... 252

Email Cited in Footnote 746....................................................................................................... 255

Email Cited in Footnote 748....................................................................................................... 256

Email Cited in Footnote 774....................................................................................................... 257

Email Cited in Footnote 775....................................................................................................... 259

Email Footnote Citations Compendium...................................................................................... 268



**Veronica Lockett <vlockett@texasappleseed.net>**

# Fwd: Correspondence and Data/Information Request
1 message

---------- Forwarded message ---------
From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Tue, Mar 24, 2020 at 4:49 PM
Subject: RE: Correspondence and Data/Information Request
To: Kevin Ryan <kevinmichaelryan1967@gmail.com>, Stephens, Andrew <andrew.stephens@oag.texas.gov>,
Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.
tx.us>, Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>, Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.
us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Kimberly Gdula <Kimberly.Gdula@oag.texas.gov>
Cc: dfowler@texasappleseed.net <dfowler@texasappleseed.net>, Linda Brooke <lbrooke@texasappleseed.net>,
mannitto@public-catalyst.com <mannitto@public-catalyst.com>


Kevin/Deborah,


Attached is DFPS' response to the monitors' latest data/information request. Materials referenced within the
document have been uploaded to the SharePoint here.


Thank you,


Tara


**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Friday, February 21, 2020 5:54 PM
**To:** Stephens, Andrew <andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC)
<Corey.Kintzer@hhsc.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Harris,Rand S
(DFPS) <Rand.Harris@dfps.state.tx.us>; Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>;
Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Kimberly
Gdula <Kimberly.Gdula@oag.texas.gov>
**Cc:** dfowler@texasappleseed.net; Linda Brooke <lbrooke@texasappleseed.net>; mannitto@public-
catalyst.com
**Subject:** Correspondence and Data/Information Request


WARNING: This email is from outside the DFPS system. Do not click on links or attachments unless you
expect them from the sender and know the content is safe.

Counsel,

Correspondence and data/information request attached. Thank you for your attention to this matter.

 **Copy of Texas Data and Information Request FINAL 03.24.20.xlsx**
70K

Texas Appleseed Mail - Fwd: HHSC response to 2/21 data request



**Veronica Lockett <vlockett@texasappleseed.net>**

---

# Fwd: HHSC response to 2/21 data request
1 message

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬                          ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---------- Forwarded message ----------
From: **Kintzer,Corey D (HHSC)** <Corey.Kintzer@hhsc.state.tx.us>
Date: Tue, Mar 24, 2020 at 4:48 PM
Subject: HHSC response to 2/21 data request
To: Kevin Ryan <kevinmichaelryan1967@gmail.com>, dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Hilton, Christopher <Christopher.Hilton@oag.texas.gov>, Kimberly Gdula <Kimberly.Gdula@oag.texas.gov>,
Stephens, Andrew <andrew.stephens@oag.texas.gov>, Bingham,Joseph (HHSC) <Joseph.Bingham@hhsc.state.tx.us>,
Harris,Russ (HHSC) <Russ.Harris@hhsc.state.tx.us>, Lam,Taryn (HHSC) <Taryn.Lam@hhsc.state.tx.us>,
Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>,
Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>


Good evening, Kevin and Deborah.


In response to your February 21 updated data request, HHSC submits the attached spreadsheet
containing responses to your new requests and the contention of missing data.


Thank you.


**Corey D. Kintzer** | Associate Director

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-438-3274 | Cell: 512-627-1183

www.hhs.texas.gov | www.dshs.texas.gov



This message may contain confidential information. If you received this message in error,
please notify me immediately and then delete the message.

**20200324 Texas Data and Information Request - ongoing_HHSC Responses.xlsx**

---

 70K



**Veronica Lockett <vlockett@texasappleseed.net>**

---

## Fwd: DFPS Information and Data Request Proposal
1 message

---------- Forwarded message ---------
**From:** "Stephens, Andrew" <Andrew.Stephens@oag.texas.gov>
**Date:** October 18, 2019 at 6:00:09 PM EDT
**To:** Kevin Ryan <kevinmichaelryan1967@gmail.com>, "dfowler@texasappleseed.net" <dfowler@texasappleseed.net>
**Cc:** "Carmical,Audrey (DFPS)" <Audrey.Carmical@dfps.state.tx.us>, Tiffany Ropoer <Tiffany.Roper@dfps.state.tx.us>
**Subject:** DFPS Information and Data Request Proposal

Kevin, Deborah,

Attached is DFPS' information and data request proposal. This document is follow up to the October 8 call, particularly the discussion related to the concept of leveraging existing reports and also adjusting some of the format, time frames, and timelines. Note that the DFPS and HHSC have separate proposal documents, which will relate solely to those items required for each agency to produce. For those instances in which DFPS and/or HHSC propose an alternative to the original data request or make you aware of limitations related to the data request, the agencies included this information in their respective proposals. To the extent a request is not included here, it means the agencies are not proposing a modification to the request in terms of the data production and are simply working on that request.

Further, we understand that there may be portions of this proposal that need to be raised with the Court for a decision; we ask that you let us know any decision points you are able to make and which ones need to be elevated to the Court.

In order to work toward the timelines in the request, the agencies began work on reporting in accordance with the proposals. If modifications need to be made after your review of the proposals, the production schedule may be impacted. We will continue to keep you updated if that occurs. We understand that this is an ongoing conversation and we will work to keep you informed in real-time to the greatest extent possible.

Andrew

---

📄 **DFPS Information and Data Request Proposal 10.18.19.pdf**
7558K



# Fwd: Additional data for heightened monitoring analysis

1 message

---------- Forwarded message ---------
From: **Kintzer,Corey D (HHSC)** <Corey.Kintzer@hhsc.state.tx.us>
Date: Tue, May 5, 2020 at 5:17 PM
Subject: RE: Additional data for heightened monitoring analysis
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: narrigona@texasappleseed.net <narrigona@texasappleseed.net>, Linda Brooke <lbrooke@texasappleseed.net>, Viveca Martinez <vmartinez@texasappleseed.net>, Lam,Taryn (HHSC) <Taryn.Lam@hhsc.state.tx.us>, Harris,Russ (HHSC) <Russ.Harris@hhsc.state.tx.us>, Bingham,Joseph (HHSC) <Joseph.Bingham@hhsc.state.tx.us>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Gdula, Kimberly <Kimberly.Gdula@oag.texas.gov>, Kevin Ryan <kevinmichaelryan1967@gmail.com>

Good evening, Deborah.

In an effort to expedite the report you requested, the majority of the FCL reports due 05/15/2020 have been uploaded to SharePoint. The highlighted reports below contain the additional two years of date requested. Here is a summary of what was uploaded today:

| Report Name | Date Range | Changes from last report |
|---|---|---|
| RO.22.1 Rep.ANE.To.DFPS | 01/01/2020-03/31/2020 | None |
| RO.22.1 7.31.2020-3.31.2020 Rep.ANE.To.DFPS.B 5.5.2020 | 07/31/2019-03/31/2020 | None - NEW |
| RO.20.2 9.30.2014-3.31.2020 Lic.Enf.Recom 5.5.2020 | 09/30/2014-03/31/2020 | Added the date the recommendation was generated<br>Added Facility ID |
| RO.20.2 9.30.2014-3.31.2020 Lic.Inspections 5.5.2020 | 09/30/2014-03/31/2020 | Added investigation ID(s) linked to the inspection<br>Added agency home facility ID for CPA investigation inspections tied to AH<br>Removed "basis for" columns |

| | | Added facility ID<br>Added date the inspection notification was sent |
|---|---|---|
| RO.20.2 9.30.2014-3.31.2020 Lic.Assessments 5.5.2020 | 09/30/2014-03/31/2020 | None - NEW |
| RO.20.8 9.30.2014-3.31.2020 List.EBI 5.5.2020 | 09/30/2014-03/31/2020 | Added Facility ID. |
| RO.22.3 9.30.2014-3.31.2020 Rep.Punish 5.5.2020 | 09/30/2014-03/31/2020 | Inspection tab:<br>Removed investigation defiencies to eliminate duplication with the investigation tab.<br>Added follow-up information<br>Added ID_INSPCTN_STNDRD, facility ID, standard description, finding status, and admin review status<br>Removed "basis for" columns.<br><br>Non ANE Investigation tab:<br>Added standards linked to the allegations and the allegation narrative<br>Added follow-up information<br>Removed "basis for" columns<br>Added the ID_INSPCTN_STNDRD, facility ID, standard description, and admin review status<br><br>Assessments tab:<br>Added follow-up information<br>Added the ID_INSPCTN_STNDRD, facility ID, and standard description, and admin review status<br>Removed "basis for" columns<br><br>ANE Investigation tab:<br>Added a report of standards tied to ANE investigation allegations |
| RO.22.4 ECH.ANE.Intakes.B As of 05/01/2020 | As of 05/01/2020 | None - NEW |
| RO.22.4 ECH.Corp.Punishment.A As of 05/01/2020 | As of 05/01/2020 | None - NEW |
| RO.B1.1 Caseloads As of | As of | Added supervisor staff |

| 05/01/2020 | 05/01/2020 | Updated Hire Date to reflect the date an inspector was hired |
| RO.15-19.2 9.30.2014-3.31.2020 RCCL.Inspec 5.5.2020 | 09/30/2014-03/31/2020 | Added sensitive case indicator<br>Added facility ID<br>Added agency home facility ID if investigation is linked to an agency home<br>Added investigation closure date<br>Change date used for report to investigation complete date |

RCCL has updated the HHSC SharePoint Document Log to include the newly added reports.

We will provide an update when the remaining reports have been uploaded.

Thank you.

**Corey D. Kintzer** | Associate Director

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-438-3274 | Cell: 512-627-1183

www.hhs.texas.gov | www.dshs.texas.gov

cid:image003.png@01D521F6.43754D10

This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

| | |
|---|---|
| **Subject:** | FW: Problems with the CCI Caseload Data |
| **Date:** | Tuesday, June 23, 2020 at 5:48:48 PM Central Daylight Time |
| **From:** | Linda Brooke |
| **Attachments:** | image001.jpg, RCCI investigator caseload data questions-final.docx, RO.B1 RCI caseloads as of 12-31-19 - revised 4-23-20.xlsx |

From: **Burstain,Jane (DFPS)** <Jane.Burstain@dfps.state.tx.us>
Date: Fri, Apr 24, 2020 at 3:22 PM
Subject: RE: Problems with the CCI Caseload Data
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: narrigona@texasappleseed.net <narrigona@texasappleseed.net>, Harris,Rand S (DFPS)
<Rand.Harris@dfps.state.tx.us>, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>, Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>, Kevin Ryan <kevinmichaelryan1967@gmail.com>, Viveca Martinez
<vmartinez@texasappleseed.net>, Linda Brooke <lbrooke@texasappleseed.net>, Batiste,Ashland (DFPS)
<Ashland.Batiste@dfps.state.tx.us>, Baxter,Ross M. (DFPS) <Ross.Baxter@dfps.state.tx.us>

Hi all,

Hope everyone is staying safe and sanitized!

Attached is the revised December report which includes Unit 16. We re-ran the entire report so the date of the data will be different from the original report. As we discussed on our telephone call last week, other than adding the investigations assigned to staff in Unit 16, the number of investigations did not really change. There are, however, more alleged victims than in the original report (even accounting for adding Unit 16) due to the updated data as alleged victims can be added over the course of an investigation. So the revised report reflects the number of alleged victims in the investigations on the date the data was pulled. We will be producing the next regular RCI caseload report on May 1, 2020 (reflecting caseloads on March 31, 2020).

Also attached are the written responses to the questions Nancy sent prior to our telephone conference last week.

As previously discussed, the RCI program is managed at the state level. What you are seeing in the databook page you reference below is the location of the office where staff are housed (as noted on the information tab for the databook page). As we discussed in the telephone call last week, staff generally work cases in the region where they are housed and we have at least one staff person housed in each of the 11 regions. There are circumstances, however, where staff may work investigations in a different region as part of the backlog project or at times when a child care operation may be in a different region, but is geographically closer to an investigator across regional lines. We have previously provided a list of the location of offices where staff from each unit are housed.

Given this context, in response to Nancy's request for suggestions about how to determine the number of staff needed to meet the 14-17 caseload guidelines for Residential Child Care Investigation (RCI), using the monthly report produced to the monitors entitled "RO.B1 RCI caseloads":

**Page 1 of 4**

·   Option 1:  Take the total number of investigations and divide by the total number of caseworkers

·   Option 2:  Average the caseloads of all caseworkers

·   Option 3:  Take the total number of investigations and divide by 17 (the upper limit of the caseload guidelines) and subtract the total number of caseworkers already working cases

In any calculations you do, however, please remember that both the total number of investigations and the number of caseworkers has been changing over the past few month as new staff have come onboard and RCI works down its backlog of cases.  As a result, any numbers that you from the reports will likely look different in a few months.

As always, please let us know if you have any questions or need any additional information.

*Jane Burstain*
Chief Data and Analytics Officer
Texas Department of Family and Protective Services
512-547-7960 (cell)
512-438-3279 (office)

---

**From:** Deborah Fowler [mailto:dfowler@texasappleseed.net]
**Sent:** Friday, April 24, 2020 12:41 PM
**To:** Burstain,Jane (DFPS) <Jane.Burstain@dfps.state.tx.us>
**Cc:** narrigona@texasappleseed.net; Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Kevin Ryan <kevinmichaelryan1967@gmail.com>; Viveca Martinez <vmartinez@texasappleseed.net>; Linda Brooke <lbrooke@texasappleseed.net>; Batiste,Ashland (DFPS) <Ashland.Batiste@dfps.state.tx.us>; Baxter,Ross M. (DFPS) <Ross.Baxter@dfps.state.tx.us>
**Subject:** Re: Problems with the CCI Caseload Data

> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Hi, Jane - just following up on this.  Do you think you will have the December data to us today?

Also, Nancy noticed the following on the DFPS website - which seems to indicate that CCI staff are included in this regional count - which we thought we understood you guys to say couldn't really be done during our call last week:

https://www.dfps.state.tx.us/About_DFPS/Data_Book/Employee_Statistics/CPS/CPS-Staff_Demographics.asp

Can you clarify this for us?  We just want to make sure we understand correctly -

Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org

**Error! Filename not specified.** **Error! Filename not specified.** **Error! Filename not specified.** **Error! Filename not specified.** **Error! Filename not specified.**

On Fri, Apr 17, 2020 at 12:48 PM Burstain,Jane (DFPS) <Jane.Burstain@dfps.state.tx.us> wrote:

> Hi Nancy and Deborah,
>
> Just wanted to say thanks again for a productive call yesterday.  We appreciate you working through all the nuances of our data with us.  Please reach out to us anytime you have any questions or to talk through the best way to get you the information you need.
>
> For follow up, we'll get you the revised December report next week along with a written summary of what we talked about in response to each of your questions.  We'll try to get you some options for allocating staff geographically soon thereafter.
>
> *Jane Burstain*
> Chief Data and Analytics Officer
> Texas Department of Family and Protective Services
> 512-547-7960 (cell)
> 512-438-3279 (office)
>
> ---
>
> **From:** Nancy Arrigona [mailto:narrigona@texasappleseed.net]
> **Sent:** Wednesday, April 15, 2020 12:10 PM
> **To:** Burstain,Jane (DFPS) <Jane.Burstain@dfps.state.tx.us>
> **Cc:** dfowler@texasappleseed.net; Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Kevin Ryan <kevinmichaelryan1967@gmail.com>; Viveca Martinez <vmartinez@texasappleseed.net>; Linda Brooke <lbrooke@texasappleseed.net>; Batiste,Ashland (DFPS) <Ashland.Batiste@dfps.state.tx.us>; Baxter,Ross M. (DFPS) <Ross.Baxter@dfps.state.tx.us>

**Subject:** Re: Problems with the CCI Caseload Data

> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Jane,

I have attached a list of questions concerning the RCI investigator caseload data. I look forward to talking with you tomorrow at 2.

Thank you,
Nancy

On Tue, Apr 14, 2020 at 4:02 PM Burstain,Jane (DFPS) <Jane.Burstain@dfps.state.tx.us> wrote:

> Hi Nancy,
>
> I'm happy to talk through the data with you. If possible, it'd be great if we could get any specific questions you have ahead of time so we can research and hopefully have an answer for you when we talk. But we can also just discuss things on the phone and, if needed, get back to you later.
>
> Will sometime between 2-4 on Thursday work for you?
>
> *Jane Burstain*
>
> Chief Data and Analytics Officer
> Texas Department of Family and Protective Services
> 512-547-7960 (cell)
> 512-438-3279 (office)
>
> ---
>
> **From:** Deborah Fowler [mailto:dfowler@texasappleseed.net]
> **Sent:** Tuesday, April 14, 2020 3:41 PM
> **To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>
> **Cc:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Kevin Ryan <kevinmichaelryan1967@gmail.com>; narrigona@texasappleseed.net; Viveca Martinez <vmartinez@texasappleseed.net>; Linda Brooke <lbrooke@texasappleseed.net>; Burstain,Jane (DFPS) <Jane.Burstain@dfps.state.tx.us>; Batiste,Ashland (DFPS) <Ashland.Batiste@dfps.state.tx.us>; Baxter,Ross M. (DFPS) <Ross.Baxter@dfps.state.tx.us>
> **Subject:** Re: Problems with the CCI Caseload Data
>
> > **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Hi, Rand - I understand from talking with Nancy that there are some other issues with the date.  She thinks it would be easiest just to talk by phone with Jane or the person on your team that is familiar with the data.

Could Nancy and Jane find a time to talk - or who is the best person for Nancy to talk to?  I've copied Nancy here.

Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org

**Questions about RCI Investigator Caseload Data:**

1.  Units in files not consistent with units reported by state.  Data contains the following "employee units": Unit 0, Unit 5, Unit 6, Unit 8, Unit 13, Unit 14, Unit 16, Unit 24, Unit 25, Unit 26, Unit 29, Unit 33, Unit 40, Unit 41, Unit 3D.  (units not included in "office locations by RCI unit" file provided by DFPS).

    *   Unit 0:  Generally, a unit is a group of individuals with similar job functions who report to one supervisor who is responsible for managing and overseeing the work produced by each unit member.   Unit 0, however, was created for budgetary purposes to track positions created in response to the foster care litigation.  As a result, individuals in that unit perform different functions and report to different supervisors.  From a functional perspective, the unit that should be used for these individuals is the unit of their supervisor.

    *   Unit 14 – this is a day care unit and only appears on this list because the unit Supervisor, ▄▄▄▄▄▄▄▄▄▄, is assigned a daycare investigation (DCI) that was incorrectly coded as an RCI investigation.  A data correction is pending and this investigation should not be considered in the RCI data.  Otherwise, DCI staff are not assigned primary on RCI investigations.

    *   Unit 29 is a State Office unit comprised of the Director of RCI, RCI Program Administrators (with a job title of Manager III), an Admin Tech, and new Program Specialist positions. Unit 3D is the Complex Investigation Division.   Investigations assigned to staff in these units are generally:
        *   Investigations that are assigned temporarily until they can be assigned to an investigator.
        *   Investigations that are assigned as part of RCI's project to close backlog of investigations.

2.  Units 40 and 41 are both in the data as of December 31, 2019 and going forward.  Unit 40 has one investigator for December through February and one supervisor, Unit 41 has seen an increase in the number of investigators from 2 in December to 6 in February.  *** Rand indicated that these units were new as of December.  These units were created December 2019 as a result of new supervisor and investigator positions received.  Unit 40 staff are all newly created positions.  Unit 41 staff are a mixture of newly created positions and existing positions that were added as units were restructured.

3.  Unit 16 staff are included in data for October 31, November 31, January 31, and February 29 but do not appear in the data for December 31. – this is 5 staff all carrying caseloads. (60 cases in November, 80 cases in January).  ***Rand indicated that this was a "data glitch" and a new December file would be provided.  This was actually a SQL coding glitch that resulted from the new and complex coding required to produce the report in the format monitors requested, which is different from the way in which the agency normally reports caseloads.

4.  Unit 29 is included in the data with a investigations in September, October, December, January and February.   In October there were 30 investigations for the unit and in December there were 14 cases for the unit. There are no investigations for Unit 29 in November. ████████ is a caseload carrying supervisor for all months.   In November ███ is in the data as a supervisor only, with no cases for the unit.   See comments for Unit 29 in response to #1 above.  We confirmed that ███ ███ was not assigned primary to any RCI investigations on November 30, 2019.

5.  ████████████ (supervisor II in unit 5 and manager III in unit 29) is included in the Oct and Nov data as a supervisor carrying a caseload.  In December he is only carrying cases in unit 29 – he is no longer included as a supervisor.  He is a supervisor carrying a caseload again in January and February. All of ███████ staff were shifted to ████████ in December.  ████████████████ was a supervisor who was carrying cases in the September, October and November reports so he was included on the list of staff carrying cases and in the aggregate count of supervisors carrying cases. On December 30, 2019, he was promoted to a Manager III and so was included on the December 31, 2019 list of staff carrying cases but not included in the aggregate count of supervisors carrying cases. In January he was similarly was included on the list of staff carrying cases but not included in the aggregate count of supervisors carrying cases.  In February, however, we started including any individual with supervisory responsibilities in the aggregate count of supervisors carrying cases (not just those with a position title of supervisor) so he was both included on the list of staff carrying cases and included in the aggregate count of supervisors carrying cases.  After ████████████ was promoted, all investigators were temporarily shifted to reporting to ████████████, a Manager III, while logistics regarding new positions were sorted out.  ██████████ and ██████████ (Manager III) supervise unit supervisors.

6.  Data on hire date and case assignable dates were provided to the monitors for the investigator interviews conducted this month.  This data was matched to caseload data.  Five staff included in the November and December 31 caseload data have case assignable dates of 1/31/20.  These staff are:

* ███████████ – 2 cases in December (also in November data – 8 cases) hire date as RCCI 11/12/19
* ███████████ - 2 cases in December (also in November data-10 cases) RCCI hire – 11/11/19
* ███████████ – 10 cases in December (also in November data-10 cases) RCCI hire – 10/7/19
* ███████████ – 7 cases in December (also in November data -10 cases) RCCI hire – 11/12/19
* ███████████ – 9 cases in December (also in November data 9 cases) RCCI  hire – 10/14/19

As part of the RCI Case Closure project, some RCI investigations were assigned to Special and Master Investigators who are part of the DFPS Child Protection Investigations division but do not report through the RCI chain of command.  To ensure RCI investigations assigned to these staff continued to be counted under the RCI program, RCI staff, including the above staff who were trainees at the time, were assigned primary in IMPACT while the Special and Master Investigators were assigned primary in CLASS.  The RCI trainees, however, did not perform primary investigation duties but only performed tasks such as transcribing audio, documenting contacts in CLASS, requesting information from the operation, and uploading audio/video to One Case.   The practice was subsequently changed on March 1, 2020 so that trainees are no longer assigned as primary on cases until they complete their training.

7. ██████████, investigator in unit 5, is in the data in November, December and February.  She is not in the data for January.  We confirmed that ██████████ was not assigned primary for any RCI cases on January 31, 2020.

8. ██████████ is included in all data – October to February – with a title of CCI supervisor II but not supervising any investigators and carrying 1 case in unit 14.  (14 does not appear to be a unit) ***Rand indicated that ██████ was a DCI supervisor and had been carrying a single RCI case for 2 years.  See comments for ██████████ is response to #1.

9. January and February data include a staff person with the title of "Admin Assistant II' as an investigator carrying 1 case.  (██████████).  That is correct.  ██████████ is a router which means investigations can be temporarily assigned to him while it is determined to which investigator the investigation will be assigned.

   a. Routing Process
      i. SWI places an intake on the router's workload in IMPACT.
      ii. The router assigns the IMPACT intake to the designated screener's workload.
      iii.     The screener assesses the intake to make the priority decision and complete documentation in IMPACT.
      iv.     If the intake is accepted for A/N investigation, the screener stage progresses the intake to investigation and places it on the router's workload in IMPACT.
      v. The router then places the investigation on the assigned investigator's workload in IMPACT.

10. ██████████, caseload carrying supervisor in unit 33 has a title change in February to "CPS Inv Screener PS II" in unit 0 but is still carrying a caseload of 7 cases.  ██████, supervisor in unit 16 in October and November is not in the data for December or January and is in the February data as a "CPS Inv Screener PS II" in unit 0 carrying 1 case.
   - For ██████████, see comments about Unit 0 in response to #1 above.  The cases assigned to her in the February caseload report are those that had been assigned to her in her prior position that had not yet closed.
   - Could you please explain the role of the screener position
      o Screener role: performs advanced consultative child protective investigations work that includes reviewing child abuse, neglect, and exploitation intake reports for child care operations to determine assignment for investigation or other appropriate actions. Screeners provide case decisions regarding intake prioritization and assignment for investigations with consideration for child safety factors, and will provide input and guidance to staff on case decisions as needed. Decisions are based on the understanding and application of the statutory definitions of abuse, neglect, and exploitation; CCI jurisdiction; CCI policy and procedure; quality investigative practice; and sound professional judgment.

- as well as the absence of ████████ in the data for the months of December and January.
  - ████████ was hired as a CPS INV Screener II on 12/30/19 which is why he did not show up as a supervisor in the December or January report (which are based on an individual's status on the last day of the month).  He shows up in the February report because he is assigned primary to at least 1 RCI investigation and his current job title as a Screener is correctly identified.

11. Investigator interview data provided by state included a PID# and an Employee ID number for all staff interviewed.  These numbers do not match to the "employee person ID" provided in the investigator caseload data.  Could you please clarify these ID numbers?  The number we provided in the caseload report is the staff's PID and we confirmed that it matches the PID provided in the investigator interview data.

12. Could you please clarify the definition of a unit?  We had assumed, in error, that the units represented specific offices, but data provided on office location show a single unit with offices all over the state.  We had originally requested data on investigator location – primarily city or region – and were provided with unit information.  We will not be able to use unit as a proxy for investigator location.
  - For CCI's purposes a unit is a group of individuals, with similar job functions who report to one supervisor who is responsible for managing and overseeing the work produced each unit member. CCI does try to house unit staff and its supervisor in the same region or office, whenever possible. However, due to the program's size, and the limited number of positions, it isn't always feasible or efficient to house all unit members in the same region or office.  We provided the offices in which each unit is housed but it will not necessarily be reflective of the area in which they cover cases.  Staff generally work cases in the region where they are housed and we have at least one staff person housed in each of the 11 regions.  There are circumstances, however, where staff may work investigations in a different region as part of the backlog project or at times when a child care operation may be in a different region, but is geographically closer to an investigator across regional lines.

13. Could you please clarify the workload for supervisors in the data?  Some supervisors only appear to be supervising one investigator.   Do all supervisors/ managers supervise investigators as well as other staff?
  - Generally, staff with a job title of supervisor manage investigators and, sometimes, administrative assistants.   The number of investigators in any particular unit assigned cases on a given day can vary over time as positions become vacant, staff go on extended leave and their cases are reassigned or new units are created (e.g., Unit 40 and 41) to accommodate new investigator positions.

**Subject:**       FW: Problems with the CCI Caseload Data

**Date:**          Tuesday, June 23, 2020 at 5:50:24 PM Central Daylight Time

**From:**          Linda Brooke

**Attachments:** image001.jpg, RCCI investigator caseload data questions-final.docx, RO.B1 RCI caseloads as of
                 12-31-19 - revised 4-23-20.xlsx

From: **Burstain,Jane (DFPS)** <Jane.Burstain@dfps.state.tx.us>
Date: Fri, Apr 24, 2020 at 3:22 PM
Subject: RE: Problems with the CCI Caseload Data
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: narrigona@texasappleseed.net <narrigona@texasappleseed.net>, Harris,Rand S (DFPS)
<Rand.Harris@dfps.state.tx.us>, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>, Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>, Kevin Ryan <kevinmichaelryan1967@gmail.com>, Viveca Martinez
<vmartinez@texasappleseed.net>, Linda Brooke <lbrooke@texasappleseed.net>, Batiste,Ashland (DFPS)
<Ashland.Batiste@dfps.state.tx.us>, Baxter,Ross M. (DFPS) <Ross.Baxter@dfps.state.tx.us>

Hi all,

Hope everyone is staying safe and sanitized!

Attached is the revised December report which includes Unit 16.  We re-ran the entire
report so the date of the data will be different from the original report.  As we
discussed on our telephone call last week, other than adding the investigations
assigned to staff in Unit 16, the number of investigations did not really change.  There
are, however, more alleged victims than in the original report (even accounting for
adding Unit 16) due to the updated data as alleged victims can be added over the
course of an investigation. So the revised report reflects the number of alleged victims
in the investigations on the date the data was pulled.  We will be producing the next
regular RCI caseload report on May 1, 2020 (reflecting caseloads on March 31, 2020).

Also attached are the written responses to the questions Nancy sent prior to our
telephone conference last week.

As previously discussed, the RCI program is managed at the state level.  What you are
seeing in the databook page you reference below is the location of the office where
staff are housed (as noted on the information tab for the databook page).  As we
discussed in the telephone call last week, staff generally work cases in the region
where they are housed and we have at least one staff person housed in each of the 11
regions.  There are circumstances, however, where staff may work investigations in a
different region as part of the backlog project or at times when a child care operation
may be in a different region, but is geographically closer to an investigator across
regional lines.  We have previously provided a list of the location of offices where staff
from each unit are housed.

Given this context, in response to Nancy's request for suggestions about how to
determine the number of staff needed to meet the 14-17 caseload guidelines for
Residential Child Care Investigation (RCI), using the monthly report produced to the
monitors entitled "RO.B1 RCI caseloads":

·   Option 1:  Take the total number of investigations and divide by the total number of caseworkers


·   Option 2:  Average the caseloads of all caseworkers


·   Option 3:  Take the total number of investigations and divide by 17 (the upper limit of the caseload guidelines) and subtract the total number of caseworkers already working cases

In any calculations you do, however, please remember that both the total number of investigations and the number of caseworkers has been changing over the past few month as new staff have come onboard and RCI works down its backlog of cases.  As a result, any numbers that you from the reports will likely look different in a few months.

As always, please let us know if you have any questions or need any additional information.

*Jane Burstain*

Chief Data and Analytics Officer
Texas Department of Family and Protective Services
512-547-7960 (cell)
512-438-3279 (office)

**Megan Annitto**

| | |
|---|---|
| **From:** | Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us> |
| **Sent:** | Wednesday, March 11, 2020 6:09 PM |
| **To:** | Kevin Ryan; Carmical,Audrey (DFPS); Masters,Jaime D (DFPS); Stephens, Andrew |
| **Cc:** | Diane Carter Gmail; Megan Annitto; dfowler@texasappleseed.net; Roper,Tiffany (DFPS); Batiste,Ashland (DFPS); Olah,Tara (DFPS) |
| **Subject:** | RE: TAC §700.507 (e)(1)(A)-(C) |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Kevin,

Child Care Investigations (CCI) policy is not in conflict with the Texas Administrative Code (TAC) rule you mention as that rule applies solely to Child Protective Investigations (CPI). For the purpose of CCI intakes, if the information is too vague or general, contact may occur with the reporter or other individuals in order to obtain clarifying information, as outlined in the Prioritization Guidelines.

Thank you

Rand Harris
512-438-3083

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Wednesday, March 4, 2020 8:08 AM
**To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>; Stephens, Andrew <andrew.stephens@oag.texas.gov>
**Cc:** Diane Carter Gmail <dscott3555@gmail.com>; mannitto@public-catalyst.com; dfowler@texasappleseed.net
**Subject:** TAC §700.507 (e)(1)(A)-(C)

<div style="border:2px solid red;">

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

</div>

Rand,

When the information from a referral to SWI or the CCI Screening Unit is insufficient to determine whether or not there are safety threats to the child, the Administrative Code supports concluding that these cases should be investigated as a result. The Admin Code state that:

DFPS staff must complete a thorough investigation if DFPS obtains information indicating that:
   (A) there are safety threats to the child because of abuse or neglect;
   (B) risk of abuse or neglect is indicated; or
   (C) **based on information in the report and any initial contacts, <u>it is impossible to determine whether or not there are safety threats to the child because of abuse or neglect or whether risk of abuse or neglect is indicated.</u>** TAC §700.507 (e)(1)(A)-(C)

At the same time, a portion of the Child Care Licensing Policy and Procedures Handbook section for 'Downgrading an Abuse or Neglect Report' appears to directly contradict that section of the code. There, the policy states that CCI may downgrade an abuse or neglect report when the information in the report:

1) suggest a minimum standard was violated, but not that a child was abuse or neglected; **2) or indicates that there is some risk to children, but the information is too vague to determine that a child was abused or neglected."** CCI Handbook §6242.2.

How does DFPS reconcile this guidance in the Handbook policy and procedures with TAC §700.507 (e)(1)(C)



# Fwd: FW: Data and Information Request from Monitors

1 message

---

**From:** Deborah Fowler <dfowler@texasappleseed.net>

**Sent:** Monday, September 30, 2019 4:14 PM
**To:** Stephens, Andrew <Andrew.Stephens@oag.texas.gov>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Townsend,Frances R (HHSC) <Frances.Townsend@hhsc.state.tx.us>
**Subject:** Data and Information Request from Monitors

Andrew, Audrey & Frances,

Attached please find a data and information request.  Please let us know of any questions.

Thank you,

Deborah Fowler

*Executive Director*

Texas Appleseed

1609 Shoal Creek Blvd., Ste. 201

Austin, TX 78701

512.473.2800, ext. 105

512.757.1458 (cell)

www.texasappleseed.org



---

📄 **9.30.2019 Data Request Final copy.docx**
723K

September 30, 2019

Mr. Andrew Stephens, Esq.
Office of the Attorney General
PO Box 12548
Austin, Texas 78711-2548


Dear Mr. Stephens:

Attached here please find a data and information production request from the Monitors regarding the State's obligations pursuant to the U.S. District Court's order in *M.D. v. Abbott*. The initial submission is due by November 1, 2019, unless a later date is specified in the request, and the first quarterly report is due November 15, 2019. Additionally, the Monitors have established the schedule for quarterly submissions going forward and have included those dates in the attached document. Based on our review and analysis of the data and information submitted, the Monitors may request supplemental or clarifying data and information for this period and may amend our data and information request for future periods.

If you have any questions, please contact us.


Sincerely,


Deborah Fowler                   Kevin Ryan


Cc:

Trevor Woodruff
Audrey Carmical
Frances Townsend
Paul Yetter

# Information and Data Request: September 30, 2019

Please note the following:

1) Consistent with the Court's order in *M.D. v. Abbott*, the data and information requested herein pertains to all children in the PMC class, unless otherwise indicated in the request.

2) Where a quarterly report is requested, the Monitors have established the following reporting schedule: the first quarterly report is due November 15, 2019, covering the period ending September 30, 2019, unless otherwise noted; the second is due February 15, 2020, covering the period October 1, 2019 – December 31, 2019; the third is due May 15, 2020, covering the period January 1, 2020 – March 31, 2020; the fourth is due August 15, 2020, covering the period April 1 – June 30, 2020; and continued annually. When a due date falls on a holiday or weekend, the data and information is due on the next available workday.

3) Any acronyms used below that are not defined in the document shall have the same meaning that the Court has assigned to them in the course of the litigation.

4) For each file produced, Texas should include a data dictionary that describes the fields in the data and a detailed description of the business rules used to extract numerators, denominators and calculate any measures.

**Remedial Order: Injunction**

**The Court therefore ENJOINS the Defendants from placing children in permanent management conservatorship ("PMC") in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm.**

For the period July 1, 2019 to September 30, 2019, due November 15, 2019, then quarterly thereafter, provide:

1) A list of all PMC children on the first day of the quarter with name; date of birth; removal date; gender; ID number; county; county code; placement name; placement type; placement/provider identification number; private or public agency responsible for the placement; contact information for the placement; service level; and name and contact information for their AAL, GAL, and CASA, if they have one; and the date they entered PMC status.

2) A list of all PMC children on the last day of the quarter with name; date of birth; removal date; gender; ID number; county; county code; placement name; placement type; placement/provider identification number; private or public agency responsible for the placement; contact information for the placement; service level; and name and contact information for their AAL, GAL, and CASA, if they have one; and the date they entered PMC status.

3) A list of all PMC children who spent any time in care during the quarter with name; date of birth; removal date; gender; identification number; county; county code; last placement; last placement/provider identification number; private or public agency responsible for the last placement; last placement contact information; service level; and name and contact information for their last AAL, GAL, and CASA, if they have one, the date they entered PMC status; and the exit date and type (if applicable).

4) A list of all entries during the quarter for children ever in PMC status with name; date of birth; removal date; gender; identification number; county; county code; the first placement identification number; first placement type; and contact information for the first placement; service level; and name and contact information for their AAL, GAL, and CASA, if they have one.

5) A list of all exits from care during the quarter of children in PMC status with name; date of birth; removal date; exit date and type; gender; identification number; county; county code; placement at exit including placement identification number, placement type, and contact information for the placement; service level; and name and contact information for their AAL, GAL, and CASA, if they have one.

6) A placement movement file for all children in the PMC class during the quarter. This file should include all movements recorded for each PMC child. Each row should include the name of the child; date of birth; removal date; gender; identification number; county; and county code. Each move should include placement type; placement/provider identification number and contact information; private or public agency responsible for the placement; the placement start date; and the placement end date. The file should include temporary absences from care such as AWOL, detention/jail, hospitalizations and similar movements. Every child in the PMC class should be included in the file and the first row for each child should be the current placement at the beginning of the quarter.

7) In succeeding quarters, Texas should include a "gap analysis" that accounts for any differences between the end of the quarter cohort and the beginning of the next quarter cohort. The analysis should identify differences in the two cohorts caused by lagged entries and lagged exits, and any other differences between the two cohorts.

Note: There may be multiple placement, setting, episode and move identifiers in IMPACT and CLASS. The data produced should include all the identifiers pertinent to movements. If there are questions as to whether an identifier or move should be included, Texas should contact the monitoring team.

**Remedial Order: 1**

**Within 60 days, the Texas Department of Family Protective Services ("DFPS") shall ensure statewide implementation of the CPS Professional Development ("CPD") training model, which DFPS began to implement in November 2015.**

1) Provide a list of all staff hired by DFPS between September 1, 2018 and September 30, 2019, who have or do serve(d) as a primary caseworker for any child in the PMC class and any newly hired staff who are intended to serve in the position of a primary caseworker for any child in the PMC class. Include the full name; identification number; start date; exit date (if applicable); and assigned work location(s) by county and office.

2) Provide a list of all staff trained in the CPD training model between September 1, 2018 and September 30, 2019, with start dates and completion dates (if applicable) identified. Identify all staff hired in 2019 who have not been trained in the CPD training model, the plan for those staff to be trained in the CPD training model and the dates by which the training will be completed.

3) On an ongoing, monthly basis (commencing for the month of October 2019, and due to the Monitors by November 15, 2019, and by the 15th of each month thereafter) provide a list of any and all staff hired by DFPS in the prior month to serve as a primary caseworker, and provide an updated list of all staff who completed training in the CPD training model, including the date they completed the training. Include the full name; identification number; start date; exit date (if applicable); and assigned work location.

**Remedial Orders: 2, 35**

**2: Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.**

**35: Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in**

December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.

1) Provide a report by November 15, 2019 and on a monthly basis thereafter, with caseloads for all staff, including supervisors, who provide primary case management services to any child in the PMC class, with name of employer (public or, as evolves, private), and indicate whether full-time or part-time. The report will be a point in time caseload for November 1 and is due by November 15, then for December 1, 2019 due by December 15, 2019, and monthly thereafter. The reports must include all staff who provide case management services to children in the PMC General Class and their caseloads; the number and percent of staff with caseloads within, below and over the DFPS guideline once established, by office, by county, by agency (if private) and statewide; the identification number and location of all individual staff and the number of PMC children and, if any, TMC children to whom they provide case management; include caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions. Identify all staff subject to a graduated caseload. Provide individual fields for every type of case that the worker carries, including those outside the child welfare domain, if any. Identify for each staff all non-case carrying work, such as IV-E eligibility determinations, that impacts their capacity. Identify all secondary assignments for each staff. Identify at the bottom of the report the total number of supervisors carrying a case.

2) Provide a copy of DFPS's graduated caseload policy and any field guidance, information or directives describing to managers and/or supervisors the graduated caseloads policy and schedule.

3) On an ongoing monthly basis (commencing for the month of October 2019, and due to the monitors by November 15, 2019, and by the 15th of each month thereafter), provide the average monthly caseload, by county, for all staff with one or more PMC children on their caseload.

4) On an ongoing monthly basis (commencing for the month of October 2019, and due to the monitors by November 15, 2019, and by the 15th of each month thereafter), provide a list of all employees subject to the graduated caseloads during the previous month. Identify the full name; title; identification number; start date; exit date (if applicable); agency name; county; district or region; the name of the supervisor and supervisor identification number; assigned work location(s); and whether they were compliant with the relevant graduated caseload at all times during the month. For any staff whose caseloads exceeded the graduated caseload standard at any time in the previous month, identify the number of days they were not compliant with the graduated caseload standard.

**Remedial Order: 3; 5 -10; 12-19; B5**

**3: DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.**

**5: Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the**

PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)

6: Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)

7: Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.

8: Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.

9: Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.

10: Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

12: Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL")2 investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.

13: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.

14: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.

15: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.

16: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.

17: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

18: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards

investigation.

**19: Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.**

**B5: Effective immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account all times the safety needs of children.**

1) Provide a list of all referrals received by DFPS and HHSC between July 31, 2019 and September 30, 2019, via phone call, website, fax, regular mail and any other manner in which the referent expresses concern about child maltreatment regarding any and all PMC children in the General Class, regardless of placement type and licensure status, and provide same on a monthly basis thereafter. For October 2019, the report will be due November 15, 2019, and so forth. The list shall include the identification number of the referral; the PMC child identifier(s) linked to the referral; the date of the call/communication; the disposition of the report by Statewide Intake (where referred, whether it was classified as an intake or information and referral, and the priority assigned); the date and manner of notification to the child's primary caseworker of the allegations; and the disposition of the report by the office/division to which it is referred (CCI, RCCL, CPI, etc.) including whether it was referred for an abuse and neglect investigation, a minimum standards investigation, the priority assigned to the investigation, and any other information with regard to how the state addressed or planned to address the report.

2) For all investigations, including all those conducted by CCI, CCL, CPI etc. regarding any child in the PMC General Class initiated between July 31, 2019 and September 30, 2019, identify in a report due November 15, 2019: the manner of initiation (action taken that triggered the start of the investigation); the county where the maltreatment is alleged; the date/time of face to face contact with the alleged victim(s) (as applicable) noting any and all untimely face to face contacts and the reason for any approved extensions to the face to face contact timeframe; the relationship(s) of the alleged perpetrator(s) to the alleged child-victim(s); the child's placement type at the time of the alleged maltreatment; the placement/provider identification number; the referral identification number; the investigation identification number; and the name and identification number of the assigned investigator. Provide the date/time the investigation was launched and, if applicable, completed; the date documentation of completion was entered in IMPACT; the reason for all approved extensions to the investigation completion date/time (when applicable); the date the completed investigation was submitted to the supervisor for approval; the date the supervisor approved the investigation; the disposition of each allegation; the overall disposition of the investigation; and the date of any notification letters to parents, providers, and/or referents. Report quarterly thereafter.

3) Provide DFPS Investigations Division Field Communication #008, published March 11, 2019.

4) Provide DFPS Investigations Division Field Communication #010, published June 19, 2019.

5) Provide DFPS Investigations Division Field Communication #007, published March 8, 2019.

**Remedial orders: 4, 32**

**4: Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.**

**32: Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.**

1) Due to the monitors by November 15, 2019 and on a quarterly basis thereafter, provide a list that includes the date of completion of sexual abuse training for all caseworkers and caregivers (including the name and identification number of the caseworkers; and the names, identification numbers, and addresses of the caregivers) assigned to serve children in the PMC class as of September 30, 2019. For quarterly reporting beginning with February 15, 2020 report, include all caseworkers and caregivers assigned to serve children in the preceding period. Consistent with the Court's order, training is required to include information about how to recognize and report sexual abuse training, including child-on-child abuse. For ongoing quarterly reporting, provide a list that includes the date of completion of sexual abuse training for all caseworkers and caregivers (including the name and identification number of the caseworkers; and the names, identification numbers and addresses of the caregivers) assigned to serve children in the PMC class as of the last date of the quarter.

2) Provide a copy of current sexual abuse training materials referenced above and, if changes or updates are made, provide updated materials on a quarterly basis thereafter.

**Remedial Order: 11**

**Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked.**

For all investigations opened between July 31, 2019 and September 30, 2019, provide by November 15, 2019, a list of all child abuse and neglect investigations conducted by CCI (or other divisions, offices, or agencies) involving children in the PMC class, noting whether they were completed on time, or not; note all investigation identification numbers; any and all approved extensions; and identify the reason for any and all approved extensions. Provide same on an ongoing quarterly basis.

**Remedial Order: 20**

**Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.**

Provide:

1) A detailed description of how RCCL defines a pattern of contract or policy violations. Provide the policy or protocol, if any, used to instruct decisions about whether a pattern of contract or policy violations exists for child care placement facilities.

2) A list of all licensed placements, excluding agency foster homes, inspected over the last three years, starting from September 30, 2016 through September 30, 2019. The list should identify whether the inspection was announced or unannounced; all deficiencies cited during the inspection; any follow up inspections and the results of those inspections; any enforcement taken (including warning letters) as a result of a cited deficiency; the placement/provider name and identification number and county; agency responsible for the placement; number of beds; and name of the facility.  Include the CLASS Risk Review Enforcement Recommendations, and, if an alternative to the recommended enforcement was chosen, the reason for the alternative.

3) For the same time period, all requests by an operation for Licensing to review a policy, and the results of the request.

4) For the same time period, all risk analyses performed pursuant to the process described in section 4800 et seq. of the HHSC Child Care Licensing Policy and Procedures Handbook, and any action taken as a result of the analysis.

5) For the same time period, a list of all agency foster homes inspected. The list should indicate the date of the inspection(s); whether the home was inspected due to random sampling or because some other event triggered the inspection; whether the inspection was announced or unannounced; any deficiencies cited as a result of the inspection; any immediate hazards reported; and any enforcement action taken by the CPA or RCCL. The list should include the placement/provider name; the unique foster home identification number; the date the home was opened; the date the home was closed (if applicable); contact information for the home; the home's county; and the agency responsible for the foster home, with contact information for the agency.

6) For the same time period, all documentation of monitoring plans or corrective actions taken by the State (either by DFPS or RCCL) as a result of heightened contract or licensing monitoring or enforcement.

7) For the same time period, a list of all child care placements that includes any and all allegations of contract violations, policy violations, minimum standards violations, or abuse and neglect, including the nature of the allegation and specific standard, policies, or contractual provisions allegedly violated; whether the allegation was substantiated; and any enforcement or corrective action taken.

8) Starting July 31, 2019 through September 30, 2019, and on a quarterly basis thereafter, a report that includes a list of all restraints and/or Emergency Behavior Interventions (EBI) disaggregated by placement. The report shall include placement/provider name, identification number, county, contact information, and, if a foster home, the agency responsible; type of restraint or EBI; date of incident; reason for restraint or EBI; name of child(ren) involved, along with identification number, date of birth, and race/ethnicity/gender of the child. Identify all situations in which the child sustained an injury and all situations in which the child required medical attention as a result of the restraint or EBI.

9) Provide a copy of DFPS shell contracts and contract amendments for each type of residential placement facility for FY 2018 and FY 2019.

## Remedial order: 21

**Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.**

1) Provide the number of placement licenses that have been revoked by the State over the last five years through September 30, 2019 and reasons for revocation.

2) Going forward, provide the names of placements under consideration for revocation or suspension, prior to a final decision, including the reason(s) for such consideration. Immediately upon suspension or revocation of a license, provide the name of the placement; identification number; county; contact information; the agency responsible; and reasons for revocation or suspension.

## Remedial Order: 22

**Effective immediately, RCCL, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements. During inspections, RCCL, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate**

**corrective action, up to and including termination or modification of a contract.**

Starting July 31, 2019 through September 30, 2019, and updated quarterly thereafter, provide:

For each item below include the name of the placement; identification number; county; contact information; and the agency responsible.

1) All reports RCCL has sent or sends to DFPS related to failure to report abuse or neglect.

2) All notifications DFPS has sent or sends to placements regarding violations and corrective action or contract terminations related to failure to report abuse or neglect.

3) Reports of punishments used on a PMC youth that are prohibited by TAC 749.1953 or 749.1957, disaggregated by type of punishment, reason for punishment, and placement.


**Remedial Order: 23**

**Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.**

1) Provide confirmation by November 15, 2019, that the DFPS electronic case records include a profile characteristic option for caseworkers or supervisors to designate whether any PMC or TMC child is confirmed to have been "sexually abused" by an adult or another youth.

2) Provide all instructions workers receive regarding when to check the profile characteristic box.


**Remedial Orders: 24-27**

**24: Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.**

**25: Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.**

**26: Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.**

**27: Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.**

1) Provide a list of all children who are confirmed victims of sexual abuse as of November 15, 2019. Update same quarterly. The list should include the child's identification number; date of birth; current placement; placement type; provider identification number; date of placement; removal date.

2) For the period July 31, 2019 to September 30, 2019, and quarterly thereafter, provide a list of all placements for every child identified as a sexual abuse victim. Include the child's identification number; date of birth; the child's current placement; placement type; provider identification number; date of placement; removal date; date the profile characteristic option was selected; the date all placements during the quarter commenced; the date the placement caregivers were notified of confirmed allegations of sexual abuse involving the PMC child; and whether all of the child's placement summary forms and common applications for placement during the period included all information about the child's sexual abuse.

**Remedial Order: 28**

**Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.**

Provide a current list of children whose electronic case record documents "child sexual aggression" and/or "sexual behavior problem" through the profile characteristic option (and on a quarterly basis thereafter). Include the child's identification number; date of birth; current placement; placement type; provider identification number; date of placement; removal date; and when the profile characteristic option was selected. Provide an updated list quarterly.

**Remedial Order 29-31**

**29: Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.**

**30: Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.**

**31: Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.**

For the period July 31, 2019 to September 30, 2019, and quarterly thereafter, provide a list of all placements for every child identified with sexual aggression and/or a sexual behavior problem. Include the child's identification number; date of birth; the child's current placement; placement type; provider identification number; date of placement; removal date; date the profile characteristic option was selected; the date all placements during the quarter commenced; and the date the placement caregivers were notified of confirmed allegations of sexual abuse involving the PMC child as the aggressor.

**Remedial Order: 37**

**Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.**

1) Beginning September 16, 2019 through September 30, 2019 and on a quarterly basis, identify all referrals involving a foster home that were not ultimately referred for a child abuse and neglect investigation by or through Statewide Intake or a secondary review process; the date of the referral; the referral identification number; the child's name(s); the allegations/concern; the placement name and identification number; the county responsible for the child; the date notification of the referral was made to the PMC child's caseworker; and the date notification of the referral was made to the caseworker's supervisor.

2) Provide a copy of the DFPS "Prioritization Guideline Handbook" and any other guidelines, policies and handbooks established to inform the initiation of an investigation.

**Remedial Orders: A1-A4**

**A1: Within 60 days of the Court's Order, DFPS, in consultation with and under supervision of the Monitors, shall propose a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.**

**A2: Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.**

**A3: Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly.**

**A4: Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class.**

Pending submission from the State.

**Remedial Order: A6**

**Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.**

For the period August 31, 2019 to September 30, 2019, and on a quarterly basis thereafter, provide a list of all reports made by children in the General Class to the Texas Health and Human Services Ombudsman and/or any person(s) designated by the State as the "appropriate point of contact for reporting issues relating to abuse or neglect" and the disposition of those referrals. If the report is received through a point of contact other than the Ombudsman, please so indicate. Identify for each report, the reporting child's name; date of birth; identification number; county; agency responsible for the placement; placement name and identification number. If referred for investigation, identify the status of the investigation and the investigation number.

**Remedial Orders: A7-A8**

**A7: The Defendants shall immediately cease placing PMC children in licensed foster care (LFC) placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be**

designed to alleviate any unreasonable risk of serious harm.

**A8: Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.**

1)  Provide a current list of all licensed placements housing more than 6 children, including all foster, biological and adoptive children as of September 30, 2019, due November 1, 2019, and quarterly thereafter. Identify the placements by name; identification number; county; address and responsible agency.

2)  Provide a detailed update and verification concerning the State's provision of continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children by November 1, 2019 and on a quarterly basis thereafter. Identify the dates the 24-hour awake-night plans were implemented for each placement. Identify all reports that an LFC placement is out of compliance, the date of the report, and who made the report.

3)  Provide a certification to the court through the Monitors that the State is providing continuous 24-hour awake-night supervision in the operation of all LFC placements that house more than 6 children, inclusive of all foster, biological and adoptive placements.

4)  Provide a list of any placements that have discharged children to avoid providing 24-hour awake-night supervision per the Court's remedial order, including any reasons cited for discharging children other than compliance.

**Remedial Order: B1**

**Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.**

Provide a report with caseloads for staff, including any supervisors, and any other staff who conduct investigations involving any PMC child. The report will be a point in time caseload for November 1, 2019 and is due by November 15, 2019; then for December 1, 2019 due by December 15, 2019; and so forth monthly thereafter. The reports must include all staff who investigate maltreatment involving any child in the PMC class, and detail their caseloads; the number and percent of staff with caseloads within, below and over the relevant guideline once established, by office, by county, and statewide; the identification number and location of all individual staff; include caseloads for staff, as defined above, who spend part-time in investigative functions and part-time in other functions and so note. Identify all staff subject to a graduated caseload and so note. Provide individual fields for every type of case that the staff carries. Identify for each staff all non-case carrying work that impacts capacity. Identify by total at the bottom of the report the total number of supervisors carrying a case. Identify all secondary assignments for each staff. The report shall include the number of investigations assigned to each worker and identify each investigation by number. The report shall identify the number of children involved in each investigation; the supervisor name and identification number; title of investigating staff; and the county location of investigating staff. The report shall provide the identification number for each child linked to an identified investigation.

**Remedial Orders: B2-B4**

**B2: Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.**

**B3: Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.**

**B4: Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators, or successor staff.**

Pending submission from the State.

**From:** Kevin Ryan <kevinmichaelryan1967@gmail.com>
**Date:** Monday, October 28, 2019 at 8:54 AM
**To:** Andrew Stephens <Andrew.stephens@oag.texas.gov>, "Townsend,Frances R (HHSC)" <Frances.Townsend@hhsc.state.tx.us>, "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>, "Carmical,Audrey (DFPS)" <Audrey.Carmical@dfps.state.tx.us>
**Cc:** Deborah Fowler <dfowler@texasappleseed.net>, Megan Annitto <mannitto@public-catalyst.com>, Linda Brooke <lbrooke@texasappleseed.net>
**Subject:** M.D. v. Abbott Information and Data Request


Dear Counsel,

The monitors have carefully reviewed the DFPS Information and Data Request Proposal ("DFPS Proposal") sent on October 18, 2019, in response to the monitors' Information and Data Request of September 30, 2019. The monitors appreciate the time you took on October 24, 2019, to answer the monitors' questions about the DFPS Proposal. The monitors repeat the request that in the future, should DFPS or HHSC choose to offer a proposal in response to a data or information request from the monitors, the agencies make explicit in the proposal any information and/or data Texas proposes not to provide as requested.

This letter confirms, where indicated, the monitors' agreement to specified parts of the DFPS Proposal that alter the terms of the September 30, 2019, original Information and Data Request. Unless specified herein, the monitors otherwise maintain the terms of the original Information and Data Request, including but not limited to all instances where the monitors request ongoing, quarterly reporting and DFPS proposes not to continue reporting information and data to the monitors.

1. With respect to page 1 of the DFPS Proposal, the monitors agree with DFPS' proposal to align reporting periods with the Texas state fiscal year. Specifically, the period for Quarter 1 will be September 1 through November 30, and the Quarter 1 report will be due to the monitors by January 15; the period for Quarter 2 will be December 1 through the end of February, and the Quarter 2 will be due to the monitors by April 15; the period for Quarter 3 will be March 1 through May 31, and the Quarter 3 report will be due to the monitors by July 15; and the period for Quarter 4 will June 1 through August 31, and the Quarter 4 report will be due to the monitors by October 15.

2. With respect to the Injunction referenced on page 1 of the DFPS Proposal, the monitors agree to the integrated format proposed for the report.

3. With respect to the Injunction referenced on page 1 of the DFPS Proposal, the monitors agree to suspend the monitors' original request for the name and contact information for PMC children's AAL, GAL and CASA, if they have one, based on DFPS's representations during the October 24, 2019 phone call that this information is not easily reportable by DFPS and, for the most part, this information is contained in children's IMPACT case records. The monitors will look for the information there, when needed. Should the monitors find that the information is not consistently available in the children's IMPACT case record, the monitors will revisit this request with the State.

5. With respect to Remedial Order 1 (CPD Training) discussed on page 2 of the DFPS Proposal, the monitors agree to move DFPS's submission from November 1, 2019, to November 15, 2019.

6. With respect to Remedial Order 1 (CPD Training) discussed on page 3 of the DFPS Proposal, the monitors agree to move DFPS's submission from November 15, 2019, to December 15, 2019.

7. With respect to Remedial Orders 2 and 35 (Caseloads), discussed on page 3 of the DFPS Proposal, the monitors confirm that DFPS intends by use of the words "Caseworker name" in the box on the bottom right to include "all staff, including supervisors, who provide primary case management services to any child in the PMC class," as requested.

8. With respect to Remedial Orders 2 and 35 (Caseloads), discussed on pages 3 and 4 of the DFPS Proposal, the monitors do not agree to alterations in the terms of the monitor's September 30, 2019 request. Because of the challenges DFPS' Proposal poses for timely verification and the monitors' data validation work on behalf of the Court, the monitors do not agree to a 45 day lag from the point at which caseloads are captured in a report and the submission of the report to the monitors. We make explicit here this disapproval because DFPS is considering an alternative proposal to support the monitors' responsibilities. The monitors are willing to receive and review an alternative proposal prior to the original deadline of November 1, 2019.

9. With respect to Remedial Order 2 and 35 (Caseloads), discussed on pages 3 and 4 of the DFPS Proposal, and for all future caseload reporting by DFPS on or after December 1, 2019, the monitors request that DFPS list, by staff member, the names and identification numbers of all children assigned to all staff, including supervisors, who provide primary case management services to any child in the PMC class.

10. With respect to Remedial Order 2 and 35 (Caseloads), discussed on pages 3 and 4 of the DFPS Proposal, the monitors understand from the DFPS Proposal that DFPS cannot track and report secondary case assignments as requested. The monitors did not see in the Summary of IMPACT Enhancements sent by email from Tara Olah on October 25, 2019, a plan to address this issue. Please advise when this data issue will be resolved.


11. With respect to Remedial Orders 3, 5-10, 12-19 and B5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors agree to the proposed deadline modifications requested by DFPS to the initial and second report.

12. With respect to Remedial Orders 3, 5-10, 12-19 and B5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors confirm their use of the word "referrals" as recited on page 5 of the DFPS Proposal includes any and all calls to the Statewide Intake (SWI) hotline referring to all children in the PMC class, regardless of whether sent for investigation, and regardless of where the child is placed at the time the call/email is made/sent to SWI.

13. With respect to Remedial Orders 3, 5-10, 12-19 and B-5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors confirm that DFPS is to provide the following information and data from ALL investigations opened during the period involving any child in PMC General Class: Intake stage ID number; Investigation stage ID number; Person ID (for all alleged PMC victims); County where maltreatment is alleged; Most recent investigator name and ID; Date and time investigation stage started; Program conducting investigation; Child's placement type at intake; Placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; the relationships of the alleged perpetrator(s) to the child-victims.

14. With respect to the Remedial Orders 3, 5-10, 12-19 and B-5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors confirm that DFPS is to provide the following information and data from ALL investigations closed during the period involving any child in the PMC General Class: Intake stage ID number; Investigation stage ID number; Person ID (for all alleged PMC victims); County where maltreatment is alleged; Most recent investigator name and ID; Date and time investigation stage started; Program conducting investigation; Date the investigation completed; Date documentation is completed and submitted to the supervisor; the status of all allegations involving all PMC children; overall investigation disposition; the reason(s) for all approved extensions to the investigation completion date/time (when applicable); the date any notification letters are sent to parents, providers, and and/or referents.

15. With respect to Remedial Orders 3, 5-10, 12-19 and B-5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors requested data and information to determine for the court which active investigations are overdue for completion. DFPS wrote in the DFPS Proposal that "Due to an IMPACT 2.0 issue, which the DFPS IT division is addressing, DFPS is currently unable to report on timeframes for extensions or timely completion [of investigations]," which the monitors will report to the Court."

16. With respect to Remedial Orders 4 and 32 (Sexual Abuse Training), discussed on page 7 of the DFPS Proposal, the monitors have carefully reviewed the email from Tara Olah, dated October 25, 2019, on behalf of DFPS proposing to provide the monitors with "attestations from operations serving PMC children, certifying that their caregivers serving PMC children have received the mandated training. In addition, operations will provide

**Page 2 of 4**

quarterly reports to DFPS that include the following data for caregivers serving PMC children: date caregiver completed Sexual Abuse training; caregiver name; caregiver ID number; and caregiver address. DFPS will aggregate these quarterly reports and submit them to the monitors. The first quarterly report will be submitted to the monitors by December 1, 2019." The monitors request that the operation attestations list all of the names of caregivers serving PMC children who completed the mandated training, and all of the names of the caregivers serving PMC children who did not complete the mandated training as of the date of attestation.

17. With respect to Remedial Order 20 (Heightened Monitoring), discussed on page 8 of the DFPS Proposal, the monitors agree to the DFPS Proposal for revising the reporting period.

18. With respect to Remedial Order 22 (Serious Incident Reporting), discussed on page 8 of the DFPS Proposal, the monitors agree to revise the reporting period.

19. With respect to Remedial Order 23 (Profile Characteristic), discussed on page 9 of the DFPS Proposal, the monitors will advise the Court of the latest status contained in the DFPS Proposal. On September 9, 2019, DFPS advised the Monitors that compliance with Remedial Order 23 required changes to the agency's IMPACT data system, which were due to be completed by November 17, 2019. By email transmission dated September 28, 2019, from Tara Olah of DFPS, the agency confirmed "Interim (manual) solution completed. Automated solution in development with targeted completion date of November 17, 2019. On September 9, 2019, DFPS provided the Monitors and their staff detailed information concerning the Department's activities, implementation challenges and next steps. Until the necessary IT enhancements can be made (estimated completion – November 17, 2019), CPS has implemented an interim solution that requires caseworkers to document sexual victimization on a paper form (Placement Summary Form 2279). CPS staff are conducting qualitative case reads to ensure appropriate documentation is included in the child's records. Absent further instruction from the Monitors, DFPS will provide the first quarterly case read report in November 2019. Once the IT enhancements are deployed, DFPS staff will invite the Monitors to participate in an IMPACT demo on the required functionality." By email transmission on October 18, 2019, DFPS advised the Monitors: "Required IMPACT enhancements are scheduled to deploy 12.19.19. Meanwhile, CPS has implemented an interim, manual solution requiring documentation in the placement summary form." Please identify by November 1, 2019 the November date by which DFPS intends to provide the first quarterly case read report referenced above.

20. With respect to Remedial Orders 24-27 (Victim Documentation), discussed on page 9 of the DFPS Proposal, the monitors agree to the revised deadline for data and information contained in the DFPS Proposal.

21. With respect to Remedial Order 28 (Child Sexual Aggression), discussed on page 10 of the DFPS Proposal, the monitors confirm the list of PMC children described in the DFPS Proposal for the first report will be current as of August 31, 2019.

22. With respect to Remedial Order 37 (Home History Reviews), discussed on page 11 of the DFPS Proposal, DFPS indicates that "[p]ending IMPACT enhancements are needed to track notification to the child's caseworker and supervisor." The monitors agree to the revised reporting period and deadline.

23. With respect to Remedial Order 37 (Home History Reviews), discussed on page 11 of the DFPS Proposal, DFPS indicates that some required notifications did not commence until October 2019. As a result, the monitors request that DFPS's second report for this provision be made to the monitors for the period October 1, 2019 – October 31, 2019, due December 15, 2019, and thereafter the reporting for this provision will align to Quarter 1 as defined in the DFPS Proposal.

24. With respect to Remedial Order A6 (Points of Contact), discussed on page 12 of the DFPS Proposal, the monitors learned from DFPS on the October 24, 2019 phone call among DFPS, HHSC and the monitors, that DFPS does not have access to the requested information. The monitors believe HHSC does have access to this information and maintain our request. In addition, please provide by November 15, 2019, a detailed description of how DFPS complies with Remedial Order A6, and what information and data the agency tracks to assess compliance on an ongoing basis.

25. With respect to Remedial Order A7-A8 (24 Hour Supervision), discussed on page 12 of the DFPS Proposal, the monitors do not agree to the revised deadline or terms in the DFPS Proposal, and make this decision explicit to ensure the agency provides this information as requested well in advance of the scheduled Court hearing.

26. With respect to Remedial Order B1 (RCCL Workload Studies), described on page 13, the monitors agree to the

revised reporting period contained in the DFPS Proposal. The monitors intend to revisit this cadence with DFPS and HHSC after reviewing the initial data and information submission.

27. With respect to Remedial Order B1 (RCCL Workload Studies), described on page 13, DFPS indicates the agency cannot provide any information on secondary assignments. The monitors did not see in the Summary of IMPACT Enhancements sent by email from Tara Olah on October 25, 2019, a plan to address this issue. Please advise when this data issue will be resolved.


Kevin Ryan and Deborah Fowler

Court Monitors

M.D. v. Abbott

## Megan Annitto

| | |
|---|---|
| **From:** | Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> |
| **Sent:** | Friday, April 3, 2020 1:46 PM |
| **To:** | Kevin Ryan |
| **Cc:** | Harris,Rand S (DFPS); Carmical,Audrey (DFPS); Kintzer,Corey D (HHSC); dfowler@texasappleseed.net; Masters,Jaime D (DFPS); Gdula, Kimberly; Linda Brooke; Megan Annitto; Stephens, Andrew |
| **Subject:** | FW: Case Reads |
| **Attachments:** | JAN RCCI Addendum to Cohort and Non-Cohort Reports Issued 1-29-2020(Final).pdf; NOV RCCI Addendum to Cohort and Non-Cohort Reports Issued 11-15-2019(Final).pdf |

Hi Kevin,

I apologize for the delay. Amid the flurry of activity during the past few weeks, I mistakenly believed we had already sent this information to you. Historically, CCI interpreted policy to mean that investigation initiation is met by making face-to-face contact with the alleged victim, unless an exception is granted. While all alleged victims should be observed or interviewed within the required time frames, in these case reads, CCI determined that the investigation initiation was met when contact was made with at least one alleged victim, or by other means if an exception to the face-to-face contact with the alleged victim was granted. The case reading measured timely contact with all alleged victims as a separate measure. The CCI Quality Assurance Team (QAT) has reevaluated data in the November 2019 and January 2020 case read reports for compliance with investigation initiation time frames based on strict interpretation of CCI Policy and Field Communication #008. The results of the CCI QAT's reevaluation is in the attached addendums, in which investigations are only credited for timely initiation if all alleged victims were interviewed. Future case read reports will do the same.

Please let us know if you need anything additional.

Thank you,

Tara

---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Friday, April 3, 2020 10:24 AM
**To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>; dfowler@texasappleseed.net; Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>; Kimberly Gdula <Kimberly.Gdula@oag.texas.gov>; Linda Brooke <lbrooke@texasappleseed.net>; mannitto@public-catalyst.com; Stephens, Andrew <andrew.stephens@oag.texas.gov>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Subject:** Fwd: Case Reads

---

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

---

Rand and Tara,

Can you advise me when you will be able to respond to our question of March 2nd below?

Thank you,

Kevin Ryan

**Sent:** Monday, March 2, 2020 5:38 PM
**To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>; Deborah Fowler <dfowler@texasappleseed.net>; Gdula,
Kimberly <Kimberly.Gdula@oag.texas.gov>; Megan Annitto <mannitto@public-catalyst.com>;
Jaime Masters <Jaime.Masters@dfps.state.tx.us>; Linda Brooke <lbrooke@texasappleseed.net>;
Andrew Stephens <Andrew.stephens@oag.texas.gov>; Olah,Tara (DFPS)
<Tara.Olah@dfps.state.tx.us>; Roper,Tiffany (DFPS) <tiffany.roper@dfps.state.tx.us>
**Subject:** Case Reads


Dear Rand,


We are reviewing the DFPS case reads, which appear to credit the agency with satisfactory
performance for initiation of a CCI investigation when there is a timely face-to-face meeting
with one alleged child victim, even if other alleged child victims are not seen timely and there is
no permissible exception or extension. We have reviewed the DFPS guidance in effect at the
time with respect to initiation of an investigation, and it clearly requires timely face-to-face
contact with all alleged child victims absent an authorized exception/extension. Can you explain
how to reconcile the policy guidance with the case reads?


Kevin

Texas Appleseed Mail - Fwd: Data Request for Remedial Order A6



# Fwd: Data Request for Remedial Order A6

1 message

---------- Forwarded message ---------
From: **Townsend,Frances R (HHSC)** <Frances.Townsend@hhsc.state.tx.us>
Date: Wed, Oct 30, 2019 at 5:31 PM
Subject: Data Request for Remedial Order A6
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>, Kevin Ryan <kevinmichaelryan1967@gmail.com>
Cc: Stephens, Andrew <andrew.stephens@oag.texas.gov>, Angela Colmenero <Angela.Colmenero@gov.texas.gov>, Joe Bingham <Joe.Bingham@gov.texas.gov>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>, Fescenmeyer,Megan C (DFPS) <Megan.Fescenmeyer@dfps.state.tx.us>, Harris,Russ (HHSC) <Russ.Harris@hhsc.state.tx.us>

Dear Deborah,

I am following up from our call last week in which you asked me if HHSC had access to the reports that PMC children make to the HHSC Ombudsman.  The answer is yes.

In response to the data request for Remedial Order A6, HHSC is prepared to produce to the Monitors and to the Court a list of all reports that PMC children made to the HHSC Ombudsman for the period of August 31, 2019 to September 30, 2019.  Due to the confidentiality statute governing communications with the ombudsman, HHSC is concerned that this information cannot be shared with any third parties, such as Plaintiffs' counsel.  (Please see S.B 830, 84th Legislature, Regular Session, 2015, (https://capitol.texas.gov/tlodocs/84R/billtext/html/SB00830F.htm).  Do you mind sharing your thoughts on this issue?

Also, due to the confidentiality statute, I greatly would appreciate your guidance on how to send this information to you and to the Court. Does the Court have a preferred method for transmitting sensitive information, perhaps such as filing it under seal with the Court?

Thank you so very much for your help!

Respectfully,

Frances Townsend

**Frances Townsend** | Attorney

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

6/24/2020                    Gmail - Re: Texas Mari-Level Data Request for Remediation Order

Austin, TX 78751

Office: 512-424-6926

www.hhs.texas.gov | www.dshs.texas.gov



This message may contain confidential information.  If you received this message in error, please notify me immediately and then delete the message.



# Fwd: Correspondence and Data/Information Request
1 message

---------- Forwarded message ---------
From: **Kevin Ryan** <kevinmichaelryan1967@gmail.com>
Date: Fri, Feb 21, 2020 at 5:54 PM
Subject: Correspondence and Data/Information Request
To: Andrew Stephens <Andrew.stephens@oag.texas.gov>, Corey D Kintzer <Corey.Kintzer@hhsc.state.tx.us>, Audrey
Carmical <Audrey.Carmical@dfps.state.tx.us>, Rand S Harris <Rand.Harris@dfps.state.tx.us>, Jaime Masters
<Jaime.Masters@dfps.state.tx.us>, Tiffany Roper <Tiffany.Roper@dfps.state.tx.us>, Tara Olah
<Tara.Olah@dfps.state.tx.us>, Kimberly Gdula <Kimberly.Gdula@oag.texas.gov>
Cc: Deborah Fowler <dfowler@texasappleseed.net>, Linda Brooke <lbrooke@texasappleseed.net>, Megan Annitto
<mannitto@public-catalyst.com>

Counsel,

Correspondence and data/information request attached. Thank you for your attention to this matter.

---

**2 attachments**

 **2020.02.19 Letter to AG re DI Request.Final.pdf**
88K

 **Texas Data and Information Request - ongoing.xlsx**
58K

February 21, 2020

Mr. Andrew Stephens, Esq.
Office of the Attorney General
PO Box 12548
Austin, Texas 78711-2548


Dear Mr. Stephens:

The attached spreadsheet provides an updated data and information production request from the Monitors regarding the State's obligations pursuant to the U.S. District Court's Order in *M.D. v. Abbott*. The document identifies two categories of information. First, the monitors have added new data and information requests. Second, the document identifies data that was previously requested by the Monitors in the September 30, 2019 correspondence and in the October 28, 2019 correspondence, and which the Monitors assert the State did not produce.

We are aware that the State previously identified information in the Monitors' requests that it could not provide due to technological deficiencies in its systems or otherwise and that those deficiencies may have been cured or will be cured in future data submissions to the Monitors. To the extent the State believes some information in this request has already been provided to the Monitors, please identify and summarize how the State has addressed the defects. If the State remains unable to provide certain data and information, please identify, summarize, and provide an expected date of when the State will be able to do so. Where possible, please provide these summaries in the spreadsheet provided in the relevant space identified. For responses that require an attachment or a lengthier explanation, please indicate as such within the relevant cell.

Sincerely,


Deborah Fowler                     Kevin Ryan


CC:
Audrey Carmical
Corey Kintzer
Tara Olah
Jaime Masters

**Subject:**      FW: RO37 - Home History Reviews (process, documentation, timeframes)
**Date:**        Tuesday, June 23, 2020 at 6:05:05 PM Central Daylight Time
**From:**        Linda Brooke
**Attachments:** Home History Review Process and Screen Shots 01.29.20.pdf

From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Wed, Jan 29, 2020 at 7:15 PM
Subject: RE: RO37 - Home History Reviews (process, documentation, timeframes)
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Kevin Ryan <kevinmichaelryan1967@gmail.com>, mannitto@public-catalyst.com <mannitto@public-catalyst.com>, Viveca <vmartinez@texasappleseed.net>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>


Kevin/Deborah,

Please see attached for the PowerPoint presentation mentioned in my email below. I also uploaded it to the SharePoint. Please let us know if you have questions or need any additional information.

Thank you,

Tara

---------- Forwarded message ---------
From: **Deborah Fowler** <dfowler@texasappleseed.net>
Date: Mon, Mar 9, 2020 at 9:55 AM
Subject: Re: RO 37
To: Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
Cc: Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Harris,Rand S (DFPS)
<Rand.Harris@dfps.state.tx.us>, Kevin Ryan <kevinmichaelryan1967@gmail.com>, Viveca Martinez
<vmartinez@texasappleseed.net>, Linda Brooke <lbrooke@texasappleseed.net>


Tara, following up on this - there is an element in our recent data & information request that was mistakenly
included for RO 37:

"Provide Abuse and Neglect and Corporal Punishment reports created to help inspectors compile datafor the
5 year retrospective reports."

That information does not relate to RO 37 - I think it was just a mistake in adding information to the
spreadsheet, we do not need that data.

However, we would like to have the home history reviews themselves.  I don't think we have access to the
files where these are being stored - but I'd like to just clarify that when we talk later this morning.  If that's
true, I'd like to talk about where these could be made available to us - either in Sharepoint or OneCase.

Thank you,

Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org



**Page 1 of 1**

**From:** "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Date:** Wednesday, January 15, 2020 at 11:47 PM
**To:** Kevin Ryan <kevinmichaelryan1967@gmail.com>
**Cc:** "dfowler@texasappleseed.net" <dfowler@texasappleseed.net>, "Stephens, Andrew"
<andrew.stephens@oag.texas.gov>, "Kintzer,Corey D (HHSC)" <Corey.Kintzer@hhsc.state.tx.us>,
"Carmical,Audrey (DFPS)" <Audrey.Carmical@dfps.state.tx.us>, "mannitto@public-catalyst.com"
<mannitto@public-catalyst.com>, Linda Brooke <lbrooke@texasappleseed.net>, "Hilton, Christopher"
<Christopher.Hilton@oag.texas.gov>, "Roper,Tiffany (DFPS)" <Tiffany.Roper@dfps.state.tx.us>
**Subject:** RE: M.D. v. Abbott Information and Data Request

Kevin/Deborah,

We have uploaded to the SharePoint everything we believe is responsive to the items in your information and
data request dated 9.30.19 and having a 1.15.20 deadline, as modified by your email dated 10.28.19. In
addition, we note the following:

- ***New Data Dictionaries:*** Pursuant to the Monitors' recent request, a data dictionary has been provided
  for each report, describing the data in each column in the format the Monitors requested. To the
  extent a column is repeated in multiple tabs in the same report, it is included in the data dictionary
  only once, as the description is the same for each tab. For all reports, if a particular field tab is blank, it is
  either because the column is not applicable particular row (e.g., children still in PMC at the end of the
  quarter will not have a placement at exit from PMC) or the information was not in the data warehouse
  at the time the data was pulled.

- ***New Reports:***
  - R03.2 CPI Investigations Q1 FY 20 – CPI investigative timeframes are different from RCI
    timeframes.  CPI policies are available at: https://www.dfps.state.tx.us/handbooks/ (generally
    sections 2000-3000).

  - R0.Inj Gap Analysis for List of Children in PMC Q1 FY 20 – Children in PMC on the first day of the
    quarter who had a PMC date that started in the previous quarter but who were not on the
    previous quarter's PMC list. These children represent approximately 1% of all children in PMC
    and appear to be the result of data entry issues and/or delayed documentation.

- ***Revisions to Existing Reports:***
  - R01.1 CPD Completion as of 9-30-19 – 11-15-19 – CLOE:  After the initial report was produced,
    DFPS identified a number of incorrect CPD start and exit dates and staff included on the list who
    were not hired as a CVS caseworker. DFPS re-ran the list to include individuals hired as a CVS
    caseworker between 9.1.18 and 9.1.19, corrected their CPD start and exit dates and added an
    indicator for whether they had completed all CPD requirements, along with relevant notes
    about their CPD status, where appropriate. The revised file is entitled:  R01.1 CPD Completion as
    of 9-30-19 – 11-15-19 – CLOE – amended 1-15-20.

  - R01.1 CPD for Workers hired October 2019 (with their CPD status as of October 30, 2019)

provided on December 15, 2019:  This report was updated to include this cohort's CPD status as of November 30, 2019.

- ○ R02.4 Graduated Caseloads Sept 2019:  Determining the individuals subject to graduated caseloads is based on the date they complete all CPD requirements. As the initial CPD list included some errors, the list of individuals included in this report as being subject to graduated caseloads also included some errors. Once the initial CPD list (September 2018 – September 2019) was revised and the October 2019 CPD list was updated, a cohort of individuals subject to graduated caseloads at some point between September-November 2019 was created. That list is entitled:  R02.4 CVS Caseworkers Subject to Graduated Caseloads Sept-Nov 2019 1-15-20 96799.

- ○ Moving forward, we will produce the following CPD and graduated caseloads data monthly:
  - ▪ Individuals hired as CPS caseworkers in the month and their initial CPD status
  - ▪ Individuals completing CPD during the month
  - ▪ Caseloads for individuals subject to graduated caseloads during the month

- ● ***New Columns in Existing Reports:***
  - ○ R03.1 RCI and CPI Intakes – added:
    - ▪ Column for both RCI and CPI with reason for changing an intake priority from a P1 or a P2 to a PN
    - ▪ Column for RCI with an indicator for whether an investigation was opened in CLASS. Generally, when an RCI intake is closed PN, HHSC RCCL reviews the intake to determine whether it should be investigated as a minimum standards violation. If so, RCCL will open an investigation in CLASS. Any RCI intake with a PN that has a "Y" in this column means RCCL opened it for an investigation.

  - ○ R03.2 RCI Investigations
    - ▪ Extension timeframes and reason for extension have been added to this report.
    - ▪ As previously noted, to meet the Monitors' timeframes, previous reports for investigations started between August - September 2019 and closed during that timeframe were pulled from multiple reports, and the format and columns in the two reports (R03.2 RCI Closed INV in Aug and Sept 2019 and R03.2 RCI Investigations July 31-Sept 30) did not match. To better align reporting and navigability, the investigations started between October - November 2019 and investigations closed during that time period and the related extensions and allegations are all in different tabs within the same report entitled:  R03.2 RCI Investigations Oct-Nov 2019 Jan-15-20- 96882.  The columns across the tabs have been aligned.
    - ▪ Moving forward, DFPS will provide a quarterly report on the state fiscal year (SFY) quarter timeframes. The next report will cover SFY Quarter 2 (December 2019 – February 2020).

- ● ***Request for Two-Week Extension on RCCI Case Read Report:***  For the SFY 2019 Q1 RCCI case reading report, we need to request a two-week extension to ensure the most useful work product is provided to you. Going forward, we do not anticipate the need for additional extensions.

- ● ***CPI Investigative Reports:***  We would like to reiterate our position regarding the CPI investigative reports being outside the scope of the LFC-related orders upheld by the 5th Circuit. While DFPS intends to continue cooperating with the data and information requests, we view any remedial action in response to CPI data as out of scope.

Thank you,

Tara

**Megan Annitto**

| | |
|---|---|
| **From:** | Kevin Ryan <kevinmichaelryan1967@gmail.com> |
| **Sent:** | Tuesday, February 4, 2020 1:37 PM |
| **To:** | Jaime.Masters@dfps.state.tx.us; Carmical,Audrey (DFPS); Andrew Stephens; Kintzer,Corey D (HHSC); Olah,Tara (DFPS); Roper,Tiffany (DFPS); Gdula, Kimberly; Harris,Rand S (DFPS); Levy,Leslie M (DFPS); joseph.bingham@hhsc.state.tx.us; Lam,Taryn (HHSC) |
| **Cc:** | Deborah Fowler; Linda Brooke; Eileen Crummy; Lisa Taylor; Tim Ross; Viveca Martinez; Nancy Arrigona; Megan Annitto |
| **Subject:** | Comments on the CVS, CCI and CCL Draft Workload Standards/Guidance |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Commissioner and Counsel,

Thank you for submitting for our review and feedback the proposed CVS, CCI, and RCCL workload standards.  Our comments follow.

<u>All Three Drafts</u>:

 1. On Page 1 of the CVS and CCI draft workload standards, the drafts state, "These recommendations and guidelines are intended to be utilized as a mechanism in support of achieving the [] Caseload Standards. As nonbinding guidance in support of the Standards, the recommendations and instructions in this document should not be construed to apply to the extent the Standards are achieved." Similarly, on page 1 of the RCCL draft workload standards, the draft states, "These recommendations and guidelines are intended to be utilized as a mechanism in support of achieving the RCCL Workload Standards.  As non-binding guidance in support of the Standards, the recommendations and instructions in this document should not be construed to bind future practice to the extent the Standards are achieved."

We do not think this language will be clearly understood by the staff who are accountable for implementation.  Please consider deleting the second sentence and inserting the word "nonbinding" in front of "recommendations and guidelines."

2.  The three drafts do not provide adequate specific, measurable guidance.  More specific, measurable guidance will strengthen the guidance and better assist supervisors and Program Administrators in working toward the 14-17 workload standards.  Examples for each draft are discussed, below.

CVS draft Standards:

1.      The draft mentions a new report, "the CVS caseload report," which is to be used for internal monitoring of caseload standards. Please confirm whether this report is separate from the monthly CVS caseload data that is currently produced to the monitors.

2.      Beginning on Page 2, the draft shies away from providing measurable guidance to the field that would be useful to supervisors. Recognizing the Department's need to exercise discretion with caseload assignments, we think more specific, measurable guidance will strengthen the guidance to supervisors. We want to provide examples from pages 2-3 of the CVS Caseload Standards draft to make sure the point is clear. This section identifies various factors of case complexity that supervisors should take into consideration when assigning cases. The guidance in the document does not go beyond taking these factors into consideration, and is not sufficiently clear about the factors.  Consider:

•       Travel time: The Standards will be more useful to supervisors if DFPS provides more specific, measurable guidance, for example: "avoid assigning any caseworker more than two cases that require more than 60 minutes travel time."

•       New Caseworker: How does DFPS define a new caseworker, i.e., 12 months, 18 months? Is that universally understood by all supervisors?

•       Is a "less-complex case" defined by DFPS in the INSIGHT case complexity tool referenced on page 3? If not, how is it defined and how do supervisors know what constitutes a "less-complex case." If yes, please send us the formula for assessing case complexity.

•       What does "increased support" entail?

3.      There is a lack of measurable guidance concerning when to skip the wheel of assignments.  While the document lists factors to take into consideration, they don't list measurable criteria. In light of the guidelines around case assignment recited on pages 2-3, it is unclear how "rotation" on page 3 factors into workload assignment.  Please clarify and consider providing stronger guidance.

4.      From page 3, under "Reassignment of Cases," is there guidance around how long extended leave is?

5.      On page 4, the draft states, "Supervisors must always utilize the expertise of their Program Directors in the following circumstances." Please clarify whether supervisors are required to enlist their Program Director as these circumstances arise or only during the monthly staffings described below.

5.      On page 5, the draft states, "In order to determine the average daily caseload, supervisors should use the CVS caseload report." Please confirm that you intend here to use the word "daily" and not "monthly."

7.      On page 5, the draft references "Cases that require special handling." What kinds of cases are these? Where is that defined for supervisors receiving this guidance?

8.      On page 5, the draft references "an informal conference." How is that defined? How is that different from a "formal conference?" Where is that defined for supervisors receiving this guidance?

9.      On page 7, the draft states, "If there is not a perpetual posting in the region, upon notification of an upcoming vacancy, supervisors should notify TAG to ensure the position is posted quickly." Is there currently a required time frame for the posting?

CCI draft Standards:

1. "Assigning Investigations" on page 3 of the draft includes travel as a factor to be considered, but does not include measurable guidance.  The workload study completed in 2017 indicated that of the entities reported on in the survey, 70 percent take between 30 minutes and 2 hours to reach one-way, and 10 percent take more than 2 hours to reach.  40 percent required more than an hour of travel, one-way.  Travel is an important consideration in investigator workloads.  It is also an important consideration for Program Administrators' decision to reassign investigation to other units or regions (discussed on page 7).

2. Complex Investigations (beginning on page 3 of draft): Problems similar to those discussed above, in the section regarding the CVS draft, exist with regard to the lack of specificity in the CCI discussion of complex investigations.  While there is discussion of INSIGHT as a workload management tool, the draft does not clearly indicate whether INSIGHT includes measures of case complexity for investigations.  If it does not assign weights to the different complexity factors described on pages 3-4, providing more specific, measurable guidance in this section of the caseload standard would assist supervisors in assigning investigations.

There are also additional measures of complexity that should be considered that are not listed in the draft, based on the workload study completed in 2017.  In that study, investigators reported several investigation characteristics that require more time:

- The investigation is a Priority 1 (while the draft lists fatalities and near-fatalities as a consideration for complexity, not all Priority 1 investigations include a fatality or near-fatality);

- There are allegations of sexual abuse;

- The investigation regards an RTC.

More specific, measurable guidance would give supervisors some guidelines for the number of complex cases to assign an investigator.  For example, "Avoid assigning more than one Priority 1 investigation to any one investigator" or "Avoid assigning more than X cases involving multiple allegations, perpetrators, or victims to any one investigator."

3.  Removal from Rotation:  the draft states, "supervisors should determine an appropriate time to stop assigning new investigations." Because this section includes both temporary removals (based on FMLA or "extended leave," case complexity, or other factors) as well as permanent removal due to staff leaving a position, please consider providing more specific guidance regarding when to stop assigning new cases to investigators who are leaving a position permanently.  Similarly, because FMLA may be planned in advance, please include specific recommendations regarding the lead up to FMLA – for example, "If FMLA is planned, begin tapering the assignment of new cases X months prior to the expected start of FMLA."

4.  Caseload for New Investigators: the draft indicates that supervisors may skip a new investigator in the assignment rotation during the first 60 days that an investigator is case assignable. Are new investigators immediately eligible for a full caseload as soon as they become caseload assignable?  Please consider more specific guidance for supervisors regarding caseloads for new investigators.

5.  Hiring: How is the decision to have a "perpetual posting" determined?  Is this left to the discretion of TAG, or Program Administrators?  If it is a decision made by Program Administrators (or if they can make the decision), providing specific guidance regarding when this is appropriate would be helpful, perhaps based on the number of positions that are historically vacant in a unit.

RCCL draft Standards:

1.  Under "Items to Consider When Assigning Tasks," the list fails to include specific, measurable goals.  It also fails to include specific, measurable goals related to the balance between the four tasks listed on the first page just above this section.

According to the workload report completed in 2017, inspectors reported spending about half their time on standards investigations, and approximately 23 percent of their time on monitoring inspections, despite the fact that inspectors' average daily caseloads included fewer standards investigations than operation inspections.  This suggests that

standards investigations are more time consuming.  Specific, measurable guidance regarding a balanced assignment of the 4 tasks described on the first page would be helpful to supervisors making assignments.

More specific guidance should be given related to travel (see discussions above).

While the table in this section includes complexity measures related to operations, it does not include items specific to complex standards investigations.  Complexity measures for standards investigations – including the number of standards at issue, the weight of the standards at issue, the number of victims or perpetrators involved, the number of allegations involved, whether there are allegations of sexual abuse, and whether the entity being investigated is an RTC – should be added, along with specific, measurable guidance regarding assignment of complex investigations and operations.  The number of investigations that an investigator is providing technical assistance or follow-up in should also be considered during task assignments.

Furthermore, as described above, specific, measurable guidance should be given regarding the number of complex operations or investigations assigned.  For example, "avoid assigning more than X operations that are on a corrective action plan" or "avoid assigning more than one operation that serves children with specialized medical needs," etc.

2.  Under "Additional Guidance" on page 3:  The guidance instructs supervisors to skip an inspector if they are "well above the workload guideline."  Providing more specific, measurable guidance will insure supervisors consistently understand when they should skip an inspector.  For example, "if an inspector's caseload is X tasks above the guidelines, the inspector should be skipped for assignment if another inspector has a smaller workload."

3.  Under "Task to Reassign" – consider including language like that described above, that would taper assignments if a staff is planning FMLA or extended leave for a future date, or if they have given advance notice that they will leave permanently.

Please let us know if you have any questions about this. We look forward to hearing from you on this.

Kevin Ryan and Deborah Fowler



## Fwd: Fw: Comments on the CVS, CCI and CCL Draft Workload Standards/Guidance
1 message

---

---------- Forwarded message ---------
From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Tue, Feb 18, 2020 at 8:41 PM
Subject: RE: Comments on the CVS, CCI and CCL Draft Workload Standards/Guidance
To: Kevin Ryan <kevinmichaelryan1967@gmail.com>, dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>, Stephens, Andrew <andrew.stephens@oag.texas.gov>, Hilton, Christopher <Christopher.Hilton@oag.texas.gov>, Gdula, Kimberly <Kimberly.Gdula@oag.texas.gov>, Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>, Lam,Taryn (HHSC) <Taryn.Lam@hhsc.state.tx.us>, Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>


Kevin/Deborah,


Thank you for your recent feedback concerning the caseload standards we submitted to you on 1.16.20 in accordance with ROA3 (CVS Internal Caseload Standards) and ROB3 (RCCL/RCCI Internal Caseload Standards). We have incorporated your feedback where feasible (see attached). Also attached for your reference are communications and training materials CVS and RCCI developed and administered to staff concerning the caseload standards. In accordance with ROA4 (CVS Standards Guidance) and ROB4 (RCCL/RCCI Standards Guidance), these caseload standards are now being utilized to guide supervisors handling caseload distribution and inform DFPS' hiring goals. Please let us know if you have questions or need any additional information.


Thank you,


Tara


---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Tuesday, February 4, 2020 12:37 PM
**To:** Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Stephens, Andrew <andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>; Gdula, Kimberly <Kimberly.Gdula@oag.texas.gov>; Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>; Bingham,Joseph (HHSC) <Joseph.Bingham@hhsc.state.tx.us>; Lam,Taryn (HHSC) <Taryn.Lam@hhsc.state.tx.us>
**Cc:** dfowler@texasappleseed.net; Linda Brooke <lbrooke@texasappleseed.net>; Eileen Crummy <ecrummy@public-catalyst.com>; Lisa Taylor <ltaylor@public-catalyst.com>; Tim Ross <tross@actionresearchpartners.com>; Viveca Martinez <vmartinez@texasappleseed.net>;

narrigona@texasappleseed.net; mannitto@public-catalyst.com

**Subject:** Comments on the CVS, CCI and CCL Draft Workload Standards/Guidance

---

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

---

Dear Commissioner and Counsel,


Thank you for submitting for our review and feedback the proposed CVS, CCI, and RCCL workload standards.  Our comments follow.


All Three Drafts:


  1. On Page 1 of the CVS and CCI draft workload standards, the drafts state, "These recommendations and guidelines are intended to be utilized as a mechanism in support of achieving the [] Caseload Standards. As nonbinding guidance in support of the Standards, the recommendations and instructions in this document should not be construed to apply to the extent the Standards are achieved." Similarly, on page 1 of the RCCL draft workload standards, the draft states, "These recommendations and guidelines are intended to be utilized as a mechanism in support of achieving the RCCL Workload Standards.  As non-binding guidance in support of the Standards, the recommendations and instructions in this document should not be construed to bind future practice to the extent the Standards are achieved."


We do not think this language will be clearly understood by the staff who are accountable for implementation.  Please consider deleting the second sentence and inserting the word "nonbinding" in front of "recommendations and guidelines."


2.  The three drafts do not provide adequate specific, measurable guidance.  More specific, measurable guidance will strengthen the guidance and better assist supervisors and Program Administrators in working toward the 14-17 workload standards.  Examples for each draft are discussed, below.


CVS draft Standards:


1.       The draft mentions a new report, "the CVS caseload report," which is to be used for internal monitoring of caseload standards. Please confirm whether this report is separate from the monthly CVS caseload data that is currently produced to the monitors.


  2.       Beginning on Page 2, the draft shies away from providing measurable guidance to the field that would be useful to supervisors. Recognizing the Department's need to exercise discretion with caseload assignments, we think more specific, measurable guidance will strengthen the guidance to supervisors. We want to provide examples from pages 2-3 of the CVS Caseload Standards draft to make sure the point is clear. This section identifies various factors of case complexity that supervisors should take into consideration when assigning cases. The guidance in the document does not go beyond taking these factors into consideration, and is not sufficiently clear about the factors.  Consider:


•        Travel time: The Standards will be more useful to supervisors if DFPS provides more specific, measurable guidance, for example: "avoid assigning any caseworker more than two cases that require more than 60 minutes travel

time."

- New Caseworker: How does DFPS define a new caseworker, i.e., 12 months, 18 months? Is that universally understood by all supervisors?

- Is a "less-complex case" defined by DFPS in the INSIGHT case complexity tool referenced on page 3? If not, how is it defined and how do supervisors know what constitutes a "less-complex case." If yes, please send us the formula for assessing case complexity.

- What does "increased support" entail?


3.    There is a lack of measurable guidance concerning when to skip the wheel of assignments.  While the document lists factors to take into consideration, they don't list measurable criteria. In light of the guidelines around case assignment recited on pages 2-3, it is unclear how "rotation" on page 3 factors into workload assignment.  Please clarify and consider providing stronger guidance.


4.    From page 3, under "Reassignment of Cases," is there guidance around how long extended leave is?


5.    On page 4, the draft states, "Supervisors must always utilize the expertise of their Program Directors in the following circumstances." Please clarify whether supervisors are required to enlist their Program Director as these circumstances arise or only during the monthly staffings described below.


5.    On page 5, the draft states, "In order to determine the average daily caseload, supervisors should use the CVS caseload report." Please confirm that you intend here to use the word "daily" and not "monthly."


7.    On page 5, the draft references "Cases that require special handling." What kinds of cases are these? Where is that defined for supervisors receiving this guidance?


8.    On page 5, the draft references "an informal conference." How is that defined? How is that different from a "formal conference?" Where is that defined for supervisors receiving this guidance?


9.    On page 7, the draft states, "If there is not a perpetual posting in the region, upon notification of an upcoming vacancy, supervisors should notify TAG to ensure the position is posted quickly." Is there currently a required time frame for the posting?


CCI draft Standards:

1.  "Assigning Investigations" on page 3 of the draft includes travel as a factor to be considered, but does not include measurable guidance.  The workload study completed in 2017 indicated that of the entities reported on in the survey, 70 percent take between 30 minutes and 2 hours to reach one-way, and 10 percent take more than 2 hours to reach.  40 percent required more than an hour of travel, one-way.  Travel is an important consideration in investigator workloads.  It is also an important consideration for Program Administrators' decision to reassign investigation to other units or regions (discussed on page 7).


2.  Complex Investigations (beginning on page 3 of draft): Problems similar to those discussed above, in the section regarding the CVS draft, exist with regard to the lack of specificity in the CCI discussion of complex investigations.  While there is discussion of INSIGHT as a workload management tool, the draft does not clearly indicate whether INSIGHT

includes measures of case complexity for investigations.  If it does not assign weights to the different complexity factors

described on pages 3-4, providing more specific, measurable guidance in this section of the caseload standard would assist supervisors in assigning investigations.

There are also additional measures of complexity that should be considered that are not listed in the draft, based on the workload study completed in 2017.  In that study, investigators reported several investigation characteristics that require more time:

- The investigation is a Priority 1 (while the draft lists fatalities and near-fatalities as a consideration for complexity, not all Priority 1 investigations include a fatality or near-fatality);

- There are allegations of sexual abuse;

- The investigation regards an RTC.

More specific, measurable guidance would give supervisors some guidelines for the number of complex cases to assign an investigator.  For example, "Avoid assigning more than one Priority 1 investigation to any one investigator" or "Avoid assigning more than X cases involving multiple allegations, perpetrators, or victims to any one investigator."

3.  Removal from Rotation:  the draft states, "supervisors should determine an appropriate time to stop assigning new investigations." Because this section includes both temporary removals (based on FMLA or "extended leave," case complexity, or other factors) as well as permanent removal due to staff leaving a position, please consider providing more specific guidance regarding when to stop assigning new cases to investigators who are leaving a position permanently. Similarly, because FMLA may be planned in advance, please include specific recommendations regarding the lead up to FMLA – for example, "If FMLA is planned, begin tapering the assignment of new cases X months prior to the expected start of FMLA."

4.  Caseload for New Investigators: the draft indicates that supervisors may skip a new investigator in the assignment rotation during the first 60 days that an investigator is case assignable. Are new investigators immediately eligible for a full caseload as soon as they become caseload assignable?  Please consider more specific guidance for supervisors regarding caseloads for new investigators.

5.  Hiring: How is the decision to have a "perpetual posting" determined?  Is this left to the discretion of TAG, or Program Administrators?  If it is a decision made by Program Administrators (or if they can make the decision), providing specific guidance regarding when this is appropriate would be helpful, perhaps based on the number of positions that are historically vacant in a unit.

RCCL draft Standards:

1.  Under "Items to Consider When Assigning Tasks," the list fails to include specific, measurable goals.  It also fails to include specific, measurable goals related to the balance between the four tasks listed on the first page just above this section.

According to the workload report completed in 2017, inspectors reported spending about half their time on standards investigations, and approximately 23 percent of their time on monitoring inspections, despite the fact that inspectors' average daily caseloads included fewer standards investigations than operation inspections.  This suggests that standards investigations are more time consuming.  Specific, measurable guidance regarding a balanced assignment of the 4 tasks described on the first page would be helpful to supervisors making assignments.

More specific guidance should be given related to travel (see discussions above).

While the table in this section includes complexity measures related to operations, it does not include items specific to complex standards investigations. Complexity measures for standards investigations – including the number of standards at issue, the weight of the standards at issue, the number of victims or perpetrators involved, the number of allegations involved, whether there are allegations of sexual abuse, and whether the entity being investigated is an RTC – should be added, along with specific, measurable guidance regarding assignment of complex investigations and operations. The number of investigations that an investigator is providing technical assistance or follow-up in should also be considered during task assignments.

Furthermore, as described above, specific, measurable guidance should be given regarding the number of complex operations or investigations assigned. For example, "avoid assigning more than X operations that are on a corrective action plan" or "avoid assigning more than one operation that serves children with specialized medical needs," etc.

2. Under "Additional Guidance" on page 3: The guidance instructs supervisors to skip an inspector if they are "well above the workload guideline." Providing more specific, measurable guidance will insure supervisors consistently understand when they should skip an inspector. For example, "if an inspector's caseload is X tasks above the guidelines, the inspector should be skipped for assignment if another inspector has a smaller workload."

3. Under "Task to Reassign" – consider including language like that described above, that would taper assignments if a staff is planning FMLA or extended leave for a future date, or if they have given advance notice that they will leave permanently.

Please let us know if you have any questions about this. We look forward to hearing from you on this.

Kevin Ryan and Deborah Fowler



---

**6 attachments**

   **Child Care Investigations - Caseload Guidelines.pdf**
   790K

   **FC020_Resources_to_Support_RCCI_Targeted_Case_Ranges_and_Equitable_Workl....pdf**
   23K

   **CPS Generally Applicable Internal Caseload Standards.pdf**
   382K

   **RCCI Caseload Standards PowerPoint.pdf**
   402K

   **CPS CVS Caseload Standards PowerPoint.pdf**
   410K

   **CPS CVS Communication re Mandatory Training on Caseload Standards.pdf**
   38K

| | |
|---|---|
| **From:** | DFPS CPS Communications |
| **Cc:** | Blackstone,Kristene (DFPS); Banuelos,Erica (DFPS); Broussard-White,CJ (DFPS); Cannata,George (DFPS); Fisher,Leshia E (DFPS); Judson,Ginny L (DFPS); Martinez,Georgina (DFPS); O"Connell,Tara (DFPS); Ortiz,Hector (DFPS); Smith,Sheryl (DFPS); Van Buskirk,Lindsey (DFPS); Bugg,Heather M (DFPS); Emerson,Debra D (DFPS); Hinson,Jenny R (DFPS); Hobbs,Melissa (DFPS); Kromrei,Elizabeth (DFPS); Letts,Ellen K (DFPS); Self,Carol G (DFPS); Taccetta,Kaysie E. (DFPS); Voss,Angie K (DFPS); Eaton,Leigh A (DFPS); Shores,Julie L (DFPS) |
| **Subject:** | ACTION REQUIRED: Implementation of Generally Applicable Caseload Standards – Mandatory Training |
| **Date:** | Tuesday, February 11, 2020 9:30:25 AM |

To:  CPS Conservatorship (CVS) Supervisor, PD, PA, and RD Staff
From:  Kristene Blackstone, Associate Commissioner for CPS
Subject: Implementation of Generally Applicable Caseload Standards
Date: February 11, 2020

## ACTION REQUIRED: Implementation of Generally Applicable Caseload Standards – Mandatory Training

**Reminder:  Participation in the webinar is mandatory for CVS Supervisors and above level management staff.**

### Implementation of Generally Applicable Caseload Standards

To ensure equitable caseloads across the state Child Protective Services (CPS) has developed, and will implement, a caseload guideline of 14-17 children per conservatorship (CVS) worker. The guideline is **not** a caseload cap, or an enforced caseload range.

CVS supervisor, and above, level staff will participate in **mandatory** webinars to learn strategies for working toward equitable caseload distribution.

Register for an upcoming webinar via this link:
https://attendee.gotowebinar.com/rt/3119556785228123661

Webinar schedule:

### Tuesday, February 11
- 9:00-10:00 AM CST
- 10:30-11:30 AM CST
- 1:30-2:30 PM CST
- 3:00-4:00 PM CST

Please direct questions to ███████████ or ███████████

**Subject:**               FW: Comments on the CVS, CCI and CCL Draft Workload Standards/Guidance

On Feb 18, 2020, at 8:41 PM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

Kevin/Deborah,

Thank you for your recent feedback concerning the caseload standards we submitted to you on 1.16.20 in accordance with ROA3 (CVS Internal Caseload Standards) and ROB3 (RCCL/RCCI Internal Caseload Standards). We have incorporated your feedback where feasible (see attached). Also attached for your reference are communications and training materials CVS and RCCI developed and administered to staff concerning the caseload standards. In accordance with ROA4 (CVS Standards Guidance) and ROB4 (RCCL/RCCI Standards Guidance), these caseload standards are now being utilized to guide supervisors handling caseload distribution and inform DFPS' hiring goals. Please let us know if you have questions or need any additional information.

Thank you,

Tara

---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Tuesday, February 4, 2020 12:37 PM
**To:** Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Stephens, Andrew <andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>; Gdula, Kimberly <Kimberly.Gdula@oag.texas.gov>; Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>; Bingham,Joseph (HHSC) <Joseph.Bingham@hhsc.state.tx.us>; Lam,Taryn (HHSC) <Taryn.Lam@hhsc.state.tx.us>
**Cc:** dfowler@texasappleseed.net; Linda Brooke <lbrooke@texasappleseed.net>; Eileen Crummy <ecrummy@public-catalyst.com>; Lisa Taylor <ltaylor@public-catalyst.com>; Tim Ross <tross@actionresearchpartners.com>; Viveca Martinez <vmartinez@texasappleseed.net>; narrigona@texasappleseed.net; mannitto@public-catalyst.com
**Subject:** Comments on the CVS, CCI and CCL Draft Workload Standards/Guidance

> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Dear Commissioner and Counsel,

Thank you for submitting for our review and feedback the proposed CVS, CCI, and RCCL workload standards.  Our comments follow.

All Three Drafts:

 1. On Page 1 of the CVS and CCI draft workload standards, the drafts state, "These recommendations and guidelines are intended to be utilized as a mechanism in support of achieving the [] Caseload Standards. As nonbinding guidance in support of the Standards, the recommendations and instructions in this document should not be construed to apply to the extent the Standards are achieved." Similarly, on page 1 of the RCCL draft workload standards, the draft states, "These recommendations and guidelines are intended to be utilized as a mechanism in support of achieving the RCCL Workload Standards.  As non-binding guidance in support of the Standards, the recommendations and instructions in this document should not be construed to bind future practice to the extent the Standards are achieved."

We do not think this language will be clearly understood by the staff who are accountable for implementation.  Please consider deleting the second sentence and inserting the word "nonbinding" in front of "recommendations and guidelines."

2.  The three drafts do not provide adequate specific, measurable guidance.  More specific, measurable guidance will strengthen the guidance and better assist supervisors and Program Administrators in working toward the 14-17 workload standards.  Examples for each draft are discussed, below.

CVS draft Standards:

1.      The draft mentions a new report, "the CVS caseload report," which is to be used for internal monitoring of caseload standards. Please confirm whether this report is separate from the monthly CVS caseload data that is currently produced to the monitors.

2.      Beginning on Page 2, the draft shies away from providing measurable guidance to the field that would be useful to supervisors. Recognizing the Department's need to exercise discretion with caseload assignments, we think more specific, measurable guidance will strengthen the guidance to supervisors. We want to provide examples from pages 2-3 of the CVS Caseload Standards draft to make sure the point is clear. This section identifies various factors of case complexity that supervisors should take into consideration when assigning cases. The guidance in the document does not go beyond taking these factors into consideration, and is not sufficiently clear about the factors.  Consider:

•       Travel time: The Standards will be more useful to supervisors if DFPS provides more specific, measurable guidance, for example: "avoid assigning any caseworker more than two cases that require more than 60 minutes travel time."

•       New Caseworker: How does DFPS define a new caseworker, i.e., 12 months, 18 months? Is that universally understood by all supervisors?

•       Is a "less-complex case" defined by DFPS in the INSIGHT case complexity tool referenced on page 3? If not, how is it defined and how do supervisors know what constitutes a "less-complex case." If yes, please send us the formula for assessing case complexity.

•       What does "increased support" entail?

3.      There is a lack of measurable guidance concerning when to skip the wheel of assignments.  While the document lists factors to take into consideration, they don't list measurable criteria. In light of the guidelines around case assignment recited on pages 2-3, it is unclear how "rotation" on page 3 factors into workload assignment.  Please clarify and consider providing stronger guidance.

4.      From page 3, under "Reassignment of Cases," is there guidance around how long extended leave is?

5.      On page 4, the draft states, "Supervisors must always utilize the expertise of their Program Directors in the following circumstances." Please clarify whether supervisors are required to enlist their Program Director as these circumstances arise or only during the monthly staffings described below.

5.      On page 5, the draft states, "In order to determine the average daily caseload, supervisors should use the CVS caseload report." Please confirm that you intend here to use the word "daily" and not "monthly."

7.      On page 5, the draft references "Cases that require special handling." What kinds of cases are these? Where is that defined for supervisors receiving this guidance?

8.      On page 5, the draft references "an informal conference." How is that defined? How is that different from a "formal conference?" Where is that defined for supervisors receiving this guidance?

9.      On page 7, the draft states, "If there is not a perpetual posting in the region, upon notification of an upcoming vacancy, supervisors should notify TAG to ensure the position is posted quickly." Is there currently a required time frame for the posting?

CCI draft Standards:

1.  "Assigning Investigations" on page 3 of the draft includes travel as a factor to be considered, but does not include measurable guidance.  The workload study completed in 2017 indicated that of the entities reported on in the survey, 70 percent take between 30 minutes and 2 hours to reach one-way, and 10 percent take more than 2 hours to reach.  40 percent required more than an hour of travel,

one-way.  Travel is an important consideration in investigator workloads.  It is also an important consideration for Program Administrators' decision to reassign investigation to other units or regions (discussed on page 7).

2.  Complex Investigations (beginning on page 3 of draft): Problems similar to those discussed above, in the section regarding the CVS draft, exist with regard to the lack of specificity in the CCI discussion of complex investigations.  While there is discussion of INSIGHT as a workload management tool, the draft does not clearly indicate whether INSIGHT includes measures of case complexity for investigations.  If it does not assign weights to the different complexity factors described on pages 3-4, providing more specific, measurable guidance in this section of the caseload standard would assist supervisors in assigning investigations.

There are also additional measures of complexity that should be considered that are not listed in the draft, based on the workload study completed in 2017.  In that study, investigators reported several investigation characteristics that require more time:

•  The investigation is a Priority 1 (while the draft lists fatalities and near-fatalities as a consideration for complexity, not all Priority 1 investigations include a fatality or near-fatality);

•  There are allegations of sexual abuse;

•  The investigation regards an RTC.

More specific, measurable guidance would give supervisors some guidelines for the number of complex cases to assign an investigator.  For example, "Avoid assigning more than one Priority 1 investigation to any one investigator" or "Avoid assigning more than X cases involving multiple allegations, perpetrators, or victims to any one investigator."

3.  Removal from Rotation:  the draft states, "supervisors should determine an appropriate time to stop assigning new investigations." Because this section includes both temporary removals (based on FMLA or "extended leave," case

complexity, or other factors) as well as permanent removal due to staff leaving a position, please consider providing more specific guidance regarding when to stop assigning new cases to investigators who are leaving a position permanently.  Similarly, because FMLA may be planned in advance, please include specific recommendations regarding the lead up to FMLA – for example, "If FMLA is planned, begin tapering the assignment of new cases X months prior to the expected start of FMLA."

4.  Caseload for New Investigators: the draft indicates that supervisors may skip a new investigator in the assignment rotation during the first 60 days that an investigator is case assignable. Are new investigators immediately eligible for a full caseload as soon as they become caseload assignable?  Please consider more specific guidance for supervisors regarding caseloads for new investigators.

5.  Hiring: How is the decision to have a "perpetual posting" determined?  Is this left to the discretion of TAG, or Program Administrators?  If it is a decision made by Program Administrators (or if they can make the decision), providing specific guidance regarding when this is appropriate would be helpful, perhaps based on the number of positions that are historically vacant in a unit.

RCCL draft Standards:

1.  Under "Items to Consider When Assigning Tasks," the list fails to include specific, measurable goals.  It also fails to include specific, measurable goals related to the balance between the four tasks listed on the first page just above this section.

According to the workload report completed in 2017, inspectors reported spending about half their time on standards investigations, and approximately 23 percent of their time on monitoring inspections, despite the fact that inspectors' average daily caseloads included fewer standards investigations than operation inspections.  This suggests that standards investigations are more time consuming.  Specific, measurable guidance regarding a balanced assignment of the 4 tasks described on the first page would be helpful to supervisors making assignments.

More specific guidance should be given related to travel (see discussions above).

While the table in this section includes complexity measures related to operations, it does not include items specific to complex standards investigations.  Complexity measures for standards investigations – including the number of standards at issue, the weight of the standards at issue, the number of victims or perpetrators involved, the number of allegations involved, whether there are allegations of sexual abuse, and whether the entity being investigated is an RTC – should be added, along with specific, measurable guidance regarding assignment of complex investigations and operations.  The number of investigations that an investigator is providing technical assistance or follow-up in should also be considered during task assignments.

Furthermore, as described above, specific, measurable guidance should be given regarding the number of complex operations or investigations assigned.  For example, "avoid assigning more than X operations that are on a corrective action plan" or "avoid assigning more than one operation that serves children with specialized medical needs," etc.

2.  Under "Additional Guidance" on page 3:  The guidance instructs supervisors to skip an inspector if they are "well above the workload guideline."  Providing more specific, measurable guidance will insure supervisors consistently understand when they should skip an inspector.  For example, "if an inspector's caseload is X tasks above the guidelines, the inspector should be skipped for assignment if another inspector has a smaller workload."

3.  Under "Task to Reassign" – consider including language like that described above, that would taper assignments if a staff is planning FMLA or extended leave for a future date, or if they have given advance notice that they will leave permanently.

Please let us know if you have any questions about this. We look forward to hearing from you on this.

Kevin Ryan and Deborah Fowler

<Child Care Investigations - Caseload Guidelines.pdf>
<FC020_Resources_to_Support_RCCI_Targeted_Case_Ranges_and_Equitable_Workl....pdf>
<CPS Generally Applicable Internal Caseload Standards.pdf>
<RCCI Caseload Standards PowerPoint.pdf>
<CPS CVS Caseload Standards PowerPoint.pdf>
<CPS CVS Communication re Mandatory Training on Caseload Standards.pdf>
<CPS CVS Staff Communication 2.12.20.pdf>
<CPS CVS Staff Communication 2.14.20.pdf>



# Fwd: Secondary assignment question

1 message

---------- Forwarded message ---------
From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Fri, Feb 28, 2020 at 9:54 PM
Subject: RE: Secondary assignment question
To: Kevin Ryan <kevinmichaelryan1967@gmail.com>
Cc: Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, mannitto@public-catalyst.com <mannitto@public-catalyst.com>, Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>, Stephens, Andrew <andrew.stephens@oag.texas.gov>, Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>, dfowler@texasappleseed.net <dfowler@texasappleseed.net>, Lisa Taylor <ltaylor@public-catalyst.com>, Eileen Crummy <ecrummy@public-catalyst.com>, Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>

Kevin/Deborah,

Attached is the information you recently requested concerning secondary assignments. Please let us know if you have any additional questions.

Thank you,

Tara

---

**2 attachments**

**Secondary Assignments - RCCI 2.28.20.pdf**
73K

**Secondary Assignments - CVS 2.28.20.pdf**
140K

FN-559 Attachment I

RCCI policy does not directly address secondary assignments in IMPACT, and while staff may be familiar with the term "secondary assignment" or "secondary investigator," RCCI policy uses the term "designee." This is due to the program's use of CLASS to document investigations and the term "designee" historically being a term used for CLASS. A secondary assignment may be utilized when investigators are assisting with investigation tasks or when a trainee is assigned as a designee during basic skills training to perform basic tasks on investigations.

Per CCI Policy 1221, an investigator may be assigned as a designee (the IMPACT term would be secondary assignment or secondary investigator) to assist with the following:

### Inspectors and Investigators

A Licensing inspector or investigator may assign designee status to another Licensing inspector or investigator only for the purposes of:

- completing a specific task; or
- temporarily covering a caseload.

Once the specific task is completed, the designee status must be deactivated.

Examples of the tasks appropriate for assignment to a designee include:

a.  conducting courtesy interviews during an investigation;

b.  sharing inspection responsibilities, temporarily, for a vacant caseload; or

c.  completing other specific tasks assigned by a supervisor, manager, or district director.

Specific examples of tasks a designee or secondary investigator have completed include:
- Upload audio, external records, and photos into One Case
- Assist with Persons List merges (if needed)
- Access One Case externals for documentation into CLASS
- Review AP/OV history

Trainees may also be assigned as a secondary in IMPACT during basic skills training. This helps the investigator become familiar with the computer applications and job tasks they will be doing once they graduate from training. Trainees may assist in transcribing documentation such as incident reports, medical documents, or audio recordings, and uploading documents into OneCase.

Secondary Assignments – 2.28.2020

**INFORMATION REQUEST:**

**By February 28, 2020** detail how DFPS defines a secondary assignment, and what responsibilities are involved in the secondary assignment.

**RESPONSE:**

Secondary assignments are defined as actions performed by a caseworker on a case to which they are not assigned primary.

Conservatorship (CVS) caseworkers, who also have primary assignments, may be assigned secondary to cases requiring courtesy supervision. Courtesy supervision is required when:

- A parent resides outside of the child's legal region.
- A child or youth in conservatorship is placed outside of the region that has legal jurisdiction and is residing with a parent.
- A child or youth is placed in an adoptive home outside of the region that has legal jurisdiction. An adoption preparation worker is assigned as secondary.
- A child or youth is placed in Texas from another state.
- A child or youth is residing in a General Residential Operation for children with intellectual disabilities.*
- A child or youth is placed in an intermediate care facility for individuals with intellectual disabilities.*
- A child or youth is placed in a nursing home.*

*Note that children in the last 3 bullets may be served by Local Permanency specialists, developmental disability specialists and/or CVS caseworkers, depending on resources, workloads, geographical location and the child's needs.

In most cases, the duties performed by CVS workers providing courtesy supervision are brief and not extensive.

Examples of CVS caseworkers' responsibilities when providing courtesy supervision are detailed in the following policies:

6314.11 Courtesy Caseworker Responsibilities
6314     Services to Children and Parents Across Regional Lines
6314.1   Coordination Between Primary Caseworker and Courtesy Supervision Caseworker
6320     Conducting Visits with the Family
6413     Services to Children and Caregivers Across Regional Lines
6417     Supervising a Child Placed in Texas From Another State
6900     Adoption Preparation and Support Services

CVS caseworkers may also be assigned secondary when children or youth have been removed from their custodian by Child Protective Investigation, and the case has not yet been transferred to conservatorship. In general, cases are transferred to CVS after the Adversary Hearing.
Required tasks include:

- Review the case in IMPACT
- Review the case file

Secondary Assignments – 2.28.2020

- Contact other caseworkers to offer assistance and obtain information about the child and family.
- Notify required parties of caseworker's assignment and provide contact information
- Ensure all potential caregivers within the child's family, or designated by the parent, have been provided notice of CPS conservatorship

CVS caseworkers who are assigned primary for children in DFPS conservatorship may receive support from the following types of secondary workers assigned to their cases:

- Local Permanency specialist
- Courtesy supervision/adoption services (another CVS worker – see above)
- Protégé
- FAD worker
- KIN worker
- Special Investigator assigned when a child is missing
- Developmental disability specialist
- Immigration specialist
- Eligibility specialist
- FGDM (Family Group Decision Making) specialist
- Well-being specialists
- Nurse consultants
- Education specialists

Information can be provided, as needed, on any of the above-mentioned roles.

Local Permanency specialists are secondary caseworkers for children and youth in DFPS conservatorship placed outside the region that has legal jurisdiction. The Local Permanency specialist acts as an extension of the primary caseworker and aids the primary caseworker in ensuring that the child or youth's needs for safety and well-being are being met. Local Permanency specialists are not generally primary on any cases. The Local Permanency specialist also works to ensure that the child or youth achieves permanency. The roles of Local Permanency specialists are to:

- Ensure that children and youth in out-of-region placements are seen at least monthly and that most of the visits occur in the child's home.
- Assess a home or facility's safety and appropriateness.
- Increase the child's sense of support and stability.
- Allow for a quick response to a child in crisis.
- Ensure that case planning activities are communicated to:
  - The placement
  - The child or youth.
  - The legal region (the region that holds legal jurisdiction).

Additional information about Local Permanency specialists is available in the CPS Handbook Section 6414[1].

---

[1] The CPS Handbook Section 6414 is available online at https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_6400.asp#CPS_6414 (last accessed February 28, 2020).

**Megan Annitto**

| | |
|---|---|
| **From:** | Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> |
| **Sent:** | Monday, March 2, 2020 5:19 PM |
| **To:** | Kevin Ryan |
| **Cc:** | Masters,Jaime D (DFPS); Carmical,Audrey (DFPS); Roper,Tiffany (DFPS); Megan Annitto; Harris,Rand S (DFPS); Stephens, Andrew; Kintzer,Corey D (HHSC); dfowler@texasappleseed.net; Lisa Taylor; Eileen Crummy; Levy,Leslie M (DFPS) |
| **Subject:** | RE: Secondary assignment question |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Kevin,

We are working with CPS program and Data and Systems Improvement staff to provide data/information in response to your question below. We should be able to provide this data/information by Monday, March 16, 2020.

Thank you,

Tara

---

**From:** "Kevin Ryan" <kevinmichaelryan1967@gmail.com>
**Date:** Monday, March 2, 2020 at 11:04:05
**To:** "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Cc:** "Masters,Jaime D (DFPS)" <Jaime.Masters@dfps.state.tx.us>, "Carmical,Audrey (DFPS)" <Audrey.Carmical@dfps.state.tx.us>, "Roper,Tiffany (DFPS)" <Tiffany.Roper@dfps.state.tx.us>, "mannitto@public-catalyst.com" <mannitto@public-catalyst.com>, "Harris,Rand S (DFPS)" <Rand.Harris@dfps.state.tx.us>, "Stephens, Andrew" <andrew.stephens@oag.texas.gov>, "Kintzer,Corey D (HHSC)" <Corey.Kintzer@hhsc.state.tx.us>, "dfowler@texasappleseed.net" <dfowler@texasappleseed.net>, "Lisa Taylor" <ltaylor@public-catalyst.com>, "Eileen Crummy" <ecrummy@public-catalyst.com>, "Levy,Leslie M (DFPS)" <Leslie.Levy2@dfps.state.tx.us>
**Subject:** Re: Secondary assignment question

> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Tara,

The attached DFPS document reports that "In most cases, the duties performed by CVS workers providing courtesy supervision are brief and not extensive." Please send us the data/data reports DFPS is using for this analysis.

Our interviews with caseworkers and our reviews in Impact indicate that secondary assignments can be quite extensive and ongoing in numerous instances. Does DFPS track the amount of time required for secondary assignments?

Kevin Ryan

On Feb 28, 2020, at 10:54 PM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

Kevin/Deborah,

Attached is the information you recently requested concerning secondary assignments. Please let us know if you have any additional questions.

Thank you,

Tara

---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Thursday, February 27, 2020 11:20 AM
**To:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Cc:** Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>; mannitto@public-catalyst.com; Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Stephens, Andrew <andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>; dfowler@texasappleseed.net; Lisa Taylor <ltaylor@public-catalyst.com>; Eileen Crummy <ecrummy@public-catalyst.com>; Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>
**Subject:** Re: Secondary assignment question

> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Thank you Tara

Kevin Ryan

> On Feb 27, 2020, at 11:13 AM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:
>
> Hi Kevin,
>
> We are working toward the delivery date requested in your email below. So far, we appear to be on target; however, if that changes, I will be in touch with an estimated delivery date.
>
> Thank you,
>
> Tara
>
> ---
>
> **From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
> **Sent:** Thursday, February 27, 2020 10:24 AM
> **To:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>

**Cc:** Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>; Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>; Roper,Tiffany (DFPS)
<Tiffany.Roper@dfps.state.tx.us>; mannitto@public-catalyst.com; Harris,Rand S (DFPS)
<Rand.Harris@dfps.state.tx.us>; Stephens, Andrew <andrew.stephens@oag.texas.gov>;
Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>;
dfowler@texasappleseed.net; Lisa Taylor <ltaylor@public-catalyst.com>; Eileen Crummy
<ecrummy@public-catalyst.com>; Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>
**Subject:** Re: Secondary assignment question

---

**WARNING:** This email is from outside the DFPS system. Do not click on links or
attachments unless you expect them from the sender and know the content is
safe.

---

Tara,

Do you have a target date when you'll be sending this information?

Kevin Ryan

> On Feb 21, 2020, at 9:11 AM, Olah,Tara (DFPS)
> <Tara.Olah@dfps.state.tx.us> wrote:
>
> Kevin,
>
> We are working with CCI and CPS staff to address your inquiry and will
> get back to you as soon as possible with the information you have
> requested.
>
> Thank you,
>
> Tara
>
> **From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
> **Sent:** Friday, February 21, 2020 8:38 AM
> **To:** Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>;
> Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>;
> Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>; Olah,Tara
> (DFPS) <Tara.Olah@dfps.state.tx.us>; mannitto@public-catalyst.com;
> Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Stephens, Andrew
> <andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC)
> <Corey.Kintzer@hhsc.state.tx.us>; dfowler@texasappleseed.net; Lisa
> Taylor <ltaylor@public-catalyst.com>; Eileen Crummy
> <ecrummy@public-catalyst.com>
> **Subject:** Secondary assignment question

**WARNING:** This email is from outside the DFPS system. Do not
click on links or attachments unless you expect them from the
sender and know the content is safe.

Dear Commissioner and Counsel,

The caseload data for CVS workers indicates that secondary assignments are prevalent among the workforce. It appears some CCI investigators also have secondary assignments. Our field interviews with CVS staff, so far, indicate some types of secondary assignments can be quite robust.

Would you please detail to us by February 28, 2020 how DFPS defines a secondary assignment and what responsibilities are involved in the secondary assignment. We would like to understand this information and evaluate it as we conduct our next rounds of interviews with CVS caseworkers and CCI investigators.

Kevin

<Secondary Assignments - RCCI 2.28.20.pdf>
<Secondary Assignments - CVS 2.28.20.pdf>

## Megan Annitto

| | |
|---|---|
| **From:** | Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> |
| **Sent:** | Monday, March 16, 2020 10:53 PM |
| **To:** | Kevin Ryan |
| **Cc:** | Masters,Jaime D (DFPS); Carmical,Audrey (DFPS); Roper,Tiffany (DFPS); Megan Annitto; Harris,Rand S (DFPS); Stephens, Andrew; Kintzer,Corey D (HHSC); dfowler@texasappleseed.net; Lisa Taylor; Eileen Crummy; Levy,Leslie M (DFPS) |
| **Subject:** | RE: Secondary assignment question |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Kevin,

At this time, we do not have a way of tracking aggregate data on time spent on secondary assignments. However, supervisors are aware of and use information concerning the duration/complexity of CVS caseworkers' current secondary assignments when assigning primary cases. Although we cannot presently track aggregate data on time spent on secondary assignments, we have the average number of days secondary assignments remain on a CVS caseworker or supervisor's workload. Statewide, average timeframes for all secondary assignments for all SUB stages are as follows:  CVS caseworker (86 days) and CVS supervisor (187 days). Since most conservatorship stages are open 12-18 months at a minimum, average timeframes for all secondary assignments for all SUB stages are considerably shorter than the average substitute care case time. Likewise, variation in duration/complexity exists across secondary assignments (e.g., setting up services, making visits), with some activities requiring more extensive involvement than others. However, secondary workers (aka local permanency specialists or LPS) are exclusively required to complete and document those tasks, and they do not have the significant additional responsibilities of a primary CVS caseworker, including notification and coordination of parties, and court reports and hearings, among others. Finally, CVS caseworkers who have secondary assignments on their workload may also have workers assigned secondary to complete certain tasks on their primary caseload, which effectively equalizes workloads.

Thank you,

Tara

---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Monday, March 16, 2020 3:43 PM
**To:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Cc:** dfowler@texasappleseed.net; mannitto@public-catalyst.com
**Subject:** Re: Secondary assignment question

---

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

---

That's fine Tara as long as it doesn't delay your response on secondary assignments, which I believe is coming today. If it delays your response, please treat them as distinct.

Kevin Ryan

On Mar 16, 2020, at 4:39 PM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

Hi Kevin,

I saw your email of this morning which was directed to Rand and pertains to the CVS caseload methodology and questions concerning CVS caseworkers' time spent on non-caseload carrying functions. As your inquiry of 3.2.20 pertaining to secondary assignments appears directly related to today's broader inquiry, we would like to address your inquiry of 3.2.20 within our response to the inquiry you submitted to Rand today. Please let us know if you have any concerns with this requested approach.

Thank you,

Tara

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Monday, March 2, 2020 4:21 PM
**To:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Subject:** Re: Secondary assignment question

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Thank you Tara

On Mon, Mar 2, 2020 at 5:19 PM Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

Kevin,


We are working with CPS program and Data and Systems Improvement staff to provide data/information in response to your question below. We should be able to provide this data/information by Monday, March 16, 2020.


Thank you,


Tara


**From:** "Kevin Ryan" <kevinmichaelryan1967@gmail.com>
**Date:** Monday, March 2, 2020 at 11:04:05
**To:** "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Cc:** "Masters,Jaime D (DFPS)" <Jaime.Masters@dfps.state.tx.us>, "Carmical,Audrey (DFPS)"

<Audrey.Carmical@dfps.state.tx.us>, "Roper,Tiffany (DFPS)"
<Tiffany.Roper@dfps.state.tx.us>, "mannitto@public-catalyst.com" <mannitto@public-catalyst.com>, "Harris,Rand S (DFPS)" <Rand.Harris@dfps.state.tx.us>, "Stephens, Andrew"
<andrew.stephens@oag.texas.gov>, "Kintzer,Corey D (HHSC)"
<Corey.Kintzer@hhsc.state.tx.us>, "dfowler@texasappleseed.net"
<dfowler@texasappleseed.net>, "Lisa Taylor" <ltaylor@public-catalyst.com>, "Eileen
Crummy" <ecrummy@public-catalyst.com>, "Levy,Leslie M (DFPS)"
<Leslie.Levy2@dfps.state.tx.us>
**Subject:** Re: Secondary assignment question

---

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

---

Tara,

The attached DFPS document reports that "In most cases, the duties performed by CVS workers providing courtesy supervision are brief and not extensive." Please send us the data/data reports DFPS is using for this analysis.

Our interviews with caseworkers and our reviews in Impact indicate that secondary assignments can be quite extensive and ongoing in numerous instances. Does DFPS track the amount of time required for secondary assignments?

Kevin Ryan

> On Feb 28, 2020, at 10:54 PM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

> Kevin/Deborah,

> Attached is the information you recently requested concerning secondary assignments. Please let us know if you have any additional questions.

> Thank you,

Tara

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Thursday, February 27, 2020 11:20 AM
**To:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Cc:** Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>; Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>; Roper,Tiffany (DFPS)
<Tiffany.Roper@dfps.state.tx.us>; mannitto@public-catalyst.com; Harris,Rand S (DFPS)
<Rand.Harris@dfps.state.tx.us>; Stephens, Andrew
<andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC)
<Corey.Kintzer@hhsc.state.tx.us>; dfowler@texasappleseed.net; Lisa Taylor
<ltaylor@public-catalyst.com>; Eileen Crummy <ecrummy@public-catalyst.com>;
Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>
**Subject:** Re: Secondary assignment question

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Thank you Tara

Kevin Ryan

On Feb 27, 2020, at 11:13 AM, Olah,Tara (DFPS)
<Tara.Olah@dfps.state.tx.us> wrote:

Hi Kevin,

We are working toward the delivery date requested in your email
below. So far, we appear to be on target; however, if that changes, I
will be in touch with an estimated delivery date.

Thank you,

Tara

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Thursday, February 27, 2020 10:24 AM
**To:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Cc:** Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>;
Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>;
Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>;
mannitto@public-catalyst.com; Harris,Rand S (DFPS)
<Rand.Harris@dfps.state.tx.us>; Stephens, Andrew
<andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC)
<Corey.Kintzer@hhsc.state.tx.us>; dfowler@texasappleseed.net; Lisa
Taylor <ltaylor@public-catalyst.com>; Eileen Crummy
<ecrummy@public-catalyst.com>; Levy,Leslie M (DFPS)
<Leslie.Levy2@dfps.state.tx.us>
**Subject:** Re: Secondary assignment question

> **WARNING:** This email is from outside the DFPS system. Do not
> click on links or attachments unless you expect them from the
> sender and know the content is safe.

Tara,

Do you have a target date when you'll be sending this
information?

Kevin Ryan

> On Feb 21, 2020, at 9:11 AM, Olah,Tara (DFPS)
> <Tara.Olah@dfps.state.tx.us> wrote:

> Kevin,

We are working with CCI and CPS staff to address your inquiry and will get back to you as soon as possible with the information you have requested.

Thank you,

Tara

---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Friday, February 21, 2020 8:38 AM
**To:** Masters,Jaime D (DFPS) <Jaime.Masters@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; mannitto@public-catalyst.com; Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Stephens, Andrew <andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>; dfowler@texasappleseed.net; Lisa Taylor <ltaylor@public-catalyst.com>; Eileen Crummy <ecrummy@public-catalyst.com>
**Subject:** Secondary assignment question

> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Dear Commissioner and Counsel,

The caseload data for CVS workers indicates that secondary assignments are prevalent among the workforce. It appears some CCI investigators also have secondary assignments. Our field interviews with CVS staff, so far, indicate some types of secondary assignments can be quite robust.

Would you please detail to us by February 28,
2020 how DFPS defines a secondary
assignment and what responsibilities are involved
in the secondary assignment. We would like to
understand this information and evaluate it as we
conduct our next rounds of interviews with CVS
caseworkers and CCI investigators.


Kevin

<Secondary Assignments - RCCI 2.28.20.pdf>

<Secondary Assignments - CVS 2.28.20.pdf>



# Fwd: HHSC's Data Production

1 message

**From:** "Townsend,Frances R (HHSC)" <Frances.Townsend@hhsc.state.tx.us>
**Date:** November 15, 2019 at 6:02:18 PM EST
**To:** Kevin Ryan <kevinmichaelryan1967@gmail.com>, "dfowler@texasappleseed.net" <dfowler@texasappleseed.net>
**Cc:** "Harris,Russ (HHSC)" <Russ.Harris@hhsc.state.tx.us>, "Hilton, Christopher" <Christopher.Hilton@oag.texas.gov>
**Subject: HHSC's Data Production**

Good Evening, Kevin and Deborah,

Thank you very much for the additional time for HHSC to supplement its November 1st data production and to create the attached data production chart.  All information has been posted to the SharePoint site.  Please let me know if I can assist in any way.

Respectfully,

Frances

**Frances Townsend** | Attorney

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-424-6926

www.hhs.texas.gov | www.dshs.texas.gov

This message may contain confidential information.  If you received this message in error, please notify me immediately and then delete the message.

**3 attachments**

image001.gif
1K



**image002.png**
38K



**HHSC_Data_Response_Chart.pdf**
373K

## November 15, 2019

## HHSC'S DATA PRODUCTION CHART IN RESPONSE TO

## SEPTEMBER 30TH DATA AND INFORMATION REQUEST

## I.   MONITORS' DATA AND INFORMATION REQUEST
### Injunction or Remedial Relief Related to HHSC: 15 – 19

15. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.

16. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.

17. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

18. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.

19. Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.

| Injunctions: 15 – 19 (Request 1) | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 1**<br>Provide a list of all referrals received by DFPS and HHSC | 11/1/19, and monthly thereafter | RO.15-19.1 Ref.Maltr. | **Request 1 - DRIT: 95929**<br>For July 31, 2019 through September 30, 2019**,** HHSC can provide a list of |

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| | | | |
|---|---|---|---|
| between July 31, 2019 and September 30, 2019, via phone call, website, fax, regular mail and any other manner in which the referent expresses concern about child maltreatment regarding any and all PMC children in the General Class, regardless of placement type and licensure status, and provide same on a monthly basis thereafter. For October 2019, the report will be due November 15, 2019, and so forth.<br><br>The list shall include the identification number of the referral; the PMC child identifier(s) linked to the referral; the date of the call/communication; the disposition of the report by Statewide Intake (where referred, whether it was classified as an intake or information and referral, and the priority assigned); the date and manner of notification to | *Supplement 11/15<br><br>11/15/2019, *Due 12/6/19 | | all referrals received by HHSC which the referent expresses concern about child maltreatment regardless of placement type and licensure status, including:<br><br>1. the identification number of the referral;<br><br>2. the date of the call/communication;<br><br>3. the disposition of the report by Statewide Intake (where referred, whether it was classified as an intake or information and referral, and the priority assigned); and<br><br>4. the disposition of the report by RCCL, including whether it was referred for an abuse and neglect investigation, a minimum standards investigation, the priority assigned to the investigation, and any other information with regard to how the state addressed or planned to address the report.<br><br>**Information HHSC Cannot Provide** |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

| | | | |
|---|---|---|---|
| the child's primary caseworker of the allegations; and the disposition of the report by the office/division to which it is referred (CCI, RCCL, CPI, etc.) including whether it was referred for an abuse and neglect investigation, a minimum standards investigation, the priority assigned to the investigation, and any other information with regard to how the state addressed or planned to address the report. | | | 1. The list shall not include the PMC child identifier(s) linked to the referral and<br><br>2. the date and manner of notification to the child's primary caseworker of the allegations.<br><br>**The reason why HHSC Cannot Provide Information**<br><br>1. The agency is operations-centric not child centric. CLASS does not contain the PMC identifier of children involved in a referral; the PMC identifier is only associated with referrals of abuse or neglect in IMPACT.<br><br>2. RCCL does not have requirements for notifying the child's caseworker during a non-abuse/neglect investigation. |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

| **Injunctions: 15 – 19 (Request 2)** | **Production Due Date** | **File Name** | **Information HHSC Can Provide** |
|---|---|---|---|
| **Request 2**<br><br>For all investigations, including all those conducted by CCI, CCL, CPI etc. regarding any child in the PMC General Class initiated between July 31, 2019 and September 30, 2019, identify in a report due November 15, 2019: the manner of initiation (action taken that triggered the start of the investigation); the county where the maltreatment is alleged; the date/time of face to face contact with the alleged victim(s) (as applicable) noting any and all untimely face to face contacts and the reason for any approved extensions to the face to face contact timeframe; the relationship(s) of the alleged perpetrator(s) to the alleged child-victim(s); the child's placement type at the time of the alleged maltreatment; the | 11/15/19, and quarterly thereafter, *Extended to 12/06/19<br><br>2/15/2020<br><br>5/15/2020<br><br>8/15/2020<br><br>*Continue Annually | RO.15-19.2 RCCL.Inspec. | **Request 2** - **DRIT: 95930**<br><br>HHSC will respond to this data request on or before 12/06/2019 |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

| | | | |
|---|---|---|---|
| placement/provider identification number; the referral identification number; the investigation identification number; the name and identification number of the assigned investigator.<br><br>Provide the date/time the investigation was launched and, if applicable, completed; the date documentation of completion was entered in IMPACT; the reason for all approved extensions to the investigation completion date/time (when applicable); the date the completed investigation was submitted to the supervisor for approval; the date the supervisor approved the investigation; the disposition of each allegation; the overall disposition of the investigation; the date of any notification letters to parents, providers, and/or referents.<br><br>Report quarterly thereafter. | | | |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

## II.   MONITORS' DATA AND INFORMATION REQUEST

### Injunction or Remedial Relief Related to HHSC: 20

20. Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

| Injunction 20 (Request 1) | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 1**<br><br>A detailed description of how RCCL defines a pattern of contract or policy violations. Provide the policy or protocol, if any, used to instruct decisions about whether a pattern of contract or policy violations exists for child care placement facilities. | 11/1/19<br><br><br>*No future deadline | RO.20.1<br><br>Pol.Viol. | **Request 1**<br><br>HHSC provided the information on November 1, 2019, on its SharePoint. |

11/15/2019

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| Injunction 20 (Requests 2 – 7) | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 2**<br><br>A list of all licensed placements, excluding agency foster homes, inspected over the last three years, starting from September 30, 2016 through September 30, 2019. The list should identify whether the inspection was announced or unannounced; all deficiencies cited during the inspection; any follow up inspections and the results of those inspections; any enforcement taken (including warning letters) as a result of a cited deficiency; the placement/provider name and identification number and county; agency responsible for the placement; number of beds;<br><br>And name of the facility. | 11/1/19<br>(first data uploaded),<br>*Supplement 11/15/19<br><br>*No future reports requested | RO.20.2<br>List.Inspec. | **Request 2**<br>**DRIT 95932**<br>**DRIT 95940**<br>**DRIT 95965**<br>HHSC can provide the following information about the list of all licensed placements, excluding agency foster homes, inspected over the last three years, starting from September 30, 2016 through September 30, 2019:<br><br>1. the inspection was announced or unannounced;<br><br>2. all deficiencies cited during the inspection;<br><br>3. any follow up inspections and the results of those inspections;<br><br>4. all deficiencies that led to the enforcement action;<br><br>5. the placement/provider name and identification number and county; |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

| | | | |
|---|---|---|---|
| Include the CLASS Risk Review Enforcement Recommendations, and, if an alternative to the recommended enforcement was chosen, the reason for the alternative. | | | 6. licensed capacity;<br><br>7. name of the facility; and<br><br>8. the CLASS Risk Review Enforcement Recommendations, and, if an alternative to the recommended enforcement was chosen, the reason for the alternative.<br><br>**Information HHSC cannot provide**<br><br>1. The list shall not include the agency responsible for placement.<br><br>**The reason why HHSC Cannot Provide Information**<br><br>Since the purpose of CLASS is to track information about an operation that RCCL regulates, CLASS does not contain placement information about children. |

11/15/2019

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| **Request 3**<br><br>For the same time period, all requests by an operation for Licensing to review a policy, and the results of the request. | 11/1/19<br><br>*No future reports requested | RO.20.3<br>Req.Op.Rev.Pl | **Request 3**<br><br>**Information HHSC Cannot Provide**<br><br>The list shall not include for the same time period, all requests by an operation for Licensing to review a policy, and the results of the request.<br><br>**The reason why HHSC Cannot Provide Information**<br><br>RCCL does not have a process in place to track when an operation requests licensing to review an operation's policy. |
| **Request 4**<br><br>For the same time period, all risk analyses performed pursuant to the process described in section 4800 et seq. of the HHSC Child Care Licensing Policy and Procedures Handbook, and any action taken as a result of the analysis. | 11/1/19<br><br>*No future reports requested | RO.20.4<br><br>Risk.Analysis | **Request 4**<br><br>This information is contained in the Performance Management Unit Reports on HHSC's SharePoint site. |

11/15/2019

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| Request 5 | | | Request 5 |
|---|---|---|---|
| For the same time period, a list of all agency foster homes inspected. The list should indicate the date of the inspection(s); whether the home was inspected due to random sampling or because some other event triggered the inspection; whether the inspection was announced or unannounced; any deficiencies cited as a result of the inspection; any immediate hazards reported; and any enforcement action taken by the CPA or RCCL. The list should include the placement/provider name; the unique foster home identification number; the date the home was opened; the date the home was closed (if applicable); contact information for the home; the home's county; and the agency responsible for the foster home, with contact information for the agency. | 11/1/19 (first data uploaded) *Supplement 11/15/19 *No future reports requested | RO.20.5 List.Ag.Fst.Hm | **DRIT 95931** **DRIT 95932** HHSC can provide the following information about the list of all agency foster homes inspected: 1. the date of the inspection(s); 2. whether the home was inspected due to random sampling or because some other event triggered the inspection; 3. whether the inspection was announced or unannounced; 4. any deficiencies cited as a result of the inspection; and 5. name and contact information for the CPA and agency home. **Information HHSC Cannot Provide** The list shall not include any enforcement action taken by the CPA or RCCL. |

11/15/2019

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| | | | The reason why HHSC Cannot Provide Information |
|---|---|---|---|
| | | | RCCL does not require a CPA to report to CCL any action the CPA takes on a foster home; RCCL takes enforcement actions on CPAs, not foster homes. |
| **Request 6**<br><br>For the same time period, all documentation of monitoring plans or corrective actions taken by the State (either by DFPS or RCCL) as a result of heightened contract or licensing monitoring or enforcement. | 11/1/19<br><br>(first data uploaded)<br><br>*Supplement 11/15/19<br><br><br>*No future reports requested | RO.20.6<br><br>Lic.Mon.Enf. | **Request 6**<br><br>**DRIT 95965**<br><br>**DRIT 95966**<br><br>HHSC can provide all corrective action plans and expedited monitoring. |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

| Request 7 | 11/1/19 | RO.20.7 | Request 7 |
|---|---|---|---|
| For the same time period, a list of all child care placements that includes any and all allegations of contract violations, policy violations, minimum standards violations, or abuse and neglect, including the nature of the allegation and specific standard, policies, or contractual provisions allegedly violated; whether the allegation was substantiated; and any enforcement or corrective action taken. | (first data uploaded) *Supplement 11/15/19 *No future reports requested | Min.Stand.Def. | **DRIT: 95932** HHSC can provide a list of all minimum standards deficiencies cited for an operation that lead to the enforcement action. **Information HHSC Cannot Provide** The list shall not include any contract violations or policy violations. **The reason why HHSC Cannot Provide Information** RCCL can provide a list of minimum standard violations, but does not track contract or policy violations. |

11/15/2019

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| Injunction 20 (Request 8) | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 8**<br><br>Starting July 31, 2019 through September 30, 2019, and on a quarterly basis thereafter, a report that includes a list of all restraints and/or Emergency Behavior Interventions (EBI) disaggregated by placement. The report shall include placement/provider name, identification number, county, contact information, and, if a foster home, the agency responsible; type of restraint or EBI; date of incident; reason for restraint or EBI; name of child(ren) involved, along with identification number, date of birth, and race/ethnicity/gender of the child.<br><br>Identify all situations in which the child sustained an injury and all situations in which the child | 11/1/19 (first data uploaded) *Supplement 11/15/19<br><br>11/15/19, and quarterly basis thereafter, extended to 12/6/19<br><br>2/15/20<br><br>5/15/2020<br><br>8/15/2020<br><br>*Continue Annually | RO.20.8 List.EBI | **Request 8**<br>**DRIT: 95935**<br>HHSC can provide a report that includes a list of all restraints and/or Emergency Behavior Interventions (EBI) disaggregated by placement. The report will include<br><br>1. the operation name and number;<br><br>2. operation contact information (**PLEASE NOTE this is confidential information by law**); and<br><br>3. the type of restraint or EBI.<br><br>**Information HHSC Cannot Provide**<br><br>1. The list shall not include the name of child(ren) involved, along with identification number, date of birth, and race/ethnicity/gender of the child;<br><br>2. Identify all situations in which the child sustained an injury and all situations in which the child required medical attention as a result of the restraint or EBI; and |

11/15/2019

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| required medical attention as a result of the restraint or EBI | | | 3. the reason for punishment, and placement. **The reason why HHSC Cannot Provide Information** 1. RCCL requires an operation to report aggregate numbers of emergency behavior interventions used at the operation on a quarterly basis.  This aggregate information is being provided.  However, RCCL does not require operations to report every instance of an EBI to RCCL, therefore RCCL does not have the name of each child who received an EBI, or the accompanying requested demographic information. 2. Since RCCL does not require operations to report each instance of an EBI used at the operation, RCCL cannot identify all situations in which a child sustained an injury or required medical attention as a result of an EBI. 3. RCCL is providing a list of all minimum standard violations, including violations for prohibited forms of punishment, however, RCCL does not capture the reason for punishment in the CLASS system. |
| --- | --- | --- | --- |

11/15/2019

DATA PRODUCTION CHART

NOVEMBER 15, 2019

## III.   MONITORS' DATA AND INFORMATION REQUEST
### Injunction or Remedial Relief Related to HHSC: 21

21. Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.

| Injunction 21 (Request 1) | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 1**<br><br>Provide the number of placement licenses that have been revoked by the State over the last five years through September 30, 2019 and reasons for revocation. | 11/1/19 (first data uploaded)<br><br>*Supplement 11/15/19<br><br>*No future deadlines | RO.21.1<br><br>Hist.Licen.Rev | **Request 1**<br><br>- RCCL has not revoked the licenses of any placements in the last 5 years.<br><br>- RCCL is producing denials of licenses for prospective operations. |

| Injunction 21 (Request 2) | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 2**<br><br>Going forward, provide the names of placements under consideration for revocation or suspension, prior to a final decision, including the reason(s) for such consideration. Immediately upon suspension or revocation of a license, provide the | Continuous | RO.21.2<br><br>Lic.Rev. [Dated and named as appropriate due to the ongoing nature of this particular request] | **Request 2**<br><br>HHSC will provide both types of requested information when such situations arise per the production due date. |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

| | | | |
|---|---|---|---|
| name of the placement; identification number; county; contact information; the agency responsible; and reasons for revocation or suspension. | | | |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

## IV.   MONITORS' DATA AND INFORMATION REQUEST
### Injunction or Remedial Relief Related to HHSC: 22

22. Effective immediately, RCCL, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements. During inspections, RCCL, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.

| Injunction 22 (Request 1) | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 1**<br><br>Starting July 31, 2019 through September 30, 2019, and updated quarterly thereafter, provide:<br><br>For each item below include the name of the placement; identification number; county; contact information; and the agency responsible.<br><br> (1) All reports RCCL has sent or sends to DFPS related to failure to report abuse or neglect. | 11/1/19<br><br>11/15/19 and quarterly thereafter, *Extended to 12/6/19<br><br>2/15/20<br><br>5/15/2020 | RO.22.1 Rep.ANE.To.DFPS | **Request 1**<br><br>HHSC provided this information on 11/1/19.<br><br>HHSC will produce the next information on 12/6/19 |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

|  | 8/15/2020<br><br>*Continue Annually |  |  |
|--|--|--|--|

11/15/2019

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| Injunction 22 (Request 3) | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 3**<br><br>Starting July 31, 2019 through September 30, 2019, and updated quarterly thereafter, provide:<br><br>For each item below include<br>1. the name of the placement;<br>2. identification number;<br>3. county;<br>4. contact information; and<br>5. the agency responsible.<br><br>(3) Reports of punishments used on a PMC youth that are prohibited by TAC 749.1953 or 749.1957, disaggregated by type of punishment, reason for punishment, and placement. | 11/1/19 (first data uploaded)<br><br>*Supplement 11/15/19<br><br>11/15/19, and quarterly thereafter, **\*Extended to 12/6/19**<br><br>2/15/20<br><br>5/15/2020<br><br>8/15/2020<br><br>*Continue Annually | RO.22.3 Rep.Punish | **Request 3**<br>**DRIT: 95932**<br>HHSC can provide information on operations that have violated the applicable minimum standards, including<br><br>1. the name of operation;<br><br>2. identification number;<br><br>3. county; and<br><br>4. contact information (**Please note this information is confidential by law**).<br><br>**Information HHSC Cannot Provide**<br><br>1. The list will not include the reason for punishment, and placement.<br><br>**The reason why HHSC Cannot Provide Information**<br><br>1. RCCL is providing a list of all minimum standard violations, including violations for prohibited forms of punishment, however, RCCL |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

|  |  |  | does not capture the reason for punishment in the CLASS system. |
|---|---|---|---|

11/15/2019

# V.   LIST OF REPORTS TO HEALTH & HUMAN SERVICES OMBUDSMAN

Remedial Order: A6 Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or wellbeing and document the same in the child's electronic case record.

| Remedial Order: A6 | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| For the period August 31, 2019 to September 30, 2019, and on a quarterly basis thereafter, provide a list of all reports made by children in the General Class to the Texas Health and Human Services Ombudsman and/or any person(s) designated by the State as the "appropriate point of contact for reporting issues relating to abuse or neglect" and the disposition of those referrals. If the report is received through a point of contact | 11/1/19, extended to 11/13/19

11/15/19, Quarterly thereafter, extended to 12/6/19


2/15/20 | RO.A6.1

Ombuds.Q4.2019 [or dated as appropriate for that quarter] | On 11/13/19, HHSC uploaded de-identified reports made by children in the General Class to the Texas Health and Human Services Ombudsman and for the period August 31, 2019 to September 30, 2019.

HHSC will upload the reports made from October 1, 2019 to October 31, 2019 on 12/6/2019. |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

| | | | |
|---|---|---|---|
| other than the Ombudsman, please so indicate. Identify for each report, the reporting child's name; date of birth; identification number; county; agency responsible for the placement; placement name and identification number. If referred for investigation, identify the status of the investigation and the investigation number. | 5/15/2020<br><br>8/15/2020<br><br>*Continue Annually | | |

11/15/2019

# VI.  CASEWORKER WORKLOAD STUDY PROVISIONS

### Injunction or Remedial Relief Related to HHSC: B1

B1. Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.

| Request/Report: B1 | Production Due Date | File Name | Information HHSC Can Provide |
|---|---|---|---|
| **Request 1**<br><br>Provide a report with caseloads for staff, including any supervisors, and any other staff who conduct investigations involving any PMC child. The report will be a point in time caseload for November 1, 2019 and is due by November 15, 2019; then for December 1, 2019 due by December 15, 2019; and so forth monthly thereafter. The reports | **Monthly**<br><br>11/15/19<br><br>12/15/19<br><br>1/15/20<br><br>Continue annually | RO.B1 Caseloads | RCCL regulates and licenses operations, not PMC child investigations.<br><br>HHSC can provide a list of RCCL inspectors whose caseloads involve evaluation of an operation's compliance with minimum standards to ensure the safety of children. |

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| | | | |
|---|---|---|---|
| must include all staff who investigate maltreatment involving any child in the PMC class, and detail their caseloads; the number and percent of staff with caseloads within, below and over the relevant guideline once established, by office, by county, and statewide; the identification number and location of all individual staff; include caseloads for staff, as defined above, who spend part-time in investigative functions and part-time in other functions and so note. Identify all staff subject to a graduated caseload and so note. Provide individual fields for every type of case that the staff carries. Identify for each staff all non-case carrying work that impacts capacity. Identify by total at the bottom of the report the total number of supervisors carrying a case.  Identify all secondary assignments for each staff. The report shall include the number of investigations assigned to each worker and identify each investigation by number. The report shall identify the number of children involved in each investigation; the supervisor name and identification number; title of investigating staff; | | | |

11/15/2019

**DATA PRODUCTION CHART**

**NOVEMBER 15, 2019**

| | | | |
|---|---|---|---|
| and the county location of investigating staff. The report shall provide the identification number for each child linked to an identified investigation. | | | |

11/15/2019

# VII. CASEWORKER WORKLOAD STUDY PROVISIONS

### Injunction or Remedial Relief Related to HHSC: B2 – B4

**B2:** Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.

| Request/Report: B2 | Production Due Date | File Name | Status |
|---|---|---|---|
| **Request 2**<br>Complete workload study | Per consultation with monitors | Per consultation with monitors | **Request 2**<br>Pending submission from the State. |

**B3:** Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.

| Request/Report: B3 | Production Due Date | File Name | Status |
|---|---|---|---|
| **Request 3**<br>Establish internal guidelines for RCCL inspectors for caseload ranges based | Per consultation | Per consultation | **Request 3**<br>Pending submission from the State. |

DATA PRODUCTION CHART

NOVEMBER 15, 2019

| | | | |
|---|---|---|---|
| on the workload study. | with monitors | with monitors | |

**B4:** Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators, or successor staff.

| Request/Report | Production Due Date | File Name | Status |
|---|---|---|---|
| **Request 4**<br><br>Implement internal guidelines for RCCL inspectors for caseload ranges to serve as guidance for supervisors who are handling caseload distribution and to inform hiring goals. | Per consultation with monitors | Per consultation with monitors | **Request 4**<br><br>Pending submission from the State. |

11/15/2019



# Fwd: Problems with the CCI Caseload Data
1 message

On Mon, Apr 13, 2020 at 5:37 PM Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us> wrote:

Deborah,

Please see responses below to the specific issues you raised. Feel free to have Nancy reach out to Jane if she has further questions.

Unit 16 not showing up in December report

• Creating the report pursuant to the monitors' specifications required new and complex coding as the monitor's request is not aligned with the agency's normal business process for reporting on caseloads. This new code resulted in a glitch for the December report because the supervisor position for Unit 16 appears to have been vacant on December 31, 2019. We have double checked the rest of the December report along with all the other reports provided (September through February) and it appears that only staff in Unit 16 was affected and only for the December report. We have fixed the issue and it should not be a problem moving forward. We will re-run the December report in its entirety.

Unit 40 and 41 only having a small number of staff assigned to them

• These are new units created in December for the new FTEs we received in the Fall, so the units have slowly been filling up as FTEs are filled, trained and become case carrying

Supervisor appearing in some months and not others

• We could not find an example exactly like they described so would need the supervisor's name and PID.

One person in Unit 14

• This person is a DCI supervisor ████████████ and has been assigned 1 RCI investigation for the last 2 years that technically is open but in looking at it, probably is a mistake and should be data fixed to be closed. That's why no other individuals from Unit 14 appear on the list because, generally, DCI staff do not work RCI cases.

Rand Harris

512-438-3083

**From:** Deborah Fowler [mailto:dfowler@texasappleseed.net]
**Sent:** Saturday, April 11, 2020 10:46 AM
**To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>;
Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>
**Cc:** Kevin Ryan <kevinmichaelryan1967@gmail.com>; narrigona@texasappleseed.net; Viveca Martinez
<vmartinez@texasappleseed.net>; Linda Brooke <lbrooke@texasappleseed.net>
**Subject:** Problems with the CCI Caseload Data

---

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from
the sender and know the content is safe.

---

Rand, Nancy was finishing the analysis on the CCI caseload data that we've received pursuant to the data and
information requests and has found a major problem with the data.

This is the problem that she and one of our data analysts found:

Today discovered a major issue with the RCI data. I had asked ███ to run the number of
investigators per unit per month for me and in looking at that compared to other data per unit
noticed that staff for unit 16 were in the analysis for November and December but were not included
in the data for January. They are back in the February data. So that is 5 staff that are not included
in the data for a month. Then ███ and I reviewed the other units and Units 40 and 41 have only
one staff person in one month of the 3 months analyzed; staff drop off as supervisors in one month
only to come back as a supervisor in the next (so supervisor in 2 month, not in one, and then
supervisor again), a person whose title is "CCL supervisor II" in the data in all months in a unit that
doesn't seem to exist (14) and in the data carrying one case as an investigator and not supervising
anyone. I could go on.

We are going to need to set up a call with whoever at DFPS can help us address this issue as soon as possible.
Can you please let us know when we might be able to schedule this call next week.

Thank you,

Deborah Fowler

*Executive Director*

Texas Appleseed

1609 Shoal Creek Blvd., Ste. 201

Austin, TX 78701

512.473.2800, ext. 105

512.757.1458 (cell)

www.texasappleseed.org

[Image removed by sender.] [Image removed by sender.] [Image removed by sender.]
[Image removed by sender.] [Image removed by sender.]

**2 attachments**

**image001.jpg**
1K

**RO.B1 RCI caseloads as of 12-31-19 - revised 4-23-20.xlsx**
100K



# Fwd: Meeting invite

1 message

---

---------- Forwarded message ---------
From: **Burstain,Jane (DFPS)** <Jane.Burstain@dfps.state.tx.us>
Date: Mon, May 18, 2020 at 8:26 PM
Subject: RE: Meeting invite
To: narrigona@texasappleseed.net <narrigona@texasappleseed.net>, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>


Thanks, Nancy!  We'll pull some things together to cross-walk and hopefully get you what you need on Thursday.


I did want to briefly respond to the other part of your email about Residential Child Care Investigation (RCI) caseloads.  As we've discussed previously, the RCI program is managed at the state level.  In a previous email, we provided a few alternative ways to calculate RCI caseloads as well as a description of how units operate.  We have provided you the units in which each caseworker and supervisor work and the office addresses and counties where each unit is housed from which you can tell the region in which each unit is located.  While staff generally cover cases in the region in which they are housed, it is not uncommon for staff to also cover cases in other regions.  I'm not sure what else we can provide.  If there is a specific piece of information you think you're missing, let us know.


*Jane Burstain*

Chief Data and Analytics Officer

Texas Department of Family and Protective Services

512-547-7960 (cell)



## Fwd: RCCI Backlog Plan Update
1 message

████████████████████████████

---------- Forwarded message ---------
From: **Harris,Rand S (DFPS)** <Rand.Harris@dfps.state.tx.us>
Date: Thu, Apr 9, 2020 at 7:32 PM
Subject: RCCI Backlog Plan Update
To: Kevin Ryan <kevinmichaelryan1967@gmail.com>, dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>, Batiste,Ashland (DFPS) <Ashland.Batiste@dfps.state.tx.us>, Burstain,Jane (DFPS) <Jane.Burstain@dfps.state.tx.us>


Kevin and Deborah,


There were 554 cases that were over 45 days on February 29th (this is the number Ashland was trying to pull up during the call). As of April 5th, the number was 501.


The more recent number comes from a weekly report that pulls patterns and trends from the INSIGHT data (see example below).  The Associate Commissioner and the Director of RCCI review this report every week and use it to discuss with RCCI leadership the current status and trends.  Additionally, caseworkers and supervisors can use INSIGHT reports to manage their workloads and cooing deadlines.


Closures are still not where we would like them. Although the new investigators hired in September, 2019, increased RCCI's case carrying capacity by nearly sixty percent, those caseworkers have only recently become case assignable. It is our hope that as they get up to speed some of the lag will decrease.


Thank you


Rand



Below is a visual representation of the actual number of delinquent cases closed (red) and the backlog growth (grey).





**Fwd: RCCI Backlog Plan Update**

1 message

---------- Forwarded message ---------
From: **Harris,Rand S (DFPS)** <Rand.Harris@dfps.state.tx.us>
Date: Fri, Apr 10, 2020 at 8:47 AM
Subject: RE: RCCI Backlog Plan Update
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>, Kevin Ryan <kevinmichaelryan1967@gmail.com>
Cc: Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>, Olah,Tara <Tara.Olah@dfps.state.tx.us>, Burstain,Jane (DFPS) <Jane.Burstain@dfps.state.tx.us>, Batiste,Ashland (DFPS) <Ashland.Batiste@dfps.state.tx.us>

Deborah,

Please see below.

| 2018 | | | 2019 | | | | | 2020 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Opened | Closed | Month | Open | Change From 2018 | Closed | Change From 2018 | Month | Open | Change From 2019 | Closed | Change From 2019 |
| Jan 2018 | 155 | 151 | Jan 2019 | 210 | 35% | 197 | 30% | Jan 2020 | 276 | 31% | 396 | 1... |
| Feb 2018 | 151 | 158 | Feb 2019 | 174 | 15% | 164 | 4% | Feb 2020 | 319 | 83% | 339 | 1... |
| Mar 2018 | 167 | 207 | Mar 2019 | 183 | 10% | 178 | -14% | | | | | |
| Apr 2018 | 149 | 194 | Apr 2019 | 228 | 53% | 195 | 1% | | | | | |
| May 2018 | 181 | 233 | May 2019 | 193 | 7% | 202 | -13% | | | | | |
| Jun 2018 | 138 | 145 | Jun 2019 | 161 | 17% | 175 | 21% | | | | | |
| Jul 2018 | 141 | 138 | Jul 2019 | 265 | 88% | 144 | 4% | | | | | |
| Aug 2018 | 145 | 168 | Aug 2019 | 212 | 46% | 183 | 9% | | | | | |
| Sep 2018 | 158 | 147 | Sep 2019 | 230 | 46% | 166 | 13% | | | | | |
| Oct 2018 | 149 | 169 | Oct 2019 | 277 | 86% | 293 | 73% | | | | | |
| Nov 2018 | 179 | 195 | Nov 2019 | 255 | 42% | 158 | -19% | | | | | |
| Dec 2018 | 160 | 132 | Dec 2019 | 207 | 29% | 224 | 70% | | | | | |
| Totals | 1873 | 2037 | Totals | 2595 | 39% | 2279 | 12% | YTD Total | 595 | 55% | 735 | 1... |



**Veronica Lockett <vlockett@texasappleseed.net>**

---

## Fwd: RCCI Backlog Plan Update
1 message

---

---------- Forwarded message ---------
From: **Harris,Rand S (DFPS)** <Rand.Harris@dfps.state.tx.us>
Date: Fri, Apr 10, 2020 at 9:33 AM
Subject: RE: RCCI Backlog Plan Update
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Kevin Ryan <kevinmichaelryan1967@gmail.com>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>, Burstain,Jane (DFPS) <Jane.Burstain@dfps.state.tx.us>, Batiste,Ashland (DFPS) <Ashland.Batiste@dfps.state.tx.us>


The total cases opened in 2017 was 2,399. Calendar year 2019 was tracking to be between 2017 and 2018, but began to increase in July.


Rand Harris

512-438-3083

---



# Fwd: Pending requests

1 message

---

---------- Forwarded message ---------
From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Fri, May 15, 2020 at 3:52 PM
Subject: RE: Pending requests
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Kevin Ryan <kevinmichaelryan1967@gmail.com>, Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>,
mannitto@public-catalyst.com <mannitto@public-catalyst.com>

Hi Deborah,

Thank you for the opportunity to review and respond to the Praesidium report. Attached is a document summarizing
the agency's feedback concerning this report.

Thank you,

Tara

---

📄 **DFPS Response to Praesidium Report 05.15.20.pdf**
114K

https://mail.google.com/mail/u/0?ik=9a092f35a7&view=pt&search=all&permthid=thread-f%3A1667855600848084828%7Cmsg-a%3Ar1655398070340…    1/1

The DFPS training curriculum and resources Praesidium reviewed, including the online course, Child Sexual Aggression Resource Guide, and CPS Professional Development Core Competencies Training – Sexual Abuse, comprise a comprehensive approach to training and reinforcing the various learning modalities. Trainings build on one another and serve different purposes—some are more foundational, while others are more task-oriented.

At this time, many caregivers and caseworkers have already been trained on the material reviewed by Praesidium. As noted below, DFPS agrees in principle with many recommendations in this report and can consider operationalizing them; however, DFPS suggests that if the training is modified, it be provided on a going forward basis to new caseworkers and caregivers who have not already completed the existing training and to existing caseworkers and caregivers as refresher training, when such training is required.

***Scope of Work***
The Praesidium report's Scope of Work mischaracterizes DFPS trainings and materials as being developed to guide understanding of child-on-child sexual abuse *prevention*, as these trainings and materials are primarily focused on *identification and reporting* of sexual abuse, including child-on-child sexual abuse. This focus on identification and reporting is consistent with the Court's orders directing DFPS to ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child on child sexual abuse, and for DFPS to create a clear policy on what constitutes child on child sexual abuse.

In addition to the online course titled "Recognizing and Reporting Child Sexual Abuse:  A Training for Caregivers," caregivers receive pre-service training through their child placing agency (CPA)/employer (general residential operation (GRO)). Pre-service training content, such as PRIDE Session 7 – Responding to Signs and Symptoms of Sexual Abuse, includes much of the same content Praesidium recommends.

***Online Course Section A. Course Development and Learner Engagement***
DFPS agrees with Praesidium's feedback in Report Findings Section A. Course Development and Learner Engagement. Prior to developing the online course, DFPS staff discussed the potential benefits and shortcomings associated with placing the training on the public website versus the external Learning Management System (LMS). Ultimately, DFPS placed the training on the public website due to the substantial additional resources that would have been required to support external users accessing the training via LMS. Although functionality and data analytics are somewhat limited, the training is nonetheless consistent with the Court's orders. DFPS appreciates the thoughtful recommendations Praesidium offered. However, many of them are impossible to implement due to the limitations of the public website. Recommendations DFPS can consider operationalizing include:

1. Create a Table of Contents menu that can be accessed at any time within the course to facilitate direct access to slide content for review.
2. Evaluate opportunities to improve readability level (such as, shorter sentences, bulleted lists, condensed text) to reflect comprehension and accessibility for wider audience.
11. Revise Knowledge Check to be a pass/fail test, rather than a forced pass, to better hold learner accountable to understanding course content by requiring a pass for course completion.
12. Revise Knowledge Check to include additional applied learning and scenario-based questions to better evaluate learner competency and application of content.
13. Create a question bank that randomly selects a defined number of questions for each individual's Knowledge Check so the learning experience will be slightly different for each learner each time.

15. Consider adding a list of course objectives to the completion certificate to demonstrate overall training content that was reviewed.

***Online Course Section B. Sexual Abuse Prevention Content***

DFPS would like to reiterate that this course is designed to help caregivers recognize and report sexual abuse, in accordance with the Court's orders, not to teach caregivers about sexual abuse prevention, teach children about anatomically correct terms, or to prevent or manage sexual activity between children (though other trainings may include such content). DFPS appreciates Praesidium calling attention to some unclear wording concerning the definition of sexual abuse and can reword the content to more clearly communicate the definition.

Recommendations DFPS can consider operationalizing include:

4. Revise the Reporting Sexual Abuse section to include clear guidance as to whether and to what extent sexual behavior problems and/or sexually aggressive behaviors should be reported by caregivers to the abuse hotline and shared with CPS caseworkers.

   DFPS can add language about reporting incidents of child on child sexual abuse to the Texas Abuse Hotline. However, sexual behavior problems are not generally reported to the hotline. Appropriate avenues to report a sexual behavior problem include reporting to the child's caseworker, therapist/treatment team, and/or agency case manager.

6. Incorporate content from the Child Sexual Aggression Resource Guide's "Immediate Intervention and Response" section (pages 20-25) into the online course.

***Electronic Documents Section A. Child Sexual Aggression Resource Guide***

The recommendation to create revised Child Sexual Aggression (CSA) Resource Guides for different target audiences requires further consideration. Resource guides are intended for use by DFPS caseworkers. Extensive time and resources may be required to implement this recommendation and DFPS may not be the most appropriate entity to undertake it. Entities with whom DFPS contracts utilize their own training curriculums and develop their own protocols. DFPS provided the CSA Resource Guide to various caregiver organizations to use as a foundation for any training curriculum they wanted to develop and many representatives of these caregiver organizations participated in the development of the guide.

***Electronic Documents Section B. CPS Professional Development Core Competencies Training – Sexual Abuse***

Recommendation #4 is already in CPS policy concerning child visits, and in the Resource Guide, concerning safety visits. To better understand the utility of implementing Recommendation #6, DFPS requests additional information, as it is unclear from the report what observations led to this recommendation.

Recommendations DFPS can consider operationalizing include:

1. Identify specific core competencies caseworkers should demonstrate in understanding child sexual abuse and administer an evaluation or assessment against those identified competencies for each caseworker prior to them working alone in the field.

2. Ensure recognition of child on child sexual abuse is included within overall discussion of child sexual abuse.

3. Ensure core competencies include guidance as to what caseworkers should do when they hear sexual slang words within vague or explicit disclosures from children.

5. Update case examples to include a variety of instances in which child sexual abuse may occur in the field including child on child sexual aggression.

7. Further flesh out the instructor guide to provide more consistent descriptions and information on child sexual abuse within the child welfare system.

***Electronic Documents Section C. DFPS Modules 1-4 Storyboards***

DFPS agrees with Praesidium's recommendation to utilize several case examples of child on child sexual interactions in every module to allow the learner to continuously think through multiple scenarios and dynamics for determining whether the behavior is normal development, problematic, or sexually aggressive. However, DFPS would like to consider incorporating case examples within additional training resources to reinforce learning, rather than to add more scenarios to this training.



# Fwd: Follow up from yesterday's call
1 message

---

---------- Forwarded message ----------
From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Fri, Oct 25, 2019 at 6:21 PM
Subject: RE: Follow up from yesterday's call
To: Kevin Ryan <kevinmichaelryan1967@gmail.com>
Cc: dfowler@texasappleseed.net <dfowler@texasappleseed.net>, Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Fescenmeyer,Megan C
(DFPS) <Megan.Fescenmeyer@dfps.state.tx.us>, Stephens, Andrew <andrew.stephens@oag.texas.gov>,
Townsend,Frances R (HHSC) <Frances.Townsend@hhsc.state.tx.us>, Linda Brooke <lbrooke@texasappleseed.net>,
Megan Annitto <mannitto@public-catalyst.com>

Hi Kevin,

Attached is a summary of the IMPACT enhancements and identified IMPACT 2.0 defects that our IT division is working
on. The IMPACT enhancements are now scheduled to deploy by 12.19.19 and the defects are on target for full resolution
by 12.31.19.

To your request yesterday evening, as of 5pm today, 177 GROs have certified plans (90% of 196 GROs) and 19 GROs
do not. Of the 25 cottage homes, all of their certifications are pending while we await further guidance from the Court.

*Please note 3 of the 25 cottage homes did not have a PMC child placed at the time we provided you the list of cottage
homes. However, because they could potentially have a PMC child placed in their facility at a future date, we have
requested 24 hour awake night supervision policies from those cottage home providers.

Please let us know if you need anything additional,

Tara

---

📄 **IMPACT Enhancements and Defects Status 10.25.19.pdf**
939K

**IMPACT Enhancements – Status Document**

| Order | Description | IMPACT Enhancements | Begin Date | Sch Deploy |
|---|---|---|---|---|
| 23, 25-27 | *Sexual Abuse/ Victimization History* | **Create Sexual Victimization page**<br>   o  Characteristic for Confirmed Sexual Abuse<br>   o  Date of Incident<br>   o  Approximate Date Checkbox<br>   o  Text boxes to capture information concerning the person responsible for the abuse and description of the abuse<br>   o  Text box for additional relevant information, including previous unconfirmed allegations<br>   o  Text box for a list of persons with whom the child should be closely supervised, or have no contact.<br>**Create Attachment A**<br>   o  Attached to Placement Summary Form 2279<br>       ▪  Confirmed Sexual Abuse History<br>       ▪  List of persons with whom the child should be closely supervised or have no contact<br>       ▪  CSA information<br>       ▪  Human Trafficking (sexual) information<br>**Enhancements to Human Trafficking page**<br>   o  Radio Button for Confirmed<br>   o  Date of Incident<br>   o  Approximate Date Checkbox<br>   o  Text boxes to capture information about the person responsible for the abuse and a description of the abuse.<br>**Placement Information Page**<br>   o  Date Attachment A was provided to caregiver<br>**Person Merge/Split Detail**<br>   o  Indicator that Sexual Victimization History was merged into a new case<br>**One Case Button added to Case Summary page to upload Placement Summary Form 2279** | 8.27.19 | 12 |

**IMPACT Enhancements – Status Document**

| Order | Description | IMPACT Enhancements | Begin Date | Sch Deploy |
|-------|-------------|---------------------|------------|------------|
| 5, 37 | *Home Referral History* | **Create new IMPACT data fields**<br>• Priority Closure Page<br>    o Priority closure text boxes will allow up to 4,000 characters.<br>    o List of victims and non-victims in a foster home in the intake stage.<br>    o Primary caseworker & supervisor for each child.<br>    o Notify button - sends notification to all caseworkers and supervisors of victim and non-victim children.<br>    o Legal status indicators for victim and non-victim children in the foster home.<br>• Contact Detail Page<br>    o Contact type drop down box; "Home History Review and Staffing"<br>**IMPACT Notification**<br>• Assigned Workload Page<br>    o Notification alerting CVS caseworker and supervisor of PN of an intake for victim and non-victim children in foster home<br>    o Child's legal status<br>    o CSA indicator<br>• Sexual victimization history indicator | 8.27.19 | 12 |
| 9, 11 | *RCCI Investigation Timeframes* | **Create new IMPACT data fields**<br>• Add "Initiation" in the "Purpose" drop down box on Contact Detail page.<br>• Make "Time" field under Contact Detail page a field that is accessible to CCI (it is currently visible but does not allow entry)<br>• IMPACT changes on Contact Detail Page under "Purpose" by adding "Exception to FTF with Victim" in the drop down box<br>• IMPACT changes on Contact Detail Page under "Purpose" by adding "Extension to FTF with Victim" in the drop down box (possibly merge exception and extension drop down options).<br>• Add exception/extension reason field<br>• Add supervisory approval function to exceptions/extensions<br>• Migrate case extension documentation and supervisory approvals to IMPACT<br>    o Determine functionality of entering the first extension and any subsequent extensions<br>    o Determine release of IMPACT mod that will pull the first extension documented in CLASS to IMPACT<br>• Add "Length" field under Contact Detail Page for "Extension Request" Type. | 8.30.19 | 12 |

IMPACT Enhancements – Status Document

| Order | Description | IMPACT Enhancements | Begin Date | Sch Deploy |
|-------|-------------|---------------------|------------|------------|
| 18 | *RCCI Reporter Letter* | **Create new IMPACT data fields**<br>• Create notification to reporter letter for RCCI | 8.30.19 | 12 |

| Defect # | IMPACT 2.0 Defects | Begin Date | Sch Deploy |
|----------|--------------------|------------|------------|
| 12489 | Production transactions responding slow, 10.653 seconds to download the Common Application Form | 7.10.19 | |
| 12937 | ADO stage created in error-case showing closed-recalculated rec retention | 9.5.19 | |
| 12839 | 8888 error code displayed when user tries to add a transmittal in 100A Placement Request | 8.21.19 | |
| 12822 | 8888 Error Code displayed when user tries to upload document for ICPC 100 A Placement Request. System should successfully save the uploaded document and display it under the 'ICPC Document List'. | 8.19.19 | |
| 12776 | Date Completed field in the Common Application form is not prefilled with the System Date and displays the date on the copied form. System should prefill the 'Date Completed' field with the system date. | 8.14.19 | |
| 12572 | There are Two open Placement Details on the same child in the Sub stage. Expected: Child should only have one open placement at a time | 7.12.19 | IT is a defe |
| 11836 | New Table column contains all null values. Column was implemented with IMPACT Mod2 R2. From implementation to current, this data element contains no data. | 5.31.19 | defe workin resolu |
| 11758 | 8888 error is seen when trying to open documents list. | 5.28.19 | no la 12 |
| 11343 | Users receive an error that 'Status Effective date cannot be the same as any other Legal Status' when attempting to add a legal status effective 3/18/2019 on case 43439434. This case has no other legal status effective 3/18/2019. There was previously a legal status which has since been deleted but it still shows in the database despite not appearing in IMPACT. | 5.6.19 | |
| 11068 | DataFix R2 – the PCA placement end date - We need a data fix to enter The foster care placement date ended on 4/12. This is a data fix request for defect 11116 | 4.23.19 | |
| 11034 | When a sub stage is created in IMPACT, it appears to be creating a duplicate stage/placement. Could affect case load counts. This is a Legacy issue. Of 9,500 SUB stages created in the last 5 months, this defect occurred 85 times (<1%), making troubleshooting very difficult. IT team put a script in place on 10/6/2019 to notify them when it happens and help with the troubleshooting. With Program Support's assistance, occurrences identified by the script are fixed as they occur. | 4.22.19 | |

**Megan Annitto**

| | |
|---|---|
| **From:** | Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> |
| **Sent:** | Monday, April 6, 2020 6:11 PM |
| **To:** | Megan Annitto |
| **Cc:** | Harris,Rand S (DFPS); Catherine Smith |
| **Subject:** | RE: Question about RO 4 Caseworker Files - ATTY CLIENT |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Megan,

Please see DFPS responses below in red.

Thank you,

Tara

---

**From:** "Megan Annitto" <mannitto@public-catalyst.com>
**Date:** Tuesday, March 24, 2020 at 13:33:51
**To:** "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Cc:** "Harris,Rand S (DFPS)" <Rand.Harris@dfps.state.tx.us>, "Catherine Smith" <csmith@public-catalyst.com>
**Subject:** Question about RO 4 Caseworker Files

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Dear Tara,

We have three questions about the information provided about caseworker training information for RO 4 to ensure we are understanding the files correctly:

1. In the first data file provided on 11/15/2019 for Remedial Order 4 for Caseworker "CSA training RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 - 96492," it states that "Date Course Taken represents the most recent time, through November 7, 2019, in which the employee completed one of the CSA courses. If the employee completed both courses, the later date will be given. A blank in this column indicates that the employee has no record of having completed either course." Please confirm the information about the 2 courses that are referenced in the data file above. (name of courses/name(s) of the data file provided to the monitoring team relating to the courses). The two courses referred to in the report on caseworker training entitled "CSA training RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 – 96492" are: (1) Child Sexual Aggression – Course #0003632; and (2) Child Sexual Aggression FY19 – Course #0003805 (this is the currently active course). Course #0003805 did not change any of the substantive content from course #0003632 but, rather, added some technical detail about where the information is located in IMPACT with the new child sexual aggression page that rolled out in April 2019.

2.  In the second data file provided on 2/17/2020 for Remedial Order 4 for Caseworker Sex Abuse training "RO.4 CVS Caseworker completion of Sex Abuse Training Q1 FY20 – 2-17-20 - 96784," the data dictionary states "The most recent date that the employee completed one of the sexual abuse training courses.  If the employee completed more than one course, the later date is given."

    So rather than a new list of only workers whose training was completed during the interim time period after Sept 30, is this all the CVS workers and the difference would be a) newly added workers; and b) new dates for workers who completed an additional portion of the training? Our understanding of the monitors' data request is that they asked for all caseworkers, not just caseworkers who completed the training during the reporting period. The difference between the quarterly reports would be the inclusion of a) CVS workers active on the last day of the current quarter but not active on the last day of the prior quarter and their latest training dates; and b) updated training dates (if any) for workers active on the last day of the prior and current quarter; and the exclusion of CVS workers active on the last day of the prior quarter but not active on the last day of the current quarter

    (If different from #1, please confirm the information about the courses that are referred to in the data file above (name of courses/name(s) of data file provided to the monitoring team relating to the courses; but we assume the reference is to the same two courses).  The course for the report entitled "RO.4 CVS Caseworker completion of Sex Abuse Training Q1 FY20 – 2-17-20 - 96784," are the same as for the report entitled "CSA training RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 – 96492"

3.  Please confirm whether in order for a caseworker to be considered by the Agency as having completed sex abuse training, that person is required to complete both courses that are referenced in the files. In order for a caseworker to be considered by the Agency as having completed sex abuse training, the caseworker must have completed either (1) Child Sexual Aggression – Course #0003632; or (2) Child Sexual Aggression FY19 – Course #0003805.

Thank you.
Megan

Megan Annitto
MD v Abbott Monitoring Team
Public Catalyst
Cell:  732-859-6450
public-catalyst.com

**Megan Annitto**

| | |
|---|---|
| **From:** | Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> |
| **Sent:** | Thursday, April 30, 2020 12:44 PM |
| **To:** | Megan Annitto |
| **Cc:** | Catherine Smith; Harris,Rand S (DFPS) |
| **Subject:** | RE: Question about RO 4 Caseworker Files - ATTY CLIENT |

Hi Megan,

Just following up on our discussion last Thursday. All CVS caseworkers are trained to recognize and report sexual abuse, including child-on-child sexual abuse, through:

(1) CPD Core Competencies Training (Week 1 Day 2 - Indicators of Sexual Abuse; Indicators of Sexual Abuse:  Defining what it is; Myth vs. Fact Activity; and Reviewing a Sexual Abuse Care on IMPACT 2.0 and Activity Debrief), and

(2) CSA course #0003632 or CSA FY19 course #0003805.

Both CPD Core Competencies Training and the CSA FY19 course have been updated to reflect related IMPACT 2.0 changes. CVS caseworkers hired before CPD rolled out received training on recognizing and reporting sexual abuse through Basic Skills Development (BSD) classroom training. I uploaded the BSD sexual abuse content from 2010 – 2015 to the SharePoint.

Thank you,

Tara

---

**From:** Megan Annitto [mailto:mannitto@public-catalyst.com]
**Sent:** Tuesday, April 14, 2020 12:05 PM
**To:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Subject:** Re: Question about RO 4 Caseworker Files - ATTY CLIENT

---

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

---

(For #2, referring to plan w/r/t caseworkers).

---

**From:** Megan Annitto <mannitto@public-catalyst.com>
**Sent:** Tuesday, April 14, 2020 12:33 PM
**To:** Olah,Tara (DFPS)
**Cc:** Harris,Rand S (DFPS); Catherine Smith
**Subject:** RE: Question about RO 4 Caseworker Files - ATTY CLIENT

Thank you, Tara.

So that we are clear, I understand this to mean that:
1) DFPS is confirming that completion of the four modules provided to the monitors in November constitute completion of the"Course(s)"  referred to in the Caseworker CSA spreadsheets noted below and in the description provided in response: "The two courses referred to in the report on caseworker training entitled "CSA training RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 – 96492" are:  (1) Child Sexual Aggression – Course #0003632; and

(2) Child Sexual Aggression FY19 – Course #0003805 (this is the currently active course).  Course #0003805 did not change any of the substantive content from course #0003632 but, rather, added some technical detail about where the information is located in IMPACT with the new child sexual aggression page that rolled out in April 2019."

2) Completion of those 4 modules via 1) Child Sexual Aggression – Course #0003632; or (2) Child Sexual Aggression FY19 – Course #0003805 is the DFPS compliance plan for RO 4.

Can you please confirm whether the understanding above correctly represents the Agency's position with respect to RO 4?

Thank you,
Megan

**From:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Sent:** Tuesday, April 14, 2020 10:56 AM
**To:** Megan Annitto <mannitto@public-catalyst.com>
**Cc:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Catherine Smith <csmith@public-catalyst.com>
**Subject:** RE: Question about RO 4 Caseworker Files - ATTY CLIENT

Hi Megan,

The files uploaded to the SharePoint on 11.1.19 that are associated with caseworker training mentioned below include:
- Categories of Sexual Behavior – Module 1_Storyboard_tg
- Child Sexual Aggression Discovered in an Investigation of a Kinship Plac…
- Child with Sexually Aggressive Behavior Entering Conservatorship – Modul…
- CPS Actions When There is a Residential Child Care Investigation (RCCI).._

Please let us know if you need any additional information.

Thank you,

Tara

**From:** "Megan Annitto" <mannitto@public-catalyst.com>
**Date:** Monday, April 6, 2020 at 19:23:07
**To:** "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Cc:** "Harris,Rand S (DFPS)" <Rand.Harris@dfps.state.tx.us>, "Catherine Smith" <csmith@public-catalyst.com>
**Subject:** RE: Question about RO 4 Caseworker Files - ATTY CLIENT

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Thank you, Tara.

That is really helpful. In the first production in response to the D&I (uploaded on 11/1), we received about 8 files in response to the request for sex abuse training materials (relevant to various aspects of ROs 4/32). Can you please confirm which file/files are associated with the Caseworker training mentioned below?

(The docs include 4 modules on Child Sexual Aggression and a word doc entitled CPS Professional Development Core Competencies Training – Sex Abuse, along with a few others).
Thank you,
Megan

**From:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Sent:** Monday, April 6, 2020 6:11 PM
**To:** Megan Annitto <mannitto@public-catalyst.com>
**Cc:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Catherine Smith <csmith@public-catalyst.com>
**Subject:** RE: Question about RO 4 Caseworker Files - ATTY CLIENT

Hi Megan,

Please see DFPS responses below in red.

Thank you,

Tara

**From:** "Megan Annitto" <mannitto@public-catalyst.com>
**Date:** Tuesday, March 24, 2020 at 13:33:51
**To:** Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Cc:** "Harris,Rand S (DFPS)" <Rand.Harris@dfps.state.tx.us>, "Catherine Smith" <csmith@public-catalyst.com>
**Subject:** Question about RO 4 Caseworker Files

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Dear Tara,

We have three questions about the information provided about caseworker training information for RO 4 to ensure we are understanding the files correctly:

1. In the first data file provided on 11/15/2019 for Remedial Order 4 for Caseworker "CSA training RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 - 96492," it states that "Date Course Taken represents the most recent time, through November 7, 2019, in which the employee completed one of the CSA courses. If the employee completed both courses, the later date will be given. A blank in this column indicates that the employee has no record of having completed either course." Please confirm the information about the 2 courses that are referenced in the data file above. (name of courses/name(s) of the data file provided to the monitoring team relating to the courses). The two courses referred to in the report on caseworker training entitled "CSA training RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 – 96492" are:  (1) Child Sexual Aggression – Course #0003632; and (2) Child Sexual Aggression FY19 – Course #0003805 (this is the currently active course).  Course #0003805 did not change any of the substantive content from course #0003632 but, rather,

added some technical detail about where the information is located in IMPACT with the new child sexual aggression page that rolled out in April 2019.

2. In the second data file provided on 2/17/2020 for Remedial Order 4 for Caseworker Sex Abuse training "RO.4 CVS Caseworker completion of Sex Abuse Training Q1 FY20 – 2-17-20 - 96784," the data dictionary states "The most recent date that the employee completed one of the sexual abuse training courses.  If the employee completed more than one course, the later date is given."

   So rather than a new list of only workers whose training was completed during the interim time period after Sept 30, is this all the CVS workers and the difference would be a) newly added workers; and b) new dates for workers who completed an additional portion of the training? Our understanding of the monitors' data request is that they asked for all caseworkers, not just caseworkers who completed the training during the reporting period. The difference between the quarterly reports would be the inclusion of a) CVS workers active on the last day of the current quarter but not active on the last day of the prior quarter and their latest training dates; and b) updated training dates (if any) for workers active on the last day of the prior and current quarter; and the exclusion of CVS workers active on the last day of the prior quarter but not active on the last day of the current quarter

   (If different from #1, please confirm the information about the courses that are referred to in the data file above (name of courses/name(s) of data file provided to the monitoring team relating to the courses; but we assume the reference is to the same two courses). The course for the report entitled "RO.4 CVS Caseworker completion of Sex Abuse Training Q1 FY20 – 2-17-20 - 96784," are the same as for the report entitled "CSA training RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 – 96492"

3. Please confirm whether in order for a caseworker to be considered by the Agency as having completed sex abuse training, that person is required to complete both courses that are referenced in the files. In order for a caseworker to be considered by the Agency as having completed sex abuse training, the caseworker must have completed either (1) Child Sexual Aggression – Course #0003632; or (2) Child Sexual Aggression FY19 – Course #0003805.

Thank you.
Megan

Megan Annitto
MD v Abbott Monitoring Team
Public Catalyst
Cell:  732-859-6450
public-catalyst.com

**Subject:**     FW:

**Date:**        Thursday, June 25, 2020 at 3:12:25 PM Central Daylight Time

**From:**        Linda Brooke

**Attachments:** 96004 special list output - current assigned primary and plcmt-locked -monitors.xlsx

From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Fri, Nov 8, 2019 at 4:59 PM
Subject:
To: Kevin Ryan <kevinmichaelryan1967@gmail.com>, dfowler@texasappleseed.net
<dfowler@texasappleseed.net>
Cc: Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS)
<Tiffany.Roper@dfps.state.tx.us>, Fescenmeyer,Megan C (DFPS) <Megan.Fescenmeyer@dfps.state.tx.us>,
Stephens, Andrew <andrew.stephens@oag.texas.gov>, Hilton, Christopher
<Christopher.Hilton@oag.texas.gov>

Kevin/Deborah,

In accordance with the Court's Amended Order filed on November 6, 2019, attached is a complete list of
identified sexually aggressive PMC children and identified PMC sexually abused children with a corresponding
list of each assigned caregiver. Further, DFPS verifies to the Monitors that each caregiver has been notified of
this status. As we advised the Monitors earlier this afternoon, in some situations, there was either not an
assigned caregiver or it would be potentially detrimental to notify the caregiver. However, we can
supplement at the direction of the Monitors.

Please let us know if you have any questions,

Tara

---------- Forwarded message ---------
From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Tue, Apr 21, 2020 at 8:43 PM
Subject: Re: Following up on my Q re: caregiver notification
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>, Burstain,Jane (DFPS)
<Jane.Burstain@dfps.state.tx.us>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>,
narrigona@texasappleseed.net <narrigona@texasappleseed.net>, Linda Brooke
<lbrooke@texasappleseed.net>, Viveca Martinez <vmartinez@texasappleseed.net>

Hi Deborah,

I apologize for the delay. We remain on schedule to begin reporting on the date Attachment A was provided
to the child's caregiver(s) in Quarter 3. One clarification – the reportable IMPACT data field only captures the
date Attachment A was provided to the child's new caregiver(s) at placement change, as this data field is tied
to placement and is only populated during a placement change (it is located on a Placement page
caseworkers only access/document in at placement change). At present, we do not have the ability to report
on the date Attachment A was provided to the caregiver during an open placement. For children already
in/remaining in their placement at the time a new incident occurs or is reported, caregiver notification is
provided based on CPS' notification policy, and a new Attachment A is provided to the caregiver and
uploaded into OneCase. However, there is not a specific contact that identifies that Attachment A was
provided. Notwithstanding, if the child is staying in the same placement, the caregiver would be aware of the
incident, would be part of the investigation, and most likely would be the one who reported it. If the
caregiver was the perpetrator, the child would be moved and the information would be included in the
Attachment A provided to the child's next caregiver and documented on the Placement page.

Please let us know if you have any further questions.

Thank you,

Tara

---



---

## Fwd: 24 Hour Supervision Certification

---

████████████████████████

---------- Forwarded message ---------
From: **Deborah Fowler** <dfowler@texasappleseed.net>
Date: Wed, Feb 26, 2020 at 8:05 PM
Subject: Fwd: 24 Hour Supervision Certification
To: Linda Brooke <lbrooke@texasappleseed.net>, Viveca Martinez <vmartinez@texasappleseed.net>, Nancy Arrigona <narrigona@texasappleseed.net>, :) <crogers@texasappleseed.net>


Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org

    


---------- Forwarded message ---------
From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Wed, Feb 26, 2020 at 11:35 AM
Subject: 24 Hour Supervision Certification
To: Kevin Ryan <kevinmichaelryan1967@gmail.com>, dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>, Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>, Gdula, Kimberly <Kimberly.Gdula@oag.texas.gov>


Kevin/Deborah,


In compliance with the Court's order dated February 21, 2020 in which the Court directed DFPS to "submit to the Court, from July 31, 2019 through today, the full names of each and every DFPS employee who visited each relevant facility; the dates of these employee visits; the specific place of visits of these employees; the specific hour of the day when the employees visited; the length of each employee visit; and the full names of each and every facility staff member identified as an awake night supervisor," we have uploaded to the SharePoint here (for November 2019) and here (for December 2019 – February 2020) certification forms for each operation visited, according to the month in which the visit occurred. As a reminder, in accordance with the Court's Order that became effective on July 30, 2019, DFPS has undertaken a number of activities to ensure 24-hour awake-night supervision in all licensed foster care (LFC) placements for which awake-night supervision of children and youth in PMC is required. These activities are enumerated in the trial record (see Dkt. 728, Defendant's Exhibit List, and all associated exhibits; Dkt. 739.1, Amended Declaration of Trevor Woodruff Regarding Compliance Activities for 24-Hour Awake Night Supervision).

Since November 2019, DFPS has conducted monthly unannounced overnight visits to LFC placements for which awake-night supervision of children and youth in PMC is required. During December 2019 and January 2020, DFPS staff visited all LFC placements required to have awake-night supervision. For a majority of LFC placements visited in December 2019 and January 2020, DFPS staff immediately verified that the facilities had awake night supervision. As a result, during February 2020, DFPS staff conducted targeted overnight visits of facilities that appeared to require technical assistance or other support to comply with the Court's Order. Recently, DFPS hired additional staff dedicated to conducting ongoing monitoring of LFC placements to ensure 24-hour awake-night supervision; these staff will begin conducting overnight visits in March 2020.

For each operation visited, staff conducting the visit completed a certification form, which was developed under the Court's direction (see Dkt. 725.0, Order dated November 7, 2019) and in close collaboration with the Monitors. The certification form includes the following 14 data elements:

- Visit date and time
- DFPS staff conducting visit (including title and cell phone number)
- Placement name
- Placement address
- Placement ID
- Total child population on date of visit, including any caregivers' biological and adoptive children if they reside at the operation, and any private placement children
- Number of PMC children in placement on date of visit
- Names of PMC children in placement on date of visit
- Detailed description of how awake-night supervision is being provided, including number of staff providing awake-night supervision and how many children each night staff person is responsible for supervising
- Name of placement staff person(s) providing awake-night supervision
- Name, title and contact information of placement staff and caregivers interviewed
- Verification that all PMC children in placement are provided 24-hour awake-night supervision
- Certifying DFPS agency staff signature
- Placement caregiver staff signature (acknowledging he/she was the awake night staff on the date the monitoring visit occurred)

When developing the certification form, DFPS incorporated all data elements directed by the Court and recommended by the Monitors. At this time, the form does not capture length of each employee visit. We will modify the form to include this data element. The modified form will be used during overnight visits occurring in March 2020 and henceforward.

Thank you,

Tara

--

| | |
|---|---|
| **Subject:** | FW: Awake Night Policies |
| **Date:** | Tuesday, June 23, 2020 at 5:11:31 PM Central Daylight Time |
| **From:** | Linda Brooke |
| **Attachments:** | Concho Valley CCS Floor Plan and Policy.pdf, Caring Heart Residential.pdf, Caring Heart Residential Floorplan.pdf, Supervision Policies and Certification Forms Requested v.4.0.pdf |

---------- Forwarded message ---------
From: **Olah,Tara (DFPS)** <Tara.Olah@dfps.state.tx.us>
Date: Tue, May 12, 2020 at 3:13 PM
Subject: RE: Awake Night Policies
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Kevin Ryan <kevinmichaelryan1967@gmail.com>, Linda Brooke <lbrooke@texasappleseed.net>, Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>

Hi Deborah,

Attached are the Caring Heart and Concho Valley supervision policies and floorplans, which have also been uploaded to the SharePoint. Also, concerning the two outstanding certification forms you requested – for Rolling Hills Hospital and Texas Boys Ranch Children's Shelter, there are no certification forms for these operations from November 2019 – February 2020 because no PMC children were placed in those operations during this time period. Attached is a revised status update with additional information concerning these operations (and all other certification forms and supervision policies you and Linda requested).

As a reminder, while DFPS initially verified awake-night supervision primarily through supervision policy reviews/verifications, that is no longer our focus. Since November 2019, DFPS has verified awake-night supervision by conducting monthly unannounced overnight visits to contracted LFC placements for which awake-night supervision of children and youth in PMC is required. Between November 2019 and January 2020, DFPS staff visited all contracted LFC placements required to have awake-night supervision. For a majority of contracted LFC placements visited in December 2019 and January 2020, DFPS staff immediately verified that the facilities had awake night supervision. As a result, during February 2020, DFPS staff conducted targeted overnight visits of facilities that appeared to require technical assistance or other support to comply with the Court's Order. Since then, DFPS hired additional staff dedicated to conducting ongoing monitoring of contracted LFC placements to ensure 24-hour awake-night supervision and in March 2020, these staff began conducting overnight visits of contracted LFC placements in which a TMC or PMC child resides.

Finally, although not requested, we have uploaded to the SharePoint certification forms from 2.22.20 – 2.29.20, and for March 2020. We are working to upload the April 2020 certification forms by 5.22.20.

Thank you,

Tara

Concho Valley Home for Girls-Residential Setting for girls ages 12-18.

The Girls Home accepts the following levels of care:  Basic, Moderate and Specialized.

Concho Valley Home for Girls capacity is no more than 6 girls, our home is licensed for 12 girls. We offer 24 hour awake supervision, staff conducts 3 random room checks throughout the night.

The Girl's Home is a one story home with 6 bedrooms, our houseparent's room is located in the center of the house.  Each bedroom houses 1 female.  Our home stays at a capacity of 6 due to ratio.

Contractor, will notify DFPS if it ever falls out of compliance with the 24 hour Continuous Supervision requirement within 24 hours of occurrence.  DFPSRESIDENT@dfps.state.tx.us

# Child/Caregiver Ratio

*DAY*

(a) The number of children that a single caregiver may care for during waking hours depends on the ages and treatment service needs of the children in the group. A single caregiver may care for no more than five children. Children younger than five years old count as two children.

(b) Children may be separated into groups based on age and/or treatment services in order to vary the child/caregiver ratio required for each group, as long as:

   1. The groups remain easily distinguishable and separated, such as by unit;
   2. (2) The child/caregiver ratio is re-calculated any time groups intermingle, such as on a field trip or in the dining room.

(c) A child does not count in the child/caregiver ratio while participating in an approved unsupervised childhood activity

*NIGHT TIME*

The caregiver during night time sleeping hours is expected to remain fully awake throughout the shift at all times regardless of how many children that is present in the facility. Children younger than five years old count as two children.

With CHRC being a 2 story facility, the night time awake staff are expected to sit in the hallway just after the office during intervals between mandatory routine rounds. This location allows visibility of the two exits, first floor rooms and the stairs. There are motion sensors, window sensors as well as alarms to alert staff of any unusual movements. Night time staff are expected to do **MANDATORY** every 15 minutes check and must visualize every child is in bed. The rounds form should be initialed after each check to account for each child

(a) The caregiver may care for not more than 15 children at a time

(b) Additional caregiver will be added to the child/caregiver ratio as needed

(c) Children may be separated into groups based on age and/or treatment services in order to vary the child/caregiver ratio required for each group, as long as:

   1) The groups remain easily distinguishable and separated, such as by cottage or unit; and
   2) The child/caregiver ratio is re-calculated any time groups intermingle, such as on a field trip.

**A member of the CHRC management team (Executive Director, Program Director, Treatment Director, Case Manager) will be responsible for notifying DFPS within one business day if it fails to comply with the continuous 24-hour awake supervision requirement.**



**Caring Heart Residential Care**

Richmond, TX 77407



**Caring Heart Residential Care**

Richmond, TX 77407



| Supervision Policies Requested: | Status |
|---|---|
| Austin Children's Shelter, Austin, TX | Complete. Austin Children's Shelter is now doing business as SAFE Alliance. Uploaded to SharePoint 4.30.20 |
| Autistic Treatment Center, Inc, Dallas/Garland, Tx | Complete. Uploaded to SharePoint 4.29.20 |
| BCV ES/Assessment Center, Beaumont Tx | Complete. BCV ES is Buckner Children and Family Services. Uploaded to SharePoint 9.7.19 |
| Camp Worth LLC, Fort Worth Tx | Complete. Uploaded to SharePoint 4.29.20 |
| Canyon State, Queen Creek AZ | Complete. No supervision policy exists, as DFPS does not contract with this facility. This is a JPD only facility. Some children in DFPS conservatorship may be placed there but the contract would be between TJJD and the facility. CPS does not place children at this facility. |
| Concho Valley Home for Girls GRO | Pending. Working with operation to submit updated supervision plan. |
| Caring Heart Residential Care | Complete. Uploaded to SharePoint 5.7.20. |
| Farrington-Dewey, Arizona | Complete. The legal name of this operation is Mingus Mountain Residential. Uploaded to SharePoint 4.30.20 |
| Freedom Place RTC, Porter, TX | Complete. Uploaded to SharePoint 4.29.20 |
| Galveston Multicultural Institute, Galveston Tx | Complete. No supervision policy exists, as this operation is closed/inactive. The last child in DFPS conservatorship was moved from this operation in October 2018. |
| Grace Place RTC, Lucas Tx | Complete. No supervision policy exists, as this operation is closed/inactive. The last child in DFPS conservatorship was moved from this operation in August 2019. |
| Gulf Coast Treatment Center, Fort Walton Beach, FL | Complete. Uploaded to SharePoint 4.29.20 |
| Heartbridges, Cypress Tx | Complete. Uploaded to SharePoint 4.29.20 |
| Laurel Ridge Treatment Center, San Antonio, Tx | Complete. No supervision policy exists as DFPS does not contract with or place children at this facility. |
| Moving Forward, Grand Prairie Tx | Complete. Uploaded to SharePoint 4.29.20 |
| Open Arms Open Hearts Foundation | Complete. Uploaded to SharePoint 4.29.20 |
| Piney Ridge Treatment Center, Fayetteville, AR | Complete. Uploaded to SharePoint on 9.13.19 and again on 4.29.20 |
| Promise Rose Residential Care Home Inc, Houston Tx | Complete. Uploaded to SharePoint 4.29.20 |
| Red Rock RTC, Saint George, UT (Care Youth Group) | Complete. No supervision policy exists, as this operation is closed/inactive. Since November 2019, no PMC children have been placed at this operation. |
| Sequel TSI of Idaho, Mountain, ID | Complete. Uploaded to SharePoint 4.29.20 |
| Sophie's House for Children, Lufkin Tx | Complete. Uploaded to SharePoint 4.29.20 |
| Sound Decisions, Humble Tx | Complete. Uploaded to SharePoint 4.29.20 |

| Supervision Policies Requested: | Status |
|---|---|
| St Peter-St Joseph Children's Home and Emergency Shelter, San Antonio Tx | Complete. Uploaded to SharePoint 4.29.20 |
| The Gladney Center, Fort Worth Tx | Complete. Uploaded to SharePoint 4.29.20 |
| Vitruvian Treatment Center, Porter Tx | Complete. No supervision policy exists, as this operation surrendered its license. No children in DFPS conservatorship have been placed at this operation since September 2019. |
| Woodward-Delta RTC, Woodward IA | Complete. No supervision policy exists, as DFPS does not contract with this facility. This is a JPD only facility. Some children in DFPS conservatorship may be placed there but the contract would be between TJJD and the facility. CPS does not place children at this facility. |
| YFT -VA, Bristow VA | Complete. No supervision policy exists, as this child specific contract was developed in 2017 and no child was ever placed at this operation. |

| 24-Hour Awake Night Supervision Certification Forms Requested: | Status |
|---|---|
| 1 Ce'Renity Place Inc - EM - Red Oak | Complete. No certification forms from November 2019 – February 2020. Three TMC children residing there moved to PMC in December 2019. However, they moved the same month. After that, the first PMC child was placed there on January 17, 2020. Contracts staff conducted overnight visits to this operation in March and April 2020. |
| Arrow Child & Family Ministries EM – Amarillo | Complete. No certification forms from November 2019 – February 2020, as this operation is closed/inactive. No child in DFPS PMC has been placed at this operation since July 15, 2019. |
| Bayes Achievement Center - RTC – Huntsville | Complete. Uploaded to SharePoint 4.29.20. Operation now closed/inactive. The last PMC child left the operation on November 1, 2019. |
| BCV ES/ Assessment Center EM – Beaumont | Complete. No certification forms from November 2019 – February 2020. Since November 2019, only TMC children have been placed at this operation. |
| Camp Worth, LLC, Fort Worth | Complete. Uploaded to SharePoint 4.29.20. |
| Children's Village and Family Service Agency, Inc. BC – Tyler | Complete. No certification forms from November 2019 – February 2020. Since November 2019, only TMC children have been placed at this operation |
| Farrington - Dewey, Arizona | Complete. The legal name of this operation is Mingus Mountain Residential. No certification forms from November 2019 – February 2020. Since November 2019, no PMC children have been placed at this operation. Staff conducted virtual overnight visits to this operation in March and April 2020 and plan to conduct an in-person visit this weekend. |

| 24-Hour Awake Night Supervision Certification Forms Requested: | Status |
|---|---|
| Galveston Multicultural Institute | Complete. No certification forms from November 2019 – February 2020, as this operation is closed/inactive. The last child in DFPS conservatorship was moved from this operation in October 2018. |
| Grace Place - RTC - Lucas Tx | Complete. No certification forms from November 2019 – February 2020, as this operation is closed/inactive. The last child in DFPS conservatorship was moved from this operation in August 2019. |
| Greater San Marcos Youth Council – EM | Complete. No certification forms from November 2019 – February 2020. Since November 2019, only TMC children have been placed at this operation. |
| Gulf Coast Treatment Center, Fort Walton Beach, FL | Complete. No certification forms from November 2019 – February 2020. Since November 2019, no PMC children have been placed at this operation. Staff conducted a virtual overnight visit to this operation in April 2020. |
| Heartbridges, Cypress | Complete. Uploaded to SharePoint 4.29.20. |
| Lakeside Academy, Kalamazoo, MI | Complete. No certification forms from November 2019 – February 2020. Since November 2019, no PMC children have been placed at this operation. |
| Laurel Ridge Treatment Center | Complete. No certification forms from November 2019 – February 2020. Since November 2019, no PMC children have been placed at this operation. |
| Moving Forward, Grand Prairie, | Complete. Uploaded to SharePoint 4.29.20. |
| My Friend's House (city House)- EM – Plano | Complete. Uploaded to SharePoint 4.29.20 |
| North Texas Youth Connection (Grayson County) – Sherman | Complete. No certification forms from November 2019 – February 2020. Since November 2019, no PMC children have been placed at this operation. |
| Option House Es - EM – Killeen | Complete. No certification forms from November 2019 – February 2020, as this operation only began serving PMC children in February 2020. Staff conducted overnight visits to this operation in March and April 2020. |
| Perimeter Bahavioral Forrest Cit (Woodridge) – AR | Complete. Uploaded to SharePoint 4.29.20. |
| Red Rock RTC, Saint Geoge, UT (Care Youth Group) | Complete. No certification forms from November 2019 – February 2020, as this operation is closed/inactive. Since November 2019, no PMC children have been placed at this operation. |
| Resource Treatment Center - Indianapolis, Indiana | Complete. Uploaded to SharePoint 4.29.20. |
| Rising Star Scholars Academy, Houston | Complete. Uploaded to SharePoint 4.29.20 |
| Rolling Hills Hospital | Complete. No certification forms from November 2019 – February 2020, as child's legal status was TMC until 3.5.20. Staff conducted overnight visits to this operation in March and April 2020. |

| 24-Hour Awake Night Supervision Certification Forms Requested: | Status |
|---|---|
| Sophies House for Children, Lufkin/Nacodoches | Complete. Uploaded to SharePoint 4.29.20. |
| Sound Decisions, Humble | Complete. Uploaded to SharePoint 4.29.20. |
| Starr Ablion Prep | Complete. No certification forms from November 2019 – February 2020, as this operation is closed/inactive. Since November 2019, no PMC children have been placed at this operation. |
| Texas Boys Ranch Children's Shelter – Lubbock | Complete. No certification forms from November 2019 – February 2020 because no PMC children have been placed at this operation. |
| The Children's Emergency Shelter & Teen Shelter (West Tx Society)- Wichita Falls | Complete. No certification forms from November 2019 – February 2020 because no PMC children were placed at this facility between mid-November 2019 and March 2020. Staff conducted overnight visits to this operation in March and April 2020. |
| Treatment Solutions Kaizen -Fairview UT | Complete. No certification forms from November 2019 – February 2020, as one PMC child was placed at this operation from February 2019 until November 8, 2019. Since that time, no PMC children have been placed at this operation. |
| Vitruvian Treatment Center – Porter | Complete. No certification forms from November 2019 – February 2020, as operation surrendered license and no children in DFPS conservatorship have been placed at this operation since September 2019. |
| YFT- VA , Bristow, VA | Complete. No certification forms from November 2019 – February 2020. Since November 2019, no PMC children have been placed at this operation. |



## Fwd: Responses to State's Requests

1 message

---------- Forwarded message ---------
From: **Kevin Ryan** <kevinmichaelryan1967@gmail.com>
Date: Mon, Oct 7, 2019 at 10:22 AM
Subject: Responses to State's Requests
To: Andrew Stephens <Andrew.stephens@oag.texas.gov>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Townsend,Frances R (HHSC) <Frances.Townsend@hhsc.state.tx.us>, Roper,Tiffany (DFPS) <tiffany.roper@dfps.state.tx.us>
Cc: Deborah Fowler <dfowler@texasappleseed.net>, Linda Brooke <lbrooke@texasappleseed.net>, Megan Annitto <mannitto@public-catalyst.com>

Dear Andrew, Audrey, Tiffany and Frances,

We met this morning with the Court and received guidance with respect to your outstanding questions.

First, **with respect to L.D**., the Court does not require 24-hour, awake-night supervision in L.D.'s cottage home as long as that home serves 6 or fewer children and there is a primary caregiver in the home, 24 hours a day, 7 days a week.

Second, with respect to **DFPS's Proposal for 24-Hour Awake Supervision** at the cottage homes, the Court has instructed the Monitors to make unannounced visits to a selection of Cottage Homes to inform the Court. Please provide us by Wednesday, October 9, 2019 with the following: a list of all Cottage Homes in the State; the address for each Cottage Home; contact information for each Cottage Home; and the names and IDs of all PMC children placed in each Cottage Home.

Please alert all Cottage Home providers that Deborah Fowler, Kevin Ryan and their staff may be conducting unannounced visits to their campuses and should be permitted access to the Cottage Homes and access to meet privately with children in the PMC class and caregivers. Please forward to us a copy of your notice to providers this week. We will carry with us government-issued identification and a copy of your notice when we visit the Cottage Homes.

Third, with respect to **HHSC's Request for Clarification for Remedial Order 20**, the Court directs the State to propose a specific and detailed definition of "pattern" using a retrospective analysis of nothing fewer than 5 years. With respect to heightened monitoring, the Court directs the State to propose a detailed definition of heightened monitoring that moves beyond the existing oversight and enforcement framework.

Fourth, with respect to **HHSC's Request for Clarification for Remedial Order 21**, the Court determines that the State's proposal too narrowly construes Remedial Order 21 and is not consistent with the language of the injunction.

Fifth, with respect to **HHSC's Request for Clarification for Remedial Order 22**, the Court directs with respect to the look-back period for considering all referrals of, and in addition, all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment, RCCL inspectors should assess the previous 5 years. With respect to the request for clarification about how to document that the inspectors have considered these referrals and findings, a check box is insufficient. The Court directs the agency to have inspectors document in CLASS (1) the number of referrals of child abuse/neglect; (2) the number of confirmed findings of child abuse/neglect; (3) the number of confirmed findings of corporal punishment; and (4) a narrative description of how this data and information was considered.

Deborah and Kevin

**Subject:** FW: Additional data for heightened monitoring analysis

**Date:** Friday, June 26, 2020 at 10:13:50 AM Central Daylight Time

**From:** Linda Brooke

**Attachments:** image001.png

FN 610

On Tue, May 5, 2020 at 5:17 PM Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us> wrote:

Good evening, Deborah.

In an effort to expedite the report you requested, the majority of the FCL reports due 05/15/2020 have been uploaded to SharePoint. The highlighted reports below contain the additional two years of date requested. Here is a summary of what was uploaded today:

| Report Name | Date Range | Changes from last report |
|---|---|---|
| RO.22.1 Rep.ANE.To.DFPS | 01/01/2020-03/31/2020 | None |
| RO.22.1 7.31.2020-3.31.2020 Rep.ANE.To.DFPS.B 5.5.2020 | 07/31/2019-03/31/2020 | None - NEW |
| RO.20.2 9.30.2014-3.31.2020 Lic.Enf.Recom 5.5.2020 | 09/30/2014-03/31/2020 | Added the date the recommendation was generated Added Facility ID |
| RO.20.2 9.30.2014-3.31.2020 Lic.Inspections 5.5.2020 | 09/30/2014-03/31/2020 | Added investigation ID(s) linked to the inspection Added agency home facility ID for CPA investigation inspections tied to AH Removed "basis for" columns Added facility ID Added date the inspection notification was sent |
| RO.20.2 9.30.2014-3.31.2020 Lic.Assessments 5.5.2020 | 09/30/2014-03/31/2020 | None - NEW |
| RO.20.8 9.30.2014-3.31.2020 List.EBI 5.5.2020 | 09/30/2014-03/31/2020 | Added Facility ID. |

| | | |
|---|---|---|
| RO.22.3 9.30.2014-3.31.2020 Rep.Punish 5.5.2020 | 09/30/2014-03/31/2020 | Inspection tab:<br>Removed investigation defiencies to eliminate duplication with the investigation tab.<br>Added follow-up information<br>Added ID_INSPCTN_STNDRD, facility  ID, standard description, finding status, and admin review status<br>Removed "basis for" columns.<br><br>Non ANE Investigation tab:<br>Added standards linked to the allegations and the allegation narrative<br>Added follow-up information<br>Removed "basis for" columns<br>Added the ID_INSPCTN_STNDRD, facility ID, standard description, and admin review status<br><br>Assessments tab:<br>Added follow-up information<br>Added the ID_INSPCTN_STNDRD, facility ID, and standard description, and admin review status<br>Removed "basis for" columns<br><br>ANE Investigation tab:<br>Added a report of standards tied to ANE investigation allegations |
| RO.22.4 ECH.ANE.Intakes.B As of 05/01/2020 | As of 05/01/2020 | None - NEW |
| RO.22.4 ECH.Corp.Punishment.A As of 05/01/2020 | As of 05/01/2020 | None - NEW |
| RO.B1.1 Caseloads As of 05/01/2020 | As of 05/01/2020 | Added supervisor staff<br>Updated Hire Date to reflect the date an inspector was hired |

| RO.15-19.2 9.30.2014-3.31.2020 RCCL.Inspec 5.5.2020 | 09/30/2014-03/31/2020 | Added sensitive case indicator<br>Added facility ID<br>Added agency home facility ID if investigation is linked to an agency home<br>Added investigation closure date<br>Change date used for report to investigation complete date |
|---|---|---|

RCCL has updated the HHSC SharePoint Document Log to include the newly added reports.

We will provide an update when the remaining reports have been uploaded.

Thank you.

**Corey D. Kintzer** | Associate Director
Litigation Department | Legal Services Division
4900 North Lamar, Mail Code: 1100
Austin, TX 78751
Office: 512-438-3274 | Cell: 512-627-1183
www.hhs.texas.gov | www.dshs.texas.gov



This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

**Megan Annitto**

| | |
|---|---|
| **From:** | Kevin Ryan <kevinmichaelryan1967@gmail.com> |
| **Sent:** | Friday, February 21, 2020 5:41 PM |
| **To:** | Andrew Stephens; Kintzer,Corey D (HHSC); Carmical,Audrey (DFPS); Olah,Tara (DFPS); Deborah Fowler; Yetter, Paul; Marcia Lowry; Sara Bartosz; Stephen Dixon; Lonny Hoffman; Megan Annitto |
| **Subject:** | Remedial Orders 12, 13 and 14 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Counsel,

Deborah Fowler and I have conferred with Judge Jack and want to ensure a shared understanding between the parties that, in light of DFPS's and HHSC's reorganization, the references in Remedial Orders 12, 13 and 14 to "successor staff" apply to CCL, not CCI. If the provisions were to refer to CCI, which they do not, they would simply replicate three earlier Remedial Orders that already require the same measure of timeliness by CCI.

Kevin Ryan

**Megan Annitto**

| | |
|---|---|
| **From:** | Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us> |
| **Sent:** | Thursday, February 27, 2020 8:08 PM |
| **To:** | Kevin Ryan |
| **Cc:** | Lam,Taryn (HHSC); Stephens, Andrew; Carmical,Audrey (DFPS); Olah,Tara (DFPS); dfowler@texasappleseed.net; Yetter, Paul; Marcia Lowry; Sara Bartosz; Stephen Dixon; Lonny Hoffman; Megan Annitto; Bingham,Joseph (HHSC) |
| **Subject:** | RE: Remedial Orders 12, 13 and 14 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Good evening, Kevin.

HHSC and DFPS are two distinct agencies with delineated responsibilities. We have always interpreted ROs 12, 13, and 14 as pertaining to DFPS because RCCL conducts minimum standards investigations, not abuse/neglect investigations. The term "successor staff" would only pertain to DFPS unless HHSC later inherited those responsibilities.

Thank you.

**Corey D. Kintzer** | Associate Director
Litigation Department | Legal Services Division
4900 North Lamar, Mail Code: 1100
Austin, TX 78751
Office: 512-438-3274 | Cell: 512-627-1183
www.hhs.texas.gov | www.dshs.texas.gov



This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

---

**From:** Kevin Ryan <kevinmichaelryan1967@gmail.com>
**Sent:** Friday, February 21, 2020 4:41 PM
**To:** Stephens, Andrew <andrew.stephens@oag.texas.gov>; Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>; Carmical,Audrey (DFPS) <AUDREY.CARMICAL@dfps.state.tx.us>; Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; dfowler@texasappleseed.net; Yetter, Paul <pyetter@yettercoleman.com>; Marcia Lowry <mlowry@abetterchildhood.org>; Sara Bartosz <sbartosz@childrensrights.org>; Stephen Dixon <sdixon@childrensrights.org>; Lonny Hoffman <LHoffman@central.uh.edu>; mannitto@public-catalyst.com
**Subject:** Remedial Orders 12, 13 and 14

**WARNING:** This email is from outside the HHS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Dear Counsel,

Deborah Fowler and I have conferred with Judge Jack and want to ensure a shared understanding between the parties that, in light of DFPS's and HHSC's reorganization, the references in Remedial Orders 12, 13 and 14 to "successor staff" apply to CCL, not CCI. If the provisions were to refer to CCI, which they do not, they would simply replicate three earlier Remedial Orders that already require the same measure of timeliness by CCI.

Kevin Ryan

## Fwd: Heightened Monitoring Feedback

Deborah Fowler <dfowler@texasappleseed.net>

Tue 5/19/2020 5:36 PM

**To:** Viveca Martinez <vmartinez@texasappleseed.net>

📎 1 attachments (451 KB)

Agencies Feedback on Heightened Monitoring 02192020 FINAL.PDF;

More RO 20

Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org

    

---------- Forwarded message ---------
From: **Lam,Taryn (HHSC)** <Taryn.Lam@hhsc.state.tx.us>
Date: Wed, Feb 19, 2020 at 11:31 AM
Subject: Heightened Monitoring Feedback
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>, kevinmichaelryan1967@gmail.com
<kevinmichaelryan1967@gmail.com>
Cc: Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>, Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>,
Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>, Gdula, Kimberly
<Kimberly.Gdula@oag.texas.gov>, Hilton, Christopher <Christopher.Hilton@oag.texas.gov>,
Stephens, Andrew <andrew.stephens@oag.texas.gov>, Bingham,Joseph (HHSC)
<Joseph.Bingham@hhsc.state.tx.us>

Kevin/Deborah,

Pursuant to the Court's February 12, 2020 Order (ECF No. 801), DFPS and HHSC submit the attached
document providing both agencies' combined comments and feedback to the "Heightened
Monitoring" document attached to Deborah's February 4 e-mail.  I understand that DFPS is also
sending an additional document with additional information in a separate email.

Mail - Robert Martinez - Outlook

Thank you.


**Taryn Lam** | Attorney

Litigation Department | Legal Services Division

701 West 51st Street | Mail Code W252

P.O Box 149030

Austin, TX 78714-9030

Office: 512-438-2266 | Fax: 512-438-2113

www.hhs.texas.gov | www.dshs.texas.gov



This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

## Fwd: Heightened Monitoring

Viveca <vmartinez@texasappleseed.net>

Tue 5/19/2020 8:52 PM

**To:** Viveca Martinez <vmartinez@texasappleseed.net>

📎 1 attachments (39 KB)

2020 02 19 HM communication.pdf;

---------- Forwarded message ---------
From: **Harris,Rand S (DFPS)** <Rand.Harris@dfps.state.tx.us>
Date: Wed, Feb 19, 2020 at 11:38 AM
Subject: Heightened Monitoring
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>, kevinmichaelryan1967@gmail.com <kevinmichaelryan1967@gmail.com>
Cc: Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>, Kimberly.Gdula@oag.texas.gov <Kimberly.Gdula@oag.texas.gov>

Good morning Deborah and Kevin,

The attached document provides the agency's plan to address heightened monitoring of contracted providers along with feedback to your guidance on this important issue. We appreciate you providing recommendations and incorporated them where appropriate. DFPS worked with HHSC to provide a coordinated response to specific items raised in your *Heightened Monitoring and Pattern Definitions* document of February 4th. That response will be sent in a separate document.

We look forward to discussing any questions you may have.

Thank you

Rand Harris

Associate Commissioner of Compliance, Coordination and Strategy

Department of Family and Protective Services

512-438-3083

Dear Deborah and Kevin,

We appreciate your guidance concerning the heightened monitoring document we submitted to you on November 1, 2019 in accordance with Remedial Order 20. We have carefully reviewed your response and have incorporated your thoughts as appropriate into our heightened monitoring process. To the extent that we had any concerns, we have discussed them along with the summary of our continuous monitoring process, which is provided below. We have also outlined some of our specific comments concerning the proposal in a document with HHSC that will be sharing in a separate email. We will continue our collaboration with HHSC as they also evaluate and establish any additional processes for heightened monitoring at their agency.

While there are facets of this process for which we have previously provided information, others are recent enhancements effectuating state legislation and improving upon our prior processes. We are improving our processes by harnessing trend information, utilizing additional staff, drawing upon real-time qualitative inputs and overall focusing resources on residential contractors identified needing additional support.

Please be aware that we will not be able to connect formally with the Oklahoma leadership for whom you provided contact information until next week. However, we have had a preliminary conversation with agency staff and are reviewing materials they provided for potential inclusion in our processes.

Overview

DFPS has several mechanisms to continuously evaluate residential operations' quality and compliance with contract requirements, at any stage of the contracting process. Contract monitoring can be divided into four stages: 1. Contract Creation and Provisional Period; 2. Continuous Quality Improvement Support (i.e., proactively working with operation to improve the quality of services); 3. Heightened Monitoring; and 4. Immediate intervention due to imminent safety concerns.

1. Contract Creation and Provisional Period

During the application and provisional contracting period, DFPS uses a contract application vendor screening process to determine administrative, programmatic, and fiscal readiness of an operation. Specific activities include evaluating any historical performance prior to a provisional contract,

assessing the applicant's internal controls, vendor status, and ability to demonstrate reasonable compliance with service level indicators.

After an application is approved, there is a provisional period (usually 18-24 months). Routine monitoring and oversight activities of provisional contracts include but are not limited to the following activities:

1. Annual third-party utilization review conducted to assess the Contractor's compliance with delivery and documentation of service level requirements.
2. Contractor monitoring prioritized based on risk.  This specialized monitoring is conducted by designated contract monitoring staff prior to making a recommendation for award or denial of a post provisional contract.
3. Targeted contract compliance monitoring conducted by the application specialist every 6 months during the provisional contracting period.
4. Annual and quarterly assessments of contract performance measures and assessment of liquidated damages and incentives. The quarterly reviews assess the contractor's compliance with performing background checks, emergency Behavior Intervention & Trauma Informed Care trainings, and obtaining TX Health Steps Assessments for children coming into care. The annual assessment looks at Safe In Care, keeping siblings together, placement close to home, and building foster home capacity for accepting older youth.
5. Monthly unannounced awake supervision verification checks.

Recognizing that all new contractors can benefit from robust continuous quality improvement support during a provisional period, the DFPS Office of Data and Systems Improvement (DSI) will provide two separate reports about the facility to the DFPS Contracts Division: a monthly report on any abuse and neglect intakes and confirmed allegations and minimum standards citations and a quarterly report across six contractor domains (operational management, therapeutic model and services, supervision and staff interaction, meeting basic needs, physical environment, and population served). DFPS Contracts staff will review these reports with the operation and offer technical support, as needed, focused on compliance with the operational plan, contract terms and conditions, ability to meet performance measures and HHSC Licensing requirements and maintain quality services.

If any material concerns related to child safety are identified, DFPS Contracts staff immediately elevate them for appropriate handling (e.g., HHSC Licensing, FITS staffing, state-wide intake).  Prior to the end of the

provisional period, if on-going concerns have been identified, Contracts will take a recommendation to the CPS Director of Conservatorship for the extension of the provisional contract or to allow the provisional contract to expire. If a contractor does not exhibit material weaknesses during the provisional contracting period, the contract is then transitioned to a residential contract manager after a full contract is executed.

### 2. Continuous Quality Improvement Support

After a contractor successfully completes the provisional period, DFPS continues to provide support to ensure contractors maintain the quality of services they provide.  DSI will be implementing a quarterly contractor Continuous Quality Improvement (CQI) tool which the DFPS Contracts Division will use to strengthen its existing, continuous contract monitoring process.  Through this existing process, the DFPS Contracts Division provides technical assistance and support to operations before there are serious concerns about the risk of an operation or child safety.

The CQI tool consists of analytic machine learning algorithms that help identify operations that may benefit from targeted quality improvement support.  The tool analyzes multiple operation-specific variables across six domains (operational management, therapeutic model and services, supervision and staff interaction, meeting basic needs, physical environment, and population served) and identifies contractors whose performance appears to be a significant outlier from other operations as measured by the number of standard deviations from the mean for each facility type.

When an operation is identified through the CQI tool, DSI will analyze recent and historical performance across the six contractor domains and generate a report summarizing key patterns and trends along with the underlying data. This report will be similar to those used in the provisional period. Contracts staff will use this information to evaluate the operation and determine, in consultation with the operation, what additional information, actions or technical support, if any, may be needed, such as a quality improvement plan.  As noted previously, if material safety concerns are identified at any stage, Contracts staff will immediately elevate them for appropriate handling.

In addition to the continuous contract monitoring process occurring throughout the year and further strengthened by the CQI tool, DFPS Contracts staff utilize an Annual Risk Assessment Instrument (RAI) to guide risk categorization and help identify contractors for specialized monitoring.

Specialized monitoring includes document review and on-site visits to the facility.

3. Heightened Monitoring

Any facility already on the FITS I agenda or experiencing a pattern of declining performance will be subject to heightened monitoring. A pattern of declining performance is any operation that is under an open quality improvement plan where there has been the following:

- At least 1 confirmed allegation for abuse or neglect from an investigation that started after implementing the quality improvement plan; or
- A high rate of minimum standards violations within a period of 2 consecutive quarters after the start of the quality improvement plan. DSI will conduct an analysis to determine when an operation's rate is "high" by examining the distribution and standard deviation of rates for each facility type.

An operation identified for heightened monitoring will trigger a multi-divisional response. The facility will be put on the agenda for a FITS I staffing and Contracts will evaluate contractual remedies as specified in Policy 4.7: Contractor noncompliance and contract remedies.

FITS I staffing are multi-disciplinary meetings to discuss each program's in-depth analysis of operations. This ensures all agencies have all relevant information. In our January 27th meeting we indicated that we would provide our FITS protocols to you. We have included those in an attachment for your reference. In a FITS I meeting, tailored action items are identified for the operation and for DFPS staff.  Those action items could include safety checks, targeted review of service plans or other documentation regarding services to children, a contract action plan, a review of home studies (for a CPA), unannounced visits to the operation, a placement cap or suspension, or elevation to FITS II.

Heightened monitoring may function differently by operation, according to the issues that triggered the need for heightened monitoring as well as operation's response, strengths, and identified issues.  Actions will be customized based upon the issues identified through contract's assessment and may include recurrent unannounced visits, contract non-renewal, comprehensive and/or random reviews of caseworker contacts in a placement, review of qualitative information related to the facility, placement caps, centralized placement staffing through state office, requiring the operation to hire a consultant, direct technical assistance based on identified needs, and internal audits.  If there are risk or safety concerns,

then heightened monitoring my also include a placement suspension, recurrent safety checks and/or movement of children.

4. Immediate intervention due to imminent safety concerns

CPS, DFPS Contracts, Residential Child Care Investigations, and Residential Child Care Licensing have many avenues for elevating concerns regarding child safety. Each division can elevate concerns through their own internal chain of command. Additionally, each region hosts a regional FITS meeting where all 4 programs meet to discuss an operation where local staff identified a concern regarding risk or safety. Through that process, regional staff may resolve issues or elevate an operation to state-office FITS. State-office placement safety analysts and DFPS contracts participate in the regional FITS meetings and are also able to elevate a concern, if identified. Residential Child Care Investigations notifies DFPS executive leadership and RCCL, Contracts, and CPS Placement directors of any intakes involving a near fatality or child fatality of a child in conservatorship in a licensed operation.

In addition to these two mechanisms for elevating risk or safety concerns, operations on FITS I agendas may be elevated to FITS II.

FITS II is designed to address issues that could pose immediate safety concerns to children. The meeting is convened quickly so that a flexible and immediate response can be achieved. At this meeting all relevant divisions meet at the executive level to make sure all information is received and synthesized. Responses to FITS II concerns could include: removal of children from facilities or operations; contract terminations; licensing revocations; or high-risk contract non-renewals.

Things considered include child fatalities within DFPS licensing and contracted residential operations, serious injuries within DFPS licensing and contracted residential operations, facilities and operations on probation, and any major trends associated with safety issues and overall quality of care.

Methodological Issues

It has been our experience that when concerns arise in facilities, DFPS needs to have a flexible approach that allows fast action when warranted. We are concerned that by only looking at violations, the system that you propose may be too slow to respond to emerging situations that require a response faster than the formal contracts violations or licensing processes.

Similarly, flexibility needs to be built in to appropriately respond to the range of violations that may occur. Minimum standards violations, abuse findings, and contract violations typically necessitate differential responses, according to the unique risks posed to child safety. For example, an RTB for sexual abuse may require a stronger response than a contract violation related to timing of service plans. The multistage process we have in place will allow DFPS to respond to warning signs such declining performance for an operation under a quality improvement plan, prior to violations occurring.

We are concerned that a 5 year look back will result in a methodology that is both over inclusive of outdated information and under-inclusive of recent trends.  The staff, management, population served and service delivery model in an operation often change over the course of time.  As a result, an operation's most recent performance is the best reflection of the current issues at hand.   Including 5 years of data into the model will likely undermine the validity of any high rate pattern determination by masking recent patterns of declining performance.  Once an operation is identified as having a recent pattern of a high rate of violations, an operation's past historical performance should be used to help determine the type and frequency of any heightened monitoring efforts and actions.  DSI could find no support in its review of existing research literature for a 5 year look back. If, however, the monitors are aware of such research support, we would be happy to review it.

In addition to the problems with the five year look back period discussed above, the DSI review of existing research literature revealed no support establishing that stratifying operations by size was beneficial. Minimum standards and contract requirements are generally based on the type of services an operation provides, not the size of the operation.  If, however, the monitors are aware of such research support, we would be happy to review it.  We are, however, using size of the facility to inform the substance of our technical support.

Finally, we were not sure what you mean by a "combined rate of violations". If by "combined rate", the proposal refers to identifying all operations who are above the average or median rate, we could find no support in the research literature establishing that an average or a median is a generally accepted method for determining a high rate of violations or determining a high incidence rate in any other context.   Defining a pattern as a "high rate" necessarily implies that an operation's performance is significantly different from other operations.  There is no basis to believe that rates slightly above the mean, at the mean or slightly below the mean represent significant distinctions.

Operations identified as having a "high rate" of violations (but no established pattern of harm to children) will be subject to operational disruption, increased costs and, potentially, adverse contract or licensing actions, including loss of their license and contract.  Any methodology employed should include a generally accepted analytic technique based on a threshold that better balances identification of true positives, while minimizing any false positives.  A true positive is an operation that has a high rate of violations in which children are actually harmed while a false positive is an operation that has a high rate of violations in which children are not harmed. The methodology of establishing a "high rate" as operations that fall outside of an established number of standard deviations that we have proposed above is one such analytic technique.

Conclusion

We hope that this document provides additional context concerning our heightened monitoring processes. We believe continuous monitoring with various potential elevation points will build in the agility and flexibility necessary to respond to a continuum of concerns. We also believe that early interventions (e.g., front-end targeted technical support) will ultimately prevent or contain emerging safety and other concerns in a way that is effective and child-safety focused.

## Pattern:

A pattern is defined as a high rate of contract and standards violations for at least three of the last five years.

**Agency Comment:**

**DFPS and HHSC would like to note concerns with utilizing 5 years of data for reasons further emphasized below and in the methodological comments in the DFPS proposed approach to Heightened Monitoring (provided separately). The 5-year approach may overweight historical and potentially outdated information and penalizes operations that may have improved performance as well as masks more immediate issues. Further, postponing action until each agency has engaged in backwards-looking calculations of violation rates is less agile than responding to currently emerging situations.  DFPS and HHSC believe that the objectives of heightened monitoring would be better and more effectively served via the agencies' continued collaboration towards a more flexible approach tailored to the specific violations and operations at issue.**

 Steps in identifying the pattern:

1. Review data for the rate of contract and standards violations, including confirmed findings of abuse and neglect, for the last five years.  The rate is calculated using the number of violations divided by the placement's average daily population multiplied by 10 (Number of contract or standards violations/average population X 10).

**Agency Comment:**

**As the purchaser, DFPS would look at the rate of contract violations. HHSC, in its licensing capacity, would separately track and look at the rate of standards violations.**

**Additionally, the formula appears to weight all violations equally such that, for example, a Youth For Tomorrow finding about timeliness of a service plan update would have the same weight as more objectively serious violations such as an RTB for sexual abuse or neglectful supervision. Furthermore, counting all minimum standards violations and all contract violations could lead to double counting inasmuch as minimum standards violations are also contract violations as contractors are contractually required to adhere to all standards.**

**Also, it is unclear to what time period this may apply.**

**The support is unclear for the methodology of multiplying by 10, which does not appear to increase statistical significance but may artificially inflate the rate. As an additional point of clarification, would the rate be calculated using PMC children only or all children in care?**

**HHSC and DFPS do not track or capture the average daily population in an operation. Only the maximum capacity of the operation is available.**

2. Compare the operation's rate of violations to the combined rate of violations for all operations of similar size (small, medium, or large) for each of the last five years.

**Agency Comment:**

**Although this comparison might be feasible if the combined rate of all violations (standard and contract) can be obtained and if an alternate value for the ADP can be used, we are concerned about the practical utility of such an approach since the basis or supporting research for comparing rates of violations based on the size of an operation is unclear. Contractors are generally measured based on the services they provide, not their size. This methodology would treat emergency shelters the same as RTCs or basic GROs or IPTP providers the same as a CPA.**

3. If the operation's rate of violations is above the combined rate of violations for similarly-sized operations for three of the last five years, then there is a pattern of deficiencies;

**Agency Comment:**

**To determine risk to children and how an operation is functioning, HHSC and DFPS currently review an operation's most recent history. If an operation has a higher rate of violations during the first 3 years of the 5-year period, that would indicate the operation has improved, meaning heightened monitoring may be unnecessary.**

**Also, the basis for this methodology is unclear. Assuming this proposes to use the mean or median, it would elevate about 50% of operations for heightened monitoring.  Operations just below the mean, at the mean, and just above the mean are unlikely to significantly differ in the degree of risk.**

And

4. If the operation's rate of violations rated medium-high or high is above the combined rate of violations rated medium-high or high for similarly-sized operations for three of the last five years, then there is a pattern of deficiencies.

Small operations:    Those with an ADP of 20 or fewer children or, for CPAs, 20 or fewer open foster homes;

Medium operations:  Those with an ADP of 21-50 children or 21- 50 open foster homes; and

Large operations:    Those with an ADP of more than 50 children or more than 50 open foster homes.

**Agency Comment:**

**Consistent with our feedback above, DFPS and HHSC recommend looking at operations across a broad range of variables and targets and providing additional technical assistance to operations with rates of violations that are a set number of standard deviations from other operations of comparable type.**

Heightened Monitoring

When an operation is identified for heightened monitoring, a Facility Intervention Team Staffing (FITS) is scheduled within 5 days.  The intervention team is made up of staff from RCCL, DFPS CCI, DFPS Contracts, and CPS.

**Agency Comment:**

**DFPS and HHSC agree that FITs should be utilized as a tool for outlining heightened monitoring but we are concerned that a hard 5-day timeframe for scheduling FITS will not allow sufficient time for the multiple agencies and divisions involved to review the operation's history, look for trends, or conduct other related research to discuss during FITS to effectively determine the appropriate next steps for the facility.**

During the FITS, which will include the operation leadership, the team will review:

**Agency Comment:**

**The agencies need to communicate with one another during any FITS meeting prior to reaching out and sharing planned actions and requirements with the operations and their leadership.**

- Trends identified in the 5-year retrospective analysis that resulted in heightened monitoring.

**Agency Comment:**

**We request clarification on whether this refers to an analysis of the operation under review or requires a comparison of the operation under review to other operations.**

- Any monitoring plans or corrective or enforcement actions for the operation in the last 5 years;

**Agency Comment:**

**HHSC and DFPS both currently review any monitoring or corrective or enforcement actions, as applicable, but not always over a 5-year timeframe. Typically, compliance history from the prior 2 years is reviewed. However, additional history may be reviewed on a case-by-case basis.**

- Any risk analyses conducted by RCCL or DFPS for the operation in the last 5 years.

**Agency Comment:**

**DFPS and HHSC are currently doing this review.  Typically, compliance history from the prior 2 years is reviewed. However, additional history may be reviewed on a case-by-case basis.**

If the review reveals trends that implicate an immediate concern for the health and safety of children, the intervention team will develop a safety plan and temporarily suspend placements until all immediate concerns for health and safety have been addressed.  This must be documented in CLASS.

**Agency Comment:**

**The agencies currently act, including developing safety plans and suspending placements among other actions, as warranted and depending on the circumstances.  For example, if safety concerns are identified, DFPS may consider changing a child's or youth's placement rather than instituting a placement suspension.  There may be other alternative actions, such as abatement or termination of the employment of operation staff, that may address a safety issue.  DFPS and HHSC recommend a tailored approach, which allows for a more nuanced plan for the affected operation.**

**Regarding documentation, CCL documentation is entered in CLASS.  However, CLASS is not the system of record for DFPS generally and for CPS in particular.  With respect to DFPS, CLASS is the record system for some DFPS CCI investigation activities.**

The FITS team is responsible for developing a heightened monitoring plan that:

- Outlines a coordinated response from RCCL & DFPS, including a list of staff from both agencies who will serve on the heightened monitoring team for the operation;

**Agency Comment:**

**HHSC and DFPS plan to do this, as appropriate.**

- Describes a detailed and specific plan addressing:
  - The pattern of policy violations that led to heightened monitoring;

**Agency Comment:**

**HHSC and DFPS plan to do this.**

  - Any barriers to compliance identified during a review of previous corrective or enforcement actions or risk analyses;

**Agency Comment:**

**HHSC and DFPS plan to do this.**

  - Any technical assistance needed by the operation from FPS, RCCL, or a third party;

**Agency Comment:**

**HHSC and DFPS plan to do this.**

  - The steps the operation must take to satisfy the plan.

**Agency Comment:**

**HHSC and DFPS plan to do this.**

While a facility is on heightened monitoring, RCCL and DFPS will share responsibility for twice monthly unannounced visits.

**Agency Comment:**

**Monthly unannounced visits occur (RCCL engages in such visits for operations subject to corrective action), but not part of a specific plan or requirement.  More frequent visits at the operation may occur during investigations or as part of regular monitoring activities, depending on the seriousness of the violation and the operation's response. A one-size-fits-all approach may not effectively ensure child safety at a specific facility, as well as potentially impact the ability to reach appropriate caseload ranges.**

The heightened monitoring plan will remain in place for at least one year and until:

**Agency Comment:**

**While possible, this will exceed the timeframe currently required for operations that have been placed on corrective action. HHSC and DFPS recommend determining completion of heightened monitoring based on the operation's ability to meet the items identified in the plan rather than a specified timeframe.  Finally, the methodological or research-informed basis for the one-year requirement is unclear.**

- the operation satisfies the conditions of the plan;
- at least four successive unannounced visits indicate the operation is in compliance with the standards or contract requirements that led to heightened monitoring;

**Agency Comment:**

**The expected or defined degree of compliance is unclear and may not be practical.  Significant improvements, rather than 100% compliance, should be observed to determine when an operation has met the requirements of the heightened monitoring plan.  Also, the basis for requiring at least four successive unannounced visits before finding significant improvement is unclear, including whether research suggests that is the appropriate frequency. DFPS and HHSC recommend a tailored, more nuanced approach for each facility that takes into account the nature and seriousness of the violations and the responses of the operation.**

- and
- the operation is not out of compliance on any medium-high or high weighted licensing standards.

After the operation is released from the plan, DFPS and RCCL will coordinate to make two unannounced visits in the three months following the release from the plan,

**Agency Comment:**

**DFPS and HHSC will coordinate visits whenever possible, and recommend determining the appropriate number, frequency, and timeframe of unannounced visits based on the issues presented at the facility.**

and the heightened monitoring team will continue to track intake data for the operation for six months to ensure it does not lose progress made during monitoring.

**Agency Comment:**

**HHSC and DFPS plan to do this; however, we note that intake data do not accurately reflect improvements at an operation.**

If the operation does not come into compliance with the plan during the heightened monitoring period, DFPS and RCCL will identify one or more of the following penalties:

- suspension of placements;
- imposition of fines;
- suspension or revocation of the facility or CPA's license;
- termination of the contract.

**Agency Comment:**

**HHSC currently issues administrative penalties, corrective action, or revocation, as appropriate based on Texas laws and rules. Please note that failure to come into compliance with the plan may not justify one or more of the items listed based on current Texas laws and rules.**

**DFPS plans to take action as laid out in its heightened monitoring protocols, sent separately.**

**Further, it is unclear whether the suspension of placements is applicable to only children and youth in the PMC.**


The heightened monitoring plan, unannounced visits associated with the plan, and progress toward meeting the plan must all be documented in CLASS.  Caseworkers for PMC children in operations under heightened monitoring must be made aware of the monitoring.

**Agency Comment:**

**HHSC currently documents in CLASS unannounced visits and any corrective actions taken by that agency.  DFPS, however, does not document unannounced visits and any corrective actions taken by that agency in CLASS.**

**If the combined rate of violations is utilized as a methodology resulting in a relatively high number of operations for a lengthy period of time, DFPS recommends primarily providing the appropriate information to CPU staff and/or to regional leadership, as necessary, to alert them of the heightened monitoring and what led to it, rather than adding this task to the workload of individual caseworkers.**

**Subject:** FW: DFPS and HHSC heightened monitoring cost estimate submission

**Date:** Tuesday, June 23, 2020 at 5:25:48 PM Central Daylight Time

**From:** Linda Brooke

**Attachments:** FCL Heightened Monitoring Cost Estimate.pdf, Heightened Monitoring Methodology Notes.pdf, Copy of ACE - Heightened Monitoring.xlsx

From: **Gdula, Kimberly** <Kimberly.Gdula@oag.texas.gov>
Date: Fri, Apr 10, 2020 at 4:36 PM
Subject: DFPS and HHSC heightened monitoring cost estimate submission
To: Aaron Finch <afinch@childrensrights.org>, Marcia Lowry <mlowry@abetterchildhood.org>, Paul Yetter <pyetter@yettercoleman.com>, Deborah Fowler <dfowler@texasappleseed.net>, Kevin Ryan <kevinmichaelryan1967@gmail.com>

All,

Pursuant to the Court's April 3 order, attached please find DFPS and HHSC's heightened monitoring cost estimates and related notes. If you have any issues opening the documents, please let me know.

Thank you,

_____
**Kimberly Gdula**
Assistant Attorney General
General Litigation Division
300 W. 15th Street
Austin, Texas 78701
(512) 475-4071 (Direct)
(512) 320-0667 (Fax)

**FCL Heightened Monitoring Cost Estimate**

**Remedial Order 20 (January 19, 2018):** *Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.*

**Order issued March 18, 2020:** *When an operation is identified for heightened monitoring, a Facility Intervention Team Staffing (FITS) is scheduled within 5 days. The intervention team is made up of staff from, at least, RCCL, DFPS CCI, DFPS Contracts, and CPS.*

*During the FITS, the team will review:*
- *Any trends for the operation identified as a result of the 5-year retrospective analysis*
- *Any monitoring plans or corrective or enforcement actions for the operation in the last 5 years.*
- *Any risk analyses conducted by RCCL or DFPS for the operation in the last 5 years.*

*If the review reveals events that implicate an ongoing concern for the health and safety of children, the intervention team will develop a safety plan and temporarily suspend placements until all concerns for children's health and safety have been addressed. This must be documented in CLASS.*

*The FITS team is responsible for developing a heightened monitoring plan that:*
- *Outlines a coordinated response from RCCL & DFPS, including a list of staff from both agencies who will serve on the heightened monitoring team for the operation;*
- *Describes a detailed and specific plan addressing:*
  - *The pattern of policy violations that led to heightened monitoring;*
  - *Any barriers to compliance identified during a review of previous corrective or enforcement actions or risk analyses.*
  - *Any technical assistance needed by the operation from FPS, RCCL or a third party;*
  - *The steps the operation must take to satisfy the plan*

*While an operation is on heightened monitoring, RCCL and DFPS will share responsibility for at least weekly unannounced visits to the operation, and any placements of PMC children must be directly approved by the Associate Commissioner of CPS.*

*The heightened monitoring plan will remain in place for at least one year and until:*
- *The operation satisfies the conditions of the plan;*
- *At least six months' successive unannounced visits indicate the operation is in compliance with the standards and contract requirements that led to heightened monitoring; and*
- *The operation is not out of compliance on any medium-high or high or high weighted licensing standards.*

*After the operation is released from the plan, DFPS and RCCL will coordinate to make at least three unannounced visits in the three months following the release from the plan, and the heightened monitoring team will continue to track intake data for the operation for six months to ensure it does not lose progress made during monitoring.*

*If the operation does not come into compliance with the plan during the heightened monitoring period, DFPS and RCCL will identify one or more of the following penalties:*

- *Suspension of placements;*
- *Imposition of fines;*
- *Suspension or revocation of the facility or CPA's license;*
- *Termination of the contract.*

*The heightened monitoring plan, unannounced visits associated with the plan, and progress toward meeting the plan must all be documented in CLASS.  Caseworkers for PMC children in operations under heightened monitoring must be made aware of the monitoring.*

| Heightened Monitoring Component | Rationale for Resource Request | Identified FTEs | Annual Cost Estimate* |
|---|---|---|---|
| Facility Intervention Team Staffing (FITS)<br><br>*When an operation is identified for heightened monitoring, a FITS is required.  The FITS team includes HHSC RCCL, DFPS CCI, DFPS Contracts, and DFPS CPS. (March 18, 2020 Order)* | Estimated 130 facilities identified for heightened monitoring that would require a FITS meeting.  Facilities will require either weekly, monthly or quarterly meetings based upon facility status.  Staff anticipate there will be 46 FITS each week.<br><br>*DFPS Child Protective Services (CPS)*<br>Additional FTEs are required to conduct pre and post FITS tasks including researching facility performance, reviewing records of individual children, consulting with caseworkers on individual children, writing individual facility reports, identifying trends, and monitoring ongoing activity in the operation as part of the FITS process.<br><br>*DFPS Child Care Investigations (CCI)*<br>Additional FTEs are required to review 5-year history, consult with investigators/supervisors/Program Administrators, analyze trends, monitor ongoing activity while on Heightened Monitoring and as part of the FITS process, and document all findings and actions.<br><br>*DFPS Residential Contract Management (RCM)*<br>Additional FTEs are required to coordinate the increased number of meetings (scheduling, agenda development, & documentation); complete facility research to prepare information at initial review and on-going status meetings; participate in the development of the | *DFPS CPS*<br>14.0 Program Specialist VI<br>1.0 Administrative Assistant II<br>3.0 Manager IV/Division Administrator<br>1.0 CPS Director II<br><br>*DFPS CCI*<br>11.0 Program Specialist VI<br>2.0 Manager IV<br>1.0 CCI Director II<br><br>*DFPS RCM*<br>3.0 Program Specialist VI<br>1.0 RCM Director II<br>1.0 Contract Technician (Administrative Assistant III)<br><br>*HHSC RCCR*<br>14.0 Program Specialist V<br>2.0 Manager II<br>1.0 Director II | DFPS FTEs:  38<br>DFPS Costs:  $3,550,226<br><br>HHSC FTEs:  17<br>HHSC Costs: $1,928,809 |

**Heightened Monitoring Cost Estimate p. 2**

2

| Heightened Monitoring Component | Rationale for Resource Request | Identified FTEs | Annual Cost Estimate* |
|---|---|---|---|
| | heightened monitoring plan track the progress or lack thereof; and provide identify technical assistance for the contractor.<br><br>*HHSC Residential Child Care Regulation (RCCR)*<br>Additional FTEs are required to research, analyze, and document compliance history for each operation, participate in development of the heightened monitoring plan for each operation, participate in the FITS meetings, and assist with tracking the operation's compliance with the heightened monitoring plan. | | |
| Response to FITS | Additional FTES are required to perform all functions resulting from the contractor's status on heightened monitoring<br><br>*DFPS RCM*<br>Additional FTEs (contract managers and management) are required to conduct facility visits, monitor the contractors, and document the status in CLASS.<br><br>*DFPS Legal*<br>Legal will require an additional 1.0 FTE to respond to issues identified by DFPS RCM.<br><br>*DFPS Statewide Intake*<br>Additional FTEs will be required to assess contacts to SWI as a resulting from increased monitoring visits. Increased visits by mandatory reporters generally results in increased intakes. Though these intakes are not necessarily a reflection of increased abuse, neglect, or exploitation<br><br>*DFPS CCI*<br>Increased visits by mandatory reporters generally results in increased intakes. Though these intakes are not necessarily a reflection of increased abuse, neglect, or exploitation, additional FTEs will be required to assess contacts to SWI as a resulting from increased monitoring visits. | *DFPS RCM*<br>23.0 Program Specialist IV (Contract Managers)<br>3.0 Manager IV (Supervisors)<br><br>*DFPS Legal*<br>1.0 Attorney II<br><br>DFPS Statewide Intake<br>2.0 Protective Services Intake Specialist I<br><br>*DFPS CCI*<br>4.0 RCCL Investigator I<br>3.0 CCI Investigation Screeners<br>1.0 RCCL Supervisor II<br>1.0 CCI INV Supervisor<br>1.0 RCCL Admin Asst<br>1.0 Administrative Assistant III<br><br>*DFPS Contract Performance*<br>3.0 Research Specialist V<br>1.0 Data Analyst IV<br><br>*DFPS DDS*<br>2.0 Systems Analyst V | DFPS FTEs:  46<br>DFPS Costs:  $3,726,937<br><br>HHSC FTEs: 47<br>HHSC costs:  $4,235,228 |

3

Heightened Monitoring Cost Estimate p. 3

| Heightened Monitoring Component | Rationale for Resource Request | Identified FTEs | Annual Cost Estimate* |
|---|---|---|---|
| | *DFPS Contract Performance*<br>Additional FTEs are required to run the Court's model (includes cleaning the data, compiling the data, running the model and QA the results), and then run model to triage identified operations, create reports summarizing data from the Court's model that resulted in operation being identified for heightened monitoring and provide support to CPS and Contracts around using reports from DDS to track progress on all DFPS activities related to heightened monitoring.<br><br>*DFPS Data Decision Support (DDS)*<br>Additional FTEs are required to create, QA and maintain monthly reports to the monitors tracking all the DFPS related activities for operations subject to heightened monitoring.  It is anticipated that all the reports will require new development and include new data elements from IMPACT and CLASS.<br><br>*HHSC Residential Child Care Regulation (RCCR)*<br>Additional FTEs are required to conduct facility visits, monitor compliance with the heightened monitoring plan, and all other duties regarding to support operations on heightened monitoring. Additional FTE required to develop training curriculum for heightened monitoring processes and conduct training for added FTEs. | *HHSC RCCR*<br>36.0 Inspector III<br>7.0 Supervisor II<br>3.0 Administrative Assistant II<br>1.0 Training Specialist V | |
| Child Safety Response | *DFPS CPS*<br>Although not specifically required by the March 18, 2020 order, DFPS views these staff as necessary to implement the Order. CPS will supplement face to face visits to facilities with placement holds and safety checks to ensure the health and safety of children placed in those operations.  Staff will interview children and develop plans to address any immediate needs.  Interviews from these visits will be reviewed by the CPS FITS program specialists for inclusion in ongoing facility monitoring. | *DFPS CPS*<br>17.0 CVS Caseworker<br>2.0 CVS Supervisor | DFPS FTEs:  19<br>DFPS Costs:  $1,499,107 |

Heightened Monitoring Cost Estimate p. 4

4

| Heightened Monitoring Component | Rationale for Resource Request | Identified FTEs | Annual Cost Estimate* |
|---|---|---|---|
| Associate Commissioner Placement Review | Additional director-level staff and new processes to account for the requirement that the Associate Commissioner directly approve any placement of PMC children into an operation on heightened monitoring.  This is estimated to require 300 approvals per month and conservatively require 75 hours per month by the division head. Processes will need to be put in place for absorption of many of the Associate Commissioner's duties, as well as a mechanism for 24/7 approvals wherever possible to avoid placement delays when a placement is made in the middle of the night. | In order to comply with this order, DFPS would need an additional senior director which is estimated to have a salary and fringe of $188,624.  However, given that this may not be the intent of the requirement, DFPS respectfully requests further discussion of implementation of this requirement with the Court and the monitors. | For discussion |
| Technical Assistance Contractor | Resources and the legally required time frame to procure third-party technical assistance. | For discussion | For discussion |
| IMPACT Modifications | Modifications to IMPACT to support casework and documentation. IMPACT changes include updates to an existing interface between IMPACT and CLASS to send and receive data on facilities on HM status; providing alerts and tasks for caseworkers when children are placed in a facility on HM or a facility receives a HM status; modifications to capture information on required Safety Checks and required approvals of placements; creation of a dashboard to indicate a facilities monitoring status; and development of other reports on facilities and addition of new audit tables. | 3.5 Systems Analyst V | DFPS FTEs:  3.5 DFPS Costs: $706,906 |
| CLASS Modifications | Modifications to CLASS to support heightened monitoring tracking and documentation. | | HHSC Costs:  $1,998,598 |
| | | **TOTAL** | TOTAL DFPS FTEs:  106.5 TOTAL HHSC FTEs:  64 **TOTAL FTEs: 170.5**<br><br>TOTAL DFPS Costs:  $9,483,176 TOTAL HHSC Costs: $8,162,635 **TOTAL Costs:  $17,645,811** |

*Annual costs to be prorated upon implementation.

Heightened Monitoring Cost Estimate p. 5

5

# Methodology Notes

## 130 Facilities

Based on the February 26, 2020 discussion with the Monitors, it appeared the Monitors had developed a preliminary estimate of 110 facilities, but did not have contract violations to include in the estimate. DFPS estimates an additional 20 facilities would need to be included in Heightened Monitoring (HM). DFPS must continue to provide a response to operations with actual or emerging issues that are not identified through the HM process; therefore, operations with actual or emerging concerns will be elevated to FITS and then subjected to the HM processes, as it is most efficient to review operations using the same approach. Additionally, the agencies assume the methodology should be applied to all licensed, contracted operations and are including additional facilities in case some operation types were not included in the Court's methodology, based on the wording of the Order and the above-referenced discussion with the Monitors. Finally, the agency estimate assumes the inclusion of contract violations in the analysis may pull additional facilities into HM using the Court's methodology.

### FITS Meetings

|  | Weekly Staffing | Monthly Staffing | Quarterly | Total Operations Staffed per Week |
|---|---|---|---|---|
| Week 1 | 33 | 8 | 5 | 46 |
| Week 2 | 33 | 8 | 5 | 46 |
| Week 3 | 33 | 8 | 5 | 46 |
| Week 4 | 33 | 8 | 5 | 46 |

25% (33) meet definitions of ongoing concern for safety and will have a weekly staffing
25% (33) will have a monthly staffing. (33/4.33 = 8 per week)
50% (65) will have a quarterly staffing (65/3 months = 22/4.33 = 5 per week)

### FITS Meetings/Preparation, Attendance, Follow Up
Because the March 18, 2020 Order specifically requires "FITS" for portions of HM, DFPS applied its current FITS framework, procedures, and processes combined with the order's specifications around requirements and duration of monitoring, to determine the resources required to comply with the Order. The increased number of facilities on HM combined with the other court ordered components requires additional CPS, CCI, and RCM to meet the court ordered requirements.

Child Care Investigations
11.0 Program Specialist VI, 2.0 Manager IV, 1.0 CCI Director II

*Program Specialist VI Assumptions:*

9 hours of prep work per operation to review 5-year history, consult with investigators/supervisors/Program Administrators, analyze trends, monitor ongoing activity while on Heightened Monitoring and as part of the FITS process, and document all findings and actions.

• 9 hours of prep x 46 operations a week= 414 hours of total prep work a week
• 414 hours of work per week/38 hours for these tasks = 11 FTEs

Additional duties of new FTEs: tracking operations once they are released from the heightened monitoring plan to ensure the progress made during the plan is sustained

*Manager IV Assumptions:*
1:5 ratio Program Specialist VI to Manager due to complexity of Program Specialist work

*Director II Assumptions:*
1 additional Director FTE to participate in FITS meetings (30 minutes per meeting, 46 facilities per week, 23 hours per week), oversee work performed by the new FTEs and assure appropriate follow up.

Child Protective Services
14.0 Program Specialist VI, 3.0 Manager IV, 1.0 CPS Director II

*Program Specialist VI Assumptions:*
12 hours of prep work per operation to FITS tasks including researching facility performance, reviewing records of individual children, consulting with caseworkers on individual children, writing individual facility reports, identifying trends, and monitoring ongoing activity in the operation as part of the FITS process.
• 12 hours of prep X 46 operations a week = 516
• 516 hours of work per week/38 hours for these tasks = 14 FTEs

*Manager IV Assumptions:*
1:5 ratio Program Specialist VI to Manager due to complexity of Program Specialist work

*Director II Assumptions:*
1 additional Director FTE to participate in FITS meetings (30 minutes per meeting, 46 facilities per week, 23 hours per week), oversee work performed by the new FTEs and assure appropriate follow up.

Residential Contract Management
Program Specialist VI, Contract Technician (Admin III), Director II

*3 Program Specialist VI* – Responsible for developing the heightened monitoring plans, documenting the status, and managing the logistical aspects of recording, archiving, and reporting.

*Contract Technician*
1 contract technician (Admin III) - scheduling, packet development, and uploading.

*Director II*
1 additional Director FTE to participate in FITS meetings (30 minutes per meeting, 46 facilities per week, 23 hours per week), oversee work performed by the new FTEs

HHSC Residential Child Care Regulation

14.0 Program Specialist V, 2.0 Manager II, 1.0 Director II, 1 Training Specialist V

*Program Specialist V Assumptions:*

10 hours of prep work per operation to FITS tasks researching the operation information (ages served, service provided, governing body, etc.), reviewing and summarizing compliance history, identifying and noting patterns and trends, reviewing any corrective action conditions and status and obtaining field input.

- 10 hours of prep X 46 operations a week = 460
- 460 hours of work per week/35 hours for these tasks = 14 FTEs

*Manager II Assumptions:*

1:5 ratio Program Specialist V to Manager II to support program specialists.

*Director II Assumptions*:

1 additional Director FTE to participate in FITS meetings (30 minutes per meeting, 46 facilities per week, 23 hours per week), oversee work performed by the new FTEs and assure appropriate follow up.

*Training Specialist V Assumptions:*

1 additional Training Specialist to develop training curriculum for heightened monitoring and conduct training for additional positions.

**Residential Contract Management Facility Visits**
Responsible for monitoring facilities under heightened monitoring and conducting visits on a weekly basis.  It is assumed the equivalent of one day per week will be required for writing reports and completing other administrative duties, including addressing any potential issues of non-compliance or involvement in FITS meetings or gathering of data. The number of facilities in rural areas able to be visited will be impacted by lengthier travel times.

Assumption: 10 residential contract managers deployed to urban areas (4 travel days X 2 visits a day = 80 visits per week) and 13 (4 travel days per week X 1 facility visit a day = 52 visits a week) to rural areas for a total of 132 visits a week.

Total FTE: 23 Residential Contract Managers and 3 Managers
**accounts for potential need for follow up for certain facilities

**Statewide Intake Response**

Calls to SWI intake are expected to increase as a result of increased visits by staff to facilities. DFPS has observed over time that increased visits result in additional reports. This does not in and of itself reflect an increase in abuse, neglect, and exploitation or existence of active safety concerns, as many reports may have been investigated but must be reported by mandatory reporters who are unaware whether a report has been investigated.

For the purpose of this estimate, DFPS assumed the child safety checks @25 operations every week X 52 weeks X 3 contacts per week = 3,900 additional SWI contacts

Assumption: 3,900/1.75 CPH /1,690 Hours = 1.3 Intake specialist, rounds to 2 as there is also likely to be additional calls resulting from RCCL and Contract visits.

**Child Care Investigations Response**

Annual calls to SWI = 3900, Converted to Monthly = 325, 25% becomes CCI intake = 81

Assumption: 81 are screened as policy requires all intakes to be screened. Screeners: 81 *1.5 hours=122 hours per month= 3 FTEs plus supervisor

Assumption: 40% administratively closed or PN (32), 60% progress to investigations (49), using caseload ratio/functional unit to derive total FTEs.  4 investigators (rounded up from 3.3)   plus supervisor and admin staff

**Office of Data and Systems Improvement Response**

DFPS Data Decision Support (DDS)

2 Systems Analyst V are required to create, QA and maintain monthly reports to the monitors tracking all the DFPS related activities for operations subject to heightened monitoring.  It is anticipated that all the reports will require new development and include new data elements from IMPACT and CLASS.

DFPS Contract Performance

3 research specialist V and 1 Data Analyst (team lead) are required to run the Court's model (includes cleaning the data, compiling the data, running the model and QA the results), and then run model to triage identified operations , create reports summarizing data from the Court's model that resulted in operation being identified for heightened monitoring and provide support to CPS and Contracts around using reports from DDS to track progress on all DFPS activities related to heightened monitoring.

**Child Protective Services Child Safety Checks**

Although not specifically required by the March 18, 2020 order, DFPS views these staff as necessary to implement the Order.  CPS will supplement face to face visits to facilities with placement holds and safety checks to ensure the health and safety of children placed in those operations.   Staff will interview children and develop plans to address any immediate needs.  Interviews from these visits will be reviewed by the CPS FITS program specialists for inclusion in ongoing facility monitoring.

Assumptions:
75% GROs (25 total of 33 with ongoing concerns) require child safety check
5 hours visits per week per operation (3 visits)
5 hours of documentation and travel per operation
20 hours/week/operation

20 hours per facility x 25 facilities per week = 500 hours a week
- 500 per week x 52 weeks=26000 hours per year
- 26000 hours per year/12 months per year=2166 hours per month
- 2166/126 work hours per month* = 17 workers
  *based upon CVS work measure study

** applies to GROs only, children placed in CPAs will be visited by their assigned CVS worker

## HHSC Residential Child Care Regulation Facility Visits

HHSC is responsible for monitoring facilities under heightened monitoring and conducting visits on a weekly basis.

The following assumptions were used to determine how many inspectors were needed:

- An average of 1.5-2 hours per inspection at each operation
- An average of 3 hours of travel time per inspection
- An average of 1 hour of prep time per inspection
- An average of 3 inspections per month at each operation

Total HHSC staff required for heightened monitoring, including leadership support, is as follows:

- 36 Inspectors (390 inspections per month, 12 inspections per staff/month with 10% turnover rate included)
- 7 Supervisors (a 1:5 ratio for supervision)
- 3 Administrative support staff

## IMPACT

Modifications to IMPACT to support casework and documentation.

IMPACT changes include updates to an existing interface between IMPACT and CLASS to send and receive data on facilities on HM status; providing alerts and tasks for caseworkers when children are placed in a facility on HM or a facility receives a HM status; modifications to capture information on required Safety Checks and required approvals of placements; creation of a dashboard to indicate a facilities monitoring status; and development of other reports on facilities and addition of new audit tables.

## CLASS

Modifications to CLASS to support heightened monitoring tracking and documentation.

Anticipated changes include, but are not limited to:
- Way to identify an operation on heightened monitoring – new indicator in the Indicators section on the operation's main page
- New heightened monitoring section in CLASS that will be used by DFPS/HHSC staff with:
  - Way to document the heightened monitoring plan (date started, plan requirements, heightened monitoring triggers, etc.)
  - Way to identify who the heightened monitoring reps are
  - New To Dos generated for the heightened monitoring reps associated with heightened monitoring inspections and actions items due
  - New notifications specific to heightened monitoring
  - Way to track compliance with the heightened monitoring plan
  - Way for DFPS contract staff and/or SSCC staff to document contract violations
  - Way for DFPS SSCC staff to document heightened monitoring inspections in CLASS
- New inspection type (Heightened Monitoring)
- Changes to trigger the weighted enforcement system (WES) following a heightened monitoring inspection
- Add details regarding heightened monitoring inspections to the Search Texas Child Care site
- Ability to view heightened monitoring plan and inspections in CLASSMate
- Ability to document inspections related to heightened monitoring in CLASSMate
- New CLASS security role for DFPS contract staff and SSCC staff
- Mechanism to identify an operation that is on FITS, frequency of staffing required, triggers for when meetings must be scheduled, documentation of the meeting date/time/notes/action taken, ability to view a history of FITS meetings that occurred for an operation
- Interface between SCOR and CLASS to pull in DFPS contract violations – this may need a discussion with the SCOR team to figure out what they would need for this
- Way to send/receive Placement Hold distinction from IMPACT to CLASS
- Way to pull heightened monitoring information from CLASS to IMPACT

**From:** Deborah Fowler <dfowler@texasappleseed.net>
**Sent:** Wednesday, April 8, 2020 11:17 AM
**To:** Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>
**Cc:** Kevin Ryan <kevinmichaelryan1967@gmail.com>; Stephens, Andrew <andrew.stephens@oag.texas.gov>
**Subject:** Fwd: Responses to State's Requests

**WARNING:** This email is from outside the HHS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Hi, Corey - I wanted to check in with you on whether HHSC is working toward an alternative proposed rule for RO 21, based on the communication below.  I realize this was before you were involved - but I don't believe we ever received any alternative proposed rules or policy.  Is the agency working on an alternative proposal?

Thank you,

Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org





# Fwd: Fw: Responses to State's Requests

1 message



On Thu, Apr 9, 2020 at 1:57 PM Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us> wrote:

Good afternoon, Deborah.

As I indicated on the conference call today, HHSC has decided to move away from using a new rule to effectuate the provisions of RO 21, which we understand to be self-executing. Instead, HHSC is taking a more streamlined approach by complying directly. During all home visits, inspectors assess for various risk factors. If any child safety concerns are identified that cannot be mitigated, staff will fill out a separate form, outlining concerns. For example, if an inspector was completing a sampling visit or investigation inspection at a home and observed concerns, they would submit a form. In addition, with the new heightened monitoring definition, HHSC's presence in Child Placement Agencies (CPAs) and homes the CPAs verify will also increase significantly. Staff will fill out a form anytime there is a safety concern observed in a home that could warrant closure, regardless of whether the visit is related to heightened monitoring or as part of regular monitoring or investigative activities. These operations will then be staffed and considered for closure. If warranted, HHSC will close the home through the CPA and work with DFPS to prevent future placements of children in the home.

Thank you.

**Corey D. Kintzer** | Associate Director

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-438-3274 | Cell: 512-627-1183

www.hhs.texas.gov | www.dshs.texas.gov

This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.



## Fwd: Fw: Responses to State's Requests

1 message



---------- Forwarded message ---------

**From:** Deborah Fowler <dfowler@texasappleseed.net>

**Sent:** Thursday, April 9, 2020 2:00 PM
**To:** Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>
**Cc:** Kevin Ryan <kevinmichaelryan1967@gmail.com>; Stephens, Andrew <andrew.stephens@oag.texas.gov>;
Christopher.Hilton@oag.texas.gov; Kimberly.Gdula@oag.texas.gov; Bingham,Joseph (HHSC)
<Joseph.Bingham@hhsc.state.tx.us>; Harris,Russ (HHSC) <Russ.Harris@hhsc.state.tx.us>; Lam,Taryn (HHSC)
<Taryn.Lam@hhsc.state.tx.us>; Carmical,Audrey (DFPS) <AUDREY.CARMICAL@dfps.state.tx.us>
**Subject:** Re: Responses to State's Requests

Thanks so much, Corey, I appreciate your quick response.  Do you have any specific examples yet that we can share with the Court that illustrate how this works?

Deborah Fowler

*Executive Director*

Texas Appleseed

1609 Shoal Creek Blvd., Ste. 201

Austin, TX 78701

512.473.2800, ext. 105

512.757.1458 (cell)

www.texasappleseed.org

    



## Fwd: Fw: Responses to State's Requests
1 message

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---------- Forwarded message ---------
From: **Kintzer,Corey D (HHSC)** <Corey.Kintzer@hhsc.state.tx.us>
Date: Mon, Apr 13, 2020 at 5:59 PM
Subject: RE: Responses to State's Requests
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Kevin Ryan <kevinmichaelryan1967@gmail.com>, Stephens, Andrew <andrew.stephens@oag.texas.gov>,
Christopher.Hilton@oag.texas.gov <Christopher.Hilton@oag.texas.gov>, Kimberly.Gdula@oag.texas.gov
<Kimberly.Gdula@oag.texas.gov>, Bingham,Joseph (HHSC) <Joseph.Bingham@hhsc.state.tx.us>, Harris,Russ (HHSC)
<Russ.Harris@hhsc.state.tx.us>, Lam,Taryn (HHSC) <Taryn.Lam@hhsc.state.tx.us>, Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>


Good afternoon, Deborah.


We don't currently have any examples to offer as this new process has not yet been
fully implemented.


CCR originally had a plan to implement procedures this month. That plan included
additional home visits based solely on a heightened monitoring-type model. For that
plan, the sole purpose of those additional visits would be to conduct reviews for
potential closure. However, the new heightened monitoring definition would increase
visits such that it did not make sense to have a plan that included another wave of
increased visits. Therefore, we had to go back and retool, including reworking training
on this process. Attached please find a draft version of the form CCR will have
inspectors use for recommending closure.


The expected full rollout of the new process is May 1, 2020.

Thank you.


**Corey D. Kintzer** | Associate Director

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-438-3274 | Cell: 512-627-1183

www.hhs.texas.gov | www.dshs.texas.gov



This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

---

**Agency Home Closure Recommendation Form.pdf**
81K

TEXAS
**Health and Human
Services**

Form XXXX
April 2020

# CCR AGENCY HOME CLOSURE RECOMMENDATION

**Purpose:** Use this form to recommend closure of an agency home when health or safety concerns have been identified that cannot be mitigated.

**Directions:** Complete this form and email it to the RCCLFCL@hhsc.state.tx.us mailbox.

| AGENCY HOME INFORMATION | | |
|---|---|---|
| **Agency Home Name:** | **Agency Home Number:** | **Agency Home Region:** |
| | | |

| Child Placing Agency Name: | Child Placing Agency Number: |
|---|---|
| | |

| REQUESTOR INFORMATION | | |
|---|---|---|
| **Requestor's Name:** | **Requestor's Phone Number:** | **Requestor's Office Region:** |
| | | |

**Requestor's Title:**
☐RCCR Inspector      ☐RCCR District Director      ☐Other: _____
☐RCCR Supervisor     ☐RCCR Program Administrator

| REASON FOR AGENCY HOME CLOSURE RECOMMENDATION |
|---|
| Describe the reason(s) for the recommendation of agency home closure: |
| |

**\*TO BE COMPLETED BY THE FCL PROJECT MANAGER\***

| DECISION INFORMATION | |
|---|---|
| **Decision:**<br>☐Approved      ☐Denied | **Decision Date:** |

Page **1** of **1**

**Subject:**  FW: Enforcement Action data
**Date:**  Monday, June 22, 2020 at 8:43:50 PM Central Daylight Time
**From:**  Linda Brooke
**Attachments:** image001.png

---

**From:** "Kintzer,Corey D (HHSC)" <Corey.Kintzer@hhsc.state.tx.us>
**Date:** Monday, June 1, 2020 at 3:12 PM
**To:** "dfowler@texasappleseed.net" <dfowler@texasappleseed.net>
**Cc:** Linda Brooke <lbrooke@texasappleseed.net>, Viveca Martinez <vmartinez@texasappleseed.net>,
"narrigona@texasappleseed.net" <narrigona@texasappleseed.net>, Kevin Ryan
<kevinmichaelryan1967@gmail.com>, "Lam,Taryn (HHSC)" <Taryn.Lam@hhsc.state.tx.us>,
"Harris,Russ (HHSC)" <Russ.Harris@hhsc.state.tx.us>, "Bingham,Joseph (HHSC)"
<Joseph.Bingham@hhsc.state.tx.us>
**Subject:** RE: Enforcement Action data

Good afternoon, Deborah.

In response to your question about Kingdom Kids, the reason you all were not
notified of the letter of intent is because they did not have any PMC children
placed through the CPA at the time HHSC issued the letter of intent.  In addition,
DFPS had already terminated their contract with Kingdom Kids. Therefore, that
information didn't fall within our response criteria at the time.

Thank you.

**Corey D. Kintzer** | Associate Director
Litigation Department | Legal Services Division
4900 North Lamar, Mail Code: 1100
Austin, TX 78751
Office: 512-438-3274 | Cell: 512-627-1183
www.hhs.texas.gov | www.dshs.texas.gov



This message may contain confidential information. If you received this message in
error, please notify me immediately and then delete the message.

**From:** Deborah Fowler <dfowler@texasappleseed.net>
**Sent:** Monday, June 1, 2020 11:51 AM
**To:** Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>
**Cc:** Linda Brooke <lbrooke@texasappleseed.net>; Viveca Martinez <vmartinez@texasappleseed.net>;
narrigona@texasappleseed.net; Kevin Ryan <kevinmichaelryan1967@gmail.com>; Lam,Taryn (HHSC)
<Taryn.Lam@hhsc.state.tx.us>; Harris,Russ (HHSC) <Russ.Harris@hhsc.state.tx.us>; Bingham,Joseph (HHSC)
<Joseph.Bingham@hhsc.state.tx.us>
**Subject:** Re: Enforcement Action data

**Page 1 of 4**

I appreciate your clarification, Corey.

I do think Kingdom Kids would have fallen within the language in the request seeking placements under consideration for revocation or suspension, however, since the date of the data & information request was September 30 and the letter of intent for Kingdom Kids was sent in October.  Was there some reason that you notified us of North Fork and Children's Hope, but not Kingdom Kids -

Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org

On Mon, Jun 1, 2020 at 8:46 AM Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us> wrote:

Good morning, Deborah.

We interpret your email message below as asking two questions:

1. Why did certain operations appear in our recent production of enforcement data that you assert should have been in our September production?
2. Why is there what appears to be gaps between the intent to revoke and the actual decision to revoke?

To answer your first question, the original data request did not include information specific to intent to revoke. Data was requested on licenses that were revoked during the timeframe (21.1) and monitoring plans or corrective actions during the timeframe (20.6). HHSC provided reference to deficiencies being the basis for adverse action at Galveston Multicultural Institute in the report of deficiencies (20.7 Min.Stand.Def.). HHSC provided details of the intent to revoke in the latest data request based on the language requesting data on all enforcement actions.

To answer your second question, I'll separate them into the two operations you reference.

1. Daystar Residential: The operation has not been operating since January 2011. The revocation was awaiting completion of administrative reviews on several investigations at the operation, and additional administrative tasks

**Page 2 of 4**

before completing the revocation. The revocation was finalized in 2019 as part of a clean-up effort to close out operations that were not operating.

2. Kingdom Kids CPA: The operation has not been operating since October 2019. The operation requested an administrative review on the revocation, which is currently in progress and is expected to be completed by 6/2/2020.

Thank you.

**Corey D. Kintzer** | Associate Director
Litigation Department │ Legal Services Division
4900 North Lamar, Mail Code: 1100
Austin, TX 78751
Office: 512-438-3274 │ Cell: 512-627-1183
www.hhs.texas.gov │ www.dshs.texas.gov



This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

---

**From:** Deborah Fowler <dfowler@texasappleseed.net>
**Sent:** Thursday, May 28, 2020 3:14 PM
**To:** Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>
**Cc:** Linda Brooke <lbrooke@texasappleseed.net>; Viveca Martinez <vmartinez@texasappleseed.net>; narrigona@texasappleseed.net; Kevin Ryan <kevinmichaelryan1967@gmail.com>
**Subject:** Enforcement Action data

> **WARNING:** This email is from outside the HHS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Hi, Corey - we have been reviewing the five-year dataset provided related to deficiencies and enforcement actions and I have a few questions.

We noticed that there were several operations that the data shows had an enforcement action of "revocation" at some point - and one of them appears to have fallen within the 3-year window we asked for in our original data and information request in September - for example:

Galveston Multicultural Institute - looks like the intent to revoke was sent in October 2018.  But it wasn't included in RCCL's response to the September request.

Also Daystar Residential was in the most recent data you provided re: enforcements, and it looks like the decision to revoke letter was sent in October 2019, but the intent to revoke was sent in 2011.  I'm actually extremely confused by what might have happened there because even though the intent letter was sent in 2011, and the admin review was completed in 2012, the decision letter was just sent in October 2019?

Similarly, Kingdom Kids CPA (1544555-9931) - looks like the intent to revoke letter was sent in that case December 6, 2019?


Thanks,



Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org



# Fwd: Potential license revocation - RO21

1 message

██████████████████████████████

---------- Forwarded message ---------

On Thu, Dec 19, 2019 at 1:47 PM Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us> wrote:

Good afternoon.

As part of our ongoing reporting requirements, and pursuant to Remedial Order 21, HHSC's RCCL is considering a license revocation of Children's Hope Residential Services Inc – Lubbock, Operation #1423046.

The reasons for this potential revocation are, following a RCCL finding of abuse of a child in Children's Hope's care in October 2019, RCCL determined that, between 12/19/2018 and 12/13/2019, this facility received investigations and inspections resulting in 28 citations. Those citations include patterns of deficiencies in the areas of discipline and punishment (5 citations), physical site (5 citations), ratio (3 citations), and emergency behavior interventions (3 citations).

Thank you.

**Corey D. Kintzer** | Associate Director

Litigation Department │ Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-438-3274 │ Cell: 512-627-1183

www.hhs.texas.gov │ www.dshs.texas.gov

This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

---

**2 attachments**



**image001.png**
38K

**image002.gif**
1K



# Fwd: Potential license revocation - RO21

1 message

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

--------- Forwarded message ---------

**From:** Deborah Fowler <dfowler@texasappleseed.net>
**Sent:** Thursday, December 19, 2019 2:51 PM
**To:** Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>
**Cc:** kevinmichaelryan1967@gmail.com; Hilton, Christopher <Christopher.Hilton@oag.texas.gov>;
Stephens, Andrew <andrew.stephens@oag.texas.gov>; Gdula, Kimberly
<Kimberly.Gdula@oag.texas.gov>
**Subject:** Re: Potential license revocation - RO21

> **WARNING:** This email is from outside the HHS system. Do not click on links or
> attachments unless you expect them from the sender and know the content is safe.

And Corey, apologies for a second e-mail - but can you also give us a sense of the timeline - you say
HHSC is considering revoking their license.  How soon would that happen, if it were to happen and what
process is the agency going through to make a determination?  And then - how soon would children be
moved, etc?


Deborah Fowler

*Executive Director*

Texas Appleseed

1609 Shoal Creek Blvd., Ste. 201

Austin, TX 78701

512.473.2800, ext. 105

512.757.1458 (cell)

www.texasappleseed.org

    



# Fwd: Potential license revocation - RO21
1 message

---

---------- Forwarded message ---------
**From:** "Kintzer,Corey D (HHSC)" <Corey.Kintzer@hhsc.state.tx.us>
**Date:** December 23, 2019 at 3:21:28 PM CST
**To:** "dfowler@texasappleseed.net" <dfowler@texasappleseed.net>
**Cc:** "kevinmichaelryan1967@gmail.com" <kevinmichaelryan1967@gmail.com>, "Hilton, Christopher" <Christopher.Hilton@oag.texas.gov>, "Stephens, Andrew" <Andrew.Stephens@oag.texas.gov>, "Gdula, Kimberly" <Kimberly.Gdula@oag.texas.gov>
**Subject:** RE:  Potential license revocation - RO21

Good afternoon, Deborah.


Attached please find a formal response to your questions regarding the potential closure of Children's Hope.


Thank you.


**Corey D. Kintzer** | Associate Director

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-438-3274 | Cell: 512-627-1183

www.hhs.texas.gov | www.dshs.texas.gov

This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

---

**3 attachments**


**image001.png**
38K

**image002.gif**
1K

 **20191221 December 21.pdf**
103K



**Texas Health and Human Services Commission**

Dr. Courtney N. Phillips
*Executive Commissioner*

December 21, 2019

Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
www.texasappleseed.org

Subject: Children's Hope Closure

Greetings, Deborah.

In response to the information we provided about the intent to close Children's Hope, you posed the following questions:

1. Can you also give us a sense of the timeline for revoking their license?
2. How soon would that happen?
3. If it were to happen, what process is the agency going through to make a determination?
4. How soon would children be moved?

The timeline question is complex. Much depends on decisions made throughout the due process procedures. I'll walk you through that process here.

On December 19, 2019, HHSC issued a notice of intent to revoke licensure to Children's Hope. The effect of this action puts Children's Hope on notice that HHSC plans to revoke its license, but the operation has a right to due process. Pursuant to 40 TAC § 745.8806, Children's Hope has 15 calendar days after receiving the notice of intent to revoke to request an administrative review. If HHSC does not receive a request, the right for an administrative review is waived.

Page 2

For RCCL, due process consists of an informal administrative review. As further described in 40 TAC § 745.8815, there are various timeframes during which certain activities can be conducted, which makes pinpointing an exact timeframe for revocation impossible. However, if Children's Hope does not request due process, we will issue the revocation letter in 15 calendar days after it received the revocation.  If the operation does request due process, then HHSC will not issue the revocation letter until due process is complete, if the decision is upheld.

After the operation receives the results of its administrative review, the operation can have the matter heard in front of State Office Administrative Hearing (SOAH). Further complicating the timeframe question, if the operation requests records, then the process slows down pending the record redaction process. Some cases can take from six months to a year to make it in front of SOAH.

In response to your final question, our understanding is that all DFPS children have been moved from the operation as of December 16, 2019.

Kind regards,


/s/
_____
Jean Shaw



## Fwd: Fw: North Fork
1 message

---------- Forwarded message ----------
From: **Kintzer,Corey D (HHSC)** <Corey.Kintzer@hhsc.state.tx.us>
Date: Thu, Feb 27, 2020 at 6:54 PM
Subject: RE: North Fork
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Kevin Ryan <kevinmichaelryan1967@gmail.com>, Lam,Taryn (HHSC) <Taryn.Lam@hhsc.state.tx.us>, Stephens, Andrew <andrew.stephens@oag.texas.gov>, Gdula, Kimberly <Kimberly.Gdula@oag.texas.gov>, Hilton, Christopher <Christopher.Hilton@oag.texas.gov>, Bingham,Joseph (HHSC) <Joseph.Bingham@hhsc.state.tx.us>, Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>

Good evening, Deborah.

Yes, RCCL is taking action against North Fork. I am attaching a draft intent to revoke letter (NorthForkAALetter02272020.pdf) that RCCL plans to submit to the operation tomorrow. The letter details the reasoning behind the revocation. Also attached is an investigation history (201001.pdf).

In addition, I want to follow up on the outcome of our intent to revoke Children's Hope – Lubbock's license. Attached please find an agreement RCCL entered into with Children's Hope -Lubbock (Exec Agree.pdf).  Signed by all parties today, the agreement states Children's Hope Lubbock will voluntarily relinquish its license at that location and will not open another child care operation for five years.  In return, RCCL will withdraw the intent to revoke the license of this operation.

Thank you.

**Corey D. Kintzer** | Associate Director

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-438-3274 | Cell: 512-627-1183

www.hhs.texas.gov | www.dshs.texas.gov



This message may contain confidential information. If you received this message in error, please notify me immediately and then delete the message.

**From:** Deborah Fowler <dfowler@texasappleseed.net>
**Sent:** Thursday, February 27, 2020 5:02 PM
**To:** Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>
**Cc:** Carmical,Audrey (DFPS) <AUDREY.CARMICAL@dfps.state.tx.us>; Kevin Ryan <kevinmichaelryan1967@gmail.com>
**Subject:** North Fork

> **WARNING:** This email is from outside the HHS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Hi, Corey -


When I spoke to Audrey earlier today about our visit to Prairie Harbor, she mentioned that DFPS had decided to end its contract with North Fork RTC.  She mentioned that she believed that licensing is looking at enforcement action for that facility, as well.


Kevin and I are interested to learn more about what CCL is planning in terms of enforcement, and the reasons for the decisions for North Fork.


Thank you,


Deborah Fowler

*Executive Director*

Texas Appleseed

1609 Shoal Creek Blvd., Ste. 201

Austin, TX 78701

512.473.2800, ext. 105

512.757.1458 (cell)

www.texasappleseed.org

    

---

**3 attachments**

 **NorthForkAALetter02272020.pdf**
232K

 **201001.pdf**
459K

**Exec Agree.pdf**
154K



**TEXAS**
**Health and Human Services**

**Executive Commissioner**
**Dr. Courtney N. Phillips**

February 27, 2020



Operation #1019226
North Fork Educational Center

Re: Intent to Impose Adverse Action

**REGULAR AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
#Hand Delivery

Dear ⬛⬛⬛⬛⬛⬛,

On 09/23/2010, the Child Care Licensing (CCL) division of the Texas Health and Human Services Commission (HHSC) issued you permit # 1019226 to operate a(n)  Licensed General Residential Operation-Residential Treatment Center located at 3001 ELM GROVE RD, WYLIE, TX 75098-6251.  This letter shall serve as notice that HHSC intends to revoke that permit.

Tex. Hum. Res. Code §42.072(a) authorizes HHSC to take adverse action against an operation that does not comply with the minimum standards, rules, Chapter 42 of the Texas Human Resources Code, or the specific terms of the permit.


40* Tex. Admin. Code §745.8605 sets forth the circumstances when HHSC may take a form of enforcement action against an operation. HHSC applied this rule to the decision to take enforcement action against your operation as follows:

Subsections (5), (6), and (7) of this rule respectively provide that HHSC may take an enforcement action against an operation because of a single serious deficiency of minimum standards, rules, or laws, including a finding of abuse or neglect; several deficiencies that create an endangering situation; or a repetition or pattern of deficiencies.

███████

February 27, 2020
Page 2

CCL met with your operation on 01/10/2020 to review HHSC's intent to impose Corrective Action Probation based on four separate findings of physical abuse by the Department of Family and Protective Services (DFPS) and related patterns of deficiencies. On the date of the meeting, HHSC had sent you the notification of the most recent of those findings in a letter dated 12/20/2019.

Since that meeting, there have been three additional findings of physical abuse, all related to emergency behavior restraints and/or inappropriate discipline measures:

Following an investigation of allegations reported to DFPS on or about 08/12/2019, HHSC sent you a letter dated 01/28/2020 concerning DFPS's finding that a caregiver abused a child by using a broom to hit the child and pushing the child.

Following an investigation of allegations reported to DFPS on or about 08/18/2019, HHSC sent you a letter dated 01/28/2020 concerning DFPS's finding that a caregiver abused a child when the caregiver used inappropriate physical discipline.  The caregiver pushed the child, resulting in the child suffering a laceration.

Following an investigation of allegations reported to DFPS on or about 07/04/2019, HHSC sent you a letter dated 02/02/2020 concerning DFPS's finding that staff abused a child, who received a fractured femur as a result of an inappropriately implemented restraint that was also unwarranted.

Each of these three and the previous four findings of abuse were in themselves a single serious deficiency.  Related to these findings were deficiencies related to the child victim's right to be free from abuse, neglect, or exploitation; implementation of emergency behavior intervention; and prohibited punishments.  Given that your operation cares for children with significant emotional and behavioral issues, it is vital that caregivers at your operation be able to provide appropriate behavioral intervention.  Hence, these repeated serious deficiencies not only form a pattern, but they create an endangering situation for the children in your operation's care.

40* Tex. Admin. Code §745.8654 describes when HHSC may revoke a permit for an issue described in 40* Tex. Admin. Code §745.8605. Based on its application of this rule, HHSC has determined that revocation is the appropriate form of enforcement action to take against your operation:

26 Tex. Admin. Code 745.8654(2) states that HHSC may revoke an operation's permit if HHSC cannot address the risk at your operation by taking corrective action or another type of adverse action.  As you know, CCL met with your operation concerning its intent to place your operation on probation due to the first four abuse findings and related deficiencies.  But due to

███████

February 27, 2020
Page 3

the additional three findings of abuse, related patterns of deficiencies, and the resulting endangering situation, HHSC has determined that probation or any type of enforcement action other than revocation would not mitigate the risk posed by your operation.

Between 2/10/19 and 2/10/20 your operation received investigations and inspections resulting in 32 deficiencies. Those citations include patterns of deficiencies in the areas of discipline and punishment, emergency behavior intervention, medications and children's rights. Since February of 2019, there have been a total of seven findings of child abuse against caregivers at your operation who were tasked with caring for children requiring treatment services for emotional disorders. In short, HHSC cannot address risk at your operation by implementing a correction plan.

Copies of forms or letters from the inspections or investigations used as a basis for this action are incorporated by reference and are enclosed with this notice. The deficiencies cited during these inspections or investigations are listed below:

An investigation was completed by ███████████████ Licensing Staff, on 01/12/2020 and the following standard(s) deficiencies were found:

| | |
|---|---|
| 748.1101(b)(1)(B) | Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 |
| 748.2463(3) | Emergency Behavior Intervention-Never used as a means to get a child to comply |
| 748.2551(c)(2) | EBI Implementation-Caregiver must use the minimal amount of reasonable and necessary physical force |
| 748.685(a)(5) | Caregiver responsibility - being able to intervene when necessary to ensure child's safety |

An investigation was completed by ███████████████ Licensing Staff, on 01/09/2020 and the following standard(s) deficiencies were found:

▇▇▇▇▇▇

February 27, 2020
Page 4

| 748.2551(c)(2) | EBI Implementation-Caregiver must use the minimal amount of reasonable and necessary physical force |

An investigation was completed by ▇▇▇▇▇▇▇▇▇▇ Licensing Staff, on 12/22/2019 and the following standard(s) deficiencies were found:

| 748.1101(b)(1)(B) | Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 |
| 748.2307(1) | Other Prohibited Punishments-any harsh, cruel, unusual, unnecessary, demeaning, or humiliating discipline/punishment |
| 748.2307(9) | Other Prohibited Punishments-subjecting a child to abusive or profane language |

An investigation was completed by ▇▇▇▇▇▇▇▇▇▇ Licensing Staff, on 12/13/2019 and the following standard(s) deficiencies were found:

| 748.1101(b)(1)(B) | Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 |
| 748.2303(a) | Corporal Punishment-May not use/threaten corporal punishment, such as hitting/spanking, forced exercise, holding physical position, unproductive work. |
| 748.2307(9) | Other Prohibited Punishments-subjecting a child to abusive or profane language |

██████████
February 27, 2020
Page 5

748.535(1)        Child-care administrator
                  responsibilities-Daily supervision and
                  on-site administrative responsibility for
                  the overall operation

An investigation was completed by ████████████████ Licensing Staff, on 12/05/2019 and
the following standard(s) deficiencies were found:

748.1101(b)(1)(   Children's rights-Adhere to the child's
B)                rights to be free of abuse, neglect, and
                  exploitation as defined in Texas Family
                  Code 261.401

748.2307(1)       Other Prohibited Punishments-any
                  harsh, cruel, unusual, unnecessary,
                  demeaning, or humiliating
                  discipline/punishment

An investigation was completed by ██████████ Licensing Staff, on 11/02/2019 and the
following standard(s) deficiencies were found:

748.2003(b)(5)    Administration of prescription
                  medication-Ensure the child has taken
                  the medication as prescribed

An investigation was completed by ████████████ Licensing Staff, on 09/26/2019 and
the following standard(s) deficiencies were found:

748.2101(2)       Medication Storage-Keep medication
                  inaccessible other than to employees
                  responsible for stored medication

An inspection was conducted by ██████████ Licensing Staff, on 09/25/2019 and the
following standard(s) deficiencies were found:

748.1205(a)(10)   Admission Documentation-Includes
                  known contraindications to the use of
                  restraint

██████████
February 27, 2020
Page 6

| | |
|---|---|
| 748.1437(3) | Discharge/Transfer Documentation-Must include name, address, telephone number, and relationship of person to whom child is discharged |
| 748.2003(b)(2) | Administration of Medication-Store medication in the original container unless there is an additional container with the same label & instructions |
| 748.2101(3) | Medication Storage-Store medication covered by Schedule II of the Texas Controlled Substances Act under double lock in a separate container |
| 748.2151(c)(6) | Medication record - must include name & signature of person who administered each medication |
| 748.2151(d) | Medication Record-must include accurate daily count of each prescribed medication, unless operate on a cottage home model |
| 748.3239(d) | Evacuation-Must document fire and severe weather drills, including date, time, type of drill, and length of time for evacuation/relocation |
| 748.3271(3) | First Aid Kits-Each one must be in good condition and not have expired medications or supplies |
| 748.3359(1) | Bedroom Space-Rooms commonly used for other purposes cannot be used as bedrooms |

An investigation was completed by ████████████████ Licensing Staff, on 07/12/2019 and the following standard(s) deficiencies were found:

██████████
February 27, 2020
Page 7

| | |
|---|---|
| 748.2303(a) | Corporal Punishment-May not use/threaten corporal punishment, such as hitting/spanking, forced exercise, holding physical position, unproductive work. |
| 748.2307(9) | Other Prohibited Punishments-subjecting a child to abusive or profane language |
| 748.3353(c) | Monitoring Devices-Video cameras may not be used to tape the child, and images may not be accessible except to operation employees and caregivers |
| 748.685(c)(6) | Implement and follow the children's service plans. |

An inspection was conducted by ████████ Licensing Staff, on 06/10/2019 and the following standard(s) deficiencies were found:

| | |
|---|---|
| 748.3443(a)(4) | Food Preparation-Food items must be stored in a container that is protected from insects & rodents |

An inspection was conducted by ████████ Licensing Staff, on 03/08/2019 and the following standard(s) deficiencies were found:

| | |
|---|---|
| 748.1103(a) | Informing child of rights-Review rights with child/parents within 7 days of child's admission; provide child/parents with written copy of rights |
| 748.509 | TB screening-Caregivers, employees, volunteers, contract service providers screened for TB before having contact with children in care |

An investigation was completed by ████████ Licensing Staff, on 02/13/2019 and the following standard(s) deficiencies were found:

February 27, 2020
Page 8

| 748.1101(b)(1)(B) | Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 |
|---|---|
| 748.2461(a)(2) | Short Personal Restraint-Caregiver must use minimal amount of reasonable and necessary physical force |

An investigation was completed by ███████████████ Licensing Staff, on 01/16/2019 and the following standard(s) deficiencies were found:

| 748.1101(b)(1)(B) | Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 |
|---|---|
| 748.1101(b)(4)(B) | Children's rights-The right to discipline that is appropriate to the child's age, maturity, and developmental level |
| 748.2455(a)(2) | Emergency Behavior Intervention-Basis for EBI is an emergency situation or to administer medication |
| 748.2551(a) | EBI Implementation-Must be an appropriate response to the behavior demonstrated, and de-escalation must have failed |

An investigation was completed by ██████████ Licensing Staff, on 12/10/2018 and the following standard(s) deficiencies were found:

| 748.1101(b)(1)(B) | Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 |
|---|---|

February 27, 2020
Page 9

748.2461(a)(2)   Short Personal Restraint-Caregiver
must use minimal amount of
reasonable and necessary physical
force

Within five (5) days of receipt of this letter, you must send a copy of this letter by certified mail to the parents or managing conservator of each child currently enrolled in your operation, if any. You must file the copies of the certified receipts with HHSC within five days after you receive them. You must also notify anyone seeking to enroll a child in your operation of this action.

You have the right to request an administrative review if you disagree with the decision to impose adverse action. To request a review, you must send a written statement that includes your reason for dispute to ███████████ 701 W 51ST ST, AUSTIN, TX 78751 (512) 438-3243 within fifteen(15) days of receipt of this letter. You may also expedite the adverse action by sending a written statement that indicates  your decision to waive your right to an administrative review before the 15-day timeframe to submit the request expires.  For additional information concerning administrative reviews, please refer to 40* Tex. Admin. Code §745.8809 - 8817.

**If you do not request an administrative review, HHSC will issue you a decision notice explaining your remaining due process rights.**

You may not apply to HHSC for a child-care permit or be a controlling person at an operation for five (5) years after the date that this adverse action takes effect.

Each controlling person with your operation will be designated as controlling and will receive a letter offering an administrative review on that designation. A person's designation as a controlling person will be sustained when the revocation and the due process for a designated controlling person are final. A sustained controlling person cannot have a permit to operate a child-care operation or be a controlling person for five years.

**You must post this notice in a prominent place near all public entrances immediately following receipt.**

*Currently, Child Care Licensing rules are located in Title 40 of the Texas Administrative Code.  The rules will be transferred to Title 26 at a later date.

███████

February 27, 2020
Page 10

Sincerely,

████████

District Director

████████

Enclosure(s):

cc:
████████ CEO
███████
█████████



**TEXAS**
**Health and Human Services**

**Executive Commissioner**
**Dr. Courtney N. Phillips**

March 8, 2019



Operation #1019226
North Fork Educational Center

Investigation # 2379604

Dear ███████████

Your operation, North Fork Educational Center located at 3001 ELM GROVE RD, WYLIE, TX 75098-6251, was recently investigated because of a report concerning a possible deficiency of the minimum standard rules or another law.

Specifically, the report states the following that led to this investigation:

It is alleged a child in care sustained unexplained injuries as a result of an improper restraint.

The Child Care Licensing Division of the Health and Human Services Commission (CCL) has evaluated applicable administrative rules, minimum standard rules, and other laws and made the following findings:

██████████

March 8, 2019
Page 2

| Inspection Start Date | Standard/Rule Description | Specifics | Deficient? | Comply By | TA Given |
|---|---|---|---|---|---|
| | 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | This standard was found to be deficient as a result of the investigation. | Y | 03/15/2019 | N |
| | 748.2461(a)(2) Short Personal Restraint-Caregiver must use minimal amount of reasonable and necessary physical force | A child in care received injuries as a result of an inappropriate restraint. | Y | 03/15/2019 | N |

If CCL conducted an inspection as part of this investigation, you received an inspection report form.

**CCL may take an enforcement action if your operation fails to maintain compliance on an ongoing basis.**

If you disagree with the outcome of this investigation, you may request an administrative review within 15 days of the receipt of this letter by writing ████████████ Program Specialist, 1200 E. Copeland Rd., Suite 400, Arlington, TX 76011, ████████████
███████████████████████████████

If you have any other questions or need additional information, please contact me.

Sincerely,

██████████████

Licensing Representative
(817) 792-4422



**TEXAS**
**Health and Human Services**

**Executive Commissioner**
**Dr. Courtney N. Phillips**

February 25, 2019



Operation #1019226
North Fork Educational Center

Investigation # 2362559

Dear ▮▮▮▮▮▮:

Your operation, North Fork Educational Center located at 3001 ELM GROVE RD, WYLIE, TX 75098-6251, was recently investigated because of a report concerning a possible deficiency of the minimum standard rules or another law.

Specifically, the report states the following that led to this investigation:

It is alleged that a child in care was improperly disciplined.

This investigation was conducted by DFPS Investigator ▮▮▮▮▮▮. Please refer to Alexander for questions specific to the investigation.

The Child Care Licensing Division of the Health and Human Services Commission (CCL) has evaluated applicable administrative rules, minimum standard rules, and other laws and made the following findings:

████████████
February 25, 2019
Page 2

| Inspection Start Date | Standard/Rule Description | Specifics | Deficient? | Comply By | TA Given |
|---|---|---|---|---|---|
| | 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | This standard was found to be deficient. | Y | 03/01/2019 | N |
| | 748.2461(a)(2) Short Personal Restraint-Caregiver must use minimal amount of reasonable and necessary physical force | A child in care was inappropriately restrained resulting in an injury. | Y | 03/01/2019 | N |

If CCL conducted an inspection as part of this investigation, you received an inspection report form.

**CCL may take an enforcement action if your operation fails to maintain compliance on an ongoing basis.**

If you disagree with the outcome of this investigation, you may request an administrative review within 15 days of the receipt of this letter by writing ███████████, Program Specialist, 1200 E. Copeland Rd., Suite 400, Arlington, TX 76011, ██████ ████████████████

If you have any other questions or need additional information, please contact me.

Sincerely,


████████████
Licensing Representative
██████████



**TEXAS**
**Health and Human Services**

**Executive Commissioner**
**Dr. Courtney N. Phillips**

February 2, 2020



Operation #1019226
North Fork Educational Center

Investigation # 2551185

Dear Mr. ████████:

Your operation, North Fork Educational Center located at 3001 ELM GROVE RD, WYLIE, TX 75098-6251, was recently investigated because of a report concerning a possible deficiency of the minimum standard rules or another law.

Specifically, the report states the following that led to this investigation:

It is alleged a child in care suffered a severe injury during an improper restraint.

The Child Care Licensing Division of the Health and Human Services Commission (CCL) has evaluated applicable administrative rules, minimum standard rules, and other laws and made the following findings:

██████

February 2, 2020
Page 2

| Standard/Rule Description | Specifics | Deficient? | Comply By | TA Given | Notification Date |
|---|---|---|---|---|---|
| 748.685(a)(5) Caregiver responsibility - being able to intervene when necessary to ensure child's safety | Caregivers that were witness to an inappropriate restraint did not intervene for child safety when the child expressed pain. As a result the child suffered a significant injury. | Y | 01/29/2020 | Y | 02/02/2020 |
| 748.2463(3) Emergency Behavior Intervention-Never used as a means to get a child to comply | A caregiver inappropriately restrained a child in care when the child refused to pick up a broken toy.  The caregiver performed an improper restraint hold when the behavior did not warrant a restraint and was not an emergency situation. | Y | 01/29/2020 | Y | 02/02/2020 |
| 748.2855(a)(2) EBI Documentation-Must include a description and assessment of the circumstances and specific behaviors that were the basis for EBI | | N | | Y | |

February 2, 2020
Page 3

| | | | | | |
|---|---|---|---|---|---|
| 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | A 13 year old child was inappropriately restrained, resulting in the child receiving a subtrochanteric fractured femur when the caregiver took the child down to ground and placed his body weight on the child. Staff members that witnessed the restraint did not intervene for the protection of the child when the restraint occurred resulting in the fractured femur. | Y | 01/29/2020 | Y | 02/02/2020 |
| 748.2551(c)(2) EBI Implementation-Caregiver must use the minimal amount of reasonable and necessary physical force | The caregiver performed an inappropriate restraint that subjected the child to the staff person's weight while laying on the floor. | Y | 01/29/2020 | Y | 02/02/2020 |

The Technical Assistance provided for these standards described below:

| Standard/Rule Description | Technical Assistance Given |
|---|---|
| 748.685(a)(5) Caregiver responsibility - being able to intervene when | The purpose of this rule is to protect the health, safety, and well-being of children by ensuring adequate care and supervision of children. |

██████████

February 2, 2020
Page 4

| | |
|---|---|
| necessary to ensure child's safety | |
| 748.2463(3)<br>Emergency Behavior Intervention-Never used as a means to get a child to comply | The purpose of this rule is to prevent harm to children due to the inappropriate use of emergency behavior intervention. Restraint and seclusion can lead to injuries and even death. Therefore, caregivers must ensure that these interventions are used only during a crisis, and only when other efforts to defuse the situation have failed. |
| 748.2551(c)(2)<br>EBI Implementation-Caregiver must use the minimal amount of reasonable and necessary physical force | During a restraint it is important that the caregiver(s) use minimal force in order to prevent an unnecessary injury to a child. The purpose of this rule is to prevent physical and emotional harm to children due to the inappropriate use of personal restraint.  Personal restraint leads to injuries, and even death, of children in care.  The requirements listed in this rule are designed to minimize the risk of injury or death. |
| 748.1101(b)(1)(B)<br>Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | The purpose of this rule is to protect the rights of children in care.  Child rights are intended to safeguard the health of the children; assure the safety and comfort of their physical environment; provide for personal privacy and property; and assure the children of appropriate and necessary equipment, supplies, and facilities to meet their personal, recreational, and educational needs. Many children placed away from home have experienced disruptions in their environment and pattern of living. These rights attempt to minimize the disruptions by normalizing the children's physical and psychological environment and activities as much as possible. |
| 748.2855(a)(2)<br>EBI Documentation-Must include a description and assessment of the circumstances and specific behaviors that were the basis for EBI | Documentation of an implemented EBI  by caregivers should accurately reflect the incident and events.  To ensure accuracy, it is recommended that supervisors and administrative staff review the documentation within timeframes and address any discrepancies with staff upon review. |

This letter serves as notification of the above-listed finding(s) with a Notification Date of 02/02/2020. If you disagree with a finding with this notification date, you may request an administrative review of it within 15 days of your receipt of this letter by writing ██████████
RCCL Administrative Assistant 5155 Flynn Pkwy, Suite 201, Corpus Christi, Texas  78411,
██████████████████

TXSD

██████████
February 2, 2020
Page 5

The list of findings above is cumulative and includes all findings that CCL has made related to DFPS's investigation up to this point. As such, the list may include findings for which you received prior notification. For any finding listed above with an earlier notification date, your 15-day timeframe for requesting an administrative review of that finding began when you first received notification of that finding. If the time period to request an administrative review of a finding has expired, you may no longer request an administrative review of that finding.

If CCL conducted an inspection as part of this investigation, you received an inspection report form.

Your operation is responsible for maintaining compliance with relevant minimum standards, administrative rules, and statutes on an ongoing basis.  CCL may take an enforcement action for a repetition or pattern of deficiencies or for any other reason listed in 26 Tex. Admin. Code §745.8605.

If you have any other questions or need additional information, please contact me.

Sincerely,


██████████████
Program Manager
██████████

Enclosure(s):

cc:



## TEXAS
### Health and Human Services

**Executive Commissioner**
**Dr. Courtney N. Phillips**

January 28, 2020



Operation #1019226
North Fork Educational Center

Investigation # 2561718

Dear Mr. ███████

Your operation, North Fork Educational Center located at 3001 ELM GROVE RD, WYLIE, TX 75098-6251, was recently investigated because of a report concerning a possible deficiency of the minimum standard rules or another law. This was a self-report made on 08/18/2019 in compliance with the minimum standards.

Specifically, the report states the following that led to this investigation:

It is alleged a child in care has been subjected to inappropriate discipline.

The Child Care Licensing Division of the Health and Human Services Commission (CCL) has evaluated applicable administrative rules, minimum standard rules, and other laws and made the following findings:

███████

January 28, 2020
Page 2

| Standard/Rule Description | Specifics | Deficient? | Comply By | TA Given | Notification Date |
|---|---|---|---|---|---|
| 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | A 17 year old child was inappropriately disciplined, resulting in the child receiving a laceration when the caregiver pushed the child during an altercation. | Y | 01/29/2020 | Y | 01/28/2020 |
| 748.2307(14) Other Prohibited Punishments-withholding food that meets the child's nutritional requirements | | N | | Y | |
| 748.2307(9) Other Prohibited Punishments-subjecting a child to abusive or profane language | A caregiver used profanity towards a child in care while executing his duties at the operation. | Y | 01/29/2020 | Y | 01/28/2020 |
| 748.2307(1) Other Prohibited Punishments-any harsh, cruel, unusual, unnecessary, demeaning, or humiliating discipline/punishment | A caregiver engaged in a physical altercation with a child in care causing an injury.  The child received an abrasion to the face due to the altercation with the caregiver. | Y | 01/29/2020 | Y | 01/28/2020 |

The Technical Assistance provided for these standards described below:

| Standard/Rule Description | Technical Assistance Given |
|---|---|
| | |

███████

January 28, 2020
Page 3

| | |
|---|---|
| 748.1101(b)(1)(B)<br>Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | The purpose of this rule is to protect the rights of children in care.  Child rights are intended to safeguard the health of the children; assure the safety and comfort of their physical environment; provide for personal privacy and property; and assure the children of appropriate and necessary equipment, supplies, and facilities to meet their personal, recreational, and educational needs. Many children placed away from home have experienced disruptions in their environment and pattern of living. These rights attempt to minimize the disruptions by normalizing the children's physical and psychological environment and activities as much as possible. |
| 748.2307(1)<br>Other Prohibited Punishments-any harsh, cruel, unusual, unnecessary, demeaning, or humiliating discipline/punishment | The purpose of this rule is to prevent harm to children due to the use of behavior management techniques that inflict physical or emotional pain or discomfort.  These prohibited methods of punishment are considered physically, psychologically and/or emotionally abusive.<br>Discipline is most effective when it is consistent, recognizes and reinforces desired behaviors, and offers natural consequences (for example, when a child breaks a toy, the toy no longer works) and logical consequences (for example, not being able to play in the sandbox for a period of time as a consequence for throwing sand) for negative behaviors. |
| 748.2307(9)<br>Other Prohibited Punishments-subjecting a child to abusive or profane language | The purpose of this rule is to prevent harm to children due to the use of inappropriate language towards children in care at the operation. The operational staff should not use language that is considered physically, psychologically and/or emotionally abusive towards a child. |
| 748.2307(14)<br>Other Prohibited Punishments-withholding food that meets the child's nutritional requirements | The purpose of this rule is to ensure that food is not used as a means of discipline for children that are placed in care of the operation. Food should be used to fulfill the nutritional requirements of the children that placed in care at the operation. |

This letter serves as notification of the above-listed finding(s) with a Notification Date of 01/28/2020. If you disagree with a finding with this notification date, you may request an administrative review of it within 15 days of your receipt of this letter by writing ███████ RCCL Administrative Assistant,5155 Flynn Pkwy, Suite 201, Corpus Christi, Texas 78411.███████

The list of findings above is cumulative and includes all findings that CCL has made related to DFPS's investigation up to this point. As such, the list may include findings for which you

███████████

January 28, 2020
Page 4

received prior notification. For any finding listed above with an earlier notification date, your 15-day timeframe for requesting an administrative review of that finding began when you first received notification of that finding. If the time period to request an administrative review of a finding has expired, you may no longer request an administrative review of that finding.

If CCL conducted an inspection as part of this investigation, you received an inspection report form.

Your operation is responsible for maintaining compliance with relevant minimum standards, administrative rules, and statutes on an ongoing basis.  CCL may take an enforcement action for a repetition or pattern of deficiencies or for any other reason listed in 26 Tex. Admin. Code §745.8605.

If you have any other questions or need additional information, please contact me.

Sincerely,

███████████████

Program Manager
███████████████

Enclosure(s):

cc:
████████, Administrator



**TEXAS**
**Health and Human Services**

**Executive Commissioner**
**Dr. Courtney N. Phillips**

January 28, 2020



Operation #1019226
North Fork Educational Center

Investigation # 2560346

Dear Mr. ███:

Your operation, North Fork Educational Center located at 3001 ELM GROVE RD, WYLIE, TX 75098-6251, was recently investigated because of a report concerning a possible deficiency of the minimum standard rules or another law.

Specifically, the report states the following that led to this investigation:

It is alleged that a caregiver inappropriately disciplined a child in care.

The Child Care Licensing Division of the Health and Human Services Commission (CCL) has evaluated applicable administrative rules, minimum standard rules, and other laws and made the following findings:

██████

January 28, 2020
Page 2

| Standard/Rule Description | Specifics | Deficient? | Comply By | TA Given | Notification Date |
|---|---|---|---|---|---|
| 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | A 13 year old child received an abrasion to his face due to the caregiver hitting the child with a broom. | Y | 01/29/2020 | Y | 01/28/2020 |
| 748.2301(b)(1) Disciplinary Measures-must be consistent with operation policies and procedures | | N | | Y | |
| 748.2307(1) Other Prohibited Punishments-any harsh, cruel, unusual, unnecessary, demeaning, or humiliating discipline/punishment | A caregiver engaged in a physical altercation with a child in care causing an injury. The child received an abrasion to the face due to the behavior of the caregiver. | Y | 01/29/2020 | Y | 01/28/2020 |

The Technical Assistance provided for these standards described below:

| Standard/Rule Description | Technical Assistance Given |
|---|---|
| 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | The purpose of this rule is to protect the rights of children in care. Child rights are intended to safeguard the health of the children; assure the safety and comfort of their physical environment; provide for personal privacy and property; and assure the children of appropriate and necessary equipment, supplies, and facilities to meet their personal, recreational, and educational needs. Many children placed away from home have experienced disruptions in their environment and pattern of living. These rights attempt to minimize the disruptions by normalizing the children's physical and psychological environment and activities as much as possible. |

January 28, 2020
Page 3

| 748.2307(1)<br>Other Prohibited Punishments-any harsh, cruel, unusual, unnecessary, demeaning, or humiliating discipline/punishment | The purpose of this rule is to prevent harm to children due to the use of behavior management techniques that inflict physical or emotional pain or discomfort. These prohibited methods of punishment are considered physically, psychologically and/or emotionally abusive. Discipline is most effective when it is consistent, recognizes and reinforces desired behaviors, and offers natural consequences (for example, when a child breaks a toy, the toy no longer works) and logical consequences (for example, not being able to play in the sandbox for a period of time as a consequence for throwing sand) for negative behaviors. |
|---|---|
| 748.2301(b)(1)<br>Disciplinary Measures-must be consistent with operation policies and procedures | The purpose of this rule is to prevent the use of disciplinary measures that cause physical or emotional harm to children. The focus of any disciplinary measure should be on teaching and supporting children to practice methods to manage their own behavior. Caregivers are more likely to avoid abusive practices if they are well-informed about effective, non-abusive methods for managing children's behaviors. Positive methods of discipline create a constructive and supportive environment for children and reduce incidents of aggression.<br>The operation may benefit from having a method for staff to discuss concerns or report observations of other staff that may or may not be subject to reporting. |

This letter serves as notification of the above-listed finding(s) with a Notification Date of 01/28/2020. If you disagree with a finding with this notification date, you may request an administrative review of it within 15 days of your receipt of this letter by writing ▮▮▮▮ RCCL Administrative Assistant,5155 Flynn Pkwy, Suite 201, Corpus Christi, Texas 78411, ▮▮▮▮▮

The list of findings above is cumulative and includes all findings that CCL has made related to DFPS's investigation up to this point. As such, the list may include findings for which you received prior notification. For any finding listed above with an earlier notification date, your 15-day timeframe for requesting an administrative review of that finding began when you first received notification of that finding. If the time period to request an administrative review of a finding has expired, you may no longer request an administrative review of that finding.

If CCL conducted an inspection as part of this investigation, you received an inspection report form.

[REDACTED]

January 28, 2020
Page 4

Your operation is responsible for maintaining compliance with relevant minimum standards, administrative rules, and statutes on an ongoing basis.  CCL may take an enforcement action for a repetition or pattern of deficiencies or for any other reason listed in 26 Tex. Admin. Code §745.8605.

If you have any other questions or need additional information, please contact me.

Sincerely,

[REDACTED]

Program Manager

[REDACTED]

Enclosure(s):

cc:



**TEXAS**
**Health and Human Services**

**Executive Commissioner**
**Dr. Courtney N. Phillips**

December 20, 2019



Operation #1019226
North Fork Educational Center

Investigation # 2576925

Dear ███████

Your operation, North Fork Educational Center located at 3001 ELM GROVE RD, WYLIE, TX 75098-6251, was recently investigated because of a report concerning a possible deficiency of the minimum standard rules or another law.

Specifically, the report states the following that led to this investigation:

It is alleged that a child in care was improperly disciplined.

The Child Care Licensing Division of the Health and Human Services Commission (CCL) has evaluated applicable administrative rules, minimum standard rules, and other laws and made the following findings:

█████

December 20, 2019
Page 2

| Standard/Rule Description | Specifics | Deficient? | Comply By | TA Given | Notification Date |
|---|---|---|---|---|---|
| 748.2307(9)<br>Other Prohibited Punishments-subjecting a child to abusive or profane language | A staff member became escalated with a child in care by yelling and using inappropriate language. | Y | 01/03/2020 | Y | 12/20/2019 |
| 748.2303(a)<br>Corporal Punishment-May not use/threaten corporal punishment, such as hitting/spanking, forced exercise, holding physical position, unproductive work. | A staff member pushed and punched a child in care. The result of this contact caused a contusion of left elbow and shoulder, and multiple scratches. | Y | 01/03/2020 | Y | 12/20/2019 |
| 748.535(1)<br>Child-care administrator responsibilities-Daily supervision and on-site administrative responsibility for the overall operation | A staff member who was physically and verbally aggressive with a child in care had previously been counseled for the same inappropriate behavior months prior to the incident. There is no indication the administrator took action to develop and supervise this staff's behavior. | Y | 01/03/2020 | Y | 12/20/2019 |

■■■■■■■
December 20, 2019
Page 3

| 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | A staff member physically harmed a child in care while engaging in an altercation. | Y | 01/03/2020 | Y | 12/20/2019 |

The Technical Assistance provided for these standards described below:

| Standard/Rule Description | Technical Assistance Given |
|---|---|
| 748.2307(9) Other Prohibited Punishments-subjecting a child to abusive or profane language | The purpose of this rule is to ensure that an appropriate work culture is being established with children. When direct care staff use derogatory language while disciplining, it can change discipline from being constructive to punitive and unproductive. It is advised that additional training and monitoring be provided to staff. |
| 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | When abuse happens in an operation, it effects the whole program. Under these circumstances it is recommended that a program evaluation be conducted to isolate risk and new intervention methods be developed for implementation. |
| 748.535(1) Child-care administrator responsibilities-Daily supervision and on-site administrative responsibility for the overall operation | Ensuring staff with performance concerns and inappropriate responses to children are thoroughly developed, assessed, and monitored for compliance is important for child safety and ongoing compliance.  Appropriate monitoring of a staff person with direct contact with children after noted concerns is the responsibility of the Administrator.  It is recommended the Administrator document all development or corrective actions, the outcome of any actions, and their assessment of the staff prior to allowing unsupervised access or resuming direct caregiver responsibilities. |
| 748.2303(a) Corporal Punishment-May not use/threaten corporal punishment, such as hitting/spanking, forced exercise, holding physical position, unproductive work. | When a staff member experiences stress it can effect their ability to handle conflict appropriately. Failure to monitor for risk in employee behaviors will result in harm to children. It is recommended that house supervisors monitor direct care staff"s behavior closely and recommend staffing changes as needed. |

███████████

December 20, 2019
Page 4

This letter serves as notification of the above-listed finding(s) with a Notification Date of 12/20/2019. If you disagree with a finding with this notification date, you may request an administrative review of it within 15 days of your receipt of this letter by writing ███████ ████████HHSC RCCL 4 Corners District Program Specialist 1200 E. Copeland Rd, Suite 400 Arlington, Texas 76011███████████████

The list of findings above is cumulative and includes all findings that CCL has made related to DFPS's investigation up to this point.  As such, the list may include findings for which you received prior notification. For any finding listed above with an earlier notification date, your 15-day timeframe for requesting an administrative review of that finding began when you first received notification of that finding. If the time period to request an administrative review of a finding has expired, you may no longer request an administrative review of that finding.

If CCL conducted an inspection as part of this investigation, you received an inspection report form.

Your operation is responsible for maintaining compliance with relevant minimum standards, administrative rules, and statutes on an ongoing basis.  CCL may take an enforcement action for a repetition or pattern of deficiencies or for any other reason listed in 26 Tex. Admin. Code §745.8605.

If you have any other questions or need additional information, please contact me.

Sincerely,

███████████

Licensing Supervisor
███████████

Enclosure(s):

cc:

Child-Care Licensing
8700 N STEMMONS FWY, DALLAS, TX 75247



**TEXAS**
**Health and Human Services**

**Executive Commissioner**
**Dr. Courtney N. Phillips**

September 13, 2019



Operation #1019226
North Fork Educational Center

Investigation # 2503356

Dear Mr. ████████:

Your operation, North Fork Educational Center located at 3001 ELM GROVE RD, WYLIE, TX 75098-6251, was recently investigated because of a report concerning a possible deficiency of the minimum standard rules or another law.

Specifically, the report states the following that led to this investigation:

It is alleged that a child in care was inappropriately restrained, resulting in an injury to a vital area.

The Child Care Licensing Division of the Health and Human Services Commission (CCL) has evaluated applicable administrative rules, minimum standard rules, and other laws and made the following findings:

███████

September 13, 2019
Page 2

| Inspection Start Date | Standard/Rule Description | Specifics | Deficient? | Comply By | TA Given |
|---|---|---|---|---|---|
| | 748.1101(b)(1)(B) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401 | A 17 year old child was pushed and hit by operation staff. Although there were no visible injuries from the interactions this placed the child at substantial risk of harm. | Y | 09/18/2019 | N |
| | 748.1101(b)(4)(B) Children's rights-The right to discipline that is appropriate to the child's age, maturity, and developmental level | A food snack was inappropriately knocked out of the hand of a child in care. | Y | 07/12/2019 | N |
| | 748.2463(3) Emergency Behavior Intervention-Never used as a means to get a child to comply | A restraint was initiated by staff in order to get a child to comply with a staff's directive. | Y | 09/18/2019 | N |
| | 748.2551(d)(2) EBI Implementation-Caregiver must make every effort to protect child's dignity and well-being, including ensuring that child's body is covered | A staff initiated an improper and unwarranted restraint in the presence of residents and staff. | Y | 09/18/2019 | N |

If CCL conducted an inspection as part of this investigation, you received an inspection report form.

**CCL may take an enforcement action if your operation fails to maintain compliance on an ongoing basis.**

███████

September 13, 2019
Page 3

If you disagree with the outcome of this investigation, you may request an administrative review within 15 days of the receipt of this letter by writing ███████████ Program Specialist, 1200 E. Copeland Rd., suite 400, Arlington, TX 76011, ███████████ ███████████████████████████████

If you have any other questions or need additional information, please contact me.

Sincerely,

███████████████████

Licensing Supervisor
█████████████



**TEXAS**
Health and Human
Services

**Texas Health and Human Services Commission**

Dr. Courtney N. Phillips
*Executive Commissioner*

## SETTLEMENT AGREEMENT

### I.    JURISDICTION

The Texas Health and Human Services Commission (HHSC), Division of Child-Care Licensing (Licensing), is responsible for regulating childcare as provided Texas Human Resources Code (HRC) Chapter 42 (Act) and the HHSC rules found in 26 Texas Administrative Code (TAC) Chapters 745 and 748 (Rules).  Children's Hope Residential Services Inc. (referenced herein, Children's Hope) operates a general residential operation – residential treatment center at 2402 Canyon Lake Drive, Lubbock, Texas 79415-2000 (referenced herein, Children's Hope RTC –Lubbock), which is subject to Licensing's regulation under the aforementioned Act and Rules.

### II.    PARTIES

The parties to this agreement are Licensing and Children's Hope, the permit holder of Children's Hope RTC –Lubbock, Operation # 1423046.

### III.    BACKGROUND

On April 26, 2013, Licensing issued permit # 1423046 to Children's Hope for the operation of Children's Hope RTC - Lubbock.  The issuance of that permit subjected the operation to regulation by HHSC minimum standards, statutes, rules, and any other law governing the issued permit. Texas Human Resources Code §42.072(a) authorizes Licensing to take adverse action, including revocation, against the permit of operation that does not comply with the minimum standards, rules, Chapter 42 of the Texas Human Resources Code, or the specific terms of the permit.  Furthermore, 26 TAC §745.8605 lists several reasons that Licensing may take an enforcement action against an operation.  In turn, 26 TAC §745.8654 describes when Licensing may revoke a permit for an issue identified in 26 TAC §745.8605.

In a letter dated December 19, 2019, Licensing informed Children Hope of its intent to revoke permit # 1423046.  Licensing addressed this letter specifically to ███████████████, the administrator for Children's Hope RTC –Lubbock.  In this letter, Licensing described its application of 26 TAC §745.8605 and §745.8654 to deficiencies that Licensing had cited while inspecting and investigating the operation.  As cited in the letter, Children's Hope had the right to request an administrative review of Licensing's intent to revoke, and Children's Hope subsequently requested an administrative review. As of the date of this agreement, the administrative review has not occurred.  In the event that the revocation were upheld at the administrative review level, the operation would have the opportunity to request a due process hearing before the State Office of Administrative Hearings in order to challenge the revocation.

[Settlement Agreement for Children's Hope RTC - Lubbock]
Page 2

## IV.   SETTLEMENT

In order to resolve this matter and to avoid the uncertainty and expense of litigation, the parties agree to resolve this matter according to the following terms and conditions:

1. Children's Hope will relinquish the permit for Children's Hope RTC –Lubbock, Operation #1423046.

2. Children's Hope waives it right to an administrative review to challenge Licensing's intent to revoke the permit for Children's Hope RTC –Lubbock, Operation # 1423046.

3. Licensing will withdraw its Intent to Revoke the permit to operate Children's Hope RTC –Lubbock, Operation # 1423046.

4. The following may not apply for a new permit of any type issued by HHSC to operate a child-care operation regulated under Human Resources Code Chapter 42 before the fifth anniversary date of this agreement:
   a. Children's Hope;
   b. Any other business entity formed by or associated with Children's Hope; or
   c. An executive, an officer, or a board member of Children's Hope or any person who either alone or in connection with others has the ability to influence or direct the management, expenditures, or policies of the operation or business entity formed by such a person.

5. This agreement does not waive Licensing's right to enforce this agreement or to seek remedies against Children's Hope for any violations of any laws governing Children's Hope RTC –Lubbock, Operation # 1423046 or any other permits that Children's Hope currently holds or may hold in the future.

## V.   COMPLETE AGREEMENT

This agreement is made pursuant to Chapter 2001 of the Texas Government Code § 2001.056(2), and the procedural rules adopted by the Department.  This agreement represents the complete settlement of all matters as described in section "III.  Background."

[Settlement Agreement for Children's Hope RTC - Lubbock]
Page 3

## VI.   COMPLETE UNDERSTANDING

The Petitioner acknowledges understanding of the terms of this settlement agreement, enters into the settlement agreement freely, and agrees to all the terms of this settlement agreement.

Agreed to and effective the date of the last signature by a party to this agreement.

Approved by:

Date:  February 27, 2020

HHSC Associate Commissioner of Childcare Licensing

Date:  2·27·2020

Chief Executive Officer, Children's Hope

Approved as to Form:

Date: February 26, 2020

HHSC Attorney for Childcare Licensing

Date: 2/27/20

Attorney for Children's Hope

On Wed, May 20, 2020 at 3:44 PM Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us> wrote:

Deborah and Kevin,

I want to inform you that two residential providers will no longer be serving children in DFPS conservatorship.

Children's Hope (Washington Campus) has decided to end their contracts with DFPS and the SSCC.  I believe as of today, all but one child has been moved to a new placement.

Also, Hector Garza Residential Treatment Center will be phasing out their service to children in DFPS conservatorship. CPS and SSCC placement staff are working closely with the clinical team at Hector Garza to ensure a seamless and therapeutic transition for all children and youth while new placements are being secured. The process for moving children will take some time, and must be done in a fashion that meets the needs of the children. Hector Garza has begun the process of notifying facility staff.

It is important that both providers continue to provide needed services until new placements are secured.

I will provide updates as more information becomes available.

Thank you.


Rand Harris
Associate Commissioner of Compliance, Coordination and Strategy
Department of Family and Protective Services
512-438-3083

---------- Forwarded message ---------
From: **Harris,Rand S (DFPS)** <Rand.Harris@dfps.state.tx.us>
Date: Fri, May 22, 2020 at 11:48 AM
Subject: Children's Hope and Hector Garza
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>, Kevin Ryan
<kevinmichaelryan1967@gmail.com>
Cc: Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>, Roper,Tiffany (DFPS)
<Tiffany.Roper@dfps.state.tx.us>, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>, Levy,Leslie M (DFPS)
<Leslie.Levy2@dfps.state.tx.us>, Shaw,Jean (HHSC/DFPS) <Darla.Shaw@hhsc.state.tx.us>, Kintzer,Corey D
(HHSC) <Corey.Kintzer@hhsc.state.tx.us>, Taccetta,Kaysie E. (DFPS) <Kaysie.Taccetta@dfps.state.tx.us>,
Flores,Rebecca M (so) (DFPS) <Rebecca.Flores@dfps.state.tx.us>


Deborah,

Contracts and CPS were actively monitoring the Quality Improvement Plan of Hector
Garza. After a deliberate and months-long monitoring process, the agency determined
that while improvements were being made, their particular model was not the direction
DFPS was going long-term. After mutual discussions, both parties agreed to develop a
plan to transition children and to end our contractual relationship with one another.

With Children's Hope, the contractor reached out after DFPS further increased scrutiny
of the operation and indicated they would like to voluntarily terminate their contract.
The contract is worded in terms of DFPS taking the termination action for convenience,
which we are doing.

Thank you,
Rand


Rand Harris
512-438-3083

---

**From:** Deborah Fowler [mailto:dfowler@texasappleseed.net]
**Sent:** Wednesday, May 20, 2020 4:38 PM
**To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>
**Cc:** Kevin Fowler <kevinmichaelryan1967@gmail.com>; Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>; Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>; Olah,Tara (DFPS)
<Tara.Olah@dfps.state.tx.us>; Levy,Leslie M (DFPS) <Leslie.Levy2@dfps.state.tx.us>; Shaw,Jean (HHSC/DFPS)
<Darla.Shaw@hhsc.state.tx.us>; Kintzer,Corey D (HHSC) <Corey.Kintzer@hhsc.state.tx.us>; Taccetta,Kaysie E.
(DFPS) <Kaysie.Taccetta@dfps.state.tx.us>; Flores,Rebecca M (so) (DFPS) <Rebecca.Flores@dfps.state.tx.us>
**Subject:** Re: Children's Hope and Hector Garza

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Thanks so much for letting us know, Rand.

I'm curious to know if DFPS Contracts or RCCL took some action that precipitated these decisions - I have been following the problems at Children's Hope and had talked with you all about concerns that we were aware of, but I'm particularly curious about Hector Garza.

Deborah Fowler
*Executive Director*
Texas Appleseed
1609 Shoal Creek Blvd., Ste. 201
Austin, TX 78701
512.473.2800, ext. 105
512.757.1458 (cell)
www.texasappleseed.org

On Wed, May 20, 2020 at 3:44 PM Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us> wrote:

> Deborah and Kevin,
>
> I want to inform you that two residential providers will no longer be serving children in DFPS conservatorship.
>
> Children's Hope (Washington Campus) has decided to end their contracts with DFPS and the SSCC. I believe as of today, all but one child has been moved to a new placement.
>
> Also, Hector Garza Residential Treatment Center will be phasing out their service to children in DFPS conservatorship. CPS and SSCC placement staff are working closely with the clinical team at Hector Garza to ensure a seamless and therapeutic transition for all children and youth while new placements are being secured. The process for moving children will take some time, and must be done in a fashion that meets the needs of the children. Hector Garza has begun the process of notifying facility staff.

It is important that both providers continue to provide needed services until new placements are secured.

I will provide updates as more information becomes available.

Thank you.


Rand Harris
Associate Commissioner of Compliance, Coordination and Strategy
Department of Family and Protective Services
512-438-3083



## Fwd: Children's Hope and Hector Garza

1 message



---------- Forwarded message ----------
From: **Kintzer,Corey D (HHSC)** <Corey.Kintzer@hhsc.state.tx.us>
Date: Fri, May 22, 2020 at 1:48 PM
Subject: RE: Children's Hope and Hector Garza
To: dfowler@texasappleseed.net <dfowler@texasappleseed.net>
Cc: Kevin Ryan <kevinmichaelryan1967@gmail.com>, Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>,
Roper,Tiffany (DFPS) <Tiffany.Roper@dfps.state.tx.us>, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>, Levy,Leslie M
(DFPS) <Leslie.Levy2@dfps.state.tx.us>, Shaw,Jean (HHSC/DFPS) <Darla.Shaw@hhsc.state.tx.us>, Taccetta,Kaysie E.
(DFPS) <Kaysie.Taccetta@dfps.state.tx.us>, Flores,Rebecca M (so) (DFPS) <Rebecca.Flores@dfps.state.tx.us>,
Harris,Russ (HHSC) <Russ.Harris@hhsc.state.tx.us>, Lam,Taryn (HHSC) <Taryn.Lam@hhsc.state.tx.us>,
Bingham,Joseph (HHSC) <Joseph.Bingham@hhsc.state.tx.us>, Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>

Good afternoon, Deborah.

RCCL is not planning any action against Children's Hope as they have informed RCCL
that they will relinquish their license once all the children are moved.

With Hector Garza, RCCL is constantly evaluating the situation there. Although there
is no corrective action currently planned, RCCL will reevaluate their history for such if
we receive a new RTB from DFPS.

Thank you.

**Corey D. Kintzer** | Associate Director

Litigation Department | Legal Services Division

4900 North Lamar, Mail Code: 1100

Austin, TX 78751

Office: 512-438-3274 | Cell: 512-627-1183

www.hhs.texas.gov | www.dshs.texas.gov

**Megan Annitto**

| | |
|---|---|
| **From:** | Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> |
| **Sent:** | Wednesday, May 6, 2020 8:30 PM |
| **To:** | Kevin Ryan; Harris,Rand S (DFPS); Carmical,Audrey (DFPS); Kimberly Gdula |
| **Cc:** | dfowler@texasappleseed.net; Megan Annitto; Charmaine Thomas |
| **Subject:** | RE: C.G. |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Kevin,

Staff are looking into this. I will be in touch with a response as soon as possible.

Thank you,

Tara

-----Original Message-----
From: Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
Sent: Wednesday, May 6, 2020 6:22 PM
To: Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>;
Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Kimberly Gdula <Kimberly.Gdula@oag.texas.gov>
Cc: dfowler@texasappleseed.net; mannitto@public-catalyst.com; Charmaine Thomas <cthomas@public-catalyst.com>
Subject: C.G.

WARNING: This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from
the sender and know the content is safe.

Tara and Rand,

The C.G. video referenced in your email appears incomplete. The video clips stop at 20:25:28 and pick up again at
20:41:07. The investigation indicates video from 20:26:00 to 20:41:09 is relevant.  Can you advise when you will make
that available to us?

Thank you,

Kevin Ryan

**Megan Annitto**

| | |
|---|---|
| **From:** | Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> |
| **Sent:** | Thursday, May 7, 2020 3:10 PM |
| **To:** | Kevin Ryan |
| **Cc:** | Harris,Rand S (DFPS); Carmical,Audrey (DFPS); Kimberly Gdula; dfowler@texasappleseed.net; Megan Annitto; Charmaine Thomas |
| **Subject:** | RE: C.G. |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Kevin,

It appears there were two videos labeled 2025. The one uploaded to SharePoint was only 24 seconds long. We have uploaded the second video, titled "2025 ████ becomes upset – crying," which is 15:36 and covers the time period noted in your email below.

Thank you,

Tara

-----Original Message-----
From: Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
Sent: Wednesday, May 6, 2020 6:22 PM
To: Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; Kimberly Gdula <Kimberly.Gdula@oag.texas.gov>
Cc: dfowler@texasappleseed.net; mannitto@public-catalyst.com; Charmaine Thomas <cthomas@public-catalyst.com>
Subject: C.G.

WARNING: This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Tara and Rand,

The C.G. video referenced in your email appears incomplete. The video clips stop at 20:25:28 and pick up again at 20:41:07. The investigation indicates video from 20:26:00 to 20:41:09 is relevant.  Can you advise when you will make that available to us?

Thank you,

Kevin Ryan

**Megan Annitto**

---

| | |
|---|---|
| **From:** | Kevin Ryan <kevinmichaelryan1967@gmail.com> |
| **Sent:** | Sunday, May 24, 2020 5:11 PM |
| **To:** | Olah,Tara (DFPS) |
| **Cc:** | Harris,Rand S (DFPS); Carmical,Audrey (DFPS); dfowler@texasappleseed.net; Megan Annitto |
| **Subject:** | Re: C.G. Request |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Tara,

Please advise when you are going to upload the complete records from C.G.'s placement.

Thank you,

Kevin Ryan


On May 7, 2020, at 10:55 AM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

Kevin,

We have received your email and will be in touch with the information you requested.

Thank you,

Tara

---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Thursday, May 7, 2020 9:00 AM
**To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>
**Cc:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>; dfowler@texasappleseed.net; mannitto@public-catalyst.com
**Subject:** C.G. Request

> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments
> unless you expect them from the sender and know the content is safe.

Attached is a request for additional information. I will send the password in a separate email.

Kevin

**Megan Annitto**

| | |
|---|---|
| **From:** | Kevin Ryan <kevinmichaelryan1967@gmail.com> |
| **Sent:** | Wednesday, May 27, 2020 12:12 PM |
| **To:** | Olah,Tara (DFPS) |
| **Cc:** | Harris,Rand S (DFPS); Carmical,Audrey (DFPS); dfowler@texasappleseed.net; Megan Annitto |
| **Subject:** | Re: C.G. Request |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Tara,

Do you have an update on this request?

Kevin Ryan

> On May 26, 2020, at 7:33 AM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

> Kevin,

> We are working with field staff to determine whether there are any additional documents beyond what we provided to you on 5.12.20 and 5.19.20. We should be able to confirm this by COB today.

> Thank you,

> Tara

**From:** "Kevin Ryan" <kevinmichaelryan1967@gmail.com>
**Date:** Sunday, May 24, 2020 at 16:11:21
**To:** "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Cc:** "Harris,Rand S (DFPS)" <Rand.Harris@dfps.state.tx.us>, "Carmical,Audrey (DFPS)" <Audrey.Carmical@dfps.state.tx.us>, "dfowler@texasappleseed.net" <dfowler@texasappleseed.net>, "mannitto@public-catalyst.com" <mannitto@public-catalyst.com>
**Subject:** Re: C.G. Request

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Tara,

Please advise when you are going to upload the complete records from C.G.'s placement.

Thank you,

Kevin Ryan

> On May 7, 2020, at 10:55 AM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
> wrote:
>
> Kevin,
>
> We have received your email and will be in touch with the information you requested.
>
> Thank you,
>
> Tara
>
> ---
>
> **From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
> **Sent:** Thursday, May 7, 2020 9:00 AM
> **To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>
> **Cc:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Carmical,Audrey (DFPS)
> <Audrey.Carmical@dfps.state.tx.us>; dfowler@texasappleseed.net; mannitto@public-
> catalyst.com
> **Subject:** C.G. Request
>
> ---
>
> **WARNING:** This email is from outside the DFPS system. Do not click on links or
> attachments unless you expect them from the sender and know the content is
> safe.
>
> ---
>
> Attached is a request for additional information. I will send the password in a
> separate email.
>
> Kevin

**Megan Annitto**

| | |
|---|---|
| **From:** | Kevin Ryan <kevinmichaelryan1967@gmail.com> |
| **Sent:** | Wednesday, May 27, 2020 5:12 PM |
| **To:** | Olah,Tara (DFPS) |
| **Cc:** | Harris,Rand S (DFPS); Carmical,Audrey (DFPS); dfowler@texasappleseed.net; Megan Annitto |
| **Subject:** | Re: C.G. Request |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Tara,

The records the State has provided refer to a treatment plan at the ▮▮▮▮▮▮▮▮ for this child and describe some of the contents of that plan.  We have not found that treatment plan among the documents the State provided, nor another document that contains the information described in the reference materials. Please advise if that document exists and, if so, please provide it.

Kevin Ryan


On May 26, 2020, at 7:33 AM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

Kevin,

We are working with field staff to determine whether there are any additional documents beyond what we provided to you on 5.12.20 and 5.19.20. We should be able to confirm this by COB today.

Thank you,

Tara

---

**From:** "Kevin Ryan" <kevinmichaelryan1967@gmail.com>
**Date:** Sunday, May 24, 2020 at 16:11:21
**To:** "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Cc:** "Harris,Rand S (DFPS)" <Rand.Harris@dfps.state.tx.us>, "Carmical,Audrey (DFPS)" <Audrey.Carmical@dfps.state.tx.us>, "dfowler@texasappleseed.net" <dfowler@texasappleseed.net>, "mannitto@public-catalyst.com" <mannitto@public-catalyst.com>
**Subject:** Re: C.G. Request

<div style="border: 2px solid red;">

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

</div>

Tara,

Please advise when you are going to upload the complete records from C.G.'s placement.

Thank you,

Kevin Ryan

> On May 7, 2020, at 10:55 AM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:
>
> Kevin,
>
> We have received your email and will be in touch with the information you requested.
>
> Thank you,
>
> Tara
>
> ---
>
> **From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
> **Sent:** Thursday, May 7, 2020 9:00 AM
> **To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>
> **Cc:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; dfowler@texasappleseed.net; mannitto@public-catalyst.com
> **Subject:** C.G. Request
>
> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.
>
> Attached is a request for additional information. I will send the password in a separate email.
>
> Kevin

**Megan Annitto**

| | |
|---|---|
| **From:** | Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> |
| **Sent:** | Wednesday, May 27, 2020 4:47 PM |
| **To:** | Kevin Ryan |
| **Cc:** | Harris,Rand S (DFPS); Carmical,Audrey (DFPS); dfowler@texasappleseed.net; Megan Annitto |
| **Subject:** | RE: C.G. Request |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Kevin,

We have provided you with all records from ███████████ . We are still working to obtain the ██ records, but are encountering difficulties due to the hospital being closed since December 2019. We will update you if the status of the ██ records changes.

Thank you,

Tara

---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Wednesday, May 27, 2020 11:12 AM
**To:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>
**Cc:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>; Carmical,Audrey (DFPS) <Audrey.Carmical@dfps.state.tx.us>; dfowler@texasappleseed.net; mannitto@public-catalyst.com
**Subject:** Re: C.G. Request

---

> **WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

---

Tara,

Do you have an update on this request?

Kevin Ryan


On May 26, 2020, at 7:33 AM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:


Kevin,

We are working with field staff to determine whether there are any additional documents beyond what we provided to you on 5.12.20 and 5.19.20. We should be able to confirm this by COB today.

Thank you,

Tara

---

**From:** "Kevin Ryan" <kevinmichaelryan1967@gmail.com>
**Date:** Sunday, May 24, 2020 at 16:11:21
**To:** "Olah,Tara (DFPS)" <Tara.Olah@dfps.state.tx.us>
**Cc:** "Harris,Rand S (DFPS)" <Rand.Harris@dfps.state.tx.us>, "Carmical,Audrey (DFPS)"
<Audrey.Carmical@dfps.state.tx.us>, "dfowler@texasappleseed.net"
<dfowler@texasappleseed.net>, "mannitto@public-catalyst.com" <mannitto@public-catalyst.com>
**Subject:** Re: C.G. Request

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Tara,

Please advise when you are going to upload the complete records from C.G.'s placement.

Thank you,

Kevin Ryan

On May 7, 2020, at 10:55 AM, Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us> wrote:

Kevin,

We have received your email and will be in touch with the information you requested.

Thank you,

Tara

---

**From:** Kevin Ryan [mailto:kevinmichaelryan1967@gmail.com]
**Sent:** Thursday, May 7, 2020 9:00 AM
**To:** Harris,Rand S (DFPS) <Rand.Harris@dfps.state.tx.us>
**Cc:** Olah,Tara (DFPS) <Tara.Olah@dfps.state.tx.us>; Carmical,Audrey (DFPS)
<Audrey.Carmical@dfps.state.tx.us>; dfowler@texasappleseed.net; mannitto@public-catalyst.com
**Subject:** C.G. Request

**WARNING:** This email is from outside the DFPS system. Do not click on links or attachments unless you expect them from the sender and know the content is safe.

Attached is a request for additional information. I will send the password in a separate email.

Kevin

**Megan Annitto**

| | |
|---|---|
| **From:** | Kevin Ryan <kevinmichaelryan1967@gmail.com> |
| **Sent:** | Tuesday, May 5, 2020 1:24 PM |
| **To:** | Rand S Harris; Audrey Carmical; Tara Olah; Kimberly Gdula |
| **Cc:** | Deborah Fowler; Megan Annitto; Charmaine Thomas |
| **Subject:** | Information request: C.G. |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Rand and Tara,

With respect to C.G., who died 4/26/20, would you please provide us with all of the child's medical, pharmacological and mental/behavioral health records from February 13, 2020 to April 26, 2020, and the child's complete records/files from her last placement?

Thank you.


Kevin Ryan

# Email Footnote Citations Compendium

*Below are all of the emails in order that are cited in the report and the corresponding footnote reference is noted next to the cite; the email is bolded to indicate the first time that particular email was cited.*

- **Section I: Demographics of Children in PMC Care**
- **Section II: Overview of State Data and Data Systems Challenges**
    - 32 **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (attaching DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).**
    - 37 *See* TEX. HEALTH & HUMAN SERVS. COMM'N, *Data Response Chart* (Dec. 5, 2019) (on file with the Monitors) (stating that HHSC "is operations-centric not child-centric" and as a result cannot provide PMC identifiers of children involved in HHSC referrals); **Email from Corey Kintzer, Assoc. Dir. of Litig. Dep't, Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:48 EST) (on file with the Monitors) (including HHSC Response to Monitors' Feb. 21, 2020 Data and Information Request and stating that HHSC cannot provide investigation information specific to PMC children).**
    - 41 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (attaching DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).
    - 43 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request)
    - 45 **Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors)**; Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).
    - 47 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request). For further discussion of DFPS's challenges reporting on training of caseworkers, *see infra* Section V (discussing the incomplete reporting by DFPS of caseworker sex abuse training).
    - 48 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).
    - 50 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).
    - 53 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).
    - 54 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

- o   55 Email from Corey Kintzer, Assoc. Dir. of Legal Servs. Div., Health & Human Servs. Comm'n to Deborah Fowler, Monitor (May 5, 2020, 17:17 EST) (on file with the Monitors) (including HHSC response to Monitors' Feb. 21, 2020 Data & Information Request).
- o   56 Email from Nancy Arrigona, Director of Research, Monitoring Team to Jane Burstain, Chief Data & Analytics Officer, Dep't of Family & Protective Servs. (Apr. 14, 2020, 16:02 EST) (on file with the Monitors) (including questions to DFPS concerning RCCI Investigator caseload data).
- o   57 Email from Jane Burstain, Chief Data & Analytics Officer, Texas Dep't of Family & Protective Servs. to Deborah Fowler (Apr. 24, 2020, 15:22 EST) (on file with the Monitors) (including DFPS response to questions sent by the Monitoring Team on Apr. 14, 2020).

- **Section III: Screening, Intake and Investigation of Maltreatment in Care Allegations**

  **RO 3**

  - o   80 Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan, Monitor (Mar. 11, 2020, 18:09 EST) (on file with the Monitors) ("Child Care Investigations (CCI) policy is not in conflict with the Texas Administrative Code (TAC) rule you mention as that rule applies solely to Child Protective Investigations (CPI). For the purpose of CCI intakes, if the information is too vague or general, contact may occur with the reporter or other individuals in order to obtain clarifying information, as outlined in the Prioritization Guidelines.")
  - o   105 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (including Monitors' Sept. 30, 2019 Data & Information Request) (on file with the Monitors).
  - o   107 The Monitors' request included: intake stage ID number; investigation stage ID number; person ID (for all alleged PMC victims); county where maltreatment is alleged; most recent investigator name and ID; date and time investigation stage started; program conducting investigation; child's placement type at intake; placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; the relationships of the alleged perpetrator(s) to the child-victims. For closed investigations, the Monitors' request included: date the investigation is completed; date documentation is completed and submitted to the supervisor; the status of all  allegations involving all PMC children; overall investigation disposition; the reason(s) for all approved extensions to the investigation completion date/time (when applicable); the date any notification letters are sent to parents, providers and/or referents. *See also* **Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors).**
  - o   111 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

  **RO 5-11,16,18**

  - o   185 *Id*. On October 28, 2019, the Monitors responded to DFPS, further stating: "With respect to Remedial Orders 3, 5-10, 12-19 and B-5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors confirm that DFPS is to provide the following information and data from ALL investigations opened during the period involving any child in PMC General Class: Intake stage ID number; Investigation stage ID number; Person ID (for all alleged PMC victims); County where maltreatment is alleged; Most recent investigator name and ID; Date and time

investigation stage started; Program conducting investigation; Child's placement type at intake; Placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; the relationships of the alleged perpetrator(s) to the child-victims. With respect to the Remedial Orders 3, 5-10, 12-19 and B-5 (Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors confirm that DFPS is to provide the following information and data from ALL investigations closed during the period involving any child in the PMC General Class: Intake stage ID number; Investigation stage ID number; Person ID(for all alleged PMC victims); County where maltreatment is alleged; Most recent investigator name and ID; Date and time investigation stage started; Program conducting investigation; Date the investigation completed; Date documentation is completed and submitted to the supervisor; the status of all allegations involving all PMC children; overall investigation disposition; the reason(s) for all approved extensions to the investigation completion date/time (when  applicable); the date any notification letters are sent to parents, providers, and and/or referents. With respect to Remedial Orders 3, 5-10, 12-19 and B-5(Monitoring and Oversight), discussed on pages 5 and 6 of the DFPS Proposal, the monitors requested data and information to determine for the court which active investigations are overdue for completion. DFPS wrote in the DFPS Proposal that "Due to an IMPACT 2.0 issue, which the DFPS IT division is addressing, DFPS is currently unable to report on timeframes for extensions or timely completion [of investigations]," which the monitors will report to the Court." Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors).

o  187 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request, and stating that "a separate listing report will be provided from a case read regarding initiation, face-to-face contact including exceptions"); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data Dictionary for Reports due 11.15.19* (on file with the Monitors) (stating that DFPS cannot provide "Time of any contact; Date and time of face-to-face contact with all alleged victims; Exceptions to timely FTF contact")

o  189 TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data Dictionary for Reports due 11.15.19* (on file with the Monitors); Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request). The State anticipated reporting the time stamp for face-to-face contact with each alleged child-victim by April 15, 2020 and on approved extensions (or exceptions) to face-to-face contact by July 15, 2020. The Monitors reviewed the April 15, 2020 data and found that the data field has been added to the April data production and, thus far, in most cases the State was unable to report the date and timestamp for face-to-face contact with each alleged victim, as this field was blank or had a timestamp of 12:00:00 am; the Monitors also noted that investigations involving multiple alleged victims had the same date and timestamp listed for each alleged victim. The State noted in the Data Dictionary attached to the file:  This functionality rolled out in IMPACT on 12-19-19 so any contacts made prior to 12-19-19 will likely be blank. Blank cells can indicate that face-to-face contact has been made but not documented in this specific field, has not yet been made or can reflect a case has been or will be administratively closed in which case face-to-face contact is not required. If the timestamp is 12:00:00, it generally means that there was no timestamp entered. To the extent a contact was not made within the 24/72 hour timeframe, there may have been an exception but data reporting on exceptions will not be

available until Q3 FY 20. TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data file RO3.2 RCI Investigations Q2 FY 20 - Apr-15-20- 98263* (Apr. 15, 2020) (on file with the Monitors).

o  190 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Data Dictionary for Reports due 11.15.19* (on file with the Monitors).

o  194 After reviewing the case read reports that DFPS submitted to the Monitors to report on investigation performance, the Monitors requested clarification about why the reports used a methodology to measure initiation that was not consistent with the DFPS policy that specifically requires initiation through face-to-face contact with all alleged child victims in cases involving multiple children. DFPS responded to the Monitors' question by producing new case read reports that measured initiation using the correct policy and updated methodology. DFPS stated: "Historically, CCI interpreted policy to mean that investigation initiation is met by making face-to-face contact with the alleged victim, unless an exception is granted. While all alleged victims should be observed or interviewed within the required time frames, in these case reads, CCI determined that the investigation initiation was met when contact was made with at least one alleged victim, or by other means if an exception to the face-to-face contact with the alleged victim was granted. The case reading measured timely contact with all alleged victims as a separate measure. The CCI Quality Assurance Team (QAT) has reevaluated data in the November 2019 and January 2020 case read reports for compliance with investigation initiation time frames based on strict interpretation of CCI Policy and Field Communication #008. The results of the CCI QAT's reevaluation is in the attached addendums, in which investigations are only credited for timely initiation if all alleged victims were interviewed. Future case read reports will do the same." **Email from Tara Olah, Dir. of Implementation & Strategy, Tex. Dep't of Family & Protective Servs. to Kevin Ryan, Monitor (Apr. 3, 2020, 13:46 EST) (on file with the Monitors) (including DFPS Response to Monitors' question regarding DFPS case reads performance measurement for initiation with alleged victims).** Thus, DFPS provided to the Monitors an addendum report, reflecting the same time-periods as the initial reports: TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Addendum to the Residential Child Care Investigations Cohort and Non-Cohort Reports*. In the Addendum report, DFPS explains that "[w]hile the new policies have not been officially updated in the CCI Handbook, a field communication was disseminated to field staff delineating changes to face-to-face contact with victims and documenting exceptions." *Id.* It further states that some of the cases it evaluated during this time period were opened in 2018 and early 2019. *Id.*

o  218 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

o  220 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

**RO A6**

o  235 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).

o  237 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Deborah Fowler and Kevin Ryan, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (responding to Monitors' Sept. 30, 2019 Data & Information Request).

- o  238 **Email from Frances Townsend, Att'y, Litigation Dep't, Tex. Health & Human Servs. Comm'n, to Deborah Fowler, Court Monitor (Oct 30, 2019, 17:31 EST) (on file with the Monitors) (responding to Monitors' Sept. 30, 2019 Data & Information Request).**

### RO B5

- o  253 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (emphasis added) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).
- o  254 **Email from Kevin Ryan, Monitor to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Feb. 21, 2020, 17:54 CST).**
- o  256 Email from Tara Olah, Director of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 16:49 CST) (on file with the Monitors).

### RO 37

- o  282 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request); *see also* Letter from Deborah Fowler, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019) (on file with the Monitors).
- o  283 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).
- o  284 Email from Andrew Stephens, Ass't Att'y General, Office of Att'y General of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including response to Monitors' Sept. 30, 2019 Data & Information Request).
- o  285 Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y General, Office of Att'y General of Tex. (Oct. 28, 2019 08:53 CST) (on file with the Monitors) (including Monitor's response to the State's Data Request Proposal).
- o  286 **Email from Tara Olah, Director of Implementation & Strategy, Tex. Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews process, documentation, timeframes)** *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Review Process and Screen Shots* (Jan. 29, 2020) (on file with the Monitors).
- o  287 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews (process, documentation, timeframes)); *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Review Process and Screen Shots* (Jan. 29, 2020) (on file with the Monitors).
- o  288 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews (process, documentation, timeframes); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Review Process and Screen Shots* (Jan. 29, 2020) (on file with the Monitors).
- o  289 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews process, documentation, timeframes); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS.,

*IMPACT Enhancement Reference Doc 1.28.20* ("[R]eporting on this data element cannot commence until after the IT data team builds the needed data warehouse tables and DDS builds the corresponding report. Date of PN notification to CVS caseworkers and supervisors should be included in the RO3.1 RCI and CPI Intakes report due July 15, 2020. DDS and IT are meeting on January 29, 2020 to confirm.").

- o  290 Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Feb. 21, 2020, 17:54 CST) (on file with the Monitors) (including Monitors' Feb. 21, 2020 Data & Information Request).
- o  291 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 16:49 CST) (on file with the Monitors) (responding to Monitors' Feb. 21, 2020 Data & Information Request).
- o  **292 Email from Deborah Fowler, Monitor, to Tara Olah, Dir. of Implementation & Strategy, Tex. Dep't of Family & Protective Servs. (Mar. 9, 2020, 9:55 EST) (regarding request for additional copies of completed home history reviews).**
- o  300 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 29, 2020, 19:15 CST) (regarding RO37 - Home History Reviews (process, documentation, timeframes); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Home History Review Process and Screen Shots* (Jan. 29, 2020) (on file with the Monitors).

- **Section IV: Organizational Capacity**

  **RO 1**

  - o  **312 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Jan. 15, 2020, 23:47 CST) (on file with the Monitors).**
  - o  323 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 16:49 CST) (on file with the Monitors).

  **RO 2**

  - o  332 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request); *see also* Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors).
  - o  333 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (attaching DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).
  - o  334 *Id.* Because a forty-five day lag impedes the Monitors' ability to complete timely verification of compliance with Remedial Order Two on behalf of the Court, the Monitors did not agree to this proposed timeframe. DFPS confirmed more recently that it remains unable to process the data in a timeframe that is less than forty-five days. *See* Email from Tara Olah, Dir. of Implementation & Strategy**,** Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (attaching DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).
  - o  335 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (attaching DFPS Information and Data Request Proposal in response to the Monitors' Sept. 30, 2019 Data and Information request).

- ○ 336 Email from Tara Olah, Dir. of Implementation & Strategy**,** Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020 17:49 EST) (attaching DFPS response to Feb. 21, 2020 Data and Information Request). The Monitors did not receive the October 2019 data as initially requested; the State reported a problem to the Monitors about its data extraction for graduated caseloads. The Monitors eventually received all graduated caseload data for September through November 2019 when the State resubmitted the data on January 15, 2020 after a correction in its process. In this reporting period, DFPS produced four data files in response to the Monitors' request for a list of CVS caseworkers subject to graduated caseloads on the following dates: (1) file produced on November 15, 2019 reporting September 2019 data; (2) file produced on January 15, 2020 reporting September-November 2019 data; (3) file produced on February 18, 2020 reporting October-December 2019 data, and (4) file produced on March 16, 2020 reporting January 2020 data.
- ○ 337 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors) (attaching DFPS response to Monitors' February 21, 2020 Data & Information Request update). ("Providing the caseload on each day and comparing to a threshold for each day requires complex coding. We will research how and when we can provide the requested information."). Because of the agency's policy with a variable standard by county based on average caseloads within that county throughout the month, the data the Monitors requested is necessary for validation of the State's performance under Remedial Order Two during the period at issue.

**ROs 35, A1, A2, A3, A4**

- ○ **349 Email from Kevin Ryan, Monitor to Dep't of Family & Protective Servs. (Feb. 4, 2020, 13:36 EST) (on file with the Monitors).**
- ○ **350 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Feb. 18, 2020, 21:41 EST) (on file with the Monitors).**
- ○ 351 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 5:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request in attachment)
- ○ 352 Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors).
- ○ 357 CVS Specialists I, II, III, IV, V staff accounted for 1,418 staff or 96.9 percent of all the staff listed by DFPS carrying at least one PMC child's case. For caseload calculations, the Monitors included Possessory Conservatorship cases that Texas excluded from their caseload count (this impacted seven workers). For this report, the Monitors eliminated from the analysis staff with other titles because they account for a relatively small number of staff (45) carrying a small number of PMC children. Staff with eight other titles accounted for the remaining 45 staff (3.1%) percent of all the staff listed. Of the 45 staff, 29 held titles of CVS Supervisor I or II. Going forward, the Monitors will include all supervisors carrying at least one PMC case in reporting to the Court for Remedial Orders Thirty-Five and A-Four. The State advised the Monitors that "the supervisor to staff ratio for CVS is 1:7." Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 17:49 EST) (on file with the Monitors). Therefore, when assessing the workloads of supervisors who carry at least one PMC child's case, the Monitors will assign a weight of 14.29% for each supervised caseworker (100% - a full workload - divided by seven) and 5.88% (100% - a full workload - divided by the agreed-upon standard of seventeen cases) for each PMC/TMC child

managed directly by the supervisor. So, for example, a supervisor who supervises six caseworkers is dedicated 85.74% of the time to supervision (six workers x 14.29%). If that supervisor also serves as the primary case manager for one child, an additional 5.88% weight is added to their workload, yielding 91.62% of a workload, which is below the supervisor's 100% availability and within the standard. If the supervisor supervises six caseworkers and serves as the primary case manager for four children, an additional 23.52% weight (5.88% x four) is added to their workload of six supervision assignments (85.74% + 23.52%) yielding 109.26% of a caseload, which is greater than 100 percent of their availability.

o  [359] **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Feb. 28, 2020, 22:54 EST) (attaching information) (on file with the Monitors).**

o  [360] **Email from Kevin Ryan, Monitor, to Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (Mar. 2, 2020, 11:04 EST) (on file with the Monitors).**

o  [361] **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (Mar. 16, 2020, 22:53 EST) (on file with the Monitors).** Although IMPACT includes a drop-down option for caseworkers to indicate "Estimated Time with Client(s)," the Monitors' review of numerous IMPACT records shows that workers infrequently utilize this option. Moreover, even if caseworkers used the option more often, DFPS cannot compile the information into a data report. DFPS did offer that:

> Although we cannot presently track aggregate data on time spent on secondary assignments, we have the average number of days secondary assignments remain on a CVS caseworker or supervisor's workload. Statewide, average timeframes for all secondary assignments for all SUB stages are as follows: CVS caseworker (86 days) and CVS supervisor (187 days). Since most conservatorship stages are open 12-18 months at a minimum, average timeframes for all secondary assignments for all SUB stages are considerably shorter than the average substitute care case time.

o  [362] DFPS may give conservatorship (CVS) caseworkers secondary assignments, in addition to their primary assignments, that require them to provide courtesy supervision. Under DFPS policy, courtesy supervision is required when:

• A parent resides outside of the child's legal region.

• A child or youth in conservatorship is placed outside of the region that has legal jurisdiction and is residing with a parent.

• A child or youth is placed in an adoptive home outside of the region that has legal jurisdiction. An adoption preparation worker is assigned as secondary.

• A child or youth is placed in Texas from another state.

• A child or youth is residing in a General Residential Operation for children with intellectual disabilities.

• A child or youth is placed in an intermediate care facility for individuals with intellectual disabilities.

• A child or youth is placed in a nursing home…

• CVS caseworkers may also be assigned secondary when children or youth have been removed from their custodian by Child Protective Investigation, and the case has not yet been transferred to conservatorship. In general, cases are transferred to CVS after the Adversary Hearing.

Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Feb. 28, 2020, 22:54pm EST) (on file with the Monitors).

**ROs B1, B2, B3, B4**

- 368 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).
- 369 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).
- **370 Email from Frances Townsend, Att'y, Litigation Dep't, Health & Human Servs. Comm'n to Deborah Fowler, Monitor (Nov. 15, 2019, 18:02 EST) (on file with the Monitors) (responding to Monitors' Sept. 30, 2019 Data & Information Request).**
- 371 Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Feb. 21, 2020, 17:54 EST) (on file with the Monitors) (including Feb. 21, 2020 Data & Information Request).
- 374 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020, 16:49 EST) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).
- 375 Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2019, 17:48 EST) (on file with the Monitors) (including HHSC response to Monitors' Feb. 21, 2020 Data & Information Request).
- **376 Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Apr. 13, 2020 17:37 CST).**
- 377 Email from Jane Burstain, Chief Data & Analytics Officer, Dep't of Family & Protective Servs. to Deborah Fowler, Monitor (Apr. 24, 2020 15:22 CST) (on file with the Monitors).
- 378 Email from Tara Olah, Dir. of Information & Strategy, Tex. Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Feb. 18, 2020, 20:41 EST) (including DFPS response regarding comments on the CVS, CCI and CCL Draft Workload Standards/Guidance) (on file with the Monitors).

- **404 Email from Jane Burstain, Chief Data & Analytical Officer, Dep't of Family & Protective Servs. (May 18, 2020, 20:26 EST) (on file with the Monitors) (regarding meeting invite to discuss Residential Child Care Investigation (RCCI) caseloads). According to DFPS:**

  For CCI's purposes a unit is a group of individuals, with similar job functions who report to one supervisor who is responsible for managing and overseeing the work produced each unit member. CCI does try to house unit staff and its supervisor in the same region or office, whenever possible. However, due to the program's size, and the limited number of positions, it isn't always feasible or efficient to house all unit members in the same region or office. We provided the offices in which each unit is housed but it will not necessarily be reflective of the area in which they cover cases. Staff generally work cases in the region where they are housed and we have at least one staff person housed in each of the 11 regions. There are circumstances, however, where staff may work investigations in a different region as part of the backlog project or at times when a child care operation may be in a different region, but is geographically closer to an investigator across regional lines.

- 405 When the Monitors asked DFPS to suggest how to determine the number of staff needed to meet the caseload guidelines, the agency responded with the following options: "Option 1: Take the total number of investigations and divide by the total number of caseworkers; Option 2: Average the caseloads of all caseworkers; Option 3: Take the total number of investigations and divide by 17 (the upper limit of the caseload guidelines) and subtract the total number of caseworkers already working cases." Email from Jane Burstain, Chief Data & Analytics Officer, Dep't of Family & Protective Servs., to Deborah Fowler, Monitor (Apr. 24, 2020, 15:22 PM CST).

However, the interviews with investigators and the need to shift cases between workers as part of the "backlog project," discussed herein, clearly indicate that some investigators have higher caseloads than others. Each of the options described would obscure that reality.

- o **406Email from Rand Harris, Assoc. Comm'r for Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan and Deborah Fowler, Monitors (Apr. 09, 2020, 19:32 EST) (on file with the Monitors) (regarding RCCI backlog plan update).**
- o **407 Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (Apr. 10, 2020, 8:47 EST) (on file with the Monitors) (regarding RCCI Backlog Plan Update).**
- o **409 Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (Apr. 10, 2020, 9:33 EST) (on file with the Monitors) (regarding RCCI Backlog Plan Update).**

- **Section V: Preventing Child-on-Child Sexual Aggression**

  **RO32**
  - o 424 Email from Deborah Fowler, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of the Att'y Gen. of Tex. (Sept. 30, 2019, 16:14 CST).
  - o 426 Email from Deborah Fowler, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of the Att'y Gen. of Tex. (Sept. 30, 2019, 16:14 CST) (on file with the Monitors).
  - o 429 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (submitting DFPS Information and Data Request Proposal in response to Monitors' Sept. 30, 2019 Data & Information Request).
  - o **436 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Deborah Fowler, Monitor (May 15, 2020, 15:52 CST) (including DFPS response to Praesidium report) (attached as Appendix 5.3).**

  **ROs 23, 28, 24, 30**
  - o **458 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Oct. 25, 2019, 6:21 EST) (on file with the Monitors) (responding to questions raised related to IMPACT enhancements and defect resolutions).**

  **RO 4**
  - o 487 The Monitors requested inclusion of the name and identification number of the caseworkers; and the names, identification numbers, and addresses of the caregivers for the first report and regular quarterly reporting. Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request); *see also* Email from Kevin Ryan and Deborah Fowler, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 28, 2019, 09:54 EST) (on file with the Monitors). In response to the October 18, 2019 proposal provided by DFPS in response to the Monitors' Data and Information Request, the Monitors stated:

    With respect to Remedial Orders 4 and 32 (Sexual Abuse Training), discussed on page 7 of the DFPS Proposal, the monitors have carefully reviewed the email from Tara Olah dated October 25, 2019, on behalf of DFPS proposing to provide the monitors with "attestations from operations serving PMC children, certifying that their caregivers serving PMC children have received the mandated training. In addition, operations will provide quarterly reports to DFPS that include the following data for caregivers serving PMC children: date caregiver completed Sexual Abuse training; caregiver name;

caregiver ID number; and caregiver address. DFPS will aggregate these quarterly reports and submit them to the monitors. The first quarterly report will be submitted to the monitors by December 1, 2019." The monitors request that the operation attestations list all of the names of caregivers serving PMC children who completed the mandated training, and all of the names of the caregivers serving PMC children who did not complete the mandated training as of the date of attestation.

o  488 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS Information and Data Request Proposal, in response to Monitors' Sept. 30, 2019 Data & Information Request).

o  491 DFPS indicated that the training dates included are for either a course entitled Child Sexual Aggression – Course #0003632; or a subsequent updated version entitled Child Sexual Aggression FY19 – Course #0003805. **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Megan Annitto, Monitoring Team (Apr. 6, 2020, 18:11 EST) (on file with the Monitors) (including response to Questions about RO 4 Caseworker Files); Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Megan Annitto (Apr. 30, 2020, 12:44 EST) (on file with the Monitors) (including DFPS Response to Questions about RO 4 Caseworker Files).** Both caseworker data files include all DFPS caseworkers, which includes those serving children in PMC but does not distinguish them separately. *See* RO4.1 CVS Caseworker CSA Training as of 11-7-19 – Nov-15-19 -96402 (Nov. 15, 2019) (on file with the Monitors); RO.4 CVS Caseworker completion of Sex Abuse Training Q1 FY20 – 2-17-20 – 96784 (Feb. 17, 2020) (on file with the Monitors).

o  492 Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Megan Annitto, Monitoring Team (Apr. 30, 2020, 12:44 EST) (on file with the Monitors) (including DFPS Response to Questions about RO 4 Caseworker Files).

o  493 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).

### ROs 25, 26, 27, 29, 31

o  529 Email from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Deborah Fowler and Kevin Ryan, Monitors (Oct. 18, 2019, 18:00 EST) (on file with the Monitors) (including DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).

o  532 **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs., to Deborah Fowler and Kevin Ryan, Monitors (Nov. 8, 2019, 16:59 PM CST) (on file with the Monitors).**

o  534 Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y General, Office of Att'y Gen. of Tex. (Feb. 21, 2020, 17:54 CST) (on file with the Monitors) (including Monitors' Feb. 21, 2020 Data & Information Request).

o  535 **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Megan Annitto, Monitoring Team (Apr. 21, 2020 22:43 EST) (on file with the Monitors) (including DFPS response to questions regarding its ability to retrieve information related to caregiver's notification into data reports).**

### ROs A7, A8

o  572 **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (Feb. 26, 2020, 11:35 CST) (pertaining to Awake Night Certifications)**

- o   573 **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler, Monitor (May 12, 2020, 15:35 CST) (pertaining to Awake Night Certifications).**

- **Section VI: Regulatory Monitoring and Oversight of Licensed Placements**

  **RO 22**
  - o   603 Email from Frances Townsend, Att'y, Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Nov. 15, 2019, 18:02 EST) (on file with the Monitors) (including HHSC response to Monitors' Sept. 30, 2019 Data & Information Request).
  - o   604 Email from Kevin Ryan, Court Monitor to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Texas (Feb. 21, 2020, 17:54 CST) (on file with the Monitors) (including Feb. 21, 2020 Data & Information Request).
  - o   607 Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2019, 17:48 EST) (on file with the Monitors) (including HHSC response to Monitors' Feb. 21, 2020, Data & Information Request).
  - o   608 **Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 7, 2019, 10:22 EST) (on file with the Monitors) (regarding DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).**
  - o   610 Data related to this analysis was produced on May 5, 2020 as relayed and entitled by email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (May 5, 2020, 17:17 EST) (on file with the Monitors); *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *RO.22.1 7.31.2020-3.31. 2020 Rep. ANE. To. DFPS. B 5.5.2020* (on file with the Monitors).

  **ROs 12-19**
  - o   635 **Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. et al. (Feb. 21, 2020, 17:41 EST) (on file with the Monitors) (regarding Remedial Orders 12, 13 and 14). That email provided:**

    > Dear Counsel, Deborah Fowler and I have conferred with Judge Jack and want to ensure a shared understanding between the parties that, in light of DFPS's and HHSC's reorganization, the references in Remedial Orders 12, 13 and 14 to "successor staff" apply to CCL, not CCI. If the provisions were to refer to CCI, which they do not, they would simply replicate three earlier Remedial Orders that already require the same measure of timeliness from CCI.

  - o   636 **Email from Corey D. Kintzer, Assoc. Dir., Litig. Dep't, Legal Servs. Div., Health & Human Servs. Comm'n, to Kevin Ryan and Deborah Fowler, Monitors (Feb. 27, 2020, 10:08 EST) (on file with the Monitors).**

  **RO 20**
  - o   673 Email from Kevin Ryan, Monitor, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Texas (Oct. 7, 2019, 10:22 EST) (on file with the Monitors) (regarding DFPS response to Monitors' Sept. 30, 2019 Data & Information Request).
  - o   676 **Email from Rand Harris, Assoc. Comm'r for Compliance, Coordination & Strategy, Dep't of Family & Protective Servs., to Kevin Ryan and Deborah Fowler, Monitors (Feb. 19, 2020, 11:38 EST) (on file with the Monitors) (regarding heightened monitoring); Email from Tarryn Lam, Att'y, Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler,**

Monitors (Feb. 19, 2020, 11:31 EST) (on file with the Monitors) (regarding heightened monitoring).

- o **692 Email from Kimberly Gdula, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Aaron Finch, Senior Staff Att'y, Children's Rights (Apr. 10, 2020, 16:36 EST) (on file with the Monitors) (including DFPS and HHSC heightened monitoring cost estimate submission);** *See* TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., ET AL., *FCL Heightened Monitoring Cost Estimate* (Apr. 10, 2020).

## RO 21

- o 718 Email from Kevin Ryan, Monitor to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Oct. 7, 2019, 10:22 EST) (on file with the Monitors)
- o 719 Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen. of Tex. (Sept. 30, 2019, 17:14 EST) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request).
- o **720 Email from Deborah Fowler, Court Monitor to Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n (Apr. 8, 2020, 11:17 EST) (on file with the Monitors) (regarding Responses to State's Request and an Alternative Proposed Rule for RO 2).**
- o **722 Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Apr. 9, 2020, 13:57 EST) (on file with the Monitors) (regarding Responses to State's Request and an Alternative Proposed Rule for RO 21).**
- o **723 Email from Deborah Fowler, Monitor, to Corey Kintzer, Assoc. Director, Legal Servs. Div. Health & Human Servs. Comm'n (Apr. 9, 2020 14:00 EST) (on file with the Monitors) (regarding Responses to State's Request and an Alternative Proposed Rule for RO 21).**
- o **724 Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Apr. 13, 2020 17:59 EST) (on file with the Monitors) (regarding Responses to State's Request and an Alternative Proposed Rule for RO 21).**
- o 727 On May 22, 2020, the Monitors received data from the State as a result of the Court's orders related to Remedial Order Twenty, discussed in the last section. In this data, seven operations (Daystar Residential, Galveston Multicultural Institute, Kingdom Kids CPA, Wings of Refuge CPA, North Fork Educational Center, and Children's Hope-Lubbock) were identified as having been subject to a revocation enforcement action by RCCL at some point after September 30, 2014. The Monitors e-mailed HHSC to ask why they were not notified of these revocations in response to the data and information requests for Remedial Order Twenty-One, as they had been notified for Children's Hope Residential Services – Lubbock, and North Fork Educational Center. **Email from Deborah Fowler, Monitor, to Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n (May 28, 2020, 15:14 CST).** HHSC responded that "the original data request did not include information specific to intent to revoke. Data was requested on licenses that were revoked during the timeframe." **Email from Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n to Deborah Fowler, Monitor (June 1, 2020, 08:46 CST).** In response to specific questions about the revocation of Daystar Residential (which closed in 2011) and Kingdom Kids CPA, HHSC indicated that the revocation for Daystar Residential was "finalized in 2019 as part of a clean-up effort to close out operations that were not operating" and that Kingdom Kids CPA "has not been operating since October 2019. The operation requested an administrative review on the revocation, which is currently in progress and is expected to be completed by 6/2/2020." Email from Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n to Deborah Fowler, Monitor (June 1, 2020, 08:46 CST). The Monitors asked why they were not at least notified of the letter of intent to revoke the license for Kingdom Kids CPA, which was sent December 6, 2019, just prior to the letter of intent to revoke sent to North Fork Educational Center. **Email from Deborah Fowler, Monitor, to Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n (June 1, 2020, 11:51 CST).** HHSC responded, "the reason

you all were not notified of the letter of intent is because they did not have any PMC children placed through the CPA at the time HHSC issued the letter of intent. In addition, DFPS had already terminated their contract with Kingdom Kids. Therefore, that information didn't fall within our response criteria at the time." **Email from Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n to Deborah Fowler, Monitor (June 1, 2020, 15:12 CST).** The Monitors reviewed the letter of intent to revoke for Kingdom Kids CPA in CLASS, which was sent to the operation on December 6, 2019 and indicated that RCCL's decision to revoke the operation's license was based on a child fatality that occurred in December 2018, the investigation of which led to the discovery that children in care had been subjected to sexual abuse by the son of the foster parent. Letter from Toni Cantu, District Dir., Residential Child Care Licensing, Health & Human Servs. Comm'n to Michelle Williams, Controlling Person, Kingdom Kids Child Placing Agency (Dec. 6, 2019) (on file with the Monitors). Though an administrative review was requested, the decision to revoke was upheld on June 2, 2020. The Monitors also reviewed the letter of intent to revoke for Galveston Multicultural Institute, which was sent on October 31, 2018, and indicated the decision to revoke the operation's license was based on the "likely fatality" of two foster children assumed to have drowned, and serious medical concerns for other children who did not drown but who did not receive medical attention after a near-drowning incident. Letter from Amber Krause, Dir. of Residential Licensing, Health & Human Servs. Comm'n, to Vivian Putney, Controlling Person, Galveston Multicultural Institute (Oct. 31, 2018). The operation requested an administrative review of the decision, which still appears to be pending.

- o  [728] **Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Dec. 19, 2019, 13:47 EST) (on file with the Monitors) (regarding Potential License Revocation - RO 21).**

- o  [730] Email from Corey Kintzer, Assoc. Dir., Litig. Dep't, Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Dec. 19, 2019, 13:47 EST) (regarding Potential License Revocation - RO 21).

- o  [731] **Email from Deborah Fowler, Monitor, to Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n (Dec. 19, 2019, 14:51 EST) (on file with the Monitors) (regarding Potential License Revocation - RO 21).**

- o  [732] **Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Dec. 23, 2019, 15:21 EST) (on file with the Monitors) (regarding Potential License Revocation - RO 21 and including formal response attachment** regarding the potential closure of Children's Hope); *See also* Letter from Darla Shaw, Asst. Comm'r, Health & Human Servs. Comm'n, Residential Child Care Licensing, to Deborah Fowler, Court Monitor (Dec. 21, 2019) (on file with the Monitors) (regarding Children's Hope closure).

- o  [742] **Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Feb. 27, 2020, 18:54 EST) (on file with the Monitors) (regarding North Fork and attaching the agreement RCCL entered into with Children's Hope - Lubbock).**

- o  [744] **Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs. to Deborah Fowler and Kevin Ryan, Monitors (May 20, 2020 18:44 EST) (on file with the Monitors) (regarding Children's Hope - Levelland campuses terminating its contract with DFPS).**

- o  [745] **Email from Rand Harris, Assoc. Comm'r of Compliance, Coordination & Strategy, Dep't of Family & Protective Servs., to Deborah Fowler and Kevin Ryan, Monitors (May 22, 2020 11:48 EST) (on file with the Monitors) (regarding Children's Hope - Levelland campuses terminating its contract with DFPS).**

- o 746 **Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (May 22, 2020 13:48 EST) (on file with the Monitors) (regarding Children's Hope - Levelland campuses terminating its contract with DFPS).**
- o 748 **Email from Deborah Fowler, Monitor to Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n (Feb. 27, 2020, 17:02 EST) (regarding North Fork enforcement action).**
- o 749 Email from Corey Kintzer, Assoc. Dir., Legal Servs. Div., Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors (Feb. 27, 2020, 18:54 EST) (on file with the Monitors) (regarding North Fork and including the draft letter of intent to revoke which detailed the reasoning behind the license revocation).

- • **Section VII: Child Fatalities**
    - o 774 The initial video clips provided by DFPS to the Monitors omitted approximately fifteen minutes of footage. The Monitors emailed the agency, "[t]he C.G. video . . . appears incomplete. The video clips stop at 20:25:28 and picks up again at 20:41:07. The investigation indicates video from 20:26:00 to 20:41:09 is relevant. Can you advise when you will make that available to us?" **Email from Kevin Ryan, Monitor to Tara Olah, Dir. of Strategy & Implementation, Dep't of Family & Protective Servs. (May 6, 2020, 19:22 EST) (on file with the Monitors).** DFPS provided all the requested footage and noted "[i]t appears there were two videos labeled 2025. The one uploaded to SharePoint was only 24 seconds long. We have uploaded the second video." **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. to Kevin Ryan, Monitor (May 7, 2020 15:10 EST) (on file with the Monitors).**
    - o 775 On May 5, 2020, the Monitors requested that DFPS "please provide us with all of the child's medical, pharmacological and mental/behavioral health records from February 13, 2020 to April 26, 2020, and the child's complete records/files from her last placement." **Email from Kevin Ryan, Monitor to Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (May 5, 2020, 13:23 EST) (on file with the Monitors).** DFPS provided some of the requested information on May 12, 2020 and May 19, 2020, but the submission was incomplete. The Monitors inquired again on May 24, 2020, requesting DFPS "[p]lease advise when you are going to upload the complete records from C.G.'s placement." **Email from Kevin Ryan, Monitor (May 24, 2020, 16:11 EST) (on file with the Monitors).** DFPS responded, "We are working with field staff to determine whether there are any additional documents beyond what we provided to you on 5.12.20 and 5.19.20. We should be able to confirm this by COB today." **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (May  26, 2020, 07:33 EST) (on file with the Monitors).** On May 27, 2020, DFPS informed the Monitors that the agency had "provided [the Monitors] with all records from [the shelter]." **Email from Tara Olah, Dir. of Implementation & Strategy, Dep't of Family & Protective Servs. (May 27, 2020, 16:46 EST) (on file with the Monitors).** The Monitors believed that representation was inaccurate, based on the monitoring team's review of the case, which suggested a treatment plan existed at the shelter, and it may have included important information about the level of supervision required for C.G. As a result, the Monitors again asked DFPS for the information. "The records the State has provided refer to a treatment plan at [the shelter] for this child and describe some of the contents of that plan. We have not found that treatment plan among the documents the State provided, nor another document that contains the information described in the reference materials. Please advise if that document exists and, if so, please provide it." **Email from Kevin Ryan, Monitor (May 27, 2020, 16:12 EST) (on file with the Monitors).** On May 28, 2020, DFPS provided the treatment plan to the Monitors. The treatment plan evidences that DFPS and the shelter staff knew about, and agreed to, a plan to monitor C.G. "by staff at all times," due to her high risk for suicide.