IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, et al., | § § § § | |
| Defendants. | § § | |

**The Court Monitors' Report to the Court on Data and Information Production by the State, and Update on State Policy Changes Associated with the Remedial Orders**

I.   **Data and Information Production by the State**

In its Objections to the Monitors' Report, filed June 16, 2020, and its response to Plaintiffs' Motion for an Order to Show Cause now pending before the Court, the State criticized the time frames and sample sizes used by the Monitors to validate performance under the Court's Orders. Those time frames, and the number of cases included in the Monitors' validation samples, were driven in each instance by the length of time the State took to provide the Monitors with requested data and information; the deficiencies of the data and information produced by the State; the associated challenges encountered by the monitoring team in analyzing the data and information; and the length of time required by the monitoring team to find, read and analyze the IMPACT, CLASS and other information on a case-by-case basis for hundreds of individual children's cases based in part on gaps in the State's data systems, as detailed in the Monitors' Report to the Court on June 16, 2020.

**Remedial Order Two – Graduated Caseloads**

The Monitors evaluated the State's compliance with Remedial Order Two using DFPS data that reflected the period September 1, 2019 to November 30, 2019. DFPS provided this data to the Monitors on January 2, 2020 and January 16, 2020. Verifying compliance with Remedial Order Two was time-consuming and complex, as detailed in the Monitors' report, because the State chose graduated caseload standards that varied for every county in the State. DFPS's graduated caseload policy limited workers in their first month following training to one-third of the average caseload in the county and in the second month to two-thirds of the average caseload in the county. To verify compliance, the Monitors needed average caseloads for each county with a worker in their first two months of service. DFPS did not ultimately produce these data and said that doing so would require significant resources.

1

The following data issues were encountered by the monitoring team through its data verification activities:

- DFPS indicated that it did not have the capacity to provide the data within the time frame requested by the Monitors; rather, the State reported it requires a forty-five day timeframe or "lag" to calculate and process the request after the month ends (i.e., October data was provided on December 15th and so on). Because a forty-five-day lag impeded the Monitors' ability to complete timely verification of compliance with Remedial Order Two on behalf of the Court, the Monitors never agreed to this proposed timeframe.

- DFPS informed the Monitors that it does not have the current capacity to report on the total number of days during the prior month that caseworker caseloads were not compliant with the graduated caseload standard. Instead, DFPS provided to the Monitors compliance data on the fifteenth and forty-fifth days after caseworkers' eligibility for primary case assignment. The agency stated more recently that it is unlikely that it can report on the daily compliance data for graduated caseloads in the near term but that it will keep the Monitors apprised of its progress.

On a monthly basis, the State provided the Monitors with graduated caseload data with a 45-day production lag. The Monitors received graduated caseload data for the period of December 1, 2019 to March 31, 2020 monthly from February 18, 2020 to May 15, 2020, but there was not adequate time to analyze and apply these data sets to validate performance for every county in the State prior to submitting the report on June 16, 2020.[1]

**Remedial Order Three – Receiving, Screening and Investigating Allegations of Abuse, Neglect or Exploitation**

*Receiving Allegations at Statewide Intake (SWI)*
The Monitors evaluated the State's compliance with Remedial Order Three in relation to appropriately receiving referrals of abuse or neglect of children in the PMC class using SWI's Avaya call data of 372,897 calls made to SWI from August 1, 2019 to January 31, 2020. This data was provided to the Monitors on February 26, 2020 by Court Order. To analyze the data from the 372,897 referrals fully and present it to the Court and parties in the June 16, 2020 report, the Monitors relied on all data provided by the State through March 1, 2020.

