United States District Court
Southern District of Texas
**ENTERED**
December 18, 2020
David J. Bradley, Clerk

<div align="center">

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

</div>

| | | |
|---|---|---|
| M.D.; bnf STUKENBERG, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:11-CV-00084 |
| | § | |
| GREG ABBOT, *et al*, | § | |
| | § | |
| Defendants. | § | |

<div align="center">

**ORDER**

</div>

Named Plaintiffs brought this class action under 42 U.S.C. § 1983 against officials of the State of Texas.  Following a bench trial, the Court found that the State of Texas had violated the Fourteenth Amendment substantive due process rights of children in the Permanent Managing Conservatorship of the Texas Department of Family and Protective Services, including "the right to be reasonably safe from harm while in government custody and the right to receive the most appropriate care, treatment, and services."  The Court crafted remedial orders to ensure the safety of current and future children in the Permanent Managing Conservatorship of the State.  Court-appointed Monitors charged with verifying the State's compliance with these orders issued a comprehensive report that provides data and information demonstrating that the State has failed to comply with several of the remedial orders. Plaintiffs filed the instant Motion to Show Cause Why Defendants Should Not Be Held in Contempt, and a hearing was held on the Motion.  Due to the fact-intensive nature of the Motion and the show cause hearing, the Court's opinion is lengthy.  As the Court stated in its 2015 Memorandum Opinion and Verdict, the children deserve nothing less.

**TABLE OF CONTENTS**

I.      INTRODUCTION...................................................................................7

II.     JURISDICTION ...................................................................................8

III.    PROCEDURAL HISTORY ...................................................................9

        A.      Procedural History Before the Present Motion....................................9

        B.      Prior Contempt Order .......................................................................11

        C.      The Monitors' Report ........................................................................13

        D.      The Present Show Cause Motion ......................................................14

IV.     FINDINGS OF FACT AND CONCLUSIONS OF LAW ...........................16

        A.      Legal Standards for Civil Contempt ..................................................16

                1.      Civil Contempt Elements....................................................18

                2.      Civil Contempt Sanctions ...................................................19

        B.      The Court Finds Defendants To Be in Contempt of Its Remedial Orders............20

        C.      Overview of Texas Foster Care: The Structure, Roles, Functions, Recordkeeping Practices, and Data Systems of Pertinent State Agencies....................................22

                1.      The Organization and Roles of the Agencies at the Time of Trial ...........24

                        a.      CPS's Role at the Time of Trial................................25

                        b.      SWI's Role at the Time of Trial ...............................26

                        c.      RCCL's Role at the Time of Trial .............................27

                                i.      Investigating Allegations of Abuse, Neglect, and Exploitation..........................................28

                                ii.     Inspecting Licensed Placements .........................30

                        d.      Inconsistent Record Keeping and Failure to Communicate and Coordinate Across Divisions at the Time of Trial.......................31

                2.      The Reorganization and Roles of the Agencies Following Trial..............33

                        a.      SWI's Current Role...............................................36

                                i.      Forwarding Reports of Abuse and Neglect to CCI...........39

                                ii.     Forwarding Reports of Abuse and Neglect to CPI ...........40

                                iii.    Forwarding Reports to HHSC-RCCL..............................40

                        b.      RCCI's Current Role.............................................41

                                i.      Prioritizing Allegations of Abuse, Neglect, and Exploitation..........................................41

                                ii.     Investigating Allegations of Abuse, Neglect, and Exploitation..........................................44

                        c.      HHSC-RCCL's Current Role .....................................45

       i.     Investigating Licensed Placements ................................... 48

       ii.    Inspecting Licensed Placements ....................................... 55

    d.   Continued Inconsistent Record Keeping and Failure to Communicate and Coordinate Across the Agencies' Divisions ... 57

D.   Child Fatalities Within the Foster Care System in the Past Year ........................ 62

   1.    K.C. (Born September 1, 2005, Died February 9, 2020) ......................... 63

   2.    A.B. (Born June 9, 2016, Died April 12, 2020)........................ 65

   3.    C.G. (Born December 29, 2005, Died April 26, 2020)............................ 67

E.   Remedial Order 3: Properly Investigating Allegations of Abuse, Neglect, or Exploitation While Taking into Account Child Safety......................................... 70

   1.    The Court's Findings at Trial Related to Remedial Order 3................... 70

   2.    The Procedural History of Remedial Order 3 ........................... 76

   3.    Defendants Have Failed To Comply with Remedial Order 3.................. 77

    a.   SWI: Receiving and Forwarding Allegations of Abuse and Neglect ................................................................................. 79

       i.     Receiving Allegations: SWI's Call Hold Times and Dropped Call Rates ........................................................ 79

       ii.    Forwarding Allegations: Deficiencies in Defendants' Data and Information Production to the Monitors .................. 84

    b.   RCCI: Screening and Investigating Allegations .......................... 86

       i.     Screening Allegations: RCCI's Inappropriate Priority Downgrades ....................................................................... 87

       ii.    Investigating Allegations: RCCI's Inappropriate Investigation Procedures and Dispositions .................... 109

       iii.   Inconsistent Record Keeping and Failure to Communicate and Coordinate Across the Agencies' Divisions ............ 128

F.   Remedial Orders 5 and 7: Prompt Initiation of, and Face-to-Face Contact with the Alleged Child Victim(s) in, Priority One Investigations ................................... 130

   1.    The Court's Findings at Trial Related to Remedial Orders 5 and 7 ....... 131

   2.    The Procedural History of Remedial Orders 5 and 7............................ 133

   3.    Defendants Have Failed To Comply with Remedial Orders 5 and 7. .... 134

G.   Remedial Order 10: Prompt Completion of Priority One and Priority Two Investigations ................................................................................................... 143

   1.    The Court's Findings at Trial Related to Remedial Order 10................. 143

   2.    The Procedural History of Remedial Order 10 ...................................... 144

   3.    Defendants Have Failed To Comply with Remedial Order 10.............. 145

H.  Remedial Order B5: Properly Notifying Primary Caseworkers of Allegations of
    Abuse ................................................................................................................ 152

    1.  The Court's Findings at Trial Related to Remedial Order B5 ............... 152

    2.  The Procedural History of Remedial Order B5 ..................................... 153

    3.  Defendants Have Failed To Comply with Remedial Order B5. ............ 154

I.  Remedial Order 22: RCCL Review of the History of Allegations and Findings of
    Abuse and Neglect at Licensed Placements ..................................................... 164

    1.  The Court's Findings at Trial Related to Remedial Order 22 ................ 166

        a.  Inadequate Oversight in Licensing and Enforcement ................. 167

        b.  Failure to Recognize Problematic Patterns in the Histories of
            Licensed Placements ................................................................... 173

    2.  The Procedural History of Remedial Order 22 ..................................... 176

    3.  Defendants Have Failed To Comply with Remedial Order 22. ............. 179

        a.  Ongoing Unreasonable Risk of Serious Harm to Children in
            Licensed Placements ................................................................... 182

            i.   Inadequate Oversight in Licensing and Enforcement ..... 182

                 (a)  Hector Garza ...................................................... 185

                 (b)  Prairie Harbor ..................................................... 199

                 (c)  Fresh Start .......................................................... 209

                 (d)  St. Jude's Ranch for Children ............................. 213

            ii.  Failure to Recognize Problematic Patterns in the Histories
                 of Licensed Placements .................................................. 215

            iii. Inconsistent Record Keeping and Failure to Communicate
                 Across the Agencies' Divisions ...................................... 220

        b.  The Requirements of Remedial Order 22 .................................... 225

            i.   The Monitors' Analysis of "Inspections" ....................... 228

            ii.  Completing and Documenting Extended Compliance
                 History Reviews Prior to Inspections ............................. 232

            iii. Complying or Making Good Faith Efforts To Comply
                 Within the Required Timeframe ...................................... 240

            iv.  Attempting to Ensure Compliance Through Case Reads 246

J.  Remedial Order 37: DFPS Review of the History of Allegations of Abuse and
    Neglect at Foster Homes ................................................................................. 251

    1.  The Court's Findings at Trial Related to Remedial Order 37 ................ 252

    2.  The Procedural History of Remedial Order 37 ..................................... 255

    3.  Defendants Have Failed To Comply with Remedial Order 37. ............. 256

        a.  Timeframe for Compliance .......................................................... 258

|  |  | i. | Reviewing Home Histories and Assessing Concerns for Child Safety and Well-Being "Upon Receipt" of Uninvestigated Allegations of Abuse or Neglect............ 259 |
|  |  | ii. | Alerting Caseworkers and Supervisors of Uninvestigated Allegations Within Forty-Eight Hours............................ 262 |
|  | b. | | Completing Home History Reviews ............................................. 263 |
|  | c. | | Caseworkers' Review of Home Histories and Assessment of Concerns for Child Safety or Well-Being................................... 264 |
| K. | | | Remedial Orders 24, 28, 30: Documenting Sexual Abuse and Sexual Aggression ................................................................................................... 269 |
|  | 1. | | The Court's Findings at Trial Related to Remedial Orders 24, 28, and 30 ................................................................................................. 270 |
|  | 2. | | The Procedural History of Remedial Orders 24, 28, and 30................... 277 |
|  | 3. | | Defendants Are Not in Contempt of Remedial Orders 24, 28, and 30... 277 |
| L. | | | Remedial Orders 25, 26, 27, 29, and 31: Notifying Caregivers about Sexual Abuse and Sexual Aggression................................................................ 287 |
|  | 1. | | The Court's Findings at Trial Related to Remedial Orders 25, 26, 27, 29, and 31................................................................................................ 288 |
|  | 2. | | The Procedural History of Remedial Orders 25, 26, 27, 29, and 31....... 288 |
|  | 3. | | Defendants Have Failed To Comply with Remedial Orders 25, 26, 27, 29, and 31................................................................................................ 288 |
| M. | | | Remedial Order 2: Overburdened Caseworkers .................................................. 300 |
|  | 1. | | The Court's Findings at Trial Related to Remedial Order 2.................. 300 |
|  | a. | | The Interconnectedness of High Caseloads and High Caseworker Turnover......................................................................................... 301 |
|  | b. | | High Caseloads .......................................................................... 302 |
|  |  | i. | Workload Studies.......................................................... 304 |
|  |  | ii. | Stages ........................................................................... 305 |
|  | c. | | High Caseworker Turnover....................................................... 307 |
|  | 2. | | The Procedural History of Remedial Order 2 ........................................ 311 |
|  | 3. | | Defendants Have Failed To Comply with Remedial Order 2.................. 312 |
|  | a. | | December 2019 Order Regarding Workload Studies ................ 313 |
|  | b. | | Defendants' Data Provision to the Monitors ............................ 317 |
|  | c. | | The Requirements of Remedial Order 2 ................................... 320 |
| V. | **CONCLUSION** ........................................................................................ **326** |
| VI. | **GLOSSARY**.............................................................................................. **330** |
| **ATTACHMENT 1** .............................................................................................. **332** |

**ATTACHMENT 2** ................................................................................................................ **334**

**ATTACHMENT 3** ................................................................................................................ **336**

**ATTACHMENT 4** ................................................................................................................ **338**

**ATTACHMENT 5** ................................................................................................................ **340**

**ATTACHMENT 6** ................................................................................................................ **342**

**ATTACHMENT 7** ................................................................................................................ **344**

**ATTACHMENT 8** ................................................................................................................ **346**

**ATTACHMENT 9** ................................................................................................................ **348**

**ATTACHMENT 10** .............................................................................................................. **350**

**ATTACHMENT 11** .............................................................................................................. **352**

**ATTACHMENT 12** .............................................................................................................. **354**

## I.      INTRODUCTION

Nearly a decade has passed since Plaintiffs first brought to the Court's attention the numerous deficiencies in the Texas foster care system that were violating the right of children in the Permanent Managing Conservatorship ("PMC") of the State of Texas to be free from an unreasonable risk of harm, under the Fourteenth Amendment to the United States Constitution. *See* D.E. 1.  Plaintiffs alleged that by the time they filed their Complaint on March 29, 2011, Defendants had already "long been aware of these and other deficiencies of the Texas foster care system, yet ha[d] failed to effectively address them." *Id.* ¶ 10.  In the almost ten years since, this case proceeded to trial; the Court held that PMC children face an unconstitutional risk of harm in the State's custody; the Court and its Special Masters underwent two years of work to fashion appropriate orders to remedy the State's constitutional violations ("Remedial Orders"); the Fifth Circuit heard multiple appeals of those Remedial Orders; and this Court found that Defendants were in contempt of one Remedial Order, as modified by the Fifth Circuit.  As part of its remedy of the State's constitutional violations, the Court also ordered the appointment of Monitors who would review information from Defendants to assess their compliance with the Remedial Orders.

On June 16, 2020, the Monitors filed the First Court Monitors' Report ("Report" or "Monitors' Report"), their first comprehensive report, in which they concluded, after "ten months of investigation, analysis, interviews, and site visits," that "more than two years after the Court issued its Final Order, the Texas child welfare system continues to expose children in permanent managing conservatorship ('PMC') to an unreasonable risk of serious harm."  D.E. 869 at 11.[1] The Monitors revealed "non-compliance across many of the Court's remedial orders."  *Id.* at 16; *see also id.* at 19–20, 23.

---

[1] Citations herein to pages of the Monitors' Report use the Report's original pagination, rather than the page numbers reflected in the filing stamp of the docket entry.

Following the Monitors' Report, on July 2, 2020, Plaintiffs filed the present Motion to Show Cause Why Defendants Should Not Be Held in Contempt ("Plaintiffs' Motion" or "Motion to Show Cause") for their failures to "address[] glaring safety risks in its foster care system," after nearly ten years of litigation over those very safety risks, and for their continued violations of certain remedial orders.  D.E. 901 at 1.

On September 3 and 4, 2020, the Court held a hearing for Defendant GREG ABBOTT, in his official capacity as Governor of the State of Texas; Defendant CECILE ERWIN YOUNG, in her official capacity as Executive Commissioner of the Health and Human Services Commission ("HHSC") of the State of Texas; and Defendant JAIME MASTERS, in her official capacity as Commissioner of the Department of Family and Protective Services ("DFPS") of the State of Texas, to show cause why Defendants should not be held in contempt.  *See* D.E. 901, 934, 941, 958, 960, 990–91.

## II.    JURISDICTION

Plaintiffs' Motion to Show Cause seeks to hold Defendants in contempt of this Court's orders regarding remedies for a class action brought under 42 U.S.C. § 1983, in which the Court held, and the Fifth Circuit affirmed, that Defendants—officials of the State of Texas—violated the substantive due process rights of a class of foster children in Texas State custody under the Fourteenth Amendment to the United States Constitution.  The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

Furthermore, "[t]he power to punish for contempt is an inherent power of the federal courts and . . . it includes the power to punish violations of their own orders."  *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009); *see also Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911) ("[T]he power of courts to punish for contempt[] is a necessary and integral part of the

independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law.").

## III.    PROCEDURAL HISTORY

### A.    Procedural History Before the Present Motion

The prior procedural history of this case is more thoroughly described in previous orders. *See* D.E. 368 (December 17, 2015 Memorandum Opinion and Verdict); D.E. 546 (Special Masters' Implementation Plan); D.E. 559 (January 19, 2018 Final Order); D.E. 601 (Fifth Circuit Opinion in Defendants' appeal of the January 19, 2018 Final Order); D.E. 606 (November 20, 2018 Order); D.E. 627 (Fifth Circuit Opinion in Defendants' appeal of the November 20, 2018 Order); D.E. 725 (November 7, 2019 Order).   When Plaintiffs M.D., D.I., Z.H., S.A., A.M., J.S., K.E., D.P., and T.C. initiated this action through their Next Friends, they alleged that by failing to meet the State's constitutional obligations to children like them in the custody of the PMC of DFPS, Defendants exposed them and other PMC children to ongoing harm or risk of harm through the very system designed to protect them.  *See* D.E. 1.  Plaintiffs sought declaratory and injunctive relief on behalf of a putative class of current and future children in the PMC.  *Id.* ¶¶ 17, 355(c)–(d).[2]

The Court certified a general class of all PMC children and a subclass of such children that are still in effect today:

- The General Class consists of "all children now, or in the future, in the Permanent Managing Conservatorship of the State of Texas."  D.E. 213 at 105.

---

[2] *See also* D.E. 130 (First Amended Complaint); D.E. 154 (Second Amended Complaint); D.E. 179 (Third Amended Complaint); D.E. 206 (Fourth Amended Complaint); and D.E. 215 (Corrected Fourth Amended Complaint).

- The Licensed Foster Care ("LFC") Subclass consists of "all members of the General Class who are now or will be in a licensed or verified foster care placement, excluding verified kinship placements." *Id.*[3]

On November 20, 2018, following Defendants' appeal ("*Stukenberg I*") of the Court's January 19, 2018 Final Order ("January 2018 Order") instating remedies to the constitutional harms found at trial, *see* D.E. 559–60, 601, the Court entered an order on remand ("November 2018 Order"), which issued the following final injunction:

> The Court . . . ENJOINS the Defendants from placing children in permanent management conservatorship ("PMC") in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm.

D.E. 606 at 2 (footnote omitted).[4]  A total of 46 Remedial Orders put in place along with this injunction survived numerous appeals and are currently in effect.

In the November 2018 Order, the Court issued 50 Remedial Orders: 37 Remedial Orders that the Fifth Circuit validated in *Stukenberg I*, and 13 "Modified" Remedial Orders. *See id.* at 2–15. Defendants again appealed to the same Fifth Circuit panel. *See* D.E. 607.  In this second appeal ("*Stukenberg II*"), Defendants raised seven issues regarding 14 provisions from the

---

[3] Two other subclasses—the Basic Care Group Residential Operation Subclass and the Foster Group Home Subclass—were also certified prior to trial, *see* D.E. 213 at 105, but each of these was decertified by later court order, *see* D.E 368 at 159 (decertifying the Basic Care Group Residential Operation Subclass); D.E. 601 at 50 (decertifying the Foster Group Home Subclass).

[4] In the 2015 Opinion and Verdict, the Court's initial injunction required that: "The State shall establish and implement policies and procedures to ensure that Texas's PMC foster children are free from an **unreasonable risk of harm**." D.E. 368 at 245 (emphasis added).  This standard articulated throughout the 2015 Opinion and Verdict is different from the applicable standard set forth in the November 2018 Order. *See* D.E. 606 at 2.  The November 2018 Order's standard requiring that the State must ensure that PMC children are "free from an **unreasonable risk of serious harm**" is the final and applicable standard. *See id.* (emphasis added).

In stating this injunction, the Court expressly noted that the Fifth Circuit opinion in *Stukenberg I* "included psychological harm in its definition of serious harm." *Id.* at 2 n.1 (quoting D.E. 601 at 14) ("We agree that plaintiffs' substantive right to 'personal security and reasonably safe living conditions' includes the very limited right to be free from severe psychological abuse and emotional trauma—both of which are often inextricably related to some form of physical mistreatment or deprivation.").

November 2018 Order, none of which are the Remedial Orders at issue in Plaintiffs' present Motion.[5]

In *Stukenberg II*, the Fifth Circuit affirmed in part, modified in part, and vacated in part the November 2018 Order.  *See* D.E. 627 at 2.  The 46 surviving Remedial Orders went into effect on July 30, 2019 upon the Fifth Circuit's mandate ("the Fifth Circuit's Mandate" or "July 30, 2019 Mandate").  *See id.* at 3–11; *see also* D.E. 606 at 2–19; D.E. 627 at 11 ("[T]he stay will remain in place until the final mandate issues. . . .  The case is remanded to the district court to begin implementing, without further changes, the modified injunction with the alterations we have made.").  As discussed below, 16 of the 46 effective Remedial Orders are at issue here.  *See infra* Section III.D.

### B.     Prior Contempt Order

This is not the first time the Court has considered whether Defendants are in contempt of its orders in this case.   On October 18, 2019, following the Fifth Circuit's Mandate in *Stukenberg II*, Plaintiffs moved for an order to show cause why Defendants should not be held in

---

[5] Defendants appealed the following Remedial Orders in the November 2018 Order that the Court had modified pursuant to *Stukenberg I*:

1. "[T]he 24-hour-supervision provisions" (D.E. 627 at 3), i.e., Remedial Orders A7 and A8, *see* D.E. 606 at 12 ¶¶ A7–A8; Case No. 18-40057, Appellants' Supp. Brief, D.E. 00514794858 [hereinafter "Supp. Brief"] at 13, 18, 25–29;

2. "[T]he face-to-face meeting provision" (D.E. 627 at 3), i.e., Remedial Order A5, *see* D.E. 606 at 10 ¶ A5; Supp. Brief at 13, 18–19, 29–32; and

3. "[T]he workload-study provisions" (D.E. 627 at 3), i.e., Remedial Orders A1 and A2 (pertaining to workload studies for conservatorship caseworkers), *see* D.E. 606 at 8–9 ¶¶ A1–A2; Supp. Brief at 13, 19, 32–35; and Remedial Orders B1 and B2 (pertaining to workload studies for RCCL investigations), *see* D.E. 606 at 13 ¶¶ B1–B2; Supp. Brief at 13, 19, 35–37.

Defendants also appealed the following Remedial Orders that the Fifth Circuit had validated in *Stukenberg I* and that the Court restated in the November 2018 Order:

1. "[T]he missing-medical-records provision" (D.E. 627 at 3), i.e., Remedial Order 36, *see* D.E. 606 at 7 ¶ 36; Supp. Brief at 13, 19, 37–40; and

2. "[T]he integrated-computer-system provisions" (D.E. 627 at 3), i.e., Remedial Orders 33 and 34, *see* D.E. 606 at 6 ¶¶ 33–34; Supp. Brief at 13, 19–20, 40–46.

contempt for, *inter alia*, "[f]ailure to comply with the Order requiring defendants to provide 24-hour awake-night supervision in all placements housing more than six children."[6]  D.E. 695 at 2. This Court held an evidentiary hearing on November 5, 2019.  *See* D.E. 697.  On November 7, 2019, following the show cause hearing, the Court issued an order ("Prior Contempt Order") holding Defendants in civil contempt for failure to follow the Court's Remedial Order A7, which requires Defendants to provide 24-hour awake-night supervision in facilities housing more than six children where PMC children are placed.  D.E. 725 at 1, 18–20.  The Court "impose[d] a fine of $50,000.00 a day beginning Friday, November 8, 2019."  *Id.* at 1.  In addition to this sanction, the Court enjoined Defendants "from moving any PMC child from their current licensed foster care placement as a result of enforcement of the Court's requirement for 24-hour awake-night supervision unless application is made to the Court through the Monitors prior to proposed discharge."  *Id.* at 19–20.

On November 13, 2019, Defendants filed a notice to the Court that the State was providing continuous 24-hour awake-night supervision as of the night of November 11, 2019.  D.E. 732, 732-1; *see also* D.E. 741 (affirming and supplementing the notice).  The State paid $150,000.00 in fines.

On December 5, 2019, Defendants filed an appeal of the portion of the Prior Contempt Order prohibiting the State "from moving any PMC child from their current licensed foster care placement" for purposes of following the 24-hour awake-night supervision requirement without first applying to the Court through the Monitors.  *See* D.E. 761 (citing D.E. 716 at 1–2; 718 at 1–

---

[6] Plaintiffs also moved for an order to show cause why Defendants should not be held in contempt for "[f]ailure to comply with the Order requiring defendants within 60 days after issuance of the Fifth Circuit's Mandate to provide detailed proposals for the required workload studies as to conservatorship caseworkers and [Residential Child Care Licensing] investigators" D.E. 695 at 2.  The Court did not hold Defendants in contempt for this order.  *See* D.E. 725 at 23.

2; 725 at 19–20) (also appealing an additional previous Order and Amended Order requiring the same).  The Fifth Circuit decided on October 16, 2020 that this portion of the Prior Contempt Order was a "modification" of the injunction, which had already been appealed to the Fifth Circuit twice, as discussed above.  *See* D.E. 1004 at 3; *see also supra* Section III.A.  The Fifth Circuit held that this "modification" in the Prior Contempt Order contravened the Fifth Circuit's mandate in *Stukenberg II*, in which the Fifth Circuit had remanded the modified injunction to this Court for implementation "without further changes."  D.E. 1003, 1004 at 1–3, 5 (quoting D.E. 627 at 12) ("This modification demonstrably constitutes a 'further change' to the injunction.").

### C.  The Monitors' Report

On June 16, 2020, the Court-appointed Monitors submitted their Report regarding Defendants' efforts and progress toward implementing and complying with the Remedial Orders set forth in the November 2018 Order, as affirmed or modified by the Fifth Circuit's Mandate.  *See* D.E. 869; *see also* D.E. 869-1 to 869-5, 870 to 895 (appendices to the Report).  To assess Defendants' performance in complying with the Remedial Orders, the Monitors used varying methodologies, tailored for the specific issues addressed by each Remedial Order, to analyze data from various time periods following the Fifth Circuit's Mandate, when the Remedial Orders became enforceable.  Those time periods captured by the Monitors' analysis reflected the varying deadlines for compliance provided in the Remedial Orders.  *Compare, e.g.*, D.E. 606 at 2–7 ¶¶ 2, 5, 7, 10, 24, 37 (requiring that Defendants come into compliance with Remedial Orders 2, 5, 7, 10, 24, and 37 "[w]ithin 60 days"), *with id.* at 5–15 ¶¶ 22, 25–31, B5 (requiring that Defendants come into compliance with Remedial Orders 22, 25–31, and B5 "immediately").

Overall, the Monitors concluded that there remained "non-compliance across many of the Court's remedial orders."  D.E. 869 at 16.  "The Monitors' ten months of investigation, analysis, interviews and site visits lead to the conclusion that . . . the Texas child welfare system continues

to expose children in permanent managing conservatorship ('PMC') to an unreasonable risk of harm." *Id.* at 11. Specifically, the Monitors determined that the State has failed "to comply with the Court's order related to appropriately screening, receiving, and investigating child maltreatment in care"; that "[e]ven when children are appropriately identified by the State, every method of validating performance for the remedial orders related to caregiver notification of child sexual aggression or victimization revealed lapses"; that the State's "limited organizational capacity" continues to "contribute[] to risk of maltreatment for PMC children"; that "[h]igh caseloads affect the State's ability to comply with remedial orders related to timeliness of investigations and inspections"; and that "DFPS and HHSC-[Residential Child Care Licensing ('RCCL')] rarely take meaningful contract or licensing enforcement action"; among other failings specific to the Court's individual Remedial Orders, as affirmed or modified by the Fifth Circuit. *Id.* at 16, 19–20, 23.

### D.     The Present Show Cause Motion

On July 2, 2020, Plaintiffs filed the instant Motion to Show Cause, which alleges that Defendants have failed to implement specific Remedial Orders from the Court's November 2018 Order. As stated above, *see supra* Section III.A., in that November 2018 Order, the Court issued the following injunction:

> The Court . . . ENJOINS the Defendants from placing children in permanent management conservatorship ("PMC") in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm.

D.E. 606 at 2 (footnote omitted). As also stated above, *see supra* Section III.A., 46 Remedial Orders survived numerous appeals. Here, Plaintiffs allege that Defendants have failed to implement 16 of those 46 Remedial Orders, grouped into various categories of alleged failures by Defendants:

1. Remedial Order 3: Taking Account of Child Safety Needs While Screening and Investigating Reports of Abuse and Neglect

2. Remedial Orders 5 and 7: Failure to timely investigate where a child appears to face a safety threat of abuse or neglect that could result in death or serious harm

3. Remedial Order 10: Failure to complete child abuse and neglect investigations within 30 days of intake

4. Remedial Order B5: Failure to notify caseworkers of ongoing investigations of abuse

5. Remedial Order 37: Failure to review foster home histories to determine if there are patterns indicating a dangerous environment for children

6. Remedial Order 2: Failure to ensure that newly hired caseworkers have caseloads which do not overwhelm them and endanger children

7. Remedial Orders 24, 28, and 30: Failure to protect children from child-on-child sexual abuse while in state custody

8. Remedial Orders 25–27, 29, and 31: Failure to inform frontline caregivers when children placed in homes or facilities have been sexual abuse victims or aggressors

9. Remedial Order 22: Failure to implement a credible system for considering a licensed provider's history as to allegations of abuse and neglect[7]

D.E. 901 at 4–17.  Plaintiffs' Motion urges the Court to find Defendants to be in civil contempt of the listed Remedial Orders.  *Id.* at 2–4.  Defendants filed Verified Objections to the Monitors' Report ("Objections") on July 6, 2020, *see* D.E. 903, and a Response in Opposition to the Motion to Show Cause ("Response" or "Defendants' Response") on July 24, 2020, *see* D.E. 911.

On July 29, 2020, the Court ordered Defendants to appear for a hearing to show cause ("Show Cause Hearing") why they should not be held in contempt and sanctioned.  D.E. 934.  The

---

[7] Plaintiffs also alleged a tenth category of Defendants' failures to comply with the Court's Remedial Orders, arguing that Defendants failed to comply with an additional Remedial Order: "Remedial Order 20: Failure to implement a credible system of heightened monitoring of private providers with a pattern of violations."  D.E. 901 at 17–18. However, on August 13, 2020, Defendants filed an Agreed Proposed Order in which Plaintiffs agreed "to confirm that Defendants are not required to show cause as to why they should . . . not be held in contempt and sanctioned for failing to comply with Remedial Order No. 20."  D.E. 942, 942-1.  The Court confirmed this in an order entered on August 31, 2020.  D.E. 950 at 2.

Court scheduled the Show Cause Hearing for September 3 and 4, 2020 via agreed video conferencing.  *See* D.E. 941.  At the Show Cause Hearing, the Court considered Plaintiffs' nine contempt allegations, based on the information in the Monitors' Report regarding Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, and B5.

## IV.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law.  Any finding of fact that also constitutes a conclusion of law is adopted as a conclusion of law.  Any conclusion of law that also constitutes a finding of fact is adopted as a finding of fact.  All of the Court's findings of fact and conclusions of law are based upon clear and convincing evidence.[8]

### A.   Legal Standards for Civil Contempt

The Court has broad powers to issue a finding of civil contempt and to levy sanctions in accordance with that finding.  "[T]he power of courts to punish for contempt[] is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law."  *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911) ("Without [the power to punish for contempt], [courts] are mere boards of arbitration, whose judgments and decrees would be only advisory."); *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009) ("The power to punish for contempt is an inherent power of the federal courts and . . . it includes the power to punish violations of their own orders.").  "[F]ederal courts are not reduced to issuing injunctions against state officers and hoping for compliance.  Once issued, an injunction

---

[8] "Clear and convincing evidence is that weight of proof which produces in the mind of the trier of fact a firm belief or conviction . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case."  *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 396 (5th Cir. 2004) (quotation marks and citations omitted).

may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1978).  Moreover, where "the trial judge [has] years of experience with the problem at hand," the "exercise of discretion . . . is entitled to special deference."  *Id.* at 688; *see also Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 394 (O'Connor, J., concurring) ("Our deference to the District Court's exercise of its discretion is heightened where, as in this litigation, the District Court has effectively been overseeing a large public institution over a long period of time.").

In the *Hutto* litigation, which had begun nearly ten years before the Supreme Court's opinion issued, the district court had found that the conditions of confinement in the Arkansas penal system constituted cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution.  *Hutto*, 437 U.S. at 680–81, 683.  However, the district court found that, upon a fourth set of hearings to assess the state's compliance with the district court's order to improve the conditions of confinement, "the constitutional violations identified earlier had not been cured."  *Id.* at 684.  "[The district court] entered an order that placed limits on the number of men that could be confined in one cell, required that each have a bunk, discontinued the 'grue' diet, and set 30 days as the maximum isolation sentence"; in addition, it awarded attorneys' fees to the plaintiffs.  *Id.* at 684–85.  The Supreme Court found that:

> In fashioning a remedy, the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation.  The District Court had given the Department repeated opportunities to remedy the cruel and unusual conditions in the isolation cells.  If petitioners had fully complied with the court's earlier orders, the present time limit might well have been unnecessary.

*Id.* at 687.  The Supreme Court further determined that, "taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance."  *Id.*

Upon a finding of contempt, "[m]any of the court's most effective enforcement weapons involve financial penalties."  *Id.* at 690.  District courts may use their discretion in imposing

sanctions in civil contempt proceedings. *Rousseau v. 3 Eagles Aviation, Inc.*, 130 F. App'x 687, 689 (5th Cir. 2005); *see also Hutto*, 437 U.S. at 690 ("Civil contempt proceedings may yield a conditional jail term or fine. Civil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance."). In particular, "[i]f a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance. . . . [The] power to impose a fine is properly treated as ancillary to the federal court's power to impose injunctive relief." *Hutto*, 437 U.S. at 691.

### 1.    Civil Contempt Elements

"A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995); *Martin v. Trinity Industries, Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) ("Contempt is committed only if a person violates a court order requiring in specific and definite language that a person do or refrain from doing an act."). "For civil contempt, this must be established by clear and convincing evidence." *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013). Specifically, "the party seeking an order of contempt need only establish (1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995). An effective court order places the party of whom it "require[s] certain conduct," *id.*, "under a duty to make in good faith all reasonable efforts to comply," *Smith v. Smith*, 194 F.3d 1309, 1309 (5th Cir. 1999). "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Waste Mgmt. of Washington, Inc. v. Kattler*, 776 F.3d 336, 341 (5th Cir. 2015) (internal quotations and citations omitted).

If the movant has made the above three-part showing, the burden shifts to the respondent to defend against a civil contempt finding through justifying noncompliance, rebutting the conclusion, demonstrating an inability to comply, asserting good faith in its attempts to comply, or showing mitigating circumstances or substantial compliance.  *See LeGrand*, 43 F.3d at 170 (noting that an inability to comply is a defense against civil contempt); *Petroleos Mexicanos v. Crawford Enterprises, Inc.*, 826 F.2d 392, 401 (5th Cir. 1987) (good faith and inability to comply are defenses to civil contempt); *Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987) (burden falls on defendants "to show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the consent order").

Due process requires "that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses." *Kattler*, 776 F.3d at 339–40.  Adequate notice typically takes the form of a show-cause order and a notice of hearing identifying each litigant who might be held in contempt.  *Id.* at 340.

### 2.    Civil Contempt Sanctions

Upon a finding of civil contempt, the Court may determine the appropriate sanctions by taking into account (1) "the character and magnitude of the harm threatened by the continued contumacy"; (2) "the probable effectiveness of [the] suggested sanction in bringing about the result desired"; and (3) "the amount of [the party in contempt's] financial resources and the consequent seriousness of the burden to that particular defendant."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947).

Such sanctions "may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."  *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000)

(quoting *United Mine Workers of Am.*, 330 U.S. at 303–04); *see also In re Dinnan*, 625 F.2d 1146, 1149 (5th Cir. 1980) ("A coercive, nonpunitive fine payable to the clerk of the court is an appropriate tool in civil contempt cases.").  "Civil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance. . . .  If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance."  *Hutto*, 437 U.S. at 691.

B.    **The Court Finds Defendants To Be in Contempt of Its Remedial Orders.**

As stated above, Plaintiffs' operative[9] allegations are that Defendants have not complied with 16 of the Court's Remedial Orders and therefore should be held in contempt of the Court's November 2018 Order.  D.E. 901 at 4, 9–16.  The Court finds Defendants to be in contempt of 13 of these Remedial Orders, as discussed herein.

It is undisputed that, as to each of these allegations, the first element of civil contempt, "that a court order was in effect," is fulfilled.  *See LeGrand*, 43 F.3d at 170; D.E. 911 at 6; D.E. 990 at 7:4–12.  The Fifth Circuit's July 2019 Mandate did not disturb the Remedial Orders at issue in Plaintiffs' Motion; therefore, those Remedial Orders remain in effect as stated in the November 2018 Order.  *See* D.E. 606; D.E. 627.  Furthermore, Defendants' Response to Plaintiffs' Motion does not dispute the effectiveness of the Remedial Orders at issue, *see* D.E. 911, and Defendants' counsel stipulated at the Show Cause Hearing that these Remedial Orders were in effect during the time frames in which the Monitors assessed Defendants' compliance, *see* D.E. 990 at 7:4–12.

In addition, the second element of civil contempt, "that the order required certain conduct by the respondent" is fulfilled.  *See LeGrand*, 43 F.3d at 170; D.E. 911 at 6.  The Remedial Orders each require Defendants to "implement the remedies . . . to ensure that Texas's PMC foster

---

[9] As previously discussed, *see supra* note 7, on August 31, 2020, the Court ordered that Plaintiffs' tenth allegation regarding Remedial Order 20 would not be considered at the Show Cause Hearing.  D.E. 950 at 2.

children are free from an unreasonable risk of serious harm."  D.E. 606 at 2.  Each Remedial Order

contains specific language detailing required conduct by Defendants.

Defendants primarily dispute whether Plaintiffs have established with "clear and

convincing evidence" the third element of civil contempt, "that the respondent failed to comply

with the court's order."  *See LeGrand*, 43 F.3d at 170; D.E. 911 at 6.  Defendants argue that:

> Here, the Motion fails to show sufficient evidence of the third element for each
> Remedial Order . . . because it solely relies on data pulled from the Report which,
> as discussed above and described below in more detail, is incomplete, unreasonably
> limited, or otherwise unreliable.  Therefore, Plaintiffs have not showed the elements
> of contempt sufficient to shift the burden to Defendants to rebut those claims, and
> the Motion should be denied.

D.E. 911 at 6.  Despite arguing that the Monitors' Report is "unreliable" in their Response to

Plaintiffs' Motion and otherwise objecting to the Report in their Objections, Defendants do not

offer evidence that effectively challenges the substantive information in the Monitors' Report.  In

addition, **at the Show Cause Hearing, Defendants' counsel and witnesses did not dispute the**

**facts presented in the Monitors' Report**.  *See* D.E. 990 at 6:5–19, 27:24–29:15, 116:4–6; D.E.

991 at 12:15–13:10, 58:13–23, 137:6–11; *see also* D.E. 990 at 250:16–19 (Court commenting on

the lack of a factual dispute), 251:19–22 (same).

In general, Defendants argue that they have not "failed to comply" with the Remedial

Orders or that they "have substantially complied with these provisions or have otherwise made

every reasonable effort to comply and, therefore, should not be held in contempt."  D.E. 911 at 6.

**Defendants have not argued or presented evidence to demonstrate that they were unable to**

**comply with the Court's Remedial Orders.**

Therefore, the Court's analysis primarily addresses the third element of civil

contempt—whether Defendants have complied with each of the Remedial Orders at issue—and,

if not, whether they have substantially complied or made good faith efforts to comply.  *See*

*LeGrand*, 43 F.3d at 170; *Petroleos Mexicanos*, 826 F.2d at 401; *Pennington*, 832 F.2d at 914. Plaintiffs argue that within the year since the Fifth Circuit's Mandate, Defendants have continued to fail to implement these Remedial Orders in order to avoid exposing foster children to an unreasonable risk of serious harm. As to 13 out of the 16 Remedial Orders at issue here, the Court agrees. The Court finds Defendants to be in contempt of **Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37,** and **B5**. The Court does not find Defendants to be in contempt of **Remedial Orders 24, 28,** or **30**.

C.   **Overview of Texas Foster Care: The Structure, Roles, Functions, Recordkeeping Practices, and Data Systems of Pertinent State Agencies**

After trial, in 2017, the State's agencies, departments, and divisions thereof, that are responsible for the safety and well-being of PMC children in the State's foster care system underwent changes in their structure and organization. Nonetheless, these same agencies, departments, and divisions have all remained subject to this Court's Orders to remedy the constitutional harms inflicted on the PMC children in the foster care system. Figures 1 and 2 below depict the changes that took place in the structure of the pertinent agencies, departments, and divisions since trial. The roles of each of these entities in maintaining the safety and well-being of the PMC children are described in further detail below.

**Figure 1.**  The Organization of Pertinent State Agencies, Departments, and Divisions at Trial[10]



**Figure 2.**  The Reorganization of Pertinent State Agencies, Departments, and Divisions after 2017[11]



---

[10] The Court created this diagram based on filings in this case and information found at trial.  *See infra* Section IV.C.1.

[11] The Court created this diagram based on information provided in filings in this case and information of which the Court has taken judicial notice.  *See infra* Section IV.C.2, notes 19, 20.

### 1.     The Organization and Roles of the Agencies at the Time of Trial

As described in the Court's December 17, 2015 Memorandum Opinion and Verdict ("2015 Opinion and Verdict")[12] and as depicted in Figure 1 above, at the time of trial, the overarching state agency that oversaw all of the departments, divisions, and entities pertinent to this case was HHSC.  D.E. 368 at 4 n.2 ("The Health and Human Services Commission oversees and administers the agencies in Texas's Health and Human Services system.").  Within HHSC, DFPS oversaw the entire foster care system as "the agency responsible for protecting the State's children, elderly, and disabled."  *Id.* at 4 n.2, 5–6.

The Court determined at trial that two of the various divisions of DFPS were "pertinent to this case": Child Protective Services ("CPS") and Child Care Licensing ("CCL").  *Id.* at 5.  "Both divisions work directly with families, children, and childcare providers to protect all of Texas's children, whether or not they are in foster care."  *Id.* at 5–6.  "An Assistant Commissioner heads each division" of CPS and CCL.  *Id.* at 6.  At the time of trial, Lisa Black was the Assistant Commissioner of CPS and Paul Morris was the Assistant Commissioner of CCL.  *Id.* at 6, 33, 33 n.12 ("Morris . . . [was] the top executive of that division.").  As reflected in the DFPS organizational chart attached to the 2015 Opinion and Verdict, both Lisa Black and Paul Morris

---

[12] The Court provided as an attachment to its 2015 Opinion and Verdict the organizational chart of DFPS from the time of trial, which is re-attached here for reference.  *See* D.E. 368. at 257–58 (Attach. 1); *infra* Attachment 1.

reported directly to John J. Specia, Jr., who was the Commissioner of DFPS at the time of trial "and overall chief executive officer of DFPS."[13]  *Id.* at 6, 33, 258.

### a.    CPS's Role at the Time of Trial

In its 2015 Opinion and Verdict, the Court noted that the CPS division of DFPS was responsible for the process of removing children when "it is not safe for a child to live with her legal guardian" and obtaining Temporary Managing Conservatorship ("TMC") with DFPS.  D.E. 368 at 6.  During TMC, which "lasts up to one year unless a court extends it another six months," "CPS's goal for each child is 'permanency,'" but "[i]f the child has not achieved permanency at the end of TMC, the child enters the State's Permanent Managing Conservatorship."[14]  D.E. 368 at 6–7.

The placement function of the CPS division entailed "ensuring that [CPS has] some level of expertise when . . . matching children to the best placement options."  D.E. 328 at 104:20–21 (trial testimony of Gail Gonzalez, then-Director of Placement and Foster and Adoptive Home Development and Interstate Compact for Placement of Children).  As the Fifth Circuit stated in *Stukenberg I*, "[i]t is DFPS policy to find the most appropriate placement for foster children."  D.E.

---

[13] Including Specia, there have been nine DFPS Commissioners since 2004.  *See* D.E. 368 at 6 (explaining that, at the time of trial, Specia was the seventh DFPS Commissioner since 2004); Edgar Walters, *Family and Protective Services Commissioner to Retire in May*, Texas Tribune, Mar. 4, 2016, https://www.texastribune.org/2016/03/04/texas-head-family-and-protective-services-stepping (reporting that Specia retired in 2016); Edgar Walters, *Texas Child Welfare Chief Hank Whitman Announces Retirement*, Texas Tribune, May 28, 2019, https://www.texastribune.org/2019/05/28/texas-child-welfare-chief-hank-whitman-announces-retirement (reporting that Henry Whitman, Jr. served as Commissioner from April 2016 to June 2019); *Jaime Masters*, DFPS, https://www.dfps.state.tx.us/About_DFPS/Executives/Masters_Jaime.asp (last visited Dec. 15, 2020) (stating that Jaime Masters has served as Commissioner since December 2019); *see also* Fed. R. Evid. 201(b), (c)(1) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. . . .  The court . . . may take judicial notice on its own."); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web."); *infra* note 20.

[14] "The act of designating children a 'permanent' part of a foster care system is unique to Texas.  Unlike TMC, PMC is considered a final order similar to reunification, adoption, or aging out."  D.E. 368 at 7 (citing D.E. 299 at 60; DX 31 at 80).  "[T]here is significantly less attention paid by caseworkers to children once they enter PMC."  *Id.* at 8 (citing D.E. 323 at 67–68).

601 at 3.  However, as the Court found at trial, children placed in the PMC of the State are not always shielded from a risk of harm.  When allegations of abuse, neglect, exploitation, or other harms to children arise at the placements that CPS finds for children, it is important that they are investigated promptly, thoroughly, and accurately.  *See* D.E. 368 at 201; *see also* D.E. 301 at 28:20–23 (trial testimony regarding the importance of a sound investigation system to overall child welfare); D.E. 304 at 20:18–20 (same).  At the time of trial, Statewide Intake ("SWI") and Residential Child Care Licensing ("RCCL") were tasked with investigating such allegations.

### b.    SWI's Role at the Time of Trial

At trial, Specia testified that "one of the components of [DFPS] is a statewide intake hotline that operates 24/7."  D.E. 331 at 41:8–10.  Specia described the SWI hotline as a "very, very sophisticated operation" that receives "every report of abuse and neglect of a child" that goes to a "1-800 number."  *Id.* at 41:10–13.  At the time of trial, SWI was organized as a division that reported to the Chief Operating Officer of DFPS.  *See* D.E. 368 at 257–58 (Attach. 1); *see also infra* Attachment 1.  Darla Jean Shaw, the then-Director of RCCL, also testified that SWI came into play "[a]t the point an intake is received," when "it goes to our centralized processing unit, called statewide intake."  D.E. 329 at 31:25–32:1.  Another trial witness, Frianita Wilson, the then-Director of Purchased Client Services[15] at DFPS, testified that when an allegation is called into SWI, "they will prioritize it and then it would get routed to the appropriate person in order to conduct an investigation."  *Id.* at 67:12–14.

Shaw testified that there were "different prioritizations for intakes."  *Id.* at 26:15.  The priority designated for an allegation starts with "Priority One," which means "a child has been

---

[15] Wilson testified that this role entailed "overseeing and directing the staff that is responsible for awarding, executing, managing, maintaining, and monitoring contracted services for residential and nonresidential services," the "residential component" of which "involves foster care."  D.E. 329 at 53:23–54:5.

killed or there is an immediate threat of serious and physical or emotional harm." D.E. 301 at 81:4–7 (trial testimony of Morris); *see also* D.E. 329 at 26:14–17 (trial testimony of Shaw) (explaining that Priority One means "there's high risk to children and we have to respond within 24 hours"). The next designation is "Priority Two," which means "there is an allegation of abuse and neglect, but the child is currently safe or not at an immediate risk of serious physical or emotional harm." D.E. 301 at 81:8–11 (trial testimony of Morris); *see also* D.E. 329 at 26:18–20 (trial testimony of Shaw) (explaining that a Priority Two "still rises to the level of abuse and neglect but we have up to 72 hours to initiate"). Other priority levels[16] do not "call for abuse/neglect investigations," but instead call for "minimum standards investigations," according to Shaw's trial testimony. D.E. 329 at 27:14–19.

### c.    RCCL's Role at the Time of Trial

At the time of trial, RCCL was the entity "responsible for licensing and inspecting all licensed residential childcare operations, as well as investigating allegations of abuse and neglect at those facilities." D.E. 368 at 200; *see also* D.E. 601 at 6, 39 n.37 ("The task of inspecting, investigating, and licensing placements is managed by RCCL."); D.E. 368 at 9, 34 (citing DX 31 at 163–64) ("RCCL is ultimately responsible for inspecting, investigating, and licensing. . . . RCCL licenses, investigates, and monitors Texas's residential foster care facilities."). Thus, "RCCL [was] the State's mechanism for ensuring that foster care providers meet minimum standards, keep children safe, and provide adequate care." D.E. 368 at 200. As the Director of

---

[16]    A P3 is something our staff will have to go out on, but they -- it's basically just alleging possible violations of a rule. A P4 and P5 get into more like illegal operations, which our daycare side of the program handles far more frequently than we do. And a P5 in residential is there are some investigations that are very, very low risk related to a possible minimum standards deficiency and we can allow the child placing agency to conduct an internal investigation that we review related to that possible deficiency.

D.E. 329 at 27:24–28:8 (trial testimony of Shaw).

RCCL at the time of trial,[17] Shaw reported directly to Morris.  *Id.* at 33; *see also id.* at 258 (Attach. 1); *infra* Attachment 1.  Shaw "ha[d] held [her] position since 2010, but ha[d] been at DFPS since 1995 (in CPS and RCCL) as an investigator, caseworker, inspector, supervisor, and district manager."  D.E. 368 at 34.

At trial, Morris and Shaw elaborated on the functions of RCCL, which involve (1) investigating allegations of abuse, neglect, and exploitation, and (2) inspecting licensed placements.  Morris testified that RCCL had both investigators and inspectors.  *See* D.E. 323 at 184:7–8.  Shaw testified that "inspectors who perform inspections" are "[t]o be distinguished from investigators who perform investigations."  D.E. 329 at 12:13–18.  However, Shaw also testified that "abuse/neglect investigators . . . just focus on abuse/neglect investigations, **but evaluate the standards related to those**" and that "**our inspectors also conduct the standards investigations**."  *Id.* at 24:19–23 (emphasis added).

### i.      Investigating Allegations of Abuse, Neglect, and Exploitation

At trial, Shaw described the "investigation functions that RCCL performs."  *Id.* at 23:18–19.  She testified that RCCL has "two different types of investigations":

> We have **abuse/neglect investigators** and their job is to investigate allegations of abuse and neglect for children in residential settings and through the course of their investigations they're also evaluating the minimum standards or rules for compliance, either related to those specific allegations or related to the physical environment the children are in.  And then we also have what we call **standards investigations** and those are investigations that allege a minimum standard is possibly deficient, but it does not rise to the level of abuse and neglect.

*Id.* at 23:20–24:5 (emphasis added).  Shaw went on to testify that when an investigator investigated allegations of abuse and neglect, "they're also evaluating minimum standards as well."  *Id.* at 24:14–16.  Shaw explained that minimum standards are "basically the rules that operations have

---

[17] Shaw is currently the Associate Commissioner for Child Care Regulation at RCCL, which is now separate from DFPS but remains under HHSC.  D.E. 911 at 65:20–21.

to follow. . . .  When we conduct investigations, we also check that the rules are being followed related to those allegations."  *Id.* at 13:1–2, 13:4–5.

Once RCCL conducted and concluded an investigation, "one of four dispositions follow[ed]: (1) Reason to Believe, . . . ; (2) Ruled Out, . . . ; (3) Unable to Determine, . . . ; [or] (4) Administrative Closure."  D.E. 368 at 201; *see also* D.E. 601 at 6, 39 n.37.  A "Reason to Believe" ("RTB") disposition meant that "[a] preponderance of evidence indicates that abuse, neglect, or exploitation occurred."  D.E. 368 at 201 (quoting PX 86 at 113); *see also* D.E. 301 at 9:15–11:7.  A "Ruled Out" ("R/O") disposition meant that "[a] preponderance of evidence indicates that abuse, neglect or exploitation did not occur."  D.E. 368 at 201 (quoting PX 86 at 113).  An "Unable to Determine" ("UTD") disposition meant that "[a] determination could not be made because of an inability to gather enough facts.  The investigator concludes that there is not a preponderance of evidence that [abuse or neglect] occurred; but it is not reasonable to conclude that abuse or neglect did not occur."  *Id.* (quoting PX 86 at 113).  Finally, an "Administrative Closure" meant that "[t]he operation is not subject to regulation; or the allegations do not meet the definition of abuse, neglect, or exploitation."  *Id.* (quoting PX 86 at 113).

CCL Assistant Commissioner Morris and RCCL Director Shaw both testified at trial about the importance of these investigative systems to the overall safety of foster children.  Morris admitted that investigators and inspectors "have to make correct decisions" in their investigations, "otherwise, victims could be subject to continued risk and perpetrators could be given more opportunities to cause harm."  D.E. 301 at 28:20–23; D.E. 368 at 201.  Shaw also affirmed that "[i]f you don't have a good investigative system, you can't have a good [child welfare] system."  D.E. 304 at 20:18–20; D.E. 368 at 201.  To that end, the Performance Management Unit ("PMU") was a unit of DFPS's CCL division that "provide[d] quality assurance for all of DFPS."  D.E. 368

at 6, 33 ("[T]he Division Administrator of PMU, Leslie Reed, report[ed] to Morris.").   PMU

"ensure[d] that CCL acts according to policies and procedures.   It perform[ed] internal quality

control."   *Id.* at 201; *see also* D.E. 601 at 6, 39 n.37 ("The Performance Management Unit ('PMU')

[was] responsible for internal quality control for all of DFPS, including RCCL.").

<p align="center">ii.        <strong>Inspecting Licensed Placements</strong></p>

Morris and Shaw also testified concerning the role of inspectors within RCCL.   According

to Morris, "the inspectors would actually handle a facility from the submission of the application

[for a license] through the walk through process, the entire application process."   D.E. 323 at

184:12–14.   "Then . . . once the final license is issued to a facility, they would conduct inspections

on a regular basis for those facilities."   *Id.* at 184:15–17.   Shaw also elaborated that "[t]he

inspection portion of RCCL is really to make sure operations are fully in compliance with the rules

and standards on a regular basis."   D.E. 329 at 20:23–25.   She said that at "monitoring

inspections, . . . . [i]f an operation is not meeting minimum standards in the way [inspectors] feel

that they should or there's any risk indicator . . . , then [RCCL] will go out and conduct an

inspection process more often."   *Id.* at 21:2–6.

Further, "if an operation is really struggling with meeting standards, [RCCL] can look at

taking corrective action or adverse action."   *Id.* at 21:6–8.   Shaw explained that "corrective action"

is "placing an operation on either evaluation or probation," meaning that "during that period of

time we're going to impose what we call conditions, which are things an operation has to do above

the minimum standards or rules to come into compliance to fix the identified issues."   *Id.* at 21:10–

15.   Shaw said that RCCL would then "inspect at least once a month during that evaluation or

probation period."   *Id.* at 21:15–17.

### d. Inconsistent Record Keeping and Failure to Communicate and Coordinate Across Divisions at the Time of Trial

Across these divisions and units of DFPS, the Court found at trial "problems of inadequate and incomplete caseworker documentation," which were "considerably magnified by the way in which DFPS maintains foster children's case files." D.E. 368 at 168. The Fifth Circuit similarly noted the "abysmal state of DFPS's recordkeeping systems" and that "[w]ith respect to recordkeeping, DFPS's methods are shockingly haphazard and inefficient." D.E. 601 at 5, 22 n.24, 29–30 ("[C]ase files are often woefully fragmentary and scattered across multiple recordkeeping databases. . . . [R]ecords and case files are outdated and woefully incomplete.").

This Court found that "[c]hildren's records are not kept in a single location nor are they consistently maintained in chronological order." D.E. 368 at 168. Children's case files were in general disarray, in various formats and stored on various systems that were not seamlessly accessible to caseworkers. For example, DFPS and CCL maintain separate systems for storing children's electronic case files: DFPS uses the "Information Management for the Protection of Adults and Children in Texas," or "IMPACT," *id.* at 80 n.25 (describing IMPACT as "the automated system, included in children's case files, in which DFPS staff record caseworker related activities"); while CCL uses the "Child Care Licensing Automation Support System," or "CLASS," *id.* at 141 n.43 (describing CLASS as "the electronic case file system utilized by CCL (similar to the IMPACT system utilized by CPS)"). "Some of the children's files are kept electronically on DFPS's IMPACT casework system," *id.* at 168, but "records relating to abuse and neglect investigations of children in foster care are kept separately by RCCL in the CLASS database," *id.* at 168–69; *see also* D.E. 601 at 5 ("A significant portion of children's records are kept in DFPS's electronic IMPACT casework system. Data on abuse and neglect investigations are maintained by the Residential Child Care Licensing ('RCCL') division in its CLASS

database.").   "Although [conservatorship ('CVS')] caseworkers have access to the CLASS database, CLASS files are not merged with IMPACT files and it is unclear whether CVS caseworkers are trained, let alone have the time, to check whether children newly transferred to their caseloads have CLASS files."  D.E. 368 at 169 (citing D.E. 343 at 2); *see also* D.E. 601 at 5 (noting that the data in CLASS "is not merged with IMPACT files"); D.E. 368 at 160 ("It is unclear how easily CPS caseworkers can access their foster children's RCCL files, and how often they do so when receiving new files.").

Furthermore, some "children's files are maintained entirely in External paper files."  D.E. 368 at 168.  "External case files contain[] supporting case documentation," which "cannot be entered or uploaded into the IMPACT system, including paper documents, spreadsheets, photographs, computer disks, audio tapes, and video tapes."  *Id.* at 81 n.26; *see also* D.E. 601 at 6 ("Some children's files are maintained entirely in paper form, and casefiles are often inordinately long.").

"Thus, not only are foster children's case files shockingly long (358,102 pages of case files for the 20 children for whom the Court has records), they are incredibly disorganized."  D.E. 368 at 169; *see also* D.E. 601 at 6 n.7 ("The district court noted that the records for the 20 children it had access to totaled over 350,000 pages.").  Even these "shockingly long" case files that the Court reviewed at trial represented incomplete records because "the records contained no [Child Placing Agency ("CPA")] investigation files, and there were no IMPACT or RCCL files for multiple children."  D.E. 368 at 166.  Moreover, these records were missing educational records (which are hard copies that follow each child to the caregiver), medical records, and psychological records

pertaining to the Plaintiff children.[18]  *See, e.g.*, *id.* at 131, 141, 152, 185 (citing PX 1988 at 53–54)

(discussing the "incomplete school records" of foster youth); *see also* D.E. 312 at 32:11–34:24

(trial testimony of Camille Gilliam, a CPS Regional Director at the time of trial, that children's

medical and dental records were not consistently documented).

Since trial, the Special Masters and the Monitors have discovered ongoing inadequate

recordkeeping by the State.  *See infra* Section IV.C.2.d.  This problem has been further exacerbated

by the fact that, since trial, the State has bifurcated the functions of the agencies, departments, and

divisions that are subject to the Court's Remedial Orders into different agencies that are failing to

effectively communicate and coordinate "to ensure that Texas's PMC foster children are free from

an unreasonable risk of serious harm."  *See* D.E. 606 at 2; *see also infra* Sections IV.C.2.,

IV.E.3.b.iii., IV.I.3.a.iii.

## 2.    The Reorganization and Roles of the Agencies Following Trial

HHSC and DFPS underwent a restructuring in 2017, as illustrated in Figures 1 and 2 above.

The Monitors' Report describes the changes made to DFPS, noting that:

> At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and
> Human Services Commission ("HHSC"), and is now an independent state agency
> reporting directly to the Governor. . . .  The 85th Texas Legislature passed House
> Bill 5, transforming DFPS into an independent state agency reporting directly to
> the Governor.

---

[18] Any medical and psychological records only mentioned, if at all, children's appointments with care providers, with
no further detail.  *See, e.g.*, D.E. 368 at 151–52 ("In August 2011, one of the children's caseworkers stated in [the]
Child's Service Plan, 'caseworker will ensure that child is referred for a psychological assessment to ensure that all
of his [sic] medical health needs are met.'  The next Plan, done by a different worker, in December 2011 says, 'should
the child require additional/testing evaluations, the caregiver will schedule the appointment and provide the agency
with the completed report.'  The Plan does not indicate that any mental health evaluations took place in the three
months between Plans, nor is there a report in the files.") (citations omitted).

D.E. 869 at 10 n.2 (citing Act of May 30, 2017, 85th Leg., R.S., ch. 316, 2017 Tex. Gen. Laws 601 (House Bill 5)).[19]  Following this restructuring, "**DFPS [is] responsible for investigating reports of abuse, neglect or exploitation.**"  *Id.* at 18 (emphasis added).  DFPS also maintains the CPS division, which continues to have the purpose to "protect children and to act in the children's best interest."  *Child Protective Services Handbook* § 1110 ("Purpose and Objectives"), https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_1000.asp#CPS_1110 (Sept. 2020).[20] Furthermore, it remains the role of CPS to "[p]rovide permanence for a child who cannot return to the family by recommending . . . other suitable legal authorization for permanent placement of the child with another family or caretaker."  *Id.*

As the Monitors describe, "[e]ffective September 1, 2017 the responsibility for oversight and regulation of child-care operations, which had resided with Residential Child Care Licensing

---

[19] Updated organizational charts of DFPS, following its reorganization as a separate department from HHSC, are provided herein as Attachments 2 and 3.  *See infra* Attachment 2 (DFPS's organizational chart as of June 1, 2018—before the November 2018 Order, in which the Court put in place the Remedial Orders at issue here); Attachment 3 (DFPS's current organizational chart, last revised on May 10, 2020).

The Court takes judicial notice of the archived version of DFPS's June 1, 2018 organizational chart (Attachment 2), obtained from Archive.org.  *See supra* note 11; *infra* note 20; Fed. R. Evid. 201(b), (c)(1) (describing the circumstances under which a court may take judicial notice on its own of "a fact that is not subject to reasonable dispute"); *see also, e.g.*, *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 604 n.2 (C.D. Cal. 2017) (collecting cases) ("[C]ourts have taken judicial notice of the contents of web pages available through [the internet archive service] the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Pond Guy, Inc. v. Aquascape Designs, Inc.*, No. 13-13229, 2014 WL 2863871, at *4 (E.D. Mich. June 24, 2014) ("As a resource the accuracy of which cannot reasonably be questioned, the Internet Archive has been found to be an acceptable source for the taking of judicial notice."); *Martins v. 3PD, Inc.*, No. 11-11313-DWP, 2013 WL1320454, at *16 n.8 (D. Mass. Mar. 28, 2013) (taking judicial notice of historical versions of the defendant's website obtained from Archive.org); *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *3 (W.D. Mich. Oct. 31, 2011) ("[T]he federal courts have recognized that Internet archive services, although representing a relatively new source of information, have sufficient indicia of reliability to support introduction of their contents into evidence, subject to challenge at trial for authenticity.").

[20] The Court takes judicial notice of information from the Texas State agencies' websites.  *See* Fed. R. Evid. 201(b), (c)(1); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (denying petition for rehearing *en banc*) ("[W]e fail to see any merit to an objection to the panel taking judicial notice of the state agency's own website."); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of the information published on the website of the National Mediation Board); *Gemstar Grp. USA, Inc. v. Ferragamo USA, Inc.*, No. H-08-1822, 2008 WL485863, at *7 n.40 (S.D. Tex. Nov. 10, 2008) (taking judicial notice of the defendant's website); *see also O'Toole*, 499 F.3d at 1225 ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

within DFPS, was transferred to the Health and Human Services Commission."  D.E. 869 at 57

n.65.  "**HHSC-Residential Child Care Licensing ('RCCL') [is now] responsible for licensing**

**oversight and monitoring minimum standards.**"[21]  *Id.* at 18 (emphasis added).  Defendants also

describe this restructuring in their objections to the Special Masters' Recommendations, stating

that "[f]ollowing the transformation that occurred on September 1, 2017, parts of RCCL were split

between HHSC and DFPS."  D.E. 556 at 33.  RCCL was organized under a division of HHSC

called the "Regulatory Services Division."[22]  *See, e.g.*, Health & Human Servs. Comm'n,

Minimum Standards, https://hhs.texas.gov/doing-business-hhs/provider-portals/protective-

services-providers/child-care-licensing/minimum-standards (last visited Dec. 15, 2020) ("[T]he

HHSC Child Care Licensing Department, Regulatory Services Division, develops rules for child-

care in Texas.").  Again, despite the transfer of RCCL and its functions of overseeing licensed

operations to HHSC, "[t]he responsibility to investigate allegations of abuse, neglect or

exploitation within those settings . . . remained with DFPS."  D.E. 869 at 57 n.65.

     The State's procedure to address allegations of abuse, neglect, or exploitation of a child in

foster care still begins with a report of such allegations to SWI, as it did at trial.  However, as fully

discussed below, under this new structure, depending on the nature of that report, SWI may

forward the allegation to either (a) the Residential Child Care Investigations ("RCCI") division

within DFPS (which is now an independent department separate from HHSC) if it involves abuse,

---

[21] The term "HHSC-RCCL" as used in this order refers to RCCL following the reorganization in 2017 when the agency was no longer organized under DFPS.

[22] Updated organizational charts of HHSC following these changes are attached as Attachments 4 and 5.  *See infra* Attachment 4 (HHSC's organizational chart as of August 20, 2018—before the November 2018 Order, in which the Court put in place the Remedial Orders at issue here—showing the "Regulatory Services" Division as a division overseen by HHSC's "Chief Policy Officer"); Attachment 5 (HHSC's current organizational chart, last revised on November 20, 2020, showing the "Regulatory Services" Division as a division overseen by HHSC's "Chief Policy and Regulatory Officer").

neglect, or exploitation or (b) HHSC-RCCL (which remains within HHSC, separate from the rest of DFPS) if it involves other allegations regarding licensed operations.

> ### a.    SWI's Current Role

SWI continues to be "the unit within DFPS that operates the Texas Abuse Hotline, which is responsible for receiving reports of abuse, neglect, and exploitation and forwarding them to the appropriate program for investigation."  D.E. 869 at 56 (citing Tex. Dep't of Family and Protective Servs., *Statewide Intake Policy & Procedures* § 1000 ("Statewide Intake (SWI) Contact Center") (Nov. 2019), https://www.dfps.state.tx.us/handbooks/SWI_Procedures [hereinafter *SWI Policy and Procedures Handbook*]); *see also infra* Attachments 1–3.  SWI has intake specialists who "are highly trained in interviewing callers":

> The intake specialist assesses reported information to determine whether the situation meets the legal definition of abuse, neglect, or exploitation and, if so, further determines priority, allegation type, and report processing.  Based on the circumstances described by the reporter, the intake specialist exercises judgment to determine whether an intake is warranted and to assign a priority to the report that determines the time frame in which the investigation is initiated in the field.

*SWI Policy and Procedures Handbook* § 1610 ("Intake Specialists") (Nov. 2019).  The *SWI Policy and Procedures Handbook* describes the knowledge, understanding, and experience that intake specialists at SWI must have.  It provides that:

> This [the job of an intake specialist] requires knowledge of family dynamics and the ability to assess risk with little information.  The intake specialist is knowledgeable about all laws, policies, and procedures for all programs and the services they offer so that intakes are directed to the appropriate offices. . . .  The intake specialist is able to think and act quickly, handle crises, and cope with secondary trauma.

*Id.*  The testimony at the Show Cause Hearing of Stephen Black, the Interim Associate Commissioner for SWI at DFPS, confirmed that SWI intake specialists receive extensive training:

> They get seven weeks of training.  First couple days of training is just an orientation.
> Then they have three weeks what we call "Basic Skills Development," where they
> learn all of the programs that we take reports for.  Then they get another three to
> four weeks of on-the-job training where they're -- they're still -- they're taking the
> live calls, but doing it in a training environment with -- with their trainer.

D.E. 991 at 21:14–21.  Stephen Black affirmed that he has confidence in the SWI intake specialists.

*Id.* at 21:22–24.

The *SWI Policy and Procedures Handbook* describes SWI's process as follows:

- Obtains and assesses the information reported according to definitions of abuse,
  neglect, or exploitation for each program.
- Enters the information in the case management system (IMPACT).
- Routes reports to the appropriate program and field office.
- Serves as a referral center when appropriate or when information received does
  not meet statutory definitions.

*SWI Policy and Procedures Handbook* § 1000; *see also* D.E. 869 at 57 ("SWI's first responsibility
is to receive and evaluate the information provided by each reporter to determine whether the
allegations meet any of the statutory definitions of abuse or neglect that govern the specified
programs.  Based on that evaluation, SWI will either route the report to the appropriate program
or, if the report does not rise to that level for any program, make a referral.").

The SWI specialist classifies the report into one of three categories: (1) "an intake," (2) "a
special request," or (3) "an information and referral (I&R)."   *SWI Policy and Procedures
Handbook* § 2120 ("Assessing Information Provided to SWI") (Mar. 2018); *see also id.* § 2220
("Special Requests and Information & Referrals (I&Rs)") (Mar. 2018) ("Any reports that are not
intakes of abuse, neglect, or exploitation are documented and classified as one of the
following . . . .").  (1) An "intake" is "a report that is recommended for investigation by a DFPS
program."  *See id.* §§ 2120, 2220; *see also id.* § 2162 ("Offensive or Inappropriate Callers") (Mar.
2018) ("Any information provided by the reporter is assessed for allegations of abuse or neglect
and processed accordingly.").  (2) A "special request" may be either an administrative special

request or a case-related special request.[23]  *See id.* § 2220.  (3) An information and referral, or "I&R," is any report received by SWI "that is not assessed to be an intake or Special Request."  *Id.* § 2222 ("Information and Referrals (I&Rs)") (Mar. 2018).

For intakes, the SWI specialists "then prioritizes and processes the intake following normal procedures based on allegations and safety threats."  *See id.* § 2213 ("Limited Locating Information") (Mar. 2018).  Intakes may be assessed as Priority 1 (P1), Priority 2 (P2), or Priority None (PN) based on the immediacy of the risk and the severity of the possible harm to the child. *See id.* §§ 4300 ("CPS Assessment of Priority") (Mar. 2015), 5220 ("CCL Assessment of Priority") (July 2016).  However, "[e]ach DFPS program has its own method of determining how quickly an investigator must respond to a report of abuse or neglect.  Intake specialists, therefore, assign the priority of a report according to the policies of the DFPS program to which the report relates."  *Id.* § 3143.3 ("Priority Initial Drop-Down List") (Mar. 2018).

However, as the Monitors note, the sections of the *SWI Policy and Procedures Handbook* reflecting its policies for sending reports to individual agencies and divisions did not appear to have been updated as of the Show Cause Hearing to reflect the organizational change that took place among these agencies and divisions after 2017.  *See* D.E. 869 at 57 n.65; *see also supra* Figures 1 & 2.  At the time of the Show Cause Hearing, the handbook still described procedures for sending intakes to CPS, *see SWI Policy and Procedures Handbook* § 4000 *et seq.*, and CCL, *see SWI Policy and Procedures Handbook* § 5000 *et seq.*, rather than to Child Protective Investigations ("CPI") and Child Care Investigations ("CCI") within DFPS, and to RCCL within

---

[23] Section 2000 of the *SWI Policy and Procedures Handbook* does not explain administrative special requests, but case-related special requests are "requests for assistance that do not include allegations of abuse, neglect, or exploitation but require some type of casework."  *SWI Policy and Procedures Handbook* § 2221 ("Case-Related Special Requests for CPS and APS") (Mar. 2018).

HHSC.[24]   Therefore, it is unclear which sections of the *SWI Policy and Procedures Handbook* apply to SWI intakes that are directed to RCCI, CPI, or HHSC-RCCL for investigations.   The problem of inconsistent and disjointed record-keeping on the part of Defendants apparently affects not only the records of foster children but also the administrative guidance under which the State operates.   The Court assumes that, as of the time of the Show Cause Hearing, the *SWI Policy and Procedures Handbook* sections 4000 *et seq.* and 5000 *et seq.* are not updated and therefore do not apply.   Instead, the Court relies on the Monitors' Report, the testimony from the Show Cause Hearing, and the other handbooks specific to the divisions and units that are the recipients of reports from SWI.

### i.      Forwarding Reports of Abuse and Neglect to CCI

The Monitors explain in their Report that "[w]hen SWI makes a determination that the report involves a child who is under eighteen years of age in a licensed child-care operation that provides twenty-four hour care, SWI is required to refer the report to RCCI [within DFPS's CCI division of CPI] to investigate the allegations."   D.E. 869 at 57.   RCCI is a unit created by DFPS, following the State's global reorganization of its agencies, to be "part of a new, independent Investigations Division to investigate" abuse, neglect, or exploitation allegations arising out of licensed residential childcare operations.  *Id.* at 57 n.65.

At the Show Cause Hearing, Stephen Black testified that "[i]f a call regarding a licensed placement rises to the level of abuse or neglect or exploitation, Statewide Intake assigns an Intake to CCI.   That would either be a Priority One Intake or a Priority Two Intake. . . .   We do not take

---

[24] For example, Section 5000 ("Child Care Licensing (CCL) Division") of the *SWI Policy and Procedures Handbook* was last updated in March of 2018 but still reflects the old organizational structure of sending abuse, neglect or exploitation allegations regarding a licensed operation to "**CCL**," rather than **RCCI**.   Section 5000 provides that "[w]hen information regarding a CCL operation meets the statutory definition of **abuse, neglect, or exploitation**, the intake specialist generates an intake for **CCL** (DCL [Day Care Licensing] or **RCCL**)."  *SWI Policy and Procedures Handbook* § 5000 (Mar. 2018) (emphasis added).

a Priority None for RCCI.  We would only assign it as a P1 or a 2."  D.E. 991 at 10:24–11:4, 14:3–

5.  This is also reflected in CCI's handbook, which provides that:

> If a report alleges abuse, neglect, or exploitation, SWI staff do the following:
> 1. Process the report as an intake.
> 2. Prioritize the intake report as Priority 1 (P1) or Priority 2 (P2).
> 3. Route the intake report to the appropriate CCI routing coordinator.

*Child Care Investigations Handbook* § 6210 ("Reports Received From Statewide Intake (SWI)")

(Aug.   2020),   https://www.dfps.state.tx.us/handbooks/CCI/default.asp   [hereinafter   *CCI*

*Handbook*].

### ii.        Forwarding Reports of Abuse and Neglect to CPI

"CPI is charged, in part, with investigating allegations of abuse, neglect or exploitation of

children in the PMC General Class in unlicensed placements such as kinship foster homes."  D.E.

869 at 68 n.113; *see also* D.E. 991 at 13:22 (Show Cause Hearing testimony of Stephen Black

noting that "CCI is for licensed care," while "CPI is [for] unlicensed care"); D.E. 903 at 6 n.3

(citing Tex. Hum. Res. Code §§ 40.042, 40.0505) ("Prior to 2017, Child Protective Investigations

(CPI) were a part of CPS.  Following changes made during the 85th Regular Session of the Texas

Legislature, CPI is part of a consolidated Investigations Division").   Black explained that for

children in non-licensed care, "[i]f the information rises to the level of abuse or neglect, [SWI]

will send an Intake to the CPI program.  Most commonly that will be a Priority One Intake or a

Priority Two Intake.  With CPI there are some rare circumstances where we may assess a Priority

None Intake at the point of Statewide Intake."  D.E. 991 at 11:13–16.

### iii.        Forwarding Reports to HHSC-RCCL

"For intakes in which the allegations do not meet the definition of abuse or neglect,"

Stephen Black testified that "[t]hose calls are documented, and they are sent to RCCL with HHSC

as a possible standards violation."  *Id.* at 11:5–9.  The Monitors similarly reported that:

If the report involves a child in a child care operation and SWI determines that the allegations do not rise to the level of abuse, neglect, or exploitation, but may involve a violation of licensing rules, SWI is required to refer the report to RCCL, which is located within HHSC, for a determination about whether the report demonstrates a violation of the minimum regulatory standards applicable to those programs.

D.E. 869 at 57.

### b.     RCCI's Current Role

The various units of DFPS, now an independent department that is no longer a part of HHSC, receive allegations of abuse, neglect, or exploitation from SWI.  As noted above, CCI investigates allegations of abuse, neglect, or exploitation in licensed placements, while CPI investigates allegations of abuse, neglect, or exploitation in unlicensed placements.  D.E. 991 at 13:22; D.E. 869 at 68 n.113; *see also* D.E. 869 at 57 n.65 (describing "a new, independent Investigations Division" that investigates abuse, neglect, or exploitation allegations).  The licensed placements where CCI investigates allegations of abuse, neglect, or exploitation include child day care and residential child care operations.  *See CCI Handbook* § 1140 ("Operations and Activities Regulated by Licensing") (Dec. 2011).  The CCI unit dedicated to investigating allegations arising out of licensed residential child care operations is RCCI.  According to Defendants:

RCCI is responsible for investigation of allegations of abuse, neglect, and exploitation of children and youth in 24-hour residential child care in Texas that is subject to regulation by the Texas Health and Human Services Commission (HHSC) Residential Child Care Licensing.  This includes investigations of allegations in general residential operations, which include residential treatment centers and emergency shelters, and child placing agencies, which include foster homes.

D.E. 911 at 7 n.3.

### i.     Prioritizing Allegations of Abuse, Neglect, and Exploitation

Once RCCI receives a report of abuse, neglect, or exploitation of children in licensed residential care from SWI, "RCCI can unilaterally confirm or override any of the elements of SWI's determination."  D.E. 869 at 58.  "CCI routing coordinators assign intake reports to the CCI

Screening Unit for approval to investigate or for determination of a different action based on legal authority and CCI policy." *CCI Handbook* § 6210.  During this assessment, an RCCI "screener, supervisor, or designee may change the priority of an intake report of abuse, neglect, or exploitation received by SWI if the screener, supervisor, or designee determines that the priority assessed by SWI is not the correct priority."  *Id.* § 6241.1 ("Changing the Priority of an Abuse, Neglect, or Exploitation Intake Report") (Aug. 2020); *see also id.* § 6222 ("Assessing an Intake Report for Priority") (Aug. 2020) ("A screener, supervisor, or designee reviews and assesses each intake report containing an allegation of abuse, neglect, or exploitation to assess the priority and may change the priority assigned by SWI, if necessary.").

RCCI assesses intake reports from SWI "to determine the correct priority" by reviewing the following factors:

- The information available at the time of intake.
- The presence of current threats to the child's immediate safety.
- The degree of harm the child has sustained or may sustain in the foreseeable future.
- The allegation that presents the greatest risk to the child, if multiple allegations are reported.

*Id.* § 6222.  CCI's definitions of Priority One and Priority Two are as follows:

An abuse or neglect intake report is classified as a **Priority 1 (P1)** investigation in IMPACT and CLASS, if the report concerns either of the following:
- The death of a child.
- An immediate threat of serious physical or emotional harm or death of a child caused by abuse or neglect.

*Id.* § 6222.1 ("Classifying an Intake Report as a Priority 1 Investigation") (Aug. 2020) (emphasis added).

An abuse, neglect, or exploitation report is classified as a **Priority 2 (P2)** investigation in IMPACT and CLASS, if the report concerns an allegation of abuse, neglect, or exploitation, and either of the following applies:

- The child is currently safe.
- The child is not at an immediate risk of serious physical or emotional harm as a result of the abuse, neglect, or exploitation.

*Id.* § 6222.2 ("Classifying an Intake Report as a Priority 2 Investigation") (Aug. 2020) (emphasis added).  If "the screener, supervisor, or designee . . . [l]eaves the priority unchanged," he or she then "assigns the intake report in IMPACT and the associated intake report in CLASS to an investigator as an investigation of abuse, neglect, or exploitation."  *Id.* § 6241 ("Investigate, Downgrade, or Close an Intake Report") (Aug. 2020).  If the "screener, supervisor, or designee . . . [c]hanges the priority from P1 to P2 or from P2 to P1," he or she "assigns the intake report in IMPACT and the associated intake report in CLASS to an investigator as an investigation of abuse, neglect, or exploitation."  *Id.*

However, the RCCI "screener, supervisor, or designee" may "[d]owngrade[] the priority to Priority None (PN)," in which case, he or she "refers the associated intake report in CLASS to the Child Care Licensing division of Texas Health and Human Services" or "closes the intake report in IMPACT and the associated intake report in CLASS with no investigation."  *See id*.  Hence, if RCCI downgrades a report of alleged abuse, neglect, or exploitation to Priority None, an investigation for abuse, neglect, or exploitation will not take place.  RCCI defines "Priority None" as follows:

A screener, supervisor, or designee may downgrade an abuse, neglect, or exploitation intake report received by SWI to a **Priority None (PN)** intake report when the information in the report does either of the following:

- Suggests that a minimum standard was violated, but not that a child was abused, neglected, or exploited.
- Indicates that risk to children existed in the past, but does not allege current abuse, neglect, or exploitation . . . .

*Id.* § 6241.2 ("Downgrading an Abuse, Neglect, or Exploitation Report to a Priority None (PN) Intake Report") (Aug. 2020) (emphasis added).

### ii.   Investigating Allegations of Abuse, Neglect, and Exploitation

If an allegation of abuse, neglect, or exploitation survives the second screening by RCCI and remains classified as a Priority One or Priority Two, RCCI will investigate the allegation. If it is a Priority One investigation, it "must begin immediately if the allegations involve either . . . [t]he death of a child" or "[c]ircumstances in which serious physical or emotional harm or death of a child will occur without immediate intervention." *Id.* § 6361.1 ("Time Frame for Initiating a Priority 1 (P1) Investigation") (Aug. 2020). "All other Priority 1 investigations must be initiated within 24 hours of the intake report." *Id.* "A Priority 2 investigation must begin as soon as possible, but no later than 72 hours after the intake report." *Id.* § 6361.2 ("Time Frame for Initiating a Priority 2 (P2) Investigation") (Aug. 2020).

The possible dispositions that RCCI may make at the end of an investigation are "Reason to Believe (RTB)," "Ruled Out (R/O)," "Unable to Determine (UTD)," or "Administrative Closure (ADM)." *Id.* § 6623 ("Possible Dispositions") (Aug. 2020). The definitions of these dispositions

are the same as the those that were in place for RCCL (as a division of DFPS) at the time of trial. *Compare supra* Section IV.C.1.c.i.; *with CCI Handbook* § 6623.[25]

### c.      HHSC-RCCL's Current Role

Following the reorganization of the State's agencies, *see supra* Figures 1 & 2; *infra* Attachments 4 & 5, the "regulatory activities" of RCCL, as a division of HHSC, include "inspecting and investigating operations," "seeking to ensure ongoing compliance with the requirements in Texas statutes and rules," "providing technical assistance ['TA'][26] to operations and licensees,"[27] and "taking administrative, corrective, or adverse action on operations and licensees, as appropriate." *Child Care Licensing Policy and Procedures Handbook* § 1110 ("Licensing's     Regulatory     Activities")     (Dec.     2011),     https://hhs.texas.gov/laws-regulations/handbooks/cclpph/child-care-licensing-policy-procedures-handbook [hereinafter *CCL Policy and Procedures Handbook*].  As part of these regulatory activities, HHSC-RCCL oversees

---

[25]     IMPACT and CLASS provide the following dispositions for CCI cases:
- *Reason to Believe (RTB)* – A preponderance of evidence indicates that abuse, neglect, or exploitation occurred.  If the disposition for any allegation is *Reason to Believe*, the overall case disposition is *Reason to Believe*.
- *Ruled Out (R/O)* – A preponderance of evidence indicates that abuse, neglect, or exploitation did not occur.  If the dispositions for all allegation are *Ruled Out*, the overall case disposition is *Ruled Out*.
- *Unable to Determine (UTD)* – A determination could not be made because of an inability to gather enough facts.  The investigator concludes that there is not a preponderance of evidence that abuse, neglect, or exploitation occurred; but it is not reasonable to conclude that abuse, neglect, or exploitation did not occur.  If the disposition for any allegation is *Unable to Determine*, and there is no allegation with a disposition of *Reason to Believe*, the overall case disposition is *Unable to Determine*.
- *Administrative Closure (ADM)* – The operation is not subject to regulation, or the allegations do not meet the definition of abuse, neglect, or exploitation.  If the dispositions for all allegations are *Administrative Closure*, the overall case disposition is *Administrative Closure*.

*CCI Handbook* § 6623.

[26] "Technical assistance," or "TA," means "[a]ssistance that Licensing staff give to permit holders, applicants, and operation employees to help them comply with applicable law and the minimum standards."  *CCL Policy and Procedures Handbook*, Definitions of Terms (May 2020).

[27] A "license" is "[a] type of permit issued by Licensing stating that an operation has met applicable statutes, administrative rules, and minimum standards and may operate.  Licenses are issued to all operations except listed family homes, registered child care homes, certified operations, and CPA homes."  *CCL Policy and Procedures Handbook*, Definitions of Terms.  A "licensee" is "[t]he holder of a license."  *Id.*

licensed operations' compliance with "minimum standards," which are "[t]he minimum requirements for permit holders, enforced by HHSC to protect the health, safety, and well-being of children." *Id.*, Definitions of Terms (May 2020) (citing 26 Tex. Admin. Code §§ 743.1 *et seq.* ("Minimum Standards for Shelter Care"), 744.101 *et seq.* ("Minimum Standards for School-Age and Before or After-School Programs"), 746.101 *et seq.* ("Minimum Standards for Child-Care Centers"), 747.101 *et seq.* ("Minimum Standards for Child-Care Homes"), 748.1 *et seq.* ("Minimum Standards for General Residential Operations"), 749.1 *et seq.* ("Minimum Standards for Child-Placing Agencies"), 750.1 *et seq.* ("Minimum Standards for Independent Foster Homes")).

Notwithstanding the State's generally applicable minimum standards, an operation may request a "variance," which is:

> An alternate method of compliance requested by a child care facility or child-placing agency that allows them to comply with a specific minimum standard in a way that meets the intent of the standard but is different from the usual compliance, as long as the health, safety, and well-being of the children is reasonably protected.

*Id*. In addition, a "waiver" is:

> An exception granted by Licensing when a child care facility or child-placing agency requests that it not be required to comply with a specific minimum standard. The waiver is granted if Licensing determines that the economic impact of compliance is great enough to make compliance impractical and the possibility of risk is not significantly increased.

*Id*.

The investigation and inspection functions of RCCL have been interrelated since before trial. *See* D.E. 329 at 13:4–5 ("When we conduct investigations, we also check that the rules are being followed related to those allegations."); *see also supra* Sections IV.C.1.c.i, IV.C.1.c.ii. However, as discussed above, after trial, the State created a bifurcated system that separates HHSC-RCCL's licensing inspections and minimum standards investigations from DFPS's abuse

and neglect investigations.  Although the State's administrative guidance still contemplates—and necessitates—a system in which HHSC-RCCL's inspections inform its investigations, and vice versa, and in which DFPS's abuse and neglect investigations inform HHSC-RCCL's inspections and investigations, and vice versa, this does not occur in reality.

The *CCL Policy and Procedures Handbook* provides that "HHSC Licensing staff work in conjunction with the Department of Family and Protective Services (DFPS) child care investigators to complete the regulatory tasks associated with DFPS investigations of abuse, neglect, or exploitation in child care facilities regulated by HHSC."  *CCL Policy and Procedures Handbook* § 6910 ("Responsibilities of HHSC Licensing Staff") (Sept. 28, 2018); *see also id.* §§ 6911 ("HHSC Investigator Responsibilities") (May 2020) (listing the "activities related to a DFPS investigation" for which HHSC investigators are responsible, such as "[p]articipating in risk assessment with DFPS"; "[d]iscussing with DFPS information that DFPS shares about the operation that relates to HHSC's regulatory responsibilities," etc.), 6940 ("Citing Deficiencies for a DFPS Investigation") (Dec. 2019) ("HHSC investigators evaluate information collected during DFPS investigations and cite deficiencies . . . ."), 6940.2 ("Possible Deficiencies Identified at the End of the DFPS Investigation") (Dec. 2019) ("If the DFPS investigator makes a finding of Reason to Believe for abuse, neglect, or exploitation in a listed family home, the HHSC investigator cites Texas Family Code §§ 261.001(1) [defining abuse], 261.001(3) [defining exploitation], or 261.001(4) [defining neglect], as appropriate.").

The intended interconnectedness of the investigations and inspections that take place is also reflected elsewhere in the *CCL Policy and Procedures Handbook*, which provides that:

A licensing **inspector** who conducts an **investigation** becomes an **investigator** for purposes of Licensing policies and procedures and:

1. responds to reports of possible violations of statute, administrative rules, or minimum standards that do not allege abuse, neglect, or exploitation (an **investigation**);

2. **receives information about possible deficiencies** a DFPS investigator noted during an **abuse, neglect, or exploitation investigation (a DFPS investigation)** and cites deficiencies when warranted; and

3. **follow[s] up[] on deficiencies cited during investigations and DFPS investigations** and completes entries related to the follow-up in the CLASS automated support system.

*Id.* § 6120 ("Role of the Inspector") (Sept. 28, 2018) (emphasis added).

It is not just the State's policies and administrative guidance that require the State's departments and agencies tasked with child safety to coordinate and communicate. This Court has also instated Remedial Orders that require Defendants to take action, including coordinating among the State's agencies and departments, to remedy the State's constitutional violations of PMC children's right to be free from an unreasonable risk of serious harm. *See, e.g.*, D.E. 606 at 5 ¶ 22 ("When RCCL, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract."). However, as discussed herein, the vision for the State's system to cooperate among departments and agencies to keep children safe that is contemplated and required by the State's policies and administrative guidance, as well as this Court, does not occur in reality. *See infra* Sections IV.E.3.b.iii., IV.I.3.a.iii.

### i.      Investigating Licensed Placements

At the time of trial, investigations of abuse and neglect would also involve investigations of minimum standards. *See* D.E. 329 at 24:14–16. However, the current "**investigation**" role of HHSC-RCCL is limited to "[s]teps taken by Licensing staff to determine the validity of a report alleging **violation of the law or minimum standards**." *CCL Policy and Procedures Handbook*,

Definitions of Terms (emphasis added).  The *CCL Policy and Procedures Handbook* provides that

there are "two types of intake reports" for investigations:

> **Reports of Abuse, Neglect, or Exploitation**: The Department of Family and
> Protective Services (DFPS) investigates reports of abuse, neglect, or exploitation
> that allege a child in care of an operation was or may be harmed because of an act
> or omission by a person working under the supervision of a child care operation.
> Such harm must meet the definitions of abuse, neglect, or exploitation, as described
> in the Texas Family Code and Texas Administrative Code. . . .   The operation
> where the alleged abuse, neglect, or exploitation occurred may also be violating
> statutes, administrative rules, or minimum standards.
>
> Within this policy, any investigation that includes an allegation of abuse, neglect,
> or exploitation is a "DFPS investigation."
>
> **Reports of Non-Abuse, Neglect, or Exploitation**: HHSC investigates reports that
> allege statute, administrative rules, or minimum standards have been or are in
> violation.  No allegation of abuse, neglect, or exploitation is involved.
>
> Within this policy, an investigation that only includes an allegation of statute,
> administrative rules, or minimum standards, with no allegation of abuse, neglect,
> or exploitation is an "investigation".

*Id.* § 6110 ("Types of Investigations") (Sept. 28, 2018); *see also id.*, Definitions of Terms (defining

"DFPS Investigations" to include investigations of "reports of abuse or neglect").  HHSC-RCCL

only "investigates the report if the report does not contain an allegation of abuse, neglect, or

exploitation or the death of a child, but does contain an allegation involving" (1) "a violation of

statute, administrative rules, or minimum standards"; (2) "a person or operation that is subject to

regulation providing care to children without the proper permit, unless the location of the operation

is unknown"; (3) "an operation with a permit is providing care to more children than authorized

by the permit"; or (4) "an immediate risk of danger to the health or safety of children." *Id.* § 6231.1

("Intake Reports to Be Investigated by Licensing") (Feb. 2020); *see also id.* §§ 6210,[28] 6231.2.[29]

When HHSC-RCCL receives reports of allegations (not involving abuse, neglect, or exploitation), it, too, designates them with defined priorities. *Id.* § 6240 ("Assessing an Intake Report for Priority") (Feb. 2020) ("For each intake report that warrants an investigation, the investigator must assess the intake report to determine the correct priority."). To assign priorities to reports, HHSC-RCCL uses the following criteria:

1. information available at the time of intake;
2. the presence of current threats to the child's immediate safety;
3. degree of harm the child has sustained or may sustain in the next 12 months; and
4. the allegation that presents the greatest risk to the child, if multiple allegations are reported.

*Id.* HHSC-RCCL uses the following definitions of Priority One and Priority Two allegations that

it investigates. **Priority One** means "[v]iolation of the law or minimum standards that pose an

immediate risk to children." *Id.* § 6241 ("Classifying the Priority of the Intake Report") (Aug.

---

[28]    If a report does not involve an allegation of abuse, neglect, or exploitation, but does involve children or staff at a child care operation, DFPS staff:
- process the report as an Information and Referral (I&R) for an alleged violation of statute, administrative rules, or minimum standards in the IMPACT case management system; or
- downgrade an intake report with allegations of abuse, neglect, or exploitation to a Priority None (PN) in the IMPACT case management system.

In both instances, DFPS staff do not assess whether the information violates the statute, administrative rules, or minimum standards or prioritize the report. Rather, they just route the report to the appropriate HHSC router.

*CCL Policy and Procedures Handbook* § 6210 ("Reports Received From the Department of Family and Protective Services (DFPS)") (Sept. 28, 2018). The *CCL Policy and Procedures Handbook* defines "router" as "[t]he DFPS or HHSC staff member identified in each program and district to receive intake reports from Statewide Intake (SWI) staff. The router assesses the reports and assigns them to appropriate staff for investigation or other handling." *Id.*, Definitions of Terms.

[29]    Licensing does not investigate reports that include allegations of abuse, neglect, or exploitation or incidents involving a child fatality. The Licensing supervisor or designee refers a report to DFPS if Licensing receives an intake report that contains the following:
1. an allegation of abuse, neglect, or exploitation; or
2. a child fatality.

*CCL Policy and Procedures Handbook* § 6231.2 ("Intake Reports to Be Investigated by DFPS as Abuse, Neglect, or Exploitation") (Sept. 28, 2018).

2020). It entails "[a] report of a violation of a law or minimum standard [that] places children in care at immediate risk of serious of [sic] substantial harm."[30] *Id.* **Priority Two** means any of the following:

- "Injury or serious mistreatment of a child,"[31] which entails "[a] report that a child in care is disciplined, punished, or physically restrained in a manner that is prohibited by minimum standards, including a report that a child in care sustained a serious injury[32] as a result of discipline, punishment, physical restraint, or other type of mistreatment prohibited by minimum standards." *Id.*

- "Serious Accidental Injury," which entails "[a] report that a child suffered accidental injury (i.e., a serious injury that is the result of an accident) and the injury may be a result of a violation of minimum standards." *Id.*

- "Serious safety or health hazards," which entails, *inter alia*, "[a] report of a violation of the minimum standards related to safety or health that may pose a risk of substantial harm to children in care." *Id.*

- "Serious supervision problems," which entails "[a] report of a violation of the minimum standards related to supervision that may pose a risk of substantial harm to children in care." *Id.*

As for lower priority levels, **Priority Three** involves either "[i]llegal operations with no other allegations (RC only),"[33] or a "[m]inor violation of the law or minimum standards that

---

[30] "[S]ubstantial harm" or "serious harm" means "[b]odily harm or an observable impairment in a child's psychological growth, development, or functioning that is significant enough to require treatment by a medical or mental health professional." *CCL Policy and Procedures Handbook*, Definitions of Terms.

[31] "[S]erious mistreatment" means "[a] child in care is disciplined, punished, or physically restrained in a manner that is prohibited by minimum standards and sustains serious injury." *CCL Policy and Procedures Handbook*, Definitions of Terms.

[32] "[S]erious injury" means "[a]ny physical injury to a child that requires medical treatment and resulted or may result in impairment to the child's overall health or well-being." *CCL Policy and Procedures Handbook*, Definitions of Terms.

[33] A Priority 3 investigation of an "illegal operation[] with no other allegations (RC only)" entails "[a] report that care is being provided to children by a residential care operation that does not have a permit, may be subject to regulation, and there are no other allegations." *CCL Policy and Procedures Handbook* § 6241.

involve low risk to children."[34]  *Id.*  **Priority Four** means that a Priority Five report has been re-classified:

> A Priority 5 investigation is re-classified as a Priority 4 investigation in CLASS
> when one of the following types of investigations requires an inspection:
>    a.  an unregulated operation with no other allegations (DC only);
>    b.  a CPA internal investigation; or
>    c.  a desk review.

*Id.* § 6243 ("Re-Classifying a Priority 5 Investigation") (Feb. 2020).  "For all investigations assigned a Priority 5, the investigator does not conduct an inspection at the operation that is the subject of the investigation."  *Id.* § 6431.4 ("Inspection Not Required for Priority 5 Investigations") (Sept. 28, 2018).  However, "[i]f the investigator determines that an inspection is necessary, the investigator changes the priority to a Priority 4 as soon as possible during the investigation."  *Id.*  Finally, a **Priority Five** investigation is one of two types of investigations: (1) "CPA internal investigation," which entails "[a] report that is assigned to the child placing agency as an internal investigation" or (2) "Desk review,"[35] which "may be investigated without an inspection."  *Id.* § 6241.

---

[34] A "[m]inor violation of the law or minimum standards that involve low risk to children" entails one of the following:

- "A report of a violation of a law or minimum standard that poses low risk of harm to the health or safety of children in care," *CCL Policy and Procedures Handbook* § 6241;

- "Risk factors exist that indicate children may be at risk of harm.  Risk factors include, but are not limited to[] minor injuries that are accidental in nature and may indicate supervision problems; and[] a pattern of incidents that normally do not require an investigation (such as repeated runaways)," *id.*; or

- "A report of a serious injury or medical incident that[] contains information in the intake report that the parent or guardian has concerns regarding supervision or safety; and[] is not a self-report; and[] does not indicate the serious injury or medical incident is the result of a minimum standards violation," *id.*

[35] A "[d]esk review" entails either "[a] self-report of a minor violation of minimum standards that:[] does not contain information in the intake report that the parent or guardian has concerns regarding supervision or safety; and[] may be investigated without an inspection" or "[a] self-report of a serious injury that:[] does not contain information in the intake report that the parent or guardian has concerns regarding supervision or safety;[] does not indicate that the serious injury is the result of a minimum standards violation; and[] may be investigated without an inspection." *CCL Policy and Procedures Handbook* § 6241.

When conducting an investigation, the HHSC-RCCL investigator "must evaluate an operation's compliance with applicable statute, administrative rules, and minimum standards during each investigation." *Id.* § 6312.2 ("Determining Which Minimum Standards to Evaluate") (Sept. 28, 2018).  HHSC-RCCL must initiate the investigations within specific timeframes:

- "The investigator must initiate a **Priority 1** investigation as soon as possible, but no later than **24 hours** after the time that SWI or the Licensing office received the intake report." *Id.* § 6412.1 ("Time Frame for Initiating a Priority 1 (P1) Investigation") (Sept. 28, 2018) (emphasis added).

- "The investigator must initiate a **Priority 2** investigation as soon as possible, but no later than **five days** after the day that SWI or the Licensing office received the intake report." *Id.* § 6412.2 ("Time Frame for Initiating a Priority 2 (P2) Investigation") (Sept. 28, 2018) (emphasis added).

- "An investigator must initiate a **Priority 3** investigation as soon as possible, but no later than **15 days** after the day that SWI or the Licensing office the intake report [sic]."  *Id.* § 6412.3 ("Time Frame for Initiating a Priority 3 (P3) Investigation") (Sept. 28, 2018) (emphasis added).

- "An investigator must initiate a **Priority 5** investigation as soon as possible, but no later than **five days** after the day that SWI or the Licensing office received the intake report." *Id.* § 6412.4 ("Time Frame for Initiating a Priority 5 Investigation") (Sept. 28, 2018) (emphasis added).

At the conclusion of an investigation, the HHSC-RCCL investigator must determine the "findings," that is, "whether violations of statute, administrative rules, or minimum standards have occurred" and "whether future action is needed." *Id.* § 6620 ("Determining the Findings") (Sept. 28, 2018).[36]  The HHSC-RCCL investigator also comes to a "disposition," which is defined as an "[a]ction taken or recommended on an operation's licensing status as a result of the findings of an investigation or inspection."  *Id.* Definitions of Terms.  "[A]ctions Licensing may impose if an

---

[36] A "finding" is defined as "[t]he conclusion of an investigation or inspection indicating compliance or deficiency with one or more minimum standards, administrative rules, or statutes."  *CCL Policy and Procedures Handbook*, Definitions of Terms.

operation is deficient[37] in a minimum standard, rule, law, specific term of a permit, or condition of evaluation, probation, or suspension" are "enforcement actions." *Id.* There are four types of enforcement actions: (1) voluntary and corrective; (2) adverse; (3) judicial; and (4) monetary actions. *Id.*

(1) A "corrective action" is defined as "[a] type of enforcement action that licensing may impose to address an operation's deficiency without requiring it to close. Corrective actions are not imposed against listed family homes. Evaluation and probation[38] are the two types of corrective actions."[39] *Id.* One type of "voluntary enforcement action that Licensing recommends to an operation in order to encourage the operation to actively participate in developing a plan to correct compliance with Licensing statutes, administrative rules, or minimum standards" is referred to as a "plan of action." *Id.*

(2) An "adverse action" is "[a] type of enforcement action that licensing may impose to address a deficiency. This may require the closure of an operation, the addition of permanent restrictions or conditions to a permit, or both."[40] *Id.*

(3) A "judicial action" is "[a] type of enforcement action" that "[a] court may impose . . . , including closure, when Licensing requests a court order to address a deficiency."[41] *Id.*

---

[37] The handbook defines a "deficiency" or "violation" as "[a]ny failure to comply with an administrative rule, minimum standard, statute, a specific term of a permit, or a condition of evaluation, probation, or suspension." *CCL Policy and Procedures Handbook*, Definitions of Terms. A "serious deficiency" or "serious violation" is defined as "[a] deficiency or violation that results in a child's death, serious injury, or harm or immediate risk of serious injury or harm to a child." *Id.*

[38] "[P]robation" is defined as "[a] type of corrective action for which Licensing imposes a corrective plan that is more restrictive and intense than an evaluation. Conditions will be imposed beyond the requirements of the minimum standards and the basic permit, and inspections will be conducted monthly." *CCL Policy and Procedures Handbook*, Definitions of Terms.

[39] A "corrective action plan" is "[a] plan used to remedy the deficiencies of an operation that is under evaluation or on probation," except "[c]orrective action plans are not used with listed family homes." *CCL Policy and Procedures Handbook*, Definitions of Terms.

[40] "The four types of adverse actions are: denial, adverse amendment, suspension, and revocation." *CCL Policy and Procedures Handbook*, Definitions of Terms. A "suspension" is defined as "[t]he temporary closure of an operation pending correction of deficiencies with statutes, administrative rules, or minimum standards, or temporary closure for a limited time period as requested by the permit holder. Suspension may be voluntary on the part of the operation or imposed as a remedial action by Licensing." *Id.*

[41] "The two types of judicial actions are temporary restraining order (TRO) and temporary or permanent injunction." *CCL Policy and Procedures Handbook*, Definitions of Terms.

(4) A "monetary action" is "[a] type of enforcement action" that entails "fines or penalties that Licensing may impose as provided by Human Resources Code §§ 42.075 and 42.078."[42] *Id.*

Following the conclusion of an investigation of a regulated operation, HHSC-RCCL may choose to do any of the following:

1. Take adverse action;
2. Take corrective action;
3. Take no action;
4. Re-evaluate monitoring frequency;[43] or
5. Do routine monitoring.[44]

*Id.* § 6820 ("Actions to Take Following the Investigation of a Regulated Operation") (Sept. 28, 2018).

### ii.        Inspecting Licensed Placements

Licensing staff at HHSC-RCCL "inspect child care operations to assess the risk to children in those operations, in accordance with licensing law, administrative rules, and minimum standard rules." *Id.* § 4100 ("Inspecting Child Care Homes and Operations") (Aug. 2012).  There are various types of inspections that HHSC-RCCL conducts.   These include "Application Inspections,"[45] "Attempted Inspections,"[46] "Follow-Up Inspections,"[47] "Initial Inspections,"[48]

---

[42] "There are two types of monetary actions: administrative penalties and civil penalties. *CCL Policy and Procedures Handbook*, Definitions of Terms.

[43] "[M]onitoring frequency" means "[t]he acceptable range within which an operation's next monitoring inspection will be conducted, as determined by an assessment of the risk factors at the operation." *CCL Policy and Procedures Handbook*, Definitions of Terms.

[44] "[M]onitor" means "[t]he regulation of an operation by evaluating compliance with applicable statutes, administrative rules, and minimum standards." *CCL Policy and Procedures Handbook*, Definitions of Terms.

[45] "Application inspections are conducted during the application phase and generally include an evaluation of all applicable subchapters." *CCL Policy and Procedures Handbook* § 4121 ("Application Inspections") (Dec. 2011).

[46] "Attempted inspections include inspections conducted without making contact with the operation." *CCL Policy and Procedures Handbook* § 4122 ("Attempted Inspections") (Aug. 2012).

[47] "Follow-up inspections include evaluating individual minimum standards, conditions, or restrictions, rather than evaluating an entire subchapter of minimum standards or all conditions or restrictions associated with the operation." *CCL Policy and Procedures Handbook* § 4123 ("Follow-Up Inspections") (Feb. 2020).

[48] "Initial inspections are inspections that are conducted during the initial period for a licensing permit." *CCL Policy and Procedures Handbook* § 4124 ("Initial Inspections") (Dec. 2015).

"Investigation Inspections," "Monitoring Inspections,"[49] "Monitoring and Investigation Inspections,"[50] and "Other Types of Inspections."[51]   *Id.* § 4120 ("Types of Inspections") (Dec. 2015).   "Licensing staff select the most appropriate inspection type to record an inspection in CLASS.   Except for inspections of child-placing agencies, all inspections at all operations must include a walk-through for obvious minimum standard deficiencies (deficiencies that are in plain view)."   *Id.*

"When conducting any type of inspection, Licensing staff must," among other things, "assess the risk to children," "document the inspection results in CLASS," and "offer technical assistance to help the permit holder identify problems that contribute to deficiencies with the minimum standard rules and understand how to comply with the rules."   *Id.* § 4150 ("Conducting Inspections") (Sept. 28, 2018).

As stated above, and as has been the case since the time of trial, HHSC-RCCL's inspection activities are meant to coordinate and correspond with investigation activities.   *See* D.E. 329 at 24:19–23.   For example, certain investigations require accompanying inspections: "The investigator must conduct an unannounced inspection for all investigations assigned a Priority 1, 2, 3, or 4."   *CCL Policy and Procedures Handbook* § 6430 ("Conducting Inspections") (Sept. 28,

---

[49] "Monitoring inspections must include evaluation of at least one entire subchapter of the applicable minimum standards and may include evaluation of additional individual laws, administrative rules, or minimum standards, or any conditions or restrictions."   *CCL Policy and Procedures Handbook* § 4126 ("Monitoring Inspections") (Dec. 2015).

[50] "Monitoring and investigation inspections include the investigation of a report during a monitoring inspection."   *CCL Policy and Procedures Handbook* § 4127 ("Monitoring and Investigation Inspections") (Dec. 2015).

[51] "Other types of inspections are conducted for purposes other than determining compliance with pre-identified minimum standards, such as: a. consulting with an operation's administrator or director; b. hand-delivering a corrective or adverse action notice; c. conducting an investigation interview; or d. conducting a risk-based inspection for a residential child care operation."   *CCL Policy and Procedures Handbook* § 4128 ("Other Types of Inspections") (May 2020).

2018).  For another example, one of the types of inspections that HHSC-RCCL conducts is called

an "Investigation Inspection."

> Investigation inspections include the investigation of reports alleging:[] violations
> of Licensing statutes;[] violations of administrative rules;[] violations of minimum
> standards;[] or a combination of these.  If an investigation interview is conducted
> at an operation other than the one named in the report, the inspection is classified
> as *Other* in CLASS.

*Id.* § 4125 ("Investigation Inspections") (Sept. 28, 2018).  This type of inspection is a clear

example of how HHSC-RCCL's inspection processes must coordinate with its investigation

processes.  Nonetheless, as discussed herein, *see infra* Section IV.I.3., HHSC-RCCL's inspection

activities have failed to capture and prevent patterns of minimum standards violations.

Furthermore, under the current organizational structure, in which inspection and minimum

standards investigation functions have been separated from abuse, neglect, and exploitation

investigation functions, there is an ongoing discord and inconsistency in findings across the now-

separate agencies—HHSC-RCCL and DFPS—that are responsible for each of these sets of

functions.  *See infra* Sections IV.E.3.a.ii., IV.E.3.b.iii., IV.I.3.a.iii.  As a result, children continue

to face an unreasonable risk of serious harm while in the PMC of the State.

> ### d.    Continued Inconsistent Record Keeping and Failure to Communicate and Coordinate Across the Agencies' Divisions

Since trial, the Special Masters and the Monitors have discovered ongoing problems with

the State's data systems and recordkeeping practices.  The problems that the Court found at trial

regarding the disjointed data systems maintained by the State agencies that are responsible for the

safety of PMC children are now compounded by the more recent reorganization of those agencies.

*See* D.E. 368 at 168–69; D.E. 601 at 5, 22 n.24, 29–30; D.E. 869 at 67.  Defendants have been on

notice since class certification on August 27, 2013 that this case involves a General Class

consisting of PMC children.  *See* D.E. 213 at 105.  Defendants have further been on notice that

they would be subject to Remedial Orders related to that General Class of PMC children since 2018.  *See* D.E. 559 (January 2018 Order); D.E. 601 (*Stukenberg I*); D.E. 606 (November 2018 Order); D.E. 627 (*Stukenberg II*).   Yet, as discussed herein, subsequent to the Court's 2015 Opinion and Verdict, the State separated DFPS from HHSC, while also separating the RCCL division, and certain functions that it previously carried out, from DFPS by keeping it organized within HHSC.  *See supra* Figures 1 & 2.  Furthermore, HHSC continues to use the CLASS database, which does not communicate and is incompatible with DFPS's IMPACT database.  *See* D.E. 869 at 48–51.

The disjointed nature of the State's two databases poses problems not only for the State to coordinate among its agencies in order to "ensure" that PMC children are "free from an unreasonable risk of serious harm," *see* D.E. 606 at 2, but also for the Monitors to assess the State's performance of the Court's Remedial Orders.  As discussed herein, one of the ways that the State has failed to ensure that DFPS and HHSC-RCCL coordinate and communicate about child safety is by failing to ensure that DFPS workers have seamless access to HHSC-RCCL's CLASS database, which contains information about the safety of the licensed facilities where PMC children are placed.  *See infra* Sections IV.E.3.b.iii., IV.I.3.a.iii.

Further, even if DFPS workers did have access to it, CLASS cannot track or identify the PMC children who are in the licensed placements that HHSC-RCCL oversees.  *See* D.E. 869 at 50; *see also infra* Section IV.I.3.a.iii.  "The legal status of a child in foster care is recorded in IMPACT.  CLASS does not contain this information and the data provided to the Monitors by HHSC do not include the name of the children associated with its referrals."  *Id.*; *see also id.* at 67 ("CLASS does not contain the PMC identifier of children involved in a referral [or investigation]" and "the PMC identifier is only associated with referrals of abuse or neglect in IMPACT.").  The

state's failure to track which allegations pertain to PMC children reflects the same problems that

the Court found at trial years ago, and that the Fifth Circuit observed in *Stukenberg II*, regarding

the disjointed nature of the State's data systems.  *See* D.E. 869 at 55 ("The difficulties experienced

by the monitoring team accessing the information using the State's databases are consistent with

post-trial findings made by the Court in 2015.").  **It defies justification or explanation that the**

**PMC children that are the very subject of this litigation are not identifiable by name or**

**otherwise in HHSC's CLASS system that purports to track licensing violations both in**

**physical deficiencies and in failure to correct abuse, neglect, and exploitation found by DFPS.**

Moreover, because the IMPACT and CLASS databases are not compatible, even

individuals who have access to both must reconcile information that is inconsistently identified

and logged in order to cross-reference the information therein.  *See id.* at 49 ("The data as provided

by DFPS and HHSC makes it very difficult to match and connect the records of facilities from

both agencies.").  As the Monitors discovered, one problem is that "the identifiers and variable

names in each data system are distinct."  *Id.*

> In CLASS, for example, the field that indicates the calendar day an investigator
> finished each required part of an investigation is called Date Investigation
> Completed.  In IMPACT, the same status is recorded in a variable called Date
> Approval Submitted to Supervisor.  CLASS records the closing date of an
> investigation as Date Case Closed while in IMPACT the same status is recorded as
> the Date Supervisor Approved.

*Id.* at 49 n.30.  "[T]he lack of uniform identifiers between the two agencies inhibits the ability to

identify patterns of child maltreatment."  *Id.* at 49.  Another problem with toggling between these

two systems is that "matching data across Child Placing Agencies (CPAs) is also challenging.

CLASS generates an operation number and a contract number, while IMPACT generates a resource ID and a contract number.[52]  None of these numbers match across the two systems."  *Id.*

> In addition, CLASS and IMPACT do not share a unique ID number that identifies individual foster homes and residential facilities across the two systems.  Within IMPACT, furthermore, the most common identifier, the resource ID, is referred to by different names in different tables within the application.  In response to the Monitors' questions about identifying facilities, DFPS noted that ". . . two names may represent the same facility entered differently or it may represent two different facilities operated by the same organization."  **These differences are prohibitive to efforts to create a unified dataset of child maltreatment and minimum standards investigations related to a single organization or a single facility.**

*Id.* at 49–50 (emphasis added) (footnotes omitted).

As the Monitors note in their Report, the resulting "challenges of tracking alleged perpetrators and child victims between systems **hinders efforts to ensure child safety**."  *Id.* at 51 (emphasis added).

> Deficiencies in the data systems used by DFPS and HHSC prevent the agencies from having access to aggregate real-time data and information critical to child safety, including . . . certain children's placements; staff caseloads and training; the timeliness of child abuse or neglect investigations; and caregiver training for sexual abuse, among other areas.

*Id.* at 48.  Further, "[t]hese gaps add extensively to the time and staffing required by the monitoring team to validate the agency's performance under [the] remedial orders."  *Id.* at 49.

The Monitors also faced technical issues with using the State's data systems that contributed to the time lags between the date of the data reviewed and the publication date of the Report:

---

[52] This problem regarding contract numbers arose after trial, as recently as 2019, when HHSC-RCCL knew it was required to comply with Remedial Orders from this Court.  *See* D.E. 869 at 49 ("Contract numbers do not match because at the start of Fiscal Year 2019, HHSC implemented a new contracting system that changed the contract numbering conventions.").

> Monitoring team members routinely experienced delays when moving between
> screens within both IMPACT and CLASS. . . .   To compound this issue, the
> electronic connections to IMPACT and CLASS were routinely disrupted, forcing
> monitoring team members to log back into the systems repeatedly in a single day
> and resulting in periods of time where the monitoring team members repeatedly
> tried but could not log into the systems. . . .   For example, for a period of two days
> between February 5, 2020 and February 7, 2020, two members of the monitoring
> team attempting to perform review of investigations and referrals could not access
> IMPACT 2.0.

D.E. 869 at 55, 55 n.60.   The combination of these problems with the State's data systems

prolonged the time required by the Monitors to complete their analysis for the Report.

In addition to the State's continually problematic data systems, both the Special Masters

and the Monitors identified that the problem of inconsistent and incomplete recordkeeping by the

State persists.  In their December 4, 2017 Implementation Plan, the Special Masters noted that "the

IMPACT system contained no uploaded medical records, dental records, educational records or

mental health records" and that "PMC children's records are currently stored in different locations

with different custodians."  D.E. 546 at 5, 8.  Further, the Monitors identified instances in which

caregivers and licensed placements are continuing to fail to maintain complete records pertaining

to children's medical, psychological, and other needs.  *See, e.g.*, D.E. 869 at 86–87 (discussing the

report of neglectful supervision of a child who was at risk for self-harm but whose records did not

detail the safety plan that was created for her);   D.E. 869-3 at 35–36 (same); *infra* Section

IV.E.3.b.i. (same).  One example of a licensed operation housing PMC children that is still failing

to consistently maintain complete and accurate records for the children in their care is A Fresh

Start Treatment Center ("Fresh Start"), where reports revealed that the facility had received "two

citations for not maintaining current, accurate and complete records," such as for "failing to

document an incident."  D.E. 877 (App. 5.5c to the Monitors' Report) at 6.

The Monitors also discovered that another facility, Prairie Harbor, LLC Residential

Treatment Center ("Prairie Harbor"), "had been cited for violations related to failure to

appropriately report and document serious incidents" and had failed to document "administration of prescribed medications," as well as "therapy visits, and medication logs and records"; further, "medication records were not updated when a child's doctor changed their medication dosage." D.E. 869 at 13, 343.  There had been similar problems related to the incomplete medical records of a certain child housed at Prairie Harbor during the months leading up to her tragic death on February 9, 2020.  *See id.* at 341–49.  The circumstances surrounding this death are discussed more fully below.  *See infra* Section IV.D.1.  The child, K.C., died from a pulmonary embolism associated with a deep venous thrombosis (i.e., a blood clot) in her right calf, and she had complained of leg pain in the days leading up to her death.  *See* D.E. 869 at 342.  While "three forms included in the child's progress notes clearly document leg pain," "there are no medical records or 'injury/illness' forms for K.C. that reference leg pain," aside from one unrelated incident a little more than a month prior to her death.  *Id.* at 347–48.

Children's files and records at the facilities and agencies that are tasked with keeping them safe continue to be in disarray.  The circumstances surrounding K.C.'s death illustrate ongoing problems including Prairie Harbor's failure to consistently maintain complete records regarding the children in its care.  During the time since this Court's Remedial Order went into effect, at least two other foster children have also tragically and needlessly died while in the care of the State under circumstances that are similarly emblematic of ongoing problems in the State's foster care system that the Court's Remedial Orders seek to address.

### D.     Child Fatalities Within the Foster Care System in the Past Year

From the day that this Court's Remedial Orders went into effect upon the Fifth Circuit's July 30, 2019 Mandate, through April 30, 2020, eleven children in the PMC General Class have died while in the care of the State, and DFPS is investigating alleged maltreatment in connection with five of those children's deaths.  D.E. 869 at 340.  The tragic circumstances surrounding the

deaths of three of those children,[53] in particular, "reveal[] numerous, missed opportunities by the Texas child welfare system to protect the children and reveal[] substantial gaps in care that exposed these children to risks of serious harm." *Id.* Each of these deaths was discussed during the Show Cause Hearing.

### 1.   K.C. (Born September 1, 2005, Died February 9, 2020)

K.C. was born on September 1, 2005 and died on February 9, 2020 at the age of fourteen. *Id.* at 13. K.C. was living at Prairie Harbor, a residential treatment center ("RTC"), when she collapsed in the middle of the night on February 9, 2020. *Id.* at 13, 342. Staff at Prairie Harbor waited more than thirty minutes before calling 911 because they believed that they needed permission from administrators to call 911. *Id.* at 13, 344–45. Staff members had "made a series of calls to 'get permission' to call 911, during which . . . [they were] told that they should take K.C. to the hospital themselves rather than call 911," to which they responded that "they would not be able to take the child to the hospital themselves because of her size and condition." *Id.* at 344. As a result of these delays, the paramedics did not arrive until almost 40 minutes after K.C. collapsed. *See id.* The paramedics attempted CPR and transported K.C. to the hospital, where was pronounced dead shortly thereafter. *See id.* The Monitors discovered conflicting protocols for staff to follow in an emergency medical situation when a child falls and hits their head or a "vital area." An administrator reported that the staff person is to check if the child is responsive

---

[53] The other two deaths for which DFPS is investigating alleged maltreatment were L.B. and T.M., both of whom used tracheal tubes to support breathing. L.B. was born on March 28, 2018 and died on November 20, 2019. D.E. 869 at 341. L.B. suffered from hypoglycemia and Pierre Robbins syndrome, for which he used a feeding tube and tracheal tube and received round-the-clock nursing care. *Id.* The final autopsy results and the DFPS investigation into L.B.'s death remained pending as of April 30, 2020, but the preliminary autopsy results did not indicate signs of trauma or abuse, and the child's records show that the child's tracheal tube may have come undone while the child was temporarily unsupervised. *Id.*

T.M. was born on October 27, 2013 and died on March 15, 2020. *Id.* at 350. T.M. was non-verbal and relied on a tracheal tube to support breathing. *Id.* The final autopsy results and the DFPS investigation into T.M.'s death remained pending as of April 30, 2020, but the treating physicians expressed concern for potential abuse based on multiple brain bleeds, a spinal fracture, and bruising on the face, neck, and forearms. *See id.*

and get the child to the ER as quickly as possible; but if the child is not responsive or breathing, the staff person is to call 911 immediately. *See id.* at 345. However, the administrator also reported that the staff person should first call their supervisor "right off the bat," and 911 will be called after the supervisor arrives on the scene. *See id.* Staff members at Prairie Harbor echoed these inconsistent protocols for emergency response. *See id.*; D.E. 956 at 25–26. One staff member said that she was trained to tell her supervisor and "was scared to call 911 because she was afraid that she would get into trouble." *See* D.E. 869 at 345.

The cause of K.C.'s death was determined to be a pulmonary embolism associated with a deep venous thrombosis (i.e., a blood clot) in her right calf. *Id.* at 13, 350. K.C. had hypertension and diabetes, both of which are contributing factors to deep venous thrombosis. *See* D.E. 956 at 16–17. K.C. had complained of pain in her right calf in the weeks preceding her death, but the RTC did not take her complaints seriously. *See* D.E. 869 at 13, 346. Daily progress notes completed by the RTC documented K.C.'s complaints on January 19, 2020; January 21, 2020; January 22, 2020; January 23, 2020; and January 24, 2020, yet K.C. did not receive any medical treatment. *Id.* at 13.

HHSC-RCCL had placed Prairie Harbor on probation five days prior to K.C.'s death after the facility had been cited more than 60 times for minimum standards violations between February 2017 and December 2019. *Id.* at 13, 21, 342. These violations include the failure to report and document serious medical incidents, the failure to maintain medication logs and records, and the failure to administer the correct dosage of prescribed medications. *See id.* at 13, 342–43.

Ashland Batiste, the Director of CCI, testified at the Show Cause Hearing on September 3, 2020 that the preliminary investigation shows "potential findings related to medical neglect and neglectful supervision." *See* D.E. 990 at 120:16–25. However, the investigation was not

completed by the Show Cause Hearing.  All investigations are due within thirty days, but Batiste testified that "[f]atality investigations generally take much longer because of the complexity of those investigations."  *Id.* at 117:8–13.  Two extensions were requested for the investigation of K.C.'s death, the second of which was requested on April 24, 2020 and approved on April 25, 2020 for thirty days for medical information.  *Id.* at 118:24–119:6.  Based on this information, DFPS should have completed the investigation by May 2020 but has failed to do so.  *See id.* at 119:7–11.  Three different investigators had been assigned to investigate K.C.'s death by June 2020: the first resigned; the second was a supervisor; and the third was a new investigator.  *See id.* at 115:9–20.  By the time of the Show Cause Hearing, the investigators had not interviewed five awake-night staff who signed K.C.'s night-time progress reports, five day-shift caregivers who signed K.C.'s day-time progress reports, or K.C.'s psychiatrist or primary care physician.  *See* D.E. 956 at 15–17; D.E. 990 at 126:18–23.

## 2.  A.B. (Born June 9, 2016, Died April 12, 2020)

A.B. was born on June 9, 2016 and died on April 12, 2020 at the age of three while he and his sibling were in the care of a fictive kin provider.[54]  D.E. 869 at 14.  A.B. was found on the floor of his foster home, unresponsive and bleeding from his ear.  *Id.* at 15, 350.  A.B. was taken to a hospital where he later died.[55]  *Id.* at 15.

DFPS missed critical, re-occurring opportunities to protect A.B. from the abuse in custody that ended his life. *See* D.E. 991 at 22–23.  His death highlights deficiencies in DFPS investigations of child maltreatment.  In the month preceding the death, four calls were made to the SWI hotline reporting concerns related to maltreatment of A.B.  D.E. 869 at 17; *see also* D.E. 991 at 53:24–

---

[54] "Fictive kin" refers to the care of a child by family friends with a longstanding and significant relationship with the child and family.  D.E. 869 at 47, 359.

[55] A.B.'s sibling was removed from the fictive kinship placement after A.B.'s death.  D.E. 869 at 354.

54:7 (affirming that SWI had received "many referral calls . . . alleging physical abuse concern for [A.B.'s] safety").  These reports sparked two investigations for abuse and neglect, neither of which resulted in DFPS removing A.B. from the fictive kinship placement.  *See* D.E. 869 at 14, 17, 350.

The first two calls, from separate callers on March 7, 2020, were merged into a single case, and DFPS downgraded the case from a Priority One to a Priority Two.  *Id.* at 350–51.  During the investigation, the investigator documented "concerns [that] the placement has broken down; either the child was injured at the guardians [sic] home or the guardian allowed the parents to have unsupervised access and were injured by the parents."  *See id.* at 351.  A.B. underwent a forensic child abuse evaluation in which the examining pediatrician expressed concerns of "non-accidental trauma" based on A.B.'s bruising and injuries.  *See id.* at 14, 17, 351.  The kinship caregiver alleged that the bruises appeared after A.B. returned from unsupervised visits with his birth parents.  *See id.* at 351–52.  Such visits violated a court order.  *See id.* at 350.  A.B.'s daycare staff also expressed concerns to A.B.'s caseworker regarding injuries that they observed and changes in A.B.'s behavior, but these staff were not interviewed during the DFPS investigations.  *See id.* at 17.  On March 10, 2020, the investigator documented that "the home was observed to be appropriate for the children . . . [and he] had no concerns for the boys at this time," in part, because both children had been evaluated at a hospital and a safety plan was in place to prevent the birth parents from having any contact with the children.  *See id.* at 352.

The third call on March 11, 2020 alleged that the caller had witnessed the caregiver's domestic partner grab A.B.'s arm as a form of discipline.  *See id.*  The call was coded "Information and Referral."  *Id.*  The fourth call on March 17, 2020 alleged that the caller had witnessed the caregivers hit the children, reported that the caregiver's domestic partner "beats [the children] really bad," and alleged pervasive substance abuse by the caregivers.  *Id.*  The fourth call was only

coded as a Priority Two, despite the allegation of physical abuse.  *See id.* at 17, 352.  The investigator failed to make face-to-face contact with A.B. after the March 17, 2020 call and instead merged the investigation with the investigation for the March 7, 2020 phone calls and noted that A.B. had already been seen during the first investigation.  *See id.*

Sherry Gomez, the Director of Field of CPI, testified at the Show Cause Hearing on September 4, 2020 that "there were so many policy issues" and problems with the investigation of the calls to SWI that led to A.B.'s death, including "multiple missteps in the case, policies that were not followed, and interventions that were not put in place for [A.B.]."  D.E. 991 at 54:9–56:16.  The police investigation and the DFPS investigation into A.B.'s death remained open as of May 15, 2020, D.E. 869 at 354, and DFPS was still awaiting the final autopsy report as of September 4, 2020, almost seven months after A.B.'s death, D.E. 991 at 57:10–14.

### 3.    C.G. (Born December 29, 2005, Died April 26, 2020)

C.G. was born on December 29, 2005 and died on April 26, 2020 at the age of fourteen. D.E. 869 at 15.  C.G. hanged herself in the bathroom of Williams House, the emergency shelter where DFPS had placed her.[56]  *See id.* at 15, 354.  C.G. had been discharged from a psychiatric hospital on March 4, 2020, and a treatment plan signed by her caseworker, shelter staff, and the shelter's clinical social worker on April 4, 2020 required that C.G. be "monitored by staff at all

---

[56] Williams House is now closed.  *See* D.E. 956 at 28.  Prior to closing, Williams House was one of five medium-sized (i.e., with a capacity of 21-50 children) general residential operations with the "highest high and medium-high" citations rates between September 30, 2014 and March 31, 2020.  D.E. 869 at 307; *see also id.* at 297 (defining "[m]edium operations").  From October 2014 through March 2020, Williams House fluctuated between risk levels assigned by the State based on its citations for minimum standards violations and RTB findings in abuse and neglect investigations.  *See id.* at 313–14; *see also id.* at 15 ("The emergency shelter where C.G. died has a troubled history, marked by a high number of minimum standards deficiencies and nine investigations of abuse and neglect resulting in an RTB between September 30, 2014 and March 31, 2020.").  Williams House was placed at a medium-low risk level medium-low on July 6, 2019, where it remained through March 2020.  *Id.* at 314.  According to the Monitors, Williams House was in the "top tier" of heightened monitoring.  D.E. 956 at 29; *see also infra* Section IV.I. (discussing heightened monitoring).

times" due to her risk for self-harm.[57]  *Id.* at 15, 355.  However, on the night of her death, C.G. entered the bathroom by herself and remained in the bathroom for 30 minutes before a staff person found her.[58]  *See id.*

During her seven years in the foster care system, C.G. exhibited increasing psychological distress and harm, progressing from an adjustment disorder in December 2012 to Post-Traumatic Stress Disorder in January 2013, to recurrent and severe Major Depressive Disorder episodes in September 2019, to Bipolar Disorder in March 2020.  *See id.*  She was placed in a psychiatric hospital three times between 2019 and 2020 for suicidal behavior and risk of self-harm.  *Id.*  A Child and Adolescent Needs and Strengths Assessment evaluation on March 18, 2020 indicated that C.G. was an "Overall suicide Risk" and "require[d]" a same day safety plan.  *Id.* at 15, 356. Following her last hospitalization in March 2020, C.G. was prescribed at least three psychotropic medications for anxiety and depression.  *See id.* at 15, 355.

Williams House, the emergency shelter where C.G. was placed after her final hospital discharge, had a troubled history marked by a high number of minimum standards deficiencies and nine investigations of abuse and neglect between September 30, 2014 and March 31, 2020, which resulted in an RTB.  *See id.* at 16, 355–56.  The Monitors discovered that "between September 30, 2014 and March 31, 2020, the emergency shelter where C.G. died had the third highest rate of minimum standards violations ranked high or medium high across Texas, compared to all other [general residential operations ('GROs')] that had a standards violation during that period."  *Id.* at 21.  At the Show Cause Hearing, Batiste did not dispute that Williams House was "one of the most

---

[57] Williams House is located in a very rural county in Texas, which is rated as having very few mental health professionals.  *See* D.E. 869 at 356.

[58] "The day before her death, shelter staff took an MP3 player away from C.G. as a disciplinary matter, and on the day of her death, immediately preceding her entry to the bathroom, she was scolded and brought to tears by a staff person for going into the staff's purse to look for something."  D.E. 869 at 356.

cited for deficiencies . . . of all the GROs in the DFPS system," and she confirmed that children had been moved out of the facility following the death of C.G., but she could not articulate the specific reasons why the children were moved.  *See* D.E. 990 at 134:11–20.

C.G.'s access to appropriate mental health resources at Williams House is questionable. C.G.'s psychiatrist documented that: "Based on the information presented from the facility and obtained from the interactive audio/visual telecommunications assessment, [C.G.] is determined to meet medical and psychiatric necessity criteria and [C.G.] would benefit from admission to inpatient level of care."  D.E. 869 at 356.  As the Monitors noted, "DFPS moved C.G. from the hospital - a highly structured and clinically expert environment - to a shelter with a troubled regulatory history that did not provide adequate mental health care or supervision."  *Id.* at 355–56. The Monitors further opined:

> [T]he decision to place a child with significant mental health needs, with a recent history of repeated hospitalizations related to self-harm and suicide attempts, in a shelter in rural Texas, was an affirmative act by DFPS that placed C.G. at an unreasonable risk of serious harm.  Access to mental health care for C.G. was clearly an issue.

*Id.* at 22.  The Monitors described C.G.'s case as one of "numerous instances where children with a history of suicide attempts or ideation were placed by DFPS in situations with unsafe levels of supervision and support."[59]  *Id.* at 84 n.156.  Batiste testified at the Show Cause Hearing that her group had not looked into the culpability of the owners or administrators of Williams House for C.G.'s death.  *See* D.E. 990 at 134:5–10.  The Court finds this failure to review the culpability of the owners and administrators to be particularly disturbing given the high number of citations and violations at the facility since at least 2014.  *See* D.E. 869 at 355–56; D.E. 990 at 134:11–20.

---

[59] During the Show Cause Hearing, Plaintiffs' Counsel noted that DFPS had labeled C.G. at a "basic" level of care, which is the level of care for children "without heightened emotional or psychiatrist needs."  D.E. 990 at 132:14–19.

The deaths of K.C., A.B., and C.G. are tragic and demonstrate systemic issues that remain within the Texas foster care system. This Court's Remedial Orders were designed to address many of these systemic issues, and the fact that they remain demonstrates that the State has still failed to remedy the constitutional violations that the Court found at trial and therefore continue to place children at an unreasonable risk of serious harm. Plaintiffs allege in their Show Cause Motion that the State is in contempt of certain of the Court's Remedial Orders. The purpose and requirements of each of those Remedial Orders and the Court's findings regarding whether Defendants have complied with those Remedial Orders, are addressed below, in turn.

### E. Remedial Order 3: Properly Investigating Allegations of Abuse, Neglect, or Exploitation While Taking into Account Child Safety

<u>Remedial Order 3</u> provides that:

> DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.

D.E. 606 at 2 ¶ 3.

### 1. The Court's Findings at Trial Related to Remedial Order 3

At trial, the Court found that, despite the grave importance of "correct decisions" in investigations of potential abuse and neglect of children, as testified to by Morris and Shaw, *see supra* Section IV.C.1.c.i., "faulty investigations" were putting children at an "unreasonable risk of harm."[60] *See* D.E. 368 at 201, 208; D.E. 301 at 28:20–23; D.E. 304 at 20:18–20. The Fifth Circuit

---

[60] As noted above, *see supra* Section III.A., the applicable standard in the final injunction is the following: "The Defendants SHALL implement the remedies herein to ensure that Texas's PMC foster children are free from an **unreasonable risk of serious harm**." D.E. 606 at 2 (emphasis added).

agreed in *Stukenberg I*, saying that it "seems painfully obvious" that "high error rates in abuse investigations . . . place children at a substantial risk of serious harm." D.E. 601 at 43. In its 2015 Opinion and Verdict, this Court provided numerous examples of children whose outcries of abuse and neglect were met with faulty investigations, if they were investigated at all.

As thoroughly laid out in the 2015 Opinion and Verdict, Plaintiff M.D. is one foster child for whom, the Court found at trial, DFPS failed to adequately investigate outcries of abuse and neglect. The Court found that "[o]n multiple occasions M.D. alleged physical, sexual, and verbal abuse. Many allegations received cursory reviews, with RCCL terminating investigations without gathering important facts. Other allegations were not investigated at all." D.E. 368 at 73.

M.D. alleged that at one of her early placements while in foster care "a staff member physically abused her during a restraint" and that "the same staff member sexually abused her and her roommate." *Id.* at 59. Although "[a] nurse at the RTC confirmed that M.D. had a bruise on her back following the incident" involving the restraint, RCCL "Rule[d] Out" M.D.'s sexual abuse allegation because she "did not make the sexual abuse outcry until a year later." *Id.* This was the first of numerous abuse outcries made by M.D. that were not taken seriously or effectively investigated by RCCL.

M.D. was later moved to the Hector Garza Group Residential Treatment Center ("Hector Garza"), where her multiple outcries of abuse were again ignored. *See id.* at 60–61. These outcries involved allegations of sexual abuse by M.D.'s roommate and sexual and physical abuse by facility staff members. *Id.* at 60. "On one occasion in June 2011, M.D. saw the staff member place his hand underneath her roommate's bed covers while the roommate was in bed." *Id.* RCCL either terminated the resulting investigations without making findings (in one instance, RCCL terminated an investigation of an accused staff member after the staff member "stopped coming to work") or

Ruled Out the allegations.  *Id.*  In one case, in making its "Ruled Out" disposition, RCCL noted "M.D.'s lack of bruising at the time of her interview" and the fact that "the Hector Garza staff [said] M.D. 'would do anything to get moved out of the facility.'"  *Id.* at 60–61.

M.D. was then placed at another RTC, where "after only one week at that RTC, M.D. accused a staff member of sexually assaulting and raping her."  *Id.* at 61.  When M.D. made this outcry,[61]  DFPS again completely mishandled the investigation.  M.D. did not receive a Sexual Assault Nurse Examiner Test in time to aid in a criminal investigation, and although a rape kit was done, "the results were never revealed to M.D., her caseworker, or *ad litem*."  *Id.* at 61–62.  The RCCL investigator called the facility six days after M.D.'s allegation "to retrieve M.D.'s clothes and linens for testing, but those items had been washed."  *Id.* at 62.  These significant delays in crucial steps of the investigation caused gaps in the information gathered, ultimately leading to a disposition of "Unable to Determine."[62]  *Id.* at 61.  After this botched investigation yielded inconclusive results, M.D. was then subjected to retaliation by the staff members of the placement for her outcries.[63]  *Id.* at 62.

---

[61]     A psychiatrist who interviewed M.D. the following week believed that she was telling the truth. M.D. also experienced vaginal bleeding for two weeks following the alleged incident, "even though her period had ended approximately three days prior."  The day of the alleged incident, the staff member in question left work early, purportedly due to issues with his blood sugar.

D.E. 368 at 61.

[62] "The RCCL investigator did not find a 'preponderance of evidence that abuse occurred,' but made an Unable to Determine ('UTD') disposition because he could not definitively rule out the allegations." D.E. 368 at 62.  The staff member who M.D. had accused of raping her was later offered his job back at the facility "on the condition that he never work in the female unit, which he declined." *Id.*

[63] M.D. "complained to Stukenberg and her primary caseworker that the RTC staff were 'covering for' the staff member she accused of rape." D.E. 368 at 62.  "[O]ne female staff verbally harassed M.D., ordering M.D. to stop 'spreading rumors' and 'stop telling everyone about what happen[ed].'" *Id.*  "[T]hat staff member allegedly physically abused M.D. during a restraint." *Id.*  The intake report for that allegation noted that "the staff member's 'inappropriate physical treatment of M.D. and 'threats caus[ed] emotional injury that results in observable impairment to [M.D.'s] psychological functioning.'" *Id.*  However, once again, "RCCL Ruled Out these allegations because there was not a 'preponderance of the evidence that abuse occurred.'" *Id.*

After cycling through several foster homes and hospitalizations, M.D. "was sent back to the Hector Garza RTC despite her negative experiences there and her repeated pleas, as well as a previous court order, to not return."  *Id.* at 65.  "She was again subjected to inappropriate restraints,"[64] her outcries of which were not investigated.  *Id.*  Hector Garza's history of abuse and neglect allegations arising out of the facility is extensively discussed below.  *See infra* Section IV.I.3.a.i(a).

M.D. is just one among numerous PMC children whose allegations and outcries of abuse and neglect were insufficiently investigated.  Indeed, trial testimony revealed that, sadly, the experiences of the Named Plaintiffs in this case were "typical" of the entire General Class.  *See* D.E. 368 at 43 ("[Dr. William Lee Carter, Plaintiffs' child psychology expert,] found that the experiences of the Named Plaintiffs while in DFPS custody, including the psychological harm that they suffered, were typical for the Texas foster children he evaluated and counseled over the years."), 152 (noting that the experiences of Plaintiffs were "typical" of the General Class); *see also, e.g.*, D.E. 368 at 56, 73, 79, 90, 97, 105, 128, 132, 140; D.E. 326 at 132:22–133:5, 193:22–194:2, 194:12–15 (trial testimony of Dr. Carter that the experiences of the Plaintiffs are typical of PMC foster children).

---

[64]     On May 18, [2013,] a staff member allegedly verbally provoked M.D. while taking her back to her room and then pushed her into a wall.  When M.D. resisted, the staff member restrained M.D. by placing her face-down on the ground and pressing her elbow on M.D.'s neck, making it difficult to breathe.  M.D. was bruised on her neck and had a six-inch scratch from the staff member's ring . . . .  Shortly after the incident, an RTC staff member told M.D.'s primary caseworker that "no matter what M.D. did there is a proper way to restrain, just like in jail/prison guards have to act a certain way."

D.E. 368 at 65–66.  Not one of "M.D.'s 33,000 pages of case files . . . mention an investigation of this improper restraint, or of the staff member being cited for it.  For the second time in two years, M.D. told her caseworker that she did not feel safe at Hector Garza."  *Id.*

As another example, when attorney *ad litem* Anna Ricker visited the placement of Plaintiff J.R., she reported violations taking place, but RCCL Ruled Out the allegations and in the process, violated its own policy for the proper steps to take in conducting an investigation:

> The child Ricker visited, J.R., was non-verbal, had fingernails so long that they curled forward to touch his fingers, had a purple "goose-egg" on his forehead that no one could explain, and was wearing a torn shirt and pants that he had to hold up with his hand because there was no button. The place "REEKED horribly of urine" and had "smeared feces on the wall." Ricker visited on numerous occasions, each time finding another child with a black-eye. Ricker twice reported to RCCL the abuse and neglect occurring at this facility. **RCCL Ruled Out the allegation without even contacting Ricker, in violation of its policy to interview "adults who may have knowledge of the incident." RCCL made its disposition solely on information provided by the children involved, some of whom were nonverbal and intellectually disabled, and the facility's staff.**

D.E. 368 at 204 (emphasis added) (citations omitted). The Fifth Circuit noted that this instance was an example of how "the information gathering process" in RCCL's investigations "was fundamentally flawed." D.E. 601 at 41 n.39.

Furthermore, the investigation of a sexual abuse outcry by Plaintiff S.A., after which no action was taken by RCCL, also exemplifies the woefully inadequate investigations performed by the agency, as found at trial. S.A. made her first sexual abuse outcry within four months of entering foster care, while at a foster home where she was placed by the CPA the Bair Foundation. D.E. 368 at 80. She reported "anal penetration by an older male foster child." *Id.* "After this abuse was reported, RCCL's only response was to request that the Bair Foundation complete an internal investigation." *Id.* The CPA investigated the allegations as a Priority 3 investigation, "meaning that it related to 'minor violations of the law or minimum standards that involve low risk to children.'" D.E. 368 at 80. The Bair Foundation performed the internal investigation but "'did not cite any non-compliances' and planned no further action." *Id.* "There is no evidence in S.A.'s 33,000 pages of case files that she was interviewed regarding these allegations or that she received any type of physical examination or medical treatment in connection with these allegations." *Id.*

(citations and footnotes omitted); *see also, e.g.*, *id.* at 74–77 (describing the investigations of allegations of abuse and neglect of Plaintiff D.I.).

In general, where RCCL bothered to investigate allegations at all, this Court found, and the Fifth Circuit agreed, that it still "ha[d] an alarmingly high investigatory error rate." *See* D.E. 601 at 31, 39 ("RCCL investigations have an exceedingly high error rate. . . . [D]efficient investigatory practices have yielded a high error rate in abuse investigations."); D.E. 368 at 202–04, 206, 212, 215–17. The Fifth Circuit observed that "the main issue with the investigations was not merely that there was competing evidence or that reports were uncorroborated. Rather, the information gathering process was fundamentally flawed." D.E. 601 at 40–41. "In 2012, PMU reviewed 89 investigations from the year prior and concluded that 20% 'should not have been approved' by supervisors because 'most of those were inadequate in the preponderance explanation.'" D.E. 368 at 212 (quoting PX 1074 at 21).

Also, in 2014, a review by Shaw and the PMU division of CCL (which, as previously described, is supposed to "ensure[] that CCL acts according to policies and procedures") revealed an extremely high rate of error in the dispositions of RCCL's investigations. *Id.* at 201–02; *see also* D.E. 601 at 39, 43. After reviewing all of the "111 UTD dispositions for cases involving physical abuse, sexual abuse, and negligent supervision investigations" that occurred from August 1, 2012 through July 31, 2013, they found that:

> [Some] 84 of 111 (75%) UTDs were incorrect. Likewise, Shaw determined that 33 of 44 (75%) UTDs for physical abuse allegations were incorrect. PMU concluded that 35 of 44 (79.5%) were incorrect. Shaw also found that 31 of 38 (81.6%) UTDs for negligent supervision, and 20 of 29 (69.8%) UTDs for sexual abuse were incorrect. Many of the incorrect findings should have been RTB.

D.E. 368 at 202 (citing PX 1065); *see also* D.E. 601 at 39–40. In contrast, a typical investigation error rate for a child welfare system is 2% or 3%. D.E. 303 at 49:4–50:11. Dr. Viola Miller, the Plaintiffs' child welfare systems expert, stated at trial that she was "horrified by that data" showing

an error rate of 75%. *Id.* at 49:18. The problem was summed up by the statement of one DFPS employee, who said that the "threshold in RCCL" investigations is "no Autopsy, no RTB." D.E. 368 at 204 (quoting PX 1706 at 1).

> Furthermore, the Court found that:
>
> DFPS ha[d] known for over a decade about RCCL's faulty investigations and the substantial risk of serious harm they pose to LFC children. In 2004, a Comptroller Report[65] mentioned investigation shortcomings as a major concern. A 2007 report reiterated the 2004 report's worry and recommended "thoroughly investigating all complaints, allegations or reports and making the results public."

*Id.* at 212 (quoting PX 1966 at 29). The Court also observed that "[e]ach year there are around 5000 investigations, 2000 of which are for abuse and neglect. Due to RCCL's systemic failures, children are left with their abusers with nothing indicating a risk. The substantial risk of serious harm to LFC children from faulty investigations 'is obvious.'" *Id.* (quoting *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004)). Overall, this Court found, and the Fifth Circuit agreed, that RCCL's faulty investigations . . . cause an unreasonable risk of harm to all LFC children." *Id.* at 208; *see also* D.E. 601 at 43–44.

## 2.      The Procedural History of Remedial Order 3

In order to remedy the deficiencies in Defendants' investigation processes found at trial, the Court ordered the Special Masters to "help craft . . . reforms and oversee their implementation." *See* D.E. 368 at 245; *see also id.* at 246–48, 250, 252. In its January 2018 Order, the Court adopted the Special Masters' proposed remedies to address DFPS's failure to adequately investigate allegations of abuse and neglect giving rise to an unreasonable risk of harm to children. D.E. 559 at 39 ¶ D2; *see also* D.E. 546 at 13 ¶ 2. In *Stukenberg I*, the Fifth Circuit, noting that

---

[65] At trial, the Court considered several reports by organizations, committees, and firms that reviewed the Texas foster care system. These reports frequently cited and relied on a report published in April 2004 by Texas Comptroller Carol Keeton Strayhorn titled *Forgotten Children, A Special Report on the Texas Foster Care System* ("Comptroller Report" or "*Forgotten Children*"). *See* D.E. 368 at 24 (citing PX 1966 at 5–6).

"egregious intrusions on a child's emotional well-being—such as, for example, persistent threats of bodily harm or aggressive verbal bullying—are constitutionally cognizable," D.E. 601 at 15, held that "[m]ost of the injunction provisions are reasonably targeted toward remedying the identified issues," and expressly validated those provisions. *See id.* at 57–58 ¶ 1. Therefore, in its November 2018 Order implementing *Stukenberg I* on remand, the Court restated one of those validated Remedial Orders as Remedial Order 3.[66]   D.E. 606 at 2.  The Fifth Circuit's opinion in *Stukenberg II* did not disturb Remedial Order 3, and it became effective upon the Fifth Circuit's July 30, 2019 Mandate.  *See* D.E. 627 at 3 (listing issues on appeal, which did not pertain to Remedial Order 3).  Thus, the first element for a finding of civil contempt, that an order was in effect, *see LeGrand*, 43 F.3d at 170, is satisfied as to Remedial Order 3, which Defendants do not dispute, *see* D.E. 990 at 7:4–12.

### 3.      Defendants Have Failed To Comply with Remedial Order 3.

The text of Remedial Order 3 is clear that it requires Defendants to "investigate[]" "reported allegations of child abuse and neglect involving children in the PMC class" and to "commence[] and complete[ the investigations] on time consistent with the Court's Order."  D.E. 606 at 2 ¶ 3.  However, simply checking the boxes of commencing and completing investigations by certain times is not sufficient for Defendants to implement this Remedial Order in a way that "ensure[s] that Texas's PMC foster children are free from an unreasonable risk of harm," as required by the Court's injunction.  *See id.* at 2.  Defendants must also "conduct" investigations in such a way that "**tak[es] into account at all times the child's safety needs**."  *Id.* (emphasis added). Defendants must approach allegations of abuse and neglect involving PMC children in such a way

---

[66] Remedial Order 3 repeats the language of the corresponding Remedial Order from the Court's January 2018 Order, with only slight revisions to the wording.  *Compare* D.E. 559 at 39 ¶ D2 (referring to "the Court's Final Order," the "monitor(s)," and "Items 9-6 of this Section of the Court's Final Order"), *with* D.E. 606 at 2 ¶ 3 (referring to "the Court's Order," the "Monitors," and "this Order").

that "taking into account at all times the child's safety needs" is the main objective.  *See id.* at 2

¶ 3.  Moreover, Defendants are subject to review by the Monitors to ensure that "the statewide

system [is] appropriately receiving, screening, and investigating reports of abuse and neglect

involving children in the PMC class," again, not just to "ensure the investigations of all reports are

commenced and completed on time consistent with this Order," but also to "ensure the

investigations are . . . conducted **taking into account at all times the child's safety needs**."  *Id.*

(emphasis added).  Hence, Remedial Order 3 "require[s] certain conduct" by Defendants and

fulfills the second element of civil contempt.  *See LeGrand*, 43 F.3d at 170.

As discussed above, following trial, the Court found, and the Fifth Circuit affirmed, that

"DFPS's investigations of foster child maltreatment are woefully deficient and often inaccurate."

D.E. 368 at 28; D.E. 601 at 39–41, 41 n.39, 43.  In their present motion, Plaintiffs argue that the

Defendants have perpetuated "ongoing and immediate harm to . . . PMC children" who have made

outcries of abuse or neglect and "ongoing and immediate risk of harm to other PMC children" that

"remains unremedied" nearly ten years after this litigation began and five years after trial.  D.E.

901 at 4–6, 8.  Therefore, Plaintiffs urge the Court to find that Defendants have failed to comply

with Remedial Order 3.  *Id.*

Indeed, the Monitors discovered "lapses at every step of [the State's] process," D.E. 869 at

16, of "screening, receiving, and investigating reports of abuse and neglect," D.E. 606 at 2.  The

lapses in the process begin with "a high rate of abandoned calls to SWI's child abuse and neglect

hotline," and continue with "a high rate . . . of inappropriate downgrades [in the Priority

designation for] reports of abuse or neglect," particularly high rates of inappropriate downgrades

to "Priority None," meaning that reports will not be investigated for abuse or neglect at all.  D.E.

869 at 16, 69.  Finally, "[o]f reports that are investigated, the Monitors' review of cases found substantial deficiencies in . . . investigations."  *Id.* at 16.

### a.   SWI: Receiving and Forwarding Allegations of Abuse and Neglect

### i.   Receiving Allegations: SWI's Call Hold Times and Dropped Call Rates

As described above, *see supra* Section IV.C.2.a., SWI is the "centralized hotline" that receives all reports of alleged abuse and neglect of adults, children, or people with disabilities in the state of Texas.  D.E. 869 at 56–57.  It is crucial for this call center to function effectively in order for the State to learn of and investigate allegations of abuse and neglect of foster children, as Remedial Order 3 requires.  *See* D.E. 990 at 92:7–10, 95:14–16 (Show Cause Hearing testimony of Batiste regarding the importance of SWI).

The Monitors describe in their Report the process that occurs when someone places a call to SWI.  First, "[c]alls . . . are answered by an automated system that asks the caller a series of questions in order to determine the way the call is routed."  D.E. 869 at 62.  The questions include things such as the caller's language and the purpose of the call (i.e., to inquire about the status of a case, to learn more about online reporting).  *Id.*  Depending on how the caller answers, the call "is routed to one of twenty-two 'call queues.'"  *Id.*  "If an SWI staff member is not immediately available, the caller waits on the queue."  *Id.*  The abuse hotline is one of the three busiest queues to which calls to SWI are routed, with 234,270 calls made to that queue in a six-month period.  *Id.* at 65.

An automated system records information about each call, including the date and time of the beginning of each call, the call queue to which each call is routed, how long the caller waits on the queue before speaking with an SWI staff member, and whether the call is handled or abandoned.  *Id.* at 63.  "If a caller hangs up before an SWI staff member answers the call, the call

is categorized as 'abandoned.'   If an SWI staff member speaks with the caller, the call is categorized as 'handled.'"   *Id.* at 62–63.

Starting on February 19, 2020, the Monitors conducted a three-day, on-site visit of Fresh Start, beginning with a late-night unannounced visit to determine whether the facility was complying with the Court's order that "placements housing more than 6 children, inclusive of all foster, biological, and adoptive children" must provide 24-hour awake-night supervision of the children placed there.   D.E. 606 at 12; D.E. 877 at 1; *see also* D.E. 601 at 3–5; D.E. 725 at 1–2, 25.   Throughout this multi-day visit to Fresh Start, the Monitors observed or were told about alleged abuse and/or neglect of the children at the facility.[67]   *See* D.E. 869 at 62.   One of the Monitors "attempted to report" allegations of abuse to SWI; however, "upon calling the hotline, [she] was placed on hold for twenty-five minutes before she ended the call, subsequently calling in a second time to make the intended report upon her return to Austin later that night."   *Id.*

As a result of the lengthy hold time that the Monitor experienced while attempting to report allegations of abuse and neglect taking place at Fresh Start, the Court ordered the State to "provide the Monitors with records of all hotline calls made and the wait time for each call including, but not limited to, dropped and unanswered calls," including "the specific times of these calls to the hotline."   D.E. 811 at 2; *see also* D.E. 869 at 61–62.   The Monitors analyzed the data related to the

---

[67] As the Monitors' Report explains:

> [T]he Monitors interviewed several children who complained of inappropriate restraints.   The children reported being required to hold their arms over their heads with their arms crossed, causing their heads to be forced forward and resulting in difficulty breathing and a report of at least one child passing out.   The program director at the RTC confirmed that the restraint described by the children is not an approved restraint.   The Monitors also interviewed children who reported physical abuse in the form of slaps and punches by the staff; one child complained of being slammed against a wall by a staff person, resulting in a prolonged headache.   Additionally, the Monitors observed and reported very little evidence of medical treatment for the children other than psychotropic drugs.

D.E. 869 at 62.

372,897 calls made to SWI from August 1, 2019 to January 31, 2020 and found substantial issues regarding call volume, hold times, and dropped calls at SWI.  *See* D.E. 869 at 63–66.

Over that six-month period, SWI handled more than 62,000 calls per month on average, including both calls from the public and calls and transfers within SWI.  *Id.* at 63.  Between August 1, 2019 and January 31, 2020, 18% of all calls made to SWI were abandoned, totaling 65,786 abandoned calls from August 1, 2019 to January 31, 2020.  *Id.* at 64.  The timing of the abandoned calls was as follows:

- "[O]ne-third (22,771) of the calls were abandoned before the caller had been waiting on the queue for a minute."  *Id.*  "One-fifth (13,411) of all abandoned calls occurred before the caller finished navigating the automated system."  *Id.*

- "Another one-third (23,851) of abandoned calls occurred [between] one [and] five minutes in the call queue."  *Id.*

- "[T]he final one-third (19,164)" of abandoned calls occurred "after the caller had been on the call queue for over five minutes."  *Id.*

Out of the 67,995 total calls (including both abandoned and handled calls) that were waiting in a queue "between one and five minutes . . . , over one-third (23,851)" of those were abandoned.  *Id.* "Many callers, however, waited much longer before hanging up.  In the six months examined, 8,338 calls . . . were abandoned after the caller waited for ten minutes or more."  *Id.*

As noted above, the abuse hotline queue was one of the three most popular queues, with a total of 234,270 calls—"[a]bout two-thirds of all calls"—routed to that queue during the period of August 1, 2019 to January 31, 2020.  *Id.* at 65.  Out of that high number of calls routed to the abuse hotline queue, 22% (51,409) were abandoned (in contrast to 3% of calls from law enforcement, which go to a separate hotline queue).  *Id.*

The call hold times and abandonment rates often varied by the day of the week and time of day that the calls were made.  Problematically, calls made to the hotline during weekday business hours had some of the highest hold times and abandonment rates.  The Monitors noted that

"abandoned call rates routed to the abuse hotline during weekday afternoons were much higher than average." *Id.* "Of the 17,577 calls to SWI that were placed on Monday or Friday between 3:00 p.m. and 5:00 p.m. and routed to the abuse hotline, 40% of calls (7,023) were abandoned." *Id.* at 65–66. Of those 17,577 calls made on weekday afternoons, 56% (9,907) took more than ten minutes to either be handled by SWI or abandoned by the caller. *Id.* In contrast, "[c]alls to SWI on weekends, at night, or in the early morning have shorter queue times and lower than average abandoned call rates." *Id.* at 65.

Defendants object to the Monitors' Report's discussion of SWI hold times by saying that the Report "is based on the false premise that the 2018 Order against which Defendants' conduct is judged prescribes hold time limits related to Statewide Intake and fails to acknowledge that DFPS satisfied the threshold set by the Texas Legislative Budget Board." D.E. 903 ¶ 15. However, Remedial Order 3 requires that the Monitors "review the statewide system for appropriately **receiving** . . . reports of abuse and neglect involving children in the PMC class." D.E. 606 at 2 ¶ 3 (emphasis added). Batiste affirmed at the Show Cause Hearing that if "Statewide Intake doesn't do its job well" and "never answer[s] the phone," then "children will be hurt" because "[w]hen the information cannot be obtained through the caller, there is a possibility that abuse/neglect is not being reported." D.E. 990 at 92:7–10, 95:14–16. Hence, analyzing hold times and the rates at which attempted calls are dropped is pertinent to whether "the statewide system . . . appropriately receiv[es] . . . reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time . . . and conducted taking into account at all times the child's safety," and so it was appropriate that the Monitors reviewed this call hold time and abandonment information under Remedial Order 3. *See* D.E. 606 at 2 ¶ 3.

Furthermore, regardless of whether SWI's hold times "satisf[y] the threshold set by the Texas Legislative Budget Board," the Court's determination of whether Defendants have complied with Remedial Order 3 depends on whether "the statewide system . . . appropriately receiv[es] . . . reports of abuse and neglect" so that investigations may be conducted "taking into account at all times the child's safety needs." *See id.* A system in which 8,338 callers during a six-month period wait on hold for ten minutes or more before abandoning their calls, *see* D.E. 869 at 64, and in which, overall, 22% of the 234,270 calls to the abuse hotline queue during those six months are abandoned, *see id.* at 65, is not a system that "appropriately receiv[es] . . . reports of abuse and neglect" so that investigations are conducted "taking into account at all times the child's safety needs," *see* D.E. 368 at 245.  Defendants' Objection 15 to the Monitors' Report is OVERRULED.

At the Show Cause Hearing, Stephen Black testified about the actions taken at SWI to address the dropped calls and the length of call hold times as follows:

> [A]t Statewide Intake, it's really been a two-year process in reducing call hold times.  When you look at abandoning calls, it[] usually correlates to whatever our hold time is.  So starting two years ago, we began a program to look at all of our inefficiencies and to get rid of those inefficiencies. . . .  [S]o we looked at all of our processes, trying to get rid of any inefficiencies in our work. . . .  Also, in the spring of 2019, we retrained all of our staff to improve their interviewing techniques. . . . And to improve their documentation.  Since that time, over this two-year period, we have cut our average hold time in half. . . .  As of right now, as of fiscal year 2020 through July, it was 4.9 minutes.  Once the August numbers are included into that, it will drop even further, so it will finish below five minutes.

D.E. 991 at 61:19–24, 62:1–3, 62:5–7, 62:11–13, 62:15–18.  Black's information regarding more recent call times, including call times that post-date the Monitors' Report, was not provided to the Monitors in time for verification in either their Report or otherwise.  Therefore, the Court affords this information less weight than the information in the Monitors' Report when assessing whether "clear and convincing evidence," *see Salazar*, 713 F.3d at 792, establishes that the State has been

"ensur[ing] that reported allegations of child abuse and neglect . . . are investigated . . . and conducted taking into account at all times the child's safety needs," *see* D.E. 606 at 2 ¶ 3.

### ii. Forwarding Allegations: Deficiencies in Defendants' Data and Information Production to the Monitors

Once SWI receives a report of an allegation and designates a priority for that allegation, it forwards it to the appropriate division of DFPS or HHSC to carry out an investigation. However, as discussed above, the Monitors learned that through this process, the State does not track which of the allegations that are forwarded to HHSC-RCCL for investigations of minimum standards involve PMC children, despite the fact that HHSC-RCCL is under orders from this Court and the Fifth Circuit to remedy violations of the constitutional rights of that class of children. *See* D.E. 869 at 67 ("HHSC cannot distinguish between PMC and non-PMC child-related referrals in its data."); *see also supra* Section IV.C.2.d. Instead, "HHSC's data includes all referrals for that period"—some 7,333—"and does not identify PMC children because, as the agency reported to the Monitors, '[t]he agency is operations-centric not child centric.'" *Id.*; *see also supra* Section IV.C.2.d. Thus, "as an apparent result of a bifurcated system for processing and storing data associated with referrals to SWI," "DFPS and HHSC together or separately—has been unable to provide the Monitors with a unified list of all referrals to SWI involving PMC children." D.E. 869 at 67; *see also id.* at 50 ("[A]s a result of the bifurcated system used to process and store data associated with referrals to SWI, the State is unable to provide the Monitors with a unified dataset of all referrals of abuse or neglect in which a PMC child is the subject.").

So, "[i]n response to the Monitors' request to the State for data about referrals to SWI, the Monitors received separate data files from both DFPS and HHSC." *Id.* at 67. "DFPS produced monthly data for all referrals to SWI in which a PMC child was an alleged victim and SWI staff determined that the referral involved abuse or neglect allegations." *Id.* However, HHSC-RCCL

produced all of its data regarding 7,333 reports, without distinguishing whether they pertained to a PMC child.

> [T]he majority of the 7,333 referrals included in the data reported by HHSC from July 31, 2019 through November 30, 2019 **d[id] not include the name of the child or children associated with the referral**. Moreover, for the limited data where the name of a child [was] identified, **PMC status [was] not distinguished**. In addition, . . . HHSC data related to referrals [was] **not limited to children who are in DFPS custody**.

*Id.* (emphasis added); *see also id.* at 50 ("In response to the Monitors' request for data and information, for example, HHSC reported it is unable to disaggregate its data on referrals and investigations to identify those that pertain to PMC children only.").

As a result of the problems with the data provided by HHSC-RCCL, the Monitors had "to independently identify the children involved in the referral and then whether those children were in PMC status." *Id.* at 72 n.120. However, as discussed above, *see supra* Section IV.C.2.d., "[t]he data as provided by DFPS and HHSC makes it very difficult to match and connect the records of facilities from both agencies." *Id.* at 49. "To identify the investigations in which a PMC child was an alleged victim of abuse, neglect or exploitation requires shifting between the IMPACT and CLASS systems after locating child identifiers in IMPACT to use in searches." *Id.* at 50. In sum, the fact that the information that HHSC-RCCL provided to the Monitors did not specify whether it pertained to PMC children, combined with numerous other problems with the data systems fully described above, *see supra* Section IV.C.2.d., made the Monitors' task of tracking the outcomes and propriety of all reported allegations related to PMC children difficult and time-consuming.

Grappling with these issues regarding the State's data significantly increased the amount of time that the Monitors had to spend analyzing the data. Moreover, the Monitors had already received that data on a delayed timeframe from Defendants, to begin with, as the State did not provide the information that the Monitors requested on the timeline that the Monitors requested.

*See* D.E. 869 at 66–68. "For the monthly files, the Monitors requested the production on a fifteen-day lag but have received it on a forty-five-day lag." *Id.* at 67–68. *But see* D.E. 606 at 18 ¶ A10 (Monitoring Appointment Provision A10, requiring that "Defendants shall deliver to the Monitors all records, reports, data and information within 30 days of the Monitors' request").

As discussed below, *see, e.g.*, *infra* Section IV.E.3.b.i., Defendants argue in their Response to Plaintiffs' Motion that some of the analysis in the Monitors' Report is not comprehensive or representative because it does not take into account data from a more recent time frame. *See* D.E. 911 at 7–9. However, these arguments are unavailing because Defendants' own delays in providing the data, combined with the serious problems with the data provided, added significantly to the time that elapsed between the date of the latest data captured in the Report and the publication date of the Report. *See* D.E. 869 at 49–55, 67–68.

**b. RCCI: Screening and Investigating Allegations**

After SWI receives and prioritizes an allegation of abuse or neglect as a "Priority One" or a "Priority Two" intake, it forwards that intake either to DFPS's RCCI division, if the intake regards a child in licensed care, or to DFPS's CPI unit, if the intake regards a child in unlicensed care, such as in a kinship placement. *See supra* Sections IV.C.2.a.i., IV.C.2.a.ii.; *see also* D.E. 911 at 7 n.3. When RCCI receives a report of alleged abuse, neglect, or exploitation of foster children in licensed care, it conducts a secondary review of the report that was initially reviewed by SWI. D.E. 901 at 5; D.E. 869 at 58; D.E. 990 at 26:1–7 (Show Cause Hearing testimony of Batiste ("If [an intake is] something that RCCI has investigative jurisdiction to look into, it is referred to . . . RCCI for further assessment to determine the correct priority.")); *CCI Handbook* § 6241. During its secondary review, RCCI can confirm or override SWI's initial decision that a report alleges possible abuse, neglect, or exploitation of a child and what priority the allegation should be given for an investigation. D.E. 901 at 5; D.E. 869 at 58; D.E. 990 at 26:1–27:19 (Show

Cause Hearing testimony of Batiste); *CCI Handbook* §§ 6241.1–6241.2.  If RCCI does not downgrade an allegation of abuse or neglect to "Priority None" at the screening phase, then it must assign it to one of its investigators, who must evaluate the risk to children and timely initiate and complete an investigation of alleged abuse, neglect, or exploitation.  D.E. 869 at 60; *see also infra* Section IV.F. (discussing the requirements of Remedial Order 5 regarding prompt initiation of investigations and Remedial 7 regarding prompt face-to-face contact with alleged victims), Section IV.G. (discussing the requirements of Remedial Order 10 regarding prompt completion of investigations).  As discussed below, **this secondary review process has effectively functioned as a downgrading process** in which RCCI lowers the priority designation of the reports to "Priority None," meaning that, despite the fact that SWI determined that the report involves allegations of abuse or neglect, RCCI will not conduct an abuse/neglect investigation.  *See infra* Section IV.C.2.b.i.; *see also* D.E. 991 at 19:14–20:6 (Show Cause Hearing testimony of Stephen Black affirming that most of the reports of abuse or neglect forwarded from SWI to RCCI are downgraded).

In evaluating RCCI's screening and investigation processes, the Monitors discovered that RCCI is not "appropriately . . . screening[] and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs."  *See* D.E. 606 at 2 ¶ 3.  Testimony from the Show Cause Hearing and other evidence support the conclusion that Defendants' conduct with regard to screening and investigating alleged abuse and neglect has not been consistent with the Court's Remedial Order 3.

### i.     Screening Allegations: RCCI's Inappropriate Priority Downgrades

The downgrades made by RCCI screeners are not reflective of a process that "tak[es] into account at all times the child's safety needs."  *See* D.E. 606 at 2 ¶ 3.  The Monitors discovered that

after the trained screeners at SWI had designated reports for "Priority One" or "Priority Two" investigations of abuse and neglect, RCCI screeners were screening out, or downgrading many of those reports to "Priority None" (thereby eliminating the requirement to investigate them for abuse or neglect), at an alarmingly high rate that is inconsistent with Remedial Order 3.

According to the Monitors' Report, in 2019, RCCI's self-reported rate at which it screened out reports of alleged abuse and neglect from SWI in 2019 was 56.9%, or 3,179 out of 5,588 total reports that RCCI received from SWI that year.  D.E. 869 at 58 (citing Tex. Dep't of Family & Protective Servs., *Residential Child Care Investigations (RCCI): Intakes Screened Out*, https://www.dfps.state.tx.us/About_DFPS/Data_Book/Child_Protective_Investigations/Child_Ca re_Investigations/RCCI_Intakes_Screened_Out.asp (last visited by the Monitors on June 13, 2020)).  When the Monitors conducted their own review of the 935 intakes involving allegations of abuse or neglect of PMC children between August 1, 2019 and December 31, 2019, they discovered that RCCI screened out 44%, or 414 of them, by downgrading them to "Priority None." *Id.* at 68–69.

In addition to the alarmingly high rate at which RCCI screened out reports of alleged abuse and neglect, the Monitors' Report discusses the substantive allegations that were screened out and why in many of those cases, the Monitors disagreed with RCCI's decision not to investigate the allegations for possible abuse or neglect.  SWI sent 590 reports of alleged abuse or neglect to RCCI between July 31, 2019 and October 31, 2019, assigning those reports as "Priority One" or "Priority Two" investigations.  *Id.* at 73.  The Monitors reviewed a sample of 390 of those reports, "with a

95% confidence level."[68]  *Id.* at 72 n.120.  Out of that sample of 390 reports, the Monitors observed that RCCI downgraded 174 of them to "Priority None" and thereby did not investigate the allegations for possible abuse or neglect.  *Id.* at 73.  The Monitors reviewed the allegations involved in this sample of 174 intake reports that RCCI downgraded to "Priority None" between July 31, 2019 and October 31, 2019.  *Id.* at 73–74; *see also* D.E. 869-3 (App. 3.1 "Intake Screening Results Case Summaries").  The Monitors concluded that 57 (or 33%) of those cases "contained allegations that warranted investigation for abuse or neglect to ensure the safety and well-being of PMC child(ren)," and therefore, RCCI wrongly downgraded them to "Priority None."  D.E. 869 at 74; *see also id.* at 16, 24, 99; D.E. 869-3; D.E. 901 at 5.

The Monitors provide a summary of each of the 57 cases that they concluded "contained allegations that warranted investigation for abuse or neglect," in contrast to RCCI's downgrade to "Priority None."  *See* D.E. 869-3.  In these cases, the Monitors did not make determinations regarding what the ultimate investigative finding should have been; rather, they simply concluded that an investigation of abuse or neglect should have been conducted, where none was conducted

---

[68]     To evaluate DFPS's performance associated with Remedial Order Three and assess the appropriateness of screening of referrals of abuse, neglect or exploitation involving PMC children in licensed placements, **the monitoring team conducted a qualitative review of a random sample of 329 of 590 referrals made to SWI and assigned to RCCI for an investigation between July 31, 2019 and October 31, 2019.  The Monitors derived the sample from two data reports provided by DFPS.**

The **first data set** from DFPS contained referrals to SWI between July 31, 2019 and September 30, 2019.  For the two-month period, DPFS [sic] identified 379 intakes involving PMC children in licensed placements that were assigned to RCCI for investigation, of which the Monitors reviewed a random sample of 192 reports **using a 95% confidence level and a 5% margin of error**.  The **second data set** contained reports made to SWI that were assigned to RCCI between October 1, 2019 and October 31, 2019.  DFPS identified 211 intakes made to SWI and assigned to RCCI in October 2019, of which the monitoring team reviewed a random sample of 137 reports **using a 95% confidence level and 5% margin of error**.  The sample for the months of August and September 2019 was stratified to proportionally reflect DFPS's screening determinations for these two months.  In compliance with the directive in Remedial Order Three to take "into account at all times the child's safety needs," the Monitors enriched the sample of intakes that were assigned Priority None (PN) in October 2019, which were, therefore, never investigated by the State for child abuse or neglect.

D.E. 869 at 72–73 (emphasis added) (footnotes omitted).

at all.  *See* D.E. 869 at 74; D.E. 869-3.  In their Motion, Plaintiffs highlight a few illustrative

examples of the types of allegations that the Monitors believed RCCI wrongly downgraded and

therefore did not investigate for abuse or neglect.  The first example that Plaintiffs highlight was a

case in which:

> A nine-year-old foster child disclosed that when she was five, her previous foster
> mother cut her right hand with a knife and a piece of glass while drunkenly playing
> the game "hangman."  The same foster mother pushed her birth child down the
> stairs while drunk.  RCCI deemed this a *Priority None* minimum standards
> investigation.  The Monitors found these allegations to warrant a physical abuse
> investigation.

D.E. 901 at 6 (citing D.E. 869-3 at 3).  Appendix 3.1 to the Monitors' Report reveals that "SWI

assigned this case as a Priority Two investigation for Physical Abuse."  D.E. 869-3 at 3.  After

that, "RCCI downgraded to PN minimum standards investigation," and as a result, did not

investigate the allegation for possible abuse or neglect.  *Id.*

However, the Monitors determined that this allegation warranted investigation.  They

concluded that "[t]he allegations described by the child meet the threshold for a physical abuse

investigation," based on the only applicable definition for "abuse" in the Texas Administrative

Code that was in place at the time of the allegation.  D.E. 869-3 at 3 (citing 40 Tex. Admin. Code

§ 745.8557(1)).[69]  This chapter of the Texas Administrative Code, regarding "Licensing" for

purposes of DFPS, defines "[a]buse" as "any intentional, knowing, or reckless act or omission . . .

that causes or may cause emotional harm or physical injury to . . . a child" and defines

"[i]ntentional, knowing, or reckless acts and omissions" to include "[a]ny act such as striking,

shoving, shaking, or hitting a child, whether intended as discipline or not."  40 Tex. Admin. Code

---

[69] In their Objections to the Monitors' Report, Defendants explain that this is the section of the Texas Administrative
Code "where rules related to CCI have historically been found."  D.E. 903 ¶ 13.

§ 745.8557(1).[70]  Since the time of this allegation, the Texas Family Code has also defined "abuse" to include "physical injury that results in substantial harm to the child."  Tex. Fam. Code § 261.001(1)(C).  RCCI's failure to investigate these allegations for abuse or neglect is inconsistent with Remedial Order 3.

Even though the alleged incident of abuse occurred four years prior to the report, Appendix 3.1 reflects conflicting information about whether that foster home was still open to receive additional foster children at the time of the report.  *See* D.E. 869-3 at 3.  The Appendix notes that "the child was previously placed in a foster home with a very similar name spelling as provided by the child" and that "this foster home is open."  *Id.*  In contrast, when RCCI gave its reason for downgrading the report, it stated that "[t]he home is closed and is not in our region."  *Id.*  According to the Monitors, RCCI likely reached this conclusion because the screener failed to conduct an adequate search of the child's former foster home placement in the IMPACT system.  *See id.*  Because RCCI failed to correctly identify the child's former foster home placement as still open, HHSC-RCCL determined that it need not conduct a minimum standards investigation at all.  *Id.*  ("[HHSC-RCCL] Minimum Standards Findings: Due to RCCI not identifying the child's former foster home, a minimum standards investigation was not conducted.").

This case is a clear-cut example of the domino effect of problems that occur when each of the State's agencies fails to operate effectively in a way that "tak[es] into account at all times [children's] safety needs."  First, RCCI made a faulty "Priority None" designation, as a result of which, the report was not investigated for alleged abuse, in contradiction with the legal definition of "abuse" under the Texas Administrative Code, which is inconsistent with Remedial Order 3.

---

[70] A new chapter of the Texas Administrative Code, recently promulgated to apply specifically to CCI, also supports a conclusion that this report should have been investigated for abuse.  Under that chapter, "[p]hysical abuse" is defined to include "[p]hysical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child."  40 Tex. Admin. Code § 707.789(a)(1).

Then, due to RCCI's inadequate research of the child's placement history, RCCI failed to correctly identify the child's former foster home as open, so HHSC-RCCL concluded it need not even conduct a minimum standards investigation at that home. As a result, neither the home nor the caregiver therein was investigated; the home and caregiver remain available to take new children; and new foster children may be placed in a home that may have a history of undocumented abuse and could therefore be placed at unreasonable risk of serious harm.

> Plaintiffs also provide the following example from Appendix 3.1 to the Monitors' Report:
>
> A seventeen-year-old girl got pills from other foster care residents and tried to overdose because she felt unsafe at the facility and mistreated by staff. She also ingested ink that same day. Nobody at the facility took her to the emergency room or to see a doctor. RCCI deemed this a *Priority None* investigation. The Monitors found these allegations to warrant a neglectful supervision investigation, both because of her self-harming behavior and the fact that residents are keeping their own pills, which is against policy.

D.E. 901 at 6 (citing D.E. 869-3 at 11). Again, "SWI assigned this case as a Priority Two investigation for Neglectful Supervision. RCCI downgraded to PN minimum standards investigation." D.E. 869-3 at 11. The Monitors concluded that "the above allegation meets the threshold for a neglectful supervision investigation," citing the chapter of the Texas Administrative Code applicable to "Licensing" for purposes of DFPS, which defines "[n]eglect" as "an act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child," including "[f]ailure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation." *See id.* (citing 40 Tex. Admin. Code § 745.8559(1)); *see also* Tex. Fam. Code. § 261.001(4)(A)(i), (iv) (defining "[n]eglect" to include "the leaving of a child in a situation where the child would be exposed to a substantial risk of physical or mental harm, without arranging for necessary care for the child" or "a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility

or program, including failure to comply with an individual treatment plan, plan of care, or individualized service plan, that causes or may cause substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy").[71]

RCCI's provided reason for its downgrade of this report to "Priority None" was that "[p]er our definition of neglect the child was not placed in or left in a situation that caused or could of [sic] caused substantial harm." D.E. 869-3 at 11. RCCI noted that "[t]he facility, who has trained and certified medical staff, had the child assessed by medical professionals and there were no concerns related to the child demeanor or vitals and it was determined she would be placed on close observation by staff and the nurse." *Id.* However, the RCCI reasoning mentioned nothing about whether the facility had stopped allowing residents to keep their own pills, which was against policy, so that a child such as this one who might harm herself would not have access to medications that he or she should not have. *See id.* At the Show Cause Hearing, Batiste confirmed that "[i]t's not appropriate for a placement to allow children to keep medical prescription drugs that they're not supposed to have." D.E. 990 at 141:16–19.

When HHSC-RCCL conducted a minimum standards investigation related to this incident, it "found" the facility "compliant" with the minimum standard that requires General Residential Operations to "report" to HHSC-RCCL "and document . . . serious incidents involving a child," including "[a] suicide attempt by a child." D.E. 869-3 at 12 (citing 26 Tex. Admin. Code § 748.303(a)(11)(A)). HHSC-RCCL also noted that "the staff conducts supervision checks every

---

[71] *See also* 40 Tex. Admin. Code § 707.801 (applying to CCI; adopting the definition of "neglect" from Tex. Fam. Code § 261.001(4)(A)(iv); and defining "[n]egligent act or omission" to mean "a breach of duty by an employee, volunteer, or other individual working under the auspices of a facility or program that causes or may cause substantial emotional harm or substantial physical injury to a child and includes . . . [f]ailure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation").

15 minutes." *Id.* However, the HHSC-RCCL investigation similarly did not address the allegation that children were being allowed to keep their pills with them. *See id.* Again, the investigation process for this intake report shows ways in which problems slip through the cracks at every layer of the State's system. RCCI did not conduct an investigation for neglect, and when HHSC-RCCL investigated for minimum standards, they did not conduct an investigation that appropriately explored the safety risks to children at the facility. These failings are inconsistent with Remedial Order 3's requirements that "allegations of child abuse and neglect involving children in the PMC class are investigated . . . and conducted taking into account at all times the child's safety needs." *See* D.E. 606 at 2 ¶ 3. Ultimately, the facility in question in this report may still be allowing residents to keep their pills with them, against policy as the result of an investigation that was inconsistent with Remedial Order 3.

In Appendix 3.1 to their Report, the Monitors provide many more examples of inappropriate downgrades and screen-outs of abuse or neglect allegations by RCCI that the Court finds extremely troubling. The Court provides five of those examples herein.

First, in October of 2019, a staff member at a Residential Treatment Center reported that another staff member was responsible for supervising three boys, aged eleven, eight, and nine years old, when the "three boys built" and went inside "a blanket fort that obscured the staff person's line of sight"—which was against staff rules—and, over the course of three and a half hours, "engaged in sexually inappropriate behavior, including kissing, showing each other their private parts, touching of another's private parts, and one child climbing on top of another." D.E. 869-3 at 23–24; *see also* D.E. 869 at 83. "The eleven-year-old could be seen on camera climbing on top of the eight-year-old, and the eight-year-old then exposed himself to the eleven-year-old." D.E. 869-3 at 24; *see also* D.E. 869 at 83. While SWI assigned this report as a "Priority Two"

investigation for neglectful supervision, RCCI downgraded the report to "Priority None" so that it would receive no neglect investigation and instead would go to HHSC-RCCL for a minimum standards investigation.  D.E. 869-3 at 24; *see also* D.E. 869 at 83.  Incredibly, the reason given by RCCI for this downgrade was that the report "d[id]n't appear to involve abuse, neglect, or risk." D.E. 869-3 at 24; *see also* D.E. 869 at 83.  RCCI also noted that the "[i]ncident described three children exhibiting sexualized behaviors with no force/cohesion [sic[72]], does not rise to the level of abuse."  D.E. 869-3 at 24; *see also* D.E. 869 at 83.

The Monitors believe that this "allegation meets the threshold for a neglectful supervision investigation based upon" the only applicable definitions for "neglect" in the Texas Administrative Code that were in place at the time.  D.E. 869-3 at 24; D.E. 869 at 83.  Since the time of this allegation, a portion of the chapter of the Texas Administrative Code pertaining to DFPS that governs "Licensing" has defined "[n]eglect" to include "an act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child," including "[f]ailure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation."  40 Tex. Admin. Code § 745.8559(1); *see also* D.E. 869-3 at 24; D.E. 869 at 83–84.  As the Monitors concluded, under this definition, an allegation that a staff member sat in the same room while multiple children went inside a blanket fort against staff policy and engaged in sexual conduct over the course of three hours merits at least an investigation for neglect, and the fact that RCCI did not investigate is inconsistent with the requirements of Remedial Order 3. The statutory definition of "neglect" under the Texas Family Code, which was also in place at the time of this allegation, also supports a finding that an investigation for neglect was warranted.  *See*

---

[72] The Court assumes the intended word was "coercion."

Tex. Fam. Code § 261.001(4)(A)(iv) (defining "[n]eglect" to include "a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program").[73]

To support their conclusion that this report should have been investigated by RCCI, the Monitors also cite the definition for "abuse" under the Texas Administrative Code chapter governing "Licensing," which provides that "[a]buse" includes "[f]ailure to make reasonable effort to prevent sexual conduct to a child" by "someone working under the auspices of an operation." D.E. 869-3 at 24 (citing 40 Tex. Admin. Code § 745.8557(7)); D.E. 869 at 83; *see also* Tex. Fam. Code § 261.001(1) (defining "[a]buse" to include "failure to make a reasonable effort to prevent sexual conduct harmful to a child").[74]   Hence, under the statutory and regulatory definitions for both "neglect" and "abuse," the report of a staff member sitting in the same room with three young children engaging in inappropriate sexual conduct, and failing to notice or do anything to stop it, at the very least would merit an investigation for abuse or neglect, as the Monitors noted, but RCCI did nothing.   RCCI's failure to investigate this allegation is inconsistent with Remedial Order 3.

Second, in October of 2019, "[a] seventeen-year-old male called SWI" and "stated that staff improperly restrained him" by "allegedly push[ing] him into his room and tr[ying] to put him in a restraint."  D.E. 869-3 at 22; *see also* D.E. 869 at 79.  The alleged restraint involved holding

---

[73] The more recently promulgated chapter of the Texas Administrative Code that applies specifically to CCI also supports a conclusion that this report should have been investigated for neglect.  *See* 40 Tex. Admin. Code § 707.801(a)–(b)(1), (b)(3) (defining "neglect," "[f]or purposes of an investigation in a child care operation," as "a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program" and defining "[n]egligent act or omission" as "a breach of duty by an employee, volunteer, or other individual working under the auspices of a facility or program that causes or may cause substantial emotional harm or substantial physical injury to a child and includes . . . [f]ailure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation" and noting that "[s]ubstantial emotional harm is presumed when the act or omission is of a sexual nature [or] the child acts out sexually").

[74] The more recently promulgated chapter of the Texas Administrative Code governing CCI also provides that "[s]exual abuse" includes "[f]ailure to make a reasonable effort to prevent sexual conduct harmful to a child."  40 Tex. Admin. Code § 707.791 (citing Tex. Fam. Code § 261.001(1)).

his "hands behind [his] back and stretching out as far as he could."  D.E. 869-3 at 22; *see also* D.E. 869 at 79.  Then, "[a]nother staff person" allegedly "put a mat on the youth's upper chest and pushed into the middle part between the esophagus and chest and held him for fifteen to twenty minutes."  D.E. 869-3 at 22; *see also* D.E. 869 at 79.  In this way, "one staff person [was] holding the youth's arms and the other [was] pushing the mat on the youth's throat, which allegedly caused a bruise on his right shoulder."  D.E. 869-3 at 22; *see also* D.E. 869 at 79.  "The seventeen-year-old alleged victim received medical attention from the nurse on site."  D.E. 869-3 at 22; *see also* D.E. 869 at 79.  While SWI designated this report for a "Priority One" investigation for Physical Abuse, RCCI's screener determined that the report did not meet the threshold for an allegation of abuse and downgraded it to "Priority None" such that it would receive no investigation for abuse or neglect and instead would only receive a minimum standards investigation from HHSC-RCCL.  D.E. 869-3 at 22.  Part of RCCI's explanation for this downgrade was that the youth "did not report trouble breathing during restraint."  *Id.*; D.E. 869 at 79.

However, the Monitors note that "[t]he allegation of excessive force being used against a youth during a restraint meets the threshold for a physical abuse investigation."  D.E. 869-3 at 22; D.E. 869 at 79.  In support of this conclusion, the Monitors cite the definition of "abuse" provided at the time that this allegation was reported in the regulatory provision of the Texas Administrative Code applicable to "Licensing" within DFPS.  *See* D.E. 869 at 79; D.E. 869-3 at 22 (citing 40 Tex. Admin. Code § 745.8557(1)).  That provision of the Texas Administrative Code provides that:

> Abuse is any intentional, knowing, or reckless act or omission by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to . . . a child that the operation serves.  Intentional, knowing, or reckless acts and omissions include . . . [a]ny act such as striking, shoving, shaking, or hitting a child, whether intended as discipline or not.

40 Tex. Admin. Code § 745.8557(1).  In addition, the current statutory definition of "abuse" under the Texas Family Code, which was also in place at the time of this report, includes "physical injury

that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the history or explanation given" or "failure to make a reasonable effort to prevent an action by another person that results in physical injury that results in substantial harm to the child." Tex. Fam. Code § 261.001(1)(C)–(D).[75] Nowhere do the statutory or regulatory definitions of "abuse" require that a child "report trouble breathing" in order to meet the threshold for possible abuse that should be investigated. As the Monitors determined, this is a case that at least merited an investigation for alleged abuse.

Third in these examples of RCCI screeners' inappropriate downgrades is a report from August of 2019 involving "a fourteen-year-old female" who "made an outcry that she had an incident with a staff person at the [Residential Treatment Center] where she did not comply with a staff person's directive and was 'flung away from a doorway and into a wall.'" D.E. 869-3 at 47. The youth said that "she received a scratch and a three-inch mark was noticeable on her inner arm." *Id.* She also alleged that another staff member "performed an inappropriate restraint a few days prior" and "always" restrains her aggressively. *Id.* "The reporter also stated that staff minimized [the] youth's outcry by stating that the video footage did not support her allegations." *Id.* Although SWI designated this report for a "Priority Two" investigation, RCCI downgraded it to a "Priority None" minimum standards investigation by HHSC-RCCL. *Id.*

RCCI gave the following reason for the downgrade: "[d]oesn't appear to involve abuse, neglect, or risk. . . . Child's allegations were not supported by reviewed video. Child suffered

---

[75] Furthermore, the additional regulatory provisions of the Texas Administrative Code promulgated after the time of this report, which apply directly to CCI, provide a definition of "[p]hysical abuse" that would have also supported a conclusion that this allegation should have been investigated. *See* 40 Tex. Admin. Code § 707.789(a) (defining "[p]hysical abuse" to include "[p]hysical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the history or explanation given and excluding an accident" or "[f]ailure to make a reasonable effort to prevent an action by another person that results in physical injury that results in substantial harm to the child") (citing Tex. Family Code § 261.001(1)).

minor injury on her elbow when she slipped." *Id.* However, the Monitors note that "[t]here is no indication that RCCI ever received or reviewed videos prior to the downgrade" and that documentation in the CLASS database demonstrates that HHSC-RCCL did not review the videos as part of the minimum standards investigation until well after RCCI's downgrade of the report. *Id.* Therefore, RCCI's conclusions that the video does not support the allegations and that the youth merely "suffered [a] minor injury on her elbow when she slipped" do not seem credible. *See id.*

The Monitors concluded that this report should have been investigated for possible physical abuse, based on Chapter 745 of Title 40 of the Texas Administrative Code, which provides that the definition of "[a]buse" includes "[a]ny act such as striking, shoving, shaking, or hitting a child, whether intended as discipline or not" "by someone working under the auspices of an operation that causes or may cause . . . physical injury to . . . a child that the operation serves." *See id.* at 47–48 (citing 40 Tex. Admin. Code § 745.8557(1)); *see also* Tex. Fam. Code § 261.001(1) (defining "[a]buse" to include "physical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the history or explanation given").[76] In the child's report, the child alleged that she received a scratch and a mark on her arm as a result of "a reportedly forceful physical interaction with an RTC staff person." D.E. 869-3 at 47. As the Monitors determined, this meets the definition for "abuse" under the regulatory provisions of the Texas Administrative Code, as well as the

---

[76] The more recently promulgated regulatory provisions governing CCI also define "[p]hysical abuse" to include "[p]hysical injury that results in substantial harm to the child . . ." and define "[p]hysical injury that results in substantial harm to the child" to mean "any bodily harm, including but not limited to scratches; scrapes; cuts; welts; red marks; skin bruising; lacerations . . . ."  40 Tex. Admin. Code § 707.789(a)(1), (b)(3) (citing Tex. Fam. Code § 261.001(1)).

statutory definition under the Texas Family Code, and the allegation therefore should have been investigated.

Fourth, in August of 2019, two girls, aged seventeen and fifteen years old, reportedly ran away from a facility, and then returned at 11:00 p.m. D.E. 869-3 at 64. Upon their return, "they were denied access by staff, reportedly because the youth refused to be searched." *Id.* "The youth slept outside and reportedly refused to be searched in the morning . . . and were again denied access." *Id.* "The residential staff reported that the girls were being watched from the window; however, the reporter stated that the window did not provide a view to where the girls were." *Id.* When HHSC-RCCL "performed a 'courtesy visit'" that morning, they "found the girls outside at 10:40 a.m." *Id.* It was at that time that the staff finally let the girls enter the facility. *Id.* "The youth reported that they had not been given anything to eat." *Id.* SWI initially assigned the report as a "Priority Two" investigation for neglectful supervision, but an RCCI supervisor downgraded it to "Priority None" for a minimum standards investigation. *Id.* at 64–65. The reason that RCCI gave for the downgrade was that the incident "d[id]n't appear to involve abuse, neglect or risk" and that when the children stayed outside of the facility after being denied access, they "were not a[t] risk of substantial harm." *Id.* at 65.

Noting that the "[y]outh were made to sleep outside from 11 p.m. to 10 a.m. the following morning with no provision for shelter, food, or protection from the heat," the Monitors concluded that "the allegations m[et] the threshold for a neglectful supervision investigation." *Id.* In support of their conclusion, the Monitors cite 40 Tex. Admin. Code § 745.8559, which defines "neglect" as "an act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child," including "[p]lacing a child in or failing to remove him from a situation that a reasonable

member of that profession, reasonable caregiver, or reasonable person should realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities" or "[l]eaving a child in a situation where a reasonable member of that profession, reasonable caregiver, or reasonable person would expect the child to be exposed to substantial physical injury or substantial emotional harm without arranging for necessary care for the child." 40 Tex. Admin. Code § 745.8559(3)–(4); *see also* Tex. Fam. Code. § 261.001(4) (defining "[n]eglect" to include "the failure to provide a child with food, clothing, or shelter necessary to sustain the life or health of the child . . . [and] a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program including failure to comply with an individual treatment plan, plan of care, or individualized service plan, that causes or may cause substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy").[77]   As the Monitors concluded, under these definitions of "neglect," refusing youths' access to a facility such that they were made to stay outside overnight for nearly twelve hours should have merited an investigation for neglect, in contrast to RCCI's determination not to investigate.

Fifth, a "[f]acility reported that a fifteen-year-old foster child who takes psychotropic medication placed a cord to her MP3 player headphones around her neck during the overnight shift of August 23–24, 2019." D.E. 869-3 at 35; *see also* D.E. 869 at 86.  "The child did not report any injuries" but "was transported to the hospital" the following day.  *See* D.E. 869-3 at 35; D.E. 869

---

[77] *See also* 40 Tex. Admin. Code § 707.801(a)–(b) (applying to CCI and defining "neglect" as "a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program" and defining "[n]egligent act or omission" to include "a breach of duty by an employee, volunteer, or other individual working under the auspices of a facility or program that causes or may cause substantial emotional harm or substantial physical injury to a child and includes . . . [l]eaving a child in a situation where a reasonable member of that profession, reasonable caregiver, or reasonable person would expect the child to be exposed to substantial emotional harm or substantial physical injury without arranging for necessary care for the child" and "[f]ailure to provide a child with food, clothing, and shelter necessary to sustain the life or health of the child") (citing Tex. Fam. Code § 261.001(1)(4)(A)(iv)).

at 86.  She was "medically cleared by the hospital" but was "waiting to meet with the mental health team for a psychiatric assessment" at the time of the report.  D.E. 869-3 at 35; *see also* D.E. 869 at 86.  She "reported to the facility staff that she wanted to 'kill' herself at the time of the incident; however, she reported to the hospital staff that she did not intend to 'hurt' herself, but just felt as if no one cared for her."  D.E. 869-3 at 35; *see also* D.E. 869 at 86.  SWI received the intake of this incident on August 24, 2019.  D.E. 869-3 at 36; D.E. 869 at 86.

The Monitors' additional review of the child's record found that from August 5, 2019 to September 1, 2019, this child had three self-harming incidents at this facility, all of which resulted in hospitalization.  D.E. 869-3 at 36; D.E. 869 at 86.  After the first incident, "a safety plan was created," but the child's records do not provide details about the plan.  D.E. 869-3 at 36; D.E. 869 at 86.  At the time of the incident reported on August 24, "the child was subject to a safety plan and 3-day precaution due to previous self-harming.  However, she was still able to self-harm."  D.E. 869-3 at 36; *see also* D.E. 869 at 86.  After the incident documented in this report, on September 1, 2019, "the child self-harmed again and was hospitalized," after which she "did not return to the facility."  D.E. 869-3 at 36–37; D.E. 869 at 87.  As the Monitors note, "[t]his child's repeated ability to self-harm during a span of thirty days raises serious concerns about supervision."  D.E. 869-3 at 37; *see also* D.E. 869 at 87.

Nonetheless, RCCI downgraded the report, which SWI originally designated as a "Priority Two" investigation, to "Priority None" so that it would be sent to HHSC-RCCL for an investigation for a possible minimum standards violation, instead of possible abuse or neglect.  D.E. 869-3 at 35; D.E. 869 at 86.  RCCI's given reason for the downgrade was that the report "[did]n't appear to involve abuse, neglect, or risk," and RCCI noted that "no injuries were observed."  D.E. 869-3 at 35; D.E. 869 at 86.  RCCI further noted that "[t]he child later reported

her intentions were not to commit suicide therefore this was not an attempted to [sic] suicide"—a conclusion that is not credible.  D.E. 869-3 at 35; D.E. 869 at 86.

The Monitors determined that "[a] child attempted suicide and it is unclear if supervision was adequate and conformed with any increased supervision requirements at the time of the apparent suicide attempt," and therefore, the report met the threshold for a neglectful supervision investigation under the applicable provision of the Texas Administrative Code.  D.E. 869-3 at 36 (citing 40 Tex. Admin. Code § 745.8559(1) (defining "[n]eglect" as "an act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child," including "[f]ailure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation")); *see also* D.E. 869 at 86–87; Tex. Fam. Code § 261.001(4)(a)(iv) (defining "[n]eglect" to include "a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program, including failure to comply with an individual treatment plan, plan of care, or individualized service plan, that causes or may cause substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy").[78]  An apparent suicide attempt taking place under conditions that are not clear regarding the adequacy of supervision of the child

---

[78] *See also* 40 Tex. Admin. Code § 707.801(a)–(b) (applying to CCI and defining "neglect" as "a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program, including failure to comply with an individual treatment plan, plan of care, or individualized services plan that causes or may cause substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy" and defining "[n]egligent act or omission" to mean "a breach of duty by an employee, volunteer, or other individual working under the auspices of a facility or program that causes or may cause substantial emotional harm or substantial physical injury to a child and includes . . . [f]ailure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation" and "[f]ailure to comply with an individual treatment plan, plan of service, or individualized service plan that causes substantial emotional harm or physical injury to a child"; and defining "[s]ubstantial emotional harm" to mean "an observable impairment in a child's psychological growth, development, or functioning that is significant enough to require treatment by a medical or mental health professional. . . .  Substantial emotional harm is presumed when . . . the child attempts suicide.").

is a situation that, as the Monitors concluded, should meet the threshold for at least an investigation for possible neglect.  However, RCCI, once again, did not investigate.  *See* D.E. 869-3 at 35.

As these five examples demonstrate, "RCCI's inappropriate downgrades of referrals represent a significant, systemic failure that increases the risk of serious harm to children."  D.E. 869 at 74.  "When referrals are not investigated as child abuse, neglect or exploitation, but instead are relegated to a regulatory investigation, alleged perpetrators can continue perpetrating, even when there is a minimum standards violation identified by [HHSC-RCCL]."  *Id.*  The Monitors observed "precisely this circumstance," in which "perpetrators identified in the context of minimum standards violations were able to secure employment at other CPAs and GROs because their culpability had not been established as part of a child abuse, neglect or exploitation investigation."  *Id.*  These observations demonstrate that the State is not ensuring that investigations of allegations of abuse and neglect are "investigated . . . and conducted taking into account at all times the child's safety needs," as required by Remedial Order 3.  Thus, the third element of civil contempt—that Defendants have failed to comply with the Remedial Order—is established as to this aspect of Remedial Order 3.  *See LeGrand*, 43 F.3d at 170.

As previously discussed, *see supra* Section IV.A.1., if a movant for civil contempt has made the required three-part showing, the respondent may defend against civil contempt, such as by rebutting the conclusion that the three-part showing was met.  *See LeGrand*, 43 F.3d at 170. However, in their Response to Plaintiffs' Motion, Defendants do not substantively refute any aspect of the Monitors' findings regarding RCCI's inappropriate downgrades of reports of alleged abuse and neglect.  In fact, at the Show Cause Hearing, Defendants' witnesses testified that they do not dispute the truth of the factual representations made in the Monitors' Report.  *See* D.E. 990 at 6:5–19 (Defendants' counsel), 27:24–29:15 (Batiste), 116:4–6 (same); *see also* D.E. 990 at

250:16–19 (Court commenting on the lack of a factual dispute), 251:19–22 (same); D.E. 991 at

12:15–13:10 (Stephen Black affirming that he does not have "contrary statistics"), 137:6–11

(Commissioner Masters affirming that she does not have "contrary statistical evidence").  Instead,

Defendants attack the representativeness of the sample of reports from which the Monitors

conducted their review, calling it "an unreasonably restrictive sample."  D.E. 911 at 8.  Defendants

complain that:

> For reasons not explained in the Report, the Monitors chose to use only a sample
> of reports from July 31 through October 31, 2019 ignoring all information provided
> from October 31, 2019 through the submission to the Monitors on May 15, 2020,
> prior to the release of the First Monitor Report.  Neither the Report nor the Motion
> offer any explanation as to why this minimal review was conducted nor how it is
> sufficient to show Defendants are currently in contempt, more than nine months
> after the most current data referenced in the Report.

*Id.*  The Court finds this argument to be without merit.  Defendants' contention that the Monitors

do "not explain[]" the reasons that they reviewed a sample of reports from a time frame from

several months before the date of the Report is simply untrue.  As discussed above, *see supra*

Sections IV.C.2.d., IV.E.3.a.ii., the Monitors' Report thoroughly explains that Defendants' delay

in providing the necessary data to the Monitors and their inability to identify which data from

HHSC applied to the PMC class of children, combined with other issues with the State's data

systems, significantly complicated and prolonged the Monitors' analysis of that data.  *See, e.g.*,

D.E. 869 at 49 (explaining that the data system issues "added extensively to the time and staffing

required by the monitoring team to validate the agency's performance under these remedial

orders").  As a logical result of the delays, "the most current data referenced in the Report" is from

several months prior to the date of the Report.  *See* D.E. 911 at 8.  Defendants cannot create

significant delays and complications in the provision of data to the Monitors and simultaneously

argue that those delays invalidate or undermine the Monitors' analysis.  Therefore, Defendants'

attack of the Monitors' sample is unavailing.  From a sample of 329 reports out of a total of 590

(a sample of more than half of the total number of reports, which allowed for a 95% confidence level) that were made to SWI over the course of three months (July 31, 2019 through October 31, 2019), the Monitors reviewed all 174 reports that were downgraded to "Priority None" and provided thorough qualitative descriptions of those reports. *See* D.E. 869 at 72–74, 72 n.120; *see also* D.E. 869-3; *supra* note 68. The Monitors' Report provides "clear and convincing evidence," *see Salazar*, 713 F.3d at 792, that Defendants have failed to "ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated . . . and conducted taking into account at all times the child's safety needs," *see* D.E. 606 at 2 ¶ 3. Defendants' argument fails to rebut this "clear and convincing evidence" provided in the Monitors' Report.

An additional argument that Defendants put forward, rather than refuting the substantive information in the Monitors' Report, is that more recent data, not included in the Monitors' Report, purportedly show that Defendants have come into compliance with Remedial Order 3. In particular, Defendants argue that:

> Objective data confirms that DFPS's significant efforts are yielding positive results. While the Report focuses on the Monitors' opinions regarding a small subset of intakes, an analysis of the RCCI intakes reports [sic] provided to the Monitors shows the rate of RCCI intakes downgraded to a PN declined from 48% in August 2019 to 20% in June 2020.

D.E. 911 at 9–10; *see also* D.E. 990 at 49:23–50:3 (Show Cause Hearing testimony of Batiste that the rate of downgrades was reduced to 20% in June 2020). However, the Monitors could not have verified Defendants' data to support their claim that RCCI improved its downgrade rates by June 2020 in time for their June 2020 Report. Moreover, Defendants have purported to need 45 days to process information before they provide it to the Monitors, and yet, here, they proffer to the Court data regarding their actions from June of 2020 in a briefing dated July 24, 2020. *See* D.E. 869 at 67–68 ("For the monthly files, the Monitors requested the production on a fifteen-day lag but have received it on a forty-five-day lag. DFPS stated that the production timeframe is 'based

on the regular business cycle for loading data in the data warehouse tables which are what is used for ongoing reporting.'"). Defendants have not explained why they can proffer information to the Court without this processing time lag but cannot do so when providing data to the Monitors. The Court affords less weight to data that Defendants baldly provide in their briefings and testimony that has not yet been verified by the Monitors.

As noted above, the standard for a finding of civil contempt is "clear and convincing evidence." *Salazar*, 713 F.3d at 792. Defendants' unverified information does not counteract the substantial weight that the Court affords to information verified and reported by the Monitors, the factual basis of which Defendants did not refute during the Hearing. *See* D.E. 990 at 6:5–19, 27:24–29:15, 251:19–22. Therefore, Defendants' allegation that they reduced the rate of downgrades in June of 2020 does not rebut a finding that all three elements of civil contempt have been met with regard to the "receiving" and "screening" aspects of Remedial Order 3. *See* D.E. 606 at 2 ¶ 3.

A respondent may also defend against a finding of civil contempt by "asserting good faith in its attempts to comply" or inability to comply. *LeGrand*, 43 F.3d at 170; *see also Petroleos Mexicanos*, 826 F.2d at 401 (good faith and inability to comply are defenses to civil contempt). Therefore, Defendants additionally argue that they "acted in good faith and with great diligence in ensuring the intake screening process is sound, including taking proactive steps to make it even more effective." D.E. 911 at 8–9. They allege that they made various efforts to comply with the Remedial Order, which include: establishing guidelines for prioritization of allegations; centralizing the prioritization function and having it "staffed and operational by February 2020"; implementing a Quality Assurance unit to conduct case reads to determine if prioritizations were correctly made "and provide further training based on any identified needs," with the first quarterly

report completed in July 2020; and revising the RCCI screening unit handbook on July 15, 2020 and training members of the screening unit on August 1, 2020.  D.E. 911 at 9.

Remedial Order 3 does not provide a 60-day deadline for Defendants to comply, as some of the other Remedial Orders do.  *Compare* D.E. 606 at 2 ¶ 3, *with id.* at 2–7 ¶¶ 2, 5, 7, 10, 24, 37 (requiring that Defendants come into compliance with Remedial Orders 2, 5, 7, 10, 24, and 37 "[w]ithin 60 days").  As such, Defendants were bound by the requirements of Remedial Order 3 immediately when it went into effect.  Defendants have known since October of 2018 that in *Stukenberg I*, the Fifth Circuit affirmed the corresponding Remedial Order from the January 2018 Order.  *See* D.E. 601 at 57–58 ¶ 1; D.E. 559 at 39 ¶ D2.  Then, they did not appeal Remedial Order 3 in *Stukenberg II* and therefore were on notice of its requirements, which would come into effect upon the Fifth Circuit's Mandate.  *See* D.E. 627 at 3; *supra* Section III.A., note 5; *see also Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (quoting *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004)) ("[T]he [mandate] rule bars litigation of issues decided by the district court but foregone on appeal or otherwise waived.").  However, according to Defendants, they did not realize their efforts to implement Remedial Order 3 until six months to a year after the Remedial Order went into effect upon the Fifth Circuit's July 30, 2019 Mandate.  *See* D.E. 626–27.  The Court is not convinced that efforts made six months to a year after the Remedial Order went into effect (before which Defendants had known about the Remedial Order for many months) constitute "good faith" efforts to comply.

Further, Defendants do not allege that they were unable to comply.  *See LeGrand*, 43 F.3d at 170 (inability to comply is a defense to civil contempt); *see also Petroleos Mexicanos*, 826 F.2d at 401 (same).  Therefore, the Court is not satisfied that Defendants have demonstrated an inability to comply with Remedial Order 3 that excuses the fact that they have not, in fact, complied with

the Remedial Order.  Hence, Plaintiffs have established the three elements for civil contempt regarding Defendants' failure to receive and screen reports of alleged abuse and neglect of PMC children in a manner that is consistent with Remedial Order 3, and Defendants have failed to provide a credible defense against a finding of civil contempt for this aspect of the Remedial Order.

### ii.   Investigating Allegations: RCCI's Inappropriate Investigation Procedures and Dispositions

Even where RCCI did not screen out reports of abuse, neglect, or exploitation that it received from SWI and proceeded with an abuse/neglect investigation, the Monitors determined that numerous investigations reached improper dispositions or "were often so cursory, or so elongated and riddled with gaps, that the Monitors could not reach a conclusion regarding the result."  D.E. 869 at 16; *see also infra* Sections IV.F., IV.G. (discussing the State's violations of Remedial Orders 5, 7, and 10, which require prompt initiation of investigations, prompt face-to-face contact with alleged victims, and prompt completion of investigations).  The Monitors' Report reveals that the State's investigation practices have not been consistent with Remedial Order 3's requirement that "allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs."  *See* D.E. 606 at 2 ¶ 3.

As previously noted, *see supra* Sections IV.C.1.c.i., IV.C.2.b.ii., RCCI may reach one of four possible dispositions in an investigation: (1) "Reason to Believe" ("RTB"); (2) "Ruled Out" ("R/O"); (3) "Unable to Determine" ("UTD"); or (4) "Administrative Closure" ("ADM").  D.E. 869 at 60–61; *see also CCI Handbook* § 6623.  As also previously noted, *see supra* Section IV.C.2.b.ii., note 25, the definitions of these dispositions are the same as the those that were in place for RCCL (as a division of DFPS) at the time of trial.  *Compare* D.E. 368 at 201 (providing

the definitions of these dispositions at trial), *with CCI Handbook* § 6623 (providing the current definitions of these dispositions); *see also infra* Section IV.C.1.c.i.

Out of the 261 investigations that RCCI completed between August 1, 2019 and November 30, 2019, RCCI Ruled Out 243 (or 93%) of them.  D.E. 869 at 25, 87–88.  As for the remaining 18 investigations completed during that August-to-November period, RCCI found "Reason to Believe" the allegations in only nine cases (or 3% of the 261 completed investigations); RCCI administratively closed another eight cases (or approximately 3% of the 261 completed investigations); and RCCI was "Unable to Determine" whether abuse or neglect occurred in one case (less than 1% of the 261 completed investigations).  D.E. 869 at 25, 88.  To determine whether RCCI was "appropriately . . . investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports [were] . . . conducted taking into account at all times the child's safety needs" consistent with Remedial Order 3, *see* D.E. 606 at 2 ¶ 3, the Monitors analyzed a sample of 133 of the 261 investigations completed between August 1, 2019 and November 30, 2019,[79] D.E. 869 at 88.  Out of the sample of 133 completed investigations that the Monitors reviewed, RCCI had Ruled Out all allegations in 122 of them.  *Id.*  The Monitors conducted a qualitative review of those 122 investigations in which RCCI Ruled Out all allegations of abuse or neglect.  *Id.* at 87–88.

---

[79] The 261 total investigations completed between August and November of 2019 and the corresponding sample of 133 completed investigations consisted of the following:

> In the first report for the period August 1, 2019 through September 30, 2019, there were **110 investigations closed by RCCI**, of which **the Monitors reviewed a random sample of eighty-six** investigations using a **95% confidence level**. . . .   The second quarterly report showed that between October 1, 2019 and November 30, 2019, **151 investigations involving PMC children were closed by CCI**, of which **the Monitors reviewed a random sample of forty-seven investigations** using a **confidence level of 90%**.

D.E. 869 at 87 n.161 (emphasis added).

As Plaintiffs note in their Motion, the Monitors discovered that in eleven (or 9.1%) of the 122 Ruled Out allegations that the Monitors reviewed, RCCI reached inappropriate dispositions. *Id.* at 25, 88, 99; *see also* D.E. 901 at 6–7.  In another 24 cases (19.7% of the sample of 122), the Monitors determined that RCCI's investigations contained "such substantial deficiencies . . . that the Monitors were prevented from reaching a conclusion" regarding the ultimate disposition of the investigation.  D.E. 869 at 25, 88; *see also* D.E. 901 at 7.  In sum, as Plaintiffs note in their Motion, the Monitors determined that a total of 35 (or 28.7%) out of the 122 cases of RCCI's "Ruled Out" investigations either were inappropriately resolved or had substantial deficiencies.  D.E. 869 at 25, 88, 99; *see also* D.E. 901 at 7.

In their Report and the Appendix 3.2 thereto, the Monitors provide detailed accounts of investigations in which they disagreed with the dispositions of RCCI.  *See* D.E. 869 at 88–99; D.E. 869-4.  The Court provides herein just three examples of those investigations that the Monitors believe reached inappropriate dispositions.

The first example involved "a thirteen-year-old boy with a history of inappropriate sexually related behavior."  D.E. 869-4 at 3; D.E. 869 at 95.  This boy required a "Level of Care [that] was identified as 'Intense' in his Common Application due to high-risk behaviors."  D.E. 869-4 at 3; D.E. 869 at 95.  "[H]e had been discovered engaging in sexual activity with peers in the past . . . and he had been a victim of sexual abuse in the past."  D.E. 869-4 at 3; *see also* D.E. 869 at 95.  While at a GRO facility, this boy was placed in a room with an "eighteen-year-old male roommate, who has significant intellectual disabilities" and a "level of functioning that is 'minimal,' including delayed language skills and an age equivalency 'very indicative of a four year old.'"  D.E. 869-4 at 3; *see also* D.E. 869 at 95.  "[T]he older youth has aggressive, and at times violent, behavior that has resulted in injuries to himself and others."  D.E. 869-4 at 3; D.E. 869 at 95.

Under minimum standards for licensed facilities governed by HHSC-RCCL, it was improper for these two youths to be placed together as roommates. *See* D.E. 869-4 at 3; D.E. 869 at 95 (citing 26 Tex. Admin. Code § 748.1937). The relevant minimum standard for General Residential Operations provides that:

> An adult in care may share a bedroom with a child in care if:
> (1)    A professional level service provider determines there are no risks to either of them after assessing the following:
>         (A)    Their behaviors;
>         (B)    Their compatibility with each other;
>         (C)    Their respective relationships;
>         (D)    Any past history of sexual trauma or sexually inappropriate behavior; and
>         (E)    Appropriateness; and
> (2)    The assessment and approval by the professional level service provider is documented and dated in the child's record; and
> (3)    Their age difference is less than two years.

26 Tex. Admin. Code § 748.1937, *cited in* D.E. 869 at 95 n.174. Here, "there was a five-year age difference between the child and adult, well above the two-year difference permitted," D.E. 869-4 at 4; D.E. 869 at 95; the thirteen-year-old had a "history of sexual trauma or sexually inappropriate behavior," and the histories of both people demonstrate that they were not "appropriate[]" or "compatib[le]" roommates, *see* 26 Tex. Admin. Code § 748.1937; *see also* D.E. 869-4 at 4; D.E. 869 at 95.

One night at the GRO, a staff person conducting rounds "discovered and observed" "inappropriate sexual contact" between the two roommates. D.E. 869-4 at 3; D.E. 869 at 95. The staff person "observed the thirteen-year-old on top of the eighteen-year-old in a bed in their shared room." D.E. 869-4 at 3; D.E. 869 at 95. After a "House Supervisor" at the GRO reported this incident to SWI on April 25, RCCI's investigation was inappropriately prolonged and contained gaps in the information-gathering process. *See* D.E. 869-4 at 3–4; D.E. 869 at 95–96. The investigation was not completed timely, although there was no documentation of an approved

extension or explanation for the delay.  D.E. 869-4 at 3–4; D.E. 869 at 95–96 ("[T]he investigation took over four months to complete.  The intake was received on April 25, 2019 and the investigation was completed on August 23, 2019 and closed on August 30, 2019.").  Then, RCCI Ruled Out any finding of neglectful supervision.  *See* D.E. 869-4 at 4.

The Monitors disagree with RCCI's disposition of this case.  "The allegation of neglectful supervision should have been substantiated as there was sufficient evidence to support the allegations of neglectful supervision."  D.E. 869-4 at 4; *see also* D.E. 869 at 96.  In support of this conclusion, the Monitors cite a definition of "[n]eglect" under the provision of the Texas Administrative Code that was pertinent at the time of this allegation, which provides that:

> Neglect is an act or omission that is a breach of a duty by a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child.  The breach of duty includes . . . [a] **violation of any** law, rule, or **minimum standard** that causes substantial emotional harm or substantial physical injury to a child[.]

40 Tex. Admin. Code § 745.8559(8) (emphasis added), *cited in* D.E. 869-4 at 4; *see also* D.E. 869 at 96, 96 nn.175–76.  The Monitors point out that "a clear violation of minimum standards occurred when the administrators assigned the thirteen and eighteen-year-old youth as roommates, despite the five-year age difference," and so the "operation[] fail[ed] to adhere to regulatory minimum standards requirements . . . , including age requirements and an assessment of prescribed risk factors, thereby causing substantial emotional harm."  D.E. 869-4 at 4 (citing 40 Tex. Admin. Code § 745.8559(8)); *see also* D.E. 869 at 95–96.

A second example of an inappropriate outcome from an investigation conducted by RCCI involved allegations of an improper restraint by a staff person at a facility that resulted in the child suffering a sprained elbow.  D.E. 869 at 88; D.E. 869-4 at 2 (noting that the initial medical diagnosis was an elbow fracture).  The child's teacher and a staff person both reported the incident to SWI.  D.E. 869-4 at 2.  According to the child, "his arm was bent so far up his back that he

heard it pop."  D.E. 869-4 at 2; D.E. 869 at 88.  Although there were no corroborating witnesses who observed the restraint, a consultant doctor from the State's Forensics Child Abuse Team opined that "the fact that the child suffered a sprained elbow during a restraint indicated that the restraint involved 'a fair degree of force.'"  D.E. 869-4 at 2–3; *see also* D.E. 869 at 88–89. Nonetheless, RCCI Ruled Out the allegations because they found that "there was insufficient evidence to conclude 'intentional harm.'"  D.E. 869-4 at 3; *see also* D.E. 869 at 89.

The Monitors concluded that the allegation of physical abuse "should have been substantiated against the operation staff who conducted the restraint," D.E. 869-4 at 3, and cited the definition of "abuse" from the Texas Administrative Code provision that has been in place since before the time of the investigation, which does not require intent but instead provides for either "intentional, knowing, **or reckless** act[s]," 40 Tex. Admin. Code § 745.8557(1) (emphasis added).[80]  The Monitors concluded that the allegations should have been substantiated because "[t]here [was] substantial evidence to render a Reason to Believe disposition, including the doctor from the Forensic Child Abuse Team finding a 'fair degree of force' was used to cause the injury" of a sprained elbow.  D.E. 869-4 at 3.  Furthermore, the Monitors noted that the investigation was problematic in other ways.  The duration of the investigation "exceeded thirty days without explanation or approved extension" and overall, "took four months to complete."  *Id.* (noting that

---

[80]        Abuse is any intentional, knowing, or reckless act or omission by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to, or the death of, a child that the operation serves.  Intentional, knowing, or reckless acts and omissions include:
            (1)  Any act such as striking, shoving, or hitting a child, whether intended as discipline or not.

40 Tex. Admin. Code § 745.8557(1); *see also* Tex. Fam. Code § 261.001(C) ("'Abuse' includes the following acts or omissions by a person . . . physical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including injury that is at variance with the history or explanation given . . ."); 40 Tex. Admin. Code § 707.789(a)(1) (applying to CCI and defining "[p]hysical abuse" to include "[p]hysical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including injury that is at variance with the history or explanation given and excluding an accident" and defining "[p]hysical injury that results in substantial harm to the child" to mean "any bodily harm, including but not limited to . . . sprains; dislocated, fractured, or broken bones").

"[t]he intake was received on May 13, 2019 and the investigation was completed on September 10, 2019" and "closed on September 25, 2019").

Although "[t]he staff person who conducted the restraint was forbidden from restraining residents while the investigation was open, put on administrative leave and then terminated at the conclusion of the investigation," that staff person "remains employed at other facilities in the area." *Id.*; D.E. 869 at 89. "The Monitors identified ten separate allegations of physical abuse against [that staff member] at different facilities in Texas between March 2015 and February 2020. Six of these incidents allegedly occurred after May 13, 2019, the date of the restraint allegation" described herein. D.E. 869 at 89, 91, 89 n.165 (documenting the numerous allegations against this staff person); *see also* D.E. 901 at 7 (citing D.E. 869 at 89–91) ("This employee was seen punching and kicking children, putting hands around children's throats, and restraining a child to let other children punch and kick the child."). "Five of the six allegations [of] physical abuse by [the staff person] were Ruled Out, and one was pending as of April 30, 2020." D.E. 869 at 91.

> There is no evidence in any of the 2019 and 2020 investigations that RCCI was aware of, or took into account, all of the separate allegations against [the staff member] at different facilities between March 2015 and February 2020, though the investigation stemming from the February 2020 referral appears to include reference to six of the previous ten allegations.

*Id.* The facts surrounding this case demonstrate the State's failure to take into consideration a history of abuse by the same perpetrator in its investigation, which allowed the individual to continue abusing children in the same manner at various facilities throughout the State.

A third example of an investigation that reached an inappropriate disposition involved alleged abuse by a child's foster mother. D.E. 869-4 at 2; *see also* D.E. 901 at 7–8. A "staff person at the camp the alleged victim attended" reported that, because the child was "misbehaving and [was] suspended from camp for misbehaving," the foster mother "hit the child, pushed him onto the ground, and the child had a swollen lip and dried blood near his gums as a result of the

incident."  D.E. 869-4 at 2; *see also* D.E. 901 at 7–8.  Interviews with the alleged victim and the alleged victim's younger sibling seemed to confirm the allegations, but the "foster mother denied all allegations."  D.E. 869-4 at 2.  The foster mother "spoke negatively about the alleged victim to the DFPS caseworkers, describing him as the worst child she has ever served, and she sold the alleged victim's clothing after he left the home."  D.E. 869-4 at 2; *see also* D.E. 901 at 7–8.  During the course of the investigation, "RCCI never contacted the child victim's therapist about the allegations."  D.E. 869-4 at 2.  RCCI Ruled Out a finding of abuse regarding these allegations. *See id.*  However, the Monitors determined that "there was sufficient evidence to support the allegations due to the hitting and pushing of the child victim by the foster mother, which resulted in injuries sustained by the child."  *Id.*  In addition, "[t]he child victim confirmed the pushing and hitting in the interview, and the victim's younger sibling provided corroboration."  *Id.*  Therefore, the Monitors concluded that the allegations "should have been substantiated" with an RTB finding that physical abuse occurred, as defined under 40 Tex. Admin. Code § 745.8557(1).[81]  *Id.*

In two out of these three examples of RCCI's inappropriate investigation dispositions, the Monitors not only disagreed with the ultimate disposition of the investigation but also noted problems with the investigations themselves, including unexcused delays and other problems in the information-gathering process.  In numerous other cases, such problems with the investigations

---

[81] "Abuse is any intentional, knowing, or reckless act or omission by someone working under the auspices of an operation that causes or may cause emotional harm or physical injury to . . . a child that the operation serves. Intentional, knowing, or reckless acts and omissions include: . . . [a]ny act such as striking, shoving, shaking or hitting a child, whether intended as discipline or not."  40 Tex. Admin. Code § 745.8557(1); *see also* Tex. Fam. Code § 261.001(C) ("'Abuse' includes the following acts or omissions by a person . . . physical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including injury that is at variance with the history or explanation given . . ."); 40 Tex. Admin. Code § 707.789(a)(1) (applying to CCI and defining "[p]hysical abuse" to include "[p]hysical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including injury that is at variance with the history or explanation given and excluding an accident" and defining "[p]hysical injury that results in substantial harm to the child" to mean "any bodily harm, including but not limited to . . . scratches; scrapes; cuts, welts, red marks; skin bruising; lacerations").

were so egregious that the Monitors were not able to determine, based on the information gathered, whether RCCI reached the appropriate disposition.  *See* D.E. 869 at 88 ("To appropriately reach a final disposition in these investigations, additional information would have been required to determine whether children were abused or neglected.").

In one example of a case in which RCCI reviewed and gathered insufficient information, "the alleged victim's parent reported physical discipline" and "demeaning remarks by a caregiver." D.E. 869-4 at 16.  "The alleged victim reported a female staff member hit him and later the alleged perpetrator staff member resigned.  There were prior concerns of physical abuse alleged against different staff members at the facility."  *Id.*  "Based on interviews, the alleged victim had no injuries"; however, "[t]here were inconsistent allegations from the alleged victim involving different staff at different times."  *Id.*

The Monitors point out several lapses in the information-gathering process for this investigation.  First, "[t]he investigator did not interview the alleged perpetrator," and instead relied on the documentation of the interview conducted by the police.  *Id.*  In addition, "RCCI closed the investigation before viewing the video footage of the alleged incident."  *Id.*  The Monitors note that "[i]t is unknown why the RCCI investigator did not view the video footage from the day in question or other days involving the alleged perpetrator staff member(s); or why the investigator did not view the video footage from the day the alleged perpetrator staff member, who allegedly hit the victim, resigned."  *Id.*  As a result of these lapses in information-gathering, "[t]he Monitors cannot determine the disposition due to a deficient investigation."  *Id.* at 15.

In addition to poor information-gathering practices, according to the Monitors, "[m]any of these RCCI child abuse or neglect investigations were deficient because of long gaps in investigative activity and substantial delays in completion.  This remains a serious problem at

DFPS." D.E. 869 at 88. The Monitors discuss the many investigations that are part of a significant "backlog"[82] of investigations that has accumulated at RCCI. *See id.* at 196–97. DFPS informed the Monitors that this backlog consists of "554 cases that were over 45 days on February 29th," and "as of April 5th, the number was 501." *Id.* at 196. As discussed below, *see infra* Section IV.G., Remedial Order 10 requires Defendants to, "[w]ithin 60 days" of the Fifth Circuit's July 30, 2019 Mandate, "complete Priority One and Priority Two child abuse and neglect investigations . . . within 30 days of intake," D.E. 606 at 3 ¶ 10; hence, all of the backlogged cases that were not resolved within 60 days of the Fifth Circuit's July 30, 2019 Mandate, without an approved, good cause, documented exception, represent Defendants' failure to comply with Remedial Order 10, as well as their failure to comply with Remedial Order 3's requirement to "complete[]" investigations "on time consistent with the Court's Order," such that they are "conducted taking into account at all times the child's safety needs," *see* D.E. 606 at 2 ¶ 3.

The Monitors detail numerous examples of significantly delayed and deficient investigations. One, for example, involved an intake that SWI received on April 16, 2018. D.E. 869-4 at 12. Although "[o]ne extension was approved on May 15, 2018, . . . no further investigative activity occurred . . . until February 19, 2019"—nine months later. D.E. 869-4 at 12. "[As] a result, the integrity of the investigation was compromised." *Id.* Further, the investigation

---

[82] In interviews with the Monitors regarding Remedial Orders that are not at issue in Plaintiffs' Show Cause Motion (Remedial Orders B2 through B4), which pertain to investigators' caseloads, "[a]ll RCCI supervisors interviewed" told the monitoring team that:

> [They] carried a caseload in addition to supervising investigations. . . . The interviewed supervisors indicated that the majority of the cases on their caseload report were cases that were part of a backlog project. They described the backlog project to the monitoring team as an effort in which cases older than forty-five days were prioritized for completion and closure. Over the course of these interviews, RCCI supervisors shared that this form of addressing backlogged cases had been an informal practice since 2018. . . . DFPS explained that the backlog project started in November 2019 to address the high numbers of delinquent cases, and that it was originally anticipated to last until April . . . .

D.E. 869 at 196.

was not closed until October 21, 2019—a year and a half after the SWI intake, eight months after the investigative activity began, and well past the 60-day deadline following the Fifth Circuit's Mandate for Defendants to comply with Remedial Order 10 and, thereby, Remedial Order 3.  *See id.*  These delays were inappropriate and problematic in determining the appropriate disposition for the investigation.

In this case,  two intake reports to SWI included allegations "that a facility staff member did not provide adequate supervision and as a result, child-on-child sexual aggression occurred among four youth; additionally, two staff persons allegedly coached the alleged victims not to make outcries of abuse."  *Id.* at 11.  According to the first SWI report, "[t]he first alleged victim stated another child attempted to rape him, that he told staff, and staff did nothing after being notified."  *Id.*  However, when the first alleged victim was interviewed later, he made different statements.  In the forensic interview, "the first alleged victim" did not state that another child attempted to rape him and instead "stated another child tried to touch him" and "denied any other incidents of inappropriate touching."  *Id.*  In that interview, the "first alleged victim" also "reported a staff person asked him not to tell and took him to Sonic."  *Id.*

As for the "second alleged victim," according to the SWI report, he "stated he was raped by two other youth."  *Id.*  Similarly, the information from this second alleged victim's forensic interview was not the same as the information in the SWI report.  During the interview, "[t]he second alleged victim denied any sexual contact and made false statements . . . (for example, he stated that he had a child but he did not)."  *Id.*  The "interviews with some of the alleged victims were delayed by almost one year after SWI received the intake."  *Id.* at 12.

According to the Monitors' Report, "[o]ne of the alleged aggressor[s]" involved in this investigation had a "plan of service [that] noted he had poor boundaries and was at risk of acting

out sexually." *Id.* at 11.  In addition, "[a]nother alleged aggressor had two juvenile referrals for indecency with child-sexual contact and a history of sexually related behaviors, but his treatment plan did not indicate high-risk behavior." *Id.*  However, by the time RCCI attempted to interview the alleged aggressors, one of the alleged aggressors had "turned eighteen-years-old, was no longer in care and refused to be interviewed." *Id.* at 11–12.  The other alleged aggressor "denied the allegations." *Id.* at 11.  Had RCCI conducted interviews in a more timely manner, it is possible that gaps in the information obtained and discrepancies between the SWI reports and other interviews could have been mitigated or resolved.

Both staff people accused of inadequate supervision and of coaching youth not to make outcries of abuse were interviewed and "denied that they witnessed residents engaging in sexualized behaviors and denied coaching the residents against making abuse outcries." *Id.*  In addition, "[a]dministrative staff at the facility denied any issues with the alleged staff perpetrators. The operation administrators minimized incidents, which were reported and attributed by them to 'boy play.'" *Id.*  However, RCCI also interviewed "[a] former staff member" of the facility, who "disclosed that one of the administrative staff changed incident reports to minimize concerns of residents acting out sexually" and that "residents were taken on outings to encourage them not to disclose information during investigations." *Id.* at 11–12.

RCCI also interviewed "[t]hree collateral residents," two of whom "stated they witnessed other residents being sexually inappropriate with each other." *Id.* at 11.  Furthermore, "[a] law enforcement officer expressed concern because he received many reports of sexual assaults at the facility." *Id.* at 12.  Indeed, in the two years leading up to the SWI report in this case, "there were five neglectful supervision allegations reported at the same facility; one of the allegations was neglectful supervision by the same staff identified in this report and related to child-on-child sexual

activity, which was Ruled Out." *Id.* According to the Monitors' Report, "[b]ecause of the delay between the initiation of the investigation, follow-up, and completion of the investigation, it is difficult to determine if other collateral sources could have been identified." *Id.*

In general, "[m]any of the parties eventually interviewed did not have recall of the details of the events and the investigator could not reconcile the conflicting information that was eventually obtained." *Id.* As a result, these serious allegations of neglectful supervision leading to child-on-child sexual abuse, combined with attempts to cover up the incidents by encouraging youth not to report them, remained unresolved by RCCI. Due to the deficiencies in this investigation, the Monitors also could not determine what the disposition should have been. *Id.* at 11.

Another example of an unacceptably delayed and deficient investigation is the one that followed the tragic and premature death of K.C. at Prairie Harbor, discussed above. *See supra* Section IV.D.1. K.C. died on February 9, 2020, but the investigation into her death was not completed by the Show Cause Hearing on September 3, 2020, almost seven months later. *See* D.E. 869 at 13; D.E. 990 at 119:7–11. The investigation was extended twice, with the second extension until May 25, 2020 (i.e., 30 days from the approval on April 25, 2020) for the review of medical information. *See* D.E. 990 at 118:24–119:6. There is no evidence that other extensions were requested or approved, and so the investigation should have been completed by the end of May 2020. *See* D.E. 990 at 119:7–11. However, the Monitors' Report notes that "[t]he investigation remained pending as of May 22, 2020," D.E. 869 at 350, and it still had not been closed as of the Show Cause Hearing on September 3, 2020 (i.e., three months later), *see* D.E. 990 at 120:20–21 (Batiste testifying that "the investigation has not been approved yet").

RCCI failed to interview key people involved in K.C.'s care. "[M]ost of the direct caregivers who signed K.C.'s progress notes still [had] not been interviewed" by September 2, 2020, including five "[o]f the nine awake-night staff who signed K.C.'s night-time progress reports" and five of the eight day-shift caregivers who signed K.C.'s day-time progress reports between December 21, 2019 (the date of the first documented instance of leg pain) and the day she died. *See* D.E. 956 at 15–16. In addition, by the time of the Show Cause Hearing, no investigator had interviewed K.C.'s psychiatrist or primary care physician. *See* D.E. 956 at 16–17; D.E. 990 at 126:18–23. The failure to interview these caregivers and medical professionals, even nearly seven months after K.C.'s death, could result in an incomplete investigation, or one with an arbitrary finding. The failure to interview the medical professionals is particularly egregious and utterly unacceptable because these professionals noted that K.C. had hypertension and diabetes, both of which are contributing factors to deep-vein thrombosis, the cause of K.C.'s death. *See* D.E. 956 at 16–17.

Even the few interviews that RCCI conducted were lacking and incomplete. In the interview with the awake-night staff person who filled out the first report of K.C.'s complaint of leg pain, the RCCI investigator did not ask the staff person about the nightly progress report, whether she had filled out an illness or injury report, or whether she had reported K.C.'s pain to the nursing staff. *See id.* at 2–3, 18. Asking this staff person how she reported or documented K.C.'s complaints is an essential step that RCCI missed in ensuring that it collects all relevant information from all relevant staff about K.C.'s care and her reports of pain leading up to her death.

The Monitors also noted that Prairie Harbor administrators are not included in the investigation as alleged perpetrators despite repeated minimum standards violations and systemic failures related to proper documentation, required medical records, medical care, appropriate

supervision, and appropriate staff-to-youth ratios. *See id.* at 18–20, 23–25. In fact, Prairie Harbor has been cited more than 60 times for repeatedly violating minimum standards, with the rates of minimum standards violations and RTBs being so high that the RTC was placed in the State's top tier of operations subject to heightened monitoring. *See id.* at 18; *see also* D.E. 869 at 342. Prairie Harbor also appears to have an issue with emergency protocols and reporting serious incidents, which may have been a contributing factor in K.C.'s death. *See* D.E. 956 at 25–27. As previously discussed, staff at Prairie Harbor reported inconsistent and conflicting emergency protocols, with some staff stating that they are to call 911 immediately and some staff saying that they are to call a supervisor first. *See id.* at 25–26. Based on interviews with staff, the Monitors noted "a sense that direct caregivers lack the authority to make reports related to child safety," and "a sense of disempowerment in their attempts" to get children help for medical emergencies. *See id.* at 26. These issues suggest "a culture in which staff are not empowered to report serious medical or safety issues in a timely manner," for which the administrators and operators are ultimately responsible since the issues persist beyond individual staff. *See id.* Therefore, the fact that Prairie Harbor administrators were not included as alleged perpetrators in the investigation surrounding K.C.'s death, despite this history and pattern of violations and failures is further indication that the investigation was deficient.

Overall, nearly 30% of the investigations that the Monitors reviewed either were inappropriately resolved by RCCI or had such substantial deficiencies that the Monitors could not determine if they were appropriately resolved by RCCI. *See* D.E. 869 at 88, 99–100; D.E. 901 at 7. The substantial rate at which the State's investigations are inappropriately resolved or deficiently conducted demonstrates that the State has failed to "ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and

completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs," as required by Remedial Order 3.  *See* D.E. 606 at 2 ¶ 3.  This failure to properly investigate by Defendants is inconsistent with Remedial Order 3.  Therefore, the third element of civil contempt—that Defendants have not complied with the effective court order—is satisfied as to the aspect of the Remedial Order that requires proper and prompt investigations of abuse and neglect allegations.  *See LeGrand*, 43 F.3d at 170.

Once the three-part requirements for civil contempt have been met, the respondent may defend against a finding of civil contempt by rebutting the conclusion that the three-part showing was met.  *See id.*  Defendants make a blanket objection to the section of the Monitors' Report that discusses Defendants' investigation processes for purposes of Remedial Order 3, saying that:

> Defendants object to Section III(A) of the Report, related to Remedial Order No. 3, as vague, misleading, and failing to comply with the requirements of the 2018 Order.  Specifically, the Report criticizes how Defendants conducted investigations and reached dispositions without providing support for the stated conclusions or other information Defendants could utilize in improving their investigations.  This is just one way that Defendants have been excluded from the investigative and drafting process such that they have been deprived of the opportunity to specifically address conclusions stated in the Report.

D.E. 911 ¶ 14.  Defendants' assertion that this section of the Monitors' Report is "vague, misleading," and "reached dispositions without providing support for the stated conclusions or other information Defendants could utilize in improving their investigations" is entirely undermined by the detailed discussions, exemplified above, of the downgraded intake reports that the Monitors analyzed in their Appendix 3.1; by the improper dispositions and deficiencies in RCCI investigations that the Monitors analyzed in their Appendix 3.2;and by the ample data and explanation that the Monitors provided in the main body of the Report regarding these same issues.  Further, witnesses for the Defendants admitted at the Hearing that they do not dispute the factual basis of the Monitors' Report.  *See* D.E. 990 at 6:5–19 (Defendants' counsel), 27:24–29:15

(Batiste), 116:4–6 (same); *see also* D.E. 990 at 250:16–19 (Court commenting on the lack of a factual dispute), 251:19–22 (same); D.E. 991 at 12:15–13:10 (Stephen Black affirming that he does not have "contrary statistics"), 137:6–11 (Commissioner Masters affirming that she does not have "contrary statistical evidence").  In addition, Defendants provide no basis for their statement that this section of the Monitors' Report "fail[s] to comply with the requirements of the 2018 Order."  Finally, Defendants' complaint that they "have been excluded from the investigative and drafting process such that they have been deprived of the opportunity to specifically address conclusions stated in the Report" is simply untrue.  Defendants have been in contact with the Monitors for months and were provided an opportunity to review and comment on a draft of the Monitors' Report.  This objection is OVERRULED.

A respondent may also defend against a finding of civil contempt by demonstrating good faith efforts to comply with the order that was in effect.  *See LeGrand*, 43 F.3d at 170 (good faith attempts to comply is a defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same). In their Response to Plaintiffs' Motion, Defendants argue that they have "undertaken reasonable efforts in a good faith effort to comply with Remedial Order No. 3" and so "should not be held in contempt."  D.E. 911 at 13.  In particular, Defendants contend that they have "continue[d] reinforcing the policies and procedures in place related to abuse and neglect investigations."  *See* D.E. 911 at 10.  For example, they claim that at the time of their Response (dated July 24, 2020) "training materials . . . **will be rolled out in the coming months**," such as "[a] breach of duty webinar that **will roll out in August 2020**" and "advanced abuse and neglect virtual training for all [RCCI] staff **rolling out in September 2020**."  *Id.* at 10–11 (emphasis added).  In addition, Defendants note that "RCCI **is developing** an overall quality improvement process"; that it "**is currently working** to develop the RCCI model that promotes safety decision-making"; and that

the first quarterly report detailing case reads done by the Quality Assurance Unit **will be available in August of 2020**. *Id.* at 11 (emphasis added).  Defendants argue that these "reasonable and good faith efforts" should insulate them from a contempt finding, even though their own accounts of these efforts reveal that they did not implement them by the time of their Response to Plaintiffs' Motion, which they filed nearly a year after the Remedial Order went into effect.  *Id.* (dated July 24, 2020).

As discussed above, *see supra* Section III.A., after the Fifth Circuit validated the corresponding Remedial Order from the Court's January 2018 Order in *Stukenberg I*, Defendants did not appeal Remedial Order 3 from the Court's November 2018 Order in *Stukenberg II*.  *See* D.E. 559 at 39 ¶ D2 (January 2018 Order); D.E. 601 at 57–58 ¶ 1 (*Stukenberg I*); D.E. 606 at 2 ¶ 3 (November 2018 Order); D.E. 627 at 3 (*Stukenberg II*); *see also supra* note 5 (explaining the issues that Defendants raised on appeal in *Stukenberg II*).  Defendants have known that they would be bound by the terms of Remedial Order 3, as stated in the November 2018 Order, immediately upon the Fifth Circuit's Mandate.  Furthermore, Remedial Order 3 does not provide for a later deadline for Defendants to comply, as some of the other Remedial Orders do, and so Defendants were bound by its requirements immediately upon the Fifth Circuit's Mandate.  *Compare* D.E. 606 at 2 ¶ 3, *with id.* at 2–7 ¶¶ 2, 5, 7, 10, 24, 37 (requiring that Defendants come into compliance with Remedial Orders 2, 5, 7, 10, 24, and 37 "[w]ithin 60 days").  Therefore, Defendants' allegations that, nearly a year after the Mandate, they **will make** efforts to implement it do not demonstrate good faith efforts to timely comply with Remedial Order 3.

Defendants also argue that they "ha[ve] . . . taken steps to ensure that investigations are promptly completed."  D.E. 911 at 12.  In particular, they allege that they made the following improvements:

- "[A]s of **June 2020**, the number of case-carrying staff . . . increased by 51% since September 2017." *Id.* (emphasis added).

- "[B]etween December 2019 and **April 2020**, DFPS reduced RCCI caseworkers from an average investigation load of 19.9 to just 9.7." *Id.* (emphasis added).

- "DFPS has significantly reduced the backlog of investigations from 765 in January 2020 to 265 in **June 2020**, a 65% reduction." *Id.* (emphasis added).

- "DFPS will continue strengthening its caseload management practices through the Caseload Management Initiative, which was launched on **June 1, 2020**." *Id.* (emphasis added).

Because Defendants' data purporting to demonstrate that they made improvements by June 2020 were not able to be verified by the Monitors in their June 2020 Report, the Court affords this information less weight than verified information from the Monitors' Report.  In addition, these alleged improvements took place many months after Remedial Order 3 went into effect, despite the fact that Defendants knew about the Remedial Order's requirements well before it went into effect.

Similarly, Defendants allege that they made "reasonable and good faith efforts to comply with Remedial Order No. 3" "[b]y creating new functionality in IMPACT." *Id.*  They allege that, as a result, "DFPS is better positioned to collect data and report on the timeliness of abuse and neglect investigations." *Id.*  As discussed herein, Defendants did not implement this new IMPACT functionality, which is discussed several times throughout the Monitors' Report, *see, e.g.*, D.E. 869 at 53 n.49, 54–55, 104 n.189, 117, 135, until December of 2019, nearly five months after Remedial Order 3 went into effect, *see* D.E. 869 at 54.  Defendants do not allege that they were unable to make these efforts in a time frame that would allow them to comply with Remedial Order 3 in a timely manner.  *See LeGrand*, 43 F.3d at 170 (inability to comply is a defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same).  Therefore, Defendants have not sufficiently demonstrated an inability to comply that excuses their failure to timely comply or

make good faith efforts to comply with the aspect of Remedial Order 3 requiring prompt and appropriate investigations that "tak[e] into account at all times the child's safety needs."

### iii. Inconsistent Record Keeping and Failure to Communicate and Coordinate Across the Agencies' Divisions

In addition to the problems with RCCI's specific screening and investigation processes discussed above that have failed to "tak[e] into account at all times the child's safety needs," the Monitors' Report and testimony from the Show Cause Hearing reveal that deficient communication and coordination between DFPS's RCCI division and HHSC's RCCL division further perpetuate Defendants' failure to "ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm." D.E. 606 at 2.

Testimony at the Show Cause Hearing revealed that it was not until September 1, 2020—more than a year after the Fifth Circuit's Mandate and merely two days before the Show Cause Hearing—that Defendants put in place a process for DFPS to notify HHSC-RCCL consistently of the dispositions of abuse and neglect investigations so that HHSC-RCCL might take enforcement action regarding the license of a facility where abuse or neglect occurred. Batiste testified that:

> [A]s of September 1st, 2020, CCI has implemented a process in which notification is provided to child care operations within five days of investigation and closure of dispositions related to abuse/neglect investigation. These notifications include the allegations that were investigated, the alleged or designated perpetrator, the disposition of each one of those allegations, the date the investigation was closed, and the investigator who was assigned to the case.

D.E. 990 at 24:1–9. Even if this system started to effectively and consistently inform HHSC-RCCL of the disposition of abuse and neglect investigations at licensed placements as of September 1, 2020, which the Monitors could not have validated in their June 2020 Report or prior to the September 3, 2020 Show Cause Hearing, Batiste testified that DFPS also has no statistics about the rate at which HHSC-RCCL decides not to find a deficiency, issue a citation, or take any

other enforcement action following a finding by DFPS that child abuse or neglect has occurred at a facility.  *See id.* at 19:17–24 ("THE COURT:  If you make a finding in DFPS of abuse and neglect in a facility and that is forwarded to [HHSC-RCCL] and they make no citation of any kind, surely you have statistics on that? . . . [MS. Batiste]:  No.").

In addition, as discussed herein, HHSC-RCCL has also failed to consistently review the extended compliance history of licensed placements during inspections, as required by Remedial Order 22, and to consistently report its decisions regarding enforcement actions against licensed placements to DFPS.  *See infra* Section IV.I.3.a.iii. (discussing HHSC-RCCL's failure to communicate its licensing and enforcement decisions with DFPS).  As a result, DFPS does not remain informed about the extent to which HHSC-RCCL finds minimum standards violations in the operations where it chooses to place its PMC children.  Furthermore, as also discussed herein, DFPS has failed to adequately consider the histories of allegations, investigations, and findings of abuse and neglect at foster homes, as required by Remedial Order 37.  *See infra* Section IV.J.3 (discussing Defendants' failure to comply with Remedial Order 37).  Finally, the bifurcated data systems that cause HHSC-RCCL to be unable to provide to the Monitors comprehensive information regarding intakes involving the PMC class, as discussed above, *supra* Sections IV.C.2.d., IV.E.3.a.ii., is further evidence of the disconnect between DFPS and HHSC.

These combined failures have yielded a system in which DFPS's investigations of child abuse and neglect have not consistently taken into account the child's safety needs and in which DFPS's subsequent failure to review its own past abuse/neglect investigations at foster homes means that it continues to place children in problematic placements.  In turn, DFPS's investigations should, but do not always, inform HHSC-RCCL's decision of whether to allow operations to retain their licenses to operate.  Children are left to languish and fend for themselves in placements with

histories of abuse and neglect, yielding little trust in the system that is supposed to protect them. These are not circumstances under which "allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and **conducted taking into account at all times the child's safety needs**."  D.E. 606 at 2 ¶ 3 (emphasis added).

The information provided by the Monitors' Report and the testimony at the Show Cause Hearing establish by "clear and convincing evidence," *see Salazar*, 713 F.3d at 792, that Defendants have "failed to comply with the court's" Remedial Order 3, *see Le Grand*, 43 F.3d at 170, and continue to expose PMC children to an unreasonable risk of serious harm.  The third element of civil contempt is satisfied.  Moreover, Defendants have failed to establish that they have substantially complied, made good faith efforts to comply, or were unable to comply with the Court's Remedial Order.  *See LeGrand*, 43 F.3d at 170; *Petroleos Mexicanos*, 826 F.2d at 401. The Court therefore holds that Defendants are in contempt of Remedial Order 3.

### F.	Remedial Orders 5 and 7: Prompt Initiation of, and Face-to-Face Contact with the Alleged Child Victim(s) in, Priority One Investigations

Remedial Order 5 provides that:

> Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake.  (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)

D.E. 606 at 3 ¶ 5.

Remedial Order 7 provides that:

> Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.

D.E. 606 at 3 ¶ 7.

### 1.     The Court's Findings at Trial Related to Remedial Orders 5 and 7

In its 2015 Opinion and Verdict, the Court described M.D.'s fraught experience in the foster care system, which is emblematic of numerous problems with the system, including the fact that delayed investigations prevent investigators from obtaining crucial information, thereby resulting in inconclusive dispositions in investigations of children's outcries of abuse and neglect. In particular, as previously discussed, *see supra* Section IV.E.1., one outcry by M.D. that she was raped by a facility staff person was so badly investigated, with such significant delays in the crucial initial steps of the investigative process, that the investigator could only reach a disposition of "Unable to Determine." D.E. 368 at 61–62. As noted previously, the Court found at trial that the experiences of M.D. and other Named Plaintiffs were typical of the experiences of foster children in the PMC class. D.E. 368 at 43, 56, 73, 79, 90, 97, 105, 128, 132, 140, 152; *see also* D.E. 326 at 132:22–133:5, 193:22–194:2, 194:12–15 (trial testimony of Dr. Carter that the experiences of the Plaintiffs are typical of PMC foster children); *supra* Section IV.E.1.

Similarly, the Court found at trial that RCCL investigators were not consistently meeting face-to-face with alleged child victims when commencing investigations regarding their outcries of abuse and neglect. For example, when S.A. made a sexual abuse outcry "reporting anal penetration by an older male foster child," the Court found "no evidence in S.A.'s 33,000 pages of case files that she was interviewed regarding these allegations." D.E. 368 at 80; *see also supra* Section IV.E.1.; *infra* Sections IV.I.1.a., IV.I.1.b., IV.K.1. For another example, Plaintiff J.S. made a sexual abuse outcry regarding his older foster brother, R.R., who had shared a room with him. D.E. 368 at 100–01. The investigator "reviewed R.R.'s case files" and "confirmed that R.R. had a sexual abuse history, had acted out sexually in the past, and had only one week earlier exposed himself to one of the other foster children." *Id.* at 101 (citing DX 120 at

DFPS009062029). However, R.R. continued to share a room with J.S., and "the investigator never interviewed R.R., a decision his supervisor approved." *Id.* at 102 (citing DX 120 at DFPS009062031–33). As the Court noted at trial, in situations of child-on-child sexual abuse, "both children are victims." *Id.* at 207 ("Even the one we would typically call the perpetrator is him – or herself a victim."), *see also infra* Section IV.K.1. Therefore, face-to-face contact with R.R., as well as J.S., would have been important in this investigation. However, after failing to interview R.R., the investigator then "Ruled Out" a finding of neglectful supervision by the foster parents, cited no minimum standards violation, and recommended only "[r]outine monitoring." D.E. 368 at 102 (citing DX 120 at DFPS 009062035).

Even in investigations in which investigators made contact with the alleged victims of abuse or neglect, RCCL investigators were not consistently documenting this contact so that those reviewing the investigation information could understand the steps that were taken. For example, in September 2004, DFPS learned of "allegations of inappropriate sexual conduct" "that included digital penetration" between Plaintiff K.E., who was nine years old, and a fourteen-year-old female "resident of the RTC." *Id.* at 137 (citing 1 RFP 7 RCCL 02151–58). The Court found that the RCCL investigator "ma[de] 'contact with' K.E., the other child, and multiple RTC staff members, but the 'contact' is not described or summarized in the report." *Id.* (citing 1 RFP 7 RCCL 02158). The investigator Ruled Out a finding of neglectful supervision. *Id.* (quoting 1 RFP 7 RCCL 02158).

Thus, the Court found at trial that delays in the initiation of investigations, accompanied by delays or failures to make and document face-to-face contact with alleged child victims, caused problems in the accuracy and comprehensiveness of the investigations. Similarly, the Fifth Circuit noted in *Stukenberg I* that "investigators . . . were failing to interview all of the necessary parties,

ask pertinent questions, gather all evidence and key information, and address risks." D.E. 601 at 40. "In other words," the Fifth Circuit stated, "the main issue with the investigations was not merely that there was competing evidence or that reports were uncorroborated. Rather, the information gathering process was fundamentally flawed." *Id.* at 40–41; *see also id.* at 40 n.38 ("[T]he primary cause of deficient investigations seems to be a substantial breakdown of the investigatory process at the procedural level.").

## 2.    The Procedural History of Remedial Orders 5 and 7

In order to address the delays in Defendants' investigation processes, the Court's 2015 Opinion and Verdict ordered the Special Masters to propose remedies that would address each of the issues found at trial. *See* D.E. 368 at 245–48, 251–52. In January of 2018, the Court adopted the Special Masters' proposed remedies for the problems of delays in initiation of investigations and face-to-face contact with alleged victims. D.E. 559 at 42–43 ¶¶ D10, D12; *see also* D.E. 546 at 14–15 ¶¶ 10, 12. The Fifth Circuit validated these Remedial Orders in *Stukenberg I*, D.E. 601 at 57–58 ¶¶ 3, 5, and this Court restated the orders in its November 2018 Order as Remedial Orders 5 and 7, which were substantially similar to the Remedial Orders in the January 2018 Order,[83] *see* D.E. 606 at 3 ¶¶ 5, 7. Defendants did not appeal these Remedial Orders following the November 2018 Order, and so the Fifth Circuit did not disturb Remedial Orders 5 or 7 in *Stukenberg II*. *See supra* note 5; D.E. 627 at 3. These Remedial Orders became effective upon the Fifth Circuit's July 30, 2019 Mandate. *See* D.E. 627 at 3. Therefore, the first element of civil contempt is established

---

[83] Remedial Orders 5 repeats the language of the corresponding Remedial Order from the January 2018 Order but with a different specified timeframe for compliance. *Compare* D.E. 559 at 42 ¶ D10 ("Effective March 2018 . . . ."), *with* D.E. 606 at 3 ¶ 5 ("Within 60 days . . . ."). In the same way, Remedial Order 7 repeats the language of the corresponding Remedial Order from the January 2018 Order, with the exception of the language describing the compliance timeframe. *Compare* D.E. 559 at 43 ¶ D12 ("Effective March 2018 . . . ."), *with* D.E. 606 at 3 ¶ 7 ("Within 60 days . . . .").

as to Remedial Orders 5 and 7: "a court order was in effect," *LeGrand*, 43 F.3d at 170, which Defendants do not dispute, *see* D.E. 990 at 7:4–12.

### 3.   Defendants Have Failed To Comply with Remedial Orders 5 and 7.

It is both DFPS policy and this Court's requirement under Remedial Order 5 that Priority One investigations must be commenced within twenty-four hours of intake by SWI.  D.E. 869 at 60; D.E. 606 at 3 ¶ 5.  In addition, Priority One abuse and neglect investigations require "face-to-face contact with" alleged victims within 24 hours of intake, as mandated by Remedial Order 7. D.E. 869 at 60; D.E. 606 at 3 ¶ 7.  These Remedial Orders "require[] certain conduct" by Defendants, and the second element of civil contempt is met.  *See LeGrand*, 43 F.3d at 170.

In order to validate Defendants' compliance with Remedial Orders 5 and 7, the Monitors "reviewed all RCCI investigations that were opened by the State in October and November 2019." D.E. 869 at 107.  This process consisted of 184 investigations[84] that the Monitors reviewed "for compliance with the Court's orders relating to timeliness of RCCI Investigations."  *Id.*  "[O]f 184 investigations reviewed, nineteen were assigned Priority One, requiring that DFPS initiate the investigation within twenty-four hours of intake."  *Id.* at 109.  The Monitors considered "initiation" of an investigation to have taken place once DFPS made face-to-face contact with all of the alleged child victims.  *See id.* at 107 n.197, 109–12.  Therefore, the same data regarding the rate at which DFPS made face-to-face contact with child victims within 24 hours also reveal the rate at which DFPS initiated Priority One investigations within 24 hours.

As Plaintiffs allege in their Motion, the information in the Monitors' Report reveals that Defendants have not complied with Remedial Orders 5 and 7.  D.E. 901 at 9–10.  The Monitors

---

[84] "Based upon the data provided by DFPS, there were 188 RCCI investigations opened during this time period.  The monitoring team reviewed all records in CLASS and IMPACT to validate performance and confirmed that four of the investigations were administratively closed without investigation."  D.E. 869 at 107.

discovered that only 68% (13 out of 19) of Priority One investigations opened from October 1, 2019 through November 30, 2019 were initiated within 24 hours of intake by face-to-face contact with the alleged child victims.  D.E. 869 at 109, 111; *see also* D.E. 901 at 9.  In 26% (5 out of 19) of those Priority One investigations, the documentation did not signify that investigations were initiated through face-to-face contact with all alleged victims within 24 hours.  D.E. 869 at 109, 112; *see also* D.E. 901 at 9.  In one such investigation, face-to-face contact with one of the alleged victims did not take place until **22 days after intake**.  D.E. 869 at 112; *see also* D.E. 901 at 9. Finally, one investigation out of 19 was not timely initiated through face-to-face contact with an alleged victim because the child had died, and therefore the investigation "was approved by the supervisor for initiation through interviews with the caregivers."  D.E. 869 at 109, 111; D.E. 901 at 9.

The fact that, in more than one-fourth of the Priority One investigations analyzed, DFPS did not initiate the investigation through face-to-face contact with all alleged victims within 24 hours, demonstrates that Defendants have not complied with Remedial Orders 5 and 7.  *See* D.E. 869 at 109, 112.  In fact, only 68% of those Priority One investigations met the requirements of these Remedial Orders.  *See id.* at 109, 111.  Thus, the third element of civil contempt, that Defendants have "failed to comply with the court's order," is satisfied.  *See LeGrand*, 43 F.3d at 170.

As noted herein, a respondent to a motion for civil contempt may defend against a three-part showing of civil contempt by rebutting the finding that the three elements were satisfied.  *See id*.  In their Response to Plaintiffs' Motion, Defendants do not provide information that contravenes the substantive data in the Report showing that Priority One investigations were only initiated on time in 68% of cases.  *See* D.E. 911 at 13 ("The Motion alleges that DFPS should be

held in contempt for failing to comply with Remedial Order Nos. 5 and 7 because, according to the Report, Priority One investigations are timely initiated in only 68% of cases.").  Instead, Defendants argue that they should not be held in contempt because, for the balance of cases, "the Report did not find . . . that DFPS failed to timely initiate a Priority One investigation; rather, . . . the Report reflects potential issues with documentation rather than untimely initiation of investigations."  *Id.* at 14.  To support this characterization of the Report, Defendants say that, according to the Report, aside from the one case that had a documented exception related to the child's death, "the remaining 26% **lacked documentation** to determine whether Priority One investigations were timely initiated."  *Id.* at 14 (citing D.E. 869 at 109, 112) (emphasis added).

Defendants' characterization of the Report does not rebut the conclusion that the data therein reflect Defendants' non-compliance with Remedial Orders 5 and 7.  Defendants provide no evidence to demonstrate that the numbers in the Report reflect a failure to **document** timely initiation of investigations, rather than a failure to **effectuate** timely initiation of investigations.  Furthermore, even if Defendants had provided evidence that the problem truly is with documentation and not DFPS's actual timeliness, Defendants provide no justification for this purported failure to document investigation initiations through face-to-face contact with alleged child victims. Just as outright failures to timely initiate investigations can create an unreasonable risk of serious harm to PMC children, so too can issues regarding data and documentation.  *See, e.g.*, D.E. 368 at 168–69 (noting that "continuous[] fail[ure] to maintain complete, timely, and accurate documentation . . . result[s in] widespread neglect of important tasks relating to the safety and well-being of PMC children").  Further, the Court appointed the Monitors "to independently verify data reports and statistics provided pursuant to this Order."  D.E. 606 at 16 ¶ A3.  It is therefore Defendants' responsibility to document and provide information to the Monitors

regarding their compliance with the Remedial Orders for verification.   Defendants' mere conjecture that the Report's data regarding their compliance with Remedial Orders 5 and 7 could reflect failure to document, rather than failure to initiate investigations on time, is not sufficient to rebut the information in the Report.

A respondent to a motion for civil contempt also may defend against a finding of contempt by asserting good faith attempts to comply.   *See LeGrand*, 43, F.3d at 170; *Petroleos Mexicanos*, 826 F.2d at 401.   Defendants therefore argue that "DFPS has been reasonably diligent in making a good faith effort to comply with the requirements of Remedial Order Nos. 5 and 7" and that "DFPS has undertaken substantial efforts surrounding initiating Priority One investigations," which they allege the "Report fails to address."   D.E. 911 at 13–14.   For example, Defendants argue in their Response to Plaintiffs' Motion that:

> DFPS has taken several steps to address documentation issues, including implementing an IMPACT enhancement in December 2019 that allows documentation of initiations, including face-to-face alleged victim initiations, to be completed in IMPACT while also allowing RCCI staff to request, approve or reject, and document exceptions to face-to-face contact with alleged victims in IMPACT; at the same time, staff received a field communication[85] with instructions regarding these changes.

*Id.* at 14.   In addition, Defendants similarly objected to the Monitors' Report, saying that:

---

[85] As Shaw testified at the Show Cause Hearing, a Field Communication is "basically a way to inform our staff of the new policy."   D.E. 991 at 86:11–12.

> Defendants object to Section III(B) of the Report, related to Remedial Order Nos. 5 [and 7[86]] . . . , as it violates the terms of the 2018 Order by failing to acknowledge that Defendants have implemented additional reporting capabilities into their electronic systems such that they are better able to respond to the Monitors' requests for information. . . .   Therefore, with respect to Remedial Order Nos. 5 [and 7[87]], the Report relies on incomplete records, rendering the conclusions reached therein unreliable.

D.E. 903 ¶ 16.

Defendants' repeated assertion that the Monitors' Report "fail[s] to acknowledge" the capabilities that Defendants have implemented is not true.  The Monitors' Report notes that DFPS had informed the monitoring team that "its inability to comprehensively report face-to-face contact data was due to lack of functionality in IMPACT and that new functionality will allow for reporting of the requested compliance data going forward."  D.E. 869 at 104.  The Monitors' Report further notes that:

> The State anticipated reporting the time stamp for face-to-face contact with each alleged child-victim by April 15, 2020 and on approved extensions (or exceptions) to face-to-face contact by July 15, 2020.  The Monitors reviewed the April 15, 2020 data and found that the data field has been added to the April data production, and, thus far, in most cases the State was unable to report the data and timestamp for face-to-face contact with each alleged victim, as this field was blank or had a timestamp of 12:00:00 am; the Monitors also noted that investigations involving multiple alleged victims had the same date and timestamp listed for each alleged victim.

*Id.* at 104 n.189.  Thus, the Monitors thoroughly "acknowledge[d]" the IMPACT functionalities that Defendants implemented in December of 2019, contrary to Defendants' representations, and still determined that Defendants' performance to be deficient.  *See* D.E. 911 at 14 (stating that "the Report fails to address" DFPS's substantial efforts); D.E. 903 ¶ 16 (stating that the Report "fail[s]

---

[86] Defendants' objection was "related to Remedial Order Nos. 5 through 11, 16, and 18" and "Remedial Order No. B-5."  D.E. 903 ¶ 16.  Only Remedial Orders 5, 7, 10, and B5 are at issue in Plaintiffs' Show Cause Motion.  *See* D.E. 901 at 9–12.  Remedial Orders 5 and 7 are discussed here, while Remedial Orders 10 and B5 are discussed *infra*.  *See infra* Sections IV.G., IV.H.  Defendants' Objections related to Remedial Orders not at issue in Plaintiffs' Show Cause Motion will be addressed in a separate order.

[87] *See supra* note 86.

to acknowledge that Defendants have implemented additional reporting capabilities into their electronic systems such that they are better able to respond to the Monitors' requests for information").   The Monitors' Report goes on to quote a statement that the State sent to the Monitors, which admitted to the limitations of and potential confusion surrounding the time stamp functionality:

> This functionality rolled out in IMPACT on 12-19-19 so any contacts made prior to 12-19-19 will likely be blank.  Blank cells can indicate that face-to-face contact has been made but not documented in this specific field, has not yet been made or can reflect a case has been or will be administratively closed in which case face-to-face contact is not required.  If the timestamp is 12:00:00, it generally means that there was no timestamp entered.  To the extent a contact was not made within the 24/72 hour timeframe, there may have been an exception but data reporting on exceptions will not be available until Q3 FY 20.

D.E. 869 at 104 n.189.  The Monitors' Report considered the updates to the IMPACT functionality and still concluded that it to be insufficient.  Defendants' Objection 16, as it applies to the sections of the Monitors' Report dealing with Remedial Orders 5 and 7, is OVERRULED.

Furthermore, the Court does not find an update to the IMPACT system in December 2019 to constitute a "good faith effort" to comply with Remedial Orders that required compliance "[w]ithin 60 days" from their effective date of July 30, 2019, especially when Defendants knew what these Remedial Orders required well before their effective date.  The Fifth Circuit validated the corresponding Remedial Orders from the Court's January 2018 Order in *Stukenberg I*.  *See* D.E. 559 at 42–43 ¶¶ D10, D12 (providing the corresponding Remedial Orders in the January 2018 Order); D.E. 601 at 57–58 ¶¶ 3, 5 (*Stukenberg I* expressly validating the initial Remedial Orders).  Given that Defendants did not appeal Remedial Orders 5 and 7 in *Stukenberg II* following the Court's November 2018 Order, and that the Fifth Circuit accordingly did not disturb these Remedial Orders, Defendants knew well before these Remedial Orders went into effect that they would be bound by their requirements within 60 days of the Fifth Circuit's Mandate.  *See* D.E. 606

at 3 ¶¶ 5, 7 (restating the initial Remedial Orders as Remedial Orders 5 and 7 in the November

2018 Order); D.E. 627 at 3 (*Stukenberg II* not disturbing Remedial Orders 5 and 7); *supra* note 5

(explaining that Defendants did not appeal Remedial Orders 5 and 7 in *Stukenberg II*).

In support of their argument that they made a "good faith effort" to comply with Remedial

Orders 5 and 7, Defendants also note that they did the following:

- "**[I]n February and March 2019**, DFPS developed policy and job aids to emphasize the underlying requirements regarding initiating investigations with face-to-face contact, defining exceptions to that requirement, and clarifying how to get approval for an exception, and shared this information with staff through a field communication."  D.E. 911 at 14.

- "**[B]etween February and May 2019**, DFPS conducted training regarding initiating investigations."  *Id.*

- "DFPS developed a case reading program, completed **in October 2019**, that completes quarterly case reads of investigations to evaluate initiation of investigations as a quality assurance check."  *Id.*

- "DFPS has also created additional positions that add resources to improve timely initiation of investigations."  *Id.*[88]

- "Additionally, DFPS developed a quality assurance tool, completed **in October 2019**, that assesses the quality of RCCI investigation initiations."  *Id.* at 14–15.

- "**On October 25, 2019**, RCCI began case reading; as part of those reads, RCCI determined whether timely face-to-face contact was made to initiate an investigation and, if not, whether an exception was approved.  The reports generated from these case reads are shared with the Monitors, along with other reports containing detailed information regarding investigations."  *Id.* at 15 (citation omitted).

- "**Beginning in March 2020**, Program Administrators were sent the 'Face-to-Face Initiation with Victim' report to ensure staff are appropriately document [sic] investigation initiations."  *Id.*

---

[88] As noted above regarding the IMPACT enhancements, Defendants' assertion that the Report "fails to address" DFPS's "substantial efforts surrounding initiating Priority One investigations" is also untrue as to the addition of new positions.  D.E. 911 at 14.  The Report does state that DFPS informed the Monitors "that twenty new investigators had been hired in September 2019."  D.E. 869 at 196.

Defendants point to some additional staffing, policy, job aids and trainings for an unspecified number of staff in the Spring of 2019 as evidence of their "reasonable efforts . . . to comply." *See id.* at 14–15.  Defendants thus argue that because they have "undertaken reasonable efforts in a good faith effort to comply" with Remedial Orders 5 and 7 and have "shown reasonable diligence," they "therefore, should not be held in contempt."  *Id.* at 14.  However, again, despite the fact that Defendants knew well before the Fifth Circuit's Mandate what they would be required to do under Remedial Orders 5 and 7, most of their efforts to comply with those Remedial Orders took place after the deadline of sixty days following the Remedial Orders' effective date of July 30, 2019.  Sixty days after the Fifth Circuit's July 30, 2019 Mandate falls at the end of September of 2019; yet, according to Defendants' allegations, they waited until October of 2019 and thereafter to make most of their efforts to implement Remedial Orders 5 and 7.  *See* D.E. 911 at 14–15.

Defendants also fail to point out, as the Monitors note in the Report, that DFPS staff, including their own case readers who were charged to report on the agency's compliance, so poorly understood the requirements of both the agency's own policies and these Remedial Orders' requirements regarding investigative initiation and face-to-face contact with alleged child victims that Defendants provided inaccurate information to the Monitors about their compliance.[89]  As the Monitors note:

---

[89]    The tool that DFPS used for its case reads to self-evaluate several of these remedial orders did not record specific data, such as the date and time of face-to-face contacts for each child in investigations . . . .  Instead, case readers recorded whether the case file indicated in their assessment compliance with remedial orders.  As a result, the case read information supplied by DFPS could not be used by the Monitors to compare data recorded in the Monitors' case reads for these orders or to the electronic data, and prevented the Monitors from verifying that the case readers correctly recorded whether practice in the investigation complied with remedial orders.

D.E. 869 at 107.

> [R]elated to orders requiring timely initiation through face-to-face
> contact with all alleged child victims, after reviewing the DFPS case
> read submissions, the Monitors identified that DFPS used a
> methodology to measure initiation that was not consistent with
> DFPS policy. It counted a case as properly initiated so long as it
> showed face-to-face contact with one alleged child victim, rather
> than with all alleged child victims in an investigation.

D.E. 869 at 107 n.197.  This method was inconsistent with Remedial Orders 5 and 7.

In sum, Defendants did not make efforts to implement Remedial Orders 5 and 7 until well after the 60 days following the Mandate and continued to use an incorrect standard of performance for initiating an investigation with all child victims long after these orders became effective. Defendants' failure to implement, track, and report compliance based on the plain language of these Remedial Orders could not be described as "reasonable efforts" to comply with Remedial Order 5's requirement that DFPS "initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake," or with Remedial Order 7's requirement that DFPS "complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake."  *See* D.E. 606 at 3 ¶¶ 5, 7.

Defendants do not offer any further evidence as to any defense pertaining to Remedial Orders 5 and 7, such as inability to comply.  *See LeGrand*, 43 F.3d at 170 (inability to comply is a defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same).  The Court therefore finds by "clear and convincing evidence," *see Salazar*, 713 F.3d at 792, that Defendants have "failed to comply with the [C]ourt's orders," *see LeGrand*, 43 F.3d at 170, thereby continuing to expose PMC children to an unreasonable risk of serious harm.  The Court holds Defendants in contempt of Remedial Orders 5 and 7.

### G.   Remedial Order 10: Prompt Completion of Priority One and Priority Two Investigations

Remedial Order 10 provides that:

Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record.  If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

D.E. 606 at 3 ¶ 10.

### 1.   The Court's Findings at Trial Related to Remedial Order 10

At trial the Court found that, "[b]esides being full of errors, RCCL's investigations were often late.  Only 58% of investigations were completed within the required 45-day timeframe." D.E. 368 at 211 (citing PX 1118).  This problem is related to another problem that the Court found at trial, which was that RCCL investigators were overburdened.  *See infra* Section IV.M. (discussing overburdened caseworkers).  One trial witness, Daryl Chansuthus, who was Plaintiffs' expert on "continuous quality improvement and appropriate staffing levels for oversight functions in child welfare systems," D.E. 368 at 43, testified at trial that "[s]taffing" issues "seemed to be related to [the] deficiencies" of the investigators, D.E. 324 at 118:15–119:2.  RCCL workers also expressed that they "feel overwhelmed and unable to complete timely [investigations]."  D.E. 368 at 211 (quoting PX 1117 at 5).  The Fifth Circuit agreed in *Stukenberg I*, noting that "[t]hough the primary cause of deficient investigations seems to be a substantial breakdown of the investigatory process at the procedural level, excessive workload is undoubtedly a contributing factor."  D.E. 601 at 40–41 n.38.

Delays in completing investigations can create risk of harm for children because alleged perpetrators might remain free to continue causing harm to children until the investigation is finally completed.  For example, the Court noted in its 2015 Opinion and Verdict that Plaintiffs L.H. and

C.H. "were placed with their uncle . . . in spite of their caseworker expressing 'grave concerns' about this placement because of an open investigation against the uncle for threatening to hit L.H.'s and C.H.'s younger sister with a riding crop."   D.E. 368 at 158 (citing DX 120 at 1 RFP CPS 120617 (filed under seal)).   As discussed above, the Court found at trial that the experiences of Named Plaintiffs were typical of the experiences of foster children in the PMC class.   D.E. 368 at 43, 56, 73, 79, 90, 97, 105, 128, 132, 140, 152; *see also* D.E. 326 at 132:22–133:5, 193:22–194:2, 194:12–15 (trial testimony of Dr. Carter that the experiences of the Plaintiffs are typical of PMC foster children); *supra* Sections IV.E.1., IV.F.1.   "Due to RCCL's systemic failures," the Court found that "children are left with their abusers without receiving necessary treatment, and adult perpetrators continue to house foster children with nothing indicating a risk."   D.E. 368 at 212.

### 2.      The Procedural History of Remedial Order 10

In its 2015 Opinion and Verdict, the Court ordered the Special Masters to propose remedies that would address the problems with the inappropriately lengthy and delayed investigations identified at trial.   *See* D.E. 368 at 245–48, 251–52.   In its January 2018 Order, the Court adopted the provision proposed in the Special Masters' Implementation Plan.   *See* D.E. 546 at 15 ¶ 15; D.E. 559 at 43 ¶ D15.   The Fifth Circuit validated this Remedial Order from the January 2018 Order in *Stukenberg I*, D.E. 601 at 57–59 ¶ 8, and the Court restated it as the substantially similar[90] Remedial Order 10 in its November 2018 Order, *see* D.E. 606 at 3 ¶ 10.   Remedial Order 10 was not at issue and therefore remained undisturbed in *Stukenberg II*, so it became effective upon the Fifth Circuit's July 30, 2019 Mandate.   *See* D.E. 627 at 3.   Therefore, the first element of civil contempt is established as to Remedial Order 10: "a court order was in effect."   *See LeGrand*, 43

---

[90] Remedial Order 10 repeats the language of the corresponding Remedial Order from the January 2018 Order but with a different specified timeframe for compliance.  *Compare* D.E. 559 at 43 ¶ 15 ("Effective March 2018 . . . ."), *with* D.E. 606 at 3 ¶ 10 ("Within 60 days . . . .).

F.3d at 170; *see also* D.E. 990 at 7:4–12 (Defendants' counsel stipulating at the Show Cause Hearing that Defendants do not dispute the effectiveness of this Remedial Order).

### 3.    Defendants Have Failed To Comply with Remedial Order 10.

The text of Remedial Order 10 is clear that it requires Defendants to "complete Priority One and Priority Two child abuse and neglect investigations" involving PMC children "within 30 days of intake," barring an "extension . . . approved for good cause and documented in the investigative record." D.E. 606 at 3 ¶ 10. Therefore, it "require[s] certain conduct" by Defendants, which satisfies the second element of civil contempt. *See LeGrand*, 43 F.3d at 170.

With regard to Remedial Order 3, discussed above, the Monitors concluded that "[m]any of [the] RCCI child abuse or neglect investigations were deficient because of long gaps in investigative activity and substantial delays in completion," and that "[t]his remains a serious problem at DFPS." D.E. 869 at 88. This ongoing problem is pertinent to Defendants' compliance both with Remedial Order 3, *see* D.E. 606 at 2 ¶ 3 (requiring that "reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and **completed on time** consistent with the Court's Order; and conducted taking into account at all times the child's safety needs" (emphasis added)), and with Remedial Order 10, *see* D.E. 606 at 3 ¶ 10 (requiring that "DFPS shall . . . complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake").

In order to assess Defendants' compliance with Remedial Order 10, the Monitors reviewed the same 184 investigations opened in October and November of 2019 that the Monitors reviewed to assess Defendants' compliance with Remedial Orders 5 and 7. *See* D.E. 869 at 107; *see also supra* Section IV.F.3. Plaintiffs allege that the Defendants have failed to comply with Remedial Order 10 because, out of those 184 Priority One and Priority Two investigations, the Monitors discovered that only 38 (or 21%) were documented as compliant with the 30-day timeframe or an

approved and documented extension, as required by Remedial Order 10.[91]  D.E. 901 at 10 (citing D.E. 869 at 115); *see also* D.E. 869 at 114.  Furthermore, 146 (or 79%) of those 184 investigations were not timely completed.[92]  D.E. 901 at 10 (citing D.E. 869 at 114).

In fact, the Report reveals that the State's own analysis reflects similarly low rates of compliance.  DFPS conducted its own case read to evaluate whether it was completing investigations in a timely manner consistent with Remedial Order 10.  For this case read, DFPS reviewed cases that "were either **opened or closed** during October and November" 2019.  D.E. 869 at 115 n.212 (emphasis added).  This case review by DFPS did not consist of the same cases as the Monitors' case review; the Monitors reviewed "all cases **opened** in October and November."  *Id.* at 115 n.212 (emphasis added).  The results of the State's case read independently showed that only "27.1% (76 of 280) of investigations were completed within 30 days of intakes."  *Id.* at 115.  Thus, the findings of both the State and the Monitors show that less than one-third of investigations taking place around October and November 2019 were completed within 30 days of intake.  *See id.* at 114–15.

Plaintiffs further point out that as of April 5, 2020, a total of 501 investigations were overdue by at least 45 days.  D.E. 901 at 10–11 (citing D.E. 869 at 27); *see also* D.E. 869 at 196.

---

[91] Out of these 38 investigations, 35 (or 19% of the 184 investigations analyzed) were completed within 30 days, and three (or 2% of the 184 investigations analyzed) were approved for extensions and were completed within that extended time frame.  D.E. 869 at 114–15; *see also* D.E. 901 at 10.

[92] Out of the 146 investigations that were not completed within the required 30-day time frame, 18 were approved for extensions; however, nine of those investigations with approved extensions were not completed within that extended timeframe, and "the Monitors were unable to determine whether the investigation was completed within the extension timeframe" for the other nine investigations.  D.E. 869 at 114.  Out of the nine latter investigations, for seven investigations, the Monitors were not able to determine the investigations' compliance with the timeline allotted by the extension because "the investigation was still open at the time of review."  *Id.*  For the final two investigations for which the Monitors were unable to determine whether the investigation complied with the timeline allotted by the extension, "there were documentation deficiencies regarding the length of the extension."  *Id.*  Remedial Order 10 requires that extensions be "approved for good cause and documented in the investigative record."  D.E. 606 at 3 ¶ 10.  Therefore, the documentation deficiencies with the cases in which the Monitors were unable to determine whether the investigation complied with the extension represent another failure to comply on the part of Defendants.

As discussed in the Monitors' Report and above regarding Remedial Order 3, *supra* Section IV.E.3.b.ii., this backlog of "delinquent" cases remains, "even after the State had initiated a project to clear backlogged cases in November 2019."  D.E. 869 at 19; *see also* D.E. 869 at 196–97.  The Monitors' Report provides an example of an investigation, discussed in full above with regard to Remedial Order 3, *supra* Section IV.E.3.b.ii., in which, "interviews with some of the alleged victims were delayed by almost one year after SWI received the intake," and as a result, "[m]any of the parties eventually interviewed did not have recall of the details of the events and the investigator could not reconcile the conflicting information that was eventually obtained."  D.E. 869-4 at 12.  The allegations in that case were serious.  According to the reports to SWI, "a facility staff member did not provide adequate supervision and as a result, child-on-child sexual aggression occurred among four youth; additionally, two staff persons allegedly coached the alleged victims not to make outcries of abuse."  *Id.* at 11.  However, because of the deficiencies in the investigation, including delays in completing it, the Monitors could not determine what the disposition should have been.  *Id.*

In addition, the investigation of the death of K.C., also discussed in full above, is another example of an unacceptably delayed and deficient investigation.  *See supra* Section IV.E.3.b.ii. (discussing the delinquency of the investigation into K.C.'s death); *see also supra* Section IV.D.1. (discussing the circumstances surrounding K.C.'s death more generally).  The investigation of her death was not completed as of the Show Cause Hearing, which was almost seven months after her death, despite the fact that the investigation's second and last extension required that the

investigation be completed in May 2020.[93]  *See* D.E. 869 at 13; D.E. 990 at 118:24–119:6, 119:7–11.  Overall, the investigation of this tragic occurrence was woefully delinquent and deficient.

In sum, the majority of investigations opened in October and November 2019 were not compliant with Remedial Order 10 and its requirement that, without an approved and documented extension, investigations must be completed within 30 days.  *See* D.E. 869 at 114–15.  Further, Defendants have failed to resolve hundreds of backlogged investigations into child abuse and neglect that have languished uncompleted, resulting in failures to come to dispositions regarding disturbing allegations.  *See id.* at 196 (noting that as of April 5, 2020, there were 501 backlogged cases); *see also, e.g.*, D.E. 869-4 at 11–12 (providing information about an example of a backlogged investigation that was not timely completed); *supra* Section IV.E.3.b.ii. (same).  Therefore, the third element of civil contempt—"that the respondent failed to comply with the court's order"—is satisfied as to Remedial Order 10.  *See LeGrand*, 43 F.3d at 170.

Defendants promote several arguments in order to rebut the *prima facie* showing that they are in contempt of Remedial Order 10.  First, Defendants state twice in their objections to the Monitors' Report that the Report "fails to acknowledge that DFPS hired and onboarded 20 new investigators and is nearly complete with the backlog reduction project."  D.E. 903 ¶¶ 11, 16.  However, Defendants' repeated statement is not true.  The Monitors' Report does state that "DFPS . . . noted [during a scheduled call between the State and Monitors on April 9, 2020] that twenty new investigators had been hired in September 2019."  D.E. 869 at 196.  In addition, Defendants claim that as a result of DFPS's efforts, by June of 2020, "the investigation backlog

---

[93] In addition, as more fully discussed in previous sections, RCCI failed to interview key individuals who were involved in K.C.'s care at the time of her death, and the interviews that RCCI did conduct were lacking and incomplete. *See supra* Sections IV.D.1., IV.E.3.b.ii.  Furthermore, RCCI failed to include the administrators of Prairie Harbor, the facility where K.C. was residing at the time of her death, in the investigation as alleged perpetrators, despite repeated related minimum standards violations at the facility leading up to K.C.'s death.  *See* D.E. 956 at 18–20, 23–25.

had been reduced by 65%." *See* D.E. 911 at 16; D.E. 990 at 80:5–8 (Show Cause Hearing testimony of Batiste regarding investigation backlog reduction). However, the Monitors could not have verified information about Defendants' performance in June of 2020 in their Report dated June 16, 2020. Therefore, the Court affords less weight to the information Defendants baldly provide to demonstrate that their efforts have yielded the stated results. Moreover, even if this information had been verified by the Monitors, it reveals that Defendants' backlog of delinquent cases has not been eliminated.

In their Objections to the Report, Defendants also make the same objection to the Monitors' Report regarding Remedial Order 10 as they did regarding Remedial Orders 5 and 7, saying that "the Report relies on incomplete records, rendering the conclusions reached therein unreliable" because the Report "fail[s] to acknowledge that Defendants have implemented additional reporting capabilities into their electronic systems such that they are better able to respond to the Monitors' requests for information" D.E. 903 ¶ 16. For example, Defendants object that "the Report criticizes Defendants' inability to supply the information regarding investigation timelines related to Remedial Order No[.] 10[94] . . . without also acknowledging that Defendants are now or soon will be producing reports with increased functionality to address issues raised by the Monitors." *Id.* However, it is not true that the Report "fail[s] to acknowledge" that Defendants have taken steps to make changes to and "increase functionality" in their systems. *Id.* In fact, far from "failing to acknowledge" steps that Defendants took, the Report discusses these changes to the State's automated systems more than once:

---

[94] Defendants make the same objection with regard to Remedial Order 11, which is not at issue in Plaintiffs' Show Cause Motion. D.E. 903 ¶ 16; *see also* D.E. 901. As noted above, *see supra* note 86, the Court will address Defendants' Objections to aspects of the Monitors' Report pertaining to other Remedial Orders in a separate order.

- "As noted below and in the Appendices, the State had to add or indicated it will have to add enhancements to be able to report on and comply with the remedial orders."  D.E. 869 at 51.

- "Remedial Order[] . . . Ten address[es] the timeliness of various aspects of maltreatment in care investigations.  Investigators and supervisors would need to know the date and time of intakes . . . to assess their own performance.  However, neither IMPACT nor CLASS records the date and time of contact for each child for investigations involving multiple alleged child victims.  According to DFPS, enhancements to IMPACT and training of workers to enter these data are in process."  *Id.* at 53.

- "While the State has made enhancements, large and small, to expand IMPACT's functionality, which may improve the tracking of information prospectively, these steps do not fully resolve many of the problems identified above."  *Id.* at 55; *see also id.* at 104, 104 n.189; *supra* Section IV.F.3.

Hence, the Monitors' Report takes account of the updates to IMPACT functionality and concludes that deficiencies in the system remain, nonetheless.  Defendants' Objection 16, as it pertains to the section of the Monitors' Report dealing with Remedial Order 10 is OVERRULED.

Defendants further argue that they have "exercised reasonable diligence and taken reasonable efforts in a good faith effort to comply with Remedial Order No. 10."  D.E. 911 at 15–16; *see also LeGrand*, 43 F.3d at 170; (making good faith attempts to comply is a defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same).  Defendants allege that they provided a "field communication and corresponding job aid" to RCCI staff regarding investigation deadlines and extension requests in June 2019; that they "released RCCI Field Communication #014, with amended policies" regarding the timing of staffing investigations in September of 2019; that they sent weekly reports to supervisors regarding upcoming or overdue deadlines starting on September 23, 2019; and that they sent a weekly extension report to RCCI supervisors starting in March 2020 "to ensure investigators and supervisors are following DFPS policy."  D.E. 911 at 15–16.  "Therefore," they argue, "DFPS should not be held in contempt related to Remedial Order No. 10."  *Id.* at 16.

However, starting to send a "weekly extension report" to supervisors eight months after Remedial Order 10 was effective is not a performance that is consistent with the Remedial Order's requirement that Defendants comply "[w]ithin 60 days." *See* D.E. 606 at 3 ¶ 10.  As for the other efforts made by Defendants, the data in the Monitors' Report reveal that they did not bring Defendants sufficiently close to compliance with the Remedial Order's 30-day timeline for the completion of investigations.  Therefore, these efforts have not been consistent with Remedial Order 10's requirements and have not fulfilled Defendants' obligation not to place the PMC children at unreasonable risk of serious harm.  Yet, Defendants make no further arguments to excuse this noncompliance, such as by demonstrating that they were unable to comply.  *See LeGrand*, 43 F.3d at 170 (mitigating circumstances and inability to comply are defense against civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (inability to comply is a defense against civil contempt); *Whitfield*, 832 F.2d at 914 (mitigating circumstances are a defense to civil contempt).

Defendants have failed to counter the "clear and convincing evidence," *see Salazar*, 713 F.3d at 792, provided in the Monitors' Report that they have failed to comply with Remedial Order 10's requirement that DFPS must "complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake," barring an extension "for good cause" that "must be documented in the investigative record," D.E. 606 at 3 ¶ 10.  As a result of this failure, Defendants have continued to subject PMC children to an unreasonable risk of serious harm.  Hence, the Court holds Defendants in contempt of Remedial Order 10.

### H.     Remedial Order B5: Properly Notifying Primary Caseworkers of Allegations of Abuse

Remedial Order B5 provides that:

Effective immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.

D.E. 606 at 15 ¶ B5.

### 1.     The Court's Findings at Trial Related to Remedial Order B5

In its 2015 Opinion and Verdict, the Court discussed the importance of notifying caseworkers of allegations of abuse and neglect. "CVS caseworkers are . . . 'responsible for monthly face-to-face contact with the child,' 'the foster parents,' and 'all other parties involved in the case,' including the child's caregivers and attorneys and guardians *ad litem*, to ensure that the child's needs are being met." D.E. 368 at 161 (citing D.E. 324 at 11; PX 885 at 133). Defendants, themselves, in an internal memo stated that DFPS "must focus on safety and treatment for all child victims through proper notification to all key parties of an RCCL investigation, careful monitoring, and case management intervention." *Id.* at 213 (quoting DX 21 at 1–2). However, the Court found that often, children would not see their primary caseworkers for extended periods of time. For example, "S.A. would sometimes go several months without any contact with her primary caseworker and would complain about this to her various [secondary] workers." *Id.* at 86 (citing DX 120 at DFPS #49386, #49511, #49516, #49519). Darryl Jackson, a witness at trial who had formerly been in Texas foster care, "told the Court that he saw his caseworker 'once every two months,' and that 'it was just hard to get in contact with her [and] to even have a conversation with her . . . [to] tell her I needed things.'" *Id.* at 166 (citing D.E. 324 at 186). In addition, "[n]o caseworker even visited J.S. the month before an alleged sexual abuse in his placement. After the

abuse, J.S.'s primary caseworker did not visit him for another four months." *Id.* Unfortunately, the experiences of Named Plaintiffs like S.A. and J.S. were typical of the experiences of foster children in the PMC class. D.E. 368 at 43, 56, 73, 79, 90, 97, 105, 128, 132, 140, 152; *see also* D.E. 326 at 132:22–133:5, 193:22–194:2, 194:12–15 (trial testimony of Dr. Carter that the experiences of the Plaintiffs are typical of PMC foster children); *supra* Sections IV.E.1., IV.F.1., IV.G.1.

Because "CVS caseworkers are foster children's 'lifeline'" and are "the principal DFPS employees tasked with ensuring the safety, permanency, and well-being of foster children," they are "critical, critical to the provision of child safety, permanency and wellbeing" and "the eyes and ears of the State." D.E. 368 at 161 (quoting D.E. 323 at 33:15 (trial testimony of Beth Miller, former DFPS worker); D.E. 305 at 11:25–12:11 (trial testimony of Colleen McCall, then-Director of Field at CPS)). Therefore, "[w]ithout a CVS caseworker . . . 'watching for safety issues,'" which "is one of [their] 'crucial responsibilities,'" the Court found that "foster children 'would be at a clear risk of harm.'" *Id.* at 162 (quoting D.E. 305 at 12:12–18 (trial testimony of McCall)).

### 2.    The Procedural History of Remedial Order B5

The Court ordered the Special Masters to propose remedies that would address the issues that the Court found at trial regarding whether caseworkers were aware of the issues and alleged abuse involving PMC foster children. *See* D.E. 368 at 245–48, 251. In its January 2018 Order, the Court implemented provisions from the Special Master's Implementation Plan regarding "PMC Child-Caseworker Visitation," D.E. 546 at 2–3 ¶¶ 1–4; D.E. 559 at 22 ¶¶ A1–A4, as well as a provision eliminating the State's practice of substituting visits to foster children by primary caseworkers with visits by secondary caseworkers, D.E. 546 at 35 ¶ 1; D.E. 559 at 73 ¶ K1. In *Stukenberg I*, the Fifth Circuit invalidated these provisions regarding foster children's contact and communication with caseworkers. D.E. 601 at 55–57 ¶¶ 4–7, 10. The Fifth Circuit reasoned that

these provisions "would unnecessarily *add* to the volume of work for which caseworkers are responsible, and would increase the time spent managing paperwork and compliance and administrative burdens." *Id.* at 55.

In response to the Fifth Circuit's changes in *Stukenberg I*, and following briefing by the parties addressing issues on remand and proposed remedies, this Court added Remedial Order B5 to its November 2018 Order in order to require that the primary caseworker of a child must be notified of allegations of abuse involving that child. *See* D.E. 606 at 15 ¶ B5. The Court reasoned that "[p]rompt notification of the primary caseworker may seem like a simple and obvious requirement, but the record shows that allegations of abuse are not being routed to the primary caseworker." *Id.* Further, acknowledging that the Fifth Circuit sought to avoid "additional administrative burden" in *Stukenberg I*, this Court reasoned that "the primary caseworker should already be responsible for knowing the details of the children in her care, so ensuring that these allegations are communicated does not implicate those concerns." *Id.* *Stukenberg II* did not disturb Remedial Order B5, which became enforceable upon the Fifth Circuit's July 30, 2019 Mandate. D.E. 627 at 3. Therefore, the first element for civil contempt that "a court order was in effect," *LeGrand*, 43 F.3d at 170, is satisfied as to Remedial Order B5, which Defendants do not dispute, *see* D.E. 990 at 7:4–12.

### 3. Defendants Have Failed To Comply with Remedial Order B5.

Remedial Order B5 is clear that it requires the State to "ensure" that it "promptly communicates allegations of abuse to the child's primary caseworker." D.E. 606 at 15 ¶ B5. In addition, the Remedial Order requires that "[i]n complying with this order," the State "shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class." *Id.*

However, in order to implement Remedial Order B5 in a way that "ensure[s] that Texas's PMC foster children are free from an unreasonable risk of harm," as required by the Court's injunction, Defendants must do more than simply checking the boxes of (1) providing bare-bones notifications to caseworkers that allegations of abuse occurred and (2) implementing a system for receiving, screening, and assigning such allegations for investigation.  *See id.* at 2.  Instead, this Remedial Order requires that the State "promptly communicates" the allegations, themselves, including their substance, to the caseworkers.  *See id.* at 15 ¶ B5.  Moreover, the system that the State must put in place to comply with the Remedial Order must ensure that the State is "taking into account at all times the safety needs of children."  *Id.*  Hence, Remedial Order B5 "require[s] certain conduct by" Defendants, and the second element for civil contempt is met as to Remedial Order B5.  *See LeGrand*, 43 F.3d at 170.

The State conducted case reads to determine its compliance with Remedial Order B5, and in those case reads, it used a notification timeline of up to 72 hours as a benchmark for whether caseworkers had received communication regarding abuse allegations "promptly."

> In its case reads, DFPS bases the determination of whether investigators "promptly communicated" allegations of abuse to caseworkers on whether "notification is provided to the caseworker prior to initiation or within a **reasonable timeframe** after initiation."  In testing for a "**reasonable timeframe** after initiation," DFPS asks whether investigators notified caseworkers for alleged victims **within twenty-four and seventy-two hours of intake** for Priority One and Priority Two investigations, respectively.

D.E. 869 at 136 (emphasis added) (footnote omitted).  The Court does not agree that 72 hours constitutes a "prompt[]" timeframe that is consistent with Remedial Order B5.  *See* D.E. 606 at 15 ¶ B5.  Defendants need not wait for the initiation of an **investigation** in order to communicate an **allegation** to the caseworker.  Remedial Order B5 requires notification to the caseworker of the receipt of the allegation of abuse, not the initiation of an investigation; therefore tying notification of an allegation under Remedial Order B5 to the timeframe for initiating Priority One and Priority

Two investigations, as Defendants appear to have done, is not consistent with Remedial Order B5. *See* D.E. 869 at 136; *see also id.* at 137 ("[T]he State does not provide an explanation for testing for notification based on priority level.").

In order to assess the State's compliance with Remedial Order B5, the Monitors reviewed "a random sample of abuse and neglect referrals to SWI," which consisted of 115 out of "200 abuse, neglect or exploitation SWI intakes between December 1, 2019 and December 31, 2019 involving a PMC child." *Id.* at 135.  As the Monitors note, "[t]his sample allowed for a 95/5 confidence interval." *Id.* at 135 n.257.  Each report of abuse or neglect that they analyzed represents an SWI intake that is unique to a particular PMC child who each has a particular "primary caseworker," and that "primary caseworker" must "promptly" receive "allegations of abuse" pertaining to that child under Remedial Order B5.  In order to assess whether this took place, the monitoring team "evaluat[ed] if a contact note in CLASS or IMPACT indicated that an investigator notified the child's caseworker" on various timelines: within 24 hours of intake; within 48 hours of intake; within 72 hours of intake; more than 72 hours after intake; or not at all. *Id.* at 135.  In addition to conducting its own case reads, "the monitoring team reviewed results of the State's case reads," covering the time period of Quarter 4 of Fiscal Year 2019 through Quarter 2 of Fiscal Year 2020, "and analyzed the methodology underlying the reads." *Id.*

As Plaintiffs allege in their Motion, the results of the Monitors' own case reads show that Defendants have not complied with the promptness requirement of Remedial Order B5. *See* D.E. 901 at 11; *see also* D.E. 606 at 15 ¶ B5.  First, according to the Monitors' Report, out of the 115 caseworkers associated with a PMC child for whom the Monitors analyzed an abuse intake, **26 caseworkers (or 23% of the sample of 115) never received any notification at all that an abuse intake had occurred**.  D.E. 869 at 135–36, 140; *see also* D.E. 901 at 11.  In addition, the Monitors

discovered that 31 caseworkers (or 27% of the sample of 115) did not receive notification of an abuse allegation involving their PMC child until more than 72 hours after SWI received the allegation.  D.E. 859 at 135–36, 140; *see also* D.E. 901 at 11.  Finally, in two cases, between 48 and 72 hours passed before the caseworkers received notification that abuse allegations were made regarding their PMC child; and in 20 cases (17% of the sample of 115), between 24 and 48 hours passed before the caseworkers received notification.  D.E. 869 at 135–36, 140.

The fact that **nearly a quarter of the caseworkers in the Monitors' sample did not receive any notification, at all**, of an allegation of abuse involving their PMC child is, alone, inconsistent with Remedial Order B5.  In numerous additional cases, notification did not occur in a timely manner.  Defendants have failed to comply with Remedial Order B5.  *See id.* at 135–36.

Moreover, the results of the State's own case reads, published in the Monitors' Report, reveal that even under its incorrect methodology for determining the "prompt[ness]" of notifications to caseworkers (using "priority timeframes" for initiating investigations), Defendants have failed to comply with Remedial Order B5.  *See id.* at 136–40.  As noted in the Report, DFPS's analysis of data spanning from Quarter 4 of Fiscal Year 2019 through Quarter 2 of Fiscal Year 2020 reveals that "the highest rate at which investigators notified caseworkers within priority time frames across all the case reads was 69%" (or 135 out of 195 caseworkers).  *Id.* at 137.  That means that there was "a substantial number of investigations for which the investigator notified the caseworker at some point beyond the agency's priority-based timeframe for initiating an investigation."  *Id.*  As discussed above, the practice of using priority time frames to assess compliance with the "prompt[ness]" requirement is not consistent with Remedial Order B5, so even the State's reported compliance rate of 69% (or 135 caseworkers out of 195) is over-inclusive.

The above discussion pertains to the promptness with which caseworkers received notification **that abuse allegations occurred** involving a PMC child and shows that Defendants have failed to meet Remedial Order B5's requirement that notification to caseworkers occur "promptly," if at all. However, testimony at the Show Cause Hearing revealed that Defendants have also failed to comply with Remedial Order B5's requirement that DFPS "communicates **allegations of abuse** to the child's primary caseworker." *See* D.E. 606 at 15 ¶ B5. That is, even to the extent that the Monitors reported that caseworkers received a notification "promptly" to tell them that abuse or neglect allegations occurred, *see* D.E. 869 at 135–36, 139, DFPS's notification system does not convey the actual substance of the allegation in the notification, *see* D.E. 990 at 31:9–15, 46:7–9.

> At the Show Cause Hearing, Batiste testified that:
>
> [T]he notification . . . is an alert that's put on [the caseworkers'] to-do list or work list in IMPACT . . . and they can go into IMPACT and review the allegation and information. . . . They click on the red flag and it gives them the case information, and then they go to the case information to review it.

*Id.* at 31:9–15, 46:7–9. However, Defendants apparently have no way of verifying that, upon receiving the notification, the caseworkers are, indeed, taking the extra step of "click[ing] on the red flag," "go[ing] into IMPACT . . . to the case information to review" "the allegation and information." *See id.* at 31:14–15, 46:7–9. Until the caseworker takes these steps, he or she has not yet received "communicat[ion]" of the actual "**allegations of abuse**." Nevertheless, Defendants have provided no evidence that they have any way of knowing whether these extra steps are taken "promptly," as required by Remedial Order B5. *See* D.E. 606 at 15 ¶ B5. The evidence Defendants have provided establishes that the only aspect of the caseworker notification for which they do track the timing—the "alert" or "red flag"—does not convey the necessary substantive information about what the "allegations of abuse" entail. *See* D.E. 990 at 31:9, 46:6.

Therefore, Defendants' practice has not been consistent with the Court's Remedial Order B5 and confirms that Defendants have not complied.

In addition, Remedial Order B5 requires the State to "ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class," such that "allegations of abuse" are "promptly communicate[d] . . . to the child's primary caseworker" and such that the State "tak[es] into account at all times the safety needs of children"; further, the Remedial Order provides that these requirements are "[e]ffective immediately."  D.E. 606 at 15 ¶ B5.  However, Defendants' evidence establishes that they did not "immediately" put in place such a system to "receive . . . reports of maltreatment of children in the General Class" that consistently complies with the Remedial Order's requirement that a "child's primary caseworker" "promptly" receives "communicat[ion of] allegations of abuse" involving that child. *See id.*  According to Defendants' Response to Plaintiffs' Motion, an "IMPACT enhancement put in place on December 19, 2019 . . . now generates an alert and automatically notifies the CPS caseworker when a child is involved in an abuse or neglect intake."  D.E. 911 at 16.

Remedial Order B5 provided that these requirements were "[e]ffective immediately" upon the Fifth Circuit's July 30, 2019 Mandate—not months later in December of that year.  *See* D.E. 606 at 15 ¶ B5; D.E. 627.  After this Court put Remedial Order B5 in place in November of 2018, following the Fifth Circuit's *Stukenberg I* decision, Defendants did not appeal that Remedial Order in *Stukenberg II*.  *See* D.E. 601 at 30–31 (*Stukenberg I* discussing the lack of consistent records of information that caseworkers need); D.E. 606 at 15 (putting in place Remedial Order B5); D.E. 627 at 3 (*Stukenberg II* enumerating the issues on appeal, which did not include Remedial Order B5); *supra* note 5 (explaining the issues and Remedial Orders that Defendants raised on appeal). Therefore, Defendants knew well ahead of the Fifth Circuit's July 30, 2019 Mandate what

Remedial Order B5 would require and that they would need to comply "immediately."  The fact that Defendants did not implement the IMPACT enhancement until December of 2019 shows that the State failed to "immediately . . . ensure that it maintains a system to receive . . . reports of maltreatment of children in the General Class," such that "allegations of abuse" are "promptly communicate[d] . . . to the child's primary caseworker" in a way that "tak[es] into account at all times the safety needs of children."  *See* D.E. 606 at 15 ¶ B5.

In sum, given the Monitors' data indicating that Defendants did not notify caseworkers "promptly," if at all, of allegations of abuse; Defendants' failure to communicate the substance of abuse allegations to caseworkers; and Defendants' delay in implementing the terms of the Remedial Order, the third element of civil contempt, that Defendants failed to comply, is satisfied as to Remedial Order B5.  *See LeGrand* 43 F.3d at 170.

Respondents to an allegation of civil contempt may defend against a finding of contempt by rebutting the conclusion that they have failed to comply with a court order and by asserting good faith in their efforts to comply.  *LeGrand*, 43 F.3d at 170; *Petroleos Mexicanos*, 826 F.2d at 401.  Here, Defendants maintain that they are "not in contempt of Remedial Order No. B-5."  D.E. 911 at 16.

Defendants point to the December implementation of IMPACT enhancements as a defense to civil contempt, arguing that the fact that the Monitors' Report did not exclude from its case read any cases that pre-date this IMPACT update undermines the legitimacy of the Report's data and conclusions.  In particular, Defendants complain that the sample of cases analyzed in the Report does not cover a late enough time period to capture the efforts that Defendants made to improve their systems to comply with Remedial Order B5.  *See id.*; D.E. 903 ¶ 16.  Defendants object to the Monitors' Report by arguing that:

> Defendants object to . . . Section III(D) of the Report, related to Remedial Order No. B-5, as it violates the terms of the 2018 Order by failing to acknowledge that Defendants have implemented additional reporting capabilities into their electronic systems such that they are better able to respond to the Monitors' request for information. . . .The December 2019 investigation data the Monitors reviewed to assess timeliness of caseworker notification for Remedial Order No. B-5 may not include investigations which occurred after the IMPACT changes deployed. . . . Therefore, with respect to Remedial Order No[]. . . . B-5, the Report relies on incomplete records, rendering the conclusions reached therein unreliable.

D.E. 903 ¶ 16.  Similarly, in their Response to Plaintiffs' Motion, Defendants argue that "the Report acknowledges that it was only considering investigations from December 2019" and therefore "fails to account for the IMPACT enhancement put in place on December 19, 2019, which now generates an alert and automatically notifies the CPS caseworker when a child is involved in an abuse or neglect intake."  D.E. 911 at 16.

Defendants' arguments are unavailing for several reasons.  First, Defendants' allegation that the Report "fails to account for" the IMPACT enhancement that took place in December of 2019 is not true.  As just one example of the Report's "account" of the changes to IMPACT that were implemented, the Monitors' Report directly quotes correspondence from the State regarding "new IMPACT functionality."  *See* D.E. 869 at 134 ("Date of notification is based on new IMPACT functionality.  We anticipate being able to provide information as part of the [Data and Decision Support ('DDS')] report once the data warehouse tables are built and functional."); *see also supra* Sections IV.F.3., IV.G.3. (discussing other accounts in the Monitors' Report of the IMPACT enhancements).

Second, information about Defendants' compliance prior to the December 2019 IMPACT enhancement does not undermine, and instead is directly pertinent to, the Monitors' analysis.  As noted above, Remedial Order B5 was "[e]ffective immediately."  Therefore, the fact that the cases analyzed in the Monitors' Report (which constituted a sample that "allowed for a 95/5 confidence interval") partially captured allegations that took place before the IMPACT updates occurred does

not mean that the Monitors' Report "relies on incomplete records, rendering the conclusions reached therein unreliable," as Defendants contend.  *See* D.E. 903 ¶ 16.  Rather, a sample capturing earlier cases supports the conclusion that Defendants have not timely complied with Remedial Order B5, and the timeframe of the Monitors' analysis was appropriate and necessary to make this determination.  *See* D.E. 869 at 135 n.257.

Indeed, witness testimony at the Show Cause Hearing confirmed that prior to December 2019, Defendants were likely not in full compliance of the Remedial Order.  In her testimony, Batiste affirmed that DFPS did not have an automated system in place in IMPACT to notify caseworkers of allegations of abuse and neglect prior to December 2019, and prior to that, Defendants did not know and could not guarantee whether they were fully in compliance with the notification requirement of Remedial Order B5.  D.E. 990 at 39:4–8, 39:11–12.  Prior to December 2019, "there was a policy in place in which notifications were provided to caseworkers, but that was through an email process," so Batiste testified that notifications "may not have been timely and consistent a hundred percent of the time just due to the nature of investigative tasks and investigators having to complete the process through a[n] email notification versus a[n] automated process."  *Id.* at 39:9–11, 39:24–40:3.  As discussed above, Remedial Order B5 was "[e]ffective immediately" upon the Fifth Circuit's July 30, 2019 Mandate, and so the fact that Defendants' compliance was not consistent prior to December of 2019 supports the conclusion that they have failed to comply with the Remedial Order.  *See* D.E. 606 at 15; D.E. 627.

Third, updating the IMPACT system more than four months after the Mandate does not constitute good faith efforts to comply timely with the requirement of Remedial Order B5 to "immediately" "ensure that . . . allegations of abuse" are "promptly communicate[d] . . . to the child's primary caseworker" and "ensure that . . . a system" is maintained "to receive, screen, and

assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children" "immediately."  *See* D.E. 606 at 15.

A final problem with Defendants' position that the Monitors' consideration of cases pre-dating Defendants' IMPACT enhancement undermines the validity of the Monitors' analysis is that Defendants have made no argument and provided no evidence that they were unable to comply in a timely manner with Remedial Order B5.  *See LeGrand*, 43 F.3d at 170 (inability to comply is a defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same).  They have thereby provided no reason or justification for waiting until several months after the effective date of the Remedial Order to make updates to IMPACT in December 2019, after being on notice of the requirements of Remedial Order B5 for many months prior to its effective date.

Another argument that Defendants put forth in their Response to Plaintiffs' Motion is that "DFPS has implemented procedures that . . . establish compliance with Remedial Order No. B-5." D.E. 911 at 16.  In particular, Defendants allege that "[t]he intake report from May 2020 indicates that in all intakes, caseworkers received notification of the intake."  *Id.*  The problem with this allegation is that the information alleged therein could not have been verified by the Monitors in their June 2020 Report.  The Court therefore affords less weight to this information than to the information verified in the Monitors' Report concerning Defendants' compliance with Remedial Order B5.  As a result, Defendants' alleged rate of compliance in May of 2020 does not counteract the "clear and convincing evidence," *see Salazar*, 713 F.3d at 792, provided in the Monitors' Report.

Defendants have failed to rebut the *prima facie* three-part showing of civil contempt, show good faith efforts, or demonstrate that they were unable to comply.  Defendants' unexcused failure to comply with Remedial Order B5 has resulted in the continued exposure of PMC children to an

unreasonable risk of serious harm.  The Court therefore holds Defendants in contempt of Remedial

Order B5.

I.      **Remedial Order 22: RCCL Review of the History of Allegations and Findings of Abuse and Neglect at Licensed Placements**

Remedial Order 22 provides that:

> Effective immediately, RCCL, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements.  During inspections, RCCL, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect.  When RCCL, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.

D.E. 606 at 5 ¶ 22.   Remedial Order 22 is one of several Remedial Orders that this Court

implemented to shift RCCL's culture of "lethargic and ineffective" "oversight of children's

placements," D.E. 869 at 12, to meaningful enforcement.   For example, Remedial Order 20

requires that:

> Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations.  Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

D.E. 606 at 4-5 ¶ 20.  Although, as noted above, *see supra* note 7, Plaintiffs originally alleged in

their Show Cause Motion that Defendants were in contempt of Remedial Order 20, they agreed

"to confirm that Defendants are not required to show cause as to why they should . . . not be held

in contempt and sanctioned for failing to comply with Remedial Order No. 20."  *See* D.E. 942-1

at 1.  The Court entered an order to this effect on August 31, 2020.  *See* D.E. 950 at 2.  However,

a discussion of this Remedial Order is pertinent to a discussion of past referrals and confirmed

findings of child abuse/neglect and confirmed findings of corporal punishment at licensed placements for purposes of Remedial Order 22.

Following the Fifth Circuit's Mandate, Defendants requested "clarification" regarding "[h]ow to define a pattern of minimum standards violations"; "[t]he timeframe requested to determine a pattern of minimum standards violations"; and "[t]he definition of 'heightened monitoring'" for purposes of Remedial Order 20. D.E. 869 at 291–92, 295–96. Defendants and the Monitors conferred and corresponded regarding these definitions. *See, e.g.*, D.E. 803 at 8:6–9:12 (transcript of February 12, 2020 phone conference discussing definitions of "pattern" and "heightened monitoring"); D.E. 806 (February 19, 2020 Notice of Submission by Defendants regarding heightened monitoring); D.E. 811 at 4 (ordering the Monitors to provide a proposed definition and methodology by February 20, 2020). On March 18, 2020, the Court entered an order adopting definitions of and guidelines for the terms "pattern" and "heightened monitoring," from Remedial Order 20, as follows:

- **Pattern:** "A pattern is defined as a high rate of contract and standards violations for at least three of the last five years." D.E. 837 at 1. The Order also provides "[s]teps in identifying the pattern." *Id.*

- **Heightened Monitoring:** "When an operation is identified for heightened monitoring, a Facility Intervention Team Staffing (FITS) is scheduled within 5 days. The intervention team is made up of staff from, at least, [HHSC-RCCL], DFPS CCI, DFPS Contracts, and CPS." *Id.* at 2. The Order provides that "[d]uring the FITS, the team will review: [a]ny trends for the operation identified as a result of the 5-year retrospective analysis[;] [a]ny monitoring plans or corrective or enforcement actions for the operation in the last 5 years; [a]ny risk analyses conducted by [HHSC-RCCL] or DFPS for the operation in the last 5 years." *Id.* The Order goes on to describe the steps the FITS team should take if they should find an "ongoing concern for the health and safety of children" and the requirements for "developing a heightened monitoring plan." *Id.*

The requirements of Remedial Order 20 that the State must subject facilities to "heightened monitoring" where they "show a pattern of contract or policy violations" relates to and is informed by the requirements of Remedial Order 22 that inspectors consider a placement's past alleged or

confirmed findings of abuse/neglect and confirmed findings of corporal punishments during inspections and that inspectors must monitor whether placements are reporting suspected child abuse/neglect appropriately.  *See* D.E. 606 at 15 ¶ 22.  Remedial Orders 20 and 22, among others, work together to address the problematic findings that the Court made at trial regarding patterns of violations at placements that never or rarely faced enforcement action from the State, putting children at an unreasonable risk of harm.

### 1.      The Court's Findings at Trial Related to Remedial Order 22

At trial, the Court noted that "PMC children are placed in a variety of residential settings. Approximately 90% of these placements are managed by private CPAs that contract with the State. . . .  DFPS directly manages the remaining 10%."  D.E. 368 at 9 (citations to Defendants' Exhibits omitted).  "Licensed operations include independent foster family homes, independent foster group homes, general residential operations, residential treatment centers, child-placing agencies, CPA foster family homes, and CPA foster group homes."  *Id.* at 200.  As noted above, it was at trial, and remains today, RCCL's role to oversee the licensing of foster care placements. However, at trial, the Court found that RCCL was failing to adequately oversee licensed placements through its licensing and enforcement actions.  RCCL was also failing to recognize and act on problematic patterns and trends that were apparent in the histories of licensed placements.

The Court found that by "almost never tak[ing] an enforcement action" against licensed facilities, the State was putting children at an "unreasonable risk of harm."  *Id.* at 208.  The Court found that "RCCL [was] . . . failing its licensing and inspecting duties" by failing to consider "repeat violations" in determining whether to take enforcement actions," *id.* at 208–09, and that "problems of inadequate and incomplete caseworker documentation [were] considerably

magnified by the way in which DFPS maintains foster children's case files," *id.* at 168.  In short, "little changed as a result of finding out that children were abused and neglected."  *Id.* at 202.

The Fifth Circuit agreed.  In *Stukenberg I*, the Fifth Circuit held that "[t]he district court correctly found that the State was deliberately indifferent to a substantial risk of serious harm to the LFC subclass as a result of its insufficient monitoring and oversight, and that these deficiencies are a direct cause of the constitutional harm."  D.E. 601 at 44.  Specifically, the Fifth Circuit agreed with this Court that it "seems painfully obvious" that "inadequate enforcement policies place children at a substantial risk of serious harm."  *Id.* at 43.  The Fifth Circuit also agreed with this Court's findings regarding the State's record keeping and data management practices, which the Fifth Circuit said were "shockingly haphazard and inefficient."  *Id.* at 5.  This Court's findings at trial, as affirmed by the Fifth Circuit, regarding each of these issues are discussed below.

### a.      Inadequate Oversight in Licensing and Enforcement

In general, the Court found at trial that while the State could "choose from 13 types of enforcement actions when it finds a violation,"[95] the State "almost never takes an enforcement action" against licensed facilities.  D.E. 368 at 208.  "During fiscal year 2013, CCL oversaw 10,286 licensed residential childcare facilities.  Over that time, CCL cited providers for 6050 violations, but only issued 12 corrective actions and 1 adverse action."  *Id.*; *see also* D.E. 601 at 42.  Over the five years leading up to trial, "CCL issued only four adverse actions against residential operations."

---

[95] "These options include working with facilities to voluntarily correct deficiencies, probations, monetary penalties, and denial, suspension, or revocation of an operator's permit."  D.E. 368 at 208 (citation omitted).

D.E. 368 at 208.[96]  At the time of trial, CCL had closed only one facility in the previous five years:

the Daystar facility in Manvel, Texas, which had the capacity for 141 children.  *Id.* at 209; *see also*

D.E. 601 at 42.  But, the Court noted, "it is a story of horror rather than optimism regarding

enforcement."  D.E. 368 at 209.  The Fifth Circuit agreed, saying "Daystar is a particularly tragic

example."  D.E. 601 at 42.  At trial, the Court described the following horrors that had occurred at

Daystar:

> Between 1993 and 2002, three teenagers died at Daystar from asphyxiation due to
> physical restraints.  In most cases, the children were hog-tied.  Beyond these deaths,
> there were reports of sexual abuse and staff making developmentally disabled girls
> fight for snacks.  Numerous stakeholders, including the district attorney, spoke out
> against Daystar, but the facility kept its license.  In November 2010, a fourth child
> died in what was ruled a homicide by asphyxiation due to physical restraints.
> Daystar's license was still not revoked until January 2011.

D.E. 368 at 209–10.

RCCL's failure to properly institute enforcement actions against licensed placements had

severe consequences for children.  The evidence at trial regarding Named Plaintiffs painted a vivid

picture of the problem.  The experiences of the Named Plaintiffs regarding the deficiencies of the

State's investigative processes, also reflect RCCL's inadequate enforcement practices at the time

of trial.  As previously discussed, *see supra* Section IV.E.1., "[w]ithin four months of entering

foster care, [S.A.] made her first sexual abuse outcry, reporting anal penetration by an older male

foster child."  D.E. 368 at 80.  "After this abuse was reported, RCCL's only response was to request

---

[96]      Instead of enforcement actions, DFPS chooses "Collaborative approaches like corrective plans,
probation, and evaluation periods [that] can take up to one year or longer for operations to come
into compliance."  In the meantime, children remain and continue to be placed in these facilities.
The Court would not be concerned if DFPS's strategy was working, but it is not. . . .  "One
consequence of a more relaxed regulatory environment can be seen in a high incidence of repeat
violations that can result when regulated entities perceive that they will not be held accountable for
ignoring the State's requirements."

D.E. 368 at 208–09 (citations omitted) (quoting DX 119 at 90–92); *see also* D.E. 601 at 43 ("[I]ts 'collaborative'
approach to compliance was simply not working.  This is evidenced by the fact that there is a very high rate of repeat
violations, as licensees do not perceive that they will be held accountable for their malfeasance.").

-8

that the [CPA, the] Bair Foundation . . . complete an internal investigation." *Id.*  The Bair Foundation "'did not cite any non-compliances' and planned no further action." *Id.* (citations omitted).  Similarly, a few months after entering the State's PMC, eight-year-old Plaintiff D.I. fell prey to sexual abuse involving oral and anal sex by two older boys, aged 16 and 17, at the home where he was placed by the same CPA, the Bair Foundation.  *Id.* at 74.  "[T]he only action recommended in [RCCL's] investigation report was "[r]outine monitoring."  *Id.* at 76.  The RCCL investigator completed his investigation of the Bair Foundation six months later, "finding no minimum standard deficiencies."[97]  *Id.*  Specifically, the RCCL investigator found the Bair Foundation to be in compliance with the following standards:

- "Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401." *Id.* at 77.

- "The caregiver is responsible for being aware of and accountable for each child's on-going activity." *Id.*

- "The caregiver is responsible for ensuring each child's safety and well-being including auditory and/or visual awareness of the child." *Id.*

Again, "[n]either the Bair Foundation nor the foster group home was penalized or admonished in connection with this incident." *Id.*

Similarly, despite Plaintiff M.D.'s numerous complaints and outcries of sexual abuse and excessive restraints taking place at Hector Garza, as well as numerous other issues identified at the time of the Monitors' visit to the facility, as discussed below, the facility remained licensed at the time of the Show Cause Hearing.  *See supra* Section IV.E.1.; *infra* Section IV.I.3.a.i(a).  The

---

[97] Specifically, the RCCL investigator found the Bair Foundation to be in compliance with the following standards:

- "Adhere to the child's rights to be free of abuse, neglect, and exploitation as defined in Texas Family Code 261.401." D.E. 368 at 77.

- "The caregiver is responsible for being aware of and accountable for each child's on-going activity." *Id.*

- "The caregiver is responsible for ensuring each child's safety and well-being including auditory and/or visual awareness of the child." *Id.*

experience of M.D. at Hector Garza, combined with the ongoing problems at the facility, is emblematic of a system that fails to adequately oversee the facilities that it licenses by taking into consideration patterns of problems at those facilities.

M.D. complained to her caseworker that the staff at Hector Garza were excessively rough when restraining her.[98]   D.E. 368 at 61.   "[M.D.] also said the staff ignored residents fighting amongst themselves" and that "she felt unsafe at Hector Garza"; in fact, in August of 2011, M.D. was arrested for assaulting a teacher, and she "told the police that she preferred 'to remain [in jail] indefinitely' rather than return to Hector Garza."   *Id.*   The problem of Hector Garza staff exerting excessive force when restraining children has continued to this day, apparently unchecked.   *See infra* Section IV.I.3.a.i(a).   This year, the Monitors learned that the children at Hector Garza shared M.D.'s feelings about being placed there, as more fully discussed below.   Indeed, the Monitors discovered during their visit to Hector Garza that the facility continued to be a chaotic environment for foster children who were unfortunate enough to be placed there, and it had the exact same problems of excessive restraint practices and poor supervision of children that M.D. experienced almost a decade ago.[99]

---

[98] For example, during an encounter with the police, M.D. told law enforcement officials "that the Hector Garza staff used improper restraints, including placing their hands on residents' faces and throwing them to the ground.  M.D. claimed her arms were bruised repeatedly from the restraints."  D.E. 368 at 61 (citations omitted).

[99] At another RTC where M.D. was placed, she was subject to such "inappropriate living conditions" that Stukenberg commented that, "[i]f [the RTC] had been a parent the child would have been removed from the home immediately." D.E. 368 at 63 (quoting DX 120 at DFPS009014186).  When Stukenberg visited in October of 2011, "she observed that M.D. shared a trailer with nine other girls, sharing a single shower and toilet even though regulations prohibit more than eight girls to one shower or toilet."  *Id.*  "The trailer also smelled of mildew and urine."  *Id.*  Stukenberg also observed that "only one staff was assigned to the trailer, and there was a noticeable lack of training among all RTC staff."  *Id.*  In addition, "M.D. had not received medical attention for . . . lacerations" that were the result of "multiple self-inflicted cuts on M.D.'s arms and legs—including a particularly deep one on her wrist—reportedly due to the stress caused by the rape and consequent retaliation" that she experienced at the RTC.  *Id.*  RCCL merely ordered "Technical Assistance" for the RTC to meet "legal requirements" regarding the physical living conditions but "Ruled Out allegations of neglectful supervision and medical neglect."  *Id.* (citing DX 120 at DFPS009014300–01, DFPS009014304–05, 009014317).  "That disposition was based largely on the investigator not noticing a urine smell when visiting the trailer three days after the report."  *Id.* (citing DX 120 at DFPS009014300–01, DFPS009014304–05, 009014317).

At trial, the Court noted that "approximately 36 percent of all residential standards violations 'are overturned during administrative reviews' due to inadequate investigations."[100] D.E. 368 at 209.  As discussed above, Shaw and the PMU had conducted a review in 2014 of previous cases from 2012 and 2013, which had revealed error rates as high as 75%.  *Id.* at 201–02; D.E. 301 at 37:6–48:15; *see also supra* Section IV.E.1.   When RCCL learned that prior investigations of facilities had come to erroneous conclusions of UTD or Ruled Out at alarmingly high rates, the action it took in response demonstrates its reluctance to hold licensed facilities to account for the conditions that they create for children.  At trial, the Court asked Paul Morris, the Assistant Commissioner of CCL, what RCCL did when it learned of the results of this 2014 review. Morris described RCCL's follow-up actions as "basically . . . a full inspection of the facilit[ies]" where incorrect dispositions had previously been made.  D.E. 301 at 54:24–25.  However, during what he described as "full" inspections of facilities, RCCL did not require interviews of the children who had made the original allegations of abuse and neglect:

> THE COURT:  When you went back to interview -- or, to re-look at the cases that were found believable, when they hadn't been previously, were the children interviewed as well?
>
> THE WITNESS:  I believe they were.
>
> THE COURT:  Do you know that?
>
> THE WITNESS:  If the children were still in care.
>
> THE COURT:  Do you know if they were interviewed; 100 percent sure that they were interviewed?
>
> THE WITNESS:  I'm not 100 percent sure that the children were interviewed, but I do know that some of the children were no longer in care, ma'am.  So I don't know if the child left --

---

[100] "Reasons that standard violations are overturned during administrative review include investigators' failures to gather sufficient evidence and to appropriately support decisions with documentation."  D.E. 368 at 209 n.51.

THE COURT:  So you didn't -- that was not one of your directives, to go out and find these children and see what they have to say?

THE WITNESS:  I would have to rely on Ms. Shaw to see if she did that.  I don't recall that being --

THE COURT:  But you're the guy in charge, aren't you?

THE WITNESS:  Yes, ma'am.  Yes.

THE COURT:  And you didn't have that as one of your directives?

THE WITNESS:  No, your Honor.

*Id.* at 63:1–22.  During these purportedly "full" inspections of the facilities where UTD findings were incorrectly made, RCCL once again "noted no findings of abuse, no other outcries from children," and "the licenses were not revoked for the facilities or the homes where those occurred." *Id.* at 47:12–15, 48:3–4.  Thus, both the initial investigation and the follow-up inspection by RCCL contained problems in their processes and, therefore, had outcomes that were questionable, at best.

Overall, the Court found that RCCL took little meaningful enforcement action and that despite the extremely high investigatory error rate, "DFPS took no action nor made any change to RCCL investigation policies or practices."  D.E. 368 at 203.  As the Fifth Circuit pointed out, "[r]eports regarding RCCL's investigatory shortcomings date back over a decade. . . .  Yet [the State] has not done any significant work to improve on these deficiencies."[101]  D.E. 601 at 43.  In its 2015 Opinion and Verdict, this Court ordered that the Special Master "shall recommend provisions to solve RCCL's unwillingness to institute corrective actions against violating

---

[101] The Fifth Circuit went on to note that:

> DFPS apparently held a mandatory one-day meeting to impress upon its staff the importance of maintaining high standards for investigations, but RCCL policies apparently remained unchanged.  Similarly, reports have consistently flagged inadequate oversight in licensing and enforcement as a critical problem area.  But DFPS rarely heeds the advice of risk analysts to impose administrative penalties and ignores recommendations from the internal quality control experts at PMU to revoke licenses at non-compliant facilities.

D.E. 601 at 43–44.

facilities" and "shall recommend other provisions deemed necessary to ensure that RCCL protects foster children from an unreasonable risk of harm." D.E. 368 at 252.

### b. Failure to Recognize Problematic Patterns in the Histories of Licensed Placements

The Court further determined at trial that "[e]ven with correct dispositions" in RCCL's investigations, foster children would be placed "at an unreasonable risk of harm" because RCCL was failing to recognize and act on trends and patterns of problems at licensed facilities from past outcries and investigations. *Id.* at 202. In general, the Court found that many problematic placements that maintain their licenses had "repeat deficiencies." *Id.* at 209. "In 2011, PMU found that 65.6% of residential care operations had repeat deficiencies. In 2012, 77.6% of residential care operations had repeat deficiencies." *Id.* (citing PX 1111 at 13; PX 1074 at 12); *see also* D.E. 601 at 43. Moreover, "[m]ost of these repeat violations occurred on the highest-risk standards.'" D.E. 368 at 209; *see also* D.E. 601 at 43. However, "[i]n 2011 and 2012, CCL did not follow a single license revocation recommendation." D.E. 368 at 214 (citing DX 1111 at 10, 12).

The examples of sexual abuse outcries made by D.I. and S.A., discussed above, *see supra* Section IV.I.1.a., demonstrate repeated allegations of abuse and neglect at placements under the supervision of the same CPA, the Bair Foundation, which RCCL never penalized. After S.A.'s outcry involving "anal penetration by an older male foster child" in a foster home overseen by the Bair Foundation, discussed above, RCCL did not "conduct[] any independent investigation or follow-up in regard to these allegations," and "[b]ecause RCCL allows CPAs to keep their own files, the records of the CPA's internal investigation are not in [S.A.'s] IMPACT or External case files. Therefore, no subsequent caseworker would have this information." D.E. 368 at 80 (citations and footnotes omitted). After this failure in important record keeping, the exact same CPA, the Bair Foundation, placed D.I. in a foster home where he was sexually abused by older children. *See*

*supra* Section IV.I.1.a.  "During the investigation into this incident, the . . . primary caseworker" of one of the older children "told the RCCL investigator that the CPA 'should have been' aware" of a prior incident of sexual abuse by the older child because "this incident was similar to the previous incident."  D.E. 368 at 74–75.  Yet, "the only action recommended in the investigation report was '[r]outine monitoring,'" and "[n]either the Bair Foundation nor the foster group home was penalized or admonished in connection with this incident."  *Id.* at 77.  The stories of S.A. and D.I. demonstrate a pattern of RCCL failing to take seriously and act on multiple allegations arising out of placements overseen by the same CPA.

In addition, following the 2014 review by PMU and Shaw, which revealed high error rates in prior RCCL investigations, "[n]o licenses were suspended . . . .  [n]one were revoked . . . .  [n]o penalties were established on any of these facilities . . . [and] the State didn't move any of the children."  D.E. 301 at 50:15–13 (trial testimony of Morris); *see also* D.E. 601 at 40 ("Despite the fact that RCCL found several substantiated cases of abuse buried in the random sample of UTD dispositions, DFPS took no action to move any of the children, no penalties were enacted, and no licenses were revoked."); D.E. 368 at 202.  As the Fifth Circuit lamented, "[c]hildren were left in homes and facilities where DFPS knew there was a serious possibility they were being abused."  D.E. 601 at 40.  RCCL would only take enforcement action to possibly revoke the license of a facility if an **additional** allegation of abuse and neglect had been made **since** the previous one that RCCL had determined to be incorrect.  Morris testified that this was because PMU staff "need[ed] to look for any sort of trends with any of the providers" but that "[n]o trends were identified for us" and that there were "no further outcries and no other intakes."  D.E. 301 at 49:2–20; 55:2–4.

The fundamental problem with RCCL's practice of only recognizing trends when there are "further outcries" or new intakes, rather than a holistic picture of a placement's history, is that

foster children underreported abuse because of a loss of faith in a system that had not taken previous allegations seriously. "[T]he already staggering number of abuse and neglect incidents (around 2000 each year), for which there is a 75% investigation error rate, is likely much higher because foster children do not know who to contact, do not feel that anything will be done, or fear retaliation." D.E. 368 at 206; *see also* D.E. 601 at 41 ("[T]he evidence in the record indicates that abuse is underreported. . . . Even if children knew whom to call, many are so distrustful of the system that they are unlikely to feel comfortable reporting abuse.").[102]

As the Fifth Circuit noted, "[u]nder these circumstances, it is unsurprising that many children choose the path of least resistance and stay silent." D.E. 601 at 41. It was no wonder to the Court that children were not making additional outcries after a substantial number of allegations from 2012 and 2013 were ignored by the State, as reflected in its 2014 review. RCCL's failure to use past outcries, allegations, and investigations to inform its decisions regarding licensing of facilities placed the children at an unreasonable risk of harm. D.E. 368 at 202.

In its 2015 Opinion and Verdict, the Court concluded that, "[i]n sum," the "insufficient oversight of . . . licensed care facilities has caused harm and an unreasonable risk of harm to LFC children." *Id.* at 211. Moreover, as this Court found and the Fifth Circuit agreed, the State had known about these problems and failed to make changes or improvements to its system. *Id.* at 255 ("The Court has no assurance that anything has changed."); *see also* D.E. 601 at 43.

---

[102] For example, one witness at trial, former foster child Kristopher Sharp, testified that:

> I've never met a young person who stayed at an RTC that hasn't been abused and hasn't felt like they wouldn't be able to report it and somebody believe them. I think, you know, we're blamed for everything. People are constantly telling us how bad we are and I think that for most of us, we've probably out-cried before. We've probably talked about this before or at least relayed that we didn't feel comfortable. We didn't feel safe in placements and then nothing happened and so -- I mean, why -- why would you go through the process of even thinking that something would happen if you were to report something like this?

D.E. 325 at 170:17–171:3; *see also* D.E. 601 at 41; D.E. 368 at 205–06.

2.      The Procedural History of Remedial Order 22

In order to remedy the problems identified at trial regarding Defendants' inadequate oversight of licensed operations and failure to enforce standards and policies, the Court ordered the Special Masters to "help craft . . . reforms and oversee their implementation."  *See* D.E. 368 at 245; *see also id.* at 246–48, 251–52.  In its January 2018 Order, the Court adopted provisions from the Special Masters' Implementation Plan to address the problems discussed above, regarding RCCL's processes for overseeing licensed foster care placements, including a provision ensuring that prior referrals and confirmed findings of abuse/neglect and confirmed findings of corporal punishment at licensed placements were considered in RCCL's inspections.  D.E. 559 at 82 ¶ L15 (Remedial Order entered in the Court's January 2018 Order); D.E. 546 at 40 ¶ 15 (recommended

provision from the Special Masters' Implementation Plan);[103] *see also* D.E. 368 at 200–17

(discussing the fact that, at trial, "RCCL [was] . . . failing its licensing and inspection duties").

Defendants immediately appealed the January 2018 Order.  *See* D.E. 560.  In its

*Stukenberg I* opinion, the Fifth Circuit expressly validated this Remedial Order pertaining to

RCCL's oversight and placement inspections.  *See* D.E. 601 at 57 ("Most of the injunction

---

[103] The provision proposed in the Special Masters' Implementation Plan read as follows:

> Effective immediately, **DFPS**, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements.  During inspections, **DFPS**, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect.  When **DFPS**, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, **DFPS, and any successor entity charged with inspections of child care placements, shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.**

D.E. 546 at 40 ¶ 15 (emphasis added).  Defendants objected to this provision of the Special Masters' Implementation Plan, by saying that:

> The Plan requires the "entity charged with inspections of child care placements" to consider certain listed referrals and findings during placement inspections . . . .  It also requires this same entity to monitor an operation's adherence to certain listed reporting requirements and investigate violations to determine appropriate corrective action. This requirement is not clear and potentially violates state law as worded. DFPS makes child placements and RCCL conducts inspections. State law regulates the role and authority of each agency; therefore, this item cannot be implemented as worded. RCCL does monitor through the inspection and investigation process an operation's adherence to reporting suspected abuse/neglect. If a lapse is found, RCCL works with the operation to make needed corrections through RCCL's enforcement framework. Operations placed on corrective or adverse action for issues or patterns related to not reporting suspected abuse/neglect are shared by RCCL with DFPS. RCCL cannot modify or terminate a contract. The contract is a DFPS requirement and must by modified or terminated by DFPS.

D.E. 556 at 37.  Accordingly, in its January 2018 Order, the Court noted Defendants' objection and "alter[ed] Item 15, as reflected" in the Order, which replaced "DFPS" with "RCCL" and noted that RCCL shall refer matters to DFPS for appropriate action.  D.E. 559 at 82 n.55 (citing D.E. 556 at 37).  "To the extent these changes d[id] not satisfy Defendants' Objection," the Court overruled Defendants' objection to that item of the Special Masters' Implementation Plan and adopted the following language in the Remedial Order:

> Effective immediately, **RCCL**, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements.  During inspections, **RCCL**, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect.  When **RCCL**, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, **it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract**.

*Id.* at 82 ¶ L15 (emphasis added) (footnotes omitted).

provisions relating exclusively to monitoring and oversight violation are reasonably targeted toward remedying the identified issues."), 60 ¶ 20 (listing this Remedial Order as one of the validated orders).

Following *Stukenberg I* and briefing by the parties concerning the issues on remand and proposed remedies, *see* D.E. 602–04, the Court issued its November 2018 Order, which restated or modified prior remedial orders and put forth new remedial orders, to comply with the Fifth Circuit's opinion, *see* D.E. 606.  Because *Stukenberg I* did not disturb this Remedial Order pertaining to RCCL's oversight and placement inspections from the January 2018 Order, *see* D.E. 559 at 82 ¶ L15, the Court restated it as Remedial Order 22 in the November 2018 Order, *see* D.E. 606 at 5 ¶ 22.  Furthermore, as previously stated, *see supra* Section III.A., the Court issued its final injunction in the November 2018 Order:

> The Court therefore ENJOINS the Defendants from placing children in permanent management conservatorship ("PMC") in placements that create an unreasonable risk of serious harm.  The Defendants SHALL implement the remedies herein to ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm.

D.E. 606 at 2 (footnote omitted).[104]

On November 28, 2018, the Defendants appealed the Court's November 2018 Order but did not raise Remedial Order 22 as an issue on appeal.  D.E. 607; *supra* note 5; *see also* D.E. 627 at 3 (listing the issues on appeal, which did not include Remedial Order 22).  On July 30, 2019, the same Fifth Circuit panel that decided *Stukenberg I* issued its Mandate in *Stukenberg II*, affirming in part and reversing in part the Court's November 2018 Order but not addressing

---

[104] As previously noted, *see supra* Section III.A., the Court expressly noted in this injunction that in *Stukenberg I*, the Fifth Circuit "included psychological harm in its definition of serious harm."  D.E. 606 at 2 n.1 (quoting D.E. 601 at 14) ("We agree that plaintiffs' substantive right to 'personal security and reasonably safe living conditions' includes the very limited right to be free from severe psychological abuse and emotional trauma—both of which are often inextricably related to some form of physical mistreatment or deprivation.").

Remedial Order 22.  D.E. 601 at 2, 73; D.E. 627 at 3.  Thus, Remedial Order 22 became effective

upon the Fifth Circuit's Mandate.  Accordingly, as Defendants have stipulated, *see* D.E. 990 at

7:4–12, the first element for civil contempt "that a court order was in effect" is fulfilled as to

Remedial Order 22, *see LeGrand*, 43 F.3d at 170.  Defendants were required to comply upon the

date of the Fifth Circuit's July 30, 2019 Mandate.  *See* D.E. 627.

### 3.    Defendants Have Failed To Comply with Remedial Order 22.

On September 9, 2019, HHSC requested the following clarifications regarding Remedial

Order 22:

> With regards to considering all referrals of, and in addition all confirmed findings
> of, child abuse/neglect and all confirmed findings of corporal punishment, HHSC-
> RCCL respectfully requests clarification about the timeframe in which the
> inspectors should consider all referrals of any confirmed findings of child
> abuse/neglect and corporal punishment occurring in facilities.
>
> HHSC respectfully requests clarification about how to document that the inspectors
> have considered all referrals of, and in addition all confirmed findings of, child
> abuse/neglect and all confirmed findings of corporal punishment occurring in
> facilities.
>
> Possibilities include:
>
> - Adding a check box to the inspection form to indicate this information was
>   considered.
> - Requiring in policy that inspectors review the Compliance History Report
>   prior to inspecting an operation.

D.E. 869 at 263.  After conferring with the Court, the Monitors responded on October 7, 2019,

advising HHSC that:

> [W]ith respect to HHSC's Request for Clarification for Remedial Order 22, the Court directs with respect to the look-back period for considering all referrals of, and in addition, all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment, [HHSC-RCCL] inspectors should assess the previous 5 years.  With respect to the request for clarification about how to document that the inspectors have considered these referrals and findings, a check box is insufficient.  The Court directs the agency to have inspectors document in CLASS (1) the number of referrals of child abuse/neglect; (2) the number of confirmed findings of child abuse/neglect; (3) the number of confirmed findings of corporal punishment; and (4) a narrative description of how this data and information was considered.

*Id.* at 264.  Thus, while "[p]rior to the Court's Order, HHSC only required licensing inspectors to conduct a general review of an operation's compliance history as one component of the information reviewed prior to application, initial, or monitoring inspections," Remedial Order 22 "directs inspectors to conduct a more extensive five-year review,[105] with a targeted focus on abuse or neglect and corporal punishment," to which they must refer during inspections.  *Id.* at 260–61.

This requested clarification of Remedial Order 22, combined with the text of the Remedial Order, itself, is clear in what it requires Defendants to do: (1) the State "must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements" in the last five years; (2) "[d]uring inspections" the State "must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect"; and (3) when the State "discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract."  D.E. 606 at 5 ¶ 22.  The State is not simply required to check the box of completing extended compliance history reviews prior to inspections; Remedial Order 22 requires consideration of the extended compliance history reviews during the inspection in a manner that protects PMC children from an

---

[105] This review is interchangeably referred to as an "extended compliance history review" and a "five-year retrospective report."  *See, e.g.*, D.E. 869 at 37, 262.

"unreasonable risk of serious harm," per the Court's injunction.  *See id.* at 2.  One of the purposes of this Remedial Order is for the State to be equipped to recognize and act on patterns of child abuse/neglect in the histories of licensed placements housing PMC children.  It is clear from the text of the Remedial Order and the clarifying correspondence between HHSC and the Monitors that Remedial Order 22 "require[s] certain conduct"; therefore, the second element of contempt is fulfilled as to this Remedial Order.  *See LeGrand*, 43 F.3d at 170.

In their Motion, Plaintiffs allege that Defendants have not complied with Remedial Order 22 and that, therefore, the third element of civil contempt is satisfied and Defendants are in contempt of the Court's order.  D.E. 901 at 3, 16–17.  In support of this argument, Plaintiffs cite the data provided in the Monitors' Report regarding Defendants' compliance with Remedial Order 22's specific requirements for completion of extended compliance history reviews before inspections.  *Id.* at 17.  The Monitors' Report contains statistical and qualitative information that reveals that not only have Defendants failed to comply with the specific terms of Remedial Order 22, but Defendants have also generally failed to remedy the same harms that the Court found at trial regarding Defendants' lax oversight of licensed operations and their failure to consider the patterns of prior allegations of abuse and neglect occurring at certain placements.  Discussed below are, first, the information in the Monitors' Report, as well as testimony from the Show Cause Hearing, that reveal generally the same ongoing problems that the Court found at trial, which are placing children at an unreasonable risk of serious harm; and second, the information in the Monitors' Report that, as alleged by Plaintiffs, shows the specific ways in which Defendants have not complied with Remedial Order 22.

### a.   Ongoing Unreasonable Risk of Serious Harm to Children in Licensed Placements

On June 16, 2020, the Monitors released their Report, which revealed that Defendants have failed to comply with the Court's Remedial Orders in numerous ways, and, as a result, the same problems that the Court found at trial have continued within the State's foster care system.  The Monitors' Report, as well as testimony at the Show Cause Hearing, uncovered disturbing developments regarding licensed foster care placements that have occurred since the Fifth Circuit's July 30, 2019 Mandate in *Stukenberg II*.  These developments demonstrate: (1) HHSC-RCCL's ongoing failure to conduct proper inspections and investigations and to follow up with proper enforcement actions; (2) its continuing failure to recognize and act on patterns and trends from past allegations and confirmed findings of abuse/neglect and confirmed findings of corporal punishment at licensed placements; and (3) a continued—and, indeed, worsened—failure to communicate across the divisions and agencies that are responsible for child welfare in the State of Texas.

### i.   Inadequate Oversight in Licensing and Enforcement

According to the Monitors' Report, there was a total of 10,933 children in PMC status as of November 30, 2019.  D.E. 869 at 45.  Out of that total, 1,616 children (or 15%) were living in congregate care facilities, or GROs, as of November 30, 2019.  *Id.*; *see also* D.E. 368 at 9 ("Facilities that contain 13 or more children are called general residential operations ('GROs'), 10 ("GROs and RTCs are also called 'congregate care facilities.'"), 224 ("A GRO, also called a congregate care placement, is 'a child-care facility that provides care for more than 12 children for 24 hours a day.'") (quoting Tex. Human Res. Code § 42.002(4)).  These children were living in facilities that are licensed and inspected by HHSC-RCCL and therefore are relevant to Remedial Order 22.  In Fiscal Year 2019, those facilities included 278 licensed GROs, 95 of which were

RTCs.  *See* Tex. Health & Human Servs. Comm'n, Child Care Regulation Data Book - Residential Child Care Regulation Statistics - Fiscal Year 2019 4 (Aug. 6, 2020), https://hhs.texas.gov/sites/default/files/documents/about-hhs/records-statistics/research-statistics/ccl/ccr-data-book-residential-child-care-2019.pdf; *see also* D.E. 869 at 41 (noting that there were 299 GRO "campuses" at the time of the Monitors' Report).  The 278 GROs had a total child capacity for 16,532 children, and out of that, the 95 RTCs had a capacity for 3,954 children. *See* Tex. Health & Human Servs. Comm'n, Child Care Regulation Data Book - Residential Child Care Regulation Statistics - Fiscal Year 2019 4 (Aug. 6, 2020), https://hhs.texas.gov/sites/default/files/documents/about-hhs/records-statistics/research-statistics/ccl/ccr-data-book-residential-child-care-2019.pdf.

RTCs are "[f]acilities that provide specialized residential treatment care."  D.E. 869 at 359. RTCs may be licensed to treat children who have emotional disorders, intellectual disabilities, or pervasive developmental disorders, among other conditions, that require a high level of care.  *See, e.g.*, *id.* at 323, 328; *see also* D.E. 368 at 9–10 ("Residential treatment centers ('RTCs') are a type of GRO that provide therapeutic treatment 'for children with serious emotional disturbances or mental health issues.'").  So typically, RTCs are placements that are meant to house children who require a certain level of care.  PMC children are categorized into authorized levels of care depending on their specific needs.  *See* D.E. 869 at 47.  At trial, the Court found that:

> DFPS has four service levels for children in its care, depending on a child's physical and psychological needs: Basic, Moderate, Specialized, and Intense.  The higher the service level, the more the State pays the foster care facility.  Placements must be licensed to provide for children at specific service levels.

D.E. 368 at 8–9 (citations omitted).  According to the Monitors' Report, out of the 10,933 PMC children as of November 30, 2019, "1,766 (16%) were in a specialized level of care; . . . and 471

(4%) were in an intense level of care."[106]  D.E. 869 at 47; *see also id.* at 95 (explaining that a child was identified as an "intense" level of care due to high-risk behaviors).  Because RTCs are for "specialized" care, they are not appropriate places for children with "Basic" or "Moderate" levels of care.  However, at the time of trial, Kaysie Reinhard, the then-Director of Foster Care Redesign within DFPS, testified that DFPS was having "challenges with having children stay in high-end care too long."  *See* D.E. 316 at 20:11–12; *see also* D.E. 368 at 27.

The Monitors' Report reveals that in the year following the Fifth Circuit's mandate in *Stukenberg II*, HHSC-RCCL has continued to fail to ensure that past allegations or confirmed findings of abuse/neglect and confirmed findings of corporal punishment at licensed operations such as GROs and RTCs do not go unnoticed and unenforced.  The Monitors' Report notes HHSC-RCCL's options under current policy for enforcement actions against licensed placements, which include:

- Corrective Action, which today includes only probation, but prior to September 2019 also included "evaluation."
- Adverse Action, which takes some action on an operation's license, and includes adverse amendment, denial, revocation, and involuntary or emergency suspension.
- Judicial Actions; and
- Monetary Actions (administrative penalties).

D.E. 869 at 288.  In addition, "[a]n operation may also undertake a voluntary plan of action.  [HHSC-RCCL] may also offer technical assistance rather than take formal enforcement action."  *Id.* at 288 n.654.

The Monitors' team made unannounced visits to three residential treatment centers—Hector Garza, Prairie Harbor, and Fresh Start—and one general residential operation—St.

---

[106] As of November 30, 2019, 6,243 of the 10,993 PMC children (57%) were categorized in a "basic" level of care, while 1,637 (15%) were in "moderate" care.  D.E. 869 at 47.

Jude's—for the purpose of confirming whether the licensed placements were providing 24-hour, awake-night supervision, per the Court's Remedial Orders A7 and A8 and the Court's order dated November 7, 2019.  *See id.* at 126 n.239, 257; D.E. 606 at 12 ¶¶ A7–A8; D.E. 725 at 1, 3, 18–20; *see generally* D.E. 875 (App. 5.5a "Program Facility Background: Hector Garza Residential Treatment Center"); D.E. 876 (App. 5.5b "Monitors' Visit to St Jude's Ranch for Children, General Residential Operation (GRO)"); D.E. 877 (App. 5.5c "Program Facility Background: A Fresh Start Treatment Center"); D.E. 878 (App. 5.5d "Program Facility Background: Prairie Harbor, LLC").  These visits also provided the monitoring team with the opportunity to conduct interviews with children and staff and to review the files of children at the facilities, so that they could observe the general conditions at these placements, particularly those related to child safety and the Court's remedial orders.  *See, e.g.*, D.E. 869 at 29 n.14, 126 nn.239–40, 128–30, 129 n.241, 130 n.244, 131 n.245, 224–25, 224 n.512, 225 n.515, 235, 257–59, 257 n.586, 259 n.587, 271 n.613, 325 n.733.  During these visits, the monitoring team discovered ongoing, uncorrected, systemic problems at these licensed childcare facilities, which were failing to prevent unreasonable risk of serious harm to children.  Following these visits, and after the State and the Monitors conducted the analysis outlined in the Court's order, Hector Garza and Prairie Harbor were placed on heightened monitoring, per Remedial Order 20.  *See supra* Section IV.I.; *infra* Sections IV.I.3.a.i(a), IV.I.3.a.i(b); *see also* D.E. 875 at 11–12 (explaining that Hector Garza was placed on heightened monitoring); D.E. 956 at 18 (explaining that Prairie Harbor was placed on heightened monitoring).

### (a)    Hector Garza

The Hector Garza RTC in San Antonio was a placement at which the State evaluated 1,312 standards for compliance between May 1, 2018 and May 1, 2020.  D.E. 875 at 1.  As a result of these standards evaluations:

HHSC-RCCL issued fifty-nine citations and provided 120 instances of Technical Assistance (TA).[107]  Some of the more concerning citations and TA included:

- Twenty-six citations for inappropriate restraints of children and fifty-three instances of related TA;
- Five citations for inappropriate discipline of children and twenty-five instances of related TA; and
- Twelve citations for neglectful supervision of children and twenty-five instances of related TA.

*Id.*  In addition, Hector Garza gave the monitoring team great concern when they visited.

The monitoring team visited Hector Garza between December 1, 2019 and December 5, 2019.  D.E. 869 at 224.  Hector Garza was licensed to serve up to 139 male and female residents between the ages of 10 and 17.  D.E. 875 at 1.  On the night of the monitoring team's visit to the facility, there were at least 102 youth residing at Hector Garza.  *Id.* at 2–4 (30 youth residing in the Courage unit, 27 in the Honors unit, 21 in the Valor unit, and 24 in the Dream and Inspire units[108]).  Upon their arrival at the facility for their unannounced nighttime visit at 11:45 p.m. on December 1, 2019, the monitoring team divided into two groups, "Team A" and "Team B," to visit different areas of the facility.  *Id.* at 2.  Over the course of their multi-day visit to Hector Garza, the monitoring team made the following observations about the conditions at the facility.

<u>First</u>, the monitoring team discovered dilapidated and physically deteriorated conditions at Hector Garza that left some children without access to a bedroom to sleep at night, as well as a

---

[107] HHSC-RCCL has several enforcement options when dealing with placements.  HHSC-RCCL "may . . . offer technical assistance rather than take formal enforcement action."  D.E. 869 at 288 n.654.

[108] The Monitors' Report describes the layout of the Hector Garza facility as follows:

> The three upper levels of the single building house residents; the second floor has one wing for housing youth, while the third and fourth floors each have two wings for housing youth.  The secured office area or control room divides the two wings on the third and fourth floors.  Youth housing areas include:
> - Courage.  Located on the second floor with capacity for thirty female youth. . . .
> - Honor and Valor.  Located on the third floor, Valor has capacity for twenty-four male youth, and Honor has capacity for thirty male youth.
> - Dream and Inspire.  Located on the fourth floor.  Dream has a capacity for thirty females; Inspire has capacity for twenty-five females.

D.E. 875 at 5.

generally punitive environment that did not appropriately reflect the nature and purpose of the

facility as an RTC.  In particular, the monitoring team observed the following:

> Team A observed four female children sleeping in the hallway on mattresses.  Two of the children were sleeping on bare mattresses on the floor.  Staff said that [was] because they were on close supervision due to safety issues.  It was difficult to walk through the hallway because of the mattresses. . . .

> There were two to three beds in each room.  One bedroom had a pile of drywall on the floor; it appeared the wall may have been kicked and the dry wall was torn off the wall.

> Team B went to the third floor and were left by the escorting supervisor after he unlocked the door for entry into the Honors Unit. . . .  The unit appeared to be cluttered, dirty and had a lot of trash on the floors.  There were twenty-seven boys on the unit, many of whom were awake. . . .

> Team B also observed a youth sleeping on a mattress on the floor in the activity room at the far end of the hallway, and two children in one of the dark rooms seated close to one another talking.

> Two other youth who were awake and on mattresses in the hallway said the reason they were in the hallway was that their room (302) was "shut down" because it had holes in the walls.  Staff said the reason they were in the hallway was because they were on close supervision. . . .  Team B observed three bed frames in the room. One metal bed frame had been significantly bent so it sagged in the middle, along with multiple large holes in the walls.  Staff explained the room was vacant and the door would be locked until repairs could be made. . . .

*Id.* at 3–4; *see also infra* Attachments 6 & 7.

> Meanwhile, Team A left the second floor for the fourth floor to observe the Dream and Inspire units. . . .  Five youth were in the hallway on mattresses on the floor and one child was awake.

> . . .

> The following day, the monitoring team . . . completed a daytime tour, during which they observed a flurry of activity to clean and repair the damage the monitoring team saw during the night-time visit.

D.E. 875 at 2–5.

When the monitoring team interviewed children at Hector Garza, they learned that

"[o]verall, youth repeatedly emphasized how much they did not like living at Hector Garza."  *Id.*

at 6.  "When asked if they liked living at Hector Garza, <u>not a single child</u> reported liking it, when

that was presented as an option. . . .  This is the <u>only</u> facility that the monitoring team visited, as of May 2020, where no children reported they liked living there."  *Id.*  Overall, "[t]he Monitors observed an environment that was much more like a punitive, juvenile-justice facility atmosphere than a treatment-oriented atmosphere."  *Id.* at 7.  According to the Monitors:

> Ninety-five percent of the children interviewed reported having been physically searched, and all children interviewed reported having their rooms searched while they were on campus.  Children's rooms had two lines drawn in front of their doors, one inside the room and one just inside the doorway.  The child had to ask staff permission before crossing these lines when they were supposed to be in their rooms.  If they crossed a line without asking or being granted permission, youth said they were punished.

*Id.*

<u>Second</u>, problems with the facility's staff-to-child ratio was a "pattern" or "trend" identified by the monitoring team in their visit to Hector Garza.  During the unannounced nighttime visit by the monitoring team on the first day, the team observed the following:

> [The] monitoring team members arrived for the unannounced nighttime awake-night visit at 11:45 p.m. and rang a bell located by the front door, to which there was no response.  The monitoring team made multiple attempts to call the number posted at the door for night-time access, to no avail.  After waiting at the front door for approximately fifteen minutes, two Hector Garza staff members, escorting a female youth, exited the elevator into the lobby area. . . .  The staff person who opened the door introduced himself as a night-shift supervisor and immediately indicated Hector Garcia [sic] was short-staffed for the night and had "some things going on" causing them to be short staffed.
>
> . . .
>
> As Team A was completing the last staff interview on the fourth floor, the facility staff received a call on the walkie talkie requesting support on the third floor.  Initially, staff on the Inspire unit did not respond.  The caller requested back up again, and the Inspire staff responded they were not permitted to leave their assigned unit.  A third call requested help, and an Inspire staff finally indicated she had to assist, leaving the Dream unit short-staffed.

*Id.* at 2, 4–5; *see also* D.E. 869 at 261.[109]  The monitoring team reported several incidents to SWI

following their visit to Hector Garza:

> Of the two SWI referrals made by the monitoring team based on what they
> witnessed during their night-time walk-through, . . . . [t]he second related to youth
> being left alone on the Valor unit without a staff person present while staff managed
> the disruption across the hallway.  [A] citation[] w[as] issued by [HHSC-RCCL]
> after these referrals were investigated . . . for failing to meet the proper child-to-
> staff ratios on the Valor unit during the disruption across the hall.

D.E. 875 at 8–9.  Furthermore, during staff interviews, the Monitors discovered "a practice of

holding night staff until day staff ratios are met."  *Id.* at 8.

> Night staff interviews [also] revealed there are typically two staff on each hallway
> and one nighttime supervisor on each floor, but during the monitoring team's visit,
> there were only two instead of the required three night supervisors on duty. . . .
> Understaffing results in staff working double shifts.  Even when they are sick staff
> reported they are expected to work.

*Id.*

> Third, the monitoring team observed a pattern of troubling staff practices in the ways that

they physically restrained children.  As discussed above, *see supra* Sections IV.E.1., IV.I.1.a.,

problems with inappropriate and overly forceful restraints have taken place at Hector Garza since

before trial, when M.D. lived in that placement.  The account of the monitoring team reveals that

nothing has changed.  For example, when the monitoring team spoke with one child who was

standing in a bedroom doorway during their nighttime visit, that child "complained that staff had

threatened to restrain him, provoking him to misbehave."  D.E. 875 at 3.  In addition, the Monitors'

---

[109]   [T]hough Hector Garza had awake-night staff present on both wings of each floor, two of the
monitoring staff were on one of the floors housing boys when a riot started on the wing across the
hallway during the Monitors' visit.  Two monitoring staff were left alone by Hector Garza staff on
a locked wing with twenty-one youth while awake-night staff from that wing went across the hall
to help quell the disruption.  During interviews with youth – and confirmed by a review of files at
the facility – disruptions are a common nighttime occurrence at Hector Garza.  The facility was cited
for being out-of-ratio on the night of the visit as a result of a report to SWI made by the monitoring
staff.

D.E. 869 at 261 (footnote omitted).

Report describes the following incidents that took place the first night of the monitoring team's

unannounced visit:

> Team B was preparing to interview the staff on the Valor unit when they heard a disruption on the Honor unit, across the hallway. Team B could not fully view the activity, but heard a youth yell that he could not breathe. Shortly afterward, two youth ran out of the Honor unit and jumped over the control room counter into the foyer in an attempt to leave the floor via the elevator. Staff from the Valor unit left the unit to assist, leaving Team B alone on the Valor unit with twenty-one youth for approximately twenty minutes. Through a window in the locked door, Team B was able to partially view staff in the foyer tackling one youth to keep him in the area while the other child was being restrained. From Team B's vantage point, it appeared three staff members forced the youth being restrained into a seated position on the floor with his legs in front of him. One staff member was laying on the youth's legs. Another staff was directly behind the youth, holding him at the biceps and pulling his arms directly back. A third staff member was behind the second staff holding the youth at the forearm/wrist pulling the youth's arms directly back and up as far as they could force them.
>
> As the Honors unit quieted, another disruption erupted on the unit. Staff pulled another youth from the Honors unit through the office area and placed him inside the door of the Valor unit, where Team B was still waiting. Hector Garza staff left again. The youth was calm and told the monitoring team, "this happens all the time" and the unit was "worse than prison." He said the other youth were trying to "jump" (attack) him. The staff escorted him to the gym in order to keep him safe.
>
> . . .
>
> When Team A exited the elevators onto the third floor, the Hector Garza staff directed them to remain in the foyer. In the foyer, the monitoring team observed a mat on the floor, where a male child was sitting, and two staff members. The youth was upset. He explained that he had been restrained. He stated, "They did me dirty. Watch the video and see his knee in my back." Team B exited the Valor unit, and the supervisor escorted the full monitoring team to the first floor. While in transit, the supervisor informed the monitoring team that a riot had occurred on Saturday night that required staff to call the police to assist. The monitoring team departed the facility at 1:15 a.m.

*Id.* at 3–4.

When the monitoring team interviewed children later in the four-day visit, "[s]ix children

reported having been hit by a staff person, and nineteen children reported having been hit by

another child. Eighty-one percent of the youth interviewed had been restrained, and many of the

youth complained the restraints were painful." *Id.* at 6.   Youth complaints regarding "dirty"

restraints was a pattern or trend that the monitoring team discovered during their visit:

> Many youth interviewed reported "dirty" restraints are common and frequent.
> Youth reported that staff often move them into a room to conduct a restraint where
> there is no camera.  Numerous youth described restraints with "[their] arms pulled
> straight behind their backs and then lifted."  The youth described restraints that
> were painful, and several reported being injured during restraints.  When the
> monitoring team reviewed with Hector Garza's assistant administrator the video of
> the restraint, which had occurred during the monitoring team's awake-night walk
> through, the assistant administrator agreed the restraint was not appropriate.  The
> monitoring team's review of Hector Garza incident reports involving restraints and
> medical documentation revealed children's complaints involving shoulder pain or
> other injuries.

*Id.* at 8.  As noted above, the monitoring team made several reports to SWI following their visit to

Hector Garza:

> Six of the reports to SWI involved restraints (including the one that monitoring
> team witnessed during the awake-night walk through).  Three of these involved
> injuries to children, and two were reported after youth showed the monitoring team
> scars that they alleged were the result of injuries caused by restraints.

> Of the two SWI referrals made by the monitoring team based on what they
> witnessed during their night-time walk-through, one related to the restraint they
> witnessed, which appeared painful and did not appear to be in keeping with
> appropriate protocol. . . .  [A] citation[] w[as] issued by [HHSC-RCCL] after th[is]
> referral was investigated . . . for improper restraint.

*Id.* at 8–9.

An issue related to the problematic physical restraints that the monitoring team observed

was that they also observed a lack of required "triggered reviews" of the restraints used by staff,

which they explain in the Report as follows:

> Minimum standards require a triggered review when a child is restrained four times within seven days. . . .   A triggered review is a process through which a child's treatment providers and service planning team review the circumstances surrounding use of physical restraints on a child, and develop a plan for reducing the need for these interventions.   Triggered reviews are required by HHSC regulations if the same child is personally restrained four times within a seven-day period, more than twelve times within a thirty-day period, or if the child is restrained more often than the written order or service planning team recommendation allows.

*Id.* (footnotes omitted) (citing 26 Tex. Admin. Code §§ 748.2901, 748.2907).  After the monitoring team's visit, the Monitors emailed the program administrator of Hector Garza requesting documents related to any triggered reviews for PMC children that had occurred at the facility.  *Id.* at 10.  "A review of the documents showed that Hector Garza was not engaging in a triggered review process for youth who should have had one."  *Id.*  The Monitors note in their Report that under the applicable Texas Administrative Code provision, the "overuse" of restraints "is understood to be a failure of the treatment model, not the child's failure."  *Id.* at 10–11 (citing 26 Tex. Admin. Code § 748.2907[110]).  However, the documents from the Hector Garza program administrator showed that, "instead of treating overuse of personal restraints as a treatment failure," the Hector Garza policy "holds the youth responsible," which "flips the regulatory requirement on its head."  *Id.* (citing 26 Tex. Admin. Code § 748.2907).

The Monitors alerted the State of this failure to conduct triggered reviews, and "[a]s a result . . . , the issue was reported to SWI.  After an investigation, Hector Garza was cited for

---

[110]   The following must be included in a triggered review and documented in the child's record:
. . .
(3) An examination of identified behaviors and patterns, any significant events leading up to the use of emergency behavior intervention, and all attempted de-escalation methods, whether successful or unsuccessful;
(4) Identification of alternatives to manage the child's behavior and more effectively prevent the use of emergency behavior intervention in the future; and
(5) A written plan for reducing the need for emergency behavior intervention.
26 Tex. Admin. Code § 748.2907(c).

failing to conduct triggered reviews." *Id.* at 11; *see also id.* at 8.  The Court wonders if Hector

Garza would have ever received this citation, if it had not been for the monitoring team's visit,

given the fact that, despite thousands of reports of restraints at the facility in the previous two

years, HHSC-RCCL issued only a handful of citations during that time.  From 2017 to 2019, the

facility reported 7,024 incidents of restraining children, with an increasing number each year, and

a total of 4,835 between 2018 and 2019.[111]  *Id.* at 2.  "The facility had the second highest restraint

rate of licensed placements in 2017 and 2018, and the third highest restraint rate in 2019."  *Id.*

Despite having 4,835 reports of restraints between 2018 and 2019, HHSC-RCCL issued only 26

citations for "inappropriate restraints of children" from May 1, 2018 to May 1, 2020 and only 53

"instances of related TA," in place of enforcement actions.  *Id.* at 1.

   <u>Fourth and final</u>, the monitoring team also learned that Hector Garza had a pattern of

"[f]ailure to report [a]buse and [n]eglect to SWI."  *Id.* at 7–9.  Although the monitoring team

reported to SWI two incidents that the team witnessed during the site visit and reported other

incidents based on interviews with children during the visit, the Monitors' Report reveals gaps in

typical practices of reporting of abuse and neglect incidents at Hector Garza that are troubling,

particularly given the information gleaned from the monitoring team's interviews and observations

indicating that concerning incidents take place regularly at the facility.  The Monitors note the

following specific issues regarding failures to report alleged incidents of abuse and neglect at

Hector Garza to SWI:

---

[111] There were 2,189 restraints reported in 2017; 2,211 reported in 2018; and 2,624 reported in 2019.  D.E. 875 at 2.

a) Grievance forms:  Youth informed they write grievances about abuse and neglect allegations, but the facility often takes eight to ten days before they begin to review the grievance.

b) Inappropriate touching:  When children report inappropriate touching or child-on-child sexual activity to staff, the [M]onitors learned the allegations are at times addressed with room changes and not reported to SWI.

c) Phone access:  Youth reported, and staff confirmed, youth are not able to make calls to SWI or the Ombudsman without a staff member present listening to the call.

d) Review of incident report and documentation:  The monitoring team's review revealed that Hector Garza's QA staff review and investigate allegations of abuse and neglect and determine whether an incident should be reported to SWI, versus requiring staff who observe or receive the allegation to call the incident to SWI directly.

*Id.* at 7.

Even if youth at Hector Garza were given more of an opportunity to report to SWI, the monitoring team also observed a pattern of "[l]ack of [c]onfidence in SWI" among the youth that they interviewed.  *Id.*  "Youth reported a lack of confidence in reporting allegations of abuse and neglect because when the State investigates, according to numerous youth, 'nothing changes, nothing is done,' and 'there is no point in calling the Hotline for that reason.'"  *Id.*  This lack of confidence is extremely concerning, yet unsurprising, given the related issue discovered by the monitoring team that "the histories of the four staff members named as perpetrators in the eight cases the monitoring team called into SWI . . . .  revealed thirty-two previous reports where they were identified as alleged perpetrators."  *Id.* at 9.  Out of those 32 reports, only "three resulted in a citation to the facility for standards violations."  *Id.*  As to each alleged perpetrator, in particular, the monitoring team discovered the following:

- Staff 1 (reported to SWI by the Monitors for inappropriate restraint): This was the eleventh allegation over four-and-a-half years, which include five for inappropriate restraint resulting in two citations for standards violations;
- Staff 2: has six allegations in the past year and a half including five for inappropriate restraint, resulting in one citation for a standards violation;
- Staff 3: has six allegations in just over a year, and none of these have resulted in a citation.
- Staff 4: has seven allegations in the past nine months, including five for inappropriate restraint and two for inappropriate discipline, with one resulting in a citation for a standards violation related to inappropriate restraint.

*Id.* Clearly, nothing has changed in the five years since trial regarding children's lack of confidence and trust in the reporting mechanisms for outcries of abuse and neglect in the foster care system. *See supra* Section IV.I.1.b., note 102 (trial testimony of former foster child Kristopher Sharp regarding children's lack of trust in the system for reporting allegations of abuse and neglect).

In addition to the monitoring team's reports to SWI and email to the State regarding their concerns about the Hector Garza facility, the Monitors also spoke with DFPS leadership and counsel on December 10, 2019.  D.E. 875 at 11.  DFPS notified the Monitors on January 3, 2020 that "high level DFPS and HHSC staff, including DFPS Commission[er] Masters, personally visited the facility"; that the State had placed Hector Garza under heightened monitoring on December 10, 2019, shortly after the monitoring team's visit; and that "[d]ue to an abundance of caution because of the recent number [of] intakes at Hector Garza, DFPS put a temporary suspension in place today."  *See id.* at 11–12.  On January 27, 2020, the Monitors met with the DFPS Commissioner and counsel, as well as leadership from DFPS, HHSC, and the Attorney General's Office and reiterated their concerns, but DFPS said at that meeting that it "had lifted the suspension on child placements and continued to monitor the facility closely."  *Id.* at 12.

After the Monitors briefed the Court and the Court held a telephonic hearing with the parties on February 21, 2020, the Court ordered the State to explain "why the Hector Garza facility

is still open and accepting foster children in light of the concerning child safety information the Monitors shared with the State following their inspection."  D.E. 869 at 325 n.733 (quoting D.E. 811).  DFPS responded on February 26, 2020, summarizing their reasons as follows:

> Hector Garza is allowed to remain open and accept placements because (1) RCCI investigations revealed no child abuse or neglect; (2) daily safety checks revealed minimal safety and communication concerns and Hector Garza's willingness to address any negative responses; (3) Hector Garza introduced an acceptable Restraint Reduction Plan with observable results; (4) Hector Garza's willingness to continue improving, including working through a DFPS-ordered Quality Improvement Plan; and (5) [HHSC-RCCL] investigations over a two-year period resulted in one RTB and 35 deficiencies that have all been addressed through Hector Garza's willingness to make needed changes.

D.E. 875 at 13 (quoting D.E. 888 at 2).

It was not until May 20, 2020 that the Monitors received an e-mail from DFPS saying that they ultimately decided to pull DFPS conservatorship children from Hector Garza.  *See id.* at 11–13 (explaining that Hector Garza would be "phasing out their service to children in DFPS conservatorship").  Two days later in an email to the Monitors, DFPS explained that:

> Contracts and CPS were actively monitoring the Quality Improvement Plan of Hector Garza.  After a deliberate and months-long monitoring process, the agency determined that while improvements were being made, their particular model was not the direction DFPS was going long-term.  After mutual discussions both parties agreed to develop a plan to transition children and to end our contractual relationship with one another.

*Id.* at 13.

Even though DFPS eventually terminated its contractual relationship with Hector Garza, HHSC-RCCL did not revoke Hector Garza's license.  *See id.*  HHSC-RCCL stated that it would re-evaluate Hector Garza's history if it "receive[d] a **new** RTB from DFPS."  *Id.* (emphasis added).  Hector Garza still had its license by the time of the Show Cause Hearing.  *See* D.E. 991 at 71:21–23.  At trial, Shaw was the Director of RCCL, which was a division of DFPS under HHSC, but she is now Associate Commissioner for Child Care Regulation at HHSC-RCCL, a division under

HHSC that is now separate from DFPS.  *See id.* at 65:20–21; *supra* Section IV.C.1.a.  Shaw's explanation at the Show Cause Hearing for how HHSC-RCCL could still not have revoked Hector Garza's license was that DFPS "through their contract, can hold operations to a higher standard than what we do for minimum standards in our regulatory purview."  D.E. 991 at 73:25–74:2. However, she then confirmed that "[i]t is a minimum standard that children should not be abused and neglected."  *Id.* at 74:5–6.  Shaw also testified that:

> [W]hile acknowledging they [Hector Garza] have several investigations that have come in, there are very few findings that are made.  There are very few minimum standards violations that have been found.  And at this point their compliance history has not risen to taking an enforcement action. . . .

> We look at overall performance of an operation, we look at risk.  And while they might have a large number of deficiencies over a five-year period of time, those deficiencies might be lower weighted standards.  We do not feel at this time that Hector Garza's performance has proven to -- a reason to put them on any kind of corrective action or enforcement actions. . . .

> I think we reviewed Hector Garza's compliance history related to our regulatory purview and determined that Hector Garza does not rise to an Intent to Revoke the decision.

*Id.* at 72:1–6, 123:8–11.

Shaw's testimony is out of line with the reality of the conditions at Hector Garza.  *See* D.E. 875 at 1 (detailing 59 citations from HHSC-RCCL between May 1, 2018 and May 1, 2020).  As Shaw concedes, Hector Garza's compliance history, as reported in the Monitors' Report, shows significant evaluations, deficiencies, and citations.  At the Show Cause Hearing, Shaw testified that even though HHSC-RCCL "ha[s] a large number of minimum standards[ citations]," noting that Hector Garza had 113 citations in the last five years, she stated that "[t]he number is much smaller for those that are directly related to abuse and neglect."  D.E. 991 at 75:13–19.  According to the Monitors' Report, Hector Garza has had four abuse/neglect investigations over the last five

years that concluded with RTB dispositions; however, those investigations involved circumstances

that were extremely concerning and tragic:

- One involving a staff who had "consensual sex" with a resident while the resident was on a home pass.
- One involving neglectful supervision in which a child attempted suicide in a hygiene closet.
- One involving a child who swallowed batteries and had to be admitted to the hospital due to a lack of staff supervision.
- One involving neglectful supervision in which a child committed suicide by hanging herself.

D.E. 875 at 1 (citation omitted).  As to the first RTB listed above, the Monitors note that while

they quote the State's investigative findings in their Report, they dispute the appropriateness of

the State's characterization of the findings.  *Id.* at 1 n.1.  As the Monitors point out, "[c]hildren in

custody do not have the capacity to consent to sex with a staff person."  *Id.*

Moreover, as discussed above, it is clear that children continue to have little to no faith in

reporting outcries of abuse and neglect at Hector Garza, so issues at the facility are also surely

underreported.  Despite the concerning nature of these RTBs, the only corrective action that RCCL

had taken over the last five years, according to the Monitors, was that:

RCCL placed Hector Garza on probation in June of 2016 due to citations issued in investigations dating back to 2014.  However, the probation was overturned on administrative review and the facility was instead placed under evaluation.  The evaluation period lasted for approximately six months, from August 25, 2016 through February 17, 2017.

*Id.* at 2.  At the Show Cause Hearing, Shaw testified that while she "can't say" that these RTBs

"do[n]'t raise concerns," she confirmed that "Hector Garza does have a license."  D.E. 991 at 78:3–

4.  The Court asked if the RTB findings gave Shaw "any consideration about their license."  *Id.* at

79:13–14.  Shaw responded as follows:

THE WITNESS:  Absolutely.

THE COURT:  But not enough to revoke their license.

THE WITNESS:  That's correct, Your Honor.

*Id.* at 79:15–18.  HHSC-RCCL's persistent failure to enforce standards or take corrective action against Hector Garza, even in the face of DFPS's decision to completely remove foster children from the facility, is indicative of a concerning, ongoing practice of lax enforcement that could be enabling dangerous facilities to remain licensed across the state.

### (b)  Prairie Harbor

The Prairie Harbor RTC in Wallis, Texas also has an abysmal history, which reveals poor adherence to minimum standards and a lack of enforcement action by HHSC-RCCL, to the point that during the last year, a child in the custody of that facility lost her life.  The Monitors' review of the facility's standards compliance history revealed that "Prairie Harbor has had three confirmed findings for abuse and neglect over the last five years."  D.E. 878 at 1.  Two confirmed findings that took place in 2017 and 2019 "related to a staff member who had an 'inappropriate sexual relationship' with youth at the facility," and one confirmed finding in 2019 "(pending appeal) involv[ed] a staff who allegedly used excessive force during a restraint, resulting in the child's arm being broken."  *Id.*  From the facility's more recent compliance history, spanning from May 1, 2018 to May 1, 2020, the monitoring team learned that "the State evaluated 492 standards" and "issued seventy-two citations and provided forty-seven instances of Technical Assistance (TA)." *Id.*  As previously discussed, the rates of minimum standards violations and RTBs at Prairie Harbor were so high that the facility was placed in the State's top tier of operations subject to heightened monitoring.  *See* D.E. 956 at 18; *see also* D.E. 869 at 342.  Some of the more concerning citations and TA included:

- Three citations for inappropriate restraints and four instances of related TA. Two of the three cited restraints involved physical force and use of a restraint by bending a youth's limbs behind their back;
- Nine citations for inappropriate discipline (one for corporal punishment) and fourteen instances of related TA; and
- Nineteen citations for neglectful supervision and twenty-nine instances of related TA.

D.E. 878 at 1. "As of May 19, 2020, the State investigations resulting from most of the reports made by the Monitors in February 2020 were still pending." *Id.* at 6. The only exception is the "allegations related to inappropriate sexual conduct between youth," which "resulted in a [HHSC-RCCL] citation for failure to provide the level of supervision necessary to ensure each child's safety and well-being."[112] *Id.* As discussed below, it appeared that, despite having this history of citations and violations, the same executive director was able to obtain a license to open a new facility in Texas, The Landing at Corpus Christi. *See infra* Section IV.I.3.a.ii.

Despite these numerous and concerning citations, the extent of the State's most recent enforcement action against Prairie Harbor was that it placed the facility on probation on February 5, 2020 "with no identified end date." D.E. 878 at 1. The Monitors reported that "[t]he basis for the Probation include[d] use of inappropriate discipline of children, lack of supervision of children, corporal punishment of children, and abuse and neglect of children." *Id.*

> The probation notification letter lists standards violations related to restraints, inappropriate discipline, failure to appropriately supervise children, and problems maintaining appropriate staff-to-child ratios. Violations also included at least one failure to make a serious incident report to CCL within 24 hours of a child's injury or illness warranting treatment by a medical professional or hospitalization, and violations of minimum standards related to failures by direct care staff to appropriately report and document serious incidents. CLASS indicates that CCL placed the RTC under Evaluation in June of 2019, but the corrective action was stopped because [HHSC-RCCL] "met with the agency and agreed that [HHSC-RCCL] would not move forward with the corrective action" because the RTC would instead "submit a plan that will address concerns identified in the meeting."

---

[112] The Monitors noted that "[t]his investigation was linked to another investigation." *See* D.E. 878 at 6.

D.E. 869 at 342 (footnotes omitted).  Before the probation, Prairie Harbor had been "cited more than 60 times for minimum standards violations between February 2017 and December 2019," and the facility had been "subject to contract monitoring actions by DFPS" during those years.  *Id.*

> In 2017, DFPS's contract monitoring staff found problems associated with children missing psychiatric appointments required by treatment plans, as well as problems associated with documentation of administration of prescribed medications and failure to appropriately administer prescribed medications.  Though the agency agreed to corrective actions, DFPS found similar problems in 2019.  The violations documented in the monitoring report include a number of problems associated with documentation of therapy visits, and medication logs and records, and describes errors indicating children may not have received the correct dosage of medication and that medication records were not updated when a child's doctor changed their medication dosage.

*Id.* at 342–43 (footnotes omitted).  The Monitors report no further enforcement action by HHSC-RCCL as of May 19, 2020, even though "the program had not met the first four conditions of the Probation."  D.E. 878 at 1.  Tragically, many of the reasons for this indefinite Probation, under which the State allowed Prairie Harbor to continue to operate, were issues that directly contributed to the circumstances surrounding the death of K.C., a child who had been placed at Prairie Harbor.

In spite of this history of citations, at the time of the Show Cause Hearing, Prairie Harbor was licensed to serve up to 88 male and female residents between the ages of 5 and 17, although the two residential buildings have a total capacity of 66 residents.  *See id.*[113]  The monitoring team's visit to Prairie Harbor took place approximately two weeks after K.C.'s death, between February 23 and 26, 2020.  D.E. 869 at 225; D.E. 878 at 2.  The first thing that the monitoring team did was conduct an unannounced nighttime visit on February 23, 2020 to assess the facility's compliance with the Court's requirement that it provide 24-hour awake-night supervision.  D.E. 869 at 257; *see also* D.E. 606 at 12; D.E. 725 at 1–20, 25.  Also during the monitoring team's

---

[113] The Monitors' Report does not specify how many children were residing at the facility during the monitoring team's on-site visit.  *See* D.E. 878.

multi-day visit, they reviewed 36 PMC children's files[114] and 21 employee files and conducted "five awake-night staff interviews, [s]ixteen child interviews, [s]even staff interviews, [o]ne treatment director interview, and [t]wo administrator interviews."   D.E. 878 at 4 (footnote omitted); *see also* D.E. 869 at 225 n.515.   The Monitors noted that "[n]ot all youth completed the interviews.   One youth opted to end the interview after answering just a few questions.   Another youth was so unfocused that the monitoring team ended the interview with the youth early."   D.E. 878 at 4 n.1.

The Monitors' Report describes the generally austere, sparse, and unclean conditions that the monitoring team saw on their visit to the Prairie Harbor facility.   A "[p]hysical [e]nvironment in [d]isrepair" was an overall trend that the monitoring team observed at the facility.   D.E. 878 at 5.   The Report's Appendix describing the monitoring team's findings at the Prairie Harbor facility describes bedrooms with "items . . . lined [on] the floor along the baseboards," which was "[s]eemingly due to limited storage space."   *Id.* at 2; *see also infra* Attachment 8.   In addition, "[v]ery little natural light enters through the minimal windows in each of the two houses, resulting in dark living quarters" with only "overhead lighting."   D.E. 878 at 3.   "The dayrooms were sparsely equipped, and much of the furniture appeared to be in poor condition, e.g., couches with missing cushions."   *Id.*

The youth attended school on the property "in three portable buildings across the back yards," but these "portable buildings appeared old and were not in very good repair."   *Id.*   "There was no natural light in any of the classrooms as the window[s] were all covered."   *Id.* at 5.

---

[114] While the Monitors' Report does not specify the total number of children who were residing at the facility at the time of the monitoring team's visit, *see supra* note 113, the facility had the capacity to house 66 children.   *See* D.E. 878 at 1.

Teachers were not present in two of the classrooms during three of the days the monitoring team visited, and [the school] did not provide substitutes. . . .  Instead, [the youth] played cards and computer games, talked with their fellow students, or slept on the floor or under their desks.  High school students do not receive a report card, and there is no method to calculate Grade Point Averages.  It also did not appear that CPS is attending the Admission, Review, and Dismissal meetings for the youth who receive special education services.

*Id.*  The Monitors' Report provides photographs of youth napping on the floor in their classrooms, covered with coats and clothing, rather than engaged in education.  *Id.*; *infra* Attachments 9 & 10.  At the Show Cause Hearing, Shaw testified that, while she does go out to visit the facilities licensed by HHSC-RCCL, she "ha[d] not been out to Prairie Harbor" and hence had never observed these conditions.  D.E. 991 at 77:10–16.

There were "many items in need of repair," D.E. 878 at 3, and "facility leadership does not timely replace items that are broken or in disrepair," *id.* at 5.  "To ensure youth have access to safe and suitable items, staff reported they often purchase items for children out of their own pockets."[115]  *Id.*  Some items that the monitoring team observed to be in disrepair included "a ceiling fan missing several fan blades, dirty air vents, doors in the housing units with many dents, and the floors in the housing units so worn in places that bare concrete was exposed."  *Id.* at 3. "Smoke detectors . . . malfunctioned for several days, causing a continual, intermittent high-pitched chirping sound."  *Id.*  "One of the youth's bathrooms had no mirrors for personal grooming."  *Id.*  The monitoring team reported "heavy mold stains" in the bathrooms, as well as a "wooden box [that] encompassed the porcelain toilet in one of the bathrooms," which the facility staff "were in the process" of adding to the remaining porcelain toilets.  *Id.* at 2, 6; *see also infra* Attachment 11.  This "creat[ed] a health risk because the wood cannot be sanitized.  Staff informed the monitoring team that the boxes are intended to prevent youth from breaking the commodes to

---

[115] "For example, one staff member stated that they bought a TV to provide youth with entertainment."  D.E. 878 at 5.

use the pieces to self-harm." D.E. 878 at 6 ("The staff stated the facility could not use stainless-steel commodes because the pipes are not compatible."). Overall, out of the 16 children interviewed, six (37.5%) reported that they did not like living at Prairie Harbor; four (25%) said that it was "okay"; and six (37.5%) said that they liked it. *Id.* at 4. Four youth also said that "there was someone on campus that made them feel unsafe." *Id.*

"Feelings related to safety seemed to be tied to youth reports of bullying and fighting between youth," and "[y]outh on [y]outh [f]ights" was a trend at the facility that the monitoring team learned about through youth interviews. *Id.* at 4–5. "Youth interviewed related numerous fighting incidents and girls getting jumped." *Id.* at 5. "All of the youth interviewed indicated that fights between youth took place on campus, and all but one indicated that fights took place in the children's dorms." *Id.* at 4. Out of the five reports to SWI that the monitoring team made or helped youth make, two involved "youth [who] reported getting jumped and bullied by other children and being injured by other children." *Id.* at 6.

The Monitors' Report also describes the staff's practices of restraining youth, for which Prairie Harbor had been reported and issued citations in the past. "Of the fourteen youth who answered the question, eight (57%) reported having been restrained at Prairie Harbor." *Id.* at 4. Two of the five reports that the monitoring team "made or helped youth make" to SWI "involved allegations of inappropriate restraints resulting in injuries." *Id.* at 6. The monitoring team reviewed the histories of the "staff members named as alleged perpetrators" in the "four cases the monitoring team reported to SWI." *Id.* In one of the cases, the staff member had a "significant history." *Id.* When the monitoring team reported the inappropriate restraint to SWI by that staff member, it "was the fifth time since 2009 that [the staff member] was reported for inappropriately restraining youth." *Id.* "Two of these incidents resulted in HHSC citing the facility for

[Emergency Behavior Interventions]. This staff has been identified as an alleged perpetrator a total of fourteen times since 2009, resulting in three minimum standards violations, but no RTB determinations for child abuse or neglect." *Id.* Overall, from May 1, 2018 to May 1, 2020, Prairie Harbor was issued "[t]hree citations for inappropriate restraints and four instances of related TA. Two of the three cited restraints involved physical force and use of a restraint by bending a youth's limbs behind their back." *Id.* at 1. Over the last five years, one confirmed finding of abuse and neglect at Prairie Harbor involved "a staff who allegedly used excessive force during a restraint, resulting in the child's arm being broken." *Id.*

Overall, the Monitors' Report reflects that Prairie Harbor does not effectively provide children with the opportunity to report abuse and neglect. "During and upon the conclusion of the on-site visit, the monitoring team assisted two youth with calls to the Foster Care Ombudsman and were transferred to make reports to SWI. The Monitors also made two additional calls to SWI based on observations during the site visit" to report several instances of abuse or neglect. *Id.* at 6. However, the youth typically did not have access to the resources to make such reports. "The only copies of the notice on how to report Abuse or Neglect and how to contact the Foster Care Ombudsman's office were printed on an 8.5" x 11" piece of paper and posted above the door exiting the building and in the kitchen where youth do not frequent," as depicted in the Monitors' Report. *Id.* at 4; *see also infra* Attachment 12.

Another trend reported by the monitoring team was "[o]verworked [s]taff" at Prairie Harbor. D.E. 878 at 5. "Prairie Harbor policy requires staff to work long hours on consecutive days, sometimes up to four days. Staff shared that they are exhausted by the fourth day, which inhibits their ability to properly care for the youth." *Id.* The facility's staffing issues cause problems that were clear to the monitoring team upon their arrival at Prairie Harbor for the

unannounced nighttime visit at the beginning of their multi-day visit to the facility. Likely due to these staffing limitations and related problems, the monitoring team encountered an apparently unlocked and unattended facility (apart from the awake-night supervision staff) when they arrived that night:

> The monitoring team arrived unannounced at approximately 11:45 pm to conduct an awake-night verification and stayed until 12:45 am. . . .
>
> The front door to both homes was unlocked, enabling unnoticed entry to the foyers. Each of the foyers included minimal offices, a reception area, office equipment, and other administrative items. Several documents containing client identifying information were visible across tables. A second unlocked door in the foyer served as the final entrance to each house. To maintain privacy, the monitoring team repeatedly knocked on the doors, but was unable to attract anyone's attention.
>
> After no success, the monitoring team . . . attempted to contact personnel via telephone numbers collected before the visit. When those attempts failed, the monitoring team called the emergency contact lines posted on the walls of the foyers. This also proved to be fruitless. Having exhausted all options, the monitoring team opened the second door of [one of the houses] to find an on-call staff member sleeping on a sofa in a large room. Once awake, the staff member informed the monitoring team to proceed to the locked sleeping unit doors and knock to gain entrance. At that point, the monitoring team was able to gain entrance to the housing units where staff were awake and monitoring youth.

*Id.* at 2. The Monitors' Report reflected that limitations to staffing give rise to problems with the staff's ability to keep youth safe through effective supervision. A "female youth reported children engaged in sexual contact with each other in the bathroom when male staff are on duty, knowing male staff could not come into the bathroom to intervene." *Id.* at 6. "Youth reported that the Jack-and-Jill bathrooms enable them to knowingly and unknowingly enter the restroom with other residents present. One youth[ ]related inappropriate sexual touching taking place in the restrooms." *Id.* at 5. This conduct reflects ineffective supervision directly related to the staffing problems at Prairie Harbor.

Other staffing problems relate to staff competence, particularly for a facility that is "licensed to serve children with emotional disturbances." *Id.* at 1. Reports by "[s]everal staff

members and the treatment director" confirmed that staff had insufficient capabilities and competence to carry out the facility's purpose for licensure, "to serve children with emotional disturbances." *Id.* at 1, 6. These staff and the treatment director "reported a lack of programming (activities) and knowledge about keeping youth safe. The facility provides minimal therapy, trauma informed care, or positive behavioral support plans." *Id.* at 6. Exemplifying these problems with staff competence to work with children with emotional disturbances, one child reported that "she did not feel safe because she feared she might harm herself, but that staff did not take her seriously when she talked with them about her fears." *Id.*

K.C.'s death is a tragic occurrence that took place under circumstances at Prairie Harbor involving these staffing problems and reflecting other numerous systematic issues. *See supra* Sections IV.D.1., IV.E.3.b.ii., IV.G.3. K.C. died at Prairie Harbor in the middle of the night, a mere five days after HHSC-RCCL placed Prairie Harbor on probation. D.E. 869 at 342. Prairie Harbor staff had repeatedly failed to take K.C.'s complaints of leg pain seriously. *Id.* at 14, 347. RCCI's interviews and notes related to K.C. also reveal the staff's inconsistency in reporting her complaints of leg pain and failure to provide medical treatment for it. *Id.* at 14, 346–47. This was not the first time that the staff at Prairie Harbor had been identified as having problems with correctly ensuring proper medical care of the children placed there. *Id.* at 342–43. Prior to K.C.'s death, HHSC-RCCL had cited the facility for "failure to appropriately supervise children," and "at least one failure to make a serious incident report to CCL within 24 hours of a child's injury or illness warranting treatment by a medical professional or hospitalization." *Id.* at 342. In addition, Prairie Harbor had also had problems maintaining appropriate staff-to-child ratios prior to K.C.'s death. *Id.*

K.C.'s story reflects problems on an institutional level that have placed children such as her at unreasonable risk of serious harm.  The systemic institutional problems that already existed at Prairie Harbor at the time of K.C.'s death are exactly the types of issues that should have been addressed by HHSC-RCCL through licensure decisions or enforcement actions.  By the time of the Show Cause Hearing, HHSC-RCCL had still not revoked Prairie Harbor's license, despite the fact that Prairie Harbor had failed to meet four conditions of its probation that had been in place since before K.C. died.  *See* D.E. 878 at 1; D.E. 991 at 112:6–113:8  Instead, between K.C.'s death and the Show Cause Hearing, HHSC-RCCL had reduced the requirements that the facility must meet.  On July 15, 2020, HHSC-RCCL approved a staffing variance to expressly allow Prairie Harbor to operate at a lower staff-to-child ratio because "[t]he pandemic of COVID-19 has put quite a few operations at risk of not having enough staff."  D.E. 991 at 113:10–21, 114:2–116:2. Maintaining safe staff-to-child ratios was one of the key problematic aspects of Prairie Harbor at the time of K.C.'s death.

A child's death taking place at a facility that waited more than 30 minutes to summon medical assistance after the child collapsed, a mere five days after HHSC-RCCL placed that facility on probation, followed by no revocation of that facility's license, is a stark example of the reality that HHSC-RCCL enforcement action, when or if it takes place at all, is simply too little and too late.  The fact that these systematic problems are allowed to continue to exist on an institutional level at a licensed child care facility and that HHSC-RCCL's policies and practices allowed such a facility to remain open and functioning, despite conditions under which a child died in its care, demonstrates that the trial testimony of Plaintiffs' child welfare systems expert witness, Dr. Miller, more than five years ago, continues to be the reality today: HHSC-RCCL "simply doesn't work.  It's broken."  *See* D.E. 303 at 51:8–9; D.E. 368 at 202.  Clearly, little has

changed since the Court found at trial that the State "almost never takes an enforcement action" against licensed facilities, *see* D.E. 368 at 208, and the Fifth Circuit agreed that it "seems painfully obvious" that "inadequate enforcement policies place children at a substantial risk of serious harm," D.E. 601 at 43. Remedial Order 22 was put in place to remedy the constitutional violations arising from HHSC-RCCL's systematic dysfunction; however, as discussed herein, HHSC-RCCL has continued to flout the Court's Remedial Order.

### (c)   Fresh Start

The monitoring team conducted an unannounced three-day site visit at Fresh Start, an all-male residential treatment center in Houston, Texas, between February 18 and February 20, 2020. D.E. 869 at 225; D.E. 877 at 1. Between May 1, 2018 and May 1, 2020, Fresh Start had a total of 199 standards reviewed, of which the State issued 68 citations and provided TA in 49 instances, including:

- nine citations associated with inappropriate restraints of children with ten instances of related TA;
- seven citations for inappropriate discipline of children with seven instances of related TA;
- five citations for neglectful supervision of children with four instances of related TA.

D.E. 877 at 1. There was also an "RTB related to the investigation resulting from RCCI's observation of another child's injuries." *See id.* at 1, 5.

At the time of the Show Cause Hearing, Fresh Start was licensed to serve up to 30 male residents between the ages of 6 and 17. *Id.* at 1. The facility was at full capacity the night of the monitoring team's on-site visit, with 30 boys residing there. *Id.* at 1–2. During this brief visit, the monitoring team learned of numerous issues that seem to be systemic and ongoing problems at Fresh Start and that endanger the children placed at the facility.

The monitoring team discovered issues with awake-night staff in both buildings of the Fresh Start campus: Winship and Orville House.  In Winship, two awake-night staff were monitoring twenty boys.  *Id.* at 1.  The staff immediately greeted the monitoring team when the team arrived.  *Id.*  In an interview with the monitoring team, the staff members described "the policy requiring staff to conduct fifteen-minute checks on each resident throughout the night and contemporaneously fill out a progress note on each resident's fifteen-minute check log."  *Id.* at 1–2.  However, the monitoring team observed that no logs had been made between 9:00 p.m. and 1:00 a.m. that night.  *See id.* at 2.  In Orville House, a single staff member was monitoring ten boys.  *Id.*  The monitoring team waited approximately fifteen minutes before the staff member answered the door.  *Id.*  The team reported that the staff member appeared drowsy.  *Id.*  The staff member was not aware of the requirement to conduct fifteen-minute checks on the residents or to conduct the required documentation of night checks.  *See id.*

The monitoring team heard continuous, high-pitched chirping sounds from fire alarms or carbon monoxide detectors in Orville House.  *Id.*  The awake-night staff member advised that the alarms had been chirping for several days and that he had "tuned them out."  *See id.*  Children reported that the alarms had been chirping for days and that the noise prevented them from sleeping.  *Id.* at 3.  The chirping continued throughout the monitoring team's three-day visit and was not resolved before the team left.  *See id.* at 2–3.

The monitoring team interviewed fourteen children at Fresh Start.  *Id.* at 3.  Most of these children reported feeling safe at Fresh Start, but four children (or 29% of those interviewed) reported that they did not feel safe or that someone on campus made them feel unsafe.  *See id.*  Ten children reported that there were physical fights between children on campus, and nine reported that fights took place in their dorm rooms.  *Id.*  Children reported that staff do not always intervene

to break up these fights. *Id.* at 4. Children also reported that staff often slept at night and that sexual activity occurs at night. *Id.* at 3. In addition, children reported that they are only allowed to use the phone after 6:00 p.m., which interferes with their ability to contact their caseworkers or to call SWI, s*ee id.* at 4, and only six children (or 43% of those interviewed) were aware of the SWI Hotline, D.E. 869 at 128.

Twelve children (or 86% of those interviewed) reported having been restrained, and several children reported that three specific staff members restrain children as a form of punishment. *See* D.E. 877 at 3–4. These restraints involved children having their arms crossed and raised over their heads or twisted behind their backs, which caused pain and difficulty breathing. *Id.* at 4. Children also stated that staff hit them or slapped them on their head. *Id.* One child reported that "the staff hit them and beat on them every day for no reason." *See id.* at 5.

After the three-day on-site visit, the monitoring team made five reports to SWI: four involved physical restraints and one involved child-on-child sexual contact. *Id.* at 4–5.[116] First, a child reported being restrained twice for stealing money from the offering plate of the on-site church, being lifted off the ground with his arms behind him, being required to stand at attention for up to two hours, and being required to clean until midnight on school nights. *Id.* at 4. Second, a child reported being restrained twice with his arms crossed over his head to the point that he could not breathe and almost passed out. *Id.* The child also reported being thrown against the wall during one restraint. *Id.* Third, a child reported that a staff member punched him and that staff restrained him by twisting his arm behind his back. *Id.* at 5. Fourth, a child reported being hit multiple times by staff, including once on the back of the head and once in the face cutting his lip and causing his lip to bleed. *Id.* The same child reported that he has asthma and that his inhaler

---

[116] As previously discussed, *see supra* Section IV.E.3.a.i., for one report, Monitor Deborah Fowler was on hold for 25 minutes with SWI before she gave up and made a report later that night. D.E. 877 at 4.

was not provided to him.  *See id.*  Finally, a child alleged that child-on-child sexual contact occurred at night in the room he shared with several other children.  *Id.* at 4.

According to the Monitors, "[n]one of the State investigations of these allegations resulted in Reason to Believe findings."  *Id.* at 5.  RCCI investigated the reports but Ruled Out any abuse. *Id.*  However, HHSC-RCCL issued three citations for violations of minimum standards: (1) a citation for corporal punishment for hitting children on the back of the head, (2) a citation for corporal punishment for requiring children to stand for long periods of time as punishment, and (3) a citation for inappropriate restraint for obstructing a child's airway or impairing a child's breathing.  *Id.*  In addition, during the RCCI investigation, the RCCI investigator noted that one child involved in the reports " was wearing broken glasses and his right temple and cheek appeared to be red and discolored."  *See id.*  The child reported that a staff member had slapped him on the right side of his face multiple times the previous night, which left the mark on his face and broke his glasses.  *See id.*  DFPS found Reason to Believe against the alleged perpetrator for this case. *Id.*

Fresh Start has a troublesome history of minimum standards violations related to child safety.  Between May 1, 2018 and May 1, 2020, the State issued 68 citations, including nine citations associated with inappropriate restraints of children, seven citations for inappropriate discipline of children, and five citations for neglectful supervision of children.  *Id.* at 1.  The monitoring team also identified three staff members at Fresh Start with a pattern of alleged abuse:

(1) Staff 1 was reported by the Monitors to SWI for "slapping a child," and was the staff member who hit the child with glasses.  *See id.* at 5.  Staff 1 has been the subject of 24 investigations, all but one of which were for abuse or neglect.  *Id.*  These investigations include seven reports of slapping or punching a child since 2016, two of which resulted in HHSC citing Fresh Start for corporal punishment; and twelve reports of inappropriate restraints, which also resulted in two facility citations.  *See id.*  Staff was also involved in an investigation at another operation in 2003 in which it was reported that he picked up a child, threw the child to the floor, and placed the child in a "neck hold" until the child turned blue in the face.  *See id.* at 5–6.

(2) Staff 2 was reported by the Monitors for allegedly slapping a child.  *Id.* at 6.  Staff 2 has been named as an alleged perpetrator in eight abuse and neglect investigations, three of which included an allegation of slapping a child.  *Id.*

(3) Staff 3 was reported by the Monitors for alleged inappropriate discipline of a child, resulting in an HHSC-RCCL citation for corporal punishment.  *See id.*  Staff 3 has been investigated as an alleged perpetrator ten times previously, and this investigation was the seventh time since 2017 that the staff member had been investigated for inappropriate discipline, resulting in two citations.  *See id.*

Based on the similar allegations from different children over a period of ten to fifteen years, the Monitors concluded that "the kind of physical abuse reported by children to the monitoring team during [their] visit may be systemic and ongoing."  *See id.*  The Court agrees.  Fresh Start and its staff, including the three staff discussed, have demonstrated a history of abuse, yet the facility remains licensed and DFPS continues to place children there.

### (d)      St. Jude's Ranch for Children

St Jude's Ranch for Children ("St. Jude's") is a General Residential Operation in Bulverde, TX that is licensed to serve up to 45 children, both male and female, of any age up to 17.  D.E. 876 at 1.  St. Jude's provides multiple services including foster care, transitional living services, assessment services, and respite care.  *Id.*  Between May 1, 2018 and May 1, 2020, the State evaluated 116 standards at St. Jude's for which the State issued six citations for noncompliance and provided 23 instances of TA.  *Id.*  The State did not issue any confirmed findings of abuse or neglect during this period.  *Id.*

The monitoring team conducted an unannounced three-day, on-site visit to St. Jude's between January 26, 2020 and January 29, 2020. *See* D.E. 869 at 225; D.E. 876 at 1. The first night of the monitoring team's on-site visit, there were 28 children residing at St. Jude's. *See* D.E. 878 at 1–2. Upon arrival at St. Jude's, the monitoring team divided into two teams to tour the four cottages where children are housed and to conduct interviews with awake-night staff. *See* D.E. 876 at 1. Awake-night staff informed the monitoring team that they perform bed checks every 30 minutes and document the checks on a pre-timed log. *Id.* Staff also advised that youth who require close supervision are either checked more frequently or sleep on the couch located in the living room of a cottage. *See id.* The monitoring team noted that the "[c]ottages appeared clean and orderly." *Id.*

The monitoring team interviewed eleven children at St. Jude's. *Id.* at 2. All eleven children reported that they felt physically safe living at St. Jude's and that there is no one on the campus who makes them feel unsafe. *Id.* Four children reported that there are sometimes fights among children on the campus. *Id.* None of the children reported that they had seen staff spank children or been spanked themselves by staff, and none reported being restrained by staff. *Id.* All but one of the children knew how to call SWI and the Foster Care Ombudsman. *See id.*

Between May 1, 2018 and May 1, 2020, the State issued six citations for noncompliance but did not issue any confirmed findings of abuse or neglect. *See id.* at 1. Based on the interviews with staff and children, and reviews of on-site case files, the Monitors noted two issues. First, the monitoring team only found Placement Summary reports in two of the 24 on-site case files that they reviewed. *See id.* at 2. The monitoring team learned in an interview with the administrator that the State often does not provide the Placement Summary form when placing children at St. Jude's. *See id.* Second, the monitoring team observed that "some of the bedrooms have a shared

restroom (Jack-and Jill)." *Id.*  Although no children expressed concerns or problems about these restrooms, the Monitors noted that these restroom arrangements "have been found to be an opportunity for children to be victimized by other children in other GROs." *Id.*  The monitoring team did not identify any instances of abuse or neglect or other standards violations that required reporting to SWI.  *Id.* at 3.

<p style="text-align:center"><strong>ii.      Failure to Recognize Problematic Patterns in the Histories of Licensed Placements</strong></p>

The descriptions of the issues at Hector Garza and Prairie Harbor, above, reflect the same failure of RCCL to recognize and act on trends and patterns from "repeat deficiencies" at facilities that the Court found at trial five years ago.  *See* D.E. 368 at 209.  When determining whether to implement enforcement actions, HHSC-RCCL still does not take a holistic view of the licensed facilities and the historical experiences of children at them.  Instead, HHSC-RCCL continues to take only a narrow, forward-looking view of specific allegations or incidents to determine whether to take action against a specific facility.

As noted above, despite the fact that HHSC-RCCL had received 4,835 reports of restraints at Hector Garza from 2018 to 2019, it only issued 26 citations for "inappropriate restraints of children" from May 1, 2018 to May 1, 2020.  D.E. 875 at 1–2; *see supra* Section IV.I.3.a.i(a). Even though DFPS eventually decided to remove foster children from placement at Hector Garza on May 20, 2020, HHSC-RCCL did not revoke its license and told the Monitors that it would only re-evaluate Hector Garza's history if it "receive[d] a **new** RTB from DFPS."  D.E. 875 at 13 (emphasis added).  Furthermore, as also discussed above, Shaw testified at the Show Cause Hearing that HHSC-RCCL "do[es] not feel at this time that Hector Garza's performance has proven to -- a reason to put them on any kind of corrective action or enforcement actions," D.E.

991 at 76:5–7, even though from May 2018 to May 1, 2020, Hector Garza had been evaluated for 1,312 standards and been issued 59 citations, D.E. 875 at 1.

Similarly, despite having to "evaluate[] 492 standards" and "issue[] seventy-two citations" regarding Prairie Harbor, between May 1, 2018 and May 1, 2020, HHSC-RCCL merely placed Prairie Harbor on probation on February 5, 2020 "with no identified end date" and no further enforcement action by HHSC-RCCL as of May 19, 2020, even though "the program had not met the first four conditions of the Probation" and a child had died in its care.  D.E. 878 at 1.  These issues with Hector Garza and Prairie Harbor demonstrate that HHSC-RCCL's approach to evaluating placements tends to ignore the reality at these facilities and thus allows these facilities to continue to be licensed for the placement of children.  The State is required to implement various Remedial Orders, including Remedial Order 22 and Remedial Order 20 that are meant to remedy oversight and enforcement failings such as these.

The same problem occurs when HHSC-RCCL considers whether to license new facilities.  The Court has made the extremely concerning discovery that HHSC-RCCL has licensed new facilities that are owned and operated by the very same individuals and entities that operated facilities where systemic problems had been rampant.  For example, as of the time of the Show Cause Hearing, the Executive Director of Prairie Harbor appears also to have been the Executive Director of a more recently opened facility, called The Landing at Corpus Christi.  *Compare Leadership*, Prairie Harbor, http://prairieharbor.org/?page_id=1595 (last visited Dec. 15, 2020),[117] *with Child Care Administrators for Corpus Christi*, DFPS, https://www.dfps.state.tx.us/Child_Care/Licensed_Administrators/Administrators_Results.asp?c

---

[117] The Court takes judicial notice of the information provided on Prairie Harbor's website.  *See* authorities cited *supra* note 20.

=Corpus+Christi&admtype=LCCA (last visited Dec. 15, 2020). *See* D.E. 990 at 21:19–22, 123:10–13 (discussion during the Show Cause Hearing concerning the operators of Prairie Harbor and The Landing at Corpus Christi).

The Court later asked Shaw about how the licensing of The Landing took place when it appears to have the same owners and operators as Prairie Harbor. Shaw responded that "[a]t the time that The Landing applied, it was September of 2019 when they were issued their first initial license. That was before Prairie Harbor was put on any kind of corrective action such as probation." D.E. 991 at 70:3–6. However, Shaw did not address the fact that, despite HHSC-RCCL's failure to put Prairie Harbor on corrective action, the facility had already accumulated numerous citations by September of 2019. *See id.* at 70:3–13, 80:1–15; *see also* D.E. 878 at 1. In addition, even if HHSC-RCCL had taken adverse action against Prairie Harbor prior to the licensing of The Landing, Shaw testified that she did not know if such adverse action would be grounds for refusing to issue a license to a new facility with the same owner:

> [THE COURT]: And so you let these same people open a new place in Corpus Christi in September of 2019. Did you review their history, the owner's history, with Prairie Harbor?
>
> THE WITNESS: Our regulation related to -- not to the same owners opening a new operation. We can look to see if there's been any adverse action as a reason to not issue any license. If there has not been an adverse action and the applicant meets all the requirements, then we move forward . . . .

D.E. 991 at 81:2–10.

As the Monitors stated, "[h]olding operators and administrators responsible for child safety is essential to preventing the serious risks to child safety detailed in the Monitor[s'] Report." D.E. 956 at 31. This includes "facilities that are allowed to voluntarily relinquish a license in the face of increased scrutiny due to a pattern of abuse or neglect investigations or minimum standards violations related to child safety." *Id.* The Court agrees.

In the context of a child care operation, a "controlling person" is defined as:

(1) **Owner of the operation or member of the governing body of the operation**, including, as applicable, an executive, an officer, a board member, a partner, a sole proprietor and the sole proprietor's spouse, or the primary caregiver at a child-care home and the primary caregiver's spouse;

(2) **Person who manages, administrates, or directs the operation or its governing body**, including a day care director or a licensed administrator; or

(3) **Person who either alone or in connection with others has the ability to influence or direct the management, expenditures, or policies of the operation**. For example, a person may have influence over the operation because of a personal, familial, or other relationship with the governing body, manager, or other controlling person of the operation.

26 Tex. Admin. Code § 745.901(a) (emphasis added).  The State may "designate" someone who meets the above definition as a "controlling person" when either (a) the State revokes the license of the operation, or (b) the operation voluntarily closes or relinquishes its license **after** receiving notice either that the State is in the process of revoking the permit or that the State intends to revoke the license.  *See id.* § 745.905 (emphasis added).  The consequences of being designated a "controlling person" under § 745.905 are that the State may not issue a license to operate a child care operation to that person for five years, and that person may not be the owner, administrator, etc. (any role defined in § 745.901(a)) of a child care operation for five years.  *See id.* § 745.907(a); *see also CCL Policy and Procedures Handbook* § 7631.26 ("Notifying an Operation About the Restrictions on Reapplying for a Permit") (Aug. 2020) ("[T]he permit holder or applicant whose permit has been denied or revoked may not apply for another permit before the fifth anniversary after the adverse action takes effect.").

In one case that the Monitors describe, the Children's Hope Lubbock RTC was undergoing license revocation proceedings based on the facility's history of deficiencies and findings of abuse and neglect, but the facility entered into an agreement with HHSC-RCCL to relinquish its license voluntarily.  D.E. 956 at 29–30; *see also* D.E. 869 at 323–27.  As a consequence of voluntarily relinquishing a license after the State has initiated license revocation proceedings, the owners and

administrators of facilities like Children's Hope Lubbock RTC should be barred from receiving a license to operate another child care operation or from serving as an owner or administrator of another child care operation for five years.  *See* 26 Tex. Admin. Code § 745.907(a); *see also* D.E. 956 at 30 (explaining that the terms of the agreement with Children's Hope Lubbock RTC prohibit the operators of this facility from opening another childcare operation for five years).

However, the Monitors detail other facilities with problematic histories that voluntarily relinquished their license **before** the State provided notice of any potential license revocation proceedings (i.e., before the facilities received notice either that the State was in the process of revoking the license or that the State intended to revoke the license).  *See, e.g.*, D.E. 956 at 28–30 (describing the voluntarily license surrender of Williams House and Houston Serenity, among others).  There is nothing to keep the owners or administrators of these facilities from applying to HHSC-RCCL to license a new facility under a different name, regardless of how problematic the previous operation may have been.  *See id.* at 30–31.  The owners and administrators of problematic facilities may see the writing on the wall and therefore act to license a new facility under a new name—but with similar problems—or to relinquish their current license without being prohibited from licensing a new facility, so long as they take either course of action **before** HHSC-RCCL revokes their license or **before** they receive notice of license revocation proceedings.  This practice has the perverse effect of protecting the owners and administrators of problematic operations across the State at the cost of children in their care.  The continued licensing by HHSC-RCCL of problematic and dangerous placements remains at the root of the problem of children being placed at an unreasonable risk of serious harm.  In addition, as more fully discussed in the next section, this practice seems to be compounded by the separation and disconnect between agencies wherein DFPS may find a facility to be problematic and even remove children from the

facility, but HHSC-RCCL takes no licensing action, which allows the facility to continue to be licensed and the owners and administrators to receive new licenses and to open new facilities.

### iii.    Inconsistent Record Keeping and Failure to Communicate Across the Agencies' Divisions

As fully described above, *see supra* Sections IV.C.2., IV.E.3.a.ii., IV.E.3.b.iii., following trial, the State divided and reorganized the agencies that are responsible for child safety in the State of Texas and pertinent to this litigation.  The State made DFPS into "an independent state agency reporting directly to the Governor," rather than a part of HHSC, D.E. 869 at 10 n.2, while "split[ting]" "parts of RCCL . . . between HHSC and DFPS," D.E. 556 at 33.  As a result, HHSC-RCCL was no longer responsible for abuse and neglect investigations, which fell to DFPS.  *See* D.E. 869 at 18, 57 n.65.  HHSC-RCCL remained responsible only for the aspects of oversight related directly to licensing and "monitoring minimum standards."  *Id.* at 18, 57 n.65.  This bifurcation of agency responsibility for oversight related to child safety has exacerbated the disorganization and disjointed record keeping that this Court found at trial and that the Fifth Circuit observed in *Stukenberg I*.  *See* D.E. 368 at 168–69; D.E. 601 at 5, 22 n.24, 29–30.  As a result, there continues to be a disconnect among the State agencies.  *See supra* Sections IV.C.1.d., IV.E.3.a.ii., IV.E.3.b.iii. (discussing the disjointed nature of the agencies' separate database systems, which are not compatible and do not communicate well).  The disconnect pertinent to Remedial Order 22 concerns the responses of HHSC-RCCL and DFPS when they find problems at facilities.  This disconnect also perpetuates an overall breakdown of communication across the agencies regarding information that affects the safety of PMC children in their care.

Shaw's testimony at the Show Cause Hearing reflects the systematic disconnect between HHSC-RCCL and DFPS regarding the circumstances under which they take actions to protect children in licensed facilities and the divergence in the level of risk of harm to children at licensed

facilities that each of the agencies will tolerate.  She testified that "DFPS can, through their contract, can hold operations to a higher standard than what we do for minimum standards in our regulatory purview."  D.E. 991 at 73:25–74:2; *see also id.* at 74:5–6 (conceding that "[i]t is a minimum standard that children should not be abused and neglected").  DFPS has pulled children out of both Hector Garza and Prairie Harbor, *see* D.E. 990 at 123:17–20, 171:20–24, 174:11–15, 186:10–19; D.E. 991 at 73:13–22, 122:11–15; but Shaw had "not been out to Prairie Harbor" to visit the facility, D.E. 991 at 77:10–16, and both Prairie Harbor and Hector Garza still had their licenses from HHSC-RCCL at the time of the Show Cause Hearing, despite numerous deficiencies, citations, and violations, and even a child's death, *see id.* at 69:6–15, 71:19–72:6, 75:25–76:7, 76:20–22, 78:3–4, 79:13–18, 83:1–9, 112:6–113:8, 122:16–24, 123:5–18, 124:17–21; *see also supra* Sections IV.I.3.a.i(a), IV.I.3.a.i(b).  Commissioner Masters testified at the Show Cause Hearing that "[i]t is concerning" to her that HHSC-RCCL does not revoke the license of a facility that DFPS has determined is not safe for foster children.  *Id.* at 144:4–11.  It is concerning to the Court, as well.

In addition, testimony at the Show Cause Hearing revealed that there is no policy requiring communication between DFPS and HHSC-RCCL when the latter chooses to approve variances so that licensed facilities may operate outside of minimum standard requirements.  Shaw confirmed at the Show Cause Hearing that when HHSC-RCCL grants a variance to a placement, it does not have a policy of communicating this information to DFPS:

> [PL. COUNSEL:]  Ms. Shaw, now, when your group, RCCL at HHSC -- when you grant a variance, do you bother telling the folks at DFPS about it?
>
> [MS. SHAW:]  There -- no, we don't inform DFPS.
>
> . . .

[PL. COUNSEL:]  So the folks at DFPS, the caseworkers and the administrators, they're trying to keep these children safe and you're giving these placement facilities variances from the normal rules of safe staffing and you don't directly inform them; is that correct?

[MS. SHAW:]  There is no direct communication between us and DFPS related to variances.

*Id.* at 117:16–20, 118:1–7.   Indeed, several witnesses from DFPS, including Commissioner Masters, were not even aware that HHSC-RCCL had granted a variance to Prairie Harbor related to its staff-to-child ratios following the death of K.C., while that facility was on probation:

[PL. COUNSEL:]  . . . [T]his RTC, Prairie Home [sic], has been shorthanded for a long time, and they have asked for a variance from the State to operate shorthanded. Correct?

[MS. BATISTE:]  That information has to be confirmed by HHSC RCCL.

. . .

THE COURT:  Do you know about this, Ms. -- Commissioner?

COMMISSIONER MASTERS:  About the placements?

THE COURT:  Yes.  This is a place that has been identified by DFPS for heightened monitoring, and yet, they have been approved, apparently, from -- by HHSC for a staffing variance, so they have even less staff per child than is required?

COMMISSIONER MASTERS:  No, Your Honor.  I was not aware.

. . .

[PL. COUNSEL]:  And in July, did HHSC or RCCL tell you that they were granting a variance for Prairie Harbor for the caregiver/child ratio, in other words, having less caregivers than the required ratio?  Did they tell you that?

[MS. TACCETTA[118]]:  I don't recall having myself personally a conversation. They may have worked with some of our staff to inform them, but me personally, no, sir.

. . .

THE COURT:  So you wouldn't even know about that?  You wouldn't even know about that as head of the department?

---

[118] Kaysie Taccetta is the Deputy Associate Commissioner for CPS.  D.E. 990 at 144:13–14.

[MS. TACCETTA]:  I did not know that -- if that occurred, no, ma'am.

. . .

[PL. COUNSEL:]  Okay.  And so even until today, you probably didn't realize that HHSC was granting variances to Prairie Harbor while you were evaluating whether to keep children there.  Right?

[MS. TACCETTA:]  If there was a variance, I was unaware until today.

D.E. 990 at 122:4–7, 122:18–123:2, 174:16–22, 174:24–175:2, 175:12–16.

Shaw testified that, although HHSC-RCCL and DFPS do not communicate directly about the variances that HHSC-RCCL grants to licensed facilities, "[i]t's in [the HHSC-RCCL] computer system and [DFPS] staff can access with the IMPACT System."  D.E. 991 at 117:19–21.  However, Shaw's testimony regarding the accessibility of CLASS through DFPS's IMPACT system is contradicted by the Monitors' Report and other witnesses' testimony at the Show Cause Hearing. As previously discussed, *see supra* Sections IV.C.2., IV.E.3.a.ii., IV.E.3.b.iii.,  DFPS, as a separate and independent agency from HHSC-RCCL, operates using IMPACT, which is a different and incompatible database from HHSC-RCCL's CLASS.   Several witnesses at the Show Cause Hearing confirmed that not all DFPS workers have access to HHSC-RCCL's CLASS system:

THE COURT:  Caseworkers in DFPS cannot access the CLASS system.  Did you know that?

[MS. BATISTE]:  I did not know that.  There are some -- there are caseworkers who have some read-only access to CLASS.  I'm not sure the percentage of those. But there are people who in CPS that have that access.

THE COURT:  Why don't they all have that access?

[MS. BATISTE]:  I'm not aware.  I can't answer that.

THE COURT:  Can -- Commissioner Masters, can you answer that?

COMMISSIONER MASTERS:  The only thing that I do know, Your Honor, is that HHSC owns the CLASS system.  Why caseworkers cannot have access to it, I'm unaware.  But we will definitely follow-up to find out.

. . .

THE COURT:  . . . .  Well -- do caseworkers have -- from DFPS have access to the CLASS system?

[MS. HINSON[119]]:  Some caseworkers do, but not all.

D.E. 990 at 56:24–57:12, 198:24–199:5.  Shaw testified that any DFPS worker with a "business need" is "welcome to have access to CLASS," but only "[i]f they put in a request for it and need access."  D.E. 991 at 83:20–24, 84:8–9.  Commissioner Masters confirmed that she would "make all due efforts then to have all [DFPS] caseworkers apply for access to CLASS."  *Id.* at 84:12–15.

However, even if DFPS caseworkers gain access to HHSC-RCCL's CLASS system, they will not know what information in that database pertains to PMC children.  As previously discussed, *see supra* Sections IV.C.2.d., IV.E.3.a.ii., the State does not track whether certain information in CLASS pertains to PMC children, despite the fact that HHSC-RCCL is under Court orders to remedy constitutional violations against that class of children.  As a result, it is impossible to know which placements house PMC children in licensed foster care without having to undertake laborious cross-referencing.  *See supra* Sections IV.C.2.d., IV.E.3.a.ii.  A DFPS caseworker reviewing information in CLASS regarding minimum standards investigations or inspections at licensed facilities would not be able to determine from that information alone whether those investigations or inspections pertain to placements affecting PMC children.  The persistent breakdown of communication between DFPS and HHSC-RCCL, both of which are under orders from this Court to remedy constitutional violations regarding the safety and wellbeing of children, undermines Defendants' position that they have complied with both Remedial Order 3, as previously addressed, *see supra* Sections IV.E.3.a.ii., IV.E.3.b.iii., and Remedial Order 22.

The Monitors' findings in their Report and the testimony by the State's witnesses at the Show Cause Hearing reveal that Defendants' conduct regarding the operations of HHSC-RCCL

---

[119] Jenny Hinson is the Director of Heightened Monitoring for HHSC-RCCL.  D.E. 990 at 193:2–3.

has not been consistent with the terms of the remedy ordered by this Court and affirmed by the Fifth Circuit for the constitutional violations found at trial.  Despite the requirements of Remedial Order 22, nothing has changed since trial, when the Court found that RCCL failed to conduct proper inspections and enforcement actions and failed to take patterns of problems into consideration when evaluating licensed placements.  As discussed below, additional data provided in the Monitors' Report demonstrate the precise ways in which Defendants have failed to comply with the specific requirements of this Remedial Order; further, Defendants have failed to defend against a finding of civil contempt.

### b.      The Requirements of Remedial Order 22

As noted above, *see supra* Section IV.I.3., the Court clarified the Requirements of Remedial Order 22 on October 7, 2019, when the Monitors advised HHSC that:

> [W]ith respect to HHSC's Request for Clarification for Remedial Order 22, the Court directs with respect to the look-back period for considering all referrals of, and in addition, all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment, [HHSC-RCCL] inspectors should assess the previous 5 years.  With respect to the request for clarification about how to document that the inspectors have considered these referrals and findings, a check box is insufficient.  The Court directs the agency to have inspectors document the following in CLASS: (1) the number of referrals of child abuse/neglect; (2) the number of confirmed findings of child abuse/neglect; (3) the number of confirmed findings of corporal punishment; and (4) a narrative description of how this data and information was considered.

D.E. 869 at 264.

To assess Defendants' compliance with Remedial Order 22, the Monitors "conducted a case record review using a survey tool to test for completion of the extended compliance history review prior to an onsite investigation/inspection and to assess the extended compliance history review for compliance with the required content identified in the remedial order." *Id.* at 266.  The Monitors conducted this case review for "a sample of operations (CPAs and GROs) with the highest number of referrals to [HHSC-RCCL] for investigations of minimum standards violations

between July 31, 2019 and December 31, 2019." *Id.* This sample included "those facilities with a referral to SWI for a minimum standards violation between October 7, 2019 (the date the Court provided a response to the State's request for clarification) and January 31, 2020." *Id.* The resulting sample consisted of 92 operations, for which the Monitors reviewed 787 minimum standards investigations to determine if extended compliance history reviews had taken place prior to the corresponding inspections. *See id.*

The Monitors' review reveals that HHSC-RCCL has not complied with Remedial Order 22. As Plaintiffs note in their Motion, out of all of the inspections, dated October 7, 2019 through January 31, 2020, that the Monitors reviewed, they discovered that the State has not consistently completed five-year retrospective/extended compliance history reviews. *See* D.E. 901 at 17.

> Only 28% of inspections associated with an investigation of a minimum standards violation contained a completed five-year retrospective report, and 29% of the operations (twenty-two of ninety-two) had **no** five-year retrospective reports in CLASS. Only 7% of the operations (six of ninety-two) had a five-year retrospective report for all (100%) of the investigations or inspections conducted during the period under review.

D.E. 869 at 271; *see also id.* at 266; D.E. 901 at 17.

The Monitors report that "the State did not direct [HHSC-RCCL] inspectors to begin conducting the five-year retrospective report until December 1, 2019." D.E. 869 at 266; *see also* DX E-4 at 1–2 (Field Communication #271, dated December 1, 2019, communicating the requirements of Remedial Order 22 to HHSC-RCCL inspectors). Therefore, the State has failed to comply with Remedial Order 22's provision that it was "[e]ffective immediately" upon the Fifth Circuit's July 30, 2019 Mandate. In order to capture any change that may have occurred in the rate at which the State completed extended compliance history reviews following the State's December directive to HHSC-RCCL inspectors, "the monitoring team also completed an analysis of compliance for the periods between December 1, 2019 and January 31, 2020 for nineteen

operations." D.E. 869 at 266. However, the Monitors' analysis of inspections occurring in that period "showed no difference in the percentage of inspections associated with minimum standards investigations that contained a completed five-year retrospective report (28%)." *Id.*[120]

In addition to assessing the State's rate of completing extended compliance history reviews, the Monitors also assessed the timing of that completion, that is, whether extended compliance history reviews were completed and documented on time to be considered "during the placement inspection[s]," per Remedial Order 22. *See* D.E. 606 at 5 ¶ 22. In order for the inspectors to consider extended compliance history reviews during inspections, the extended compliance history reviews had to be completed "prior to or on the same day of the initiation of the investigation/inspection." D.E. 869 at 267. Therefore, in order to determine whether Defendants met these timing requirements, the Monitors "reviewed 205" of the "five-year retrospective reports" that were completed for 58 operations. *Id.* Out of the 205 five-year retrospective reports completed between October 7, 2019 and January 31, 2020 that the Monitors reviewed, HHSC-RCCL only completed 118 (or 58%) prior to or on the same day that the corresponding investigation was initiated. *Id.* at 267, 270.

The statistics reported by the Monitors, combined with their accounts of ongoing and disturbing problems at licensed facilities such as Hector Garza and Prairie Harbor, reveal that Defendants have "failed to comply with the [C]ourt's order" to remedy constitutional violations that put children at an unreasonable risk of serious harm. *See LeGrand*, 43 F.3d at 170; *Pennington*, 832 F.2d at 914. The third element of civil contempt is met as to Remedial Order 22.

---

[120] While the Monitors did find that "the December 2019 through January 2020 data did show an 8% decrease in operations (4 of 19, or 21%) with no five-year retrospective reports, and a 9% increase in operations (3 of 19, or 16%) that had a five-year retrospective report for all of the investigations conducted during the period," the "overall percentage of completed five-year retrospective reports" from the December 2019 through January 2020 period "did not change from the Monitors' full case read sample." D.E. 869 at 266.

In their Objections to the Monitors' Report and their Response to Plaintiffs' Motion, Defendants attempt to rebut the Monitors' conclusions by calling them "flawed and unreliable" and attempt to establish that they have "exercised reasonable diligence in a good faith effort to comply . . . and should not, therefore, be held in contempt." D.E. 911 at 35; *see also LeGrand*, 43 F.3d at 170 (rebutting a showing of noncompliance and good faith attempts to comply are defenses to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (good faith is a defense to civil contempt). First, Defendants attempt to rebut the conclusions in the Monitors' Report by arguing that it wrongly considered whether Defendants completed extended compliance history reviews for investigations, rather than inspections. Second, Defendants argue that the Monitors' Report does not accurately reflect their compliance with Remedial Order 22 because, contrary to the Report's analysis, they say (incredibly) that extended compliance history reviews need not be completed and documented prior to inspections in order for inspectors to consider them during the inspections. Third, Defendants argue that the Monitors' data sample represents a timeframe that was unreasonably early to expect them to have been able to implement Remedial Order 22. However, information provided by the Monitors and by the witnesses at the Show Cause Hearing demonstrates that HHSC-RCCL made little, if any, effort to timely comply with Remedial Order 22. Finally, in contrast to Defendants' allegations in their Response to Plaintiffs' Motion that they "worked diligently" to comply with Remedial Order 22, the Monitors' Report and the Show Cause Hearing revealed that Defendants did not make any attempt at all to assess their own compliance with the Remedial Order. Each of these issues are addressed below, in turn.

### i.      The Monitors' Analysis of "Inspections"

Defendants argue that the Monitors' analysis is "incapable of supporting a finding of contempt" of Remedial Order 22 because the Monitors analyzed HHSC-RCCL's completion of

extended compliance history reviews not just for "inspections," but also for "investigations."  D.E.

911 at 32; *see also* D.E. 903 ¶ 33.  Defendants argue in their Response to Plaintiffs' Motion that:

> [T]he Monitors apparently looked at HHSC "investigations" in their analysis of
> Remedial Order No. 22 when the plain language of that order expressly refers to
> "inspections." . . .   The processes and procedures for inspections conducted by
> HHSC differ from those for investigations. . . .  Neither HHSC policy nor Remedial
> Order No. 22 require extended compliance history . . . reviews for
> investigations. . . .  Therefore, the Report's compliance analysis is not based on the
> correct underlying data, rendering it incapable of supporting a finding of contempt.

D.E. 911 at 32 (citing D.E. 869 at 266; *CCL Policy and Procedures Handbook* §§ 4000

(Inspections), 6000 (Investigations)).  Similarly, Defendants made the following objection to the

Monitors' Report:

> Defendants further object to Section VI(A) of the Report, related to Remedial Order
> No. 22, on the grounds that the Report incorrectly states that an extended
> compliance history review is required prior to an investigation.  The plain language
> of Remedial Order No. 22 requires that extended compliance history reviews be
> considered during placement inspections; however, the Report discusses data
> related to investigations rather than inspections.

D.E. 903 ¶ 33.  Also, at the Show Cause Hearing, Shaw testified that the Monitors' Report "w[as]

looking at the date of initiation of the investigation as the date time point for the extended

compliance history review," while "[s]ometimes those investigations can be initiated without

inspection.  We have specifically tied the extended compliance history review to the time an

inspector goes out to the operation and conducts any inspections."  D.E 991 at 92:8–15.  Finally,

in June of 2020, in response to a draft of the Monitors' Report shared with the State, HHSC-RCCL

suggested that the Monitors misapplied language in the remedial orders because HHSC-RCCL

personnel are "inspectors, not investigators."  *See* D.E. 990 at 107:6–108:10 (Show Cause Hearing

colloquy concerning HHSC's communication with the Monitors stating that HHSC-RCCL

employs "inspectors, not investigators"); D.E. 991 at 66:13–67:9 (same).

It is not true that the Monitors only evaluated whether Defendants completed extended compliance history reviews before investigations, rather than inspections, nor is it true that HHSC-RCCL's inspectors are not also investigators. As stated above, the Monitors assessed "completion of the extended compliance history review prior to an **onsite** investigation/inspection."[121]  D.E. 869 at 266 (emphasis added). The *CCL Policy and Procedures Handbook* defines "inspection" as "[t]he **physical presence of licensing staff at an operation** to determine an operation's compliance with child care licensing law and HHSC rules." *CCL Policy and Procedures Handbook*, Definitions of Terms; *see also* D.E. 991 at 66:9–11 (Show Cause Hearing testimony of Shaw, specifying that an "inspection is where our inspectors physically go out to an operation and conduct some kind of activity onsite"). Therefore, the fact that the Monitors' methodology was based on completion of the extended compliance history review prior to an "**onsite**" process illustrates that the process the Monitors refer to is, by definition, an inspection.

Furthermore, HHSC-RCCL's own policy handbook requires inspections to accompany most types of investigations: "The investigator must conduct an unannounced inspection for all investigations assigned a Priority 1, 2, 3, or 4." *CCL Policy and Procedures Handbook* § 6430. In addition, the handbook provides that one of the types of inspections that HHSC-RCCL conducts is an "**investigation inspection**." *Id.* § 4125 (emphasis added). An investigation inspection "include[s] the investigation of reports alleging[] violations of Licensing statutes;[] violations of administrative rules;[] violations of minimum standards; or[] a combination of these." *Id.* The discussion of Defendants' compliance with Remedial Order 22 in the Monitors' Report uses the term "investigation/inspection," or the terms "investigation" or "inspection" interchangeably, to

---

[121] The Monitors confirmed to the Court that the "investigation/inspection" term in the Report refers to "investigation inspections," as defined by Section 4125 of the *CCL Policy and Procedures Handbook*. *See* D.E. 606 at 18 ¶ A9 (Monitoring Appointment Provision A9) ("The Monitors may periodically meet privately with the Court concerning issues related to this case.").

refer to that exact type of inspection.  *See* D.E. 869 at 266–67.  Also, Defendants' own Field Communication informing HHSC-RCCL inspectors of the extended compliance history review requirements also acknowledge that investigations and inspections take place together.  The Field Communication acknowledges that Remedial Order 22 pertains to "any type of inspection, including an **inspections** [sic] Licensing conducts as part of a **minimum standards investigation**."  DX E-4 at 2 (Field Communication #271) (emphasis added);

Shaw's testimony at the Show Cause Hearing further reveals Defendants' understanding that investigations and inspections often take place together and that it is important that each process informs the other.  Shaw affirmed that HHSC-RCCL's "understanding of the Remedial Order" was that it was "important . . . for these **inspectors** . . . to know this information, this history of these homes before or during the **inspection** . . . so that they can conduct an informed **investigation**."  D.E. 991 at 97:3–8 (emphasis added).  She further affirmed that HHSC-RCCL informed its inspectors that "they have to look at this information [from extended compliance history reviews] before they go . . . out on the **inspection for [HHSC-RCCL's] investigation**."  *Id.* at 98:18–21.

Shaw's testimony at the Show Cause Hearing is clear that inspectors at HHSC-RCCL often conduct inspections along with or as part of investigations, such as minimum standards investigations, which is consistent with Shaw's own trial testimony from nearly six years ago.  At trial, Shaw testified that while "abuse/neglect investigators . . . just focus on abuse/neglect investigations," they also "**evaluate the standards related to those**," and that "**our inspectors also conduct the standards investigations**."  D.E. 329 at 24:19–23; *supra* Section IV.C.1.a.  At the Show Cause Hearing, Shaw testified to the same thing, saying that "[t]he job title for our staff are inspectors, but part of their job duties are to conduct minimum standards investigations."  D.E.

991 at 66:22–24.  The need for such investigations to accompany HHSC-RCCL's inspections is especially heightened considering that, as discussed above, the breakdown in communication between DFPS and HHSC-RCCL means that information regarding alleged abuse, neglect, and other deficiencies at placements is not being shared seamlessly across the agencies.  *See supra* Sections IV.C.1.d., IV.E.3.a.ii., IV.E.3.b.iii., IV.I.3.a.iii.

Finally, Defendants' own *CCL Policy and Procedures Handbook* states that an HHSC-RCCL inspector's role involves both inspection and investigation duties.  The handbook describes the "Role of the Inspector" as follows:  "A licensing **inspector** who conducts an **investigation** becomes an **investigator** for purposes of Licensing policies and procedures and," *inter alia*, "responds to reports of possible violations of statute, administrative rules, or minimum standards that do not allege abuse, neglect, or exploitation (an **investigation**)."  *CCL Policy and Procedure Handbook* § 6120 (emphasis added); *see also* D.E. 990 at 108:11–109:14.  Hence, under HHSC-RCCL's own policies, inspections and investigations go hand-in-hand and are often conducted by one person who is both an inspector and an investigator.  The Monitors' analysis of the inspections that accompany investigations pertains directly to HHSC-RCCL's compliance with Remedial Order 22.

The Court OVERRULES Defendants' Objection 33 to the Monitors' Report, *see* D.E. 903 ¶ 33, and rejects their corresponding arguments in their Response to Plaintiffs' Motion that the Monitors' Report does not accurately reflect Defendants' compliance with Remedial Order 22, *see* D.E. 911 at 32.

        **ii.**        **Completing and Documenting Extended Compliance History Reviews Prior to Inspections**

The Monitors report that HHSC-RCCL inspectors have not consistently completed and documented extended compliance history reviews prior to inspections of placements, D.E. 869 at

264, in violation of Remedial Order 22's requirement that the Defendants "must consider **during the placement inspection** all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements," *see* D.E. 606 at 5 ¶ 22 (emphasis added).  As described above, the Monitors reviewed 205 of the extended compliance history reviews that Defendants completed for 58 operations between October 7, 2019 and January 31, 2020, and determined that only 118 (or 58%) of those reviews were completed and documented in CLASS by the HHSC-RCCL inspector prior to or on the same day of the initiation of inspections that took place.  D.E. 869 at 267.  Therefore, the Monitors concluded that HHSC-RCCL "rarely completes the five-year retrospective review prior to or on the same day as the [HHSC-RCCL] inspection." *Id.* at 271.  As the Monitors state, HHSC-RCCL's failure to consistently complete and document five-year retrospective reviews/extended compliance history reviews before HHSC-RCCL inspections "ma[de] it impossible for the information to be consider[ed] during the inspection, as required by Remedial Order Twenty-Two." *Id.*; *see also* D.E. 901 at 17.

In their Response to Plaintiffs' Motion, Defendants argue that "the cited 58% rate undermines the Motion's contention that [extended compliance history] reviews are 'rarely' done." D.E. 911 at 35.  This argument fails to consider that the 58% of extended compliance history reviews done prior to inspections comes from a pool of extended compliance history reviews that were even "completed" at all; the Monitors' case read showed that an extended compliance history review was completed in only 28% of the investigation inspections reviewed.  D.E. 869 at 266–67.  Defendants' performance of timely completing and documenting extended compliance history reviews in only 58% of reviewed inspections, combined with Defendants' position, discussed

below, that they are not required to complete and document extended compliance history reviews prior to inspections, is inconsistent with Remedial Order 22.

Defendants take the position, incredibly, that Remedial Order 22 does not require them to complete and document extended compliance history reviews in CLASS before conducting inspections. They argue that:

> [T]he plain language of Remedial Order No. 22 provides that the [extended compliance history] be considered during inspections, not before. That an [extended compliance history] review is not documented before an inspection does not mean the review was not completed by the inspection date. Rather, inspectors are instructed to conduct the review prior to the inspection and have 24 hours after completing the inspection to document their review and assessment.

D.E. 911 at 34. Defendants previously made a similar objection to the Monitors' Report:

> Defendants also object to Section VI(A) of the Report, related to Remedial Order No. 22, in that it incorrectly concludes that failure to document the extended compliance history review before the inspection date necessarily means the reviews are not completed by the inspection date. Rather, inspectors are instructed to conduct the review prior to the inspection and have 24 hours after completing the inspection to document their review and assessment.

D.E. 903 ¶ 37.

Defendants' position is inconsistent with the plain language of Remedial Order 22. Remedial Order 22 requires that HHSC-RCCL "must consider **during the placement inspection** all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements." D.E. 606 at 5 ¶ 22 (emphasis added). As the Court clarified in October of 2019, Remedial Order 22 requires reviews of this information over the course of a five-year look-back period, or a five-year retrospective review/extended compliance history review. *See* D.E. 869 at 264. Therefore, if the extended compliance history reviews must be considered **during** an inspection, it strains logic to argue that they need not be completed and documented **before** that same inspection. Also, if a review is not documented prior to or on the same day as the inspection, the Monitors have no way of validating

that the inspector considered the information during the inspection, as required by the language of the Remedial Order.  *See* D.E. 606 at 5 ¶ 22; *see also id.* at 16 ¶ 3 ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order.  The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary.").

Defendants' argument is also disingenuous and not credible, not only because it contravenes the plain language of the Remedial Order, but also because it contradicts HHSC-RCCL's own prior interpretation of Remedial Order 22.  To support their argument that they "worked diligently" to "provide[] instructions to [HHSC-RCCL] inspectors for performance of [extended compliance history] reviews," Defendants cite their own Field Communication #271. D.E. 911 at 33 (citing DX E-4).  This very Field Communication reveals that HHSC-RCCL informed its staff—and thus was clearly aware—that in order to comply with Remedial Order 22, inspectors must conduct the five-year retrospective review/extended compliance history review of the location's compliance history **prior to** an inspection of that location.  Field Communication #271 states that:

> Effective December 1, 2019, [HHSC-RCCL] Inspectors will be required to conduct and document an extended compliance history review for each operation **before** conducting an inspection. . . .  A thorough review and assessment of an operation's compliance history **prior to** conducting an inspection or investigation is a critical part of assessing risk. . . .  While inspectors are currently required to conduct a review of an operation's compliance history **prior to** conducting an application, initial, or monitoring inspection of an operation . . . , a federal court has ordered [HHSC-RCCL] Inspectors to conduct a more extensive and targeted compliance history review **before** conducting any type of inspection, including an inspections [sic] Licensing conducts as part of a minimum standards investigation, follow up inspection, and inspection categorized as "other".

DX E-4 at 2 (emphasis added).  Contrary to the Defendants' position in their Response to the Plaintiffs' Motion to Show Cause and in their Objections to the Monitors' Report, Field Communication #271 shows that Defendants understood that Remedial Order 22 requires

completion and documentation of five-year retrospective reviews before inspections of placements.

Furthermore, at various points throughout the Show Cause Hearing, Shaw's testimony revealed that she understood perfectly well the necessity for completing and documenting an extended compliance history review before an inspection:

> [DEF. COUNSEL:]  Ms. Shaw, you had just said that an inspection is when the staff physically goes out to an operation.  Would you explain when an inspector -- what an inspector reviews as part of their inspection?
>
> [MS. SHAW:]  So **before** an inspector goes out to conduct, for example, a monitoring inspection, they had to review the operation[']s compliance history, . . . looking at the prior inspection of the operation to see if there are any deficiencies cited that indicate a high risk to children; if so, then they (indiscernible) those same areas of concern **during** their inspection. . . .
>
> [DEF. COUNSEL:]  And what is an Extended Compliance History Review?
>
> [MS. SHAW:]  An Extended Compliance History Review requires the inspectors to gather information from the operation's compliance history for the last five years.  That would include the number of abuse/neglect investigations, the number of confirmed findings of abuse/neglect, and the number of corporal punishment deficiencies.  **They then take that information and do an assessment of the operation.  And once they conduct the inspection, they do need to come back and document how they addressed risk based off their assessment from the Extended Compliance History Review.**
>
> . . .
>
> [DEF. COUNSEL:]  And how are extended -- I think that you had mentioned what is included in them, but how are Extended Compliance Histories ultimately used in the inspection?
>
> [MS. SHAW:]  So looking at the information that's required **before the inspection** helps the inspector focus and identify any risk areas.  Once they've completed the inspection, keeping in mind the areas of concern they've identified, they will then come back and do kind of a risk mitigation assessment of what they have done and based off the information they gathered and what they saw during the inspection.
>
> . . .

[PL. COUNSEL:]   Yes, yeah, okay.   So the reason why it's important under Remedial Order 22 for these inspectors of your group, RCCL or HHSC, for them to know this information, this history of these homes **before** or during the inspection is so that they can conduct an informed investigation.   Right?

[MS. SHAW:]  Yes, that is our understanding of the Remedial Order.

[PL. COUNSEL:] Right.  So if -- if the inspector -- well, that -- that's only common sense that if you don't have your inspectors read and review and understand this information **before** or during the inspection, they can't do a thorough investigation without knowing the information.  Right?

[MS. SHAW:]  I believe our policy prior to required the inspectors to look at the overall compliance history.   That was in place before.   But the Extended Compliance History Reviews have a specific purpose for our staff to look at.

[PL. COUNSEL:]  Yeah.   And so what you told them is they have to look at this information **before** they go on -- out on the inspection for your investigation. Right?

[MS. SHAW:]  That's correct.

[PL. COUNSEL:]  So they know what questions to ask.  True?

[MS. SHAW:]  And they know what they need to look at during the course of the inspection.

[PL. COUNSEL:]  Sure.  And they know what risks to look for.  Right?

[MS. SHAW:]  Correct.

. . .

[PL. COUNSEL:]   Well this Remedial Order 22 makes perfect sense that it's requiring RCCL to have these inspectors know this information **before** or during the inspection itself, the investigations.  Right?

[MS. SHAW:]  Yes, it's very helpful information to have.

[PL. COUNSEL:]  Because it's going to help make better decisions and ultimately that promotes child safety, doesn't it?

[MS. SHAW:]  Yes.

D.E. 991 at 84:24–85:23, 86:15–24, 97:3–98:1, 98:8–15 (emphasis added).  This testimony belies

Defendants' arguments in their Response and their Objections to the Monitors' Report.  It reveals

that HHSC-RCCL leadership understood that if a five-year retrospective review/extended

compliance history review is not conducted and documented before an inspection, the inspector would have no way of "tak[ing] that information" and "do[ing] an assessment of the operation," as Shaw stated they must do. *See id.* at 85:19–20. The Court rejects Defendants' arguments to the contrary.

Although Remedial Order 22 requires documentation of extended compliance history reviews prior to inspections, Defendants did not implement a system in CLASS to contain this documentation until August 31, 2020. *Id.* at 88:5–7. Defendants therefore did not timely comply with Remedial Order 22, which was "[e]ffective immediately" upon the Fifth Circuit's Mandate. *See* D.E. 606 at 5 ¶ 22. This delay in implementing a mechanism in CLASS also affected the Defendants' ability to provide data to the Monitors regarding compliance with Remedial Order 22. *See* D.E. 869 at 264–65 ("In response [to the Monitors' data request], HHSC indicated that, until it implements Information Technology automation changes, HHSC is unable to provide data regarding the review of compliance history."). When asked at the Show Cause Hearing why HHSC-RCCL was failing to provide such data to the Monitors, Shaw responded that, prior to August 31, 2020, "we just did not have any mechanism in CLASS to capture this information," and "[w]e have staff document it through a chronology and there's not a way to track that data." D.E. 991 at 88:5–11. HHSC-RCCL's failure to document extended compliance history reviews in CLASS prior to August 31, 2020 is inconsistent with the Court's Order because the Monitors cannot verify timely completion of the extended compliance history reviews if that completion is not documented in CLASS. D.E. 991 at 92:19–93:4; *see also* D.E. 606 at 5, 16–17 ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. . . . The Monitors shall . . . review all plans and documents to be developed and produced

by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order.").

Furthermore, Defendants failed to adequately document in extended compliance history reviews the information that the Court specified that these reviews must contain, namely, "a narrative description of how this data and information was considered."  D.E. 869 at 264; *see also supra* Section IV.I.3.  The Monitors discovered that:

> Although the extended compliance history reviews contained the data elements required by the remedial order, the Monitors' case reviews revealed concerns related to the content of the information and the failure of the investigators to include "a narrative description of how this data and information was considered," as directed by the Court, and communicated to the State by the Monitors on October 7, 2019.  **Inspectors failed to provide a narrative description of how they considered referral for, or a confirmed finding of, abuse and neglect or a confirmed finding of corporal punishment in 213 of 270 (79%) of the extended compliance history reviews.**

D.E. 869 at 268 (emphasis added).  Hence, in addition to failing to complete and document extended compliance history reviews timely and consistent with Remedial Order 22, Defendants have failed to include the necessary information in those extended compliance history reviews.

In sum, Defendants' own evidence and testimony demonstrates that HHSC-RCCL was aware that Remedial Order 22 requires completion and documentation of extended compliance history reviews **before** a location is inspected, contrary to Defendants' position in their Objections to the Monitors' Report and their Response to Plaintiffs' Motion.  Defendants' Objections 33, 35, and 37 to the Monitors' Report are OVERRULED.  The Court concludes that Defendants have not complied with Remedial Order 22's requirements to complete and document extended compliance history reviews prior to inspections and to include a "narrative description of how this data and information" from extended compliance history reviews "was considered."  *Id.* at 264, 268. Defendants have failed to comply with these aspects of Remedial Order 22 and have failed to exert good faith efforts to do so.

### iii.  Complying or Making Good Faith Efforts To Comply Within the Required Timeframe

Inability to comply and good faith efforts to comply are defenses to civil contempt.  *See LeGrand*, 43 F.3d at 170; *Petroleos Mexicanos*, 826 F.2d at 401.  Defendants argue that the Monitors' Report is "flawed" and cannot support a finding of contempt because the Monitors analyzed a data sample representing a timeframe that, according to Defendants, reflects unreasonable expectations of how quickly they would be able to comply with Remedial Order 22.  D.E. 911 at 32.  In order to assess HHSC-RCCL's compliance with Remedial Order 22, the Monitors analyzed a sample of HHSC-RCCL's inspections that took place between October 7, 2019 and January 31, 2020.  D.E. 869 at 266.  In their Response to Plaintiffs' Motion, Defendants complain that:

> [T]he Monitors used data from October 7, 2019 through January 31, 2020, when it is undisputed that on October 7, 2019, the Court provided clarification as to the requirements for Remedial Order No. 22, including that [HHSC-RCCL] inspectors must assess data encompassing an extended five-year "look-back period." . . .  In other words, the Report unreasonably assumes that HHSC was able to immediately implement the clarifications provided by the Court and fails to allow HHSC the opportunity to communicate with and train its staff on compliance with such requirements.

D.E. 911 at 32–33.  Similarly, Defendants state in their Objections that:

> Defendants object to Section VI(A) of the Report, related to Remedial Order No. 22, because it uses an improper data timeframe as the basis for its analysis.  Specifically, the Report acknowledges that on October 7, 2019, the Monitors clarified Defendants' obligations under Remedial Order No. 22 but then proceeds to evaluate Defendants' performance under a stated timeframe that starts immediately on October 7, 2019 and does not allow time for Defendants to actually implement Remedial Order No. 22 in accordance with these clarifications.

D.E. 903 ¶ 34.  Hence, Defendants both attempt to undermine the Report's conclusions based on the timeframe captured by the data therein and suggest that they were unable to come into compliance with Remedial Order 22 within the required timeframe.  The Court finds these arguments to be unavailing.

Contrary to Defendants' arguments, the Monitors did take Defendants' delay in implementing Remedial Order 22 into account in the time frame for which they analyzed Defendants' compliance in their Report. After acknowledging that, despite the Court's October 7, 2019 clarification, no policy was in place to effectuate Remedial Order 22 at HHSC-RCCL until December 1, 2019, the Monitors note that in addition to the analysis completed for the October 7, 2019 through January 31, 2020 timeframe, "the monitoring team also completed an analysis of compliance for the periods between December 1, 2019 and January 31, 2020 for nineteen operations." D.E. 869 at 266. During that timeframe with the later beginning date, the Monitors still did not identify an improvement. *Id.* ("The analysis showed no difference in the percentage of inspections associated with minimum standards investigations that contained a completed five-year retrospective report (28%)."). Therefore, the Court OVERRULES Defendants' Objection 34 that the Monitors' Report "uses an improper data timeframe."

The Court also rejects Defendants' arguments suggesting that they were unable to comply within that timeline. *See* D.E. 911 at 32–33. Defendants argue that "the Report unreasonably assumes that HHSC was able to immediately implement the clarifications provided by the Court" on October 7, 2019 and that "HHSC has exercised reasonable diligence in a good faith effort to comply." *Id.* at 33, 35. By its terms, Remedial Order 22 was "[e]ffective immediately" upon the Fifth Circuit's Mandate on July 30, 2019—more than two months before the October 2019 date by which Defendants say that it was unreasonable for the Court and the Monitors to have expected them to begin complying. *See* D.E. 606 at 5 ¶ 22. Defendants did not appeal Remedial Order 22 in *Stukenberg II* following this Court's November 2018 Order, so Defendants knew the terms of Remedial Order 22 well before it went into effect upon the Fifth Circuit's July 30, 2019 Mandate. *See supra* note 5. Thus, Defendants had months to seek clarification from the Court about what

the Remedial Order required of them.  The fact that they waited until after the Fifth Circuit's Mandate to do so does not affect the Court's finding that Defendants have failed to comply with Remedial Order 22 "immediately," as required.  The Court is not convinced that Defendants were unable to comply with Remedial Order 22 "immediately."  *See* D.E. 606 at 5 ¶ 22.

In addition, the Court is not convinced that Defendants made good faith efforts to comply. The Monitors' Report and the testimony at the Show Cause Hearing reveal three ways in which Defendants did not even attempt to begin to implement the terms of Remedial Order 22 until months after its effective date.  As illustrated below, first, HHSC-RCCL did not communicate the requirements of Remedial Order 22 to its inspectors until December 1, 2019.  *See* D.E. 869 at 266; D.E. 991 at 100:2–12.  In addition, HHSC-RCCL did not finally implement a formal policy instating the terms of the Remedial Order 22 until May of 2020.  *See* D.E 991 at 87:11–16, 99:11–16; D.E. 911 at 33; D.E. 903 ¶ 32.  Finally, HHSC-RCCL did not make changes to its CLASS system to ensure that they were complying with Remedial Order 22 until three days before the Show Cause Hearing.  *See* D.E. 991 at 95:18–25.

First, the Monitors' Report reveals that "the State did not direct [HHSC-RCCL] inspectors to begin conducting the five-year retrospective report until December 1, 2019."  D.E. 869 at 266; *see also* DX E-4 at 1 (Field Communication #271) ("Effective Date: December 1, 2019"); D.E. 911 at 33.  Shaw's testimony at the Show Cause Hearing also confirmed this timeline:

[PL. COUNSEL:]  Right.  So let's just be clear.  For the last -- so the Court's Order went into effect in July of 2019.  Right?

[MS. SHAW:]  Yes.

[PL. COUNSEL:]  And then RCCL didn't send anything out telling your field people to do anything to comply with the Court Order until five months later on December 1st, 2019.  Right?

[MS. SHAW:]  Yes, once we received clarification on what was required, we did implement that, effective December 1st of 2019.

> [PL. COUNSEL:]  Five months later, right?

> [MS. SHAW:]  I guess September, November, December, four months.

D.E. 991 at 100:2–12.  Thus, according to Shaw's testimony and the Monitors' Report, HHSC-RCCL did not tell its inspectors to start complying with Remedial Order 22 until four months after the Fifth Circuit's Mandate and nearly two months after this Court's clarification of Remedial Order 22.  The Court does not consider these actions to constitute a good faith effort to comply with the Remedial Order, which was "effective immediately."

In addition, the Monitors' Report, which is dated June 16, 2020, notes that "HHSC has not adopted a formal policy related to the extended compliance history review five-year retrospective report."  D.E. 869 at 261.  In their Objections to the Monitors' Report, Defendants argued that:

> Defendants object to Section VI(A) of the Report, related to Remedial Order No. 22, in that it incorrectly states that HHSC has not adopted a formal policy for extended compliance review.  In fact, that policy was published in May 2020.

D.E. 903 ¶ 32.  In their Response to Plaintiffs' Motion, Defendants also note that "HHSC has also adopted formal policies for extended compliance history reviews for inspections; such policies were effective May 2020."  D.E. 911 at 33.  In addition, at the Show Cause Hearing, Shaw testified about the formalized policy:

> [DEF. COUNSEL:]   And I know that you mentioned some trainings and communications that were sent out in 2019.  What recently has HHSC been doing to educate its staff on the Extended Compliance History Review process?

> [MS. SHAW:]  We formalized the Field Communication through policy in May of 2020.

> . . .

> [PL. COUNSEL:]  Now, the -- RCCL actually still does not have a formal policy implementing Remedial Order 22, does it?  It just has a Field Communication. Right?

> [MS. SHAW:]  No, that's not correct.  We implemented a formal policy that took the information from the Field Communication in May of 2020.

D.E 991 at 87:11–16, 99:11–16.   However, when the Court asked about when HHSC-RCCL informed the Monitors of the policy that was formalized in May of 2020, Shaw's testimony confirmed that HHSC-RCCL never informed the Monitors:

> THE COURT:  I also notice that in the Monitors' Report, they say that HHSC has not adopted a formal policy related to the Extended Compliance History Review Five-Year Retrospective Report.  That's on Page 261.
>
> Since the Monitors' Report was dated June of 2020, I wondered when you intended to let the Monitors know about the new policy?
>
> [MS. SHAW]:  I'll make sure to do that in the future, your Honor.  We did not alert them to the policy -- to the formalization of the policy in May of 2020.

*Id.* at 102:22–103:6.  Therefore, Defendants' Objections to the Monitors' Report, their Response to Plaintiffs' Motion, and the Show Cause Hearing testimony were the first times that the Monitors or the Court learned about this formal policy, even though in preparing their June 2020 Report, the Monitors had requested from Defendants on February 21, 2020 a "[c]opy of policy regarding documentation of five-year chronology and review in CLASS."  D.E. 869 at 265.  HHSC's failure to even implement a formal policy until May of 2020—nearly ten months after Remedial Order 22 went into effect—is inconsistent with Remedial Order 22 and its requirement that its provisions must be put in place "[e]ffective immediately."  *See* D.E. 606 at 5 ¶ 22.  In addition, Monitoring Appointment Provision A10 of the Court's November 2018 Order requires that the State provide information to the Monitors "within 30 days of the Monitors' request."  D.E. 606 at 18 ¶ A10. Defendants' failure to inform the Monitors of the formalized policy for four months after the policy was put in place is also inconsistent with that provision.[122]

---

[122] After the Monitors requested the policy from Defendants in February, Defendants were on notice that the Monitors required this information.  *See* D.E. 869 at 265.  Having already made the request once, the Monitors were not required to continually make a repeated request in order to start the 30-day timeline within which the Defendants had to provide the information.

Finally, HHSC-RCCL made changes to its CLASS system to ensure that the agency was complying with Remedial Order 22, but those changes did not take effect until August 31, 2020, and Defendants did not attempt to make these changes more promptly in order to comply with Remedial Order 22 "immediately." *See* D.E. 911 at 33 (alleging on July 24, 2020 that "HHSC **has begun** efforts to enhance to [sic] its CLASS system . . . .  The enhancements, which HHSC anticipates **will be implemented before September 2020**, **will enable** HHSC's enforcement of the requirements for inspectors' documentation of their [extended compliance history] reviews and **will allow** HHSC to track compliance by its inspectors") (emphasis added); D.E. 991 at 95:18–25 (Shaw testifying at the Show Cause Hearing that the CLASS automation was not made until August 31, 2020).  Shaw testified at the Show Cause Hearing that:

> Now that we have the automation in place, we have been running a daily report since August 31st to ensure that our staff are completing the information required before the inspection, as well as completing the information required after the inspection within 24 hours.
>
> For any errors that we have found, we are working with our district directors to come up with a plan for how they're going to evaluate this and correct it moving forward.

D.E. 991 at 93:25–94:8.  However, HHSC-RCCL had only begun to run the "daily report[s]" that Shaw described mere days before the Show Cause Hearing.  *Id.* at 95:18–25, 96:20–97:2 (Shaw affirming that as of the Show Cause Hearing, HHSC-RCCL only had "four days' worth" of reports).  Given that Defendants did not implement systems to ensure their compliance with Remedial Order 22 until just days before the Show Cause Hearing, they have failed to establish good faith efforts to meet Remedial Order 22's requirement that it was "[e]ffective immediately." *See* D.E. 606 at 5 ¶ 22.

Overall, the Court finds that, having waited four months after the Remedial Order went into effect and nearly two months after receiving clarification regarding the Remedial Order to

communicate its requirements to HHSC-RCCL inspectors; having waited until May of 2020 to implement a formal policy to effectuate Remedial Order 22's requirements; and having waited more than a year after the Remedial Order went into effect to update its automated system in CLASS to be consistent with the Remedial Order's requirements, Defendants have failed to comply or make good faith efforts to comply with Remedial Order 22 "immediately."

### iv.    Attempting to Ensure Compliance Through Case Reads

The Monitors' findings further reveal that HHSC-RCCL did not attempt to assess its own compliance with Remedial Order 22 through case reads or otherwise, in contrast to DFPS, which conducted its own case reads in order to gather data about its compliance with the Remedial Orders that apply to its operations:

> [PL. COUNSEL:]  And -- but since it [Field Communication #271] went out, you have not had -- you, RCCL, has -- have had no way to confirm that the -- your staff is actually complying with the Field Communication other than doing a case review -- a case read.  Right?
>
> [MS. SHAW:]  Until August 31st of 2020, that is correct.
>
> . . .
>
> [PL. COUNSEL:]  Then for the last nine months from December through August, you had no idea whether -- no way to know whether your field people were actually following any Field Communication for Remedial Order No. 22.  Right?
>
> [MS. SHAW:]  We did not have a method to track that information; that is correct.
>
> [PL. COUNSEL:]  Now, you could have by doing case reads.  Right -- true?
>
> [MS. SHAW:]  Yes, and we do do case readings for our staff on a sample of cases and since that was a policy requirement, that would have been included in any of those case readings but we did not do a specific (indiscernible) case reading for compliance with the Extended Compliance History Review.
>
> [PL. COUNSEL:]  Well, when the Monitors talked to you about how you were complying, you didn't have any case reads to give them that showed that your team was complying for the past year with Remedial Order 22.  Did you?
>
> [MS. SHAW:]  No, we did not.

D.E. 991 at 99:22–100:1, 100:13–101:5.   When the Court asked why HHSC-RCCL did not conduct manual case reads to determine whether they were complying with the mandate from this Court and the Fifth Circuit, Shaw replied, "that's just not something we implemented, Your Honor."[123]  *Id.* at 101:16–17.

After HHSC-RCCL conducted no case reads of its own, Defendants then objected to the section of the Monitors' Report discussing Remedial Order 22 because the Monitors did not provide HHSC-RCCL with the cases that the Monitors reviewed:

> Defendants further object to Section VI(A) of the Report, related to Remedial Order No. 22, because, in contradiction of the requirements of the 2018 Order, it criticizes Defendants' conduct based on case reviews without providing information regarding what cases were included in the sample selected by the Monitors or what process the Monitors employed to conduct their case reviews, again depriving Defendants of the opportunity to specifically address the conclusions stated in the Report.

D.E. 903 ¶ 36.  Similarly, at the Show Cause Hearing, Shaw testified that she could not confirm the Monitors' findings because she "was not given the sample cases that they reviewed to go double-check."  D.E. 991 at 104:22–23.  However, as the Court clarified at the Show Cause Hearing, the Monitors are not obligated to give HHSC-RCCL a list of every case included in their case reads; HHSC-RCCL can conduct its own case reads to verify its own compliance with the court order to which they are subject.  *Id.* at 106:9–13.

In general, the testimony at the Show Cause Hearing confirmed that HHSC-RCCL had no way of knowing, did not know, and did not attempt to find out the extent to which they were complying or failing to comply with Remedial Order 22 until August 31, 2020—more than a year after the Remedial Order went into effect, more than ten months after the Court clarified the Remedial Order, and a mere three days before the Show Cause Hearing.

---

[123] This testimony is demonstrative of HHSC-RCCL's disinterest in complying with Remedial Order 22.

[PL. COUNSEL:]  Ms. Shaw, you gathered -- other than guessing a minute ago about what your inspectors did, you gathered no statistics of your own to present to the Court today about how many -- for example, about how many of the operations that you monitor have completed five-year retrospective reports in CLASS -- in the CLASS system.  You don't know that number personally, do you?

[MS. SHAW:]  I know it starting August 31st of how many operations we've been to and the inspections that require the Extended Compliance History Reviews.

[PL. COUNSEL:]  You certainly don't know across your system and across the State of Texas; do you?

[MS. SHAW:]  Since August 31st, I do know how many we've done across the State.

THE COURT:  Well, before then, do you have any idea?

THE WITNESS:  No, Your Honor.

THE COURT:  Have you made any attempt to get that information?

THE WITNESS:  No, we have not run every case, Your Honor.

D.E. 991 at 106:22–107:17.

HHSC-RCCL's failure to even attempt to determine whether its inspectors were conducting extended compliance history reviews in compliance with Remedial Order 22 until August of 2020—more than a year after the Remedial Order went into effect—reveals that the agency did not make good faith efforts to comply and also fails to establish that they were unable to comply with the Remedial Order that was "[e]ffective immediately."  Furthermore, because HHSC-RCCL is capable of reviewing its own sample of case reads in order to analyze its compliance with this Court's and the Fifth Circuit's orders, its Objection 36 to the Monitors' Report that they were not provided with the exact case reads that the Monitors conducted is OVERRULED.  *See* D.E. 903 ¶ 36.

In sum, the three-part showing of civil contempt is established as to Remedial Order 22, and Defendants have failed to defend against this three-part showing.  *See LeGrand*, 43 F.3d at 170.  The Court finds Defendants' argument suggesting that they were unable to comply timely

with the Remedial Order, and Defendants' rebuttals of the information and conclusions in the Monitors' Report to be unavailing.  Further, the Court does not find that the Defendants made good faith efforts to comply "immediately" with the requirements of Remedial Order 22.  By failing to comply with Remedial Order 22, Defendants have continued to subject PMC children to an unreasonable risk of serious harm in licensed operations.  The Court holds Defendants in contempt of Remedial Order 22.

As stated previously, upon a finding of civil contempt, the Court may determine the appropriate sanctions by taking into account (1) "the character and magnitude of the harm threatened by the continued contumacy"; (2) "the probable effectiveness of [the] suggested sanction in bringing about the result desired"; and (3) "the amount of [the party in contempt's] financial resources and the consequent seriousness of the burden to that particular defendant." *United Mine Workers of Am.*, 330 U.S. at 303–04; *see also Hutto*, 437 U.S. at 691 ("If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance."); *In re Dinnan*, 625 F.2d at 1149 ("A coercive, nonpunitive fine payable to the clerk of the court is an appropriate tool in civil contempt cases.").

Here, all three considerations for civil contempt sanctions justify substantial sanctions against Defendants for HHSC-RCCL's failure to comply with Remedial Order 22.  First, as established herein, HHSC-RCCL's failure to take into account the histories of abuse and neglect at licensed placements has continued to place PMC children at an unreasonable risk of serious harm five years after trial.  Placements with numerous problems, including past allegations, citations, and deficiencies, have been allowed to maintain licenses, including a placement where a child tragically died in the past year under circumstances that likely were preventable.  The magnitude of harm that could take place if Defendants continue to fail to comply with Remedial

Order 22 is dire.  Second, the only way that the Court has been able to coerce compliance from Defendants, despite their ongoing disinterest, in this case has been through severe coercive sanctions.  *See, e.g.*, D.E. 725 at 18–20, 25 (imposing sanctions of $50,000 per day for seven business days, and then $100,000 per day until Defendants come into compliance with the Court's order to provide 24-hour awake-night supervision at placements housing more than six children).  Therefore, the Court fashions a sanctions remedy, described below, to "bring[] about the result desired."  *See United Mine Workers of Am.*, 330 U.S. at 303–04.

Finally, the financial resources of Defendants are vast, as evidenced by the amount of money the State has been willing to appropriate toward funding this litigation.  *See, e.g.*, D.E. 725 at 18.  In addition, Defendants have had no problem receiving requested legislative appropriations in the past.  *See, e.g.*, D.E. 189 at 39:14–17 (Audrey Deckinga, former Assistant Commissioner of CPS, testifying at the Class Certification Hearing on January 24, 2013 that DFPS has "real advocates in the legislature"), 46:1–5 (same), 58:8–15 ("[E]very biennium we go back to the legislature and we request what we need.  If they are able, they are always responsive to us."), 77:15–19 ("In Texas we believe that we have such a wonderful relationship with our legislators . . . that we think that when we make our needs known to the legislature that they respond."); D.E. 300 at 25:21–26:11 (former DFPS Commissioner Specia testifying at trial on December 2, 2014 that "the legislature, both [D]emocrats and [R]epublicans, have been very good to the agency since I've become Commissioner").

Given the above factors, the Court finds the following sanction to be appropriate to coerce Defendants' compliance with Remedial Order 22.  *See also infra* Section V.  Defendants must file a sworn certification of their compliance with Remedial Order 22 within 15 days of the date of this Order.  While this sworn certification need not be verified by the Monitors prior to filing,

contemporaneously with this sworn certification, Defendants must submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with Remedial Order 22, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. If Defendants fail to certify compliance with Remedial Order 22 within 15 days of the date of this Order, Defendants shall pay a fine of $75,000.00 per day beginning the sixteenth day following the date of this Order until such time that they certify compliance with this Remedial Order, at which time the fines will be stayed. As stated above, while Defendants must submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with Remedial Order 22, this sworn certification does not need to be verified by the Monitors prior to filing in order to stay the fines. All of Defendants' supporting evidence with Remedial Order 22 is subject to verification by the Monitors. To avoid additional future sanctions as to this finding of contempt, Defendants must comply with this Remedial Order in the timeframe described.

### J.      Remedial Order 37: DFPS Review of the History of Allegations of Abuse and Neglect at Foster Homes

Remedial Order 37 provides that:

> Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.

D.E. 606 at 7 ¶ 37.

### 1.     The Court's Findings at Trial Related to Remedial Order 37

Since before trial, "DFPS has [had] 'a history of poor foster care placements.'"  D.E. 368

at 224 (citing PX 1988 at 10 (2010 Texas Appleseed[124] Report)).  At trial, the Court found that

this problem persisted, in part, because "information for matching a child to a placement is often

inadequate."  D.E. 300 at 57:25–58:3 (trial testimony of Lisa Black, then-Assistant Commissioner

of CPS); *see also* D.E. 368 at 224.  In addition, "placements would sometimes be made based on

the availability of a bed rather than the appropriateness of the match."  D.E. 323 at 45:10–13 (trial

testimony of Beth Miller, a former primary caseworker); *see also* D.E. 368 at 224.

Following the re-structuring of DFPS and HHSC-RCCL beginning in 2017, even when

HHSC-RCCL continues to allow problematic operations to maintain their licenses, DFPS

maintains the authority to investigate allegations of abuse and neglect at placements and maintains

the obligation to act on allegations of abuse and neglect, both in individual cases and in the

aggregate, to make informed decisions about where to place or keep children to avoid exposing

them to an unreasonable risk of serious harm.  However, just as DFPS had been failing to wield

its authority to fulfill this obligation at the time of trial, it has continued to fail to do so and thereby

has not complied with the Court's Remedial Order 37, which was designed to correct that failure.

As discussed previously, the Court found at trial that DFPS had subjected M.D. to

numerous problematic placements and allowed her to remain in placements with histories of

outcries of abuse.  *See supra* Sections IV.E.1., IV.F.1., IV.I.1.a.  After M.D.'s first outcry of sexual

abuse at Hector Garza in April of 2011 was Ruled Out, she remained at the facility, to the detriment

of her physical and emotional well-being.  *See* D.E. 368 at 60 ("M.D.'s behavior deteriorated over

---

[124] Texas Appleseed is a nonprofit organization with the "mission . . . to promote justice for all Texans by using the volunteer skills of lawyers and other professionals to find practical solutions to broad-based problems facing the most vulnerable—including the State's foster children."  *See* D.E. 368 at 23 (quoting PX 1988 at 4).  The Court considered its 2007 and 2010 reports at trial.  *See id.* at 23–24.

the next two months.  She had to be physically restrained multiple times, sustaining injuries during two of these restraints.  M.D. told her caseworker that RTC staff purposely provoked her, hoped to see her fail, and were excessively rough during the restraints.").

The placement where the investigations of M.D.'s allegations of sexual assault and rape resulted in a botched investigation and a "UTD" disposition is a clear example of DFPS's failure to recognize a pattern of problems at a facility.  M.D.'s caseworker had been "aware that 'sexual abuse [was] not new at the facility,'" and sure enough, M.D. made an outcry of sexual assault and rape by a staff member after only one week there.  D.E. 368 at 61.  At this same placement, M.D. was subjected to such horrific living conditions that her next friend, Stukenberg, had commented that if the RTC "had been a parent," M.D. "would have been removed from the home immediately."  *Id.* at 63 (quoting DX 120 at DFPS009014186).  However, remarkably and staggeringly, during DFPS's investigation of the conditions at the facility, M.D. "informed Stukenberg that she liked this current RTC much more than Hector Garza and preferred to remain there."  *Id.* at 63–64.  Nonetheless, two years after M.D.'s horrific experience at Hector Garza, *see supra* Section IV.E.1., DFPS sent her back to that facility, "despite her negative experiences there and her repeated pleas, as well as a previous court order, to not return."  D.E. 368 at 65.

During her second placement at Hector Garza, M.D. was "again subjected to inappropriate restraints," D.E. 368 at 65, with no resulting investigations, as discussed above, *see supra* Section IV.E.1.  "For the second time in two years, M.D. told her caseworker that she did not feel safe at Hector Garza."  D.E. 368 at 65–66.  This situation is emblematic of DFPS's failure to consider patterns of similar allegations of abuse and neglect at a placement in deciding whether to place or keep a child there.  The extent of the harms that can and have resulted from the State's failure to ensure that children are not placed and do not remain in facilities with patterns and histories of

abuse and neglect allegations, investigations, and findings makes it all the more disturbing that at trial, Lisa Black, the head of DFPS's CPS unit at that time, "could not testify about the rate of abuse and neglect in foster care placements, an area for which she [was] responsible." D.E. 368 at 32–33.

J.R. is another example of a Named Plaintiff who was left in a placement with repeated violations and allegations of abuse and neglect. After attorney *ad litem* Ricker reported egregious and disgusting abuse and neglect[125] in J.R.'s a foster care facility in Levelland, Texas, as discussed above, *see supra* Section IV.E.1., "J.R., as well as the other children, remained in its uncorrected care." D.E. 368 at 204. As discussed above, *see supra* Sections IV.E.1., IV.F.1., IV.G.1., IV.H.1., trial testimony revealed that, sadly, the experiences of M.D., J.R., and the other Named Plaintiffs in this case were typical of the entire General Class. *See* D.E. 368 at 43 ("[Dr.] Carter found that the experiences of the Named Plaintiffs while in DFPS custody, including the psychological harm that they suffered, were typical for the Texas foster children he evaluated and counseled over the years."); D.E. 368 at 56, 73, 79, 90, 97, 105, 128, 132, 140, 152 (the experiences of the Named Plaintiffs were typical of the General Class); *see also, e.g.*, D.E. 326 at 132:22–133:5, 193:22–194:2, 194:12–15 (Dr. Carter's trial testimony that the experiences of the Named Plaintiffs were typical of PMC foster children).

Given the above evidence, this Court found, and the Fifth Circuit affirmed, that DFPS was failing to make informed decisions about child placement. As the Fifth Circuit noted in *Stukenberg I*, part of the problem was the fact that "caseworkers lack the time to be thorough when

---

[125] As discussed above, when attorney *ad litem* Ricker visited, "[t]he place 'REEKED horribly of urine,'" it "had 'smeared feces on the wall,'" and the children had injuries and health issues such as "a purple 'goose-egg' on [J.R.'s] forehead that no one could explain," "fingernails so long that they curled forward to touch [J.R.'s] fingers," and other children with black eyes. D.E. 368 at 204; *see also* D.E. 601 at 41 n.39.

evaluating the safety or appropriateness of a placement on the front-end." D.E. 601 at 30. The

Fifth Circuit observed that:

> This means that important red flags may get overlooked. Even assuming that a "red flag" regarding a placement has been documented, a caseworker would have to navigate tens of thousands of pages of records that are scattered across multiple databases and paper files that are not consistently maintained chronologically in order to stumble upon it. And because records and case files are outdated and woefully incomplete, there is no guarantee the information the caseworkers' [sic] need was ever recorded in the first place. Caseworkers do not have the time to perform fundamental aspects of their job; clearly, they do not have the bandwidth to replicate a needle-in-a-haystack search several times over for each individual child every time they have to move him. **This limited ability to rigorously evaluate placement choices and permanency plans substantially increases the chance that a child will be exposed to serious safety risks.**

*Id.* (emphasis added).

### 2.     The Procedural History of Remedial Order 37

In its 2015 Opinion and Verdict, the Court ordered the Special Masters to propose remedies

that would address the issues that the Court found at trial. *See* D.E. 368 at 245–48, 251–52. In its

January 2018 Order, the Court entered a Remedial Order adopting a provision recommended by

the Special Masters to address DFPS's failure to take into consideration the history of allegations

of abuse and neglect at foster homes where PMC children are placed. D.E. 559 at 42 ¶ D9; D.E.

546 at 14 ¶ 9. In *Stukenberg I*, the Fifth Circuit held that this Remedial Order was one of "the

injunction provisions [that] are reasonably targeted toward remedying the identified issues," and

expressly validated that injunction provision. D.E. 601 at 57, 61 ¶ 31. Therefore, in its November

2018 Order implementing *Stukenberg I*, this Court restated that Remedial Order as Remedial Order

37, which was substantially the same.[126]  *See* D.E. 606 at 7 ¶ 37.  Defendants did not appeal

Remedial Order 37 in *Stukenberg II*; therefore, the Fifth Circuit did not disturb this Remedial

Order, and it became effective upon the Fifth Circuit's July 30, 2019 Mandate.  *See* D.E. 627 at 3

(listing issues on appeal, which did not pertain to Remedial Order 37); *supra* note 5.  Thus, as

Defendants stipulated at the Show Cause Hearing, *see* D.E. 990 at 7:4–12, the first element for a

finding of civil contempt, that an order is in effect, is satisfied as to Remedial Order 37, *see*

*LeGrand*, 43 F.3d at 170.

### 3.     Defendants Have Failed To Comply with Remedial Order 37.

Remedial Order 37 requires Defendants to ensure that: (1) "all abuse and neglect referrals

regarding a foster home where any PMC child is placed, which are not referred for a child abuse

and neglect investigation, are shared with the PMC child's caseworker and the caseworker's

supervisor within 48 hours of DFPS receiving the referral"; (2) "[u]pon receipt of the information,

the PMC child's caseworker will review the referral history of the home and assess if there are any

concerns for the child's safety or well-being"; and (3) the caseworker must "document . . . in the

child's electronic case record" his or her "assess[ment]."  D.E. 606 at 7 ¶ 37.  Importantly,

however, to implement this Remedial Order in a manner that "ensure[s] that Texas's PMC foster

---

[126] Remedial Order 37 largely repeats the language of the corresponding Remedial Order from the January 2018 Order but with a different specified timeframe for compliance.  *Compare* D.E. 559 at 42 ¶ D9 ("Effective March 2018 . . . ."), *with* D.E. 606 at 7 ¶ 37 ("Within 60 days . . . .").

In addition, Remedial Order 37 removed the language from the corresponding Remedial Order from the January 2018 Order mentioning "the 24-hour hotline."  *Compare* D.E. 559 at 42 ¶ D9 (". . . DFPS shall ensure that all abuse and neglect **referrals to the 24-hour hotline regarding** a foster home . . . ."), *with* D.E. 606 at 7 ¶ 37 (". . . DFPS shall ensure that all abuse and neglect **referrals regarding** a foster home . . . .").  Other Remedial Orders that the Court had entered in its January 2018 Order required the State to establish a 24-hour hotline for reports of abuse and neglect. *See* D.E. 559 at 39–43 ¶¶ D1, D3, D7, D11, D13.  However, the Fifth Circuit held in *Stukenberg I* that "hotline-related provisions unnecessarily increase the time spent managing administrative burdens" and invalidated the pertinent Remedial Orders.  D.E. 601 at 61 n.48, 62–63.  Therefore, the Fifth Circuit further held that "[t]he monitoring and oversight provisions pertaining to the establishment of the 24-hour hotline," such as the Remedial Order corresponding with Remedial Order 37, "are in need of revision because they do not address the discrete issues underlying the violation."  D.E. 601 at 61–62.  As a result, in its November 2018 Order, when this Court restated its Remedial Order from the January 2018 Order as Remedial Order 37, the Court amended it by removing reference to the 24-hour hotline, in order to comply with the Fifth Circuit's holding.  D.E. 606 at 7 ¶ 37.

children are free from an unreasonable risk of serious harm," *see id.* at 2, Defendants are not merely required to check the three boxes of (1) sharing uninvestigated abuse or neglect allegations with caseworkers within 48 hours; (2) having caseworkers review home referral histories sometime after they receive information about the allegation; and (3) having caseworkers document their assessment.  First, the home history review and assessment must take place "[u]pon receipt" of the information about the uninvestigated allegation—a provision which contemplates a prompt timeline.  Second, and crucially, Remedial Order 37 requires that the caseworker's assessment of the home history, which must be documented, must determine "if there are any concerns for the child's safety or well-being" as the primary objective.   Therefore, documentation must satisfactorily convey the caseworker's assessment about safety or well-being concerns for the child stemming from the home history review.  Hence, the second element of a finding of civil contempt is satisfied, in that Remedial Order 37 "require[s] certain conduct" by the Defendants.  *See LeGrand*, 43 F.3d at 170.

Plaintiffs allege that Defendants have failed to comply with Remedial Order 37's requirements that "where there has been an uninvestigated allegation of abuse or neglect," caseworkers must timely "review the referral history of the homes—do a 'home history review'—to see if there is a pattern which indicates something is occurring which could endanger children."  D.E. 901 at 12.  Therefore, Plaintiffs urge the Court to find that Defendants are in contempt of Remedial Order 37.  *See id.* at 12–13.

In order to assess whether Defendants have complied with Remedial Order 37, "the Monitors conducted independent case record reviews for a random sample of sixty-two abuse, neglect, or exploitation SWI intakes involving a PMC child between December 1, 2019 and January 31, 2020, that the Department subsequently downgraded to PN."  D.E. 869 at 146.  As

discussed in full below, the Monitors' Report reveals that: (1) Defendants have been taking an inappropriate amount of time to complete the full review, assessment, and documentation process required by Remedial Order 37; (2) Defendants have failed to complete home history reviews consistently for uninvestigated abuse and neglect allegations received by DFPS; and (3) even where the State completed home history reviews, the caseworkers in some instances took no action, despite disturbing patterns of similar allegations at the child's placement.  Defendants' performance is not consistent with Remedial Order 37.

> ### a.    Timeframe for Compliance

As Plaintiffs point out in their Motion, part of the rationale for Remedial Order 37 is that "[e]ven though the State, often with no face-to-face contact with alleged victims, has chosen not to do an investigation, there still may be a dangerous situation that must be addressed."  D.E. 901 at 12.  Remedial Order 37 requires that DFPS caseworkers and their supervisors must find out about an allegation of abuse and neglect that will not be investigated "within 48 hours of DFPS receiving the referral" in order to then make an assessment about child safety.  *See* D.E. 606 at 7 ¶ 37.  Then, "[u]pon receipt of the information" about the allegation, the home history review and assessment of child safety must occur, which must be documented in the child's electronic case record.  *Id.*

As discussed below, the Monitors' Report and testimony from the Show Cause Hearing reveal that Defendants have implemented a policy that allows for an inappropriately lengthy timeframe that can stretch up to two weeks after intake before the caseworker has assessed the child's safety at that placement and documented that assessment in the electronic system, as mandated by Remedial Order 37.  Such a timeframe is not consistent with Remedial Order 37's provision that these steps take place "[u]pon receipt" of the information about the abuse or neglect.  Moreover, the Report further reveals that Defendants did not ensure that they were consistently

alerting caseworkers and supervisors of allegations of abuse and neglect within 48 hours by the time they were required to be in compliance with Remedial Order 37.

> i.    **Reviewing Home Histories and Assessing Concerns for Child Safety and Well-Being "Upon Receipt" of Uninvestigated Allegations of Abuse or Neglect**

According to the Monitors' Report, the State put a policy in place to implement Remedial Order 37. The policy requires the following regarding the timeline in which the process required by Remedial Order 37 must be completed:

> [T]he policy created by DFPS . . . requires only that the [home history review] be completed within two business days of the [home history review team] receiving the PN, and then gives the caseworker and supervisor a week to enter the staffing in IMPACT.

D.E. 869 at 149 n.297. However, testimony at the Show Cause Hearing revealed that this policy allows the process of completing the home history review required by Remedial Order 37 to stretch up to two weeks—an unacceptably lengthy period of time that is not consistent with Remedial Order 37's requirement that the caseworker will review the home history "[u]pon receipt" of the information about the abuse or neglect allegation that will not be investigated by RCCI.

At the Show Cause Hearing, Defendants' witness, Jenny Hinson, the Director of Heightened Monitoring for HHSC-RCCL, testified about the home history review process implemented by the State and the timeframe in which the State's policy allows it to be carried out. She testified that before the Court instated this Remedial Order, Defendants did not have any routine practice of compiling the history of past allegations of abuse and neglect at a home whenever a new allegation of abuse and neglect regarding that home was received. D.E. 990 at 197:12–198:5. Therefore, in order for PMC caseworkers at DFPS to "review the referral history of the home," an entirely new process, staffed by a newly-constituted team of people, had to be established to compile that referral history through a "home history review." *Id.* at 194:8–22,

196:17–197:11.  This team, the "home history review team," was established at HHSC-RCCL, rather than at DFPS.  *Id.* at 196:17–197:11.  According to Hinson, every time a new allegation is made, the team at HHSC-RCCL must "conduct an in-depth analysis on the foster home's history, including a review of all of the regulatory history, any minimum standards investigations, any abuse and neglect investigations that were conducted through [RCCI]."  *Id.* at 194:16–20.  In addition, Hinson testified that the team would do "a review of any history in the IMPACT system on the family through a potential child protective investigation."  *Id.* at 194:20–22.

Hinson went on to testify about the timeframe for the home history review process.  As previously discussed, SWI initially receives reports of abuse or neglect allegations, to which it gives the designation of Priority One or Priority Two; SWI does not designate intakes that it sends to RCCI as "Priority None."  *See supra* Section IV.C.2.a.i.  SWI then sends Priority One and Priority Two intakes to DFPS's RCCI division, which would have 24 hours to evaluate the intake and potentially downgrade its priority designation such that the allegations will not trigger an abuse/neglect investigation.  *See* D.E. 990 at 209:11–13 ("Residential Child Care Investigations has up to 24 hours to screen the Intake and make a determination if they are going to downgrade it to a PN."); *see also id.* at 212:14–22.

Next, if DFPS's RCCI division makes the decision that an intake alleging possible abuse or neglect should not investigated, such as by downgrading its priority designation to "Priority None," Hinson testified that the home history review team "receives that PN assignment the next business day after the PN decision" is made by RCCI.  *Id.* at 213:13–15.  So, Hinson testified, "for Intakes that come in over the weekend, then all of those are assigned to the staff Monday morning or the following business day."  *Id.* at 210:4–8.  Then, "from that point, they have two business days to conduct the thorough assessment [the home history review] and to send that out to the field

for consideration and determination of next steps." *Id.* at 213:15–17; *see also id.* at 210:4–8. Under this policy, from the time that SWI sends the "Priority None" allegation to RCCI to the time that the home history review is completed, up to three business days, amounting to up to five calendar days if the report to SWI occurs on a Friday or even more if there is an intervening holiday, could have passed. *See id.* at 233:22–234:1, 234:11–14 ("[PLS' COUNSEL:] . . . [I]t could be as much as five calendar days at this point, just to get the Home History Review report out. True?  [MS HINSON:]  In some circumstances, yes, it might take that long.").

Then, once the home history review is completed, Hinson testified that it is "sen[t] . . . out to the field," meaning it is sent to the caseworker and his or her supervisor, among other individuals. *Id.* at 213:16–17, 216:6–8.  Once these individuals receive the home history review, Hinson testified that "the caseworker and supervisor are directed to review the reports, to have a staffing so that they can discuss the information in the reports to determine if there's any next steps and then to document that information in the IMPACT system within seven days." *Id.* at 216:11–15; *see also id.* at 211:14–15 ("[T]hey [the caseworkers and supervisors] have up until seven days to document the decision that they've made."), 234:15–21 ("[P]olicy is to give the caseworker and the supervisor seven days to review the report and to document it."); D.E. 911 at 17 ("[T]he process DFPS has put in place . . . allows the caseworker and their supervisor no more than seven days to review the home history report and make an informed decision based on that review.").

All in all, the process from a report of allegations of abuse and neglect at a placement through caseworker documentation in IMPACT of their assessment of child safety at the placement could take up to **twelve days**, and **even more** if there is an intervening holiday during the time in which the home history review team receives the report and are expected to conclude their home history review.  That timeframe can stretch up to two weeks.

Hinson confirmed in her testimony that the purpose of Remedial Order 37 is "providing a thorough review of a foster home where there's been a determination that there'll be no investigation," which is ultimately a matter of "child safety." D.E. 990 at 231:6–11. She further affirmed that she believes that "child safety is urgent." *Id.* at 235:16–18. Nevertheless, Hinson admitted that she "wouldn't describe" a timeframe that can last as long as twelve days "as an urgent time frame." *Id.* at 235:11–15.

The Court agrees. A timeframe that can stretch up to twelve days is not consistent with Remedial Order 37's requirement that "the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record" "**[u]pon receipt**" of the information that an allegation would not be investigated for abuse or neglect. *See* D.E. 606 at 7 ¶ 37 (emphasis added). Defendants' policy and process of conducting home history reviews is not consistent with Remedial Order 37.

ii.   **Alerting Caseworkers and Supervisors of Uninvestigated Allegations Within Forty-Eight Hours**

"Defendants do not contest that Remedial Order No. 37 requires DFPS to provide the requisite notice to a child's caseworker and that caseworker's supervisor within 48 hours of an abuse and neglect referral regarding a foster home." D.E. 903 ¶ 17; *see also* D.E. 911 at 16–17 ("Remedial Order No. 37 requires that DFPS share abuse and neglect referrals with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral."). Remedial Order 37 became enforceable upon the Fifth Circuit's July 30, 2019 Mandate, and 60 days after that, September 28, 2019, is the date by which Defendants were required to be in compliance with the Remedial Order. *See* D.E. 606 at 7 ¶ 37.

However, in their Response to Plaintiffs' Motion, Defendants admit that they did not "roll[] out an IMPACT enhancement that automated notifications when allegations of abuse and neglect were made, as well as a notification when an allegation was downgraded to PN" until December 19, 2019—more than two months after the sixty-day deadline.  D.E. 911 at 18; *see also* D.E. 990 at 236:6–16, 223:23 (Show Cause Hearing testimony of Hinson specifying that the roll-out date was December 19, 2019); D.E. 990 at 30:3–15, 36:21–37:17 (Show Cause Hearing testimony of Batiste about the notification received by caseworkers of children in licensed care when RCCI downgrades an intake to "Priority None").  Prior to December 19, 2019, Hinson testified that "[t]here was a manual notification from Residential Child Care Investigations.  They send an email notification to the caseworker and supervisor."  D.E. 990 at 224:2–5.  Hence, Defendants did not have a system in place to ensure timely notification to caseworkers until more than two months after the 60-day deadline for compliance with Remedial Order 37.

### b.    Completing Home History Reviews

Aside from the question of the State's compliance with the timeframes required by Remedial Order 37, the Monitors' Report reveals that Defendants have failed to complete the home history reviews required by Remedial Order 37 consistently.  The Monitors reviewed a sample of 62 abuse/neglect allegations that took place between December 1, 2019 and January 31, 2020 and that were not investigated for abuse or neglect.  D.E. 869 at 146.  Out of those cases, Defendants "fail[ed] to complete a [home history review]" and did not provide a "documented reason" for this failure in 13[127] (or 21%) of them.  *Id.* at 30, 147, 155; *see also* D.E. 901 at 12 ("[T]here was no evidence of a home history review in 21% of the cases.").

---

[127] "Of the eighteen cases in which a [home history review] was not completed by the State, the Monitors determined five of these cases had a documented reason for exclusion in IMPACT . . . .  The Monitors found documented reasons to include: an investigation had already taken place; the child was no longer in the home; or the home had no prior history."  D.E. 869 at 147 n.295.

Defendants did not provide a response to this failing in their Objections to the Monitors' Report, *see* D.E. 903, or in their Response to Plaintiffs' Motion, *see* D.E. 911.  Defendants likewise did not provide a response during the Show Cause Hearing:

> [PL'S COUNSEL:]  And you don't have any statistics to rebut that 21 percent [of 'Priority None' allegations], based on the evidence that the Monitors had, were never reviewed at all? . . .
>
> [MS. HINSON:]  I don't have any information to rebut that, no.

D.E. 990 at 242:21–23.  In addition, Hinson admitted that during the timeframe in which these 13 abuse and neglect allegations with unexcused missing home history reviews took place, "there was an error in the way that information regarding PNs was being pulled into . . . [the] report that we get that is a snapshot of all the cases that were downgraded before midnight the day before."  *Id.* at 225:11–15.  Therefore, Hinson testified, "the data team identified that there were instances of cases where there had been PNs and they were not showing up on the report, which meant we were unable to conduct those reviews."  *Id.* at 225:16–19.

The Monitors' Report reveals that, by failing to conduct home history reviews for 13 (or 21%) out of 62 "Priority None" allegations between December 1, 2019 and January 31, 2020 with home history review, Defendants have failed to comply with Remedial Order 37.  Defendants have not substantively rebutted this conclusion.

### c. Caseworkers' Review of Home Histories and Assessment of Concerns for Child Safety or Well-Being

The final step in the process required by Remedial Order 37 is that, once the home history review is completed, caseworkers must review it and "assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record."  D.E. 606 at 7 ¶ 37.  The Monitors' findings reveal problems with Defendants' compliance with this aspect of the Remedial Order, as well.

First, caseworkers did not review home histories consistently. The Monitors identified that out of the 44 cases for which a home history review was done, caseworkers and supervisors reviewed the home history reviews in 27 cases (or 61%). D.E. 869 at 149. For the remaining 39% of the cases, the child's IMPACT records did not include any documentation showing that concerns for safety or well-being had been considered in light of information from the home history review. *See id.* In those cases, Defendants were in clear defiance of Remedial Order 37's requirement. *See* D.E. 606 at 7 ¶ 37.

In addition, out of the 27 cases reviewed by the Monitors that included both a home history review and a documented staffing between the caseworker and supervisor, the caseworker and supervisor "took some action to ensure the child's safety" in only 14 (or 52%) of them. D.E. 869 at 149, 155. The Monitors documented several case reviews in which the caseworker and supervisor "determined no action was needed," and they involved "deeply concerning" histories about the home. *Id.* at 149–51. One case, in particular, exemplifies the problems that the Monitors discovered. On January 3, 2020, SWI received two intakes about two siblings in the same foster home. *Id.* at 150. One intake stated that one "brother was observed with a whelp on his neck. He was unable to explain how the injury occurred. Both children have been seen with black eyes in the past. Also, both become emotional when questioned and are frightened to speak in front of the foster parents." *Id.* The other intake stated that the younger brother "is very depressed and cries excessively" and looked like he had a belt bruise on his face and neck. *Id.*

> Both intakes were downgraded to PN by RCCI on January 4, 2020, with a note in CLASS for the second intake explaining, "Based on the information gathered from the CVS Caseworker who observed the child at the same time the alleged whelp was observed, there is nothing to state abuse or neglect occurred. The CVS caseworker conducts monthly visits with the children who are of an age that they can make an outcry if necessary, which they have not. The CVS Caseworker denies a whelp was observed on the child today at a family visit."

*Id.* According to the Monitors, the home history review "for this foster home documents a disturbing pattern of similar allegations," including a citation "in 2010 for corporal punishment." *Id.* The Court finds it important to restate here the results of the home history review conducted for these intakes and the resulting decision by the caseworker who assessed it.

The home history review of this placement revealed that investigations of the following allegations resulted in "Ruled Out" dispositions:

- In 2006, "[the oldest victim], age 10, reported foster mother choked him for getting written up at the Boys Club. The child had scratches and abrasions on both sides of his head. The foster mother reported she grabbed [the oldest victim] by his shirt to keep him from running away." *Id.*

- In 2009, "[the oldest victim], age 10, reported the foster mother bent his hand back and hurting [sic] his wrist. The [oldest victim] was threatening another child with a pencil and the foster mother was attempting to remove the pencil from the child." *Id.*

- In 2010, "[the oldest victim], age 9, took a cardboard guitar to school. This angered the foster mother who shoved the [oldest victim] to the ground by the family stairs. Also, that the foster mother hits him with her knuckle on his right thigh." *Id.*

- Again in 2010, "[the oldest victim], age 12, had a 3 by 4 inch mark on the right side of his cheek. The child reported that the foster mother caused the injury. The [oldest victim] also reported the foster mother has slapped him and hit him in the stomach." *Id.* at 151.

- In 2011, "[the oldest victim], age 7, reported the foster mother pulled his arm and she grabs him by the neck and chokes him. Also, the child reported he is not allowed snacks and he goes to bed hungry." *Id.*

- Again in 2011, "[the oldest victim], age 8, reported another child in the home was 'humping him.' Both children had their clothes on and both were locked in a bathroom." *Id.*

- In 2012, "[the oldest victim], age 14, reported the foster mother hit him on several occasions for misbehaving. Also, that the foster moth hit [him] in the face with a cardboard baseball goal for using all the tape. It was alleged the foster mother hits the other children as well." *Id.*

- Again in 2012, "[the oldest victim], age 9, reported the foster mother is giving him 'beat downs' and that he wanted to run away. The child stated he is tired of having cuts and things on his body." *Id.*

- In 2014, "[the oldest victim], age 8, reported the foster father punched and kicked him as punishment for misbehaving at school.  The child is fearful when he is in trouble because of what the foster father will do." *Id.*

- In 2015, "[the oldest victim], age 6, was observed by a CPS worker of having marks and bruises all over his body.  The child also has a big scratch or burn on his earlobe." *Id.*

- In 2016, "[the oldest victim], age 7, has multiple scratches and bruising to his face.  The child reported the foster mother choked and hit him on the face.  The incident occurred over the weekend." *Id.*

- In 2017, "[the oldest victim], age 13, had a burn on his face.  The child reported a 6-year-old child in the home put an iron on his face.  The 6-year-old child denied doing this." *Id.*

- In 2018, "[the oldest victim], age 9, reported the foster mother would grab him by the throat and choke him.  Other children are placed in the home as well." *Id.*

The home history review also revealed that "the State . . . received several intakes" regarding this home "that it closed without an investigation." *Id.*  These uninvestigated allegations included the following:

- In 2010, a call to SWI alleged the [oldest victim], age 8, "has a greenish, yellow bruise on the right side of his face.  The child did not disclose how it occurred.  The foster mother reported the child fell down at the Boys Club."  The State coded the case as PN because "it did not appear to involve [abuse/neglect] or risk."
- In 2012, a call to SWI alleged, "The [oldest victim], age 9, reported he is tired of 'getting beat downs' by the foster mother.  It is worse than a spanking and they occur when the child gets a bad note from school."  Notes in the HHR indicate the State "Closed and Reclassified" this case.
- In 2016, a call to SWI was coded PN.  It alleged the [oldest victim] was "walking around the foster home exposing himself."

*Id.* at 151–52.  Finally, the notes in the home history review state that:

This home was initially verified 5/13/02 but relinquished the license 2/6/15 due to non-compliances amid a pending investigation.  The home re-opened 4/1/15 and has remained open since then.  This review reflected the home has been a placement to many children over the years.

*Id.* at 152.

Despite the pattern of allegations that is apparent from this home history review, "the caseworker and supervisor determined that no action was needed."  *Id.*  After the caseworker of

the brother who had the whelp on his neck reviewed the above home history, that caseworker made

the following notes regarding the safety assessment for that child:

> On January 3, 2020 the caseworker asked [the alleged victim] about the whelp and what occurred. [The alleged victim] stated he was not aware he had a whelp on his neck and . . . could not explain how or when the injury occurred. The caseworker observed the whelp on his neck was already in the process of healing.

> On January 3, 2020 the caseworker called the caregiver . . . to ask if she was aware of any marks on [the alleged victim] and she said no. The caregiver said [the alleged victim] horseplay [sic] with his brother and the older youth in the home all the time. The caregiver stated that [the alleged victim] is very rough and she always ask [sic] [the alleged victim] if he has an accident to let her know so she can document what happened.

> The caseworker then called the supervisor . . . informing her about the incident and provided a photo of the whelp on [the alleged victim's] neck. The supervisor ask [sic] the caseworker did she speak to the child to verify what occurred? The caseworker told the supervisor that she spoke with the child and the caregiver.

*Id.* "[B]ased on this information, the caseworker and supervisor agreed no placement change was

needed for the child." *Id.* at 153.

The home history reflected in this review reveals exactly the types of patterns of abuse and

neglect allegations that Remedial Order 37 is intended to ensure caseworkers know about so that

they can take action to improve child safety. However, the caseworker's inability to recognize and

act on a pattern of similar allegations of abuse and neglect coming out of the same home over the

course of ten years mirrors the horrific experiences of M.D. and other Plaintiff children that the

Court found at trial. M.D.'s caseworker had been "aware that 'sexual abuse [was] not new at'" a

certain RTC, where merely one week after M.D. was placed there, she made an outcry that a staff

member sexually assaulted and raped her. D.E. 368 at 61; *see also supra* Section IV.J.1. The State

has failed to comply with Remedial Order 37 and hence has failed to address the exact same

problems occurring today in their system that were taking place a decade ago at the time of trial.

Even with the information provided in the home history reviews, caseworkers have still failed to recognize "concerns for the child's safety or well-being."  *See* D.E. 606 at 7 ¶ 37.

Given Defendants' failure to complete the process ordered by Remedial Order 37 within a timeframe that reflects the urgency of the child safety involved; Defendants' failure to ensure that caseworkers had begun receiving notification of the allegations within 48 hours consistently by the 60-day deadline; Defendants' failure to complete home history reviews consistently for uninvestigated abuse/neglect allegations; and Defendants' failure to ensure that caseworkers adequately assess "concerns for the child's safety or well-being" after reviewing home histories, the Court finds that Defendants have continued to expose PMC children to an unreasonable risk of serious harm in foster home placements.  Defendants also have not argued that they were unable to comply with Remedial Order 37.  *See LeGrand*, 43 F.3d at 170 (inability to comply is a defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same).  Defendants have therefore failed to comply with Remedial Order 37 and are in contempt of that Remedial Order.

### K.  Remedial Orders 24, 28, 30: Documenting Sexual Abuse and Sexual Aggression

Remedial Order 24 provides that:

> Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.

D.E. 606 at 5 ¶ 24.

Remedial Order 28 provides that:

> Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.

*Id.* at 5 ¶ 28.

<u>Remedial Order 30</u> provides that:

> Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.

*Id.* at 6 ¶ 30.

### 1.    The Court's Findings at Trial Related to Remedial Orders 24, 28, and 30

Incidents of sexual abuse are "typical" for PMC children.  Attorney *ad litem* Ricker affirmed at trial that sexual abuse is "typical" among PMC children, and she further testified that "almost all" of the PMC children she has represented have been sexually abused.  D.E. 326 at 216:11–24.  Sandra Carpenter, the leader of the Texas non-profit Angel Reach that helps children who "age out" of foster care, testified that "50 percent of the kids that [she] work[s] with have been sexually abused."  D.E. 307 at 32:23–24.  Former foster child Patricia Virgil affirmed that her "experience with being sexually abused at a very young age [was] typical of foster care."  D.E. 324 at 202:19–25.

Subsequent sexual aggression manifesting as child-on-child sexual or physical abuse is also "typical, common, and widespread throughout Texas foster care."  *See* D.E. 368 at 207.  Another former foster child, Kristopher Sharp, testified that sexual assault between foster children was "a common thing" in big group homes where caregivers were simply "not able to watch everyone."  D.E. 325 at 172:8–17.  Sharp described one foster group home where one young boy was sexually abused by a bigger boy "almost every night."  *Id.* at 172:18–25.

Despite the horrific reality that sexual abuse was "typical" in the Texas foster care system, allegations and incidents of sexual abuse were not consistently documented in children's records and were not always communicated to their caseworkers.  The stories of named Plaintiffs M.D., D.I., J.S., and S.A. illustrate the serious issues and harm that PMC children face regarding sexual abuse and subsequent sexual aggression in the Texas foster care system.

M.D. lived with several relatives before she entered the Texas foster care system.  *See* D.E. 368 at 56–58.  Much of M.D.'s history with the Texas foster care system has been discussed in previous sections.  *See, e.g.*, *supra* Sections IV.E.1., IV.I.1.a., IV.J.1.  At the age of ten, while in her aunt's care, M.D. claimed that her older cousin had been sexually abusing her for several years.  *See* D.E. 368 at 56–57; *see also* D.E. 324 at 217:19–218:4.  RCCL investigated and found RTB that M.D. had been sexually abused, but M.D.'s case files did not indicate that any action was taken because of this finding.  *See* D.E. 368 at 58.  M.D. later made several outcries of sexual abuse while at Hector Garza.  M.D. and her roommate accused another roommate of sexually abusing them at night.  *Id.* at 60.  The allegations were "Ruled Out" because "staff conducted room checks every 15 minutes," and "none of the children had any history of sexually acting out or were under any special supervisory precautions."  *See id.* (quoting DX 120 at DFPS009013763–64).  M.D. and several other residents also reported that a staff member at Hector Garza often sexually harassed them.  *See id.*  One week after being placed at another RTC, M.D. made an outcry that a staff member at that RTC sexually assaulted and raped her.  *See id.* at 61.  M.D.'s caseworker allegedly was aware that "sexual abuse [was] not new at the facility."  *See id.*[128]

D.I. was placed in a foster group home when he was eight years old and was sexually abused by two sixteen-year-old boys in the home on at least three occasions within the first month.  *See* D.E. 315 at 23:7–27:14; D.E. 368 at 74 (citing PX 185 at 28–29); *see also supra* Sections IV.I.1.a., IV.I.1.b.  One of the older boys was known to have sexually abused a younger child in a previous foster home but his case files made no mention of him abusing others.  *See* D.E. 315 at

---

[128] M.D. had a history of running away from her placements.  *See, e.g.*, D.E. 324 at 218:15–25, 227:19–228:12.  During part of her time away from placements, M.D. was "selling her body to men for money," *see id.* at 227:21–23, and CPS staff eventually "let her leave" with "her pimp" in November 2013, which was the last time that DFPS had M.D. in their care, *see id.* at 228:14–21.  Sarah Stukenberg, the Next Friend for M.D., affirmed at trial that M.D. was still "a ward of the State of Texas . . . on the streets," and opined that M.D. "may have been sold into child trafficking, sex trafficking."  *Id.* at 228:19–230:16.

24:24–25:17, 28:24–29:2; D.E. 304 at 51:1–52:10; D.E. 368 at 74 (citing PX 185 at 3, 54).   An RCCL investigator confirmed that the sexual encounters with D.I. occurred, but RCCL found that: "None of the children in the home were known by [the foster home] to have a history of sexually acting out with one another or of sexually abusing other children."  *See* D.E. 368 at 75 (citing PX 185 at 58).  The investigator "Ruled Out" the sexual abuse allegations, despite confirming that the incidents occurred, because there was "not a preponderance of the evidence that abuse occurred." *See id.* (citing PX 185 at 58).  Following these incidents, D.I. was placed in another foster home but not in a single-child placement despite the known (albeit Ruled Out) incidents of sexual abuse. *See id.* at 77 (citing PX 185 at 109); *see also* D.E. 368 at 69 (citing D.E. 328 at 161:5–15; D.E. 329 at 161:4–12; D.E. 303 at 8:18–21) ("Defendants' and Plaintiffs' experts agreed that sexually abused children should live in single-child placements.").  A psychosocial assessment of D.I. stated that he was removed from his previous placement "due to problems getting along with the older foster kids in the home," but made no mention of D.I.'s sexual abuse history.  *See id.* (citing PX 185 at 2501–02).  D.I.'s Common Application, which was completed by his primary caseworker after the sexual abuse incidents, marked D.I.'s sexual abuse history as "unknown."  *See id.* at 77–78 (citing PX 185 at 384).[129]

   J.S. entered the Texas foster care system at the age of five and reported prior sexual abuse by two of his cousins.  *See* D.E. 368 at 98 (citing DX 120 at 1 RFP CPS 014877, DFPS009068441, DFPS #40677).  J.S. became an aggressor himself "in early elementary school" when he began acting out sexually by "exposing himself to his peers and asking for them to perform oral sex on him."  *See* D.E. 326 at 117:1–10; D.E. 368 at 98 (quoting DX 120 at DFPS009062772).  The foster

---

[129] After D.I. was adopted, he reportedly engaged in sexually inappropriate conduct with his adoptive mother's five-year-old granddaughter.  *See* D.E. 368 at 79 (citing D.E. 326 at 113; DX 262 at 57 (filed under seal)).

parents with whom DFPS placed J.S. were not notified of J.S.'s tendency to act out sexually and only learned of it when J.S. exposed himself to two of his foster siblings. *See* D.E. 368 at 100 (citing DX 120 at DFPS009062030, DFPS009061738–39). As previously discussed, *see supra* Section IV.F.1., J.S. shared a room with his older foster brother R.R. a teenage boy who also had a history of sexual victimization and subsequent sexual aggression. *See* D.E. 368 at 100–02 (citing DX 120 at DFPS009062027 (filed under seal), DFPS009062030–32). J.S. was later placed in an RTC where he immediately began exhibiting inappropriate sexual behavior, such as exposing himself to other children, sleeping in the same bed as other children, and kissing and inappropriately touching other children. *See id.* at 102 (citing DX 120 at DFPS009063328, 009067086, 009067206, 009067790, 009068214).

S.A. entered foster care at the age of five and aged out at eighteen. *See* D.E. 323 at 16:17–23. As previously discussed, *see supra* Section IV.E.1., within four months of entering foster care, S.A. reported that an eleven-year-old boy in the same foster home had sexually abused her. *See* D.E. 325 at 23:15–25:19; D.E. 326 at 192:22–24; *see also* D.E. 368 at 80 (reporting "anal penetration by an older male foster child"). S.A.'s case files did not contain any evidence that she was interviewed regarding her sexual abuse allegation or that she received any type of physical examination or medical treatment in connection with this allegation. *See* D.E. 368 at 80. There is also no evidence that RCCL conducted an independent investigation or follow-up in regard to S.A.'s allegation. *See id.* By the age of six, S.A. was already exhibiting "extreme" "sexual acting out." *See id.* at 81 (citing DX 120 at DFPS009037819). The Fifth Circuit highlighted S.A.'s story in both *Stukenberg* opinions, noting that her situation was "illustrative" of cases in which "records leave caseworkers unaware that a child is a survivor of sexual abuse." *See* D.E. 601 at 75–76; D.E. 627 at 19.

Episodes of sexual abuse have a profound and lasting impact on children. D.I. told Dr. Carter, the Plaintiffs' child psychology expert, that his sexual abuse "is something that really bothers him because he defines himself by it," and he "think[s] badly of [himself]" because of it. *See* D.E. 326 at 110:4–20. Dr. Carter described three named Plaintiffs as "very disturbed" due to their experiences, including their experiences of sexual abuse, in the Texas foster care system. *See id.* at 100:1 (Z.H.), 114:6 (J.S.), 191:4 (D.I.). Dr. Carter also stated that D.I. is now "a heavily sexualized boy" and "a high risk for sexually harming children." *See id.* at 190:18–191:12.

Experiences of sexual abuse and subsequent sexual aggression are part of a pervasive "victim-to-aggressor" cycle of sexual violence wherein a child who is sexually abused is likely to exhibit sexually aggressive behavior and become a sexual aggressor himself or herself. At trial, Plaintiffs' and Defendants' witnesses testified about the destructive nature of this cycle. *See, e.g.*, D.E. 299 at 36:9–18, 70:19–71:5 (Specia); D.E. 303 at 8:1–21 (Dr. Miller); D.E. 304 at 51:10–16 (Shaw); D.E. 328 at 161:1–11 (Gonzalez). Then-Commissioner Specia affirmed that "[s]exually abused children can act out on other children." D.E. 299 at 70:25. Dr. Carter testified that "if a child has had their sexual switch turned on much too early and they become aware of those kinds of feelings and behaviors they may continue to explore that through inappropriate sexual conduct not only with themselves, but with others." D.E. 326 at 113:22–114:1. Mary Dee Richter, the Plaintiffs' foster group home expert, explained the cycle in more detail:

> Well, if you're an older child who has been sexually abused or you've been – you're angry and you haven't been exposed to younger children and this is not your brother or sister, the chances are you're going to approach them, either physically or you're going to sexually approach them.
>
> For younger children who have been sexually abused, what I've often seen is they are afraid of big people. They've been sexually abused. Sometimes that's the only time they've gotten any positive attention, by the way, is during the abuse. So they approach the elder kids and curry favors for protection, for safety. And they've already been sexually abused and so they're a little bit sexually hyped anyway, so they do it again.

> What happens is when this cycle gets repeated, the child never gets a period of time where that behavior isn't occurring. And that's how you build healing and that's how you get them to not see that as a way of life. So by the fact that it's recurring you get a lot more trauma.

*Id.* at 15:19–16:11. When child-on-child abuse occurs, "both children are victims. Even the one that we would typically call the 'perpetrator' is him or herself a victim." D.E. 303 at 8:9–11; *see also* D.E. 299 at 36:16–18 (affirming that there are "two victims in a child on child maltreatment incident").

Identifying incidents of child-on-child abuse and tracking both children in such incidents is important to ensure that "both victims get the treatment services that they need and that they are not placed in the environments where they or other children could be . . . in danger." D.E. 303 at 16–21. Dr. Miller, the Plaintiffs' child welfare systems expert, testified that tracking child-on-child abuse is "a critically important piece of the decision making process regarding not only subsequent placements but treatment needs." *Id.* at 8:7–9. Dr. Miller further explained that she "can't imagine not tracking child-on-child abuse . . . particularly with sexually abus[ed] kids, that information has to inform all subsequent placement decision making." *Id.* at 6:17–7:1. However, DFPS did not track child-on-child sexual abuse at the time of trial. *See, e.g.*, D.E. 299 at 35:21–37:5, 71:24–72:3 (Specia); D.E. 304 at 52:6–16 (Shaw); D.E. 301 at 80:1–19 (Morris). As a result, vital information such as a history of sexual abuse was often missing from children's case files. The Fifth Circuit noted in *Stukenberg I* that:

> For example, named plaintiffs J.S. and D.I. were both sexually abused by other children in their placements who had a history of perpetrating abuse. . . . [B]ecause the pertinent information was inaccessible or entirely unavailable, both J.S. and D.I. were unwittingly placed in foster homes in which there was a high probability that they would be exposed to sexual abuse by another child.

D.E. 601 at 42.  When DFPS investigated the allegation that J.T. had sexually abused D.I., the investigator wrote that "[t]here was no mention in the client file of the [earlier] investigation involving J.T. sexually abusing a child in a previous foster home."  *See* D.E. 304 at 51:1–52:10.

Ten years before trial, in 2004, the Comptroller of the State of Texas issued its *Forgotten Children* report on the Texas foster care system, in which the Comptroller recommended that DFPS "track and report the number of reports it receives concerning child on child physical and sexual abuse by facility."  D.E. 368 at 187 (citing PX 1966 at 5–6), 212 (citing PX 1966 at 29).  Rather than tracking child-on-child abuse, DFPS instead investigated child-on-child abuse as neglectful supervision by caregivers.  *See id.* at 138, 206.  Consequently, DFPS was incapable of documenting and tracking PMC children with a history of sexual abuse to ensure that those children receive appropriate services, including appropriate and safe placements.  The Fifth Circuit also noted in *Stukenberg I* that:

> [T]here is no centralized record that tracks which children in DFPS custody have a history of physical or sexual abuse.  The only place this information would potentially be recorded is in the casefile for that individual foster child.  If caseworkers want to find out whether a child will be safe from abuse by another child in a particular home or facility, they would have to dig through thousands of pages of individual records to confirm that no one else at that placement has a history of abusing other children.  And individual abuse records may be incomplete.

D.E. 601 at 41–42.

In its 2015 Opinion and Verdict, this Court noted a pattern in how DFPS investigated allegations of sexual abuse: first, DFPS refused to document or recognize child-on-child sexual abuse; second, even when a child was sexually abused in foster care, the standards for finding that such abuse occurred were impossibly difficult.  D.E. 368 at 76.  The Court also determined that Defendants were aware of the substantial risk of serious harm posed by not tracking child-on-child abuse, in part, because the 2004 Comptroller Report recommended "keeping sexually abused children separate from other children; tracking and reporting the number of reports it receives

concerning child-on-child physical and sexual abuse by facility." *See id.* at 212 (citing PX 1966 at 29). Based on this, the Court found that Defendants were deliberately indifferent toward its faulty investigations, including not tracking child-on-child abuse, which causes an unreasonable risk of harm to PMC children. *See id.* at 213. The Court therefore ordered DFPS to "track child-on-child abuse, and categorize it as such." *Id.* at 252.

### 2.    The Procedural History of Remedial Orders 24, 28, and 30

In order to address the problems and deficiencies identified at trial, the Special Masters proposed remedies in their Implementation Plan to protect children from sexual abuse while in state custody. D.E. 546 at 40–42 ¶¶ 2, 6, 8. In January 2018, the Court adopted the Special Masters' proposed remedies for documenting sexual abuse and sexual aggression histories. D.E. 559 at 88–89 ¶¶ M2, M6, M8. The Fifth Circuit affirmed these remedies as "valid" in *Stukenberg I*, D.E. 601 at 60–61 ¶¶ 22, 26, 28, and this Court re-issued the validated orders as Remedial Orders 24, 28, and 30 in its November 2018 Order, *see* D.E. 606 at 5–6 ¶¶ 24, 28, 30.[130] *Stukenberg II* did not disturb these Remedial Orders, *see* D.E. 627 at 3; therefore, as Defendants stipulated at the Show Cause Hearing, D.E. 990 at 7:4–12, as of the Fifth Circuit's Mandate on July 30, 2019, these Remedial Orders were "in effect." The first element for civil contempt is thus satisfied for these Remedial Orders. *See LeGrand*, 43 F.3d at 170.

### 3.    Defendants Are Not in Contempt of Remedial Orders 24, 28, and 30.

Remedial Order 24 requires DFPS to document all confirmed allegations of sexual abuse in which a PMC child is a victim. D.E. 606 at 5 ¶ 24. Remedial Orders 28 and 30 require DFPS to document a PMC child's sexually aggressive behavior and confirmed allegations of sexual abuse in which a PMC child is a perpetrator or aggressor. *Id.* at 5–6 ¶¶ 28, 30. These Remedial

---

[130] Remedial Order 24 repeats the language of the previous order but with a different specified timeline. *Compare* D.E. 559 at 88 ¶ M2 ("Effective March 2018 . . . ."), *with* D.E. 606 at 5 ¶ 24 ("Within 60 days . . . .").

Orders clearly "require[] certain conduct," *see LeGrand*, 43 F.3d at 170, of Defendants to document confirmed allegations of sexual abuse victimization and sexually aggressive behavior. The second element of civil contempt is thus fulfilled as to these Remedial Orders. *See id.*

Defendants have asserted that "[s]exual abuse is a serious concern, and one DFPS has taken detailed and prompt action to address even before the Fifth Circuit's July 2019 mandate." D.E. 911 at 21. During the Show Cause Hearing, Commissioner Masters agreed that "keeping [PMC] children safe in both body and mind includes keeping them safe from sexual abuse, whether it is from caregivers or from other children." D.E. 991 at 130:19–22. Carol Self, the Director of Permanency within Child Protective Services, also testified that "ensuring that we appropriately document and capture the information in our system and provide it to caregivers is how we prevent [sexual abuse]." D.E. 990 at 301:8–10.

Self described the changes that DFPS had undergone to document sexual abuse and sexual aggression histories of PMC children since trial. Beginning in mid-2016, DFPS began to "repurpose" the "sexually acting out" indicator in the IMPACT system to identify, or "flag," children who were sexually aggressive or had a sexual behavior problem. *Id.* at 244:5–246:10. DFPS also worked with external stakeholders to develop a resource guide on child sexual aggression and implemented technology changes to the IMPACT system. *Id.* at 245:17–21. In November 2016, DFPS provided its "conservatorship Program Administrators in the region, a list of all the children who had an indicator as sexually acting out" to determine whether these children (a) were sexually aggressive, (b) had a sexual development problem, or (c) had normal sexual development and no longer needed the indicator. *See id.* at 246:11–24; *see also* D.E. 911 at 21–22. DFPS "made sure that the information [reviewed by Program Administrators] was inputted into the IMPACT system." *See* D.E. 990 at 247:5–12. The technology changes to the IMPACT

system were completed in December 2016, and Self testified that "all of the child records were updated during the month of December to indicate whether or not a child had a sexual aggression history and/or the sexual behavior problem indicator." *Id.* at 246:24–247:4.

DFPS conducted monthly reviews from January 2017 until the next update to the IMPACT system in April 2019 to ensure that "any new cases that were identified as sexual behavior problems or sexual aggression" were documented in IMPACT. *See id.* at 247:12–21. As part of these monthly reviews, "staff would go in and read the description of the behavior, make sure it was documented, make sure that [DFPS] had all the information about the incident documented correctly." *See id.* at 247:22–25. The next updates to IMPACT in April 2019 included the creation of a stand-alone "Sexual Aggression Page." *Id.* at 248:1–16. The "Sexual Aggression Page" captures the victim's information, the date of the incident, any associated cases that might be part of the victim's case, and a narrative description of the incident.[131] *See* D.E. 869 at 206; D.E. 990 at 248:17–22. The information on the "Sexual Aggression Page" prepopulates in other documents within IMPACT, such as the child's Common Application and the child's plan of service. D.E. 990 at 248:23–249:20.

DFPS made further changes to the IMPACT system in December 2019 by creating a "Child Victimization Page" to document histories of sexual victimization. *See* D.E. 869 at 210; D.E. 990 at 268:23–269:11. The "Child Victimization Page" allows DFPS to record multiple incidents for a child because some "children in care have had repeated traumas." *See* D.E. 990 at 269:12–15. For each incident, the page captures the date, "who the person responsible for the abuse is, their age, their relationship to the child," and a description of the incident that occurred. *See id.* at

---

[131] Self testified that, prior to this update, DFPS documented sexual aggression and sexual behavior problem indicators in a "Subcare stage" but lacked a place "to really capture all of the information related to that incident." *See* D.E. 990 at 245:22–24, 248:9–13.

269:12–21.  Like the "Sexual Aggression Page," information in the "Child Victimization Page" also prepopulates in documents in IMPACT:

> [I]nformation, as it relates to confirmed sexual victimization, prepopulates into the Common Application so that we can ensure that that information is, one, consistent; and, two, is put into the Common Application so that when folks are reviewing a child through their . . . home or operation, they feel like they can meet the needs of the child.

*Id.* at 269:24–270:5; *see also* D.E. 869 at 205.  A "job aid" provided to DFPS staff explains that the "Child Victimization Page" is only for "confirmed victims" of sexual abuse if one of the following is present in the child's history:

- Reason to Believe (RTB) Sexual Abuse finding by DFPS CPI or RCCI, even if the perpetrator is unknown.
- Designation as a confirmed sex trafficking victim, per the Human Trafficking Page in IMPACT.
- Confirmed by DFPS as a victim of Child Sexual Aggression.
- Criminal conviction for a charge related to sexual abuse of a child.
- Information from another state welfare system – confirmed allegation (equivalent of RTB).
- [HHSC-RCCL] Standards Investigations in which victimization is substantiated.

*See* D.E. 869 at 204.  As of December 2019, the "Sexual Aggression Page," the "Child Victimization Page," and a third page that identifies confirmed sex trafficking victims all feed into a new "Sexual History Report," also called "Attachment A."  *See* D.E. 990 at 270:6–14; *see also* D.E. 869 at 207.  In addition, Self testified that CPS is "currently in the process of creating a report that will allow [CPS] to receive each month . . . any cases that Child Care Investigations deems as involving child sexual aggression."  *See* D.E. 990 at 298:13–16.

Self also testified that DFPS established a Quality Assurance Team in August 2019 that was operational by December 2019 to determine how CPS can improve its practices, which includes "identifying where [the] gaps are."  *See id.* at 274:7–11, 283:16–19.  The Quality

Assurance Team reviews cases to ensure that information is complete and verifies whether DFPS is providing notifications to caregivers:

> [T]hey do a review of the case.  They look to determine whether or not the information -- any information regarding the child's victimization or sexual aggression is documented appropriately, that it's complete.  They check to determine whether or not the caregiver was notified of the victimization history or aggression history.  And then if, in any instances where they determine that it was not provided, then they coordinate with the caseworker to make sure that it's done in real time.  And they update any documentation that they find deficient.

*Id.* at 274:7–25; *see also id.* at 262:9–15, 272:12–19.

According to Self, DFPS has conducted "roughly 28, 60- to 90-minute webinars and/or Q and A's with staff" to educate staff on the changes to IMPACT.  *Id.* at 271:10–17.  Self and the leader of the Quality Assurance Team participate in monthly calls with the conservatorship Program Administrators about the new practice to "try to correct and identify ways to continue to further develop [DFPS] staff so that [DFPS] can advance this practice."  *Id.* at 271:23–272:5.  Self also testified that DFPS is training staff on how to recognize and document sexual abuse:

> Our staff are trained on how to recognize sexual abuse, how to speak to children and interview children, and assess child safety, and then document any of that information so that a caregiver has that information so that they can keep the children safe while they're in their care.

*Id.* at 300:20–25.  Self further testified that she "regularly, almost every day . . . work[s] with the field to ensure that [DFPS is] appropriately documenting [sexual abuse] information in [their] system."  *Id.* at 253:4–7.

The Monitors assessed Defendants' compliance with Remedial Orders 24, 28, and 30 through five methods.

<u>First</u>, the Monitors reviewed IMPACT to determine whether it had been updated to capture information about child sexual victimization and aggression history.  *See* D.E. 869 at 209.  "The

Monitors' review of IMPACT confirm[ed] that the data system includes fields intended to capture information related to child sexual aggression or sexual behavior problems." *Id.* at 210.

Second, the Monitors analyzed identification trends to determine whether the number of children whom the State identified as victims of sexual abuse or as children with an indicator for sexual aggression or for sexual behavior problem changed between the fourth quarter of Fiscal Year 2019 and the second quarter of Fiscal Year 2020 (i.e., June 1, 2019 through February 29, 2020). *See id.* at 209–211. The Monitors observed a "very slight, statistically insignificant change[]" over this period of time. *Id.* at 210. The Monitors noted that the percent of children identified as having a confirmed history of sexual victimization remained the same (at 8%) in all three quarters even though "some increase would be expected, particularly because the definition of children identified as sexual abuse victims in the DFPS data expanded between the last quarter of 2019 and the first quarter of 2020 to include all confirmed allegations."[132] *See id.* at 211.

Third, the Monitors reviewed the electronic records (i.e., conducted a "case read") of a random sample of 376 PMC children whom the State had identified as having a history of sexual abuse or with an indicator for sexual aggression in the first quarter of Fiscal Year 2020 (i.e., September 1, 2019 through November 30, 2019) to verify whether the State had documented such information in IMPACT. *See id.* at 209, 212. Of the 328 PMC children in this sample whom the State identified as having a confirmed history of sexual abuse, the Monitors identified 313 (or 95%) who had sexual abuse information on the child's Sexual Victimization Page. *Id.* at 212. Of the 56 children in this sample whom the State identified as having an indicator for sexual aggression, the Monitors identified 55 (or 98%) who had the sexual aggression information on the

---

[132] The Monitors also noted that the percent of children in each quarter that were identified as victims of sexual abuse or as children with an indicator for sexual aggression or for sexual behavior problem may be impacted by the number of children with either of these characteristics who were newly added to the PMC or left the PMC. *See* D.E. 869 at 211.

child's Sexual Aggression Page.[133]  *Id.*  The Monitors did not determine that this method of data review revealed non-compliance by the State.  *See id.*[134]

Fourth, the Monitors visited 23 placement locations across Texas from October 2019 through February 2020 and reviewed the on-site files for 272 PMC children to determine whether the information related to sexual aggression or victimization in each file was also reflected in IMPACT.  *See id.* at 209, 213.  The Monitors discovered that the on-site files for 25 children (or 9%) included information about a confirmed history of sexual abuse (for 24 of the children) or sexual aggression (for one child), but IMPACT failed to flag this information with the appropriate indicator.  *See id.* at 213.  The State updated the IMPACT records for 11 of these 25 children (or 44%) by April 2020, but the IMPACT record for the one child with a history of sexual aggression was not updated as of April 30, 2020.  *See id.*  The Monitors also identified several inconsistencies within IMPACT itself wherein information about a previous sexual abuse or sexually aggressive behavior was documented in an older Common Application in IMPACT but was not reflected in the child's Sexual Victimization Page or Sexual Aggression Page.  *See id.* at 213–14.  The Monitors concluded that "it is not clear that . . . the State is using existing information in the child's case file to update the appropriate IMPACT pages."  *See id.* at 214.  The Monitors also highlighted the concern that even information in older documents may not be shared with caregivers if the appropriate pages in IMPACT are not updated.  *See id.*

Fifth, the Monitors reviewed a random sample of 64 children out of the 931 PMC children whom DFPS had identified as confirmed victims of sexual abuse in the first quarter of Fiscal Year

---

[133] Eight of the children in the sample had both sexual victimization and sexual aggression indicators, and they were reviewed for each characteristic.  *See* D.E. 869 at 212.

[134] The Monitors concluded that: "The Monitors' case reads are consistent with the State's representation that it produces lists of children who have an active positive identifier for sexual aggression or a history [of] sexual victimization by pulling the data from the information on the sexual victimization and aggression pages created in IMPACT."  D.E. 869 at 212.

2020.  *See id.* at 209–10.  The Monitors confirmed that 62 (or 97%) of the children's records included a positive identification of child sexual victimization in IMPACT—two of the children's records did not.  *See id.* at 214–15.  However, the records for each of the 62 children showed that the confirmed allegations of sexual abuse were all based upon abuse that occurred **before** the child entered the foster care system.  *See id.* at 215.  "None of the children reviewed in the sample were confirmed as sexual abuse victims through . . . a confirmed allegation due to abuse by another child while in care."  *Id.*  Child-on-child sexual behavior is the basis of one-third of neglectful supervision allegations for PMC children, and DFPS has determined that a child should be designated as a "confirmed" victim if the other child is designated as an aggressor during the investigation of the alleged neglectful supervision.  *See id.*  The Monitors therefore noted that it is "significant" that their review of children whom DFPS identified as having confirmed allegations of sexual victimization in IMPACT only included abuse that occurred prior to entering foster care and none involved child-on-child sexual contact while in foster care.  *See id.*

At the Show Cause Hearing, Self could not confirm whether DFPS has reviewed all the cases of negligent supervision involving child-on-child sexual abuse in the past year.  *See* D.E. 990 at 299:10–14.  Self also affirmed that DFPS has not "[gone] through every PMC child's case record to review if there is a history of aggression or victimization for every child in PMC."  *Id.* at 296 at 10–14.  Instead, DFPS only checked "every PMC child's record who had a confirmed victimization record."  *See id.* at 296:23–24.  As Self explained:

> [PMC children with a confirmed victimization record] are the ones, because if they had an RTB, or if they were victim child in a sexual abuse case, or they were the victim of a child sexual aggression incident, those are the individuals that we ensured had the appropriate documentation marked in our IMPACT system.

*Id.* at 296:25–297:4.

Based on the Monitors' Report, it appears that DFPS may have documented "confirmed allegations of sexual abuse in which the child is the victim" (Remedial Order 24) and "confirmed allegations of sexual abuse involving the child as the aggressor" (Remedial Order 30) **somewhere** in a child's records, either in a child's on-site file or a file in IMPACT.  However, this documentation is not always in a central or easily accessible location, such as the Sexual Victimization Page or the Sexual Aggression Page.  Defendants stated that, "[o]n July 15, 2020, CPS policy was updated to require caseworkers to document sexually aggressive behaviors and sexual victimization histories in the Child Sexual Aggression and Sexual Victimization History IMPACT pages, Placement Summary form, Child Sexual History Report Attachment A and placement summary form."  D.E. 911 at 25–26.  IMPACT must include complete records for every PMC child since it is the central platform for records, and, pursuant to Defendants' own policy, histories of sexual victimization and sexual aggression must be reflected in the appropriate indicator page for each child.  This is especially important to ensure that a child's sexual abuse or sexual aggression history is not overlooked when the child is assigned to a new caseworker or moved to a new foster care placement.

It remains unclear whether sexual abuse and sexual aggression information is documented somewhere in the record for **every** PMC child who was involved in a confirmed allegation of sexual abuse as a victim or as an aggressor.  Defendants would have to conduct a thorough case review of every PMC child to be sure of this, but Self confirmed that DFPS has not reviewed every PMC child's record.  The Court agrees with the Monitors that the lack of any child-on-child sexual contact reported in confirmed allegations of sexual victimization is "significant."  The fact that not a single child in a random sample of PMC children, whom DFPS itself identified as confirmed victims of sexual abuse, had a confirmed allegation of sexual abuse while in foster care is dubious.

This absence raises concerns that DFPS may not be properly investigating allegations of child-on-child sexual abuse between PMC children in foster care, or that Defendants may not be documenting confirmed allegations of such sexual abuse.  Not enough information has been provided for the Court to reach a conclusion.  The Court therefore instructs the Monitors to review allegations of child-on-child sexual abuse involving PMC children while in State care that are (1) not investigated, (2) investigated and not confirmed, and (3) investigated and confirmed, in order to determine the extent to which Defendants are properly investigating and documenting such allegations.  This matter may be the subject of future contempt hearings.

Notwithstanding the issues and deficiencies mentioned, Defendants have demonstrated sustained efforts to protect PMC children through the documentation of sexual abuse and sexual aggression in compliance with Remedial Orders 24, 28, and 30.  Defendants have developed pages in IMPACT to document sexual abuse and sexual aggression histories, have integrated reporting across different parts of IMPACT, have undertaken quality assurance reviews, and have continually made improvements to their system and approach.  It is notable that Defendants began reviewing cases and developing IMPACT indicators in 2016 before the Court issued these Remedial Orders.  However, more work needs to be done to ensure that **every** allegation of sexual victimization or sexual aggression is properly investigated, and that **every** confirmed allegation is properly documented in the appropriate Sexual Victimization Page or Sexual Aggression Page in IMPACT for each PMC child.  These pages are particularly important for compliance monitoring because Defendants updated their policy to require documentation in these pages, and because these pages serve as consistent benchmarks for the Monitors to evaluate whether complete information about a child's history of sexual abuse and/or sexual aggression is documented and accessible.  The Court instructs the Monitors to continue investigating these matters.

For the foregoing reasons, the Court does not find that Defendants "failed to comply" with Remedial Orders 24, 28, or 30; and therefore, the three-part showing for civil contempt has not been met. *See LeGrand*, 43 F.3d at 170. Thus, the Court holds that Defendants are not in contempt of these Remedial Orders.

### L.     Remedial Orders 25, 26, 27, 29, and 31: Notifying Caregivers about Sexual Abuse and Sexual Aggression

Remedial Order 25 provides that:

Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.

D.E. 606 at 5 ¶ 25.

Remedial Order 26 provides that:

Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.

*Id.* at 5 ¶ 26.

Remedial Order 27 provides that:

Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.

*Id.* at 5 ¶ 27.

Remedial Order 29 provides that:

Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.

*Id.* at 6 ¶ 29.

Remedial Order 31 provides that:

Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.

*Id.* at 6 ¶ 31.

### 1.   The Court's Findings at Trial Related to Remedial Orders 25, 26, 27, 29, and 31

The same findings of fact at trial relating to Remedial Orders 24, 28, and 30 for the sexual abuse of children in foster care, *see supra* Section IV.K.1., also relate to Remedial Orders 25, 26, 27, 29, and 31 for notifying caregivers about a child's history of sexual abuse or sexual aggression.

### 2.   The Procedural History of Remedial Orders 25, 26, 27, 29, and 31

In order to address the problems and deficiencies identified at trial, the Special Masters proposed remedies in their Implementation Plan to protect children from sexual abuse while in state custody.  D.E. 546 at 40–42 ¶¶ 3–5, 7, 9.  In January 2018, the Court adopted the Special Masters' proposed remedies for notifying caregivers of a child's history of sexual abuse or sexual aggression and for documenting such histories in a child's Common Application and Placement Summary Form.  *See* D.E. 559 at 88–89 ¶¶ M3–M5, M7, M9.  The Fifth Circuit affirmed these remedies as "valid" in *Stukenberg I*, *see* D.E. 601 at 60–61 ¶¶ 23–25, 27, 29, and this Court re-issued the validated orders as Remedial Orders 25, 26, 27, 29, and 31 in its November 2018 Order, *see* D.E. 606 at 5–6 ¶¶ 25, 26, 27, 29, 31, which the Fifth Circuit did not disturb in *Stukenberg II*, *see* D.E. 627 at 3.  Therefore, as Defendants stipulated, D.E. 990 at 7:4–12, as of the Fifth Circuit's Mandate on July 30, 2019, these Remedial Orders were "in effect," thus satisfying the first element for civil contempt, *see LeGrand*, 43 F.3d at 170.

### 3.   Defendants Have Failed To Comply with Remedial Orders 25, 26, 27, 29, and 31.

Remedial Orders 25, 27, and 31 relate to "direct" caregiver notification.  Remedial Orders 25 and 27 both require DFPS to notify "all of a child's caregivers . . . at each present and subsequent placement" of confirmed allegations of sexual abuse in which the PMC child is a victim.  D.E. 606 at 5 ¶¶ 25, 27.  Remedial Order 31 requires DFPS to notify "all of a child's

caregivers . . . at each present and subsequent placement" of confirmed allegations of sexual abuse in which the PMC child is an aggressor. *Id.* at 6 ¶ 31. Remedial Orders 26 and 29 relate to "indirect" caregiver notification since these orders require sexual abuse and sexually aggressive behavior to be documented in a child's Common Application and the Placement Summary Form, which are provided to the child's caregivers in a foster care placement. *See id.* at 5–6 ¶¶ 26, 29. Each of these Remedial Orders "require[s] certain conduct" of Defendants, which fulfills the second element of civil contempt as to these Remedial Orders. *See LeGrand*, 43 F.3d at 170.

At the Show Cause Hearing, Self agreed that the purpose of providing a child's sexual abuse and sexual aggression information to all caregivers of that child "[is] to keep the child and other children safe." *See* D.E. 990 at 295:4–9. Self testified that CPS employs a "two-prong approach" to provide information related to sexual abuse and sexual aggression: the Common Application and the Placement Summary form. *Id.* at 277:19–25; *see also* D.E. 869 at 227. The Common Application is given to prospective placements prior to placement, while the Placement Summary is given upon placement. D.E. 869 at 228. The Common Application provides information related to a child's history of sexual abuse and aggression, and it "goes to administrators [of a placement facility] at the point that they're determining whether or not they can meet the child's needs." D.E. 990 at 277:11–16. The Placement Summary includes the Sexual History Report, also known as "Attachment A," as an addendum that "is supposed to be provided to every caregiver at the time of placement." *Id.* at 270:15–19, 278:8–11. Information documented on the Sexual Victimization Page and the Sexual Aggression Page pre-populates into the Common Application and Attachment A to the Placement Summary for a child. D.E. 869 at 232; D.E. 990 at 249:3–6, 269:7–270:5.

Defendants asserted in their Response to the Motion to Show Cause that, pursuant to DFPS policy, notifications related to a child's sexual abuse or sexual aggression history are provided to the director or administrator in a GRO, who is then responsible for ensuring that the information is communicated to the child's direct caregivers.  D.E. 911 at 27.  Self affirmed that DFPS "provide[s] notification to the administrators of General Residential Operations," but she could not confirm that DFPS was notifying "every single caregiver of every single child that has been so identified in [DFPS] records" as having a sexual abuse history or sexually aggressive behavior. *See* D.E. 990 at 253:22–256:24.  When questioned further, Self affirmed that DFPS is "notifying the administrators and not the individual caregivers."  *See id.* at 256:16–19.  Self affirmed that CPS relies on administrators in GROs to provide sexual abuse and sexual aggression history to individual caregivers.  *Id.* at 281:12–17.  Self also explained that the Sexual History Report for a child is provided to the administrator or the case manager who processes the child's intake at the time of the child's placement in a GRO, although "[s]ometimes" a caregiver may process a new child resident and would receive the Sexual History Report.  *See id.* at 270:23–271:8.  Self further testified that DFPS put in place policies and processes to ensure that the caregiver in a GRO is notified about a child's sexual abuse history or sexually aggressive behavior, but she still could not confirm whether every caregiver for each child is notified.  *See id.* at 256:8–11.  In contrast, the caregiver in a CPA is the foster parent who "actually receives the Placement Summary Form and the Attachment A, and signs it."  *See id.* at 281:19–21.

Self testified that DFPS notifies "every placement, . . . kinship caregivers, . . . non-licensed placements, as well as licensed placement" of a child's sexual abuse history or sexually aggressive behavior.  *Id.* at 262:20–25.  However, Self testified that DFPS does not notify psychiatric hospitals

when PMC children are placed there because DFPS does not consider a psychiatric hospital to be a placement. *Id.* at 263:3–4. Self further elaborated on this position as follows:

> I mean, if the child has needs, and they're in a foster home, and they're placed in a psychiatric hospital, oftentimes the child returns back to that foster home placement. So their placement is still with the foster home. It's just that they're temporarily in the psychiatric hospital setting. . . . I think placement in a hospital could also be a temporary absence from placement. So . . . there's still the placement. We're still -- the caregiver is still their caregiver. It's just they are temporarily somewhere else.

*Id.* at 263:21–264:1, 293:22–294:1. The Court advised Defendants during the Show Cause Hearing that "not reporting this information to all placements is not consistent with the Court's Order." *Id.* at 264:2–4. The Court also clarified that "anywhere" DFPS places a PMC child as that child's managing conservator, DFPS must follow the Remedial Orders to notify caregivers at the placement about the child's history. *Id.* at 265:5–8. Since DFPS remains the legal managing conservator of a PMC child when the child is placed in a psychiatric hospital, DFPS is required to notify caregivers at the hospital of the child's history of sexual abuse or sexually aggressive behavior.

The Monitors assessed Defendants' compliance with Remedial Orders 25, 27, and 31 (the "direct" notification orders) through three methods.

First, the Monitors cross-matched two data sets for PMC children with a sexual victimization or sexual aggression flag: (1) data for the caregiver notification that the Court ordered on November 6, 2019, and (2) data reported to the Monitors for August 2019 through November 2019. *See* D.E. 869 at 232–35. On November 6, 2019, the day after the previous Show Cause Hearing, the Court ordered that:

> DFPS shall provide the Monitors with a complete list of identified sexually aggressive PMC children and identified PMC sexually abused children with a corresponding list of each assigned caregiver. Further, DFPS shall verify to the Monitors that each caregiver has been notified of this status

*See* D.E. 718 at 1.  Pursuant to this order, the State notified the caregivers of all PMC children with an RTB finding for sexual abuse or sex trafficking as either a victim or perpetrator, as well as all PMC children who had a characteristic of child sexual aggression.  *See* D.E. 869 at 230.  Self testified that CPS contacted caregivers by phone or by email requesting that the caregiver contact CPS, and "move[d] forward with doing an in-person visit" if CPS had not been successful in reaching the caregiver by phone or email.  *See* D.E. 990 at 275:21–276:5.  On November 8, 2019, the State provided the Monitors with certification of the caregiver notification, which included information by region for (1) the caregiver notified, (2) the child for whom notification was given, (3) the location of the child at the time of the notification, and (4) the caseworker providing the notification.[135]  *See* D.E. 869 at 230.  Self testified that "[t]o [her] understanding, every caregiver was notified and provided with the information."[136]  D.E. 990 at 276:19–20.

The Monitors cross-matched the data from the caregiver notification with the data for PMC children with a sexual characteristic flag between August 2019 and November 2019.  *See* D.E. 869 at 233–35.  There were 11,442 children in PMC between August 2019 and November 2019.  *Id.* at 233.  Of these 11,442 PMC children, 1,025 (or 9%) had a sexual characteristic flag that required caregiver notification.  *Id.*  Of the 1,025 PMC children with a sexual characteristic flag that required caregiver notification, 972 (or 95%) matched the State's list of caregiver notification data, but 53 (or 5%) were not on the State's caregiver notification list.  *See id.* at 234.  Of the 972 children whose names appeared in both data sets, the State had notified the caregivers for 918 (or

[135] The State also provided the Monitors with copies of the procedures and emails developed for the notification, which included expected deadlines and recommended language.  *See* D.E. 869 at 230.

[136] Self also testified that "just a handful of folks . . . didn't receive notification" if they were in "adult jail" or "in a supervised independent living placement," such as a college dorm."  *See* D.E. 990 at 276:6–12.

89.5%), leaving 54 for whom the State did not provide notification.[137]  *See id.*  This means that the State did not provide the Monitors with verifiable data to demonstrate caregiver notification for 107 PMC children with a sexual characteristic flag that required caregiver notification.

Second, the Monitors conducted site visits to interview program administrators, direct caregivers, and children.  *See id.* at 232, 235–36.  The Monitors asked all direct caregivers at each site if they were notified when a child in their care had a history of sexual aggression or sexual victimization.  *See id.* at 235.  In a sample of interviews with five program administrators at three sites, "all of the program administrators indicated that, if they are notified of a child's history of sexual abuse or aggression, they notify direct caregivers of the child's history."  *Id.*  Two of these program administrators notify the direct caregivers verbally, one notifies in writing, and two provide notification via a child's safety plan.  *See id.*  Out of interviews with 155 direct caregivers, 77 (approximately 50%) affirmed that they are notified if a child has a history of sexual abuse, and 88 (approximately 57%) affirmed that they are notified if a child is sexually aggressive.  *See id.* The majority of these direct caregivers are verbally notified.  *See id.*  More than a quarter (26%) of direct caregivers who answered whether they were *currently* supervising a child identified as having a history of sexual abuse did not know.  *Id.* at 236.

Third, the Monitors conducted case reads for children whom the State identified as having a history of sexual victimization or aggression.  *See id.* at 232, 236–37.  As previously discussed with regard to Remedial Orders 24 and 30, *see supra* Section IV.K.3., the Monitors conducted on-site file reviews and identified 25 PMC children with a confirmed history of sexual abuse or sexual aggression but for whom IMPACT did not flag the corresponding indicator.  *See* D.E. 869 at 213.

---

[137] Of the 54 PMC children with a sexual characteristic flag that required caregiver notification who were on the State's caregiver notification list but for whom the caregiver was not notified, the State cited that the child had run away or had been adopted as the two most common reasons for not notifying the caregiver.  *See* D.E. 869 at 234.

The State later updated the IMPACT indicators for 11 of these children.  *See id.*  The Monitors determined that the caregivers of only 5 of these 11 children were notified of the children's history of sexual victimization or aggression; however, it is unclear from the Monitors' Report how placement changes may have affected these notifications.  *See id.* at 236.  The Monitors conducted a second case read for 215 children for whom the State updated information related to sexual victimization or aggression in IMPACT but did not make a placement change.  *See id.* at 236–37.  Of these 215 children, the Monitors determined that only 50 had caregivers notified.  *See id.*

The Monitors assessed Defendants' compliance with Remedial Orders 26 and 29 (the "indirect" notification orders) through four methods.

First, the Monitors reviewed three quarterly case reads that the State conducted.  *See id.* at 233, 237–40.  The first case read was a sample of 31 children; the second case read was a sample of 231 children; and the third case read was a sample of 399 children.  *See id.* at 237.  The Monitors did not evaluate the first case read due to the small sample size.  *See id.*  The State performed case reads for a sample of cases that included children who entered PMC or experienced a placement change during the months of the review and whose case file included either (a) a history of sexual aggression, (b) an RTB finding for sexual abuse or sex trafficking as a victim or an alleged perpetrator, or (c) a  removal reason of sexual abuse or sex trafficking risk, as assigned by DFPS policy.  *See id.*  The case reads did not include children who did not change placements during the month of the review.  *See id.* at 237–38.

The State's case reads revealed a significant percentage of Common Applications in both case reads that did not have complete information about a child's history of sexual victimization or sexual aggression/sexual behavior problem.  For children with a history of sexual victimization, the percentage of Common Applications with "all known information" was 69% in the second

case read, and 88% in the third case read.  *See id.* at 238, 240.  For children with a history of sexual aggression or a sexual behavior problem, the percentage of Common Applications with "all known information" was 86% in both case reads, but with more than double the sample size in the third case read (from 52 to 106 children).  *See id.*  The percentage of complete information was considerably lower at first for the Placement Summaries, but there was an improvement in the later case read with a larger sample size.  For children with a history of sexual victimization, the percentage of Placement Summaries that contained "all known information" was 57% in the second case read and 77% in the third case read.  *See id.*  For children with a history of sexual aggression or sexual behavior problems, the percentage of Placement Summaries that contained "all known information" was 59% in the second case read and 86% in the third case read.  *See id.*

The State's case reads also assessed whether DFPS had provided a Placement Summary to a caregiver by either (a) viewing a copy of the signed Placement Summary, or (b) conducting a joint call with the caregiver and caseworker for the caregiver to advise whether he or she received the child's Placement Summary and was aware of the child's history.  *See id.* at 239.  Self described the joint calls as follows:

> [I]f we contacted a caseworker and they said, "I don't have the documents, but I did tell the caregiver at the time that I placed," then the Quality Assurance Team will set up a joint call with the caseworker and the caregiver to talk to the caregiver to make sure that the caregiver can confirm that they were provided the information. . . .  When they're calling, . . . if the caregiver can't confirm that the caseworker gave them that information, they're going to mark it as a, "no."  But then they provide the TA to make sure that they then are provided the information."

D.E. 990 at 289:23–290:4, 291:11–15.

Based on this methodology, the State could not verify in the second case read whether it had provided Placement Summaries to the caregivers of 54% of children with a history of sexual abuse, or to the caregivers of 51% of children with a history of sexual aggression or sexual behavior problem.  *See* D.E. 869 at 239.  The percentage was lower in the third case read where the State

could not verify that it had provided Placement Summaries to caregivers in 47% of cases for either group of children. *See id.* at 240. The Monitors noted that "validating this information via a joint call with the caseworker and caregiver calls into question the accuracy of the results." *Id.* at 239. The Court agrees. The Monitors cannot verify these phone calls for compliance purposes to ensure that the caregiver confirmed receipt of the information. *See* D.E. 990 at 289:13–291:3.

Second, the Monitors conducted two independent case reviews to determine whether IMPACT included an updated Common Application and Placement Summary Form for random samples of children whom the State identified as having either a history of sexual victimization or an indicator for sexual aggression. *See* D.E. 869 at 233, 240–44. The first case read only included children who had a change of placement during the first quarter of Fiscal Year 2020 (not including children who entered PMC during the quarter), and the second case read only included children who did not have a placement change during the same quarter. *See id.* at 240–41. For the children with a history of sexual victimization who changed placements, 85% had an up-to-date Common Application in IMPACT, and 74% had a Common Application in IMPACT that included some information related to the child's history of sexual abuse. *See id.* at 241. For the children with a history of sexual aggression who changed placements, all but two (or 96%) had an up-to-date Common Application in IMPACT, and all but one (or 98%) had a Common Application in IMPACT that included information about the child's history of sexual aggression. *See id.* at 242. The Monitors noted that they "rarely found a Placement Summary in IMPACT, or any information indicating that the Placement Summary had been provided to the child's placement." *Id.*

For the children who did not change placements, the Monitors learned that caregivers may not have had information related to a child's history for 54% of children with a history of sexual victimization, and 83% of children with a history of sexual aggression. *See id.* at 243. The

Monitors noted that the State uses the Common Application and Placement Summary Attachment A as the primary methods of notifying caregivers. *See id.* at 243–45. However, these forms are only generated when a child moves to a new placement, so notification does not always appear to take place when a child is identified for sexual victimization or sexual aggression but has not changed placements. *See id.* at 245. The Monitors also identified a gap in caregiver notifications for children admitted to psychiatric hospitals, which do not require submission of a Common Application or Placement Summary prior to or upon admission. *See id.* at 244. As discussed above, the Court noted during the Show Cause Hearing the issue with failing to notify such hospitals. *See* D.E. 990 at 263:3–4, 263:21–264:1, 293:22–294:1.

Third, as part of the on-site interviews with program administrators and direct caregivers, the Monitors asked questions regarding whether the State had provided the Common Application and Placement Summary for children at the placement. *See* D.E. 869 at 233; *see also id.* at 235–36. Fourth, the Monitors reviewed the on-site files for children at the placements of on-site interviews. *See id.* at 233, 244. Overall, the Monitors determined that 80% of the on-site files included a copy of the child's Common Application, although the Monitors found that the completeness of children's files, regarding the Common Application, varied widely across GROs. *See id.* at 244. For example, while only 67% of children's files contained Common Applications at one site, Common Applications were present in 94% of the children's files at another site. *Id.* The Monitors noted that some of the Common Applications may have been out-of-date depending on how long a particular child had been at that placement. *See id.* The percentage of on-site files that contained children's Placement Summary was much lower, at 34%. *Id.* The Monitors noted that finding both the Common Application and the Placement Summary in a file was "atypical," occurring in only 28% of the files reviewed. *See id.*

Defendants argue that the Monitors' methodology of interviewing caregivers cannot accurately assess compliance with Remedial Orders 25, 26, 27, 29, and 31 because the Monitors did not interview the GRO directors or administrators. *See* D.E. 911 at 27. Defendants also argue that they have demonstrated "reasonable efforts" to ensure compliance with these Remedial Orders, including through the creation of a Quality Assurance Team in August 2019 that conducts quarterly reviews of case records to ensure that sexual victimization and sexual aggression histories are appropriately documented and that caregivers are notified. *See id.* Self admitted that CPS needs to "shore up [its] practice" in GROs, where there are multiple caregivers, to ensure that "the folks . . . that are responsible for the day-to-day care of the child at General Residential Operations are provided -- or given access to the Attachment A, and the child sexual victimization and sexual aggression history." *See* D.E. 990 at 278:20–23, 282:12–283:1. According to Self, "we've been working with some of the different residential operations about who it is that does our Intake, to ensure that we're getting the information to the right people." *Id.* at 279:3–7.

In sum, the Monitors' various methods for validating compliance with the Remedial Orders related to caregiver notification revealed significant gaps in Defendants' performance. Information frequently did not make it to the direct care staff who are actually engaged in protecting children's safety on a daily basis. Even if Defendants were 100% compliant with their own policy of notifying GRO directors or administrators, the Defendants' obligation under the Remedial Orders is to ensure that the **caregivers** "be apprised." The Monitors' Report demonstrates that Defendants are not fulfilling this obligation. The Monitors' interviews with a sample of direct caregivers revealed that only 50% of these caregivers are notified if a child under their care has a history of sexual abuse, and only 57% are notified if a child under their care is sexually aggressive. *See* D.E. 869 at 235. These interviews further revealed that 26% of these

caregivers did not know if they were currently supervising a child identified as having a history of sexual abuse.  *See id.* at 236.  Based on the Monitors' Report, and by Self's own admission, DFPS is not notifying "all of a child's caregivers . . . at each present and subsequent placement," as required by the Remedial Orders.  As the Court stated during the Show Cause Hearing, the failure to notify caregivers at hospitals when DFPS places PMC children in those hospitals is not compliant with the Remedial Orders.

The State's own case reads revealed that a significant percentage of Common Applications in the sampled cases did not have complete information about a child's history of sexual victimization (31% and then 12%) or sexual aggression/sexual behavior problem (14%).  *See id.* at 238, 240.  These case reads showed a higher percentage of Placement Summaries that did not have complete information about a child's history of sexual victimization (43% and then 23%) or sexual aggression/sexual behavior problem (41% and then 14%).  *See id.* at 238–40.  Despite the improvements between the case reads, there remains a considerable percentage of children in the sampled cases whose Common Application and Placement Summaries lack complete information about their history of sexual abuse or sexual aggression.  On-site files were often incomplete, lacking the Common Application, the Placement Summary, or both.  *See id.* at 244–46).

The Court notes that even the information communicated to caregivers may not accurately reflect the reality of a child's history of sexual abuse or sexual aggression.  As previously discussed, the Court is concerned that child-on-child sexual abuse allegations may not be properly investigated and/or that confirmed child-on-child sexual abuse allegations may not be properly documented.  *See supra* Section IV.K.3.  This potential deficiency in investigating and/or documenting is exacerbated by the failure to communicate information about confirmed allegations to the caregivers responsible for the care and safety of PMC children.  The Court

therefore instructs the Monitors to continue reviewing the investigation and documentation of child-on-child sexual abuse allegations involving PMC children in foster care, as well as the communication of information about such confirmed allegations to the primary caregivers of these PMC children.  These matters may be the subject of future contempt hearings.

Based on the "clear and convincing evidence," *see Salazar*, 713 F.3d at 792, the Court finds that Defendants have "failed to comply with the court's order," *see LeGrand*, 43 F.3d at 170. Defendants also have not argued that they were unable to comply with these Remedial Orders.  *See id.* (inability to comply is a defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same).  Defendants are therefore in contempt of Remedial Orders 25, 26, 27, 29, and 31. Defendants continue to place PMC children at an unreasonable risk of serious harm from child-on-child sexual abuse in foster care since not all caregivers are notified when a child placed in their home or facility has a history of sexual abuse or sexual aggression.

### M.    Remedial Order 2: Overburdened Caseworkers

Remedial Order 2 provides that:

> Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.

D.E. 606 at 2 ¶ 2.

### 1.    The Court's Findings at Trial Related to Remedial Order 2

Primary conservatorship caseworkers (i.e., CVS caseworkers) have been described as "the 'backbone' of the State's effort to protect children" who "make life-and-death decisions every day," D.E. 322 at 19:9–10; as "critical to the provision of child safety, permanency and wellbeing," D.E. 305 at 11:25–12:3; and as the "eyes and ears of the State for . . . PMC children," *id.* at 12:8–11; *see also supra* Section IV.H.1.  "The number one responsibility [of CVS caseworkers] is to

ensure the safety of the children in foster care."  D.E. 324 at 11:1–2.  The Fifth Circuit noted in

*Stukenberg I* that:

> DFPS concedes that caseworkers are critical to ensuring children's safety and that "almost every day these caseworkers can make life and death decisions about the children in their care."  It also admits that "if [caseworkers] really are too busy" to do their job, it would create a safety risk.

D.E. 601 at 24.  However, despite the crucial role that CVS caseworkers play in protecting the

safety and wellbeing of PMC children, this Court found at trial that:

> DFPS's policies toward its primary conservatorship caseworkers ("CVS caseworkers" or "primary caseworkers") cause a number of interconnected problems, such as excessive workloads and frequent CVS caseworker turnover. These problems . . . result in an unreasonable risk of harm to the General Class in violation of their Fourteenth Amendment rights. . . .  [C]aseloads are excessive to the point that foster children are placed at an unreasonable risk of harm.

D.E. 368 at 160, 176.

### a.    The Interconnectedness of High Caseloads and High Caseworker Turnover

The Court's 2015 Opinion and Verdict detailed the interconnectedness between excessive

workloads and caseworker turnover rates.  DFPS admitted that "[h]igh caseloads lead to high

worker turnover . . . [f]urther exacerbating high caseloads."  *See* D.E. 300 at 11:10–18 (discussing

PX 877 at 8); *see also* D.E. 368 at 191 (quoting PX 849 at 6–7) ("High caseworker turnover leads

to higher caseloads, less experienced caseworkers and supervisors, and impacts quality caseworker

and ultimately safety for the clients.").  Seventy percent of surveyed caseworkers cited "Workload"

as the first or second reason for why they left.  *See* D.E. 368 at 177 (citing PX 1993 at 306).  In

turn, caseworkers leaving further exacerbate the cycle of high workload.  The trial testimony of

former DFPS caseworker Beth Miller, illustrated this problem, saying that when caseworkers left,

other caseworkers had to pick up the departed workers' cases.  She testified that:

> It was time consuming because you have to go back through, read the case file, the
> hard copies, and what was in the computer system, and the impact, [sic] and study
> to see what the parents needed, if it was being addressed, if it needed any changes,
> learning the children. Those were the hardest times was trying to reconnect with
> the children after they changed workers.

D.E. 323 at 40:7–17.

The State's own expert on child welfare policy, Dr. Jane Burstain, authored an article in
2009 in which she reported that "historically, a fairly direct relationship exists between caseloads
and voluntary turnover." *See* D.E. 368 (quoting PX 1871 at 11); *see also* D.E. 601 at 26
(*Stukenberg I*, citing the 2009 article). In support of that conclusion, Dr. Burstain cited data
indicating that when "caseloads declined 16 percent from 2006 to 2008 . . . CVS voluntary
turnover declined 10 percent." *See* D.E. 368 at 177 (quoting PX 1871 at 11). Former DFPS
Commissioner Specia also testified at trial that an "appropriate workload spread out among the
workers . . . will help [DFPS] keep workers." D.E. 299 at 82:16–17.

### b.     High Caseloads

DFPS has known for decades that its primary CVS caseworkers are overburdened with
high caseloads, yet DFPS has continued to fail to remedy this problem in order to protect foster
children from an unreasonable risk of serious harm. As the Court noted in its 2015 Opinion and
Verdict:

> As early as 1996, the Governor's Committee to Promote Adoption told DFPS that
> it needed the reduce CVS caseworker caseloads. In 2004, the Texas Comptroller
> issued the *Forgotten Children* report, finding that DFPS had several serious
> problems, including "heavy caseloads and high caseworker turnover that prevented
> the agency from performing required visits with foster children." . . . Also in 2010,
> DFPS told the Texas Legislature that it needed to reduce caseloads for its CPS
> caseworkers. DFPS acknowledged that decreasing caseloads would allow
> caseworkers to make "regular, meaningful contact with children in the substitute
> care system" and "to ensure the safety and well-being of [those children] until the
> permanency goal is reached." . . . DFPS also noted that foster child "safety is
> greatly improved with lower caseloads that allow workers to spend more time on
> each case."

D.E. 368 at 187–89 (citing PX 1964; PX 1966 at 5–6; PX 1286 at 15).  DFPS acknowledged in its Legislative Appropriations Request for Fiscal Years 2012 and 2013 that "[h]igh caseloads cause quality casework to suffer, thus putting children in our system at further risk of harm," *see id.* at 189 (quoting PX 878 at 105), yet CVS caseloads only increased between 2009 and 2013, *see id.* (citing PX 885 at 18; PX 894 at 10).

Despite DFPS's knowledge of these problematic and high caseloads, McCall, the then-Director of Field for CPS, testified at trial that "the State put[] no limits on the caseload size that a conservatorship worker can carry."  *See* D.E. 305 at 27:22–28:6.  The Fifth Circuit echoed this issue in *Stukenberg I*: "DFPS does not impose any limit on caseloads . . . even by DFPS's charitable estimates, most caseloads exceed the maximum recommended by professional standards and experts."  *See* D.E. 601 at 24–25.  For example, the Child Welfare League of America[138] recommended a caseload range of 12 to 15 children, and the Council on Accreditation[139] recommended a caseload range of 8 to 15 children.  *See* D.E. 368 at 163 (citing PX 18 § 3.48; PX 2037 at 9–10); *see also* D.E. 601 at 25.  However, by July 2014, for CVS caseworkers who had at least one PMC foster child as part of their caseload, 21% had caseloads of 21–25 children; 13% had caseloads of 26–30 children; and 6% had caseloads of 31–35 children.  *See* D.E. 368 at 164 (citing PX 2129).  The Fifth Circuit noted in *Stukenberg I* that these estimates had increased by October 2018 so that nearly 50% of CVS caseworkers had caseloads of 21 or more children; 22%

---

[138] The Child Welfare League of America is "the nation's oldest and largest membership-based child welfare organization."  D.E. 368 at 25 (citing PX 2114 at 3).  Its "professional standards are universally known and respected in the child welfare community," and the "Texas Legislature mentions [its] standards in its guidelines for DFPS."  *Id.* At trial, "Plaintiffs frequently refer[red] to [its] standards to show that DFPS substantially departs from professional judgment."  *Id.*

[139] The Council on Accreditation is a "respected national nonprofit organization that recommends professional standards for state child welfare systems."  D.E. 368 at 25.  Its "standards are intended to guide foster care practices. States that meet [its] standards are accredited."  *Id.*  At trial, "Plaintiffs frequently refer[red] to [its] standards," in addition to the standards of the Child Welfare League of America, "to show that DFPS substantially depart[ed] from professional judgment."  *Id.*

had caseloads of 26 or more children; and nearly 10% had caseloads of 31 or more children.  *See* D.E. 601 at 25.

### i.      Workload Studies

Despite the risk of serious harm to children resulting from caseworkers being overburdened by high caseloads, the State long resisted conducting a workload study to determine an appropriate caseload for its CVS caseworkers.  The Court found at trial that "[DFPS] has not created a caseload range, it has not hired enough primary caseworkers, and it has not instituted policies to reduce caseworker turnover."  *See* D.E. 368 at 192.  By the time of trial, DFPS had last conducted a work measurement study to determine a manageable caseload in 2004.  *See id.* (citing DX 5 at 1).  In 2010, DFPS created a five-page update to the 2004 study, but it "[did] not explain or reevaluate any of the results from the 2004 study and instead [made] upward adjustments of the previous figures based only on DFPS policy and practice changes that [had] been instituted since 2004."  *See id.* (citing DX 5 at 1–5).

McCall testified at trial that "part of [her] job is to analyze whether or not [CVS] caseworkers have workable or manageable caseloads."  *See* D.E. 305 at 17:25–18:2.  However, she also testified that the State had not recently done a study "of how many cases would be the right optimal caseload for [CVS] caseworkers to do their job properly."  *See id.* at 27:4–8.  Additionally, Lisa Black, the then-Assistant Commissioner of CPS, testified that DFPS had not conducted a work study since the 2004 study.  *See* D.E. 300 at 19:9–20.  Former DFPS Commissioner Specia testified that he was "starting a time study of the entire agency," beginning with a smaller program, Adult Protective Services, in order to "get it right, how we do it," before then moving to CPS.  *See id.* at 23:23–24:8.  However, Ms. Black would not commit to creating caseload standards for CVS caseworkers based on the time study: "I can't say that we could commit

to standards for a workload -- for a caseload. I think it's going to help guide us in looking at what actually caseworkers can do." *See id.* at 30:9–31:5.

Based on the above evidence and this testimony, the Court determined that:

> The Court will not place blind faith in DFPS, who has ignored decades of reports that universally cite the danger of overburdened caseworkers. . . . Although at trial [Mr.] Specia stated that he planned to conduct a workload study, he did not provide a timeline for any such study and admittedly did not know what steps he would take upon the completion of the study.

D.E. 368 at 196.

### ii.        Stages

The problems of excessive caseloads and the State's resistance to limiting those caseloads are exacerbated by the related problem that it was unclear at trial, and it remains unclear to the Court to this day, whether the State has a grasp on the exact number of PMC children for which each caseworker is responsible. *See id.* at 162; D.E. 601 at 24–25.  One of the biggest problems was the DFPS approach to calculating caseloads by "stages":

> The problem is that Texas calculates caseloads in terms of "stages," each of which represents an aspect of the work that needs to be done with a child or her family, rather than by individual children.  DFPS stages could include Intake, Investigation, Family Preservation, Child Substitute Care (relating to children removed from the home), Family Substitute Care (a stage created for families when a child has been removed from the home), Foster and Adoptive Home Development, Kinship, and Adoption.  One child, then, could represent several stages simultaneously.  She could be in the Child Substitute Care and Adoption stages while her family was in the Family Substitute Care one.

D.E. 368 at 162 (citing DX 167).  The Fifth Circuit also commented on this problem of counting caseloads by stages in *Stukenberg I*:

> [G]iven the lack of reliable, up-to date-statistics, it is not even clear from the record how many children, on average, caseworkers are responsible for. . . .  The data is [sic] problematic for a host of reasons.  To begin with, DFPS calculates caseloads in terms of "stages," each representing a segment of a child's care plan, rather than by the number of individual children for whom each caseworker is responsible. This makes it difficult to assess how many children each caseworker actually has.

D.E. 601 at 24–25.  In short, calculating caseloads by stages makes it difficult for DFPS to know how many children each caseworker handles.  *See* D.E. 368 at 232; D.E. 601 at 24–25.

Calculating caseloads based on "stages" was "unique to Texas" and therefore also made it "difficult to compare DFPS caseworker caseloads to national and professional standards."  D.E. 368 at 162.  At trial, "Defendants' and Plaintiffs' experts could barely understand the stage-counting approach, let alone explain it to the Court."  *Id.*; *see also* D.E. 305 at 45:4–51:7 (trial colloquy regarding caseloads); D.E. 325 at 124:18–125:23 (trial testimony of Dr. Miller); D.E. 327 at 37:24–39:14 (trial testimony of Judy Bowman, then a Regional Director for CPS).  At trial, McCall testified that, while she was familiar with Texas's stage-based approach for measuring caseloads, she had never even assessed the number of children that caseworkers were responsible for within their caseloads.  D.E. 305 at 28:21–29:12, 30:24–31:7.  Plaintiffs' expert witness, Dr. Miller—who had forty years of experience in child welfare that the Court found to be "unrivaled by any other witness, expert or otherwise, testifying at trial," D.E. 368 at 44; D.E. 340-10 (PX2037 at 4, 64)—testified that counting caseloads by children is "pretty standard operating procedure" across the United States D.E. 302 at 50:2–13, and that counting by stages in Texas is "very unusual," D.E. 303 at 5:9–6:1.  Dr. Miller further testified that she could not understand the stage-based approach to calculating caseloads in Texas, *see* D.E. 325 at 124:18–128:9, and expressed

concerns that "there seems to be no methodology," which makes it unclear how DFPS tracks children in its care, *see* D.E. 303 at 4:21–5:4.[140]

### c.   High Caseworker Turnover

At trial, the Court found that excessive caseloads were both perpetuating and being perpetuated by caseworker turnover, which created a cycle of high caseloads and high turnovers. The Stephen Group cited the high turnover rate as "a major organizational burden" for the State. *See* D.E. 368 at 176 (quoting PX 1993 at 16–17, 76).  The annual CVS caseworker turnover rate was 26.7%, compared to a 14–15% rate in Kentucky and a 10–12% rate in Tennessee for comparable caseworkers.  *See id.* at 176–77 (citing D.E. 303 at 28–29).  The problem of turnover was especially egregious for new caseworkers who experienced the highest turnover rate— approximately 28% left in the first year and approximately 43% left within the first two years.  *See id.* at 177 (citing PX 1993 at 17–18).  The Texas Advisory Sunset Commission[141] reported that "[o]ne out of every six new caseworkers leaves CPS within six months."  *See* D.E. 303 at 27:2– 12; D.E. 368 at 177 (citing DX 119 at 20).  The Fifth Circuit noted in *Stukenberg I* that:

---

[140] The incomprehensible nature of the State's "stages" approach did not prevent this Court or the Fifth Circuit from finding that the caseloads imposed on caseworkers were unbearable and presented an unreasonable risk of harm to the foster children in the State's care.  As this Court noted:

> [E]ven by DFPS's distorted data, caseloads remain[ed] well above the maximum recommended by professional standards. According to DFPS's stage-counting method, in 2014 CVS caseworkers in many counties averaged over 40 stages, with the worst averaging 88.3.  Former CVS caseworker B. Miller testified that a "forty to 60" stage caseload is "typical" and unmanageable.

D.E. 368 at 189 (citation omitted).  The Fifth Circuit similarly noted in *Stukenberg I* that:

> As the district court lamented, "caseworker caseloads are still something of an open question despite years of litigation and weeks of trial."  Nonetheless, even by DFPS's charitable estimates, most caseloads exceed the maximum recommended by professional standards and experts. . . .  Caseload figures reported by neutral outside auditors demonstrate that the numbers presented by the State at trial are artificially low. . . .  In short, the record amply supports the district court's finding that CVS caseloads are extremely high.

D.E. 601 at 24–26.

[141] The Texas Advisory Sunset Commission ("Sunset Commission") "is a 12-member group created by the Texas Legislature to report on the conditions in Texas foster care and find ways to eliminate waste, duplication, and inefficiency."  D.E. 368 at 24.  At trial, the Court considered a report by the Sunset Commission from May 2014 for which "DFPS was mandated to provide unfettered access to the Sunset Commission."  *See id.* (citing PX 1861 at 131).

> To keep pace with the attrition rate, DFPS has to hire approximately 500 new caseworkers every year just to maintain a full-capacity workforce of 1,000. DFPS struggles to hire and train workers quickly enough to fill all of the available positions. As a result, CPS has a high volume of positions that remain vacant.

D.E. 601 at 26–27 (footnote omitted).

McCall described the cycle of high caseloads and high turnover that creates an institutional strain wherein the remaining caseworkers assume the burden of the caseworkers who left, which puts additional stress on those caseworkers, who then burn out and leave themselves. *See* D.E. 305 at 55:21–56:9. The Fifth Circuit similarly noted that:

> High turnover compounds the workload problem, as caseloads have to be redistributed as caseworkers leave. New caseworkers do not receive a full caseload for at least six months after joining CPS. Accordingly, the remaining CVS caseworkers are forced to add additional cases to their already bloated caseloads in the interim.

D.E. 601 at 27–28. With caseworkers continually burning out and departing, both the remaining caseworkers and the new replacements face the daunting task of getting up to speed on cases that are redistributed to them. For newer caseworkers, McCall testified that "it takes them a little while to get up to speed . . . probably about two years." D.E. 305 at 23:10–15.[142]

According to DFPS, "[c]aseworker turnover in all programs threatens the well-being and safety of clients." D.E. 368 at 190–91 (emphasis omitted) (quoting PX 894 at 6–7). Dr. Miller

---

[142] In reading the **incomplete** files of only 20 Named Plaintiffs, the Court experienced the problem first-hand:

> To gain a perspective on what is a manageable caseload, the Court calculated how many hours it took to simply review the 20 foster children's case files that are in the record, including Named Plaintiffs'. Bearing in mind that a 20-child caseload is below what many DFPS primary caseworkers carry, it took the Court 462 hours just to read the 358,102 pages of case files in DX 120. Admittedly, the Court is not (or was not) well trained at reading case files. That said, any added time it took the Court to read the case files was offset by their incomplete nature: the records contained no CPA investigation files, and there were no IMPACT or RCCL files for multiple children. In short, reading case files, a necessary step for caseworkers to understand the needs of their foster children, takes around eleven uninterrupted workweeks. Considering the frequent turnover among caseworkers . . . this onerous task is duplicated many times for each child. It is no surprise, then, that caseworkers "just don't have enough hours in their day" to focus on their children.

D.E. 368 at 166 (citations omitted).

affirmed that the high turnover rate "directly affects the DFPS's ability to meet its mission in protecting children," and that there is a "causal connection between high caseworker turnover and an unreasonable risk of harm to children."[143]   D.E. 303 at 25:9–21.   Caseworker turnover negatively affected PMC children as "[t]hey would be more withdrawn; not as open," which made it harder for new caseworkers to get to know them.   D.E. 323 at 40:18–21.   As noted above, the Court found at trial that caseworker turnover negatively affected Named Plaintiffs and former foster children in numerous ways, and that the experiences of the Named Plaintiffs were typical of the General Class of PMC children.   D.E. 368 at 43, 56, 73, 79, 90, 97, 105, 128, 132, 140, 152; *see also* D.E. 326 at 132:22–133:5, 193:22–194:2, 194:12–15) (trial testimony of Dr. Carter that the Named Plaintiffs' experiences were typical of the General Class; *supra* Sections IV.E.1., IV.F.1., IV.G.1., IV.H.1., IV.J.1.

Former DFPS caseworker Katrina Voelkel testified at trial that the high turnover of primary caseworkers has a "huge impact" on foster children in that they "don't want to have a relationship with [caseworkers] . . . they lose confidence, they lose trust."   *See* D.E. 324 at 20:18–21:7.   For example, the records of Plaintiff S.A. reveal that her previous caseworker left without giving her notice, and S.A. was often upset to learn she had a new primary caseworker.   *See* D.E. 368 at 85 (citing DX 120 at DFPS #49437, #49439).   Turnover not only harms the children who lose their caseworker, it also hurts children whose caseworkers remain and assume the departing workers' cases on top of their existing caseload.   *See id.* at 184.   The mother of Plaintiffs L.H. and C.H., who was still allowed to visit with her children, also noted that frequent caseworker changes made

---

[143] The high turnover rate also imposes an economic drain on the State.  The Stephen Group estimated that the State would save as much as $50 million in the first year if the State were to reduce the high caseworker turnover.  *See* D.E. 303 at 35:20–36:19.  Then-Commissioner Specia hired The Stephen Group to review Child Protective Services "from top to bottom," after which the Stephen Group produced a report with "lots of recommendations for [DFPS] to follow up on."  D.E. 305 at 56:20–57:4.

it difficult for her to know who was the actual caseworker at a given time.  *See id.* at 145 (citing DX 120 at 1 RFP CPS 132123).

A revolving door of caseworkers makes it all too easy for essential services and support for PMC children to "fall through the cracks."  *See id.* at 179 (citing PX 1988 at 68 (2010 Texas Appleseed Report)).   Plaintiff Z.H. "had at least nine different primary and secondary caseworkers," and the "[r]epeated placement changes and caseworker turnover . . . contributed to disruptions in his medication regimen, which resulted on at least one occasion in a psychiatric hospitalization that exacerbated Z.H.'s already-disturbed condition and behaviors."  *See id.* at 131 (citing DX 120 at DFPS #33580).  The Fifth Circuit noted that "[t]he combination of unmanageable caseloads and high caseworker turnover creates a 'cycle of crisis' that allows children to 'fall through the cracks.'"  D.E. 601 at 28 (footnote omitted).  "A logical result of inconsistent and perfunctory contact with caseworkers is that children don't have material access to an advocate when something goes wrong in their placement."  *Id.* at 28–29.

Caseworker turnover also hinders foster children's likelihood of being placed in a permanent adoptive family.  According to an audit of DFPS, "[n]umerous transitions in caseworker assignments disrupt momentum toward permanency by forcing children/youth and their families to 'start over' repeatedly with new caseworkers."  *See* D.E. 368 at 178 (citing PX 1880 at 5).  For Plaintiff S.A., the most common obstacle in placing her with potential adoptive families was her caseworkers' failure to update her health, social, educational, and genetic history report, and such failure was largely attributable to a frequent turnover in her primary caseworkers.  *See id.* at 86 (citing DX 120 at DFPS #49450 (filed under seal)).   S.A. was never adopted, and she had

approximately 28 different primary and secondary caseworkers during her 13 years in foster care before she aged out.[144] *See id.* at 79–80, 85 (citing DX 120 at DFPS009033366–942).

Overall, the Court found that "DFPS's policies and practices regarding its CVS caseworkers amount to structural deficiencies that violate the General Class's Fourteenth Amendment right to be free from an unreasonable risk of harm." *Id.* at 186. In particular, the Court found that:

> DFPS has known for decades that its primary CVS caseworkers are overburdened to the point where they cannot perform their required duties, namely protecting their foster children from an unreasonable risk of harm. The Court does not find that DFPS has "responded reasonably" to the substantial risk of serious harm posed by overburdened caseworkers. DFPS is therefore deliberately indifferent toward excessive caseworker caseloads. . . . DFPS caseloads far outpace [national] standards. Yet DFPS has done nothing to reduce caseloads, knowing all the while that foster children are harmed as a result. DFPS's response (or lack thereof) to its caseworkers' excessive caseloads shows "such a substantial departure from accepted professional judgment . . . that the person responsible actually did not base the decision on such a judgment."

*Id.* at 186, 198 (citations omitted).

## 2. The Procedural History of Remedial Order 2

The Court stated in its 2015 Opinion and Verdict that a "goal" of the Special Masters in proposing an implementation plan to remedy the State's constitutional violations was that "DFPS must significantly lower its primary CVS caseworker turnover rate." *Id.* at 251–52. The Court adopted in its January 2018 Order provisions recommended in the Special Masters' Implementation Plan, including the following:

> Effective May 2018, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.

---

[144] S.A. also had 45 foster care placements during her time in the State's custody. D.E. 324 at 21:15–20.

D.E. 559 at 70 ¶ J2; *see* D.E. 546 at 31 ¶ 2.  The purpose of this provision was to minimize turnover of new caseworkers by ensuring that they were not prematurely overburdened or overwhelmed at the beginning of their new job.  The Fifth Circuit explicitly validated this provision in *Stukenberg I*, holding that the provision "directly address[ed] the caseload management violation and [was] therefore valid" and that "provisions that are calculated to remedy the caseworker turnover problem are generally proper."  D.E. 601 at 53–54.  This Court restated the provision in its November 2018 Order as current Remedial Order 2, *see* D.E. 606 at 2 ¶ 2, which was not disturbed by *Stukenberg II*, *see* D.E. 627.  Therefore, as of the Fifth Circuit's Mandate on July 30, 2019, Remedial Order 2 was "in effect," satisfying the first element for civil contempt.  *See LeGrand*, 43 F.3d at 170.  This is not in dispute, as Defendants stipulated to the effectiveness of the Remedial Orders at the Show Cause Hearing.  *See* D.E. 990 at 7:4–12.

### 3. Defendants Have Failed To Comply with Remedial Order 2.

Remedial Order 2 is intended to ameliorate the Court's findings at trial regarding DFPS's high caseworker turnover rates, particularly among new caseworkers, by requiring Defendants to "ensure statewide implementation of graduated caseloads" for any newly hired primary caseworkers for PMC children.  D.E. 606 at 2 ¶ 2.  That is, Remedial Order 2 requires that Defendants ensure that there is a uniform, statewide practice of giving new caseworkers a smaller caseload than a more experienced caseworker would have, and then gradually working up to a full caseload over time.  Therefore, it is clear that Remedial Order 2 "require[s] certain conduct," and so the second element of civil contempt is fulfilled.  *See LeGrand*, 43 F.3d at 170.

Plaintiffs allege in their Motion to Show Cause that DFPS has also failed to comply with Remedial Order 2.  *See* D.E. 901 at 13–14.  First, Show Cause Hearing testimony revealed that Defendants have failed to timely ensure that a new policy for "generally applicable, internal caseload standards" is utilized amongst staff in order to set the graduated caseloads for new

caseworkers.  In addition, even under the previous caseload policy, the Monitors discovered, and Show Cause Hearing testimony likewise confirmed, that DFPS has not complied with Remedial Order 2 because caseworkers' caseloads exceeded both the established graduated caseload standards applicable at that time as well as the new caseload policy.  The Monitors determined this despite repeated problems in Defendants' production of data for the Monitors' analysis.

### a.       December 2019 Order Regarding Workload Studies

In order to implement graduated caseloads for new caseworkers, Defendants had to determine what the full caseload for experienced caseworkers would be, against which the caseloads for new caseworkers would be graduated for Remedial Order 2.  When Remedial Order 2 became effective in July 2019, DFPS policy was that newly hired CVS caseworkers may be assigned as primary caseworkers after completing CPS Professional Development Training.  *See* D.E. 869 at 162.  In the first month that a new caseworker was eligible for a primary case assignment, that caseworker's caseload could not exceed one-third of the average caseload for workers in that caseworker's county.  *Id.*  In the second month of eligibility, the new caseworker's caseload could not exceed two-thirds of the average county caseload.  *Id.*  Caseworkers could be assigned a full caseload beginning in the caseworker's third month of eligibility.  *Id.*  Defendants advised the Monitors that they determined average county caseloads by averaging "the prior three months of caseloads for that worker's county."  *See id.*

The DFPS policy for graduated caseloads changed several months after Remedial Order 2 went into effect following the Fifth Circuit's July 30, 2019 Mandate in *Stukenberg II*.  On December 16, 2019, Defendants and Plaintiffs submitted to this Court an agreed proposed "Order Regarding Workload Studies in the November 20, 2018 Order."  *See* D.E. 771-1.  The Court entered the proposed order the next day ("December 2019 Order Regarding Workload Studies"), ordering that:

> It is ordered that in lieu of performing the workload study obligations set forth in the November 20, 2018 order, Defendants will establish as guidelines for the determination of generally applicable internal caseload and investigation standards the following: (1) 14–17 children per caseworker for DFPS conservatorship caseworker caseloads; (2) 14–17 investigations per DFPS CCI investigator; and (3) 14–17 total tasks, which include operations, investigations referred from DFPS, minimum standard investigations, and agency homes sampling, per HHSC RCCL inspector.

D.E. 772 at 1–2. The December 2019 Order Regarding Workload Studies set two deadlines: (1) Defendants had "30 days from the date of [the] Order" to "establish internal caseload standards, as set forth in the November 20, 2018 order;" and (2) Defendants had "60 days from the date of [the] Order" to "ensure that the generally applicable, internal caseload standards are utilized to serve as guidance for supervisors who are handling caseload distribution and that Defendants' hiring goals for all staff are informed by the generally applicable, internal caseload standards." *Id.* at 2.

On January 16, 2020, Defendants filed a Notice of Submission to confirm that they had fulfilled the first deadline:

> Pursuant to the Court's December 17, 2019 Order Regarding Workload Studies in the November 20, 2018 Order (ECF No. 772), on January 16, 2020, Defendants submitted copies of the generally applicable internal caseload standards Defendants have developed to the Monitors . . . with a copy . . . to Plaintiffs' counsel.

D.E. 789 at 1. However, testimony at the Show Cause Hearing revealed that DFPS had not met the second deadline and that it was not until July 2020—five months after the 60-day deadline to which Defendants had agreed—that they implemented a policy to do so.

At the Show Cause Hearing, Taccetta explained the Defendants' new policy for implementing graduated caseloads for newly hired caseworkers:

> So there are guidelines as part of our Generally Applicable Caseload Standards that direct supervisors and management to limiting the number of case assignments, child assignments, for the first two months that a conservatorship caseworker becomes case assignable.

D.E. 990 at 146:9–14.  Taccetta testified that DFPS "recently" changed its policy statewide so that any new caseworker across the state, regardless of county, "should be assigned no more than six children" in the first month that the caseworker is eligible to receive case assignments, and "no more than 12 children" in the second month.[145]  *See id.* at 146:9–147:16, 154:21–24.  As stated above, the previous policy had set the first month caseload as one-third of the average full caseload carried by caseworkers in the new caseworker's county and the second month caseload as two-thirds of the county average; now, the new policy defines a one-third caseload as 6 children and a two-thirds caseload as 12 children based on a standard full caseload of 17 children that is generally applicable across the state.  *See id.* at 146:9–147:16, 154:21–24; *see also* D.E. 869 at 166–67).

In their Response to Plaintiffs' Motion, Defendants allege that, once the new caseload guidelines were in place under the December 2019 Order Regarding Workload Studies:

> DFPS promptly developed communications and training to implement these caseload guidelines, which involved, in some cases, modifying caseload structures from some areas.  DFPS held mandatory webinars for some staff in February 2020 and communicated with staff regarding the guidelines in February and March 2020, after sharing the guidelines with the Monitors and requesting feedback.

D.E. 911 at 20 (citations omitted).  However, Defendants' Response also states that it was not until "July 2020" that "staff were alerted that newly hired caseworkers would be assigned six children as the standard in the first month of eligibility and 12 in the second month . . . .  A written broadcast of this change will be distributed by the end of July 2020."  D.E. 911 at 21.  Taccetta's testimony

---

[145] The new caseload numbers are "best practice guidelines, but they're not treated as a cap."  D.E. 990 at 163:23–25.  DFPS may grant an exemption to new caseworkers under the new graduated caseload policy so that "they may not start with the staggered six and twelve in the first two months if they meet an exemption."  *See id.* at 164:12–14.  Exemptions are evaluated on a case-by-case basis for each new caseworker.  *Id.* at 163:11–14.  New caseworkers may receive an exemption if they are (a) "transferring from one stage of service within CPS to another," (b) "coming back to the department after . . . less than a year's absence," or (c) transferring to Texas from another state where they did similar work as a CVS caseworker.  *Id.* at 148:5–16, 163:5–14.  Taccetta could not report the number of caseworkers who were exempted from the graduated caseloads in the first two months, but she testified that DFPS "just formalized a more formal process for capturing those exemptions," *id.* at 148:17–25, and that DFPS "will have a systems approach to managing those exemptions from here forward through collection of a new form," *id.* at 164:17–2.

further confirmed that, in fact, Defendants did not formally implement a policy that would "ensure that the generally applicable, internal caseload standards are utilized to serve as guidance for supervisors who are handling caseload distribution" until July 2020:

> [PL. COUNSEL:]  And have -- when did those new caseload guidelines go into effect, the six and the 12?
>
> [MS. TACCETTA:]   We worked with our regional management on the development and notified them, I believe it was mid-July, around July 13th, that we were going to move to these new caseload standards. We notified our regional staff July the 31st through a broadcast, and then it formally became part of what we call a "Meeting in a Box," which is our formal out dissemination to all staff about any practice or policy change.

D.E. 990 at 147:17–148:1.

It is unclear to the Court how Defendants "ensure[d] **statewide** implementation of graduated caseloads" "[w]ithin 60 days" of the Fifth Circuit's Mandate, per Remedial Order 2, when they did not formally implement a policy that would "ensure that the **generally applicable**, internal caseload standards are utilized to serve as guidance for supervisors who are handling caseload distribution," per the December 2019 Order Regarding Workload Studies, until nearly a year after the Fifth Circuit's Mandate.  *See* D.E. 606 at 2 ¶ 2 (emphasis added); D.E. 772 at 2 (emphasis added).[146]

---

[146] In addition, testimony during the Show Cause Hearing revealed that through at least July of 2020, the State was continuing to use stages to determine caseworker caseloads.  *See* D.E. 990 at 155:10–22, 156:4–10, 158:13–19, 160:3–8.  Taccetta testified that she could not confirm whether DFPS or the State was "using stages in any other respect" since July 2020.  *See id.* at 161:1–5.  Commissioner Masters stated that she "didn't realize" that DFPS was continuing to use stages.  *Id.* at 158:24–159:10.

At trial, the Court found that the stages method of calculating caseloads made it difficult for DFPS to know how many children each caseworker handles, exacerbating the problem of ballooning caseloads.  *See* D.E. 368 at 162, 232.  As a result, the Court concluded in its 2015 Opinion and Verdict that "DFPS must track primary CVS caseworker caseloads on a child-only basis" and said that the Special Master should propose an implementation plan for this.  *Id.* at 250 ¶ 1.  After the Special Masters submitted their Implementation Plan, *see* D.E. 546 at 26 ¶ 2, the Court entered a Remedial Order requiring that "DFPS shall track caseloads on a child-only basis," D.E. 559 at 59 ¶ H2.  The Fifth Circuit validated this order in *Stukenberg I*, D.E. 601 at 53–54, and this Court re-stated it as Remedial Order 35 in its November 2018 Order, D.E. 606 at 7 ¶ 35.  The Fifth Circuit did not disturb Remedial Order 35 in *Stukenberg II*.  *See* D.E. 627 at 3.  Plaintiffs do not allege that Defendants are in contempt of Remedial Order 35, but the Show Cause Hearing testimony seems to indicate that they have failed to comply with the requirements of this Remedial Order.

####          b.          **Defendants' Data Provision to the Monitors**

As with every Remedial Order, the Monitors requested data from the State that would help

ascertain whether the State has complied with Remedial Order 2.  *See* D.E. 869 at 164.  However,

the State did not provide the requested data to the Monitors in a complete and timely manner.[147]

The State (1) did not provide timely information to the Monitors by the requested deadline, and

(2) did not give the Monitors the full substantive information that they requested to verify

compliance with Remedial Order 2.

On September 30, 2019, the Monitors requested data and information from the State in

order to begin monitoring the State's compliance with Remedial Order 2.  *See id.* at 163.  The

Monitors requested to receive the data "[o]n an ongoing monthly basis (commencing for the month

of October 2019, and due to the monitors by November 15, 2019, and by the 15th of each month

thereafter)."  *Id.*  However, the State advised the Monitors in writing that DFPS "does not have the

capacity to provide the data within the requested time period; rather, it requires a forty-five day

timeframe or 'lag' to calculate and process the request after the month ends (i.e., October data can

be provided on December 15th and so on)."  *See id.*  The Monitors did not agree to the State's

proposed timeframe "[b]ecause a forty-five day lag impedes the Monitors' ability to complete

timely verification of compliance with Remedial Order Two on behalf of the Court."  *See id.* at

163 n.334.  Nevertheless, the State not only submitted the data on a 45-day lag but also informed

---

[147] Although Plaintiffs do not allege that Defendants are in contempt of this provision, Defendants' failure to timely provide requested information to the Monitors is inconsistent with Monitoring Appointment Provision A10 of the Court's 2018 November Order.  Monitoring Appointment Provision A10 provides that:

> Defendants shall deliver to the Monitors all records, reports, data and information within 30 days of the Monitors' request.  The Monitors may grant extensions to due dates upon application in writing by the Defendants.  If the Monitors decline to grant Defendants an extension, the Monitor shall do so in writing and the Defendants shall either produce the requested records, reports, data and information by the due date or appeal to the Court for an extension.

D.E. 606 at 18 ¶ A10.

the Monitors that DFPS "remains unable to process the data in a timeframe that is less than forty-five days." *See id.*; *see also* D.E. 990 at 149:25–151:11 (Show Cause Hearing testimony of Taccetta that data reports are provided to the Monitors on a 45-day lag). Therefore, the State continually did not provide data pertaining to Remedial Order 2 to the Monitors in a timely manner.

In addition to the data being untimely, the data that the Monitors eventually received on a delayed timeframe did not contain the complete information that the Monitors requested. On September 30, 2019, the Monitors requested the following data and information from the State in order to begin monitoring the State's compliance with Remedial Order 2:

> On an ongoing monthly basis . . . , provide a list of all employees subject to the graduated caseloads during the previous month. Identify the full name; title; identification number; start date; exit date (if applicable); agency name; county; district or region; the name of the supervisor and supervisor identification number; assigned work location(s); and **whether they were compliant with the relevant graduated caseload at all times during the month. For any staff whose caseloads exceeded the graduated caseload standard at any time in the previous month, identify the number of days they were not compliant with the graduated caseload standard**.

D.E. 869 at 163 (emphasis added). However, the State did not provide the Monitors with information to determine "whether [staff] were compliant with the relevant graduated caseload at all times during the month" and "the number of days [any staff] were not compliant with the graduated caseload standard." *See id.* The Monitors report that, in response to their September 30, 2019 data and information request:

> DFPS informed the Monitors that it does not have the current capacity to report on the total number of days during the prior month that caseworker caseloads are not compliant with the graduated caseload standard. Instead, DFPS provided to the Monitors compliance data on the fifteenth and forty-fifth days after caseworker eligibility for primary case assignment. The agency stated more recently that it is unlikely that it can report on the daily compliance data for graduated caseloads in the near term but that it will keep the Monitors apprised of its progress. Although DFPS's policy establishes graduated caseloads for new workers based on the average caseload size in the worker's assigned county, rather than a statewide standard, DFPS indicated that it has not previously compared average daily caseloads for the county to which the worker is assigned.

*Id.* at 164 (footnotes omitted).  Tara Olah, the DFPS Director of Implementation and Strategy, advised the Monitors via email that "[p]roviding the caseload on each day and comparing to a threshold for each day requires complex coding.  [DFPS] will research how and when we can provide the requested information."  *Id.* at 164 n.337.  Taccetta also testified at the Show Cause Hearing that the State does not have "daily numbers" of CVS caseworkers who are subject to the graduated caseload.  D.E. 990 at 151:11–152:10.  Consequently, Taccetta could not report the number of caseworkers subject to the graduated caseload at the time of the Show Cause Hearing.  *See id.* at 151:11–17.

Remedial Order 2 requires DFPS to "ensure" that newly hired CVS caseworkers have "graduated caseloads."  In order to verify the State's compliance with this order, the Monitors need information every month on the number of cases (i.e., children) for which each new caseworker was responsible during each day of the previous month.  If the State only provides the Monitors with data on the caseloads that caseworkers had on their fifteenth and forty-fifth days of eligibility, then the Monitors will have no way to verify that caseworkers' caseloads did not balloon beyond an acceptable level during the interim days.  Moreover, daily caseload information was important for the Monitors to verify the State's compliance with Remedial Order 2 during their reporting period of September 1, 2019 to November 30, 2019, when the State's previous policy for calculating graduated caseloads was in place, because, under the previous policy, the number of cases assigned to new caseworkers was a gradually increasing percentage of the "average **daily** caseloads for workers in a given county by month."  *See* D.E. 869 at 164–65 (emphasis added).

While the State's failure to provide the necessary information to the Monitors did not completely thwart the Monitors' efforts to evaluate the State's compliance with Remedial Order 2 under its previous graduated caseload policy, it severely complicated the task.  In their Report, the

Monitors explained that the State's failure to provide complete data complicated the Monitors' work and required them to take extra steps in order to conduct a useful analysis:

> Although DFPS's graduated caseload standard during the period September 1, 2019 through November 30, 2019, was a function of the average daily caseloads for workers in a given county by month, DFPS did not provide that underlying data to the Monitors. The Monitors instead verified the calculation of dates using the data the State submitted for two points-in-time: the fifteenth and forty-fifth day after each caseworker became eligible to carry cases; the calculation of the percent of average county caseloads on the fifteenth and forty-fifth day; and the number of caseworkers who are over the allotted caseload limit on the fifteenth and forty-fifth day.

*Id.*; *see also id.* at 164 n.337 ("Because of the agency's policy with a variable standard by county based on average caseloads within that county throughout the month, the data the Monitors requested is necessary for validation of the State's performance under Remedial Order Two during the period at issue."); D.E. 869-5 (App. 4.2 "Additional Information on Graduated Caseloads Methodology")). Because "DFPS could not provide daily caseload data to verify the average caseloads in each county for the month, as DFPS policy requires," the Monitors "used the monthly caseload data as a benchmark for whether the average caseloads in the graduated caseload data appear accurate." D.E. 869 at 165 n.340. In short, the Monitors resorted to "[u]sing point-in-time caseload data provided by DFPS, and approximations of average caseloads by county calculated by the monitoring team." *See id.* at 167.

### c.    The Requirements of Remedial Order 2

Even the limited data that the Monitors had to work with demonstrated that Defendants have not complied with Remedial Order 2. The Monitors reported on Defendants' compliance with Remedial Order 2 during the period of September 1, 2019 through November 30, 2019. *See id.* at 164 n.336. Even with incomplete data, the Monitors determined that 22 out of 71 caseworkers (or 31%) who were "subject to graduated caseloads" during the time period in question had caseloads that exceeded the State's previous graduated caseload standard that was in

effect during that period (i.e., based on county-wide daily average caseloads) on the fifteenth day after they became eligible to carry cases. *See id.* at 164–67. Moreover, the State's rate of non-compliance with Remedial Order 2 during this period of September 1, 2019 through November 30, 2019 would have been even higher—a staggering 59.2%—under the new caseload guidance (i.e., based on a set standard of 6 cases assigned to caseworkers on their fifteenth day of eligibility and 12 cases on their forty-fifth day of eligibility) that became effective after the reporting period. *See id.* at 166. The statistics reported by the Monitors establish that Defendants have failed to comply with Remedial Order 2's requirement that newly hired CVS caseworkers and newly hired staff with similar responsibilities to the PMC children must have graduated caseloads.

Moreover, the State's unsatisfactory response to the Monitors' data request, discussed above, *see supra* Section IV.M.3.b., further reveals the State's failure to comply with Remedial Order 2's requirement that "DFPS shall **ensure statewide implementation** of graduated caseloads" for pertinent caseworkers and staff. *See* D.E. 606 at 2 (emphasis added). As discussed above, Taccetta admitted at the Show Cause Hearing that the State lacks "daily numbers" of caseworkers subject to graduated caseloads. *See* D.E. 990 at 151:11–152:10. Without such information, the State is unable to determine the extent to which those new caseworkers' caseloads comply with the graduated caseload requirement on any given day. Therefore, the State could not have been "**ensur[ing]** statewide implementation of graduated caseloads" if it did not have a way to track its own numbers of caseworkers who should have had graduated caseloads. *See id.* at 151: 152:10. Given the above statistics reported by the Monitors and this failure by the State to track caseworkers subject to graduated caseloads, Defendants failed to comply with Remedial Order 2, and the third element for civil contempt is satisfied. *See LeGrand*, 43 F.3d at 170.

Once a movant for civil contempt has made the three-part showing, the respondent may defend against a finding of civil contempt by, *inter alia*, rebutting the three-party showing or showing good faith efforts to comply. *See LeGrand*, 43 F.3d at 170; *Petroleos Mexicanos*, 826 F.2d at 401. Here, Defendants attempt to rebut the information in the Monitors' Report by suggesting that the rate of noncompliance reported by the Monitors may have been overstated because some new caseworkers may have been exempt from the graduated caseload guidelines. During the Show Cause Hearing, Taccetta suggested that the compliance rates reported by the Monitors were not accurate because the Monitors did not exclude from their calculations new caseworkers who were allegedly "exempt" from the graduated caseload guidelines.[148] *See* D.E. 990 at 162:15–165:1. However, Taccetta had no idea what percentage of the new caseworkers were actually exempt from the graduated caseload guidelines. *Id.* at 164:15–165:1. Moreover, the State does not have "a way of systemically tracking exemptions" and Taccetta could not say when the State would be able to report such numbers. *See id.* at 164:15–23, 166:22–167:17.

Even if the Court were to agree with Defendants that exempting certain caseworkers from Remedial Order 2's graduated caseload requirement was acceptable, Taccetta testified that the policy providing for those exemptions was not put in place until "July and August" 2020—a year after Remedial Order 2 went into effect and eight months after the Monitors' reporting period. *See id.* at 148:20–25. The Monitors needed to assess Defendants' compliance with Remedial Order 2 during the interim year, and their Report is clear that they evaluated compliance based on the policies in place at the time of their reporting period from September 1, 2019 through November 30, 2019. Therefore, for purposes of determining whether the State has complied with Remedial Order 2 between the effective date of July 30, 2019 and August 2020, by which time the new DFPS

---

[148] See *supra* note 145 for more information on new caseworker exemptions to the graduated caseload guidelines.

policy was put in place, the Court does not consider any newly hired caseworkers to have been exempt from the graduated caseload requirements.

Defendants also attempt to undermine the Monitors' findings by stating that the Report is unreliable because the Monitors lacked all of the data that they requested to verify the State's compliance with the Remedial Order. *See* D.E. 911 at 19–20 ("[T]he Report acknowledges that its conclusions regarding graduated caseloads are based on incomplete data, as the Monitors claimed they did not receive data permitting them to validate average daily caseloads."). The essence of this argument is that because **Defendants** failed to provide the Monitors with complete information with which to verify their compliance, any conclusion that Defendants have not complied with the Remedial Order is invalid. By this logic, Defendants may be excused from complying with any of the Court's Remedial Orders simply by providing incomplete data to the Monitors, thereby frustrating any analysis of their compliance. This conclusion is absurd for obvious reasons, among them being that Defendants are obligated under the Court's November 2018 Order to provide complete and timely information to the Monitors. *See* D.E. 606 at 18 ¶ A10.

Defendants also argue that the Report does not support a finding that they have failed to comply with Remedial Order 2 because the Report incorrectly "treats the guidelines as caps, which is contrary to the agreement reached by the parties and approved by the Court in December 2019." *See* D.E. 911 at 20; *see also id.* at 19 ("[T]hese figures [for graduated caseloads established by DFPS] represent guidelines, not caps, and some deviations were anticipated."). It is troubling that Defendants would consider a rate of 31%—or, indeed, 59.2%—of new caseworkers with non-complying caseloads to be only "some deviation[]" from the "guidelines" that would not merit concern or correction. The agreed order requires Defendants to "establish as guidelines for the determination of generally applicable internal caseload and investigation standards" a range of 14

to 17 children for which caseworkers are responsible.  D.E. 772 at 1–2.  Under Defendants'

interpretation, they would be free to follow, in policy and in practice, whatever graduated caseloads

they please, without any ramification for exceeding the graduated caseload standard required by

this Court in Remedial Order 2.

      At trial, then-DFPS Commissioner Specia testified that he was "starting a time study of the

entire agency" for the first time in nearly a decade, *see* D.E. 300 at 23:23–24:8, but then-Assistant

Commissioner Lisa Black would not commit to caseload standards for CVS caseworkers following

the time study, *see id.* at 30:9–31:5.  After five years, numerous Remedial Orders, and multiple

appeals, it is apparently still the State's position that they are not committed to comply with even

their own standards for caseworker caseloads.  Defendants' failure to implement graduated

caseloads and follow those caseload standards is not consistent with the Court's orders, to the

continued detriment of the PMC children.  Moreover, Defendants have not demonstrated that they

are unable to comply with this standard.  *See LeGrand*, 43 F.3d at 170 (inability to comply is a

defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same).

      Finally, as is their position regarding numerous other Remedial Orders, Defendants argue

that their efforts to comply with Remedial Order 2, including efforts that post-date the data

analyzed by the Monitors, constitute "reasonable diligence in bringing newly hired caseworkers'

caseloads within the standards set out in Remedial Order 2."  D.E. 911 at 21.  For example,

Defendants allege that while DFPS was implementing the new graduated caseload guidelines,

"staff indicated in interviews with the Monitors that when they were first eligible for primary case

assignment, they generally received limited caseloads."  *Id.* at 20.  During the Show Cause

Hearing, Taccetta testified that, for July 2020, the State's compliance rates with the new graduated

caseload policy were 75% for caseworkers in their first month and 95% for caseworkers in their

second month.  *See* D.E. 990 at 151:12–152:3, 161:21–162:2.  However, this information is unverified because the State did not provide it to the Monitors until after the Show Cause Hearing. *See id.* at 162:4–12 (Taccetta testifying that the information "comes in this month's report" to the Monitors).  The Court affords less weight to this unverified information than to the data that the Monitors verified and published in their Report.  The Court finds that Defendants have failed to rebut the three-part showing of civil contempt that the Monitors' Report establishes.

Based on the "clear and convincing evidence" before the Court, *see Salazar*, 713 F.3d at 792, the Court finds that Defendants have failed to comply with Remedial Order 2 and have failed to rebut that conclusion or justify their failure.  Defendants also have not argued that they were unable to comply with Remedial Order 2.  *See LeGrand*, 43 F.3d at 170 (inability to comply is a defense to civil contempt); *Petroleos Mexicanos*, 826 F.2d at 401 (same).  DFPS knew for "decades" before this case began that caseworkers were overburdened with high caseloads; that high caseloads led to high rates of caseworker turnover, particularly for new caseworkers; and that both issues presented a known risk of harm to children.  The interrelated problems of high caseloads, high turnover, and risk of harm to children were put into sharp relief during the trial nearly six years ago.  The Fifth Circuit affirmed this Court's Remedial Order 2 to address these interrelated problems two years ago, and the order went into effect more than one year ago.  Yet, DFPS has failed to implement the graduated caseloads ordered by this Court to remedy these problems and thereby has failed to reform its system to "ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm."  *See* D.E. 606 at 2.  The Court holds Defendants in contempt of Remedial Order 2.

## V.    CONCLUSION

For the foregoing reasons, the Court finds Defendants to be in contempt of **Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37,** and **B5**.  The Court does not find Defendants to be in contempt of **Remedial Orders 24, 28,** or **30**.

Defendants are ORDERED to file with the Court a sworn certification of their compliance with **Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37,** and **B5** within thirty (30) days of the date of this Order.  This sworn certification does not need to be verified by the Monitors prior to filing.  Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with these Remedial Orders, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type.  Defendants are further ORDERED to appear at a compliance hearing before this Court, beginning at 9:00 a.m. on Wednesday, May 5, 2021 and continuing thereafter until the compliance hearing concludes.  The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401.  All of Defendants' supporting evidence of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 is subject to verification by the Monitors prior to the May compliance hearing.  No sanctions will issue at this time, but, failing the Monitors' verification of compliance, any sanctions as to Defendants' performance of Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, or B5 will be revisited at the compliance hearing.  To avoid additional future sanctions as to these findings of contempt, Defendants must comply with each of these Remedial Orders in the timeframe described.  No retroactive sanctions will be imposed at the time of the compliance hearing.

In evaluating Defendants' compliance with Remedial Order 3, the Court instructs the Monitors to continue "to review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class," and determine whether Defendants are "taking into account at all times the child's safety needs."

Furthermore, consistent with Remedial Order 37, the Court instructs the Monitors to assess Defendants' evidence and determine whether notification of reports "which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral," and whether "[u]pon receipt" of the information that an abuse or neglect allegation was made but not referred for investigation, the child's caseworker has "review[ed] the referral history of the home[,] . . . assess[ed] if there are any concerns for the child's safety or well-being, and document[ed] the same in the child's record." In order to implement the remedy to ensure that PMC children are free of unreasonable risk of serious harm, compliance with Remedial Order 37 requires more than timely notification of an allegation.

In addition, consistent with Remedial Order B5, the Court instructs the Monitors to assess Defendants' evidence and determine whether Defendants are "promptly communicat[ing] allegations of abuse to the child's primary caseworker." In order to implement the remedy to ensure that PMC children are free from an unreasonable risk of serious harm, compliance with Remedial Order B5 requires more than prompt communication to the caseworker of the existence of an allegation. It requires that caseworkers receive prompt communication of "allegations of abuse." Therefore, the Court instructs the Monitors that in their assessment of Defendants' compliance with this Remedial Order, they must assess whether Defendants "promptly communicate[]" the substance of the "allegations of abuse" to "the child's primary caseworker."

Furthermore, Remedial Order B5 requires that Defendants "maintain[] a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children." The Monitors are therefore instructed to continue to assess not just whether Defendants are maintaining a system for receiving, screening, and assigning for investigation allegations of child maltreatment, but also that it "tak[es] into account at all times the safety needs of children."

Defendants are further ORDERED to file a sworn certification of their compliance with **Remedial Order 22** within fifteen (15) days of the date of this Order. This sworn certification does not need to be verified by the Monitors prior to filing. Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with Remedial Order 22, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. The Court instructs the Monitors to continue to assess whether Defendants document both that the HHSC-RCCL inspector or investigator did consider, and how they considered "during the placement inspection" all information in the five-year retrospective reports consistent with this Court's instructions, including "all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements." Remedial Order 22 requires more than completion of the five-year retrospective review; it requires affirmative consideration of the reviewed information during the inspection in a manner that protects PMC children from an unreasonable risk of serious harm.

If Defendants fail to certify compliance with Remedial Order 22 within fifteen (15) days of the date of this Order, Defendants shall pay a fine of $75,000.00 per day beginning the sixteenth day following the date of this Order until such time that they certify compliance with this Remedial

Order, at which time the fines will be stayed. As stated above, while Defendants must submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with Remedial Order 22, this sworn certification does not need to be verified by the Monitors prior to filing in order to stay the fines. Defendants are further ORDERED to appear at the compliance hearing beginning on May 5, 2021 with respect to this Remedial Order. The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401. All of Defendants' supporting evidence of their compliance with Remedial Order 22 is subject to verification by the Monitors prior to the May compliance hearing. To avoid additional future sanctions as to this finding of contempt, Defendants must comply with this Remedial Order in the timeframe described. No retroactive sanctions will be imposed at the time of the compliance hearing.

Defendants are ordered to pay any and all fines levied in accordance with this Order into the Registry of the Court at:

> Clerk, U.S. District Court
> Attn: Finance
> 1133 N. Shoreline Blvd., Ste. 208
> Corpus Christi, TX 78401

The Court hereby directs the Clerk of the Court to segregate and preserve all funds paid in accordance with this Order for the benefit and use of PMC foster care children, to be determined by future order of the Court.

SIGNED and ORDERED this 18th day of December, 2020.

Janis Graham Jack
Senior United States District Judge

# VI.    GLOSSARY

**CCI** – Child Care Investigations.  A division of CPI within DFPS that investigates abuse, neglect, and exploitation allegations regarding children in licensed care.  CCI contains RCCI, which investigates allegations of abuse, neglect, and exploitation regarding children in licensed residential foster care (*see also* **RCCI**).

**CCL** – Child Care Licensing.  A division of HHSC (previously a division of DFPS within HHSC) responsible for establishing minimum standards for foster care operations and licensing such operations.

**CLASS** – Child Care Licensing Automation Support System.  The electronic case file system used by HHSC-RCCL.

**CPA** – Child Placement Agency.  A private agency contracted by DFPS to place foster children in homes.

**CPI** – Child Protective Investigations.  A division of DFPS that investigates abuse, neglect, and exploitation allegations regarding children.  CPI contains CCI, which investigates allegations of abuse, neglect, and exploitation regarding children in licensed care (*see also* **CCI**).

**CPS** – Child Protective Services.  A division of DFPS responsible for providing services to children and families, and for placing children in foster care.

**CVS** – Conservatorship (i.e., foster care).

**DFPS** – Department of Family and Protective Services.  A Defendant, and the Texas State agency responsible for protecting the State's children, elderly, and disabled.

**GRO** – General Residential Operation.  A child-care facility that provides care for more than 12 children for 24 hours a day.  GROs include RTCs, halfway houses, emergency shelters, and therapeutic camps, and may be a single building or a campus with multiple cottages.

**HHSC** – Health and Human Services Commission.  A Defendant and the Texas State agency responsible for overseeing licensing and minimum standards for foster care operations.

**HHSC-RCCL** (*see also* **RCCL**) – Residential Child Care Licensing within HHSC.  A division of CCL that regulates, licenses, and investigates residential foster care operations.  This division is currently in HHSC and separate from DFPS, but at the time of trial, RCCL was a division of DFPS, which fell within HHSC.

**IMPACT** – Information Management for the Protection of Adults and Children in Texas.  An automated system, included in case files, in which DFPS staff record casework related activities.

**LFC** – Licensed Foster Care.  Refers to foster care operations that receive licensing and oversight from RCCL.  LFCs include independent foster family homes, independent foster group homes, GROs, RTC, maternity homes, child-placing agencies, CPA foster family homes, and CPA foster group homes.

**PMC** – Permanent Managing Conservatorship.  A type of legal custody granted by the courts to DFPS.  The legal status for children typically progresses to PMC from TMC, 12–18 months after the child enters foster care.

**PMU** – Performance Management Unit.  At trial, a unit within CCL that performs internal quality control.

**PN** – Priority None.  A "downgraded" investigation prioritization in which an allegation of abuse, neglect, or exploitation is determined to involve either (a) a minimum standard violation but not the abuse, neglect, or exploitation of a child; or (b) a past risk to a child without current abuse, neglect, or exploitation.

**RCCI** – Residential Child Care Investigations.  A division of CCI that investigates abuse, neglect, and exploitation allegations regarding children in licensed residential foster care (*see also* **CCI**, **CPI**).

**RCCL** – Residential Child Care Licensing.  A division of CCL that regulates, licenses, and investigates residential foster care operations.

**R/O** – Ruled Out.  An investigation disposition, meaning that a preponderance of evidence indicates that abuse, neglect, or exploitation did not occur.

**RTB** – Reason to Believe.  An investigation disposition, meaning that a preponderance of evidence indicates that abuse, neglect, or exploitation occurred.

**RTC** – Residential Treatment Center.  A type of GRO for children with more serious physical and mental health needs.

**SWI** – Statewide Intake.  A division of DFPS that is responsible for receiving reports of abuse, neglect, and exploitation and referring those reports to the appropriate program for investigation.

**TA** – Technical Assistance.  Assistance given to permit holders, applicants, and operation employees in order to help them comply with the applicable law and the minimum standards.

**TMC** – Temporary Managing Conservatorship, a type of legal custody granted by the courts to DFPS.  A child may remain in the State's TMC for 12 months, although a court can order a 6-month extension.

**UTD** – Unable to Determine.  An investigation disposition, meaning that a determination could not be made because of an inability to gather enough facts.  The investigator concludes that there is not a preponderance of evidence that abuse or neglect occurred; but it is not reasonable to conclude that abuse or neglect did not occur.

# ATTACHMENT 1

Former Organizational Chart of DFPS, as
a Department of HHSC
(as of trial)



*Source*: D.E. 368 at 257–58 (Attach. 1) (citing PX 811).

# ATTACHMENT 2

Updated Organizational Chart of DFPS,
as a Separate Department from HHSC
(as of June 1, 2018)



*Source:* Dep't Family & Protective Servs., Organizational Chart (revised June 1, 2018), https://web.archive.org/web/20180904131837/https:/www.dfps.state.tx.us/About_DFPS/Executives/DFPS_Org_Chart.pdf; *see also* Dep't Family & Protective Servs., 2018 Annual Report 24, https://www.dfps.state.tx.us/About_DFPS/Annual_Report/2018/DFPS_2018_Annual_Report.pdf.

# ATTACHMENT 3

Updated Organizational Chart of DFPS,
as a Separate Department from HHSC
(current; last revised Dec. 1, 2020)



*Source*: Tex. Dep't of Fam. & Protective Servs., *Executives*, https://www.dfps.state.tx.us/About_DFPS/Executives/ (last visited Dec. 15, 2020).

# ATTACHMENT 4

Updated Organizational Chart of HHSC
(as of Aug. 20, 2018)



*Source*: Health & Human Servs. Comm'n, Legislative Appropriations Request for Fiscal Years 2020-2021 (Aug. 31, 2018), https://hhs.texas.gov/sites/default/files/documents/about-hhs/budget-planning/lar/hhsc-legislative-appropriations-request-2020-2021.pdf (last visited Dec. 15, 2020).

# ATTACHMENT 5

Updated Organizational Chart of HHSC
(current; last revised Nov. 10, 2020)



*Source*: Health & Human Servs. Comm'n, Organizational Chart (Nov. 10, 2020), https://hhs.texas.gov/sites/default/files/documents/about-hhs/leadership/hhs-org-chart.pdf (last visited Dec. 15, 2020).

# ATTACHMENT 6

Picture from Hector Garza



*Source*: D.E. 875 at 3.

"Two . . . youth who were awake and on mattresses in the hallway said the reason they were in the hallway was that their room (302) was 'shut down' because it had holes in the walls. Staff said the reason they were in the hallway was because they were on close supervision. [The monitoring team] found the door to room 302, which was locked. [The monitoring team] asked Hector Garza staff to open the door. When the door was unlocked, [the monitoring team] observed three bed frames in the room. One metal bed frame had been significantly bent so it sagged in the middle, along with multiple large holes in the walls. Staff explained the room was vacant and the door would be locked until repairs could be made." D.E. 875 at 3–4.

# ATTACHMENT 7

Picture from Hector Garza



*Source*: D.E. 875 at 3.

"Two . . . youth who were awake and on mattresses in the hallway said the reason they were in the hallway was that their room (302) was 'shut down' because it had holes in the walls.  Staff said the reason they were in the hallway was because they were on close supervision.  [The monitoring team] found the door to room 302, which was locked.  [The monitoring team] asked Hector Garza staff to open the door.  When the door was unlocked, [the monitoring team] observed three bed frames in the room . . . . , along with multiple large holes in the walls.  Staff explained the room was vacant and the door would be locked until repairs could be made."  D.E. 875 at 3–4.

# ATTACHMENT 8

## Picture from Prairie Harbor



*Source*: D.E. 878 at 3.

"Children store personal items in either a wooden or plastic box that can fit under a bed, or they use an open 'cubby': open shelving fastened to a wall of the bedroom.  Seemingly due to limited storage space, items also lined the floor along the baseboards in many rooms."  D.E. 878 at 2.

# ATTACHMENT 9

## Picture from Prairie Harbor



*Source*: D.E. 878 at 5.

"Teachers were not present in two of the classrooms during three of the days the monitoring team visited, and Brazos ISD did not provide substitutes.  Students were not engaged in education.  Instead, they played cards and computer games, talked with their fellow students, or slept on the floor under their desks."  D.E. 878 at 5.

# ATTACHMENT 10

Picture from Prairie Harbor



*Source*: D.E. 878 at 5.

"Teachers were not present in two of the classrooms during three of the days the monitoring team visited, and Brazos ISD did not provide substitutes.  Students were not engaged in education. Instead, they played cards and computer games, talked with their fellow students, or slept on the floor under their desks."  D.E. 878 at 5.

# ATTACHMENT 11

## Picture from Prairie Harbor



*Source*: D.E. 878 at 3.

"[A] wooden box encompassed the porcelain toilet in one of the bathrooms. . . .  The facility enclosed or were in the process of enclosing porcelain toilets with unsealed wooden boxes, creating a health risk because the wood cannot be sanitized.  Staff informed the monitoring team that the boxes are intended to prevent youth from breaking the commodes to use the pieces to self-harm. The staff stated the facility could not use stainless-steel commodes because the pipes are not compatible."  D.E. 878 at 2, 6.

# ATTACHMENT 12

## Picture from Prairie Harbor



*Source*: D.E. 869 at 131; D.E. 878 at 4.

"The only copies of the notice on how to report Abuse or Neglect . . . were printed on an 8.5" x 11" piece of paper and posted above the door exiting the building and in the kitchen where youth do not frequent." D.E. 878 at 4.