IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity | § | Civil Action No. 2:11-CV-00084 |
| as Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

**The Court Monitors' Update to the Court Regarding Conditions
at Devereux – League City Residential Treatment Center**

On October 3, 2020, the Monitors became aware of media reports of a riot in the Devereux Advanced Behavioral Health - League City (Devereux – League City) residential treatment center located in Galveston County, Texas.  The media reports indicated that a number of children were arrested as a result of the riot.[1]  These articles also noted that the League City police department had received a high number of calls for service to the facility since January 2019.[2]

That day, the Monitors sent an e-mail to the Texas Department of Family and Protective Services (DFPS) and the Texas Health and Human Services Commission – Residential Child Care Regulation (RCCR) division asking for information related to the riot, including whether any of the children arrested were children in the State's permanent managing conservatorship (PMC) and, if so, whether they were being held in juvenile detention or jail.

On October 4, 2020, DFPS responded with preliminary information but noted that the situation was "evolving" and that the agency would need to update the Monitors as more was learned.[3]  According to the agency's e-mail, a 13-year-old PMC child (B.B.), was arrested and being held at the local juvenile detention facility.[4]  In addition to sharing information related to the October 2, 2020 riot, DFPS noted that the agency's Residential Child Care Investigations unit (RCCI) was

---

[1] *See* Steve Campion, *Teens riot inside League City treatment center*, abc13.com, Oct. 3, 2020; Chloe Alexander, *Nine arrested during riot at League City behavior facility*, khou.com, Oct. 3, 2020; Anna Bauman, *8 kids, 1 young adult arrested at riot at League City behavioral health facility*, Houston Chronicle, Oct. 3, 2020; James Lacombe, *9 arrested after riot at behavioral health facility*, The Daily News, Oct. 3, 2020;

[2] *Id.* (all noting that the League City police had received 459 calls for service from the facility since January 2019).

[3] E-mail from Audrey Carmical, Assoc. Comm'r for Compliance, Coordination & Strategy, DFPS to Deborah Fowler and Kevin Ryan, Court Monitors, October 4, 2020 (on file with Monitors).

[4] *Id.*

conducting an abuse and neglect investigation regarding a September 18, 2020 riot at the same campus.[5]

In their October 3, 2020 e-mail to DFPS and RCCR requesting information related to the riot, the Monitors asked how many PMC children were placed at Devereux – League City.  DFPS indicated that there were 25 children in the conservatorship of the State (both PMC and TMC) who were living at the facility at the time of the riot, 24 of whom had been placed by Single Source Continuum Contractors (SSCCs).[6]

---

[5] *Id.*  The intake to the abuse and neglect hotline (SWI) for the investigation into the September 18, 2020 riot occurred on September 22, 2020; CLASS notes indicate that the incident was originally reported to SWI on September 18, 2020 "but there was limited information to progress it to an investigation.  Child Care Regulation has since learned that there was a riot that occurred at the facility on 09/18 and this was the reason behind the reports received concerning the children."  Three reports to SWI made by Devereux – League City (one made on September 18, 2020, and two made on September 19, 2020) separately reported that three children were arrested for assaults on staff or "aggression and threats" but did not report a riot.  These three children (including B.B., whose experience at Devereux is discussed in detail, *infra*) were also among the children arrested in connection with the October 2, 2020 riot.  One of the September 18, 2020 assaults involved a child stabbing another child with a pencil.  CLASS investigation notes indicate that the riot started after a child who had been arrested in connection with one of the assaults earlier in the day returned to the facility.  Several boys allegedly "jumped" the youth who returned, reportedly because they were upset that the returning youth broke a window.  Notes in CLASS indicate the fight progressed to a riot resulting in property damage to the unit that included broken lights and lightbulbs.  The children reportedly used the broken glass to threaten staff who attempted to intervene.  The police were called and arrested the three youth who continued to act out after the police arrived.

[6] SSCCs contract with DFPS to provide services to foster children in DFPS regions that have transitioned to the Community Based Care (CBC) model.  CBC was formerly known as Foster Care Redesign.  There are currently four regions that have transitioned to the CBC model, or are in the process of doing so:  Region 1 (Texas Panhandle); Region 2 (30 counties in North Texas); Region 3b (seven counties around Fort Worth); and Region 8a (San Antonio and Bexar County).

There are two stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services.  The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families."  DFPS, *Community-Based Care*, *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services.  Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.*

DFPS has contracts with the following providers for CBC:

- Region 3b – Our Community. Our Kids. (OCOK) (Stage II)
- Region 2 – 2Ingage (Stage II)
- Region 8a – Family Tapestry (Stage I)
- Region 1 – Saint Francis (Stage I)

*Id.*

According to DFPS, the guiding principles for CBC include:

- Keeping children and youth safe from abuse and neglect;
- Placing children and youth in their home communities;
- Placing children and youth in the least restrictive setting that meets their needs;
- Minimizing moves that disrupt children's or youth's personal connections and educational progress;
- Placing children and youth with siblings;

The Monitors responded by asking which SSCCs had children placed at Devereux – League City, and how many children were placed by each SSCC. DFPS responded:

> As of the date of the Serious Incident Report, the number of DFPS children placed there were as follows:
>
> - 1 youth is placed by DFPS via a Child Specific Contract
> - 4 youth are placed via St. Francis – CBC contract
> - 4 youth are placed via 2Ingage – CBC contract
> - 16 youth are placed via Family Tapestry – CBC contract[7]

DFPS later indicated that of these children, 15 were approved by DFPS for Exceptional Care, which the agency described as similar to a child-specific contract.[8]

---

- Respecting the culture of each child and youth;
- Providing children and youth with opportunities, experiences, and activities similar to those enjoyed by their peers who are not in foster care;
- Preparing youth for successful adulthood;
- Providing children and youth opportunities to participate in decisions that affect their lives;
- Reunifying children and youth with their biological parents when possible; and
- Placing children and youth with relative or kinship caregivers if reunification is not possible.

DFPS, *Implementation Plan for the Texas Community-Based Care System* 4-5 (December 2019).

In keeping with these guiding principles, DFPS indicates implementation of CBC is expected to:

- Increase the number of children and youth placed with their siblings and in their home communities;
- Increase the number of children and youth who remain in their school of origin;
- Decrease the average time children and youth spend in foster care before achieving positive permanency;
- Decrease the number of moves children and youth experience while in foster care;
- Decrease the duration and intensity of services that children and youth need while in foster care due to improved well-being and behavioral functioning; and
- Create robust and sustainable service continuums in communities throughout Texas.

*Id.*

[7] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, October 6, 2020 (on file with Monitors). Despite DFPS' guiding principles and expected outcomes associated with CBC, which place a high priority on SSCCs placing children within their home communities, none of the SSCCs that placed children at Devereux – League City operate in regions that include League City, Texas. In fact, St. Francis and 2Ingage, both of which are responsible for children in north Texas regions, are placing children hundreds of miles away from their home counties. For example, B.B., the PMC child who was arrested and placed in juvenile detention after the riot, was placed in Devereux – League City by St. Francis. B.B.'s home county is in the northern section of the state's panhandle. According to Google Maps, B.B.'s home county is approximately 646 miles from League City, Texas. B.B.'s home county is significantly closer to Oklahoma City and Albuquerque, New Mexico than it is to League City. The children placed by Family Tapestry are closest to their home counties, but still more than 200 miles away.

[8] The Exceptional Care rate paid by DFPS to the SSCCs is significantly higher than the blended rate typically paid for placements. According to DFPS, while the daily blended rate paid by DFPS to the SSCCs for placements range from $83 to $88 depending on the region, the statewide Exceptional Care rate is $458.92. E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, October 12, 2020 (on file with Monitors). According to DFPS, it authorizes Exceptional Care when: there is a Court Order that dictates a child specific placement or payment that exceeds the blended rate; the child has extraordinary service needs that far exceed the traditional residential child care settings; or,

I.       **October 2, 2020 Riot and Resulting Investigations**

On October 10, 2020, the Monitors sent an e-mail to DFPS and HHSC asking whether the agencies had video of the October 2, 2020 riot at the facility.  On October 16, 2020, the Monitors received video of the riot from HHSC and DFPS.  The Monitors reviewed the video, and the intakes in CLASS related to and describing the riot.

      A.   October 2, 2020 Riot

The Monitors' review of video and CLASS investigation notes related to the incident show that the events leading to the riot started just before 10:00 p.m. on October 2, 2020, when a child who had pulled the fire alarm in her dorm, or "unit," was moved to another unit (Unit 5), where she also pulled the fire alarm.  The alarm woke the children in Unit 5, and they began to exit their rooms.  Staff reported the alarm "triggered" some of the children, who refused to return to their rooms and began acting out.  Staff reported they restrained children to keep them from fighting other children and staff, or engaging in disruptive behavior.

When law enforcement arrived, the officers asked staff to exit the unit, leaving the children on the unit alone.  After the staff left, children can be seen on the video walking around the unit.  Approximately five minutes after the staff left, some of the children in the unit began to break or destroy property, and threw paper out of the office behind the staff desk.  A copy machine was pulled out of the office and broken, and eventually placed in front of the main doors as a barricade.  Items were added to the barricade on top of the copier.  A fire extinguisher was sprayed in the area around the staff desk.  A child can be seen making a telephone call from the phone at the staff desk.  All of the property damage took place after staff left the unit, leaving the children without any adult supervision.

Children who were not engaging in the riot were removed from the unit by Devereux – League City staff through exit doors at the rear of the unit hallways.  The 11 children who were involved in the incident were in the unit by themselves for more than an hour, while law enforcement waited for backup.  The video shows the last staff leaving the unit at approximately 10:12, and law enforcement opening the main doors to the unit at approximately 11:34.  The local police department indicated that because their officers had been assaulted by youth at Devereux – League City in the past, they called for backup assistance from the local SWAT team, waiting until backup arrived to enter the unit.

After the officers opened the door and pushed away the items erected as a barricade, a child immediately walked into the common area and surrendered himself to the police.  After this child left the unit, several officers in tactical gear began to enter with guns drawn.  Another child then surrendered and left the unit.

_____

the SSCC has performed an exhaustive search and placement cannot be located without the use of a child-specific contract whose rate exceeds the contemplated rate structure of the blended rate.  *Id.*

The remaining children were hiding in bedrooms on the south side of the unit (the boys' hallway). Eventually, approximately 20 officers flooded into the area next to the staff desk,[9] pointing flashlights and guns toward the unit's south hallway. They began moving through the unit to look for the remaining children. At approximately 11:41, a group of approximately eight officers entered the unit from the south hallway's exit door (guns drawn) and began opening the doors to the children's bedrooms. They pulled two children out of a bedroom and arrested them. Shortly after that, a third child was seen on the screen and arrested.

     B. <u>Investigations of Allegations Related to the Riot</u>

The events surrounding the October 2020 riot resulted in ten separate reports to statewide intake (SWI), the state's abuse and neglect hotline. The first report was made the morning of October 3, 2020 by an RCCR staff person, who reported that police arrested "nearly a dozen residents," that there was an estimated $40,000 in property damage, and that employees were hurt and had bruises.[10] The investigation of this report was merged with an investigation of a report made by Devereux – League City staff twenty-seven minutes later. The Devereux – League City staff person reported five youth were arrested and detained, one of whom – because she was 17 years old – was detained at the Galveston County jail.[11] The other four detained youth were held in Galveston County's juvenile detention center. Four more youth were arrested, but were released back to Devereux – League City.[12] The next day, a DFPS staff person reported to SWI that a child who was interviewed during an on-site visit reported that a Devereux – League City caregiver bragged and laughed about restraining children during the riot. This intake was also merged with the investigation of the first two reports made to SWI.

Additional reports included a call to SWI reporting that three children ran away the night of the riot, two calls reporting that the same child reported having been injured by a staff person during a restraint (these were merged into a single investigation, and the allegations were ruled out after an investigation), and three calls reporting three additional children reported being abused by staff or injured during restraints that took place during the riot. These three calls were also merged into a single investigation.

Finally, a call was made to SWI reporting that a child was able to self-harm after picking up a piece of glass during the riot, and that several youths, one as young as thirteen, had sexual contact during the riot. This intake was merged with a report later made related to medical care involving two of the female youth who were reported to have had sexual contact with male peers during the riot.

---

[9] It is difficult to tell from the video how many officers responded and entered the unit. Law enforcement officers appeared to include officers from different agencies, wearing different uniforms – likely because multiple agencies make up the local SWAT team. In CLASS notes in one of the investigations of the events surrounding the riot, the inspector/investigator indicates that "approximately 20 to 30" officers entered the building.

[10] The source of the reporter's information is unknown, but seems to repeat information found in media reports, which inaccurately reported the number of children arrested. This is supported by a note in CLASS which refers to the news report related to property damage.

[11] In Texas, 17-year-olds are considered adults for purposes of criminal prosecution.

[12] The report to SWI by Devereux – League City did not include any information about the riot, it simply reported the arrests.

To date, the DFPS and HHSC investigations have resulted only in a citation issued for a minimum standards violation unrelated to the riot itself.[13]  According to notes in CLASS, RCCR did not issue a citation in its investigation of minimum standards violations related to appropriate supervision during the riot because video footage showed that the staff appeared to have regained control in the unit, with most of the property damage occurring after the staff were asked by law enforcement to leave the unit.  RCCR found, "After analyzing the report it is indicated staff took necessary precautions in order to monitor the children until instructed off the unit by law enforcement."

## II.     Interview with League City Chief of Police & Analysis of Calls for Service Data

After reading the media articles that referred to the very high number of calls for service received by the local police department from Devereux – League City, the Monitors contacted the Chief of the League City Police Department (LCPD).   During an interview with Monitor Deborah Fowler, the Chief spoke very candidly regarding his concerns related to the facility, noting that he felt that it was a "safety hazard to his officers and to every child in the facility."  He noted that he had attempted to reduce the number of calls for service from Devereux – League City by meeting with the facility administrators and having an officer go by the facility on a weekly basis, but these efforts did not result in any improvement.

According to the Chief, the facility made an average of 2.3 calls per week.  He indicated that over the last three years (156 weeks), an LCPD officer was there every week.  The Monitors sent an open records request to LCPD on October 23, 2020, requesting calls for service data for January 2019 through the request date.  The LCPD responded with data on November 24, 2020, which is analyzed by the Monitors below.

Between January 1, 2019 and October 30, 2020, there were 359 calls for service made from Devereux – League City to the LCPD.  When the Monitors later asked LCPD how many of these calls they had to respond to in-person, they clarified that "every single call" required an in-person response.  There were slightly fewer calls in January through October of 2020 than there were in the same time period in 2019.

---

[13] A deficiency related to bedding was cited when, during a walk-through of the facility by RCCR staff on October 4, 2020, the RCCR staff noticed children sleeping on the floor with no mattresses.

**Chart 1: Calls for Service to LCPD from Devereux – League City,
January – October, by Year**



The most common reasons for a call for service from Devereux – League City to LCPD were to report runaways, for which there were 95 calls for service, and to report assaults, for which there were 74 calls for service.  There were also 33 calls related to a disturbance, and 26 calls related to a sexual assault.[14]

---

[14] "Assist" includes both citizen and law enforcement assists. "Other" includes abuse, civil problem, criminal mischief, fraud, hang up, prisoner process, suspicious circumstance, theft, and warrant.

**Chart 2: Police Calls by Nature of Call,
January 2019 – October 2020**



The Monitors asked LCPD for data related to arrests made of clients or staff at the facility between January 1, 2015 and November 31, 2020.  LCPD produced data showing that over that period, 99 youth aged 18 or younger had been arrested at the facility.  The youngest child arrested was a 12-year-old, for having allegedly made a false call to 911, and for allegedly pulling a fire alarm. Four 13-year-olds were arrested (two for charges associated with the October 2, 2020 riot), and eight 14-year-olds were arrested during that time period.  The highest number of arrests were of children aged 15 and 16 years old.

**Chart 3: Arrests by Age Range, January 1, 2015 – November 31, 2020**



Arrests of children at Devereux – League City have increased since 2015.[15]

**Chart 4:  Child Arrests, January 1, 2015 – November 31, 2020**



---

[15] As indicated by the chart title, 2020 arrests are current only through November 31, 2020.

Assault was the most commonly charged alleged offense for the children arrested at Devereux – League City.

**Chart 5:  Child Arrests by Offense, January 1, 2015 – November 31, 2020**



In addition to the children arrested, at least four staff have been arrested for sexual abuse and physical abuse of children at the facility.[16]   The circumstances surrounding these arrests are described below in the discussion of substantiated findings of abuse or neglect.

---

[16] The LCPD arrest data does not distinguish between Devereux – League City clients and staff.  However, the data included the age of the person arrested, and did not include any arrests for persons over the age of 18, leading the Monitors to conclude that the data reflect arrests of children living on the campus.  If staff were arrested, they were likely arrested off-campus.  This was true for the staff arrested for crimes described in the section of this report detailing substantiated findings of abuse or neglect.

### III.     Minimum Standards Violations, Enforcement Action Taken by RCCR & Substantiated Reports of Abuse or Neglect

The Monitors also reviewed data for Devereux – League City related to minimum standards violations, licensing enforcement action taken by RCCR, and reports of abuse or neglect substantiated by RCCI.

### A.   Deficiencies Cited by RCCR

The Monitors' analysis of RCCR data shows that between January 1, 2015 and August 31, 2020,[17] Devereux – League City was cited by RCCR 86 times for a violation of minimum standards. A majority of the citations (67 citations, or 78%) were issued for violations of standards weighted high or medium-high by RCCR.

**Chart 6: Total Deficiencies (86) by Type of Standard Violated,**
**January 1, 2015 – August 31, 2020**



Examples of RCCR investigations inspections resulting in one or more deficiencies cited include:[18]

- An investigation resulting in a deficiency cited for a violation of minimum standards related to emergency behavior interventions, when a staff "did not walk away from an incident or call for back up assistance" and "an incident that could have been de-escalated was elevated." The child was injured during a scuffle with this staff person that occurred

---

[17] The Monitors receive data related to deficiencies on a monthly basis from RCCR, and the data must be validated by the monitoring team and then matched to the appropriate weight for each standard. When the Monitors conducted this analysis in December 2020, that process had been completed for data through the end of August.

[18] These examples were pulled from a CLASS Compliance History Report capturing minimum standard compliance history for Devereux – League City for the dates of October 23, 2018 to January 19, 2021. None of these examples included substantiated findings of abuse or neglect; the deficiencies cited were the only enforcement action taken.

when the staff person went into a child's bedroom to discipline him for slamming his bedroom door after the staff person had asked the child not to slam his door.[19]

- Investigations resulting in deficiencies cited for violations of minimum standards related to caregiver responsibility:

  - A citation issued when review of video footage during an abuse and neglect investigation (which did not result in a substantiated finding of physical abuse or neglectful supervision) showed "staff did not intervene to stop children from playing the asphyxiation game."[20]  One of the staff members acknowledged he did not intervene when children were playing the game, because he felt that the children were "just being boys."  He also indicated that he did not feel there was much staff could do to intervene because if they "grab the child they have to do the paperwork."
  - A citation issued when a child put another child in a chokehold, then dropped the child out of the chokehold when he passed out.  The child who passed out had a broken nose as a result of being dropped.  A serious incident report notes that the child who passed out "started tapping [the child who put him in the chokehold] to let him go and he didn't, then the next thing he remembered was waking up and his nose was bleeding."  This occurred when the children were in a dayroom, and supervising staff was "splitting the wing," meaning that the staff person was responsible for supervising children in the dayroom as well as children who were in their bedrooms.   This incident also resulted in a citation for failure to appropriately obtain medical care, because the injured child was not given an x-ray or taken to the emergency room until the following day.

