IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity | § | |
| as Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

## The Court Monitors' Report to the Court Regarding
## Maltreatment in Care and Unsafe Placements for Children Without a Placement

The Court in this matter enjoined "the Defendants from placing children in permanent management conservatorship ("PMC") in placements that create an unreasonable risk of serious harm."[1] Despite that prohibition, the Monitors learned that PMC children categorized by DFPS as Children Without Placement (CWOP) are being housed in unlicensed settings, and a growing body of evidence from State records has surfaced serious allegations that children are being abused and neglected in these settings. In January 2021, for example, DFPS reported to the Monitors two incidents involving child-on-child sexual contact between children who were housed at two separate locations: a church and a DFPS office.[2] In two other cases, the Monitors learned that PMC children were reportedly able to access and ingest drugs in DFPS offices, requiring emergency medical attention for the children. More recently, the Monitors discovered numerous allegations of child maltreatment stemming from the housing of children in unlicensed facilities by three Single Source Continuum Contractors (SSCCs)[3] in Community-Based Care (CBC) regions (Family Tapestry, Our Community Our Kids (OCOK), and 2Ingage).

---

[1] *M.D. ex rel. Stukenberg*, No. 2:11-cv-84, Order, ECF No. 606.

[2] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *CWOP Follow Up*, January 19, 2021 (referring to a call between the Monitors and DFPS Commissioner Masters, during which the Commissioner relayed information about a referral to SWI involving two TMC youth, and notifying them of an additional incident). The church entered into a Memorandum of Understanding with DFPS allowing it to use the location to house children.

[3] SSCCs contract with DFPS to provide services to foster children in DFPS regions that have transitioned to the Community Based Care (CBC) model. CBC was formerly known as Foster Care Redesign. There are currently four regions that have transitioned to the CBC model, or are in the process of doing so: Region 1 (Texas Panhandle); Region 2 (30 counties in North Texas); Region 3b (seven counties around Fort Worth); and Region 8a (San Antonio and Bexar County).

There are two stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services. The focus in Stage I is improving the overall well-being of children in foster care and

The SSCCs have cited the closure of congregate care facilities in Texas over the past year as contributing to the lack of placements for children. It is important to note that prevalent, unsafe conditions for children over the course of many years in most of those facilities led to their closure. In the Monitors' First Report to the Court in June 2020, the Monitors determined that there had not been any license revocations for any placement (foster home, Child Placement Agency (CPA), or General Residential Operation (GRO)) in the five-year period preceding September 30, 2019.[4] HHSC had notified the Monitors of pending license revocations for two GROs – Children's Hope – Lubbock, and North Fork Educational Center – in December 2019 and February 2020, respectively, following troubled histories of confirmed abuse and neglect of children.[5] The Monitors' First Report also discussed two GROs for which DFPS had terminated its contract in 2020: Hector Garza RTC, and High Frontier Treatment Center, each with extensive histories of standards violations and child maltreatment.[6]

On September 2, 2020, the Monitors filed an Update to the Court related to facility closures, discussing DFPS's decision to remove all of the children in Williams House following the death of a PMC child at the facility, discussed at length in the Monitors' First Report.[7] Williams House voluntarily relinquished its license. The Monitors' September 2, 2020 Update to the Court also reported on the closure of three other GROs: Houston Serenity, Youth and Family Enrichment Center (YFEC) and the YFEC Shelter, all of which surrendered their licenses. Had they not surrendered their licenses, Williams House, Houston Serenity, and the YFEC Shelter would each have been subject to Heightened Monitoring pursuant to Remedial Order 20 due to troubled child safety histories involving violations of minimum standards and confirmed findings of child abuse and neglect.[8]

Since the Monitors' September 2, 2020 Update, RCCR issued letters to four additional GROs, notifying them of the agency's intent to revoke their license, and denied a license to two GROs that were operating in an initial licensure period. In addition, DFPS notified the Monitors of its decision to cancel its contract with two GROs, and an additional GRO – Whataburger Center for Children – voluntarily relinquished its license. In every instance, a long history of child

---

keeping them closer to home and connected to their communities and families." DFPS, *Community-Based Care*, *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services. Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.*
DFPS has contracts with the following providers for CBC:

- Region 3b – Our Community. Our Kids. (OCOK) (Stage II)
- Region 2 – 2INgage (Stage II)
- Region 8a – Family Tapestry (Stage I)
- Region 1 – Saint Francis (Stage I)

*Id.*
[4] Deborah Fowler & Kevin Ryan, First Court Monitors' Report 2020 322, June 16, 2020, ECF No. 869.
[5] *Id.* at 323-339.
[6] *Id.* at 317.
[7] Deborah Fowler & Kevin Ryan, The Court Monitors' Update to the Court Regarding Child Fatalities and Congregate Care Facility Closures, September 2, 2020, ECF No. 956.
[8] *Id.*

maltreatment and minimum standards violations preceded action by HHSC and DFPS. The most recent example of a facility closure followed a raid of the facility by local law enforcement, and a call to SWI by the local district attorney's office alleging individuals within the operation took retaliatory action against staff who called SWI to report abuse or neglect. [9]

---

[9] The State sent an e-mail to the Monitors on April 9, 2021, indicating that it would begin removing children from The Treehouse Center, an operation that is under Heightened Monitoring:

> DFPS and HHSC want to make you aware of an evolving situation at The Treehouse Center, a General Residential Operation, in Conroe, TX. As of April 8, 2021, 10 youth in DFPS conservatorship reside at the operation, 3 of whom are in PMC. The Treehouse Center is on Heightened Monitoring. As you are aware, DFPS and/or HHSC CCR have been conducting weekly site visits; residents are visited in-person monthly to assess their safety and well-being; and DFPS has been conducting monthly, unannounced overnight visits to the operation to verify compliance with 24-hour awake night supervision requirements. The Treehouse Center had been on placement suspension from November 8, 2020 until March 12, 2020, when a corrective action plan and safety plan were lifted.
>
> On April 5, 2021, [a District Court judge] issued a search warrant for property located at The Treehouse Center. Law enforcement executed the search and seized:
>
> - Computers and computer equipment
> - Personnel records
> - CPS documentation, including child records
> - Licensing records
> - Training guides
> - Policies and procedures (including for restraints)
> - Cell phones and other communication devices
> - Photographs
> - Video equipment
> - Cameras, and all other devices used for the capture, taking, storing, transferring developing and otherwise manipulating images
> - Financial records
> - Documents showing dominion or control over the operation.
>
> CPI Special Investigators were present during the execution of the search warrant***The search occurred during daytime hours. The DA's office declined to share a copy of the affidavit in support of the search warrant at that time.
>
> In response thereto, DFPS began daily, unannounced safety checks*** on April 6, 2021 and overnight visits were increased to 2-3 visits per week. On April 7, 2021, The Treehouse Center was formally notified that placements into the operation have, again, been suspended. DFPS is working with Treehouse Center staff to reconstruct the records of children in our conservatorship to support the operation's ongoing ability to appropriately care for these children. Treehouse Center staff notified us that they received a subpoena ordering them to appear on April 13, 2021 before a grand jury.
>
> Today, the DA phoned in an intake to SWI***that asserts serious allegations against [X]. Based on the seriousness of the allegations, DFPS has decided to remove the children and has sent staff to provide 24/7 monitoring to ensure the safety of the children until they are removed.
>
> We will continue to monitor the situation closely and will update you as more information becomes available.

In total, of the 23 GROs that have voluntarily relinquished their license, been notified of RCCR's intent to revoke their license (or denied a final permit), or with which DFPS has cancelled a contract, all but seven of these GROs were or would have been placed under Heightened Monitoring due to ongoing safety problems and unreasonable risks of serious harm to children. These 23 GROs were responsible for 238 substantiated allegations of abuse, neglect or exploitation, and were cited for 2,438 minimum standards violations between January 1, 2015 and December 31, 2020.

## I.    CHILDREN WITHOUT PLACEMENTS, AUGUST 1, 2020 TO MARCH 21, 2021[10]

Concerned about the safety of PMC children, the Court ordered the State to provide daily reports to the Monitors regarding information on the number of children without placements, the identity of these children, and the location of the children, effective April 2, 2020.[11] The Court entered the Order after the State raised the possibility that placing operations with a five-year history of abuse or neglect findings and safety violations under Heightened Monitoring (as required by Remedial Order 20) could exacerbate the placement crisis.[12]

### A.  Data and Information

DFPS reports the number of PMC children without placement in weekly emails to the Monitors.[13] In these reports, DFPS provides information about all PMC children without

E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, *The Treehouse*, April 9, 2021 (on file with Monitors). The Monitors review of the April 9, 2020 CLASS intake referenced in the State's e-mail showed that a first April 8, 2021 intake from the D.A.'s office was referred to RCCR as a Priority 3 investigation, and re-entered on April 9, 2021 as a Priority 2 abuse or neglect investigation. The intake alleges that an individual instructed the facility not to run a background check on a staff person who "is a habitual felon and has a record of aggravated assault and a history of possession of substances." The intake goes on to allege that this staff person "has keys which would allow access to the medication room and other rooms where [children] can be found." The intake also alleged that an individual sent a text telling a manager to "get all the employees [sic] phones and check to see who made a call to SWI." It further alleged that the same individual "sent a text that has requested a list of all employees so they can say people have been working so that they are not out of ratio compliance." DFPS notified the Monitors on April 13, 2021 that all children had been moved from The Tree House Center, and that "DFPS staff were present at the operation continuously since 04/09/21." E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *The Treehouse*, April 13, 2021 (on file with Monitors). DFPS notified the Monitors that it terminated its contract with The Tree House Center on April 15, 2020. E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Re: The Treehouse*, April 15, 2021 (on file with Monitors).

[10] This is an update to data previously reported as part of the Monitors' Update to the Court Regarding the State's COVID-19 Response, filed September 2, 2020. As discussed in that report, the State reported an increase in the number of children without placements as a result of the COVID-19 pandemic. Deborah Fowler & Kevin Ryan, The Court Monitors' Report to the Court Regarding the State's COVID-19 Response and Implementation of the Courts' Order Regarding Heightened Monitoring, September 2, 2020, ECF No. 955.

[11] Order, ECF No. 843.

[12] Deborah Fowler & Kevin Ryan, The Court Monitors' Report to the Court Regarding the State's COVID-19 Response and Implementation of the Courts' Order Regarding Heightened Monitoring, September 2, 2020, ECF No. 955.

[13] The State was originally ordered by the Court to provide the reports on a daily basis. In September 2020, DFPS sent a request to the Monitors asking to modify the production schedule for reports related to children without placement to be produced weekly rather than daily. E-mail from Audrey Carmical, Associate Commissioner of Compliance,

placements the prior week with a compilation of daily reports, including detail about their individual characteristics (age, sex, level of care), their care team (caseworker, supervisor, region and county), and the period without placement (first night without placement, characteristics that DFPS identifies as "barriers to placement," and location).[14]

The State provided to the Monitors an addendum to the weekly reports on March 31, 2021 that included information previously missing from the weekly reports about 32 of the 51 children under the care of the SSCCs who experienced a lack of placement during the time period.[15] The addendum included both children who DFPS previously reported in the weekly reports as well as children the State previously excluded, with the latter being significantly larger. The addendum did not contain demographic characteristics of the included children; therefore, the analyses below of characteristics are based only on children reported in DFPS's original weekly reports.[16]

B. Overview

There was at least one child without placement every night (233 nights in total) in the analyzed period.[17] On average, 18 children were without placement on a given night, with a maximum of 52 children (which occurred on February 28, 2021 and March 1, 2021). The number of children without placement increased considerably in 2021. On average, ten children were without placement per night for the period of August 1 – December 31, 2020, which increased to an average of 35 children per night for the period of January 1 – March 21, 2021.

---

Coordination, and Strategy, to Deborah Fowler and Kevin Ryan, *Records Related*, September 21, 2020 (on file with Monitors). After conferring with the Court, the Monitors agreed to the change.

[14] Children are often first reported to the Monitors the day after their first night without placement. Therefore, the number of children without placement reflected in the weekly compilation of daily reports tends to be lower than the actual number of children without placement on a given night as calculated using the data provided about a child's first night in placement.

[15] DFPS first provided an addendum to the Monitors on March 22, 2021 and then provided an Updated/Corrected Addendum on March 31, 2021 after reporting that the prior addendum was again missing relevant children. *See* Email from Tara Olah, Dir. of Implementation & Strategy, DFPS, to Kevin Ryan and Deborah Fowler, Monitors, *SSCC CWOP addendum report – CORRECTED*, March, 31, 2021 (on file with Monitors).

[16] Additionally, the monitoring team noted discrepancies in the dates between the data received in the weekly emails and the March 31, 2021 addendum document for eight of the children who were included in both sources of information.

[17] This figure was calculated using data on each child's first night without placement as reflected in daily reports, not necessarily the number of children who appeared in a given daily report.

**Figure 1: Children Without Placement by Day (August 1, 2020 - March 21, 2021)**



Children Without Placement by Day (Aug 1, 2020 - Mar 21, 2021)
*Source: AR analysis of TX DFPS CWOP data*
*n=339 unique children over 473 spells without placement*

Note: Number of children without placeemt is calculated based on each child's first night without placement, as reflected in daily reports

Three hundred thirty-nine (339) PMC children experienced at least one night without placement during this period. Most children who were listed (74%, 252) experienced a single spell without placement; 17% (57) had two spells without placement; 5% (18) had three spells without placement; 2% (8) had four spells without placement; 1% (3) had five spells without placement, and one child (<1%) had six spells without placement.

The average spell without placement lasted nine nights, with the longest spell lasting 51 nights.[18] The average total number of nights without placement per child (i.e., combining the length of all spells experienced by that child who was without placement during the period) was 12 nights, with one child experiencing a total of 80 nights without placement. Almost 60% of the children without placement during this period experienced more than seven total nights without placement.[19]

---

[18] This calculation does not include the current spells for the 37 children without placement on the last day of the period, March 21, 2021 as they have not yet reached their conclusion.

[19] This does not include the current spells for the 26 children without placement on the last day of the period who did not have a previous spell.

**Figure 2: Total Nights Without Placement per Child (August 1, 2020 – March 21, 2021)**



Total Nights Without Placement (Aug 1, 2020 - Mar 21, 2021)
*Source: AR analysis of TX DFPS CWOP data*
*n=313 unique children*

- 68, 22% — 3 or fewer
- 58, 19% — 4-6
- 98, 31% — 7-14
- 89, 28% — More than 14

C.  Profile of children without placement[20]

### Demographics

The majority (88%, 271) of children without placement during the period were teenagers. The youngest children were four years old at the time a spell began and the oldest were 17 years old. More than half (62%, 189) of the children without placement during the period were female – higher than the share of females in the broader PMC population (47% on February 28, 2021).[21] Most female children without placement were teenagers (90%, 171) and 70% (132) were older teens aged 15-17. Male children without placement during this period tended to be slightly younger than female children: 85% (99) were teenagers and 65% (76) were older teens aged 15-19.

### Characteristics and Needs

DFPS described multiple "barriers to placement" for most children reported during this period which the Monitors will instead describe as corresponding characteristics or treatment needs. These children typically have experienced multiple placements; frequently the children's mental health needs and underlying trauma have not been effectively addressed in the numerous

---

[20] DFPS data included the demographic information for 307 of 339 children. Therefore, unless otherwise noted, percentages are calculated using the total of 307. Gender identification data was missing for one additional child.
[21] This data is for PMC children disclosed as without placement as of February 2021.

placements that accepted them.[22] Placement instability, unsafe placements that retraumatize children, and the chronic failure to meet children's behavioral health needs, contribute to, and in many instances, cause, the most commonly indicated characteristics or needs identified by DFPS: history of physical aggression (224 children, 73%), history of self-harm or suicidal ideation (210 children, 69%), and prior hospitalizations for mental health crises (210 children, 69%).[23] As shown in Figure 3, there were notable differences in the reported characteristics for male and female children: the most common reported characteristic for males was physical aggression (reported for 72% of all males without placement during the period); and the most commonly reported characteristic for females was self-harm or suicidal ideation (reported for 77% of all females without placement during the period).

---

[22] *See* Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center, February 8, 2021, ECF No. 1027 (detailing the experience of two children, A.A. and B.B.).

[23] The monitoring team coded the text descriptions provided by DFPS using categories derived from the Common Application for Placement of Children in Residential Care.

**Figure 3: Number of Children in Sample with Indicated Barrier per DFPS, by Gender (August 1, 2020- March 21, 2021)**



As noted above, many children were identified with co-occurring characteristics identified by DFPS. The most frequently identified co-occurring characteristics were as follows:

- Self-harm and mental health hospitalization co-occurred for 59% (180) of children;
- Physical aggression and mental-health hospitalization co-occurred for 57% (176) of children;
- Physical aggression and self-harm co-occurred for 54% (167) of children;
- Running away and physical aggression co-occurred for 49% (150) of children;
- Running away and self-harm co-occurred for 47% (143) of children;
- Running away and mental-health hospitalization co-occurred for 44% (134) of children;

- Physical aggression and justice involvement co-occurred for 35% (108) of children; and
- Running away and justice involvement co-occurred for 32% (98) of children.

The children without placement during this period had notably high assigned levels of care compared to the broader PMC population as show in Figure 4. DFPS reported that nearly half (45%, 138) of the children without placement during this period required a "specialized" level of care, with 27% (83) needing "intense" care, and 19% (58) requiring "moderate" or "basic" care; the level of care was reported as expired for 28 children (9%).[24]

**Figure 4: Assigned Level of Care for Children Without Placement Compared to PMC Population**



Assigned Level of Care for Children Without Placement Compared to PMC Population

*Source: Analysis of DFPS data on children without placement, and DFPS PMC cohort data (as of Feb 28, 2021)*

D. Geography and Location[25]

Over 45% of children without placement were reported from four counties: Harris (20%, 61), Bexar (13%, 39), Dallas (8%, 24), and Hidalgo (5%, 15). However, children experienced spells without placement in 74 different counties.

