UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CIVIL ACTION NO. 2:11-CV-00084

05-04-2021

M.D.; bnf STUKENBERG, *et al*., Plaintiffs, v. GREG ABBOTT, *et al*., Defendants.

Janis Graham Jack Senior United States District Judge

# SECOND REPORT OF THE MONITORS

Deborah Fowler and
Kevin Ryan, Monitors

MONITOR STAFF

<u>Texas Appleseed</u>

Linda Brooke
Viveca Martinez
Nancy Arrigona
Monica Benedict
Deborah L. Borman
Clarice Rogers
Mahiri Moody
Shay Price
Cassie Davis
Adrian Gaspar
Anna Farr
Beth Mitchell
Victoria Foster

<u>Public Catalyst</u>

Lisa Alexander-Taylor
Megan Annitto
Robin K. Coleman
Eileen M. Crummy
Jody Drebes
Frank Luby
Natalie Nunez
Nadezhda MT Sexton
Claudia C. Tahan
Charmaine Thomas
Melea Weber
Aileen E. Williams
Charlene E. Womack
Mary Graw Leary
Samatha Loewen
Yana Mayevskaya
Oliver Ponce
Timothy A. Ross
Diane Scott
Hanna Shaw

TABLE OF CONTENTS

I.    INTRODUCTION & EXECUTIVE SUMMARY ............................................... 8

   A.   SECTION IV.  SCREENING, INTAKE, AND INVESTIGATION OF MALTREATMENT IN CARE
   ALLEGATIONS ............................................................................................. 13
   B.   SECTION IV.  ORGANIZATIONAL CAPACITY ...................................... 20

II.   DEMOGRAPHICS OF CHILDREN IN PMC CARE ................................. 34

   A.  AGE, GENDER, AND RACE .................................................................. 34
   B.  LIVING ARRANGEMENTS AND LENGTH OF TIME IN CARE ................. 36
   C.   LEVEL OF CARE ................................................................................. 39
   D.   GEOGRAPHIC LOCATION .................................................................. 39
   E.   SINGLE SOURCE CONTINUUM CONTRACTOR PRESENCE AND PLACEMENT OVERSIGHT ..... 39

III.   OVERVIEW OF STATE DATA AND DATA SYSTEMS CHALLENGES ................. 41

   A.   FRAGMENTED DATA SYSTEMS ........................................................... 41
   B.   LIMITED FUNCTIONALITY .................................................................. 45
   C.   LIMITED VPN CAPACITY AND BARRIERS TO ACCESSING INFORMATION ......................... 50

IV.   SCREENING, INTAKE AND INVESTIGATION OF MALTREATMENT IN CARE
ALLEGATIONS ....................................................................................................... 51

   A.   REMEDIAL ORDER 3 .......................................................................... 51
   Policy Changes and Updates about RCCI's Secondary Screening of Allegations of Abuse or
   Neglect ......................................................................................................... 51
   Change of Name for HHSC's Residential Child Care Regulation ...................... 52
   DFPS Investigation of Allegations of Abuse or Neglect .................................. 53
   Statewide Intake Performance ..................................................................... 54
      a.   Background ...................................................................................... 54
      b.   Statewide Intake Call Center Performance Analysis ........................... 55
      i.   Methodology ................................................................................... 55
      ii.   Volume of Calls to SWI .................................................................... 55
      iii.   Queue Times ................................................................................. 56
      iv.   Handled Calls ............................................................................... 57
      v.   Abandoned Calls ............................................................................ 58
      vi.   Call Queues .................................................................................. 59
      vii.   Calls by Day of the Week and Time of Call .................................... 59
   DFPS Intake Screening and Maltreatment in Care Investigations ................... 60
      a.   Data and Information Request and Production ................................... 60
      i.   Monitors' Data and Information Request ........................................... 60
      ii.   DFPS Data and Information Production ............................................ 61
      b.   Overview of Allegations in Referrals and Investigations for Maltreatment in Care 62
      i.   Intakes for PMC Children Referred to RCCI and CPI .......................... 62
      ii.   RCCI Intake Rates and Types of Abuse or Neglect Allegations .......... 64
   B.   REMEDIAL ORDER 3: SCREENING AND INTAKE PERFORMANCE VALIDATION ................. 65
   Methodology ................................................................................................ 65

Remedial Order 3 Secondary Screening Validation Results for RCCI and CPI ................. 69
   a.   RCCI Results ................................................................................. 69
   b.   CPI Intakes................................................................................. 69
   c.   Remedial Order 3: SWI Original Screening Validation Results for Referrals
Assigned to HHSC ................................................................................. 69
   d.   Remedial Order 3: Maltreatment in Care Investigations ............................ 70
      i.   Overview of RCCI Maltreatment in Care Investigations ..................... 71
      ii.   Methodology ................................................................................. 72
      iii.   Remedial Order 3 Investigation Validation Results ........................... 73
C.   INVESTIGATIONS WITH SUBSTANTIAL TIME DELAYS AND GAPS CONTRIBUTING TO
DEFICIENCY ................................................................................. 74
D.   DEFICIENT INVESTIGATIONS FOR NEGLECTFUL SUPERVISION IN THE CONTEXT OF SELF-
HARM BY CHILDREN ................................................................................. 75
E.   SUMMARY OF PERFORMANCE FOR RECEIVING, SCREENING AND INVESTIGATING
ALLEGATION OF MALTREATMENT ................................................................................. 77
F.   TIMELINESS OF RCC INVESTIGATIONS: REMEDIAL ORDERS 5 THROUGH 11; 16 AND 18
PERFORMANCE VALIDATION (DFPS)................................................................................. 79
   1.   Recent Policy Changes ................................................................................. 80
Data and Information Request and Production ................................................................................. 81
Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS) ..................... 81
   a.   Methodology ................................................................................. 81
   b.   Remedial Order 5: Initiation within 24 Hours in Priority One Investigations.......... 84
   c.   Remedial Order 6: Initiation within 72 Hours in Priority Two Investigations........ 85
   d.   Remedial Order 7: Timeliness of initial face-to-face contact with the alleged victims
in Priority One Investigations ................................................................................. 87
   e.   Remedial Order 8: Initial Face-to-Face Contact with All Alleged Victims in Priority
Two Investigations within 72 Hours ................................................................................. 88
   f.   Remedial Order 9:................................................................................. 89
   g.   Remedial Order 10: Completion of Priority One and Priority Two Investigations
within 30 Days ................................................................................. 90
   h.   Remedial Order 11: DFPS Track and Report Requirement....................................... 91
   i.   Remedial Order 16: Timeliness of Completion and Submission of Documentation in
Priority One and Priority Two Investigations ................................................................................. 93
   j.   Remedial Order 18: Timeliness of Notification Letters to Referent and Provider... 93
Summary ................................................................................. 95
G.   REMEDIAL ORDER B5 ................................................................................. 97
   1.   Background ................................................................................. 97
   a.   First Court Monitors' Report Validation Findings ................................. 97
   b.   Updates and Policy Changes Following the Monitors' First Report ...................... 97
   c.   September 2020 Contempt Hearing & December 18, 2020 Contempt Order ......... 98
   d.   Updates and Policy Changes Following the Contempt Hearing............................ 101
   e.   DFPS' January 16, 2021 Certification of Compliance ................................. 101
Data and Information Production................................................................................. 102
Remedial Order B5 Performance Validation ................................................................................. 103
   a.   Methodology ................................................................................. 103
   b.   Performance Validation Results, Remedial Order B5 Case Read Results ............ 104

Summary ............................................................................................................... 107
H. REMEDIAL ORDER 37 .................................................................................................. 108
  1. Background .................................................................................................... 108
    a. First Court Monitors' Report Findings related to Remedial Order 37 .................. 108
    b. September 2020 Contempt Hearing & December 18, 2020 Contempt Order ........ 108
    c. State's Certification of Compliance ............................................................... 110
  Remedial Order 37 Performance Validation .................................................................. 111
    a. Methodology ............................................................................................. 111
    b. Performance Validation Results ................................................................... 111
      i. Validation of Casework Notification .......................................................... 111
      ii. Home History Reviews ............................................................................ 112
      iii. Verification of Home History Review Staffing ........................................... 114
      iv. State's Remedial Order 37 Case Read Results ........................................... 120
  Summary ............................................................................................................... 122

V. ORGANIZATIONAL CAPACITY ............................................................................. 123

  A. REMEDIAL ORDER 1: CPS PROFESSIONAL DEVELOPMENT TRAINING ........................... 123
    1. Background .................................................................................................... 123
      a. First Court Monitors' Report Performance Validation Findings ........................... 123
      b. Policy Changes Following the Monitors' First Report ....................................... 123
        i. DFPS Updates to CPD Training ................................................................. 123
        ii. SSCCs Providing Case Management Services ............................................. 126
    2. Data & Information Request & Production ...................................................... 127
      a. Monitors' Data and Information Request ...................................................... 127
      b. DFPS and SSCC Data & Information Production ............................................ 128
    3. Remedial Order 1 Performance Validation ...................................................... 131
      a. Methodology ............................................................................................. 131
      b. Performance Validation Results ................................................................... 132
        i. Caseworkers Hired and Trained by DFPS .................................................... 132
        ii. Caseworkers Hired by OCOK and 2Ingage ................................................ 138
    Summary ............................................................................................................... 143
  B. REMEDIAL ORDER 2: GRADUATED CASELOADS ............................................................ 143
      i. DFPS Graduated Caseload Policy ............................................................... 144
      ii. Data and Information Request and Production ............................................. 144
    c. Remedial Order 2 Graduated Caseloads Results and Performance Validation: ..... 145
      i. Methodology ............................................................................................. 145
      ii. Remedial Order 2: Performance Validation Results ...................................... 146
      iii. Summary of Performance Validation ......................................................... 149
  C. REMEDIAL ORDER 35, A-1, A-2, A-3, AND A-4: CASELOADS ........................................ 149
      i. Background ............................................................................................... 150
      ii. Data and Information Request and Production ............................................. 151
      iii. DFPS Data and Information Production ..................................................... 152
  D. REMEDIAL ORDERS 35 AND A-4: CASEWORKER CASELOADS ........................................ 152
      i. Methodology ............................................................................................. 153
      ii. Remedial Order 35 and Remedial Order A-4: Performance Validation results . 154
    d. Summary ..................................................................................................... 159
  E. REMEDIAL ORDERS B1 TO B4: .................................................................................. 159

1.    Background .................................................................................................. 160
2.    Data & Information Request & Production ................................................. 160
    a.   Monitors' Data and Information Request ........................................... 160
    b.   DFPS and HHSC Data & Information Production .............................. 161
    c.   Remedial Orders B-1 to B-4 Performance Validation ............................. 161
    d.   Remedial Orders B1 – B4 Performance Validation Results .................... 162
       i.   RCCI Caseloads ................................................................................. 162
       ii.   RCCI Interviews ................................................................................ 166
       iii.   RCCR Caseloads ............................................................................... 167
       iv.   RCCR Interviews .............................................................................. 172
Summary .......................................................................................................... 173

VI.     PREVENTING SEXUAL ABUSE AND CHILD-ON-CHILD SEXUAL AGGRESSION
     175

  A. REMEDIAL ORDER 32: POLICY CREATION & TRAINING OF STAFF RESPONSIBLE FOR MAKING
    .............................................................................................................. 177
    1.   Determinations ........................................................................................ 177
    Background ................................................................................................... 177
       a.   Court Monitors' First Report Performance Validation Findings ................... 177
       b.   September 2020 Contempt Hearing .................................................. 178
       c.   Updates Following the Contempt Hearing ....................................... 180
       d.   Remedial Order 32 Performance Validation ..................................... 181
       1.   Methodology .................................................................................. 181
       2.   Results of Performance Validation ................................................ 181
    3.   Summary ................................................................................................. 184
  B. REMEDIAL ORDER 4: CASEWORKER AND CAREGIVER TRAINING ON SEXUAL ABUSE ...... 184
    1.   Background ............................................................................................. 184
       a.   Policy ............................................................................................... 184
       b.   The Monitors' Data Information Request .......................................... 185
       c.   DFPS Data and Information Production for Caseworker and Caregiver Sexual Abuse
       Training ................................................................................................... 187
    2.   Remedial Order 4: Caseworker and Caregiver Sexual Abuse Training Performance
    Validation ...................................................................................................... 189
       a.   Caseworker Training Methodology ................................................... 189
       b.   Caseworker Training Performance Validation Results........................ 190
       c.   Caregiver Child Sexual Abuse Training ............................................ 191
       d.   Summary of Caseworker and Caregiver Sexual Abuse Training Performance
       Validation ................................................................................................. 192
  C. REMEDIAL ORDERS 23, 24, 28, AND 30: TRACKING AND DOCUMENTING SEXUAL ABUSE
  AND CHILD-ON-CHILD SEXUAL AGGRESSION ................................................... 192
    1.   Background ............................................................................................. 193
       a.   First Court Monitors' Report Performance Validation Findings ............ 193
       b.   Policy Changes Following First Report ............................................. 193
       c.   September 2020 Contempt Hearing .................................................. 194
       d.   The Contempt Order & DFPS' Certification of Compliance ................ 197
  D. REMEDIAL ORDERS 23, 24, 28, AND 30 PERFORMANCE VALIDATION ............................ 198
    1.   Methodology ........................................................................................... 198

Results of Performance Validation ................................................................ 199
    a.   Increase in Indicators for Sexual Abuse or Sexual Aggression............................ 199
    b.   Sexual Abuse After Children Enter Foster Care................................................. 200
    c.   Case Review of Sexual Victimization History in Dispositions with Reason to
    Believe ........................................................................................................... 203
Summary .......................................................................................................... 204
E.   Remedial Orders 25, 26, 27, 29 &31: Caregiver Notification .............................. 204
   1.   Background .................................................................................................. 205
    a.   First Court Monitors' Report Performance Validation Findings........................... 205
    b.   Policy Changes Following First Report ............................................................ 205
    c.   Contempt Hearing ......................................................................................... 206
    d.   Policy Updates that Followed the Contempt Hearing.......................................... 210
       i.   Definition of "Caregiver" ........................................................................ 210
       ii.   Definition of "apprised"........................................................................... 211
       iii.   Definition of "Caregiver" ........................................................................ 213
       iv.   Definition of "apprised".......................................................................... 214
    e.   The Court's Contempt Order & DFPS's Certification of Compliance.................. 216
F.   Remedial Orders 25, 26, 27, 29, and 31 Performance Validation ....................... 220
   1.   Methodology ............................................................................................... 220
Results of Performance Validation ................................................................ 222
    a.   Common Application ...................................................................................... 222
    b.   Placement Summary ...................................................................................... 227
    c.   State's Case Record Reviews.......................................................................... 232
Summary .......................................................................................................... 234
G.   Remedial Orders A7 and A8: Awake-Night Supervision.................................... 235
   1.   Background .................................................................................................. 235
    a.   Monitors' First Report Performance Validation Findings ................................. 235
    b.   September 2020 Contempt Hearing.................................................................. 235
    c.   Policy Changes Following the Monitors' First Report....................................... 236
H.   Remedial Orders A7 and A8 Performance Validation ........................................ 239
   1.   Methodology ............................................................................................... 239
Results of Performance Validation ................................................................ 240
    a.   DFPS Certifications of Awake Night Supervision ........................................... 240
    b.   DFPS Action Related to Contractual Violations of Awake-Night Supervision
    Requirements .................................................................................................. 243
Summary .......................................................................................................... 246

VII.   REGULATORY MONITORING & OVERSIGHT OF LICENSED PLACEMENT ... 247

A.   Remedial Order 22: Consideration of Abuse or Neglect/Corporal Punishment &
Obligation to Report Suspected Abuse or Neglect ............................................ 247
   1.   Background .................................................................................................. 247
    a.   First Court Monitors' Report Performance Validation Findings.......................... 247
    b.   Updates & Policy Changes Following the Monitors' First Report....................... 248
    c.   September 2020 Contempt Hearing & The Court's December 18, 2020 Contempt
    Order ............................................................................................................. 249
    d.   HHSC's December 31, 2020 Certification of Compliance................................... 250
   2.   Data and Information Production.................................................................... 252

Remedial Order 22 Performance Validation.........................................................253
   a.   Methodology ....................................................................................253
      i.   ECHR Validation ................................................................253
      ii.   Validation of Requirements Related to Reporting Abuse or Neglect.................254
   b.   Performance Validation Results .........................................................254
      i.   ECHR Validation ................................................................254
      ii.   Validation of Requirements Related to Reporting Abuse or Neglect.................262
Summary .....................................................................................................266
B.   REMEDIAL ORDERS 12-19: TIMELINESS OF MINIMUM STANDARDS INVESTIGATIONS......267
   1.   Remedial Orders 12 through 19: Timeliness of Minimum Standards Investigations. 267
      a.   Background ...................................................................................268
      b.   Monitors Data and Information Request and Production .........................269
         i.   Monitors Data and Information Request................................269
         ii.   DFPS Data and Information Production ................................269
      c.   Remedial Orders 12 through 19 Performance Validation (HHSC) .........................270
         i.   Methodology ..............................................................270
         ii.   Remedial Order 12: Timeliness of Observations or Interviews with Alleged Child Victims in Priority One Investigations ........................................272
         iii.   Remedial Order 13: Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations ........................................273
         iv.   Remedial Order 14: Completion of Priority One and Two Investigations within 30 Days ..........................................................................274
         v.   Remedial Order 15: Completion of Priority Three, Four, and Five Investigations within 60 Days of Intake ......................................................274
         vi.   Remedial Order 16: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations.........276
         vii.   Remedial Order 17: Completion and Submission of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations .........................277
         viii.   Remedial Order 18: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations..........................................278
         ix.   Remedial Order 19: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and Five Investigations ..................................................279
C.   REMEDIAL ORDER 20: HEIGHTENED MONITORING .........................................280
      a.   Background ...................................................................................280
         i.   First Court Monitors' Report Performance Validation Findings.........................281
         ii.   Updates and Policy Changes Following the First Report .........................281
      b.   Data and Information Requests and State's Production .........................285
      c.   Remedial Order 20 Performance Validation.......................................286
         i.   Methodology ..............................................................286
         ii.   Performance Validation Results ................................................287
      d.   Overview and Analysis of Phase One of Heightened Monitoring.........................294
         i.   Phase One Operations' Histories of Compliance Problems .........................296
         ii.   Quality of Heightened Monitoring Plans for Phase One Operations.................299
         iii.   Timeline for Completing Tasks Identified in Heightened Monitoring Plans .....304
         iv.   Review of Heightened Monitoring Visits to Phase One Operations .................307
         v.   Review of Placement Approvals for Phase One Operations .............................314

vi.   Summary ................................................................................................ 328

D.   Remedial Order 21: Revocation of Licenses ............................................ 328

    a.   Background ............................................................................................ 329

        i.   First Court Monitors' Report Performance Validation Findings ...................... 329

        ii.   September 2020 Contempt Hearing .................................................. 329

        iii.   Policy Updates Following the Contempt Hearing ............................. 331

    b.   Remedial Order 21 Performance Validation ........................................... 333

        i.   Methodology ........................................................................................ 333

        ii.   Remedial Order 21 Performance Validation Results ........................................ 333

        iii.   Pending Closure Recommendation ...................................................... 338

        iv.   Denied Closure Recommendation ........................................................ 340

        v.   Congregate Care Facility Closures & DFPS Contract Terminations ............... 344

        vi.   Summary ............................................................................................ 366

VIII.   CHILD FATALITIES ........................................................................................ 367

A.   Child Fatalities Involving Abuse and Neglect (July 31, 2019 – Aril 10, 2021). 368

B.   Child Fatality Investigations Pending ........................................................... 373

C.   Abuse and Neglect Ruled Out/UTB; Possible Neglect (July 31, 2019 – April 10, 2021) ............................................................................................................. 379

D.   Child Fatalities, No Abuse or Neglect Determined (May 1, 2020 and April 10, 2021) ............................................................................................................. 381

## I. INTRODUCTION & EXECUTIVE SUMMARY

This is the Monitors' second comprehensive report to the United States District Court ("Court") in *M.D. by Stukenberg v. Abbott* following the mandate issued by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") implementing the Court's remedial orders.[1] The Plaintiffs are a certified class of children in the Permanent Managing Conservatorship ("PMC") of the Texas Department of Family and Protective Services ("DFPS") who sought injunctive relief against the State of Texas. At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and Human Services Commission ("HHSC").[2] Now DFPS is an independent State agency reporting directly to the Governor.[3]

Following a bench trial in 2014, the Court published a Memorandum Opinion and Verdict in December 2015 finding that Texas had failed to protect PMC children from an unreasonable risk of harm.[4] The Court issued a Final Order on January 15, 2018, and following a stay order, the Fifth Circuit adopted in part and reversed in part and modified the remedial orders, remanding to the Court, which issued a modified Order on November 20, 2018.[5] The Fifth Circuit again adopted in part and reversed in part the Court's Order and issued its Judgment as Mandate on July 31, 2019.[6] The Court's November 20, 2018 Order, as modified by the Fifth Circuit on July 8, 2019,[7] specifies numerous remedial orders that implement the Court's injunction as detailed below, charging the Monitors "to assess and report on Defendants' compliance with the terms of this Order."[8]

On June 16, 2020, the Monitors filed the first comprehensive report ("First Report") with the Court, concluding that "the Texas child welfare system continues to expose children in

---

[1] *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626.

[2] Effective February 2021, HHSC changed the name of its child care regulation unit, Residential Child Care Licensing (RCCL), to Residential Child Care Regulation (RCCR). This report uses RCCR to describe this division of HHSC even when referring to historic work done by the unit under its previous name.

[3] The 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent state agency reporting directly to the Governor, H.B. 5 (TX 2017), 85th Leg., R.S.

[4] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[5] *Id.*

[6] *M.D. ex rel. Stukenberg*, 929 F.3d at 277; J. (5th Cir. 2019), ECF No. 626.

[7] *M.D. ex rel. Stukenberg*, 929 F.3d at 277.

[8] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 16 (S.D. Tex. Nov. 20, 2018), ECF No. 606. ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. In order to avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order. The Monitors shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order. The Monitors shall provide a written report to the Court every six months. The Monitors' reports shall set forth whether the Defendants have met the requirements of this Order. In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.") *Id.* at 17.

permanent managing conservatorship ('PMC') to an unreasonable risk of serious harm." On July 2, 2020, Plaintiffs filed a Motion to Show Cause Why Defendants Should Not Be Held in Contempt for their failure to comply with Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, and B5 ("July 2, 2020 Show Cause Motion"). The State filed written objections to the Monitors' First Report on July 6, 2020[9] and a Response in Opposition to the Motion to Show Cause on July 24, 2020. On September 3 and 4, 2020, the Court held a hearing on Plaintiffs' July 2, 2020 Show Cause Motion, and on December 18, 2020, found Defendants to be in contempt of Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37, and B5, but not in contempt of Remedial Orders 24, 28, or 30.[10]

In preparing this report, the Monitors and their staff ("the monitoring team") undertook a comprehensive set of activities to validate the State's performance, as detailed both in the Methodology Section below and throughout this report. The Monitors requested data and information from both DFPS and HHSC to validate the agencies' compliance with the Court's remedial orders, as detailed in various sections of this report. The Monitors also requested data and information from the Single Source Continuum Contractors ("SSCC") with which DFPS contracts to provide case management and placement services to foster children in DFPS regions that have transitioned to the Community Based Care ("CBC") model.[11]

---

[9] Defendants' Verified Objections to Monitors' Report, ECF No. 903.

[10] The Court held: "Defendants are ORDERED to file with the Court a sworn certification of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 within thirty (30) days of the date of this Order. This sworn certification does not need to be verified by the Monitors prior to filing. Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with these Remedial Orders, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. Defendants are further ORDERED to appear at a compliance hearing before this Court, beginning at 9:00 a.m. on Wednesday, May 5, 2021 and continuing thereafter until the compliance hearing concludes. The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401. All of Defendants' supporting evidence of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 is subject to verification by the Monitors prior to the May compliance hearing. No sanctions will issue at this time, but, failing the Monitors' verification of compliance, any sanctions as to Defendants' performance of Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, or B5 will be revisited at the compliance hearing. To avoid additional future sanctions as to these findings of contempt, Defendants must comply with each of these Remedial Orders in the timeframe described. No retroactive sanctions will be imposed at the time of the compliance hearing."

[11] CBC was formerly known as Foster Care Redesign. There are currently five regions that have transitioned to the CBC model, or are in the process of doing so: Region 1 (Texas Panhandle); Region 2 (30 counties in North Texas); Region 3b (seven counties around Fort Worth); Region 8a (San Antonio and Bexar County; and, effective October 2021, Region 8b (26 counties surrounding Bexar County). There are two stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services. The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families." DFPS, *Community-Based Care, available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services. Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.* Two SSCCs – OCOK and 2INgage – moved to Stage 2 of the CBC model in 2020. Stage 2 includes shifting case management services from DFPS to the SSCC.

The monitoring team examined tens of thousands of documents and records, including data files; children's case records, both electronic and paper; investigations; critical incidents; child fatality reports; medical examiner reports; restraint log entries; videos of critical incidents; witness statements; interviews; policies; resource materials such as handbooks; plans; guidelines and field guidance; child abuse, neglect or exploitation referrals to Statewide Intake ("SWI"), including E-Reports and recorded phone calls; Awake-Night certifications; and an array of employee and caregiver human resources and training records and certifications.

*SUMMARY OF THE MONITORS' FINDINGS*

The Court's Final Order enjoins the State "from placing children in the permanent managing conservatorship ("PMC") in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas' PMC foster children are free from an unreasonable risk of serious harm."[12]

The Monitors' investigation, analysis, interviews and site visits in preparation for this report identified areas in which the State made progress toward eliminating the "substantial threats to children's safety" that surfaced in the Monitors' First Report, including performance associated with Remedial Orders 2, 3 (Receiving and Screening), 5, 7, 9, 10, 18 (DFPS only; HHSC's performance dropped off), 19 and B5.

- DFPS improved its performance with respect to Remedial Order 3. DFPS implemented reforms to its secondary screening process, which had been inappropriately downgrading a substantial number of referrals of child maltreatment in licensed foster care.[13] Following the Monitors' First Report, the agency winnowed the criteria for downgrading referrals to Priority None ("PN"), reassigned the secondary screeners from the unit charged with investigating maltreatment in licensed foster care to SWI and enhanced their training. As a result, downgrades to PN in licensed foster care fell from 29.8% (53 out of 178 intakes) in May 2020 to just 2.2% (3 out of 138 intakes) in November 2020, which is when DFPS formally implemented its policy and structural changes restricting PNs to a narrow set of categories.

- SWI received 533,471 calls from February 1, 2020 to November 30, 2020. On average, callers waited for 2.3 minutes before their calls were handled or abandoned, an improvement of almost two minutes from the data reported in the Monitors' First Report.[14] Seventy percent (373,970) of callers waited on the queue for under one minute.

- DFPS's compliance with Remedial Order 2 improved sharply during the period reviewed. Just over half (56%) of the 31 new caseworkers who became eligible for primary case management in March 2020 had caseloads that conformed to the graduated caseload standard but about nine in every ten caseworkers who became case assignable on July 1, 2020 or later had case assignments that conformed to the graduated caseload standard as validated by the Monitors.

---

[12] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 2 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

[13] Deborah Fowler and Kevin Ryan, First Court Monitors' Report 2020, ECF No. 869.

[14] During the last reporting period, the data demonstrated an average queue time of 4.2 minutes for calls placed from August 1, 2019 to January 31, 2020.

- Of 815 SWI intakes assigned to Residential Child Care Investigations ("RCCI") for a Priority One or Priority Two investigation between April 1, 2020 and October 31, 2020, the automated system of notification designed by DFPS to promptly communicate allegations of abuse or neglect to the child's primary caseworker was observed to be working: notification occurred in almost all cases reviewed.  While the quality of the contact could not be reviewed to determine whether all allegations were discussed, RCCI investigators contacted the child's caseworker after the automated notification was sent in 728 (89%) of the cases reviewed.

- DFPS made substantial progress eliminating a backlog of overdue RCCI investigations by April 6, 2021. Of the 151 Priority One and Priority Two RCCI investigations that remained open as of April 6, 2021, the State's data documented that 5% (8) were open for more than 30 days with an extension, and 1% (2) were open more than 30 days without an extension. The two oldest investigations that were overdue as of April 6, 2021 without extensions were 1 and 3 days overdue.

Although there were no license revocations for any placement (foster home, Child Placement Agency ("CPA"), or General Residential Operation ("GRO")) in the five-year period preceding issuance of the mandate in this matter, since July 31, 2019 and through April 23, 2021, HHSC has initiated revocation proceedings or denied a license for eight GROs, and DFPS has notified the Monitors that the agency canceled contracts with three GROs. Five other GROs voluntarily relinquished licenses after being placed on Heightened Monitoring or another type of Residential Child Care Regulation ("RCCR") enforcement action. At the same time, serious risks of harm to children persist, as detailed in this Report. In its January 19, 2018 Final Order, which appointed Kevin Ryan and Deborah Fowler as Monitors, the Court noted that "[i]n its December 2015 Order, the Court found Texas' foster care system was broken.  Over two-years later, the system remains broken and DFPS has demonstrated an unwillingness to take tangible steps to fix the broken system."[15]

The State's performance in some areas, including its oversight of the care of children by the SSCCs and certain GROs, is contrary to the Court's remedial orders. Specifically:

- In less than 21 months since the Fifth Circuit issued the mandate in this matter (July 31, 2019 – April 10, 2021), 23 PMC children have died in State custody. These fatalities include six children whose caregivers were determined to have abused or neglected them in connection with their deaths or their care prior to their deaths. In addition, a seventh child fatality is strongly suspicious for caregiver abuse. A DFPS investigation is underway in that case and five additional child fatalities. Of the six cases involving confirmed abuse or neglect and a seventh case strongly suspicious for abuse, SSCCs were involved with five of the seven children. State records indicate SSCCs directly managed care for four of the children; DFPS directly managed care for two children; and in the case of one child, C.G., whose death is discussed in the Monitors' First Report, an SSCC was responsible for placement, while DFPS was responsible for case management.

---

[15] *Id.*

11

- As detailed in a report separately filed with the Court, the Monitors recently learned that three SSCCs have housed children in unlicensed GROs. In one instance, one of the SSCCs, Family Tapestry, has repeatedly placed children in a facility (owned by the SSCC's parent) that relinquished its license following a troubled history of child abuse, neglect and safety problems, with many of the same staff members, and repeated enforcement actions, even as fresh allegations of child maltreatment mounted.

- The Monitors discovered in December 2020 that several operations that had been identified or should have been identified for Heightened Monitoring due to their history of abuse, neglect and safety violations, had escaped enforcement by simply closing and opening under a different name.  The State remedied the problem after the Monitors raised concerns to HHSC and DFPS leadership, but there is no evidence the State was correcting the lapse on its own.

- The very low number (5) of agency foster homes recommended for closure sharply contrasts with the State's growing efforts to monitor its most troubled GROs. The State recommended closure of only five agency homes between May 1, 2020 and March 16, 2021, and only three have closed. RCCI investigated two of those three homes in connection with the fatality of a PMC child, resulting in confirmed Reason To Believe ("RTB") findings.

- With respect to Remedial Orders 1, 2, 26, 29, 35 and A-4, the SSCCs' compliance with the Remedial Orders lagged behind DFPS, raising questions about the State's implementation of the CBC model and its oversight of the SSCCs. In some instances, DFPS and the SSCCs lacked the data and processes to oversee the SSCCs' performance with respect to the Remedial Orders.[16] SSCCs' caseloads were typically higher than DFPS; the SSCCs' implementation of graduated caseloads was less rigorous; the SSCCs' training for new caseworkers appears to be substantially shorter than the Court-ordered Child Protective Services Professional Development ("CPD") model requires; the SSCCs' data in some important instances was unreliable or nonexistent; and as the Monitors assessed whether a Common Application corresponding to a child's placement could be found that included all known history of sexual abuse and sexual aggression, DFPS out-performed the SSCCs for both placements involving children with an indicator for sexual aggression and sexual abuse.

- The Monitors' review of the Heightened Monitoring Plans created for the most risk-prone ("Phase One") operations revealed gaps between operations' safety and compliance problems and the quality of the tasks in the Heightened Monitoring Plans intended to reduce the risks of harm to children. Many of the tasks were similar or identical to tasks the operations had completed under previous enforcement actions, raising questions about whether they will reduce or eliminate the risks of harm to children as intended.  Further, a review of minimum standards variances approved for operations under Heightened

---

[16] For example, the State represented it discovered in February 2021, that it had not been collecting and reporting to the Monitors data on Children Without Placement (CWOP) from the SSCCs. As another example, the Monitors' review of the graduated caseload data from the SSCCs, and the Monitors' exchanges with the SSCCs and DFPS about this data, indicate a gap in quality assurance and oversight.

Monitoring revealed that two operations repeatedly received variances related to staffing ratios despite their troubled child safety records.

- The Monitors were not able to validate that all PMC placements in Phase One Heightened Monitoring operations reviewed were approved by a DFPS Associate Commissioner, or, later, a Regional Director prior to the placement, per the Court's orders.  Of the 118 placements made to operations under Phase One of Heightened Monitoring, the Monitors were unable to validate placement approval in 77 (65%), and were unable to find a placement request provided by the State in even more (84 of 118, or 71%).

## *SUMMARY OF FINDINGS BY REMEDIAL ORDER*

### A.    Section IV.  Screening, Intake, And Investigation of Maltreatment In Care Allegations

**Remedial Order 3:** *DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

### Receiving Allegations

- Between February 1, 2020 and November 30, 2020, SWI received 533,471 calls. During the period analyzed, 13% (69,468) of calls were abandoned, a decrease from 18% observed in the previous report.[17]
- On average, callers waited for 2.3 minutes before their calls were handled or abandoned, a decrease of almost two minutes from the data reported in the Monitors' First Report.[18] Seventy percent (373,970) of callers between February 1, 2020 and November 30, 2020, waited on the queue for under one minute.

### Screening Allegations

- The Monitors reviewed 185 referrals received between May 1, 2020 and November 30, 2020, to ascertain whether DFPS appropriately downgraded the referrals after SWI initially assigned them to RCCI for a Priority One or Two abuse or neglect investigation. The Monitors determined 162 (88%) were appropriately downgraded.

---

[17] The Monitors' First Report found that 18% of calls were abandoned from August 1, 2019 to January 31, 2020.  *See* Deborah Fowler and Kevin Ryan, First Report 64, ECF No. 869.

[18] During the last reporting period, the data demonstrated an average queue time of 4.2 minutes for calls placed to SWI from August 1, 2019 to January 31, 2020.

- Most of the 23 inappropriately downgraded referrals arose prior to the effective date of the new DFPS policy restricting secondary screening downgrades of intakes. The Monitors did not identify any referrals involving maltreatment in licensed foster care that were inappropriately downgraded in October or November 2020.

- In the Monitors' First Report, the Monitors determined that of 174 intakes downgraded at secondary screening between July 31, 2019 and October 31, 2019, DFPS inappropriately downgraded 57 intake reports (33%), which contained allegations that warranted investigation for abuse or neglect. Thus, the Monitors' rate of disagreement with downgrade determinations dropped by 21 percentage points from 33% in the First Report to 12% presently.

- The Monitors reviewed 90 referrals made between May 1 and November 30, 2020, to ascertain whether DFPS appropriately downgraded the referrals after SWI initially assigned them to CPI for a Priority One or Two abuse or neglect investigation. The Monitors determined CPI appropriately downgraded 88 of these intake reports (98%).

- The Monitors also reviewed 241 referrals made to SWI from January and February 2020, which SWI sent directly to HHSC, involving a PMC child. Of these 241 referrals, SWI assigned 76 to HHSC for a non-abuse or neglect investigation to determine whether there was a violation of statute, administrative rules, or minimum standards and the other 165 intakes were administratively closed. Of these 241 reports, the Monitors concurred with SWI's determination in 98% (235) of intakes.

- The Monitors also reviewed 66 referrals that SWI sent directly to HHSC for a minimum standards investigation in October 2020, that involved children with PMC status. The Monitors found that SWI appropriately determined that none of these intakes contained an allegation of abuse or neglect of a PMC child and were properly assigned to RCCR for follow up.

- The Monitors also reviewed 88 SWI referrals from November 2020 that involved children with PMC status and found that SWI appropriately determined that 94% (83 intakes) did not contain an allegation of abuse or neglect of a PMC child and were properly assigned to HHSC.

**Investigating Allegations**

- Of the 768 RCCI investigations DFPS completed involving PMC children between May 1, 2020 and October 31, 2020, the Monitors evaluated 403 investigations. Of those 403 RCCI investigations, the Monitors concurred with the outcomes of all 31 (8%) that resulted in a substantiation of the allegations with a disposition of RTB.

- The Monitors found that of the 365 investigations where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 300 cases (82%); inappropriately in 18 cases (5%); and conducted investigations with such substantial deficiencies in 47 cases (13%) that the Monitors were prevented from reaching a conclusion.

- In addition to the 65 cases (18%), among a sample of 365 investigations that RCCI Ruled Out between May 1, 2020 and October 31, 2020, that had substantial deficiencies or were inappropriately resolved by RCCI, the Monitors also identified four investigations in which

14

RCCI assigned an RTB disposition to some allegations or administratively closed that had substantial deficiencies or were inappropriately resolved by RCCI.

- In the First Report, the Monitors determined 28.6% of sampled investigations had substantial deficiencies and/or were inappropriately resolved, and the present results for this period reflect a significant improvement.

**Remedial Order 5:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

- The monitoring team reviewed all 657 RCCI investigations that were opened by DFPS between May 1, 2020 and September 30, 2020.
- The Monitors found that of 657 investigations opened by RCCI between May 1, 2020 and September 30, 2020, 48 were assigned Priority One, requiring that DFPS initiate the investigation within 24 hours of intake.
- DFPS initiated 79% (38) of Priority One investigations within 24 hours of intake in a manner consistent with existing policy. Twenty-one percent (10) of investigations were not initiated timely or did not have sufficient data to assess timeliness.
- The timely initiating of investigations represents an improvement of 11% from the Monitors' First Report when RCCI's rate of initiating Priority One investigations consistent with Remedial Order 5 was 68%.

**Remedial Order 6:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

- RCCI opened 609 Priority Two investigations requiring DFPS initiation within 72 hours of intake between May 1, 2020 and September 30, 2020. DFPS initiated 81% (494) of Priority Two investigations within 72 hours of intake in a manner consistent with existing policy.
- Eighteen percent (107) of investigations were not initiated timely or did not have sufficient data to assess timeliness. One percent (8) of investigations had a documented exception and were initiated timely.
- DFPS's rate of initiating Priority Two investigations through face-to-face contact with each alleged victim within 72 hours in the Monitors' First Report was also 81%.

**Remedial Order 7:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

15

- Of the 48 Priority One investigations opened by RCCI between May 1, 2020 and September 30, 2020, the Monitors found that 79% (38) of the investigations included initial face-to-face contact with each alleged child victim individually within 24 hours.
- An additional 4% (2) of investigations had documentation of approved exceptions to face-to-face contact.
- DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority One investigations within 24 hours in the Monitors' First Report was 68%.

**Remedial Order 8:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

- Of the 609 RCCI investigations assigned Priority Two between May 1, 2020 and September 30, 2020, 79% (484) of investigations included initial face-to-face contact with each alleged child victim within 72 hours of intake.
- Twenty-two additional investigations (4%) had documented exceptions to face-to-face contact. Of the 22 investigations with documented exceptions for face-to-face contact, 27% (6) were due to the unknown whereabouts of the child; 14% (3) were due to a prior interview with alleged victim by CPS, Law Enforcement, or a child advocacy center before RCCI received the Intake report; 5% (1) were due to the alleged victim no longer living in Texas; and 55% (12) were due to "other circumstances beyond the investigator's control preventing the interview or observation from taking place within the initiation time frame."
- DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority Two investigations within 72 hours in the Monitors' first report was 81%.

**Remedial Order 9:** *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

- Overall, in 90% (590) of all 657 investigations (both single and multi-alleged victim investigations), DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with each alleged child victim within an investigation and the date and time that contact occurred for each child.
- In 97% (435) of the 450 investigations with one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with the alleged child victims within an investigation and the date and time the contact occurred.
- In 75% (155) of 207 investigations with more than one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with each of the alleged child victims within an investigation and the date and time the contacts occurred.

**Remedial Order 10:** *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

- Of the 657 Priority One and Priority Two RCCI investigations opened between May 1, 2020 and September 30, 2020, 51% (337) were not completed within 30 days.
- Forty-two percent (273) of investigations were documented as completed within 30 days of intake and 7% (47) had approved extensions and were completed within the extension timeframe. DFPS's rate of completing Priority One and Two investigations within 30 days in the Monitors' First Report was 19%.[19]
- DFPS made substantial progress complying with Remedial Order 10 by April 6, 2021. Of the 151 Priority One and Priority Two RCCI investigations that remained open as of April 6, 2021, the State's data documented that 5% (8) were open for more than 30 days with an extension, and 1% (2) were open more than 30 days without an extension. The two oldest investigations that were overdue as of April 6, 2021, without extensions were 1 and 3 days overdue.

**Remedial Order 11:** *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked.*

- Of the 337 investigations that were opened by RCCI between May 1, 2020 and September 30, 2020, and were not completed within 30 days, DFPS data included extensions approved for 82 investigations with the dates the extensions were approved, the reasons for the extensions, and the number of additional days approved by each of the extensions.[20]
- Each of these 82 investigations contained at least one extension approved for either seven, 14, 21, or 30 days each.
- Of those investigations with extensions, 66% (54) included one extension, 27% (22) included two, 6% (5) included four, and 2% (1) included six extensions. All extensions included documented approval dates and all but two included documented reasons for the extension.
- Five percent (8) of open RCCI investigations as of April 6, 2021 were open for more than 30 days with a current, approved extension, and 1% (2) of open RCCI investigations were open for more than 30 days without an extension. To achieve this level of performance, DFPS had to close at least 465 RCCI investigations involving PMC children between

---

[19] *See* Deborah Fowler and Kevin Ryan, First Report 114, ECF No. 869.
[20] These data matched to the investigations' corresponding intake start date and original due date and therefore, the Monitors were able to determine the due dates associated with the extensions to assess timeliness of completion within the extension period.

March 1, 2021 and April 6, 2021. To offer perspective on that volume of closure, the average monthly rate of closure during the past 19 months has been 120 closures per month and has ranged between 48 and 180 investigations per month.

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

- *(Remedial Order 16 applies to both DFPS and HHSC)* With respect to DFPS, the agency advised the Monitors it uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered complete when the documentation is finally submitted to the supervisor in compliance with this Order.

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

- *(Remedial Order 18 applies to both DFPS and HHSC)* With respect to DFPS, of the 538 (out of 657) Priority One and Priority Two RCCI investigations that were documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 40% (213) of investigations.
- Of the remaining cases, in 1% (3) of investigations, notification letters to the referents were not mailed timely; 56% (299) were mailed to the referent prior to supervisor approval; 3% (17) of investigations had an anonymous reporter; and one percent (6) were unknown due to documentation deficiencies.
- DFPS's rate of mailing notification letters to referents within five days of investigation closure in Priority One and Two investigations in the Monitors' First Report was 78%.
- Of the 538 (out of 657) Priority One and Priority Two RCCI investigations that were documented as closed at the time of the Monitors' review, HHSC mailed notification letters to providers in abuse, neglect, and exploitation investigations within five days of closure in 59% (317) of investigations.
- The notification letters to providers were not mailed timely in 20% (106) of investigations. In addition, 1% (8) were mailed prior to supervisor approval; and 20% (107) did not have sufficient data to assess timeliness. HHSC's rate of mailing notification letters to providers within five days of investigation closure in Priority One and Two investigations in the Monitors' First Report was 65%.

**Remedial Order A6:** *Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral*

*history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

- The Monitors rely on record reviews and interviews conducted on-site with children to validate Remedial Order A6. Due to the pandemic, the Monitors were able to make only one on-site visit to an operation in this period to Devereux Advanced Behavioral Health Center – League City. The Monitors filed a report with the Court discussing findings related to that visit on February 8, 2021, and do not include further discussion of A6 within the Second Report.

**Remedial Order B5:** *Effective immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

- The Monitors reviewed 815 RCCI intakes which SWI assigned for a Priority One or Priority Two investigation between April 1, 2020 and October 31, 2020.
- The Monitors' case reviews reflect that the automated system of notification designed by DFPS to promptly communicate allegations of abuse or neglect to the child's primary caseworker were observed to be occurring in almost all cases reviewed. While the notification does not include the substance of the allegations, the monitoring team verified follow-up communication between the RCCI investigator assigned to the case and the child's caseworker in most cases reviewed but could not assess the quality of that communication.

**Remedial Order 37:** *Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

- The Monitors' case record review showed that, at least through October 31, 2020, the State was still not complying with the timeliness standard required in Remedial Order 37. Although in 99% of the cases the automatic notifications to caseworkers occurred within two days of the SWI referral, the average total time from the date the case was received by SWI to the date the Home History Review ("HHR") staffing occurred, as documented in the DFPS's Information Management for Protection of Adult & Children in Texas ("IMPACT") system, was 8 days with a range from one to 70 days.[21]

---

[21] The average total time from the date of downgrade to Priority None to the date the Home History Review staffing occurred, as documented in IMPACT, was 7.51 days with a range of one day to 70 days.

- In addition to failing to comply with the timeliness requirement of Remedial Order 37, the State frequently did not consistently document HHR staffings between the caseworker and the supervisor. In cases in which documentation of an HHR was located, the monitoring team did not find any staffing or a reason for failing to hold a staffing in 27% (23 of 86) of the cases.  As detailed in this report, the monitoring team again found concerns with the quality of caseworkers' reviews of the HHRs and staffing narratives.  The State's case read also reflects the Monitors' findings, having found in both the State's June to August 2020 and September to November 2020 case record reviews that in 25% of the cases, the caseworker's narrative did not contain an accurate review of the HHR.

## B.     Section IV.  Organizational Capacity

**Remedial Order 1:** *Within 60 days, the Texas Department of Family Protective Services ("DFPS") shall ensure statewide implementation of the CPS Professional Development ("CPD") training model, which DFPS began to implement in November 2015.*

- Of the 313 caseworkers who were hired by DFPS between January 1, 2020 and July 31, 2020, who did not leave the agency prior to or during training, and who should have been subject to CPD training requirements, 97% (305 of 313) had completed CPD training as of the time of the analysis.
- One of the SSCCs, Our Community Our Kids ("OCOK"), did not provide reliable data for its caseworkers' case-assignable dates in time for assessment of their performance associated with Remedial Order 1.  The repeated failure to report reliable data suggests that neither OCOK nor DFPS was actively assessing OCOK's conformance with training completion requirements and case assignability prior to the Monitors' efforts to validate the data.
- Of the 85 caseworkers hired by 2INgage, another SSCC, who were required to complete CPD training and stayed with the agency through training, all (100%) had completed the "2INgage Academy" training as of January 2021.  Of those 85, 79 (93%) were new hires subject to full CPD training. On average, caseworkers completed the 2INgage training in 43 days.  Ten of these new hires completed 2INgage training in just 28 days, far shy of the time required by the Court-ordered CPD training model.

**Remedial Order 2:** *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

- For the 601 caseworkers whose caseloads the Monitors assessed at two points in time and the 588 workers whose caseloads the Monitors assessed at three points in time, the State

20

was in conformance with the graduated caseload standards for new caseworkers 76% of the time.

- The agency's compliance with Remedial Order 2 improved sharply during the period reviewed. Just over half (56%) of the 31 caseworkers who became eligible for primary case management in March 2020 had caseloads that conformed to the graduated caseload standard and less than half (41%) of the 141 such workers in June 2020 conformed to the graduated caseload standard. But about nine in every ten caseworkers who became case assignable on July 1, 2020 or later had case assignments that conformed to the graduated caseload standard at three points in time evaluated by the Monitors.

**Remedial Order 35:** *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

**Remedial Order A2:** *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

**Remedial Order A3:** *Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly.*

**Remedial Order A4:** *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General Class.* [The Court subsequently changed the effective date of this order to February 15, 2020.]

21

- The parties agreed to, and the Court approved, a workload standard of 14 to 17 children per caseworker, pursuant to Remedial Order A3. As of December 31, 2020, 57% of all caseworkers (846 of 1,495), including those employed by OCOK and 2INgage, had primary caseloads within or below the standard of 17 children per caseworker.

  From March 2020 to December 2020, conformity with the caseload standard remained within a narrow band ranging from 52% to 58% of all caseworkers

- The Monitors found that conformity with the caseload standard varied among DFPS, OCOK and 2INgage. Of the 1,302 DFPS workers carrying at least one PMC case on December 31, 2020, 750 workers (58%) had primary caseloads within or below the standard of 17 children per worker.  As of December 31, 2020, the two SSCCs that are undertaking case management, OCOK and 2INgage, had 53% and 46% of their workers working within or below the standard, respectively. In the data the Monitors received from March 31, 2020 to December 31, 2020, the rate of caseworkers meeting the standard at OCOK was at its highest point on December 31, 2020; the rate of caseworkers meeting the standard at 2INgage was at its lowest point on December 31, 2020. The rates of caseworkers meeting the standard at both the SSCCs were lower than those at DFPS.

**Remedial Orders B1:** *Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

**Remedial Order B2:** *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

**Remedial Order B3:** *Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who*

22

*spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

**Remedial Order B4:** *Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators, or successor staff.*

- The majority of RCCI investigator caseloads were within or below the guidelines between March and December 2020.[22] The caseload for RCCI investigators during this time ranged from 9 to 14 cases, with 72% of investigators (389 of 541) having caseloads of fewer than 14 investigations per month during the period, and 14% of investigators (77 of 541) having caseloads between 14 and 17 investigations.

- Although the majority of RCCI investigators had caseloads within the guidelines during the period, large differences in caseload numbers existed between investigators with the lowest and highest caseloads: investigators with the highest caseloads were assigned as much as forty times the number of investigations than the number of investigations assigned to those investigators with the lowest caseloads. Between March and December 2020, monthly RCCI investigator caseloads ranged from one to 45 investigations, with 35% of investigators (25 of 72) experiencing a caseload of 18 or more investigations for one or more months and 17% of investigators (12 of 72) experiencing a caseload of 25 or more abuse, neglect, or exploitation investigations for one or more months.

- Between March and December 2020, the majority of RCCR inspectors had caseloads within the guidelines (one to 17 tasks assigned), although the proportion of inspectors with caseloads within the guidelines sharply declined from a high of 92% in June 2020 to 58% in December 2020.[23]

- Between March and December 2020, monthly RCCR inspector caseloads ranged from 1 to 29 tasks with 71% of inspectors (76 of 107) having one or more months with a caseload of 18 or more tasks. Fifty-eight percent of inspectors (62 of 107) had at least one month with a caseload of 20 or more tasks. In December 2020, 21 inspectors (25% or 21 of 85) had caseloads with 20 or more tasks assigned, while 12 inspectors (14% or 12 of 85) had caseloads of 13 or fewer.

---

[22]In the First Report, the Monitors found that caseload data provided by DFPS showed that on December 31, 2019, forty-three RCCI investigators and twelve non-investigators and supervisors carried a total of 1,011 cases. Of the 43 investigators, 20 (46.5%) had more than 17 investigations.

[23] By way of comparison, the Monitors' analysis for the First Report indicated that caseload data provided by HHSC showed that on January 1, 2020, 82 RCCR inspectors carried a total of 1,854 cases or "tasks." Of the 82 inspectors, fifty-four (59%) had caseloads above 17 tasks.

23

A. Section V.  Preventing Sexual Abuse and Child Sexual Aggression

**Policy Creation and Training of Staff Responsible for Making Determinations**

**Remedial Order 32:** *Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

- The Monitors' analysis of Child Sexual Abuse ("CSA") training data for staff responsible for making determinations regarding what constitutes child-on-child sexual abuse shows that almost all (95%, or 4,622 of 4,853) have completed training.  The entity with the lowest training completion rate was OCOK, at 86% (31 of 36) of OCOK staff having completed CSA training.  Of those who had not completed CSA training, 19% (43 of 231) of staff responsible for making determinations regarding what constitutes child-on-child sexual abuse did not have a reason for failing to complete the training.  An additional 13 staff who had not completed CSA training reported the reason as leaving the agency, but they left the agency with enough time to complete all training.

**Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression**

**Remedial Order 23:** *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order 24:** *Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order 28:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order 30:** *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

- The number of children flagged with an indicator for sexual abuse or sexual aggression increased by 22% (from 991 to 1,210) between November 30, 2019 and December 31, 2020.  Though a monthly trend analysis shows increases peaked in February 2020 and have declined since then, the peak coincides with the State's launch of the IMPACT enhancements related to sexual victimization and would have been expected to follow this change.

24

- The Monitors' case review showed that 21% of children with a sexual victimization indicator (63 of 304) had a confirmed abuse incident which occurred after entering care, and 48% of children with a sexual aggression indicator (61 of 128) had an aggression incident which occurred after the child entered care.  Of those children whose records indicated a confirmed incident of sexual abuse after entering care, 37% (23 of 63) were abused by another child in their placement.  A case review of substantiated findings of Neglectful Supervision or Sexual Abuse showed that 70% (7 of 10) of cases reviewed showed that sexual victimization was properly documented in the child's electronic case record.

**Caseworker and Caregiver Training and Notification on Child Sexual Abuse**

**Remedial Order 4:** *Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

**Remedial Order 25:** *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

**Remedial Order 26:** *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order 27:** *Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

**Remedial Order 29:** *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order 31:** *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

- The State implemented the child sexual abuse training requirement in Remedial Order 4 by providing a Child Sexual Aggression course and through pre-service training for new caseworkers. State data indicates 98.1% of case-assignable workers between July 1, 2020 and August 31, 2020 had completed the training.

- Regarding caregiver sexual abuse training, the State does not maintain a list of all caregivers serving DFPS children or their training completion date(s), and, therefore, the Monitors cannot validate that all or most caregivers completed the full child sexual abuse training required by Remedial Order 4. The Monitors identified weaknesses in the State's certification technology which allow individuals to print a training completion certification without successfully completing the training.

- The monitoring team found Common Applications that corresponded to placements reviewed by the Monitors containing all known information related to a child's history of sexual abuse in 50% (234 of 465) of the placements reviewed, and containing all information related to a child's history of sexual aggression in 57% (83 of 145) of the placements reviewed.  The rate of finding a Common Application with complete information corresponding to the placement reviewed did not improve over time for children with an indicator for sexual aggression, though it did improve for children with a history of sexual abuse.  DFPS outperformed the SSCCs when the Monitors examined results according to the entity responsible for the child's placement.

- The monitoring team found a Placement Summary and Attachment A that included the complete history for children with an indicator for sexual aggression in 54% of placements (93 of 171) reviewed and found a Placement Summary and Attachment A that included the complete history for children with an indicator for sexual abuse in 40% (226 of 565) of cases. Of those, the Placement Summary and Attachment A were hand-signed by the receiving caregiver on or up to 30 days before the placement in only 30% (171 of 565) of placements reviewed for children with an indicator for sexual abuse, and only 40% (68 of 171) of placements reviewed for children with an indicator for sexual aggression.  The SSCCs outperformed DFPS on this analysis.

**Awake-Night Supervision**

**Remedial Order A7:** *The Defendants shall immediately cease placing PMC children in licensed foster care (LFC) placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour Awake-Night supervision. The continuous 24-hour Awake-Night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

**Remedial Order A8:** *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour Awake-Night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster children, biological children, and adoptive children.*

- Though relatively infrequent, DFPS continues to document instances in which operations fail to comply with the 24-hour Awake-Night supervision requirements of Remedial Orders A7 and A8.  Of the 40 instances in which DFPS identified a violation of the Awake-Night requirement between March and October 2020, it required a corrective action plan in only 17 instances.  Five operations (Autistic Treatment Center, Bluebonnet Youth Ranch, Presbyterian Home, Sheltering Harbor, and Whataburger Center) had more than one non-compliance incident during the period.

B. Section VI.  Regulatory Monitoring and Oversight of Licensed Placements

**Remedial Order 22:** *Effective immediately, RCCL, and any successor entity charged with inspections of child care placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements. During inspections, RCCL, and any successor entity charged with inspections of child care placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of child care placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

- While the Monitors' case record reviews showed that RCCR's Child Care Licensing and Automation Support System ("CLASS") update substantially improved Extended Compliance History Review ("ECHR") completion rates, the quality of the narratives discussing abuse or neglect and corporal punishment findings declined: in ECHRs reviewed between March and August 2020, 32% (43 of 135) did not include a discussion of the abuse or neglect findings and 31% (43 of 139) did not include a discussion of the corporal punishment findings in the narrative, while in ECHRs reviewed between September and October 2020, 38% (85 of 223) did not include a discussion of the abuse or neglect findings and 42% (94 of 222) did not include a discussion of the corporal punishment findings in the narrative. Similarly, though 70% of cases included in the review between September and October 2020 (290 of 409) revealed a pattern or trend in abuse or neglect intakes or substantiated findings or in corporal punishment findings, only half of those ECHRs discussed the pattern or trend in the narrative. The Monitors' case review also revealed a gap in applying the ECHR to foster homes: often the data and the narrative were reflective of the CPA's history and did not consider the history of the foster home that was the focus of an investigation.

**Timeliness of Minimum Standards Investigations**

**Remedial Order 12:** *Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

- HHSC reported two Priority One investigations with intake dates between April 1, 2020 and September 30, 2020. One of those Priority One investigations included first face-to-fact contact with an alleged child victim within 24 hours of intake.

**Remedial Order 13:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

- HHSC reported 406 Priority Two investigations with an intake date between April 1, 2020 and September 30, 2020. Forty-one percent (167) of investigations included first face-to-face contact with an alleged child victim within three days of intake; 26% (106)

27

of investigations did not include face-to-face contacts within three days; and data were not available for 33% (133) of investigations.

- The rate of first face-to-face contact within three days declined from the rate in the Monitors' First Report (59%) due to low rates in the first months of the pandemic.

**Remedial Order 14:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

- HHSC reported 408 Priority One (2) and Priority Two (406) investigations with an intake date between April 1, 2020 and September 30, 2020. During this period, HHSC completed 96% (392) of minimum standards investigations within 30 days of intake.

- HHSC's rate of completing Priority One and Priority Two minimum standards investigations within 30 days was nearly the same as the rate in the Monitors' First Report (95%).

**Remedial Order 15:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

- HHSC reported 1,817 Priority Three, Four, and Five minimum standards investigations with an intake date between April 1, 2020 and September 30, 2020. The priorities of investigations broke down as follows: Priority Three (1,288); Priority Four (10); and Priority Five (519) investigations.
- HHSC completed 98% (1,786) of investigations within 60 days of intake. HHSC's rate of completing Priority Three, Four, and Five minimum standards investigations within 60 days in the Monitors' First Report was 96%.

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

- *(Remedial Order 16 applies to both DFPS and HHSC)* With respect to HHSC, the agency reported 408 Priority One (2) and Priority Two (406) completed investigations with an intake date between April 1, 2020 and September 30, 2020. During this period, in 93% (381) of the investigations, the documentation was completed on the same day the investigation was completed.

- HHSC's rate of completing documentation on the same day the investigation was completed in Priority One and Priority Two investigations was close to the rate in the Monitors' First Report (96%).

28

**Remedial Order 17:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

- HHSC completed 1,817 Priority Three (1,288), Priority Four (10), and Priority Five (519) investigations with intake dates between April 1, 2020 and September 30, 2020. During this period, HHSC completed documentation within 60 days of the intake date in 97% (1,765) of the investigations.

- HHSC's rate of completing documentation on the same day the investigation was completed in Priority Three, Priority Four, and Priority Five investigations was nearly the same as the rate in the Monitors' First Report (96%).

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

- *(Remedial Order 18 applies to both HHSC and DFPS)* With respect to HHSC, the agency reported completion of 408 Priority One (2) and Two (406) minimum standards investigations with intake dates between April 1, 2020 and September 30, 2020. Of those 408 investigations, 93% (380) of investigations included notification to the referent (or referent was anonymous); and notification to the provider within five days of completion of the minimum standards investigation.
- HHSC's reported rate of notifying the referent and provider within five days of completion of Priority One and Priority Two minimum standards investigation was higher than the rate in the Monitors' First Report (77%). Previously, HHSC did not report data indicating which investigations did not require notification to the reporter.

**Remedial Order 19:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

- HHSC reported completion of 1,817 Priority Three (1,288), Priority Four (10), and Priority Five (519) investigations with intake dates between April 1, 2020 and September 30, 2020. Of the 1,817 investigations, 96% (1,753) of investigations included notification to the referent (or no letter to the referent was required); and to the provider within 60 days of intake.

- HHSC's rate (96%) of notifying the referent when required and the provider within 60 days of completion of Priority Three, Priority Four, and Priority Five investigations was higher than the rate in the Monitors' First Report (79%); previously, HHSC did not report data indicating which investigations did not require notification to the reporter.

**Heightened Monitoring**

**Remedial Order 20:** *Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.*

- The State's list of operations to be placed under Heightened Monitoring changed twice after the Monitors validated the list sent on June 5, 2020: First, to add two CPAs and remove seven CPAs after the State corrected a coding error that resulted in a miscount of CPA foster homes; second, nine operations were added after the Monitors raised concerns regarding GROs that were originally slated for Heightened Monitoring, but fell off the list after having "closed," only to reopen under a new name. The Monitors' analysis for this report focused on operations prioritized for Phase One of Heightened Monitoring. Phase One operations had the highest scores on a risk stratification analysis used by the State.

- Between 2016 and 2020, Phase One operations analyzed accounted for 67 substantiated findings of abuse or neglect, and more than 2,000 citations for minimum standards deficiencies. All but one Phase One operation, A Fresh Start,[24] had been placed under some type of enforcement action at least once; some had been the focus of more than one type of enforcement action. A comparison of tasks in the Phase One operations' Heightened Monitoring Plans with those included in previous enforcement actions showed that 31% (22 of 71) of the tasks included in Heightened Monitoring Plans were similar to requirements included in the operations' previous enforcement actions.

- The State's Heightened Monitoring visits to Phase One operations occur on a weekly basis, as required. Thirty-eight percent of Heightened Monitoring visits (33 of 86) conducted by RCCR Heightened Monitoring inspectors between June and December 2020 resulted in a citation of one or more deficiencies; RCCR cited a total of 83 deficiencies in Phase One operations during Heightened Monitoring visits made during that time period. DFPS and RCCR identified one or more allegations of abuse or neglect or other safety or compliance problems in 23% (55 of 244) of visits, including 21 calls by Heightened Monitoring team members to SWI to report allegations identified during the visits. After Phase One operations were placed on Heightened Monitoring, a total of 113 allegations of abuse or neglect were made to SWI about those operations; RCCI opened at least two abuse or neglect investigations in every Phase One operation between June and December 2020.

---

[24] A Fresh Start was placed under a Plan of Action in December 2020, after the operation was placed on Heightened Monitoring.

- A review of requests to approve placement of a child in a Phase One operation subject to Heightened Monitoring showed: they were almost always approved: of the 133 requests provided to the Monitors by the State for the months of June through December 2020, the Associate Commissioner of CPS, CPS Director of Field or a Regional Director approved 131 (99%). However, the Monitors were unable to validate placement approval by either the Associate Commissioner for CPA, or (later) the Regional Director, for the overwhelming majority of PMC children placed in the Phase One operations after they were moved on Heightened Monitoring.  Of the 118 PMC child placements made during that time period, the monitoring team was unable to find approval for 65% (77 of 118) and could not find a placement approval request in the documents provided by the State for 71% (84 of 118) of these placements.

**Revocation of Licenses**

**Remedial Order 21:** *Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.*

- Though RCCR and DFPS appear to be more proactive in addressing safety shortfalls in GROs, their implementation of Remedial Order 20 continues to fall short for agency homes.  Since the last update to the Court related to congregate care facility closures, another eight GROs with troubled child safety and compliance histories have closed. Of those, RCCR acted on the facility's license in six, either denying a final license (2) or issuing an "intent to revoke" (4), and DFPS terminated its contract with two. The remaining GRO (Whataburger Center) relinquished its license.  However, between May 2020 and March 16, 2021, RCCR staff recommended closure for only five agency foster homes across Texas, and of those had only approved closure for three.

*Child Fatalities*

After learning through the Monitors of the death of a child in the PMC General Class, the Court Ordered on February 21, 2020: *Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

- In less than 21 months since the Fifth Circuit issued the mandate in this matter (July 31, 2019 – April 10, 2021), 23 PMC children have died in State custody. These fatalities include six children whose caregivers were determined to have abused or neglected them in connection with their deaths or their care prior to their deaths. In addition, a seventh child fatality is strongly suspicious for caregiver abuse. A DFPS investigation is underway in that case and five additional child fatalities. Of the six cases involving confirmed abuse

31

or neglect and a seventh case strongly suspicious for abuse, SSCCs were involved with five of the seven children. State records indicate SSCCs directly managed care for four of the children; DFPS directly managed care for two children; and in the case of one child, C.G., whose death is discussed in the Monitors' First Report, an SSCC was responsible for placement, while DFPS was responsible for case management.

**Scope and Methodology of the Monitors' Work**

To prepare this report, the Monitors conferred in person, by phone and by video-conference numerous times, separately, with the parties and their counsel from issuance of the mandate through April 14, 2021. On October 9, 2020, the Monitors provided DFPS and HHSC a detailed chart identifying reporting period deadlines by which the State could submit data and information for the Monitors to assess performance for each remedial order in this report, taking into account the time required by the monitoring team to analyze and validate the information, which varies by remedial order.[25] Wherever possible, the Monitors included validated data and information in this report beyond the deadlines in order to give DFPS and HHSC the benefit of additional time to demonstrate compliance to the Court, and to provide the Court with the most current, validated data and information available.

To assess compliance with multiple remedial orders, the monitoring team analyzed 1,667 Awake-Night certifications for operations licensed by HHSC and under contract with DFPS to serve PMC children.

The Monitors assessed the caseloads of 1,495 caseworkers, 106 RCCI investigators and supervisors and 138 RCCR inspectors and supervisors. To validate the accuracy of the State's data with respect to workloads and graduated caseloads, the monitoring team interviewed 200 of 1,482 caseworkers who were assigned at least one PMC child, 28 RCCI investigators and supervisors and 42 RCCR inspectors and supervisors. The monitoring team also analyzed 742 caseworkers' CPS Professional Development ("CPD") training records and 4,853 Child Sexual Abuse ("CSA") training records for CVS supervisors, program directors, program administrators, investigative staff, and other non-CVS staff.

The monitoring team analyzed data from DFPS's Statewide Intake ("SWI") related to 533,471 calls placed to SWI from February 1, 2020 to November 30, 2020 and conducted an announced site visit to SWI facilitated by DFPS. The monitoring team undertook an independent assessment of the appropriateness of the State's screening decisions with respect to 1,228 referrals to SWI between January 2020 and November 2020. As part of this assessment of the 1,228 referrals, the monitoring team listened to recordings of the original referral calls in all instances when the report was made by phone.

In addition, the Monitors examined the State's compliance with multiple remedial orders by examining the timeliness for all 657 RCCI child abuse, neglect or exploitation investigations

---

[25] Email from Kevin Ryan, Monitor, to Audrey Carmical, Attorney Commissioner for Compliance, Coordination, and Strategy, DFPS, Assistant Attorney General, *et* al. (October 9, 2020) (with attachment).

opened between May 1, 2020 and September 30, 2020 involving a PMC child. The monitoring team also reviewed records for 736 of 2,142 placements of PMC children and assessed the contents of the Placement Summary Form and Common Application.[26]

The monitoring team examined 402 of 768 investigations completed by RCCI between May 1, 2020 and October 31, 2020 into alleged maltreatment of PMC children and youth while they were in DFPS custody and assessed the appropriateness of RCCI's investigations and outcomes. The monitoring team also reviewed 815 intakes which SWI assigned for a Priority One or Priority Two RCCI investigation between April 1, 2020 and October 31, 2020, to assess the timeliness of DFPS's notification to the child's caseworker.  In addition, the monitoring team reviewed electronic records for 947 inspections for Extended Compliance History Reviews.

Due to the pandemic, the Monitors limited visits to GROs from April 2020 to April 2021. During an unannounced daytime visit to one GRO, the monitoring team interviewed one program administrator, one treatment director, one clinical staff, as well as 24 caregivers (including six Awake Night staff). The monitoring team interviewed nine PMC children selected by the Monitors during this site visit. During this visit, the monitoring team examined 17 PMC children's files and 55 caregiver records.

---

[26] 126 of the 736 placements were in a kinship or adoptive home which does not require a Common Application. The monitoring team reviewed the Common Application in the remaining 610 placements.

## II. DEMOGRAPHICS OF CHILDREN IN PMC CARE

According to DFPS data, there were 9,820 children in PMC status as of December 31, 2020,[27] a decrease of about 1,100 children since November 30, 2019.[28] Between March 1, 2020 and December 31, 2020, 4,056 children entered PMC and 6,039 exited PMC. Therefore, DFPS cared for 16,203 PMC children between March 1, 2020 and December 31, 2020.

### A. Age, Gender, and Race

As of December 31, 2020, 36% of children with PMC status were age zero to six years old (3,518); 23% were seven to eleven years old (2,263); and 41% were twelve to seventeen years old (4,039).

---

[27] The point in time analyses in this section are based on DFPS data production of children in Permanent Managing Conservatorship (PMC) during December 2020. The number of entries to PMC, exits from PMC, and PMC children served are based on information from DFPS data production of children in PMC during Quarter 3 FY 2020, Quarter 4 FY 2020, September 2020, October 2020, and November 2020 in addition to data from December 2020.
DFPS, *RO.Inj - List of Children in PMC Q3 FY 20 - July 15-20 - 97961* (July. 16, 2020) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC Q4 FY 20 - sept 30-20 - 99712* (Oct. 8, 2020) (on file with the Monitors); DFPS., *RO.Inj - List of Children in PMC Sept 20 - 11-2-20 - 100568* (Nov. 3, 2020) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC Oct 20 - 11-30-20 - 100738* (Dec. 2, 2020) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC Nov 20 - 1-4-21- 100950* (Jan. 8, 2021) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC Dec 20 - 2-1-21- 101237* (Feb. 2, 2021) (on file with the Monitors).
[28] *See* Deborah Fowler and Kevin Ryan, First Report 43, ECF No. 86.

34

**Figure 2.1: Age of Children in PMC on December 31, 2020**



The population is almost evenly split between genders—47% of children were female and 53% were male.

The race of children in PMC status breaks down as follows: 27% (2,664) of children in PMC on December 31, 2020 were White; 25% (2,486) were Black/African American; less than 1% (24) were Native American; less than 1% (22) were Asian; and 6% (562) were categorized as "Other." Additionally, 41% (4,062) of children in PMC on December 31, 2020 were of Hispanic ethnicity. Non-Hispanic Black/African American children in PMC status appear to be disproportionately represented compared to the racial category estimates for Texas' population of all children ages 0 to 17 years.[29]

---

[29] *See* the University of Texas at San Antonio Population Estimates and Projections Program, Texas Demographic Center, (November 2020) available at https://demographics.texas.gov/data/tpepp/estimates/. The most recently available data is from July 1, 2019. *Id.*

Table 2.1: Race for Children in PMC on December 31, 2020 and Estimates of Total Population
in Texas by Race for Children ages 0 to 17 years, July 1, 2019[30,31]

| Race | Children in PMC on December 31, 2020 | | Estimates of Total Population in Texas by Race for Children ages 0 to 17 years | |
|---|---|---|---|---|
| | Frequency | Percent | Frequency | Percent |
| Non-Hispanic White | 2,664 | 27% | 2,291,470 | 31% |
| Non-Hispanic Black/African American | 2,486 | 25% | 864,794 | 12% |
| Non-Hispanic Other | 562 | 6% | 266,754 | 4% |
| Non-Hispanic Native American | 24 | 0.2% | 0 | 0% |
| Non-Hispanic Asian | 22 | 0.2% | 316,786 | 4% |
| Hispanic (of any race) | 4,062 | 41% | 3,629,684 | 49% |
| **Total** | **9,820** | **100%** | **7,369,488** | **100%** |

## B. Living Arrangements and Length of Time in Care

Based upon information provided by DFPS, 79% (7,789) of children in PMC on December 31, 2020 lived in family settings, including 24% (2,383) living with relatives or fictive kin and 4% (406) living in adoptive homes; and 16% (1,531) of children in PMC lived in congregate care.[32] Of the children in PMC on December 31, 2020, 39% (3,805) were in care for one to two years; 25% (2,502) were in care for two to three years; 31% (3,069) were in care for more than three years; and 4% (418) were in care for less than one year. Additionally, for 26 children (less than 1%) the data did not include removal dates, thus the Monitors were unable to calculate their length of time in care.

---

[30] *See* the University of Texas at San Antonio Population Estimates and Projections Program, the Texas Demographic Center, (November 2020) [https://demographics.texas.gov/data/tpepp/estimates/]

[31] The format of the DFPS data received by the Monitors does not provide the ability to identify the racial categories for any child of Hispanic ethnicity.

[32] The living arrangement categories are based on information provided by DFPS to the Monitors on April 17, 2020, DFPS., *Living Arrangement Categories* (Apr. 17, 2020) (on file with the Monitors).

**Figure 2.2: Living Arrangements for Children in PMC on December 31, 2020[33]**



Source: List of Children in PMC Dec 2020
*n=9,820*

Adoptive Home
4%
406

Other
5%
500

Foster Home
51%
5000

Congregate
Care
16%
1531

Relative/Fictive
Kin
24%
2383

---

[33] The "Other" living arrangement category groups together the "Other" (3%), "Runaway" (1%), "Incarcerated" (<1%), "Own-home/Non-Custodial Care" (<1%), and "Independent Living" (<1%) living arrangement types.

**Figure 2.3: Length of Stay in Care of Children in PMC on December 31, 2020**
Source: List of Children in PMC December 20
*n=9,820*



Children exited from PMC status through adoption; reunification with family; having custody transferred to relatives; or by aging out of care. Of the 6,039 children who exited from PMC between March 1, 2020 and December 31, 2020, the most frequent reason for exit was adoption, with more adoptions by non-relatives (2,101) compared to relatives (1,974). The breakdown is as follows: 67% (4,075) of children were adopted; 16% (945) of children had custody transferred to a relative; and 13% (804) of children who exited were emancipated—or aged out—of foster care. Finally, a small number (181 or 3%) were reunified with their families or had other outcomes (34 or 1%).

**Table 2.2: Exits from PMC by Exit Outcome, March 1, 2020 to December 31, 2020**

| Exit Outcome | Frequency | Percent |
|---|---|---|
| Adoption | 4,075 | 67% |
| Custody to Relative | 945 | 16% |
| Emancipation | 804 | 13% |
| Reunification | 181 | 3% |
| Other | 34 | 1% |
| **Total** | **6,039** | **100%** |

38

## C.     Level of Care

More than half (5,796 or 59%) of children in PMC status on December 31, 2020 were in a basic authorized level of care. For the remaining 4,024 PMC children, 1,612 (16%) were in a specialized level of care; 1,438 (15%) were in a moderate level of care; and 386 (4%) were in an intense level of care. The data include 527 PMC children with no recorded authorized level of care.[34]

**Table 2.3: Authorized Level of Care for Children in PMC as of December 31, 2020**

| Authorized Level of Care | Frequency | Percent |
|---|---|---|
| Basic | 5,796 | 59% |
| Specialized | 1,612 | 16% |
| Moderate | 1,438 | 15% |
| No Authorized Level of Care Recorded | 527 | 5% |
| Intense | 386 | 4% |
| (TFC) Treatment Foster Care | 46 | 0.5% |
| Psychiatric Transition | 10 | 0.1% |
| Intense Plus | 5 | 0.1% |
| **Total** | **9,820** | **100%** |

## D.     Geographic Location

The county of removal for 40% (3,968) of children with PMC status on December 31, 2020 was one of five Texas counties: Bexar, Harris, Dallas, Tarrant, and McLennan.

**Table 2.4: Top 5 Counties of Removal for Children in PMC on December 31, 2020[35]**

| County Name | Frequency | Percent |
|---|---|---|
| Bexar | 1,183 | 12% |
| Harris | 1,121 | 11% |
| Dallas | 859 | 9% |
| Tarrant | 519 | 5% |
| McLennan | 286 | 3% |

## E.     Single Source Continuum Contractor Presence and Placement Oversight

As of December 31, 2021, 32% (3,168) of children in PMC status were living in regions where Single Source Continuum Contractors (SSCCs) are in the first two stages of implementation.

---

[34] The Monitors found that for most of those children lacking identification of an authorized level of care (486), the placement type in the data was identified as "kin only (non-licensed)."
[35] These are the counties with jurisdiction over the child's removal case. DFPS describes these counties as the "legal" counties in the corresponding IMPACT data.

**Table 2.5: PMC Children From Regions with Single Source Continuum Contractor Presence on December 31, 2020[36]**

| Regions | PMC Children | Percent |
|---------|-------------|---------|
| SSCC Regions | 3,168 | 32% |
| DFPS Regions | 6,652 | 68% |
| All Regions | 9,820 | 100% |

As shown in the table below, Bexar County (Region 8a), where Family Tapestry is charged with placement identification, has the greatest number of children residing in a region with SSCC placement oversight.

**Table 2.6: PMC Children From Regions with Single Source Continuum Contractor Presence by Region on December 31, 2020[37]**

| SSCC Name | Legal Region | PMC Children | Percent |
|-----------|-------------|-------------|---------|
| Saint Francis Ministries | 1 | 663 | 21% |
| 2Ingage | 2 | 437 | 14% |
| Our Community of Kids (OCOK) | 3b | 885 | 28% |
| Family Tapestry | 8a | 1,183 | 37% |
| **Total** | | **3,168** | **100%** |

---

[36] *Id.*
[37] *Id.*

### III. OVERVIEW OF STATE DATA AND DATA SYSTEMS CHALLENGES

The Monitors faced many challenges related to the State's reported data and its data recording systems. This section describes these challenges, their potential impact on children and staff, and on the State's performance associated with the Court's remedial orders.

As discussed in the Monitors' First Report,[38] deficiencies in the data systems used by DFPS and HHSC prevent the agencies from having access to aggregate real-time data and information critical to child safety, including certain children's placements; staff training; the timeliness of child abuse or neglect investigations; and caregiver training for sexual abuse, among other areas. These gaps add extensively to the time and staffing required by the monitoring team to validate the agencies' performance under these remedial orders. DFPS and HHSC have addressed some issues mentioned in the First Report that inhibited performance and/or reporting associated with the remedial orders, but other challenges remain. This section includes a discussion of the persisting issues from the last reporting period in condensed form and raises new challenges.

### A.     Fragmented Data Systems

DFPS and HHSC share responsibility for the safety of children who are in the care of the State's child welfare system through a variety of connected processes, including abuse, neglect, or exploitation investigations and regulation of licensed facilities which are the subject of several remedial orders. The agencies, however, use different data systems to track investigations and related information about both children in care and childrens' caregivers. DFPS uses a case management system called the Information Management for Protection of Adult & Children in Texas system, ("IMPACT"), as well as a records management system called the Child Care Licensing and Automation Support System, ("CLASS"); HHSC uses CLASS only. Responsibility for investigating alleged maltreatment in care or risk of harm to children alternates between agencies depending in part on the nature of the allegations and underlying facts.[39]

The IMPACT and CLASS systems were designed separately and serve different purposes. The data systems reflect differences in policies, procedures, and practices related to child maltreatment investigations conducted by DFPS and inspections and minimum standards investigations conducted by HHSC, even though both systems involve tracking or recording critical child safety interests. As a result, the identifiers and variable names in each data system are distinct.[40] RCCI investigators, who work for DFPS, are required to move back and forth between both systems to complete and enter tasks associated with child maltreatment

---

[38] *See* Deborah Fowler and Kevin Ryan, First Report 43, ECF No. 869.
[39] *Id.* At 48 (discussion of the agencies' divided responsibilities for investigating potential child maltreatment in care or risk of harm to children).
[40] In CLASS, for example, the field that indicates the calendar day an investigator finished each required part of an investigation is called Date Investigation Completed. In IMPACT, the same status is recorded in a variable called Date Approval Submitted to Supervisor. CLASS records the closing date of an investigation as Date Case Closed while in IMPACT the same status is recorded as the Date Supervisor Approved.

investigations, and at times are required to enter the same data twice.[41] This fragmentation of data collection and reporting across the two systems consumes limited investigator time and makes it more difficult to track investigation histories about children and facilities.

The Monitors' First Report raised several issues that data fragmentation causes. The issues detailed below continue to inhibit DFPS's and HHSC's performance and reporting in compliance with the remedial orders and increase the complexity of the monitoring team's work, requiring additional time and expense:

- Remedial Order 1 requires the State to ensure the implementation of the CPS Professional Development ("CPD") training model, which requires all caseworkers to complete CPD training prior to becoming eligible for case assignment. At present, DFPS is unable to provide actual training completion dates. An assigned training cohort start date and an anticipated training completion date are provided by DFPS after it performs a data match with the Center for Learning and Organizational Excellence (CLOE), the DFPS training division, which compiles the data from electronic and hard copy (paper) records.[42] DFPS instead uses the "case assignable" date, provided under Remedial Order 2, is used by DFPS as a proxy for training completion. Training cohort end dates are also estimated for the SSCCs, which provide training information independently. For one of the SSCCs, OCOK, training dates provided to the Monitors were those dates associated with their Permanency Academy, not the full training time period required by Remedial Order 1. OCOK was unable to provide actual case assignable dates in time for monitoring team validation, despite repeated requests, making the verification of training completion impossible.

- Remedial Order 2 requires statewide implementation of graduated caseloads for newly hired caseworkers. To produce a list of staff subject to the graduated caseloads policy requires DFPS to conduct a match between CLOE, the DFPS training division, and Data and Decision Support (DDS).  DFPS analytic staff conducted this match for the Monitors; this analysis was not routinely produced for DFPS leadership to facilitate monitoring of its graduated caseloads policy or the State's performance associated with the Court's remedial order. Moreover, each SSCC tracks its own new caseworkers and the case-assignable dates independent of DFPS, creating additional challenges. The Monitors' experience with validating this data suggests that DFPS was not accurately tracking the SSCCs' performance associated with Remedial Order 2.[43]

---

[41] For example, the business flow process described by DFPS is as follows for child protective investigations:

> [A]n intake is documented in IMPACT.  When all needed action in the intake has been taken, it is closed and, if a decision is to pursue an investigation, an investigation stage is opened. When all essential investigative tasks are completed, the investigation is documented as complete in CLASS and IMPACT. After the investigation is completed in CLASS, it is submitted to the supervisor in IMPACT. After the supervisor reviews and approves, the investigation stage is closed.

DFPS, *Response to Monitors' Questions related to Remedial Order 3 Data* (Feb. 3, 2020) (on file with the Monitors).
[42] DFPS, *RO1.1 CPD Completion as of September 30, 2019 to November 15, 2019* (Jan. 15, 2020) (amended by CLOE) (on file with the Monitors).
[43] *See infra* Section IV. B.

- Remedial Order 3 requires DFPS to "ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs." Tracking alleged perpetrators and child victims between systems takes considerable time to learn and complete in the current system constructs, hindering efforts to ensure child safety. Even when not confirmed, multiple reports of child maltreatment involving an alleged perpetrator at a CPA or a GRO may indicate unreasonable risk of serious harm and predict future substantiated reports and, therefore, if readily available DFPS could use the information to identify the need for intervention. In addition, children who are the subject of multiple reports may have special needs that are not being addressed, medical issues that are not being treated, or other personal traits that increase risk of harm.

- Remedial Order 3 also requires the Monitors to "periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs." Because HHSC's CLASS system cannot distinguish children in PMC status from other children, validating the agencies' compliance takes extensive efforts. To identify referrals from HHSC in which a PMC child was an alleged victim of abuse, neglect or exploitation requires first locating children's names in IMPACT and then shifting between the IMPACT and CLASS systems after locating child identifiers in IMPACT for use in searches. Similarly, because of the bifurcated system used to process and store data associated with referrals to SWI, the State is unable to provide to the Monitors a unified dataset of all referrals of abuse or neglect in which a PMC child is the subject. Instead, both agencies provide separate listings of child maltreatment allegations depending on how SWI screened the original intake.

- Remedial Order 4 requires all caregivers to be trained to recognize and report the sexual abuse of children. As discussed in the Monitors' First Report, DFPS does not have a system that tracks this training in the aggregate for caregivers.[44] For the second report, DFPS provided 1,041 files pertaining to caregiver training. The Monitors determined that the large number and non-standardized format of the files did not allow for verification of the caregiver portion of Remedial Order 4. Moreover, during the last reporting period, DFPS notified the Monitors that it was currently evaluating the feasibility of providing this training to caregivers through the external Learning Management System, which would streamline and largely automate training completion reports. DFPS noted in March 2020

---

[44] Email from Tara Olah, Dir. of Implementation & Strategy, DFPS. to Kevin Ryan and Deborah Fowler, (Mar. 24, 2020) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request). For discussion of DFPS's challenges reporting on training of caregivers, *see infra* Section V (discussing the incomplete reporting by DFPS of caregiver sex abuse training).

that taking this approach may require additional funding and other resources.[45] More recently, in March 2021, DFPS has indicated that it is implementing a more centralized process for recording caregiver training completion.[46]

- Remedial Order 4 also requires all caseworkers to be trained to recognize and report the sexual abuse of children. The Monitors encountered several issues with the caseworker training data that complicated verification of Remedial Order 4. The initial caseworker training data provided by DFPS contained an *Employee ID* from the training database, while the caseload data from DFPS contained the *Person ID* from IMPACT. The monitoring team requires a common identifier to match the caseworker data with the training data. As a result, the Monitors made an additional data request that included both the employee IDs and person IDs.

- Remedial Orders 12 to 19 set forth various requirements for HHSC investigations. HHSC, however, is unable to disaggregate CLASS data on referrals and investigations to identify those that pertain to PMC children only.[47] Thus, the monitoring team examined the data for *all* the HHSC investigations during the period from April 1, 2020 to September 30, 2020 associated with Remedial Orders 12 to 19.[48]

- Remedial Order 18 requires the Defendants, in part, mail notification letters to provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation. During the monitored period, both DFPS and HHSC mailed letters to providers. The Monitors were provided with three data sources regarding letters to providers. DFPS and HHSC use different dates within their different systems to determine closure of an abuse and neglect investigation. DFPS requested that the CLASS closure date not be used to calculate compliance with the Remedial Orders associated with RCCI investigations. DFPS instead requested the Monitors use the date of supervisor approval in IMPACT to calculate compliance with the Remedial Order.[49] The Monitors assumed when DFPS made the request that it had conferred with HHSC, but the Monitors learned on April 30, 2021 that HHSC instead wants

---

[45] Deborah Fowler and Kevin Ryan, First Report 53, ECF No..869. (citing an email from Tara Olah, Dir. of Implementation & Strategy, DFPS, to Kevin Ryan and Deborah Fowler, (Mar. 24, 2020) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request)).

[46] Email from Corliss Lawson, Associate Commissioner of Compliance, DFPS, to Kevin Ryan and Deborah Fowler, (March 25, 2021) (on file with the Monitors) (notifying the Monitors that DFPS is in process of adding an online form to create a database related to training completion that will be functional by April 12, 2021).

[47] For a complete discussion of the HHSC response regarding this information, *see* Section III of the Monitors' First Report (discussing screening, intake, and investigation of maltreatment in care allegations) Deborah Fowler and Kevin Ryan, *First Court Monitors' Report 2020*, at 50, ECF No. 869.

[48] *See* HHSC, *Data Response Chart* (Dec. 5, 2019) (on file with the Monitors) (stating that HHSC "is operations-centric not child-centric" and as a result cannot provide PMC identifiers of children involved in HHSC referrals); Email from Corey Kintzer, Assoc. Dir. of Litig. Dep't, Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler (Mar. 24, 2020) (on file with the Monitors) (including HHSC Response to Monitors' Feb. 21, 2020 Data and Information Request and stating that HHSC cannot provide investigation information specific to PMC children).

[49] Email from Heather Bugg, Dir. of Project Management, to Kevin Ryan and Deborah Fowler, Monitors (Jan. 4, 2021).

the Monitors to use a different date to mark case completion and measure compliance, rather than the date requested by DFPS.[50]

- Remedial Order 20 requires DFPS to identify, track and address concerns at facilities that show a pattern of contract or policy violations and implement heightened monitoring that subjects them to more frequent inspections, corrective, and remedial actions. The data as provided by DFPS and HHSC make it difficult to match and connect the records of facilities—both family foster care homes and residential facilities—and thus, challenging to identify patterns of child maltreatment, and contract and policy violations as required by Remedial Order 20. For example, first, matching data across CPAs and GROs is challenging because CLASS generates an operation number and a contract number, while IMPACT generates a resource ID and none of these numbers match across the two systems. Next, within IMPACT, the most common identifier is the resource ID; however, the Resource ID it is referenced by different names in different tables within the application.[51] Third, some organizations are licensed to run multiple types of facilities (*e.g.,* a residential treatment center and an emergency shelter), or do business as "DBA" under another name. Therefore, two names may represent the same facility entered differently or it may represent two different facilities operated by the same organization."[52] Finally, some facilities provide multiple levels of care and as a result, they have two or more resource identifications associated with a single location and a single operation number.

- Remedial Orders A7 and A8 require continuous 24-hour Awake-Night supervision for children in certain settings. An additional data problem affecting child safety surfaced through the monitoring team's review of DFPS's awake-night certifications, described in this report.[53] In 41 certifications reviewed by the Monitors, DFPS staff noted the census sheet that DFPS brought to a facility visit did not accurately reflect the children who were currently residing in the facility. In some instances, children were on the DFPS list, but were not present at the placement. In others, PMC children resided in the placement but were not on the list that DFPS was using to monitor the awake night supervision.

## B.    Limited Functionality

Efforts to report on performance associated with the remedial orders are hindered by limited functionality within IMPACT and CLASS. The examples below demonstrate the limits of the State's child welfare data systems. As noted below, the State added or indicated it will add enhancements to be able to report on and comply with the remedial orders.

---

[50] Email from Nathaniel Danko, Asst Atty General to Deborah Fowler and Kevin Ryan, Monitors (April 30, 2021) with attachment.
[51] DFPS, *DFPS HHSC Operation ID Cross-walk* (May 21, 2020) (on file with the Monitors).
[52] DFPS, *Response to Monitors' Questions related to Remedial Order 3 Data* (Feb. 3, 2020) (on file with the Monitors).
[53] *Infra* Section IV.

In addition, the monitoring team spent considerable effort managing data regarding PMC children without placement (described by the State as "CWOP") because neither IMPACT nor CLASS track this information for the provision of an aggregate report. Instead, DFPS sends lists of children without placement and accompanying information to the Monitors in weekly emails. These emails are compilations of daily reports sent to a DFPS central office each day in the prior week. To analyze and report on this data, the monitoring team enters the information from the emails into an Excel spreadsheet and manually logs each weekly email. The DFPS data on children without placement in 2020 excluded some of the PMC children whose placements were managed by the SSSCs, which DFPS reported it discovered in February 2021, forcing the agency to attempt to retroactively create a portion the information with the SSCCs. DFPS began to report the information to the Monitors in February 2021 and made subsequent, retroactive modifications to the information in March 2021.

Obstacles remain for accurate reporting related to the placements of all PMC children in the class. Updates or changes to a child's placement end or exit dates frequently lag, contributing to differences in the number of children in care between the placement data report and the children in care data.[54] Moreover, children whose placement exits are entered into IMPACT in the month following the actual placement end have continued to appear in that placement in data, making validation very difficult. For children whose final PMC placement exits are entered in this way, the final placement remains open (in error) until their 18th birthday.

- Remedial Orders 2 and 35 require DFPS to report on the caseloads of workers carrying one or more PMC cases. DFPS continues to report that the minimum time in which DFPS can produce aggregate reports on caseloads is 30 days from the last day of the month that is being monitored. This discrepancy occurs because DFPS uploads data to the State's data warehouse once a month with a month lag between the end date of the month and the upload of the data.[55]

- DFPS shifted its policy defining the initiation of an investigation three times between May 1, 2020 and January 31, 2021.[56] For investigations initiated from May 1, 2020 through August 31, 2020, the DFPS policy in effect required initiation to occur through face-to-face contact with all alleged victims. In September 2020, the policy in effect at the time required initiation to occur through face-to-face contact with an alleged victim, an adult involved in the allegation, or contact with a collateral source. The change in policy required the Monitors to assess these two time periods separately for Remedial Orders 5 and 6, using different methodologies and data points for each. This change presented challenges in evaluating the data and providing a consistent assessment of timeliness across the reporting period. In December 2020, DFPS again changed its initiation policy to require face-to-face

---

[54] Email from Jane Burstain, Chief Data and Analytics Officer, DFPS, to Nancy Arrigona, Monitoring Team (December 16, 2020) (including response to questions about the data in the Children in PMC and PMC placements files).

[55] Email from Tara Olah, Dir. of Project Management, DFPS to Kevin Ryan and Deborah Fowler, Monitors (Mar. 24, 2020) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[56] *See infra* Section III. B.

contact with one alleged victim or through an attempted contact with the victim.[57]   In January 2021, DFPS changed the policy again, and required initiation to occur through face-to-face contact with all alleged victims.

- Remedial Order 11 requires DFPS to track and report all child abuse and neglect investigations involving children in the PMC class that are not completed on time, as well as any approved extensions on investigation reports. For approved extensions, DFPS reported the agency cannot provide the Monitors with details about extensions along with the list of investigations because each investigation can have multiple extensions and different timeframes and reasons for each.[58] As a result, DFPS provided the list of extensions to the Monitors on a separate spreadsheet tab and provided the investigation stage ID on both tabs so the Monitors could cross-match the two tabs. While these data allowed the Monitors to assess the extensions, it is unclear whether DFPS can track in real time multiple extensions for good cause in the aggregate to allow for the ongoing management of compliance with Remedial Orders 10 and 11, including the updating of due dates and timely completion of investigations. The Monitors will continue to evaluate DFPS's ability to do so.

- Remedial Orders 12 and 13 address the timeliness of initiation of HHSC investigations. HHSC remains unable to provide through CLASS the first face-to-face contact for all alleged victims. The Monitors found, moreover, that the data field provided by HHSC for the first face-to-face contact with an alleged child victim in a Priority One investigation was unavailable for one of the two investigations. Therefore, the Monitors were unable to determine whether it is blank because it did not occur for a valid reason, whether it is due to data issues, or some other reason, without conducting a case record review in CLASS to assess.

- Remedial Order 13 could not be assessed with full accuracy, as HHSC was not able to provide timestamps for the "face-to-face contact with victim date" for alleged victims in Priority Two investigations. The Monitors therefore used calendar days rather than hours to assess whether investigations were initiated within 72-hours. In addition, timestamp data were not available for contacts with one third of the alleged victims in Priority Two investigations. Starting in November 2020, HHSC updated its policies and began submitting data reports based upon case record reviews by HHSC staff which the Monitors will assess in the next reporting period.[59]

---

[57] *See* DFPS., Child Care Inv. Handbook §6411-6413 (in effect December 1, 2020); *see also*, Email from Heather Bugg, Dir. Of Project Management, Foster Care Litigation and Compliance, DFPS, to Kevin Ryan and Deborah Fowler (Dec. 1, 2020) (on file with the Monitors).

[58] Deborah Fowler and Kevin Ryan, First Court Monitors' Report 2020 at 53, ECF No.. 869 (discussing the email from Tara Olah to Kevin Ryan and Deborah Fowler (Mar. 24, 2020,) (on file with the Monitors) (including DFPS response to Monitors' Feb. 21, 2020 Data & Information Request).

[59] [*See Infra* reference to Section on ROs 12-19].

- Remedial Order 20 requires the State to identify, track, and address concerns at facilities that show a pattern of child maltreatment and contract or policy violations. It also requires that when DFPS determines that facilities show a pattern of contract or policy violations, they are subject to heightened monitoring. The State's data and data systems make the identification of patterns and the examination of heightened monitoring time-consuming and challenging. For instance:

     The State provides the Monitors with contract monitoring reports for all operations monitored in the year. However, these reports are PDF documents that do not include quantifiable data. The State has indicated that non-compliance data contained in these reports must be "translated" into quantifiable data in the State's System of Contract Operation and Reporting (SCOR) system in order to determine the contract categories and number of records out of compliance for pattern analysis. Furthermore, contract monitoring conducted by the SSCCs and provided to the State in multiple report formats must also be translated to correspond to scoring consistent with the in the SCOR system.[60]

Organizations operating a facility may, and did, choose to change location or facility name, resulting in a new contract with the State and a new resource and operation number for the facility. These associated facilities are not automatically linked in the CLASS system, so historical maltreatment, and contract and policy violations are effectively lost. In some instances, the Monitors discovered that the State did not initially include facilities meeting criteria for heightened monitoring pursuant to Remedial Order 20 were not initially included because the original name and contract were no longer active and the new name, operated by the same controlling person(s), did not have a history of maltreatment or violations. In one instance, for example, an organization that would have been subject to heightened monitoring closed and reopened in the same location with the same children in care under the same controlling person but with a different organizational name. The State did not identify the organization subject to Heightened Monitoring until the Monitors discovered the change and raised the issue.

Documentation to verify heightened monitoring visits, communication, compliance, and processes are provided to the Monitors monthly in PDF files which must be compiled, scanned, and uploaded by the State. Documentation is often incomplete.  Functionality in the CLASS system currently only allows for monitoring visits conducted by RCCR inspectors to be entered into the system.  All visits made by heightened monitoring team members other than RCCR inspectors, all Facility Intervention Team Staffing ("FITS") meetings, evaluation, and analysis reports, and all other heightened monitoring communications may be documented in facility chronology entries. In order to examine compliance with heightened monitoring requirements, the Monitors must review PDF files as well as monitoring and chronology information found in CLASS.

---

[60] Discussed during a virtual meeting between the State and Monitors concerning heightened monitoring and pattern analysis data, March 5, 2021.

Review of facility progress under heightened monitoring requires access to all deficiencies cited by the State's heightened monitoring team. In order to identify deficiencies related to heightened monitoring, the Monitors must match the deficiencies and inspection data provided by the State. However, the State did not provide to the Monitors an indicator identifying an inspection was related to heightened monitoring until December 30, 2020 in the data file for inspections conducted during the month of November 2020. A note for the newly added heightened monitoring inspection variable in this file indicated that "some of the data in this field is manually entered since heightened monitoring functionality is not yet in CLASS." [61]

- Remedial Order 35 requires that caseworker assignments conform to the caseload standard of 14 to 17 children. In reviewing and validating caseload data, the monitoring team observed that some SSCC staff carried large numbers of secondary case assignments. At 2INgage, two staff members carried 55 and 57 secondary case assignments respectively, while at OCOK one staff member had 307 secondary assignments. In separate meetings with the Monitors, both SSCCs reported that the high case assignments were the result of limitations in their data systems and that the staff were not responsible for any secondary assignment work.[62] The Monitors will conduct field interviews with SSCC staff to validate the SSCCs' caseload data and report results in the next report to the Court.

- Remedial Order B4 requires the State to establish internal guidelines for caseload ranges, which allow inspectors and investigators to safely manage their workloads. DFPS is able to provide the number of RCCI investigations assigned but the minimum time in which DFPS can produce aggregate reports on caseloads is 30 days from the last day of the month that is being monitored. Data produced include RCCI investigations that have been assigned to investigators who do not report through the RCCI chain of command.[63] To ensure RCCI investigations assigned to these staff are counted, DFPS reports that it designates certain RCCI staff as the primary investigator even though they are not acting in that capacity. Caseload analysis, therefore, may not accurately reflect investigator workloads because of limitations to tracking investigations in IMPACT.[64]

There are other limitations to the State's data systems. The systems do not have a method to distinguish between missing data and data that are not applicable. This system defect causes challenges in interpreting blank cells within reports. The list of placement types and living arrangements provided by DFPS is complex and contains many categories that are not fully defined, making it challenging to analyze and report characteristics of PMC children for validation of remedial order compliance that requires placement type information. The race and Hispanic ethnicity data are reported in the same field, which means there are no available data concerning the race of children identified as Hispanic.

---

[61] Data file "RO.20, 2 11,1, 2020-11.30.2020 Lic. Inspections 12.30.2020" uploaded to SharePoint by HHSC.

[62] SSSCs explained these issues in telephone meetings with monitoring team members on January 15, 2021.

[63] Email from Nancy Arrigona to Jane Burstain (Apr. 14, 2020) (on file with the Monitors) (including questions to DFPS concerning RCCI Investigator caseload data).

[64] Email from Jane Burstain to Deborah Fowler (Apr. 24, 2020) (on file with the Monitors) (including DFPS response to questions sent by the Monitoring Team on Apr. 14, 2020).

While the State enhanced IMPACT's functionality with a goal toward prospective improvements in information tracking, these enhancements have not yet fully resolved the issues and defects in recording and reporting identified above.

## C.    Limited VPN Capacity and Barriers to Accessing Information

The difficulties experienced by the monitoring team accessing information using the State's databases are consistent with both the Court's 2015 post-trial findings in 2015 and the Monitors' First Report.[65] Monitoring team members continued to routinely experience delays when moving between screens within both IMPACT and CLASS. Access to information about investigations requires a reviewer to move through multiple screens in two different systems, which substantially increases the time needed to review investigative history. At times, access to the State's systems of record was entirely disrupted.

Inconsistent access to reports also hampered the work of the Monitors and extended the amount of time required for the monitoring team to validate performance. The CLASS database can produce a Compliance and Sampling Report, a standard, pre-programmed report that allows the user to view the compliance history of a facility for a chosen time frame. When the Monitors requested access, HHSC, which manages the CLASS database, made changes to ensure the report was accessible for the monitoring team through CLASS. However, thereafter, the report again became inaccessible; as a result, the Monitors had to make repeated, additional requests to HHSC to produce these reports. Investigation reports in CLASS were at times also inaccessible to the Monitors.

---

[65] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015) (explaining inherent problems with DFPS's outdated IMPACT system impede caseworkers' ability to review important electronic case file information, resulting in delays and frustration among caseworkers); Deborah Fowler and Kevin Ryan, First Report 55, ECF No. 869.

IV. SCREENING, INTAKE AND INVESTIGATION OF MALTREATMENT IN CARE ALLEGATIONS

## A.    Remedial Order 3

Remedial Order 3: *DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

To assess the State's performance with respect to Remedial Order 3, the Monitors gathered and reviewed a wide range of data relating to the safety of PMC children for analysis and qualitative review. This section discusses the monitoring team's assessment and review of the statewide system for appropriately receiving, screening, and investigating reports of abuse, neglect, and exploitation involving PMC children at several points, including referrals to SWI; the screening of those reports to determine whether they should be investigated for child abuse, neglect or exploitation; and investigations of child maltreatment allegations.

**Policy Changes and Updates about RCCI's Secondary Screening of Allegations of Abuse or Neglect**

Prior to November 1, 2020, DFPS policy instructed RCCI staff to conduct a secondary review of all intakes that SWI had assigned to RCCI for investigation due its determination that the intake contained an allegation of abuse or neglect involving children in licensed placements. During this secondary review, RCCI was able to unilaterally confirm or override any of the elements of SWI's determination.[66]

As of November 1, 2020, DFPS eliminated this policy and restructured its secondary review practice for intakes related to licensed placements. First, the DFPS Child Care Investigations Handbook has eliminated the ability of RCCI to override any elements of the SWI

---

[66] Deborah Fowler and Kevin Ryan, First Report 58-60, ECF No. 869. The previous version of the Child Care Investigations Handbook included in *Child Care Investigations* §6220 provided:

> All intake reports require an evaluation to determine:
> (a) whether the information involves allegations of abuse or neglect;
> (b) whether the information involves possible violations of the statute, administrative rules, or minimum standards; (c) the immediate safety of children;
> (d) the degree of risk to children;
> (e) whether the operation is subject to a Licensing investigation; and
> (f) the appropriate Licensing priority.

determination.[67] Second, DFPS restructured the secondary screening function so that any review of the SWI intake specialist's determination to assign an intake for investigation is made by an individual within the SWI RCCI Screening unit. Third, under the new policy, once the intake specialist at SWI determines that a report related to a licensed placement should be investigated for abuse, neglect, or exploitation, the report can only be downgraded and reclassified to a Priority None (PN) for the following reasons:

- The allegations in the intake report reflect that another DFPS division, another state agency, or law enforcement has investigative jurisdiction. That is, the intake report is outside RCCI jurisdiction.

- The allegations in the intake report have already been investigated in a closed investigation, and the intake report does not include new allegations. The intake involves the same incident that was previously investigated, with the same alleged victim and the same alleged perpetrator.[68]

In the First Report, the Monitors previously described a lack of congruence between the Administrative Code and the DFPS Child Care Licensing Policy and Procedures Handbook that was in place at the time.[69] When the information within a referral to SWI is insufficient to determine conclusively whether or not there are safety threats to the child, the Texas Administrative Code supports concluding that cases should be investigated for abuse, neglect or exploitation.[70] In its prior iteration, the DFPS Child Care Licensing Policy and Procedures Handbook section for "Downgrading an Abuse or Neglect Report" was in apparent conflict with the Texas Administrative Code's direction to resolve uncertainty in favor of investigation. The Handbook previously stated that RCCI may downgrade an abuse or neglect report when the information in the report: "1) suggest a minimum standard was violated, but not that a child was abused or neglected; 2) or indicates that there is some risk to children, but the information is too vague to determine that a child was abused or neglected."[71] The newly implemented DFPS policy eliminated this conflict.

**Change of Name for HHSC's Residential Child Care Regulation**

As noted previously, effective February 2021, HHSC changed the name of its child care regulation unit Residential Child Care Licensing (RCCL) to Residential Child Care Regulation

---

[67] DFPS., *Child Care Investigations Handbook* § 6211.1, *available at* https://www.dfps.state.tx.us/handbooks/CCI/default.asp [hereinafter *Child Care Investigations*]. DFPS notified the Monitors that it instructed staff about the new downgrade practice effective October 1, 2020 and that the policy would be finalized and published as of November 1, 2020. Email from Audrey Carmical, to Deborah Fowler and Kevin Ryan (October 1, 2020).

[68] *Id.*

[69] Deborah Fowler and Kevin Ryan, First Report 59-60, ECF No. 869.

[70] DFPS staff must complete a thorough investigation if DFPS obtains information indicating that:
 (A) there are safety threats to the child because of abuse or neglect;
 (B) risk of abuse or neglect is indicated; or
 (C) based on information in the report and any initial contacts, it is impossible to determine whether or not there are safety threats to the child because of abuse or neglect or whether risk of abuse or neglect is indicated. TEX. ADMIN. CODE § 707.489 (d) (1)(A)-(C).

[71] Deborah Fowler and Kevin Ryan, First Report 59, ECF No. 86.

(RCCR). The department maintains its charge to regulate child day care and residential child care operations and other child care activities, as well as child care administrators and child-placing agency administrators.

## DFPS Investigation of Allegations of Abuse or Neglect

All reports that SWI determines will be investigated as abuse, neglect or exploitation are assigned to an RCCI investigator.[72] The RCCI investigator is required to assess the immediate safety of involved children,[73] to evaluate the risk to the children during the investigation,[74] and to initiate the investigation timely based on the assigned priority – 24 hours for Priority One and 72 hours for Priority Two.[75] The RCCI investigator is required to conduct interviews of children and collateral witnesses,[76] to collect evidence,[77] and to complete the investigation within 30 days for both Priority One and Priority Two cases.[78] RCCI's possible findings include:

Reason to Believe ("RTB") – A preponderance of evidence indicates that abuse, neglect, or exploitation occurred. If the disposition for any allegation is Reason to Believe, the overall case disposition is Reason to Believe.

Ruled Out ("R/O") – A preponderance of evidence indicates that abuse, neglect, or exploitation did not occur. If the dispositions for all allegations are Ruled Out, the overall case disposition is Ruled Out.

Unable to Determine ("UTD") – A determination could not be made because of an inability to gather enough facts. The investigator concludes that:

- there is not a preponderance of the evidence that abuse or neglect occurred; but
- it is not reasonable to conclude that abuse or neglect did not occur.

   If the disposition for any allegation is UTB and there is no allegation assigned a disposition of RTB, the overall case disposition is UTB.

Administrative Closure (ADM) – The operation is not subject to regulation; or the allegations do not meet the definition of abuse, neglect, or exploitation. If the dispositions for all allegations are Administrative Closure, the overall disposition is Administrative Closure.[79]

RCCI is charged with investigating allegations of abuse, neglect, or exploitation of children in operations licensed by RCCR, which includes foster homes and GROs.[80] Child Protective Investigations (CPI) is responsible for investigating abuse or neglect of children in unlicensed placements such as kinship foster homes. CPI's investigative authority also includes investigating

---

[72] DFPS, *Child Care Investigations* § 6100.
[73] DFPS, *Child Care Investigations* § 6330.
[74] DFPS, *Child Care Investigations* § 6220.
[75] DFPS, *Child Care Investigations* § 6361.1-2.
[76] DFPS, *Child Care Investigations* § 6420.
[77] DFPS, *Child Care Investigations* § 6440.
[78] DFPS, *Child Care Investigations* § 6110.
[79] DFPS, *Child Care Investigations* § 6622.3
[80] DFPS, *Child Care Investigations* §1142.

reports of child abuse or neglect that are alleged to have occurred prior to the child's entrance into DFPS custody.[81]


**Statewide Intake Performance**

        a.    **Background**

On February 21, 2020, the Court ordered the State to provide to the Monitors the records of all SWI calls made, the specific times of all calls made to SWI, and the wait time for each SWI call including, but not limited to, dropped and unanswered SWI calls.[82] The Court required the State to produce these records to the Monitors by February 26, 2020, and continuing thereafter until further order of the Court.

In compliance with the Court's order, on February 26, 2020 and thereafter, the State continued to produce data files containing monthly SWI call records during this reporting period of all hotline calls made; the specific times of these calls to the hotline; and the wait time for each call, including, but not limited to, dropped and unanswered calls.[83]

Calls to SWI are answered by an automated system that asks the caller a series of questions in order to determine the way the call is routed.[84] These questions include a caller's language preference; whether the caller is asking about the status of a case; or whether the caller wants to learn more about online reporting.[85] Depending upon the answers to these questions, the call is routed to one of 22 "call queues."[86] If an SWI staff member is not immediately available, the caller waits on the queue.[87] If a caller hangs up before an SWI staff member answers the call, the call is categorized as "abandoned."[88] If an SWI staff member speaks with the caller, the call is categorized as "handled." The automated system records the date and time that each call starts and ends; the call queue to which the call is routed; whether the call is handled or abandoned; the time the caller waits after being routed to a queue before speaking with an SWI staff member; and other information.[89]

---

[81] DFPS, *Child Protective Services Handbook* §2120, *available at* https://www.dfps.state.tx.us/handbooks/CPS/default.asp [hereinafter *Child Protective Services*].

[82] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-CV-84, slip. op. at 2 (S.D. Tex. Feb. 20, 2020), ECF No. 811 (ordering that starting February 26, 2020 and continuing thereafter in 24-hour increments until further order of the Court, the Defendants are to provide the Monitors with records of all Statewide Intake hotline calls made and the wait time for each call including, but not limited to, dropped and unanswered calls, and including the specific times of these calls to the Statewide Intake hotline).

[83] The data files provided by the State utilized in this section of the report are: (1) export_0819.csv; (2) export_0919.csv; (3) export_1019.csv; (4) export_1119.csv; (5) export_1219.csv; and (6) export_0120.csv, provided to Monitors February 26, 2020 (on file with the Monitors). Additionally, the State provided the Monitors with a Data Dictionary defining each data element. DFPS, *SWI Calls Raw Data Report – Data Dictionary* (Feb. 26, 2020) (on file with the Monitors).

[84] *See* DFPS., *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

[85] *Id.*

[86] *Id.*

[87] *See* DFPS, *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors).

[88] *Id.*

[89] DFPS, *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors); DFPS., *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

b.      **Statewide Intake Call Center Performance Analysis**

i.      **Methodology**

The Monitors analyzed SWI's Avaya call data related to the 533,471 calls made to SWI from February 1, 2020 to November 30, 2020. The analysis examined the distribution of calls by month, weekday, hour and call queue, the prevalence of handled and abandoned calls, and the amount of time callers waited before the call was answered by a staff person.

ii.      **Volume of Calls to SWI**

On average, the SWI data recorded over 53,000 calls a month. These calls included calls from the public as well as calls and transfers within SWI. Call volume declined at the onset of the pandemic in April 2020, coinciding with the closure of schools and many businesses,[90] but rose from July 2020 through October 2020. Call volume in November 2020 (55,118 calls) decreased marginally (3%) compared to November 2019 (57,076 calls).

Average call volume decreased by an average of 9,000 calls per month as compared to the trends observed in the Monitors' previous report.[91]

---

[90] Texas Governor Greg Abbott issued an executive order on March 19, 2020 which included orders to limit social gatherings to 10 people, limit business operations, and temporarily closed schools. *See* Tex. Exec. Order No. GA-08 (March 19, 2020), https://gov.texas.gov/news/post/governor-abbott-issues-executive-orders-to-mitigate-spread-of-covid-19-in-texas.

[91] The Monitors previously found an average of 62,000 calls per month from August 1, 2019 to January 31, 2020. *See* Deborah Fowler and Kevin Ryan, First Report 63, ECF No. 869.

**Figure 4.1: Number of SWI Calls by Month**



iii.     **Queue Times**

On average, callers waited for 2.3 minutes on the queue before their calls were handled or abandoned, an improvement by almost two minutes from the previous reporting period.[92] Seventy percent (373,970) of callers waited on the queue for under one minute; 14% (72,824) waited for one to five minutes; 8% (44,508) waited five to ten minutes; 4% (22,178) waited ten to fifteen minutes; 2% (10,783) waited fifteen to twenty minutes; and 2% (9,208) waited more than twenty minutes.

---

[92] During the last reporting period, the data demonstrated an average queue time of 4.2 minutes for calls placed from August 1, 2019 to January 31, 2020.

**Figure 4.2: Time Callers Waited before Calls were Handled or Abandoned**



iv.     **Handled Calls**

Of 533,471 calls, 87% (463,943) were answered, an increase from 82% observed in the First Report.[93] Handled calls had an average duration of 11.5 minutes. Six percent (25,528) of handled calls lasted under one minute; 20% (94,945) lasted one to five minutes; 26% (122,014) lasted five to ten minutes; 23% (108,017) lasted ten to fifteen minutes; 12% (56,512) lasted fifteen to twenty minutes; and 12% (56,909) lasted more than twenty minutes.[94]

---

[93] The First Report found that 82% of calls were handled from August 1, 2019 to January 31, 2020. *See* Deborah Fowler and Kevin Ryan, First Report 65, ECF No. 869.
[94] Percentages total 99% due to rounding. Fewer than 1% (18) of handled calls had a duration of zero minutes, a potential indicator of data quality issues; calls that were answered should, by definition, have a duration. Calls with a duration of zero minutes were abandoned before the caller finished navigating the automated system.

**Figure 4.3: Duration of Handled SWI Calls**



There were 991 calls in the dataset with durations longer than two hours, which may be indicative of data system issues. Of these 991 calls, 561 (57%) lasted two to three hours; 212 (21%) lasted three to four hours; 153 (15%) lasted four to five hours; 47 (5%) lasted five to six hours; and 18 (2%) lasted more than six hours.

v.   **Abandoned Calls**

During the period analyzed, 13% (69,468) of calls were abandoned, a decrease from 18% observed in the previous report.[95] Thirty-one percent (21,754) of all abandoned calls occurred before the caller finished navigating the automated system. An additional 47% (32,838) of abandoned calls occurred after callers waited for up to five minutes.

Of the 373,970 calls waiting on the queue for up to a minute, 8% (31,602) were abandoned; of the 72,824 calls waiting for one to five minutes, 32% (22,990) were abandoned; of the 44,508 calls waiting for five to ten minutes, 20% (8,924) were abandoned; of the 22,178 calls waiting for ten to fifteen minutes, 15% (3,379) were abandoned; of the 10,783 calls waiting fifteen to twenty

---

[95] The First Report found that 18% of calls were abandoned from August 1, 2019 to January 31, 2020.  *See* Deborah Fowler and Kevin Ryan, First Report 64, ECF No. 869.

minutes, 13% (1,450) were abandoned; and of the 9,208 calls waiting for more than twenty minutes, 12% (1,123) were abandoned.

### vi.   Call Queues

Calls were routed to 22 different queues in the reporting period. Of the 533,471 calls, the abuse queue received the majority of incoming calls (61%, 324,391). The next most common queues were calls from intake staff to their supervisors (14%, 74,041); calls from law enforcement (11%, 59,642); calls to support staff (4%, 22,248); and other general calls in English including calls pertaining to state hospitals and state supported living centers (4%, 20,845). These five queues represent 94% (501,167) of all calls.

Only 3% (1,581) of the 59,642 calls to the law enforcement queue were abandoned. In contrast, 16% (50,933) of 324,391 calls to the abuse queue were abandoned. On the law enforcement queue, 86% (51,319) of calls were handled or abandoned in the first minute and 97% (57,894) in the first five minutes. In contrast, 61% (196,791) of calls to the abuse queue were handled or abandoned in the first minute and 77% (250,506) were handled or abandoned in the first five minutes.

The rate of abandoned calls decreased from 22% in the previous reporting period to 16% between February 1, 2020 and November 30, 2020. The rate of calls handled or abandoned in the first five minutes increased from 58% in the previous reporting period to 77%.[96]

### vii.   Calls by Day of the Week and Time of Call

SWI calls were higher in volume on weekdays than on weekends. The average weekday call volume (296 calls per day) was more than twice the average weekend call volume (141 calls per day). There was no difference in rates of abandonment on weekdays compared to weekends; 13% of calls were abandoned on both weekdays and weekends. Queue times also remained constant when comparing weekdays to weekends.

---

[96] The Monitors previously reported that, from August 1, 2019 to January 31, 2020, 22% of calls to the abuse queue were abandoned, and 58% of calls were handled or abandoned in the first five minutes. Deborah Fowler and Kevin Ryan, First Report 65, ECF No. 869.

**Figure 4.4: Number of SWI Calls Handled and Abandoned by Day of the Week**



Sixty percent (319,866) of all calls were placed during typical work hours (9:00am through 6:00pm), with a higher rate (71%) placed during work hours on weekdays. The Monitors did not find that abandonment rates spiked during the work week, as was observed in the previous report.[97]

**DFPS Intake Screening and Maltreatment in Care Investigations**

    a.    **Data and Information Request and Production**

        i.    **Monitors' Data and Information Request**

To validate the State's performance with respect to appropriately screening referrals for child maltreatment associated with Remedial Order 3, the Monitors requested from the State, and on an on-going monthly basis, a list of all referrals received through SWI via phone call, website, fax, regular mail, or any other manner in which the referent expresses concern about child

---

[97] The Monitors previously found that from August 1, 2019 to January 31, 2020, 40% of calls placed on Mondays or Fridays between 3:00 p.m. and 5:00 p.m. were abandoned. Deborah Fowler and Kevin Ryan, First Report 66, ECF No. 869.

maltreatment regarding children in the PMC General Class, regardless of placement type.[98] The Monitors requested inclusion of relevant data points about the child and the placement, including where the child is placed at the time of the referral to SWI; licensure status; and whether the referral was sent for an investigation. The Monitors also requested key data points about the referrals including the date of the referral; the disposition of the report by SWI (where referred, whether it was classified as an intake or I/R, and the priority assigned); the disposition of the report by the office/division to which it is referred (RCCI, RCCR etc.), including whether it was referred for an abuse or neglect investigation or a minimum standards investigation; the priority assigned to the investigation; and any other information about how the State addressed or planned to address the referral.[99]

To validate the State's performance with respect to appropriately investigating child maltreatment in care associated with Remedial Order 3, the Monitors requested from the State, on an ongoing basis, a list of all investigations involving any child in the PMC General Class. The Monitors requested key information about the investigations including the date and time of intake; allegations; alleged victims in the PMC Class; investigator; and PMC child placement, among other requested fields relevant to Remedial Order 3 and other remedial orders.[100]

ii.    **DFPS Data and Information Production**

For purposes of data related to SWI, the State—DFPS and HHSC together or separately— remains unable to provide the Monitors with a unified list of all referrals to SWI involving PMC children as an apparent result of a bifurcated system for processing and storing data associated with referrals to SWI.[101]

HHSC cannot distinguish between PMC and non-PMC child-related referrals in its data. HHSC's data includes all referrals for that period and does not identify PMC children because, as

---

[98]Email from Deborah Fowler and Kevin Ryan to Andrew Stephens (Sept. 30, 2019), (including Monitors' Sept. 30, 2019 Data & Information Request) (on file with the Monitors).

[99] *Id.*

[100] The Monitors' request included: intake stage ID number; investigation stage ID number; person ID (for all alleged PMC victims); county where maltreatment is alleged; most recent investigator name and ID; date and time investigation stage started; program conducting investigation; child's placement type at intake; placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; the relationships of the alleged perpetrator(s) to the child-victims. For closed investigations, the Monitors' request included: date the investigation is completed; date documentation is completed and submitted to the supervisor; the status of all allegations involving all PMC children; overall investigation disposition; the reason(s) for all approved extensions to the investigation completion date/time (when applicable); the date any notification letters are sent to parents, providers and/or referents. *See also* Email from Kevin Ryan and Deborah Fowler to Andrew Stephens (Oct. 28, 2019) (on file with the Monitors).

[101] *See also* Section II. In response to the Monitors' request to the State for data about referrals to SWI, the Monitors continued to receive separate data files with both DFPS and HHSC. DFPS produced monthly data for all referrals to SWI in which a PMC child was an alleged victim and SWI staff determined that the referral involved abuse or neglect allegations; HHSC produced monthly data for all referrals overall to SWI that were not screened as abuse or neglect, meaning the referrals were administratively closed, referred for an RCCR minimum standards investigation or otherwise.

the agency reported to the Monitors, "[t]he agency is operations-centric not child centric. CLASS does not contain the PMC identifier of children involved in a referral [or investigation]; the PMC identifier is only associated with referrals of abuse or neglect in IMPACT."[102] Thus, the majority of the 13,042 referrals included in the data reported by HHSC from May 1, 2020 through November 30, 2020 do not include the name of the child or children associated with the referral. Moreover, for the limited data where the name of a child is identified, PMC status is not distinguished.[103]

In response to the Monitors' request for data reporting on closed maltreatment in care investigations, DFPS has produced regular files on closed investigations for this reporting period.[104]

### b.    Overview of Allegations in Referrals and Investigations for Maltreatment in Care

The Monitors analyzed data about maltreatment in care allegations for PMC children using (1) data about intakes pertaining to PMC children received by SWI from May 1, 2020 to November 30, 2020;[105] RCCI investigations, pertaining to PMC children in licensed facilities, that were opened from May 1, 2020 to October 31, 2020; and (3) RCCI investigations, pertaining to PMC children in licensed facilities, that were closed between May 1, 2020 and October 31, 2020.[106]

### i.    Intakes for PMC Children Referred to RCCI and CPI

From May 1, 2020 to November 30, 2020, DFPS reported 1,205 intakes for PMC children in licensed placements that were coded as abuse, neglect, or exploitation by SWI intake specialists. Until November 2020, RCCI performed a secondary screening function that allowed it to downgrade intakes to Priority None without investigation if it determined that the referral did not include allegations of abuse, neglect or exploitation. In that same time period, DFPS reported 574 intakes for PMC children in unlicensed placements that were coded as abuse, neglect or exploitation by SWI intake specialists for investigation by CPI.

---

[102] DFPS, *Data Production Chart* at 5-6 (Dec. 6, 2019) (responding to Monitors' Sept. 30, 2019 Data and Information Request).

[103] In addition, the Monitors were also able to discern that HHSC data related to referrals is not limited to children who are in DFPS custody. HHSC and DFPS each produced different referral files for this reporting period. For the monthly files, the Monitors requested the production on a 15-day lag; received it on a 45-day lag; and subsequently, beginning in September 2020, the State provided the data at a 30-day lag.

[104] These files were originally produced quarterly and are now produced monthly as of September 2020. The files separately reported on investigations conducted through RCCI and Child Protective Investigations ("CPI").

[105] DFPS, *RO3.1 RCI and CPI Intakes May 2020 - July-15-20 - 98621* (July 16, 2020) (on file with the Monitors); DFPS, *RO3.1 RCI and CPI Intakes June 2020 - Aug-15-20 - 98899* (Aug. 18, 2020) (on file with the Monitors); DFPS, *RO3.1 RCI and CPI Intakes July 2020 - Sept-15-20 - 99252* (Sept. 16, 2020) (on file with the Monitors); DFPS *RO3.1 RCI and CPI Intakes Aug 2020 - Sept-30-20 - 99654* (Oct. 8, 2020) (on file with the Monitors); DFPS, *RO3.1 RCI and CPI Intakes Sept 2020 - 11-2-20* (Nov. 3, 2020) (on file with the Monitors); DFPS, *RO3.1 RCI and CPI Intakes Oct 2020 - 11-30-20 - fcl 01* (Dec. 1, 2020) (on file with the Monitors); DFPS, *RO3.1 RCI and CPI Intakes Nov 2020 - 1-4-21- fcl 01* (Jan. 8, 2021) (on file with the Monitors).

[106] Some intakes include more than one child and more than one allegation for each child.

The total number of referrals received by SWI about PMC children is unknown because the State is unable to report on the total number due to its bifurcated reporting system, as described in Section II.

During its secondary screening between May 1, 2020 and November 30, 2020, DFPS downgraded 185 of the 1,205 RCCI intakes (15%) involving a PMC child to Priority None (PN), meaning that at secondary screening, the screener assigned the intake as a Priority None and determined that RCCI would not conduct an abuse or neglect investigation. In addition, the secondary screener downgraded 152 of 1,205 intakes (13%) from Priority One investigations to Priority Two investigations. As reflected in the Figure below, the overall rate of downgrades fell dramatically from May 2020 (46.6%) to November 2020 (13%). Specifically, downgrades to PN fell from 29.8% (53 out of 178 intakes) in May 2020 to just 2.2% (3 out of 138 intakes) in November 2020, which is when DFPS formally implemented its policy and structural changes restricting PNs to a narrow set of categories. Moreover, consistent with the new policy, in November, none of the reasons for downgrade to PN were due to a determination that the report did not involve abuse, neglect or exploitation. In October 2020, only one of the five downgrades to PN was made for that reason.

**Figure 4.5: RCCI Rate of Downgrades from May 1, 2020 to November 30, 2020**



During the secondary screening for CPI intakes between May 1, 2020 and November 30, 2020, DFPS downgraded 90 of the 574 CPI intakes (15.7%) involving a PMC child to Priority None (PN), meaning that at secondary screening, the CPI staff assigned the intake as a Priority None and determined that CPI would not conduct an abuse or neglect investigation. In addition, DFPS downgraded 32 of 574 total intakes (5.6%) from Priority One investigations to Priority Two

63

investigations. The rate of downgrades fell from May (36.6%) to November (7.2%). Specifically, downgrades to PN fell from 36.6% (23 out of 71 intakes) in May to just 2.4% (2 out of 83 intakes) in November.

**Figure 4.6: CPI Rate of Downgrades from May 1, 2020 to November 30, 2020**



ii.    **RCCI Intake Rates and Types of Abuse or Neglect Allegations**

The 1,205 intakes by SWI that were reported by DFPS involved 1,533 children in licensed placements between May 1, 2020 and November 30, 2020 and contained 1,646 allegations of child abuse, neglect, or exploitation. Among those 1,646 allegations, Neglectful Supervision was the most common allegation type at 59%, affecting 965 children; Physical Abuse allegations constituted 23% of allegations, affecting 376 children; and Sexual Abuse allegations constituted 9% of all allegations, affecting 147 children.[107] Other allegation types account for the remaining ten percent of allegations; those include Medical Neglect, Emotional Abuse, and Physical Neglect. The data may underrepresent the prevalence of alleged sexual abuse victimization among PMC children due to the nature of Neglectful Supervision allegations. The Monitors found during reviews of intakes and investigations that between one quarter to one third of allegations of Neglectful Supervision involve child on child sexual contact, both in the First Report and during

_____

[107] If a child was the subject of the same type of allegation in two separate intakes, that child would be double counted in this analysis.

this reporting period. DFPS's data does not identify the type of harm underlying Neglectful Supervision allegations.

**Figure 4.7: Allegation Types for RCCI Intakes Involving PMC Children in Licensed Placements, May 1, 2020 to November 30, 2020**

Source: RCCI Intakes May - November 2020
*n=1,646 allegations for 1,205 intakes*

[Bar chart showing Percent by Allegation (number of allegations):]

- Neglectful Supervision (965): 59%
- Physical Abuse (376): 23%
- Sexual Abuse (147): 9%
- Medical Neglect (85): 5%
- Emotional Abuse (46): 3%
- Physical Neglect (27): 2%

## B.      Remedial Order 3: Screening and Intake Performance Validation

During this reporting period, DFPS reconfigured its policy and structure to better align its screening process with child safety as discussed above.

**Methodology**

To evaluate DFPS's performance associated with Remedial Order 3 and assess the appropriateness of screening of referrals of abuse, neglect or exploitation involving PMC children in licensed and unlicensed placements, the monitoring team conducted a qualitative review of referrals received by SWI.

65

First, the Monitors assessed the appropriateness of DFPS's secondary screenings and reviewed all 275 referrals that SWI initially assigned to either RCCI or CPI[108] for investigation between May 1, 2020 and November 30, 2020, but were later downgraded in a secondary screening process to non-abuse or neglect reports or for other reasons.[109] A secondary screener at RCCI (and later within SWI) or CPI[110] reversed the original determination at SWI and assigned a Priority None (PN) classification so that the State did not investigate the referrals for abuse, neglect or exploitation.[111]

The DFPS data between May 1, 2020 and November 30, 2020 identified 1,205 intakes involving PMC children in licensed placements that were assigned by SWI to RCCI for a Priority One or Two abuse or neglect investigation. Secondary RCCI screeners downgraded 185 of these intakes. The table below shows the number of intakes downgraded to PN for each of the seven months reviewed by the Monitors. As of November 2020, the reasons for downgrade following SWI's decision to assign a referral for investigation by RCCI no longer included any determination that the intake did not include abuse or neglect, consistent with the new policy.[112]

---

[108] Referrals assigned to RCCI involve PMC children placed in licensed placements, while referrals assigned to CPI involve PMC children placed in unlicensed placements and/or involve allegations of abuse or neglect related to a child's birth family or caregiver(s) often prior to entering DFPS custody.

[109] On Sept 4, 2020, during a hearing regarding Plaintiffs' motion to hold the state in contempt for failure to implement certain Remedial Orders, the State agreed that Remedial Order 3 applies broadly to the PMC class and thereby incorporates PMC children placed in licensed and unlicensed placements. *See* Contempt Hr'g Tr. 6:14 to 8:21, Sept. 4, 2020. Specifically, Kimberly Gdula, Assistant Att'y General, stated, "I do understand that Remedial Order Number Three references the PMC class, not RCCI specifically." *Id*. at 7:14-17. Child Protective Investigations, CPI, is the investigative unit within DFPS charged with screening and investigating allegations of abuse or neglect involving PMC children placed in unlicensed placements. Following the State's agreement, the Monitors included a qualitative review of CPI's screening decisions of referrals involving PMC children placed in unlicensed homes in their assessment of Remedial Order 3.

[110] Referrals assigned to RCCI involve PMC children placed in licensed placements, while referrals assigned to CPI involve PMC children placed in unlicensed placements and/or involve allegations of abuse or neglect related to a child's birth family or caregiver(s) often prior to entering DFPS custody.

[111] The determination of non-abuse or neglect was the primary reason for the downgrades under the former policy. Other reasons included "closed and reclassified," "other agency/out-of-state," "allegations addressed in previous case," and "too vague or general." As described above, as of November 1, 2020, RCCI no longer conducts a secondary screening of intakes assigned to abuse or neglect investigations by SWI. All screening decisions, including downgrades, are now made internally by the newly created unit within SWI. As such, in its review of November 2020 referrals downgraded to PN, the Monitors assessed the screening decisions of SWI not RCCI. For CPI referrals, DFPS has not made any policy changes and CPI continues to complete secondary screenings of those intakes assigned to an abuse or neglect investigation by SWI.

[112] The reasons for downgrade were permissible under the current policy in DFPS *Child Care Investigations Handbook* § 6211.1 as discussed above.

**Table 4.1**: **Intakes Downgraded by RCCI between May 1, 2020 and November 30, 2020**

| Month (2020) | Total No. of Intakes Assigned for RCCI Investigation by SWI | Total No. of Intakes Downgraded | Percent of Downgraded Intakes |
|---|---|---|---|
| May | 178 | 53 | 29.8% |
| June | 193 | 39 | 20.2% |
| July | 142 | 32 | 22.5% |
| August | 185 | 29 | 15.7% |
| September | 188 | 24 | 12.8% |
| October | 181 | 5 | 2.8% |
| November | 138 | 3[113] | 2.2% |
| **Total** | **1,205** | **185** | **15%** |

The DFPS data between May 1, 2020 and November 30, 2020, identified 574 intakes involving PMC children in unlicensed placements that were assigned by SWI to CPI for a Priority One or Two abuse or neglect investigation. Secondary CPI screeners downgraded 90 of these intakes, all of which the Monitors reviewed. The table below shows the number of intakes downgraded by CPI for each of the seven months reviewed by the Monitors.[114]

**Table 4.2: Intakes Downgraded by CPI between May 1, 2020 and November 30, 2020**

| Month | Total No. of Intakes Assigned for CPI Investigation by SWI | Total No. of Intakes Downgraded by CPI | Percent of Downgraded Intakes |
|---|---|---|---|
| May | 71 | 23 | 32.4% |
| June | 88 | 15 | 17.1% |
| July | 97 | 22 | 22.7% |
| August | 73 | 14 | 19.2% |
| September | 74 | 12 | 16.2% |
| October | 88 | 2 | 2.3% |
| November | 83 | 2 | 2.4% |
| **Total** | **574** | **90** | **15.7%** |

---

[113] For the three intakes downgraded in November 2020, SWI secondary screening staff made the determination to reclassify these intakes as PN and not assign them for an abuse or neglect investigation.

[114] For the months of October and November 2020, CPI downgraded a total of four intakes citing the following reasons: "Allegations addressed in previous case;" "Doesn't appear to involve abuse, neglect or risk;" and, "Other Agency/Out of State."

Second, the Monitors conducted a primary screening review of SWI's decision-making. The Monitors randomly selected 953 out of 7,829 referrals to SWI during the months of January and February 2020; and October and November 2020, in order to assess SWI's decision-making at the beginning of the calendar year and then toward the end of the calendar year. The Monitors' review focused on referrals where an intake specialist at SWI determined that the report did not include an allegation of abuse, neglect, or exploitation and referred the matter to HHSC for further assessment for a potential minimum standards investigation or administrative closure.[115] For these 953 referrals, SWI determined that they did not contain an allegation of abuse or neglect and assigned the referrals to RCCR within HHSC as an Information and Referral (I&R) for a potential minimum standards investigation or administrative closure. The Monitors' review focused on whether SWI appropriately screened the referrals when it determined that they did not contain any allegations of abuse or neglect.[116]

As the HHSC referral data does not provide child identifiers, the Monitors' methodology and analysis involved a preliminary two-step process to ascertain which referrals involve children in PMC status. The monitoring team first undertook the effort of reviewing each individual report to identify which child or children were the subject of the report. Next, the monitoring team searched the IMPACT records of each child or children identified in each report to determine whether a given report involved a child in PMC status by checking for the child's legal status.

For the months of January and February 2020, HHSC identified 3,480 referrals involving all children in licensed placements that SWI determined should not be assigned for a child abuse, neglect, or exploitation investigation and were instead assigned to RCCR within HHSC for further analysis. The Monitors randomly selected a sample of 599 of these referrals. Of those 599 referrals, the monitoring team identified 241 that involved children with PMC status; the other 358 intakes involved children in TMC status or children who were not then in the State's custody and therefore, those referrals are not included in these results.

For the months of October and November 2020, HHSC identified 4,349 referrals involving all children in licensed placements that SWI assigned to RCCR for further analysis. The monitoring team randomly selected a sample of 354 reports; of these, the monitoring team identified 154 referrals that involved children with PMC status. The other 200 intakes involved children in TMC status or children not then in the State's custody and therefore, those referrals are not included in these results.

---

[115] When a report to SWI is assigned for investigation to RCCI or CPI, the Monitors receive the data from DFPS in a separate report; therefore, these data are representative of the reports originally assigned to HHSC. HHSC referred nine reports originally coded by SWI as non-abuse or neglect back to SWI and SWI staff reentered them as intakes that warranted an abuse or neglect investigation.

[116] The sample was selected using a 95% confidence level from monthly data reports provided by HHSC listing all referrals it received related to children in licensed placements. For January and February 2020, the sample was created independently using a 95% confidence level for each month; the Monitors selected referrals for October and November 2020 using a 95% confidence level on the total between the two months. In the October and November 2020 sample, the Monitors oversampled for referrals that were sent to RCCR within HHSC with an intake of Priority One, Two, or Three and then assigned for a minimum standards investigation.

**Remedial Order 3 Secondary Screening Validation Results for RCCI and CPI**

The Monitors' secondary screening review focused on whether RCCI[117] and CPI appropriately downgraded a total of 275 referrals after SWI initially assigned them for a Priority One or Two abuse or neglect investigation between May 1, 2020 and November 30, 2020.

a.     **RCCI Results**

The Monitors' review determined that of the 185 intakes that RCCI downgraded at secondary screening, RCCI appropriately downgraded 162 (88%) intakes, and inappropriately downgraded 23 (12%) intakes which contained allegations that warranted investigation for abuse, neglect, or exploitation to ensure the safety of a PMC child(ren).  In these 23 cases, summarized in the Appendix, the Monitors agreed with the original SWI determination to assign the intakes for abuse, neglect, or exploitation investigations and disagree with the secondary screeners' final determination not to do so. All of these cases arose prior to the effective date of the new DFPS policy restricting secondary screening of RCCI intakes. The intakes with which the Monitors disagreed primarily fell in the earlier months of the review period as follows: eight in May; eight in June; two in July; three in August; and two in September 2020. The Monitors did not identify any referrals to RCCI that were inappropriately downgraded in October or November 2020.

Because of the change in DFPS's screening policy and practice in the months leading up to the effective date of the new policy, for the current review period, the Monitors found significant improvement in RCCI's screening of abuse, neglect, or exploitation referrals involving PMC children when compared with the review findings presented in the Monitors' First Report. The Monitors in the First Report found that of 174 intakes RCCI downgraded at secondary screening between July 31, 2019 and October 31, 2019, RCCI inappropriately downgraded 57 intakes reports (33%), which contained allegations that warranted investigation for abuse or neglect.[118] Thus, the Monitors' rate of disagreement with RCCI's downgrade determinations dropped by 21 percentage points from 33% in the First Report to 12% in this Second Report.

b.     **CPI Intakes**

For the review of SWI intakes involving PMC children referred to CPI, the Monitors determined that of the 90 intakes that CPI downgraded at secondary screening, CPI appropriately downgraded 88 (98%) of intakes, and inappropriately downgraded only two intake reports (2%), which contained allegations that warranted investigation for abuse or neglect to ensure the safety of children in the PMC class.  In these two cases, summarized in the Appendix, the Monitors agreed with the original SWI determination to assign the intakes for abuse or neglect investigations and disagree with the CPI final determination not to investigate.

c.     **Remedial Order 3: SWI Original Screening Validation Results for Referrals Assigned to HHSC**

---

[117] In November 2020, SWI performed this function internally.
[118] Deborah Fowler and Kevin Ryan, First Report 73-75, ECF No. 869.

In the Monitors' sample of 599 SWI referrals from January and February 2020 sent directly to HHSC for RCCR assessment, the Monitors identified 241 reports that involved a child or children with PMC status. Of these 241 referrals assigned to HHSC, 76 were assigned by HHSC for a non-abuse or neglect investigation to determine whether there was a violation of statute, administrative rules, or minimum standards and the other 165 intakes were administratively closed, consistent with the distribution within the HHSC data.

Of these 241 reports, SWI appropriately determined that 98% (235 intakes) did not contain an allegation of abuse or neglect of a PMC child and were properly assigned to RCCR. The Monitors found six reports (3%) which the Monitors had inappropriately referred to RCCR and did not assign for an abuse or neglect investigation. The Monitors concluded that these six reports contained allegations that warranted an investigation for abuse, neglect, or exploitation to ensure the safety and well-being of a child(ren) with PMC status. Of the six reports with which the Monitors disagreed, five were assigned by RCCR for a Priority Two or Three minimum standards investigation and one was administratively closed.

During the Monitors' review of 175 SWI referrals from October 2020, the Monitors identified 66 reports that involved children with PMC status. The Monitors found that SWI appropriately determined that all 66 (100%) of these intakes did not contain an allegation of abuse or neglect of a PMC child. Of the 66 reports assigned to HHSC that involved children with PMC status, HHSC assigned 26 for a non-abuse or neglect investigation to determine whether there was a violation of statute, administrative rules, or minimum standards and the other 40 intakes were administratively closed.

During the Monitors' review of 179 SWI referrals that were assigned to RCCR for a Priority One, Two or Three minimum standards investigation in the sample for November 2020, the Monitors identified 88 referrals that involved a PMC child. Of the 88 referrals, the Monitors found that SWI appropriately determined that 94% (83 intakes) did not contain an allegation of abuse or neglect of a PMC child and were properly assigned to RCCR. The Monitors found that 6% (5) had been inappropriately screened by SWI.

       d.      **Remedial Order 3: Maltreatment in Care Investigations**

In response to the Monitors' First Report and its associated findings about investigations of abuse, neglect, or exploitation of children in the PMC class, DFPS stated that under its new leadership, DFPS "understands and recognizes the Monitors' child safety concerns due to issues with the investigations or the interpretation of various administrative code sections."[119] DFPS confirmed that its review of the investigations included in Appendix 3.2 to the Monitors' First Report prompted the State to make changes to improve the quality of investigations. For the current report, the Monitors subsequently undertook a similar and expanded method of review to assess the State's performance associated with Remedial Order 3.

---

[119] Email from Audrey Carmical, DFPS to Kevin Ryan and Deborah Fowler (December 4, 2020) (on file with the Monitors).

i.      **Overview of RCCI Maltreatment in Care Investigations**

RCCI opened 851 new investigations involving at least one PMC child between May 1, 2020 and October 31, 2020. Foster parents and institutional staff accounted for 87% of the alleged perpetrators.[120] Institutional staff accounted for 908 (47%) of the alleged perpetrators; foster parents accounted for 778 (40%) of the alleged perpetrators; relative/household members accounted for 59 (3%); service providers accounted for 28 (1%); parents/guardians accounted for four (less than 1%); and the perpetrator was unknown, not listed, or listed as other for 170 (9%) of the alleged perpetrators. Some investigations recorded multiple perpetrators; therefore, the number of perpetrators is greater than the number of investigations.[121]

**Figure 4.8: Alleged Perpetrators in RCCI Involving PMC Children in Licensed Placements**



Source: RCCI Open Investigations, May - October 2020 Investigations Data
*n= 1,947 perpetrators in 851 investigations*

RCCI closed 768 investigations of maltreatment of a PMC child in licensed placements between May 1, 2020 and October 31, 2020, and 7% (52) of the investigations resulted in a disposition of Reason to Believe, thereby substantiating the allegations as abuse, neglect, or

---

[120] The 851 RCCI investigations involved 1,947 allegations. In the data the Monitors received from DFPS, each allegation has a perpetrator category, but not a unique identifier for each perpetrator. As a result, it is possible that some perpetrators may be counted more than once in a single investigation or over time.

exploitation. RCCI Ruled Out 698 (91%), Administratively Closed 17 (2%), and closed one as UTB.

**Figure 4.9: Reason to Believe Findings in Closed RCCI Investigations Involving PMC Children in Licensed Placements**



Source: RO3.2 Closed Investigations Percent RTB, May - October 2020
*n=768 Dispositions*

ii.    **Methodology**

To validate DFPS's performance associated with Remedial Order 3 and the appropriateness of RCCI investigations of alleged maltreatment of PMC children, the monitoring team conducted reviews on a randomly selected sample of 403 (out of 768) RCCI investigations closed between May 1, 2020 and October 31, 2020.[122]

---

[122] To evaluate dispositional results for the investigations included in the sample, the Monitors designed a review tool for the case record review. To support consistency in scoring, both inter-rater reliability and secondary reviews were tested and used. The sample was drawn from quarterly and monthly reports provided to the Monitors by DFPS during the reporting period. During this time period, there were 768 investigations closed by RCCI, of which the Monitors reviewed a random sample of 403 investigations using a 97% confidence level for the sample drawn from all investigations closed from June through October 2020; and reviewed 133 or the 144 investigations closed in May 2020.

### iii.      Remedial Order 3 Investigation Validation Results

Of the 403 (of 768) RCCI investigations analyzed by the monitoring team, 31 (8%) resulted in a substantiation of at least one allegation with a disposition of RTB; in the review of those investigations, the Monitors concurred with the State's investigative conclusions to substantiate at least one allegation with a disposition of RTB. However, the Monitors also identified that in three of these investigations, RCCI either should have substantiated an additional allegation of abuse or neglect (one investigation) or that it conducted a deficient investigation of other allegations of abuse or neglect in order to render a disposition (two investigations). Six of the investigations (1%) were administratively closed, and the Monitors disagreed with RCCI's closure of one of these investigations and one investigation resulted in a finding of UTB; the Monitors concurred with those findings.

RCCI Ruled Out all the allegations in 365 (91%) of the investigations reviewed by the Monitors.   The Monitors found that of the 365 investigations where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 300 cases (82%); inappropriately in 18 cases (5%); and conducted investigations with such substantial deficiencies in 47 cases (13%) that the Monitors were prevented from reaching a conclusion. To appropriately reach a final disposition in these investigations, additional information would have been required to determine whether children were abused or neglected. Many of these RCCI child abuse or neglect investigations were deficient because of long gaps in investigative activity and substantial delays in completion that compromised access to relevant evidence and diminished the inability of witnesses to recall critical information.

The Monitors' summaries of these investigations are located in the Appendix. In sum, the Monitors identified 65 cases (18%) among a sample of 365 investigations that RCCI assigned a disposition of Rule Out to all allegations between May 1, 2020 and October 31, 2020 that had substantial deficiencies or were inappropriately resolved by RCCI. In the First Report, the Monitors determined 28.6% of sampled investigations had substantial deficiencies and/or were inappropriately resolved, and the present results for this period reflect a significant improvement.

In addition, of the investigations that RCCI had assigned a RTB disposition to some allegations or administratively closed, the Monitors identified four investigations that had substantial deficiencies or were inappropriately resolved by RCCI, bringing the total to 69 investigations identified by the Monitors as having been inappropriately conducted or resolved between May 1, 2020 and October 31, 2020.

**C.      Investigations with Substantial Time Delays and Gaps Contributing to Deficiency**

Of the 69 investigations the Monitors determined RCCI inappropriately conducted or resolved, the majority were not completed in a timely manner, in violation of Remedial Order 10. Specifically, 38 (55%) were not completed within the 30-day timeframe;[123] of the remaining investigations, 28 were completed within the required 30-day timeframe (41%), and three (4%) were completed outside of the 30-day timeframe but were completed in compliance with approved extensions. The Monitors found that the significant delays in RCCI's completion of investigations resulted in substantial deficiencies that undermined the dispositional finding(s). The Monitors observed that while the investigations were generally initiated timely and investigators frequently interviewed alleged victims within the required timeframes of 24 or 72 hours, investigative activity often stalled for many months or ceased entirely after these initial tasks were completed.  Although the deficiencies were not limited to the delays, the impact of the delays had a significant impact on the quality of the investigations.

For example, in an investigation that remained open with RCCI for over 20 months, an anonymous caller reported to SWI on October 1, 2018 that a few weeks prior to the call, a staff member at Five Oaks Achievement Center, an RTC, choked a child (age 12), threw her on the bed, and "jacked" her up. The reporter stated that a second staff member was present and witnessed the incident but did not report it. Finally, the reporter stated that the shift supervisor at the RTC drinks beer on campus and allows other staff to smoke marijuana. RCCI completed the investigation on June 30, 2020, 20 months after intake. Between January 2019 and June 2020, the investigator completed no activities related to this case. When the investigation was recommenced in June 2020, over a year and half after RCCI initiated the investigation, the investigator attempted for the first time to interview the alleged perpetrators. Likely due to the investigative delay, the investigator did not interview two of the alleged perpetrators and reported that the investigation would be "closed without their input."

In addition to significant gaps contributing to missed interviews with key individuals, the Monitors also found that long delays impair the ability of investigators to gather pertinent information from interviewees about the allegations to render an accurate disposition. In one investigation, for example, which took over 10 months to be completed, the gap between the alleged incident and the interviews with key individuals diminished these individuals' ability to recall the relevant allegations of abuse. On June 13, 2019, a DFPS staff person reported to SWI that a staff person at Houston Serenity Place pushed a youth (age 15) down on her bed several times for refusing to go to bed. The staff person allegedly grabbed the youth by her hair and pushed the youth's face into the mattress and, as a result, the youth struggled to breathe. The reporter also stated that the staff person inappropriately restrained the youth by forcefully grabbing the youth's

---

[123] None of these investigations were compliant with any approved extensions.

arm and yanking it up toward her shoulder blades. The youth cried out in pain and yelled for the staff person to stop.

The investigation was deficient due to a significant gap between the alleged incident and interviews with key individuals and for a failure to follow-up with pertinent information. The investigator interviewed the alleged perpetrator and collateral witnesses ten months after the alleged incident occurred and, as a result, some individuals were unable to recall details of the incident. The alleged perpetrator reported that on the day of the incident she was not working and that she was not familiar with the alleged victim. The investigator did not review employee records to corroborate whether this staff person was working on the day of the alleged incident, but instead accepted this staff person's denial ten months later. Because the investigator did not verify the veracity of the staff member's claim, it is unknown whether this staff member was working and involved in the incident as the youth alleged. Moreover, the gap in time between the incident and the interview with the perpetrator diminishes the reliability of the information.[124]

In another example from Houston Serenity Place involving an investigation that remained open with RCCI for six months, a CPS staff member reported on January 29, 2020 that staff observed a youth (age 16) with injuries to his face that appeared to be caused by "blunt force." The reporter stated the youth appeared scared and showed signs of "physical trauma/abuse" when he explained the incident to the reporter. The youth reported another youth at Houston Serenity Place caused the injuries. However, the youth also disclosed that his stepfather was "beating on him" and threw all his belongings against a wall. The reporter stated that she believed the incident that caused his injury occurred a few days prior to the report. Through their review, the Monitors found that due to significant delays in the investigation, the investigator did not gather sufficient evidence to Rule Out the allegations of Physical Abuse and Neglectful Supervision. The investigator did not attempt to interview key individuals, including the alleged perpetrator, a child victim, and collateral staff and residents, until approximately five months after RCCI initiated the investigation. The investigator's attempts to locate and interview the alleged perpetrator, some collateral youth and staff and the children's caseworkers were unsuccessful, likely because of the delay. The youth witnesses who were interviewed late in the investigation were unable to recall any specifics related to the alleged incident. Similarly, a staff member who could have provided relevant information, also interviewed late in the investigation, was unable to recall the alleged incident. Due to these numerous deficiencies, the Monitors found that a disposition cannot be rendered on this investigation which took six months for RCCI to complete.

## D.  Deficient Investigations for Neglectful Supervision in the Context of Self-Harm by Children

Of the 69 investigations that the Monitors identified as having incorrect dispositions or deficiencies, nine (13%) included allegations of Neglectful Supervision involving a child who had attempted or committed self-harm. In these investigations, the investigative record was often

---

[124] The Monitors' September 2, 2020 Update alerted the Court to the closure of Houston Serenity Place.

deficient in its inquiry and documentation about key issues related to supervision. The Monitors repeatedly encountered lapses in supervision and treatment for children with serious emotional disturbances in the Texas child welfare system that expose the children to a risk of serious harm, as the Monitors discussed in the First Report in connection with the death of C.G., and more recently in the Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center.[125]

In eight of the nine investigations involving self-harm that were identified by the Monitors for deficiencies or for incorrect dispositions, the children had been placed at inpatient psychiatric facilities (6) or had been assessed by a psychiatric facility (2) during the year prior to the self-harming incident that was the subject of the investigation under review. In at least two instances, the self-harming incident occurred within weeks of the child's psychiatric assessment or inpatient psychiatric placement. The investigations raised common themes around child safety, the children's mental health needs and potential gaps in the preparedness of certain facilities to appropriately address the needs of these children and ensure their safety.

For example, in one instance, an 11-year-old child was placed at an inpatient psychiatric facility for a week from April 21 to April 27, 2020. One month after her discharge from psychiatric care, in early June 2020, a DFPS staff member reported to SWI that the child attempted to cut her wrist with a piece of glass and that the child had also attempted to hang herself during the previous month while placed at The Tree House Center, a GRO. The DFPS staff member voiced concern about inadequate supervision due to the child's repeated self-harming incidents at the GRO. During the investigation for Neglectful Supervision, staff members and residents told the investigator that the child self-harmed "often" at the GRO. The investigator did not appear to consider these statements in the decision to Rule Out the allegations of Neglectful Supervision. Further, the investigator did not assess whether a child with a "history of suicidal thoughts and psychiatric hospitalizations" as well as prior self-harming incidents at the GRO required greater supervision to ensure her safety.

On another occasion, one of the Monitors reported two prior incidents involving a youth (age 17) who the Monitor discovered had been documented by Hector Garza Residential Treatment Center (Hector Garza), an RTC, in incident reports, but which the RTC never reported to SWI. The Monitors' First Report discussed DFPS's decision to terminate its contract in 2020 with Hector Garza. In the first incident, it was alleged that on August 11, 2019, the youth was observed by a staff person to be tying her bra around her neck in an effort to commit suicide. Staff members intervened and the youth had some redness on her neck from the action. In the second incident, it was alleged that on February 7, 2019, the youth informed staff that she had swallowed laundry detergent in an attempt to self-harm. Hector Garza documents stated that medical staff observed the youth and reported no serious injury. The youth reportedly had an extensive history of self-harming and suicide attempts. This investigation took five months to complete and there was no approved extension. The youth had a history of self-harming, but the investigation was unable to determine whether the youth was subject to heightened supervision at the time of the alleged incidents. The investigator's requests for documentation from the facility were not satisfied. In

---

[125] Deborah Fowler and Kevin Ryan *The Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center* at 36-58, (February 2, 2021), ECF No. 1027; Deborah Fowler and Kevin Ryan, First Report 354-356, ECF No. 869.

fact, despite multiple information requests, the investigator documented the lack of cooperation by the facility in its failure to provide requested documentation. The facility's failure to timely report the allegations, along with its failure to cooperate with the investigation, erected barriers that contributed to the investigation's deficiencies.

On another occasion, an administrator at a GRO, the Whataburger Center for Children and Youth (Whataburger),[126] reported that a youth (age 16) allegedly attempted suicide by ingesting a metal bolt. The reporter stated that during the incident, staff were present and attempted to take the object away from the youth. The youth had a history of suicidal ideation. Following the incident, the youth was taken to the hospital for medical care and then to an inpatient facility.

RCCI's Whataburger investigation was deficient for a failure to interview key individuals and to follow-up on information disclosed during the investigator's interviews. The investigator did not interview two staff members who had pertinent information about the alleged incident of self-harming as documented in the investigative record. Staff members reported that the youth made a first attempt to self-harm earlier that same morning; however, the investigator did not sufficiently investigate whether supervision was adequate during this incident nor whether the shelter staff increased the youth's level of supervision following the first self-harming incident. Based upon evidence gathered during the investigation, it appears the shelter staff should have placed the youth on a specialized level of supervision due to a history of self-harming. The case reveals the gaps in the preparedness of certain facilities to appropriately address the needs of children and ensure their safety.

## E.   Summary of Performance for Receiving, Screening and Investigating Allegation of Maltreatment

Receiving Allegations

- Between February 1, 2020 and November 30, 2020, SWI received 533,471 calls. During the period analyzed, 13% (69,468) of calls were abandoned, a decrease from 18% observed in the previous report.[127]
- On average, callers waited for 2.3 minutes before their calls were handled or abandoned, an improvement by almost two minutes from the data reported in the Monitors' First Report.[128] Seventy percent (373,970) of callers waited on the queue for under one minute.

Screening Allegations

---

[126] Whataburger relinquished its license on January 5, 2021. The Monitors include a detailed description of the events leading up to the closure of this GRO, and the subsequent use of the facility by Family Tapestry, an SSCC, in a concurrently filed but separate report.

[127] The First Report found that 18% of calls were abandoned from August 1, 2019 to January 31, 2020.  *See* Deborah Fowler and Kevin Ryan, First Report 64, ECF No. 869.
[128] During the last reporting period, the data demonstrated an average queue time of 4.2 minutes for calls placed from August 1, 2019 to January 31, 2020.

- The Monitors reviewed whether DFPS appropriately downgraded 185 referrals after SWI initially assigned them to RCCI for a Priority One or Two abuse or neglect investigation between May 1, 2020, and November 30, 2020. The Monitors determined 162 (88%) were appropriately downgraded.

- Most of the 23 inappropriate downgrades arose prior to the effective date of the new DFPS policy restricting secondary screening downgrade of intakes. The Monitors did not identify any referrals involving maltreatment in licensed foster care that were inappropriately downgraded in October or November 2020.

- In the First Report, the Monitors determined that of 174 intakes downgraded at secondary screening between July 31, 2019 and October 31, 2019, DFPS inappropriately downgraded 57 intake reports (33%), which contained allegations that warranted investigation for abuse or neglect. Thus, the Monitors' rate of disagreement with downgrade determinations dropped by 21 percentage points from 33% in the First Report to 12% presently.

- The Monitors reviewed whether DFPS appropriately downgraded 90 referrals after SWI initially assigned them to CPI for a Priority One or Two abuse or neglect investigation between May 1, 2020 and November 30, 2020. The Monitors determined CPI appropriately downgraded 88 of these intake reports (98%).

- The Monitors also reviewed 241 referrals to SWI from January and February 2020, which SWI sent directly to HHSC, involving a PMC child. Of these 241 referrals, 76 were assigned to HHSC for a non-abuse or neglect investigation to determine whether there was a violation of statute, administrative rules, or minimum standards and the other 165 intakes were administratively closed. Of these 241 reports, the Monitors concurred with SWI's determination in 98% (235) of intakes.

- The Monitors also reviewed 66 referrals that SWI sent directly to HHSC for a minimum standards investigation in October 2020 that involved children with PMC status. The Monitors found that SWI appropriately determined that none of these intakes contained an allegation of abuse or neglect of a PMC child and were properly assigned to HHSC for follow up.

- The Monitors also reviewed 88 SWI referrals from November 2020 that involved children with PMC status and concurred with SWI's determination 94% of the time (83 intakes), agreeing those referrals did not contain an allegation of abuse or neglect of a PMC child and were properly assigned to HHSC.

Investigating Allegations

- Of the 768 RCCI investigations DFPS completed involving PMC children between May 1, 2020 and October 31, 2020, the Monitors evaluated 403 investigations. Of those 403 RCCI investigations, the Monitors concurred with the outcome of all 31 (8%) that resulted in a substantiation of the allegations with a disposition of RTB.

- The Monitors found that of the 365 investigations where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 300 cases (82%); inappropriately in 18 cases (5%); and conducted investigations with such substantial deficiencies in 47 cases (13%) that the Monitors were prevented from reaching a conclusion.

- In addition to the 65 cases (18%) among a sample of 365 investigations that RCCI Ruled Out between May 1, 2020 and October 31, 2020 that had substantial deficiencies or were inappropriately resolved by RCCI, the Monitors also identified four investigations in which RCCI assigned an RTB disposition to some allegations or administratively closed that had substantial deficiencies or were inappropriately resolved by RCCI.

- In the First Report, the Monitors determined 28.6% of sampled investigations had substantial deficiencies and/or were inappropriately resolved, and the present results for this period reflect a significant improvement.

## F.   Timeliness of RCC Investigations: Remedial Orders 5 through 11; 16 and 18 Performance Validation (DFPS)

Remedial Order 5: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

Remedial Order 6: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

Remedial Order 7: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

Remedial Order 8: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

Remedial Order 9: *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

Remedial Order 10: *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

79

Remedial Order 11: *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Remedial Order 16: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

Remedial Order 18: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

## 1.      Recent Policy Changes

DFPS changed its policy defining the initiation of an investigation three times between May 1, 2020 and January 31, 2021. For investigations initiated from May 1, 2020 through August 31, 2020, the DFPS policy in effect required initiation to occur through face-to-face contact with all alleged victims.[129] In September 2020, DFPS revised its policy. This policy required investigators to initiate investigations through face-to-face contact with one alleged victim, an adult involved in the allegation, or through contact with a collateral source.[130] DFPS stated that it made this change because:

> [D]ata intended to measure timeliness of initiations and face-to-face contact with all alleged victims had the unintended consequence of double-counting the timeliness of face-to-face contact with all alleged victims while excluding other potential methods for initiating an investigation. The double-count occurs when both the initiation measure and the measure of timeliness of face-to-face contact with all alleged victims are defined identically.[131]

DFPS reported that the change was meant to eliminate the "total overlap and reflect that timely initiation and face-to-face contact with alleged victims were two related but distinct measures…"[132] Moreover, DFPS communicated that it would employ these new measures retrospectively to evaluate its performance due to its belief that this was a better representation of performance.[133] Soon thereafter, however, in December 2020, DFPS again changed its initiation

---

[129] DFPS, Investigations Division Field Communication #008 (Mar. 11, 2019) (on file with the Monitors).

[130] DFPS, Investigations Division Field Communication #26 (September 3, 2020) (on file with the Monitors).

[131] Email from Heather Bugg to Kevin Ryan and Deborah Fowler, *summarizing the reason for the September 2020 policy change and the December 2020 policy change* (Dec. 1, 2020) (on file with the Monitors).

[132] *Id.*

[133] Email from Audrey Carmical to Kevin Ryan and Deborah Fowler (August 27, 2020) (on file with the Monitors). "We will utilize this definition for the timeliness indicator we will add in Q4 reporting (for all investigations upon which we are reporting, including those initiated prior to the policy change). We understand that the Monitors may

policy to require face-to-face contact with one alleged victim or through an attempted contact with the victim.[134]

Subsequently, in January 2021, DFPS changed its initiation policy again to require investigators to make face-to-face contact with each alleged victim to initiate an investigation.[135] At that time, DFPS further stated that:

> [e]ffective January 4, 2021 and thereafter, there will be no additional time added to the required timeframes even if there is an approved exception. In the reports we provide to you, however, we will continue to include information about approved exceptions to face-to-face contact to provide context. As a result of these changes, we anticipate that timely face-to-face and timely initiation in reports will likely be lower than using the previous methodology.[136]

For reviews conducted for investigations opened under the January 2021 policy, the Monitors will measure performance in association with this policy. During the period under review, the Monitors measured performance in association with the effective date of the DFPS policies.

**Data and Information Request and Production**

To validate the State's performance associated with Remedial Orders 5 through 11, 16 and 18, the Monitors requested from the State key data and information for all investigations conducted by RCCI regarding any child in the PMC General Class.[137]

In the previous reporting period, the State notified the Monitors that it could not provide some of the requested data relevant to its performance for these orders.[138] Subsequently, the State implemented updates to its data systems, particularly IMPACT, and began to submit data reports with the relevant information to measure performance related to Orders 5 through 11, 16 and 18.

**Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS)**

      a.     **Methodology**

For validation of orders measuring the timeliness of various aspects of RCCI investigations, the monitoring team reviewed all RCCI investigations that were opened by the State

---

wish to continue measuring our timeliness of initiation by looking solely at FTF contact with all alleged victims but we think tracking them as separate measures provides a more illustrative view of whether action is being taken quickly at the outset of investigations." *Id.*

[134] *See* DFPS., Child Care Inv. Handbook § 6411-6413 (in effect December 1, 2020); *see also*, Email from Heather Bugg, DFPS to Kevin Ryan and Deborah Fowler, Monitors (Dec. 1, 2020) (on file with the Monitors).

[135] DFPS, Child Care Inv. Handbook § 6411 (in effect Jan. 2021); *see also*, Email from Heather Bugg, to Kevin Ryan and Deborah Fowler, Monitors, *alerting the Monitors of the January 2021 change in policy* (Jan 4, 2021) (on file with the Monitors). Email from Jane Burstain to Tim Ross et al. (April 29, 2021 8:55 ET) (on file with the Monitors) ("Under current policy, timely initiation of an RCI investigation is only measured through face-to-face contact with all alleged victims within the required timeframes.").

[136] *Id.*

[137] Deborah Fowler and Kevin Ryan, First Report 102-103. ECF No. 869.

[138] *Id.* at 104-105, ECF No. 869.

from May 1 to September 30, 2020.[139] The monitoring team reviewed the data provided by DFPS to validate performance for all 657 investigations opened by RCCI during this time period.[140] The monitoring team also independently performed corresponding case record reviews for all 657 investigations opened during this time period to validate the data as reported by DFPS. Through these case record reviews, the Monitors were able to substantially validate the accuracy of the data reports and thus, the results in this report reflect the data as reported to the Monitors by DFPS. The monitoring team reviewed the 657 investigations for compliance with the Court's orders relating to timeliness of RCCI Investigations using the methodologies described below, by Order:

- Remedial Order 5: To measure initiation in Priority One Investigations within 24 hours, the Monitors reviewed the data to determine whether the investigation was initiated within 24 hours in a manner consistent with the DFPS policy in effect at the time of the investigation initiation, two of which are relevant to this time period under review. For investigations initiated from May 1, 2020 through August 31, 2020, the DFPS policy in effect required initiation to occur through face-to-face contact with all alleged victims.[141] In September 2020, the revised DFPS policy in effect at the time required initiation to occur through face-to-face contact with an alleged victim, an adult involved in the allegation, or through contact with a collateral source.[142] Therefore, for investigations initiated from May 1 through August 31, 2020, the Monitors reviewed the intake date and time, and the date and time of the first face-to-face contact with each alleged victim; for September 2020 investigations, to measure initiation in Priority One Investigations within 24 hours, the Monitors reviewed the intake date and time from IMPACT, and the initiation date, time, and method of initiation to determine whether the investigation was initiated within 24 hours of intake in conformance with the effective policy.

- Remedial Order 6: To measure initiation in Priority Two Investigations within 72 hours, the Monitors reviewed the data to determine whether the investigation was initiated within 72 hours in a manner consistent with the DFPS policy in effect at the time of the investigation initiation. For investigations initiated from May 1 through August 31, 2020, the DFPS policy in effect required initiation to occur through face-to-face contact with all alleged victims.[143] In September 2020, the revised DFPS policy in effect at the time required initiation to occur through face-to-face contact with an alleged victim, an adult

---

[139] To identify investigations opened between May 1, 2020 and September 30, 2020, the Monitors used the "Date Investigation Stage Start" data field. The source files included: open investigations and closed investigations, as reported in RO3.2 RCI Investigations Q3 FY 20 - July-15-20- 99217.xlsx; RO3.2 RCI Investigations Q4 FY 20 - Sept-30-20- 99229-with provider dates.xlsx; RO3.2 RCI Investigations FY21-Sept 100165 with provider dates.xlsx; RO3.2 RCI Investigations - Oct 20 100489 with provider dates.xlsx, and RO3.2 RCI Investigations - Nov 20 101137 with provider dates.xlsx.

[140] The DFPS data included 13 investigations that were administratively closed and were, therefore, excluded from the analysis. Another five investigations lacked Priority status indication and are not included in these results but were reviewed manually. In addition, for Remedial Order 10, the Monitors reviewed DFPS's report of the total number of RCCI investigations involving children in the PMC class open longer than 30 days as of April 6, 2021, and the total number of investigations with an extension approved for good cause documented in the investigative record as of April 6, 2021.

[141] DFPS, Investigations Division Field Communication #008 (Mar. 11, 2019) (on file with the Monitors).

[142] DFPS, Investigations Division Field Communication #26 (September 3, 2020) (on file with the Monitors).

[143] DFPS, Investigations Division Field Communication #008 (Mar. 11, 2019) (on file with the Monitors).

involved in the allegation, or through contact with a collateral source.[144] Therefore, for investigations initiated from May 1 through August 31, 2020, the Monitors reviewed the intake date and time and the date and time of the first face-to-face contact with each alleged victim; for September investigations, to measure initiation in Priority Two Investigations within 72 hours, the Monitors reviewed the intake date and time from IMPACT, and the initiation date, time, and method of initiation to determine whether the investigation was initiated within 72 hours of intake consistent with the effective policy.

- Remedial Order 7: To measure face-to-face contact with all alleged victims in Priority One investigations within 24 hours, the monitoring team calculated performance using the intake date and time in IMPACT and the date and time of the first face-to-face contact with each alleged victim in IMPACT.[145]

- Remedial Order 8: To measure face-to-face contact with all alleged victims in Priority Two investigations within 72 hours, the monitoring team calculated performance using the intake date and time in IMPACT and the date and time of the first face-to-face contact with each alleged victim in IMPACT.

- Remedial Order 9: To measure reporting of all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, the Monitors assessed the quality and availability of data concerning the date and time of the first face-to-face contact with each alleged victim in IMPACT.

- Remedial Order 10: To measure completion of Priority One and Priority Two investigations within 30 days, the monitoring team calculated compliance using the intake date and time in IMPACT and the date submitted for approval in IMPACT.[146] In addition, the Monitors reviewed the total number of investigations reported by DFPS as open as of April 6, 2021, and the total number of those open longer than 30 days as of April 6, 2021. The Monitors assessed whether the investigations reported by DFPS as open longer than 30 days included a current extension approved for good cause documented in the investigative record as of April 6, 2021. If the investigation was extended more than once, the Monitors assessed whether all extensions for good cause were documented in the investigative record.

---

[144] DFPS, Investigations Division Field Communication #26 (September 3, 2020) (on file with the Monitors).

[145] Investigations were only deemed timely if investigators met with each alleged victim associated with an investigation individually, denoted by a timestamp of first face-to-face contact in IMPACT.

[146] Email from Heather Bugg to Kevin Ryan and Deborah Fowler (Jan 4, 2021) (on file with the Monitors). DFPS states the correct field to calculate completion of investigations is the final date submitted for approval in IMPACT. "For reports due to you January 4, 2021 and after, the final date submitted for approval in IMPACT will be used to calculate the completion of all investigations as we believe that this will better align with the Court's Order and will ensure consistency in reporting and ultimately ease verification efforts. When an investigator submits for closure an investigation in IMPACT, the supervisor may determine that the case needs additional work or documentation to ensure a quality investigation has occurred. If so, the supervisor will return the investigation and once the additional tasks have been completed, the caseworker will submit it again. Because the IMPACT date is captured in an automated way and the CLASS date is manually entered, the IMPACT date will provide a more accurate date and may ease verification and as the agency moves forward in its efforts to improve the quality of its investigations, it believes it's important to capture the final submission rather than initial submission date." *Id.*

- Remedial Order 11: To measure documentation of approved extensions to investigations, the monitoring team reviewed the extensions for RCCI Investigations sections of the source files. The Monitors also assessed whether the investigations reported by DFPS as open longer than 60 days as of April 6, 2021 included a current extension approved for good cause documented in the investigative record as of April 6, 2021. If the investigation was extended more than once, the Monitors assessed whether all extensions for good cause were documented in the investigative record.

- Remedial Order 16: The Monitors measured investigation completion using the date documentation was submitted to the supervisor. Therefore, investigations are completed only when the documentation has been submitted to the supervisor for the final time.[147]

- Remedial Order 18: To measure timeliness of mailing notification letters to the referents and providers in Priority One and Two investigations, the Monitors calculated compliance using the date of supervisor approval, the date of notification to the reporter from IMPACT, and the date of notification to the provider from CLASS. In addition, beginning in September 2020, the Monitors calculated DFPS performance with its newly added IMPACT data field identifying the date of notification to the provider. To be considered timely for this Order, the State must have notified both the referent and the provider within five days of closing the investigation. If either the referent or the provider was notified more than five days after the investigation was closed or was not notified at all, the notification was counted as untimely. The Monitors used only the investigations that opened and closed during the time period since the required action is only triggered by case closure.

  b.  **Remedial Order 5: Initiation within 24 Hours in Priority One Investigations**

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within twenty-four hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

  The Monitors found that of 657 investigations opened by RCCI between May 1, 2020 and September 30, 2020, 48 were assigned Priority One, requiring that DFPS initiate the investigation within 24 hours of intake. DFPS initiated 79% (38) of Priority One investigations within 24 hours of intake in a manner consistent with existing policy. Twenty-one percent (10) of investigations were not initiated timely or did not have sufficient data to assess timeliness. DFPS's rate of initiating Priority One investigations through face-to-face contact with each alleged victim within 24 hours in the Monitors' first report was 68%.[148]

---

[147] Email from Heather Bugg, Dir. of Project Management, DFPS. to Kevin Ryan and Deborah Fowler, Monitors (Jan 4, 2021) (on file with the Monitors).

[148] *See* Deborah Fowler and Kevin Ryan, First Report 109, ECF No. 869.

**Figure 4.10: Initiation of Investigations within 24 Hours in Priority One Investigations per Existing Policy**



Source: Priority One Investigations Opened May - September 2020
*n=48 investigations opened*

■ Twenty-four hours   ■ Not timely

Of the 37 RCCI investigations opened between May 1, 2020 and August 31, 2020 that were assigned Priority One, DFPS initiated 76% (28) of the investigations within 24 hours of intake through face-to-face contact with each alleged victim (per the existing policy). An additional 5% (2) of investigations had documentation of exceptions to initiation through face-to-face contact but neither of the investigations with documented exceptions were initiated timely through an alternate method. The remaining 19% (7) of investigations either did not include face-to-face contact with each alleged victim within 24 hours or did not have sufficient data to assess timeliness.

During September 2020 when the DFPS policy changed and no longer required face-to-face contact with each alleged victim in order to initiate an investigation, of the 11 Priority One investigations opened in September 2020, 91% (10) of investigations were initiated within 24 hours of intake with face-to-face contact with at least one alleged child victim (consistent with the policy in effect at the time). One investigation did not have sufficient data to assess timeliness.

    c.    **Remedial Order 6:  Initiation within 72 Hours in Priority Two Investigations**

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within seventy-two hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

DFPS disclosed 609[149] Priority Two RCCI investigations requiring DFPS initiation within 72 hours of intake. DFPS initiated 81% (494) of Priority Two investigations within 72 hours of intake in a manner consistent with existing policy. Eighteen percent (107) of investigations were not initiated timely or did not have sufficient data to assess timeliness. One percent (8) of investigations had a documented exception and were initiated timely. DFPS's rate of initiating Priority Two investigations through face-to-face contact with each alleged victim within 72 hours in the Monitors' first report was also 81%.[150]

**Figure 4.11: Initiations of Investigations within 72 Hours in Priority Two Investigations per Existing Policy**



Source: Priority Two Investigations Opened May - September 2020
*n= 609 investigations opened*

Of the 468 RCCI investigations opened between May 1 and August 31, 2020, that were assigned Priority Two, DFPS initiated 78% (366) of the investigations within 72 hours of intake through face-to-face contact with each alleged victim (per the existing policy). Of 16 investigations with documented exceptions, 50% (8) of the 16 were initiated timely.[151] The remaining 18% (86) of investigations either did not include face-to-face contact with each alleged victim within 72 hours or did not have sufficient data to assess timeliness.

During September 2020 when the initiation policy did not require face-to-face contact with each alleged victim, out of the 141 Priority Two investigations opened that month, 91% (128) of investigations were initiated within 72 hours of intake consistent with the DFPS initiation policy

---

[149] One investigation involved seven alleged victims, five who were classified as alleged victims of a Priority One matter and two who were classified as alleged victims in a Priority Two matter. This investigation is only included in the Priority One analyses.

[150] *See* Deborah Fowler and Kevin Ryan, First Report 110, ECF No. 869. During the prior reporting period, the policy required face-to-face contact with each alleged victim. *Id*.

[151] Seven of the investigations with exceptions were initiated through face-to-face contact and one investigation was listed as "Other."

in effect during September. Four investigations were not initiated within 72 hours, and nine investigations did not have sufficient data to assess timeliness. Ninety-three percent (131) of investigations were initiated with face-to-face contact with at least one alleged child victim.[152]

     d.    **Remedial Order 7:  Timeliness of initial face-to-face contact with the alleged victims in Priority One Investigations**

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than twenty-four hours after intake.*

Of the 48 Priority One investigations opened by RCCI between May and September 2020, the Monitors found that 79% (38) of the investigations included initial face-to-face contact with each alleged child victim individually within 24 hours. An additional 4% (2) of investigations had documentation of approved exceptions to face-to-face contact. DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority One investigations within 24 hours in the Monitors' first report was 68%.[153]

Of the two investigations with exceptions for face-to-face contact, the data documented that in one instance, the child's whereabouts was unknown and in the other instance, the approved exception was due to "other circumstances beyond the investigator's control preventing the interview or observation from taking place within the initiation time frame."

The remaining eight investigations (17%) either did not include face-to-face contact with each alleged victim individually within 24 hours of intake (7) or did not have sufficient data to assess timeliness (1).

---

[152] One investigation's initiation type was listed as "Other," and nine investigations did not have data available to indicate the type of initiation. However, the case record reviews showed that the methods were consistent with policy.
[153] *See* Deborah Fowler and Kevin Ryan, First Report 111,  ECF No. 869.

**Figure 4.12: Face-to-Face Contact within 24 Hours with All Alleged Child Victims in Priority One Investigations**



e.    **Remedial Order 8:  Initial Face-to-Face Contact with All Alleged Victims in Priority Two Investigations within 72 Hours**

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than seventy-two hours after intake.*

Of the 609 RCCI investigations assigned Priority Two, the Monitors' review found that 79% (484) of investigations included initial face-to-face contact with each alleged child victim within seventy-two hours of intake. Twenty-two additional investigations (4%) had documented exceptions to face-to-face contact. DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority Two investigations within 72 hours in the Monitors' First Report was 81%.[154]

Of the 22 RCCI investigations with documented exceptions for face-to-face contact, 27% (6) were due to the unknown whereabouts of the child; 14% (3) were due to a prior interview with alleged victim by CPS, law enforcement, or a child advocacy center before RCCI received the report; 5% (1) were due to the alleged victim no longer living in Texas; and 55% (12) were due to "other circumstances beyond the investigator's control preventing the interview or observation from taking place within the initiation time frame."

---

[154] *See* Deborah Fowler and Kevin Ryan, First Report 112, ECF No.  869.

The remaining 103 investigations (17%) either did not include individual face-to-face contact with each alleged victim within 72 hours (59) or did not have sufficient data to assess timeliness (44).

**Figure 4.13: Face-to-Face Contact within 72 Hours with All Alleged Child Victims in Priority Two Investigations**



Source: Priority Two Investigations Opened May - September 2020
*n=609 investigations opened*

- 103 / 17% — Not timely
- 22 / 4% — Other
- 484 / 79% — Seventy-two hours

Legend: ■ Seventy-two hours  ■ Not timely  ■ Other

    f.    **Remedial Order 9:**

*Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

Overall, in 90% (590) of all 657 RCCI investigations (both single and multi-alleged victim investigations) DFPS was able to track and report in its data whether face-to-face contact was made with each alleged child victim within an investigation and the date and time that contact occurred for each child.

In 97% (435) of the 450 investigations with one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with the alleged child victims within an investigation and the date and time the contact occurred.

In 75% (155) of 207 investigations with more than one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with each of the alleged child victims within an investigation and the date and time the contacts occurred.

89

g.     **Remedial Order 10:  Completion of Priority One and Priority Two Investigations within 30 Days**

*Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Of the 657 Priority One and Priority Two RCCI investigations opened between May 1, 2020 and September 30, 2020, the data documented that 51% (337) were not completed within 30 days. Forty-two percent (273) of investigations were documented as completed within 30 days of intake and 7% (47) had approved extensions and were completed within the extension timeframe. DFPS's rate of completing Priority One and Two investigations within 30 days in the Monitors' first report was 19%.[155]

While 82 investigations had approved extensions, as noted above, only 47 of those investigations were completed within the approved timeframe allotted by the extension; 24 were not completed within the allotted extension timeframe; and 11 investigations were still open at the time of review.

**Figure 4.14: Completion of Priority One and Two Investigations within 30 Days**



While over 50% of investigations opened in May, June, and July 2020 were completed within 30 days, timely investigation completion dropped to 44% in August 2020 and to 35% in September 2020.

---

[155] *See* Deborah Fowler and Kevin Ryan, First Report 114, ECF No. 869.

**Figure 4.15: Completion of Priority One and Two Investigations within 30 Days over Time**



DFPS made substantial progress complying with Remedial Order 10 by April 6, 2021. Of the 151 Priority One and Priority Two RCCI investigations that remained open as of April 6, 2021, the State's data documented that 5% (8) were open for more than 30 days with an extension, and 1% (2) were open more than 30 days without an extension. The two oldest investigations that were overdue as of April 6, 2021 without extensions were one and three days overdue.

The Monitors confirmed the eight investigations reported by DFPS as open longer than 30 days with a current extension had extensions that were approved for good cause documented in the investigative record as of April 6, 2021. To achieve this level of performance, DFPS had to close at least 465 RCCI investigations involving PMC children between the March 1, 2021 and April 6, 2021. The average monthly rate of closure from August 1, 2019 through February 28, 2021 has been 120 closures per month and has ranged between 48 and 180 investigations per month. The Monitors will review the quality of those investigations pursuant to Remedial Order 3 and will advise the Court.

h.    **Remedial Order 11: DFPS Track and Report Requirement**

*Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an*

91

*investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

The Monitors reviewed data and information provided by DFPS in association with Remedial Order 11, which requires DFPS to track and report all investigations that are not completed on time. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

Of the 337 investigations that were opened by RCCI between May and September 2020 and were not completed within 30 days, DFPS data included extensions approved for 82 investigations with the dates the extensions were approved, the reasons for the extensions, and the number of additional days approved by each of the extensions.[156]

Each of these 82 investigations contained at least one extension approved for either seven, 14, 21, or 30 days each. Of those with extensions, 66% (54) included one extension, 27% (22) included two, 6% (5) included four, and 2% (1) included six extensions. All extensions included documented approval dates and all but two included documented reasons for the extension.

**Figure 4.16: Number of Extensions in Priority One and Two Investigations**



The total number of extension days approved for an investigation ranged from seven to 120. Twenty-one percent (17) of investigations with extensions were for 7-14 days; 49% (40) were extended for 15-30 days; 7% (6) were extended 31-44 days; 16% (13) were extended 45-60 days; and 7% (6) were extended for more than 60 days.

---

[156] These data matched to the investigations' corresponding intake start date and original due date and therefore, the Monitors were able to determine the due dates associated with the extensions to assess timeliness of completion within the extension period.

For all open investigations as of April 6, 2021, the total number of extension days approved for an investigation ranged from 14 to 60. Twenty percent (2) of investigations with extensions were for 7 to 14 days; 60% (6) were extended for 15 to 30 days; and 20% (2) were extended 45 to 60 days.

i. <strong>Remedial Order 16: Timeliness of Completion and Submission of Documentation in Priority One and Priority Two Investigations</strong>

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

DFPS advised the Monitors that the agency uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered completed when the documentation is finally submitted to the supervisor in compliance with this Order.[157]

j. <strong>Remedial Order 18: Timeliness of Notification Letters to Referent and Provider</strong>

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

For the referent letter, of the 538 (out of 657) Priority One and Priority Two investigations that were documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 40% (213) of investigations. Of the remaining cases, in 1% (3) of investigations, notification letters to the referents were not mailed timely; 56% (299) were mailed to the referent prior to supervisor approval; 3% (17) of investigations had an anonymous reporter; and one percent (6) were unknown due to documentation deficiencies. DFPS's rate of mailing notification letters to referents within five days of investigation closure in Priority One and Two investigations in the Monitors' First Report was 78%.[158]

---

[157] DFPS advised the Monitors, "When an investigator submits for closure an investigation in IMPACT, the supervisor may determine that the case needs additional work or documentation to ensure a quality investigation has occurred. If so, the supervisor will return the investigation and once the additional tasks have been completed, the caseworker will submit it again. Because the IMPACT date is captured in an automated way and the CLASS date is manually entered, the IMPACT date will provide a more accurate date and may ease verification and as the agency moves forward in its efforts to improve the quality of its investigations, it believes it's important to capture the final submission rather than initial submission date. Finally, the final date submitted for approval in IMPACT will also be used as the one date to determine compliance with Remedial Order 16 to 'submit and complete documentation in Priority One and Priority Two investigations on the same day the investigation is completed.' The date complete in CLASS will no longer be used to calculate compliance with any remedial order." Email from Heather Bugg, to Kevin Ryan and Deborah Fowler (Jan 4, 2021) (on file with the Monitors).

[158] *See* Deborah Fowler and Kevin Ryan, First Report 118, ECF No. 869.

**Figure 4.17: Notification Letter Sent to Referent within Five Days of Investigation Closure in Priority One and Two Investigations**



For the provider letter, HHSC mailed its notification letters to providers in abuse, neglect, and exploitation investigations within five days of closure in 59% (317) of investigations.[159] The notification letters to providers were not mailed timely in 20% (106) of investigations. In addition, 1% (8) were mailed prior to supervisor approval; and 20% (107) did not have sufficient data to assess timeliness. HHSC's rate of mailing notification letters to providers within five days of investigation closure in Priority One and Two investigations in the Monitors' First Report was 65%.[160]

---

[159] The Monitors were provided with three data sources regarding letters to providers. DFPS and HHSC use different dates within their different systems to determine closure of an abuse and neglect investigation. The Monitors adhered to the DFPS request that the CLASS closure date not be used to calculate compliance with the Remedial Orders associated with RCCI investigations. DFPS instead requested the Monitors use the date of supervisor approval in IMPACT. Email from Heather Bugg to Kevin Ryan and Deborah Fowler, Monitors (Jan. 4, 2021). The Monitors assumed when DFPS made the request that it had conferred with HHSC, but the Monitors learned on April 30, 2021 that HHSC instead wants the Monitors to use a different date to measure compliance than the date requested by DFPS.
[160] *See* Deborah Fowler and Kevin Ryan, First Report 119, ECF No. 869.

**Figure 4.18: Notification Letter Sent to Provider within Five Days of Investigation Closure in Priority One and Two Investigations**



Beginning in September 2020, the Monitors also assessed whether notification letters to providers were mailed by DFPS within five days of investigation closure using a new DFPS data field provided for date of notification to provider in IMPACT. The letter to the provider is sent by DFPS pursuant to its new policy effective for cases closed after September 1, 2020.[161] The Monitors identified 87 investigations opened between May 1, 2020 and September 30, 2020 and closed between September 1, 2020 and September 30, 2020. Of these 87 investigations, the notification letters were mailed within five days of investigation closure in 83% (72) of investigations. In 17% (15) of investigations, the Monitors could not determine whether the letters were sent timely due to documentation deficiencies.

Of the 538 (out of 657) investigations that were documented as closed at the time of the Monitors' review, 23% (123) included evidence that notification to the referent and provider occurred within five days of closure of the investigation as required by Remedial Order 18.

**Summary**

Remedial Order 5:
- 79% (38) of RCCI investigations opened from May 1 to September 30, 2020 were initiated within 24 hours of intake; and
- 21% (10) of RCCI investigations opened from May 1 to September 30, 2020 were not initiated timely or did not have sufficient data to assess.

Remedial Order 6:

---

[161] DFPS, Investigations Division Field Communication #26 (September 3, 2020) (on file with the Monitors).

- 81% (494) of RCCI investigations opened from May 1 to September 30, 2020 were initiated within 72 hours of intake;
- 18% (107) of RCCI investigations opened from May 1 to September 30, 2020 were not initiated timely or did not have sufficient data to assess; and
- 1% (8) of RCCI investigations opened from May 1 to September 30, 2020 had a documented exception and were initiated timely.

Remedial Order 7:
- 79% (38) of RCCI investigations opened from May 1 to September 30, 2020 included initial face-to-face contact with all alleged victims within 24 hours of intake;
- 17% (8) of RCCI investigations opened from May 1 to September 30, 2020 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess; and
- 4% (2) of RCCI investigations opened from May 1 to September 30, 2020 had an approved exception to face-to-face contact.

Remedial Order 8:
- 79% (484) of RCCI investigations opened from May 1 to September 30, 2020 included initial face-to-face contact with all alleged victims within 72 hours of intake;
- 17% (103) of RCCI investigations opened from May 1 to September 30, 2020 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess; and
- 4% (22) of RCCI investigations opened from May 1 to September 30, 2020 had an approved exception to face-to-face contact.

Remedial Order 10:
- 51% (337) of investigations were documented as completed within 30 days of intake;
- 42% (273) of investigations were not completed timely; and
- 7% (47) of investigations had an approved extension and were completed within the extension timeframe.
- For RCCI investigations open as of April 6, 2021, 5% (8) of investigations still open as of April 6, 2021 were open for more than 30 days and had an extension and 1% (2) of investigations still open were open for more than 30 days and did not have an extension.

Remedial Order 16:
- Investigation completion is measured by the date the investigation is submitted for approval. Therefore, all investigations are completed on the same day as submission.

Remedial Order 18 (Notification to Referent):
- 40% (213) of investigations included data that notification letters to referent(s) were mailed within five days of investigation closure;
- Less than 1% (3) of investigations did not have timely notification to referent(s);
- 56% (299) of investigations were mailed prior to supervisor approval;
- 1% (6) of investigations were unknown due to documentation deficiencies; and

- 3% (17) of investigations had an anonymous reporter

Remedial Order 18 (Notification to Provider):
- 59% (317) of investigations included data that notification letters to provider(s) were mailed within five days of investigation closure;
- 20% (106) of investigations did not have timely notification to provider(s);
- 1% (8) of investigations included letters that were mailed prior to supervisor approval; and 20% (107) of investigations were categorized as unknown due to documentation deficiencies.

## G.    Remedial Order B5

Remedial Order B5: *Effective Immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

## 1.    Background

### a.    First Court Monitors' Report Validation Findings

The Monitors' First Report reviewed findings from the monitoring team's independent case reads, and found that in 57 of the 115 (50%) cases reviewed, investigators took longer than 72 hours to notify the child's caseworker of an abuse or neglect allegation, if the investigators notified the caseworker at all.[162]  The First Report also included a review and summary of the State's own case read, which used the investigation priority timeframes as the measure for determining timeliness of the notifications.[163]  Of the 1,282 caseworkers that the State identified as requiring notification, 710 (55%) were notified within priority time frames.[164]

### b.    Updates and Policy Changes Following the Monitors' First Report

After the First Report was filed, the monitoring team asked the State to provide any policy changes or field communications related to IMPACT enhancements of December 19, 2019, which created an automated process to notify caseworkers when an abuse or neglect intake was received for a child on their caseload.[165]  On July 9, 2020, DFPS provided the Monitors with Field

---

[162] Deborah Fowler and Kevin Ryan, First Report 135, ECF No. 869.
[163] "DFPS determined that the highest rate at which investigators notified caseworkers within priority time frames across all the case record reviews was 69%, leaving a substantial number of investigations for which the investigator notified the caseworker at some point beyond the agency's priority-based timeframe for initiating an investigation. This rate of notification is much greater than the CPS Handbook's requirement that investigators notify caseworkers within 24-hours of receiving a report of abuse or neglect regardless of priority assigned."
[164] Deborah Fowler and Kevin Ryan, First Report 140, ECF No. 869.
[165] E-mail from Linda Brooke, Director, Monitoring Team, Texas Appleseed to Tara Olah *et al*., DFPS, June 30, 2020 (on file with Monitors).

Communication #017 (FC 17), and also provided a December 2019 Child Care Investigations Job Aid related to IMPACT notifications.[166]

FC 17 outlines the RCCI process for entering information into IMPACT during intake to ensure that the automated notification is sent.[167]  According to FC 17, the screener, supervisor, or designee at SWI notifies the CPS caseworker and supervisor by completing a "Notifications" section in IMPACT on the Priority/Closure page prior to stage progressing the intake report to an investigation.[168] The notification is generated during the intake stage once the investigation is either progressed to an investigation or downgraded.[169] According to the CCI Job Aid, once the investigator follows the described process for generating the notification, "[a]n alert and event will be sent to the Assigned Workload of the CVS Caseworker and Supervisor as well as an RCI intake indicator."[170]

### c.    September 2020 Contempt Hearing & December 18, 2020 Contempt Order

The Plaintiffs' July 2, 2020 Motion to Show Cause included an argument that the State should be held in contempt for failing to comply with Remedial Order B5.[171] The Plaintiffs' argument was based on the finding in the Monitors' First Report that caseworkers were timely notified of ongoing abuse and neglect investigations in only 50% of cases reviewed.[172] In response, the State argued that DFPS was not in contempt of Remedial Order B5 but had, in fact, implemented procedures that demonstrated  compliance.[173] The State argued that the Monitors' case record review failed to account for the IMPACT enhancement it implemented on December 19, 2019, which automatically generates an alert that notifies the CPS caseworker when a child is involved in an abuse or neglect intake.[174]  The State noted that in May 2020, caseworkers received the automated notification of all abuse and neglect intakes.[175]

During the contempt hearing on September 3, 2020, the Court asked the State's witness, Ashland Batiste, the Director of RCCI, about the notifications that the IMPACT enhancements automated on December 19, 2019:

> [ASHLAND BATISTE]: During the screening process, if an Intake involves a foster home and it's downgraded to a Priority None, an automated IMPACT alert is sent to the victim's caseworker and that caseworker's supervisor.

---

[166] Email from Tara Olah to Deborah Fowler, *re. RO B5 and RO37* (July 7, 2020) (on file with the Monitors).
[167] DFPS, Field Communication #017, December 20, 2019 (on file with Monitors).
[168] IT Automation in IMPACT 2.0 Roll Out, December 19, 2019, Field Communication #017
[169] *Id*. at 10.
[170] DFPS, *Child Care Investigations Job Aid: Notifications in IMPACT 5* (December 2019).
[171] Plaintiffs' Motion for Order to Show Cause Why Defendants Should Not be Held in Contempt (Plaintiffs' Motion to Show Cause), ECF No. 901.
[172] Plaintiffs' Motion to Show Cause at 11-12, ECF No. 901.
[173] Defendant's Response in Opposition to Motion to Show Cause at 16 (July 24, 2020), ECF No. 911.
[174] See Exhibit A (Batiste Declaration), 10 :32
[175] See Exhibit A (Batiste Declaration), 15 57.

If there are non-victim children in the foster home, an automated alert notification is also sent…[to] caseworkers and supervisors…The most recent data indicates that in May, June and July, those automated alerts were sent 100 percent of the time to caseworkers and those supervisors.

THE COURT: Okay.  The notifications of the PNs, as well as Priority One and Priority Two, do you send those to caseworkers and their supervisors?

THE WITNESS: Yes, Your Honor.  For Priority One and Priority Two, Intake notifications are also sent to the caseworker's supervisor using the IMPACT automated alert.

THE COURT: How quickly?

THE WITNESS: Those are done upon screening.  And so the screening requirement and priority decisions must be made the same day and no later than 24 hours from Intake.

THE COURT: Okay.  And what do you put in those notifications?  Do you just say that there was – according to the Monitors, there's a little flag, but it doesn't say – it means the caseworkers have to go to IMPACT or CLASS to actually see what the allegations is.  Have you corrected that or can they actually – do they actually get notification instantly of the – of the particular allegations?

THE WITNESS: So the notification, it is an alert that's put on their to-do list or work list in IMPACT…and they go into it and review the – they can go into IMPACT and review the allegation and information.[176]

On September 4, 2020, the second day of the hearing, the Plaintiffs' counsel asked the DFPS Director of Field for CPI, Sherry Gomez, twice whether this notification process was in place for all children in the General PMC Class who are placed in kinship homes.  However, Ms. Gomez appeared to misunderstand the question; her answers related to notification of CPI caseworkers, rather than the child's CVS caseworker.[177]  When Plaintiffs' counsel asked DFPS Commissioner Masters the same question, she was not able to provide a definitive answer, but she said she "thought" CPI sent caseworkers for children in kinship placements a notification when an abuse or neglect investigation is opened, but was unsure how the notification was sent or what it looked like.[178]

In its December 18, 2020 order holding the State in contempt, the Court found that Defendants failed to comply with Remedial Order B5.[179]  The Court wrote that in order to implement Remedial Order B5 in a way that "ensure[s] that Texas's PMC foster children are free from an unreasonable risk of harm," as required by the Court's injunction, Defendants must do

---

[176] Telephonic/Zoom Show Cause Hr'g Tr. (September 3, 2020) 30-31, ECF No. 964.
[177] *See* Telephonic/Zoom Show Cause Hr'g Tr. (September 4, 2020) 32-33, 53, ECF No. 967.
[178] *Id*. at 148-49.
[179] Order at 155 (December 18, 2020) ECF No. 1017.

more than simply checking the boxes of (1) providing bare-bones notifications to caseworkers that allegations of abuse occurred; and (2) implementing a system for receiving, screening, and assigning such allegations for investigation.[180]

The Court found that Remedial Order B5 requires the State to ensure that it "promptly communicates" the allegations, themselves, including their substance, to the caseworkers, and the system that the State must put in place to comply with the Remedial Order must ensure that the State is "taking into account at all times the safety needs of children."[181] The Court noted that in testing for a "reasonable timeframe after initiation," DFPS asked whether investigators notified the caseworkers within the timeframe that is required for initiation of the investigation.[182] The Court found that this was not an appropriate measure:

> Defendants need not wait for the initiation of an **investigation** in order to communicate an **allegation** to the caseworker.  Remedial Order B5 requires notification to the caseworker of the receipt of the allegation of abuse, not the initiation of an investigation; therefore, tying notification of an allegation under Remedial Order B5 to the timeframe for initiating Priority One and Priority Two investigations is inconsistent with the remedial order.[183]

The Court noted that the Monitors' case read showed that nearly a quarter of caseworkers in the sample did not receive any notification of an allegation of abuse or neglect, and that "in numerous additional cases, notifications did not occur in a timely manner."[184]  The Court ordered the State to submit sworn certification of its compliance with Remedial Order B5 within 30 days following the date of the Order.[185]

In reviewing the State's compliance with Remedial Order B5, the Court instructed the Monitors to:

> Determine whether Defendants are "promptly communicat[ing] allegations of abuse to the child's primary caseworker." In order to implement the remedy to ensure that PMC children are free from an unreasonable risk of serious harm, compliance with Remedial Order B5 requires more than prompt communication to the caseworker of the existence of an allegation. It requires that caseworkers receive prompt communication of "allegations of abuse." Therefore, the Court instructs the Monitors that in their assessment of Defendants' compliance with this Remedial Order, they must assess whether Defendants "promptly communicate[]" the substance of the "allegations of abuse" to "the child's primary caseworker.[186]

---

[180] *Id*.
[181] *Id*.
[182] *Id*.
[183] *Id*. at 155-56.
[184] *Id*. at 157.
[185] Order at 326 (December 18, 2020), ECF No. 1017.
[186] Order at 327 (December 18, 2020), ECF No. 1017.

d.      **Updates and Policy Changes Following the Contempt Hearing**

On October 16, 2020, DFPS notified the Monitors of a policy change as a result of the agency's review of notifications made in accordance with Remedial Order B5: during DFPS's review of August 2020 data, DFPS discovered six instances in which notification was not sent.[187] In each case, the six children were placed in an adoptive placement, but DFPS's responsibility for the children had not yet been terminated by the court.[188] DFPS policy allowed for a child's subcare stage to be closed in IMPACT when an adoption stage was opened.  A November 1, 2020, policy change requires the caseworkers to keep the subcare stage open until DFPS responsibility is terminated by a court.[189]

The monitoring team also asked the two SSCCs in Stage Two of CBC (therefore providing casework services for children under their purview), questions related to compliance with Remedial Order B5 during a January 7, 2021 virtual meeting with DFPS and the SSCCs.  The Monitors asked OCOK how their caseworkers receive notice that an abuse or neglect investigation has been opened.  OCOK responded that its caseworkers receive the automated notification in IMPACT, and also receive an email from RCCI.  According to OCOK, the SSCC has an internal expectation that its caseworkers and supervisors read the investigation in CLASS.  OCOK said that its staff had received training on using CLASS, however, the SSCC noted that they had experienced access problems with CLASS. 2INgage, the other SSCC providing case management for PMC children during the period, reported that they follow the same procedure for compliance with Remedial Order B5 that DFPS follows.  Case mangers stay abreast of allegations, track them in IMPACT, and share the information with the caseworker's supervisor.

e.      **DFPS' January 16, 2021 Certification of Compliance**

On January 16, 2021, DFPS filed its sworn certifications, including an affidavit (Exhibit F) from Clint Cox, DFPS Director of Residential Child Care Investigations (RCCI), that included DFPS's attempts to comply with Remedial Order B-5 prior to the contempt hearing and since.[190] In the affidavit, Mr. Cox certified enhancements to the IMPACT 2.0 system were deployed on December 19, 2019 and included automated notification to caseworkers of abuse and neglect intakes. According to Mr. Cox, the notification is sent to the caseworker and supervisor at the point in time the RCCI screener or supervisor makes the decision to stage progress to an investigation.[191] Mr. Cox also certified dissemination of Field Communication #17 to RCCI staff related to the deployed changes for Remedial Order B5.[192] Mr. Cox certified the November 1, 2020 update to CPS Policy Section 1411 that rectified the error of caseworker notification in instances of caseworkers not receiving notice.[193] The certification by Mr. Cox also documented the monthly

---

[187]  Email from Heather Bugg to Deborah Fowler and Kevin Ryan. (October 16, 2020) (on file with the Monitors).
[188] *Id*.
[189] Email from Heather Bugg to Deborah Fowler and Kevin Ryan *Caseworker Notifications of Abuse/Neglect Intakes – Remedial Order B5* (October 16, 2020) (on file with the Monitors).
[190] Defendants' Certification of Compliance, Exhibit F: Sworn Declaration for Remedial Order Nos 3, 5, 7, 10, and B-5, ECF No.1021-6.
[191] *Id*. at 153.
[192] *Id.*
[193] *Id*. at 154.

reporting for the automated notifications to CVS caseworkers; for the seven months of reporting reviewed, DFPS found 100% of the notifications were received by the child's caseworker during four of the seven months, two months were documented at 99%, and one month at 97%. [194]

A sworn certification by Erica Banuelos (Exhibit E), DFPS CPS Director of Field, was also filed on January 16, 2021. In her affidavit, Ms. Banuelos attested to short- and long-term solutions DFPS implemented in response to the Court's requirement that prompt notice include the substance of the allegations of abuse or neglect and account for the safety needs of children in *either* a licensed or unlicensed placement.[195] Ms. Banuelos's affidavit states that beginning January 14, 2021, "Statewide Intake (SWI) will be creating Information and Referrals (I&R) and directly assigning them to a caseworker's workload simultaneous to receiving a report of abuse and/or neglect and creating the intake when a child in DFPS temporary or permanent managing conservatorship is a principal in a Child Protective Investigation (CPI) or RCCI abuse or neglect referral."[196] Ms. Banuelos's affidavit states that this short-term solution will be created and assigned on the worker's caseload by SWI, will include the child's IMPACT person ID, information about the alleged victim[s] and perpetrator[s], and a narrative regarding the substance of the allegations.[197] The caseworker can click on the Information & Referral and launch a report with the intake information and allegations.[198] Furthermore, "[a]s a redundancy, when an RCCI intake is screened by the SWI screeners, the screener will email the caseworker and supervisor. This second notification will also include the allegations."[199] The certification also speaks to a "long-term IT solution," which will build on the December 19, 2019 IMPACT enhancements, and has an implementation date estimated in Fall 2021.[200]

## Data and Information Production

The State continues to provide monthly Statewide Intake data of abuse and neglect referrals received for all PMC children in the General Class in response to the Monitors' first data and information request.  In a subsequent request sent by the Monitors on February 21, 2020, the Monitors noted that DFPS had failed to provide the previously requested data for dates and manner of caseworker notification.[201]  The State responded that it "anticipate[d] being able to provide information as part of the DDS report once the data warehouse tables are built and functional. We currently anticipate including the information for Q3 FY 20 reports."[202]

---

[194] *Id*. at 156.

[195] Defendants' Certification of Compliance, Exhibit E: Sworn Declaration for Remedial Order Number B-5 ¶5, ECF No. 1021-5.

[196] *Id*. at ¶5.

[197] *Id*.

[198] *Id*. The affidavit also speaks to what a caseworker is required to do when they receive an I&R.  In addition to reviewing the abuse or neglect report in IMPACT, CLASS, or both and discussing it with their supervisor, according to the affidavit, they are also required to consult with the program director about the circumstances surrounding the investigation "no later than 7 p.m. the next business day" and document the staffing in the child's IMPACT record. *Id*. at ¶ 8.  They are also required to document any follow-up actions in IMPACT when they are completed.  *Id*. at ¶ 9.

[199] *Id*. at ¶ *6.*

[200] *Id*. at  ¶ 7.

[201] Email from Kevin Ryan, to Andrew Stephens (Feb. 21, 2020) (on file with the Monitors).

[202] Email from Tara Olah, DFPS to Kevin Ryan and Deborah Fowler, Monitors (March 24, 2020) (on file with the Monitors).

Beginning in July 2020 (for May 2020 data) DFPS included two new variables in its monthly RCCI intake data reports including "Notice to CVS worker and supervisor" and "Notice within 48 hours (RO37)." DFPS defined "Notice to CVS worker and supervisor" as the date/time that an automated notice about the intake was sent to the CVS caseworker and supervisor. DFPS did not make changes to the data it provided for CPI intakes for PMC children in the General Class.

The monitoring team discovered limitations in the SWI data of abuse and neglect referrals during the monitoring team's case record reviews. Referrals to RCCI are assigned an IMPACT case ID number which uniquely identifies the allegation and can be used to track investigations in the State's CLASS system. Allegations and their associated case ID numbers can be "linked" if multiple calls are made for the same allegation, for the same child, or for a similar allegation at an operation where an investigation is already underway. Linked allegations are grouped under a single case ID number. The case ID used for an investigation usually relates to the first referral related to the allegations that is received by SWI.

Data provided by the State included a case ID for all allegations. This case ID (IMPACT Case ID) was used by the Monitors to identify a child's case for both the automatic notification and caseworker communication verification. During the automatic notification verification, the monitoring team found that, for linked allegations, the case ID provided in the RCCI intake data represented the "linked" case ID, not the ID originally assigned to that allegation at intake. The automatic notification in the child's IMPACT event list was found for the correct intake date (usually the same or next day) but the case ID did not match the data for that date in the SWI intake data of abuse and neglect referrals provided the State. The case ID matching the SWI intake data was, in most cases, found in the child's event list with automatic notification occurring prior to the date of the selected intake. Questions posed to the State by the monitoring team verified that the case ID included in the RCCI SWI intake data represented the linked case ID for all linked allegations rather than the original Case ID assigned at intake.

**Remedial Order B5 Performance Validation**

a.    **Methodology**

To validate DFPS's compliance with Remedial Order B-5, the monitoring team conducted three separate case reads for the months of April 2020 through October 2020. For each sample period, all RCCI intakes received by SWI with a final Priority of One or Two were included in the randomized sample. Cases meeting the selection criteria were randomly selected based on a 95% confidence level for each month of data.[203]

The first case record review included 319 SWI intakes from April 2020 to June 2020. The second case read included 226 SWI intakes from July 2020 through August 2020, and the third case read included 270 SWI intakes from September 2020 through October 2020.

---

[203] Duplicate cases were removed from the universe of cases prior to sample selection. A duplicate was defined as a child with multiple intakes on the same day or a child with multiple intakes during the month for the same allegation and same Case ID. For both the first intake for that child in the month was included in the universe of cases for the sample.

To assess compliance with Remedial Order B5 regarding prompt communication of allegations of abuse or neglect to a child's primary caseworker, all three case reads included the following methodology:

- Verification of Automatic Notification: The monitoring team reviewed child event records in the State IMPACT system were reviewed to identify the date automatic notification[204] of an RCCI intake was sent to the child's caseworker.  The automatic notification analysis calculated the number of days from the date of the SWI intake to the date of notification. The exact time of notification was not available in IMPACT and therefore, the monitoring team measured the notification time period using calendar days.[205]

- Verification of Communication with Caseworker: The monitoring team reviewed CLASS investigation contact log records were reviewed to identify the first communication between the RCCI investigator and the child's primary CVS caseworker regarding the sample intake.[206] The caseworker communication analysis calculated the number of calendar days between the SWI intake and the first communication and the method of communication.

    b.    **Performance Validation Results, Remedial Order B5 Case Read Results**

For the three case reads conducted by the monitoring team, each sample consisted of RCCI intakes from SWI with a final Priority of One or Two (excluding intakes that were downgraded to PN).  Over the course of the three case reads, the monitoring team evaluated a total of 815 intakes alleging abuse or neglect.

The results of each case read found a high rate of timely automatic notifications from SWI to CVS caseworkers. Of automatic notifications identified by the monitoring team, all automatic notifications occurred within two days of RCCI intake.  The table below documents the rate of automatic notification identified and the timing of those notices.

---

[204] Automatic notification refers to the IMPACT system generated alert that appears on a child's event record and the caseworker's workload/To Do list when the SWI completes the *Notifications* section in IMPACT on the Priority/Closure page before stage progressing the intake to an investigation (Child Care Handbook CCI Policy 6353.1).

[205] Because State policy does not require an investigator to notify a caseworker of each intake linked to an existing investigation, the time to first caseworker communication for linked cases was calculated using the date of intake for the "primary" or first linked case rather than the date of intake found in the sample.

[206] DFPS Policy requires after initial notification, the investigator must attempt to maintain contact with the child's CPS caseworker if a child is listed as an alleged victim.  DFPS, *Child Care Investigations Handbook* §6353.2.

**Table 4.3: Automatic Notification Found and Timing of Automatic Notification**

| Data Point | Case Read No. 1: Apr-Jun 2020 *n=319* | Case Read No. 2: Jul-Aug 2020 *n=226* | Case Read No. 3: Sept-Oct 2020 *n=270* |
|---|---|---|---|
| Automatic Notification Found | 100.0% (319) | 99.1% (224) | 100.0% (270) |
| Timing of Automatic Notification | 48.3% (154) same day 51.1% (163) next day 0.6% (2) 2 days | 61.5% (139) same day 37.2% (84) next day 0.4% (1) 2 days 0.9% (2) no notification | 57.8% (156) same day 41.8% (113) next day 0.4% (1) 2 days |

In its analysis, the monitoring team compared the notification date provided by the State to the date of notification identified by the monitoring team in the verification of automated notification found in the child's record in IMPACT.[207] Of the 718 intakes sampled between May and October, 2020 for which a notification was found, the monitoring team identified 16[208] intakes with notification dates that did not match the date provided in the State's data. In almost all of these intakes, the automated notification date the Monitors identified had occurred one day prior to the automated notification date provided by the State.[209] For two intakes, the monitoring team identified an automatic notification, but the State did not report an automatic notification date.

**Table 4.4: Automatic Notification Date Comparison of State Data and Case Read Data**

| Data Point | Case Read #1: May-Jun 2020 *n=224* | Case Read #2: Jul-Aug 2020 *n=224* | Case Read #3: Sept-Oct 2020 *n=270* |
|---|---|---|---|
| Automatic Notification Dates the Same | 98.7% (221) | 96.4% (216) | 98.1% (265) |

Although the monitoring team could not determine the quality of exchange of information in most communications between RCCI investigators and the CVS caseworkers, the monitoring team conducted a verification of the first contact documented between the two, using the contact log for

[207] The state provided a variable "Notice to CVS worker and supervisor" in RCI intake data provided for May, 2020. "Notice to CVS worker and supervisor" was defined as the date/time that an automated notice about the intake was sent to the CVS caseworker and supervisor.
[208] The monitoring team received notification on October 16, 2020 that August 2020 data provided by DFPS had seven instances (four total children) in which notifications were not sent to caseworkers in accordance with RO B5. According to the RCI intake data if "Notice to CVS worker and Supervisor" field is blank, this "generally indicates that notice was not sent, usually because the child did not have an open SUB stage."
[209] The State provided data for the date and time of automated notification for RCCI intakes beginning in May 2020. Time of automatic notification was not available to the monitoring team. On average, the State reported that automated notification occurred within **12:27 to 12:31 hours** of intake.

the selected investigation in CLASS, was conducted.   Of the 815 investigations reviewed for the sample period, a contact was documented in 728 or 89% of the investigations.

**Table 4.5: Communication Between RCCI Investigator and CVS Caseworker Found**

| Data Point | Case Read #1: Apr-Jun 2020 *n=319* | Case Read #2: Jul-Aug 2020 *n=226* | Case Read #3: Sept-Oct 2020 *n=270* |
|---|---|---|---|
| Communication Found in CLASS | 90.6% (289) | 92.0% (208) | 85.6% (231) |

The timing of the contact and the method of contact was also documented.   The time between SWI intake and documented communication in CLASS between the RCCI investigator and the CVS caseworker ranged from 0 days to 67 days.

**Table 4.6: Timing and Most Common Method of Communication Between RCCI Investigator and CVS Caseworker**

| Data Point | Case Read No. 1: Apr-Jun 2020 *n=289* | Case Read No. 2: Jul-Aug 2020 *n=208* | Case Read No. 3: Sept-Oct 2020 *n=231* |
|---|---|---|---|
| Average Time of Communication from Intake (days) | 5.17 | 4.36 | 4.45 |
| Communication within three days of intake | 70.2% (203) | 69.2% (144) | 80.5% (186) |
| Most Common Method of Communication | Email 42.6% (123) | Email 44.7% (93) | Email 43.3% (100) |

The most common methods of initial communication between RCCI investigators and CVS caseworkers were via emails and phone calls.   In 43% of cases (316 of 728), initial documented communication between RCCI investigators and CVS caseworkers occurred via email while in 36% of cases (264 of 728) initial documented communication occurred via phone call.

For the case reads conducted for July-August 2020 and September-October 2020, the monitoring team added an additional step to document a second communication between the RCCI investigator and the child's CVS caseworker for those instances where the initial documented contact was *not* a phone call.[210]

---

[210] The monitoring team included this additional inquiry due to concerns that an initial contact via e-mail or voicemail might not allow the caseworker to ask questions about the allegations or clarify information received by the investigator.

Between July and October 2020, communication between RCCI investigators and CVS caseworkers was found in 89% of cases (439 of 496). This initial communication was via phone in 34% of cases (149 of 439). For the majority of cases where initial contact was through voicemail, email, or other type of contact (not phone), 76% of cases (219 of 290) had a subsequent contact documented in CLASS. The most common method of the subsequent contact was made via phone call (50%, 110 of 219).

**Table 4.7: Subsequent Communication Between RCCI Investigator and CVS Caseworker for Cases Where Initial Contact was NOT a Phone Call and Most Common Method**

| Data Point | Case Read No. 2: Jul-Aug 2020 *n=135* | Case Read No. 3: Sept-Oct 2020 *n=155* |
|---|---|---|
| Subsequent Communication Documented | 78.5% (106) | 72.9% (113) |
| Most Common Method of Communication | Phone 61.3% (65) | Phone 39.8% (45) |

**Summary**

The Monitors' case reviews reflect that the automated system of notification designed by DFPS to promptly communicate allegations of abuse or neglect to the child's primary caseworker is working: notifications were observed to be occurring in almost all cases reviewed. While the notification does not include the substance of the allegations, the monitoring team verified follow-up communication between the RCCI investigator assigned to the case and the child's caseworker in most cases reviewed, but could not assess the quality of that communication.

The State's January 2021 certifications indicate that changes in the intake process have allowed SWI to create an Information and Referral report that gives caseworkers the ability to access a report from IMPACT that includes intake information and the allegations associated with the intake. Due to the timing of the new policy and the State's data production, the Monitors did not conduct case reviews testing for this new function in time for this report, and will do so for the next comprehensive report to the Court.

## H.    Remedial Order 37

Remedial Order 37: *Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record.*

### 1.    Background

#### a.    First Court Monitors' Report Findings related to Remedial Order 37

In the First Report to the Court, the Monitors found that the policy adopted by DFPS to implement Remedial Order 37 failed to implement the timeline set out in the Order, which requires notification to the child's caseworker and the caseworker's supervisor and the caseworker's review of the home's history (home history reviews, or "HHRs") within 48 hours. The results of the Monitors' case read detailed in the First Report showed HHRs were completed in 71% of the cases reviewed, but only 27.2% were completed within 48 hours of the SWI referral.  Even when there was a timely HHR, the caseworkers failed to document any type of staffing with their supervisors 41.7% of the time.  When there was documentation of a staffing, only 33% occurred within 48 hours.  Where a staffing was documented, some failed to document any action taken despite disturbing patterns of similar allegations for the child's placement.

#### b.    September 2020 Contempt Hearing & December 18, 2020 Contempt Order

In their July 2, 2020 Motion to Show Cause, the Plaintiffs requested the Court sanction the State for failing to comply with Remedial Order 37 based on the Monitors' findings that the State failed to timely conduct HHRs.[211] The State responded that the plain language of Remedial Order 37 required only a 48-hour timeframe for the notice to a child's caseworker and the caseworker's supervisor, but that the remedial order did not include a timeline for the staffing by the caseworker and supervisor and documentation of any safety concerns.[212]  The State replied that Remedial Order 37 did not require reviews of an HHR and an assessment and documentation of concerns for the child's safety or well-being within *any* specified period.

In holding DFPS in contempt of Remedial Order 37, the Court found the amount of time DFPS took to complete the full review, assessment, and documentation process inconsistent with Remedial Order 37; DFPS failed to complete HHRs consistently for Priority None cases; and DFPS failed to take action when there were disturbing patterns of similar allegations at the child's placement.[213]  The Court emphasized that the purpose of Remedial Order 37 was to quickly assess

---

[211] Plaintiffs' Motion to Show Cause Why Defendants Should Not Be Held in Contempt (July 2, 2020 ) ECF No.  901.
[212] Defendant's Verified Objections to Monitors' Report at 17, ECF No. 903.
[213] Order (December 18, 2020) at 258, ECF No. 1017.

and address potentially dangerous placements in cases in which the State has chosen not to conduct an abuse or neglect investigation.[214] For that reason, Remedial Order 37 requires caseworkers and their supervisors to be notified within 48 hours of a case being screened out or downgraded to PN. Then, "[u]pon receipt of the information" about the allegation, the home history review and assessment of child safety must occur, which must be documented in the child's electronic case record.[215]

State witness testimony at the Contempt Hearing revealed that the State failed to implement necessary processes and procedures to remedy urgent safety issues targeted by Remedial Order 37 The Court found that:

> A timeframe that can stretch up to twelve days is not consistent with Remedial Order 37's requirement that "the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being, and document the same in the child's electronic case record" "**[u]pon receipt**" of the information that an allegation would not be investigated for abuse or neglect.[216]

The Court concluded that the State failed to complete an HHR in 21% of the cases, and had no explanation for this failure.[217] For those HHRs that were completed, in 39% of the cases there was no documentation indicating any discussion of concerns for children's safety or well-being based on the HHR.[218] In addition, the Court noted that even when an HHR was completed and there was a discussion, in some cases the caseworker failed to recognize and act on a pattern of similar allegations of abuse and neglect from the same home.[219]

In finding the State in contempt, the Court found "that Defendants have continued to expose PMC children to an unreasonable risk of serious harm in foster home placements… and hence…failed to address the exact same problems occurring today in their system that were taking place" at the time of trial.[220] The Court ordered DFPS to file with the Court sworn certification of compliance with Remedial Order 37 within 30 days of the date of the Order.[221]

The Court also instructed the Monitors to:

> [A]ssess Defendants' evidence and determine whether notification of reports "which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral," and whether "[u]pon receipt" of the information that an abuse or neglect allegation was made but not referred for investigation, the child's caseworker has "review[ed] the referral history of the home[,] . . .

---

[214] Order (December 18, 2020) at 258, ECF No. 1017.
[215] *Id.*
[216] Id. at 262, ECF No. 1017.
[217] *Id*. at 263-4, ECF No. 1017.
[218] *Id*. at 265, ECF No. 1017.
[219] *Id*. at 265-68, ECF No. 1017.
[220] *Id*. at 268-9, ECF No. 1017.
[221] *Id*. at 326, ECF No. 1017.

assess[ed] if there are any concerns for the child's safety or well-being, and document[ed] the same in the child's record."[222]

### c.   State's Certification of Compliance

On January 15, 2021, DFPS filed its Certification of Compliance, attaching an affidavit from DFPS Director for Conservatorship Services, Hector Ortiz, that outlined DFPS's attempts to comply with Remedial Order 37 prior to the Contempt Hearing and afterward.[223]  In the affidavit, Mr. Ortiz certified that DFPS had changed its policies regarding the timeframe to complete all of the steps required by Remedial Order 37, but also changed its policy related to downgrading abuse or neglect investigations, as discussed, *supra*.

Mr. Ortiz averred that on October 1, 2020,[224] DFPS policy changed and "solely allows downgrades of intakes to a PN in two narrow circumstances: when the allegations were previously investigated or when the allegation is not within RCCI jurisdiction. Additionally, sole screening responsibilities were moved to Statewide Intake."[225]  In addition, according to Mr. Ortiz's affidavit, as of January 2021, policies regarding the timeline for completion of the HHR and the review and documentation by the caseworker now require:

- Statewide Intake screeners, upon making a decision to PN a case, create an HHR report and email it to the caseworker and supervisor.  Intakes received outside of regular business hours go to a rotation of on-call SWI screeners who complete the HHR.[226]

- Caseworkers review and staff the HHR reports with their supervisors immediately upon receipt from the SWI screener. If a report is received outside of business hours… it is also sent to the on-call CPS caseworker for the region for an immediate safety review.[227]

Because policy changes did not go into effect until mid-January 2021, the State Certification of Compliance did not provide any case record reviews showing how the new policy translated into compliance with Remedial Order 37.[228]

---

[222] Order (December 18, 2020) at 327, ECF No. 1017.

[223] Defendants' Certification of Compliance Regarding RO-37, Exhibit D, Sworn Declaration for RO-37 at 4, ECF No. 1021.

[224] DFPS notified the Monitors that it instructed staff about the new downgrade practice effective October 1, 2020 and that the policy would be finalized and published as of November 1, 2020. Email from Audrey Carmical, Associate Commissioner for Compliance, Coordination, and Strategy, DFPS to Deborah Fowler and Kevin Ryan, Court Monitors (October 1, 2020).

[225] Defendants' Certification of Compliance Regarding RO-37, Exhibit D, Sworn Declaration for RO-37 at 4,45, ECF No. 1021.

[226] Defendants' Certification of Compliance Regarding RO-37, Exhibit D, Sworn Declaration for RO-37, -4, ¶ 48

[227] Defendants' Certification of Compliance Regarding RO-37, Exhibit D, Sworn Declaration for RO-37 at 4,49, ECF No. 1021.

[228] The Monitors reviewed Priority None intakes for January 2021, and determined that none involved foster homes. Data provided by DFPS for the month of January 2021, included a total of five intakes, involving eight PMC children, that were downgraded to Priority None. Review of each of these intakes revealed none of the five reports to SWI occurred for a child residing in a foster home. Two intakes occurred for four children at Glenn Eden (an SSCC operated location for children without placement), one intake with two victims occurring while at Have Haven RTC, one intake with one victim while at an out of state facility called Capstone RTC, and the final intake involved one victim while at Connections Emergency Shelter.

**Remedial Order 37 Performance Validation**

      a.      **Methodology**

To validate the State's performance with respect to Remedial Order 37, the monitoring team conducted independent case record reviews for intakes involving a PMC child occurring between April 1, 2020 and October 31, 2020, which were subsequently downgraded to PN.[229] The Monitors reviewed all of the 129 intakes[230] that were downgraded to Priority None for PMC children in a licensed foster care setting between April 1, 2020 and October 31, 2020.

The case review examined:

- whether the caseworker received notification of the SWI allegation within 48 hours of the referral;
- whether upon receipt of the notification, the child's caseworker reviewed the HHR and assessed any concerns for the child's safety or well-being;
- and whether the caseworker documented this information in the child's electronic case record.[231]

The monitoring team also reviewed the State's case reviews and analyzed the underlying methodology.  The State conducted quarterly case record reviews for a random sample of 34 intakes downgraded to PN from March 1, 2020 to November 30, 2020.

      b.      **Performance Validation Results**

        i.      **Validation of Casework Notification**

The monitoring team reviewed child event records in the IMPACT system to identify the notification to a caseworker of an SWI RCCI intake downgraded to Priority None where the

---

[229] DFPS formally changed the screening procedures on November 1, 2020, limiting the circumstances when a case could be downgraded to a Priority None, resulting in a significant reduction in the percentage of Priority None intakes, as discussed in Section III *supra*.

[230] Duplicate cases were removed from the universe of eligible cases. A duplicate was defined as children with multiple intakes on the same day or a child with multiple intakes during the same month for the same allegation and same Case ID.  Where duplicates were found, the first intake for the child in the month was included in the universe of cases.

[231] In conducting the case record review, the monitoring team found the following data limitation:

- Data provided by the State included a case ID for all allegations.  This case ID (IMPACT Case ID) was used by the monitoring team to identify a child's case for both the automatic notification and caseworker communication verification.  During the automatic notification verification, the monitoring team found that, for linked cases, the case ID provided in the RCI intake data represented the "linked" case ID not the unique ID assigned to that case originally at intake.  The automatic notification in the child's IMPACT event list was found for the correct intake date (usually the same or next day) but the case ID did not match the data for that date in the sample.  The case ID matching the sample was, in most cases, found in the child's event list with automatic notification occurring prior to the date of the selected intake.  Questions posed to the State verified that the case ID included in the RCI intake data represented the linked case ID for all linked cases rather than the original Case ID assigned at intake.

alleged victim was residing in a foster home. Because the exact time of notification is not available in IMPACT, the notification analysis calculated the number of calendar days from the date the case was referred[232] to the date of the caseworker's notification. The exact time of notification was not available. The monitoring team found the system-generated notification for the Priority None intakes occurred 100% of the time (129 of 129); additionally, 99% (128 of 129) of automatic notifications to caseworkers occurred within two days of the SWI referral. Only one case had an automatic notification that occurred three days after intake.[233]

## ii.   Home History Reviews

The monitoring team analyzed HHRs completed by the HHR team[234] to determine whether: an HHR was found and completed for all foster homes in the sample; the accuracy of the HHR information compared to intake and investigation history data in CLASS for the foster home in the case; and the number of days from the date the case was referred to the date the HHR was completed.

The monitoring team found that DFPS completed 86 HHRs of 129 intakes (67%).[235]  Of the 86 cases where an HHR was found, 59 (69%) were completed within two days of the case referral date. For the 33% of cases (43 of 129) that did not contain an HHR, the reason for its lack of completion was found in 100% (43 of 43) of the cases, with most (95%) found through DFPS documentation and two cases (5%) found through the monitoring team's review.[236]  The most common reasons that an intake did not have an associated HHR were that the foster home was closed, or that the incident did not occur in a foster home (61%, 26 of 43).

---

[232] Intake start date as provided in the SWI data.

[233] The monitoring team also calculated the automatic notification from the PN disposition date. Three cases had different notification timing in the State data compared to the monitoring team' case read data. Two of the cases reviewed by the monitoring team had a notification the day before for State data and the notification occurred same day in the case read. The third case had a same day notification in the State data and a next day notification in the monitoring team's case record review. Starting in May 2020 RCCI intake data provided to the Monitors included a variable "RCCI data notice within 48 hours flag," which is defined as "an indicator for whether the automated notice was sent within 48 hours of the intake date/time for intakes on a foster home with PN as a final priority. Ninety-four percent (96 of 102) reported "Yes" to the notice happening within 48 hours.

[234] The HHR Team is comprised by DFPS staff and is described more fully in the Monitors' First Report.  *See* Deborah Fowler and Kevin Ryan, First Report 144, ECF No. 869.

[235] Home History Review documents were provided to the Monitors in PDF documents and named by foster parent name.  To locate the corresponding HHR to a case downgraded to Priority None, the Monitors searched the completed home history reviews provided by the State for the child's foster home.

[236] On March 11, 2021, the Monitors sent a list of intakes not found in INT_07 reports and on the Home History Review Not Completed log to the State.  On April 3, 2021, the State produced three data files and provided 21 home history review documents. The data files addressed those INT_07 cases not found, the No HHR log cases, and an updated HHR log for FY 2020. Using the DFPS HHR log data provided information on 41 cases (95%) where no HHR was completed and the monitoring team's case record review identified the reason for two (5%) of the cases where no HHR was found. In their updated data, the State reported that in one case there was an HHR provided for the child, but the child is not listed on the HHR. In one case the state reported an HHR was completed, but it was not provided until the State submitted its updated data on April 3, 2021

**Figure 4.19: Reason Found for Home History Review Not Completed**



The monitoring team reviewed the content of the HHRs and determined that they generally listed a summary of all investigations (including deficiencies and any Reason To Believe (RTB) findings), the CPAs under which the foster home had operated, a reason for leaving a prior CPA, and a listing of all children in the home.

**Figure 4.20: Home History Review Content[237]**
Source: Remedial Order 37 April - October 2020 Monitor Case Read Data
*n=86*



---

[237] Averages are rounded (2.4 investigations, 0.9 deficiencies, and 0.05 RTBs).

Additionally, the monitoring team conducted an analysis to identify the proportion of foster homes with a history of investigations, deficiencies, and confirmed allegations of abuse, neglect or exploitation ("ANE"). If a home reported more than one investigation, deficiency and/or RTB, they were considered to have a history of ANE:

- No foster home had a history of all three elements - investigation, deficiency, and/or RTB.
- 44% of foster homes (38 of 86) had more than one investigation, deficiency, and/or RTB within the last five years.
- The majority of foster homes, 56%, (48 of 86) had no history of child abuse, neglect and exploitation.

### iii.    Verification of Home History Review Staffing

To determine whether the child's caseworker (1) reviewed the HHR; (2) staffed the case with their supervisor to assess whether there were any concerns for the child's safety or well-being; and (3) documented the same in the child's record, the monitoring team reviewed the child's record in IMPACT.[238]  In 50% (43) of the 86 cases where the monitoring team identified an HHR in the record, there was no documentation of a staffing.[239]

In those 43 cases, the monitoring team attempted to identify a reason for the lack of staffing. The monitoring team was unable to identify a reason for the lack of a documented staffing in 53% (23 of 43) of the cases. In 33% (14 of 43) of cases the incident that was the basis of the reported allegation occurred prior to the child's current placement.

---

[238] For the case read, the monitoring team attempted to locate documentation of the staffing either on the Child event record or in the contact record.

[239] Of the total number of cases reviewed, 34% (44 of 129) had a staffing documented in IMPACT.  One case with a staffing documented did not have an HHR found.

114

**Figure 4.21: Reason Found for Not Documenting a Home History Review Staffing**



Even where there was a documented reason for a lack of staffing in the record, the monitoring team found cases in which staffings should still have occurred to ensure a child's safety and well-being. For example, a case was not staffed based on "allegation previously investigated." The allegation involved a 7-year-old child touching a 6-year-old foster sibling on his private parts while they were riding the school bus. Yet, the case had not been previously investigated as abuse or neglect, but instead was the focus of an RCCR standards investigation for which a caseworker would not have received notification. This case should have been staffed by the caseworker to, at a minimum, appropriately counsel the foster parent about how to address the situation with the children and to create a safety plan for the children while on the school bus.

The monitoring team also analyzed the timing between the date the case was referred and the date the staffing occurred by the caseworkers with their supervisors. In 91% (39 of 43) of the cases where DFPS held a staffing, it took more than two days for the caseworker to complete all the components of Remedial Order 37.[240]

---

[240] The cases reviewed by the Monitors and the State all occurred before the State made several policy changes that may impact the timing between the date a case is downgraded to PN and a documented staffing.

**Figure 4.22: Time from Case Referral to Home History Review Staffing Documented**



Source: RO 37 April - October 2020 Monitor Case Read Data
*n=43*

Of the 44 cases in which a home history review staffing was documented, almost all (95%, 42 of 44) had a narrative description of the staffing in IMPACT. One staffing was documented for a case where no HHR was found. Staffings were documented for 43 of the cases where an HHR was completed. Of the 42 cases with a narrative description found in the staffing, 33 (79%) indicated that the caseworker and supervisor discussed and considered the child's safety and well-being in the staffing.  Almost half of those cases (48%, 16 of 33) indicated that some action was taken as a result of the HHR staffing, and an additional 27% (9) reflected an action had been take prior to the staffing.

**Figure 4.23: Actions Taken as a Result of a Home History Review Staffing[241]**



During the monitoring team's case review, the team flagged some cases that did not appear to adequately address issues related to child safety and well-being. Examples of problems identified in flagged cases include:

- The foster home had the same citations for the same ongoing issues over time.
- No discussion of runaway notification to the police or other measures to locate runaway youth.
- No discussion of safety, training, therapy, next steps when the child was known to be suicidal.
- No discussion of immediate safety precautions and delayed change of placement
- Foster parent not meeting medical, school, or therapy needs.
- No information about the staffing discussion, concerns, or next steps.

Two examples illustrating inadequately documented staffings are provided, below.

In the first example, SWI received an intake on July 3, 2020 made by the foster parent. The intake was recorded as follows:

Last night, OV was taken to Hospital for suicidal ideations. After OV came to the hospital, FP learned that OV was on the phone with his girlfriend when he got a knife from the kitchen and threatened to kill himself. OV's girlfriend was able to calm him down. It is unclear at what point OV was talked down from killing himself as he did have the means and method for causing his death. FP said she was asleep when this happened.

---

[241] More than one action could have occurred in a single home history review staffing.

Yesterday, OV had a counseling session and afterwards, he came to FP and said that he thought he was in danger. OV wanted to go to the hospital. It is unknown when OV will be released. FP will accept OV back once he is released.

A couple of years ago, OV attempted to hang himself. FP had no instruction that OV would need any special supervision because of his past suicidal attempt.

An HHR was completed on July 6, 2020 and the caseworker staffed the case on July 8, 2020 with the program director, five days after the intake.  The caseworker documented in the staffing notes that she was "unaware of this child's suicidal ideations in the past," that she had read through the child's records and did not find any documentation related to this, and that she would request the documentation from a previous placement to determine what happened.

The staffing did not meet the requirements of Remedial Order 37 in that the staffing occurred five days after the intake was downgraded to Priority None, there was not a documented review of the foster home's history, and the staffing only stated that the child would remain in the home. There was not a documented discussion regarding the safety and well-being of the child. The HHR provided to the caseworker indicated a previous report to SWI was made on April 3, 2020, just three months prior to this incident, reporting that another child in the home had self-harmed with a knife he had gotten from the foster home.  The staffing should have addressed any need for safety plans, training the foster parents on how to care safely for a child with suicidal ideations and the need to secure knives in the home.  The foster parents are verified for basic and moderate services, treatment services for emotional disorders and specialized services.

The caseworker indicated a lack of oversight by Benchmark (a CPA currently under heightened monitoring) and the lack of any suicide history in the CPS file.  What is of even greater concern is that the child had a psychological evaluation completed at the end of June 2020 and, according the caseworker, the psychologist found that the child could be considered a suicide risk, but had not alerted anyone to this finding until after the incident.

In the second example, SWI received an intake on June 2, 2020 made by the foster parent. The intake was recorded as follows:

Yesterday, L. A. and N got into a fight. L.A. said that N climbed onto the bunk bed and started throwing away L.A.'s possessions from the bed. L.A. and N started wrestling and [Foster Parent] (72yo) told them to stop and they did. About 1 or 2 minutes later, L.A. and N were standing about 20 feet apart, N had a broom, ran towards L.A. and struck L.A. in the face with the broom on the right side of the face. L.A. was injured from the strike and was taken to Texas Children's Hospital for medical assistance.

LA was given 3 stitches for the cut on [the child's] face.

While a Home History Review was developed on June 3, 2020, an HHR staffing was not conducted until 23 days after the initial intake date. The HHR staffing was brief and lacked the substantive discussion required by the Court. The staffing notes did not include information related to the discussion regarding this incident, a summary of what was reviewed from the HHR, nor any

indication of what steps would be taken to ensure the safety of the youth.  The HHR staffing notes simply indicated:

> "[Placement] was discussed and reviewed and we are not going to request a placement change. The foster parents were not at fault and they provided immediate medical attention for L.A. after the incident."

In reviewing the HHR, the Monitors found that the foster home is verified to provide care for six children, male or female, ages 0 – 17, with basic, moderate and specialized levels of care. The foster home is also authorized to provide treatment services for children with emotional disorders, pervasive developmental disorders and an intellectual disability.  The foster home may additionally provide special services for physically challenged children and youth, emergency care services, and transitional living services.

The victim (L.A.) in this incident is documented as a moderate level of care while the aggressor is at a specialized level of care. Specifically, the record states:

- Youth information indicates that each of the two youth are within separate levels of care in which N (the aggressor) is at a Specialized level of care, diagnosed with Depressive Disorder and Adjustment Disorder with mixed disturbance of emotions/conduct for which he is prescribed psychotropic medication requiring supervision within visual and hearing distance of the caregiver. N requires supervision within visual and hearing distance of his caregiver.
- L.A. is at a Moderate level of care, having ADHD and Bipolar Disorder and requiring supervision within visual and hearing distance of the caregiver.

A discussion regarding how to ensure the safety of both children given these distinctive needs should have been documented. Additionally, the SWI allegation narrative included that additional concerns, as reported during that call, indicated that the two youth 'usually wrestle like children.' That statement indicates a pattern of physical contact between the youth could be present and should be addressed.

By August 24, 2020, the victim in the case for which this HHR had been developed, was released to a behavioral health hospital. Over the course of the investigations documented in the HHR, there appears to be a pattern of transferring youth to behavioral health hospitals. While each instance does include circumstances and may be appropriate, a discussion related to this foster home's current ability to continue to care for youth with specialized needs seems warranted.

The lack of detail in the HHR staffing is concerning. Given the level of care that the home is licensed to offer, more thorough discussion should have been documented. The current documentation does not indicate a thorough review of the HHR or the children's safety was fully taken into account.

iv.     **State's Remedial Order 37 Case Read Results**

To assess its compliance with Remedial Order 37, the State conducted three quarterly case reads of a sample of intakes downgraded to PN that involved a PMC child in a foster home.  For each quarter the State reviewed 30% of the total number of downgraded intakes.  For the period March to May 2020, 22 cases were reviewed and 17 HHRs were found, 21 cases were reviewed for the period June to August 2020 with 13 HHRs found, and for September to November 2020, 10 cases were reviewed and four HHRs were found.[242]

The State's case reads continued to test whether an HHR was completed within a two-business day timeframe, rather than 48 hours.  When using the two-business day timeframe, the State found for all three quarters that in 100% of the cases the HHRs were completed timely.[243]

The State also reviewed whether there was an HHR staffing documented.  Between March and May 2020, the monitoring team found almost the same percentage of HHR staffings documented as the State case read. The State, however, observed more HHR staffings documented from June through November 2020 than the monitoring team.

---

[242] *RO37 Q1 FY 2021 Home History Review State Case Read Report,* (Q1 State Case Read Report) p. 1.
[243] Q3 (2020), Q4 (2020), and Q1 (2021) State Case Read Report p. 2.

**Figure 4.24: Home History Review Staffing Contact Documented: Monitor Case Read Compared to State Case Read**





For quarters June to August and September to November 2020, the State added a question to its case read, "If the staffing was held, did it occur within 7 days of receipt of the Home History Review report?"[244]  The State did not analyze for any shorter period.  Because the Court indicated in its contempt order that this timeframe does not comply with Remedial Order 37, the Monitors have not included the State's results here.

The State also reviewed the staffing narrative to determine if it contained an accurate summary of the review of the HHR, but it does not appear that the State reviewed the narrative to determine whether there was any consideration for the child's safety and well-being.[245]  Even when looking at whether there was an accurate summary of the HHR in the narrative, the State found that for both June to August and September to November 2020, 25% of the cases[246] did not contain an accurate review of the HHR.[247]  This was a significant decline from earlier in the year, when for the period March to May 2020, the State found that 11 out of 12 applicable cases (92%) contained an accurate summary of the HHR report.[248]  The State also determined that through

---

[244] Q4 (2020) and Q1 (2021) State Case Read Report, p. 2.

[245] For all three case reads the question asked was "*Did the narrative of that staffing contain an accurate summary of the review completed by the Home History Review team?*" Q3 (2020), Q4 (2020), and Q1(2021) State Case Read Report p. 3.

[246] 25% of the cases for the June-August read equated to 3 of 12 cases.  In September- November 2020, 25% of the cases equated to 1 of 4 cases.

[247] Q4 (2020) and Q1 (2021) State Case Read Report, p. 3.

[248] Q3 (2020) State Case Read Report, p. 3.

each of the quarters, between 92% and 100% of the narratives contained details of any decision or action taken by the caseworker or supervisor.[249]

**Summary**

The monitoring team's case read confirms that, at least through October 2020, the State was not complying with the timeliness required in Remedial Order 37. Although in 99% of the cases the automatic notifications to caseworkers occurred within two days of the SWI referral, the average total time from the date the case was received by SWI to the date the home history review staffing occurred, as documented in IMPACT, was eight days with a range from one to 70 days.[250]

In addition to failing to comply with the timeliness requirement of Remedial Order 37, the State frequently did not consistently document HHR staffings between the caseworker and the supervisor. In cases in which an HHR was located, the monitoring team did not find any staffing or a reason for failing to have a staffing in 27% (23 of 86) of the cases. Finally, the monitoring team again found concerns with the quality of the caseworkers' reviews of the HHRs and staffing notes. The State's case read confirmed the Monitors' finding, having found in both its June to August and September to November 2020 case reads that in 25% of the cases, the caseworker's narrative did not contain an accurate review of the HHR.

---

[249] Q3 (2020), Q4 (2020), and Q1(2021) State Case Read Report, p. 4.
[250] The average total time from the date of PN to date home history review staffing occurred, as documented in IMPACT, was 7.51 days with a range of 1 day to 70 days.

**V. ORGANIZATIONAL CAPACITY**

**A.      Remedial Order 1: CPS Professional Development Training**

Remedial Order One: *Within 60 days, the Texas Department of Family Protective Services ("DFPS") shall ensure statewide implementation of the CPS Professional Development ("CPD") training model, which DFPS began to implement in November 2015.*

1.      **Background**

      a.      **First Court Monitors' Report Performance Validation Findings**

For the First Report, the Monitors analyzed data produced by DFPS related to hiring and training for staff employed to serve as a primary caseworker between September 1, 2018 and September 30, 2019.  The Monitors' analysis indicated that almost all caseworkers who were hired between September 1, 2018 and September 30, 2019 started and completed some CPD training.

While most caseworkers completed CPD training within the expected time frames, 22% of those with a training cohort start date of September 2019 or later completed the training earlier than the CPD training model timeframe.[251] Similarly, of the caseworkers for whom the Monitors recorded both a training cohort start date and a hire date, it was unclear whether they completed the full CPD training program: 15% were newly hired with a training cohort start date that fell prior to their hire date.[252]  The average length of training for these caseworkers was significantly shorter than the average for those caseworkers who started and finished training with their cohort.[253]

For caseworkers who were included in the sample for which the Monitors could cross-match training and data, approximately 14% were newly hired staff who appeared to have become case assignable prior to their completion of CPD training.[254]

      b.      **Policy Changes Following the Monitors' First Report**

        i.      **DFPS Updates to CPD Training**

On December 18, 2020, DFPS alerted the Monitors to changes that the agency anticipated making to CPD training:

---

[251] *Id*. at 160.
[252] *Id*.
[253] *Id*.
[254] *Id*. at 161.

We would like to apprise you of some upcoming improvements being made to the CPS Professional Development (CPD) training model which was implemented in 2015. These improvements are designed to align the CPD curriculum with current best practice and maximize proteges' hands on practical experience with case work tasks. Although the ratio of classroom and field training will remain the same, the distribution of this training across the 13-week period will shift to focus on practical application of classroom content and case work decision-making under a mentor's supervision. These improvements are scheduled to deploy by March 1, 2021, and we will share the revised CPD modules with you as soon as they are finalized. Meanwhile, attached is a document highlighting these scheduled improvements. Please let us know if you have questions or need additional information.[255]

The three-page document attached to the e-mail described the anticipated changes to the CPD model. The document described the existing timeline for the current CPD model, which consisted of a mix of classroom and field-based training.[256] The existing 13-week timeline requires the trainee to begin with four weeks of "Specialty Field I" training, followed by two weeks of "Core Class," then two weeks of "Specialty Field II" training, followed by one week of "Specialty Class," and ending with four weeks of "Specialty Field III" training.[257]

The changes to the timeline would continue to require 13 weeks of training, but would decrease the time spent in "Specialty Field I" training from four weeks to three weeks, reduce the "Core Class" to one week, but increase "Specialty Class" to two weeks, and "Specialty Field III" to five weeks.[258] The document explained:

Looking at the models, time has been shifted from Specialty Field and Core.

1) A shift of one week of Core Class content into Specialty Class. This change is updated curriculum to reflect current evidence based best practice and giving more time to teaching the leaner [sic] how it applies to the Conservatorship specialty.

2) Moving one week of Specialty Field I into Specialty Field III. This is to give more time to taking lead on case work decision making under the supervision of the mentor. This adjustment is aligned with the emphasis of increasing time spent hands on engagement with casework.[259]

The document also described "a few other minor tweaks to the model" to be delivered across classroom and field delivery:

---

[255] E-mail from Tara Olah to Deborah Fowler and Kevin Ryan, *CPS Professional Development Training Improvements,* December 18, 2020 (on file with Monitors).
[256] The CPD model is described in more depth in the Monitors' First Report. *See* Deborah Fowler and Kevin Ryan, First Report 156-57, ECF 869.
[257] DFPS, *Summary of Improvements to the CPD model* (undated) (on file with Monitors).
[258] *Id*.
[259] *Id*.

124

- More focus on specialty concepts;
- Updating individualized training plans to reflect field training tasks to be completed with the caseworker's mentor during field training;
- Increasing the number of knowledge assessments;
- More hands-on practice with IMPACT and assessment tools;
- Incorporating more demonstration of skills beyond the standard knowledge assessments;
- Guided observation tools;
- Conversion of some computer-based trainings to instructor-led content.[260]

Because Remedial Order 1 explicitly requires implementation of the CPD training model, on January 24, 2021, the Monitors asked DFPS for a detailed list of changes to the model, as well as any associated material highlighting any substantive differences from the model in place at the time the Fifth Circuit validated the remedial order.[261]

DFPS responded by email on February 23, 2021, attaching a side-by-side comparison of the planned updates to CPD and the existing curricula, and a more detailed description of the changes as follows:[262]

> Per your request, we are providing a detailed list of all new changes to CPD and associated material describing the enhancements. We have not yet implemented but tentatively plan to begin delivering this content in May 2021.
>
> The CPD model was implemented in a phased rollout beginning in January 2015, and since that time, the only revisions to the curriculum have been made to reflect changes in DFPS policy, legislative initiatives and updates to modernize content or to improve processes, such as revising forms. Hence, the CPD model has not changed since October 2018 when the Fifth Circuit affirmed Remedial Order One. The CPD model is characterized by the following characteristics:
>
> - Supports the adopted Practice Model;
> - Includes 20% classroom instruction and 80% field instruction;
> - Contains a mentoring component;
> - Alternates sequence between classroom and field instruction; and
> - A duration of 13 weeks.
>
> The changes do not vary from these characteristics.[263]

---

[260] *Id.*

[261] E-mail from Kevin Ryan to Heather Bugg, *Training Update* (January 24, 2021) (on file with Monitors).

[262] E-mail from Heather Bugg to Kevin Ryan & Deborah Fowler, *Training Update* (February 23, 2021) (on file with Monitors).  DFPS also sent an e-mail to the Monitors on January 24, 2021, describing updates to the CPD training that were consistent with recommendations made by Praesidium, as part of its review of the agency's policy and trainings related to sexual abuse.  This e-mail and the description of the changes are discussed in Section V, *infra*.

[263] *Id.*

125

Some of the described changes to the curriculum included adding training in elements consistent with other remedial orders or changes made as a result of concerns expressed by the Court, including:

- The addition of an introduction to CLASS and the Black Bell IMPACT notification for RCCI investigations to the "Intro to Tech";[264]
- Increased content on Child Sexual Aggression in the "CPS Core Competencies Training;"

Adding content regarding child sexual aggression, searching CLASS and "enhanced discussion" on "assessing for safety" in the Specialty Classroom training.[265]

## ii.    SSCCs Providing Case Management Services

Two SSCCs – OCOK and 2INgage – moved to Stage II of the Community Based Care (CBC) model in 2020.  Stage Two includes shifting case management services from DFPS to the SSCC.[266]  The Monitors did not include data or information related to CPD training for OCOK and 2INgage caseworkers in the First Report, because case management services were not transferred to OCOK and 2Ingage until March 1, 2020 and June 1, 2020, respectively.[267] While this shift  does not relate to a change in policy, it resulted in a significant change in practice for the

---

[264] The Black Bell IMPACT notification was an IMPACT change made by DFPS in an effort to comply with Remedial Order B-5.

[265] DFPS, *CPS Professional Development (CPD) Classroom Training Overview* (undated)(on file with Monitors).

[266] SSCCs contract with DFPS to provide services to foster children in DFPS regions that have transitioned to the Community Based Care (CBC) model.  CBC was formerly known as Foster Care Redesign.  There are currently four regions that have transitioned to the CBC model, or are in the process of doing so:  Region 1 (Texas Panhandle); Region 2 (30 counties in North Texas); Region 3b (seven counties around Fort Worth); and Region 8a (San Antonio and Bexar County).

There are two stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services.  The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families."  DFPS, *Community-Based Care*, *available at*      https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp  According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services.  Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.*

DFPS has contracts with the following providers for CBC:

- Region 3b – Our Community. Our Kids. (OCOK) (Stage II)
- Region 2 – 2INgage (Stage II)
- Region 8a – Family Tapestry (Stage I)
- Region 1 – Saint Francis (Stage I)

*Id.*

[267] *See* DFPS, *Community-Based Care in Region 3b, available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/region3b.asp (noting that OCOK began providing case management, kinship, and family reunification services to youth and families in Region 3b on March 2, 2020); DFPS, *Community-Based Care in Region 2, available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/region2.asp (noting that 2INgage began providing case management, kinship, and family reunification services to youth and families in Region 2 on June 1, 2020).

two regions served by OCOK (Region 3b) and 2INgage (Region 2).  Consequently, the monitoring team met virtually with DFPS and the SSCCs to better understand the data provided by the SSCCs and the caseworker training models they used.  In addition, the Monitors requested data and information related to OCOK and 2INgage caseworker training in a supplemental data and information request sent to DFPS in November 2020, as described below.

2.     **Data & Information Request & Production**

    a.     **Monitors' Data and Information Request**

In October 2020, the monitoring team began to hold regular virtual meetings with DFPS staff to discuss questions and issues related to the data provided by the State to the Monitors.  The data provided by DFPS for Remedial Order 1 was discussed during these meetings, after the monitoring team sent DFPS a list of questions related to data provided for this remedial order on October 28, 2020.[268]

In response to questions the monitoring team sent to DFPS,  OCOK and 2INgage began providing data to the Monitors related to Remedial Order 1, in January and March of 2020, respectively.  Staff from both OCOK and 2INgage joined one of three total meetings devoted to discussing the data related to Remedial Order 1 to answer questions regarding the OCOK and 2INgage training data.[269]

Following these meetings, on November 16, 2020, the Monitors sent a supplemental data request to DFPS and HHSC that included requests related to Remedial Order 1.  The Monitors asked DFPS to provide the following data:

- For DFPS CVS Caseworker hires:
  - IMPACT personal identification;
  - A flag to indicate if an individual is required to participate in partial CPD training only;
  - A flag to indicate if a DFPS employee transfers to an SSCC prior to completing CPD training.

The Monitors also asked DFPS to include in  reports of CVS caseworkers hired between October 1, 2019 through September 30, 2020 additional information to support the Monitors' validation work: the caseworkers' IMPACT identification number; each individual's case-assignable date or an explanation as to why there is no date (e.g., worker still in training or left agency before completing CPD); an indicator of whether the individual was a stipend student;[270]

---

[268] E-mail from Nancy Arrigona to Jane Burstain, *RO 1 data questions* (October 28, 2020) (on file with Monitors).

[269] The monitoring team met virtually with DFPS on November 5, 2020 to discuss questions related to the DFPS data; on November 19, 2020, the monitoring team met with DFPS and OCOK to discuss questions related to OCOK data; and on December 3, 2020, the monitoring team met with DFPS and 2INgage to discuss questions related to the 2INgage training data.

[270] According to DFPS, a "stipend student" is " an individual who is generally hired and completes CPD while they are still in school and, after completing school, is hired as a caseworker.  Generally, their graduated caseload starts when they are hired as a caseworker."  DFPS, *RO 1 Questions for State Call* (undated)(on file with Monitors).

an indicator for whether the individual only had to complete part of CPD; and an indicator for whether the individual transferred to an SSCC/CBC provider prior to completing CPD.

In addition, the Monitors asked for the following information related to the SSCCs' caseworkers:

- Dates that reflect the employee's total time in training;
- DFPS region and county;
- Separation of hire type and notes into two fields;
- A flag to indicate whether the employee transferred to the SSCC from DFPS; and
- A flag to indicate when an individual is only required to participate in partial training.

### b.  DFPS and SSCC Data & Information Production

Following the Monitors' supplemental data request on November 16, 2020, beginning on December 15, 2020, and monthly thereafter, DFPS provided the requested data, and also corrected data for CVS caseworkers hired between October 1, 2019 and September 30, 2020.  In addition, DFPS compiled corrected data for CVS staff subject to graduated caseloads between May 1, 2020 and November 30, 2020 and provided it to the Monitors on January 4, 2021.

As was true of the data analyzed for the First Report, the Monitors again encountered limitations with the data provided for CPD training validation.   The data was limited in the following respects:

- OCOK Training Dates and Case Assignable Dates:  The training start and end dates provided by OCOK represented the dates that OCOK's Permanency Academy training began and ended, not a caseworker's total time in training.[271]   In addition, in a virtual meeting between the Monitors, the State, and OCOK on November 19, 2020, OCOK reported that the caseworker training end dates provided to the Monitors was the estimated end date. The Monitors attempted to use the case assignable dates provided by OCOK as training end dates, as all training must be completed prior to a caseworker becoming case assignable.  On January 15, 2021, during a virtual meeting among the Monitors, the State, and the SSCCs, OCOK reported that the case assignable date provided to the Monitors was the expected case assignable date, not the actual date. Without reliable dates of training completion and case assignable dates for all OCOK caseworkers, the Monitors were not able to validate training completion or time in training for OCOK caseworkers.  Therefore, the Monitors have not included analysis of training completion or time in training for OCOK staff in this report, and cannot verify OCOK's compliance with Remedial Order 1.

- DFPS Training Start and End Dates and Case Assignable Dates:  The training start date provided by DFPS is the "date the cohort to which the caseworker was assigned started."  For some caseworkers this is the actual CPD training start date, but for staff who were rehired or transferred, they may be placed in a cohort already underway. DFPS indicated during a virtual meeting held on November 5, 2020, that the cohort start date for rehires

---

[271] Expected CPD training for OCOK includes a seven-day new hire orientation, a possible two to six weeks of field work prior to starting the Permanency Academy and the six-week Permanency Academy.

and transfers is "either the cohort start date or hire date, whichever comes later." The training end date provided by DFPS is the "Anticipated Cohort End Date", the date the cohort is expected to end. DFPS reported that "as the caseworkers in this report were newly hired into their position, we cannot provide their actual CPD completion date."[272] Because actual training completion dates were not provided, DFPS directed the Monitors to use the case assignable date as a proxy for the actual training completion date. The State provided the Monitors with case assignable dates in the graduated caseload data separate from the caseworker hired data. The data defines the caseworker's case assignable date as the "date the caseworkers completed CPD training and became eligible to be assigned primary on cases."[273] In the data dictionary, DFPS provided an additional note that there may be a delay when the case assignable date is entered into CLOE Learning Management system, in which case they enter the actual case assignable date and not the date the data is entered.[274]

- DFPS Paper Records and Manual Notes on Training: Some CPD training is tracked through paper forms that are manually entered and updated in the CLOE system. As a result, many data entry and completeness issues can occur. Specifically, the "notes on training" are entered into the data by hand and are not standardized and may be missing notes that would support the understanding of staff CPD training requirements. For transfers and rehires without training notes, DFPS directed the Monitors to assume full CPD was needed.[275]

- DFPS CVS Caseworkers Transferring to SSCCs: Caseworkers hired by DFPS in January, February, and April 2020 were flagged as transferring to OCOK or 2INgage. Information for these caseworkers was not consistent or thorough in initial hired data provided by the State but was provided in corrected data.

- 2INgage Training End Dates:  Data provided by 2INgage included the "anticipated cohort end date" which was defined in the data dictionary as the anticipated date training will end. The case assignable date provided by 2INgage was used as a proxy for training end date.

- OCOK and 2INgage Incomplete Hire Records (OCOK & 2INgage): For both SSCCs, not all caseworkers hired during the period were included in initial data. For OCOK, six additional caseworkers were included in the corrected data who were not accounted for in

---

[272] Data dictionary for hired data, provided monthly by DFPS.

[273] Data dictionary as provided monthly by DFPS in file RO2.4 and RO1.1 DFPS CVS Grand CL and CPD grads "date".xls.

[274] In an informal response to a draft of the Monitors' First Report, the State also noted, "The monitors note that all new hires (unless excepted) are enrolled in CPD.  With regard to the report noting that 21.7% of the caseworkers in their sample finished CPD early, the case-assignable date is manually entered after CLOE staff audits the employee's training record to verify completion of all requirements. This process can create a delay between the actual date training was completed and when case assignability is recorded. Some supervisors assigned cases when the training was completed instead of when CLOE verified the worker was assignable. Clarification has been sent to the field on this point."  DFPS & HHSC, *Agency Response to DR Texas Report* 11-12 (June 15, 2020)(on file with Monitors).

[275] DFPS assured the Monitors that there were quality assurances in all reports. However, paper records and manual notes as text fields are subject to data errors. In addition, text notes did not provide quantifiable data for the Monitors' analysis.

initial data provided to the Monitors. For 2INgage, 65 of 125 (52%) caseworkers were not provided in initial hire data sent to the Monitors.

- OCOK and 2INgage Hire Types and Training Requirements**:** Hire type and training information found in notes were, at times, mismatched in the data. Staff categorized by hire type, who should have been required to participate in full CPD training, were found to be exempted from training as recorded in other data or in the notes associated with that caseworker. These mismatches in hire types and training time required that CPD completion and timing had to be adjusted for analysis. Data provided also did not clearly specify the reasons that some caseworkers were flagged as in need of "partial" or "no training," though training materials indicated they should have participated in full CPD training. The same was true for staff who, according to training materials provided, should not have been required to participate in training but who had cohort start dates.

In addition to providing data to the monitoring team, OCOK and 2INgage provided information describing their training programs. The materials provided highlight what appear to be significant differences in the length of training between the two SSCCs' training programs and the 13-week DFPS CPD training in place when the Fifth Circuit validated Remedial Order 1. For example, the timeline provided by OCOK for training its caseworkers (referred to as "Permanency Workers"), indicates that its training model could be as short as 11 weeks, depending on the lag between a caseworker's hire and the date of the next "Permanency Academy."[276]

**Figure 5.1: OCOK Training Timeline for New Permanency Workers**



OCOK described the following timeline for its training in a written response to the questions posed by the monitoring team:

Total training time before case assignability is 11-15 weeks, depending on when the hire date falls in the monthly training cycle. This includes 7 business days of

---

[276] OCOK, *Training Timeline for New Permanency Workers* (undated) (on file with Monitors).

new hire training, followed by 2-6 weeks of observation/field work, followed by 2 weeks of Academy training in the class room, followed by 2 weeks in the field, followed by an additional 2 weeks of Academy training, followed by 2 weeks in the field.  At that time, the worker graduates from training and is assessed for readiness to take on full case management responsibility.  If they are not assessed to be ready, their supervisor and mentor will continue to develop their skills until such time as the worker is assessed to be ready.  For this reason, the Case Assignable date for a few workers will extend beyond graduation from the Academy.[277]

2INgage materials describe a six-week "2INgage Academy" program for training caseworkers (referred to as "Permanency Case Managers"), alternating one week in the classroom with a week in the field for the six-week period.  In an overview of professional development, 2INgage reported:

> Training for Permanency Case Managers begins on the date of hire and includes a minimum of six weeks to include 3 weeks of Classroom training and an additional three weeks of other On-line and Field training outlined in the Individual Training Plan.
>
> …
>
> 2INgage Academy is structured by alternating one week of classroom training with one week of training in the field.  Each week's curriculum is independent of the other and allows new employees to begin Academy the week following hire date.[278]

This training curriculum was confirmed by 2INgage in the written responses the agency provided to the monitoring team's questions:

> Total training time of six weeks includes both 3 weeks of classroom and 3 weeks of [field training] and other online training requirements as documented in the Individual Training Plan. This time starts on date of hire and ends when all requirements of the classroom and Individual Training Plan are met.
>
> …
>
> Our model includes a total of 6 weeks [of training] with an additional 5 weeks of Solution Based Casework provided after the staff are case assignable.[279]

## 3.    Remedial Order 1 Performance Validation

### a.    Methodology

---

[277] OCOK, *OCOK Responses to RO1* Questions (on file with Monitors).
[278] 2INgage, *2INgage Professional Development Overview* (undated)(on file with Monitors).
[279] 2INgage, *RO1 Questions for State Call* (undated)(on file with Monitors).

In order to validate DFPS's performance for Remedial Order 1, the Monitors analyzed a cohort of data consisting of all persons hired to perform the job of DFPS CVS caseworker during the months of January 1, 2020 to July 31, 2020. A total of 440 persons were hired by DFPS as CVS caseworkers during this time period. The cohort included caseworkers who were newly hired (new hires), rehired after leaving the agency (rehires), or transferred to the caseworker position from another position in the agency (transfers). The analysis included a review of:

- Time to leaving the CVS caseworker job and/or leaving DFPS, to allow the Monitors to better understand incomplete training records, CVS staff turnover, and the timing of staff turnover.
- Verification of Completion of CPD Training, by using the case assignable date as the date of completion.
- Verification of Time to Complete CPD Training, analyzing caseworkers subject to full training separately from partial training due to differences in requirements related to training.[280]
- Expected CPD Completion, to determine whether CVS caseworkers required to complete the full CPD training course completed within the expected timeframe of 13 weeks (91 days), based on the CPD curricula.

In order to validate performance for the two SSCCs, the Monitors analyzed two cohorts of data consisting of 302 persons across the two SSCCs:

- OCOK hired 177 caseworkers between January 1, 2020 and July 31, 2020. Caseworkers could have been newly hired with no previous experience (new hires), or transferred to the position from DFPS or another SSCC (transfers).
- 2INgage hired 125 caseworkers between April 1, 2020 and July 31, 2020. Caseworkers could have been newly hired with no previous experience (new hires), transferred to the position from DFPS (transfers), or been hired with previous DFPS experience (previous DFPS).

The analysis conducted for the SSCCs included the same elements as the DFPS analysis, described above.

b.   **Performance Validation Results**

i.   **Caseworkers Hired and Trained by DFPS**

DFPS hired 440 CVS caseworkers between January 1, 2020 and July 31, 2020. The majority of caseworkers hired, 79% (347 of 440), were classified as new hires. Of new hires, 26 were described as "stipend students," interns who completed CPD training with the agency prior to being hired as full-time caseworkers. Stipend students are fully case assignable on their hire date.

---

[280] Transfers, rehires, and "student stipends" are not subject to full CPD training.

**Figure 5.2: DFPS CVS Caseworkers Hired by Hire Type, January 1, 2020 to July 31, 2020**



**Figure 5.3: DFPS CVS Caseworkers Hired by New Hire Type**



Out of these 440 caseworkers, 123 (28%) had left the agency as of December 1, 2020.  Of those that exited, 20 DFPS caseworkers transferred to an SSCC.

More than half of the caseworkers leaving the agency (51%, or 63 of 123) exited during CPD training.  Caseworkers who left the agency during the CPD program completed 71 days of training on average.

Thirty-two percent (39 of 123) of caseworkers who left the agency exited after completing CPD training.  On average, caseworkers who completed training and left the agency did so within 83 days after completing training.

**Figure 5.4: Hired DFPS CVS Caseworkers Who Left Position by December 1, 2020 Timing of Exit***



*Analysis assumes left the agency or CVS, based on provided exit dates. Most left the agency entirely.

**Figure 5.5: DFPS CVS Caseworkers Hired by Agency Status as of December 1, 2020**



Three DFPS regions – Region 7, Region 8, and Region 1 -- hired close to half (45%, or 196 of 440) of all caseworkers hired between January 1, 2020 and July 31, 2020. One region – Region 2 – lost all 13 of the caseworkers hired during this time period, with four of those transferring to an SSCC. Region 3W, in the Fort Worth area, also lost a high percentage of the caseworkers hired (18 of 23, or 78%) during this time period.

**Figure 5.6: Caseworkers Hired, Active, and Left Agency by Region**



Of the 440 caseworkers hired by DFPS during the time period analyzed, 313 were subject to CPD training requirements, and remained at the agency through training.

**Figure 5.7: CVS Caseworkers CPD Training Completion Sample**
Source: DFPS CVS Hire Data
*n=313*



Of these 313 caseworkers, 78% (244 of 313) were newly hired subject to full CPD training, and the remaining 69 caseworkers were rehired or transferred into the agency, subject to full or partial CPD training. Of the 69 rehired and transferred staff subject to CPD training, 52% (36 of 69) were subject to full training, while 33 (48%) were subject to partial CPD training.

Of the 313 caseworkers required to complete full or partial CPD training, 97% (305 of 313) had completed CPD training as of January 2021. The eight caseworkers who had not yet completed training were noted as being "not case assignable yet" in the "Date Case Assignable Notes" provided by DFPS. However, of these eight, one caseworker was identified in full caseload data for November 2020 and December 2020. This caseworker was never included in graduated caseload data.

**Figure 5.8: DFPS CVS Caseworkers CPD Training Completion**



Source: DFPS CVS Hire Data
*n=313*

97%
305

3%
8

■ Training Completed    ■ Training Not Completed

DFPS reported that, on average, CPD training takes 13 weeks (91 days) to complete. Of the 304 caseworkers[281] hired by DFPS who completed CPD training, 271 were subject to full training.  The average time to complete CPD training for these 271 caseworkers was 102 days. The 33 caseworkers who were rehired or transferred into the agency completed their partial CPD training in 65 days, on average.

The Monitors also analyzed training for the two SSCCs – OCOK and 2INgage – that transitioned to providing casework services for the children in their regions in 2020.  The results of those analyses follow.

ii.    **Caseworkers Hired by OCOK and 2Ingage**

On March 1, 2020, OCOK took over all case management, kinship, and reunification services in Region 3b, as part of the Community Based Care ("CBC") plan.[282]  DFPS staff who had been providing these services in the region were allowed to apply to transfer to OCOK, if they preferred.[283]  Consequently, of the 177 staff OCOK hired as caseworkers during the time period

---

[281] One caseworker was excluded from the time to complete analysis due to leaving on maternity leave during training.
[282] While OCOK did not begin providing case management services until March 1, 2020, the Monitors began receiving hiring data from OCOK in January 2020.
[283] The Family Code requires the SSCC to give preference for employment to employees of DFPS who are considered to be in good standing.  Tex. Fam. Code §264.155(7).  According to DFPS, the SSCCs have a goal of modifying the process for hiring in order to expedite the process for CPS staff in good standing.  *See* DFPS,

studied, most (114 of 177, or 64%) were hired as transfers from DFPS, and most of those caseworkers transferred to OCOK on March 1, 2020 (106 of 114).   One staff person hired by OCOK as a caseworker transferred from ACH (the parent company for OCOK); the remaining caseworkers hired (62, or 35%) were new hires.

**Figure 5.9: OCOK Caseworkers Hired Type January 1, 2020 to July 31, 2020 by Hire Type**



2INgage took over case management, kinship, and reunification services in Region 2 on June 1, 2020.   Between April 1, 2020 and July 31, 2020, 2INgage hired 125 staff to act as caseworkers.   In contrast to OCOK, most of 2INgage hires were new hires (85 of 125, or 68%) rather than transfers from DFPS.   Of the remaining 40 caseworkers hired by 2INgage, 30 (75%) were transfers from DFPS, and another 10 (25%) had worked for DFPS at some point in the past but were not working for the agency when they were hired by 2INgage.

---

*Community-Based Care FAQs,* Position Specific/Hiring Questions, *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/FAQ.asp.

**Figure 5.10: 2INgage Caseworkers Hired April 1, 2020 to July 31, 2020 by Hire Type**



Of the 177 caseworkers OCOK hired between January 1, 2020 and July 31, 2020, 15% (26 of 177) had left the agency as of December 2020,.  More than three-fourths of these caseworkers (20 of 26, or 77%) had transferred to the agency from DFPS and were not required to complete CPD training.  Of the remaining OCOK caseworkers who were required to take CPD training but left the agency, three (12%) left prior to completing CPD training and three (12%) left after completing CPD training.

**Figure 5.11: Caseworkers Leaving OCOK as of December 2020, Timing of Exit**



140

The majority of caseworkers hired by OCOK served Tarrant County, which also had the highest number of caseworkers leave the agency during the period analyzed.

**Figure 5.12: Number of OCOK Caseworkers Hired, Active, and Left Agency as of December 2020, by Work County**



Of the 125 caseworkers hired by 2INgage during the time period studied, 35 (28%) had left the agency as of November 2020.  Of the 35 caseworkers who left, 11 (31%) transferred from DFPS and were not required to complete CPD training and 24 (69%) were required to complete CPD training.  Of those 24, four left prior to completing CPD training, and 20 left after completing CPD training.

**Figure 5.13: Caseworkers Leaving 2INgage as of November 2020, Timing of Exit**

Most of the caseworkers hired by 2INgage, and most who left the agency, served three counties: Brown, Taylor, and Wichita.

**Figure 5.14: Number of 2INgage Caseworkers Hired, Active, and Left Agency as of November 2020, by Work County**



Of the 85 caseworkers hired by 2INgage who were required to complete CPD training and who stayed with the agency through completion of the training, all (100%) had completed the "2INgage Academy" training by November 2020.  Though six of the caseworkers hired by 2INgage had prior DFPS experience, they were nevertheless required to complete the full CPD training.

The average time to complete training for these 85 caseworkers was 43 days.  However, ten caseworkers completed CPD training within 28 days.  2INgage did not explain to the Monitors why these caseworkers were case assignable four weeks after they started training.

**Figure 5.15: 2INgage CPD Completion Time Compared to Expected, Caseworkers Requiring Full Training**



**Summary**

Ninety-seven percent (305 of 313) of DFPS caseworkers had completed CPD training as of the time of the analysis. These caseworkers were hired by DFPS between January 1, 2020 and July 31, 2020, did not leave the agency prior to or during training, and were subject to CPD training requirements. Of the eight caseworkers who did not complete CPD training, one caseworker was identified in the full caseload data, and was never included in graduated caseload data as would be expected. On average, CPD training takes DFPS caseworkers 13 weeks (91 days) to complete.

Of the 85 caseworkers hired by 2INgage who were required to complete CPD training and stayed with the agency through training, all (100%) had completed the "2INgage Academy" training as of January 2021. Seventy-nine (93%) of those 85 caseworkers were newly hired and subject to full CPD training. On average, caseworkers completed the 2INgage training in 43 days. Ten of these newly hired staff completed 2INgage training in just 28 days.

OCOK did not provide reliable data to the Monitors in time for assessment of their performance associated with Remedial Order 1. The failure to report reliable data about OCOK suggests that neither OCOK nor DFPS was actively assessing OCOK's conformance with training completion requirements and case assignability prior to the Monitors' efforts to validate the data.

**B.    Remedial Order 2: Graduated Caseloads**

Remedial Order 2: *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility*

*for primary case management services to children in the PMC class, whether employed by a public or private entity.*

### i.      DFPS Graduated Caseload Policy

According to its policy, DFPS's newly hired conservatorship caseworkers, or "protégés," may be assigned primary case management responsibility on cases after completion of CPD Training.[284] Once protégé workers complete CPD Training, DFPS policy requires that their case assignments are subject to the graduated caseload standard relevant to Remedial Order 2, which the State calls "Advancing Practice."[285]

Pursuant to the generally applicable, internal caseload standards, effective February 15, 2020, caseloads should not exceed 14 to 17 children per worker.[286] Under that new standard, therefore, in the first month following protégé worker eligibility for primary case assignment, per DFPS's policy, the protégé's caseload may not exceed 6 children, one-third of the generally applicable caseload standards.[287] In the second month of eligibility, the protégé's caseload may not exceed 12, or two-thirds of the caseload standards.[288] In the third month of eligibility, the protégé is eligible to be assigned a full caseload.[289]

### ii.      Data and Information Request and Production

As reported previously, DFPS informed the Monitors that it does not have the current capacity to report on the total number of days during the month that new caseworkers' caseloads are not compliant with the graduated caseload standard.[290] Instead, DFPS provided to the Monitors compliance data on the 15th and 45th days after caseworkers' eligibility for primary case assignment.[291] The Monitors also received data reporting on the dates that caseworkers become

---

[284]DFPS, *Graduated Caseloads Compliance Summary*, at 1 (Nov. 1, 2019) [hereinafter *Graduated Caseloads Compliance Summary*] (on file with the Monitors). In response to the Monitors' Data and Information Request for graduated caseload policies; field guidance; and information or directives describing to managers and/or supervisors the graduated caseloads policy and schedule, the State produced various documents. *See id.*, DFPS, *Supervisor BSD (Basic Skills Development) Information* (Nov. 1, 2019) [hereinafter *Supervisor BSD*] (on file with the Monitors); DFPS. *CVS Individualized Training Plan July 19* (Nov. 1, 2019) (on file with the Monitors).

[285] Graduated Caseloads Compliance Summary, at 1.

[286] Order Regarding Workload Studies in the November 20, 2018 Order at 1-2, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-CV-84, slip. op. (S.D. Tex. Dec. 17, 2019), ECF No. 772 (Workload Studies Order).

[287]DFPS, *Generally Applicable Caseload Standards – Guidelines for Conservatorship (CVS)*, at 8 (July 2020) [hereinafter *CVS Caseload Standards]*.

[288]DFPS., *Generally Applicable Caseload Standards – Guidelines for Conservatorship (CVS)*, at 8 (July 2020) [hereinafter *CVS Caseload Standards]*.

[289] *Id.*

[290] Deborah Fowler and Kevin Ryan, First Court Monitors' Report 2020, at 163-164, ECF No. 869; Email from Andrew Stephens to Kevin Ryan and Deborah Fowler (Oct. 18, 2019) (on file with the Monitors) (attaching DFPS Information and Data Request Proposal in response to the Monitors' Sept. 30, 2019 Data and Information request).

[291] DFPS reported in March 2020 that it was unlikely it could report on the daily compliance data for graduated caseloads in the near future. *See* Email from Tara Olah, to Kevin Ryan and Deborah Fowler (Mar. 24, 2020) (attaching DFPS response to Feb. 21, 2020 Data and Information Request). There were no additional updates to report. (on file with the Monitors).

eligible for primary case assignments, thus triggering the start date for calculation of graduated caseload performance.

During this reporting period, DFPS began providing data reporting the caseloads for the caseworkers employed by the two SSCCs that became responsible for case management in their respective regions, along with the dates associated with primary case assignment eligibility. However, DFPS did not provide data from OCOK that was sufficiently reliable to assess performance associated with Remedial Order 2. In the data reporting on OCOK caseworkers, the Monitors learned that many of the caseworkers' case assignment eligibility dates were estimated and, therefore, requested that the State, in conjunction with OCOK, provide the actual dates that workers became eligible for case assignment.[292] The State resubmitted the data from OCOK but when the Monitors again reassessed the resubmissions in March 2021, the data did not appear reliable. The Monitors sought clarity about the data that OCOK provided and DFPS confirmed that the data did not include the actual eligibility dates that the Monitors requested but remained the estimated dates for workers.[293] DFPS indicated that, going forward, OCOK is implementing technical improvements to ensure submission of the correct data for assessment.[294] The failure to report reliable data suggests that during this time period, neither OCOK nor DFPS was able to assess accurately OCOK's ongoing conformance with the graduated caseload policy and Remedial Order 2 prior to the Monitors' efforts to validate the data.

    c.      **Remedial Order 2 Graduated Caseloads Results and Performance Validation:**

         i.      **Methodology**

The monitoring team evaluated the State's performance associated with Remedial Order 2 through analysis of data provided by DFPS about its own caseworkers and the caseworkers employed by the two SSCCs responsible for case management during this period, OCOK and 2Ingage.[295] The Monitors used the standard that became effective on February 15, 2020 to assess performance.[296] The Monitors also interviewed 50 randomly selected caseworkers who were subject to graduated caseloads and validated the data in the caseload reports.

---

[292]Email from Megan Annitto, Monitoring Team, to Heather Bugg, (January 27, 2021) (attaching request for resubmission of data in format conforming with DFPS caseworker data and requesting the SSCCs to confirm that the date provided is the actual date the workers are eligible for case assignments) (on file with the Monitors).

[293] Email from Heather Bugg to Kevin Ryan and Deborah Fowler, *RO 2* (March 23, 2021) (on file with the Monitors).

[294] Email from Heather Bugg, to Kevin Ryan and Deborah Fowler, *RO 2* (March 24, 2021) (on file with the Monitors) (stating that "as [its] reporting has begun to become more consistent, OCOK will be able to use [an analytic] server to automate the reports, reducing the likelihood of human error and allowing for more advanced error handling.").

[295]DFPS, *R02.4 and R01.1 DFPS CVS Grad CL and CPD grads mar 2020 - 4-15-20  99287* (May 18, 2020) (on file with the Monitors); DFPS., *R02.4 and R01.1 DFPS CVS Grad CL and CPD grads Apr 2020 - 6-15-20  98629* (June 16, 2020) (on file with the Monitors); DFPS., *R02.4 and R01.1 DFPS CVS Grad CL and CPD grads May -Nov 2020 - 1-4-20  101199* (January 8, 2021) (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *R02.4 and R01.1 DFPS CVS Grad CL and CPD grads Dec 2020 - 2-1-21  101040* (February 2, 2021) (on file with the Monitors); DFPS., *2INgage Graduated caseload request to SSCCs through 02012021* (March 2, 2021) (on file with the Monitors); DFPS, *OCOK Graduate caseload request to SSCCs* (March 2, 2021) (on file with the Monitors).

[296] *See* Section IV.(C)(1), *infra*; *Workload Studies Order.*

For this report, the monitoring team examined the caseloads of caseworkers who became eligible for case assignment between March 1, 2020 and December 31, 2020. The Monitors verified whether staff subject to graduated caseloads conformed to the graduated caseload standard at three points in time: the 15th day after eligibility, the 45th day after eligibility, and on the calendar date at the end of the month after the 15th day of eligibility. To assess performance associated with the graduated caseload standards, the monitoring team calculated the percentage of workers who carried a number of children on their caseloads that was at or below the allotted caseload limit by the total number of staff subject to graduated caseloads at each point in time.[297]

## ii.    Remedial Order 2: Performance Validation Results

The monitoring team identified 665 caseworkers who became eligible for case assignment and subject to graduated caseloads between March 1, 2020 and December 31, 2020. Of these 665 staff, 470 staff worked for DFPS, 64 worked for OCOK, and 131 worked for 2INgage.[298] Most of the caseworkers subject to graduated caseloads who worked for DFPS had the job title CPS CVS Specialist I (408 of 470 or 86.8%). The other workers subject to graduated caseloads had the job titles CPS CVS Specialist II (19 of 470 or 4.0%), III (24 of 470 or 5.1%), or IV (15 of 470 or 3.2%). Four caseworkers had other titles, including CPS CVS Specialist V (2), CPS Heightened Monitoring IV (1), and CPS Master CVS V (1). The caseworkers subject to graduated caseloads at 2INgage all had the title of Permanency Case Manager. The caseworkers subject to graduated caseloads at OCOK all had the title of Permanency Specialist.

In the period from March 1, 2020 to December 31, 2020, 665 caseworkers were subject to graduated caseloads and were in caseworker positions on their 15th day after becoming case assignable. The Monitors confirmed that OCOK did not submit accurate data on their caseworkers subject to the graduated caseload standards during the required timeframe[299] and, therefore, the

---

[297] For example, a worker who became case assignable on June 7, 2020 would be assessed on the worker's caseload on the 15th day after case assignability (June 22, 2020); the last day of the calendar month after the 15th day (June 30, 2020); and on the 45th day after case assignability (July 22, 2020). The monitoring team analyzed the data to determine if the last day of the calendar month after the 15th day was in the first 30-day period after case assignability with a standard of six children or the second 30 day period after case assignability with a standard of 12 children.

[298] The monitoring team conducted quality checks on the data submitted by 2INgage. Of the 157 rows of data originally submitted, the monitoring team removed 26 rows. Nine rows had caseworkers who became case assignable in January or February 2021, as the Monitors requested but that were not in the timeframe for this analysis. Of the remaining 148 rows of caseworkers, six rows did not have a case assignability date for the case worker (each of these six rows had termination dates), one row had a worker with the same termination and case assignability date, and two workers had termination or transfer dates before their 15th day. These nine rows were eliminated from the analysis, as there was no way to assess whether they complied with the graduated standard. Four rows had the same caseworker listed twice with different case assignability dates and case counts and therefore, those four rows were removed from the analysis. Three Person IDs appeared in two rows each with different caseworker names; the monitoring team kept the row where the name and Person ID matched the name and Person ID that appeared in the monthly caseload data and removed the other three rows form the analysis.

[299] Email from Heather Bugg to Kevin Ryan and Deborah Fowler, *RO 2* (March 24, 2021) (on file with the Monitors). In the period from March 1, 2020 to December 31, 2020, OCOK reported 64 caseworkers who were subject to graduated caseload standards. Because the monitoring team's analysis suggested systemic data quality issues concerning the dates of eligibility, the Monitors inquired with DFPS and OCOK. OCOK confirmed in March 2021 that the dates for 29 staff were incorrect.

Monitors eliminated the OCOK workers from this analysis and assessed the remaining 601 caseworkers at DFPS and 2INgage.

As shown in the table below, on the 15th day after becoming case assignable, 72% (432 workers) of the 601 workers conformed to the graduated caseload standard of six or fewer case assignments. In the previous reporting period, 69% were in conformance.[300] On the last day of the month following the 15th day, 75% (449 workers) of the 470 workers were in conformance with the graduated caseload standard.[301] On the 45th day after becoming case assignable, 80% (473 workers) of the 588 workers still receiving case assignments on the 45th day conformed to the graduated caseload standard. In the previous reporting period, 94.4% were in conformance.[302]

**Table 5.1. Caseworkers Conforming to the Graduated Caseload Standards at Three Points in Time**

| Texas Caseworkers Conforming to Graduated Caseload Standard at Three Points in Time | | | | | |
|---|---|---|---|---|---|
| Month Case Assignable | New Caseworkers | 15th Day | Last Day of Month | 45th Day | Average |
| March | 31 | 29% | 65% | 74% | 56% |
| April | 49 | 47% | 76% | 80% | 67% |
| May | 37 | 81% | 89% | 94% | 88% |
| June | 142 | 35% | 32% | 55% | 41% |
| July | 51 | 86% | 84% | 98% | 90% |
| August | 54 | 94% | 91% | 92% | 93% |
| September | 70 | 96% | 91% | 96% | 94% |
| October | 67 | 91% | 94% | 92% | 92% |
| November | 36 | 97% | 89% | 83% | 90% |
| December | 64 | 97% | 97% | 77% | 90% |
| **Total** | **601** | **72%** | **75%** | **80%** | **76%** |

Over the three points in time, 76% of new caseworkers' caseloads conformed with the graduated caseload standard. The similarity of the rate of conformance to the graduated caseload standard on the last day of the month compared to the rates for the other two points in time (the 15th and 45th days) is important, as that data was verified by the Monitors through interviews with caseworkers.[303]

In general, workers who became case assignable in the first four months of the period examined, March 1, 2020 to June 30, 2020, had lower rates of conformance with the graduated caseload standard. Two factors likely contributed to the lower rates. First, March 2020 was the

[300] *See* Deborah Fowler and Kevin Ryan, First Report 167, ECF No. 869.
[301] The standard the Monitors used on the last day of the month after the 15th day of case assignability was either six assignments or 12 assignments depending on when the worker became eligible to accept cases.
[302] Deborah Fowler and Kevin Ryan, First Report 168, ECF No. 869.
[303] *See infra*, Section IV.C.

147

first full month of the new graduated caseloads standard and DFPS supervisors were in the process of adjusting their practice. Second, June 2020 was the first month that 2INgage accepted permanency cases. In June, 2INgage had many new workers who did not conform to the graduated caseload standard, resulting in lower overall performance.

The monitoring team interviewed 50 caseworkers subject to graduated caseloads over two time periods. On April 22, 2020, the monitoring team interviewed via videoconference a randomly selected sample of 20 DFPS caseworkers assigned to 15 counties across the state who were hired into a CVS caseworker position in November 2019 and became subject to graduated caseloads between March 2, 2020 and April 21, 2020. All 20 caseworkers in the sample had the job title CPS CVS Specialist I. The monitoring team reviewed with the workers' their case assignment detail reports dated April 20, 2020 generated from the DFPS INSIGHT system. The individual caseloads of the sample of caseworkers interviewed ranged from three to 17 children. Fourteen of the caseworkers were in the first month of eligibility; six of the workers were in the second month of case assignability. A total of six caseworkers (30%) had caseloads that exceeded the caseload guidance—five workers in the first month and one worker in the second month of case assignability. The monitoring team compared the results of the interviews of these caseworkers with the monthly caseload data submitted by DFPS in June 2020 to confirm the accuracy of the graduated caseload data collected during the caseworker interviews.[304]

On December 2 and 3, 2020, the monitoring team interviewed by videoconference a randomly selected sample of 30 DFPS caseworkers assigned to 20 counties across the state who were hired into a CVS caseworker position between May 11, 2020 and August 1, 2020 and became subject to graduated caseloads between October 1, 2020 and November 6, 2020. All 30 of the caseworkers in the sample had the job title CPS CVS Specialist I. The monitoring team reviewed with the workers case assignment detail reports dated December 1, 2020 generated from the DFPS INSIGHT system. The individual caseloads of the sample of caseworkers interviewed ranged from two to 11 children. One of the caseworkers was in the first month of eligibility to be assigned a case; 29 workers were in the second month of case assignability. All caseworkers interviewed had caseloads within the generally applicable graduated caseload standards. The monitoring team compared the results of the interviews of these caseworkers with the monthly caseload data submitted by DFPS in February 2021 to confirm the accuracy of the graduated caseload data collected during the caseworker interviews. During the Monitors' cross-data validation of the INSIGHT reports of these 30 workers with the DFPS monthly caseload data, the monitoring team found that 100% of the caseloads were a perfect match to those reported directly by caseworkers interviewed who were subject to graduated caseloads.

---

[304] During cross-data validation of the INSIGHT reports of the twenty workers interviewed with the monthly caseload data, the monitoring team found that 65% of the caseloads in primary substitute and adoption stages were a perfect match, 80% were within one case, and 95% were within two cases in the graduated caseloads reviewed. The date of the INSIGHT reports requested by the Monitors for worker interviews was April 20, 2020 and were to be cross validated with the monthly caseload data for April 30, 2020. The ten-day span between the two reports could reasonably account for some of these discrepancies. Starting in August 2020, the monitoring team requested INSIGHT reports and monthly caseload data with no more than a one-day gap between the two data sets.

### iii.    Summary of Performance Validation

- For the 601 workers that the Monitors assessed at two points in time and the 588 workers the Monitors assessed at three points in time, the State was in conformance with the graduated caseload standards 76% of the time.

- On the 15th day, 28% of workers who became eligible for primary case management and reached their 15th day between March 1 and December 31, 2020 had caseloads in excess of the graduated caseload standard of six children.

- On the 45th day, 20% of workers who reached their 45th day between March 1 and December 31, 2020 had caseloads in excess of the graduated caseload standard of 12 children.

- The agency's compliance with Remedial Order 2 improved sharply during the period reviewed. Just over half (56%) of the 31 caseworkers who became eligible for primary case management in March 2020 had caseloads that conformed to the graduated caseload standard and less than half (41%) of the 141 such workers in June 2020 conformed to the graduated caseload standard. But about nine in every ten caseworkers who became case assignable on July 1, 2020 or later had case assignments that conformed to the graduated caseload standard at three points in time.

- 2INgage submitted data that was sufficiently reliable to allow the monitoring team to provide a performance assessment and are included in the analysis; OCOK did not provide reliable data in time for assessment of their performance associated with Remedial Order 2.

- The failure to report reliable data about OCOK suggests that neither OCOK nor DFPS was actively assessing OCOK's conformance with the graduated caseload policy and Remedial Order 2 prior to the Monitors' efforts to validate the data.

### C.    Remedial Order 35, A-1, A-2, A-3, and A-4: Caseloads

Remedial Order 35: *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS' reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined*

149

*above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

Remedial Order A1: *Within 60 days of the Court's Order, DFPS, in consultation with and supervision of the Monitors, shall propose a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

Remedial Order A2: *Within 120 days of the Court's Order, DFPS shall present the completed workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which the determination is based, for the establishment of appropriate guidelines for caseload ranges.*

Remedial A3: *Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be pro-rated accordingly.*

Remedial Order A4: *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class.* [The Court modified the effective date of this Remedial Order to February 15, 2020.[305]]

### i.   **Background**

On December 16, 2019, the Court approved an agreed motion by the parties that provided in lieu of conducting workload studies pursuant to Remedial Orders A1, A2, B1 and B2, DFPS and HHSC would use as caseload guidelines:

- 14-17 children per conservatorship caseworker, for the purpose of satisfying State obligations within Remedial Orders A-2, A-3 and A-4;
- 14-17 investigations per DFPS CCI investigator, for the purpose of satisfying State

---

[305] Workload Studies Order, at 1-2. Supra 284.

obligations within Remedial Orders B-2, B-3 and B-4; and
- 14-17 tasks per RCCR inspector, for the purpose of satisfying State obligations within Remedial Orders B-2, B-3 and B-4.

  ii.  **Data and Information Request and Production**

  To assess the State's compliance with Remedial Order 35, the Monitors requested that DFPS comply with the following reporting schedule:

> Provide a report by November 15, 2019 and on a monthly basis thereafter, with caseloads for all staff, including supervisors, who provide primary case management services to any child in the PMC class, with name of employer (public or, as evolves, private), and indicate whether full-time or part-time. The report will be a point in time caseload for November 1 and is due by November 15, then for December 1, 2019 due by December 15, 2019, and monthly thereafter. The reports must include all staff who provide case management services to children in the PMC General Class and their caseloads; the number and percent of staff with caseloads within, below and over the DFPS guideline once established, by office, by county, by agency (if private) and statewide; the identification number and location of all individual staff and the number of PMC children and, if any, TMC children to whom they provide case management; include caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions. Identify all staff subject to a graduated caseload. Provide individual fields for every type of case that the worker carries, including those outside the child welfare domain, if any. Identify for each staff all non-case carrying work, such as IV-E eligibility determinations, that impacts their capacity. Identify all secondary assignments for each staff. Identify at the bottom of the report the total number of supervisors carrying a case.[306]

  The Monitors subsequently wrote to the State and requested DFPS list "by staff member, the names and identification numbers of all children assigned to all staff, including supervisors, who provide primary case management services to any child in the PMC class."[307]

---

[306] Email from Deborah Fowler and Kevin Ryan to Andrew Stephens (Sept. 30, 2019) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request in attachment).
[307] Email from Kevin Ryan and Deborah Fowler to Andrew Stephens (Oct. 28, 2019) (on file with the Monitors).

### iii.    DFPS Data and Information Production

The State provided point-in-time caseload data to the Monitors monthly, most recently at a 30-day lag. The last point-in-time caseload data submitted by DFPS prior to the cut-off for validation in this report was submitted on February 2, 2021 and reflected the point-in-time caseloads for December 31, 2020. The information in the monthly caseload submissions for DFPS and for OCOK and 2Ingage caseworkers included spreadsheets listing all caseload carrying staff, details for the caseloads they carried and spreadsheets listing each child in the custody of DFPS and their legal status. The information in the caseload submissions for the SSCCs did not contain the information the Monitors requested for supervisors. On January 27, 2021, the Monitors notified DFPS that it should "coordinate with all SSCCs, including those currently in Stage II and going forward, so that all data are provided in the same format wherever possible" for data and information requests as to all Remedial Orders.[308]

To validate the accuracy of the State's caseload data submissions, the Monitors randomly selected and interviewed 150 CVS caseworkers from 52 counties as described below. In advance of the monitoring team's interviews, DFPS provided caseload information from the State's INSIGHT reporting tool for each identified worker for a date selected by the Monitors.[309] The State also separately provided the INSIGHT reports for 317 workers to inform a comprehensive analysis and comparison of INSIGHT reports and the State's monthly caseload data submissions.[310]

In this reporting period, the State has also provided to the Monitors and to the Court information related to the development and implementation of a new caseload tracking tool for supervisors.[311]

## D.    Remedial Orders 35 and A-4: Caseworker Caseloads

Remedial Order 35: *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management*

---

[308] *Memorandum from Kevin Ryan and Deborah Fowler* to DFPS, at 1 (January 27, 2021) (on file with the Monitors) (requesting information and instructing that DFPS ensure that the SSCCs provide information consistent with the Monitors' requests for all Remedial Orders).

[309] DFPS describes INSIGHT as a tool to "manage critical case tasks and deadlines." DFPS., *Impact Modernization, available at*
 https://www.dfps.state.tx.us/Doing_Business/IMPACT_Modernization/default.asp.

[310] DFPS, *RO2.1 CVS caseloads as of 7-31-20 - sept-1-20 - 99357 (002).xlsx*
*FINAL -List of workloads for a select group on 8-1 – 99647.xlsx; Copy of Caseload Verification Results April – Dec 2020.xlsx* (on file with the Monitors).

[311] The State provided several documents to the Monitors in association with its Affidavit filed in relation to Graduated Caseloads that bear on supervisor management of caseloads. *See generally* Exhibit A Sworn Declaration for Remedial Order No. 2 Related to Graduated Caseloads, ECF No. 1021-1 (supporting documentation on file with the State and the Monitors).

*services to children in the PMC class and their caseloads. In addition, DFPS' reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

Remedial Order A4: *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class.* (The Court modified the effective date of this Remedial Order to February 15, 2020.)

### i.    **Methodology**

The Monitors cross-checked the monthly data files provided by the State for DFPS caseworkers, OCOK caseworkers, and 2INgage caseworkers and found the number of children assigned to each worker in the listing table added to the number of children in the caseload table. To analyze caseloads, the Monitors used the total number of children assigned to CPS CVS Specialists (I-V) at DFPS; Permanency Specialists at OCOK, and Permanency Case Managers at 2INgage.[312],[313] The monitoring team also independently replicated caseload validation by interviewing 150 CVS caseworkers,[314] selected by the Monitors, about their caseloads between August 2020 and January 2021 and by conducting a comparison of 317 caseworkers' INSIGHT reports with the State's caseload data report for the corresponding month. Finally, the Monitors met with the representatives from DFPS and HHSC to discuss DFPS's new caseload tracking tool on January 29, 2021.

For this report, the State reported the data as requested by the Monitors with respect to DFPS supervisors who managed PMC children's cases, but not for OCOK or 2INgage supervisors.

---

[312] CVS Specialists I, II, III, IV, V staff account for over 95% of all the staff listed by DFPS carrying at least one PMC child's case in each of the ten caseload reports the Monitors received from March 2020 to December 2020. Supervisors account for most of the remaining case carrying staff.  For this report, the Monitors eliminated from the analysis staff with other titles because they account for a relatively small number of staff carrying a small number of PMC children. On December 31, 2020, for example, of the 1,337 DFPS carrying at least one PMC case, 1,302 (97%) are CVS Specialists I-V and 14 are supervisors (1%). Program specialists (12), master CVS specialists (5), and staff with other titles (4) account for the remaining 21 staff.

[313] The Monitors did not weight secondary assignments in their assessment of conformity with the caseload guidelines for this report and continue to collect information in interviews with caseworkers and assess the appropriate methodology.

[314] The Monitors also interviewed 50 additional workers who were subject to graduated caseloads and report on those validation efforts separately in the corresponding section of this report under Remedial Order 2.

ii.     **Remedial Order 35 and Remedial Order A-4: Performance Validation results**

As of December 31, 2020, the State reported there were 1,495 caseworkers who managed at least one PMC child's case, which includes caseworkers employed by DFPS, OCOK, and 2INgage combined.[315]  In ten months of caseload reports between March 2020 and December 2020, the State reported the highest number of caseworkers managing at least one PMC child's case on October 31, 2020 (1,512) and the lowest number on April 30, 2020 (1,413). From the March 31, 2020 report to the December 31, 2020 report, the number of caseworkers managing at least one case rose by 54 (4%).

Remedial Order A-4 became effective on February 15, 2020, requiring DFPS to ensure that the caseload standard of 14 to 17 children is "utilized to serve as guidance for supervisors who are handling caseload distribution" and is used to inform "hiring goals for all staff." In ten months of caseload reports starting on March 31, 2020 and ending on December 31, 2020, an average of 56% of caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 44% of these caseworkers served 18 or more children. The highest rate of conformance with the guidelines among the ten caseload reports occurred in July (58%) and the lowest rate occurred in March (52%).

As shown in the Table below, on December 31, 2020, of the 1,495 caseworkers who managed at least one PMC child's case, 846 (57%) caseworkers had 17 or fewer children on their caseload. Two-hundred and 63 (18%) carried 18 to 20 children on their caseloads. Two hundred and eighty-four workers (19%) carried 21 to 25 children on their caseloads. The remaining 102 workers (7%) carried more than 25 children on their caseloads, with 20 (1% of all workers) carrying more than 30 children on their caseloads. Over one-quarter (386 workers, 26%) of all caseworkers carried 21 children or more on their caseloads on December 31, 2020.

---

[315]DFPS, *RO2.1 CVS caseloads as of 12-31-20 - 2-1-21 - 101129* (Feb. 2, 2021) (on file with the Monitors).

**Table 5.2:  Caseworkers Managing at Least One PMC Child
March 2020 to December 2020**

| Month | Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| Mar-20 | 1441 | 745 | 52% | 696 | 48% |
| Apr-20 | 1413 | 756 | 54% | 657 | 46% |
| May-20 | 1448 | 816 | 56% | 632 | 44% |
| Jun-20 | 1473 | 841 | 57% | 632 | 43% |
| Jul-20 | 1472 | 858 | 58% | 614 | 42% |
| Aug-20 | 1474 | 822 | 56% | 652 | 44% |
| Sep-20 | 1,496 | 869 | 58% | 627 | 42% |
| Oct-20 | 1512 | 873 | 58% | 639 | 42% |
| Nov-20 | 1487 | 825 | 55% | 662 | 45% |
| Dec-20 | 1495 | 846 | 57% | 649 | 43% |
| **Average** | **1471** | **825** | **56%** | **646** | **44%** |

As of December 31, 2020, DFPS directly employed 1,302 (87%) of the 1,495 caseworkers managing at least one PMC child's case. The 1,302 caseworkers are a decline of 3% from the 1,349 DFPS caseworkers managing at least one PMC child in March 2020, caused in part by some DFPS caseworkers transferring to OCOK or 2INgage. In the ten months of caseload reports starting on March 31, 2020 and ending on December 31, 2020, an average of 57% of DFPS caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 43% of these caseworkers served 18 or more children. The highest rate of conforming to the guidelines among the ten caseload reports occurred in October (59%) and the lowest rate occurred in March (53%).

As shown in the Table below, on December 31, 2020, of the 1,302 DFPS caseworkers who managed at least one PMC child's case, 750 (58%) caseworkers had 17 or fewer children on their caseload. Two-hundred and twenty-six (17%) carried 18 to 20 children on their caseloads. Two hundred and thirty-three workers (18%) carried 21 to 25 children on their caseloads. The remaining 93 workers (7%) carried more than 25 children on their caseloads, with 20 (2% of all workers) carrying more than 30 children on their caseloads. One-quarter (326 workers, 25%) of all DFPS case workers carried 21 children or more on their caseloads on December 31, 2020.

155

**Table 5.3: DFPS Caseworkers Managing at Least One PMC Child
March 2020 to December 2020**

| Month | Serving at least one PMC Child | | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|---|
| | No. | | No. | % | No. | % |
| Mar-20 | 1349 | | 713 | 53% | 636 | 47% |
| Apr-20 | 1317 | | 722 | 55% | 595 | 45% |
| May-20 | 1301 | | 728 | 56% | 573 | 44% |
| Jun-20 | 1292 | | 733 | 57% | 559 | 43% |
| Jul-20 | 1283 | | 742 | 58% | 541 | 42% |
| Aug-20 | 1286 | | 728 | 57% | 558 | 43% |
| Sep-20 | 1302 | | 766 | 59% | 536 | 41% |
| Oct-20 | 1319 | | 780 | 59% | 539 | 41% |
| Nov-20 | 1298 | | 740 | 57% | 558 | 43% |
| Dec-20 | 1302 | | 750 | 58% | 552 | 42% |
| **Average** | **1305** | | **740** | **57%** | **565** | **43%** |

On December 31, 2020, 14 DFPS supervisors managed at least one PMC child's case. The 14 supervisors are a decrease of 48% from the 27 supervisors managing at least one case on March 31, 2020. In the ten months of caseload reports starting on March 31, 2020 and ending on December 31, 2020, an average of 19 DFPS supervisors managed at least one PMC child's case.

As of December 31, 2020, 106 (7%) of the 1,495 caseworkers who managed at least one PMC child's case were employed by OCOK. The 106 caseworkers are an increase of 15% for OCOK from the 92 caseworkers managing at least one PMC child on March 31, 2020. In the ten months of caseload reports starting on March 31, 2020 and ending on December 31, 2020, an average of 44% of OCOK caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 56% of these caseworkers served 18 or more children. OCOK's highest rate of conforming to the guidelines among the ten caseload reports occurred on December 31, 2020 (53%) and the lowest rate occurred on March 31, 2020 (35%).

As shown in the table below, on December 31, 2020, of the 106 OCOK caseworkers who managed at least one PMC child's case, 56 (53%) caseworkers had 17 or fewer children on their caseloads. Fifteen (14%) carried 18 to 20 children on their caseloads. Twenty-nine workers (27%) carried 21-25 children on their caseloads. The remaining six workers (6%) carried more than 25 children on their caseloads. No workers carried 31 or more children on their caseloads. One-third (35 workers, 33%) of all OCOK caseworkers carried 21 children or more on their caseloads on December 31, 2020.

156

**Table 5.4: OCOK Caseworkers Managing at Least One PMC Child
March 2020 to December 2020**

| Month | Serving at Least One PMC | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| Mar-20 | 92 | 32 | 35% | 60 | 65% |
| Apr-20 | 96 | 34 | 35% | 62 | 65% |
| May-20 | 100 | 42 | 42% | 58 | 58% |
| Jun-20 | 102 | 48 | 47% | 54 | 53% |
| Jul-20 | 105 | 50 | 48% | 55 | 52% |
| Aug-20 | 101 | 42 | 42% | 59 | 58% |
| Sep-20 | 105 | 49 | 47% | 56 | 53% |
| Oct-20 | 103 | 44 | 43% | 59 | 57% |
| Nov-20 | 100 | 43 | 43% | 57 | 57% |
| Dec-20 | 106 | 56 | 53% | 50 | 47% |
| **Average** | **101** | **44** | **44%** | **57** | **56%** |

As of December 31, 2020, 87 (6%) of the 1,495 caseworkers managing at least one PMC child's case were employed by 2INgage. The 87 caseworkers are an increase of 85% from the 47 caseworkers managing at least one PMC child in May 2020 when 2INgage first started managing cases. In the eight months of caseload reports for 2INgage starting on May 31, 2020 and ending on December 31, 2020, an average of 63% of 2INgage caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 37% of these caseworkers served 18 or more children. The highest rate of conforming to the guidelines among the ten caseload reports occurred in May (98%) and the lowest rate occurred in December (47%).

As shown in the Table below, on December 31, 2020, of the 87 2INgage caseworkers who managed at least one PMC child's case, 40 (46%) caseworkers had 17 or fewer children on their caseload. Twenty-two (25%) carried 18 to 20 children on their caseloads. Twenty-two workers (25%) carried 21 to 25 children on their caseloads. The remaining three workers (3%) carried more than 25 children on their caseloads. No workers carried 31 or more children on their caseloads. Over one-quarter (25 workers, 29%) of all 2INgage caseworkers carried 21 children or more on their caseloads on December 31, 2020.

**Table 5.5: 2INgage Caseworkers Managing at Least One PMC Child
May 2020 to December 2020**

| Month | Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| Mar-20 | 0 | 0 | 0 | 0 | 0 |
| Apr-20 | 0 | 0 | 0 | 0 | 0 |
| May-20 | 47 | 46 | 98% | 1 | 2% |
| Jun-20 | 79 | 60 | 76% | 19 | 24% |
| Jul-20 | 84 | 66 | 79% | 18 | 21% |
| Aug-20 | 87 | 52 | 60% | 35 | 40% |
| Sep-20 | 89 | 54 | 61% | 35 | 39% |
| Oct-20 | 90 | 49 | 54% | 41 | 46% |
| Nov-20 | 89 | 42 | 47% | 47 | 53% |
| Dec-20 | 87 | 40 | 46% | 47 | 54% |
| **Average** | **82** | **51** | **63%** | **30** | **37%** |

*2INgage began caseworker performance in May 2020.

To validate the accuracy of the State's monthly caseload data submissions from its IMPACT system, which the Monitors most recently received on a 30-day lag, the monitoring team examined the symmetry of the data within those reports with caseload data from the DFPS INSIGHT database, which is available to caseworkers and their supervisors on a daily basis. The monitoring team used the INSIGHT data DFPS provided for a sample of 317 caseworkers, selected by the Monitors.[316] The analysis compared the INSIGHT data report extracted at 8:00 a.m. CST August 1, 2020 (reflecting July 31, 2020 caseloads) against the primary and secondary caseload information in the DFPS monthly caseload data report extracted from the IMPACT database reflecting July 31, 2020 caseloads. The analysis found that 98% of primary caseloads were a perfect match and over 99% were within one case. For secondary caseloads, 88% were a perfect match and 96% were within one case. Very few caseloads differed by more than three cases.

Next, the monitoring team interviewed individually 150 DFPS caseworkers and their supervisors from 52 counties remotely by videoconference between August 5, 2020 and January 7, 2021. All 150 of the caseworkers in the sample had job titles of CPS CVS Specialist I, II, III, IV, or V. In preparation for these interviews, the monitoring team asked DFPS to provide in advance a caseload report from DFPS's INSIGHT system for each individual interviewee corresponding to a previous date near the time of the interview. The monitoring team then reviewed the records with the caseworker, discussing each listed child by name and other work assignments, if any, and observed whether the caseworker's workload matched the DFPS records.

---

[316] DFPS, *RO2.1 CVS caseloads as of 7-31-20 - sept-1-20 - 99357 (002).xlsx;*
*FINAL -List of workloads for a select group on 8-1 – 99647.xlsx; Copy of Caseload Verification Results April – Dec 2020.xlsx* (on file with the Monitors).

The monitoring team compared the results of the interviews of these caseworkers with the monthly caseload data from IMPACT submitted by DFPS to confirm the accuracy of the caseload data collected during the caseworker interviews. During cross-data validation of the INSIGHT reports of the 150 workers interviewed with the monthly caseload data, the monitoring team found that 94% of primary case assignments were a perfect match and 99% were within one case in the caseloads reviewed. The individual caseloads of the sample of caseworkers interviewed ranged from four to 34 children. The monitoring team found 84 (56%) of the 150 workers were within the generally applicable caseload standards and 66 (44%) exceeded the caseload standards.

        d.    **Summary**

The parties agreed to, and the Court approved, a workload standard of 14 to 17 children per caseworker, pursuant to Remedial Order A-3. To validate the State's performance, the Monitors reviewed and analyzed all data provided by the State. The Monitors' analysis showed that as of December 31, 2020, 57% of all caseworkers (846 of 1,495), including OCOK and 2INgage, had primary caseloads within or below the standard of 17 children per worker. From March 2020 to December 2020, conformity with the standard remained within a narrow band ranging from 52% to 58% of all State workers. Although supervisors carried only a small percentage of PMC cases, those who did were rarely compliant with the workload standard.

The Monitors found that conformity with the caseload standard varied among DFPS, OCOK and 2INgage. Of the 1,302 DFPS workers carrying at least one PMC case on December 31, 2020, 750 workers (58%) had primary caseloads within or below the standard of 17 children per worker.  As of December 31, 2020, the two SSCCs that are undertaking case management, OCOK and 2INgage, had 53% and 46% of their workers within or below the standard, respectively. In the data the Monitors received from March 31, 2020 to December 31, 2020, the rate of caseworkers meeting the standard at OCOK was at its highest point on December 31, 2020; the rate of caseworkers meeting the standard at 2INgage was at its lowest point on December 31, 2020. The rates of caseworkers meeting the standard at both the SSCCs were lower than those at DFPS.

**E.**    **Remedial Orders B1 to B4:**

Remedial Orders B1: *Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include but will not be limited to:  the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

*Remedial Order B2: Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

*Remedial Order B3: Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

*Remedial Order B4: Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators or successor staff.*

## 1.    Background

The court granted the Plaintiffs' and Defendants' agreed order, wherein the parties agreed to include workload guidelines of 14 - 17 total assigned "tasks" per RCCR inspector and 14 -17 investigations per RCCI investigator,[317] and extended the time for establishing internal guidance for supervisors that administer caseload distribution until February 17, 2020.

## 2.    Data & Information Request & Production

### a.    Monitors' Data and Information Request

DFPS and HHSC provided data to the Monitors, which the Monitors used for validation of caseloads. Data from DFPS represented RCCI investigations and investigator and supervisor caseloads as of the last day of the month and data provided by HHSC represented RCCR tasks and inspector and supervisor caseloads as of the first day of the month.

As part of its caseload verification work, the Monitors requested staffing and caseload information to use in conducting interviews with RCCI investigators, RCCI supervisors, RCCR inspectors, and RCCR supervisors. The Monitors requested a complete listing of RCCI and RCCR investigators/inspectors and supervisors with information as follows: Position, Assigned Region, Assigned Unit, City, Employee ID, and RCCR/RCCI Hire Date.[318][319] The Monitors later requested

---

[317] Order (December 17, 2019), ECF No. 722.
[318] Email from Linda Brooke to Georgette Oden, *RCCI Interviews* (September 25, 2020 (on file with Monitors).
[319] Email from Linda Brooke to Audrey Carmical, *RCCI Interviews* (October 28, 2020) (on file with Monitors).

that the State provide the inspectors' and investigators' caseload reports the day prior to the date of each interview.

On November 16, 2020, the Monitors submitted a supplemental data and information request to the State for DFPS caseworker caseload data asking the State to include the date of hire for RCCI inspectors and supervisors, as well as the county where the staff assigned as the primary investigator in at least one RCCI investigation during the month was housed or officed.[320]

### b.       DFPS and HHSC Data & Information Production

HHSC and DFPS both provided data and information to the Monitors. The following data issues were noted:

- Data provided by DFPS did not include caseloads for special and master investigators or staff working in the complex investigation unit.
- Data provided by DFPS did not include staff work location or hire dates.  Date of hire was found in data provided to validate CSA training requirements (RO32), though not all staff were included in the data.
- Monthly data provided by HHSC varied both in content and structure.  Data on supervisor caseloads and administrative review cases was added to the monthly caseload data file in May, 2020.  However, the hire date data were incomplete: the field for that information exists in the data but not all staff are recorded as having a hire date.[321]

### c.       Remedial Orders B-1 to B-4 Performance Validation

The methodology for validation of the State's performance related to Remedial Orders B1 to B4, included analyzing the monthly caseload data submissions from both DFPS and HHSC for inspector, investigator, and supervisor caseloads. The Monitors analyzed data for the months of March through December 2020.

The monitoring team also conducted 70 interviews with both DFPS and HHSC staff via videoconferencing between October 21, 2020, and December 9, 2020.  The purpose of these interviews was to assist the Monitors in better understanding the workloads of investigators and inspectors.[322] Approximately 50% of eligible staff were randomly selected for interview. The

---

[320] E-mail from Deborah Fowler to Audrey Carmical, *Data and Information Request (*November 16, 2020) (on file with Monitors).

[321] The Monitors First Report to the Court identified similar data issues and limitations. Deborah Fowler and Kevin Ryan, First Report 179 -182. ECF No. 869.

[322] Because of the timing of the interviews, the list provided by the State prior to the scheduled interviews with RCCI and RCCR investigators/inspectors and supervisors could not be independently verified or cross-matched to the State's monthly data production, as was done for the analysis of caseloads for CVS caseworkers.  Going forward, the Monitors will correct for this by changing the timing of interviews to coincide with the State's data production, so that the caseload information produced for interviews can be cross-matched to the State's data as a method of validating the State's data production for RCCI and RCCR caseloads. DFPS caseload data includes RCI and non-RCCI staff assigned

monitoring team selected 28 RCCI investigators and supervisors from a list provided by DFPS of all staff working as RCCI investigators and supervisors as of October 30, 2020.[323]  The monitoring team also selected 42 RCCR inspectors and supervisors from a list provided by HHSC comprising all staff working as RCCR inspectors and supervisors as of September 4, 2020.[324]

During the period reviewed for this report, three factors may have had an impact on RCCI and RCCR caseloads: (1) the State's response to the COVID-19 pandemic; (2) implementation of Heightened Monitoring; and (3) the change in RCCI Priority-None screening procedures, as described in Section III of this report.[325]

### d.    Remedial Orders B1 – B4 Performance Validation Results
#### i.    RCCI Caseloads

The Monitors analyzed caseload data for RCCI investigators, supervisors and non-investigator staff working on RCCI investigations. The total number of open RCCI investigations declined between March and July of 2020, then steadily increased by month through the end of the year.[326]  The number of open RCCI investigations increased from 807 in March 2020 to 828 in December 2020, for a 3% increase.

---

to work as the primary staff on investigations and their supervisors. Staff were categorized based on job title with the exception of supervisors.  Staff were categorized as a supervisor in the month if they were assigned one or more subordinates during the month.  Supervisors working investigations and having no subordinates in the month were considered to be "non-investigator" staff. DFPS reported that RCCI investigators and supervisors could be assigned as the primary investigator on a case "in name only."  This is done so that investigations assigned to staff outside of the RCCI program will continue to show up in RCCI caseload data.  There was no data provided to identify those cases where RCCI staff have investigations on their caseload that other DFPS staff were actually working. Administrative review cases were included in RCCR data provided by HHSC as of July 2020 for the month of May 2020.  The actual work of determining if a finding should be overturned or upheld in an administrative review case is the responsibility of RCCR supervisors.  Administrative review cases are then returned for closure to the inspector who had been assigned to the case.  These cases were not included in the inspector caseload analysis as the work for the case was already completed and in order to have RCCR caseloads comparable to RCCI caseloads. RCCI investigations appealed or/under administrative review were not included in the caseloads of investigators who have been assigned that investigation.

[323] Staff excluded from interviews were: (1) staff interviewed previously, in April 2020; (2) staff not yet case assignable; and (3) staff that had been case assignable for one month or less.

[324] Staff excluded from interviews were: (1) staff interviewed in April 2020, (2) staff not yet case assignable; and (3) staff that had been case assignable for one month or less.

[325] From mid-March through the end of May, 2020, on-site investigations and inspections were limited due to the pandemic. At the end of June/early July 2020 the newly required Heightened Monitoring process began pursuant to Remedial Order 20. Heightened Monitoring teams were recruited from existing staff, leading to reductions in the number of RCCI investigators and, especially, RCCR staff available for investigations and inspections. Additionally, on November 1, 2020, DFPS implemented new policies which changed the criteria for downgrading an ANE case to Priority None. Screening procedures were changed as of November 1, 2020.

[326] The decline in investigations may have resulted from on-site visit limitations imposed from March through May 2020 in response to the COVID-19 pandemic.  Increases in RCCI investigations after October 1, 2020, may have resulted from the change in criteria for SWI in downgrading to RCCI Investigations.

**Figure 5.16: Number of RCCI Investigations by Month**



The majority of RCCI investigator caseloads were at or below the guidelines between March and December 2020.[327] The caseload for RCCI investigators during this time ranged from 9 to 14 cases, with 72%[328] of investigators (389 of 541) having caseloads of fewer than 14 investigations per month during the period, and 14% of investigators (77 of 541) having caseloads between 14 and 17 investigations. Secondary caseloads are not included in the caseload calculations as the average number of secondary cases assigned to investigators was less than one per month.[329]

---

[327] In the First Report, the Monitors found that caseload data provided by DFPS showed that on December 31, 2019, forty-three RCCI investigators and twelve non-investigators and supervisors carried a total of 1,011 cases. Of the forty-three investigators, twenty (46.5%) had more than seventeen investigations.

[328] Between March and December 2020, 76% of investigators experienced a caseload of 7 or fewer investigations for one or more months; 17% of investigators had caseloads of 7 or fewer investigations for 6 or more months during the March to December 2020.

[329] Between March and December 2020, only 21 of 72 investigators carried one or more secondary cases in addition to their primary cases. The average number of secondary cases for these investigators was less than 1 per month.

**Table 5.6: RCCI Investigators[330] with Caseloads within Guidelines March to December 2020**

| RCCI Investigators Conforming to Caseload Guidelines | | | |
|---|---|---|---|
| Month | Number Investigators | Number within Guidelines | Percent within Guidelines |
| March | 50 | 39 | 78% |
| April | 50 | 45 | 90% |
| May | 48 | 43 | 90% |
| June | 58 | 53 | 91% |
| July | 56 | 54 | 96% |
| August | 55 | 53 | 96% |
| September | 51 | 44 | 86% |
| October | 59 | 47 | 80% |
| November | 59 | 45 | 76% |
| December | 55 | 43 | 78% |

Although the majority of investigators had caseloads within the guidelines during the period, large differences in the number of cases existed between investigators with the lowest and highest caseloads:  investigators with the highest caseloads were assigned as much as 40 times the number of investigations than the number of investigations assigned to those investigators with the lowest caseloads.  Between March and December 2020, monthly RCCI investigator caseloads ranged from one to 45 investigations, with 35% of investigators (25 of 72) experiencing a caseload of 18 or more investigations for one or more months and 17% of investigators (12 of 72) experiencing a caseload of 25 or more abuse, neglect, or exploitation investigations for one or more months.

---

[330] Investigations assigned to supervisors and non-investigators are not included in this analysis.

**Figure 5.17: Low and High Caseloads for RCCI Investigators[331]**



Investigator tenure, or length of employment, does not appear to be a factor in higher caseload levels. RCCI investigators assigned seven or fewer investigations as of the end of December had worked for DFPS an average of 4.7 years while investigators assigned 20 or more investigations had worked for DFPS an average of 2.4 years. Overall, 28% of investigators (15 of 54) in December 2020 had been with DFPS less than one year while 26% of investigators (14 of 54) had been with DFPS for four years or more.  The average time with DFPS for all investigators was 3.5 years.

DFPS manages RCCI investigations and investigator caseloads in part by assigning RCCI investigations to RCCI supervisors and non-investigator staff.[332]  Between March and December 2020, the percent of investigations assigned to supervisors and non-investigator staff as the primary investigator ranged from 24% to 3% of all investigations. Non-investigator caseloads ranged from one to 14 during the period while RCCI supervisor caseloads ranged from zero to 77 investigations.

---

[331] Includes only investigations assigned to investigators.  Does not include investigations assigned to supervisors and non-investigators.
[332] Non-investigators include program specialists, RCCR administrative assistants, CPS investigative screeners, CPS investigators, and CPS Special Investigations investigators.  During our conversations with DFPS about caseloads, the monitoring team was told that some investigators and supervisors may have been assigned an investigation even though they are not acting as the primary investigator.  The monitoring team was told that this occurs when DFPS staff who do not report through the RCCI chain of command are assigned investigations in order to ensure that the cases are counted under the RCCI program.  Of the four RCCI supervisors interviewed, two reported having been assigned as the primary investigator on the caseload report, though they were not acting as the primary investigator on the case.

  
**Figure 5.18: RCCI Investigations by Staff Type Acting as Primary Investigator**



| | Mar20 | Apr20 | May20 | Jun20 | Jul20 | Aug20 | Sep20 | Oct20 | Nov20 | Dec20 |
|---|---|---|---|---|---|---|---|---|---|---|
| ■ Non-Investigator Cases | 30 | 14 | 12 | 9 | 3 | 10 | 4 | 9 | 8 | 8 |
| ■ Supervisor Cases | 163 | 116 | 81 | 53 | 15 | 19 | 25 | 32 | 18 | 37 |
| ■ Investigator Cases | 614 | 487 | 480 | 549 | 490 | 522 | 566 | 702 | 800 | 783 |

RCCI supervisors are expected to oversee the work of five to seven investigators, staffing and providing assistance with cases as needed, reviewing investigation findings, and approving completed cases. RCCI supervisors provided support on as many as 136 investigations per month during March and December 2020.  In addition to overseeing the work of their subordinates, RCCI supervisors may be assigned as the primary investigator on a case.  Between March and December 2020, xx RCCI supervisors were assigned an average of five investigations per month.

## ii.    **RCCI Interviews**

The Monitors conducted 28 interviews with RCCI investigators and supervisors over the course of four days during the month of December 2020. The interviews collected information from investigators and supervisors on the following topics:

- Supervision of other staff (supervisors only)
- Training details
- Casework process and caseloads
- COVID process and challenges
- Two-year risk assessment
- Process for case closure
- Additional job responsibilities

All investigators and supervisors were asked to provide their caseload report from the day prior to the date of their interview. For 12 investigators and two supervisors interviewed on December 1 and December 2, 2020, these caseload reports were compared to November 30, 2020, monthly caseload data provided by DFPS.  Of the investigators interviewed the first two days of December, 75% (9 of 12) had caseload reports that matched the November 30, 2020 caseload data provided. For the three remaining investigators (25%), all had caseload reports showing one fewer investigation than was found in the monthly caseload data.

On average, RCCI investigators reported being assigned nine new investigations per month. The range of new investigation assignments per month was between two and 20. Investigators who reported seven or more new investigations per month were all investigators who had been working as an investigator for RCCI for over a year.

RCCI investigators reported an average of 17 investigations as the highest number of investigations on their caseload in the past six months. The highest number of investigations reported ranged from seven to 37 investigations. Twenty-nine percent of investigators (7 of 24) reported having had 18 to 20 cases on their caseload as the highest number of investigations on their caseload in the last six months, and 21% percent (5 of 24) reported having 21 or more investigations as the highest number of investigations in the past six months.  Two of those five investigators had been an investigator for less than one year.

Supervisors reported assigning newly case assignable investigators an average of six investigations while maintaining a "round robin" assignment method for investigations. The range for investigations assigned to newly case assignable investigators was one to ten investigations.

Seventy-five percent of supervisors (3 of 4) reported giving investigators "courtesy"[333] assignments. All supervisors reported conducting weekly staffings with investigators and indicated they participate on visits with investigators in order to mentor new staff, conduct field assessments, or when protocols change.

### iii.   RCCR Caseloads

The Monitors analyzed caseload data for RCCR inspectors and supervisors. As shown in the figure below, the total monthly number of RCCR tasks (investigations and inspections) declined between March and May 2020 before increasing to approximately the same level by the end of 2020.[334]

---

[333] Investigators given courtesy assignments are most often asked to assist in an investigation by conducting interviews with children or others associated with an investigation. Courtesy assignments are not considered secondary assignments.

[334] Total RCCR cases, as reported by HHSC, include investigations under administrative review. Cases under administrative review are assigned to supervisors.  Once the review is complete and a decision is made, the case returns to the inspector for closure.  Administrative review cases accounted for approximately five percent of total cases each month but never less than three percent.  Administrative review cases are included in the supervisor analysis only.

**Figure 5.19: Number of RCCR Tasks**



All RCCR inspectors are assigned specific operations as part of their caseload. On average, caseload data showed each inspector was assigned an average of eight operations between March and December 2020.  All monitoring inspections in a specific operation are led by that inspector. Assigned operations are usually monitored twice a year. Inspector caseloads reflect operations to which they are assigned although they may not be actively conducting monitoring activities.[335] Agency home sampling inspections, which are usually assigned to inspectors on a quarterly basis, were completely suspended from mid-March to the end of May 2020 because of the pandemic.

Facility inspections[336] accounted for more than half of the RCCR inspectors' "tasks"[337] reported for the period March to December 2020, ranging from 54% to 65% of total tasks assigned. Investigations include abuse or neglect investigations reviewed by RCCR for minimum standards violations (which may or may not involve an on-site inspection), and those assigned to RCCR by SWI for an investigation of minimum standards compliance.

---

[335] Call with HHSC and Monitors, September 24, 2020.
[336] Facility inspections include inspections at assigned operations and agency home sampling inspections.
[337] Tasks include monitoring and sampling inspections, ANE investigations, and non-ANE investigations.  Does not include administrative review cases.

**Figure 5.20: RCCR Tasks by Type**



Between March and December 2020, the majority of RCCR inspectors had caseloads within the guidelines (1-17 tasks assigned), although the proportion of inspectors with caseloads within the guidelines sharply declined from a high of 92% in June 2020 to 58% in December 2020.[338]

---

[338] By way of comparison, the Monitors' analysis for the First Report indicated that caseload data provided by HHSC showed that on January 1, 2020, ninety-two RCCR inspectors carried a total of 1,854 cases or "tasks." Of the ninety-two inspectors, fifty-four (59%) had caseloads above seventeen tasks.

**Table 5.7: RCCR Inspectors with Caseloads[339] within Guidelines, March to December 2020**

| RCCR Inspectors Conforming to Caseload Guidelines | | | |
|---|---|---|---|
| Month (2020) | Number Inspectors | Number within Guidelines | Percent within Guidelines |
| March | 85 | 48 | 57% |
| April | 94 | 68 | 72% |
| May | 94 | 85 | 90% |
| June | 92 | 85 | 92% |
| July | 90 | 76 | 84% |
| August | 93 | 83 | 89% |
| September | 92 | 64 | 70% |
| October | 90 | 61 | 68% |
| November | 87 | 52 | 60% |
| December | 85 | 49 | 58% |

During the period of March to December 2020, there was a fluctuation in the number of inspectors who had one or more tasks assigned at the beginning of each month, beginning and ending the period with 85 inspectors after reaching a high of 94 inspectors in May 2020.[340] The average tenure of RCCR inspectors in March 2020 was 4.9 years, with 5% (4 of 85) having less than one year with the agency, and the average tenure of RCCR inspectors in December 2020 was 4.2 years, with 13% (11 of 85) having less than one year with the agency.

---

[339] Includes monitoring and sampling inspections, ANE investigations, and non-ANE investigations. Does not include administrative review cases.

[340] The analysis did not include inspectors who were not yet case assignable or who were not assigned tasks at the beginning of the month.

**Figure 5.21: Caseload Lows and Highs for RCCR Inspectors\***



\*Includes monitoring and sampling inspections, ANE investigations, and non-ANE investigations.  Does not include administrative review cases.

Between March and December 2020, monthly RCCR inspector caseloads ranged from one to 29 tasks with 71% of inspectors (76 of 107) having one or more months with a caseload of 18 or more tasks. Fifty-eight percent of inspectors (62 of 107) experienced at least one month with a caseload of 20 or more tasks.  In December 2020, 25% of inspectors (21 of 85) had caseloads with 20 or more tasks assigned, while 14% of inspectors (12 of 85) managed caseloads of 13 or fewer. The average tenure of inspectors with 20 or more tasks was 4.3 years and the average tenure of inspectors with 13 or fewer tasks was 4.6 years.

The number of RCCR supervisors increased slightly between March and December 2020. Supervisors of RCCR inspectors were responsible for providing support on as many as 149 tasks a month during the period. In December 2020, RCCR supervisors oversaw an average of 64 tasks. RCCR supervisors managed an average of four inspectors per month although the number of inspectors supervised ranged from one to 14.[341] RCCR supervisors are also responsible for conducting administrative reviews on investigation findings appealed by operations. Between

---

[341] Data on RCCR supervisors assigned cases and administrative reviews was not provided by HHSC until May, 2020. Prior to that time, HHSC had informed the Monitors that RCCR supervisors did not carry a caseload and no breakout of data for supervisors was necessary. HHSC indicated in a footnote provided in the May 2020, caseload data that investigations assigned to an RCCR supervisor were pending assignment to an inspector. Between May and December, RCCR supervisors had an average of three administrative review cases assigned as of the beginning of the month.

March and December 2020, RCCR supervisors had an average of three administrative review cases assigned as of the beginning of each month.

iv.  **RCCR Interviews**

The Monitors conducted 42 interviews with RCCR inspectors and supervisors over the course of eight days during the months of October and November 2020.

All RCCR inspectors and supervisors were asked to provide their caseload reports from the day prior to the date of their interview. The interviews conducted collected information from investigators and supervisors on the following topics:

- Supervision of other staff (supervisors only)
- Training details
- Casework process and caseloads
- COVID process and challenges
- Extended Compliance History Review (ECHR) process
- Process for case closure
- Enforcement action decisions and process
- Heightened Monitoring operations
- Waivers and variances process
- Licensing approval and revocation
- Additional job responsibilities

Inspectors reported having an average of nine operations on their caseloads at the time of the interview. The range of operations on the inspector caseloads was five to fifteen operations. Two RCCR inspectors with less than a year of service reported having ten or more operations on their caseloads at the time of the interviews.

The monitoring team's interviews with inspectors gleaned the following data regarding caseload assignments:

- 68% of inspectors (21 of 31) reported being assigned four to six new investigations per month with a range of three to 15 investigations assigned. Inspectors who reported seven or more new investigations per month had all been inspectors at RCCR for over a year.
- 52% of inspectors (16 of 31) reported having six to ten investigations as the highest number of investigations on their caseloads in the past six months, with a range of four to 16 investigations.
- 81% of inspectors (25 of 31) reported that they work on inspections even when not the primary inspector on the case. Twenty-three inspectors (74%) reported they work on investigations where they are not the primary inspector on the case.
- 91% of inspectors (28 of 31) reported other ongoing job responsibilities with the most common being courtesy assignments, enforcement team conferences, waiver/variance reviews and new operation applications.

RCCR inspectors were asked to share the level of contact they have with RCCI investigators when assigned a closed RCCI investigation for standards review. According to HHSC policy, investigators are required to participate in risk assessments and to discuss

information related to regulatory responsibilities with DFPS investigators during an ANE investigation.

Almost half of inspectors (45%, 14 of 31) reported having contact with the RCCI investigator throughout an investigation. Nine inspectors (29%) reported having contact with the investigator only at the beginning of the investigation. Three inspectors (10%) reported having no communication or contact with the RCCI investigator during the investigation.

**Figure 5.22: Timing of Communication Between RCCR Inspectors and RCCI Investigators During an ANE Investigation**



RCCR supervisors reported assigning newly case assignable inspectors an average of nine total cases. The range for total cases assigned to inspectors was five to 12 cases.

**Summary**

*RCCI*

The majority of RCCI investigator caseloads were within or below the guidelines between March and December 2020. Although the majority of investigators had caseloads within the guidelines during the period, large differences in number of cases existed between investigators with the lowest and highest caseloads. Investigators with the highest caseloads were assigned as much as 40 times the number of investigations than the number of investigations assigned to those investigators with the lowest caseloads.

173

*RCCR*

The majority of RCCR inspectors had caseloads within the guidelines during the period, although some inspectors had higher caseloads, outside of caseload guidelines. Between March and December 2020, RCCR inspector caseloads ranged from one to 29 tasks.  As of December 1, 2020, inspectors and tasks per work county indicated that an additional eight inspectors are necessary to achieve caseloads of 17 tasks per inspector

## VI. PREVENTING SEXUAL ABUSE AND CHILD-ON-CHILD SEXUAL AGGRESSION

This section of the report discusses the remedial orders related to identifying, documenting, and notifying caregivers of a child's history of sexual abuse, sexual aggression, or sexual behavior issues and to preventing child-on-child sexual abuse.

As of December 31, 2020, the most recent point-in-time data[342] analyzed by the Monitors, DFPS had identified 1,210 children with a confirmed history of sexual abuse or an indicator for sexual aggression. These children represented approximately 12.3% of the 9,820 PMC children in a placement on that day. DFPS flagged an additional 158 children with an indicator for a sexual behavior problem, bringing the total number to 1,368.

Children with a history of sexual abuse or an indicator for sexual aggression were more likely to be in a congregate care (GRO or RTC) placement than children with no sexual characteristic flag: 380 (31%) of the 1,210 children identified, were in a congregate care placement and 467 (39%) were in a foster home, while 13% of children (1,151 out of 8,610) with no sexual characteristic flag were in a congregate care placement and 53% (4,533 of 8,610) were in a foster home.[343]

Children whose case records are positively identified in IMPACT for either for a history of sexual abuse or with an indicator for sexual aggression change placements more frequently than children whose IMPACT records were not flagged. Of the total 16,326 children[344] in PMC between March and December 2020, 1,458 (9%) were children with an indicator for sexual victimization, and 297 children (2%) had an indicator for sexual aggression.[345]

---

[342] Unless otherwise noted, the data relied upon to produce the case read samples and analyses for this section of the report are data the State has provided on PMC children in response to the Monitors' Data and Information requests, including sexual abuse and sexual aggression indicators, since November 15, 2019. Data was provided on a quarterly basis but was changed to monthly with a 30-day lag for data received, beginning November 2, 2020. The last data submitted by DFPS prior to the cut-off for validation for this report was submitted on February 2, 2021 and reflected children in the PMC class and PMC child placements for December 2020. Data for the months of March through December 2020 was used for the trend analysis while data for the months of March through October was used for the case read samples. Data submitted monthly include a file of all children in the PMC class during the month ("List of Children in PMC") and a file of all placements for those children during the month ("List of Placements for Children in PMC"). Both files include the following sexual history indicators: sexual victimization history, ever a confirmed victim of sex trafficking, active child sexual behavior problem characteristic, date characteristic active, active child sexual aggression episode, and date child sexual aggression episode started. The additional data element, "Confirmed RCI Victim of Sex Abuse/Sex Trafficking After Removal" was added to the data submission as of November 30, 2020. A fuller discussion of the history of the Monitors' data and information requests and the State's responses can be found in Section V of the Monitors' First Report. Deborah Fowler and Kevin Ryan, *supra* note XX, at 197 – 260.
[343] Kinship placements are not included in foster homes.
[344] Data as reported by the State in "List of Placements for Children in PMC" data. Data as contained in the placements data file does not exactly match "List of Children in PMC" data provided by the State for the same period. Excludes 137 children who were on runaway status the entire period.
[345] Children with indicators for sexual abuse and sexual aggression are counted in both.

Children with an indicator for sexual aggression or sexual victimization were over three times more likely than children with no sexual characteristic indicator to have a high frequency of placement changes (four or more) during this time period.  While only 5% of children without a sexual characteristic indicator (736 of 14,653) had four or more placements during this period, 18% of children (53 of 297) with an indicator for sexual aggression and 18% of children (256 of 1,458) identified as victims of sexual abuse had four or more placements during this 10-month period.

**Table 6.1: Number of Placements for PMC Children by Sexual Indicator Type,[346] March to December 2020**
(n=16,326)

| Number of Placements | Sexual Abuse Indicator (n=1,458) | | Sexual Aggression Indicator (n=297) | | No Sexual Indicator (n=14,653) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| One Placement | 576 | 39% | 99 | 33% | 6,589 | 45% |
| Two to Three | 626 | 43% | 145 | 49% | 7,328 | 50% |
| Four to Six | 171 | 12% | 37 | 13% | 588 | 4% |
| Seven or More | 85 | 6% | 16 | 5% | 148 | 1% |

In addition to more frequent placement moves, the data revealed that runaway incidents were more common among children with an indicator for sexual victimization or sexual aggression than for children without a sexual characteristic indicator.  Children who had an indicator for sexual abuse victimization had more runaway incidents during the ten-months period than other children, with 8% (123) having one or more runaway incidents compared to 7% of children (20) with an indicator for sexual aggression, and 2% of children (322) with no sexual characteristic indicator.

---

[346] Eighty-two children had both a sexual abuse and sexual aggression indicator and so are counted in both indicator categories.

**Table 6.2: Number of Runaway Incidents for PMC Children by Sexual Indicator Type, March to December 2020**
(n=16,326)[347]

| Number of Runaway Incidents | Sexual Abuse Indicator (n=1,458) | | Sexual Aggression Indicator (n=297) | | No Sexual Indicator (n=14,653) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| One | 81 | 5% | 17 | 6% | 215 | 1.5% |
| Two or more | 42 | 3% | 3 | 1% | 107 | 0.7% |

## A.  Remedial Order 32: Policy Creation & Training of Staff Responsible for Making

### 1.    Determinations

Remedial Order 32: *Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse.  Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

**Background**

### a.     Court Monitors' First Report Performance Validation Findings

For the First Report, the Monitors reviewed the State's policies related to child-on-child sexual abuse, and the training modules used for staff who make determinations related to child-on-child sexual abuse.[348]  The Monitors contracted with Praesidium, a Texas-based consulting firm that works with organizations to prevent the sexual abuse of children.[349]  Praesidium analyzed the State's policies and training related to child-on-child abuse and provided a written report to the Monitors.[350]  The Monitors outlined Praesidium's recommendations in the First Report, as well as the concerns it expressed regarding whether the training modules were sufficient to appropriately

---

[347] A total of 16,463 children were in PMC placement between March and December 2020, including those who were on runaway status the entire period. Of these, 1,488 children had a sexual abuse indicator, 298 children had a sexual aggression indicator, and 14,759 children did not have either indicator. Children with an indicator for sexual abuse and sexual aggression are counted in both categories.
[348] Deborah Fowler and Kevin Ryan, First Report 202., ECF 869.
[349] *Id*.
[350] *Id*. at 202-203.

prepare investigators, CPS supervisors, and program administrators or directors to prevent or appropriately respond to child-on-child sexual aggression.[351]

b.    **September 2020 Contempt Hearing**

At the contempt hearing, the State's witnesses were questioned about the State's objections to the Praesidium report.  The State relied on testimony from Carol Self, the Director of Permanency for DFPS ("Self" or "Carol Self") to support its position that it was in compliance with the remedial orders related to identification of, and caregiver notification for, children with a history of sexual aggression or sexual abuse. During her cross-examination, Self admitted that DFPS is obligated to ensure the safety of children while at the same time asserting that RO 32 does not specifically require prevention of abuse, but only to provide documentation:

> [MR. YETTER]: You may have seen this in the State's papers in response to the Monitors, but there is some suggestion by the State that the Remedial Orders are not requiring that the State of Texas prevent sexual abuse of children in foster care.
>
> Is that your understanding of what the Order does, or do you think it does require the State to keep these children safe?
>
> A: Well, absolutely, we're required to keep the children safe.  I think that the question regarding prevention had to do with training.
>
> And we train on ensuring that – that our staff know how to document that we have the information, and through…ensuring that folks can recognize sexual abuse and document it, then that will prevent future abuse and neglect.
>
> THE COURT: How would that – how would that prevent it? Documenting it, how would that prevent it?
>
> THE WITNESS: Being aware of a child's history is what helps.
>
> ….
>
> THE COURT: What do you train your staff on preventing sexual abuse?

---

[351] *Id*. at 203.    The State filed written objections to the First Report, including an objection to the Praesidium recommendations, "Defendants object to Section V(A) of the Report, related to Remedial Order No. 32, and Section V(C) of the Report, related to Remedial Order No. 4, because it improperly attempts to redefine the requirements of those Remedial Orders. Specifically, the Report references a third-party report commissioned by the Monitors to examine Defendants' training on child-on-child sexual abuse, which relates to Defendants' efforts to "create a clear policy on what constitutes child on child sexual abuse" and "ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse," as required by Remedial Order Nos. 4 and 32 * * * However, the Report, in summarizing information  from the third-party report, criticizes Defendants for not focusing  on  prevention of child-on-child sexual abuse in the training.  While Defendants appreciate and take into consideration the recommendations provided by the Monitors, Defendants also object to the Monitors' disregard of the actual language in Remedial Order Nos. 4 and 32 and their failure to evaluate Defendants' compliance with that actual language. Defendants' Verified Objections to Monitors' Report, ECF No. 903.

THE WITNESS: Our staff are trained on how to recognize sexual abuse, how to speak to children and interview children, and assess child safety, and then document any of that information so that a caregiver has that information so that they can keep the children safe while they're in their care.

THE COURT: Well, it is your position that the Remedial Orders do not address DFPS's attempt to order DFPS to try to prevent child sexual abuse?

THE WITNESS: My understanding of the Orders, as they're written, is that we are to train on sexual abuse, and not – I mean, I think that --

THE COURT: And not prevent it?

THE WITNESS: Well, I think ensuring that we appropriately document and capture the information in our system and provide it to caregivers is how we prevent it. Making caregivers a way to –

….

THE COURT: Do you think documenting a history of child abuse will prevent it in the future without – especially, this is odd, since you don't even give the notification to caregivers.  I'm not sure how it is you're supposed to be preventing child abuse.

Or do you consider that that's part of your job, is to prevent child abuse – sexual abuse?

THE WITNESS: Yeah.  I absolutely feel like it's our responsibility to ensure that children are safe.

THE COURT: Okay.  And that includes preventing child sexual abuse?

THE WITNESS: Yes.

…

THE COURT: What was the – what was the aspect of the Praesidium Study that you objected to?

THE WITNESS: I don't have it in front of me.  I know that, specific to prevention, we provide training as to caregivers and to our caseworkers on understanding sexual abuse, recognizing sexual abuse, reporting –

THE COURT: Okay.  This is my question.  Listen to the question.

179

What was your objection to implementing the Praesidium Study?

THE WITNESS: I'm not certain I can answer without having it in front of me and seeing what our objections are.

THE COURT: Do you know, Commissioner?

COMMISSIONER MASTERS: No, ma'am, I do not.  But I'm already asking.[352]

Commissioner Masters was also asked about the State's objection to the Praesidium report during her testimony:

[MR. YETTER]: …It is among the most important issues that your group deal with is simply keeping the children in the custody of the State safe.  You'd agreed with that.  Wouldn't you?

A: I would.  I agree.

Q: And keeping these children safe in both body and mind includes keeping them safe from sexual abuse, whether it is from caregivers or other children.  Agree?

A: Agreed.

Q: It's not enough for your department simply to document sexual abuse of children in the custody of the State.  Is it?

A: No.

Q: The purpose is to prevent abuse of these children whether it's sexual or physical or emotional.  Right?

A: Yes.  We make every effort to keep them safe.[353]

### c.   Updates Following the Contempt Hearing

On January 24, 2021, DFPS sent an email update to the Monitors regarding CPD curriculum, noting that it had implemented some of Praesidium's recommendations:

As you are aware from our correspondence on December 18, 2020, DFPS is working to update CPD curriculum. While updating the curriculum, DFPS has implemented some of the recommendations from Praesidium that could be done within existing resources.  In particular, the following recommendations have been included in the new CPD training curriculum:

---

[352] Telephone/Zoom Show Cause Hr'g Tr. (September 3, 2020) at 299 - 303, ECF No. 964.
[353] Telephone/Zoom Show Cause Hr'g Tr. (September 4, 2020), at 130 - 131, ECF No. 967.

- Section B – CPS Professional Development Core Competencies Training – Sexual Abuse, recommendation 1 has been partially implemented where there are questions in the knowledge assessment that address child sexual abuse and child sexual aggression.
- Section B – CPS Professional Development Core Competencies Training – Sexual Abuse recommendations 2–7 have been incorporated into the training curriculum.

As our previous correspondence shared with you, DFPS plans to go-live with the new CPD training curriculum in March 2021.[354]

### d.   Remedial Order 32 Performance Validation

### 1.   Methodology

In addition to assessing DFPS policy changes following the Monitors' First Report to the Court, the Monitors analyzed training data for staff responsible for making the determination of what constitutes child-on-child sexual abuse in order to validate the training requirement included in Remedial Order 32.  The Monitors analyzed a total of 4,853 staff records to assess completion of Child Sexual Aggression (CSA) training for non-caseworker staff[355] active with DFPS, OCOK, or 2INgage between March 1, 2020 and November 30, 2020 (Q2 FY 20 -Q1 FY 21).[356] The monitoring team reviewed employee records provided by the State[357] to identify the presence of the most recent date supervisors and employees completed the CSA computer-based training.[358]

### 2.   Results of Performance Validation

The State confirmed CSA training as complete if there was a date in the employee's record of the most recent date the employee completed the training. When records did not provide a completion date for staff, the data noted the following reasons:  employee left the agency; or employee was still in training.

---

[354] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Training Update* (January 24, 2021) (on file with Monitors).
[355] Non-caseworker staff include CVS supervisors, program directors, program administrators, screeners, and RCI and CPI investigators, supervisors, and program administrators.
[356] Data provided by DFPS, OCOK, 2INgage training data, Q2 FY 20 - Q1 FY 21.
[357] *Id*.
[358] The data provided indicated the CSA completion date as "the most recent date the individual completed the child sexual aggression computer based training."  In some instances, this date preceded the most recent date of hire for the staff person. Data provided by the State indicated that the most recent hire date provided was not necessarily "the individual's most recent date of hire in their current position."  CSA training, therefore, may have occurred prior to the individual becoming a supervisor, program administrator, program director, investigator or other non-CVS positions.

**Figure 6.1: CSA Training by Position for Staff Active March to November 2020**



**Figure 6.2: CSA Training Verification, Staff Active March to November 2020 by Position**



Source: DFPS, OCOK, and 2INgage CSA training data, Q2 FY 20 - Q1 FY 21
*n=4,853*

■ Non-CVS Staff

■ Investigation Staff

■ Supervisors

■ Directors/Adminstrators

Of the 4,853 staff active between March and November 2020, 95% (4,622 of 4,853) had completed CSA training.  All directors and administrators had completed CSA training and those who did not complete training held staff supervisor, investigation, or non-CVS positions.

CSA training was documented as complete across regions at rates between 86% to 97% for 4,853 staff members.[359]

- Of the 4,622 staff that completed CSA training, 98% completed it after the hire date for their current position.
- The average time from hire date to CSA completion date was four (4) years. Of the 96 staff members with a CSA completion date prior to their hire date, the average time from CSA completion date to hire date was two years.
- Thirty-two percent (1,498 of 4,462) of staff had a most recent CSA training date in 2020, 38% (1,760 of 4,462) had a most recent CSA training date in 2019 and 29% (1,364 of 4,462) had a most recent CSA training date between 2016 and 2018.

The most common reasons given for an individual's failure to complete CSA training were either that they left the agency or the individual was still in training at the time that data was

---

[359] The lowest completion rate was in region 3B, OCOK staff, and regions 1, 2, 4, 7, 10, & 12 had the highest completion rates of 97%, which included DFPS and 2INgage staff.

provided. Staff leaving the agency should have had a CSA training date unless their departure occurred prior to completing training associated with hire. For staff stating the reason CSA was not completed was due to leaving the agency, the Monitors calculated that 6% (13 of 231) should have had enough time to complete CSA training before leaving the agency.[360]

Of the 231 staff members who did not complete CSA training, 19% (43/231) did not have a reason for not completing training included in the data. An additional 13 staff who had not completed CSA training reported it was due to leaving the agency, but they left the agency with enough time to complete all training.

- A total of 4,789 staff were reviewed for CSA training completion from DFPS. Of DFPS staff, 95% (4,564 of 4,789) completed CSA training.
- A total of 36 staff were reviewed for CSA training completion from OCOK. Of OCOK staff, 86% (31 of 36) completed CSA training.
- A total of 28 staff were reviewed for CSA training completion from 2INgage. Of 2INgage staff, 96% (27 of 28) completed CSA training.

## 3.    Summary

The Monitors' analysis of CSA training data for staff responsible for making determinations regarding what constitutes child-on-child sexual abuse shows that almost all (95%, or 4,622 of 4,853) have completed training. The entity with the lowest training completion rate was OCOK, at 86% (31 of 36) of OCOK staff having completed CSA training. Of the 231 staff across DFPS, OCOK and 2INgage who had not completed CSA training, 43 did not have a reason for failing to complete the training included in the data. Thirteen additional staff reported they had not completed CSA training due to leaving the agency, but they left the agency with enough time to complete all training.

## B.    Remedial Order 4: Caseworker and Caregiver Training on Sexual Abuse

Remedial Order 4 directs the State to ensure that it trains those who interact extensively with PMC children, namely caseworkers and caregivers, to identify and report child sexual abuse, including child-on-child sexual abuse:

Remedial Order 4: *Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

## 1.    Background

### a.    Policy

The Texas Family Code requires the adoption of "standards for persons who investigate suspected child abuse or neglect at the state or local level," which "must provide for a minimum

---

[360] The average time in CPD or BSD training is 90 days. Analysis assumed that staff employed longer than 120 days should be been working in their position prior to leaving the agency.

number of hours of annual professional training for interviewers and investigators of suspected child abuse or neglect."[361] The implementing regulations provide that each such person must receive at least 20 hours of training each year, including information pertaining to abuse and neglect as defined by Texas statute and regulation (which includes sexual abuse) and law-enforcement style-training regarding the investigative process.[362] Applicable regulations provide that DFPS can offer, require, and fund training, but the regulations do not specify topics that have to be covered.[363]

For foster parents, DFPS requires that they complete pre-service training and annual training thereafter.[364] Pre-service training must include training "to recognize and report sexual abuse, including abuse of a child by another child," which must be repeated annually.[365] As such, DFPS developed an online training entitled "Recognizing and Reporting Child Sexual Abuse: A Training for Caregivers"[366] and in September 2020, DFPS assembled separate, extensive training guides, called "Sexual Abuse Core Concepts Refresher," for both instructors and participants.

Like foster parents, GRO employees are required to complete pre-service training and annual training thereafter.[367] Pre-service training must include "[m]easures to prevent, identify, treat, and report suspected occurrences of child abuse (including sexual abuse), neglect, and exploitation."[368] GRO employees must also complete annual training that includes several mandatory topics, none of which focus on child sexual abuse.[369] However, annual training may include "supervision and safety practices for children in care."[370]

b.    **The Monitors' Data Information Request**

To validate the State's performance with respect to Remedial Order 4, the Monitors requested the following from the State:

- Due to the Monitors by November 15, 2019, and on a quarterly basis thereafter, provide a list that includes the date of completion of sexual abuse training for all caseworkers and caregivers (including the name and identification number of the caseworkers; and the names, identification numbers, and addresses of the caregivers) assigned to serve children in the PMC class as of September 30, 2019. For quarterly reporting beginning with February 15, 2020 report, include all caseworkers and caregivers assigned to serve children in the preceding period. Consistent with the Court's order, training is required to include information about how to recognize and report sexual abuse training, including child-on-

---

[361] 26 TEX. ADMIN. CODE § 261.310 (2017).

[362] 26 Tex. Admin. Code § 748.931(a-b).

[363] *See generally* 40 TEX. ADMIN. CODE §§ 702.601 – 702.621.

[364] 26 Tex. Admin. Code § 749.863 (pre-service training);  26 Tex. Admin. Code § 749.931 (annual training).

[365] DFPS, Child Protective Services Handbook, §§ 7330, 7521.

[366] DFPS, *Recognizing and Reporting Child Sexual Abuse for Caregivers Training* (Nov. 15, 2019), available at http://www.dfps.state.tx.us/Training/Child_Sexual_Abuse_for_Caregivers/index.html (last updated 2019).

[367] 26 Tex. Admin. Code § 748.863 (pre-service training); 26 Tex. Admin. Code § 748.931 (annual training).

[368] *Id.* at § 748.881.

[369] *Id.* at § 749.931.

[370] *Id.* at § 748.943.

child abuse. For ongoing quarterly reporting, provide a single, unified list that includes the date of completion of sexual abuse training for all caseworkers and caregivers (including the name and identification number of the caseworkers; and the names, identification numbers and addresses of the caregivers) assigned to serve children in the PMC class as of the last date of the quarter.[371]

- Provide a copy of current sexual abuse training materials referenced above and, if changes or updates are made, provide updated materials on a quarterly basis thereafter.

As detailed in the Monitors' First Report to the Court, the State did not fully comply with the above data and information request with respect to caseworkers and caregivers.[372] Due to the State's limited compliance, the Monitors subsequently communicated the following updated request during this reporting period:

- To the extent that such workers [caseworkers] completed the training(s) by different and various methods, the Monitors request the State identify within a single, unified list the methods by which each worker completed the training(s).  For example, for a CVS worker who completed the online training and CPS Professional Development ("CPD") to satisfy the requirements of Remedial Order 4, the list should identify the worker, the methods for completion of the training, and the dates of completion for each method.[373]

- As this request had not been fulfilled by the State in a unified or complete manner as of September 23, 2020, the State should provide to the Monitors by November 1, 2020 a quarterly report that lists all caseworkers assigned to serve PMC children from May 1, 2020 through August 31, 2020.  Training completion dates may go through October 31, 2020 to reflect the State's efforts to ensure compliance.[374]

- Consistent with the Monitors' original request for ongoing quarterly reporting after November 1, 2020, the Monitors request that the State provide a single, unified list that includes the methods and dates of completion of sexual abuse training for all caseworkers assigned to serve children in the PMC class as of the last date of the quarter, whether employed by DFPS or a private agency.[375]

---

[371] For a complete discussion of this request and the State's response, see Deborah Fowler and Kevin Ryan, First Report 217-218, ECF No. 869. When DFPS responded that it was unable to provide the information due for caregiver training, DFPS stated that it will instead provide attestations from operations serving PMC children certifying that their caregivers serving PMC children have received sexual abuse training as required by the Court. In addition, DFPS stated that operations will provide quarterly reports that include the following data for caregivers serving PMC children: date caregiver completed Sexual Abuse Training, caregiver name, caregiver ID number, and caregiver address. DFPS will aggregate these quarterly reports and submit them to Monitors. The attestations will include the names of the caregivers serving PMC children who completed the training and the names of those who did not as of the date of the attestation. *Id.*

[372] *See* Deborah Fowler and Kevin Ryan, First Report 218-222, ECF No. 869, (describing the deficiencies in the data provided by DFPS in response to the Monitors' request).

[373] Email from Kevin Ryan to Audrey Carmical, (Sept. 23, 2020) (on file with the Monitors).

[374] *Id.*

[375] *Id.*

- Consistent with the Monitors' original request, the State shall provide a copy of current sexual abuse training materials used to train caseworkers and caregivers and, if changes or updates are made, provide updated materials within 30 days of implementation instead of on a quarterly basis thereafter.[376]

- Provide the Monitors with all training records for the selected individuals who have served as primary caseworkers for any PMC child(ren) and who were hired between October 2019 and September 2020. The State should include any and all documentation of training completion, including competency-based test results, certificates of training, module completion and other data and information demonstrating compliance with Remedial Order 4.[377]

c.    **DFPS Data and Information Production for Caseworker and Caregiver Sexual Abuse Training**

For validation of caseworker sexual abuse training completion, DFPS provided the Monitors with three separate data files on November 2, 2020. The files contained a listing of all caseworkers, including those employed by private entities conducting primary casework for PMC children, OCOK and 2InNgage,[378] and the respective date(s) these workers completed the training required by Remedial Order 4.[379] The State confirmed that for DFPS caseworkers, the requisite training is generally completed in two parts. First, during the pre-service training, CPS Professional Development ("CPD"), caseworkers receive training about child sexual abuse in the core curriculum,[380] and second, caseworkers complete a computer-based training ("CBT") on recognizing and documenting problematic sexual behavior and sexual abuse, including child-on-child sexual abuse.[381],[382] OCOK and 2INgage each reported that in in this reporting period, its

---

[376] *Id.*

[377] Email from Deborah Fowler to Tiffany Roper (Jan. 11, 2021) (on file with the Monitors). A random sample of caseworkers' names was included with this request. *Id.*

[378] DFPS, *RO.4 and RO.32 CVS CW Training 5-1-20 to 8-31-20 - 100527* (Nov. 2, 2020) (on file with the Monitors). DFPS, *RO.4 and RO.32 2INgage CW Training 5-1-20 to 8-31-20* (Nov. 2, 2020) (on file with the Monitors). DFPS, *RO.4 and RO.32 OCOK CW Training 5-1-20 to 8-31-20* (Nov. 2, 2020) (on file with the Monitors). In addition, DFPS produced for the third quarter on August 17, 2020, two separate files for CVS and OCOK permanency caseworkers, supervisors, PA and PD staff who were active on May 31, 2020. DFPS, *R0.4 CVS and RCI CW Sup, PD, and PA CSA Training Q3 FY 20 – 8-17-20 - 98242* (Aug. 17, 2020) (on file with the Monitors); DFPS, *OCOK CSA Training Q3 FY 20 – 8-17-20 - OCOK* (Aug. 17, 2020) (on file with the Monitors).

[379] DFPS, OCOK and 2INgage document similar methodologies for reporting on caseworker training completion in data files provided to Monitors.

[380] DFPS reported that for caseworkers hired after November 2015, they receive pre-service training through CPD and complete a course on child sexual abuse called Child Protective Services Professional Development Core Competencies Training for Sexual Abuse. For caseworkers hired prior to November 2015, they received pre-service training through Basic Skills Development (BSD) and completed training during BSD on recognizing and reporting child sexual abuse.

[381] Email from Audrey Carmical to Kevin Ryan (Sept. 17, 2020) (on file with the Monitors) (with some variations depending on worker hire date).

[382] Data on caseworkers' completion of this course indicated that the date provided for course completion represents the most recent time the employee completed the course. The data report stated that any blanks indicated that the employee had no record of having completed the course. The file submitted for DFPS caseworkers included a "Date CPD/BSD Core Complete," which is described as "the most recent date the individual completed CPD/BSD core curriculum which includes recognizing and reporting sexual abuse." The file submitted for DFPS caseworkers also included "Date CBT Complete," which is described as "the most recent date the individual completed the computer-

caseworkers completed training with the same content as the DFPS CPD training and a course with training content that addresses child-on-child sexual abuse. The agencies report that this separate course will be incorporated into their respective pre-service training programs going forward.[383]

DFPS reported that in some circumstances for staff who completed the new caseworker training several years ago, documentation of the date they completed CPD or its predecessor, Basic Skills Development (BSD), could not be located.[384] For those staff, DFPS stated that it created, and required completion of a comparable training course that had the same content on recognizing and reporting sexual abuse as is contained in the current CPD training.[385]

For validation of caregiver sexual abuse training completion, DFPS is unable to track independently whether all caregivers have completed child sexual abuse training. DFPS provided the Monitors with data files on May 15, 2020, August 17, 2020, September 30, 2020, and November 2, 2020. DFPS divided its reporting on caregiver child sexual abuse training completion into three separate categories: 1) CPA; 2) CPS as a CPA; and 3) GRO.[386]

In May 2020, the State provided the Monitors with data files containing those caregivers who completed sexual abuse training between January and March 2020. The data files include individual logs of those foster parents and operation staff who reportedly completed training from 59 different CPA agencies and 240 different GROs respectively. The State also produced 11 separate certification forms for caregivers in foster homes who completed the training in the State's 11 regions, as defined by DFPS. In its May 2020 reporting, DFPS did not provide the Monitors with aggregate reporting that compiled the individual CPA and GRO logs into comprehensive listings of caregivers and the respective date(s) they completed sexual abuse training.

In August 2020, the State provided the Monitors with an aggregate report listing all caregivers who completed child sexual abuse training between April and June 2020 for both the CPA and GRO categories. The data files include individual logs of those foster parents and operation staff who reportedly completed training from 141 different CPA agencies and 241 different GROs respectively. Finally, the State produced an electronic folder which includes 11 separate certification forms by region, as defined by DFPS.

In September and November 2020, the State provided the Monitors with a separate aggregate report listing all caregivers who completed child sexual abuse training for the months of July, August, and September 2020 for both the CPA and GRO categories. For July and August 2020,

---

based training (CBT) on child-on-child sexual abuse and aggression." DFPS, *RO.4 and RO.32 CVS CW Training 5-1-20 to 8-31-20 - 100527* (Nov. 2, 2020) (on file with the Monitors).

[383]DFPS, *RO.4 and RO.32 2INgage CW Training 5-1-20 to 8-31-20* (Nov. 2, 2020) (on file with the Monitors); DFPS, *RO.4 and RO.32 OCOK CW Training 5-1-20 to 8-31-20* (Nov. 2, 2020) (on file with the Monitors).

[384]DFPS, *R0.4 and RO.32 CVS CW Training 5- 1-20 to 8-31-20 - 100127* (Nov. 2, 2020) (on file with the Monitors).

[385] Email from Audrey Carmical to Kevin Ryan, Monitor (Sept. 17, 2020, 22:09 EST) (on file with the Monitors). *See also* Deborah Fowler and Kevin Ryan, First Report 218-222, ECF No. 869(describing the deficiencies in the data provided by DFPS in response to the Monitors' request).

[386] The categories "CPA" and "CPS as CPA" contain data on foster parents serving PMC children who reportedly completed the requisite training for Remedial Order 4. The category "GRO" contains data on caregivers serving PMC children in congregate care settings who reportedly completed training in accordance with Remedial Order 4.

the data files include individual logs of those foster parents and operation staff who reportedly completed training from 142 different CPA agencies and 232 different GROs respectively. For November 2020, the State provided the Monitors with similar data as produced in September 2020. The data showed the same number of CPA agencies and GROs as reported in September 2020.

With regard to the provision of content of training materials, DFPS provided to the Monitors its current course materials related to child sexual abuse training in association with Remedial Orders 4 and 32 during the prior reporting period.[387] Pursuant to the requirement that the State provide any updates to those materials ongoing, the State has subsequently provided refresher training materials used for some DFPS caseworkers in September 2020.[388]  In addition, the State has submitted the supplemental training materials used by 2INgage[389] and OCOK.[390] The State also notified the Monitors that based upon the Monitors' First Report to the Court, the State has implemented some of the recommendations from Praesidium into its sexual abuse training course included in the CPD curriculum.[391]

## 2.    Remedial Order 4: Caseworker and Caregiver Sexual Abuse Training Performance Validation

### a.    Caseworker Training Methodology

The methodology for validation of Remedial Order 4 on caseworker training included data analysis, caseworker interviews, and meetings with training managers at SSCCs.[392] The Monitors analyzed data files produced by the State that contained names and identifiers of caseworkers and separate dates for when each worker completed training on recognizing and reporting sexual abuse and training on child-on-child sexual abuse. The Monitors cross-matched the caseworkers listed in the training data provided by the State with lists of case-carrying caseworkers produced by the State as part of the Monitors' work verifying compliance with Remedial Order 35.

Based upon information from DFPS, the Monitors understand that completion of sexual abuse training includes completion of a) either the CPD Core Competencies Training for Sexual Abuse

---

[387] *See* Deborah Fowler and Kevin Ryan, First Report 201-202; 218-222, ECF No. 869 (describing the data and information provided by DFPS in response to the Monitors' request).

[388]*DFPS Sexual Abuse Core Concepts Refresher – Training Guide* (Nov. 2, 2020) (on file with the Monitors); *DFPS Sexual Abuse Core Concepts Refresher – Instructor Guide* (Nov. 2, 2020) (on file with the Monitors); *DFPS Sexual Abuse Core Concepts Refresher Training* (Nov. 2, 2020) (on file with the Monitors).

[389]DFPS, *2INGAGE Training Overview* (Jan. 4, 2021) (on file with the Monitors).

DFPS, *Academy Training Agenda November 2020* (Jan. 4, 2021) (on file with the Monitors).

DFPS, *Child Sexual Aggression* (Dec. 4, 2021) (on file with the Monitors).

[390]DFPS., *OCOK Peer to Peer Abuse Prevention Training Summary* (Jan. 23, 2021) (on file with the Monitors); TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *OCOK PTP Abuse Prevention 2016-1* (Jan. 23, 2021) (on file with the Monitors).

[391] Email from Heather Bugg to Kevin Ryan and Deborah Fowler (January 24,) (on file with the Monitors). For the Monitors discussion of the recommendations from Praesidium, see Deborah Fowler and Kevin Ryan, First Report 202-203, ECF No. 869.

[392] The monitoring team met with representatives from OCOK on November 19, 2020 and from 2INgage on December 3, 2020 to discuss data on new workers' training, including training related to recognizing and reporting sexual abuse, including child-on-child sexual abuse. The Monitors then met with representatives from 2Ingage and OCOK on January 15, 2021, to discuss their reporting on each order, including Remedial Order 4.

or relevant training under BSD, depending upon when a caseworker was hired; and b) four modules of Child Sexual Aggression computer-based training.[393] In addition, the Monitors completed independent verification of the data through interviews with caseworkers to verify completion of the required child sexual abuse training.

### b.   Caseworker Training Performance Validation Results

The State provided training completion data for DFPS CVS caseworkers, OCOK caseworkers, and 2INgage caseworkers.[394] The Monitors determined that between July 1, 2020 and August 31, 2020 there were 2,157 case-assignable caseworkers. Of those workers 98.1% (2,116) completed the child sexual abuse training.[395]

**Table 6.3: Child Sexual Abuse Training Completion by Caseworker Type, July 1, 2020 to August 31, 2020**

| Caseworker Type | Child Sexual Abuse Training Completion Categories | | Total Caseworkers | Percent Compliant |
|---|---|---|---|---|
| | Completed | Not Completed | | |
| DFPS CVS | 1,894 | 6 | 1,900 | 99.7% |
| OCOK | 127 | 17 | 144 | 88.2% |
| 2INgage | 95 | 18 | 113 | 84.1% |
| **Total Caseworkers** | **2,116** | **41** | **2,157** | **98.1%** |

The monitoring team compared the list of caseworkers in the data provided by the State listing caseloads for DFPS CVS, OCOK, & 2INgage caseworkers as of June 30, 2020, July 31, 2020, and August 31, 2020 with the list of DFPS CVS, OCOK & 2INgage caseworkers in the data provided by the State regarding completion of child sexual abuse training.[396] Using the June 30, 2020, July 31, 2020 and August 31, 2020 caseload files, the Monitors matched all 1,900 (100.0%) CVS caseworkers listed in the caseload data with CVS caseworkers listed in the DFPS child sexual abuse training data set, matched all 144 (100.0%) OCOK caseworkers listed in the caseload data with the OCOK caseworkers listed in the child sexual abuse training data set, and matched all 113

---

[393] According to DFPS, the CBT portion of the training included either completion of (1) Child Sexual Aggression – Course #0003632 or (2) Child Sexual Aggression FY19 – Course #0003805.DFPS, *RO.4 and RO.32 CVS CW Training 5-1-20 to 8-31-20 - 100527* (Nov. 2, 2020) (on file with the Monitors).

[394] This analysis included those workers identified in the files as caseworkers, consistent with Remedial Order 4, DFPS, *R0.4 and RO.32 2Ingage CW Training 5- 1-20 to 8-31-20* (Nov. 2, 2020) (on file with the Monitors).
DFPS, *R0.4 and RO.32 CVS CW Training 5- 1-20 to 8-31-20 - 100127* (Nov. 2, 2020) (on file with the Monitors); DFPS, *R0.4 and RO.32 OCOK CW Training 5- 1-20 to 8-31-20* (Nov. 2, 2020) (on file with the Monitors).

[395] Because DFPS could not locate training data for some workers with longstanding tenures, the Monitors agreed that if those workers completed a refresher training course after August 31, 2020, they would count as compliant with Remedial Order 4. A total of 271 workers (One hundred and seventy DFPS workers, 40 OCOK workers, and 61 2INgage workers) completed the training required by Remedial Order 4 after August 31, 2020.

[396] DFPS, *RO2.1 CVS caseloads as of 8-31-20 - sept-30-20 - 99667* (Oct. 8, 2020) (on file with the Monitors); DFPS, *RO2.1 CVS caseloads as of 7-31-20 - Sept-1-20 - 99357 (002)* (Sept. 8, 2020) (on file with the Monitors); DFPS, *RO2.1 CVS caseloads as of 6-30-20 - Aug-1-20 - 99328* (Aug. 4, 2020) (on file with the Monitors).

(100.0%) 2INgage caseworkers listed in the caseload data with 2INgage caseworkers listed in the child sexual abuse training dataset.

Finally, the Monitors interviewed a random sample of 180 caseworkers between August 2020 and January 2021 to further verify caseworker completion of sexual abuse training. Through individual interviews with each caseworker, the Monitors found that all 180 caseworkers reported having completed training about child sexual abuse.[397]

c.      **Caregiver Child Sexual Abuse Training**

From May 2020 through November 2020, the State provided the Monitors with 1,351 separate data files from its various operations attesting that caregivers completed child sexual abuse training in accordance with Remedial Order 4. In addition, the State provided aggregate training logs for both GROs and CPAs for the August 2020, September 2020 and November 2020 reporting periods. The State did not produce an aggregate report showing that all its caregivers completed child sexual abuse training and the date of completion. Because of the format of the data produced, the Monitors are unable to verify that all caregivers have completed child sexual abuse training.[398,399]

The Monitors determined that it was possible for a user to obtain a certificate of completion for the caregiver training without completing the training.[400] Therefore, the Monitors were unable to rely on case record reviews as a reliable method of verifying training completion by caregivers during this reporting period. The Monitors communicated the problem to DFPS upon discovery and the State has subsequently notified the Monitors that they are addressing the technical issues raised by the Monitors and plan to make additional technical improvements.[401]

---

[397] In addition, each caseworker provided the dates on which they completed the child sexual abuse trainings. Of these 180 workers, 95.6% provided the same date for completion of the computer-based component on child sexual aggression in their interview as was documented in the data file produced by the State for RO 4 training completion.

[398] Additionally, DFPS alerted the Monitors that the caregiver compliance spreadsheets previously submitted did not account for staff whose employment has been terminated. DFPS stated that future reports will be cumulative and will not exclude any terminated staff, beginning with the next round of quarterly reports due on November 16, 2020. Email from Audrey Carmical to Kevin Ryan (Sept. 25, 2020) (on file with the Monitors).

[399] During a site visit to Devereux-League City, the monitoring team conducted on-site caregiver interviews, records inspection and validation. Based on the results of this review, the Monitors reported to the Court concerns of inexperience and lack of training among staff employed at the RTC Devereux – League City. Through interviews with Devereux staff, the Monitors found that only three out of 18 caregivers interviewed stated that they would call SWI if a child disclosed sexual contact with another child. This number was confirmed by the monitoring team's employee record review, which showed that 70% (28 out of 40) of the reviewed records of direct care staff and supervisors included documentation showing they had completed the Child Sexual Aggression training. Deborah Fowler and Kevin Ryan, *The Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center,* (February 2, 2021) at 35-36, ECF No. 1027.

[400] The Monitors were able to access the training and obtain a certificate of completion without completing the training on February 19, 2021, without completing the training.

[401] "As was mentioned in our March 18, 2021 email, we took note of your statement that you were 'stuck' on how to verify compliance for RO 4 because of the computer glitches. To that end, we are in the process of adding an online form in the training to gather information on who completed it, rather than relying on a printed certificate.  At the completion of the training, each person will be asked to type in his/her name, email address, name of the operation they are associated with, and the Operation ID. This information can only be entered once and cannot be accessed without taking the training all over again.  This information will be securely stored in an online database so that DFPS can sort the data and distribute a list to the various providers across the state advising them of who has completed the

d.      **Summary of Caseworker and Caregiver Sexual Abuse Training Performance Validation**

The State implemented the child sexual abuse training requirement in Remedial Order 4 by providing a Child Sexual Aggression course and through pre-service training for new caseworkers. The Monitors determined that State data indicates 98.1% of case-assignable workers between July 1, 2020 and August 31, 2020 had completed the training. All of the CVS caseworkers, OCOK caseworkers and 2INgage caseworkers listed in the caseload data matched with the respective caseworkers listed in the child sexual abuse data set.  A random sample of 180 caseworkers interviewed by the monitoring team between August 2020 and January 2021 resulted in all of the caseworkers confirming their completion of sexual abuse training, though their reported completion dates varied somewhat from the dates provided by the State.

Regarding caregiver sexual abuse training, the State does not maintain a list of all caregivers serving DFPS children or their training completion date(s), and, therefore, the Monitors cannot validate that all or most caregivers completed the full child sexual abuse training required by Remedial Order 4.

## C.      Remedial Orders 23, 24, 28, and 30: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression

Four remedial orders issued by the Court relate to tracking and documenting sexual abuse and child-on-child sexual aggression:

Remedial Order 23 : *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

Remedial Order 24 *: Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim*

Remedial Order 28 : *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

---

training. Each person who completes the training will receive a unique confirmation ID number. We anticipate that this database solution will be up and running by April 12, 2021.  Once the electronic form is operational, we will issue a direction to the providers that we are requiring all caregivers to immediately retake the training, We will also set a time deadline of May 1, 2021 for the retaking of the training course. While we truly believe most caregivers would have honestly completed the course, we understand your dilemma with verification and trust these additional changes will be viewed favorably by the Court." Email from Corliss Lawson to Kevin Ryan and Deborah Fowler (March 25, 2021) (on file with the Monitors).

Remedial Order 30: *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

## 1.    Background

### a.    First Court Monitors' Report Performance Validation Findings

The Monitors' First Report found that the State created pages within its IMPACT data system that allow DFPS to record information related to sexual victimization, sexual aggression, or a sexual behavior problem in a child's electronic case record.  The Monitors also determined, through a case record review, that the IMPACT records for PMC children identified by the State as having an indicator for sexual abuse or sexual aggression almost always had relevant information included on the appropriate IMPACT page.[402]

During on-site reviews of children's records, the Monitors found that approximately 9% of the records reviewed revealed children who should have been flagged with a sexual characteristic indicator but were not.[403] In addition, the data analysis of trends in identification did not indicate a notable change in the percentage of children identified with an IMPACT indicator for a sexual characteristic, even when accounting for the children who were newly added to PMC and those who left PMC.  Finally, the Monitors' review of case records for children with an indicator for sexual victimization did not reveal a single child identified as a result of child-on-child abuse while in care, though sexual-related behaviors between children formed the basis of one-third of all Neglectful Supervision allegations for PMC children in care.

### b.    Policy Changes Following First Report

On July 24, 2020, DFPS sent the Monitors an e-mail update that included a policy update published on July 15, 2020 related to caregiver notification:

> **CSA/SXAB documentation and caregiver notification** – A CPS policy update published on July 15, 2020 requires caseworkers to document sexually aggressive behaviors and sexual victimization histories in the IMPACT CSA and Sexual Victimization History (SVH) IMPACT pages, Child Sexual History Report Attachment A and placement summary form.[404]

Several attachments to the e-mail included:

- An e-mail to CPS staff related to a "Q&A webinar" regarding the changes in policy and the IMPACT pages.
- The sections of the CPS handbook that reflected the changes in policy; and

---

[402] The Monitors found that of the 328 PMC children included in the case read identified as having a confirmed history of sexual abuse, IMPACT records for 313 (95%) included information on the sexual victimization history page.  For the 56 children included in the case read flagged with an indicator for sexual aggression, 55 (98%) included information on the child sexual aggression page.

[403] Deborah Fowler and Kevin Ryan, First Report 212-214, ECF 869.

[404] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *MD—updates*, July 24, 2020 (on file with Monitors).

- The updated Child Sexual Aggression Resource Guide.

In addition to updating the handbook, DFPS also updated the Child Sexual Aggression Resource Guide to include the same requirements related to capturing information in IMPACT.[405]

### c.  September 2020 Contempt Hearing

In their July 2, 2020 Motion to Show Cause, the Plaintiffs argued that the State should be held in contempt for, in part, failing to comply with Remedial Orders 23, 24, 28, and 30.[406] The Plaintiffs based their argument on the Monitors' findings that on-site file reviews revealed confirmed findings of abuse in some children's files, even though the children had not been flagged with an indicator by the State.  During their case record review, the Monitors did not find any case records where children were flagged with an indicator for sexual abuse due to child-on-child abuse endured while in care, despite the prevalence of the problem.[407]

On July 24, 2020, the State filed a response, attaching affidavits from DFPS and HHSC staff relevant to each of the remedial orders at issue.  The response included an affidavit from Carol Self, describing the agency's attempts to comply with Remedial Orders 24 through 31.[408] The affidavit outlined the agency's changes to policy and practice related to these remedial orders, and pointed to the results of its own case record reviews to support its argument that DFPS should not be held in contempt.[409]  The affidavit also referred to a July 15, 2020 update to its policies related to documenting sexual victimization and aggression and caregiver notification, and to updates to the Child Sexual Aggression Resource Guide, and referred to a plan to publish a Child Victimization Resource Guide in September 2020.[410]

During the Contempt Hearing, Carol Self testified regarding DFPS's attempts to comply with Remedial Orders 24-31. Self's testimony generally comported with the affidavits the State filed in response to the Motion to Show Cause.  However, when the Court questioned Self about the Monitors' findings that none of the children identified as victims of sexual abuse who were included in the case review sample were identified as the result of abuse that occurred after entering care, Self did not answer the Court's questions directly:

THE COURT: Can you tell me how it is that not a single one of these child abuse victims – all of them occurred before they came into foster care, nothing during the foster care? In fact, we – just to remind you that the Monitors found 11 cases that were definitively investigated involved child-on-child abuse, and none of those children were marked as victims or as sexual aggressors.

Can you explain how you did not identify a single child that was sexually abused while in care?

---

[405] DFPS, *Child Sexual Aggression Resource Guide* 13-14 (updated June 2020).
[406] Plaintiffs' Motion to Show Cause Why Defendants Should Not Be Held in Contempt (July 2, 2020). ECF No. 901.
[407] *Id*. at 14.
[408] Defendant's Response to Motion to Show Cause, Exhibit D, Declaration of Carol Self Regarding Compliance Activities for Remedial Orders Nos. 24-31, ECF No. 916.
[409] *Id*.
[410] *Id.* at ¶¶ 43, 51, and 52.

…

THE COURT:  What is your response to that? That you can't – that you – that you have not identified a single child that was abused in care –

…Now, there are some sexual aggressors that have been identified in care that were not identified prior to care, but not sexual – child sexual abuse victims.  And in fact, as I said, the Monitors identified 11 cases of child-on-child sexual abuse that should have been investigated that are not reported – that were not reported in your case notes.

…

THE WITNESS: I am 100 percent onboard, and part of what I do regularly, almost every day, is work with the field to ensure that we are appropriately documenting this information in our system.  And so, when we find out that something's not documented, that's part of what we do, is we want to know so we can provide TA.

While we've been doing this for – you know, we had the update April of last year.  So we're a year into it.  You know, we…want to be able to continue to improve our practice.  And there may be instances where we want to do some one-on-one TA with specific workers, with specific supervisors, or units, or Program Administrators, so that we can help them perfect this practice.

During cross-examination, Self testified as to the extent of the State's review of children's case records to determine whether their history indicated that an indicator for sexual abuse or aggression should be added to their IMPACT electronic records:

[MR. YETTER]:  The – since the Judge's – since the Court's Order, affirmed by the Fifth Circuit a year ago came down, has DFPS made a comprehensive review of all of the case records of PMC children to – that have been identified as – that had not been identified as victims or aggressors – have you reviewed those records to make sure that there wasn't something missed because of the State's prior history of not keeping track of that sort of thing?

A: Are you asking if – I just want to make sure that I understand your question.

Are you asking if we went through every PMC child's case record to review if there is a history of aggression or victimization for every child in PMC?

Q: Correct.

A: No, we have not done that.

195

Q: * * * How did you expect to do that if you didn't go back and check the children's records?

A: Well, we did check every PMC child's record who had a confirmed victimization record.

Those are the ones, because if they had an RTB, or if they were victim child in a sexual abuse case, or they were the victim of a child sexual aggression incident, those are the individuals that we ensured had the appropriate documentation marked in our IMPACT system.

Q: And did you do that for – pardon me? Go ahead.

A: Well, and, as I mentioned, like when we first instituted this in 2016 with creating the child sexual aggression indicator, reviewing, you know, the cases where we previously had children who had been marked as sexually acting out – even though we weren't sure what exactly sexually acting out – why someone may have made that determination – that we reviewed every one of those cases.

And then when we updated the system in 20 – December of 2019, any child that had that – in the system, that was a victim of an RTB of sexual abuse, a confirmed victim of sex trafficking – all that information pulled into the sexual victimization page in IMPACT.

And a review of those cases was done.  And there was roughly, I want to say 4,000 or so of those cases that were reviewed.  They weren't necessarily all PMC kids.

But it was – we reviewed over 4,000 cases to make sure that that information that pulled over from their – the allegation detail of the investigation into the sexual victimization page that was just created.[411]

Self was also asked whether the agency had conducted a review of Neglectful Supervision cases involving child-on-child sexual abuse to determine whether an indicator should be added to IMPACT records for any of the children involved, either as victims or as aggressors:

[MR. YETTER]: Okay, Ms. Self, my question was: In the past year, while the Court's order has been in effect, has DFPS reviewed all the cases of negligent supervision involving child-on-child sexual abuse?

A: I can't confirm that we've done that.

Q: To your knowledge, it hasn't been done?

---

[411] Telephonic/Zoom Show Cause Hr'g Tr. (September 3, 2020) 295 -297, ECF No. 964.

A: To my knowledge – it's – it's being done per policy of when the investigations come in.  They're supposed to be reviewing them as the investigations come in.

But I can't confirm that it's happening.[412]

### d.   The Contempt Order & DFPS' Certification of Compliance

In its Order of December 18, 2020, the Court did not find the State in contempt of Remedial Orders 23, 24, 28, and 30.  However, the Court noted:

It remains unclear whether sexual abuse and sexual aggression information is documented somewhere in the record for **every** PMC child who was involved in a confirmed allegation of sexual abuse as a victim or as an aggressor.  Defendants would have to conduct a thorough case review of every PMC child to be sure of this, but [Carol] Self confirmed that DFPS has not reviewed every PMC child's record.  The Court agrees with the Monitors that the lack of any child-on-child sexual contact reported in confirmed allegations of sexual victimization is "significant."  The fact that not a single child in a random sample of PMC children, whom DFPS itself identified as confirmed victims of sexual abuse, had a confirmed allegation of sexual abuse while in foster care is dubious.  This absence raises concerns that DFPS may not be properly investigating allegations of child-on-child sexual abuse between PMC children in foster care, or that Defendants may not be documenting confirmed allegations of such sexual abuse.  Not enough information has been provided for the Court to reach a conclusion.  The Court therefore instructs the Monitors to review allegations of child-on-child sexual abuse involving PMC children while in State care that are (1) not investigated, (2) investigated and not confirmed, and (3) investigated and confirmed, in order to determine the extent to which Defendants are properly investigating and documenting such allegations.  This matter may be the subject of future contempt hearings.

Notwithstanding the issues and deficiencies mentioned, Defendants have demonstrated sustained efforts to protect PMC children through the documentation of sexual abuse and sexual aggression in compliance with Remedial Orders 24, 28, and 30…However, more work needs to be done to ensure that **every** allegation of sexual victimization or sexual aggression is properly investigated, and that **every** confirmed allegation is properly documented in the appropriate Sexual Victimization Page or Sexual Aggression Page in IMPACT for each PMC child. These pages are particularly important for compliance monitoring because Defendants updated their policy to require documentation in these pages, and because these pages serve as consistent benchmarks for the Monitors to evaluate whether complete information about a child's history of sexual abuse and/or sexual aggression is document and accessible. The Court instructs the Monitors to continue investigating these matters.[413]

---

[412] *Id*. at 299.
[413] Order at 285-86, ECF No. 1017 (emphasis in original).

**D.      Remedial Orders 23, 24, 28, and 30 Performance Validation**

**1.      Methodology**

The Monitors' First Report validated the State's compliance with Remedial Orders 23 and 28, requiring the creation of profile characteristics in IMPACT that would allow DFPS to document a child's history of sexual abuse or an indicator for sexual aggression.[414]  For this report, the Monitors' method of validating the State's compliance with Remedial Orders 24 and 30 included:

- A review of trends in identification for children flagged with an indicator for sexual victimization or sexual aggression; and

- Independent case record reviews principally conducted for the remedial orders related to caregiver notification (and described more fully below), but that included questions regarding whether any incidents of sexual abuse or sexual aggression occurred after the child was placed in care, and capturing information related to the perpetrator of abuse for victims who endured abuse after entering care.

- Case Review of Sexual Victimization History in Dispositions with Reason to Believe: To validate performance associated with Remedial Order 24, the Monitors reviewed all case records for investigations with allegations of Sexual Abuse and/or Neglectful Supervision involving child-on-child sexual contact that were substantiated with a disposition of Reason to Believe between May 1, 2020 and October 31, 2020, which was a total of ten investigations. The Monitors assessed whether the sexual victimization history pages for the associated victims should have been positively indicated consistent with DFPS policy when appropriate. Because DFPS is unable to separately identify which Neglectful Supervision investigations involve child-on-child sexual contact, for allegations involving confirmed allegations of Neglectful Supervision, the Monitors first determined whether the allegations involved child-on-child contact in the 27 Neglectful Supervision investigations;

---

[414] Deborah Fowler and Kevin Ryan, First Report 216, ECF 869.  The case record reviews for the First Report, which tested whether IMPACT records for children identified by the State as having an indicator for sexual aggression or sexual abuse, included the relevant information in the children's electronic records confirmed that the overwhelming majority of records reviewed (95% - 98%) did so.  *Id.* at 212.  These case reads confirmed that the State's IMPACT enhancements allow it to develop a report of children identified as having a sexual characteristic indicator by relying on the flag added to IMPACT, and did not need to be repeated for this report to the Court. This report does not include a robust validation sample from on-site interviews with direct caregivers as the Monitors' First Report did. The onset of the COVID-19 pandemic in March 2020 severely curtailed the Monitors' ability to make site visits.  The monitoring team visited one GRO, Devereux Advanced Behavioral Health – League City, in October 2020 after the media reported a riot that resulted in the arrest of a number of children housed at the facility.  That visit was the subject of a separate report, filed by the Monitors on February 8, 2021.  Deborah Fowler and  Kevin Ryan, *The Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center*, ECF No. 1027.The Monitors are working toward identifying new methods to test for whether children who are not currently flagged with an indicator should be. On-site reviews of children's files are one method of testing for this, but, to date, the case files kept on-site by placements visited by the Monitors have never been complete; at most, they may include some records from a child's last placement, but do not include all the child's records.  Thus, even this method of identifying children who should be flagged with a sexual characteristic indicator likely misses important information.

they then reviewed the investigative record to examine the sexual aggression staffing conclusion and associated documentation. (Remedial Orders 23 and 24).

**Results of Performance Validation**

    a.      **Increase in Indicators for Sexual Abuse or Sexual Aggression**

The number of children with an indicator for sexual abuse or sexual aggression increased by 22% (from 991 to 1,210) between November 30, 2019 and December 31, 2020.

The Monitors analyzed data for the number of children identified with an indicator for sexual victimization or sexual aggression on a given day between November 30, 2019 and December 31, 2020 to determine trends in identification. The point-in-time analysis (using the last day of the quarter for the first, second, third and fourth quarters of 2020, and December 31, 2020) shows a steady 22% increase (from 991 children on November 30, 2019 to 1,210 children on December 31, 2020) in the number of children flagged with a sexual characteristic indicator.

**Figure 6.3: PMC Children with a Sexual Characteristic Flag (Victim or Aggressor) Active as of November 30, 2019 to December 31, 2020**



The number of children's records flagged with an indicator for sexual victimization increased more significantly than the number of children's records flagged with an indicator for sexual aggression. The number of children's records flagged with an indicator for victimization increased 26% during this time period, from 832 on November 30, 2019, to 1,050 on December 31, 2020. Children's records flagged with an indicator for sexual aggression increased 13% during the same time period, from 197 on November 30, 2019 to 223 on December 31, 2020.

A trendline analysis beginning in January of 2019 and continuing through December 31, 2020, indicates that the monthly number of newly flagged placements for sexual victimization and aggression[415] increased in late 2019 and reached a peak in early 2020, but declined in late 2020.

**Figure 6.4: Number of Newly Flagged PMC Children by Month,
January 2019 to December 2020**



The number of newly flagged PMC children has averaged two per month for sexual aggression and ten per month for sexual victimization since June 2019 (the first month for which the Monitors received data).

    b.    **Sexual Abuse After Children Enter Foster Care**

Given the Court's concerns related to DFPS's compliance with the remedial orders for children who were victims of abuse in care, or who engaged in incidents of child-on-child sexual aggression after entering care, the Monitors adapted the case record review tool used to validate caregiver notification to include questions related to whether children with a sexual abuse indicator had been victimized while in foster care. These new questions were included in the monitoring team's review of new placements made from June 1, 2020, through October 31,2020 and will be part of the Monitors' case record reviews going forward.

Of the 304 children whose case records were reviewed and started a new placement between June 1, 2020 and October 31, 2020[416] and who had an indicator for sexual victimization,

---

[415] Newly flagged placement is defined as a new placement start for a child with an indicator for sexual victimization or aggression where the child's previous placement did not have an indicator.

[416] As discussed more fully in the next section, these case record reviews were conducted using a confidence interval of 95 percent. PMC child placement data was initially provided by the State quarterly. As of November 2020, this

the information included on the IMPACT sexual history page indicated that the child had an abuse incident that occurred after entering care for 21 percent (63 out of 304) of the children.

**Figure 6.5: Percent of Children with a Sexual Abuse Indicator with Abuse After Entering Care, June to October 2020[417]**



     Of the 63 children included in the case record review who had an indicator for sexual abuse and had an abuse incident that occurred after the child entered care, the perpetrator was most commonly an adult not associated with the placement where the abuse occurred (25 of 63, or 40%) or another child in the placement (23 of 63, or 37%).[418]

---

data was received monthly, allowing the Monitors to review case records through October 2020.  The collection of data for children with an indicator for sexual victimization and whose sexual history page indicated that the abuse incident occurred after entering care began with the Monitors' second case read.  Data is not available for children sampled during the 3rd quarter case read (March – May 2020).

[417] Abuse occurring after entering care was determined by reviewers as any identified abuse occurring in care for children with a history of sexual victimization. Beginning in September 2020 and going forward, the State began providing the Monitors a variable identifying confirmed RCCI victims after removal (i.e., while in care) which does not include victims of abuse outside of RCCI investigations with confirmed findings.

[418] It is possible for the cases involving an adult perpetrator not associated with the child's placement that these incidents occurred during a runaway episode.  Thirty-eight percent (24 of 63) of children had been abused while on runaway status.

**Figure 6.6: Perpetrators Identified for Children with Abuse Occurring After Entering Care**



Of the 128 children whose case records were reviewed and started a new placement between March 1, 2020 and October 31, 2020[419] and whose IMPACT records included an indicator for sexual aggression, 48% of children (61 out of 128) had a sexual aggression incident after being placed in foster care.

---

[419] Data provided by the State included the child's sexual aggression indicator, the date child sexual aggression episode started, and the child's removal date.

**Figure 6.7: Sexual Aggression Occurred After Entering Care for Children with a Sexual Aggression Indicator**



Source: Aggression occurred after entering care for children in case review sample with aggression indicator, March - October 2020
*n=128*

■ Yes   ■ No

52%
67

48%
61

More than one-quarter of the children (16 of 61, or 26%) whose records were reviewed who were flagged with an indicator for sexual aggression and had a sexual aggression incident after being placed in foster care were placed in congregate care settings at the time of the incident, while more than one-third (21 of 61, or 34%) were placed in a foster home setting at the time of the incident.  Thirty-two percent (20 of 61) were placed in a kinship or adoptive placement at the time of the incident.[420]

c.   **Case Review of Sexual Victimization History in Dispositions with Reason to Believe**

Of the 27 investigations involving Neglectful Supervision or Sexual Abuse that the monitoring team reviewed, six included substantiated allegations of Neglectful Supervision and/or Sexual Abuse; and four included substantiated allegations of Sexual Abuse only. The monitoring team reviewed the documentation in those ten investigations and found seven of ten investigations (70%) were properly documented:

- One child's record should have had a positive indication for sexual victimization but did not.
- Two of the confirmed child victims' records already had a positive indication for sexual victimization history prior to the confirmed allegation that was under review. In those instances, the child's record was not updated with the more recent victimization event in the sexual victimization history page but was otherwise properly documented.
- In the remaining seven investigations, the record for sexual victimization history did not contain omissions and the documentation was appropriate.

---

[420] More than one type of placement could have been identified.

**Summary**

Both the Monitors' analysis of trends and the case review show that the State is making progress in identifying children with a confirmed history of sexual abuse or sexual aggression and adding the required documentation to their IMPACT records.  The number of children flagged with an indicator for sexual abuse or sexual aggression increased by 22% (from 991 to 1,210) between November 30, 2019 and December 31, 2020.  Though a monthly trend analysis shows increases peaked in February 2020 and have declined since then, the peak coincides with the State's launch of the IMPACT enhancements related to sexual victimization and would have been expected to follow this change.

In addition, the Monitors' case review showed that 21% of children with a sexual victimization indicator had an abuse incident which occurred after entering care, and 48% of children with a sexual aggression indicator had an aggression incident which occurred after the child entered care.  Of the children who endured sexual abuse after entering care, 37% were abused by another child in their placement. A case record review of substantiated findings of Neglectful Supervision or Sexual Abuse showed that 70% (7 of 10) of cases reviewed indicated that sexual victimization was properly documented in the child's electronic case record.

## E.    Remedial Orders 25, 26, 27, 29 &31: Caregiver Notification

As discussed in the Monitors' First Report, three remedial orders speak directly to caregiver notification of child sexual aggression or victimization:

> Remedial Order 25: *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

> Remedial Order 27: *Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

> Remedial Order 31: *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

Two additional remedial orders speak to caregiver notification indirectly, by requiring the state to document child sexual aggression or victimization in forms that DFPS policy mandates staff provide to caregivers before or upon a child's placement:

> Remedial Order 26: *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application.*

> Remedial Order 29: *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form and common application.*

1.      **Background**

      a.      **First Court Monitors' Report Performance Validation Findings**

For the First Report, the Monitors used several different methods to determine compliance with the remedial orders related to direct and indirect caregiver notification, including a cross-match of data provided by the State that identified children with a sexual characteristic flag. In addition, the Monitors reviewed data the State provided for a mass notification of caregivers ordered by the Court, on-site interviews of caregivers, on-site reviews of children's files, and multiple case record reviews.

Each of these methods revealed gaps in notification, but the gaps in communication were particularly acute among CPS, Program Administrators, and the caregivers responsible for the day-to-day supervision of children in the GROs visited by the Monitors.  During on-site interviews with caregivers, only 57% of the caregivers interviewed indicated they received notice when a child had been identified as sexually aggressive, and 50% said they received notice when a child had been identified as having a history of sexual abuse.[421]  Furthermore, the Monitors' on-site child file reviews frequently revealed that one or both of the forms used to notify caregivers were missing.  The Monitors' case record reviews, which examined children's records to determine whether information related to sexual abuse or sexual aggression was included in Common Applications and Placement Summaries' Attachment A, also revealed gaps.

      b.      **Policy Changes Following First Report**

DFPS sent the Monitors an e-mail update related to several issues on July 24, 2020, including a policy update related to caregiver notification published on July 15, 2020:

> **CSA/SXAB documentation and caregiver notification** – A CPS policy update published on July 15, 2020 requires caseworkers… must notify caregivers of new information involving CSA/SVH by updating the relevant IMPACT page, launching a new Attachment A and reviewing with the caregiver, obtaining the caregiver's signature, uploading a signed copy into OneCase, and documenting in a contact that the information was provided to the caregiver.  Also on July 15th, the CSA Resource Guide was updated to reflect the IMPACT 2.0 enhancements and CPS policy changes.[422]

The e-mail attached the updated sections of the CPS Handbook.  In addition to outlining the requirements for capturing information related to a child's indicator for sexual abuse or sexual

---

[421] In filed objections to the First Report, the State argued that the Monitors' findings related to on-site interviews "[i]mproperly restricts validation activities regarding caregiver interviews to General Residential Operations (GRO) employees.  As notifications of a child's history of sexual victimization or aggression are made to GRO directors and administrators and not GRO direct care staff, the Report fails to meet the requirements of the 2018 Order by wholly failing to address notifications to GRO directors and administrators in evaluating compliance." Defendants' Verified Objections to Monitors' Report, ECF No. 903, paragraph 27.

[422] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *MD—updates* (July 24, 2020) (on file with Monitors).

aggression on the relevant IMPACT pages, the updated CPS Handbook included the following documentation requirement:

**Notifying Caregiver of New Information Involving Child Sexual Aggression or Sexual Victimization**

> If at any time during the course of the case the child is determined to have a confirmed history of sexual victimization or sexual aggression that has not previously been documented, the caseworker must update the relevant page in IMPACT. The caseworker must launch a new Child Sexual History Report Attachment A, review with the caregiver, obtain the caregiver's signature, and upload a signed copy into One Case. The caseworker must also document in a contact that the information was provided to the caregiver. The caseworker must also notify other individuals listed in 6151.3 Notification Requirements and Schedule.[423]

The updated handbook also noted that in Community-Based Care (CBC) catchment areas, the caseworker "follows the placement process in the relevant CBC operations manual" and states that the SSCC is contractually responsible for making sure caregivers are aware of a child's history of sexual aggression, sexual behavior problems, or sexual victimization.[424]

In addition to updating the handbook, DFPS also updated the Child Sexual Aggression Resource Guide to include the same requirements related to reviewing the information with the caregiver and uploading the signed copy of Attachment A in One Case.[425]

### c. Contempt Hearing

The Plaintiffs also argued that the State should be held in contempt for failing to comply with Remedial Orders 25, 26, 27, 29, and 31, and based their argument on the Monitors' findings that on-site interviews with caregivers showed that only half reported receiving information related to sexual victimization, and just under half reported receiving information related to a child's history of sexual aggression.[426] The State's response included Carol Self's affidavit as a supporting exhibit and described DFPS's attempts to comply with Remedial Orders 24 through 31 by updating policy, improving practice through staff trainings, and conducting case record reviews.[427]

At the Contempt Hearing, Carol Self testified to the State's efforts to comply with Remedial Orders 25, 26, 27, 29 and 31. The Court asked questions related to caregiver notification. Self demurred on the definition of "caregiver," resulting in the following exchange:

---

[423] DFPS, *Child Protective Services Handbook* §6241.11 (updated July 2020).
[424] *Id.*
[425] DFPS, *Child Sexual Aggression Resource Guide* 13-14 (updated June 2020).
[426] *Id.* at 15-16.
[427] Defendant's Response to Motion to Show Cause, Exhibit D, Declaration of Carol Self Regarding Compliance Activities for Remedial Orders Nos. 24-31 at ¶¶43, 51, and 52, ECF No. 916.

THE COURT: Are you notifying all of the caregivers of the sexual abuse and sexual victimization and aggression history of these children, every single caregiver of every single child that has been so identified in your records?

(Pause in the proceedings.)

THE WITNESS: I think my – my struggle in answering is, is because of the definition of caregiver.  And in a foster home –

THE COURT: What is – oh, my goodness.  What is your definition of a caregiver?

THE WITNESS: Well, in a General Residential Operation, you have – you can have multiple caregivers.  And when we – when we place –

THE COURT: Do you have a definition from DFPS as to a caregiver?

THE WITNESS: It's someone responsible for the day-to-day care of the child.

THE COURT: Okay.  Are you notifying each of those individual caregivers?

THE WITNESS: We provide a Placement Summary Form to – at the time of placement and it provides –

THE COURT: Are you notifying every –

THE WITNESS: I'm sorry.

THE COURT: -- are you notifying every single caregiver of the sexual history of the child, abuse and victimization?

THE WITNESS: We make efforts to notify the caregivers (indiscernible) –

…

THE COURT: This is a yes or a no question.  Are you notifying every single caregiver of these children in the Common Application?

THE WITNESS: I can't speak to what's happening every single day at the time of placement.  I can speak to the policies and the processes that we put in place to ensure that the caregiver is notified.

THE COURT: Well, the Monitors –

THE WITNESS: If the caregivers are found –

THE COURT: -- the Monitors' Report – just a moment.

207

The Monitors' Report says that you're admin --- notifying the administrators and not the individual caregivers.  Is that true or not true?

THE WITNESS: That is true.

…

THE COURT: Now, does DFPS have a definition of a caregiver, so we can narrow this down since there seems to be some confusion, years down the road, after my Orders?

Commissioner, do you know if there's a definition as to caregiver for DFPS?

COMMISSIONER MASTERS: I would assume that there would be.  I've asked the same question and they are looking.[428]

The next day, Commissioner Masters testified and was asked about the agency's definition of a "caregiver" for purposes of complying with the remedial orders:

[MR. YETTER]: When the Court's Order says that every one of a child's...caregiver [sic] should get notice, that's not just the administrator of a facility.  Is it Commissioner?

A: Yes.  That was clear.

Q: In other words, it's not just the administrator of a facility, it's every one of the caregivers, the employees, the staff, the nurse, the caseworker, all of them.  Right?

A: Yes.  Yes.[429]

In addition to the definition of a caregiver, the Court asked the witness about settings that a child could be placed in that would not receive notification of an indicator for sexual abuse or aggression under the agency's policy:

THE COURT: I also want to know, when I say that this must be given to all caregivers, what placements does DFPS except from this Order?

(Pause in the proceedings.)

THE WITNESS: They're – the only placements that we would not notify a caregiver of a child's sexual aggression or sexual victimization history would be –

---

[428] Telephonic/Zoom Show Cause Hr'g Tr. (September 3, 2020) 254 -260, ECF No. 964.
[429] Telephonic/Zoom Show Cause Hr'g Tr. (September 4, 2020) 146, ECF No. 967.

I mean, we notify every placement, we notify kinship caregivers, we notify non-licensed placements, as well as licensed placement.

THE COURT: And you notify the psychiatric hospitals when you place them there?

THE WITNESS: We don't consider a psychiatric hospital as placement.

THE COURT: Why is that?

THE WITNESS: Because it's –

THE COURT: What would it be?

THE WITNESS: It's a hospital stay.  And so we haven't –

THE COURT: Don't you place them there yourselves? You're the managing conservator.  Right?

THE WITNESS: They're – we –

THE COURT: Are you the legal managing conservator of the PMC children?

THE WITNESS: Yes. Yes, ma'am.

THE COURT: So when you put them some place, you're saying it's not a placement? What on earth is it? Don't you place them in the psychiatric hospital? Aren't you the only people who have the authority to do that as managing conservators?

THE WITNESS: If the child has – yes.  I mean, if the child has needs, and they're in a foster home, and they're placed in a psychiatric hospital, oftentimes the child returns back to that foster home placement.  So their placement is still with the foster home.  It's just that they're temporarily in the psychiatric hospital setting.

THE COURT: Okay.  Well, let me tell you that not reporting this information to all placements is not consistent with the Court's Order.  I'm going to give you a heads-up on that because that's a contempt issue.

And if you're not telling the psychiatric hospitals, of all places, that these children have sexual aggression and sexual victimization history, it's actually shameful.[430]

---

[430] Hr'g Tr., *supra* note 426, at 262- 64.

####        d.        **Policy Updates that Followed the Contempt Hearing**

After the Contempt Hearing, DFPS asked the Monitors for feedback regarding proposed definitions of "caregiver" and "apprised," initially looking to existing definitions within the Texas Administrative Code (TAC) that could be referenced in policy related to the remedial orders.[431] DFPS sent the Monitors the following proposed definitions:[432]

As we mentioned to you in our call on 9/28/2020, we propose for consideration the following approach to caregiver notification as it relates to placement settings and ROs 25, 27, and 31:

####        i.        **Definition of "Caregiver"**

For purposes of Remedial Orders 25, 27, and 31, a caregiver is a person who is counted in the child/caregiver ratio pursuant to 26 TAC §§ 748.43(5) or 749.43(8), or, for a setting other than a foster home or General Residential Operation, a person whose duties include direct care, supervision, guidance, and protection of a child in care to the extent that they would be counted in the child/caregiver ratio in a setting subject to Child-Care Regulation.  This definition does not authorize DFPS to direct or otherwise control how an entity housing a member of the PMC class distributes the provided information if DFPS is not authorized by contract, statute, or law to exercise such authority."

The aforementioned TAC sections are as follows:

26 TAC Section 748.43 (Minimum Standards for GROs)

5) Caregiver--A person counted in the child/caregiver ratio, whose duties include the direct care, supervision, guidance, and protection of a child. This does not include a contract service provider who:
    (A) Provides a specific type of service to your operation for a limited number of hours per week or month; or
    (B) Works with one particular child.

26 TAC Section 749.43 (Minimum Standards for CPAs)

(8) Caregiver--A caregiver:
    (A) Is a person counted in the child/caregiver ratio for foster care services, including employees, foster parents, contract service providers, and volunteers, whose duties include direct care, supervision, guidance, and protection of a child in care. This includes any person that is solely responsible for a child in foster care. For example, a child-placement staff

---

[431] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Proposal for approach to caregiver notification*, (October 7, 2020) (on file with Monitors).
[432] *Id*.

that takes a foster child on an appointment or doctor's visit is considered a caregiver;

    (B) Does not include babysitters, overnight care providers, or respite child-care providers unless they are:

        (i) Verified foster parents.

        (ii) Licensed foster parents; or

        (iii) Agency employees.

    (C) Does not include a contract service provider who:

        (i) Provides a specific type of service to your agency for a limited number of hours per week or month.

        (ii) Works with one particular child: or

        (iii) Is a nurse being reimbursed by Medicaid; and

    (D) Does not include a person left alone momentarily with a child in care while the caregiver leaves the room.

The definition of caregiver in Texas Family Code Section 261.001(5) does not define the term "caregiver" as such, though it does define the related concept of "person responsible for a child's care, custody, or welfare." This definition, however, is relevant to the agency's authority to investigate child abuse and neglect and may be too broad for application in licensed residential placement settings, particularly where the definition includes entities for which DFPS may not exert some control of the distribution of information. Also, the definition includes school personnel or volunteers at a child's school, an entity for which DFPS may not exert some control over the distribution of information or limitations on the distribution of history to persons who may not need to know the history. Considering potential privacy or confidentiality concerns youth may have about sharing their background, whether school personnel may need to know a youth's history should be considered on a case-by-case basis rather than across the board and possibly include consideration of factors such as the nature of the youth's history, the age of the child, and whether the child will be in situations without supervision while in the educational setting.

The term "caregiver" as defined above also excludes babysitters, overnight care providers, and respite caregivers unless they meet certain criteria. DFPS construes this exclusion to be consistent with obligations under state and federal law to promote normalcy and apply the reasonably prudent parent standard. *See* 42 U.S.C. § 675(5)(B),(10), (11); Tex. Fam. Code §§ 264.001(1) and 264.125. So, for example, a child who is allowed to go on a weekend camping trip with a friend from school will not be required to have sensitive sexual victimization history shared, presuming that such normalcy activity is already consistent with any service planning, court orders and treatment plan in place.

ii.    <strong>Definition of "apprised"</strong>

DFPS acknowledges and agrees that in order to protect children from sexual abuse, those individuals who meet the definition of caregiver above, i.e., who have day to

211

day responsibility over caring for children, should be aware of the information they need to keep children safe. Given that staff of operations may fluctuate and given the expectations DFPS will add and enforce in contracts regarding administration/intake staff sharing this information with direct-care staff who need it, DFPS proposes to define "apprise" as follows: "to direct information regarding sexual abuse or sexual aggression history to (a) with regards to a foster home, the individual foster parents, and (b) with regards to a GRO, the administrator, receiving intake staff, and child's case manager, all of whom DFPS must ensure (through monitoring and contractual enforcement) share this information to those staff who need it to protect children. The obligation to apprise also includes the obligation to monitor and enforce contractual requirements and agency expectations regarding provision of the information to those staff who need the information to protect children."

Once the definition of "caregiver" for the purposes of these remedial orders is settled, DFPS is prepared to move forward with changes to policy, updating forms, communicating to staff, and completing contract amendments within 30 days.

If you are open to continuing to discuss, perhaps we can discuss this on the 21st when we meet (invite forthcoming).[433]

The Monitors responded to the DPFS inquiry by asking additional questions about the definitions.[434] DFPS responded to the Monitors' additional questions within the body of the Monitors' e-mail. (In the exchange below, the Monitors' questions are featured in regular typeface, and the agency's response is shown in italicized typeface):

Your proposed definition of caregiver includes this sentence:

"This definition does not authorize DFPS to direct or otherwise control how an entity housing a member of the PMC class distributes the provided information if DFPS is not authorized by contract, statute, or law to exercise such authority."

Can you give some examples of entities that might house a member of the class but that DFPS is not authorized by contract, statute, or law to exercise authority over?

*Yes, we were thinking primarily of the situation where a child is admitted to an in-patient psychiatric hospital or medical hospital or is adjudicated into a detention setting. We would certainly have a practice to share the information but we are not the regulator or contractor in those situations so would not have the same authority to direct actions. In those scenarios we of course would want the child to get the*

---

[433] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Proposal for approach to caregiver notification* (October 7, 2020) (on file with Monitors).
[434] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Proposal for approach to caregiver notification* (October 22, 2020) (on file with Monitors).

*needed hospital services, or would lack the authority to determine the placement if the child were adjudicated, respectively.*

Next, I understand why you suggest incorporating the TAC definition by reference into the definition, and I know that these definitions and the Family Code definition came up during the hearing.  However, I'm a bit concerned about using the TAC definitions because they exempt contract service providers who work in an operation for a limited number of hours per week/month or work with one particular child.

While this makes abundant sense for purposes of limiting the people who can be counted in the ratio - I worry that it may be problematic in this context.  I'm thinking in particular of the BCFS awake-night staff as just one example - you'd certainly want those folks to know which kids have been flagged, and there may be other similar examples.

Do you have any suggestions about how to address this - I suppose one option would be to simply create a definition of caregiver for purposes of these ROs that does not refer to any existing definition?

*I think that sounds like a good option, and we could quickly take that back to come up with something to propose that focuses on day-to-day supervision (or nightly supervision in your example). I think you are right that BCFS was exempted from the ratios, so maybe we could simply look at something to address-head on the issue of contractors providing awake-night supervision. Where we struggled was also wanting to preserve some normalcy, so for example if a child had a mentor or a tutor, who would not be responsible for day-to-day care, the child could have some privacy on that sensitive information with people who are there on a limited basis.*[435]

After this e-mail exchange, DFPS agreed that rather than using existing TAC definitions, it would craft a definition specific to the remedial orders.  On October 28, 2020, DFPS sent the Monitors the following proposed definitions:

### iii.    Definition of "Caregiver"

For purposes of Remedial Orders 25, 27, and 31, a caregiver is a person, including an employee, foster parent, contract service provider, or volunteer, whose day to day responsibilities include direct care, supervision, guidance, and protection of a child/youth in care. This includes employees and contract staff who routinely provide 24-hour awake night supervision in accordance with Remedial Orders A7 and A8.

This definition does not authorize DFPS to direct or otherwise control how an entity housing a member of the PMC class distributes the provided information if DFPS

---

[435] *Id.*

is not authorized by contract, statute, or law to exercise such authority. However, DFPS is committed to partnering with the state agencies having such authority (e.g., HHSC, TJJD), and is assessing opportunities for collaboration related to the provision and distribution of this information once it is determined that a child/youth will be admitted to or detained in a psychiatric hospital or TJJD facility.

Generally, and in furtherance of a child/youth having as normal of a life experience as possible while in substitute care, "caregiver" does not include individuals who are not routinely responsible for direct care, supervision, guidance, and protection of a child/youth in care, such as school personnel, mentors, tutors and chaperones. Instead, determining what information to provide an adult involved with a child/youth's normalcy activity (e.g., extra-curricular activity, part-time job, church activities, school field trip, visit to friend's house) must be considered on a case-by-case basis, keeping in mind the confidential nature of the information and the need to balance the child/youth's privacy concerns. Depending on the history, age of the child/youth, and situation in which the child/youth may be when engaging in a normalcy activity, the involved adult may not need to know of the child/youth's history, for example a tutor periodically at the child/youth's placement or an adult chaperone on a school field trip.

       iv.      **Definition of "apprised"**

DFPS acknowledges and agrees that in order to protect children from sexual abuse, those individuals who meet the definition of caregiver above, i.e. who have day to day responsibility over caring for children, should be aware of the information they need to keep children safe. Given that staff of operations may fluctuate and given the expectations DFPS will add and enforce in contracts regarding administration/intake staff sharing this information with direct-care staff who need it, DFPS proposes to define "apprise" as follows: "to direct information regarding sexual abuse or sexual aggression history to (a) with regards to a foster home, the individual foster parents, and (b) with regards to a GRO, the administrator, receiving intake staff, and child's case manager, all of whom DFPS must ensure (through monitoring and contractual enforcement) share this information to those staff who need it to protect children. The obligation to apprise also includes the obligation to monitor and enforce contractual requirements and agency expectations regarding provision of the information to those staff who need the information to protect children."[436]

After conferring with the Court, the Monitors responded to DFPS's proposed definitions, striking the second paragraph in the caregiver definition that limited DFPS's responsibility for caregiver notification in certain settings. The Monitors also made small changes to the definition of "apprised" to clarify that DFPS must ensure that information related to an indicator for sexual

---

[436] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Proposal for approach to caregiver notification*, (October 28, 2020) (on file with Monitors)

abuse or aggression is shared with all those who fall within the definition of a caregiver rather than only "those staff who need the information to protect children."[437]

The agency responded, asking:

> With regard to the struck language pertaining to entities over which DFPS is not authorized by contract, statute, or law to control how those entities operate their facilities, we want to make sure we are on the same page as you—and the Court, of course—regarding notification. For example, DFPS will not necessarily have access to nurses or other employees who may provide care to a child in a psychiatric hospital. In that scenario, DFPS would provide notification to the person doing intake (or another appropriate staff person) and request it be placed in the child's file for others to view. Would that be your understanding as well? If a follow-up call would be helpful, we are happy to set that up.[438]

In response, the Monitors advised DFPS, "The Judge expects the State to apprise caregivers for PMC children of confirmed allegations wherever the children may be living, whether the arrangement is temporary or longer term, and to be able to certify that it is doing so" and offered to schedule a teleconference with the Court if further clarification was needed.[439] DFPS responded that a teleconference was not necessary.[440]

On November 25, 2020, DFPS sent a memorandum ("memo") to all CPI and CPS staff and SSCCs alerting them to changes that would become effective December 1, 2020 related to caregiver notification.[441] The memo noted that staff would be required to review the information contained in the Placement Summary and Attachment A with caregivers at each initial and subsequent placements, obtain the caregivers' signatures, and provide a copy of the document per the memorandum's guidance.[442] The memo included a chart setting out requirements and guidance specific to unverified kinship homes, foster homes, GROs, and "Other Facilities" which includes juvenile detention settings, psychiatric hospitals, state supported living centers, and medical hospitals.[443] The guidance for the "other facilities" specifies that the individual responsible for admissions is required to sign the Placement Summary and Attachment A, and notes, "Caseworkers must review the information with the staff who is admitting the child and make efforts to have them sign the documents. If they refuse to sign, document who the information was

---

[437] E-mail from Deborah Fowler and Kevin Ryan, *Proposal for approach to caregiver notification* (October 29, 2020) (on file with Monitors).

[438] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Proposal for approach to caregiver notification*, October 31, 2020 (on file with Monitors).

[439] E-mail from Deborah Fowler and Kevin Ryan to Audrey Carmical, *Proposal for approach to caregiver notification*, (November 5, 2020) (on file with Monitors).

[440] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Proposal for approach to caregiver notification*, (November 8, 2020) (on file with Monitors).

[441] Memo from Jim Sylvester, Association Commissioner for CPI & Deneen Dryden, Associate Commissioner for CPS to All CPI and CPS staff and SSCC Contractors regarding Notification to Caregivers Regarding Sexual Victimization and Sexual Aggression History of children in DFPS conservatorship (November 25, 2020) (on file with Monitors).

[442] *Id.*

[443] *Id.* at 2.

215

provided to, their title, date, and indicate their refusal to sign. If the caregiver admits the child, staff must review the information and obtain the signatures upon notification of the admission."[444]

The DFPS memo answered the question "Must I obtain signatures for children who are already placed?" as follows:

> For children currently placed in **General Residential Operations (GRO),** State office staff are coordinating with providers to obtain the required signatures for any children who are identified in IMPACT as having a history of sexual victimization and or sexual aggression.  If a GRO attempts to give you copies of the Attachment A they received from state office staff, please ask them to send it back to the individual who provided it to them.

> For children placed in **foster homes** and **unverified kinship homes** who have a history of sexual victimization and or sexual aggression, at the workers next visit with the caregiver, caseworkers should obtain the signature of any caregivers who have not signed the Attachment A and upload it into One Case.  If the child does not have a history of sexual victimization or sexual aggression, there is no additional action required.[445]

The memo also included a list of documents and policies that would be updated to reflect the guidance.[446]

### e.    The Court's Contempt Order & DFPS's Certification of Compliance

The Court held DFPS in contempt of Remedial Orders 25, 26, 27, 29, and 31.  In so doing, the Court found gaps in and non-compliance with DFPS's own policies:

> In sum, the Monitors' various methods for validating compliance with the Remedial Orders related to caregiver notification revealed significant gaps in Defendants' performance.  Information frequently did not make it to the direct care staff who are actually engaged in protecting children's safety on a daily basis. Even if Defendants were 100% compliant with their own policy of notifying GRO directors or administrators, the Defendants' obligation under the Remedial Orders is to

---

[444] *Id*.

[445] *Id*. at 2-3 (emphasis in original).

[446] These documents and guidance included 14 sections in the CPS Handbook (4121.2 Prepare the Current and New Caregivers for the Move; 4121.3 Complete the Placement Summary Form; 4133 Provide and Discuss the Placement Summary Form; 4152.2 Meeting the Needs of a Child or Youth Until a Placement is Secured; 4220 Placements into Facilities Regulated by the Health and Human Services Commission (HHSC); 4221 Abuse and Neglect Investigations of Placements; 4221.1 RCCI Notifying CPS of Alleged Abuse or Neglect; 4221.2 CPS Responsibility and Procedure after Receiving a Notification of Abuse or Neglect by either RCCI or CPI; 4221.3 CPS Protocol During an Investigation Involving a Child in Conservatorship; 4230 Facilities Under the Authority of Other State Agencies; 4231 DFPS's Continuing Responsibilities When a Child in Conservatorship is Placed in a Facility Regulated by Another State Agency; 4231.1 Notifying a Facility Regulated by Another State Agency of a Child's Sexual Victimization and Sexual Aggression History; 4233 TJJD and JPD Facilities; 6241.11 Working with Children Who Are Sexually Aggressive, Have Sexual Behavior Problems, or Are Victims of Sexual Abuse), the Placement Summary Form 2279, the Kinship Caregiver Agreement Form 0695, and The Child Sexual Aggression Resource Guide.  *Id*. at 3.

ensure that the **caregivers** "be apprised." The Monitors' Report demonstrates that Defendants are not fulfilling this obligation. The Monitors' interviews with a sample of direct caregivers revealed that only 50% of these caregivers are notified if a child under their care has a history of sexual abuse, and only 57% are notified if a child under their care is sexually aggressive…These interviews further revealed that 26% of these caregivers did not know if they were currently supervising a child identified as having a history of sexual abuse…Based on the Monitors' Report, and by Self's own admission, DFPS is not notifying "all of a child's caregivers…at each present and subsequent placement," as required by the Remedial Orders. As the Court stated during the Show Cause Hearing, the failure to notify caregivers at hospitals when DFPS places PMC children in those hospitals is not compliant with the Remedial Orders.[447]

The Court also expressed concerns about whether caregivers who did receive some information received complete information, finding:

> The Court notes that even the information communicated to caregivers may not accurately reflect the reality of a child's history of sexual abuse or sexual aggression. As previously discussed, the Court is concerned that child-on-child sexual abuse allegations may not be properly investigated and/or that confirmed child-on-child sexual abuse allegations may not be properly documented…This potential deficiency in investigating and/or documenting is exacerbated by the failure to communicate information about confirmed allegations to the caregivers responsible for the care and safety of PMC children. The Court therefore instructs the Monitors to continue reviewing the investigation and documentation of child-on-child sexual abuse allegations involving PMC children in foster care, as well as the communication of information about such confirmed allegations to the primary caregivers of these PMC children. These matters may be the subject of future contempt hearings.[448]

The Court ordered DFPS to file with the Court sworn certification of their compliance with these remedial orders within 30 days of the date of the Order.[449]

On January 16, 2021, DFPS filed its sworn certifications, including Carol Self's affidavit repeating much of what was included in the affidavit submitted in response to the Plaintiffs' Motion to Show Cause, but adding information about the agency's attempts to come into compliance following the contempt hearing.[450] The same day, DFPS sent the Monitors links to their shared electronic database for the documents referred to in the supporting affidavits that had not previously been provided.[451] The documents in the database included:

---

[447] Order (December 18, 2020) 298-99, ECF No. 1017 (emphasis in original).
[448] *Id*. at 299-300.
[449] *Id*. at 326.
[450] Defendants' Certification of Compliance Regarding Remedial Order Nos. 2, 3, 5, 7, 10, 25-27, 29, 31, 37 and B-5, Exhibit C, Sworn Declaration for Remedial Order Nos. 25, 26, 27, 29 and 31, ECF No. 1021-3.
[451] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Remedial Order Sworn Declarations – supplemental documents* (January 16, 2021) (on file with Monitors).

217

- The updated 24-hour Residential Care Requirements, which added the caregiver notification requirements, and definitions of "caregiver" and "apprised," and a notification sent to residential providers calling their attention to the revisions.

- Forms created by three SSCCs – 2Ingage, Family Tapestry, and OCOK – to comply with the remedial orders' requirements for notifying caregivers upon placement via the Common Application and Placement Summary.

- The updated Child Sexual Aggression Resource Guide.

- Amendments made to child-specific contracts to include updates related to caregiver notification.

- The updated kinship caregiver agreement.

- E-mail notifications sent to out-of-state providers on January 13, 2021, requiring that they "provide notice to any temporary placement or alternate caregiver (psychiatric or medical hospital, juvenile detention facility, respite care, both formal and informal babysitters, etc.) of any associated child sexual aggression, behaviors or victimization noted in the Attachment A of Placement Summary form 2279."

- A unilateral amendment form for DFPS' contracts with SSCCs, adding the definitions of "caregiver" and "apprised," and describing the notification requirements for caregivers, including the requirement that they obtain caregiver signatures indicating they received information related to a child's history of victimization or aggression. This amendment also required SSCCs to ensure that each CPA provider has a written process in place to provide notice to a temporary placement. Examples of temporary placements that the language includes are a psychiatric or medical hospital, a juvenile detention facility, and respite care.[452]

- December and January updates to the CPS Handbook related to caregiver notification, including notification that Foster and Adoptive Home Development (FAD) caseworkers are required to provide to alternative caregivers or temporary placements.[453]

---

[452] DFPS, *Department of Family and Protective Services Unilateral Amendment No. X* (undated)(on file with Monitors).
[453] The updated sections of the handbook require caseworkers to provide and discuss the Placement Summary form and Attachment A with the new caregivers at the time of placement. For foster or kinship homes, section 4130 specifies that "all caregivers in the home" must sign the Placement Summary and Attachment A to acknowledge receipt. The same section requires that if the placement is a GRO, the forms must be signed by the administrator for the GRO, receiving intake staff (if applicable), and the child's caseworker. DFPS, *CPS Handbook* §4133 (updated December 2020). If the placement is an initial placement into foster care, the caseworker must provide the documents to the new caregivers within 72 hours of the child's placement; if it is a subsequent placement, the documents must be provided and signed at the time of placement. *Id*. The signed forms are required to be uploaded to OneCase by 7 p.m. on the next calendar day after the day of the placement. This section of the handbook also specifies, "If any caregivers are not present during the placement, the caseworker must review the information with those who were not present and obtain signatures on Form 2279 and Attachment A within three business days. Required signatures for those who were not present may be collected electronically." *Id*. The section of the handbook related to an FAD

218

- A "Psychiatric Hospital Contact Protocol for Children/Youth in DFPS Conservatorship" that includes language requiring the caseworker to notify the hospital of a child's sexual aggression and aggression history "[i]mmediately, but no later than 3 business days after notification that a child/youth on your caseload has been admitted to a psychiatric hospital." The form requires the child's primary CVS caseworker to provide a copy of the Placement Summary Attachment A to the admissions staff or person responsible for the oversight of the child, and "make every attempt to obtain a signature on the Attachment A." It notes that if the facility refuses to sign the document, the caseworker must note the refusal on the form and upload the form into OneCase.[454]

- An Excel spreadsheet listing the children with an indicator for sexual abuse, a sexual behavior problem, or sexual aggression for whom DFPS represented a mass caregiver notification was completed in December 2020.[455]

In addition, in February 2021, DFPS provided the Monitors with more than 400 policies for caregiver notification adopted by GROs.[456]

---

worker's responsibilities requires the FAD worker to inform foster or foster/adoptive parents that they must provide information about a child's sexual history to alternate caregivers or temporary placements, stating that this "includes when a child is placed in a psychiatric hospital or arrested and placed in juvenile detention." It requires FAD workers to "ensure that alternate caregivers or temporary placements have received the child's sexual history information by obtaining signatures of all caregivers" on a form created to certify receipt of the information. This section also incorporates the definition of "caregiver" and requires that for "unplanned temporary placements, such as psychiatric hospitals or juvenile detention, the FAD worker must" obtain signatures on the certification within 24 hours of receiving a serious incident notification, and provide the signed certification to the child's primary caseworker within three business days. DFPS, *CPS Handbook* § 7911.

[454] DFPS, *Psychiatric Hospital Protocol For Children/Youth in DFPS Conservatorship* (undated) (on file with Monitors). One Case is the electronic database associated with IMPACT that allows for storage of external documents.

[455] In order to validate the list of children included in the mass caregiver notification, the Monitors matched children identified in the State's Excel caregiver notification spreadsheet with November 30, 2020 PMC child placement data for children having a flag for sexual abuse, or an indicator for sexual aggression or sexual behavior problem, and found few discrepancies for children identified as a victim of sexual abuse or with an indicator for sexual aggression, but a higher number of discrepancies for children identified with an indicator for a sexual behavior problem. Eleven children with a flag for a history of sexual victimization in the PMC child placement data were not included in the caregiver notification list, and three children with a flag for sexual aggression in the PMC child placement data were not included in the caregiver notification list. However, 154 children with a flag for a sexual behavior problem in the PMC child placement data were not included in the caregiver notification list. While the Monitors were not able to conduct a statistically significant case read of the IMPACT records of children included on the State's mass caregiver notification spreadsheet, the few records the Monitors have checked do not always include a signed "Attachment A" in the child's One Case file for the placement that the spreadsheet indicates should have been notified, per the instructions given to the DFPS staff completing the mass notification.

[456] These policies are referred to in paragraph 72 of Carol Self's affidavit filed as an exhibit to the State's certification of compliance. Defendants' Certification of Compliance Regarding Remedial Order Nos. 2, 3, 5, 7, 10, 25-27, 29, 31, 37 and B-5, Exhibit C, Sworn Declaration for Remedial Order Nos. 25, 26, 27, 29 and 31, at ¶ 72, ECF No. 1021-3.

**F.      Remedial Orders 25, 26, 27, 29, and 31 Performance Validation**

**1.      Methodology**

The monitoring team conducted three case record reviews[457] using a sample of new placements for children with an indicator for sexual victimization or sexual aggression in each.[458] The sample sizes for each were as follows:

- March – May 2020: a sample of 264 cases, out of a total of 779.
- June – August 2020: a sample of 265 cases, out of a total of 817.
- September – October 2020: a sample of 207 cases out of a total of 546.

The chart below captures the characteristics for the total sample of 736 case records reviewed across all three quarters.

---

[457] Several of the methods used by the Monitors to validate the direct caregiver notification requirements of Remedial Orders 25, 31 and 37 for the First Report could not be replicated for this report.  The cross-match of data included in the First Report was based on a one-time mass notification of caregivers by DFPS ordered by the Court on November 5, 2019 that has not been repeated by the State.  Similarly, the Monitors' First Report included a robust dataset compiled from on-site interviews with direct caregivers.  As discussed, the Monitors' ability to conduct site visits was hampered by the onset of the pandemic.

[458] The sample was taken from all children with a sexual characteristic flag who started a placement requiring a Common Application or caregiver notification during each quarter.  The confidence interval for each sample is 95/5.  Children who began more than one qualifying placement in the quarter may be in the sample more than once.  Children with an indicator for both sexual abuse and sexual aggression may be in both the abuse and aggression sample.

**Figure 6.8: Case Record Review Sample Characteristics, March to October 2020**



The 736 case records reviewed by the monitoring team across all three quarters involved 525 children (128 children flagged with an indicator for sexual aggression, and 408 children flagged with an indicator for sexual abuse. Eleven children (2%) were flagged with both indicators.

The case record review tool asked questions related to:

- Which indicator the child's records showed had been marked for the child (sexual victimization, or sexual aggression).
- The placement name, the type of placement, and the start date for the placement.
- The date the child's history page had last been updated.
- The date the caseworker documented in IMPACT for providing Attachment A to the placement.
- Whether a Common Application corresponding to the placement could be found, and if so, the date for the document and questions related to the information included.
- Whether a Placement Summary and Attachment A could be found corresponding to the placement, and if so, dates they were completed, questions related to the information included, who signed the Attachment A form, the dates of the signatures, and whether the signature was made by hand or typed.

**Results of Performance Validation**

    a.    **Common Application**

        The monitoring team found a Common Application that corresponded to the placement under review which contained all known information related to a child's history of sexual abuse in 50% of the placements reviewed, and containing all information related to a child's history of sexual aggression in 57% of the placements reviewed. The rate of finding a Common Application with complete information corresponding to the placement reviewed did not improve over time for children with an indicator for sexual aggression, though it did improve for children with a history of sexual abuse. DFPS slightly outperformed SSCCs when results were examined according to the entity responsible for the child's placement.

        DFPS's own case record reviews failed to consider whether the Common Application not only included all known information related to a child's history of sexual abuse or sexual aggression, but also whether it was provided to the caregiver. There did not appear to be any inquiry into whether the reviewers could find documentation indicating caregivers received the Common Application. Similarly, the State's case record reviews did not conjunctively consider whether the Placement Summary and Attachment A were provided to a placement or caregiver and whether they included all known information related to the child's history of sexual abuse or sexual aggression. The State's case record reviews appeared to test for one or the other but did not examine the percentage of cases in which they could confirm that the documents were both provided to the caregiver *and* included all known information related to the child's sexual history.[459]

        Consequently, the Monitors' second series of case record reviews, completed for this report, assessed whether a Common Application *associated with the placement being reviewed* could be found in IMPACT, and if so, whether it included all known information related to a child's history of sexual abuse or sexual aggression. Whether a Common Application includes all information related to the child's history does not show that the caregiver received the Common Application, particularly if there is no Common Application in IMPACT that clearly corresponds with the placement under review.[460]

        Determining whether a Common Application found in IMPACT corresponded to the placement under review was challenging. Of the 145 placements reviewed by the monitoring team involving a child who had an indicator for sexual aggression, 94 (65%) Common Applications

---

[459] Deborah Fowler and Kevin Ryan, *First Court Monitors' Report 2020* at 239 -240.

[460] The Monitors' case reviews for the First Report asked only whether the child's Common Application included information about the child's history of sexual abuse or aggression, similar to DFPS's case reviews. While adding the question related to whether a Common Application could be found corresponding to the placement under review improves the case reads, it still does not guarantee that the caregivers at the placement received it or reviewed it. As discussed in the Monitors' First Report, on-site child file reviews showed the Common Application to be missing in 20% of files reviewed. Deborah Fowler and Kevin Ryan, First Report at 244. The monitoring team found a Common Application in only 47% of children's files reviewed during the only site visit the Monitors conducted since publication of the First Report, to Devereux-League City. Deborah Fowler and Kevin Ryan, First Report at footnote 51.

clearly corresponded to the placement under review. In another 39 (27%), the Common Application was found in IMPACT, but the monitoring team was unable to determine whether it corresponded to the placement being reviewed. The monitoring team could not find any Common Application in 12 cases (8%).[461]

**Figure 6.9: Common Application in IMPACT with Children's History of Sexual Aggression**



Similarly, of the 465 placements reviewed for children who had an indicator for sexual abuse, the monitoring team found a Common Application that was clearly associated with that placement in 271 (58%) instances. The monitoring team found a Common Application but was unable to determine whether it corresponded to the placement being reviewed in another 128 (28%) cases and found no Common Application for 66 (14%) placements.

---

[461] The Common Application was considered "not found" when no Common Application was found for the child in IMPACT or when the date on the Common Application was prior to the placement and the child's placement log had not been updated.

**Figure 6.10: Common Application in IMPACT with Children's History of Sexual Victimization**



The number of placements reviewed in which the monitoring team found a corresponding Common Application that included all of a child's sexual history was lower.  For placements involving a child with an indicator for sexual aggression, the monitoring team found a Common Application corresponding with the placement under review that included all of the child's history in 57% (83 of 145) of placements.  For placements involving a child with a history of sexual abuse, a Common Application corresponding to the placement that included all of the child's history of sexual abuse was found in 50% (234 of 465) of those reviewed.

**Figure 6.11: Common Application in IMPACT with Children's Complete History of Sexual Aggression or Sexual Abuse**



The rate of finding a Common Application with complete information corresponding to the placement reviewed did not improve significantly over time for children with an indicator for sexual aggression, though it did improve for children with a history of sexual abuse:

**Figure 6.12: Common Application in IMPACT with Children's Complete History of Sexual Aggression or Sexual Abuse By Period**



As the Monitors assessed whether a Common Application corresponding to a child's placement could be found that included all known history, the Monitors also analyzed whether differences emerged when the entity responsible for the placement was DFPS or an SSCC.  The analysis showed that DFPS out-performed the SSCCs for both placements involving children with an indicator for sexual aggression and sexual abuse:

**Figure 6.13: Common Application in IMPACT with Children's Complete History of Sexual Aggression or Sexual Abuse By Entity Responsible for Placement**



Source: Case Review Data, March - October 2020
*n=608*

*The entity responsible for placement was unknown for two cases (one sexual aggression and one sexual abuse case).

b.      **Placement Summary**

In addition to the Common Application, DFPS relies on the Placement Summary form and Attachment A to provide caregivers with information related to a child's history of sexual victimization or aggression.  The Placement Summary includes a section to guide the "Discussion with the Receiving Caregiver" which includes "Needs Relative to History of Sexual Victimization, Sex Trafficking, Sexual Behavior Problem, or Sexual Aggression."[462]  This section allows the caseworker to indicate, by checking a box, whether the child has any known sex trafficking or sexual victimization history, has sexual behavior problems and a corresponding characteristic marked in IMPACT, or has engaged in sexually aggressive behavior and a corresponding episode documented on the sexual aggression page in IMPACT.[463]  The form notes:

"All information regarding a child's history of sexual victimization, or sexual aggression is documented on Child Sexual History Report (Attachment A). Caregivers and Caseworker must sign Attachment A acknowledging that they have reviewed and received/provided the document. For foster homes, this includes all foster parents.  For kinship homes, this includes all adults with unsupervised access

[462] DFPS, Placement Summary, Form K-908-2279.
[463] *Id.*

227

to the child living in the home.  For placement in General Residential Operation, this form must be signed by the administrator of the operation, the intake or admissions staff, if applicable, and the case manager.  Caseworkers must ensure that this form is reviewed with any caregivers not present at the time of placement and obtain their signatures on the form within three business days.  Additional required signatures on the form may be scanned and returned through e-mail."[464]

During the Monitors' case record review, in addition to determining whether a Common Application could be found corresponding to the placement episode being reviewed, the monitoring team also looked for a Placement Summary and Attachment A associated with the placement.  Reviewers found both a Placement Summary and Attachment A for placements involving a child with an indicator for sexual aggression in 64% of placements reviewed (110 out of 171) and found both forms for placements involving a child with an indicator for sexual abuse in 54% (306 out of 565) of placements reviewed.  The case record reviews also revealed that the percentage of placements in which the reviewer found both a Placement Summary and Attachment A associated with the placement increased over time.

**Figure 6.14: Percent of Placements in which Both Placement Summary and Attachment A Associated with the Placement was Found By Period**



The monitoring team also recorded how often the Placement Summary and Attachment A included all information related to a child's history of sexual abuse or sexual aggression, and whether the

---

[464] *Id.*; DFPS began requiring the caseworker and caregiver to sign the Attachment A when the new IMPACT enhancements were deployed on December 19, 2019, which automatically populate Attachment A with the information included in the relevant IMPACT pages related to a child's history of sexual abuse or aggression.  *See* Exhibit C, *supra* note 454, at paragraphs 26 – 29.

forms were hand-signed[465] by the receiving caregiver.  If the form was signed, the monitoring team also determined whether it was signed on or before the placement start date.  The charts below show the results of the case record review.

**Figure 6.15: Number of Placements with Both Placement Summary and Attachment A Found, Includes Sexual History Information, and Signed by Receiving Caregiver on or Before Start of Placement**



Results across all of the issues that the monitoring team reviewed improved over time, though results for placements involving a child flagged with an indicator for sexual abuse lagged behind those for placements involving a child flagged with an indicator for sexual aggression.

---

[465] While it is possible that the ability to obtain hand signatures was affected by the onset of the pandemic, particularly during the period when caseworkers were not making in-person visits to children's placements, a typed "signature" is problematic from the standpoint of validating caregiver receipt.

**Figure 6.16: Percent of Placements with Hand Signed Placement Summary and Attachment A On or Before Placement By Period**



Finally, the placements were analyzed according to the entity responsible for placement (DFPS or an SSCC).  The SSCCs outperformed DFPS in this analysis:

230

**Figure 6.17: Percent of Placements with Hand Signed Placement Summary and Attachment A On or Before Placement By Entity Responsible for Placement**



Results were also analyzed according to placement type: foster home, congregate care (GROs), and adoptive/kin. As the charts indicate, results were particularly poor for adoptive or kinship placements.

231

**Figure 6.18: Percent of Placements with Hand Signed Placement Summary and Attachment A On or Before Placement By Living Arrangement**



c. **State's Case Record Reviews**

The Monitors reviewed the State's case record reviews for the 3rd and 4th quarters of fiscal year 2020, and the first quarter of fiscal year 2021. The review for the 4th quarter was an "abbreviated" review that included a partial month of August 2020. In these case record reviews, DFPS tested for:

- Whether the Common Application includes all known information about the child's sexual history.
- Whether the Placement Summary (or equivalent SSCC form) and Attachment A include all known information about the child's sexual history.
- Whether the caregiver received the Placement Summary and Attachment A.

  o According to the case review reports, "Reviewers are confirming this either by seeing the copy of the signed Placement Summary Form 2279 and Attachment A or by speaking with the caregiver in a joint call with the caseworker during which

232

the caregiver confirms he or she received the child's 2279 and Attachment A and was aware of the child's sexual victimization history."[466]

In each of the three case record reviews reviewed, DFPS reported that almost all of the Common Applications reviewed included all known information about a child sexual victimization history or history of sexual aggression:

- Quarter 3, FY 2020: The Common Application included all known information related to a child's sexual victimization history in 86% (177 of 205) of cases reviewed, and included all known information related to a child's history of sexual aggression in 90% (47 of 52) cases.

- Quarter 4, FY 2020: The Common Application included all known information related to a child's sexual victimization history in 93% (208 out of 224) of cases reviewed, and included all known information related to a child's history of sexual aggression in 83% (49 of 59) of cases.

- Quarter 1, FY 2021: The Common Application included all known information regarding a child's sexual victimization history in 92% (206 of 224) of cases reviewed, and included all known information related to a child's history of sexual aggression in 84% (52 of 62) of cases.

The State did not verify that the caregiver received the Common Application, nor that the Common Application found in IMPACT corresponded to a particular placement reviewed.

The State's case reviews present mixed success related to the Placement Summary and Attachment A. Though the reviewers found a high percentage of the forms included all known information related to the child's history of sexual victimization or sexual aggression, results related to confirmation of caregiver receipt of the forms were problematic:

- Quarter 3, FY 2020: The State reported Attachment A included all known information related to a child's history of sexual victimization in 95% (162 of 170) of cases reviewed, and included all known information related to a child's history of sexual aggression in 98% (42 of 43) cases reviewed. However, the reviewers could verify that the Placement Summary form and Attachment A were provided to the caregiver in only 57% (129 of 228) of cases reviewed for children with a history of sexual victimization. Similarly, the reviewers verified that the Placement Summary form and Attachment A were provided to

---

[466] DFPS, *Child Sexual History Case Review Results Quarter 3 – Federal Fiscal Year 2020,* at 3-4 (on file with Monitors); DFPS, *Child Sexual History Case Review Results Quarter 4 – Federal Fiscal Year 2020 (abbreviated)*, at 4 (on file with Monitors); DFPS, *Child Sexual History Case Review Results Quarter 4 – Federal Fiscal Year 2020*, at 3 (on file with Monitors). During the contempt hearing, Carol Self gave an example of the way that telephone calls were used to verify caregiver receipt, "[I]f we contacted a caseworker and they said, 'I don't have the documents, but I did tell the caregiver at the time that I placed,' then the Quality Assurance Team will set up a joint call with the caseworker and caregiver to talk to the caregiver to make sure that the caregiver can confirm that they were provided the information." Transcript, Testimony of Carol Self, *supra* note 174, at 289-90.

the caregiver in only 60% (35 of 58) of cases involving a child with a history of sexual aggression.

- Quarter 4, FY 2020: The State reported Attachment A included all known information related to a child's history of sexual victimization in 91% (190 of 209) of cases reviewed, and included all of a child's history of sexual aggression in 88% (46 of 52) of cases reviewed. However, the reviewers verified that the forms were provided to the caregiver in only 67% (168 of 252) of cases reviewed for children with a history of sexual victimization. Reviewers verified that the forms were provided to caregivers in 75% (46 of 61) of cases reviewed for a child with a history of sexual aggression.

- Quarter 1, FY 2021: The State reported Attachment A included all known information related to a child's history of sexual victimization in 93% (186 of 199) of cases, and included all known information related to a child's history of sexual aggression in 87% (47 of 54) of cases. However, reviewers verified the forms were given to the caregiver in only 66% (158 of 240) of cases involving a child with a history of sexual victimization and in only 68% (44 of 65) of cases involving a child with a history of sexual aggression.

**Summary**

The monitoring team found a Common Application that corresponded to the placement under review which contained all known information related to a child's history of sexual abuse in 50% of the placements reviewed, and contained all information related to a child's history of sexual aggression in 57% of the placements reviewed. The rate of finding a Common Application with complete information corresponding to the placement reviewed did not improve over time for children with an indicator for sexual aggression, though it did improve for children with a history of sexual abuse. DFPS outperformed the SSCCs when results were examined according to the entity responsible for the child's placement.

The monitoring team found a Placement Summary and Attachment A for the placement reviewed that included the complete history for children with an indicator for sexual aggression in 54% of placements reviewed and found a Placement Summary and Attachment A that included the complete history for children with an indicator for sexual abuse in only 40% of cases. Of those, the Placement Summary and Attachment A were hand-signed by the receiving caregiver on or up to 30 days before the placement in only 30% of placements reviewed for children with an indicator for sexual abuse, and only 40% of placements reviewed for children with an indicator for sexual aggression. The SSCCs outperformed DFPS on this analysis.

While the State's case reviews show that the Common Application, Placement Summary (or equivalent SSCC document) and Attachment A almost always include all the known information related to a child's sexual history, the evidence indicates caregivers do not routinely receive the information.

## G.    Remedial Orders A7 and A8: Awake-Night Supervision

**Remedial Order A-7:** *The Defendants shall immediately cease placing PMC children housing more than 6 children, inclusive of all foster, biological, and adoptive children, in licensed foster care (LFC) placements that lack continuous 24-hour awaken-night supervision.  The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

**Remedial Order A-8:** *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.*

## 1.    Background

### a.    Monitors' First Report Performance Validation Findings

The Monitors' First Report found that the State's own certifications, as well as placements' self-reports, indicated ongoing issues related to Awake-Night supervision. While the Monitors and the monitoring team did find Awake-Night staff at all GROs visited prior to the First Report, during one visit the Awake-Night staff in one house appeared to be sleeping and during another, a riot broke out and monitoring staff were left alone on a wing with more than 20 children.[467]

### b.    September 2020 Contempt Hearing

During the September 2020 Contempt Hearing, the Court raised concerns revealed by the Monitors' review of the State's Awake-Night certifications that the State's list of children residing in facilities did not match the children found in the residential facilities during on-site visits:

THE COURT: One other thing, just for the record. There were 91 certifications of 24-hour awake-night supervision lists that were provided to the monitors that did not match the children that were in the facility, including 13 repeat visits to those same facilities. And that is really stunning. And when the monitors asked, I think they were, "Why you don't have a current list?"

---

[467]At least two certifications documented failures to comply with the required staff-to-youth ratio. Certifications indicated staff had not documented room checks as required by the facility's Awake-Night policy, and one instance in which the staff had pre-populated the room check document for the night. There was documentation of instances in which Awake-Night staff were present in the facility but did not conduct frequent room checks (one example involved room checks every two hours) or did not conduct *any* room checks during the night. Six certifications noted facility staff did not have a listing of the children they were supervising and, in some of these cases, could not name the children they were assigned to supervise. State staff notes from a visit to one placement indicated that the alarm on the door of a child with a history of sexual aggression was not working and that the Awake-Night staff checked rooms only three times each night.

I think we're told something vague like, "Well, that's just sort of a guideline." And you're going, "Oh, no, this is not -- this is not actually happening." Somebody needs to know where these children are.[468]

### c.  Policy Changes Following the Monitors' First Report

Beginning September 2020, DFPS instituted a number of progressive intervention contract actions to address residential operations' noncompliance with the continuous 24-hour Awake-Night supervision requirement.

The new policy provided for a range of contract actions depending on the number, frequency or both of any episodes of noncompliance as follows:

- Residential operations and DFPS staff are required to document and formally notifying the operation of any violations in a final monitoring report.
- DFPS staff is to remain on the premises until compliance is achieved.
- DFPS staff and residential operation leadership conducting root cause analysis to identify issues and barriers to implementing resolutions.
- The imposition of liquidated damages (withholding supplemental payments for each episode of noncompliance), and a placement hold.[469]

On December 18, 2020, DFPS provided the Monitors with email correspondence between DPFS and contracted residential providers that notified the providers of updates to the 24-Hour Residential Child Care requirements. These updates are incorporated into the DFPS contract with providers and include modifications to Section 1115 that define "Failure to Provide Supervision and Failure to Provide Access" as follows:

Failure to Provide Supervision. Contractor's Caregiver staff that fails to provide continuous awake supervision for DFPS children. Examples of noncompliance include, but are not limited to, Contractor's Caregiver staff sleeping, have been asleep, or awake staff that is not present at the location where DFPS children and youth are located.

Failure to Provide Access. DFPS monitoring staff is unable to access the facility or foster home. Examples of non-compliance include, but are not limited to monitoring staff's access that is denied, delayed by more than ten minutes, or there is no response to DFPS monitoring staff's attempt to obtain access to the placement.

Appendix V clarifies the contract action and liquidated process for contract violations as follows:

Contract Actions and Liquidation Damages

---

[468] Telephone/Zoom Show Cause Hr'g Tr., September 4, 2020 at 147- 148, EFC No 967.
[469] Email from Audrey Carmical to Kevin Ryan and Deborah Fowler, *Updates related to 24-hour supervision* (Oct. 24, 2020) (on file with the monitors).

Contract Action #1.  Four or fewer Non-Consecutive Violations of Section 1115.
- DFPS Staff will stay on the premises until Contractor complies;
- DFPS will contact the placement's leadership (i.e., Director and/or Administrator) to:
    o Identify the cause for non-compliance, including challenges and barriers; and
    o Provide technical assistance as needed to assist in identifying a solution to achieve compliance; and
- DFPS will provide written notification of a contract violation of the Continuous 24-Hour Awake Supervision contract term in the form of a final monitoring report; and
- DFPS will require a Corrective Action Plan be submitted by the Contractor to correct the concern(s) identified by DFPS.

Contract Action #2.  Five Non-Consecutive Violations of Section 1115.
- The steps for Contract Action #1 will apply; and
- DFPS will contact the Contractor's Board President or Executive Director, as applicable, to address the pattern of violations and explain the Progressive Intervention Steps.

Contract Action #3.  At least one violation for non-compliance with Section 1115 in each month for two consecutive months OR when there are two Consecutive Violations.
- The steps for Contract Actions #1 and #2 will apply;
- The DFPS Director of Placement will also participate when DFPS contacts the Contractor to discuss the Contract Action and future plans for compliance; and
- Liquid Damages will be assessed.  DFPS will withhold payments for one shift equal to 415.46 x 8 hours - $123.68 for each instance of non-compliance beginning with the second instance of non-compliance.

Contract Action #4.  At least one violation for non-compliance with Section 1115 in three consecutive months or when there are three consecutive Violations.
- The steps for Contract Actions #1 - #3 will apply;
- DPFS will suspend any further placements at the Contractor's facility or operations; and
- Liquidated Damages will be assessed.  DFPS will withhold payments for ALL shifts for each instance for non-compliance beginning with the third instance of non-compliance.
    o Liquidated Damages will continue until two unannounced visits within a four week period show compliance with Section 1115.

Contract Action #5.  At least one violation for non-compliance with Section 1115 in each month in a consecutive five month period OR when there are five consecutive violations.
- The steps for Contract Actions #1 - #4 will apply;
- **DFPS will continue with placement hold;
- DFPS will proceed with the removal of children after taking appropriate next steps;
- DFPS will evaluate the need to terminate the Contractor's contract; and

- Liquidated Damages will be assessed.  DFPS will withhold supplemental payments for ALL shifts for each instance of non-compliance beginning with the third instance of non-compliance until all DPFS children have been removed from the operation.

NOTE ON PLACEMENT HOLD FOR CPA. If a facility is a CPA, a placement hold will be specific to the foster home that is in violation of Section 1115. The placement hold will continue until, through attrition, the number of children in the foster home is six or fewer. Once a foster home is reduced to six or fewer child because of non- compliance with Section 1115, DFPS will not expand the number of children in the foster home.

EXCEPTIONS
- Kinship homes are excluded from placement changes.
- Contract Actins #3,4, and 5 are not applicable to CPA foster homes. [470]

During a meeting on January 25, 2021, with DFPS and HHSC, the Monitors asked the DFPS and HHSC what method the agencies used to follow-up on allegations raised during abuse or neglect or RCCR investigations of failure to provide appropriate Awake-Night supervision.  In a follow-up to the conversation, the Monitors provided an example of a case that involved a child who stated during an RCCI maltreatment investigation that staff slept at night and did not appropriately check on residents. The Monitors asked DFPS whether "DFPS has a process in place for investigators and caseworkers to relay information about gaps in Awake-Night supervision to the unit/team responsible for overseeing compliance with Remedial Order A-7. If so, please detail that process and indicate how the Monitors can find examples of that process at work." [471]

DFPS responded to the Monitors on March 11, 2021, reporting that it re-examined the current process and identified gaps, explaining:

[W]e did not have a process for investigators to investigate those allegations when they are *unrelated* to the allegations currently under investigation and not tied to a specific allegation of abuse and/or neglect. We also did not have a process in place for Residential Child Care Contracts and the 24-Hour Awake Monitoring Unit to communicate such allegations or confirmed violations to RCCI so that it could investigate to determine whether the circumstances rise to the level to constitute Neglectful Supervisions. [472]

---

[470] Email from Heather Bugg to Deborah Fowler and Kevin Ryan (December 18, 2020) 24-Hour Residential Child Care Requirements, Residential Contracts (RCC). Available at https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf .

[471] Email from Kevin Ryan to Heather Bugg, *January 25, 2021 Meeting Follow-Up* (February 2, 2021) (on file with the Monitors.

[472] Email Heather Bugg to Deborah Fowler and Kevin Ryan, *ROA7 – Follow up from January 25, 2021 Meeting* (March 11, 2020) (on file with the monitors).

On March 16, 2021, DFPS provided the Monitors with details about "the new process being implemented to address the identified gaps," which had been communicated to staff through a Field Communication:[473]

> **Field Communication #307**:
> Notifications Required When Residential Operation Does Not have 24-Hour Awake Night Supervision, was issued on February 2, 2021 to Residential Child Care Staff.  The Field
>
> Communication provided notification to CCR staff of the procedures to take if during the course of an inspection or investigation, "CCR staff become aware that staff are sleeping on the job." CCR staff are directed to report the information to DFPS Statewide Intake.[474]

DFPS followed the policy update with a flow chart detailing the updated reporting process.[475]

DFPS also provided details about the policy for 24-hour awake supervision:

> In instances where operations are providing 24-hour awake supervision but are not complying with the specifics of [its] 24-hour awake supervision policies and procedures, effective December 15, 2020, DFPS contract managers making overnight visits were instructed to continue monitoring whether operations are in compliance with [its] own 24-hour awake supervision policies and procedures and provide technical assistance when infractions are observed.  These breaches, however, are not documented as violations and will not be applicable to 24-Hour Residential Child Care Requirements, APPENDIX V: 24-Hour Awake Supervision Progressive Intervention and Liquidated Damages. However, an operation's failure to follow its 24-hour supervision policy is reported to the primary DFPS contract manager, who will address the concern with the Provider through standard contract management processes, including corrective action plans.[476]

In addition, DFPS reported that "by May 1, 2021, the agency plans to review all contracted operations' 24-hour supervision policies to determine if adjustments or refinements are needed. Thereafter, each operation's 24-hour policies will be reviewed annually beginning in FY 2022."[477]

## H.    Remedial Orders A7 and A8 Performance Validation

### 1.    Methodology

---

[473] *Id*. Although HHSC did not directly respond to the Monitors' question from the January 25, 2021 meeting or email, on March 16, 2021, the Monitors received a transmittal email from HHSC indicating the agency had sent "CCR Policy Updates," which contained Field Communication #307.

[474] HHSC, *Field Communication #307* (Feb. 5, 2021), Notifications Required When a Residential Operation Does Not have 24-Hour Awake Night Supervision.

[475]   Email from Heather Bugg to Deborah Fowler and Kevin Ryan, *supplementing DFPS response dated* March 11, 2021 (March 18, 2021) (on file with the Monitors)

[476] Email from Heather Bugg to Deborah Fowler and Kevin Ryan, *Progressive Intervention Plan* (March 15, 2021) (on file with the Monitors).

[477] *Id.*

The Monitors' validation of the State's performance associated with Remedial Orders A7 and A8 on 24-hour awake supervision included data analysis and review of information from four primary sources:

- DFPS on-site Awake-Night verification documents;
- PMC child placement data;
- A list of foster homes with capacity greater than six children;
- Operations' self-report violations; and
- Contract violations and progressive interventions required when an operation is found out of compliance by DFPS.[478]

**Results of Performance Validation**

### a.    DFPS Certifications of Awake Night Supervision

Based on the placement data the State provided for PMC children, the Monitors determined a total of 246 operation locations required Awake-Night supervision[479] in at least one month from March 2020 to October 2020. Of the 246 locations, 235 (96%) were GROs and 11 (4%) were foster homes. Twenty-two of the operations[480] (9%) were located outside the state.

The Monitors reviewed 1,667 DFPS Awake Night certifications provided by DFPS from March 2020 to October 2020 and found that DFPS made overnight, unannounced visits to between 84% and 90% of the operation locations requiring Awake-Night supervision each month, and that 70% of the operations were visited in every month that they were required to have Awake-Night supervision.[481]

---

[478] The data was limited in the following respects:
- Data captured from Awake-Night certification documents were matched to PMC child placement data based on Resource ID. For agency homes, both the CPA ID and the Placement Resource ID are included in the child placement data and more than one Resource ID may be included in the certification document. Additionally, multiple Resource IDs may be used for a single operation/location due to differences in contracts and levels of care within a location. A number of attempts were made to match the Resource ID contained in the certification documents to the PMC placement file, but there are some instances where operation/location identified in the PMC data did not match to a certification due to conflicting Resource IDs.
- DFPS onsite verification visits could have been conducted at operations/locations that do not require 24-hour Awake-Night supervision (i.e., some operations have no PMC children present).
- DFPS noncompliance incident reports include the operation name, but do not include address or operation number/ID for matching to other datasets.

[479] Operations requiring Awake-Night supervision include GROs and foster homes with a total capacity greater than 6 children, and at least one PMC child placed or active in the month. The PMC child placement data has limitations including, at times, gaps in updated placement dates. This could result in slight discrepancies in the number of PMC children active or placed in a given month, and thus the total number of operations requiring Awake-Night supervision each month.

[480] Operation location was defined by street address. Operations with multiple addresses were counted for each address and those operating different levels of care at the same address (e.g., emergency shelter and residential treatment) were only counted once.

[481] Eligible is defined as having at least one PMC child placed or active in the month and a total capacity greater than 6 children. Eligibility may change month to month for an operation depending on whether or not a PMC child is placed there.

**Figure 6.19: Number of Operation Locations Requiring Awake-Night Supervision Visited, March to October 2020[482]**



- 170 operation locations requiring Awake-Night supervision were visited in March (84%) and 184 were visited in October (86%). Of the 30 locations with no visit in October 2020, six were out of state and three were foster homes.
- 173 operation locations (70%) had visits in every month where that location had at least one PMC child in placement. Of the 36 locations with no visits in any eligible month, eight (22%) were out of state.
- Locations were visited multiple times in a month if an initial visit could not be completed or if follow-up was needed. Between March and October 2020, 229 operation locations accounted for a total of 1,667 visits.[483] Of those, 1,462 (88%) involved an operation with at least one PMC child present. The majority of locations requiring a visit were visited in all eight months of the period examined.
- 13% of visits (209 or 1,667) lasted 15 minutes or less and 13% (214 of 1,667) lasted one hour or longer. Visits lasting 15 minutes or less reported an average of 12 total children present while visits lasting one hour or longer reported an average of 42 total children

---

[482] Awake night certification visits conducted by DFPS continued to be made in person through spring of 2020 while other in-person visits (i.e., licensing inspections) were suspended due to COVID-19. Of the operations without a visit each month, some did have a visit (identified by operation name and address) but the Resource IDs provided on the awake-night certification documents did not match the IDs provided in the PMC placement data. There were four such cases in March, three cases in April, July, August, September, and October, and two cases each in May and June.

[483] Multiple certification forms submitted for a single location with the same date and times (e.g., visits to an emergency shelter and a residential care facility) were counted as a single visit. The total number of certification forms DFPS provided to the Monitors was 1,744, eight of these were exact duplicates or otherwise in error.

present. Of all visits, a total of 20 children and seven PMC children were present on average.

The monitoring team's review of the certification reports revealed that DFPS documented difficulty accessing sites in 5% (28 of 558) of visits that occurred between August and October 2020.[484] In only 15 of 1,667 visits (1%), it was indicated that DFPS could not certify compliance with the 24-hour Awake-Night requirement.

On October 13, 2020, DFPS conducted an Awake Night certification at the Hearts with Hope – GRO – House B for which eight children were present. DFPS documented the following:

> RCM arrived at House B at 2:45 am. RCM rang the doorbell and no one answered. RCM knocked on the door and no one answered. RCM looked through the window and saw someone laying on the couch with a blue, green and white comforter. RCM called the facility number at 2:51, while still looking in the window. The phone rang for 10 second and the person that was on the couch answered the phone. RCM informed Ms. M, RCM was outside and please open the door. Ms. M opened the door. RCM asked Ms. M if she was asleep. Ms. M stated no. Ms. stated she did not hear the doorbell because she was in the bathroom. While talking to Ms. M, she was stretching and seemed to be tired.
>
> Ms. M stated she was monitoring 8 kids. Ms. M stated she does 15 minute bed checks. Ms. M stated she logs her bed check but she did not have copies of the log. Ms. M found copies of the logs and stated she did not know she had copies. She started the logs while RCM was standing at the facility.

During a case record review for another remedial order, the monitoring team reviewed an RCCI abuse and neglect investigation of a child at the Kidz Safe Harbor Emergency Shelter. During an interview, the child stated that staff were asleep during the night. In the review of the State's Awake-Night certifications, the monitoring team found that in follow-up to the child's statement, DFPS staff conducted an unannounced 24-Hour awake visit and documented the following:

> "I arrived at Kidz Safe Harbor Treatment Center Houston and rang the doorbell. There's a phone number listed outside to call to gain entrance. I called the phone number twice and there was no answer. I could see someone looking through the blinds. I called the phone number again no answer. Someone opened the door and identified themselves as a resident. I asked was there a staff in the house and the youth stated that he had just left and should return shortly. There was another youth that came outside to observe. The youth were not able to go outside the gate because it was locked, so they were talking to me through the gate. I waited in the driveway for about 15 minutes until the night staff B

---

[484] The monitoring team assessed in March – July whether the narrative reflected any issues. In August – October the monitoring expanded consideration of the narrative to include whether there were any issues accessing the facility, as well as whether the narrative reflected any issues with awake night supervision.

arrived. B arrived and stated that he was filling in for someone tonight. I asked were the youth left alone after the previous shift and he stated no that he ran to the store to use the restroom due to plumbing issues at the house. I inquired about the youth being able to use the bathroom and he stated the plumbing was fixed earlier and it just became an issue when he had to go to the bathroom. The children were left in the home unattended and locked in the home with burglar bars. B was asked was the supervisor notified that he would be leaving the youth unsupervised and he stated no one was notified.

There are currently 10 boys total tonight in which 4 are PMC. B is the only staff providing awake night supervision and he conducts room checks every 15 minutes. When B isn't conducting room checks he sits in the middle hallway so that he could hear and observe movement. When not doing room checks staff is responsible for house chores."[485]

b.     **DFPS Action Related to Contractual Violations of Awake-Night Supervision Requirements**

The Monitors reviewed self-reports of non-compliance made by operations to DFPS, and reports provided by DFPS documenting violations found during awake night visits.  Violations documented included: staff sleeping or not present to provide awake supervision; not logging bed checks as the operation's policy requires; not complying with supervision ratio as the operation's policy requires; and DFPS not able to gain access to the operation for verification of awake supervision.

DFPS reported 40 incidents of contractual violations reported by DFPS for Awake-Night supervision requirements between March 1, 2020 and October 31, 2020. Some incidents had multiple violations.  Of the 40 incidents, 15 were self-reported by an operation, and 25 violations were cited by DFPS following an unannounced visit.

---

[485]DFPS, *Certification of Awake Night Supervision, Kidz Safe Harbor Treatment Center Houston*, January 21, 2021.

**Figure 6.20: Incidents of Noncompliance with Awake-Night Supervision Requirements**



- 27 operations accounted for 40 incidents of noncompliance with Awake-Night supervision requirements between March and October 2020.
- The 25 incidents cited as a result of unannounced visits represents approximately 1.5% of the 1,667 visits conducted during the period.
- In 10% of incidents (4 of 40), COVID-19 was noted as an issue that affected staffing and/or gaining access to facilities.
- 5 operations had more than one incident of noncompliance during the period. All of these operations were subject to a corrective action.

The reasons noted for noncompliance were inconsistently documented in writing, , however a hand count performed by the monitoring team recorded the following violations:

| Violation Noted | Number of Violations* |
|---|---|
| Staff sleeping or not present | 20 |
| Not documenting bed checks per operation policy | 11 |
| Out of ratio per operation policy | 9 |
| Problem gaining facility access by DFPS staff | 7 |

*More than one violation could have been found within a single incident.*

More than half of noncompliance incidents did not have a corrective action plan requested by DFPS following the finding of noncompliance.

**Figure 6.21: Corrective Action Taken for Incidents of Noncompliance with Requirements of Awake-Night Supervision**



Source: DFPS Noncompliance Reports, March - October 2020
*n = 40*

No corrective action   TA only   CAP only   Both TA and CAP

CAP is a Corrective Action Plan

Of the 14 incidents that did not result in a corrective action, four were later found to be compliant with supervision requirements (reported as ratios found to be compliant or that there were fewer than six children in placement) and one operation had their contract terminated (Prairie Harbor). Two operations were documented as having failed to maintain bed check logs; these facilities have contracts with the Community Based Care provider not with DFPS. In one instance, the State documented that the CBC would address the issue with the provider to ensure compliance. In a second instance, the State documented that the supervisor on duty would reiterate the importance of maintaining accurate checks during shift briefings and would review random bed log checks throughout the shift to ensure accuracy.

Five operations documented more than one incident of noncompliance during the period. All of these operations were placed on a corrective action.[486]

[486] According to the DFPS 24 Hour Residential Child Care Requirements, DFPS determines after a Monitoring Visit or Self-Reported Violation that the Contractor is not in compliance with this Section. If a Contractor is not compliant during a Monitoring Visit or a Self-Reported Violation, Progressive Contract Actions and Liquidated Damages may be assessed against the Contractor (Appendix V). *See* DFPS 24-Hour Residential Child Care Requirements https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf .

245

**Table 6.4: Number of Noncompliance Incidents for Operations with More Than One Noncompliance Incident**

Source: DFPS Noncompliance Reports, March – October 2020

*n = 18*

| Operation | Number of Incidents |
|---|---|
| Autistic Treatment Center | 4 |
| Bluebonnet Youth Ranch | 3 |
| Presbyterian Home | 6 |
| Sheltering Harbor | 2 |
| Whataburger Center* | 3 |

*No longer in operation.

**Summary**

DFPS continues to document instances in which operations are failing to comply with the 24-hour Awake-Night supervision requirements of Remedial Orders A7 and A8.  Of the 40 instances in which DFPS identified a violation of the Awake-Night requirement between March and October 2020, however, it required a corrective action plan in only 17 instances.

## VII. REGULATORY MONITORING & OVERSIGHT OF LICENSED PLACEMENT

### A.    Remedial Order 22: Consideration of Abuse or Neglect/Corporal Punishment & Obligation to Report Suspected Abuse or Neglect

Remedial Order 22: *Effective Immediately, RCCL, and any successor entity charged with inspections of childcare placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment occurring in the placements.*[487]  *During inspections, RCCL, and any successor entity charged with inspections of childcare placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect.  When RCCL, and any successor entity charge with inspections of childcare placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

### 1.    Background

As discussed in the Monitors' First Report, Remedial Order 22 contains two distinct requirements: First, the requirement that RCCR consider referrals and confirmed findings of abuse or neglect and corporal punishment during inspections (which the State documents in CLASS in "Extended Compliance History Reviews," or ECHRs); and second, the requirement that RCCR monitor obligations to report abuse or neglect and report any lapses to DFPS.

#### a.    First Court Monitors' Report Performance Validation Findings

For the First Report, the Monitors conducted a case record review for the period of July 31, 2019 through January 31, 2020 to determine compliance with the remedial order's first requirement related to RCCR's consideration of confirmed abuse, neglect or corporal punishment findings during inspections.   The case record review revealed that regardless of the period reviewed, only 28% of the inspections/investigations completed an ECHR, and of those that had an ECHR, only 58% were completed prior to or on the same day as the inspection/investigation.

---

[487] In response to the State's request for clarification regarding the timeframe for review and how to document RCCRs consideration of the required elements during inspections, on October 7, 2019, the Monitors advised HHSC that the Court, "directs with respect to the look-back period for considering all referrals of, and in addition, all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment, RCCL inspectors should assess the previous 5 years.  With respect to the request for clarification about how to document that the inspectors have considered these referrals and findings, a check box is insufficient.  The Court directs the agency to have inspectors document in CLASS (1) the number of referrals of child abuse/neglect; (2) the number of confirmed findings of child abuse/neglect; (3) the number of confirmed findings of corporal punishment; and (4) a narrative description of how this data and information was considered." Email from Kevin Ryan and Deborah Fowler to Andrew Stephens, (October 17,2019)(on file with the monitors).

To validate compliance with the second requirement of Remedial Order 22, the Monitors analyzed data provided by the State for citations related to failure to report abuse or neglect, and interviewed caregivers during their on-site visits to GROs and RTCs. The State's citation data for the period between July 31, 2019 and March 20, 2020 indicated that RCCR issued very few (20) citations for failure to report abuse or neglect. Yet, the interviews of direct care staff during the on-site monitoring visits revealed that many staff were not aware of the policy and legal requirements related to reporting abuse or neglect, and most said that they would not call SWI themselves if they became aware of abuse or neglect. [488]

b.    **Updates & Policy Changes Following the Monitors' First Report**

RCCR updated  its Policy and Procedure Handbook in August 2020 ("Policy"), which explicitly requires "Child Care Regulation (CCR) staff [to] conduct an extended compliance history review prior to inspecting a residential child care operation, for all monitoring, investigation, and monitoring/investigation inspections."[489] If a review of the extended compliance history report reveals a confirmed finding of abuse or neglect or corporal punishment violation on the RCCR SharePoint site, the inspector is required to consider: "the *Explanation of the Disposition Based on Preponderance* narrative box located on the *Investigation Conclusion* page (if applicable); the allegation narrative for the citation (if applicable); whether the allegations involved a child under the age of 6; any follow-up activity that was completed; and any patterns of investigations or the agency homes involved in the investigations."[490]

The Policy also describes how RCCR staff are to document the ECHR. The inspector is required to fill out in CLASS "the *Extended Compliance History Review*" section on the "*Inspection Details*" page which includes the following data: the date the information was reviewed; the number of abuse, neglect or exploitation intakes received; the number of confirmed findings of abuse, neglect, or exploitation; the number of citations issued for corporal punishment; and an assessment of the information reviewed, including any risk identified. In addition, within one day of completing the inspection, the inspector is to document the steps taken during the inspection to mitigate risk.[491]

---

[488] The State responded to the Monitors' findings in its written objections to the First Report, filed with the Court on July 6, 2020. Defendant's Verified Objections to Monitors' Report, ECF No. 903. The State's specific objections to the section of the report detailing the Monitors' findings related to Remedial Order 22 were: that the report incorrectly stated that an ECHR is required prior to an investigation; that the report used an improper data timeframe as the basis for its analysis; incorrectly concluded that failure to document the ECHR prior to the inspection date necessarily means the reviews are not completed by the inspection date; incorrectly stated that HHSC had not adopted a formal policy for ECHRs; criticizes defendants' conduct based on case reviews without provided information regarding the cases included in the sample or the process employed; and was based on the Monitors' subjective assessments and interpretations of inspectors' responses during the interviews. *Id.* at ¶¶ 32, 33, 34, 36, 37, and 39. DFPS and HHSC also provided the Monitors with an informal, unfiled response to the Report on June 15, 2020, which included many of the same complaints raised in the objections.

[489] HHSC, *Policy and Procedures Handbook* §4143.

[490] *Id.* (emphasis in the original)

[491] *HHSC Policy and Procedures Handbook* § 4143. (Emphasis in original).

c. **September 2020 Contempt Hearing & The Court's December 18, 2020 Contempt Order**

Plaintiffs addressed Remedial Order 22 in their July 2, 2020 Motion to Show Cause, arguing that the State should be held in contempt for failing to comply with the remedial order based on the Monitors' findings related to the low percentage of case reviews that showed an ECHR had been completed.[492]  In response, the State pointed to the field communication to RCCR inspectors issued in November 2019, and policy developed in May 2020 related to ECHRs as evidence of compliance.[493]  The State also raised the same arguments regarding the flaws in the Monitors' case reviews that the State raised in its formal objections to the report.[494]

During the contempt hearing, Jean Shaw ("Shaw"), the Associate Commissioner for Child Care Regulation within HHSC, testified to RCCR's compliance with Remedial Order 22.  Shaw testified that RCCR began using ECHRs in December of 2019, and subsequently formalized the process in policy in May 2020.[495] Shaw also testified that, effective August 31, 2020 (four days before the hearing started), RCCR began using a new field in CLASS to document ECHRs.[496]  The Court asked the witness about RCCR's inability to provide data indicating compliance with the remedial order:

> THE COURT: Why is it that you're unable to provide any data as to completion or agency review for the Extended Compliance History Review?
>
> THE WITNESS: Prior to August 31st of 2020, we just did not have any mechanism in CLASS to capture this information.  We had staff document it through a…chronology, and there's not a way to track that data.  But as of August 31, 2020, we now have the components in our CLASS system that we will be able to track that information and provide reports to the Monitors.

Shaw confirmed that RCCR did not do any case record reviews to verify compliance prior to the August 31, 2020 CLASS enhancements becoming operational and could not offer any data or information to rebut the Monitors' findings in the First Report. [497]

The Court held RCCR in contempt for failing to comply with Remedial Order 22,  noting HHSC made no efforts to verify whether its inspectors were conducting ECHRs for inspections for more than a year after Remedial Order 22 went into effect, from July 30, 2019 through August 31, 2020. [498]  The Court also rejected RCCR's argument that Remedial Order 22 does not require

---

[492] *Plaintiffs' Motion to Show Cause Why Defendants Should Not Be Held in Contempt* (July 2, 2020), ECF No. 901.
[493] *Defendants' Response in Opposition to Motion to Show Cause* (July 24, 2020) 32-35, ECF No. 911.
[494] *Id*.
[495] Telephonic/Zoom Show Cause Hr'g, Tr. (September 4, 2020) 86-87, ECF No. 967.
[496] *Id*. at 95-96.
[497] *Id*. at 93:22 – 94:8; 100:13–101:5
[498] HHSC attempted to shift blame for its inability to provide proof it was complying with RO-22, by arguing that the Monitors did not provide HHSC with the sample of cases the Monitors reviewed.  At the Show Cause Hearing, the Court made clear that "the Monitors are not obligated to give HHSC-RCCL a list of every case included in their case reads; HHSC-RCCL can conduct its own case reads to verify its own compliance with the court order to which they are subject." *Id.* at 106:9–13

its inspectors to document the ECHR before conducting an inspection.  The Court found this position to be inconsistent with the plain language of Remedial Order 22, which requires HHSC to consider the ECHR during the placement inspection:

> [I]f the extended compliance history reviews must be considered *during* an inspection; it strains logic to argue that they need not be completed and documented *before* that same inspection.  Also, if a review is not documented prior to or on the same day as the inspection, the Monitors have no way of validating that the inspector considered the information during the inspection, as required by the language of the Remedial Order.[499]

The Court also found HHSC's argument disingenuous because its own Field Communication #271 explicitly states "Effective December 1, 2019 [HHSC] Inspectors will be required to conduct *and document* an extended compliance history review for each operation **before** conducting an inspection."[500]

Finally, the Court rejected HHSC's argument that it exercised reasonable diligence in a good faith effort to comply with Remedial Order 22, and that the Monitors' case review did not provide HHSC with any leeway for implementation after the date of the Court's October 7, 2019 clarification of the remedial order.  The Court reiterated that Remedial Order 22 was "effective immediately" upon the Fifth Circuit's Mandate on July 30, 2019, more than two months before the Court's clarification in October 2019. Yet, as the Court noted, HHSC did not inform its inspectors of the requirements of the remedial order until December 1, 2019, did not implement a formal policy until May of 2020, and did not make changes to its CLASS system that would allow the agency to determine if it was in compliance with the remedial order until three days before the Show Cause Hearing.[501]

Having rejected all of HHSC's objections and arguments, the Court ordered DFPS to file with the Court sworn certification of their compliance with RO-22 within 15 days of the date of the Order.[502]

### d.   HHSC's December 31, 2020 Certification of Compliance

On December 31, 2020, the State filed its sworn certifications related to Remedial Order 22.  The certification attached as an exhibit an affidavit from Lana Estevilla (Estevilla) (Exhibit A), HHSC Deputy Associate Commissioner for Regional Operations for Child Care Regulation, outlining HHSC's attempts to comply with RO-22 prior to the Contempt Hearing and after.[503]   In the affidavit Estevilla certifies that HHSC has been running reports every weekday since September 2, 2020 to "track the ECHR timeliness by staff.  The reports are sent via email to each regional director, who works with staff to ensure any overdue items are quickly entered."[504]  Based

---

[499]Order (December 18, 2020) 234-5, ECF No.1017.
[500] *Id*. at 235. (Emphasis added).
[501] *Id*. at 241-2
[502] *Id.* at 250.
[503] Defendants' Certification of Compliance Regarding RO-22, Exhibit A, Sworn Declaration for RO-22, ECF No. 1019-1.
[504] *Id*. at ¶16.

on this review, HHSC changed its policy regarding the timeframe to complete the documentation for the steps taken to mitigate risk after the inspection from 24 hours to one calendar day after the inspection is completed.[505]   In October 2020, 199 RCCR staff participated in a webinar informing staff of the steps to be taken prior to the inspection, the steps to be taken after the inspection, and what should be documented in the narrative boxes in CLASS.[506]

Estevilla's affidavit indicates that in November 2020, HHSC conducted a case review to certify that inspectors were timely and accurately entering the number of abuse or neglect intakes, the number of confirmed findings of abuse or neglect, and the number of corporal punishment deficiencies.[507] The agency reviewed 33 cases, representing a 5% sample of inspections from September 15, 2020 through October 31, 2020. [508]   Although the review did find that inspectors were entering the data points, the review also found that "inspectors may need further training to ensure they properly document the assessment of the information reviewed, including any risk identified."[509] To address this issue, Estevilla's affidavit avers "an ECHR job aid was updated on December 31, 2020, to provide additional information on completing the assessment of the information reviewed, including examples of good documentation."[510]

Estevilla's affidavit also referred to the requirements in the remedial order related to abuse and neglect reporting, reiterating RCCR policy that if during the course of an inspection or investigation, an operation fails to report suspected abuse or neglect, a deficiency will be cited and is contained in CLASS.[511]   When an operation fails to report suspected abuse or neglect, HHSC has had an automated report that has been in place prior to July 2019 that pulls deficiency information and sends it to DFPS.[512]

The State also filed an affidavit from William Walsh (Walsh) (Exhibit B), DFPS Director of Purchased Client Services, in which he certified that when DFPS receives a notification from RCCR of a Failure to Report Abuse/Neglect citation to its Residential Contracts mailbox, the agency works to determine whether the facility cited is a DFPS provider; if it is, the course of action may include providing the contractor with technical assistance, requiring a corrective action plan, or modifying or terminating the contract.[513]   Walsh's affidavit also addresses DFPS's amended investigation accounting procedures:

> DFPS is also amending its procedures to account for investigations of Failure to Report Abuse/Neglect citations that do not involve a child in DFPS conservatorship. DFPS is also developing written guidelines that should be

---

[505] *Id*. at ¶17.

[506] *Id*. at ¶18.

[507] *Id*. at ¶19.

[508] *Id*. An additional 2 cases were read initially by the PMU team for consistency and case reading criteria validation. PMU Case Reading Special Request - RC Extended Compliance History Review 2 (on file with Monitors).

[509] Defendants' Certification of Compliance Regarding RO-22, Exhibit A, Sworn Declaration for RO-22, ECF No. 1019-1, at ¶20.

[510] *Id*.

[511] *Id*. at ¶5(a).

[512] *Id*. at ¶5(b).

[513] Defendants' Certification of Compliance Regarding RO-22, Exhibit B, Sworn Declaration for RO-22, ECF No. 1019-2, ¶10.

considered when determining a response. Additionally, DFPS will continue to develop a more structured process for providing technical assistance and documenting that technical assistance, as well as continuing to ensure timely action is taken after receiving notice of a citation. Finally, DFPS is developing guidance that will strengthen enforcement actions against operations with more than one Failure to Report Abuse/Neglect citation.[514]

## 2. Data and Information Production

HHSC provided inspections data, pursuant to the Monitors' September 2019 and February 2020 and information requests to validate the Extended Compliance History Reviews (ECHRs) required by Remedial Order 22. As of September 2020, data was provided monthly and includes data for all inspections, investigations, assessment and monitoring conducted. For September 2020 and thereafter, the data includes the ECHR review date and the date steps to mitigate risk were entered in CLASS. Deficiencies data is also provided by HHSC and is used to identify operations cited for failure to report.

For validation of the remedial order provisions related to abuse and neglect reporting, three sources of information from HHSC and DFPS were utilized:

- HHSC provides data for all deficiencies cited, including corporal punishment, other forms of prohibited punishment, failure to report, and failure to report within required timeframes;
- HHSC produces a list of deficiencies cited for failure to report abuse or neglect each month to DFPS; and
- DFPS provides the Monitors with a report on the failure to report notifications the agency receives from HHSC

---

[514] *Id*. at ¶21.

**Remedial Order 22 Performance Validation**

      a.     **Methodology**

          i.     **ECHR Validation**

To validate HHSC's compliance with the Remedial Order 22 requirement that RCCR consider referrals and confirmed findings of abuse or neglect and corporal punishment during inspections, the monitoring team conducted a total of four case record reviews for the period from March 1, 2020 through October 31, 2020.

Between March and August 2020, all RCCR inspections, with the exception of attempted, application, and initial inspections, were included in the sample of cases reviewed.  Two separate case reviews were conducted for this time period:

- The first case reviews included a sample of 261 inspections out of a total of 803 from March 1, 2020 to June 30, 2020; the second case reviews included a sample of 277, out of a total of 980 inspections from July1, 2020 to August 31, 2020. Both case reviews included 95/5 samples.
- Inspections sampled included monitoring, investigation, monitoring and investigation, follow-up, and "other" inspections.
- Both case reviews included identical questions regarding (1) whether or not an ECHR was completed and the timing of completion; (2) the total number of intakes, ANE investigations, and corporal punishment citations provided in the report; and (3) whether or not the ECHR included a narrative description and if so, the extent to which the narrative provided a discussion of how the information was considered (i.e., discussion of risk and steps taken to mitigate risk).

RCCR inspections sampled for the case review between September 2020 and October 2020, were limited to monitoring, investigation, and monitoring and investigation inspections since, as of August 2020, the State was no longer requiring ECHRs for any other type of inspection. Because of this change, as well as the change in the method that ECHRs were being recorded in CLASS,[515] analysis of sampled cases between March 2020 and August 2020 are reported separately from those sampled in September 2020 and October 2020.  Two separate case reviews were conducted for these two months:

- The first case review included a sample of 213 out of 436 inspections in September 2020 and the second case review included a sample of 196 out of 399 inspections in October 2020.

---

[515] Starting September 1, 2020, a section was added to the Inspection Details page of CLASS, allowing ECHR data entry directly into this page for each inspection. Prior to this date, ECHRs were documented by the inspector in the CLASS chronological listing for the operation.

- Inspections sampled included monitoring, investigation, and monitoring and investigation inspections. Monitoring and investigation inspections are counted under investigation inspections.

    ii.    **Validation of Requirements Related to Reporting Abuse or Neglect**

To assess compliance with the Remedial Order 22 requirements related to the reporting of abuse or neglect, the Monitors methodology included:

- Analysis of standards violations cited by RCCL against operations for failure to report, or delayed reporting of, allegations of abuse or neglect; and
- Analysis of two state reports: – (a) HHSC list of deficiencies cited for Failure to Report abuse or neglect provided each month to DFPS; and (b) DFPS report on the failure to report notifications the agency receives from HHSC in a given time period – and comparison of these reports with state deficiency data.

Though the Monitors' methodology for the First Report included information from on-site interviews conducted with direct care staff in GROs across the state, the onset of the COVID-19 pandemic significantly restricted the Monitors' ability to conduct on-site visits to GROs during this reporting period.

    b.    **Performance Validation Results**

    i.    **ECHR Validation**

*First Two Case Record Reviews (March 1, 2020 through August 31, 2020)*

For the first two case record reviews, encompassing the period March 1, 2020 through August 31, 2020, the Monitors sampled 538 of 1,783 HHSC inspections, a 95/5 sample, including all types of inspections RCCR conducts as part of a minimum standards investigation, follow up inspections, and inspections categorized as "other" in accordance with HHSC's November 22, 2019, Field Communication #271.[516]  HHSC suspended on-site inspections due to the COVID-19 pandemic, other than those related to abuse or neglect investigations, for the period starting on April 3, 2020, resuming inspections on June 11, 2020.  This reduced the overall number of inspections in the sample for this case review.

The Monitors conducted these case reviews prior to HHSC's addition of a section to the Inspection Details page in CLASS for ECHR data entry.  To determine whether an ECHR was associated with a given inspection, the Monitors examined the Operation's chronological history to identify a combination of the date the ECHR was completed, and the Inspection ID or Investigation ID included in the report.

---

[516] HHSC, *Field Communication #271* (12/01/2019) at  2.

The Monitors sought to determine whether an inspector completed an ECHR for its inspection, and whether an ECHR was clearly linked with that inspection during the period examined.  The Table below indicates how the Monitors made this determination.

**Table 7.1:  Definition for ECHR Found in Case Review**

| Case Review Response | Definition Used |
|---|---|
| Yes | An ECHR is found that explicitly indicates that it is for the inspection or a linked investigation (i.e., the inspection ID is listed on the ECHR). |
| No | An ECHR cannot be located, there is an ECHR with no associated inspection ID dated more than 5 days after the inspection begin date, or there is an ECHR with a different inspection ID dated more than 5 days after the inspection begin date. An ECHR is found dated on or up to 5 days after the inspection begin date, but the inspection ID is not found in the report or a different inspection ID is listed. |

The Monitors analyzed the results of the two case record reviews together.  A majority of inspections included in the two samples, 88%, (475 of 538) were monitoring or investigation inspections.[517]  Only 5% (24) were follow up inspections and 7% (39) were considered "other" inspections.

Of the 538 cases reviewed, 51% (273) of the inspections did not have an ECHR that was clearly linked to the inspection.  Monitoring inspections had an ECHR completed most often, with a 55% completion rate followed by Investigations inspections with a 51% completion rate.  Of those inspections with an ECHR, 27% (72 of 265), were completed one or more days prior to the inspection, 60% (159 of 265) were completed the same day as the inspection,[518] and 13% (34 of 265) were completed one or more days after the inspection.

The monitoring team reviewed the completed ECHRs to determine if they contained all of the Court required components and found that 235 of 538 (44%) had completed ECHRs containing all of the required components.  Of those with a completed ECHR:

•   93% (246 of 265) included all three required data elements (abuse or neglect intakes and findings, and corporal punishment citations).
•   94% (250 of 265) included a narrative discussion:

---

[517] "Monitoring and Investigation inspections" are counted as part of "Investigation inspections."

[518] During the monitoring team's interviews with inspectors, of the 31 inspectors interviewed, 23 (74%) reported they start the ECHR the day before the inspection, while eight (26%) reported they start the ECHR the day of the inspection. All 11 supervisors interviewed reported that their expectation is that the ECHR should be completed no later than the day before the inspection is to take place.

- o 17% of ECHRs (43 of 250) did not include a discussion of the abuse or neglect findings in the narrative.
- o 17% of ECHRs (43 of 250) did not include a discussion of the corporal punishment findings in the narrative.
- 62% (154 of 250) of inspections where an ECHR narrative was found had risk factors identified, of these 31% (48 of 154) did not include a discussion of risk in the ECHR narrative.
- 53% of completed ECHRs with a narrative and identified risk did not include a discussion of steps to mitigate the risk identified.
- 45% of the 250 ECHRs with a narrative were assessed by the monitoring team as poor quality, overall.[519]
- 7% of inspections with an ECHR found and a prior ECHR had either no change at all or no change in the narrative from the prior to the current ECHR.

*Third & Fourth Case Record Reviews (September through October 2020)*

The third and fourth case record reviews were conducted for the time period of September 1, 2020 to October 31, 2020, and changed the methodology (as discussed, above) to account for changes HHSC made to the Inspection Details page. The modification included data entry for ECHR into CLASS for each inspection, instead of documenting the ECHR as a chronological entry for the operation. The CLASS Inspection Details page was modified to include the following sections related to ECHRs: Date ECHR Reviewed; Number of Abuse/Neglect/Exploitation Intakes Received; Number of Confirmed Abuse/Neglect/Exploitation Findings; Number of Corporal Punishment Citations; Assessment of Information Reviewed (a narrative box); and Steps Taken to Mitigate Risk (also a narrative box).[520]

Additionally, on September 29, 2020, HHSC, through a new Field Communication #292, instructed staff that RCCR would not require an ECHR to be completed for follow-up and "other" inspections.[521] These changes resulted in differences in findings across case record reviews before and after Sept. 1, 2020.

For this case record review, the monitoring team sampled 49% (409 of 835, a 95/5 sample) of monitoring, investigation, or monitoring and investigation inspections from September 1, 2020 through October 31, 2020. The majority of inspections included in the case review (75%, or 307 of 409) were investigation inspections and 25% (102 of 409) were monitoring inspections.[522] With the change to documenting the ECHR in CLASS in the Inspection Details page, complete ECHR information was more consistently recorded. The number of inspections with completed ECHRs dramatically improved to 100%, as did the inclusion of the required elements (abuse or neglect

---

[519] In assessing ECHR narratives, the monitoring team considered the quality of information provided in the narrative related to findings of abuse, neglect, and corporal punishment, and the potential implications for risk to child safety, and whether the narrative included any discussion of steps taken to assess or mitigate identified risks.

[520] HHSC guidance allows for the "Steps to Mitigate Risk" section to be completed up to one day after the inspections.

[521] Field Communication #292, and HHSC *Policy and Procedures Handbook* § 4143 requires RCCR staff to conduct an ECHR prior to conducting a monitoring, investigation, or monitoring/investigation inspection at a residential childcare operation. HHSC did not base changes to state policy on changes in court requirements.

[522] "Monitoring and Investigation" inspections are counted as a part of "Investigation" inspections.

intakes, abuse or neglect findings, and corporal punishment citations as well as a narrative description), also found to be 100% (409 of 409).

In 33% (137 of 409) of the ECHRs reviewed, inspectors entered these elements one-to-five or more days before the inspection, with the remaining ECHRs reviewed entered the day of the inspection.[523]

**Figure 7.1: Days from ECHR Review Date to Inspection Begin Date for Inspections with an ECHR**



Data elements reported by inspectors in the ECHRs regarding abuse or neglect intakes and findings and corporal punishment citations were found to be largely consistent with the data provided by the State to the Monitors for the operation, with the exception of abuse or neglect intakes.

---

[523] Though the inspection page includes the time the inspection began and ended, the ECHR box does not include a time stamp; therefore, it is impossible to know whether it was completed prior to the start of the inspection, during the inspection, or after the inspection concluded.

**Figure 7.2: Comparison of ANE/Corporal Punishment Data Found in Extended
Compliance History Reviews and State Aggregate Data as of the First Day of the Month**



Accuracy improved slightly from the May 1, 2020 - August 31, 2020 time period[524] for abuse or neglect findings and corporal punishment citations. Abuse or neglect findings (160 of 175) and corporal punishment citations (165 of 182) matched exactly for 91% of ECHRs in the May 1, 2020 - August 31, 2020 sample of cases reviewed, compared to 94% (385 of 409) of ECHRs with matching information on abuse or neglect findings and 97% (395 of 409) of ECHRs with matching information on corporal punishment citations in the September 1, 2020 – October 31, 2020 sample of cases reviewed. For abuse or neglect intakes, the proportion matching exactly declined from 70% (121 of 174) in the May 1, 2020 -August 31, 2020 sample of cases reviewed to 57% (233 of 409) in the sample of September 1, 2020 - October 31, 2020 cases reviewed.

There is no date field in CLASS that the Monitors could use to determine when inspectors entered the "Steps Taken to Mitigate Risk" narrative in the Investigation Details page. Data provided by HHSC indicates that 85% of inspections in the case record review sample (349 of 409) had the "Steps Taken to Mitigate Risk" entered on the same day or the day after the inspection.

Although documentation of the completion of ECHR rose dramatically with the change in CLASS, the discussion of abuse or neglect findings and corporal punishment citations in the narrative decreased. For inspections with at least one abuse or neglect finding, 38% of ECHRs

---

[524] Starting in May 2020, the State began providing the Monitors with aggregate data on the number of ANE intakes, confirmed findings, and corporal punishment citations for each operation as of the first day of each month. This data was matched to the case read data by operation for inspections conducted in May through August 2020, and September through October 2020, to compare the numbers included in ECHRs.

(85 of 223) in September 1, 2020 – October 31, 2020 cases reviewed did not include a discussion of the abuse or neglect findings in the narrative compared to 32% (43 of 135) of ECHRs reviewed between March 1, 2020 and August 31, 2020.  This was also true for inspections with at least one corporal punishment citation: 42% of ECHRs (94 of 222) did not include a discussion of the corporal punishment findings in the narrative in September 1, 2020 – October 31, 2020 cases reviewed compared to 31% (43 of 139) of ECHRs reviewed between March 1, 2020 and August 31, 2020.  Inspectors were more likely to include a discussion of the abuse or neglect findings and corporal punishment citations in the narrative if the inspection was tied to monitoring instead of an investigation inspection.[525]

Inspectors often listed abuse or neglect cases with an RTB outcome and/or corporal punishment citations but included no synopsis of trends or patterns found.  Inspectors were also more likely to include a discussion of the abuse or neglect findings and corporal punishment citations in the narrative when inspecting an RTC versus a GRO versus a CPA.[526] When the ECHR was linked to an investigation of a foster home, the ECHRs would often review the CPA's compliance history, without considering the history of the foster home that was the focus of the investigation.

To determine whether the inspectors were analyzing identified patterns or trends, the Monitors reviewed the narrative discussion to determine if identified patterns/trends were in the inspection or investigation.  Approximately 70% (290 of 409) of inspections were found to have a pattern or trend to consider. However, as shown in Figure 7.3 only half of these ECHRs included in the narrative a discussion incorporating an analysis of this pattern into the inspection.

---

[525] For operations with at least one abuse or neglect finding, 73% of ECHR narratives for monitoring inspections (33 of 45) included a discussion of abuse or neglect findings compared to 59% of those for investigation inspections (105 of 178).  For operations with at least one citation for corporal punishment, 75% of ECHR narratives for monitoring inspections (36 of 48) included a discussion of citations compared to 53% of those for investigation inspections (92 of 174).

[526] 70% of ECHR narratives for inspections at RTCs (41 of 59) included a discussion of abuse or neglect findings for operations with at least one finding compared to 60% of inspections at GROs (37 of 62) and 59% of inspections at CPAs (33 of 45).  71% of ECHR narratives for inspections at RTCs (30 of 42) included a discussion of corporal punishment citations for operations with at least one citation, compared to 53% of inspections at GROs (26 of 49) and 55% of inspections at CPAs (72 of 131).

**Figure 7.3: Consideration of Identified Pattern, September to October 2020[527]**



Specific examples of the failure to include discussion of patterns or trends in the ECHR narrative, include:

- An ECHR for an investigation inspection, in which the foster parent who was the subject of the underlying investigation had multiple intakes for inappropriate discipline, including at least one substantiated allegation that involved pinching a child for wetting their pants. None of this was mentioned in the narrative; the narrative simply listed the case numbers.

- An ECHR for an inspection of a GRO with a history of RTBs for Physical Abuse that did not include a discussion of the abuse in the narrative.

- An ECHR in an investigation inspection in which the narrative noted that there had been multiple citations and RTBs for corporal punishment for the CPA but did not look at the history of the particular home under investigation.  The foster parent had been investigated for abuse or neglect seven times across two CPAs and had an RCCR investigation in a case that had been downgraded from SWI and sent to HHSC.  Review of the intakes shows a

---

[527] "Other" cases cite the inspector taking some steps to discuss risk but not enough to qualify identification or discussion of a pattern.

pattern of allegations of the foster mother hitting the children, but none of this is mentioned in the narrative.

- An ECHR in an investigation inspection which failed to note that the home that was the subject of the underlying investigation is one of the homes that had been cited for corporal punishment. Though the allegations in the underlying investigation were not related to corporal punishment, when the child was interviewed he said that the foster mother laid on top of him during a restraint when he was on his stomach, and was verbally provoking him to hit her. This allegation was discounted by the inspector/investigator after a cursory investigation because the foster parents denied it happened.

- An ECHR for a GRO with a history of ANE for Physical Abuse and corporal punishment noted that the operation had been cited 166 times over the previous five years, but did not indicate the nature of the citations or if any pattern(s) were present.

- An ECHR in an investigation inspection for an operation that is currently under Heightened Monitoring did not discuss any of the abuse or neglect or corporal punishment findings, or make any attempt to determine whether there were patterns or trends that should be considered.

The case record reviews also collected information regarding how well RCCR inspectors/investigators updated the content of ECHRs from one inspection to the next. Of the 409 ECHRs reviewed between September 1, 2020 and October 31, 2020, 86% (353) had a prior ECHR found for the associated operation; of these, the narrative and numbers had changed in 72% (255 of 353). The narrative alone had changed in 21% (73 of 353); the numbers had changed but the narrative had not in another 4% (13 of 353), and in 12 (3%), the ECHRs showed no change at all.

When the associated inspection was a result of an investigation, the monitoring team reviewed whether a current allegation for the underlying investigation was similar to a pattern or trend identified in the ECHR. Of the 307 investigation inspections reviewed between September 1, 2020 and October 31, 2020, the Monitors found that 18% (56 of 307) of the allegations that were the subject of the investigation were similar to a pattern or trend in the ECHR and of those, only 43% (24) of the ECHRs discussed the similarity.

Finally, in assessing ECHR narratives, the monitoring team considered the quality of information provided in the narrative on findings of abuse, neglect, or corporal punishment, potential risk to child safety, and steps taken during inspection to mitigate and/or identify risk to child safety. Nearly 40% of ECHR narratives reviewed by the monitoring team between September 1, 2020 and October 31, 2020 were found to be of poor quality overall.

*State Case Record Review on Extended Compliance History Reviews*

HHSC provided the Monitors a case record review on compliance with ECHRs. The State's case record review sampled both investigation inspections and monitoring inspections

261

between September 15, 2020 and October 31, 2020 and included a sample size of 33.[528] The findings of the State's case record review[529] are reflected in the table, below.

**Table 7.2: State Case Record Review on Extended Compliance History Reviews**

| Case record review questions | % Responding "Yes" |
|---|---|
| Staff entered the correct data in the following field in CLASS:<br><br>• ANE Intakes<br><br>• ANE Findings<br><br>• Corporal Punishment Citations | ANE Intakes – 89%<br><br>ANE Findings – 97%<br><br>Corporal Punishment Citations – 94% |
| If staff included a reference to the number of ANE intakes, ANE findings, and/or corporal punishment citations in the narrative field, was the data correct? | **Overall – 96%**<br><br>CPA – 100%<br><br>GRO – 90% |
| The steps taken to mitigate risk were in line with the assessment. | **Overall – 86%**<br><br>CPA – 95%<br><br>GRO – 73% |

ii. **Validation of Requirements Related to Reporting Abuse or Neglect**

The first analysis utilized was to review the monthly deficiencies data provided by the State including deficiencies cited in investigations, inspections, and assessments. The six standards identified as Failure to Report abuse or neglect include:

- 748.303(a)(3)(A), related to a GROs obligation to report allegations of abuse, neglect, or exploitation;
- 748.303(a)(4)(A) related to a GROs obligation to report allegations of physical abuse committed by a child against another child;
- 748.303(a)(5)(A) related to a GROs obligation to report allegations of sexual abuse committed by a child against another child;
- 749.503(a)(3)(A) related to a CPAs obligation to report allegations of abuse, neglect, or exploitation;

---

[528] An additional 2 cases were read initially by the PMU team for consistency and case reading criteria validation. PMU Case Reading Special Request - RC Extended Compliance History Review 2 (on file with Monitors).
[529] PMU Case Reading Special Request Summary of Findings.

- 749.503(a)(4)(A) related to a CPAs obligation to report allegations of physical abuse committed by a child against another child;
- 749.503(a)(5)(A) related to a CPAs obligation to report allegations of sexual abuse committed by a child against another child.

Citations for Failure to Report Abuse or Neglect make up a small proportion of overall deficiencies cited, 0.8% or 29 out of a total of 3,669 citations issued during the period of March 2020 through October 2020.[530]  Deficiencies for Failure to Report abuse or neglect were steady throughout the period with an average of 4 citations a month.[531]

Slightly more than half of citations, 15 of 29, were issued in connection with an abuse or neglect investigation, while 12 of 29 were issued in connection with a non-abuse or neglect investigation.  One Failure to Report citation was issued in connection with a monitoring inspection, and one was issued in connection with an assessment.

- 41% of the deficiencies cited for Failure to Report abuse or neglect, or 12 of 29, occurred in CPA operations while the remainder were split between GROs (9 of 29) and RTCs (8 of 29).

- Regarding the standards cited, both CPAs and RTCs had a majority of their Failure to Report citations around findings of abuse, neglect or exploitation (nine of 12 and six of eight, respectively), while a majority of the Failure to Report citations for GROs concerned findings of sexual abuse (five of nine).

- 26 operations accounted for the 29 deficiencies cited for Failure to Report during the time period.

    o 38% or ten of the 26 operations are currently on Heightened Monitoring.[532]

    o Three operations had two deficiencies cited during the period.[533]

    o 13 operations had a Failure to Report deficiency cited during the prior past five years.

---

[530] Deficiencies cited include waived, upheld, and pending administrative review.
[531] RCCR suspended all on-site inspections, with the exception of those related to abuse or neglect findings investigations, between April 3 and June 11, 2020 due to the COVID-19 outbreak.
[532] Operations cited as of April 14, 2021 on Heightened Monitoring: A World for Children, Benchmark Family Services, The Grandberry Intervention Foundation, Inc, Children's Shelter, Connections Inc Emergency Shelter, Fred and Mabel R Parks Youth Ranch, Freedom Place, Promise House, A Fresh Start Treatment Center, Texas Hill Country School. An additional three operations cited were placed on Heightened Monitoring but as of January 4, 2021 no longer had a contract with DFPS: Whataburger Center, Prairie Harbor LLC, and Hearts with Hope Foundation
[533] Operations with two deficiencies:  Benchmark Family Services, Presbyterian Children's Home and Services, and Promise House.

**Figure 7.4: Number of Prior Failure to Report Deficiencies Between 9/30/2014 and 2/29/2020 for Operations with a Failure to Report Deficiency Between March 1, 2020 and October 31, 2020**



The second analysis completed by the Monitors was a comparison of the following three sources of data:

- deficiencies data associated with RCCR inspections, investigations and assessments provided to the Monitors monthly by HHSC;
- the HHSC report, submitted to the Monitors monthly, including only deficiencies cited for Failure to Report abuse or neglect; and
- the DFPS report, provided monthly to the Monitors, including the failure to report notification (i.e., citations issued) DFPS receives from HHSC.

The number of citations for failure to report abuse or neglect varied across the different deficiencies data reported to the Monitors.

**Figure 7.5: Number of Failure to Report ANE Deficiencies Cited Between March 1, 2020 and October 31, 2020 by Data Source**



- Sixteen citations for Failure to Report abuse or neglect were found in all three data sources.
- Three citations were found in both the deficiencies data and the HHSC report that were not found in the DFPS report.
- One citation was found in the DFPS and the HHSC reports that were not found in the deficiencies data.[534]

Citations included in the HHSC reports appear to be limited to the abuse or neglect standards and exclude those specifically related to physical or sexual abuse.

---

[534] This deficiency was later overturned following administrative review.

**Figure 7.6: Citations for Failure to Report ANE in Deficiencies Data**
Source: Deficiencies Data and HHSC Report on Failure to Report Deficiencies Cited
*n=29*



## Summary

While HHSC has made improvement ensuring ECHRs are reviewed prior to or on the day of the inspection and has created a consistent method for staff to document the ECHRs in CLASS, improvement remains necessary in the documentation of trends and patterns, as well as in the quality of how the information was considered during the inspection. The Monitors' first case review revealed that only 44% of cases reviewed had an ECHR containing all of the required components.

While the Monitors' third and fourth case record reviews showed that the changes to CLASS dramatically improved ECHR completion rates, the quality of the narratives discussing abuse or neglect and corporal punishment findings declined: in cases reviewed between September 1, 2020 and October 31, 2020, 38% of ECHRs did not include a discussion of the abuse or neglect findings in the narrative and 42% did not include a discussion of the corporal punishment findings, compared to 32% of ECHRs that did not include a discussion of abuse or neglect findings and 31% that did not include a discussion of corporal punishment findings in cases reviewed between March 1, 2020 and August 31, 2020. Similarly, though 70% of cases included in the review revealed a pattern or trend in abuse or neglect intakes or substantiated findings, or corporal punishment findings, only half of those ECHRs discussed the pattern or trend in the narrative. The case review also revealed a gap found in applying the ECHR to foster homes: often the data and the narrative were reflective of the CPA and not the foster home where an investigation was occurring.

When comparing the three sources of data for Failure to Report, the number of citations for failure to report abuse or neglect varied across deficiencies data. Citations included in the

HHSC reports appear to be limited to the abuse or neglect standards found in Title 26 of the Texas Administrative Code §§748.303 (a)(3)(A) and 749.503(a)(3)(A)(which require a report of allegations of abuse, neglect, or exploitation) and seem to exclude those specifically related to child-on-child physical or sexual abuse, found Title 26 of the Texas Administrative Code §§748.303(a)(4)(A) and 749.503(a)(4)(a) (which both relate to reporting an incident of physical abuse of a child against another child) and §§748.303(a)(5)(A) and 749.503(a)(5)(A)(which relate to reporting an incident of sexual abuse of a child against another child) . The Monitors could not find an explanation for this variation.

**B.    Remedial Orders 12-19: Timeliness of Minimum Standards Investigations**

**1.    Remedial Orders 12 through 19: Timeliness of Minimum Standards Investigations**

Remedial Order 12: *Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

Remedial Order 13: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

Remedial Order 14: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

Remedial Order 15: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

Remedial Order 16: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

Remedial Order 17: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

Remedial Order 18: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

**Remedial Order 19:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

a.   **Background**

HHSC is responsible for regulating child-care and child-placing operations in Texas and for creating and enforcing minimum standards. Each set of minimum standards is based on a particular chapter of the Health and Human Services title of the Texas Administrative Code; Title 26 Chapter 749 sets forth the minimum standards for CPAs, including those that serve PMC children.[535] The minimum standards establish basic requirements to protect the health and safety of children in care and are weighted by HHSC based on the agency's assessment of the risk that a violation of that standard presents to children. RCCR, as part of HHSC, is responsible for inspecting CPAs for compliance with these minimum standards and investigating reports of standards violations. These investigations by RCCR, ordinarily known as minimum standards investigations, are classified as Priority One, Two, Three, Four or Five.[536]

During the last reporting period, HHSC indicated to the Monitors its position that Remedial Orders 12 through 14 did not apply to minimum standards investigations.[537] While its policies were consistent with Remedial Order 14, the policies conflicted with Remedial Orders 12 and 13. As of November 1, 2020, HHSC has updated its policies to be consistent with Remedial Orders 12 and 13. HHSC policies now requires RCCR staff to initiate and make face-to-face contact with all identified victims within 24 hours of intake in Priority One investigations and within 72 hours in Priority Two investigations.[538] The policy change requires staff to document the date and time of each face-to-face contact with an alleged victim in Priority One and Two investigations at a residential operation.[539] The exceptions for making such contact with a victim outside of the required timeframe include if the alleged victim's whereabouts are unknown during the initiation timeframe; or "the alleged victim was identified after the required time frame to conduct face-to-face contact."[540] The previous policy for Priority One investigations did not require face-to-face contact, although initiation was required within 24 hours.[541] Similarly, in Priority Two investigations, initiation did not require face-to-face contact with all alleged child victims;

---

[535] *See generally* 26 TEX. ADMIN. CODE §§ 749.1 - 749.4267.

[536] *See generally* HHSC, *Child Care Licensing Policy and Procedures Handbook* § 6240 (2021) *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/6000-investigations#6240 (*Child Care Licensing Policy and Procedures*). More information about the definitions of the priorities is also included in the first Monitors' report to the Court. *See also* Deborah Fowler and Kevin Ryan, First Report 273, ECF No. 869.

[537] *See* Deborah Fowler and Kevin Ryan, First Report 274-275, ECF No. 869.

[538] DFPS, *RCCR Field Communication #294* (Jan. 29, 2021) (on file with the Monitors).

[539] *Id.*

[540] HHSC., *RCCR Field Communication #294* (Jan. 29, 2021) (on file with the Monitors). An investigation may be completed without making face-to-face contact with the victim only when the whereabouts of the victim were unknown during the entire course of the investigations; the alleged victim is deceased; or the alleged victim no longer lives in Texas. *Id.*

[541] *See* Deborah Fowler and Kevin Ryan, First Report 273-274, ECF No. 869.

268

moreover, the initiation time frame permitted five days between intake and initiation instead of 72 hours.[542] The current policies are now consistent with Remedial Orders 12 and 13.

> b.   **Monitors Data and Information Request and Production**
> i.   **Monitors Data and Information Request**

To validate the State's performance with respect to Remedial Orders 12 through 19, the Monitors requested from the State key data points for all investigations conducted by RCCR regarding any child in the PMC General Class on a quarterly (now monthly) basis.[543]

> ii.   **DFPS Data and Information Production**

HHSC produced data files for RCCR investigations on the Monitors' requested timeline. HHSC cannot distinguish between PMC and non-PMC child-related investigations in its data production; therefore, the data does not include the PMC child identifier(s) linked to the referrals or investigations as requested by the Monitors and rather include all investigations for the time period contained in the report.[544] HHSC also stated that it could not provide the following requested data fields as to RCCR investigations:

- the time of the first face-to-face contact with an alleged victim, noting any and all untimely face-to-face contacts and the reason for any approved extensions to the face-to-face contact timeframe;
- the relationship(s) of the alleged perpetrator(s) to the alleged child-victim(s);
- the date the completed investigation was submitted to the supervisor for approval;
- the date the supervisor approved the investigation;
- the disposition of each allegation; the overall disposition of the investigation; and
- the date of any notification letters to parents.[545]

---

[542] *See* Deborah Fowler and Kevin Ryan, First Report 273-27, ECF No. 869.

[543] *Monitors' Data and Information Request* (Sept. 30, 2019) (on file with the Monitors). The Monitors requested certain identifying information to support validation, including: Intake stage ID number; Investigation stage ID number; Person ID (for all alleged PMC victims); County where maltreatment is alleged; Most recent investigator name and ID; Date and time investigation stage started; Program conducting investigation; Child's placement type at intake; Placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; the relationships of the alleged perpetrator(s) to the child-victims. *Id.*

[544] According to HHSC: "[t]he agency is operations-centric not child centric. CLASS does not contain the PMC identifier of children involved in a referral [or investigation]; the PMC identifier is only associated with referrals of abuse or neglect in IMPACT." *Memorandum from Tex. Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors*, at 5-6 (Dec. 6, 2019) (on file with the Monitors) (responding to the Monitors' Sept. 30, 2019 Data and Information Request). *See also*, Deborah Fowler and Kevin Ryan, First Report 275, ECF No. 869.

[545] *Id.*

In addition, consistent with the prior reporting period, HHSC did not provide the date and time of face-to-face contact with all alleged child victims in cases that involve multiple alleged victims; rather, it provided only the first face-to-face contact date with an alleged child victim in cases where such contact occurred.[546] As of December 2020, HHSC began to provide an additional monthly report starting with cases initiated as of November 1, 2020. The report includes case reviews by HHSC of its Priority One and Two investigations, reporting on timely face-to-face contact performance. Those data will be reviewed in the next reporting period. Finally, in this reporting period, HHSC added a data field to indicate which investigations did not require notification to the reporter consistent with its policy.[547]

c.     **Remedial Orders 12 through 19 Performance Validation (HHSC)**

i.     **Methodology**

To validate the timeliness of the State's performance associated with Remedial Orders 12 through 19, the Monitors assessed all 2,225 completed minimum standards investigations with an intake date between April 1, 2020 through September 30, 2020. Because HHSC reported it does not have the capacity to distinguish which investigations involve PMC children and instead produced to the Monitors all of its minimum standards investigations in the period, the Monitors evaluated all RCCR investigations included in the data HHSC produced with intake dates between April 1 through September 30, 2020.[548] The investigations fell into the priority levels described in Table 7.3 below.

- Remedial Order 12: To measure timeliness of HHSC's face-to-face contact with alleged child victims in Priority One investigations, the Monitors calculated performance using the data fields for intake date and "first face-to-face contact with victim date." The "face-to-face contact with victim date" provided by HHSC includes only a date, not a time-of-day timestamp. The Monitors used a standard of one calendar day to approximate performance. The calculation is based upon the intake date and the date of the first face-to-face contact with the child victim.

- Remedial Order 13: To measure timeliness of HHSC's face-to-face contact with alleged child victims in Priority Two investigations, the Monitors calculated performance using the data fields for intake date and "first face-to-face contact with victim date." The "face-to-face contact with victim date" provided by HHSC includes only a date, not a time-of-day timestamp. The Monitors used a standard of three calendar days to approximate performance. The calculation is based upon the intake date and the date of the first face-to-face contact with the child victim.

---

[546] *See* Deborah Fowler and Kevin Ryan, First Report 276. ECF No. 869.
[547] HHSC, *Child Care Licensing Policy and Procedures Handbook* § 6640 (2021) *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/6000-investigations#6640.
[548] The data file used for this analysis was a listing of all non-abuse neglect investigations completed between December 1, 2019 to December 31, 2020. HHSC AR TX 229 RO.15-19.2 12.01.2019-12.31.2020 RCCL.Inspec 1.14.2021.xlsx (on file with the Monitors).

- Remedial Order 14: To measure timely completion of Priority One and Priority Two investigations, the Monitors calculated performance using the intake date and the date the investigation was completed.

- Remedial Order 15: To measure timely completion of Priority Three, Priority Four, and Priority Five investigations, the Monitors calculated performance using the intake date and the date the investigation was completed.

- Remedial Order 16: To measure timeliness of completing and submitting documentation in Priority One and Priority Two investigations, the Monitors calculated performance using the date the investigation was completed and the date documentation was completed.

- Remedial Order 17: To measure timeliness of completing and submitting documentation in Priority Three, Priority Four, and Priority Five investigations, the Monitors calculated performance using the intake date and the date the documentation was completed.

- Remedial Order 18: To measure timeliness of mailing notification letters to the referents and providers in Priority One and Two investigations, the Monitors calculated performance using the date the investigation was completed; the date of notification to the reporter; whether notification to the reporter was required;[549] and the date of notification to the provider. To be compliant with this Order, HHSC must have notified both the referent and the provider within five days of completing the investigation. If either the referent or the provider was notified more than five days after the investigation was completed or was not notified at all, the notification was counted as untimely.

- Remedial Order 19: To measure timeliness of mailing notification letters to referents and providers in Priority Three, Priority Four, and Priority Five investigations, the Monitors calculated performance using the data fields for intake date; date of notification to reporter; whether notification to the reporter was required; and date of notification to provider. To be compliant, HHSC must have notified both the referent and the provider within sixty days of the intake date. If either the referent or the provider was notified after more than sixty days or were not notified at all, the notification was counted as untimely. Where HHSC left data cells in the date of notification fields empty, the Monitors assumed that notification had not occurred when calculating performance.

---

[549] Pursuant to the Texas Health and Human Services Commission Child Care Licensing Policies and Procedures Handbook, §6640, there are five exceptions to referent notification: "the reporter has indicated that he or she does not want to be notified; there is a reasonable likelihood that notifying the reporter will jeopardize the reporter's safety; the reporter is the person in charge, director, administrator, applicant, permit holder, head of governing body or designee and will receive notice in another capacity; the intake is identified as a *Self Report* on the *Intake Report* page and the *Investigation Main* page; or the reporter is anonymous." HHSC, *Child Care Licensing Policy and Procedures Handbook* § 6640 (2021) *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/6000-investigations#6640.

271

**Table 7.3: Priority of RCCR Investigations**

| RCCR Investigations, April 1 to September 30, 2020 Source: HHSC RO12-RO19 data | | |
|---|---|---|
| Priority | Number | Percent |
| Priority One | 2 | 0.1% |
| Priority Two | 406 | 18.2% |
| Priority Three | 1,288 | 57.9% |
| Priority Four | 10 | 0.4% |
| Priority Five | 519 | 23.3% |
| **Total** | **2,225** | **100%** |

ii.    **Remedial Order 12: Timeliness of Observations or Interviews with Alleged Child Victims in Priority One Investigations**

*Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

HHSC reported two Priority One investigations with intake dates between April 1 and September 30, 2020. HHSC's data submissions did not include time stamps for face-to-face contact with the victims in Priority One investigations; therefore, the monitoring team used calendar days to approximate performance with Remedial Order 12 with the data available.[550] Using this methodology, the data confirm that 50% (1) of the Priority One investigations included first face-to-fact contact with an alleged child victim within 24 hours of intake.

The data field provided by HHSC for the first face-to-face contact with an alleged child victim was available for one of the two investigations; in that investigation, the contact was completed within 24 hours of intake.[551] In the second Priority One investigation, the data did not indicate whether or not face-to-face contact was made with an alleged child victim and the data field was blank.[552]

---

[550] For example, if the intake date was August 1, 2020, and the face-to-face contact with victim date was August 4, 2020, the Monitors calculate three days between intake and initiation.

[551] The Monitors also conducted a case record review and confirmed that the child was seen within twenty-four hours; additionally, the Monitors confirmed that the alleged victim was a child with PMC status.

[552] The Monitors conducted a case record review and confirmed that face-to-face contact did not occur with an alleged child victim within twenty-four hours due to the child's runaway status; that child was in TMC status. In the Monitors' first report, there was only one Priority One investigation and it was related to a child fatality. Deborah Fowler and Kevin Ryan, First Report 278, ECF No. 869.

### iii. Remedial Order 13: Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

HHSC reported 406 Priority Two investigations with an intake date between April 1, 2020 and September 30, 2020. HHSC's data submissions did not include time stamps for face-to-face contact with the victims in Priority Two investigations; therefore, the monitoring team used calendar days to approximate performance for Remedial Order 13. Using this methodology, 41% (167) of investigations included first face-to-face contact with an alleged child victim within three days of intake; 26% (106) of investigations did not conduct face-to-face contacts within three days; and data were not available for 33% (133) of investigations. The rate of first face-to-face contact within three days declined from the rate in the Monitors' first report (59%) due to low rates in the first months of the pandemic.[553]

**Figure 7.7: Timeliness of Face-to-Face Contact with Alleged Child Victims in Priority Two HHSC Investigations**



---

[553] *See* Deborah Fowler and Kevin Ryan, First Report  279, ECF No. 869.

iv.     **Remedial Order 14: Completion of Priority One and Two Investigations within 30 Days**

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

　　　HHSC reported 408 Priority One (2) and Priority Two (406) investigations with an intake date between April 1, 2020 and September 30, 2020. During this period, HHSC completed 96% (392) of investigations within 30 days of intake. HHSC's rate of completing Priority One and Priority Two minimum standards investigations within 30 days was nearly the same as the rate in the Monitors' first report (95%).[554]

**Figure 7.8: Completion of Priority One and Two Investigations within 30 Days**



v.      **Remedial Order 15: Completion of Priority Three, Four, and Five Investigations within 60 Days of Intake**

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

---

[554] *See* Deborah Fowler and Kevin Ryan, First Report 280, ECF No. 869.

HHSC reported 1,817 Priority Three, Four, and Five minimum standards investigations with an intake date between April 1, 2020 and September 30, 2020. The priorities assigned to these investigations are as follows: Priority Three (1,288); Priority Four (10); and Priority Five (519) investigations. During this period, HHSC's performance improved by completing 98% (1,786) of investigations within 60 days of intake. HHSC's rate of completing Priority Three, Four, and Five minimum standards investigations within 60 days in the Monitors' first report was 96%.[555]

---

[555] *See* Deborah Fowler and Kevin Ryan, First Report at 280, ECF No. 869.

**Figure 7.9: Completion of Priority Three, Four, and Five Investigations within 60 Days of Intake**



Source: HHSC Investigations April - September 2020
*n=1,817 Priorty Three, Four, and Five Investigations*

vi.      **Remedial Order 16: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations**

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

HHSC reported 408 completed Priority One (2) and Priority Two (406) completed investigations with an intake date between April 1, 2020 and September 30, 2020. During this period, in 93% (381) of the investigations, the documentation was completed on the same day the investigation was completed. HHSC's rate of completing documentation on the same day the investigation was completed in Priority One and Priority Two investigations was close to the rate in the Monitors' First Report (96%).[556]

---

[556] *See* Deborah Fowler and Kevin Ryan, First Report 282, ECF No. 869.

**Figure 7.10**
**Priority One and Two RCCR Investigations Completed**



vii.    **Remedial Order 17: Completion and Submission of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations**

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

HHSC reported completion of 1,817 Priority Three (1,288), Priority Four (10), and Priority Five (519) investigations with intake dates between April 1, 2020 and September 30, 2020. During this period, HHSC completed documentation within 60 days of the intake date in 97% (1,765) of the investigations. HHSC's rate of completing documentation on the same day the investigation was completed in Priority Three, Priority Four, and Priority Five investigations was nearly the same as the rate in the Monitors' First Report (96%).[557]

---

[557] *See* Deborah Fowler and Kevin Ryan, First Report 283, ECF No. 869.

**Figure 7.11: Completion and Submission of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations**



viii.     **Remedial Order 18: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations**

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

HHSC reported completion of 408 Priority One (2) and Two (406) minimum standards investigations with intake dates between April 1, 2020 and September 30, 2020. Of those 408 investigations, 93% (380) of investigations included notification to the referent (or the

referent was anonymous);[558] and notification to the provider was within five days of completion of the minimum standards investigation.[559] HHSC's reported rate of notifying the referent and provider within five days of completion of Priority One and Priority Two minimum standards investigations was higher than the rate in the Monitors' First Report (77%);[560] previously, HHSC did not report data indicating which investigations did not require notification to the reporter.

**Figure 7.12: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations**



ix.     **Remedial Order 19: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and Five Investigations**

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

---

[558] The data showed that no letter was required in 35% (142) of Priority One and Two investigations.
[559] In one Priority Two investigation, the notification to the referent was documented as sent before the investigation was closed. This investigation was counted as non-compliant.
[560] *See* Deborah Fowler and Kevin Ryan, First Report 284, ECF No. 869.

HHSC reported completion of 1,817 Priority Three (1,288), Priority Four (10), and Priority Five (519) investigations with intake dates between April 1, 2020 and September 30, 2020. Of the 1,817 investigations, 96% (1,753) of investigations included notification to the referent (or no letter to the referent was required);[561] and to the provider within 60 days of intake. HHSC's rate of notifying the referent when required and the provider within 60 days of intake of Priority Three, Priority Four, and Priority Five investigations was higher than the rate in the Monitors' First Report (79%).[562] Previously, HHSC did not report data identifying investigations that did not require notification to the reporter.

**Figure 7.13: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and Five Investigations**



Source: HHSC Investigations April - September 2020
*n=1,817 Priorty Three, Four, and Five Investigations*

## C.      Remedial Order 20: Heightened Monitoring

Remedial Order 20: *Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations.  Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions, and as, as appropriate, other remedial actions under DFPS' enforcement framework.*

###       a.      **Background**

---

[561] In 34% (619) of Priority Three, Four, and Five investigations, the data reported that notification was not required.
[562] *See* Deborah Fowler and Kevin Ryan, *First Report* 285, ECF No. 869.

i.      **First Court Monitors' Report Performance Validation Findings**

The State was not required to produce its list of operations identified for Heightened Monitoring until June 5, 2020, just eleven days before the Monitors filed the First Report with the Court. The First Report therefore reviewed the GROs and CPAs with the highest RTB and minimum standard deficiency rates and detailed the lack of effective oversight and enforcement by DFPS and HHSC for troubled facilities but did not include a validation of the State's implementation of Heightened Monitoring.

ii.     **Updates and Policy Changes Following the First Report**

a.      The State's List of Placements Subject to Heightened Monitoring & Request to Implement in Phases

The State sent the Monitors the list of 98 operations it identified as subject to Heightened Monitoring on June 5, 2020, along with a "triage proposal" to implement Heightened Monitoring in three phases, arguing that the State lacked the capacity to immediately implement Heightened Monitoring for the full list of operations.[563] The State proposed using a "risk stratification" analysis to determine which operations would be prioritized for the first and second phases of implementation.[564] The State's proposal suggested immediately placing nine operations on Heightened Monitoring during Phase One of implementation, then placing ten facilities with the next highest risk scores on Heightened Monitoring "by the end of the calendar year."[565] The State proposed placing the remaining facilities on Heightened Monitoring "no later than Spring 2022."[566]

After conferring with the Court, on June 17, 2020, the Monitors asked the State to make application directly to the Court to request implementation of Heightened Monitoring in phases, and asked the State to file with the Monitors or the Court the steps it had taken to secure the additional funding needed to fully implement Heightened Monitoring.[567] On June 19, 2020, the State filed its response to the Court's request for information, describing its attempts to obtain the

---

[563] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *List and Triage Proposal* (June 5, 2020) (on file with Monitors); DFPS, *HM List – Risk Stratification Steps* (undated) (attached to June 5, 2020 e-mail) (on file with Monitors); Letter from Audrey Carmical to Deborah Fowler and Kevin Ryan, *proposal for a staged roll out of Heightened Monitoring* (undated) (attached to June 5, 2020 e-mail) (on file with Monitors). *See also* The Court Monitors' Update to the Court Regarding the State's COVID-19 Response and Implementation of the Court's Order Regarding Heightened Monitoring (September 2, 2020), ECF No. 955.
[564] DFPS, HM List – Risk Stratification Steps, *supra* note 561.
[565] Letter from Audrey Carmical to Deborah Fowler and Kevin Ryan, *supra* note 561.
[566] *Id*.
[567] *See* The Court Monitors' Update to the Court Regarding the State's COVID-19 Response and Implementation of the Court's Order Regarding Heightened Monitoring, *supra* note 561, at 26.

funding needed to fully implement Heightened Monitoring.[568]  On June 26, 2020, the State filed a Motion to Modify the Court's March 18, 2020 Order regarding Heightened Monitoring.[569]  In its motion, the State requested that the Court modify the March 18, 2020 Order to allow it to have until January 1, 2021 to fully implement Heightened Monitoring for the 98 operations identified by the State on June 5, 2020.[570]  On August 13, 2020, the parties submitted an agreed order to the Court, indicating that the Plaintiffs were not opposed to the relief requested in the State's motion.[571]  On August 31, 2020, the Court entered an order granting the State's motion, giving the State until January 1, 2021 to fully implement Heightened Monitoring for all the operations identified.[572]

The Monitors completed the pattern analysis to validate the State's list of operations subject to Heightened Monitoring, and the State agreed to add several GROs identified by the Monitors based on the Court-approved formula.[573]  The State also agreed to eliminate some elements of the risk stratification analysis that the Monitors assessed did not take into account children's safety needs.[574]

On December 11, 2020, the State filed a notice with the Court indicating that, due to a coding error, the foster care home count the State used to complete the "pattern" analysis for CPAs "caused an overcount of some and an undercount of others."[575]  According to the notice, the new count resulted in a "change in status" for approximately nine operations.[576]  The State also noted that it made changes to the list of operations qualifying for Heightened Monitoring in keeping with the Monitors' validated list.[577]  On December 14, 2020, the State sent an e-mail to the Monitors with the revised list of CPAs required to be placed under Heightened Monitoring; the list added two CPAs, based on the corrected analysis, and removed seven CPAs from the list.[578]  The Monitors subsequently validated the corrected list, and the operations were notified.[579]

---

[568] Defendants' Response to Court's Request for Information and Advisory Regarding Implementation of Heightened Monitoring, June 19, 2020, ECF. No. 898.

[569] Defendants' Advisory Regarding Compliance with Heightened Monitoring Requirements and Motion to Modify Order, June 26, 2020, ECF No. 900.

[570] Id.

[571] Submission of Agreed Order, August 13, 2020, ECF No. 942.

[572] Order Granting Defendants' Motion to Modify (August 31, 2020), ECF. No. 950.  The order also allowed the State to compile documentation related to heightened monitoring using a manual process until CLASS could be modified to allow for electronic entries.  Id.

[573] The Court Monitors' Update to the Court, *supra* note 256, at 27.

[574] Id. at 27-28.

[575] Defendants' Verified Notice Regarding Proposed Amendment to List of Operations Subject to Heightened Monitoring, December 11, 2020, ECF No. 1014.  The State had notified the Monitors of the error prior to filing the notice to the Court.

[576] Id. at 2.

[577] Id.

[578] E-mail from Tiffany Roper, General Counsel, DFPS to Deborah Fowler and Kevin Ryan, *Revised CPA report for Heightened Monitoring*, December 11, 2020 (on file with Monitors).

[579] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Heightened Monitoring Follow Up*, March 11, 2020 (on file with Monitors) (indicating that the monitoring team verbally notified the State of its validation of the list during a videoconference meeting).

*b.*      The State's Request to Modify the Court's Order Regarding Placement Approval

On October 25, 2020, DFPS sent an e-mail to the Monitors describing the challenges associated with the requirement that the Associate Commissioner of CPS approve placements for operations on Heightened Monitoring.[580]  DFPS proposed that Regional Directors, rather than the Associate Commissioner, approve placements.[581]  The agency also proposed that "the Heightened Monitoring team have the discretion to allow placements without review into branches of CPAs that have not had a pattern of poor performance."[582]

The Monitors responded with several questions related to the ability of Regional Directors to document in IMPACT their review of the operation's history, and justification for approval, as part of the approval process.[583]  The Monitors also asked how many CPAs would be affected by the proposed change related to placement approvals for CPA branches.[584]  DFPS confirmed that the documentation proposed by the Monitors could be included in the Regional Directors' approval. [585]  In response to the Monitors' question related to CPA branches, DFPS said that it was "still in the process of considering as we review the data and look at specific issues for various branches.  In that vein, we would like to propose working with the monitoring team to look at parameters around this distinction and in the meantime would not apply the distinction or seek the modification."[586]

---

[580] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Heightened Monitoring – Associate Commissioner Approval* (October 25, 2020) (on file with Monitors).

[581] *Id.*

[582] *Id.*

[583] E-mail from Deborah Fowler and Kevin Ryan to Audrey Carmical, re: Heightened Monitoring – Associate Commissioner Approvals (October 26, 2020) (on file with Monitors).

[584] *Id.*

[585] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, re: Heightened Monitoring – Associate Commissioner Approvals (November 9, 2020) (on file with Monitors). The State also described the existing process for approving placements, "We notify caseworkers if a prospective placement is on heightened monitoring. Caseworkers alerted that a youth on their workload is in a facility on Heightened Monitoring must document the notification email in IMPACT as a contact.  Caseworkers of children placed in an operation on Heightened Monitoring enter the notification into IMPACT as a contact in the FSU or SUB stage.  For new placements, the caseworker documents the Associate Commissioner's approval in the placement section of IMPACT. The Associate Commissioner for CPS must approve all placements into an operation on heightened monitoring before placing a child.  The State Office Placement Team will coordinate and notify the caseworker or SSCC designee upon approval." According to policy adopted by DFPS in October 2020, when a placement in an operation on Heightened Monitoring was being proposed, the Regional Placement Team requested approval by sending an e-mail that included the child's name, age, and identification number, their common application, the placement name, the date the placement was needed, any court orders regarding placement, and a statement outlining why it was in the child's best interest to be placed at the operation to the "DFPS HM Placement Approval mailbox."  DFPS, CPS Handbook §4211.2 (October 2020).  The policy also required the caseworker to document the associate commissioner's approval or denial in IMPACT in the child's placement detail under the "Appropriateness of Placement" question in the Discussion tab. *Id.*

[586] *Id.*

The Monitors responded, asking for clarification related to the process SSCCs follow when placing children into operations under Heightened Monitoring.[587]   DFPS indicated, "although the SSCCs are generally authorized to make placement decisions independently of DFPS in Stage II, there are requirements that still apply to them when they stand in our shoes.  In this instance, given the Court's order, the requirement regarding associate commissioner approval is in place with respect to SSCC placements in operations on HM as it is with DFPS placements."[588]  After conferring with the Court, the Monitors advised the State to include in any motion to modify the Court's order the language related to documenting justifications for approval in IMPACT.[589]

On December 4, 2020, the parties filed a joint motion to modify the Court's order regarding Heightened Monitoring.[590] On December 7, 2020, the Court entered an order granting the parties' motion, and ordering:

> Direct approval for placement of a PMC child into a facility on Heightened Monitoring will be done by the Regional Director, including placements made by the Single Source Continuum Contractor.  Approval will be made by the Regional Director for that child's legal county unless the Regional Director is unavailable. Should the Regional Director be unavailable, the placement may be approved by the CPS Director of Field or the CPS Associate Commissioner.

> Before approving a PMC child's placement into a facility on Heightened Monitoring, the Regional Director must consider all required elements as set forth in applicable DFPS policy, including but not limited to reviewing the facility's history over the previous five years. If the Regional Director approves the placement, he or she will personally document approval of the placement in the comment box within the placement section of IMPACT, will confirm that the facility's history was reviewed and considered for the past five years, and will document the justification for the approval, which will constitute certification that the Regional Director approved the placement and followed the required DFPS policy.

> Caseworkers are to receive notification from DFPS if a prospective placement is on Heightened Monitoring, and caseworkers will ensure those email notifications are documented in IMPACT as a contact.

---

[587] E-mail from Deborah Fowler and Kevin Ryan to Audrey Carmical, *Heightened Monitoring – Associate Commissioner Approval* s (November 9, 2020) (on file with Monitors).
[588] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Heightened Monitoring – Associate Commissioner Approvals* (November 9, 2020) (on file with Monitors).
[589] E-mail from Deborah Fowler and Kevin Ryan to Audrey Carmical, *Heightened Monitoring – Associate Commissioner Approvals* (November 16, 2020) (on file with Monitors).
[590] Joint Motion to Modify Order Regarding Heightened Monitoring, December 4, 2020, ECF No. 1011.

If a child is placed in an operation on Heightened Monitoring, that child's caseworker will enter the notification of that placement into IMPACT as a contact in the FSU or SUB stage.[591]

### b.    Data and Information Requests and State's Production

On November 12, 2020,[592] the Monitors requested any and all documentation and data utilized and/or created as part of the Heightened Monitoring process to include, but not limited to:

- Any documentation and/or data used in the development and update of Heightened Monitoring plans, contractual obligations (to include base contracts), decision making processes, and/or risk analysis;

- Any documentation and/or data used to monitor and track operation progress and compliance with Heightened Monitoring including all monitoring and tracking tools;

- A listing of all reportable qualitative data elements associated with Heightened Monitoring;

- Any documentation and/or data related to operation reporting and the evaluation of an operation during and at the close of Heightened Monitoring.

The Monitors also requested that all information for each operation be provided in a designated "folder" which would be updated monthly and that data related to Heightened Monitoring be provided in a specific data folder.  Lastly, the Monitors requested that all files related to the Heightened Monitoring process, policies and procedures, trainings, organizational charts, points of contact, and FITS staffings and Heightened Monitoring team meetings covering multiple operations be provided in a Heightened Monitoring General folder.  The State notified the Monitors that the requested Heightened Monitoring documents had been provided on December 2, 2020.[593]

The Monitors also requested additional data related to Heightened Monitoring in the November 16, 2020 supplemental data request. Beginning on December 15, 2020 and monthly or quarterly thereafter, the Monitors requested from DFPS all policy violations, complaints and all contract violations identified as part of the Heightened Monitoring process and from HHSC all inspections and assessments conducted and all deficiencies cited as part of the Heightened Monitoring process.

---

[591] Order Modifying Order Regarding Heightened Monitoring, December 7, 2020, ECF No. 1012.  The State amended its policy in the CPS Handbook related to placements to reflect these changes in April 2021.  DFPS, CPS Handbook §4211.6 (April 2021).

[592] Email from Linda Brooke to Audrey Carmical, *Heightened Monitoring* (November 15, 2020) (on file with the Monitors).

[593] Email from Heather Bugg to Linda Brooke, *Heightened monitoring* (December 2, 2020) (on file with the monitors).

c. **Remedial Order 20 Performance Validation**

i. **Methodology**

To validate the State's performance with respect to Remedial Order 20, the monitoring team reviewed Heightened Monitoring documents and analyzed monthly RCCI investigations, RCCR non-ANE investigations, RCCR inspections, and deficiency data submissions from DFPS and HHSC. To ensure the completeness of data used in the analysis, the monitoring team also collected data related to Heightened Monitoring visits and ANE investigations from the CLASS system.

The Monitors focused the analysis on those operations that began Heightened Monitoring between June and September, 2020 and were still active as of January 15, 2021. This included eight operations identified as presenting the most risk of harm for children and designated as "Phase One" by the State.[594] Each operation's progress under Heightened Monitoring was tracked through December 31, 2020. Analysis included a review of the following for each operation: history of violations; trends and problems as identified by the State; Heightened Monitoring Plans and Plan tasks; Heightened Monitoring visit documentation; placement authorization requests; investigations, inspections, and deficiencies before and after commencement of Heightened Monitoring; and requests for variances after beginning Heightened Monitoring.

The monitoring team undertook two case record reviews to validate placement approvals for children sent to Phase One operations under Heightened Monitoring.[595]

---

[594] Originally there were nine Phase One operations, but Whataburger Center closed on January 4, 2021, prior to the Monitors' analysis of Heightened Monitoring. The State proposed a phased in approach to heightened monitoring using the stratified risk score developed by DFPS to identify those operations that posed the greatest risk to children.

[595] For the first case record review, the monitoring team used all placement requests uploaded by the State to the shared electronic database between June and December 2020 as the primary data source. Placement requests provided by the State were PDFs of emails between caseworkers, the DFPS placement authorization "mailbox," and DFPS staff coordinating and approving placements. Emails did not always provide complete information. The monitoring team then used the child's personal identification number (PID) to match the requests to a list of children selected by the Monitors from the DFPS data warehouse, and to PMC placement data. As discussed in the Data and Technology Section of this report, the PMC child placement data has limitations including, at times, gaps in updated placement dates. This could result in slight discrepancies in the number of PMC children placed in a given month. The children's PID numbers were then searched in IMPACT to retrieve the children's electronic case records to identify placements made and any discrepancies between the documentation. The analysis included: a) PMC/TMC status of children for whom placement requests were made; b) number of requests associated with a placement found in IMPACT; c) number of requests that were approved according to court requirements; d) documentation of approval in IMPACT; e) request timing and content. In the second case record review, the monitoring team used PMC placement data as the primary data source, and matched the data to placement requests using the children's PIDs. Children's PID numbers that did not match to a placement request were then searched in IMPACT, and the children's electronic case records were reviewed to determine whether the placement was approved according to the Court's requirements. The analysis included: a) total number of placements post-Heightened Monitoring; b) number/percent of total placements that were approved according to Court requirements; and c) average number of placements per month prior to and following placement on Heightened Monitoring.

ii.    **Performance Validation Results**

a.    Overview of Operations Identified for Heightened
Monitoring in 2020

A total of 97 operations with an active DFPS contract[596] were placed or met the criteria for placement on Heightened Monitoring (HM) between June and December 2020. This included 45 CPAs, 41 GROs, and 11 GRO-RTCs. The number of operations that are currently active on Heightened Monitoring includes 71 that were placed on Heightened Monitoring in 2020 and seven that were placed on HM in 2021.[597]

- 87 operations were notified and placed on Heightened Monitoring between June and December 2020. Of the 87 operations placed on HM in 2020, nine (10%) have since had their DFPS contract terminated or the operation closed through April 16, 2021, and seven (8%) were removed from HM due to a recalculation of capacity which resulted in the operation no longer meeting the criteria for Heightened Monitoring.
- Three (3) operations met the criteria for placement on Heightened Monitoring, but had their contract terminated or closed prior to notification of their HM status.
- Seven (7) operations met the criteria for placement on Heightened Monitoring in 2020, but were notified and placed on Heightened Monitoring in 2021.

**Figure 7.14: Operations Placed or Meeting Criteria for Placement on Heightened Monitoring in 2020**



*87 operations placed on HM in 2020*

[596] An additional 15 operations met criteria for Heightened Monitoring but did not have an active contract with DFPS in 2020 when Heightened Monitoring was implemented.
[597] Gulf Coast Trades Center, Willow Bend Center, and The Tree House Center are not counted in the 71 active Heightened Monitoring operations. While they were actively on HM as of the end of 2020, their contracts were terminated in 2021. Information on closures as of April 16, 2021. On April 2, 2020, the Monitors were notified that Fostering Life Youth Ranch purchased Children's Hope Residential, Levelland, and operation on Heightened Monitoring. Fostering Life Youth Ranch will be subject to Heightened Monitoring.

b.      Operations that Closed After or Just Prior to Being Placed on Heightened Monitoring

Several operations closed[598] after the State identified them for Heightened Monitoring, as discussed in Section VII, *infra*, either as a result of DFPS's decision to cancel its contract with the operation due to ongoing safety concerns, RCCR's decision to revoke or deny its final license for the same reason, or the operation's voluntary relinquishment of its license.[599]

---

[598] The Monitors reported some of these closures in the September 2, 2020 Update to the Court regarding facility closures. Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding Child Fatalities and Congregate Care Facility Closures (September 2, 2020), ECF No. 956. Others are included in this report's updates regarding Remedial Order 21, *infra*.

[599] The State also notifies the Monitors of placement suspensions for operations on Heightened Monitoring. One of the recent notifications of a placement suspension was for Gulf Winds RTC. DFPS indicated the agency suspended placements after the suicide of a TMC child. E-mail from Tara Olah to Deborah Fowler and Kevin Ryan, re: Child

Fatality in TMC, February 27, 2021 (on file with Monitors). The child, Z.A., hanged himself in the shower at the facility, using a sheet from his bed. The bathroom was "not far" from Z.A.'s room but was not attached to Z.A.'s bedroom. According to the investigation notes in CLASS, when Z.A. committed suicide, he was on "close watch," which (according to the staff member assigned to Z.A. when he died) means "to keep him in eyesight at all times." The child was being supervised by a female staff member and when Z.A. asked to use the restroom, the female staff member unlocked the door and stood outside the male bathroom. She did not go into the bathroom until she knocked on the door and called out to Z.A. and he did not respond, at which point the staff member found him and called for assistance. During her interview, the staff member said that though Z.A. was on one-to-one supervision, she was also supervising two other children the night that he died. Before he hanged himself, Z.A. posted a picture of himself on Instagram in the bathroom, waving to the camera, with the sheet hanging from the shower bar in the background. Z.A. was not supposed to have electronics, but children interviewed for the investigation said he was able to borrow a tablet from a staff person to post on Instagram.

Z.A. had disclosed thoughts of suicide earlier in the week, to a staff member at Gulf Winds, who called the local mental health authority (LMHA) to have him assessed by a counselor. The day of his suicide, Z.A. had confided to someone at his high school that he was feeling suicidal, and a counselor with the crisis response team from the LMHA again assessed Z.A. before he left school that day. The initial recommendation made by the LMHA professional was that Z.A. be hospitalized, but after a discussion with the LMHA professional's supervisor, Z.A.'s psychiatrist, and Gulf Winds staff, the decision was instead to change Z.A.'s medication and return him to Gulf Winds with one-on-one supervision. Notes in CLASS indicate, "This evaluation included that they believed that [Z.A.] wanted to demand hospitalization whenever he wanted to and that was not a productive solution for this patient." Z.A.'s psychiatrist "did not want to reinforce behavior that the patient could just demand going to the hospital because he was mad or depressed." Staff at Z.A.'s high school objected verbally and in writing to the decision to return Z.A. to Gulf Winds instead of hospitalizing him. After Z.A. returned to the facility, the serious incident report timeline indicates he had a "rough call" with his girlfriend, prompting his case manager to speak to the supervisor and floor staff to ask them to "keep an eye on him." Two children interviewed indicated that Z.A. said he wanted to kill himself during group the day that he died. Z.A. had a history of trauma and a diagnosis of major depression, and according to his service plan had been hospitalized three times in 2020, once for attempting to hang himself, and twice for suicidal ideation.

**Table 7.4: Operations Meeting the Criteria for Heightened Monitoring that Closed or with Which DFPS Terminated Contracts**
Source: State Heightened Monitoring List

| Operation | Operation Type | Closed or Terminated Contract | Notified of HM |
|---|---|---|---|
| Eckerd Youth Alternatives, Inc. | CPA | License Relinquished | No |
| Panhandle Child Placement Svcs | CPA | License Relinquished | Yes |
| The Payton Foundation | CPA | License Relinquished | Yes |
| Gulf Coast Trades Center | RTC | Contract Terminated by DFPS | Yes |
| Prairie Harbor, LLC | RTC | RCCR Intent to Revoke | Yes |
| Houston Serenity Place, Inc. | RTC | License Relinquished | Yes |
| Whataburger Center for Children | RTC | License Relinquished | Yes |
| Hearts with Hope Foundation | GRO | Foundation Contract Terminated by DFPS | No |
| The Tree House Center | GRO | Contract Terminated by DFPS | Yes |
| Williams House | GRO | License Relinquished | Yes |
| Willow Bend Center | GRO | RCCR Intent to Revoke | Yes |
| Youth and Family Enrichment Centers | GRO | License Relinquished | No |

289

       *c.*      Operations that Reopened Under Another Name Following Closure

When the State provided the Monitors with its initial list of operations that qualified for Heightened Monitoring on June 5, 2020, the State indicated that nine of the CPAs on the list, and six of the GROs, had already closed.[600]  On December 18, 2020, the Monitors sent an e-mail to the State after determining that at least two GROs that were on the State's original Heightened Monitoring list, but that the State removed from the list because (according to the State) the GROs were no longer operating, appeared to have reopened under a different name.[601]   The Monitors noted:

> The Care Cottage***which was located in Willis, TX is shown as having closed on January 2, 2020.  On the very same day, the same controlling persons opened another RTC – HeartBridges – in Cypress, TX, with the Children who were in Care Cottage moved to HeartBridges.   This Care Cottage location had an RCCR enforcement history, having been on probation from January 2, 2019 through August 6, 2019.   Our heightened monitoring analysis showed this operation's minimum standards violations and contract violations, in particular, placed it above the State average in four out of five years of the analysis.  Across all five years, the operation was cited 96 times for a standards violation rated medium, medium-high, or high, and had 12 contract violations.  It had one "reason to believe" finding in 2018 related to the physical abuse of a child, after a child alleged that a staff member "grabbed her by the shirt, slammed her to the ground, drug her to [a] room…and put his knee in her throat."  Her allegation was substantiated by two witnesses, and the staff person was charged with a felony offense.[602]

The Monitors' e-mail noted that this was the second Care Cottage location to voluntarily close, with the first having closed in 2018 after being raided by law enforcement due to reports of physical and sexual abuse.[603]  The Monitors indicated that their review of the "new" operation (HeartBridges) in CLASS showed that inspectors and investigators were not connecting the history of The Care Cottage with HeartBridges, frustrating the intent of Remedial Orders 3 and 22, in addition to Remedial Order 20:

> In addition to frustrating the purpose of Remedial Order 20, this frustrates the purpose of Remedial Order 22 and Remedial Order 3.  Remedial Order 22 requires inspectors to consider an operation's history of referrals and substantiated findings of abuse or neglect and citations related to corporal punishment during inspections,

---

[600] According to the State, the following GROs qualified for Heightened Monitoring, but had already closed: Arrow's Endeavor Place, Carter's Kids RTC, Five Oaks Achievement, Shoreline, Inc., The Care Cottage, and Visionquest Residential.  The following CPAs were included on the list, but were identified as closed: J. Elohim Inc., Jameson Center, Kids at the Crossroads, Inc., Kingdom Kids Child Placing Agency, Respite Care of San Antonio, Strawberry Creek Services, Trinity Foster Care, Houston Serenity Place CPA, Optimum Children's Services.
[601] E-mail from Deborah Fowler and Kevin Ryan to Tiffany Roper and Georgette Oden, *Closure & Reopening of Facilities* (December 18, 2020) (on file with Monitors).
[602] *Id.*
[603] *Id.*

including inspections undertaken as part of an investigation of a minimum standards violation. A review of the "extended compliance history review" conducted most recently for HeartBridges shows that the inspector found only 18 abuse or neglect referrals, and no confirmed abuse or neglect findings and no corporal punishment citations. This is because by changing the name of the entity, the operators have erased the poor compliance history.[604]

Further, the Monitors found that this was not the only operation that had escaped Heightened Monitoring by closing and reopening under a different name, noting that Carter's Kids, an RTC that had 10 substantiated findings of abuse or neglect and 158 minimum standards deficiencies rated medium, medium-high, or high during the five-year period examined, reopened under the name "Life's Purpose," with related owners and in the same location as the closed Carter's Kids.[605] The Monitors advised the State that "[a]llowing operators of troubled entities to avoid enforcement action and wipe their histories clean, simply by relocating or changing their name (or both, as in the case of HeartBridges) is deeply problematic from the standpoint of child safety. But it is also deeply problematic from the standpoint of allowing these troubled entities to dodge enforcement of the Court's order. Judge Jack spoke to these very problems at the recent contempt hearing."[606] The Monitors asked the State to verify whether any of the other operations that the State removed from the Heightened Monitoring list due to closure were operating under a new name, or in a new location, with the same controlling persons, and also asked the State to explain why HeartBridges and Life's Purpose were not under Heightened Monitoring.[607]

On December 23, 2020, RCCR responded:

Like you, HHSC is very concerned about ensuring that the Heightened Monitoring process takes into account operations that may maintain the same controlling persons but move locations, change names, or otherwise operate under a new license. We have been coordinating with DFPS and agree that HeartBridges and Life's Purpose should be added to the Heightened Monitoring list. We have notified those operations and we began unannounced visits this week. The Heightened Monitoring team is presently searching for other operations in a similar situation as HeartBridges and Life's Purpose, and we will keep you updated about those findings.

HHSC recognizes the need to capture additional data and evaluate permutations of other factors aside from controlling persons, such as different owners, staff members, locations, and so on. HHSC, in coordination with DFPS, will work together on a plan to address these circumstances and hope [sic] to share that with you in January.[608]

---

[604] *Id.*

[605] *Id.*

[606] *Id.*

[607] *Id.*

[608] E-mail from Georgette Oden to Deborah Fowler and Kevin Ryan, *closure and reopening of facilities* (December 23, 2020) (on file with Monitors). DFPS also sent an e-mail to the Monitors that was almost identical in content. E-mail from Tiffany Roper to Deborah Fowler and Kevin Ryan, *Closure & Reopening of Facilities* (December 23, 2020) (on file with Monitors).

RCCR filed an Emergency Rule, effective December 30, 2020 and posted in the Texas Register on January 15, 2021, which addressed the problems raised by the Monitors.   The Emergency Rule requires RCCR:

> [T]o consider the previous five-year compliance history of related operations when evaluating an application for a new residential child-care operation license.   The rules require the review when an application has been operating in a different location, has previously closed an operation, or has significant ties to another operation.   The new emergency rules also require the continuation of heightened monitoring as a condition of a new license if a previous or related operation is on heightened monitoring, met the criteria for heightened monitoring in the previous five years, but was not placed on heightened monitoring, or was placed on heightened monitoring in the previous five years and did not successfully complete it.[609]

The agency also confirmed that HeartBridges and Life's Purpose had been placed under Heightened Monitoring.[610]  On January 20, 2021, the State sent an update to the Monitors identifying nine GROs that would be placed on Heightened Monitoring as a result of the concerns raised by the Monitors in December 2020.[611]  In addition to identifying operations "first licensed in calendar year 2019 or 2020 which would have met the criteria for Heightened Monitoring if the HHSC emergency rules effective on and after 12/30/20 had been retroactively applied," the State also noted that, for purposes of Heightened Monitoring, operations would be treated as one continuous operation if they had the same controlling persons and location, received an initial permit, but withdrew prior to being issued a full license on one or more occasions, then subsequently received a full license.[612]  The e-mail also identified seven operations that were reviewed but did not meet the State's criteria for being placed on Heightened Monitoring as a linked operation.[613]  The Monitors asked the State for an explanation of the seven operations that it determined should not be placed on Heightened Monitoring, which the State sent to the Monitors on February 10, 2021.[614]

---

[609] Emergency Rule, 26 TAC §§ 745.10201, 745.10203, 745.10207, Tex. Reg., January 15, 2021.

[610] E-mail from Georgette Oden to Deborah Fowler and Kevin Ryan, *closure and reopening of facilities* (January 12, 2021) (on file with Monitors).

[611] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *RO 20 Heightened Monitoring* (January 20, 2021)*(*on file with Monitors).   The nine operations placed on Heightened Monitoring are: HeartBridges, Life's Purpose RTC, Children's Hope Residential Services (Levelland), A Pathway 2 New Beginnings, Road to Wisdom, 1 Archangel Foster and Adoption Agency, House of Shiloh Family Service, A Fresh Start RTC (a second campus), Hands of Healing.

[612] *Id*.

[613] *Id*.

[614] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *RO 20 Heightened Monitorin*g (February 10, 2021) (on file with Monitors).   On February 5, 2021, the State also sent the Monitors an update on RCCR's efforts to link current and closed operations for extended compliance history reviews, pursuant to Remedial Order 22.   E-mail from Taryn Lam to Deborah Fowler and Kevin Ryan, *HHSC Linked Operations Information* (February 5, 2021) (on file with Monitors).

>    *d.*    Location of Operations Placed on Heightened Monitoring
>          & Date of Notification

Sixty-two percent of active Heightened Monitoring operations (44 of 71) were located in Regions 6, 7, and 8.[615] In comparison, 62% of all operations (201 of 324) were in Regions 6, 7, and 8.[616] There were no operations on Heightened Monitoring in Regions 9 and 10, while 3% of all operations were in Regions 9 and 10. Regions 6 and 8 had the highest numbers of GROs and RTCs on Heightened Monitoring, while Regions 3 and 7 had the highest number of CPA's on Heightened Monitoring.

**Figure 7.15: Operations Currently on Heightened Monitoring by Type of Operation and Region**

**Figure 7.16: Operations with an Active Residential Child Care Contract by Region**





Within five (5) days of identifying an operation for Heightened Monitoring, DFPS is required to schedule an initial Facility Intervention Team Staffing (FITS).[617] The date of the initial FITS meeting is the Heightened Monitoring start date for the operation, and the day the operation is notified.[618] At that point, a Heightened Monitoring development team is formed and the

---

[615] Includes active operations placed on Heightened Monitoring in 2020 but does not include Gulf Coast Trades Center, Willow Bend Center, and The Tree House Center which had their contracts terminated in early to mid-2021.

[616] Includes all active Child Placing Agencies, General Residential Operations, and Residential Treatment Centers operating in-state.

[617] FITS staffings are "multidisciplinary meetings between DFPS and HHSC to discuss operations that are licensed by HHSC and serve children and youth in DFPS conservatorship" which were "[i]nitially…focused on operations where there were concerns regarding child safety based upon a serious incident, a pattern of performance issues, or a corrective action issued by HHSC's CCR division."   HHSC & DFPS, Heightened Monitoring Process Overview (undated) (On file with Monitors).

[618] HHSC & DFPS, *Heightened Monitoring Process Overview* at 2 (undated).

development team has four weeks to develop a draft Heightened Monitoring Plan (HM Plan).[619] Approval of the HM Plan occurs after the development team presents the draft plan to HM directors in each division to review, discuss, and edit the plan.[620]

> *e.* Date of Notification for Operations Placed on Heightened Monitoring

Eighty-five percent of operations placed on Heightened Monitoring in 2020 (74 of 87) received notification between October and December 2020. Of the nine operations notified between June and September 2020, five closed after starting Heightened Monitoring (Whataburger Center, Williams House, Houston Serenity Place, Inc., The Payton Foundation, and Prairie Harbor) and one had its contract terminated in March 2021 (Gulf Coast Trades Center). November 2020 was the month with the highest number of Heightened Monitoring notifications.

The average time from notification to HM Plan start for operations notified in 2020 was 28 days.[621] Eleven percent (11%) of operations notified (nine of 82) had a HM Plan start date that was the same day as the notification date.[622] CPAs had, on average, the shortest time between notification and HM Plan start at 27 days, compared to 28 days for GROs and 40 days for RTCs. The time to HM Plan commencement decreased over the year. For operations notified between June and September 2020, the average time from notification to HM Plan start was 45 days, but for operations notified between October and December 2020 the average time was 26 days.

> d.   **Overview and Analysis of Phase One of Heightened Monitoring**

The State's implementation of Heightened Monitoring featured a three-phase roll-out, prioritizing sites based on the identified risk of harm to children, with Phase One operations having the highest scores according to the State's risk stratification analysis.[623] A total of nine (9) operations were classified as Phase One Heightened Monitoring operations.[624] Originally, those operations included Williams House, Houston Serenity Place Inc., Prairie Harbor, and The Payton Foundation. However, those operations closed soon after the start of Heightened Monitoring, as discussed above, and were replaced in Phase One with A Fresh Start, Beacon of Hope, Connections Emergency Shelter, and New Life.[625]

---

[619] *Id*. 3.

[620] *Id*. at 4.

[621] One notified operation did not have a Heightened Monitoring plan start date in documents provided to the Monitors.

[622] The Heightened Monitoring start date designated on the plan was the operation's notification date rather than the date the Heightened Monitoring plan was finalized.

[623] DFPS developed a risk stratification scoring system which incorporates different data related to child safety and incorporating both recent trends and historic pattern including acuity and volume of children placed, quality of services, EBIs, minimum standards violations, ANE investigations and RTBs and corrective actions.

[624] Assuring Love, Azleway Valley View, Benchmark, and Gulf Coast Trades Center were initially classified as Phase One, while A Fresh Start Treatment Center, Beacon of Hope, and New Life Residential Treatment were originally classified as Phase Two but moved to Phase One. Whataburger was classified as Phase One and began Heightened Monitoring in June but closed in January 2021, prior to the Monitors' analysis of Phase One Heightened Monitoring operations.

[625] Though Whataburger Center also closed, the facility closed later in the Heightened Monitoring process after all other operations identified for Heightened Monitoring had already started the process, making it unnecessary to replace Whataburger Center with another operation in Phase One.

**Figure 7.17: Timeline for Starting Heightened Monitoring at Operations in Phase One Analysis**[626]
Source: State Heightened Monitoring List



According to the Court's March 18, 2020 Order[627] adopting definitions for pattern and Heightened Monitoring, the State is required to engage in a pattern analysis to identify operations for Heightened Monitoring, then:

- Schedule a FITS staffing to review: trends identified as a result of the five-year pattern analysis, and any monitoring plans or corrective actions for the operation and risk analyses conducted by RCCR or DFPS in the last five years.
- Suspend placements to and create a safety plan for the operation if the FITS review reveals events that implicate ongoing concern for the health and safety of children.
- Develop a Heightened Monitoring plan that:
  - Outlines a coordinated response from RCCR & DFPS, including a list of staff from both agencies who will serve on the Heightened Monitoring team for the operation;
  - Describes a detailed and specific plan addressing: the pattern of policy violations that led to Heightened Monitoring; any barriers to compliance identified during a

---

[626] Whataburger Center was initially a Phase One Heightened Monitoring operation that closed on January 4, 2021, prior to the Monitors' analysis. The Payton Foundation, Williams House, Prairie Harbor, and Houston Serenity Place, Inc. were initially Phase One operations that closed after Heightened Monitoring notification.
[627] Order, ECF No. 837.

review of previous corrective or enforcement actions or risk analyses; any technical assistance needed by the operation; and, the steps the operation must take to satisfy the plan.

- Share responsibility between DFPS and RCCR for weekly unannounced visits to the operation.

- Ensure all children's placements to operations under Heightened Monitoring are directly approved by the DFPS Associate Commissioner of CPS (or, following the Court's December 2020 Order, discussed above, the Regional Director).[628]

### i. Phase One Operations' Histories of Compliance Problems

Altogether, over the five-year period between 2016 and 2020, these eight troubled operations accounted for 67 substantiated findings of child abuse or neglect (RTBs), and 2,002 citations for minimum standards deficiencies[629].   Broken out by operation:

- A Fresh Start Treatment Center (Fresh Start) had one RTB for Physical Abuse during this period, and 174 citations for minimum standards deficiencies.

- Assuring Love CPA had five RTBs (two for Physical Abuse, two for Neglectful Supervision, and one for Sexual Abuse), and 128 citations for minimum standards violations.

- Azleway Valley View GRO had 12 RTBs (all for Neglectful Supervision), and 94 citations for minimum standards deficiencies.

- Beacon of Hope CPA had three RTBs (all for Physical Abuse), and 205 citations for minimum standards deficiencies.

- Benchmark CPA had 26 RTBs (14 for Neglectful Supervision, four for Sexual Abuse, seven for Physical Abuse, and one for Medical Neglect), and 930 citations for minimum standards deficiencies.

- Connections Emergency Shelter had six RTBs (two for Sexual Abuse, two for Physical Abuse, and two for Neglectful Supervision), and 124 citations for minimum standards deficiencies.

- Gulf Coast Trade Center had seven RTBs (four for Neglectful Supervision, two for Sexual Abuse, and one for Physical Abuse), and 198 citations for minimum standards violations.

- New Life Children's Treatment Center (New Life) had seven RTBs (three for Neglectful Supervision, two for Medical Neglect, one for Sexual Abuse, and one for Physical Abuse), and 149 citations for minimum standards deficiencies.

---

[628] *Id.* at 1-2.
[629] Deficiencies cited include all citations waived, upheld and pending.

All of the Phase One operations have had a prior risk analysis, monetary penalty, and/or RCCR enforcement action prior to being placed on Heightened Monitoring. Phase One operations have had, on average, two prior risk analyses and four prior monetary penalties. Three operations had a prior Enforcement Evaluation, including Azleway, Beacon of Hope, and Gulf Coast. Two operations had a prior Plan of Action (POA), including Connections and New Life. Two operations had both a prior Enforcement Evaluation and a prior POA, including Assuring Love and Benchmark Family Services. No Phase One operation had been previously placed on Probation. One operation was on a POA at the time of starting Heightened Monitoring (Connections) while another operation was placed on a POA after starting Heightened Monitoring (A Fresh Start).

**Figure 7.18: Number of Prior Risk Analyses, Monetary Penalties, and Enforcement Actions Since 2015 at Operations in Phase One Heightened Monitoring Analysis**



For the five Phase One operations with a prior Evaluation, the operations were under Evaluation for a total of 211 days on average. For the four operations with a prior POA, the operations were under a POA for a total of 230 days on average.[630] The minimum amount of time an operation was under Evaluation or POA was a total of 181 days and the maximum amount of time was a total of 552 days.[631]

The monitoring team reviewed Heightened Monitoring documents, compliance reports, CLASS, and a summary of the operation's history based on data provided to the Monitors by the State. Based on this collective information, the Monitors analyzed trends in child safety and

---

[630] Includes the three most recent enforcement actions since 2015 to the date of placement on Heightened Monitoring. Benchmark was the only operation to exceed three enforcement actions during this time period.
[631] Operations under both Evaluation and POA include the total time under both.

compliance problems within each Phase One operation. The Monitors compared the safety and compliance problems from each Phase One operation's historical review with the issues identified by the State in the operation's Heightened Monitoring Plan (HM Plan).

The monitoring team identified the three most serious issues[632] at Phase One operations from 2015-2019 (the period that the State reviewed to determine which operations would be subject to Heightened Monitoring), and from 2019-2020. Poor supervision was the most prominent serious issue from 2015-2019, identified in six of eight operations. Inadequate service planning and poor supervision were most often identified as serious issues from 2019-2020.  Two operations, A Fresh Start and Beacon of Hope, had the same issues identified as most serious between 2015-2019 and 2019-2020. At least one issue recurred in all but one operation, Assuring Love, across both time periods.

**Table 7.5:  Most Serious Issues at Phase One Heightened Monitoring Operations as Identified by the Monitors, 2015 to 2019**

| Operation | Three Most Serious Issues at Phase One HM Operations as Identified by Monitors, 2015-2019 | | |
|---|---|---|---|
| | Issue #1 | Issue #2 | Issue #3 |
| A Fresh Start | Inappropriate Discipline | Poor Supervision | Missing/ Incomplete Records |
| Assuring Love | Inadequate Medical Care/Meds Management | Missing/No Background Checks | Administration Gaps |
| Azleway Valley View | Inadequate Medical Care/Meds Management | Poor Supervision | Physical Plant Problems |
| Beacon of Hope | Inadequate Medical Care/Meds Management | Inadequate Service Planning | Administration Gaps |
| Benchmark Family Services | Inadequate Medical Care/Meds Management | Inappropriate Discipline | Poor Supervision |
| Connections Inc. Emergency | Poor Supervision | Inadequate Service Planning | Physical Plant Problems |
| Gulf Coast Trades Center | Inappropriate EBI | Poor Supervision | Administration Gaps |
| New Life | Sexual Abuse | Inappropriate Discipline | Poor Supervision |

---

[632] Issues were identified by looking at patterns or trends in standard and contract violations, abuse or neglect investigations, and other compliance issues.

**Table 7.6:  Most Serious Issues at Phase One Heightened Monitoring Operations as Identified by the Monitors, 2019 and 2020**

| Operation | Three Most Serious Issues at Phase One HM Operations as Identified by Monitors, 2019-2020 | | |
|---|---|---|---|
| | Issue #1 | Issue #2 | Issue #3 |
| A Fresh Start | Inappropriate Discipline | Poor Supervision | Missing/Incomplete Records |
| Assuring Love | Violations of Children's Rights | Inadequate Service Planning | Poor Supervision |
| Azleway Valley View | Inadequate Medical Care/Meds Management | Inadequate Service Planning | Physical Plant Problems |
| Beacon of Hope | Inadequate Medical Care/Meds Management | Inadequate Service Planning | Administration |
| Benchmark Family Services | Inadequate Medical Care/Meds Management | Inadequate Service Planning | Physical Plant Problems |
| Connections Inc. Emergency[633] | Poor Supervision | Inadequate Service Planning | -------- |
| Gulf Coast Trades Center | Poor Supervision | Inadequate Service Planning | Administration Gaps |
| New Life | Serious Incidents Harmful to Children | Poor Supervision | Lapses in Training |

The monitoring team identified other safety and compliance problems outside of those deemed most serious. The number of other identified issues ranged from two (Assuring Love) to 11 (Connections). On average, operations had six other issues identified outside of the three most serious from 2015-2019 and 2019-2020.  In addition to the safety and compliance problems identified above, the monitoring team noted staff turnover or retention as serious problems in four of the eight operations: Azleway Valley View, Benchmark, Gulf Coast Trades Center, and New Life.

     ii.     **Quality of Heightened Monitoring Plans for Phase One Operations**

The monitoring team compared the identification of serious safety issues and compliance problems for the Phase One operations analyzed to those identified by the State in the operations' HM Plans.

---

[633] Connections Inc. Emergency Shelter had only two issues identified as most serious, but had several other issues identified that did not meet the definitions used for most serious.

**Figure 7.19: Number of Operations with Identified Issues in Monitors' Review and the Operations' Heightened Monitoring Plan**



*Other issues identified by the Monitors include Failure to Report. Other issues identified in the HM plan include Behavioral Health

Of the 14 possible categories,[634] Phase One operations had, on average, 10 safety or compliance problems identified during the monitoring team's review, compared to an average of seven problems identified by the State in the Heightened Monitoring Plans.

---

[634] Categories include Child Rights, Discipline/Physical and Emotional Abuse, Emergency Behavior Interventions (EBI), Serious Incidents, Supervision/Neglectful Supervision, Sexual Abuse/Exploitation, Medicine/Medical/Medical Neglect, Health and Safety/Physical Neglect, Service Planning, Training, Records, Criminal Background Checks, Administration, Physical Plant, and Other.

**Table 7.7: Problems Identified at Phase One Operations by the Monitoring Team's Review of Heightened Monitoring Documentation and by the State in Heightened Monitoring Plans**

Source: State Heightened Monitoring Documentation and Heightened Monitoring Plans

| Operation | Number of Problems Identified | |
|---|---|---|
| | Monitors' Review | HM Plan |
| A Fresh Start | 9 | 6 |
| Assuring Love | 8 | 8 |
| Azleway Valley View | 8 | 5 |
| Beacon of Hope | 7 | 4 |
| Benchmark Family Services | 13 | 11 |
| Connections Inc. Emergency Shelter | 14 | 7 |
| Gulf Coast Trades Center | 7 | 7 |
| New Life | 11 | 8 |

In half of Phase One operations analyzed (four of eight), the monitoring team determined that the safety or compliance problems identified through the monitoring team's review of historical documents were <u>overall consistent</u> with those identified in the Heightened Monitoring Plan. The four operations for which the monitoring team determined that patterns of problems identified during compliance history reviews were <u>not</u> comprehensively consistent with those identified in their Heightened Monitoring Plan were A Fresh Start, Assuring Love, Azleway Valley View, and Beacon of Hope.

**Table 7.8:  Phase One Operations with Inconsistencies Between their Historical Trends and the Issues Identified on their Heightened Monitoring Plan**

| Operation | Description of Inconsistencies Across Historical Review and Heightened Monitoring Plan |
|---|---|
| A Fresh Start | Most of the issues were captured in the HM Plan, but not violations of Children's Rights and Neglectful Supervision. |
| Assuring Love | There are some issues identified in the history that are found in the HM Plan, but not all. Issues identified but not found in the Plan include violations of Children's Rights, inadequate Service Planning, and missing Criminal Background Checks for staff. |
| Azleway Valley View | Inappropriate Discipline and Emergency Behavioral Intervention EBI were identified in the historical review but neither were addressed in the history described in the HM Plan. |
| Beacon of Hope | Most of the issues in the HM Plan are related to administration, home screening, verifications, service planning, and supervisory visits. Additional issues found in the historical review include Health and Safety and Physical Plant. |

301

The State's HM Plans feature tasks each operation must complete in order to reduce the risk of harm to children. The monitoring team reviewed the tasks outlined in each operation's HM Plan to assess the quality of the tasks and whether they appropriately addressed the safety and compliance problems identified in the HM Plan. The same categories used for issues were assigned to tasks.[635] The number of tasks in each operation's HM Plan ranged from two (Assuring Love) to 15 (A Fresh Start and Gulf Coast Trades Center).

Operations had a range of four (Beacon of Hope) to 11 (Benchmark) safety or compliance problems referenced in their HM plans.  All but one operation, A Fresh Start, had at least one problem area in the HM plan that was not also identified in a task. Half of operations (four of eight) had two or more problem areas identified in the HM plan that were not also addressed in a task.

**Figure 7.20: Categories Identified as Problems in Operations' Heightened Monitoring Plans**

| A Fresh Start | Assuring Love | Azleway Valley View | Beacon of Hope | Benchmark | Connections | Gulf Coast | New Life |
|---|---|---|---|---|---|---|---|
| Discipline | Discipline | Supervision | Discipline | Child Rights | Discipline | Discipline | EBI |
| EBI | Serious Incidents | Medical | Supervision | Discipline | Supervision | EBI | Serious Incidents |
| Health /Safety | Supervision | Service Plan | Medical | EBI | Medical | Supervision | Supervision |
| Service Plan | Sexual Abuse | Admin | Admin | Serious Incidents | Service Plan | Sexual Abuse | Sexual Abuse |
| Training | Medical | Physical Plant | | Supervision | Training | Service Plan | Medical |
| Records | Training | | | Medical | Admin | Admin | Training |
| | Admin | | | Health/ Safety | Physical Plant | Physical Plant | Records |
| | Other-BH | | | Service Plan | | | Admin |
| | | | | Training | | | |
| | | | | Background Checks | | | |
| | | | | Admin | | | |

| Not covered in HM tasks |
|---|

*Sexual abuse was provided as an issue category but was not included as a task category.

Source: State Heightened Monitoring Documentation and Heightened Monitoring Plans

The Monitors' review of the tasks also indicates that some may not fall within the Court's vision for a "specific and detailed" Heightened Monitoring Plan; similarly, some tasks did not

---

[635] Tasks may have sub-tasks if there are separate compliance due dates for each sub-task. A primary and secondary category was assigned to each task and sub-tasks, where applicable. Operations had, on average, nine tasks outlined in their Plan.

seem measurable. Examples of tasks that the monitoring team highlighted during their review include:

- Operation will explore the costs associated with obtaining video cameras with recording capabilities.
- Operation will complete a self-evaluation to: Identify what issues led to the operation breakdown; Identify areas of improvement implemented to ensure successful ramp up.
- Administrator will contact other RTC's that serve the same age groups and ask what EBI models they use, outcomes with their model, and any injuries related to the use of their EBI model to determine which EBI model best fits this operation's population.
- The operation must provide an updated organizational chart including staff that have responsibilities over all operations.

Other tasks simply appear to require the operation to meet existing minimum standards, something they are already obligated to do. Examples include:

- The operation will demonstrate and provide evidence that supervision and admission policies are sufficient and in place. Operation will submit a copy of updated Supervision and Admission Policies.
- Operation will create and deliver training for all staff on minimum standards with an emphasis on physical site, fire safety and vehicle safety.
- The operation will develop policies and procedures to ensure supervision of staff during supervisory visits to ensure quality.
- The Administrator must develop a plan to ensure that all records are maintained as per minimum standards. This includes the development of a check list for personnel files and child files to be used to train staff and conduct quality assurance record reviews.

Some tasks simply required the operation to comply with another enforcement action:

- The operation will provide documentation of improvements made during licensing corrective action regarding supervision and discipline. The operation will provide evidence as requested of continued compliance.
- The operation will ensure compliance with any enforcement of voluntary plan of action.

Some tasks require the Administrator of the operation to actually visit it, or – even more basic – conduct a walkthrough. Examples include:

- The Administrator must develop a staff oversight and development plan that includes specific strategies the operation will take to ensure that direct delivery staff interact safely and appropriately with the children while ensuring that the children achieve their therapeutic goals. The plan must include onsite and unannounced visits by Administrator.
- The operation will enhance supervision of direct care staff by having the Administrator conduct unannounced onsite visits during evening and weekend hours. The Administrator

will observe staff/child interactions and document concerns during onsite visit. The administrator will document how these concerns will be addressed.

- The Administrator will conduct a walkthrough of the dining hall and non-school grounds on a daily basis to ensure physical site conditions meet minimum standards requirements.

And perhaps most troubling is a task that simply requires the Administrator of the operation to talk to youth, something one would hope they would not have to be instructed to do:

- The Administrator must conduct interviews with the youth in care regularly and consistently. The youth should be selected at random with a minimum of five (5) youth being interviewed each month. The Administrator must interview the youth about the following topics: (1) concerns with EBI; (2) discipline practices; (3) staff interactions; (4) supervision.

### iii.    Timeline for Completing Tasks Identified in Heightened Monitoring Plans

The monitoring team reviewed the timeline in each HM Plan for completing tasks. Expected compliance with tasks and sub-tasks for Phase One operations was, on average, due 50 days out from an operation's HM Plan Start Date:

- 25% of the 80 tasks and sub-tasks, or 20, were due within two weeks (14 days) of the HM Plan start date. Seven of 80 were due within five days. Nearly half (48%, 38 of 80) of tasks and sub-tasks were due within 31 to 90 days of the HM Plan Start Date.

**Figure 7.21: Proportion of Heightened Monitoring Tasks and Sub-Tasks Due Within Two Weeks of the Heightened Monitoring Plan Start Date**



The average time to the latest task compliance due date (i.e., full compliance) for all Phase One operations was 111 days from the HM Plan start date. The time to full compliance from the HM Plan start date was from 14 days (Assuring Love) to 203 days (Gulf Coast Trades Center).

**Table 7.9: Time to Expected Compliance of All Tasks for Phase One Heightened Monitoring Operations Analyzed**

| Operation | Number of Days from Heightened Monitoring Plan Start to Expected Compliance of All Tasks |
|---|---|
| A Fresh Start | 97 |
| Assuring Love | 14 |
| Azleway Valley View | 60 |
| Beacon of Hope | 105 |
| Benchmark | 92 |
| Connections | 75 |
| Gulf Coast Trades Center | 203 |
| New Life | 87 |
| **Total average** | **111** |

Although the HM Plan for Assuring Love contained only two tasks, they were broad in scope, calling into question the 14-day timeline expected for compliance.

| Tasks for Assuring Love |
|---|
| The operation will provide documentation of improvements made during licensing corrective action regarding supervision and discipline. The operation will provide evidence as requested of continued compliance. |
| The operation will develop policies and procedures to ensure Supervision of staff during supervisory visits to ensure quality. |

f.   Comparison Between Prior Enforcement Actions and Heightened Monitoring Plan

The monitoring team reviewed prior enforcement actions taken against each Phase One operation based on the information provided in the HM Plan and documents. The issues and requirements from prior enforcement actions were then compared with the identified safety and compliance problems and tasks outlined in the operation's HM Plan.

All but one operation (A Fresh Start) had previously been under enforcement action for similar issues that led to Heightened Monitoring.[636] Two operations – Benchmark and Gulf Coast – had been under enforcement action for all of the same trends/issues identified in the operation's current HM Plan. The remaining five operations had been under enforcement action for some of the same trends/issues identified in the current HM Plan.

**Table 7.10: Prior Enforcement Actions at Phase One Heightened Monitoring Operations and Similarities in Issues and Requirements to Current Heightened Monitoring Plan**

| Operation | Type(s) of Prior Enforcement Action | Comparison of Prior Enforcement Action to Current HM Issues/Tasks | |
|---|---|---|---|
| | | Similar Trends/Issues | Similar Requirements |
| A Fresh Start | None | N/A | N/A |
| Assuring Love | POA & Evaluation | Yes, some | No |
| Azleway Valley View | Evaluation | Yes, some | Yes, some |
| Beacon of Hope | Evaluation | Yes, some | Yes, some |
| Benchmark | POA & Evaluation | Yes, all | Yes, all |
| Connections | POA | Yes, some | Yes, some |
| Gulf Coast | Evaluation | Yes, all | Yes, all |
| New Life | POA | Yes, some | Yes, some |

The monitoring team compared the tasks included in the HM Plan with tasks included under prior enforcement actions, if any, and found that 31% of HM Plan tasks, or 22 of 71, were similar to requirements included in prior enforcement actions.  Six of eight operations (all but A Fresh Start and Assuring Love) had at least one task that was similar to requirements in prior enforcement actions.[637]

---

[636] Enforcement action is defined as a Plan of Action, Enforcement Evaluation, or Probation since 2015 to the date of placement on Heightened Monitoring.
[637] A Fresh Start had not been placed under enforcement action prior to Heightened Monitoring. The prior enforcement action requirements for Assuring Love were much more detailed while their Heightened Monitoring tasks are broad. While the past requirements for Assuring Love were different – mostly due to their Heightened Monitoring tasks being broad – they addressed similar issues.

**Figure 7.22: Proportion of Heightened Monitoring Tasks with Similar Requirements to Prior Enforcement Actions at Operations in Phase One Heightened Monitoring**



iv.     **Review of Heightened Monitoring Visits to Phase One Operations**

The monitoring team reviewed Heightened Monitoring visit documentation provided by the State and found in CLASS "other" monitoring inspection entries and Heightened Monitoring chronological entries for the Phase One operations.[638]   The State's monitoring visits were conducted between June 17 and December 31, 2020.

Two hundred and fifty-three (253) Heightened Monitoring visits were documented between June 17, 2020 and December 31, 2020 in the Phase One operations analyzed.  Visits were made to GROs,[639] CPA branch offices, and agency homes. An additional 24 visits were attempted during the period.  Attempted visits were all associated with CPAs, with 92% of attempted visits (22 of 24) occurring at foster homes.

---

[638] This analysis is based on documentation as detailed in Residential Contracts Weekly Monitoring Visit, Child-Care Inspection Form 2936, CPS Monitoring Visit, and CPS Safety Visit forms. Incomplete visit form information was supplemented, where possible, with details found for a visit in the heightened monitoring chronology entry.
[639] GROs include residential treatment centers (RTCs) and emergency shelters.

**Table 7.11: Number of Heightened Monitoring Visits at Phase One Heightened Monitoring Operations Analyzed**

| Operation | Number of Visits | Type of Operation |
|---|---|---|
| A Fresh Start | 25 | GRO |
| Assuring Love | 33 | CPA |
| Azleway Valley View | 31 | GRO |
| Beacon of Hope | 22 | CPA |
| Benchmark | 52 | CPA |
| Connections | 28 | GRO |
| Gulf Coast | 47 | GRO |
| New Life | 15 | GRO |
| Total | 253 | ----- |

The majority (58% or 146 of 253) of Heightened Monitoring visits at Phase One operations were conducted at GROs.  Visits to CPA branch offices accounted for 23% of visits (58 of 253) while visits to agency homes accounted for 19% (49 of 253).

**Figure 7.23: Heightened Monitoring Visits at Phase One Operations by Type of Operation and Entity Conducting Visit,[640] June-December 2020**



Twenty-one percent of Heightened Monitoring visits (52 of 253) at Phase One operations occurred prior to the development of the operation's Heightened Monitoring Plan.  Operations were, on average, visited for the first time within five days of being notified that they were being placed under Heightened Monitoring.  Two operations, Assuring Love and Connections Emergency Shelter, were visited the day of notification, while Azleway Valley View was not visited until 13 days after notification.  On average, Heightened Monitoring visits lasted just under three hours. The shortest visit documented was 10 minutes while the longest visit was over 7 hours.

Heightened Monitoring visits for Phase One CPAs occurred at the main CPA office, CPA branch offices, and at agency homes associated with the CPA branches.  Phase One CPAs with branches and agency homes did not experience Heightened Monitoring visits equally.  The State indicated that visits to CPA branches and agency homes were determined based on risk scoring, with those branches and homes with the highest risk visited more frequently.[641]   Benchmark McAllen, however, received only five of the agency's 52 visits (10%) even though they were under a Plan of Action (POA) as of September 1, 2020.

---

[640] The Heightened Monitoring team responsible for conducting visits includes RCCR Heightened Monitoring Inspectors (HM Inspectors), DFPS Heightened Monitoring Specialists (HM Specialists), and DFPS Heightened Monitoring Residential Contract Managers (HM Residential Contract Managers).  Between June and December 2020, 37% of Heightened Monitoring visits (94 of 253) were conducted by RCCR HM Inspectors, 34% (86 of 253) were conducted by DFPS HM Residential Contract Managers, and 29% (73 of 253) were conducted by DFPS HM Specialists.

[641] Virtual meeting between Monitors and State, January 25, 2021.

**Table 7.12:  Heightened Monitoring Visits Associated with Child Placing Agencies**

| CPA Branch Office | Branch Office Visited | Agency Homes Visited | Total Heightened Monitoring Visits |
|---|---|---|---|
| Assuring Love-Desoto[*] | 23 | 10 | 33 |
| Beacon of Hope-Corpus Christi[*] | 11 | 8 | 19 |
| Beacon of Hope-Harlingen | 3 | 0 | 3 |
| Benchmark-San Antonio[*] | 13 | 14 | 27 |
| Benchmark-McAllen | 3 | 2 | 5 |
| Benchmark-Sugarland | 0 | 0 | 0 |
| Benchmark-Duncanville | 1 | 2 | 3 |
| Benchmark-Pflugerville | 1 | 0 | 1 |
| Benchmark-Longview | 1 | 0 | 1 |
| Benchmark-League City | 0 | 7 | 7 |
| Benchmark-Corpus Christi | 0 | 0 | 0 |
| Benchmark-Killeen | 1 | 6 | 7 |
| Benchmark-Ft Worth | 1 | 0 | 1 |
| Benchmark-Spring | 0 | 0 | 0 |
| Total | 58 | 49 | 107 |

* Indicates CPA main branch.

Phase One CPA offices were visited more frequently than agency homes.  Between June and December 2020, CPA offices were visited 58 times (54%) while agency homes received 49 visits (46%). Eighty-one percent of CPA office visits (47 of 58) occurred at the main branch.  Three Benchmark branches received no Heightened Monitoring visits between June and December 2020.

Between June and December 2020, 15% of agency homes (42 of 271) associated with a Phase One CPA[642] were visited.  The percent of homes visited per branch ranged from 3% of associated homes (Benchmark Duncanville) to 50% of associated homes (Beacon of Hope Corpus Christi).  Six homes received two or more visits during the period.

Operations on Heightened Monitoring are required to receive weekly unannounced visits. Between June and December 2020, only 1% of all unannounced visits to Phase One operations (3 of 253) did not meet this requirement.[643]  Eighteen percent of visits (46 of 253) occurred on the same day as another visit at that operation.  Same day visits were most often associated with agency

---

[642] Number of agency homes associated with the CPA branch as of March 21, 2021.  The actual number of homes associated between June and December 2020 may have been different.
[643] Three visits which occurred at Benchmark Family Services (9/3/20 to 9/17/20), A Fresh Start (11/12/20 to 11/22/20) and Beacon of Hope (11/18/2020 to 12/1/2020) did not take place as part of a weekly cadence.

home visits. Sixty-five percent (32 of 49) of agency home visits occurred on the same day compared to 7% of visits to GRO (10 of 146) and CPA branch offices (4 of 58).

Heightened Monitoring visit documentation was reviewed to identify what occurred during the visit. This analysis is based on the details included in documents provided by the State, and in CLASS "other" monitoring inspections, and Heightened Monitoring chronological entries.[644] Four percent of visit documentation (9 of 253) included no details about what occurred during the visit.

Heightened Monitoring visits conducted prior to Heightened Monitoring Plan development are intended to support the development of the operation's plan, engage operation leadership, and identify improvement areas, while visits conducted after the plan is finalized are intended to evaluate the operation's compliance history and progress with Heightened Monitoring tasks.[645] Between June and December 2020, 45% of visits (91 of 201) conducted after an operation's plan was finalized[646] clearly identified the tasks monitored during the visit. On average, six (6) tasks were monitored during visits, with the percent of total tasks monitored per visit ranging from 7% to 100% of an operation's heightened monitoring tasks.

**Table 7.13:  Number of Heightened Monitoring Plan Tasks per Operation and Average Number of Tasks Reviewed During Visits**

| Operation | Number of Plan Tasks | Average Number of Tasks Reviewed During Visit |
|---|---|---|
| A Fresh Start | 15 | 8.0 |
| Assuring Love | 2 | 1.5 |
| Azleway Valley View | 7 | 5.7 |
| Beacon of Hope | 8 | 2.2 |
| Benchmark | 10 | 1.9 |
| Connections | 8 | 4.7 |
| Gulf Coast | 15 | 8.8 |
| New Life | 6 | 5.0 |

Fifty-five percent of Heightened Monitoring visits (135 of 244) to Phase One operations included a review of one or more documents. Documents most often reviewed included: staff/foster parent training records, background checks, staffing plans, child service plans, admission assessments, medication logs, and serious incident reports. Agency home visits were the least likely to include a document review (15% or 7 of 46) while CPA branch office visits were

---

[644] CLASS "other" monitoring inspections and Heightened Monitoring chronological entries were checked to ensure that all heightened monitoring visits that occurred during the period were included in the analysis. Eight percent of visits (20 of 253) were documented solely based in CLASS entries.
[645] Heightened Monitoring Process Overview, HHSC and DFPS, November 30, 2020.
[646] Fifty-two of the visits documented between June and December 2020 occurred prior to the finalization of the operation's Heightened Monitoring plan.

most likely to include a document review (69% or 38 of 55).  DFPS or RCCR staff documented a walk-through of the operation in 79% of visits conducted at GROs and agency homes.  A walk-through was not expected for visits conducted at CPA branch offices.

**Figure 7.24:  Percent of Heightened Monitoring Visits to Phase One Operations that Included Document Review, Standards Review, a Walk Through, and Technical Assistance**



\* Includes only applicable visits; standards were only reviewed during Heightened Monitoring inspector visits and walk throughs were only conducted at GROs and agency homes.

Files of both staff/foster parents and children were reviewed during 24% (59 of 244) of Heightened Monitoring visits at Phase One operations, while State representatives reviewed only child files in 12% of visits (29 of 244) and only staff/foster parent files in 9% of visits.  No files were reviewed in 55% of visits (135 of 244).  Children and/or staff or foster parents were interviewed in 68% (166 of 244) of Heightened Monitoring visits.  Both children and staff/foster parents were interviewed in 35% of visits (86 of 244), while only staff/foster parents were interviewed in 18% of visits (43 of 244) and only children were interviewed in 15% of visits (37 of 244).

**Figure 7.25:  Type of Files Reviewed and Interviews Conducted During Heightened Monitoring Visits at Phase One Operations**



RCCR Inspectors monitor an operation's compliance with minimum standards during Heightened Monitoring visits.  Standards were reviewed in 66% (57 of 86) of all visits conducted by RCCR Heightened Monitoring Inspectors at Phase One operations.  During visits including a standard review, an average of two standards were monitored.  Thirty-eight percent of Heightened Monitoring visits (33 of 86) conducted by Heightened Monitoring Inspectors resulted in one or more deficiencies being cited.  A total of 83 deficiencies were cited in Phase One operations between June and December 2020.[647]

Technical assistance was provided to operations and agency homes in 34% (84 of 244) of Heightened Monitoring visits at Phase One operations.  RCCR Heightened Monitoring Inspectors were the most likely to provide technical assistance during visits (64% of visits or 55 of 86) while DFPS Heightened Monitoring Specialists were the least likely (1% of visits or 1 of 73).

DFPS and RCCR identified one or more allegations of abuse or neglect or other safety or compliance problems in 23% (55 of 244) of visits, including 21 calls to Statewide Intake made as a result of visits. Reasons for SWI calls included:

- Child touching another child inappropriately
- Two foster children were staying in another home because their foster home was problematic, no meals prepared, problem with administering medications and inappropriate documentation
- Staff member calling a child "fat ass"

---

[647] Includes all standards cited during a Heightened Monitoring visit. Some standards cited during Heightened Monitoring visits may have been overturned after administrative review or may be pending an administrative review decision.

313

- Safety concern for a child who was threatened by a group of other children
- Child was attempting to self-harm with scissors and no staff was in close proximity
- Child reported staff asleep at night
- Child left alone while foster parents were out of town
- Child not being able to call caseworker

Other noted problems included:

- Foster parent reported that the turnover in CPA case managers is disconcerting
- Foster parent expressed concerns with the case manager: paperwork not timely, incident reports are sent several months after the incident, recommendations are not followed-up timely, agency not meeting needs of children or the caregivers. Discipline techniques not provided by CPA. CPA not responsive when concerns are expressed
- One child interviewed stated that he did not know who to contact if he has complaints or issues, and he had not heard of the Ombudsman
- Two youth were still not enrolled in a court-ordered GED program, and staff and Admin stated that there was a plan in place to have them enrolled in regular school if the GED program still had not responded by 10/30
- Three child service plans were reviewed. All three had a generic narrative to address the child's needs that the operation used for every child
- Monitor noted at 6:45 dinner was not being prepared for 7:00 service.  Staff were not aware what would be served as the cook was out.  One staff obtained 3 frozen pizza for 8 children

v.    **Review of Placement Approvals for Phase One Operations**

The Monitors engaged in two analyses to validate the Court's requirement that the Associate Commissioner for CPS, or, later, the Regional Director approve children's placements to operations on Heightened Monitoring prior to the child's admission.  The first analysis was based on a review of placement authorization requests provided to the Monitors for June through December 2020.  The second analysis used PMC child placement data for the same time period.

A total of 133 placement authorization requests were provided to the Monitors by the State between June and December 2020 for the eight operations in Phase One of Heightened Monitoring. Of these, 99% were approved (131 of 133).

**Figure 7.26: Placement Authorization Requests for Phase One Heightened Monitoring Operations Analyzed**



Of the 131 placement requests that were approved, only eight had conditions associated with the placement, including:

- Child must be the only child in the home.
- Caregivers must be briefed on behaviors of the child.
- Child not allowed to room with another child with a history of child sexual aggression of child sexual abuse and must be supervised when with another child with a history of sexual abuse or aggression.
- No staff currently under investigation may supervise the child.
- Extra visits by worker are required to observe child and home environment.

Seven of the eight children whose placement approvals included conditions were ultimately placed in the setting subject to Heightened Monitoring.  Only one of the two denied placement approval requests featured a reason provided in the denial: the children who would be sharing a bedroom did not comply with agency policy around allowable age differences, as the child who would have been placed was a four year-old, and the child who would have shared the bedroom was an 11 year-old.

Forty-seven of the 131 (36%) approved placement requests provided to the Monitors were for placements of PMC children; the rest (84 of 131) of the approved requests were for TMC children.

315

**Figure 7.27: Legal Status of Children with Approved Placement Authorizations in Phase One Heightened Monitoring Operations Analyzed**



Source: Placement Authorization Requests in SharePoint, June – December 2020 and pp_10slx report from Data Warehouse
*n = 131*

Of the 47 placement approvals for PMC children into a Phase One Heightened Monitoring operation between June and December 2020, 34 resulted in placement in the operation. Overall, the Monitors found 79% of approved placement requests (104 of 131) resulted in placements in the operations.

**Figure 7.28: Placement Requests at Phase One Heightened Monitoring Operations with an Approved Placement by PMC Status**



Most of the placement approval requests were made prior to the Court's December 7, 2020 order, which modified the placement approval process.  Consequently, 97% of approved PMC placements that resulted in placement in a Phase One operation (33 of 34) between June and December 2020, were approved by the CPS Associate Commissioner.

The information included in placement requests was more robust following the Court's order of December 7, 2020.  However, even before the modification, the placement requests almost always included a "best interest" statement for the child, and a description of the child's needs.[648]

---

[648] All of the 17 placements made after the Court's December 7, 2020 order through December 31, 2020 were for TMC children, so a "before and after" comparison could not be made solely for PMC children.

**Figure 7.29: Information Included in Approved Placement Requests that Resulted in Placement by Timing of Request**

Source: Placement Authorization Requests in SharePoint, June – December 2020 and IMPACT
*n = 104*

Before court order modification (n = 87)
After court order modification (n = 17)

| | Operation history | Statement of best interest | Description of child's needs | All three elements | No elements |
|---|---|---|---|---|---|
| Before court order modification | 39% (34) | 87% (76) | 75% (65) | 24% (21) | 5% (4) |
| After court order modification | 94% (16) | 100% (17) | 53% (9) | 53% (9) | 0% |

Of the 34 PMC children with an approved placement request who were placed in a Phase One operation, 62% (21 of 34) were placed after the request for approval was made. Six (18%) were placed the same day as the approval, and seven (21%) were placed prior to the approval.

**Figure 7.30: Timing of Placement Start for PMC Children with Approved Placement Requests and Placement at Phase One Operations**



Source: Placement Authorization Requests in SharePoint, IMPACT, PMC Child Placement Data, June - December 2020
*n = 34*

| | |
|---|---|
| Placed prior to approval | 21% (7) |
| Placed same day as approval | 18% (6) |
| Placed 1 to 7 days after approval | 41% (14) |
| Placed more than 7 days after approval | 21% (7) |

The Monitors next used the PMC placement data provided by the State to identify placements of PMC children in Phase One operations that occurred after the operation was notified that it was placed on Heightened Monitoring.  The monitoring team looked for documentation of an approved placement request in IMPACT, based on the State's description of the process for approving placements prior to and after the Court's order of December 7, 2020.

There were a total of 118 new placements of PMC children in the Phase One operations analyzed after the operations were notified of being placed on Heightened Monitoring.[649]

**Figure 7.31: Number of PMC Placements at Phase One Operations After Operation was Placed on Heightened Monitoring, June – December 2020**



Of the 118 PMC placements at Phase One operations, the monitoring team was unable to find a placement approval for 65% (77 of 118).  The monitoring team also compared the 118 PMC placements to the placement requests provided by the State and found that 71% (84 of 118) of the children placed in a Phase One operation subject to Heightened Monitoring between June and December 2020 did not match to a placement request provided to the Monitors by the State. However, of those 84 placements, seven did have a placement approval by either the CPS Associate Commissioner (6 of the 7), or Regional Director (1) documented in IMPACT.

---

[649] New placement is defined as a child having a Placement Start Date after the date of notification of Heightened Monitoring for that operation. Placement starts occurring within one day of a prior placement end at the same operation location (*e.g.*, a change in level of care) were excluded. Gulf Coast Trades Center was put on a placement suspension on December 11, 2020.  Of the 12 PMC placements made to Gulf Coast Trades Center, none occurred after the placement hold was put in place.

**Figure 7.32: PMC Placements at Phase One Heightened Monitoring Operations by Approval**



Since the eight operations were placed under Heightened Monitoring, the number of PMC placements has declined in all of them.

**Figure 7.33: Average Monthly PMC Placements at Phase One Operations One Year Prior to Heightened Monitoring and in the Months Following Placement on Heightened Monitoring through December 31, 2020**



> *g.* Analysis of Minimum Standards Citations and Substantiated Abuse or Neglect Allegations for Phase One Operations

The monitoring team analyzed the number of citations issued for minimum standards violations, the number of intakes and substantiated allegations of abuse or neglect, and the number of minimum standards waivers or variances granted after Phase One operations were placed on Heightened Monitoring.  The Monitors compared the average number of deficiencies per month in the 12 months prior to the onset of Heightened Monitoring with the average number of deficiencies per month from placement on Heightened Monitoring through December 2020 for Phase One operations.

**Figure 7.34: Average Number of Deficiencies Prior to and Following Placement on Heightened Monitoring through December 31, 2020 for Phase One Operations Analyzed**



Five of the eight Phase One operations analyzed (63%) had a higher number of deficiencies per month after placement on Heightened Monitoring than in the year prior to heightened monitoring. In total, Phase One operations had 396 deficiencies cited in the year prior to placement on Heightened Monitoring and 266 deficiencies cited in the months following placement on Heightened Monitoring.[650] Seven of the eight Phase One operations had a higher number of high or medium-high deficiencies per month after placement on Heightened Monitoring than in the year prior to Heightened Monitoring.

---

[650] One year prior to placement on HM was calculated as 365 days prior to the HM notification date. The average number of deficiencies per month following placement on HM was calculated by summing the number of deficiencies cited after the HM notification date through December 31, 2020 and dividing the sum total by the number of months each operation was on HM in 2020. If an operation was notified of HM toward the end of the month, that month was not counted in the number of months placed on HM. Deficiencies include those with an administrative review status of Waived, Upheld, or Pending.

**Table 7.14: Total Number of Deficiencies Prior to and Since Placement on Heightened Monitoring Through December 31, 2020 for Phase One Operations Analyzed**

| Operation | Total number of deficiencies in year prior to Heightened Monitoring | Total number of deficiencies since placement on Heightened Monitoring[651] | Number of months on Heightened Monitoring |
|---|---|---|---|
| A Fresh Start | 47 | 48 | 5 |
| Assuring Love | 12 | 18 | 6 |
| Azleway Valley View | 4 | 14 | 6 |
| Beacon of Hope | 70 | 17 | 4 |
| Benchmark | 156 | 123 | 6 |
| Connections Inc. | 43 | 14 | 5 |
| Gulf Coast Trades Center | 44 | 29 | 6 |
| New Life | 20 | 3 | 3 |

Some of these citations were issued following an abuse or neglect investigation. A total of 113 allegations of child abuse, neglect, or exploitation were associated with 93 RCCI investigations opened for Phase One operations subject to Heightened Monitoring between June and December 2020. RCCI opened at least two investigations in every Phase One operation during the time period. Benchmark had the highest number (61) and Connections had the lowest number (2). Operations had a total of 66 citations[652] for standards violations associated with investigations during the period.

Half of the allegations at Phase One operations (56 of 113, 50%) were for Neglectful Supervision, 21% (24 of 113) were for Physical Abuse, 12% (14 of 113) were for Sexual Abuse, and the remaining 17% (19 of 113) were for Emotional, Medical, or Physical Neglect. All Phase One operations had at least one Neglectful Supervision allegation and all but one operation (Connections) had a Physical Abuse allegation. Five of eight Phase One operations had a Sexual Abuse allegation.

Of the 113 allegations at Phase One operations, 104 (92%) were Ruled Out, seven (6%) were substantiated with a finding of Reason to Believe (RTB),[653] one was found UTB and one was pending at the time of data collection.[654] Three of the RTBs were for Neglectful Supervision, two were Physical Abuse, one was for Sexual Abuse, and one was for Medical Neglect. A total of 121 perpetrators were identified in the 113 ANE allegations at Phase One operations. More than 90% of perpetrators were caregivers or foster parents (114 of 121, 94%).

---

[651] Deficiencies from the date of notification through December 31, 2020.
[652] Includes all minimum standards violations as found in CLASS. Some citations may have been overturned.
[653] Of RCCI investigations started between June and December 2020 with a disposition of RTB, 6 were completed in 2020 and one was completed in 2021.
[654] Data was collected as of the week of April 5, 2021.

**Table 7.15: ANE Allegation Dispositions for ANE Investigations Conducted at Phase One Heightened Monitoring Operations**

| Operation | Allegation Disposition | | | Total |
|---|---|---|---|---|
| | Reason to Believe | Ruled Out | Unable to Determine | |
| A Fresh Start | 0 | 6 | 0 | 6 |
| Assuring Love | 0 | 6 | 0 | 6 |
| Azleway Valley | 0 | 3 | 0 | 3 |
| Beacon of Hope | 1 | 8 | 1 | 10 |
| Benchmark | 4 | 56 | 0 | 61[655] |
| Connections | 0 | 2 | 0 | 2 |
| Gulf Coast | 1 | 15 | 0 | 16 |
| New Life | 1 | 8 | 0 | 9 |
| **Total** | **7 (6%)** | **104 (92%)** | **1 (1%)** | **113[656]** |

> *h.*     Analysis of Minimum Standards Waivers or Variances Requested and Granted at Phase One Operations

Operations on Heightened Monitoring can request and be granted waivers and variances of minimum standards. The Monitors first raised concerns related to RCCR's approval of minimum standards variances for troubled facilities in its updated review of the investigation of K.C.'s fatality, filed September 2, 2020. During the research for the Update to the Court, the Monitors discovered that Prairie Harbor LLC, the facility where K.C. died, had been granted a variance for minimum standards related to staffing ratios, though the facility was on probation and had been identified for Heightened Monitoring.[657]

During the September 2020 contempt hearing, the Court discovered that DFPS was unaware that the variances had been granted by HHSC:

THE COURT: Do you know about this***Commissioner?

COMMISSIONER MASTERS: About the placements?

THE COURT: Yes. This is a place that has been identified by DFPS for heightened monitoring, and yet, they have been approved, apparently, from – by HHSC for a staffing variance, so they have even less staff per child than is required?

---

[655] Benchmark had one allegation that was pending a disposition.
[656] Id.
[657] Deborah Fowler and Kevin Ryan, First Report, 25, ECF No. 869.

COMMISSIONER MASTERS: No, Your Honor.  I was not aware.[658]

The next day, the Court asked Jean Shaw, the Director of RCCR, about the variances that were granted for Prairie Harbor:

THE COURT: Who granted – who granted the variance for the***staff-to-child after they were put on probation in February?

THE WITNESS:  It was reviewed and approved by a supervisor.

THE COURT: In your department?

THE WITNESS: Yes, Your Honor.

THE COURT: And why was it approved knowing they were on probation?

***

THE WITNESS: The pandemic of COVID-19 has put quite a few operations at risk of not having enough staff. *** So Prairie Harbor requested it, knowing that they weren't going to have enough staff.  We did approve a variance, but we put conditions on that variance, such as they could only – the normal ratio requires one-to-five.  We put – allowed them to go to a ratio of one-to-six.  If any child was on one-to-one supervision, that child was still required to be on one-to-one supervision being supervised by somebody within their administration staff.  We did put other additional conditions on there as well.

Plaintiffs' counsel also asked this witness about the variances:

BY MR. YETTER:

Q: There's been a variance for several months after this child died in February.  You know that, Ms. Shaw.  Don't you?

A: Yes.

Q: And what – and this is a facility that's had 145 citations and a recent child – very preventable child's death and your group is actually allowing them to have – get out of ratio on the number of caregivers to children.  That would – you just explained to the Court?

A: Yes.  I think that under normal circumstances, that would not be approved, but we recognized that Prairie Harbor is not going to have enough staff.  So we

---

[658] Telephonic/Zoom Show Cause H'rg Tr, (September 3, 2020) 122-23, ECF No. 964.

implemented to *** to try to mitigate the risk to the fact that they are not going to have enough staff whether we approve the variance or not.[659]

The Court instructed RCCR to provide DFPS and the Monitors with information related to variances or waivers of minimum standards on a monthly basis going forward.[660]

Between June and December 2020, 360 minimum standards variances were requested by operations on Heightened Monitoring,[661] including 30 requests at Phase One operations.  HHSC granted requested variance to operations on Heightened Monitoring 163 times (of 323 requests, 50%).[662]

Phase One operations were granted variances in 57% of requests (17 of 30).  Only one Phase One operation (Gulf Coast Treatment Center) did not request a variance or waiver between June and December 2020.  On average, variances were effective for 66 days.

**Table 7.16:  Requested Variances at Phase One Heightened Monitoring Operations**

| Operation | Number of Variances Requested | Number of Variances Granted | Average Days Effective |
|---|---|---|---|
| A Fresh Start | 2 | 2 | 7 |
| Assuring Love | 1 | 1 | 365 |
| Azleway Valley View | 2 | 1 | 60 |
| Beacon of Hope | 2 | 2 | 62 |
| Benchmark | 11 | 4 | 84 |
| Connections | 4 | 1 | 0 |
| Gulf Coast | 0 | 0 | 0 |
| New Life | 8 | 6 | 30 |
| Total | 30 | 17 | 66 |

---

[659] Telephonic/Zoom Show Cause Hr'g. Tr. (September 4, 2020) 113-15, ECF No. 967.

[660] *Id*. at 120-21.

[661] There were a total of 2,214 requests for variances and waivers between June 1,2020 and December 31, 2020, 360 of which were requested by operations on heightened monitoring (14%).

[662] HHSC granted approval for variance waivers in operations not on Heightened Monitoring 85% of the time (1,668 of 1,968 requests). Calculations include only those requests for which data on decision was provided.  Data on requested waivers and variances provided by the State included missing supervisor decision information, with the majority of missing information occurring for requests made in the month of August.  Thirty-seven of Heightened Monitoring requests and 246 of non-Heightened Monitoring requests did not have decision data.

Variances in Phase One operations were granted for the following minimum standards:

**Table 7.17: Variances Granted to Phase One Heightened Monitoring Operations, June to December 2020**
Source: Variance and Waiver Data as Provided by DFPS, June – December 2020

| Standard for Variance | Number of Variances Granted | Operation |
|---|---|---|
| 748.1003(a)- Child/caregiver ratio-Caregiver may care for 5 children if any require treatment services, 8 children if not; children under 5 years old count as 2 children | 5 | Azleway Valley View New Life |
| 748.1007(b)(1)- Child/caregiver ratio-Awake caregiver may care for 15 children if any child in group requires treatment services | 2 | New Life |
| 748.983(a)- First-aid-CPR renewal-Each caregiver must complete any new first-aid training, as required to maintain a current certification | 2 | A Fresh Start |
| 749.1251(a)- Pre-placement visits-A child over six months of age must visit the foster home at least once before placement | 1 | Beacon of Hope |
| 749.1291(a)- Contact between child placement staff and children-except for child with primary medical needs, monthly face-to-face contact; no longer than 60 days without a visit | 1 | Beacon of Hope |
| 749.2815(a)(1)- Supervisory Visits-must have supervisory visits in the foster home at least quarterly | 1 | Benchmark |
| 749.3021(a)- Space-Bedroom must have at least 40 square feet of space per occupant; only four occupants per bedroom | 1 | Benchmark |
| 749.304- You must have a main or branch office in each region of DFPS where you verify homes or within 150 miles of each verified home | 1 | Benchmark |
| 749.673- Child placement staff qualifications-Employees who perform child placement activities must meet educational and professional qualifications | 1 | Assuring Love |

New Life received variances related to child/caregiver ratios monthly, with effective dates from July 3, 2020 to November 9, 2020.

327

vi.      **Summary**

The State's list of operations to be placed under Heightened Monitoring changed twice after the Monitors validated the list sent on June 5, 2020. First, the State added two CPAs and removed seven after correcting a coding error that resulted in a miscount of CPA foster homes. Second, the State added nine operations after the Monitors raised concerns regarding GROs that were originally slated for Heightened Monitoring, but fell off the list after having "closed," only to reopen under a new name.  The Monitors' analysis for this report focused on the eight operations prioritized for Phase One of Heightened Monitoring.  Phase One operations had the highest scores on a risk stratification analysis used by the State.

Between 2016 and 2020, the eight Phase One operations analyzed accounted for 67 substantiated findings of abuse or neglect, and more than 2,000 citations for minimum standards deficiencies.  All Phase One operations had been placed under some type of enforcement actions at least once; some had been the focus of more than one type of enforcement action.  A comparison of tasks in the Phase One operations' Heightened Monitoring Plans with those included in previous enforcement actions showed that 31% (22 of 71) of the tasks included in Heightened Monitoring Plans were similar to requirements included in the operations' previous enforcement actions.

Heightened Monitoring visits in Phase One operations occur on a weekly basis, as required. Thirty-eight percent of Heightened Monitoring visits (33 of 86) conducted by RCCR Heightened Monitoring Inspectors between June and December 2020 resulted in one or more deficiencies being cited; a total of 83 deficiencies were cited at Phase One operations during a Heightened Monitoring visit.  DFPS and RCCR identified one or more allegations of abuse or neglect or other safety or compliance problems in 23% (55 of 244) visits, including 21 calls to SWI made as a result of visits.  After Phase One operations were placed on Heightened Monitoring, a total of 113 allegations of abuse or neglect were made;  RCCI opened at least two abuse or neglect investigations in every Phase One operations between June and December 2020.

A review of placement approval requests showed they were almost always approved: of the 133 provided to the Monitors by the State between June and December 2020, 131 (99%) were approved. However, the Monitors were unable to validate placement approval by either the Associate Commissioner for CPA, or (later) the Regional Director, for the overwhelming majority of PMC children placed in the Phase One operations after they were placed on Heightened Monitoring.  Of the 118 PMC placements made during that time period, the monitoring team was unable to find approval for 65% (77 of 118) and could not find a placement approval request in the documents provided by the State for 71% (84 of 118).

## D.      Remedial Order 21: Revocation of Licenses

Remedial Order 21: *Effective immediately, RCCL and/or its successor entity, shall have the right to directly suspend or revoke the license of a placement in order to protect children in the PMC class.*

### a.   Background

### i.   First Court Monitors' Report Performance Validation Findings

In the Monitors' First Report, after a review of all the documents and information submitted by the State, the Monitors determined that there had not been any license revocations for any placement (foster home, CPA, or GRO) in the five-year period preceding September 30, 2019.[663] HHSC had notified the Monitors of pending license revocations for two GROs – Children's Hope – Lubbock, and North Fork Educational Center –in December 2019 and February 2020, respectively. The First Report discussed the history of RTBs leading up to the closure of these facilities.[664] The Monitors' First Report also discussed two GROs for which DFPS had terminated its contract in 2020: Hector Garza RTC, and High Frontier Treatment Center.[665] In the three years between September 30, 2016 and September 30, 2019, DFPS had terminated only four contracts.[666]

The Monitors subsequently filed an update to the Court related to facility closures on September 2, 2020, discussing the closure of Williams House, after DFPS removed all of the children in the placement following the investigation of the death of C.G., discussed at length in the Monitors' First Report and updated in Section VIII of this report.[667] Williams House voluntarily relinquished its license.  The Monitors' September 2, 2020 Update also alerted the Court to the closure of three other GROs: Houston Serenity, Youth and Family Enrichment Center (YFEC) and the YFEC Shelter, all of which surrendered their licenses.  Had they not surrendered their licenses, Williams House, Houston Serenity, and the YFEC Shelter would all have been subject to Heightened Monitoring pursuant to Remedial Order 20 due to troubled child safety histories involving violations of minimum standards and confirmed findings of child abuse and neglect.[668]

The Monitors had not received any notifications from HHSC related to closure of an agency foster home, though HHSC had indicated that it was developing a process for determining when agency homes should be closed and expected a "full rollout of the new process by May 1, 2020."[669]

### ii.   September 2020 Contempt Hearing

---

[663] Deborah Fowler and Kevin Ryan, First Report 322, ECF No. 869.
[664] *Id*. at 323-339.
[665] *Id*. at 317.
[666] *Id*.
[667] Deborah Fowler and Kevin Ryan, *The Court Monitors' Update to the Court Regarding Child Fatalities and Congregate Care Facility Closures* (September 2, 2020), ECF No. 956.
[668] *Id*.
[669] *Id*. at 322.  In addition, in an informal response to a draft of the First Report, HHSC indicated, "HHSC's new procedures for recommending closure of an agency home by RCCL inspectors rolled out on April 29, 2020, effective May 1, 2020."  DFPS & HHSC, *Agency Response to DR Texas Report* 27 (June 15, 2020) (on file with Monitors).

Though Remedial Order 21 was not included in the Plaintiffs' Motion to Show Cause, the Court asked questions related to the issuance of license revocations and facility closures during the testimony of Jean Shaw, the Associate Commissioner for Child Care Regulation at HHSC:

THE COURT: …[H]ow many licensed placements have you revoked in the past five years?

    …

THE WITNESS: I believe three.

THE COURT: And what are those – what are they?

THE WITNESS: One was for Five Oaks Achievement Center, one was for North Fork, and the other one was for Children's Hope…

THE COURT: So all of these placements that – you revoked their licenses?

THE WITNESS: We issue an Intent to Revoke.  Throughout that process –

THE COURT: Which ones have you actually revoked?

THE WITNESS: Children's Hope voluntarily relinquished their license after we issued the Intent to Revoke.  Five Oaks did the same thing.  And North Fork is under due process right now.

THE COURT: Okay, so of those three, which ones did you make it a stipulation that they can't reopen a – a facility in the future?

THE WITNESS: We have statutory requirements that guide us for that.  So if –

THE COURT: How many? Just answer the question.

THE WITNESS: None at this time, Your Honor.

THE COURT: Okay.  You know Five Oaks and North Fork are the same owners. Right?  And these are for profit organizations; is that right?

THE WITNESS: That is correct.

THE COURT: Same owners and for-profit, correct?

THE WITNESS: Yes, Your Honor.

330

THE COURT: So what is it you've licensed them for if DFPS won't put children there?  These other places like Prairie Harbor and Hector Garza, what are they licensed to do exactly?

THE WITNESS: I believe Prairie Harbor is licensed to be a residential treatment center, which falls under a general residential license.  It's a service type.  If they no longer accept children from DFPS, they can look for other placement sources, as long as they have a license.

THE COURT: Well that must be reassuring to the public generally.[670]

### iii.   Policy Updates Following the Contempt Hearing

In October 2020, HHSC updated the Child Care Regulation Handbook to reflect the policy changes for agency home closures that went into effect May 1, 2020.[671]  A new section was added to the Handbook devoted to policies and procedures related to agency home closures.[672]

According to the Handbook, RCCR staff will recommend the closure of an agency home when there is a high degree of risk to children and the risk cannot be mitigated.[673]  When RCCR staff identifies risk at an agency home, the following criteria are used in assessing the home for closure:

- patterns and repeated violation of high risk deficiencies;
- number of intakes and investigations; and
- whether the home was previously closed for deficiencies by another CPA.[674]

---

[670] Telephonic/Zoom Show Cause Hr'g Tr. (September 4, 2020) 81-83, ECF No. 967 .

[671] Despite HHSCs representation that the new policies were "rolled out" April 29, 2020, and would go into effect May 1, 2020, HHSC did not provide the new policy or procedures to the Monitors, even after the Court instructed both agencies to send the Monitors any policy changes related to the remedial orders during the September 2020 contempt hearing.  The Monitors found the October 2020 changes in the Handbook during their own review.  On March 14, 2021, the Monitors e-mailed HHSC to ask the agency to send them any policy updates related to Remedial Order 21, including Field Communications.  E-mail from Deborah Fowler and Kevin Ryan to Taryn Lam, *Policy Updates, Field Communications, and Documents Related to RO 21* (March 14, 2021).  The Monitors also asked for any recommendations for an agency home closure made by RCCR staff, and the responses to the recommendations.  *Id.*  In response, HHSC uploaded to the shared database redlined revisions to the Handbook related to Remedial Order 21, as well as other remedial orders, and nine Field Communications, one of which was related to Remedial Order 21 and eight related to other remedial orders, with effective dates ranging from May 1, 2020 to February 5, 2021.  HHSC also uploaded five agency home closure recommendations and related documents, which are discussed *infra*.  E-mail from Taryn Lam to Deborah Fowler and Kevin Ryan, *Policy Updates, Field Communications, and Documents Related to RO 21* (March 16, 2021).  Field Communication 284, the Field Communication related to Remedial Order 21 that was provided to the Monitors on March 16, 2021, has an effective date of May 1, 2020 and is almost identical to the updates made to the Handbook in October 2020.

[672] HHSC, *Child Care Regulation Handbook* §4450 et seq. (October 2020), *available at* https://hhs.texas.gov/laws-regulations/handbooks/ccrh/section-4000-inspections

[673] *Id.* at §4450.

[674] *Id.* at §4451.

The next section describes "Agency Home Compliance History Considerations," instructing CCR staff:

> When evaluating the compliance history of the agency home, CCR staff considers if there is a pattern or repeated violations of high risk deficiencies related to:
>
> a.  inappropriate discipline;
> b.  inadequate supervision;
> c.  unsafe living conditions;
> d.  safe sleep violations;
> e.  interference with an investigation; or
> f.  failure to report to the CPA a household member or frequent visitor for background checks.[675]

When CCR staff "determines that an agency home has a high level of risk that cannot be mitigated," the staff person is to recommend closure within 24 hours of identifying the risk.[676] The procedure for submitting a recommendation for closure involves e-mailing a completed form and supporting documentation to HHSC, and copying the staff person's supervisor, program administrator, and district director on the e-mail.[677]

> The Handbook next describes a "Closure of Agency Home Meeting" that takes place:
>
> If CCR state office accepts the recommendation for closure, CCR leadership and HHSC legal hold an internal meeting to discuss the details of the recommended closure.
>
> If the recommendation for closure is approved during the meeting, the final approval is requested from the HHSC Regulatory Services leadership.[678]

> If HHSC RCCR leadership approves the closure during this meeting, the Handbook indicates the RCCR regional director contacts the CPA to request closure of the home, and notifies DFPS to assess for "placement disallowance."[679]

---

[675] *Id.* at §4451.1.

[676] *Id.* at §4452.

[677] *Id.*

[678] *Id.* at §4453. Field Communication #284 indicates that within three days of a recommendation for closure form being submitted, "the FCL project manager reviews the form for completion and, if warranted, schedules a closure of agency home (CAH) review meeting" with the CCR Associate Commissioner, RCCR Director, RCCR field staff and HHSC legal representative. HHSC, *Child Care Regulation Field Communication #284* (April 29, 2020) (on file with Monitors).

[679] *Id.* at §4454. On March 19, 2021, the Monitors e-mailed RCCR to ask why a "placement disallowance" would be necessary for an agency home that has been subjected to a forced closure. Email from Deborah Fowler and Kevin Ryan to Taryn Lam, *Policy Updates, Field Communications, and Documents Related to RO 21*, March 19, 2021 (on file with Monitors). RCCR explained, "Under applicable statutes and corresponding rules, the new CPA would be required to review and consider background check determinations and other information from the previous CPA before the new CPA can verify an agency foster home…With respect to transfer of an agency foster home from one CPA to another, the home must notify the new CPA of all licensing violations cited during the preceding 3 years, and the DFPS caseworker can provide input on whether the transfer is in the best interest of each child placed in the

b. **Remedial Order 21 Performance Validation**

i. **Methodology**

The Monitors reviewed all documents related to policy changes associated with agency home closures, and documents submitted by HHSC to the Monitors related to the five agency homes for which a closure recommendation was submitted. The Monitors also reviewed CLASS to determine the history associated with each of the homes.

Since the Monitors' last update to the Court related to congregate care facility closures, RCCR issued letters to four additional GROs, notifying them of the agency's intent to revoke their license, and denied a license two GROs that were operating in an initial licensure period. In addition, DFPS has notified the Monitors of its decision to cancel its contract with one GRO, and one troubled GRO – Whataburger Center for Children – voluntarily relinquished its license. The Monitors reviewed CLASS and data provided by the State regarding the history of these GROs.

ii. **Remedial Order 21 Performance Validation Results**

*a.* Agency Homes Recommended for Closure by RCCR

Between the time that the new policy related to agency homes went into effect on May 1, 2020 and March 16, 2021, the date that the State responded to the Monitors' request for information related to agency home closures, five recommendations for closures had been submitted by RCCR staff. Of those five recommendations, one was still pending at the time that the information was provided to the Monitors, three had been approved for closure and closed, and one recommendation for closure had been denied.

---

home…Additionally, where CCR's closure recommendation is not related to a RTB finding, the disallowance referenced in Tila's e-mail to DFPS would prevent the agency home from receiving placements in the future. CCR has initiated an IT change in CLASS to add "CCR Recommended Closure" as a reason that a CPA can select for any agency home closure on the provider portal. Such change could deter reverification because the new CPA would be able to see that the agency home was previously closed by another CPA at CCR's recommendation." E-mail from Taryn Lam to Deborah Fowler and Kevin Ryan, *Policy Updates, Field Communications, and Documents Related to RO 21* (March 22, 2021) (on file with Monitors). For clarification, the Monitors responded by asking, "If the foster parent has an RTB – would the background check come back showing them as ineligible?" E-mail from Deborah Fowler and Kevin Ryan, *Policy Updates, Field Communications, and Documents Related to RO 21* (March 22, 2021) (on file with Monitors). RCCR responded, "If someone who requires a background check has a sustained finding for Physical Abuse, Sexual Abuse, Labor Trafficking, or Sex Trafficking, the CPA would receive notification that the person is Ineligible to be present at the operation. If the person has a sustained finding for Emotional Abuse or any type of Neglect, the Centralized Background Check Unite would offer the subject of the background check a risk evaluation. The CBCU would then evaluate the information obtained as part of the risk evaluation to determine whether the person is ineligible to be present at the operation or eligible (with our without conditions placed on the person's presence)." E-mail from Taryn Lam to Deborah Fowler and Kevin Ryan, *Policy Updates, Field Communications, and Documents Related to RO 21* (March 22, 2021) (on file with Monitors).

b.      Approved Closure Recommendations

Of the three homes that were closed, two were closed after abuse and neglect investigations arising out of child fatalities resulted in RTBs:

- An investigation involving an 18-month old infant, E.C., discussed in Section VIII of this report, who drowned in the foster family's backyard swimming pool. An investigation of the child's death by RCCI led to a finding of Neglectful Supervision. CLASS shows the CPA closed the home (by relinquishing its verification of the home) on December 8, 2020, listing the relinquishment reason as "Voluntarily Closed with Deficiencies."

- An investigation involving the April 13, 2020 death of a three-year-old foster child, R.M.[680] The autopsy report revealed she had suffered blunt-force trauma to her head, trunk, and extremities and that the injuries were "concerning" for inflicted trauma. However, the child was also suffering from influenza when she died; therefore, the autopsy listed the cause of death as "undetermined." The investigation also revealed that R.M. had been lethargic and had refused food for two days after the foster parent and other children in the home said she fell off of her bike and hit her head. The February 10, 2021 RTB included findings for physical abuse, medical neglect, and neglectful supervision. The child's sibling, who also lived in the home, had expressed homicidal ideation toward her, and had injured her "multiple times," resulting in a safety plan requiring her to sleep in a separate room from the sibling, requiring the foster parent to install cameras in common areas of the home, and requiring the child to be supervised when with her sibling. The foster parent failed to follow the safety plan. This investigation was the first of this home, which had opened less than a year before the child died. The recommendation for closure was made February 23, 2021.[681] RCCR also sent a background check letter to the CPA noting that

---

[680] This child was not in PMC at the time of her death. The CPA responsible for oversight of the foster home where the child died, Circle of Living Hope, is one of the CPAs subject to Heightened Monitoring pursuant to Remedial Order 20.

[681] An e-mail thread included in the materials that RCCR provided to the Monitors for this closure shows that the RCCI investigation that resulted in the RTB was completed on February 10, 2021. The final report related to the fatality was sent to DFPS leadership that day, indicating "Attached is the Confirmed Death Report for [R.M.]. [R.M.] was found vomiting in her bedroom, became unresponsive, and was taken to the hospital and pronounced dead on 4/13/2020. During the investigation it was determined that [R.M.] had multiple unexplained bruises and injuries. The autopsy was inconclusive but noted that she had suffered blunt force trauma concerning for inflicted child abusive trauma. It was also determined that [R.M.] had been exhibiting symptoms of injury for multiple days prior to her death and the foster mother…failed to obtain medical services. The investigation was closed with Reason to Believe for Medical Neglect, Neglectful Supervision, and Physical Abuse of [R.M.] by [foster parent]." E-mail from Jonathan D. Wilson, Lead Investigative Analyst, Complex Investigations Division, CCI, to Jillian Bonacquisti et al, *Child Death Final Report Region 07* (February 10, 2021) (on file with Monitors). The e-mail thread shows that DFPS sent the fatality report to RCCR the same day, and the RCCR staff person who received it forwarded it to additional RCCR staff, one of whom responded "This case is from April 2020 and has been back and forth with the autopsy cause of death coming back as undetermined and LE stopped pursuing charges last August. The [Plan of Action] on several other branches is coming to an end…Temple was not included in the PoA pending the outcome of this case." E-mail from Nicol Hoffer, Program Specialist, RCCR to Tila Johnson, *et al*, *Child Death Final Report Region 07*, (February 11, 202)1 (on file with Monitors). On February 22, 2021, Tila Johnson, the Director of Regional Operations for RCCR, responded "Can you have someone complete the form to recommend closure of this foster home…Her home is showing 'inactive' in CLASS. I'll get a call set up once it's submitted to me and to the mailbox. Todd – moving forward with probation for all of the branches." E-mail from Tila Johnson, Director of Regional Operations, RCCR,

334

the foster parent was ineligible to be a foster parent on February 25, 2021.  CLASS shows the CPA's closure of the home was effective February 26, 2021 and lists the closure reason as "Criminal History Match."

The third closure involved a home that had been investigated for abuse or neglect seven times, for minimum standards violations four times, and had received five citations related to inappropriate discipline over its 11-year period of being licensed by two different CPAs (Beacon of Hope and Benchmark Family Services).[682]  The foster home first operated under the McAllen branch of Benchmark Family Services, from June 22, 2010 until September 23, 2013.  During this time, the home was the subject of four abuse and neglect investigations:

- An investigation opened January 3, 2011, alleging that when the nine-month old foster child was on a visit with his parents, a diaper change resulted in the discovery of marks on the child that appeared to be bruises, and a severe diaper rash.  Abuse and neglect was Ruled Out and the investigation was closed without any citations being issued.

- An investigation opened May 18, 2011, after a two-year old child made an outcry that the foster parent hit her on the mouth. The child was observed by her CVS worker to have a small circular bruise on her left cheek "possibly the size of a thumb."  During a follow-up interview, the child recanted and said her sister hit her.  Her sister said she got the bruise when she fell.  The foster parent also said the child had fallen, and a serious incident report dated the day before the child's outcry showed the foster parent had reported the fall and the bruise. Abuse and neglect were Ruled Out and the investigation was closed.

- An investigation opened August 31, 2012, linking two intakes to SWI made by the same reporter for two different sibling groups formerly in the foster parent's care.  Both intakes alleged that the foster parent was physically abusive to the children while they were in her care.  However, the investigator discredited the reports when it was determined that the reporter's husband had left her and was romantically involved with the foster parent.  Though one of the children acknowledged that the foster parent hit him on the arm with a water bottle, another child denied any physical abuse or discipline aside from time-outs.  The other children were too young to be interviewed.  No concerns were expressed by any of the other witnesses interviewed. The allegations of abuse were ruled out and the investigation was closed.

- An investigation opened April 4, 2013, after a child made an outcry at school that the foster parent put her younger sister, who was afraid of the dark, into a closet for time out and also slapped her "for no reason."  The reporter, a staff person at the child's school, also indicated that the child said she does not have food at home and eats her best meal at school.  The child recanted the allegations during an interview with the investigator.  The other foster

---

to Nicol Hoffer *et al*, *Child Death Final Report Region 07* (February 22, 2021) (on file with Monitors).  The next day, the closure recommendation was sent from Nicol Hoffer to Tila Johnson and the e-mail address used for submitting closure recommendations.  E-mail from Nicol Hoffer to Tila Johnson, et al, Re: COLH King 2980e, February 23, 2021 (on file with Monitors).
[682] Both of these CPAs are on Heightened Monitoring pursuant to Remedial Order 20.

children in the home were too young to be interviewed. A citation was issued for inappropriate discipline because the foster parent acknowledged yelling at the children.

On September 24, 2013, Beacon of Hope CPA licensed the foster home.  Between that date and the date that RCCR recommended closure of the home, the home was the subject of three more abuse or neglect investigations:

- An investigation opened May 2, 2014, after a three year-old foster child was observed with marks under his arm on the right side of his body and made an outcry that the foster parent's boyfriend had hit him with a flyswatter. During the interview with the foster parent, she said that the child obtained the injuries when he fell while he was playing and denied that her boyfriend hit the children.  During this interview, the investigator noticed a fly swatter hanging on the wall, picked it up and asked the child with the injuries to come over to him. The investigator lifted the child's shirt and showed the foster parent that the handle of the fly swatter aligned perfectly with the markings on the child's body.  This investigation was closed with an RTB finding of Physical Abuse by the foster parent's boyfriend but ruled out Neglectful Supervision on the part of the foster parent.  Three citations were issued: a citation associated with the minimum standard for a child's right to be free from abuse or neglect; a citation issued related to inappropriate discipline due to the boyfriend's use of physical discipline; and a citation issued for inappropriate discipline related to the foster parent's admission during the investigation that she placed a toddler in a crib as a form of discipline.

- An investigation opened June 6, 2017, when a five year-old foster child was found wandering in the neighborhood.  When law enforcement took the child back to the home, the foster parent was in the bathroom and said she thought the child was asleep.  The child left the home twice the day before; the foster parent reported that she had new deadbolts that she was planning to have installed on the doors.  During the interview with the child, he indicated that he left the home because he missed his family.  However, he also said that the foster parent hit him on his stomach "a lot," that she hit the other kids "harder," and that she pushed him down to the floor from his neck when he didn't go to sleep.  He also reported being spanked with a belt on his buttocks. Three other foster children were interviewed and denied any physical abuse or discipline.  Two children acknowledged that the foster parent yelled at them.  The investigation ruled out the allegation of neglectful supervision and physical abuse. However, three citations were issued: one for inappropriate discipline related to the foster parent yelling at the children; one due to the foster parent's admission that she left the door unlocked the day the child was found wandering in the neighborhood, despite a safety plan requiring deadbolts on the doors (put in place after the same child had left the house on a previous occasion); and a citation related to the foster parent's failure to appropriately supervise the foster child the day that he wandered out of the house.

- An investigation opened December 12, 2019 after an eight year-old child who was formerly in the foster parent's care made an outcry of having been choked by the foster parent.  The same intake alleged that the foster parent would give a six year-old foster child and three year-old foster child medications prescribed for older foster children who lived in the home

336

to make them sleep.  Though the child who made the outcry repeated the allegation when she was interviewed, none of the other children reported physical abuse or discipline.  One child said that his sister's allegation that she was choked was not true, that she was hitting the foster parent and was never choked.  None of the children reported being given medication prescribed for another child.  However, some of the children reported having access to their medication and to medication prescribed for others in the home.  The foster parent acknowledged leaving medication in an unlocked drawer.  The allegations related to physical abuse were ruled out. However, four citations were issued related to the findings related to the children's access to medication.

Another four minimum standards investigations were opened after the foster parent was licensed by Beacon of Hope:

- A Priority 3 minimum standards investigation initiated by RCCR on December 5, 2016, after a foster child made an outcry that a five-year old child in the home was hit with a shoe thrown by the foster parent.  The child also alleged the child was "struck in other ways."  When the child who was allegedly hit with the shoe was interviewed for the investigation he said the other children in the home hit him.  However, he also alleged that the foster parent hit another foster child with a stick and "made his nose bleed."  This foster child denied being hit with a stick during his interview.  Another child interviewed stated that the foster parent sometimes hit the five-year old foster child on the hand with a shoe.  The foster parent denied physically disciplining the children, but did admit that when the five-year old misbehaved she redirected him by noting that if he "continued to make bad choices that he may have to leave her home and could be separated from his sister" and also threatened that he might not be able to visit his father.  The foster parent also acknowledged calling law enforcement for help deescalating the five-year old on one occasion. The investigator ruled out any violation of minimum standards and no citations were issued.

- A Priority 3 minimum standards investigation initiated by RCCR on January 22, 2019 due to allegations that the foster parent brought all five children in her care to a holiday party in a car that was too small to transport the children.  The intake also indicated that it "has also been reported that FP repeatedly makes threats to call the police to remove the child when that child cries, regardless of the reason the child is crying."  The children all denied the allegations during their interviews.  No citations were issued.

- A Priority 2 minimum standards investigation initiated by RCCR on June 18, 2020 after three siblings had a Facetime visit with their father and one of the children told her father that the foster parent hit her and her siblings.  The child's father asked her what she meant, and she said that the foster parent hit them, repeating this twice.  During her interview with the investigator, the child recanted the allegations.  The foster parent admitted using a booster seat/high chair for time outs for one of the children during her interview, but denied any physical discipline.  A citation for inappropriate discipline was issued based on the use of the booster/high chair as a form of discipline.

- A Priority 3 minimum standards investigation was initiated by RCCR on August 21, 2020, involving the same sibling group, based on the following intake: "The children have video

chat visits with their FA.  FA had a video chat with the children last week (second week of 08/2020) and noticed [M] appeared to look scared.  FA asked [M] what was wrong.  [M] said nothing.  SBs indicated 'they are hurting her.' However, SBs did not provide specifics. Unknown who they are or how they are hurting [M]."  When the children were interviewed, they denied any physical abuse or discipline.  No citations issued. However, before the investigation was closed on October 11, 2020, the recommendation was made to close the home.

The recommendation for closure was submitted to RCCR on September 16, 2020 and approved on September 25, 2020.[683]  The CPA was notified of the recommendation by letter on September 29, 2020.[684]  DFPS was notified of the closure the same day via e-mail.[685] CLASS lists the closure reason as "Noncompliance."

### iii.   Pending Closure Recommendation

The closure recommendation that RCCR indicated remained pending on March 16, 2021 was made on October 26, 2020, at the same time that the closure recommendation was made for E.C.'s home, discussed above.   Both homes were licensed by the same CPA.   The closure recommendation form includes the following in the "Closure Recommendation Summary":

---

[683] An e-mail thread included in the materials submitted to the Monitors shows the submission was made via e-mail by an RCCR Supervisor.  E-mail from Erina Torres, RCCR Supervisor, *CCR Agency Home Closure Recommendation* (September 16, 2020) (on file with Monitors).  On September 25, 2020, an e-mail was sent in response that said "The closure recommendation…has been approved.  *Tila* please contact the CPA to discuss the concerns and request closure, and coordinate with Jean to notify DFPS of the closure recommendation.  *Toni*, no further action is required by you or your team at this time. Tila will communicate with the CPA to request closure of the home and we will work with DFPS to pursue a disallowance of placement preventing children from being placed in the home in the event the CPA does not close the home.  Thank you for your effort to get this one through the process and doing our part to keep kids safe.  Let me know if you have any questions."  The e-mail is signed "Audrey" but does not include a last name or title.  E-mail from HHSC RCCL Foster Care Litigation to Tila Johnson, *CCR Agency Home Closure  Recommendation* (September 25, 2020) (italics in original) (on file with Monitors).

[684] The letter notifying Beacon of Hope states, "As you may know, the federal district judge in M.D., et al, issued an order effective July 31, 2019, concerning HHSC's 'right to directly suspend or revoke the license of a placement in order to protect children in the PMC (permanent managing conservatorship) class.'  In line with that order, the Child Care Regulation department of the Health and Human Services Commission (HHSC) recommends that your agency close the following agency home [(home name and operation number listed)]  HHSC's recommendation is based on a repetition of minimum standard deficiencies regarding discipline and medication at this foster home" and ends by noting "Your failure to close the home may result in HHSC taking an enforcement action against your license if the home continues to be deficient."  Letter from Tila Johnson to Jose Gomez, Beacon of Hope, September 29, 2020 (on file with Monitors).

[685] The e-mail to DFPS states, "This is to notify you that CCR has officially notified Beacon of Hope Child Placing Agency by contacting Adriana Orozco, Executive Director, of our recommendation to close the…foster home, as a result of a federal district court order to suspend or revoke the license of a placement in order to protect children in the PMC class.  This decision was made based on a determination that the home had a repetition of violations related to discipline and medication.  Ms. Orozco reported that she would take this information back to her team and communicate back to CCR their decision to accept the recommendation to close the home or not.  Please let me know if you have additional questions."  E-mail from Tila Johnson to Kaysie Tacetta, *et al.,* DFPS, *Beacon of Hope – Foster Home Closure* (September 29, 2020) (on file with Monitors).

[Foster parents] have had two A/N investigations involving a lack of supervision. The most recent investigation involved a [Primary Medical Needs] child with Down Syndrome almost drowning in the above ground pool.  This happened because [Mrs. R], though in the pool, was making adjustments to the pool pump and was not supervising the child.  There are concerns regarding the story she gave about the events that took place as she stated the child was in a life jacket but when the child was discovered, she was not breathing and CPR had to be performed.  During the sampling visit on 10/7/20, [Mrs. R] brought up the incident and framed it as an "accident" that just happened rather than a lack of supervision on her part.  This investigation was Ruled Out with a citation for supervision.

The other A/N investigation took place in May 2018.  The allegations noted that [Mr. R] took a newborn child in care into the CPS office in Abilene for a visit. While [Mr. R] waited, he left another 10 month-old child in care in the vehicle in the parking lot.  The vehicle was running and unlocked.  The child was left in the car for approximately 3-5 minutes.  The child was crying while in the vehicle.  This incident was observed by 2 CPS Investigation Program Directors, who spoke with [Mr. R.] about the dangers of leaving a child unattended but [Mr. R.] felt this was appropriate because he did not want to get both infants out of the vehicle.  This investigation was Ruled Out with a citation for supervision.  On 6/4/18, during the investigation inspection, a crib was observed with blankets and a stuffed toy in it and ammunition was stored in the same locked safe with the hand guns.  This resulted in two High weighted citations by assessment and an Administrative Penalty for the blanket and toy in the crib.

…

During the sampling visit on 10/7/20, it was noted that the two-car garage is so full of belongings that it cannot be entered.  The home was observed with large amounts of clothing and toys all around the home.  There was a garbage bag with garbage in it on the kitchen table.  There was a desk located in the kitchen with papers and books stacked up and also cluttered.  [Mrs. R] could not locate any of the pet vaccinations because of the paper clutter.  The home had six dogs plus a litter of five puppies.  Though the dogs appear clean, well care for, and friendly, there are also six children living in the home.  One adopted child was observed during the visit to have a high level of need regarding interventions.  This child was adopted and had been shaken as a baby, resulting in low levels of emotional control and frequent tantrums.  There is a foster child currently placed that has Down Syndrome and a heart condition.  Another foster child placed has Autism Spectrum Disorder and has a vocabulary of 15 words.  Medication logs were unable to be viewed during this sampling visit as [Mrs. R] stated that her husband completes this documentation at work.  While asking about unannounced visits, [Mrs. R] noted she could not recall the agency ever completing one and stated it would be hard for this to take place as she stays very busy and the agency office is so far from her home. When reviewing the Quarterly documentation from 2019 it was documented that all 4 Quarterly visits were unannounced.  The foster home is not licensed for

> IDD Treatment Services though a current placement qualifies for this service.
> When this was brought to the attention of the agency, their response was that YFT
> and 2Ingage did not increase the child's service level.
>
> It appears that [Mrs. R] has a large amount of responsibility with all the needs of
> the children and the large amount of animals in the home.  There have been major
> concerns about supervision.  The two current placements in the home require a high
> level of supervision and intervention due to their needs.  It is concerning that the
> agency does not appear to have spoken with the [Rs] about the near-drowning
> incident, other than checking on [Mrs. Rs] emotional state.[686]

This document is the only one the Monitors received related to this home closure recommendation,
aside from the e-mail sent to the e-mail address that RCCR created for making closure
recommendations, attaching the recommendation form.  RCCR offered no explanation for the
pending status of the recommendation, despite the fact that the recommendation was made almost
six months earlier.

### iv.    Denied Closure Recommendation

One recommendation for closure was not approved by RCCR.  This recommendation was sent to
the RCCR e-mail designated for closure recommendations on January 19, 2021.  The "Closure
Recommendation Summary" in the recommendation stated:

> In the past six months there have been 2 separate occasions in which the foster
> mother's home was found to be out of compliance with CBCU [background check]
> requirements regarding household members and visitors.
>
> The foster mother is deceptive and vague in confirming the individuals who reside
> in her home.
>
> The Administrators and Compliance Officer are adversarial in communicating with
> the RCCR Representative to discuss identified deficiencies or concerns.  The foster
> mother receives disability payments and is unable to work outside of the home due
> to serious injuries she sustained from a car accident back in 2008.  There is concern
> regarding her ability to meet her needs and supervision requirements for the
> children in the home given her physical limitations.  Failure to adhere to CBCU
> requirements pose a high risk to the health, safety and welfare of the children placed
> in the home.  Furthermore, the foster placement is currently verified to care for
> children with Autism Spectrum Disorder or Emotional Disturbances as well as
> children under the age of 5.  The children's diagnosed disorders as well as their age
> increase their overall vulnerability to potential risk of harm.[687]

---

[686] HHSC, CCR Agency Home Closure Recommendation (Undated) (on file with Monitors).
[687] HHSC, CCR Agency Home Closure Recommendation (Undated) (on file with Monitors).

This home was verified by the Spring, Texas branch of the Youth in View CPA on June 29, 2018, and since then has been the subject of nine minimum standards investigations and three investigations of allegations of abuse or neglect.  The three abuse or neglect investigations include:

- An investigation opened January 2, 2020, after the foster parent got into an argument with a 16-year old foster child and called the police, alleging that the foster child had physically assaulted her.  According to the reporter, the foster child denied hitting the foster parent, and the foster parent did not have any visible injuries.  When the police called the foster parent to pick the child up after determining the child would not be detained, the foster parent refused, stating that she was getting ready to go on a cruise.  The CPA was also called and they refused to come and pick up the foster child.  DFPS staff attempted to reach the foster parent, and the foster parent refused to pick up the foster child.  A 24-hour discharge notice was issued.  DFPS staff went to the foster parent's home to pick up the child's insulin and psychotropic medications, and no one would answer the door.  Consequently, the foster child was without the medication for the entire weekend.  A neighbor told DFPS that the foster parents were abusive.  During an interview with the foster child, the foster child acknowledged hitting the foster parent when they argued over whether she could have a laptop or tablet in her bedroom.  Medical Neglect was ruled out and no citations issued.

- An investigation opened February 3, 2021, after a 15 year-old foster child who stayed in this home for a little over a week reported to her caseworker that the placement was "not good," that "there was a lot of alcohol in the house" and that she could smell alcohol on the foster parent.  The foster child reported that it was easy to steal cigarettes from the man who lived in the home, that the foster children in the home had easy access to alcohol, and that she was able to run away from the home because the back door was left unlocked and unsupervised.  The child also reported that there were unauthorized people in the home, and that the adults in the home would throw parties at night, that included alcohol and cigarettes. When she was interviewed by the investigator, the child also alleged that the older foster youth had to take care of the younger children in the home because "no adult was around most of the time."  She said that the adults in the home were gone from 8:00 a.m. to 5:00 p.m. and would check on the youth by logging into the camera that was in the dayroom of the house.  None of the collateral children or other witnesses substantiated the allegations, and the investigation Ruled Out abuse and neglect.

- An investigation opened February 13, 2021, when the caseworker for an 11-year old foster child and the child's four year-old sibling, who were living in the home, requested they be moved due to concerns related to a lack of supervision.  The 11 year-old began self-harming while living in the home and the caseworker was concerned that the child was not receiving the assessment needed to address the behavior.  None of the children reported a lack of supervision when they were interviewed, and the 11-year-old's therapist said she was receiving treatment for the self-harming incidents.  The investigation Ruled Out abuse and neglect.

The nine investigations of minimum standards violations include:

- An investigation was initiated July 16, 2018, after medical personnel from a hospital called SWI to report that the foster parent "abandoned her foster child at the ER for hours at a time and was unwilling to help the child get the mental/medical attention she needed after having suicidal ideations. Foster mother was belligerent, aggressive toward the child and all staff involved an uncooperative. Child was obviously frightened of this woman and refused to speak with myself or her nursing staff." Another report to SWI, made on July 31, 2018, was tied to this intake. That report came from a neighbor, who alleged that there were "at least 13 people" living in the foster home, that "there are always at least 7 vehicles parked there" and "other people and cars coming at all hours of the day and night." The caller also alleged that the adults smoked marijuana in the back yard. During the investigation, the foster child who was hospitalized denied the allegation that the foster parent abandoned her at the hospital, and none of the three other foster children interviewed substantiated any of the allegations raised in either report. No citations were issued.

- An investigation was initiated on April 4, 2019, after a report to SWI that the foster parent's adopted child was sent to live with her father in California, though he had lost his parental rights to the child due to abuse and neglect. The child's father kicked her out and the child called the foster parent, who pretended not to know the child. The caller alleged that the foster parent still had the adopted child's birth certificate, clothing, and money, and that the foster parent never returned SSI money that she collected for the child. The caller said that the foster parent sells her own pain medication, was abusive to the other children in the home, and threatened children with putting in a notice to have them removed from her home. The caller indicated the children lie for the foster parent, and that the foster parent rewards the children. The intake indicates, "SWI Worker advised REP that this information doesn't meet definition of abuse or neglect that FPS would investigate. SWI Worker advised that this information would be sent to RCL per standards compliance concerns." All four foster children were interviewed during the investigation; none of them substantiated any of the allegations (though none appear to have been asked about the allegations related to the adopted child). No citations were issued.

- An investigation was initiated on May 15, 2019, when a 16 year-old foster child's high school teacher reported that she was found vomiting in the school bathroom, and said she was afraid because one of her foster siblings had threatened to kill members of the household. The child recanted during her interview with the investigator, and said she was not threatened, that the foster sibling had threatened the foster parent during an outburst. None of the other children interviewed reported feeling unsafe in the home. No citations were issued.

- An investigation was initiated on August 27, 2019, when a foster child (the same child who reportedly threatened the foster parent in May 2019) reported being bullied by the foster parent and the other foster children in the home. However, when she was interviewed by the investigator, the child said she liked being in the home, but cut the interview short because she did not feel like talking. During a later interview, the foster child said she was not comfortable in the home, but did not feel unsafe. None of the other children substantiated the allegation that the child was being bullied. No citations were issued.

- A separate RCCR investigation was initiated on January 2, 2020, related to the allegations that the foster parent refused to provide the medications for the child who was arrested (discussed above).  A citation was issued based upon the finding that the foster parent refused to provide the foster child's medication to the child's caseworker, and the caseworker was not able to obtain the prescriptions from the pharmacy because they had just been filled by the foster parent.

- An investigation was initiated on October 12, 2020, when a six year-old foster child reported to his caseworker that when he gets in trouble he gets a time out or a "whooping." When he was asked who "whoops" him, he confirmed that the foster parent did.  When the child was interviewed by the investigator he said that he was disciplined with a time out and that "if a kid is super bad…maybe you'll get a whipping."  However, the other foster child interviewed denied corporal punishment being used in the home, and the foster parent and caregivers denied using corporal punishment.  A citation was issued related to the failure to have an updated background check for a person (the foster parent's daughter) listed as a staff person, though the investigator acknowledged the foster parent may have incorrectly characterized the daughter as staff.

- An investigation was initiated December 18, 2020, when an RCCR staff person called SWI to report concerns related to the home. The RCCR staff who made the report is the licensing representative for the CPA.  The CPA contacted RCCR to discuss "whether or not the CPA should continue to be affiliated with the…foster placement," raising concerns about the foster parent's ex-husband, who the CPA suspected of having continued access to the home.  The ex-husband was ineligible to be present at the foster home, based on his DFPS history.  When the foster parent was interviewed, she said that she got married November 14, 2020 but had submitted her husband's paperwork for a background check before they married.  She said that he does not reside in the home with her.  When the background check revealed that he was ineligible to be in the home, they decided to get an annulment. The foster parent showed a receipt for the annulment to the investigator.  However, though the children agreed that the husband did not live in the house, three of the four children interviewed said the foster parent's husband did visit the home, and that they also saw him outside the home.  A citation was issued for the failure to complete the background prior to allowing access to the children, and an administrative penalty was issued.

- An investigation was initiated on February 10, 2021, when a medical provider made a report to SWI that when he called to let the foster parent know that a 16 year-old foster child tested positive for chlamydia, the foster parent told him that the child had run away from the home with her boyfriend.  This report is linked with the foster parent's report of the runaway, made two days earlier.  This case is still pending.

- An investigation was initiated February 22, 2021, after a foster child made an outcry that the foster parent's brother "goes to the foster home frequently and drinks at the foster home."  The foster child reported that the foster parent's brother talks to her about his past abuse and "is very touchy, no[t] sexually touchy but invading space touchy."  The reporter also noted that the foster child had self-harmed.  This investigation is still pending.

343

Prior to being verified by the Spring, Texas branch of Youth in View, the home operated under the Desoto, Texas branch of the same CPA.  During the time that the home operated under the Desoto branch, the home was the subject of three abuse or neglect investigations, none of which resulted in substantiated findings: once for allegations of Negligent Supervision related to child-on-child sexual contact between a 13 year-old girl and 10 year old-boy (which the children agreed occurred); once for Medical Neglect; and once for Physical Abuse and Neglectful Supervision.

While operating under the Desoto branch, the home was also the subject of three RCCR investigations related to minimum standards violations; one of these investigations resulted in two citations for inappropriate discipline after it was found that the foster parent instructed two foster children in the home to pull another foster child who was hiding in the closet out of the closet and to strip off her clothes, and after the child had refused to change her clothes to go to church.

The Monitors did not receive any information related to RCCR's decision denying the recommendation for closure, or any other documentation associated with this recommendation, aside from the email sending the closure recommendation form to the e-mail address created by RCCR for making closure recommendations.

### v.   Congregate Care Facility Closures & DFPS Contract Terminations

As discussed in the Monitors' First Report, there were no license revocations for any placement (foster home, CPA, or GRO) in the five-year period preceding September 30, 2019. Since then, RCCR has initiated revocation proceedings or denied a license for eight GROs, and DFPS has notified the Monitors that the agency cancelled contracts with two GROs. Five other GROs voluntarily relinquished licenses after being placed on Heightened Monitoring or another type of RCCR enforcement action.

In the First Report, the Monitors discussed the first two GROs (Children's Hope Residential Services – Lubbock, and North Fork Education Center) against which RCCR initiated license revocation proceedings, and two additional closures, one resulting from a voluntary relinquishment (Children's Hope – Levelland (Washington Campus), and another from DFPS's decision to cancel its contract with the operation (Hector Garza Residential Treatment Center).

In an update to the Court filed on September 2, 2020,[688] the Monitors reported an additional four closures, for Williams House, Houston Serenity, Youth and Family Enrichment Center (YFEC) and the YFEC shelter, all of which voluntarily relinquished their licenses. Three of these operations (Williams House, Houston Serenity, and the YFEC shelter) would have been subject to Heightened Monitoring pursuant to Remedial Order 20 had they remained open.  Williams House closed after C.G.'s death, discussed in the First Report and in this report below, resulted in an RTB for Neglectful Supervision that included the administrator of the facility.  YFEC also was under a corrective action plan relating to issues with 24-hour supervision and RTBs at the time that it relinquished its license.

---

[688] Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding Child Fatalities and Congregate Care Facility Closures (September 2, 2020), ECF No. 956.

Since the Monitors' September 2, 2020 Update, RCCR issued letters to four additional GROs, notifying them of the agency's intent to revoke their license, and denied a license to two GROs that were operating in an initial licensure period.  In addition, DFPS has notified the Monitors of its decision to cancel its contract with two GROs, and one troubled GRO – Whataburger Center for Children – voluntarily relinquished its license.[689]

**Table 7.18: Congregate Care Facility Closures, September 2, 2020 – April 16, 2021**

| Operation Name | Reason for Closure | Date of Notification to Monitors |
|---|---|---|
| Prairie Harbor LLC | RCCR Intent to Revoke | 09/03/2020 |
| The Landing at Corpus Christi | RCCR Denial of Final License | 09/16/2020 |
| The Pillar of Progression for the Youth | RCCR Intent to Revoke | 12/15/2020 |
| Whataburger Center | License Relinquished | 01/05/2021 |
| Merkabah RTC | RCCR Denial of Final License | 01/26/2021 |
| Brave Hearts Children Center | RCCR Intent to Revoke | 02/06/2021 |
| Gulf Coast Trades Center | Contract Terminated by DFPS | 02/23/2021 |
| The Tree House Center | Contract Terminated by DFPS | 04/15/2021 |
| Willow Bend Center RTC | RCCR Intent to Revoke | 03/02/2021 |

        *a.*      Prairie Harbor LLC

The Monitors' First Report included a detailed description of the RCCI investigation of the death of K.C., who died during her stay at Prairie Harbor LLC (Prairie Harbor), a residential treatment center.  The Monitors included an update of the investigation and discussion of the

---

[689] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, The Treehouse (April 9, 2021) (on file with Monitors).  The Monitors review of the April 9, 2020 CLASS intake referenced in the State's e-mail showed that a first April 8, 2021 intake from the D.A.'s office was referred to RCCR as a Priority 3 investigation, and re-entered on April 9, 2021 as a Priority 2 abuse or neglect investigation.  The intake alleges that the CEO of the operation instructed the manager of the facility not to run a background check on a staff person who "is a habitual felon and has a record of aggravated assault and a history of possession of substances."  The intake goes on to allege that this staff person "has keys which would allow access to the medication room and other rooms where [children] can be found."  The intake also alleged that the CEO sent a text telling the facility manager to "get all the employees [sic] phones and check to see who made a call to SWI."  It further alleged that the CEO "sent a text that has requested a list of all employees so they can say people have been working so that they are not out of ratio compliance."

The Monitors were notified on April 13, 2021 that all children had been moved from The Tree House Center, and that "DFPS staff were present at the operation continuously since 04/09/21".  E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, re: The Treehouse, April 13, 2021 (on file with Monitors).  However, DFPS and RCCR have not confirmed whether any action will be taken related to the contract with the operation or its license.

On April 15, 2021, the Monitors were notified that DFPS provide notice to Treehouse that DFPS is terminating their contract. Email from Heather Bugg to Deborah Fowler and Kevin Ryan, *re: The Treehouse* (April 15, 2021) (on file with Monitors). Also on April 15, 2021, HHSC notified the Monitors that on 4/27/2021, RCCR attempted to deliver an "intent to involuntary suspend: letter to Treehouse. However, no one was at the location, a copy was left and a copy was also subsequently mailed. Email from Katy Gallagher, HHSC Attorney to Kevin Ryan and Deborah Fowler, *The Treehouse* (April 28,2021) (on file with the Monitors).

chronic systemic problems associated with the facility in the report filed with the Court on September 2, 2020, and a further update on the investigation is included in this report in Section VII.[690]

On September 3, 2020, during the hearing on the Plaintiffs' Motion to Show Cause, DFPS advised the Court that it was no longer placing children in Prairie Harbor and was in the process of transitioning children out of the facility.[691]   The next day, the Court asked RCCR whether the license for the facility would be revoked.   RCCR testified that if an RTB finding was made associated with the child fatality, the agency would issue an intent to revoke letter.[692]   On September 9, 2020, RCCI completed its initial investigation, which resulted in RTBs for several of the direct care staff who were with K.C. the night that she died.[693]

On September 11, 2020, the agency issued an intent to revoke letter to Prairie Harbor.   The letter cited the operation's failure to successfully complete the probation on which RCCR placed the facility just before the child's death:

> On February 5, 2020, your operation was placed on probation due to poor compliance with minimum standards, requiring on-going adherence to minimum standards and specific conditions of the probation…The probation sought to address the risk to the health and safety of children in care created by the numerous deficiencies related to caregiver responsibilities, judgment, punishment, discipline and supervision.   Further, the probation sought to address emergency behavior intervention (EBI), as well as staff oversight and management.   At the time of the probation, investigations at the operation concluded that children in care were sexually and physically abused by caregivers. Further, an investigation remained on-going related to allegations of medical neglect related to the death of a child in care.   During the probation period, 4 inspections resulted in citations for 40 violations of minimum standards.[694]

The letter also referred to substantiated findings of Medical Neglect resulting from the investigation of K.C.'s death, and to RCCI investigations substantiating allegations of Sexual Abuse:

> After the conclusion of an abuse and neglect investigation, numerous staff members were found responsible for medical neglect related to the child death at your operation.   It was determined that the child had not received necessary medical

---

[690] Deborah Fowler and Kevin Ryan, First Report, 1-27, ECF No. 869.

[691] Telephonic/Zoom Show Cause Hr'g Tr. (September 3, 2020) 123, ECF No. 964.

[692] Telephonic/Zoom Show Cause Hr'g Tr. (September 4, 2020) 69, ECF No. 967.

[693] As discussed in Section VII, after this initial finding, RCCI re-opened the investigation to consider whether the systemic issues related to K.C.'s death, identified by the Monitors, warranted RTBs for the facility's administrators. They were added as perpetrators to the investigation, and RCCI's review resulted in RTB findings for the three administrators of the facility.  Of the eleven staff and administrators for whom the investigation of the fatality resulted in an RTB, the RTBs have been upheld for all but two direct care staff; administrative review has been requested for one of the two direct care staff and is pending for the second.

[694] Letter from Tila Johnson to Anthony Hurst, Program Administrator, Prairie Harbor LLC (September 11, 2020) (on file with Monitors).

attention in the weeks prior to the child suffering a medical emergency in the weeks prior to the child suffering a medical emergency.  During the medical emergency, staff failed to timely seek medical attention, and the child was denied timely emergency medical assistance.

In addition to the child death detailed above, there were several investigations related to the sexual abuse of children in care of your operation.  Two staff members were ultimately found responsible for the sexual abuse of children in care as a result of those investigations.[695]

Finally, the letter referenced "numerous and repetitious deficiencies related to caregiver responsibilities, caregiver judgment, inappropriate discipline and improper punishments, inappropriate emergency behavior intervention (EBI), and improper supervision."[696]

The operation requested administrative review of the revocation decision on September 14, 2020, and the decision was upheld on February 2, 2021.[697]

### b.    The Landing at Corpus Christi

The Monitors' review of Prairie Harbor's history and systemic problems revealed that the same administrators and operators had opened a second RTC, The Landing at Corpus Christi (The Landing), in August of 2019.  During the September 2020 contempt hearing, the Court asked whether RCCR reviewed Prairie Harbor's history prior to issuing a license to The Landing:

THE COURT:  …Back now to Prairie Harbor, they had 145 citations in the past five years.  The pictures that the Monitors have in their report is just – is disgusting.

And so you let these same people open a new place in Corpus Christi in September of 2019.  Did you review their history, the owners' history, with Prairie Harbor?

THE WITNESS: Our regulation related to – not to the same owners opening a new operation.  We can look to see if there's been any adverse action as a reason to not issue any license.  If there has not been an adverse action and the applicant meets all the requirements, then we move forward…

THE COURT:  What would you consider an adverse action for Prairie Harbor with 145 citations in the past five years?

THE WITNESS: An adverse action…means a revocation.[698]

---

[695] *Id.* at 2.
[696] *Id.*
[697] CLASS database, Prairie Harbor LLC, Provider Adverse Action (for Revocation/Denial), last accessed March 23, 2021.
[698] Telephonic/Zoom Show Cause Hr'g. Tr (September 4, 2020) 80 -81, ECF No. 967.

On September 7, 2020, DFPS notified the Monitors that they had suspended placements for The Landing, effective September 3, 2020.[699]  On September 21, 2020, DFPS notified the Monitors that RCCR had issued a denial of license to The Landing on September 16, 2020, and that all children had been removed from the facility on the same day.[700]

The letter to the administrator and operator of The Landing, notifying them of RCCR's intent to deny the license cited the revocation of Prairie Harbor's license as one of the reasons for the denial of the license for The Landing:

> HHSC designated you as a controlling person when it revoked the license of Prairie Harbor…This designation may be sustained once the revocation of that operation's license and your due process for the designation are final.  Because of the pending status of your designation as a controlling person, HHSC cannot issue you a permit to operate a child-care operation.[701]

The letter also referred to an ongoing investigation into an allegation of sexual abuse,[702] which has since been substantiated.  In that case, a child made an outcry that she and a staff member had sexual intercourse, and that she believed she might be pregnant.  The investigation revealed that the staff member had a habit of walking the grounds of the facility with children without other staff present.  He had sexual contact with the victim in a shed on the facility grounds.  While a pregnancy test was negative, interviews with other children and staff substantiated details of the child's outcry, and the investigation concluded with an RTB for Sexual Abuse and three citations: one for a minimum standards violation related to a child's right to be free from abuse or neglect, another for the administrator's violation of minimum standards by allowing staff to be alone with children, and a third for the perpetrator's failure to demonstrate "prudent judgment" by taking the child outside and to the storage shed alone.[703]  The same staff member had been the subject of a similar Sexual Abuse investigation while he was employed by another GRO after a report was made to SWI by two adults to whom the child made an outcry, but Sexual Abuse was Ruled Out when the alleged victim denied the allegations.

The letter also referred to a number of minimum standards violations during The Landing's initial licensure period, many of which were similar to the systemic problems associated with Prairie Harbor's history, including:

- A minimum standards violation related to the failure of the facility to timely report to RCCR a child's attempt to commit suicide by drinking disinfectant spray.
- A minimum standards violation associated with the operation's inability to meet the needs of the children, by "admitting too many children with behaviors caregivers were unable to handle," after six children damaged property while trying to break out of the facility, and

---

[699] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Updates – contracts and CPS* (September 7, 2020) (on file with Monitors).

[700] E-mail from Audrey Carmical to Deborah Fowler and Kevin Ryan, *Updates on operations* (September 21, 2020) (on file with Monitors).

[701] Letter from Tila Johnson to Jason Peeler, Administrator, The Landing at Corpus Christi (September 16, 2020) (on file with Monitors).

[702] *Id*. at 2.

[703] An administrative review upheld the findings of the investigation on March 4, 2021.

attacked and injured two other children. According to the findings, staff were unable to bring the situation under control, resulting in the citation.

- A minimum standards violation related to caregiver responsibility, involving an allegation of child-on-child sexual abuse, based on the failure to follow the safety plan for a child who was alleged to have demonstrated sexual aggression.

- A minimum standards violation associated with the facility's failure to follow a child's safety plan, which included provisions related to her history of running away, after she told staff she wanted to run away prior to her attempt, and then injured herself when she jumped out of a window while attempting to run away.

- Two minimum standards violations associated with the failure of the facility to seek medical care for a child who reported being in pain and requesting to see a doctor. The child had "landed wrong" while jumping on a trampoline and reported having a headache to several staff for several days. When she was finally taken to the doctor, she was discovered to have a mild concussion and neck injury.[704]

The letter also referred to a number of minimum standards violations found across a range of issues during RCCR inspections.[705]

> c.      The Pillar of Progression for the Youth

On December 1, 2020, RCCR notified the Monitors of its intent to issue a revocation of license letter to The Pillar of Progression for the Youth (Pillar of Progression), an RTC licensed March 8, 2018.[706] On December 15, 2020, RCCR sent the Monitors the letter notifying the RTC of the agency's intent to revoke its license.[707]

This enforcement action taken by RCCR against this RTC was not the first: Pillar of Progression had been placed on a one-year probation, beginning on November 4, 2019, due to the high number of minimum standards deficiencies for which it had been cited by RCCR during its first 18 months of operation. The letter notifying the RTC of RCCR's decision to place the facility on probation listed more than 50 minimum standards violations between March 28, 2018, and August 28, 2019. Of the 14 conditions associated with the probation, the facility does not appear to have met a single one during its probationary period. According to the December 15, 2020 intent to revoke letter:

> On November 4th, 2019 [Pillar of Progression] was placed on corrective action probation due to poor compliance with minimum standards, which created a risk of harm to the health and safety of children in care. On-going adherence to minimum standards and specific conditions of the probation were required by the corrective action probation. Specifically, the probation sought to address the risk to the health and safety of children in care created by the numerous deficiencies related to caregiver responsibilities, supervision, child's rights, discipline, serious incident reporting, staff records, frequent unauthorized absences and child records. As the

---

[704] *Id*. at 3 -7.
[705] *Id*.
[706] E-mail from Georgette Oden to Deborah Fowler and Kevin Ryan (December 1, 2020) (on file with Monitors).
[707] E-mail from Georgette Oden to Deborah Fowler and Kevin Ryan ( December 15, 2020) (on file with Monitors).

probation deficiencies progressed, an additional condition was required in order to address a new pattern of deficiencies related to medical records and storage. At the time the operation was placed on probation, there were three open investigations. Those investigation concluded with disposition related to the physical abuse and neglectful supervision of children in care by caregivers at the operation. During the corrective action probation period, 10 inspections resulted in citations for 55 additional violations of minimum standards.[708]

The Monitors' analysis of data related to minimum standards deficiencies confirms that Pillar of Progression was a troubled facility. In the short time that this RTC was in operation, it accumulated 150 minimum standards deficiencies. Of those, 69 were weighted high or medium-high. In addition, three RCCI investigations of abuse or neglect resulted in substantiated findings in 2020, as discussed in the intent to revoke letter.

Four RTBs were related to a single case reported to SWI on May 7, 2019, in which the reporter, an RCCR staff person, alleged that a child made an outcry that a Pillar of Progression staff member discussed details of her sex life with children. The child who made the outcry also alleged that the staff member allowed him to drive her car to Walmart, though the child did not have a driver's license and "he was scared." The child alleged that several other children were in the car with them when this happened. The child also alleged that the staff member would take children to unauthorized places when she was transporting them on outings or to visits with family, and that she gave another child a cigarette. Several of the children confirmed the allegations that the staff member allowed the child to drive her car, and the investigator obtained a video of the incident recorded by one of the children who was a passenger in the car. The other allegations were not substantiated, though one of the children interviewed said that the staff member "smokes cigarettes around them and talks about nasty stuff." RCCI made RTB determinations of neglectful supervision by the staff person for the child who was allowed to drive the car, and each of the three other children who were passengers in the car. RCCR issued three citations to the facility as a result of the investigation: a citation related to the operation's failure to maintain the staff member's employee records after terminating her; a citation related to the staff member's failure to demonstrate prudent judgment by allowing the child to drive her car; and, a citation related to the staff member's violation of the children's right to be free of abuse or neglect. The investigation was closed January 30, 2020.

Another RCCI investigation resulted in an RTB for Neglectful Supervision after a report was made to SWI on September 11, 2019 alleging that a child tried to hang himself from a tree outside the facility by putting a belt around his neck, and that staff saw the child and failed to intervene.[709] The investigation resulted in a RTB for Neglectful Supervision for one staff member. According to the findings:

---

[708] Letter from Todd Willis, Licensing Representative, RCCR, to Edwin Dearman, Administrator, The Pillar of Progression for the Youth (December 15, 2020) (on file with Monitors).

[709] A linked intake in CLASS appears to indicate that this case was initially not identified as a case involving abuse or neglect. A September 12, 2020 intake shows that a DFPS staff member called SWI and reported that the earlier intake "needs to be upgraded to abuse/neglect. Child tried to self-harm by tying a belt around his neck and hang himself from a tree…The child was put on 1:1 supervision a few hours before the incident occurred because the child told staff he wanted to harm himself. The staff member…who actually saw the child and got him down from the tree was not the same staff member who was on 1:1 with the child." The September 11, 2019 intake, reported to SWI by a

[J.F.], 13 year-old alleged victim, wrapped a belt around his neck and a tree branch to try to self-harm.  [J.F.] wanted to self-harm because he was bullied at school. [J.F.] expressed suicidal ideations after returning home from school and was placed on 1:1 supervision according to a safety plan implanted [sic] by the facility upon [J.F.'s] arrival from school.  [The staff member] was assigned to [J.F.] as his 1:1 staff to monitor his behavior.  While [the staff member] was in another area of the parking lot, [J.F.] had enough time to wrap a belt around his neck and a tree branch. Additionally, [J.F.] dropped down from the tree branch once [J.F.] saw another staff member in [J.F.'s] eyesight.  [J.F.'s] suicide attempt was the result of lack of supervision from [the staff member].  [The staff member] breached his duty as a caregiver when he failed to adequately supervise and properly intervene during a crisis.

This investigation also resulted in four citations for Pillar of Progression: a citation related to the staff person's failure to follow the safety plan for the child that required one-to-one supervision; a citation related to the failure of the staff person to intervene; a citation related to the facility's failure to document the incident through a serious incident report; and, a citation related to the violation of the minimum standard associated with a child's right to be free from abuse or neglect.  The investigation closed on February 1, 2020; the staff member waived administrative review.

The third investigation resulting in an RTB for Physical Abuse was opened after a report was made to SWI on October 8, 2019, that a Pillar of Progression staff member physically abused a child in care.  The report was made by the child's caseworker, after the child told her that he punched a television, injuring his hand and told his attorney that a staff person at the facility pinned him on the ground, put his knee in his throat, and "choked [him] out."  The child did not have any injuries that required medical attention, but had a bloody nose as a result of the incident. Two children and another staff person interviewed corroborated the child's report that he was choked after the child got into an argument with the staff person when the staff person attempted to redirect him.  RCCI's investigation resulted in an RTB for Physical Abuse, and RCCR issued three citations to the facility associated with the incident: a citation for the failure of the staff person to demonstrate prudent judgment when he became physically aggressive with the child; a citation associated with the discrepancies in the facility's serious incident report; and a citation for the staff member's violation of the minimum standard associated with a child's right to be free from abuse or neglect.  The investigation was closed February 20, 2020, and an administrative review was pending as of March 24, 2021.

The intent to revoke letter sent to Pillar of Progression on December 15, 2020, concluded with a finding that the facility posed an immediate risk to the children in the facility:

The determination that your operation poses an immediate risk to the health or safety of children in care is supported by the multiple investigations with reason-to-believe dispositions for neglectful supervision and physical abuse of a child in

---

Pillar of Progression administrator, indicates "[Victim] does have a history of self-harm but no history of one-to-one supervision."

care at your operation.  Additionally, despite being placed on corrective action probation to address the numerous and repetitious deficiencies that created a risk to the children in care, your operation failed to meet the terms and conditions of the implemented probation.

HHSC has concluded that you are unable or unwilling to ensure compliance with minimum standards and other applicable laws as your operation has consistently been cited for repeated high and medium-high deficiencies while on corrective action probation.  Further, the severity of the deficiencies, as well as the repetition of deficiencies demonstrates that no other form of corrective action or conditions could be implemented to avoid further deficiencies.  HHSC asserts that the deficiencies described above provide sufficient basis for revocation and the deficiencies are evidence that your operation poses an immediate threat or danger to the health and/or safety of children in care.  For these reasons, the issued permit is revoked.[710]

> d.      Whataburger Center for Children and Youth

The Court Monitors include a detailed description of the events leading up to the closure of this GRO, and the subsequent illegal use of the facility by Family Tapestry SSCC, in a separately filed report.[711]

> e.      Merkabah Residential Treatment Center

On January 19, 2021, the Monitors received an e-mail from RCCR indicating that the agency would be issuing an intent to deny the application for Merkabah RTC "based on issues related to maintaining compliance with standards."  RCCR noted, "The operation has patterns of [deficiencies] related to children's records, personnel records, and physical plant issues.  In addition, there have been two instances in which falsification of records has occurred."  RCCR stated that DFPS had been notified and was working to move the children out of the RTC and into new placements.

According to CLASS records, RCCR granted Merkabah RTC's initial permit October 8, 2019, and the facility began operating soon after.  The Monitors' data analysis showed that in 2019 and 2020, the facility was cited for minimum standards deficiencies more than 80 times, with almost all of those citations issued for standards weighted high, medium-high, or medium by RCCR.  The letter sent by RCCR to Merkabah RTC notifying the operators of the agency's intent to deny the final permit notes:

An investigation by Texas Department of Family and Protective Services (DFPS) resulted in confirmation that direct care staff were allowed to work with residents without having a cleared background check.  In addition, several patterns of deficiencies were observed at your operation during the initial permit phase, which

---

[710] Letter from Todd Willis, *supra* note 706, at 18.
[711] Deborah Fowler and Kevin Ryan, The Court Monitors' Report to the Court Regarding Maltreatment in Care and Unsafe Placements for Children Without a Placement, April 27, 2021, ECF No. 1066.

has placed children at risk of harm.  On two occasions your operation was cited for records issues, specifically records required to be kept by licensing were falsified. One instance of falsification involved your Licensed Child-Care Administrator (LCCA) providing answers to the Emergency Behavioral Intervention (EBI) Training post-test for direct care staff.  Direct care staff are charged with, and responsible for executing techniques learned during the post-test phase.  Because your LCCA provided the answers to the post- tests, the results were inaccurate and falsified.  During the second citation for records issues, a different Licensed Child-Care Administrator attempted to pass personnel records as Merkabah RTC records when they were clearly marked as another operation's personnel records.

Additionally, there were numerous deficiencies related to Child-Care Administrator responsibility, caregiver responsibility, prohibited punishments, record keeping and the physical site of the operation.  Falsifying records related to Emergency Behavior Intervention training creates a risk of harm to children in care as it is required that direct care staff have the knowledge, skills and ability necessary to interact and provide competent care for the children at the operation.  Further, staff engaging in repeated instances of prohibited punishments evidences a toxic culture at the operation that is tolerated by management.  There are clearly several deficiencies that create an endangering situation, as well as a repetition or pattern of deficiencies that create an overall immediate threat or danger to the health or safety of children in care.  As a result, your permit is denied.[712]

In addition to the minimum standards deficiencies cited by RCCR, three abuse and neglect investigation resulted in three substantiated findings and five RTBs:

- An investigation opened after a September 24, 2020 report to SWI alleged that a child was able to steal a vehicle from the operation twice: driving to Lubbock the first time, then, when he was returned to the facility, stealing the vehicle again on the same night that he was returned.  Each time, the child who took the vehicle was accompanied by one other child.  The investigation resulted in three RTBs for Neglectful Supervision against the same staff person for each of the children.  RCCR issued three citations for violation of minimum standards: a citation for violation of the minimum standards associated with the child care administrator's responsibilities, because the administrator "failed to properly secure the keys to operation vehicles after children in care had stolen them and taken the vehicle;" a citation for violation of the minimum standard associated with caregiver responsibility; and a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect.  An administrative review of the citations is listed as "pending" in CLASS.

- An investigation resulted in an RTB for Physical Abuse, after a November 16, 2020, report to SWI alleged that a child was "body slammed" on his head, causing the child to lose consciousness.  According to the findings, the staff member "lifted up" the child and "slammed" him to the floor, causing injury to the child when he hit his head on the floor.

---

[712] Letter from Todd Willis, District Director, RCCR to Byron Parker, Controlling Person, Merkabah RTC, January 29, 2021 (on file with Monitors).

RCCR issued four citations: a citation for violation of the minimum standard associated with EBI implementation; a citation for violation of the minimum standard associated with medical care, because the child did not receive immediate medical attention for the injury; a citation associated with violation of the minimum standard associated with prohibited punishment; and a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect. An administrative review of the citations is listed as "pending" in CLASS.

- An investigation resulted in an RTB for Physical Abuse after a January 26, 2021 report to SWI alleged a child was thrown to the ground by a staff member, causing a deep cut to the child's hand that required medical attention. Five citations were issued by RCCR in connection with this investigation: a citation for violation of the minimum standard associated with employee responsibility because "a child in care was assaulted by staff, resulting in injury;" three citations related to violation of the minimum standards associated with EBI implementation; and one citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect. An administrative review of the citations is listed as "pending" in CLASS.

*f.*     Brave Hearts Children Center

On January 25, 2021, the Monitors received an e-mail from DFPS notifying them of an "evolving situation concerning Brave Hearts Children Center" (Brave Hearts).[713] Brave Hearts was an RTC located in Houston, Texas that opened in June of 2020. According to the e-mail, DFPS and HHSC State Office directors planned to make an unannounced visit to the facility the next day, and DFPS was issuing an immediate placement suspension for the operation for DFPS and SSCCs.[714] According to the e-mail:

> As of 1/21/2021, there were 32 open investigations at Brave Hearts Children Center, with an increase in intakes in January, including allegations of and concerns relating to improper restraints, physical abuse, supervision issues, background checks, employment of staff with negative history at other operations (including Devereux), administrator appearing resistant to intervention, high acuity needs of the children in placement, children's educational needs, and lack of adequate medical care.[715]

The e-mail indicated that DFPS held a standard contract with the facility, eight child-specific contracts, and a contract for children who had tested positive for COVID-19. OCOK also contracted with the operation for placements.[716] The e-mail also noted, "HHSC CCR is currently contemplating next steps related to the license, which will be informed by formal issuance of RTBs

---

[713] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, re: Brave Hearts Children Center, January 25, 2021 (on file with Monitors).
[714] *Id.*
[715] *Id.*
[716] *Id.*

for open CCI investigations.   CCI is also contemplating whether the administrator will be considered for abuse/neglect findings."[717]

DFPS e-mailed the Monitors with an update later the same week, indicating that during the unannounced visit the day before, "a number of supervision, leadership/organizational, physical environment, and COVID issues were noted," and advising that DFPS and OCOK were seeking and obtaining new placements for the youth housed at the facility. [718] The e-mail noted that in addition to the safety precautions that had already been put in place, as of January 26, 2021, DFPS was making nightly visits to the facility, and sent "[a]beyance letters…to the operation to prevent individuals who have a prior, concerning history from having contact with children."[719]

On February 4, 2021, DFPS again e-mailed the Monitors with an update:

> Since we first updated you, DFPS and OCOK have moved 26 youth from the facility and have pending placements for an additional 7 youth.  The 7 youth should be moved by February 5.  As of this communication, DFPS and OCOK continue to work to locate placements for the remaining 17 youth who are still placed in Brave Hearts Children Center and do not have a subsequent placement identified.  Several of these youth have complex behavioral health needs and it has been challenging to locate placements that can safely care for the youth and meet their needs; however, at this time, DFPS and OCOK plan to have all youth moved from the facility on or by February 12, 2021.  The daily visits to the operation and weekly staffings are continuing as described in previous communications.[720]

Another e-mail update was sent February 6, 2021:

> We wanted to provide you with an update relating to Brave Hearts Children Center, which has continued to evolve throughout the day. As of yesterday afternoon, DFPS made the determination that in order to ensure child safety in the operation, DFPS and OCOK staff must be present at the operation 24/7.

> Also yesterday, RCCI finalized a Reason to Believe Finding for physical abuse against the owner of Brave Hearts Children Center.  As a result, DFPS issued an abeyance against her and a contract termination letter was sent.  The contract termination was to be effective the last day children were placed there, with the goal of having all children moved out of the facility by February 12, 2021.[721]

On February 8, 2021, RCCR e-mailed the Monitors to notify them that the agency sent Brave Hearts an intent to revoke letter, based on "patterns of deficiencies, abuse/neglect findings,

---

[717] *Id.*

[718] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, re: Brave Hearts Children Center, January 28, 2021 (on file with Monitors).

[719] *Id.*

[720] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Brave Hearts Children Center* (February 4, 2021) (on file with Monitors).

[721] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Brave Hearts Children Center* (February 6, 2021) (on file with Monitors).

and the operation's inability to make corrections."[722]   Finally, on February 16, 2021, DFPS e-mailed with a final update:

> As we previously shared with you, DFPS has terminated the contract with Brave Hearts Children Center.  DFPS and/or OCOK staff started having a 24/7 presence at Brave Hearts Children Center beginning on Friday, February 5, 2021.  As of Saturday, February 6, 2021, all youth were moved from Brave Hearts Children Center.  DFPS and OCOK were able to locate placements for all but five of the youth.  Since then, DFPS has found placement for one of those children and the remaining four are currently under staff supervision in CWOP.  DFPS and OCOK continue to actively look for placements that can meet the needs of these youth.[723]

According to the Monitors' analysis of deficiencies data provided by the State, the operation received 21 citations for minimum standards deficiencies in 2020, though it opened six months into that year.  Of those, 16 deficiencies were issued for standards that were ranked high, medium-high, or medium by RCCR.  A review of CLASS shows another 30 deficiencies cited in 2021 before the operation closed in February.

Four RCCI investigations resulted in eight RTBs for Physical Abuse, Sexual Abuse, and Neglectful Supervision:

- An investigation opened after a report by an EMS staff member to SWI on December 5, 2020 alleged that a child "was assaulted by a facility staff member" and that this was "a frequent occurrence at this facility, and EMS responds daily for similar incidents involving staff members assaulting patients."  The reporter also alleged that "the staff is neglectful and the children there are all at risk."  During his interview, the child said that he was choked and punched by a staff member after he refused to turn off the television.  Though the staff member denied harming the child, video showed him place the child in a choke hold, refusing to let the child go until another staff person pulled the remote out of the child's pocket.  The investigation resulted in an RTB for Physical Abuse against the staff person.

- An investigation opened after a December 8, 2020 report to SWI alleging that a child was injured and required medical treatment after another child hit her over the head with a metal bar that she had taken off of one of the facility's bunkbeds.  Two staff were present and witnessed the altercation, but failed to intervene to stop it.  The investigation resulted in four RTBs: two RTBs for each staff member, for each of the two children.  RCCR issued three citations:  two citations for violation of minimum standards associated with the failure of staff to intervene to prevent the injury; and violation of the minimum standard associated with a child's right to be free from abuse or neglect.

---

[722] E-mail from Taryn Lam to Deborah Fowler and Kevin Ryan, *Brave Hearts RTC* (February 8, 202)1 (on file with Monitors).
[723] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Brave Hearts Children Center* (February 16, 2021) (on file with Monitors).

- An investigation opened after a hospital social worker made a report to SWI on December 15, 2020 alleging that a 15 year-old child made an outcry of sexual abuse against a Brave Hearts staff member when she was in the hospital.  An investigation revealed the child first told the owner of Brave Hearts about the alleged abuse five days before she was hospitalized, and that multiple staff also told the owner of the sexual abuse; the owner did not report the allegations to SWI and left the staff member on the facility schedule after the child reported the abuse to her.   The investigation resulted in an RTB against the staff member who sexually abused the child, and an RTB against the owner for Neglectful Supervision.  Though the other staff members who reported the abuse to the owner were aware of it and did not report it to SWI, RCCI ruled out Neglectful Supervision for those staff because "they did report the allegation through their chain of command at Brave Hearts Children Center and were told by [the owner/director of the facility] that she would take care of it."  RCCR issued five citations in connection with the investigation: a citation for violation of the minimum standards associated with caregiver responsibility due to the owner/director's failure to report the allegations and failure to remove the alleged perpetrator from the shift schedule; a citation for violation of the minimum standard associated with interference with an investigation because "3 different staff members made attempts to question the victim about the allegation;" a citation for violation of the minimum standard requiring the permit holder to ensure compliance with minimum standards; a citation for violation of the minimum standard requiring employees to report suspected abuse or neglect; and a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation opened after a child's probation officer made a report to SWI on January 22, 2021 alleging that a child reported being hit by a staff member, but also told the probation officer that there were fights "all the time" at the facility, that staff "will watch residents fight instead of intervening to protect them," and that the facility did not wash her clothes very often.  Video captured the incident, showing that after the child tried to make a phone call and the staff person twice disconnected the call by pushing the hang-up button. The child became angry and "slapped" the phone off the wall.  The phone hit the staff person, and the staff person "went after" the child and "the two engaged in a wrestling match, which included hair pulling, clawing with finger nails, and [the staff member's] glasses being pulled off her face."  The investigation resulted in an RTB for Physical Abuse of the child by the staff member.

### g.  Gulf Coast Trades Center

On March 2, 2021, DFPS alerted the Monitors that it had terminated its contract with Gulf Coast Trades Center (GCTC), a GRO in New Waverly, Texas.[724]  DFPS noted that all the foster youth who were living in the facility were moved by January 19, 2021, with the exception of a child for whom the placement was court ordered.[725]  That child was reunited with his father on February 23, 2021.[726]

---

[724] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Gulf Coast Trade Center* (March 2, 2021).
[725] *Id.*
[726] *Id.*

GCTC was one of the GROs prioritized for Heightened Monitoring by the State pursuant to Remedial Order 20; the facility had the highest risk score of the more than 40 GROs placed on Heightened Monitoring.  DFPS instituted a placement hold for GCTC on December 11, 2020, just six months after having notified the operation that it would be placed under Heightened Monitoring.[727]

Prior to being placed under Heightened Monitoring, GCTC had twice been placed under Evaluation by RCCR: once from October 4, 2016 through March 17, 2017 and again from January 9, 2019 through July 9, 2019.  Prior to being placed under Evaluation, the operation had been placed under a voluntary plan of action due to "the number and seriousness of the deficiencies cited during the last two years and the overall noncompliance of the agency," that lasted from March 25, 2011 to June 25, 2011.  The Monitors asked RCCR whether it intended to take any action on the operation's license; RCCR responded that it intended to place GCTC on probation, but that the facility had not yet been informed of that decision.[728]  RCCR notified the Monitors on April 12, 2021 that the only children remaining in the facility were Texas Juvenile Justice Department (TJJD) placements, and that RCCR met with the operation to discuss placing Gulf Coast Trades Center on probation on April 8, 2021, but that the operation "asked for some changes to the Corrective Action Letter prior to finalization and that CCR is in the process of finalizing that letter."[729]

The Monitors' analysis shows the troubled history of GCTC:  the facility was cited by RCCR for minimum standards deficiencies 198 times between January 1, 2016 and December 31, 2020.  Of these citations, 161 were for standards weighted high, medium-high, or medium by RCCR.  During the same time period, GCTC was also the subject of five RCCI abuse or neglect investigations, resulting in seven RTBs, with substantiated allegations of Neglectful Supervision, Sexual Abuse, and Physical Abuse:

- An investigation opened after DFPS made a report to SWI on February 26, 2016 alleging that a sleeping child was left behind by a GCTC staff member when the staff member and other children evacuated a dorm during a fire.  RCCI found that the staff member was the first person out of the burning building, and failed to follow protocol to ensure all of the children were safely evacuated.  The child was "left in a burning building for at least five minutes unaccounted for."  During his interview, the child said that he woke up twice during the fire "after becoming hot" and that the second time, "he saw the smoke had filled the room and he got up from bed and ran out."  The investigation resulted in an RTB finding against the staff member for Neglectful Supervision of the child.  Four citations were issued

---

[727] Because DFPS did alert the Monitors that it had ended its contract with GCTC until March 2, 2021, GCTC was included in the Heightened Monitoring reviews conducted by the monitoring team, discussed *supra*.  Consequently, the Monitors will not include a review of the Heightened Monitoring plan here.

[728] E-mail from Taryn Lam to Deborah Fowler and Kevin Ryan, re: Gulf Coast Trade Center, March 2, 2021 (on file with Monitors).  RCCRs decision not to take any action against GCTC's license has important implications, since DFPS informed the Monitors, "The Texas Juvenile Justice Department (TJJD) has informed DFPS that they plan to continue to use this facility for future placements.  If TJJD recommends placement of a youth in DFPS conservatorship into this facility, DFPS will discuss concerns with TJJD in the interest of child safety."  E-mail from Heather Bugg, *supra* note 722.

[729] E-mail from Katy Gallagher, Attorney, HHSC, to Deborah Fowler and Kevin Ryan, *Gulf Coast Trade Center* (April 12, 2021) (on file with Monitors).

by RCCR for minimum standards violations, but one citation (for a minimum standard related to having an accessible fire extinguisher) was overturned.  The three citations that were upheld on administrative review were: a citation for the minimum standard associated with fire drills (which were not being conducted during night shifts); a citation for violation of the minimum standard related to caregiver responsibility; and a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation opened after a report was made to SWI May 8, 2018, alleging that a 16 year-old child told his probation officer that a staff member at GCTC allowed children to give each other tattoos, smoke cigarettes behind the building outside, and that staff allowed children to go into the bathroom and fight and did nothing to intervene.  The child had several bruises on this arm; he said that other children at the facility hit him and staff did not stop it from happening.  The staff confirmed the child was getting bullied at the facility.  The investigation resulted in three RTB findings for Neglectful Supervision of the alleged victim and two other children by the same staff member, based on the staff member's failure to intervene appropriately when he observed the children tattooing each other with sharpened paper clips and ink from pens.  RCCR issued two citations: a citation associated with the minimum standard associated with child-to-caregiver ratio because a review of staffing schedules showed that six staff were in charge of 13 -16 children during both shifts, two days in a row; and a citation associated with the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation opened after a report was made to SWI on July 19, 2017, alleging a 17 year-old male youth had sexual contact with a female staff member.  The child confirmed during a forensic interview that the female staff member performed oral sex on him and that they had sexual intercourse.  The female staff member denied the allegations, but the child was able to describe tattoos on the staff member's back, lower arm, and chest.  The investigation resulted in an RTB for Sexual Abuse against the staff member.  RCCR issued two citations: a citation for violation of the minimum standard associated with employee responsibilities; and a citation for violation of the minimum standard associated with a child's right to be free of abuse or neglect.

- An investigation opened after a report was made to SWI on October 10, 2017, alleging a shift supervisor was involved in a physical altercation with a 17 year-old youth at the facility.  During his interview, the staff person acknowledged starting the fight when he pushed the child who had "invaded his personal space" and hit the youth back after the youth hit him.  The investigation resulted in an RTB for Physical Abuse against the staff member.  RCCR issued three citations: a citation for violation of the minimum standard prohibiting corporal punishment; a citation for violation of the minimum standard related to caregiver supervision, due to the failure of the administrative staff to "provide the level of oversight necessary to direct care staff;" and a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation opened after a report was made to SWI on April 27, 2020, alleging that a former GCTC staff person and a youth who had aged out of care two months earlier announced on Facebook that the former staff person was pregnant with the youth's child.

359

The reporter alleged that the former staff person "sexually exploited" the youth while he was a resident at GCTC. During her interview, the former staff person admitted to engaging in sexual contact with the youth while he was a resident at GCTC, stating that she was suspended from GCTC for engaging in inappropriate behavior with the youth. She acknowledged that her sexual contact with the youth during his stay at the facility resulted in her pregnancy. The investigation resulted in an RTB finding for Sexual Abuse of the youth by the staff member. RCCR issued three citations: a citation for violation of the minimum standard associated with employee responsibilities; a citation for violation of the minimum standard related to child-care administrator responsibilities, due to the failure to protect the child from inappropriate contact by the staff member; and a citation associated with the minimum standard associated with a child's right to be free from abuse or neglect.

*h.*      Willow Bend Center RTC

On March 2, 2021, RCCR notified the Monitors that the agency had decided to issue an intent to revoke letter to Willow Bend Center RTC (Willow Bend Center), located in Tyler, Texas, "based on ongoing patterns related to restraints, supervision, and recent reason to believe findings."[730] RCCR indicated that DFPS was working to secure placements for the children at the operation, and that the operation had not yet been notified.[731] The Monitors asked RCCR to provide them with the intent to revoke letter once it had been sent to the operation.

On March 24, 2021, RCCR notified the Monitors that the agency had delivered the letter to the operation the day before, after confirming that all the children had been discharged from the operation.[732] The same day, DFPS notified the Monitors that on March 3, 2021, the agency "immediately began working with the SSCCs who had children placed in the facility to find new placements" and that on March 23, 2021, all children had been moved and DFPS had terminated its contract with the facility.[733]

Willow Bend Center, which opened in 2009, had been subject to RCCR enforcement actions prior to the agency's decision to revoke the RTC's license. The RTC was under Heightened Monitoring when it was notified of RCCR's intent to revoke its license. Prior to being placed under Heightened Monitoring, Willow Bend Center had been placed on Evaluation by RCCR from September 19, 2017 through March 19, 2018. The RTC had also twice been placed on a voluntary Plan of Action: once from May 21, 2014 through August 21, 2014, and again from June 5, 2020 through December 5, 2020. The 2020 POA was not successfully completed.

---

[730] E-mail from Taryn Lam to Deborah Fowler and Kevin Ryan, *Willow Bend Center RTC* (March 2, 2021) (on file with Monitors).

[731] *Id.*

[732] E-mail from Taryn Lam to Deborah Fowler and Kevin Ryan, re: Willow Bend Center RTC, March 24, 2021 (on file with Monitors).

[733] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, re: Willow Bend Center RTC, March 24, 2021 (on file with Monitors).

According to RCCR's letter notifying Willow Bend Center of its intent to revoke the operation's license, the decision was based on findings of abuse and neglect, as well as a pattern and repetition of severe minimum standards deficiencies.[734]   The letter specified:

> From 9/19/2017 to 3/19/2018, your operation, Willow Bend, was required to complete an Evaluation to address concerns with emergency behavior intervention (EBI), supervision, child's right, discipline, medication, and physical site deficiencies.  On 6/5/2020, Willow Bend was requested to complete a Provider Plan of Action to, again, address concerns related to EBI, child's rights, and discipline. The Plan of Action ended unsuccessfully on 12/5/2020 due to Reason to Believe findings and the operation's overall compliance during the Plan of Action period.
>
> Since 12/2019, Willow Bend has had 6 Abuse/Neglect investigations, 5 of which resulted in Reason to Believe findings of Abuse or Neglect.  An investigation completed on 12/12/2019 determined a child was physically abused during an altercation with Willow Bend staff.  An investigation completed on 8/7/2020 concluded that a child was physically abused during an altercation with Willow Bend staff.  On 11/4/2020, an investigation revealed that Willow Bend caregivers neglectfully supervised two children by not accounting for their specific supervision needs and they were able to engage in sexual misconduct. Investigations completed on 1/22/2021 and 2/3/2021, respectively, found a Willow Bend direct caregiver physically abused children by striking a child in the face during an EBI and kicking a child in the stomach and slamming a door on the child's foot.  In addition, a prior physical abuse investigation completed on 1/13/2020 resulted in a finding of UTB for the same caregiver.
>
> In addition to the findings of abuse and neglect, there is an on-going pattern and repetition of severe deficiencies for child's rights, discipline, emergency behavior intervention, medication, serious incidents, supervision, and physical site.
>
> Between 1/9/2018 and 2/9/2021, 44 investigations or inspections of Willow Bend resulted in citations for 73 deficiencies.  Willow Bend was cited 29 times for corporal punishment or other prohibited punishments, 11 times for child's rights, 6 times for medication or medical care, 6 times for EBI or personal restraint implementation, 7 times for physical site, 4 times for caregiver responsibility or supervision, and 2 serious incident deficiencies.
>
> Child Care Regulation has determined that your operation poses an immediate risk to the health or safety of children in care.  This is due to findings that numerous staff have been found responsible for physical abuse and neglectful supervision of children in care, as well as the patterns of deficiencies in multiple sections of minimum standards.

---

[734] Letter from Shellie Adetona, Program Manager, RCCR to Leslie Harrold, Administrator, Willow Bend Center, March 23, 2021 (on file with Monitors).

Due to the severity, patterns, and repetitious nature of deficiencies, confirmed findings of abuse and neglect, your operation's demonstrated inability to implement lasting corrections, and the threat to children that has created an endangering situation, your permit to operate a residential operation is revoked.[735]

The Monitors' analysis confirms RCCR's findings. Between January 1, 2016, and December 31, 2020, RCCR cited Willow Bend Center 137 times for minimum standards deficiencies. Of those, 125 were standards weighted high, medium-high, or medium by RCCR. During the same time period, seven RCCI investigations resulted in twelve RTBs for physical abuse or neglectful supervision:

- An investigation opened after a report was made to SWI on May 10, 2016 alleging that an I-See-You worker had learned that two 16 year-old children, who two days earlier had been reported as having run away, had been taken to a hotel by a Willow Bend staff member, who also paid for the hotel room. The RCCI investigation revealed that the staff member encountered the two residents after they had run away from the facility, and rather than reporting that she had found them and returning them to Willow Bend Center, she rented a room at a motel for them for two nights, then drove one child to his birth mother's home in Houston and left the other child at a truck station. The investigation resulted in two RTB findings for the staff person for Neglectful Supervision for each child. Though RCCR issued three citations in connection with this investigation, two citations associated with violation of minimum standards related to caregiver responsibilities were overturned after an administrative review, because the staff person in question had been suspended prior to taking the children to the motel. The remaining citation was issued for violation of the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation opened after a report was made to SWI on May 18, 2016, alleging that a staff member slapped and hit a 15 year-old child, and kicked him in the head. The investigation resulted in an RTB for Physical Abuse by the staff member, finding that the staff member "punched [the child] in the head before taking him to the ground" and that after taking the child to the ground, the staff member "punched [the child] in the head a few more times." The incident was witnessed by two other staff members. RCCR issued three citations related to the investigation: a citation for violation of the minimum standard associated with caregiver responsibilities; a citation related to EBI implementation; and, a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation opened after a report was made to SWI on June 3, 2016, alleging that a 13 year-old child made an outcry of having been choked by a staff member, another child alleged having been kicked by a staff member, and a third child reported having been shoved by a staff member. The investigation resulted in an RTB for Physical Abuse of the 13-year old child due to video showing the staff member "grabbing and choking" the child, "sitting on top of the child with one hand around his neck." RCCR issued three citations: a citation for prohibited punishment; a citation for corporal punishment, and a citation for

---

[735] *Id*. at 2-3.

violation of the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation opened after a report was made to SWI by RCCI on February 4, 2017 that while an RCCI investigator was reviewing video at the facility as part of another investigation, "[The investigator] ran across another incident with a staff using physical force on a child. The staff took a chair and placed it over the child and squeezed the child in between the legs of the chair. The staff forcefully put his forearm on the back of the child's neck while holding him up against the wall. He grabbed and push [sic] the child several times by the back of his neck. The child was drug down the hall…The video showed the staff kicking the child. The child had an accident in his clothes apparently and the staff took the soiled underwear and hit the child several times with the dirty underwear. The staff also sprayed the child twice with Lysol. There was another staff who stood by and witnessed the incident but she did not report it." The investigation resulted in two RTBs: one for Physical Abuse of the child by the staff person who hit, kicked and dragged him, and one for Neglectful Supervision of the child by the staff person who failed to intervene. RCCR issued six citations in connection with the investigation: one citation for failure to report the incident; one citation related to violation of the minimum standard associated employee responsibilities; one citation for prohibited punishments; one citation for violation of the minimum standards associated with appropriate disciplinary measures; a citation for corporal punishment; and a citation for violation of the minimum standards associated with a child's right to be free from abuse or neglect.

- An investigation opened after a May 6, 2019, report to SWI alleging a child was injured when he got into an altercation with a staff person. The investigation revealed that the staff person took his hat off and his keys out of his pocked "to prepare for the altercation" and returned the child's punches when the child hit him. The investigation resulted in an RTB for Physical Abuse by the staff person. RCCR issued two citations: one for corporal punishment; and, one citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation opened after a July 9, 2020, report to SWI alleging a staff member injured a 15 year-old child when he "used inappropriate force." During the investigation, the staff member. E.M., "admitted to grabbing, hitting, and kicking [the child]" E.M. was "unsure how many times he hit or kicked [the child]." Another staff person who witnessed the incident indicated that when the child refused to go back to his room after being told repeatedly to do so, E.M. grabbed the child by the back of the neck and threw him to the ground and that the child "kept trying to leave but [E.M.] kept coming for him." The investigation resulted in an RTB for Physical Abuse by E.M. RCCR issued three citations: a citation for failure to follow EBI training; a citation for corporal punishment; and a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect.

- An investigation resulting from an October 6, 2020, report to SWI alleging that two children who had histories of sexually acting out engaged in sexual contact while they were showering. Both children were flagged as having indicators for sexual aggression. Service

plans for both indicated they needed constant supervision. Despite this, they were allowed to shower at the same time. The investigation resulted in four RTBs for two staff assigned to supervise the two children at the time of the incident. RCCR issued three citations: a citation for violation of the minimum standard associated with caregiver responsibility; a citation for violation of the minimum standard associated with a child's right to be free from abuse or neglect; and, a citation for the minimum standard associated with the child-care administrator's responsibilities, because "[a]dministration was aware that there was an ongoing concern about a child's behavior but did not ensure there were enough staff on duty to meet the supervision needs of the children in care."

In addition to these RTBs, RCCR's letter referred to two abuse or neglect investigations resulting in substantiated findings in 2021:

- An investigation resulted in an RTB for Physical Abuse after an investigation substantiated a December 24, 2020 report to SWI alleging that a staff member hit a child on the head after the child bit his finger.

- An investigation resulted in two RTBs for Physical Abuse of two other children, by the same staff member involved in the December 24, 2020 incident. An investigation of a January 4, 2021 report to SWI substantiated allegations that the staff member slammed a child's foot in the door, as well as allegations made by another child that the same staff member gave him a black eye during a restraint

### i.    The Tree House Center

The most recent e-mail from the State[736] indicating that it would begin removing children from a facility under due to safety concerns was sent to the Monitors on April 9, 2021, regarding The Tree House Center, an operation that is under Heightened Monitoring:

> DFPS and HHSC want to make you aware of an evolving situation at The Treehouse Center, a General Residential Operation, in Conroe, TX. As of April 8, 2021, 10 youth in DFPS conservatorship reside at the operation, 3 of whom are in PMC. The Treehouse Center is on Heightened Monitoring. As you are aware, DFPS and/or HHSC CCR have been conducting weekly site visits; residents are visited in-person monthly to assess their safety and well-being; and DFPS has been conducting monthly, unannounced overnight visits to the operation to verify compliance with 24-hour awake night supervision requirements. The Treehouse Center had been on placement suspension from November 8, 2020 until March 12, 2020, when a corrective action plan and safety plan were lifted.

> On April 5, 2021, [a District Court judge] issued a search warrant for property located at The Treehouse Center. Law enforcement executed the search and seized:

---

[736] Email from Corliss Lawson to Deborah Fowler and Kevin Ryan, *The Treehouse* (April 9, 2021) (on file with Monitors).

- Computers and computer equipment
- Personnel records
- CPS documentation, including child records
- Licensing records
- Training guides
- Policies and procedures (including for restraints)
- Cell phones and other communication devices
- Photographs
- Video equipment
- Cameras, and all other devices used for the capture, taking, storing, transferring developing and otherwise manipulating images
- Financial records
- Documents showing dominion or control over the operation.

CPI Special Investigators were present during the execution of the search warrant***The search occurred during daytime hours.  The DA's office declined to share a copy of the affidavit in support of the search warrant at that time.

In response thereto, DFPS began daily, unannounced safety checks*** on April 6, 2021 and overnight visits were increased to 2-3 visits per week.  On April 7, 2021, The Treehouse Center was formally notified that placements into the operation have, again, been suspended.  DFPS is working with Treehouse Center staff to reconstruct the records of children in our conservatorship to support the operation's ongoing ability to appropriately care for these children.  Treehouse Center staff notified us that they received a subpoena ordering them to appear on April 13, 2021 before a grand jury.

Today, the DA phone in an intake to SWI***that asserts serious allegations against the Administrator. Based on the seriousness of the allegations, DFPS has decided to remove the children and has sent staff to provide 24/7 monitoring to ensure the safety of the children until they are removed.

We will continue to monitor the situation closely and will update you as more information becomes available.

The Monitors review of the April 9, 2020 CLASS intake referenced in the State's e-mail showed that a first April 8, 2021 intake from the D.A.'s office was referred to RCCR as a Priority 3 investigation, and re-entered on April 9, 2021 as a Priority 2 abuse or neglect investigation.  The intake alleges that the CEO of the operation instructed the manager of the facility not to run a background check on a staff person who "is a habitual felon and has a record of aggravated assault and a history of possession of substances."  The intake goes on to allege that this staff person "has keys which would allow access to the medication room and other rooms where [children] can be found."  The intake also alleged that the CEO sent a text telling the facility manager to "get all the employees [sic] phones and check to see who made a call to SWI."  It further alleged that the CEO

365

"sent a text that has requested a list of all employees so they can say people have been working so that they are not out of ratio compliance."

The Monitors were notified on April 13, 2021 that all children had been moved from The Tree House Center, and that "DFPS staff were present at the operation continuously since 04/09/21".[737] DFPS notified the Monitors that it cancelled its contract with The Tree House Center on April 15, 2021;[738] RCCR has not confirmed whether any action will be taken related to the contract with the operation or its license.

vi.   **Summary**

Between May 1, 2020 (the date the new RCCR policy went into effect related to agency home closures) and March 16, 2021, there have been only five recommendations made by RCCR staff to close an agency foster home.  Of those, only three were ultimately approved; one remains pending, though the recommendation was made at the end of October 2020.

There were no license revocations for any placement (foster home, CPA, or GRO) in the five-year period preceding September 30, 2019.  Since then, RCCR has initiated revocation proceedings or denied a license for eight GROs, and DFPS has notified the Monitors that the agency cancelled contracts with two GROs. Five other GROs voluntarily relinquished licenses after being placed on Heightened Monitoring or another type of RCCR enforcement action.

Each of the agency homes and GROs that have closed, regardless of whether the closure was the result of a voluntary surrender of their license, RCCR action, or DFPS's termination of a contract, share deeply troubled histories that include not only a pattern of minimum standards deficiencies, but in each case, multiple substantiated findings of abuse or neglect.  Many had failed to come into compliance despite previous enforcement action.

---

[737] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *The Treehouse* (April 13, 2021) (on file with Monitors).
[738] E-mail from Heather Bugg to Deborah Fowler and Kevin Ryan, *Re: The Treehouse* (April 15, 2021) (on file with Monitors).

## VIII. CHILD FATALITIES

After learning through the Monitors of the death of a child in the PMC General Class, the Court Ordered on February 21, 2020:

*Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

Defendants have continued to provide notification to the Monitors of PMC child fatalities. As discussed in the Monitors' First Report, DFPS notified the Monitors that 11 children in the PMC General Class died between July 31, 2019 and April 30, 2020. Since then, DFPS notified the Monitors that 13 additional PMC children died between May 1, 2020 and April 10, 2021.

In less than 21 months since the Fifth Circuit issued the mandate in this matter (July 31, 2019 – April 10, 2021), 23 PMC children have died in State custody.[739] These fatalities include six children whose caregivers were determined to have abused or neglected them in connection with their deaths or their care prior to their deaths. In addition, a seventh fatality, J.C., is strongly suspicious for abuse. As of April 10, 2021, a DFPS investigation was underway in that case and five additional child fatalities, which the Monitors will review and discuss in the next report to the Court.

The fatalities that DFPS determined did not involve abuse or neglect include a teenager who drowned; children with severe medical conditions; and a youth who had run away from care and was found murdered on the side of the road. One child was in a placement in another state, and DFPS did not investigate that fatality.

Of the six cases involving confirmed abuse or neglect and a seventh case strongly suspicious for abuse, SSCCs were involved with five of the seven children. State records indicate SSCCs directly managed care for four of the children; DFPS directly managed care for two of the children and in the case of one child, C.G., whose death is discussed in the Monitors' First Report and within this Section, an SSCC was responsible for placement, while DFPS was responsible for case management.

---

[739] DFPS initially reported to the Monitors that L.B., whose death was discussed in the First Report, was a PMC child. After DFPS confirmed an RTB finding for caregiver neglect in connection with the child's death on February 18, 2021, the agency notified the Monitors on April 30, 2021, that L.B. was a TMC child at the time of death.  L.B.'s death is excluded from the total of 23 fatalities presented in this report

## A.    Child Fatalities Involving Abuse and Neglect (July 31, 2019 – Aril 10, 2021)

K.C., Born September 1, 2005; Died February 9, 2020

The Monitors' First Report detailed the circumstances surrounding K.C.'s death, but the RCCI investigation into her death remained open at that time. K.C. was living at Prairie Harbor, an RTC, when she died after collapsing in the middle of the night on February 9, 2020. As the Monitors noted in the First Report, "RTC staff waited thirty-seven minutes before calling 911 after K.C. collapsed, because direct care staff believed they needed permission from administrators to make the call."[740]  The cause of death was a pulmonary embolism associated with a deep venous thrombosis in her right calf.

As described in the First Report, RCCR had cited Prairie Harbor  more than 60 times for minimum standards violations between February 2017 and December 2019, and RCCR had placed Prairie Harbor on probation just five days prior to K.C.'s death.[741] DFPS Contract monitoring staff had also identified concerns in 2017 and again in 2019 related to children missing psychiatric appointments required by treatment plans, as well as problems associated with documentation of administration of prescribed medications and failure to appropriately administer prescribed medications.[742, 743]

During RCCI's investigation into K.C.'s death, seven children (of the ten interviewed) reported that K.C. had complained of leg pain in the weeks before she died, but the staff members at the facility did not address her complaints. Only two staff (of eleven interviewed) advised RCCI investigators that they were aware of K.C.'s complaints; however, the Monitors found contemporaneous documentation of K.C.'s complaints of pain in her right calf dated January 19, 21, 22, 23, and 24 2020. Despite that documentation, K.C. did not receive medical attention.

On September 3, 2020, the Court convened the first day of a two-day hearing regarding the Plaintiffs' Show Cause motion. During that hearing DFPS announced that they would no longer refer children to Prairie Harbor.[744] RCCR issued a notification of revocation to the facility on

---

[740] *Report*, at 13.

[741] *Id.*

[742] TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., *Fiscal Year 2017 Residential Child Care Program Contract Monitoring Report Prairie Harbor LLC* (July 17, 2017) (on file with the Monitors).

[743] *Id*. at 5-7.

[744] As discussed earlier in this report, the owner of Prairie Harbor had opened another RTC, The Landing at Corpus Christi. That program had been issued an initial permit on September 27, 2019, which was renewed on March 26, 2020 for six months (or through September 27, 2020). The record at that time indicates that: "The permit will be renewed due to the number of open investigations, similar investigative allegations, pattern of investigations involving the same staff, and the operation transitioning EBI and practice."  (CLASS record, The Landing at Corpus Christi, viewed November 29, 2020). On September 16, 2020, as the permit was again up for renewal (on September 27, 2020), the second renewal was denied: "Denial of permit based on revocation of permit issued to controlling persons identified for this applicant. There is a pending sexual abuse case at this operation as well."  *Id.* The controlling person identified in that note was also a controlling person for Prairie Harbor.

September 11, 2020. Prairie Harbor requested administrative review of that determination, which has been upheld.[745]

Approximately one week after the Court hearing in September 2020, DFPS re-opened the investigation into the death of K.C. in order to evaluate whether administrative staff were negligent in their duties to provide oversight and management of Prairie Harbor. Based on that investigation, RCCI substantiated the allegations with a disposition of RTB for Neglect by three Prairie Harbor administrators. In total, including those administrative staff, the state investigation into K.C.'s death resulted in eight findings of Neglectful Supervision and ten findings of Medical Neglect.

D.D., Born May 16, 2017; Died February 10, 2020

D.D. suffered from Methylmalonic acidemia, a metabolic disorder that prevented the child's body from breaking down proteins and fats. D.D.'s condition was terminal. On January 30, 2020, shortly before D.D.'s death, DFPS substantiated allegations of child maltreatment against the child's licensed foster mother for Neglectful Supervision with a disposition of RTB for excessively leaving the child alone with nurses. D.D. was in the hospital in a pediatric Intensive Care Unit at the time of death.

T.M., Born October 27, 2013; Died March 15, 2020

At the time of the Monitors' First Report, T.M.'s death remained under investigation. T.M. was non-verbal and relied on a tracheal tube to support breathing. The child's caregivers reported T.M. suffered a respiratory event that prompted the child's licensed foster parents to call 911 and request emergency medical aid. At the time, the child's pulse oximeter, an electronic device that measures the saturation of oxygen carried in the blood, indicated T.M. was experiencing hypoxemia and the child's breathing was shallow. The foster father reported he performed a sternum rub and bagged the child for oxygen support. First responders transported the child to the hospital and treating physicians observed multiple brain bleeds, some bruising on the left neck, left ear, possibly both sides of the nose, both sides of the forearms, and on and under the chin. T.M. also had a spinal fracture, and evidence of possible strangulation. The treating physicians expressed concern for potential abuse. T.M.'s foster parents denied causing the child's injuries.

The Medical Examiner conducted an autopsy and concluded that the cause of death was blunt force trauma to the head from an undetermined source. The Forensic Assessment Center Network (FACN) agreed and noted that the child sustained the injuries in the hours leading up to his death.

Based on the Medical Examiner's and FACN's findings, RCCI issued a disposition of RTB for Physical Abuse, but with an unknown perpetrator, and RTB for Neglect against both foster parents.

---

[745] Prairie Harbor's "Operating Status" in CLASS is denoted as "No," with an effective date of September 14, 2020. Prairie Harbor does, however, continue to show as an active placement on the State's residential child care website. *See* http://www.dfps.state.tx.us/Child_Care/Search_Texas_Child_Care/ppFacilityDetails.asp?ptype=RC&fid=1191339 (visited March 18, 2021) ("Temporarily Closed:  No").

The foster home was initially verified on October 16, 2018. There were two prior investigations in the home. Both involved an 11-year-old with autism, intellectual disability, and limited verbal ability. In the first incident, in July 2019, the foster father and a nurse confirmed the child had fallen to the ground. The nurse had assessed him and did not believe he needed to see a doctor, but the next day the foster parents realized he was in pain and sought medical attention, which confirmed that he had broken his arm. RCCI Ruled Out abuse and neglect.

In the second investigation, in October 2019, the same child had broken his leg and an RCCI investigator observed several faint bruises when she saw the child. His doctor advised that he had a history of easily breaking bones and easily bruising. The doctor reportedly advised that the medical condition that caused him to bruise easily was "unknown," and that the child was a "medical mystery."  RCCI again Ruled Out abuse and Neglect.

A.B., Born June 9, 2016; Died April 12, 2020

The Monitors' First Report detailed the circumstances surrounding A.B.'s death but the CPI investigation into his death remained open. On April 12, 2020, A.B., a three-year-old, was found unresponsive on the floor, bleeding from his ear, with injuries suspicious for physical abuse. SWI had received multiple referrals in the month leading up to A.B.'s death alleging Physical Abuse and safety concerns. Those referrals sparked two investigations for abuse or neglect, neither of which caused DFPS to remove the child from the placement. Those calls to SWI included allegations that the caregiver's domestic partner "beats [the children, including A.B. and A.B.'s sibling, who also resided with the caregivers] really bad."

In addition, the child's OCOK caseworker on a visit to the home saw a bump on A.B.'s forehead and scratches on A.B.'s face. The caregiver's partner denied knowledge of the bump and said that the scratches were from A.B.'s long nails. A.B.'s daycare had expressed numerous concerns about changes in A.B.'s demeanor since the placement in the caregiver's home, sporadic attendance, and bruises and injuries. One of the referrals resulted in an evaluation by a pediatrician at a hospital clinic that provides forensic child abuse evaluations, which expressed concerns for "non-accidental trauma" based on the child's injuries. And three days before A.B.'s death, the daycare texted the OCOK caseworker a picture of A.B.'s eye, swollen shut; the caregiver previously told the caseworker that the child's eye was swollen due to allergies, which the caseworker repeated to the daycare center staff. The CPI investigator did not interview anyone from the daycare prior to A.B.'s death. A witness interviewed after the child's death described numerous injuries to A.B. over the prior several weeks including a hip injury, a black eye, and facial bruising.

DFPS completed its investigation on October 29, 2020. DFPS substantiated the allegations with a disposition of RTB for Physical Abuse of A.B. by both the caregiver and the caregiver's domestic partner, and for Neglectful Supervision by the caregiver and the caregiver's domestic partner for both A.B. and A.B.'s sibling. Investigators were UTB whether the caregiver and the caregiver's domestic partner also physically abused A.B.'s sibling. Both the caregiver and the caregiver's domestic partner were arrested and criminally charged in connection with A.B.'s death in January 2021.

370

C.G., Born December 29, 2005; Died April 26, 2020

The Monitors' First Report detailed the circumstances of C.G.'s death, but the RCCI investigation into her death remained open. Fourteen-year-old C.G. hanged herself in the bathroom of a shelter, Williams House, where she was placed by DFPS following her third discharge from a psychiatric hospital on March 4, 2020, where she had been treated for suicidal behavior and risk of self-harm. C.G.'s treatment plan required that she be "monitored by staff at all times." Despite that requirement C.G. was left alone in the bathroom for thirty minutes before a staff person opened the door and found her.

The shelter where C.G. died, Williams House, had a troubled history, including nine investigations that substantiated abuse or neglect between late 2014 and March 2020. During her stay at the shelter, C.G. presented as overwhelmed, tearful, "on edge," and upset by the fighting among other residents. Three weeks before her death she expressed sadness because a new policy prohibiting phone calls with family after work hours meant that she was less able to talk with her family. The day before her death staff took away an MP3 player she had been given to help manage her anxiety, and immediately preceding her entry into the bathroom, she had been reprimanded and brought to tears by a staff person for going into the staff person's purse to look for a hair tie.

RCCI completed its investigation on November 16, 2020 and issued a disposition of RTB for Neglectful Supervision against three staff arising from their failure to supervise C.G. while she was in the bathroom for 30 minutes, and against one administrator for failing to ensure that the staff provided the required level of supervision due to significant systemic issues.

E.C., Born December 12, 2018; Died June 22, 2020

E.C., an 18-month-old girl, drowned in an above-ground pool when her licensed foster parents inadvertently left the ladder in place. According to the foster parents, each thought the other was supervising the child. There were three foster children in the home – E.C., 13-year-old M.R., (E.C.'s half-sister), and 7-month-old T.C., (E.C.'s birth sister), as well as the foster parents' birth children.

The foster home had a handful of prior reports addressed by RCCR. One of the prior reports, on April 24, 2019, pertained to E.C. when she was three months old. A report was made to SWI that the child had a bruise on her temple. Based on the documents received, which included medical reports and photographs, RCCR concluded that the child had a birthmark on her temple and that there was no minimum standards violation or other concerns with the foster parents. The remaining four reports involve M.R., who was E.C.'s half-sibling.

At the time of E.C.'s death, all three foster children in the home – E.C., M.R., and 7-month-old T.C. - had goals of adoption with the foster parents. In the days after E.C.'s death, M.R. and T.C. were placed in respite care until a court hearing regarding whether they could return to the foster home. At that hearing, which occurred on July 2, 2020, the court permitted both to return to the foster home. RCCI documented a safety plan, which it indicated was based on a court order dated July 8, 2020, allowing M.R. and T.C. to return to the foster home.

On July 31, 2020, RCCI entered a disposition of RTB against the foster parents for Neglectful Supervision of E.C., noting:

> Based on a preponderance of the information gathered, there is sufficient evidence to support the documented circumstances to meet the criteria of abuse/neglect as defined in the Texas Family Code Section 261.001 and further defined in the Texas Administrative Code 700.465.

> [The foster parents] were not watching the child when she left the home to enter the back yard, crawl up the ladder and fall into the 4 foot deep above ground swimming pool.

> [E.C.] did not survive and was pronounced dead at 8:34 PM 06/22/2020.

> [The foster mother] admitted to leaving the pool ladder accessible to entry into the pool after attempting to clean the pool earlier in the day.

> While [the foster father] was feeding the animals and [the foster mother] was cooking in the kitchen each thought the other was watching [E.C.] when in fact neither was watching her and she fell to a tragic accident.

> This case will be ruled Reason To Believe for Neglectful Supervision of [E.C.] due to neither parent noticing the child had left the home and fallen into the pool.

That finding was not final. On August 18, 2020, the RCCI investigator requested and received an extension request because E.C.'s death certificate had not yet been received. The extension was to expire on September 19, 2020. Records in CLASS indicate that RCCI received the death certificate and emailed it to the CPA supervising the foster home that same day.

Although the RCCI investigator received the death certificate on August 18, 2020, the next set of entries in CLASS are dated October 27, 2020. On that date the RCCI investigator advised one of the involved agencies of the case closure and RTB findings, sent the notification letters to the referent and perpetrators, and documented a case transfer to HHSC that included concerns RCCI identified to HHSC.

After that transfer, on October 28, 2020, HHSC notified the Centralized Background Check Unit regarding the disposition of RTB for Neglectful Supervision with regard to the foster parents. Next, on November 5, 2020, HHSC conducted an exit interview with an administrator from the CPA supervising the foster home. HHSC advised the administrator regarding the "citations for supervision, the pool being accessible to the children in care by the ladder being left in the pool,

372

and Child right's [sic] being free from abuse/neglect." The administrator responded that she had received a conditional check on the foster parents, and that she understood that the CPA could not place additional children in the home. She indicated, however, that the CPA intended to leave the home open until the adoption of M.R. and T.C. was finalized, which was scheduled to occur before the end of November 2020.

## B.   Child Fatality Investigations Pending

<u>A.F., Born September 6, 2003; Died November 30, 2020</u>

Seventeen-year-old A.F. died by an overdose of acetaminophen on November 30, 2020. On Saturday, November 28, 2020, F.D., a 24-year-old male, met A.F. through social media. According to F.D., A.F. told him that she had been kicked out of where she was previously living and did not have anywhere to go. He picked her up in Amarillo at a hotel and drove her to his apartment in Lubbock. On Sunday, November 29, 2020, he saw that she had taken over-the-counter pills and was acting "out of it." She eventually vomited and, according to F.D., ultimately began to act normal. He left for work at 2:00 p.m. and returned Monday morning, November 30, 2020. He noticed that the window of his apartment was broken and when he entered the bedroom, he said he found A.F. unresponsive on the bed. He called 911, the authorities responded, and A.F. was pronounced dead. The autopsy concluded that A.F. died by suicide by means of an overdose of acetaminophen.

A.F. had experienced a total of 39 placements during the more than fifteen years that she was in DFPS's care. Within those placements, two were non-consecutive moves into the same foster home with the goal of adoption (in the second placement at the same home); and two were non-consecutive moves into a relative's home with the hope of permanency (again in the second placement at the same home). One placement change was into an unrelated adoptive home; two were into relative homes; one was into a fictive kin home; seven were into foster homes; three were foster group homes; six were RTCs; six were shelters; and one was a GRO. A.F. was hospitalized four times; she was on runaway status twice; and she stayed in two unauthorized placements, including her final placement, which was subsequently approved as a relative/fictive kin placement.

In 2020, DFPS moved A.F. to a therapeutic foster home, where she stayed for less than two months until she ran away and refused to return. She alleged that the foster mother called her names and treated her differently from other children in the home. She went to stay with a friend's mother in an unauthorized placement, which DFPS subsequently approved as a fictive kin placement in early November 2020. A few days later, A.F. left to stay with a friend, on the weekend of November 6-7, 2020, and never returned.

During the next few weeks, A.F. was in occasional contact with the fictive kin caregiver, her CASA worker, and her caseworker. She reported to her CASA worker that she was in Fresno, California, but would not reveal her location to anyone else. She also indicated at some point that she was in a relationship with a "boy" who could take care of her, and on at least two occasions, she expressed suicidal ideation. According to the fictive kin caregiver, at one point, she asked to return to the home with a boyfriend and the caregiver said no. At another point, she indicated that

they had been kicked out of where they were staying because her boyfriend had been selling drugs. She also told the CASA worker that she was engaging in survival sex in order to eat.

DFPS's fatality investigation included allegations of Sex Trafficking and Neglectful Supervision against A.F.'s last fictive kin caregiver. The allegations arose after A.F. told her cousin in November 2020 that the fictive kin caregiver had either allowed or facilitated her and another girl to have sex with two of the caregiver's adult relatives; as a result, A.F. contracted a sexually-transmitted disease.

According to the investigation, on August 4, 2020, the caregiver, who was not yet approved as a fictive kin caregiver for A.F., encountered A.F. and another girl in DFPS care, Z.C., age 14, after they had run away from their placements. The caregiver indicated that she told the girls she would provide them with a place to stay but that she was leaving for a trip to Denver.  According to the caregiver, she did not want to leave the girls in her home alone, so she placed them in a hotel room for the night until she could return. She asked two of her fictive kin, both age 27, to go to the hotel to check on the girls. She stated that she told them specifically not to go into the room. She did not report to DFPS nor law enforcement that the girls were found and that she put them in a hotel.

The caregiver said she learned in August 2020 that the two men she allegedly sent to check on the girls instead had sex with them that night. The caregiver allegedly showed the investigators documentation from her phone as proof that she confronted the two men via text message, telling them that she found out about they had sex with the two teenagers and that she did not want them coming to her home.

The DFPS investigator did not interview the two men, one of whom had allegedly committed sexual assault of a minor, Z.C. The investigator interviewed Z.C., but never asked her questions to probe whether the caregiver trafficked the girls for sex by arranging for them to have sex with men. The investigator did not ask Z.C. whether she engaged in sexual activity with one of the men, nor whether the caregiver had planned for them to have a sexual encounter with men in the hotel while she was in Denver. The caregiver said that after A.F. moved in with her, she discovered that the men had sex with the two girls in the hotel. According to the caregiver, A.F. told her that she wanted to have sex with one of the men, but Z.C. reportedly would not admit to the caregiver that she had sex with the other man. However, Z.C. ran away the same day that DFPS placed A.F. with the caregiver, so it is unlikely the caregiver would have had an opportunity to question Z.C. about the sexual assault by the 27 year-old man. This raised an inconsistency in the timeframe reported by the caregiver which the investigator did not attempt to resolve. Finally, it is undisputed the caregiver failed to notify law enforcement or DFPS about the sexual activity between the two teenagers and the two men nor that she had located the girls before she left for Denver.

Later in November, the caregiver failed to notify police and DFPS for a few days after A.F. ultimately ran away again, which was inconsistent with the Kinship Agreement she signed. She also left A.F. to care for her other fictive kin, a 14 old-boy, while she was out of town. Therefore, when A.F. ran away, the boy was alone. Although A.F. left her home for the final time on

November 6 or 7, 2020, the caregiver waited until November 9, 2020 to notify authorities that she was missing.

CPI initially issued a disposition of Ruled Out as to all allegations. In concluding that there was no abuse, neglect or exploitation involved in her death, the investigator did not discuss the caregiver's role in placing the girls unsupervised in a hotel; her failure to contact DFPS; her decision to send two 27 year-old men to the hotel room to check on the girls; nor her failure to contact DFPS or law enforcement upon learning the men had engaged in sexual activity with the girls. The investigator concluded:

> The allegations of Neglectful Supervision do not meet the preponderance of evidence standard and is [in]sufficient to state that [caregiver] neglectfully supervised [A.F.]. Neglectful Supervision is defined as placing a child in or failing to remove a child from a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in bodily injury or a substantial risk of immediate harm to the child; placing a child in or failing to remove the child from a situation in which the child would be exposed to a substantial risk of sexual conduct harmful to the child; or placing a child in or failing to remove the child from a situation in which the child would be exposed to acts or omissions that constitute abuse under Subdivision (1)(E), (F), (G), or (K) committed against another child. [Caregiver] reported [A.F.] as a runaway. [Caregiver] was meeting [A.F.'s] needs while she was in her home. [A.F.] left the county and met up with random men from online dating sites. [A.F.] was found to have died due to an overdose of Tylenol. [A.F.] was not in [caregiver's] care when her death occurred.

> The allegations of Sex Trafficking do not meet the preponderance of evidence standard and is [in]sufficient to state that [caregiver] sex trafficked [A.F.]. The injuries/circumstances do not meet the definitions of abuse/neglect as outlined in the Texas Family Code. Sex trafficking is defined as knowingly cause, permit, encourage, engage in, or allow a child to be trafficked in a manner punishable as an offense under 20A.02(a)(7) or (8), Penal Code, fail to make a reasonable effort to prevent a child from being trafficked in a manner punishable as an offense under 20A.02(a)(7) or (8), Penal Code, compel or encourage a child to engage in sexual conduct that is an offense under 20A.02(a)(7) or (8), Penal Code (trafficking of persons), 43.02(b), Penal Code (prostitution), or 43.05(a)(2), Penal Code (compelling prostitution). [Caregiver] denied the allegations and there has been no evidence in speaking with family members and collaterals to support this allegation. Law enforcement is not pursuing charges for sex trafficking of [A.F.] by [caregiver].

On April 4, 2021, however, CPI entered new, tentative findings in this investigation. DFPS appeared to reverse its earlier decision and concluded there was Reason to Believe the allegation of Neglectful Supervision of A.F. by the caregiver. That investigative record notes:

> [Caregiver] did place [A.F.] in a situation that the child would be exposed to a substantial risk of sexual conduct harmful to the child. [Caregiver] met [A.F.] while she was on runaway from a foster home (8/3/20). [Caregiver] put [A.F.] and another runaway foster child in a hotel room for the night while she left town. [Caregiver] asked some male family friends who are in their 20's to stay at the hotel, allegedly outside, to ensure the girls did not run. [Caregiver] set [A.F.] up in a situation that left her vulnerable and easily able to be taken advantage of. Based on interviews completed, [A.F.] did end up having sexual intercourse with one of these males that night in the hotel; it is unclear if the sexual intercourse was consensual or not. In addition, [Caregiver] failed to report [A.F.] as a runaway to the authorities in a timely manner.

As of April 4, 2021, DFPS also entered a disposition of UTB as to allegations of Sex Trafficking of A.F. and UTB as to allegations that the caregiver gave A.F. and the other child marijuana the night they stayed in the hotel.

However, as of April 10, 2021, IMPACT records appeared to show that DFPS altered its conclusion, again, and was poised to Rule Out or administratively close all of the allegations against the caregiver. The documentation appeared to reframe the allegations of Neglectful Supervision around the caregiver's failure to notify the agency that A.F. ran away on November 6th or 7th. With respect to the allegations stemming from the night the caregiver hosted A.F. was hosted at the hotel, DFPS appeared poised to administratively close the investigation into allegations of Physical Abuse and Sex Trafficking, citing the agency's lack of jurisdiction. The IMPACT records noted the investigation was open as of April 10, 2021, and provide:

> The allegations of Neglectful Supervision do not meet the preponderance of evidence standard and thus it is not sufficient to state that [caregiver] neglectfully supervised [A.F.] Neglectful Supervision is defined as placing a child in or failing to remove a child from a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in bodily injury or a substantial risk of immediate harm to the child; placing a child in or failing to remove the child from a situation in which the child would be exposed to a substantial risk of sexual conduct harmful to the child; or placing a child in or failing to remove the child from a situation in which the child would be exposed to acts or omissions that constitute abuse under Subdivision (1)(E), (F), (G), or (K)

376

committed against another child. [A.F.] is not here to speak for herself, however based upon the investigation there has been no evidence found to state that [caregiver] was neglectful in her care of [A.F.] [Caregiver's] delay in reporting [A.F.] as a runaway appears to have been based on her misunderstanding of the law, the fact that [A.F.] was seventeen, and [caregiver's] belief that law enforcement would not consider [A.F.] a runaway at that age. There is insufficient evidence to support [caregiver] was neglectful in her supervision due to the delay in reporting [A.F.] as a runaway.

[A.F.] Physical Abuse

The Texas Family Code states Physical Abuse includes the following acts or omissions by a person: physical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the history or explanation given and excluding an accident or reasonable discipline by a parent, guardian, or managing or possessory conservator that does not expose the child to a substantial risk of harm; failure to make a reasonable effort to prevent an action by another person that results in physical injury that results in substantial harm to the child; the current use by a person of a controlled substance as defined by Chapter 481, Health and Safety Code, in a manner or to the extent that the use results in physical, mental, or emotional injury to a child; or causing, expressly permitting, or encouraging a child to use a controlled substance as defined by Chapter 481, Health and Safety Code; [Caregiver] was not an approved caregiver for [A.F.] at the time of the alleged abuse and neglect, thus the Department does not have jurisdiction to investigate this allegation.

[A.F.] Sex Trafficking

Sex trafficking is defined as knowingly cause, permit, encourage, engage in, or allow a child to be trafficked in a manner punishable as an offense under 20A.02(a)(7) or (8), Penal Code, fail to make a reasonable effort to prevent a child from being trafficked in a manner punishable as an offense under 20A.02(a)(7) or (8), Penal Code, compel or encourage a child to engage in sexual conduct that is an offense under 20A.02(a)(7) or (8), Penal Code (trafficking of persons), 43.02(b), Penal Code (prostitution), or 43.05(a)(2), Penal Code (compelling prostitution).The Department does not have jurisdiction to investigate this allegation. [Caregiver] was not an approved caregiver at the time of the alleged incident and was acting as a good samaritan [sic] when the decision was made to secure a hotel room for [A.F.] Moreover, [caregiver] had no duty or

obligation to [A.F.] but acted to remove [A.F.] from risk of harm
and provided shelter, food, and clothing.

D.H., Born May 17, 2006; Died January 30, 2021

D.H., a 14-year-old boy, was unresponsive when his foster mother found him in their home upon her return from the restroom. D.H. resided in a foster home that cares for children with Primary Medical Needs ("PMN"). According to DFPS, D.H. was diagnosed with involuntary muscle movement, spastic quadriplegic cerebral palsy, seizure disorder, asthma, esophageal reflux, GERD, tracheomalacia, reactive airway disease, bronchomalacia, osteoporosis, spasticity, epilepsy, and unspecified brain abnormality. D.H. was fed via G-tube and required a wheelchair and specialized bed. According to the intake regarding his death, because of his medical challenges D.H. was not expected to live past two years old.

When D.H.'s foster mother found him unresponsive, she called EMS. First responders managed to resuscitate D.H., but he stopped breathing again. The first responders tried to resuscitate him again for an hour, but they were not successful. There was no autopsy after his death. The Harris County Institute of Forensic Sciences conducted an inquest and determined that the cause of death was complications from cerebral palsy and the manner of death was natural. According to DFPS, D.H. had been in the same foster home since he entered care in 2006. An RCCI investigator interviewed the foster mother, the adoptive children and the other foster child, the CVS worker, the case manager, and several of D.H.'s treating physicians. None of them raised any concerns about—and in fact were complimentary of—the foster mother's care of D.H. Although the investigation was not yet formally closed as of April 10, 2021, it appeared RCCI intended to Rule Out the allegations of Neglectful Supervision.

J.C., Born July 1, 2019; Died February 15, 2021

J.C., was a one-year-old child who had been in DFPS care for the year prior to her death. The child's caregiver reported that she, the victim and an adolescent living in the home had taken a nap. She stated that when she awoke two hours later, J.C. was unresponsive. The caregiver called 911 and first responders transported J.C. to the hospital, where the child was ultimately declared dead after showing no signs of brain activity. Preliminary medical evidence is strongly indicative of Physical Abuse. The investigation was pending as of April 10, 2021.

J.R., Born January 31, 2004; Died March 18, 2021

A caregiver found 17-year-old J.R. unresponsive in the home where he resided, which was designed to meet his ongoing specialized medical needs. The caregiver called EMS but the attempts by first responders to revive J.R. were unsuccessful. Adult Protective Services (APS), an entity within HHSC, is conducting the investigation into J.R.'s death. While J.R. was 17 at the time of his death, his placement was a specialized foster home for people with developmental disabilities that operates under the auspices of a home and community-based services (HCS)

provider. APS is responsible for investigations in those settings.[746]  An autopsy was pending and the investigation was ongoing as of April 10, 2021.

<u>C.S., Born July 31, 2019; Died April 3, 2021</u>

C.S. was 21 months old when she died and was diagnosed with Zellweger syndrome, a rare congenital disorder. Patients with Zellweger syndrome do not typically survive beyond one year of age. On April 3, 2021, C.S.'s foster parent noticed she was not breathing and was unresponsive. First responders unsuccessfully attempted to revive C.S. and transported her to the hospital, where she was pronounced dead. An investigation into the child's fatality was open and a determination of the cause and manner of death remained pending as of April 10, 2021.

<u>E.T., Born December 13, 2015; Died April 8, 2021</u>

Five-year-old E.M. had been diagnosed with anoxic brain injury, feeding difficulty, failure to thrive, sleep apnea, spastic quadriplegic cerebral palsy, global developmental delays, cortical vision loss, hip dysphagia due to contractures and hypertonia. E.T. was also dependent on a g-tube, had pneumonia in the past, as well as breathing issues. E.T. resided in a foster home that cares for children with PMN.

On the morning of April 7, 2021, E.T. was having difficulty breathing and suction (a method used for her care) was not improving her condition. The foster mother and a nurse were both caring for E.T. at the time. The foster mother called 911 and EMS first responders transported E.T. to the hospital.  E.T. died the next day.  RCCI reported that there would not be an autopsy due to E.T.'s medical history. The RCCI investigation remained open as of April 10, 2021.

## C.    Abuse and Neglect Ruled Out/UTB; Possible Neglect (July 31, 2019 – April 10, 2021)

<u>D.P., Born June 26, 2004; Died September 5, 2020</u>

D.P., a 16-year-old male, went to a waterpark and then to a beach in Galveston with his girlfriend and her parents. He and his girlfriend resided with her grandmother, where DFPS recently assigned D.P. for placement. He went swimming at the beach between 9:00 and 9:30 p.m. and never returned to shore. A passerby notified the beach patrol upon seeing the body in the water the next day. The record indicates that his CPS worker had approved the trip to the waterpark but had not—and would not have—approved the evening trip to the beach.

D.P. was diagnosed with behavioral challenges including adjustment disorder with mixed disturbance of emotions and conduct, oppositional defiant disorder, and attention deficit

---

[746] *See* 26 Texas Admin. Code § 711.1(2)(A)(ii) (stating that the regulations in the chapter are to "describe . . . Adult Protective Services (APS) investigations of allegations of abuse, neglect, and exploitation involving . . . adults <u>or children</u>" living in a home operated by a provider agency "in the home and community-based services (HCS) waiver program") (emphasis added).

hyperactivity disorder. As of August 21, 2020, he was prescribed Vyvanse, Quetiapine, Clonidine, Escitalopram and Melatonin. D.P.'s episode in out-of-home placement began in June 2018 after he was released from a juvenile detention facility. At the time of his release, his mother was incarcerated and could not care for him and his other relatives declined to take physical custody of him.  DFPS initially placed him in a shelter. He then had six additional placements over two years: (1) an RTC, which he left because it became all female; (2) another RTC, which he left at the request of his attorney *ad litem* for a placement closer to Houston; (3) and (4) two different contracts in the same RTC, where he lived for 18 months; (5) an RTC where he lived for six weeks; and (6) the fictive kin placement with his girlfriend's grandmother.

DFPS interviewed the adults and children who were present at the time of D.P.'s death. According to the interviews, D.P. asked his girlfriend's mother whether he could go in the water at the beach, despite that it was dusk. She indicated that he could, as long as he agreed to sit on a towel in the car on the way home so that he would not get the car seat wet. She and her husband also told him that they would shine the lights on their phones to signal him to come back in to shore, which acknowledged that, even if it was not already, soon it would be too dark for D.P. to see them and for them to see him. D.P.'s girlfriend's mother also acknowledged that she had been primarily monitoring her son, D.P.'s girlfriend's brother, who was also in the water. Finally, the toxicology report confirmed that D.P., a sixteen-year-old, had a blood alcohol concentration of .024. A witness reported that D.P.'s girlfriend's father had provided D.P. with at least some amount of an alcoholic beverage; the father denied it. DFPS also noted that there were signs posted near a lifeguard stand warning "Danger/Rip Tide" and prohibiting swimming or wading near the rocks. DFPS initially concluded that the allegations of Neglectful Supervision should be substantiated with a disposition of Reason to Believe. DFPS subsequently revised that conclusion and instead entered a disposition of UTB, though the record contains no new evidence to support the change. DFPS closed the investigation on January 28, 2021.

On March 31, 2021, DFPS reported to the Monitors that a review of the case had initially led the agency to decide in March 2021 to change the disposition "back to RTB based on the lack of any analysis to support UTD."[747] However, in the same communication, DFPS reported that "CPI determined it never had jurisdiction of this case in the first instance. CPI only investigates parents, guardians, conservators, relatives/family member, household member, and paramours."[748] Because D.P.'s girlfriend's parents were not D.P.'s caregivers, DFPS reported "the case will be reopened and administratively closed."[749]

Because the question of CPI's jurisdiction was not well investigated in this matter[750] and D.P.'s death remains suspicious for neglect, the Monitors cannot determine whether the agency's final disposition is appropriate.

---

[747] Email from Corliss Lawson to Kevin Ryan (March 31, 2021) (with attachment).

[748] *Id*.

[749] *Id*.

[750] *See* Texas Family Code § 261.301 (requiring DFPS investigate allegations of abuse or neglect against a person who is a member of a child's "household.")  A "household" is defined as "a unit composed of persons living together in the same dwelling, without regard to whether they are related to each other."  Texas Family Code § 71.005.  The Texas Administrative Code further defines "household" to include:

> (A) A unit composed of persons living together in the same dwelling, whether or not they are related to each other, when the dwelling consists of:

**D.      Child Fatalities, No Abuse or Neglect Determined (May 1, 2020 and April 10, 2021)**

A.C., Born October 1, 2004; Died Unknown

A.C. was a 15-year-old girl with a significant history of running away. DFPS's records also indicate the victim may have been a sex trafficking survivor. A.C. had most recently entered into DFPS's care in June 2019. In February 2020, DFPS placed her back with her mother under a CPS safety plan, but she ran away in mid-April 2020. Law enforcement located A.C. again on May 8, 2020 and turned her over to CPS; while the CPS worker was driving her to a new placement, A.C. asked to use the restroom at a convenience store and ran away again. Nine days later, on May 17, 2020, she was found deceased on the side of the road. DFPS did not undertake an investigation. It closed the intake concluding that it was a matter for law enforcement. Preliminary autopsy results indicated that she suffered from multiple sharp force injuries (injuries caused by pointed or sharp objects), and the death was classified as a homicide. Law enforcement officials have arrested an individual who is suspected to have killed A.C.

N.M., Born March 29, 2003; Died May 9, 2020

N.M., a seventeen-year-old youth, had been placed with his aunt on March 30, 2020, about five weeks prior to his death, following at least two dozen placements during the past several years. On the day of his death, N.M. went to the lake with his aunt, uncle, cousins (one of whom was 13 years old), and a friend who was 18 years old.  N.M., the 13 year-old cousin, and the 18 year-old friend went swimming in the lake. His aunt made them take a flotation device and instructed them not to go past the marked boundaries. The 13 year-old and the 18 year-old swam back to shore because they could not touch the bottom, leaving N.M. with the float. The float apparently blew away and N.M. swam further away from the shore in an attempt to try to get the float; the two

---

               (i)  The child's family's household, including the households of both parents when the parents reside separately;

               (ii)  A household in which the parent has arranged for or authorized placement of the child; or

               (iii)  A household in which the child is legally placed by a parent or a court.

(B)  During the receipt and investigation of reports of child abuse and neglect, we treat an unrelated person who resides elsewhere or whose place of residence cannot be determined as a member of the household if the person is at least 10 years old and either:

               (i)  Has regular free access to the household; or

               (ii)  When in the household dwelling takes care of or assumes responsibility for children in the household.

Texas Admin. Code § 707.451(a)(8).

On its face, it appears that D.P.'s girlfriend's parents are each an "unrelated person who resides elsewhere" and are "at least 10 years old." There is also information in the record that indicates that D.P.'s girlfriend's parents had "regular free access to the household" and/or had "take[n] care of or assume[] responsibility for children in the household." Whether D.P.'s girlfriend's parents meet those definitions does not appear to have been well investigated by DFPS as of March 31, 2021.

others called to him to come in and he attempted to swim back in, but the waves and the current pulled him under the water. His uncle and other bystanders swam out to try to save him but he was limp when they reached him. It took them ten minutes to bring him to shore, where they performed CPR until EMS arrived. N.M.'s uncle and others who assisted also went to the hospital due to intake of water. At the hospital the doctors advised that N.M. had been under the water for a significant period of time and that his prognosis was poor. They ultimately removed him from life support.

The Medical Examiner's final report noted that there were reports of witnessed submersion in a lake, there was fluid retention in the tissue, and there was no evidence of significant trauma or acute toxicity, with the report indicating that alcohol and drugs were not detected. The Medical Examiner concluded that N.M. died as a result of complications of drowning. DFPS subsequently concluded that the cause of death was asphyxiation (drowning) and the manner of death was accidental. As a result, DFPS concluded that there was no abuse or neglect involved.

J.G., Born June 26, 2013; Date of Death July 7, 2020

J.G., a 7-year-old girl, had significant health problems including end-stage renal failure (she was in need of a kidney transplant and required daily dialysis), a feeding tube, developmental delays, pulmonary issues, and was non-verbal and unable to walk. She did not have a do-not-resuscitate order or a hospice nurse, but some of her medical caregivers indicated that she was likely terminally ill. Because of her medical fragility, DFPS appeared to have classified her as PMN.

J.G. had resided in a specialized foster home with other PMN children since November 20, 2019. The home included the foster mother, who was also a nurse, the foster father, two other foster children, four adopted children, and three adult birth children. It appears that she had 24/7 one-to-one nursing care (in addition to the foster mother).

On the day J.G. died, the foster father, foster mother, and J.G.'s nurse were taking her to a scheduled medical appointment which appeared to have been her regular dialysis treatment. During the ride to her appointment, her pulse oximeter began to alarm and she appeared blue and was unresponsive. Her caregivers pulled the car over and called 911. Her foster mother and the nurse provided CPR until EMS and police arrived and took over. After a period of time, J.G. did not respond and first responders discontinued CPR.

During the investigation into the death, the nurses and the foster mother indicated that J.G. did not have any significant medical issues earlier on the day of her death. They also noted that she had seen a physician, her ear, nose, and throat specialist, the day before her death and the physician did not raise any concerns.  During their interviews, the foster father and the adult children did not appear to have extensive knowledge about J.G.'s medical conditions.

J.G.'s birth mother requested an autopsy, which concluded that the death was caused by complications of chronic renal disease. An RCCI investigator interviewed the foster parents, the nurse who was with them at the time of J.G.'s death, five other home nurses, J.G.'s primary care provider and treating nephrologist, CPA staff, the CPS caseworker, and the foster parents' adult

birth children. None raised any concerns regarding the foster parents' care of J.G. The medical providers also indicated that due to J.G.'s serious health conditions, J.G.'s death was not unexpected. Based on those findings, RCCI Ruled Out abuse and neglect by the foster parents and closed the investigation on January 8, 2021.

<u>D.N., Born December 20, 2015; Died October 25, 2020</u>

D.N., a four-year-old child with significant medical needs, resided in a specialty foster home. His foster mother noticed that his pulse oxygen meter went off at 6:00 a.m. She went to check on him and found that he had stopped breathing. She tried to call 911 unsuccessfully and then eventually was able to call police. She tried to resuscitate him for 30 minutes before EMS arrived at the home and took him to the hospital.

D.N. had been in the conservatorship of DFPS since 2017 based on findings of Medical Neglect because his parents were not providing for his medical needs. According to DFPS, D.N. had severe cerebral palsy, unspecified epilepsy, was nonverbal, used a standing wheelchair and a specialized hearing aid, and had a tracheotomy tube, a G-tube, and, at time, used a ventilator. The foster mother was a nurse, and D.N. and other children in the home also received in-home nursing care.

RCCI Ruled Out abuse or neglect in the fatality investigation. According to the investigation there was no physical evidence of maltreatment. Moreover, the other nurses in the home and D.N.'s primary care provider, his treating pulmonologist for the last several years, and the emergency room physician had no concerns regarding the fatality or the foster mother's care of D.N. The physicians attributed the death to D.N.'s significant health concerns. His treating pulmonologist indicated that the foster mother had never missed an appointment and that her excellent care had extended D.N.'s life. The Medical Examiner determined that there were no circumstances to warrant an autopsy. Law enforcement also determined that an investigation was not warranted.

RCCI completed the investigation on February 6, 2021, and reported the finding to the provider on February 8, 2021. On February 9, 2021, the foster home voluntarily closed without deficiencies.

I.R., Born March 15, 2012; Died December 28, 2020

In June 2017, DFPS was granted TMC over I.R., who had a number of medical conditions including Down Syndrome, severe intellectual disability, seizure disorder, and encephalopathy. I.R. could not walk and used a G-tube, suction machine, CPAP with ventilator, CPT vest, nebulizer, pulse oximeter, and a VNS chip/magnet to help control seizures. DFPS took custody of I.R. because he was severely malnourished and near death. DFPS substantiated allegations of Physical and Medical Neglect against both his mother and father and was ultimately awarded PMC over I.R., although without termination of parental rights. I.R.'s mother and father were arrested for child neglect in July 2017. His mother was indicted in October 2017, apparently because she had primary physical custody of I.R., and the charge against her was dismissed in July 2019. She reported that the charge was dismissed because the hospital searched its records and it was documented that she had, in fact, brought I.R. in for medical treatment.

According to DFPS, after the charge was dismissed, both I.R.'s mother and father were complying with DFPS's instructions to address the reasons for removal. As a result, on July 23, 2020, DFPS returned I.R. home to live with his mother and grandmother but he remained under DFPS supervision. One of the conditions of the return home was the provision of 24/7 nurse coverage, for which DFPS assumed a role to set up.

During the next few months I.R.'s mother and grandmother advised DFPS several times that the nursing service was not consistently able to ensure 24/7 nursing coverage. In early October 2020, I.R.'s grandmother advised DFPS that I.R.'s mother was only able to care for I.R. with 24/7 nursing coverage. In addition, one of the nurses raised concerns about the care by I.R.'s mother, as well as implicitly acknowledging that the agency was not covering all of the shifts. She indicated that when she returned to care for I.R. after another nurse had not been at the home for a couple of days, I.R. always seemed like he was not doing well and they would have to "build him back up." Around that same time, I.R.'s mother changed nursing services to attempt to address the staffing challenges, but the issues continued with the new agency.

On November 1, 2020, DFPS noted that I.R.'s mother "struggles with getting nursing staff daily to show up for their shifts; she has changed nursing companies and still has issues with staffing."   On December 11, 2020, I.R.'s grandmother communicated to the DFPS worker who had been conducting home visits that even the new nursing agency struggled to appropriately staff the home with nurses on nights and weekends. "[Grandmother] stated that if we really wanted to help them we would make sure there was always a nurse there." Another DFPS worker responded to the visiting worker: "I don't know what to say, it's challenging because those are things that are beyond our control [having home health fully staffed and able to work shifts]."

On December 28, 2020, I.R.'s grandmother advised the caseworker that I.R. had passed away. She said he had been having trouble breathing for a few weeks and had severe seizures, and that earlier on the morning of the child's death, I.R.'s mother had noticed he was not breathing well and was turning purple. I.R.'s mother indicated that she had been monitoring him that night and that she had left the room for two minutes to wash her hands so she could clean him. She stated that when she returned, he was gasping for air and turning blue. She called out to her family who called 911. The family tried to revive him with CPR before EMS arrived and attempted to revive

him as well. First responders transported I.R. to the hospital but he did not revive. On the morning of his death, there was no nurse coverage at the home, although the records were not clear whether nursing coverage was supposed to be 24/7 or 7 a.m. to 7 p.m. with the new agency.

DFPS issued a disposition of Ruled Out as to the allegations of Neglectful Supervision on February 18, 2021, noting that no autopsy was done and that the attending physician indicated that I.R. died of natural causes.

# List of Tables

Table 2.1: Race for Children in PMC on December 31, 2020 and Estimates of Total
Population in Texas by Race for Children ages 0 to 17 years, July 1, 2019...............................36
Table 2.2: Exits from PMC by Exit Outcome, March 1, 2020 to December 31, 2020...............38
Table 2.3: Authorized Level of Care for Children in PMC as of December 31, 2020...............39
Table 2.4: Top 5 Counties of Removal for Children in PMC on December 31, 2020 ...............39
Table 2.5: PMC Children Living in Regions with Single Source Continuum Contractor
Presence on December 31, 2020 .................................................................................................40
Table 2.6: PMC Children Living in Regions with Single Source Continuum Contractor
Presence by Region on December 31, 2020 ...............................................................................40
Table 4.1: Intakes Downgraded by RCCI between May 1, 2020 and November 30, 2020 .......67
Table 4.2: Intakes Downgraded by CPI between May 1, 2020 and November 30, 2020 ..........67
Table 4.3: Automatic Notification Found and Timing of Automatic Notification ...................105
Table 4.4: Automatic Notification Date Comparison of State Data and Case Read Data ........105
Table 4.5: Communication Between RCCI Investigator and CVS Caseworker Found ...........106
Table 4.6: Timing and Most Common Method of Communication Between RCCI
Investigator and CVS Caseworker ...........................................................................................106
Table 4.7: Subsequent Communication Between RCCI Investigator and CVS Caseworker
for Cases Where Initial Contact was NOT a Phone Call and Most Common Method .............107
Table 5.1. Caseworkers Conforming to the Graduated Caseload Standards
at Three Points in Time .............................................................................................................147
Table 5.2:  Caseworkers Managing at Least One PMC Child March 2020 to December
2020............................................................................................................................................155
Table 5.3: DFPS Caseworkers Managing at Least One PMC Child March 2020 to December
2020 ...........................................................................................................................................156
Table 5.4: OCOK Caseworkers Managing at Least One PMC Child March 2020 to December
2020 ...........................................................................................................................................157
Table 5.5: 2INgage Caseworkers Managing at Least One PMC Child May 2020 to December
2020 ...........................................................................................................................................158
Table 5.6: RCCI Investigators with Caseloads within Guidelines March to December 2020 ..164
Table 5.7: RCCR Inspectors with Caseloads within Guidelines, March to December 2020 ...170
Table 6.1: Number of Placements for PMC Children by Sexual Indicator Type,  March to
December 2020 ..........................................................................................................................176
Table 6.2: Number of Runaway Incidents for PMC Children by Sexual Indicator Type, March
to December 2020 ......................................................................................................................177
Table 6.3: Child Sexual Abuse Training Completion by Caseworker Type, July 1, 2020 to
August 31, 2020 ........................................................................................................................190
Table 6.4: Number of Noncompliance Incidents for Operations with More Than One
Noncompliance Incident ...........................................................................................................246
Table 7.1:  Definition for ECHR Found in Case Review  .......................................................255
Table 7.2: State Case Review on Extended Compliance History Reviews .............................262
Table 7.3: Priority of RCCR Investigations ............................................................................272
Table 7.4: Operations Meeting the Criteria for Heightened Monitoring that Closed or with
Which DFPS Terminated Contracts .........................................................................................289
Table 7.5:  Most Serious Issues at Phase One Heightened Monitoring Operations as Identified
by the Monitors, 2015 to 2019 .................................................................................................298

Table 7.6:  Most Serious Issues at Phase One Heightened Monitoring Operations as Identified by the Monitors, 2019 and 2020 ........................................................................................ 299
Table 7.7: Problems Identified at Phase One Operations by the Monitoring Team's Review of Heightened Monitoring Documentation and by the State in Heightened Monitoring Plans..301
Table 7.8:  Phase One Operations with Inconsistencies Between their Historical Trends and the Issues Identified on their Heightened Monitoring Plan .......................................................... 301
Table 7.9: Time to Expected Compliance of All Tasks for Phase One Heightened Monitoring Operations Analyzed ........................................................................................................ 305
Table 7.10: Prior Enforcement Actions at Phase One Heightened Monitoring Operations and Similarities in Issues and Requirements to Current Heightened Monitoring Plan .................. 306
Table 7.11: Number of Heightened Monitoring Visits at Phase One Heightened Monitoring Operations Analyzed ........................................................................................................ 308
Table 7.12:  Heightened Monitoring Visits Associated with Child Placing Agencies .............. 310
Table 7.13:  Number of Heightened Monitoring Plan Tasks per Operation and Average Number of Tasks Reviewed During Visits ......................................................................... 311
Table 7.14: Total Number of Deficiencies Prior to and Since Placement on Heightened Monitoring Through December 31, 2020 for Phase One Operations Analyzed ..................... 323
Table 7.15: ANE Allegation Dispositions for ANE Investigations Conducted at Phase One Heightened Monitoring Operations ................................................................................. 324
Table 7.16:  Requested Variances at Phase One Heightened Monitoring Operations Source: Variance and Waiver Data as Provided by DFPS, June – December 2020 ............................ 326
Table 7.17: Variances Granted to Phase One Heightened Monitoring Operations, June to December 2020                                     ............................................................................ 327
Table 7.18: Congregate Care Facility Closures, September 2, 2020 – April 16, 2021 ............. 345

## List of Figures

Figure 2.1: Age of Children in PMC on December 31, 2020 ..................................................... 35
Figure 2.2: Living Arrangements for Children in PMC on December 31, 2020 ........................ 37
Figure 2.3: Length of Stay in Care of Children in PMC on December 31, 2020  ..................... 38
Figure 4.1: Number of SWI Calls by Month  ......................................................................... 56
Figure 4.2: Time Callers Waited before Calls were Handled or Abandoned  ........................... 57
Figure 4.3: Duration of Handled SWI Calls  .......................................................................... 58
Figure 4.4: Number of SWI Calls Handled and Abandoned by Day of the Week  ................... 60
Figure 4.5: RCCI Rate of Downgrades from May 1, 2020 to November 30, 2020 .................. 63
Figure 4.6: CPI Rate of Downgrades from May 1, 2020 to November 30, 2020 ..................... 64
Figure 4.7: Allegation Types for RCCI Intakes Involving PMC Children in Licensed Placements, May 1, 2020 to November 30, 2020 ..................................................................... 65
Figure 4.8: Alleged Perpetrators in RCCI Involving PMC Children in Licensed Placements ... 71
Figure 4.9: Reason to Believe Findings in Closed RCCI Investigations Involving PMC Children in Licensed Placements ...................................................................................................... 72
Figure 4.10: Initiation of Investigations within 24 Hours in Priority One Investigations per Existing Policy ...................................................................................................................... 85
Figure 4.11: Initiations of Investigations within 72 Hours in Priority Two Investigations per Existing Policy ...................................................................................................................... 86
Figure 4.12: Face-to-Face Contact within 24 Hours with All Alleged Child Victims in Priority One Investigations .................................................................................................................. 88

Figure 4.13: Face-to-Face Contact within 72 Hours with All Alleged Child Victims in Priority Two Investigations ................................................................................................................. 89
Figure 4.14: Completion of Priority One and Two Investigations within 30 Days ................... 90
Figure 4.15: Completion of Priority One and Two Investigations within 30 Days over Time ... 91
Figure 4.16: Number of Extensions in Priority One and Two Investigations ........................... 92
Figure 4.17: Notification Letter Sent to Referent within Five Days of Investigation Closure in Priority One and Two Investigations .......................................................................................... 94
Figure 4.18: Notification Letter Sent to Provider within Five Days of Investigation Closure in Priority One and Two Investigations ......................................................................................... 95
Figure 4.19: Reason Found for Home History Review Not Completed ................................... 113
Figure 4.20: Home History Review Content ........................................................................... 113
Figure 4.21: Reason Found for Not Documenting a Home History Review Staffing .............. 115
Figure 4.22: Time from Case Referral to Home History Review Staffing Documented ......... 116
Figure 4.23: Actions Taken as a Result of a Home History Review Staffing .......................... 117
Figure 4.24: Home History Review Staffing Contact Documented: Monitor Case Read Compared to State Case Read ................................................................................................. 121
Figure 5.1: OCOK Training Timeline for New Permanency Workers .................................... 130
Figure 5.2: DFPS CVS Caseworkers Hired by Hire Type, January 1, 2020 to July 31, 2020 .. 133
Figure 5.3: DFPS CVS Caseworkers Hired by New Hire Type ............................................. 133
Figure 5.4: Hired DFPS CVS Caseworkers Who Left Position by December 1, 2020 Timing of Exit ........................................................................................................................................ 134
Figure 5.5: DFPS CVS Caseworkers Hired by Agency Status as of December 1, 2020 .......... 135
Figure 5.6: Caseworkers Hired, Active, and Left Agency by Region ..................................... 136
Figure 5.7: CVS Caseworkers CPD Training Completion Sample .......................................... 137
Figure 5.8: DFPS CVS Caseworkers CPD Training Completion ............................................ 138
Figure 5.9: OCOK Caseworkers Hired Type January 1, 2020 to July 31, 2020 by Hire Type .................................................................................................................................................. 139
Figure 5.10: 2INgage Caseworkers Hired April 1, 2020 to July 31, 2020 by Hire Type ......... 140
Figure 5.11: Caseworkers Leaving OCOK as of December 2020, Timing of Exit ................. 140
Figure 5.12: Number of OCOK Caseworkers Hired, Active, and Left Agency as of December 2020, by Work County ............................................................................................................ 141
Figure 5.13: Caseworkers Leaving 2INgage as of November 2020, Timing of Exit ............... 141
Figure 5.14: Number of 2INgage Caseworkers Hired, Active, and Left Agency as of November 2020, by Work County ............................................................................................................ 142
Figure 5.15: 2INgage CPD Completion Time Compared to Expected, Caseworkers Requiring Full Training ............................................................................................................................ 143
Figure 5.16: Number of RCCI Investigations by Month ........................................................ 163
Figure 5.17: Low and High Caseloads for RCCI Investigators ............................................. 165
Figure 5.18: RCCI Investigations by Staff Type Acting as Primary Investigator ................... 166
Figure 5.19: Number of RCCR Tasks .................................................................................... 168
Figure 5.20: RCCR Tasks by Type ......................................................................................... 169
Figure 5.21: Caseload Lows and Highs for RCCR Inspectors ............................................... 171
Figure 5.22: Timing of Communication Between RCCR Inspectors and RCCI Investigators During an ANE Investigation ................................................................................................ 173
Figure 6.1: CSA Training by Position for Staff Active March to November 2020 ................. 182
Figure 6.2: CSA Training Verification, Staff Active March to November 2020 by Position .. 183

Figure 6.3: PMC Children with a Sexual Characteristic Flag (Victim or Aggressor) Active as of November 30, 2019 to December 31, 2020 ................................................................. 199

Figure 6.4: Number of Newly Flagged PMC Children by Month, January 2019 to December 2020 .................................................................................................................................. 200

Figure 6.5: Percent of Children with a Sexual Abuse Indicator with Abuse After Entering Care, June to October 2020 ................................................................................................ 201

Figure 6.6: Perpetrators Identified for Children with Abuse Occurring After Entering Care .. 202

Figure 6.7: Sexual Aggression Occurred After Entering Care for Children with a Sexual Aggression Indicator ........................................................................................................... 203

Figure 6.8: Case Review Sample Characteristics, March to October 2020 .............................. 221

Figure 6.9: Common Application in IMPACT with Children's History of Sexual Aggression ............................................................................................................................ 223

Figure 6.10: Common Application in IMPACT with Children's History of Sexual Victimization ......................................................................................................................... 224

Figure 6.11: Common Application in IMPACT with Children's Complete History of Sexual Aggression or Sexual Abuse ............................................................................................... 225

Figure 6.12: Common Application in IMPACT with Children's Complete History of Sexual Aggression or Sexual Abuse By Period .............................................................................. 226

Figure 6.13: Common Application in IMPACT with Children's Complete History of Sexual Aggression or Sexual Abuse By Entity Responsible for Placement ................................... 227

Figure 6.14: Percent of Placements in which Both Placement Summary and Attachment A Associated with the Placement was Found By Period ........................................................ 228

Figure 6.15: Number of Placements with Both Placement Summary and Attachment A Found, Includes Sexual History Information, and Signed by Receiving Caregiver on or Before Start of Placement ....................................................................................................................... 229

Figure 6.16: Percent of Placements with Hand Signed Placement Summary and Attachment A On or Before Placement By Period .................................................................................... 230

Figure 6.17: Percent of Placements with Hand Signed Placement Summary and Attachment A On or Before Placement By Entity Responsible for Placement ......................................... 231

Figure 6.18: Percent of Placements with Hand Signed Placement Summary and Attachment A On or Before Placement By Living Arrangement ............................................................... 232

Figure 6.19: Number of Operation Locations Requiring Awake-Night Supervision Visited, March to October 2020 ....................................................................................................... 241

Figure 6.20: Incidents of Noncompliance with Awake-Night Supervision Requirements ...... 244

Figure 6.21: Corrective Action Taken for Incidents of Noncompliance with Requirements of Awake-Night Supervision .................................................................................................. 245

Figure 7.1: Days from ECHR Review Date to Inspection Begin Date for Inspections with an ECHR ................................................................................................................................... 257

Figure 7.2: Comparison of ANE/Corporal Punishment Data Found in Extended Compliance History Reviews and State Aggregate Data as of the First Day of the Month ................... 258

Figure 7.3: Consideration of Identified Pattern, September to October ................................... 260

Figure 7.4: Number of Prior Failure to Report Deficiencies Between 9/30/2014 and 2/29/2020 for Operations with a Failure to Report Deficiency Between March 1, 2020 and October 31, 2020 .................................................................................................................................... 264

Figure 7.5: Number of Failure to Report ANE Deficiencies Cited Between March 1, 2020 and October 31, 2020 by Data Source ...................................................................................... 265

Figure 7.6: Citations for Failure to Report ANE in Deficiencies Data ....................................... 266
Figure 7.7: Timeliness of Face-to-Face Contact with Alleged Child Victims in Priority Two
HHSC Investigations  .................................................................................................................. 273
Figure 7.8: Completion of Priority One and Two Investigations within 30 Days .................... 274
Figure 7.9: Completion of Priority Three, Four, and Five Investigations within 60 Days of
Intake ........................................................................................................................................... 276
Figure 7.10: Priority One and Two RCCR Investigations Completed  ..................................... 277
Figure 7.11: Completion and Submission of Documentation within 60 Days of Intake in
Priority Three, Four, and Five Investigations  ............................................................................ 278
Figure 7.12: Notification Letters Sent within Five Days of Investigation Closure in Priority
One and Two Investigations ....................................................................................................... 279
Figure 7.13: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and
Five Investigations ...................................................................................................................... 280
Figure 7.14: Operations Placed or Meeting Criteria for Placement on Heightened Monitoring
 in 2020  ....................................................................................................................................... 287
Figure 7.15: Operations Currently on Heightened Monitoring by Type of Operation and
Region .......................................................................................................................................... 293
Figure 7.16: Operations with an Active Residential Child Care Contract by Region .............. 293
Figure 7.17: Timeline for Starting Heightened Monitoring at Operations in Phase One
Analysis........................................................................................................................................ 295
Figure 7.18: Number of Prior Risk Analyses, Monetary Penalties, and Enforcement Actions
Since 2015 at Operations in Phase One Heightened Monitoring Analysis  .............................. 297
Figure 7.19: Number of Operations with Identified Issues in Monitors' Review and the
Operations' Heightened Monitoring Plan .................................................................................. 300
Figure 7.20: Categories Identified as Problems in Operations' Heightened Monitoring
Plans ............................................................................................................................................. 302
Figure 7.21: Proportion of Heightened Monitoring Tasks and Sub-Tasks Due Within Two
Weeks of the Heightened Monitoring Plan Start Date................................................................ 304
Figure 7.22: Proportion of Heightened Monitoring Tasks with Similar Requirements to Prior
Enforcement Actions at Operations in Phase One Heightened Monitoring  ............................. 307
Figure 7.23: Heightened Monitoring Visits at Phase One Operations by Type of Operation and
Entity Conducting Visit, June-December 2020 ......................................................................... 309
Figure 7.24:  Percent of Heightened Monitoring Visits to Phase One Operations that Included
Document Review, Standards Review, a Walk Through, and Technical Assistance ............... 312
Figure 7.25:  Type of Files Reviewed and Interviews Conducted During Heightened
Monitoring Visits at Phase One Operations................................................................................ 313
Figure 7.26: Placement Authorization Requests for Phase One Heightened Monitoring
Operations Analyzed................................................................................................................... 315
Figure 7.27: Legal Status of Children with Approved Placement Authorizations in Phase One
Heightened Monitoring Operations Analyzed  ......................................................................... 316
Figure 7.28: Placement Requests at Phase One Heightened Monitoring Operations with an
Approved Placement by PMC Status ......................................................................................... 317
Figure 7.29: Information Included in Approved Placement Requests that Resulted in Placement
by Timing of Request .................................................................................................................. 318
Figure 7.30: Timing of Placement Start for PMC Children with Approved Placement Requests
and Placement at Phase One Operations .................................................................................... 318

Figure 7.31: Number of PMC Placements at Phase One Operations After Operation was Placed on Heightened Monitoring, June – December 2020 ..............................................................319
Figure 7.32: PMC Placements at Phase One Heightened Monitoring Operations by Approval ..............................................................................................................................320
Figure 7.33: Average Monthly PMC Placements at Phase One Operations One Year Prior to Heightened Monitoring and in the Months Following Placement on Heightened Monitoring through December 31, 2020........................................................................................................321
Figure 7.34: Average Number of Deficiencies Prior to and Following Placement on Heightened Monitoring through December 31, 2020 for Phase One Operations Analyzed .....322