1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                        CORPUS CHRISTI DIVISION

4    M.D. et al.,                    §    CASE NO. 2:11-cv-84
                                      §    CORPUS CHRISTI, TX
5    VERSUS                           §    THURSDAY,
                                      §    MAY 6, 2021
6    GREG ABBOTT et al.               §    9:04 AM TO 12:38 PM

7                                 HEARING

8            BEFORE THE HONORABLE JANIS GRAHAM JACK
                   UNITED STATES DISTRICT JUDGE

9
                               APPEARANCES:
10

11        FOR THE PARTIES:              SEE NEXT PAGE

12        COURT REPORTER:               A. MARTINEZ

13        COURT CLERK:                  LORI PURIFOY

14

15

16

17

18

19

20                  TRANSCRIPTION SERVICE BY:

21                  Veritext Legal Solutions
                  330 Old Country Road, Suite 300
22                      Mineola, NY 11501
                 Tel: 800-727-6396 ▼ www.veritext.com
23
        Proceedings recorded by electronic sound recording; transcript
24              produced by transcription service.

25

```
 1                          APPEARANCES:

 2
      FOR THE PLAINTIFFS:              A BETTER CHILDHOOD, INC.
 3
                                      Marcia Lowry
 4
                                      355 Lexington Ave.
 5
                                      Floor 16
 6
                                      New York, NY 100017
 7
 8                                    CHILDREN'S RIGHTS

 9                                    Christina Remlin

10                                    Stephen Dixon

11                                    330 Seventh Ave.

12                                    4th Floor

13                                    New York, NY 10001

14
      FOR DEFENDANT JAIME MASTERS/DFPS:   TEXAS OFFICE OF THE ATTORNEY
15
                                      GENERAL
16
                                      Elizabeth Brown Fore
17
                                      Kara Holsinger
18
                                      Clayton Watkins
19
                                      P.O. Box 12548
20
                                      Austin, TX 78711-2548
21

22

23

24

25
```

```
 1   FOR DEFENDANT CECILE ERWIN        TEXAS OFFICE OF THE ATTORNEY
 2   YOUNG/HHSC:                       GENERAL
 3                                     Reynolds Brissenden
 4                                     Raymond Winter
 5                                     Eugenia Krieg
 6                                     Paul Moore
 7                                     Noah Reinstein
 8                                     300 W. 15th St.
 9                                     WPC Bldg., 9th Floor
10                                     Austin, TX 78701

11   FOR DEFENDANT GREG ABBOTT:        TEXAS OFFICE OF THE ATTORNEY
12                                     GENERAL
13                                     Patrick K. Sweeten
14                                     P.O. Box 12548
15                                     MC-009
16                                     Austin, TX 78711-2548

17
18   FOR THE CHILDREN'S SHELTER/FAMILY NORTON ROSE FULBRIGHT US LLP
19   TAPESTRY/ANNETTE RODRIGUEZ:       Jay Dewald
20                                     Frost Tower
21                                     111 W. Houston St.
22                                     Suite 1800
23                                     San Antonio, TX 78205
24
25
```

```
 1    MONITORS:                      PUBLIC CATALYST

 2                                   Kevin M. Ryan

 3                                   99 Wood Ave. So.

 4                                   Ste. 301

 5                                   Iselin, NJ 08830

 6
                                     TEXAS APPLESEED
 7
                                     Deborah Fitzgerald Fowler
 8
                                     1609 Shoal Creek
 9
                                     Ste. 201
10
                                     Austin, TX 78701
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          <u>CORPUS CHRISTI, TEXAS; THURSDAY, MAY 6, 2021; 9:04 AM</u>

2                    THE COURT:  Would you call the case then, please?

3                    CLERK:  Yes, Your Honor.  The Court calls Civil

4     Action 11-84 M.D. et al. v. Abbott et al.  May we have

5     appearances, please?

6                    THE COURT:  Charlie, I'm missing the CWOP.  Is it

7     here?  Okay.  Will you get appearances again, please?

8                    MS. LOWRY:  Your Honor, Marcia Lowry for Plaintiffs.

9     Mr. Yetter will not be with us today.

10                    THE COURT:  I did give permission through the

11    Monitors to go ahead and go to his other hearing.

12                    MS. LOWRY:  Yes, Your Honor.  I understood that he

13    had gotten leave from the Court to do that.

14                    THE COURT:  Go ahead.  I interrupted somebody giving

15    their appearance.  Sorry.

16                    MS. REMLIN:  Good morning, Your Honor.  Christina

17    Remlin, lead counsel Children's Rights for Plaintiff children.

18                    THE COURT:  Thank you.

19                    MR. DIXON:  Your Honor, Stephen Dixon for Plaintiff

20    children at Children's Rights.

21                    THE COURT:  Let's see.  For the governor, for HHSC

22    and DFPS?

23                    MR. SWEETEN:  Your Honor, Patrick Sweeten on behalf

24    of the Office of the Governor.  With me --

25                    MR. BRISSENDEN:  Good morning, Your Honor.  This is

1    Reynolds Brissenden from the Texas Attorney General's Office on

2    behalf of HHSC and Executive Commissioner Young.  Also with me

3    this morning, as were present yesterday, my colleagues, Raymond

4    Winter, Division Chief of Civil Medicaid Fraud Division,

5    Eugenia Krieg, Deputy Chief, along with Paul Moore, Noah

6    Reinstein.

7              MS. FORE:  Good morning, Your Honor.  Elizabeth Brown

8    Fore appearing on behalf of Defendant Jaime Masters in her

9    official capacity as Commissioner of DFPS.  Along with me is

10   Kara Holsinger and Clayton Watkins.

11             THE COURT:  I see Mr. Carson is here.  Is Ms.

12   Rodriguez here?

13             MR. DEWALD:  Yes, Your Honor, Ms. Rodriguez is here,

14   and Jay Dewald, Norton Rose Fulbright, representing Children's

15   Shelter, Family Tapestry and Ms. Rodriguez.

16             THE COURT:  Thank you.  What I neglected to do

17   yesterday, I read off some of the RTBs for Whataburger and

18   Family Tapestry and Children's Shelter after they were placed

19   on heightened monitoring.  But I didn't go into the ones that

20   put them on heightened monitoring.  You know, Children's

21   Shelter is the overall CPA with three -- GRO, Children's

22   Shelter, Family Tapestry, and Whataburger.  And the Children's

23   Shelter, the CPA, which is unusual itself, has 10 right to

24   believes, 56 total deficiencies, of which 28 are high, which is

25   -- those are minimum standards, which are quite serious.

1              Eight of -- of the 15 right to believes, eight from

2    the -- from five are abuse and neglect investigations opened

3    before heightened monitoring.  On June 10, 2016, a report to

4    SWI, which is the statewide call-in center, had an abrasion and

5    bruise on his face after he threw a box at a staff member.  The

6    staff member picked the box up and threw it back at the child,

7    hitting him the face and causing him to fall to the ground.

8              The staff person picked him up then and slammed him

9    into a bed, and the child has bruises on his chest, arms and

10   underneath his left eye.  Video footage reviewed during the

11   investigation showed the staff person physically escorting the

12   child down the hallway to his room, and the staff person could

13   be seen dragging the child on the floor and lifting him up by

14   his neck; throwing an object in an overhead motion with force

15   into the child's bedroom.  That was an RTB for physical abuse

16   by a staff member.

17             On August 26, 2017, two children ran out of an open

18   gate on the facility and attempted to run away.  That was

19   neglectful supervision.  During one of the runaways that's --

20   of course, the staff had to redirect traffic because the child

21   was in the middle of the road, of a busy road.  It turns out

22   the facility was understaffed that night, and one of the

23   children who attempted to run away was supposed to be on one-

24   to-one supervision, however, that was not happening.  So, the

25   minimum standards violation was also issued for a right -- for

1  a child to be free from abuse and neglect.

2             And then on April 9, 2019, a 16-year old male foster

3  child was having a sexual relationship with a female staff

4  member.  The child was wearing a charm bracelet that he told

5  other children it was given to him by the staff member.

6             Another report was made to the SWI, the call-in

7  center, by the child's caseworker alleging that the foster

8  child told the caseworker he'd gotten a female staff member

9  pregnant, but believed she had not -- that it had been

10  terminated.  The child was again interviewed and acknowledged a

11  sexual relationship with staff members and provided great

12  detail.  And the investigator was able to substantiate.

13             Another investigation in April of 2019, an 18-year

14  old female -- male foster youth in facility made a graphically

15  sexual -- inappropriate remarks to a 17-year old female, a 14-

16  year old female foster child, and a 13-year old female child.

17  The 13-year old was described as the 18-year old's girlfriend,

18  however, the 13-year old may have denied this but revealed the

19  18-year old had been placed on a safety plan requiring one-to-

20  one supervision, which also was not occurring.

21             In May of 2019, a 17-year old made an outcry to a

22  staff member at Whataburger that his 17-year old roommate

23  touched him inappropriately.  Both children acknowledged sexual

24  contact.  The aggressor had been flagged as an indicator for

25  sexual aggression and had a safety plan requiring one-on-one

1    supervision, and shouldn't have been in the room with another

2    person.  And video footage showed that the staff member

3    responsible for one-on-one check wasn't doing that.

4         And this just goes on and on and on.  There was a

5    substantiated report of a child being body-slammed into the

6    floor by a staff member and knocked unconscious.  I mean, this

7    is not a history of a stable, and good, and safe environment

8    for any child.  And it's not just -- and for the CPA itself to

9    have received that many placement RTBs is stunning.  So I

10   wanted to double-check for the record that we had that clearly

11   there.

12        Also, Ms. Rodriguez, yesterday you complained about

13   having too many kids, when, in fact, we have email records of

14   you emailing the Department saying that you needed more

15   children to make this financially survivable for you.  And, in

16   fact, you were already getting $500 a day, and you weren't even

17   a residential treatment program.  And one of the residential

18   treatment programs -- I don't know the finances for each of

19   them but Devereux, which was fortunately subsequently -- DFPS

20   removed all the children -- was getting under 500.  Four

21   hundred-and-something dollars a day in a residential treatment

22   program.  So, it's not like you were being underpaid.  So you

23   can't say you had too many kids on one hand and that you want

24   more for money on the other.  That's not survivable.

25        And then at the -- at some point I'm going to talk in

1    a minute about the remedial orders that were not part of the

2    contempt but are of concern now in the Monitors' Report.  And I

3    want to ask -- is Commissioner Masters with us today?  Yes, I

4    see you.  Thank you.  Last hearing, you said you would

5    investigate -- or somebody said -- the caseworkers' access in

6    CLASS in order to get the information or allegations that came

7    through SWI.  And HHSC had told me at that last hearing that

8    they were going -- that people -- that caseworkers who needed

9    it -- and I don't know what that meant -- would have access.

10             Now, are there still problems back and forth in this

11    area, Commissioner Masters?

12             COMMISSIONER MASTERS:  No, Your Honor.  It is my

13    understanding that we worked collectively together with HHSC to

14    get access to those who needed it.  And that should be

15    remedied.

16             THE COURT:  Thank you.  Now, yesterday I talked

17    about, but I'm not sure -- I went through all my notes for

18    preparing for the hearing, during the hearing, and here are

19    just some loose ends I need to talk to you about.

20             I need to identify the variances granted to the

21    heightened Monitored places, as well as talk about the

22    placement request for waivers.  The Monitors received all the

23    requests for variances for heightened monitoring, but what they

24    didn't get access to were those granted and why they were

25    granted.  And they also, in cross-referencing on case reads,

1    they couldn't match up some of the placements that were placed

2    there with any kind of request or any kind of variance.  Am I

3    saying that right, Ms. Fowler?

4             MS. FOWLER:  It doesn't -- it's not the variances,

5    Judge (indiscernible) --

6             THE COURT:  I mean, the placement -- we're talking

7    about placement requests.  Not variances on staff and what have

8    you, but placement requests.  They couldn't match up the kids

9    with any placement request approvals, or placement requests

10   even.  So, though they were supposedly given all the requests,

11   they weren't given any of the approvals.  And, in fact, far --

12   of 118 PMC children that were placed as a result of -- in

13   heightened monitoring, after heightened monitoring began, they

14   don't have all the requests for 71 percent of those children.

15   Is that right, Ms. Fowler?

16            MS. FOWLER:  Right.  We cannot find --

17            THE COURT:  They couldn't find them.

18            MS. FOWLER:  Right.

19            THE COURT:  They couldn't find them anywhere.

20            MS. FOWLER:  We couldn't find the request in what had

21   been provided to us for 71 percent of the PMC children.

22            THE COURT:  Of the request provided to Ms. Fowler --

23   and that's part of her assignment as the Monitor -- she

24   couldn't find requests for 71 percent of the 118 PMC children

25   that were placed in heightened monitoring after -- in these

 1    facilities.  So, that needs to be taken care of immediately.

 2            And I want to talk to you about variances.  When last

 3    we met, HHSC was granting variances to these facilities that

 4    were on heightened monitoring -- or not on heightened

 5    monitoring but had -- I guess they were all on heightened

 6    monitoring.  They were granting -- HHSC was granting the

 7    variances to heightened monitoring places for staffing and

 8    training.  DFPS did not know that and they're the placement

 9    agency.

10            When last we met, that was my understanding.  Has

11    that been worked out at least?  Are you getting notice of that,

12    Miss -- Commissioner Masters?  You're shaking your head yes.

13            COMMISSIONER MASTERS:  Yes, Your Honor.  Yes, Your

14    Honor.

15            THE COURT:  So, now you know about it.  Now, let me

16    suggest another remedy.  Instead of giving variances, HHSC, to

17    heightened monitoring places or staff -- or staffing, take the

18    children out so that the staffing still is the right ratio for

19    the children.  Don't put the children at risk but just lower

20    the number of children there.  And whatever it takes, try to do

21    that.

22            And I'm not understanding the variances for training.

23    Because the ratios are supposed to be five children per

24    caregiver, and a place like Azleway Valley View, New Life were

25    granted variances for eight children per caregiver.  That's a

 1    huge variance.  And that's somebody on heightened monitoring.

 2    I mean, that's just, to me, it endangers children more than

 3    necessary.

 4         Obviously, these ratios were established for a

 5    reason, and here these are heightened monitoring places -- huge

 6    issues with these people on heightened monitoring.  And we go

 7    through each one of them.  They're in the Report and they're in

 8    the CWOP Report, the Children Without Placements Reports.

 9         And for benchmark -- supervisory visits must have --

10    supervisory visits in the foster home must occur at least

11    quarterly.  And that was granted a waiver.  Why on earth would

12    you grant a waiver of a supervision visit to a heightened

13    monitoring place?  So, that may be a matter for -- I'm just

14    giving you a heads up here, that this may be a matter for a

15    future contempt.  And these are very serious concerns.  So,

16    heads up, try to fix this, please.

17         And I know we -- you want to talk about the pandemic

18    and all these other things, but we can't -- the children are

19    already in danger with the pandemic without making it --

20    exacerbating the situation.

21         Okay, so we talked about that.  And I wanted to ask

22    HHSC in Remedial Order 21 -- for license revocations, there was

23    this new rollout, I guess, in May of 2020 for determining

24    closures.  And have you -- I haven't seen it but I'm sure the

25    Monitors have.  When -- how do you determine enough is enough

```
 1   with some of these right to believes and standards violations?

 2   And the standards violations, I emphasize once again, affect

 3   the safety of these -- safe placements of these children.

 4   HHSC?

 5           MR. BRISSENDEN:  Thank you, Judge.  We have with us

 6   this morning Ms. Shaw from HHSC CCR.

 7           THE COURT:  Do you have Commissioner Young?  Do you

 8   have Commissioner Young?

 9           MR. BRISSENDEN:  And we have -- yes, Your Honor --

10   Executive Commissioner Young with us here this morning as well.

11   And they are both --

12           THE COURT:  Can I ask -- can I ask you, Commissioner

13   Young, when is -- I mean, let me just tell you this.  Ms. Shaw

14   testified last time that HHSC was not child-centric and that

15   was so concerning that I'm not really interested in hearing

16   from her in the future testimony.  I just have to lay that out

17   to you right now.  That was so appalling, when I reviewed these

18   minimum standards violations, that they were operation-centric

19   and not child-centric.  That was so stunning.  So, I want to

20   hear from you, when is enough enough with the right to believes

21   and the deficiencies?  Are you on mute?

22           COMMISSIONER YOUNG:  Oh, I'm sorry.

23           THE COURT:  That's all right.

24           COMMISSIONER YOUNG:  Your Honor, thank you very much.

25   You know, it is -- my position, as the Executive Commissioner
```

```
 1   of HHSC, that we become the agency that protects children, that

 2   is our job and we are --

 3              THE COURT:  And you're coming along, Commissioner,

 4   you're coming along.  But I just want everybody to go up here

 5   and --

 6              COMMISSIONER YOUNG:  Yes, Your Honor.  And so I -- we

 7   will continue to work with the Monitors on these issues.  I

 8   know that we have had a lot of improvements that we've had to

 9   make.  I really believe that we are working in the right

10   direction to protect our children.  And again, these are our

11   children.  So, I just want to assure you we'll work with the

12   Monitors on this, and we can continue to improve.

13              THE COURT:  So, when is enough enough?  What is your

14   cutoff for closing down or recommending license revocations?

