Defendant DFPS, Exhibit A, 2:11-CV-00084



**TEXAS**
**Department of Family**
**and Protective Services**

# Children Without Placement

September 2021

# Table of Contents

Table of Contents ...............................................................................................................i

Executive Summary .........................................................................................................1

Background .......................................................................................................................4

Demographics, Characteristics and Treatment Needs ....................................................7

Factors Affecting Timely, Appropriate Placements .....................................................10

Current/Planned Activities ............................................................................................18

Additional Developments ..............................................................................................26

Conclusion .....................................................................................................................27

Children Without Placement – September 2021

# Executive Summary

All children and youth in the state's foster care system deserve access to safe, stable placements that meet their individual needs and support their permanency goals. Countless stakeholders within the Texas child welfare system—including state leadership and lawmakers, health and human services and other agencies, residential and acute care providers, faith-based community organizations, state and local courts and court-appointed professionals, and other child welfare advocates—have worked tirelessly toward this effort every day of the year. Yet, despite this enduring commitment, some youth[1] must receive temporary emergency care (referred to as "child without placement," or "CWOP") until a licensed, appropriate placement can be secured. As of September 7, 2021, 28,943 children and youth are in the Texas child welfare system; 161 (0.56%) are in CWOP, pending an appropriate placement.[2]

The provision of temporary emergency care to youth in CWOP—a "last resort," has been utilized under Department policy[3] to varying degrees for years. However, since August 2020, we have seen a marked increase in the number of youth in CWOP. As we have watched the numbers grow exponentially, we have come to realize that a number of factors have contributed to this increase, beginning with the unprecedented and ongoing COVID-19 pandemic, which coincided with both DFPS and HHSC increasing stricter regulation under the existing regulatory framework coupled with the implementation of increased oversight pursuant to the Court's Heightened Monitoring orders. Further, as noted by the Monitors, Texas has a shortage of providers for youth with higher acuity needs.[4] As the number of youth in CWOP has grown, so has their refusal to accept placement and/or to disrupt placement so they can be discharged with the hope of returning to CWOP, thereby causing the youth to cycle between placement and CWOP. As I have met with providers, judges, our caseworkers, and other stakeholders, it has become very clear that many of the youth are in our custody because of behavioral and mental health issues. Many have heard me say that the child welfare system is here to protect children from abusive and neglectful families; we are not equipped to protect families from their children or take over parenting when families have reached their limit with behaviors or trying to navigate the mental health system. To that end, I will be collaborating with HHSC to pursue refinements to the "front door" of the state's foster care system to ensure that children who are experiencing mental and behavioral

---

[1] Throughout this report, children and youth in CWOP are collectively termed "youth." Based on August 2021 CWOP data, 79% of CWOP spells were among youth age 13-17; 18% were 6-12 years old and 2% were 3-5 years old.

[2] *See* CWOP placement tracker, pp_26 as of 9/7/2021, DFPS Data Warehouse. Excludes children with no legal status or a legal status of adoption consummated, child emancipated, CS not obtained, FPS resp terminated, Other legal basis for Resp, poss conservatorship.

[3] *See* CPS Handbook §4152.1 "Plans for a Child or Youth When Placement Is Unavailable."

[4] "Higher acuity needs" refers to complex mental health needs that require a higher level of services, often including psychiatric services, and that may require inpatient hospitalization to stabilize.

challenges can access those needed services under the continued care and supervision of their families, while furthering the goal of keeping families together.

DFPS has asked every stakeholder to help with the abatement of CWOP, including our state court judges. We learned during a CWOP emergency docket recently held by one state judge that the youth's Guardian Ad Litem, CASA, parents, and even our caseworkers may be contributing to extending a youth's stay in CWOP and we are working with these stakeholders to address the issue. Also, rates continue to be a reason that providers cite for being unable to accept a youth for placement, and we have raised this issue with the Legislature and the Governor's office. Those discussions led the Governor to making it a priority during a special session and the Legislature providing an additional and unprecedented $90 million to support providers in enhancing capacity for youth with higher acuity needs. As is noted in the Monitor's report, providers have cited Heightened Monitoring as a reason for declining a placement so much that DFPS had no choice but to evaluate it and to determine whether there were modifications that could be made to address some of their fears while not taking anything away from the intent to ensure that youth are not placed in placements that present an unreasonable risk of serious harm. Hence, there are myriad factors contributing to the recent increase in the number of youth experiencing CWOP; DFPS raising providers' concerns with Heightened Monitoring is but one aspect and the only one the Department believed the Court could assist us with.

CWOP is the exception to the rule. There is nothing normal about it and it cannot continue in its current state. As we explore the reasons children are not being accepted for placement, we are constantly learning. Although we were not required to file a response, it is imperative that the Court know that DFPS is not "blaming" the CWOP crisis on the Court's Heightened Monitoring Orders. DFPS is every bit as concerned as the Court about this small but extremely important population of youth in our custody. For this reason, DFPS has willingly shared data and our efforts to address the crisis with the Court, directed our workers to provide the Monitors with information during the visits, and to answer their questions because we are in search of solutions to this crisis. DFPS also accepted the Court's direction to take advantage of the Monitors' experience and to discuss with them the challenges we face. Although the Monitors reminded us that this is not a CWOP lawsuit, we pursued a discussion regarding CWOP with them because it is impacting, and has the potential to further impact, gains we have made in demonstrating compliance, particularly with respect to the Remedial Orders pertaining to our caseworkers.

It is against this backdrop that DFPS is submitting this written response to show our efforts to comprehensively address the issues contributing to the present capacity crisis, with the long-term goal of generating and sustaining quality placements and placement capacity that meets the diverse needs of foster children and youth within their home communities. While the Monitors have noted DFPS' "collaborative" efforts of listening to concerns of its stakeholders, it is an undisputed fact that DFPS cannot do this alone. Our partnerships with stakeholders along the foster care continuum are essential, as is the constant leadership and support of the Governor's

Children Without Placement – September 2021

office and state lawmakers who have invested considerable resources and provided clear direction as we work together to solve this pressing issue.

We look forward to having an engaging conversation with the Court regarding the challenges CWOP presents for our youth and staff. I will leave no stone unturned in remedying this crisis.

***Commissioner Masters***

Children Without Placement – September 2021

# Background

When the Department of Family and Protective Services (DFPS) is named temporary or permanent managing conservator of a child or youth, Child Protective Services (CPS) staff become responsible for selecting a placement that is safe, supports the child's permanency plan, and best meets the child's needs. Whenever possible, CPS seeks placements with non-custodial parents, kin, and other significant connections. However, when such placements are not able to meet the child's needs, the alternative is regulated, licensed foster care placements. Although staff attempt to identify a placement that meets all of the child's needs and will be the last placement prior to the child achieving positive permanency, circumstances may give rise to the "last resort" of the child entering temporary emergency care, otherwise known as CWOP.

