

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as | § | |
| Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

### The Court Monitors' Update to the Court Regarding Children Without a Placement Housed in CPS Offices, Hotels, and Other Unlicensed Settings

The Court Monitors previously filed a report in this matter on April 27, 2021, documenting safety concerns related to unlicensed settings housing children without placement (CWOP) in Community Based Care (CBC) regions. This report reviews safety for children without placement statewide, including in the regions of the State that are not yet part of the CBC model. The findings of this report are informed by the monitoring team's visits in seven (7) Department of Family and Protective Services (DFPS) regions to 25 unlicensed settings (collectively referred to as "CWOP Settings") between June 22, 2021 and July 22, 2021, housing children without placement: 14 Child Protective Services (CPS) offices, eight (8) unlicensed cottages or homes, and, in Region 11, three (3) hotels housing children. During the visits, the monitoring team interviewed 56 children without placement, reviewed on-site records for 81 children without placement, and interviewed 58 DFPS caseworkers and staff tasked with supervising children in CWOP Settings.

In addition, to better understand the experience of foster children who are without placement, and the safety of CWOP Settings, the monitoring team reviewed: IMPACT records for 50 of the children who were housed in a CWOP Setting that the monitoring team visited; reports to Statewide Intake (SWI) of abuse, neglect, or exploitation (ANE) of children without placement; and Serious Incident Reports related to incidents that occurred in settings housing children without placement. Finally, to analyze the State's claims regarding the causes of its ongoing utilization of unlicensed CWOP Settings to house children, the Monitors reviewed placement data, including data for operations subject to Heightened Monitoring by the State, and data and information related to closed operations and lost capacity due to contract terminations. The Monitors also reviewed information related to the State's claims that unaccompanied migrant children displaced foster children from licensed placements, contributing to the placement crisis.

When DFPS does not have a placement for a child, the agency houses the child in an unregulated CWOP Setting and assigns direct supervision of the child to DFPS staff ("Under DFPS Supervision"), in addition to existing responsibilities. An average of 106 PMC children were

without placement each night in June 2021, up from an average of 22 PMC children in January 2021.  In June 2021, there were almost as many new instances of PMC children housed in unregulated CWOP settings as there were new placements of PMC children in congregate care settings and foster homes.

As detailed in this report, the Monitors found substantial risks to children's safety associated with Texas's decision to continue housing children in unregulated CWOP Settings, such as offices, unlicensed facilities and cottages, or in hotels and motels.  The monitoring team's interviews with PMC children and supervising DFPS staff in CWOP Settings, as well as extensive reviews of State records, confirm that by housing children in these unregulated settings, Texas has assigned children to caregivers who are overburdened and not well-trained to ensure their safety, placing them at an unreasonable risk of serious harm. The Monitors discovered instances this summer in CWOP Settings across Texas where overwhelmed, untrained staff restrained children as young as seven-years-old; provided children multiple doses of incorrect medication while other children went without prescribed medications for days; and in one instance, security at a CWOP Setting handcuffed a child. There was disturbing evidence of child-on-child sexual abuse in these CWOP settings, as well as evidence that children connected from CPS offices with sex traffickers and buyers and ran away from CWOP Settings. The Monitors also discovered instances of children with serious emotional disorders, some having gone without treatment, harming themselves with sharp objects, attempting to hang themselves to the point of losing consciousness, and ingesting cleaning fluids.

The Monitors' review of the records of 50 PMC children without placement this summer revealed that many of the children have complex mental and behavioral health needs, which require treatment and specialized care.  In numerous instances, the absence of treatment and stability, as well as the revictimization of the children by maltreatment in care, contributed to the children's suffering, leading to suicidal ideation, self-harm, running away, anger, and aggression. Many of the children affected by Texas's current lack of safe placements are victims of unsafe conditions in the Texas child welfare system that led to the closure of operations over the last two years; the children's mental health and behavioral challenges – the "barriers" to placement that DFPS cites – were frequently worsened by the very system intended to protect them.

Texas's lack of safe placements for PMC children is the result of the closure of hundreds of unsafe beds across the State. Since January 1, 2020, Texas has closed 21 GROs with capacity of 1,213 beds and two CPAs, affecting 291 agency homes, operations deemed so unsafe by either the Texas Health and Human Services Commission ("HHSC") or DFPS that the State determined revoking a license or ending a contract and removing children was the best option. In addition, five GROs, accounting for another 134 beds, voluntarily closed in lieu of facing license revocation or denial; an additional 241 beds and 157 verified homes were eliminated from the system when GROs and CPAs with a serious history of child safety violations voluntarily closed after being placed under Heightened Monitoring.

Most operations in the Texas foster care system are not under Heightened Monitoring. Of the 485 operations that provided placements for foster children between 2015 and 2020, 358 (74%) had safety records that did not warrant enhanced oversight.  However, 127 operations (26%) had combined violation rates over the state rate in three or more years, making them eligible for

Heightened Monitoring.  Of these 127 eligible operations, 82, or 17% of the 485 evaluated, were still active as of June 2021, and are currently under Heightened Monitoring.

There is no question that the operations that qualified for Heightened Monitoring had serious child safety problems: the 127 operations that qualified for Heightened Monitoring in either 2020 or 2021 accounted for a total of **631 substantiated allegations of abuse, neglect, or exploitation** of children entrusted to their care over the five-year period included in the analyses, and **14,227 minimum standards violations**, of which **12,558 (88%) were for minimum standards ranked high, medium-high, or medium.** Texas's response to its closure of unsafe, regulated placements for PMC children has been an ever-growing dependence on unsafe, unregulated placements for PMC children, many of which now pose an unreasonable risk of serious harm to children.

## I.      Demographics and Trends for Children Without Placement

### A.  Data and Information

DFPS reports the number of PMC children without placement to the Monitors on a weekly basis. In its reports, DFPS provides information about all PMC children without placements the prior week, including details about their individual characteristics (age, sex, level of care), their care team (caseworker, supervisor, region, and county), and the period without placement (first night without placement, DFPS' identified "barriers to placement," and location of the children).[1]

DFPS also provided the Monitors with an addendum to its reports on March 31, 2021 that included information previously missing from the weekly reports for 32 of the 51 children under the care of the SSCCs who experienced a lack of placement during the time period.[2] The addendum included both children about whom DFPS previously reported in the weekly reports, as well as children the State previously excluded from the weekly reports, with the latter group being significantly larger. The addendum did not contain demographic characteristics of the included children; therefore, the analyses of these characteristics are based on children only included in DFPS's original reports.[3]

---

[1] DFPS often first reports children to the Monitors the day after their first night without placement. Therefore, the number of children without placement reflected in the weekly compilation of the daily reports tends to be lower than the actual number of children without placement on a given night as calculated using the data provided about a child's first night in placement.

[2] DFPS first provided an addendum to the Monitors on March 22, 2021, and then provided an Updated/Corrected Addendum on March 31, 2021 after reporting that the prior addendum was again missing relevant children. See Email from Tara Olah, Dir. of Implementation & Strategy, DFPS, to Kevin Ryan and Deborah Fowler, Monitors, SSCC CWOP addendum report – CORRECTED, March, 31, 2021 (on file with Monitors).

[3] Additionally, the monitoring team noted discrepancies in the dates between the data received in the weekly emails and the March 31, 2021, addendum document for eight of the children who were included in both sources of information.

B.  Overview

On average, 61 PMC children were without placement on a given night between January 1, 2021 and June 30, 2021, with a maximum of 124 children (which occurred on June 24, 2021), a substantial increase from the previous reporting period.[4] The number of PMC children without placement has increased considerably over time: on average, 10 children were without placement per night for the period of August 1, 2020 – December 31, 2020.[5] In January 2021, 22 children, on average, were without placement per night; by June 2021, the number increased to an average of 106 children per night.

**Figure 1: Children Without Placement by Day (January 1, 2021 - June 30, 2021)**



Children Without Placement by Day (Jan 1, 2021 - Jun 30, 2021)
*Source: Analysis of DFPS CWOP data*
*n=501 unique children over 749 spells without placement*

Note: Number of children without placeemt is calculated based on each child's first night without placement, as reflected in daily reports

During this period, 501 unique PMC children experienced at least one night without placement during this period. Most children (69%, 344) experienced a single spell[6] without placement; 19% (96) had two spells without placement; 7% (37) had three spells without placement; 4% (19) had four spells without placement; 1% (4) had five spells without placement; and one child (<1%) had six spells without placement.

---

[4] In the previous report covering August 1, 2020, to March 21, 2021, there was an average of 18 children without placement per night, with a maximum of 52 children. Deborah Fowler and Kevin Ryan, The Court Monitors' Report to the Court Regarding Maltreatment in Care and Unsafe Placements for Children Without a Placement 5, April 27, 2021, ECF No. 1066.

[5] Deborah Fowler and Kevin Ryan, The Court Monitors' Report to the Court Regarding Maltreatment in Care and Unsafe Placements for Children Without a Placement 5, April 27, 2021, ECF No. 1066.

[6] A spell denotes each separate time period that DFPS reports a child has spent one or more consecutive nights without placement. For example, if a child is without placement from June 1, 2021, to June 5, 2021, is then placed in an RTC from June 6, 2021 to June 10, 2021, and is then again without placement from June 11, 2021 to June 20, 2021, the child has had two CWOP spells.

Children's average spells without placement lasted 14 nights, with the longest spell lasting 144 nights, an increase from the previous reporting period.[7,8] The average number of nights without placement per child (*i.e.*, combining the length of all spells without placement during the period) was 20 nights, with a maximum of 163 nights. Almost 60% of the children without placement during this period experienced more than seven total nights without placement, and 19% (94) experienced more than four weeks without placement.[9]

**Figure 2: Total Nights Without Placement per Child (January 1, 2021 – June 30, 2021)[10]**



Total Nights Without Placement (Jan 1, 2020 - Jun 30, 2021)
*Source: Analysis of DFPS CWOP data*
*n=452 unique children*

Legend: ■ 7 or fewer   ■ 7 to 14   ■ 14 to 21   ■ 21 to 28   ■ More than 28

C. Profile of children without placement[11]

**1. Demographics**

The majority (86% or 422) of children without placement during the period were teenagers. The youngest child was one-year-old at the time a spell began and the oldest children were 17-years-old. More than half (54% or 263) of the children without placement during the period were

---

[7] This figure does not include the current spells for the 113 children without placement on the last day of the period, June 30, 2021.

[8] In the previous report, the average spell without placement lasted nine nights, with the longest spell lasting 51 nights.

[9] This figure does not include the current spells for the 49 children without placement on the last day of the period who did not have a previous spell.

[10] The graph does not include the current spells for the 49 children without placement on the last day of the period who did not have a previous spell.

[11] DFPS did not provide demographic information in the March 31, 2021, addendum on children under the care of SSCCs, therefore demographic data was available for 488 of 501 children. Unless otherwise noted, percentages are calculated out of 488.

female – higher than the share of female children in the broader PMC population (47% on June 30, 2021). The vast majority of female children without placement were teenagers (ages 13 to 17) (88% or 231) and 62% (164) were older teens aged 15-17. Male children without placement during this period were similarly aged: 85% (191) were teenagers and 64% (143) were older teens aged 15-17.

### 2. Characteristics and Needs

DFPS described multiple "barriers to placement" for most children it reported during this period.[12] These children typically have experienced multiple placements; frequently the children's mental health needs and underlying trauma have not been effectively addressed in their numerous placements.[13]

The most common corresponding characteristics or treatment needs that DFPS identified were: history of physical aggression (405 children, 83%); prior hospitalizations for mental health crises (347 children or 71%); and a history of self-harm or suicidal ideation (346 children or 71%).[14] As shown in Figure 3, the reported treatment needs for male and female children were similar.

---

[12] DFPS did not include "barriers to placement" for 11 unique children. Unless otherwise noted, percentages are calculated out of 490.

[13] *See* Deborah Fowler and Kevin Ryan, The Court Monitors' Report to the Court Regarding Maltreatment in Care and Unsafe Placements for Children Without a Placement 7-8, April 27, 2021, ECF No. 1066; Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center, February 8, 2021, ECF No. 1027 (detailing the experience of two children, A.A. and B.B.).

[14] The monitoring team coded the text descriptions provided by DFPS using categories derived from the Common Application for Placement of Children in Residential Care.

**Figure 3: Number of Children in Sample with Indicated Treatment Need, By Sex (January 1, 2021- June 30, 2021)**



The children without placement during this period had notably high assigned levels of care compared to the broader PMC population (see Figure 4). DFPS reported that nearly half (45% or 218) of the children without placement during this period required a "Specialized" level of care, with 21% (104) needing "Intense" care, and 24% (116) requiring "Moderate" or "Basic" care. The level of care was reported as expired for 41 children (8%).[15]

---

[15] For children with multiple spells without placement during the period, this analysis reflects the highest reported level of care across all spells. For children whose level of care changed over the course of their spell, their highest initial level was used in this analysis.

**Figure 4: Assigned Level of Care for Children Without Placement Compared to PMC Population[16]**



Assigned Level of Care for Children Without Placement Compared to PMC Population

*Source: Analysis of DFPS CWOP data; DFPS PMC cohort data (June 30, 2021)*
*n = 489 PMC children without placement; 9,805 PMC children*

### D. Geography and Location

Almost 50% of children without placement were reported from five counties: Bexar (17%, 83) Harris (14% or 68), Dallas (9%, 44), Nueces (4% or22) and Hidalgo (3% or 15).  However, children experienced spells without placement in 88 different counties.

The top three legal counties for children without placement (Bexar, Harris, and Dallas) are the same among the broader PMC population. However, children without placement have a larger representation from Nueces and Hidalgo County as compared to the PMC population.

---

[16] Level of care data was available for 489 PMC children in a CWOP Setting and 9,805 PMC children as of DFPS' June 30, 2021 cohort data.

**Figure 5: Legal County for Children Without Placement Compared to PMC Population[17]**



The majority of children were under the care of DFPS (79% or 397), with 21% under the care of an SSCC: Family Tapestry (17% or 85),[18] OCOK (3%, 15), 2INGage (<1% or 3), and St. Francis (<1% or 1).[19]

DFPS reports a child's placement location prior to the child's spell without placement in a CWOP Setting.[20] According to this data, 23% (164) of CWOP spells between January 1, 2021, and June 30, 2021, occurred after a child's stay in a psychiatric hospital. Eighteen percent (128) of CWOP spells occurred after a child ran away from a placement,[21] and 17% (120) occurred after a child's stay at a Residential Treatment Center (see Figure 6).

---

[17] Legal county data was available for 9,805 PMC children as of DFPS' June 30, 2021, cohort data.

[18] Family Tapestry notified DFPS on April 29, 2021, of its intent to terminate its contract with DFPS in a letter to DFPS Commissioner Jaime Masters, and it no longer serves as the SSCC for the region.

[19] Of the total population of PMC children, 19% (1,908) were under the care of SSCCs as of June 30, 2021.

[20] Prior location data was available for 717 of 749 spells without placement.

[21] The data does not indicate from which type of placement a child ran away.

**Figure 6: Child Location Prior to Spell Without Placement (January 1, 2021 - June 30, 2021)**



When children experienced nights without placement, DFPS reported that children were held at CPS offices (56%, 423); various facilities (22%, 167); hotels (15%, 114); and churches (5%, 39).

**Figure 7: Child Location During Spell Without Placement (January 1, 2021 - June 30, 2021)**

Child Location During Spell Without Placement
(Jan 1, 2021 - Jun 30, 2021)
*Source: AR analysis of TX DFPS CWOP data*
*n=749 spells without placement*

- 423, 56%
- 167, 22%
- 114, 15%
- 39, 5%
- 6, 1%

■ CPS Office   ■ Foster Care Facility   ■ Hotel   ■ Church   ■ Other

## II.   The State's Claims Regarding the Causes of the Crisis

State law tasks DFPS and HHSC with responsibility for developing a plan to meet the capacity needs of the foster care system.[22]  Since at least 2017, DFPS has produced an annual report documenting the capacity needs of the Texas foster care system.[23]  In each of the reports published since 2017, DFPS has documented a capacity shortfall, particularly for children whose treatment needs place them in the Specialized or Intense level of care.[24]  In January 2017, DFPS noted "DFPS

[22] Tex. Hum. Res. Code §40.051 (requiring DFPS to develop a strategic plan based, in part, on "the goal of increasing the capacity and availability of foster, relative, and kinship placements in this state."); Tex. Fam. Code §264.1261 (requiring DFPS to work with stakeholders in each region of the state to create a plan to address substitute care capacity needs in the region).  During the 87th Regular Legislative Session, S.B. 1869 amended section 264.1261 of the Family Code to require HHSC, in collaboration with DFPS and the SSCCs, to develop a plan to increase placement capacity in each catchment area of the state with the goal of eliminating the need to place a child outside the child's community. S.B. 1896, 87th Reg. Session (Tx. 2021).

[23] *See* DFPS, DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES FOSTER CARE NEEDS ASSESSMENT (January 2017). DFPS produced reports prior to 2017 focused on capacity in response to SB 758, passed by the Texas Legislature in 2007.  *See* DFPS, SB 758 FOSTER CARE CAPACITY-BUILDING PROGRESS REPORT (2009); DFPS S.B. 758 FOSTER CARE CAPACITY-BUILDING PROGRESS REPORT (2012).  A plan for building capacity was outlined in a 2008 DFPS report, which noted, "DFPS began tracking the number of youth without placements in January 2007.  Prior to January, youth were known to stay overnight in offices on occasion, but the increasing occurrences led DFPS to develop a centralized database in order to determine the scope of the issue."  DFPS, MOVING FOSTER CARE FORWARD 5 (2008).  This report noted that 32 youth stayed overnight in a CPS office or other location in January 2007 and that the "placement challenge peaked in the month of May 2007 with 160 youth spending at least one night in an office."  *Id.*

[24] DFPS, FOSTER CARE NEEDS ASSESSMENT (2018); DFPS, FOSTER CARE NEEDS ASSESSMENT (2019); DFPS, FOSTER CARE NEEDS ASSESSMENT (2020).

is experiencing difficulty securing and maintaining placement resources for children."[25]  By July 2019, the same month the Fifth Circuit issued its mandate in this case, DFPS noted a need for, "[m]ore foster home capacity across the state for: youth 14 and older with basic and moderate service levels; for all higher needs children and youth; and in rural areas, capacity for all ages and services levels."[26]  In the report that DFPS released in November 2020, it noted that there "is still a need" to build capacity in these areas.[27]

DFPS' needs assessment reports also refer to Texas's reliance on private providers to meet children's placement and safety needs.  DFPS states, "Building capacity depends largely on contracted provider efforts.  Contracted providers develop and manage 90 percent of all foster homes across the state, all foster homes for higher needs children, and all congregate care."[28]  In Community-Based Care regions, Single Source Continuum Contractors are responsible for ensuring adequate capacity to meet the placement and safety needs of children in their regions.[29]

Though DFPS' reports since 2017 document an historical and ongoing problem with capacity, particularly for children with a high level of care, the State attributes the current prevalence of children being housed in unregulated CWOP Settings, such as offices,  to a number of different causes, none related to failures associated with DFPS' statutory and constitutional responsibility to ensure that the system's capacity provides for safe placements that do not expose children to an unreasonable risk of serious harm.  The State first pointed to the COVID-19 pandemic as the cause for the growing placement crisis, an issue the Monitors discussed in the September 2, 2020 report filed with the Court discussing children without placement.[30]  The State has also pointed to "lost" beds within the system, and to displacement of foster children by unaccompanied migrant children in operations that contract with the federal government to house these children.  Most recently, the State has claimed that implementation of the Court's orders related to Heightened Monitoring has led providers to either opt out of serving foster children altogether, or serve children with a lower level of care.[31]

---

[25] DFPS, DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES FOSTER CARE NEEDS ASSESSMENT 5 (January 2017). While this report, and those that follow, are principally focused on the capacity needed in each region or catchment area to support keeping children within their legal county or regional catchment, the report also points out that "there is not an excess of supply at the state level.  All supply is being used." Id. at 8.

[26] DFPS, FOSTER CARE NEEDS ASSESSMENT 3 (July 2019).

[27] DFPS, FOSTER CARE NEEDS ASSESSMENT, Executive Summary (November 2020).

[28] DFPS, FOSTER CARE NEEDS ASSESSMENT 3 (July 2019); DFPS, FOSTER CARE NEEDS ASSESSMENT, Executive Summary (November 2020) ("Building capacity still largely depends on contracted provider efforts.").

[29] See DFPS, DFPS Statement of Work for Region 3b Single Source Continuum Contractor, Exhibit A: DFPS Statement of Work – Version 4.0 (October 2019).

[30] Deborah Fowler and Kevin Ryan, The Court Monitors' Report to the Court Regarding the State's COVID-19 Response and Implementation of the Court's Order Regarding Heightened Monitoring, September 2, 2020, ECF 955.

[31] The State has also pointed to children's refusal of placements as a reason for the crisis.  During site visits, the monitoring team asked the 56 children interviewed whether they had ever refused a placement.  Very few (16% or 9) answered that they had.  Of those who answered that they had, when asked why they refused the placement, reasons included not wanting to move out of state, and not wanting to move far away from siblings or other family members. Children also reported that in some cases, they had heard from other children who had unsafe experiences at the facility where the State wanted to place them, and they were afraid to go based on what they had heard about the placement.  In DFPS' informal response to the Monitors' report, the State indicates an even lower number of children (eight of 169, or 4.7%) had refused placement.  Despite the very low number, the State still included this as a material factor contributing to the current placement crisis.  DFPS, Children Without Placement, September 2021 (on file with the Monitors).

Despite repeatedly raising these issues as causes for the crisis, the State has not provided data or information that can be validated by the Monitors to substantiate these representations, apart from DFPS' statements regarding beds lost due to operation closures. The Monitors' analysis revealed the vast majority of "lost" beds were in unsafe operations across Texas and were closed because of the State's action: either HHSC's decision to revoke or deny an operation's license because of serious safety problems, or DFPS' decision to cancel a contract for the same reason.

In all, more than 1,200 beds have closed in operations deemed so unsafe by either HHSC or DFPS that the State determined that revoking a license or ending a contract and removing children was the best option; more than 200 were eliminated from the system when operations with a serious history of safety violations voluntarily closed after being placed under Heightened Monitoring. These closures are appropriately linked to the State's implementation of the Court's orders in this matter and Texas's efforts to remedy the constitutional infirmities documented by the Court and validated by the Fifth Circuit.  The Court found, and the Fifth Circuit agreed, that Texas's foster care system was unconstitutional due, in part, to the State's failure to appropriately monitor and enforce minimum standards, causing PMC children to be placed in settings that posed an unreasonable risk of serious harm.  As the Fifth Circuit explained, Texas's lax enforcement created a system in which repeat violators were "not a new phenomenon" and "licensees do not perceive that they will be held accountable for their malfeasance."[32]  That some placements would close as the State implemented the Court's remedial orders is unsurprising, but the State did not add adequate capacity in new, safe settings for higher-needs children, despite its own reports having for years identified a capacity problem.

The children most affected by the current placement crisis are, in many cases, PMC children who were formerly served in the RTCs and GROs that the State closed due to safety problems. Many of the children the monitoring team met during on-site visits to CWOP Settings this summer had cycled through multiple operations closed due to safety violations; some were living in facilities when they closed.  Most of these children are very much like "A.A." and "B.B.," the two children discussed in the Monitors' February 8, 2020 report to the Court regarding Devereux – League City,[33] shuffled for years between RTCs and psychiatric hospitals, retraumatized along the way by unsafe conditions. Many of these children, like the named plaintiffs in this matter, have suffered the consequences of a constitutionally infirm system. They are now suffering through the capacity crisis that follows in the wake of shuttering operations that HHSC and DFPS deemed so unsafe that closure or contract termination was the best option for keeping children safe.

A.  Heightened Monitoring

### 1.  Background of the Court's Orders Regarding Heightened Monitoring

The background of the Court's orders regarding Heightened Monitoring is discussed at length in the Monitors' first two full reports, and in reports focused on implementation of Remedial Order

---

[32] *M.D. v. Abbott*, 907 F. 3d 237, 265 (5th Cir. 2018).
[33] Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center, February 8, 2021, ECF No. 1027.

20.[34]   In short, after the State asked the Court to clarify the language of Remedial Order 20, particularly with respect to determining a "pattern" and the process for Heightened Monitoring, the Monitors reviewed and discussed proposed clarifications with HHSC and DFPS for each of those terms.[35]   The Monitors made recommendations to the Court for the clarifications sought by the State.[36]   The Court entered an Order on March 18, 2020 that provided the clarification the State sought.[37]   The State did not appeal this order.

Since then, the Court has twice entered Agreed Orders modifying the March 18, 2020 Order: First, on August 31, 2020, granting the State until January 1, 2021 to fully implement Heightened Monitoring for all of the operations it identified as qualifying for enhanced oversight.[38] And a second time, on December 7, 2020, the Court allowed placement approvals to be made by a DFPS Regional Director, rather than the Associate Commissioner, for operations on Heightened Monitoring.[39]

The State has twice evaluated operations for purposes of determining which qualify for Heightened Monitoring: first in 2020, and again in 2021.   Of the 485 operations that provided placements for foster children between 2015 and 2020, 127 (26%) had combined violation rates over the state rate in three or more years, making them eligible for Heightened Monitoring.   Of the 127[40] eligible operations, 82, or 17% of the 485 evaluated, were still active as of June 2021, and are currently under Heightened Monitoring.

There is no question that the operations that qualified for Heightened Monitoring had serious child safety problems: the 127 operations that qualified for Heightened Monitoring in either 2020 or 2021 accounted for a total of 631 substantiated allegations of abuse, neglect, or exploitation of children entrusted to their care over the five-year period included in the analyses, and 12,558 citations for minimum standards violations rated high, medium-high, or medium.   As discussed, below, of the operations that qualified for Heightened Monitoring that closed; those that closed voluntarily accounted for 57 of the 631 substantiated allegations of abuse, neglect, or exploitation and 1,570 minimum standards citations weighted high, medium-high, or medium while those that closed because of license revocation or denial, or contract termination, accounted for 142 substantiated allegations of abuse, neglect, or exploitations and 1,977 minimum standards citations ranked high, medium-high, or medium.

---

[34] Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding Remedial Order 20, March 3, 2020, ECF 832; Deborah Fowler and Kevin Ryan, First Court Monitors' Report 2020, June 16, 2020, ECF 869; Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding the State's COVID-19 Response and Implementation of the Court's Order Regarding Heightened Monitoring, September 2, 2020, ECF 955; Deborah Fowler and Kevin Ryan, Second Report of the Monitors, May 4, 2021, ECF 1079.

[35] Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding Remedial Order 20, March 3, 2020, ECF 832.

[36] Id.

[37] Order, ECF 837.   The Court entered an Order on March 29, 2020, temporarily suspending the "in person" elements of Heightened Monitoring definition included in the March 18, 2020, Order. Order, ECF 838.

[38] Order, ECF 950.

[39] Order, ECF 1012.

[40] An additional seven CPA operations originally qualified for heightened monitoring in 2020 but were removed after CPA capacity corrections were made by the State.   Once capacity was corrected, these seven operations were no longer eligible for Heightened Monitoring.

**2.  The State's Claims Linking Remedial Order 20 and Heightened Monitoring to Placement Crisis**

At times, some providers have pointed to Heightened Monitoring as a primary cause for the shortage of placements and the spike in the number of foster children in CWOP Settings. One of the provider associations, the Texas Alliance of Child and Family Services (TACFS) sent a letter to the Monitors in December 2020, which included the following characterization of the alleged impact of the lawsuit on care provided:

> We believe it is important for you to hear from the caregivers working directly with children and youth in the system every day.  We have been talking and working with providers for the past year to understand and adapt to the lawsuit and court's orders.  With that in mind, we want to bring to your attention a few critical issues impacted by the lawsuit and the ongoing monitoring process.
>
>> 1.  **Loss of capacity for children with complex needs.**  Many TACFS members care for children with complex needs or trauma-induced behaviors – children who have a history of running away, displaying aggressive behavior toward others or themselves, or are survivors of child sex trafficking and exploitation.  It is our understanding that the methodology for heightened monitoring does not adjust for the unique needs of children and therefore does not account for the significant challenges of caring for children with higher needs.  Caring for children with complex or behavioral needs brings an increased risk of punitive regulatory sanctions that could ultimately shut down a program when such a shutdown may not be warranted.  And this risk aversion is leading organizations to reconsider serving children with complex, therapeutic needs that they might otherwise have served and served well.[41]

Some providers and their representatives also raised a similar concern when the capacity crisis was reported in the media.[42]  More recently, DFPS leadership has pointed to its own

---

[41] Letter from Katie Olse, CEO, Texas Alliance of Child and Family Services, to Deborah Fowler and Kevin Ryan, December 3, 2020 (on file with Monitors).  The letter also claimed that Heightened Monitoring is having a negative impact on child well-being because "Some organizations are so focused on the risk of harm that they are cautious or even avoiding allowing children normal experiences of growing up, like going to the park or outings with friends, connecting with a mentor, and more."  *Id.*  Ms. Olse further complained that "complying with regulations stemming from the ongoing lawsuit is pulling limited resources away from direct care and services."  *Id.*  DFPS later repeated these complaints to the Monitors.  Ms. Olse's letter advocated "Forward-thinking heightened monitoring," stating "With so many contracted providers on heightened monitoring, many with strong histories and excellent track records, the end is unclear…with the current methodology including a rolling average, it is highly likely that many will be right back on heightened monitoring again next year, and the year after."  *Id.*

[42] *See* Robert T. Garrett, *Abused, neglected children again sleeping in CPS offices in repeat of Texas foster care crisis*, Dallas Morning News, December 18, 2020; Robert T. Garrett, '*Capacity catastrophe': Texas' big outsourcing of foster care tested by system's woes*, Dallas Morning News, April 30, 2021; Avery Travis, '*A catastrophe': More than 200 kids sleeping in CPS offices as need for foster care intensifies*, KXAN.com, May 4, 2021; Robert T. Garrett, *Foster care providers 'very disappointed' Texas lawmakers didn't raise rates to ease capacity*, Dallas Morning News, May 28, 2021; Reese Oxner & Neelam Bohra, *Texas foster care crisis worsens, with fast-growing numbers of children sleeping in offices, hotels, churches*, Texas Tribune, July 19, 2021.

implementation of Heightened Monitoring as a cause of the crisis, linking it to the difficulty that the agency is having in finding placements for what it refers to as "high acuity" youth. In a letter to Texas State Senator Lois Kolkhorst and Texas State Representative James Frank dated May 10, 2021, DFPS Commissioner Jaime Masters wrote:

> Our lack of capacity undoubtedly increased significantly with COVID-19, but that is no longer the primary issue. The federal foster care lawsuit and insufficient rates are now having a significant impact. While the District Court has explained its remedies are designed to improve care and safety for children, providers nevertheless say they are afraid of heightened monitoring and what it means.

