O'Dell Case: 2019-1827-3 and Cause: 2020-1044-C1 Brief

I, William O'Dell and Emily O'Dell, state:

1. We are the biological parents of Gwendolyn, Parker, and William (Liam) O'Dell
2. This is in reference to case number: 2019-1827-3
3. On May 23rd, I (William O'Dell) took my daughters Gwendolyn and Parker to school for Aloha Day. Same as usual without issue. Took my wife Emily to work in Dallas with Liam in the backseat. Liam was so good on that 4-hour trek that I felt it necessary to treat him with Dairy Queen. I left to pick up the girls at 3:20 pm to arrive at the school as it let out at 3:25pm. When I was approached by CPI Erika Jackson. Mrs. Jackson informed me she interviewed my Children but did not state that there were witnesses or that it was recorded.
4. I was never informed prior to the interview that my children were interviewed, credentials were not properly displayed, and no court order was present.
5. My children were detained by CPI Mrs. Jackson after the interview with myself and a phone interview with my wife. In which Erika was very rude and condescending.
6. I was never informed of the allegations as to why I was being interviewed or why my children were being detained. She only called her supervisor and informed me that it "is a removal."
7. After the interview and during the interview I noticed that there was no recording that was being performed. I noticed this because no recording equipment was present during my interview to even suggest that my children's' interview was even recorded.
8. Law Enforcement was not present until the very end of the process that day. Which suggested that they did not fear imminent danger. I arrived at the school at 3:25 and left at 5:36pm. Law enforcement was not there until I went to say goodbye to my children to which Gwendolyn made it clear she did not want to go with anyone else. As per TFC 261.105, 261.301(f)-(h) & TFC 261.3011 It is my belief that if she suspected the children were under physical abuse then law enforcement should have been contacted immediately to perform their own investigation and for them to be there during the children's investigation as part of their investigation of these allegations. This is the first of several failures on Erika Jacksons part. With that said there was no Court order for the removal of my children, and I felt strong armed into giving my children up to the state.
9. Afterwards when she released me and I got to my car, Erika called me back to give me a receipt for the removal in which she needed help to fill out. This was the only time that I saw another CPS official in the office. I felt at this time that Erika was new and should have been shadowed as part of this process to make sure she was in fact competent to perform her duties. Since she was alone, no court order was present, and no recording was performed it left Erika to pretty much make any allegation that she felt necessary to make the situation seem as if Exigent circumstances were present. Which there were none as it took her 24 hours to respond, she did not visit our home where I was present before going to the school and my son was with me the entire time until the removal.
10. At the first visitation in Temple, TX Gwendolyn stated to CPS/HST Stephanie (last name unknown) that "Daddy would never hurt us." It was documented but never acknowledged.
11. I had only learned about the allegations upon receiving the first affidavit on June 3rd for the hearing on Jun 6th, 2019. As Erika Jackson Denied informing me of my allegations twice prior.

