UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CIVIL ACTION NO. 2:11-CV-00084

1-10-2022

M.D.; bnf STUKENBERG, *et al*., Plaintiffs, v. GREG ABBOTT, *et al.*, Defendants.

Hon. Janis Graham Jack, Senior United States District Judge

**T̲h̲i̲r̲d̲ ̲R̲e̲p̲o̲r̲t̲ ̲O̲f̲ ̲T̲h̲e̲ ̲M̲o̲n̲i̲t̲o̲r̲s̲:̲ ̲R̲e̲m̲e̲d̲i̲a̲l̲ ̲O̲r̲d̲e̲r̲s̲ ̲1̲,̲ ̲2̲,̲ ̲3̲,̲ ̲5̲ ̲t̲o̲ ̲1̲1̲,̲ ̲1̲6̲,̲ ̲1̲8̲,̲ ̲3̲5̲,̲ ̲3̲7̲,̲ ̲A̲1̲ ̲t̲o̲**
**A̲4̲,̲ ̲A̲6̲,̲ ̲a̲n̲d̲ ̲B̲1̲ ̲t̲o̲ ̲B̲5̲**

Deborah Fowler and Kevin Ryan, Monitors

MONITORING STAFF

| Texas Appleseed | Public Catalyst |
|---|---|
| Nancy Arrigona | Lisa Alexander-Taylor |
| Monica Benedict | Megan Annitto |
| Deborah Borman | Robin K. Coleman |
| Linda Brooke | Eileen M. Crummy |
| Anna Farr | Jody Drebes |
| Victoria Foster | Taran Dugal |
| Adrian Gaspar | David Howard |
| Veronica Lockett-Villalpando | Mary Graw Leary |
| Viveca Martinez | Samantha Loewen |
| Rob McManus | Frank Luby |
| Beth Mitchell | Cheryl MacDougall |
| Mahiri Moody | Natalie Nunez |
| Shay Price | Oliver Ponce |
| Clarice Rogers | Timothy A. Ross |
| Monica Santiago | Diane Scott |
| | Nadezhda Sexton |
| | June Simon |
| | Claudia C. Tahan |
| | Charmaine Thomas |
| | Margaux Zsa Toms |
| | Melea Weber |
| | Aileen E. Williams |
| | Charlene E. Womack |

TABLE OF CONTENTS

I.  Introduction and Executive Summary ........................................................................ 3

A.  Summary of the Monitors' Findings ....................................................................... 5

B.  Summary of Findings by Remedial Order ............................................................. 7

   1.  Section III: Screening, Intake, and Investigation of Maltreatment in Care Allegations 7

   2.  Section IV: Organizational Capacity ................................................................. 13

II.  Demographics of Children in PMC Care ............................................................... 17

A.  Age, Gender, and Race ......................................................................................... 18

B.  Living Arrangements and Length of Time in Care ............................................. 19

C.  Out of State Placement ......................................................................................... 21

D.  Level of Care ......................................................................................................... 22

E.  Geographic Location ............................................................................................. 22

F.  Single Source Continuum Contractor Presence and Placement Oversight ........ 23

III.  Screening, Intake and Investigation of Maltreatment in Care Allegations ........... 24

A.  Remedial Order 3 ................................................................................................. 24

   1.  Overview ............................................................................................................ 25

   2.  Statewide Intake Performance .......................................................................... 28

   3.  DFPS Intake Screening and Maltreatment in Care Investigations ................... 34

   4.  Remedial Order 3: Screening and Intake Performance Validation ................... 36

   5.  Remedial Order 3: Maltreatment in Care Investigations ................................... 40

   6.  Summary of Performance for Receiving, Screening and Investigating Allegations of Maltreatment ........................................................................................................ 49

B.  Timeliness of RCCI Investigations: Remedial Orders 5 through 11; 16 and 18 Performance Validation (DFPS) .................................................................................. 50

   1.  Data and Information Request and Production .................................................. 51

   2.  Remedial Orders 5 through 11, 16, and 18 Performance Validation (DFPS) ........... 51

   3.  Summary ............................................................................................................ 63

C.  Remedial Order A6: Reporting Allegations ........................................................ 65

   1.  Background ........................................................................................................ 66

   2.  Performance Validation ..................................................................................... 66

   3.  Summary ............................................................................................................ 68

D.      Remedial Order B5 ........................................................................................ 69

    1.      Background ........................................................................................ 69

    2.      Remedial Order B5 Performance Validation ..................................... 72

    3.      Summary ............................................................................................ 83

E.      Remedial Order 37 ........................................................................................ 84

    1.      Background ........................................................................................ 84

    2.      Remedial Order 37 Performance Validation ..................................... 86

    3.      Summary ............................................................................................ 89

IV.     Organizational Capacity ............................................................................... 90

A.      Remedial Order 1: CPS Professional Development ..................................... 90

    1.      Background ........................................................................................ 90

    2.      Remedial Order 1 Performance Validation ....................................... 91

    3.      Summary ............................................................................................ 97

B.      Remedial Order 35, A1, A2, A3, and A4: Caseloads .................................. 98

    1.      Background ........................................................................................ 99

    2.      Data and Information Request and Production ................................... 99

    3.      Remedial Orders 35 and A4: Caseworker Caseloads ...................... 100

    4.      Caseloads and Supervision of Children Without Placement ........... 109

    5.      Summary .......................................................................................... 109

C.      Remedial Orders B1 to B4: RCCI and RCCR Investigator Caseloads ...... 110

    1.      Background ...................................................................................... 111

    2.      Remedial Orders B1 through B4 Performance Validation ............... 112

    3.      Summary .......................................................................................... 124

D.      Remedial Order 2: Graduated Caseloads ................................................... 124

    1.      DFPS Graduated Caseload Policy .................................................. 124

    2.      Data and Information Request and Production ................................. 125

    3.      Remedial Order 2 Graduated Caseloads Results and Performance Validation ........ 125

    4.      Summary .......................................................................................... 128

2

I.   INTRODUCTION AND EXECUTIVE SUMMARY

This is the Monitors' third comprehensive report to the United States District Court ("Court") in *M.D. by Stukenberg v. Abbott* following the mandate issued by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") implementing the Court's remedial orders.[1] The Plaintiffs are a certified class of children in the Permanent Managing Conservatorship ("PMC") of the Texas Department of Family and Protective Services ("DFPS") who sought injunctive relief against the State of Texas. At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and Human Services Commission ("HHSC").[2] Now DFPS is an independent State agency reporting directly to the Governor.[3]

Following a bench trial in 2014, the Court published a Memorandum Opinion and Verdict in December 2015 finding that Texas had failed to protect PMC children from an unreasonable risk of harm.[4] The Court issued a Final Order on January 15, 2018, and following a stay order, the Fifth Circuit adopted in part and reversed and in part modified the remedial orders, remanding to the Court, which issued a modified Order on November 20, 2018.[5] The Fifth Circuit again adopted in part and reversed in part the Court's Order and issued its Judgment as Mandate on July 31, 2019.[6] The Court's November 20, 2018 Order, as modified by the Fifth Circuit on July 8, 2019,[7] specifies numerous remedial orders that implement the Court's injunction as detailed below, charging the Monitors "to assess and report on Defendants' compliance with the terms of this Order."[8]

---

[1] *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626.

[2] Effective February 2021, HHSC changed the name of its child care regulation unit, Residential Child Care Licensing ("RCCL"), to Residential Child Care Regulation ("RCCR"). This report uses RCCR to describe this division of HHSC even when referring to historic work done by the unit under its previous name.

[3] The 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent state agency reporting directly to the Governor, H.B. 5 (TX 2017), 85th Leg., R.S.

[4] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[5] *Id.*

[6] *M.D. ex rel. Stukenberg,* 929 F.3d at 277; J. (5th Cir. 2019), ECF No. 626.

[7] *M.D. ex rel. Stukenberg*, 929 F.3d at 277.

[8] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 16 (S.D. Tex. Nov. 20, 2018), ECF No. 606. ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. In order to avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order.  The Monitors shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order. The Monitors shall provide a written report to the Court every six months. The Monitors' reports shall set forth whether the Defendants have met the requirements of this Order. In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.") *Id.* at 17.

On June 16, 2020, the Monitors filed the first comprehensive report ("First Report") with the Court, concluding that "the Texas child welfare system continues to expose children in permanent managing conservatorship ('PMC') to an unreasonable risk of serious harm." On July 2, 2020, Plaintiffs filed a Motion to Show Cause Why Defendants Should Not Be Held in Contempt for their failure to comply with Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, and B5 ("July 2, 2020 Show Cause Motion"). The State filed written objections to the Monitors' First Report on July 6, 2020[9] and a Response in Opposition to the Motion to Show Cause on July 24, 2020. On September 3 and 4, 2020, the Court held a hearing on Plaintiffs' July 2, 2020 Show Cause Motion, and on December 18, 2020, found Defendants to be in contempt of Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37, and B5, but not in contempt of Remedial Orders 24, 28, or 30.[10]

On May 4, 2021, the Monitors filed the second comprehensive report ("Second Report") with the Court, concluding that the State made progress toward eliminating some of the "substantial threats to children's safety" that surfaced in the Monitors' First Report; but the Monitors also concluded the State's performance in some areas, including its oversight of the care of children by the Single Source Continuum Contractors ("SSCC") and certain general residential operations ("GRO"), was contrary to the Court's remedial orders.[11]

Following discussions with the Court and parties in 2021, the Monitors developed a report schedule which focuses this third report to the Court on Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 35, 37, A1 to A4, A6, and B1 to B5. The fourth report to the Court on the balance of the remedial orders will be filed in the Spring of 2022. In preparing this report, the Monitors and their staff ("the monitoring team") undertook a broad set of activities to validate the State's performance, as detailed both in the Methodology Section below and throughout this report. The Monitors requested data and information from both DFPS and HHSC to validate the agencies' compliance with the Court's remedial orders, as detailed in various sections of this report. The Monitors also requested data and information from the SSCCs with which DFPS contracts to

---

[9] Defendants' Verified Objections to Monitors' Report, ECF No. 903.
[10] The Court held: "Defendants are ORDERED to file with the Court a sworn certification of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 within thirty (30) days of the date of this Order. This sworn certification does not need to be verified by the Monitors prior to filing. Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with these Remedial Orders, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. Defendants are further ORDERED to appear at a compliance hearing before this Court, beginning at 9:00 a.m. on Wednesday, May 5, 2021 and continuing thereafter until the compliance hearing concludes. The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401. All of Defendants' supporting evidence of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 is subject to verification by the Monitors prior to the May compliance hearing. No sanctions will issue at this time, but, failing the Monitors' verification of compliance, any sanctions as to Defendants' performance of Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, or B5 will be revisited at the compliance hearing. To avoid additional future sanctions as to these findings of contempt, Defendants must comply with each of these Remedial Orders in the timeframe described. No retroactive sanctions will be imposed at the time of the compliance hearing."
[11] Deborah Fowler & Kevin Ryan, Second Report, ECF No. 1079.

provide case management and placement services to foster children in DFPS regions that have transitioned to the Community Based Care ("CBC") model.[12]

The monitoring team examined tens of thousands of documents and records, including data files; children's case records, both electronic and paper; investigations; critical incidents; child fatality reports; medical examiner reports; restraint log entries; videos of critical incidents; witness statements; interviews; policies; resource materials such as handbooks; plans; guidelines and field guidance; child abuse, neglect or exploitation referrals to Statewide Intake ("SWI"), including E-Reports and recorded phone calls when available; and an array of employee and caregiver human resources and training records and certifications.

A.  Summary of the Monitors' Findings

The Court's Final Order enjoins the State "from placing children in the permanent managing conservatorship ("PMC") in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas' PMC foster children are free from an unreasonable risk of serious harm."[13]

The Monitors' investigation, analysis, interviews and site visits in preparation for this report identified areas in which the State made progress toward eliminating "substantial threats to children's safety" surfaced in the Monitors' First and Second Reports, including performance associated with Remedial Orders 2, 3 (Investigating),18 (DFPS) and B5.

- DFPS improved its performance with respect to Remedial Order 3 (Investigating). With respect to investigations the Monitors reviewed in which Residential Child Care Investigations ("RCCI") did not substantiate any allegations of abuse, neglect or exploitation,[14] the Monitors' rate of disagreement and findings of deficiencies declined from 28% in the First Report to 14% in the current period from January 1, 2021 to April

---

[12] CBC was formerly known as Foster Care Redesign.  There are currently four regions that have transitioned to the CBC model (excluding the failed transition in Region 8a):  Region 1 (Texas Panhandle); Region 2 (30 counties in North Texas); Region 3b (seven counties around Fort Worth); and, most recently effective October 2021, Region 8b (26 counties surrounding Bexar County). Region 8a, which previously was operating under the CBC model, has transitioned back to DFPS management. There are three stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services.  The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families."        DFPS,        *Community-Based        Care*,        available        at https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services.  Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children."  *Id.* Two SSCCs – OCOK and 2INgage – moved to Stage II of the CBC model in 2020. Stage II includes shifting case management services from DFPS to the SSCC.  Stage III involves performance assessment and financial incentives for achievement of permanency for children. *Id.*

[13] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 2 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

[14] In these investigations, RCCI issued a disposition of Ruled Out, Unable to Determine, or Administrative Closure.

30, 2021.[15] Moreover, the rate of RCCI's dispositions substantiating allegations of abuse, neglect, and exploitation increased from an average of 7% from May 1, 2020 to October 31, 2020 to 11% from January 1, 2021 to April 30, 2021.

- DFPS's performance with respect to Remedial Order 2 was strong during the period reviewed. Nearly all (98%) of the caseworkers who became eligible for primary case management after January 1, 2021 through June 30, 2021 had caseloads that conformed to the graduated caseload standard.

The State's performance in some areas is contrary to the Court's remedial orders; gaps in DFPS's oversight of the SSCCs persisted. Specifically:

- With respect to Remedial Order 1, the Monitors previously raised concerns that the timeframe implemented under the SSCCs' training for new caseworkers appeared to be substantially shorter than the Court-ordered Child Protective Services Professional Development ("CPD") model requires. During the period of review, 2INgage hired 37 caseworkers, 22 of whom were subject to full or partial CPD training. All caseworkers completed the 2INgage training by June 30, 2021; the 20 caseworkers subject to full training completed the 2INgage training in 40 days, less than half the time that DFPS reports (and the Monitors validated) that it takes caseworkers to complete CPD training. Nine of the 20 caseworkers completed training in significantly less time, with a range of completion from 28 to 34 days. According to 2INgage, DFPS instructed it to lengthen its training program to a minimum of 13 weeks after the Monitors raised concerns; 2INgage reported to the monitoring team that it began to require caseworkers to complete the 13-week training starting March 1, 2021.

- Of the 1,313 DFPS workers carrying at least one PMC case on June 30, 2021, 769 workers (58%) had primary caseloads within or below the standard of 17 children per worker.

- As of June 30, 2021, the two SSCCs that are undertaking case management, OCOK and 2INgage, had 68% and 50% of their workers within or below the standard, respectively. In the data the Monitors received detailing caseloads from January 31, 2021 to June 30, 2021, the rate of caseworkers meeting the standard at OCOK was at its highest point (68%) on June 30, 2021; the rate of caseworkers meeting the standard at 2INgage was at its highest point (51%) on May 31, 2021. On June 30, 2021, the combined SSCC rate of caseworkers meeting the standard (60%) was two percentage points higher than the rate at DFPS (58%).

---

[15] Deborah Fowler & Kevin Ryan, First Report 25, ECF No. 869. In the Second Report, the Monitors disagreed or found deficiencies in 18% of investigations they reviewed where RCCI did not substantiate any allegations. Deborah Fowler & Kevin Ryan, Second Report 73, ECF No. 1079.

- The Monitors' evaluation of the State's system for notifying caseworkers of allegations of abuse, neglect, or exploitation for purposes of Remedial Order B5 shows ongoing gaps. Although the automated notification system launched by DFPS in December 2019 almost always works to notify caseworkers of the existence of an allegation, steps taken by the State in January 2021 to communicate the substance of the allegations to caseworkers through an "I&R Notification" and subsequent I&R Notification Staffing between the caseworker and supervisor have not been implemented consistently. The monitoring team did not find an I&R Notification Staffing in 38% (248 of 654) of the RCCI intakes included in the sample of cases reviewed. Results for Child Protective Investigations ("CPI") and Provider Investigations ("PI") intakes were significantly lower: an I&R Notification Staffing was not found for 71% (263 of 373) of CPI intakes and was not found for 60% (70 of 117) of PI intakes.

B. Summary of Findings by Remedial Order

1. Section III: Screening, Intake, and Investigation of Maltreatment in Care Allegations

**Remedial Order 3:** *DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

**Receiving Allegations**

- From January 1, 2021 to June 30, 2021, SWI received 355,816 calls. During the period analyzed, 20% (72,121) of calls were abandoned, an increase from 13% observed in the previous report.[16]

- On average, callers waited for 4.6 minutes before their calls were handled or abandoned, an increase from the data reported in the previous report.[17] Fifty percent (178,481) of callers waited on the queue for under one minute.

---

[16] The Monitors found that 13% of calls were abandoned from February 1, 2020 to November 30, 2020. *See* Deborah Fowler & Kevin Ryan, Second Report 77, ECF No. 1079.

[17] In the Second Report, the data demonstrated an average queue time of 2.3 minutes for calls placed from February 1, 2020 to November 30, 2020. *See* Deborah Fowler & Kevin Ryan, Second Report 77, ECF No. 1079.

**Screening Allegations**

- The Monitors reviewed 243 referrals to SWI from January 1, 2021 to June 30, 2021, which SWI sent directly to HHSC and that Residential Child Care Regulations ("RCCR") then assigned for a minimum standards investigation with an intake Priority of One, Two or Three, involving a PMC child. Of these 243 referrals, the Monitors concurred with SWI's determination in 92% (223) of them.

**Investigating Allegations**

- Of the 910 RCCI investigations DFPS completed involving PMC children between January 1, 2021 and April 30, 2021, 102 investigations resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 808 investigations where RCCI issued a disposition of Ruled Out, Unable to Determine or which resulted in Administrative Closure, the Monitors evaluated 275 investigations.

- RCCI Ruled Out all the allegations in 264 (96%) of the 275 investigations reviewed by the Monitors. The Monitors found that of these 264 investigations, RCCI did so appropriately in 227 cases (86%) and conducted investigations with such substantial deficiencies in 37 cases (14%) that the Monitors were prevented from reaching a conclusion.

- In addition to the 37 cases (14%) that RCCI Ruled Out that had substantial deficiencies, the Monitors also identified two investigations in which RCCI assigned a disposition of Unable to Determine or Administrative Closure that had substantial deficiencies or were inappropriately resolved by RCCI.

**Remedial Order 5:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

- 81% (102) of RCCI investigations opened from January 1, 2021 to June 30, 2021 were initiated within 24 hours of intake; and

- 19% (24) of RCCI investigations opened from January 1, 2021 to June 30, 2021 were not initiated timely or did not have sufficient data to assess.

**Remedial Order 6:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is*

8

*assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

- 88% (774) of RCCI investigations opened from January 1, 2021 to June 30, 2021 were initiated within 72 hours of intake;

- 12% (109) of RCCI investigations opened from January 1, 2021 to June 30, 2021 were not initiated timely or did not have sufficient data to assess; and

- No RCCI investigations opened from January 1, 2021 to June 30, 2021 had an approved exception to face-to-face contact.

**Remedial Order 7:**  *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

- 81% (102) of RCCI investigations opened from January 1, 2021 to June 30, 2021 included initial face-to-face contact with all alleged victims within 24 hours of intake;

- 19% (24) of RCCI investigations opened from January 1, 2021 to June 30, 2021 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess; and

- No RCCI investigations opened from January 1, 2021 to June 30, 2021 had an approved exception to face-to-face contact.

**Remedial Order 8:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

- 88% (774) of RCCI investigations opened from January 1, 2021 to June 30, 2021 included initial face-to-face contact with all alleged victims within 72 hours of intake;

- 12% (109) of RCCI investigations opened from January 1, 2021 to June 30, 2021 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess; and

- No RCCI investigations opened from January 1, 2021 to June 30, 2021 had an approved exception to face-to-face contact.

**Remedial Order 9:** *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

- In 95% (677) of investigations with one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with the alleged child victim within an investigation and the date and time the contact occurred; and

- In 93% (277) of investigations with more than one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with each of the alleged child victims within an investigation and the date and time the contact occurred.

**Remedial Order 10:** *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

- 63% (634) of investigations were documented as completed within 30 days of intake;

- 9% (95) of investigations had an approved extension and were completed within the extension timeframe;

- 28% (280) of investigations were not completed timely;

- For the 166 RCCI investigations that were open as of September 20, 2021, 19% (31) of investigations were open for more than 30 days and had an extension and 22% (36) of investigations were open for more than 30 days and did not have an extension.

**Remedial Order 11:** *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked.*

- 89% (123) of investigations with extension(s) had one extension.

- 10% (14) of investigations with extension(s) had two extensions.

- 1% (1) of investigations with extension(s) had three extensions.

10

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

- *(Remedial Order 16 applies to both DFPS and HHSC)* With respect to DFPS, the agency advised the Monitors it uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered complete when the documentation is finally submitted to the supervisor in compliance with this Order.

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

*(Remedial Order 18 applies to both DFPS and HHSC)* With respect to DFPS:

Notification to Referent:

- 74% (731 of 982 closed investigations) of investigations included data that notification letters to referent(s) were mailed within five days of investigation closure;

- 4% (44) of investigations did not have timely notification to referent(s);

- 9% (84) of investigations were mailed prior to supervisor approval;

- 11% (106) of investigations were unknown due to documentation deficiencies; and

- 2% (17) of investigations had an anonymous reporter.

Notification to Provider:

- 51% (500 of 982 closed investigations) of investigations included data that notification letters to provider(s) were mailed within five days of investigation closure;

- 2% (15) of investigations did not have timely notification to provider(s);

- 1% (7) of investigations included letters that were mailed prior to supervisor approval; and

- 47% (460) of investigations were categorized as unknown due to documentation deficiencies.

**Remedial Order A6:** *Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

- Of youth interviewed who were without an authorized placement, also known as Children Without Placement ("CWOP" or "CWOP Settings"), most knew that they could call the SWI hotline to report abuse, neglect, or exploitation. However, a smaller percentage knew how to reach the hotline if needed. Far fewer children were familiar with the Foster Care Ombudsman ("FCO") or how to reach the FCO to make a complaint. Because CWOP Settings are unlicensed, the State has not required posters with FCO and hotline numbers to be posted.

**Remedial Order B5:** *Effective immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

- After the State changed its policies related to caseworker notification of allegations of abuse, neglect, or exploitation to conform with the Court's December 2020 contempt order, DFPS struggled to successfully implement its policies. The new policies implement the Court's requirement that caseworkers receive notice of a report to SWI of abuse, neglect, or exploitation and also of the substance of the allegations in the report. The policies require SWI intake staff to manually send caseworkers I&R Notifications that include the substance of the allegations reported to SWI. The caseworkers then document their review of the information by staffing the notification with a supervisor and documenting the staffing in a child's event contacts in IMPACT.

- Although the percentage of RCCI intakes for which the monitoring team found an I&R Notification Staffing contact increased over the period of review, the monitoring team did not find an I&R Notification Staffing contact in 38% (248 of 654) of the intakes included in the sample. The results for CPI and PI intakes were even lower: for 71% (263 0f 373) of CPI intakes no I&R Notification Staffing contact was found, and for 60% (70 of 117) of PI intakes no I&R Notification Staffing contact was found.

- In the cases in the sample for which an I&R Notification Staffing was found and the monitoring team's review confirmed that the caseworker staffed the notification with a

supervisor, child safety was discussed and some action was planned or taken in 44% (132 of 300) of cases involving an RCCI intake, in 41% (33 of 81) of cases involving a CPI intake, and in 50% (15 of 30) of cases involving a PI intake.

**Remedial Order 37:** *Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

- DFPS's policy change limiting downgrades of RCCI intakes has significantly reduced the number of intakes for which a Home History Review ("HHR") is completed. Of the three intakes involving allegations related to a foster home during the period reviewed by the Monitors, two involved allegations of child-on-child sexual abuse between siblings that were subsequently re-reported to SWI and investigated. The third involved a child in a New Mexico verified kinship home; RCCI determined it did not have jurisdiction to investigate the allegations though the kinship home was licensed by DFPS Region 1. The monitoring team did not find an HHR for this intake.

- The State's case record reviews for the second quarter of Fiscal Year 2021 (December 2020 – February 2021) found that two intakes, both made in December 2020, required an HHR. The Monitors' case review found that an HHR and HHR Staffing were completed for nine of the ten children in these two homes and that the narrative in the Staffing notes included an accurate summary of the review for only three of the nine children. The case record review for the third quarter of Fiscal Year 2021 (March – May 2021) found that of the 17 intake reports made to SWI regarding a foster home where a PMC child was placed, none of the intakes required an HHR.

2. Section IV: Organizational Capacity

**Remedial Order 1:** *Within 60 days, the Texas Department of Family Protective Services ("DFPS") shall ensure statewide implementation of the CPS Professional Development ("CPD") training model, which DFPS began to implement in November 2015.*

- The Monitors analyzed training data related to caseworkers hired by DFPS and the two SSCCs (OCOK and 2INgage) that have entered Stage II of CBC during the six-month period included in the analysis (September 2020 to February 2021). The analysis showed that of the 256 caseworkers hired by DFPS subject to full or partial CPD training, 236 completed training by June 30, 2021. The average length of time that it took the 236 caseworkers to complete CPD training was 104 days. Of the 20 caseworkers for whom the

Monitors could not validate completion of training, DFPS data reported that 11 of them carried full caseloads.

- OCOK hired 48 caseworkers during the six-month period analyzed, 39 of whom were subject to full or partial CPD training. All of them had completed the OCOK training by June 30, 2021. For those subject to full training (29 of 39, or 74%), the average time to complete training was 85 days. Four of these caseworkers completed the training seven or more days earlier than expected; OCOK did not provide an explanation for their early completion.

- 2INgage hired 37 caseworkers during the six-month period analyzed, 22 of whom were subject to full or partial CPD training. All caseworkers completed the 2INgage training by June 30, 2021; the 20 caseworkers subject to full training completed the 2INgage training in 40 days, less than half the time that DFPS reports (and the Monitors validated) that it takes caseworkers to complete CPD training. Nine of the 20 caseworkers completed training in significantly less time DFPS requires, with a range of completion from 28 to 34 days. According to 2INgage, DFPS instructed it to lengthen its training program so that caseworkers receive a minimum of 13 weeks of training after the Monitors raised concerns. 2INgage reported to the monitoring team that it began to require caseworkers to complete the 13-week training starting March 1, 2021. The Monitors will validate this adjustment to the training program in future monitoring of Remedial Order 1.

**Remedial Order 2:** *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

For staff subject to graduated caseload standards between January 1, 2021 and June 15, 2021:

- On average, staff's caseloads conformed with the graduated caseload standards over 98% of the time. This represents the average rate of conformance of the 296 workers assessed on their 15th day following case assignability; the 294 workers assessed on the last day of the month following the 15th day of case assignability; and the 218 workers assessed on their 45th day following case assignability.

- On the 15th day, 97% of workers conformed to the graduated caseload standard of six children.

- On the last day of the month following the 15th day of case assignability, 98% of workers conformed to the graduated caseload standard.

- On the 45th day, 100% of workers conformed to the graduated caseload standard of 12 children.

14

- The State's compliance with Remedial Order 2 exceeded 97% in each of the six months during the period.

- Rates of conformity did not vary significantly between DFPS and the two SSCCs with case management responsibilities (OCOK and 2Ingage).

**Remedial Order 35:** *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

**Remedial Order A2:** *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

**Remedial Order A3:** *Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly.*

**Remedial Order A4:** *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General Class.* [The Court subsequently changed the effective date of this order to February 15, 2020.]

15

- The parties agreed to, and the Court approved, a workload standard of 14 to 17 children per Conservatorship ("CVS") worker, pursuant to Remedial Order A3. To validate the State's performance, the Monitors reviewed and analyzed all relevant data provided by the State during the review period. The Monitors' analysis showed that as of June 30, 2021, 58% of all caseworkers (885 of 1,515), including those employed by OCOK and 2INgage, had primary caseloads within or below the standard of 17 children per worker. From January 31, 2021 to June 30, 2021, conformity with the standard was 59% of all caseworkers serving at least one PMC child.

- Supervisors carried only a small percentage of PMC cases; those who did rarely conformed with the workload standard. In the six months of caseload reports starting on January 31, 2021 and ending on June 30, 2021, an average of 8% of supervisors managing at least one PMC child's case had one workload or less. From January 31, 2021 to June 30, 2021, conformity with the standard increased from 6% to 8% of all supervisors carrying at least one PMC case.

- The Monitors found that conformity with the caseload standard varied among DFPS, OCOK, and 2INgage. Of the 1,313 DFPS workers carrying at least one PMC case on June 30, 2021, 769 workers (58%) had primary caseloads within or below the standard of 17 children per worker. As of June 30, 2021, the two SSCCs that are undertaking case management, OCOK and 2INgage, had 68% and 50% of their workers within or below the standard, respectively.

- Caseworkers reported significant CWOP shift work during interviews with the monitoring team, including workers whose caseloads did not conform to the caseload standards: 25% (13) of the 53 workers interviewed who reported CWOP shift activity from February through June 2021 had caseloads that exceeded the caseload standard. For the 38 workers interviewed in August and September 2021 who reported CWOP shift activity, 47% (18) of them had caseloads that exceeded the caseload standard.

**Remedial Orders B1:** *Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

**Remedial Order B2:** *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

**Remedial Order B3:** *Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

**Remedial Order B4:** *Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators, or successor staff.*

The majority of RCCI investigators' caseloads were within the guidelines during each month of the period from January 2021 through June 2021. The majority of RCCR inspectors' caseloads were within the guidelines during each month of this period, except for February 2021. The number of open RCCI investigations dropped substantially between January 2021 and March 2021 due to DFPS's effort to reduce backlogs of overdue investigations by bringing in staff member assistance from other divisions. Although there were minor discrepancies between the caseload reports and monthly data for investigators and inspectors interviewed, the Monitors were able to substantially validate the data.

