# Recommendations for Improving Texas' Safe Placement and Services for Children, Youth and Families

**A Report of the Expert Panel Appointed under the Collaboration Agreement of the Texas Department of Family and Protective Services, Texas Health and Human Services Commission and the *M.D. v. Abbott* Plaintiffs**

**Submitted by:**
**Ann Stanley, Managing Director, Casey Family Programs**
**Paul Vincent, MSW, Independent Consultant**
**Judith Meltzer, President, Center for the Study of Social Policy**

**January 10, 2022**



## Preface and Introduction

Today and in the recent past, Texas has struggled to ensure the safety, security and well-being of the children and youth who need protection and end up in state custody. The system failures and wide range of policy, practice and resource problems have been well documented in the *M.D. v. Abbott* litigation and reports issued by state advocacy groups, the court monitors, Department of Family and Protective Services (DFPS), Health and Human Services Commission (HHSC), state legislature and others.[1] Numerous initiatives to address these problems have been started, or are reported to be in planning, as a result of legislative or administrative action.[2]

Placement problems in Texas reached crisis proportions beginning in 2019, increasing in scale and urgency in 2020 and into 2021. As the *M.D. v. Abbott* lawsuit began to uncover serious failures and harm to children and youth in many state-funded congregate care settings, the state responded appropriately with increased investigations, closures of unsafe facilities, and increased surveillance by state officials. As a result of those efforts, the number of placements available for children and youth shrank significantly. Urgently needed parallel efforts to develop the right array of new placement and treatment programs to keep children safe in their homes and communities have not kept pace.

When an appropriate placement is not available, children and older youth are temporarily housed in settings such as hotels, offices, and rented spaces that are unlicensed and ill-equipped to keep them safe, let alone address their trauma and help them heal. By the summer of 2021, the number of such placements had grown to 416 children[3] and 513 unique episodes. There was broad agreement that the efforts to house and supervise these children, mostly older youth, were not working, and that a fresh, independent perspective on the problem was needed to develop actionable solutions.

As a result, the parties to the *M.D. v. Abbott* lawsuit—upon suggestion of The Honorable Janis Graham Jack—agreed to authorize a panel of independent experts, with experience in multiple states across the country and in  in transforming child welfare systems, to carry out an intensive, short-term assessment of the structure and operations of the Texas child welfare system and produce a report with actionable short-, medium- and long-term recommendations for reducing and ultimately eliminating the number of Children Without Placement (CWOP).[4] The panel members (Ann Stanley, Managing Director, Casey Family

---

[1] *The Court Monitors' Update to the Court Regarding Children Without a Placement Housed in CPS Offices, Hotels, and Other Unlicensed Settings*. Civil Action #2:11-CV-00084. September 13, 2021. https://thetexan.news/wp-content/uploads/2021/09/DFPS-Court-Monitor-Update.pdf.

[2] Texas Department of Family & Protective Services. (2021). *Children Without Placement*. https://www.dfps.state.tx.us/About_DFPS/Reports_and_Presentations/CPS/documents/2021/2021-09-14-DFPS_CWOP_Report.pdf.

[3] DFPS. Children Without Placement Dashboard, July 2021.

[4] *Agreement Between HHSC, DFPS, and Plaintiffs' Counsel to Collaborate*. Civil Action No. 2:11-CV-00084. October 22, 2021. https://www.kxan.com/wp-content/uploads/sites/40/2021/10/Dkt-1143-2021-20-22-Agmt-between-HHSC-DFPS-and-Pltfs-Counsel-re-Collaborate.pdf.

Programs; Paul Vincent, MSW, Independent Consultant; and Judith Meltzer, President, Center for the Study of Social Policy) recognize the urgent need for solutions that quickly address the harms to children now living in what have come to be known as "CWOP Placements," and those who continue to enter these placements each day.

The panel members quickly determined that addressing the immediate needs of these children will only be a band-aid unless solutions address the roots of the problem. Further, the panel recommends that solutions to the immediate problem should *not* result in increased development and use of congregate facilities in the state. In crafting its recommendations, the panel has chosen to look broadly at system breakdowns and inadequacies and suggest solutions for both the short and long term.

During the past six weeks, the panel has reviewed thousands of pages of documents and spoken to more than 30 informants (see Appendix A), including:

- DFPS leaders, program staff and caseworkers
- Administrators and program staff within Texas Health and Human Services Commission (HHSC) Departments and Divisions
- Private providers operating in both the legacy and community-based care systems
- Court monitors
- Foster parents
- State and local advocates
- Lawyers and judges overseeing children's cases
- Youth whose experiences are at the heart of the panel's inquiry

The panel also benefited from the advice from national experts and the experiences of other jurisdictions that have faced placement crises. This report summarizes the panel's activities, findings, and recommendations; it is not intended to be a recitation of all that has been shared with and learned by the panel in this process.

The panel members wish to thank each of the individuals and organizations that have given so generously of their time for their willingness to candidly share their concerns and hopes. We also wish to thank the leadership of both DFPS and HHSC for responding to our numerous requests for data and information as quickly and completely as possible. We appreciate the commitment shown by all to finding solutions to the state's current problems.

Our report is organized as follows:

- Section 1: Summary of Data and Trends
- Section 2: Stakeholder Concerns
- Section 3: Assessment of the Problem
- Section 4: Recommendations

## Section 1: Summary of Data and Trends

The following are key findings from a review of available data provided by the state.

***The number of children housed in offices, hotels and unlicensed facilities grew throughout 2021 to a peak in July 2021; since then, it has slowly declined but remains sizable.***

DFPS reports that the total number of children and youth without placement throughout the month ranged from a low of 165 in January 2021 to a high of 416 in July, a 152 percent increase. Correspondingly, the average daily Children Without Placements (defined as the number of active Children Without Placement episodes on the average day during the month) increased from 25.2 in January 2021 to 190.8 in July, and the number of new[5] children and youth without placement each month more than doubled, from 148 in January 2021 to 278 in July 2021. In November 2021, 236 children experienced at least one day without placement, and the number of new entrants was 170.[6] This reflected a continuing downward trend and a decrease of 43 percent from July's peak.

A large proportion of Children Without Placement remain in this status for unacceptably long periods.  Table 1 below shows the length of stay in an unlicensed placement as of November 30, 2021[7]



**Table 1**

---

[5] New children and youth without placement are defined as children who experience an episode during the month who were not in an active episode when the month began.
[6] DFPS. November 2021, Children Without Placement Dashboard as of December 13, 2021.
[7] DFPS. November 2021, Children Without Placement Dashboard as of December 13, 2021. Note: Some Children Without Placement events from November 2021 continued beyond November 13, 2021, per DFPS.

At the beginning of 2021, less than 4 percent of children were in CWOP status for 36 nights or more; by August 2021, 27 percent of the children had stays of 36 nights or greater. There has been some recent improvement; the percentage of children without placement for more than 36 nights was 16 percent in November 2021.

