1

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                         CORPUS CHRISTI DIVISION

4    M.D., ET AL                    §       CASE NO. 2:11-CV-00084
                                     §       CORPUS CHRISTI, TEXAS
5    VERSUS                          §       TUESDAY,
                                     §       JANUARY 11, 2022
6    GREG ABBOTT, ET AL              §       8:57 A.M. TO 2:56 P.M.

7

                          STATUS CONFERENCE (VIA ZOOM)
8
                   BEFORE THE HONORABLE JANIS GRAHAM JACK
9                       UNITED STATES DISTRICT JUDGE

10

11

12   APPEARANCES:                            SEE NEXT PAGE

13   ELECTRONIC RECORDING OFFICER:      JESSIE HUTCHINSON

14   CASE MANAGER:                      LORI PURIFOY

15

16

17

18

19

20                       TRANSCRIPTION SERVICE BY:

21                 JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                        935 Eldridge Road, #144
22                      Sugar Land, TX 77478
                           281-277-5325
23                   www.judicialtranscribers.com

24
         Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

```
 1                    APPEARANCES (VIA ZOOM):

 2

 3  FOR THE PLAINTIFF:            R PAUL YETTER, ESQ.
                                  YETTER COLEMAN LLP
 4                                811 MAIN STREET
                                  SUITE 4100
 5                                HOUSTON, TX  77002
                                  713-632-8000
 6
                                  MARCIA ROBINSON LOWRY, ESQ.
 7                                A BETTER CHILDHOOD, INC.
                                  355 LEXINGTON AVE.
 8                                FLOOR 16
                                  NEW YORK, NY  10017
 9                                646-795-4456

10  FOR THE DEFENDANT:            REYNOLDS BRISSENDEN, IV, ESQ.
                                  RAYMOND WINTER, ESQ.
11                                PAUL MOORE, ESQ.
                                  NOAH REINSTEIN, ESQ.
12                                OFFICE OF THE ATTORNEY GENERAL
                                  CIVIL MEDICAID FRAUD DIVISION
13                                300 W 15TH STREET
                                  WPC BLDG, 9TH FLOOR
14                                AUSTIN, TX  78701
                                  512-936-2158
15
                                  ERIC ALAN HUDSON, ESQ.
16                                OFFICE OF THE ATTORNEY GENERAL
                                  P.O. BOX 12548
17                                MC-009
                                  AUSTIN, TX  78711
18                                512-936-2266

19  FOR COMMISSIONER OF THE
    DEPARTMENT OF FAMILY AND
20  PROTECTIVE SERVICES OF
    THE STATE OF TEXAS:           KARL ERIC NEUDORFER, ESQ.
21                                CLAY WATKINS, ESQ.
                                  OFFICE OF THE ATTORNEY GENERAL
22                                OF TEXAS
                                  P.O. BOX 12548
23                                CAPITAL STATION
                                  AUSTIN, TX  78711
24                                832-258-1686

25
```

```
 1              APPEARANCES (VIA ZOOM - CONT'D):

 2

 3  FOR EXECUTIVE COMMISSIONER
    OF THE HEALTH AND HUMAN
 4  SERVICES COMMISSION OF THE
    STATE OF TEXAS:              REYNOLDS BRISSENDEN, IV, ESQ.
 5                               OFFICE OF THE ATTORNEY GENERAL
                                 CIVIL MEDICAID FRAUD DIVISION
 6                               300 W 15TH STREET
                                 WPC BLDG, 9TH FLOOR
 7                               AUSTIN, TX  78701
                                 512-936-2158
 8

 9  ALSO ATTENDING:             PAUL VINCENT
                                JUDITH MELTZER
10                              ANN STANLEY
                                JAMIE MASTERS
11                              CECILE YOUNG

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **CORPUS CHRISTI, TEXAS; TUESDAY, JANUARY 11, 2022; 8:57 A.M.**

2              THE CLERK:  Court calls Civil Action 2:11-84,

3    M.D., et al vs. Abbott, et al.

4              May we have appearances, please?

5              MR. YETTER:  Paul Yetter for the Plaintiff

6    children.

7              MS. LOWRY:  Marcia Lowry for the Plaintiff

8    children.

9              MR. NEUDORFER:  Karl Neudorfer for Jaime Masters

10   in her official capacity as Commissioner of DFPS.

11             THE COURT:  I'm sorry, the name again.

12             MR. NEUDORFER:  Karl Neudorfer.

13             THE COURT:  Thank you, Mr. Neudorfer.

14             MR. NEUDORFER:  Sure.

15             MR. BRISSENDEN:  Good morning, Your Honor.

16   Reynolds Brissenden from the Civil Medicaid Fraud Division

17   of the Texas Attorney General's Office appearing on behalf

18   of Cecile Young, in her official capacity as Executive

19   Commissioner of HHSC.  Along with me here this morning are

20   Raymond Winter, Paul Moore, and Noah Reinstein also from the

21   Civil Medicaid Fraud Division of the Texas Attorney

22   General's Office.

23             THE COURT:  Could I have your name one more time,

24   I'm sorry.

25             MR. BRISSENDEN:  Yes, Judge.  Reynolds Brissenden.

1          THE COURT:  Thank you.

2          MR. HUDSON:  Good morning, Judge.  Eric Hudson on

3  behalf of the Office of the Governor.

4          MR. WATKINS:  Your Honor, Clay Watkins is here as

5  well for DFPS co-counsel to Karl Neudorfer.

6          THE COURT:  Thank you.

7          Any other parties?

8      (No audible response.)

9          THE COURT:  I think that's everybody.

10          I've considered this as sort of a status

11  conference, I don't have any statement to give you today.

12  There are some bright spots in the Monitors' Report and yet

13  way too many grim places.  So I want this to -- how I wanted

14  to start with the Panel's Report -- is the Panel present?

15          MR. VINCENT:  Yes, Your Honor.  This is Paul

16  Vincent.

17          MS. MELTZER:  Yes.  Good morning, Your Honor.

18  This is Judith Meltzer.

19          THE COURT:  Thank you.

20          MS. STANLEY:  Good morning, Your Honor.  This is

21  Ann Stanley.

22          THE COURT:  Thank you.

23          And thank you for the work you've done.

24          I thought we ought to start with the expert's

25  Report and then review the Monitors' Report.  Then that was

1  their major Report, and then there are children without

2  placement Report.  And then I have a list -- I went through

3  all the prior transcripts to write down prior concerns and

4  what the responses were and I wanted to review for status

5  purposes some of those concerns.

6          And DFPS, just as a starting -- another starting

7  place, do you understand now that the restraining order --

8  sorry the injunctive relief and all the remedies crafted to

9  support that injunction apply to all the children in your

10 care, the M.C. children?

11         MR. NEUDORFER:  Your Honor, Karl Neudorfer for

12 DFPS again.

13         Our position is aligned with that of the

14 Governor's office --

15         THE COURT:  Okay.

16         MR. NEUDORFER:  -- and we're --

17         THE COURT:  Then that's a yes?

18         MR. NEUDORFER:  Yes, Your Honor.  Our position is

19 that is aligned with that of the Governor's office and the

20 filing that they made I believe was in September, Your

21 Honor.

22         THE COURT:  Well, I just need a clear yes from

23 DFPS, do you understand that to be the case?

24         MR. NEUDORFER:  Yes, Your Honor.

25         THE COURT:  Okay.  Thank you.

1          And it's a good thing your cabinet member is

2     aligned with the Governor's position.

3          So Mr. Yetter, since this was your idea, did you

4     want to call members of the Panel?  How do you want to

5     proceed with this?

6          MR. YETTER:  Yes, Your Honor.  I think that would

7     be a great idea.  And I am open to whichever member you'd

8     like, Your Honor.  Ms. Meltzer would be fine with us if we

9     -- if she might be the one that we could talk to first.

10          THE COURT:  Okay.  Anybody then can call any of

11     the others that want to and I want to hear from the others

12     as well if they have something to supplement.  In fact, why

13     don't we just swear in the three Panel Members now,

14     Ms. Purifoy, because I want the Panel Members to feel free

15     to jump in to supplement at any point and add their thoughts

16     as we go along, so we don't have to circle back every time.

17          Ms. Purifoy?

18          THE CLERK:  Yes, Your Honor.

19          Please raise your right hands.

20     (Panel Members Paul Vincent, Judith Meltzer, and Ann

21     Stanley sworn.)

22          THE CLERK:  Mr. Vincent?

23          MR. VINCENT:  I do.

24          THE CLERK:  Ms. Meltzer?

25          MS. MELTZER:  I do.

1          THE CLERK:  Ms. Stanley?

2          MS. STANLEY:  I do.

3          THE COURT:  All right.  Go ahead, Mr. Yetter.

4          MR. YETTER:  Thank you, Your Honor.

5          I thought I would start very briefly with just,

6  since there's a lot of stakeholders in this -- listening to

7  this hearing, Your Honor -- and some of this I know Your

8  Honor already knows -- but I think it's important to put

9  into the context the excellent work that the Panel has done

10 to start with, their background.  Start with a brief

11 overview of the amount of work they put into the Panel

12 Report and then move to the conclusions fairly quickly, if

13 that's okay with the Court?

14          THE COURT:  That's fine with me.

15          MR. YETTER:  Ms. Meltzer, again, just briefly,

16 this work that you've done here on behalf of all the parties

17 in this case with regard to child welfare issues in

18 connection with the Texas Foster Care System, is a subject

19 matter that you have spent your entire career working on, is

20 it not?

21          MS. MELTZER:  Yes.  Pretty much so.

22          MR. YETTER:  And at this point I believe you've

23 been in the child welfare-related occupations and

24 professional for now 40 years?

25          MS. MELTZER:  Yes.  Probably 35.  But yes.

1          MR. YETTER:  And what is your current position

2    in --

3          THE COURT:  She started as a teenager, Mr. Yetter.

4          THE WITNESS:  I did.

5          MR. YETTER:  I almost hesitated to say 40 -- but I

6    think it's significant that these are --

7          THE COURT:  It is.

8          MR. YETTER:  -- completely incredibly qualified

9    experts.

10          Ms. Meltzer, just briefly remind us again of your

11    position and your responsibilities right now?

12          MS. MELTZER:  So I am currently the president of

13    the Center for the Study of Social Policy.  We're a national

14    non-profit with offices in New York, Washington, D.C., and

15    Los Angeles.  And we work with states and communities around

16    the nation on really improving life chances and

17    opportunities for children, youth, families, and

18    communities.  I personally do a lot of work with states that

19    have been involved in trying to improve (glitch in the

20    audio) system in the context of class action litigation.

21          MR. YETTER:  So have you -- it's fair to say that

22    you have not only in your day job, but in your consulting

23    work -- have dealt with issues like what the State of Texas

24    is struggling with now and reforming and improving its

25    Foster Care System.

1          MS. MELTZER:  Yes.

2          MR. YETTER:  Ms. Meltzer, one of your co-Panel

3    Members is Paul Vincent, who I believe you have worked with

4    in the past in his capacity in various context.  Am I right

5    about that?

6          MS. MELTZER:  Yes.  That's right.  I mean I can

7    let Paul -- maybe we can let Paul talk about his experience,

8    but I've worked with him over many years.  He is one of the

9    most revered child welfare professionals in the nation,

10   because of both what he did as director of the Alabama

11   system when he was director and his work over many, many

12   years --

13         THE COURT:  Okay.  Just so we're clear, you're

14   talking about Mr. Vincent and not Mr. Yetter, who is also

15   good, but in another --

16         MS. MELTZER:  That's right.  I'm talking about

17   Mr. Vincent --

18         THE COURT:  Thank you.

19         MS. MELTZER:  -- and he was the founder and the

20   director of an organization called the Child Welfare Group,

21   which has been working with states all over the country.

22   Perhaps Mr. Vincent can say a little bit about himself for

23   the Record?

24         MR. YETTER:  That would be fine with me.  I'm not

25   sure he could say anything more glowing than what you just

1   said Ms. Meltzer, but I --

2           THE COURT:  I think he's talking about

3   Mr. Vincent.

4           MR. YETTER:  Yes.

5           MS. MELTZER:  Yes.

6           MR. YETTER:  Yes.

7           MR. VINCENT:  Your Honor, I'll say something

8   briefly.  So I worked in Alabama's child welfare system for

9   25 years and was its child welfare director for seven years

10  before I left the agency.  And in those seven years the

11  Department was a Defendant in a class action lawsuit on

12  behalf of a class of children in child welfare who had

13  mental health needs.

14           And following that tenure in directing the child

15  welfare group, we provided technical assistance to states

16  around the country, maybe -- mostly focused on strengthening

17  front line practice.  And in that role, became Court Monitor

18  in a number of states similar to the experience of

19  Ms. Meltzer, Utah and New York City, Tennessee, Los Angeles

20  County where I still have monitoring Panel role, and South

21  Carolina -- I think that's all of them.

22           So now I'm semi-retired and still continue in

23  monitoring roles in LA County and as a co-Monitor with

24  Ms. Meltzer in South Carolina.

25           THE COURT:  Thank you, Mr. Vincent.

1          MR. YETTER:  And while I have --

2          DR. KLEIN:  Judge Jack?

3          THE COURT:  Yes.

4          DR. KLEIN:  Judge Jack, I just wanted to let you

5    know this is Dr. Arthur Klein (phonetic).  I just joined,

6    thank you for allowing me to.

7          THE COURT:  Thank you.  But keep it -- keep it on

8    mute, Dr. Klein.  Thank you.

9          DR. KLEIN:  You got it.

10         THE COURT:  The Monitors have a new expert, and I

11   wanted to tell you about Dr. Klein, who has recently become

12   available and he has offered to the Monitors to be a medical

13   expert pro bono, so I didn't want the State to be concerned

14   about possible fees in the future for Dr. Klein.

15         He has a particular interest in the area -- in

16   this area.

17         Go ahead.

18         MR. YETTER:  Yes, Your Honor.

19         Ms. Stanley, why don't we move to you?  And you

20   obviously have got an equally impressive background in child

21   welfare matters.  In particular, you have a -- your firm has

22   a deep understanding or experience with the Texas Foster

23   Care System.

24         Am I right about that?

25         MS. STANLEY:  Yes.  That's correct.

1            I'm a managing director for Casey Family Programs,

2   which is the largest operating foundation in the country,

3   specifically focused on child welfare.  We're really working

4   to improve child welfare systems in all 50 states and

5   territories.  In my role at Casey -- and I've been there for

6   21 years, I have a long history of working in child welfare

7   and children's mental health -- is to oversee a group of

8   consultants, who specifically work in states to build strong

9   families, supportive communities, and really help children

10  stay safely with families whenever possible.

11           Prior to coming to Casey Family Programs, I was at

12  the Health and Human Services Commission in Texas and I led

13  an effort to bring together the child serving agencies in a

14  way that really provided important and needed support to

15  children and families, especially those children who are at

16  risk of being placed in residential treatment.

17           And prior to that I was a director of children's

18  mental health for what was often Travis County MHMR, now

19  Integral Care overseeing children's mental health services

20  in Travis County and surrounding counties.

21           MR. YETTER:  Thank you, Ms. Stanley.

22           Ms. Meltzer, let me return back to you.  And I

23  think one of the important aspects of the work that you did

24  was that it was independent.  And if you could explain for

25  us the importance of why the work of this Panel,

1  Mr. Vincent, Ms. Stanley, and yourself, that each of you was

2  independent from the parties and why that was important to

3  you?

4         MS. MELTZER:  Yes.  So we were absolutely

5  independent and that's sort of been a hallmark of my work

6  over the -- over my entire career.  That in trying to help

7  systems one cannot -- what we want to do is try to work

8  collaboratively with all the parties to get to solutions and

9  did not want to be, in this case, unduly influenced by any

10  of the parties in this litigation.

11         I've written personally on something that we call

12  "non-adversarial approaches to litigation," which is really

13  an attempt to focus on the substantive issues and minimize

14  the legal wrangling around some of these consent decrees and

15  other litigation strategies.  So it was very important to

16  both Ann -- to Ann, Paul, and I that we be independent.

17         As someone said, I've worked with Paul in the

18  past, I knew him, I know that that was the case with him.  I

19  did not -- never worked with Ann until this effort and it's,

20  of course, been a real pleasure and she added so much to our

21  abilities (glitch in the audio) things going on in states

22  that we were not familiar with, as well as really

23  understanding Texas, its history and culture.

24         We did this work completely independently.  When

25  we interviewed people -- we relied on data provided to us by

1    DFPS and HHSC, so we did not independently validate their

2    data.  We also relied on the information and data provided

3    in the Monitors' Reports, and we interviewed about

4    30 stakeholders over a very short period of time.  In each

5    of those conversations, we identified to those stakeholders,

6    one, the independent nature of our work, and that nothing

7    that they told us would be identified with them.  That we

8    would hold those conversations confidential, that we would

9    use them to make our assessments and findings, but we wanted

10   -- especially because the amount of time for this work was

11   so compressed -- we wanted to provide opportunities for

12   people to feel very candid in sharing both their concerns

13   and their suggestions for improvement.

14            MR. YETTER:  Thank you, Ms. Meltzer.

15            Before we turn to the work that you did and the

16   information that you considered, let me just verify one last

17   thing.  Your work was the Panel's -- Expert Panel's work was

18   independent of the parties, was it also independent of the

19   Court Monitors and, in fact the Court itself, in being

20   completely independent?

21            MS. MELTZER:  Absolutely.  We had absolutely no

22   contact with the Court, we interviewed the Court Monitors

23   just the way we interviewed the leadership at HHSC and DFPS.

24            MR. YETTER:  So let's turn to the work that you

25   did in a fairly compressed time frame.  And obviously the

1  parties put significant time constraints on the Panel's

2  work, roughly 60 days, given the -- did you understand why

3  the parties were so interested in quick work by the Expert

4  Panel?

5          MS. MELTZER:  Yes.  You know, I think each of us

6  agreed to do this, because we recognized the urgency of the

7  task, and we recognized that the numbers of children in

8  Texas that are cycling in and out of these unlicensed

9  placements is just really unacceptable, right?  And

10 everybody is concerned about doing something about it.  So

11 that was really why we agreed, each of us, to do this.  And

12 particularly, you know, recognizing that the time frame was

13 very constricted.

14         MR. YETTER:  So within the 60 days that the Expert

15 Panel did its work, you've already shared with us that you

16 interviewed 30 stakeholders.  I think you have Appendix A,

17 which lists almost daily interviews by the Expert Panel with

18 various stakeholders.

19             Is that what Appendix A shows?

20         MS. MELTZER:  Yes.  That's right.

21         MR. YETTER:  And beyond the interviews, how much

22 data did you all and your staff digest?

23         MS. MELTZER:  So we began by reading some of the

24 core foundational documents that related to this, which

25 include the Monitors' Reports to the Court, which includes

1  Reports prepared by the Department and shared with the

2  legislature, which included the Reports provided by the

3  Departments to the Court.  We began by those.

4         Everybody we talked to had more information for us

5  and shared with us data and documents which we read.

6  Everybody we talked to, we asked if there were things they

7  said they could send us that they thought we should look at,

8  including their own data and documents.  So you know, it was

9  a voluminous amount of material that we tried to both

10 categorize and digest as we did this work.

11        In addition to the interviews, which by and large

12 we did as a team, altogether there may have been a few that,

13 you know, two of the three of us did.  We met quite often

14 among ourselves to share our, you know, our understandings

15 of what was going on, make sure that we were getting things

16 right -- at least from our perspective.

17        MR. YETTER:  Sure.  So one last question on that

18 source of information.  You mentioned that much of it came

19 from the State itself, and was the State agencies, DFPS and

20 HHSC, were they cooperative and provide you with all the

21 data that you all asked for?

22        MS. MELTZER:  They were absolutely cooperative,

23 and I think we all want to thank them for their -- for their

24 engagement of this.  Not only were they cooperative in, you

25 know, helping us to get the interviews set up quickly, but

1  when we -- we had lots of follow up questions, and we went

2  back to them and asked for data about this or data about

3  that, asked them to try to produce data on things that we

4  had not seen, if they had that data available, and, you

5  know, both of the State agencies were completely cooperative

6  in our effort.

7       MR. YETTER:  Given how important they are in this

8  whole situation, obviously the State is caring for these

9  children, did the Panel -- do you feel like the Panel made

10 every effort to give the State agencies as much input into

11 this process as you felt they wanted or you felt they

12 needed?

13      MS. MELTZER:  Yes.  I guess I think so.  I think

14 that when we produced our draft Report, actually the State

15 agencies and the Court Monitor wanted to have an additional

16 conversation with us about our draft.  We declined that, we

17 got comments from people, written comments which were

18 helpful and informed our final product, but we declined the

19 last set of conversation.

20      MR. YETTER:  So just to be clear, before the final

21 Expert Panel Report was done, you gave the State a chance to

22 comment in writing?

23      MS. MELTZER:  Yes.

24      MR. YETTER:  And did the Panel take those comments

25 into consideration in finalizing --

1          MS. MELTZER:  Absolutely.

2          MR. YETTER:  So let's move to the conclusions, if

3    we could.  And I'm going to keep this at a fairly high level

4    and we can -- obviously we can go into any one of them in

5    more detail.  But I'm going to -- and I'm not going to try

6    to test your memory, Ms. Meltzer, but I'm going to refer to

7    your Report.

8          And in the conclusion, at a high level, kind of

9    summarizing, it seems to me that what the Expert Panel

10   Report suggests is the solution, in the near term and the

11   long term, to this crisis of children being put into

12   unlicensed placements is three things:  Strong leadership,

13   strategic coordination across all stakeholders, and a

14   targeted infusion and coordination of resources.  And I'm

15   quoting from the conclusion on page 24.

16          Is that a fair summary of the three main

17   recommendations and conclusions that the Panel came to?

18          MS. MELTZER:  Well, I think that's a fair summary

19   of three of the main recommendations and conclusions that we

20   came to.  I think we believe very strongly that there have

21   to be both short-term solutions to deal with the children

22   who are currently cycling in and out without placement, and

23   those require leadership, accountability, coordination among

24   the agencies, and we had very specific recommendations about

25   getting resources and clinical staffing for those children.

1           I think we also recognize that the roots of this

2    problem, you know, do not lie in -- it's not a -- there are

3    roots of this problem that go back many years and that they

4    reflect the need for fairly significant systemic reforms

5    both within HHSC and the Department to increase the

6    availability of services and supports to children and

7    families in homes and communities.  So many of our

8    recommendations are about that and reflect the need to, you

9    know, focus on reducing the trauma for these children.

10          So yes, your three points are good ones and

11   they're right, and they're what we said.  I think we had --

12   we were -- we want the message to be and children and these

13   children had to be recognized as children, not as (glitch in

14   the audio) youth, you know, a group that is responsible for

15   these problems.  That we need to focus on that in a very

16   individualized way to begin to heal the trauma that these

17   children have experienced and provide the resources

18   necessary for them to heal and thrive.  So that's a very

19   important part of our findings.

20          I think we also, you know, we also felt that the

21   high level of interest in this problem that was communicated

22   to us by everybody that we talked to, is an asset for the

23   State, that people are concerned about this, they're

24   interested in this, there is -- there are many opportunities

25   to build on things that are currently happening within the

1   State, you know, to improve the system.  So some of that is

2   reflected in our recommendations as well.

3           THE COURT:  Can we just go through these

4   recommendations one at a time?  I want to address HHSC and

5   DFPS to see which ones they're going to follow.

6           I really would like to cut to the chase,

7   Mr. Yetter.

8           MR. YETTER:  Okay, Your Honor.

9           THE COURT:  First, I'm not sure if you and your

10  Panel are aware, that the State is apparently pleased to

11  give up $44 million this year and next year from the Federal

12  Government by not -- because they refuse to be in compliance

13  with Family First, which requires, of course, lower use of

14  qualified GROs, lower use of congregate care, and that

15  certain requirements be met.

16          And I don't know if you have seen DFPS's plans.

17  After our September hearing they told me they would get

18  together plans to handle the array problem that we have in

19  Texas, which is just significant.  In contrast, as I said

20  last time to Oklahoma, which closed 40 percent of their GROs

21  and did not have this problem of placement because they were

22  prepared.  Texas, in spite of 11 years of litigation, was

23  not prepared for closing these unsafe GROs and thrust all

24  these children in hotels, motels, and offices, whereas you

25  can see from the Monitors' Report, from their children in

1  unlicensed care, that they were subject to sex with hotel

2  staff members, tasers, they were tased by the security

3  officers hired by DFPS to stay at these unlicensed placement

4  areas.  Two 13-year-old's were pepper sprayed, children were

5  slapped.  You know, this is what happened.

6          Now DFPS's plans that they promulgated and gave to

7  the Monitors who shared with me, the number one thing is

8  building a stronger congregate care network.

9          Did you know that, Ms. Meltzer?

10          MS. MELTZER:  We knew that that was part of their

11  plans.  And I think as we said in the Report, we really

12  disagree with that.

13          THE COURT:  Yes.

14          MS. MELTZER:  We think the solution to the problem

15  is not more congregate care.

16          THE COURT:  And in fact, there isn't a single

17  expert in the field of child protection that recommends

18  congregate care, unless except in exceptional circumstances;

19  is that right?

20          MS. MELTZER:  Yes.  If it's needed for treatment

21  for short periods of time.

22          THE COURT:  But yet here we are, struggling in

23  this situation, with a Department that not only believes in

24  congregate care, for whatever reasons, for the pride of it,

25  for profit congregate care people, for the not-for-profit

1  congregate care people and the lobbyists they support.  And

2  it's just a chain, as I'm sure you're aware, Ms. Meltzer.

3          MS. MELTZER:  You know, I don't know enough about

4  Texas to understand the -- you know, the politics of this.

5  But I do believe that there is an overemphasis on the use of

6  congregate settings.

7          THE COURT:  Yes.  And I have a real concern about

8  that.  So also have you worked in any State that suddenly,

9  after the trial by the way, split their licensing division

10 into HHSC and the Child Protective Services into DFPS?

11         MS. MELTZER:  I'm not sure I'm qualified to answer

12 that question, Judge Jack.  So many states keep licensing,

13 you know, together within the agency and there are some

14 states that I'm aware of that separate out some licensing

15 functions, particularly for medically based facilities.

16         THE COURT:  Right.

17         MS. MELTZER:  From the -- agency, but I'm not an

18 expert on that.  I don't know if Ann or Paul want to

19 respond.

20         THE COURT:  Anybody else on the Panel know about

21 separating these two agencies, these two entities that are

22 so vital to childcare and HHSC originally said they were not

23 child focused, they were facility focused.

24         That would be Mr. Vincent?

25         MS. MELTZER:  You're on mute.

1          THE COURT:  You're on mute, Mr. Vincent.

2      (No audible response.)

3          THE COURT:  You're still on mute.

4          How about we go -- while you work out the mute

5  problem -- to Ms. Stanley.

6          MS. STANLEY:  I'm, you know, in the same boat as

7  Judith.  There are so many ways that child welfare and their

8  Department of Human Services are organized.  Having a split

9  isn't unusual, and so I believe when we -- in the Report

10  that we spoke to that.  And --

11          THE COURT:  Yes.

12          MS. STANLEY:  -- it increases the need for

13  coordination and collaboration, which was lacking between

14  the two agencies.

15          THE COURT:  And it still is.  You know, the

16  computer systems are split, they don't talk to each other.

17  And DFPS, for instance, since the beginning -- since we've

18  had these hearings at post-remedy in 2019, the DFPS, for

19  instance, will issue citations, and HHSC would vacate them.

20  And vice-versa.  And so it has devolved somehow into a

21  semi-adversarial position.  And I don't know how, for the

22  children's sake, to make that un-adversarial.

23          What recommendations do you all have?

24          In fact, so much so that the last time we met, we

25  reviewed some testimony in a private placement center in

1   Houston that was suing the State for revoking the license

2   because it was unsafe.  And DFPS sent its person Trevor

3   Woodruff to testify that it was perfectly safe and HHSC sent

4   its experts to say in no way is it safe.

5            So that's the atmosphere we've been working in.

6            By the way, Ms. Masters, where did Trevor Woodruff

7   go?

8        (No audible response.)

9            THE COURT:  Is Ms. Masters here?

10           MR. NEUDORFER:  Yes, Your Honor.  She is, bear

11   with us for just one moment, she'll be right here ready to

12   speak to your question.

13           THE COURT:  Trevor Woodruff testified on behalf of

14   DFPS that it was a safe placement in spite of the incredible

15   citations that had been issued.

16           MS. MELTZER:  So, Your Honor, it was very clear to

17   us that when we talked to providers that they feel caught --

18   they frequently feel caught in the middle, because of the

19   lack of coordination and they want there to be a clear

20   coordinated strategy from both Departments.

21           THE COURT:  Yes.  Mr. -- okay.  Ms. Masters, where

22   did Mr. Woodruff go?

23           MS. MASTERS:  He resigned from the Department,

24   Your Honor.

25           THE COURT:  Okay.  Where is he working now?

1          MS. MASTERS:  I'm not sure where he's working.

2          THE COURT:  Well, you told the Monitors he was

3   working for one of the providers, which we assumed he was

4   all along, but what provider is he working for now?

5          MS. MASTERS:  I would have to check.  I know that

6   he didn't want to reveal too much when he left.  He did make

7   it clear it was a provider, but I don't know that he would

8   want me to reveal where.

9          THE COURT:  Well, I'm telling -- I'm ordering you

10  to do it, tell me now.

11         MR. NEUDORFER:  Your Honor, I don't know that we

12  can do that without Mr. Woodruff's permission.

13         THE COURT:  Is there some -- is there some -- tell

14  me exactly what the privilege is why you're denying this

15  Statement?

16         MS. MASTERS:  Well, for me, Your Honor, I can just

17  go give him a call and ask.  I didn't ask him what agency he

18  was going to.

19         THE COURT:  Okay.  Well, give him a call.  Because

20  he's already there, so it shouldn't be a secret, right?

21         MS. MASTERS:  One second please.

22         THE COURT:  Okay.

23         Go ahead, Mr. Yetter.

24         Oh.  I'm mispronouncing your name Ms. Meltzer.

25         MS. MELTZER:  It's okay.  It's Meltzer.