*Screening Allegations*
The Monitors evaluated the State's compliance with Remedial Three related to the appropriateness of screening of referrals of abuse or neglect involving PMC children in licensed placements by using DFPS data on referrals made to SWI between July 31, 2019 and October 31, 2019. The State provided this data to the Monitors on November 15, 2019 and December 16, 2019. The Monitors

---

[1] DFPS produced new December 2019 graduated caseload data on February 18, 2020. DFPS produced new January 2020 graduated caseload data on March 16, 2020. DFPS produced new February 2020 graduated caseload data on April 15, 2020. DFPS produced new March 2020 graduated caseload data on May 15, 2020.

identified a random sample of 329 (of 590) reports that had been assessed by SWI as requiring a Priority One or Priority Two investigation by RCCI for child abuse, neglect or exploitation. Because of the extensive amount of time required to assess each referral, which involved listening to the original referral phone call, analyzing the referral information and researching the history of the child(ren), placement(s) and alleged perpetrator(s) in both IMPACT and CLASS, the Monitors extended the sample period to include data provided by the State through December 31, 2020. That review of these 329 referrals by the monitoring team required until May 2020 to complete. The following data issues were encountered by the monitoring team through its validation activities:

- Across the ROs that include investigation data (including Remedial Orders Three, Five, Seven and Ten), the monitoring team encountered ongoing problems identifying the unique identifiers that could be used across data sets. The names of the variables produced by the State changed from one production to the next, which delayed analysis as the State continuously changed how the data were organized. The monitoring team joined a call with DFPS in January 2020 to try to better understand and standardize the State's data. The monitoring team supplied DFPS with over 50 written questions ahead of the call. DFPS officials said they would provide written responses after the phone call and it took DFPS nearly a month to supply answers, which further delayed the Monitors' analysis for the June 16, 2020 report to the Court.

- The Monitors requested the State produce the screening data on a fifteen-day lag following the end of a month, but the State continued to provide it on a forty-five-day lag. DFPS stated that the production timeframe was "based on the regular business cycle for loading data in the data warehouse tables which are what is used for ongoing reporting."

- For purposes of data related to SWI, the State—DFPS and HHSC together or separately—has been unable to provide the Monitors with a unified list of all referrals of abuse or neglect made to SWI involving PMC children as an apparent result of the agencies' bifurcated system for processing and storing data associated with referrals to SWI. Further, HHSC cannot distinguish between PMC and non-PMC child-related referrals in its data, and is unable to provide the Monitors with a list of referrals to SWI of abuse and neglect of only PMC children.

On a monthly basis, the State provided the Monitors with data containing referrals involving TMC and PMC children made to SWI with a 45-day production lag. The Monitors received referral data for the period of November 1, 2019 to March 31, 2020 monthly from January 15, 2020 to May 15, 2020.[2] That data is being used as part of the Monitors' current validation work.

*Investigating Allegations*

The Monitors evaluated the State's compliance with Remedial Order Three related to the appropriateness of investigations of abuse, neglect or exploitation involving PMC children by

---

[2] November 2019 data was received on January 15, 2020; December 2019 data was received on February 18, 2020; January 2020 data was received on March 16, 2020; February 2020 data was received on April 15, 2020; and, March 2020 data was received on May 15, 2020.

3

using DFPS data on RCCI investigations closed between August 1, 2019 and November 30, 2019. This data was provided to the Monitors on November 15, 2019 and January 15, 2020.[3] Analyzing each of the 133 investigations identified in the Monitors' sample was enormously time-consuming, and required extensive examination of the State's IMPACT and CLASS data systems for each investigation, and the electronic files for involved child(ren), placement(s) and perpetrator(s). As stated above, the monitoring team encountered ongoing problems identifying the unique identifiers that could be used across data sets. The names of the variables produced by the State changed from one production to the next, which delayed analysis as the State continuously changed how the data were organized.

On a quarterly basis, the State provided the Monitors closed investigative data. The State sent the Monitors closed investigative data for hundreds of cases in the period of December 1, 2019 to March 31, 2020, on April 15, 2020 and July 15, 2020, and it was not possible to assess these cases for the Monitors' June 16, 2020 final report.