- Investigations resulting in deficiencies cited for violations of minimum standards related

---

[19] There are a number of incidents involving injuries to youth that occurred in their bedrooms, where there are no cameras.  Another incident reported to SWI just before this one resulted in a recommendation from RCCI to RCCR to cite the operation for a staff person's failure to follow minimum standards associated with "prudent judgment" after the staff person could be seen on video pushing a child into the child's bedroom, and following the child into the bedroom.  The report to SWI indicates that after the interaction between staff and child in the bedroom, a nursing assessment was completed and the child "was observed to have a hematoma on the left temple, a knee abrasion, and a spot on his nose."  During his interview, the child indicated that he injured himself when he tripped over his shoe and hit his head on the bathroom door.  The staff person said the child hit his head on the dresser when he grabbed him to try to restrain him, and they both fell to the floor.  RCCR did not cite the operation, despite RCCI's recommendation, because "The Investigator did not explore what [the alleged perpetrator] meant by 'pushing.'  In one way it can be interpreted that [the alleged perpetrator] was lightly nudging him into his room or had his hand on his shoulder guiding him back into his bedroom."  However, the RCCI investigator made this recommendation after having viewed the video of the event, which RCCR does not appear to have viewed.  The same alleged perpetrator is named as an alleged perpetrator in one of the investigations resulting from the riot, in which a child alleged he was injured by the staff person when he was taken to the floor by the staff person.  There have also been three prior investigations in which children alleged this staff person hit or punched them, including two that alleged the abuse occurred in the child's bedroom.

[20] Four children were playing the game just before they attacked staff and attempted to incite a riot.  A child was injured during a restraint, which was the subject of the report to SWI.  The investigator discovered the children were playing the "space monkey game" during a review of video footage.

to caregivers' failure to appropriately supervise children:[21]

- o A citation issued when two children had sexual contact in one of the children's bedrooms. Staff were seen on video going to the doorway of both children's rooms to do room checks, but they did not fully enter the bedrooms and did not discover the activity or that one of the children was not in their bedroom.
- o A citation issued after several girls "engaged in inappropriate activity" by engaging in oral sex with each other during a game of truth or dare. This case was originally referred to RCCI for an abuse and neglect investigation, but downgraded because DFPS determined the intake "[did] not rise to the level of NSUP. Children performed a consensual sexual act while playing a game and there was no indication of Child Sexual Aggression." The incident was reported to SWI by one of the children's caseworkers, who also reported that this child "had a history of 'poor sexual boundaries' and was supposed to be on special supervision because of an incident involving a male resident." The children had been caught in each other's rooms twice on the night this occurred (though when they were caught they were not engaging in inappropriate activity). The children involved were inconsistent when asked how long they were together unsupervised: one child reported they were together half an hour, another said it was three or four hours. The staff person interviewed said "they had a lot going on that night" and the kids were threatening to "turn it up (a term used to describe starting a riot)" and could not remember what time it was when they caught the children together the second time.
- o A citation issued when a female youth and a male youth had sex in the female bathroom. The male youth indicated they were in the bathroom for 30 minutes before they were caught. The female youth involved in this incident is the same victim in the case alleging inappropriate contact by a staff member, discussed below.
- o A citation issued for failure to appropriately supervise a child when the child was left alone in her room after being bullied by other children, and restrained by another staff member, and then used a blade from a pencil sharpener to engage in self harm.

---

[21] In addition to these incidents, which resulted in a citation being issued, the Monitors identified another incident that simply resulted in Devereux – League City being given "technical assistance" related to the minimum standards for a caregiver's responsibility to ensure appropriate supervision. The case was investigated by RCCI for abuse or neglect after a child made an outcry of being raped by two children who lived in the room that shared a bathroom with the alleged victim's room. The child alleged the other two children popped the locks and entered his room on two different occasions, and raped him. The other children denied the allegations, and claimed the alleged victim offered to perform oral sex. One of the children acknowledged agreeing, the other claimed he did not and that he never had sexual contact with the alleged victim. RCCI did not make a finding of neglectful supervision, but in the notification to HHSC of the findings noted "Possible Standards Violations: Technical assistance is recommended for the investigation for supervision. It was noted children pick locks into the restroom." One of the reasons that RCCI claimed the alleged victim was not credible was that he made the same allegations when placed at a Devereux facility in Florida, and one in Utah. The investigator indicated, "It was noted that [the alleged victim] had made two similar accusations of this occurring at Devereux facilities in Florida and Utah, and ended up being moved both times. There was concern noted that he may being [sic] trying to manipulate his placement." Since then, the Philadelphia Inquirer has published a series of stories which show allegations related to sexual abuse have been substantiated at Devereux campuses all over the United States. *See* Lisa Gartner & Barbara Laker, *At the nation's leading behavioral health nonprofit for youth, Devereux staff abused children in their care for years – while red flags were dismissed.* Philadelphia Inquirer, August 11, 2020; Barbara Laker & Wendy Ruderman, *An additional 13 allege they were assaulted as children by Devereux staff,* Philadelphia Inquirer, October 5, 2020.

o A citation issued for failure to appropriately supervise a child who was on one-to-one supervision due to self-harming behavior. The victim arrived at Devereux – League City from California with an open wound on his calf caused by self-harm. While at Devereux – League City, the victim was placed on one-to-one supervision after repeatedly placing objects in the open wound. Staff interviewed during the investigation indicated that the victim removed the staples that closed the wound on his second day at the facility, and had to be taken to the emergency room to have the wound treated. After that, he started putting foreign objects in the wound, including pens and a toothbrush. Even after being placed on one-to-one, the victim was able to continue this behavior, on one occasion placing the straw from the pump in a shampoo bottle in the wound, and on another, a one-to-two inch piece of plastic in the wound. Hospital records reviewed during the investigation indicated the child was treated for self-harm related to the leg wound six times between September 16, 2020 and November 3, 2020 (four of these visits resulted in surgery to remove the object). Nine incident reports completed by Devereux – League City documented instances of self-harm. During his interview, the victim indicated he was able to do this when staff who were responsible for his supervision were on their phones, or when he was in the bathroom. Collateral children also reported that staff were frequently distracted by their cell phones. Video footage reviewed during the investigation verified that a staff member responsible for his supervision was using a cell phone during one of the self-harming incidents. Though RCCI ruled out neglectful supervision, a citation was issued by HHSC.

• An investigation resulting in a deficiency cited for a violation of minimum standards related to employee responsibilities after a child reported that a staff person was engaging in sexual contact with another child. Both the staff person and child denied having a sexual relationship, and sexual abuse was ruled out. However, a citation was issued because video footage showed the staff person "entering and exiting [the] child's bedroom several times and closing the door behind him. He was also observed hugging her and brushing his fingers down her face."

• Deficiencies cited for minimum standards associated with a child's right to be free from harsh, cruel, unusual, unnecessary, demeaning, or humiliating treatment or punishment:

o A citation issued for a violation of minimum standards related to staff's use of profanity with children.[22]
o A citation issued when a staff person "moved a child by the child's ankles…out of the doorway of the main entrance to the unit" resulting in an injury to the child's back.
o A citation issued when a staff person, during an argument with a child, "made inappropriate comments to [the child] about her biological parents."

---

[22] This investigation was the result of a caseworker's report to SWI regarding concerns related to supervision at the facility, after she noticed that one of the children on her caseload had several hickeys on her neck. The child reported that another child at the facility gave her the hickeys. Staff claimed it happened during a home pass. During the investigation, children and staff reported that the children pop the locks on the bathroom doors to open them. Children also reported being able to engage in sexual activity.

- A deficiency cited for corporal punishment when a staff person hit a child on her shoulder in response to the child hitting the staff person.  The investigation also resulted in a citation for violation of the minimum standard related to staff using prudent judgment, because a different staff person tipped the child out of a wheelchair she was sitting in when she refused to get out of it. The doctor had not ordered use of a wheelchair for the child; she sat in it because she said she was dizzy.

- Deficiencies cited for inappropriate restraints:

  - Three investigations resulting in deficiencies cited for inappropriate use of supine restraints, including one involving a restraint that lasted 18 minutes.
  - One investigation resulting in a deficiency cited when "a caregiver restrained a child in care when there was not an emergency situation.  The restraint of the child was unwarranted."
  - One investigation resulting in a deficiency when "the caregiver that conducted a restraint on a child used more force than needed to restrain the child."  The child and corroborating witnesses indicated the staff person threw the child against a wall and slammed her on the ground.

B. <u>RCCR Enforcement Action</u>

Devereux – League City was recently placed on probation by HHSC – RCCR, with a planned begin date of December 28, 2020.  The probation letter listed 76 citations for minimum standards violations issued to Devereux – League City as the basis for placing the operation on probation, with all but two of those citations issued between May 15, 2015 and November 10, 2020.[23]

The terms of the probation include:

- training requirements related to appropriate methods of discipline and punishment;
- training requirements related to the appropriate use of restraints;
- development of a plan for direct care staff related to appropriate boundaries and maintaining composure;
- development of a plan for informing direct care staff of each child's past trauma and trauma triggers;
- a requirement that the child care administrator or designee meet with each child involved in a restraint no later than 24 hours after the restraint to debrief and discuss any concerns the child may have; and
- the formation of a work group to address reasons that children run away from the placement and how to prevent children from running away.

---

[23] The last two citations listed were issued August 12, 2011.  This is not a comprehensive list of all citations issued during that time period.  The list includes nine citations issued since August 31, 2020, that were not included in the Monitors' data analysis, above.

Devereux – League City is also required to correct the minimum standards that were cited as deficient.[24]

Prior to being placed on probation, the operation had entered into a voluntary plan of action (POA) three times:

- The first POA had a start date of March 7, 2011 and an end date of June 7, 2011.  The Plan Summary in CLASS notes, "The plan of action is based on the number of investigations and failure to report serious incidents."  It referred to eight investigations, which resulted in thirteen citations for minimum standards violations, as the basis for the plan of action. CLASS indicates that the plan of action was completed successfully, though the operation received 13 more citations during the period that the facility was under the plan of action.[25]

- The second POA had a start date of May 10, 2016 and an end date of August 10, 2016. The Plan Summary notes that it was also "based on the number of investigations and failure to report serious incidents."   As the basis for the plan of action, CLASS listed 16 investigations which resulted in 24 citations for minimum standards violations, 17 inspections which resulted in 23 citations, and two assessments resulting in two standards violations.   CLASS shows the second POA was also completed successfully, though the operation was cited 14 additional times during the plan of action.[26]

---

[24] Letter from Alicia Courtney, Licensing Supervisor, RCCR, to Pamela Reed, Executive Director, Devereux – Texas Treatment Network, December 18, 2020.

[25] A review of CLASS shows that the facility received two citations on April 6, 2011: one related to a failure to document appropriate information in a child's service plan, and another related to the failure to provide appropriate oversight of caregivers.  The operation was given two citations on April 12, 2011, both related to failures to include appropriate information in treatment plans.  The operation was issued two citations on April 19, 2011: one for prohibited punishment, when a caregiver punished a child by tying a rope attached to a table around the child's waist and having the child drag the table, and a second for having an incomplete background check for a staff member.  The operation was issued three citations on April 28, 2011: one for corporal punishment when "[a] child was struck with a closed fist by a staff member," another related to EBI implementation when a child's shirt came off during a restraint and the staff member failed to cover the child, and a third related to a staff member's failure to "demonstrate competency, prudent judgment, self-control" when a staff member "allowed a door to slam shut on a child's hand causing bruising and swelling by letting the door go while the child was pulling it open."  Finally, the operation received four citations on May 25, 2011: one related to employees who failed to complete annual training hours, one related to the failure to complete a service plan review within 90 days, one related to the failure to have service plans signed, and one for failing to timely inform parents of a child's service plan meeting.

[26] A review of CLASS shows that the facility received five citations on May 20, 2016: one for caregiver supervision when "[w]hile walking the grounds of the facility, children were observed roaming without proper supervision," three related to issues with the physical site or food safety, and one for failing to produce a safety plan that was put in place after an incident was reported to SWI (the notes indicate "employees nor administration could provide the safety plan and they were not aware of the safety plan").  Another citation was issued May 23, 2016 related to annual training requirements, and a citation was issued May 24, 2016 for failing to follow a minimum standard related to general operational policies.  On June 2, 2016, the facility was cited because "staff was not aware of a child's on-going activity while supervising them."  On June 23, 2016, the facility was cited for failing to meet one of the POA's conditions related to training required for medical staff.  On June 29, 2016, the operation was cited because "it was determined staff was not properly supervising a residents [sic], resulting in the resident being bruised by another resident."  The operation was cited on July 26, 2016 because a reviewed restraint report failed to include documentation of caregivers debriefing with other residents who witnessed the restraint.  Finally, on July 27, 2016, the operation was cited for being out-of-compliance with requirements related to the timeliness of a fire inspection.

- The third POA had a start date of January 28, 2020 and an end date of July 28, 2020. The Plan Summary notes, "Although the facility has not had a large quantity of deficiencies there has been a pattern of allegations within recent months, which has led to this plan of action. The plan of action will be for six months." In a comments box in CLASS, there is a note indicating that an extension for the POA was given due to the COVID-19 pandemic, with a new end date of October 16, 2020. CLASS listed 14 investigations (resulting in 18 deficiencies cited) and 8 inspections (resulting in 8 citations) as forming the basis for the plan of action. This plan of action was not completed successfully, and led to the recommendation that the operation be placed on probation.

C. Substantiated Findings of Abuse or Neglect by RCCI

In addition to being cited for minimum standards violations, eight investigations have resulted in substantiated allegations of abuse or neglect since January 1, 2015. The substantiated allegations include physical abuse, sexual abuse, and neglectful supervision:

- An investigation that opened on August 25, 2014 and closed on January 23, 2015 substantiated allegations that a child's mouth was injured, including a broken tooth and loss of a dental bridge, when a staff member head-butted the child's face during an altercation.[27]

- An investigation that opened on December 8, 2015 and closed on November 8, 2016 substantiated allegations that a staff member ran over a child with a golf cart.[28]   The child

---

[27] The victim in this case was a child who was placed in the facility by an out-of-state juvenile justice agency.

[28] The victim in this investigation was referred to Devereux – League City by Antelope Union High School District in California. A number of children placed in Devereux – League City are special education students referred by school districts outside of Texas. A Houston Press story published in April of 2003 indicates that Devereux – League City has long been a facility that public schools from outside Texas refer students to – the story details the 1996 suicide of a child referred to the facility by an Illinois school district. Margaret Downing, *A Hanging Offense*, Houston Press, April 24, 2003, *available at* https://www.houstonpress.com/news/a-hanging-offense-6556541 In addition to the safety concerns at Devereux – League City, the referral of children to Devereux – League City for educational services is noteworthy because one of the 2019 citations issued by RCCR to Devereux – League City was for failure to meet a PMC child's educational needs (this child has since aged out of care). Devereux – League City has a private school on campus, and most (if not all) of the children at the facility attend this private school. The victim in the 2019 investigation was placed at the facility for just under two years, and had been placed in the facility by OCOK. The findings of the RCCR investigation indicate that during her stay at Devereux – League City, the child (who attended the on-campus private school) "continued in course work well above her cognitive ability and did not have her education assessment adequately or timely determined in order to best meet her education needs…The psychological completed by [the child] on 9/5/19 indicated she was in 12th grade and receiving regular education. [The child's] measure of intelligence testing placed her with an age equivalence of 9-10 yrs old and an IQ of 74 (below average)…[The child's] school report card shows she was enrolled in 9th and 10th grade courses and significantly failing grades or incompletions…Had [the child's] education assessment been completed at the beginning of placement to determine her true education needs and behavior management program, she may have improved her academic achievements." This child's experience was also the subject of a complaint to the Texas Education Agency (TEA) against the local school district on behalf of the student (and as a representative of similarly situated students), alleging violations of state and federal law related to the education of students with disabilities. The TEA found against the school district, explaining that the local school district has a responsibility to locate children eligible for special education that reside within the district, and to ensure that surrogate parents are appointed to act as the education decision-maker for foster children who are eligible for special education and residing at Devereux – League City, which it had failed to do. The TEA also found that Devereux – League City failed to report children eligible for

17

was chased by the staff person when she attempted to run away from the facility. The staff person caught up with her in the parking lot of a nearby restaurant, intentionally "bumped" her with the cart, then ran over her and dragged her when she fell. The cart had to be lifted off of her by witnesses. This investigation resulted in a "reason to believe" finding for physical abuse and negligent supervision.

- An investigation that opened on February 14, 2018 and closed on July 24, 2020[29] substantiated allegations that a 16 year-old child was sexually abused by two different staff members.[30] This resulted in a "reason to believe" finding for each of the two staff members.

- An investigation that opened on August 24, 2019 and closed on November 17, 2020 substantiated allegations that four children were sexually abused by the same staff member. The victims, all girls, included a 12 year-old, a 13 year-old, and two 16 year-olds.[31]

- An investigation that opened on September 14, 2019 and closed on September 23, 2020

---

special education to the local school district, as required by state law. In addition to the TEA complaint, among the documents provided to the Monitors by DFPS related to Remedial Order 20's Heightened Monitoring analysis was a letter from OCOK dated February 20, 2020, which indicates it was sent in response to a complaint filed with the DFPS Office of Consumer Relations. The letter from OCOK states that the SSCC agreed to ensure that it would seek approval from DFPS, on an individual basis, for any children it placed at Devereux – League City to attend the private school, among other things. OCOK noted that it did not have any children placed in Devereux – League City at the time that the letter was written. During a January 15, 2021 meeting with OCOK, 2Ingage, and DFPS, OCOK told the Monitors that they stopped placing children at Devereux – League City "about a year ago" due to concerns related to the facility, including concerns regarding their educational programming. 2Ingage also indicated they were no longer placing children at Devereux – League City, and were actively looking for placements for the children in their region who remained in the facility's care.

[29] According to CLASS, the investigation was completed August 30, 2018. It is not clear why the closure date is in 2020.

[30] This child was a special education student referred to Devereux – League City by Long Beach Unified School District in California.