---

[24] For children with multiple spells without placement during the period, this analysis reflects the highest reported level of care across all spells. For children whose level of care changed over the course of their spell, the Monitors have used their highest initial level of care.

[25] Geographic data was available for 307 of 339 children. Prior location data was available for 430 of 473 spells without placement. One child was missing this data point and DFPS did not provide this data point for 42 spells.

When children experienced nights without placement, DFPS reported that children were held at CPS/DFPS offices for 52% of spells (248 spells), at churches for 11% of spells (52), at the Family Tapestry Intake Center (formerly known as Whataburger Residential Treatment Center (RTC)) for 10% of spells (48), and at hotels for 9% of spells (44). For 16% of spells (76), DFPS reported the location as various foster care facilities (e.g. Foster Village, Care Cottage, and Sunny Glen). DFPS identified that children were located at "Point of Entry" for four spells (1%).[26]

As shown below in Figure 5, DFPS included a child's location prior to a spell without placement. According to this data, 20% (86) of spells occurred after a stay in a psychiatric hospital; 18% (79) occurred after a child ran away from a placement;[27] and 15% (66) occurred after a stay at a Residential Treatment Center.

**Figure 5: Child Location Prior to Spell Without Placement (August 1, 2020 - March 21, 2021)**



---

[26]The data did not include the location for one child. If a child was moved over the course of their spell, the monitoring team identified the first location in this analysis.
[27] The data does not indicate from which type of placement a child ran away.

Of the 339 children who were without placement, SSCCs were responsible for placement for 15% (51) of children. The average number of nights without placement for these children was ten nights, with a maximum of 42 nights. [28]

Until February 22, 2021, DFPS did not provide the Monitors with information regarding the number of children without placements in SSCC regions. When DFPS did begin to include SSCC children without placements in its weekly reporting to the Monitors, DFPS's e-mail did not in any way alert the Monitors to its failure to report these children for SSCCs prior to that date. DFPS simply included children in Region 8A for the first time, noting their location as "FT Intake Center."[29]

---

[28] The Monitors' reviews associated with this data, and DFPS's acknowledged failure to provide timely and accurate data to the Monitors on PMC children without placements, raise questions about the reliability of the data. DFPS notified the Monitors on March 22, 2021 that it had not previously reported to the Monitors 44 children due to incomplete information from two SSCCs, Family Tapestry and OCOK, and submitted an addendum. Email from Jaime Masters, Commissioner, DFPS, to Deborah Fowler and Kevin Ryan, Court Monitors, *RE: CWOP placements*, March 22, 2021 (on file with the Monitors). On March 31, 2021, DFPS again notified the Monitors that its addendum report was inaccurate as to information from Family Tapestry and it reported additional children who had been without placement through Family Tapestry. Email from Tara Olah, Dir. of Implementation & Strategy, DFPS, to Kevin Ryan and Deborah Fowler, Monitors, *SSCC CWOP addendum report – CORRECTED*, March, 31, 2021 (on file with Monitors). The Monitors observed inconsistencies in the data reported by DFPS and its corrected addendum; the Monitors will continue to evaluate the accuracy of the data.

[29] E-mail from Tara Olah, *PMC Children without Placement Daily Reports for February 17-22, 2021*, February 22, 2021 (on file with Monitors). Documents, spreadsheets, and e-mails provided to the Monitors since this e-mail show that the SSCCs began reporting children under their supervision to DFPS on a daily basis significantly earlier than the data was reported to the Monitors. Among the documents provided to the Monitors in April 2021, the earliest e-mail referencing a child without placement in an SSCC region shows that OCOK reported a child under its supervision to DFPS on September 14, 2020, and again on November 13, 2020 and November 22, 2020. On October 28, 2020, the Community-Based Care Administrator for Region 3b e-mailed OCOK and said, "For a period of time I was receiving the SSCC supervision notices from your team, however, I stopped receiving those notices *** I have been advised that I still need to be tracking any instance and duration so I also need to receive those notices moving forward *** When I talked with George about this, he felt confident that someone on your team is probably also keeping a log of these. Can I get a copy of that log over the past 3 months or so to capture any of the ones I missed since notices to me stopped." E-mail from Carressa Cherry, CPS Community-Based Care Administrator – 3b, to Marie Clark, Director of Care Management, OCOK, *External: SSCC Supervision*, October 28, 2020 (on file with Monitors). There are also a number of e-mail exchanges between DFPS and OCOK, and DFPS and Family Tapestry in January and February 2021 asking for the daily reports of children under the SSCCs' supervision, and responses from the SSCCs indicating this information was provided. In one e-mail exchange between DFPS staff, the Director of Community-Based Care notes, "The reports from the SSCCs are combined with legacy report – then sent to Kaysie for review/approval to send to governor and monitors by noon each day." E-mail from Ellen Letts, Director of Community-Based Care, DFPS, to Veronica Alvarez, DFPS, *FW: SSCC Supervision Daily Log,* February 9, 2021 (responding to an e-mail with February 9, 2021 daily report forwarded from Veronica Alvarez with a message from Family Tapestry expressing concern about the timeframe for making daily reports) (on file with Monitors).

In a hearing held by Zoom on April 21, 2021, the Court asked Elizabeth Farley, an advisor to Governor Greg Abbott, when the Governor's Office became aware of children without placements in the SSCC regions:

THE COURT: But can you -- can you take a moment and find out when that -- when the knowledge became known by the Executive branch, governor? I assume that the governor would get these reports in October of 2020.

This stands in contrast to DFPS's notification to the Monitors on February 9, 2021 that it "failed to include in our prior CWOP reports a small subset of children/youth termed 'PMC – JMC.'" [30] That e-mail apologized for the oversight, and included daily reports for five PMC-JMC children who had been without a placement for at least one day between April 2020, when the agency began reporting the information to the Monitors, and January 2021.[31]

It was only after the Monitors received information from a whistleblower and discovered that children without placement were being housed in unlicensed facilities in two SSCC regions and asked DFPS about the issue (as detailed below), that DFPS provided the Monitors with an "addendum" report for children without placements in SSCC regions between April 3, 2020 and March 18, 2020.[32] According to the data included in the addendum, only two SSCCs – OCOK and Family Tapestry – reported children without placements during that time period. Since then, 2Ingage has also reported a PMC child without placement, as discussed, *infra*.

## II. UNSAFE HOUSING OF CHILDREN WITHOUT PLACEMENTS

### A. DFPS Notifications of Allegations of Child-on-Child Sexual Abuse

On January 11, 2021, Commissioner Masters alerted the Monitors to an investigation involving two TMC youth, a 13 year-old female foster child and a 17 year-old male foster child, who allegedly engaged in sexual contact while the 13 year-old was housed in a DFPS office and the 17 year-old was on runaway status. The two youth had communicated via social media and agreed to "meet up" on the 3rd floor of the CPS office where the 13 year-old was housed. Though the 13 year-old female was missing for about 20 minutes after the 17 year-old "dropped in" to the CPS office, the CPS staff were unaware of the incident until the 13 year-old asked about the need for a pregnancy test. A Child Protective Investigations (CPI) investigation Ruled Out Neglectful Supervision.[33]

---

MS. FARLEY: We would have been informed by DFPS and HHSC, yes, Your Honor.

THE COURT: In October of 2020?

MS. FARLEY: Yes.

Telephonic/Zoom Hr'g Tr. at 15, April 20, 2021, ECF No, 1049.

[30] E-mail from Tara Olah to Deborah Fowler and Kevin Ryan, *PMC Children without Placement report – addendum*, February 9, 2021 (on file with Monitors). The e-mail explained that PMC-JMC status is used when "families of children who experience severe emotion disturbance" cannot access care for the child. *Id.* In those cases, "DFPS will file for joint conservatorship with the parent for the purpose of providing therapeutic residential services for the child." *Id.*

[31] *Id.*

[32] Email from Jaime Masters, Commissioner, DFPS, to Deborah Fowler and Kevin Ryan, *RE: CWOP placements*, March 22, 2021 (on file with the Monitors).

[33] CPI, within DFPS, investigates abuse, neglect, and exploitation of children in unlicensed settings.

On January 19, 2021, in a follow-up e-mail,[34] DFPS notified the Monitors of another incident that the agency had "recently learned of," reported to SWI on December 30, 2020, involving a 17 year-old male foster child who allegedly digitally penetrated a 12 year-old female foster child while the children were sitting on a couch watching television under the supervision of DFPS staff. The children were without placements and were housed in a space owned by a local church. CPI investigated the allegations and Ruled Out Neglectful Supervision, after the DFPS staff who were present and the 17 year-old youth said that the alleged sexual abuse did not occur. The 12 year-old refused an interview.

In the e-mail notifying the Monitors of the second incident, DFPS indicated:

> The safety of youth in our care is paramount and DFPS leadership are working to urgently communicate expectations to staff in an effort to prevent a situation like this from happening again.
>
> Since Commissioner Masters spoke with you, she sent a statewide broadcast to all DFPS staff regarding her expectations when a child in in CWOP status and is under the supervision of DFPS staff.[35]

---

[34] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *CWOP Follow Up*, January 19, 2021 (on file with Monitors).

[35] DFPS attached a January 14, 2021 memorandum from Commissioner Masters to all DFPS staff which stated:

> Our core mission is to ensure child safety, and this obviously includes ensuring child safety when we have a child under our own care and supervision in our office or another community location.
>
> When you are serving in the role of providing supervision to a child in need of placement, it is imperative that they have your undivided and full attention. This means no multi-tasking, while you are responsible for providing supervision for a child or youth in care.
>
> It is my expectation that the following occur:
>
> - If a child is entering DFPS supervision (in the office or a community location) for the first time, the shift staff assigned will take a picture of the child and send it to the child's primary caseworker to be uploaded into IMPACT.
> - The child or youth's individual needs and relevant history is known by the staff providing supervision for the child. This includes any information from the child's sexual abuse history page, such as victimization or aggression, as well as human trafficking.
> - All children and youth under our supervision remain in your direct line of sight and close proximity at all times.
> - If a significant event or issue arises during your shift while supervising a child or youth, you shall notify your supervisor immediately.

Memorandum from Jaime Masters, Commissioner, DFPS, to all DFPS Staff, re: Children Under DFPS Staff Supervision, January 14, 2021 (on file with Monitors). DFPS also attached an e-mail sent from the Associate Commissioner for CPS to all CPS/CPI staff, listing actions that must be taken when a child enters DFPS Supervision without placement. The e-mail instructs that when a child is without placement "[a]n e-mail must be sent to all staff responsible for supervision of children" that attaches a form created by DFPS for providing information related to children without placement, an IMPACT "Attachment A" summary of the child's sexual history, and a medication log. E-mail from Deneen Dryden, Associate Commissioner for CPS to all CPS/CPI Staff, *CWOP Protocols*, January 15, 2021 (on file with Monitors). An e-mail produced by the State show the SSCCs received these instructions on

Effective immediately, and building upon existing practices, key information will be sent to all staff responsible for supervision of children, including a CWOP form which includes characteristics about the child, a medication log, and the Attachment A detailing the child's sexual abuse and sexual aggression history. Each staff responsible for the child will sign an acknowledgement that they received the information, which will be uploaded to OneCase. If a significant issue occurs while the child is in CWOP status, regional leadership must be notified immediately.[36]

The e-mail answered questions that the Monitors had asked about licensure for operations that house CWOP children, like the local church where the second incident occurred:

In your call with Commissioner Masters, you inquired about licensure for CWOP situations. DFPS has statutory authority *** to provide temporary emergency care for a child for whom the Department is unable to find an appropriate placement. Specifically, the statute states, "if the department is unable to find an appropriate placement for a child, an employee of the department who has on file a background and criminal history check may provide temporary emergency care for the child. An employee may not provide emergency care under this subsection in the employee's residence. The department shall provide notice to the court for a child placed in temporary care under this subsection not later than the next business day after the date the child is placed in temporary care."

In order to ensure the safety of children and youth in temporary care, DFPS utilizes a Memoranda of Understanding (MOU) with community partners, such as churches or local CASA agencies, which outline the respective responsibilities and expectations of the community partner and DFPS in supervising and caring for the youth temporarily staying at the community partner's property. Although generally the properties used for this type of temporary supervision are not licensed under child care licensing statutes, DFPS ensures that the properties are safe for youth and that the youth are supervised by awake staff at all times. When a community partner's property is not available, youth may be temporarily cared for in a DFPS office.[37]

During a January 25, 2021 meeting between DFPS and the Monitors, the Monitors asked for a list of the operations with which DFPS had an MOU for housing children without placements, and a copy of the MOU template. DFPS provided the documents to the Monitors via e-mail on February 16, 2021.[38]

---

January 25, 2021. E-mail from Ellen Letts, Director of Community-Based Care, DFPS, to Linda Garcia, Executive Director, 2Ingage, et al, *FW: ACTION REQUIRED: CWOP Protocols*, January 25, 2021 (on file with Monitors).
[36] *Id*.
[37] *Id*.
[38] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *CWOP Follow Up from 1/25/2021*, February 16, 2021 (on file with Monitors).

Under the terms of the MOU template, DFPS is responsible for supervision of the children while they are housed at the private entity's site, and the operating entity is responsible for maintaining the property.[39] The agency attached two lists of sites where children without placement are housed: a list that included DFPS offices and hotels, and a list that included churches and other private entities that had an MOU with DFPS. Both lists indicated that Region 1 and Region 2 did not have any active DFPS CWOP locations because they are Community Based Care (CBC) areas.[40] The same e-mail also notified the Monitors of a policy change made by DFPS related to children without placements, and provided a red-lined copy of the changes. The changes clarified that two "DFPS employees" rather than two "adults" are responsible for supervision of children without placements.[41] DFPS also notified the Monitors on March 10, 2021 that a training had been developed for staff related to children without placements; the e-mail attached the computer-based training modules, and an e-mail sent to staff giving them until March 26, 2021 to complete the training.[42]

B. Deficient Investigations of Abuse, Neglect or Exploitation of Children in Unlicensed Settings

In addition to the reports to SWI that DFPS disclosed to the Monitors, during the Monitors' review of RCCI investigations completed between May 1, 2020 and October 31, 2020, the Monitors' random sample of 402 of 768 investigations included two RCCI investigations involving children without placements that Ruled Out abuse, neglect, or exploitation and were identified by the Monitors as deficient.[43] The first is one that resulted from allegations that a 15 year-old youth without a placement, who was under DFPS's direct supervision in a facility used as a temporary location, accessed and ingested prescription medications (six Souoxetine pills (20mg) and twenty Hydroxyzine pills (50mg)). The reporter stated that the medication was locked in a medication box, which the RCCI investigator determined was located in the kitchen on top of the refrigerator. The reporter believed the youth retrieved the key to the medication box while two DFPS staff who were responsible for her supervision were absent from the kitchen: one staff member was in the restroom and the other was in a different room nearby. Due to a lack of supervision by the DFPS staff members assigned to supervise the youth, the investigative record documented she was able to remove medication and ingest the pills. Based upon the evidence gathered during RCCI's investigation, the Monitors found that an allegation of Neglectful Supervision should have been substantiated, though RCCI Ruled Out any finding of neglect.[44]

---

[39] DFPS, MOU Template (on file with Monitors).

[40] DFPS, CWOP Locations by Region – DFPS Offices and Hotel Accommodations (undated)(on file with Monitors)(affirmatively states, "Region 1 is a CBC area and does not have any active DFPS CWOP locations" and "Region 2 is a CBC area and does not have any active DFPS CWOP locations."); DFPS, CWOP – Community and Provider List (undated)(on file with Monitors)(simply says "none" for Region 1 and Region 2). The lists did not make any reference to the Region 8a CBC catchment area, which the Family Tapestry SSCC is responsible for; it lists only DFPS offices and hotels for Region 8 and on the list of community provider reports "none" for Region 8.

[41] DFPS, Red-lined copy of §4152 of the CPS Handbook (February 2021)(on file with Monitors).

[42] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Red-lined Policy, Meeting in a Box, Blue Prints, Training, and Field Communications*, March 10, 2021 (on file with Monitors).

[43] Although RCCI, within DFPS, investigates abuse, neglect and exploitation of children in licensed settings, these investigations of maltreatment in DFPS offices were assigned to RCCI for investigation.

[44] 40 Tex.Admin.Code §745.8559.

The investigative record in this case surfaced concerns for the safe supervision of children who do not have a placement and require direct supervision by DFPS or an SSCC. DFPS staff interviewed during the investigation said the agency did not provide them with critical information and history about the youth they were supervising. According to the staff members, administrators informed them about the youth's history through an information binder and emails. They indicated that those two sources of information stated that the youth had a history of running away; that she had been trafficked; and that she required strict supervision around the use of electronics, but not the child's history of self-harm or suicidal ideation.

One of the staff members who was identified as the secondary person in charge of the youth was a protégé who had been employed for one month by DFPS. The primary DFPS worker assigned to supervise the youth stated she was not aware that the secondary worker was a protégé, only that she was new. According to the child's Common Application, only six weeks prior to this incident, on March 5, 2020, the youth had been hospitalized for seven days for having suicidal thoughts with a plan. Between April 13, 2020 and April 21, 2020, she ran away four separate times from her prior placement. Law enforcement officers found the youth in a hotel on April 21, 2020 and she appeared to have been trafficked and sexually assaulted. She was discharged by her prior placement before being housed in the office directly under DFPS supervision. She was on an Intense Level of Care and required in-depth, comprehensive therapy.