15   Because I -- I will talk to you, too, about these -- you know,

16   the five facilities that were recommended for closure for DFPS,

17   and only three of them closed.  And the one that didn't close

18   was the one with all six -- I don't remember how many children

19   -- six or seven children, with six dogs, tons of puppies.  They

20   were hoarders.  They couldn't even find the vaccination for the

21   animals that they had.  And that starts on page 340 of the

22   Monitors' Report.  I mean, those are really serious issues.

23              COMMISSIONER YOUNG:  Yes, ma'am.

24              THE COURT:  So, there's still children there in a

25   house full of animals that may or may not be vaccinated.
```

1        COMMISSIONER YOUNG:  Your Honor, I'm trying to look

2   at the document.

3        THE COURT:  That's all right.  I'm trying to pull it

4   up, too, so --

5        COMMISSIONER YOUNG:  Your Honor, excuse me one moment

6   while I get --

7        THE COURT:  339.  Sorry.  Thank you.  Ms. Fowler's

8   just pointed me to the -- Medication logs weren't able to be

9   viewed -- It begins at 338 of the Monitors' Report.  There was

10  a closure recommendation and it was made in March and is still

11  pending -- I'm sorry, it was made in October and it's still

12  pending when the Monitors last checked.  That was the one with

13  the Downs child -- Syndrome child almost drowning in the pool

14  because the foster mother was in the pool making adjustments to

15  the pool pump and not advising -- supervising the child.

16       There was some concern regarding the story that she

17  told about the events that took place.  She stated that the

18  child was in a lifejacket but when the child was discovered,

19  she was not breathing and CPR had to be performed.  She framed

20  it as an accident rather than a lack of supervision.

21       I mean, these are the kinds of things that are very

22  concerning when you have -- I think there are at least two

23  special needs children in that foster home.  And an above-

24  ground pool is especially a red flag, especially if somebody's

25  getting almost drowned.

1          And then (indiscernible) newborn child in May of 2018

2     to a CPS office for a visit, and left another -- and left a 10-

3     month-old in a car, in a running (indiscernible) outside.  I

4     mean, duh.

5          COMMISSIONER YOUNG:  Terrible.  Terrible.

6          THE COURT:  Now, why would that (indiscernible) -- ?

7     Just pointing this out.

8          COMMISSIONER YOUNG:  Your Honor, I -- no, go ahead,

9     I'm so sorry.

10          THE COURT:  I'm just pointing that out as something

11     of great concern and possibly a matter for a future

12     investigation.  And then there's the one on, I think, the 340

13     that was denied closure altogether.  And this one says the

14     foster mother is deceptive and vague and confronting the

15     individuals who reside in her home.

16          Oh, my goodness.  This is the one where the neighbors

17     all called in.  There are seven-eight cars all there all night

18     long, marijuana being smoked in the backyard, people living

19     there that are adults that are confirmed there that are not

20     supposed to be there.  Nobody knew they were there.  Why on

21     earth would that be a denied closure?  I mean, this is so

22     dangerous, and the children are too afraid to tell you --

23     except they're telling you there's lots of alcohol going on in

24     the house.  And that -- the caseworker actually could smell

25     alcohol on the foster parent.  And, yet, that closure was

1   denied.  I'm holding you responsible, Commissioner, I'm just

2   telling you.

3            And you're getting a good record but you don't want

4   to blemish it with this kind of stuff.  This is why I'm asking,

5   when is enough enough?  I mean, the neighbors are calling in,

6   for goodness' sake, complaining about all-night comings and

7   goings.  So, what do you think is going on there with marijuana

8   in the backyard and alcohol on the foster parent's breath?

9   This is not a place where children need to be, and I need a

10  follow-up by the end of workday today about this place, and are

11  the children still there?

12           COMMISSIONER YOUNG:  Yes, ma'am.  We can get that for

13  you.

14           MR. BRISSENDEN:  Judge, if it's of any assistance,

15  with regards to the one child that you were referencing at the

16  beginning with regards to the pool.  In looking at the

17  Monitors' Report, there was description of -- that the

18  situation was that there were two other foster care children in

19  that home as well.  So, there were three children, from my

20  understanding in looking at the Monitors' Report.  And that the

21  family was in the process of adopting the other two children,

22  and there was a judge that actually ordered that those two

23  foster care children remain with the --

24           THE COURT:  That's a different case.  That's a

25  different case.  You've got the wrong case.

```
 1                MR. BRISSENDEN:  Okay.

 2                COMMISSIONER YOUNG:  We will get that information to

 3      you by the end of the day today.

 4                THE COURT:  Thank you.

 5                COMMISSIONER YOUNG:  Thank you, Your Honor.

 6                THE COURT:  And these things are going to pop up and,

 7      you know, I know this is going to happen, and none of us are

 8      perfect -- unfortunately, not even federal judges.  You know

 9      how it goes.  So, we can all work together and share

10      responsibility on this, okay?

11                COMMISSIONER YOUNG:  Okay.

12                THE COURT:  Okay, let me move on to my point.  So,

13      those -- that's concerning.  And only five -- there have only

14      been five closures since May of 2020, in total, I think.

15                The Monitors reported, on page 344 of the Monitors'

16      Report, that, for instance, Brave Heart -- I love all these

17      names.  Apparently, the -- Anyway, my Monitors think there's a

18      direct correlation between the name and the number of RTBs.

19      But Brave Heart -- Brave Heart says here that the majority of

20      the staff do not know that they're supposed to inform the call-

21      in statewide number to report abuse and neglect.  They just --

22      if they see it, they tell their supervisors and it does not get

23      called in.

24                So, we need to make sure that there's training

25      somehow for these staff members.  I think that's what the CBV,
```

1    if I've got the right acronym -- I think that's what they're

2    supposed to be told, that they've got to call in people.

3            Well, Mr. Carson, while we're talking, are you there?

4    The Monitors got 11 o'clock last night your list that we talked

5    about.  They need ID numbers so they can go into them exactly.

6    Can you provide those?

7            MR. CARSON:  Yes, I'm working on that.  I have some

8    of them and I don't have all of them yet, but I will provide

9    those.

10           THE COURT:  They will get that information to you

11   immediately -- as soon as you get those numbers to them, so

12   they can go review the cases.

13           MR. CARSON:  Thank you.

14           THE COURT:  I also want to know is there some policy

15   in place -- I'm sure there is, but I don't know what it is; the

16   Monitors may know -- when a child complains, like the body-

17   slamming and being knocked out in Whataburger, do you remove

18   the child to a respite care -- respite place, while you're

19   investing?  Or if you don't, how serious does the complaint

20   have to be during the investigation for a child to be placed in

21   a safe place while the investigation is going on?  I'm

22   particularly concerned about physical and sexual abuse and

23   staff abuse.  Commissioner Masters, is that your area?

24           COMMISSIONER MASTERS:  Yes, Your Honor, that is my

25   area.  And I may not have all of the information

```
 1    (indiscernible) to speak up, but I don't know that there is a
 2    policy.  If the child is in danger, though, it would be my
 3    expectation that the child would be removed while that
 4    investigation is going on to ensure that they are safe.
 5              THE COURT:  I know -- I asked the Monitors and they
 6    said they knew that some were put in a respite -- I think
 7    that's the right word, I'm not sure that's the right word.
 8              COMMISSIONER MASTERS:  Yes.
 9              THE COURT:  But can we get some numbers on that?  You
10    know, I'm looking at some of these right to believes and
11    wondering how long they stayed in that facility after these
12    horrendous things happened to them.
13              COMMISSIONER MASTERS:  Absolutely.  And I know it
14    depends on the severity of what's happened.
15              THE COURT:  Yes.
16              COMMISSIONER MASTERS:  But we will absolutely
17    (indiscernible) your response.
18              THE COURT:  And here's another great name, Pillars of
19    Progress.  Now, they were closed but they still have -- this is
20    outside my purview, but I still point out that they still have
21    an adult daycare center.  And those are -- people are very
22    vulnerable, too.  Just point that out.
23              Now, at the contempt hearing we discovered that
24    DFPS's right to believes were being downgraded or waived by
25    HHSC.  Has that changed?  Commissioner Young and Commissioner
```

1    Masters, where are we on that?

2              COMMISSIONER MASTERS:  I'm sorry, Your Honor, could

3    you repeat that again?

4              THE COURT:  Can I ask -- I hate to make it part of

5    the record but is everything doing all right with your

6    situation, Commissioner Masters?

7              COMMISSIONER MASTERS:  Thank you, Your Honor, for

8    asking.  It is still the same.  No change.

9              THE COURT:  Okay.  If you need to leave at any time,

10   just designate somebody to take over from you, okay?

11             COMMISSIONER MASTERS:  Yes, Your Honor.

12             THE COURT:  Okay.  So, back to the question.  What's

13   happening with the downgrading of the complaints?  You know, we

14   found this out because the Monitors were saying to these GROs

15   and RTCs, you know, you've got 37 right to believes and you're

16   still operating.  What are you doing about that?  And they

17   said, no, we don't have any of those.  I'm making up the

18   numbers.  But it turns out when the Monitors inspect -- further

19   investigated, they were being downgraded or waived by HHSC.

20             So, what's the process there, Commissioner Young and

21   Commissioner Masters?  How is that happening?  I should hear

22   from Commissioner Young first, I think.

23             COMMISSIONER YOUNG:  Are we -- can you hear me, Your

24   Honor?

25             THE COURT:  Yes, ma'am, thank you.

 1              COMMISSIONER YOUNG:  I'm not -- I'm not aware that we

 2   are doing downgrading.  I believe that -- I don't believe

 3   that's something that happens at HHSC.

 4              THE COURT:  Yes, it was documented and I think it was

 5   --

 6              COMMISSIONER YOUNG:  Okay.

 7              THE COURT:  Was it in the First Report, Ms. Fowler or

 8   Mr. Ryan?  We talked about --

 9              COMMISSIONER MASTERS:  Your Honor --

10              THE COURT:  We talked about it at the contempt

11   hearing.

12              COMMISSIONER MASTERS:  Your Honor, if I can --

13              THE COURT:  Yes.

14              COMMISSIONER MASTERS:  -- I think that it was a joint

15   communication between us and HHSC.  I believe Justin from my

16   shop may be able to speak better to that.

17              THE COURT:  Ms. Fowler, was that your purview or Mr.

18   Ryan's?

19              MS. FOWLER:  (indiscernible)

20              THE COURT:  Yes.

21              MS. FOWLER:  That was Kevin.

22              THE COURT:  Mr. Ryan, are you there?

23              MR. RYAN:  Yes, I'm here, Judge.

24              THE COURT:  Now, does that -- does that problem sound

25   familiar?

```
 1              MR. RYAN:  Yes, I believe so.

 2              THE COURT:  Can you help them out and explain to them

 3    what is happening?

 4              MR. RYAN:  Judge, this is with respect to the --

 5    could you just restate this, Judge?  I want to make sure that

 6    I'm speaking to -- You're talking about the First Report, is

 7    that correct?

 8              THE COURT:  I think it was in the First Report that

 9    there were several -- DFPS was issuing right to believes

10    through their SWI process and otherwise, and investigations --

11    RCCI, and instead of the facility being notified that that was

12    happening, either they were appealing or they were doing

13    something to HHSC who was waiving or downgrading them.  Have I

14    got that right?

15              MR. RYAN:  Yes, so the issue was this, Your Honor:

16    That after RCCI completed an investigation and made a

17    determination of reason to believe, the information was sent to

18    HHSC and HSSC, through what's now RCCR, conducted its own

19    standards investigation and it had independent findings that

20    were regulatory.

21              And there were instances in which HHSC made minimum

22    standards deficiency violation findings, overturned those,

23    those were communicated to providers who misunderstood that the

24    original RTB had also been overturned, and providers were

25    sharing with Ms. Fowler and with me that they didn't realize
```

     1     that they continued to have an RTB because they had received

     2     information from HHSC that the finding had been reversed.

     3               So we, in each of these instances, told the providers

     4     be in touch directly with DFPS and with HHSC because these are

     5     independent agencies making independent judgments.  And just

     6     because one is overturned, it doesn't mean that another is

     7     overturning their decision.  And, yes, Judge, there are cases

     8     where there is an abuse and neglect finding from DFPS but HHSC

     9     has nonetheless overturned its regulatory findings of

    10     deficiencies or violations.

    11               THE COURT:  Okay.

    12               MR. RYAN:  Does that capture that issue?

    13               THE COURT:  Thank you very much, Mr. Ryan.  So, now,

    14     Commissioner Young, you have the issue and probably you were

    15     unaware that this was happening.  So, I'm going to ask Mr.

    16     Ryan, do you all meet together, by the way?  Do you jointly

    17     meet Commissioner Masters, Commissioner Young and the two

    18     Monitors?

    19               COMMISSIONER YOUNG:  Yes, Your Honor.  You requested

    20     that we do that at the last hearing and we have honored that.

    21     And commissioner Young and I meet monthly.

    22               THE COURT:  So, why don't we Zoom in on your next

    23     meeting, the two of you, with Mr. Ryan and Ms. Fowler and give

    24     you a better understanding of the history of this and my

    25     concern?

```
 1                COMMISSIONER YOUNG:  Yes, Your Honor.

 2                THE COURT:  And we'll address it at the next hearing.

 3     There's bound to be a next hearing for something.  And, if not,

 4     in the next Report.

 5                Now, again, I wanted to emphasize that the SSCCs, all

 6     of them, have been woefully deficient.  I wanted to ask, in

 7     particular -- we don't have on St. Francis Ministries, which

 8     has -- is a CPA with three branches.  The CPA itself has, I

 9     think, seven total deficiencies with a high deficiency -- high

10     rating of five, medium is one, and medium-high is one.

11                HHSC, what were those deficiencies?  Somehow the

12     Monitors weren't able to track those.

13                COMMISSIONER YOUNG:  Your Honor, can you hear me?

14                THE COURT:  Yes, ma'am.

15                COMMISSIONER YOUNG:  Let us look at those right now.

16     We're looking them up.

17                THE COURT:  St. Francis is just -- St. Francis

18     Ministries as a CPA has just started?  Has just come on, is

19     that right, Ms. Fowler?

20                MS. FOWLER:  St. Francis is one of the more recent

21     entries to the SSCC responsibility.

22                THE COURT:  St. Francis, are you there?  Do you have

23     a representative?

24                MR. GARCIA:  Yes, ma'am.  We're here, Your Honor.

25                THE COURT:  When did you all come into contract as a
```

1      --

2                  MS. FOWLER:  SSCC.

3                  THE COURT:  -- SSCC?

4                  MR. GARCIA:  We finalized our contract in July of

5      2019, and we assumed responsibility and ownership of receiving

6      children on 1-6-2020.

7                  THE COURT:  Okay, it looks like subsequent to that

8      time, you received -- I guess, including the CPA and the

9      entities, ten total deficiencies, of which five were rated

10     high?  Is that 2INgage, also?  2INgage is one of your

11     facilities?

12                 MS. FOWLER:  2INgage is another SSCC.

13                 THE COURT:  Separate SSC -- SSCC?

14                 MR. GARCIA:  Yes, Your Honor.

15                 THE COURT:  And St. Francis Community Services and

16     Texas Inc. is a separate SSCC, and I lumped that in with the

17     other St. Francis Ministries, which I shouldn't have done,

18     right?  Those are separate?

19                 MR. GARCIA:  Yes, Your Honor, those are separate

20     entities.

21                 THE COURT:  Okay.  Thank you.  So, you don't have

22     that many St. Francis Ministries.  It's seven, of which five

23     are high, one's medium-high, and one's medium.  In the

24     meantime, St. Francis Community Services, when did you start

25     accepting children?

```
 1              MR. GARCIA:  On January 6, 2020.
 2              THE COURT:  Okay.
 3              MR. GARCIA:  Yes, Your Honor.
 4              THE COURT:  Oh, wait a minute, I'm talking St.
 5    Francis Ministries.
 6              MR. GARCIA:  Oh, St. Francis Ministries, our CPA?
 7              THE COURT:  Yes.
 8              MR. GARCIA:  Your Honor, that was about three years
 9    ago.  I need to look at the exact date.
10              THE COURT:  Okay, so they are connected, those two?
11              MR. GARCIA:  Yes, we are the same -- we're the same
12    organization under two different entities.
13              THE COURT:  St. Francis Ministries is the CPA, and
14    one of their placements is St. Francis Community Services in
15    Texas, is that right?
16              MR. GARCIA:  St. Francis Community Services is the
17    SSCC; St. Francis Ministries is our CPA.
18              THE COURT:  Okay.
19              MR. GARCIA:  Two different entities, Your Honor.
20              THE COURT:  Okay.  Okay, then you do have nine
21    deficiencies, of which five are high, one's medium-high, and
22    one's medium.
23              So, while you're looking that up, Commissioner Young,
24    on Remedial Order 27, order to report abuse and neglect to the
25    proper places -- I think, SWI and -- well, no, I need to talk
```

 1   to Commissioner Young about this.  Never mind.  Have you looked

 2   it up, Commissioner Young?  Are we --

 3               COMMISSIONER YOUNG:  Yes, Your Honor.  So, for the

 4   SSCC we have three noted deficiencies.  One person didn't take

 5   normalcy training.  There was a policy needed revision for

 6   babysitter respite care, and the policy needed revision for

 7   emergency behavioral intervention.  And that's for the SSCC.

 8   And we're now looking for the CPA, so --

 9               THE COURT:  Okay, thanks.

10               Okay, while we're doing that, Commissioner Masters, I

11   want to talk to you about Remedial Orders 35 and A4, which has

12   to do with DFPS and, of course, encompasses the SSCCs.  While

13   DFPS dramatically improved in the graduated caseloads, these

14   are the caseloads workloads.  And with all the SSCCs and DFPS,

15   there's only a 57 percent compliance.

16               Can you tell me, DFPS and the SSCCs, what you need to

17   come into compliance with Remedial Order 35 and A4?

18   Commissioner Masters?

19               COMMISSIONER MASTERS:  Yes, Your Honor.  I know that

20   we have a request in to the legislature to increase our

21   staffing, and that is moving through the process, and I know

22   that will -- that will be essential to us coming into

23   compliance.

24               THE COURT:  And for the SSCCs that need more -- I was

25   thinking of OCOK.  I mean, ACH, in particular and 2INgage --

1    will that be reflected with them, also, for more staffing?  Or,

2    Mr. Carson, what do you need for your staffing that you can't

3    get?

4            MR. CARSON:  We have people -- and the training

5    process is five months to get them fully case-assignable.  We

6    have people in the pipeline now being trained.  So, the primary

7    thing we need is time to get people trained and get them case-

8    assignable.

9            THE COURT:  Okay.  How about your turnover rate?  You

10   know, there was a time when DFPS had a 65-70 percent turnover

11   in the first two years.  So, all that training money has gone

12   down the tubes.

13           MR. CARSON:  Exactly.  Yeah, ours was high the first

14   year.  We had the transition of workers to us, and then we had

15   about -- it's in the Report, the exact numbers -- I believe it

16   was about 25 percent of the staff that joined us in March had

17   turned over.  But it is higher than we'd like it to be right

18   now, and we're working on stabilizing that, too.

19           THE COURT:  Okay.  So you think you're going to be in

20   compliance soon?

21           MR. CARSON:  Our projections are September at this

22   point, given the folks that we have in training and the

23   vacancies we need to fill and the turnover we're experiencing

24   now.

25           THE COURT:  So, you're telling me not in the next 30

1    minutes.

2              MR. CARSON:  The next 30 days?  Minutes?

3              THE COURT:  In the next 30 minutes, it's not going to

4    happen.

5              MR. CARSON:  You scared me, Your Honor.  No, we --

6              THE COURT:  I understand.

7              MR. CARSON:  We're looking at September.

8              THE COURT:  I just needed an answer.  I just needed

9    an answer.  That's really good, thank you.  Commissioner

10   Masters, what is your thought on this?  How many more

11   caseworkers are you asking for?  Funds for caseworkers?

12             COMMISSIONER MASTERS:  I want to say we've asked for

13   close to 300.  I can't recall now.  And Deneen or David may be

14   able to remind me.  But we also have a similar challenge that

15   Ray had mentioned, and just keep the turnover -- keeping staff

16   and getting them case-assignable.

17             THE COURT:  How is your turnover rate going?

18             COMMISSIONER MASTERS:  We are at, I believe, 23 or 24

19   percent.

20             THE COURT:  In the first year or what?  Two years or

21   -- ?

22             COMMISSIONER MASTERS:  In this last year, I believe.

23             THE COURT:  Okay.

24             COMMISSIONER MASTERS:  And it's gone up, obviously,

25   because of COVID, the challenge anyone's had.