Under state law, the Texas Department of Family and Protective Services (DFPS) may provide temporary emergency care, if unable to find an appropriate placement.[5] As the managing conservator, DFPS must provide food, clothing and shelter for a DFPS youth in CWOP.[6] The care is provided through agreements with community partners in which the community partner provides lodging (e.g., a local recreational center or church) and DFPS staff ensure the lodging is safe and provide supervision, food, clothing, and access to educational and medical services.[7] If a community partner's property is not available, youth may receive care in a hotel or other community location. Pursuant to a recent change in state law, children and youth are no longer permitted to stay overnight in a DFPS office.[8]

As discussed further herein, DFPS is pursuing a number of activities to grow and sustain capacity in partnership with state leadership, the Texas Legislature, Texas Health and Human Services Commission (HHSC) and other state agencies, foster care providers, faith-based community organizations, child welfare advocates, judges, state and private psychiatric hospitals and many others. Concurrently, DFPS is focused on eliminating the use of DFPS offices. While DFPS is moving with all due haste to immediately relocate youth residing at CPS offices, doing so has

---

[5] *See* Tex. Fam. Code §264.107(g). A single source continuum contractor ("SSCC"), an entity contracted with DFPS to provide services to children and families within a designated geographic catchment area, is also authorized to provide temporary emergency care if unable to find an appropriate placement. *See also* Child Protective Services Handbook §§4152, 4152.1. Regional placement staff must continue searching for a placement that meets the needs of the child or youth until a placement is secured. During fiscal year 2021, DFPS supervised approximately 90% of youth in CWOP, while SSCCs supervised approximately 10%.

[6] *See* CPS Handbook §4152.24. *See also* Tex. Fam. Code §153.371 for rights and duties of DFPS as sole managing conservator, generally.

[7] DFPS utilizes Memoranda of Understanding that outline the respective responsibilities and expectations of the community partner and DFPS in supervising and caring for youth temporarily residing at the community partner's property.

[8] In June 2021, state law was amended to immediately prohibit overnight stays in DFPS offices. *See* Tex. S.B. 1896, 87th Leg., R.S. (2021). The CPS Handbook was likewise updated. *See* CPS Handbook §4152.1.

Children Without Placement – September 2021

taken longer than anticipated as we work through Memoranda of Understanding (MOUs) and residential leases that will provide suitable temporary housing. DFPS' initial efforts at relocating youth from offices have been met with setbacks. Through this process, DFPS has discovered that temporary housing in hotels is not optimal, given the limited space and behaviors of some youth which has resulted in property damage and/or frequent calls to law enforcement. Numerous hotels will no longer allow DFPS to provide temporary emergency care at their operations. DFPS has also considered leasing space from some of the very operations that have closed because of the stricter regulation discussed further herein. While not a favored option, these closed and empty operations have the appropriate infrastructure to temporarily house youth in CWOP.

As of September 9, 2021, 169 youth were in CWOP; 57 were in a hotel, 53 were in a community-based lodging, 23 were in a leased space, and 36 were in a DFPS office. As indicated in Figure 1, since August 2020, the number of children in CWOP has precipitously increased.

*Figure 1. Number of children without placement from September 2019 - August 2021*



Source: Internal DFPS CWOP tracker; SSCC CWOP self-reported data. Values represent unique children who experience a CWOP episode during the month.

The average length of time a youth remains in CWOP has likewise increased, from a low of 1.6 days in December 2019 to a high of 18.2 days in August 2021, a more than 1,000% increase. During fiscal year (FY) 2021, the average length of time a youth remained in CWOP was 11.2 days.

Children Without Placement – September 2021

Figure 2. *Average Stay in Days for Children Without Placement from September 2019 - August 2021*



Source: Internal DFPS CWOP tracker; SSCC CWOP self-reported data.

*Supervision Requirements; Reporting Abuse/Neglect and Serious Incidents*

Because Texas law requires supervision by a DFPS employee,[9] a youth in CWOP may be supervised by as many as 12 staff per day.[10] Youth in CWOP are supervised 24/7 by awake DFPS or SSCC staff.[11] To ensure safety, all youth must remain in close proximity to CPS or CPI staff and other trained adult caregivers at all times.[12] Normalcy, the youth's service/treatment plan and the youth's best interests should be considered when determining the type of supervision to be implemented.[13] There must be at least two caregivers at every location where a youth is being supervised (one must be a CPS or CPI staff member at the caseworker level or higher), and there must be at least one CPS or CPI staff member (caseworker or higher) for every three youth at a location.[14] All staff responsible for supervision of youth in CWOP must review the Form 2915 (used to document when a youth enters DFPS supervision), the youth's sexual history report (Attachment A) and the youth's medication log.[15] Staff must report all incidents of suspected abuse or neglect to Statewide Intake.[16] If a significant event or issue arises while supervising

---

[9] *Supra* note 5.

[10] In regions in which staff work a four-hour CWOP shift, 12 staff would be required to work during a 24-hour period. In regions in which staff work an eight-hour CWOP shift, six staff would be required to work during this period.

[11] *See* CPS Handbook §4152.24.

[12] *Id*.

[13] *Id*.

[14] *Id*.

[15] *See* CPS Handbook §4152.2.

[16] *See* Tex. Fam. Code §§261.101 and 261.109. Texas is a mandatory reporting state. If a person has cause to believe a child's physical or mental health or welfare has been adversely affected by abuse or neglect, that person must immediately report the suspected abuse/neglect. CPS and CPI

youth, staff must notify their supervisor immediately; all such incidents must be documented on the CWOP Serious Incident Report and immediately escalated to the regional director and director of field.[17]

# Demographics, Characteristics and Treatment Needs

Youth in CWOP tend to be older (13-17 years of age), have higher acuity needs, require a specialized or intense level of care, and are almost evenly distributed between males and females. Commonly, youth in CWOP have experienced prior psychiatric hospitalizations; a history of running away; self-harm, suicidal ideation, physical aggression/assault, sexual victimization and/or sexual aggression.

Figure 3 includes the prevalence of various placement types prior to youth entering CWOP. Almost 25% of youth in CWOP during August 2021 were discharged from a psychiatric hospital immediately before entering CWOP.

*Figure 3. Most Common Placements Prior to CWOP Stay, FY 2021 vs August 2021*



Source: Internal DFPS CWOP tracker; SSCC self-reported CWOP data

---

staff are considered "professionals" under this law; a professional's knowing failure to report suspected abuse or neglect is a Class A misdemeanor offense, or a state jail felony if the actor intended to conceal the abuse or neglect.

[17] *Supra* note 15. Pursuant to the Court-appointed Monitors' request on June 26, 2021, DFPS uploads serious incident reports to the Monitors' SharePoint on a monthly basis.