> While we always need more placements, we have unused capacity because of apprehension over accepting children with a history of physical or sexual aggression and/or significant mental health issues. Providers fear licensing or abuse/neglect findings that may lead to heightened monitoring. The other factor I mention above, rates, figures directly into this equation. Most providers do not exist to run a profit, and as such, do not have discretionary funds to supplement rates. Higher rates would allow some providers to increase staffing or wrap-around supports. Others may be able to operate by serving fewer high-acuity children with greater focus.[43]

When DFPS sent the Monitors a copy of this letter, DFPS also sent a spreadsheet that it had provided to the legislators that showed capacity changes for foster homes and congregate care facilities in each region of the state.[44] Though Commissioner Masters' letter points to "unused capacity" and providers' fears related to Heightened Monitoring as the causes of the crisis, the spreadsheet indicates that though total foster home capacity increased statewide between April 30, 2019 and March 31, 2021 by 259 homes, the total GRO capacity decreased statewide by 664 beds.[45] More recent statements from DFPS place the number of "lost" beds (most of which resulted from the closure of unsafe congregate care facilities) at over 1,000.[46]

On June 28, 2021, Commissioner Masters sent an e-mail to the Monitors that pointed to Heightened Monitoring as a factor contributing to DFPS' difficulty in obtaining placements for "high acuity" youth. Though the e-mail raised a number of other problems more directly related to capacity, including appropriate staffing, loss of beds, the treatment needs of "high acuity" youth,

---

[43] Letter from Jaime Masters, Commissioner, DFPS, to Senator Lois Kolkhorst, Chair, Texas Senate Health and Human Services Committee, and Representative James Frank, Chair, Texas House Human Services Committee, May 10, 2021 (on file with Monitors).
[44] DFPS, Excel Spreadsheet: SSCC Placements and Capacity Changes (on file with Monitors). The Monitors have not validated the data included on the DFPS spreadsheet.
[45] *Id.* The children DFPS identified as most affected by the placement crisis are children who have not historically been placed in foster homes. *See* Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding the State's COVID-19 Response and Implementation of the Court's Order Regarding Heightened Monitoring, at 29-30, September 2, 2020, ECF 955 (examining level of care by living arrangement and finding children with a Specialized or Intense level of care are most often placed by Texas in congregate care settings).
[46] E-mail from Trevor Woodruff to Deborah Fowler and Kevin Ryan, re: Capacity Loss Numbers, June 28, 2021 (breaking out capacity lost from September 1, 2020 to the date of the e-mails by operation type, and indicating a total capacity loss of 1,026) (on file with Monitors).

and payment rates, the singular focus of the e-mail's request for a conversation with the Monitors was to discuss the potential for changes to Heightened Monitoring "including the exit parameters."[47] Commissioner Masters' e-mail states:

> It is beyond question that the acuity of children in care continues to steadily increase. An analysis to barriers to placement (percentage of youth on average with identified behaviors), yields three overwhelmingly common characteristics:
>
> - History of psychiatric hospitalizations (self-harm, suicidal ideations/attempts) – 85%
> - Aggression/violent outbursts/assault – 75%
> - History of running away – 60%[48]
>
> These statistics are alarming and the increasing acuity of children are joined with other drivers for the drastic increase in CWOP. Candid discussion with providers to address CWOP yield the same core issues – inability to secure staff, foster care litigation, and frustration over rates.
>
> During the height of the pandemic, providers began experiencing problems with maintaining staff sufficient to serve children. Whether it was quarantined staff or simply staff who were afraid to work, providers had no choice but to begin to restrict some of their ability to serve children. This was exacerbated by children who were quarantined, requiring their separation from other children and requiring additional staff to care for them on an individual basis. This has coincided with the implementation of Heightened Monitoring and there is no denying it, they have never recovered to pre-pandemic levels of staffing.
>
> Providers generally speak in terms of concerns of DFPS investigations and HHSC licensing actions. They view the increase in investigations and licensing action as creating a punitive environment. They have complained that there are not sufficient technical assistance or opportunities for understanding or correction, which I have asked the Heightened Monitoring team to immediately address. They further complain that the Heightened Monitoring process requires additional staff and time for the operation that is taking away from serving youth. Providers report not

---

[47] As discussed at length in the Monitors' previous reports, to exit Heightened Monitoring, an operation must: satisfy the conditions of the State's Heightened Monitoring Plan; have at least six months of successive unannounced visits indicating the operation is following the standards and contract requirements that led to Heightened Monitoring; and the operation is not out of compliance on any medium-high or high weighted licensing standards. Order, ECF 837.

[48] Though the preceding sentence implies that the acuity of all children in care is increasing, it is important to point out that the data cited are not for all children in care; they are statistics for children in CWOP Settings. If level of care is a proxy for "acuity," the level of care for children in DFPS custody does not appear to have changed significantly since DFPS provided information to the Court's Special Masters in this case on April 26, 2016. A Slideshow presentation shared with the Special Masters on that date showed that 14 percent of foster children were classified as having a Specialized level of care, and three percent were classified as having an Intense level of care. DFPS Placement Array, PPT, April 26, 2016 (on file with the Monitors). The Monitors' review of PMC children's level of care for this report shows that in June 2021, approximately 15% of PMC children had a Specialized level of care, and four percent (4%) had an Intense or Intense Plus level of care (a level added since the 2016 PPT presentation).

wanting to take youth with high acuity needs due to fear of the state, reporting a "self-preservation" mode, which further compounds the staffing issues. They report staff quitting due to fear of an abuse/neglect finding; concerns with findings being punitive and not helpful or collaborative; findings of RTBs for what they believe are "common sense" situations, such as choosing between competing needs in a very dynamic and fluid environment; and a feeling that investigators are no longer taking into account the environment or competing needs of the kids they are serving.

Finally, it has long been the case that providers struggle with finding qualified administrators to run operations.[49] This struggle now extends to finding and maintaining quality staff. This is part of the frustration over rates. With the current economic climate, providers struggle to attract and maintain sufficient staff for operations. A lack of staffing and other necessary staff (therapeutic providers, maintenance personnel, etc.) directly reduces the ability of providers to increase capacity. This inability to gain appropriate staffing has a greater detrimental impact as providers now desire additional supervision and support for children in care to guard against potential increase in investigations and licensing actions that may place them on heightened monitoring or other actions (probation or contract termination).

These are difficult challenges to overcome not only for our providers but for both DFPS and our SSCC partners as we are not having much success with getting them to resume accepting our kiddos. We have experienced a net loss of 994 beds as of May 28, 2021 for this fiscal year thus far...While I understand, the scope of this litigation does not cover CWOP, compliance with the Heightened Monitoring Order is having an impact on our ability to place these high acuity kiddos with providers…Would you be open to discussing with me and a few others on the leadership team about the impact of the litigation, always with the primary focus of keeping our kids safe. We are in full agreement that safety will not be compromised but would like to meet to review and discuss the current parameters, including the exit parameters. We need our providers and need to also show them that we hear them. I have to find a way to change the Providers' perception of Heightened Monitoring and to help them succeed.[50]

On July 1, 2021, DFPS sent an update to the Monitors regarding the steps the agency was taking to address the lack of safe placements for children. Though the e-mail was principally focused on the agency's work to develop new capacity, particularly capacity focused on the treatment needs of "high-acuity" youth, DFPS also raised Heightened Monitoring:

---

[49] SB 1896 amended Chapter 42 of the Texas Human Resources Code to add section 42.080 prohibiting HHSC from issuing citations to GROs or CPAs for failing to employ a licensed child-care administrator if the operation has been without an administrator for less than 60 days and made substantial efforts to hire a qualified administrator. Tex. Hum. Res. Code §42.080.

[50] E-mail from Commissioner Masters to Deborah Fowler and Kevin Ryan, re: CWOP/Capacity, June 28, 2021 (on file with the Monitors).

We continue to focus on developing sub-acute capacity to meet the placement needs of children in CWOP. ***

***

I know Commissioner Masters has requested a meeting to discuss Heightened Monitoring (HM).  One of the new operations, The Bridge, recently placed on HM, requested a meeting with us to share their concerns.  We met yesterday and they opened by stating, "we have spent the last 4 of the last 5 years accepting your higher acuity youth, and the 'thank you' was HM."  They further stated, "we were warned by other operations not to accept these youth as it would increase licensing violations and we now see they were right."[51]  They advised they will be sharing their experience with other providers and suggested we need to make allowances for operations who accept these youth, recognizing that their behaviors lead to increased investigations and licensing deficiencies.  They were critical of both DFPS investigations and HHSC licensing.  They also complained of the rates.  I requested that they send all their concerns in writing.  Also, while I know Trevor Woodruff shared with you a list of the operations that have closed over the last year, the providers continue to tell us that the impact of HM extends to operations on HM and those who fear being placed on HM so they are refusing to accept our higher acuity needs youth.[52]

The Monitors responded to the e-mail by noting that operations qualify for Heightened Monitoring only if they have had a higher than average number of *substantiated* findings of abuse, neglect, or exploitation (aka RTBs), citations for minimum standards violations (rated high, medium-high, or medium), and contract violations, in at least three of the five years of the analysis,

---

[51] The Heightened Monitoring analysis for The Bridge, an Emergency Shelter with a capacity ranging from 22 to 38 beds between 2016 and 2020, showed that the operation was well above the average rate of violations for similarly sized GROs in 2017, 2018, and 2020.  In 2017, the average rate of combined RTBs for child abuse or neglect, minimum standards violations rated high, medium-high, and medium, and contract violations was 2.668; The Bridge had a rate of 3.182.  In 2018, the average rate for similarly-sized GROs was 3.003; The Bridge had a rate of 5.0.  And in 2020, the average rate was 3.777 for similarly sized operations; The Bridge had a rate of 6.364.  Between 2016 and July 30, 2021, four State investigations of allegations of maltreatment of children at The Bridge have resulted in seven substantiated findings of child abuse, neglect, or exploitation:  In 2017, a finding of Reason to Believe for Physical Abuse resulted from a case in which a child was "punched several times on his head" by a staff person, resulting in an injury to the child's eye.  This finding was upheld on administrative review.  In 2019, a finding of Reason to Believe for Physical Abuse resulted from an investigation in which a 6'2", 280-pound male staff person "slammed" a 16-year-old girl, described as 5'4" and about 120 pounds, against the wall during a restraint, and then "slammed her against the tip of the door frame," with the child reporting that she "felt her face hit the door frame and her feet were no longer touching the floor."  The RTB was upheld after an administrative review.  In 2021, three Reason to Believe findings for Physical Abuse (one for each staff person involved) resulted from a failure to intervene when two children attacked and injured another child.  An administrative review is pending.  In 2021, two findings of Reason to Believe for Neglectful Supervision resulted from the failure of two staff members to intervene or prevent an incident in which a child threw a pencil at and injured a 15-year-old girl who has cerebral palsy and is partially blind, after the aggressor (who had repeatedly indicated she had a problem with special needs children) had been threatening to kill or injure the child.  An administrative review is pending.

[52] E-mail from Corliss Lawson, Associate Commissioner for Foster Care Litigation Compliance, to Deborah Fowler and Kevin Ryan, re: CWOP, July 1, 2021, (on file with the Monitors).

when compared to similar operations.[53]  In fact, 74% (358) of the 485 operations that provided placements for foster children between 2015 and 2020 had safety records that did not warrant enhanced oversight. The Monitors asked whether it was DFPS' position that operations that care for "high acuity" youth should be allowed a higher number of substantiated findings of abuse, neglect, or exploitation, minimum standards violations, and contract violations before being placed on Heightened Monitoring.[54]

In the alternative, the Monitors asked if DFPS was suggesting that DFPS substantiates allegations of abuse, neglect, or exploitation involving "high acuity" youth when unwarranted, that DFPS takes contract action against these operations when unwarranted, or if it was suggesting HHSC takes unwarranted action on minimum standards.  DFPS responded, opening its e-mail with reassurances that the agency did not intend to suggest that a lower standard of care should be tolerated for providers that accept those whom DFPS describes as "high acuity" youth:

> First, DFPS wants to be clear our position is not that Providers who care for "high acuity" youth should be allowed a higher number of substantiated findings of abuse, neglect, or exploitation, minimum standards violations (rated high, med-high, or medium), and contract violations before being placed on Heightened Monitoring. The problem is much more complex, and we don't believe there is a magical number.  Nonetheless, providers have complained that the existing regulatory system does not take into consideration the level of care needed by the youth being

---

[53] E-mail from Deborah Fowler and Kevin Ryan to Corliss Lawson, et al, re: CWOP, July 2, 2021, (on file with the Monitors).

[54] This is not the first time that DFPS has made the argument that children's level of care should be considered when determining whether an operation qualifies for Heightened Monitoring. The argument was first raised when DFPS asked the Court to allow it to use a tiered approach at the start of Heightened Monitoring, citing a lack of resources and capacity.  *See* Deborah Fowler and Kevin Ryan, The Court Monitors' Report to the Court Regarding the State's COVID-19 Response and Implementation of the Court's Order Regarding Heightened Monitoring, at 27-30, September 2, 2020, ECF 955.  DFPS proposed using a "risk stratification" analysis to prioritize rollout that included, among other things, a credit for providers serving "high acuity" youth, subtracting points from their risk score if they served youth with a high level of care.  This risk stratification analysis was already used by DFPS in its oversight of contractors; it was created by DFPS in conjunction with its efforts to improve monitoring and evaluation of contractor performance, in response to a bill passed by the Texas legislature in 2019.  DFPS, *Senate Health and Human Services, Department of Family & Protective Services Overview* 89, PowerPoint Presentation, March 10, 2021.  DFPS uses its risk stratification tool to run quarterly evaluations of all of its residential care contractors to evaluate trends related to child safety.  *Id.*  DFPS explained to the Monitors that its purpose for including level of care in the analysis was not to discount RTBs and deficiencies, but instead to balance factors, including early discharges from placements and EBI rates, that the agency contends are correlated to level of care but not to violations or evidence of actual harm. When the Monitors replicated the State's risk stratification analysis, the Monitors found that subtracting points for operations serving youth with a higher level of care overcompensated for the elements DFPS claimed it was trying to balance, presenting the possibility that it could mask safety risks to children evidenced by RTBs for child abuse and neglect and deficiencies.  Ultimately, the State agreed that it would not use level of care as a piece of the risk stratification analysis for Heightened Monitoring going forward, particularly after the Monitors' replication of the analysis also showed that removing the level of care credit from the analysis for the operations that qualified for Heightened Monitoring did not change the priority list for the rolling implementation of the first set of operations identified for Heightened Monitoring.  In other words, even when accounting for operations serving youth with a higher level of care, prioritization of operations for the 2020 Heightened Monitoring rollout did not change.  Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding the State's COVID-19 Response and Implementation of the Court's Order Regarding Heightened Monitoring, at 31, September 2, 2020, ECF 955.

served and the complexities of the youth's behaviors. What DFPS is suggesting is *non-adversarial* undertaking, together with you all as Monitors, to address what we believe is an unintended consequence of the Heightened Monitoring Order that is contributing to the barriers we are facing in finding placements for youth with high acuity needs. For purposes of this conversation, "high acuity youth" are the youth who are ending up in CWOP and…whom Providers are unwilling to accept because there are no allowances given for caring for this population. As Commissioner Masters stated in her communication to you, those youth overwhelmingly have the following 3 potential barriers to placement:

- o History of psychiatric hospitalizations (self-harm, suicidal ideations/attempts) – 85%
- o Aggression/violent outbursts/assault – 75%
- o History of running away – 60%[55]

However, despite DFPS' assurances that the agency did not intend to suggest a lower standard, the e-mail goes on to describe exactly that, raising the example of The Bridge, again, as an operation that felt it was being punished for "help[ing].out" DFPS[56] by taking "high acuity" youth:

As provider staff engage with youth to control behaviors so that they do not harm themselves or others, it undeniably leads to more investigations and potential RTBs and the corresponding license violations. As I mentioned in my communication by way of example, we spoke last week with staff from The Bridge in San Antonio, which had a TEP contract with DFPS to accept its "high acuity" youth, often the ones in CWOP, or headed to CWOP, for 4 of the last 5 years. Because it was a TEP contract, it had a "no eject/no reject" clause so The Bridge was obligated to accept our youth. They noted that they could have terminated the contract but wanted to care for these youth and help us out, knowing that other providers often will not accept this population. The staff are experts in the field and have been serving in this capacity for many years, with one staff member noting she had been

---

[55] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: CWOP, July 7, 2021 (emphasis in original) (on file with the Monitors).

[56] According to the contract between DFPS and The Bridge, a "Temporary Emergency Placement" or "TEP" are "[t]emporary programs to provide temporary emergency placement for children and youth with high needs while a longer term placement is identified." DFPS, Purchased Client Services Contract Amendment Contract #200094-008, June 21, 2017 (on file with the Monitors). TEP programs were created in 2017 to respond to a previous crisis in the number of children without placements. *See* DFPS, CHILD PROTECTIVE SERVICES BUSINESS PLAN FISCAL YEAR 2018, at 31 (October 2017). The daily rate for providers that "help out" DFPS by providing TEP beds is at the top of the rate scale. The Bridge entered into a TEP contract with DFPS in 2017 and continued to contract with DFPS in 2018 and 2019 for these beds. According to the contract between The Bridge and DFPS, the provider was paid $400.72 per day (for an annual rate of almost $150,000 for each bed) regardless of whether the beds were actually occupied by children. DFPS, Purchased Client Services Contract Amendment Contract #200094-998, June 21, 2017 (on file with the Monitors). During the first year of the contract between DFPS and The Bridge, the provider agreed to reserve five TEP beds. *Id.* An amendment to the contract raised the number of beds to seven in 2018, and another amendment dropped the number back to five in 2019. DFPS, Department of Family and Protective Services Bilateral Amendment No. 2, June 22, 2018 (on file with Monitors); DFPS, Texas Department of Family and Protective Services Bilateral Contract Amendment, September 5, 2019 (on file with the Monitors).

there for 38 years. The Bridge is now on heightened monitoring and opined that without allowances for serving this population, DFPS is soon going to find that it has no placements for this population.[57]

The e-mail further describes the pressure being placed on DFPS by providers to reward those who take "high acuity" youth by "grad[ing] them accordingly" or risk losing the operation as a placement option:

> Commissioner Masters requested the meeting before we even met with The Bridge because providers are unwilling to accept these youth. Providers are not going to open new operations for this population if the system does not realize the extent of care needed for the youth and grade them accordingly.[58]

DFPS eventually blamed Heightened Monitoring for the capacity crisis:

> This is not a CWOP lawsuit.[59]  Nonetheless, the Heightened Monitoring Remedial Order to protect PMC youth in licensed foster care placements, is causing a small

---

[57] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: CWOP, (July 7, 2021) (on file with the Monitors).

[58] *Id.*

[59] DFPS repeated this point in another e-mail sent to the Monitors, stating, "[A]s you and Kevin have clearly noted, *M.D. v. Abbott* is not a CWOP lawsuit or injunction.  We concur in that assessment.  We do not concur, however, that PMC children in CWOP falls within the Court's general injunction.  We will continue to assert that the *M.D. v. Abbott* injunction only applies to **PMC** children who are **placed in foster care facilities**…We understand the Court's concern and, therefore, Commissioner is willing to provide the requested information but we do not want our production to be construed as a concession that this lawsuit now includes…PMC children outside of licensed foster care."  E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: SB 1896/SSCC OCOK, (July 28, 2021) (on file with the Monitors).  In response, Monitor Deborah Fowler asked, "[J]ust so Kevin and I understand.  Is it DFPS' position that the Court's general injunction does not apply to the general class?"  E-mail from Deborah Fowler to Corliss Lawson, re: SB 1896/SSCC OCOK, July 28, 2021 (on file with the Monitors) (emphasis in original).

On July 30, 2021, DFPS' General Counsel responded:

> Corliss requested that I respond to your question below.  I want to start by saying that DFPS is extremely concerned with the safety of children who are in CWOP.  In fact, the safety of the children in CWOP, as well as the staff who work with those children, has been the Commissioner's main focus in working on the CWOP crisis.  She has made it very clear that dealing with the CWOP crisis is a priority, and she is diligently working on a solution to remedy the situation, in both short and long term.
>
> Turning to your specific question, the general injunction reads as follows:
>
>> The Court therefore ENJOINS the Defendants from placing children in permanent managing conservatorship ("PMC") in placements that create an unreasonable risk of serious harm.  The Defendants SHALL implement the remedies herein to ensure that Texas's PMC foster children are free from an unreasonable risk of harm.
>
> Certain remedies involve the General Class.  The first sentence of the general injunction, however, references "placements."  The Fifth Circuit's ruling is based on the following understanding of what the word "placement" means.  "Placements must be licensed to care for children at specific service

population in DFPS custody to be without placement and, thus, under DFPS supervision in an unlicensed setting. We do not believe this was an intended effect by the Court when the Heightened Monitoring Order issued but DFPS increasingly is hearing from providers that Heightened Monitoring is a primary factor for why they will not accept these youth for placement.[60]

DFPS acknowledged that children are being harmed by the lack of placements and suggested the Court's Heightened Monitoring orders "exclude[d] this very important population" from placements:

> *It is the "high acuity" youth who are being harmed by not having licensed placements with staff specially trained to address the youth's needs.* DFPS does not believe Judge Jack's intent was to exclude this very important population. In most cases these youth will be adults in one to three years, and thus, there is a sense of urgency for them to [be] in placements with trained caregivers. With respect to DFPS' collaboration with providers, the reality is that we have to be concerned with their success as we cannot provide appropriate placements without them.[61]

Finally, DFPS again reassured the Monitors that it did not intend to suggest a lower standard for providers serving "high acuity" youth, but then represented that DFPS and HHSC have become rigid and inflexible, applying "unrealistic" legal standards that "no one can meet" and suggested that the State's "knee jerk" reactions to the lawsuit fail to account for the complexities of the child welfare system:

> DFPS is not suggesting that it or HHSC should go slow on enforcing regulations designed to protect children from safety risks. Rather, the state must improve its efforts to provide technical assistance and additional resources to help the operation quickly come into compliance without compromising child safety. This is a criticism that providers also have shared with DFPS. While we need providers, we do not need those who are not willing to quickly come into compliance and keep children safe. Most professionals who chose to be caregivers have a passion for caring for these youth, desiring to help them to survive in spite of the trauma they have suffered. We have not heard any provider say they should be allowed more RTBs; they do feel, however, that as a result of the lawsuit and the Remedial Orders,

---

levels." [citation omitted] The Fifth Circuit cited examples of "placements" as licensed facilities including foster family homes, general residential operations, and residential treatment centers. [citation omitted] The Fifth Circuit, throughout its opinion, consistently refers to "placements" as licensed foster care facilities.

For this reason, CWOP does not fall within that portion of the injunction, as you have asserted. As Mr. Ryan pointed out during our last meeting CWOP is related to the issue of placement array that was struck by the Fifth Circuit.

E-mail from Vicki Kozikoujekian, General Counsel, DFPS to Deborah Fowler and Kevin Ryan, re: FW: SB 1896/SSCC OCOK, (July 30, 2021) (on file with the Monitors).
[60] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: CWOP, (July 7, 2021) (on file with the Monitors).
[61] *Id.* (Emphasis in original)

some enforcement actions have become "punitive" and the state can do a better job of evaluating all factors when rendering a finding under the applicable legal standard. They feel we have become tone death to the realities and are imposing standards that are so unrealistic that no one can meet them. They also are requesting a reasonable time period to correct noted deficiencies. We are meeting with HHSC to address these concerns.

Second, DFPS is concerned that the state has become too reactive to the lawsuit, which unfortunately leads to "knee jerk" actions and inconsistency and does not account for the complexities that exist in all child welfare systems. For example, as DFPS has accelerated contract terminations and HHSC license revocations, providers are fighting back. In fact, two providers recently filed suit against HHSC for licensing revocations.[62] We learned last week that Willow Bend's petition for a temporary restraining order filed against HHSC was granted. You may recall that Willow Bend was one of the providers who HHSC decided to revoke its license earlier this year, leaving DFPS with no choice but to terminate the contract. Willow Bend was one of the providers who would accept our high acuity boys. Reportedly, youth were very upset with being removed from that operation. As DFPS scrambles for space to temporarily house the youth in CWOP, Willow Bend has now offered to lease its now vacant facility to DFPS. As DFPS notified you previously, we have done the same with the Brave Hearts facility. This is not a good outcome. By citing these two facilities, DFPS is not passing judgment on whether the license revocations were warranted; rather, the point is that DFPS is now considering leasing space from two former operations so DFPS staff can go into the now unlicensed facility and care for the youth while it continues the search for suitable placements. Another major problem is that the current methodology leaves operations without certainty, wondering whether their rate of violations will be above the combined rated [sic] of violations for operations of similar size. The providers have shared that they would like to be graded or scored based on how their operation is performing when all aspects of their operations have been

---

[62] In response to HHSC's notification to them of the agency's intent to revoke their licenses, two providers, Willow Bend and Carson Parke filed petitions in state court to enjoin HHSC from prohibiting their operation pending administrative review. The hearing for one of these providers, Carson Parke, exposed a disagreement between two of the Governor's cabinet agencies, HHSC and DFPS, regarding the safety of this operation. Trevor Woodruff, the Deputy Commission for DFPS, was subpoenaed to testify for Carson Parke at the hearing on the provider's petition for a temporary injunction against HHSC. During his testimony, when asked whether he believed that the operation "posed a risk to the safety or health of the children that had been placed at the facility," Mr. Woodruff said that at the time that DFPS ended their contract with the provider, he did not see a health or safety reason to end the contract. Transcript of Record, Motion for Temporary Injunction at 38, Chester Pitts Foundation D/B/A Carson Parke v. Texas Health and Human Services Commission, No. 2021-29160, 215th District Court, Harris County. Later, Mr. Woodruff testified that, prior to terminating its contract with DFPS (which he indicated they were required to do because HHSC moved forward with license revocation), the agency found that Carson Parke had met the conditions of a corrective action plan that DFPS had imposed, and had decided to lift the placement hold the agency had imposed. *Id.* at 82. In contrast, Jean Shaw, Associate Commissioner for Childcare Regulation for HHSC, testified to the operation's history of minimum standards violations and enforcement actions, and said that the pattern showed an ongoing risk to children in the operation's care. *Id.* at 157. Associate Commissioner Shaw testified that she disagreed that the operation showed improvement. *Id.* at 158-59.

considered.   Further, DFPS is struggling with articulating how operations can successfully complete heightened monitoring and even questioning whether the exit conditions are realistic, particularly for large GROs.  Thus, we want to discuss and seek clarification of the standards for exiting.[63]

The Monitors met with DFPS and HHSC on July 21, 2021 to discuss Heightened Monitoring. During the meeting, DFPS shared a slideshow presentation that the agency had created to discuss concerns related to Heightened Monitoring, and propose changes.  The concerns included:

- That the five-year pattern analysis does not take into account sudden improvements;[64]
- That the GRO/RTC analysis "deserves more consideration" due to a "weak correlation between capacity and violations;"[65]
- That "no matter how well CPAs or GROs are performing, a percentage always end up on Heightened Monitoring;"[66]

DFPS' proposed revisions:

- Maintain objective measures but add a qualitative analysis:

---

[63] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: CWOP, (July 7, 2021) (on file with the Monitors).

[64] The slideshow states, "Monitors expressed concern that 6 years smoothed the average and 2 years did not identify a sudden change for the worse.  But 5 years review does not make allowance for sudden improvements."  This misrepresents the Monitors' previously expressed concern because it removes the context of the original DFPS recommendation to which the Monitors were responding. In the Slideshow, DFPS refers to the Monitors' analysis of RCCL's initial proposed definition of "pattern," discussed in the Monitors' March 3, 2020, report to the Court regarding Heightened Monitoring.  RCCL proposed an analysis that would have compared an operation's average number of deficiencies by subchapter for the most recent two years to a six-year average of its deficiencies by subchapter, and find a "pattern" existed only if the two-year average was two or more times the six-year average for a particular subchapter.  The Court instead adopted a methodology that compares the operation's combined rate of RTBs, citations, and contract violations to the average rate for similarly-sized operations for each year of the five-year analysis, avoiding the problems associated with masking either a sudden turn for the worse or sudden improvement. While it is true that this could result in an operation being placed on Heightened Monitoring based on a higher-than-average rate in only the first three years of the five-year analysis, of the operations identified for Heightened Monitoring to date, only one of the operations qualified because its rate was higher than average in the first three years of the analysis, but was not higher than average in the last two years of the analysis.  However, the State's "risk stratification" analysis, used to determine how to prioritize the operations that qualified for Heightened Monitoring in 2020, showed that this operation had a higher risk score than other operations that fell within the same tier of operations identified for Heightened Monitoring.

[65] In comparing rates, the capacity of an operation has a significant impact.  Comparing operations not just by type, but also by size, controls for this.

[66] DFPS, *Heightened Monitoring: Strategy for Improvement*, PPT, July 21, 2021.  DFPS' argument assumes some set of operations will always perform more poorly than others, yet the potential exists for all operations to perform equally well, and for *no* operation to qualify for Heightened Monitoring.  The question DFPS may actually be posing is what level of abuse, neglect, or exploitation, minimum standards violations, or contract violations should reasonably be tolerated within a system.  The answer lies in the constitutional standard articulated by the Fifth Circuit: The State is required to provide care that does not pose an unreasonable risk of serious harm to PMC children.

- o A provider qualifies for HM with a minimum number of citations/violations but has steadily improved performance;[67]
- o Determine frequency of visits based on qualitative post-analysis;
- o Ongoing workgroup with monitor data team for analysis that focuses on operations that will prove most meaningful.

- Clarify requirements for exiting HM so that rather than requiring the operation not to be out of compliance on any medium-high or high weighted licensing standards in the six months prior to exit, the requirement specifies that if an operation has been cited, it has the opportunity to "repair and achieve compliance" and exit.[68]

DFPS did not explain how these concerns and revisions were related to providers' refusals to accept "high acuity" children or the children without placement crisis, nor is it clear to the Monitors how they are related. More importantly, when the Monitors asked DFPS whether HHSC agreed with the proposed changes to the Heightened Monitoring process, DFPS answered that HHSC was not in agreement with DFPS' proposed changes and that the agencies were continuing to meet to discuss a shared proposal.