12. Also, in the affidavit Mrs. Jackson stated she came to the house then went to the school. She called the state of our house to be "In Chaos." But when called to the stand she stated that she only went to the school. Which leads me to believe that she perjured herself under oath or the court documents. TCC inconsistent statement.
13. Jun 11th, 2019, At the hearing there was no evidence produced from CPS other than photos to which based on articles of discovery were thrown out because CPS and their DA attorney failed to follow those protocols. Procedural due process
14. We were informed of the family plan over a month after that hearing and started right away once we received it and have been compliant ever since.
15. On November 1st we learned of new Allegations from Mrs. Kimberly Witt our case worker to the effect of Sexual Assault. That were called in by Mrs. Cynthia Snodgrass. She did not recommend any actions except the polygraph but claimed it may not be admissible.
16. On November 14th we received the new affidavit for the Nov 19th hearing. In it we found the true context of the allegations and were disturbed to find they were reported on October 1st, that a forensic interview was conducted by the Las Vegas Metropolitan Police abuse and neglect unit on October 3rd and October 28th and that even though Mrs. Witt visited our house on October 25th, the first and only monthly check up on us to date, we were never informed until a total of 30 calendar days later.
17. The evidence received in the affidavit suggests that spoliation took place through withholding the evidence of the report from Andrew Thompson with the Brett H. Pritchard Law Firm. Andrew did not receive notification and did not receive the information until he received the affidavit on November 5th.
18. At the November 19th hearing we were blindsided with this once again with which Mr. Price called Emily to the stand and proceeded entrapping my wife to make statements leading against or to incriminate me.
19. When questioned by Mr. Thompson, Mr. Price looked up Rule 504 over spousal privilege and stated that in section 4 in criminal proceedings my wife is subject to cross-examination. He failed to state that in subsection C (i) it states that in civil proceedings that the allegations (if proven) lead to a Criminal case the exemption stands and Emily would then be legally subject to cross-examination under that rule. Which leads me to believe that once again a violation occurred.
20. During the questioning by Mr. Price, Emily exercised her 5th amendment right stating, "I plead the fifth." Judge Mundkowsky stated, "It doesn't work like that, you have to answer the question, better yet, I order you to answer the question." This was appalling and damaging to my wife's character and emotional stability as it was a blatant attack by the judge to force her to answer a question even after she was told she could invoke the fifth amendment on any question see deemed unfit to answer. The confusion generated from these contradictory modes of operating undermined the justice by compromising truth finding.
21. CPS has claimed coaching of Gwendolyn and Parker by the Paternal grandparents Mark and Teresa O'Dell. The paternal grandparents had no knowledge of these allegations until Nov 4th and after they reported suspicious activity on the part of Cynthia, Gary and Katherine Snodgrass. To which after Mrs. Witt spoke to Cynthia about the reported concerns, Gary Snodgrass called and informed Mark and Teresa five days later, on Nov. 10th, that they are discontinuing their visitations. To this we believe that if there is no wrongdoing or anything to hide, then this retaliatory action should not have taken place.

22. Mark and Teresa were unaware of the new allegations until Nov 4th and the second forensic interview until the new affidavit was received on Nov 14th.
23. At this point in time CPS has claimed, on several occasions, that they have evidence but have not produced tangible evidence to any of the allegations at this time but have been persistent on pursuing corrective actions based on hearsay. Rule evidence be sufficient to strike evidence.
24. Nov. 21st 2019, During a Facetime visitation with their children which were recorded on a regular basis, Mr. and Mrs. O'Dell recorded video testimonies from Gwendolyn and Parker where the children state that some Explicit activities have happened in the Foster home with "Big" Boys. Included in this video recorded evidence Parker and Gwen have mentioned names of two of those boys in and what they were taught through a physical motion from Parker that very closely resembled fellatio. Further causing fear in Mr. and Mrs. O'Dell that the children were more than likely abused under state care. This was completely unacceptable to the O'Dell's as they made it very clear that they did everything in their power to protect their children from harm in any fashion.
25. Dec. 29th 2019, Mrs. O'Dell was allowed to travel to Las Vegas for physical visitations with the children. On this date Mrs. O'Dell and her best friend Teresa Bresee were enjoying the day with the children. Not too long into the 6 hour visitation, Mrs. O'Dell leaned over to hug her son William. He stated that he does not want a hug and that he's a bad boy. Mrs. O'Dell was shocked at this behavior as William was always willing to hug his mother. This alerted her to possible abuse in the Snodgrass home. When she asked him why he did not want a hug he replied, "Because I'm a bad boy and I'm stupid..." Mrs. O'Dell shocked again told William that he's a not bad and that anyone who calls him that to ignore them.
26. After this situation happened William ran upstairs. Mr. Gary Snodgrass asked if he should go get William. Mrs. Cynthia Snodgrass said "Yes, but don't do what you did last time and kick him down the stairs..." Mrs. O'Dell and Mrs. Bresee looked at each other in shock and disbelief. Mrs. Snodgrass said, "Oh, I'm just kidding..." to which Gwendolyn told her mother, "No mommy, you can't trust her, She's lying!" Mrs. O'Dell and Mrs. Bresee were fearful that the children were being subjected to the same level of abuse or worse than what Mrs. O'Dell went through when she was a child.
27. On Tuesday January 14th, 2020 It was confirmed that there is no recording of the interview Erika Jackson had with our children. This was the second confirmation and was confirmed by Detective Miller with the Waco Sheriff's Dept. The first confirmation was from Kyle with the DFPS Office of Consumer Relations. Upon research this is a clear Violation of Texas State regulations of first TFC 261.311 not informing me that my children were interviewed and TFC's 104.002 & 261.302(e). she failed to record and/or provide reason as to why the interviews were not recorded.
28. Throughout this case Mrs. Kimberly Witt has stated that children do not lie. When I placed a complaint based on a recorded statement made from Parker regarding abuse from Gary Snodgrass made with the Nevada CPS office and Las Vegas Metro police Abuse and Neglect unit. I forwarded audio evidence to all parties, including Mrs. Witt. Two days later I was informed by Mrs. Witt that the children said they lied, and that the investigation was being dropped. If she believes that children do not lie, then it means that there was not need to question the children and that she is incapable of acting without bias. To this it is my firm and sound belief that CPS is choosing what they want to investigate and ignore pertinent evidence