## II.   DEMOGRAPHICS OF CHILDREN IN PMC CARE

According to DFPS data, there were 9,805 children in PMC status as of June 30, 2021,[18] a decrease of 15 children since December 31, 2020.[19] Of the 9,820 children in PMC status on

---

[18] The point-in-time analyses in this section are based on DFPS data production of children in PMC during June 2021. The number of entries to PMC, exits from PMC, and unique PMC children served are based on information from DFPS data production of children in PMC during January 2021, February 2021, March 2021, April 2021, May 2021, and June 2021. *See* DFPS, *RO.Inj - List of Children in PMC Jan 2021 - 3-1-21- 101616* (Mar. 2, 2021) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC Feb 2021 - 4-1-21- 101887* (Apr. 2, 2021) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC Mar 2021 - 5-3-21- 102221* (May 4, 2021) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC Apr 2021 - 6-1-21_102489* (Jun. 2, 2021) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC May 2021 - 7-1-21_102731* (Jul. 2, 2021) (on file with the Monitors); DFPS, *RO.Inj - List of Children in PMC Jun 2021 - 8-2-21_103047* (Aug. 3, 2021) (on file with the Monitors).

[19] *See* Deborah Fowler & Kevin Ryan, Second Report 34, ECF No. 1079.

December 31, 2020, 2,990 (30%) had exited PMC status between January 1, 2021 and June 30, 2021.  Of the 9,805 children in PMC status on June 30, 2021, 2,975 (30%) children entered PMC status between January 1, 2021 and June 30, 2021. DFPS cared for 12,986 PMC children between January 1, 2021 and June 30, 2021.[20]

A.  Age, Gender, and Race

As of June 30, 2021, 37% of children with PMC status were age zero to six years old (3,635); 22% were seven to 11 years old (2,183); 41% were 12 to 17 years old (3,986), and <1% were 18 years old (1).

**Figure 1: Age of Children in PMC on June 30, 2021**

*n=9,805*



Forty-seven percent of children in PMC status were reported as female and 53% were reported as male.

The race of non-Hispanic children in PMC status breaks down as follows: 27% (2,677) of children in PMC on June 30, 2021 were White; 25% (2,435) were Black/African American; <1% (22) were Native American; <1% (27) were Asian; and 6% (569) were categorized as "Other." Additionally, 42% (4,075) of children in PMC on June 30, 2021 were of Hispanic ethnicity. Non-Hispanic Black/African American children in PMC status appear to be disproportionately represented compared to the racial category totals for Texas's population of all children ages zero to 17 years in the 2020 census.

---

[20] In the Second Report covering a longer time period, DFPS cared for 16,203 PMC children between March 1, 2020 and December 31, 2020. *See* Deborah Fowler & Kevin Ryan, Second Report 34, ECF No. 1079.

**Table 1: Race for Children in PMC on June 30, 2021 and Estimates of Total Child Population in Texas by Race, August 12, 2021[21,22]**

| Race | Children in PMC on June 30, 2021 | | Estimates of Total Population Under 18 Years Old in Texas by Race | |
|---|---|---|---|---|
| | Frequency | Percent | Frequency | Percent |
| Non-Hispanic White | 2,677 | 27.3% | 2,146,604 | 29.5% |
| Non-Hispanic Black/African American | 2,435 | 24.8% | 869,455 | 11.9% |
| Non-Hispanic Other | 569 | 5.8% | 346,518 | 4.3% |
| Non-Hispanic Native American | 22 | 0.2% | 25,890 | 0.2% |
| Non-Hispanic Asian | 27 | 0.3% | 355,940 | 4.9% |
| Hispanic (of any race) | 4,075 | 41.6% | 3,534,398 | 48.6% |
| **Total** | **9,805** | **100%** | **7,278,805** | **100.0%** |

Note: Columns may not add to 100.0% due to rounding.

## B. Living Arrangements and Length of Time in Care

Based upon information provided by DFPS, 80% (7,800) of children in PMC on June 30, 2021 lived in family settings, including 24% (2,379) living with relatives or fictive kin and 5% (455) living in adoptive homes; 14% (1,345) of children in PMC lived in congregate care; and 544 (6%) children lived in other types of living arrangements. The remaining 116 (1%) of PMC youth were without an authorized placement (also known as Children Without Placement or CWOP) on June 30, 2021.

---

[21] *See* UNITED STATES CENSUS BUREAU, Table IDs P2 & P4, Product: 2020: DEC Redistricting Data (PL 94-171) (August 2021), available at https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity&tid=DECENNIALPL2020. P2, and https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity%20&tid=DECENNIALPL2 020.P4. These totals were derived by subtracting Table P4 totals (population over 18) from Table P2 totals (total population). The categories used by the Census Bureau and Texas DFPS do not match exactly. The Census data were aggregated as follows: the Non-Hispanic Other category includes all children in the Non-Hispanic Other category with one race and all Non-Hispanic children with more than one race; the Non-Hispanic Native American totals combine the American Indian Alaska Native category with the Native Hawaiian and Pacific Islander category.

[22] The format of the data provided by DFPS to the Monitors does not provide the ability to identify the racial categories for any child of Hispanic ethnicity.

**Figure 2: Living Arrangements for Children in PMC on June 30, 2021[23]**

*n=9,805*



Of the children in PMC on June 30, 2021, 38% (3,750) were in care for one to two years; 24% (2,354) were in care for two to three years; 33% (3,218) were in care for more than three years; and 5% (460) were in care for less than one year. Additionally, for 23 children (<1%) the data did not include removal dates, thus the Monitors were unable to calculate their length of time in care.

**Figure 3: Length of Stay in Care of Children in PMC on June 30, 2021**

*n=9,805*



---

[23] The 544 children in the "Other" living arrangement category in this figure includes those identified by DFPS as: "Runaway" (1%, 132), "Incarcerated" (<1%, 61), "Own-home/Non-Custodial Care" (<1%, 22), "Independent Living" (<1%, 6), "Unauthorized Placement" (1%, 125) "HCS Group 1-4" (1%, 73), "Psychiatric Hospital" (48, <1%), Data Entry Error (<1%, 4), and eight other living arrangement types (73, 1%). The chart does not add up to 100% due to rounding.

Children exited from PMC status primarily through adoption; reunification with family; having custody transferred to relatives; or by aging out of care.[24] Of the 2,814 exits from PMC status of children that DFPS reported between January 1, 2021 and June 30, 2021, the most frequent reason for exit was adoption, with more adoptions by non-relatives (947) than relatives (817). The breakdown of exit reasons is as follows: 63% (1,764) of children were adopted; 17% (476) of children had custody transferred to a relative; and 16% (447) of children who exited were emancipated—or aged out—of foster care.[25] Finally, a small number, 4% (110), were reunified with their families or had other outcomes <1% (17).

**Table 2: Exits from PMC by Exit Outcome, January 1, 2021 to June 30, 2021**

| Exit Outcome | Frequency | Percent |
|---|---|---|
| Adoption | 1,764 | 63% |
| Custody to Relative | 476 | 17% |
| Emancipation | 447 | 16% |
| Reunification | 110 | 4% |
| Other | 17 | <1% |
| **Total** | **2,814** | **100%** |

C.  Out of State Placement

Of the 9,805 children in PMC status on June 30, 2021, 473 (4%) were placed in living arrangements that were located out of state. Of the children placed out of state, 367 (78%) lived in family settings, including 34% (162) living with relatives or fictive kin and 15% (70) living in adoptive homes; and 19% (92) of children in PMC lived in congregate care out of state.

---

[24] The Monitors discovered that an additional 375 children appeared to have exited from PMC status but had no exit dates in the data provided by DFPS during the period. After the Monitors inquired with DFPS, supplemental data that DFPS provided to the Monitors in September 2021 provided the exit dates for those children, 339 of whom exited during this reporting period and the remaining children exited prior to January 2021; at the time of reporting, the Exit Outcome for those children was not yet available to the Monitors but they have subsequently reviewed that data.

[25] The 2,814 exits include four children who exited care twice during the period from January 1, 2021 to June 30, 2021.

**Table 3: Out of State PMC Youth by Living Arrangement Type,**
**January 31, 2021 and June 30, 2021**

| Living Arrangement Type | Jan. 31, 2021 | June 30, 2021 | Percent Change |
|---|---|---|---|
| Congregate Care | 54 | 92 | 70% |
| Foster Home | 126 | 135 | 7% |
| Relative/Fictive Kin | 180 | 162 | -10% |
| Adoptive Home | 81 | 70 | -14% |
| Other | 9 | 10 | 11% |
| Own Home/Non-Custodial Care | 2 | 1 | -50% |
| Data Entry Error | 1 | 3 | 200% |
| **Total** | **453** | **473** | **4%** |

D.  Level of Care

Of the 9,805 children in PMC status on June 30, 2021, 5,765 (59%) children were in a Basic authorized level of care. Of the remaining 4,040 PMC children, 1,573 (16%) were in a Specialized level of care; 1,390 (14%) were in a Moderate level of care; and 411 (4%) were in an Intense level of care. The data include 597 (6%) PMC children with no recorded authorized level of care.[26]

**Table 4: Authorized Level of Care for Children in PMC as of June 30, 2021**

| Authorized Level of Care | Frequency | Percent |
|---|---|---|
| Basic | 5,765 | 59% |
| Specialized | 1,573 | 16% |
| Moderate | 1,390 | 14% |
| No Authorized Level of Care Recorded | 597 | 6% |
| Intense | 411 | 4% |
| (TFC) Treatment Foster Care | 58 | 0.6% |
| Psychiatric Transition | 7 | 0.1% |
| Intense Plus | 4 | 0.0% |
| **Total** | **9,805** | **100%** |

E.  Geographic Location

For 39% (3,842) of the 9,805 children with PMC status on June 30, 2021, the county of removal was one of five Texas counties: Bexar, Harris, Dallas, Tarrant, and McLennan.

---

[26] The Monitors found that for most of those children lacking identification of an authorized level of care (521), the placement type in the data was identified as "kin only (non-licensed)."

**Table 5: Top Five Counties of Removal for PMC Children on June 30, 2021[27]**

| County Name | Frequency | Percent |
|---|---|---|
| Bexar | 1,191 | 12% |
| Harris | 1,062 | 11% |
| Dallas | 739 | 8% |
| Tarrant | 516 | 5% |
| McLennan | 334 | 3% |

F.  Single Source Continuum Contractor Presence and Placement Oversight

As of June 30, 2021, 27% (2,610) of children in PMC status were from[28] regions where SSCCs operated in the first two stages of implementation.[29]

**Table 6: PMC Children by Regions on June 30, 2021**

| Regions | PMC Children | Percent |
|---|---|---|
| SSCC Regions | 2,610 | 27% |
| DFPS Regions | 7,195 | 73% |
| **All Regions** | **9,805** | **100**% |

As shown in the table below, Bexar County (Region 8a), where Family Tapestry was responsible for placement identification prior to terminating its contract, had the greatest number of PMC children residing in a region that either had or has SSCC placement oversight.

---

[27] These are the counties with jurisdiction over the child's removal case. DFPS describes these counties as the "legal" counties in the corresponding IMPACT data.

[28] DFPS reports to the Monitors both the Legal Region and the Placement Region of children; here, the Monitors are referring to Legal Region for ease of reference. However, the children may be placed in and therefore, currently living in another region.

[29] On April 29, 2021, Family Tapestry provided DFPS with a 60-day contract termination notice.

**Table 7: PMC Children from Regions with Single Source Continuum Contractor Presence by Region on June 30, 2021**

| SSCC Name | Legal Region | PMC Children | Percent |
|---|---|---|---|
| Saint Francis Ministries | 1 | 437 | 17% |
| 2Ingage | 2 | 295 | 11% |
| Our Community Our Kids (OCOK) | 3b | 687 | 26% |
| Family Tapestry* | 8a | 1,191 | 46% |
| **Total** | | **2,610** | **100%** |

*On April 29, 2021, Family Tapestry provided DFPS with a 60-day contract termination notice.

In Region 8b where an SSCC, Belong, became responsible for placement identification on October 4, 2021,[30] the total number of PMC children living in that region as of June 30, 2021 was 521.

III.   SCREENING, INTAKE AND INVESTIGATION OF MALTREATMENT IN CARE ALLEGATIONS

A.  Remedial Order 3

Remedial Order 3: *DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

To assess DFPS's performance with respect to Remedial Order 3, the Monitors gathered and reviewed a wide range of data relating to the safety of PMC children for analysis and qualitative review. This section discusses the Monitors' assessment and review of the statewide system for appropriately receiving, screening, and investigating reports of abuse, neglect, and exploitation involving PMC children at several points, including referrals to SWI; the screening of those reports to determine whether they should be investigated for child abuse, neglect or exploitation; and investigations of child maltreatment allegations.

---

[30] DFPS, *Quarterly Report on Community Based Care Implementation Status*, 1, 3 (September 2021).

1.   Overview

a.   Child Care Investigations Quality Improvement Plan

In May 2021, DFPS began to implement a Child Care Investigations Quality Improvement Plan. The Plan includes several components, many of which are summarized below:[31]

- Targeted use of Special Investigators: DFPS assigned Special Investigators to assist RCCI and join investigations that include allegations of Physical Abuse involving serious injuries to children; sexual abuse in which a facility staff member or foster parent is the alleged perpetrator; child fatalities or near fatalities; and investigations that allege or allude to Child Sex or Labor Trafficking.

- Identification of Operations with Multiple Referrals: In July 2021, DFPS reports it implemented a new feature, the multiple referral indicator (M-Ref), in its IMPACT system to identify child care operations with a high frequency of investigations in the "recent past," which it defined as the six months prior to the intake.[32] Operations qualify for a multiple referral review if, during the prior six months, the frequency of investigations meets a threshold number based upon the size and type of the operation.[33] As a result, when RCCI receives an intake report with allegations at an operation that has had a high frequency of investigations in the six months preceding the intake, a multiple referral indicator should appear in IMPACT on a page with the case summary for that referral. According to the RCCI Handbook, when this occurs, RCCI's Complex Investigation Division (CID) is instructed to conduct a "multiple referral review" for that operation to assist the RCCI investigation of the instant allegation(s).

    For the multiple referral review, the RCCI Handbook instructs that the CID review will determine: 1) whether additional actions or allegations must be included in the investigative tasks and 2) whether the investigation should include an administrator, signatory authority, or other person in charge at an operation as an alleged perpetrator of Neglectful Supervision in the investigation, consistent with the Texas Administrative

---

[31] DFPS, *Child Care Investigations Quality Improvement Plan*, 1-3 (May 19, 2021) (on file with the Monitors and DFPS).

[32] *Id.*; DFPS, *Child Care Investigations Handbook* §6627.1, *available at* https://www.dfps.state.tx.us/handbooks/CCI/Menu/MenuLIC6000.asp [hereinafter *Child Care Investigations*]; DFPS, *RCCI Multiple Referrals Reference Guide*, 1-3 (May 2021) (defining the recent past as the prior six months) (on file with the Monitors and DFPS); Email from Ingrid Vogel, Program Specialist, DFPS to Megan Annitto, Monitoring Team (October 11, 2021) (updating the implementation date of the Multiple Referral Indicator).

[33] For example, a General Residential Operation that is medium size (a capacity of 26-75 children) will meet the threshold for a multiple referral review if there have been 12 or more investigations by RCCI in the prior six months. DFPS, *RCCI Multiple Referrals Reference Guide*, 1-3 (May 2021) (on file with the Monitors and DFPS).

Code.[34,35] DFPS explained that the multiple referral functionality seeks to better identify situations where administrative culpability may be present in relation to allegations at a child care operation.[36]

- Expansion of the types of investigations that require secondary approval by CID to include those with allegations of Physical Abuse involving serious injuries to children; investigations resulting in a substantiation of Sexual Abuse; child fatalities or near fatalities; and investigations that involve the activation of the multiple referral indicator;

- Implementation of a formal mentoring program between tenured investigators and new workers;

- Implementation of a Quality Monitoring Business Process to ensure that quality assurance processes feedback is "provided to front-line staff and supervisors relating to the quality of investigations [is] resulting in continuous quality improvement;" and

- Various levels of increased and enhanced trainings and adaptive coaching.[37]

b.   Statutory Amendment

Effective September 2021, the Texas Legislature amended the Texas Family Code definition of Neglect to add a new provision at the beginning of the definition which states that:

> Neglect means an act or failure to act by a person responsible for a child's care, custody, or welfare evidencing the person's blatant disregard for the consequences of the act or failure to act that results in harm to the child or that creates an immediate danger to the child 's physical health or safety.[38]

The definition of Neglect applicable to allegations in a child care operation[39] remains unchanged and the subsection of the Neglect definition that the legislature added in the above language states that such Neglect includes:

> [A] negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program, including failure to comply

---

[34] The Handbook specifically references 40 TEX. ADMIN. CODE §707.801(b)(1)(K), (L), and/or (M).

[35] DFPS informed the Monitors that the implementation of this new tool became effective in July 2021 which is outside the period of investigations the monitoring team reviewed for this report; the Monitors' review of investigations for the next reporting period will include those completed after implementation of the multiple referral review feature.

[36] DFPS, *RCCI Multiple Referrals Reference Guide*, 1-3 (May 2021) (on file with the Monitors and DFPS).

[37] The Monitors will assess the effectiveness of DFPS's reported strategies in a future report to the Court.

[38] TEX. FAM. CODE §261.001(4).

[39] A child care operation is a "facility, family home, or other entity that is subject to regulation by [RCCR] under Chapter 42, Human Resources Code, regardless of whether the operation has received the necessary permit to provide the child care under that chapter." 40 TEX. ADMIN. CODE §707.703 (a)(7).

with an individual treatment plan, plan of care, or individualized service plan, that causes or may cause substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy.[40]

Other subsections of the statutory definition of Neglect in the Family Code were amended with new language that creates a higher threshold for defining caregiver behavior as Neglect. A child must be exposed to an "immediate danger" of substantial physical injury or emotional harm; the new standard of "immediate danger" replaced the lower threshold that previously required a "substantial risk" of such injury or harm.[41]

c.   DFPS Investigation of Allegations of Abuse or Neglect

Reports in licensed residential operations that SWI determines will be investigated as abuse, neglect or exploitation are assigned to an RCCI investigator.[42] The RCCI investigator is required to assess the immediate safety of involved children,[43] to evaluate the risk to the children during the investigation,[44] and to initiate the investigation timely based on the assigned priority – 24 hours for Priority One and 72 hours for Priority Two.[45] The RCCI investigator is required to conduct interviews of children and collateral witnesses,[46] to collect evidence,[47] and to complete the investigation within 30 days for both Priority One and Priority Two cases.[48] RCCI's possible findings include:

> Reason to Believe ("RTB") – A preponderance of evidence indicates that abuse, neglect, or exploitation occurred. If the disposition for any allegation is Reason to Believe, the overall case disposition is Reason to Believe.

> Ruled Out ("R/O") – A preponderance of evidence indicates that abuse, neglect, or exploitation did not occur. If the dispositions for all allegations are Ruled Out, the overall case disposition is Ruled Out.

> Unable to Determine ("UTD") – A determination could not be made because of an inability to gather enough facts. The investigator concludes that:

> - there is not a preponderance of the evidence that abuse or neglect occurred; but

---

[40] TEX. FAM. CODE §261.001(4)(A)(iv).
[41] See e.g., TEX. FAM. CODE §261.001(4)(A)(ii)(b) (requiring exposure of a child by a person responsible for the child's care to immediate danger for a finding of Medical Neglect in place of a substantial risk).
[42] Child Care Investigations § 6100.
[43] Child Care Investigations § 6330.
[44] Child Care Investigations § 6220.
[45] Child Care Investigations § 6361.1-2.
[46] Child Care Investigations § 6420.
[47] Child Care Investigations § 6440.
[48] Child Care Investigations § 6110.

- it is not reasonable to conclude that abuse or neglect did not occur.

If the disposition for any allegation is Unable to Determine and there is no allegation assigned a disposition of Reason to Believe, the overall case disposition is Unable to Determine.

Administrative Closure ("ADM") – The operation is not subject to regulation; or the allegations do not meet the definition of abuse, neglect, or exploitation. If the dispositions for all allegations are Administrative Closure, the overall disposition is Administrative Closure.[49]

RCCI is charged with investigating allegations of abuse, neglect, or exploitation of children in operations licensed by RCCR, which includes foster homes and GROs.[50] CPI is responsible for investigating abuse or neglect of children in unlicensed placements such as kinship foster homes and CWOP Settings. CPI's investigative authority also includes investigating reports of child abuse or neglect that are alleged to have occurred prior to the child's entrance into DFPS custody.[51,52]

## 2. Statewide Intake Performance

### a. Background

On February 21, 2020, the Court ordered DFPS to provide the Monitors by February 26, 2020, and continuing thereafter until further order of the Court, the records of all SWI calls made, the specific times of all calls made to SWI, and the wait time for each SWI call including, but not limited to, dropped and unanswered SWI calls.[53]

In compliance with the Court's order on February 26, 2020, DFPS continued to produce data files containing monthly SWI call records during this reporting period of all hotline calls made;

---

[49] *Child Care Investigations* § 6622.3
[50] *Child Care Investigations* § 1142.
[51] DFPS, *Child Protective Services Handbook* § 2120, *available at* https://www.dfps.state.tx.us/handbooks/CPS/default.asp [hereinafter *Child Protective Services*].
[52] The language in Remedial Order 3 specifically refers to the General Class, rather than limiting its application to children in licensed settings. In an advisory filed with the Court on September 21, 2021, Governor Greg Abbott advised that with respect to the scope of the Court's injunctions, "[A] General Class member should receive the same protections under the Court's remedial orders regardless of the licensed or unlicensed nature of the facility where the member is housed, unless the remedial order at issue specifies that it applies only to the [Licensed Foster Care] subclass or licensed or unlicensed facilities." Governor Greg Abbott's Advisory Concerning the Court's September 14, 2021 Inquiries 3, ECF No. 1137.
[53]*M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-CV-84, slip. op. at 2 (S.D. Tex. Feb. 20, 2020), ECF No. 811 (ordering that starting February 26, 2020 and continuing thereafter in 24-hour increments until further order of the Court, the Defendants are to provide the Monitors with records of all Statewide Intake hotline calls made and the wait time for each call including, but not limited to, dropped and unanswered calls, and including the specific times of these calls to the Statewide Intake hotline).

the specific times of these calls to the hotline; and the wait time for each call, including, but not limited to, dropped and unanswered calls.[54]

Calls to SWI are answered by an automated system that asks the caller a series of questions in order to determine the way the call is routed.[55] These questions include a caller's language preference; whether the caller is asking about the status of a case; or whether the caller wants to learn more about online reporting.[56] Depending upon the answers to these questions, the call is routed to one of 22 "call queues."[57] If an SWI staff member is not immediately available, the caller waits on the queue.[58] If a caller hangs up before an SWI staff member answers the call, the call is categorized as "abandoned."[59] If an SWI staff member speaks with the caller, the call is categorized as "handled." The automated system records the date and time that each call starts and ends; the call queue to which the call is routed; whether the call is handled or abandoned; the time the caller waits after being routed to a queue before speaking with an SWI staff member; and other information.[60]

b.   Statewide Intake Call Center Performance Analysis

i.   Methodology

The Monitors analyzed SWI's Avaya call data related to the 355,816 calls made to SWI from January 1, 2021 to June 30, 2021. The analysis examined the distribution of calls by month, weekday, hour and call queue, the prevalence of handled and abandoned calls, and the amount of time callers waited before the call was answered by a staff person.

ii.   Volume of Calls to SWI

On average, the SWI data recorded over 59,000 calls a month. Call volume increased by an average of 6,000 calls per month compared to the average reported in the Monitors' previous report.[61] Call volume rose by 19% from February 2021 (53,793 calls) to March 2021 (64,038 calls) and remained near that level through May 2021 (63,232 calls). Call volume in June 2021 (55,822 calls) increased marginally (1%) compared to January 2021 (55,136 calls).

---

[54] The Monitors receive SWI call data in workbooks with titles in the following format: "export_[month]-[day]-[year].csv". The Monitors received individual files for each day from January 1, 2021 to June 30, 2021.

[55] *See* DFPS, *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

[56] *Id.*

[57] *Id.*

[58] *See* DFPS, *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors).

[59] *Id.*

[60] DFPS, *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors); DFPS, *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

[61] The Second Report found an average of 53,000 calls per month from February 1, 2020 to November 30, 2020. *See* Deborah Fowler & Kevin Ryan, Second Report 55, ECF No. 1079. The calls listed in the data are from the public as well as calls and transfers within SWI.

**Figure 4: Number of SWI Calls by Month**



iii.     Queue Times

On average, callers waited for 4.6 minutes on the queue before their calls were handled or abandoned, twice the wait time observed in the previous reporting period.[62] Fifty percent (178,481) of callers waited on the queue for under one minute; 19% (69,047) waited for one to five minutes; 13% (46,212) waited five to ten minutes; 7% (26,271) waited ten to 15 minutes; 5% (17,969) waited 15 to 20 minutes; and 5% (17,836) waited more than 20 minutes (percentages do not add to 100 due to rounding).

---

[62] The Second Report found an average queue time of 2.3 minutes for calls placed from February 1, 2020 to November 30, 2020. *See* Deborah Fowler & Kevin Ryan, Second Report 56, ECF No. 1079.

**Figure 5: Time Callers Waited before Calls were Handled or Abandoned**



iv.   Handled Calls

Of 355,816 calls, 80% (283,667) were answered,[63] a decrease from 87% observed in the Second Report.[64] Handled calls had an average duration of 11.7 minutes. Four percent (12,199) of handled calls lasted under one minute; 19% (54,403) lasted one to five minutes; 26% (74,796) lasted five to ten minutes; 25% (70,359) lasted ten to 15 minutes; 13% (37,334) lasted 15 to 20 minutes; and 12% (34,576) lasted more than 20 minutes (percentages do not add to 100 due to rounding).[65]

---

[63] Handled calls were determined by the presence of a 'Handled Flag.' Twenty-eight calls were not flagged as either handled or abandoned.

[64] The Second Report found that 87% of calls were handled from February 1, 2020 to November 30, 2020. *See* Deborah Fowler & Kevin Ryan, Second Report 57, ECF No. 1079.

[65] Fewer than 1% (8) of handled calls had a duration of zero minutes; calls that were answered should, by definition, have a duration. Calls with a duration of zero minutes were abandoned before the caller finished navigating the automated system.

**Figure 6: Duration of Handled SWI Calls**



There were 554 calls in the dataset with durations longer than two hours, which may be indicative of data system issues. Of these 554 calls, 298 (54%) lasted two to three hours; 142 (26%) lasted three to four hours; 86 (16%) lasted four to five hours; 23 (4%) lasted five to six hours; and five (1%) lasted more than six hours (percentages do not add to 100 due to rounding).

v.  Abandoned Calls

During the period analyzed, 20% (72,121)[66] of calls were abandoned, compared to 13% during the period covered by the Second Report.[67] Nineteen percent (13,660) of all abandoned calls occurred before the caller finished navigating the automated system. An additional 51% (36,592) of abandoned calls occurred after callers waited for up to five minutes.

Of the 178,481 calls waiting on the queue for up to one minute, 13% (23,895) were abandoned; of the 69,047 calls waiting for one to five minutes, 38% (26,357) were abandoned; of the 46,212 calls waiting for five to ten minutes, 25% (11,565) were abandoned; of the 26,271 calls waiting for ten to 15 minutes, 22% (5,878) were abandoned; of the 17,969 calls waiting 15 to 20 minutes, 15% (2,645) were abandoned; and of the 17,836 calls waiting for more than 20 minutes, 10% (1,781) were abandoned.

---

[66] Abandoned calls were determined by the presence of a "Queue Abandoned Flag." Twenty-eight calls were not flagged as either handled or abandoned.
[67] *See* Deborah Fowler & Kevin Ryan, Second Report 58, ECF No. 1079.

vi.     Call Queues

Calls were routed to 22 different queues in the reporting period. Of the 355,816 calls, the abuse queue received the majority of incoming calls (65%, 229,790). The next most common queues were calls from law enforcement (11%, 40,771); calls from intake staff to their supervisors (11%, 39,669); calls to support staff (4%, 14,454); and other general calls in English including calls pertaining to state hospitals and state supported living centers (3%, 10,265). These five queues represent 94% (334,949) of all calls.

Four percent (1,523) of the 40,771 calls to the law enforcement queue were abandoned. In contrast, 25% (58,350) of 229,790 calls to the abuse queue were abandoned. On the law enforcement queue, 74% (30,070) of calls were handled or abandoned in the first minute and 95% (38,821) in the first five minutes. In contrast, 35% (81,570) of calls to the abuse queue were handled or abandoned in the first minute and 58% (133,104) were handled or abandoned in the first five minutes.

The rate of abandoned calls to the abuse queue increased from 16% in the previous reporting period to 25% between January 1, 2021 to June 30, 2021. The rate of calls handled or abandoned in the first five minutes decreased from 77% in the previous reporting period to 58% for the current reporting period.[68]

vii.    Calls by Day of the Week and Time of Call

SWI calls were higher in volume on weekdays than on weekends. The average weekday call volume (2,354 calls per day) was more than twice the average weekend call volume (1,003 calls per day). On average, calls were abandoned at a slightly higher rate on weekdays (21%) as compared to weekends (17%). Average queue times were also almost two minutes higher on weekdays (4.8 minutes) as compared to weekends (2.9 minutes).

---

[68] *See* Deborah Fowler & Kevin Ryan, Second Report 59, ECF No. 1079.

**Figure 7: Number of SWI Calls Handled and Abandoned by Day of the Week[69]**



Sixty-eight percent (243,226) of all calls were placed during typical work hours (9:00 a.m. through 6:00 p.m.), with a higher rate (71%) placed during work hours on weekdays as compared to weekends (56%). Calls were abandoned at a higher rate during the typical work week (Monday through Friday, 9:00 a.m. through 6:00 p.m.). On average, 24% of calls placed during the typical work week were abandoned, as compared to the overall average abandonment rate of 20%. Similar to the findings observed in the First Report, on average, 36% of calls placed on Mondays and 34% of calls placed on Fridays between 3:00 p.m. to 5:00 p.m. were abandoned;[70] in contrast, the Second Report did not find that abandonment rates spiked during the work week.[71]

3.   DFPS Intake Screening and Maltreatment in Care Investigations

a.   Data and Information Request and Production

   i.   Monitors' Data and Information Request

To validate DFPS's performance with respect to appropriately screening referrals for child maltreatment associated with Remedial Order 3, the Monitors requested from the State, on an on-going monthly basis, a list of all referrals received through SWI via phone call, website, fax, regular mail, or any other manner in which the referent expresses concern about child maltreatment

---

[69] The number of calls included is 355,788 because 28 of the total calls were not flagged in the data as either handled or abandoned.

[70] The Monitors previously found that from August 1, 2019 to January 31, 2020, 40% of calls placed on Mondays or Fridays between 3:00 p.m. and 5:00 p.m. were abandoned. Deborah Fowler & Kevin Ryan, First Report 66, ECF No. 869.