**The number of children per month for whom placements are not available continues to be high.**

The average number of children per month from January 2021 through November 2021 was 312, with the lowest number (165) in January and the highest (416) in July. In November 2021, 236 unique new children were identified as being without placement.[8]

*Tables 2 and 3[9] below shows that the majority of children and youth without placement are older (ages 13–17) and have significant service and treatment needs.*



**Table 2**



**Table 3**

---

[8] Ibid
[9] Ibid

The percentage of older youth as a proportion of children without placement grew in October and November to 88 and 91 percent, respectively.  In November, DFPS classified these children's needs as Intense or Specialized for two-thirds (67%) of the children.

***Children and youth without placement have typically previously experienced multiple group care and restrictive placements.***

Of the 236 children and youth labeled as being without placement from November of 2021, almost one quarter (22%) were discharged from psychiatric hospitals with no plan for their next placement. Eighteen percent (18%) were on runaway status immediately before being classified as a child without placement. Seventeen percent (17%) of children came from group care and residential treatment facilities, and Eighteen percent (18%) came from disrupted kinship placements.[10]

***There is a shockingly high rate of recidivism, meaning that children and youth who exit CWOP status to a licensed placement often do not achieve stability in their next placement. More than 40 percent of these children return to Children Without Placement status within three months.***

Of the children and youth who experienced a Children Without Placement episode that ended in August 2021[11]:

- 33.8% had a subsequent CWOP episode within 30 days
- 39.1% had a subsequent CWOP episode within 60 days
- 41.9% had a subsequent CWOP episode within 90 days

## Section 2: Stakeholder Concerns

Almost everyone with whom the panel spoke had strong feelings about the current situation and its root causes. Many offered recommendations for what might make a difference. The intensity of stakeholders' interest is, in our view, an asset and provides opportunities for engagement, collaboration and joint problem-solving going forward. This report's findings and recommendations are drawn from the following observations and themes that were raised in multiple stakeholder interviews and/or appeared repeatedly in documents reviewed.

Private providers who currently serve children and youth in DFPS custody, while generally accepting and recognizing the need for greater accountability, were almost uniformly critical of the ways in which the state has increased its oversight of placements and the safety of children in those placements.  Several shared that they experience the process of investigation, state oversight and heightened monitoring as unnecessarily burdensome and punitive. Providers on heightened monitoring asked for greater clarity about what is expected of them to exit that status and for assistance in making the changes necessary to demonstrate

---

[10] See Appendix B – DFPS Children Without Placement Dashboard, Additional Characteristics, November 30, 2021.
[11] Email to the panel from DFPS, Deputy Commissioner, dated December 13, 2021.

compliance and improvement. The panel understands that HHSC and DFPS have established exit criteria that will be shared with providers in January 2022[12].

Providers are also critical of the current performance-based contracting system, which levies fines and includes incentives based primarily on process requirements as opposed to quality performance and achievement of positive outcomes for children, youth, and families. Providers want a much stronger focus on technical assistance from experts in the use of trauma informed care and evidenced based practices for congregate settings, to support efforts to improve quality, as opposed to what they perceive to be a deficit-driven process. They shared concerns about multiple inspectors from both DFPS and HHSC coming on-site separately, sometimes providing misleading and contradictory information. They reported having difficulty getting data about what inspectors have found, and they want the two departments to coordinate better and develop a more respectful and transparent process.

In DFPS's own survey of GROs,[13] providers indicate that the DFPS contracting process bifurcates functions between DFPS and HHSC, often leading to mixed signals, unnecessarily long delays, and barriers to contracting. Finally, providers uniformly raised the concern of insufficient rates, saying that one of the obstacles to serving more of the state's children with high-acuity needs was that the rate structure does not allow them to develop the treatment programs and procure the staffing levels needed to be successful.

Foster parents interviewed by the panel focused primarily on the challenges of supporting a child or youth in a system with inconsistent and often unhelpful practices. Problems raised most frequently were high caseworker turnover and inconsistent knowledge of and help in accessing services needed to stabilize a child in their home, especially community-based behavioral health services. Foster parents caring for teens expressed worry about the challenges of providing a normal teen experience along with the fear of being cited for minor infractions related to a youth's exercise of autonomy, sometimes breaking household rules.

While the panel did not hear from Kinship parents directly, it is assumed that relative caregivers are experiencing similar challenges as licensed non-relative foster parents.  In fact, it could be surmised, that the challenges of accessing services and providing normalized environments are greater for kinship families given their lower rate of reimbursement.

Given time constraints, the panel interviewed only a few workers. Nonetheless, we heard many stories of the difficulties workers have faced working overtime and without sufficient training as caregivers in unlicensed placements. The challenges included not only work hours and stress added to an already difficult job, but also the uncertainty and anxiety of transitioning into a caregiving role for youth whose needs outstrip their experience and skills. The fact that the workers often lack a relationship with the youth they are responsible for during their shift makes these assignments even more challenging. One worker explained that

---

[12] Per statement provided December 23, 2021, by HHSC to Draft Texas Expert Panel's Recommendations document.
[13] DFPS. (2021). General Residential Operations (GRO) Interest Survey: Summary and Findings.

it took a long time to establish a trusting relationship with a youth on her caseload who was without placement. Caregivers for a CWOP placement often don't have the time required to see beneath the youth's veneer and disruptive behavior, which is often a reflection of traumatic past experiences in and out of placements.

We also spoke with some youth currently without placement and could see and feel their hopelessness and lack of agency in their lives. The culture that has classified them as "CWOP youth" is damaging, causing the system to focus on their behaviors and deficits without having the interest, time, or ability to cultivate and nurture their strengths. When asked, youth are very clear that they do not want to return to a group home and want to be placed with family.

From reviewing case histories shared by DFPS of some of the youth, the panel gleaned much about the system and how it is failing them. Detailed case studies of some of these youths were provided in the September 2021 report, *The Court Monitors' Update to the Court Regarding Children Without a Placement Housed in CPS Offices, Hotels, and Other Unlicensed Settings.*[14]

DFPS and HHSC leaders and staff also met with the panel to provide essential information, their views of the causes of the placement crisis (which frequently matched those of other stakeholders), and details about the actions they have taken and plans currently under way to resolve the crisis. Appendix C summarizes some of the Department's efforts to reduce the number of children without placement, including plans for using the legislature's recent appropriation of additional funds.

## Section 3: Assessment of the Problem

Although there appears to be little disagreement within the child welfare community about the urgency of the placement crisis or the need to solve it quickly, explanations for why the state has experienced such a significant increase in Children Without Placement vary. They include:

- The lack of intensive, home-based mental health services
- The impact of the pandemic
- Stricter regulation of providers by the state
- Insufficient provider rates
- Parental relinquishment of rights due to their inability to access needed mental health services for their children

---

[14] The case studies appear on pages 48 to 65 of report: https://thetexan.news/wp-content/uploads/2021/09/DFPS-Court-Monitor-Update.pdf.