```
 1                THE COURT:  Meltzer.

 2                MS. MELTZER:  It's okay.

 3                THE COURT:  All right.  Tell me --

 4                MR. YETTER:  Your Honor, I think Mr. --

 5                THE COURT:  -- please what's -- what's your --

 6    okay.

 7                MR. YETTER:  -- Mr. Vincent --

 8                THE COURT:  Mr. Vincent is with us?

 9                MR. YETTER: -- wanted to answer yes.

10                MR. VINCENT:  Yes.

11                THE COURT:  Yes.  Go ahead we were talking about

12    the split between HHSC and DFPS.

13                MR. VINCENT:  Judge, if you're asking me, in my

14    career as a -- in a consulting role in over 20 states that

15    we worked in, in that 20-year period, I don't recall ever

16    seeing this division between these two functions.  It's not

17    to say it might not exist in some states, but --

18                THE COURT:  It does exist here.  And it's not -- I

19    can tell you, it's not --

20                MR. VINCENT:  I've never encountered it.

21                THE COURT:  -- been beneficial.

22                Go ahead, Mr. Vincent.  Thank you.

23                MR. VINCENT:  I just said I've never encountered

24    it.

25                THE COURT:  Well, and I cannot understand what the
```

1  thinking was.  It occurred right after trial and before I

2  issued my order in 2015.  Trial was in 2014, the order came

3  in December of 2015, it was between those two periods.

4         So what are your thought processes to get these

5  agencies to cooperate?  I must say that with us anyway, in

6  court and with the Monitors, HHSC has been extremely

7  cooperative.  It's one little glitch that the Monitors are

8  going to try to work out later, but we've not found that to

9  be the case with DFPS.

10         Any thoughts on how to fix this?

11         MS. STANLEY:  Well, I think one of our

12  recommendations and one of the things I think we were

13  surprised to not find initially was an interagency team.

14  That was really working on this issue between HHSC and DFPS,

15  but also to include some other child serving agencies as

16  relevant.  And included in that team would be a lead,

17  someone who was in charge of and accountable for insuring

18  that the interagency team developed the plan, that they

19  executed on that plan, and that they used data to inform the

20  work and that they consistently were able to gather

21  information from children and families at the local level to

22  inform work that was really meeting family needs, was

23  flexible, and was thinking outside of things they had

24  already tried.

25         THE COURT:  Okay.  Ms. Masters, are you committed

1  to -- yes or no -- forming an interagency commission --

2  committee?

3            MS. MASTERS:  Yes.

4            THE COURT:  Ms. Young?

5            MS. YOUNG:  Yes.

6            THE COURT:  Do you want me to help you pick a

7  chair, or can you all do that yourselves?

8            MS. MASTERS:  We can do that ourselves.

9            THE COURT:  All right.  And how quickly can you do

10  that?

11            MS. MASTERS:  We will be meeting this week.

12            MS. YOUNG:  Agreed.

13            THE COURT:  Thank you, Ms. Masters and Ms. Young

14  and the Panel Members for your facilitation in that.

15            So let's go on to the next issue.  We have -- I

16  know you addressed stakeholders concerns about fees.  I

17  think you handled appropriately the concerns about -- that

18  they were objecting to heightened monitoring, and there's a

19  lot of politics in that.  So that is a settled issue by the

20  Fifth Circuit, as well as the exit plan from heightened

21  monitoring.  That is a settled issue that cannot be changed.

22            So if you all understand that, that is also

23  something that is in remedial -- the exit plan is in

24  Remedial Order 20 and has been affirmed by the Fifth

25  Circuit.  And as subsequent appeal by the State taught me

1  and some of the other people that you really cannot issue

2  new remedies at all.  So that's fixed.

3        MR. YETTER:  Your Honor, may I follow up on that

4  point, just briefly?

5        THE COURT:  Yes, sir.

6        MR. YETTER:  Okay.  Ms. Meltzer, on behalf of the

7  Panel, the Panel did hear all sorts of issues, you took

8  input from all sorts of stakeholders and I just want to

9  highlight three points that it seemed to me the Panel was

10 very clear were not the solution.  If I could get you to

11 verify.  One, reduced safety monitoring, including

12 heightened monitoring, is not the solution to the crisis

13 that we're in, right?

14       MS. MELTZER:  That's correct.

15       MR. YETTER:  Blaming the children is not the

16 solution to the crisis that we're in, right?

17       MS. MELTZER:  That's correct.

18       MR. YETTER:  And more group homes, more congregate

19 care, is a bad idea and it's not the solution to the problem

20 -- the crisis that we're in, am I right?

21       MS. MELTZER:  That's correct.

22       MR. YETTER:  But I suspect it's true that you

23 heard from all stakeholders some variation of each of those

24 complaints and none of them are a solution to the crisis

25 that we're in, right?

1              MS. MELTZER:  That's correct.

2              MR. YETTER:  Sorry, Your Honor.  I just wanted to

3     make that point.

4              THE COURT:  No, thank you.  Thank you, Mr. Yetter.

5     As usual, you clean up my questions nicely.

6              So in sum for that area, do you accept that those

7     three premises as correct, Ms. Young?  Commissioner Young?

8              MS. YOUNG:  Yes, Your Honor.

9              THE COURT:  Commissioner Masters?

10             MS. MASTERS:  Yes, Your Honor.

11             THE COURT:  And Commissioner Masters, can you

12    rework your plan to increase congregate care to address the

13    concerns that both the Court and the Panel and the

14    Plaintiffs have?

15             MS. MASTERS:  We can.

16             THE COURT:  Were you all able to read the

17    Monitors' update on the children in unlicensed placements

18    that was filed yesterday?

19             MS. MELTZER:  Yes, Your Honor.

20             THE COURT:  It's pretty stunning -- it's pretty

21    sad, isn't it?

22             MS. MELTZER:  Yes, Your Honor.

23             THE COURT:  I had to read it and take breaks,

24    because it broke my heart that Texas is treating their

25    children like this.  And to think that these children have

1  been in and out -- we'll get to that later, but I mean one

2  of those footnotes with those children that had been in 10,

3  15, 20 placements in a small matter of time, just points out

4  the failure of the system to help these children.  And when

5  somebody testifies before the legislature that one of the

6  big problems is the police not arresting these children

7  enough and bringing them back too quickly after they arrest

8  them, is a huge concern that I have as to a mind set of an

9  agency.

10         Did you know about that, Panel?

11         MS. MELTZER:  Yeah.  I'll speak for myself right

12  now because the Panel hasn't discussed this as a Panel, but

13  I must say that the story that really touched me very

14  strongly, when reading yesterday's Report, was the eight or

15  nine-year-old child who wouldn't go to bed --

16         THE COURT:  Was that the story by the police

17  officer?

18         MS. MELTZER:  Yes.  And so how it escalated in

19  terms of people understanding how to de-escalate the

20  situation with that child until they had a police officer

21  who read a story to the child and was then able to get her

22  to settle.

23         You know, for me that was such a poignant example

24  of why -- which Paul reminds us of all the time working on

25  the practice so that the people that are interacting with

1  children and families really understand how to talk to kids,

2  how to listen to kids, and then how to intervene is so

3  important.

4          Mr. Vincent, maybe you want to add a little to

5  that since you're always reminding us of the importance of

6  that?

7          MR. VINCENT:  Well, apart from just being sad

8  about the circumstances of those examples, which were --

9  which are helpful to make this problem real instead of sort

10  of the abstraction it becomes, you know, in big

11  organizations.  And I'm not criticizing either Department

12  for that, there's just that tendency in bureaucracies.

13          We interviewed a worker who was speaking of an

14  experience -- her experience with a rental house where one

15  of her children was, and it was striking to hear how

16  committed she was to this very challenging youth.  She

17  understood the defiance, she had a relationship with the

18  child, and she felt responsible for trying to make sure this

19  child had new outcomes than it had -- than she had.

20          And you know, I think that's the organization the

21  Department has to strive to create.

22          A lot of new services are essential, better

23  support for kin is necessary, you know, better interagency

24  coordination is important.  But you know, as we speak to in

25  the section on practice, you want to workforce that has

1  empathy for these kids and feels a singular responsibility

2  to solve many of the problems that bring kids to the

3  Department's attention.

4         And so I couldn't help but think of her and what a

5  difference it would make if the entire workforce had that

6  view of the children it serves.

7         THE COURT:  I'll tell you, we've had such a

8  historic adversarial position with all of -- with both of

9  these agencies for many years, that I think one agency has

10  been able to adjust better than another agency, and I would

11  love any suggestions you have to help me with that.

12         MR. VINCENT:  Are you speaking of the example I

13  was using or --

14         THE COURT:  Just in general the -- no, and I

15  appreciate your suggestions on certainly there needs to be a

16  training.  You know, for some time these children without

17  placements were handled and still are in unlicensed

18  facilities like hotels, which is so dangerous, offices --

19  caseworker offices where they were actually trafficked, sex

20  trafficked during the day, and completely unsupervised, and

21  not in school, and not getting their medications by

22  caseworkers who are not trained (glitch in the audio) in

23  restraints, they're not trained in soothing children or

24  talking them out.

25         As you pointed out, Ms. Meltzer, the training has

1  been a lost component and it's not the caseworker's fault

2  for sure.  They just aren't trained in medications or in

3  restraints and so their first reaction in too many times has

4  been just call police when these children are acting out.

5  And these are children by the way who have such troubled

6  histories, they're mostly 14 to 17-years-olds, they have had

7  psychiatric hospitalizations, they have been on psychotropic

8  medicines, they have been abused before they were in care

9  and then abused after they were in care repeatedly.

10       And so the way they act out is perfectly

11  understandable and should be anticipated, yet the people

12  that are responsible for actually taking care of them 24/7

13  have no training to do so.

14       MS. STANLEY:  Your Honor, I think one of the --

15  sorry, Paul, were you speaking?

16       MR. VINCENT:  Yeah.  Go ahead.

17       MS. STANLEY:  Oh, I was just going to mention from

18  the Panel, thank you, Paul.

19       One of the things we recommended is that both HHSC

20  and DFPS create a shared values and principles.  They're

21  really guided by a trauma informed approach.  And that --

22       THE COURT:  It's reactionary -- it's a reactionary

23  approach.

24       MS. STANLEY:  Right.  And really understanding

25  some of the root causes of behavior linked to trauma and

1   training to that, and that part of what's missing right now

2   is a really coordinated approach at the child and family

3   level.  There's a lot of activity going on, there are a lot

4   of staffing, but it's not coordinated.  We really see the

5   potential to have immediate impact to improve the children's

6   situation by having a clinical coordinator assigned to every

7   child who is in unlicensed care, and to have that clinical

8   coordinator be able to direct a multidisciplinary team.  And

9   to be able to follow the child when they're discharged from

10  an unlicensed placement, because what we see are children

11  going back to unlicensed placement at a very high rate, the

12  recidivism --

13          THE COURT:  Recycled -- recycled over and over

14  again.

15          MS. STANLEY:  Yes.  And it really requires

16  following, an individual to follow that child.  The

17  caseworker has too many cases and the turnover is such that

18  we can't depend on them to fulfill that function.

19          THE COURT:  Well, did you have any -- what is your

20  recommendation as to broadening the array for family-based

21  kinship and family-based -- one of the things that you -- I

22  want to point out and ask about the funding, because there's

23  funding -- there should be funds they can use for this to

24  increase the funding for kinship placement.

25          Ms. Masters, can you do that?  Did you understand

1  that from the Report and can you do that?

2        MS. MASTERS:  I did -- I did understand it from

3  the Report, Your Honor, I don't know that I have the

4  authority to increase the funding for kindship, but that is

5  one of the meetings that I will be having.

6        THE COURT:  Who does have the authority?

7        MS. MASTERS:  That may be the authority of the

8  legislature, but I can't say that for sure at this point.

9        THE COURT:  When can you find out?

10        MS. MASTERS:  I will be having meetings on all of

11  these topics over the next couple of weeks.

12        THE COURT:  So what are you going to do for the

13  44 million from the Federal Government on the congregate

14  care placement, is that just gone for '22 and '23?

15        MS. MASTERS:  So I can't -- I'm not sure that that

16  is the case, Your Honor.  I will find out.

17        THE COURT:  It's going to require a major

18  restructuring of these congregate care facilities.

19        MS. MASTERS:  Agreed.

20        THE COURT:  Have you got anybody on that?  Who

21  have you got in charge of restructuring these placements?

22        MS. MASTERS:  I will be working with our CPS

23  associate Commissioner Jeanine Grander (phonetic) and our

24  contracts team.

25        THE COURT:  And what about the funding for the

1   mobile mental health thing, which looks so wonderful, can

2   you get that?

3          MS. MASTERS:  That would be on the HHSC side, I

4   believe.

5          THE COURT:  Okay.  Ms. Young, how about that?  Can

6   you get that?

7          MS. YOUNG:  Yes, Your Honor.  We will also have to

8   look to see what additional funding might be needed, and we

9   can work on that in the same way over the next four weeks

10  and get back to the Monitors and let them know.

11         THE COURT:  Okay.  And what are the other funding

12  that you recommended?  I'm looking for the pages.

13         MR. VINCENT:  Well, one of the suggestions we made

14  was for the Department to consider a particular Medicaid

15  waiver option.  I'm not too familiar with the fiscal

16  constraints the Department experiences in terms of

17  legislative support -- but I have a colleague who is a

18  Medicaid expert who was advising me on new strategies for

19  supporting mental health services for kids in foster care --

20  and pointed out among all of the federal waivers there was

21  one provision, one waiver, that did not hold states to

22  federal cost neutrality.  It's an 11-15I waiver where you

23  could just target kids in foster care.

24         There would be more costs, because the State would

25  be creating more resources.  But this State and another

1   State on the West Coast are using it to create a very

2   diverse public services like mobile crisis teams and other

3   intensive supports to children in their own homes that could

4   be very promising to states.

5           THE COURT:  Okay.  What have you done --

6           MR. VINCENT:  The Departments --

7           THE COURT:  What -- can you commit to looking into

8   that and doing everything you can to get that funding, the

9   extensions?

10          Ms. Masters, Ms. Young?

11          MS. MASTERS:  Medicaid would be housed at HHSC.

12          THE COURT:  Okay.  HHSC.  What's the story with

13  that?

14          MS. YOUNG:  Yes, Your Honor.  We will look into

15  this, I'm not -- I'm not certain what this waiver is, but we

16  will look into it.

17          MR. VINCENT:  How soon do you --

18          THE COURT:  Well --

19          MR. VINCENT:  Excuse me, Your Honor.

20          THE COURT:  Go ahead.

21          MR. VINCENT:  I'll send you a link to this

22  colleague and copy of their plan amendment.

23          MS. YOUNG:  Thank you very much.

24          THE COURT:  And what about HHSC the identifying

25  existing partial hospitalization programs with the highest

1    potential for expansion and begin negotiations to procure

2    more slots?

3            MS. YOUNG:  Your Honor, I think that might also

4    require additional appropriations.  Again, I would have to

5    look at it, we will have our staff look at it in the next

6    couple weeks again and get back to the Monitors.

7            MR. YETTER:  Your Honor, may I circle back to the

8    mental health issue just for one line of questioning?

9            THE COURT:  You know, that's just kind of an

10   overriding issue in every child that is in foster care.  It

11   is the most critical issue, and you know, it has been my

12   concern for years now that there are no proper mental health

13   records or physical health records in these files, which

14   we'll get to later.

15           But go ahead and say anything you want to about

16   the mental health.  I'm very concerned about both those

17   issues.

18           MR. YETTER:  Thank you, Your Honor.

19           Ms. Meltzer, let me return back to you.  One of

20   the -- one of the most blunt points that the Report makes is

21   about the state of the -- system of mental health care for

22   children -- care for children's mental health.  And I say

23   system loosely, because there really isn't one, and the

24   Report makes the factual statement that the State has been

25   quote, "Working on a State-wide system of children's mental

1   health for 25 years.  Since the late 1990's, but that the

2   current system of care in Texas is woefully inadequate."

3          How important is that, Ms. Meltzer, to all of the

4   Panel Members, how important is a well thought out, well

5   executed, system of care for children's mental health to be

6   a well running child welfare system?

7          MS. MELTZER:  You know, it's central, right?  It's

8   absolutely central.  Because if your goal is to reduce the

9   number of children and youth who have to come to the

10  attention of the child welfare system, you have to have a

11  state-wide system of access to mental health supports to

12  families, to serve children.

13         So what you have in Texas now is, you know, you

14  have families giving up their rights to their children in

15  this joint conservatorship, because they think they're sort

16  of at their wit's end in being able to find access to

17  services for their children, that they think that a path to

18  get services to their children is to give them

19  responsibility to the State.

20         You know, so you have to begin to reverse that.

21  So that you know, biological families, kin families, that

22  they can feel that they're going to be supported if they

23  take care of the children, you know, their children.  And

24  you don't have that now.

25         I mean, one of the -- I've been involved over -- I

1   don't know, 15 years with the State of New Jersey, which

2   really has turned around their child welfare system.  And

3   two of the most important reforms in the New Jersey system

4   were, one, that they developed -- they have developed a

5   state-wide system of care for mental health services for

6   children and families that you don't have to be in the child

7   welfare system in order to get access to those services.

8           And the other actually -- and it's not something

9   we recommended in the Report because we didn't -- we didn't

10  get to that point.  Is they actually developed a system of

11  having nurses attached to child welfare units, who could

12  help the workers -- families, you know, get access to the

13  full range of both medical and behavioral health services

14  for the children in --

15          THE COURT:  Okay.  So we have in the past, and I'm

16  never given up on this, asked both the Departments to check

17  with other states in how they have managed their array

18  problem.  How they have managed all kinds of problems, and

19  that's not occurred.

20          So maybe we can get a commitment today from

21  Ms. Young and Ms. Masters, within the next 30 days to

22  develop a plan to expand mental health care services.  To

23  children in kinship, as well as in conservatorship.

24          Do you think you could do that, Ms. Masters?

25          MS. MASTERS:  Yes, Your Honor.  And I already have

1  met with several states.

2            THE COURT:  Thank you.

3            I'm behind the times.  Thank you, Ms. Masters.

4            And Ms. Young?

5            MS. YOUNG:  Your Honor, I know Shane Shaw

6  (phonetic), who is here with me, has also talked to other

7  states, but we will -- I know we are having a meeting with

8  the Expert Panel on the 21st.  One of the things we want to

9  make sure is that we fully understand the work that they've

10 done, it's -- I have to just say it's been very impressive,

11 and I really appreciate all of the work that they have done

12 in interviewing both our staff, DFPS, and the stakeholders.

13            It's very impressive, we want to make sure we

14 fully understand.  Just sitting here in this hearing, it's

15 obvious that there is a wealth of information behind the

16 Report and we think that's going to be very important in

17 helping guide us.

18            So thank you, Your Honor.

19            THE COURT:  Okay.  So you can commit to coming up

20 with a plan in 30 days?

21            MR. BRISSENDEN:  Your Honor, this is Reynolds

22 Brissenden for HHSC.

23            Part of the collaboration agreement for

24 Mr. Yetter's proposal, one of the things that we had agreed

25 to as the parties was to have the opportunity to meet with

1  the Expert Panel and discuss these in more detail, similarly

2  to what we're doing today.  So we've worked to get that

3  meeting set up, it's set for January 21st, and we appreciate

4  the hard work of the Expert Panel and recognize the hard

5  work that they did in a short time frame and --

6          THE COURT:  Okay.  No more legalese --

7          MR. BRISSENDEN:  -- and want to meet with them --

8          THE COURT:  -- I'm asking if they'll commit today

9  to come up with a plan in 30 days.  You will have met with

10  the experts then.

11          We've been doing this for 11 years.  I know you're

12  new to the case, I'm not.  I just need some results for

13  these children and no more legal-speak, please.

14          Ms. Young, can you commit to try to come up with a

15  plan in 30 days to work on this?

16          MS. YOUNG:  Your Honor, we will commit to doing

17  something in the 30 days -- I don't know if 30 days is

18  reasonable for a thorough plan, but --

19          THE COURT:  Tell me how much.  What do you think,

20  90 days?

21          MS. YOUNG:  Your Honor, I honestly don't know.  I

22  want to do it right.

23          MR. BRISSENDEN:  And we've provided the Report to

24  our staff here at HHSC and the leadership team and they are

25  evaluating that and will be present at the meeting on the

1  21st.

2          THE COURT:  Ms. Meltzer, what's a reasonable time

3  to come up with a plan?

4          MS. MELTZER:  Oh, God --

5          THE COURT:  You've got timelines in here of

6  30 days, 90 days.

7          MS. MELTZER:  I would say that 90 days makes sense

8  in terms of being reasonably getting people together to know

9  what directions they're going to take and have them --

10          THE COURT:  Okay.  This is for the mental health

11  prong of this.

12          Can you do that, Ms. Masters, within 90 days, work

13  with Ms. Young to come up with a plan to address these

14  issues?

15          MS. MASTERS:  Yes.  And for those (glitch in the

16  audio) we've already (glitch in the audio) --

17          THE COURT:  Ms. Young, can you do that?

18          MS. YOUNG:  Yes, Your Honor.

19          THE COURT:  Thank you.

20          Okay, moving right along, Mr. Yetter, next?

21          MR. YETTER:  Yes.  So, Your Honor.

22          Ms. Meltzer, I want to focus on another issue or

23  approach that the State has been -- that the agencies have

24  been taking in the last couple of years in particular and

25  whether it's a solution.  The Panel on page 10 of the Report

1    talks about the State's placement of children out of state,

2    is putting -- is shipping children out of state a solution

3    to the current crisis -- a solution that makes sense for the

4    children to the current crisis?

5           MS. MELTZER:  No.  And maybe I would also turn to

6    Mr. Vincent to talk about that because we do not think

7    out-of-state placement is the answer.

8           MR. YETTER:  Before we get to Mr. Vincent, it is

9    increasing at least -- did the Panel find this in your

10   investigation that the State is sending more and more

11   children out at least over the last couple of years?

12          MS. MELTZER:  Actually, we did not do a historical

13   analysis.  We did ask for data on the out-of-state placement

14   of the children who are without placement and then we asked

15   for data on out-of-state placement for all children.  The

16   data that we received -- and, in fact, I think our Report

17   might be slightly misleading -- it showed that there were

18   about 2,000 out-of-state placements.

19          When we looked more closely at the spreadsheet

20   that was provided to us, you know, some number of those out-

21   of-state placements are for kinship placements or for foster

22   care placements or are related to adoption.  But there still

23   is a very sizable number of out-of-state placements to

24   residential treatment, psychiatric hospitals, kids in

25   juvenile detention out-of-state, which we think is

1  excessive.

2       Many states that have been engaged in reform have

3  made it a priority to bring back all the children back into

4  the State.  You can't -- when filed as out-of-state, it's

5  very hard to do the kind of reunification work you want to

6  do.  They are disconnected from their family, they're

7  disconnected from their communities and that's why you see

8  so much recycling of -- even in that list of out-of-state

9  placement episodes, kids -- there were kids who have

10  multiple episodes that show in the data we received for

11  those nine months.

12       THE COURT:  Well, we'll talk about that more when

13  we review the Monitors' update and the OCOK and to Engage,

14  as well as DFPS and the rate they're putting children out-

15  of-state.  You'll find that -- I don't know if you've -- I'm

16  sure you read it.  You said you did, Ms. Meltzer, it is very

17  disturbing --

18       MS. MELTZER:  Right.

19       THE COURT:  -- that the SSCCs, for those that are

20  not familiar, are those agencies that have DFPS and HHSC.

21  DFPS has given over all their responsibilities in a certain

22  area to find placements and to place children in that

23  particular geographic area in Texas and they are quite

24  (glitch in the audio) placements.

25       It turns out about that HHSCs are sending children

1  out-of-state at twice the rate that DFPS is or approximately

2  and that is a huge concern for all of us.

3         MS. MELTZER:  Right.

4         THE COURT:  As soon as we started cracking down --

5  not me but with the heightened monitoring, the Department,

6  the State has determined -- not me, but the State has

7  determined which of these placements are unsafe and closed

8  them down.  Then the HHSCs -- there seems to be a

9  correlation -- began shuttling children out-of-state.

10        Now we will find in a Report for the children who

11 were placed without -- in unlicensed care, that those

12 placements are very suspect in some out-of-state placements

13 that are on watch lists around the country as dangerous for

14 placement of children and on certain types of probation and

15 what have you.  It's (glitch in the audio).

16        MS. MELTZER:  Right.  I mean, the other thing to

17 really understand is these out-of-state placements cost a

18 lot of money.  The State -- I think the data that was

19 provided to us, the average cost of these out-of-state

20 placements is $44,000 a year per child, you know.  And when

21 we talk about redirecting resources to services in the

22 community to support families, that's one of the ways you

23 can get the funds you need to redirect the resources by

24 limiting these really expensive, not helpful and frequently

25 very dangerous out-of-state placements.

1        MR. YETTER:  Your Honor, let me pick up on that

2   last point that Ms. Meltzer said.

3        THE COURT:  Go ahead.

4        MR. YETTER:  Three million dollars, the State has

5   spent $3 million, according to the Expert Panel Report, in

6   the first 10 months of 2021 on out-of-state placements,

7   $2.9 million.  That's on page 10.  Excuse me for

8   interrupting.

9        MS. MELTZER:  No.  That's the data that was

10  provided to us by the State and those are for the

11  out-of-state placements for the children in this -- children

12  without placement.

13       MR. YETTER:  But that's just a part of -- that's

14  just some of the funds.

15       MS. MELTZER:  Right.

16       MR. YETTER:  Mr. Vincent, Ms. Meltzer suggested

17  that you would have some helpful insights on this for us.

18       MR. VINCENT:  Yeah.  One particular experience I

19  had seems relevant to the challenge the State's facing now.

20  A number of years ago our organization was helping the child

21  welfare and children's mental health system in Arizona,

22  which was implementing a class action settlement in their

23  mental health system primarily, and they had a large number

24  of kids placed out-of-state and so they, on their own,

25  initiated what they called the "300 Kids Project."  And they

1   made a commitment to -- in a short amount of time to do

2   intensive work to bring 300 kids back to Arizona.

3         And what they did was and what our role was is to

4   train their case managers to use intensive child and family

5   team meetings, not just a single meeting, but a process of

6   meetings with the families of those kids out-of-state with

7   the kids with existing and potential providers craft

8   individualized plans to get them back into the State, not in

9   congregate care -- although some of them did go to

10  congregate -- high-end congregate placements, but back in

11  family-based settings as close to their home as possible.

12  And you know, over a period of a number of months or a year,

13  the Department was successful in doing that.

14        All those kids were Medicaid eligible.  The

15  Department also contributed some of its own funds for things

16  that weren't claimable against Medicaid.  And they -- not

17  only did they succeed with those kids, but the process

18  produced high-quality case managers who were able to use

19  those techniques to keep kids from ever going out-of-state

20  in the first place.

21        And you know, I've seen that work on a different

22  scale of different populations.  I think all of us have, the

23  three of us have, on numerous occasions and what strikes us

24  is that might be one strategy the Department might

25  undertake.

1          I think we don't quite know enough to be real
2  concrete about it yet, but that's one example that occurred
3  to me while Judy was speaking.
4          MS. STANLEY:  And, Your Honor, if I might add that
5  there are a number of states that have focused in on the
6  population of children who have been placed out-of-state and
7  have been successful in bringing them back and, as Paul
8  said, bringing them back to family-based settings.
9          And I think this is one area where Texas doesn't
10 need to start from scratch.  There are a lot of ideas that
11 with some external consultation, they can connect with other
12 states to really learn what has worked and apply that to
13 their issues.
14         THE COURT:  Ms. Masters, can you come up with a
15 plan to get those children back in this State?
16         MS. MASTERS:  Yes, Your Honor.
17         THE COURT:  How much time would you need, 90 days,
18 60 days?
19         MS. MASTERS:  I mean, it would be nice to have
20 90 days.  I would hope not to take 90 days.
21         THE COURT:  Okay.  Let's do 90 days then, that
22 you're committed to doing that within 90 days.
23         And speaking of that, you also need to figure out
24 if you want to accept the recommendation of the Panel to do
25 a DFPS community liaison to the four regions that have the

1  highest number of children without placements in licensed

2  care to start building community capacity to prevent

3  placements in unlicensed care and get them out of

4  congregate, make sure they don't go back into congregate

5  care.

6          Do you think you could do that also with a

7  community liaison?

8          MS. MASTERS:  That is something I'm looking at to

9  see whether or not I can do that, as well as some others

10  with our -- with my existing resources.

11          THE COURT:  Is that a problem with your resources?

12          MS. MASTERS:  I haven't figured that out yet,

13  Your Honor.

14          THE COURT:  Okay.  Well, can you let me know

15  within -- let the Monitors know within 30 days whether or

16  not it's possible to have a liaison to do this?

17          MS. MASTERS:  Yes, Your Honor.

18          THE COURT:  Okay.  Go ahead, Mr. Yetter.

19          MR. YETTER:  I had another one, Your Honor, I

20  wanted to ask Ms. Meltzer about and the Panel, and that is

21  the strong suggestion in the Expert Panel Report that the

22  State recruit or secure providers with the expertise of

23  dealing with the significant needs of these children in

24  unlicensed placements.  And you -- the Report mentions that

25  there are -- that in other states, they have developed

1  targeted requests for proposal to establish high-quality

2  qualified residential treatment programs.

3        And could you explain a little bit more of how

4  that works and how the State of -- the agencies here in

5  Texas could find and retain the services of providers that

6  would help this and (glitch in the audio) --

7        MS. MELTZER:  Fine.  So I'll start and then I'm

8  going to turn to Ann to finish that, but what my experience

9  is with states working on these problems is that they look

10 at the needs of the children that they're trying to serve.

11 And, for example, they use their data to identify, you know,

12 is there a problem placing children on the autistic

13 spectrum.  You know, do we have a problem?  How many -- what

14 do we need to do for sexually reactive children?  What do we

15 need to do with -- the different kind of treatment needs

16 that children have?

17        And once they determine that from looking at their

18 data, they will prepare an RFD that they will solicit

19 specific providers to provide those services with defined

20 treatment modalities, hopefully evidenced-based treatment

21 modalities, resource sufficiently to hire the staff with the

22 skills to meet the treatment needs of those children.

23        We did not have the time to really fully

24 understand Texas' contracting processes, but our initial --

25        THE COURT:  I don't think anybody -- I don't think

 1   anybody understands it.

 2            MS. MELTZER:  Okay.

 3            THE COURT:  It may take several years to figure

 4   that one out.

 5            MS. MELTZER:  Right.  Oh, we didn't, I'll tell you

 6   that.

 7            But we did not think that that was the way

 8   services were being procured, right, that there is like a

 9   request for, you know, more GROs.  And I think I'm

10   forgetting the title of the open enrollment for whatever.

11   And we think that has to be changed, that the State has to

12   use their data to understand what their specific needs are

13   and then procure providers who can demonstrate that they

14   have experience meeting those needs.  They're going to staff

15   these programs, you know, to meet those needs and that they

16   aren't going to be held accountable for the treatment

17   services that the children need.  And there are lots of

18   examples, I think, out there of states that try to procure

19   services in that way.

20            Ann, can I turn to you to expand on that?

21            MS. STANLEY:  Yes.  I think it's important to

22   recognize that the State is working on the Foster Care Rate

23   Modernization Project.  And this project appears to be a

24   time and a place where DFPS and HHSC are working together