**Remedial Orders Five, Seven and Ten: Timeliness of RCCI Investigations**

The Monitors evaluated the State's compliance with Remedial Orders Five, Seven and Ten by reviewing all RCCI investigations that were opened by the State in October and November 2019. The State provided this information to the Monitors on November 15, 2019, December 16, 2019 and January 15, 2020.[4] Because the State's data systems did not generate reliable, aggregated reports on performance for these provisions, the monitoring team had to undertake a time-consuming case record review for every investigation. The case record review involved searching through the electronic investigative records for each case to find the information needed to assess compliance with the relevant Remedial Order. To complete the work necessary for analysis and inclusion in the Monitor's June 16, 2020 report to the Court, the Monitors included investigations reported by the State through January 31, 2020.

For Remedial Orders Five and Seven, which focus on the timely initiation of Priority One investigations, the following data issues were encountered by the monitoring team through its data verification activities:

- The State reported that it could provide the date for its first face-to-face contact with an alleged child victim, but not the time it occurred; and moreover, that it was unable to provide data about face-to-face contact with each additional alleged child-victim for investigations involving multiple alleged victims. Additionally, the State notified the Monitors that it was unable to provide the requested data on approved extensions for face-to-face contact with alleged child-victims during this reporting period. DFPS stated that its inability to comprehensively report face-to-face contact data was due to lack of functionality in IMPACT and that new functionality would allow for reporting of the requested compliance data going forward. As of July 2020, that functionality has not yet

---

[3] On February 3, 2020, the State provided the Monitors with revised data for the January 15, 2020 production as the original data was missing the CLASS investigation number.
[4] On February 3, 2020, the State provided the Monitors with revised data for the January 15, 2020 production as the original data was missing the CLASS investigation number.

4

consistently yielded data showing distinct interview dates and times for all PMC children in investigations. Due to the lack of the State's data reporting on face-to-face contact in the period reviewed by the monitoring team, validation activities required a more laborious review of CLASS records to search for, and locate, face-to-face contact data in every investigation, which was not consistently documented by DFPS staff.

- Due to data reporting limitations, the State reported on its performance through its own case reads, involving searches through the State's electronic record keeping systems. The State reported it will continue to rely in part on case reads as of August 2020.[5]

- The tool that DFPS used for its case reads to self-evaluate several of these remedial orders did not record certain data, such as the date and time of face-to-face contacts for each child in investigations; the dates of investigation completions; the dates, durations, and approvers of extensions; dates of transfers to RCCL inspectors; or the dates of notifications to various parties. Instead, case readers recorded whether the case file indicated, in their assessment, compliance with remedial orders. As a result, the State's case read information could not be used by the Monitors to compare data recorded in the Monitors' case reads for these orders or to the electronic data. This prevented the Monitors from verifying that the State's case readers correctly recorded whether practice in the investigation complied with the relevant Remedial Orders.

- The case read reports submitted by DFPS on January 29, 2020 divided RCCI investigations into three categories for reporting purposes, depending upon when an investigation was opened and/or closed. DFPS did not report on monthly cohorts as the Monitors did, making data comparison and validation more time consuming.

- The Monitors identified that DFPS used a methodology to measure initiation of investigations that was not consistent with DFPS policy at the time, which specifically required initiation through face-to-face contact with all alleged child victims in cases involving multiple children. The Monitors' review of DFPS' case read reports showed that the State counted a case as properly initiated so long as it showed face-to-face contact with

---

[5] "We agree with you that different children should not have an identical interview time stamp. We are still looking into it but we think the bottom line is, as is regularly the case with new functionality, staff will need some time, training and re-training to ensure proper utilization." E-mail from Audrey Carmical, Associate Commissioner of Compliance, Coordination, and Strategy, DFPS to Kevin Ryan and Deborah Fowler, (August 13, 2020), on file with the Monitors. "We will continue to closely monitor the data reports relating to these Remedial Orders to gauge our performance and help drive any internal practice changes. In addition to these data reports, we will continue conducting our quality case reads, specifically looking for any instances in which children involved in the same investigation have an identical interview time stamp." E-mail from Tara Olah, Director of Implementation and Strategy, DFPS to Kevin Ryan and Deborah Fowler, (August 17, 2020), on file with the Monitors.

one alleged child victim, rather than with all alleged child victims in an investigation. In response, DFPS produced an addendum to its original case read reports using the correct methodology, which reported slightly lower compliance in Remedial Orders Five and Six. DFPS notified the Monitors on August 27, 2020,[6] that the agency intends to no longer define the initiation of an investigation as face-to-face contact with all alleged child victims (discussed in Section II. below).