[31] Two of the victims in this case, A.A., whose experience at Devereux – League City is discussed, *infra*, and N.R., are PMC children. Another victim was in CPS custody, but her legal status is unclear. The fourth victim was referred to Devereux by her California school district. The RCCI findings indicate A.A. "was subjected to sexual abuse by [the staff member] when he knowingly encouraged, coerced and forcefully engaged in sexual acts with [A.A.]…when he entered her bedroom and touched her buttocks over her clothing and instructed her not to tell any other residents or staff. [The staff member] continued his inappropriate sexual contact by digitally penetrating [A.A.] both inside of her bedroom and eventually inside of the unit's seclusion room. [The staff member] would coerce [A.A.] and instruct her to go to the seclusion room so they could engage in sexually explicit conduct while using vulgar language. While in the seclusion room [the staff member] both digitally penetrated [A.A.] and touched her breast underneath her clothing. [The staff member] positioned himself in front of [A.A.'s] bedroom door and encouraged her to kiss him on multiple occasions. [The staff member] additionally while positioned at A.A.'s door twice verbally coerced and encouraged her to engage in oral sex with him by stating 'I bet you won't give me a blow job.'" The findings letter included the following related to the staff member's sexual abuse of N.R., "[N.R.] was subject to sexual abuse by [the staff member] when he knowingly encouraged and tried to coerce [N.R.] into a sexual act by shutting her bedroom door isolating her from others then telling her he wanted to engage in intercourse with her and preceding [sic] to touch her buttocks over her clothes. When [N.R.] told [the staff member] no he forced himself onto her and kissed her on the mouth. [The staff member] threatened N.R. stating there would be consequences if she disclosed what he did to her. [The staff member], on two additional occasions, forced himself onto [N.R.] and kissed her on the mouth. [The staff member] exceeded his bounds as a caregiver and tried to coerce [N.R.] into engaging in sexual conduct by bringing her gifts such as food and candy. [The staff member] would try and compel [N.R.] to engage in sexual acts with him by stating he only came to work for her."

substantiated allegations that a staff member punched a 16 year-old child while another staff member watched without intervening, resulting in "reason to believe" findings for both staff members for physical abuse, and a "reason to believe" finding for negligent supervision for the staff member who watched without intervening. The findings noted, "Both [perpetrators] have a history of violent behavior and physical abuse allegations. This presents a concerning pattern of allegations involving physical altercations with residents."

- An investigation that opened on April 7, 2020 and closed on June 2, 2020 substantiated allegations that a staff member hit and choked a 15 year-old child while attempting to initiate a restraint.[32] The incident was captured on video.

- An investigation that opened on September 14, 2020 and closed on November 23, 2020 substantiated allegations that two staff members were smoking marijuana while they were on duty, resulting in a "reason to believe" finding for negligent supervision.

- An investigation that opened on October 28, 2020 and completed on November 25, 2020[33] substantiated an allegation that a 14 year-old child was slammed to the floor and punched by a staff member.[34]  This incident was captured on video.

Three investigations resulted in an "unable to determine" (UTD) determination, which means that while abuse or neglect could not be substantiated, it also could not be ruled out:

- One investigation opened on May 9, 2019 and closed January 13, 2020, regarding an allegation that a staff person hit a child's[35] head on a wall, pushed him to the ground, and punched him in the eye. No citations were issued, though the findings of the investigation included that "the statements provided by [collateral child witness] and [collateral staff witness] evince that there were multiple standard violations that occurred."[36]  This investigation involved the same staff person against whom allegations of abuse were substantiated in the investigation closed on September 23, 2020, discussed above.

- One of the investigations into allegations that staff members hit and kicked children during the October 2, 2020 riot resulted in an administrative closure of the physical abuse allegations, because the allegations were being investigated in another case. However, during the face-to-face interview, one of the alleged victims also reported that "staff would persuade the residents with outside food and drugs" and that a staff member gave two other

---

[32] The victim in this case is a PMC child.

[33] Though CLASS shows the investigation having been transferred to HHSC, there was not a closure date in CLASS as of the date that this report was written. IMPACT shows the RCCI investigation into abuse and neglect closed on December 16, 2020. The case was transferred to HHSC and seven deficiencies were cited; administrative review has been requested for four of these deficiencies.

[34] This child was referred to Devereux – League City by the Los Angeles Unified School District.

[35] The alleged victim in this case is a PMC child.

[36] This is contradicted by the CLASS notes related to the HHSC transfer notification, however, which state "Possible Standards Violations: None." Those notes also indicated, "It should be noted that it has been alleged in a number of investigations that [the alleged perpetrator] has punched other children. Although these violations were not substantiated, the totality of the number of investigations with similar allegations does present a reason for concern."

children[37] a wax pen (similar to a vape pen) with marijuana wax in it. Children and staff who were interviewed were consistent during interviews in confirming that one of the children named by the alleged victim had a wax pen, but were inconsistent in their reports regarding who gave him the pen. While there was no evidence indicating that the staff member had used marijuana while he was supervising children, the staff person tested positive for marijuana. Therefore, the investigation of negligent supervision by that staff member resulted in a UTD finding.

- An investigation opened on October 30, 2020 and completed on February 1, 2021 resulted from a report to SWI after the parent of a 16 year-old youth who had returned to his home in California reported to Devereux – League City that the child had received "pornographic photographs" from a staff person via social media after being discharged. The RCCI investigator reviewed the Instagram messages that the child's mother sent to the Devereux – League City staff, which included a picture of what the investigator characterizes as "blurred private area" with a message saying, "I can't believe I'm doing this lol" and asking the child to "show me yours too." However, the findings indicate the investigator could not establish that this was sent from the staff person since documentation from Devereux – League City showed that the staff person's name did not match the Instagram name. It is clear from the interviews that the name the staff person used matched his Instagram name, and when he was confronted by Devereux – League City staff, he "confirmed that he made contact via social media" with the child. However, the Instagram picture was sent after the child had returned home and was no longer living at Devereux – League City, and the RCCI investigator did not find any evidence that the child had been sexually abused by the staff person while he was at the facility. None of the children or staff interviewed reported any concerns about the staff person, and he was fired by Devereux – League City after the parent reported the issue.

D. <u>Investigations of Abuse or Neglect in Psychiatric Unit</u>

During a review of CLASS intakes and investigations, and during the Monitors' visit to Devereux – League City,[38] the Monitors became aware that investigations of allegations of abuse or neglect

---

[37] This investigation does not appear to include any PMC youth. The alleged victim in this case (the child who reported that a staff member gave children wax pens) was from California and returned before the investigation was completed. One of the children who allegedly received the wax pen was referred to Devereux – League City by the Inglewood Unified School District. Prior to his interview, he ran away from Devereux – League City and returned to California by Greyhound bus. He was subsequently arrested in California and was interviewed by RCCI by phone while he was in juvenile detention. The other child who allegedly received a wax pen from the staff member was also from California, but Devereux – League City staff reported she came "directly from juvenile hall."

[38] During an on-site file review at Devereux – League City, the Monitors shared concerns with DFPS via e-mail on October 21, 2020, related to a serious incident report in one of the children's files. The incident report indicated that while she was housed in the psychiatric unit, the child (B.C.) attempted to commit suicide by tying a shoelace around her neck. Because she was placed in the psychiatric unit, the monitoring team could not determine whether the incident had been appropriately reported. Monitor Deborah Fowler e-mailed the serious incident report to DFPS along with the following note, "I've attached the serious incident report. We also noticed that just two days earlier, the doctor had ordered that all sharps, ligatures, etc be removed from her room and her environment, so they clearly knew there was a risk. It would appear that this wasn't followed closely, since she tied a ligature around her neck." The serious incident report indicated that dinner was brought to the girls' wing of the unit at approximately 5:40 p.m. the evening of the incident. B.C. had not responded to the staff members' calls for the girls to come and retrieve their dinner trays.

in the psychiatric unit on Devereux – League City's campus may not be investigated by RCCI, even when the allegation involves a child in foster care. Because psychiatric hospitals are licensed and regulated by a different entity within HHSC, a division of HHSC is tasked with investigating those allegations. Consequently, on December 28, 2020, the Monitors sent the following request to DFPS and HHSC:

> In reviewing CLASS records and intakes related to Devereux, and in our time at Devereux, we have come across referrals for abuse or neglect that occurred in the psych unit at the facility. My understanding – and our review of records at the facility – shows that PMC children may transition between the dorm that is licensed as their psych unit and the regular RTC dorms on campus. Yet, because of the way that unit is licensed, we cannot access information related to any substantiated reports of abuse or neglect that may occur in that unit. My understanding is that a different division within HHSC investigates those allegations.

> We would like information related to any allegations and any substantiated claims of abuse or neglect involving PMC children in the psych unit since January 1, 2015, so that we can more fully understand any safety concerns for PMC youth on this campus.[39]

The next day, both agencies responded that they would work on getting the requested information to the Monitors. On January 20, 2021, the Monitors still had not received any information, and asked the agencies whether any responsive information was found. There was no response.

---

When a staff member asked where B.C. was, another staff indicated she was in the bathroom. The staff members continued to talk with the girls as they ate their dinner when they suddenly heard a loud thud. One of B.C.'s peers was eating her dinner and pointed towards the restroom to signal that the noise had originated from the shared bathroom. Staff entered the bathroom and found B.C. with the shoelace tied tightly around her neck. Staff observed blood on the flood. B.C. "appeared to be asphyxiating. [B.C.s] face appeared blue as she struggled to breathe. Staff attempted to insert a finger between the shoelace and [B.C.s] neck and were unsuccessful due to the tightness of the shoelace. Staff then called down the hallway for the nurse to bring scissors. A member of nursing staff ran to [B.C.'s] bedroom with the scissors in hand…As nursing staff approached, direct care staff continued to attempt to release some pressure from [B.C.'s] neck by positioning her head downward, while rubbing her back and verbally consoling [B.C.] At this time, [B.C.'s] legs were shaking as tears rolled down her face. Nursing staff ran into the bedroom and cut the shoestring from [B.C.'s] neck using safety scissors at exactly 5:49PM. [B.C.] then exhaled as spurts of blood projected from her mouth….[B.C.] then verbalized that she had been cutting herself for the last 3 days using her fingernails, and willingly showed staff multiple superficial scratches covering both of her upper thighs…[B.C.]…asked if she would be placed on Stop. Staff then mentally prepared [B.C.] for the worst case scenario which would result in becoming a level of supervision: one." A review of B.C.'s IMPACT records show that the facility notified B.C.'s caseworker via e-mail, and the caseworker followed up by asking if B.C. had "been assessed at the ER or psych hospital for possible admission due to the suicide attempt." Devereux – League City staff responded, "Being that we are a licensed psychiatric hospital unit, [B.C.] will not need to be transferred to a psychiatric hospital separate from Devereux. [B.C] was assessed by nursing staff, who remain on the unit 24/7, and it was determined that [B.C.] did not need to be transported to an emergency room for any physical consequences of the attempt." The Monitors remain concerned that based on the documents received from HHSC, this does not appear to have ever been reported for investigation, despite the facility's evident notice that B.C. was suicidal, raising questions related to whether the facility had taken appropriate steps to monitor her. In addition, Devereux – League City's failure to take B.C. to be evaluated by a doctor given the injuries described by the serious incident report and the length of time it appears to have taken to cut the ligature from her neck warranted an investigation for abuse or neglect.

[39] E-mail from Deborah Fowler, Court Monitor, to Georgette Oden, Attorney, Litigation Department, HHSC, and Tiffany Roper, General Counsel, DFPS, December 28, 2020 (on file with Monitors).

Finally, during a scheduled call between the Monitors and the agencies on January 25, 2021, the Monitors asked again about the status of the request. HHSC responded that it was working to provide the responsive documents, but was having to redact names from the documents of adults and children who are not members of the class, which was slowing their response to the request. On January 28, 2020, HHSC sent responsive documents attached to an encrypted e-mail that stated:

> There were six complaints of abuse or neglect involving PMC children at the Devereux psychiatric facility since January 2015. [40] As a licensed psychiatric facility, Devereux is not regulated by CCR, but instead, as prescribed by the Health & Safety Code chapter 577, is regulated by Health Care Regulation. These records are confidential under Health & Safety Code Section 577.013(d); we have redacted names of patients not part of the PMC class to protect their privacy.
>
> - 358298 and 365254 were completed HHSC Health Care Regulation Investigations.
> - 332131 and 282071 were referred to HHSC PI/CPS for investigation because they were residential claims that didn't involve the psychiatric facility. These should be included in the normal reporting in the possession of the Monitors.
> - 359697 and 347408 are pending.[41]

The responsive documents were attached to the encrypted e-mail. The two cases in which the investigations were completed (358298 & 365254) involved one allegation that a child had been injured during restraints, and one report alleging sexual abuse:

- On August 10, 2020, a child's mother reported concerns to SWI related to her son's claims that he was injured during repeated restraints. DFPS transferred the case to HHSC after determining that the child was in Devereux – League City's psychiatric unit. The child reported that a staff member slammed his head on the ground during a restraint, causing a knot and bruise. The child later recanted, and the investigator's review of video did not substantiate the allegations of abuse. However, HHSC recommended that before the staff member who initiated the restraint in question was released from a safety plan prohibiting him from being assigned to work with the client and that required he be monitored by another staff person when using restraints on others, that the staff member should take a refresher training in appropriate restraint practices. Additionally, because HHSC determined that a nurse completed the child's psychological evaluation, rather than a physician, and the evaluation was incomplete, HHSC cited Devereux – League City's

---

[40] According to the most recent "extended compliance history review" for Devereux – League City that the Monitors found in CLASS, between January 19, 2016 and January 19, 2021, SWI had received 394 intakes alleging abuse or neglect of children for the RTC. But HHSC's recent submissions assert that since January 1, 2015, there have only been six complaints of abuse or neglect of a PMC child in the Devereux – League City psychiatric unit. The enormous difference between intakes raises concerns that allegations of abuse or neglect of PMC children that occur in the psychiatric unit are not being reported.

[41] E-mail from Georgette Oden to Deborah Fowler & Kevin Ryan, January 28, 2020 (on file with Monitors).

psychiatric unit for standards violations.

- On November 18, 2020, a former client (whose name is redacted from the materials received by the Monitors)[42] reported that a female staff member who worked in the psychiatric unit, "presented a pattern of grooming, sexual favors, and giving girls a special apple juice drink that makes them sleepy. She reported that [the staff member] was familiar with the resident's problems/history and would carefully pick her victims…[The former client] stated that during her stay at Devereux there were at least two residents who were sexual [sic] abused by [the staff person]…She reported that one girl believe [sic] she was in a consensual relationship with [the staff person]. [The former client] stated that she personally witnessed the consensual relationship. [The former client] stated that in her opinion the girl was underage, so she was unable to consent. [The former client] reported that another girl was terrorized sexually by [the staff person]. She stated that this girl had serious cognitive impairment and psychotic behaviors. She reported that [the staff person] would pull the sheets from this girls [sic] bed and get into her bed. She stated that [the staff person] would bit [sic] the girls [sic] breast, and 'goat [sic] her into acting out by grabbing her butt.' She reported that this girl received lots of medication, had sleep problems, and no family support system. [The former client] reported that recently some younger girls have begun sharing their stories within the group. She stated that two female resident [sic] shared that they lived at Devereux about a year ago and [the staff person] would serve them a special apple juice and then abuse them. She reported one of the female girls shared that [the staff person] would buy her Popeye's for sexual favors. [The former client] stated that the same girl disclosed that [the staff person] would look at her pictures on the wall and comment about what an attractive child she was in an uncomfortable manner. [The former client] reported that she has a lot of concerns with [the staff person], and previous employees. She stated that some of the group members are not comfortable giving their names." The investigator was unable to reach the reporter to further discuss the allegations. After visiting the facility, reviewing incident logs, and interviewing the facility's Human Resources Director, the Unit Supervisor, and the Director of Operations – all of whom indicated they did not know of any children or other staff who complained of the staff person in question -- the investigation was closed, finding all of the allegations to be unsubstantiated.[43]

The allegations in the two pending investigations:

- On April 17, 2020, DFPS transferred a case originally reported by the child's caseworker (the reporter is listed as "FPS Staff" in CLASS, and place of employment as "CPS") to SWI, involving concerns of negligent supervision after the child reported having been stabbed with a pencil and choked with a headphone cord by a peer, and that "it took staff awhile to get to them to break it up." The child reported to the caseworker that she did not feel safe at the facility because "everyone bullies her." In response to the intake question "Explain if the child has engaged in dangerous activities while unsupervised?" the

---

[42] This former client lives in California
[43] The Monitors observed what appears to be a very cursory investigation of the reporter's very specific and detailed allegations. The investigator did not attempt to interview any children, and does not appear to have interviewed the alleged perpetrator.

caseworker answered "Yes, [the child] attempted to choke herself about two weeks ago and staff walked in on her during round checks. [The child] was placed on close supervision." The caseworker also reported that she had not received an incident report or e-mail related to the incident. The caseworker who reported the incident to SWI suggested that the case manager at Devereux – League City should have details of the incident, including incident reports. When the case was transferred, the investigator for HHSC appears to have misunderstood this information, assuming that the case manager was the reporter (rather than the child's DFPS caseworker). The HHSC investigator made two calls to the facility in an attempt to reach the case manager. The investigator eventually spoke to a director at the facility, who told the investigator "that facility was not trying to self report incident as facility investigated the incident and no injury occurred. [The child] stated she was stabbed, but what happened was that she was poked with a pencil when patients were playing around. Pencil did not break the skin." Based on what HHSC provided to the Monitors, it does not appear the investigation has moved beyond this initial inquiry.[44]

- On August 12, 2020, DFPS transferred a case originally reported to SWI involving allegations that the same child whose parent reported concerns to SWI related to restraints on August 10, 2020 (discussed above), also reported her concerns to the child's CASA. The CASA then called SWI. Though HHSC reported to the Monitors that this case remains pending, it does not appear as though the investigation has moved beyond the intake stage, nor is it clear from the documentation that this intake was linked to the intake that was investigated, above.

## IV.    On-Site Monitoring Visit to Devereux – League City

Members of the monitoring team made a three-day unannounced visit to Devereux – League City, beginning with an awake-night visit on October 18, 2020 and continuing with records reviews and interviews October 19, 2020 through October 21, 2020.

---

[44] On January 30, 2021, the Monitors sent an e-mail to HHSC asking why this investigation was still pending, since intake was completed in April of 2020. The Monitors also asked if any progress had been made in the investigation that wasn't reflected in what HHSC provided related to the case. E-mail from Deborah Fowler & Kevin Ryan to Georgette Oden, January 30, 2021 (on file with monitors). On February 5, 2021, HHSC responded, "In accordance with federal prioritization guidelines issued by the Centers for Medicare & Medicaid Services (CMS) applicable to this type of investigation, Investigation No. 34708 was assigned as 'Non-Immediate Jeopardy: Medium' (also known as 'Next Onsite') because it was reported by the facility, the patient was not injured, and the patient stated that she felt safe, as noted in the records (see excerpt below). Because 'Non-Immediate Jeopardy: Medium' is a low-priority category, the complaint is typically addressed during the next on-site survey, although staff is authorized to address prior to the due date unless that would conflict with federal workload prioritization requirements.