In another investigation identified by the Monitors as deficient, a DFPS staff reported that a youth (age 15) without placement, disclosed that she consumed 15 pills. At the time of the incident, the youth was allegedly supervised by two caseworkers at a DFPS office because a placement could not be located for her. The youth reported that she took the medication from a caseworker's workstation. The youth was transported to a hospital for treatment and assessment. Medical staff reported that the youth's drug test was negative and her blood levels were not abnormal. The medical staff advised that the youth's statements were not consistent with the allegations and they could not determine whether the youth swallowed the medication. The medical staff determined that the youth did not require further medical attention for the alleged ingestion. The investigator failed to sufficiently question the youth and the DFPS staff responsible for supervising the youth, but one of the most troubling aspects of the investigation is the record showed the staff responsible for the youth's supervision were not aware of the youth's extensive history of suicidal ideation.

Though RCCI maintained and exercised jurisdiction in 2020 to investigate abuse, neglect and exploitation of children without a placement in temporary unlicensed settings under the supervision of DFPS staff, DFPS appears to have had a change of direction in 2021 with respect to allegations of maltreatment to PMC children in SSCC unlicensed settings, as discussed below.

C. SSCC Housing of Children Without Placements in Unlicensed GROs

On March 19, 2021, after receiving reports that children without placements in two SSCC regions were being housed in unlicensed facilities, the Monitors sent an e-mail to DFPS asking whether this was accurate and asking the agency to describe how SSCCs were handling children without placements.[45] On March 22, 2021, Commissioner Masters responded to the e-mail, noting

---

[45] E-mail from Deborah Fowler to Jaime Masters, Commissioner, DFPS, *CWOP placements*, March 19, 2021 (on file with Monitors).

that she had been receiving "weekly updates" on children without placements, and that "children under staff supervision for 2 or more nights (commonly referred to as CWOP) are of grave concern whether it is DFPS legacy or a SSCC that is responsible for the placement."[46] The e-mail stated:

> *** While the SSCCs have responsibility for only 21% of the PMC placements, both OCOK and Family Tapestry have encountered situations where they were unable to locate a timely placement for a child. ***

> We have been closely monitoring the CWOP situation with the SSCCs. Through a series of telephone calls, we communicated to each of the SSCCs that the use of any unlicensed facility for the housing of children under staff supervision does not fulfill the contractual obligation to provide children with suitable placements in a Title IV-E eligible residential care facility for youth within the timeframes noted in the SSCC contract. We further advised that DFPS has the latitude to assess liquidated damages for such contract violations. *** DFPS has issued a notice of violation to both OCOK and Family Tapestry for their use of unlicensed facilities, noted in your e-mail, to temporarily provide housing for CWOP and required the submission of a Correction Action Plan (CAP).[47]

The e-mail indicated that DFPS first reported SSCC children without placements to the Monitors as part of the regular, weekly reporting in mid-February 2021, but that during "internal quality assurance" in early February, the agency discovered that the Monitors had not received any information on children without placements from the SSCCs prior to mid-February 2021.[48] Commissioner Masters indicated that DFPS was "preparing to submit an addendum report last week when we received your inquiry."[49] The spreadsheet with the SSCC children without placements that had not been reported to the Monitors was included as an attachment to the e-mail, along with letters sent to the SSCCs requiring the corrective action plan.[50]

1. OCOK and Glen Eden

Commissioner Masters's e-mail described OCOK's use of "Glen Eden," an unlicensed GRO:

> OCOK *** has occasionally encountered the inability to locate a timely placement for a child and, therefore, used an unlicensed facility for temporary housing during the search process. Again, we first reported on OCOK's use of Glen Eden in mid-February 2021.[51] Fortunately, OCOK has not had many instances of more than a few children at any one time and most stays have not exceeded a couple of nights.[52]

---

[46] E-mail from Jaime Masters to Deborah Fowler & Kevin Ryan, *CWOP placements*, March 22, 2021 (on file with Monitors).
[47] *Id*.
[48] *Id*.
[49] *Id*.
[50] *Id*.
[51] The first e-mailed report from DFPS of PMC children without placement under OCOK supervision that the Monitors could find is dated March 1, 2021.
[52] In fact, a review of the children without placement report addendum sent to the Monitors on March 22, 2021 shows that 12 of the 16 children who stayed at Glen Eden between September and February 2020 stayed three or more nights;

Nonetheless, in early December 2020, when we learned of OCOK's use of Glen Eden for CWOP, we immediately inquired about the use.[53]  After receipt of a December 15, 2020,[54] e-mail from OCOK confirming that it had used Glen Eden for CWOP, DFPS sent OCOK a letter advising that Glen Eden does not meets [sic] OCOK's contractual obligation to provide children with suitable placements in a Title IV-E eligible residential care facility for youth within the timeframes noted in

---

[53] As discussed in footnote 29, e-mails subsequently provided by the State to the Monitors indicate DFPS was receiving reports of children under OCOK's supervision as early as September 2020.

[54] E-mail exchanges later provided by the State show that DFPS first notified OCOK of the requirement for a corrective action plan on December 9, 2020, and due from OCOK by December 20, 2020.  E-mail from Larry Isbell, Contract Administration Manager, DFPS Region 3b, to Wayne Carson, CEO, ACH Child and Family Services, *CAP Unlicensed Placement 12-2020*, December 9, 2020 (on file with Monitors).  Wayne Carson responded to DFPS's request for a corrective action plan the same day:

> As per our call this morning at 8 am, we understood that a corrective action plan is required and we briefly described several of the actions we are taking to prevent the use of Glen Eden. We understand that it is a contract violation for us to have children in an unlicensed placement and we have been taking action to prevent this.  However, we were not understanding from the call this morning that we are required to stop the use of Glen Eden immediately.
>
> As you know, there is currently a placement shortage being experienced statewide.  While Glen Eden is not our placement of choice, it is unfortunately sometimes the only option we have temporarily for youth when an appropriate placement is not available.  We want to be clear that DFPS understands that prohibiting our use of Glen Eden will result in youth sleeping in our offices.  Youth will be supervised by the same staff who would be supervising them in Glen Eden but would not be able to enjoy the comforts of the home we have available while waiting for a licensed placement to be found.
>
> OCOK went over a year without using Glen Eden at all until recently.  While we are confident that our efforts to create new capacity will again make our need to use Glen Eden a rare occurrence, the critical shortage of placements statewide will prevent an immediate solution as this is a larger issue than just in Region 3b.  Despite being an unlicensed placement, Glen Eden is without question, a more normalized, safer, and better controlled option than having youth sleep in offices.
>
> Please confirm that we are restricted from using Glen Eden immediately, and the [sic] DFPS understands that this will result in youth sleeping in offices rather than in a home setting.  We are open to other solutions if the Department has other ideas, and think that when you see our corrective action plan, you will see that we anticipate having one new licensed solution available in early January.  We request being able to continue the use of Glen Eden at least until you review our corrective action plan and determine if we are taking reasonable and appropriate steps to avoid future use of Glen Eden.

E-mail from Wayne Carson, CEO, ACH Child and Family Services, (the parent company for OCOK), to Larry Isbell, *CAP Unlicensed Placement 12-2020*, December 9, 2020 (on file with Monitors).  On December 21, 2020, an OCOK administrator sent a follow-up e-mail to DFPS, asking "I wanted to check in to see if I missed a response to the question that Wayne sent that would help us know how to complete the CAP? I am very sensitive to the timeframe that you put for the due date but believe that the answer to Wayne's question will support us in getting the right plan to you." E-mail from Kris Naylor, COO, OCOK to Larry Isbill, *CAP Unlicensed Placement 12-2020*, December 21, 2020 (on file with Monitors).

the SSCC contract.[55] OCOK was directed to submit a CAP by December 28, 2020. You will see in its CAP that it cites both COVID-19 and the decrease in availability of beds at Residential Treatment Centers as contributing reasons for CWOP.[56] As you will see in the Monitor CWOP reports, OCOK has not had a CWOP child since February 25, 2021 in Region 3b.[57]

The Monitors were notified on April 21, 2020, that OCOK reported another child without placement housed at Glen Eden and that DFPS would "send a letter advising them, once again, that neither Glen Eden, nor any other unlicensed facility, may be used to temporarily house CWOP youth."[58] On April 23, 2021, DFPS notified the Monitors that it had sent OCOK a letter regarding its use of Glen Eden, and attached the letter, which states:

> DFPS received your list of children and youth under SSCC supervision. DFPS understands the critical shortage of placements statewide but ACH Child and Family Services/OCOK is responsible for making decisions around how to safely and appropriately care for children, and the practice of utilizing an unlicensed

---

[55] On December 21, 2020, DFPS sent the CEO for ACH Child and Family Services stating:

> DFPS has researched the situation and cannot reconcile how allowing children or youth to stay at the Glen Eden location or any other non-Title-IV-E eligible site overnight, meets the requirements of [the SSCC contract with DFPS]. DFPS understands the shortage placements statewide but ACH Child and Family Services/OCOK must implement strategies to immediately stop utilizing Glen Eden, and to find suitable placements in a Title IV-E eligible residential care facility for youth referred within the timeframes noted in the [SSCC] contract.

> The Department stresses that OCOK is responsible for making decisions around how to safely and appropriately care for children, and the practice of utilizing an unlicensed residential care, violates the Community-Based Care (CBC) Contract with the Department.

> Please develop and submit a detailed Contract Corrective Action Plan on or before December 28, 2020 that contains detailed information on how ACH Child and Family Services/OCOK will ensure timely and appropriate placements for all youth referred, into fully licensed Title IV-E eligible facilities and come into compliance with your CBC contract.

[56] The Corrective Action Plan submitted by OCOK consists of a plan for increasing the number of emergency foster care placements within the region by increasing the number of foster home beds, shelter or residential beds, and therapeutic foster care beds available. Kris Naylor, COO, OCOK, OCOK Corrective Action Plan (December 28, 2020). The OCOK CAP defines the "Issue requiring improvement" as "OCOK's utilization of our unlicensed, child-friendly, house setting for children awaiting placement has increased significantly in 2020. The SSCC contract requires all children to be in either approved parental, kinship or licensed placements therefore keeping children in an unlicensed house setting while continuing to search for a placement is a contract violation." *Id. It* describes factors contributing to the identified issue: "The State of Texas has lost over 400 residential treatment center beds over the last year. These beds represented the bulk of facilities willing and able to accept children with therapeutic needs or behaviors and on an emergency basis. Most remaining residential treatment centers do not accept emergency placements in the evening, weekends, or over Holidays. 2020 also brought some capacity issues with the introduction of COVID-19. OCOK has utilized alternative unlicensed settings on occasion such as a hotel to provide care and supervision to children who are positive with COVID-19. Creative solutions have been necessary to ensure that children are cared for in a friendly, safe setting where other children will not be exposed to the virus." *Id.*

[57] E-mail from Jaime Masters to Deborah Fowler & Kevin Ryan, *CWOP placements*, March 22, 2021 (on file with Monitors).

[58] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, *Updates re: Family Tapestry/2Ingage/OCOK and Communication to SSCCs*, April 21, 2021 (on file with Monitors).

residential care, violates the Community-Based Care (CBC) Contract with the Department.

As these situations occur DFPS is now requiring that you submit a daily report to the CAM, that lists the placement searches made for each youth and a time line for moving them to a more appropriate licensed placement. This report is due every day by 5:00 p.m.[59]

Two members of the monitoring team visited Glen Eden on April 26, 2021. They did not find any children at the facility, but were told that a PMC child who had been at the house for over a month had run away on April 25, 2021. They were told that this child frequently ran from the house, but would return. The Monitors' review of CLASS does not show a report of the runaway incident was made to SWI.

In addition to reviewing the attachments and data that Commissioner Masters provided, the Monitors also reviewed child abuse, neglect and exploitation intakes for OCOK. A report was made to SWI by a PMC child's caseworker on December 4, 2020 alleging that the child, who had been "suicidal in the past" and was under OCOK supervision, but without placement at the time of the incident, took a sharp kitchen knife from the pantry in Glen Eden, something the staff at the operation were "shocked to learn," though the intake noted "it is believed the staff knew that all knives needed to be put away." RCCI, determining "there is no way to measure abuse/neglect as the OCOK workers are not held to any standard," administratively closed the matter with the following explanation:

Based on a preponderance of the information gathered there is not sufficient evidence to support the documented circumstances to meet the criteria of abuse/neglect as defined in the Texas Family Code Section 261.401 and further defined in Texas Administrative Code 745.8557. Based on the interviews, the case findings will be Admin. Closed. RCCI cannot cite facility as it is not licensed. There is no way to measure abuse/neglect as the OCOK workers are not held to any standard. There was no treatment plan to follow as well.

On March 25, 2021, the Monitors asked whether a CPI investigation was subsequently opened since RCCI asserted it could not investigate child maltreatment in this instance. The Monitors inquired if not, why not.[60] DFPS responded on March 30, 2021:

[Y]ou asked whether a CPI investigation was subsequently opened after RCCI administratively closed a December 4, 2020 intake of an investigation into alleged NSUP at Glen Eden *** Since this investigation was an "Administrative Closure," it was flagged for a routine review and assessment by CCI on February 25, 2021, following its closure on January 25, 2021. It was determined the policy had not been followed to request a Program Administrator staffing prior to entering an

[59] Letter from Judy Pavone, CBC Contract Director, DFPS, to Wayne Carson, CEO, ACH Child and Family Services, April 22, 2021 (on file with Monitors).
[60] E-mail from Deborah Fowler and Kevin Ryan to Corliss Lawson, *CWOP Placements*, March 25, 2021 (on file with Monitors).

"Administrative Closure." This was communicated to field leadership on February 26, 2021. At this time, it has not yet been processed but will be changed to a finding of "Ruled Out." ***

The challenge of dealing with children without placement is a new phenomenon in the context of Texas SSCCs and the question of authority to investigate ANE allegations in unlicensed CWOP settings was an unsettled issue. The initial issue with investigating CWOPs under the supervision of SSCCs is not because of its status as a [sic] "illegal operation." Rather, it was a question of to which entity to tie the finding. HHSC encountered the same difficulty and *** determined on February 8, 2021 that the investigations should be tied to the actual license of the SSCC as a Child Placing Agency (CPA) responsible for placements of children, thereby providing a standard. Thus, with this determination regarding to which entity to tie the finding, there is no need to have a CPI investigation as RCCI can investigate as it has authority to investigate ANE allegations involving a CPA.

DFPS explained that after reviewing the case again, "CCI determined that a 'ruled out' disposition is appropriate for several reasons:"

There was no finding that there were current concerns that the youth was contemplating harming herself; although she has a history of suicidal ideations, there was no indication she took the knife intending to harm herself and she stated she was going to run and needed it for protection.[61] CCI further determined that the 2:1 ratio of staff to children does not require that each child has two people assigned to watch the child's every move. Nor should the statement that the 'youth are not allowed to be alone' be construed to mean that someone is watching them every minute as clarified by the statement that workers do check ins every 15 minutes. That leaves the question of whether the house director's statement that sharp items are locked up in a hallway closet is sufficient to find NSUP on the alleged perpetrators because this youth obtained a knife from a pantry and there is no suggestion that these staff were aware of the location of the exact knife to tie it back to an individual's breach of duty.[62]

In fact, the Monitors review of CLASS notes related to the investigation showed that two staff who were working at the time that the child stayed at Glen Eden were never interviewed because the RCCI investigator was not able to contact them; they were no longer employed by OCOK. During her interview, the child told the RCCI investigator that there were also scissors in a jar in the pantry at Glen Eden and that "none of these things were locked up." The CLASS notes related to the Incident Report indicate that the child showed her caseworker where she found the knife (in the pantry in a plastic box on the top shelf), and a small pair of nail scissors she had also taken from a box under the bathroom sink, and that "[w]hen the worker was looking in the box there was another pair of larger scissors."

---

[61] The RCCI report notes that she did in fact run away, and that her CPS caseworker obtained the knife from her after she was picked up.

[62] Letter from Corliss Lawson, Associate Commissioner of Foster Care Litigation Compliance, to Deborah Fowler and Kevin Ryan, attached to encrypted e-mail, March 30, 2021 (on file with Monitors).

Furthermore, the Monitors' review of the child's IMPACT records showed that child's November 18, 2020 Common Application, documents six psychiatric hospitalizations, first from June 27, 2019 – July 9, 2019 for suicidal behavior and ideations, and again for suicidal ideations March 16, 2020 – April 3, 2020; April 15, 2020 – April 20, 2020; August 13, 2020 – August 18, 2020; August 28, 2020 – September 10, 2020; and October 29, 2020 – November 6, 2020 (just one month before the report to SWI regarding the incident at Glen Eden).