```
 1              THE COURT:  Okay.  So, we're hoping next year,
 2   everybody will be in compliance and --
 3              COMMISSIONER MASTERS:  Yes, Your Honor, that is our
 4   hope.
 5              THE COURT:  -- that the funds will be there?  I know
 6   that the legislature has always been responsive -- you all, at
 7   the time of trial anyway.  Everybody testified that they've
 8   never been denied funds that they needed for the safety of the
 9   children.  It's what happened to those funds that has always
10   been an issue.
11              So, what are we doing about Remedial Order 27, where
12   you've got -- everybody has to report the abuse and neglect to
13   the SWI or police, I think?  So, in the -- oh, you know what?
14   Commissioner Young, are we ready to go?
15              COMMISSIONER YOUNG:  We are.
16              THE COURT:  Okay.  Go ahead.  What have you got?
17              COMMISSIONER YOUNG:  For the CPA we had nine total,
18   including service planning, the child didn't sign a child
19   rights form, a child was acting -- the child acting as a
20   babysitter didn't have a CPR supervision, a child slept in a
21   caregiver's room, a caregiver used belittling remarks to a
22   child, a child's clothes were dirty, and a caregiver pretended
23   to call 911 as a punishment.
24              THE COURT:  Okay.  I assume, St. Francis, that you're
25   going to take care of that and make sure that that's not done
```

1    in the future.

2              MR. GARCIA:  Yes, Your Honor.

3              THE COURT:  And also I'm really concerned here about

4    remedial order 27, Commissioner Young.  That has -- the

5    Monitors found widespread among the staff a lack of

6    understanding that they have an obligation to call SWI or law

7    enforcement to report any abuse and neglect.  And because

8    that's so widespread, and the lack of training and the lack of

9    requirement -- RCCL issued only 20 citations for failure to

10   report abuse and neglect.  So, I think that's probably much

11   underdone here.

12             So, you all need to come up with some way, besides

13   paying the Monitors to do it, to verify that staff members, as

14   part of their training module, know and understand they have to

15   direct-report this, and not just inform their supervisors and

16   apparently that kind of gets lost in the shuffle.

17             So, would you work with the Monitors to come up with

18   a plan to do that, Commissioner Young?

19             COMMISSIONER YOUNG:  Yes, Your Honor.

20             THE COURT:  And Commissioner Masters?

21             COMMISSIONER MASTERS:  Yes, Your Honor.

22             THE COURT:  Thank you.

23             Okay, then, I want to talk to you about the

24   Treehouse.  How did this slip under the radar that you all

25   didn't take out children from the Treehouse until the district

1    attorney of that area executed a search warrant and grand jury

2    indictments proceeded against the caregivers and the owners

3    there -- where they -- the search warrant was executed on April

4    5th based on, apparently, multiple calls and concerns to law

5    enforcement about restraints and abuse to the children.  And,

6    of course, they seized in that search warrant all the

7    children's records, all the computers, all cameras, which also

8    caused concern.  And you all had no heads up about this?  You

9    didn't have any red flags?  That's -- that's frightening.

10           So, I don't expect you to fall on the sword.  I

11   expect you to know -- to tell me what you should have done and

12   what you should have known before this happened.  Commissioner

13   Masters?

14           COMMISSIONER MASTERS:  So, Your Honor, I will say for

15   me, this did not come up prior to this event.  This was the

16   first time I heard of Treehouse when this happened.  I think --

17   I'm not sure if Justin can speak to any information we may or

18   may not have had that would've been red flags for us before

19   this happened.

20           THE COURT:  Commissioner Young?

21           COMMISSIONER YOUNG:  My understanding is that they

22   were on heightened monitoring.  And we have someone who can

23   speak to -- the Treehouse and heightened monitoring.

24           THE COURT:  I'm going to talk about heightened

25   monitoring altogether anyway, but I just -- just --

```
 1              COMMISSIONER YOUNG:  (indiscernible) Your Honor.

 2              THE COURT:  I also want to ask about Prairie Harbor.

 3   I know it's gone now along with its progeny.  And they were put

 4   on probation only for sexual abuse of children by a staff

 5   member.  Do you have in your rollout -- what is progressive

 6   about it?  What does it go to next?  The death of a child?

 7              For instance, the DFPS closures -- of the three

 8   closures this last year, two of them involved child fatalities

 9   that were attributable to direct negligence or deficiencies in

10   those two placements.  What does it take, I mean, for these

11   places to be closed and at least to protect, -- ?  You think of

12   the PMC children getting sacrificed but my class is PMC

13   children and I don't want them in places -- I don't think

14   that's safe -- where children are sexually abused by the staff.

15   And my thought is, is that probation is not really enough.  I'm

16   just saying.

17              So, we should talk about the Children Without

18   Placements Report.  We need to talk about fatalities.  I want

19   an update on the fatalities of the PMC children.

20              MS. FORE:  Your Honor, for DFPS, we have some

21   witnesses who are available who can talk about PMC fatalities.

22   That's going to be Marta Talbert as well as Justin Lewis.

23              THE COURT:  Okay.  Would you administer the oath,

24   please, Ms. Purifoy.

25              CLERK: Yes, Your Honor.  Ms. Talbert and Mr. Lewis,
```

1    please raise your right hand.  Do you swear the testimony

2    you're about to give in the case now before the Court will be

3    the truth, the whole truth, and nothing but the truth, so help

4    you God?  Mr. Talbert?

5              MR. LEWIS:  Ms. Talbert is just making it into the

6    room.

7              CLERK:  Ms. Talbert, please raise your right hand.

8    Do you swear the testimony you're about to give in the case now

9    before the Court will be the truth, the whole truth, and

10   nothing but the truth, so help you God?

11             MS. TALBERT:  I do.

12             CLERK:  And Mr. Lewis?

13             MR. LEWIS:  Yeah, I do.

14             THE COURT:  I guess we'll just take these in order,

15   starting on page 381.  The 15-year-old.  These are child

16   fatalities that had no abuse or neglect determined as of May 1,

17   2020 and April 10, 2021.  A.C. was 15 years old with a

18   significant history of running away.  She may have been a sex

19   trafficking survivor, according to DFPS records.  A.C. entered

20   DFPS's care in June of 2019.  In February, DFPS placed her back

21   with her mother under CPS safety plan, but she ran away in mid-

22   April.

23             Law enforcement located her in 2002, returned her to

24   CPS.  And while the CPS was driving her to a new placement,

25   A.C. asked to use the restroom at a convenience store and ran

1   away again.  And nine days later, she was found deceased on the

2   side of the road.

3           DFPS did not undertake an investigation, and it

4   closed the intake, concluding it was a matter for law

5   enforcement.  The autopsy showed that she suffered from

6   multiple sharp-force injuries and is classified is a homicide.

7   Who wants to talk about that?

8           MS. TALBERT:  Yes, I'm not sure.  I need to talk to -

9   - I need to look at that case because it wasn't actually worked

10  by my department or in my division, and so I'm not aware of

11  that actual case.

12          THE COURT:  I'm sorry, who's speaking?

13          MS. TALBERT:  This is Marta Talbert, and I'm the

14  Director of Field for CPI.  So, I have the investigations in my

15  area that are with PMC or TMC that are with non-licensed

16  caregivers.  But this one didn't actually come in to my

17  department.

18          THE COURT:  Okay, where did A.C. fit in the overall

19  department?

20          MS. TALBERT:  We did not do an investigation, so it

21  was not (indiscernible) nor my department.

22          THE COURT:  Okay.

23          COMMISSIONER MASTERS:  Your Honor --

24          THE COURT:   (indiscernible) was a permanent managing

25  conservator and you all were managing conservators, who was in

 1    charge of this child and why was this death not investigated?
 2         COMMISSIONER MASTERS:  Your Honor, this is
 3    Commissioner Masters.  If I can -- I believe one of our special
 4    investigators should have picked this up after this happened.
 5    If I can have one second, I've asked for our Associate
 6    Commissioner over investigations to go and --
 7         THE COURT:  And I'm sorry, on Treehouse I misspoke.
 8    There are not any indictments at this point, is that right?
 9         MR. LEWIS:  Your Honor, this is Justin Lewis.  At
10    this point, that is correct.  There are no indictments.  The
11    grand jury proceedings are ongoing.
12         THE COURT:  Okay, so -- I have child fatalities
13    involving abuse and neglect.  I was looking kind of at one that
14    did not have an investigation and were not found to be abuse
15    and neglect.  And this one didn't even have an investigation,
16    even though she was actually in the physical custody of a CPS
17    worker when last seen.  So, that's all we have on that?
18         MR. LEWIS:  Are you still talking about A.C., Your
19    Honor?
20         THE COURT:  I am.
21         MR. LEWIS:  Okay.  So, when the child --
22         THE COURT:  Who's speaking?
23         MR. LEWIS:  This is Justin Lewis.  I'm sorry.
24         THE COURT:  Okay, thank you.
25         MR. LEWIS:  So, when the child ran away, a special

 1   investigator should have been assigned to the case to track the
 2   child down as a runaway.  And I did not look into that part.  I
 3   just know that RCCI did not do an investigation into the death
 4   because she was not in a licensed facility at the time that the
 5   death occurred; she was on runaway status and --
 6            THE COURT:  But was there -- who can tell me if there
 7   was a special investigator appointed?
 8            COMMISSIONER MASTERS:  It is my understanding that a
 9   special investigator was appointed.  I do have their director
10   in my office, if you would like to allow her to speak, Judge.
11            THE COURT:  Sure.  Could you administer the oath?
12            CLERK:  Please raise your right hand.  Do you swear
13   the testimony you're about to give in the case now before the
14   Court will be the truth, the whole truth, and nothing but the
15   truth, so help you God?
16            MS. FONVIELLE-BAUGHMAN:  I do.
17            THE COURT:  So, what happened?  The special
18   investigator was appointed, was that right?
19            MS. FONVIELLE-BAUGHMAN:  Yes, ma'am.  Whenever a
20   youth runs away --
21            THE COURT:  Can I get your full name, please?
22            MS. FONVIELLE-BAUGHMAN:  Yes, ma'am. Sharon
23   Fonvielle-Baughman, I'm the Director of Special Investigations
24   for the Department of Family & Protective Services.
25            THE COURT:  Okay.  And a special investigator was

1    appointed?

2              MS. FONVIELLE-BAUGHMAN:  A special investigator is

3    assigned every time a TMC or PMC child is on runaway status,

4    yes, ma'am.

5              THE COURT:  When was a special investigator

6    appointed?

7              MS. FONVIELLE-BAUGHMAN:  There's an eight-hour

8    timeframe that CBS has to request that an SI be assigned to the

9    runaway case.

10              THE COURT:  Okay, this is my question:  When was the

11    special investigator assigned in A.C.'s case?

12              MS. FONVIELLE-BAUGHMAN:  I do not have direct

13    knowledge of that.  I'm just now learning about this --

14              THE COURT:  Find out.  Find out, please, because

15    that's what I want to know.

16              MS. FONVIELLE-BAUGHMAN:  I'm requesting that from

17    somebody.

18              THE COURT:  Thank you.  Now, let's move on while

19    you're doing that and I'll come circle around back to that.

20    N.M. died May 2020.  A 17-year old youth had been placed with

21    his aunt -- again, a (indiscernible) PMC child and went to the

22    late at night with his girlfriend and the parents, I think, and

23    cousins.  And he had alcohol in his system at autopsy.

24              Sorry, that one did not have alcohol, I guess.  So,

25    DFPS concluded there was no abuse or neglect involved?

 1          MR. LEWIS:  Yes, ma'am, that's correct.  This is

 2   Justin Lewis.

 3          THE COURT:  And apparently there was some time

 4   between the time he disappeared and between the time the 13-

 5   year old -- 18-year old came back to shore and the time they

 6   discovered N.M. was no longer there?

 7          MS. TALBERT:  That's correct.  This is Marta Talbert

 8   and we did determine that there was no abuse or neglect

 9   regarding the 17-year old swimming with his cousins at that

10   time.

11          THE COURT:  At night?

12          MS. TALBERT:  No, N.M. was actually during the day.

13          THE COURT:  Okay, the other one was at night?

14          MS. TALBERT:  Yeah, D.P. -- D.P. was in the evening,

15   yes, at night.

16          THE COURT:  So, J.G., a seven-year old girl,

17   significant health problems including end-stage renal failure.

18   And I can see why you ruled out any abuse or neglect there.

19          And the four-year old that died December 2020 had

20   been in the conservatorship of – Permanent Managing

21   Conservatorship or conservatorship since 2017.

22          And this was the -- the next one is I.R. that died, I

23   guess eight-years old, seven-and-a-half, had Down Syndrome, was

24   placed back with the mother -- mother and grandmother.  And

25   this child was supposed to have had 24/7 nursing at home and

 1   that didn't happen.  It looks to me like DFPS might've been

 2   negligent in this one because there was no nurse coverage at

 3   home.  And the mother and grandmother complained repeatedly to

 4   DFPS that they weren't getting the nurses there.  So, what was

 5   the problem here?  You don't want to cite yourself for abuse

 6   and neglect for the caseworkers or what?  Who's the agency that

 7   you all were using to provide the nurses that refused to -- or

 8   did not provide them?  Commissioner Masters?

 9           COMMISSIONER MASTERS:  Yes, Your Honor.  CPS would be

10   the ones to respond to that.  I think probably Erica may or --

11   may have a response to who the nursing facility was.  Or

12   Hector.  I'm sorry.

13           THE COURT:  So, are you still using that nursing

14   facility?

15           COMMISSIONER MASTERS:  Erica's researching and trying

16   to gather that information right now regarding that particular

17   case.

18           THE COURT:  Okay.  Then I'm going to talk about the

19   child fatalities that did find abuse and neglect.  K.C., I

20   think that was detailed in the First Report.  It was at Prairie

21   Harbor.  And I think at the time of the First Report, it was

22   still pending as to the investigation, because it wasn't found

23   to be abuse and neglect until after our contempt hearing.  Is

24   that right?  In September?

25           COMMISSIONER MASTERS:  That is right.  We had -- not

1    Justin but -- oh, goodness -- we had Clint go back and review

2    all of those, and I do believe that that was RTB.

3                 THE COURT:  And all those children were -- all our

4    PMC children stayed in that Prairie Harbor until we revoked

5    their license after the contempt hearing?

6                 COMMISSIONER MASTERS:  I can't speak to the license

7    but I do know that we moved our kids out.

8                 THE COURT:  You reopened the investigation into the

9    death of K.C. a week after the contempt hearing when we all --

10   the Monitors and myself raised concerns about Prairie Harbor

11   and your investigation.

12                COMMISSIONER MASTERS:  Yes, ma'am.

13                THE COURT:  D.D. died February 10, 2020.  She had a

14   metabolic disorder.  And DFPS substantiated allegations of

15   child maltreatment against the child's licensed foster mother

16   for neglectful supervision, leaving the child alone.  And she

17   died in the hospital.  So, is that foster mother still a

18   licensed foster mother?

19                COMMISSIONER MASTERS:  She should not be.  We will

20   get that confirmed for you.  But she'd better not be.

21                THE COURT:  Well, can you find out and confirm?

22                COMMISSIONER MASTERS:  Yes.

23                THE COURT:  You got somebody checking into that,

24   Commissioner?

25                COMMISSIONER MASTERS:  The foster home has been

1    closed.

2            THE COURT:  Thank you.  So, those people will not get

3    a license again?  You can assure me of that?

4            COMMISSIONER MASTERS:  I can't speak to the license.

5    That's on HHSC, but we won't be placing any kids with her.

6            THE COURT:  Commissioner Young, where's her license?

7    Where's that foster mother's license?

8            COMMISSIONER YOUNG:  We're checking right now.

9            (Overlapping)

10           THE COURT:  Ms. Lowry?

11           MR. BRISSENDEN:  Just to be clear on that --

12           THE COURT:  Ms. Lowry, did you want to say something?

13           MS. LOWRY:  Yes, Your Honor, I just have a question

14   with regard to T.M.  Is this one of the three to five homes

15   that was found to -- that was reported on heightened

16   monitoring?  Was this one of the -- I think it was 23 homes

17   that DFPS and HHSC disagree about the homes that each agency

18   has found not to (indiscernible).  I just wonder what the

19   status of this home is and whether it's one of the 23 or one of

20   the three to five.

21           THE COURT:  Actually, there are 24, including

22   Landing, which wasn't in the original 23.  So, let me get to

23   that.  Let me check on this.  Let me do -- take care of the

24   home and D.D. and the licensing there.  I want to see where the

25   license is for that foster home.

1          MS. LOWRY:  Thank you.

2          MR. BRISSENDEN:  Your Honor, just to be -- just to

3    make sure we're understanding your question as to D.D., are you

4    asking for the license over the CPA?  My understanding is there

5    are no licenses directly issued for individual foster care

6    parents or homes.

7          THE COURT:  Okay.  Well, it says licensed foster

8    mother.  That's what it -- that's why I was saying that.  There

9    are no objections to that on page 369.  So, is the CPA -- does

10   the CPA have the license?  And, if so, who's the CPA?

11         MR. BRISSENDEN:  Okay.  Okay, thank you for the

12   clarification and we can check on that.

13         THE COURT:  Commissioner Young, do you have any

14   information on where that license is?

15         COMMISSIONER YOUNG:  Yes, Your Honor, we're checking

16   on that right now.

17         THE COURT:  Okay then, go on -- going on to T.M., age

18   seven.

19         COMMISSIONER MASTERS:  Yes, Your Honor.  Oh, I'm

20   sorry.  I believe the question was what was being done with

21   this home.  On the DFPS side, we have requested a disallowance,

22   which is pending a legal review.  I think the home is

23   challenging the investigation findings.  So, we won't be

24   placing anyone with this home.

25         THE COURT:  Are there children there now?

1          COMMISSIONER MASTERS:  No.  Not to my knowledge.

2          THE COURT:  Is this a CPA?

3          COMMISSIONER MASTERS:  This is just a home.

4          THE COURT:  Is this a DFPS home?

5          COMMISSIONER MASTERS:  Yes, Your Honor.

6          THE COURT:  Okay.  And so you don't have children

7    there, any foster children there.

8          COMMISSIONER MASTERS:  Correct.

9          THE COURT:  But where is the license for this home?

10   Commissioner Young?

11         COMMISSIONER YOUNG:  There are -- this facility is on

12   probation.

13         THE COURT:  On probation?  It's still got a license?

14         COMMISSIONER YOUNG:  (indiscernible)

15         THE COURT:  What?

16         COMMISSIONER YOUNG:  Hold on, just one moment, Your

17   Honor.  I apologize.  The CPA has the license, not the home.

18         THE COURT:  Okay, the CPA that was in charge of

19   placing T.M. has a license?

20         COMMISSIONER YOUNG:  They're on probation.

21         THE COURT:  Who is the CPA?

22         COMMISSIONER YOUNG:  Therapeutic Family Life.

23         THE COURT:  These names are just amazing, aren't

24   they?  Therapeutic Family Life.  And this child, multiple brain

25   bleeds, some bruising on the left cheek, left ear, both sides

1    of the nose, both sides of the forearms, under the chin, a

2    spinal fracture, and evidence of possible strangulation.  And

3    T.M.'s foster parents denied causing the child's injuries.  Oh,

4    for goodness' sake.  And you've kept the license for this -- is

5    this foster care still part of the CPA and are there children

6    there?  Commissioner Young?

7              COMMISSIONER YOUNG:  We're checking right now, Your

8    Honor.  I'm told the foster home is closed, Your Honor.

9              THE COURT:  Speaking of that now, do you have the

10   names of these foster parents?  It's a man and a woman.  And

11   can they go to another CPA and get placements, or do you track

12   these things?  Remember, we had -- last time, we found out that

13   staff members who were sexually and physically abusing children

14   were going from one CPA to another without any tracking.

15             COMMISSIONER YOUNG:  We do track them, Your Honor.

16             THE COURT:  You've got an overall list of these -- of

17   these parents?  They're on a list?  Like a no-fly list?

18             COMMISSIONER YOUNG:  Yes, ma'am.

19             THE COURT:  Okay.  And I thought they were appealing

20   -- they're appealing the finding.  Who's appealing the finding?

21             COMMISSIONER MASTERS:  Well, the family is appealing

22   the finding, Your Honor.

23             THE COURT:  Who do they appeal it to?

24             COMMISSIONER MASTERS:  So, they appeal the

25   investigation finding to us.