Children Without Placement – September 2021

As indicated in Figure 4, older youth also tend to experience longer stays without placement.

*Figure 4. CWOP Length of Stay by Age Group, FY 2021*



Between FY 2020 and FY 2021, almost half of youth in CWOP had a specialized or intense level of care. In August 2021, that percentage increased to 62%.

*Caseworker Turnover and CWOP*

The increasing prevalence of youth in CWOP is a contributing factor in the prevalence of caseworker turnover. Maintaining adequate numbers of conservatorship (CVS) caseworkers or even keeping pace with exits is becoming a challenge. Unabated, this staffing challenge may soon impact the Department's ability to remain within the caseworker guidelines in accordance with the Court's remedial orders concerning caseloads and caseworker training. Between February and July 2021, DFPS hired 319 CVS caseworkers. During the same time period, 309 CVS caseworkers terminated their employment. According to exit surveys CVS caseworkers submitted during 2021, 86% cited work-related stress as a reason for terminating their employment (up from 40% in 2020); 43% cited safety concerns (up from 23% in 2020) and 35% cited inadequate training (up from 14% in 2020). As of September 8, 2021, there were 236 CVS caseworker vacancies.

As the number of youth in CWOP has bourgeoned, so too has the toll on caseworkers and other staff supervising youth in these settings, in addition to performing their other job duties, as reflected in the caseworkers' responses to the Monitors' questions. Between September 2020 and July 2021, 6,270 staff worked an average of 29.4 hours per month supervising youth in CWOP. As the number of youth in CWOP increased, the number of staff providing supervision likewise increased, from 530 staff in September 2020 to more than 4,000 staff by June 2021. The average number of staff hours per employee has also substantially increased, from a low of 22.5 hours in December 2020 and January 2021 to a high of 35.7 hours in July 2021. Between September 2020

and July 2021, the cumulative number of staff hours worked for CWOP was approximately 714,083 hours—roughly equivalent to 343 full time staff working 40 hours per week for an entire year.

In addition to their assigned workloads and entrenched exhaustion, many caseworkers supervising youth in CWOP have been subjected to both verbal and physical assaults during their CWOP shifts. Although most youth in CWOP do not exhibit aggressive behaviors, some have perpetrated assaults that were so brutal, the caseworker required emergency medical care. Adding to this challenging landscape, caseworkers risk license revocation if an adverse event occurs during their CWOP shift and they are ultimately issued a reason to believe (RTB) finding for neglectful supervision.

During the 87th Texas Legislature (Regular Session, 2021), DFPS requested $83.1 million in general revenue (GR) funds ($88.7 million all funds (AF)) for the fiscal year (FY) 2022-23 biennium to support ongoing compliance with the Court's orders. The Legislature fully funded this request, which includes an appropriation for an additional 312 CVS staff, including 192 CVS caseworkers. Further, as noted in the Executive Summary, during the 87th Second Called Special Session of the Texas Legislature, Commissioner Masters requested and received an additional $90 million to support providers in enhancing capacity for youth with complex treatment needs. With the additional resources, providers are expected to have the needed resources to hire well-trained staff to address the needs of youth in CWOP, particularly youth with complex treatment needs. This will also assist in reducing the amount of overtime caseworkers must work on CWOP shifts.

In addition to the 87th Texas Legislature fully funding DFPS' appropriation requests, in April 2021, Commissioner Masters authorized a number of activities to provide immediate support to staff supervising youth without placement. These activities include:

- hiring 100 temporary staff for six months who have prior CPS (or related) experience to supervise youth in CWOP. To date, 33 temporary staff have been hired and trained.
- authorizing the immediate pay-down of overtime for staff who supervise youth in CWOP.
- directing staff from other DFPS program and support divisions to assist CPS in working CWOP shifts.
- prioritizing the hiring of staff for CPS CVS units deployed to high-needs areas of the state. Once training is completed, staff will supervise youth in CWOP as needed until circumstances allow them to carry a caseload.
- securing law enforcement presence when needed to assist in de-escalation and prevent physical attacks on staff or other youth.

Finally, CVS caseworkers supervising youth in CWOP will receive assistance from supervision visitation contractors, who have historically provided supervision during parent-child visits. As of August 2021, 11 supervised visitation contractors have amended their contracts to provide CWOP supervision alongside CPS and CPI staff, in addition to supervised parent-child visits. Under these arrangements, supervised visitation contractors' staff travel to CWOP locations and

Children Without Placement – September 2021

help CPS and CPI staff care for the youth residing there.[18] These contractors are located in Region 6 (Houston area), Region 7 (Austin area), Region 8 (San Antonio area), Region 10 (El Paso area) and Region 11 (Edinburg area).

# Factors Affecting Timely, Appropriate Placements

Texas struggles to maintain and improve capacity along the entire foster care continuum as providers continue to adjust to stricter regulation and oversight, while simultaneously responding to the unprecedented COVID-19 pandemic. During FY 2020, Texas lost 540 beds in congregate care settings, while gaining 393. As indicated in Figure 5, in FY 2021, Texas lost 1,454 GRO beds due to contract closures; most were GRO-RTC beds. DFPS does not dispute that a portion of the lost capacity resulted from the closure of operations with unreasonably high rates of minimum standards deficiencies and RTB findings. Rather, the continued loss of capacity is occurring at higher rates than capacity gained. This has contributed to increases in the number of children experiencing a CWOP spell, with numbers reaching an all-time monthly high of 416 children in CWOP at some period during July 2021.

---

[18] *See* CPS Handbook §4152.24. Supervised visitation contractor staff are considered "other trained adult caregivers." As such, they cannot administer or lock up medication. Further, CPS and CPI staff members (caseworkers or higher) must ensure other trained adult caregivers who supervise children or youth without placement have received information about the child, including child sexual history, and their supervision needs.

Children Without Placement – September 2021



*Figure 5. Beds Lost by Facility Type, September 2020 - August 2021*

Although beds have been gained through new contracts, they have not replaced the lost beds. As indicated in Figure 6, between September 2020 and August 2021, Texas experienced a net loss of 471 beds; including a net loss of 426 GRO-RTC beds.[19]

*Figure 6. Total Lost & Gained Capacity by Facility Type, September 2020 - August 2021*



_____

[19] Children and youth with complex behaviors and/or treatment needs are commonly served in GRO-RTCs.

Children Without Placement – September 2021

As GRO-RTC placements, which predominantly serve youth with complex treatment needs, have declined, the number of youth in CWOP has substantially increased.

*Figure 7. CWOP Youth vs Youth Placed in GRO-RTCs, September 2019 - July 2021*



Source: Internal DFPS CWOP tracker; SSCC CWOP data, Open Placements DRIT September 2019 – July 2021

In addition to the effects of the COVID-19 pandemic and providers' declining placement based on voiced concerns about stricter regulation and oversight, DFPS' ability to secure timely, appropriate placements for youth is also being impeded by a shortage of subacute care providers and youths' refusal of placement. Each of these factors are discussed further herein.