After the meeting, the Monitors asked DFPS whether their research showed a correlation between higher levels of care and substantiated cases of abuse, neglect, or exploitation.[69] DFPS responded, "We did see, during a cursory analysis, a relationship between [Level of Care] and validated findings of abuse/neglect. We have been constructing a dataset to explore this further."[70] Despite Commissioner Master's statement (quoted above) that, "As provider staff engage with youth to control behaviors…it undeniably leads to more investigations and potential RTBs and the corresponding license violations," it does not appear as though DFPS has conducted the kind of research that supports an "undeniable" relationship between the two. Nevertheless, DFPS appears to suggest that, to some extent, this is an inevitable consequence for these children in these settings and (in arguing for an oversight standard that takes children's level of care into account) advocates for a higher systemic tolerance of abuse, neglect, and exploitation and minimum standards violations before enhanced oversight is triggered. And though DFPS expressed to the Monitors that it worried that Texas's self-described "knee-jerk" reaction to the lawsuit fails to account for the "complexities" of the child welfare system, it has not asserted that any of its substantiated findings of abuse, neglect, or exploitation for "high acuity" children were in error.

The Monitors' reviews of DFPS' abuse, neglect, and exploitation investigations have not revealed disagreement with the agency's substantiated findings; rather, the reviews have shown disagreement most often with cases that were Ruled Out.[71] Similarly, the Monitors' report to the

---

[67] The Monitors understand the suggestion to be that recent, improved performance should be considered in determining whether to place an operation under Heightened Monitoring.

[68] DFPS, *Heightened Monitoring: Strategy for Improvement*, PPT, July 21, 2021.

[69] E-mail from Deborah Fowler and Kevin Ryan to Adam King, re: System Capacity, September 1, 2021 (on file with the Monitors).

[70] E-mail from Adam King to Deborah Fowler and Kevin Ryan, re: System Capacity, September 2, 2021 (on file with the Monitors). DFPS has not shared with the Monitors the results of this analysis.

[71] *See* Deborah Fowler and Kevin Ryan, First Court Monitors' Report 2020, June 16, 2020, ECF 869; Deborah Fowler and Kevin Ryan, Second Report of the Monitors, May 4, 2020, ECF 1079.

Court discussing a proposed framework for Heightened Monitoring,[72] as well as the first full report to the Court,[73] detail RCCR's lethargic minimum standards enforcement prior to the implementation of the Court's remedial orders.

Although DFPS described HHSC's revocation of licenses for Willow Bend and Carson Parke as examples of "knee jerk" reactions to the lawsuit, it stated that it "[was] not passing judgment on whether the license revocations were warranted."[74]  When providers have previously identified claims to the Monitors related to what they characterized as unwarranted citations for minimum standards violations, the Monitors' review of the investigations found the providers' claims to be without merit.[75]

The Monitors' analyses of level of care for PMC children in operations subject to Heightened Monitoring does show a higher percentage of children with a Specialized level of care placed in operations (both GROs and CPAs) that are currently under Heightened Monitoring as compared to those that are not.  However, as Figure 8 demonstrates, GROs on Heightened Monitoring have almost identical percentages of children with an Intense LOC in their care as those operations not under Heightened Monitoring.

**Figure 8: Level of Care for PMC Children in Placement at a GRO on May 31, 2021**



*Source: List of Children in PMC May 31, 2021*

■ HM operation (N = 294)
■ Not an HM operation (N = 1,528)

| | Basic | Moderate | Specialized | Intense |
|---|---|---|---|---|
| HM operation | 36%* | 12% | 41%* | 10% |
| Not an HM operation | 51%* | 11% | 28%* | 9% |

*Statistically significant (p < .05)

---

[72] Deborah Fowler and Kevin Ryan, The Court Monitors' Update to the Court Regarding Remedial Order 20, March 3, 2020, ECF 832.

[73] Deborah Fowler and Kevin Ryan, First Court Monitors' Report 2020 at 287-317, ECF 869.

[74] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: CWOP, (July 7, 2021) (on file with the Monitors).

[75] Deborah Fowler and Kevin Ryan, The Court Monitors' Report to the Court Reviewing Findings of Abuse, Neglect, or Exploitation and Minimum Standards Violations Complained of by Providers, June 10, 2021, ECF 1101.

**Figure 9: Level of Care for PMC Children in Placement at a CPA on May 31, 2021**



*Statistically significant (p < .05)

The Monitors' analyses also show that the percentage of children with a high level of care in operations on Heightened Monitoring decreased slightly between September 2020 and May 2021, while the percentage of children with a Basic level of care increased slightly, suggesting that either those placements are refusing to accept children with a higher level of care, or that DFPS is reluctant to place children with a higher level of care in facilities that are struggling.

The Heightened Monitoring process requires DFPS to be more thoughtful about which children, and how many, it places in historically troubled operations that implicate child safety concerns. It is possible that the slight shift in placement is attributable to this process. After the first group of eight operations were placed under Heightened Monitoring, DFPS caseworkers requested more placement approvals for TMC children than PMC children in these operations.[76] The Monitors also found that the average monthly placement of PMC children in the first eight operations prioritized for early rollout of Heightened Monitoring declined after Heightened Monitoring began.[77]

As Figures 10 and 11 demonstrate, the percentage of children with a high level of care in operations that are not on Heightened Monitoring – the majority of operations – did not change between September of 2020 and May 2021, drawing into question DFPS' conclusion that Heightened Monitoring is having a chilling effect on placements for "high acuity" children in operations that are not under Heightened Monitoring.

---

[76] Deborah Fowler and Kevin Ryan, Second Report of the Monitors, May 4, 2020, ECF 1079 at 317 – 321.

[77] *Id.* at 321. It is also possible that providers, sensitive to the safety concerns raised by the Heightened Monitoring process, are self-correcting by ensuring that the children they accept for placement are children they believe they can safely serve.

**Figure 10: Percent of PMC Children in Placement with "Basic" Level of Care, September 2020 to May 2021**



**Figure 11: Percent of PMC Children in Placement with "Specialized" Level of Care, September 2020 to May 2021**



During the Monitors' meeting with the State on July 21, 2021 to discuss DFPS' proposed changes to Heightened Monitoring, the Monitors asked whether the State had any data that supported the claim that Heightened Monitoring was having a chilling effect on providers' willingness to accept high-needs youth. DFPS did not have data available during the meeting, but on August 18, 2021, e-mailed the Monitors the following information:

In the existing CPA [Heightened Monitoring] network, we've seen admissions drop of 27.5%, and in the existing GRO network, that drop has been 21.6%. In full transparency, there are two factors that should be considered:

1. There is a 3-4% RD [Regional Director] rejection rate among HM placements where the operation was willing to accept the youth but the RD rejected the placement (which too is pursuant to the Court's HM Order); and

2. The network overall saw an 8% reduction in placement activity since around November.

So, while you could reasonably gift the networks 8% to adjust for the change in placement activity, you would still see a reduction in their admission rates. As such, there is existing capacity in the system we cannot reach.

Regarding differences in acuity levels, we would note that our data on this issue isn't very strong. We are using level of care, but there are significant differences between children with the same level of care. So there could be a data point that we don't have or haven't explored that is affecting what we are seeing. Nonetheless, providers on average are taking less [sic] high needs children (specialized and above), even though we have not been able to decipher a network-wide difference in the ***proportion*** of high-needs children accepted by facilities.

In addition to the above, we continue to routinely hear from providers that they are reluctant to serve high-acuity children because of the current climate.[78]

During a subsequent meeting on August 23, 2021, the Monitors discussed the methodology for the analysis with DFPS, and after confirming that operations on Heightened Monitoring with a placement hold during the time period reviewed were included, DFPS indicated that it would run the analysis again without those operations included. The Monitors also asked why the analysis included only operations under Heightened Monitoring and asked whether it was DFPS' position that Heightened Monitoring was having an impact on the placement decisions made by providers that are not under Heightened Monitoring, as the agency's e-mails and public statements suggested. DFPS confirmed that its concerns were not solely focused on placements in operations under Heightened Monitoring, and indicated that the agency would include in the next analysis a review of operations not under Heightened Monitoring.

On September 1, 2021, DFPS e-mailed the Monitors their updated analysis:

When we accounted for placement holds (with all the other prior conditions), the pre/post HM difference within the [Heightened Monitoring] network was:

- CPAs: 27.7% reduction in new placements
- GROs 27.9% reduction in new placements

We also re-ran the network placement activity changes, but excluded the HM operations. Neither the "Non-HM" CPA or GRO networks experienced a substantive change in the total number of new placements between the pre and post

---

[78] E-mail from Trevor Woodruff to Deborah Fowler and Kevin Ryan, re: System Capacity (August 18, 2021) (on file with the Monitors).

periods.  There were obviously changes within individual provider's rates of new admissions (placements), but the non-HM network totals were fairly static.[79]

The State's own analysis refutes the conclusion that providers not on Heightened Monitoring – the majority – have responded to the existence of enhanced oversight by refusing placements that they once accepted.  If providers that are under Heightened Monitoring are making different decisions since being placed under enhanced oversight about which children, and how many children, they can safely serve, these decisions are likely overdue.

In a constitutionally infirm system in which child abuse, neglect, and exploitation went underreported, recurrent minimum standards violations were tolerated, investigations of abuse, neglect, or exploitation were frequently deficient, "[c]hildren were left in homes and facilities where DFPS knew there was a serious possibility they were being abused,"[80] and "licensees [did] not perceive that they [would] be held accountable for their malfeasance,"[81] it is not difficult to imagine that operations that accepted the hardest-to-place children might have been among those historically held least accountable, allowed to continue to operate year-after-year despite unreasonable risk of serious harm to children.  Shifting from a system in which, as the Fifth Circuit noted, "children are left in facilities that repeatedly violate standards while the state attempts to 'collaborate' with the facility"[82] will continue to require Texas to move away from a model in which any provider expects to be "thanked" by the State for accepting high-needs children with softer oversight of child safety.

Adopting Heightened Monitoring criteria that allow a higher violation rate for operations that accept "high acuity" children would essentially tolerate a lower standard of safety and protection for these children.  While there are serious safety problems associated with housing children without placement in unlicensed CWOP Settings, the answer to the current shortage of safe placements is not to tolerate unsafe placements for the highest needs children in the system.  As the Texas Sunset Commission noted, and as the Fifth Circuit quoted in its opinion:

> [T]o go slow on enforcing regulations designed to protect children from safety risks out of concern that some providers may have trouble meeting such protective standards is essentially to accept a level or risk to the children simply because the state needs providers, regardless of their quality.[83]

---

[79] E-mail from Adam King, Director of Data & Systems Improvement, DFPS, to Deborah Fowler and Kevin Ryan, re: System Capacity (September 1, 2021) (on file with the Monitors).  The Monitors note that there are still other factors that may be having an impact on decisions to accept placement of children that the State's analysis did not control for.  For example, though DFPS has raised operations' ability to maintain staffing levels during the COVID pandemic as a contributor to the placement crisis, it did not attempt to control for this in any way.  Between June 2020 and June 2021 (the period included in the State's analysis), operations on Heightened Monitoring requested a variance from the staff-to-youth ratios required by minimum standards 43 times; HHSC denied the variance for 49% of those requests (21 of 43).

[80] *M.D. v. Abbott*, 907 F. 3d 237, 265 (5th Cir. 2018).

[81] *Id*. at 267.

[82] *Id*.

[83] *Id*.

B.  Rate of Pay for Congregate Care Facilities

Providers have also raised insufficient payment rates as one of the causes of the lack of safe placements. Some providers pointed to higher compensation rates paid by the federal government to facilities housing unaccompanied migrant children and suggested that because the State's compensation rates were lower, providers were opting to enter into contracts with the federal government to house unaccompanied migrant children, displacing Texas foster youth.[84]

Governor Greg Abbott expressed concern about this possibility and issued a disaster declaration in June 2021 ordering HHSC to revoke the licenses of placements that contract with the federal government to house unaccompanied migrant children.  The Disaster Declaration stated, in part:

> WHEREAS, the unabated influx of individuals resulting from federal government policies threatens to negatively impact state-licensed residential facilities, including those that serve Texas children in foster care…
>
> …
>
> I hereby direct the Texas Health and Human Services Commission (HHSC) to take all necessary steps to discontinue state licensing of any child-care facility in this state that shelters or detains unlawful immigrants or other individuals not lawfully present in the United States under a contract with the federal government.  Pursuant to Section 418.016 of the Texas Government Code, I hereby suspend Sections 42.046 and 42.048 of the Texas Human Resources Code, and all other relevant laws, to the extent necessary to allow HHSC to deny a license application for any new child-care facility that shelters or detains unlawful immigrants or other individuals not lawfully present in the United States under a contract with the federal government, to renew any existing such licenses for no longer than a 90-day period beginning on the date of this order to wind down any existing such licenses.[85]

After reading about the disaster declaration, the Monitors asked DFPS and HHSC whether any of the facilities that housed unaccompanied migrant children also housed foster youth, and if so, how many.[86]  HHSC responded that "[o]ut of the 52 operations in Texas with [a federal government] contract to care for [migrant and refugee] children, HHSC understands that only 7 of those operations may also currently house foster children pursuant to a DFPS contract."[87]  DFPS

---

[84] *See* Robert T. Garrett, '*Capacity catastrophe,' supra* note 42 (Providers "described a four-pronged blast of COVID-19, meager state rations, competition from more lucrative federal contracts for temporary immigrant housing and tough new enforcement inspired by a long-running lawsuit against the state.")

[85] Governor Greg Abbott, Proclamation by the Governor of the State of Texas, May 31, 2021.

[86] E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, Attorney – Foster Care Litigation, HHSC, and Corliss Lawson, DFPS, re: DMN article, (June 2, 2021) (on file with the Monitors).

[87] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: DMN article, (June 2, 2021) (on file with the Monitors).

responded that the seven operations that had a contract with DFPS for placement of foster children were housing 91 foster children, of whom 22 were PMC youth.[88]

The Monitors asked HHSC and DFPS what the plan would be for the foster children housed in the seven GROs if the operations did not cancel their contracts with the federal government.[89] The Monitors also asked DFPS whether any of the 45 operations that contracted solely with the federal government had recently contracted with DFPS for placements for foster children.[90]  DFPS responded:

> With regard to the plan should the operations with the [federal government] contracts elect not to terminate, DFPS will have to evaluate the needs of each youth and locate a suitable placement.  As you know, we are in the midst of a placement crisis in that providers are refusing to accept our higher acuity needs and hard to place youth, which some of these youth fall within such as the parenting youth. Once we learn that an operation has elected to continue with its ORR contract, we will begin the search for a suitable placement for the youth.  Disruption of placement is traumatic for youth and we try to avoid makings moves when a youth is not having any issues with the placement.  Thus, we do not want to start making moves until we know that the operation's license will be revoked.

> We reviewed the list of 45 operations that contract solely with the Federal Government for ORR and Devereux – Victoria is the only one with a standard DFPS and/or SSCC contract over the past 5 years.  For the other 44, DFPS has no history of standard contracts in the foster care network.  DFPS began contracting with Devereux – Victoria in 1995…The last DFPS placement ended in February 2021.[91]

On July 13, 2021, HHSC published an emergency rule to implement Governor Abbott's direction to the agency regarding licensing of child-care facilities.  The emergency rule prohibits a licensed or certified GRO from providing care to an "unlawfully present individual" after August 30, 2021.[92] It exempts programs that provide care for an "unlawfully present individual" from licensing requirements and requires them to operate separately from licensed or certified GROs.[93] It allows licensed or certified GROs to operate separately from an exempt program that provides care to an "unlawfully present individual" if it has separate caregivers from the GRO or has caregivers that do not provide care at the GRO while caring for children at the exempt program, and does not use an area of the GROs building or grounds at the same time that the GROs is.[94] The

---

[88] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: DMN article, (June 3, 2021) (on file with the Monitors).
[89] E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher & Corliss Lawson, re: DMN article, (June 4, 2021) (on file with the Monitors).
[90] Id.
[91] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: DMN article – DFPS and ORR Placements, (June 5, 2021) (on file with the Monitors).
[92] Tex. Admin. Code §745.10301.
[93] Id.
[94] Id.

rule also required a GRO to notify HHSC whether it would continue to provide care to "unlawfully present individuals" after August 30, 2021; and if it intended to do so, whether it would relinquish its license or continue to operate a licensed operation while an exempt program separately provides care for unaccompanied migrant children.[95]

On August 9, 2021, HHSC notified the Monitors that five of the seven operations previously identified as serving both foster children and unaccompanied migrant children are CPAs, rather than GROs, and therefore not subject to the new emergency rules.[96]  HHSC further advised, "Of the two dual-serving operations that are GROs, both have elected to keep their GRO permit to provide care to children in custody in Texas and will also operate an exempt program to continue to house unlawfully present individuals in separate spaces."[97]

Governor Abbott included enhanced funding for foster care providers in the list of items that the Texas Legislature was tasked with addressing during the first called special legislative session, and, most recently, the second called special legislative session.[98]  During the second called special session, the Texas House and Senate both filed bills that include funding to increase rates and capacity for the foster care system.[99]  The bill that the Texas Legislature passed, House Bill 5, includes $35 million in funding in each year of the biennium for "supplemental payments" to retain providers and increase provider capacity.[100]  It also includes an additional $20 million in funding for Fiscal Year 2022 for "targeted foster care capacity grants" to address the existing foster care capacity shortage.[101]  The bill requires DFPS to prepare a report documenting the "specific efforts" implemented with the appropriated funds and the effect of those efforts on improving capacity, due to the Legislative Budget Board on September 1, 2022.[102]

C.  Closure of Operations for Safety Reasons

In response to DFPS Commissioner Masters' e-mail, discussed above, stating that DFPS "experienced a net loss of 994 beds as of May 28, 2021," the Monitors asked for the list detailing the "lost" beds.[103]  DFPS sent a high-level capacity analysis that appears to show that the total licensed capacity for the foster care system was **slightly higher** in May 2021 than it was in May 2020. DFPS shared the following data:

---

[95] Id.

[96] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: DMN article – DFPS and ORR Placements, (August 9, 2021) (on file with the Monitors).

[97] Id.

[98] Governor Greg Abbott, Proclamation by the Governor of the State of Texas, July 7, 2021; Governor Greg Abbott, Proclamation by the Governor of the State of Texas, August 5, 2021.

[99] SB 11, 2nd Spec. Sess. (Tx. 2021); HB 5, 2nd Spec. Sess. (TX 2021).

[100] HB 5, Section 11, ¶ 52(a) 2nd Spec. Sess. (Tx. 2021).

[101] Id. at Section 11, ¶ 52(b).

[102] Id. at Section 11, ¶ 52€.

[103] E-mail from Deborah Fowler and Kevin Ryan, re: CWOP/Capacity (June 28, 2021) (on file with the Monitors).

**Table 1: DFPS, Bed Difference Summary May 2020/May 2021[104]**

| Facility Type | May 2020 Capacity | May 2021 Capacity | % Difference | Count Difference |
|---|---|---|---|---|
| **GRO – Child Care Services Only** | 6,777 | 7,824 | 15.4% | 1,047 |
| **GRO – Emergency Care Services Only** | 2,245 | 2,323 | 3.5% | 78 |
| **GRO – Multiple Services** | 4,467 | 4,530 | 1.4% | 63 |
| **GRO – RTC** | 4,163 | 4,102 | -1.5% | -61 |
| **CPA** | 29,623 | 28,636 | -3.3% | -987 |
| **TOTAL** | **47,275** | **47,415** | **< 1%** | **140** |

This analysis is somewhat at odds with the earlier capacity analysis that DFPS sent to the Monitors on May 10, 2021, prepared for Senator Kolkhorst and Representative Frank (discussed above), which examined trends over a longer period (between April 30, 2019 and March 31, 2021) and showed an increase in the number of agency homes verified by CPAs of 259 and a decline of 664 in total GRO beds (without breaking them out by GRO type) during that period. The Monitors requested a list of the operations that represented the reported increase in capacity described in the spreadsheet; DFPS has not yet provided this information.[105]

---

[104] The Excel spreadsheet that included this data was attached to an e-mail from DFPS. The body of the e-mail reported that since September 1, 2020, seven CPAs had closed, 12 GROs/RTCs had closed (with a "bed loss" of 477), four GRO/Emergency Care Shelters had closed (with a "bed loss" of 107), seven GRO/Multiple Care/Child Care Services had closed (with a "bed loss" of 442), and one Supported Independent Living operation for children who aged out of care had closed. E-mail from Trevor Woodruff, Deputy Commissioner, DFPS, to Deborah Fowler and Kevin Ryan, re: Capacity Loss Numbers, (June 28, 2021) (on file with the Monitors).

Because the Monitors had asked for a list of all the lost beds, the Monitors responded by again requesting a detailed list, which was provided the next day. E-mail from Trevor Woodruff to Deborah Fowler and Kevin Ryan, re: Capacity Loss Numbers, (June 29, 2021) (on file with the Monitors). This list appears to have captured only the closures that occurred in FY 2021.

On August 19, 2021, HHSC e-mailed the Monitors a capacity loss analysis that it had completed. The HHSC analysis detailed all operations closed and provided the reason for closure. E-mail from Katy Gallagher, HHSC Data Related to Capacity and Deficiencies (August 19, 2021) (on file with the Monitors). The monitoring team conferred with HHSC to discuss discrepancies between the agency's list and information compiled by the monitoring team and developed the comprehensive list of closed operations used for the analysis in this report.

[105] E-mail from Deborah Fowler and Kevin Ryan to Trevor Woodruff, re: Capacity Loss Numbers (August 8, 2021) (on file with the Monitors). This analysis is also at odds with a more recent analysis that the State provided to the Monitors. On September 9, 2021, the Monitors e-mailed DFPS at the Court's request to ask for the current number of operations, by type, that provide placements to children in foster care, and their licensed capacity. E-mail from Deborah Fowler and Kevin Ryan to Commissioner Jaime Masters, re: Placement Numbers (September 9, 2021) (on file with the Monitors). In response, DFPS provided a spreadsheet that showed significantly lower capacity numbers

Even without the list of operations that DFPS indicates have added capacity to the system, assuming DFPS accurately reported the capacity increases between May 2020 and May 2021 (which the Monitors have not been able to validate), the capacity increase described in the chart above fails to address the capacity gap that DFPS has for years identified related to a lack of adequate placements for children with a Specialized or Intense level of care.  GROs that provide Child Care Services Only, the only type of GRO that DFPS reports to have significantly increased capacity between May 2020 and May 2021, are not GROs that serve children with a Specialized or Intense Level of Care.[106]

The Monitors' analysis of operations with a history of violations that were either closed by the State, or that voluntarily closed since being placed under Heightened Monitoring, shows that the clearest contributor to capacity lost in the foster care system over the last two years is the closure of unsafe operations.  Most of the operations that have closed for safety reasons have been congregate care facilities more likely to house "high acuity" children with a Specialized or Intense level of care.  Though some operations have voluntarily closed, most beds "lost" have been lost after the State determined that they were unsafe.

## 1.  Closure of Operations with History of Safety Violations

Each year, DFPS loses some number of beds through attrition: each year there are some providers which, for whatever reason, do not renew a contract with DFPS.  The Monitors analyzed contracted capacity lost and gained by DFPS between years by comparing active contracts for 2016 through 2020.[107]  For the most part, based solely on the number of GRO beds or the number

---

across almost every type of operation.  For example, the capacity for CPAs (as measured by licensed homes) was 10,995 rather than 28,636; the capacity for RTCs was shown to be 1,894 rather than 4,102.  **Combined, the total capacity for all operations, according to this new chart, was 18,177 – far short of the more than 47,000 shown in the chart included above.**  The Monitors asked DFPS the reason for the difference, and DFPS responded noting:

> [T]here are two methodological differences in the counts:
>
> 1.  The CPA totals in the most recent file includes the number of licensed & contracted homes rather than the summation of the licensed capacity of the individual homes.
> 2.  The GRO licensed capacity totals in the file you shared represents the licensed capacity of all operations licensed in Texas. It did not exclude operations who do not contract with the Department or the SSCC.

E-mail from Adam King to Deborah Fowler and Kevin Ryan, re: Capacity Loss Numbers (September 10, 202) (on file with the Monitors).  DFPS also indicated that while licensing issues a capacity value for verified homes, DFPS avoids using it "as the value is often not reflective of how many children each home will serve."  E-mail from Adam King to Deborah Fowler and Kevin Ryan, re: Capacity Loss Numbers (September 10, 2021) (on file with the Monitors).

[106] *See* HHSC, Types of Programs & Services That Can Be Offered by Residential (24-hour) Child-Care Operations: What are child care services? (Undated) (defining childcare services as "services that meet a child's basic need for shelter, nutrition, clothing, nurture, socialization and interpersonal skills, care for personal health and hygiene, supervision, education and service planning.  All residential child-care operations provide child care services.").

[107] Capacity is the number of beds for GROs and RTCs and the number of homes for CPAs.  Calculations include calendar years 2015 through 2020 and are based on operation capacity data provided by DFPS related to the Heightened Monitoring pattern analysis.  Operations include out-of-state operations with an active contract with

of homes verified by CPAs, capacity gains outpaced capacity losses from year-to-year.[108]  For example, although active contracts in 2019 showed a loss of 664 beds or agency homes for GROs or CPAs compared to 2018, DFPS gained 987 beds or agency homes in contracts with new operations in 2019:

**Figure 12: Bed Capacity "Lost" from Previous Calendar Year, 2016 to 2020**



**Figure 13: Bed Capacity "Gained" from Previous Calendar Year, 2016 to 2020**



DFPS.  If an operation was included as active in data for the calendar year with capacity of one or more and that same operation was not active in the following year, they were considered to be "lost" in that following year.  For example, if operation A was active in 2016 with a capacity of 20 beds and was not active in 2017, that operation and their capacity was "lost" in 2017.  2020 capacity loss numbers do not reflect those that closed or terminated their contract at some point during 2020.

[108] This analysis is based on licensed capacity.  The Monitors did not independently validate the availability of any of the beds identified by DFPS in its analysis.

Until 2020, closures and loss of capacity due to license revocations or denials, and contract terminations for safety reasons, were rare. In fact, as the Monitors discussed in the first full report filed with the Court, between September 30, 2016 and September 30, 2019, DFPS cancelled contracts with only four operations.[109] And in the five years preceding September 30, 2019, there had been no license revocations by HHSC.[110]

Since January 1, 2020, HHSC has notified 16 GROs, 13 of which were RTCs, and two CPAs of its intent to revoke or deny a license, and DFPS (and/or SSCCs[111]) cancelled contracts with an additional five GROs, three of which were RTCs. In all, since January 1, 2020, Texas has closed 21 GROs with capacity of 1,213 beds and two CPAs affecting 291 agency homes.[112] In 2020, six of these operations were closed due to a license revocation or denial, and three closed when DFPS cancelled a contract; in 2021, to date, 12 operations have closed due to a license revocation or denial, and DFPS has cancelled contracts with two.

In addition, another five GROs voluntarily closed in lieu of HHSC pursuing a license denial or revocation. Though these operations were allowed to either withdraw or relinquish their license voluntarily, HHSC found them so unsafe that the agency intended to pursue revocation or denial of their license if they did not act on their own.

These 28 operations accounted for a total of 176 substantiated allegations of abuse, neglect, or exploitation of children entrusted to their care over the five-year period between 2016 and 2020, and 2,715 minimum standards deficiencies ranked high, medium-high, or medium. Of these 28 operations, 13 were closed after being determined to be eligible for Heightened Monitoring. These 13 operations were responsible for 142 of the 176 (81%) substantiated allegations of abuse, neglect or exploitation during that time period, and 1,977 of the 2,715 (73%) minimum standards citations ranked high, medium-high, or medium.

---

[109] Deborah Fowler and Kevin Ryan, First Court Monitors' Report 2020 at 317, June 16, 2020, ECF 869.
[110] *Id*. at 322.
[111] SSCCs 2INgage and St Francis ended contracts with Trulight 127 Ministries CPA and St Francis ended a contract with Trulight Youth Village GRO in June 2021. These operation terminations are not included as contract terminations or closed beds/agency homes as it was not clear the reason for the termination.
[112] At the time of revocations, agency homes associated with the two CPAs were in the process of transferring to other CPAs in their area. Because of this, it is not clear the number of agency homes that were lost as a result of the revocations.

**Table 2: Operations Closed on or After January 1, 2020, Due to License Revocation/Denial or DFPS Contract Termination**

| Operation Name | Operation Number | Operation Type | Capacity | Date Capacity Lost | Type of Closure |
|---|---|---|---|---|---|
| Five Oaks Achievement Center | 809907 | GRO-RTC | 55 | 1/1/2020 | Revocation |
| North Fork RTC | 1019226 | GRO-RTC | 40 | 2/28/2020 | Revocation |
| Children's Hope – Lubbock | 1423046 | GRO-RTC | 40 | 3/2/2020 | Revocation |
| Prairie Harbor | 1577796 | GRO-RTC | 66 | 9/11/2020 | Revocation |
| The Landing | 1696071 | GRO-RTC | 32 | 9/16/2020 | License denied |
| The Pillars of Progression | 1669255 | GRO-RTC | 13 | 12/15/2020 | Revocation |
| Merkabah RTC | 1696638 | GRO-RTC | 72 | 1/26/2021 | License denied |
| Robbins Nest for Children | 1696943 | GRO-RTC | 12 | 2/5/2021 | License denied |
| Brave Hearts | 1707118 | GRO-RTC | 71 | 2/8/2021 | Revocation |
| Willow Bend Center RTC | 968529 | GRO-RTC | 52 | 3/23/2021 | Revocation |
| Carson Parke | 1675497 | GRO | 90 | 5/4/2021 | Revocation |
| The Tree House Center | 1105786 | GRO | 25 | 5/26/2021 | Revocation |
| A Fresh Start RTC | 1697296 | GRO-RTC | 15 | 5/28/2021 | Revocation |
| A Fresh Start Treatment Center | 849130 | GRO-RTC | 30 | 5/28/2021 | Revocation |
| HeartBridges | 1696989 | GRO-RTC | 20 | 5/28/2021 | Revocation |
| Guiding Hope Inc. | 1715609 | GRO | 7 | 6/4/2021 | License denied |
| High Frontier | 69332 | GRO-RTC | 84 | 3/20/2020 | Contract terminated |
| Hector Garza | 959366 | GRO-RTC | 139 | 9/1/2020 | Contract terminated |
| Devereux-Texas Treatment Network-Houston | 511519 | GRO-RTC | 88 | 12/11/2020 | Contract terminated |
| Gulf Coast Trade Center | 54326 | GRO | 196 | 2/23/2021 | Contract terminated |
| Children's Shelter | 16765 | GRO | 66 | 4/26/2021 | Contract terminated |
| **Licensed GRO Capacity "Lost": Revocation/Denial or Contract Terminated** | | | **1,213** | | |
| FaithWorks | 867939 | CPA | 29 | 4/9/2021 | Revocation |
| Benchmark Family Services | 860008 | CPA | 262 | 5/31/2021 | Revocation |
| **Licensed CPA Capacity "Lost"[113]: Revocation/Denial** | | | **291** | | |
| **Total Licensed Capacity "Lost": Revocation/Denial or Contract Terminated** | | | **1,504** | | |

---

[113] The capacity lost for CPAs represents the number of verified agency homes.