that shows that the children are in possible danger and neglecting their safety as conservators of my children.
29. This has made me aware and fearful that my daughter may have been subject to this kind of violence under CPS care to which has prompted me into contesting these and all previous allegations. As well the confusion created with my children and their developing minds has created a situation which hinders their abilities to speak out about their abuse and future abuse. Citing these practices are a systemic issue that impacts children and society as a whole.
30. On Apr. 8th, 2020, Hannah Hartman the intern therapist for our children called Emily and informed her that there was a change to a visitation that would have included me, but they changed it to a private visitation with Emily and the kids.
31. On Apr. 9th, 2020, The visitation was not what Emily had expected. It ended up being a visitation only between her and Gwendolyn. The visitation was only geared towards leading and coercing our daughter to state the false sexual abuse allegations to her mother to turn Emily against her husband. Leading statements such as "Tell mommy where it happened, tell mommy when it happened and Tell mommy how many times it happened…" were amongst the commands made to Gwendolyn to coerce her into stating the false information that Gwendolyn attempted not to say by changing the subject in between statements. After following the commands given by the therapist our daughter felt that her rewards would be to go home as stated as follows. Gwendolyn stated that she had something to tell her mommy. When Emily inquired as to what it was, she had to say Gwendolyn stated, "Kim promised we could go home!" Seeming very excited. Emily got suspicious of this as it seemed that Kim made a promise to the children that if Gwen said these false and rehearsed statements that she would be able to go home. Emily was made aware as to the game being played and continued taking notes about the situation.
32. Afterwards, Kim immediately proceeded to contact Emily's mother Cynthia Snodgrass to tell her the "Good news" and force Emily to talk with her mother. Emily at this point was very uncomfortable and felt manipulated and much less forced to speak with her own abuser of whom she made clear she did not want to talk to her. This behavior from the department and the therapist is both appalling and abusive to Emily. Mrs. Witt stepped outside of her duties at this time.
33. After the conversation with her mother Kim asked the therapist if she recorded and Mrs. Hartman confirmed it. Once again stepping outside of her duties, Kim proceeded to state that she did as well and told Mrs. O'Dell that she "Will Testify." This is an unconstitutional situation as Emily was not informed that she or her daughter would be recorded at any time except after all of the coercion and manipulation was complete. Emily made it clear that she felt threatened and informed her husband that she was being forced to move back to Las Vegas to be with the children.
34. On Apr. 9th, 2020, After the situation unfolded Mr. O'Dell became very troubled with the loss of his children and the feeling of losing his wife based off the manipulation of the department and Mrs. Hartman. He became suicidal as he stated to the Waco Sheriff's Department officers that he felt his life was ending and that he could not handle losing his wife after losing his children. He was arrested without being read his Miranda rights making him much more suicidal. At the jail up in northern Waco he was further humiliated during processing, unclothed without under garments, placed in a suicide gown then placed into a solitary cell to which other detainees were yelling and screaming. Mr. O'Dell made it clear he could not

handle that and feared for his life as he has never been in that situation before. He could not sleep due to being cold and the lack of undergarments humiliated him. He spent some time talking with a doctor at the jail house to which he expressed to them that he lost his wife and children and that he did not want to live anymore. After what seemed like hours to Mr. O'Dell, he was finally transferred to general population right outside the central desk. All Mr. O'Dell could do is curl up under the bench. He was finally able to make contact his family after a couple of hours and explain the situation. His parents posted a bail of $500 after he was called to and was seen by the judge via video call.