[71] Deborah Fowler & Kevin Ryan, Second Report 60, ECF No. 1079.

regarding children in the PMC General Class, regardless of placement type.[72] The Monitors requested inclusion of relevant data points about the child and the placement, including where the child is placed at the time of the referral to SWI; licensure status; and whether the referral was sent for an investigation. The Monitors also requested key data points about the referrals including the date of the referral; the disposition of the report by SWI (where referred, whether it was classified as an intake or Information and Referral (I&R) and the priority assigned); the disposition of the report by the office/division to which it is referred (RCCI, RCCR etc.), including whether it was referred for an abuse or neglect investigation or a minimum standards investigation; the priority assigned to the investigation; and any other information about how the State addressed or planned to address the referral.[73]

To validate DFPS's performance with respect to appropriately investigating child maltreatment in care associated with Remedial Order 3, the Monitors requested from the State, on an ongoing basis, a list of all investigations involving any child in the PMC General Class. The Monitors requested key information about the investigations including the date and time of intake; allegations; alleged victims in the PMC Class; investigator; and PMC child placement, among other requested fields relevant to Remedial Order 3 and other remedial orders.[74]

### ii.    DFPS Data and Information Production

For purposes of data related to SWI, the State—DFPS and HHSC together or separately—remains unable to provide the Monitors with a unified list of all referrals to SWI involving PMC children as an apparent result of a bifurcated system for processing and storing data associated with referrals to SWI.[75]

HHSC cannot distinguish between PMC and non-PMC child-related referrals in its data. HHSC's data includes all referrals for that period and does not identify PMC children because, as the agency reported to the Monitors, "[t]he agency is operations-centric not child centric. CLASS does not contain the PMC identifier of children involved in a referral [or investigation]; the PMC

---

[72] Email from Deborah Fowler and Kevin Ryan, Monitors, to Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. (Sept. 30, 2019) (including Monitors' Sept. 30, 2019 Data & Information Request) (on file with the Monitors).

[73] Id.

[74] The Monitors' request included: intake stage ID number; investigation stage ID number; person ID (for all alleged PMC victims); county where maltreatment is alleged; most recent investigator name and ID; date and time investigation stage started; program conducting investigation; child's placement type at intake; placement resource at time of intake; the manner of initiation (action taken by the investigator that triggered the start of the investigation); the date/time of face to face contacts with alleged victim(s) as applicable noting any and all untimely face to face contacts and the reason(s) for any approved extensions to the face to face contact timeframe; and the relationships of the alleged perpetrator(s) to the child-victims. For closed investigations, the Monitors' request included: date the investigation is completed; date documentation is completed and submitted to the supervisor; the status of all allegations involving all PMC children; overall investigation disposition; the reason(s) for all approved extensions to the investigation completion date/time (when applicable); and the date any notification letters are sent to parents, providers and/or referents. *See also* Email from Kevin Ryan and Deborah Fowler to Andrew Stephens (Oct. 28, 2019) (on file with the Monitors).

[75] Deborah Fowler & Kevin Ryan, Second Report 61, ECF No. 1079.

identifier is only associated with referrals of abuse or neglect in IMPACT."[76] Thus, the majority of the 16,046 referrals included in the data reported by HHSC from January 1, 2021 to June 30, 2021 do not include the name of the child or children associated with the referral. Moreover, for the limited data where the name of a child is identified, PMC status is not distinguished.[77]

In response to the Monitors' request for data reporting on closed maltreatment in care investigations, DFPS has produced regular monthly files on closed investigations for this reporting period.

4.   Remedial Order 3: Screening and Intake Performance Validation

a.   Overview of Allegations in Referrals for Maltreatment in Care

The Monitors analyzed data about maltreatment in care allegations for PMC children using data about intakes pertaining to PMC children received by SWI from January 1, 2021 to June 30, 2021.[78] From January 1, 2021 to June 30, 2021, DFPS reported 1,095 intakes for PMC children in licensed placements that were coded as allegations of abuse, neglect, or exploitation by SWI intake specialists. In that same time period, DFPS reported 593 intakes for PMC children in unlicensed placements that were coded as allegations of abuse, neglect, or exploitation by SWI intake specialists for investigation by CPI.

During its secondary screening between January 1, 2021 and June 30, 2021, DFPS downgraded 33 of the 1,095 RCCI intakes (3%) involving a PMC child to Priority None ("PN"), meaning that at secondary screening, the screener assigned the intake as a Priority None and determined that RCCI would not conduct an abuse or neglect investigation.[79] In addition, the secondary screener downgraded 108 of 1,095 intakes (10%) from Priority One investigations to Priority Two investigations. The overall rate of downgrades to Priority None was minimal, reflecting the policy change discussed in the Second Report and implemented in November 2020 eliminating the policy allowing for downgrades to occur based upon a determination that the report did not involve an allegation of abuse, neglect or exploitation.[80] Moreover, the Monitors confirmed that none of the

---

[76] TEX. HEALTH & HUMAN SERVS. COMM'N, *Data Production Chart* at 5-6 (Dec. 6, 2019) (responding to Monitors' Sept. 30, 2019 Data and Information Request).

[77] In addition, the Monitors were also able to discern that HHSC data related to referrals is not limited to children who are in DFPS custody. HHSC and DFPS each produced different referral files for this reporting period.

[78] DFPS, *RO3.1 RCI and CPI Intakes Jan 2021- 3-1-21- fcl 01* (on file with the Monitors); DFPS, *RO3.1 RCI, CPI and PI Intakes Feb 2021- 4-1-21- fcl 01* (on file with the Monitors); DFPS, *RO3.1 RCI, CPI and PI Intakes March 2021 05-03-2021 fcl_01* (on file with the Monitors); DFPS, *RO3.1 RCI CPI and PI Intakes April 2021 06-01-2021 fcl_01* (on file with the Monitors); DFPS, *RO3.1 RCI CPI and PI Intakes May 2021 07-01-2021 fcl_01* (on file with the Monitors); DFPS, *RO3.1 RCI CPI and PI Intakes June 2021 08-02-2021 fcl_01* (on file with the Monitors).

[79] DFPS, *Child Care Investigations Handbook* § 6211.1, *available at* https://www.dfps.state.tx.us/handbooks/CCI/default.asp [hereinafter *Child Care Investigations*]. An allegation can be assigned PN only due to lack of RCCI jurisdiction over the allegation or when the allegation has already been investigated. *Id.*

[80] Deborah Fowler & Kevin Ryan, *Second Report* 52-53, ECF No. 1079.

reasons for downgrade to Priority None were due to such a determination for intakes referred to RCCI.

During the secondary screening for CPI intakes between January 1, 2021 and June 30, 2021, DFPS downgraded nine of the 593 CPI intakes (2%) involving a PMC child to Priority None, meaning that at secondary screening, the CPI staff assigned the intake as a Priority None and determined that CPI would not conduct an abuse or neglect investigation. In addition, DFPS downgraded 50 of 593 total intakes (8%) from Priority One investigations to Priority Two investigations.

The 1,095 RCCI intakes that were reported by DFPS involved 1,398 children in licensed placements between January 1, 2021 and June 30, 2021 and contained 1,759 allegations of child abuse, neglect, or exploitation, an average of 293 allegations per month.[81] This represents an increase of average monthly allegations of 19 (7%) per month from the Second Report.[82] Among those 1,759 allegations, Neglectful Supervision was the most common allegation type, constituting 58% of all allegations (1,012), affecting 878 children; Physical Abuse allegations constituted 24% of allegations (414), affecting 382 children; and Sexual Abuse allegations constituted 9% of all allegations (157), affecting 115 children.[83] Other allegation types account for the remaining 10% of allegations; those include Medical Neglect, Emotional Abuse, Physical Neglect, and Exploitation. The data may underrepresent the prevalence of alleged sexual abuse victimization among PMC children due to the nature of Neglectful Supervision allegations. The Monitors have found during their ongoing reviews of intakes and investigations that between one quarter to one third of allegations of Neglectful Supervision involve sexual contact between children in care;[84] in this reporting period, the Monitors found again that one third of the investigations they reviewed with allegations of Neglectful Supervision involved reports of sexual contact between children in care. DFPS's data does not identify the type of harm underlying Neglectful Supervision allegations.

---

[81] Some intakes include more than one child and more than one allegation for each child. If a child was the subject of the same type of allegation in two separate intakes, that child is double counted in this analysis; the unique number of children is 940.

[82] Deborah Fowler & Kevin Ryan, Second Report 62, ECF No. 1079.

[83] If a child was the subject of the same type of allegation in two separate intakes, that child would be double counted in this analysis.

[84] Deborah Fowler & Kevin Ryan, Second Report 64-65, ECF No. 1079.

**Figure 8: Allegation Types for RCCI Intakes Involving PMC Children in Licensed Placements, January 1, 2021 to June 30, 2021**



Source: RCCI Intakes January 2021 - June 2021
*n = 1,759 allegations for 1,095 intakes*

b. Referrals Received by SWI and Referred to HHSC

As discussed above, the total number of referrals received by SWI about PMC children is unknown because the State is unable to report on the total number due to its bifurcated reporting system. However, additional monitoring efforts, analysis and case record reviews by the Monitors have provided insight into the estimated number of referrals that involve PMC children in licensed facilities that are assigned for review by HHSC.

In its data reports to the Monitors, HHSC reported that 16,046 referrals were assigned to the agency between January 1, 2021 and June 30, 2021. When the Monitors excluded the referrals related to facilities that did not house children in DFPS care, the total number was 9,864. After reviewing a total of 1,487 referrals assigned by SWI to HHSC for potential minimum standards investigations or administrative closure during this and the previous reporting period, the monitoring team was able to determine that the rate of referrals assigned to HHSC involving PMC children was 46%.[85] Therefore, from January 1, 2021 and June 30, 2021, it is estimated that out of the 9,864 referrals SWI received and referred to HHSC, approximately 4,537 (46%) of these referrals involved PMC children.

---

[85] In the Second Report, the Monitors described that out of the 953 referrals selected for review, 441 (46%) involved children in PMC status. *See* Deborah Fowler & Kevin Ryan, Second Report 68, ECF No. 1079.

c.  Methodology

To evaluate DFPS's performance associated with Remedial Order 3 and assess the appropriateness of screening of referrals of abuse, neglect or exploitation involving PMC children, the monitoring team conducted a qualitative review of referrals received by SWI.[86] The Monitors' review focused on whether SWI appropriately screened the referrals when it determined that they did not contain any allegations of abuse or neglect. In this reporting period, the Monitors' review focused on referrals where an intake specialist at SWI determined that the report did not include an allegation of abuse, neglect, or exploitation and referred the matter to HHSC for further assessment for a potential minimum standards investigation, excluding those that were later administratively closed.[87] Specifically, the Monitors' review focused on reports that, upon referral to RCCR by SWI, were assigned a minimum standards intake Priority of One, Two, or Three by RCCR.[88]

The Monitors focused on this group of referrals after finding in the Second Report a high rate of concurrence between the Monitors and the State regarding the dispositions of a subset of referrals that were later administratively closed by RCCR. Specifically, in the Second Report, the Monitors' review included 205 referrals that were administratively closed by RCCR and the Monitors agreed with the screening decision for all but one of the 205.[89] For this reporting period, in order to assess SWI's decision-making, the Monitors randomly selected 534 of the 1,484 referrals where SWI referred allegations to RCCR, instead of RCCI, and RCCR subsequently assigned a minimum standards intake Priority One, Two, or Three between January 1, 2021 and June 30, 2021. The Monitors will continue to monitor all referrals in future reporting periods.

---

[86] The monitoring team historically gained access to the audio of hotline calls associated with reports received through the SWI hotline via remote access to the database used by DFPS to store the calls, Verint. During this reporting period, access to the Verint database was interrupted due to challenges with the State's data systems. As a result, the monitoring team was unable to access call audio for several months in 2021. These technology problems were resolved in November 2021, following the completion of validation work for this report.

[87] When a report to SWI is assigned for investigation to RCCI or CPI, the Monitors receive the data from DFPS in a separate report; therefore, these data are representative of the intake reports originally assigned to HHSC or were downgraded for some other permissible reason.

[88] The Monitors took several steps to enhance the quality of the sample and successfully identify referrals related to PMC children. First, when the Monitors learned that numerous licensed facilities contract only with the federal government and do not house children in DFPS conservatorship, the Monitors requested that HHSC identify the facilities; the Monitors themselves then undertook the process each month of identifying and removing from the data all referrals related to facilities that do not house children in DFPS conservatorship since those referrals would not include PMC children. Next, to increase the number of referrals reviewed associated with PMC children, the Monitors created a sample pool that was 50% greater than the sample required for the target population. To account for the fact that the Monitors have identified no greater than 50% of PMC children among the referrals, the number of referrals in the target population was reduced by half to calculate the sample size needed. The Monitors selected the sample using a 95% confidence level for the total referrals with an intake Priority of One, Two or Three assigned by RCCR from monthly data reports for the period of January 2021 through June 2021 provided by HHSC listing all referrals it received related to children in licensed placements.

[89] *See* Deborah Fowler & Kevin Ryan, Second Report 70, ECF No. 1079. Of the referrals the Monitors reviewed in the Second Report that were assigned to RCCR and were administratively closed, 165 were contained in a sample of referrals from January and February 2020 and 40 were referrals from October 2020. *Id.*

As the HHSC referral data does not provide child identifiers, the Monitors' methodology and analysis involved a preliminary two-step process to discern which referrals involve children in PMC status. The monitoring team first undertook the effort of reviewing each individual report to identify which child or children were the subject of the report. Next, the monitoring team searched the IMPACT records of each child or children identified in each report to determine whether a given report involved a child in PMC status by checking for the child's legal status on the date of the intake report.

Of the 534 referrals that the Monitors reviewed, 243 involved PMC children. The other 291 referrals involved children in TMC status or children who were not in DFPS custody and therefore, were not included in the Monitors' review.

d.   SWI Original Screening Validation Results for Referrals Assigned to HHSC

In the Monitors' sample of 534 SWI referrals from January 1, 2021 to June 30, 2021 sent directly to HHSC and assigned by RCCR with an intake Priority One, Two, or Three for a minimum standards investigation, the Monitors identified 243 reports that involved a child(ren) with PMC status. Of these 243 reports, SWI appropriately determined that 92% (223 intakes) did not contain an allegation of abuse or neglect of a PMC child and were properly assigned to RCCR. The Monitors found that SWI inappropriately referred 20 reports (8%) to RCCR and did not assign them for an abuse or neglect investigation. The Monitors concluded that these 20 reports contained allegations that warranted an investigation for abuse, neglect, or exploitation to ensure the safety and well-being of a child(ren) with PMC status. In the Second Report, out of the 190 referrals that were referred to HHSC and then assigned by RCCR with an intake Priority One, Two, or Three for a minimum standards investigation, the Monitors determined that 95% (181 referrals) did not contain an allegation of abuse or neglect of a PMC child and were properly assigned to RCCR. The Monitors found that 5% (10) had been inappropriately screened by SWI.[90]

5.   Remedial Order 3: Maltreatment in Care Investigations

a.   Overview of RCCI Maltreatment in Care Investigations

RCCI opened 740 new investigations involving at least one PMC child between January 1, 2021 and April 30, 2021.[91] The number of investigations opened per month ranged from 173 to

---

[90] The Second Report discussed the results in the aggregate by the months reviewed, reporting on both referrals that RCCR either assigned for investigation or administratively closed. Here, in order for comparison, the Monitors have identified and disaggregated the comparable group of referrals from among those reviewed in the Second Report. Deborah Fowler & Kevin Ryan, Second Report 70, ECF No. 1079.

[91] The Monitors analyzed data about maltreatment in care investigations pertaining to PMC children in licensed facilities that were opened from January 1, 2021 to April 30, 2021; and RCCI investigations pertaining to PMC children in licensed facilities that were closed between January 1, 2021 and April 30, 2021.

197, with the highest number of investigations opened in February 2021 and the lowest number of investigations opened in March 2021.[92]

RCCI closed 910 investigations of maltreatment of a PMC child in licensed placements between January 1, 2021 and April 30, 2021. The number of investigations closed per month ranged between 139 and 443, with the highest number of investigations closed in March 2021 when RCCI was working to reduce its backlog of investigations that were opened for longer than 30 days.[93]

**Figure 9: Closed RCCI Investigations, January 1, 2021 to April 30, 2021**



Of the 910 investigations closed during this period, 11% (102) of the investigations resulted in a disposition of Reason to Believe, thereby substantiating the allegations as abuse, neglect, or exploitation. The rate of substantiation represents a slight increase from the Second Report which found that 7% of RCCI investigations resulted in a disposition of Reason to Believe.[94] Additionally, RCCI Ruled Out 778 (85%) investigations, Administratively Closed 19 (2%) investigations, and closed 11 (1%) investigations as Unable to Determine. The rate of substantiation of investigations was highest in March 2021 when it reached 14%.

---

[92] Seventeen investigations opened in this period were Administratively Closed and therefore excluded from the pool of investigations assessed in Section III.B.

[93] For additional discussion of the backlog, *see* Deborah Fowler & Kevin Ryan, Second Report 11, ECF No. 1079.

[94] Deborah Fowler & Kevin Ryan, Second Report 71, ECF No. 1079.

**Figure 10: Reason to Believe Findings in Closed RCCI Investigations Involving PMC Children in Licensed Placements**



Foster parents and institutional staff accounted for 79% of the 1,875 alleged perpetrators.[95] Institutional staff accounted for 945 (50%) of the alleged perpetrators; foster parents accounted for 543 (29%) of the alleged perpetrators; household members accounted for 55 (3%); service providers accounted for 29 (2%); parents and guardians accounted for eight (<1%); and the perpetrator was unknown, not listed, or listed as other for 228 (12%) of the alleged perpetrators.

---

[95] The 740 RCCI investigations opened from January 2021 to April 2021 involved 1,875 allegations. In the data the Monitors received from DFPS, each allegation has a perpetrator category, but not a unique identifier for each perpetrator. As a result, it is possible that some perpetrators may be counted more than once in a single investigation or over time.

**Figure 11: Alleged Perpetrators in RCCI Involving PMC Children in Licensed Placements**



b.   Methodology

To validate DFPS's performance associated with Remedial Order 3 and the appropriateness of RCCI investigations of alleged maltreatment of PMC children, the monitoring team conducted reviews on a randomly selected sample of 275 (out of 910) RCCI investigations closed between January 1, 2021 and April 30, 2021.[96]

c.   Remedial Order 3 Investigation Validation Results

RCCI Ruled Out all the allegations in 264 (96%) of the 275 investigations reviewed by the Monitors. The Monitors found that of the 264 investigations where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 227 cases (86%) but conducted investigations with such substantial deficiencies in 37 cases (14%) that the Monitors were prevented from reaching a conclusion. To appropriately reach a final disposition in these investigations, additional

---

[96] To evaluate dispositional results for the investigations included in the sample, the Monitors designed an instrument for the case record review. To support consistency in scoring, both inter-rater reliability and secondary reviews were tested and used.  The sample was drawn from monthly reports provided to the Monitors by DFPS during the reporting period. During this time period, there were 910 investigations closed by RCCI, of which the Monitors reviewed a random sample of 275 investigations using a 95% confidence level for the sample drawn from all investigations closed from January through March 2021 and a 90% confidence level in its review of investigations closed in April 2021. In the sample, the Monitors excluded investigations where RCCI substantiated any or all allegations with a disposition of Reason to Believe.

information would have been required to determine whether children were abused or neglected. Many of these RCCI child abuse or neglect investigations were deficient because of gaps in investigative activity and substantial delays in completion that compromised access to relevant evidence and diminished the ability of witnesses to recall critical information in addition to a failure to thoroughly interview all relevant individuals about the allegations to ensure that investigation dispositions are based upon sufficient evidence.

In addition, of the 275 RCCI investigations analyzed by the monitoring team, six (2%) were administratively closed, and the Monitors disagreed with RCCI's closure of one of these investigations. Five (2%) of the investigations reviewed by the Monitors resulted in a finding of Unable to Determine, and the Monitors disagreed with RCCI's finding for one of these investigations, resulting in 39 investigations identified by the Monitors as having been inappropriately conducted or resolved between January 1, 2021 and April 30, 2021. The Monitors' summaries of these 39 investigations are located in the Appendices.

In sum, of the 264 investigations that RCCI assigned a disposition of Ruled Out to all allegations during the reporting period, the Monitors identified 37 investigations (14%) that had substantial deficiencies; and two additional investigations that were otherwise inappropriately resolved through a disposition of Unable to Determine or Administrative Closure. In the First and Second Reports, the Monitors determined 28.6% and 18% of sampled investigations to which RCCI assigned a disposition of Ruled Out to all allegations, respectively, had substantial deficiencies or were inappropriately resolved.[97] The present results for this period reflect a continued improvement in the State's implementation of this component of Remedial Order 3.

i.    Investigations with Substantial Time Delays and Gaps Contributing to Deficiency

Of the 39 investigations the Monitors determined RCCI inappropriately conducted or resolved, the majority were not completed in a timely manner, in violation of Remedial Order 10. Specifically, 31 (79%) were not completed within the 30-day timeframe;[98] of the remaining investigations, four were completed within the required 30-day timeframe (10%), one (3%) was administratively closed, and three (8%) were completed outside of the 30-day timeframe but were completed in compliance with approved extensions.[99] Untimely overdue investigations represent a greater share of deficiently resolved investigations than in the Second Report, suggesting investigative improvement during the period among investigations that are completed timely.[100]

The Monitors found that significant delays in RCCI's completion of investigations resulted in substantial deficiencies that undermined the dispositional finding(s). Consistent with the Second Report, the Monitors observed that while the investigations were generally initiated timely and

---

[97] Deborah Fowler & Kevin Ryan, Second Report 73, ECF No. 1079; Deborah Fowler & Kevin Ryan, First Report 25, ECF No. 869.
[98] None of these investigations were compliant with any approved extensions.
[99] The numbers add to 101% due to rounding.
[100] Deborah Fowler & Kevin Ryan, Second Report 76, ECF No. 1079.

investigators frequently interviewed alleged victims within the required timeframes of 24 or 72 hours, investigative activity often ceased after these initial tasks were completed—sometimes for many months.

For example, the Monitors found that in an investigation that took RCCI over one year to complete, significant gaps in investigative activity impaired the ability of the investigator to gather sufficient evidence to Rule Out the allegation of Neglectful Supervision. In this investigation, a child's therapist reported to SWI that a child (Child A, age 10) disclosed that another child (Child B, age 16) tried to touch him while they were on an outing under the supervision of staff members of Have Haven, a Residential Treatment Center ("RTC"). In a second intake, reported three months after the first intake, a staff member at Child A's new RTC reported that Child A saw a photograph and identified a child within that photograph as having "molested" him at his previous placement. The investigative record showed that the investigator did not attempt to interview one of the alleged perpetrators until over a year after the intake was reported to SWI. Likely due to this substantial delay, this individual did not respond to requests to be interviewed. In the absence of this critical interview, the investigator was unable to conduct a thorough assessment of supervision at the time of the alleged incident. The investigator also failed to adequately identify and question the children who attended the outing about supervision on that day. In addition, the investigator did not sufficiently question another staff member present during the outing about supervision that afternoon. The investigator's failure to conduct thorough and timely interviews with relevant individuals was especially problematic because Child A was unwilling to discuss the alleged incident during his interview. Child A's therapist reported that Child A had previously stated that if an investigator interviewed him about his disclosure, he would deny the allegation. Due to these numerous deficiencies, the Monitors found that a disposition of Ruled Out cannot be rendered on this investigation, which took 13 months for RCCI to complete.

In addition to significant gaps contributing to missed interviews with key individuals, the Monitors also found that long delays impair the ability of investigators to gather pertinent information from interviewees about the allegations to render an accurate disposition. In an investigation, which took RCCI over five months to complete, the Monitors found that the record failed to establish whether a child (age 14) was subject to Physical Abuse at Houston Serenity Place, Inc., an RTC that subsequently relinquished its license and would otherwise have been subject to Heightened Monitoring due to its poor child safety record. Due to an approximately five-month gap in investigative activity, the investigator did not conduct timely interviews with the alleged preparators. When the investigator interviewed the alleged perpetrators, they were unable to recall the alleged incident, or the children reportedly involved in the incident. In addition, the investigator did not interview two children who were allegedly involved in the incident; the children were no longer placed at the RTC when the investigator attempted their interviews five months after the alleged incident. Also, while the investigator attempted to identify the additional staff members included in the incident report through interviews with other staff members and children, the investigator did not attempt to review facility records from the day of the incident to determine whether these individuals were present on the day of the incident and should be

interviewed. As a result of these deficiencies, the Monitors found that a disposition of Ruled Out cannot be rendered on this investigation.

ii.   Deficient Investigations for Neglectful Supervision in the Context of Self-Harm by Children

Of the 39 investigations that the Monitors identified as having incorrect dispositions or deficiencies, eight (21%) included allegations of Neglectful Supervision involving a child who had attempted or completed self-harm. In these investigations, the investigative record was often deficient in its inquiry and documentation about key issues related to supervision of the child. As discussed in previous reports to the Court, the Monitors have repeatedly encountered lapses in supervision and treatment for children with serious emotional disturbances in the Texas child welfare system that expose the children to a risk of serious harm. The Monitors raised this concern in their First Report in connection with the death of C.G. and have done so in several subsequent reports to the Court, including the Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center; the Second Report; and in The Court Monitors' Update to the Court Regarding Children Without a Placement Housed in CPS Offices, Hotels, and Other Unlicensed Settings.[101]

In all eight of the instant investigations involving self-harm that were identified by the Monitors for deficiencies, the alleged child victims had been placed at inpatient psychiatric facilities during the year prior to the self-harming incident that was the subject of the investigation under review. In at least three instances, the self-harming incident occurred within weeks of the child's inpatient psychiatric placement. The investigations are consistent with common themes the Monitors have raised around child safety, the children's mental health needs and potential gaps in the capacity of certain facilities to appropriately address the needs of these children and ensure their safety.

The Monitors observed that in investigations involving children who self-harmed, RCCI did not consistently scrutinize whether facilities adhered to children's required level of supervision to prevent or mitigate the self-harming behavior. In some instances, RCCI's failure to adequately explore and evaluate supervision at the time of the self-harming incidents undermined RCCI's determination to Rule Out the allegation of Neglectful Supervision.

For example, in one investigation, a hospital social worker reported that a 15-year-old child allegedly ate a light bulb while at Krause Children's Residential, an RTC which later voluntarily closed in lieu of a license denial by HHSC due to a poor child safety record. The day before this incident, the child returned to the RTC after hospitalization for ingesting a screw. The reporter

---

[101] Deborah Fowler & Kevin Ryan, The Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center 36-58, (February 2, 2021), ECF No. 1027; Deborah Fowler & Kevin Ryan, First Report 354-356, ECF No. 869; Deborah Fowler & Kevin Ryan, Second Report 75-77, ECF No. 1079; Deborah Fowler & Kevin Ryan, The Court Monitors' Update to the Court Regarding Children Without a Placement Housed in CPS Offices, Hotels, and Other Unlicensed Settings 99-100, (September 13, 2021), ECF No. 1132.

stated that over the several weeks prior, children from the RTC had been admitted to the hospital for ingesting various objects, such as nails, screws, and plastic.

Due to significant investigative deficiencies, the record contained insufficient information to Rule Out the allegation of Neglectful Supervision. The investigation took over five months to be completed. First, the investigator learned during the investigation that in addition to the child who was the subject of the report, two other children ingested glass during the incident; yet the investigator did not add the two other children involved in the incident to the investigative record as alleged victims. Second, the investigator did not determine the required supervision level for the three children. Due to recent discharges from a hospital, the alleged child victim stated that all three children were "on precaution" and required line of sight supervision at the time of incident. However, the investigator did not gather nor review the children's service plans to determine their required supervision levels.

The question about whether the children required line-of-sight supervision at the time of the incident was highly relevant to the question about appropriate supervision. Had the investigator reviewed this documentation, the investigative record may have included sufficient evidence to substantiate Neglectful Supervision: the children ingested glass while in a back room of the facility, out of sight of staff members. Third, the investigator did not adequately question the staff members who were present at the time of the incident to understand what actions, if any, they took to address the children's actions while they climbed on chairs, removed light bulbs from the ceiling, and finally, ingested the glass from the light bulbs. Fourth, the investigator did not interview a therapist and case manager who reportedly were present during the incident. These individuals may have provided pertinent information related to staff members' supervision of the children. Finally, the Monitors attempted to view the video footage of the incident obtained by the investigator. Due to one of the children placing yogurt on the camera lens prior to the incident, the Monitors were unable to view the full incident clearly. However, in the footage that was visible, the Monitors were able to observe that a staff member appeared to take no action while she stood by and watched a child stand on a chair and place yogurt on the camera lens. The video also showed that staff members failed to clean the yogurt off the camera lens for approximately one hour. During interviews with staff members, the investigator did not ask staff members about these issues. Due to these numerous deficiencies, the Monitors found the allegations of Neglectful Supervision could not be Ruled Out.

Similarly, in the following investigation, RCCI did not gather critical information to evaluate whether staff members at Brave Hearts Children's Center, an RTC whose license was subsequently revoked by HHSC due to a poor child safety record, adequately supervised a child who allegedly self-harmed to Rule Out the allegation of Neglectful Supervision. The RTC closed on February 6, 2021. When the investigator attempted to interview the 14-year-old about her alleged self-harming, the child reported that she was unwilling to discuss the alleged incident, concerned it might have triggered her, though she did report that she had no concerns about supervision at the time of the incident. Following this initial interview with the child, the investigator failed to timely and thoroughly interview relevant staff members and children about

the incident that prompted the report. During interviews with staff members and children, the investigator largely focused the questioning on another allegation related to two other children. The investigator also did not request or review any medical or incident reports related to the child's alleged self-harming incident. As a result of these numerous deficiencies, the investigator failed to determine the following: whether the child self-harmed and what actions she took that led to the allegation; whether the child was injured; which staff member was responsible for supervising the child at the time of the alleged incident; and whether this individual appropriately supervised the child at the time of the alleged incident. In the absence of the investigator collecting and assessing this information, there was not sufficient information to Rule Out the allegation of Neglectful Supervision.