- A lack of providers that are willing and sufficiently staffed to serve children with high intensity needs
- Lack of interagency coordination

Stakeholders disagree about which of these factors are most relevant. The panel believes that each is likely to have contributed to some degree. *However, the core failure is the absence of a fully developed system of care, including home and community-based resources, targeted and well-resourced treatment, and appropriate placement services matched to children's needs.*

**Challenges to be Addressed**

*The lack of appropriate mental health services*

Expanding mental health services is essential to solving the problem of children without placement. As in most states, the availability of intensive home-based mental health services for children in Texas is inadequate. Because of this, children with high mental health needs who otherwise could live with family or in family-based settings, attend their neighborhood school, and lead a normal life are too often moved to distant placements where they have less contact with siblings and parents, live in a restrictive environment, change placements frequently, and sometimes find themselves without any placement at all. These system failures only exacerbate the youth's problems and behaviors, providing more trauma instead of healing. There is widespread agreement that Medicaid rates for mental health services are too low to create and sustain the services that are needed. Furthermore, the credentialling process for therapists under STAR Health is burdensome and lengthy, sometimes taking up to a year to complete.

*Provider rates*

Provider rates were uniformly criticized as being too low to support the programming needs of youth with high intensity needs. Providers appreciated the legislature's recognition of the need for a rate increase but pointed out that the rate study the state is undertaking projects implementation not until 2024. Some providers pointed out that rate increases were needed not just for residential providers but also for independent clinicians, such as those who serve children with sexualized behaviors and those who self-harm. Further, although DFPS executes child-specific contracts at higher rates to secure a "bed" or an out-of-state psychiatric placement, it does not use these contracts for services to stabilize an existing placement or provide intensive in-home treatment. HHSC reports that it is conducting a STAR Health Psychiatric Rate Evaluation, the report for which is due on September 1, 2022.

Preventing children from being without placement will require a full array of residential services beyond custodial group care and will also require more than additional high quality residential services. The panel interviewed executives from a number of high-quality programs that already provide a continuum of services ranging from intensive home-based services to intensive residential treatment; they point out that the only way they can do this

is because of supplemental financial support from the community. Other providers expressed an interest in diversifying their service array but are not receiving technical assistance or resources from the state in support of this goal. Building capacity and financing home-based services needs to be a priority for state leaders and will be essential to creating a responsive system of supports for high-need children.

### Placement of children out-of-state

Because of the lack of safe, appropriate placement settings for children and youth, DFPS has increasingly relied on out-of-state placements. There were 109 out-of-state placements for 99 unique children without placement during the reporting period of January through November 2021[15].    Further, there were 2,072 additional out-of-state episodes for all children served by DFPS during that period[16].

Out-of-state placements are undesirable for many reasons. They are a significant distance from the youth's home, making kin and caseworker visits more challenging, resulting in a loss of critical connections, and keeping fewer eyes on the youth's safety and well-being. Such placements also further distance youth from informal supports such as teachers, faith leaders and friends. Distance makes transitional planning more challenging, further complicating reintegration into home and community. Being in a different state also feels isolating for youth, which causes additional harm.

These placements not only remove children from their homes and communities but significantly increase state costs.[17] Total costs for out-of-state placement for those children identified as a "Child Without Placement" from January through October 31, 2021, were $2.9 million, with an average cost for the reporting period of $44, 386.85 per placement. DFPS funded 66 of the 109 placements; others were funded through Medicaid or other means[18].

### The status of community-based care

Currently, Texas' child welfare system operates within two cultures, community-based care, (implemented in four pilot areas to date) and the legacy system. The prolonged implementation timeline for community-based care makes it difficult to achieve uniform operations, practice, and procedures across the state. Providers must deal with different cultures and policies, and the public may experience confusion navigating different rules based on location.

---

[15] DFPS Children Without Placement Out-Of-State Placement Within FY 2021.

[16] DFPS, All Children/Youth in DFPS Conservatorship With A Placement Out-Of-State During Calendar Year 2021 through November 30, 2021.

[17] DFPS Out-Of-State Placement Report, Placement Starts January 1, 2021 through November 14, 2021.

[18] DFPS Comments dated December 22, 2021, to Draft Texas Expert Panel Recommendations document.

*The underutilization and lack of supports for kin caregivers*

In the panel's view, Texas has not made supporting kin caregivers a sufficient priority. Although the legislature recently appropriated $90 million for additional funding for foster care providers and $34 million for foster care capacity-building by SSCCs, none of this funding has been made available to kinship caregivers. [19]

Kinship caregivers are a backbone of child welfare systems. There is compelling evidence that children placed with kin experience increased stability, improved well-being and behavioral health outcomes, and higher levels of permanency than children placed with strangers.[20] As a result, some states are taking steps to dramatically increase placement of children with kin. Through FY2021, the percentage of children placed with kin by Texas DFPS was 45 percent, which is above the national average of 32 percent. Still, there is room for improvement: New Jersey, for example, has focused efforts on identifying, supporting, and placing children with kin and has a goal of 80 percent and current performance of 68 percent placed with kin. DFPS officials acknowledge that they want the number of Texas children living with kin to be higher.

Despite the goal of supporting kinship care, kin caregivers in Texas (and in many other states) are treated far differently than traditional foster parents, receiving less compensation and attention from case managers, having fewer rights, receiving less consideration by the courts, and being offered fewer services. In Texas, kinship providers are paid $11.55 per day, compared to daily rates for foster parents ranging from $47.37 at the moderate level to $92.43 at the intense level.

A recent DFPS report stated that 12.3 percent of placements prior to a Children Without Placement stay were kinship settings.[21] If the Department could wrap supports around at-risk kinship caregivers before a disruption occurs, fewer children would end up without placement. When kin live in the same community as a child without a placement, even if they are not the most recent caregiver, adding them to team meetings and placement staffings could be highly beneficial.

Many state child welfare systems now make effective use of kinship navigators, who are staff that help kin caregivers complete the approval process and link them to support groups and other community resources. This strategy significantly increases kinship caregiver availability. The state should also take full advantage of the resources available through the Title IV-E Kinship Navigator Program.

---

[19] CPRT Workgroup, 3rd Special Session, Utilization of ARPA Funds, Recommendation #2, September 28, 2021.
[20] North Carolina Division of Social Services. (2014). Research on kinship care: Implications for practice. *Practice Notes* 20:1. https://practicenotes.org/v20n1/kinship.htm; Child Welfare Information Gateway. (n.d.). Impact of kinship care on permanency outcomes. https://www.childwelfare.gov/topics/permanency/relatives/impact/.
[21] DFPS Children Without Placement Dashboard, January 2021-November 24, 2021.