25   really well to -- and it has the potential to really address

1   some of the issues that were brought up in our Report.

2        So it has the potential to use data and they're

3   using Cann's data to look at what services and supports are

4   really needed and then to really provide the right level of

5   reimbursement for those.

6        But this project is multi-year.  It's going to

7   take years for it to come to implementation.  And one of our

8   suggestions is for HHSC and DFPS to, as they're working

9   through this process and really creating the placement and

10  service system that they want in Texas, to start applying

11  what they've learned to the current system and not wait

12  until 2023-2024 for the completion and the approval of this

13  project.

14        MR. VINCENT:  In a related matter, sort of related

15  to what Judy was speaking of, we were interviewing the

16  director of very high-quality residential and community and

17  home-based service agency who certainly seemed to share the

18  principles we were recommending the Department adopt and so

19  just out of curiosity, we asked in relation to the children

20  placed out-of-state, but it could apply to kids in-State as

21  well, if the Departments ask you what it would take for his

22  agency to create the ability to bring those kids home, pay

23  that organization to reduce the number of kids in out-of-

24  state care?  And his answer was, "No.  If all they want --

25  all they want is for me to get them back within the State

1  borders, I wouldn't be interested."

2          If that came with the resources to support them

3  once they got back with intensive home and community-based

4  supports, I think we might be really interested in that.

5          And so, you know, our thinking was: There are

6  probably numerous agencies that you respect and that produce

7  high-quality care that with the right incentives could begin

8  the process, respond to these high-need children while

9  you're waiting for a more systemic approach with the rate

10 analysis process.

11          THE COURT:  Ms. Masters, do you understand that?

12 Ms. Young?

13          MS. MASTERS:  Yes, Your Honor.

14          THE COURT:  I mean, there are providers out there,

15 as we've been saying for years, that provide quality

16 services for these children that no one has looked at.  This

17 seems to be kind of a political thing about what providers

18 to go with, what lobbyists to pay attention to, which is

19 why, Panel Members, you may not know that before 2014, the

20 trial actually, the State of Texas in the previous 10 years

21 had only closed one GRA [sic] and that's when I think that

22 there was more than one death of a child -- one GRO.  That

23 was it.

24          So that's why people are so distressed in the

25 provider network with all of these congregate care places

1  being closed because of safety reasons now that the

2  standards had been enumerated clearly.

3          So as far as I know, DFPS and HHSC have never --

4  in spite of the -- actually they at one point asked the

5  Monitors for recommendations and they got them.  The

6  providers that did not have a history of probation and child

7  restraint and physical and emotional abuse of these

8  children, they are out there, as you're saying, Mr. Vincent.

9  And Texas has never, to my knowledge, explored this option.

10          Ms. Masters and Ms. Young, can you all do that

11  forthwith?

12          MS. MASTERS:  Yes, Your Honor.  I don't think

13  we've left any stone unturned.  A lot of those services that

14  they need to provide cost money and that's a lot of the

15  issue.  It's not about -- I'm not aware of any politics that

16  keep us from working with anyone.

17          THE COURT:  Well, you're talking $44,000 --

18  $40,000-something a year per child to keep them out-of-

19  state.  You were paying that incredible place.

20          Where was that, Ms. Fowler, that you went to look

21  for the 13-year-old that had been put in juvenile detention

22  that the police kept -- told you that they were called out

23  all the time?

24          MS. FOWLER:  Devereux.

25          THE COURT:  Devereux.  The Devereux, was it

1   Liberty City or --

2            MS. FOWLER:  No, it was in League City.

3            THE COURT:  League City.

4            MS. FOWLER:  But that was actually -- I don't

5   believe that was the DFPS placement.  I believe she was

6   placed by an SSCC.

7            THE COURT:  Right.  It was placed -- but still a

8   DFPS placement because they're in charge of these children.

9   They are the parents of these children, which we'll get to

10  another comment later.  But they were paying $800-and-

11  something a day, weren't they for the Devereux?

12           MS. FOWLER:  No.  It was 400 -- I think it was

13  $400-some-odd a day.  It is -- which is about -- that's the

14  top of the scale for --

15           THE COURT:  But to have these children be

16  arrested, physically abused and sexually molested.

17           So surely as we know, Ms. Masters, and you may not

18  know this because you're relatively new, but the

19  constitutional rights that have to be protected of these

20  children are not driven by monetary factors.  Money is not

21  an issue for these factors.  You must comply with safe

22  placements, period.

23           I'm going to have to start doing contempt in the

24  next -- I'm going to do it in the next four months, if we

25  don't get some response here, and that's going to be real

1  money.

2      And talk about money you're using -- you're

3  wasting $44,000 over the next two years for failing to bring

4  these GROs into compliance with federal regulations to get

5  that money and that has to be because of your providers.

6  They don't want to do it.  Not you, but the providers.  And

7  the money that you're throwing away is just stunning.  Out-

8  of-State placements, in-State placement for these children

9  that are just ghastly, $4-500 a day for this.

10      Now that you cannot -- Mr. Vincent, do you know of

11  any of these places that you're talking about that cost more

12  than $40 a day?

13      MR. VINCENT:  You mean the out-of-state

14  placements?  No.

15      THE COURT:  No, I'm talking about the ones that

16  you're recommending that might come to Texas under the

17  appropriate circumstances.

18      MR. VINCENT:  Honestly, I don't know, Your Honor.

19      THE COURT:  Okay.  So, Ms. Masters, I'm not going

20  to be listening any longer to your complaints about money.

21  The legislature throws you all money.  Anytime you ask for

22  it, you get it.  And where it goes, we're just now finding

23  out and it's not good, so please do not come back anymore

24  with "It costs too much money to give these children their

25  constitutional safeguards."  You cannot do that anymore.

1          Do you understand, Ms. Masters?

2          MS. MASTERS:  I understand, Your Honor.  It wasn't

3  meant to be a complaint or to keep me from doing what needs

4  to be done.

5          THE COURT:  Okay.  Explore that option and within

6  90 days, report to the Monitors what you have found on a

7  cost analysis and how practical it is to have decent

8  placements come into the State of Texas for these high-needs

9  children?

10          Will you do that?

11          MS. MASTERS:  Yes, Your Honor.

12          THE COURT:  Ms. Young, will you join in that?

13          MS. YOUNG:  Yes, Your Honor.  We will do

14  everything we can to help.

15          THE COURT:  Thank you.  I'm not sure that that's

16  particularly your area, but certainly you'll need to license

17  these places.

18          MS. YOUNG:  Yes, Your Honor.

19          THE COURT:  Okay.  Mr. Yetter, I'm moving along

20  here.

21          MR. YETTER:  Yes.  I had just really one more

22  question from the Expert Panel, if I could, Your Honor?

23          THE COURT:  Please.

24          MR. YETTER:  And that, Ms. Meltzer, is really a

25  step back sort of question having --

1          THE COURT:  I finally got her name down so we're

2     not going to get rid of her yet, are we?

3          MR. YETTER:  Your Honor, I'm -- there -- I'm happy

4     to go through each one of these recommendations as much as

5     the Court needs.

6          THE COURT:  You do it.  Thanks.

7          MR. YETTER:  Okay.  But the big picture point that

8     I wanted, Ms. Meltzer, you had a sense of what you were

9     getting into.  Sixty days later you've now intensively

10    analyzed the system, assessed the system.

11         Is this -- for a child welfare system of a wealthy

12    State like Texas, is it just business as usual to have

13    hundreds of their foster children placed in unlicensed --

14    and the evidence shows -- unsafe placements?  Is that just

15    business as usual or how concerned were you once you learned

16    what was going on?

17         MS. MELTZER:  No.  I think it's fair to say as we

18    dug into this, we were concerned when we got involved and in

19    my case it was from reading press reports.  And as we began

20    to examine it further, our concerns were heightened.

21         It's fair to say that right now with COVID -- and

22    I think the impact of COVID is that a lot of states are

23    struggling to have the services that they have in place be

24    adequately staffed, right, that more and more states are

25    experiencing this problem in a very small way like 10 kids

1   that they cannot -- you know, that they're having difficulty

2   placing and as they're addressing it.

3          But I know Texas is a big State, but the magnitude

4   of the problem here, I think, give us pause as the Panel

5   experts and the fact that by kind of institutionalizing it

6   as an approach to handling this problem would

7   (indiscernible) use by setting up these unlicensed

8   facilities across the State and staffing them with CPS

9   workers.  I think we found that a little -- very unusual and

10  a little startling.

11         THE COURT:  It's so dangerous, not just for the

12  kids, but for the caseworkers who have no -- and they're

13  required to do this by the Commissioner.  They're required

14  to put in so much time every week staffing these unlicensed

15  placements for children because there's no one else, which

16  is why children are wandering out of hotel rooms, having sex

17  with the staff, getting into fights because they're high-

18  needs children.

19         MS. MELTZER:  Right.

20         THE COURT:  And we'll get more of that later, but,

21  I mean, it's really stunning.

22         Speaking of that, Ms. Masters, do you recognize

23  that COVID is dangerous for these -- for the children in

24  your care, these PMC children?

25         MS. MASTERS:  I do.

1          THE COURT:  And for the staff that works with

2  them?

3          MS. MASTERS:  I do.

4          THE COURT:  You remember that I -- I guess you

5  know that I asked the Monitors to find out from you what

6  percentage of the children that were eligible for

7  vaccinations in your care, as you are the parents of these

8  children now, the State of Texas, for my PMC children that I

9  -- they're not mine but, I mean, I consider them near and

10  dear to my heart I will tell you.  You're the parents now,

11  the State of Texas, for these PMC children, almost 10,000 in

12  the State of Texas.

13          Vaccines have been available for children at the

14  high risk since January of -- at least, I guess, 15 to 18

15  since January of '21, 12 to 15-year-olds since May for any

16  -- 12 and above from May for all the children.  And I got

17  the statistics back from you all that 75.3 percent of the

18  children in your care in the State of Texas have no

19  vaccination for COVID.

20          And apparently -- I can't find the actual data,

21  but apparently in the entire group of Texas children that

22  are eligible for vaccinations, 5 through 17, it's either

23  44 or 51 percent of all children in Texas in that age group

24  that are eligible are vaccinated.

25          What is your position exactly on not getting these

1  children vaccinated?

2          MS. MASTERS:  So I agree with you, Your Honor, it

3  is important.  I believe the children have the ability to

4  say they don't want the vaccine.

5          THE COURT:  Five-year-olds?  Five-year-olds, I'm

6  sorry?

7          MS. MASTERS:  Not five-year-olds.  And I can't say

8  that I know all the specifics.  I think that Deneen Dryder

9  or Erica Banuelos would be able to speak better to that.

10          THE COURT:  Then let me hear from them.

11      (No audible response.)

12          THE COURT:  A hush fell over the room.

13          MR. NEUDORFER:  Your Honor, we will have

14  Ms. Dryder here in just a moment.

15          MR. YETTER:  Your Honor, I might suggest that it

16  would be a good time for a break.  I think we've been going

17  about 90 minutes, if the Court's okay with that.

18          THE COURT:  Well, if you insist, Mr. Yetter.

19          Everybody else okay with that?

20      (No verbal response.)

21          THE COURT:  I guess the Panel can stay as long as

22  they can stay on this because I'm anxious for them to hear

23  the Monitors' Third Report review, as well as discussing the

24  issues and the children without licensed placement.

25          MR. VINCENT:  We blocked out the day, Your Honor.

 1          MR. YETTER:  Your Honor, you're on mute.

 2      (No audible response.)

 3          MS. MELTZER:  I guess she's on break.  Okay.

 4          MR. YETTER:  I think we're on break.

 5          MS. MELTZER:  How long are breaks typically?

 6          MR. YETTER:  It would be about -- I'd say

 7  10 minutes.

 8          MS. MELTZER:  Okay, great.  Thank you.

 9          THE COURT:  Okay.  Let's do 10 -- let's do

10  15 minutes, okay?

11          MR. YETTER:  Thank you, Your Honor.

12          THE COURT:  Okay.  Sorry.

13          MS. MELTZER:  That's okay.

14      (Recess taken from 10:28 a.m. to 10:40 a.m.)

15                      AFTER RECESS

16      (Audio begins abruptly.)

17          MS. DRYER:  -- percent to have been fully

18  vaccinated.

19          THE COURT:  Now why is that when the State of

20  Texas -- depending on whose records you use 44 to 51

21  percent, what efforts are you making to get these children

22  vaccinated?

23          MS. DRYER:  We send out guidance to the field

24  that --

25          THE COURT:  Let me tell you one more time.  You

1  all are the parents of these children.  You must act like

2  responsible parents.  These children, so many of them, at

3  BMC and otherwise are high-risk children, they've got

4  asthma, they've got neurological problems, they've got

5  physical problems.  They're high-risk COVID patient

6  possibles.

7          So why have you not physically made sure that

8  these kids are vaccinated?  It's been available since last

9  May and this is January of 2022.

10          MS. DRYER:  We agree with you, Judge, and have

11  very much encouraged and stated to the caseworkers the

12  importance to get -- they get vaccinated.

13          THE COURT:  I'm sorry, that doesn't fly.

14          Why are they not vaccinated?  And I'm not issuing

15  mandates.  I don't want to go there.  I'm just talking about

16  these are mostly high-risk children.

17          Why are they not vaccinated?

18          MS. DRYER:  We continue to work to increase that

19  number.

20          THE COURT:  How?

21          MS. DRYER:  We send out --

22          THE COURT:  You're lagging behind.  The whole

23  State of Texas was not a high-vax State.  Your children are

24  last in the category of vaccinated, and you all are the

25  parents.  I tell you what, in other states, you might have

1  these children removed from your care because of this

2  failure to safely protect these children.

3          MR. NEUDORFER:  Your Honor, perhaps

4  Erica Banuelos, who is also with us, is -- can perhaps speak

5  to the details regarding vaccination in a little more

6  detail, if you'd like to hear from her?

7          THE COURT:  One more thing before I forget because

8  the older one gets, one has to keep track of these things.

9          Ms. Masters, what providers have you contacted to

10  see exactly the per diem cost of really good care that

11  Mr. Vincent was talking about and what is their per diem?

12          MR. NEUDORFER:  Your Honor, if you'll bear with us

13  just a moment, we'll ask Ms. Masters to rejoin us here.

14          THE COURT:  Oh, good.

15      (Pause in the proceedings.)

16          THE COURT:  Ms. Masters, let me repeat the

17  question.

18          What providers of these -- of the providers

19  Mr. Vincent is talking about that provide quality care in

20  congregate settings that's short term, which ones have you

21  contacted and what is their daily rate?

22          MS. MASTERS:  So I would have to check with my

23  contract staff, Your Honor.  I don't have that information

24  in front of me.

25          THE COURT:  Okay.  Well, who is that and when can

1   you get it?

2          MS. MASTERS:  That would be Bill -- I forget is

3   name last -- Bill Walsh and I could step out and try to

4   reach him now.

5          THE COURT:  Let's do that.

6          Okay.  Now, Ms. Banuelos, is that who we're

7   talking to now?

8          MR. NEUDORFER:  Yes.

9          MS. BANUELOS:  Good morning.

10          THE COURT:  Tell me about the vaccinations.

11          MS. BANUELOS:  Your Honor, I agree with you that

12   this is a really important thing for our youth and some of

13   the things that we have been doing at the field level is not

14   only have we provided guidance, but every -- you know, when

15   I talk to the regional directors who are in charge of the

16   regions, they are talking to their staff about the

17   importance of vaccination.  We have provided information

18   about why it's important.  We provided information to our

19   youth who have refused to be vaccinated.

20          THE COURT:  What percent?  Well, how many youths

21   have refused it and why is it not in their records?

22          MS. BANUELOS:  I don't have the exact percentage

23   of the youth that have --

24          THE COURT:  What youth are you talking about, what

25   age group are refusing?

1          MS. BANUELOS:  The older youth typically are

2    the --

3          THE COURT:  What age groups?

4          MS. BANUELOS:  I would say anywhere from 13 up

5    will sometimes refuse.

6          THE COURT:  You allow 13 and 14-year-olds to

7    refuse their vaccinations?

8          MS. BANUELOS:  Your Honor, we try to talk them

9    into coming --

10          THE COURT:  This is a "Yes" or "No."

11          You allow that?

12          MS. BANUELOS:  I would say that if --

13          THE COURT:  Apparently yes.

14          MS. BANUELOS:  Yes, we do.

15          THE COURT:  Okay.  And what guidance do you get to

16    allow your children to be unvaccinated?  Where are you

17    getting that guidance from?

18          MS. BANUELOS:  Your Honor, we cannot put a child

19    in the car if they don't want to get in the car with us.  I

20    know that, you know, foster parents try to talk to our kids

21    about getting vaccinated.

22          THE COURT:  Okay.  Where is this in the records?

23    Where is this in their medical records and their health

24    passports anywhere that children are refusing their

25    vaccinations?

1          MS. BANUELOS:  Workers will typically document

2    that in the narrative where they are asking the youth about

3    vaccination and trying to educate them to get them to go

4    with them to get vaccinated.

5          THE COURT:  Okay.  How about you do a word search

6    of those records right now and tell me exactly how many

7    children have refused, first.

8          Second, is it possible that your caseworkers are

9    so overwhelmed with taking care of children without licensed

10   placements that they're unable to do this job?

11         MS. BANUELOS:  We have offered them resources to

12   try to help them.  Yes, you're correct, Your Honor, it is

13   overwhelming to do child watch without placement and also do

14   other tasks, but I know that other regional level people are

15   working and trying to support wherever we can to assure that

16   things still get done.  And vaccination has been one

17   those --

18         THE COURT:  Okay.  Do you have any -- what

19   guidance are you using to say that -- you know, your people

20   have no problem drugging these children with psychotropic

21   drugs or restraining them and hauling them out with the

22   police.

23         Why is it you can't get them vaccinated?  I'm not

24   understanding this at all.  This is shameful.  So I want --

25   by Friday at noon, I want you to file a list of -- with the

1  Monitors of every child who's refused a vaccination, their

2  age and their placement.

3          Can you do that?

4          MS. BANUELOS:  Yes, Your Honor.

5          MR. NEUDORFER:  Your Honor, may I ask a few

6  questions on this issue?

7          THE COURT:  Yes.  I'm not exactly finished.  I

8  want to know where --

9          MR. NEUDORFER:  Yes, Your Honor.

10          THE COURT:  -- they're getting -- where you're

11  getting your guidance.

12          Do you have some specific public health guidance

13  that 13 and 14-year-olds can refuse vaccination when told

14  they have to do it by their parents?

15          MS. BANUELOS:  Your Honor, I think when I'm saying

16  that they refuse is I'm saying that we are not able to put

17  them in our car and take them to go get vaccinated.

18          THE COURT:  So you're going to give me a list of

19  those children by Friday at noon to the Monitors.

20          MS. BANUELOS:  Your Honor, I am going to get you

21  the list of those youths by Friday.

22          THE COURT:  Okay.  Do you know that there are

23  probably ways you can bring those vaccinations to the

24  children in their placements?  Have you tried that?

25          MS. BANUELOS:  Your Honor, we have and --

1            THE COURT:  And how did that work?

2            MS. BANUELOS:  Some still refuse.  Some got it and

3   some refused.

4            THE COURT:  Okay.  Can you give me a list exactly

5   of the providers that you have contracted to bring the

6   vaccines to the congregate care places and other places to

7   get these children vaccinated?

8            MS. BANUELOS:  We got them to go up to our offices

9   where we had our children placed and I could see if they've

10  been to any other congregated places and I can send that --

11           THE COURT:  So you're talking the unlicensed

12  places, you had them come to the caseworkers' offices?

13           MS. BANUELOS:  Yes, Your Honor, we did.

14           THE COURT:  And, Mr. Carson, what is your problem

15  with getting the children in your care vaccinated?

16           MR. CARSON:  I'm not aware of a problem.  We offer

17  vaccines, but we're not aware that they can be required.

18           THE COURT:  I'm not requiring them, but what do

19  you use to determine whether they should have them or not?

20  Surely you know these high-risk children in your care need

21  to be vaccinated.

22           MR. CARSON:  Yes, we know that.  We've provided

23  information to them.  We've had Zoom calls.  We've had

24  access to medical professionals.  We've tried to help them

25  understand the importance of them being vaccinated.

1        THE COURT:  Who have you -- what about the five-

2   year-olds in your care, are they vaccinated?

3        MR. CARSON:  I don't know.

4        THE COURT:  Who would know, since you're in local

5   parentis to all these children in your care?

6        MR. CARSON:  I'd have to check with our placement

7   folks and see if we --

8        THE COURT:  Do you give them MMR vaccines?

9        MR. CARSON:  Yes, we do.

10        THE COURT:  Do you make sure they have tetanus

11   shots?

12        MR. CARSON:  I believe we do.  Do we make -- I'm

13   checking.  I think they have to have those to get into

14   schools, so yes.

15        THE COURT:  And so what is -- do you have a

16   political objection to the vaccines, or just out of

17   curiosity?

18        MR. CARSON:  I do not.  I'm fully vaccinated and

19   boosted.

20        THE COURT:  But your children are not.

21        MR. CARSON:  Some are and some aren't.

22        THE COURT:  Well, apparently we know that less

23   than 25 percent are and of those 25 percent actually, the

24   Monitors were unable to verify a huge portion of those

25   25 percent actually were vaccinated.  We just -- they just

1  accepted the State's numbers for that.

2          Is that right, Mr. Ryan?

3          MR. RYAN:  Yes, Your Honor, that's correct.  We

4  were not able to validate that all of the children --

5          THE COURT:  The 25 percent?

6          MR. RYAN:  Yes.  We were -- in a sample of 65, we

7  were unable to confirm that 15 of those children had been

8  vaccinated.

9          THE COURT:  All right.  So -- Mr. Yetter?

10         MR. YETTER:  Yes, Your Honor, briefly.

11         Ms. Banuelos, are you the DFPS official that is in

12 charge of the whole vaccination issue?

13         MS. BANUELOS:  I am the director of field.  I'm

14 responsible for the field work.

15         MR. YETTER:  The field work.  Okay.

16         So part of your responsibility is keeping the

17 children healthy and safe, right, medically?

18         MS. BANUELOS:  That is correct.

19         MR. YETTER:  And I'm sure that part of the work

20 that you do involves knowing when children get their

21 childhood vaccination, whooping cough, polio, diphtheria.

22         MS. BANUELOS:  Yes.  We have a health passport

23 that we use.

24         MR. YETTER:  And they don't get a choice about

25 whether they get those vaccinations, do they?

1          MS. BANUELOS:  Some are mandatory for school and

2    they have to get them in order to be in school.

3          MR. YETTER:  And are there any other -- and you

4    know that the --

5          THE COURT:  Mr. Yetter, let me just -- are they

6    mandatory to be your placements, those vaccines that

7    Mr. Yetter just talked about?  Take away the schools.

8    Aren't they mandatory to be in placement for the protection

9    of the other children and your staff?

10         MS. BANUELOS:  I'm not -- I don't have the list of

11   all the ones that if any placement is mandating certain

12   particular vaccinations.

13         THE COURT:  Well, what about DFPS, do they require

14   vaccinations?  I thought you were supposed to, in 24 hours,

15   when a child comes into care get their medical records.

16         MS. BANUELOS:  We do, we have them assessed at

17   that time and if they are missing some vaccinations, we will

18   make sure that they get updated with vaccinations.

19         THE COURT:  Everything but COVID.  Okay.

20         MR. YETTER:  And is there something written down

21   that says vaccinations you can -- you're going to provide

22   for the health and safety of the foster children by giving

23   them all vaccinations except for COVID?  Is there something

24   written down that says that?

25         MS. BANUELOS:  No.

1          MR. YETTER:  Do you have any written policy, as

2    the Government parent of these children, about whether and

3    how to keep them safe from the COVID vaccine with -- excuse

4    me, from the COVID virus with a vaccination?  Do you have

5    any written policy on that?

6          MS. BANUELOS:  Yes.

7          MR. YETTER:  And what does it say?  Does it say

8    children get the choice of whether they're going to be kept

9    safe from the virus or not?

10         MS. BANUELOS:  Doesn't say that they have a

11   choice.

12         THE COURT:  And you've got nine placements -- nine

13   GROs that are under COVID watch at this time, right?

14         MS. BANUELOS:  I would have to verify that,

15   Your Honor.

16         THE COURT:  Well, that's what you told the

17   Monitors as of early January and you told the Monitors that

18   you've had, what, 55-65 children hospitalized with COVID?

19         MS. BANUELOS:  I believe that's right, from the

20   beginning of COVID.  We don't have any right now as of today

21   in the hospital.

22         MR. YETTER:  And you told the Judge that evidently

23   the State is giving 13 and 14-year-olds the right to choose

24   whether to get a vaccination to keep them healthy and free

25   of the virus; is that what you told the Judge?

1          MS. BANUELOS:  What I was trying to -- and maybe I

2    didn't explain it correctly, Mr. Yetter, is that when we

3    talk to the youth about the vaccination and about taking

4    them to get vaccinated, some of the youths refused to get in

5    the car to go get the vaccination.  Some of the youths say

6    they don't want it.  And as you know, if we take them in to

7    get vaccinated, we cannot restrain a child down to put the

8    vaccination in their arm.

9          So we do our best to talk to the child to try to

10   make them understand why this is important to their safety

11   and their health and how it could benefit them.  And so we

12   are constantly trying to talk to them about why they need to

13   get it because we feel it's important for their safety just

14   like it's important for my child, too.

15          MR. YETTER:  Okay.  And is that policy --

16          THE COURT:  Is your child vaccinated?

17          MR. YETTER:  Yes, that's right.

18          THE COURT:  Pardon?

19          MS. BANUELOS:  Yes, my child is vaccinated.

20          THE COURT:  How old is your child?

21          MS. BANUELOS:  My child -- I have a 10-year-old

22   and I have a -- I have an 11-year-old and I have a 13-year-

23   old.

24          MR. YETTER:  Did you give them --

25          THE COURT:  And did you give them the option of

1   refusal?

2          MS. BANUELOS:  I had a conversation with them

3   about what it was and I took them and they allowed the

4   pharmacist to put the vaccination in their arm.

5          THE COURT:  And what would you have done if they

6   said, "No"?

7          MS. BANUELOS:  I would have continued to have a

8   conversation with them and I would have taken them to where

9   I get them vaccinated and hope that they would allow the

10  technician to put a vaccination in their arm because if not,

11  the technician would not put the vaccination in their arm, I

12  would assume, if the child is refusing.

13         MR. YETTER:  Come on.  Ms. Banuelos, you're the

14  parent of your children.  You keep them safe by your choice.

15  They're not old enough to choose, are they, when they're 11

16  and 13-years-old.

17         MS. BANUELOS:  That's correct.  I spoke to them

18  and I took them in to get the vaccination.  They got in the

19  car with me and we went and got the vaccinations.

20         MR. YETTER:  And foster children that are 11 and

21  13 and 14-years-old are children.  They're not old enough to

22  make that choice about their medical health, are they, about

23  whether to get a vaccine or not get a vaccine.  They're just

24  children.  You're their parent.

25         MS. BANUELOS:  That is correct.  And so we do our

1   best as the caseworkers, they do their best --

2          THE COURT:  Okay.  Mr. Yetter, that's -- we're not

3   going to get anywhere with this.  This is just -- it's not

4   just negligence, it's --

5          MR. YETTER:  It's just shocking, Your Honor,

6   frankly.

7          THE COURT:  Mr. Vincent, Ms. Stanley, Ms. Meltzer,

8   are you all getting an idea of what we've been going through

9   for the past 11 years?

10         MR. VINCENT:  Well, Your Honor, we learn more

11  every day about the path this system has been on.

12         THE COURT:  Thank you.

13         It's not good and it just seems to be on a

14  downhill trajectory.  My Orders have not made a difference.

15  The mindset is there.

16         And apparently we're not talking about --

17  apparently there's no indication about the vaccination might

18  be safe for the staff or the caseworkers.  And you know

19  these nine facilities that are on COVID restrictions, the

20  caseworkers cannot come in person and you wonder -- anyway,

21  I think we've done all we can on that.

22         Mr. Yetter, everything that you think is important

23  in the Panel's Report, I want you to go item-by-item.

24         MR. YETTER:  Will do.

25         THE COURT:  Not every single thing, but the

1  important things and let's see.  We can talk to the DFPS and

2  HHSC about these recommendations.

3         MR. YETTER:  Will do, Your Honor.  And I'd like

4  to, if I could, start with -- before we got to the

5  recommendations, Ms. Meltzer, the Panel Report has a summary

6  of trends and data that you saw, some of which I think are

7  -- all which are important and some of which I'd like to go

8  over with you.  And this is on page 4 and -- starting on

9  page 4.

10        On page 5, you make -- the data that you saw you

11  summarize there.  It appears that roughly 90 percent of the

12  children that are being placed in unlicensed places --

13  placements are teenagers.

14        Is that what that chart reflects?

15        MS. MELTZER:  Yes, 13 to 17-year-olds.  In

16  November, that was 91 percent of the children in unlicensed

17  placements.

18        MR. YETTER:  And these children -- the next chart

19  reflects that 60 to 67 percent of these children are at

20  service levels of either specialized or intense, right?

21        MS. MELTZER:  Yes, that's correct.  Just to

22  clarify that these are based on data that were provided to

23  us by the State agencies.

24        MR. YETTER:  Correct.  You're just summarizing the

25  data that they have.

1        And what conclusions did you draw -- you, the

2   Panel, draw about whether the State is appropriately

3   tailoring the services that they give to these children in

4   unlicensed placements based on the fact that these are

5   teenagers and that they have very high service needs?  What

6   is the significance of that from the Panel's perspective?

7        MS. MELTZER:  Well, I think -- and I'll let others

8   on the Panel add.  You know, the fact is it ties into the

9   recommendations we made about very tailored specific service

10  to meet the needs of youths with -- from high acuity needs

11  and when you're working with older youth, it makes it even

12  more important that you focus on the practice, that you have

13  staff who are skilled to engage these youths in thinking

14  about their futures and in developing of the plans and that

15  is an important skill of how you both talk to youths.

16       And by looking at the experiences of many of these

17  youths, you're having to deal with behaviors that are

18  reflections of the trauma that they experienced.  So it

19  takes both empathy and skill not to blame these youths for

20  the situations (glitch in the audio) work with them.  Let me

21  turn, I think, to Ms. Stanley on this.

22       MS. STANLEY:  Your Honor, I'll speak briefly and

23  then I know we want to hear from Mr. Vincent, too.

24       You know, I think services and supports are really

25  key in individualized plans, but nothing -- nothing beats

1  having a family and a faith-supported permanent family can

2  do more for these children than any service and support.

3  　　　　And sometimes in systems, these older youths are

4  not getting to permanency with families, and sometimes we're

5  overlooking to possibility of them going back to their

6  biological family, who many times has undergone drastic

7  changes and is fully prepared to care for them at that time.

8  　　　　It takes work, it takes effort to do those

9  reconnections, but we've seen it happen.  It is possible.

10 And when it does happen, when children are in permanent,

11 safe placements with families, that's where we see the real

12 healing begin with their trauma.

13 　　　　MR. YETTER:  Mr. Vincent, did you want to add to

14 this?

15 　　　　MR. VINCENT:  Yeah.  In Texas and in a lot of

16 systems, the intensive services a lot of kids needs are tied

17 to a location, which means a child has to move to get higher

18 intensity.  And there's an old saying that you want the

19 dollars to chase the kids, rather than kids chasing the

20 dollars.

21 　　　　And you know, I think that's contributed to the

22 problem here and why we think it's so important to both

23 create the right services and both -- and to have the

24 ability to tailor them, so children don't have to leave

25 perhaps their own families or a family-based placement that

1  they're happy in just to get more intense -- usually more

2  intense mental health services.

3          MR. YETTER:  Ms. Meltzer --

4          MS. MELTZER:  If I can just add one thing?  It was

5  one of the reasons in our short-term recommendations where

6  we talk about the need to form clinical teams to work with

7  these older youth and their families and to bring them all

8  together to come up with a plan.  We also said it's very

9  important that they have attached to those teams the ability

10  to access flexible resources.  So you know, a pot of funds

11  that can be used flexibly to put in place both traditional

12  and nontraditional services that families or foster families

13  may need in order to support these kids safely and to

14  stabilize their condition.

15          MR. YETTER:  Also, Your Honor, on a related issue

16  to this, these children with specialized and intense medical

17  holds, is there a connection, based on your 35 years in the