For Remedial Order Ten, which focuses on the timely completion of Priority One and Priority Two investigations, including documentation of all extensions, the monitoring team encountered the following data issues through its verification activities:

- The DFPS data submitted to the Monitors in association with closed and open investigations did not include a list of investigations that featured an indicator of timeliness as defined by Remedial Order Ten.

- Until IMPACT functionality could be improved, DFPS stated it could not report on the timeframe for investigation extensions, including multiple extensions, or whether the investigation was completed within approved extension timeframes. Instead, DFPS initially provided a separate list of approved extensions and the reasons for the approved extensions but did not include the length of time of the extensions.

- Due to data reporting limitations, the State reported on its performance through individual case reads of its electronic record keeping systems, as opposed to using data reports on the timeliness of investigations. The tool that DFPS used for its electronic case reads to self-evaluate several of these Remedial Orders did not record specific data, such as the date and time of face-to-face contacts for each child in investigations; the dates of investigation completions; the dates, durations, and approvers of extensions; dates of transfers to RCCL inspectors; or the dates of notifications to various parties. Instead, the State's case readers recorded whether the case file indicated, in their assessment, compliance with Remedial Orders. As a result, the State case read information supplied by DFPS could not be used by the Monitors to compare data recorded in the Monitors' individual case-by-case assessments for these orders or to the electronic data, and prevented the Monitors from verifying that the State's case readers correctly recorded whether practice in the investigation complied with the relevant Remedial Orders.

- The Monitors' review of DFPS' case reads for Remedial Order Ten showed that 26 cases were removed from DFPS' review because they had been examined in a prior review of open cases between July 31, 2019 and September 30, 2019. This created another layer of complexity for tracking and reporting performance. In the back-up data DFPS provided on its case reads, critical data were missing related to investigations such as completion dates

---

[6] E-mail from Audrey Carmical, Associate Commissioner of Compliance, Coordination, and Strategy, DFPS to Kevin Ryan and Deborah Fowler (August 27, 2020), on file with the Monitors.

and information about extensions. DFPS explained that the Monitors cannot use data submitted on the agency's closed and open investigations to verify DFPS's case read reports. DFPS said this is because the case read process began prior to the date that the data were extracted and finished after the data were extracted. The status of the investigations in the State's case read submissions may be different at the time the case is read when compared to the time the data are extracted by DFPS and sent to the Monitors.

To validate the State's performance on the above timeliness Remedial Orders, the Monitors used both quarterly investigative data and monthly referral data made to SWI. The Monitors received closed investigative data from the State for the period of December 1, 2019 to March 31, 2020 on April 15, 2020 and July 15, 2020, and it was not possible to assess these cases for the Monitors' June 16, 2020 final report. The State produced to the Monitors monthly intake data for December 2019 through March 2020 from February 18, 2020 through May 15, 2020.

**Remedial Order B-5 – Caseworker Notification of Allegations of Abuse or Neglect.**

Remedial Order B-5 became effective "immediately" upon the issuance of the Fifth Circuit's mandate on July 31, 2019. The State complains that the Monitors' case review only considered investigations from December 2019, which they say is problematic because the IMPACT enhancements that generate the automated notification were not in place until December 19, 2019.

The Monitors' case read[7] was drawn from a sample of SWI intakes between December 1, 2019 and December 31, 2019. The Monitors' case read involved a case-by-case examination of the State's electronic records. It included cases initiated prior to and after the automated notification process was implemented. Because of the 45-day time lag in the State's data production, this December 2019 data was not produced by the State to the Monitors until February 18, 2020. Once the data was produced, the monitoring team identified a random sample and undertook a time-consuming electronic case record review of each selected case, analyzed the results and included the findings in the June 16, 2020 report to the Court. Because of the length of time required to undertake this work, the Monitors relied for the June 16, 2020 report to the Court on data and information provided by the State through March 1, 2020.