Under current CMS guidelines, the backlog of higher priority cases caused by the current COVID-19 public health emergency should be completed before this investigation. CMS has also issued a currently effective 30-day mandate to limit on-site visits to hospitals to investigations assigned the 'Immediate Jeopardy' priority level; CMS has denied our request for an exception. However, we are exercising other statutory authority to escalate this investigation as an exception and we anticipate that this investigation will be initiated within the next 3-4 weeks." E-mail from Taryn Lam, Attorney, Litigation Dep't, HHSC, February 5, 2021 (on file with monitors).

A.  Physical Site

Devereux Advanced Behavioral Health sits on a 40-acre campus in League City, Texas. The campus has ample green space throughout, with gazebos, rocking chairs on outside porches, and activity areas.  There are six residential buildings or "units," an administration building, office building, school building, cafeteria and several recreation facilities (gymnasium, game room, exercise area, outdoor swimming pool, and river access).  One of the six residential buildings operates as the campus' psychiatric unit for children; another building on campus houses a psychiatric unit for adults.

Each residential unit has one long hallway that runs across the length of the unit with a large staff desk in the middle. The units are co-ed, with the girls' bedrooms located at one end of the long hallway and the boys' bedrooms at the other end.   There is no doorway separating the boys' side of the unit from the girls' side of the unit.  Units include a dayroom used for group meetings, watching TV, and other indoor recreational activities.  A fenced yard with a covered porch and outdoor furniture is behind each unit, divided by a fence, to allow girls and boys outside access when they are on the unit.

Each unit also has a seclusion room with concrete walls, and metal doors that can be locked.  The door has a window to allow staff to see into the room when the door is closed.  Some had a mattress on the floor.  When staff put a child in seclusion, staff are expected/required to be stationed outside the door to maintain constant supervision.  Seclusion rooms have cameras, with monitors just outside the room for staff viewing.  Both photographs, below, show seclusion rooms in Devereux – League City living units.



Each unit has 11 bedrooms and can house up to 22 clients. Youth typically share a bedroom, though some dorms were not full and allowed for youth to have their own bedroom if needed for safety reasons. The children's bedroom doors cannot be locked, but are supposed to remain closed when children are in their rooms unless they are on heightened supervision or have requested that the door remain open. All but one of the bedrooms share a "Jack-and-Jill" style bathroom, which are supposed to have locked doors. Staff report they unlock bathroom doors when children need to gain access. Bathrooms consist of a commode, shower, and vanity with a sink and mirror. Many showers did not have a shower curtain or any type of door.

On the night of the monitoring team's awake-night visit, the team noticed children sleeping on mattresses on the floor in unit hallways. The team was told that youth may be required to sleep in the hallway if they are one-on-one supervision, and that youth could request to sleep in the hallway if they wished to do so because of problems with a roommate. Staff also indicated that youth on one-to-one supervision may be moved to bedrooms immediately across from the staff desk, sleeping with the door open.[45]

---

[45] Of the awake-night staff interviewed, five indicated that during sleeping hours a child on close supervision could be supervised in one of several ways: a child could sleep on a mattress in the hallway (this was the most common answer, with five of six staff indicating this was how children were supervised), a staff person could sit outside the child's door (two of six staff reported this form of supervision), and one staff said that a staff person supervised a child who was on close supervision during sleeping hours by sitting in the child's room.

During the awake-night visit and daytime tours of the facility, the monitoring team observed bathroom doors missing in at least six of the shared bathrooms, with two of the doorways covered with mattresses.   The monitoring team was told that youth had kicked down or broken the bathroom doors and that it takes some time to replace them.[46]   Youth in rooms with missing bathroom doors were observed to have closed bedroom doors despite the safety risk posed by the open shared bathroom.  The monitoring team also observed unlocked bathroom doors, even though in some instances, youth were in the bedroom.  Staff also told the monitoring team that children could pick or "pop" the locks on the bathroom doors.

The picture on the left, below, shows a mattress serving as a door; the picture on the right shows the view through the bathroom with the mattress-door removed and on the floor of the bedroom.



The picture on the left, below, two bedrooms and the connecting bathroom, with both bathroom doors missing, the picture on the right, below, shows a bedroom with the bathroom door in place and closed.

---

[46] Staff at Devereux – League City told the monitoring team that the doors had special hinges that were made to prevent the use of the doors as an anchor for ligatures that youth could use to attempt suicide.  They explained this was why it took time to replace the doors.



The campus includes recreational spaces and facilities, with a gym and workout room and outdoor pool.

   B.   <u>Staff & Child Interviews, Child and Staff Record Reviews & Document Reviews</u>

. The interviews conducted by monitoring staff during the visit included:

- Interviews with 6 awake-night staff;
- Interviews with 18 other caregivers;
- An interview with the program administrator;
- An interview with the treatment director;
- An interview with a nurse;[47]
- Interviews with 9 PMC children;[48]

Record reviews included:

---

[47] The interview tools used by the monitoring team did not include a tool for a nurse. Consequently, handwritten notes were taken by Monitor Deborah Fowler. The nurse's answers are not included in the quantitative analysis of responses.
[48] The monitoring team attempted to interview every PMC child on campus. Several children refused the interview and one child was in quarantine pending the results of a COVID-19 test. More children refused interviews during this on-site visit than for any of the other facilities visited by the Monitors. This is perhaps a measure of the number of interviews children are asked for as a result of the high number of investigations of the campus by both RCCI and RCCR.

- A review of records for 37 direct care staff;
- A review of records for 3 direct care staff supervisors;
- A review of records for 15 treatment staff;
- A review of records for 17 PMC children.[49]

In addition to conducting interviews and reviewing records for children and staff, the monitoring team reviewed documents, provided by Devereux – League City, that described their treatment program.

i.      Children Living at Devereux – League City

The program administrator indicated that at the time of the monitoring team's visit, Devereux – League City had 132 beds available for youth, with 91 youth housed at the facility at the time of the visit. Devereux – League City has children from Texas and from out-of-state, and accepts referrals from school districts, child welfare departments, behavioral health departments, and "rarely," juvenile justice departments. The operation also accepts private placements. The average length of stay for children was reported to be 12 to 18 months. When the monitoring team visited Devereux – League City, there were 17 PMC children living at the campus.

File reviews indicated a high prevalence of behavioral health and special needs among the PMC children at Devereux – League City. Sixteen of the 17 PMC children (94%) had a mental health diagnosis. Three children's files (18%) included information indicating suicidal ideation or behavior, and 11 (65%) included information showing self-harming behaviors. Eleven of 17 children's files (65%) indicated they had previously qualified for special education services.

Nearly half of all child files (8 out of 17, or 47%) reviewed included information indicating the child had a confirmed or unconfirmed history of sexual abuse. Most caregivers (14 out of 18, or 80%) reported currently supervising a child who was a victim of sexual abuse.[50] Almost half of the children whose files were reviewed (8 of 17, or 47%) had at some point run away from a placement. Ten of the 17 PMC children's (59%) files indicated the child exhibited three or more of these behaviors.

---

[49] Review of children's records includes all records that are kept on-site, including educational and medical records. In the Monitors on-site reviews, none of the GROs visited to date appear to have a child's complete record. Most educational and medical records are thin, including information related to the child's education and medical treatment or screenings since placement at the GRO visited, with a very few including some educational and medical records for the placement that immediately preceded the child's placement in the visited GRO. This reality is generally acknowledged by the GRO administrators interviewed, who often express frustration with the lack of information available upon a child's placement. The Devereux – League City administrator noted that academic records for foster children are often not provided, particularly for children who have been in many different placements. She reported that she asks staff to "research" and "recreate" information noting that "they've created their own process to try to get information about a child's academic history" but that it is difficult to do.

[50] When direct caregivers were asked whether they were notified when a child they were supervising had a history of sexual abuse, 83% of caregivers (15 out of 18) indicated that they were; however, when asked if they were notified in cases in which a child was newly identified as a victim of sexual abuse (after being placed at Devereux – League City), six out of 18 (33%) said they were not notified. Almost all (16 of 18) caregivers indicated they were notified if a child was identified as having a history of sexual aggression, and if a child was newly identified (15 of 18) as sexually aggressive.

The treatment director indicated that they generally do not accept children with intense medical issues, sexualized behavior, or extreme aggression.  Despite this, five children's files (29%) included information indicating they had acted out sexually since coming to the campus, and six of the direct caregivers interviewed (33%) reported currently supervising a child who is sexually aggressive.  Nine children's files (53%) included information indicating that they had engaged in physical aggression, and four children (24%) had harmed others on campus.[51]

ii.      Staffing & Capacity

Each unit is staffed with a unit supervisor, a case coordinator, a therapist, and direct care staff.  Of the 18 caregivers interviewed by the monitoring team, 12 were direct care staff, three were supervisors, two were case coordinators, and one was a unit therapist.

The treatment director, a clinical psychologist, noted that the treatment staff included six licensed professional counselors, five licensed master social workers, and one licensed chemical dependency counselor.  There are nurses on campus at all times, though they are not housed in the units.   Devereux – League City has doctors on contract, and a doctor is always on call, however, there is not a doctor on staff.[52]

Caregiver interviews indicated a high rate of turnover in direct care staff, and a high number of staff reporting overtime hours.  Of caregivers interviewed, 44% (8 out of 18) said they had worked at Devereux – League City for under a year; the median length of employment for staff who were interviewed was 14.5 months.  Record reviews showed that supervisors and treatment staff generally had more tenure, with 38% (14 of 37) of direct care staff having been employed less than a year, compared to 33% (1 out of 3) of direct care supervisors, and 13% (2 out of 15) of treatment staff.

Overall, 72% (13 out of 18) of caregiver staff interviewed reported working overtime;[53] more than half of these staff (7 out of 13, or 54%) reported working overtime every week.  Of the 13 staff who reported working overtime, more than half (7 of 13) reported they worked more than 16 hours of overtime each month.   All four of the evening-shift staff who were interviewed reporting

---

[51] It is possible that one reason for this disconnect could be that the operation did not receive adequate information about the child's history prior to their placement.  Though the 5th Circuit agreed that caregiver notification of a child's history of sexual abuse or sexually aggressive behavior was necessary to ensure child safety, *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 278-79 (5th Cir. 2018), children's files at Devereux – League City often did not include a Common Application, Placement Summary, or Attachment A to the Placement Summary, the forms that DFPS relies upon to inform caregivers of a child's history of abuse or aggression.  Of the 17 PMC children's files reviewed by the monitoring team, fewer than half (8 of 17, or 47%) included a Common Application, only one file included a Placement Summary, and three files (18%) included Attachment A to the Placement Summary.  However, of the 17 PMC children on campus at the time of the monitoring team's visit, five were flagged by DFPS as having been a victim of sexual abuse.  Of these five, the monitoring team found the Common Application in four of the children's files, and in each case it included information related to the child's history of sexual abuse.  The program administrator indicated that the SSCCs require them to sign Attachment A but she questioned whether the information included is accurate, noting that she "doesn't believe anything they give" her because she has seen so many errors in children's documentation.

[52] The program administrator indicated that Texas law prevented them from being able to hire a doctor as staff.

[53] Of the caregivers who reported working overtime, 10 were direct caregivers, one was a supervisor, and two were case coordinators.

working overtime (with three of those indicating they worked more than 16 hours of overtime each month), compared to 9 of 13 day-shift staff.  Of the awake-night staff who were interviewed during the monitoring team's late-night visit, two out of six reported that they were not fully staffed on the night they were interviewed.[54]

iii.      Treatment & Programming

The RTC's treatment program model, called "RISE," was one developed by the Devereux corporate office, and is reportedly based on positive behavioral interventions and supports (PBIS). PBIS is an evidence-based, three-tiered model that increases the level of support provided to children as they move up the tiered model, based on their individual needs.[55]  Children who do not respond to the most basic, universally applied tier, move into the second tier of the model, which provides more targeted supports than the universal tier.[56]  Children who still do not respond to the more focused supports provided in the second tier of the model move into the top tier, which provides intensive supports based on formal assessments that allow for the development of an individualized support plan.[57]  Devereux describes its program:

> The campus-wide program, R.I.S.E. program, is a blended Positive Behavioral Interventions and Supports and Trauma Informed Care model which provides a three-tiered ecological framework within which treatment intensity can be targeted based on the individual's needs and level of risk to himself and/or others.  Our program maintains a focus on creating a milieu or context for supporting desired behaviors, thereby making problem behaviors less efficient and less effective.[58]

RISE is an acronym that stands for: Responsibility, Integrity, Safety, and Empowerment.[59] Devereux – League City's RISE program uses a point system to support four named levels that children move up or down as they gain or lose points.  Children gain points by complying with programmatic and behavioral expectations.  As they move up the levels, each level increases a child's access to responsibility and privileges.   The four levels are: Commitment, Learning, Practice, and Role Model.[60]  The treatment director indicated that staff are trained in the RISE model using intensive start-up training and shadowing of more experienced staff.   In theory, Devereux's PBIS model would assist children in moving up these four levels by targeting supports

---

[54] It is not clear that Devereaux- – League City  was not compliant with minimum standards related to staff-to-youth ratios, however, as the program administrator indicated that they try to staff at a 1:8 ratio at night, which is lower than the 1:15 night-time staff-to-youth ratio required by HHSC minimum standards.  Of the staff interviewed by the monitoring team during the awake-night walk-through, the highest number of children a staff person reported they were supervising that night was 13.  Regardless of whether Devereaux- – League City was compliant with minimum standards, some Devereux – League City awake-night staff reported to the monitoring team that there were times when they feared for their own safety at the facility.

[55] *See* Center on Positive Behavioral Interventions & Supports, *Tiered Framework*, *available at* https://www.pbis.org/pbis/tiered-framework

[56] *Id.*

[57] *Id.*

[58] Devereux Texas, Procedural Memorandum Administration 2 (Updated July 2017).

[59] Devereux, RISE Devereux Positive Behavioral Interventions and Supports (D-PBIS) Staff Training Manual 16 (undated).

[60] *Id.*

based on their level of need.  Once children reach level four of the RISE program, they are eligible for release.

Devereux – League City's Staff Training Manual outlines the universal supports that are provided to all clients at Devereux – League City to assist them in moving through the four levels of the RISE program:

- Clear expectations
- Procedures for teaching expectations
- Procedures for encouraging expectations with high rates of praise
- Procedures for discouraging infractions
- Individual, group, family therapy
  - Cognitive Behavior Therapy (CBT)
    - Problem solving skills training (PSST)
- Group contingencies
- Effective academic instruction (school)
- Data based decision making[61]

Consistent with PBIS, as children move up the pyramid in terms of their need for additional supports, the RISE Staff Training Manual describes a mid-level "Targeted-Group Support" for children who do not respond to the universal supports outlined above, and are therefore unable to gain the points they need to successfully move up the four levels in the RISE program.  The Manual indicates these children will receive:

- Informal (brief) FBA[62] with BSP
- Check-in/Check-out, Mentoring
- Targeted skills training (examples):
  - Aggression Replacement Training (ART)[63]
  - Coping with Depression in Adolescence (CWDA)
  - Life Skills Training[64]

For children who do not respond to even these more targeted supports, a third level at the top of the PBIS pyramid is shown in the RISE Staff Training Manual, listing the following as "Indicated Individual Support":

- Comprehensive FBA with BSP
- Trauma focused CBT
- One-to-one[65]

---

[61] *Id*. at 7.
[62] An "FBA" is a functional behavioral assessment.  "BSP" is a behavior support plan.  These are evidence-based methods of evaluating behavioral needs and structuring plans to support those needs.
[63] This is an evidence-based program.  During the monitoring team's visit to Devereux – League City, the monitoring team did not find any evidence in any file reviews that this is being implemented, or hear any mention of this during our interviews with staff or children.
[64] Devereux, *supra* note 59, at 7.
[65] *Id*.

After describing the different tiers of support that are (theoretically) part of the RISE PBIS model, the Training Manual affirms "Additional layers of support will be provided to individuals who do not respond to the universal supports."[66]

According to information provided to the monitoring team by Devereux – League City, "Trauma informed care is integrated into the care, treatment, and management of each child."[67]   The last two pages in Devereux – League City's 106-page staff training manual discuss trauma and trauma informed care.[68]   According to the training manual: "A trauma-informed program is based on the approach of 'universal precautions,' meaning that we treat all individuals as if they were exposed to trauma, and the overall treatment environment is structured to promote sensitivity, healing and avoiding re-traumatization."   The manual emphasizes, "Providing positive, supportive relationships and a safe, secure and predictable environment can promote resilience, reduce the effects of the trauma experience, and improve psychosocial functioning."[69]

According to the treatment director, all children receive two individual counseling sessions and two group sessions each week, and substance abuse treatment is available on campus.  However, none of the children interviewed by the monitoring team who answered questions related to treatment reported attending group or individual counseling this frequently.  Six of the eight children interviewed (75%) reported seeing a counselor one-on-one once a week and five of the eight children reported attending group therapy once a week.  Two children reported they did not see a counselor one-on-one, and three reported that they did not attend group counseling.[70]

During interviews with caregivers, two out of six (33%) of the interviewed awake-night staff reported that they had a child on close supervision, and 10 of the 18 (56%) interviewed direct caregivers reported that they were currently supervising a child who was on close supervision.

The treatment director reported that a child may be placed on safety precautions for self-harm or suicidal ideation; if a child expresses suicidal ideation, they are reassessed every 24 hours and may be put in seclusion with constant supervision, though staff reported that they are usually kept in their environment. The nurse interviewed by the monitoring team noted that there were two levels of one-to-one supervision: LOS-1, which required the staff to be an arm's length from the child at all times; and LOS-2, which required the staff to keep the child in their line of sight.  She noted that in addition to children who are self-harming, children who are aggressive may be on one-to-one supervision because there always needs to be someone available to restrain the child.

The nurse reported that if a therapist is not available, nurses may complete a suicide risk assessment.  According to the nurse, children who are rated at a moderate or high level are placed on suicide precaution, and are not allowed off the unit, even for school; the teacher brings school work to the child to complete on the unit.  The nurse reported that a child may also be "programmed

---

[66] *Id.*
[67] Devereux, *supra* note 59, at 1.
[68] *Id.* at 104-106.
[69] *Id.* at 104.
[70] The children who reported that they did not attend counseling or group therapy may have refused to attend counseling or therapy sessions.  We do not know why they were not attending weekly sessions.

to their room" if they are physically aggressive.  Devereux – League City's RISE program treats suicidal behavior and self-injurious behavior as a "major challenging behavior," along with running away, bullying, having dangerous contraband, physical aggression, fire play, pulling a fire alarm, property damage, posing a safety threat, theft, and sexually inappropriate behavior.[71]  The consequence for all of these behaviors is being placed on "STOP," which stands for "Support to Overcome Problems."[72]  Children who are placed on STOP lose all privileges, and are not allowed to leave the unit, except to go to school "if safety allows."[73]  They must earn points and complete a series of assignments to get off of STOP.[74]

Children who engage in "minor challenging behaviors," including horseplay, not following rules and directions, being out of the area that they are authorized to be in, lying, or refusing to participate in programming may be placed on "PAWS" which stands for "Positive Action with Support."[75]  Similar to STOP, the child is not allowed to participate in some activities and must earn their way off of PAWS by earning points.[76]

During her interview, the nurse also indicated that her responsibilities included calling the doctor to gain approval for a child to be placed in seclusion.  Nurses also facilitate restraints to ensure they are done properly.  Restraint and seclusion are practices that are commonly used at Devereux – League City.  Of the seven children who completed the interview, five reported having been restrained during their time at the facility.  Their reports were consistent with interviews with direct care staff: 16 of 18 direct care staff (89%) reported having restrained a child during their employment at Devereux – League City.  Three of the 18 caregivers (17%) reported having used restraints more than 20 times in the last six months.