    2.  Family Tapestry and Whataburger Center

Commissioner Masters's March 22, 2021 e-mail also spoke specifically to DFPS's interactions with Family Tapestry and its use of the Whataburger Center for Children and Youth (Whataburger Center) a GRO that had surrendered its license in January 2021, for children without placements:

> As stated above, we began reporting to the Monitors in mid-February of CWOP children who were being temporarily housed at the Family Tapestry Intake Center. On March 8, 2021, DFPS provided written notification to Family Tapestry of reported allegations made through numerous intakes regarding Family Tapestry Intake Center (a/k/a Whataburger Center), an unlicensed facility, used by Family Tapestry for the temporary housing of CWOP children. As was detailed in the letter, the allegations ranged from a chaotic environment characterized by children running away and returning at will to allegations that the children's educational and medical needs were not being met. Family Tapestry was directed to submit a CAP within one week of the date of the letter but was granted a one-day extension. DFPS recited in the letter the relevant contractual obligations and directed Family Tapestry to address not only the allegations but also what efforts were being taken to find appropriate placements as well as all measures that are taken to ensure the medical, educational and safety needs of the CWOP children are met.[63]

***Troubled History of Whataburger Center***

The Monitors' concerns related to the use of Whataburger Center as an unlicensed placement are magnified by the GRO's history of confirmed findings of abuse, neglect or exploitation and safety violations during the time that it <u>was</u> licensed. On January 5, 2021, RCCR notified the Monitors via e-mail that Whataburger Center sent letters to RCCR and DFPS indicating their intent to surrender their license once all children in the placement were moved.[64] Two days later, DFPS

---

[63] E-mail from Jaime Masters to Deborah Fowler & Kevin Ryan, *CWOP placements*, March 22, 2021 (on file with Monitors).
[64] E-mail from Georgette Oden, Attorney, HHSC, Litigation Division, to Deborah Fowler & Kevin Ryan, *License surrender – Whataburger*, January 5, 2021 (on file with Monitors). In response to a subsequent request from the Monitors, RCCR sent a copy of the letter from The Children's Shelter, the organization that owned and operated Whataburger Center, to RCCR regarding their intent to voluntarily relinquish their license. In the letter, Family Tapestry notes, "The voluntary closure decision was made with great care, based on a variety of factors, including financial strain on the Center and the ongoing impacts of the COVID-19 pandemic," notes that there were six children in Whataburger Center when the letter was sent and says that it will "continue to rely on its license solely for the purpose of providing services to the current children/youth at the Center, as we work to identify appropriate

provided the Monitors with a letter sent by Family Tapestry (the only entity contracting with Whataburger Center)[65] to DFPS, indicating its intent to terminate its contract with the GRO.[66]

At the time that Whataburger Center surrendered its license, the facility was under both Heightened Monitoring, pursuant to Remedial Order 20, and on probation. RCCR and DFPS notified Whataburger Center that it had been placed on Heightened Monitoring on June 11, 2020, and that starting June 12, 2020, all placements at the facility would have to be approved by the Associate Commissioner of CPS.[67] While the operation was immediately subject to the weekly Heightened Monitoring visits, the start date for the Heightened Monitoring plan developed by DFPS and RCCR was August 1, 2020.[68]

Whataburger Center was in the first tier of GROs subject to Heightened Monitoring under Remedial Order 20, and had the third highest safety risk score of the more than 40 GROs identified by the State for Heightened Monitoring. The only two facilities with a higher safety risk score were Gulf Coast Trades Center and Williams House, one of the sites of a child fatality discussed at length in the Monitor's First Report.[69] Whataburger Center's ongoing safety problems led DFPS to place the operation on an admissions hold on September 9, 2020.[70] RCCR subsequently placed Whataburger Center on probation on September 30, 2020 due to "a continued pattern of deficiencies in the area of supervision, medication, and reports/record keeping."[71]

---

placements for these children and carry out any contractual obligations." Letter from Annette Rodriguez, President/CEO, The Children's Shelter, to Kimberley Maradiaga, RCCR, December 17, 2020 (on file with Monitors).
[65] Though Family Tapestry SSCC was contracting with Whataburger Center, both entities are subsidiaries of The Children's Shelter. According to CLASS, several entities are licensed as part of The Children's Shelter non-profit corporation: The Children's Shelter GRO, The Children's Shelter CPA, Family Tapestry SSCC, and Whataburger Center. All of these entities share the same CEO (Annette Rodriguez) and have overlapping controlling persons, according to CLASS. CLASS also shows two former CPA branches for The Children's Shelter that voluntarily relinquished licenses: a CPA branch in Corpus Christi, Texas that relinquished its license in 2009 (The former Director/Administrator for this CPA branch is now listed as the Director/Administrator for Family Tapestry); and a branch in Laredo, Texas that voluntarily relinquished its license in 2005. The Children's Shelter website indicates that it formed Family Tapestry in 2018 (the same year that they were awarded the SSCC contract for Region 8a) to "restructure the service delivery model of critical services to ensure children and youth experience safety, well-being, and permanency." The Children's Shelter, website, last accessed April 1, 2021, *available at* https://childrensshelter.org/about
[66] E-mail from Heather Bugg to Deborah Fowler & Kevin Ryan, re: Whataburger Center for Children, January 7, 2021 (on file with Monitors).
[67] Letter from Christina Guerrero, Residential Child Care Contracts Director, DFPS & Jean Shaw, Associate Commissioner, RCCR (June 11, 2020)(on file with Monitors).
[68] DFPS & RCCR, Heightened Monitoring Plan, Whataburger Center for Children, July 27, 2020 (on file with Monitors).
[69] Deborah Fowler & Kevin Ryan, *supra* note 4, at 313-14.
[70] E-mail from Tiffany Roper, General Counsel, DFPS, to Deborah Fowler & Kevin Ryan, *Quick question*, December 17, 2020 (on file with Monitors)(sent in response to the Monitors' question regarding which operations under Heightened Monitoring had been placed on an admissions hold.)
[71] Letter from Kimberly Maradiaga, Licensing Representative, RCCR, to Yvette Sanchez, Administrator, Whataburger Center for Children and Youth, September 15, 2020 (on file with Monitors). Prior to being placed on probation and Heightened Monitoring, Whataburger Center had entered into a Plan of Action with RCCR on December 16, 2019, which it did not successfully complete. Whataburger Center had also been placed under an Evaluation on October 16, 2017, but requested an administrative review of the corrective action, and the decision was overturned. At the time that the operation was placed on the Evaluation that was overturned, Whataburger Center was already under a Plan of Action that had started on July 5, 2017. Notes in CLASS related to the administrative review for the Evaluation that was overturned indicate, that the RCCL staff who recommended that Evaluation action "noted that the [operation] has

The Monitors' analysis of data shows that over the five-year period between 2016 and 2020, RCCR cited Whataburger Center 239 times for minimum standards deficiencies. Of these, 174 were weighted high or medium-high by RCCR. RCCI investigations resulted in 15 RTBs for abuse or neglect allegations during the same period, with one substantiated finding of physical abuse in 2016, two substantiated findings (and two UTDs) of Neglectful Supervision in 2017, one substantiated finding of Sexual Abuse in a 2019 investigation, eight substantiated findings of Neglectful Supervision and three substantiated findings of Medical Neglect resulting from six RCCI investigations in 2020. In addition to the standards violations and substantiated abuse or neglect findings, the Heightened Monitoring plan created for the facility indicates Whataburger Center was in violation of contractual provisions 11 times over the five-year period that served as the basis for Heightened Monitoring.[72]

Of the 15 RTBs, eight resulted from five abuse or neglect investigations opened before Whataburger Center was placed under Heightened Monitoring:

- An investigation opened after a June 10, 2016 report to SWI alleged a child had an abrasion and bruise on his face after he threw a box at a staff member, and the staff member picked the box up and threw it back at the child "really hard," hitting him in the face and causing him to fall to the ground. According to the report, the child said that after he fell, the staff person picked him up and slammed him onto the bed. The report indicated the child also had bruises on his chest, arms, and underneath his left eye but said he did not know how he got them. Video footage reviewed during the investigation showed the staff person physically "escorting" the child down the hallway to his bedroom, during which time the staff person could be seen dragging the child on the floor and lifting him up by grabbing his neck. It also showed the staff person throwing an object "in an overhead motion with force" into the child's bedroom. The investigation resulted in an RTB for physical abuse by the staff member. Three citations were also issued by RCCR: a citation related to caregiver supervision based on staff reports that they are not provided with enough coverage to allow for breaks, which leads to frustration; a citation related to employee responsibilities based on the failure of the staff person to exhibit self-control; and, a citation issued for violation of the minimum standard associated with a child's right to be free from abuse or neglect. The investigation was closed on June 10, 2016.

- An investigation opened after an August 26, 2017 report to SWI alleged two children ran out of an open gate on the facility campus and attempted to run away. The investigation revealed that a number of runaway incidents occurred over the course of the weekend due to understaffing, and resulted in two RTBs for Neglectful Supervision for each of the children against "unknown staff." During one of the runaway incidents, the children ran into a busy road, and staff had to redirect traffic to keep cars from hitting the children. All

made some progress, are implement their POA, but still have a ways to go. Big area remaining is supervision. They have fired some staff, hired new staff. Still need to pay attention to weekend shifts and put some tenured staff on those shifts…they decided to switch from POA to [corrective] action due to July and August citations." CLASS notes indicate that the GRO successfully completed this Plan of Action, which ended on January 1, 2018.

[72] DFPS & RCCR, Heightened Monitoring Plan for Whataburger Center for Children, July 27, 2020 (on file with Monitors).

staff interviewed said the facility was understaffed that night. One of the children who attempted to run away was supposed to be on one-to-one supervision, however the staff person responsible for the child's supervision indicated that she had been assigned to a group of seven other children because the facility was short staffed. The staff said they had notified the facility administrator that the facility was understaffed.[73] RCCR also issued four citations: a citation for violating the minimum standard associated with documenting serious incidents, due to the operation's failure to document some of the runaway events; a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect; a citation for violation of the standard associated with caregiver responsibility; and, a citation for violation of the minimum standard associated with staff-to-child ratio. The investigation closed June 25, 2018.

- An investigation opened after an April 9, 2019 report to SWI alleged a 16 year-old male foster child was having a sexual relationship with a female staff member. During intake, the reporter noted that the child was wearing a charm bracelet that he told other children was given to him by the staff member. The child and staff member initially denied the relationship. However, before the investigation closed, another report was made to SWI on May 14, 2019 by the child's caseworker, alleging that the foster child told his caseworker that he had "gotten a female staff pregnant" but believed she had a miscarriage. The child was again interviewed and acknowledged the sexual relationship with the staff member, and provided details that the investigator was able to substantiate. The allegation against the staff member resulted in an RTB for Sexual Abuse. RCCR also issued two citations for minimum standards violations: one citation for failing to maintain the required staff-to-youth ratio when one staff member left her group of children with another staff member, and one citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect. The investigation was closed June 27, 2019.

- An investigation opened after a report to SWI on April 22, 2019 alleged that an 18 year-old male foster youth in the facility made graphic, sexually inappropriate remarks to a 17 year-old female foster youth, a 14 year-old female foster child, and a 13 year-old female foster child. The intake also alleged that the 13 year-old was described as the 18 year-old's

---

[73] An "unable to determine" (UTD) finding against the Director/Administrator of the facility also resulted from the investigation, despite RCCI's findings that, "[A.G.] was aware that the weekend shifts are understaffed and remained understaffed during the weekend for months based on the gathered interviews from staff…[A.G.'s] previous program manager had made suggestions to help resolve the situation of the weekend staff being understaffed and yet no changes were made. [A.G.] admitted that the staff that work the weekend shifts are new staff…[A.G.] stated that the weekend shift staff would be out of ratio when a staff or multiple staff have to leave the campus to chase after the child/children who ran away from the campus…[A.G.] admitted that she was aware of all the incidents that took placed [sic] during the weekend of 08/26/17 – 08/28/17. There is a total of 23 investigations related to runaways from January 2017 – August 2017. [A.G.] knew there was a high turnover in staff and knew she didn't have enough staff in order to provide appropriate supervision for the children or to respond in an emergency situation. [A.G.] indicated she implemented changes however based on the overall interviews conducted during the course of the investigation the environment at the operation continued to be chaotic, runaways continued to occur and continued to being out of ratio. All staff were consistent regarding being out of ratio on most days…Evidence supports that no single action of [A.G.] contributed to the overall failure of children not receiving adequate care and supervision. It was determined that the lack of supervision was a systematic failure and it is unclear as to how much influence or due diligence [A.G.] exercised in ensuring the system and protocols in place were being followed by an adequate number of staff. Therefore, this case will be closed with a disposition of Unable to Determine by [A.G.] for the neglectful supervision of [the children]."

girlfriend; however, the 13 year-old denied this during two interviews over the course of the investigation. The investigation revealed that the 18 year-old had been placed on a safety plan on March 22, 2019, requiring one-to-one supervision. Despite this, several children who were interviewed for the investigation confirmed that the 18 year-old was able to repeatedly make inappropriate comments, give other children sexually explicit drawings, and inappropriately touch at least two other foster children. Video showed the 18 year-old sitting with female residents in the facility, in violation of the safety plan. RCCI made three RTB findings against an "unknown perpetrator" for Neglectful Supervision of the three victims: two of the female foster children and the 18 year-old foster youth. In addition, RCCR issued three citations for minimum standards violations: one citation for violation of the minimum standard associated with child-care administrator responsibilities, due to the failure to follow the safety plan; one citation for failing to maintain records, due to the failure to document the staff person assigned to provide one-to-one supervision for the 18 year-old youth; and, one citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect. The investigation was closed July 23, 2020.

- An investigation opened after a report to SWI on May 19, 2020 alleged that a 17 year-old male foster youth made an outcry to a staff member at Whataburger Center that his 17 year-old roommate touched him inappropriately. In subsequent interviews, both children acknowledged sexual contact, but the alleged aggressor claimed it was consensual. The alleged aggressor had been flagged with an indicator for sexual aggression on November 16, 2019, and had a safety plan that required one-to-one supervision with a Whataburger Center staff member. Video footage revealed that the staff member responsible for one-to-one supervision of the child on the night that the incident occurred failed to make visual checks or supervise him for 44 minutes, providing the opportunity for the incident to occur. The investigation resulted in a Reason to Believe (RTB) finding for Neglectful Supervision against this staff member, and RCCR issued one citation for the minimum standard associated with a child's right to be free from abuse or neglect. The investigation closed July 2, 2020.

DFPS and RCCR identified the following patterns and trends for the facility in The Heightened Monitoring Plan (Plan) created for Whataburger Center:

Administrative Operations:
- medication concerns and admin penalties;
- reports, and record keeping;
- failure to report serious incident; 7 failure to report deficiencies in past 5 years

Supervision and staff interaction:
- staff supervision; 4 RTBs and 4 UTDs over the past 5 years all related to neglectful supervision;
- confirmed allegations of sexual abuse;
- confirmed allegations of physical abuse;

- runaways; caregiver responsibility – being aware of and accountable for each child's on-going activity.[74]

DFPS and RCCR noted the following as barriers to compliance in the Plan:

1. Operation slow to recognize and identify areas of concern and the need to develop a plan to address the concern.
2. The WBC is a CBC only residential provider and is used as an emergency shelter to provide temporary placement for children and youth until a more permanent placement is found. Therefore, the mix of children placed there is dynamic and for that reason admission screening to evaluate child characteristics for new admissions compared to child characteristics for overall milieu is critical to determine if the Center is able to meet all children's need.
3. Staff shortages and the Operations [sic] inability to bring on quality staff quickly in this situation who can meet the children's needs had occurred.[75]

The Plan listed seven tasks, with some sub-tasks, though three of the seven identified tasks merely required the operation to continue to meet the terms included in the RCCR Plan of Action (POA) that the operation was under prior to being placed on Heightened Monitoring.[76] The new tasks that were not already part of the POA included:

- Operation must submit a robust staffing plan to allow and plan for census ebbs and flows and to address emergency unanticipated shortage of staff.

- The plan should include strategy to have PRN staff on call if needed and a "hire ahead" component that anticipates staff turnover.

- Operation must submit a detailed internal quality assurance and continuous quality improvement (CQI) process that explains:
  o how the operation will more proactively identify areas of concern,
  o timeframes in which the internal reviews will take place,
  o how addressing the identified areas will be prioritized,
  o who will be responsible for implementation of the improvement strategies, and
  o how improvement will be tracked and measured.

- Once the quality assurance plan/CQI process had been implemented; submit a summary of the identified concerns and the actions it will undertake to mitigate them, including who is responsible, and how success of the actions will be evaluated.[77]

---

[74] DFPS & RCCR, *supra* note 78, at 2.
[75] *Id.*
[76] *Id.* at 3-6.
[77] *Id.* at 3.

The new tasks also included requiring the operation to "develop and submit a runaway prevention plan."[78] The POA terms listed in the Plan include the following terms related to medical care:

- Administrator will review each child referred for placed [sic] at the WBC for appropriateness, including those with medical needs.
- If a child residing at the WBC has medical needs, the Whataburger Center Director must continue to consult with Christus Children's Hospital nurses to determine if proper medical care can be provided at the WBC prior to admission.
- Continue to submit the WBC daily census and staffing report to the SSCC.
- Continue with CCR POA Medications and re-asses for effectiveness: Continue the process whereby the medical care coordinator reviews all medications daily or weekly. Medical care coordinator will e-mail or meet in person with the assistant or COO to discuss any errors or medical refill needs, etc. Director of compliance reviews medication records each month and pulls 5-10 records to review.
- Operation will maintain the documentation of this record review and have the results made available upon CCR request.
- Director of Compliance will debrief with the Medical Care Coordinator, Assistant PD and COO. Christus will come every Wednesday, if a child is admitted with significant medical needs, will train staff on how to care for children with those needs. Staff training conducted will be maintained in staff's personnel file and available upon request.[79]

The Plan also included POA terms related to reports and record keeping and supervision:

Operation will continue with CCR POA-Reports/record keeping: A review of the [serious incident reports (SIRs)] is conducted by the assistant program director and COO as they occur. Director of compliance completes monthly random reviews of SIR's and reviews 5-10 residents. After review, a debrief is completed with the assistant and COO. Staff have been re-trained with SIR's.

Operation will document the items reviewed, the staff trained on the items and maintain this information at the Operation which must be available upon CCR request.

---

[78] *Id.* at 5. RCCR's analysis for the FITS staffing for Whataburger Center described a high rate of runaways as one of the operation's barriers to compliance, "Barriers: The operation is an ER shelter and takes children who are no-refuse children. There is a high number of child on child fighting with injuries, bullying, and inappropriate sexual contact due to the population of children. The operation also has a high rate of runaway children. The operation attempted to remedy this with a large fence around the operation. Although numbers have lessened, children continue to run away from the operation. They typically return to the operation after they run away. The operation will need a plan to curb these runaways due to new legislation in RCCR resulting in action being taken based on children who run away." RCCR, RCCR Operation Analysis for FITS 5 (undated)(on file with Monitors).