```
 1                THE COURT:  Okay.  Now, circling back to D.D., what
 2     do we know about -- Oh, Ms. Lowry, you had questions about
 3     T.M.?  This is -- now we know it's Therapeutic Family Life
 4     that's on heightened monitoring.  Is that right, they're on
 5     heightened monitoring?
 6                MAN 1:  Probation.
 7                THE COURT:  Probation.  They're on probation?
 8                MS. LOWRY:  Yes, I (indiscernible).
 9                THE COURT:  But they're not on heightened monitoring?
10                COMMISSIONER MASTERS:  They are on heightened
11     monitoring.
12                COMMISSIONER YOUNG:  They are on heightened
13     monitoring.  And they're on probation.
14                THE COURT:  They're now on heightened monitoring?
15     Which is more severe, heightened monitoring or probation?
16                COMMISSIONER YOUNG:  Probation.
17                THE COURT:  So they're on probation.  Are they on
18     heightened monitoring phase 1, and probation?
19                COMMISSIONER YOUNG:  Yes, ma'am.  Yes, Your Honor.
20                THE COURT:  Okay.  Now, I hear from the Monitors that
21     the mother in this foster home actually had a license.  Has
22     that license been revoked, Commissioner Young?  I'm talking
23     about T.M. now.
24                COMMISSIONER YOUNG:  Your Honor, let me check.  I'm
25     not aware of their -- (indiscernible) give us one moment.
```

1          MR. BRISSENDEN:  Judge, for clarification, this may

2    be a point that was raised before or asked for clarification.

3    We know that the CPAs hold licenses but foster parents per se

4    do not hold licenses.  That may be --

5          THE COURT:  Okay, I just have a note from the

6    Monitors that this particular mother had a license.

7          COMMISSIONER YOUNG:  Your Honor, it appears that the

8    foster parent has a nursing license but not a foster care

9    license.  So, the license is a nursing license.

10          THE COURT:  Oh, my goodness.  Well --

11          COMMISSIONER YOUNG:  Which is not -- yes, ma'am.

12          THE COURT:  So, what is HHSC doing about the homes

13    that are being -- that fall under the purview of this

14    Therapeutic Family Life?  Are they all on heightened

15    monitoring?  How many are there?

16          COMMISSIONER YOUNG:  Let me find the number for you.

17          THE COURT:  Thank you.

18          MR. BRISSENDEN:  And, Your Honor, we have with us the

19    Director of Heightened monitoring, who would have that

20    information.  And she can also assist the Court in providing

21    that information, if you're willing.

22          THE COURT:  Yes, I'm certainly willing.

23          MR. BRISSENDEN:  Okay.  All right. Ms. Jenny Hinson

24    is Director of Heightened monitoring and she can share that

25    information with the Court.

1          THE COURT:  Could you administer the oath, please?

2          MS. HINSON:  Good afternoon, Your Honor.

3          CLERK:  Ms. Hinson, please raise your right hand.  Do

4   you swear the testimony you're about to give in the case now

5   before the Court will be the truth, the whole truth, and

6   nothing but the truth, so help you God?

7          MS. HINSON:  Yes, I do.

8          THE COURT:  Okay, now, so, Therapeutic Family Life is

9   on phase one heightened monitoring, is that correct?

10          MS. HINSON:  Yes, ma'am.

11          THE COURT:  And they're also on probation?

12          MS. HINSON:  Yes, ma'am.

13          THE COURT:  What's the difference between the two?

14          MS. HINSON:  With heightened monitoring, the

15   frequency of visiting the operation is increased to weekly.

16   That's the minimum amount of times that we can go out under the

17   heightened monitoring construct.  And with probation, the

18   minimum number of visits is monthly.

19          In addition, it is a joint venture with DFPS and HHSC

20   to visit the operations, to visit the homes, and to focus on

21   the components of our heightened monitoring plan.

22          THE COURT:  How many homes -- how many homes does

23   this Therapeutic Family Life have?

24          MS. HINSON:  82.

25          THE COURT:  82?

```
 1              MS. HINSON:  Yes, ma'am.

 2              THE COURT:  Are you visiting each of the homes

 3   weekly?

 4              MS. HINSON:  Your Honor, we don't visit each of the

 5   homes weekly, but we do work with DFPS.  They visit a number of

 6   homes each week.  While HHSC focuses on visiting the branch

 7   offices, and we do visit some foster homes.  But the CPS

 8   program does the majority of the foster home visits.

 9              THE COURT:  Okay, about these other 82 homes, are you

10   having problems with these, also?  You must be or they wouldn't

11   be on probation and heightened monitoring, phase one.

12              MS. HINSON:  Your Honor, I'd like to review some of

13   our notes on our meetings about that just to verify before I

14   answer.  So, if I can have a minute to just double-check.

15              THE COURT:  Okay.

16              The Monitors -- I want to tell you that the Monitors'

17   understanding is that each of these homes are licensed by CPAs,

18   by the CPA.  And that's -- that's the understanding from the

19   Monitors.  Is that not the case or do you all even know?

20              MS. HINSON:  I don't know the terminology.  The child

21   placing agency --

22              THE COURT:  It's not terminology.  It's a license.

23   Do these homes, are they licensed by the CPA?  Mr. Carson, do

24   you know -- do you know what I'm talking about?

25              MR. CARSON:  Yes, Your Honor.  The CPA's job is to
```

1    license their homes individually, so each foster home holds a

2    license with the child placing agency that they're a member of.

3            THE COURT:  That's what was the Monitors'

4    understanding.  We're texting back and forth, by the way, which

5    is why -- I don't come up with all these wonderful ideas

6    myself.  I rely on my wonderful law clerks and these two

7    incredible Monitors, also.

8            So, apparently, nobody in HHSC knows that.  And that

9    disturbs me.  So, if this had been one of your homes, Mr.

10   Carson, how -- would you have taken away the license from that

11   home, when we're talking about what happened to T.M.?

12           MR. CARSON:  Your Honor, I'm not familiar with all

13   the details but from what's in the Report, certainly.

14           THE COURT:  The medical examiner found the cause of

15   death to be blunt force trauma to the head, a ruptured -- a

16   broken spine, everything imaginable, while in the placement of

17   this home.  And so the home was closed.  And my question to

18   HHSC was the license of that foster care parent -- because they

19   understood the mother was licensed -- was that revoked?  And

20   they said, oh, no, it's the CPA that has the license, not the

21   home.  You have now informed me that the CPA licenses the homes

22   themselves.  I think you do your own inspections as well, is

23   that right, Mr. Carson?

24           MR. CARSON:  That's correct.  So, I think there are

25   two licenses we're talking about.

1              THE COURT:  Yes.

2              MR. CARSON:  The license that the CPA has is from

3    HHSC to operate as a child placing agency.  And the CPA issues

4    their licenses to individual homes.  So, the CPA can revoke the

5    license of the home.

6              THE COURT:  So, I assume that, under these

7    circumstances, if all I had just read to you is true and

8    correct, you would have revoked the license of that particular

9    foster mother?

10             MR. CARSON:  Correct.

11             THE COURT:  And that's what I'm trying to find out.

12   And do you notify HHSC when you do that, of a particular foster

13   parent of a home?

14             MR. CARSON:  I am not sure if we do a notification on

15   individual licenses or not but I'll find out.

16             THE COURT:  Well, the reason I want to know is that I

17   don't want these -- you know, you've just heard me tell --

18   inform you that staff that have found reason to believe to have

19   abused children under their care have gone to different CPAs

20   and they were not tracked before the First Monitors' Report.

21   Now I'm told that they are carefully tracked with names in a

22   registry.

23             I need to know that these foster parents are not

24   going to go to another CPA and get a license.  You know,

25   whether they misrepresent themselves or not, I need to know

```
1    that they can't do that.  So, to do that, you have to be
2    telling, if you revoke a license, HHSC that these foster
3    parents have been revoked for the following reasons.  Is that -
4    - is that a problem?
5              MR. CARSON:  I am -- I'm getting an email from my
6    folks right now.  So, yes, we would close them, we would revoke
7    their license.  I need to find out if we would notify HHSC of
8    that immediately.  I'm working on that.
9              THE COURT:  Well, you just muted me.  Somebody muted
10   me.  Can you hear me, Mr. Carson?  No.  I probably did
11   something.  Thank you.  Can you hear me now, Mr. Carson?  Nope.
12             MR. CARSON:  Yes, Judge, I can hear you.
13             THE COURT:  Okay, good.
14             MR. CARSON:  Everything is (indiscernible).  The only
15   thing I'm trying to verify is if we close the license of a
16   home, how do we notify HHSC?  And I'm not quite sure of that
17   step yet but I will have it in a second.
18             THE COURT:  Okay.  I need to know somewhere in the
19   mechanism that you have made a determination as a CPA that this
20   is not a place to put -- this is not a safe place for the
21   children.  And you've revoked that license and reported it to
22   somebody in the state, so they don't go from CPA to CPA.
23             So, a question that I have to -- when you find that
24   answer, you'll let me know, Mr. Carson?  Why were -- did the
25   RCCR -- did RCCR not recommend closure of that home?  T.M.'s
```

 1    home, I'm talking about T.M.'s foster home.

 2          MR. BRISSENDEN:  Your Honor, we have a couple --

 3    several witnesses.

 4          THE COURT:  I just want to know --

 5          MR. BRISSENDEN:  Again, Miss --

 6          THE COURT:  -- was the home, was the license revoked

 7    in the CPA of Therapeutic Family Life?  This is just a yes or a

 8    no -- was that license revoked of that foster home by the CPA?

 9    Do we have anybody here from --

10          MR. BRISSENDEN:  Ms. Estevilla (indiscernible) --

11          THE COURT:  Do we have anybody here from Therapeutic

12    Family Life?

13          MR. CARSON:  Your Honor, my folks that do this and

14    several other friends are telling me when an agency revokes the

15    license of a home, that license gets revoked in the CLASS

16    system and the CLASS system is available for HHSC.  So it is

17    visible to them in the CLASS system when a home is closed.

18          THE COURT:  Thank you.  So that's the computer system

19    that only belongs to HHSC.  So, they will know about it.  So,

20    Commissioner Young, in your CLASS system before the CPAs

21    license new homes, does anybody check through the CLASS system

22    to see if they've had their license revoked in the past?  I

23    don't care that they certified that they haven't had their

24    license revoked; I want to know if there's a safety check in

25    place.

 1          COMMISSIONER YOUNG:  Yes, Your Honor.

 2          THE COURT:  Okay, these are deaths in your care DFPS

 3   and HHSC.  Somebody needs to have -- you all need to have

 4   information about this.  Surely the commissioners would know

 5   this carefully and quickly.  In T.M., has the foster parent

 6   lost their license from the CPA?

 7          COMMISSIONER YOUNG:  Yes.  The CPA closed the home.

 8          THE COURT:  Did they revoke the license?  It's in

 9   your CLASS system.

10          MR. BRISSENDEN:  Let us check, Your Honor.

11          THE COURT:  And, Commissioner Young, while they're

12   checking on that, did you go back to see about D.D.'s home, of

13   the license?  Was that license revoked for that foster mother?

14          COMMISSIONER YOUNG:  Yes.

15          THE COURT:  Sorry?

16          COMMISSIONER YOUNG:  Yes, yes, my understanding is

17   yes.

18          THE COURT:  Okay, do you have a record of that in

19   your CLASS system that that license -- the name of the foster

20   mother and the license revocation?  So that the Monitors can

21   verify it in your CLASS system, is that right?  You're on mute,

22   Commissioner.

23          COMMISSIONER YOUNG:  Oh, oh, I am?  Yes, Your Honor.

24          THE COURT:  Okay.  So, Ms. Fowler or Mr. Ryan, you

25   can verify that that foster mother has had her license revoked

1    by the CPA and it is entered in the CLASS system.  Now, do you

2    have a policy in place, Commissioner Young, for all CPAs and

3    any other licensing to check -- to keep track of the revoked

4    license by name of the person, and the CPA, and the owners,

5    when licenses are revoked, so you can double-check before a new

6    one is issued?

7                COMMISSIONER YOUNG:  Yes.

8                THE COURT:  Pardon?

9                COMMISSIONER YOUNG:  Yes, Your Honor.

10               THE COURT:  Okay.  And do you have a person in charge

11   of that checking for licensing?

12               COMMISSIONER YOUNG:  One moment, I'm getting a name.

13               THE COURT:  Thank you.

14               COMMISSIONER MASTERS:  Your Honor, if I may?

15               THE COURT:  Yes, ma'am?

16               COMMISSIONER MASTERS:  For the disallowance that we

17   were doing (indiscernible) on the DFPS side, even if by some

18   chance another CPA managed to still pick them up and give them

19   a license, on our side we would see it that it was disallowed,

20   and so no child would be placed there.

21               THE COURT:  Okay, I just want to make sure that

22   another Landing incident and all these other places that have

23   closed and reopened under new names -- those were not picked

24   up.

25               MR. CARSON:  Your Honor, there is one other check and

```
 1    balance if an RTB is issued against the family -- if the agency

 2    does try to move licenses, the new agency still has to do a

 3    criminal history check on the family and that would show up.

 4              THE COURT:  It's not -- how would it show up in a

 5    criminal history if it's not a crime to have your license

 6    revoked?

 7              MR. CARSON:  Well, it would show up on the -- it

 8    would show up in the background check on the central registry.

 9              THE COURT:  What central registry?

10              MR. CARSON:  The central registry that identifies --

11    there's probably someone else who can speak better to this, but

12    it tracks people that have allegations of child abuse against

13    them.  An RTB is an allegation of child abuse.

14              THE COURT:  Okay.  And so there's a central registry

15    for that?  For both staff and placements?  Is that right,

16    somebody?

17              MR. CARSON:  Yes, Your Honor, we have to run that

18    check for foster parents and for employees so -- and an RTB

19    would show up on that as well.

20              THE COURT:  Oh, thank you, Mr. Carson.  Okay, now,

21    Commissioner Masters, how many homes have you disallowed

22    licenses for just in the past year?