Amid these factors affecting DFPS' ability to secure timely, appropriate placements, DFPS works quickly and diligently to find placements for children and youth in foster care. DFPS placement staff develop placement referral packets and communicate daily with providers, in an effort to match children to available placements based on their treatment needs and permanency goals. For each child, placement staff contact approximately 240 child placing agencies (CPA). If CPA outreach is unsuccessful or if the child requires enhanced treatment services in a residential treatment setting, placement staff will contact more than 100 GROs throughout Texas. Once in-state placement search efforts are exhausted, placement staff will contact more than 50 out-of-state child-care operations. For many youth without placement, placement staff have exhausted all efforts, both with in- and out-of-state providers. Approximately 15 to 20 youth in CWOP have an identified placement; however, as discussed further herein, these youth are registered on a four to six-week waitlist. Notwithstanding, placement staff continue to search for an alternate placement, in the event one can be secured sooner. Additionally, some youth in CWOP have been offered a placement, but refuse treatment.

To keep pace with new placement needs, staff must secure 20 to 30 placements each day for youth in CWOP. Placement staff make more than 3,000 placements each month. Throughout the present capacity crisis, workloads have doubled and placement staff routinely work 10 to 20 overtime hours per week, despite a more than 50% increase in staff.

Children Without Placement – September 2021

*COVID-19 Pandemic and Corresponding Workforce Impacts*

At the height of the COVID-19 pandemic, Texas providers struggled to maintain sufficient numbers of staff to serve children. As some staff were quarantined and others feared returning to work, providers reduced the number of children they served. Many providers report that they continue to struggle with staff shortages and never recovered from the workforce impacts that coincided with the emergence of COVID-19 in March 2020. Such ongoing staff shortages make it especially difficult for providers to increase capacity, or to be best equipped to prevent future investigations, contract actions and/or licensing actions that could lead to them being placed on Heightened Monitoring or facing potential closure. Compounding the ongoing COVID-related staffing shortages (which may persist or worsen amid this second wave of increased COVID-19 infections), when children contracted COVID, they were required to isolate, which required separation from other children and additional staff to care for them.

*Current Regulatory and Oversight Environment*

Many residential providers that have historically served youth with complex behaviors and/or treatment needs have expressed concerns that the current regulatory and oversight environment is overly punitive and inflexible amid the already challenging landscape of inequitable provider rates and pandemic-related challenges recruiting and retaining quality staff. In light of these challenges, over the last year, providers have expressed increasing hesitation to continue accepting youth into their care who have complex treatment needs. Specifically, providers have noted that youth's behaviors sometimes necessitate physical interventions, which may lead to additional investigations and potentially, RTB findings. Such findings are issued against individuals and can be career ending, as operations may not employ individuals with upheld RTB findings without potentially incurring an adverse licensing action. Reason to believe findings are also among the most heavily weighted actions and can lead to an intent to revoke the provider's license and/or contract termination. DFPS will continue to work collaboratively with HHSC to determine the appropriate thresholds at which RTB prevalence reflects a pattern of practice that the operation must take immediate steps to cure.

Providers' observations about stricter regulation are reinforced by increased numbers of investigations and RTB findings. As illustrated in Table 1, during the previous four calendar years, the rate of abuse/neglect reports to Statewide Intake have remained stable; yet, the number of abuse/neglect investigations and the number of allegations being investigated and the investigations resulting in a RTB finding all have markedly increased.

13

Children Without Placement – September 2021

*Table 1. RCI Investigation Information (Monthly Averages)*

| RCI Investigation Information (Monthly Averages) | | | | |
|---|---|---|---|---|
| Year | Monthly Intake Average | Monthly Open Investigation Average | Monthly RTB (by Investigation) Average | Monthly RTB (by allegation) Average |
| 2018 | 440.3 | 126.3 | 7.0 | 16.3 |
| 2019 | 475.3 | 172.8 | 9.6 | 25.4 |
| 2020 | 446.6 | 269.4 | 19.4 | 36.2 |
| 2021 | 463.2 | 361.0 | 44.6 | 112.8 |

*Shortage of Subacute Care Providers in Texas*

As discussed further herein, the lack of psychiatric residential treatment facilities (PRTF) in Texas has underscored the need for additional placements serving youth who step down from psychiatric treatment. The Intensive Psychiatric Transition Program (IPTP) was designed to serve such youth; however, only three IPTP providers remain throughout Texas. As a result, DFPS must enter into child specific contracts, often with out-of-state subacute providers equipped to serve youth stepping down from psychiatric treatment, and is pursuing additional options to expand this provider network.

**STAR Health Medicaid Managed Care Program**

Star Health is a Medicaid managed care program administered by HHSC that is designed to improve coordination and access to healthcare for children and youth in foster care. STAR Health provides mental and behavioral health services for children in need of treatment for abuse, neglect, trauma, depression, attachment disorders, and other mental or behavioral health needs. These services include inpatient and outpatient mental health services; intensive outpatient services; inpatient and outpatient chemical dependency services; community-based services through a local mental health center; and partial hospitalization. Most children enrolled in STAR Health are automatically authorized to receive mental health services. Therefore, they do not require a primary care provider's referral to schedule an appointment with an in-network mental health provider.

While DFPS works to ensure that every youth in CWOP has access to medical services, DFPS must necessarily work in collaboration with a variety of stakeholders, including HHSC, Superior HealthPlan (the managed care organization that delivers STAR Health services), Texas Medicaid, and medical professionals responsible for assessment, diagnosis, and provision of medical services. Multidisciplinary case staffings between DFPS, HHSC and Superior are held as needed to discuss specific children's needs that exceed available options within the foster care continuum.

During these staffings, participants discuss steps DFPS should take to meet the youth's medical needs while in CWOP and whether DFPS staff have all necessary medical supplies and information (including instructions for care, adequate training and medical treatment team contact information). If any gaps are identified, participants develop a plan to ensure adequate supplies and information are provided. Superior STAR Health service management staff may assist in identifying, referring, and coordinating medical and behavioral health services.

If DFPS believes a youth may need immediate mental health services (including potential hospitalization), DFPS staff contact the local mental health authority (LMHA) to request a crisis assessment. HHSC contracts with 37 LMHAs and two local behavioral health authorities to deliver mental health services in communities across Texas.[20] Often, crisis assessments are conducted on-site by a Mobile Crisis Outreach Team (MCOT), a resource offered through the LMHA.[21] The MCOT will conduct the assessment and provide in-person counseling services 24 hours a day, 365 days a year to individuals at risk of harming themselves or others. DFPS is unable to independently determine whether hospitalization is necessary and relies on the LMHA/MCOT to make such determinations.