**Table 3: GRO Operations Closed Voluntarily on or After January 1, 2020 in Lieu of License Revocation or Denial**

| Operation Name | Operation Number | Operation Type | Capacity | Date Capacity Lost | Type of Closure |
|---|---|---|---|---|---|
| Mossy Oaks | 1700679 | GRO-RTC | 11 | 3/23/2021 | In lieu of denial |
| Children's Hope Residential Services - Levelland | 1696467 | GRO-RTC | 15 | 3/29/2021 | In lieu of revocation |
| Wilton Place | 1704354 | GRO-RTC | 24 | 4/7/2021 | In lieu of revocation |
| Kidz Safe Harbor Emergency Care Services | 1706418 | GRO | 12 | 5/17/2021 | In lieu of denial |
| Krause | 520430 | GRO-RTC | 72 | 7/19/2021 | In lieu of revocation |
| **Licensed Capacity "Lost": In Lieu of Revocation/Denial** | | | **134** | | |

| | | |
|---|---|---|
| **Total Licensed Capacity "Lost" Due to Safety Reasons** | **1,638** | |

In addition to the operations from which Texas removed children due to safety concerns, another group of eight GROs and eight CPAs voluntarily closed after being notified of, or placed under, Heightened Monitoring.[114]   These voluntary closures resulted in the loss of an additional 241 beds in GROs and affected up to 157 agency homes in the CPAs, though some of the agency homes may have been absorbed by other CPAs.

**Table 4: GRO Operations on Heightened Monitoring Closed Voluntarily on or After January 1, 2020**

| Operation Name | Operation Number | Operation Type | Capacity | Date Capacity Lost | Type of Closure |
|---|---|---|---|---|---|
| Williams House | 827818 | GRO | 32 | 8/24/2020 | Voluntary closure |
| Youth and Family Enrichment RTC | 210777 | GRO-RTC | 54 | 9/18/2020 | Voluntary closure |
| Hearts with Hope Foundation | 872214 | GRO-RTC | 14 | 10/10/2020 | Voluntary closure |
| Whataburger Center | 851405 | GRO | 20 | 1/5/2021 | Voluntary closure |
| Houston Serenity Place, Inc - Marrow Street | 852576 | GRO-RTC | 67 | 7/18/2020 | Voluntary closure |
| Houston Serenity Place, Inc GRO - Sealey Street | 1406186 | GRO | 23 | 6/4/2021 | Voluntary closure |
| George Gervin Youth Center | 1012667 | GRO | 16 | 6/10/2021 | Voluntary closure |
| Connections Inc Emergency Shelter | 839957 | GRO | 15 | 6/30/2021 | Voluntary closure |
| **Licensed Capacity "Lost": Heightened Monitoring Operations Voluntarily Closed/Terminated Contract:** | | | **241** | | |

---

[114] Some of these operations had such an extensive history of safety violations, DFPS suspended children's placements prior to the operation's decision to close.

40

**Table 5: CPA Operations on Heightened Monitoring Closed/Contract Terminated Voluntarily on or After January 1, 2020**

| Operation Name | Operation Number | Operation Type | Capacity | Date Capacity Lost | Type of Closure |
|---|---|---|---|---|---|
| Eckerd Youth Alternatives | 1538985 | CPA | 8 | 6/1/2020 | Voluntary closure/ termination |
| Trinity Foster Care | 846072 | CPA | 16 | 6/16/2020 | Voluntary closure/ termination |
| Strawberry Creek Services | 1555534 | CPA | 39 | 6/22/2020 | Voluntary closure/ termination |
| Houston Serenity Place, Inc | 1618452 | CPA | 67 | 7/17/2020 | Voluntary closure/ termination |
| The Payton Foundation | 1511164 | CPA | 1 | 9/11/2020 | Voluntary closure/ termination |
| Panhandle Child Placement SVCS | 555945 | CPA | 9 | 1/7/2021 | Voluntary closure/ termination |
| Angel Wings Family Services | 1500926 | CPA | 16 | 3/29/2021 | Voluntary closure/ termination |
| Promise House Inc | 535329 | CPA | 1 | 6/20/2021 | Voluntary closure/ termination |
| **Licensed Capacity "Lost": Heightened Monitoring Operations Voluntarily Closed/Terminated Contract:** | | | **157** | | |

Appendix A includes the history of safety violations and substantiated allegations of child abuse, neglect, or exploitation in the closed operations with a significant history of safety violations.

## 2. Capacity loss due to Voluntary Closure of Operations not under Heightened Monitoring

Another group of GROs and CPAs that had not been placed under Heightened Monitoring voluntarily closed. Though some of these operations had more recent safety problems,[115] the operations had not qualified for Heightened Monitoring. Some closed when operators retired, and others opted to end their contracts with DFPS to serve other children. These closures represented another 541 beds lost from GROs since January 1, 2020 and affected at least 61 agency homes.[116]

---

[115] For example, according to information provided by HHSC: Arrow's Endeavor Place opted to request a voluntary suspension of their license after being placed on probation, as a result of declining census. Refuge of Light RTC opted to close in lieu of entering into a voluntary plan of action to remedy safety problems. Youth and Family Enrichment received multiple RTBs, and "[t]he board of directors met and decided they were unhappy with the compliance history and voted to relinquish their license." HHSC, Copy of Request #1 – GRO RTC Ops that Stopped Operating Since June 2020 Final plus notes, Excel Spreadsheet (undated) (on file with the Monitors).

[116] The Monitors recognize that when a CPA closes, another CPA may absorb some of that CPS verified agency homes. However, the Monitors do not have information related to agency homes that may have been absorbed.

**Table 6: GRO Operations Closed/Terminated Contract Voluntarily on or After January 1, 2020**

| Operation Name | Operation Number | Operation Type | Capacity | Date Capacity Lost | Type of Closure |
|---|---|---|---|---|---|
| Divine Prosperity Home, LLC | 1698030 | GRO | 16 | 6/26/2020 | Voluntary closure/ termination |
| Arrow's Endeavor Place | 1291806 | GRO-RTC | 67 | 7/7/2020 | Voluntary closure/ termination |
| Presbyterian Children's Homes & Services | 7455 | GRO | 72 | 7/29/2020 | Voluntary closure/ termination |
| Texas Baptist Children's Home | 6061 | GRO | 70 | 8/25/2020 | Voluntary closure/ termination |
| Safe Haven for Kids | 1688706 | GRO | 14 | 8/31/2020 | Voluntary closure/ termination |
| The Center for Health Care Services dba Crisis Respite Center | 1551121 | GRO | 14 | 9/1/2020 | Voluntary closure/ termination |
| Trinity Family Mentoring, LLC | 1693979 | GRO | 32 | 10/6/2020 | Withdrew application |
| Devereaux – Victoria | 5460 | GRO | 85 | 1/1/2021 | Voluntary closure/ termination |
| Care Shelter: Youth and Family Enrichment ES | 194039 | GRO | 23 | 9/21/2020 | Voluntary closure/ termination |
| Chrio | 1710028 | GRO | 10 | 1/22/2021 | Voluntary closure/ termination |
| Nelda Shavers Elijah's House of Texarkana | 1698114 | GRO | 13 | 3/3/2021 | Withdrew application |
| Texas Care Center | 1707689 | GRO-RTC | 10 | 5/27/2021 | Voluntary closure/ termination |
| Bluebonnet Youth Ranch GRO | 36122 | GRO | 40 | 6/4/2021 | Voluntary closure/ termination |
| Refuge of Light RTC | 1679549 | GRO-RTC | 13 | 6/16/2021 | Voluntary closure/ termination |
| Thompson's Residential Treatment Center | 1686051 | GRO-RTC | 24 | 7/2/2021 | Voluntary closure/ termination |
| St. Jude's Ranch for Children - Texas Region, Inc. | 222080 | GRO | 24 | 7/12/2021 | Voluntary closure/ termination |
| Rising Star GRO | 1693629 | GRO | 14 | 7/21/2021 | Voluntary closure/ termination |
| **Licensed Capacity "Lost":  Voluntary Closed/Terminated Contract, Not Safety Related:** | | | **541** | | |

**Table 7: CPA Operations Closed/Contract Terminated Voluntarily on or After January 1, 2020**

| Operation Name | Operation Number | Operation Type | Capacity | Date Capacity Lost | Type of Closure |
|---|---|---|---|---|---|
| Houston Serenity Place-Crockett | 1629376 | CPA | 42 | 2/11/2020 | Voluntary closure/ termination |
| Crescent City Youth and Family Services | 1682842 | CPA | 1 | 6/2/2020 | Voluntary closure/ termination |
| Houston Achievement Place | 247479 | CPA | 18 | 8/31/2020 | Voluntary closure/ termination |
| Family Tapestry SSCC - The Children's Shelter | 1682166 | CPA | Not available | 7/1/2021 | Voluntary closure/ termination |
| **Licensed Capacity "Lost": Voluntary Closed/Terminated Contract, Not Safety Related:** | | | **61** | | |

Since January 1, 2020, a total of 2,129 beds in GROs have been eliminated from the foster care system, and closed CPAs accounted for 509 verified agency homes.  Of the beds that have been eliminated from GROs due to closures, more than half (1,213 of 2,129, or 57%) were eliminated after HHSC revoked or denied a license or DFPS cancelled a contract.  The percentage of GRO beds lost in which the State documented a serious history of safety violations jumps to 75 percent (1,588 of 2,129) when including the GROs that had a history of significant safety violations, but voluntarily closed in lieu of revocation or denial or after being placed under Heightened Monitoring,

Determining the true capacity lost when a CPA closes is more difficult, because agency homes may be absorbed by other CPAs.  Nonetheless, agency homes verified by CPAs that closed after HHSC revoked or denied a permit, or DFPS cancelled a contract for safety reasons, account for 57% (291 of 509) of all agency homes verified by CPAs that have closed.  When agency homes verified by CPAs that had a history of significant safety violations, but closed after being placed under Heightened Monitoring, are included, it brings the percentage of agency homes verified by a CPA with a serious history of safety violations documented by the State to 88 percent (448 of 509) of lost homes.  CPAs that closed but did not have a serious history of safety violations accounted for only 12% of affected agency homes (61 of 509).

### 3. Correlation of Capacity Loss and CWOP Placement Events

The accumulating loss of capacity due to the closure of operations (whether for safety reasons or otherwise), particularly in operations that formerly served as placements for children with a high level of care, correlates with the increase in the number of children without placements. As Figure 14 demonstrates, as placements closed, DFPS housed more children in unregulated CWOP Settings. Of the GROs that closed after having a license revoked or denied, or a contract cancelled, or that closed voluntarily in lieu of revocation or denial or after being placed under Heightened Monitoring due to a serious history of safety violations, 23 of 34 (68%), were RTCs, representing 1,086 of the 1,588 (68%) of beds lost in GROs that had a documented history of significant safety problems.  Of GROs that voluntarily closed that were not on Heightened Monitoring, 21 percent (114 of 541) of the beds eliminated from capacity were in RTCs.

**Figure 14: Number of Children in CWOP Settings and GRO Capacity Lost[117] by Month, January 2020 to June 2021**



In June 2021, almost as many PMC children experienced being newly housed in an unregulated CWOP Setting (207) as were newly placed in a congregate care setting (215) and only slightly fewer than were newly placed in a foster home (243).

---

[117] Includes the cumulative number of beds lost due to GRO/RTC facility closures because of voluntary closure, DFPS contract termination, and intent to revoke or revocation of a license. Capacity is defined as licensed capacity. Child placing agencies were excluded due to the ability of foster homes to remain open by transferring to a different CPA.

**Figure 15: New Placements in Foster Homes, Congregate Care, and CWOP, January 2020 to June 2021**



*Source: PMC Placements Data, Placements in Foster Care, Congregate Care, and CWOP*
*n = 13,088*

D.  Impact of Constitutionally Deficient System on Children Without Placement Crisis

In addition to the closure of unsafe placements, the impact of a constitutionally deficient system on children has itself played a role in the current placement crisis.  The Monitors' data analysis and review of records shows PMC children without placement have been in care longer and have had a higher number of placement disruptions than other PMC children, cycling among multiple placements, including RTCs (many of which have since closed) and psychiatric hospitals before finding themselves without placement.

DFPS describes the children's behavioral health needs as "barriers" to placement.  The Monitors' review of children's records revealed time and again the role the system has played in creating or worsening these problems by repeatedly cycling children through unsafe congregate care facilities that re-traumatized children, and were unable, or ill-equipped, to meet their behavioral health needs.  The records show children repeatedly discharged from RTCs for reasons associated with the very behavior and needs justifying their admissions to more restrictive congregate care placements, often admitted to psychiatric hospitals when they decompensate in the RTC, then sent to a new RTC that discharges them for similar reasons, only to have the cycle repeat until the State runs out of placement options.

Of PMC children who had at least one night without placement between September 1, 2020 and June 30, 2021, more than half had been in foster care three or more years.

45

**Figure 16: Time in Foster Care Prior to First CWOP Placement Between September 1, 2020 and June 30, 2021 for Children in CWOP**



In addition to having been in foster care for a long period, PMC children without placement have experienced a high number of placement disruptions.  Between September 1, 2020 and June 30, 2021, PMC children who had at least one night without placement under DFPS Supervision in a CWOP Setting had, on average, 6.5 placements during that time period compared to other PMC children, who had only 1.4 placements.  In other words, during that time period, children who had at least one night without placement had more than four times the total number of placements as other PMC children during their time in care.  **Sixty-five percent of PMC children who had at least one night without placement during that 10-month time period had five or more placements during the period.**

**Figure 17: Average Number of Placements Between September 1, 2020, and June 30, 2021, for Children With and Without a CWOP Experience by Age Category**



**Figure 18: Total Number of Placements Between September 1, 2020, and June 30, 2021 for Children Housed in a CWOP Setting**



The children who the monitoring team encountered during on-site visits to CWOP Settings this summer had experiences reminiscent of the named plaintiffs in this matter. Most had frequent placement disruptions, as is true of PMC children without placement. The placement histories for most of the PMC children in the CWOP Settings visited by the monitoring team included facilities that later closed or were placed on Heightened Monitoring due to a history of safety violations. Some children had been placed in more than one of these facilities over the course of their time in foster care.

Of the 54 PMC children who were in a CWOP Setting visited by the monitoring team, 43 children (80%) had been placed in operations that later either closed or were placed under Heightened Monitoring due to safety violations; and 25 children (46%) had been placed in two or more operations that later closed or was placed under Heightened Monitoring.

**Figure 19: Prior Placements in Operations with Safety Concerns for Children in CWOP Settings Visited by Monitoring Team between June and July 2021**



**Table 8: Number of Prior Placements in Operations with Safety Concerns for Sample of Children in CWOP Settings, June – July 2021[118]**

| Number of Prior Placements in Operations with Safety Concerns | Number of Children | Percent of Total |
|---|---|---|
| 0 | 11 | 20% |
| 1 | 18 | 33% |
| 2 | 14 | 26% |
| 3 or 4 | 11 | 20% |
| Total | 54 | 100% |

The Monitors conducted an in-depth review of IMPACT records for 50 of the PMC youth housed in CWOP Settings that the monitoring team visited.  The stories of six children are shared, below.  Stories for 44 more children are included in Appendix B to this report.

*AO*

AO is a 16-year-old female whose June 29, 2021, Common Application describes her as "naturally friendly and respectful."  AO returned to the CWOP Setting from a psychiatric hospital the day the monitoring team visited, but she declined an interview.  AO entered foster care in Texas in 2016, when she was 11 years old, following allegations that AO and her nine-year-old sister

---

[118] Multiple placements within a single operation are only counted once.

were acting out sexually, and had sexually abused their younger stepbrothers (ages five and six years old).

Before AO and her sister entered the Texas foster care system, they were removed from their mother's care in 2008 by the State of Tennessee, due to having been physically abused by their mother's boyfriend. AO's mother allowed her boyfriend to "tie [AO] up and hang her by her hands until her hands turned white as well as drag her through the house by her hair," resulting in serious injuries to AO. AO's Common Application also indicates that she was sexually abused by her paternal grandfather prior to leaving Tennessee from ages three to eight years old.

AO also has made an outcry of sexual abuse by a family friend who spent a night in the family's home when she was nine years old, after she was placed with her father in Texas. She also alleges she was raped by a teenager prior to entering the Texas foster care system. Neither of these allegations have been substantiated.

AO's father was awarded custody of the children after they were removed from their mother's care, and AO and her sister moved to Texas. AO's father is in the military, and care of the children often fell to their stepmother. When the children were removed by DFPS, their father was stationed outside the U.S.

AO's stepmother also had a history of DFPS involvement, including a 2012 Reason to Believe finding of Neglectful Supervision, for leaving her children with their father for days to go on "party benders." The children's father reportedly was in the habit of smoking marijuana and "passing out" while caring for the children. And in 2015, prior to AO and her sister's entry into the Texas foster care system, DFPS had investigated allegations involving AO and her sister's sexual abuse of their stepbrothers. The children's stepmother had agreed to put alarms on the girls' bedroom doors at night and agreed to ensure they were participating in counseling although she reportedly did not follow through. Instead, AO's stepmother appears to have attempted to limit their night-time behavior by locking them in their bedrooms and drugging the children: AO's stepmother admitted to locking AO and JX in their bedrooms at night, and to giving them three to four Melatonin pills at night to sleep. On one occasion, AO's stepmother was reported to have had difficulty waking her up. As a result, after AO and her sister entered foster care, allegations of Neglectful Supervision were substantiated against AO's stepmother.

AO's father and stepmother divorced after AO and her sister entered foster care, and although her father initially worked with DFPS toward the return of the children to his care, he ultimately relinquished his parental rights in March of 2019. AO has had some contact with her father since he relinquished his parental rights, but a call with him on Father's Day "did not go well" and AO "ended up in the hospital."

Both AO's Common Application and a Service Plan dated June 25, 2021, indicate that AO was diagnosed with Unspecified Bipolar and Related Disorder, Other Specified Trauma and Related Stressor Disorder, ODD, and ADHD. She is prescribed several psychotropics, which she takes daily. A Needs Assessment dated February 13, 2020, recommended that she receive Targeted or Specific Trauma Therapy. The assessment also notes, "She would benefit from continued individual therapy services to assist her in exploring and venting painful thoughts and

feelings stemming from past traumatic events." However, the Service Plan indicates she did not have a therapist. AO's Service Plan also recommends placement in a highly structured and closely supervised setting, such as an RTC or therapeutic foster home, pharmacological intervention supervised by a pediatric psychiatrist, weekly individual therapy provided by a professional therapist, and group and milieu therapy.

AO has had 10 primary caseworkers (two of whom have served as her caseworker during two different periods, for a total of 12 changes in caseworker) and more than 20 placements since entering foster care in 2016, including at least 11 psychiatric hospitalizations, 11 placements in GROs or RTCs, and two brief visits with family in Tennessee. AO has had seven spells without placement.

Four of the GROs or RTCs where AO was placed have since closed due to safety problems (Williams House, Children's Hope – Levelland, Hector Garza, and Carson Parke); AO was placed in one of these (Williams House) twice. One of the other RTCs where she was placed (New Life Treatment Center) is currently under Heightened Monitoring due to safety violations, as is an emergency shelter (The Bridge) where AO was placed as a temporary emergency placement. She has been referred to the juvenile justice system and placed in detention twice. AO's level of care has fluctuated between Intense, Specialized, and Psychiatric Transition throughout her time in care. She had a Basic level of care for two months after entering care in 2016.

AO's first placement in an RTC, at Children's Hope – Levelland, occurred during her first year in care, when she was just 11 years old. Children's Hope had safety problems in all of the facilities that the agency operated, which have been discussed at length in the Monitors' previous reports. During AO's time at Children's Hope – Levelland, during her first Face-to-Face visit with a caseworker, in May 2016, AO reported that she did not like the facility because "girls are inappropriate," reporting that other children attempted to touch her inappropriately, had threatened her, and had come into her room to try to beat her up. During a subsequent visit, she reported that she "blacked out" during a restraint when a staff person restrained her and she couldn't breathe.[119] At her next Face-to-Face visit, in June 2016, AO reported she did not feel safe at the RTC because "girls are always fighting and making threats." She reported that she got "punched in the leg by a teenager" who also punched her in the arm. During her Face-to-Face visit with a caseworker in August 2016, staff reported that AO was on "Safety Order" for cutting and stating that she wanted to die. When a caseworker arrived for her September 2016 Face-to-Face visit, staff reported that AO had been arrested the day before for assaulting a teacher, and that the RTC had submitted a 24-hour discharge notice. When the caseworker went to juvenile detention to pick up AO, she was informed that the child was "cleaning" because she had "smeared feces on the walls." The facility staff also reported that she had been on suicide alert.

[119] AO's allegations were investigated, and Physical Abuse was Ruled Out. However, the staff person she complained of was the subject of at least nine reports to SWI between August 2015 and June 2016. During an interview with an investigator who was looking into allegations of abuse at the facility, AO told the investigator about this restraint, and about a subsequent restraint involving a different staff person, during which her face was slammed into the carpet. When the investigator asked if she felt safe at the facility, AO answered "Nope."

After her first spell as a child without placement, and a subsequent psychiatric hospitalization,[120] AO was placed in New Horizons RTC, her longest placement to date.  AO was placed at New Horizons for more than two years; her sister was also placed at the facility during AO's stay.  AO was able to engage in family therapy sessions (by phone) with her father during this placement.  Her father was working toward having AO and her sister returned to his care.  Notes in IMPACT show that her therapist was recommending that AO be returned to her father's care in the summer of 2018 and praised AO for her progress at the RTC.  Notes in AO's IMPACT records in May 2018, indicate that her therapist told her that she could go for a visit to see her father, who was living in Virginia, and that she should be ready to go home or to a therapeutic foster home soon.  An August 21, 2018, contact note in IMPACT, however, documents a text exchange between AO's caseworker and AO's father, during which he acknowledged he could not recall the last time he participated in therapy with AO and that he was no longer able to care for the children.  The text exchange indicates that a home study had been pending for him for over a year and he told the caseworker that, in the meantime, the circumstances surrounding his military career had changed and he would again be sent overseas.  In September 2018, AO's father again told their caseworker, via text message, that he could no longer be a resource for the children, and he would relinquish his parental rights.  AO was discharged from New Horizons successfully, with her therapist recommending a therapeutic foster home placement.  Just before being discharged from the RTC, AO sent an e-mail to her DFPS caseworker about "what she wants in a home (foster or adoptive) in hopes that it may help in the search for a therapeutic foster home."  The e-mail also reported that AO was feeling overwhelmed with information and "all she wants to know/be told, is when a placement has been undoubtedly secured."

On April 23, 2019, AO's caseworker went to visit her at the RTC to tell her that a placement had been found and "that while this is not a foster home this is the best next step to finding a forever home."  AO's sister stayed at New Horizons, and despite promises to AO that her next placement would be a home, she was placed in her second RTC, Roy Maas Meadowlands.  AO's behavior deteriorated almost immediately. When a caseworker visited MM on May 17, 2019, the caseworker noted that AO had engaged in self-harm, cutting her arm, and cutting her face with a "joker smile."  In June 2019, AO reported that she was being bullied by the other children at the facility and that she had "just lost her mother, father, and feels that she may lose her sister as well."  On July 5, 2019, AO ingested nail polish remover and was admitted to a psychiatric hospital.[121]  The day after she returned to Roy Maas, she engaged in self harm, was aggressive toward staff, and was hospitalized again.  A year after her placement at Roy Maas, during an interview with an investigator who interviewed her after a runaway incident during her second placement at Williams House, AO explained that she started acting out after leaving New Horizons because of her extreme frustration at having been promised that she would be placed in a foster home instead of another RTC, only to be placed at Roy Maas.  AO also explained to the investigator why she cut a smile into her face (she had just re-opened the cuts), "I'm depressed and I've never really smiled before, so I wanted to carve a permanent smile into my face."

---

[120] AO was hospitalized a second time after she attempted suicide during a weekend visit with her father, after having been released from Children's Hope.  She took 16 pills and wrapped a cord around her neck.
[121] This hospitalization does not appear in the placement list in IMPACT because the RTC was willing to allow AO to return to the campus after her hospitalization.  Similarly, a review of IMPACT shows that not all runaway incidents are recorded.  For example, when AO was being discharged from New Life RTC, she ran away.  She met up with a 22-year-old man, who had sex with her.  The man's uncle called law enforcement, and AO was taken to the psychiatric hospital where she was next placed.

AO's next placement was at Hector Garza RTC, an operation that closed after DFPS (and SSCCs) cancelled their contracts, and after the monitoring team's on-site visit revealed several significant safety concerns.  AO's time at Hector Garza was similarly fraught with episodes of self-harm.  Notes in IMPACT indicate that when AO attempted to hang herself with her bra during her placement at Hector Garza, because the transport person was not at the facility, she was not transported to the hospital until a CPS worker arrived.  During a DFPS investigation that followed one of AO's self-harming incidents, AO told the investigator that she did not feel safe at the facility because she was bullied by other children.  Additionally, during an interview for an investigation that took place just two weeks before AO was discharged, she described an improper restraint that many children who the monitoring team interviewed described as having caused injuries at the facility, "[the staff person] kept readjusting, leaning back, pulling my arms out of the socket, literally just trying to rip my arms off…he said, 'restraints are not meant to be comfortable.'" During another interview with DFPS, when AO was asked how she was supervised at Hector Garza, she told the investigator that in December 2019, she "had a chance to hang [herself] one night, they didn't check on [her] for like 45 minutes."  Notes in IMPACT indicate that a staff person found AO in her room with her sweatpants around her neck in December 2019, consistent with her report.  AO also reported being able to cheek and later snort her medications and "getting high" after taking other children's' medications.

After leaving Hector Garza, AO continued to bounce between RTCs, emergency shelters, and psychiatric hospitals.  Her longest stay at an RTC since leaving Hector Garza lasted just over four months; one lasted only a month.  Since being discharged from New Life RTC on March 19, 2021, AO has moved between CWOP Settings and psychiatric hospitals.  AO was reported to have had two visits to cousins in Tennessee.  One of these appears as an "Unauthorized Placement" on her placement list in IMPACT for November 30, 2020 through December 8, 2020.  The second appears to have taken place during a time when IMPACT indicates she was under DFPS Supervision, March 27, 2021 through May 16, 2021, ending only after AO was hospitalized in Tennessee after she called the suicide hotline and reported that she felt suicidal.[122]  This second trip to Tennessee appears to have been precipitated by DFPS' inability to find an appropriate placement for AO  On March 24, 2021, just three days before AO's second trip to Tennessee, a Case Planning contact in IMPACT notes, "No foster home options, no shelters and GRO have accepted, not too many options given [AO's] intense needs.  Only meet admission requirements for half of the RTC's and getting declined due to her intense level of needs.  May have a couple of facilities that may be interested, but they are max capacity and may have openings next week." Records from the hospital in Tennessee indicate AO was admitted May 4, 2021, and was released to DFPS on May 14, 2021.

When AO returned to Texas, she was without placement for a fifth time since entering foster care in 2016.  A Preliminary Service Plan for Children without Placement dated May 14,

---

[122] There is one IMPACT placement entry with a start and end date of March 27, 2021 for an "Unauthorized Placement," and another entry for DFPS Supervision with a start date of March 27, 2021 and end date of May 16, 2021.  MM's March 2021 monthly evaluation documents that her caseworker took her to Tennessee on March 27, 2021.  The monitoring team discovered the trip to Tennessee after noticing paperwork related to MM's hospitalization while in Tennessee in MM's OneCase records in IMPACT.  Notes on the placement page for the "Unauthorized Placement" state, "This is not a placement.  [MM] is only visiting with family.  There are not identified placement options for [MM] at this time."

2021, found in AO's IMPACT records indicated she was seeing a therapist and psychiatrist via virtual visits, however June 2021 hospital records note "No Therapist" and "No Psychiatrist." AO's Preliminary Service Plan specifies that she is to be on line-of-sight supervision while in the CWOP Setting.  An entry in AO's Common Application describes her chaotic stay while housed at the DFPS office:

> [AO] has been in CWOP since 5/13/21.  [AO] enjoys going to the park with peers in CWOP and loves to swing as she finds this very therapeutic.  As of recently, [AO] has struggled to follow rules while in CWOP and has had multiple runaways and an arrest.  [AO] walked away from CWOP location on 5/16/21 and came back with a piece of glass from a dumpster that she had used to cut her arms.  She was taken to emergency room for evaluation and psychiatric hospitalization was recommended however no beds ever came available and she was released back to CWOP on 5/19/21.  The week following her being in the hospital she slept majority of the days.  Her psychiatrist adjusted her meds on 5/27/21 and there has been an improvement in her sleep however as of 6/8/21 [AO] is refusing to take her prescribed medication.  [AO] left from CWOP in the early morning hours of 6/9 and was found by [law enforcement] within 2 hours and brought back to CWOP.  She ran again on 6/10/21 and was missing until 6/12/21 when she was located by [law enforcement] walking down the highway in the middle of the night.  [AO] admitted to having sex with multiple adult men while on runaway and was taken to the ER for testing prior to returning to CWOP.  There was an incident on 6/12/21 where [AO] and another peer…attempted to run away but [law enforcement] arrived on location before they could go.  [AO] reportedly did not like how [law enforcement] was talking to the peer and bit the officer.  She was detained for assault on a public servant and resisting arrest.  She was released on 6/13/21 and returned to CWOP however ran again that night with a peer.  She was recovered on 6/15/21 when she reached out to her [caseworker] to pick her up and return her to an alternate CWOP location.  On 6/15/21 [AO] ran from placement with 2 peers. She was located and returned within the hour by [law enforcement].

AO's stay at the DFPS office ended with her most recent hospitalization, after she broke open two rat traps in the parking lot of the office, took pouches of poison out, opened one bag and emptied the contents in the parking lot, tracing her fingers through the poison.  Staff reportedly thought they saw her put something in her mouth as she was walking back to the building and called EMS due to concern she may have ingested some of the poison.  When law enforcement searched her, they found one bag of poison in a pocket in the sweatshirt she was wearing.[123]  After

---

[123] An investigation of this incident by was opened by DFPS.  During an interview with one of the DFPS staff present during the incident, the staff person noted that she was hired by DFPS for an administrative position on June 1, 2021, just three weeks before the incident occurred.  This CWOP shift was her first, and she described it to the investigator this way: "From my experience, it (CWOP shift) was insane…there was no connection for me with those kids, they saw me as a stranger and someone new to come in and boss them around, I guess, so they were not going to interact with me at all.  Which is one of the reasons that… [the other DFPS staff person] and I were like – who is going to go with her to the hospital…But…some consistency with the kids would be better."  The caseworker assigned to this shift was also new, and had only been case assignable for four months.  During her interview with SI, the caseworker described the CWOP shift as "out of control" and said "[The children] are all pissed about being in CWOP.  None of

AO was hospitalized overnight to ensure she had not ingested any poison, she was transferred to a psychiatric hospital.  When the psychiatric hospital discharged her on July 22, 2021, AO was taken to Austin State Hospital.  According to AO's Common Application, the incident involving the rat poison was precipitated by a call with her father.  On Father's Day, AO called her father.  AO told her caseworker that during the call, her father said that the reason she was in DFPS' custody was "all of her fault."  Her Common Application notes that she is "having a lot of difficulty processing the abandonment of her family."