35. On Apr. 10th, 2020, Mr. O'Dell was released on Bail with nowhere to go. He called his wife who sent a church friend to pick him up so he could reclaim their vehicle. Upon arriving at the friends house he was able to talk to his wife who explained what had happened and explained the notes she took. After knowing what had transpired and why everything was going the way it was. He felt a sense of relief but expressed his distaste at the loss of his wife due to the fact that Mrs. Kim Witt, Hannah Hartman and Sonya Cooper were in agreement that Emily should move to Las Vegas and follow their unwritten plan based on the illusory promise to regain physical visitations with the children. Mr. O'Dell expressed to Emily that they had no intention of reuniting her with the children and that it would become clear as the situation progresses. She felt it necessary to take the chance.

36. On Apr. 15th, 2020, Another hearing was held to which Mrs. Mundkowsky terminated Mr. O'Dell's visitations with the children. The prosecution gloated about the fact that Mr. O'Dell was arrested and showed their contempt at the fact that he was bailed out. They still allowed Mrs. O'Dell to have facetime visits with her children and stated that they would not allow her to have physical visits unless she completes some individual counseling first. Emily was allowed to testify to the fact that the O'Dell's were in possession of a video recording of their daughter Parker stating that the children were subjected to sexual abuse in the foster home. Emily during her testimony quoted the video verbatim and left out nothing that would allow skepticism. After her testimony the Judge Mundkowsky broke for a private conference with the attorney's. After the hearing was over Emily's attorney Mr. Sam Kinslow called her to inform her that the judge believed her and knew that sexual abuse happens all the time in foster homes. That overjoyed Mrs. O'Dell as she had the reaffirmation to her belief that it would show that not only was her husband innocent but that it would allow the judge to bring the children home to reunite their family. Emily remained in Las Vegas to continue her counseling as Mr. O'Dell provided the funding for it out of his pocket. Emily and her friends informed the court that she had no place to live, no car and no job. That they were appalled at the Department and the court that they would force her to move to a place without any guarantee of seeing the children much less any help to get on her feet in a city with slim employment opportunities.

37. On July 15th, 2020, we started our final hearing that was geared and modeled towards Termination of my parental rights. Initially it started out as such with all testimonies defaming my character and the character of my wife. Cynthia Snodgrass testified that Emily O'Dell was unable to determine how to keep the children safe or care for the children properly as she was unable to determine a suitable "Boyfriend" and that I was narcissistic. Private realm of family Gary Snodgrass on the other hand testified that the children "Lie all the time" about hitting, kicking, pinching, and biting each other. Once again CPI Erika Jackson perjured herself on the stand when she stated she went to the school, then our home and back to the school.

Kimberly Witt testified that there was no evidence of maltreatment of the children during the forensic interviews performed by the Las Vegas Metropolitan Police Dept. Which shows in the absence of coercive influence the children state their father is innocent. She further noted that there were two forensic interviews but when she attempted to get another one performed, LVMPD declined and informed her that no prosecution would follow. Further affirming innocence.

38. On July 16th, LCSW Hannah Hartman testified and confirmed that she was not a licensed therapist but in fact an intern. When asked how False memory could occur, she testified and confirmed that it can be caused by repetitive questioning, speech around the victim and gaslighting. During this day of testimony all the witnesses stated and affirmed that the only person they heard allegations from was Cynthia Snodgrass Not Gwendolyn, Parker or Liam O'Dell. Further affirming innocence.

39. On Jul 17th 2020, Mr. O'Dell found out from his attorney Doyle Young that an indictment was put out but with one more charge on it for his younger daughter Parker and that his bail has been raised from $10,000 to $30,000. His parents once again paid the bail but in the amount of $2000 this time. He agreed to do a walkthrough to avoid a second arrest.

40. On August 3rd 2020, Final day of the trial Mr. O'Dell was on the stand to continue his testimony, After several questions and what could be determined as malicious prosecution, he testified to the truth while prosecution attempted to manipulate his story. Emily Testified that she in fact did believe the children that they were sexually and physically abused but only in the foster home and not by her husband. During Emily's testimony it was once again brought up about the video regarding Parker who stated the sexual abuse and who committed it at the foster home in Austin. Attorney Sam Martinez played the video as it dictated to the court exactly where, who and what the children were taught. Our witnesses testified to the care and love that Both William and Emily gave to their children and the great care for their safety which was paramount in these witness testimonies. After all testimonies and closing arguments, where the defense attorneys stated the Department did not meet the standard of clear and convincing and had a Lack of Evidence to support the allegations against Mr. O'Dell. Judge Nikki Mundkowsky adjourned the trial stating it would take her a few days to go over the case and report her judgment.