In another example from Brave Hearts Children Center, a staff member reported that the prior evening, a 15-year-old child reportedly "snapped." She broke her bedroom window, cut her arm with the broken glass and attempted to eat some of the broken glass. Prior to this self-harming incident, the child reportedly had an "emotional episode" and a clinical director was able to calm the child. Following the self-harming incident, the child was admitted to a hospital and medical personnel reported that the child's wounds were superficial. At the hospital, the child told a doctor that she was not serious about eating glass and that she only wanted attention. Prior to admission to this RTC, the child was in a psychiatric hospital. The Monitors found that due to a deficient investigation, it was unclear whether staff members at the RTC adequately supervised the child at the time of the self-harming incident. First, the child's service plan documented that the child was not subject to heightened supervision at the time of the incident; however, the child's CVS caseworker stated in her interview that the child's contract specified that the facility must provide the child with one-to-one supervision. The investigator did not probe whether the child was required to be on one-to-one supervision at the time of the incident. This deficiency is particularly problematic due to the child's extensive history of self-harming, including a recent hospitalization that included documentation that the child continued to have "many cutting incidents" while hospitalized. Second, the RTC's incident report documented that a clinical director was present at the time the child broke her window and cut herself; however, the investigator did not identify nor interview the clinical director to determine more information about the child's supervision during the incident. Contrary to the information documented in the incident report, the child alleged that she was alone when she cut herself. In the absence of clarifying information, the investigator failed to establish the child's prescribed supervision level and whether staff adhered to the prescribed supervision level at the time the child broke a window and cut herself.

6.  Summary of Performance for Receiving, Screening and Investigating Allegations of Maltreatment

Receiving Allegations

- Between January 1, 2021 to June 30, 2021 SWI received 355,816 calls. During the period analyzed, 20% (72,121) of calls were abandoned, an increase from 13% observed in the previous report.[102]

- On average, callers waited for 4.6 minutes before their calls were handled or abandoned, an increase from the data reported in the Second Report.[103] Fifty percent (178,481) of callers waited on the queue for under one minute.

Screening Allegations

- The Monitors reviewed 243 referrals to SWI from January 1, 2021 to June 30, 2021, which SWI sent directly to HHSC and that RCCR then assigned for a minimum standards investigation with an intake Priority of One, Two or Three, involving a PMC child. Of these 243 reports, the Monitors concurred with SWI's determination in 92% (223) of reports.

Investigating Allegations

- Of the 910 RCCI investigations DFPS completed involving PMC children between January 1, 2021 and April 30, 2021, 102 investigations resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 808 investigations where RCCI issued a disposition of Ruled Out, Unable to Determine or which resulted in Administrative Closure, the Monitors evaluated 275 investigations.

- The Monitors found that of the 264 investigations reviewed where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 227 cases (86%) and conducted investigations with such substantial deficiencies in 37 cases (14%) that the Monitors were prevented from reaching a conclusion.

- In addition to the 37 cases (14%) that RCCI Ruled Out that had substantial deficiencies, the Monitors also identified two investigations RCCI resolved as Unable to Determine or Administratively Closed that had substantial deficiencies or were inappropriately resolved by RCCI.

---

[102] The Monitors found that 13% of calls were abandoned from February 1, 2020 to November 30, 2020. *See* Deborah Fowler & Kevin Ryan, Second Report 77, ECF No. 1079.

[103] In the Second Report, the data demonstrated an average queue time of 2.3 minutes for calls placed from February 1, 2020 to November 30, 2020. *See* Deborah Fowler & Kevin Ryan, Second Report 77, ECF No. 1079.

B.  Timeliness of RCCI Investigations: Remedial Orders 5 through 11; 16 and 18 Performance Validation (DFPS)

Remedial Order 5: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

Remedial Order 6: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

Remedial Order 7: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

Remedial Order 8: *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

Remedial Order 9: *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

Remedial Order 10: *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Remedial Order 11: *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation*

*has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Remedial Order 16: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

Remedial Order 18: *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

1. Data and Information Request and Production

To validate DFPS's performance associated with Remedial Orders 5 through 11, 16 and 18, the Monitors requested from the State key data and information for all investigations conducted by RCCI regarding any child in the PMC General Class.[104]

In the first reporting period, the State notified the Monitors that it could not provide some of the requested data relevant to its performance for these orders.[105] Subsequently, the State implemented updates to its data systems, particularly IMPACT, and began to submit data reports with the relevant information to measure performance related to Orders 5 through 11, 16 and 18.

2. Remedial Orders 5 through 11, 16, and 18 Performance Validation (DFPS)

a. Methodology

For validation of orders measuring the timeliness of various aspects of RCCI investigations, the monitoring team reviewed the data provided by DFPS to validate performance for all 1,009 investigations opened by RCCI from January to June 2021.[106],[107] The monitoring team reviewed the 1,009 RCCI investigations for compliance with the Court's orders relating to timeliness using the methodologies described below, by Order:

---

[104] Deborah Fowler & Kevin Ryan, First Court Monitors' Report 2020, ECF 869, at 102-103.

[105] *Id*. at 104-105.

[106] To identify the investigations opened by DFPS and the corresponding data points, the Monitors used as source files the monthly data on open and closed investigations that DFPS submitted to the Monitors for the months corresponding with the investigations under review. In the prior reporting period, the Monitors performed case record reviews on every investigation reported in the data and were able to substantially validate the accuracy of the data reports and thus, the results in this report reflect the data as reported to the Monitors by DFPS. In this report, the monitoring team independently performed spot checks of randomly selected investigations opened during this time period to validate the data as reported by DFPS.

[107] The DFPS data included 21 investigations that were administratively closed and were, therefore, excluded from the analysis.

- Remedial Order 5: To measure initiation in Priority One Investigations within 24 hours, the monitoring team calculated performance using the intake date and time in IMPACT and the date and time of the first face-to-face contact with each alleged victim in IMPACT.[108]

- Remedial Order 6: To measure initiation in Priority Two Investigations within 72 hours, the monitoring team calculated performance using the intake date and time in IMPACT and the date and time of the first face-to-face contact with each alleged victim in IMPACT.

- Remedial Order 7: To measure face-to-face contact with all alleged victims in Priority One investigations within 24 hours, the monitoring team calculated performance using the intake date and time in IMPACT and the date and time of the first face-to-face contact with each alleged victim in IMPACT.[109]

- Remedial Order 8: To measure face-to-face contact with all alleged victims in Priority Two investigations within 72 hours, the monitoring team calculated performance using the intake date and time in IMPACT and the date and time of the first face-to-face contact with each alleged victim in IMPACT.

- Remedial Order 9: To measure reporting of all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, the Monitors assessed the quality and availability of data concerning the date and time of the first face-to-face contact with each alleged victim in IMPACT.

- Remedial Order 10: To measure completion of Priority One and Priority Two investigations within 30 days, the monitoring team calculated compliance using the intake date and time in IMPACT and the date submitted for approval in IMPACT.[110] In addition, the Monitors reviewed the total number of investigations reported by DFPS as open as of January 1, 2021, and the total number of those open longer than 30 days as of June 30, 2021. The Monitors assessed whether the investigations reported by DFPS as open longer than 30 days included a current extension approved for good cause documented in the investigative record as of June 30, 2021. If the investigation was extended more than once, the Monitors assessed whether all extensions for good cause were documented in the investigative record.

---

[108] Consistent with current DFPS policy, investigations were deemed timely for initiation if investigators met with each alleged victim associated with an investigation individually, denoted by a unique timestamp of first face-to-face contact in IMPACT. The DFPS policy on initiation which currently requires face-to-face contact with each alleged victim shifted during the time period in the Second Report but has remained consistent throughout this reporting period. *See* Deborah Fowler & Kevin Ryan, Second Report 82, ECF No. 1079.

[109] Investigations were only deemed timely if investigators met with each alleged victim associated with an investigation individually, denoted by a unique timestamp of first face-to-face contact in IMPACT.

[110] DFPS states the correct field to calculate completion of investigations is the final date submitted for approval in IMPACT. Email from Heather Bugg, Dir. of Project Management, DFPS, to Kevin Ryan and Deborah Fowler (Jan 4, 2021) (on file with the Monitors).

- Remedial Order 11: To measure documentation of approved extensions to investigations, the monitoring team reviewed the extensions for RCCI Investigations.

- Remedial Order 16: The Monitors measured investigation completion using the date documentation was submitted to the supervisor. Therefore, investigations are completed only when the documentation has been submitted to the supervisor for the final time.[111]

- Remedial Order 18: To measure timeliness of mailing notification letters to the referents and providers in Priority One and Two investigations, the Monitors calculated compliance using the date of supervisor approval, the date of notification to the reporter from IMPACT and the date of notification to the provider from IMPACT. Regarding the letters to providers, DFPS and HHSC agreed that the Monitors will calculate performance using the date of notification by letter from IMPACT provided by DFPS.[112] To be considered timely for this Order, the State must have notified both the referent and the provider within five days of closing the investigation. If either the referent or the provider was notified more than five days after the investigation was closed or was not notified at all, the notification was counted as untimely. The Monitors used only the investigations that opened and closed during the time period since the required action is only triggered by case closure.

b.  Remedial Order 5: Initiation within 24 Hours in Priority One Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within twenty-four hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

The Monitors found that of 1,009 investigations opened by RCCI between January 1, 2021 and June 30, 2021, 126 (13%) were assigned Priority One, requiring that DFPS initiate the investigation within 24 hours of intake. DFPS initiated 81% (102) of Priority One investigations within 24 hours of intake through face-to-face contact with all alleged victims. Nineteen percent (24) of investigations were either not initiated timely (17) or did not have sufficient data to assess timeliness (7). DFPS's rate of initiating Priority One investigations through face-to-face contact with each alleged victim within 24 hours in the Monitors' previous report was 79%.[113]

---

[111] Email from Heather Bugg to Kevin Ryan and Deborah Fowler (Jan 4, 2021) (on file with the Monitors).

[112] Email from Kevin Ryan to Elizabeth Fore Brown, Division Chief, Admin. Law Div., Office of the Attorney Gen. of Tex., Corliss Lawson, Associate Commissioner for Foster Care Litigation Compliance, DFPS, Raymond Winter, Ass't Attorney General, Office of the Attorney Gen. of Tex., Reynolds Brissenden, Ass't Attorney General, Office of the Attorney Gen. of Tex., Katy Gallagher, Counsel, HHSC, David Bickham, Counsel, HHSC, Tara Olah, Director of Implementation and Strategy, DFPS and Jaime Masters, Commissioner, DFPS (May 24, 2021) (on file with the Monitors); Email from Corliss Lawson to Kevin Ryan, et al. (May 24, 2021) (on file with the Monitors); Email from Katy Gallagher to Kevin Ryan, et al. (May 24, 2021) (on file with the Monitors).

[113] *See* Deborah Fowler & Kevin Ryan, Second Report 84, ECF No. 1079.

**Figure 12: Initiation of Investigations within 24 Hours in Priority One Investigations per existing policy**



c.  Remedial Order 6:  Initiation within 72 Hours in Priority Two Investigations

> *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within seventy-two hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

There were 883 Priority Two investigations requiring DFPS initiation within 72 hours of intake. DFPS initiated 88% (774) of Priority Two investigations within 72 hours of intake through face-to-face contact with all alleged victims. Twelve percent (109) of investigations either did not include individual face-to-face contact with each alleged victim within 72 hours (89) or did not have sufficient data to assess timeliness (20).

No investigations had a documented exception to initial face-to-face contact. DFPS's rate of initiating Priority Two investigations through face-to-face contact with each alleged victim within 72 hours in the Monitors' previous report was 81%.[114]

---

[114] *See* Deborah Fowler & Kevin Ryan, Second Report 86, ECF No. 1079.

**Figure 13: Initiations of Investigations within 72 Hours in Priority Two Investigations per existing policy**



d.  Remedial Order 7:  Timeliness of initial face-to-face contact with the alleged victims in Priority One Investigations

> *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than twenty-four hours after intake.*

Of the 126 Priority One investigations opened by RCCI between January 1, 2021 and June 30, 2021, the Monitors found that 81% (102) of the investigations included initial face-to-face contact with each alleged child victim individually within 24 hours. No investigations had documentation of approved exceptions to face-to-face contact. DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority One investigations within 24 hours in the Monitors' previous report was 79%.[115]

The remaining 24 investigations (19%) either did not include face-to-face contact with each alleged victim individually within 24 hours of intake (17) or did not have sufficient data to assess timeliness (7).

---

[115] *See* Deborah Fowler & Kevin Ryan, Second Report 87, ECF No. 1079.

**Figure 14: Face-to-Face Contact within 24 Hours with All Alleged Child Victims in Priority One Investigations**



e.   Remedial Order 8:  Initial Face-to-Face Contact with All Alleged Victims in Priority Two Investigations within 72 Hours

> *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than seventy-two hours after intake.*

Of the 883 investigations assigned Priority Two, the Monitors' review found that 88% (774) of investigations included initial face-to-face contact with each alleged child victim within 72 hours of intake. No investigations had documented exceptions to face-to-face contact. DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority Two investigations within 72 hours in the Monitors' previous report was 79%.[116]

The remaining 109 investigations (12%) either did not include individual face-to-face contact with each alleged victim within 72 hours (89) or did not have sufficient data to assess timeliness (20).

---

[116] *See* Deborah Fowler & Kevin Ryan, Second Report 88, ECF No. 1079.

**Figure 15: Face-to-Face Contact within 72 Hours with All Alleged Child Victims in Priority Two Investigations**



f.  Remedial Order 9:

> *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

Overall, in 95% (954) of all 1,009 investigations (both single and multi-alleged victim investigations) DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with each alleged child victim within an investigation and the date and time that contact occurred for each child. DFPS's rate of tracking and reporting whether face-to-face contact was made with each alleged child victim within an investigation and the date and time the contact occurred in the Monitors' previous report was 90%.[117]

In 95% (677) of the 710 investigations with one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with the alleged child victim within an investigation and the date and time the contact occurred. In investigations with one victim, DFPS's rate of tracking and reporting whether face-to-face contact was made with the alleged child victim within an investigation and the date and time the contact occurred in the Monitors' previous report was 97%.[118]

---

[117] *See* Deborah Fowler & Kevin Ryan, Second Report 89, ECF No. 1079.

[118] *See* Deborah Fowler & Kevin Ryan, Second Report 89, ECF No. 1079.

In 93% (277) of 299 investigations with more than one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with each of the alleged child victims within an investigation and the date and time the contacts occurred. In investigations with more than one victim, DFPS's rate of tracking and reporting whether face-to-face contact was made with each of the alleged child victims within an investigation and the date and time the contact occurred in the Monitors' previous report was 75%.[119]

g.   Remedial Order 10:  Completion of Priority One and Priority Two Investigations within 30 Days

> *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Of the 1,009 Priority One and Priority Two investigations opened between January 1, 2021 and June 30, 2021, the data documented that 28% (280) were not completed in a timely manner; of these, 23% (237) were not completed within 30 days of intake and 4% (43) had approved extensions and were not completed within the extension timeframe. Of the remaining investigations, 63% (634) were documented as completed within 30 days of intake and 9% (95) had approved extensions and were completed within the extension timeframe.[120] DFPS's rate of completing Priority One and Two investigations within 30 days of intake in the Monitors' previous report was 42%.[121]

Of the 138 investigations that were documented to have approved extensions, as noted above, 95 of those investigations were completed within the approved timeframe allotted by the extension and 43 were not completed within the allotted extension timeframe.[122]

---

[119] *See* Deborah Fowler & Kevin Ryan, Second Report 89, ECF No. 1079.

[120] There were 27 investigations that opened during this time period and did not have a closure date nor active extension reported by DFPS in the data as of August 31, 2021 delivered to the Monitors on October 1, 2021; the Monitors counted them as untimely. Due to DFPS's methodology of reporting data about extensions to the Monitors, it is possible that open overdue investigations have active extensions that DFPS did not yet report to the Monitors in the data. DFPS reports extensions to the Monitors in its monthly data for investigations that opened or closed in that month. If an extension is granted in a month other than the one in which an investigation opened or closed, the data reports capture this extension upon case closure but not in the previous interim months.

[121] *See* Deborah Fowler & Kevin Ryan, Second Report 90, ECF No. 1079.

[122] As noted above, there were 27 investigations that opened during this time period and did not have a closure date or active extension reported by DFPS in the data as of August 31, 2021 received by the Monitors on October 1, 2021.

**Figure 16: Completion of Priority One and Two Investigations within 30 Days**



The percentage of investigations completed within 30 days increased from below 60% in January 2021 to above 80% in February 2021 and March 2021; however, the rate dropped from April 2021 (72%) to June 2021 and ended at 66% for the period.

**Figure 17: Completion of Priority One and Two Investigations within 30 Days over Time**

DFPS's progress under Remedial Order 10 as of September 20, 2021 was as follows:

Of the 166 Priority One and Priority Two RCCI investigations that remained open as of September 20, 2021, the State's data documented that 19% (31) were open for more than 30 days with an extension, and 22% (36) were open more than 30 days without a reported extension. The oldest investigation that was overdue as of September 20, 2021 without an extension reported was opened on June 13, 2021 and had remained open for 99 days.

h.   Remedial Order 11: DFPS Track and Report Requirement

> *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

The Monitors reviewed data and information provided by DFPS in association with Remedial Order 11, which requires DFPS to track and report all investigations that are not completed on time. Approved extensions to the standard closure timeframe and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

Of the 374 investigations that were opened by RCCI between January 1, 2021 and June 30, 2021 and were not completed within 30 days, DFPS data documented extensions approved for 137 investigations with the dates the extensions were approved, the reasons for the extensions, and the number of additional days approved by each of the extensions.[123,124] (There were 138 investigations with extensions; however, one of those investigations was still completed within 30 days).

Of these 138 investigations that contained at least one extension, the extensions were approved for either seven, 14, 21, or 30 days each. Of those with extensions, 89% (123) included one extension, 10% (14) included two, and 1% (1) included three extensions. All extensions included documented approval dates; five were missing documented reasons for the extension.

---

[123] These data matched to the investigations' corresponding intake start date and original due date and therefore, the Monitors were able to determine the due dates associated with the extensions to assess timeliness of completion within the extension period.

[124] DFPS reports extensions to the Monitors in the monthly data for investigations that opened or closed in that month. If an extension is granted in a month other than the one in which an investigation opened, DFPS reports the extension(s) in the data upon closure of the investigation. Due to DFPS's methodology of reporting data about extensions to the Monitors, it is possible that investigations have active extensions that DFPS had not reported to the Monitors in the data as of August 31, 2021, received by the Monitors on October 1, 2021.

**Figure 18: Number of Extensions in Priority One and Two Investigations**



Investigations Opened January 1, 2021 - June 30, 2021
*n=138 investigations with extensions*

■ One  ■ Two  ■ Three

The total number of extension days approved for an investigation ranged from seven to 60 days. Twenty-six percent (36) of investigations with extensions were extended for 7-14 days; 64% (89) were extended for 15-30 days; 3% (4) were extended 31-50 days; and 7% (9) were extended for more than 50 days.

i.   Remedial Order 16: Timeliness of Completion and Submission of Documentation in Priority One and Priority Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

DFPS advised the Monitors that the agency uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered completed when the documentation is finally submitted to the supervisor in compliance with this Order.[125]

---

[125] DFPS advised the Monitors, "When an investigator submits for closure an investigation in IMPACT, the supervisor may determine that the case needs additional work or documentation to ensure a quality investigation has occurred.  If so, the supervisor will return the investigation and once the additional tasks have been completed, the caseworker will submit it again. Because the IMPACT date is captured in an automated way and the CLASS date is manually entered, the IMPACT date will provide a more accurate date and may ease verification and as the agency moves forward in its efforts to improve the quality of its investigations, it believes it's important to capture the final submission rather than initial submission date. Finally, the final date submitted for approval in IMPACT will also be used as the one date to determine compliance with Remedial Order 16 to 'submit and complete documentation in Priority One and Priority Two investigations on the same day the investigation is completed.'  The date complete in CLASS will no longer be used to calculate compliance with any remedial order." Email from Heather Bugg to Kevin Ryan and Deborah Fowler (January 4, 2021) (on file with the Monitors).

61

j.  Remedial Order 18: Timeliness of Notification Letters to Referent and Provider

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

For the referent letter, of the 982 (out of 1,009) Priority One and Priority Two investigations that were documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 74% (731) of investigations. Of the remaining cases, in 4% (44) of investigations, notification letters to the referents were not mailed timely; 9% (84) were mailed to the referent prior to supervisor approval; 2% (17) of investigations had an anonymous reporter; and 11% (106) were unknown due to documentation deficiencies.[126] The State's rate of mailing notification letters to referents within five days of investigation closure in Priority One and Two investigations in the Monitors' previous report was 40%.[127]

**Figure 19: Notification Letter Sent to Referent within Five Days of Investigation Closure in Closed Priority One and Two Investigations**



Investigations Opened January 1, 2021 - June 30, 2021
*n= 982 closed investigations*

- Timely
- Not timely
- Mailed prior to approval
- Reporter anonymous
- Data missing

For the provider letter, of the 982 (out of 1,009) Priority One and Priority Two investigations that were documented as closed at the time of the Monitors' review, the notification letter to the provider was mailed within five days of closure in 51% (500) of investigations. Of the remaining cases, in 2% (15) of investigations, notification letters to the provider were not mailed timely; 1% (7) were mailed to the provider prior to supervisor approval; and 47% (460) were unknown due to

---

[126] The documentation deficiencies included blank cells.
[127] *See* Deborah Fowler & Kevin Ryan, Second Report 93, ECF No. 1079.

documentation deficiencies.[128, 129] The State's rate of mailing notification letters to providers within five days of investigation closure in Priority One and Two investigations in the Monitors' previous report was 59%.[130]

**Figure 20: Notification Letter Sent to Provider within Five Days of Investigation Closure in Closed Priority One and Two Investigations**



Of the 982 (out of 1,009) investigations that were documented as closed at the time of the Monitors' review, 41% (403) included evidence that notification to the referent and provider occurred within five days of closure of the investigation as required by Remedial Order 18. DFPS's rate of mailing notification letters to the referents and providers within five days of investigation closure in the Monitors' previous report was 23%.

3. Summary

Remedial Order 5:

- 81% (102) of RCCI investigations opened from January 1, 2021 to June 30, 2021 were initiated within 24 hours of intake; and
- 19% (24) of RCCI investigations opened from January 1, 2021 to June 30, 2021 were not initiated timely or did not have sufficient data to assess.

---

[128] Of the 460 investigations with documentation deficiencies, 312 (68%) were blank and 148 (32%) noted "not yet due." All of the 148 investigations noted as "not yet due" closed during the last five days of the month.

[129] The percentages of investigations opened between January 1 and June 30, 2021 which were found to have had notifications to provider completed timely (51%), not timely (2%), were mailed prior to approval (1%), or had missing data (47%) as of August 31, 2021 does not sum to 100% due to rounding.

[130] *See* Deborah Fowler & Kevin Ryan, Second Report 94, ECF No. 1079.

Remedial Order 6:
- 88% (774) of RCCI investigations opened from January 1, 2021 to June 30, 2021 were initiated within 72 hours of intake;
- 12% (109) of RCCI investigations opened from January 1, 2021 to June 30, 2021 were not initiated timely or did not have sufficient data to assess; and
- No RCCI investigations opened from January 1, 2021 to June 30, 2021 had an approved exception to face-to-face contact.

Remedial Order 7:
- 81% (102) of RCCI investigations opened from January 1, 2021 to June 30, 2021 included initial face-to-face contact with all alleged victims within 24 hours of intake;
- 19% (24) of RCCI investigations opened from January 1, 2021 to June 30, 2021 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess; and
- No RCCI investigations opened from January 1, 2021 to June 30, 2021 had an approved exception to face-to-face contact.

Remedial Order 8:
- 88% (774) of RCCI investigations opened from January 1, 2021 to June 30, 2021 included initial face-to-face contact with all alleged victims within 72 hours of intake;
- 12% (109) of RCCI investigations opened from January 1, 2021 to June 30, 2021 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess; and
- No RCCI investigations opened from January 1, 2021 to June 30, 2021 had an approved exception to face-to-face contact.

Remedial Order 9:
- In 95% (677) of investigations with one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with the alleged child victim within an investigation and the date and time the contact occurred; and
- In 93% (277) of investigations with more than one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with each of the alleged child victims within an investigation and the date and time the contact occurred.

Remedial Order 10:
- 63% (634) of investigations were documented as completed within 30 days of intake;
- 28% (280) of investigations were not completed timely;
- 9% (95) of investigations had an approved extension(s) and were completed within the extension timeframe.
- For the 166 RCCI investigations open as of September 20, 2021, 19% (31) of investigations still open were open for more than 30 days and had an extension and 22% (36) of investigations still open were open for more than 30 days and did not have an extension.

Remedial Order 11:
- 89% (123) of investigations with extension(s) had one extension;
- 10% (14) of investigations with extension(s) had two extensions;
- 1% (1) of investigations with extension(s) had three extensions.

Remedial Order 16:
- Investigation completion is measured by the date the investigation is submitted for approval. Therefore, all investigations are completed on the same day as submission.

Remedial Order 18 (Notification to Referent):
- 74% (731 of 982 closed investigations) of investigations included data that notification letters to referent(s) were mailed within five days of investigation closure;
- 4% (44) of investigations did not have timely notification to referent(s);
- 9% (84) of investigations were mailed prior to supervisor approval;
- 11% (106) of investigations were unknown due to documentation deficiencies; and
- 2% (17) of investigations had an anonymous reporter

Remedial Order 18 (Notification to Provider):
- 51% (500 of 982 closed investigations) of investigations included data that notification letters to provider(s) were mailed within five days of investigation closure;
- 2% (15) of investigations did not have timely notification to provider(s);
- 1% (7) of investigations included letters that were mailed prior to supervisor approval; and
- 47% (460) of investigations were categorized as unknown due to documentation deficiencies.

C. Remedial Order A6: Reporting Allegations

Remedial Order A6: *Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect.  This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of this information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

1.  Background

a.  Data and Information Production

As discussed in the First Report, the State was unable to provide any responsive data to the Monitors' requests for data and information related to Remedial Order A6, with the exception of a list of complaints made by PMC children to the FCO, which were subsequently forwarded to SWI.[131]

b.  Validation Findings from the Monitors' Previous Reports

During the pandemic, the Monitors curtailed on-site monitoring visits; consequently, the Second Report did not include performance validation related to Remedial Order A6. The performance validation analysis included in the First Report was based on on-site visit observations and child and staff interviews conducted during visits to 23 licensed GROs (Cottage Homes, GROs, and RTCs) in late 2019 and early 2020. Interviews with youth indicated that most (72%) did not know who or what the FCO was or how to contact that office to make a complaint. While most of the youth interviewed (60%) were aware of the SWI hotline, most indicated limited access to a telephone, particularly without a staff person monitoring the call. The monitoring team also noted that in many of the facilities visited, FCO posters were placed in locations or positions that made it difficult for children and youth to see or read them.

2.  Performance Validation

a.  Methodology

The monitoring team conducted site visits to 25 unlicensed settings where children without placement were housed ("CWOP Settings") between June 22, 2021 and July 22, 2021. During these visits, the monitoring team interviewed 56 children and 58 DFPS staff members. Interview tools included questions related to children's knowledge of the FCO, the SWI hotline, and their access to a telephone. Caregiver interview tools included questions related to the children's access to a telephone and ability to call the SWI hotline or FCO without restrictions.

The monitoring team also reviewed the data provided by the State regarding complaints made by PMC children to the FCO and subsequently reported to SWI for the period of January 2021 through June 2021.

---

[131] Calls or complaints made to the FCO that include information that gives the FCO reason to suspect abuse or neglect are transferred to SWI, with the FCO available to assist the youth in making the report.  *See* 26 TEX. ADMIN. CODE §87.313(e).

b.   Remedial Order Two: Performance Validation Results

    i.   Complaints made to FCO forwarded to SWI

For the months of January 2021 through June 2021, a total of 20 complaints made by PMC children to the FCO were subsequently forwarded by FCO staff members to SWI.

**Table 8: Number of Complaints Made to Foster Care Ombudsman, January to June 2021**

| Month | Number of Complaints |
|-------|----------------------|
| January | 5 |
| February | 1 |
| March | 3 |
| April | 2 |
| May | 8 |
| June | 1 |
| **Total** | **20** |

The 20 complaints involved 14 operations. Three operations had more than one complaint about it during the period:  New Life Children's Treatment had four complaints, and Settlement Home and Krause Children's Residential each had two complaints. One complaint was made from and about a CWOP Setting in May 2021. Five of the 14 operations (36%) with complaints are under Heightened Monitoring.

More than half of the complaints (13 of 20 or 65%) involved complaints against staff members. Nine were general complaints against staff members; three specifically alleged physical abuse or aggressive use of restraints; and one involved a child who reported denial of the right to contact the SWI hotline. Five of the 20 complaints (25%) cited a concern about the placement. The remaining two complaints involved a child who reported feeling unsafe due to other youth at the placement and a child who reported being unable to access their bank account.

    ii.   Onsite Visits to CWOP Settings

Of the caregivers interviewed during the onsite visits to CWOP Settings, 57 answered questions related to children's access to a telephone and ability to call the FCO or SWI hotline. All of these caregivers reported that children had access to a telephone. According to the caregivers interviewed, children either had their own telephones, were able to use a caregiver's State-issued telephone or were able to use the telephone in their hotel rooms. Caregivers reported that, depending on who the child was calling, the child may have the call placed on speaker or be supervised by a staff person during the call.

The vast majority of caregivers (54 of 57 or 95%) indicated that children were allowed to call the SWI hotline or the FCO whenever they wanted or needed to call. There was no explanation given by caregivers who said that children were not allowed to call the SWI hotline or FCO.

Out of the 56 children interviewed during the onsite visits to CWOP Settings, only one child reported a lack of knowledge about whether they had access to a telephone. The other children interviewed indicated that they either had their own telephones, were able to use a DFPS staff person's telephone, or could use the hotel telephone to make calls. Seventy-five percent of children interviewed (41 of 55[132]) knew that they could call the SWI hotline to report abuse, neglect, or exploitation.  However, only 31% (17 of 55) knew they could call the FCO to make a complaint. Fewer children knew how to reach those lines if needed. Fifty-five percent of the children interviewed (28 of 51[133]) said they knew how to reach the SWI hotline if needed, while 29% (15 of 51) said they knew how to reach the FCO.

**Figure 21: Child Responses to the Questions "Do You Know You Can Call the Hotline and Ombudsman?" and "Do You Know How to Reach Them if You Need to?"**



**3.  Summary**

Of youth interviewed in CWOP Settings, most of them (75%) knew that they could call the SWI hotline to report abuse, neglect, or exploitation. A smaller percentage (55%) knew how to reach the hotline if needed. Far fewer children were familiar with the FCO or how to reach the FCO to make a complaint. Because CWOP Settings are unlicensed, the State has not required FCO and hotline numbers to be posted.

---

[132] One child interviewed did not answer the question related to knowing they could call the hotline and the FCO.
[133] Four children interviewed did not answer the question related to knowing how to call the hotline and the FCO.