*Frontline practice*

The panel did not have the opportunity to observe frontline practice directly, but in interviews with staff and stakeholders, the panel gathered clear impressions about the nature of system practice and the challenge it represents for meeting the needs of children without placement. It appears that practice in the system remains significantly deficit based. Either directly or by implication, children without placement are too frequently blamed for their status and disruptive behavior without considering the trauma history that underlies their resistance, aggression, and withdrawal. Their behavior may overshadow their strengths, which is a missed opportunity to redefine the youth to others and build the elements of a successful plan.

The panel saw little evidence that assessments look for root causes of behavior. As a result, services are focused on symptoms rather than underlying needs.  For example, DFPS regularly refers to residential placement as a need, when in fact a placement is a living arrangement, not a need. Needs of children without placement might include:

- The exclusive attention of and trust in a caring adult
- Success in school
- Friends
- The ability to calm themselves when angry
- Recognition and support of their full identity

Interventions matched to these needs need to be planned for and developed and they do not have to occur in a residential setting.  In fact, out-of-state placement, and in-state residential care, except when needed for short-term and intensive treatment, make it more difficult to meet these individualized needs.

Regular child and family team meetings to identify a child's strengths and needs, establish, or adjust plans, and address crises have been at the heart of successful reforms nationwide. The panel understands that DFPS policy is for youth to have team meetings at regular intervals. However, the lives of children and families are dynamic, so successful systems have adopted the principle that families receive team meetings whenever they need them, which could be weekly, monthly, or quarterly, depending on their circumstances. High-fidelity team meetings, with the family and youth selecting some of their own team members, would be a valuable resource for children without placement.

Plans produced by effective child and family teams can be unconventional, especially when they are based on a child's needs and when youth and their families are involved in the planning. Such plans demand a flexible service array, a resource largely missing in the Texas child welfare system. A thoughtfully crafted plan to diversify the provider community would better enable the system to tailor services to children's needs. The panel found the service

provider community to be highly interested in partnering with the state to develop such an approach.

### Children who refuse placement

One of the most challenging circumstances DFPS faces within the population of children without placement is children who *refuse* placement, seeming to prefer CWOP status to a more stable setting. Although these children are a small percentage of those without placement, these youth are frustrating to staff, consume a considerable amount of their time, and delay placement in a setting that could be more normalized, stable, and therapeutic. In speaking with DFPS staff, stakeholders and colleagues about this issue, the panel has begun to view this behavior as adaptive to a certain degree, even though it is often viewed as oppositional.

Most children without placement realize that, given their histories, their next placement is likely to be in congregate care. Some residential placements are short-term, therapeutic, stable, and attentive to children's needs, but many are not. The environment in these non-therapeutic settings is not stable. Children and direct care staff cycle through continuously. Programming may be limited, meaning children have little that is productive to do with their time. Conflict between residents is a constant. Privileges are transactional and may be withheld for seemingly minor reasons. Residents are unlikely to have their own room.  Central to the harm that many of these youth experience is the absence of the power to control any of the most vital elements of their lives – where they live, with whom, where they attend school, when they see their families and friends and who are their helpers.  Resistance is a natural response to such an environment.

For some youth with experiences like this, the impermanent status of being without placement may seem like a better alternative. Their caseworker may spend a lot of time with them, they may not have to interact with large numbers of other children, and they can avoid another move and adjustment to a congregate setting.

The panel believes that if DFPS can construct placements reflective of a highly supported treatment foster home or kinship home in their home community, some foster children would prefer these options to continued instability. Bringing prospective caregivers to meet with children in placement staffings has been effective in some cases, as has matching youth in care with peer mentors. It may be effective to consult with other systems around the country that are learning more about reaching these children. Through whatever means, solutions to this problem are an urgent need.

### Relationships with providers

Heightened monitoring was mentioned by providers as a reason that there are not enough placements; however, the panel does not believe that safety monitoring is a valid argument for the lack of placements. Since at least 2017, the state has annually documented the need

for more placements for children whose needs categorize them as requiring Specialized or Intensive levels of care and since 2019, the state's Needs Assessments have documented the need for increased foster home capacity for all children and youth over age 14. Clearly, as well documented in the Monitor's September 2021 Report to the Court[22], far too many placements were unsafe, and the state's closing of unsafe living arrangements is essential to ensuring child safety. All parties agree that it is not acceptable for facilities that care for youth with higher acuity needs to be allowed to operate with a higher number of safety violations.

Nevertheless, based on interviews with state agency staff and providers, the panel believes there is a need to strengthen trust and confidence between these entities to support unity in addressing the problem of children without placement. For children to be safe and cared for, all entities should listen to the needs of children and families and work together to develop safe, high quality, trauma informed placements and services that meet those needs.

There is inevitable and at times healthy tension between regulators and the regulated; however, cooperative, and productive relationships are essential. Because DFPS and HHSC are dependent on service providers for therapeutic supports, basic foster care, treatment foster care, residential care, and psychiatric care, both must develop constructive and reliable relationships with providers to maximize the focus on children's needs and ensure the mental, emotional, and physical safety of each child.  As the state moves to implement community-based care statewide, maintaining these relationships will be even more vital.

## Section 4: Recommendations

***Short-term recommendations (to begin immediately and be implemented within 3 months)***

***The panel's short-term recommendations:*** *Develop guiding principles; strengthen infrastructure and accountability; provide clinical staffings with youth, family and the child's team for all children without placement and expand family-based placement options and access to flexible non-placement resources to provide solutions that can be immediately acted upon and contribute to the long-term goal of having all children safe and with family.*

**Develop guiding principles.**

The leadership of DFPS and HHSC should immediately adopt and apply a set of shared values and principles to all work with children and families.  These values are foundational to addressing the current crisis and should guide the work of the state interagency team that is focusing on elimination of children without placement as well as guide the longer-term work to improve the state's systems of care.

---

[22] The Court Monitors' Update to the Court Regarding Children Without Placement Housed in CPS Offices, Hotels, and Other Unlicensed Settings, September 13, 2021.

As the panel talked to stakeholders, state employees, youth, and families, some shared values emerged that could inform the development of a set of guiding principles for this work. These include:

- Children deserve to be mentally, emotionally, and physically safe and cared for by family and in settings that permit them to heal, develop and thrive in normalized and non-restrictive environments.
- The voices of those with lived experience are central to informing and transforming the system's understanding of what families and children need to thrive.
- The system needs to provide equitable and just treatment for all, by addressing racism and eliminating practices that add trauma to vulnerable children, including those who identify as LGBTQ.
- In the rare case when services need to be provided in a congregate treatment setting, the family needs to be central to the healing and therapies provided.
- Services and supports should be individualized to address the unique strengths and needs of each child and family.

The shorthand term "CWOP youth" dehumanizes these children and carries the implication that they are troublesome, disruptive, and difficult to serve. All stakeholders need to find a better way to describe these young people and to develop caring relationships with them.