18  child welfare profession, is there a connection between a

19  State having a comprehensive and effective system for care

20  of children's mental health and keeping the children safe,

21  is there a connection between the two or can you just sever

22  the two and not worry about one and only focus on the other?

23          MS. MELTZER:  Well, again, there's an absolute

24  connection, right?  When these children come to the

25  attention of the child welfare agency, it is because

1   something's happened in their family that the agency decides

2   that have to intervene, you know, to protect them.  And then

3   if they're put in placements where they are either not

4   protected or they're not supported, their conditions just --

5   it just exacerbates the condition.

6          And then every time a child is moved to a

7   different placement, even if the intent of that move is to

8   provide, you know, more services, it makes the situation

9   worse.  So by the time you get to 13-year-olds who may have

10  experienced 10-12 placements over their life, you can -- you

11  know, it's not -- you don't need to be a clinical specialist

12  to understand why their behaviors are the way they are.

13  They're not trusting.  It's very difficult for them to form

14  relationships.  And if you ask youth almost uniformly, they

15  say, "I want to be with my family" or a family of some kind.

16  So, yeah, absolutely connected.

17          MR. YETTER:  One of the findings that the Panel

18  has in its Report is that there is a revolving door for

19  these children that are being placed in unlicensed

20  placements by the State, which you call "recidivism."

21          Do you see that as being -- endangering the safety

22  of the children and harming the physical or mental wellbeing

23  of the children?

24          MS. MELTZER:  Absolutely.  Every time a child

25  gets, you know, moved to a psychiatric placement or to a

1   group home and then they -- you know, it fails for some

2   reason and then they're moved somewhere else and then they

3   try somewhere else, it just contributes to their trauma and

4   their -- you know, their problems.  And then you get -- I'm

5   going to turn to Paul and ask him to talk about that.

6           You know, one of the things we talked about was,

7   you know, people say that these children -- some of these

8   children in the facilities are refusing placement as if it's

9   a willful activity, but we believe it kind of reflects the

10  experiences they have and in some cases, you know, it's an

11  appropriate response to their situation.

12          Mr. Vincent, you want to expound on that a little?

13          MR. VINCENT:  Yeah.  This issue made me --

14  reminded me of a project Judy and I were both involved in

15  with kids who are long-stayers who had been in care for a

16  lengthy period of time in another State and it involved

17  intensive interviews with a group of that population of

18  children and in debriefing and writing our Report, the one

19  thing we were struck with is how powerless all these

20  children felt.  They didn't have the power to decide where

21  they lived, with whom, when and if they saw their families,

22  what school they went to, what their daily schedule was

23  like.  And a couple of the more articulate kids sort of said

24  that, you know, "I don't have the power of a normal teenager

25  to do routine things."

1          And you know, I think that's -- what you see from

2     that is the frustration and anger those kids feel in sort of

3     a generalized way and those are often the characteristics of

4     these children without placement, which is why we argue so

5     much about bringing kids into the decision-making process,

6     not just in a single meeting to decide where they're going

7     next, but you know, throughout their life in the system

8     whenever there are plans being made and changes considered,

9     you want the kid at the center of the conversation.

10          And one other thing I'll say about group care is

11     even if a kid is stable in a group home placement, there's

12     nothing stable about that environment.  The kids there

13     through cycle through over and over.  You have different

14     roommates all the time.  The direct care staff often are

15     only there for a short time and they leave for other work.

16     And so stability in an environment like that is sort of an

17     illusion.

18          MR. YETTER:  Mr. Vincent, is it your experience

19     over your many years in child welfare that extended stays

20     for children -- not just focused, you know, therapeutic

21     stays in specialized aggregate care facilities, but extended

22     stays in group facilities actually hurt the children more

23     than they help them?

24          MR. VINCENT:  I think that when you reach a

25     certain point, they do.  There are a small number of kids

1   who don't have high needs who, you know, after years of

2   moving around, might find a stability in a caring, small

3   facility and you know, would prefer just to stay there until

4   they age out of the system, but for the majority of the

5   kids, I think -- we all think it's harmful.

6           And if you ask children, they don't like group

7   care.  There's not enough programming.  There's a lot of

8   conflict.  As I said before, there are not many choices.

9   They're far away from home.  So what we see in the

10  population of kids without placement is how -- what the

11  natural reaction to that mistreatment is.

12          MR. YETTER:  Based on your investigation,

13  Mr. Vincent, have the -- do you have an -- have you drawn an

14  opinion about whether it's -- the State of Texas' heavy

15  reliance on group care is healthy for these children?

16          MR. VINCENT:  I do.  I think -- I think that

17  creates -- if they're not in that status now, I think it

18  creates the category of children without placement.

19          THE COURT:  You know, this -- I'm sure you all

20  have now read my original Order from 2015 that I found that

21  these children who come into care with basic -- in the basic

22  needs level age out at 18, out of resident treatment centers

23  under multiple psychotropic drugs, and they come in already

24  damaged and they're tremendously damaged.  They go out even

25  more damaged of foster care because of this congregate care.

1   And we've had providers that didn't know where else to put

2   the children just they just put them in psychiatric

3   hospitals and it's just a revolving door.

4          These children without licensed placements have

5   gone through placements that have been under heightened

6   monitoring over and over again and have gone through

7   placements that were subsequently closed because they were

8   unsafe.  I mean, these congregate care places, so many of

9   them are just so dangerous as it turns out, according to the

10  State and to the Monitors.

11         And there's one of the -- between July and -- I'm

12  going to the Monitors' Updated Children Without Placements

13  Program Report.  Two hundred of the -- 161 children were

14  identified among 290 serious incident Reports related to

15  those children and they were involved in two more incidents

16  and three of the children with the -- they call it "SIR,"

17  Serious Incident Reports, one is a 14-year-old PMC youth who

18  entered foster care in 2010 and has had 42 placements --

19  42 placements, including in an RTC that was -- had its

20  licensed revoked, two that have been -- two that were

21  revoked and opened under a different name and that child is

22  currently -- and placements included at least 10 psychiatric

23  hospitalizations, four periods without placements -- without

24  licensed placement in 2021.

25         That child is currently in an RTC, Residential

1    Treatment Center, in Tennessee, significant mental and

2    behavioral needs, four psychotropic medicines.  One of the

3    children with serious incident Reports that's not in a

4    licensed placement.

5           Sixteen-year-old PMC child first entered care in

6    2006, has 49 placements -- 49 placements.  She made an

7    outcry that her older adopted brother and his friend

8    sexually abused her between the ages of seven and eight,

9    which was substantiated, that allegation.  She's been in 15

10   psychiatric hospitals, 13 periods without a licensed

11   placement.

12          During three of those placement periods without

13   licensed, she was in Family Tapestry, (indiscernible), which

14   was -- subsequently lost its license or gave up the license.

15   She was -- we're going to talk about these TEP placements.

16          I don't know if you ever heard of those,

17   Mr. Lawrence [sic], Ms. Meltzer and Ms. Stanley, but she was

18   in a TEP placement at Promise House, but was discharged

19   after assaulting a police officer and she was taken to

20   juvenile detention.  That's how she was treated.  And she

21   spent a night there before discharged to another unlicensed

22   placement.  She has significant mental and behavioral health

23   needs and is on three psychotropic medicines.

24          D., another child that is a 17-year-old PMC child

25   who reentered foster care in 2018.  Since reentering care,

1    that child has had 38 placements including at least six

2    psychiatric hospitalizations, eight periods without

3    placements in licensed care all in 2021.  That child's

4    placement includes a residential treatment center that

5    closed after being placed under heightened monitoring.

6    Multiple placements in another RTC that was subsequently

7    placed under heightened monitoring.  Multiple placements in

8    Hector Garza RTC, which was just an abomination really, and

9    that lost its license by the State.  Multiple placements in

10   another RTC that was subsequently placed under heightened

11   monitoring.

12           Most recent placements includes an RTC that's been

13   given notice of a license revocation and a temporary TEP

14   placement in an emergency shelter.  She spent one night --

15   that person spent on night in jail after he got into an

16   altercation with another youth at an unlicensed setting and

17   knocked the staff person to the ground when he was trying to

18   get to the other youth.  D. is -- that person's diagnosed as

19   bipolar, prescribed medication, two other psychotropic drugs

20   for anxiety and mood disorder.  That child is currently

21   without placement and will age out in this coming May.

22           Oddly enough, that child has expressed an interest

23   to no longer be in foster care and that on aging out, he

24   doesn't want any support from DFPS.

25           And I can go on and on and on with the same

1   statistics.  Unbelievable.  And all we hear from DFPS is

2   that these children are aggressive and need to be arrested,

3   or they need to be drugged, and if that doesn't make you

4   weep, not much will.

5          So, Ms. Masters, have you -- did you have a Report

6   back -- I'm going to circle back before I forget about the

7   contract issue with the qualified providers that

8   Mr. Lawrence [sic] was discussing?

9          MS. MASTERS:  Bill is on the call.

10         THE COURT:  Okay.

11         MR. WALSH:  Good morning, Your Honor.  This is

12  Bill Walsh with the Department of Family and Protective

13  Services.

14         THE COURT:  And?

15         MR. WALSH:  Could you repeat the question, please?

16         THE COURT:  What providers -- I don't know if

17  you've been listening to the testimony, but Mr. Lawrence

18  [sic] says there are qualified providers that have very

19  high-quality care in residential treatment that should be

20  short term until a better placement is found, that are ready

21  and willing to come to Texas and help get children from --

22  back in the State from out-of-state, as long as they have an

23  ongoing relationship with the State.

24         So which of those facilities have you been in

25  contact with?

1          MR. WALSH:  So, Your Honor, I have been listening

2    and I'm not familiar with which operations that were

3    referred.

4          THE COURT:  Mr. Ryan, didn't you -- at the request

5    of Ms. Masters, which was not part of my doing because

6    that's not in my purview, didn't she ask you about some --

7    how to find qualified providers and you gave her a list of

8    people to call?

9          MR. RYAN:  Your Honor, we identified a list of

10   states that had addressed this problem and put the State in

11   touch with those State leaders, so New Jersey and to

12   Oklahoma among others.

13         THE COURT:  Okay.  So the bottom line, Mr. Walsh,

14   you have not contacted any providers from another State that

15   have been rated highly in qualified care that would fall

16   under the auspices by the way of the Family -- I've

17   forgotten the name of it, Ms. Meltzer, the one that our

18   State is giving out $44 million to --

19         MS. MELTZER:  It's QRTP, Qualified Residential

20   Treatment Programs.

21         THE COURT:  Okay.  So you've not been in touch

22   with any of those, Mr. Walsh?

23         MR. WALSH:  I personally have not been, but I'll

24   be -- I cannot say the Department hasn't been, so I will --

25         THE COURT:  Well, Ms. Masters said you were the

1  man -- you were the person on the spot that would know

2  because I asked her --

3          MS. MASTERS:  Your Honor --

4          THE COURT:  She said they were real expensive so I

5  asked her to find out what the daily rate you were quoted

6  and apparently you weren't quoted because you never

7  contacted them.

8          MS. MASTERS:  Your Honor, if I may?

9          THE COURT:  Please.

10          MS. MASTERS:  So I -- after hearing Kevin Ryan's

11  statement -- so I did talk to New Jersey, Florida, New York

12  and another State that is escaping me at the moment, but it

13  was not to -- no one gave referrals for specific facilities.

14  These were practice conversations, not about certain

15  facilities contract with.  I do know that we did send out a

16  survey asking all of the facilities who are currently

17  licensed with the State of Texas that are not serving DFPS

18  and why that is and we can share that data with you if you'd

19  like.

20          THE COURT:  I think these are -- Mr. Lawrence,

21  weren't you talking -- I'm sorry -- I keep calling you --

22  now I'm terrible with this -- Mr. Vincent, I apologize.

23          Have you shared the names of these providers with

24  DFPS?

25          MR. VINCENT:  Your Honor, actually I was talking

1  to a Texas provider.

2          THE COURT:  Okay.

3          MR. VINCENT:  It was a Texas provider of high

4  quality, but residential and home and community based

5  services and I just asked him that theoretical question.

6          THE COURT:  Okay.

7          MR. VINCENT:  So I --

8          THE COURT:  So you don't even know how expensive

9  these are because you never contacted them; is that right?

10         MS. MASTERS:  That is not -- that's not correct,

11 Your Honor.  We actually surveyed all of those facilities in

12 hopes of getting them to start serving our kids.

13         THE COURT:  But what were the rates?  I thought

14 you told me you were going to bring somebody in that would

15 tell me what rates you were quoted, the daily rate.

16         MS. MASTERS:  Okay.  I was understanding your

17 question differently and it's clear now and so, no, I don't

18 know what the daily rates are and if --

19         THE COURT:  Well, you told me in your testimony

20 earlier -- put her under oath, would you, Ms. Purifoy?

21         THE CLERK:  Yes, Your Honor.

22         Ms. Masters, please raise your right hand.

23      (Oath administered.)

24         MS. MASTERS:  I do.

25         THE COURT:  Do you adopt your previous statements,

1    Ms. Masters, that you gave here on the Record as true and

2    correct?

3              MS. MASTERS:  With the understanding that I had

4    other questions, Your Honor.

5              THE COURT:  Well, I asked you what you were going

6    to do to get qualified providers and you said they were too

7    expensive, and we had this whole discussion about

8    constitutional rights are not tied into expense.  So that's

9    why I asked you to find out who you contacted and what these

10   rates were and then you --

11             MS. MASTERS:  So, Your Honor --

12             THE COURT:  -- defer to Mr. Walsh and it turns out

13   you all have not done anything, which does not remotely

14   surprise me.

15             MS. MASTERS:  Your Honor, we have done quite a bit

16   and --

17             THE COURT:  Who have you contacted and what rates

18   have you been given when you told me it was too expensive?

19             MS. MASTERS:  Your Honor, I did not say that it

20   was too expensive or that we could not do it.  What I am

21   saying is for a lot of our providers to serve some of the

22   needs of the children that we have and to have the

23   programming that is needed, that is a significant

24   investment.  I did not say it is why we have not --

25             THE COURT:  Then what is it?  You've made that

1  statement.  What is that based on?  What fact, what figures

2  is that based on?

3          MS. MASTERS:  It is --

4          THE COURT:  This is not hard.

5          MS. MASTERS:  It is the providers' comments about

6  the current rates not being sufficient enough.

7          THE COURT:  Your current providers have not done a

8  very good job and we're going to get into that later.

9  Surely you know that.

10          We're talking about these providers that are not

11  under contract with DFPS that have been known to give high-

12  quality care.  You told me that it was expensive so what do

13  you base that on, besides the present providers you have who

14  are not doing that great a job?

15          MS. MASTERS:  It is just based on the current rate

16  that is clearly not sufficient.

17          THE COURT:  Okay.  And that -- and you found that

18  out because how?

19          MS. MASTERS:  Because of the surveys that we have

20  done with the providers.

21          THE COURT:  Okay.  You know I looked up yesterday

22  just out of curiosity, speaking of these private providers

23  and these SSCCs, your salary is about a third of what

24  Mr. Carson's is; did you know about that?

25          MS. MASTERS:  I did.

1          THE COURT:  Okay.  Just as an aside, speaking of

2     expense.  And I realize the SSCC is a huge portion of their

3     expense is from charitable contributions, so maybe it is

4     apples and oranges, but it is of interest.

5          So you don't know what these high-quality

6     providers are going to charge because you have not contacted

7     them.

8          MS. MASTERS:  In some of the meetings that we have

9     had, it's been quite a range.  There is nothing consistent.

10    Everyone has --

11         THE COURT:  What are -- what range have you talked

12    to about Mr. Lawrence's -- I'm sorry.  I keep doing that,

13    Mr. Vincent.  Mr. Vincent's contacts, what have you talked

14    to these other providers that would fall into the purview of

15    the -- what is it, the Q what?

16         MS. MELTZER:  QRTP.

17         THE COURT:  The QRTP that would fit those needs so

18    you would get the $44 million over the next two years?

19    Which of those providers have you talked to?

20         MS. MASTERS:  Okay.  So I think we're talking

21    about two different kinds of placement and so --

22         THE COURT:  We are, we are.  I'm not talking about

23    your present providers.  I am talking about providers that

24    presently fall in the QR-thingamabob.

25         MS. MASTERS:  I don't think that we have any

1    providers that fit the criteria to be --

2              THE COURT:  Yes, I know that.

3              Have you talked to any that do?

4              MS. MASTERS:  So, Your Honor, first, for the

5    providers who are high quality that can meet the needs of

6    the kids, we have had quotes from anywhere from $500 a day

7    to $1,000 a day and those vary.

8              For the QRTPs, it's not about the rate.  It's

9    about a set of requirements that have to be met to meet the

10   criteria to be a QRTP.

11             THE COURT:  Right.

12             MS. MASTERS:  So two different things.

13             THE COURT:  Well, none of your providers meet the

14   requirements of that, right?

15             MS. MASTERS:  That is correct.

16             THE COURT:  Okay.  So you're willing to give up

17   $44 million to keep subsidizing these providers that are not

18   giving that good of care to your children.

19             Is that the bottom line on this?

20             MS. MASTERS:  No, ma'am.

21             THE COURT:  Well, why are you giving up the

22   $44 million?  Why don't you find providers that meet the

23   QR-whatever?

24             MS. MASTERS:  I believe we have two pilots going

25   on that may be able to speak to that better to get them

1  ready to be QRTPs and are working with others to bring them

2  up to the required (glitch in the audio).

3         THE COURT:  How about people that are already

4  ready?

5         MS. MASTERS:  We don't have any in the State that

6  are already ready.

7         THE COURT:  Mr. Vincent, is that correct?

8         MR. VINCENT:  I don't know, Your Honor.

9         THE COURT:  Does anybody know on the Panel?

10         MS. STANLEY:  Yes, that's correct.  They don't

11  have any QRTP providers currently and are working on a

12  couple of pilots and they delayed Family First when it first

13  came out so that was three years ago because they didn't

14  have any QRTP-ready providers and knew that it would take

15  some time to develop those functions.

16         THE COURT:  Well, I thought that Mr. Vincent said

17  that there are providers that are willing to do that.

18         MR. VINCENT:  Out-of-state providers, Your Honor.

19  Out-of-state providers are already QRTP.

20         THE COURT:  The out-of-state providers.

21         MR. VINCENT:  Yes, Your Honor.

22         THE COURT:  That could come into the State of

23  Texas.

24         Has anybody looked into that?  I realize this is a

25  political issue because it'll put the nose out of joint of

1  the present providers and I'm not concerned with that at

2  all.

3           MS. DRYDER:  We are working with those who want to

4  be a QRTP to help them get the specific services to get to

5  that level.  We have a team that's been working diligently

6  for over a year and so there are people who are wanting to

7  step up to the plate and want to do that service.

8           THE COURT:  Who?

9           MS. DRYDER:  Jillian would probably be the one who

10 could give specific names.  She can come over here and give

11 them to me.

12          THE COURT:  Okay.  Where is she?

13          MR. NEUDORFER:  We will have her here in just a

14 moment, Your Honor.

15          THE COURT:  Okay.  Mr. Yetter, we'll circle back

16 to that.  You go ahead.

17          MR. YETTER:  All right.  Let me -- let's turn,

18 Ms. Meltzer, to the -- what I want to call the "leadership

19 recommendations" that the Panel Report includes and that is

20 with regard to strengthening the infrastructure and

21 accountability on page 15 of the Report and as I count, I

22 think there's six recommendations and we can take those as a

23 group, each of which have different timelines, but those six

24 would be developing a dedicated State interagency team,

25 which you've explained, right?

1          MS. MELTZER:  Uh-huh.  Yes.

2          MR. YETTER:  Creating a clinical coordinator

3    position to coordinate services to youth in unlicensed care,

4    right?

5          MS. MELTZER:  Yes, more than one.

6          MR. YETTER:  More than one clinical -- several --

7    a number of clinical coordinator positions.

8          MS. MELTZER:  Right, right.

9          MR. YETTER:  Developing a cadence of

10   accountability within the State interagency team.

11         MS. MELTZER:  Yes.  So keep going and maybe I'm

12   going to have -- ask Ms. Stanley to talk about that

13   specifically, but it is really what we think is essential,

14   which is to set goals, use data, track on a continuance

15   basis, and then use that to basically track and adjust what

16   you're doing to achieve the results you want to -- you set

17   out.

18         MR. YETTER:  All right.  Well, let's circle back

19   on these in one minute.

20         MS. MELTZER:  Yeah, yeah.

21         MR. YETTER:  Let me get all six of them out.

22         Number 4 is:  Have the interagency team complete

23   an analysis of the data of the children that have been

24   placed out-of-state during 2021 so they understood why those

25   children were being placed out-of-state and impact and

1    things like that.

2         MS. MELTZER:  And even who they are.  So, for

3    example, there needs to be an analysis by race, by age, what

4    their past experience is, what the -- what their experience

5    has been since then, et cetera.

6         MR. YETTER:  All right.  Number 5 was creating and

7    assigning a DFPS community liaison to the four regions with

8    the highest number of children in unlicensed placements.

9         THE COURT:  I think they committed to that.

10         MR. YETTER:  They did.

11         THE COURT:  DFPS did commit to that.

12         MR. YETTER:  They did, Your Honor.

13         And then number 6 is:  Having the agencies, the

14    DFPS leadership team assisted by an external consultant or

15    team with the sort of expertise that they need, right?

16         MS. MELTZER:  That's correct.

17         MR. YETTER:  All right.  So with that, one of

18    which we've already had commitment by the agencies on, are

19    there any of those other five that you'd like to comment?

20    First of all, are these unique and novel leadership

21    structure recommendations or do other states have similar

22    sorts of setups?

23         MS. MELTZER:  So, no, they're unique and novel.

24    They reflect I think, the Panel's assessment based on what

25    we know about what's successful in other states, which

1  strategies that might be helpful to address these problems.

2         MR. YETTER:  Is there anything that you saw in --

3  or heard from the State in the intense investigation that

4  the Panel did that led any of the Panel Members to your

5  knowledge to doubt whether the State could actually

6  implement these sorts of leadership changes to have more

7  accountability and more direction, that sort of thing?

8         MS. MELTZER:  I would say, "No."  I mean, I think

9  it's certainly doable.  You know, again, we don't know

10  enough about the politics of the State or what's going on,

11  you know, on an interagency basis, but these are perfectly

12  feasible, doable short-term recommendations.

13         MR. YETTER:  All right.  One last question.

14         THE COURT:  Let me just ask a couple of things.

15         Ms. Masters, are there any of these

16  recommendations that you are unwilling or unable to follow?

17         MS. MASTERS:  Your Honor, I don't know that

18  there's any that I'm unwilling.  The ability is what I have

19  to have meetings about.  But there are several -- I mean, as

20  Commissioner Young said, I mean, the Report is excellent and

21  I think it's great information, so.  I mean, I'm looking

22  forward to seeing what I can do from this Report.

23         THE COURT:  Ms. Young, are there any of these

24  recommendations that you're unwilling to unable to do?

25         MS. YOUNG:  Your Honor, I'm sorry, we were having

 1   trouble here.  I'm sorry, I was having the one meeting.

 2           None of these recommendations I'm unwilling to

 3   implement.  Just again, try and figure out what

 4   implementation would look like and resources that we can

 5   gather to (indiscernible) there.

 6           THE COURT:  But are you opposed theoretically or

 7   philosophically to any of these recommendations?

 8           MS. YOUNG:  No, ma'am.

 9           THE COURT:  Okay.

10           MS. YOUNG:  I'm sorry, no, Your Honor.

11           THE COURT:  It doesn't matter.

12           MR. YETTER:  Ms. Meltzer, let me just ask one

13   concluding question on this.

14           Do you think -- in your opinion, does the -- you

15   and the Expert Panel believe that these leadership changes

16   are important to solve the current crisis and to keep these

17   children that are now being put in unlicensed placements

18   safe?

19           MS. MELTZER:  Yes.  And I'd like to turn to

20   Ann Stanley so she can expound a little on these

21   recommendations.

22           MR. YETTER:  Thank you.

23           MS. STANLEY:  Well, I'll start out with the idea

24   of lead and lag measures.  Those really speak to the data we

25   received from DFPS on their dashboard for the children

1   without placement, which we would look at -- it's important

2   information, but it was lag measured.  So it was giving us a

3   snapshot of what had happened.

4           And what this interagency team that we're

5   proposing could do is to consider some hypothesis of why

6   children are coming into these unlicensed placements, for

7   instance, children coming out of psychiatric care and put in

8   place some strategies to make sure that when children are

9   discharged, they're not ending up in unlicensed care and

10  then measure those strategies over time to see what worked

11  or refine them, change them to stick with them.  And that's

12  the kind of work that we believe this interagency team could

13  do that could really make a difference in terms of moving

14  this -- the number significantly.  So that's one example

15  from the recommendations.

16          I think the idea of having a community liaison is

17  really critical.  We've seen with a couple of counties where

18  the State District Judge has gotten involved, has pulled

19  together stakeholders, including psychiatric hospitals,

20  education and especially people with lived experience, young

21  adults who've been in foster care and have had the

22  experience and knowledge firsthand of what that was like to

23  really inform what the system up here looks like at a local

24  level, and to start to develop the relationships that could

25  really prevent children from coming into unlicensed care or

1    congregate care and could more quickly move children out of

2    unlicensed care back with their families.

3            I think throughout the Report we recommended that

4    the DFPS and HHSC look externally.  I think it's critical.

5    When we looked at the numbers of children in these

6    unlicensed placement for Texas, what stands out was

7    different than other states that I'm working in is that the

8    problem has gone on for a long time, there are a lot of

9    children and they're staying for a long time.

10           In many states that have tackled this issue, they

11   have put a lot of resources and coordinated efforts early on

12   when the problem first erupted and even though at times in

13   many of these jurisdictions, they'll have a few children

14   here and there end up in an unlicensed placement, it's very

15   short term and it hasn't become institutionalized.

16           And I think it's very critical that these efforts

17   be initiated right away and that's why we put such tight

18   time frames so that we really end the idea that this is the

19   way of doing business.

20           And part of I think our considerations in terms of

21   root causes was considering what we've seen -- and I'd like

22   other -- the other Panel Members to weigh in on this -- we

23   really tried to get at what's holding the Texas system in

24   place to where they haven't been able to make the

25   significant changes that need to be made and that the use of

1    unlicensed care has become part of the day-to-day operation.

2            And I don't think we have the 60 days to fully

3    answer to that, but I do think it is linked into the lack of

4    a shared vision and value and principles for how we treat

5    children and families.  And we're hopeful that in putting

6    together this interagency team, that one of their first

7    steps could be to adopt those, to adopt them for their team

8    and then to adopt them more broadly in terms of all their

9    work with children and families throughout the State.  I'll

10   let Paul and Judith weigh in too.

11           THE COURT:  Thank you, Ms. Stanley.

12           MR. VINCENT:  And I don't think I could add

13   anything useful to that.  I think you spoke to that very

14   eloquently.

15           MS. MELTZER:  Thank you.

16           I think the -- when we talk about these --

17   adopting these values and principles, you know, it's not

18   just having them on paper.  It's making sure that they are

19   foundational to all the strategies and plans so they have to

20   be operationalized in the strategies that we're hoping that

21   this leadership team will focus on and put in place.

22           THE COURT:  I just can't thank you all enough for

23   the work that you've done for the children in this foster

24   care program --

25           MS. MELTZER:  Thank you.

1          THE COURT:  -- and to be in the foster care
2  program.  One of the things I guess that's always concerned
3  me is that every governor we've had and every legislature we
4  have had made this issue a priority, foster care.  Money has
5  been expended going back to -- I think Governor Perry,
6  Governor Bush, George W. Bush, commissioned studies for the
7  foster care that came up with these same list of problems.
8  We're talking 20-25 years ago, same list of -- 30 years ago,
9  same list of problems that we're facing today.  And now
10  they're under a mandate, the Federal Court, and resisted for
11  11 years -- 10 years and still it looks like we're just
12  going from bad to worse.  It's very discouraging.
13          There are, like I said at the beginning, some
14  bright spots, but these -- this continued unconstitutional
15  and unsafe treatment of these children is just -- it's
16  getting to everybody that's deeply involved in this case.
17  So I appreciate you coming in and doing this work with your
18  vast years combined of experience and giving us a helping
19  hand when we need it.  And on behalf of the children of
20  Texas, thank you.
21          I think we'll go now to the -- I think it
22  logically follows instead of going to the Monitors' full
23  Report that we go to the Monitors' Updated Children Without
24  Licensed Placement Report, which is pretty grim.  One of the
25  serious incident reports, several of them have to do with

1    sexual issues, child-on-child activities in these

2    non-licensed facilities.  The 15-year-old child having the

3    sexual relationship with the hotel clerk while supposedly

4    being supervised.  These are children predominantly 14 to

5    17-year-old children who have been in foster care most, if

6    not all, of their lives.  They're on multiple medications in

7    placements now that people are not qualified to -- according

8    to the Monitors' Report, not qualified to administer the

9    medications, don't know where the medications are and in

10   many times don't know where the children are, which brings

11   me to another question.

12          Months ago I questioned why it is we do not have

13   an adequate instant account of where each child in the

14   system is in the placements.

15          Now do we have that yet, Ms. Masters?

16          MS. MASTERS:  I believe my team may be still

17   working on that process.

18          THE COURT:  Oh, for God's sake.  I just don't

19   understand this incompetence, I have to tell you.  This is

20   just inexcusable, unsafe and dangerous.  You don't know

21   where the children are.  When the Monitors went to some of

22   these awful leased homes that you've leased that are

23   unlicensed, the people there, the staff didn't know where

24   the children were.  They didn't know if they were in school,

25   if they'd run away, they had no idea where they were.

1          We've been worried -- we've been talking about

2    this for some time since the Monitors went out with a list

3    of children that you gave them.  There was supposed to be in

4    this GRO to check where they were.  The staff didn't know

5    where they were.  One of the children had hung yourself

6    three months before and was still on the list of being

7    placed -- hung herself to death I might add, and was still

8    on the list of being placed in this GRO.

9          Now we know today 11 years into this lawsuit that

10   no one knows where these children are placed.  I just -- I'm

11   speechless.

12          MS. MASTERS:  Your Honor --

13          THE COURT:  You are the parents.  I don't want to

14   hear that IT is still working on it.

15          Mr. Yetter, Ms. Lowry, do you have any comments on

16   this?

17          MR. YETTER:  Your Honor, it is -- it's another

18   example that the system of recordkeeping in the State is a

19   mess and why they persist on having four different systems

20   that don't talk to each other and resist the Court's Order

21   to have a unified system is beyond me.

22          THE COURT:  Well, because the Fifth Circuit

23   vacated that remedy.  After affirming it once, they vacated

24   it because the State went to oral arguments and stated it