**Remedial Order Thirty-Seven - Notice of Cases Downgraded to a Priority None (PN) and Home History Reviews**

Remedial Order 37 became effective 60 days after the mandate issued (October 1, 2019). The State's primary complaints are unrelated to the Monitors' timeline for the case review conducted

---

[7] In the Monitors' data and information request sent on September 30, 2019, the Monitors asked the State to provide the date and manner of notification to the child's primary caseworker of the allegations. In the data and information request sent on February 2020, the Monitors noted that this information was not included in the data produced by the State. On March 24, 2020, the State responded, noting that the date of notification was based on new IMPACT functionality and would not be available to be pulled into the data reports shared with the Monitors until the third quarter of fiscal year 2020. Because the State was unable to produce the data needed to verify notification, the Monitors conducted a case-by-case assessment of the State's electronic record keeping systems, using a sample detailed in the Monitors' First Report to the Court. Deborah Fowler and Kevin Ryan, First Court Monitors' Report 2020 134 (June 16, 2020).

by the monitoring team. However, the State's response to the Plaintiffs' Show Cause Motion refers to the "restricted sample size" of the case read.

The Monitors drew the sample from two sets of data: The first was drawn from the December 2019 SWI data, produced to the Monitors on February 18, 2020. A second sample was drawn from the January 2020 SWI data, produced to the Monitors on March 16, 2020. The Monitors' case review included 62 of 72 SWI referrals involving a PMC child and subsequently downgraded to PN between December 1, 2019 and January 31, 2020. The confidence interval for the sample was 95/5.

The State's own case reviews for Remedial Order 37 included smaller samples. The State's Quarter 1 FY 2020 case read for RO 37 included a sample of 24 intakes, and the State's Quarter 2 FY 2020 case read included a sample of 20 intakes.

### Remedial Order Twenty-Four – Documentation of all Confirmed Allegations of Sexual Abuse in Child's Record

The Monitors evaluated the State's compliance with Remedial Order Twenty-Four using DFPS data that contained a list of all children in care with the legal status of PMC during the first quarter of 2020 (September 1, 2019 to November 30, 2019). This data was provided to the Monitors on January 15, 2020. The following data issue was encountered by the monitoring team through its data verification activities:

- The data provided by the State was not a comprehensive list of all PMC children ever confirmed as a victim of sexual abuse or trafficking. As documented by the State in the data file submitted on January 15, 2020, the information only identified those children with "any CPS or Licensing (Residential Childcare or Day Care) investigation where the child had a confirmed Sexual Abuse (SXAB) and/or Sex Trafficking (SXTR) allegation." According to DFPS' Job Aid on documenting a child's history of sexual abuse, a child is a "confirmed victim" if one of six categories is present in the child's history. The data provided by the State only included identification of children from one of these six categories.

   For the sixty-two children who were indicated as confirmed sexual abuse victims by DFPS in IMPACT 2.0 and reviewed by the Monitors, the record documented that the confirmed allegations were all based upon sexual abuse that occurred prior to the child's entrance into foster care that resulted in an RTB disposition by CPI. None of the children reviewed in the sample were confirmed as sexual abuse victims through category three of the State's definition of confirmed allegations of sexual abuse—which would be associated with a confirmed allegation due to abuse by another child while in care.

On a quarterly basis, the State provided the Monitors with a list of all PMC children in care. For the period of December 2019 through March 2020, the Monitors received applicable data on April

15, 2020 and July 15, 2020, and it was not possible to complete and include analysis of that information in the June 16, 2020 report.

**Case Reads and On-Site Reviews of Files for Remedial Orders 24, 28, and 30 (Documentation of Victimization & Aggression)**

Remedial Orders 28 and 30 (documentation with indicator for sexual aggression in profile characteristic and records) became effective immediately upon issuance of the mandate. Remedial Orders 23 and 24 (documentation of victimization in profile characteristic & records) became effective within 60 days of the mandate's issuance (October 1, 2019).