The review of children's files confirmed frequent use of restraints and seclusion, with ten of 17 children's files (59%) including documentation of at least one restraint.  Eight of these 10 children's files included documentation showing they had been restrained three or more times during their stay at Devereux – League City.  Of children who had been restrained at least once, the median number of restraints per child was four.  Ten of the 17 PMC children (59%) had been placed in seclusion at least once during their stay at Devereux – League City; eight of these children had been placed in seclusion three or more times.

iv.     Child Safety

Of the nine children interviewed, five (56%) said they did not like living at Devereux – League City.  Of eight children who answered questions related to feelings of safety, five (63%) said that they do not feel physically safe on the campus.  Four of the eight children (50%) indicated that there was someone on campus who made them feel afraid, and four (50%) indicated that they been

---

[71] Devereux, *supra* note 59, at 59-62.

[72] *Id.*

[73] The monitoring team heard conflicting reports during the on-site visit regarding whether children who are on STOP go to school.  Some children and staff reported that children stay on the unit all day, and receive packets of schoolwork to complete on the unit.  Others reported that children are allowed off the unit only to go to school.  Devereux – League City's staff training manual indicates "the client will participate in the school program if safety allows."  *Id.* at 67.

[74] *Id.*

[75] *Id.* at 66.

[76] *Id.*

34

bullied by another child at the facility.  All eight children reported that they had seen other children being bullied.

Of the same eight children, six (75%) reported that riots occurred on the campus; three reported that riots occurred weekly, monthly or "quite often."  Of the 18 direct caregivers interviewed, all said that only one riot had occurred in the last six months; of these staff, only two reported having received training on what to do in the event of a riot.  Similarly, of the six awake-night staff interviewed during the monitoring team's late-night visit, four reported only one riot in the last six months, with one reporting three riots and one reporting none.[77]   Half of the awake-night staff reported having received training related to how to manage a riot.

Nearly half of the 17 PMC children's files (8, or 47%) included a serious incident report involving the child; four (24%) included two or more incident reports.  Serious incident reports included:

- Physical injury requiring medical attention (2);
- Critical illness or communicable disease (2);
- Suicide attempt (2);
- Allegation of abuse or neglect (1);
- Allegation of child-on-child sexual abuse (1);
- Runaway (4).

Seven of the eight children who completed a full interview reported that there were fights between children in their dorm.  Of the seven children who answered the question, four (57%) reported having been hit by another child at Devereux – League City.  When direct care staff and awake-night staff were asked how often police had been called to the facility in the last six months, 19 of the 22 staff who answered the question (86%) said police had been called at least once, with 12 responding that police were called once or twice (54%), and seven (32%) responding that police were called three or more times.  The nurse reported that disruptions most often occurred during the 3:00 – 11:00 p.m. shift, because that time "is not as structured" and that there is downtime for the children which "may not always be a good thing."  She noted that this shift "can be very hectic" and that while she had never felt unsafe, she acknowledged that there may be moments when other staff do not feel safe.

Eight out of the 18 caregivers interviewed (44%) reported that a child had made an outcry to them of abuse or neglect that occurred at Devereux – League City.  One staff reported having witnessed something that appeared to be abuse or neglect, and three (17%) reported they were aware of allegations of abuse that were not reported.  Troublingly, when asked what they would do if a child disclosed sexual abuse by a staff member, only 28% (5 of the 18) reported that they would call the abuse and neglect hotline.  Only three caregivers (out of 18, or 17%) indicated that they would call SWI if a child disclosed sexual contact with another child.[78]   Three caregivers said that they had

---

[77] DFPS confirms more than one riot, having reported to the Monitors that a riot also occurred in September 2020, discussed in note 5, *supra*.

[78] These answers may reflect the inexperience and lack of training among Devereux – League City staff.  For example, of direct caregivers interviewed, 72% (13 out of 18) reported having completed training related to child sexual aggression (CSA).  This was confirmed by the employee record review, which showed that 70% (28 out of 40) of the direct care staff and supervisors whose records were reviewed included documentation showing they had completed

never heard of the abuse or neglect hotline, and six (33%) were not sure whether a child could call the hotline directly.  Almost all caregivers (17 out of 18) indicated that their first response if they became aware of abuse or neglect would be to notify their supervisor.

Of the seven children who answered  the monitoring team's questions related to phone access, all of the children reported having restricted access to a phone, with four indicating that phones could only be used on specific days and times, and three children indicating they had to obtain approval from a caregiver or supervisor to use the phone.[79]  Five of the seven children (71%) reported that other children or staff were always able to hear their conversations when they used the phone.  This was confirmed by direct caregivers who were interviewed, all of whom indicated that there was a phone available on the unit for children to use, but described a process setting limits on when the children could make calls.  Direct caregivers confirmed that staff were always present during children's phone calls.

Most children did not indicate that they had critical knowledge that would assist them in protecting their safety.  Five of nine children (56%) indicated that they had not heard of the Foster Care Bill of Rights; one of the four children who had heard of the Bill of Rights had not read it or had their rights explained.  Six of nine (67%) had not heard of the foster care ombudsman.  Of seven children who answered the question, only three (43%) had heard of the abuse or neglect hotline (but had never called).  Only three of the 17 PMC children's files (18%) included a copy of the Foster Care Bill of Rights.

The monitoring team's review of employee files found that only 78% (31 of 40) included a background check.  Nearly all direct care staff whose files did not include a background check had been employed for less than one year.

## V.   The Link Between Safety & Treatment Needs: A.A. & B.B.[80]

The Monitors conducted a more in-depth review of two PMC children's experiences at Devereux – League City, and the events leading up to their placement at Devereux – League City, to better understand:

---

the CSA training.  Only 65% (26 out of 40) of direct caregiver records included documentation showing they had completed abuse and neglect training in the last year.  Of those who had not completed abuse and neglect training in the last year, approximately 40% (11 out of 26) had been employed for less than one year.  Compared to other GROs visited by the monitoring staff, Devereux – League City's staff were less likely to answer that they would report child sexual abuse by a staff member to the hotline, and reported having had training on abuse and neglect less recently (if at all) than those asked at other GROs.

[79] Information related to the RISE program provided by Devereux – League City indicates that use of the phone is considered a privilege, with phone access increasing as children move up in their level.  In the lowest level, "Commitment," youth have three scheduled phone days and are allowed two 10-minute calls for each scheduled phone day.  On Sundays, they may receive two 10-minute phone calls.  When children move up two levels, to the "Practice" level, their phone calls, including incoming calls on Sunday, may be 15 minutes in length.  Devereux, *supra* note 58, at 14-16.  Similarly, Devereux – League City's staff training manual indicates, "Two 10 or 15 minute phone calls are allowed (depending on phase) on schedule phone days at specified times."  Devereux, *supra* note 59, at 12.

[80] These case studies are based on the Monitor's interviews with both children, reviews of the records during the on-site visit to Devereux – League City, and review of IMPACT records.  In addition, the Monitors requested and reviewed B.B.'s entire records – including those that exist in hard copy – from DFPS.

- How or whether the children's safety and treatment needs, and their history prior to arriving at Devereux – League City, made Devereux – League City a safe placement for them.
- How or whether Devereux – League City met the specific safety needs of the two children who were part of the in-depth review.
- How or whether the children's histories of trauma and mental/behavioral health needs were addressed during their time at Devereux – League City.
- Any impact that failing to meet their treatment needs had on their safety and the safety of those around them.

For A.A.'s review, the Monitors' focus was almost entirely on her time at Devereux – League City. A.A. was one of the children the monitoring team met and interviewed during the on-site visit. The monitoring team also interviewed B.B., the PMC child arrested as a result of the riot, prior to her release from juvenile detention.  For B.B.'s review, the Monitors requested DFPS provide a complete copy of her records.

A. <u>A.A.'s & B.B.'s Histories & Treatment Needs Prior to Placement at Devereux – League City</u>

i.    A.A.'s History & Treatment Needs

A.A. entered the foster care system in May of 2018, when she was 11 years old.  On July 3, 2019, A.A. was placed at Devereux- League City by Family Tapestry, 225 miles and more than a three-hour drive from her home.[81]  According to her Common Application, A.A. is a "smart young lady" who "loves her family very much."  According to her initial Service Plan, A.A. "is a very social youth" who is "very articulate," "can make friends anywhere" and "likes to sing and dance." A.A. has four siblings who are also in care; because they are placed in their home county, A.A.'s in-person visits with them are severely limited.[82]  A.A. stayed at Devereux – League City for

---

[81] Based on MapQuest directions between A.A.'s address at the time of her removal and Devereux – League City.

[82] In May of 2019, A.A.'s caseworker indicated in her monthly evaluation that she sent a request to the caseworker for A.A.'s siblings and to the case manager at Devereux – League City asking them to set up virtual contact for A.A. and her siblings.  The report notes, "Providing [A.A.'s] behaviors are appropriate 72 hours prior to the virtual visit, she will be allowed two virtual visits with her younger siblings a month." The July monthly evaluation report for A.A. notes that she told her caseworker on July 9, 2019 that she was supposed to have a Zoom call with her siblings but "did not know when" and that "her zoom calls are depended on her behaviors."  The August 2019 monthly report for A.A. notes that on August 20, 2020, A.A.'s caseworker spoke to Devereux – League City staff and "the agreement would be every other Friday [A.A.] could have virtual contact as long as she had appropriate behaviors 72 [hours] prior to the contact."  It also included a note that on August 21, 2020, A.A. called her caseworker and "expressed she was upset because she does not feel she has to have good behavior to have virtual visits with her younger siblings. She also says her behaviors have nothing to do with her having virtual visits.  We talked about her being a big sister and should be setting good examples for her younger [siblings].  She said she understood.  [Caseworker] gave [A.A.] positive encouragement as to what she needs to do to have her visits."  The most recent Service Plan the Monitors found in IMPACT for A.A., dated September 15, 2020, indicates she was to have quarterly in-person visits with her siblings.  It also indicated that A.A.'s caseworker would attempt to schedule virtual visits between A.A. and her siblings.  However, notes related to an October 5, 2020 call between A.A. and her caseworker indicate that A.A. "informed that she would like to have virtual visits with her [siblings] or Zoom meetings." Another contact note in the October monthly evaluation indicates A.A. had been able to see one of her siblings in-person that month; a later October contact note showed A.A. again asked her caseworker about virtual visits with her siblings.  During the monitoring team's onsite visit to Devereux – League City, A.A. complained that she was not able to have visits or

37

approximately 16 months, leaving for a placement at another Houston-area RTC on November 12, 2020.

A.A. came into care because her mother reported being unable to manage A.A.'s behavior; by the time she entered the foster care system, A.A. had run away from home seven times.  A.A. reported drinking alcohol three-to-four times a week, and reported frequent marijuana use, which she said began when she was just nine years old.  After entering care, and just prior to being placed at Devereux – League City, A.A. had run from foster care twice.  A.A.'s first runaway event after entering care, which occurred just after A.A. turned 12 years old, ended when she was arrested and placed in detention for being in possession of a gram of ice cocaine.

IMPACT records indicate A.A. has an unconfirmed history of sexual abuse prior to coming into care, having made an outcry to a therapist that "she has a hard time sleeping in a bed due to her having flash back of her mom's boyfriend raping her."  The most recent Common Application indicates that A.A.'s mother "stated that when [A.A.] was younger she reported be [sic] inappropriately touched by men who her mother and/or grandmother rented rooms to.  According to her mother, [A.A.] would not provide specific information about the incidents." Since coming into care, and prior to her placement at Devereux – League City, A.A. also made an outcry that during the runaway incident that resulted in her arrest, she was raped by an unrelated man.

Common Applications on file for A.A. indicate she displayed sexualized behavior prior to coming into care, at an early age.  When she entered care, A.A.'s mother reported that her daughter "tends to be flirtatious with males" and that she was "concerned she may become pregnant."  An early Common Application noted that A.A. "propositioned other students at school to meet her in the restroom to have sex and that she would trade marijuana for sex."  A.A. had to be moved to another unit during her psychiatric hospitalization after entering foster care because she kissed another child.  Despite this, none of her Common Applications (even the most recent one, completed on December 30, 2020) indicate any history of problematic sexual behavior, though the last Service Plan completed during A.A.'s stay at Devereux – League City, dated September 15, 2020, notes that DFPS has identified her as having a sexual behavior problem, observing, "[A.A.] has not been identified as…sexually aggressive.  However, [A.A.] engages in sexual relationships with older males."

A.A.'s first placement after entering foster care was a psychiatric hospital.  She was hospitalized for 24 days.  A psychological evaluation completed during her stay resulted in the following diagnoses:

- Major Depressive Disorder, Recurrent, Moderate;
- Oppositional Defiant Disorder;
- Attention-Deficit/Hyperactivity Disorder, Combined Type (per history);
- Alcohol Use Disorder;
- Cannabis Use Disorder;
- Child Neglect, Victim (by history).

---

contact with her siblings; the monitoring team helped A.A. call the foster care ombudsman to seek help in scheduling sibling visits.

A.A. was placed on psychiatric medications soon after coming into care.  Her first service plan, dated June 22, 2018, noted she was taking Prazosin (1 mg) for nightmares and Latuda (20 mg) for "moods."  This does not appear to have changed until she was placed at Devereux – League City, where she was taken off Latuda and Prazosin and prescribed Abilify (2 mg), which she took twice a day.

Devereux was the third RTC, and fourth GRO,[83] that A.A. had been placed in, though she had only been in foster care for a little more than a year when she arrived in League City.  A.A.'s Common Application notes that she has a history of depression and anxiety and is "hurting emotionally for various reasons."  It indicates she "needs intense trauma therapy to help her with her depression and anxiety."  A.A. also has a history of self-harming behavior,[84] which continued during her placement at Devereux – League City.  A Service Plan completed approximately one month after entering Devereux – League City indicates that she was admitted to the operation to treat symptoms of depression, as well as to help her address behavioral challenges that included a history of physical aggression and disrespect toward authority figures, a history of alcohol and drug use, and a history of running away from home and from foster care placements.

ii.    B.B.'s History & Treatment Needs

B.B. entered foster care July 15, 2009, when she was two years old, though her mother first had contact and involvement with DFPS when B.B, was an infant.  She and her five siblings were removed from their parents' home due to neglectful supervision, after one of the children was taken to the hospital with what was suspected to be alcohol poisoning.  Common Applications for B.B. note that her birth parents' home, "lack[ed] structure, stability, discipline, boundaries, or appropriate supervision." Her oldest siblings, both brothers, were 12 and 13 years old when B.B. was placed in foster care.  B.B.'s older sister is fourteen months older, and twins (a boy and a girl) were infants when the children were taken into the state's custody.  The state was given temporary managing conservatorship of the children on July 24, 2009, and parental rights were terminated and the children were moved into permanent managing conservatorship (PMC) on April 20, 2011.

After entering foster care, B.B. and her older sister both made outcries of sexual abuse by their older brothers and an unnamed perpetrator.  It is not clear when this was discovered.  A Common Application completed in March of 2010 does not discuss abuse, but noted that she and her sister, who had been placed together, "have acted out sexually in the past…and should sleep in separate rooms, if able."  At that time, B.B. was three years-old and her sister was four years-old.  This Common Application also noted that she "had been displaying sexualized behaviors" that "had tapered off." B.B. also suffered enuresis as a result.

---

[83] Two of the GROs that A.A. lived in prior to Devereux – League City, Whataburger Center for Children and Youth (an emergency shelter) and Houston Serenity Residential Treatment Center, have since closed, after having been identified for heightened monitoring (pursuant to Remedial Order 20) due to a high rate of minimum standard or contract violations related to child safety and/or substantiated findings of abuse or neglect.  A.A. ran away from Whataburger Center and did not return to care for almost three weeks, and returned only after being arrested and placed in juvenile detention for evading a police officer.

[84] A.A.'s IMPACT records indicate that she was hospitalized during her placement at the second RTC, in October 2018, due to "self harming behaviors at school."

By 2016, her Common Application had been changed to indicate that she had suffered severe sexual abuse, noting that "[a] lot of [her] behaviors can be tied to the sexual assault she has experienced," said she "can be aggressive with peers and staff" and "wets herself on a daily basis usually out of anger."  This Common Application provided more information related to the sexual abuse she and her sister suffered, noting, "The older boys apparently carried significant responsibility for the care of both [B.B.] and [her sister].  They bathed them, changed their diapers, fixed their hair and sexually assaulted them."  A 2018 Common Application also noted "[B.B.] has made progress in her fear of strange men, she is able to communicate with case manager [E], this is a big step for her, for she has always had a fear of men and would not tolerate them being near to her" and "[B.B.] does struggle with interaction with men due to her significant history of sexual abuse."  However, the sexual victimization page in IMPACT minimizes the abuse, stating only that B.B. was digitally penetrated by a brother, that her mother was aware of the incident and failed to report it, and fails to note how extensive the abuse was.

In B.B.'s 11 years in DFPS care she has been in 38 placements, including eight psychiatric hospitals and nine RTCs.  Two of the RTCs in which B.B. lived are now closed because of systemic safety problems, including substantiated abuse or neglect allegations.  Of the 16 foster homes where B.B. was placed, only four lasted more than 60 days. In 2016 alone, when B.B. was nine years old, she was moved to nine different placements.

Through all of these placements, B.B.'s behaviors have been consistent, although increasing in intensity. Her IMPACT records show that though her behavioral problems were identified early in her time in care, they were not effectively addressed, resulting in a constant cycle of disrupted foster care and adoptive placements, and eventually a cycle between psychiatric hospitals and RTCs.  During the monitoring team's interview with her, B.B.'s placements seemed to be a blur to her.  She did not seem to remember any placements prior to her first RTC placement at Children's Hope.  This is not terribly surprising, since she was seven years old at the time of that placement.  She was able to remember the RTCs when prompted with the name and the sequence.

During the interview with B.B., she noted that she did not think that any of the RTCs had been helpful in addressing her behavioral needs, and said she instead felt she picked up bad behavior from other children in these settings.  For example, before going to Hector Garza she had never cut herself but while there she started cutting.  These placements have also further exposed B.B. to antisocial behaviors, teaching her about riots and how to protect herself from staff and other residents.  While she has been sexually active in some of the recent RTC placements, no notes indicate that she is receiving proper sexual education and health education.  When she was interviewed by Monitor Deborah Fowler and a member of the monitoring team, B.B. reported that she had had sex with her boyfriend during the riot at Devereux – League City, but noted that she did not believe she was pregnant because "it doesn't hurt when I sleep on my stomach."