[79] *Id.* at 3-4.

Continue with CCR POA – Supervision: The assistant and COO rotate on the floor to observe general supervision. The program support specialist and medical care coordinator also rotate on the floor daily and on weekends as needed. Cameras are reviewed daily by the assistant. The lead mental health technician observes the floor as part of their role and ensures general supervision is met randomly. Topics of discussion, such as supervision are discussed during staff meetings. Safety plans are created within 24 hours if [sic] intake for supervision. The COO or Assistant will provide feedback. An email is sent to all supervisors and assistants with supervision requirements. Shift supervisors staff daily with Assistant and COO regarding the need for staff coverage. Supervisors submit daily shift assignments reviewed by Assistant and COO. The Program Support Specialist provides a weekly staffing pattern report to the COO of the previous week. Shift Supervisors are responsible for reviewing observation logs daily. The Shift Supervisor, at the end of each shift, provides reports to all pertinent staff.[80]

RCCR continued to cite Whataburger Center for violations after it was placed on Heightened Monitoring. The Monitors' analysis showed that of the 239 total citations issued to Whataburger Center between January 1, 2016 and December 31, 2020, 43 were issued after Heightened Monitoring started on June 11, 2020. Of these, 17 were weighted high in terms of their risk to child safety, 13 were weighted medium-high, 11 were weighted medium, and two were weighted medium-low. The most frequently cited standards during this time period were related to medical care (11), followed by standards associated with supervision (5) and child rights (4). Examples of citations issued after Heightened Monitoring started include:

- Two deficiencies were cited on June 16, 2020, after "[a] staff person instigated a fight between two residents, made inappropriate comments towards a resident and threatened to harm them if the resident were to hit staff. The staff also used profane language towards the resident."

- A deficiency cited on June 18, 2020 related to caregiver responsibility, because "[s]taff admitted child in care who was on one to one was allowed to *** talk to another resident who showed signs of aggression…leading to a physical altercation. Both residents were on one to one, however, due to being friends staff allowed them to interact even after witnessing one child provoke the other."

- A deficiency cited on July 6, 2020 related to caregiver responsibility when a 15 year-old male broke a window in the boys' hallway of the facility, and he and two other female residents escaped through the window and ran away. Staff assigned to the children reported not being aware that they were assigned to them and said they did not witness the incident.

- A deficiency was cited on August 14, 2020, when a child who had previously self-harmed by cutting himself with a soda can was able to obtain another soda can and self-harm again. The child's safety plan required that he be kept within eye-sight

---
[80] *Id.* at 4-5.

or hearing range of staff, due to a history of suicidal ideation and self-harm. The child's roommate left the can in their room, and the child retrieved it, took it to the restroom, and repeatedly bent the can until it broke in half, then used the sharp edges to cut his arm. Staff responsible for supervising the child did not know how the child got the soda can.

- Three deficiencies cited during a monitoring inspection on August 20, 2020 related to administration of medication when the inspection revealed that medication logs did not include the time or dosage administered, and showed inaccurate medication counts and dosage provided to the children.

- Two deficiencies cited during an inspection on September 17, 2020, related to children's records: a child's preliminary service plan was not updated after the child left the facility and then returned; and, a child's emergency admission stated that the child had chronic health conditions and later said she did not. Another deficiency was cited because a child's room and bathroom were dirty. The operation was re-cited for this during a follow-up inspection.

- A deficiency was cited on October 13, 2020, because a child who had been in the facility for five months did not have a completed service plan.

- Four deficiencies were cited related to children's medical care, identified during a monitoring inspection on October 15, 2020: medication records showed staff did not ensure that a child took medications as prescribed (the records documented missed dosages and that the child was asleep); the medication room was left unlocked; a child's record showed that the medication log for the child's prescription medications was pre-filled; and, two children's records showed staff failed to document all instances of medication errors.

- A deficiency was cited during an October 26, 2020 follow-up inspection because a child's medication log documented the reason for a missed dose as both that the child refused the medication, and that the child did not wake up.

- A deficiency was cited during an inspection on November 23, 2020, because staff failed to document medication administered in the morning in the cumulative medication record within the required timeframe.

- A deficiency was cited after RCCR investigated a DFPS staff report to SWI on December 16, 2020 of having reviewed medication logs for all six children staying at the facility, and finding errors in all of them. RCCR cited the facility after finding that the medication log viewed during the investigation inspection "contained conflicting dispensing instructions for an over the counter medication."

- A deficiency was cited during a follow-up inspection on December 29, 2020, when the supervisor's keys were observed in the doorknob to the medication room during a walk through.

In addition to these citations, several abuse or neglect investigations opened after the facility was placed on Heightened Monitoring and resulted in RTBs and citations:

- An investigation opened after a report to SWI on August 10, 2020 alleged that a child reported that he had not been receiving his psychotropic medications. The intake indicated that the child's caseworker provided the medications to the facility "but the medical director [said] that they can't find them." The intake indicated the child had reported feeling anxious and depressed and punched a window to try to escape. The child was placed at Whataburger Center on July 20, 2020; during an interview with the medical care coordinator for the facility on August 12, 2020, she said that he had been back on his medications for two to three days. She indicated that the medications were eventually found "on the top of the fridge." When the victim was interviewed, he confirmed that he had not received his medications until he complained to his caseworker on August 10, 2020, which was substantiated by the RCCI investigator's review of medication logs. The investigation resulted in one RTB for Medical Neglect against an unknown perpetrator. Two citations were issued by RCCR: one for improperly storing the child's medication on top of the refrigerator, and one for violating a child's right to be free from abuse or neglect by failing to provide a child with their prescribed medications for 15 days after being admitted to the facility. The investigation was closed November 12, 2020.

- RCCI opened an investigation after a report to SWI on August 25, 2020 alleged that the victim had "a lot of medical issues and requires a lot a medications" but had refused medications many times between July 17, 2020 and August 13, 2020. The intake indicated "The staff didn't do anything about [the victim] refusing his life sustaining medications." On August 13, 2020, the child was sent to the hospital because his blood sugars were "very high." The hospital determined that the child was about to go into adrenal failure and diabetic ketoacidosis because he had not been receiving medication. During his interview, the child said he refused his medication because he was very sad, and that he also refused to eat. Several Whataburger Center staff, including the medical care coordinator, acknowledged the child refused his medications. However, according to the medical care coordinator, the child's caseworker was not notified because the child "missed medications...but not in a pattern" and that medical professionals and caseworkers are only notified when there is a pattern of refusing medications. A medication log showed the child had refused his medications 49 times before being taken to the hospital. His service plan noted a history of refusing medications as a form of suicide, and classified this as a "high risk" behavior. The investigation resulted in RTBs for Medical Neglect by a shift supervisor who was aware that the child was refusing his medications, and the medical care coordinator. Two citations were issued by RCCR: one for violating the minimum standard associated with providing appropriate medical care, and one for violating the minimum standard associated with a child's right to be free from abuse or neglect. The investigation was closed November 12, 2020.

- An investigation was opened after a report to SWI on September 16, 2020 alleged that a 12 year-old female child had been sexually assaulted by a 17 year-old male child at Whataburger Center. The 12 year-old child made an outcry to staff that the 17 year-old

child touched her breast, "butt," and digitally penetrated her while they were on a nature trail outside the facility. The alleged aggressor had also been reported to law enforcement after he was observed touching the same child's breasts over her clothing by facility staff on September 8, 2020; however, this incident was not reported to DFPS. This allegedly occurred prior to the incident on the nature trail, prompting the facility to place the alleged aggressor on a safety plan that required that he not be left alone with other children. The plan was not followed. This child also had been placed at Whataburger Center in the past[81] and had a history of sexual aggression and having poor boundaries during his previous placement at the facility. The investigation resulted in RTBs for Neglectful Supervision for the Assistant Program Director and for the two staff supervising the children on September 8, 2020. Two additional RTBs were included for an unknown perpetrator, described as the unknown staff member who should have been supervising the children the day of the incident on the nature trail. RCCR issued three citations: one for the failure to implement the safety plan for the 17 year-old child, one for the failure to report the September 8, 2020 incident to RCCR, and one for the failure to adhere to minimum standards associated with a child's right to be free from abuse or neglect. The investigation was closed February 2, 2021.

When HHSC notified the Monitors of Whataburger Center's decision to relinquish its license on January 5, 2021, the Monitors responded by asking whether any restrictions had been placed on the ability of the administrators to apply for a new license in exchange for the voluntary relinquishment.[82] HHSC responded that because HHSC had not notified the operation of its intent to take disciplinary action against them, the facility's license relinquishment did not trigger the automatic five-year exclusion.[83]

### *Family Tapestry's Use of the Unlicensed Whataburger Center to House Children Without Placements*

A letter sent by DFPS to Family Tapestry on March 8, 2021 was included as an attachment to Commissioner Masters' March 22, 2021 e-mail to the Monitors responding to their questions regarding the use of unlicensed facilities by SSCCs. The letter listed concerns related to the facility that are identical to the problems DFPS and RCCR identified prior to Whataburger Center's relinquishment of its license:

> The correspondence serves as notification that The Department of Family and Protective Services (DFPS) has identified concerns with the practice of using the Family Tapestry Intake Center, which is an unlicensed facility under the direct supervision of Family Tapestry. This location is used for the immediate and temporary care for children brought into the SSCC continuum as a more permanent placement is being sought. The environment is very chaotic, youth are staying for long periods of time and run away and returning at will. Youth are often not being

---

[81] This is the same child who was the alleged aggressor in the May 19, 2020 case.

[82] E-mail from Deborah Fowler to Georgette Oden, *License surrender – Whataburger*, January 5, 2021 (on file with Monitors).

[83] E-mail from Georgette Oden to Deborah Fowler & Kevin Ryan, *License Surrender – Whataburger*, January 5, 2021 (on file with Monitors).

enrolled in school when required, their medical needs are not being addressed and inadequate supervision has resulted in multiple intakes and investigations.

DFPS is requiring that Family Tapestry develop, implement and report to DFPS what actions will be put in place by the SSCC to address these noted concerns; including the specific strategies to be implemented to address the concerns, who at Family Tapestry will be responsible for the implementation, and targeted goals with timeline to meet them.

The intakes specifically allege serious incidents of supervision, medical neglect, and elopement.[84]

The letter referred to three specific sections in the SSCC's contract with DFPS that the agency indicated were implicated by the concerns expressed in the letter: a section requiring that children are safe in their placements, a section related to compliance with general accountability requirements, and the section of the contract requiring the SSCC to "ensure that any placement provided by itself or its subcontractors that serves seven or more children in a facility must provide Continuous 24 – Hour Awake Supervision."[85] The letter requested that Family Tapestry "develop, submit, and implement" a contract action plan (CAP)" and asked that it include:

- The steps being taken to reduce the youth from running away and deescalating strategies for reducing other problematic behavior that add to the chaotic environment.
- The steps being taken to work with DFPS and ensure youth are enrolled and attending school, when applicable.
- The steps to ensure the medical needs are being met and prescribed medicine is being provided and accurate documentation is being tracked.[86]

The letter further required Family Tapestry to submit a weekly report that included the following information:

- A weekday and weekend staffing plan that includes 24-hour awake night supervision. The plan must ensure adequate supervision is provided to ensure the safety of all children/youth at the location.
- Exhaustive search lists for each child/youth remaining in this location for more then [sic] two nights.[87]

Last, the letter directed the SSCC to "… also submit any other actions being taken to reduce the utilization of this unlicensed location and reduce the length of time youth are remaining at this location" and indicated the CAP was due March 15, 2021.[88]

---

[84] Letter from Veronica Alvarez, Contract Administration Manager, 8a, DFPS to Annette Rodriguez, Chief Executive Officer, The Children's Shelter, March 8, 2021 (on file with Monitors).
[85] Id.
[86] Id. at 2.
[87] Id.
[88] Id.

On March 16, 2021 Family Tapestry sent a response to DFPS.[89]  The response addressed each of the concerns raised by DFPS separately.  The response to concerns regarding runaways stated:

> The statement that children/youth are running away and returning to the Intake Center at will is inaccurate.  A child/youth is often at the Intake Center specifically because the child/youth has recently run away from his/her home or placement.  Several children/youth with runaway histories, including active runaways returned to DFPS custody, have been referred to Family Tapestry since the beginning of the year.

> As DFPS is aware, a child/youth with an active runaway history is more inclined to run away again, and finding an appropriate placement with a willing provider, can be challenging.  However, when a child/youth at the Intake Center makes reference to leaving/running away or a staff member anticipates that a child/youth may attempt to run away, a trained staff member will make every effort to deescalate the situation and walk through solutions with the child/youth.  Family Tapestry staff always seek to keep children/youth comfortable at the Intake Center during the search process.  In the event that a child/youth runs away from the Intake Center (which in keeping with its role as an SSCC intake location, is not a locked center), staff follow all applicable protocols to secure the child/youth's prompt and safe return.[90]

In addition to describing existing training that Family Tapestry staff receive, the letter indicated that Family Tapestry initiated additional training for staff in runaway prevention and de-escalation due to "the increase in children/youth referred to Family Tapestry with runaway histories and problematic behaviors."[91]  The SSCC also noted that it was establishing a runaway prevention policy and protocol that incorporates elements identified in the DFPS Runaway Prevention Resource Guide.[92]  In response to DFPS's concerns related to school attendance, Family Tapestry responded:

> As DFPS is aware, at this time, Family Tapestry remains in Stage 1 of community based care, such that case management and education decision making for children/youth referred for placement remain the responsibility of DFPS.  Nevertheless, Family Tapestry is fully committed to supporting the education of children/youth at the Intake Center awaiting placement.  To that end, Family Tapestry has been and will continue to:

---

[89] DFPS agreed to extend the deadline for submitting materials to them by one day, to March 16, 2021.

[90] Letter from Annette Rodriguez, CEO, The Children's Shelter, to Veronica Alvarez, Contract Administration Manager, 8a, DFPS, March 16, 2021 (on file with Monitors).

[91] *Id*. at 2.

[92] *Id*.  The Monitors noted that of the strategies listed in the letter, almost all are already required of licensed GROs by the Texas Administrative Code or DFPS policy.  It should also be noted that the Family Tapestry administrator that signed this letter was the same administrator who was named as a perpetrator in the 2017 RCCI investigation into runaway incidents that resulted in the UTD finding.

- Ensure that a child/youth attending school in person is up, dressed, and ready for physical transportation to school in accordance with the child/youth's education plan (unless the child/youth arrived at the Intake Center after midnight or the case worker indicates that the child/youth will not be physically attending school following the child/youth's intake);

- If a child/youth is participating in a virtual school program, Family Tapestry will provide an appropriate location and wifi services to allow a child/youth to participate in school. Family Tapestry will provide the child/youth with a lunch and snacks during the day; and

- Children/youth remaining at the Intake Center for remote school will be supervised by Family Tapestry Staff.[93]

The letter noted that these "education enhancement procedures have been formalized and were implemented effective immediately."[94]

   With regard to children's medical needs, Family Tapestry responded:

> Family Tapestry maintains policies and practices to ensure that children/youth awaiting placement received prescribed medications. Any medications transferred to Family Tapestry during the intake process or subsequently from DFPS are documented and secured in a double locked container (excluding non-prescription medications). Medications are dispensed in accordance with a child/youth's existing medication management plan by appropriately trained personnel. In addition, although Family Tapestry staff do not serve as medical decision makers for children/youth awaiting placement, Family Tapestry Intake staff review and assess, with the child/youth's case manager, the medical needs of each child/youth arriving at the Intake Center. If following intake, emergency care is needed, emergency care is promptly secured. Alternatively, a child/youth's case worker is contacted to arrange for non-urgent medical care.[95]

Family Tapestry indicated it was "revisiting and updating its protocols for Family Tapestry staff" and that the updated protocols "will continue to include and/or formalize" a list of protocols already required by statute, the Texas Administrative Code, or DFPS/RCCR policy for GROs.[96]

   After reviewing the documentation sent by DFPS, the Monitors responded on March 23, 2021, asking DFPS to send any e-mail correspondence between DFPS and the SSCCs. The Monitors

---

[93] *Id.*

[94] *Id.*

[95] *Id.* at 3.

[96] The listed protocols included :ensuring staff are informed about a child's diagnosis and medications and the actions/side effects of prescribed medications; storing medication in double-locked containers; updating a child's prescription and non-prescription medication logs; having supervisor audit medication logs to ensure that they are being filled out correctly; requiring Family Tapestry staff to document medication administration in IMPACT; ensuring children are available for and ready to attend scheduled medical appointments; and arranging emergency care. *Id.*

also noted, "in your letter to OCOK you advised them that they must 'implement strategies to immediately stop utilizing Glen Eden'" but that the same language was missing from the letter to Family Tapestry. The Monitors asked DFPS to explain the reason that Family Tapestry was not similarly advised.[97]

The response from DFPS revealed that the agency had been responding to Family Tapestry's housing of children in its Intake Center (which is attached to Whataburger Center) since the fall of 2020.[98] On October 6, 2020, Family Tapestry sent a letter to DFPS notifying the agency that it was having difficulty finding placements for emergency referred youth:

> We do want to advise DFPS that, due to a combination of factors, including the continued impact of the COVID-19 pandemic on residential child care provider capacity, Family Tapestry is currently experiencing a challenge in its ability to immediately place emergency referred youth, specifically referred youth with higher needs, in paid placements within the 8a catchment area.
>
> To date, two minor youth have stayed overnight at the Family Tapestry Intake Center (which, notably, while connected to the Whataburger Center for Children and Youth, is *not* part of the Whataburger Center). One youth had a placement secured, but the judge presiding over this particular youth's case did not provide approval in a time frame that allowed for timely admission within the identified facility. The youth's placement is pending approval. The second youth ran away from the facility in which he is currently placed and was brought to San Antonio, into Family Tapestry's physical custody, in the early morning hours this past Saturday, October 2, 2020. This youth has since been returned to the facility. A young adult, 18 years of age, with an Intellectual Development Disorder has also stayed overnight at the Intake Center. This young lady requires a HCF home. Family Tapestry is jointly participating with HHSC in the search for a placement for this youth.[99]

Family Tapestry included some solutions to the "placement challenge," including utilizing a cottage on the campus of a licensed provider within the network, utilizing the Family Tapestry Intake Center as a temporary, unpaid placement to shelter youth for whom paid placement has not

[97] E-mail from Deborah Fowler & Kevin Ryan to Jaime Masters, *CWOP placements*, March 23, 2021 (on file with Monitors).