23              COMMISSIONER MASTERS:  Yes, Your Honor, can you give

24    me a moment?  We will get that answer for you.

25              THE COURT:  Thank you.
```

 1            MR. RYAN:  Your Honor, can you mute?  Thank you.

 2            THE COURT:  I'm just talking to Ms. Fowler.  I'm

 3    trying to -- It's okay that I'm not muted.  I don't really

 4    care.  Ms. Fowler is expressing a concern that you all have

 5    that HHSC has only recommended in the past year closure of five

 6    homes, of which three were actually closed, two of which had

 7    one of these deaths in them, and --

 8            And DFPS has, on the other hand, disallowed 22 homes,

 9    of which HHSC has only recommended closure of five of those

10    disallowed homes.  Well, I don't know if they overlap but I'm

11    just saying, theoretically, if they overlap.  So, there's a

12    disconnect there that we need to get a handle on.  And I don't

13    care if I'm muted talking to Ms. Fowler because obviously the

14    Monitors have a much better take on these situations than I do.

15    The information I get comes from the Monitors.

16            So, can anybody explain that to me, why DFPS has

17    disallowed 22 homes and the HHSC has recommended closure of

18    five, of which only three actually closed and one is pending?

19    Commissioner Young?

20            COMMISSIONER YOUNG:  Let me -- We're conferring, Your

21    Honor.

22            MR. BRISSENDEN:  And, Judge, we've been going for

23    almost -- approaching 11 o'clock.  Is now a good time to take a

24    break, take our morning break, and it'll give us a chance to

25    find some of this information for the Court?

 1          THE COURT:  Okay, a 15-minute break, because we're on

 2   a tight schedule.  I want to get this over and done no later

 3   than 1:45 this afternoon.  That's my schedule.

 4          MR. BRISSENDEN:  Understood.

 5          THE COURT:  And at 12 noon I have a quick sentencing.

 6   And then I'm back with this.

 7          MR. BRISSENDEN:  Thank you, Judge.

 8          THE COURT:  So there'll be another 15-minute break

 9   then.  So, we'll take a short break now.

10          (Recess)

11          THE COURT:  Okay.  Do we have the information?

12          MR. BRISSENDEN:  We do, Judge.  Thank you for

13   allowing us to take a break, and we -- Ms. Estevilla, who is

14   from CCR here at HHSC, will provide that information.  And

15   also, Judge, I would re-offer Ms. Shaw.  She has a lot of the

16   information to the questions you are asking.

17          THE COURT:  That's fine.  If that's all you've got --

18          MR. BRISSENDEN:  To assist the Court.

19          THE COURT:  -- then that's what we'll have to do, but

20   I'm just not impressed --

21          MR. BRISSENDEN:  Okay.

22          THE COURT:  -- with somebody from HHSC that looks at

23   the buildings instead of the children.

24          MR. BRISSENDEN:  Understood, Judge.  Ms. Estevilla,

25   could you provide the information --

```
 1              THE COURT:  You're still under oath from yesterday.

 2              MS. ESTEVILLA:  Hi, yes.  And can we revisit the

 3    specific questions?

 4              THE COURT:  Okay.  These are the questions.  D.D.,

 5    the home she was in, does it still have a license?

 6              MS. ESTEVILLA:  D.D. is the -- was in the TFL -- the

 7    Therapeutic Family Life home or --

 8              THE COURT:  No.  Oh, never mind.  We'll go onto

 9    something else until you all have the information.  This is

10    ridiculous.  What I want to know -- Mr. Carson supplied me the

11    information that in his practice if a foster -- if a home loses

12    its license because of a right to believe, the right to believe

13    is entered into the CLASS system; is that right, Mr. Carson?

14              MR. CARSON:  The reason -- the revocation of the

15    foster home license is entered into the CLASS system.

16              THE COURT:  Right.

17              MR. CARSON:  If an RTB -- which an RTB is essentially

18    a conviction of child abuse.  If that is issued against a

19    foster family, then that would go into the central registry.

20    So, you have -- the information sits in two places.  You've got

21    the license that's been revoked in the CLASS system and you've

22    got the RTB in the central registry.

23              THE COURT:  Okay.  Is this -- now, Commissioner

24    Young, is this the process for every one of your CPAs?

25              COMMISSIONER YOUNG:  Yes, Your Honor.
```

```
 1              THE COURT:  Now, I want to talk to you about --
 2    speaking of Therapeutic Family Life, which had a reason to
 3    believe negligent death, more than negligent with the broken
 4    bones of a 7-year-old, I understand now that Therapeutic Family
 5    Life history is as follows.  First of all, it's on heightened
 6    monitoring but not phase one.  It has 37 homes.  They have 43
 7    investigations in the review period with eight operations
 8    receiving 17 deficiencies.  This branch does not have any plan
 9    of actions or corrective actions at all under review.
10              There are two child fatalities at this branch from
11    June 17, 2019 at the Tammy and Dale Bolin home and on 03/13/20
12    at the home of Kash Bolin.  The child with medical needs
13    contracted salmonella leading to sepsis as a cause of death.
14    This is the third child fatality at the Tammy/Kash Bolin home
15    and is part of an active investigation at this time.
16              The Kerrville branch of this Therapeutic Family
17    branch history was closed August 18, 2017 after two child
18    fatalities.  Both of those fatalities were in the Tammy and
19    Dale Bolin home, which serves the primary medical needs
20    children.  The first occurred on February 13, 2015.  The 5-
21    year-old was found unresponsive, air lifted to the hospital,
22    and died from cardiac arrest.  They determined that it wouldn't
23    be practical to expect the caregivers to identify sepsis as an
24    underlying issue.
25              Second fatality was in December 2016 on Christmas Eve
```

1    due to the child passing, again from sepsis and respiratory

2    distress.  The same child actually just had a leg fracture on

3    the 20th of that month of the same year at the Bolin home,

4    allegedly due to brittle bones.

5            During the five-year review period, the Bolin home

6    has had seven investigations with multiple allegations of

7    negligent supervision and medical -- lack of medical -- medical

8    negligence, not a lack of but a finding of medical negligence

9    or at least allegations of.

10           Currently, there are three children in the home that

11   require 24-hour nurses.  The most recent inspection, though,

12   did not have any concerns from July 24, 2020.  The

13   investigation from July 24, 2020 indicates that Tammy Bolin

14   will have confirmed dispositions of right to believe for

15   negligent supervision.

16           This case is not currently closed in IMPACT.  After

17   review and investigation with the Tammy Bolin home, there are

18   some concerns with this operation from the Monitors.  Foster

19   parents have been named in seven residential child and --

20   childcare investigations, two AFC investigations, and one APS

21   investigation.

22           All investigations bring about questions related to

23   the care for the children that are medically fragile along with

24   fraudulent documentation at time of caring for children in

25   their foster home.  These inconsistencies are related to

```
 1    residency caregiver roles, presence at the home with false

 2    documentation that she is caring for children in her step-son's

 3    home while also caring for children in her home.

 4              So, that's what we know about family -- Therapeutic

 5    Family Life, and this is a - T.M.'s death occurred under the

 6    auspices of that CPA with the multiple brain bleeds, blunt

 7    force trauma to the head from an undetermined source.

 8              So, that question is this.  Does that foster home

 9    still have a license?  HHSC?  Commissioner Young?

10              MR. BRISSENDEN:  Judge, let us check on that, and get

11    you a quick answer.

12              THE COURT:  I thought somebody was just checking on

13    that.  That's what we took a break for.

14              MR. BRISSENDEN:  Okay.  Ms. Estevilla has the answer,

15    Judge.

16              THE COURT:  How hard a question could this be?

17              MS. ESTEVILLA:  Your Honor, yes -- yes, the home is

18    still open.

19              THE COURT:  Pardon?

20              MS. ESTEVILLA:  The home is still open.

21              THE COURT:  The home is still open.  And how many --

22    how many PMC children are there?

23              COMMISSIONER MASTERS:  Your Honor, if I -- oh, I'm

24    sorry.  Your Honor, if I may, so I need to correct my

25    statement.  So, Mr. and Mrs., that home is still open.  There
```

1    are two court-ordered children there that we are not able to

2    remove.  The home that has been closed is the son, which is

3    where the incident happened with the child.

4              THE COURT:  Is this the same home, the Bolin home?

5              COMMISSIONER MASTERS:  This is there -- yeah, this is

6    their son's home, yes, that was closed where the incident

7    happened to the child, and there are two children with Mr. and

8    Mrs. that are court-ordered to be there that we cannot remove.

9              THE COURT:  Guess what -- guess what, Commissioner?

10   Federal courts take precedence over state orders.  Those

11   children need to be removed and placed in a safe placement.

12   Enough is enough.

13             COMMISSIONER MASTERS:  Thank you.

14             THE COURT:  And you need to review whether you put

15   any more PMC children there ever.  Ms. Lowry, do you have any

16   comments on this?

17             MS. LOWRY:  Thank you, Your Honor.  I'm frankly quite

18   stunned by some of what I'm hearing today.

19             THE COURT:  Well, I'm sure there's more to come.

20             MS. FORE:  Your Honor, if I could, we have -- DFPS

21   has some answers to some of the questions you asked earlier.

22             THE COURT:  Thank you.  Go ahead.

23             MS. FORE:  So, I've got Erica Banuelos who can talk

24   about I.R.'s nurses.  Ms. Banuelos?

25             MS. BANUELOS:  Good morning.  Do I need to be sworn

1    in again?

2            THE COURT:  No.

3            MS. BANUELOS:  Okay.  So, we did -- in working with

4    grandma and mom, we did find out that the nursing staff were

5    not coming in 24 hours, so we worked with both of them to get a

6    new agency to come in, and so a new agency started working with

7    a family named Aviana, and this was during the pandemic when El

8    Paso was at the highest, and so Aviana was having a hard time

9    as well finding enough nurses to come in around the clock.

10           Grandma and mom were trained to meet the child's

11   medical needs as well before the child was returned to them, to

12   their care.  That was one of the conditions, and they had met

13   that condition.  And so, what we offered to the family was we

14   offered to put in additional services to help the family

15   however, because the child has special needs and the mom and

16   grandma felt like having more people in the home was putting

17   the child at risk to get COVID, they did not want any more --

18   anybody else in the home.  So the -- we did do some follow-ups

19   with both.  We were trying to support mom and grandma and were

20   working with the nursing agency as well.

21           THE COURT:  So who's the nursing -- tell me what --

22   are you telling me that the -- I'm sorry.  I was texting about

23   another case I've got.  Are you telling me that the nursing

24   people wanted to go, but the people didn't -- but the home did

25   not want them there?

```
1              MS. BANUELOS:  No, ma'am.  The second nursing -- we

2    did get the family to switch over once, and they have a new

3    parking -- a new nursing program called Aviana.  A-v-i-a-n-a, I

4    believe.  And they were also -- they started having a difficult

5    time having nurse coverage 24 as well, because they didn't have

6    enough nurses to come in because of -- my understanding is

7    because of COVID.

8              And so, we then offered grandma and mom additional

9    support through other medical services that they just felt like

10   there was too many people coming into the home, and this child

11   was special needs and they were in the height of the pandemic

12   in El Paso.  And they didn't want to expose the baby to any

13   more other individuals.  And --

14             THE COURT:  So they went without nursing care and the

15   child died?

16             MS. BANUELOS:  I'm sorry?

17             THE COURT:  So they went without nursing care and the

18   child died?

19             MS. BANUELOS:  No, they did have nursing care.  It

20   wasn't around the clock, but both mom and grandma were also

21   trained to meet the child's medical needs, that that was part

22   of the --

23             THE COURT:  But the medical -- were they trained?

24   Were they nurses?  Were they nurses?

25             MS. BANUELOS:  They were not nurses, Your Honor.
```

1          THE COURT:  Well, I understood the placement plan was

2    that there were supposed to be 24-hour nurses.

3          MS. BANUELOS:  That is correct.

4          THE COURT:  And that didn't happen.

5          MS. BANUELOS:  It did not at some point.

6          THE COURT:  Oh, well, it was before the child died.

7          MS. FORE:  Your Honor, unless you have any additional

8    questions regarding I.R., I also have Sharon Baughman, who's

9    available to talk about A.C.

10          THE COURT:  K.C.?

11          MS. FORE:  A.C.  A as in apple, C as in Cat.

12          THE COURT:  Okay.  Before I forget it, tell me why it

13   is that DFPS recommended the closing, what, 22 homes and HHSC

14   only recommended five of which three were done?  Tell me.  Were

15   those -- any of those overlap or what's going on there?  HSSC

16   what --

17          WOMAN:  From what I understand, Commissioner --

18   (indiscernible) --

19          THE COURT:  HSSC -- let me just ask Commissioner

20   Young why those homes were not closed.

21          COMMISSIONER YOUNG:  Your Honor, we've gotten a list

22   from Commissioner Masters and we're doing a side-by-side check

23   right now.

24          THE COURT:  Marshal?

25          COMMISSIONER YOUNG:  And I --

```
 1              THE COURT:  I'm continuing that case until December.
 2   There's not enough vaccinated people and I can't do --
 3   interrupt -- stop this Zoom to do another Zoom.
 4              MR. DELOSSANTOS:  Yes, Your Honor.
 5              THE COURT:  Too many people logging in and out.
 6              MR. DELOSSANTOS:  Yes, Your Honor.  Thank you.
 7              THE COURT:  Thank you very much for doing that, I'm
 8   sorry.
 9              MR. DELOSSANTOS:  Yes, Your Honor.  Your Honor, if we
10   may, we're going to move -- quickly move them back out, since
11   they --
12              THE COURT:  Any way you want to.  Oh wait a minute.
13   Is he vaccinated?
14              MR. DELOSSANTOS:  The inmate?
15              THE COURT:  Yeah.
16              MR. DELOSSANTOS:  I'm not sure, Your Honor.
17              THE COURT:  I don't want him in here with all these
18   other people if he's not vaccinated.
19              MR. DELOSSANTOS:  We'll wait until a break is taken,
20   then, Your Honor.
21              THE COURT:  Okay, thank you.
22              MR. DELOSSANTOS:  Yes, Your Honor.
23              THE COURT:  Sorry.  Side issue.  You want to get your
24   masks, just in case?  You got 'em.  Ms. Purifoy, will you get
25   mine?  From --
```

```
1                MS. PURIFOY:  Yes.

2                THE COURT:  Thank you.

3                MS. FOWLER:  Judge, do you want us to move into the -

4      -?

5                THE COURT:  I will, but not now.  I think the issue's

6      taken care of.  Okay.  Okay.  Now tell me, Commissioner, why

7      DFPS -- why you didn't close any of the homes DFPS recommended,

8      the 22 homes?  Or if so, were -- or the three of the homes that

9      you closed part of that list?

10               COMMISSIONER YOUNG:  Your Honor, we've gotten a list

11     from Commissioner Masters and we're doing a check now as we

12     speak.  But I do believe that this raises an important point,

13     which is that in our communications, we will look at these on a

14     monthly or more regular basis and continue to communicate with

15     the Monitors on this issue.  I do think it raises a gap and I

16     appreciate the -- that you all are able to point this out.

17               THE COURT:  Okay.  So how do you think you -- this --

18     how do you propose to resolve this kind of issue?  Do you get -

19     - I'm just going to ask you, do you get lobbied to not close

20     the houses or places that -- I don't want to know any

21     particulars, I just want to know.  Do you get lobbied to not

22     make these closures that another department recommends?

23               COMMISSIONER YOUNG:  No, Your Honor.  No, Your Honor.

24               THE COURT:  So you're free from that, and this ought

25     to be an independent decision.
```

1          COMMISSIONER YOUNG:  Yes, Your Honor.

2          THE COURT:  Okay.  So we still don't know if that --

3   the home has lost its license?  We know that (indiscernible) so

4   where T.M. died, there's still -- that was that Bowles home?

5   And that there's still PMC children there, right?

6          COMMISSIONER MASTERS:  That is correct, Your Honor.

7          THE COURT:  Could you get another place for --

8   placement for them in that (indiscernible) school time?

9          COMMISSIONER MASTERS:  That is the -- those are the

10  children, that is my understanding, are court ordered to be

11  there.  And so, I just -- I am running this (indiscernible) to

12  make sure what I am telling you is accurate.  And what --

13         THE COURT:  Okay, well you got -- you just got

14  another court order.

15         COMMISSIONER MASTERS:  Yes.

16         THE COURT:  Lawyers, anybody -- does anybody object

17  to that?  Okay.

18         MS. FORE:  Your Honor?

19         THE COURT:  Yeah.

20         MS. FORE:  I certainly don't object.  My only concern

21  is I want to look at and do an analysis of what's --

22         THE COURT:  The needs of the child --

23         MS. FORE:  -- allowed -- I'm sorry?

24         THE COURT:  The needs of those children?  Go ahead,

25  I'm sorry.

1      MS. FORE:  Yeah, so I would just want a little time

2  to look into the issue, just from a legal standpoint.  But

3  because I just don't have an answer to that right now.

4      THE COURT:  Well, this is -- you know, this is a home

5  that also involved an 11-year-old with autism and intellectual

6  disability, limited verbal ability.  The foster father and a

7  nurse confirmed the child had fallen to the ground.  The nurse

8  assessed him and didn't believe he needed to see a doctor, but

9  the very next day, the foster parents realized he was in pain.

10      And they confirmed after taking him to a doctor that

11  he had broken his arm.  The same child in October broke his

12  leg.  And the RCCI investigator observed several

13  (indiscernible) bruises when she saw the child.  I know that

14  the doctor said that a history of easily broken bones, whatever

15  that means, and easily bruising.

16      However, this condition was unknown.  And the child

17  was a medical mystery.  You know, those are red flags.  And

18  RCCI again ruled out abuse and neglect for these broken bones

19  of the mystery illness.  These are all kinds of red flags, so I

20  want those children out.

21      Then A.B.  There's no reason, by the way, for the

22  attorney representing DFPS that the children can be kept --

23  ought to be able to be kept in the same area, if there's school

24  --

25      MS. FORE:  Your Honor --

```
1              THE COURT:  -- and medical needs that are being taken

2    care of.  Yes ma'am?