### Intensive Psychiatric Transition Program

The 80th Texas Legislature (Regular Session, 2007) appropriated funds to DFPS to provide intensive residential treatment services to youth in state conservatorship with acute, intensive psychiatric needs at the time of their release from a psychiatric hospital or as an alternative to a psychiatric hospitalization. In 2007, DFPS developed the Intensive Psychiatric Transition Program (IPTP) and contracted with residential treatment facilities ("RTCs") to provide structured, short-term therapeutic step-down services to stabilize youth and promote their successful transition to less restrictive placements. The IPTP may also be used as an alternative to imminent psychiatric hospitalization. Placement into the IPTP is limited to 60 days but allows for extensions up to 120 days for individuals who require extended treatment for stabilization.

A number of factors affect the Department's ability to fully utilize this program, including:

- the ability to adequately address intensive psychiatric needs in a residential treatment setting (compared to a subacute or PRTF setting),

---

[20] *See* "Find Your Local Mental Health or Behavioral Health Authority," Available online at: https://www.hhs.texas.gov/services/mental-health-substance-use/mental-health-substance-use-resources/find-your-local-mental-health-or-behavioral-health-authority (last accessed September 11, 2021).

[21] 21 *See* "Mobile Crisis Outreach Teams" on the Texas Health and Human Services website at: https://www.hhs.texas.gov/services/mental-health-substance-use/mental-health-crisis-services/mobile-crisis-outreach-teams (last accessed September 8, 2021).

Children Without Placement – September 2021

- unused bed capacity,[22]

- providers' ability to convert IPTP beds to regular GRO-RTC beds based on need,

- staffing shortages, and

- stricter regulation and oversight (discussed herein).

In August 2020, DFPS had contracts with 11 IPTP providers; however, that number has since declined to only three having a combined capacity of 31 beds. During 2020, 167 children were served in this program;[23] during 2021 to date, only 48 children have been able to be served, owing to the precipitous decrease in contracted IPTP providers. As of September 9, 2021, only 5 youth are being served in this program.

**Treatment Family Foster Care**

In 2018, DFPS CPS launched the Treatment Family Foster Care (TFFC) program, which is designed to provide intensive services to children in a highly structured home environment, often as an alternative to GRO-RTC placement. The TFFC program is available for youth ages 17 and younger who have mental health and/or socio-behavioral needs that cannot be met in traditional foster care settings. The program includes innovative, multi-disciplinary treatment services that are evidence-based or research-supported. Under the program, foster parents and contractors receive a higher reimbursement but have additional expectations, including more training, more frequent treatment plan reviews and ongoing support following discharge. Each TFFC foster home's capacity is limited to two children; however, some caregivers limit their actual capacity to one child receiving TFFC services. The TFFC program is 9 months with a three-month extension option. Between 2018 and 2019, 126 children/youth were served in the TFFC program. During 2020, the number of youth served decreased to 106. During 2021 to date, 114 youth have been served in this program. Currently, three providers with a combined capacity of 112 beds are contracted to provide TFFC services throughout Texas. As of September 9, 2021, 80 youth are being served in the TFFC program.

Before December 2020, TFFC eligibility was limited to children age 10 and under. In an effort to increase capacity for older youth, the 87th Texas Legislature (Regular Session, 2021) broadened eligibility criteria to include youth up to age 17. Following this eligibility expansion, providers are developing capacity and training foster parents to ensure they are equipped to treat this older population. DFPS is also exploring additional procurement options, as current need far outpaces capacity.

---

[22] At the time of this writing, the IPTP provider that holds a majority of the capacity (20 beds) was on a voluntary placement hold due to staffing issues; this provider's current operating capacity is 12 beds.
[23] Numbers represent unduplicated counts of children/youth receiving services.

Children Without Placement – September 2021

### Psychiatric Residential Treatment Facilities

The 81st Texas Legislature (Regular Session, 2009) directed HHSC to analyze the benefit and cost effectiveness of modifying the IPTP and establishing a program for the provision of inpatient psychiatric services in psychiatric residential treatment facilities (PRTF) for youth in the Texas Medicaid program.  Federal regulations define a PRTF as a non-hospital facility that has a provider agreement with a State Medicaid Agency[24] to provide inpatient service benefits to individuals under age 21. In December 2010, HHSC conducted an analysis of the benefit and cost effectiveness of establishing a PRTF benefit in Medicaid and found:

- Texas Medicaid did not have a mechanism for certifying PRTFs. A certification process and clinical coverage criteria would need to be established to recognize PRTFs and ensure that the level of service and facility structure met state and federal standards for the state to be eligible for federal Medicaid matching funds.
- The population that would be eligible for coverage in a PRTF through Medicaid (all children meeting the clinical criteria) was greater than the population served by the IPTP, which is limited to children in state conservatorship.
- The Medicaid cost of providing services in PRTFs could range from $45.5 to $67 million (all funds) annually and would exceed the cost to the state of providing services in the IPTP ($2.4 million). It is unknown if the individuals receiving services in a PRTF would require a longer duration of treatment than assumed in this study or if the cost of providing services in this setting would be offset by a reduction in other medical services or reduced hospital readmissions.

To date, Texas has not pursued a PRTF model and thus, Texas foster care youth requiring PRTF services presently receive them through child-specific contracts with out-of-state PRTF providers. PRTF providers are residential treatment facilities with a psychiatric component. These PRTF providers are equipped to meet the complex needs of youth who often cycle in and out of psychiatric hospitals. As such, they typically do not decline placement based on behaviors and treatment needs that many in-state GRO-RTCs would decline to serve. However, presently these out-of-state PRTF operations must maintain lengthy waitlists of approximately four to six weeks. Consequently, while some youth in CWOP have been accepted into these programs, they remain on the waitlist. DFPS is working diligently to expand capacity by partnering with out-of-state PRTFs willing and able to accept into their care and meet the complex treatment needs of many youth in CWOP.

---

[24] HHSC is the state's single State Medicaid Agency.

Children Without Placement – September 2021

*Youths' Refusal of Placement*

Although youth do not have a legal right to refuse placement, historically they have done so because of DFPS' inability to compel the child to go to the placement. Even when staff are able to encourage the child to go to the placement (e.g., through motivational interviewing), the provider may ask the child upon arrival if they want to be there and if the child responds in the negative, the provider may advise DFPS that they are declining the placement. Other children may decide to run away soon after placement, which also may trigger the provider issuing a discharge notice to DFPS for the child. Finally, some children may engage in physically aggressive behaviors, such as assaulting staff, to disrupt their placement.

Among the 169 youth in CWOP on August 25, 2021, eight (4.7%) had refused placement. [25] DFPS staff are reviewing practices related to youth refusing placement to ensure consistency and address behaviors and circumstances that may encourage youth to remain under DFPS or SSCC supervision rather than receive the needed treatment and care that an appropriate placement provides. A few state court judges have also expressed their willingness to assist DFPS with this recurring impediment to placements.