Though notes in IMPACT indicate that AO was ready to leave Austin State Hospital in early August, DFPS did not have a placement until September 3, 2021, when she was placed in Unity Children's RTC.

*AA*

AA, a 15-year-old girl in the State's PMC, entered foster care in 2014 at the age of eight. The monitoring team interviewed AA during a visit to the CPS office where she stayed with her caseworker during the day. According to her most recent Common Application, updated June 15, 2021, AA is "very intelligent" and enjoys reading, drawing, and being creative.  "She is an avid reader and has over 50-75 books…She is normally on the A/B Honor Roll."  It notes she "can be very funny, outgoing, and has a great laugh…She is very into Greek Mythology and enjoys talking about it with someone who knows about it as well as she does."  She is on grade level, was promoted to 9th grade at the end of the last school year, and has been in gifted and talented classes.

AA and her sister entered the foster care system after their mother went to a domestic violence shelter in October 2014.  Their mother reported that prior to coming to the shelter, she felt suicidal, and wanted to kill herself and both children.  Their mother was hospitalized shortly after coming to the shelter.  AA's family had a history of DFPS involvement from the time that she was seven years old, with referrals for neglectful supervision, emotional abuse, and physical abuse by their father in 2012, and a subsequent referral alleging neglectful supervision and physical abuse by their mother in 2013. The earlier allegations were Ruled Out and the family successfully completed family-based safety services (FBSS), but it was recommended that if the family received another referral, the children should be taken into care.

The domestic violence shelter reported to DFPS that both children were going to counseling for sexual abuse; yet AA's sexual victimization page in IMPACT does not report a history of abuse.  An early Service Plan for AA, completed in 2015, indicates that a psychological evaluation revealed a history of sexual abuse, as well as physical abuse and neglect.  AA's most recent Service Plan, completed June 28, 2021, elaborates, "[AA] was…sexually abused by a babysitter, whom she and her sister were left with when their mother was hospitalized for medical needs."[124]

According to her Common Application, AA is diagnosed with Disruptive Mood Dysregulation Disorder, and Persistent Depressive Disorder, Early Onset, with anxious distress. Her Service Plan notes a "mild form of Asperger's" and says "ASD" (Autism Spectrum Disorder)

---

them want to be there and I don't know what we're supposed to do when they take off.  That highway…is not a nice highway…We can't run after them…I'm so worried the whole time."

[124] An investigation of the babysitter appears to have been administratively closed due to "insufficient evidence."

has been diagnosed.  AA reports that she "doesn't like people" and though her Service Plan indicates she struggles with hygiene, she "reports that she does this to keep others at a distance."[125] AA's Service Plan adds to her list of diagnoses Bipolar I disorder, MRE manic severe (w/o psychosis), and Oppositional Defiant Disorder.  She is prescribed several psychotropic medications.  AA also has Type 2 Diabetes; in addition to her medication, AA's Service Plan indicates that she is "to watch her sugar intake and diet" to help control her Diabetes.

AA's Common Application notes that she needs "a safe, stable and structured environment that is able to meet her needs at this time including close supervision and therapy to help [AA] learn impulse control and how to cope and use positive techniques with working through past trauma."  Her Service Plan indicates that a November 2019 CANS Assessment recommended "Trauma Focused Cognitive Behavioral Therapy…to address the chronic instability in the care of this youth and multiple transitions…A psychological evaluation is required to identify underlying issues of anxiety and attachment issues."

Despite her need for stability, in the seven years since she entered the foster care system, AA has had seven primary caseworkers, and cycled through at least 19 different placements, including five psychiatric hospitalizations, prior to her time without placement.  AA's first psychiatric hospitalization occurred just before she turned 12-years-old.   Her second psychiatric hospitalization, in 2018, lasted for more than a month because DFPS did not have a placement for AA when the hospital was ready to discharge her.

AA has been in eight foster homes and four RTCs.  One of the RTCs (Krause Children's RTC) has since closed, and two have been placed under Heightened Monitoring (Hearts with Hope Foundation and New Life Treatment Center) due to a history of safety violations.  AA completed two of these programs successfully (Krause and New Life Children's Treatment Center) and was discharged when her level of care dropped, only to deteriorate in the foster home placements that followed.  After being discharged from a psychiatric hospital on June 2, 2021, AA was without placement until July 21, 2021, when she was placed at another RTC, Bluebonnet Haven.

AA's longest stay in a placement was in a therapeutic foster home, which was her third foster home; she lived in this home for almost two years.  The placement disrupted when AA expressed a desire to be adopted by the foster parent and was told that the foster parent did not wish to adopt. Her behavior deteriorated after that, and her behavioral challenges have continued.  AA's Level of Care was Basic, then became Moderate just before the placement in the therapeutic foster home disrupted in 2017.  Since then, her Level of Care has bounced between Moderate and Specialized, lowering to Moderate after successfully completing RTC programs, then raised back to Specialized when the foster home placements that followed disrupted.

DFPS substantiated that AA had been neglected by AA's foster parents in the last foster home where she was placed after being discharged from New Life.  DFPS found that AA and her foster siblings were regularly left at the home alone without an adult or approved caregiver.  Two of AA's foster siblings ran away one night while the foster parents were not home; an adult male picked up the two children and they "engaged in unsafe behaviors such as sexual intercourse and

---

[125] AA has refused recent placements because they had more than 1 or 2 children and has stated a preference for a foster home where there are only 1 or 2 other children.

drug use." DFPS found that the children were routinely left alone in the house, despite all of the children having supervision requirements listed in their service plans. The foster parents said this occurred because the children were unable to go to school during COVID, resulting in their being left at home alone to attend school virtually while the foster parents worked.

AA's records show the difficulty of ensuring children who are without placement continue to receive needed mental health services. A monthly contact note entered by her caseworker in IMPACT on July 8, 2021, states, "[AA's] medication needs to be reviewed. She was prescribed 3 50 mg Seroquel tablets in the morning and again 3 50 mg of Seroquel tablets in the evening when released from the psychiatric hospital…We called the office for a refill when her medication ran out this past weekend. The doctor only prescribed 1 50 mg tablet of Seroquel in the evenings." Another face-to-face monthly IMPACT contact note made by AA's caseworker on June 23, 2021, indicated "she is not in any therapy services due to being in CWOP." In the placement summary for Bluebonnet Haven RTC, AA's caseworker noted "Child need[s] to see a therapist for anger issues and to learn how to calm herself down, for self-esteem to build her self-confidence. She has been ordered by Judge…to be put into Trauma-Based therapy…CHILD NEED[S] TO BE PLACE[D] IN THERAPY ASAP," noting "Child has been in child without placement status but need[s] to be placed back in therapy."

There is a contact note in IMPACT dated August 9, 2021, which indicates AA was accepted for placement in a foster home that is licensed for four children but had only two children placed in it. The CPA for the home is on Heightened Monitoring, but approval for the placement was granted. Nevertheless, as of September 7, 2021, AA remained in the RTC where she was placed on July 21, 2021.

### BB

BB is a 16-year-old female PMC youth who first entered foster care when she was three years old due to parental substance abuse, neglect, and physical abuse. She was adopted by her grandmother in 2008, but BB reentered care in January 2018, after it was reported that she assaulted her grandmother. BB was admitted to a psychiatric facility after the alleged assault; her grandmother refused to accept BB upon discharge. At that time, her grandmother remained hospitalized due to injuries from the assault.

BB is described as artistic, sweet, friendly, and caring, and as a girl who loves her family very much. She has been described as someone who "connect[s] very well with other workers and the youth." Her July 2021 Common Application reports: "If BB is given the opportunity to stay in one placement and not be moved frequently, learn new coping skills, attend school on campus, and have the therapeutic as well as medication management she can adjust and do very well."

BB's parents reportedly used drugs and left the children unsupervised for extended periods of time when BB was 10 years old, and her sister was five months old. Her record includes allegations of Physical Abuse by her father. BB's mother was deceased, and she entered the care of her maternal grandmother when her father abandoned the children in 2007. As a result of his abandonment, DFPS substantiated allegations of Neglectful Supervision in 2007. BB was in TMC

status from February 2007 to August 2008. BB's maternal grandmother adopted her in August 2008.

During a recent psychological evaluation, BB disclosed that she was repeatedly sexually assaulted by a male cousin while in her grandmother's care.  In a subsequent forensic interview, BB reported that her cousin sexually assaulted her from the ages of six to nine years-old and that he had contacted her recently through Snapchat and apologized for inappropriately touching her. She revealed that this included kissing and penetration. BB reported that the cousin continues to try to reach her via Instagram and asks for photos, uses sexual language, and sent her photos of his penis.  BB reported being depressed and sad about this and not telling anyone.  She said she had hurt herself in the past when feeling overwhelmed with pain but stopped. She attributed her present anger to this pain.

DFPS investigated BB's outcry of abuse by her adult cousin and Ruled Out the allegations of Sexual Abuse, concluding: "During the forensic interview, [BB] was in consistent [sic] saying with the time from stating that it occurred when she was 5-6 then ended at age 9. She was not able to provide any details of the incidents and could not remember the last incident when asked."

BB has experienced several traumatic events during her time in care, including frequent placement disruptions; many of these placements were later determined unsafe and either closed or placed under Heightened Monitoring.  Since 2018, BB has been in at least 13 different placements, including six RTCs, three emergency shelters (she was placed at one of these twice), and three psychiatric hospitals.  In between these 13 placements, BB has been without placement and housed in a CWOP Setting seven times.

The first RTC in which BB was placed after re-entering care, The Care Cottage North, closed after allegations of physical and sexual abuse resulted in a raid by law enforcement, and the subsequent arrest of several staff.  BB was moved to a second Care Cottage location, which later voluntarily closed after being identified for Heightened Monitoring.[126]  BB's placements include three other RTCs – Five Oaks Achievement Center, Prairie Harbor LLC, and Hector Garza RTC – that also closed after the State determined they were unsafe. One of BB's placements, The Bridge Emergency Shelter, has since been placed under Heightened Monitoring due to a history of safety violations.

At another placement, Guardian Angels, BB was assaulted, verbally and physically, by a staff member a month into her stay. DFPS substantiated the allegations. The perpetrator appealed and the finding was upheld on administrative review.

BB's 10-month placement at Hector Garza was noted in the record as too restrictive and chaotic for BB to feel safe. BB was discharged from Hector Garza for reportedly hitting staff with pool balls. As a result, she was arrested and admitted to Juvenile Detention in July 2020 where she remained for four months and during which time her grandmother died.  The charges were ultimately dropped.

---

[126] This second location closed, and the operators opened a new location the same day under another name, HeartBridges.  *See* Deborah Fowler and Kevin Ryan, Second Report of the Monitors 290, May 4, 2021, ECF 1079. HHSC recently moved to revoke HeartBridges' license due to a history of safety violations.

BB's most recent period without placement started on May 30, 2021, when she returned to care after having run away from an emergency shelter. This CWOP Setting stay has been punctuated by BB running away; she was sexually exploited during at least one of these runaway incidents, according to her IMPACT records. On July 26, 2021, BB was arrested and placed in juvenile detention because she had marijuana with her when she returned to the CWOP Setting after having run away. Notes in a July 2021 monthly evaluation in her IMPACT records note, "[BB] continues to be in CWOP, however, appears to be leaving the facility when she is not suppose to [sic].... On July 26, she left the facility and went to get high with whoever she goes to, and came back and was arrested…due to her being in possession of marijuana."

BB is diagnosed with Diabetes Type II, Disruptive Mood Dysregulation Disorder, Conduct Disorder, and Borderline Intellectual Functioning. Health records indicate that BB was in psychiatric in-patient care twice prior to re-entering foster care, in 2016 and 2017. BB has a history of self- harm. Her record indicates that the most recent incident occurred in January or February 2020, while she was still housed at Hector Garza RTC. "She cut herself with a sharp object she found in her unit. Staff were able to assist her and had one on one supervision." There are no indications that BB has received individual or group therapy since her stay at Hector Garza in 2019-2020. State records indicate BB is prescribed psychotropic medications for depression and "mood."

BB qualifies for special education services and is not on grade level. During a forensic interview on April 28, 2021, BB reported that she would like to be a nurse or midwife to help pregnant women and indicated she would "like to get pregnant soon."

*XA*

XA, a 15-year-old PMC youth, entered foster care in 2010 at the age of four, after he was found wandering near the highway alone. XA was interviewed by the monitoring team at the CPS Office where he had been housed since June 15, 2021. As of September 7, 2021, XA was still without placement.

According to DFPS records, XA is quick-witted and enjoys interacting with his peers. He proudly embodies "the life of the party." He is kind and never fails to offer a helping hand at home and at school. During the school year, he plays baseball and participates in ROTC, aligning with his ambition of joining the military that he shared with the monitoring team. During his interview with the monitoring team, he was sociable, funny, and engaged easily in conversation.

Prior to entering the foster care system in 2010, XA had been removed from his mother's care and placed with his biological father. While in the care of his biological father, DFPS found XA wandering near the highway on three separate occasions at the age of four years. Both biological parents refused to pick him up. His biological mother reported it would be "too difficult" to handle both of her of sons at the same time. Shortly afterwards, she relinquished her rights to XA. After several failed attempts made by DFPS to keep the family together, XA began his 11-year involvement with foster care, while XA's biological twin brother remained in the care of their biological mother.

Since entering foster care, XA has had at least seven placements, including four placements in foster homes, one placement in an RTC, and two psychiatric hospitalizations. Several of XA's placements in foster homes have been lengthy. He resided with his first foster family for more than four years. After being discharged from this home, XA was placed in another foster home where he stayed less than a year, followed by placement in a foster home where he stayed for almost two years. This foster family expressed interest in adopting XA, but the adoption failed. He was next placed in Children's Hope, an RTC that has since been closed due to safety reasons.

Upon completing his program and therapeutic goals at Children's Hope RTC, IMPACT records indicate XA was placed with a Spanish-speaking foster family. This was his last foster home prior to being without placement; he lived with this family for almost three years. XA felt he found acceptance in this placement, a family of five with two parents and three young daughters. XA told his caseworker that he loves them and considers them "his family." The foster parents requested his removal due to a language barrier. As he grew in this home that spoke Spanish as a primary language, the parents became concerned about the safety of their three daughters because they could not speak to XA about puberty in his language, English.

After he was discharged from this foster home on June 15, 2021, XA was without a placement and housed in the CWOP Setting where the monitoring team met him. XA shared with his caseworker that all he wants in a placement is a family who will love him and accept him for who he is. Currently, XA's permanency plan includes adoption outside of his family or a relative/fictive kin adoption.

Although unsubstantiated, there is a notation in his March 2021 Service Plan in IMPACT, that indicates it was "recently found out that there was extensive sexual abuse history amongst the siblings." This history of sexual abuse is not reflected in XA's Attachment A nor in the Applications for Placement.

The Applications for Placement suggests XA needs guidance on developing healthy sexual boundaries. On-site records provided in the DFPS office where the monitoring team met XA suggest he requires diligent supervision, because when he is around girls he becomes "easily aroused." CLASS records show multiple cases alleging Neglectful Supervision, in which XA was alleged to have engaged in inappropriate sexual behavior. However, all of the cases were either Ruled Out or closed with no citations for the operations.

Since entering care, IMPACT records show that DFPS consistently maintained XA at a Specialized level of care, with occasional, short reductions to a Moderate level of care. Just before being discharged from Children's Hope RTC, in April 2018, DFPS reduced XA's service level to Moderate.

In February 2019, more than a year after being placed with his last foster family, an increase in XA's level of care to Specialized level was requested. The reasons noted in IMPACT for justifying the increase in his level of care included a diagnosis of Autism, walking around his foster home with an erection, experiencing difficulty distinguishing between right and wrong, fighting with peers, becoming easily angered, and requiring assistance with daily tasks.

The justification for the increase in the level of care was the first reference in XA's IMPACT records to a diagnosis of Autism.  DFPS failed to obtain an evaluation that resulted in this critical diagnosis until XA had been in care for eight years, despite his entering care as a non-verbal four-year-old child, experiencing severe difficulties in social settings, and struggling with emotional regulation.  IMPACT records include a psychological evaluation of XA in July 2019, that includes the first formal diagnoses that the monitoring team found in his records.

Documentation in IMPACT indicates that XA has experienced short psychiatric hospitalizations. XA was admitted to the hospital in 2016 (prior to his Autism diagnosis) for behavioral outbursts at school and later discharged with a diagnosis of Bipolar I Disorder and Severe Depressed State. XA was also hospitalized in 2018 for Post-Traumatic Stress Disorder (PTSD) and Brief Psychotic Disorder. XA's hospitalizations are inconsistently documented in his Applications for Placement.

An additional discrepancy in XA's medical documentation includes a Bipolar I Disorder diagnosis in 2016 that is not reflected in more recent documentation. Medical logs show XA is prescribed medication for Bipolar, but his most recent list of diagnoses does not include a diagnosis of Bipolar. According to XA's most recent Application for Placement, he received a psychological evaluation in December 2020, which presented the following diagnoses: Autism Spectrum Disorder; Attention Deficit Hyperactivity, Combined Type (ADHD); Major Depressive Disorder; Child Neglect; and Child Physical Abuse.

Further, according to documentation gathered by the monitoring team at the CWOP Setting where he was housed, medication logs show XA is taking two medications: one for Bipolar (despite not having this diagnosis in his most recent psychological evaluation) and one for ADHD, which aligns with the medication prescribed in his most recent Child Plan of Service. However, his March 2021 Child Plan of Service includes a medication prescription for Depression, but administration of this medication is not reflected in the documents reviewed by the monitoring team at the DFPS office during the onsite visit.

Throughout XA's documentation, he is consistently described as kind, helpful, loving, active, and respectful. When speaking with the monitoring team, XA was calm, talkative, and approachable. Though diagnosed with Autism, he is verbal, attends to his own hygiene, and takes care of his living space. Previous foster parents have reported he needs supervision and guidance in social settings as a he struggles with social cues and norms.

Before he was a child without placement, XA lived in a foster home in El Paso, Texas, and attended school there. In June of 2021, DFPS returned XA to his legal county and placed him in a CWOP Setting in another city. As a result of being moved, he will enroll in a new school for the upcoming school year.  XA is reported as smart but developmentally functioning at an 8-year-old level. In XA's Applications for Placement, documentation shows a gap in school attendance between 2014 and 2017 when he started attending the on-campus school at Children's Hope. However, XA is reported to be functioning on grade-level and advancing to 10th grade in Fall 2021. The Child Plan of Service completed in February 2021 indicates a history of XA receiving

special education services in a Specialized Support Behavior program with no other details provided.

### AN

AN is a 15-year-old male PMC youth who reentered foster care in 2013. AN's August 2021 Application for Placement describes him as a "very articulate, charming young man." AN is kind and typically thoughtful of others, and enjoys listening to music, watching television, reading, and interacting with his peers. He loves to learn and socialize. AN can be talkative and has a great sense of humor. He can get along with older people more than children his age. AN also enjoys being a part of adolescent clubs and activities.

AN first entered foster care at the age of three. He was removed from his home for Physical Neglect. AN was adopted in September 2011 by his foster parent. At the age of seven, AN returned to care due to his adoptive parent's inability to care for him or his two siblings. Records show that AN's adoptive mother, who had adopted both AN and his twin brothers, refused to allow AN to return to her home following inpatient care in a psychiatric hospital. She reported she was having difficulty handling his challenging behaviors and was afraid for the other children.

Since reentering foster care, AN has been in at least 28 separate placements, including ten foster homes, six RTCs, two emergency shelters, one kinship placement, and has been admitted to a psychiatric hospital nine times. Two of the RTCs where AN was placed (Heartbridges and The Pillar of Progression) have since had their licenses revoked by HHSC. Four of the CPAs that oversaw foster homes where AN was placed are now subject to Heightened Monitoring due to a history of safety violations: Passage of Youth Family Center (which placed AN in three homes), Circle of Living Hope (which placed him in three homes), Family Link Treatment Services (which placed him in a group home and a foster home), and Beacon of Hope (which placed AN in one home).

When AN first reentered care in January 2013, he was initially placed in a foster group home until the home was closed six months later. AN was then placed in a foster home where he lived for 11 months. AN's first Service Plan, dated February 21, 2013, indicated he had Enuresis and was prescribed five medications, both psychotropic and non-psychotropic.

AN was removed from the foster home in June of 2014, hospitalized, and then placed at Devereux – Victoria, where he remained until February 2014. He was discharged due to meeting his therapeutic goals. AN's December 14, 2015, Application for Placement reflects that his "aggressive behaviors have decreased and his ability/willingness to comply with expectations and verbal directions have improved." AN was subsequently placed in a therapeutic foster home where he quickly regressed and began demonstrating aggressive behaviors. In less than three months he was again hospitalized. His level of care at this time was Specialized.

Upon discharge from the psychiatric hospital in May 2015, AN was placed in a foster group home by Circle of Living Hope CPA. The group home was closed five months later and AN moved to a therapeutic foster home for an additional four months. Due to his behavior, he was discharged from the home and placed at Guiding Light RTC. AN remained at Guiding Light RTC for 19 months and was discharged in August 2017 to be moved to a less restrictive environment.

After moving from Guiding Light, AN in August 2017, AN cycled through four psychiatric hospitalizations and four foster homes. He returned to Guiding Light RTC in December 2017 for an additional 16 months until his therapeutic goals were met.  AN's Service Plan was updated during this time, on July 27, 2018, and reflected a psychological evaluation that was completed on August 3, 2018.  The resulting diagnoses included: Disruptive Mood Dysregulation [sic] Disorder; Attention Deficit/Hyperactivity Disorder; and Enuresis.  Recommendations were made for medication therapy, cognitive behavioral therapy and special education classes.

After another short foster home placement, on July 8, 2019, AN was placed at The Pillar of Progression RTC where he remained for 10 months.  According to AN's June 2019 Application for Placement, a psychological evaluation indicated that AN continued to exhibit symptoms of depressed mood, including increased irritability or sadness and poor self-esteem. He expressed suicidal ideations, engaged in self-injurious acts, aggressiveness, and had low frustration tolerance. In May of 2020, AN was discharged. He cycled through a foster home, a psychiatric hospital, and an emergency shelter, before being placed at HeartBridges RTC where he remained for 11 months, with one hospitalization during this placement.

While at HeartBridges, according to his Child Service Plan dated January 15, 2021, another psychological evaluation was completed, and AN's intellectual functioning was found to be in the borderline range. His diagnoses included:  ADHD; Intermittent Explosive Disorder, and Child Neglect.  The psychologist recommended AN remain in a highly structured environment. AN's April 2021 Service Plan reported he was receiving individual therapy and noted that he was engaging well in therapy and was focused on gaining the skills to reduce impulsivity and increase goal-directed behavior.

On September 16, 2020, a DFPS staff reported to SWI serious concerns for the safety of the children at HeartBridges.  One of the worker's reported concerns was having observed AN with a healing black eye.  An DFPS investigation resulted in a finding of Reason to Believe for Neglectful Supervision.  The incident involved a child in care who was supposed to be on 1:1 supervision entering AN's room and assaulting him.  A caregiver stood in the doorway during the incident and did nothing. Two other staff stopped the altercation.

AN was removed HeartBridges due to its closure in May 2021 and was without placement and housed in a CWOP Setting for several days.  He was then placed in a foster home, but after three days he was again hospitalized.  AN returned to DFPS Supervision on June 9, 2021 and was still placed in the CWOP Setting when the monitoring team visited.   As of September 7, 2021, AN was still without placement.

According to AN's April 2021 Service Plan, AN is excelling in school and doing well both behaviorally and academically. He currently has a behavioral intervention plan and is receiving accommodations in the areas of assignments, tests, and comprehension.

*AQ*

AQ is a 16-year-old male PMC youth who entered the foster care system in 2018. In his July 6, 2021, Application for Placement, DFPS notes that AQ enjoys listening to music and working with horses, loves animals, likes funny movies and the Laker's Basketball team. AQ is self-reflective and accepts responsibility for his actions. He answered questions honestly, describing himself as a "determined and good-hearted person," and describing his weaknesses as his "anger and depression." He shared that he wants a home where he can have a normal life.

AQ's family had a history of contact with DFPS before he entered care. In March 2018, DFPS received a report alleging AQ's mother physically abused him. The report stated that AQ's mother was upset that AQ was suspended from school. When AQ returned to school he had a swollen eye, scratches all over his face and appeared to have been beaten. AQ explained that he got into a fight with his cousin, but later admitted that his mother caused the injuries to his face. After investigation, DFPS found the allegations against his mother to be Unable to Determine.

There was also a concern reflected in the child's record of substance abuse by AQ's mother. During a traffic stop police reportedly found two baggies of crack cocaine and a baggie of cocaine as well as over $600 in her purse and text message on her phone of people asking for a "40" or a "20".

In September 2018, DFPS received a report of neglectful supervision of AQ by his mother. The report alleged that AQ was hit by a car while walking on the street and the car sped off. AQ was taken to Driscoll Children's Hospital and had minor injuries. At the time of the accident, AQ had run away from home. In an interview with law enforcement personnel, AQ [said] that he spent time living out of friends' houses, on the roof of a church, and the roof of the school because, he said, his mother "doesn't care for him or care what happens" to him.

AQ was discharged from the Driscoll Children's Hospital to his maternal grandmother while awaiting his mother's return from an out-of-town trip. After the accident, N.F ran away again and then returned to his mother's home under the influence of Xanax. AQ's mother called the police, who transported AQ to a psychiatric hospital.

In late October 2018, DFPS received a report alleging that AQ's mother was Refusing to take Parental Responsibility of AQ, describing the circumstances of the report as follows:

> [AQ] was scheduled to be discharged from Bayview Behavioral Hospital, but his mother did not pick up [AQ] after she was informed that he was ready for discharge. Bayview Behavioral Hospital attempted to contact [AQ]'s mother but hospital staff were unable to reach her. Despite reports to the Hospital Supervisor that she would indeed pick him up [AQ]'s mother never showed up at the Hospital.

AQ has a history of substance and alcohol abuse. He started using marijuana between the ages of seven and ten, started smoking cigarettes at the age of ten, started using prescription drugs between the ages of 11 and 13, cocaine and crack at the age of 13, and he began drinking alcohol at the age of 14. AQ has a history of self-harming behaviors; he has stated he will just hurt himself

and not talk with anyone. He has a history of suicidal ideations and cutting on his left arm. He reports he used to cut his legs but has little to no scarring except for his left arm. He requires monitoring of his glucose levels due to diabetes.

AQ also has a history of behavioral disorders and psychiatric hospitalization, and has the following diagnoses:

- Major Depressive Disorder
- Disruptive Disorder
- Conduct Disorder
- Cannabis Use Disorder Moderate, Sedative
- Hypnotic or Anxiolytic Use Disorder, Moderate;
- ADHD

Since entering foster care in 2018, AQ has had seven Primary Caseworkers and more than 20 placements, including five psychiatric hospitalizations, six RTC placements, four emergency shelter stays, and two foster home placements.  Of these operations, several have closed after HHSC initiated the process for revoking the operation's license:  a CPA (Benchmark Family Services) that placed AQ in a foster home, an emergency shelter (Kidz Safe Harbor, and an RTC (The Pillar of Progression).  In addition, two RTCs, The Lighthouse and Sunny Glen) have since been placed under suspension and Heightened Monitoring respectively, due to a history of safety violations.  AQ has been without placement and housed in a CWOP Setting five times, with his most recent spell without placement starting on July 15, 2021.  As of September 7, 2021, AQ was still without placement.

AQ is academically delayed by at least two years.  AQ's IMPACT records show that in 2019, he was enrolled in ninth grade attended three different high schools.  In 2020, he was enrolled in ninth grade and attended two different high schools.  To date, in 2021, he has attended two high schools and remains in ninth grade.

According to his December 11, 2020, Service Plan, DFPS requested a special education assessment and 504 services for AQ because he was "struggling and reported he was feeling lost and frustrated as he did not understand the material."  This information first appeared on AQ's Service Plan (verbatim) in November 2020, yet AQ reported when he entered foster care in 2018 that he had been skipping school prior to his admission to the psychiatric hospital because "he did not understand the material and would show up but could not do the assignments as he understood nothing that was being communicated."  The November 2020 Service Plan also indicates "a special education assessment was requested in all areas as he had missed a lot of school."

A contact note in IMPACT dated August 31, 2021, indicates that AQ left school that day and walked back to the CPS office.  He told his caseworker that he did not want to go to school, was upset, and said school was "fucking with" him.  When his caseworker asked him to be more specific, he started to cry and told her that he was "tired of all the shit."  His caseworker told AQ she "would be setting up an ARD for him" (which suggests he may have been assessed for special education services at some point, though a July 6, 2021, Common Application indicates he is in regular classes with 504 modifications) and that they had requested information related to credit

recovery.  His caseworker encouraged him to "focus on his work and class since he is failing and the school has already placed him on an attendance contract and have also issued a criminal trespass warning."

AQ does not have an interest in remaining in foster care. AQ expressed interest in becoming an underwater welder or barber and obtaining his G.E.D. as he is struggling with regular school due to excessive absences.  AQ reported he does not want to go to college.

### III.     Safety of CWOP Settings for Children Without Placement

A.  The Monitors' On-Site Visits

Though children who were interviewed in CWOP Settings reported feeling safe more often than children interviewed by the monitoring team in many of the congregate care placements previously visited by the monitoring team, in-depth reviews of children's on-site records, IMPACT records, interviews with DFPS staff, review of Serious Incident Reports,[127] analysis of reports of abuse, neglect, or exploitation to SWI, and observations regarding conditions during site visits raise substantial concerns regarding safety for children housed in these CWOP Settings.  The monitoring team's review of Serious Incident Reports for CWOP Settings revealed that as the population in these unlicensed settings increased, reports of serious incidents also increased.

---

[127] DFPS provided all Serious Incident Reports (SIRs) to the Monitors for the period of January – June 2021.  The monitoring team developed a tool to standardize responses for analysis, including categories of different incident types, the results of the incidents, and whether abuse or neglect was involved (based on the review of the Serious Incident Report and whether a report to SWI was made).  Additional fields captured the location and date of the incident, the number of children involved, and the names and legal status (PMC or TMC) of up to four children involved in the incident.  The materials reviewed by the Monitors' staff include documentation of serious incidents by DFPS staff through Serious Incident Report forms, which were developed in June 2021, as well as email communications between staff and supervisors.  Some email communications were limited in detail on the location, full names of children, and/or the legal status of the children involved.  The reference of serious incident reports in this analysis includes both unofficial email communications and SIR documents completed.  There were 134 serious incidents for children in CWOP placements covering the period January to June 2021 and all were reviewed by the monitoring team.  Of these, there were three reports for which the exact location was unknown, and three reports for which a child's legal status was unknown.