41. August 4th 2020, We received the final judgement via email through our attorneys stating our Parental rights were terminated on two basis', one being that we failed to keep the children safe or engaged in unsafe behavior; endangering the children's safety, two being that we did not complete the required safety plan which is a form of servitude or exploitation and a violation of our 8th amendment. This ruling was based clearly on hearsay as will be proven upon submission of the Transcripts from the final hearing and the submission of several other KEY articles of evidence that were submitted for the final hearing. This is a clear failure to protect.

42. This ruling based on hearsay is a clear attack on the constitutional rights of our family and a blatant act of treason as we are not the first family this has happened to. To rule on hearsay goes against all basis of our Constitution and violates the sanctity of the Nuclear Family structure as granted in our most basic and fundamental of rights. Judge Mundkowsky's blatant ignorance of tangible evidence and willingness to side with hearsay is an act that trespasses on the court itself which shows she is incompetent in her position and negligent of the laws and rights of the citizens she is mandated to protect. Therefore, joining the DFPS in

treasonous acts against the citizens of Texas and adding to the nationwide statistics of children Kidnapped by the CPS system under the Adoption and Safe Families Act (1997), Title IV D which provides funding for this unconstitutional act of treason.

43. After months of no updates from his attorney Mr. O'Dell got a call in December from Mr. Young informing him that a hearing was scheduled for January 26th 2021. This hearing was to push for a court order for discovery from the District attorney and from DFPS. Unfortunately to Mr. O'Dell's dismay, the DA representative motioned that he not be allowed to view the evidence against him due to a post he made on Facebook calling a few of the actors in the first case liars. The judge ordered that Mr. O'Dell not be allowed to view the evidence against him violating his rights as stated in the Confrontation Clause in his 6th amendment rights. This does not allow him to understand or have any ability to prepare for his life to be controlled by the state.
44. Apr. 30th 2021, Mr. O'Dell's attorney received discovery from the DA but it was not complete. It was missing the DFPS records.
45. May 5th 2021, Judge West writes an order demanding discovery from DFPS be submitted to Mr. Young for review and defense of Mr. O'Dell.
46. Later in July 2nd 2021, William attended his first pretrial. At this time Mr. Doyle young informed Judge West that the Department failed to provide discovery of the DFPS files. The DA representative, in a hostile demeanor stated that they had sent over all of their discovery. Mr. Young replied that he received the DA's discovery but not the DFPS records as ordered by the court on May 5th. The Pretrial was adjourned on a 60 day stay.
47. Aug. 27th 2021, Mr. O'Dell attended a second pre-trial to which his attorney again had to inform the court that discovery has not been met by DFPS and that a stay is needed yet again further prolonging the case. The DA representative replied that they have subpoenaed the discovery and should receive it soon.
48. At the time of writing this Brief the Attorney Doyle Young has not received discovery from DFPS and the District Attorney has Defaulted time and again. Doyle Young refuses to file any motions at this time as he is more concerned in seeing the DFPS records. Mr. O'Dell is fearful that he is going to take part in another kangaroo court and further carry the burden of another who has committed crimes against his family. He respectfully asks that his rights be upheld as they have been violated at every turn in these two cases.

Executed this 23rd day of November, 2021.

I declare under penalty of Perjury that the foregoing is true and correct.

*[signature]*

William O'Dell


*Unavailable*

Emily O'Dell

_____
Notary Public



```
WILLIAM O DELL                         1 LBS        1 OF 1
                                       SHP WT: 1 LBS
WOODWAY  TX 76712                      DATE: 23 NOV 2021

SHIP  JUDGE JANIS JACK
TO:   1133 N SHORELINE BLVD

      CORPUS CHRISTI  TX 78401-2003

      TX 784 9-01

      UPS GROUND
TRACKING #: 1Z 2V2 40F 03 3355 8439

BILLING: P/P

REF #1: 11-23-2021
REF #2: HO
                          ISH 13.00F ZZP 450 48.5U 11/2021
```




The UPS Store — To Document Mailer
From:

JUDGE JANIS JACK
1133 N SHORELINE BLVD
CORPUS CHRISTI TX 78401
S: 307
P: RED
STVE - 1324
8439
1Z2V240F033355  TXCOR61BUDC  NOV 24 06:39:25 2021