## D.  Remedial Order B5

Remedial Order B5:  *Effective immediately, DFPS shall ensure that RCCL or any successor entity promptly communicates allegations of abuse to the child's primary caseworker.  In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigations, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

### 1.  Background

After the Monitors filed their first full report with the Court in June 2020, the Plaintiffs filed a Motion to Show Cause asking the Court to find the State in contempt for failing to comply with Remedial Order B5, among other Remedial Orders.[134] The Court granted the motion and held a contempt hearing in September 2020. In the Court's December 18, 2020 order finding the State in contempt, the Court included instructions to the Monitors related to validating Remedial Order B5:

> [C]onsistent with Remedial Order B5, the Court instructs the Monitors to assess Defendants' evidence and determine whether Defendants are "promptly communicat[ing] allegations of abuse to the child's primary caseworker." In order to implement the remedy to ensure that PMC children are free from an unreasonable risk of serious harm, compliance with Remedial Order B5 requires more than prompt communication to the caseworker of the existence of an allegation. It requires that caseworkers receive prompt communication of "allegations of abuse." Therefore, the Court instructs the Monitors that in their assessment of Defendants compliance with this Remedial Order, they must assess whether Defendants "promptly communicate[]" the substance of the "allegations of abuse" to "the child's primary caseworker."[135]

### a.  Data and Information Production

The State continues to provide monthly SWI data of abuse and neglect referrals received for all PMC children in the General Class in response to the Monitors' first data and information request. In a subsequent request the Monitors sent to the State on February 21, 2020, the Monitors noted that DFPS had failed to provide the previously requested data for dates and manner of caseworker notification. The State responded that it "anticipate[d] being able to provide information as part of the DDS report once the data warehouse tables are built and functional. We currently anticipate including the information for the Q3 FY 20 reports."[136]

---

[134] Plaintiffs' Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt, ECF No. 901.
[135] Order at 327, ECF No. 1017.
[136] Email from Tara Olah to Kevin Ryan and Deborah Fowler (March 24, 2020) (on file with the Monitors).

Beginning in July 2020 (for May 2020 data), DFPS included two new variables in its monthly RCCI intake data reports including "Notice to CVS caseworker and supervisor" and "Notice within 48 hours (RO37)." DFPS defined "Notice to CVS worker and supervisor" as the date/time that an automated notice about the intake was sent to the CVS caseworker and supervisor. DFPS did not make changes to the data it provided to the Monitors for CPI intakes for PMC children in the General Class, however, and does not include the automated notification information in data for CPI intakes.

Beginning in April 2021 (for February 2021 data), DFPS included new variables in its monthly RCCI intake data reports including "Date of 1ˢᵗ A/N Notification Staffing Contact" and "Date SUB Worker First Assigned to the I&R Stage." DFPS provided the following definition for "Date of 1ˢᵗ A/N Notification Staffing Contact": "The first date/time of a documented I&R staffing in a stage that is open in the child's case that occurred after the date of the intake. A blank cell may indicate that the staffing did not occur or that the staffing did occur but was not documented as such. In some circumstances, there may be a staffing documented but no I&R Stage ID or there may be a staffing documented but no SUB worker first assigned to the I&R stage. This may mean the child's worker received some notice of the intake and the I&R notification even if it was not documented as such." DFPS defined Date SUB Worker First Assigned to the I&R Stage as follows: "The first date and time that the notification I&R associated with the child as an alleged victim in the intake was assigned to the child's primary worker at the time of the intake. A blank cell with a corresponding I&R Stage ID means that there was an I&R notification generated for the alleged victim in the intake but there was no documentation that it was assigned to the child's primary worker at the time of the intake. The worker, however, may have received notification of the intake and allegations through another means." In April 2021 (for February 2021 data), DFPS also began providing data for PI intakes. DFPS did not include automated notification information or I&R staffing information in data provided to the Monitors for PI intakes for PMC children.

b.   Validation Findings from the Monitors' Second Report

The Monitors' Second Report reviewed findings from the monitoring team's independent case reads covering 815 SWI intakes for the months of April 2020 through October 2020, and found that after the State deployed the new, automated, notification system in the IMPACT 2.0 system in December 2019, notification almost always occurred.[137] The monitoring team also verified that the notification date provided by the State was almost always consistent with the date found in IMPACT.[138]

The monitoring team could not determine the quality or substance of the exchange of information in the communications between RCCI investigators and CVS caseworkers; however, the case reads included verification of the first contact documented between the two and found a contact in 89% (728 of 815) of the investigations reviewed for the sample period.[139] The timing of

---

[137] Deborah Fowler & Kevin Ryan, Second Report 105, ECF No. 1079.
[138] *Id.*
[139] *Id.* at 106.

the contact was also reviewed and the monitoring team found that communication occurred within three days of intake in most cases.[140] The most common methods of initial communication between RCCI investigators and CVS caseworkers were emails and phone calls.[141]

c.   Updates and Policy Changes

In January 2021, DFPS changed its policies related to the SWI process of notification to caseworkers of an allegation of abuse, neglect, or exploitation after the Court issued its contempt order.[142] According to the new policy, if a child in DFPS conservatorship is a principal in an intake for abuse, neglect, or exploitation, in addition to the automated notification that IMPACT generates, the SWI intake specialist must complete an "I&R CVS Caseworker Notification" (I&R Notification) and send the notification to the child's caseworker.[143] The I&R Notification is required to include the reporter's information, the alleged victims and perpetrators included in the report, and the narrative for the report.[144] This step is done manually by the intake specialist; it is not automated.[145]

DFPS also updated its policies related to a caseworker's responsibilities following notification of an RCCI or CPI intake for an abuse, neglect, or exploitation investigation. Under the new policy, once a caseworker receives the I&R Notification, they are required to immediately review the abuse, neglect, or exploitation report in either IMPACT or CLASS and discuss it with a supervisor.[146] Caseworkers are required to contact the RCCI or CPI investigator for additional information about the allegations. They are then required to consult with the program director about the investigation and document an "I&R/A/N Notification Staffing" (I&R Notification Staffing) in the child's IMPACT records no later than 7:00 p.m. the next business day after notification of the report.[147] The I&R Notification Staffing is documented in IMPACT as a contact in the child's event record; the narrative in the contact is required to include a copy of the notification, notes of discussions with the caseworker's supervisor and program director, consideration of the child's safety needs and any related actions, and any plans for future action.[148] The caseworker is required to document the execution and results of any follow-up actions as

---

[140] *Id.*

[141] *Id.*

[142] *See* Defendants' Certification of Compliance, Exhibit F: Sworn Declaration for Remedial Order Nos. 3, 5, 7, 10, and B5, ECF No. 1021-6; Defendants' Certification of Compliance, Exhibit E: Sworn Declaration for Remedial Order B5, ECF No. 1021-5.

[143] DFPS, CVS Caseworker Notification, Statewide Intake Policy & Procedures §3101 (January 2021) (redlined copy on file with the Monitors).

[144] *Id.*  On March 31, 2021, DFPS issued an Email reminding staff of the change, indicating that errors had been noted regarding I&R Notifications not being created, the wrong I&R type being selected, and I&R Notifications being routed to the wrong caseworker.  Email from Elizabeth Johnson, Program and Policy Specialist, DFPS, to DFPS staff re: Reminder I&R CVS Caseworker Notification (March 31, 2021) (on file with the Monitors).

[145] DFPS, Caseworker Notification, Statewide Intake Policy & Procedures §3101 (notes that the intake specialist "manually assigns" the I&R Notification to the CVS caseworker).

[146] DFPS, CPS Responsibility and Procedure after Receiving a Notification of Abuse, Neglect, or Exploitation by either RCCI or CPI, CPS Handbook §4221.2 (January 2021) (redlined version on file with the Monitors).

[147] *Id.*

[148] *Id.*

contacts in IMPACT when they are completed, and must also document a summary and disposition of the investigation once it is completed.[149]

2.   Remedial Order B5 Performance Validation

a.   Methodology

The monitoring team conducted case reads for intakes to SWI for RCCI, CPI, and PI investigations.[150] To validate DFPS's compliance with Remedial Order B5, the monitoring team conducted case reads for a sample of 654 RCCI intakes to SWI with a final Priority of One or Two received during the time period of January 15, 2021 through May 31, 2021. The monitoring team conducted case reads for a sample of 373 CPI intakes to SWI with a final Priority of One or Two for the same period.[151] Finally, the monitoring team conducted case reads for a sample of 117 PI intakes with a Priority of One or Two received from February 1, 2021 through May 31, 2021.[152]

The case reads involving RCCI intakes included a review of child event records in the State IMPACT system to identify the date of the system-generated notice for the RCCI intake sent to the child's caseworker. The system-generated notice analysis calculated the number of days from the date of the SWI intake to the date of notification.[153] Because data provided by the State for CPI and PI cases do not include the date of the system-generated notice, this step was not included in the case reads for CPI and PI intakes. The case reads also included a review of children's IMPACT records for RCCI, CPI, and PI intakes to verify that the new I&R Notification to caseworkers, developed in response to the Court's contempt order, could be found for the cases included in the case record review.

Consistent with the Court's instructions to the Monitors (discussed above), for RCCI, CPI, and PI intakes, the monitoring team reviewed children's event records in the State IMPACT system for case contacts related to the abuse, neglect, or exploitation intake that was the subject of the case read. Records were reviewed to identify whether and when an I&R Notification Staffing between the child's caseworker and supervisor occurred and was documented. If an I&R

---

[149] *Id.*

[150] The language in Remedial Order B5 specifically refers to the General Class, rather than limiting its application to children in licensed settings. In an advisory filed with the Court on September 21, 2021, Governor Greg Abbott advised that with respect to the scope of the Court's injunctions, "[A] General Class member should receive the same protections under the Court's remedial orders regardless of the licensed or unlicensed nature of the facility where the member is housed, unless the remedial order at issue specifies that it applies only to the [Licensed Foster Care] subclass or licensed or unlicensed facilities." Governor Greg Abbott's Advisory Concerning the Court's September 14, 2021 Inquiries 3, ECF No. 1137.

[151] The Monitors created a randomly selected sample using a 95% confidence level for each month of data. Duplicate intakes were removed from the target population prior to sample selection; the Monitors defined a duplicate as an intake involving a child with a prior intake on the same date. The first intake for that child on that date was included in the target population of intakes for the sample; subsequent intakes received on the same date listing that child were excluded.

[152] PI intakes were not included in the data provided to the Monitors by the State prior to February 2021.

[153] The exact time of system-generated notice was not available in IMPACT; the monitoring team was only able to measure the system-generated notice time period using calendar days.

Notification Staffing contact was located, the monitoring team reviewed it to determine whether it was coded correctly, and whether the date and time of the staffing was on the contact detail page. The monitoring team examined the contents of the staffing narrative to evaluate their discussion of safety and planned actions to protect child safety.

b. Data Limitations

As discussed in the Monitors' Second Report, the monitoring team discovered limitations in the SWI data of abuse and neglect referrals during the monitoring team's case record reviews.[154] Referrals to RCCI are assigned an IMPACT case ID number which uniquely identifies the allegation and can be used to track investigations in the State's CLASS system. Allegations and their associated case ID numbers can be "linked" if multiple calls are made for the same allegation, for the same child, or for a similar allegation at an operation where an investigation is already underway. Linked allegations are grouped under a single case ID number. The case ID used for an investigation usually relates to the first referral associated with the allegations that is received by SWI.

Data provided by the State included a case ID for all allegations. This case ID (IMPACT Case ID) was used by the Monitors to identify a child's case for both the automatic notification and caseworker communication verification. During the automatic notification verification, the monitoring team found that, for linked allegations, the case ID provided in the RCCI intake data represented the "linked" case ID, not the ID originally assigned to that allegation at intake. The automatic notification in the child's IMPACT event list was found for the correct intake date (usually the same or next day) but the case ID did not match the data for that date in the SWI intake data of abuse and neglect referrals provided by the State. The case ID matching the SWI intake data was, in most cases, found in the child's event list with automatic notification occurring prior to the date of the selected intake. When questioned by the monitoring team, the State verified that the case ID included in the RCCI SWI intake data represented the linked case ID for all linked allegations rather than the original Case ID assigned at intake.

The State indicated that the contact detail date and time found in the IMPACT contact on the child's event page was the date and time the I&R Notification Staffing occurred between the caseworker and their supervisor. However, in addition to the date and time found in the IMPACT contact, the monitoring team found that some caseworkers documented a staffing date and/or time within the contact narrative itself. The monitoring team's analysis often revealed inconsistent documentation of the I&R Notification Staffing date and time in the narrative and variances in the contact detail date and time compared to the I&R Staffing date and time when found in the narrative. Because of these discrepancies, the contact detail date and time is not verifiable as the date and time the actual staffing occurred. When a case worker documented the date and time in the I&R Notification Staffing narrative, the monitoring team used the date and time documented

---

[154] Deborah Fowler & Kevin Ryan, Second Report 103, ECF No. 1079.

within the narrative to verify that a staffing occurred, and the timing of that staffing, rather than the contact date in IMPACT.

Although DFPS policy, discussed above, requires the "I&R A/N Notification Staffing" option to be selected when documenting an I&R Staffing, contacts were recorded under different contact types on the child's event page in IMPACT, including "Contact," "Other," "Notification," "Staffing," and "Coord/Monitor." The monitoring team therefore included all types of contacts in the case reads, despite the narrower DFPS policy, in order to afford the State the fullest possible consideration of its performance.

c.   Results of the Monitors' Case Record Reviews

   i.   Review of automated notification for RCCI intakes

The Monitors' case record review for RCCI intakes included evaluation of the timing of the automated notification sent to the child's caseworker.[155] The monitoring team found a system-generated notice for 99.8% (653 of 654) of the RCCI intakes sampled. Of the system-generated notices identified by the monitoring team, 99.2% (649 of 653) occurred on the day of intake or the day following the intake. The average time from intake to system-generated notice date was 0.49 days (11.76 hours). The monitoring team found a system-generated notice for all but one intake.

The monitoring team also compared the date included in the data provided by the State as the automated notification date with information found in IMPACT during the case reads. Of the 653 RCCI intakes in the review sample that had a system-generated notice, the monitoring team identified only 14 intakes with notice dates that did not match the notice date provided in the State's data. In all but one of these intakes, the system-generated notice date found in IMPACT was one day prior to the date provided in the State's data.

   ii.   Review of Case Contacts for RCCI, CPI, and PI intakes for I&R Notification Staffing

When an intake to SWI is made for allegations of abuse, neglect, or exploitation, the SWI intake specialist is to send an I&R Notification to the child's caseworker. The caseworker is then required to follow up by documenting an I&R Notification Staffing in the child's IMPACT records.[156] The monitoring team's case reads for RCCI, CPI, and PI intakes reviewed IMPACT

---

[155] This review is only for the automated notification that became operational in December 2019; it does not include a review of the I&R Notification. The monitoring team's review of the I&R Notification, which includes substantive information regarding the allegations reported to SWI, is found in section ii *et seq*, *infra*.

[156] SWI intake specialists manually assign I&R Notifications to caseworkers directly through IMPACT but the Monitors do not have access to individual caseworkers' IMPACT records; therefore, the only method the monitoring team could use to determine whether a notification occurred was to review the IMPACT records for the child victim to determine whether, after receiving an I&R Notification, the caseworker documented an I&R Notification Staffing in the child's records. This methodology, therefore, does not measure the percentage of intakes for which there was an I&R Notification. Rather, it measures the percentage of intakes for which there was both a notification and evidence that the caseworker followed up on the notification with a documented I&R Notification Staffing. It is possible that,

records to determine whether this reporting and documentation process was properly completed for each allegation.

The monitoring team found an I&R Notification Staffing contact in most RCCI intakes, but not in most CPI and PI intakes. Of the 654 RCCI intakes reviewed for the sample period, the monitoring team found an I&R Notification Staffing contact in IMPACT in 406 (62%). However, in CPI intakes, the monitoring team found an I&R Notification Staffing contact in only 110 of 373 (29%) of the intakes. Similarly, of the 117 PI intakes reviewed, the monitoring team found an I&R Notification Staffing in only 47 (40%) of intakes.

**Figure 22: Case Contact Found in IMPACT for RCCI Intakes**



---

in some cases, an I&R Notification was sent to the caseworker by the SWI intake specialist, but the caseworker either failed to staff the notification with a supervisor or failed to document the staffing.

**Figure 23: Case Contact Found in IMPACT for CPI Intakes**



**Figure 24: Case Contact Found in IMPACT for PI Intakes**



Across all types of intakes – RCCI, CPI, and PI – the percentage of I&R Notification Staffing contacts varied across the case record review period by month. The Monitors found that the percentage of RCCI intakes for which an I&R Notification Staffing contact was found increased significantly between January 2021 and February 2021 and then levelled out. The percentage of CPI intakes for which an I&R Notification Staffing was found stayed consistently low across the period reviewed, and the percentage of PI intakes for which an I&R Notification Staffing was found decreased between February 2021 and March 2021 but improved in April 2021 and May 2021.

**Figure 25: Case Contact Found in IMPACT for RCCI, CPI and PI Intakes**



The monitoring team found that the percentage of intakes in which an I&R Notification Staffing contact could be found also varied by region for all intake types (RCCI, CPI, PI). For example, in RCCI intakes, while the percentage of intakes in which an I&R Notification Staffing contact was found varied across regions, a contact was found in a majority of intakes across all regions.

**Figure 26: Case Contact Found in IMPACT for RCCI Intakes by Region**

However, the monitoring team's review of CPI intakes showed an I&R Notification Staffing contact in a majority of cases in only three of the 11 DFPS regions.

**Figure 27: Case Contact Found in IMPACT for CPI Intakes by Region**



In PI intakes, the monitoring team found an I&R Notification Staffing contact in a majority of the cases reviewed for five regions; however, in two regions, the monitoring team did not find an I&R Notification Staffing contact in any of the cases reviewed.

**Figure 28: Case Contact Found in IMPACT for PI Intakes by Region**



### iii.    Review of Content of I&R Notification Staffing Contact

In addition to reviewing IMPACT records to identify documentation of an I&R Notification Staffing contact, the monitoring team examined the content of the staffing contact narrative. As discussed above, DFPS policy not only requires that a staffing occur, but also requires documentation of the staffing, specifying that documentation should include a copy of the I&R Notification in the narrative of the contact, as well as any consideration of the child's safety needs and related actions taken to address safety.

Though the frequency with which the monitoring team found an I&R Notification Staffing contact varied by intake type (RCCI, CPI, PI), the narratives for most contacts included the required content regardless of the type of intake. Of the 406 RCCI intakes for which the monitoring team found an I&R Notification Staffing contact, the case reads confirmed that the caseworker staffed the I&R Notification with a supervisor or program director in 301 (74%) of the intakes, and that a copy of the I&R Notification was included in 336 (83%) contacts. Similarly, of the 110 CPI intakes for which the monitoring team found an I&R Notification Staffing contact, 83 (75%) of the contacts documented that the I&R Notification was staffed with a supervisor or program director, and 81 (74%) contacts included a copy of the I&R Notification in the narrative.  And of the 47 PI intakes for which the monitoring team found an I&R Notification Staffing contact, 31 (66%) contacts showed the notification was staffed with the caseworker's supervisor or program director, and 39 (83%) contacts included a copy of the I&R Notification.

iv.     Review of Timing of I&R Notification Staffing

In addition to examining the I&R Notification Staffing contacts and reviewing the content of the contact narrative, the monitoring team attempted to assess the timing of the staffing. However, the monitoring team found that in many of the cases reviewed, the contact detail date and time in IMPACT did not match the date and time included in the I&R Notification Staffing contact narrative. The monitoring team also found that while some of the I&R Notification Staffing contact narratives included a copy of the I&R Notification, a staffing between the caseworker's supervisor or program director was not documented. Some contact detail date and time entries were made outside of work hours; in these cases, the contact date and time appeared to be the date and time that the caseworker received the I&R Notification from the SWI intake specialist, rather than the date and time that a staffing with the caseworker's supervisor or program director occurred.

Because of these irregularities, the contact detail date and time could not be used to verify the date and time the I&R Notification Staffing occurred between the caseworker and their supervisor or program director. Instead, the monitoring team used the date and time found in the I&R Notification contact narrative to verify the timing of the staffing between the caseworker and their supervisor or program director.

Of the 406 RCCI intakes for which the monitoring team found an I&R Notification Staffing, 300 (74%) had a staffing documented between the caseworker and their supervisor or program director in the narrative on or after the intake date in the data sample.[157] Not all I&R Notification Staffing contact narratives included both the date and time the staffing took place:

- 44% of cases (132 of 300) had a staffing date recorded in the contact narrative;
- 16% of cases (48 of 300) had a staffing time recorded in the contact narrative; and
- 15% of cases (45 of 300) had both a staffing date and time recorded in the contact narrative.

Of the 132 RCCI cases where a staffing date was recorded in the I&R Notification Staffing contact narrative, the average time from the date of the intake to the date of the staffing recorded in the contact narrative was 2.16 days. The timing from intake to staffing ranged from zero to 13 days. Most staffings (104 of 132, or 79%) occurred within three days of intake for RCCI cases.

---

[157] One case documented a staffing prior to the date of the intake; it was not included in the analysis.

**Figure 29: RCCI Time from Intake to Staffing**



The same patterns in time between intake and staffing emerged for CPI and PI intakes. Of the 110 CPI intakes for which an I&R Notification Staffing contact was found in IMPACT, 81 (74%) contacts documented a staffing between the caseworker and their supervisor or program director on or after the date of the intake.[158] Of these:

- 35% (28 of 81) had a staffing date recorded in the contact narrative;
- 15% (12 of 81) had a staffing time recorded in the contact narrative; and
- 14% (11 of 81) had both a staffing date and time recorded in the contact narrative.

Of the 28 cases where a staffing date was included in the I&R Notification Staffing contact narrative, the average time from intake to the date of the staffing recorded in the contact narrative was 2.64 days. The timing for a staffing in CPI cases ranged from zero to 13 days. The staffing occurred within three days of intake in 68% (19 of 28) of CPI cases.

---

[158] Two cases had a staffing date recorded that was prior to the date of the intake and were therefore excluded from the analysis.

**Figure 30: CPI Time from Intake to Staffing**



Of the 47 PI intakes for which an I&R Notification Staffing contact was found in IMPACT, 30 (64%) contacts documented a staffing between the caseworker and their supervisor or program director on or after the date of the intake.[159] Of these:

- 50% (15 of 30) had a staffing date recorded in the contact narrative;
- 20% (6 of 30) had a staffing time recorded in the contact narrative; and
- 20% (6 of 30) had a staffing date and time recorded in the contact narrative.

Of the 15 cases that included a staffing date recorded in the contact narrative, the average time from intake to the date of the staffing recorded in the contact narrative was 2.33 days. The timing ranged from zero to 15 days. The staffing occurred within three days of intake in 93% (14 of 15) of PI cases.

    v.    Review of Narrative Details Related to Safety and Documented Safety Actions

The monitoring team also reviewed the narratives in I&R Notification Staffing contacts to determine whether the child's safety was considered, and if so, whether any action was planned or taken related to safety.  The monitoring team reviewed the type of safety actions planned or taken, if they were described in the narrative. Results were similar across intake types.

Child safety was discussed and some action to protect child safety was planned or taken in 44% (132 of 300) of cases involving an RCCI intake where a staffing occurred, in 41% (33 of 81)

---

[159] One case had a staffing date recorded that was prior to the date of the intake and was excluded.

of cases involving a CPI intake where a staffing occurred, and in 50% (15 of 30) of cases involving a PI intake where a staffing occurred. A need for further investigation into child safety was indicated in 6% (17 of 300) of cases involving an RCCI intake where a staffing occurred, 4% (3 of 81) of cases involving a CPI intake where a staffing occurred, and in 23% (7 of 30) of PI intakes where a staffing occurred. Safety was mentioned and no action was deemed necessary in 33% (100 of 300) of cases involving an RCCI intake where a staffing occurred, 35% (28 of 81) of cases involving a CPI intake where a staffing occurred, and 17% (5 of 30) of PI intakes where a staffing occurred.

In a small percentage of cases across all intake types, safety was mentioned without further steps or discussion documented. Safety was mentioned without further steps or discussion documented in 7% (20 of 300) of cases involving an RCCI intake, in 5% (4 of 81) of cases involving a CPI intake, and in 3% (1 of 30) of cases involving a PI intake. Safety was not mentioned at all in 10% (31 of 300) of cases involving an RCCI intake, 16% (13 of 81) of cases involving a CPI intake, and 7% (2 of 30) of cases involving a PI intake.

In cases in which a safety action was planned or taken:[160] the action taken was a safety plan in 30% (40 of 132) of cases involving an RCCI intake; 24% (8 of 33) of cases involving a CPI intake; and in 27% (4 of 15) of cases involving a PI intake.

The child was moved within the campus or operation in response to safety concerns in 11% (14 of 132) of cases involving an RCCI intake; 6% (2 of 33) of cases involving a CPI intake; and 13% (2 of 15) of cases involving a PI intake. A child's placement was changed in response to safety concerns in 45% (59 of 132) of cases involving an RCCI intake; in 24% (8 of 33) of cases involving a CPI intake; and 27% (4 of 15) of cases involving a PI intake.

The action taken was increased or enhanced supervision of the youth in 25% (33 of 132) of cases involving an RCCI intake; in 24% (8 of 33) of cases involving a CPI intake; and in 40% (6 of 15) of cases involving a PI intake. In 14% (18 of 132) of cases involving an RCCI intake, 6% (2 of 33) of cases involving a CPI intake, and 20% (3 of 15) of cases involving a PI intake, the action taken was to prohibit contact between the child and an individual who posed a safety threat. Finally, in 13% (17 of 132) of cases involving an RCCI intake and 21% (7 of 33) of cases involving a CPI intake, the action taken was a medical visit for the child. Some other action was taken in 5% (7 of 132) of cases involving an RCCI intake, and in 18% (6 of 33) of cases involving a CPI intake.

3.  Summary

After the State changed its policies related to caseworker notification of allegations of abuse, neglect, or exploitation to conform to the expectations required by the Court's December 2020 contempt order, DFPS struggled to implement its policies to comply with the Court's order. The new policies implement the Court's requirement that caseworkers receive notice, not just of a

---

[160] More than one action could have been planned or taken in a case.

report to SWI of abuse, neglect, or exploitation, but of the substance of the allegations. The policies require SWI intake staff to send caseworkers I&R Notifications that include the substance of the allegations reported to SWI. The caseworkers then document their review of the information by staffing the notification with a supervisor and documenting the staffing in a child's event contacts in IMPACT.

Though the percentage of RCCI intakes for which the monitoring team found an I&R Notification Staffing increased over the period studied, the monitoring team did not find an I&R Notification Staffing contact in 38% (248 of 654) of the intakes included in the sample. The results for CPI and PI intakes were lower: for 71% (263 0f 373) of CPI intakes, no I&R Notification Staffing contact was found, and for 60% (70 of 117) of PI intakes, no I&R Notification Staffing contact was found.

The monitoring team's case reads, however, showed the great importance of the notification and review in ensuring child safety. In the cases in the sample for which an I&R Notification Staffing contact was found and where the monitoring team's review confirmed that the caseworker staffed the notification with a supervisor, child safety was discussed and some action was planned or taken in 44% (132 of 300) of cases involving an RCCI intake; in 41% (33 of 81) of cases involving a CPI intake; and in 50% (15 of 30) of cases involving a PI intake.

E. Remedial Order 37

Remedial Order 37: *Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

1. Background

The Court's Order of December 18, 2020, held the State in contempt, after finding the State failed to comply with the requirements of Remedial Order 37. In that Order, the Court instructed the Monitors to validate Remedial Order 37 as follows:

> [A]ssess Defendants' evidence and determine whether notification of reports "which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral," and whether "[u]pon receipt" of the information that an abuse or neglect allegation was made but not referred for investigation, the child's caseworker has "review[ed] the referral history of the home[,]…assess[ed]

if there are any concerns for the child's safety or well-being, and document[ed] the same in the child's record."

a.   Data and Information Production

The State continues to provide monthly SWI data of abuse and neglect referrals received for all PMC children in the General Class in response to the Monitors' first data and information request. In a subsequent request sent by the Monitors to the State on February 21, 2020, the Monitors noted that DFPS had failed to provide the previously requested data for dates and manner of caseworker notification. The State responded that it "anticipate[d] being able to provide information as part of the DDS report once the data warehouse tables are built and functional.  We currently anticipate including the information for the Q3 FY 20 reports."[161]

Beginning in July 2020 (for May 2020 data), DFPS included two new variables in its monthly RCCI intake data reports including "Notice to CVS worker and supervisor" and "Notice within 48 hours (RO37)." DFPS defined "Notice to CVS worker and supervisor" as the date and time that an automated notice about the intake was sent to the CVS caseworker and supervisor.

b.   Validation Findings from the Second Report of the Monitors

For the Second Report, the Monitors conducted independent case record reviews for all 129 intakes involving a PMC child occurring between April 1, 2020 and October 31, 2020, which were subsequently downgraded to PN.[162] The case review examined whether the caseworker received notification of the allegations reported to SWI within 48 hours  of the referral, whether upon receipt of the notification, the child's caseworker reviewed the HHR and assessed any concerns for the child's safety, and whether the caseworker documented this information in the child's electronic case record. The monitoring team also analyzed the underlying methodology and results of the State's case record reviews for a random sample of 34 intakes downgraded to PN from March 1, 2020 to November 30, 2020.