1. **Strengthen infrastructure and accountability.**

The separation of traditional child welfare functions between DFPS and HHSC requires closer coordination and cooperation between the two agencies. Numerous efforts are under way to address the problem of children without placement. However, coordinated interagency, multisector approaches at the state and local levels are lacking. A coordinated approach will require clear lines of authority and accountability and must be grounded in proven methods of process and outcome improvement. To accomplish this, the state should:

*Within 30 days,* assign a single high-level leadership position from DFPS to lead a dedicated state interagency team to be accountable for the elimination of children being placed in unlicensed care. This position and team should have the authority to cut through bureaucracy and approve resources for placements and community-based services. Team members should be assigned by the Commissioner of HHSC and the Commissioner of DFPS. The position and Interagency team should work closely with the DFPS Director of Services to establish greater capacity in that unit to address the clinical needs of children in unlicensed care and to work in DFPS Regions to expand capacity for services and placements.

*Within 30 days,* DFPS to assign clinical coordination services to all youth in unlicensed care. A Clinical Coordinator position should be hired or designated within the DFPS Services Unit for every region. Their primary responsibility will be to intervene at the child and family level,

adopting an interdisciplinary team approach, which includes primary stakeholders involved with the child including, a STAR Health Medical Case Manager as well as professionals from the courts, education, juvenile justice, mental health, family members and others, to quickly get children out of unlicensed care, prevent entry into unlicensed care, and decrease recidivism. Under the direction of the Clinical Coordinator, the interdisciplinary team should establish trauma-informed staffings and provide trauma-informed, individualized plans of care created with youth and family. These teams should be granted authority to quickly commit funds, where needed, to implement these individualized plans.  The successes and challenges that are realized through the work of the Clinical Coordinator should be shared with the state interagency team to inform as well as strengthen the spread of successful practices.

The Clinical Coordinator should work with each child's caseworker to ensure youth and their families are adequately prepared and supported to fully engage in these staffings. The Clinical Coordinator should practice in alignment with the core principles and values so that family-based care is optimized and there is an individualized approach that does not subscribe to cookie cutter step down pathways. The Clinical Coordinator should work with the caseworker and the regional lead to ensure that every child in an unlicensed placement is being supervised by a trained child caregiver, not a CPS worker, and that there is a positive relationship between the caregiver and the child.

The Clinical Coordinator should work with caseworkers to follow children for a minimum of 90 days after discharge from unlicensed placement to ensure that adequate services and supports are in place to stabilize them. The recidivism rate for children in unlicensed care is very high; decreasing the number of children who re-enter unlicensed placement could greatly improve the crisis.

**Within 60 days,** develop a cadence of accountability within the state interagency team to measure "lead and lag measures" and establish targets for reduction of children in unlicensed care.  If Texas continues at the current pace, it will be at least 6 months before there are no children without placement.  Therefore, the interagency team should consider creating targets that substantially reduce the numbers in a shorter period of time.  Texas should look to external consultants and other states for support in developing this approach. In particular, Texas can learn from other states in which tracking lead measures leverages potential for success. The use of data to inform planning should include the review of disaggregated data on race and ethnicity for youth in unlicensed care and an analysis of the data with the DFPS Director of Diversity to understand disparities for children of color and youth who identify as LGBTQ.

**Within 90 days,** the DFPS and HHSC Interagency Team should complete an analysis of the data on the more than 2100 times a child experienced an out-of-state placement during the

2021 calendar year[23].  This analysis should disaggregate the data by the age, race and ethnicity of the child, the number of out-of-state placement episodes per child; the length of stay of each out-of-state placement and the overall length of stay of the child in DFPS conservatorship.  Based on the data analysis, DFPS should develop a plan to bring children back to Texas and reduce the number of new out-of-state placements.  DFPS should also develop a data dashboard and capacity to track this information on a weekly basis as part of their standard data collection and reporting practice.  Funds saved from reducing out-of-state placements should be redirected to support expansion of family-based setting with enhanced services.

**Within 90 days,** assign a DFPS Community Liaison to the four regions that have the highest number of children without placement, to build community capacity to prevent placements in unlicensed care and to transition children out of unlicensed care into safe settings. The community liaison position would work directly with the state lead, DFPS Director of Children's Services, DFPS Regional Director, courts, community stakeholders, hospital, other providers, and individuals with lived experience.

At the regional level, the Community Liaison position would work across sectors to educate caseworkers, families and other providers about the services and supports available to prevent a crisis. They would track utilization and support development of new crisis stabilization approaches, including mobile crisis units and respite. These positions would build linkages between residential and community providers to increase placement stability and support successful transitions out of facilities. The position would serve as a liaison with psychiatric hospitals in the region to develop protocols for discharge and ensure access to partial hospitalization and day treatment. The position should serve on the Community Resource Coordination Groups (CRCGs), which are designed to provide interagency coordination for youth with multiagency needs.[24]

A number of communities have already come together to address the problem of children without placement. Travis and Bexar counties have begun community-based initiatives that merit support and could serve as a model for others. Community Liaisons can share best and promising practices that are emerging from their regions and communities with the interagency state team to encourage and support expansion.

**Within 90 days,** increase the capacity of the DFPS leadership team by gaining technical assistance with an external consultant (or team) with direct experience in child welfare systems. This consultant/team would report to and be selected by the DFPS Commissioner and would support the urgent issue of children in unlicensed care and the large-scale transformation initiatives that the DFPS Commissioner has identified. This position/team

---

[23] DFPS, Children/Youth in DFPS Conservatorship With A Placement Out-Of-State During Calendar Year 2021, Data Through November 30, 2021. Note: DFPS data provided is per episode and not child in this report. Some children had more than one out-of-state placement during this timeframe.
[24] Community Resource Coordination Groups. https://crcg.hhs.texas.gov/.

would create the capacity needed in the mid- and long-term to solve the entrenched problems across agencies that have led to the current crisis.

2. **Expand family-based placement options and access to flexible non-placement resources.**

*Within 30 days,* HHSC/DFPS and the state interagency team should develop a plan to expand the Turning Point Program[25] to additional counties with the greatest need. Turning Point offers an array of crisis services that may help prevent placement disruption and entry into unlicensed care. These include:

- A 24/7 crisis and information line for members and referring providers
- Full mental-health evaluations, including psychiatric services
- In-home assessments, as needed
- Intensive counseling
- Personalized consultation for the entire family
- 24-hour, short-term respite placement for youth ages 10 to 17, as needed, in a pleasant residential environment
- Support and plans for post-reunification to help families better handle future challenges
- Access to Beacon Intensive Case Management for ongoing care coordination

*Within 60 days,* DFPS and the state interagency team should designate a pool of funds in each region that can be accessed quickly for trauma-informed services and supports to families, kin caregivers and foster parents beyond traditional outpatient therapies. In the long term, Texas needs to consider efforts to pool funds across child-serving agencies, such as the Integrated Care for Kids (InCK) Model, but in the short term, much progress could be made with ready access to flexible funds. Texas should look at data and solicit input from individuals with lived experience to determine the needs and identify resources that would be most helpful. Some of the needs identified by stakeholders during this process include transportation, concrete supports, and activities that contribute to normal positive socialization and help children and teens thrive and grow. DFPS and HHSC should ask elected decisionmakers to allocate federal American Rescue Plan Act funds for this purpose.