25   would cost $32 million without any evidence that was not

1  presented at any trial or any hearing and have refused to

2  give us that information subsequently, so we could inquire

3  into that and let them take it back up to the Fifth Circuit

4  with verified evidence.

5         I don't know, Panel Members, if you know that the

6  DFPS and HHSC's two computers -- some of their -- they have

7  several different computer systems.  There's an IMPACT,

8  there's a CLASS, there's a Health Passport.  None of these

9  systems speak to each other.  And so when I prepare for my

10 Final Order after the trial for the 20-22 representative

11 class members, I ordered DFPS, which was one agency at that

12 time, to provide me with all the records they had for each

13 of these Plaintiff children.  It took me 12 weeks I think to

14 go through the records that they had.

15        What they didn't provide me were any educational

16 records or any medical records or any mental health records,

17 zero.  And it turns out that the educational records are

18 hand carried from place to -- they're hard copies, hand

19 carried, I don't know by whom, from placement to placement

20 to placement.  You can see these children who've had 40, 50,

21 60 placements in their time in foster care, they don't have

22 any of those records.

23        Medical records, most of them now they tell me are

24 hand carried hard copies from place to place to place, so we

25 don't have those either.  We don't have any mental health

1    records on these children.  Many of them have been raped in

2    care, they've been beaten in care, they've been restrained

3    by GROs that have subsequently been closed as unsafe by the

4    State, and yet we have no counseling records unless it just

5    says, "Counseling today."  We don't know what was done.

6    There's no -- you can't take those from placement to

7    placement and have any continuity.

8            So I appreciate the Panel's focus on mental health

9    issues because all these children need mental health care

10   desperately and we don't know if it's being given because

11   there are no records.

12           I asked back in 2017, I think, in a hearing the

13   Commissioner who was Mr. Whitman at the time -- wasn't that

14   the guy from the Coast Guard?  He was one of the -- the

15   Coast Guard person, I think.

16           MR. YETTER:  I don't remember, Your Honor.  We've

17   had so many commissioners (indiscernible).

18           THE COURT:  We've had so many is another issue,

19   almost as many commissioners as placements for some of these

20   children.  And I asked Mr. Whitman about, for instance, just

21   medical records and mental healthcare records because

22   there's an E-filing requirement in the country that the

23   Department enters into contracts with the Medicaid

24   providers.  Somewhere they've got to E-file what happened at

25   a given time for immunizations, for mental health for all

1   kinds of other things, so I said, "How about you have them

2   E-file into the health passport, which are the medical

3   records for the children?"  He said, "I'm putting two stars

4   by that," and that's the last we heard.  So we have no

5   medical records to speak of, no educational records.

6          The kids will come in at seven-years-old in good

7   standing in the second grade, for instance, age out at 18 in

8   the third grade level.  The Monitors went to -- I think

9   Ms. Fowler did -- some of these unlicensed placements and

10   the children were actually crying out for school, "When can

11   I go to school?  When can I get registered for school?"

12   They weren't in school.

13          And the Monitor said, well, just to the wonderful

14   places in the rundown neighborhoods with the rental duplexes

15   or whatever, "Where are these children?"  "Well, I believe

16   they're in school," the staff said.  "Well, what school?"

17   "Well, I'm not sure."  "Can I see the educational records?"

18   "We don't have them."  "Well, these children are supposed to

19   be on medications.  Where are your medication records?"

20   "Well, we don't have them."  "Well, where are the

21   medications?"  "I don't know."

22          And that was just those awful-looking houses that

23   they were renting that are unlicensed and stuffing children

24   four to a room, poorly or lack of furnishings, plumbing that

25   didn't work, toilets that didn't flush, sinks that didn't

1   work, showers that didn't work.  I mean, kids in juvenile

2   detention get better than that.

3           MR. NEUDORFER:  You're on mute.

4           MS. MASTERS:  Your Honor, if I may?  I was just

5   told by -- that IT is scheduled to go live with the fix July

6   of 2022.

7           THE COURT:  July of 2022.  Then do you think we'll

8   know where the children actually are?

9           MS. MASTERS:  I sure hope so, Your Honor.

10          THE COURT:  That would be a really new twist in

11  this, wouldn't it?  Sorry I act so angry.  It's actually

12  because I am angry.

13          You know, all of these investigations also that

14  are in the appendices of the Monitors' Report -- I know I'm

15  doing this out of order, but most of these were agreed to by

16  HHSC and DFPS that the investigations were inadequate.

17          What consequences do you have in place for the

18  investigators that do -- that are found to have inadequate

19  investigations for the RCCI, Ms. Masters?

20          MS. MASTERS:  We are bringing Justin in now.  He

21  is over that division.

22          THE COURT:  You don't know yourself?

23          MS. MASTERS:  I think those are on case-by-case

24  basis.  There are some staff who I have released myself

25  based on the work that has been done.

1          THE COURT:  Do you have written consequences that

2    if this happens, you lose salary, you lose whatever?

3          Do you have any written policy?

4          MS. MASTERS:  No, I don't think there's anything

5    that restrictive, Your Honor.

6          THE COURT:  Why not?

7          MS. MASTERS:  I don't know that there's a --

8          THE COURT:  Shouldn't the investigators know what

9    they're facing if they do these pitiful interviews and

10   investigations?

11         MS. MASTERS:  Yes.

12         THE COURT:  While we're talking about that, you

13   have a new data person?

14         MS. MASTERS:  I do.

15         THE COURT:  And that data person has actually

16   asked the Monitors for a toolset that they use in evaluating

17   investigations.  Now, okay, I'm going to give you a head's

18   up and a full disclosure.  This is going to be a sarcastic

19   answer.  The tools are their brains.

20         If you read their investigation summaries, you

21   find out what they're using.  You're not interviewing the

22   staff involved, you're not interviewing the children

23   involved, you're not interviewing the reporters that

24   reported the abuse and neglect, not getting medical records,

25   those are the tools.

1          Why would you have to know what that is to make a

2   decent investigation?  Those are the tools.  There will be

3   no further response from the Monitors about the tools

4   they're using to evaluate your shoddy investigations.  So

5   please tell that to the data expert that you've hired.

6          Did you know that, Mr. Yetter and Ms. Lowry, that

7   they were asking for tools?

8          MR. YETTER:  I had not heard that, Your Honor.

9          THE COURT:  Is that the most pitiful thing you can

10  imagine that they don't know what tools to use to

11  investigate serious incidents of abuse and neglect?

12         MR. YETTER:  It actually explains a lot,

13  Your Honor.

14         THE COURT:  It does, doesn't it?

15         So, Ms. Young, same question.  For the RCCL

16  investigators, do you have any written consequences for

17  shoddy investigations?

18         MS. YOUNG:  Your Honor, I'm going to turn this

19  over to Jean Shaw.

20         THE COURT:  Hi, Ms. Shaw.

21         MS. SHAW:  Hi, Your Honor.  How are you?

22         THE COURT:  I'm not going to have a stroke today,

23  I can you that.  I'll be around a while.

24         MS. SHAW:  We're glad to hear that, Your Honor.

25      (Laughter.)

1          THE COURT:  Tell me, Ms. Shaw, what consequences

2    do you have in place for investigators that do this kind

3    of -- I'm saying, "Shoddy," trying to keep this clean --

4    shoddy investigations?

5          MS. SHAW:  We have different systems in place

6    within -- I'm sorry, I'm not sure if you can hear me very

7    well with the mask on.

8          THE COURT:  I can.

9          MS. SHAW:  Okay.  We have different systems in

10   place within our programs.  We review the work of our staff

11   and if we find that our staff are not being compliant, we

12   follow our HR policies that could lead to a written warning,

13   it could lead to coaching, or it could lead to termination.

14         THE COURT:  Do you have written policies of

15   consequences that are available that are handed to the

16   investigators so they know what happens when they go out and

17   take six months to do a policy -- to do an investigation for

18   a child that's claimed sexual rape by a staff or by another

19   child and is not even removed from the placement?  Do you

20   have anything -- and it turns out they never get an

21   extension.  There are no extensions given that the Monitors

22   could see for almost all of these delayed reports, and they

23   didn't interview all the people involved.

24         So do you have any written warnings to the

25   investigators that what happens if you don't do the

1  following?

2       MS. SHAW:  We don't have anything specific that

3  says, "If you fail to do these things, here are the Human

4  Resources policies that apply."  We can certainly can look

5  at adding that into the future.  We do handle it on a case-

6  by-case basis and our supervisors meet individually with our

7  inspectors who are not meeting their time frames, if not

8  determining compliance with standards or the standards are

9  deficient timely.

10       THE COURT:  Okay.  Then are -- both Ms. Young and

11  Ms. Masters, what do you tell these people to investigate

12  when they're doing the investigations?  Is there an outline

13  of what they're supposed to be doing, who they're supposed

14  to be interviewing, what records they're supposed to get,

15  what videos they're supposed to get?

16       MS. YOUNG:  Your Honor, this is Commissioner

17  Young.  Again, I'm going to hand it over to Jean Shaw.

18       THE COURT:  Ms. Shaw?

19       MS. SHAW:  Yes, Your Honor.  We have extensive

20  policies about what's required during the course of an

21  investigation and what they're supposed to do that include

22  interviewing staff, interviewing children, what it takes to

23  properly initiate a case, time frames for initiation, if

24  they're going to determine if there's a deficiency things to

25  look for an what would help them make that decision.  We

1  have a lot of information in our policy book to guide staff

2  and how to do a thorough investigation.

3          THE COURT:  So you can see from these

4  investigations that that's not being done, the ones that

5  they flagged, the ones that the Monitors flagged.

6          MS. SHAW:  Your Honor, the ones the Monitors

7  flagged I believe were investigations that were conducted as

8  abuse and neglect investigations.

9          THE COURT:  Yes.

10          MS. SHAW:  And my team at HHSC we would determine

11  deficiencies after DFPS has determined abuse or neglect has

12  occurred.

13          THE COURT:  Okay.

14          MS. SHAW:  When we reviewed the appendices, we

15  certainly found some areas in which our team could have done

16  better jobs related to citing deficiencies and we're

17  certainly going to follow up and to look into those related

18  to the deficiencies, but I cannot speak to the quality of

19  the investigations related to findings of abuse and neglect.

20          THE COURT:  Okay.  The ones that -- those are RCCI

21  investigations.  Okay.

22          Ms. Masters, what do you -- what can you tell me?

23  Would it not be helpful to have some kind of scale of

24  warnings to the investigators that if you're not -- if you

25  don't do A, B, C through ZZ, that this may happen?

1          MR. LEWIS:  If I may?

2          MS. MASTERS:  Oh, go ahead.  I'd like to turn that

3    over to Justin Lewis, Your Honor.

4          MR. LEWIS:  Justin Lewis, Your Honor.

5          THE COURT:  Mr. Lewis?

6          MR. LEWIS:  Yes, ma'am.  So in the past,

7    deficiencies were not handled as disciplinary issues.

8    However, in December, I released a memo to my command staff

9    and supervisory staff that they would, in fact, be -- handle

10   disciplinary issues from this point on.  We have an HR

11   disciplinary process.  Just a brief overview of it, I'll

12   talk about the timeliness aspect of it.

13         THE COURT:  Are you going to stay around a while?

14   You're the -- I think the third or fourth head of RCCI in

15   two years.

16         MR. LEWIS:  Ma'am, I plan to stay here until they

17   run me off.  I've been with the agency for six years now

18   after 14 years in law enforcement.  I kind of like what I'm

19   doing, so I plan on --

20         THE COURT:  Good.  Thank you.  So then you ought

21   to know what tools to use to investigate a claim of abuse

22   and neglect.

23         MR. LEWIS:  Yes, ma'am.  We have recently revamped

24   what we call the "Case Reading Guide."  It gives our workers

25   and our supervisors kind of a roadmap.  It's not an

1    all-inclusive list, but it's a roadmap of where to go.  It's

2    very hard to set out this is who you're going to interview,

3    this is what records you need to get because it changes from

4    case to case.  But that Case Reading Guide gives us a nice

5    roadmap to look at to make sure things are done.

6            The supervisors now when they read cases and

7    approve them, they personally have to sign off on that

8    Reading Guide to make sure that all of those tasks that are

9    pertinent to that investigation have been done and if they

10   weren't, why not?  So we are putting steps into place to add

11   additional layers of accountability into our investigations

12   that will help not only the time limits, but also the

13   qualitative component as well.

14           THE COURT:  Thank you.

15           In the Monitors' visits of the Villas, which are

16   euphemistically called "the Villas," and to duplexes leased

17   by DFPS in Houston and a house called "Penelope" or Penelope

18   House leased by DFPS in Belton, they interviewed -- four of

19   the five children interviewed with reported not attending

20   school.  Of the four children, three indicated they had not

21   been enrolled in school since arriving at the placement.

22   One child expressed considerable frustration of the delay in

23   enrolling her in school and noted that she had attempted to

24   reach her caseworker, but the caseworker did not respond to

25   her calls.

1           Failure to enroll children in school, of course,

2   is a safety issue.

3       (Pause in the proceedings.)

4           THE COURT:  As to medications, the -- of the 14

5   children whose onsite records were reviewed, eight records

6   included medication logs and the Monitor Team found that

7   none of those eight indicated the child always received

8   their medicine as prescribed.  Five of the eight sometimes

9   received their medication as prescribed.  Two did not

10  receive the medication as prescribed.  And one child's file

11  was missing medication logs from the first part of the stay

12  at the setting.

13          Four of the 10 caregivers reported they didn't

14  feel safe there.  Eight of the 10 caregivers interviewed

15  reported they were always informed when a child was a victim

16  of sexual abuse or had an indicator for sexual aggression;

17  however, only five of the 10 indicated they were told --

18  sorry -- that they were told when a child had a history of

19  physical aggression.

20          This Villas looks pretty bad in an abandoned

21  neighborhood.  And the duplex -- one of the duplexes -- and

22  the house duplex -- Houston duplexes indicated that one PMC

23  child was present in the unit, was asleep in her bedroom,

24  not feeling well and would be taken for a COVID test later

25  in the day, probably another unvaccinated child.  Staff

1   reported the child had been suspended from school, but

2   didn't know why or for how long.

3          Another duplex -- at the other duplex, the PMC

4   child was asleep on the couch.  Oh, from the first duplex,

5   the staff didn't appear to know whether other children

6   housed at that setting were in school or had run away.

7          The records of the duplexes were not well kept.

8   Staff didn't appear to be knowledgeable about the children

9   they were supervising or have the information to make a safe

10  supervision.

11         One of the staff couldn't tell the monitoring team

12  where the medications were kept.  There was an open, empty

13  lockbox on the floor in the kitchen.  But they did -- one of

14  the staff pointed out a lockbox that supposedly contained

15  the children's medications and other medical supplies.

16  However, nobody knew the combination to the lock.

17         And Penelope House, which is in Belton, Texas,

18  older home, exterior was cluttered with broken chair, file

19  cabinets, broken glass and other trash.  The locks to the

20  children's medicines were faulty or broken.  It took the

21  staff some time to find the right key to open one of them,

22  which indicates that they didn't -- they weren't given their

23  prescriptions.  Staff were -- when the monitoring team

24  requested the children's onsite records, the staff were seen

25  to quickly -- be quickly signing documents that should have

1   been signed at the start of their shift.  Security was

2   provided by a security -- private security company.  In the

3   pictures they provided, there were signs on the windows that

4   said that they should be blocked.

5           Another concerning thing I have about the

6   recordkeeping with the SSCCs is that DFPS or the State is

7   paying them a blended rate, so we're not sure from the

8   records which children are in temporary placements, which I

9   really -- they seem so awful that they seem to be

10  unlicensed, but in fact they are licensed, because they run

11  them in out of these TEPs so it doesn't look like they're in

12  there for a long period of time.  That's the SSCCs.

13          So I'm going to ask Ms. Masters if from this day

14  forward the SSCCs can be required to let you know by some

15  tabulation so the Monitors can review which children are in

16  the TEPs regularly, exactly which child is where on what

17  day?  And I know that it seems to be sort of disguised

18  because you -- it's a blended rate so they're not separated

19  and I'm not sure if that's the same with the TEPs.

20          What's the rate that you're paying for these

21  duplexes and houses?  Ms. Fowler, did you know that?  Did

22  you tell me what that was?

23          MS. FOWLER:  Well, they entered into residential

24  leases with private entities for the duplexes in Houston and

25  for the Villas and I -- we don't have a copy of the lease so

1    I don't know how much they're paying for them.

2              THE COURT:  Can you give them a copy of that

3    lease, Ms. Masters?  I guess that would be HHSC?

4              MS. MASTERS:  Yes, Your Honor, we can do that.

5    And I think for our TEP beds, it may vary, but I think it

6    may be around 450 or something like that, but we will get it

7    exactly for you.

8              THE COURT:  Yeah, the TEP beds -- now that's

9    temporary placements, Panel Members.  They're called "TEPs."

10   I don't know if you've seen these in other -- we're not

11   talking compassionate release, compassionate care.  You

12   know, when you grab a child that's being sexually abused in

13   a placement and put them quickly in a compassionate release

14   place till they find a placement, these are temporary TEPs

15   and it looks like, for instance, OCOK, which is one of the

16   SSCCs, have almost 3,000 days of placements.

17             Am I misquoting that, Ms. Fowler?

18             MS. FOWLER:  I would just refer to the table in

19   the Report which was provided to us by DFPS and it lists the

20   number of days for I think a portion of the providers that

21   OCOK indicated they had placed children in temporarily.  And

22   I don't know -- so I'm a little confused about the list that

23   was provided by DFPS for OCOK and perhaps they can, you

24   know, provide some clarification on that.

25             THE COURT:  So these inadequate residential and

1    abandoned -- one was in an abandoned neighborhood

2    altogether.  These leases -- because the State legislature,

3    I think, made it into law that they could not be -- these

4    children could no longer be placed in offices though they

5    still are, these were quickly rented to stuff these children

6    in these rental houses to get them out of the offices.  That

7    was my understanding.  If I'm incorrect, somebody let me

8    know.

9         (Pause in the proceedings.)

10        THE COURT:  So a lot of these children without

11   licensed placements were sent out-of-state to what the

12   Monitors described -- the visit Ms. Fowler and her team

13   visited to in Michigan that were startling actually and had

14   many -- they were not, of course, in the Michigan -- two

15   placements.  They were not given -- didn't have access to

16   all of the citations issued against these two places, but

17   they -- on the public records they put in here very clearly

18   all the deficiencies of these places, plus what they saw as

19   deficiencies.

20        (Pause in the proceedings.)

21        THE COURT:  Among the issues raised by some of the

22   stakeholders to the Monitors that was the concern that SSCCs

23   were frequently moving children between the TEP beds in

24   order to avoid listing them as children without placements,

25   which is why these TEP bed days are so high for just OCOK.

1          DFPS explained that "We've not required the SSCCs

2   to mark or flag a child in IMPACT as a step or temp

3   placement."  Step placements, as I understand, are what the

4   temporary placements are.  DFPS calls -- has their

5   placements that are temporary called "TEPs."  SSCCs have

6   them -- they call "Steps," also temporary.

7          And so we don't know exactly how many are going

8   where.  Of course, we don't know where the children are

9   period.  But DFPS did say that the word "Temp" and "Step"

10  may be used interchangeably.

11         OCOK has reserved bed agreements for their

12  temporary placements with Agape Manor Home, CK Family

13  Services, Kids First, Perfection Children's Services and Rye

14  Services of Texas (phonetic).  And additional placements

15  that they've paid temporary days to are ACH Child and

16  Family, Camp Worth Everyday Life (phonetic), Hidden Cove

17  Residential, IMDC, Pinecrest Emergency Care Services and

18  Kids First, Make A Way, Inc., Perfection Children's

19  Services, Refuge for DMST, Vision, National Youth and View

20  (phonetic), total days spent -- was it from December 20 to

21  September -- a nine-month period -- 10-month period -- nine-

22  month period by just OCOK in temporary placements were 2,904

23  billed days according to the records provided to Monitors.

24         At least five of these providers that we just --

25  as I just reviewed have a history of safety violations.

1  Promise House, for instance, is not under tightened

2  monitoring, but is on probation.  The monitoring team

3  visited two of these temporary providers, Unity Children's

4  Home is for girls only and Promise House.  These children

5  are staying months in these alleged temporary placements.

6          And on page 29 of their Updated Report, talk about

7  repeated placements in TEP programs.  Initials R.N. placed

8  in Unity Girls, was one of 20 placements what's been in over

9  the course of three years in care.  S.J. was placed in Unity

10  Girls.  It's one of 20 placements during her 19 months.

11  She'd be placed in TEP twice before.  B.R., who's placed

12  into the TEP units program and Unity Girls is one of more

13  than 20 placements since 2018, late 2018.  She'd been in TEP

14  placement at Unity Girls once before.  L.B. whose placements

15  in the TEP program at Promise House was one of at least 34

16  placements since reentering foster care in 2016 and then

17  Promise House once before.  D.D. had over 20 placements

18  since entering foster care in 2020.  Three had been in

19  Promise Care.  So you can see that this is not a good thing

20  for these children.

21          All of these children also had significant

22  behavioral and mental health challenges arising out of the

23  trauma they experienced both prior to and after entering

24  foster care and a shared history of declining mental and

25  behavioral issues since entering care.  Mostly likely,

1   according to the Monitors, exacerbated by the instability

2   and disruptions that have occurred in the multiple

3   placements.

4           So there's a -- they speak about a 15-year-old PMC

5   child whose care is provided by St. Francis, had 16

6   placements in a three-month period when she was placed at an

7   RTC in Arkansas.

8           Now each of those TEP placements are licensed.  I

9   don't know what it takes to license a TEP, but apparently

10  not much.  The Unity Home is private for-profit entity and

11  they say on their website:

12      "To assist youth in developing a mindset that supports

13      a desire to model a spiritual approach designed to

14      promote purposeful living and spiritual healing that

15      every child," it says, "is entitled to reside in an

16      environment that promotes spiritual enrichment,

17      emotional stability and appropriate physical, social

18      growth and development.  Every child should be

19      encouraged to reach their maximum potential."

20          There are two campuses.  Seven of eight of the

21  children in the temporary campus were PMC children.  Review

22  of the compliance history for that facility for the past

23  five years shows 48 citations.  Unity Girls is not on any

24  monitoring to corrective action, has only had one confirmed

25  finding of abuse, neglect or exploitation, when the DFPS in

1  March -- last March found two staff had physically abused a

2  child who was being transported to a psychiatric facility.

3  The TEP program at Unity Girls appears ill-equipped to

4  manage children who are at high risk for running away.

5          What's stunning about the Monitors' Report is that

6  DFPS placed runaway children, documented runaway children in

7  Unity Girls class -- Unity Girls, which has a history of

8  runaway children and sure enough when they got to Unity

9  Girls, they ran away.  And there's a whole timeline about

10  the children who ran away.

11          So -- and Promise House is licensed to serve 42

12  residents and they have specialized, intense, intense-plus

13  IPT or TEP.  They have an emergency shelter that also houses

14  the TEP program.  Children in the TEP are housed on the

15  second floor of the building.  When the Monitor team

16  visited, there were seven girls and one boy identified youth

17  on the TEP unit, two boys housed in the emergency shelter.

18  One of the youth from the TEP unit was on a one-to-one

19  supervision and housing emergency shelter downstairs.  All

20  of the children in the TEP program on the day of the

21  monitoring had been placed in Promise House by DFPS.  They

22  attend an onsite school, which is erratic attendance and

23  curriculum to say the least.  If you read the Report, two

24  hours a day for some -- the most they get.

25          And Promise House has been under multiple RCCR

1   enforcement actions in the last two years, one of which was

2   a staff person placing a child in a chokehold, another --

3   several were for neglectful supervision and then on

4   standards violations.

5           They failed -- the program director failed to

6   remove a child with an indicator of sexual aggression from

7   sharing a room who was a child of sexual -- who was a child

8   with a verified history of sexual abuse.  The child told the

9   therapist about the abuse that occurred in the Promise House

10  before the child running away, but the therapist did

11  nothing.

12          Another one in Promise House that was stunning was

13  there is a -- one of the children placed there had tried to

14  kill herself by wrapping a vacuum cleaner cord around her

15  throat, so as part of the corrective action, the Promise

16  House was supposed to keep the vacuum under lock and key and

17  instead the Monitors saw it in the open kitchen unlocked.

18          The Promise House does not appear to implement

19  positive behavior intervention practices despite the claim

20  on its website.  All the website apparently promises and

21  outlines and goals were incorrect and not being followed.

22  In fact, many of the staff didn't even know what they were

23  or how to explain the definitions of what they were supposed

24  to be.

25          In October of 2021, 15 percent of the DFPS

1    placements in RTC were out-of-state, 31 percent of US -- of

2    the SSCCs were out-of-state.  Not promising here.

3          So the Monitors then went to Evart Youth Center in

4    Michigan.  Ten of the youth of the Texas -- there were 10

5    Texas youths.  Eight of those were PMC.  Eight were placed

6    at Evart by DFPS, one by OCOK and one by To Engage

7    (phonetic).  And the one that was OCOK was discharged at the

8    facility's request.  One had planned to go, I think, live at

9    a staff house, didn't want to go back to El Paso.

10         (Pause in the proceedings.)

11         THE COURT:  The girls facility under public

12   records has multiple violations reported, yet -- oh, and one

13   of the interesting things about To Engage, you know, they're

14   supposed to make -- the caseworkers are supposed to make

15   face-to-face visits once a month.  So To Engage had this

16   wonderful way of cutting down 12 months of visits into six

17   by going on the 31st of the month and the 1st of the month

18   the next day, or the 30th and the 1st whichever months had

19   30 days.  Now of course that is stunning and apparently DFPS

20   really doesn't track those things, but fortunately for us,

21   the Monitors do.

22         One of the violations of the boys' facility there

23   was that the front door of the facility was missing and then

24   there hadn't been any heat for 24 hours despite it being

25   28-degree weather.  Physical restraints, sexual conduct

1  between the girls in the girls' facility and the boys in the

2  boys' facility.

3          And these pictures of these Michigan places -- I'm

4  just curious, Mr. Carson, what exactly before you place a

5  child in something like this, what kind of an investigation

6  do you do?

7          MR. CARSON:  (No audible response).

8          THE COURT:  You're on mute.

9          MR. CARSON:  There we go.  We take a look at the

10  history of the organizations, so this organization has been

11  nationally accredited since 2020 through (indiscernible).

12  We do get --

13          THE COURT:  But you don't have any watch list that

14  facility is on?

15          MR. CARSON:  Yes.  We did get a history of their

16  licensing history and part of looking at, you know, whether

17  or not to use them, we're not aware of --

18          THE COURT:  Did you look at these public citations

19  for the boys units and the girls units here?  They're really

20  quite stunning.

21          MR. CARSON:  We look at --

22          THE COURT:  No treatment plans, no interval

23  checking for 24 hours for the overnight -- for the awake

24  nights, which apparently is a rule in Michigan.  We had to

25  make it one in Texas, but it is a rule in Michigan.

 1              Did you find all these about --

 2              MR. CARSON:  We did look at their licensing

 3  history.  We were informed by licensing that there were no

 4  open investigations at the time we contracted with them, so

 5  that --

 6              THE COURT:  Did you look at the history of these

 7  violations?

 8              MR. CARSON:  We did, yes, Your Honor.

 9              THE COURT:  Okay.  Well, let me explain to you,

10  Mr. Carson -- who is the coordinator, who's the director of

11  To Engage?

12              MS. DRYER:  Your Honor, Shirley Dryer.

13              THE COURT:  Okay.  Let me explain to both of you.

14  This six visits in a year for a 12-month period is not going

15  to work, Ms. Dryer.  It's shameful.  You all cannot avoid

16  the remedies that this Court has ordered by stuffing these

17  children into these awful facilities out-of-state.

18              Do you understand that, Ms. Dryer?

19              MS. DRYER:  Yes, Your Honor.

20              THE COURT:  Mr. Carson, is that clear?

21              MR. CARSON:  Yes.  We have no intent to put kids

22  in bad facilities.

23              THE COURT:  Well, you did.  Well, you did.  You

24  put one of your children -- it just -- if you read this

25  Report, it's pretty bad.

1           So, Mr. Yetter, do you have questions about this

2    Report for the unlicensed children -- or unlicensed

3    placements?

4           MR. YETTER:  Your Honor, I think you've covered

5    everything that I was going to bring up.  I will say one

6    comment, Your Honor, is that the Monitors' most recent

7    Report, Docket No. 1171, reflects the serious physical and

8    psychological safety risks to children that are being placed

9    by the State in unlicensed facilities and it is ongoing and

10   it is a shameful crisis for the State to see this and it is

11   not new.  According to the Expert Panel and as the Monitors

12   have made clear, this has been going on for years, long

13   before the remedial Order went into effect.  This is a -- as

14   I believe Ms. Stanley said, this has become

15   institutionalized in Texas and that's what's so frustrating

16   and (indiscernible) about this.

17          THE COURT:  It's all abuse.

18          MR. YETTER:  It is now part of the structure of

19   the system and unless it gets changed now, it will continue

20   to be.

21          THE COURT:  The Monitors couldn't find face-to-

22   face visits for one of the children in this Evart place.

23   The monitoring team noticed -- which SSCC was this for, was

24   this a placement where they said they couldn't make a face-

25   to-face because of the COVID because it was a 14-day COVID

1    restriction?  Do you remember what --

2            MS. FOWLER:  I don't think that was an SSCC.  I

3    think that may have been a DFPS placement.

4            THE COURT:  Okay.  And of course it turns out that

5    the Monitors discovered there was no 14-day COVID

6    restriction during that time period, just an excuse for not

7    (indiscernible).

8            MS. FOWLER:  Right.  I want to be clear, I don't

9    know if the facility told the caseworker that because we

10   don't have the ability to see what they communicated to the

11   caseworker.  All we can see is the reason that the

12   caseworker included it in IMPACT for not making a face-to-

13   face visit.  So I don't know if -- I don't know where the

14   miscommunication was.

15           THE COURT:  Okay.  But we know the child was not

16   seen and that there was no COVID restriction.

17           MS. FOWLER:  There certainly wasn't a COVID

18   restriction that we were made aware of by the time we

19   arrived on the campus to visit just a few days later.

20           MR. YETTER:  I think, Your Honor -- excuse me.

21   One thing I will say, if I could, is that I think the

22   recommendations in the Expert Panel Report are -- would go a

23   long way to address the very things that the Court Monitors

24   have memorialized in their supplement or update on the

25   children without licensed -- in licensed -- children in

1   unlicensed placements.  And perhaps maybe after lunch,

2   Your Honor, we could -- we might want to go through that.

3          THE COURT:  Oh, is it that time?

4          MR. YETTER:  Yes, I think it would be a good time

5   for lunch.

6          THE COURT:  So we have left to cover -- I have a

7   whole -- it's not that much, but it is a notebook I made of

8   reviewing prior transcripts to see about questions I asked

9   that were going to -- someone was going to get back to me

10  and so that's some of the things I want to cover at the end,

11  but I want to go through the Monitors' Reports, any

12  questions anybody has.

13         And what -- Krause (phonetic) Children's

14  Residential, what -- whose RTC is that?

15         MS. FOWLER:  Judge, Krowsi (phonetic) has -- is

16  one of the operations that's closed.

17         THE COURT:  Okay.

18         MS. FOWLER:  It was closed in lieu of a licensed

19  revocation.

20         THE COURT:  Right.  And that was because an OCOK

21  caseworker reported that one of their children that they

22  placed there reported emotional abuse.  That was one of the

23  reasons.  And this is in the appendices for inadequate

24  investigations.

25         So how much time do you all want for lunch?