The State does not complain of the Monitors' data analysis in their response to the Plaintiffs' Show Cause Motion, except to argue that the Monitors' on-site review of facility records and children's files found a small percentage of children (9%) who were not identified by the State but should have been. In their separately filed Objections to the Report, they complain of the Monitors' "limited independent validation efforts" and "limited review of files."

The Monitors used several different methods to validate compliance with these Remedial Orders, rather than basing findings solely on the on-site file reviews:

- A review of children's IMPACT pages created to record information about victimization and aggression,
- An analysis of data for trends in identification;
- The inclusion of questions on two case reads for a sample of 376 (out of 783) electronic records for children with a positive indicator for sexual abuse victimization or aggression. The confidence interval was 95/5;
- An on-site review of children's files;
- And the case review of sexual victimization history, discussed above.

The "limited review" of files referred to in the State's objection was a review of 272 files for PMC children in GROs visited by the Monitors, (just under 17% of the PMC children in a GRO on November 30, 2019). All of these reviews took place *after* the effective dates of these remedial orders (the Monitors' visits to Cottage Home campuses started in mid-October). Furthermore, though the State did not launch their IMPACT enhancements until December 19, 2019, they were obligated to identify and document a history of aggression beginning July 31, 2019, and to identify and document victimization by October 1, 2019. And, as discussed on page 213 in the Monitor's Report, the monitoring team acknowledged that when the team reviewed these children's IMPACT files again in April 2020, 11 of the 25 children's records had been updated to include the flag.

In the State's objections to the Report, the State mischaracterizes the Monitors' findings from the on-site file reviews. <u>The Monitors did not find that 91% of the files reviewed "included the information indicated."</u> Rather, the Monitors found that – based on the information found in the files kept on-site (which do not include a child's entire record) – 9% should have been flagged as a victim or aggressor, but were not. This does not mean that the other 91% "included the information indicated." It means that those files did not include information that allowed the Monitors to determine whether the children's electronic record should include a flag.

9

Extrapolating the 91% from the 9% is like saying that because only 1% of the population has tested positive for COVID-19, 99% of the population must not have been infected with the virus.

**Remedial Order Twenty-Two – Consideration of Abuse and Neglect Findings and Corporal Punishment During Placement Inspections**

Remedial Order 22 became effective immediately upon issuance of the Fifth Circuit's mandate. The State complains of the Monitors' "inherently flawed statistics" in their response to the Plaintiffs' Show Cause Motion. The State first objects to the Monitors' case read because it included inspections conducted as the result of a minimum standards investigation.

HHSC's own field communication to its staff interprets the Court's Remedial Order as applying to all inspections, even those conducted as part of an investigation of a minimum standards violation. HHSC's Field Communication #271, cited in the Report, states:

> [A] federal court has ordered RCCL Inspectors to conduct a more extensive and targeted compliance history review before conducting any type of inspection, including an inspections [sic] Licensing conducts as part of a minimum standards investigation, follow up inspection, and inspection categorized as 'other'.

Section 4125 of HHSC's child care licensing policies and procedures handbook describes investigation inspections as follows:

> Investigation inspections include the investigation of reports alleging:
> - violations of Licensing statutes;
> - violations of administrative rules;
> - violations of minimum standards; or
> - a combination of these.

The State also objects to the Monitors' data sample for the case review conducted by the Monitors. The State argues that it was unfair to draw the sample beginning on October 7, 2019, the date that the Court clarified the "look back" period for Remedial Order 22. Field Communication #271, which notified RCCL inspectors of the Remedial Order and the method of complying, was not issued until November 22, 2019. The Field Communication's effective date was December 1, 2019, almost two months after the Court clarified the look back period for the remedial order.

The Monitors identified an audit sample of operations (CPAs and GROs) with the highest number of referrals to RCCL for investigation of minimum standards violations between July 31, 2019 and December 31, 2019, and then drew the case read sample from those operations with a referral to SWI for a minimum standards violation between October 7, 2019 (the date the Court clarified the look-back period) and January 31, 2020.