All of the changes in B.B.'s placements come with changes in educational settings.  B.B.'s records indicate that she has been enrolled in at least 23 different schools since entering care.[85]  As her permanency plan notes, her frequent moves and hospital stays have been a major factor in why

---

[85] Because this number seems low given the number of placements B.B. has been in, it is possible the Monitors are missing information related to B.B.'s educational records.

B.B. is behind in school.  The Monitors review of B.B.'s records show her frequent placement disruptions resulted in frequent educational disruptions:

- B.B. attended four different Kindergarten programs, repeating Kindergarten twice.
- B.B. attended two schools for first grade.
- Records do not appear to be complete for second grade, showing only one school starting in the spring semester.
- B.B. attended four schools for third grade.
- B.B. attended one school for fourth grade.
- B.B. attended eight schools for fifth grade.
- B.B. attended two schools for sixth grade.
- To date, B.B. has attended two schools for seventh grade.

B.B. has been receiving special education services (while placed in settings where she attends public school) since she started school.  Her most recent Service Plan indicates that B.B. is "academically delayed," and indicates that she needs "a structured and supportive academic environment in a special education setting with modifications."

B.B.'s experiences have been so chaotic she has no real perception of normalcy.  A September 30, 2020 note in B.B.'s Devereux – League City records captured the tragic impact of her experience in the foster care system: "[B.B.] appears to have difficulties envisioning herself as living outside of a residential placement setting and may cover underlying feelings of hopelessness."  Some of B.B.'s previous evaluations and service plans recommend an evidence-based treatment modality that does not appear to have ever been implemented, according to the Monitors' review of her records: A Functional Behavioral Assessment (FBA) by a board-certified behavioral analyst (BCBA).  Recommendations made by those who have evaluated B.B. indicate that an FBA would allow for the development of an individualized, safe, appropriate positive behavioral support plan (PBSP).  A properly implemented PBSP would help caregivers provide the significant structure, monitoring, and guidance needed to manage B.B.'s behaviors, increasing her own safety and the safety of other children in her placements and that of caregivers.

    a. Early Placements

At the time of removal, B.B. was described as not very verbal and extremely delayed. In care, B.B. was initially placed in a foster home, then lived in a kinship placement for about six months.  She was removed from their home because "The Department decided that B.B. needed more professional care than the aunt and uncle could provide due to her self-harm behaviors."  While she was in this placement, B.B. was referred to a psychologist for individual therapy.  A November 30, 2009 treatment summary prepared by the psychologist characterized B.B.'s behavior in daycare and out of daycare as "off the charts."  A psychological evaluation completed around the same time indicated the kinship placement disrupted due to B.B.'s instigation of sexual acting-out behaviors (removing all of her clothes, engaging in masturbation, and inserting objects into her body) and temper tantrums.

Despite this, B.B.'s service level remained at Basic.  She was placed in another foster home from March 30, 2010 until May 13, 2010.  According to her records, she was moved and placed in a

home with her sister.  By the time of the May 13, 2010 placement, B.B.'s service level had increased to Specialized "due to the severity and intensity of her behaviors."  According to placement information B.B.'s behaviors worsened during this placement. Therapy notes dated June 2, 2010 indicate "she continues to stick excessive objects in the toilet, bites her sister and foster parent regularly. Requires constant supervision due to extreme behaviors."

Due to B.B.'s behaviors on June 11, 2010, she was separated from her sister[86] and again moved, this time to a therapeutic foster home.  This home was her longest placement, to date.  A Service Plan completed during this placement notes, "[B.B.] is clearly bonded to her foster mom as she tends to run to her when she has a need and hides behind her when strangers come around the home…Since her placement, there has been [sic] no more reports of sexualized behaviors but [B.B.] continues to struggle with potty training.  She has made lots of progress but will still have accidents at times."  And later, under "High Risk Behaviors" the plan notes, "[B.B.] is the most aggressive [of the sibling group].  She tends to be the initiator of any sexualized behaviors (e.g. masturbating, inserting items in her vagina, stripping off her clothes, etc).  However, this worker has not received any reports of [B.B.] displaying these types of behaviors since she was placed in this foster home over a year ago."

During this placement, at the age of three-and-a-half years old, she was first placed on significant psychiatric medications. An August 23, 2010 psychiatric note indicates that B.B. was diagnosed with ADHD and impulse control disorder and prescribed Risperidone (0.25mg once a day). Clonidine (0.1mg) and Ritalin (5mg ½ tab twice a day) were added on September 29, 2010.  B.B. was also attending play therapy on a weekly basis.  She was later enrolled in Head Start and a Service Plan completed March 29, 2011 indicated she was "doing fairly well" though she had "some behavioral problems in the classroom for which they use time-outs and redirections."  Her level of care was reduced to Moderate, and the Service Plan noted that B.B. "requires frequent time-outs and re-directions.  However, she has made significant progress as she is no longer throwing the major fits that she use [sic] to when told not to [sic] something she wanted to do."  It noted that while separating B.B. and her sister "helped decrease both the frequency and the intensity of her sexualized behaviors," that there were plans to add play therapy with B.B.'s sibling to help address areas of concern related to B.B.'s interactions with her sibling.  By the date of the next Service Plan (July 18, 2011), B.B. and her sister were interacting in play therapy on a weekly basis.  An October 31, 2011 Service Plan noted that the siblings did so well in play therapy, that the therapist had released them from therapy and recommended that they continue to have regular contact with one another outside of a therapist's office.

B.B. remained in this home for close to two years, until April 12, 2012, when she and her sister were moved to a GRO, in preparation for adoption. B.B. left the GRO to be placed with her sister in an adoptive home on September 24, 2012, but due to B.B.'s behaviors, the adoptive parents

---

[86] B.B.'s records include contradictory statements regarding whether her sister was moved to this placement with her. A Service Plan completed January 3, 2011, first stated that B.B. "sees her sister…all the time as they are in the same placement" but later noted the following under "Discharge Planning:" "[B.B] needed to have her level of care raised to more accurately reflect her needs (done).  She needed to be moved to a Therapeutic Family Foster Home (done). She needed to be separated from her sister…as her behaviors significantly worsen when they are placed together (done).  She needed to find a therapist and be taken for regular Play Therapy (done).  Since there is only one earlier Service Plan (dated 2009), it is likely that this version was not updated completely, resulting in contradictory information.

requested that B.B. be removed less than a month later on October 17, 2012. The adoptive parents wanted to keep B.B.'s sister, but not B.B. DFPS removed both children from the placement. Notes indicate that B.B. "was upset to leave [this] placement."

Following the failed adoption, B.B. was separated from her sister reportedly because there was no available home for both girls. B.B.'s level of care again increased to Specialized, and she was placed in another foster home from October 17, 2012 until November 13, 2013. A Service Plan completed during this placement noted, "Due to [B.B.'s] age and her sexualized behaviors…as well as violent and lengthy tantrums, she needs constant supervision to ensure that her basic needs are met and that she, as well as others, remains safe. The foster mom has also installed a baby monitor in the bedroom…to monitor [B.B.] at all times. [B.B.] is also monitored closely when interacting with the younger children in the home due to her increased sexualized behaviors." Although she remained for almost a year, discharge was requested due to B.B.'s behavior.

    b.   First Psychiatric Hospitalization & Placement in a Residential Treatment Center

B.B. was placed in yet another foster home from November 13, 2013 to April 25, 2014. According to the next Service Plan in B.B.'s records (dated January 20, 2014), a new psychological evaluation had been requested from B.B.'s Child Placing Agency (CPA) in March 2013, since her last evaluation had been completed in April 2010. The January 20, 2014 Service Plan noted that this request was "still pending." This plan indicated that B.B.'s therapy had decreased to twice monthly, despite B.B. being at a Specialized level of care. It also indicates that her sister was placed in the same home, and noted that in addition to the baby monitor in her bedroom, the foster parents installed bed alarms to ensure that B.B. and her sister "comply with the rules at night." This placement also disrupted due to B.B.'s behavior.

She was then placed in her first psychiatric hospital until May 16, 2014. A Service Plan completed just before her hospitalization, on May 6, 2014, indicated that the psychological evaluation requested from the CPA in March 2013 was **still** "currently pending." At this point, at the age of seven, B.B. had already bounced around approximately 18 different placements.

After her first psychiatric hospital admission, B.B.'s level of care was again raised to Specialized, and she was placed at her first RTC, Children's Hope, from May 16, 2014 until March 11, 2015. This started a cycle between psychiatric hospitalizations and RTCs that continues today. Children's Hope was a troubled facility, and had been placed under a corrective action evaluation plan by HHSC Licensing just before B.B. was admitted. Licensing indicated that it took this step due to repeated citations for minimum standards deficiencies. The list of citations that spurred the plan included violations of minimum standards associated with corporal punishment and other prohibited punishment, and citations related to inappropriate restraints.[87]

During this stay, a neuropsychological evaluation was completed for B.B. It was noted during this assessment that B.B. was sexually abused by an older brother. It was also known that the mother used drugs and alcohol during the pregnancy. This evaluation made note of a few other assessments that B.B. had completed reflecting behavioral concerns such as temper tantrums,

---

[87] *See* Deborah Fowler & Kevin Ryan, *The Monitors' Update to the Court Regarding Remedial Order 20*, ECF 832, at 13; Deborah Fowler & Kevin Ryan, *First Court Monitors' Report 2020*, ECF 869, at 323 – 328.

sexually acting out, urinating and defecating on herself.   The evaluation made specific educational[88] and behavior recommendations related to how to handle B.B.'s tantrums and other behaviors.

The behavioral recommendations made by the evaluation included:

- Do not tolerate B.B.'s temper tantrums; place her in another room or remove her from the environment where she is throwing the tantrum;
- Have a pre-arranged place where B.B. can go until she calms down;
- Do not try to engage her in conversation when she is upset;
- Do not "get down on her level" when she is upset so that she cannot head butt;
- Remove secondary gains B.B. achieves through her negative behavior, i.e. getting attention, avoiding a task or getting her way;
- Allow B.B. to suffer the logical and natural consequence of her behavior;
- Do not try to save her by only threatening her with consequences;
- Do not argue with B.B., and
- Identify B.B.'s strengths and allow her to demonstrate these strengths frequently.

It is impossible to verify whether these recommendations were followed, and if they were, what outcome was achieved, due to the lack of records and B.B.'s frequent placement moves.  B.B.'s January 9, 2015 Service Plan does note that Children's Hope was using the evaluation as a "tool" in her treatment program, that she received therapy on a daily basis at the RTC, and that her medications were being reduced.   The Safety Plan also discloses that "a sibling split has been approved for B.B. due to the sisters [sic] behavior when placed together."  During this first RTC placement, B.B.'s case worker made a report to the abuse and neglect hotline when she noticed a mark on B.B.'s face.  When asked about it, B.B. told her that a staff person caused the injury during a restraint.  B.B.'s case worker noted that the mark on B.B.'s face looked like a rug burn.  After an investigation, DFPS ruled out abuse by the staff person.   However, two years later (after multiple investigations of allegations against this staff), the facility was issued citations for inappropriate discipline after several children reported that the same staff person hit them with a wooden stick.

After she was discharged from Children's Hope for "leveling down to basic" B.B. was placed in another foster home, which lasted five months, from March 11, 2015 to August 11, 2015.  B.B.'s condition worsened while in the foster home and she was again placed in a psychiatric hospital. The foster parent asked that B.B. not be returned to her home.

---

[88] The Educational recommendations suggested reinforcing instructions individually to B.B., allowing her to take test tests or do class work in a distraction free environment, giving her preferential seating in front of instructor's desk, having teachers supply lesson plans or the course syllabus to caregivers, providing hard copies of information, reducing the amount of information B.B. is exposed to in class, reducing the length of assignments and allowing extra time for tests, teaching step-by-step approaches to understanding verbal information, transferring any verbal information into visual information, organizing verbal information with a diagram outline, teaching B.B. effective rehearsal strategies in order to improve her long term memory and short term memory, and having the teachers notify the caregivers immediately if an assignment has not been turned in on time.

After spending 20 days in the psychiatric hospital, on August 31, 2015, Children's Hope RTC admitted B.B. back into their program; her service level was changed to Intense.  B.B. was eight years old.  A Service Plan completed during this placement notes, for the first time, that "[B.B.] has a history of threatening to harm herself and others, these behaviors require that [B.B.] be monitored at all times."  B.B. remained in this placement until February 1, 2016, when all the children were removed from the facility by DFPS due to contractual violations which included: improperly restraining children, rooms that "smelled strongly of urine," incomplete medication logs, children injuring other children, punishing children who refused to go to sleep by making them go outside without proper clothing for the weather, a significant number of reports that staff members hit or kicked children, mouse droppings in the kitchen and bedrooms and dead roaches throughout the facility, diabetic children who had to be hospitalized because the facility did not have appropriate testing equipment, and feces smeared on walls in some rooms.[89]   During the Monitor's interview with B.B., she said that she was a "good fighter," and when asked where she learned to fight, she said that she initially learned at Children's Hope, got better during her stay at Prairie Harbor RTC, but really honed her skills at Hector Garza, just before her placement at Devereux – League City.[90]

With no placement arranged when Children's Hope closed, B.B. was placed in an Emergency Shelter for seven days before being admitted to another RTC.  During this placement, a Service Plan adds that in addition to monitoring B.B. closely in other settings, B.B. "also must be monitored closely at school."  She remained for seven months before the RTC requested she be moved due to her behavior. B.B. was then placed in her 3rd psychiatric hospital.

During the last two months of 2016, B.B. moved placements six times, with most of these placements lasting no longer than two weeks.[91]   These placement moves included yet another hospitalization at a 4th psychiatric hospital.  It was also during this time that her psychiatric

---

[89] *See* Deborah Fowler & Kevin Ryan, *The Monitors' Update to the Court Regarding Remedial Order 20*, ECF 832, at 13; Deborah Fowler & Kevin Ryan, *First Court Monitors' Report 2020*, ECF  869, at 323 – 328.

[90] B.B. was interviewed in connection with allegations of abuse and neglect that allegedly occurred at Children's Hope, reported to SWI on January 26, 2016.  The report to SWI included allegations that a child was "sexually pushing herself" on other children.  B.B. was eight years old at this time.  During her first interview for this investigation, B.B. reported that her former roommate was moved out of their room for "being sexual."  B.B. said that the child "was trying to play boyfriend and girlfriend, which is where you 'kiss and stuff'."  She indicated that the child "tried to be sexual with her."  During a follow-up interview, the investigator noted that B.B. "was observed with a significant bite mark on her left upper arm."  When asked about it, B.B. told the investigator that another child attacked B.B. physically, then got mad and bit B.B. when she did not fight back.  This occurred in the hallway, and B.B. reported that because the staff member who is usually in the hallway was sick, there was no staff person present to intervene.  B.B. again reported during this interview that a former roommate was moved from her room because the other child "did 'sexual stuff' to her" and, when pressed to be more specific, said the other child "kissed her on the mouth and touched her privates under her clothes when she was sleeping."  B.B. reported the other child would "'hump her' with their clothes on."  Though abuse or neglect was ruled out, the facility received seven citations for minimum standards deficiencies, including a citation related to the staff's failure to appropriately supervise the child who sexually assaulted B.B. (who had a history of sexual aggression prior to her placement at Children's Hope), and a citation related to the staff's failure to appropriately supervise during the incident that resulted in B.B. being bitten.  The facility was also cited for failing to report an incident during which B.B. bit the child who sexually assaulted her, which resulted in the child being taken to the emergency room to receive medical treatment.

[91] These placements consisted of a foster home placement from 10/11/16-10/13/16, a fictive kin's home from 10/13/16-11/4/16, a foster home from 11/4/16-11/16/16, the psychiatric hospital this 11/16/16-12/2/16, and a foster home from 12/2/16-12/6/16.

medication dosages increased and additional psychiatric medications were added: Trileptal (600 mg 2 times a day) for bipolar disorder along with Trazadone at night for sleep. Risperidone was increased (1 mg 3 times a day) for mood.

     c.   Out of State & Out of Region Placements

DFPS moved B.B. on December 6, 2016 to a Florida RTC, where she remained until June 29, 2017. A Service Plan completed just before B.B.'s placement in Florida noted that her sister had been adopted, but that B.B. was still allowed to have contact through phone calls, letters, and visits (though they were unable to visit while she was placed in Florida). Upon entering this RTC, B.B.'s diagnoses were: Bipolar Disorder, Learning Disability, PTSD, and Nocturnal Enuresis. B.B.'s medications were again adjusted, and B.B. regained her ADHD diagnosis. She was placed on the following medications: Clonidine (0.2 mg. once a day), Risperidone (2 mg once a day) for mood, Trileptal (600 mg 3 times a day) for mood, DDVAP (0.4 mg) for the enuresis, and Topamax (50 mg a day) for mood. A Service Plan completed during this placement noted, "[B.B.] has been restrained at least 13 times due to her behaviors since being placed...Her placement reports that when she gets upset and doesn't get her way that she will frequently strip naked and run down the halls." Treatment included "Eye Movement Desensitization Therapy" in April 2017, but the Service Plan indicated that this "has not decreased her behaviors at this time." In fact, the plan revealed that B.B. "has digressed in the progress she had made in the first 3 months of being placed" and says B.B. is "only able to calm down after being restrained, placed in seclusion, or sometimes both." Due to a lack of progress, the facility recommended B.B. be transferred to an RTC in Texas. On discharge, the RTC also recommended "A certified behavioral analysis … to help identify and address her behavioral needs." Based on the records the Monitors received, this does not appear to have been done.

When B.B. returned to Texas, she was placed at Devereux Treatment Center in Victoria where she remained until October 19, 2018 when her service level was decreased. This is one of the placements that B.B. indicated she liked during her interview with Monitor Deborah Fowler, noting that "it was the homiest" of the RTCs she had been in and that she liked the staff. B.B.'s records show that one of the reasons she liked this placement was because she "got more contact with [her] sister." While at Devereux – Victoria, her medications were again adjusted: Risperidone was changed out for Geodon which was again changed out for Latuda. Clonidine and Trileptal were continued and Strattera was added for ADHD. Her diagnosis changed back from bipolar disorder to DMDD; Oppositional Defiance Disorder (ODD) and PTSD, ADHD and nocturnal enuresis remained. When B.B. was discharged from Devereux – Victoria, her service level was reduced from intense to moderate, though the treating professional stated that B.B. "continues to display ongoing physical aggression." The Devereux – Victoria team recommended that "B.B. be placed in a therapeutic foster home and continue to receive psychiatric services and medication management."

B.B. was then placed with a therapeutic foster on October 19, 2018. Notes indicate that B.B. was "excited to be in a family home." Unfortunately, in just under a month, she was discharged and admitted to yet another psychiatric hospital, from November 13, 2018 through November 29, 2018. Next, B.B. was moved to another therapeutic foster family. This placement also lasted less than a

month, and at this point B.B.'s behavior began to escalate. B.B.'s foster mother took B.B. to a new psychiatric hospital where she remained from December 21, 2018 through January 7, 2019.