[98] E-mail from Corliss Lawson, TITLE, to Deborah Fowler & Kevin Ryan, *CWOP placements*, March 25 2021 (on file with Monitors).

[99] Letter from Annette Rodriguez to Judy Pavone, CBC Contract Director, DFPS, October 6, 2020 (on file with Monitors).

been secured or approved,[100] and continuing to work to increase capacity.[101] The SSCC noted, "I would like to stress that Family Tapestry anticipates that this is a temporary, specific challenge."[102]

DFPS responded on October 9, 2020, indicating it had received Family Tapestry's letter and noting that Family Tapestry's letter "stated that youth referred for placement to Family Tapestry have stayed overnight at the Family Tapestry Intake Center, which is physically connected to the Whataburger Center" and advised "the Department stresses that this practice violates the Community Based Care Contract with the Department."[103] DFPS requested an immediate contract corrective action plan describing steps the SSCC would take to find suitable placements for all youth "without use of the Whataburger Center or any use of connecting buildings as a stand in for appropriately licensed residential care…The Whataburger Center also meets the criteria to be on Heightened Monitoring by DFPS and was recently put on placement hold. While Family Tapestry states the youth staying overnight were not placed in the Whataburger Center, the building the children stay in is separated only by a door. At the least, this is inconsistent with the placement hold issued by DFPS for the Whataburger Center."[104] The letter required, "Family Tapestry must immediately stop the use of the Family Tapestry Intake Center as a place for youth to stay overnight."[105]

Family Tapestry responded to DFPS's letter on October 19, 2020, first disagreeing with the agency's characterization of the use of the Intake Center as a potential violation of a specific provision of the parties' contract, and then taking issue with DFPS's characterization of the proximity of the Intake Center to the Whataburger Center as a problem:

> DFPS states in the October 9, 2020 Letter that Family Tapestry must immediately stop the use of the Family Tapestry Intake Center as a place for youth to stay overnight, as inconsistent with the placement hold issued by DFPS for the Whataburger Center. We disagree that the use of the Intake Center should be viewed as use of the Whataburger Center. The Intake Center is staffed separately from the Whataburger Center and maintains its own, secured space specific to Family Tapestry's Intake functions. Nevertheless, we recognize DFPS's position as set out in the Letter and detail below the solutions to this finding.[106]

The first solution offered by Family Tapestry's response was for DFPS to work with Family Tapestry by reducing DFPS's use of foster home and residential care capacity for legacy

---

[100] The Texas Family Code allows DFPS to pay the cost of foster care for a child "only if" the child has been placed in a foster home or other residential child-care facility, as defined by Chapter 42 of the Texas Human Resources Code. Tex. Fam. Code §264.101. Chapter 42 of the Texas Human Resources Code prohibits any person from operating a child-care facility or child-placing agency without a license, Tex. Hum. Res. Code §42.041, and defines a child-care facility as "a facility licensed, certified, or registered by the department to provide assessment, care, training, education, custody, treatment, or supervision for a child who is not related by blood, marriage, or adoption to the owner or operator of the facility, for all or part of the 24-hour day, whether or not the facility is operated for profit or charges for the services it offers." Tex. Hum. Res. Code §42.002(3).

[101] *Id.*

[102] *Id.*

[103] Letter from Judy Pavone to Annette Rodriguez, October 9, 2020 (on file with Monitors).

[104] *Id.*

[105] *Id.*

[106] *Id.* at 2.

placements within the 8a Catchment Area. Though the response indicated that Family Tapestry had negotiated an agreement with DFPS allowing a percentage of children who could be placed in the SSCC's catchment area, it claimed that the negotiated capacity was being exceeded – "in some cases monthly."[107] The letter ended by listing steps Family Tapestry had taken to increase capacity for emergency placements.[108] The letter also noted that of the children listed in the October 6, 2020 communication, all had been placed.[109] On October 22, 2020, DFPS issued a letter to Family Tapestry stating:

> On October 9, 2020, the Department of Family and Protective Services (DFPS) requested a Corrective Action Plan (CAP) from The Children's Shelter DBA Family Tapestry (SSCC) to address concerns that (1) Family Tapestry as the Single Source Continuum Contractor has not found timely and appropriate placements for referred youth[110] and (2) the Family Tapestry Intake Center had been used as an overnight placement of a youth although the Intake Center is not licensed.

---

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] There are several e-mails included in the documents provided by the State to the Monitors in April 2021 that show DFPS staff and caseworkers expressing concern and frustration with the amount of time that it took for Family Tapestry to find placements for children. Though none of these children were staying at Whataburger Center, their caseworkers expressed concerns about the emergency shelters that they were housed in while awaiting placement. One e-mail states "I have concerns with the amount of time it is taking to find placement for [M.M.] and [H.W.]. The children have been placed at The Children's Shelter since 07/13/2020. On October 15, 2020, you stated an updated Common Application was needed in order to place the children because I had expressed concerns for the children's safety and lack of supervision at The Children's Shelter. I provided an updated common application on 10/16/2020. On October 28, 2020, you asked for the children's parent-child visitation schedule. I submitted you the children's parent-child visitation schedule on the same day. On November 12 and November 13, 2020, I made an inquiry about the status of placement. On 11/13/2020, you stated that you do not have anything for them together because most homes for older children prefer for the children to be the same gender, so they can share a room. You asked if I would be open to splitting them up. I replied back to your email on the same day, approving the children be split up for placement. Today, you are stating due to the holidays, it will be difficult to find a home for them right now because *some* homes are going out of town. *** The children have been at The Children's Emergency Shelter for 140 days." E-mail from Jacqueline Hood, CPS Specialist III, DFPS to Kristina Villarreal, Family Tapestry, *Re: [External] Status of Placement*, November 20, 2020 (on file with Monitors). Another series of e-mails about a child shows one DFPS staff complaining to the Community-Based Care Administrator that "[Family Tapestry] received a 30 day notice from CPS on September 19th but it appears they did not begin looking for placement until October 17th. The child is currently in a respite home." E-mail from Tim Gobel, Adoption Program Director, CPS Region 08, to Guy Hanson, Community-Based Care Administrator – Bexar County, *FW: [M.R.] Placement*, October 21, 2020. Guy Hanson forwarded the e-mail to "Consumer Affair" and says, "Please review the attached email chain *** This was a non-emergency request for placement. Upon reviewing the exhaustive search list, most placements were not contacted until very late in process. *** It appears this situation didn't get looked at until the 30th day was nearly at hand." E-mail from Guy Hanson to Consumer Affair, *FW: [M.R.] placement - Non Emergency Referral PROCESS COMPLAINT*, October 21, 2020 (on file with Monitors). Another 14-page e-mail exchange documents DFPS staff expressing ongoing concerns and frustrations about the slow movement on placing a 13-year old child who was living in an emergency shelter, but had serious behavioral health needs. One of the e-mails in the chain notes, "[L] has not been in appropriate placement in nine months. She continues to run away, have sex, take illegal substances and self-harm herself. She is a prime target for trafficking and being seriously hurt. We need an appropriate placement for [L] ASAP." E-mail from Ann Marie Proo-Davila, G8 Adoption Supervisor, DFPS, to Uzuri Amandla, Family Tapestry, et al, *Re: [External][L.P.] moving her to placement is critical*, November 23, 2020 (on file with Monitors).

The Department received the CAP on October 20, 2020 and has reviewed the response for each finding. The Department has accepted your CAP, and is considered closed, however the plan will be monitored to ensure compliance is strictly maintained. [111]

However, on December 30, 2020, DFPS issued another letter to Family Tapestry notifying it of "repeated concerns with Family Tapestry allowing children or youth to stay in non-Title IV-E eligible location overnight."[112] The letter outlined the actions included in the approved corrective action plan, then found:

It is evident that the contract action strategies previously submitted have either not been implemented or have not been sufficient to find suitable placements for all youth without use of the Family Tapestry Intake Center as a stand in for appropriately licensed residential care as is required. On December 28, 2020, DFPS found four (4) children sleeping on the floor of the Family Tapestry Intake Center. Repeated use of this and or any other non-licensed location is considered a reject and the SSCC could be held liable to DFPS for payment of liquidated damages in the amount of Ten Thousand Dollars ($10,000) for each instance of noncompliance with the Contract's no eject/no reject requirement. The SSCC may also be liable to DFPS for actual damages in the amount of what the substitute provider bills DFPS for the child's or youth's care should the Department have to find appropriate placement for these youth.[113]

DFPS again told Family Tapestry, "The Children's Shelter must immediately stop the use of the Family Tapestry Intake Center (or any other non-IV-E eligible placement) as a place for youth to stay overnight and maintain compliance with the no reject term of the CBC SSCC contract with the Department."[114] DFPS required Family Tapestry to submit a review of the original CAP and the results of the review and "an updated, enhanced Corrective Action Plan to include a more aggressive approach to ensure timely and appropriate placements for all youth referred into fully

---

[111] Letter from Veronica Alvarez, Contract Administration Manager, DFPS, to Annette Rodriguez, CEO, The Children's Shelter, October 22, 2020 (on file with Monitors).

[112] Letter from Veronica Alvarez to Annette Rodriguez, December 30, 2020. In fact, e-mails between HHSC staff indicate that an RCCR investigator visited Whataburger Center on December 30, 2020 to complete an "illegal operation" investigation and "found two children sleeping in the conference room, which she was told was considered a [Family Tapestry (FT)] office. She waited for the FT administrator to arrive who then confirmed that the children do live at Whataburger Center but in the FT office. They are brought food from the Whataburger Center into the office but do take showers in the Whataburger Center *** One child has lived there for 1 week and another for 2 weeks. *** [The administrator] told [the investigator] that she understands they will be cited as an illegal op again but said they have no choice because [they] have nowhere to place these children. She said they have no desire to put in an application as a GRO and will not be doing so." E-mail from Rebeca Reyes, HHSC-RCCR, to Willie Salas and Nicol Hoffer, HHSC-RCCR, *FW: Family Tapestry*, December 30, 2020. A response in the same e-mail chain, dated January 21, 2021, states "I wanted to update you on the latest information. [The RCCR investigator] spoke with a caseworker today who stated her child did not leave the operation until 1/7. [The RCCR investigator] visited the operation on 12/30/20 and had let [the Family Tapestry administrator] know then that the children needed to be moved immediately. *** [The RCCR investigator] spoke with Raquel from FT who said that state office is aware of the situation. They do not have any intent of applying as a GRO." E-mail from Rebeca Reyes to Willie Salas and Nicol Hoffer, *FW: Family Tapestry*, January 21, 2020 (on file with Monitors).

[113] *Id.*

[114] *Id.*

licensed Title IV-E eligible facilities."[115] DFPS indicated that it would impose "further progressive interventions up to and including liquidated damages" should a subsequent contract violation occur.[116]

Family Tapestry responded on January 5, 2021, indicating that each element of the CAP had been fully implemented or was in the process of being implemented, with the exception of the CAP's request that DFPS limit use of Region 8a beds.[117] However, the SSCC complained that DFPS's finding ignored the State's "current capacity crisis:"

> *Family Tapestry will continue its efforts to add capacity and resources to Region 8a, particularly for higher acuity children/youth, **but Family Tapestry and Region 8a are not immune from the State-wide crisis.** As DFPS is well aware, providers – many of whom serve higher acuity children/youth – are closing or they are limiting capacity for a variety of reasons.*

> As DFPS surely appreciates, closures and capacity limits (which are often self-imposed by the providers) are connected to a number of present challenges. Providers have shared with Family Tapestry that they are closing or limited their operations, due to (for example):

> - provider concerns connected to the COVID-19 pandemic (set out in more detail below);

> - for providers not on heightened monitoring, a desire to avoid heightened monitoring and accepting children/youth the provider perceives as potentially enhancing risks of non-compliance of [sic] complaints; or

> - for providers on heightened monitoring, a desire to end heightened monitoring, translating into accepting fewer children/youth.

> In addition, while the federal lawsuit and the federal monitors have led to necessary reforms and increased compliance by the provider community, our experience is that there has also been a chilling effect on providers willing to enter into child welfare or to expand operations. Providers who had previously expressed an interest to Family Tapestry in opening operations in the State or expanding operations to serve kids with greater needs or older youth, are currently reluctant to do so.[118]

The letter also spoke to capacity problems created by the pandemic, including staffing challenges and loss of placements due to outbreaks in residential facilities, or foster homes limiting

---

[115] *Id.*

[116] *Id.*

[117] Letter from Annette Rodriguez to Veronica Alvarez, January 5, 2021 (on file with Monitors).

[118] *Id.* (emphasis in original).

or declining placements due to COVID concerns.[119] The letter again reiterated that DFPS's continued use of placements in Family Tapestry's region contributed to the SSCC's challenges in finding appropriate placements.[120] It attached an updated CAP.

According to DFPS's e-mail to the Monitors, after Family Tapestry submitted the updated CAP on January 5, 2021:

> [O]n January 26, 2021, Commissioner Masters and Deputy Commissioner Trevor Woodruff met with Family Tapestry…as Family Tapestry's continued use of the Intake Center (a portion of the now unlicensed Whataburger Center) had morphed from single-night to CWOP for many youth. I attach for your review the summary of the meeting prepared by Family Tapestry and email transmissions regarding the same. In the summary prepared by Family Tapestry, you will see it acknowledged not only the two (2) contract violations and CAP from DFPS but the two (2) citations from HHSC for running an illegal operation. So the short answer to your question regarding the difference between the previously submitted Notice of Violation and CAP for OCOK and the March 8, 2021, Notice of Violation and CAP to Family Tapestry is that DFPS already had made repeated demands that Family Tapestry immediately stop using the Family Tapestry intake Center and requested two prior CAPs.
>
> After reviewing the communications and talking with staff over the course of the last week, Commissioner Masters continued to have serious concerns and determined it is time to take the next step. To that end, on March 24, 2021, Commissioner telephoned Annette Rodriguez and advised that Family Tapestry has until 5:00 p.m. on March 25, 2021 to move all children form the Family Tapestry Intake Center to appropriate placements. She further directed regional staff to go to the Family Tapestry Intake Center to ensure that all needs of the remaining children are met during the transition. Finally, she advised Family Tapestry that DFPS will no longer tolerate *any use* of the Family Tapestry Intake Center, no exceptions![121]

The Monitors sent another e-mail response to DFPS, this time copying RCCR, and asked DFPS why the agency waited until March 24, 2021 to demand that the agency move all the remaining children out of the unlicensed facility.[122] The Monitors also asked RCCR to inform them of any action the agency had taken with regard to Family Tapestry's continuous operation of an unlicensed GRO.[123]

DFPS responded on March 29, 2021, attaching a 14-page timeline of interactions between DFPS and Family Tapestry, beginning with the October 2020 problems associated with children sleeping in the Family Tapestry Intake Center and ending with an entry for March 24, 2021, the

---

[119] *Id.*
[120] *Id.*
[121] E-mail from Corliss Lawson to Deborah Fowler & Kevin Ryan, *CWOP Placements*, March 25, 2021.
[122] E-mail from Deborah Fowler & Kevin Ryan to Corliss Lawson, *CWOP Placements*, March 25, 2021.
[123] *Id.*

day that Commissioner Masters told Family Tapestry it had 24 hours to move the remaining children out of the facility.[124] DFPS explained:

> We are providing the attached summary, which in large part tracks the e-mail communications between DFPS and Family Tapestry, detailing the agency actions taken since October 2020 [footnote omitted]. You will see that on March 12, 2021, Family Tapestry reported that its census for CWOP was increasing to 17. During a March 16th safety check conducted by CPS staff at the Family Tapestry Intake Center, serious issues were discovered that resulted in [an intake being reported to SWI]. The allegations ranged from unsanitary conditions, children not enrolled in school, medical needs not being met, children reporting that they were feeling unsafe, etc., as evidence by the interviews. A subsequent visit to the Intake Center on March 18, 2021 confirmed the same safety concerns. Then on March 23rd, CPS regional staff noted that a new youth who was in a wheelchair and wore a urostomy bag and diaper had arrived at the Intake Center. Another factor of consideration was although DFPS had advised Family Tapestry on March 12, 2021 that it must move DFPS youth placements from the Devereux RTC by March 31, 2021, as of March 19, it still had no placements for 6 of the youth, which posed the unacceptable risk that Family Tapestry might add these youth to its CWOP population at the unlicensed Family Tapestry Intake Center. ***

> While the Commissioner has been receiving updates on Family Tapestry and the growing number of youth being temporarily housed at the Intake Center, she was not provided with the details of the day-to-day regional handling. After DFPS began receiving CWOP reports from the SSCCs, as noted during an earlier communication to you, it became evident that Family Tapestry was having greater challenges than it had previously indicated. I began to have discussions with program and learned that the situation was growing worse as Family Tapestry's numbers were increasing as well as the number of intakes. This discussion was underway when we received your initial inquiry and as I reviewed the CAPs and continued discussion with program, I provided the Commissioner with a more detailed account of the severity of the situation. It was decided that although Family Tapestry is contractually obligated to provide placements for these youth, DFPS must act given Family Tapestry's failure to address the serious safety concerns identified on March 16.[125]

RCCR also responded to the Monitors on March 29, 2021, outlining the actions the agency had taken since fall 2020, and indicating that it had placed Family Tapestry on probation on March 26, 2021:

> On October 8, 2020, HHSC became aware that Family Tapestry had begun allowing children to sleep at the Family Tapestry office. Accordingly, HHSC staff opened an illegal operation…investigation since it appeared that the operation was

---

[124] DFPS, Intake Center: Email Summaries (undated)(on file with Monitors).
[125] *Id.* [sent as an attachment to the e-mail].

illegally operating as a GRO. HHSC cited Family Tapestry…for operating illegally on 10/21/2020 and 12/30/2020.[126]

In early February 2021, CCR regional staff brought to the attention of CCR leadership that Family Tapestry continued to house multiple children at the Family Tapestry office. CCR leadership responded with instructions to initiate the newest intake as a Priority 1 investigation. On February 4, 2021, HHSC held an internal meeting to discuss available options to force Family Tapestry to stop operating as an illegal operation. Ultimately, HHSC determined that it could more effectively address the problems by investigating Family Tapestry under its CPA license, since its placement decisions were impacting its ability to meet the children's needs under minimum standards for CPAs; moreover, any resulting citations for deficiencies would become part of Family Tapestry's license compliance history. At this point, HHSC began attaching all new intake reports to Family Tapestry's CPA license [operation number omitted].