3              MS. FORE:  I'm sorry.  I -- you had just asked if

4    anyone objected.  And so, I'm going to -- although I completely

5    understand your position, I am going to object just on the

6    grounds that at this moment I don't know enough about who

7    ordered what.  And it's -- I just feel a little bit like I lack

8    the knowledge at this point.  So I'm going to --

9              THE COURT:  See, this is what stuns me.

10             MS. FORE:  I'm going to object to this

11   (indiscernible) that --

12             THE COURT:  This has been in the Report.  You all

13   have had this Report.  You've known about these child

14   fatalities.  And why this should come as a surprise to anybody

15   about getting those children out is beyond me.  I will tell you

16   right now that I find that those children are in an unsafe

17   placement.

18             Now, this moment and either do something about it by

19   the end of the day or we'll have another contempt hearing.  And

20   I have no problem convening a hearing tomorrow.  That is an

21   unsafe placement.  And certainly not in conformity with the

22   remedial orders of the Court.

23             Now whether I have the authority to remove those

24   children -- order them removed, I don't know, but I can tell

25   you that you're going to be in contempt for unsafe placements.
```

1    So you take your pick.

2           COMMISSIONER MASTERS:  And Your Honor, I did just

3    verify with the regional director, who has been closely

4    following this home, and she is confirming that there are three

5    kids that are court ordered to be there.  And so, we will

6    follow up with the Attorney General's Office and that Court

7    immediately.

8           THE COURT:  Thank you.  Well, I don't think you need

9    to follow up in any Court but this one, actually.

10          MS. LOWRY:  Your Honor (indiscernible) --

11          COMMISSIONER MASTERS:  Yes ma'am.

12          THE COURT:  You just need to look at your case

13   records.

14          MS. LOWRY:  Your Honor, may I raise a point if we're

15   done with that case?  I have nothing to say about that case.

16          THE COURT:  Go ahead.

17          MS. LOWRY:  So Your Honor, looking at individual

18   cases is really critically important for understanding what is

19   happening to the children.  One of the things, though, that has

20   concerned us in this Report is the fact that there are such low

21   numbers of investigations and closing of homes with regard to

22   foster homes.

23          We don't know offhand how many foster homes there are

24   in the system. But when there are only 23, 24 and three or

25   five, that were closed, both through DFPS and through HHCC, we

 1   are concerned about what kind of investigations are going on to

 2   determine whether there are more homes.

 3          Given what we know that's going on in the group

 4   facilities, whether there are more homes that perhaps should be

 5   cited as well.

 6          THE COURT:  Well, I think we have to rely on the

 7   Monitors to check that out.  What do you think, Mr. Ryan and

 8   Ms. Fowler?  They're shaking their head yes.  So it looks like

 9   DFPS has this special investigator who was assigned to A.C.'s

10   runaway case.  So that was from the -- Page 381, I think.  Is

11   that right?

12          MS. FONVIELLE-BAUGHMAN:  Yes, that's correct.

13          THE COURT:  That was A.C.  So when was a special

14   investigator assigned?

15          MS. FONVIELLE-BAUGHMAN:  The special investigator was

16   assigned on May the 11th.

17          THE COURT:  So that was three days after the child

18   ran away?

19          MS. FONVIELLE-BAUGHMAN:  The child ran away on the

20   9th.  She left the caseworker's car and didn't want to return.

21   She apparently returned at some point according to the

22   documentation, and then subsequently ran away again.

23          THE COURT:  Right.  I have the second runaway.  The

24   first runaway in April.  The second one on May the 8th.

25          MS. FONVIELLE-BAUGHMAN:  The runaway documentation on

 1    the runaway page indicates that the 5/9 was the last documented

 2    runway.   The documentation, the narrative indicates that she

 3    returned home and then ran away again on the 10th.

 4            THE COURT:   That's not the documentation that the

 5    Monitors got, so that's an issue.   And so, Mr. Ryan, did you

 6    have something to say about T.M.?

 7            MR. RYAN:   Yes, Your Honor.   I just wanted to make

 8    sure that the record is clear in this case that the foster home

 9    where T.M. was being cared for was substantiated for abuse or

10    neglect.   It was an RTB.

11            That home has been closed.   That caregiver has

12    parents who are also foster parents.   There are children in

13    that home.   That home was not part of this case.   So I just

14    wanted to clarify that the home where this child is being cared

15    for is closed and the case that Commissioner Masters is talking

16    about, where children have been court ordered there are the

17    parents of this caregiver.

18            THE COURT:   Okay.   I vacate my order.   Counsel, you

19    were right to object and delay this.   Thank you.   However, to

20    save face, I do have -- still have concerns about that

21    placement and not to save face, I'm kidding.   But I have

22    concerns about that Therapeutic Family Life.   And apparently

23    you all do, too, which is why they're on heightened monitoring.

24            Now that's closed, but now one more question to close

25    that out on T.M.   Has that license been revoked for that

1    particular -- the -- it was the son of the other couple?

2    Commissioner Young?

3              COMMISSIONER YOUNG:  Just go ahead, Lana.

4              MS. ESTEVILLA:  Your Honor, yes,  That -- the home

5    where the fatalities were, yes.  That home -- that – the CPA

6    did close that home.

7              THE COURT:  Okay, I -- has the license been revoked?

8    Because this is what I understand from Mr. Carson, not from you

9    all, but that CPAs have a license, CPAs license the foster

10   homes.  And this was a license.  This was apparently a licensed

11   foster home.  So was that license revoked?

12             MS. ESTEVILLA:  The CPA took away the home's license.

13             THE COURT:  Okay.  That's what I want to know.  Thank

14   you.  Now the A.B. -- and this was in the Monitors' First

15   Report.  This is the three-year-old that was found unresponsive

16   on the floor, bleeding from the ear, injuries suspicious of

17   physical abuse.

18             The Statewide Intake had received several calls in

19   the month leading up to A.B.'s death, alleging physical abuse

20   and safety concerns.  Those referrals sparked two

21   investigations for abuse and neglect, neither of which caused

22   DFPS to remove the child from the placement.

23             Calls to the Statewide Intake indicated that the

24   foster parent's partner was physically abusing the child.  So

25   does that caregiver still have a license?

```
 1              MS. TALBERT:  That was a non-licensed caregiver and
 2    CPA actually worked that investigation and they were both
 3    arrested, is my understanding.  And so, there's no children in
 4    that household, or we have not placed children into that
 5    relative's household.
 6              THE COURT:  How did they get in there, if they were -
 7    - how did a PMC child get in there, into a home that was
 8    unlicensed?
 9              MS. TALBERT:  So it's like a fictive kin or kinship
10    care.
11              THE COURT:  Well, there wasn't any relation to the
12    child, was there?
13              MS. TALBERT:  That was aunt.  An aunt.
14              THE COURT:  Okay.
15              MS. TALBERT:  And uncle, is what I believe.  Or it
16    was two males, yeah.  So maybe it was uncle --
17              MR. RYAN:  They were friends of the father, Your
18    Honor.
19              MS. TALBERT:  Friends of the father.  So fictive kin,
20    fictive relationship with the child.
21              THE COURT:  So those people are listed into the
22    databank for never having children placed by the Department
23    again, right?
24              MS. TALBERT:  Yeah, so they're actually listed as
25    like reason to believe for physical abuse into our system.
```

```
 1              THE COURT:  So C.G., who was I guess four years old -
 2   - sorry, 14 years old -- the one that hung herself in Williams
 3   House, who'd just been discharged from a psychiatric facility
 4   and required monitoring at all times, which obviously didn't
 5   happen.  She was alone -- left alone in the bathroom for 30
 6   minutes.  Williams House is closed, is that right?
 7              COMMISSIONER MASTERS:  That is my understanding, Your
 8   Honor.
 9              WOMAN:  Yes, yes, Your Honor.
10              THE COURT:  So Williams House was under what CPA?
11              MS. ESTEVILLA:  Your Honor, Williams House was a GRO.
12              THE COURT:  Okay.  And does that -- does Williams
13   House still have a license?
14              MS. ESTEVILLA:  No, Your Honor.
15              THE COURT:  That was revoked, then, correct?
16              MS. ESTEVILLA:  Your Honor, they voluntarily
17   relinquished their license before the revocation.
18              THE COURT:  Okay.  E.C., that drowned in the above-
19   ground pool, when her licensed foster parents inadvertently
20   left the ladder in place, three foster children in the home.  I
21   think this is the one I thought where the Judge says keep the
22   children there, where the State Judge said --
23              MS. ESTEVILLA:  Your Honor, that's my understanding,
24   yes.
25              THE COURT:  And so, this was -- was this a right to
```

1    believe, a negligent supervision?  Yes.  And was this

2    overturned by anybody?

3              COMMISSIONER MASTERS:  My understanding, there's

4    administrative review pending for the disallowance that we were

5    planning to put against the home.

6              THE COURT:  Okay.  And --

7              COMMISSIONER MASTERS:  The family is challenging our

8    RTB.

9              THE COURT:  Okay, but no further children are being

10   placed there?

11             COMMISSIONER MASTERS:  There are no children there.

12             THE COURT:  Well, they've got those other -- the

13   siblings of this -- of the deceased child, right?

14             COMMISSIONER MASTERS:  I believe those children were

15   adopted by them.

16             THE COURT:  Okay, they're still there?

17             COMMISSIONER MASTERS:  Yes, Your Honor.

18             THE COURT:  Okay.  So who -- will HHSC review this

19   appeal or who reviews it?

20             COMMISSIONER MASTERS:  So we will review their -- oh

21   goodness, I've lost my words, but their complaint about the

22   disallowance that we want to put on their home, we will review

23   that.  I believe -- I think this might be a 2INgaged home.  And

24   I think it's closed, but they may be able to speak to that.

25             MS. ESTEVILLA:  It's closed and HHSC would review if

 1   the agency appealed any of the deficiencies.  I'd have to look

 2   that up to see if they did, so HHSC would hold the review of

 3   the deficiencies related to the fatalities.

 4          MS. DWYER:  Your Honor, this is Shirley Dwyer with

 5   2INgage.  And the home is -- was (indiscernible).

 6          THE COURT:  Okay, go ahead.  Start over.  I was

 7   coughing.  Please.

 8          MS. DWYER:  Sure.  This is Shirley Dwyer with

 9   2INgage.  And the home was licensed through PCHAS, which is a

10   provider that we use.  It was not licensed through

11   (indiscernible).  I'm sorry Presbyterian Children's Home.

12          THE COURT:  And you use that home also?

13          MS. DWYER:  We did use that home, yes ma'am.

14          THE COURT:  Are you using it anymore?

15          MS. DWYER:  We are not.

16          THE COURT:  Okay.  So then A.F., a child fatality,

17   and an investigation's under pending, A.F. had an overdose of

18   acetaminophen on November 30th, 2020.

19          MS. TALBERT:  Yes.

20          THE COURT:  After meeting with A.F. on social media,

21   I mean, he picked her up in Amarillo and drove her to a hotel -

22   - apartment in Lubbock.  She had 39 placements in the more than

23   15 years she was in DFPS care.  A runaway status twice.  Six

24   shelters.  In November, the caregiver failed to notify the

25   police after she ultimately ran away, which is inconsistent

1   with the kinship agreement she signed.  And this was some kind

2   of a fictive kin placement.

3           MS. TALBERT:  Yes, that's correct.

4           THE COURT:  She also left A.F. in the care of her

5   other fictive kin, a 14 year old boy, the 17 year old and the

6   14 year old were left alone, which was in violation of her

7   agreement also.  So CPI initially issued a disposition or ruled

8   out as to all allocations.  And that has been reviewed, is that

9   right?

10          MS. TALBERT:  That is correct.

11          THE COURT:  Have you got a final determination?

12          MS. TALBERT:  Yes, two allegations regarding the

13  neglected supervision and the alleged sex trafficking, which

14  was on the 8/4 and 8/5 date.  We actually did an administrative

15  closure on those two actual allegations because that was prior

16  to her being a fictive kin or for us, approving that placement.

17          THE COURT:  So is there -- are there any

18  investigations with right to believe as to the negligent

19  supervision ongoing --?

20          MS. TALBERT:  No.

21          THE COURT:  -- leaving the children alone?  Why is

22  that?

23          MS. TALBERT:  No.

24          THE COURT:  Is that okay, to leave the children alone

25  like that?

```
 1              MS. TALBERT:  At the time that she -- well, there's -
 2    - at the time that we did the investigation on some of those
 3    pieces, she was not the fictive kin.  At the time she was
 4    fictive kin and left the I think 16 and 14 maybe or I wish I
 5    had the actual -- hold on.  Let me see if I have them.
 6              I think it was 16 and 14 home alone.  We did not find
 7    that as considered neglectful in our definition of
 8    unreasonable.  She does not have -- she has one of her -- a
 9    child that she's caring for that is not with DFPS or in our
10    care, TMC or PMC in her household.  (indiscernible) there's no
11    other placements.
12              THE COURT:  Does she have a license?
13              MS. TALBERT:  No.
14              THE COURT:  Isn't this where she took the kids to the
15    -- two girls to a hotel and sent two men over?  And you don't
16    think there's anything wrong with that?
17              MS. TALBERT:  So that was prior to her becoming a
18    fictive kin or any kind of placement or known --
19              THE COURT:  But she had that history.  For goodness'
20    sake, she had that history, and you let them place -- you let a
21    PMC child go to that home with a history of sex trafficking?
22    She took these -- she took that child, who hanged herself, and
23    another 14 year old to a hotel and sent two men over for the
24    night.  Does that not --
25              MS. TALBERT:  Well --
```

1        THE COURT:  -- is that not a red flag, for goodness'

2   sake?  If that's not a red flag, you all need to get other

3   jobs.

4        MS. TALBERT:  No, absolutely, it'd be a red flag.

5   There's a little bit more information around that, that -- of

6   how she did it and why she did it.  She didn't send the two men

7   to be with them at the hotel.  So there's a little bit more

8   information.  But absolutely, that would be a concern for us.

9   And we wouldn't have allowed it is that was what the

10  information was.

11       But the information we gathered was a little bit

12  different than that on her, was the (indiscernible) of getting

13  a hotel room for the two girls, that she asked the two men --

14  was cousins of hers to check on the females, not necessarily to

15  be around them --

16       THE COURT:  Oh please, please.

17       MS. TALBERT:  -- or to go into the hotel.

18       THE COURT:  Don't go any further than that.  For

19  goodness sake.  I can't believe we're having this conversation.

20  Okay.  We're just moving on.  That girl is dead and hanged

21  herself after you placed her there.  So moving on to D.H.

22  Fourteen year old boy was unresponsive when his foster mother

23  found him in their home upon a return from the restroom.

24       I don't know who returned from the restroom.  D.H.

25  resided in the home, cared for children with primary medical

 1    needs.  He was diagnosed with involuntary muscle movements,

 2    spastic quadruple cerebral palsy, all kinds of issues.  Was on

 3    a G -- NG tube, wheelchair and specialized bed.

 4            She found him unresponsive and managed to resuscitate

 5    him, but then he stopped breathing again.  Meanwhile, she had

 6    already called EMS.  I don't think the Monitors have any

 7    concern about your findings in this, do you, Ms. Fowler or Mr.

 8    Ryan?

 9            MS. FOWLER:  No.

10            THE COURT:  So --

11            MR. RYAN:  No, Your Honor.

12            THE COURT:  J.C.  Two year old -- one year old child

13    died while the caregiver was taking a nap.

14            MS. TALBERT:  We believe that to be physical abuse at

15    this time.

16            THE COURT:  Preliminary medical evidence is strongly

17    indicative of physical abuse.  Is this a licensed placement?

18            MS. TALBERT:  No, this is fictive kin relatives.

19            THE COURT:  And this was another TMC child that was

20    placed -- okay.  Do you have this person with a right to

21    believe?

22            MS. TALBERT:  The case is still pending.  It's still

23    open in our investigation stage, but yes, at this time, we do

24    know that it will be a reason to believe, we just don't have it

25    in our system at this point because we have not resolved the

1   case.

2           THE COURT:  Okay.  So there are no further children

3   placed with that caregiver?

4           MS. TALBERT:  They -- not that caregiver, no.

5           THE COURT:  Was there another caregiver in that home

6   that has children?

7           MS. TALBERT:  So, there's actually two people -- two

8   adult women in that household.  And at the time of this injury,

9   it was only one of them.  And so, they have their own children.

10  So the -- how was that -- the other person that was not

11  involved or we do not believe was involved with the abuse to

12  this child has those two children, but it's their own children,

13  nothing -- we don't have custody of those children.

14          THE COURT:  Okay.  So you have not placed any

15  children in that home with either one of those caregivers,

16  subsequent to this child dying?

17          MS. TALBERT:  That's correct.

18          THE COURT:  And I'm sorry, I misspoke --

19          MS. TALBERT:  Yes ma'am.

20          THE COURT:  -- that the 17 year old overdosed and did

21  not hang herself.  I'm thinking of another child that did.

22          MS. TALBERT:  That is correct.

23          THE COURT:  So J.R., 17 year old, unresponsive in the

24  home.  Well, he had ongoing special medical needs.  The

25  caregiver called EMS.  The autopsy's pending.  Do you have the

1    results from that autopsy?

2         COMMISSIONER MASTERS:  Your Honor, I believe this is

3    one -- this investigation remains open, but I think it is being

4    investigated by HHSC and not us.

5         THE COURT:  What do you know about this, HHSC, what's

6    the autopsy show?

7         MS. ESTEVILLA:  Your Honor, his investigation is

8    being investigated by provider investigation because this is an

9    HCS facility that the child was placed in.  And I don't have

10   that information, but we have somebody in that division that

11   can provide us that information, so we'll get that.

12        THE COURT:  Okay.  And C.S. was 21 months, I think.

13   I don't think there are any questions about your determination

14   on that from the Monitors.  E.T., five years old.  Had a --

15   came into care with an anoxic brain injury and a failure to

16   thrive.  I don't think that there's any question about your --

17   in the -- with the Monitors about the reason -- about the cause

18   of that death.  Am I correct, Monitors?

19        MR. RYAN:  That's correct, Your Honor.

20        THE COURT:  There's some deaths that were ruled out

21   for possible neglect.  A six -- that was a 16 year old male

22   that went to the waterpark with his girlfriend and her parents.

23   Another -- this is a PMC child.  Of course, these are all PMC

24   children.  Records indicate that the CPS worker approved the

25   trip to the waterpark, but would not have approved the evening

1    trip to the beach, which is what happened.

2              The child had alcohol.  This is the one with alcohol,

3    was found at autopsy.  You didn't find any reason to believe

4    that there was negligent supervision from your placement

5    because the child was with his girlfriend and the girlfriend's

6    parents?

7              MS. TALBERT:  Yes, that's correct.

8              THE COURT:  Did you get a call -- did anybody get a

9    call from his placement caregivers that he hadn't returned home

10   after dark?

11             MS. TALBERT:  It was actually immediately with law

12   enforcement.  The girlfriend's parents was at the ocean with

13   this child and they called law enforcement.  And so, it was an

14   immediate response of people involved with this child that we

15   couldn't find or child fatality.

16             THE COURT:  So the Monitors, because there's no

17   investigation, can't determine whether your call was correct or

18   not correct on that.  And a -- okay, then we've covered all of

19   the child fatalities.  Should we go to the Children Without

20   Placement?  CWOP?  Child?  Charlie, the CWOP?

21             CLERK:  (indiscernible).

22             THE COURT:  You did?  Here?  Thank you.  Ms. Lowry,

23   do you want to talk about the CWOP, Children Without Placement

24   regarding the maltreatment in care, unsafe placements for

25   children without a placement?  I just don't know why this is

1    happening, actually.  Can you explain why there are Children

2    Without Placements, DFPS, HHSC?

3                COMMISSIONER MASTERS:  Your Honor, this is

4    Commissioner Masters, and --

5                THE COURT:  Some are runaways.  I understand that.

6    But the ones that are not.

7                COMMISSIONER MASTERS:  Yes.  And taking into

8    consideration, you know, the comments that I know you may feel

9    about this.  I'm going to try to tread lightly.  So what I will

10   say is that Children Without Placement is when they are

11   sleeping in the office, we do not consider that a placement.

12   That is not where we want the children.  That only happens when

13   we cannot find a placement.

14               Either the provider refuses to take them or the child

15   refuses to go to the placement that we have found.  And so, I

16   know there is this issue of licensing for the SSCCs and an

17   unlicensed placement.  I'm not sure why we have interpreted a

18   law -- I mean, they take over for us, and so they should have

19   the same rights to do what we do when there's a child without a

20   placement.  And I feel like I'm not being clear.

21               THE COURT:  Well, they don't take over.  You are, but

22   what you're saying is, is they replaced DFPS caseworkers in

23   their catchment area.

24               COMMISSIONER MASTERS:  Correct.

25               THE COURT:  But they do not replace you.  These