# Current/Planned Activities

DFPS is working to comprehensively address the issues contributing to the present capacity crisis, with the long-term goal of generating and sustaining quality capacity that meets the diverse needs of foster youth within their home communities. In parallel, DFPS is taking immediate steps to comply with a recent change in state law to keep youth from staying overnight in DFPS offices. DFPS has identified a need for at least 669 additional beds throughout the state to ensure that youth have ready access to appropriate placements equipped to meet their unique needs. Figure 8 illustrates both the number and types of capacity needed by region.

---

[25] This is a marked reduction from early August; as of August 3, 2021, 24 (12.6%) youth in CWOP had refused placement.

Children Without Placement – September 2021



Figure 8. Number of Therapeutic Beds Needed by Type and DFPS Region

Source: Data and Decision Support Report #102893

*Fiscal Year 2022 – 2023 Legislative Appropriations; Foster Care Rate Modernization*

Texas Senate Bill 1896 (87th Texas Legislature, Regular Session, 2021) requires HHSC, DFPS, and each SSCC to develop a plan to increase placement capacity such that youth remain in their community of origin. The plan must include contingencies for reserve capacity to serve youth whose placement is impacted by contractual or regulatory actions or who are otherwise without an appropriate placement.  The Legislature provided immediate support to build quality and placement capacity in regions where Community-based Care ("CBC") has been implemented by appropriating $34.8 million for temporary rate increases, awarding incentive payments to providers showing improvement on performance measures, and through grants to providers.[26] Similarly, during the 87th Second Called Special Session of the Texas Legislature, DFPS requested and received $90 million in the legacy foster care system to build on the Legislature's intent for a more stable foster care system that provides higher quality services for children across the continuum.

Specifically, the $90 million will fund (1) targeted supplemental payments to retain providers and enhance capacity and (2) foster care grants to promote capacity enhancements and growth. Supplemental payments totaling $70 million will stabilize the foster care system and encourage capacity growth. Funds will be provided per child per day for children placed in certain settings

---

[26] Texas General Appropriations Act, 2022-2023 biennium, Article II, Department of Family and Protective Services, Item 51.

to improve the quality of services. Foster care providers may use these funds to enhance their ability to care for children with complex treatment needs (i.e., by hiring additional staff, administering additional staff training, and engaging in other recruitment and retention efforts). Foster care capacity grants totaling $20 million will promote the growth of enhanced capacity and/or additional capacity across the foster care continuum. Foster care providers will propose innovative approaches to expand capacity, focusing on serving children with complex treatment needs. DFPS will fund organizations that: (1) serve children with the higher levels of need; (2) expand certain types of placements and bring new providers and capacity online; and (3) use funds to promote long-term viability of their organizations. This dual approach, coupled with other capacity building efforts, will enable foster care providers to sustain capacity and placements appropriate for children with complex treatment needs, such as the IPTP, TFFC program and RTCs, and to create needed subacute programs.

In addition to the indispensable support DFPS has received from the Governor's office and the 87th Texas Legislature, the Legislature provided a long-term strategy to expand quality capacity by directing DFPS and HHSC to jointly undergo a comprehensive rate methodology modernization project and develop an alternative reimbursement methodology proposal for foster care and community-based care rates.[27]   The goal of this project, known as Foster Care Rate Modernization, is to improve outcomes for children, youth, and young adults through the establishment of a well-defined service continuum that meets the needs of the foster care population and recognizes and compensates the caregiver for delivering high-quality services.  DFPS and HHSC are gathering information from stakeholders, researching other states' models, and analyzing Texas-specific data in an effort to produce a series of reports to the Texas Legislature in advance of the 88th Legislative Session.  These reports will lay out a clearly defined foster care continuum and newly established rate methodology that better aligns the cost of care with service provision and incentivizes improved child outcomes.

*Recent Capacity Infusions to Eliminate Overnight Stays in DFPS Offices*

DFPS has engaged in continual and innovative outreach efforts to identify and secure additional residential, home-like settings for youth in CWOP to avoid overnight stays in DFPS offices. Since June 2021, DFPS has identified, and executed new contracts with, residential providers and other community partners to add 158 new beds as alternatives to DFPS offices. Table 2 provides additional details concerning this new capacity. For reasons discussed elsewhere herein, subacute care capacity was largely unavailable in Texas prior to these recent efforts. Likewise, executing residential leases with community partners was unprecedented, both within DFPS and seemingly as to other state agencies. As a result of these sustained efforts, DFPS has reduced the number of youth staying in DFPS offices by 62%, from 91 in July 2021 to 35 as of September 9, 2021.

---

[27] Texas General Appropriations Act, 2022-2023 biennium, Article II, Department of Family and Protective Services, Special Provisions, Sec. 26.

Children Without Placement – September 2021

Table 2. New Residential Capacity to Eliminate DFPS Office Stays, June – September 2021

| Contracts | Beds | Region(s) |
|---|---|---|
| Residential lease | 76 | Houston, San Antonio, Wallis |
| General Residential Operation (GRO) | 33 | Houston, Terrell |
| Memorandum of Understanding (MOU)[28] | 24 | Houston, El Paso, Kingwood, San Antonio, Henderson |
| Temporary Emergency Placement (TEP)[29] | 20 | San Antonio, Oklahoma |
| Subacute Care | 18 | San Antonio, Texarkana |
| GRO-RTC | 11 | Houston |

While the total number of beds secured appears sufficient to meet present CWOP needs, the new GROs, GRO-RTCs, and subacute providers are all taking a carefully considered approach to accepting youth into their care to ensure they have access to safe, stable placements that meet their needs and support their permanency goals. DFPS regional staff are also taking a deliberate, stepped approach to transitioning youth from offices and hotels into leased sites. While Texas has and will continue working to increase quality placements and placement capacity, some capacity will continue to be lost. For example, in June 2021, 101 MOU beds were available. By September 2021, an additional 24 MOU beds were made available. However, during the same period, 36 MOU beds were lost. This ebb and flow of available day-to-day bed capacity underscores the need to continuously and resolutely invest in quality capacity growth.

*Planned Capacity Infusions to Generate and Sustain Quality Capacity in Children's Home Communities*

Through extensive and ongoing outreach efforts and partnerships with both in- and out-of-state providers, DFPS is planning for quality capacity infusions in several programs to serve youth with complex treatment needs. These programs include subacute inpatient treatment, the intense plus pilot program and the qualified residential treatment program pilot, each of which are discussed further herein.

---

[28] Since September 2020, the DFPS Faith-Based and Community Engagement division and CPS have substantially increased the number of community locations in which youth may receive temporary emergency care. As of September 1, 2021, DFPS had 20 active MOUs with a capacity to serve 98 youth across Texas, an increase of more than 200% from September 2020.