**Figure 20: Number of PMC Children in CWOP and Number of Serious Incidents Involving PMC/TMC Children in CWOP, January to June 2021[128]**



Though most Serious Incident Reports involved only one problem or issue, many reported more than one.  Of the 134 Serious Incident Reports reviewed by the monitoring team, 46% involved two or more issues.

**Figure 21: Number of Issues Identified in Serious Incidents in CWOP Settings, January to June 2021**



---

[128] The Monitors include this chart only for purposes of showing the corresponding trends, without intending to show a rate of Serious Incident Reports (SIRs) for children without placement.  The Monitors do not have data for TMC children without placement, making it impossible to determine the rate of SIRs for children without placement.

The most common issue reported in Serious Incident Reports was a child's mental health episode, reported in 46 of 134 reports reviewed (34%).  Physical aggression toward staff (27 of 134 or 20%) and disruptive behavior (26 of 134 or 19%) were the second and third most commonly reported, respectively, but were reported with much less frequency.  Fifty-six percent of incidents involving physical aggression toward staff (15 of 27) also involved a child's mental health episode.  Children's self-harming or suicide attempts (22 of 134 or 16%) and runaway incidents (20 of 134 or 15%) rounded out the top five most common issues reported.

**Table 9: Type of Issues Involved in Serious Incidents in CWOP Settings, January to June 2021**

| Types of Issues Involved in Serious Incident | N | % of incidents with issue (n = 134) |
|---|---|---|
| Mental health episode | 46 | 34% |
| Physical aggression towards staff | 27 | 20% |
| Disruptive behavior | 26 | 19% |
| Self-harm or suicide attempt | 22 | 16% |
| Runaway or left facility without permission | 20 | 15% |
| Property destruction | 16 | 12% |
| Threatened staff or verbally aggressive | 17 | 13% |
| Fight (between youth) | 16 | 12% |
| Threatened to self-harm or suicidal ideations | 11 | 8% |
| Child-on-child physical aggression | 8 | 6% |
| Illness | 5 | 4% |
| Issues with medication | 5 | 4% |
| Child refused medication | 1 | 1% |
| Alleged inappropriate staff /child relationship | 1 | 1% |
| Injury due to accident | 2 | 2% |
| Consensual child-on-child sexual activity | 3 | 2% |
| Possession of drugs or alcohol | 3 | 2% |
| Nonconsensual child-on-child sexual activity | 0 | 0% |
| Other | 4 | 3% |
| Total Issues Identified | 233 | - |
| Total Number of Serious Incidents | 134 | - |

Of the 134 Serious Incident Reports reviewed, the monitoring team identified seventeen that appeared to involve abuse, neglect or exploitation; of those seventeen, eight were not reported

to SWI.  In addition, the Monitors asked DFPS for all allegations of abuse, neglect, or exploitation investigated in a CWOP Setting between January 1, 2021 and June 30, 2021.  DFPS provided information for 39 investigations, of which DFPS Ruled Out 29, substantiated four and closed six as Unable to Determine.

Of the children interviewed by the monitoring team in June and July 2021 in a CWOP Setting, 96 percent (52 of 54) reported that they felt safe[129] at the CWOP Setting where they were housed; by comparison, 67% of children interviewed by the monitoring team at five GRO and RTC sites between December 2019 and October 2021 reported feeling safe.  Similarly, when asked whether they felt comfortable talking with staff at the CWOP Setting where they were housed, 70 percent (37 of 53) of the children interviewed said that they always did, compared to 52% of children interviewed by the monitoring team in GROs or RTCs.[130]

**Figure 22: Percent of Children Reporting Feeling Safe in Their CWOP Setting**



When asked whether there were physical fights at the site where they were housed, 70 percent (38 of 54) of children reported there were not.[131]  This, again, stands in stark contrast to five of the six RTCs the monitoring team has visited, where children overwhelmingly reported fights among children.[132]

---

[129] Children reported always feeling safe 89% of the time (48 of 54) and sometimes feeling safe 7% of the time (4 of 54).

[130] Of children interviewed in the GROs and RTCs by monitoring team, 28 percent answered they did not feel comfortable talking with staff, and 20 percent said they felt comfortable talking to staff "sometimes."  Only nine percent of the children interviewed in CWOP Settings answered they did not feel comfortable talking to staff and 21 percent said they felt comfortable talking to staff "sometimes."

[131] This is borne out by a review of Serious Incident Reports; 16 of 134 SIRs, or 12%, reported a fight between children, and eight of 134 SIRs (6%) reported child-on-child physical aggression.

[132] All of the children interviewed at Hector Garza RTC and Prairie Harbor LLC reported fights among children were commonplace; 71% of children interviewed at A Fresh Start Treatment Center reported fights, and 75% of children at Devereux – League City reported riots took place at the RTC.

**Figure 23: Percent of Children Reporting Physical Fights at Their CWOP Setting**



Children's feelings of safety may, in part, be due to the lower ratios between staff and youth in CWOP Settings than in many of the congregate care settings where children were placed previously. The majority of DFPS staff interviewed by the monitoring team reported that the staff-to-child ratio at the CWOP Setting where they were interviewed was either one-to-one, or that there were more staff than children.

**Figure 24: Typical Ratio of Staff to CWOP Children**

DFPS staff reported that children were always in their line of sight, and that staff were always awake at night.

**Figure 25: Caregivers Reporting Children Always in Sight and Staff Always Awake at Night in CWOP Settings**



Children's feelings of safety may also be due to the rare use of restraints in CWOP Settings. DFPS staff, almost uniformly, reported that they were instructed not to restrain children, and that they were not trained to restrain children. This differs dramatically from the RTCs and GROs that many of the PMC children without placement have cycled through over the course of their time in foster care.

**Figure 26: Percent of Caregivers Reporting Ever Restraining or Seeing a Restraint at a CWOP Setting**



Children in CWOP Settings may also report feeling safe in these settings simply because many of the settings where they were previously placed were so unsafe. As discussed below, most

of the children in the CWOP Settings visited by the monitoring team had been placed in operations that later had a licensed revoked or denied, or a contract cancelled by DFPS for safety reasons, or in an operation that was later placed under Heightened Monitoring due to a high rate of safety violations.

Though children reported feeling safe in CWOP Settings, many of the DFPS staff interviewed by the monitoring team reported the opposite. This contrasting view is itself a clear indicator of the safety problems that exist in these settings: if the caregivers do not feel safe, it is hard to imagine that they are confident they are able to maintain safety for the children they supervise.

Staff supervising children in CPS offices were more likely to report that they did not feel safe. Of the 39 DFPS staff who were interviewed and who provided supervision of children without placements in a CPS office, only 18 (46%) reported that they felt safe. DFPS staff providing supervision in unlicensed cottages or homes were more likely to report feeling safe: of the 18 DFPS staff interviewed in these settings, 15 (83%) reported feeling safe.

**Figure 27: Percent of Caregivers Reporting Feeling Safe When Working in CWOP Settings**



DFPS staff's feelings of safety did not necessarily improve in settings that had on-site security officers. In fact, in the settings where DFPS staff reported they always had security on-site, DFPS staff reported feeling safe less often than in settings where there was no security on-site.

**Figure 28: Percent of Caregivers Reporting Feeling Safe in CWOP Settings by Security On-Site**



DFPS staff who supervised children without placements in CPS offices, as opposed to in unlicensed cottages or homes, also reported witnessing more serious incidents.  Overall, 58 percent (33 of 57) of DFPS staff reported having witnessed a serious incident while they were supervising children without placement.  Of the 39 DFPS staff who supervised children at CPS offices, 62 percent (24 of 39) reported having witnessed a serious incident, while 50 percent (9 of 18) of staff who supervised children in unlicensed home settings reported having witnessed a serious incident.

**Figure 29: Percent of Caregivers that Witnessed a Serious Incident in CWOP Settings**



What is evident from both the interviews with children, on-site file reviews, review of Serious Incident Reports and reports of abuse, neglect, or exploitation to SWI is that housing children who are without placement in unlicensed settings, without caregivers who are well-trained to ensure safety, places these children at an unreasonable risk of serious harm, including child-on-child sexual abuse, harms associated with running from care (including prostitution and sex trafficking), and injury associated with self-harm or suicide attempts.  Further, the demands that providing direct care for children in CWOP Settings places on DFPS caseworkers increases the risk of harm to all PMC children in foster care by overwhelming caseworkers with an additional set of responsibilities.

B. Specific Safety Concerns Revealed by On-Site Visits and Review of Serious Incident Reports and Abuse, Neglect, and Exploitation Investigations for CWOP Settings

1. **DFPS staff interviewed by the monitoring team were frustrated, often appeared exhausted, and expressed deep concern about their ability to carry out the duties of their full time jobs at the same time that they were being required to work overtime to provide direct care for children without placement.**

*I know you know this, but we are dying. I have staff at their breaking point, both mentally and physically. This is completely draining everyone as I have 17 kids who all have EXTREME needs that we are not able, equipped, or trained to manage/care for. I am terrified that our youth are going to be seriously injured or worse. We are putting everything humanly possible in place we can but these kids need serious treatment and stability.*

-   DFPS Staff E-mail Reporting Serious Incident to Regional Leadership

By and large, the DFPS staff interviewed by the monitoring team expressed deep frustration with the additional burdens associated with being required to work overtime to supervise children in CWOP Settings.  Of the 58 DFPS staff who were interviewed, 43 (74%) were caseworkers.[133]  All of the staff interviewed reported being required to work shifts supervising children; the frequency with which they were required to do so varied among regions.  DFPS staff in Regions 4 and 5 indicated that they were required to work 12 CWOP shifts per month, while staff in Region 8 were required to work two shifts per week.  In most locations, staff used an online platform to choose and sign up for shifts; however, if they did not sign up for the required number of shifts, they were assigned to shifts. Some of the DFPS staff reported that they volunteered to work additional shifts to relieve the pressures faced by co-workers who had their own children or other family demands.

[133] The other DFPS staff interviewed included Supervisors, Program Administrators, Program Assistants, and other administrative staff.

**Figure 30: Number of CWOP Shifts Caregivers Reported Working Per Week by Region**



Just as the requirements varied by region for the number of shifts assigned to each worker, shift lengths also varied. The majority of DFPS staff interviewed indicated that their typical shift supervising children without placement lasted four hours. However, in some regions, staff reported shifts of four or five hours on week days, and six hours on weekends or overnight. Their shift time did not include the time it took staff to travel to and from the CWOP Setting, which could be more than an hour each way, depending on the region where they worked. The longest time DFPS staff reported having worked in a CWOP Setting in a single day ranged from four to twenty hours, with an average of eight hours as the most worked in a CWOP Setting in a single day. Staff who reported working more than eight hours reported that this was usually due to working a planned double shift.

**Figure 31: Typical CWOP Shift Length in Hours**



**Figure 32: Average CWOP Shift Length in Hours by Region**



Most of the DFPS staff who were interviewed reported that the requirement to work shifts supervising children without placement was having an impact on their ability to meet the demands of their regular, full-time jobs, that they were suffering from increased stress, and that the demands made their work/life balance difficult to manage. One DFPS supervisor reported being so tired she is "sleeping in parking lots during her breaks." Another caseworker said she takes naps during her lunch break because she is so exhausted. Another, whose spouse was an administrator for DFPS and was also required to work CWOP shifts, said, "I don't want to be a part of this anymore…I have been doing this for 16 years…this is unsustainable." Another reported that "staff are all tapped out." One caseworker reported that she managed the competing duties of her regular job and CWOP shifts by working during the day and scheduling late night CWOP shifts, a schedule she described as "just miserable." Other caseworkers spoke of the challenges of being single parents and having to schedule CWOP shifts around child care. One caseworker said that she had

a family member who was terminally ill, but that she was not able to spend time with them because of the demands of her job.

Caseworkers spoke of the difficulty of covering their regular, daytime jobs after having worked a CWOP night shift.  One reported that she "get[s] overwhelmed sometimes" because of the competing demands of her caseload, which she reported to be above the caseload guidelines, and CWOP shifts. Another caseworker said that being required to supervise children without placements was "extremely stressful" because she had a caseload of 25 children, and "gets very behind" when she is unable to work on her caseload during her time supervising CWOP shifts. Another reported that she was falling behind with paperwork due to her CWOP shifts; one DFPS staff said that work was sometimes completed late, not done completely, or not completed with the necessary level of detail because they had to work CWOP shifts.

Caseworkers spoke of low morale, and said many staff were resigning from DFPS.  Many workers who were interviewed reported feeling burned out; some were tearful and visibly exhausted.  One caseworker started crying during the interview, and said that she was so frustrated she had considered quitting; she said that in addition to the frustration associated with the long hours she is working, she is expected to cover costs for which she is eventually reimbursed, but that are difficult to manage while she is waiting for reimbursement.  She said that she spent $300 in gas and tolls in one week related to her responsibilities for CWOP shifts.

In regions where workers provide daytime supervision for children without placement who are on their caseloads, caseworkers spoke of the difficulty of having a child with them during the day while they are also trying to complete tasks for other children on their caseloads. These caseworkers uniformly noted the difficulty of getting out "into the field" with the other children on their caseloads while they were supervising a child without placement during the day. One caseworker used the example of a child who might need to be taken to a medical appointment, and noted that if she had a child without placement who she was required to supervise during the day, she would have to try to figure out how to cover supervision for that child while she took the other child to the medical appointment.

The Court identified the risk posed to children when caseworkers have unmanageable workloads, and the Fifth Circuit agreed, speaking at length to the "direct causal link" between unmanageable workloads and an increased risk of serious harm to foster children.[134]  In addressing the caseworker workloads, the Fifth Circuit found:

> That a policy or practice of maintaining overburdened caseworkers directly causes all PMC children to be exposed to a serious risk of physical and psychological harm is adequately supported by the facts in the record.  Moreover, the principle seems obvious: when workloads exceed caseworker bandwidth, caseworkers are not able to effectively safeguard children's health and well-being.[135]

The DFPS staff interviewed by the monitoring team very clearly articulated that the demands being placed on them by the requirement that they supervise children without placement

---

[134] *M.D. v. Abbott*, 907 F. 3d at 264.
[135] *Id*. at 264-65.

was compromising their ability to do their regular jobs.  Adding to their workload by requiring caseworkers to supervise children in CWOP Settings likely contributes to the placement crisis.  As the he Fifth Circuit noted:

> Caseworkers do not have the time to perform fundamental aspects of their job; clearly, they do not have the bandwidth to replicate a needle-in-a-haystack search several times over for each individual child every time they have to move him.  This limited ability to rigorously evaluate placement choices and permanency plans substantially increases the chance that a child will be exposed to serious safety risks.[136]

It is equally evident, based on the Monitors' review, that having frustrated, overwhelmed staff supervise high-needs children in unlicensed settings also poses safety risks for children without placement.

### 2. DFPS staff are not trained for the role of providing direct day-to-day care and supervision for children.

A common complaint among the DFPS staff who spoke to the monitoring team was frustration with what they described as inadequate training for the direct caregiver role that they were being required to provide, particularly for children who have high behavioral health needs. They frequently reported feeling ill-prepared to intervene when children acted out with each other or with staff, and noted that they had no training in the appropriate use of restraints, which is required of direct caregivers in other settings.[137]

a. Little Training is Required for DFPS Staff Specific to Providing Supervision in CWOP Settings

In early 2021, DFPS developed a 60-minute, online training that all CPS and CPI staff who were assisting with supervising children in CWOP Settings were required to complete between February 22, 2021 and March 26, 2021.[138]  The online training consists of an 80-slide Slideshow presentation that begins its first "module" of the training by setting out the expectations for DFPS staff who are supervising children in CWOP Settings:

- **Expectation 1:** If a child is entering DFPS supervision (in the office or a community location) for the first time, the shift staff assigned will take a picture of the child and send it to the child's primary caseworker to be uploaded into IMPACT.

---

[136] *Id.* at 260.

[137] HHSC minimum standards require that if an operation allows the use of emergency behavior intervention (EBI), that at least 75% of pre-service training hours must focus on less restrictive techniques, and the other 25% must include training in safe implementation of restraint techniques.  Tex. Admin. Code §748.903.

[138] DFPS Broadcast e-mail, re:  CPS & CPI Staff – Children Without Placement Training Set to Begin, February 19, 2021 (on file with the Monitors).  By contrast, RCCR's minimum standards delineating the hourly training requirements for caregivers in GROs require from eight to 16 hours of pre-service training.  Tex. Admin. Code §748.863(a) (eight hours of general pre-service training required for all caregivers and 16 hours of pre-service training regarding Emergency Behavior Intervention (EBI) for caregivers caring for children receiving treatment services).

- **Expectation 2:** The child or youth's individual needs and relevant history is known by the staff providing supervision for the child.  This includes any information from the child's sexual abuse history page, such as victimization or aggression, as well as human trafficking.
- **Expectation 3:** All children and youth under our supervision remain in your direct line of sight and close proximity at all times.
- **Expectation 4:** If a significant event or issue arises during your shift while supervising a child or youth, you shall notify your supervisor immediately.[139]

The training then explains the process that caseworkers are required to follow when a child is without a placement.  It starts by noting that describing children as "without placement" is not "strength-based" according to DFPS policy, and states that children who are without placement should instead be referred to as "a child under DFPS supervision" because "saying [a child] is without placement could suggest unfounded negative assumptions for later placement."[140] It then walks the viewer through the documents required to be submitted for a child in order to aid in a placement search, and the process that DFPS uses to find a placement for a child.

The training next outlines DFPS supervision requirements for children without placement, including the forms that must be completed and e-mailed to those supervising the child each day that the child is in a CWOP Setting.  It describes DFPS policy requirements related to meeting children's needs in CWOP Settings, including policy requiring regions to have a plan in place to ensure that staff providing supervision are aware of a child's history of sexual victimization, sexual behavior problems, or sexual aggression.  Regional plans are also required to include a plan for ensuring children's basic needs are met, along with supervision and educational needs, and that they include opportunities for entertainment and recreation.[141]   Regions are required to follow DFPS policy related to medication administration, storage, and destruction, including use of medication logs to document a child's receipt of dosages of prescription medication.[142]

The training also sets out supervision requirements for CWOP Settings.  According to DFPS policy, a child or youth in a CWOP Setting must be supervised at all times by at least two DFPS employees, one of whom is a CPS caseworker or above.[143]   It also states that at least one DFPS employee supervising the child or youth must be the same gender as the child or youth, unless the child is under three years old, and that there must be at least one DFPS employee for every four

---

[139] DFPS, Children Without Placement for DFPS Staff: Meeting Responsibilities, Needs, and Expectations PPT, (undated) (on file with the Monitors).

[140] *Id*. at 13.  This policy is at odds with DFPS' policy requiring staff to document the "reasons" for the child's status as a child without placement, asking them to choose from a long checklist of disabilities and behavioral characteristics as the "reasons."  *See*, *infra*, note 130.  The State has repeatedly cited these disabilities and behavioral characteristics as the "barriers" that prevent placement.

[141] *Id*. at 48.

[142] *Id*. at 50.

[143] *Id*. at 53.  The Adobe version of the PowerPoint training that DFPS provided to the Monitors appears to have been created in Adobe on March 7, 2021.

children.[144]  Children five years-old or younger count as two children for purposes of supervision ratios.[145]

   In an effort to ensure that caregivers are aware of a child's history of sexual victimization or status as having an indicator for sexual aggression, DFPS requires each staff person who supervises a child without placement to sign the child's Attachment A form.[146]  The training specifies that DFPS staff who supervise children overnight must remain awake.[147] It walks through the requirements related to enrolling children in school, and for ensuring "the child or youth has sufficient recreational activities," which (according to the training) may include television, board games, and outdoor recreational time.[148]  The training also notes that a child's region "must ensure that any additional supports and services that may be required to meet the child or youth's needs are available to the youth," and directs staff to contact the STAR Health Manager for any services related to behavioral health needs.[149]  Finally, the online training walks trainees through requirements related to documentation of a child's status as a child under DFPS Supervision in IMPACT, and requirements related to documenting overtime for eligible employees.

   In addition to the online training that DFPS created, some regions have created short Slideshow trainings that explain the policies specific to the region's plan for CWOP Settings.  For example, Region 6A provides its staff with a 44-slide slideshow presentation ("6A slideshow") that explains the process specific to the region. The 6A slideshow includes pick-up and drop-off times and the protocol for primary caseworkers who supervise children without placement during the day and pick them up and drop them off at the hotel or office where they sleep; the protocol for checking in for an overnight shift and for shift transition; the protocol for children's meals and showers; the laundry protocol; reminding staff to store children's medication in a locked file cabinet; what to do if a child runs from care and the protocol to follow when they return; and information and resources for behavioral crisis intervention.[150]  The monitoring team visited other regions that provide staff with a guide setting out protocols specific to the region.[151]

---

[144] *Id*. at 53-54.  DFPS changed this policy in February 2021 to remove the requirement that at least one adult supervising the youth must be the same gender, to instead require "DFPS staff must take into consideration the child or youth's needs, gender, and age when assigning staff to supervise."  In June 2021, the policy changed again, removing this language entirely.  DFPS, Meeting the Needs of a Child or Youth Without Placement, redlined policy (on file with the Monitors).

[145] *Id.*  DFPS policy related to supervision ratios have changed since this training was developed.  When the training was developed, policy required one DFPS employee for every four children.  In June, DFPS policy was changed to require one CPS or CPI staff member (caseworker or higher) for every three children at any one location.  DFPS, Meeting the Needs of a Child or Youth without Placement, CPS Handbook §4152.2 (redlined copy) (on file with the Monitors).

[146] *Id*. at 55.

[147] *Id*.

[148] *Id*.

[149] *Id*. at 60.

[150] DFPS, CWOP Expectations Region 6A (undated) (on file with the Monitors).

[151] The monitoring team has reviewed two guides – one for Region 8 and another for Region 7.  Each sets out policy and protocol specific to the region, much like the Region 6A slideshow.

b. The Monitoring Team's Interviews with DFPS Staff Showed Many Received No Training

Though most of the interviewed DFPS staff (32 of 58, or 55%) reported having completed the 60-minute online training, 31 percent (18 of 58) of the staff reported having received no training prior to supervising children in CWOP Settings. Another 14 percent (8 of 58) reported having received some other training,[152] but not the training specific to supervising children in CWOP Settings. Only 12 (21%) of the DFPS staff interviewed reported having received some other training in addition to the online CWOP training.[153]

**Figure 33: Training Received by Caregivers for CWOP Supervision**



During interviews with DFPS staff, many expressed frustration and concern with the lack of training they had received, particularly given some of the behavioral challenges of the children that they were supervising. One DFPS staff person noted that they are not getting any training on how to manage children's behaviors, and that while they attempt to prevent situations from escalating, they have no guidance on how to handle the situation if they do escalate. In particular, they noted that they were not trained in the use of restraints, and were instructed not to attempt to restrain a child, although one staff person reported being told to use "minimal force" if they believed they needed to restrain a child.

Despite not being trained in proper restraint techniques, DFPS staff reported they sometimes resorted to restraining youth. One DFPS staff person reported that she and another caseworker restrained a seven-year-old child who was having an emotional outburst, despite not having had restraint training, in order to protect staff and the child. A DFPS staff person

---

[152] Other training included the child sexual abuse training, first-aid, trauma-informed care training, and de-escalation training.

[153] Other training received in addition to the online 60-minute training included medication administration, medication management, and de-escalation training.

interviewed at another location reported holding a child's arms while another staff held the child's legs to keep the child from hurting herself or others, but said they did not consider this to be a restraint and, as such, did not document it as a restraint. Another DFPS staff person said that she was working a shift when a child was self-harming by banging his head on the floor; she put her body underneath the child and other staff held the child's arms and legs to try to stop him from banging his head until the police could arrive and take him to the hospital.

Similarly, a caseworker at another CWOP Setting reported that a child who was dysregulated and self-injuring by banging her head on the wall also became aggressive with staff; at one point, she was on the ground and the caseworker was "on top of the girl" to keep her from grabbing people, and held the child's legs down to keep her from kicking. The child started banging her head on the floor, so staff put a blanket under her. Another staff person reported having to hold a child's ankles to keep them from kicking a door and other staff. Staff at another CWOP Setting reported they had not restrained youth themselves, but that the on-site security guard had used handcuffs to restrain a child on at least one occasion.

Another staff person interviewed said that they were instructed to "motivate" children rather than restrain, but that she did not know how to motivate them. Staff reported having tried to use point systems to reward and encourage children's good behavior, but noted that because there were so many different staff providing supervision, use of the system was inconsistent and therefore did not work to address youth's behavior. Another said she was frustrated by the lack of training, and worried that if something happened, the State would not "back her" if faced with liability. She said that her staff are "terrified" and felt as though they were expected to know what they were doing, but did not feel they had adequate guidance. Other staff reported that they were afraid to intervene with children for fear of being confirmed as a child abuser, which would end their ability to work with children at all.

DFPS Commissioner Masters has herself noted that the staff who are providing supervision are not trained for this role. During a hearing before the Texas House Appropriations Committee on August 23, 2021, Commissioner Masters spoke to the members about the behavioral challenges some children without placement have exhibited, and of the DFPS staff who were supervising them, testifying "It is a significant crisis, and [DFPS staff providing supervision] are not trained to deal with that behavior and that's why our turnover is what it is because they are completely worn out."[154]

c.   <u>Without Appropriate Training, Staff Rely on Law Enforcement, Psychiatric Hospitalizations, and EMS to Manage Behavior</u>

As a default, many DFPS staff reported relying on law enforcement to manage the behavior of youth who act out physically. When asked how they responded in those situations, most staff (39 of 57, or 68%) indicated they attempted to de-escalate the child, but the second most commonly reported intervention reported by 29 interviewed staff (51%)[155] was to call the police.

---

[154] Testimony of DFPS Commissioner Jaime Masters, Hearing before Texas House Appropriations Committee on House Bill 5, August 24, 2021.
[155] Interviewees could choose more than one intervention type.

**Figure 34: How Caregivers Reported Managing Behavior at CWOP Settings**



When asked whether police or on-site security had been called to assist with a child who was dysregulated at a CWOP Setting, 46 percent (26 of 57) of interviewed staff said police had been called. Only seven percent (4) reported relying solely on on-site security to manage the situation, and 35 percent of interviewed staff (20 of 57) reported relying on both the police and on-site security.

**Figure 35: Percent of Caregivers Reporting Calling Police or On-Site Security at CWOP Setting**



The Monitors' analysis of Serious Incident Reports shows that Law Enforcement were called in 72% (96 of 134) of incidents that DFPS staff reported. The next most frequent responses to a serious incident, respectively, were psychiatric hospitalizations, medical treatment, EMS, and arrest and/or detention.

**Table 10: Result in Serious Incidents at CWOP Settings, January to June 2021**

| Result of Serious Incident | N | % of incidents with result (n = 134) |
|---|---|---|
| Law enforcement called/responded | 96 | 72% |
| Psychiatric evaluation/hospitalization | 36 | 27% |
| EMS called | 31 | 23% |
| Medical treatment | 33 | 25% |
| Arrest and/or detention | 22 | 16% |
| Child restrained | 6 | 5% |
| Child ticketed | 5 | 4% |
| Change of placement | 6 | 5% |
| No result | 13 | 10% |
| Other | 3 | 2% |

During interviews, DFPS staff recounted incidents when police expressed frustration with being called to the CWOP Setting frequently.  DFPS staff also expressed frustration with the failure of law enforcement to take youth into custody; the monitoring team also found Serious Incident Reports in which DFPS staff expressed frustration that police did not take youth into custody when called to assist with an incident.

At a recent hearing before the Texas House Appropriations Committee, Commissioner Masters expressed frustration that calls to law enforcement did not result in "consequences" more often.  Commissioner Masters testified:

> There are many times when we call for help and nothing happens to the child.  And what I've said is: we're not helping the kid.  If there are no consequences for any kind of behavior, and consequences don't have to mean being locked away, but when they age out, the world isn't going to care about their trauma. They can't just go punch somebody in the face when they age out and they're used to nothing happening.[156]

---

[156] DFPS Commissioner Jaime Masters, Testimony, Hearing before the Texas House Appropriations Committee on House Bill 5, August 24, 2021.  Despite the concern Commissioner Masters expressed regarding a lack of consequences for aggressive behavior, as shown by Table 10, in 22 out of 134 (16%) of the Serious Incident Reports, a youth was arrested or detained as a result of the incident.  An analysis by type of incident showed that in incidents in which a youth threatened a staff person, the child was arrested 41% (7 of 17) of the time.  In incidents involving physical aggression toward staff, a youth was arrested or detained in 26% (7 of 27) of the incidents, and 38% (6 of 16) of incidents involving a fight resulted in arrest.  A youth was arrested in 31% (8 of 26) of incidents involving disruptive behavior.  **Further, the Monitors' found that out of the reported serious incidents that involved**

### 3. DFPS Staff report that they do not receive all pertinent information needed to ensure appropriate supervision of high-needs youth.

In addition to expressing frustration related to a lack of training for direct care of children in CWOP Settings, DFPS staff also expressed frustration about the lack of information they receive related to children's needs.  DFPS policy requires regions to have a process in place to ensure that all staff responsible for supervision of children in CWOP Settings receive the following:

- A two-page CWOP Form (Form 2915) that includes basic information about the child, including a check-list of "reasons" the child is without placement;[157]
- The child's sexual history report (Attachment A); and
- Prescription and non-prescription medication logs for the children.[158]

The CPS Handbook specifies that the listed forms must be e-mailed to the staff responsible for supervising youth each day, and that DFPS staff supervising youth in CWOP Settings are responsible for reviewing the forms.[159]  DFPS staff who are supervising youth are required to sign

---

physical aggression toward staff, more than half of those incidents (15 of 27), involved a child who was having a mental health episode.