The monitoring team's independent case reads confirmed that at least through October 2020, the State was not complying with the timeliness requirements of Remedial Order 37. The monitoring team found that while the automated notifications to caseworkers occurred within two days of the SWI referral, the average total time from the date the case was received by SWI to the date the HHR staffing occurred was eight days, with a range from one to 70 days.[163] The State also failed to consistently document HHR staffings between the caseworker and supervisor. In cases in which the monitoring team located an HHR, they did not find any documentation of a staffing nor any documented reason for the failure to have a staffing in 27% (23 of 86) of the cases.[164] The Monitors also noted concerns with the quality of the caseworkers' reviews of the HHRs and

---

[161] Email from Tara Olah to Kevin Ryan and Deborah Fowler (March 24, 2020) (on file with the Monitors).
[162] Deborah Fowler & Kevin Ryan, Second Report 111, ECF No. 1079.
[163] *Id*. at 122.
[164] *Id*.

staffing notes.[165] The State's case reads confirmed the Monitors' findings, noting many of the same problems.[166]

c.  Updates and Policy Changes

As discussed in the Monitors' Second Report, DFPS made significant changes to its policies related to downgrading RCCI intakes to PN, allowing an RCCI intake to be downgraded to PN only if the allegations were previously investigated or the allegation is not within RCCI jurisdiction.[167] These changes were effective November 1, 2020.[168]

Following the Court's December 2020 contempt Order, DFPS also made changes to its policies related to the timeline for completion of the HHR and review and documentation of the HHR staffing between the caseworker and supervisor.[169] The changes require SWI screeners to create an HHR report upon making the decision to downgrade the intake to PN, and email it to the child's caseworker and supervisor, even if the intake is made outside regular business hours.[170] Caseworkers are required to review and staff the HHR with their supervisors immediately; if the HHR is received outside of business hours, it is sent to an on-call CPS caseworker for the region.[171] These changes went into effect in mid-January 2021.[172]

2.  Remedial Order 37 Performance Validation

a.  Methodology

To validate the State's performance with respect to Remedial Order 37, the monitoring team reviewed all of the 19 intakes to SWI involving a PMC child occurring between January 1, 2021 and May 31, 2021 that were subsequently downgraded to PN. The monitoring team also reviewed the State's case record reviews for the second and third quarters of the 2021 Fiscal Year.

b.  Results of the Monitors' Performance Validation

    i.  The monitoring team's review of intakes

Of the 19 reports to SWI involving a PMC child between January 1, 2021 and May 31, 2021 that were subsequently downgraded to PN, only three intakes involved allegations related to a PMC child placed in a foster home. Of the remaining 16 intakes, five involved allegations of abuse, neglect, or exploitation related to a Home & Community Services ("HCS") Group Home, four

---

[165] *Id.*
[166] *Id.*
[167] *Id.* at 110.
[168] *Id.* at 52.
[169] *Id.*
[170] *Id.*
[171] *Id.*
[172] *Id.*

involved reports related to CWOP Settings, two involved reports related to RTCs (one of which was out-of-state), two involved reports of abuse that allegedly occurred in a previous placement, two involved reports related to residential facilities for individuals with intellectual disabilities, and one involved a report related to a substance abuse treatment facility.

Of the three intakes involving allegations in foster homes, two were intakes for siblings who were living in the same home. The allegation involved child-on-child sexual abuse of one sibling by the other. Notes in IMPACT indicate the case was downgraded to PN after it was determined the allegations were re-reported to SWI three days after the intake date because the case was not originally routed to RCCI, but to RCCL, and then re-reported but backdated. The intake report explains:

> A CPI Supervisor is the one that called it back in based on this being a foster home and alleging Sexual Abuse. The screening unit received this intake on 2/13/21 and it was discovered based on the intake date that this had been backdated and would not allow for initiation by the RCCI timely. Therefore, the screening unit called this back in for re-entry for today's date, 2/13/21, to allow for time for initiation. The new intake…has the same exact information from the original intake…This intake…will be administratively closed and [the other intake] will be stage progressed to a Priority 2 Neglectful Supervision allegation, and sent to the field for investigation as a neglect case. Although this intake is being administratively closed, the allegation will be investigated under the new IMPACT case number.

The third intake involving a foster home was made to SWI on February 11, 2021; the foster home was located in New Mexico but verified as a kinship placement and licensed by DFPS Region 1.[173] The PMC child is placed with an aunt and uncle who live in New Mexico and who intend to adopt him. According to the intake report, the reporter was "with an agency in New Mexico that is familiar with the family." The reporter indicated that four to six weeks earlier, another child in the home put a battery in the three-year-old PMC child's mouth. According to the reporter, the aunt/foster mother, who is noted to have health issues, "saw this but was not physically able to get up and take out the battery." The foster father "heard what was going on and had to leave a session to take the battery out of [the child's] mouth." The report also noted that the PMC child "is said to be left in the crib for the majority of the day" because his special needs are challenging and the foster parents "will put him in the crib rather than deal with him." The reporter also noted concerns that the child "may miss meals because he falls asleep in the crib." The report notes that CPS in New Mexico was contacted concerning the other children in the home and states that agencies in New Mexico are looking into placing the other children elsewhere. Under "additional concerns" the intake report notes that the foster parents "scream at" the three-year-old PMC child and that for some period of time they did not have health insurance for him and may not have taken him to a doctor during that time.

---

[173] The Monitors confirmed this by locating the home in the agency home list for DFPS Region 1.

The reason for the priority change is documented in the intake report as follows:

> Per LPPH 6221.5 Intake Reports to Be Closed Without an Investigation. It is of concern that [foster mother] is not physically able to care for [the child]. This has led to his reportedly swallowing a battery and possibly other supervision issues in the home.  It is of concern that [the child] is said to be left in his crib all day with no interaction and has been reported to miss meals due to being allowed to sleep all day. Screener reviewed placement information for the relative/fictive kin foster home.  The…home is located in Albuquerque, New Mexico and is not under the jurisdiction of DFPS RCCI.  Therefore, it is recommended that this case be closed without investigation and referred to New Mexico Child Services for further investigation. Screener [name removed] contact CPS for New Mexico and spoke with Intake worker identified by [number]. Report information was provided and reference number was given.

The monitoring team was unable to locate an HHR for this intake, presumably because the home is located out of state, although it is verified as a kinship placement by DFPS Region 1. There was an I&R Notification and I&R Notification Staffing in the child's IMPACT records, consistent with the requirements of Remedial Order B5.[174]

ii.    The State's Case Reads

The State conducted two case reads that overlapped with the period reviewed by the Monitors for this report: the first covered the second quarter of the Fiscal Year 2021 or December 1, 2020 through February 28, 2021.[175]  Of the eight reports made to SWI involving a PMC child placed in a foster home that were downgraded to PN, only two required an HHR. Of the remaining six cases:

- One involved a child who had turned 18 and was no longer in foster care, and no other PMC children were placed in the home;

---

[174] The I&R Notification Staffing notes several tasks were assigned to the child's CVS caseworker to follow up on the child's safety. The caseworker called the local police department to ask whether any child welfare checks were conducted or whether anyone was dispatched to the home's address since 2018.  The police department did not find any recent reports or records.  The caseworker left several messages for the aunt/foster parent that were not returned but was able to speak to the New Mexico CPS caseworker assigned to the home and was told the aunt had been admitted to the hospital the night before. The caseworker indicated she did not believe the children in the home were in immediate danger, but that they had "concerns about the home in regards to the caregivers' ability to care for the children due to health issues" and that they were going to do a review of their Home Study to decide whether or not to continue to license the home. The child's monthly face-to-face visits are being conducted by a New Mexico caseworker who provides a report to his DFPS caseworker. Monthly evaluations that follow indicate that New Mexico's concerns regarding the placement were delaying the adoption of the child and two other children in the home. DFPS has not taken any additional actions to follow up on the safety of the home, however, the New Mexico caseworker who makes monthly visits to the home has not reported any additional concerns.

[175] DFPS, *Home History Case Review Results*, December 2020 – February 2021 Review/Quarter 2 – Fiscal Year 2021 (undated) (on file with the Monitors).

88

- One involved a PMC child who had already been moved from the home, and no other PMC children were in the home; and
- Four involved a placement that was not a foster home.

In both of the cases requiring an HHR, the HHRs were completed within 24 hours of intake. Between the two intakes, there were ten PMC children in the two foster homes. The reviewer found the following gaps in performance after a review of the ten children's IMPACT records:

- Staffings were held between the caseworker and supervisor for nine of the ten children; and
- The staffing narrative in only three of the nine cases, or 33%, contained an accurate summary of the HHR.

The second case reads conducted by the State covered March 1, 2021 through May 31, 2021 or the third quarter of Fiscal Year 2021.[176] During this period, 17 reports made to SWI involving a PMC child were downgraded to PN. However, according to the State's case review, of the 17, 14 involved allegations that were not within RCCI jurisdiction, two involved foster homes that no longer had children placed in them, and one involved allegations that had previously been investigated. Consequently, an HHR was not completed for these 17 intakes.

3. Summary

DFPS's policy restricting the practice of downgrading RCCI intakes has significantly reduced the number of cases for which an HHR is completed. Of the three intakes involving allegations related to a foster home during the period reviewed by the Monitors, two involved allegations of child-on-child sexual abuse between siblings that were subsequently re-reported to SWI and investigated.  The third involved a child in a New Mexico verified kinship home; RCCI determined it did not have jurisdiction to investigate the allegations though the kinship home was licensed by DFPS Region 1. The monitoring team was unable to locate an HHR for this intake.

The State's case record reviews for the second quarter of Fiscal Year 2021 (December 2020 – February 2021) found that two intakes, both made in December 2020, required an HHR. The case review found that an HHR and HHR Staffing were completed for nine of the ten children in these two homes, and that the narrative in the Staffing notes included an accurate summary of the review for only three of the nine children. The case record review for the third quarter of Fiscal Year 2021 (March – May 2021) found that of the 17 intake reports made to SWI regarding a foster home where a PMC child was placed, none of the intakes required an HHR.

---

[176] DFPS, *Home History Case Read Results, March – May 2021 Review/Quarter 3 – Federal Fiscal Year 2021* (undated) (on file with the Monitors).

IV.   ORGANIZATIONAL CAPACITY

A.  Remedial Order 1: CPS Professional Development

Remedial Order 1: *Within 60 days, the Texas Department of Family Protective Services ("DFPS") shall ensure statewide implementation of the CPS Professional Development ("CPD") training model, which DFPS began to implement in November 2015.*

1.  Background

a.  Data and Information Production

DFPS continues to provide monthly data related to Remedial Order 1 in response to the Monitors' September 30, 2019 data and information request and to a supplemental request made November 16, 2020.

OCOK began providing data related to Remedial Order 1 on March 16, 2020 for the month of January 2020 and continues to provide monthly data as requested.  2INgage began providing data related to Remedial Order 1 on August 17, 2020, for conservatorship caseworkers hired in April 2020 and continues to provide monthly data.

b.  Validation Findings from the Monitors' Second Report

For the Monitors' Second Report, the monitoring team analyzed a cohort of data consisting of all 440 persons hired by DFPS as CVS caseworkers from January 1, 2020 to July 31, 2020.[177]  The Monitors also analyzed two cohorts of data consisting of 302 persons hired by the two SSCCs (OCOK and 2INgage) that had moved to Stage II of the CBC model and were beginning to provide case management services.[178]

Ninety-seven percent (305 of 313) of DFPS caseworkers who were subject to CPD training requirements and remained at the agency through training had completed CPD training as of the time of the analysis.[179]  Of the eight caseworkers who did not complete CPD training, one caseworker was identified in the full caseload data, and was never included in graduated caseload data as would be expected.[180]  On average, CPD training took DFPS caseworkers 13 weeks (91 days) to complete.[181]

Of the 85 caseworkers hired by 2INgage who were required to complete CPD training and stayed with the agency through training, all (100%) had completed the "2INgage Academy"

---

[177] Deborah Fowler & Kevin Ryan, Second Report 132, ECF No. 1079.
[178] *Id.*
[179] *Id.* at 143.
[180] *Id.*
[181] *Id.*

training as of January 2021.[182] Seventy-nine (93%) of those 85 caseworkers were newly hired and subject to full CPD training. On average, caseworkers completed the 2INgage training in 43 days.[183] Ten of these newly hired staff completed 2INgage training in just 28 days.[184] OCOK did not provide reliable data to the Monitors in time for assessment of its performance with Remedial Order 1.[185]

2.   Remedial Order 1 Performance Validation

a.   Methodology

To validate DFPS's performance for Remedial Order 1, the Monitors analyzed a cohort of data consisting of all persons hired to perform the job of DFPS CVS caseworker during the six-month period from September 2020 to February 2021. A total of 323 persons were hired as CVS caseworkers during this time period. Caseworkers included in the cohort could have been newly hired by DFPS (new hires), rehired after leaving the agency (rehires), or transferred to the caseworker position from another position in the agency (transfers).

The Monitors analyzed a cohort of data for each SSCC to validate performance for Remedial Order 1:

- The Monitors analyzed the entire cohort of 48 caseworkers hired by OCOK during the months of September 2020 to February 2021. OCOK classifies all caseworkers as new hires, but the level of training the SSCC requires may vary depending on prior experience.

- 2INgage hired 37 caseworkers during the months of September 2020 to February 2021 and the Monitors analyzed data for the entire cohort. Caseworkers could have been newly hired with no previous experience (new hires), been hired with previous DFPS experience (previous DFPS) or rehired by 2INgage (rehires).

The analysis for DFPS and the SSCCs included a review of:

- Time to leaving the CVS caseworker job and/or leaving DFPS or the SSCC, to allow the Monitors to better understand incomplete training records, CVS staff turnover, and the timing of staff turnover.
- Verification of Completion of CPD Training. For the DFPS and the SSCC analyses, completion of CPD training was verified through the case assignable data provided by DFPS and the SSCCs; case assignable date was used as a proxy for the training completion date, because this is the date all training requirements have been completed and the caseworker is eligible to be case assignable.

---

[182] *Id.*
[183] *Id.*
[184] *Id.*
[185] *Id.*

- Verification of Time to Complete CPD Training, analyzing caseworkers subject to full training separately from partial training due to differences in requirements related to training.[186]
- Expected CPD Completion, to determine whether DFPS caseworkers required to complete the full CPD training course completed within the expected timeframe of 13 weeks (91 days) based on the CPD curricula. The monitoring team also examined whether caseworkers hired by OCOK and 2INgage completed training in the expected timeframe, according to the SSCCs training programs. Both provide trainings that are completed, on average, in less time than caseworkers hired by DFPS take to complete CPD training.

b.  Data Limitations

   i.   DFPS

The caseworkers' start and end dates provided by DFPS for CPD training are estimated, not actual, training cohort start and end dates. The cohort start date is the "date the cohort to which the caseworker was assigned started." For some caseworkers, this date is the actual CPD training start date, but for staff who were rehired or transferred, they may be placed in a cohort that has already started. On a call with the monitoring team held November 15, 2020, DFPS indicated that the cohort start date for rehired staff and transfer staff is "either the cohort start or hire date, whichever comes later." The "Anticipated Cohort End Date" is the date the training is expected to end. DFPS reported in the hired data dictionary that "as the caseworkers in the report were newly hired into their positions, we cannot provide their actual CPD completion date." DFPS's reliance on estimated CPD training start and end dates make it difficult to assess time in training.

Because the actual training completion date is not provided in the CPD data files received by the State, DFPS directed the monitoring team to use the date case assignable as a proxy for the actual training completion date. The date case assignable is provided in the graduated caseload data separate from the caseworker hired data. The data provided defines the caseworker's date case assignable as "the date the caseworkers completed CPD training and became eligible to be assigned primary on cases." In the data dictionary, DFPS provides an additional note that there may be a delay in entry of the case assignable date into its Center for Learning and Organization Excellence Learning Management system,[187] but in all cases the actual case assignable date is entered.

The CPD datasets provided by the State did not include complete information on the date case assignable and the date the caseworker left the agency for all the caseworkers hired. As a result, the CSA Remedial Order 4 Training and the Remedial Order 2 full caseload data files were used to identify caseworker employment status and the dates staff left the agency.

---

[186] Transfers, rehires, and "student stipends" are not subject to full CPD training.
[187] The Center for Learning Organization Excellence Learning Management system is the system used to deliver and document training for DFPS staff.

ii.    SSCCs

*OCOK*

The two datasets provided by OCOK with respect to newly hired caseworkers did not include either complete information on the case assignable date, or the dates the caseworkers left the agency. As a result, other training and caseload data files were used to identify the date caseworkers left the agency and to determine if caseworkers were carrying a full caseload and were, therefore, still active with the agency. CSA Remedial Order 4 training data and Remedial Order 2 full caseload data were used to identify missing information.

*2INgage*

Data provided by 2INgage did not clearly specify training level or exemptions from training for all caseworkers. In addition, the two datasets used for the Remedial Order 1 analysis provided by 2INgage did not provide complete information on the date case assignable for all caseworkers hired. As a result, the full caseload Remedial Order 2 data file was used to identify active caseworkers.

c.    Performance Validation Results

i.    Caseworkers Hired and Trained by DFPS

As discussed in the Second Report,[188] DFPS updated the CPD training objectives and requirements in December 2020 and confirmed the updated training procedures in February 2021[189] as follows:

> DFPS policy requires all staff hired to perform the function of CVS Caseworker to complete professional development training, CVS Caseworker Professional Development (CPD), prior to being assigned children on a caseload. Full DFPS CVS CPD training is designed as a 13-week course, but time in training can be shortened or extended depending on the caseworker's hire type, past experience, and competencies during training. CPD training is 80% "Hands on Learning" with staff working in the field and 20% classroom time. All CVS caseworkers in training are assigned a mentor and work with a field training supervisor and their supervisor to determine competency. Once training is complete, the caseworker becomes case assignable and may begin working with children.

According to its policy, DFPS's newly hired conservatorship caseworkers, or "protégés," may

---

[188] Deborah Fowler & Kevin Ryan, Second Report 123-143, ECF No. 1079.
[189] *Id.*

be assigned primary case management responsibility on cases after completion of CPD Training.[190] Once protégé workers complete CPD Training, DFPS policy requires that their case assignments are subject to the graduated caseload standard. On December 16, 2019, the Court approved an agreed motion submitted by the parties that in lieu of conducting workload studies pursuant to Remedial Orders A1, A2, B1 and B2, DFPS and HHSC would use as caseload guidelines:

- 14 to 17 children per conservatorship caseworker, for the purpose of satisfying State obligations within Remedial Orders A2, A3 and A4;
- 14 to 17 investigations per DFPS RCCI investigator, for the purpose of satisfying State obligations within Remedial Orders B2, B3 and B4; and
- 14 to 17 tasks per RCCR inspector, for the purpose of satisfying State obligations within Remedial Orders B2, B3 and B4.[191]

Under this standard, in the first month following a protégé worker's eligibility for primary case assignment, per DFPS's policy, the protégé's caseload may not exceed six children, one-third of the generally applicable caseload standard.[192] In the second month of eligibility, the protégé's caseload may not exceed 12 children, two-thirds of the caseload standard.[193] In the third month of eligibility, the protégé is eligible to be assigned a full caseload.[194]

DFPS hired 323 caseworkers during the six-month period of September 2020 to February 2021. Of those, 256 caseworkers were subject to full or partial completion of CPD training and included in the Monitors' analysis:[195] Two-hundred were new hires subject to full CPD training, and 56 were rehires or transfers subject to full or partial CPD training. Of the 56 rehires or transfers, 14 were subject to full training and 42 were subject to partial CPD training.

According to DFPS, CPD training takes an average of 13 weeks to complete. All 256 of the caseworkers subject to training should have completed CPD training by June 30, 2021. Of the 256 caseworkers, 92% (236 of 256) had completed CPD training by June 30, 2021.[196] The average time taken to complete training was 104 days.

---

[190] DFPS, *Graduated Caseloads Compliance Summary*, at 1 (Nov. 1, 2019) [hereinafter *Graduated Caseloads Compliance Summary*] (on file with the Monitors). In response to the Monitors' Data and Information Request for graduated caseload policies; field guidance; and information or directives describing to managers and/or supervisors the graduated caseloads policy and schedule, the State produced various documents. *See id.; DFPS, Supervisor BSD (Basic Skills Development) Information* (Nov. 1, 2019) [hereinafter *Supervisor BSD*] (on file with the Monitors); DFPS, *CVS Individualized Training Plan July 19* (Nov. 1, 2019) (on file with the Monitors).

[191] Order Regarding Workload Studies in the November 20, 2018 Order at 1-2, *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-CV-84, slip. op. (S.D. Tex. Dec. 17, 2019), ECF 772 [hereinafter *Workload Studies Order*].

[192] DFPS, *Generally Applicable Caseload Standards – Guidelines for Conservatorship (CVS)*, at 8 (July 2020) [hereinafter *CVS Caseload Standards*].

[193] *Id*.

[194] *Id.*

[195] Of the 323 caseworkers hired during the time analyzed by the monitoring team, 44 left the agency before starting, or prior to completing, CPD training. Another 23 caseworkers were not subject to CPD training because they were either student hires, rehires, or transfers.

[196] Training completion could not be verified for 20 CVS caseworkers (8%).

**Figure 31:  CVS Caseworkers CPD Training Completion Timing Sample**



Of the 20 workers (16 new hires, and four rehires or transfers) for whom the monitoring team could not validate completion of CPD training, 11 were identified as caseworkers in the full caseload data.

ii.     Caseworkers Hired and Trained by OCOK

As discussed in the Second Report, OCOK policy requires all staff hired to perform the function of Permanency Specialist to complete training designed to prepare them for their work prior to being assigned children on a caseload.[197] OCOK CPD training begins with a one-week new hire agency orientation followed by as much as two to six weeks of field work while the staff person awaits the start of the next OCOK Permanency Academy training.[198] The OCOK Permanency Academy training is eight weeks, consisting of 50% field work and 50% classroom time and is conducted by alternating two weeks of classroom training with two weeks of training in the field. Time in training depends on the specialist's hire type and experience.[199] According to OCOK, full CPD training takes between 11 and 15 weeks. Once training is complete, the caseworker becomes case assignable and may begin working with children.

All OCOK permanency specialists and case managers are subject to the same graduated caseload requirements as DFPS CVS caseworkers once case assignable. Newly case assignable

---

[197] Deborah Fowler & Kevin Ryan, Second Report 130-131, ECF No. 1079.
[198] *Id.*
[199] *Id.*

staff may be assigned no more than six cases during their first month and up to 12 children for the second month.

OCOK hired 48 Permanency Specialists during the six-month period of September 2020 to February 2021. Of those, 39 were subject to completion of full or partial CPD training and were included in the Monitors' analysis[200] All 39 had completed training by June 30, 2021. For those subject to full training (29 of 39, or 74%), the average time to complete training was 85 days.[201] Only four caseworkers who were required to complete full training completed it seven or more days prior to the expected completion date; OCOK did not provide an explanation for their early completion.

### iii.    Caseworkers Hired and Trained by 2INgage

2INgage policy requires all staff hired to perform the function of Permanency Case Manager to complete the 2INgage Academy prior to being assigned children on a caseload.[202] Until recently, full 2INgage CPD training was designed as a six-week course.[203] The 2INgage Academy consists of 50% field work and 50% classroom time and is conducted by alternating one week of classroom training with one week of training in the field. Once training is complete, the caseworker becomes case assignable.[204] Though case assignable and finished with CPD, permanency case managers are expected to complete an additional 18 hours of "Solution Based Casework" training.[205] This training is web-based and provided over a five-week period.[206]

All SSCC caseworkers are subject to the same graduated caseload requirements as DFPS CVS caseworkers once case assignable. Newly case assignable staff may be assigned no more than six cases during their first month and up to 12 children for the second month.

---

[200] Four Permanency Specialists left OCOK prior to completing training, and five had previous CVS caseworker experience and were not subject to training.

[201] Of the ten caseworkers identified by OCOK as subject to partial training, the average time to complete training was 60 days.

[202] Deborah Fowler & Kevin Ryan, Second Report 131, ECF No. 1079.

[203] *Id*. During a virtual meeting with the monitoring team, 2INgage, and DFPS on June 15, 2021, 2INgage reported to the monitoring team that prior to entering Stage II of Community Based Care, they had received approval from DFPS to limit their caseworker training period to six weeks. However, 2INgage reported that after the Monitors raised concerns regarding the shorter time periods for SSCC training, particularly for 2INgage, DFPS notified 2INgage that it would be required to revise their curriculum and lengthen its training period for caseworkers to 13 weeks (the average length of time that DFPS reports that it takes to complete CPD training). According to 2INgage, it responded by lengthening the field training period, without making changes to the classroom portion of its training. Staff hired after March 1,2021 were required to complete the longer training program. To align the analysis between DFPS and the SSCCs and allow adequate time to complete training for the full cohort, the Monitors used the same cohort periods of September 2020 through February 2021; the Monitors will validate the longer training for 2INgage caseworkers in the next report.

[204] *Id*.

[205] *Id*.

[206] *Id*.

2INgage hired 37 Permanency Case Managers (caseworkers) during the six-month period from September 2020 to February 2021. Of these, 22 (59%) were subject to full or partial training and were included in the Monitors' analysis.[207] All 22 caseworkers completed training as of June 30, 2021. Of these 22, 20 were new hires subject to full training, and two had previous DFPS experience and were required to complete partial training. The average time to complete full training was 40 days, with a range in training time from 28 to 73 days. Nine new hires subject to full training completed their training even earlier than the expected time to complete the abbreviated 2INgage training: nine (45%) completed early, with a range in completion time of 28 to 34 days. Of the two caseworkers subject to partial training, one completed training in 28 days and the other completed training in 32 days.

3.   Summary

The Monitors analyzed training data related to caseworkers hired by DFPS and the two SSCCs (OCOK and 2INgage) that have entered Stage II of CBC during the six-month period included in the analysis (September 2020 to February 2021). The analysis showed that of the 256 caseworkers hired by DFPS subject to full or partial CPD training, 236 completed training by June 30, 2021. The average length of time that it took the 236 caseworkers to complete CPD training was 104 days. Of the 20 caseworkers for whom the Monitors could not validate completion of training, 11 appeared in full caseload data.

OCOK hired 48 caseworkers during the six-month period analyzed, 39 of whom were subject to full or partial CPD training.  All of them had completed the OCOK training by June 30, 2021; the 29 caseworkers subject to OCOK's full training took an average of 85 days to complete the training. Four of these caseworkers completed the training seven or more days earlier than expected; OCOK did not provide an explanation for their early completion.

2INgage hired 37 caseworkers during the six-month period analyzed, 22 of whom were subject to full or partial CPD training. All 22 caseworkers completed the 2INgage training by June 30, 2021; the 20 caseworkers subject to full training completed the 2INgage training in 40 days, less than half the time that DFPS reports (and the Monitors validated) it takes caseworkers to complete CPD training. Nine of the 20 caseworkers completed training in significantly less time, with a range of completion from 28 to 34 days. According to 2INgage, DFPS instructed it to lengthen its training program to a minimum of 13 weeks after the Monitors raised concerns. 2INgage reported to the monitoring team that it began to require caseworkers to complete the 13-week training starting March 1, 2021. The Monitors will validate this adjustment to the training program in the next report that examines compliance with Remedial Order 1.

---

[207] Three caseworkers were excluded from the analysis because they started training after March 1, 2021; five left the agency prior to completing training; two were rehires; and five had previous DFPS experience and were not required to complete training.

B.  Remedial Order 35, A1, A2, A3, and A4: Caseloads

Remedial Order 35: *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS' reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

Remedial Order A1: *Within 60 days of the Court's Order, DFPS, in consultation with and supervision of the Monitors, shall propose a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

Remedial Order A2: *Within 120 days of the Court's Order, DFPS shall present the completed workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which the determination is based, for the establishment of appropriate guidelines for caseload ranges.*

Remedial A3: *Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be pro-rated accordingly.*

Remedial Order A4: *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who*

*is charged by DFPS to provide case management services to children in the General class.* [The Court modified the effective date of this Remedial Order to February 15, 2020.[208]]

1.   Background

As discussed above, on December 16, 2019, the Court approved an agreed motion submitted by the parties that required, in part, DFPS to use standardized, statewide caseload guidelines of 14 to 17 children per CVS caseworker.

2.   Data and Information Request and Production

a.   Monitors' Data and Information Request

To assess the State's compliance with Remedial Order 35, the Monitors requested that DFPS comply with the following reporting schedule:

> Provide a report by November 15, 2019 and on a monthly basis thereafter, with caseloads for all staff, including supervisors, who provide primary case management services to any child in the PMC class, with name of employer (public or, as evolves, private), and indicate whether full-time or part-time. The report will be a point in time caseload for November 1 and is due by November 15, then for December 1, 2019 due by December 15, 2019, and monthly thereafter. The reports must include all staff who provide case management services to children in the PMC General Class and their caseloads; the number and percent of staff with caseloads within, below and over the DFPS guideline once established, by office, by county, by agency (if private) and statewide; the identification number and location of all individual staff and the number of PMC children and, if any, TMC children to whom they provide case management; include caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions. Identify all staff subject to a graduated caseload. Provide individual fields for every type of case that the worker carries, including those outside the child welfare domain, if any. Identify for each staff all non-case carrying work, such as IV-E eligibility determinations, that impacts their capacity. Identify all secondary assignments for each staff. Identify at the bottom of the report the total number of supervisors carrying a case.[209]

---

[208] *Workload Studies Order*, at 1-2.

[209] Email from Deborah Fowler and Kevin Ryan to Andrew Stephens, (Sept. 30, 2019) (on file with the Monitors) (including Monitors' Sept. 30, 2019 Data & Information Request in attachment).

The Monitors subsequently wrote to the State and requested DFPS list "by staff member, the names and identification numbers of all children assigned to all staff, including supervisors, who provide primary case management services to any child in the PMC class."[210]

b.   DFPS Data and Information Production

The State has provided point-in-time caseload data monthly to the Monitors, most recently at a 30-day lag. DFPS submitted the last point-in-time caseload data prior to the deadline for validation in this report on August 2, 2021, reflecting the point-in-time caseloads for June 30, 2021. The information in the monthly caseload submissions for DFPS and for OCOK and 2INgage caseworkers included spreadsheets listing all caseload carrying staff, details for the caseloads they carried and spreadsheets listing each child in the custody of DFPS and their legal status. As reported in the Second Report, the information in the caseload submissions for the SSCCs did not contain the information the Monitors requested for supervisors. On January 27, 2021, the Monitors notified DFPS that it should "coordinate with all SSCCs, including those currently in Stage II and going forward, so that all data are provided in the same format wherever possible" for data and information requests as to all Remedial Orders.[211] During this reporting period, the SSCCs provided the requested data for supervisors.

To validate the accuracy of the State's caseload data submissions, the Monitors randomly selected and interviewed 116 caseworkers from 37 counties as described below. In advance of the monitoring team's interviews with caseworkers, DFPS provided caseload information from the State's INSIGHT reporting tool for each identified worker for a date selected by the Monitors;[212] for the SSCCs, DFPS provided the alternative workload reports that the respective SSCCs currently use as they do not use INSIGHT.

3.   Remedial Orders 35 and A4: Caseworker Caseloads

Remedial Order 35: *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS' reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will*

---

[210] Email from Kevin Ryan and Deborah Fowler to Andrew Stephens (Oct. 28, 2019) (on file with the Monitors).

[211] *Memorandum from the Kevin Ryan and Deborah Fowler, Monitors*, to DFPS, at 1 (January 27, 2021) (on file with the Monitors) (requesting information and instructing that DFPS ensure that the SSCCs provide information consistent with the Monitors' requests for all Remedial Orders).

[212] DFPS describes INSIGHT as a tool to "manage critical case tasks and deadlines." DFPS, *Impact Modernization, available at*
https://www.dfps.state.tx.us/Doing_Business/IMPACT_Modernization/default.asp.

include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.