*Within 60 days,* DFPS and the state interagency team should reach out to providers to develop a plan for increasing the availability of treatment foster care (TFC), starting in regions with the highest number of children in unlicensed care. This effort should accelerate work that is already under way. Funding was appropriated in 2017 to launch TFC through three providers: CK Services, Arrow Child & Family Ministries, and the Bair Foundation. A recent study of the

---

[25] For more information see https://www.fostercaretx.com/for-members/stay-healthy/behavioral-health/turning-point.html.

effort found, "the majority of children placed in TFC are discharged to a less restrictive placement. Further, foster parents and provider organizations perceive that TFC is working to move children into less restrictive settings and to manage and minimize challenging behaviors for high-needs children."[26]

**Within 60 days**, HHSC should identify the existing partial hospitalization programs with the highest potential for expansion and begin negotiation to procure more slots.  HHSC/ DFPS and the state interagency team should negotiate priority access to the partial hospitalization/day treatment programs that currently exist, including those available through the University of Texas Health System.

**Within 60 days,** HHSC should develop a plan to increase access to the YES Waiver for youth in unlicensed care. Stakeholders noted that when they can access the YES Waiver, families and children benefit from the Wraparound approach, specialized therapies, and supports for parents. In addition, a recent study[27] published by the American Academy of Child and Adolescent Psychiatry shows Wraparound helps children with severe emotional disturbance avoid out-of-home placement and stay with their families and in their communities. Access to YES Waiver services varies across the state. Immediate efforts are needed to expand access and decrease wait times.

**Within 90 days,** convene a provider working group with DFPS, HHSC and *M.D. v. Abbott* court monitors to begin to rebuild the relationships needed to address the immediate crisis and to create the capacity needed for the future. The workgroup should be facilitated by an external consultant.  The first task of the group should be a review of the criteria that HHSC is expected to publish in January to identify an exit path from Heightened Monitoring when safety issues have been fully addressed.   The second task should be a joint review of the Monitor's expected Spring 2022 report on complaints regarding "uneven coordination" between DFPS and HHSC related to Heightened Monitoring. The working group should use the data and recommendations from that report to consider whether any changes are needed in processes to ensure a balance in individual and system accountability related to the safety and well-being of children.

The working group's third immediate task should be crafting recommendations and outlining actions to increase the availability of technical assistance to providers on increasing safety, well-being, and quality of care to children, youth, and caregivers.

The working group's fourth task is to research and make recommendations on how to create a shared approach to quality assurance and accountability. One methodology to consider

---

[26] Bustillos, S., Lawson, J., & McLain, B. (2021). *Treatment foster care in Texas: A mixed methods descriptive analysis.* Texas Alliance of Child and Family Services. https://tacfs.org/publication/treatment-foster-care-in-texas/

[27] Olson, J. R., Benjamin, P. H., Azman, A. A., Kellogg, M. A., Pullmann, M. D., Suter, J. C., & Bruns, E., J. (2021). Systematic review and meta-analysis: Effectiveness of Wraparound care coordination for children and adolescents. *Journal of the American Academy of Child & Adolescent Psychiatry, 60,* 1353–1366. https://www.sciencedirect.com/science/article/pii/S0890856721001556

adopting is a safety science approach.  Safety science seeks to increase safety for children, families, workers, and providers by using industry-tested approaches to create a trauma-informed learning environment while increasing accountability for outcomes. Many child welfare jurisdictions have adopted the practice of safety science to anchor their quality improvement approach[28].

**Within 90 days**, increase resources, access, and flexibility to the HHSC Residential Treatment Center (RTC) Project. The RTC Project provides intensive supports for families that are at risk of relinquishing their children to DFPS custody because they cannot access needed children's mental health services. The project currently has 50 slots for residential placement and is administered through the local mental health authority (LMHA). The LMHA provides services before, during and after residential placement with the goal of keeping children with their families. Resources should be flexible so that community-based services can be used in lieu of residential slots. Information about the project should be disseminated widely.

*Mid- to long-term recommendations*

*The panel's mid-to long-term recommendations: Eliminate barriers and expand the service array for children and families; develop a statewide children's mental health system of care and develop and strengthen child welfare practice to align with guiding principles and Texas' practice model that can broadly sustain improvements and significantly improve the well-being of children and families. Many of the following recommendations are large in scope and scale but have elements that are currently underway and can be addressed <u>immediately</u>.*

1. **Eliminate barriers and expand the service array for children and families.**

*In the first quarter of 2022 HHSC to explore Medicaid option for mobile crisis,* Recently, CMS announced a new Medicaid option for supporting community-based mobile crisis intervention services for individuals with Medicaid that is a great opportunity for Texas. Using resources available to states through the American Rescue Plan, Texas can expand 24-hour community mobile crisis services that offer behavioral health support in communities that can help to avert a placement disruption and or a decision by a family to seek joint conservatorship to meet their children's needs. The ARP provides additional federal funding, reimbursing 85% of the costs of qualifying mobile crisis intervention services for three years. This new Medicaid option also offers flexibility for states to design mobile crisis programs in ways that work for their communities and "expand access to behavioral health professionals as the initial contact for someone in crisis"[29].

---

[28] For more information on safety science and examples from the many states that are using this approach, see the following link: https://www.casey.org/safety-culture-science-topical/
[29] For additional information, go to https://www.medicaid.gov/federal-policy-guidance/downloads/sho21008.pdf.

HHSC should also explore the viability of developing a 1915(i)[30] Home and Community Based Service waiver request for developing community service options for high acuity youth.

*In the first quarter of 2022,* accelerate efforts to implement the federal Family First Prevention Services Act so that Texas-based providers who are ready to be licensed as qualified residential treatment programs (QRTPs) can launch. DFPS should develop a targeted RFP to establish high-quality QRTP providers and attract experienced out-of-state QRTP providers. Texas could look to Arkansas and Maryland for examples of RFPs that have been targeted to develop QRTPs. Taking these actions will not only help children but will also avoid a significant loss of federal funds due to noncompliance. According to data provided by DFPS to the court monitors, DFPS is expecting a loss of $17.4 million in federal support in 2022 and $25.6 million in 2023, because Texas' GROs are not compliant with Family First.