```
 1              MR. YETTER:  Whatever the Court -- we're fine with
 2   whatever the Court --
 3              THE COURT:  Oh, good answer, Mr. Yetter.
 4              Ten minutes?  No.  Okay.  I'm going to ask,
 5   Ms. Masters, what do you all want for lunch?
 6              MS. MASTERS:  Thirty minutes is enough,
 7   Your Honor.
 8              THE COURT:  How much?
 9              MS. MASTERS:  Thirty minutes.
10              THE COURT:  Is everybody okay with 30 minutes?
11   Let's make it 45 minutes.  Let's do 45.  Everybody okay with
12   that?
13              MS. MASTERS:  Yes, Your Honor.
14              MR. YETTER:  Yes, Your Honor.
15              THE COURT:  Okay.  Then I'll see you back in 45
16   minutes.  Thank you.
17              MR. YETTER:  Thank you, Your Honor.
18         (Recess taken from 12:35 p.m. to 1:19 p.m.)
19                          AFTER RECESS
20              THE COURT:  We ready to go?
21              MR. HUDSON:  Yes, Your Honor.
22              THE COURT:  Thank you.
23              Okay.  Then let's see, is everybody here?
24         (No audible response.)
25              THE COURT:  And Mr. Hudson, you can eat any time
```

1    you want here or drink.  Don't worry about it.  I saw you

2    trying to stuff the last bite and you -- no, don't -- don't

3    worry about it, please.

4              MR. HUDSON:  I appreciate that, Your Honor.  Thank

5    you.

6              THE COURT:  Anybody feel free to snack, or drink,

7    or do anything they want.  I recommend no alcoholic

8    beverages, though, until after the hearing.

9         (Pause in the proceeding.)

10             THE COURT:  Are we missing anybody?  Mr. Hudson,

11   can you do a count from your side there?

12             MR. HUDSON:  From my side, Your Honor, it looks

13   like we have H. Justine (phonetic), DFPS.  They sent me for

14   the OOJ (phonetic), one riot, one ranger for the Governor,

15   Your Honor.

16             THE COURT:  That's it.  That's all you need,

17   right?

18             MR. HUDSON:  Am I not enough?

19             THE COURT:  One riot?

20        (Pause in the proceeding.)

21             THE COURT:  So, Mr. Yetter, do you want to begin?

22   I -- I -- I sent a message through -- oh, one -- one thing I

23   wanted to tell you all.  The medical expert for the minors

24   is a friend of mine.  He's doing this for free.  I don't see

25   any particular conflict.  Because now the Monitors are

1    friends of mine as well.  So he became available with his

2    retirement at 74 and offered to do this.

3           And so I thought it was fantastic.  But I did want

4    to make that disclosure.

5        (Pause in the proceeding.)

6           MR. YETTER:  Yes, Your Honor.  I'm -- I have a few

7    questions, if the Court would permit.

8           THE COURT:  Does anybody else have any questions

9    about that with -- about --

10          MR. YETTER:  We --

11       (Pause in the proceeding.)

12          THE COURT:  Okay.

13          MR. HUDSON:  The only question from my

14   perspective, Your Honor, would be was the disclosure on the

15   Record just now?

16          THE COURT:  Yes.

17          MR. HUDSON:  Okay.

18       (Pause in the proceeding.)

19          THE COURT:  And -- and is there any problem with

20   that?

21          MR. HUDSON:  No, I -- I didn't say I raised any --

22   any issue.

23          THE COURT:  Oh, okay.

24          MR. HUDSON:  I just want to make sure it was on

25   the Record.  So I wasn't aware that the Record started back

1    up.

2            THE COURT:  Yes, it's back.

3        (Pause in the proceeding.)

4            THE COURT:  All right.  Mr. Yetter, I think we're

5    all here.

6            MR. YETTER:  Yes, Your Honor.  I'd like to -- I

7    have some questions I'd like to direct to Commission Masters

8    if I may?

9            THE COURT:  Go ahead.

10           MR. YETTER:  And I -- they -- the first two relate

11   to the update that the Monitors filed yesterday with the

12   Court about children in unlicensed placements.  This is

13   Docket Number 1171.

14           Commissioner Masters, this is the -- the Report

15   that the Monitors filed yesterday with -- about the children

16   in unlicensed placements.  Have you read it?

17           MS. MASTERS:  I have not read all of that one.

18           I spent all of my time last night going through

19   the finalized Report for the Expert Panel.

20       (Pause in the proceeding.)

21           MR. YETTER:  There is a section on the rental

22   properties called "The Villas."  And we've had some

23   discussion about that during this hearing today.  And it's

24   in -- it is in the Report, along with photographs of The

25   Villas.

1          Do you -- you know what I'm talking about?

2          MS. MASTERS:  I am familiar with that.  I believe

3   we have amended that contract a couple of weeks ago, or it's

4   due to be implemented in February, that we have reduced that

5   contract and reduced the number of -- of locations that we

6   are using.

7          MR. YETTER:  Now you -- you've seen photographs

8   of -- of The Villas and how it is geographically right next

9   to a large, abandoned, and now dangerous and lighted,

10  effectively, housing development?

11         MS. MASTERS:  I have not seen photos.  Actually, I

12  heard some things for the first time on this hearing.  And

13  so --

14         THE COURT: Well, why don't you -- why don't you

15  just look at that Report now and turn to the photos?

16         MR. YETTER:  Right.

17      (Pause in the proceeding.)

18         MR. YETTER:  It's on page 14 of the Docket 1171,

19  the -- the Monitors update regarding safety of settings,

20  housing children without placement, and site visits.

21      (Pause in the proceeding.)

22         THE COURT: While they're waiting on that --

23         MR. YETTER:  Of course.

24         THE COURT:  -- Ms. Masters, you know, I have

25  alluded to my dissatisfaction today with some of DFPS' work.

1    And I want to mention again that you have now -- you brought

2    in somebody from Kansas that's -- took over Mr. Woodruff's

3    position.

4           And when the Monitors make requests of her, she

5    makes sure she delays every response till 30 days, which is

6    not my Order.  My Order is very clear in the Monitors'

7    section that you're both -- all the entities are to

8    cooperate solely with the -- completely with the Monitors.

9           So if they ask for something that's going to

10   require ten minutes of research, do not wait the 30 days

11   anymore.  If it's a document the collection is going to take

12   a while, I can understand the 30 days.  But simple things

13   that -- that do not take that time, make sure she

14   cooperates, please, and that we get off on the right foot

15   with a new member of your staff.

16           Will you do that, Ms. Masters?

17           MS. MASTERS:  Yes, Your Honor.

18           THE COURT:  Thank you.

19      (Pause in the proceeding.)

20           MS. MASTERS:  The outside of --

21           THE COURT:  Okay.

22           MS. MASTERS: -- these facilities is disgusting.

23           MR. YETTER:  It is disgusting.  It's more than

24   disgusting, though.  It is a significant safety risk to the

25   children; is it not?

1    MS. MASTERS:  Yes.  I -- I wouldn't want to see

2  this.

3    MR. YETTER:  And as far as the Monitors, of

4  course, you've not been out there.  And you've -- have you

5  not gotten any Report form any of your DFPS staff on The

6  Villas and whether they reflect a significant safety risk to

7  children, have you?

8    MS. MASTERS:  I have not.

9    MR. YETTER:  So the -- the Monitors brought this

10  to you attention for the first time here in this lawsuit.

11  What are you going to do about it?

12    MS. MASTERS:  I -- obviously I'm just now looking

13  at these photos and hearing this information.  I will be

14  meeting with my staff immediately after this to address

15  this.

16     (Pause in the proceeding.)

17    THE COURT:  Who's in charge of doing these --

18  making these contracts?

19     (Pause in the proceeding.)

20    MS. MASTERS:  I think Bill could speak to that

21  process for our -- our contracts.  But I think it's a joint

22  decision when it comes to the licensing of the facilities

23  and then also the contracting with the Department.  I can't

24  say.

25    THE COURT:  Who entered into the lease agreement?

1              MS. MASTERS:  I believe we did.

2              THE COURT:  Uh-huh.

3              MS. MASTERS:  But I could ask Bill to speak to

4    that directly.

5              THE COURT:  Well, this is a CWOP (phonetic)

6    placement.  So it's not licensing.  So I don't know how

7    joint --

8              MS. MASTERS:  I -- so, yeah.  That would just be

9    us then if this is an unlicensed placement.

10             THE COURT:  It certainly is unlicensed.

11             Okay.  Who in you -- who in your Department knows

12   about it?

13             MS. MASTERS:  That would be Bill that can -- Bill

14   could speak to that.

15             MR. WALSH:  Yes.  Hi, good afternoon, Judge.  This

16   is Bill Walsh with Department of Family and Protective

17   Services.

18             THE COURT:  Yes, Mr. Walsh, you're -- you're

19   landing in it today.

20             So what do you know about this contract for these

21   strange looking places and unsafe looking places?

22             MR. WALSH:  Yeah.  So we enter into those leases.

23   And we do -- we do do on-site visits.  And so we research --

24             THE COURT:  Who did -- who did in your -- while --

25   while we're here you find out who did that.  And -- and put

1    him on line and put him in here.

2              MR. WALSH:  Okay.  Let me do some research to

3    figure that out.

4              THE COURT:  You're new so you didn't do it, right?

5              MR. WALSH:  No, Your Honor.  That was typically

6    done, the on-site visits were typically done by someone in

7    Child Protective Services.  And so I'm in a -- the

8    contracting position.

9              THE COURT:  Well, find out who did it and put him

10   on -- put him on the horn right now.  Thank you.

11             MR. WALSH:  Okay.

12             THE COURT:  Let me know when they're -- when you

13   got them.

14             MR. WALSH:  Okay.

15             MS. MASTERS:  Your Honor, Erica is actually

16   finding that out.

17             THE COURT:  Okay.  Thank you.

18             Okay.  Go ahead, Mr. Yetter.

19             MR. YETTER:  Okay.  Let's move --

20             THE COURT:  Will that -- that help you in your

21   process?

22             MR. YETTER:  Yes, it will absolutely.

23             But while we're waiting for that, Ms. Masters,

24   let's move to the Evart Youth Center, which is on page 42 of

25   the Monitors' update yesterday.  This is the Michigan

1  facility that DFPS has put 10 foster children, 8 PMC

2  children at in recent months.

3         Are you familiar with the Evart Youth Center?

4         MS. MASTERS:  Somewhat, yes.  I believe that's --

5  is that the one that Deborah sent us the email about?

6         MR. YETTER:  I believe it is.  And did you do an

7  investigation after the Court Monitor, Deborah Fowler, sent

8  you the email?

9         MS. MASTERS:  So I understand that our staff have

10  been out, as well as I think we might have SSCC kids there.

11  And they've also been out to do visits.

12         I don't believe, and Justin can correct me, that

13  we have authority to investigate within the facility.  And

14  we are reliant upon their either licensing or childcare

15  investigation.  I believe that we --

16         THE COURT:  Yeah.  We're not talking about you

17  licensing these facilities.  We're talking about before you

18  put a Texas child in there, do you look at it and see that

19  it's satisfactory?

20         Because I don't think you did.  Did -- did anybody

21  do that?  Yes or no.

22         MS. MASTERS:  I don't know.  Jillian, can you

23  speak to that?

24         MS. BONACQUISTI:  Yes, Your Honor.

25      (Pause in the proceeding.)

 1            MR. YETTER:  Yes, what?  Someone actually visited

 2   the facility in person?

 3            MS. BONACQUISTI:  So yes, Your Honor.  So

 4   specifically regarding Evart, we have been placing youth in

 5   Evart for quite a while.

 6            So I am not sure what was completed before we

 7   placed the first kid there.  But we do -- we have several --

 8   several procedures in place to ensure that out-of-state

 9   operations are in good standing with licenses from out-of-

10   state.

11            THE COURT:  Okay.  Well, these are -- these are

12   really not in good standing.  If you look at all of the

13   complaints, I would not consider they're good standing for

14   Texas standards.

15            So -- and let me explain to you.  These remedial

16   orders apply in out-of-state placements as to safety.  Now

17   who exactly examined this place before placements were made?

18   Physically.

19            MS. BONACQUISTI:  That would be the responsibility

20   of the State Office Placement Division under CPS.

21            THE COURT:  Okay.  Well, find out who that was and

22   get him in here.  Who physically examined this place before

23   a child from Texas was placed there.

24        (Pause in the proceeding.)

25            THE COURT:  Hello?

1          MS. BONACQUISTI:  Well, so, Your Honor --

2          THE COURT:  Uh-huh.

3          MS. BONACQUISTI:  -- we have been placing kids at

4    this facility under previous leadership.  And so I believe

5    that the people who initially started placing kids in this

6    facility are no -- no longer work for the Department.

7          However, the Associate Director of Placement

8    did -- has visited this facility.  Most recently she visited

9    the facility earlier this year.  We have followed-up with

10   the facility regarding the concerns.  Michigan licensing is

11   investigating the allegations.

12         And so far, none of the allegations have been

13   substantiated.

14         THE COURT:  That's -- that's actually not true.

15   But secondly, put that person on the phone that went to --

16   went to the person -- went to the personal visit, in-person

17   visit.

18         MS. BONACQUISTI:  Your Honor, she is not

19   available.  The Associate Director of Placement is currently

20   on a plane traveling.  She is currently conducting another

21   out-of-state site visit today.

22         THE COURT:  Okay.  You need to know, by the way,

23   Ms. Masters and your people who are putting these placed

24   children, these Texas children in these awful places, that

25   your people never go inside any -- any further than the,

1  according to the staff and according to the children, they

2  never go any further than the front office where they

3  interview the children and leave.

4            Did you know that?

5            MS. MASTERS:  No, Your Honor.  I did not know

6  that.  That was not --

7            THE COURT:  They do not go on the kids' units.

8  This is not a licensing issue that belongs to Michigan.

9            This is a placement issue that belongs to you.

10  You are the parent of this child -- of these children.  And

11  you need to act like it.

12            MS. MASTERS:  So, Your Honor, if I may, I'm being

13  told that is incorrect that that is -- that that is how it

14  happens.

15            MS. BONACQUISTI:  Your Honor, when State office

16  placement does visit an operation, we do site visits.  We do

17  walk-throughs.  We complete unannounced visits, as well as

18  announced visits.

19            And so --

20            THE COURT:  So who did the last unannounced and

21  announced visit to this place in Michigan?

22            MS. BONACQUISTI:  It was the Associate Director of

23  Placement, who is unfortunately unavailable today.  But we

24  do have a summary of her visit and some additional

25  supporting documentation that addresses the concerns that

1    the Monitors indicated in their Report.

2              And we can provide that.

3              THE COURT:  Who have you -- who have you provided

4    to?

5              MS. BONACQUISTI:  I have provided it to our foster

6    care litigation team.

7              THE COURT:  Well, you really need to provide that

8    to the Monitors so they can verify it.

9              MS. BONACQUISTI:  Yes, and I --

10             THE COURT:  Ms. Fowler -- Ms. Fowler, what was

11   your information when you went to the Evart or --

12             MS. FOWLER:  Well, yeah.  So we asked the -- we --

13   when we interview children, we ask them if their

14   caseworkers, when they visit, if their caseworkers walk

15   through their units and see their bedrooms.  And -- and all

16   of the children told us that they meet with the -- their

17   caseworkers in the office at the facility.  And that the

18   caseworkers do not -- had not seen the units or their

19   bedrooms.

20             THE COURT:  And you've got pictures of those units

21   and bedrooms in the Report?

22             MS. FOWLER:  Oh, I mean, I think -- I hope that

23   the pictures speak for themselves.  But honestly, the truth

24   is that -- that was -- it was a really a grim situation in

25   several of the units there.

1          And I think, hopefully, you can see that from the

2     pictures.  But it's always more startling in person.

3          MS. BONACQUISTI:  Yeah, Your Honor.  If I may, the

4     facility was undergoing some enhancements at that time in

5     that specific unit because there was some damage to the

6     beds, the furniture.  And it needed to be removed for

7     children's safety.  And so we have documentation confirming

8     that the operation has purchased all new furniture.

9          I believe that a lot of the furniture is there.

10    But they're still waiting on the carpet to be replaced.  But

11    they have provided that documentation there.

12         THE COURT:  Well, isn't that -- isn't that

13    fortuitous and timely?

14       (Pause in the proceeding.)

15         THE COURT:  Are you -- are you that ridiculous in

16    actually thinking that that's the case that this is -- this

17    is suddenly happening?  That the furniture was damaged

18    unbeknownst to you all?  You put children in a place with

19    damaged furniture?

20         MS. BONACQUISTI:  Your Honor, I believe that --

21    that the furniture was damaged after the youth were placed

22    in the facility.

23         THE COURT:  Really?  Now why do you think they're

24    suddenly replacing everything?

25         MS. BONACQUISTI:  From my understanding, they had

 1   plans.  And we've had discussions with them about them

 2   remodeling and doing enhancements to the facility starting

 3   back in November.

 4        (Pause in the proceeding.)

 5        THE COURT:  As soon as actually -- when exactly

 6   did you notify them that the Monitors, per my instructions,

 7   the Monitors would be making unscheduled visits to all of

 8   these out-of-state places?  When -- when was that?  When did

 9   that happen, Ms. Masters?

10        MS. MASTERS:  I don't know that we gave any

11   facility a heads-up that the Monitors would be making

12   unscheduled visits.

13        THE COURT:  Well, you -- you had to.  Because I

14   told you to let -- to let them know that they would be

15   coming, not when, and not where.  And to make sure that they

16   had complete access to your facilities.

17        That was my instruction to you.  And that was

18   done.  Do you know what date that occurred?

19        MS. MASTERS:  I don't.  Jillian, do you know?

20        MS. BONACQUISTI:  I don't know the specific date,

21   but we can get that for you.

22        (Pause in the proceeding.)

23        THE COURT:  Ms. Fowler, do you remember?  Because

24   you all got a copy of the letter when it -- when you --

25        MS. FOWLER:  Judge, I still have the paperwork in

1  my briefcase.  So I just pulled it out.  Let me see if I can

2  find a date on the email.  It looks like it was sent --

3       (Pause in the proceeding.)

4            MS. FOWLER:  -- November, I want to say this looks

5  like November 1st of this year.

6            THE COURT:  And oddly enough, subsequent to that,

7  they entered into conversations with DFPS about remodeling.

8       (Pause in the proceeding.)

9            THE COURT:  Isn't that incredible?  Are you all

10 that easily tricked?  Or you just don't care about these

11 children?

12           That's a rhetorical question.  I don't expect an

13 answer.  I think I have one.

14           Go ahead, Mr. Yetter.

15           MS. FOWLER:  Judge, I also want to just, I mean,

16 we -- they -- when we visited, they -- they told us that

17 they were working on the former secure units that was --

18 children were not housed in.

19           But we were certainly not told of any remodeling

20 that they were doing, or that they were purchasing new

21 furniture, or you know, that -- that was not in -- what

22 staff conveyed to us during our visit.

23           THE COURT:  I imagine that was the case.

24           Mr. Yetter, go ahead.

25           MR. YETTER:  Certainly.  So let's move on from

1  children's rooms that look like juvenile cells.  And let's

2  not talk about furniture anymore.

3       Let's talk about what the Monitors documented at

4  the facility about complaints of staff bullying the

5  children, the chaotic environment, staff having

6  inappropriate conversations with the children about their

7  sexual encounters, leaving the children without heat for 24

8  and 48 hours at a time, and -- or without a door.

9       Commission Masters, this is from the Court

10  Monitors' team.  It has been carefully documented.  What is

11  DFPS going to do about this?

12       MS. MASTERS:  I think everything that I'm hearing

13  is extremely concerning.  You know, it -- obviously, the

14  children need to be moved.

15       THE COURT:  Yes.  And I appreciate you saying

16  that, Ms. Masters.  Because sometimes these CYA efforts are

17  not well received by the Court.  And I see that that is not

18  happening here.  And I appreciate it.

19       Go ahead, Mr. Yetter.

20       MR. YETTER:  And I -- let me just -- can I finish

21  the picture here at --

22       THE COURT:  Yes.

23       MR. YETTER:  -- Evart is not just a prison

24  environment.  It's not just a staff chaotic and

25  disorganized, and inappropriate staff comments.  It's

1    physical restraints that are hurting the children.

2         And Commissioner Masters, if you haven't read the

3    Report, and this -- and this part of it, it is -- you need

4    to read it.  Because the children are being hurt by the

5    staff, being put into inappropriate and harmful, physical

6    restraints.  And it's being -- and it's documented by the

7    Court Monitors.

8         So I would invite you to read that.  And

9    obviously, I would like to assume that that concerns you as

10   well, Commissioner Masters.

11        MS. MASTERS:  It does concern me.

12        It sounds like I need to go to Michigan myself.

13        MR. YETTER:  These are Texas children that we've

14   sent to Michigan.  And they're being hurt hundreds of miles

15   away from our State.  And we should take responsibility for

16   them, shouldn't we, Commissioner Masters?

17        MS. MASTERS:  I take responsibility for

18   everything.

19        (Pause in the proceeding.)

20        MR. YETTER:  One last issue that -- and this

21   relates to the Expert Panel Report.  And it makes a

22   reference on page 7.  Have you read the Expert Panel Report,

23   Commissioner Masters?

24        MS. MASTERS:  Yes, I have.

25        MR. YETTER:  And it makes a reference to HHSC and

1  DFPS establishing exit criteria to heighten monitoring that

2  will be shared with providers this month, January 2022.

3           Now you understand, Commissioner Masters, that the

4  entire regime of heightened monitoring is a subject of order

5  of this Court.  It's not voluntary.  It's not consensual.

6  It is a remedial order of this Court.

7           Do you understand that, Commission Masters?

8           MS. MASTERS:  Clearly.

9           MR. YETTER:  And there is specific guidelines for

10 when a facility that has been put on heightened monitoring

11 can exit.  It details specific guidelines for when they can

12 exist heightened monitoring, Commissioner Masters.

13           MS. MASTERS:  Yes.

14      (Pause in the proceeding.)

15           MR. YETTER:  So you -- no -- neither agency is

16 entitled to develop any of its own new, quote, "exit

17 criteria."  You agree with that, don't you, Commissioner

18 Masters?

19           MS. MASTERS:  I don't have any questions about

20 that, Mr. Yetter.  I found out about this document from this

21 Report.  So I have not been a party to this.

22           MR. YETTER:  All right.  So do you know who within

23 your organization was, evidently, working on putting

24 together so-called exit criteria for heightened monitoring

25 that's subject to Court Order?

1           MS. MASTERS:  So the way I read this Report is

2   this information was provided by HHSC and not DFPS.

3           I have understood that there were DFPS staff

4   working with HHSC on this.  But I cannot speak to the

5   document.

6           MR. YETTER:  Can you find out who was on your

7   staff that was working on these so-called exit criteria

8   that --

9           MS. MASTERS:  Sure, I can -- I can find out who

10  was working with them.

11          MR. YETTER:  And are you going to tell them

12  clearly that this is not a matter for them to decide.  This

13  is a matter of Court Order?

14          MS. MASTERS:  So think my same statement.  This is

15  already clear in DFPS.

16          There  is nothing else to reiterate.  There are no

17  changes to heightened monitoring being made here.  That's

18  already clear.

19      (Pause in the proceeding.)

20          MR. YETTER:  All right.  Those are all the

21  questions, Your Honor, I have on what we've already covered

22  so far.

23          THE COURT:  All right.  Thank you.

24          You want to move on to the Monitors' Third Report?

25  I'll let you highlight whatever you think is important.  And

1 | if I find anything missing, I'll talk to you about it.  I'll

2 | say it as we go along.

3 |           You know how shy and retiring I am.

4 |           MR. YETTER:  Thank you, Your Honor.  Yes, we do,

5 | Your Honor.

6 |           Again, I'd like, Commissioner Masters, I'd like --

7 | I'd like to continue with you.  The Third Report of the

8 | Monitors, which is Docket Number 1165.  It was filed

9 | yesterday.  But there was a copy given to both of the

10 | agencies some time ago.

11 |           Have you read the Third Report of the Monitors?

12 |           MS. MASTERS:  Yes.

13 |     (Pause in the proceeding.)

14 |           MR. YETTER:  I'm sorry, I -- you --

15 |           MS. MASTERS:  Yes.

16 |           MR. YETTER: -- you broke up on my end.

17 |           MS. MASTERS:  Yes, I have.  I have reviewed this.

18 |           MR. YETTER:  All right.  I want to focus on one

19 | area in particular.  It covers a number of -- as the

20 | Monitors have done in all of their Reports, it covers --

21 | covers a number -- number of important areas.

22 |           But I want to focus on caseload for caseworkers.

23 | We've talked many times about this, Commissioner Masters,

24 | and you'll agree that caseworkers are a vital safety

25 | guardian of these foster children, right?

1          MS. MASTERS:  Yes.

2          MR. YETTER:  And if the caseworkers are

3  overloaded, they cannot do their job.  And the children are

4  put at risk of their own safety.  True?

5          MS. MASTERS:  Yes.

6          MR. YETTER:  The expert Report has -- Expert

7  Panel's Report noted that overloaded caseworkers are not

8  able to spend the time, especially with these children that

9  are being placed in unlicensed placements.  You read that,

10 didn't you?

11          MS. MASTERS:  Yes.

12     (Pause in the proceeding.)

13          MR. YETTER:  Before you became Commissioner, the

14 parties, DFPS and -- agreed, and the Court ordered that it

15 would ensure that its case -- conservatorship caseworkers

16 would meet a standard -- a certain -- a caseload standard of

17 14 to 17 children per caseworker.  You understand that;

18 don't you?

19          MS. MASTERS:  I do.

20          MR. YETTER:  And that was two years ago.  And the

21 Court approved that agreed motion December 16th, 2019,

22 right?

23          MS. MASTERS:  Yes.

24          MR. YETTER:  And the State, DFPS is nowhere close

25 to meeting that standard with its caseworkers, at least with

1    a large segment of its caseworkers.

2              MS. MASTERS:  That is correct.

3              MR. YETTER:  In fact, according to the third --

4    the Monitors Third Report, some 40 percent of DFPS

5    caseworkers have -- are in violation of that standard, have

6    18 or more children that they are responsible for.  True?

7              MS. MASTERS:  Yes.

8              MR. YETTER:  And that doesn't count the extra

9    shifts that the caseworkers are having to put -- put in

10   every week and every month on children in unlicensed

11   placements, right?

12             MS. MASTERS:  Correct.

13        (Pause in the proceeding.)

14             MR. YETTER:  And it isn't much -- it isn't much

15   better between DFPS and the SSCCs that you have outsourced

16   certain operations, is it, the rate of compliance with the

17   caseload standard.

18             MS. MASTERS:  I don't have the exact numbers in

19   front of me.  But I would assume it's similar.

20             MR. YETTER:  Yeah.  So it is on average 40 percent

21   of the DFPS caseworkers have -- are in violation of the

22   standard.  And it's roughly the same, 40 percent of the

23   caseworkers for the -- for the two SSCC's or more are out of

24   compliance.

25        (Pause in the proceeding.)

1          MR. YETTER:  I'm looking page 106 and 107.  Did

2  you know that, Commissioner Masters?

3          MS. MASTERS:  Not at -- yes.  Yes.  I did.

4       (Pause in the proceeding.)

5          MR. YETTER:  I'm sorry.  I didn't catch your --

6  I'm having --

7          Your Honor, I apologize.  I'm having me some

8  technical issues.

9          I didn't catch your answer Commissioner Masters.

10          MS. MASTERS:  Yes.

11          MR. YETTER:  All right.  So what is -- how is

12  the -- and this is a Court Order.  This is now two years

13  after the standard was agreed.  We are two and a half years

14  after the remedial went into effect.  What specific steps is

15  DFPS going to undertake in the near term to get in

16  compliance with the standard?

17          MS. MASTERS:  Well, I think many of the options

18  that have been provided in the Expert Panel Report will be

19  very helpful in us addressing that.

20          MR. YETTER:  Did you see anything in the Expert

21  Panel Report, Commissioner Masters, that you believe is

22  impossible for DFPS to adopt and pursue?

23          MS. MASTERS:  Well, I don't know that -- I don't

24  know that anything's impossible.

25          MR. YETTER:  Is there anything in the Expert Panel

1  Report that you personally believe is ill-advised for DFPS

2  to pursue?

3         MS. MASTERS:  No.

4         MR. YETTER:  Based on your review of the Expert

5  Panel Report, did you find that the recommendations that

6  were made by these three imminent, independent experts are

7  reasonable and important steps for the State to take to

8  protect the safety of these children?

9         MS. MASTERS:  Yes.

10      (Pause in the proceeding.)

11        MR. JONES:  Your Honor, can we comment just on

12  that?  Can we just kind of --

13        MR. SPEAKER:  No.  There's a lot of people in

14  there.

15      (Pause in the proceeding.)

16        MR. YETTER:  Your Honor, I'm -- let me -- I'd like

17  to pause for one second on this caseload compliance.  This

18  is a significant issue.  The -- from the day of the trial to

19  today, caseworkers have -- have clearly been recognized by

20  the Court and by every witness as vital to the safety of

21  these children.

22        The State has agreed to standards two years ago.

23  They're not close -- they've not meeting the standards with

24  40 percent of the caseworkers.  This is a very significant

25  issue to, we believe, on behalf of the children.  And unless

164

1    the State comes up with a plan to fix this and there is --

2    and there is improvement immediately, we will be petitioning

3    the Court for contempt relief to ensure that this gets done.

4              THE COURT:  I understand that.  And I would expect

5    it.

6         (Pause in the proceeding.)

7              MR. YETTER:  Your Honor, that was a -- that was

8    the -- that was the area in the third Monitors' Report that

9    we wanted to focus on, the one that concerned us the most.

10             There's obviously lots in the Report.  But the

11   caseload failures, and the violations of the standard are --

12   is what we are most concerned about.  I -- if we -- if I may

13   me ask one other question of Commissioner Masters?

14             Commissioner Masters, when will you be able to get

15   to the Court and to the Court Monitors the plan that DFPS

16   will implement quickly in order to get the casework --

17   caseworker or caseloads in compliance with the standard?

18             MS. MASTERS:  I think all of that will be part of

19   that response that I'm going to have within 90 days.

20        (Pause in the proceeding.)

21             MR. YETTER:  Thank you, Commissioner.

22             Those are all the questions I have on that issue,

23   Your Honor.

24             THE COURT:  All right.  Keep going.

25        (Pause in the proceeding.)

165

1          MR. YETTER:  Those are the questions I have on the

2  Third Report, Your Honor.

3          THE COURT:  Commissioner Masters, do you have any

4  questions on the Monitors' findings?

5          MS. MASTERS:  I do not.

6          THE COURT:  Commissioner Young?

7          MS. YOUNG:  No, Your Honor.

8          THE COURT:  Let me just review my notes on this

9  before we go.

10      (Pause in the proceeding.)

11          THE COURT:  Previously the unlicensed placements,

12  you had not required them to post posters with hotline

13  numbers and their -- and their rights, foster care rights.

14  Have you done that now, Ms. Masters?

15          MS. MASTERS:  I believe that is done.

16      (Pause in the proceeding.)

17          THE COURT:  What has happened with the SSCC's

18  training program for caseworkers that was insufficient?  I

19  mean, we had an Order that the Order is clear that it's got

20  to -- it's got to be a -- the state-wide order -- the state-

21  wide implementation of the CPS Professional Development

22  Training Model, which you began to implement in November of

23  2015.  And it turns out that your SSCCs are not doing that.

24          What's going on with that, Ms. Masters?

25          MS. MASTERS:  I think I need to bring our training

1    director in to speak to that.

2              THE COURT:  Okay.

3         (Pause in the proceeding.)

4              MR. MADRIL:  Hello.

5         (Pause in the proceeding.)

6              MR. MADRIL:  Yes, Your Honor.  My name is Brock

7    Madril.  I'm the Director for Training at DFPS.

8         (Pause in the proceeding.)

9              THE COURT:  Okay.  Do you want me to repeat the

10   question?

11             MR. MADRIL:  Yes, would you please?

12             THE COURT:  Sure.  There is a standard training

13   program for caseworkers.  And apparently, yes -- and

14   apparently, the SSCCs were not using that program, or were