However, as discussed in the report, the monitoring team completed a second analysis of compliance for the periods between December 1, 2019 and January 31, 2020 to determine whether

the State's compliance improved as they had more time to implement the clarification provided by the Court on October 7, 2019. The State's performance did not improve significantly, as discussed on page 266 of the Monitors' Report.

## II. State Policy Changes

### The Definition of "Initiation" of an RCCI Investigation

The State made the Monitors aware on August 27, 2020 of certain changes to agency policies covered by Remedial Orders Five and Six. Because the Court's next hearing in this matter is scheduled for September 3, 2020, the Monitors are providing this update to ensure the most current information is available to the Court and parties.[8]

Remedial Order Five requires that "…DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)"

Remedial Order Six requires that "…DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)"

Remedial Order Seven requires that "…DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake."

Remedial Order Eight requires that "…DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake."

On August 27, 2020, DFPS notified the Monitors of a change in agency policies, as the term "policies" is referenced in Remedial Orders Five and Six that will alter the definition of "initiate" in those provisions. The agency wrote:

---

[8] DFPS concluded its email to the Monitors by offering a dialogue ("Please let us know what questions you have, any additional information you need, or if you would like to discuss in a call.") which the Monitors will pursue following the Court hearing. E-mail from Audrey Carmical, Associate Commissioner of Compliance, Coordination, and Strategy, DFPS to Kevin Ryan and Deborah Fowler (August 27, 2020), on file with the Monitors.

**Upcoming CCI policy change.** Field Communication #08: Face to Face Initiations with Multiple Victims (and associated policy) defines initiation as face to face contact with all alleged victims. Upon review of this definition, and the data intended to measure timeliness of initiations and face to face contacts with all alleged victims, CCI determined that the policy outlined in FC #08 has had the unintended consequence of essentially double-counting the timeliness of face to face contact with all alleged victims (as it is being captured in both the initiation measure and the measure of timeliness of face to face contact with all alleged victims) while excluding other potential methods for initiating an investigation.

To address the total overlap and reflect that timely initiation and face to face contact with alleged victims are two related but distinct measures, CCI is in the process of amending the definition of initiation set forth in Field Communication #08 to clarify that the methods by which initiation can be met include:

- face-to-face contact with at least one victim (as opposed to all victims),
- contact with an adult involved in the allegations, or
- contact with a significant collateral source, if the information constitutes initiation as defined in policy.

This change will allow for face to face contact with alleged victims and initiation of an investigation to be counted as two separate measures. The change will not affect the timeframes by which CCI is required to initiate investigations or make face to face contact with alleged victims (24/72 hours). Regardless of initiation method, face-to-face contact with all alleged victims must occur within 24/72 hours unless there is an approved exception.

CCI plans to have the new policy published and in effect in the Child Care Investigations Handbook by September 1, 2020. We will utilize this definition for the timeliness indicator we will add in Q4 reporting (for all investigations upon which we are reporting, including those initiated prior to the policy change). We understand that the Monitors may wish to continue measuring our timeliness of initiation by looking solely at FTF contact with all alleged victims but we think tracking them as separate measures provides a more illustrative view of whether action is being taken quickly at the outset of investigations. We are of course happy to discuss with you at your convenience.[9]

---

[9] E-mail from Audrey Carmical, Associate Commissioner of Compliance, Coordination, and Strategy, DFPS to Kevin Ryan and Deborah Fowler (August 27, 2020), on file with the Monitors.

**Policy Change Related to Priority None (PN) Designation**

In the Monitors' Report of June 16, 2020, the Monitors identified concerns to the Court regarding RCCI's downgrading of child abuse and neglect referrals prioritized for investigation by SWI. On August 27, 2020, DFPS notified the Monitors that:

> …on August 10, CCI updated their policy to clarify the language around utilizing PNs for intakes that are vague as part of a broader policy update. We think the policy you pointed out could benefit from additional clarification. Accordingly, here is the now-current policy:
>
> **6241.2 Downgrading an Abuse, Neglect, or Exploitation Intake Report to a Priority None (PN) Intake Report**
>
> CCI August 2020
>
> A screener, supervisor, or designee may downgrade an abuse, neglect, or exploitation intake report received by SWI to a Priority None (PN) intake report when the information in the report does either of the following:
> ·      Suggests that a minimum standard was violated, but not that a child was abused, neglected, or exploited.
>
> ·      Indicates that risk to children existed in the past, but does not allege current abuse, neglect, or exploitation (see <u>6264 Reports of Incidents that Occurred in the Past</u>).
>
> If the screener, supervisor, or designee determines that an intake report does not involve abuse, neglect, or exploitation, the screener, supervisor, or designee downgrades the priority to a Priority None (PN), meaning no priority, and documents the reason for the change on the *Priority Closure* page under the *Case Management* tab in IMPACT.
>
> If the screener, supervisor, or designee is not able to enter a full explanation for closing the intake report in the *Comments* field on the *Priority Closure* page, the supervisor or designee may create a contact in the *Intake* (*INT*) stage in IMPACT to document additional information about the priority change and closure.
>
> If the intake report is for a residential care investigation involving children in DFPS conservatorship, the screener, supervisor, or designee completes the *Notifications* section in IMPACT, before closing the intake report.

> Once the priority change is entered in IMPACT, the supervisor or designee must ensure that the *IMPACT Priority* also changes in the associated CLASS *Intake Report* in the *IMPACT Information* section.
>
> The IMPACT intake report must not be closed until the priority in the CLASS *Intake Report* matches the priority of the IMPACT intake report.
>
> I have also attached the relevant field communications. Note that although the larger field communication really does not address the change in great detail, corresponding updates have also been made to the screener handbook, prioritization guidelines, and prioritization guideline job aids so that the screeners who would be conducting any downgrades at intake are up to date on the policy. In addition, unit level training for all CCI staff is anticipated for release 9/1, which will provide information regarding this change.[10]

### 3. Agency policy change related to CCI Investigation conclusions

On August 27, 2020, DFPS notified the Monitors that:

> Based on discussions with our providers, DFPS determined improvements could be made to formalize the extent to which investigation conclusion information is shared with operations. Accordingly, the agency sent out the attached communication today.
>
> Please let us know what questions you have, any additional information you need, or if you would like to discuss in a call.[11]

The attached communication reads:

> August 25, 2020
>
> Dear Residential Child Care Provider:

---

[10] E-mail from Audrey Carmical, Associate Commissioner of Compliance, Coordination, and Strategy, DFPS to Kevin Ryan and Deborah Fowler (August 27, 2020), on file with the Monitors.

[11] E-mail from Audrey Carmical, Associate Commissioner of Compliance, Coordination, and Strategy, DFPS to Kevin Ryan and Deborah Fowler (August 27, 2020), on file with the Monitors.

14

A new Child Care Investigations (CCI) policy will change the type of information you receive concerning allegations involving abuse, neglect, or exploitation in your residential child care operation.

Effective September 1, 2020, CCI will begin sending notification letters to your operation's identified controlling person, or designee, within five days of the conclusion of an investigation. This letter will include:

- *The allegation or allegations.*
- *The alleged or designated perpetrator or perpetrators.*
- *The investigation findings.*
- *The date the investigation was completed.*
- *The name of the CCI staff who conducted the investigation.*

If a designated perpetrator requests an administrative review or due process as a result of CCI's findings, and those findings are overturned as a result of the review or due process, you will also receive a notification letter of the decision.

The information CCI will be sharing in these letters is confidential by law (Child Abuse Prevention and Treatment Act and Texas Human Resources Code 40.005). Consequently, the notification letters will also include guidance on the appropriateness of sharing the findings, and storage of the notification letters.

CCI will continue to share investigation findings will HHSC's Child Care Regulations (CCR) Division. You will continue to receive notifications from CCR concerning any possible violations of law or minimum standards as a result of our investigations.

Sincerely,

Ashland Batiste Child Care Investigations Director[12]

---

[12] E-mail from Audrey Carmical, Associate Commissioner of Compliance, Coordination, and Strategy, DFPS to Kevin Ryan and Deborah Fowler (August 27, 2020), on file with the Monitors.