During this hospitalization, at the age of 11 years old, B.B. was diagnosed with Bipolar disorder. Some of her medications increased in dosage, but the medications themselves remained the same. While at the hospital a psychological evaluation was completed, since her last evaluation had been completed more than two years earlier. The evaluation suggested that B.B. be provided Cognitive Behavioral Play Therapy, noting that "Cognitive-behavioral play therapy could help her gain a better understanding of the relationship between certain environmental triggers, her emotional overreactions and her mediating thought processes." It also suggested mindfulness exercises for children: "Mindfulness involves learning how to cultivate greater self-awareness and greater awareness of others and the world. Mindfulness is an innate capacity that is tapped, developed, and deepened through practice. It all starts with attention and being present, which occurs when the child is attentive and in touch with their immediate experience. Mindfulness training has been shown to impact regions of the brain having to do with executive functioning, including impulse control and decision-making, perspective taking, learning and memory, emotional regulation, and a sense of connectedness with one's own body." The Monitors did not find any records that indicate that B.B. received any of these recommended therapies.

She left the psychiatric hospital and was placed in another RTC, The Tree House Center Inc.,[92] on January 7, 2019. While at Tree House, her DMDD diagnosis was again changed back to Bipolar Disorder. The Risperidone was again changed out for Geodon, her Trileptal was changed out for Lithium, and Prazosin was added back for B.B.'s PTSD. None of these changes seemed to make a difference, however, and in less than three months, the RTC requested that she be removed, after first having sent her to yet another psychiatric hospital. As part of its discharge information, Tree House included recommendations from her last psychological evaluation, completed during her stay at the last psychiatric hospital, that emphasized the need for weekly individual psychotherapy and group counseling. The evaluation also spoke to what would be needed to ensure B.B.'s success in foster family settings: "Once a home environment is identified, family therapy will be indicated. B.B.'s transition into a new home environment is likely to produce tension and conflict within the family. Consequently, the sooner family therapy is initiated the quicker family roles and rules can be discussed and implemented, communication channels opened, and appropriate expectations regarding behavior can be addressed. Psycho-education for new caregivers around B.B.'s diagnosis and history will help them gain a better understanding of how to effectively interface with her. B.B. will likely require significant structure, monitoring, and guidance to aid in her control and behavior. Upon discharge bi-weekly family therapy is highly recommended."[93]

---

[92] This RTC is currently under a placement hold by DFPS due to safety concerns, and is also under heightened monitoring.

[93] Despite what seems like a common-sense recommendation for a child with such intense behavioral needs, based on the records provided to the Monitors, it does not appear that bi-weekly family therapy was set up prior to B.B. moving into the foster family placement that followed her release from Devereux – League City, or that DFPS or St. Francis ensured significant structure, monitoring or guidance to this foster parent (who indicated early in B.B.'s placement that she was willing to consider being a longer-term placement for her). This is likely because these recommendations had long since been forgotten in the wake of the psychiatric hospitalization and three RTC placements that followed the evaluation.

After a brief second stay at a psychiatric hospital where she had previously received treatment, B.B. was placed at yet another RTC, Prairie Harbor,[94] where she remained until November 5, 2019. While at Prairie Harbor her medications were again adjusted. Geodon was switched back to Latuda and Lithium was stopped and not replaced with another mood stabilizer. During the Monitor's interview with her, B.B. recalled that staff at Prairie Harbor often gave the youth in care a hard time, though she said that since she was the youngest child at the facility, staff were not as hard on her. A Service Plan completed during B.B.'s placement at Prairie Harbor again recommended that "A behavior modification plan should be implemented on [B.B.'s] behalf which should be designed to increase the frequency of cooperative and acceptable social behaviors. The developing and implementing of a behavior modification plan for [B.B.] will encourage her to display positive interactions with her sister." This language was repeated in B.B.'s next Service Plan, but dropped out of the plan once B.B. was placed at Devereux – League City (despite Devereux – League City's claim in materials describing its treatment program that this was one of the assessments and supports provided in the second and third tiers of its PBIS model).

A Common Application completed just before B.B.'s move from Prairie Harbor noted "[B.B.] has expressed to worker several times that she is hearing voices, having nightmares, and they are telling her to do bad things such as self harm" and recommended, "[B.B.] will need to be treated for the voices and behaviors which are aggressive and self harming." The Common Application also noted "B.B. desperately wants a family who will love her and take care of her protecting her from further abuse and harm. B.B. wants a family where the parents work and there is no fear of being hungry or not having enough money or being homeless."

While B.B. was placed at Prairie Harbor, DFPS entered into a contract with Saint Francis Ministries to become the Single Source Continuum Contractor (SSCC) for Community Based Care in DFPS Region 1, which includes B.B.'s home county. Records indicate B.B. was discharged from Prairie Harbor due to her level of care decreasing. However, on November 6, 2019, she was moved to Hector Garza Residential Treatment Center, and was placed with an Intensive Psychiatric Transition Program (IPTP) level of care. Notes in IMPACT indicate that during her placement at Hector Garza, she was "regressing in her treatment, displaying highly aggressive behaviors." A Service Plan completed early in her placement there lists the following as "triggers" that B.B. identified: "having her arms placed behind her back" and "men touching her." This would necessarily present problems at a facility like Hector Garza that relied on restraints as a primary method of controlling children, restrained children with their arms behind their backs, and allowed male staff to restrain female clients.[95] During the Monitor's interview with B.B., she reported that while she was at Hector Garza, in addition to honing her fighting skills, she picked up the habit of cutting (self-harm) from other kids at the facility. She showed the monitoring team scars on her arms from cutting. B.B. reported a lot of "gang activity" at Hector Garza, and said that in addition to affiliations with outside gangs, the youth at Hector Garza started their own

---

[94] Prairie Harbor recently closed, after an investigation of a child fatality led to substantiated findings of neglect, and naming the administrators among the perpetrators. Administrative review of the findings has been requested and is pending.
[95] See Deborah Fowler & Kevin Ryan, *First Court Monitors' Report 2020, Appendix 5.5*, ECF 875.

gangs.  B.B. reported that Hector Garza was the first facility she was placed in where riots occurred; she indicated that she was involved in at least one riot during her time there.[96]

On May 20, 2020, DFPS reported that they had decided to end their contractual relationship with Hector Garza after determining that "while improvements were being made, their particular model was not the direction DFPS was going long-term."  B.B. stayed at Hector Garza until July 30, 2020.  While at Hector Garza, B.B. took Strattera for ADHD, Clonidine (1/2 of a .1 mg tablet, three times daily) as "a sedative," Latuda (antipsychotic), and stayed on Prazosin (for nightmares).

   B.  A.A.'s & B.B.'s Experiences at Devereux – League City

For children who have intense mental and behavioral health needs, treatment and safety go hand-in-hand.  It is difficult for a child to engage in treatment in an environment that is not safe.  Similarly, for children like A.A. and B.B. whose histories of abuse and trauma cause them to act out physically and sexually, a lack of treatment causes safety issues for themselves and those around them.

Devereux – League City acknowledges this, stating:

> At Devereux, one of the building blocks of our philosophy is the belief in creating a safe, enriching and highly structured therapeutic environment for our clients that encourages cooperation and promotes successful experiences as a foundation for building self-confidence and motivating personal growth.  A healthy therapeutic milieu can be described as a safe, structured, and nurturing environment that helps create a sense of community in both clients and staff, a sense of shared expectations and responsibility for the well-being of others as well as one's own.  A number of key characteristics are believed necessary to create this environment:
>
> - Structure that creates feelings of safety/security and orderliness (daily routines and expectations);
> - Predictability and consistency;
> - A non-threatening/nurturing approach; and
> - Ongoing supervision and guidance relative to clients' needs.[97]

In addition to providing a safe, structured environment in which children can engage in the treatment they need, children also need access to treatment that addresses their individual mental and behavioral health needs.  Devereux – League City's three-tiered PBIS model promises just such an individualized approach, particularly for children like A.A. and B.B. whose needs go beyond those that are likely to be met by the universal tier outlined in Devereux – League City's descriptions of its treatment model.

---

[96] The Monitors made an on-site visit to Hector Garza in December 2019, and while there two members of the monitoring team found themselves on a unit when a riot occurred.  B.B. was at Hector Garza when the monitors visited, but she was not interviewed by the monitoring team at that time.  After the on-site visit, the Monitors expressed deep concerns to DFPS and HHSC regarding serious risks to children's safety at the facility.  *Id.*

[97] Devereux, *supra* note 59, at 3.

Both children needed a placement that could meet their mental and behavioral health needs, including:

- Treatment related to their intense histories of trauma and abuse;
- Trauma-informed approaches to addressing their histories of physical aggression;
- A safe environment for survivors of sexual abuse who have exhibited sexualized behavior as a result of their trauma;
- For A.A., a placement that can manage her tendency to run from care.

However, the Monitors' review of A.A.'s and B.B.'s records related to their stay at Devereux – League City show substantial lapses in treatment and safety while at the facility, during which time both children deteriorated.

     i.     A.A.'s Experience at Devereux – League City

On September 5, 2019, just two months after having been placed at Devereux – League City, A.A. was interviewed at the League City Police Department for an investigation of sexual abuse allegations made against a Devereux – League City staff member.  The investigation was initiated after another child alleged the staff member had sexually abused A.A. and several other children at Devereux – League City.[98]  During her interview, A.A. reported that the Devereux – League City staff member began sexually abusing her during the first month of her placement at Devereux – League City in July 2019 and continued until the week prior to her forensic interview on September 5, 2019.  The allegations A.A. reported during her interview were among those that RCCI substantiated.  One of the other victims reported that A.A., though reluctant to report the abuse, "feels disgusted."  It took more than a year for the investigation to be completed; it closed

---

[98] These allegations were substantiated and are discussed in the section outlining abuse and neglect investigations. The CLASS chronology for the investigation shows that A.A. refused an interview with the RCCI investigator assigned to the case on August 26, 2019; this is confirmed in an August 30, 2019 contact note in IMPACT which indicated A.A. initially "refused to talk" to RCCI investigators about the abuse and refused a medical exam.  A September 5, 2019 contact note in IMPACT indicated that when A.A.'s caseworker returned a call to A.A., "[A.A.] informed [caseworker] she was touched, kissed.  When [caseworker] asked what did she mean she told [caseworker] she did not want to talk about it.  [Caseworker] asked [A.A.] if she reported it to staff and she said no.  [Caseworker] asked [A.A.] if she went for an exam and she reported staff took her but she reported she refused to take the exam. [Caseworker] asked [A.A.] why did she refuse to take the exam. [A.A.] informs because she does not want to do it and does not want to talk about it.  [Caseworker] asked [A.A.] if she felt safe.  [A.A.] informed [caseworker] she did not want to be here anymore.  [A.A.] says she does not feel safe because of what happened.  [Caseworker] asked [A.A.] if she has spoken with the [RCCI] worker in regards to what she does not want to talk about and she said no. [A.A.] asked if the plan was for her to go home.  [Caseworker] and [A.A.] discussed at this time [A.A.] needs to continue to do well like she has been doing and working on what things she needs to work on her program." On September 9, 2019, A.A.'s caseworker added another contact note in IMPACT, indicating that she called the RCCI investigator who was working on the investigation into the sexual abuse allegations and that they discussed "[A.A.] met with [caseworker] today in person and informed [caseworker] she was going to talk with the [RCCI investigator] at placement about the incident and take the SANE exam.  [A.A.] informed [caseworker] she did not want to talk about it and she refused the exam before because she does not want anyone examining her body.  [Caseworker] informed [the RCCI investigator]…[A.A.] talked about her not feeling safe at her placement and not wanting to be there but would not say why.  After [caseworker] and [A.A.] discussed her safety is important and if she does not share why she does not feel safe no one can help her.  [Caseworker] informed [RCCI investigator] [A.A.] informs she is going to talk with the investigator at her placement."  A contact note entered in IMPACT on September 27, 2019 indicated A.A. again refused a SANE exam.

five days after A.A. left Devereux – League City.[99]   The monitoring team did not find any indication in A.A.'s files that any additional assessments were completed, or supports provided, consistent with the tiered approach described in Devereux – League City materials outlining its treatment program, even after exposing A.A. to the traumatic events associated with the staff member's sexual abuse.

During the monitoring team's on-site visit to Devereux – League City, A.A. was interviewed and reported that she did not like living at Devereux – League City.  She indicated that staff are rough with children during restraints, that they instigated fights between children, and were dishonest. She indicated that she did not feel safe on campus, reported that staff made her feel unsafe, but declined questions asking her for more specific information.  She complained of a leg injury related to a recent restraint.[100]   She was upset that she was not able to have visits with her siblings.

The monitoring team's review of A.A.'s records show that, rather than improving, she deteriorated throughout the course of her stay at the facility.  A.A. repeatedly told her caseworkers that she wanted to leave Devereux– League City.   During a monthly evaluation that took place on November 15, 2020, just four months into her stay at Devereux– League City, A.A.'s caseworker noted, "[Caseworker] received several incident reports/notifications and/or phone calls related to [A.A.] eloping, being disrespectful, being verbally and physical [sic] aggressive and not following rules.  She was also placed in seclusion several times during this month."  In other words, four months after placement, Devereux – League City's treatment program was failing to address the behavioral health needs that were the basis for her admission.  Precisely the same notes were included in her December 4, 2019 monthly evaluation, and every monthly evaluation during the rest of her stay at Devereux – League City.

There were so many serious incident reports in A.A.'s Devereux – League City file that the monitoring team could not document all of them.   A.A. was often verbally and physically aggressive, which resulted in loss of privileges and, in some cases, being placed on STOP and confined to her unit.  Monthly evaluation reports repeatedly document A.A.'s reports of getting into fights with other children, and being "jumped" by other children.  A.A. acknowledged to her caseworker that she "worried about getting jumped" but quickly stated that she was "no punk and will fight back."  There were at least seven incident reports documenting A.A.'s runaway attempts. One runaway attempt resulted in a physical struggle with a police officer who found A.A. and attempted to return her to Devereux – League City; when A.A. resisted going inside her unit once they were back on campus, A.A. fought the officer when he attempted to physically move her inside.  Her nose was broken during the struggle.  Two incident reports in A.A.'s Devereux – League City records document suicide attempts, and multiple records document self-harming behavior like cutting her arms, punching herself in the face, or hitting her head on the wall of the seclusion room.[101]

---

[99] The RCCI findings are discussed in footnote 31, *supra*.

[100] The monitoring team confirmed this had already been reported to SWI.

[101] The suicide attempts are described in IMPACT notes for A.A.'s February 2019 monthly evaluation report, and her June 2019 monthly evaluation report.  The February 2019 report notes, "2/24/20 [caseworker] received an email from [Devereux – League City staff] informing last night while doing their safety rounds, staff discovered [A.A.] in her room with a sweater tied around her neck.  Staff intervened immediately and removed the sweater.  [A.A.] was purple when staff intervened and called for the nurse who was doing medication pass to come assist.  The nurse assessed [A.A.] and besides her face being discolored [sic].  The nurse completed a Diagnostic Suicide Risk Assessment and

Devereux – League City commonly used restraint and seclusion to control A.A.'s behavior.  The first record documenting restraint and seclusion for A.A. is dated July 20, 2019, a little more than two weeks after she was placed in the facility.  After being restrained, A.A. was in seclusion for an hour and a half.  Later, during the documented debriefing with A.A. and a staff member, she reported that she was upset because her case worker did not answer when she attempted to call her, and that she was feeling angry and sad, which led her to act out.  There were 17 additional documented incidents involving a restraint and/or seclusion for A.A. between September 8, 2019, and January 10, 2020.[102]

During her interview with the monitoring team, A.A. indicated that she had one-on-one therapy once a week, but that she did not engage.  This is consistent with her reports during face-to-face visits with her local permanency specialist, previously called an "I See You" worker.  A.A. indicated that after her first therapist left Devereux – League City, she "was upset she shared all her life traumas with [her former therapist] and then she just left."  A.A.'s case worker indicated that "it is hard for [A.A.] to open up and trust others.  And when she does, and they leave, she feels upset or betrayed."  A.A.'s Service Plans for her time at Devereux – League City do not indicate any additional treatment beyond weekly therapy.  Though A.A. may have had at least one counseling session with her mother,[103] parental rights were terminated while A.A. was at Devereux – League City, and her contact with her mother ended.  Despite her ongoing behavioral challenges which resulted in frequent restraints and seclusion, the Service Plans completed for A.A. during her time at Devereux – League City show no change in her treatment, aside from new prescriptions for additional psychotropics, and increased dosages.  Prazosin (1 mg)[104] was added back to her medication regimen, along with Prozac (20 mg).  Her Abilify prescription was increased in dosage (5 mg), still at twice per day.  The last Service Plan completed for A.A. during her placement at

---

rated her a high risk.  Due to the severity of the incident [A.A.'s] Level of Supervision has been changed from 3 to 1. Therefore a female staff member will be within arm's reach of her at all times including using the restroom and shower. [Devereux – League City staff] reports the next morning [A.A.] was attempting to run into another peer's room and was also attempting to tie her sweater and headband around her neck again.  Due to these unsafe behaviors it was decided that [A.A.] will be programmed to her room for safety while being on 1:1 supervision."  The June 2019 report states, "On 6/12/2020, [A.A.] was found in the bathroom on the floor with leggings tied around her neck.  Staff removed the leggings from her neck.  [A.A.} began to cry and stated she was upset over a phone call she had earlier. The charge nurse wanted to assess [A.A.] after the incident but she refused.  [A.A.] was put on Level 2 Supervision and any items that she could use to self harm were removed from her room.  On 6/13/2020, [A.A.] attempted to tie a shirt around her neck and acted as if she wanted to cut herself.  [A.A.] expressed she was battling thoughts of self harming."

[102] The monitoring team received copies of all the packets documenting a restraint or seclusion that were in A.A.'s file; since A.A. did not leave Devereux – League City until November 12, 2020, it is clear that her file was missing documentation (or the monitoring team was not given copies) for restraints and seclusions that occurred after January 10, 2020.  In fact, one restraint that occurred in October of 2020 was investigated after A.A. reported that her leg was injured during the restraint.  A.A.'s IMPACT records do not show that her experience improved during her stay – in fact, the operation put in a 14-day discharge notice prior to her removal from the placement, citing her behavior as the reason for the early discharge.

[103] Though contact notes in IMPACT previously indicated A.A. reported having a counseling session that included her mother, a contact note entered by her caseworker on October 7, 2019 indicated A.A. reported "her mom has not participated in any therapy with her" and "says they have not had one session since she has been placed with Devereux."

[104] Though A.A.'s service plans indicate she was taking "Prosatin," the Monitors do not find any psychotropic matching this name in online searches, and the monitoring team's record reviews instead indicate A.A. was taking Prazosin for nightmares, with no mention of "Prosatin."  We assume this was a typo in A.A.'s service plans.