On February 8, 2021, HHSC began receiving intakes reported by Family Tapestry staff indicating that they could not properly supervise the children. Also on February 8, HHSC notified DFPS of this information by e-mail, and further informed DFPS that HHSC had begun investigating new intakes under the Family Tapestry license.

HHSC also notified Family Tapestry that HHSC was investigating new reports under the Family Tapestry license.

On February 21, 2021, Family Tapestry sent a plan to HHSC that stated Family Tapestry would move all children to Boysville within the following 3-10 days.

On February 26, 2021, HHSC Regional Director…visited Thompson Emergency Shelter (which is an emergency shelter located on the same campus as Boysville) to verify that they were capable of caring for the children who would be moved by Family Tapestry and to confirm that the physical site was ready. Thompson Emergency Shelter indicated that they had not yet signed a contract with Family Tapestry to provide services to children, and that the building they wanted to use was empty and needed repairs/cleaning before children could be placed there.

---

[126] CLASS shows the October 21, 2020 & December 30, 2021 citations entered under intakes for a newly created CLASS operation number for an illegal operation. The findings for the October 21, 2020 citation indicate, "Operation admitted to having children sleep in the office for two days or more while placement was found. Victim [A] was on runway [sic] status throughout the investigation. Operation is operating as GRO when licensed as a CPA. Children were sleeping on cots in the office under supervision of the CPA." Findings for the December 31, 2020 citation state, "Based on the information received through interviews, inspection and documentation reviewed, it was determined that there was a preponderance of the evidence to support the allegations. There were two children at the Tapestry offices upon inspection who both stated that they had been staying at the offices for one week and the other two weeks. The staff interviewed also confirmed the children staying for several days each. In addition [the administrator] admitted that the kids had been staying at the offices for one week and the other two weeks. One CPS caseworker and one CPS Supervisor also confirmed the children staying a the offices long term. In IMPACT, the documentation also shows that the children were placed long term and was [sic] listed as "Family Tapestry DFPS Supervision" as a placement. One citation will be given for operating without a License." Both were upheld on administrative review.

Thompson Emergency Shelter also informed [the Regional Director] that they had not hired staff yet and were two months away from being able to accept children for placement. [The Regional Director] then visited Family Tapestry later that same day to verify that the children in their care were moved as described in Family Tapestry's 2/23/21 plan. An inspection on February 25 revealed that 14 children remained housed in the Family Tapestry office, and [the Regional Director] confirmed during his February 26 visit that children were continuing to be housed. An inspection on March 1, revealed 12 children were still sleeping in the Family Tapestry office.

On March 5, 2021, [the Regional Director] conducted an exit conference with Family Tapestry regarding the 25 deficiencies resulting from the Priority 1 investigation performed during the preceding month. During the exit conference, [the Regional Director] also discussed his concerns about the fact that children continued to be housed in the office despite the 02/23/21 plan, and his concerns about Thompson Emergency Shelter's inability to accept the children for immediate placement. Family Tapestry staff responded that the continued housing of children in the office was due to lack of placement options and placement decisions that were pending DFPS's approval.

On March 12, 2021, CCR staff began providing its leadership with weekly updates regarding Family Tapestry. Additional updates were provided to CCR leadership on March 19 and March 26.

On March 12, 2021, in response to an inquiry from DFPS, HHSC confirmed that all new intakes should be attached to the Family Tapestry CPA license instead of the illegal operation (as explained in HHSC's February 8 e-mail). On March 17, 2021, HHSC reached back out to DFPS as new reports were still being attached to the illegal operation. DFPS agreed to move the intakes to the Family Tapestry license.

On March 19, 2021, HHSC received its executive leadership's approval to place Family Tapestry on probation and began drafting requirements for the corrective action plan.

On March 24, 2021, while conducting a follow-up inspection, HHSC observed a child with primary/complex medical needs housed at the Family Tapestry office. HHSC relayed its finding and concerns to DFPS on the same day. On [the] same day, DFPS communicated that Commissioner Masters had instructed Family Tapestry to remove all children by 5 pm on March 25th. HHSC decided to move forward with its plan to place Family Tapestry on probation.

HHSC had a meeting with Family Tapestry on March 26, 2021 and has presented the probation notification letter. As part of its probation, Family Tapestry will be subject to inspections every two weeks. HHSC will continue to monitor Family

Tapestry and is prepared to take additional enforcement actions as warranted, including revocation of the CPA license.[127]

In addition to reviewing the e-mail responses sent by DFPS and RCCR, and the attached documents, the Monitors reviewed intakes for Family Tapestry SSCC in CLASS. One of the most disturbing intakes and findings are related to the RCCR investigation (mentioned in the RCCR response outlined above) of its own report to SWI that Family Tapestry was operating an unlicensed facility:

- A report was made to SWI on February 2, 2021 by an RCCR supervisor, alleging, "The facility is not licensed, and they are operating illegally. They currently have 12 children in their operation, but that operation is no longer operating." This report was referred to RCCR as a Priority 1 investigation for minimum standards violations. RCCR investigated and found 25 minimum standards violations, including:

    - Violation of the minimum standard requiring documentation of a debriefing in a child's record after a child returns from an unauthorized absence;
    - Violation of the minimum standard requiring documentation of first aid and CPR training completion for staff; in fact, according to the investigation findings, there were no staff records of any type at the operation;
    - Violation of standards associated with supervision, because staff are not assigned to specific children to supervise, "and therefore are not aware of which children they are responsible for."
    - Violation of the minimum standard requiring discharge summaries for children discharged;
    - Violation of the minimum standard requiring a preliminary service plan within 72 hours of admission, "The administrator stated that preliminary service plans are not being completed for any children residing at the Family Tapestry building;"
    - Violation of several minimum standards associated with recording information in a child's records; the investigation findings state that the only records for the children consisted of a one-page intake document, and medication logs (which were incomplete).
    - Violation of the minimum standard associated with a child's right to education; the notes indicate "The children are not attending school or having their educational needs met." The findings note, "[The administrator for the operation] verified that the operation does not enroll the children in school nor provide for their educational needs."
    - Violation of the minimum standard requiring children to be informed of their rights: notes indicate, "The administrator stated that children are not being informed of their rights when they are being admitted into Family Tapestry."
    - Violation of the minimum standard associated with CPA Administrator responsibilities, because "According to staff interviews and documentation

---

[127] E-mail from Taryn Lam, Attorney, Litigation Dep't, HHSC, to Deborah Fowler & Kevin Ryan, *CWOP Placements*, March 29, 2021 (on file with Monitors).

reviewed, the agency plans for Family Tapestry state that Family Tapestry will not provide care for children. However, Family Tapestry is currently caring for children at the Family Tapestry building and the building formerly licensed as Whataburger. Family Tapestry is licensed as the child-placing agency and is operating similarly to a general residential operation. There are more than six children in care (the limit of a foster home is six.) The needs of the children are not being assessed or met."

- Violation of minimum standards associated with serious incident documentation and reporting: not only was the operation failing to document serious incidents, it also failed to report them to SWI;
- Violation of the minimum standards associated with medication records: the reason for the prescription medication was not documented in medication records; the prescribing physician's name was not recorded on medication logs.
- Violation of the minimum standard requiring medication to be stored in a double-locked container: an inspection on February 3, 2021 revealed psychotropic medications were observed as not being double locked;
- Violation of the minimum standard requiring a cumulative record of prescription medications dispensed to a child: the operation was found not to be completing medication counts for prescription medication dispensed to children.

Despite the underlying problem this investigation revealed – i.e., that Family Tapestry was illegally operating an unlicensed facility – RCCR allowed Family Tapestry to represent it had cured for all of these violations, which RCCR deemed as "Compliance met" on March 16, 2021. During RCCR's conversations with the three children interviewed for the investigation, one child stated he had been placed at the facility for four weeks; another child said she had been living at the facility for two weeks. The third child reported having been at the facility for a week-and-a-half. Furthermore, the findings of the investigation included reports from staff "that although the previous shelter that operated in the building closed down, the shelter did not stop taking placements of children in care. [One of the staff] said that she has continued to work there at the location of the previous operation even though it had ceased operating. [Another staff person] also stated that he had continued to work at the closed shelter and has been employed with the operation for one year." The operation administrator not only noted that children were not being enrolled in school, she also noted that they did not complete service planning, did not intervene when children ran away, and did not debrief with children who return. Notes related to a March 24, 2021 follow-up inspection related to the violation of standards associated with supervision showed that there were nine children in the facility, and that the operation was "still working on shift assignment sheets."

CLASS shows that reports related to problems associated with children being held at this unlicensed facility began to be made to SWI as early as October 2020, and continued through March 26, 2021, the day after DFPS finally required Family Tapestry to remove all the children housed in the facility. In addition to the intake described above, the intakes for which an investigation has been completed include:

- A report to SWI on October 8, 2020 of a 15 year-old PMC child who had previously run away had been returned to care two days earlier and taken to Whataburger Center. The report noted the child was "sleeping in an office space on a mattress on the floor with 3 other girls and not in the shelter or a room...The facility is overcrowded and full." The case was administratively closed, with the note in the intake report noting a "companion call" reporting on October 16, 2020 that a child in care was sleeping in the office on a cot, and indicating that the reports would be re-entered under a different intake number as an illegal operation.

- A report to SWI on February 1, 2021, alleging that a 15 year-old foster child who had been returned to the Intake Center after running away reported he did not feel safe at the Center and "indicated he has not been attacked yet but he reported another boy at the intake center said some other boys were going to beat him up" and that the staff do not break up fights between children. RCCR investigated the allegations and issued two citations: a citation related to documentation of serious incidents, due to the facility's failure to complete a serious incident report related to the child's run away incident; and a citation related to the failure to report an unauthorized absence of a child to RCCR.[128]

- A report to SWI on February 2, 2021 alleged that a 15 year-old female PMC child made an outcry of having been sexually abused by a 15 year-old male PMC child at the facility. The female child refused to be interviewed, and the male child claimed that while they had sex, it was consensual,[129] and that it did not occur while they were on runaway status, but instead happened on the facility grounds in a shed. The male child's service plan indicated he was a "frequent runner" and had been flagged with an indicator for sexual aggression; his caseworker indicated he had "two prior sexual assault cases." The male child's probation officer indicated that he recommended the child be on one-to-one supervision. The female child has a confirmed history of sexual abuse by a family member. Despite this, the licensing report for the investigation indicates, "Supervision of the children that run away is the concern as the sexual assault allegation occurred when the children were on run away." RCCI ruled out Neglectful Supervision, concluding that the preponderance of the evidence showed that the staff responded appropriately when the children ran away and though the male child's probation officer recommended one-to-one supervision, "Family Tapestry is functioning as an illegal operation and subject to licensing and regulation, however minimum standards or regulations cannot be enforced. Regardless if

---

[128] Follow up Information in CLASS about this citation and the citation related to serious incident reports indicates that "Family Tapestry will begin using Serious Incident reports for the Intake Center. Family Tapestry had been told by RCCI not to report runaways to the hotline, but have now begun calling the hotline as a result of the citation."

[129] Spreadsheets provided by DFPS in response to the Monitors' e-mails list children in the Family Tapestry facility on the dates the information was provided by Family Tapestry to DFPS includes the following notes for youth identified as the alleged aggressor in this intake: "Discharged from…RTC due to doggedly trying to get his peers into inappropriate sexual relationships…Sexually aggressive incident in 2018 performed oral sex on each other more than once. [Alleged aggressor] would offer him things in exchange for sexual acts. [Alleged aggressor] has a pattern of propositioning younger kids for sexual acts in exchange of things. 6/13/2020 [alleged aggressor] was texting his step-cousin soliciting messages to perform oral sex in exchanged of video game cards on more than one occasion. [Alleged aggressor] would get on top of the 11-year-old and try to pull his pants down. He would also hold him down and touch his private part under his underwear. He encourages peers to run away and engage in inappropriate behaviors…Notified he is demonstrating inappropriate sexualized behavior at the intake center and advised CPS. Staff also spoke to [alleged aggressor] about his behavior."

[the male child] was on a 1:1 supervision plan, it was [the children's] choice to run away. There are no staff assignment sheets at the facility. Staff acted appropriately. Therefore, the allegations of Neglectful Supervision is Ruled Out." RCCR issued two citations: a citation for violating the minimum standards related to supervision, due to the failure to provide increased supervision for a child with a history of sexual aggression, running away, and sexual acting out; a second citation related to violation of the minimum standards associated with supervision, because "None of the children have been assigned to any of the staff therefore the staff were not aware of who they were assigned to." CLASS shows the investigation was completed on February 22, 2021, but a closure date is not yet listed.[130]

- A report to SWI on February 10, 2021 by an officer with the San Antonio Police Department, alleging that a child who cut herself during a stay at the facility and had to be taken to a psychiatric hospital cut herself again when she returned and said that "staff treat her badly." The intake report notes "Law enforcement get calls to this home all the time for the same reason and different kids." The child who cut herself is the alleged victim in the report made on February 2, 2021, above. RCCR investigated; no citations were issued.

- A child's DFPS caseworker reported to SWI on February 10, 2021 that a 17 year-old male PMC child on her caseload was caught in the shower with a 15 year-old female PMC child. The shower was in the female child's room. Neglectful Supervision was ruled out because, "Evidence and information gathered cannot support that [the staff] neglected their supervision duties based on the following. Both staff were not assigned to [the children] as there are no assigned staff to residents; furthermore staff supervise residents overall as available." The conclusion noted that the children's decision to meet in the shower "was likely premeditated" and "staff were not aware of this." RCCR did not issue any citations.

- A report to SWI on February 12, 2021 by a child's DFPS caseworker alleged that after a child was moved to a new placement, the caseworker went to Family Tapestry to pick up her things and was told "that when a child has been gone for more than a day or two the other residents just kind of take what they want out of what is left" and that the child's backpack and all of her belongings were gone. The intake also alleged that a child who ran from the facility was gone for 24 hours before staff realized she was not there, and that before the child ran away she was "jumped by a girl and a boy" and called the police, who came and took a report. However, the intake alleges that Family Tapestry did not create an incident report or notify the child's caseworker because, according to the administrator, "they are not a paid placement and do not do incident reports." When the child returned to

---

[130] On March 3, 2021, an RCCR supervisor included the following note in the contacts page in CLASS: "Initially between 10/08 to 12/30 Tapestry was using just their designated office space and conference room to house the children for whom Family Tapestry could not find alternative placement. They were allowing the children to use the bathrooms and showers located on what was licensed as the Whataburger Center. January 2021 Tapestry began to utilize the common area of the former Whataburger Center for day use***Note: the children continued to sleep in the Tapestry conference area. As of 02/02/21 Tapestry was utilizing the entire former Whataburger Center to house the children needing placement. This included the sleep and common areas. They were no longer using the Tapestry conference room. On 2/26/2021 Regional Director, Willie Salas completed a walk through at that time the children were housed in the common area of the Whataburger Center and was informed the child [sic] were allowed to sleep in the former Whataburger Center beds."

the facility, several of her belongings were missing and some were destroyed. RCCR investigated and issued three citations: a citation for violation of the minimum standard associated with a CPA administrator's responsibilities, due to the CPA Administrator failing to provide adequate supervision of caregivers; a citation for violation of the minimum standards associated with staff-to-youth ratios, after staff reported caring for 10 residents at one time; and, violation of the minimum standard associated with providing children with storage for their clothing and personal possessions, after two residents reported having possessions stolen and staff verified that personal belongings are not secured. The operation has requested administrative review, which is pending.

- A report to SWI on February 23, 2021 alleged, "There is a staff member who is causing fights between the children. The fights are happening just about every day. Sometime this week there was a child who was fighting with another resident and staff member kicked one of the children on the back." The staff member named in the report is the same staff member that the child made the outcry about that the SAPD officer reported on February 10, 2021.[131] However, because the report was anonymous and neither of the two children interviewed nor their caseworkers reported any concerns, RCCR closed the investigation without any citations being issued.