```
 1    orders cover you and everywhere you place these children --

 2              COMMISSIONER MASTERS:  Correct.

 3              THE COURT:  -- whether they're with SSCCs and CPAs,

 4    or whether they're in your own facilities.

 5              COMMISSIONER MASTERS:  Yes.  Understood.  And so,

 6    when they have a child in the office, it is not their

 7    placement.  It is -- there is nowhere for that child to go.

 8              THE COURT:  Why is that?

 9              COMMISSIONER MASTERS:  And so, it isn't -- because

10    either the provider has refused to take the child because of

11    their history of aggression, sexual aggression or physical

12    aggression, or it is my --

13              THE COURT:  Are these people you have contracts with?

14              COMMISSIONER MASTERS:  Go ahead.

15              THE COURT:  Do you have contracts with these -- do

16    you have contracts with these --?

17              COMMISSIONER MASTERS:  Yes ma'am.

18              THE COURT:  -- CPAs for placements?

19              COMMISSIONER MASTERS:  Yes.

20              THE COURT:  Do they get to --?

21              COMMISSIONER MASTERS:  Yes.

22              THE COURT:  Do they get to deny placements in your

23    contracts?

24              COMMISSIONER MASTERS:  The only -- yes, they do not

25    have the same -- no eject, no reject clause that the SSC's
```

1    have.

2              THE COURT:  Okay.

3              COMMISSIONER MASTERS:  And they can -- no, we have

4    the beds, Your Honor.  We just don't have -- we all -- we just

5    don't always get the providers to say yes, we will take the kid

6    because of the history.  And the child can refuse the

7    placement, which is something new for me coming from Kansas.

8              But the child has a right to say, no, I won't take

9    this placement you have found for me.  Or they run from the

10   placement.  I have worked CWOP myself to try to understand from

11   the kids.  And some of them that it upsets them because they're

12   like I'm being judged for my history and that's not me anymore.

13             But the provider won't take that risk on me because

14   of everything that's been disclosed to them.  And I've had

15   other kiddos tell me, I run because I can.  And I like to be in

16   CWOP because I like the staff.  I like the freedom.  There's

17   less structure that we cannot force them to go to school.  We

18   can't force them to sleep or eat at a certain time.

19             THE COURT:  Well --

20             COMMISSIONER MASTERS:  And they can hang out with

21   their friends.

22             THE COURT:  But you do have children that are CWOP

23   that are with their caseworkers from DFPS in DFPS offices

24   overnight that have overdosed with open medication.  What page

25   does that start on, Ms. Fowler, so I can quote that correctly?

 1   Of course you've got the unlicensed GROs, the SSCCs are placing

 2   them in.  Mr. Carson gets it -- the -- chastised for that as

 3   well.  Family Tapestry and Whataburger is just beyond the

 4   further discussion.

 5           MS. FOWLER:  Judge, the deficient investigation would

 6   start on Page 16.

 7           MS. LOWRY:  Your Honor, I think the CWOP discussion

 8   is in a document.

 9           THE COURT:  Yes, it is a 40-some-page document.  57

10   pages filed by the Monitors earlier.

11           MS. LOWRY:  Yes.

12           THE COURT:  Here's, on Page 16, a 15 year old youth

13   without placement who was under DFPS direct supervision, a

14   facility uses a temporary location, access and adjusted

15   prescription medications.

16           Six of one and 20 of another pill.  The reporters

17   state the medication was locked up in a medication box, which

18   RCCI investigator determined was locked in the kitchen on top

19   of the refrigerator.  Somehow, the child got the key allegedly

20   and the staff were absent from the kitchen.

21           One staff member was in the restroom, another was in

22   a different room nearby.  A lack of supervision by the DFPS

23   staff members assigned to supervise the child of an

24   investigative record document achieved was able to remove

25   medications and adjust the pills.

1           The Monitors really found that an allegation of

2    neglectful supervision should've been sustained, substantiated,

3    even though RCCI ruled out any findings of neglect.  So that is

4    one finding that the Monitors have challenged.  And unless

5    there's further information, I certainly agree with that.

6           COMMISSIONER MASTERS:  Well, that's baffling and

7    concerning to me as well, Your Honor.  I don't have a -- there

8    is no good response to that.

9           THE COURT:  In another one, the DFPS staff reported

10   that a youth aged 15 without a placement disclosed, she

11   consumed 15 pills.  At the time of that incident, she was also

12   supervised by two caseworkers at a DFPS office because a

13   placement couldn't be located for her.

14          She took the medication from a caseworker's work

15   station, transported to the hospital, where it looked like her

16   blood levels were normal.  And she did not have any reported

17   drugs in her.  And the medical staff advised that the youth's

18   statements were not consistent with the allegations.

19          But the investigator did not sufficiently question

20   the youth and the DFPS staff responsible for supervising the

21   youth.  But one of the most troubling aspects of the

22   investigation, is the record showed that the staff responsible

23   was not aware of the youth's extensive history of suicidal

24   ideation.

25          So that's another one, a finding that the Monitors

```
 1    disagreed with.  And if those are the true facts, then I would
 2    disagree as well.  And we've discussed at length I think the
 3    SSCC's placements of children in unlicensed facilities.
 4            MR. DIXON:  Judge, Stephen Dixon on behalf of
 5    Plaintiff Children.  I'd like to make a comment on the Children
 6    Without Placements and the SSCCs.  I think in yesterday's
 7    hearing we heard from Mrs. Letts, who's over community based
 8    care.  I'd have to call it foster care redesign, because I've
 9    been following the case for so many years.
10            She admits that the Defendant did not take
11    responsibility for the PMC children when the SSCCs failed.  And
12    there's a fundamental misunderstanding of the role of DFPS we
13    see here.  The Defendants cannot delegate the ultimate
14    responsibility for these children.
15            A technical assistance letter is not enough when
16    there's essentially a homeless child and progressive
17    intervention plans, which they talk about that is going to be
18    put in place are not enough when kids are not -- without
19    placement.
20            And so, there's a fundamental understanding.  They
21    cannot start working on plans and send letters when there is
22    essentially a homeless child.  They -- that is putting too much
23    on the SSCCs.  DFPS is ultimately responsible, and that's what
24    we see as the fundamental issue that keeps on coming up here
25    that is preventing this from getting solved.
```

1              MS. LOWRY:  Your Honor, if I might?  I do think that

2     there is -- there are really two issues here.  One has to do

3     with the SSCCs and the other has to do with the regular child

4     welfare agencies.  And what I think would be important to know

5     is what we thought is happening with regard to the SSCCs.

6              The SSCCs, as we understand them, take responsibility

7     for a catchment.  I don't know other than that, there is a

8     process in deciding to license a particular SSCC, to

9     determining whether the SSCC has familiarity with an expertise

10    in dealing with a range of children who need placement in the

11    catchment area.

12             It is possible to know what the needs are of the

13    children just in extremely (indiscernible) terms.  Then a

14    particular catchment area by looking at the children for

15    example who come from the catchment area you know, and you can

16    determine whether how many teenagers there are, how many babies

17    there are, how many children have mental health problems, need

18    supportive services, that all can be determined roughly by what

19    I think it might be important to look at, is what kind of

20    process is involved when the state decides to license the HSSCs

21    because the SSCs are the low reject, no reject policy.

22             They are responsible for the kids in the catchment.

23    And if they are programs that have never developed for -- they

24    (indiscernible) for example for teenagers.  You know, a lot of

25    these kids, as I'm sure the Court is aware, are kids who have

 1    been knocking around, basically, in the placement system for

 2    quite some time.

 3              THE COURT:  Well, like the one who overdosed.  39

 4    placements in like, 15 years or something.  Ms. Fowler and Mr.

 5    Ryan, is this something that you can review with HHSC or

 6    whoever gives the -- whoever's in the contracting department to

 7    see if these SSCCs who want the contracts understand the

 8    historic needs of that catchment?  Have you done that?

 9              MR. RYAN:  Yes, Your Honor.

10              THE COURT:  They've done that already?

11              MS. FOWLER:  No, we've not --

12              THE COURT:  You've not done that, but you can do

13    that?

14              MS. FOWLER:  Sure.

15              THE COURT:  Yeah, do you think Commissioner Young and

16    Commissioner Masters, this might be a good idea?

17              COMMISSIONER MASTERS:  Yes, Your Honor.  And just to

18    let you know --

19              THE COURT:  And Ms. Rodriguez -- Ms. Rodriguez with

20    the Family Tapestry SSCC seemed so surprised with the type of

21    children that would be involved.  These are children that have

22    been abused and neglected and gone from foster care placement

23    to foster care placement.  I cannot understand why they would

24    even enter into a contract without knowing the full range of

25    children that they would be responsible for with a no reject

```
 1   and no eject contract, which is one of the --

 2              MR. RYAN:  But this --

 3              MS. FORE:  Your Honor --

 4              THE COURT:  -- problems with Family Tapestry.

 5              MS. FORE:  Your Honor, I just wanted to -- I

 6   certainly don't want to make a technical objection to Counsel

 7   testifying, but there were some statements between Mr. Dixon

 8   and Ms. Lowry that I do not think were accurate.

 9              And the one that jumps out at me is I do not recall

10   Ms. Letts ever saying that the oversight of the SSCCs does not

11   fall on DFPS.  So that's just one thing that jumps out at me.

12              THE COURT:  You know, this was the way I was taking

13   that.  I just thought it was a good idea to make sure that

14   there is a reviewing process.  I imagine there is, and I can't

15   imagine these people signing contracts without knowing what

16   they're getting into other than looking at an opportunity.

17              I know that -- I know from what exactly what happened

18   with Mr. Carson, because before ACH stepped in, there was a

19   foster care redesign contract that was just abandoned because

20   this -- oh, this is -- there's too many kids with problems.  We

21   can't handle it.

22              And they were putting them all in RTCs.  You know, I

23   don't know if you know the historic -- the history behind Mr.

24   Carson's SSCC, but that's it.  I mean, they've -- they didn't

25   know where to put them, so they stuffed them all in residential
```

 1    treatment centers.  Children with base level care.

 2              And then, they just disappeared one day.  And Mr.

 3    Carson's operation, ACH stepped in knowing exactly what they

 4    were stepping into, I might add.  And the very first year, I

 5    think in an incredible monumental effort to meet the needs of

 6    these children, this nonprofit went in the hole.

 7              I can't remember if it was $6 and $9 million in the

 8    first year, because of the -- of what it took to provide a safe

 9    placement for these children.  Mr. Carson, am I stating this

10    incorrectly?

11              MR. CARSON:  You're stating it correctly, Your Honor,

12    it was 6 million over three years.  And I've shared some

13    information of our unlicensed placement history with the

14    Department.  I think it's a pretty compelling graph to show how

15    we struggled to build the capacity we needed for the first two

16    years.

17              We had essentially solved the capacity problem for

18    about four years, where we had almost no use of the rental

19    house.  And then it --

20              THE COURT:  What --

21              MR. CARSON:  I've got a chart that's pretty

22    compelling.  I don't know if I can share my screen or if the

23    Department wants to share that, but --

24              THE COURT:  Well, what you can do is send it --

25              MR. CARSON:  -- it's a problem that can be solved.

1    It just takes time.

2            THE COURT:  Send it to the Monitors, send it to DFPS.

3    You've got the Monitors' direct information now.  So I use you

4    as the example of somebody who knows exactly what they're

5    stepping into because it was a history before you got there.

6    And I commend you for not sticking those children into

7    residential treatment centers willy-nilly like the prior

8    placement was because they just didn't know what to do with

9    them.

10           And in fact, that's sort of historically with or

11   without an SSCC as if these children with basic needs were

12   being placed in RTCs all around the state because they didn't

13   have a place to put them.  And so, again, I'm not into

14   (indiscernible) issues.  I'm into safe placements.  That's as

15   clear as I can make it.  And whatever it takes to get safe

16   placements is what we're all going to do together and work

17   together.  So --

18           COMMISSIONER MASTERS:  Your Honor --

19           THE COURT:  -- Ms. (indiscernible), I will -- I'll

20   just sustain all your objections.  That's fine.  But my -- what

21   my point is, I want the Monitors to look at that and work with

22   DPS or whoever the contracting agency is to see what their plan

23   is and what their evaluation is.

24           So these Family Tapestries, I've forgot -- I've

25   already forgotten their -- Children's Shelter is their SSCC, so

1    that this doesn't happen again with new contracts and new

2    catchments.

3              MS. FOWLER:  I --

4              THE COURT:  And here we've got some new ones coming

5    online that are here today and I asked them to be here

6    yesterday and today to look at what's happening with these

7    other places.  So they can -- because they can prevent this

8    from happening in their placements.

9              And they can work carefully with the Monitors, with

10   the two departments, to make sure this doesn't happen in their

11   placements.  And so, your -- both comments from Child Advocacy

12   and yours are well taken.

13             So I think we've covered -- let's continue on with

14   the CWOP.  Anything to -- that we need to be talking about on

15   the Children Without Placements?  I see where there's

16   legislation that's probably going to pass that's going to

17   prohibit you finally from placing children in DFPS offices and

18   certain unlicensed placements.  So I assume that you all have

19   kept track of that legislation?

20             COMMISSIONER MASTERS:  Yes, Your Honor, we are

21   watching that.

22             THE COURT:  Okay.

23             MR. CARSON:  Your Honor, would it be appropriate for

24   me to ask a question?

25             THE COURT:  Absolutely.