[29] The Temporary Emergency Placement (TEP) program was created in June 2017 and provides emergency, short-term, highly structured quality residential care and services for children while CPS placement staff continue searching for a more suitable and longer-term placement. This is a no-eject/no-reject program.

### Subacute Inpatient Treatment Program Capacity

The 84th Texas Legislature (Regular Session, 2015) created a new program to provide 24-hour specialized care in an inpatient hospital setting. However, there were no bids on the procurement and ultimately, no contract was awarded. Based on the prevalence of certain complex treatment needs among youth in CWOP and an apparent gap in Medicaid eligible mental health services for adolescents in Texas, DFPS has focused efforts on developing capacity in this area.

A subacute setting is also referred to as a psychiatric intensive transition program. The trauma-informed program is typically 6 to 9 weeks in an in-patient psychiatric hospital in which staff help stabilize youth following a psychiatric hospitalization or to prevent psychiatric hospitalization, until the youth can transition to a GRO-RTC or other less restrictive setting.

Since April 2021, DFPS has partnered with three psychiatric hospitals in Texarkana, Dallas, and San Antonio that provide this program and enhanced treatment services to children in DFPS conservatorship in need of psychiatric stabilization. DFPS is working with four additional providers with the goal of having a subacute inpatient treatment program in every region of the state within the next year.

### DFPS Intense Plus Pilot

The intense plus service level is only available in GRO-RTCs and consists of a high degree of structure to support the child in his or her environment while intervening as necessary to protect the child. Caregivers have specialized training specific to the child's characteristics and needs and clinical staff must have professional licensure or graduate level education to provide therapeutic services, intense therapeutic supports and interventions. To better meet the needs of youth who have experienced human trafficking, DFPS is encouraging GROs to provide intense plus services through this pilot program. Qualifying GROs must:

- be contracted and licensed to serve children with an intense service level,
- be a licensed human trafficking provider and meet minimum standards for this license type,
- serve suspected or confirmed victims of human trafficking,
- be willing and able to meet the intense plus indicators, and
- submit to an intense plus facility monitoring review by Youth for Tomorrow.

### Qualified Residential Treatment Program Pilot

Under the federal Family First Prevention Services Act (FFPSA), a Qualified Residential Treatment Program (QRTP) is a highly structured approach to treating youth who have the most acute needs in the foster care system. In addition to requiring certain assessments and oversight, a QRTP must:

- have a trauma-informed treatment model designed to address the clinical and other needs of children with serious emotional or behavioral disorders or disturbances.

Children Without Placement – September 2021

- have registered or licensed nursing staff and other licensed clinical staff.
- facilitate participation of family members in the child's treatment program, as appropriate.
- facilitate and document outreach to family members, including siblings, and maintain contact information for any known biological family and fictive kin.
- document how family members are integrated into the treatment process, including post-discharge, and how sibling connections are maintained.
- provide discharge planning and family-based aftercare support for at least six months post-discharge.

A small subset of youth in care have extraordinarily high needs and may be well served within the QRTP model. Based on direction from the Legislature, DFPS has allocated $17.9 million in funding under the federal Family First Transition Act (FFTA) for the QRTP pilot.

A QRTP pilot is in development and will be posted as an open enrollment for providers to apply, with an anticipated contract start date of April 2022. Although the QRTP pilot will require a substantial time commitment, piloting this program will avoid potential delays that may otherwise be incurred by adding QRTPs to the existing placement array without the experience and information necessary to properly fund this type of program.

DFPS will share the results of the QRTP pilot with the 88th Texas Legislature, including potential benefits of a statewide QRTP rollout and corresponding costs, including provider rates that are commensurate with the program's prescriptive requirements (e.g., to maintain necessary medical staff, become QRTP accredited, contract with a qualified independent professional organization to complete required assessments.

A QRTP accreditation program is also in development which would offset the cost for operations to become QRTP accredited.  CPS is developing the statement of work and will post the procurement as a Request for Proposal.

*Targeted Outreach to Prospective and Contracted Residential Providers*

In addition to the Department's outreach efforts and partnership with providers to increase capacity through the subacute inpatient treatment, intense plus pilot and QRTP pilot, DFPS continuously works with prospective and contracted providers to identify capacity needs, facilitate and support capacity-building efforts and match children and youth to placements that are best equipped to meet their unique needs. These efforts are guided by the Department's annual foster care needs assessment and stakeholder input during regional strategic meetings, standing workgroup meetings, and interest surveys.

Children Without Placement – September 2021

### Foster Care Needs Assessment; Regional Provider Meetings

DFPS produces an annual foster care needs assessment[30] to identify regional capacity needs and facilitate and support capacity-building efforts. In accordance with Senate Bill 11 (85th Texas Legislature, Regular Session, 2017), DFPS CPS Regional Directors must use data from the annual foster care needs assessment to develop an annual, collaborative, regional substitute care capacity needs plan for areas in which CBC has not been implemented.

In Fall 2018, the regions created and published their first annual, collaborative capacity strategic plans. To help regional leadership continue to refine these plans going forward and to give contracted providers the data they need to build capacity, the annual foster care needs assessment provides a forecast for daily demand for substitute care through FY 2022 and an estimated daily current supply, along with some additional insights and information about capacity. As noted in the November 2020 Foster Care Needs Assessment, building capacity depends largely on contracted provider efforts. Contracted providers develop and manage 90% of all foster homes across the state, all foster homes for higher needs children, and all congregate care. DFPS can communicate the state's capacity needs and partner with the provider community to support and build the network; however, DFPS cannot itself generate new capacity.[31]

To help contracted providers understand and use the information in the foster care needs assessment, the Regional Directors host regional, strategic, capacity building meetings with foster care providers, local faith-based entities, child advocates, and other organizations. Through these meetings and other collaborative efforts, DFPS will continue to partner with contracted providers and other stakeholders to address substitute care capacity needs by identifying and expanding strategies that are working, changing or discontinuing those that are not and exploring and incorporating new strategies, as appropriate. For example, DFPS is making enhancements to the annual foster care needs assessment, including publication of an interactive dashboard and adding specificity around placement capacity needs.

### DFPS Placement Portal

In August 2021, CPS launched the "General Placement Search" (GPS) system. The GPS system was designed to provide near real-time information and data relating to placement capacity and availability and enhance CPS efforts to locate placements that are best equipped to meet a child's

---

[30] The November 2020 DFPS Foster Care Needs Assessment is available on the DFPS public website at: https://www.dfps.state.tx.us/About_DFPS/Reports_and_Presentations/CPS/documents/2020/2020-11-19_Foster_Care_Needs_Assessment.pdf (last accessed September 10, 2021). Regional strategic capacity building plans are also available on the DFPS public website.