Commissioner Masters further testified to the legislature, "[A]n occurrence that happens across our state at most of our CWOP locations…is that children fight, children attack staff, we've had staff put in the emergency room, we've had children that are hurt by other children, we've had children that Uber from one CWOP location to another to beat up kids, we have kids that are severely mentally ill and it is traumatic for other kids and staff to watch what those kids go through." *Id.*  DFPS' own data indicates the occurrences described by the Commissioner are relatively rare, though the Commissioner did not indicate as much in her testimony. In fact, of the more than 2,000 CWOP placement events between January and June 2021, staff reported 67 incidents involving physical aggression toward staff or other children, fighting, or property destruction, according to all DFPS Serious Incident Reports during the period.  This amounts to 3% of CWOP placements events. *See* DFPS et al, Understanding the Texas Foster Care Capacity Crisis (undated), *available at* https://3e78rz4783rc1234r4bkmlml-wpengine.netdna-ssl.com/wp-content/uploads/2021/07/Capacity-Placematsv4-1.pdf

[157] This checklist includes "Child Characteristics" as one of the "reasons" a child could be without placement and, underneath that box, a checklist of characteristics that DFPS often describes publicly as "barriers" to placements. The list of characteristics is essentially a list of diagnoses and disabilities, but also includes some behavioral characteristics: ADD/ADHD, Animal Cruelty, Assaultive Behavior, Autism, Bipolar, Child Sexual Aggression, Conduct Disorder, Depression, Developmental Delay, Developmental Disability, Down Syndrome, Eating Disorder, Emotionally Disturbed, Enuresis/encopresis, Failure to thrive, Fire setting history, Other Behavior Problem, Physically Disabled, Gang Activity/Affiliation, Hearing impaired, HIV Positive/AIDS, Infant alcohol addiction/prenatal exposure to alcohol/fetal alcohol syndrome or effect, Inhalant abuse, Intellectual and Developmental Disability, Limited English Proficiency, Medicaid Waiver: Receiving MDCP/CLASS, Medicaid Waiver: Waiting list, Medically Complex, Medically Fragile, Military Dependent, Mobility Impaired, Mood Disorder, Oppositional Defiant Disorder, Pregnant, Previously Adopted, Psychotic Disorder, Reactive Attachment Disorder, Runaway, Self-Abuse, Sexually Acting Out, Sexually Transmitted Disease, Sibling Group, Speech Disabled, Spina Bifida, Terminal Illness, Terminated International Adoption, Traumatic Brain Injury, Tribal Member, Visual Impairment, Youth Parent, Other.  This form and checkbox list allows DFPS to compile its report of "barriers" to placement.  This practice is out-of-step with the preference for a "strength-based" approach to children without placement prioritized by DFPS in its online CWOP training.

[158] DFPS, Meeting the Needs of a Child or Youth Until a Placement is Secured, CPS Handbook §4152.2 (Updated February 2021).

[159] *Id.*

the child's Attachment A form to show that they have read it; once the child or youth is moved into a placement, DFPS requires these forms be uploaded to a child's OneCase records in IMPACT.[160]

The monitoring team reviewed the records kept on-site for children housed at CWOP Settings during on-site visits.[161]  The majority of the on-site records reviewed (63 percent, or 50 of 79) did not contain Form 2915, the two-page form that DFPS requires to be e-mailed to staff responsible for supervision in CWOP Settings.  However, nearly all files (91percent, or 72 of 79) included the child's Attachment A, and all of them included signatures from staff who supervised the children.[162]  Medication logs are discussed in Section 4(b), below.

During interviews, a majority of DFPS staff reported that, when they supervised a child in a CWOP Setting for the first time, they were provided with a child's Attachment A, Medication Logs, and daily notes or logs for the CWOP Setting.  However, only 35 percent (20 of 58) reported they received the child's CWOP Form 2915.  A smaller percentage of DFPS staff also reported receiving a child's Common Application (14 of 58, or 24%) and Placement Summary (16 of 58, or 28%).

**Figure 36: Information Provided When Supervising a Child for the First Time in a CWOP Setting**



*Source: CWOP site visits, Caregiver Interviews*
*n = 58*

| Category | Percentage (count) |
|---|---|
| Common App | 24% (14) |
| Placement Summary | 28% (16) |
| Attachment A | 85% (49) |
| Meds Log | 78% (45) |
| Form 2915 | 35% (20) |
| CWOP Notes/Log | 64% (37) |

When staff were asked how the information was provided, most reported that the information was e-mailed to them, but almost as many reported that the information was kept in a binder at the CWOP Setting for staff to review.

---

[160] *Id.*
[161] In some locations, paper copies were not being kept on-site, but were kept electronically in an online shared database.  In those locations, DFPS staff provided access to the online records for the monitoring team's review.
[162] It was impossible for the monitoring team to determine, from the information in the child's records, whether the signatures included all staff responsible for the child's supervision on each day that the form had been signed.

**Figure 37: Caregivers Reporting How Child Information is Provided in CWOP Settings**



As Figure 38 demonstrates, despite DFPS staff reporting that they received a child's Attachment A and daily CWOP notes and logs, many said they were not consistently informed of a child's mental health needs, history of physical or sexual aggression, or sexual victimization status. When asked if they knew whether any of the children they were supervising at the time of the interview were victims of sexual abuse, 16 percent (9 of 57) answered that they did not know; 18 percent (10 of 57) did not know whether any of the children they were supervising had a history of sexual aggression.

**Figure 38: Percent of Caregivers Reporting Being Consistently Informed of Children's Needs in CWOP Settings**



Of the DFPS staff interviewed who responded that they were provided an Attachment A for children new to the CWOP Setting they were supervising, 27 percent (13 of 49) responded they were not consistently informed whether a child they were supervising was a victim of sexual abuse

and 30 percent (15 of 49) reported not being consistently informed of a child's history of sexual aggression.

The disconnect between DFPS staff's responses to questions regarding receipt of Attachment A, and knowledge regarding a child's history of sexual victimization or aggression is likely due to the limited time that some staff reported having available to read documentation that was provided to them. One staff acknowledged that the priority is to sign the documentation in a child's binder "even if you don't know what you're signing." Another DFPS staff reported that binders are available "but there's no push to read them." Another DFPS staff person noted that while they were supposed to read the binder for the child that they were assigned to supervise before signing in for a shift, she did not think everyone actually reads them. In another region where children's documentation was kept in an online database, a DFPS staff reported that she had access to the database but she had never used it for reviewing files or learning about the children. Another staff person noted that it was up to each staff person to read about the child online, but nothing required them to signify they had read the information.

The monitoring team also asked whether the DFPS staff were provided with any special instruction or guidance on how to supervise children who were victims of sexual abuse,[163] or who had high mental health needs. A majority of interviewed staff answered that they were not.

**Figure 39: Percent of Caregivers Reporting Having Received Instruction on Supervising Children who Have a Sexual History or High Mental Health Needs**



In addition to wanting accurate information related to a child's history of sexual victimization or aggression, one DFPS staff reported frustration at not having more information

---

[163] On June 23, 2021, DFPS notified CPI staff that any staff who were supervising children in CWOP Settings would be required to complete the Recognizing and Reporting Child Sexual Abuse training; they do not appear to have been required to complete the training prior to supervising children in a CWOP Setting before then. DFPS e-mail broadcast, re: CPI Weekly Wednesday Communication, June 23, 2021 (on file with Monitors).

about a child's "triggers" for challenging behavior.  A child's triggers should typically be recorded in Service Plans, and are often discussed during intake in new placements, with the information provided to the child's direct caregivers.[164]  The information assists staff in identifying situations that could cause a child's behavior to escalate, giving caregivers an opportunity to intervene and assist the child in utilizing coping skills to remain calm.  This staff person noted that if a child is triggered, it can result in the child acting out physically and injuring staff.

When asked whether they received information about how each child's day was going at the beginning of their CWOP shifts, 82 percent (47 of 57) answered that they always received information, 16 percent (9 of 57) reported they sometimes received information, and only 2 percent (1) said they never received information.  Most reported receiving this information by talking with the DFPS staff who were leaving their shift, or by reviewing a daily log for the CWOP Setting.

**Figure 40: Percent of Caregivers who Report Receiving Information on Children at the Beginning of a CWOP Shift**



*Source: CWOP site visits, Caregiver Interviews*
*n = 57*

4. **Lack of appropriate settings and appropriately trained staff present significant safety problems for children in CWOP Settings.**

In many of the CWOP Settings that the monitoring team visited, the difficulty that DFPS staff experienced in providing a safe environment, with little-to-no training, an unsuitable setting, inadequate information about the children they were supervising, and lack of access to needed medication and treatment (see below) was evident.  Housing high-needs children in unlicensed settings that in no way resemble a treatment setting, and tasking DFPS staff who do not have the training or expertise to appropriately and therapeutically intervene when children act out or are in crisis, is a recipe for precisely the kinds of safety risks PMC children now confront.  Interviews

---

[164] The IMPACT form for children's Service Plans includes a box that asks the person completing the form to "Describe the child's trauma history and any known triggers."  This information is considered so important that one RTC under Heightened Monitoring addressed the failure to provide this information to direct caregivers by creating laminated cards listing a child's triggers and coping skills that are attached to lanyards that caregivers wear during their shifts.

with DFPS staff and the monitoring teams' reviews of children's records, Serious Incident Reports, and DFPS investigations revealed settings that are often unsafe.

>   a.   Lack of Structure and Routine, Combined with Unmet Treatment Needs and Poorly Trained Staff, Results in a Setting that Often Appears Chaotic

In many of the CWOP Settings visited by the monitoring team, children suffered from a lack of routine and structure. DFPS staff reported this was particularly true when children were not able to go to school. During many of the visits, children were asleep for most or all of the time that the monitoring team was onsite. Staff reported that because they were unable to enforce a bedtime, children stayed up all night and slept during the day. When children were awake, most were watching movies or playing video games; the monitoring team witnessed or heard about children engaging in off-site activities at only a few of the sites visited. DFPS staff at some sites noted that the area around the CWOP Setting was not safe, and that this meant they typically kept the children indoors. Other staff reported that either the children's behavior, or lack of adequate staffing, kept them from being able to take children outside.

Several DFPS staff candidly reported that there was not a set daily schedule for children at the CWOP location, and children "do whatever they want." DFPS staff in some CWOP Settings noted that even if they tried to impose a daily schedule, the children would not abide by it. Some children interviewed by the monitoring team reported being bored at the CWOP Setting where they were housed. Another DFPS staff noted, "You are putting kids in a not-so-big area, and they have a lot of energy, and it is just not fun for a child. We are not good parents…What the alternative is, I don't know." Another staff person interviewed said the CWOP Setting was "like jail for the kids."

Daily logs reviewed by the monitoring team reveal many children come and go as they please, both from the CWOP Setting where they are housed, and from the area where they are housed within CWOP Settings. DFPS staff report they walk after them if they leave the building, and try to talk them into returning, but often are unsuccessful.

DFPS staff who were interviewed by the monitoring team at times described a chaotic setting when asked about Serious Incidents they had witnessed. One staff said that two girls at the CWOP Setting who "loved to play hide and seek" were "hiding all over the office." Both children had a history of cutting themselves. One of the children "was looking for scissors and thumb tacks, anything sharp." One child found the keys to the filing cabinet where children's medications were kept, unlocked the drawer, and flushed her medications down the toilet. The children would not give the keys back, so the caseworker called the police who retrieved the keys and then left. The child then took a fire extinguisher and shot it all over the office "making it hazy and foggy." Another child had an asthma attack as a result. The staff called 911, and EMS came and treated the child who suffered the asthma attack. The disruption caused another child to have a panic attack, which led the caseworker to call 911 again, and that child was admitted to a psychiatric hospital.

Some of the Serious Incident Reports reviewed by the monitoring team also captured the sense of chaos. For example, in just one night at the CWOP Setting where the Serious Incident captured, below, occurred, children were caught engaging in "inappropriate" sexual behavior,

children left the CWOP Setting, law enforcement intervened with more than one child, and EMS was called twice, once in response to a child who may have attempted suicide by ingesting pills that the staff did not realize she had accessed (letters G, J, T, and R are used in place of children's first names):

> At 1:15AM [G] decided to go smoke, staff... followed her outside. At this same time [a caseworker and staff person] noticed [T] and [J] go into the room where [R] was laying down. [The caseworker] went into the room and turned on the lights, and it seemed as the teens were trying to be inappropriate with each other they got upset due to [the caseworker] being there and not leaving, [T], [J] and [R] got up and stated they were going to walk to the store. At 1:24AM [R], [T] and [J] were stopped by [a staff person] and [asked] "Hey guys where are y'all going?" [R] responded, "We're going to take a walk to the store." [The staff person] replied, "Its dark guys, it's not a good area and if y'all wanna go to the store, let me call [a Program Director] and see if she approves for me to drive you instead of y'all walking out there as there aren't any close corner stores that are open." [R] said, "No, I don't wanna be seen with…you, you're weak and I'd be embarrassed to be seen with you." They then started walking towards [the road]. [The Program Director] was called and she advised to call law enforcement. [Law enforcement] was called and [a] missing children report was generated.

> At 3:10AM the teenagers were seen walking back to location and [law enforcement] spotted them and walked them to the location. [The Program Director] was notified teens refused to be separated. [The Program Director] informed [the staff person] that [R] will need to go to [to another CPS office]. At the same time, [G] and [T] were blowing up gloves and popping them with pencils, they were asked to stop doing that as they can hurt themselves with the pencils, they refused and said they weren't going to be hurt. [Three] min[ute]s later, [G] threw the pencil to [T's] blown glove and pencil bounced and hit [T] in the eye. [T] was asked if she was ok and she stated she wanted medical attention for her eye. [The Program Director] was called and EMS was called at 3:42AM. As EMS called for [T], [J] and [R] got up and started walking down the hall towards the outside door, [the caseworker], [T] and [G] followed. Staff…asked them where were they going? They stated mind your business we'll be back later.

> Law enforcement was called again at 3:50AM to report [R] and [J]. As they were leaving the premises, EMS pulled up and [T's] eye was checked, medical staff reported her eye looked fine and he didn't think she needed medical attention, but staff was advised if her eye keeps bothering her to take her to urgent care clinic. About 10 minutes later both [G] and [T] walked back outside. [T] stated to [the caseworker] [G] has pills with her and threatened to beat her up if she is to tell anyone as she is feeling depressed and doesn't feel like living anymore. [T] was scared and told staff, "Don't tell her I told you, but I'm worried about her." [G] was seen walking towards the trash bin. [The caseworker] mentioned to Staff…we need to closely monitor [G] as she is acting distant and weird and she was seen putting something in her mouth. [G] was called several times but purposely ignored staff

and would not take her ear phones out of her ears while making eye contact at times with staff [who motioned to her] to take them out and hear us. It was stated what [T] had told [the caseworker], then Staff…followed [G], she then went behind the bin and made gag sounds and left the scene walking towards building. When Staff…arrived at [the] trash bin, I turned on my phone's flashlight and I saw [vomit] on the floor. I was approached by [T] and she informed me [G] had a handful of pink pills and she had taken them and made the following statement to [T], "I'm done with life." Staff…approached [G] and she refused to talk to anyone and put her headphones back on. For precaution, [the Program Director] was called as we didn't physically see her with pills on her hand or taking pills, we were advised to call EMS to check up.

At 4:05AM [R] was seen around the corner running towards CWOP building and police car chasing him down. [R] opened the back door and ran inside, officer got out his car and ran inside after [R]. [The caseworker] and [police officers] walked throughout building as [R] was hiding in front of building and eventually came to CWOP area as [the caseworker] called stating he is back in area [the police officers] then stayed in hallway and placed handcuffs on [R] asking him why is he running away from police. [R] gave smart remarks back to [the police officers] and cooperated being handcuffed and was escorted out of building. Meanwhile, [G] was still outside and laid down on the floor, she was addressed and asked if she was feeling ok and did not respond. Second officer was taking [J] out of the police car and released her. [J] started cussing at the officers and told them she was going to leave. Officer went after her and told her, "get your ass inside the building" and was guiding her towards the door. [R] was then put inside the police car.

[T] came outside and told staff…she was fearful as [G] had threatened her if [she] "opened her mouth". [The staff] for safety precaution told [T] to go inside his car and stay there until it's safe. [The staff] got a call from [the caseworker] that [J] had gotten the water hose out of [the] glass door and was starting to pull it all out of [the] box. [The caseworker] pulled the hose away from [J] and told her to stop to avoid any incidents. [J] got upset and cursed at worker. [J] then walked towards front door of building and was witnessed kicking glass door to building by [the caseworker] who told her repeatedly to stop kicking [the] door as glass was going to shatter on door. [J] cursed at worker and then [G] walked into area and tried to convince her to stop. [J] would not reason with either [the caseworker] or [G] and continued kicking the door.

[G] then walked out of front area. [The caseworker] called… [to ask] …for assistance by [the police officers,] as they were still on premises [,] to help with [J] kicking glass door and trying to destroy property. During this time, [J] had woken up the rest of the youths from banging on the door. [The police] officer came and spoke to [J] and she calmed down a bit.

Shortly after…[p]aramedics walked into the front area with [the police] officer and [the caseworker] requesting [to be directed to the] child that shows signs of

overdosing. Paramedics [were] escorted to CWOP area where [G] was. [G] refused to be checked, she stated she only had two individual pills of ibuprofen a [caseworker] had given her.  [G] repeatedly kept crying stating she only had two pills and she was informed that she can't take pills without staff administering them to teens.  EMS asked [T] and [T] reported she did see [G] with a handful amount of pills. EMS and another police officer escorted [G] out as she was refusing to go outside. Once [G was] in the ambulance, [T] was brought back inside the building. [R] was taken to [another CPS office] by law enforcement. [The caseworker] escorted [G] to Texas Children's, while other staff remained. Staff started cleaning [G's] room and a box of 50 coated Ibuprofen 200mg tablets was found, however, the bottle was not found.  [Staff] reported to [the Program Director] that [the police officers] stated they were going to call in an intake because staff should have known [G] was suicidal and been watching her so she did not take the pills.  [The Program Director] also talked to an officer who asked what was our plan to prevent [J] from destroying property.  He asked if we were going to lock her in a room to prevent this from happening.  [The Program Director] explained that we cannot lock a child in a room.

b. CWOP Settings and Lack of Training present challenges for ensuring appropriate management of psychotropic and other medications.

DFPS staff are advised in the online CWOP training that regional plans for supervision of children in CWOP settings must follow DFPS policy related to medication storage and administration.  However, the training does not explain the requirements of the policy, instead relying on the DFPS regions to ensure that it is being followed.  DFPS policy regarding CPI or CPS staff who administer medications requires that staff:

- Be informed about the child's diagnosis and other medications.
- Be informed about the actions of the medication and side effects.
- Complete general pre-service training on psychotropic medication.
- Administer medications **only** if they are stored in the original pharmacy container.
- Administer medications according to the instructions on the container or from the prescribing licensed health care provider.
- Document in the following places that the medication was administered:
  o IMPACT Contact Detail.
  o Form 2400 Prescription Medication Log or Form 2401 Non-Prescription Medication Log.
- Place the original Prescription Medication Log or Non-Prescription Medication Log in the child's permanent case record.
- Provide a copy of the Prescription Medication Log or Non-Prescription Medication Log to the child's next caregiver.[165]

---

[165] DFPS, If CPI or CPS Staff Administers Medications, CPS Handbook §11310.

Though almost all DFPS staff interviewed reported that they administered medication to children in the CWOP Settings where they provided supervision, few reported having received any training related to medication administration and management.  Of the 57 staff who answered questions related to medication, 51 (89%) indicated that they administered medication to children in CWOP Settings; however, 44 of those 51 staff (86%) reported that they had not received training on administration of medication.[166]

**Figure 41: Administration of Medications to Children in CWOP Settings and Training Received by Caregivers**



DFPS policy does not allow CPI or CPS staff who are not licensed healthcare providers to administer medications by injection or suppositories.[167]  The agency allows a CPS or CPI staff to supervise an older child's administration of their own insulin injections if the child is approved to do so, and allows CPI or CPS staff to hand suppository medication to an older child who understands how to insert them, but does not allow the staff to remain in the room while the child administers it.[168]

The monitoring team's review of on-site child files shows that DFPS policy regarding medication storage and administration is not consistently followed.  During on-site reviews of child files, the monitoring team looked for medication logs in each child's file.  Of 79 children

---

[166] In July 2021, DFPS policy was updated to require staff to complete "general pre-service training on psychotropic medication," and to require staff to "[e]nsure the child takes the medication as prescribed."  The policy was also revised to specify that if a child is without placement and staying with CPI or CPS staff overnight, CPI or CPS staff at a caseworker level or above must administer medications to children. DFPS, CPI or CPS Staff Administration of Medication to Children, CPS Handbook §11310.
[167] DFPS, CPI or CPS Staff Administration of Medication to Children, CPS Handbook §11311.
[168] *Id*.  An exception is made for rectal antiseizure drugs for emergencies, for epinephrine auto-injectors for emergencies, and for glucagon administration for diabetic low blood sugar emergencies.

whose files were reviewed on-site, 82 percent (65 of 79) had a documented medication need.  The records for seven children clearly documented that they did not take medication, and records for another seven children did not document any information related to the child's medication needs.

**Figure 42: Documentation of Medication Needs in CWOP Child Files**



Excluding those children where file documentation clearly indicated no medication taken (7 of 79), 79% of children's files reviewed (57 of 72) included a completed medication log.[169]

**Figure 43: Documentation of a Medication Log in CWOP Child Files**



---

[169] Includes children with a documented need for medication and children where medication needs were not documented in their file.

However, in 28 percent (16 of 57) of these children's records, the date and time a child was given medication was not consistently indicated or not included at all, and in 26 percent (15 of 57), the count of medication was not consistently indicated or not included at all.  And when a child was not given their medication as directed, an explanation was provided in fewer than half of medication logs (26 of 57, or 46%).

**Figure 44: Information Included in Medication Logs in CWOP Child Files**



After the monitoring team's initial on-site visits, the Monitors added a question to the monitoring team's child-file review that asked whether it was evident from reviewing the child's on-site records that the child was receiving medications as prescribed.  Of the 52 children whose files were reviewed after this question was added, only 28 (54%) children's records clearly documented that they were taking their medication as prescribed.

**Figure 45: Percent of Children Appearing to Receive Medications as Prescribed in CWOP Settings**



The monitoring team noted specific examples of problems found in children's on-site medical records and logs.  For example, one child's medication records showed the child was to be given an anxiety medication three times daily, but it was only being given once per day.  The child's records showed that she engages in self-harm (cutting) when she gets anxious.  In fact, after being placed in the CWOP Setting, the child had to be hospitalized for cutting behavior.

Another child whose records were reviewed is prescribed a medication to treat Bipolar Disorder, with directions to administer it three times per day. However, the medication logs showed that the medication was not properly administered for several of the days the child was in the CWOP Setting. On two of those days the child received the medication twice daily instead of three times. One day it appears the child received the medication four times.  The child was also prescribed Abilify, a powerful antipsychotic, which was supposed to be administered once daily. Yet, there were two instances recorded of DFPS staff administering the medication to the child twice in one day. The child is also prescribed two medications to treat ADHD; for both, there were days in the log that showed the medications were not administered, without listing a reason.

Another child's medication records showed a UTI medication prescribed April 21, 2021 with directions that it be administered twice daily, in the morning and evening. On April 27, 2021, the child's medication log indicates the youth received one in the evening and on April 28, 2021 the log records one more was given, but the medication count recorded the day before was zero.

For another child's medication logs, though DFPS staff documented the time of day the medications were given, they did not consistently document whether the time was morning (a.m.) or evening (p.m.).  Nor did DFPS staff routinely count this child's medications, or update the medication log when a new drug was prescribed. For example, the child was prescribed a medication for cramps, but the medication schedule was not updated to include it.  In addition, the child was supposed to take an over-the-counter medication to treat acid reflux twice daily, but there was no record of it having ever been administered.

At one CWOP Setting, DFPS staff tracked medications on a word processing document instead of using the official Medication Log form. The official Medication Log was in the child's folder but was not completed. The word processing document used by the DFPS staff did not contain information about dosage, the time of day the medications should be taken, who administered it, and inconsistently listed how many tablets or pills were left in the bottle.

In many of the CWOP Settings visited, the monitoring team also noticed that DFPS staff were not providing children with medications at the same time of day each day, or even close to the same time of day each day.  This can be very problematic for psychotropic medications, as well as for medications that should be taken right before bed that are meant to cause drowsiness.

The danger associated with failure to follow appropriate protocol for medication administration is vividly illustrated by the investigation of a report made to SWI involving a child housed in a CWOP Setting who was inadvertently given an improper dose of medication.  The child was sent to the hospital for evaluation but did not suffer any ill effects. The investigator determined that there were two different medications for the child, with two different doses dispensed, and the staff person tasked with the child's supervision was not sure which medication was the correct medication to give the child.  After giving the child the medication, the staff person panicked, believing she had given the child an overdose, and sought medical care.  Though the child was not overmedicated, the investigation revealed that the DFPS staff person who administered the medication had not been trained in dispensing medication.  Despite the lack of training, she was the lead staff person for the CWOP shift. Further, the DFPS investigation showed that the medication logs used by DFPS staff in the CWOP Setting were confusing and poorly documented.

In addition to specifying the process for administration of medication, DFPS policy addresses medication storage for children in CWOP Settings. While minimum standards for GROs require medication covered by Schedule II of the Texas Controlled Substances Act to be kept under double lock,[170] the CPS Handbook does not include a similar requirement for storage of medication in CWOP Settings. DFPS' policy requires that medications for children in the temporary care of CPS staff to be kept in a secure and locked location at all times.[171]  The policy suggests a locked file cabinet in a CPS office as an appropriate place to store medications.[172]

During site visits, the monitoring team observed several instances of medication left outside of a locked box or file cabinet, found unlocked medication storage boxes, and also found examples described in daily logs for CWOP Settings either of children breaking into locked file cabinets and accessing medication, or of children stealing the key to the locked file cabinet and accessing medications.  During an interview, one DFPS staff person who provided supervision at a hotel noted that, because there was no place to lock medications in the hotel rooms, children's medications were kept in a bag next to the staff. The monitoring team also heard conflicting reports from DFPS staff about who was allowed to administer medication; in some places, despite DFPS policy prohibiting administrative staff from administering medication, the monitoring team was told that they were allowed to do so.

---

[170] Tex. Admin. Code §748.2101
[171] DFPS, Storing Medications, CPS Handbook §11313.
[172] *Id*.

During one site visit, the monitoring team observed staff unable to access needed medications because a staff person who supervised children during the previous shift left with the key to the locked file cabinet where the medication was stored.  Staff who supervised children at a hotel site reported storing the children's medication in the trunk of their cars; one staff person left a shift without removing the medication from their car's trunk.  During another site visit, staff reported having difficulty getting refills for medication, resulting in one child going for days without needed medications.  The monitoring team took a photograph of a note in an unlocked medication box at one CPS office that indicated the child's evening meds were "unavailable."

Problems with medication refills were also mentioned in Daily Logs for CWOP Settings. In one, a child was described as "hyper, not respecting boundaries, and bouncing off the walls." The child told the staff person that "this is the way he acts when he does not have his Ziprasidone." The Daily Logs note that the staff person e-mailed the child's primary caseworker to report that he needed a refill of this medication.

The photographs below were taken by the monitoring team during on-site visits.  The first photo shows a monitoring team member holding medications from a child's medication box, which was found unlocked (the box is visible below the medications that are held in the team member's hands).  The second photo shows a bag of prescription medications sitting on a dresser in the living area of the CWOP Setting, next to the large stuffed Teddy bear.



Serious Incident Reports reviewed by the monitoring team also documented problems. One Serious Incident Report reported that when staff attempted to retrieve a youth's medication, the medication was not secured.  This Serious Incident Report also documented that a youth was

allowed to follow the staff into the room where the medication was kept, and grabbed a bottle of Ibuprofen before the staff person could stop her. Another Serious Incident Report indicated that children's medications were found in an unlocked box. Another Serious Incident Report indicated that a child was given three psychotropic medications that were not prescribed to him; he was taken for medical treatment and reportedly did not appear to have any side effects.  In another Serious Incident Report, a note indicated that the key to the cabinet holding medications was "lost," and another Serious Incident Report reported that two children were missing medications that staff were working with pharmacies to try to fill.[173]

    c.  CWOP Settings present challenges for protecting the safety of children who have a history of self-harm.

    Many of the children who are without placement have been hospitalized for self-harm or suicidal ideation in the past.  Despite the known histories of self-harm, many children are now being housed in settings where they have easy access to objects that may be common in office settings, but that can be easily used to self-harm or as part of a suicide attempt. During on-site visits, the monitoring team documented scissors left in unlocked drawers, a "sharps" box that contained used syringes, disposable razors left in showers or bathrooms used by the children, as well as more common office items (paperclips, tacks) that children could use to self-harm.  Though direct care staff in treatment settings are typically trained to be aware of the risks that even everyday objects can pose, those who are not may not understand the risks.

    Incidents reported to SWI show the risks associated with these settings for children who have a history of self-harm or suicide attempts.  For example, one PMC child, who had a history of self-harm prior to being in a CWOP Setting, was taken to the emergency room from a CWOP Setting after having engaged in cutting, with the injuries described in the report to SWI as "about 15-20 cuts on [the child's] arm that were self-inflicted using a blade from a shaving razor."  A Serious Incident Report completed by staff indicated the child was bleeding heavily due to the cuts.  When her caseworker met with the child at the hospital, the caseworker described the injuries in a Face-to-Face Contact Note in IMPACT, "[Caseworker] observed multiple cuts over her entire inner arm from the elbow to the wrist."  The investigation report noted that the day before the child cut her arms, a child at the same location had to be transported to the hospital after swallowing earrings.  On the same day, another child in this CWOP Setting locked herself in the bathroom and cut her wrists, but EMS determined her injuries did not require hospitalization.

    A number of the Serious Incident Reports reviewed by the monitoring team documented similar, and other, risks.  Two documented incidents in other CWOP settings involving children who used the blades for a disposable razor to self-harm.  Though one of them involved only superficial cuts, the other resulted in staff finding the child in a puddle of her own blood.

---

[173] Another incident reported to SWI documented a TMC child who was able to obtain her own prescription medication from her locked medication box because, days before the incident took place, while staff were in the children's presence, the staff had called out the code ("1,2,3") for the lock on the box containing the key to the medication box. The child ingested her own anti-seizure medication in her bedroom after taking it out of her locked medication box without staff noticing.  Video reviewed by the investigator showed the child having trouble walking and acting unsteady on her feet after ingesting the medication, but staff did not notice a problem until she began vomiting, at which point they called EMS.  After an investigation, DFPS Ruled Out Neglectful Supervision for the staff supervising the child.

Another Serious Incident Report documented an incident involving a child who had a knife and locked herself in the bathroom of the CWOP Setting where she was housed; when staff forced their way into the bathroom, she was observed to be cutting herself and said that she would kill herself.  At the same CWOP Setting, another youth locked himself inside the bathroom and tied a string from a basketball net around his neck.  When the staff gained entry, they found the youth unconscious. Staff hurriedly removed the string and the youth regained consciousness; he was taken to the hospital for evaluation.[174]  A Serious Incident Report for a different CWOP Setting involved a youth who, after stating that she wanted to feel pain, grabbed scissors from a cubicle at the office where she was housed and used them to cut herself.