Remedial Order A4: *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class.* (The Court modified the effective date of this Remedial Order to February 15, 2020.)

a.   Methodology

The Monitors cross-checked the monthly data files provided by the State for DFPS caseworkers, OCOK caseworkers, and 2INgage caseworkers and found the number of children assigned to each worker in the listing table added to the number of children in the caseload table. To analyze caseloads, the Monitors used the total number of children assigned to CPS CVS Specialists (I-V) at DFPS; Permanency Specialists at OCOK, and Permanency Case Managers at 2INgage.[213],[214] The monitoring team also independently replicated caseload validation by interviewing 116 caseworkers, selected by the Monitors, about their caseloads and by conducting a comparison of the 116 worker workload reports (INSIGHT or alternative reports used by SSCCs) with the State's caseload data report for the corresponding month.[215]

---

[213] CVS Specialists I, II, III, IV, and V account for over 95% of all the staff listed by DFPS carrying at least one PMC child's case in each of the ten caseload reports the Monitors received from March 2020 to December 2020 from DFPS. Supervisors account for most of the remaining case carrying staff.  For this report, the Monitors eliminated from the analysis staff with other titles because they account for a relatively small number of staff who carry a small number of PMC children on their caseloads. On December 31, 2020, for example, of the 1,337 DFPS carrying at least one PMC case, 1,302 (97%) are CVS Specialists I-V and 14 are supervisors (1%), Program specialists (12), master CVS specialists (5), and staff with other titles (4) account for the remaining 21 staff.

[214] The Monitors did not weight secondary assignments in their assessment of conformity with the caseload guidelines for this report and they continue to collect information in interviews with caseworkers and assess the appropriate methodology.

[215] Furthermore, since the State advised the Monitors that "the supervisor to staff ratio for CVS is 1:7," via Email from Tara Olah to Kevin Ryan and Deborah Fowler on March 24, 2020, in order to assess conformance with standards for supervisors who carried cases, the Monitors calculated supervisors' workloads. The Monitors assigned a weight of 14.29% for each supervised caseworker (100% - a full workload - divided by seven) and 5.88% (100% - a full caseload - divided by the agreed-upon standard of 17 cases) for each PMC/TMC child's case that the supervisor managed directly. To assess a supervisor who supervises six caseworkers and is the primary case manager for one child, the supervisor dedicates 85.74% of their time to supervision (six workers x 14.29%) and 5.88% of their time to primary case management for one child yielding 91.62% of a workload, which is below the supervisor's 100% availability and within the standard. If the supervisor supervises six caseworkers and serves as the primary case manager for four children, an additional 23.52% weight (5.88% x four) is added to their workload of six supervision assignments (85.74% + 23.52%) yielding 109.26% of a caseload, which is greater than 100% of their availability. *See* Deborah Fowler & Kevin Ryan, First Report 173, footnote 475, ECF  869.

b.   Remedial Order 35 and Remedial Order A4: Performance Validation results

As of June 30, 2021, there were 1,515 caseworkers who managed at least one PMC child's case (the totals for the State include caseworkers employed by DFPS (1,323), OCOK (114), and 2INgage (78) combined).[216] In the six months of caseload reports between January 31, 2021 and June 30, 2021, the State reported the highest number of caseworkers managing at least one PMC child's case on May 31, 2021 (1,532) and the lowest number on January 31, 2021 (1,507). From January 31, 2021 to June 30, 2021, the number of caseworkers managing at least one PMC case increased by eight (0.5%).

Remedial Order A4 became effective on February 15, 2020, requiring DFPS to ensure that the caseload standard of 14 to 17 children is "utilized to serve as guidance for supervisors who are handling caseload distribution" and is used to inform "hiring goals for all staff." In six months of caseload reports starting on January 31, 2021 and ending on June 30, 2021, an average of 59% of all caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 41% of these caseworkers served 18 or more children. The highest rate of conformance with the guidelines among the six caseload reports occurred on May 31, 2021 (60%) and the lowest rate occurred on January 31, 2021 and June 30, 2021 (58%). The average rate of caseworkers managing at least one PMC child's case assigned to serve 17 or fewer children was 56% in the Second Report.[217]

As shown in the table below, on June 30, 2021, of the 1,515 caseworkers who managed at least one PMC child's case, 885 (58%) caseworkers had 17 or fewer children on their caseload. Two-hundred and ninety-two (19%) carried 18 to 20 children on their caseloads. Two-hundred and sixty-two (17%) carried 21 to 25 children on their caseloads. The remaining 76 workers (5%) carried more than 25 children on their caseloads, with nine (1% of all workers) carrying more than 30 children on their caseloads. Three-hundred thirty-eight workers (22%) of caseworkers carried 21 children or more on their caseloads on June 30, 2021.

---

[216] DFPS, *RO2.1 CVS caseloads as of RO2.1 CVS caseloads June 2021 8-2-2021 log102935* (on file with the Monitors).
[217] *See* Deborah Fowler & Kevin Ryan, Second Report 154-155, ECF No. 1079.

**Table 9: All Caseworkers Managing at least One PMC Child**
**January 2021 to June 2021**

| Month | Caseworkers Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2021 | 1507 | 876 | 58% | 631 | 42% |
| February 2021 | 1527 | 899 | 59% | 628 | 41% |
| March 2021 | 1524 | 905 | 59% | 619 | 41% |
| April 2021 | 1529 | 906 | 59% | 623 | 41% |
| May 2021 | 1532 | 916 | 60% | 616 | 40% |
| June 2021 | 1515 | 885 | 58% | 630 | 42% |
| **Average** | **1522** | **898** | **59%** | **625** | **41%** |

On June 30, 2021, 40 supervisors managed at least one PMC child's case. The 40 supervisors are an increase of 14% from the 35 supervisors managing at least one case on January 31, 2021. In the six months of caseload reports starting on January 31, 2021 and ending on June 30, 2021, an average of 8% of supervisors managing at least one PMC child's case had one workload[218] or less and an average of 92% had more than one full workload. The highest rate of conforming to the guidelines among the six caseload reports occurred on February 28, 2021 (20%) and the lowest rate (5%) occurred on May 31, 2021.[219]

**Table 10: All Supervisors Managing at least One PMC Child and Total Workload**
**January 2021 to June 2021**

| Month | Supervisors Serving at least one PMC Child | One Workload or Less | | More Than One Workload | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2021 | 35 | 2 | 6% | 33 | 94% |
| February 2021 | 25 | 5 | 20% | 20 | 80% |
| March 2021 | 36 | 2 | 6% | 34 | 94% |
| April 2021 | 34 | 2 | 6% | 32 | 94% |
| May 2021 | 39 | 2 | 5% | 37 | 95% |
| June 2021 | 40 | 3 | 8% | 37 | 93% |
| **Average** | **35** | **3** | **8%** | **32** | **92%** |

---

[218] A "workload" is determined by assigning weight to supervision responsibility as follows: a weight of 14.29% for each supervised caseworker (100% - a full workload - divided by seven) and 5.88% (100% - a full caseload - divided by the agreed-upon standard of 17 cases) for each PMC/TMC child managed directly by the supervisor.

[219] In the Second Report, only data from DFPS was available concerning supervisors managing at least one PMC child's case. *See* Deborah Fowler & Kevin Ryan, Second Report 153, ECF No. 1079.

Note: The average number of supervisors in each column is rounded to the nearest integer. Of the 209 instances when a supervisor carried at least one PMC case at the end of a month, in 193 (92%) the supervisor had more than one full workload.

As of June 30, 2021, 1,323 (87%) of the 1,515 caseworkers managing at least one PMC child's case were employed by DFPS. The 1,323 caseworkers are an increase of 0.5% from the 1,316 DFPS caseworkers managing at least one PMC child on January 31, 2021. In the six months of caseload reports starting on January 31, 2021 and ending on June 30, 2021, an average of 60% of DFPS caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 40% of these caseworkers served 18 or more children. DFPS's highest rate of conforming to the guidelines among the six caseload reports occurred on the February 28, 2021 (61%) and the lowest rate occurred on June 30, 2021 (58%). The average rate of DFPS caseworkers managing at least one PMC child's case assigned to serve 17 or fewer children was 57% in the Second Report.[220]

As shown in the table below, on June 30, 2021, of the 1,323 DFPS caseworkers who managed at least one PMC child's case, 769 (58%) caseworkers had 17 or fewer children on their caseload. Two-hundred and fifty-two (19%) carried 18 to 20 children on their caseloads. Two-hundred and thirty-four workers (18%) carried 21 to 25 children on their caseloads. The remaining 68 workers (5%) carried more than 25 children on their caseloads, with nine (1% of all DFPS workers) carrying more than 30 children on their caseloads. Three-hundred and two (23%) of all DFPS case workers carried 21 children or more on their caseloads on June 30, 2021.

**Table 11: DFPS Caseworkers Managing at least One PMC Child**
**January 2021 to June 2021**

| Month | Caseworkers Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2021 | 1316 | 789 | 60% | 527 | 40% |
| February 2021 | 1330 | 805 | 61% | 525 | 39% |
| March 2021 | 1323 | 797 | 60% | 526 | 40% |
| April 2021 | 1334 | 806 | 60% | 528 | 40% |
| May 2021 | 1336 | 806 | 60% | 530 | 40% |
| June 2021 | 1323 | 769 | 58% | 554 | 42% |
| **Average** | **1327** | **795** | **60%** | **532** | **40%** |

On June 30, 2021, 28 DFPS supervisors managed at least one PMC child's case. The 28 supervisors are an increase of 7% from the 26 supervisors managing at least one case on January 31, 2021. In the six months of caseload reports starting on January 31, 2021 and ending on June

---

[220] *See* Deborah Fowler & Kevin Ryan, Second Report 156, ECF No. 1079.

30, 2021, an average of 1% of DFPS supervisors managing at least one PMC child's case in an end of the month report had one workload or less and an average of 99% had more than one full workload. The highest rate of conforming to the guidelines among the six caseload reports occurred on June 30, 2021 (4%) and the lowest rate, 0%, occurred in the five monthly reports from January 31, 2021 to May 31, 2021.

**Table 12:  DFPS Supervisors Managing at least One PMC Child and Total Workload January 2021 to June 2021**

| Month | DFPS Supervisors Serving at least one PMC Child | One Workload or Less | | More Than One Workload | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2021 | 26 | 0 | 0% | 26 | 100% |
| February 2021 | 16 | 0 | 0% | 16 | 100% |
| March 2021 | 25 | 0 | 0% | 25 | 100% |
| April 2021 | 26 | 0 | 0% | 26 | 100% |
| May 2021 | 27 | 0 | 0% | 27 | 100% |
| June 2021 | 28 | 1 | 4% | 27 | 96% |
| **Average** | **25** | **0** | **1%** | **25** | **99%** |

Note: The average number of supervisors in each column is rounded to the nearest integer. Of the 148 instances when a DFPS supervisor carried at least one PMC case at the end of a month, in 147 (99%) the supervisor had more than one full workload.

As of June 30, 2021, 114 (8%) of the 1,515 caseworkers who managed at least one PMC child's case were employed by OCOK. The 114 caseworkers are an increase of 11% (11) from the 103 OCOK caseworkers managing at least one PMC child on January 31, 2021. In the six months of caseload reports starting on January 31, 2021 and ending on June 30, 2021, an average of 58% of OCOK caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 42% of these caseworkers served 18 or more children. OCOK's highest rate of conforming to the guidelines among the six caseload reports occurred on June 30, 2021 (68%) and the lowest rate occurred on January 31, 2021 (49%). The average rate of OCOK caseworkers managing at least one PMC child's case who had 17 or fewer children on their caseloads was 44% in the Second Report.[221]

As shown in the table below, on June 30, 2021, of the 114 OCOK caseworkers who managed at least one PMC child's case, 77 (68%) caseworkers had 17 or fewer children on their caseloads. Twenty workers (18%) carried 18 to 20 children on their caseloads. Sixteen workers (14%) carried 21 to 25 children on their caseloads. The remaining worker (1%) carried more than 25 children on their caseload. No OCOK worker carried 31 or more children on their caseloads. Seventeen (15%) of all OCOK caseworkers carried 21 children or more on their caseloads on June 30, 2021.

---

[221] *See* Deborah Fowler & Kevin Ryan, Second Report 157, ECF No. 1079.

**Table 13: OCOK Caseworkers Managing at least One PMC Child
January 2021 to June 2021**

| Month | Caseworkers Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2021 | 103 | 50 | 49% | 53 | 51% |
| February 2021 | 110 | 62 | 56% | 48 | 44% |
| March 2021 | 114 | 67 | 59% | 47 | 41% |
| April 2021 | 111 | 64 | 58% | 47 | 42% |
| May 2021 | 109 | 66 | 61% | 43 | 39% |
| June 2021 | 114 | 77 | 68% | 37 | 32% |
| **Average** | **110** | **64** | **58%** | **46** | **42%** |

On June 30, 2021, three OCOK supervisors managed at least one PMC child's case. The three supervisors are an increase from the two supervisors managing at least one case on January 31, 2021. In the six months of caseload reports starting on January 31, 2021 and ending on June 30, 2021, an average of 11% of OCOK supervisors managing at least one PMC child's case at the end of a month had one workload or less and an average of 89% had more than one full workload. OCOK's highest rate of conforming to the guidelines among the six caseload reports occurred on April 30, 2021 (33%) and the lowest rate, 0%, occurred in the three reports from January 31, 2021 to March 31, 2021 and on June 30, 2021.

**Table 14: OCOK Supervisors Managing at least One PMC Child and Total Workload
January 2021 to June 2021**

| Month | OCOK Supervisors Serving at least one PMC Child | One Workload or Less | | More Than One Workload | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2021 | 2 | 0 | 0% | 2 | 100% |
| February 2021 | 2 | 0 | 0% | 2 | 100% |
| March 2021 | 2 | 0 | 0% | 2 | 100% |
| April 2021 | 3 | 1 | 33% | 2 | 67% |
| May 2021 | 6 | 1 | 17% | 5 | 83% |
| June 2021 | 3 | 0 | 0% | 3 | 100% |
| **Average** | **3** | **0** | **11%** | **3** | **89%** |

Note: The average number of supervisors in each column is rounded to the nearest integer. Of the 18 instances when an OCOK supervisor carried at least one PMC case at the end of a month, in 16 (89%) the supervisor had more than one workload.

As of June 30, 2021, 78 (5%) of the 1,515 caseworkers managing at least one PMC child's case were employed by 2INgage. The 78 caseworkers are a decrease of 11% from the 88

caseworkers managing at least one PMC child on January 31, 2021. In the six months of caseload reports for 2INgage starting on January 31, 2021 and ending on June 30, 2021, an average of 45% of 2INgage caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 55% of these caseworkers served 18 or more children. 2INgage's highest rate of conforming to the guidelines among the six caseload reports occurred on May 31, 2021 (51%) and the lowest rate occurred on February 28, 2021 (37%). The average rate of 2INgage caseworkers managing at least one PMC child's case who had 17 or fewer children on their caseloads was 63% in the Second Report.[222]

As shown in the table below, on June 30, 2021, of the 78 2INgage caseworkers who managed at least one PMC child's case, 39 (50%) caseworkers had 17 or fewer children on their caseload. Twenty caseworkers (26%) carried 18 to 20 children on their caseloads. Twelve workers (15%) carried 21 to 25 children on their caseloads. The remaining seven workers (9%) carried more than 25 children on their caseloads. No 2INgage workers carried 31 or more children on their caseloads. Nineteen (24%) of all 2INgage caseworkers carried 21 children or more on their caseloads on June 30, 2021.

**Table 15: 2INgage Caseworkers Managing at least One PMC Child**
**January 2021 to June 2021**

| Month | 2Ingage Caseworkers Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2021 | 88 | 37 | 42% | 51 | 58% |
| February 2021 | 87 | 32 | 37% | 55 | 63% |
| March 2021 | 87 | 41 | 47% | 46 | 53% |
| April 2021 | 84 | 36 | 43% | 48 | 57% |
| May 2021 | 87 | 44 | 51% | 43 | 49% |
| June 2021 | 78 | 39 | 50% | 39 | 50% |
| **Average** | **85** | **38** | **45%** | **47** | **55%** |

On June 30, 2021, nine 2INgage supervisors managed at least one PMC child's case. The nine supervisors are an increase of 29% from the seven supervisors managing at least one case on January 1, 2021. In the six months of caseload reports starting on January 31, 2021 and ending on June 30, 2021, an average of 30% of 2INgage supervisors managing at least one PMC child's case had one workload or less and an average of 70% had more than one workload. The highest rate of conforming to the guidelines among the six caseload reports occurred in the February 28, 2021 monthly report (71%) and the lowest rate, 17%, occurred in the May 31, 2021 monthly report.

---

[222] *See* Deborah Fowler & Kevin Ryan, Second Report 158, ECF No. 1079.

**Table 16: 2INgage Supervisors Managing at least One PMC Child and Total Workload
January 2021 to June 2021**

| Month | 2Ingage Supervisors Serving at least one PMC Child | One Workload or Less | | More Than One Workload | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2021 | 7 | 2 | 29% | 5 | 71% |
| February 2021 | 7 | 5 | 71% | 2 | 29% |
| March 2021 | 9 | 2 | 22% | 7 | 78% |
| April 2021 | 5 | 1 | 20% | 4 | 80% |
| May 2021 | 6 | 1 | 17% | 5 | 83% |
| June 2021 | 9 | 2 | 22% | 7 | 78% |
| **Average** | **7** | **2** | **30%** | **5** | **70%** |

Note: The average number of supervisors in each column is rounded to the nearest integer. The average percent sums the number of supervisors each month. Of the 43 instances during the period when a 2INgage supervisor carried at least one PMC case at the end of a month, in 30 (70%) the supervisor had more than one workload.

To validate the accuracy of the State's monthly caseload data submissions from its IMPACT system, which the Monitors most recently received on a 30-day lag, the monitoring team examined the symmetry of the data within those reports with caseload data from the DFPS INSIGHT database and the SSCCs' data reports. The monitoring team interviewed 86 DFPS and 30 SSCC caseworkers and their supervisors from 37 counties remotely by videoconference between February 2021 and June 2021. All the DFPS caseworkers in the sample had job titles of CPS CVS Specialist I, II, III, IV, or V, CPS Program Specialist or CPS Master V. All of the OCOK caseworkers had a title of Permanency Specialist and the 2INgage caseworkers had a title of Permanency Case Manager. In preparation for these interviews, the monitoring team asked DFPS to provide in advance for its workers a caseload report from DFPS's INSIGHT system corresponding to a previous date near the time of the interview. For the interviews with the SSCC workers, DFPS provided the alterative workload reports that the respective SSCC's utilize as they do not use the INSIGHT system. The monitoring team then reviewed the records with the caseworker, discussing each listed child by name and other work assignments, if any, to verify whether the caseworker's workload matched the DFPS and SSCC records.

The monitoring team compared the results of the caseworker interviews with the monthly caseload data from IMPACT submitted by DFPS to confirm the accuracy of the caseload data collected during the caseworker interviews. During cross-data validation of the workload and INSIGHT reports of the 116 workers interviewed with the monthly caseload data, the monitoring team found that 94% of primary case assignments were a perfect match and 97% were within one case in the caseloads reviewed. The individual caseloads of the sample of interviewed caseworkers ranged from one to 27 children. The monitoring team found that 81 (70%) of the 116 workers were within the generally applicable caseload standards and 35 (30%) exceeded the caseload standards.

4.   Caseloads and Supervision of Children Without Placement

The Monitors' interviews with caseworkers to validate the data DFPS provided about caseloads provided additional insight into other major job responsibilities, over and above the duties associated with caseload management. Most notably, workers described shifts (both required and voluntary) to supervise children who are experiencing lack of placement in CWOP. From February 2021 through June 2021, 45.7% (53) of 116 of caseworkers interviewed reported working a CWOP shift(s). Among caseworkers interviewed in August 2021 and September 2021, that number increased to 63% (38) of 60 caseworkers interviewed. More specifically as to DFPS caseworkers, in February 2021, 27% (8) of 30 DFPS caseworkers reported working a CWOP shift(s) and by August 2021, 86% (26) of 30 DFPS caseworkers interviewed reported working CWOP shifts. SSCC CWOP work activity was high for OCOK workers in both months interviewed: 73% (11) of 15 workers reported CWOP activity during June 2021 interviews and 80% (12) of 15 reported CWOP activity during September 2021 interviews.

Twenty-five percent (13) of the 53 workers interviewed who reported CWOP shift activity from February 2021 through June 2021 had caseloads that exceeded the caseload standard. Of those workers whose caseloads exceeded the caseload standard, four carried 18-20 children on their caseloads; eight carried 21-25 children on their caseloads; and one carried a caseload with over 25 children. Of the 40 caseworkers reporting CWOP activity who carried caseloads meeting the standards, 16 were subject to graduated caseloads at the time they were interviewed.

For the 38 workers interviewed in August 2021 and September 2021 who reported CWOP activity, 47% (18) had caseloads that exceeded the caseload standard. Of those workers whose caseloads exceeded the caseload standard, eight carried 18 to 20 children; nine carried 21to 25 children; and one carried a caseload with over 25 children (31).

Workers described CWOP activity as a mix of required and voluntary shifts that varied in length, typically from four to eight hours. By August, 53% (16) of 30 DFPS caseworkers reported working over 24 hours total of CWOP shifts per month, including nine (30%) whose CWOP activity exceeded 35 hours per month. In September, SSCC workers who reported CWOP activity consisted primarily of OCOK workers and they tended to report less time spent per month on such shifts than did DFPS caseworkers: the majority of those reporting CWOP activity, 58% (7) of 12 SSCC workers, reported working between four and eight hours on CWOP shifts per month, and 17%, (2) of 12 workers reported working 35 CWOP hours or more in September 2021.

5.   Summary

The parties agreed to, and the Court approved, a workload standard of 14 to 17 children per CVS worker, pursuant to Remedial Order A3. To validate the State's performance, the Monitors reviewed and analyzed all data provided by the State. The Monitors' analysis showed that as of

109

June 30, 2021, 58% of all caseworkers (885 of 1,515), including OCOK and 2INgage, had primary caseloads within or below the standard of 17 children per worker. From January 31, 2021 to June 30, 2021, conformity with the standard was 59% of all caseworkers serving at least one PMC child.

Supervisors carried only a small percentage of PMC cases; those who did rarely conformed with the workload standard. In the six months of caseload reports starting on January 31, 2021 and ending on June 30, 2021, an average of 8% of supervisors managing at least one PMC child's case had one workload or less.  From January 31, 2021 to June 30, 2021, conformity with the standard increased from 6% to 8% of all supervisors carrying at least one PMC case.

The Monitors found that conformity with the caseload standard varied among DFPS, OCOK, and 2INgage. Of the 1,313 DFPS workers carrying at least one PMC case on June 30, 2021, 769 workers (58%) had primary caseloads within or below the standard of 17 children per worker. As of June 30, 2021, the two SSCCs that are undertaking case management, OCOK and 2INgage, had 68% and 50% of their workers within or below the standard, respectively. In the data the Monitors received from January 31, 2021 to June 30, 2021, the rate of caseworkers meeting the standard at OCOK was at its highest point (68%) on June 30, 2021; the rate of caseworkers meeting the standard at 2INgage was at its highest point (51%) on May 31, 2021. On June 30, 2021, the combined SSCC rate of caseworkers meeting the standard (60%) was two percentage points higher than the rate at DFPS (58%).

Caseworkers reported significant CWOP shift work during interviews with the monitoring team, including workers whose caseloads did not conform to the caseload standards: 25% (13) of the 53 workers interviewed who reported CWOP shift activity from February 2021 through June 2021 had caseloads that exceeded the caseload standard. For the 38 workers interviewed in August 2021 and September 2021 who reported CWOP shift activity, 47% (18) of them had caseloads that exceeded the caseload standard.

C.  Remedial Orders B1 to B4: RCCI and RCCR Investigator Caseloads

Remedial Order B1:  *Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safety perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges.  The proposal shall include but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study.  DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

Remedial Order B2: *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

Remedial Order B3: *Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standards and part-time in other functions shall be prorated accordingly.*

Remedial Order B4: *Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators or successor staff.*

1. Background

As discussed above, on December 16, 2019, the Court approved an agreed motion submitted by the parties that required, in part, DFPS and HHSC to use standardized, statewide caseload guidelines of 14 to 17 investigations per DFPS RCCI investigator; and 14 to 17 tasks per RCCR inspector. On February 18, 2020, the State sent the Monitors the guidance developed for HHSC and DFPS staff related to the caseload guidelines.[223]

a. Data and Information Production

DFPS and HHSC continue to provide caseload data to the Monitors on a monthly basis, with data from DFPS representing investigator and supervisor caseloads as of the last day of the month and data provided by HHSC representing inspector and supervisor caseloads as of the first day of the month.

b. Validation Findings from the Monitors' Second Report

The Monitors' Second Report analyzed caseloads for March 2020 through December 2020 and found that the majority of RCCI caseloads and RCCR caseloads were within the guidelines for each month in that time period. However, 35% of RCCI investigators (25 of 72) and 71% of RCCR inspectors (76 of 107) had caseloads that exceeded the guidelines in one or more months during

---

[223] The guidance was discussed in detail in the Monitors' First Report. Deborah Fowler & Kevin Ryan, First Report 182 -184, ECF No. 869.

the period examined. There was also a significant difference in low and high caseloads during the period examined, with RCCI caseloads ranging from one to 45, and RCCR caseloads ranging from one to 25.

2.  Remedial Orders B1 through B4 Performance Validation

a.  Methodology

The Monitors analyzed monthly caseload data submissions from DFPS and HHSC for investigator, inspector, and supervisor caseloads for the months of January 2021 through June 2021.

The monitoring team also conducted interviews via videoconference on July 29-30, 2021 and August 30-31, 2021 for DFPS RCCI staff; for HHSC RCCR staff, the monitoring team conducted interviews on August 2-3, 2021 and September 1-2, 2021. The interviews were used to validate the State's monthly data production and to assist the Monitors in better understanding RCCI and RCCR caseloads. The monitoring team interviewed 32 RCCI staff: 26 investigators, and six supervisors. [224] The monitoring team also interviewed 28 RCCR staff: 20 inspectors and eight supervisors.[225]

b.  Data Limitations

Data limitations and issues identified in RCCI data included:

- Data provided by DFPS did not include staff work locations or hire dates. Tenure data was found in data provided to validate CSA training requirements pursuant to Remedial Order 32, though not all staff hiring and location assignment details were found in the data.
- DFPS caseload data include both RCCI and non-RCCI staff assigned to work as the primary investigator on investigations, as well as their supervisors. Staff were categorized based on job title, with the exception of supervisors. Staff were categorized as a supervisor for the month if they were assigned one or more subordinates during the month. Supervisors handling investigations and having no subordinates in the month were considered to be "non-investigator" staff. No information was provided to the Monitors for special and master investigators handling RCCI cases.

---

[224] RCCI investigators and supervisors were selected for interview from a list of all staff working as RCCI investigators and supervisors as of July 22, 2021, provided to the Monitors by DFPS. Staff members who were interviewed previously, not yet case assignable, or who had been case assignable for one month or less were not eligible for interviews.  Approximately 50% of eligible staff were randomly selected for interview.  A total of 32 RCCI staff were interviewed: 26 investigators and six supervisors.

[225] RCCR inspectors and supervisors were selected from a list provided by HHSC of all staff working as RCCR inspectors and supervisors as of June 7, 2021. Staff interviewed previously, staff not yet case assignable, Heightened Monitoring inspectors and supervisors, and staff who had been case assignable for one month or less were not eligible for interview. Approximately 50% of eligible staff were randomly selected for interview.

- DFPS reported that RCCI investigators and supervisors could be assigned as the primary investigator on a case "in name only." According to DFPS, this is done so that investigations assigned to DFPS staff outside of the RCCI program will be reflected in RCCI caseload data. No information was provided to identify cases for which DFPS staff outside of RCCI are responsible.

Data limitations and issues identified in RCCR data included:

- Administrative review cases are included in RCCR data provided by HHSC. RCCR supervisors are responsible for determining whether a finding should be overturned or upheld in an administrative review case. Once a decision is made in the administrative review, the case is returned to the inspector who handled the case for closure. Administrative review cases held by inspectors are not included in the inspector caseload analysis, because no additional work is performed on the case. This process also allows for an analysis comparable to the RCCI caseload analysis; RCCI investigations pending appeal or under administrative review are not included in the caseload of investigators who handled the investigation.
- RCCR caseloads include assigned operations in all months even though there may be no monitoring activity in the operation during the month. Operations are usually monitored for minimum standards compliance one to two times per year. Agency home sampling inspections may be assigned to inspectors quarterly and remain on their caseload until completion even though no monitoring activity may have occurred during the month.

c.   Remedial Orders B1 to B4 Performance Validation Findings

  i.   RCCI Caseloads

*Analysis of caseload data*

The Monitors analyzed monthly caseload data for RCCI investigators, supervisors and non-investigator RCCI staff working on RCCI investigations. The total number of open RCCI investigations declined dramatically between January 2021 and June 2021. The total number of RCCI investigations assigned to a caseload declined 39% during that time period.[226]

---

[226] As discussed in this report, DFPS sharply reduced a substantial backlog of overdue RCCI investigations during this period and, to do so, brought in 88 staff from other divisions to assist with RCCI investigations beginning in January 2021. Status Hr'g Tr. 39:6-10 (May 4, 2021), ECF No. 1094. At the May 5, 2021 status hearing, DFPS reported that 40 special investigators were still assisting RCCI with investigations. *Id.* at 42:16-18.

**Figure 32: Number of RCCI Investigations by Month, January 2021 to June 2021**



The majority of RCCI investigator caseloads were at or below the guidelines between January 2021 and June 2021; in March and April 2021, all investigators' caseloads were within the guidelines. As the number of open cases declined, the percentage of investigators with caseloads within the guidelines increased.

**Table 17: RCCI Investigators with Caseloads At or Below the Guidelines, January 2021 to June 2021**

| RCCI Investigators Conforming to Caseload Guidelines | | | |
|---|---|---|---|
| Month (2021) | Number of Investigators | Number with 17 or Fewer Investigations | Percent with 17 or Fewer Investigations |
| January | 57 | 44 | 77% |
| February | 52 | 38 | 73% |
| March | 56 | 56 | 100% |
| April | 53 | 53 | 100% |
| May | 62 | 61 | 98% |
| June | 68 | 66 | 99% |

The vast majority of investigator caseloads were at or below the guidelines during the period, though there were RCCI investigators with caseloads higher than the guidelines in four of the six months included in the analysis. Nineteen percent of investigators (14 of 75) had a caseload of 18 or more investigations in at least one month during the period. Between January 2021 and June

2021, RCCI investigator caseloads ranged from one to 57 investigations; however, as the number of open cases declined, the range between caseload lows and highs was substantially reduced.