*Within the next 6 months,* develop a means of recruiting and contracting for targeted placement options that meet the specific needs of children at risk of being in unlicensed placement. DFPS and HHSC should have the provider working group and individuals with lived experience at the table from the start. In addition, Texas can utilize data from current child-specific contracts to identify gaps in the placement system and seek out or develop providers who can fill those gaps. As of October 2021, there were 372 active child-specific contracts. Of those:

- 31 were with psychiatric hospitals
- 109 were Home & Community-based Services (HCS) child-specific contracts
- 210 were child-specific contracts
- 20 were sub-acute child specific contracts
- 2 were medical hospital child-specific contracts

*On or before September 2022,* HHSC should establish Medicaid expansion through continued efforts with CMS to get Phase One Medicaid expansion services approved and available. In addition, the work toward implementation of Phase Two services should be accelerated so that multisystemic therapy and functional family therapy are available as soon as possible.

*In the first quarter of 2022,* accelerate*,* as is allowed by law, the Foster Care Modernization Project developed jointly by HHSC and DFPS. This project has the potential to greatly improve the reimbursement methodology for foster care and enhance service capacity and quality. The voices and perspectives of those who will be most impacted by the changes, including providers and people with lived experience, must be integrated into this process.

---

[30] For example of Illinois 1915(i) Home and Community Based Service Waiver Application see https://www.illinois.gov/hfs/MedicalProviders/cc/Pages/1915iapplication.aspx.

### 2.  Develop a statewide children's mental health system of care

Texas should begin immediately to identify the resources and coordination efforts needed to finally meet the mental health needs of children and youth.  Texas has been working since the late 1990s to develop a statewide system of care for children's mental health. Currently the system of care efforts is being led by HHSC and the Texas Institute for Excellence in Mental Health at the University of Texas at Austin. DFPS is one of five state agencies that have entered the Texas System of Care memorandum of understanding. The department is participating in efforts to coordinate services and instill common principles that uphold individualized services and family voice.

Despite this sustained effort, the current system of care in Texas is woefully inadequate, as evidenced by the steady number of parents who are relinquishing custody of their children with the hopes of getting mental health services. Since 2017, there have been 4,661 children whose parent's relinquished custody because of the child's behavioral and mental health issues and the lack of available services and supports.

Services and supports should be widely available through local providers and focused on keeping children in their homes and communities. The system should be coordinated across child-serving agencies, and those agencies should adhere to common principles that uphold individualized services and family voice. Shared data and outcomes across agencies at the state and local level are critical to growing the system in alignment with child and family needs.

Some examples of states that have successfully worked across child welfare, children's mental health, children's health, and education to build systems of care include Iowa, New Jersey[31], Colorado and Pennsylvania. Typical services available in a system of care that are not widely available in Texas include:

- Mobile crisis teams
- In-home trauma-informed parent behavioral health coaches
- Parent partners (parents with lived experience who can act as mentors and case coordinators)
- High-fidelity Wraparound services
- Family team meeting coordinators
- Child welfare psychiatric liaison units
- Kinship support for intensive behavioral health needs
- QRTPs
- Partial hospitalization/day treatment

---

[31] To learn more about New Jersey's system of care, follow this link: https://www.casey.org/new-jersey-reduce-congregate-care.

- In-school behavioral health supports
- Treatment foster care for intensive behavioral health needs

### 3. Develop and strengthen child welfare practice to align with guiding principles and practice model.

DFPS and HHSC can build on the experience they have gained in addressing children in unlicensed placement to further develop and strengthen their child welfare practices for all children and families so that they are fully aligned with their practice model. A recommended first step is to identify bright spots in the state that have best practices aligned with the CPS Practice Model[32].

DFPS should create opportunities for shared learning across regions so that skilled workers, supervisors, and managers adhere to the practice model, particularly in the areas of family finding, supporting kinship families, utilizing family-based teaming for service planning, reunification, and permanency strategies for older youth.

Because DFPS is operating a privatized and a legacy system simultaneously, there is a unique opportunity to strengthen the practice model by drawing on the innovations and best practices from both systems.  As a starting point in improving practice, the following areas detailed below should be prioritized as they would leverage significant change for the system and would reinforce a mind-set that recognizes and honors the inherent strength of families to safely care for their children: **kinship care, family group conferencing and engagement of individuals with lived experience**.

### *Kinship Care*

***Beginning Immediately,*** DFPS should take the following steps to increase the use of and support for kinship care:

- Assess current practice and policy related to relative care.
- Request funds to increase rates for kinship care so they are equivalent to rates for non-kin foster care.
- Seek changes in policy that will allow for greater support of kinship families with both concrete and mental health services.
- Get external TA to educate stakeholders, including the courts, on the benefits of kinship care.
- Adopt a relative-first placement strategy and build practices to support it. Develop a robust family-finding approach utilizing skilled workers and supportive technology.

---

[32] See link: https://www.dfps.state.tx.us/Child_Protection/Practice_Model/default.asp.

- Adopt the recommendation of the Child Protection Roundtable to appropriate funding for a kinship caregiver support pool from the American Rescue Plan Act funds, directing this funding "with particular emphasis on kinship caregivers serving high-needs children requiring specialized services" and for providing training and supports to these caregivers so they can provide a treatment foster care level of services.[33]

*Family Group Conferencing*

*Beginning 2022,* DFPS should engage with an expert consultant on family team meetings to recalibrate and reinvigorate Texas' use of family group conferencing (FGC) as a key strategy for improving engagement of families and safety and permanence for children.  FGC and other models of family team meetings bring together families and their identified network to make decisions and develop plans of care to address children's current and ongoing needs.  FGC and other models of family team meetings create space for families to resolve their own problems and differences; this requires child welfare staff to respect and honor their ability to do so. Many Texas stakeholders familiar with FGC reported that the practice, although adopted by the state, was not consistently provided, or practiced with fidelity.

*Engagement of People with Lived Experience*

*By the end of 2022,* DFPS should create an action plan to expand engagement and co-creation efforts with individuals with lived experience. The plan should:

- Build on the parent collaboration groups to fund and develop parent partner programs.
- Revive the state Youth Liaison and regional Youth Specialist positions to ensure that youth are at the table to provide input and perspective.
- Support young adults with lived experience in taking on positions as peer mentors to youth in foster care, especially youth in unlicensed placement.
- Consider a process, such as listening circles, to engage older youth in institutional placements to better understand their experience and needs.[34] Use that information to inform decisions about improvements to the system.

## In Conclusion

The problem of children in unlicensed care in Texas is complex and long in the making. The panel used its short time to gather as much first-hand information as possible from those most involved and impacted by the problem. Based on the information and interviews that were conducted, the panel believes that with strong leadership, strategic coordination across all stakeholders, and a targeted infusion and coordination of resources, Texas can resolve the problem of children in unlicensed care without creating new restrictive GROs and can put in place measures that benefit children's well-being in the long term. The panel

---

[33] CPRT Workgroup-Third Special Session-Utilization of ARPA Funds, September 28, 2021.
[34] Think of Us. *Away From Home.* https://www.thinkof-us.org/case-studies/away-from-home.

hopes that its recommendations can be used to create a blueprint and workplan for immediate and longer-term actions.  The panel wishes to thank DFPS and HHSC for their diligent efforts to provide the information we needed and the many stakeholders we interviewed for their constructive insights and candor.