15   abbreviating the program.

16             So what have you done to correct that?

17             MR. MADRIL:  Well, in March we trained three

18   cohorts for OCOK and Two Engaged to give them five months to

19   stand up the infrastructure to implement that program.

20             THE COURT:  All right.  Have you asked them to

21   retrain the ones that they insufficiently trained?

22             MR. MADRIL:  No, ma'am.  I don't know if they had

23   any remedial efforts to retrain those that weren't trained

24   originally.

25             THE COURT:  Well, I don't care what they have.

1 What are your -- you all are in charge of this.  You know,

2 you're the -- you're the parents of these children.  You're

3 the remedial order recipients.

4          What have you done to make sure these caseworkers

5 are properly trained?

6          MR. MADRIL:  Well, we've given them all of our

7 content.  We've trained their trainers.  And we have a

8 resource transfer that gives them FTE's to implement that

9 training.

10          They're well aware of our expectations within

11 their staff.  And we've given them five months to stand up.

12 And it's my understanding that they're moving forward.

13          I do think that they are submitting training

14 records to the Court just as we do.

15          THE COURT:  They're submitting to the Monitors,

16 therefore to the Court.

17          But here's -- here's the issue.  There are

18 caseworkers now that didn't have the training order that

19 I -- training that I ordered.  So what are you doing about

20 that?  This is an easy question.

21      (Pause in the proceeding.)

22          MS. MASTERS:  Your Honor, if -- I will address

23 that with the SSCC and we will get that taken care of.

24          THE COURT:  Okay.  Give me a date where you can

25 get that -- get a response to the Monitors.  How about two

1    weeks, a response to the Monitors on when that training is

2    going to be completed.

3           MS. MASTERS:  Yes.

4           THE COURT:  The additional training.  Okay?

5           MS. MASTERS:  Yes, Your Honor.

6       (Pause in the proceeding.)

7           THE COURT:  And the caseloads are still not

8    conforming.  And we've talked about that.  Mr. Yetter's

9    talked about that.  But I am also very concerned.

10      (Pause in the proceeding.)

11          THE COURT:  I notice that in Texas for the PMC

12   children that 67 percent of the children are African-

13   American or Hispanic.  I also read this strange article in

14   the *Dallas Morning News* about the Commissioner Masters

15   stopping some cultural sensitivity training.

16          What is that about?

17      (Pause in the proceeding.)

18          MS. MASTERS:  Yes.  We no longer provide the

19   knowing who you are training.  It's no longer required for

20   promotion.

21          THE COURT:  And why is that?  Isn't that a

22   national standard?

23          MS. MASTERS:  Yes, that is a training that we

24   are -- we are currently reviewing right now.

25          THE COURT:  So why did you stop it?

1           MS. MASTERS:  Because it needed to be reviewed.

2           THE COURT:  Well, who's reviewing it?

3           MS. MASTERS:  I am reviewing it with our training

4    staff.

5           THE COURT:  Well, isn't -- I thought that this was

6    a national -- a nationally approved program.  What exactly

7    did you need to -- why'd you stop it to review it?

8           MS. MASTERS:  There -- there's been some content

9    that was brought to our attention that we needed to look

10   into.  So it's --

11          THE COURT:  What content -- what content was that?

12          MS. MASTERS:  I can't say exactly, Your Honor,

13   because I haven't had the time to sit down and go through

14   it.

15          THE COURT:  Well, but it was your order that

16   stopped it being administered, right?

17          MS. MASTERS:  That is correct.

18          THE COURT:  And so you don't even have the facts

19   on why that happened?

20          MS. MASTERS:  That's really -- that's really all I

21   can offer at this time.

22          THE COURT:  Have you seen that -- have you seen

23   that training?

24          MS. MASTERS:  I have not.

25        (Pause in the proceeding.)

1           THE COURT:  And you don't know the -- what the

2  bad -- what the objected-to content was, but you stopped it

3  anyway?

4           MS. MASTERS:  No.  I don't have the specifics.

5  So, yes, Your Honor.  That's correct.

6           THE COURT:  Well, how long is that going to be

7  under review?  And who would -- who would be reviewing it?

8           MS. MASTERS:  I don't have a time frame at this

9  time.

10          THE COURT:  Who's reviewing it?

11          MS. MASTERS:  I am, along with our training staff.

12      (Pause in the proceeding.)

13          THE COURT:  And --

14      (Pause in the proceeding.)

15          THE COURT:  -- do you have any way of determining

16  the percentage of minority children, or under-represented

17  groups, that are in family settings compared to non-Hispanic

18  and non-Asian or African-American children?

19          MS. MASTERS:  Yes, Your Honor.  That's data we can

20  pull.

21          THE COURT:  Okay.  Can you supply that to the

22  Monitors, please?

23          MS. MASTERS:  Yes.

24      (Pause in the proceeding.)

25          THE COURT:  Have you started the implementation of

1   a formal mentoring program between the tenured investigators

2   and the new workers?

3          MS. MASTERS:  We have a mentor program that we've

4   had since before I came here.

5          THE COURT:  Okay.  And the state-wide intake

6   performance.  I want to ask about the SWI calls.

7          MS. MASTERS:  If we can bring Steve in.

8          THE COURT:  We've got 20 percent of those are

9   being abandoned.  And that the response time, or -- that's

10  getting the percentages of dropped, not -- not abandoned

11  calls, but the percentages of responded-to calls have gotten

12  lower than the last Report.

13         Do you know what's behind that?

14         MS. MASTERS:  Steven Black, our state-wide intake

15  Associate Commissioner has just come into the room.

16         MR. BLACK:  Yes, ma'am.  It's been increased in

17  volume since school has returned.  Both it's in person and

18  at all.

19         THE COURT:  Do you have any way -- I'm going to --

20  I can't keep circling around -- back around to the vaccine

21  issue.

22         Do you have any way of checking to see if -- what

23  percentage of the at-risk children -- I mean, we have some

24  children that are critically ill with cerebral palsy and all

25  kinds of other things, whether -- what percentage of those

1    children have been vaccinated?

2         (Pause in the proceeding.)

3              MS. MASTERS:  You can just tell her what --

4              MS. BANUELOS:  Oh.  Your Honor, yes.  We can pull

5    a list of our children that are PMN that have critical

6    needs.  And figure out whether or not they've been

7    vaccinated.

8              THE COURT:  How do you find that out by the way?

9    Where do you look?

10             MS. BANUELOS:  We would look to see -- in our

11   IMPACT system we do have an ability to see what child has

12   been designated as a PMN child that has some critical needs.

13   And then we would go to where they're currently placed and

14   follow-up with -- well, we can follow-up with the foster

15   parents.  But we can also do a record match with DHS who has

16   the records of who's been vaccinated.

17             So it's a cross-match between them and us.

18             THE COURT:  And how long will that take, do you

19   think?

20        (Pause in the proceeding.)

21             MS. BANUELOS:  I couldn't say.  I would -- we

22   could put in the request immediately.  And we would ask them

23   to expedite it as soon as possible so that we would get that

24   back to you.  So maybe in a few weeks.

25             THE COURT:  It takes weeks to find out what

1  children are vaccinated in your -- in your care?  You're the

2  parents.

3          MS. MASTERS:  Is that data is held in Dishes

4  (phonetic) system, I think we can't speak for them on how

5  long it would take then to give it to us.  So you could --

6  you could let us check.  And we'll get back to the Monitors

7  right away.

8          THE COURT:  I'm sorry.  I guess the point is you

9  don't have it in your system anywhere when children are

10 vaccinated?

11         MS. BANUELOS:  Not in our IMPACT system

12 specifically, no.

13         THE COURT:  And the PMN children are not -- don't

14 include asthmatics, do they?

15         MS. BANUELOS:  No, not always.

16         THE COURT:  So you -- we need to -- you need to do

17 a deeper search.

18         MS. BANUELOS:  Yes, Your Honor.  We will.

19     (Pause in the proceeding.)

20         THE COURT:  When they're not quite 10,000 children

21 in PMC and less than 25 percent are vaccinated.  So you do a

22 computer check of what 2500?  And see if they're -- never

23 mind.  This is -- it's not going to work for you.

24         But please get it done as soon as you can.

25     (Pause in the proceeding.)

1          THE COURT:  And, you know, when these

2    investigations of the RCCI involving PM children in licensed

3    placements, 39 of the ones that the Monitors determined were

4    inappropriately conducted or resolved were not completed in

5    a timely manner.

6          I'm not understanding why you all are not placing

7    yourselves in these -- in this kind of thing.  Why are we

8    looking at this in the Monitors' Report instead of you

9    saying -- doing something about it yourselves?

10         MS. MASTERS:  Your Honor --

11         THE COURT:  Do --

12         MS. MASTERS:  -- I believe Justin has addressed

13   that.  But he's walking in now.  And he can answer that.

14         THE COURT:  So do you have some kind of computer

15   app or something that lets you know when these things are

16   untimely?

17         MR. LEWIS:  Yes, ma'am.

18         THE COURT:  Well, what are you doing with it?

19         MR. LEWIS:  We get Reports, put this into -- let

20   me break this into two parts.

21         The cases that were looked at the Monitors this

22   time in this Monitor Group Report were done up until June.

23   Those cases were all severely over-due when I came in.

24         What we have in place now, we have multiple levels

25   of oversight on our cases.  We have added extra staffings to

1   keep -- to focus on the front end of the case, instead of

2   getting to the back end of a case and realize --

3             THE COURT:  Do you have a computer thing that'll

4   alert you when the -- an investigation is -- hadn't been

5   completed?

6             MR. LEWIS:  Yes, ma'am.

7             THE COURT:  Well, what do you do about it?

8        (Pause in the proceeding.)

9             MR. LEWIS:  When we find out that a case hasn't

10   been completed, what are we doing about it?

11             THE COURT:  In a timely fashion.  Now there -- I

12   have ordered that these have to be done in "X" amount of

13   days, absent an extension, an approved extension.

14             Almost none of these had any approved extensions,

15   or even request for extensions.  So what did your app

16   actually show you?  That it's 20 days out?  That it's

17   10 days out?  What --

18             MR. LEWIS:  No, ma'am.  It shows -- it shows when

19   -- the print-out that we get or the -- print-out -- the

20   electric file that we get tells us how many cases are over-

21   due.

22             THE COURT:  How many cases are over-due at this

23   moment?

24             MR. LEWIS:  Twelve throughout the whole State.

25             And most of those are because they were returned

1  back to the worker for corrections because they were not --

2  there was something lacking.

3       (Pause in the proceeding.)

4            THE COURT:  So you have only 12 over-due RCCI

5  inspections -- sorry, investigations, that are over-due?

6            MR. LEWIS:  And of this morning, yes, ma'am.

7            THE COURT:  And how many of those had approved

8  extensions?

9            MR. LEWIS:  I don't know that information.

10           THE COURT:  Okay.  Since you've got that in a

11 computer print-out, send that by noon tomorrow to the

12 Monitors, a list of those investigations with the names and

13 the PMC status.

14           MR. LEWIS:  Yes, ma'am.

15      (Pause in the proceeding.)

16           THE COURT:  So what do you do when you find out

17 that they're not -- they're overdue.

18           MR. LEWIS:  What we do now is we have set up a

19 process to where when we realize that a case has gone

20 overdue, the supervisor will counsel with the worker, find

21 out what's happened.

22           We set that worker on a work plan to work through

23 and get that case caught up immediately and done as soon as

24 we can.  They're put on a work plan for 30 days.  It's kind

25 of a develop -- it's -- I don't want to use the word

1   "developmental" because that is part of our progressive

2   discipline process.

3        But that very first one we now sit with the worker

4   and figure out why did this case go over.  Is it case

5   management issues?  Did their -- did it qualify for an

6   improved extension, you just didn't request it?

7        We look to see if things had been asked by the

8   supervisor through the life of the case.  Did the supervisor

9   keep up with the case and the progress of it?  We do a

10  holistic view, a holistic look at the case and tailor the

11  teaching at that moment for that specific case.

12       If it goes forward and we have more delinquent

13  cases from that worker, that worker -- that investigator

14  enters the progressive discipline process.  So we're setting

15  in the training when they first get hired.  Then when

16  they're put out to work the cases, if they start having

17  problems, we address those problems.  After we address those

18  problems, if they still cannot get these cases done in a

19  timely manner, then we go through that progressive

20  discipline process to either fix the problem or relieve the

21  employee of their investigative duties.

22       THE COURT:  Okay.  Well, I know in my Remedial

23  Order Five, for instance, there's the priority one

24  allegations are to be -- have a face-to-face within the

25  first 24 hours.

1          MR. LEWIS:  Yes, ma'am.

2          THE COURT:  And 19 percent of those were not done

3   in a timely fashion.  So what are you doing about that?

4          MR. LEWIS:  In June, I started a tracking and

5   analysis of all of face-to-face contacts missed.  And the

6   purpose of that was to identify misses that were within our

7   control, things that we either just didn't make it out there

8   or something that we had control over.

9          There are certain times we'll -- we can't control

10  whether they make -- make face-to-face contact with them or

11  not.

12         THE COURT:  Well, such as when you can't find the

13  child, but what other excuses?

14         MR. LEWIS:  Well, if the child's on runaway.  If

15  the child has gone back to their parents and their parents

16  refuse to let us talk to them.

17         If they're an unknown victim.  A lot of times we

18  get cases called in with an unknown victim.  So while we're

19  trying to identify who the victim, if that time frame

20  lapses, once we identify who the victim is, we get dinged

21  twice.

22         'Cause as soon as we enter that name into the

23  system, we have a miss for the unknown and we have a miss

24  for the person once we've identified them.

25         For misses that we did have control over, they

1   will follow the same process as untimely investigations.

2       (Pause in the proceeding.)

3           THE COURT:  So 21 percent -- also my Order said

4   that within 24 hours of an investigation of a Priority One

5   Reports must be -- the investigation must be initiated

6   within 24 hours.  And around 25, little less than 25 percent

7   were not timely.

8           What are you -- what are you doing about that?

9           MR. LEWIS:  The same thing as the face-to-face.

10  Initiation for us is only occurs when all face-to-face

11  contacts have been made with all potential child workers.

12  So the same process, Your Honor.

13          THE COURT:  Well, in fact, none of these -- none

14  of these had anywhere near an 80 percent even --

15      (Pause in the proceeding.)

16          THE COURT:  -- timely.  None of the Priority Ones

17  or Twos.  And the extensions for the ones that were not

18  timely were less than 10 percent.

19      (Pause in the proceeding.)

20          THE COURT:  So this is not a good record.  And

21  this is an ongoing problem.

22          Do you anticipate ever solving this or do we just

23  hold you in contempt?

24          MR. LEWIS:  No, ma'am.  A lot of the problem at

25  that point in time was the massive case backlog.  The case

1    backlog was resolved.

2         And since then we have been keeping the overdue

3    cases to a minimum.  We have put in place steps to increase

4    efficiency and increase timeliness, add accountability.

5         When I got here and began to look at things, I

6    noticed pretty quickly that there were two -- two areas that

7    needed major attention.  And that was quality of the

8    investigation and the timeliness of the investigation.

9         I focused on the quality first.  Because without

10   quality, you can have a timely investigation, but if you're

11   not investigating the right things, asking the right

12   questions, talking to the right people, doesn't matter how

13   quickly you get the investigation done.  It's going to be so

14   hard.

15        So we focused on that originally through the

16   summer and through the first part of the fall.  And now

17   we're working on focusing on the timeliness aspect.  A lot

18   of those efforts to focus on timeliness deal with focusing

19   efforts on the front end of the case, not waiting till the

20   middle part of the case, or the latter part of the case to

21   realize you have 13 different things that still need to be

22   done in part of the investigation.

23        So we're moving that to the front end so those

24   things get caught quicker.  We're looking at, for cases that

25   going to need an extension.  'Cause there are cases that

1  will need extensions.  We're looking at that sooner to make

2  sure that that gets put into place and it doesn't get

3  missed.

4          THE COURT:  Do you have an alert system for all

5  these things now?

6          MR. LEWIS:  We have, it's not an automated alert

7  system.  We have proscribed times that the supervisor has to

8  staff the case with the worker.  They have to staff it.

9          THE COURT:  What's the problem with getting an

10  automated alert?  Is that difficult?

11      (Pause in the proceeding.)

12          MR. LEWIS:  That's an IT issue.  I can't answer

13  that.  I can't speak to that.  But I --

14          THE COURT:  If you look into it?  Wouldn't that be

15  helpful for you?

16          MR. LEWIS:  Yes, ma'am, it would be very helpful.

17          But absent that, we set up static points in the

18  timeline of that 30 days that we have to have check-ins on

19  the case at this day, at -- when the case is assigned out,

20  before they leave the -- before the investigator leaves the

21  facility.  They have to have one at day 10, at day 20 and at

22  day 25.

23          So before it was at the beginning, day 10 and

24  day 25.  So we've added two extra slots in the life of the

25  case to have oversight of it.

1          THE COURT:  Can I recommend that you add some kind

2    of slot to comply with my Orders?  That would be even more

3    helpful.

4          MR. LEWIS:  Well, that's a good point.

5          THE COURT:  Or I'm going start -- I'm going to

6    start holding you all in contempt.  This is just dragging on

7    way too long for you all to hem and haw about why you're not

8    able to comply.

9       (Pause in the proceeding.)

10          THE COURT:  And I understand the caseworker can

11   now -- when the -- when complaints are made about children

12   in care, that abuse and neglect complaints, that the

13   caseworker can now look at the substance of the allegation

14   without any problems.

15          Is that right, Ms. Masters?

16          MS. MASTERS:  Yes.

17      (Pause in the proceeding.)

18          THE COURT:  I just -- a question about one of the

19   children that's in the appendices, the child that's placed

20   in New Mexico.  And there was an abuse and neglect.

21          What was wrong with the investigation of that,

22   Ms. Masters, do you know?

23          MS. MASTERS:  I do not.  Do you want to be able to

24   speak to that?

25      (Pause in the proceeding.)

1           THE COURT:  It was recommended the case be closed

2   without investigation?

3       (Pause in the proceeding.)

4           MS. MASTERS:  Who can speak to that?

5           MR. ORTIZ:  I can.

6       (Pause in the proceeding.)

7           MR. ORTIZ:  Good afternoon, Your Honor.  Hector

8   Ortiz.

9           THE COURT:  That you, Mr. Ortiz.

10          MR. ORTIZ:  There was an investigation that was

11  Priority None in New Mexico on a relative where we had a

12  child from the Lubbock area or Amarillo area.

13          THE COURT:  See, I don't know why there was abuse

14  none, they didn't have health insurance or they didn't take

15  the child to the -- three-year-old to the doctor.

16          MR. ORTIZ:  I believe the concerns were with

17  the -- with the aunt who was ill at the time of the intake.

18  There was concerns that the other children that were placed

19  in the home by New Mexico were abusing the children at

20  the -- one of the -- one of the siblings to our child had

21  faced a battery in the child in the mouth.  And there was --

22  there was concerns with the aunt not providing adequate care

23  for that child.

24      (Pause in the proceeding.)

25          MR. ORTIZ:  So New Mexico Priority None.  And

1    that -- and INR was called in to Texas.  And the worker and

2    supervisor worked with New Mexico to resolve any concerns

3    that they had with the home.

4              THE COURT:  So that child -- that home has still

5    -- have foster children in it?

6              MR. ORTIZ:  They -- we still have our child placed

7    in the home.  And they do -- New Mexico has two children who

8    are sibling to our child.

9         (Pause in the proceeding.)

10             THE COURT:  So I'm not understanding why you all

11   did not -- you all did not -- why you all did not

12   investigate this yourselves.

13             MR. ORTIZ:  Because the intake -- or the

14   allegations happened in New Mexico.  So --

15             THE COURT:  Well, you're the parent of the child.

16   And you put the child in New Mexico.

17             MR. ORTIZ:  Correct.

18             THE COURT:  So it had nothing to do with

19   licensing.  I can understand that that would have to be done

20   in New Mexico.  But this is -- this is your placement.

21             MR. ORTIZ:  Right.  So --

22             THE COURT:  And if you can't -- if you can't

23   investigate -- if you don't think you've got the authority,

24   or the wherewithal, or the money, to investigate an out-of-

25   state placement, don't put the children out-of-state.

1          (Pause in the proceeding.)

2          THE COURT:  Okay.  Now OCOK and Remedial Order

3   Number One, CPS professional development, OCOK did not

4   provide reliable information, or reliable data to the

5   Monitors in time for an assessment -- in time for assessment

6   of their professional development program.

7          What was -- what happened with that, Mr. Carson?

8          MR. CARSON:  Thank you, Your Honor.

9          We weren't aware that information had been

10  requested.  I do have the information.  The training dates,

11  the hire dates for the staff that were evaluated that were

12  hired between September 20 and February 21, the training

13  completion dates were January to June of '21.  The new

14  training requirements went into place on March 1st of 2021.

15         And so, although our training was nearly identical

16  to the State's at the beginning, we were --

17         THE COURT:  Well, it's -- it's actually eight

18  weeks.  And the training of the -- of the State that I --

19  that I ordered, is 11 to 15 weeks.

20         MR. CARSON:  Our training is -- I think the State

21  training ordered is 9 weeks and 13 weeks.  Our training is

22  11 weeks and 15 weeks, if I'm correct.

23         So we have two weeks longer training than

24  required.  And the content of the training has been

25  consistent ever since we started with community based case

1  in March of '20.

2         There were some team building and relationship

3  building activities that were different.  But those have

4  been incorporated and so our trainings are identical now.

5      (Pause in the proceeding.)

6         THE COURT:  Okay.

7      (Pause in the proceeding.)

8         THE COURT:  Okay.  Well, it's really DFPS' job to

9  make sure that the training is identical to what the Court

10 has ordered and recognized.  And you can't bypass those

11 training issues by turning these children over to private

12 entities.

13        We got that?

14        MS. MASTERS:  Sure, Your Honor.

15        THE COURT:  Yes.

16        MR. CARSON:  Yes, the training -- the training is

17 identical.

18     (Pause in the proceeding.)

19        THE COURT:  Thank you.

20        I think Two Engage (phonetic) may have had a

21 problem with training.  How is that going?

22        MS. DRYER:  Your Honor, Shirley Dryer.  And we are

23 in compliance with DFS training also.  That started

24 March 1st of this year.  And --

25        THE COURT:  Why -- why is that?  That was ordered

1    a long time ago.

2            Why did you wait till March to be in compliant

3    with the training?  Now you've got all these caseworkers

4    that don't have the right training.

5            MS. DRYER:  When we were approved, our training

6    plan was approved by DFPS, and it was in February of 2021

7    that they told us that we had to change our training to be

8    in compliance with DFPS training.  And then we did.

9         (Pause in the proceeding.)

10            THE COURT:  According to the caseworker load, OCOK

11   had 42 percent of their caseworkers with 18 or more

12   children.  What are you doing about that, Mr. Carson?

13         (Pause in the proceeding.)

14            MR. CARSON:  I believe we had 68 percent of our

15   caseload that was fully compliant at that time.  That data,

16   due to the nature of the reporting, is dated now.  Our

17   compliance is --

18            THE COURT:  It's not the DFPS -- it's the nature

19   of you all's reporting.

20            MR. CARSON:  No.  I think the timeline that ended

21   on that, you know, we've had another --

22            THE COURT:  That's fine.

23            MR. CARSON:  -- four or five months.  Anyway our

24   compliance is significantly higher.  We have --

25            THE COURT:  I think it's DFPS'.

1          MR. CARSON:  Yes, and it's much better today than

2     it was at the time the data was pulled for this Report.

3          THE COURT:  Okay.

4        (Pause in the proceeding.)

5          THE COURT:  And the caseloads of those caseworkers

6     who share -- carry the children with unlicensed placements

7     is even more grim.

8        (Pause in the proceeding.)

9          THE COURT:  And I noticed also in the Monitors'

10    Report that --

11       (Pause in the proceeding.)

12         THE COURT:  -- those inspectors for -- in HHSC,

13    that half of the ones interviewed indicated that secondary

14    assignments do not appear on their caseload reports.

15         So, Ms. Young, will you do something about that?

16         MS. YOUNG:  Yes, ma'am.  I would like to have Jean

17    Shaw (phonetic) speak to this.  Thank you --

18         THE COURT:  Okay.

19         MS. YOUNG:  -- Your Honor.

20         MS. SHAW:  Yes, Your Honor.  We're currently

21    watching our staff's workload.  We do have secondary

22    assignments for staff that are considered there's a need for

23    a computer destination so the staff can have access to

24    workload information.  They don't have access to when

25    they're assigned as the primary worker.

1          (Pause in the proceeding.)

2          THE COURT:  Well, you need to start reporting that

3    in the Reports those secondary jobs, also.

4          MS. SHAW:  Yes, Your Honor.  We've been talking to

5    monitoring about how to make those reports.

6          (Pause in the proceeding.)

7          THE COURT:  And did you all review the

8    insufficient -- the investigations that Monitors found to be

9    insufficient in the appendices to the Report.

10          Ms. Young?

11          MS. YOUNG:  Go ahead, Jean.

12          MS. SHAW:  Yes, Your Honor.

13          THE COURT:  Ms. Shaw.  Okay.

14          MS. SHAW:  Yes.  Yes, we did review that.

15          THE COURT:  And?

16          MS. SHAW:  And the report in the appendices, I

17    believe, related to DFPS abuse and neglect investigations.

18    But we did review the concerns with the Monitors about

19    deficiencies being cited or not cited as a result of those

20    investigations.

21          We've identified some areas of additional work we

22    need to do.  And we're going to look further into those.

23          (Pause in the proceeding.)

24          THE COURT:  A lot of these facilities where these

25    incidents occur have been closed.  There was one, I don't

1    know which appendices it was in, but the caseworker went to

2    the home.  It was a home placement.  And the foster parents

3    didn't allow the caseworker to look through the house.

4              Ms. Fowler, do you remember which one that was?

5         (Pause in the proceeding.)

6              MS. FOWLER:  Judge, I think that -- I did not

7    review that investigation.

8              THE COURT:  Okay.

9         (Pause in the proceeding.)

10             THE COURT:  On the summary of RCCR Minimum

11   Standards Investigation Findings assigned to Priority III,

12   that was Case I.D. 2729843 where the child had suicidal

13   ideas.  She hadn't had a prescription medicine for five days

14   because the staff member didn't refill the prescription.

15        (Pause in the proceeding.)

16             MS. SHAW:  Your Honor, I'm sorry to ask.  Would

17   you mind repeating the investigation number?  We're trying

18   to look up that in the remedial report.

19             THE COURT:  Two, seven, two, nine, eight, four,

20   three.

21             MS. SHAW:  Thank you.

22        (Pause in the proceeding.)

23             MS. SHAW:  I'm sorry, Your Honor, we're having --

24   I'm tracking that --

25             THE COURT:  That's all right.  How about this one,

1   74604019.  Seven, four, six, oh, four, oh, one nine.

2        (Pause in the proceeding.)

3            MR. RYAN:  Judge, that's Number 13 in the

4   Appendix.

5            THE COURT:  Yes.

6            MR. RYAN:  For ease of reference.

7            THE COURT:  Thank you.  Thank you, Mr. Ryan.  And

8   that was --

9            MS. SHAW:  Thank you.  I appreciate that.

10           THE COURT:  -- where the foster father was making

11  derogatory and degrading comments to the child.  And --

12       (Pause in the proceeding.)

13           THE COURT:  -- the foster home is still open in

14  spite of not just that complaint, but other complaints,

15  about persistent threats of bodily harm.

16           MS. SHAW:  Yes, Your Honor.  We're over --

17           THE COURT:  Verbal abuse.  And that home is still

18  open?

19           MS. SHAW:  Yes, Your Honor.  We'll go in and look

20  closely at that case and see if we need to recommend the

21  possible closure of that foster home.

22       (Pause in the proceeding.)

23           THE COURT:  Okay.  I think that's it.

24           Monitors, is there something I'm missing that you

25  want me to discuss in the -- in your current Report?

1          MR. RYAN:  Not from me, Your Honor.

2          THE COURT:  Ms. Fowler?

3          MS. FOWLER:  No, not from me.

4      (Pause in the proceeding.)

5          THE COURT:  So on the last item.

6      (Pause in the proceeding.)

7          THE COURT:  Panel Members, do you all know

8  anything about this TEP, was it in other states?  We're not,

9  again, we're not talking about the compassionate respite

10 care.  But this TEP business?

11         MS. MELTZER:  So we didn't look specifically into

12 TEPs.  But my understanding is that they are really designed

13 to be emergency, short-term placements.  In many systems

14 that I've been -- work with have had, you know, some kind of

15 short-term emergency placement they use.

16         THE COURT:  How about 2,900-and-some-odd days in

17 an --

18         MS. MELTZER:  No.

19         THE COURT:  -- in a non --

20         MS. MELTZER:  That's what I was going to say.

21         The -- we -- again, we did not look at it in

22 depth.  But it is -- seems like it is used to a very great

23 extent, and that actually children stay in these facilities

24 in the TEP placement sometimes for much longer than you

25 would want.

1          So it's a large -- you know, we think it's worth

2  looking at as an area for reform.

3          THE COURT:  I'm real concerned about that.

4  Because it seems to be a substitute for the child, the --

5  the placements of children without placements.  So they put

6  them from the unlicensed placements to the TEP, back to the

7  unlicensed, and back and forth --

8          MS. MELTZER:  Right.

9          THE COURT:  -- and back and forth.

10          MS. MELTZER:  Right.

11          THE COURT:  And, of course, TEP gets them over

12  $400 a day, too --

13          MS. MELTZER:  Right.

14          THE COURT:  -- per person.

15          MS. MELTZER:  And, you know, it's part of the same

16  pattern of instability --

17          THE COURT:  It's not good.

18          MS. MELTZER:  -- for children.  Right.

19          THE COURT:  And that's what the SSCCs are doing,

20  but they're calling them Steps.

21          MS. MELTZER:  Right.

22     (Pause in the proceeding.)

23          THE COURT:  This is my catchall folder I'm going

24  through to make sure I've asked everything that I want to

25  ask.

1        (Pause in the proceeding.)

2        THE COURT:  Back in a hearing in May of 2021,

3  according to the Monitors' Report, the staff -- many of the

4  staff in these placements were unaware that they were

5  supposed to report abuse and neglect SWI, which is Remedial

6  Order Four.

7        What has been done to facilitate that?

8        MS. BANUELOS:  Your Honor, after that, we did go

9  back.  We are mandating Orders.  We have to report by law.

10 And so we did go back and reiterate it to the caseworkers,

11 along with the regional directors that we must report, if we

12 suspect that there is any abuse or neglect going on.

13 Whether it be a licensed or unlicensed placement, we must

14 report.

15       THE COURT:  And also back in May of last year,

16 DFPS had some concerns about abuse and neglect downgrades by

17 HHSC, I think vice-versa.

18       You think this cooperative panel will help with

19 that?

20       MS. BANUELOS:  Yes, Your Honor.

21     (Pause in the proceeding.)

22       THE COURT:  And are you carefully monitoring

23 the -- you know, those private facilities that surrendered

24 their licenses and make sure they're not opening up new

25 facilities under another name?