Devereux – League City indicates the dosages of her medications had again been increased: A.A. continued taking Abilify twice daily, but at a dosage of 7.5 mg, with Prozac dosage tripling to 60 mg and Prazosin doubling to 2 mg.[105]   Nothing in A.A.'s records showed that any of the assessments or supports that Devereux – League City's materials describe as being part of its tiered PBIS model were provided to A.A., even as her behavioral challenges continued.

A.A. does not appear to have made progress in school during her 16-month stay at Devereux – League City, though there was very little information in A.A.'s educational records at Devereux – League City, and the information available in IMPACT is inconsistent.  Prior to entering care, A.A. attended 5th grade in a local charter school.  A.A. qualifies for special education services. The first Service Plan completed for A.A. a month after entering Devereux – League City indicated that she read at the 3rd grade level, and that her math skills placed her at a 2nd grade level.  The plan indicates A.A. is "in the well below average range of intellectual functioning." During her placement at Devereux – League City, she attended the on-campus private school.

In the section of the August 2019 Service Plan related to special education, the plan indicated "All academic and elective classes at Devereux – League City occur within a special education setting." A Service Plan completed in March 2020 indicated that she was in 5th grade at Devereux – League City's private school.  It noted she was not on grade level, answered "No" to a question related to her need for tutoring services, and under "Describe Plans to address" simply said "Unknown at this time."  It noted she was receiving special education services but stated "No IEP provided by referral source."  The educational information included in the Service Plan completed three months later was identical, and was again identical in a service plan completed in September 2020, the last Service Plan completed prior to her discharged from Devereux – League City.

In A.A.'s August 2019 monthly meeting with her local permanency specialist, when asked what she was doing in school, A.A. reported "sleeping."  Just before she left Devereux – League City, on October 13, 2020, the local permanency specialist asked A.A. how school was going.  A.A. reported that it was "good" but that "the teachers do not even teach you anything."  Several notes in A.A.'s documentation related to Devereux – League City blame her lack of progress in school on her behavior, noting "Her behavior is the one thing holding her back from the success she seeks in school."  However, nothing in her service plans indicates targeted school-based interventions to address any behaviors at school.[106] While A.A. reported being on grade level each time she met with her local permanency specialist (reporting that she was in the 7th grade just after being placed at Devereux – League City, and in the 8th grade just before she left), the local permanency specialist indicated this might not be accurate.  The reports in the CVS Monthly Evaluations are inconsistent: In July of 2020, for example, the report indicated A.A. was in 7th grade at Devereux – League City's private school.  But in August of 2020, the report indicated she was in 6th grade, and her September 2019 report indicated she was in 5th grade at Devereux – League City School.  During her October 2019 face-to-face with her local permanency specialist, A.A. told the worker she was

---

[105] Her most recent Common Application shows Abilify reduced back to 5 mg., however it also shows the Prazosin increased to 3 mg.

[106] The only classroom accommodations and modifications noted in A.A.'s service plans are: extra time on tests and quizzes, having tests read aloud, not being penalized for spelling in her grading, and providing immediate feedback as an instructional strategy.

in 8th grade at Devereux – League City's school, and the worker noted "I am not sure if that is correct and [caseworker] will follow up on this."[107]

ii.     B.B.'s Experience at Devereux – League City

On July 30, 2020, B.B., then 13 years old, was placed at Devereux – League City by St. Francis (the SSCC managing her care), more than 600 miles from her home county.  Notes in B.B.'s psychological evaluation, completed the day she was admitted, indicate when she was discharged from Hector Garza, her medication had changed again and she was taking Abilify and Zoloft, which she continued to take at Devereux – League City, along with Strattera.  During B.B.'s short stay at Devereux – League City, she was disciplined, restrained, and placed in seclusion on a regular basis.  The monitoring team noted at least 14 instances of restraint or seclusion documented in B.B.'s Devereux – League City records.  A Client Service Review Summary from Devereux – League City indicated that during the one-month period between August 27, 2020 and September 30, 2020, B.B. had "demonstrated 55 incidents of Major Behaviors including safety threats (39), physical aggression (9), property destruction (3), elopement (2), and self-injurious behavior (2)" though it noted "[h]er behaviors have improved in the several [sic] days."

Educational notes indicate that B.B. was enrolled in 7th grade classes at Devereux – League City's on-campus school, and also attended vocational education courses.  However, on September 30, 2020, notes indicate B.B. was "currently on unit restriction due to behavior and has been attending class on the unit."  The notes indicate that B.B.'s behavior impeded her academic progress because it often resulted in unit restrictions.  Yet, her records do not indicate any behavior intervention plan as part of the accommodations provided to support her educational progress.

In fact, despite clear indications well before the riot that B.B.'s behavioral challenges continued and escalated during her first few weeks at Devereux – League City, aside from the level system used campus-wide as part of Devereux – League City's RISE program, it does not appear that the treatment staff attempted any new strategies, or provided any additional supports and services for addressing B.B.'s behavior as her challenges and safety risks persisted, despite Devereux – League City's claim that its program was based on "D-PBIS: A **Multi-tiered** Ecological Behavioral Treatment Model."[108]  Devereux – League City claims "Program activities, materials, and behavior motivations strategies are **continually adjusted** to match each client's skill level."[109]   The Monitors found no evidence that Devereux – League City had scheduled – or even considered – a functional behavioral assessment that would allow B.B.'s treatment team to develop a behavior support plan that treated her serious emotional disorders, prioritized her safety and optimized her natural strengths and talents, which are evident.  During her interview with Monitor Deborah Fowler, B.B. was articulate, funny, and said she liked to draw.  She revealed that her room at Devereux was covered in her art work.  Moreover, B.B.'s most recent Common Application

---

[107] The confusion appears to have persisted after A.A. left Devereux – League City.  Her monthly evaluations for November and December 2020 both indicate that she would be enrolled in a local middle school (the December 3, 2020 contact note for the monthly face-to-face visit indicates she still had not been enrolled because she was not current on her vaccinations).  Yet, her most recent Common Application, dated December 30, 2020, indicates "A.A. has repeated the 5th grade several times now."  It reports A.A.'s "current grade" as 5th, and notes that A.A. is not on grade level.

[108] Devereux, *supra* note 59, at 7 (emphasis added).

[109] Devereux, *supra* note 58, at 1 (emphasis added).

describes her as friendly and outgoing, and as having a strong sense of connection to her older sister.  It notes that she loves to be outside.

 Though records in B.B.'s Devereux – League City files, reviewed on-site, indicated she was supposed to receive a trauma assessment by September 25, 2020, there was no evidence to confirm one was done.  Instead, the primary interventions used with B.B. were the same interventions that had been tried at every RTC she had been to, without success – a level system that rewards children with points and penalizes them by withdrawing privileges, along with weekly individual and group therapy.  Devereux – League City was aware of B.B.'s behavioral challenges prior to admitting her – the "brief social history" included in her admission assessments note:

> Client was…removed from biological parents at 2 months old[110] and **placed in 31 foster care families**.  Client is currently living in Hector Garza shelter.  Client does not have any knowledge of her biological parents as she was removed from their care at the age of 2 months old due to abuse.  **She has had several placements due to aggression and elopement.**  Her sibling has found adoptive family and client had also wanted to be placed there but was unable to.  Currently in 7th grade this fall.  History of repeating kindergarten twice.  Has several friends.  Identifies as bisexual and has a history of both male and female partners.  Preadmission paperwork states the client has a history of sexual abuse from brother and father and physical abuse.  **Several legal issues from rioting and elopement**…Reports a rough childhood.[111]

The "Biopsychosocial Formulation" in B.B.'s Devereux – League City psychiatric evaluation, completed on admission, notes, "Client describes significant issues with elopement, aggression and depressive symptoms which patient states have resolved…Reports multiple inpatient psychiatric admissions since age 5 years old, elopements and aggression.  Client reports a history of self harm with last cutting 2 weeks ago…Perpetuating factors include several failed placement and poor coping skills."

In the Aftercare and Discharge Instructions completed by Devereux – League City for B.B., the operation reported B.B.'s "Reason for Admission":

> [B.B.] is currently in shelter (Hector Garza) awaiting placement.  She has had a gamut of services since coming into the care of DCFS.  [B.B.] was removed due to abuse and neglect by biological parents.  She has significant loss issues due to 31 failed placements.  There was extensive drug use in the home and both [B.B.] and her sister were sexually violated by their older brothers as well as an unnamed perpetrator.  [B.B.] does not understand that her **aggressive defiant behaviors** will not be tolerated by a family and when corrected she has to be respectful of the correction and accept it rather than becoming **aggressive both verbally and physically**.[112]

---

[110] This is inaccurate; B.B. was two years old when she entered care.
[111] Emphasis added.
[112] Emphasis added.

In other words – Devereux – League City understood B.B.'s behavioral challenges upon her admission to the facility.  And even if it did not, her challenges clearly manifested well before the October 3, 2020 riot which resulted in her arrest and contact with the juvenile system.  In fact, according to a Serious Incident Report in B.B.'s Devereux – League City records, on September 18, 2020, police responded to "an incident" on B.B.'s unit that "required police to respond to get control of the situation."[113]  After police handcuffed the children involved in the incident "in order to obtain control of the situation," B.B. began to make threats toward a police officer and attempted to run through the unit.  One of the officers stopped her and handcuffed her "in order to keep her out of the situation and allow her to calm down."  Her behavior continued, and she was eventually placed in the police car "to calm down."  When B.B. was brought back into the unit, she again threatened the officers, at which point the officers again handcuffed her and took her to the police station, returning her later that night.  According to the incident report, as a result of the incident B.B. "earned consequences for safety threats and physical aggression."  The only follow-up listed was for staff members to "continue to work with [B.B.] in utilizing coping skills in this area" and for B.B. to "process the incident further in therapy."  It is difficult to understand what behaviors would trigger Devereux – League City's second-or-third tier assessments and services if being taken into police custody does not.

Despite clear indications upon her admission that B.B. struggled with behavioral issues and that these problems resulted in the disrupted placements that brought her to Devereux – League City, there is no indication in her Devereux records that she ever received any treatment beyond that outlined in Devereux – League City materials as the universal supports provided to all children in the facility.  The "Course of Treatment" in B.B.'s Aftercare and Discharge Instructions notes:

> [B.B.] was admitted to the Devereux Advanced Behavioral Health Unit 5 program on 7/30/30.  [B.B.] participated in individual group therapy, received psychiatric monitoring and medication management, participated in therapeutic recreational activities, and received educational services in a special education academic program. [B.B.] exhibited a pattern of disruptive and aggressive behaviors and had difficulties engaging in the treatment program often indicating her intention to continue her current behavior patterns.  On 10/4/20, [B.B.] became involved in a significant incident on the treatment unit, exhibiting aggressive behaviors, property destruction, and disruptive behaviors.  She was arrested and place [sic] in a juvenile facility.  Given [B.B.'s] lack of engagement in the treatment program, her ongoing disruptive and aggressive behaviors, and loss of available bed space due to the incident, the treatment team has recommended her discharge.

C.   A.A.'s & B.B.'s Placements Following Discharge from Devereux – League City

The Monitors asked DFPS to keep them informed of B.B.'s placements and progress after she was arrested.  After being discharged from Devereux – League City, B.B. was placed in a foster home, where her behavior resulted in two additional psychiatric hospitalizations.  While in the foster home, she again had contact with the juvenile system as a result of misdemeanor assault charges related to an altercation with a member of the foster parent's family.  On December 6, 2020, DFPS

---

[113] This incident is the riot referenced in note 5, *supra*.

notified the Monitors that St. Francis, the SSCC responsible for B.B.'s care, had decided to place B.B. at the same RTC in Florida where B.B. had previously been placed.  DFPS indicated:

> B.B. was previously placed in [this] RTC from December 2016 to June 2017, when she was moved from the treatment center back to Texas to be in closer proximity to her home community.  B.B. previously reported that she felt safe while receiving treatment at [this RTC]; she also demonstrated improved functioning and overall stability while in treatment there.  The treatment approach used at [this RTC] seemed to allow B.B. the opportunity to make more progress than other placements, which is why CPS and St. Francis determined it to be in her best interest to explore B.B. re-engaging in treatment in this clinical setting.[114]

In response, the Monitors shared concerns based on their review of records related to B.B.'s first placement at the RTC, which did not indicate that her behavior improved during her stay:

> I realize that B.B. is likely already settling in…or on her way as I write this.  I did just want to point out that her discharge plan from the last 6-plus months that she spent at [the Florida RTC] does not paint an optimistic picture of her progress at the facility. Of course, she was only nine-years old when she was placed there the first time - but her behavior actually seems to be intensifying, so I am concerned that this is going to simply result in another discharge (or worse, juvenile justice involvement and detention in Florida) in this child's already long list of placement disruptions. I believe B.B. has been in over 30 placements since she entered care in 2009 as a toddler.[115]

The e-mail quoted her discharge plan, which indicated that B.B. was discharged after meeting "maximum progress" in the facility and noting that B.B. was being "laterally transferred" to Devereux – Victoria, "per treatment team recommendations."  The discharge plan described B.B. as making little progress during her stay at the facility.

DFPS responded, noting the concerns conveyed by the Monitors were relayed to B.B.'s caseworker, and that CPS was "committed to regularly reviewing B.B.'s treatment plan and services while she is placed at [the RTC].  CPS will be requesting frequent staffings with the facility to ensure B.B. is receiving services that meet her needs."[116]

An update to the Monitors on January 4, 2021 reported B.B. had twice been assaulted by peers in the month that she had been at the Florida RTC.  The same update noted a new psychotropic was added to B.B.'s medications: Thorazine (25 mg. in the morning, and 50 mg in the evening).

On January 23, 2021, the Monitors received the following update from DFPS:

---

[114] E-mail from Heather Bugg, Director of Project Management, Compliance, Coordination, and Strategy Division, DFPS, to Deborah Fowler and Kevin Ryan, December 8, 2020 (on file with Monitors).
[115] E- mail from Deborah Fowler to Heather Bugg, December 10, 2020 (on file with Monitors).
[116] E-mail from Heather Bugg, to Deborah Fowler and Kevin Ryan, December 17, 2020 (on file with Monitors).

Since you were last updated, reports from B.B.'s caseworker and caregivers indicate she experienced some temporary regression. She reportedly began presenting negative behavior that she hadn't engaged in for over a year. A facility social worker (who is familiar with B.B. from her last placement) provided some suggestions for addressing her behavior and, once employed, the behavior resolved. After several years of sustained improvement, B.B. recently experienced some issues with enuresis. To treat the condition, her doctor prescribed .02 mg of DDvap. The enuresis has reportedly resolved about a week ago. B.B.'s supervision requirements were recently lowered from visual checks at least every five minutes to visual checks at least every fifteen minutes. She has also been allowed to do schoolwork via computer after having these privileges removed for a period of time due to breaking through the facility's firewall to watch YouTube videos.

DFPS also reported that, due to COVID, B.B.'s caseworker had not been able to visit her in-person, because "the facility is not allowing outside visitors at this time." Medication changes were included, showing she was taking Depakote (500 mg, twice daily) and that her Thorazine dosage had increased to include another dose (25 mg) in the middle of the day.

Less than a week later, on January 29, 2021, DFPS notified the Monitors that B.B. had been admitted to another psychiatric hospital. Her DFPS case worker visited B.B. in the hospital the day before the notification, and planned to visit again that day.

A review of IMPACT shows that A.A. has had a similar experience. Since leaving Devereux–League City, A.A. has been placed in two more RTCs, but was recently placed in a psychiatric hospital after an incident involving a physical altercation with staff and youth. The RTC that A.A. was in when this incident occurred is on Heightened Monitoring due to contractual or minimum standards violations implicating child safety and substantiated findings of abuse or neglect, pursuant to Remedial Order 20.

## VI.  CONCLUSION

The impact of Devereux – League City's failure to live up to the promises of safety and treatment outlined in its descriptions of its residential treatment program are obvious for A.A. and B.B. Though Devereux – League City promises to create a safe environment where children have access to individualized services and supports that will assist them in healing from their trauma, the Monitors have discovered that children are instead met with an environment marked by violence and chaos, with frequent riots, police calls, arrests, restraints, seclusions, suicide attempts and sexual abuse. Rather than safety and nurture, too many children have encountered physical and sexual abuse at the hands of staff. Children describe an environment in which, rather than being helped to overcome trauma, new trauma is commonplace.

And, as A.A.'s and B.B.'s experiences reflect, children who cry out for more intensive interventions, which Devereux – League City claims to provide, are eventually unsuccessfully discharged from the facility without ever having received assessments or supports that might have allowed them to improve. Both children continued to engage in the very behavior that brought

them to Devereux– League City, which had implications not only for their safety, but for the safety of the children and staff around them.

And what was striking about the monitoring team's on-site file reviews was that A.A.'s and B.B.'s stories were common among children placed at Devereux – League City.  As discussed, above, 94% of the PMC children living at Devereux – League City at the time of the monitoring team's visit had a mental health diagnosis.  Eighteen percent had a history of suicidal ideation or behavior, and 65% had a history of self-harming behaviors.  Nearly half of the children whose files the monitoring team reviewed had a confirmed or unconfirmed history of sexual abuse, and 80% of interviewed caregivers reported supervising a child who was a victim of sexual abuse.  Twenty-nine percent of the children had acted out sexually since coming to the campus, and 33% of caregivers confirmed supervising a child who was sexually aggressive.  Nine children's files included information that they had engaged in physical aggression, and four children (24%) had harmed others on campus.  Almost half (47%) of the children whose files were reviewed had run away from a placement and ten of the 17 children whose files were reviewed indicated that they exhibited three or more of these behaviors.

On a campus that has children with such intense behavioral health needs, the failure to appropriately address those needs leads to catastrophic consequences.  As the monitoring team's interviews with staff revealed, it also leads to a high rate of staff turnover and burnout, with a high percentage of low-tenure staff who report working high overtime hours.  Devereux – League City is the first facility the monitoring team has visited where staff complained that they sometimes did not feel safe.  For this setting to be a safe setting for this many children with such acute treatment needs, it must provide the treatment needed in order to keep children safe.

The tragedy for children like A.A. and B.B. is that their experiences at Devereux – League City are not unique.  B.B.'s 11 years in the foster care system show that the failure to provide appropriate supports and services go hand-in-hand with safety risks and placement disruptions.  If their mental and behavioral health needs are not met, children like A.A. and B.B. who have experienced extreme trauma may continue to act out physically and sexually, ultimately resulting in placement disruptions that exacerbate their trauma, expose them to serious risk of harm and perpetuate a harmful cycle.  Psychological evaluations for B.B. have been sporadic at best.  Even when she has been appropriately assessed and recommendations for evidence-based approaches to managing her behavior are made, poor record keeping and frequent moves mean that those recommendations get lost and buried amid her lengthy record.  Her foster families often were not provided with sufficient information related to her behavioral challenges or equipped with services and supports to meet those needs.  Today, she is caught in a cycle between RTCs and psychiatric facilities, with ever-increasing doses of psychotropic drugs.  Sadly, A.A. appears to be headed down the same path, though she has been in foster care for a shorter time.