- A report to SWI on February 27, 2021 alleged that three children ran away from the facility and, when they returned at 4:00 a.m., were not allowed back in due to COVID protocol. The intake alleged, "The three juveniles have been outside for nearly 3 hours banging on the gate trying to get inside. Police are on the scene with the three juveniles. It is unknown how long police can stay with them. They want to know if the three juveniles should be transferred to another facility." RCCR investigated and issued one citation, for violation of the minimum standard associated with supervision, finding "Operation staff failed to provide proper supervision when they allowed children in care to remain outside the main gate for three hours, from 4:00 a.m. – 7:00 a.m. This left the children exposed to cold weather and to unknown individuals in the community." The investigation was completed on March 26, 2021, and the SSCC has requested administrative review of the findings.

- A report to SWI on March 16, 2021 alleged that a staff member carries a taser, "threatens the kids and says he will use it and then say [sic] he is just kidding." The investigation is pending with RCCR as a Priority Two matter.

Many investigations remain open associated with Family Tapestry's operation of the unlicensed Whataburger Center. In all, as of March 28, 2021, the Monitors review of CLASS shows that since October 2020, approximately 70 reports had been made to SWI related to allegations of abuse or neglect, runaway children, and allegations of minimum standards violations associated with Family Tapestry's use of the Intake Center and later, the unlicensed Whataburger Center to house children. At least 36 of the reports made to SWI between January 5, 2021 (the date that Whataburger Center surrendered its license) and March 25, 2021, involved PMC children.

---

[131] This staff member worked at Hector Garza before that RTC closed. She was named as a perpetrator in at least two investigations for Hector Garza, in addition to the intakes during her time at Whataburger Center.

***Family Tapestry's Violation of the "No Eject, No Reject" Provisions in their Contract with DFPS***

Since Family Tapestry is no longer able to use the unlicensed Whataburger Center to house children without placements, they have begun to reject children referred to them by DFPS in violation of the terms of their contract.[132] On April 21, 2021, DFPS sent an e-mail notifying the Monitors:

> With regard to Family Tapestry, they continue to struggle with finding appropriate placements for youth. Yesterday, Family Tapestry advised that it is rejecting 6 youths assigned to it for placement contrary to the terms of its contract. We continue to provide technical assistance to Family Tapestry and are also providing 24/7 staffing at The Children's Shelter to ensure the safety of the children because of its reported chaotic environment.[133]

The e-mail attached the letter sent to Family Tapestry the same day, which stated:

> On April 20, 2021, DFPS received explicit confirmation from Family Tapestry that it is rejecting the referral of six children into its care in favor of incurring the remedies defined in Section 9.2.4 of the Contract's Uniform Terms and Conditions. That Section allows DFPS to collect $10,000.00 in damages for each instance of noncompliance with the contract's no eject/no reject provisions. In addition to the entirety of actual costs associated with locating and paying for placement for the child, including, but not limited to, Department administrative costs, staff time, necessary contracted care services, transportation costs, and contracted residential services costs.
>
> This is a very serious breach of contract by Family Tapestry under its Single Source Continuum Contract. As always, the Department remains committed to its partnership with Family Tapestry and encourages SSCCs to reach out to DFPS for any aid or technical assistance necessary to ensure the safety of children and youth in the foster system. The Department's primary goal will always be to ensure the safety and well-being of the children in its care, and the ejection of youth by an SSCC raises serious questions regarding the performance and stability of the Family Tapestry continuum and network. Continued instances of rejecting a properly referred child or ejecting an already served child from care in favor of incurring Section 9.2.3 damages may result in termination of the contract for cause.[134]

---

[132] *See* DFPS, *Community Based Care FAQs, What does "No Eject/No Reject" mean?* (undated), *available at* dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/FAQ.asp#sscc (explaining, "SSCC's are expected to place all children in foster care from their catchment area (No Eject) and cannot deny placement for any child (in their catchment area) due to behaviors, mental health, etc. (No Reject).")

[133] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, *Updates re: Family Tapestry/2Ingage/OCOK and Communication to SSCCs*, April 21, 2021 (on file with Monitors).

[134] Letter from Jaime Masters, Commissioner, DFPS to Annette Rodriguez, CEO, The Children's Shelter, *Re: No Eject/No Reject Contract Violations*, April 21, 2021 (on file with Monitors).

The next day, DFPS provided another letter to the Monitors that it sent to the CEO of The Children's Shelter, requiring a "written, detailed plan on how Family Tapestry intends to have adequate, licensed, and most importantly safe, placements for children in its care" by 5:00 p.m. on April 26, 2021. The letter referred not just to the violation of the no eject/no reject contractual clause, but also the disintegrating safety of The Children's Shelter GRO:

> In my letter yesterday, I addressed Family Tapestry's explicit confirmation that it was rejecting the referral of six children into its care in favor of incurring the damages defined in Section 9.2.4 of the Contract's Uniform Terms and Conditions. I advised you that this continued course of conduct may result in termination of your contract.

> Today, less than 24 hours later, I learned that Family Tapestry has not found placement for an additional three children who remain in the DFPS office. While you contend this is not a violation of the contract, it is exactly that. Again, I advise you this continued course of action is not sustainable and will not be tolerated.

> I understand the issues regarding the placement of children, but that is not the only problem. I have been receiving continuous updates about the current status of the Children's Shelter. The situation is unacceptable and threatens the safety of the children. There is no other way to put it.

> Effective immediately, the Children's Shelter is on placement hold. Any child under five (5) years of age must be moved to an alternate, licensed placement within 24 hours of the electronic transmittal of this letter. Additionally, the remaining children must be relocated from the Children's Shelter to alternate, licensed placements by 5:00 p.m., Monday, April 26, 2021. DFPS will assist in searching for appropriate placements, but the responsibility for placements belongs to Family Tapestry. DFPS staff will continue to maintain a 24-hour presence to ensure child safety. Finally, DFPS will require that either you or Raquel Garza-Martinez be present in the Children's Shelter at all time until every child is moved.[135]

The letter listed the ongoing "technical assistance and contractual warnings regarding both safety of children *** and contractual requirements" from DFPS to the operation over a nine-month period beginning in September 2020.[136]

3.  2Ingage and Harrison House

The April 21, 2020 e-mail sent to the Monitors discussing Family Tapestry's violation of the no eject/no reject rule also answered a question posed by the Monitors after they received the weekly list of PMC children without placements on April 19, 2021. The Monitors noticed a PMC

---

[135] Letter from Jaime Masters to Annette Rodriguez, *Re: Contract Action*, April 22, 2021 (on file with Monitors). In addition to the placement hold, The Children's Shelter was also subject to Heightened Monitoring.
[136] *Id.*

child without placement listed for DFPS Region 2.[137]  Region 2 is also a CBC catchment area; the SSCC for the region is 2Ingage.[138]  The April 19, 2021 weekly report listed "Harrison House" as the location of the PMC child without placement in Region 2.  On April 20, 2021, the Monitors asked the State whether Harrison House was a licensed placement, after failing to find it listed in the CLASS database of licensed operations.[139]

The State's April 21, 2021 e-mail noted, "Deborah asked yesterday about 2Ingage's use of "Harrison House," which is an unlicensed facility, for temporary housing of CWOP youth.  Please find attached our communication to 2Ingage regarding the same."[140]  The attached letter, sent by Commissioner Masters to the CEO for the parent company for 2Ingage, is dated April 20, 2021 and states:

> This communication serves as notification that the Department of Family and Protective Services (DFPS) has identified concerns with 2Ingage and the utilization of Harrison House for temporary placement of children as this facility does not possess a residential child care license.
>
> DFPS understands that 2Ingage uses this facility as a temporary supervised placement for youth; however, the SSCC Contract does not allow youth to stay overnight at this location.  The Department stresses that this practice violates the Community Based Care Contract with the Department as the Contract only permits appropriately licensed, IV-E placements.  As a result, DFPS requests 2Ingage to develop and submit a Continuous Quality Improvement Plan that details the steps 2Ingage will take to find suitable placements for all youth without use of the Harrison House or any other unlicensed facility as a stand in for appropriately licensed residential care.[141]

The letter requires 2Ingage to stop the use of Harrison House "as a place for youth to stay overnight" and develop and submit to DFPS a detailed continuous quality improvement plan on or before April 25, 2021 that "contains detailed information on how 2Ingage will ensure timely and appropriate placements for all youth referred into fully licensed facilities and come into compliance with your CBC contract."[142]

The Monitors' review of CLASS intakes for 2Ingage showed that a report was made to SWI on April 21, 2021 by a local RCCR staff person alleging that 2Ingage was "using an unlicensed

---

[137] This was not the first child without placement in Region 2.  The Monitors' review of weekly reports indicates that the same child listed in the April 19, 2021 report was first included in the April 5, 2021 report, and again on the April 12, 2021 report.  The reports indicate that this child has been without placement and housed at Harrison House since April 3, 2021.

[138] DFPS, *Community-Based Care in Region 2* (undated)(listing 2Ingage as the Single Source Continuum Contractor for Region 2), *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/region2.asp

[139] E-mail from Deborah Fowler and Kevin Ryan, *Harrison House*, April 20, 2021 (on file with Monitors).

[140] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, *Updates re: Family Tapestry/2Ingage/OCOK and Communication to SSCCs*, April 21, 2021.

[141] Letter from Reid Miller, Contact Administration Manager, Region 2 to Shirley Dwyer, Chief Operating Officer, Texas Family Initiative LLC, *Re: Continuous Quality Improvement Plan*, April 20, 2021 (on file with Monitors).

[142] *Id.*

location as a temporary placement area" and that "[l]ast week they had 4 kids in that placement." The intake report notes that the RCCR staff person who made the report "learned of information from speaking with someone who visited the unlicensed home." The intake report also notes, "The child placing agency is using staff members that are not authorized or allowed to supervise children in care. There were also concerns of medications not being locked up and that they are easily accessible to the children. There was medication seen on the counter last week." An RCCR inspector visited the facility the same day and interviewed three 2Ingage caseworkers who were on-site to provide supervision to the children who were housed at the facility. Five children were interviewed, including the PMC child who was included in the DFPS weekly report to the Monitors. One of the other four children was also a PMC child. She reported that she did not go to school, and that the only child at the house who had been enrolled in school was the other PMC child. RCCR's investigation remains pending.

Another report was made to SWI by an RCCR staff person on April 24, 2021, alleging that 2Ingage was housing children without placement at a local church. The investigation is still pending, but interviews with the church's Youth Pastor and his wife confirmed that children had stayed at the church for at least two nights. Members of the monitoring team visited Harrison House on April 25, 2021 and did not find any children or staff at the house.

## III.   DOCUMENTS WITHHELD FROM MONITORS & E-MAILS WITH STATE LEADERSHIP

The Monitors requested all communications between DFPS and HHSC related to the use of unlicensed facilities for children, and between DFPS and HHSC and state leadership, including the Governor. The Monitors asked that if the State withheld documents, that it explain the reason for doing so.

On April 16, 2021, DFPS responded, producing many of the e-mails cited in this report, and noted "HHSC and DFPS have also jointly identified three cross-agency e-mail threads which are confidential attorney-client communications made for the purpose of legal advice, and we are therefore withholding from disclosure under the attorney-client privilege."[143] Similarly, on April 19, 2021, HHSC responded by providing a link to documents uploaded to their shared electronic database, but in addition to identifying the communications between HHSC and DFPS which the State asserts are protected by attorney-client privilege, HHSC identified "one relevant communication between HHSC and the [Office of the Governor]" but said that it was "protected under the deliberative process privilege and not subject to release."[144] The Court held a Zoom/Teleconference hearing on April 20, 2021 and ordered the State to produce the withheld documents for *in camera* review by the Court.

Among the documents the State produced to the Monitors were two e-mail chains between HHSC and legislative staff. In one, HHSC responded to a February 9, 2021 inquiry from the

---

[143] E-mail from Ingrid Vogel, Program Specialist, Foster Litigation Compliance, DFPS, to Deborah Fowler and Kevin Ryan, *Email between DFPS and OCOK and Family Tapestry & HHSC and DFPS cross agency emails*, April 16, 2021 (on file with Monitors).

[144] E-mail from Katy Gallagher, Litigation Department, HHSC, to Deborah Fowler and Kevin Ryan, *Re: Email between DFPS and OCOK and Family Tapestry & HHSC and DFPS cross agency emails*, April 19, 2021 (on file with Monitors).

Committee Director for the Texas Senate Committee on Health and Human Services, who asked the HHSC Government Relations Specialist to call him "to discuss a CCL issue that has come up." The HHSC staff responded to the e-mail:

I received the following information on Whataburger/Family Tapestry:

Whataburger was licensed as a General Residential Operation providing emergency care services. Whataburger had a very poor compliance history and CCR was moving through the internal process of issuing an intent to revoke the license when Whataburger decided to voluntarily close. Since CCR had not issued the intent to revoke letter yet, Whataburger was able to voluntarily close with no limitations on when they could apply for a new license.

This is where it gets a little complicated…

Family Tapestry is licensed as a Child Placing Agency (CPA) and has a contract with DFPS to be the community based care (CBC) provider in the San Antonio area. The CBC provider is responsible for taking over duties that CPS historically performed such as placing children who come into foster care or moving children from placement to placement once they are in foster care.

Family Tapestry's business entity is The Children's Shelter. The Children's Shelter has multiple licenses, one of which was Whataburger. So there is a direct link between Family Tapestry and Whataburger by the executive director and business entity.

Family Tapestry, as the CBC, has been having difficulties finding placements for children. It is a contract violation with DFPS for Family Tapestry to reject or eject a child from their CBC responsibilities. Family Tapestry was using the Whataburger shelter as a location to place children until a more suitable placement was located. Now that Whataburger is closed, Family Tapestry is struggling to find placements for children.

For several months, Family Tapestry has not been able to secure placements for children, so they have been keeping children in the Family Tapestry offices, which is not allowed. A CPA's responsibility is to place children in an appropriate setting. CCR has been receiving reports of this and has been investigating Family Tapestry as an illegal operation for placing children in their offices.

Now, CCR has received reports that Family Tapestry is using the Whataburger location to house children in conference rooms at this unlicensed location. This is also not ok. CCR staff [sic] this with legal late last week and legal recommended we not approach this as an illegal operation since Family Tapestry has a CPA license, but instead cite Family Tapestry through its CPA license for all deficiencies associated with not having an appropriate placement for children. This will result

in multiple deficiencies for the CPA for things such as admission assessments, or children having a bed to sleep in, amongst other possibilities.

In addition, Family Tapestry staff are self-reporting that they can't keep children safe while they are in the offices or conference rooms. They report have [sic] difficulties properly supervising children and keeping children from running away. This further amplifies the risk associated with Family Tapestry not placing children in appropriate placements.

Jean and her staff have been talking to DFPS about Family Tapestry to see what DFPS' response will be as Family Tapestry's lack of placements for children is a contract violation. DFPS let us know that they are considering assessing monetary liabilities, but since Family Tapestry is working with a local legislative office, they were considering all options before assessing liabilities.

CCR has not told Family Tapestry yet about citing their CPA license, nor has CCR issued any deficiencies at this time.

There are a lot of complications that come into discussion if Family Tapestry's license is in any way affected, such as probation or a revocation, since they are a CBC provider in the area, but we are happy to have that discussion if you would like to discuss the full implications.[145]

An almost identical e-mail was sent several weeks later to the Committee Clerk for the Texas House Appropriations Subcommittee on Article II. [146]On March 15, 2021, HHSC sent an update in response to the Committee Clerk's inquiry:

I checked with our CCR staff on this and here's our latest update. HHSC last conducted an inspection at Family Tapestry on March 11th. There were 16 children at the operation. There are 12 pending DFPS abuse/neglect investigations and 6 pending HHSC investigations of minimum standards violations. Please let us know if you have further questions. Thanks![147]

IV.    Conclusion

State records reveal a continuous use of unlicensed settings to house children, resulting in recurrent and unreasonable risks of serious harm. The State has been aware of these risks, and allegations of child maltreatment in unlicensed settings, for a substantial period of time. Among the examples detailed in this report are the ongoing uses of Whataburger Center to house children, despite years of safety lapses, minimum standards violations, confirmed allegations of child abuse and neglect and, finally, the surrender of the facility's license in January 2021, just as it was becoming subject to Heightened Monitoring. But that act of relinquishment, which should have

---

[145] E-mail from Claudia Tijerina, Government Relations Specialist, HHSC to Bryan Law, Committee Director, Senate Committee on Health and Human Services, *Phone Call*, February 10, 2021 (on file with Monitors). .
[146]E-mail from Claudia Tijerina to Will Selheimer, *Family Tapestry*, March 5, 2021 (on file with Monitors).
[147] E-mail from Claudia Tijerina to Will Selheimer, *Re: Family Tapestry*, March 15, 2021 (on file with Monitors).

prevented children's ongoing exposure to unreasonable risks of serious harm at Whataburger Center, had the opposite effect. As RCCI determined, "Family Tapestry is functioning as an illegal operation and subject to licensing and regulation, however minimum standards or regulations cannot be enforced." Since October 2020, approximately 70 reports alleging abuse or neglect, runaway children, and allegations of minimum standards violations have surfaced as a result of Family Tapestry's use of the Intake Center and later, the unlicensed Whataburger Center.

The State's failure to produce information to the Monitors from April 2020 to February 2021 about the SSCCs' housing children without placements in unlicensed facilities, even as allegations of abuse and neglect in those settings grew, contravened the Court's orders. The lapse, despite the State's clear knowledge that there were children without placements in these regions, is contrary to the Court's April 3, 2020 Order requiring the State to produce that information to the Monitors on a regular basis. In addition, the State's failure to correct Family Tapestry's ongoing refusal to request and obtain DFPS's approval before placing children at Whataburger Center is contrary to the Court's orders related to Heightened Monitoring.

In sum, despite the Court enjoining the State "from placing children in permanent management conservatorship ("PMC") in placements that create an unreasonable risk of serious harm," the State of Texas appears to have done so repeatedly, with serious, harmful consequences to the children in its care.