```
 1            MR. CARSON:  You made a very profound statement this
 2   morning when you said --
 3            THE COURT:  Just one?
 4            MR. CARSON:  -- when is enough?  You said when is
 5   enough enough?
 6            THE COURT:  Yes.
 7            MR. CARSON:  And that is the critical -- from the
 8   standpoint of me being able to solve this capacity problem, the
 9   answer to that question is essential.  Yeah, I know there's
10   some really good agencies that are on heightened monitoring
11   that are working very hard to get off of it.  They see it as an
12   opportunity to improve.
13            They see it as an opportunity to serve children
14   better.  They don't want to be on it.  And so, I just wonder if
15   it would be of interest to the Court to -- in -- you're asking
16   about who's been closed and what's been done, would it also be
17   of interest to the Court to know who's getting better because
18   of heightened monitoring?  Who is responding well?  Who is
19   improving?  Who is building stronger capacity to be able to
20   serve these kids better because --?
21            THE COURT:  That's what the Monitors are doing, I --
22            MR. CARSON:  I need to know the answers to those
23   questions.
24            THE COURT:  There's some 82, 90 something places on
25   heightened monitoring.  I've only been focused on the phase
```

1   ones, the most egregious.  Some are so egregious, though, how -

2   - that have been egregious that are not even on any kind of

3   heightened monitoring.  Devereux, for instance, I don't know if

4   you're familiar with what happened with Devereux, but we got

5   called or the Monitors got -- somebody called called that there

6   have been a police raid, one of many on Devereux.

7           And a 13 year old girl who'd been -- I don't know how

8   many times she'd been in placements, tens of times in

9   placements.  Since she was two and a half, she'd been brought

10  in and it turns out when she arrived in placement she had been

11  sexually abused by step brothers or somebody in the family to

12  the extent that her bladder was damaged and she had all kinds

13  of other needs.

14          And by the time she was 13, she had gone into, I

15  think it was Children's Hope that used to hold fights.  The

16  staff would hold fights with the children.  I don't know if you

17  know the history of some of these places.  That was the only

18  one that was revoked before the trial I had in 2014.

19          I think it was Children's Hope.  A great name.  They

20  were -- the staff would regularly hold fights between the

21  children and bet on them.  This little girl had started there

22  and learned how to fight, one of her skills at Children's Hope.

23          Then she'd gone to the Hector Garza place and learned

24  another skill that -- well, that wasn't self-cutting, was it,

25  Ms. Fowler?

 1          MS. FOWLER:  Cutting and she started participating in

 2   riots, apparently.

 3          THE COURT:  She started cutting, self-cutting she

 4   learned at Hector Garza, and participating in riots, she picked

 5   up at Hector Garza, also subsequently closed.  Ended up at

 6   Devereux, where the police were called in for I don't know how

 7   many times in just a one year period, multiple times.

 8          And the police told all the staff to leave, while

 9   they surrounded the home now.  So in the hour or two that those

10   children were left alone, this little girl had another sexual

11   encounter.  And she was arrested with several children for

12   participating in a riot.  And the Monitors visited her and this

13   is a place that had never -- that was not on heightened

14   monitoring.

15          Now mind you, the Devereux I think was one in

16   Pennsylvania.  It's a national company that had been closed

17   down in Pennsylvania because of -- what were the reasons in

18   that?

19          MS. FOWLER:  Abuse and neglect.

20          THE COURT:  Abuse and neglect.  And so, they're

21   probably here also somewhere on the Zooming.  And they took

22   issue with the Monitors who filed a separate report on

23   Devereux.  They took issue with the number of times the police

24   had been called out in a year.  It wasn't 13, it was eight or

25   something like that.

 1          And that home wasn't even on -- it wasn't even on

 2     heightened monitoring, and that was a residential treatment

 3     center, a residential treatment center.  So Deborah Fowler went

 4     to visit her in the jail cell and wanted to visit with her

 5     attorney to make sure that the attorney that was appointed to

 6     represent her, and that the Judge that she went before in the

 7     juvenile system knew about her history and her placement

 8     history and what she had gone through and how she had picked up

 9     these remarkable skills along the way in foster care.

10          She is now in a placement that the Monitors think is

11     safe.  She was not where she was.  She's in Florida, is that

12     right, Ms. Fowler?

13          MS. FOWLER:  Yes.

14          THE COURT:  And so, a -- I'm just concerned about

15     what progress is made on the 90 something facilities that are

16     under heightened monitoring.  I am horrified at the ones that

17     are not on any kind of monitoring at all.  Look at Treehouse,

18     that a district attorney had to raid and seize the children's

19     files with a search warrant before anything happened, before

20     the children were removed.

21          And Devereux, if you read the -- I don't know if you

22     have access to it because it's filed publicly.  But the

23     Devereux Report that the Monitors filed.  Subsequent to that,

24     because of that Report, all PMC children and I think all the

25     foster children had been removed out of that placement.

```
 1              But and this is just like, I said yesterday, which I

 2    hate to say, I don't like this analogy, but the whack-a-mole.

 3    I mean here's one, and then two more pop up that aren't even on

 4    anybody's radar.  So you can -- to prepare for this hearing,

 5    which I felt unprepared for because I had 27 binders of Reports

 6    to review and make notice -- take notice and make notes and try

 7    to collate in my 74-year-old, almost 75-year-old brain, it's

 8    just an impossible task.

 9              And I can't thank the Monitors enough.  And now that

10    the Governor has directed cooperation between HHSC and DFPS,

11    I'm so grateful for them and hope that he keeps these same

12    positions and keeps these same people in these positions long

13    enough for us to work something out because they keep coming

14    and going, you know?

15              I don't know how many Commissioners we've had since

16    this case started, you know, when the Department was

17    altogether, HHSC and DFPS were to combine.  I think seven or

18    eight.  Do you remember, Mr. Ryan?  Ms. Lowry?  I'm sorry

19    you've been in the longest with me.  It's been a long -- it's

20    been a number.  And --

21              MR. DIXON:  Half a dozen at least.

22              THE COURT:  Yes.  So while I appreciate -- yes, I

23    should be informed and we should all congratulate any of those

24    that are working hard to get off of heightened monitoring, my

25    concerns are just so much larger than that.  It's like -- it's
```

1    hard to know where to begin sometimes, Mr. Carson.

2          MR. DIXON:  Judge, Stephen Dixon on behalf of the

3    children.  You -- when you asked when is enough enough, it made

4    me flash back to the trial in 2014.  We had a big discussion of

5    that during the trial and there was testimony --

6          THE COURT:  We had an anonymous --

7          MR. DIXON:  -- when we discussed --

8          THE COURT:  We had an anonymous email from a

9    caseworker that said -- because Children's Hope had at least

10   one death.  And that caseworker wrote, why do we -- will we

11   never close anything unless there's a death and when is enough

12   enough?  And every time I see these, I think of that

13   caseworker's remark.  Go ahead, sir.

14         MR. DIXON:  Yes, the remark basically got down to if

15   there's no autopsy, there's no RTB.  And it just seems like you

16   know, seven years on we're still faced with the same question,

17   is that the rule?

18         THE COURT:  It's not and things are changing, Mr.

19   Dixon, have heart.  Both these --

20         MR. DIXON:  Yeah, I think --

21         THE COURT:  It took Mr. Ryan to explain to me, who's

22   been involved in many more monitoring and master situations

23   than I have, many more states around the country, to tell me

24   how slow it is to move a bureaucracy of this size one inch.

25   And instead, we've gone (indiscernible) --

1        MR. DIXON:  Well --

2        THE COURT:  So I want to tell you, in my opinion,

3   we've gone quite a ways.

4        MR. DIXON:  Yeah, and --

5        THE COURT:  With the help of Commissioner Masters and

6   Commissioner Young.

7        MR. DIXON:  Yes, but I think the Court and the

8   Monitors' efforts to get rid of the Downgrade Committee is a

9   big step forward.  I think that that work -- that effort by the

10  Monitors and the Court is really going to help us get to more

11  of these investigations properly.

12       THE COURT:  Okay Mr. Carson, does that answer my huge

13  rambling response to you?  Does that at least help you identify

14  my concerns?

15       MR. CARSON:  I appreciate it.  I -- you know, I have

16  -- this is my first time, so I don't know all the history.  I

17  think I just hope that we can tell the difference between if an

18  agency that has a bad staff member or a bad home, and an agency

19  that is completely doing a poor job all across the board.  So

20  thank you for that explanation.

21       THE COURT:  I think, you know, the history is -- and

22  I think you will find, Mr. Carson, that some of the concerns

23  you have with RTBs that you may not have had access, from what

24  I understand, to the full investigation and the facts.  It's

25  possible.  So you may be correct on some and incorrect on some

1    of your concerns.  But your concerns are valid no matter.  So

2    we will see, and the Monitors will be back to you personally on

3    every one of your concerns.

4              MR. CARSON:  Thank you.

5              THE COURT:  Oh I also wanted to know, there was a

6    closure.  I have to ask about this because there were five --

7    are we going to be able to cooperate now or coordinate between

8    the homes that DFPS recommended closure, 22, what HHSC

9    recommended closures of five, and three ended up closing and

10   one is -- there's a pending one.

11             It's not even funny, but this is the one with all the

12   dogs in it.  You know, with six dogs and multiple puppies.  And

13   that's a pending closure.  And apparently these people are

14   hoarders.  There was a garbage bag with papers on the kitchen

15   table and the garage was so filled up nobody could get into it

16   with stuff.

17             They were so disorganized they couldn't show the

18   investigator whether or not these dogs had been vaccinated.

19   They had no -- they couldn't disclose any records.  And I think

20   that's the one with -- there's a child also there with a Down

21   syndrome.  And a pretty large number of children that have

22   intensive supervision.

23             And apparently the agency has not spoken about the

24   near-drowning injury to the foster care other than checking on

25   her emotional state.  So this -- the Report is just filled with

```
1    these kind of things.  So and these -- the people with the dogs
2    I think were the ones -- I think with the -- left the 10-month-
3    old in a running car while going into the DFPS office of all
4    things.  Any feedback on that from licensure or right to
5    believes or closing, closures, HHSC?  Commissioner Young?
6              MS. ESTEVILLA:  Your Honor, if I may, this is Lana
7    Estevilla.  The situation with the near-drowning and the --
8    leaving the child in the car -- both of those investigations
9    were ruled out by DFPS.  HHSC did issue citations for
10   supervision.  That was left pending for further review of the
11   investigation and we will make it a priority to resolve that
12   one as quickly as possible.
13             THE COURT:  Okay, thank you.  And I'm sorry,
14   Treehouse was on heightened monitoring, but I think not phase
15   one.  Is that right, Ms. Fowler?
16             MS. FOWLER:  That's right.
17             THE COURT:  Yeah, the Treehouse was one of the 90
18   something that were on some form of heightened monitoring.  But
19   my -- I'm still concerned that -- I mean, if what I'm looking
20   at is phase one, what on earth -- and Treehouse is not on phase
21   one and Devereux wasn't on anything, then what is in between
22   there?  I have -- you know, it's actually hard to sleep
23   thinking about these children.
24             MS. LOWRY:  Your Honor --
25             THE COURT:  All right, anything else you wanted to
```

```
 1    raise about the Children Without Placements that I'm -- that I

 2    -- need to be raised at the hearing today?

 3              MS. LOWRY:  Yes, (indiscernible) Plaintiffs --

 4              THE COURT:  I can't hear you, Ms. Lowry.

 5              MS. LOWRY:  Oh I'm -- I'm not on mute, so maybe I

 6    just need to speak louder.  Sorry, Your Honor.

 7              THE COURT:  Thank you.

 8              MS. LOWRY:  I don't think (indiscernible) from

 9    Plaintiff's standpoint, Your Honor.

10              THE COURT:  Okay.  Let me see if there are any other

11    areas that we need to cover.

12              MS. LOWRY:  Your Honor, yesterday, you had asked us

13    what issues we wanted to press for contempt.

14              THE COURT:  Yes.

15              MS. LOWRY:  And we will – with your permission --

16              THE COURT:  They're all in contempt, but what do you

17    want to press for sanctions?

18              MS. LOWRY:  I'm sorry, Your Honor, yes, for

19    sanctions.  And Your Honor, what I think we would just like a

20    little bit of time to talk among ourselves and figure that out

21    so if we could have a few days to do that, that would be

22    helpful.  And we will get back to you by the beginning of next

23    week?

24              THE COURT:  All right.  And I'm not in any hurry to

25    hear those -- have that hearing on any sanctions, if any.  I am
```

1    more concerned about working through remedies with HHSC and

2    DFPS to see what obstacles can be removed or what they need to

3    do to bring full compliance into the remedial orders.  The

4    quicker we do that, the quicker this ends.

5              MS. LOWRY:  Your Honor, we understand that, and

6    that's very much in our minds as well.

7              THE COURT:  And -- all right.  Any questions from

8    anybody else that's online?  This is the time to ask.

9              MS. FORE:  Your Honor, this is Elizabeth Fore.  You

10   had asked us, DFPS to give you an update on the exceptional

11   items and where those stand with the legislature as of now.

12             THE COURT:  Yes.

13             MS. FORE:  I have David Kinsey, who's available to

14   give you an update on that, if you would like it?

15             THE COURT:  Thank you, I would.  Do you need to give

16   the oath, Ms. Purifoy?

17             MS. PURIFOY:  (indiscernible) --

18             THE COURT:  Pardon?

19             MS. PURIFOY:  He was sworn in.

20             THE COURT:  Okay, you were?  Okay, he was sworn

21   yesterday?  Thank you, sir, for coming back.  Go ahead.

22             MS. FORE:  I don't see them on camera yet.  Oh there

23   he is.

24             MR. KINSEY:  Hi.  Thank you.  David Kinsey, CFO and I

25   can just speak to the DFPS part of the exceptional item

```
 1    funding.  Of course, HHSC would have to speak to theirs.  So

 2    you are likely aware we're in Conference Committee right now,

 3    where they're making final decisions on the appropriations.

 4              We did have a request for $88.7 million in

 5    exceptional item funding for the lawsuit.  And the House fully

 6    funded that item, and the Senate funded $63 million of that

 7    item, and the rest of that's going to be negotiated in

 8    Conference Committee.

 9              THE COURT:  What about caseworkers?

10              MR. KINSEY:  So the caseworkers, the House fully

11    funded that.  And that's the -- a total of 312 staff.  And of

12    those, we have 192 caseworkers.  And the Senate funded half of

13    that.  So that will be part of the discussion at Conference

14    Committee.

15              THE COURT:  Okay.

16              MR. KINSEY:  And then, the other difference, there's

17    just one other difference I'll mention between the House and

18    Senate, and that's what you heard yesterday on the residential

19    child care investigation staff, the 58 positions --

20              THE COURT:  Yes.

21              MR. KINSEY:  -- the House fully funded those 58 and

22    the Senate funded 14, I believe, of those positions.  So --

23              THE COURT:  Well, maybe you --

24              MR. KINSEY:  -- those are the two differences between

25    the House and Senate.
```

```
 1            THE COURT:  -- can make portions of the Monitors'

 2   Report available to the -- to them.  Of course, they're

 3   publicly available anyway, if it would help your -- help in

 4   Conference Committee.

 5            MR. KINSEY:  Yes ma'am.  We can do that.

 6            THE COURT:  I don't mean to have anything to do with

 7   your legislative efforts, but the more you get from the

 8   legislation, the better the -- the quicker this is going to be

 9   resolved, it seems to me.  Now that you're on track to say,

10   okay, these are my goals, this is what we haven't done.

11            And speaking of that, the Monitors' Report reminded

12   me again this morning that RCCL staffing caseloads is not good.

13   And a lot of that -- I have not addressed it or said anything

14   about it because I think a lot of that has to do with COVID

15   over the last 12 months.  So we'll look at that again, when

16   they're completely able to go into these physical facilities a

17   little bit easier and do more work.  Is that right, Ms. Fowler?

18            MS. FOWLER:  Well, their caseloads during the time

19   that they weren't going into facilities were actually not bad.

20   It's --

21            THE COURT:  Yes, okay.  Well, and speaking of that,

22   Ms. Fowler reminds me that the caseloads during COVID were not

23   bad because you weren't going in there.  But now they're going

24   back up, that the visits are -- the caseload that is out of

25   range again, once you're going back in and starting these
```

```
 1   inspections.  So we need to keep an eye on that.

 2           And if you need to add some inspectors also, you

 3   might do that quickly for funding purposes.  Anything else you

 4   all need to confer with me about?

 5           MS. FORE:  Your Honor, two more things.

 6           THE COURT:  Ms. Fore, yes.

 7           MS. FORE:  We -- I'm sorry?

 8           THE COURT:  Ms. Fore, yes.

 9           MS. FORE:  Thank you.  We narrowed down the list of

10   exhibits that we want to admit in evidence.  And I talked with

11   Mr. Ryan about that last night.  And we're trying to figure out

12   which exhibits were actually referenced in the Monitors'

13   Report.  Once we make that determination, I'm wondering if we

14   could make a post-hearing submission to have those particular

15   exhibits entered in evidence.

16           THE COURT:  Can we not wait for the next hearing and

17   just submit them then?  I mean --

18           MS. FORE:  Your Honor, if that's your preference, I

19   think we could do that, certainly.

20           THE COURT:  Nothing bad is happening to you today, so

21   let's not push it.  And no use --

22           MS. FORE:  I appreciate that.

23           THE COURT:  No use throwing documents in at this

24   point.

25           MS. FORE:  Okay, I understand.  Thank you.  And then,
```

 1    honestly --

 2            THE COURT:  Besides it might confuse me.  And you

 3    don't want to do that.

 4            MS. FORE:  Lastly, I just wanted to let you know that

 5    we are -- DFPS is currently evaluating the second Monitors'

 6    Report.  I understand that pursuant to Federal Rule of Civil

 7    Procedure 53, we have 21 days.  So if we decide to file any

 8    objections, we would file those on or before May 25th.  But we

 9    haven't decided at this point whether we will.

10            THE COURT:  Okay.  I did ask almost every one of your

11    witnesses the trick question:  Do you disagree with any facts

12    reported?  So that's going to narrow your objections somewhat.

13    Second, you all did have, just for the record, you did have the

14    original draft to add your comments to, at least a week in

15    advance of the hearing.

16            And I know from my own point of view that was --

17    that's a very short time because it's hard to read this and try

18    to ingest it in that period of time, let alone the months they

19    have spent preparing this and checking and double checking.

20            And I can't tell you how this -- it may reflect in

21    the Report, but these people are the most careful people.  They

22    never make a conclusion without double or triple checking.  And

23    I hear them talk to their staff -- no, we're not going to say

24    that until we can verify it and do the following.

25            And they're just very, very careful.  And as I told

 1     Ms. Masters the last time, these people are an incredible

 2     resource.  If we could stop working against everything, then I

 3     think you could benefit from these resources.  You're paying

 4     them enough.  So why not use them for help?  That's just my

 5     thought.

 6            COMMISSIONER MASTERS:  Your Honor, if I can, I took

 7     you up on your offer and I am meeting with the Monitors

 8     tomorrow.

 9            THE COURT:  Wonderful.  Wonderful.  I hope

10     Commissioner for HHSC will do the same.  And I thank you all

11     very much for being at this hearing.  I'm trying to think of a

12     good sanction for Mr. Yetter.  I did let him go to his hearing

13     today, but don't you think, Ms. Lowry, we ought to -- he ought

14     to sanction himself somehow?

15            MS. LOWRY:  I do think that, Your Honor, definitely.

16            THE COURT:  Well, tell him to self-sanction.

17            MS. LOWRY:  Okay.

18            THE COURT:  And I -- thank you all again very much

19     for all your cooperation, for being here over this two days.

20     And I agree with the man who left his mute off.  Some of this

21     was boring for all of us, but very important.  So thank you all

22     very much.  You're excused.

23            COMMISSIONER MASTERS:  Thank you, Your Honor.

24         (Hearing adjourned at 12:38 p.m.)

25                        *  *  *  *  *

```
1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 24, 2021
```