[31] In addition, HHSC permits and monitors all child-care operations and child-placing agencies for compliance with state licensing standards, rules and laws.

unique needs. The GPS system collects data from contracted GROs and CPAs concerning their placement preferences and vacancies and uses the data to search for the most appropriate, available placement. The GPS system consolidates information from IMPACT, CLASS and other databases, streamlines information-sharing concerning placement needs with providers, reduces the time required to identify available, appropriate placements (e.g., by reducing the number of systems involved and amount of data entry required)  Additional information concerning the GPS system is available on the DFPS public website.[32]

### Interest Surveys

CPS and the Division of Systems Improvement recently identified and surveyed several licensed, uncontracted GROs to gauge their interest in working with DFPS. The survey was sent to 70 providers - 25 GRO-RTCs; 21 GRO-Multiple Services; 19 GRO-CCS; and five GRO-ECS. As of September 9, 2021, DFPS received 15 survey responses. The survey remains open and DFPS will continue to follow up with all interested parties. In addition to administering interest surveys, CPS staff conduct targeted outreach to providers with decreased admissions to identify and resolve any admission barriers, and work with contracted providers to consider expanding their capacity or changing their license type from a short-term shelter status to a longer term GRO.

### Bi-Weekly Workgroups

Between April and August 2021, DFPS, HHSC and the Texas Alliance of Child and Family Services (Alliance) held a series of biweekly workgroups focused on general foster care, contract incentives and remedies, investigations and provider support. Workgroup members included representatives from both large and small CPAs and GROs, with a mix of experienced and new providers. The workgroups developed a number of recommendations to address members' concerns and perceived barriers, and DFPS is presently reviewing these recommendations.

*Additional Stakeholder Outreach and Engagement Activities*

DFPS has conducted a number of outreach activities to public and private medical and behavioral health service providers to increase collaboration and identify additional resources for youth in DFPS conservatorship with complex treatment needs. Recent outreach activities include:

- In June 2021, CPS initiated a joint CWOP convening with medical and behavioral health hospital service providers, Texas Medicaid/CHIP, state hospital and children's mental health services, and advocates. Participants discussed the service needs of youth in CWOP and the need to collaborate more directly on issues. This group meets quarterly.
- In August 2021, DFPS met with the executive directors of several LMHAs to discuss practice and program options LMHAs could implement to better serve youth in CWOP. This group meets every two weeks.

---

[32] *See* "General Placement Search" web page located at https://www.dfps.state.tx.us under "Doing Business," "About PCS," "Residential Child Care Contracts," "General Placement Search (GPS)."

Children Without Placement – September 2021

- In September 2021, a special subcommittee of the Statewide Behavioral Health Coordinating Council convened to discuss the often-complex treatment needs of, and options to serve, youth in CWOP. Participants included other agencies serving families and receiving state behavioral health resources, such as the Texas Juvenile Justice Division, Texas Education Agency, Department of State Health Services, Texas Workforce Commission and others.
- DFPS and HHSC leadership meet monthly to discuss access to services for youth in CWOP. As a result of these meetings, DFPS and HHSC have refined protocols, streamlined communications and targeted training about accessing needed resources.

*STAR Health Mental Health Service Array Enhancements*

**Multi-Systemic Therapy and Functional Family Therapy**

Multi-Systemic Therapy (MST) is provided in the youth's home, school and/or community by on call therapists who are available 24/7 to support at-risk youth and their families. Functional Family Therapy (FFT) is a family-based prevention and intervention program for at-risk youth that addresses complex problems through clinical practice that is flexibly structured and culturally sensitive. The FFT clinical model is focused on decreasing risk factors and increasing protective factors that differently affect adolescents, with an emphasis on familial factors. MST and FFT are recommended for inclusion in the Medicaid State Plan, as they have been evaluated and determined to be medically appropriate for some Medicaid recipients (including children in DFPS conservatorship), cost-effective, and evidence-based. These services are scheduled for phased implementation to occur by September 2022. Once implemented, MST and FFT will be available to Texas foster children through STAR Health.[33]

# Additional Developments

*Legal Proceedings*

On August 30-31, 2021, Bexar County Judge Peter Sakai held hearings for every child/youth in CWOP on his docket and issued emergency orders necessary to meet their best interests. Based on those hearings, he issued a number of recommendations, including:

---

[33] *See* Medicaid Behavioral Health In Lieu of Services Annual Report, November 2020. Available online at: https://www.hhs.texas.gov/sites/default/files/documents/laws-regulations/reports-presentations/2021/medicaid-bh-lieu-services-annual-report-nov-2020.pdf (last accessed September 10, 2021).

- State Office put efforts into providing appropriate technology, space, and education on proper etiquette for staff and children to participate in remote hearings. Judge Sakai emphasized the need to keep children involved and let their voices be heard.
- Child welfare participants should avoid assuming CWOP children are any more ill-behaved than other foster children. The Department can aid in this by ensuring that reports to the Court or other related organizations do not simply include behavior challenges/treatment barriers, but also include that child's strengths. The Department should also approach these children in a way that understands the anger and frustration that motivate some of their most challenging behaviors.
- Efforts should be made to put children in more stable environments such as hotels or churches rather than offices.
- Courts should consider ordering placements with relatives if they are simply pending some administrative actions and that the Department approach these situations with a sense of urgency.
- DFPS should approach new cases, especially those concerning SB 44 or a Refusal to Accept Responsibility with a desire to think outside the box and avoid removal if a placement is not available.
- Caseworkers need administrative and community support to connect children with placements and mental health services.

Also on August 31, 2021, Judge Aurora Martinez Jones of the 126th District Court in Travis County held a Contempt Hearing regarding DFPS and three children in CWOP who were staying in DFPS offices overnight. As a result of this hearing, DFPS was initially held in contempt of court and assessed monetary sanctions in the amount of $57,302.96 ($400.72 for each night a child resided at a DFPS office). DFPS was also ordered to implement a "Region 7 Task Force" funded by the sanctions. The task force was directed to work with community stakeholders to resolve placement deficiencies in the region and provide regular updates to the Court on compliance relating to the contempt order, with the ultimate goal resolving CWOP. On September 9, 2021, Judge Jones stayed her contempt orders pending reconsideration of her ruling.

# Conclusion

Children and youth in the state's foster care system deserve safe, stable placements that meet their needs and support their permanency goals. DFPS and its many and dedicated child welfare partners continue to work tirelessly toward that effort. Yet, a number of complex and enduring circumstances have resulted in youth experiencing periods without placement. DFPS is working to overcome these challenges and to generate and sustain quality placements and placement capacity, but the Department cannot accomplish this important task alone. Ensuring children's

Children Without Placement – September 2021

safety and supporting their permanency and well-being is a goal we all share, and with the ongoing partnership and support of our child welfare community, we will together achieve it.