The monitoring team reviewed the records of PMC children housed in CWOP settings this summer and discovered that one child's Common Application reported that he drank a cleaning product on July 26, 2021. On July 28, 2021, the child was reportedly placed in-patient and then discharged on August 2 due to having "met his therapeutic goals." There is no evidence that this incident of alleged self-harming was reported to SWI or investigated by DFPS.[175] None of the Serious Incident Reports reviewed by the monitoring team documented children ingesting cleaning fluids, though the Serious Incident Report did document children having access to cleaning fluids. One describes children spraying cleaning supplies "all over the building" and another describes an incident in which a child sprayed staff with a bottle of cleaning fluid.  During an interview with the monitoring team, a DFPS staff person reported a child having been hospitalized after drinking sanitizer.

Another Serious Incident Report documents a child who had access to a very uncommon object for an office setting: a pellet gun.  A child found what looked like a rifle when she was "roaming" through the CPS office where she was living.  She ran to the conference room with the gun to show it to staff, who initially thought it was a real gun.  The gun was placed in a locked room; a police officer later identified the gun as a pellet gun, and disassembled it.

> d.  CWOP Settings present challenges for ensuring safety of children who are at high-risk for running away and for trafficking.

The documented harms to children who have run from CWOP Settings include drug overdoses and suicide attempts.  One child without placement, whose experience in foster care is described in the children's stories in this report, left the office where he was living because he was sad that DFPS had not found a placement for him.  The child ran to a nearby park, where he found a piece of rope and attempted to kill himself by hanging from the monkey bars on the playground.  The child regained consciousness when the rope broke and he fell to the ground.  Another child ran from a CWOP Setting to a nearby overpass over a busy interstate highway, and threatened to jump.  Police successfully intervened and took the child to a psychiatric hospital.

---

[174] The reporting DFPS staff person overheard this child telling his CASA during a telephone call that he "[would] be killing himself in the next 5 [minutes]."  The DFPS staff person called the crisis hotline; the representative from the hotline provided the DFPS staff with a list of hospitals, since the child did not want the police called.  The DFPS staff person then called their supervisor, who advised the staff to call the police. The staff person called the police; meanwhile, the child went to the bathroom, locked himself inside, and tied the string around his neck.

[175] The Monitors alerted Commissioner Masters. Email from Kevin Ryan to Commissioner Masters (August 27, 2021) (on file with the Monitors).

The Monitors also found several instances of children being sex trafficked out of CWOP Settings.  Some children seem to come and go at will from the CWOP Settings where they are housed; in some cases, children with a history of being sex trafficked are clearly leaving to meet either the trafficker or people who paid them for sex.  Of the cases reviewed by the Monitors involved girls, all of whom had significant histories of sexual abuse as children.  One of these children, JB, entered the foster care system in 2019 at 16-years-old. She was placed in foster care after being charged with assault for having pushed her mother down the stairs.  During her time in juvenile detention, JB made an outcry of having been sexually abused by her stepfather from age seven-years-old to age 14-years-old.  She also reported that a "pimp" gave her drugs and started trafficking her at the age of 14.  When JB's case was non-suited, her mother refused to pick her up from detention, and JB entered the foster care system.  JB was in PMC until she aged out of care in April 2021.[176]

When she entered care, her initial Common Application and Service Plan detailed her extensive history of drug use, including a history of methamphetamine use, and daily use of alcohol and marijuana.  Later Common Applications added a history of heroin use, ecstasy, prescription drugs, and cocaine.  She also had a history of psychiatric hospitalizations prior to entering care, due to suicidal ideation and self-harm.  Her Common Application indicates that she needed substance abuse treatment, which she does not appear to have received during her time in care; the only substance abuse treatment listed in any of her Common Applications was received prior to entering care.  The last Common Application completed prior to her 18th birthday noted that the last date of use for a long list of illegal substances was age 17, a year after entering care, and her age at the time the Common Application was completed.  It in fact noted that two of her late 2020 runaway incidents resulted in sex trafficking, with a runaway event ending in December 2020 when her "pimp" was arrested in a police sting for sex trafficking and drug charges.  Yet, this Common Application again notes her need for substance abuse treatment, but confirms she still had not had a formal Substance Abuse Assessment, or received any treatment, 18 months after entering care.

After entering care, she was placed in six licensed GROs, was admitted to a psychiatric hospital four times, had seven spells in CWOP Settings, and ran from care 11 times.  Her first placement was in Prairie Harbor RTC, where she stayed for almost a year, until the RTC closed for safety reasons following the death of a PMC child.  She was next placed at Freedom Place RTC, which has since been placed under Heightened Monitoring for a history of safety violations. After almost a month at Freedom Place, she was admitted to a psychiatric hospital due to self-harm and suicidal ideation (she cut herself and drank Windex).  Upon leaving the hospital, she had her first spell without placement; after three days, she ran away.  This started a cycle of running both from licensed placements and CWOP Settings.  One of the Serious Incident Reports reviewed by the monitoring team discussed her last runaway event prior to aging out of care, and showed that her substance abuse was ongoing:

> [JX] is our youth that continues to run to be with her pimp. On Friday, March 12th while attempting to check into the Sonesta Hotel for CWOP one of the caseworkers noticed [JX] walking with a man. Once [JX] recognized the worker she began

---

[176] The monitoring team learned of this incident through a Serious Incident Report.

walking swiftly in the opposite direction and the male took off running through the hotel. [JX's] ad-litem later called and stated that she wanted CPS to pick her up. Upon picking her up [JX] began complaining about stomach pains and stated that she thought she was pregnant. [JX] was taken to Texas Children's Hospital. Her attending physician…reported that they completed a pelvic ultrasound due to [JX's] blood test resulting in a positive pregnancy test, however, her urine pregnancy test was negative. Dr…stated that [JX] was diagnosed with a Pelvic Inflammatory Infection and currently taking medications Gentamicin and Clindamycin via Intravenous (IV). Dr…stated that [JX] also tested positive for cocaine and was experiencing withdrawal symptoms and currently taking medication Clonidine oral to address the withdrawal symptoms. Dr…stated that [JX] would remain in the hospital to be monitored and complete additional test results. It has been confirmed that [JX] is 4 weeks pregnant. [JX] was released from the hospital today. Her grandfather has allowed her to come to his home until a placement is found for her. [JX] turns 18 [in April]. She does not plan to sign an extended foster care agreement.

Another child, KW, who is described among the children's stories in Appendix B to this report, ran away from a CWOP Setting more than once, at least in one case to meet a man who she had met on the "Plenty of Fish" social media platform. She and another child reported having been raped by the man as a result of the encounter. On another occasion, law enforcement picked her up from a motel after she called and gave her location.

A Serious Incident Report also described an incident involving SB., who was known to run from her CWOP Setting. The Serious Incident Reports described an incident in which SB. ran away around 2:00 in the morning, then returned at around 5:30 a.m., and was transported to the hospital after reporting that a man "shoved pills down her throat" and "touched her inappropriately."

Daily logs for one CWOP Setting noted the following incident:

At 10:55 pm, [A] walked fast down the hall and said she is taking a shower. Worker…followed her to the shower, where she walked quickly out of and said she had to get something from outside. Worker asked her what she needed from outside and she moved quicker and went out the back door of the building. Worker looked out the back door and could not see her or any moving vehicles.

Worker…called [the local police department] and reported [A] as a runaway and that call ended at 11:00.

At 11:05 worker…went outside and walked around until he found [A] and spen[t] time talking with her until [the police officer] arrived to speak with her at 11:15.

At 11:25, Worker [], [A], and [the police officer] came back into the building. [A] hid under a desk in a cubicle, angry and was informed by [the police officer] that he would be contacting [her school district] about disabling her wifi due to her

behaviors if she could not follow the rules.  The officer suggested that CPS contact [the school district] ourselves due to safety concerns.  [A] was caught getting in the truck of grown man this evening, that she met on SnapChat and told him where to pick her up.

The Daily Logs show that the next day, [A] ran away and one of the other children reported that [A] had told her that she was "getting an Uber." [177]

---

[177] In addition, the Monitors completed an extensive record review of the records of a child who the monitoring team met during an on-site visit to a CWOP Setting, the monitoring team was initially told that AZ was a PMC youth but discovered that she was in TMC during a review of her IMPACT records.

AZ, seemed to come and go from CWOP Settings at will, and reported having sex with adults in exchange for money during her time away. AZ is a 16-year-old girl in the State's Temporary Managing Conservatorship (TMC) who the monitoring team met during one of the on-site visits to a CPS office.  AZ is described in her most recent Common Application as being "smart," particularly when it comes to technology, and "social."  She loves listening to music; her favorite types of music are hip hop and rap.

During the monitoring team's on-site visit, AZ returned to the office after having run away.  The monitoring team's interview with was interrupted when officers from the local police department arrived to arrest her due to allegations that she had kicked a DFPS staff person during a prior runaway incident.  Notes in IMPACT reveal that AZ was returned from runaway status after she texted a DFPS staff person and asked to be picked up from the apartment where she was staying, reporting she did not feel safe.  She reported that four other foster children were in the apartment with "a few men" who AZ did not know.

A Common Application for AZ, dated June 7, 2021, indicates that though AZ is a TMC child, this is the second time she has been in foster care.  She first entered care as a young child due to her mother's substance abuse disorder, but was adopted in 2012 by her paternal aunt and uncle.

The adoption disrupted and AZ re-entered foster care in September 2020.  Just before she re-entered care, AZ told a friend's mother that her uncle/adoptive father had sexually abused her.  AZ's abuse allegation has not been substantiated, but her Common Application indicates she has been consistent in reporting the abuse.  During a psychological evaluation, AZ said that her uncle began abusing her when she was in the fourth grade, and that the abuse continued until she entered foster care in 2020.  The sexual victimization page in IMPACT states that "[AZ] reported [her uncle] came into her and her cousin's room one night and asked her to touch his penis.  [Her uncle] denied this and the cousin denied this as well."

According to AZ's Common Application:

[AZ] is in need [of] a secure and structured environment that specializes in dealing with children with sexual victimization and at high risk for being sex trafficked.  [AZ] has a history of having sex with older men for money.  She seeks out these men online and will meet up with them.  [AZ] believes this is the best way to live and is not interested in alternatives.  She reports that she has no self-worth and does not care if she puts herself in dangerous situations because "everybody dies someday."

In addition to being at high-risk for trafficking, AZ's IMPACT records show a history of psychiatric hospitalizations prior to and after re-entering care. AZ's aunt/adoptive mother reported that AZ was hospitalized twice for self-harm or suicidal ideation prior to re-entering care, once in November 2019, and again in January 2020.  She was hospitalized again after re-entering care, in February 2021, after she attempted to overdose on psychotropic drugs while housed at an emergency shelter.  AZ took 800 milligrams of Seroquel after having "cheeked" it for this purpose. AZ's Service Plan indicates that she "would benefit from participating in individual therapy consistently with a therapist" but "has moved frequently and has not had a consistent therapist," has also refused therapy, at times, but "needs individual therapy to find new and healthy coping skills."  According to the Service Plan, AZ "feels abandoned

by her family" and "has very low self-esteem and self-worth which leads to her engaging in dangerous situations." AZ's Common Application notes that she is "in need of an RTC placement so she can receive therapeutic treatment and psychiatric oversight." It also notes that AZ needs "a secure and structured environment…to ensure [her] safety."

Despite this, AZ's IMPACT records show that, between the time that she re-entered foster care in 2020, and the day that the monitoring team met her in June 2021, after her first placement in a fictive kin home, which lasted a month, and another month in a placement in her adult sister's home, AZ's only placements have been:

- a month-long stay in Carson Parke GRO, which has since had its license revoked by RCCR;
- two weeks in an emergency shelter as a "Temporary Emergency Placement;" and
- just under a month in a psychiatric hospital.

AZ's IMPACT records show that after being placed in her first CWOP setting on March 4, 2021, she developed a pattern of running away, staying away from the CWOP setting for several days before returning. In all, IMPACT shows **13 runaway incidents followed AZ's first stay in a CWOP setting;** AZ returned to DFPS supervision between each of these runaway events. After being arrested the day that the monitoring team met AZ, AZ stayed in juvenile detention for a month, until she was placed in an RTC in Nevada on July 23, 2021.

During her time in CWOP settings, AZ was sex trafficked, sometimes leaving the CPS office where she was living in an Uber that had been sent to pick her up. AZ's sexual victimization page in IMPACT states:

> [AZ] reports that she has had multiple sexual encounters with adult men for money. There is a [sic] unconfirmed encounter where she met a man online and he sent her an Uber to his home to have sex. [AZ] snuck out of her placement and met the man at his home. They had sex, he paid her, and she left. She claims she does not want to finish school because she knows she can make money easily by prostituting.
>
> On 2/2/21, [AZ] reported that her [sic] and her two roommate's [sic] at her placement left the shelter and were walking down the road and a couple pulled up to them in their car and asked if the girls wanted to go with them. They drove to a hotel room, on the way there, they smoked weed. [AZ] thinks the weed was laced with something because she blacked out and has fuzzy memories of the incident. She remembers the hotel being pitch black and the girls were on the bed and the couple was [sic] walking around doing something. The next thing she knew the man was on top off [sic] her, raping her. She does not think he was using a condom. After all that, the couple dropped them off at the shelter, or close to it.
>
> On 3/12/21 [AZ] left CWOP in a [sic] Uber. [AZ] stated her friend "Mexico" provided an Uber for her to get to San Antonio where she met him at a hotel. [AZ] reported she and "Mexico" had sex for money. She also stated that the sex was consensual. [AZ] is 15 and "Mexico" is 20. "Mexico" left the hotel checked out and asked the front desk to inform [AZ] he was not coming back. [Law enforcement] was contacted and [AZ] was taken to the hospital to have a SANE exam completed. [AZ] refused to talk to [law enforcement] after she was informed, she could not give consent for sex. A SANE exam was not completed; however she was transported to SA police to complete a forensic interview.
>
> On 04/09/21 [AZ] reported while on runaway, she states that she stayed with two [convenience store] workers she met the night before and had sex with both of them.

A review of IMPACT details all of the incidents described above, and additional similar incidents. On one occasion, when her "boyfriend" refused to bring her back to the CPS office where she was living, she got out of his car at a gas station and when she realized she was close to another CPS office where she had previously been housed, she walked to it and let herself in, because she knew the security code for the door. AZ reports having had sex with men for money during each of her runaway episodes and described one "boyfriend" from Houston as being a "pimp."

### e.   CWOP Settings present challenges for preventing child-on-child sexual abuse

The monitoring team's review of the records of children without placement, as well as reviews of Serious Incident Reports and investigations of abuse, neglect, or exploitation initiated for CWOP Settings also raise concerns about the ability of DFPS staff to ensure children are not exposed to a risk of child-on-child sexual abuse while housed in CWOP Settings.  KW, whose time in foster care is discussed in detail, above, engaged in child-on-child sexual contact with at least one other youth during her time in a CWOP Setting.

During site visits, the monitoring team noted that though DFPS staff often reported an "open door" policy for children while they were in their bedrooms, that policy was not being enforced consistently.  Serious Incident Reports also documented instances during which children barricaded themselves in their bedrooms with other children, and the monitoring team witnessed this occur in one of the sites visited.  One of the DFPS staff interviewed at a CWOP Setting noted the difficulty of separating children by history given the space constraints they faced.  The staff person noted that one-out-of-five children at the location had been sexually abused, and two-out-of-five had been sexually aggressive, but because of space constraints, DFPS placed the children in the same room overnight.

A referral to SWI reported that a child (Child A, age 17) housed at a CPS office alleged that another child (Child B, age 16) touched him inappropriately multiple times while placed in a CPS office.  While DFPS Ruled Out the allegation of Neglectful Supervision against the staff members and found no other evidence to corroborate Child A's allegation, DPFS identified Child A as a sexual abuse victim and Child B as having sexually aggressive behavior due to this incident(s).  Child A's Attachment A documents the following, "[Child A] outcried to being sexually abused by another child [Child B]. [Child A] stated that [Child B] touched him on the penis and buttocks under his pants and this was not consensual. He also reported [Child B] rubbed his penis on the outside of his clothes."

In addition, one of the referrals to SWI that related to a child who self-harmed also alleged that the child was involved in sexual contact with her roommate in the CWOP Setting.  The investigation revealed that the night-time supervision level at the time of the intake was hourly checks at night.  Despite this policy, which is concerning given the level of needs of children in CWOP Settings, the investigation Ruled Out Neglectful Supervision.

In addition to these incidents, a Serious Incident Report documents an incident in which three children were in the bathroom at a CWOP location and one of them filmed the other two, both girls, engaging in oral sex, then uploaded the video to Instagram.[178]

---

Though these incidents are included in AZ's sexual victimization page in her IMPACT records, because they are technically unsubstantiated, they do not appear in the Attachment A form that is provided to CWOP Settings.

[178] Another Serious Incident Report notes that a child told her caseworker that she made out with another female youth at the CWOP Setting.

A review of the IMPACT records and Daily Logs kept in CWOP Settings also raises another concern: in addition to the difficulties associated with supervising the interactions among children in CWOP Settings, their frequent internet and phone access may pose a risk of harm to children with whom they interact inappropriately outside the CWOP setting.  It also poses a risk of sex trafficking to children, as highlighted by T.D.'s story, discussed above.  Yet, Daily Logs and conversations with staff indicate that even when children are not supposed to have access to a phone or internet, there is so little for children to do in CWOP Settings that staff often acquiesce and allow them access as a way of managing a child's behavior.

AV's story, shared below, highlights the challenges associated with housing children with a history of sexual aggression in CWOP Settings.

### *AV's Experience in Foster Care and in CWOP Settings*

The monitoring team interviewed AV, a 15-year-old boy, during a visit to a CPS office on June 22, 2021. The monitoring team observed AV to be bright, with a good sense of humor. AV likes to skateboard and would often ride his skateboard or a bicycle through the hallways of the CPS office where he was living.  His most recent Common Application notes that AV "likes to spend time outdoors playing sports and he also enjoys video games."  AV "loves supernatural shows…loves to draw and paint…and is very intelligent."

When the monitoring team interviewed AV on June 22, 2021, he had been without placement and shuttled between CWOP Settings since April 14, 2021.  AV entered the foster care system in June 2020 because his father refused to allow him to return home after he was released from a secure Texas Juvenile Justice Department (TJJD) facility.  AV was committed to TJJD when he was just 10-years-old, after having been adjudicated delinquent for sexually abusing a younger cousin.  AV also acknowledged having sexually abused his younger siblings, though these incidents are unsubstantiated.  During his time in the juvenile system, AV successfully completed a treatment program for sex offenders.[179]

AV's IMPACT records indicate that he was a victim of sexual abuse prior to sexually abusing his cousin and siblings, though the incident is unsubstantiated.  According to information on the sexual victimization page in AV's IMPACT records, during psychological evaluations, AV made an outcry of having been sexually abused by a foster parent after he was removed from his parent's care.  AV reported that when he was three or four years-old and living with the foster family, prior to being placed with his biological father, the foster father raped him.  The sexual abuse AV experienced is strikingly like the descriptions of his sexual abuse of his younger cousin and siblings.

AV's most recent Service Plan, dated May 19, 2021, indicates he was diagnosed with ADHD, and Bipolar, and prescribed several psychotropics. However, notes in IMPACT indicate

---

[179] The sex offender treatment program, Pegasus, is licensed by RCCR.  During his time in treatment there, DFPS investigated allegations that a staff person physically abused AV.  The allegations were Ruled Out, but the findings note "The video footage clearly shows that [the staff person] was upset…It also showed [the staff person] use very inappropriate discipline, language and yelled at the children.  Pegasus acted and terminated [the staff person] immediately. Therefore, this case will be ruled out for physical abuse."

that AV has refused medications since March 2021. He also refused therapy.  AV's Common Application indicates that he also was diagnosed with Fetal Alcohol Syndrome and says, "[AV] is developmentally on target but does have trouble making logical decisions and is impulsive as a result of the Fetal Alcohol Syndrome."  His Common Application lists two psychiatric hospitalizations, due to suicidal ideation, at least one of which pre-dates his commitment to TJJD, and all of which pre-date his entry into foster care.

AV's Service Plan recommends, "This youngster should be seen by a certified sex offender counselor to address any unresolved sexual abuse and sex offender issues.  Placing this youngster in a home with other children is not recommended because of the nature of [his] sex offender history…It is suggested that the interventions at his present placement also focus on increasing age appropriate social interactions with peers while stressing respect for physical and sexual boundaries of others.  It is highly suggested that [AV] gain insight into the impact that the trauma in his life, namely parental abuse, has had on his emotional status and disrespect for others."  His Service Plan also recommends substance abuse prevention counseling.  In describing AV's supervision needs, the Service Plan notes that he "needs supervision at all times due to his past history of sexual aggression."  Under "Describe plans to ensure child's safety," the Service Plan states, "[AV] will be monitored at all times."

Despite the recommendations in his Service Plan related to therapy with a sex offender counselor, his most recent Common Application, dated August 4, 2021, states that AV's "prior RTC noted at discharge they recommend sex offender therapy for [AV], but then also note that he had no incidents of acting out while there and that he successfully completed sex offender therapy with no further recommendations in 2017 through Juvenile Probation. Also, he had a [psychological evaluation] through probation on 5/2019 in which the sexual recommendation is a 'low treatment need – alumni group.'"  Nevertheless, AV's previous Common Application, updated June 11, 2021, after AV had been in a CWOP Setting for almost two months, noted, "While at his current placement, he got on his tablet and sent a cousin…explicit sexual text messages…. [H]e is not to have any access to social media."

Since entering care, AV has been placed in three GROs: an Emergency Shelter, where he stayed for two weeks as a "Temporary Emergency Placement" (TEP) before he was placed in a Houston-area RTC (now under Heightened Monitoring due to safety violations), where he stayed for almost nine months.  AV ran away from the RTC, and when he was picked up three weeks later, he was without placement.  When AV was offered placement at an RTC in Pennsylvania, he refused placement because he did not want to be far from his friends and family.  The judge in his case ordered him into placement in the Pennsylvania RTC; he ran away three days later, and when he returned to care on June 2, 2021, he was again without placement and housed at the DFPS office where the monitoring team met him. AV remained without placement until he was placed back in an Emergency Shelter as a TEP on July 5, 2021. He ran away from the facility on August 3, 2021 and returned intoxicated at 3:00 a.m. the next morning, and was arrested and placed in juvenile detention.

AV's time living in CPS offices highlights the dangers associated with having a child with his background and needs in a CWOP setting.  During the almost three months that AV was without placement, he was moved among three different CWOP Settings.  One of his moves was

precipitated by an outcry of inappropriate sexual contact by two female youths, a 16 year-old and a 17-year-old, who were housed at the same CPS office.  The 16-year-old alleged that AV raped her; the 17-year-old reported having consensual sexual contact with AV. The youths reported that the incidents occurred when they were able to "distract the DFPS staff long enough to have sexual contact on more than one occasion."  Neglectful Supervision for an "unknown perpetrator" was Ruled Out after an investigation because "DFPS staff responsible for supervision of [AV] and [the other children] during child watch indicated that they made reasonable efforts to adequately supervise [AV] and the other children present given the totality of the circumstances.  Additionally, it was indicated that [AV] and the other children present utilized various means of concealment and diversion to overwhelm the DFPS staff responsible for supervising them."

Though AV was not supposed to have access to the internet, the day that the monitoring team interviewed him, he had a phone on which he was accessing the internet.  A member of the monitoring team asked how he was accessing the internet, and one of the other children reported AV was using another youth's hotspot to gain access.  Daily shift logs confirm AV almost always had access to phone and internet during his time living in CPS offices, despite notes in his child watch records that state "[AV] should NOT have a phone.  If he has one, he likely stole it from someone or he is using another kid's phone."  And "[AV's] phone has been taken away.  He does not need to be on anyone's social media or using staff's phone!"  Notes in IMPACT confirm that early in his time being housed in CPS offices, he was given access to a phone.[180]  Though staff attempted to take AV's phone away at times, enforcement was inconsistent, and he often just borrowed a phone from another youth.

Despite notes in AV's records indicating he should be supervised closely, AV was known to wander the CPS office building where the monitoring team interviewed him, sometimes gone for hours, without staff being aware of his location.  The monitoring team's review of the Daily Logs in AV's on-site file confirmed that he knew the office better than some of the CPS staff tasked with supervising him, and often disappeared inside the building.  In addition to wandering around the multi-story CPS office unsupervised, during the monitoring team's interview with him, AV reported that he left the CPS office for about 45 minutes each day to go to the pool at the apartment next to the office, without supervision.  Shift logs and a review of AV's IMPACT records confirmed this account.  AV knew the codes for the entry doors for the building, and left at will, returning on his own.  Staff appear to have given up trying to keep him from leaving the area where children were being supervised, and at times kept tabs on him via text.

IV.    The State's Reports Regarding Efforts to Find Solutions to the Placement Crisis

During the last regular legislative session, Texas lawmakers passed Senate Bill 1896,

---

[180] An April 15, 2021, note in a monthly evaluation found in IMPACT states, "[AV] returned from runaway when he was picked up by LE.  He was believed to be under the influence of meth.  He was brought to the Cameron CPS office and then taken to the Austin Summit CPS office.  While there he had behavioral issues that led to him being moved to Bastrop CPS office.  Now that he has a phone he is able to get on social media.  This has helped his behavior."  When law enforcement returned AV to his placement after a second runaway incident at the end of May, he had two cell phones: the phone that is supposed to be used only by staff supervising children in CPS offices, and a personal phone.  Both were taken away, with a note in IMPACT records stating, "It was staffed that [AV] is not to have any access to social media or use staff/peer phone to get on social media."

which included provisions aimed at alleviating the placement crisis. The bill, among other things, requires HHSC, in collaboration with DFPS and SSCCs, to develop a plan to increase placement capacity in every catchment area of the state "with the goal of eliminating the need to place a child outside of the child's community."[181] The bill also amended the Family Code to prohibit children without placement from being housed in CPS offices.[182]

After the bill went into effect, the Monitors asked DFPS how they intended to comply with the provisions prohibiting children from being housed in CPS offices. DFPS Responded on June 17, 2021:

We are currently working on finalizing leases of appropriate facilities for the temporary housing of children without placements…Of equal priority and even greater importance is finding suitable placements for the children in CWOP. We have some new leads that are being explored that will significantly reduce the number of children in CWOP. I should have an update on that as well by next week.[183]

The following week, DFPS sent a document to the Monitors that summarized their work to address the capacity crisis, which reported hiring 100 temporary staff to assist in child supervision, paying overtime immediately to the staff who qualified and provided supervision in CWOP Settings by working overtime, requiring "all areas of the agency to assist in child watch," and "securing law enforcement assistance when necessary to protect children and staff."[184] The document also listed five "immediate actions" that the agency was taking, including expansion of sub-acute child-specific contracts with psychiatric hospitals, leasing residential space to house children without placements, "drilling down" on Temporary Emergency Placement (TEP) beds (though the agency reported that all 22 of its existing TEP beds were full), an intensive review of each child without placement to "strategize placements and options for the youth," and pursuing interlocal agreements with "public institutions of higher learning" for "housing opportunities" by using dormitories to house children.[185]

A week later, the agency provided another update that reported on the progress made toward securing contracts with psychiatric hospitals for sub-acute care and noted "While our overall focus is developing quality capacity to meet youth's needs, we remain immediately focused on reducing the number of children in offices. From June 19th to June 29, there has been an overall reduction of 13 children in DFPS offices. We track this closely as we intend steady progress on this issue."[186] Similarly, on August 18, 2021, DFPS provided the Monitors with the following update:

---

[181] SB 1896, 87th Reg. Sess. (Tx. 2021).

[182] *Id.*

[183] E-*mail* from Commissioner Masters to Deborah Fowler and Kevin Ryan, re: SB 1896, June 17, 2021 (on file with the Monitors).

[184] DFPS, *Immediate Capacity and Placement Actions; SB 1896* (undated) (on file with the Monitors).

[185] *Id.*

[186] E-mail from Corliss Lawson to Deborah Fowler and Kevin Ryan, re: CWOP, July 1, 2020 (on file with the Monitors).

Regarding CWOP, we continue to make progress toward reducing and eventually ending children being without placement. Through various efforts and strategies, over the past month - 7/15 to 8/15 - we have reduced the number of children staying in offices from 79 to 50. Moreover, in this time period we have reduced the overall number of children without placement from 197 to 167. While reducing these numbers quickly and safely continues to be our immediate goal, we are also making strides on developing the long-term capacity needed to meet the unique needs of these children.[187]

V.      Conclusion

Texas continues to house children in unregulated CWOP Settings despite substantial risks to children's safety. The monitoring team's interviews with PMC children and supervising DFPS staff in CWOP Settings, as well as extensive reviews of State records, confirm that by housing children in these unregulated settings, children are subject to overburdened and untrained caretakers, human trafficking, sexual abuse, suicidal ideation, self-harm, running away, anger, and aggression, leaving children at an unreasonable risk of serious harm.

In addition to the grievous physical harms documented in the monitoring team's review of the records of more than 50 PMC children without placement, the children's experiences highlight the ill-effects on children's mental health of unstable and unsafe CWOP Settings. As described in this report and associated Appendices, many children housed indefinitely in CWOP locations are diagnosed with complex mental and behavioral health conditions. Their safety requires treatment, specialized care, and medication stability, none of which is shown to be readily available in the offices, unlicensed facilities and cottages, hotels or motels in which the monitoring team found and interviewed children.

The State's lack of placements for PMC children is the result of the State's closure of *irreparably unsafe* operations across Texas. As noted in this report, since January 1, 2020, Texas has closed 21 GROs with 1,213 beds and two CPAs, affecting 291 foster homes, operations deemed so unsafe by either HHSC or DFPS that the State determined revoking a license or ending a contract and removing children was the best option. Five GROs, accounting for another 134 beds, voluntarily closed in lieu of facing license revocation or denial; an additional 241 beds and 157 verified homes were eliminated from the system when GROs and CPAs with a serious history of child safety violations voluntarily closed after being placed under Heightened Monitoring.

The solution to the current placement crisis is not to revert back to a system of enforcement the Fifth Circuit called "problematic" and "inadequate," one that placed children at a substantial risk of serious harm. That constitutionally deficient system acquiesced to certain unsafe providers' expectations that the State should thank them for accepting the most traumatized children by lowering monitoring and oversight standards. Those lowered expectations ultimately led to the forced closures of 28 unsafe operations over the last two years, with foster children harmed by unconstitutional conditions time and again. Lax enforcement allowed GROs and CPAs to continue to operate, all the while racking up substantiated findings of child abuse and neglect, and minimum

---

[187] E-mail from Trevor Woodruff to Deborah Fowler and Kevin Ryan, re: System Capacity, August 18, 2021 (on file with the Monitors).

standards citations that, once the Court's orders enjoined unsafe placements, formed the basis for their eventual closure.

A solution to today's crisis is for the State to identify placements that are able to <u>safely</u> address the manifestations of children's trauma before they age out into a world that, as Commission Masters noted, may not be prepared to understand or empathize.  The solution is also to ensure that Texas continues to provide increased scrutiny of operations with troubled safety records to ensure constitutional conditions for children.