**Figure 33:  RCCI Investigators Caseload High and Low by Month, Jan. 2021 to June 2021**



RCCI supervisors oversaw up to five investigators, providing support on as many as 156 investigations per month between January 2021 and June 2021.[227] During that period, the number of investigators serving as the primary investigator on an investigation increased from 57 to 68, and the number of supervisors increased from 13 to 14. RCCI supervisors may also act as the primary investigator on an investigation in addition to supervising staff. According to DFPS, this usually occurs temporarily pending assignment of the case to an investigator; when staff leave the agency; when there are a higher-than-normal number of cases being investigated; or when supervisors are needed to work on backlogged cases. Between January 2021 and June 2021, the number of supervisors working as the primary investigator on an investigation ranged from one to six, and the total number of investigations assigned to supervisors ranged from one to 12.

---

[227] Supervisors for this analysis included RCCI supervisors and managers.  Subordinates to these supervisors are RCCI investigators. Supervisors of non-RCCI investigator staff were not included in this analysis.

**Table 18: Number of RCCI Supervisors, Average Investigators Supervised, Average and High Number of Cases Supervised, Jan. 2021 to June 2021**

| Month (2021) | Number of RCCI Supervisors | Average RCCI Investigators per Supervisor | Average and High Number of Cases Supervised | |
|---|---|---|---|---|
| | | | Average | High |
| January | 13 | 4 | 62 | 156 |
| February | 13 | 4 | 58 | 138 |
| March | 13 | 4 | 31 | 59 |
| April | 13 | 4 | 34 | 61 |
| May | 13 | 5 | 39 | 74 |
| June | 14 | 5 | 35 | 80 |

*Analysis of information collected during interviews with RCCI investigators and supervisors*

In preparation for interviews conducted by the monitoring team with RCCI investigators and supervisors, investigators and supervisors were asked to print their caseload report one day prior to the interview. These reports were provided to the Monitors by DFPS on the day of the interview.

During the interview, the monitoring team asked investigators for their current caseload, and compared the number of investigations reported by the investigator with the number of investigations on the investigator's caseload report. Of the 26 investigators interviewed, nine (35%) reported having a different number of investigations on their caseload than the number that appeared on their report. However, the difference between what was reported and what the caseload report showed was no more than two cases; four investigators had one fewer case on their caseload report than they reported having during the interview, three investigators had one more case on their caseload report than they reported having, and two investigators had two more cases on their caseload report than they reported having during the interview.

When the monitoring team compared the RCCI investigator cases shown on the caseload reports provided for the interviews to the monthly caseload data provided to the Monitors, the number of cases on the investigators' caseload report did not match the monthly data for 65% (17 of 26) of the investigators interviewed. However, the difference between the reports was no more than two cases for any of the investigators interviewed and would not have affected caseloads for purposes of the guidelines for any of the investigators with discrepancies.[228]

---

[228] Interviews were conducted July 29-30, 2021 and August 30-31, 2021. The monthly data received includes the number of cases as of July 31, 2021 and August 31, 2021. The one-to-two day time difference may account for some of the differences in the data. The interviews were conducted for the purpose of validating the accuracy of monthly data provided by DFPS and HHSC related to RCCI and RCCR caseloads, and providing insight into overall caseload

Many of the cases included on investigators' caseload reports were completed cases that were awaiting supervisor review and closure. More than a quarter of investigators (7 of 26 or 27%) had half or more of the investigations on their caseload report completed at the time of the interview. Across the 26 RCCI investigators interviewed, there were a total of 210 cases on their caseload reports; of these, 75 (36%) were showing as completed and awaiting supervisor approval.

**Figure 34:  Proportion of RCCI Investigators' Cases with a Completed Date at the Time of Interview**



All of the RCCI investigators interviewed reported that they had job duties in addition to conducting investigations. The most common examples were courtesy assignments, trainings, and staffings.

---

trends, rather than for the purpose of providing information specifically related to the caseload data provided by DFPS and HHSC for the months of January 2021 to June 2021.

**Figure 35:  Other Job Responsibilities Reported by RCCI Investigators**



## ii.    RCCR Caseloads

*Analysis of caseload data*

The monitoring team analyzed caseload data for RCCR inspectors and supervisors. The total monthly number of RCCR tasks (investigations,[229] assigned operations, and sampling inspections in agency homes), increased between January 2021 and April 2021 but then declined in May 2021 and June 2021.

---

[229] "Investigations" include abuse, neglect, and exploitation investigations and investigations of alleged minimum standards violations. Investigations may or may not include an on-site inspection.  RCCR inspectors review potential minimum standards violations identified by RCCI investigators during abuse, neglect, and exploitation investigations. These reviews may involve an inspection or a desk assessment.

**Figure 36:  Number of RCCR Tasks, January 2021 to June 2021**



Facility inspections accounted for more than half of the tasks reported each month during the period analyzed.[230]

**Figure 37: RCCR Tasks by Type, January 2021 to June 2021**

---

[230] "Facility inspections" include assigned operations and agency home sampling inspections. RCCR inspectors are assigned specific operations which remain on their caseloads in all months regardless of actual monitoring activity in those operations in the month. Operations are usually monitored one-to-two times per year for minimum standards compliance. Agency home inspections, or sampling inspections, are randomly assigned to inspectors at least quarterly and remain on the caseload until completed.

The majority of inspectors had caseloads that met the guidelines during all but one month of the period analyzed.[231] The proportion of inspectors with caseloads conforming to the guidelines varied among the months analyzed, with a low of 47% of inspectors (42 of 90) with conforming caseloads in February 2021 and a high of 79% of inspectors (76 of 96) with conforming caseloads in June 2021.

**Table 19: RCCR Inspectors with Caseloads' At or Below Guidelines,**
**Jan. 2021 to June 2021**

| RCCR Inspectors Conforming to Caseload Guidelines | | | |
|---|---|---|---|
| Month (2021) | Number of Inspectors | Number with 17 or Fewer Tasks | Percent with 17 or Fewer Tasks |
| January | 82 | 46 | 56% |
| February | 90 | 42 | 47% |
| March | 92 | 46 | 50% |
| April | 100 | 61 | 61% |
| May | 95 | 70 | 74% |
| June | 96 | 76 | 79% |

Though the proportion of RCCR inspectors with caseloads higher than the guidelines decreased through the period analyzed, between January 2021 and June 2021, 64% of inspectors (72 of 113) had one or more months with a caseload above the guidelines. Twenty-six percent of inspectors (29 of 113) had caseloads above the guidelines in every month of the period examined.[232] Caseload highs and lows varied among the months, ranging from a low of one to a high of 55 tasks.

---

[231] The number of RCCR inspectors reflects the number of inspectors with one or more assigned tasks on the first of the month. The number of tasks on inspector caseloads does not include team inspections when the inspector is not the primary on the case, or investigations where the inspector is a designee or secondary on the case.

[232] According to the policies adopted by HHSC, variation in caseloads may be the result of inspector tenure, case complexity, case location, and inspector work location. Time on the job, or tenure alone, however, does not explain differences in caseload size. In June 2021, inspectors with caseloads of ten or fewer tasks had an average tenure of five years compared to an average tenure of 2.9 years for inspectors with caseloads of 18 or more tasks.

**Figure 38:  RCCR Inspector Caseload Highs and Lows, Jan. 2021 to June 2021**



RCCR supervisors managed an average of four inspectors and oversaw an average of 66 RCCR inspector tasks per month. The number of inspectors supervised ranged from one to ten, with the highest number of tasks for which a supervisor provided oversight ranging from 103 to 167.

**Table 20:  Number of RCCR Supervisors, Average Investigators Supervised, Average and High Number of Tasks Supervised, January 2021 to June 2021**

| Month (2021) | Number of RCCR Supervisors | Average RCCR Inspectors per Supervisor | Average and High Number of Tasks Supervised | |
|---|---|---|---|---|
| | | | Average | High |
| January | 24 | 4 | 60 | 103 |
| February | 25 | 4 | 64 | 118 |
| March | 24 | 5 | 72 | 143 |
| April | 25 | 5 | 72 | 124 |
| May | 25 | 4 | 66 | 144 |
| June | 27 | 4 | 62 | 167 |

Supervisors may be assigned tasks in addition to supervising inspectors; according to HHSC,[233] investigations assigned to an RCCR supervisor were pending assignment to an inspector. Supervisors also are assigned investigations under administrative review and make determinations

---

[233] HHSC reported this to the Monitors in the May 2020 caseload data.

regarding the original findings of the case.  Once a determination is made, the case is returned to the inspector who conducted the investigation for closure. The number of administrative reviews assigned to RCCR supervisors increased 193% between January 2021 and June 2021.

**Figure 39: Tasks and Administrative Reviews Assigned to RCCR Supervisors, January 2021 to June 2021**



*Analysis of information collected during interviews with RCCR inspectors and supervisors*

In preparation for interviews with the monitoring team, RCCR inspectors and supervisors were asked to print their caseload report one day prior to their interview. These reports were provided to the Monitors by HHSC on the day of the interview.

During the interview, the monitoring team asked inspectors how many tasks were on their caseload and compared their answers to the caseload reports provided to the Monitors. The majority of inspectors' answers matched their caseload reports across all types of tasks assigned. Where there were differences between the inspector's answer and the caseload report for the inspector, differences were no more than two for the number of assigned operations, no more than three for the number of assigned sampling inspections, and no more than four for investigations.

When the monitoring team compared the inspector's caseload reports to monthly caseload data, the number of total tasks on the interviewed inspectors' caseload reports did not match the monthly data for half of the inspectors (10 of 20) interviewed.[234] Of the ten inspectors whose caseload

---

[234] The monitoring team conducted the caseload interviews on August 2-3 and September 1-2; the monthly data the Monitors received reflected the number of cases as of August 1 and as of September 1. Differences in the dates may account for some of the differences in the Monitors' caseload report comparison, especially the number of investigations.

reports did not match monthly data, seven had a difference of one task, two had a difference of two tasks, and one had a difference of four tasks. The differences were most significant for the number of investigations: the number of investigations listed on caseload reports differed from the monthly data for seven of the 20 inspectors interviewed (35%). However, the discrepancy did not affect the status of the inspectors' caseloads for purposes of the guidelines: all of the inspectors' caseloads were already over the guidelines, or the difference did not place them over the guidelines.

**Figure 40: Comparison of RCCR Inspector Tasks Reported in Caseload Reports and in Monthly Data Provided to Monitors**



More than half of the inspectors interviewed (11 of 20) reported that they had assigned tasks where they were not the primary inspector. When asked whether these assignments appeared on their caseload reports, half of the inspectors interviewed (10 of 20) indicated that secondary assignments do not appear on an inspector's caseload reports, while two inspectors reported that secondary assignments were included. Eight did not know whether secondary assignments appeared on caseload reports.

All RCCR inspectors interviewed reported having to perform duties in addition to those that appear on their caseload. The most commonly cited examples of additional job responsibilities included reviewing requests from operations for a waiver or variance, courtesy assignments, and enforcement team conferences.[235]

---

[235] Inspectors assigned to an operation are responsible for activities related to that operation in addition to regular inspections, including reviewing waiver and variance requests and conducting enforcement team conferences. These activities are considered part of the overall facility task assignment.

**Figure 41: Other Job Responsibilities Reported by RCCR Inspectors**



### 3.  Summary

The majority of RCCI investigators' caseloads were within the guidelines during each month of the period from January 2021 through June 2021. The majority of RCCR inspectors' caseloads were within the guidelines during each month of this period, with the exception of February 2021. The number of open RCCI investigations dropped substantially between January 2021 and March 2021 due to DFPS's effort to reduce backlogs and by bringing in additional staff support from other divisions. Though there were discrepancies between the caseload reports and monthly data for investigators and inspectors interviewed, the differences were minor.

### D.  Remedial Order 2: Graduated Caseloads

Remedial Order 2: *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

### 1.  DFPS Graduated Caseload Policy

Pursuant to the generally applicable, internal caseload standards, effective February 15, 2020, in the first month following a protégé worker's eligibility for primary case assignment, per DFPS's policy, the protégé's caseload may not exceed six children.[236] In the second month of eligibility, the protégé's caseload may not exceed 12 children.[237] In the third month of eligibility, the protégé is eligible to be assigned a full caseload.[238]

## 2.   Data and Information Request and Production

DFPS previously informed the Monitors that the department did not have the capacity to report the total number of days during the month that new caseworkers' caseloads are not compliant with the graduated caseload standard.[239] Instead, DFPS had provided to the Monitors compliance data on the 15th and 45th days after caseworkers' eligibility for primary case assignment.[240] DFPS now provides the total number of days during the month that new caseworkers' caseloads are not compliant with the graduated caseload standard. The Monitors also received data reporting on the dates that caseworkers become eligible for primary case assignments, thus triggering the start date for calculation of graduated caseload performance.

DFPS provides data reports for its caseworkers, along with caseloads for the caseworkers employed by the two SSCCs that are responsible for case management in their respective regions, as well as the dates associated with primary case assignment eligibility. In the Second Report, the Monitors reported that DFPS did not provide data from OCOK that was sufficiently reliable to assess performance associated with Remedial Order 2.[241] During this reporting period, DFPS resubmitted updated data reports from OCOK which were sufficient to allow for assessment of OCOK's conformance with the graduated caseload policy.

## 3.   Remedial Order 2 Graduated Caseloads Results and Performance Validation

## a.   Methodology

The Monitors evaluated the State's performance associated with Remedial Order 2 through analysis of data provided by DFPS about its own caseworkers and the caseworkers employed by OCOK and 2Ingage, the two SSCCs responsible for case management during this period.[242] The

---

[236] DFPS, *Generally Applicable Caseload Standards – Guidelines for Conservatorship (CVS)*, at 8 (July 2020) [hereinafter *CVS Caseload Standards*].

[237] *Id.*

[238] *Id.*

[239] Deborah Fowler & Kevin Ryan, First Report 163-164, ECF No. 869; Email from Andrew Stephens to Kevin Ryan and Deborah Fowler (Oct. 18, 2019) (on file with the Monitors) (attaching DFPS Information and Data Request Proposal in response to the Monitors' Sept. 30, 2019 Data and Information request).

[240] DFPS reported in March 2020 that it was unlikely it could report on the daily compliance data for graduated caseloads in the near term. *See* Email from Tara Olah to Kevin Ryan and Deborah Fowler (Mar. 24, 2020) (attaching DFPS response to Feb. 21, 2020 Data and Information Request).

[241] *See* Deborah Fowler & Kevin Ryan, Second Report 145, ECF No. 1079.

[242] The Monitors used the following reports: DFPS, *R02.4 and R01.1 DFPS CVS Grad CL and CPD grads Jan 2021 - 3-1-21  101340* (on file with the Monitors) [the file was received with January 2020 in the title but the data was

Monitors used the standard that became effective on February 15, 2020 to assess performance.[243] To further validate the accuracy of the State's caseload data, the monitoring team also interviewed 26 randomly selected caseworkers who were subject to graduated caseloads and validated the data in the caseload reports.

For this report, the monitoring team examined the caseloads of caseworkers who became eligible for case assignment between January 1, 2021 and June 15, 2021. The Monitors verified whether staff subject to graduated caseload conformed to the graduated caseload standard at three points in time: the 15th day after eligibility, the 45th day after eligibility, and on the calendar date at the end of the month after the 15th day of eligibility. To assess performance associated with the graduated caseload standards, the monitoring team calculated the percentage of workers who carried the number of children on their caseloads that was at or below the allotted caseload limit by the total number of staff subject to graduated caseloads at each point in time.[244]

b.  Remedial Order 2: Performance Validation Results

The monitoring team identified 296 unique caseworkers who became eligible for case assignment and subject to graduated caseloads between January 1, 2021 and June 15, 2021. Of these 296 staff, 245 worked for DFPS, 21 worked for OCOK, and 30 staff worked for 2INgage. Most of the caseworkers subject to graduated caseloads who worked for DFPS had the job title CPS CVS Specialist I (211 of 245 or 86%). The other workers subject to graduated caseloads had the job titles CPS CVS Specialist II (13 of 245 or 5%), III (11 of 245 or 4%), or IV

---

January 2021 and the Monitors have corrected the title to reflect the contents].; DFPS, *R02.4 and R01.1 DFPS CVS Grad CL and CPD grads feb 2021 - 4-1-21 101645* (on file with the Monitors); DFPS, *R02.4 and R01.1 DFPS CVS Grad CL and CPD grads mar 2021 5-3-21 101883* (on file with the Monitors); DFPS, *R02.4 and R01.1 DFPSCVSGradCLandCPDGrads_2021_04d2021_6_1_log 102214* (on file with the Monitors); DFPS, *RO2.4andRO1.1 DFPSCVSGradCLandCPDGrads_2021_05d2021_7_1_log102484* (on file with the Monitors); DFPS, *RO2.4andRO1.1 DFPSCVSGradCLandCPDGrads_2021_06d2021_8_2_log102749* (on file with the Monitors); DFPS, *OCOK Staffing Report - Jan 2021-NewFormat* (on file with the Monitors); DFPS, *OCOK Staffing Report - Feb 2021-NewFormat* (on file with the Monitors); DFPS, *OCOK Staffing Report - Mar 2021-NewFormat* (on file with the Monitors); DFPS, *RO1.1 CPD and graduated CL for OCOK April 2021 06-01-2021* (on file with the Monitors); DFPS, *RO1.1 CPD and graduated CL for OCOK May 2021 07-01-2021* (on file with the Monitors); DFPS, *RO1.1 CPD and graduated CL for OCOK June 2021 08-02-2021* (on file with the Monitors); DFPS, *RO1.1 CPD 2Ingage new hires jan 21 - 3-1-21* (on file with the Monitors); DFPS, *RO1.1 CPD and graduated CL for 2Ingage Feb - 4-1-21* (on file with the Monitors); DFPS, *RO1.1 CPD and graduated CL for 2INGAGE March 2021 05-03-2021* (on file with the Monitors); DFPS, AR TX 333 *RO1.1 CPD and graduated CL for 2INGAGE April 2021 06-01-2021* (on file with the Monitors); DFPS, *RO1.1 CPD and graduated CL for 2INgage May 2021 07-01-2021* (on file with the Monitors); DFPS, *RO1.1 CPD and graduated CL for 2Ingage June 2021 08-02-2021* (on file with the Monitors); *2INgage Graduated caseload request to SSCCs through 02012021* (March 2, 2021) (on file with the Monitors); DFPS, *OCOK Graduate caseload request to SSCCs* (March 2, 2021) (on file with the Monitors).
[243] *See Workload Studies Order.*
[244] For example, a worker who became case assignable on June 7, 2021 would be assessed on the worker's caseload on the 15th day after case assignability (June 22, 2021); the last day of the calendar month after the 15th day (June 30, 2021); and on the 45th day after case assignability (July 22, 2021). The monitoring team analyzed the data to determine whether the last day of the calendar month after the 15th day was in the first 30-day period after case assignability with a standard of six children or the second 30-day period after case assignability with a standard of 12 children.

(10 of 245 or 4%).[245] The caseworkers subject to graduated caseloads at 2INgage all had the title of Permanency Case Manager. The caseworkers subject to graduated caseloads at OCOK all had the title of Permanency Specialist.

As shown in the table below, on the 15th day after becoming case assignable, 97% (288 workers) of the 296 workers conformed to the graduated caseload standard of six or fewer case assignments. On the last day of the month following the 15th day, 98% (289 workers) of 294 active workers were in conformance with the graduated caseload standard.[246] On the 45th day after becoming case assignable, 100% (218 workers) of the 218 workers still receiving case assignments and who had reached their 45th day after becoming case assignable conformed to the graduated caseload standard.

**Table 21: Caseworkers Conforming to the Graduated Caseload Standards at Three Points in Time**

| Texas Caseworkers Conforming to Graduated Caseload Standard at Three Points in Time | | | | | |
|---|---|---|---|---|---|
| Month Case Assignable | New Caseworkers | 15th Day | Last Day of Month | 45th Day | Average |
| January 2021 | 55 | 96% | 96% | 100% | 98% |
| February 2021 | 60 | 100% | 98% | 100% | 99% |
| March 2021 | 57 | 96% | 98% | 100% | 98% |
| April 2021 | 44 | 95% | 100% | 100% | 98% |
| May 2021 | 41 | 98% | 100% | 100% | 99% |
| June 2021 | 39 | 97% | 97% | * | 97% |
| **Total** | **296** | **97%** | **98%** | **100%** | **98%** |

*Note: The caseworkers who became case assignable in June 2021 had not yet reached their 45th day of accepting cases in the data the Monitors reviewed for this report.

Over the three points in time, 98% of new caseworkers' caseloads were in conformance with the graduated caseload standard. The high correlation of rates of conformance on the last day of the month to the rates for the 15th and 45th days is important, as the end of month data were verified by the Monitors through interviews with caseworkers.[247]

In general, almost all workers who became case assignable after January 1, 2021 received assignments that conformed to the graduated caseload standards.  Assignments at the two SSCCs,

---

[245] The percentages do not add to 100 due to rounding.

[246] The standard the Monitors used on the last day of the month after the 15th day of case assignability was either six assignments or 12 assignments depending on when the worker became eligible to accept cases. Fewer than ten workers did not match to the end of the month caseload data and had no termination date. These workers had no cases assigned on their 15th day following case assignability and were assumed to have been assigned no cases at the end of the month (and thus were not included in the end of the month caseload data) and conformed to the graduated caseload standard.

[247] *See infra*, Section IV.B.

OCOK and 2Ingage, were often substantially below the applicable standards in the first and second months of case assignability. In conversations with the monitoring team, the SSCCs indicated that keeping caseloads low during the first two months after a worker became case assignable was part of their onboarding strategy.[248]

The monitoring team interviewed 26 caseworkers subject to the graduated caseloads policy under Advancing Practice. On April 5 and April 6, 2021, the monitoring team interviewed via videoconference a randomly selected sample of 26 DFPS caseworkers assigned to 16 counties across the state who were hired into a CVS caseworker position between September 9, 2020 and January 18, 2021 and became subject to graduated caseloads between February 12 and March 22, 2021.[249] Twenty-three of the caseworkers in the sample had the job title CPS CVS Specialist I, one was a CPS CVS Specialist II, and two had the job title of CPS CVS Specialist III. The monitoring team reviewed with the workers their case assignment detail reports dated April 1, 2021 generated from the DFPS INSIGHT system. The individual caseloads of the sample of caseworkers interviewed ranged from one to 12 children. Fifteen of the caseworkers were in the first month of eligibility for case assignment and 11 of the workers were in the second month of case assignability. Two caseworkers (15%) had caseloads that exceeded the caseload guidance; both were in the first month of case assignability. The monitoring team compared the results of the interviews of these caseworkers with the corresponding monthly caseload data submitted by DFPS to confirm the accuracy of the graduated caseload data collected during caseworker interviews. During the Monitors' cross-data validation of the INSIGHT reports of these 26 workers with the DFPS monthly caseload data, the monitoring team found that 96% of the caseloads were a perfect match to those reported directly by caseworkers interviewed who were subject to graduated caseloads.

4.  Summary

For staff subject to graduated caseload standards between January 1, 2021 and June 15, 2021:

- On average, staff's caseloads conformed with the graduated caseload standards over 98% of the time. This represents the average rate of conformance of the 296 workers assessed on their 15th day following case assignability; the 294 workers assessed on the last day of the month following the 15th day of case assignability; and the 218 workers assessed on their 45th day following case assignability.

- On the 15th day, 97% of workers conformed to the graduated caseload standard of six children.

- On the last day of the month following the 15th day of case assignability, 98% of workers conformed to the graduated caseload standard.

---

[248] These discussions occurred during virtual meetings with staff members from OCOK and 2Ingage and the monitoring team on June 15, 2021 and June 17, 2021.
[249] The Monitors plan to interview SSCC workers subject to graduated caseloads policy in the next reporting period.

- On the 45th day, 100% of workers conformed to the graduated caseload standard of 12 children.

- The State's compliance with Remedial Order 2 exceeded 97% in each of the six months during the period.

- Rates of conformity did not vary significantly between DFPS and the two SSCCs with case management responsibilities (OCOK and 2Ingage).

LIST OF TABLES

Table 1: Race for Children in PMC on June 30, 2021 and Estimates of Total Child Population in Texas by Race, August 12, 2021ˑ ................................................................................................ 19
Table 2: Exits from PMC by Exit Outcome, January 1, 2021 to June 30, 2021 .......................... 21
Table 3: Out of State PMC Youth by Living Arrangement Type, ................................................. 22
Table 4: Authorized Level of Care for Children in PMC as of June 30, 2021 ............................ 22
Table 5: Top Five Counties of Removal for PMC Children on June 30, 2021 ........................... 23
Table 6: PMC Children by Regions on June 30, 2021 ................................................................. 23
Table 7: PMC Children from Regions with Single Source Continuum Contractor Presence by Region on June 30, 2021 .............................................................................................................. 24
Table 8: Number of Complaints Made to Foster Care Ombudsman, January to June 2021 ........ 67
Table 9: All Caseworkers Managing at least One PMC Child January 2021 to June 2021 ....... 103
Table 10: All Supervisors Managing at least One PMC Child and Total Workload  January 2021 to June 2021 ............................................................................................................................... 103
Table 11: DFPS Caseworkers Managing at least One PMC Child January 2021 to June 2021 . 104
Table 12:  DFPS Supervisors Managing at least One PMC Child and Total Workload January 2021 to June 2021 ..................................................................................................................... 105
Table 13: OCOK Caseworkers Managing at least One PMC Child January 2021 to June 2021 106
Table 14: OCOK Supervisors Managing at least One PMC Child and Total Workload  January 2021 to June 2021 ..................................................................................................................... 106
Table 15: 2INgage Caseworkers Managing at least One PMC Child January 2021 to June 2021 ................................................................................................................................................... 107
Table 16: 2INgage Supervisors Managing at least One PMC Child and Total Workload January 2021 to June 2021 ..................................................................................................................... 108
Table 17: RCCI Investigators with Caseloads At or Below the Guidelines, ............................. 114
Table 18: Number of RCCI Supervisors, Average Investigators Supervised, Average and High Number of Cases Supervised, Jan. 2021 to June 2021 ............................................................. 116
Table 19: RCCR Inspectors with Caseloads' At or Below Guidelines, .................................... 120
Table 20:  Number of RCCR Supervisors, Average Investigators Supervised, Average and High Number of Tasks Supervised, January 2021 to June 2021 ........................................................ 121
Table 21: Caseworkers Conforming to the Graduated Caseload Standards at Three Points in Time ................................................................................................................................................... 127

LIST OF FIGURES

Figure 1: Age of Children in PMC on June 30, 2021 .................................................................. 18
Figure 2: Living Arrangements for Children in PMC on June 30, 2021 ..................................... 20
Figure 3: Length of Stay in Care of Children in PMC on June 30, 2021 .................................... 20
Figure 4: Number of SWI Calls by Month .................................................................................. 30
Figure 5: Time Callers Waited before Calls were Handled or Abandoned ................................. 31
Figure 6: Duration of Handled SWI Calls ................................................................................... 32
Figure 7: Number of SWI Calls Handled and Abandoned by Day of the Week ......................... 34
Figure 8: Allegation Types for RCCI Intakes Involving PMC Children in Licensed Placements, January 1, 2021 to June 30, 2021 ................................................................................................. 38
Figure 9: Closed RCCI Investigations, January 1, 2021 to April 30, 2021 ................................ 41
Figure 10: Reason to Believe Findings in Closed RCCI Investigations Involving PMC Children in Licensed Placements ................................................................................................................. 42
Figure 11: Alleged Perpetrators in RCCI Involving PMC Children in Licensed Placements ...... 43
Figure 12: Initiation of Investigations within 24 Hours in Priority One Investigations per existing policy ............................................................................................................................................ 54
Figure 13: Initiations of Investigations within 72 Hours in Priority Two Investigations per existing policy ............................................................................................................................................ 55
Figure 14: Face-to-Face Contact within 24 Hours with All Alleged Child Victims in Priority One Investigations ............................................................................................................................... 56
Figure 15: Face-to-Face Contact within 72 Hours with All Alleged Child Victims in Priority Two Investigations ............................................................................................................................... 57
Figure 16: Completion of Priority One and Two Investigations within 30 Days ........................ 59
Figure 17: Completion of Priority One and Two Investigations within 30 Days over Time ....... 59
Figure 18: Number of Extensions in Priority One and Two Investigations ................................. 61
Figure 19: Notification Letter Sent to Referent within Five Days of Investigation Closure in Closed Priority One and Two Investigations ........................................................................................... 62
Figure 20: Notification Letter Sent to Provider within Five Days of Investigation Closure in Closed Priority One and Two Investigations ........................................................................................... 63
Figure 21: Child Responses to the Questions "Do You Know You Can Call the Hotline and Ombudsman?" and "Do You Know How to Reach Them if You Need to?" ............................... 68
Figure 22: Case Contact Found in IMPACT for RCCI Intakes .................................................. 75
Figure 23: Case Contact Found in IMPACT for CPI Intakes ..................................................... 76
Figure 24: Case Contact Found in IMPACT for PI Intakes ........................................................ 76
Figure 25: Case Contact Found in IMPACT for RCCI, CPI and PI Intakes .............................. 77
Figure 26: Case Contact Found in IMPACT for RCCI Intakes by Region ................................. 77
Figure 27: Case Contact Found in IMPACT for CPI Intakes by Region .................................... 78
Figure 28: Case Contact Found in IMPACT for PI Intakes by Region ...................................... 79
Figure 29: RCCI Time from Intake to Staffing .......................................................................... 81
Figure 30: CPI Time from Intake to Staffing.............................................................................. 82
Figure 31:  CVS Caseworkers CPD Training Completion Timing Sample ................................ 95
Figure 32: Number of RCCI Investigations by Month, January 2021 to June 2021 ................. 114

Figure 33:  RCCI Investigators Caseload High and Low by Month, Jan. 2021 to June 2021.... 115
Figure 34:   Proportion of RCCI Investigators' Cases with a Completed Date at the Time of Interview ............................................................................................................................... 117
Figure 35:  Other Job Responsibilities Reported by RCCI Investigators ................................... 118
Figure 36:  Number of RCCR Tasks, January 2021 to June 2021 .............................................. 119
Figure 37: RCCR Tasks by Type, January 2021 to June 2021 ................................................... 119
Figure 38:  RCCR Inspector Caseload Highs and Lows, Jan. 2021 to June 2021 ..................... 121
Figure 39: Tasks and Administrative Reviews Assigned to RCCR Supervisors, ...................... 122
Figure 40: Comparison of RCCR Inspector Tasks Reported in Caseload Reports and in Monthly Data Provided to Monitors ......................................................................................................... 123
Figure 41: Other Job Responsibilities Reported by RCCR Inspectors ...................................... 124