**Appendix A**
**Expert Panel Interviews**

| Key Stakeholders | Date |
|---|---|
| Meeting with Parties & Attorneys | November 3, 2021 |
| Meeting with HHSC Assistant Commissioner | November 4, 2021 |
| Meeting with Monitors | November 10, 2021 |
| Meeting with DFPS Team | November 10, 2021 |
| Meeting with Expert | November 10, 2021 |
| Meeting with Expert | November 12, 2021 |
| Meeting with HHSC Chief Medical Director | November 15, 2021 |
| Meeting with State Civil Court Judge | November 16, 2021 |
| Meeting with Expert | November 18, 2021 |
| Meeting with TACFS Board Members | November 19, 2021 |
| Meeting with DFPS Commissioner | November 19, 2021 |
| CWOP Transition Planning Meeting with youth and DFPS Staff (2 meetings) | November 22, 2021 |
| Meetings with Experts (2 meetings) | November 22, 2021 |
| Meeting with Provider | November 23, 2021 |
| Meetings with Experts (2 meetings) | November 24, 2021 |
| Meeting with CWOP Parent | November 29, 2021 |
| Meeting with DFPS Contract Administration | December 2, 2021 |
| Meeting with Provider | December 3, 2021 |
| Meeting with Expert – Foster Care/Adoption | December 6, 2021 |
| Meeting with HHSC Deputy Assoc. Commissioner, Complex Procurement | December 6, 2021 |
| Meeting with DFPS Caseworkers (2) | December 7, 2021 |
| Meeting with Plaintiff's Counsel | December 8, 2021 |
| Meeting with DFPS Deputy Commissioner | December 8, 2021 |
| Meeting with Expert | December 9, 2021 |
| Meeting with CPS Director of Services | December 10, 2021 |
| Meeting with HHSC Assoc. Director of Mental Health Coordination | December 10, 2021 |

**Appendix B**
**Children Without Placement Dashboard – Additional Characteristics, November 2021**



**Appendix C**

# Department of Family & Protective Services
## Efforts To-Date Specific to CWOP (Children Without Placement)

**Children Without Placement September 2021 (DFPS report)**

"During the 87thTexas Legislature (Regular Session, 2021), DFPS requested $83.1 million in general revenue (GR) funds ($88.7 million all funds (AF)) for the fiscal year (FY) 2022-23 biennium to support ongoing compliance with the Court's orders. The Legislature fully funded this request, which includes an appropriation for an additional 312 CVS staff, including 192 CVS caseworkers. Further, as noted in the Executive Summary, during the 87thSecond Called Special Session of the Texas Legislature, Commissioner Masters requested and received an additional $90 million to support providers in enhancing capacity for youth with complex treatment needs. With the additional resources, providers are expected to have the needed resources to hire well-trained staff to address the needs of youth in CWOP, particularly youth with complex treatment needs. This will also assist in reducing the amount of overtime caseworkers must work on CWOP shifts."

In addition to the 87th Texas Legislature fully funding DFPS' appropriation requests, in April 2021, Commissioner Masters authorized a number of activities to provide immediate support to staff supervising youth without placement. These activities included:

- hiring 100 temporary staff for six months who have prior CPS (or related) experience to supervise youth in CWOP. To date, 33 temporary staff have been hired and trained
- authorizing the immediate pay-down of overtime for staff who supervise youth in CWOP
- directing staff from other DFPS program and support divisions to assist CPS in working CWOP shifts
- prioritizing the hiring of staff for CPS CVS units deployed to high-needs areas of the state. Once training is completed, staff will supervise youth in CWOP as needed until circumstances allow them to carry a caseload.
- securing law enforcement presence when needed to assist in de-escalation and prevent physical attacks on staff or other youth.

"Finally, CVS caseworkers supervising youth in CWOP will receive assistance from supervision visitation contractors, who have historically provided supervision during parent-child visits. As of August 2021, 11 supervised visitation contractors have amended their contracts to provide CWOP supervision alongside CPS and CPI staff, in addition to supervised parent-child visits. Under these arrangements, supervised visitation contractors' staff travel to CWOP locations and help CPS and CPI staff care for the youth residing there. These contractors are located in Region 6 (Houston area), Region 7 (Austin area), Region 8 (San Antonio area), Region 10 (El Paso area) and Region 11 (Edinburg area)."

The Treatment Family Foster Care (TFFC) program was launched in 2018, which is designed to provide intensive services to children in a highly structured home environment. Before December 2020, TFFC eligibility was limited to children aged 10 and under. In an effort to increase capacity for older youth, the 87th Texas Legislature broadened eligibility criteria to include youth up to age 17.

## Department of Health & Human Services and DFPS
## Efforts To-Date Specific to CWOP (Children Without Placement)

- Senate Bill 1896 (87 Texas Legislature, Regular Session, 2021) requires HHS, DFPS, and each SSCC to develop a plan to increase placement capacity such that youth remain in their community of origin.

- The Legislature provided immediate support to build placement capacity and quality in regions where Community-Based Care (CBC) has been implemented by appropriating $34.8 million for temporary rate increases and awarding incentive payments to providers showing improvement on performance measures.

- Similarly, during the 87th Second-Called Special Session of the Texas Legislature, FPS requested and received $90 million in the legacy foster care system to build on the Legislature's intent for a more stable foster care system that provides higher quality services for children across the continuum. Specifically, the $90 million will fund:

  (1) targeted supplemental payments to retain providers and enhance capacity and
  (2) foster care grants to promote capacity enhancements and growth.

  Supplemental payments totaling $70 million will stabilize the foster care system and encourage capacity growth.

- DFPS and HHSC are jointly undergoing a Rate Methodology Modernization project that will compensate the caregiver for higher levels of service to children and families.

- Since June 2021 DFPS has identified and executed new contracts with residential providers and other community partners to add 158 new beds as alternatives to DFPS offices.

- Since April 2021, DFPS has partnered with three psychiatric hospitals in Texarkana, Dallas, and San Antonio for children in need of psychiatric stabilization.

- In August 2021, CPS launched the "General Placement Search" system. The GPS system was designed to provide near real-time information and data relating to placement capacity and availability.

- Between April and August 2021, DFPS, HHSC and the Texas Alliance of Child and Family Services held a series of biweekly workgroups focused on general foster care, contract incentives and remedies, investigations, and provider support.

- DFPS and HHSC leadership meet monthly to discuss access to services for youth in CWOP.