```
1              MS. SHAW:  Right.  Your Honor, this is Jean Shaw.

2              Yes, if an operation chooses to reapply under a

3    different name, we now have rules in place that would

4    combine the history from the prior operation --

5              THE COURT:  Okay.

6              MS. SHAW:  -- to the new operation.

7         (Pause in the proceeding.)

8              THE COURT:  The Monitors still report, and we

9    talked about this again last May, that caregivers are not

10   receiving the Attachment As, which has to do with child

11   sexual aggression or victimization history.

12             I don't know how you, you know, who -- who's in

13   charge of that or how that can be rectified.  But it needs

14   to be done rather quickly.  Because clearly it's not

15   happening, or in the -- even in the places where it's

16   happening, nobody's -- some people are not paying attention.

17             MS. BANUELOS:  Your Honor, may I speak to that?

18             THE COURT:  Yes.

19             MS. BANUELOS:  So we understand the importance of

20   it.  And we did under my --

21             THE COURT:  Who's speaking?  I'm sorry.

22             MS. BANUELOS:  Sorry.  Your Honor, this is Erica

23   Banuelos.

24             THE COURT:  Thank you.

25             MS. BANUELOS:  So we did -- we have currently
```

1    about five program specialists who have -- are working under

2    a director who is specifically looking at Attachment A.

3         The information, the quality of the information

4    that is in there to ensure, number one, that it is correct

5    and two, that it's being given to the caregivers.  So we

6    started working on that about, I want to say, maybe about

7    six months ago.  And so we've made some -- some good, I want

8    to say that we made some changes to look at the quality and

9    ensure those are being given out.  And we continue to

10   monitor that very closely.

11        'Cause we know how important that information is

12   to keep the kids safe.  So we have implemented that process.

13        THE COURT:  Are you all -- is the Department

14   making unannounced visits to check on 24-hour overnight --

15   the away night supervision?

16        MS. BANUELOS:  Yes, we are, Your Honor.

17        THE COURT:  And how is that going?

18        MS. MASTERS:  To my knowledge, it's going well and

19   as expected.

20        (Pause in the proceeding.)

21        THE COURT:  And what does it mean when they --

22   when a facility says they have virtual contract-only on --

23   in the isolation plan?

24        What did -- what kicks them into that?  This has

25   to do with COVID.

1          (Pause in the proceeding.)

2          MS. DRYER:  I think that's referring to if they

3     have over 10 percent of their -- of anyone in their

4     facility, once they reach that threshold, then workers are

5     asked not to come in.  But they can do the virtual visits

6     and keep in contact with the kids.

7          And then once they reach back down under that

8     threshold, they can go visit face-to-face.

9          THE COURT:  So what about the staffing?  What do

10    you know about the staff of these nine entities that are now

11    on this COVID isolation business?

12         MS. DRYER:  Yes, they're ones, Your Honor, that

13    have gone above the 10 percent threshold.

14         THE COURT:  Right.  But have you checked on their

15    staffing issues?

16         (Voices speaking off the record.)

17         MS. DRYER:  It is -- it would be my understanding

18    that they would be just like all the other facilities.

19    There's not something different that would be done.

20         THE COURT:  Well, how did you check on that if

21    you're not allowed to go in?

22         MS. DRYER:  My guess is that they would come up

23    for their time to have the visit, they would either do that

24    virtually at the time or they would put them in another

25    status to go out once they come down off that threshold.

1          THE COURT:  Well, you're talking about the

2    caseworker face-to-face visits.  I'm talking about how do

3    you check that the staffing is adequate for these children?

4          MS. MASTERS:  Jillian, can you take that?

5          MS. BONACQUISTI:  Yeah.  I can speak to that, Your

6    Honor.  That is -- what you're referring to is caregiver

7    ratios.  And that is something that is monitored by HHSC.

8          THE COURT:  Ms. Young, what do you know about

9    this?

10         MS. SHAW:  Your Honor, this is Jean Shaw.

11         Our staff are still going out and conducting

12   routine inspections --

13         THE COURT:  Okay.

14         MS. SHAW:  -- and investigations, regardless of

15   any kind of percentage rate of infected at the operation.

16         THE COURT:  Okay.  And by the way, all of your --

17   all of your people are vaccinated, right?

18         MS. SHAW:  Your Honor, are you referring to our

19   staff?

20         THE COURT:  Yes, that are going out to these

21   places to be -- to inspect?

22         MS. SHAW:  So we don't have a requirement for a

23   vaccine, a mandatory requirement.  They are -- all are

24   provided with PPE equipment to ensure that --

25         THE COURT:  Okay.

1          MS. SHAW:  -- we're safe.

2          THE COURT:  So you don't know what their

3   vaccination status is?

4          MS. SHAW:  No, Your Honor.  I don't.

5      (Pause in the proceeding.)

6          THE COURT:  Okay.  Anything else that you all --

7   anybody here that wants any of the parties?  Any of the

8   attorneys?  Monitors?  Any questions?

9          MR. NEUDORFER:  Your Honor, this is Karl

10  Neudorfer, counsel for DFPS.  I'm wondering if I could just

11  have a brief period, five minutes to cover the caseworker

12  caseload issue?

13         THE COURT:  Yes, sir.

14         MR. NEUDORFER:  Thank you, Your Honor.  And Your

15  Honor, I'll direct my questions to Ms. Banuelos.

16         Ms. Banuelos, how are we tracking caseworker

17  caseloads today?

18         MS. BANUELOS:  So we are tracking it through

19  various methods.  We deployed a caseload tracking tool that

20  is available to every worker, every supervisor.  It's a very

21  easy hyperlink that they can get on and it shows the entire

22  state.

23         And so that, not just -- that just -- doesn't just

24  include like their regular workload.  It also captures if a

25  worker is on a graduated caseload, so a supervisor could see

1  if the workers are within the threshold or not.  And then it

2  also encompasses the SSCC's workload.

3          So we're using that.  We also have some reports

4  that we can look on data warehouse to look at the child

5  count.  And that is also -- when supervisors are

6  conferencing monthly with workers, they also talk about the

7  child caseload counts.  When we're trying to hire staff, we

8  are looking at the child case count.

9          MR. NEUDORFER:  And so when a supervisor receives

10  notification through this tool that you mentioned that a

11  case -- a caseworker's caseload is -- looks like it may be

12  excessive, what actions are taken in response to that?

13          THE COURT:  What is excessive?  What is excessive

14  in your opinion?  Give me the definition before --

15          MS. NEUDORFER:  Your Honor, when a -- when a

16  caseworker's caseload begins to exceed the guidelines that

17  are --

18          THE COURT:  Okay.

19          MS. NEUDORFER:  -- in here, 18 and up.

20          THE COURT:  Do you have an -- do you have an alert

21  system for that?

22          MS. BANUELOS:  We do.  So the daily caseload

23  tracker does capture that.  It turns a different color when

24  a worker is above a threshold.

25          THE COURT:  Thank you.

1          MS. BANUELOS:  They are able to see that, Your

2    Honor.

3          THE COURT:  So that's -- then what happens?

4          MS. BANUELOS:  So as I mentioned, the supervisors

5    do have conferences with workers to try to figure out if

6    they can move cases.  If they can't, how to support them.

7          They will work together as a team within a unit to

8    see children and make sure that all the kids get seen.

9    There's a lot of strategizing that goes on at the program

10   level, at the Program Director level, and even up to their

11   Regional Director level.

12         We absolutely understand that getting caseworkers

13   with 17 and below is definitely our target.  And so we

14   continuously try to strategize and work on how we can make

15   that happen.  And work Regional Directors at the Regional

16   level have implemented various plans to try to get there.

17         THE COURT:  So do you have a management report

18   that shows state-wide caseloads on a worker on any given

19   day?  Do you have those that -- that can be printed out and

20   given at least weekly to the Monitors?

21         MS. BANUELOS:  I know -- I know that the daily

22   caseload tracking tool does.  It's a real time.  I don't

23   know if we can print it out and -- but I can find --

24         THE COURT:  Well, could they just -- could they

25   have --

 1              MS. BANUELOS:  I do have --

 2              THE COURT:  -- access to it?  Is it on a computer

 3    thing where they can access it with their -- with their

 4    authority?

 5              MS. BANUELOS:  Yes.  It's in IMPACT.  So I'm

 6    assuming that if the Monitors have access to our IMPACT

 7    system, they can usually find it on the workload.

 8              But let me get that answer for you.

 9              THE COURT:  Okay.  Because they're getting it

10    every 30 days.  And that's really not enough for our

11    purposes of tracking.

12              MS. BANUELOS:  I understand, Your Honor.

13              THE COURT:  If you can do it -- if you can do it a

14    little bit, you know, weekly.  Or if they can have access to

15    the dailies, without even having to print it out, or going

16    to any extra trouble, that would be really helpful.

17              MS. BANUELOS:  Absolutely, Your Honor.

18              THE COURT:  How are you all doing in both HHSC and

19    DFPS on your caseworker turnover?

20              MS. BANUELOS:  So on the -- what I can speak to on

21    the DFPS side for turnover, you know, we have seen an

22    increase.  And I think the Monitors in some of their

23    interviews that with caseworkers, you know, caseworkers did

24    talk about their stress level with everything -- all the

25    various things we have going on.

1            So we have seen some turnover.  So between the

2    period that the Monitors graded, we did lose -- we hired

3    about 319 caseworkers, but we also had 309 caseworkers leave

4    at the same time.

5            So we definitely have struggled a little bit with

6    turnover where in the past we had not.  With that said, we

7    were very fortunate to get some appropriations this past

8    session with -- and if I could just explain a little bit

9    about that, Your Honor?

10           THE COURT:  Please.

11           MS. BANUELOS:  So we did get some additional

12   caseworker positions to assist with bringing down the child

13   caseload.  And those positions came in towards the end of

14   May.

15           And so in May we started, I'm sorry, in June of

16   2021, we started hiring.  And so we had about 129

17   caseworkers and supervisor positions to bring down the

18   ratio.

19           And I want to tell you, Your Honor, that I -- as I

20   was trying to determine where to place these positions, I

21   specifically looked at the child count across the State to

22   determine where I needed to put the positions.

23           And so that I how I allocated them.  Now these

24   positions were hired sometime in June.  We do have a 13-week

25   training program.  And in addition to that, we have two

1    months of graduated caseload.

2         So when you look at the entirety of when these

3    caseworkers will actually be fully case assignable, we're

4    looking at about seven months down the line.  And that's

5    okay.  Because we need to make sure that they are -- they're

6    trained properly.  And we need to make sure that they have

7    some good experience while they're doing their graduated

8    caseload.

9        (Pause in the proceeding.)

10            THE COURT:  Thank you.

11            MS. BANUELOS:  You're welcome.

12            THE COURT:  Any other attorneys want any other

13   questions of any of the people while they're here?

14            MR. YETTER:  Your Honor, I have -- I'd like to

15   follow-up on that last line of questioning about caseloads

16   with Ms. --

17            THE COURT:  Sure.

18            MR. YETTER:  -- Banuelos.

19        You say that this is a real time daily caseload

20   tracking tool that allows you to see across the State the

21   various caseloads for all of the conservatorship caseworks?

22   Am I right about that?

23            MS. BANUELOS:  That is correct.

24            MR. YETTER:  And you've seen the statistics in

25   the -- that the latest Report of the Monitors put out.

1          What is the -- which are dated a couple of months

2    ago.  Do you have a current statistic for the percentage of

3    conservatorship caseworkers that have 18 or more children on

4    their caseload?  In other words, they're in violation of the

5    standard?

6          MS. BANUELOS:  I can certainly -- I could look

7    that up right now.  If you'd just give us a second.  Because

8    we do have the daily caseload tracker and I can get that for

9    you.

10          I will tell you, Mr. Yetter, that we have

11   consistently stayed at about 40 percent of them being 18 and

12   up.  And when I drill it down to what it looks like,

13   specifically, we have over 1,000 that are 17 and below.  And

14   we typically run about 570 maybe that are between 18 and 25.

15   And then we have, I want to say maybe less than a hundred

16   that are between 25 and higher.

17          MR. YETTER:  So --

18          MS. BANUELOS:  But I'll look at the daily caseload

19   right now and I can give that to you.

20          MR. YETTER:  That would be helpful.

21          THE COURT:  When I saw, Mr. Yetter, what I saw in

22   one of the footnotes, or somewhere in one of the Monitors'

23   Reports, is that a lot of those with the huge caseloads of

24   over 18 and 25 and older -- over, were -- included cases

25   with that, children without licensed placements, which is

1  every more frightening.

2           MR. YETTER:  Yeah.  And that -- yes, Your Honor.

3  I'd like to follow-up on that.

4           So just a couple of questions, though.  Where

5  geographically in the State are you finding the most

6  violations of the standard?

7           MS. BANUELOS:  So Travis County, Region VII,

8  typically is a little bit higher on their child case count.

9  That is where I did allocate a lot of additional positions.

10          And then also in the area of III West, which would

11  be what's not outsourced around Harris County, around that

12  area.  Those were the two highest ones.  And then we have

13  Bexar County.

14          THE COURT:  Okay.  So what -- what about -- can

15  I -- did I get the answer about caseworker turnover?

16          MS. DRYER:  We've gone in the last six months,

17  Your Honor, from 25 percent to 30 percent.  So we have seen

18  an increase.

19          THE COURT:  Okay.  And that's HHSC or D --

20  where -- where am I?

21          MS. DRYER:  This is DFPS for CPS.

22          THE COURT:  And what about, Ms. Young, what about

23  your turnover rate?

24          MS. SHAW:  Your Honor, this is Jean Shaw.

25          We are averaging a turnover rate in our

1  residential childcare program of anywhere from 15 to

2  20 percent per month.

3          We are actively hiring.  That was --

4          THE COURT:  Per month?

5          MS. SHAW:  On an average, yes.

6      (Pause in the proceeding.)

7          MR. YETTER:  Is that on an annual average?  Is

8  that -- you're not saying you're losing --

9          THE COURT:  Every month, she's saying.

10         MS. SHAW:  Our turnover rate is -- it's not

11 actually new people it's maybe carryover until we're hiring,

12 we have a vacancy rate of about -- I'm sorry, I'm speaking

13 too much over, my apologies.

14         THE COURT:  Okay.  Vacancy.  Okay.  So that's the

15 consistent one.

16         MS. SHAW:  Yes.

17         THE COURT:  You're not losing 15 to 20 percent of

18 people very month.

19         MS. SHAW:  No, Your Honor.  I'm sorry.  That's my

20 apology for the confusion.

21     (Pause in the proceeding.)

22         THE COURT:  What about -- do you have a turnover

23 rate?  Is the investigators or anything else in your staff?

24         MS. SHAW:  I can get that for you.  I don't have

25 the information right now.

1          THE COURT:  Could you get that to the Monitors by

2    noon tomorrow, please?

3          MS. SHAW:  Yes, Your Honor.

4      (Pause in the proceeding.)

5          MR. YETTER:  Your Honor, if I could just follow-up

6    just a couple more questions --

7          THE COURT:  Yes, go ahead.

8          MR. YETTER:  -- if we could go back to the DFPS?

9          Ms. Banuelos, in the -- it is clear, is it not,

10   that the children without -- children in unlicensed

11   placements is causing -- is placing additional, significant

12   burden on the caseworkers for DFPS; is it not?

13         MS. BANUELOS:  I would agree that it is really

14   difficult for caseworkers.

15         MR. YETTER:  And that additional burden is adding

16   to the turnover; you'd agree?

17         MS. BANUELOS:  I would agree.  In their reason for

18   leaving, they have cited that they are very high stressed.

19         MR. YETTER:  So you really have two huge problems;

20   the placement crisis and the caseload crisis, which are --

21   which are interdependent.  And solving the placement crisis

22   will help you with your caseworker crisis, right?

23         MS. BANUELOS:  I would absolutely agree with that.

24         MR. YETTER:  All right.  So there's no time to

25   lose in solving the placement crisis, because it is also

1   causing you to lose seasoned, valuable caseworkers which is

2   making the children in licensed placements, putting them at

3   risk as well is it not?

4           MS. BANUELOS:  I'm sorry.  Can you repeat that?

5           MR. YETTER:  Sure.  There's no time to lose,

6   because until you can solve the children in unlicensed

7   placements, you're going to be putting a tremendous stress

8   on your conservatorship caseworkers, which puts the children

9   in licensed placements at risk, right?

10          MS. BANUELOS:  Yes.

11          MR. YETTER:  Okay.  I think that's all I have,

12  Your Honor.

13          THE COURT:  Anybody have any other questions?

14      (No audible response.)

15          THE COURT:  I want to thank you all very much for

16  coming.  And I really appreciate the cooperative attitude

17  today and hope we can expand on that for the sake of these

18  children and avoiding problems in the future.

19          And I'll be anxious to hear how your meeting goes

20  with the Panel tomorrow, and the Monitors, and the parties.

21          And thank you, Panel.  I feel like you validated

22  the work of the Court and the Monitors today.  And I've very

23  grateful.  And --

24          MR. VINCENT:  Glad to be helpful.

25          THE COURT:  Thank you very much.

1          MR. YETTER:  We say the same on behalf of the

2     children, Your Honor.

3          THE COURT:  You're excused.  Thank you.

4        (Proceedings adjourned at 2:56 p.m.)

5                         *  *  *  *  *

6          *I certify that the foregoing is a correct*

7     *transcript to the best of my ability due to the condition of*

8     *the electronic sound recording of the ZOOM/video/telephonic*

9     *proceedings in the above-entitled matter.*

10    */S/ MARY D. HENRY*

11    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

12    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

13    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

14    *JTT TRANSCRIPT #65043*

15    *DATE FILED:  JANUARY 17, 2022*

16

17

18

19

20

21

22

23

24

25