IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity | § | |
| as Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |

### Update to the Court Regarding COVID-19 Vaccination Status of Children in the Permanent Managing Conservatorship of DFPS

On January 11, 2022, the Court held a hearing to review the Third Report of the Monitors and the State's progress with the Court's Remedial Orders. During the hearing, the Department of Family and Protective Services ("DFPS") agreed to provide the Monitors with data and information regarding the vaccination status of children in the Permanent Managing Conservatorship ("PMC") of DFPS by January 14, 2022. DFPS provided the information to the Monitors; this report updates the Court about the vaccination status of the PMC children based on the DFPS data. The DFPS data and information file includes the vaccination status for the 9,712 children in PMC status as identified by DFPS.

DFPS' most recent report to the Monitors of the number of PMC children who tested positive for COVID-19 indicated that between September 1, 2021 and February 17, 2022, 579 PMC children tested positive.[1] Earlier reports show the impact of the Omicron variant on the number of PMC children testing positive: On December 13, 2021, 87 children had tested positive since September 1, 2021.[2]  Between April 20, 2020 and February 17, 2022, 22 PMC children were hospitalized with a primary diagnosis of COVID-19, and 51 PMC children had a secondary-

---

[1] E-mail from Eliza Martinez, Assistant to Deputy Commissioner Corliss Lawson, DFPS, to Deborah Fowler and Kevin Ryan, re: COVID Testing for PMC Children as of 2.18.2022, February 23, 2022 (on file with the Monitors). Prior to October 4, 2021, the weekly reports provided by DFPS showed the number of PMC children tested, and the results of those tests, from the date that the State began collecting the data after the onset of the pandemic.  On October 4, 2021, the weekly report shared testing data only from September 1, 2021, forward.  On September 27, 2021, the last date that DFPS reported the full testing data, DFPS reported that as of September 23, 2021, 847 PMC children had tested positive for COVID-19.  E-mail from Eliza Martinez, Executive Assistant to Chief Compliance and Strategy Officer Corliss Lawson, DFPS, to Deborah Fowler and Kevin Ryan, re: COVID Testing for PMC Children as of 9.24.2021, September 27, 2021 (on file with the Monitors).

[2] E-mail from Eliza Martinez to Deborah Fowler and Kevin Ryan, re: COVID Testing for PMC Children as of 12.10.2021, December 13, 2021 (on file with the Monitors).

COVID diagnosis during a hospitalization.[3]  Two PMC children had both COVID-primary and COVID-secondary hospitalizations, one PMC child has had two COVID-secondary hospitalizations, and one PMC child has had a COVID-primary and two COVID-secondary hospitalizations.[4]

Between December 9, 2021, and February 17, 2022, the number of hospitalizations for PMC children with COVID-primary and -secondary diagnoses increased by 14.  Those 14 hospitalizations of PMC children over eight weeks, compared to 54 earlier hospitalizations over approximately 21 months, shows a significant increase in hospitalizations during the surge caused by the Omicron variant.[5]  Much of that occurred over the course of just two weeks: between January 27, 2022, and February 11, 2022, eight PMC children were hospitalized with COVID-primary and -secondary diagnoses. Recent data released by the Centers for Disease Control and Prevention (CDC) shows the importance of vaccination for preventing serious illness in children. According to data released by the CDC in December 2021, compared to COVID-19 associated hospitalizations among fully vaccinated persons in their age group, hospitalizations among unvaccinated adolescents ages 12 to 17 years old were eight times higher.[6]  This is consistent with Texas reports of hospitalizations for children outpacing children's vaccinations.[7]

As of February 17, 2022, DFPS reported that only one of its contracted congregate care facilities was on virtual-contact only status, due to a high number of children testing positive for COVID-19.[8]  This represented a significant reduction from just four weeks earlier, when 14 operations were on virtual-contact only.[9]  One RTC, New Horizons Ranch RTC, was finally removed from virtual-contact only status on January 28, 2022, after having been on virtual-contact only since December 3, 2021.[10]  As the spike in cases caused by the Omicron variant increased the

---

[3] E-mail from Eliza Martinez, *supra* note 1. STAR Health considers a hospitalization "COVID-secondary" if the child had a COVID diagnosis during hospitalization but this was not the reason for admission.  *Id.*

[4] *Id.*

[5] A jump in the number of hospitalizations of PMC children also occurred during the surge in COVID-19 cases caused by the Delta variant.  Between July 29, 2021 and October 7, 2021, the number of PMC children hospitalized increased by nine.  E-mail from Eliza Martinez to Deborah Fowler and Kevin Ryan, re: COVID Testing for PMC children as of 8.02.2021, August 2, 2021 (on file with the Monitors); E-mail from Eliza Martinez to Deborah Fowler and Kevin Ryan, COVID Testing for PMC children as of 10.08.2021, October 11, 2021 (on file with the Monitors).

[6] CDC, *COVID Data Tracker: Rates of laboratory-confirmed COVID-19 hospitalizations by vaccination status*, *available at* https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination

[7] Karen Brooks Harper & Carla Astudillo, *For Texas children, COVID-19 hospitalizations are outpacing vaccinations* The Texas Tribune (January 14, 2022), *available at* https://www.texastribune.org/2022/01/14/texas-covid-19-children-hospitalizations/

[8] E-mail from Eliza Martinez, *supra* note 1.

[9] E-mail from Eliza Martinez to Deborah Fowler and Kevin Ryan, COVID Testing for PMC children as of 1.21.2022, January 24, 2022 (on file with the Monitors).  The fourteen operations on "virtual contact only" were: New Horizons Ranch RTC, Road to Wisdom, Roy Maas Youth Alternatives - The Meadows RTC, The Settlement Home, Hands of Healing, St. Peter – St. Joseph Children's Home, Hearts with Hope Foundation, Roy Maas Youth Alternatives Girlsville/Junction, New Life Children's Treatment Center, Texas Girls and Boys Ranch Children's Shelter, Pegasus Schools, Inc, Trinity Home of Faith, 1 CeRenity Place, and Mission Road Development Center.

[10] E-mail from Eliza Martinez to Deborah Fowler and Kevin Ryan, COVID Testing for PMC children as of 1.28.2022, January 31, 2022 (on file with the Monitors).

number of PMC children testing positive, the number of congregate care facilities on virtual-only contact also increased; on December 10, 2021, only two facilities were on virtual-only status.[11]

HHSC sends the Monitors a weekly report of the number of positive COVID-19 cases reported to the agency by licensed operations, including both the number of all children in care (not just the children in the PMC class) who tested positive and the number of adult caregivers who tested positive for COVID-19. The Monitors' analysis of trends in the data reported by HHSC shows that the COVID-19 cases reported for children in care increased 323% between January 2021 and January 2022, more than double the 150% increase reported for adult caregivers over the same period. The trends in positive cases reported to HHSC by licensed settings are driven almost entirely by congregate care settings. The table, below, summarizes the results of HHSC's survey as of January 27, 2022.[12]

| Count of Recorded Positive COVID-19 Cases at Licensed Operations | | |
|---|---|---|
| **Operation Type** | **Sum of Reported COVID-19 Cases for Children in Care Recorded as of 1/27/22** | **Sum of Reported COVID-19 Cases for Adult Caregivers Recorded as of 1/27/22** |
| Child-Placing Agency - Adoptive Only Home | 2 | 4 |
| Child-Placing Agency - Foster Home or Foster/Adoptive Home | 2021 | 2438 |
| Child-Placing Agency – Staff | 7 | 136 |
| General Residential Operation – Other | 7295 | 2231 |
| General Residential Operation – RTC | 872 | 687 |
| **Grand Total** | **10197** | **5496** |

New COVID infections among children in congregate care settings (GROs) outnumbered infections among children in other settings in 10 of 12 months in 2021, even though most children in foster care are placed in foster homes, rather than congregate care settings.[13]

---

[11] E-mail from Eliza Martinez, *supra* note 2.

[12] E-mail from Katy Gallagher, Attorney – Foster Care Litigation, to Deborah Fowler and Kevin Ryan, re: HHSC Weekly COVID-19 Reporting, January 28, 2022 (providing link to updated spreadsheet with data)(on file with the Monitors).

[13] *See* DFPS, Monthly Data: Children in Substitute Care by Living Arrangement Categories for Children Ages 0-17, Fiscal Year 2022 Year-to-Date, *available at* https://www.dfps.state.tx.us/About_DFPS/Monthly_Data/default.asp

**Figure 1: Confirmed Covid-19 Cases Added per Month for Children in Care by Operation Type and for Children 10 to 19 Statewide, January to December 2021[14]**



Covid-19 Diagnoses,  Jan-December 2021, DSHS Covid-19 Confirmed Case Demographics CY21

I.    DFPS POLICY REGARDING COVID-19 VACCINATION

As the federal government's emergency authorization for the COVID-19 vaccinations expanded to cover younger children over the course of 2021, DFPS's policy regarding COVID-19 vaccination changed.  On December 11, 2020, the United States Food and Drug Administration (FDA) issued its original emergency authorization for the Pfizer-BioNTech COVID-19 Vaccine, which covered adults and teens aged 16 and 17 years old.[15]  The Texas Department of State Health Services (DSHS) subsequently allocated vaccines in phases, with health care workers prioritized for vaccinations in Phase 1A, and Texans with underlying health conditions placing them at higher risk for severe illness or death prioritized in Phase 1B.[16]

---

[14] For children in care, number represents newly added cases in the month as of the following dates:  January 28th, February 25th, March 31st, April 29th, May 27th, June 24th, July 29th, August 26th, September 30th, October 28th, November 28th, and December 30th. Statewide cases for children 10 to 10 represent all confirmed cases in the month.

[15] U.S. Food & Drug Admin. (FDA), *FDA News Release: FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine*, December 11, 2020, *available at* https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19

[16] *See* DSHS, COVID-19 Vaccine Allocation Phase 1A Definition, December 17, 2020, *available at* https://dshs.texas.gov/coronavirus/immunize/vaccine/EVAP-Phase1A.pdf; DSHS, COVID-19 Vaccine Allocation Phase 1B Definition, December 29, 2020, *available at* https://dshs.texas.gov/coronavirus/immunize/vaccine/EVAP-Phase1B.pdf

On January 15, 2021, DFPS issued a memo to all conservatorship staff noting that some teens in DFPS's care would be eligible for vaccination in Phase 1B:

Under Phase 1B of the Texas COVID-19 vaccine rollout, some older youth with chronic medical conditions will be eligible for a COVID-19 vaccine. Vaccine supply remains limited, but more will be delivered to providers each week. Specific to youth in conservatorship, eligibility includes people 16 years of age and older with at least one chronic medical condition that puts them at increased risk for severe illness from the virus that causes COVID-19, such as but not limited to:

- Medical complexity
- Cancer
- Chronic kidney disease
- Moderate-severe asthmas, cystic fibrosis, and other chronic lung disease
- Heart conditions, such as congenital heart disease, heart failure, coronary artery disease or cardio myopathies
- Solid organ transplant
- Obesity
- Pregnancy
- Sickle cell disease
- Diabetes mellitus
- Genetic or metabolic disorders
- Severe neurologic disorders
- Immunosuppression due to malignancy or immune-weakening medications

The U.S. vaccine safety system ensures that all vaccines are as safe as possible. Safety has been a top priority while federal partners worked to make the COVID-19 vaccines available. Unless there is a known objection by the parent or person with legal authority over the child, the caseworker should ensure that children in DFPS conservatorship are immunized against infectious diseases, including COVID-19.[17]

On May 10, 2021, the FDA amended its original emergency use authorization for the Pfizer-BioNTech COVID-19 vaccine to include adolescents aged 12 through 15 years old.[18]  On May 14, 2021, DFPS sent a memo to all the CPS conservatorship staff updating their previous guidance:

As of Wednesday, May 12, 2021, **every Texan aged 12 and older is eligible to receive a COVID-19 vaccine, including youth in conservatorship.**  Vaccine

---

[17] Deneen Dryden, Assoc. Commissioner for CPS, Memorandum: Guidance Regarding Covid-19 Vaccines for older youth in DFPS Conservatorship, January 15, 2021 (on file with the Monitors).
[18] FDA, *FDA News Release: Coronavirus (COVID-19) Update: FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Adolescents in Another Important Action in Fight Against Pandemic*, May 10, 2021, *available at* https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use

supply has improved, and more will be delivered to providers each week. It is possible that local jurisdictions may still have prioritized populations such as older adults and those with underlying medical conditions.

The U.S. vaccine safety system ensures that all vaccines are as safe as possible. Safety has been a top priority while federal partners worked to make the COVID-19 vaccines available. The COVID vaccine is recommended for anyone who is eligible to receive it. Unlike other routine vaccines, the COVID vaccine is currently only authorized by the FDA for emergency use, which means getting it is voluntary and the youth should agree (if able)[19] in addition to the medical consenter.

---

[19] It is not clear what DFPS intends by including "if able" as a limitation on the policy's encouragement to seek the child's agreement to get the vaccine. This limitation was not included in the guidance issued January 15, 2021. Generally speaking, Texas children are not able to be their own medical consenter, except in very limited circumstances. *See* Baker McKenzie, et al, *Texas Homeless Youth Handbook, Consent for Medical Procedures*, *available at* https://www.homelessyouth.org/en/us/texas/health-care-and-medical-rights/?topic=5361629c058447898030bcb268901372&scroll=1236 The Texas Attorney General recently acknowledged a child's incapacity to make their own medical decisions in an opinion released February 18, 2022:

> Generally, the age of majority is eighteen in Texas. TEX. CIV. PRAC. & REM. CODE § 129.001. Children and adolescents are promised relief and asked to "consent" to life-altering, irreversible treatment – and to do so in the midst of reported psychological distress, when they cannot weigh long-term risks the way adults do, and when they are considered by the State in most regards to be without legal capacity to consent, contract, vote, or otherwise.
>
> ***
>
> The State's power is arguably at its zenith when it comes to protecting children. In the Supreme Court's words, that is due to "the particular vulnerability of children." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979); *see also Ginsberg v. New York*, 390 U.S. 629, 640 (1968) ("The State also has an independent interest in the well-being of its youth."). The Supreme Court has explained that children's "inability to make critical decisions in an informed, mature manner" makes legislation to protect them particularly appropriate. *Bellotti*, 443 U.S. at 634…*See generally T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9, 42 (Tex. App. – Fort Worth 2020), *cert denied*, 141 S. Ct. 1069 (2021)("Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*. In this respect, the [child's] liberty interest may, in appropriate circumstances, be subordinated to the State's *parens patriae* interest in preserving and promoting the welfare of the child.")

Tex. Att'y Gen. Ken Paxton, *Whether certain medical procedures performed on children constitute child abuse*, Opinion No. KP-0401, February 18, 2022.

The Texas Family Code speaks to the circumstances under which a child in foster care can become their own medical consenter, requiring the child to be at least 16 years of age, and limiting it to cases in which the court has determined that the child has the capacity to consent to their own medical care. Tex. Fam. Code § 266.010. It is possible that the "if able" limitation intends to limit the necessity of the child's agreement to cases in which a child 16 years old or older has been determined by a judge to have the capacity to consent to their medical care. However, there is no explanation of this language in the policy, and it states that the child should agree "in addition to the medical consenter." The guidance also was updated in July 2021 to include the statement that "DFPS staff should support youth who **expressly want** the vaccine by providing consent by the medical consenter or a back-up medical consenter, assuming no known parental objection." E-mail from DFPS CPS Communications, *infra* note 16 (emphasis added).

At this time, only the Pfizer vaccine is authorized for people ages 12 to 17, and it is the same vaccine already widely available across the state for use in adults.

---

It is also possible that DFPS has confused requirements related to a child's assent to participation in medical research or drug trials (codified as related to foster children in § 261.0041 of the Texas Family Code) with language in the federal statute allowing emergency authorization of a drug or medical procedure.  The Monitors asked DFPS for the regulation or statute on which it relied to support its determination that, because the vaccine was available via emergency authorization, it was voluntary, which seems to form the basis for the policy requiring children to agree to receive it "if able."  E-mail from Deborah Fowler and Kevin Ryan to Tara Olah, et al, DFPS, re: Communication with field re: COVID vaccine, January 25, 2022 (on file with the Monitors).  DFPS responded that it relied on 21 U.S. Code § 360bbb-3, which is the statute that allows for emergency authorization of a medical product.  Encrypted e-mail from Tara Olah to Deborah Fowler and Kevin Ryan, re: Communication with field re: COVID vaccine, January 27, 2022 (on file with the Monitors).  That section of the Code includes the following language:

> (A) Required conditions
>
> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following:
>
> ***
>
> (ii) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed –
>
> > (I)  that the Secretary has authorized the emergency use of the product;
> > (II)  of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
> > (III)  of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S. Code § 360bbb-3(e)(1)(A)(ii).

This language requires a medical professional to provide medical consenters with information about the product's emergency authorization to ensure informed consent; however, it does not empower those without capacity to become a medical consenter nor does it include any requirements related to a minor's assent to the treatment.  The DFPS policy and FAQs fail to articulate: 1) that only children who fall within the Texas Family Code provisions cited above are deemed to have the capacity to provide informed consent (and therefore be the decisionmaker regarding vaccination); and 2) that the ultimate decision regarding whether to vaccinate a child rests with – and is the duty of -- the child's medical consenter.  *See* Tex. Fam. Code § 266.04 (referring to the medical consenter as one who "will exercise the duty and responsibility of providing consent."). This may be causing confusion for caregivers and DFPS staff, who in some cases appear to be leaving decisions about vaccination entirely to children who are legally presumed not to have capacity to make decisions about their medical care.

[19] E-mail from DFPS CPS Communications, *supra* note 13.  If parental rights have not been terminated, a court may name a foster child's parent as a medical consenter if the court determines it is in the child's best interests; or, if the court names DFPS as the child's medical consenter, DFPS may designate a child's parent to act as medical consenter. Tex. Fam. Code § 266.004.  However, it is not the case that every parent whose rights have not been terminated acts as medical consenter for the child. The Monitors' review of IMPACT records showed that the parent was not always named the medical consenter for children for whom the DFPS vaccination data reflected the agency was awaiting parental consent. For example, in one case, the "other notes" section of the DFPS data indicated, "Parent consent is needed for vaccine.  We have been unable to locate parent."  However, a review of IMPACT showed the parent was not the medical consenter for the child, though parental rights had not been terminated.

Youth and caregivers should contact providers in their area to ensure they are offering the Pfizer vaccine before making an appointment or attending a walk-up vaccine clinic.  Primary care providers may soon be administering the vaccine in their offices so caregivers should check with a youth's medical provider to see if that is an option…Remember, the ability to get a vaccine soon will depend on vaccine availability at the vaccine provider facility.  Please call ahead to the provider as an appointment may be necessary.[20]

On July 23, 2021, DFPS again distributed updated guidance to its staff.[21]  However, for the first time, the guidance included an affirmative obligation to notify parents prior to vaccinating a child: "Caseworkers will notify parents of children in conservatorship whose parental rights have NOT been terminated so that the parent has an opportunity to object."[22]  The guidance also noted, "DFPS staff should support youth who expressly want the vaccine by providing consent by the medical consenter or a back-up medical consenter, assuming non known parental objection."[23]  The guidance required, "Medical consenters should confirm with caseworkers that parental notification has occurred prior to taking a youth for the COVID vaccine."[24]

On August 20, 2021, after the Monitors sent DFPS their first inquiry into the vaccination status of PMC children (and before DFPS responded),[25] DFPS Medical Director, Dr. Roberto Rodriguez, sent the following message to all DFPS staff:

---

[20]  Deneen Dryden, Associate Commissioner, CPS, Memorandum: Guidance Regarding Covid-19 Vaccines Adolescents ages 12 to 15 years now eligible, May 14, 2021 (on file with the Monitors).

[21]  E-mail from DFPS CPS Communications to All CPS CVS Staff, re: Updated Covid-19 Vaccine Guidance, July 23, 2021 (on file with the Monitors).

[22]  *Id.*

[23]  E-mail from DFPS CPS Communications, *supra* note 13.  If parental rights have not been terminated, a court may name a foster child's parent as a medical consenter if the court determines it is in the child's best interests; or, if the court names DFPS as the child's medical consenter, DFPS may designate a child's parent to act as medical consenter. Tex. Fam. Code § 266.004.  However, it is not the case that every parent whose rights have not been terminated acts as medical consenter for the child.  The Monitors' review of IMPACT records showed that the parent was not always named the medical consenter for children for whom the DFPS vaccination data reflected the agency was awaiting parental consent. For example, in one case, the "other notes" section of the DFPS data indicated, "Parent consent is needed for vaccine.  We have been unable to locate parent."  However, a review of IMPACT showed the parent was not the medical consenter for the child, though parental rights had not been terminated.

[24]  *Id.*

[25]  The Monitors e-mailed DFPS on August 13, 2021, and asked whether DFPS was keeping track of how many PMC children aged 12 years old and older were had received a COVID-19 vaccination.  E-mail from Deborah Fowler and Kevin Ryan to Eliza Martinez, re: COVID Testing for PMC Children as of 8.06.2021, August 13, 2021 (on file with the Monitors).  DFPS responded on September 11, 2021, indicating that 967 PMC children aged 12 years old and older were fully vaccinated, 373 were partially vaccinated, and 2,564 were not vaccinated. E-mail from Leigh-Anne Eaton, Program Specialist, DFPS, to Deborah Fowler and Kevin Ryan, re: COVID Testing for PMC Children as of 8.06.2021, September 11, 2021 (on file with the Monitors).  In that e-mail, DFPS also reported that it was "working in coordination with The National Guard to deliver mobile vaccines to locations throughout the state for children who are currently without placement."  *Id.*  Of these children, DFPS reported that 13 were fully or partially vaccinated through this partnership, and an additional 34 children were scheduled to receive their first vaccine.  58 had been offered the vaccine through this partnership, and refused, and an additional six children were said to be undecided. *Id.*

As a physician and pediatrician, I am appealing directly to those of you who have our agency's most uniquely difficult job: our foster children and youth are *your* personal responsibility.

I know you must think about this heavy responsibility countless times.  As a conservatorship (CVS) caseworker, your "caseload" is not really comprised of cases, but young people who are all in varying stages of overlapping trauma, healing, and hope.  As your DFPS Medical Director, I'm simply in awe of what you do.

In this week's message about COVID-19, Commissioner Masters referred to our "historically challenging times."  I feel in these times your job and mind have really come together as one: how do we keep these kids safe?

The delta variant of COVID-19 has made me and many of my pediatric colleagues anxious.  The strain is more infectious and is causing more symptomatic infection even among children, more so than prior variants.  As a result, we're seeing pediatric hospital capacity challenged around the state due to children with more severe disease, including some in pediatric ICU's.  We all have a role in addressing this health crisis in our state.  Vaccinating all eligible Texans aged 12+ protects their health AND helps protect all youth younger than 12 who can't yet be vaccinated.

I have one message: PLEASE ensure the young people aged 12 and over on your caseload are vaccinated and take those steps TODAY.  You know the process: talk to foster parents, kinship providers, and if necessary ask your supervisor for help if needed.  Please refer to the prior guidance documents [links omitted].[26]

DFPS distributed Dr. Rodriguez's message on August 20, 2021, to all of its staff, noting, "DFPS Medical Director Dr. Roberto Rodriguez has written an important message about the need for CPS caseworkers to ensure young people aged 12 and over on their caseload are vaccinated. While this message is targeted to CVS, we are sending to all CPS as it pertains to the vital work we all do every day."[27] Texas data on COVID-associated fatalities shows that the number of fatalities for all children aged 10 to 19 years old, statewide, spiked during the surge of the Delta variant, reaching a high of 18 fatalities for children in that age group reported on September 1, 2021, a significant jump from the two fatalities in that age group reported just two months earlier on July 1, 2021.[28]

---

[26] Dr. Roberto Rodriguez, DFPS Medical Director, *DFPS Medical Director Dr. Roberto Rodriguez's Message on COVID-19 Vaccinations for Youth* (undated) (on file with the Monitors).
[27] E-mail from DFPS CPS Communications to DDL DFPS CPS ALL, re: Message from DFPS Medical Director Dr. Roberto Rodriguez, August 20, 2021 (on file with the Monitors).
[28] DSHS, COVID-19 Dashboard: Fatality Demog. – Trends, *available at* https://www.arcgis.com/apps/dashboards/45e18cba105c478697c76acbbf86a6bc Fatality trend data has not been updated by DSHS to include 2022.

On October 29, 2021, emergency use authorization was granted for a reduced dosage of the Pfizer vaccine for children ages five through 11 years old.[29] On November 5, 2021, DFPS updated its COVID Vaccine guidance and FAQs to reflect the FDA's authorization of the vaccine for children aged five and older.[30]  DFPS's guidance and FAQs again indicated that COVID vaccination was not mandatory for eligible youth.[31] DFPS noted that caseworkers could provide consent for the COVID-19 vaccine, but the FAQs included more specific language and instructions for parental notification:[32]

> **As the primary medical consenter, the caseworker may provide consent for the COVID-19 vaccine for a youth in conservatorship.**  For children in TMC or PMC with any parent(s) whose rights have NOT been terminated, the caseworker will notify all parents with rights of a plan to obtain an approved COVID vaccine for an eligible child.  If any parent with parental rights objects, do not proceed with

---

[29] FDA, *FDA News Release: FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Children 5 though 11 Years of Age*, October 29, 2021, *available at* https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age

[30] DFPS, *COVID Vaccine Guidance*, November 5, 2021; DFPS, *COVID Vaccine FAQs*, November 5, 2021 (on file with the Monitors).

[31] DFPS has not updated the guidance to reflect the FDA's approval of the Pfizer-BioNTech COVID-19 Vaccine for individuals aged 16 and older, making it unnecessary to rely on the emergency use authorization for 16- and 17-year-olds. FDA, *FDA News Release: FDA Approves First COVID-19 Vaccine*, August 23, 2021.  To the extent that it relies on the emergency use authorization as the basis for requiring youth agreement (and that of parents whose rights have not been terminated), this should have changed for 16-and-17-year-old youth (who are not their own medical consenters) when the FDA approved the Pfizer Bio-NTech vaccine.

[32] It is possible this language was included in the FAQs distributed on July 23, 2021.  DFPS did not provide the Monitors with a copy of the July 23, 2021, FAQs, though the e-mail distributing the updated guidance to DFPS staff referred to FAQs.  E-mail from DFPS CPS Communications to All CPS CVS Staff, re: Updated Covid-19 Vaccine Guidance, July 23, 2021 (on file with the Monitors).  The January and May 2021 guidance did not include a reference to FAQs. The Monitors' review of the DFPS data and IMPACT showed that some caseworkers had difficulty reaching a parent to obtain permission for the child.  In one case involving a nine-year-old, the mother (whose parental rights have not been terminated) is incarcerated.  A contact note in IMPACT dated January 13, 2022 states: "I spoke with the caseworker…about the COVID-19 vaccination status for the children.  [Sibling 1] and [child] are currently not vaccinated.  [Sibling 2] will not receive the vaccination due to his age.  Due to [mother] still having parental rights, [caseworker] will need to ask [mother] for permission to get the girls vaccinated.  [Caseworker] will send a letter to [mother] but [mother] moves facilities often so it may take a while to get a response."  The foster parent was the primary medical consenter for the child and the caseworker was the backup consenter, and in other circumstances, would have been able to consent to vaccination.  The DFPS data "other notes" indicated that in another case involving an incarcerated father whose parental rights had not been terminated, that permission for vaccination of the child was "pending visit with father in prison to gain parental permission for the vaccine."  In that case, a January 13, 2022 contact note in IMPACT for the child notes "[Child] was exposed to covid today at school and will be tested for covid."  The Monitors did not find any contact notes related to a visit to the father to obtain permission.  In another case involving an eight-year-old child, the DFPS data "other notes" states, "Caseworker has notified mother once about having a conversation about vaccinating her child as her rights are not terminated.  Caseworker needs to attempt two more times before caseworker can consent to the COVID vaccine."  The Monitors did not find a contact note in IMPACT documenting the attempt to notify the parent.  The DFPS "other notes" state "Mother has not given consent for child to receive vaccine," in another case and a contact note in IMPACT dated January 25, 2022 confirms, noting "[Mother] has not been in contact with the department to give or decline consent for [child] to receive the COVID vaccine."  Yet, entries in IMPACT appear to show that the parental rights of the mother were terminated in 2018.  In another case, the DFPS "other notes" state, "Caregiver refused/Dad is MIA – [caseworker] will attempt to contact 3 times and after move forward with vaccinating."  Meanwhile, a contact note in IMPACT dated January 14, 2022 shows that another child in the home tested positive for COVID-19.

10

vaccination and note the objection to the COVID-19 vaccination…Parental notification should be thoroughly documented in IMPACT in a case narrative note, including the date, time, and content of the notification.

**Q: How should I notify parents (whose parental rights have NOT been terminated) about the COVID-19 vaccine?**

A: Verbal communication is adequate.  Suggested language is, "DFPS would like to help protect your child's health when in our care by providing him/her with the COVID-19 vaccine, which is approved for his/her age.  There is no cost to you." Document the parental notification as indicated above.

**Q: What if I can't reach the parents (rights not terminated)?**

A: You may also leave a voicemail of the above language and indicate that the parent can contact you with any questions or concerns.  You may proceed with vaccination of the youth if you have not heard any objection from a parent within 72 hours of your last voicemail message.  The notification via voicemail should also be documented in IMPACT, indicating the date, time, and content of your voicemail notification.

**Q: What if I can't even leave a voicemail or their phone is disconnected?**

A: You should make 3 attempts for parental notification on 3 separate days, to all known parents whose rights are not terminated.  Document your attempts including the date and time of each notification attempt.  Caseworkers may proceed with a COVID-19 vaccine for the youth after three documented notification attempts.[33]

The policy required a child's vaccination to be documented in their IMPACT records by scanning the paper record and uploading it into IMPACT.[34]  It also indicated that COVID vaccines were "entered into the statewide ImmTrac system, which uploads into a youth's Health Passport monthly."[35]

DFPS again updated its COVID-19 vaccine guidance on January 10, 2022, to include information about booster doses.[36]  The updated guidance states:

Every Texan 5 years of age and older is eligible to receive a free COVID-19 vaccine, including youth in conservatorship.  Vaccine supply has improved and is readily available throughout Texas.  The pediatric vaccine, for youth in the 5 to 11 year-old age group, comes in a different formulation from the vaccine approved for

---

[33] DFPS, *COVID Vaccine FAQs*, November 5, 2021 (on file with the Monitors) (emphasis in original).
[34] *Id*.
[35] *Id*.  Despite this, when the Monitors first tried to validate the vaccination status of a randomly selected sample of children the State identified as fully vaccinated, with a 90 percent sample confidence level, in the sample of 65 children the monitoring team could only confirm 38 were fully vaccinated and 12 partially vaccinated, for a total of 50 (77%).
[36] DFPS, *COVID-19 Vaccine Guidance for Youth*, January 10, 2022, *available at* https://www.dfps.state.tx.us/About_DFPS/Coronavirus/

adults, so it is important to seek out providers who have received the pediatric vaccine when getting children in this age group vaccinated. At this time, only the Pfizer-BioNTech vaccine is authorized for children and teens.

A booster dose is not authorized for children 5 to 11 years of age at this time. Moderately or severely immunocompromised children 5 to 11 years of age are now recommended to receive an additional dose of the Pfizer-BioNTech vaccine 28 days after their second dose. To determine if a child in conservatorship qualifies as having a moderately or severely immunocompromised condition, please follow the guidance of the child's health care provider. Examples provided by the CDC of a child that is moderately or severely immunocompromised condition [sic] include a child with a solid organ transplant or a child with a primary immunodeficiency. Children receiving complex case management service by STAR Health will receive outreach from STAR Health if they have a qualifying diagnosis.

Adolescents 12 to 17 years of age are recommended to receive a single booster dose of the Pfizer-BioNTech COVID-19 vaccine. Individuals 12 years and older who received the Pfizer COVID-19 vaccine as their primary series can now receive a single booster dose **5 months** after completing the primary series.[37]

The updated guidance retained the language indicating youth should agree to vaccination, and requiring parents whose rights have not been terminated to be notified prior to vaccination.[38] However, as was true of the earlier guidance, the updated guidance indicates that because the vaccine is authorized for emergency use, "getting it is voluntary and the youth should agree (if able) in addition to the medical consenter."[39] The updated guidance includes the language instructing that, for children whose parent's rights have not been terminated, the parent(s) must be notified and given an opportunity to object before a child is vaccinated, with the FAQs describing the same process for parental notification.[40]

## II.   PMC CHILDREN'S VACCINATION STATUS

Of the 9,712 PMC children included in DFPS's data, 2,398 (25%) are fully vaccinated; 404 (4%) are partially vaccinated; 3,898 (40%) are not vaccinated but are eligible; and 2,700 (28%) are not eligible for vaccination because they are under the age of five years old. The vaccination status of 312 (3%) children was not included in the data DFPS provided to the Monitors.

---

[37] *Id*. (Emphasis in original).

[38] *Id*.

[39] *Id*.   Updated FAQs were also released on January 10, 2022, and included the same language quoted from the November 5, 2021 FAQs indicating vaccination is not mandatory for eligible youth.  DFPS, *COVID Vaccine FAQs*, January 10, 2022, *available at* https://www.dfps.state.tx.us/About_DFPS/Coronavirus/

[40] *Id*.  In addition to promulgating policy related to eligibility for vaccination, on February 16, 2022, DFPS notified the Monitors of its efforts to collaborate with and educate stakeholders to make youth, their caregivers, and medical consenters aware of vaccine eligibility, how they can locate a vaccine site or "receive support" regarding the COVID vaccine, and to identify partners willing to host a vaccine clinic.  DFPS also indicated that planning between DFPS, HHSC, and DSHS to develop a series of COVID vaccination clinics was in process, noting that the agencies intend to hold two clinics (21 days apart to allow for second dosage) in each of the following four areas: Austin, Dallas, Houston, and San Antonio.  Encrypted e-mail from Tara Olah to Deborah Fowler and Kevin Ryan, re: DFPS/DSHS data match for vaccines, February 16, 2022 (on file with the Monitors).

**Figure 2: Vaccination Status of Children in PMC**



## A.  Vaccination Status by Age Range

The following figure[41] illustrates the vaccination status of PMC children by age range. Children between 12 to 17 years old had the highest rate of vaccination (50%) while children between five to 11 years old had the lowest rate of vaccination (17%).

---

[41] Due to rounding, data within some figures herein does not add to 100%.

**Figure 3: Vaccination Status by Age of Children in PMC**



A more detailed vaccination status by age range is included below in Table 1. Children between the ages of five and seven years old had the lowest rate of vaccination at 15% (187) while children between 14 and 16 years old had the highest vaccination rate at 52% (1011).

**Table 1. Vaccination Status by Detailed Age Range**

| Age Range | Not Vaccinated | | Partially Vaccinated | | Vaccinated (Two doses) | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Frequency | % | Frequency | % | Frequency | % | Frequency | % |
| 5 to 7 years | 972 | 78% | 85 | 7% | 187 | 15% | 1244 | 100% |
| 8 to 10 years | 876 | 74% | 92 | 8% | 217 | 18% | 1185 | 100% |
| 11 to 13 years | 785 | 54% | 93 | 6% | 586 | 40% | 1464 | 100% |
| 14 to 16 | 863 | 44% | 86 | 4% | 1011 | 52% | 1960 | 100% |
| 17 years or older | 402 | 47% | 48 | 6% | 397 | 47% | 847 | 100% |
| Total | 3898 | 58% | 404 | 6% | 2398 | 36% | 6700 | 100% |

B.  Vaccination Status by Reason

For the 3,898 PMC children who are eligible for vaccination and are not vaccinated, DFPS included the following reasons for the lack of vaccination: for 55% (2,154) of children, DFPS identified the reason for lack of vaccination as "other." The notes DFPS included under its "other" category did not appear to provide meaningful additional information about the reason for the child's lack of vaccination.[42] For 26% (1,025) of children eligible for vaccination, DFPS states

_____

[42] Many of the notes in the "other" category do not list <u>any</u> reason that a child had not been vaccinated. Many others document caregivers' reluctance or refusal to vaccinate the child, and some indicate the child was vaccinated or a vaccine was being scheduled. Some also document caregivers who responded that a primary medical needs child was too fragile to be vaccinated; in some of those cases, they said that the child's physician did not recommend vaccination. Others indicate that the child was having to wait to schedule a vaccine because they'd contracted COVID. In one of these, a nine-year-old primary medical needs child had just tested positive on January 6, 2022, along with her caregiver and nurses. Another stated, "Caregiver has been notified to vaccinate child. Child has already had COVID twice." Some showed that the caregiver had COVID and was isolating and was required to wait to vaccinate the child until the caregiver recovered and was no longer in isolation.

Many notes also indicated that caregivers were not aware that they could get children vaccinated, did not realize it was "allowed," believed that a judge had to order it (some stated they were told that a judge had to order it), or were not aware that the authorization had been extended to young children. In one of these cases, a review of IMPACT revealed a contact note dated January 19, 2022 that states, "Caseworker was notified that vaccination was pending due to the caregivers being required by their agency to have Judge's or CPS approval. Caseworker verified approval and is pending an update on appointment or vaccination. Caseworker received noted that [child] tested positive for covid 19 Sunday." The Monitors' review of IMPACT in another case revealed a contact note dated January 12, 2022 which showed that the Permanency Case Manger texted the foster parent and asked whether the child had been vaccinated. The foster parent responded, "I was waiting for permission from cps. Do I have permission?" The case manager responded that she would "get back to [her] on that" and asked if the foster parent recalled who she had asked about this. The foster parent said she thought it was "the other case worker" and said, "She said the judge had to approve it." In another case in which the DFPS data showed the caregiver was waiting for permission from the judge, an IMPACT contact note dated January 11, 2022 also documented a text conversation between the caseworker and

that the child refused the vaccine; for 10% (413), DFPS reports the parent refused the vaccine for the child; for 7.7% (302), the file was missing information concerning the reason the child was not vaccinated; and for 0.1% (4), DFPS reported that the child was not eligible for vaccination due to age though the data indicates the child was five years old.

caregiver.  When the caseworker asked if the child had been vaccinated, the caregiver responded, "No, I tried when this all happened I was told no bcz [sic] I needed the judges [sic] approval.  So I never bothered with it again."  The caseworker responded "I don't think you need the judges [sic] approval.  Let me double check." In some cases, both the DFPS data and IMPACT contact notes indicate that a judge ordered that the child could not be vaccinated.

Two cases included in the "other" category in the DFPS data document children living out of state (one in Florida, the other in Tennessee) and indicate that the policies in the state that the child lived in do not require vaccination.  In another, the child is placed in an RTC in Oklahoma, and the DFPS data notes, "[Child] has been placed out of state and was not vaccinated prior to placement.  Current placement does medical task off campus and off campus appointments are based on the child's behavior.  Worker will continue to follow up."

Despite the risks in congregate care settings, the DFPS data shows that many children in RTCs and other congregate settings are not yet vaccinated.  One of the "other" entries in the DFPS data says "[w]aiting on RTC to have vaccines available."  The RTC where the child is placed, Pegasus, was added to the "virtual contact only" list by DFPS on January 14, 2022, because of a high number of COVID infections.  Similarly, another entry in the "other" section states, "RTC has not vaccinated the children.  [Caseworker] has requested and they will set up, they report youth is likely to refuse."  The child in that case is also placed in an RTC, Roy Maas Youth RTC, that was placed on the "virtual contact only" on January 14, 2022 due to the number of children who tested positive for COVID-19.  Another entry for a nine-year-old child in the "other" category states, "per facility policy will not vaccinate."  A review of IMPACT revealed a contact note dated January 13, 2022 that states, "Telephone call to Legacy Ranch and [caseworker] spoke with [staff].  [Caseworker] inquired on why the children were not vaccinated.  [Staff] explained that they only vaccinate when requested from the caseworker in writing."  Another entry in the DFPS data states, "Child has been unable to be vaccinated due to quarantine.  Will schedule."  That child, who just turned 12 years old, has been placed at New Horizons Ranch RTC since October 2021.  New Horizons has been on "virtual contact only" since December 3, 2021.  Another entry in the DFPS data indicates, "RTC is doing vaccination in groups.  Child is currently hospitalized."  However, an IMPACT contact note dated January 18, 2022 indicates that when the child returned to the RTC, he confirmed that he had been vaccinated while he was still living with his grandparent.

**Figure 4: Reason Eligible Children in PMC Not Vaccinated**



## C.  Vaccination Status by Age and Reason

Of the children who are eligible for vaccination and who are not vaccinated, the reasons for lack of vaccination varied by age. Among the 2,172 children five to 11 years old who are not vaccinated, DFPS identified 1,515 (70%) children with "other" as the reason for lack of vaccination; for 303 (14%) children, it stated the parent refused the vaccine for the child; for 218 (10%) children, it stated the child refused the vaccine; and for 136 (6%), the file was missing information. For the 1,707 children 12 to 17 years old who are not vaccinated, DFPS stated that 798 (47%) children refused the vaccine; for 109 (6%), that the parent refused the vaccine; 636 (37%) children were listed with the reason as "other;" and for 164 (10%), the file was missing information.

**Figure 5: Reason Eligible PMC Children Not Vaccinated by Age**



*\* This chart omits four eligible children DFPS identified in the category of "Child Does Not Qualify-Under 5" for clarity.*

A more detailed vaccination status by age range is included in Table 2 below. According to DFPS, 7% (68) of children five to seven years old were identified as having refused vaccination, as well as 56% (226) of children 17 years old or older.

**Table 2. Reason Eligible Children Not Vaccinated by Detailed Age Range**

| Age Range | Reason Missing | | Child Does Not Qualify Under 5 | | Child Refused Vaccine | | Other (See Explanation) | | Parent Refused Vaccine for Child | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Frequency | % | Frequency | % | Frequency | % | Frequency | % | Frequency | % | Frequency | % |
| 5 to 7 years | 69 | 7% | 4 | 0% | 68 | 7% | 676 | 70% | 155 | 16% | 972 | 100% |
| 8 to 10 years | 45 | 5% | 0 | 0% | 94 | 11% | 616 | 70% | 121 | 14% | 876 | 100% |
| 11 to 13 years | 57 | 7% | 0 | 0% | 190 | 24% | 462 | 59% | 76 | 10% | 785 | 100% |
| 14 to 16 years | 72 | 8% | 0 | 0% | 447 | 52% | 297 | 34% | 47 | 5% | 863 | 100% |
| 17 years or older | 59 | 15% | 0 | 0% | 226 | 56% | 103 | 26% | 14 | 3% | 402 | 100% |
| Total | 302 | 8% | 4 | 0% | 1025 | 26% | 2154 | 55% | 413 | 11% | 3898 | 100% |

The Monitors reviewed IMPACT records for all of the 119 PMC children under the age of 10 who were not vaccinated because, according to DFPS, they refused the vaccine. Of these children, the Monitors did not find any information in IMPACT related to the child's vaccination status or refusal of the vaccine for 65 (54%). The Monitors found information in an IMPACT Contact Note indicating the child's caregiver, rather than the child, had refused to have the child vaccinated in eight cases (7%), and found information in IMPACT related to the child's vaccination status other than the child's refusal (including some notes indicating the child was being scheduled for the vaccine, or that the caregiver would schedule the vaccine) in another 15 cases (13%). The Monitors found information in IMPACT documenting the child's refusal of the vaccine in 31 cases (26%). Caseworkers appear to have taken to heart the message that children must agree to receiving the vaccine, regardless of their age: In more than 20 of the cases involving children under the age of 10, the child's caseworker documented a conversation during which the child was asked whether they wanted to get the COVID-19 vaccine.[43]

Examples include G, who turned five years old on December 19, 2021, is currently in preschool and, according to his service plan, "loves to play outside…have barn fires in the yard and pet…horses." G received a call from his caseworker on January 7, 2022. An IMPACT contact note describes a conversation with his caseworker about the vaccine: "The worker contacted [G] via telephone regarding the Covid shot. The worker asked [G] how he was doing and how his day was going. [G] told the worker that he was doing great and his day was going fine. The worker explained that the worker was calling to speak with him about something. The worker asked [G] if he knew about Covid, and he said that he did. The worker explained to [G] that the worker

---

[43] An "other notes" entry in the DFPS data shows the limitations associated with asking a young child about vaccination, stating "Child did not understand the question when asked if she wanted to be vaccinated or not." The child is nine years old.

wanted to make sure that he stayed healthy and did not get sick, and asked if he wanted to take the Covid shot.  [G] told the worker 'no ma'am, I don't want it.'  The worker thanked [G] for his time and explained that if he did not want it, the worker would not force him to get it."

J, a six-year-old girl who is "proud to be in kindergarten" and "loves Frozen" (the movie), is also described as "very mature for her age."  J's caseworker documented their conversation about the vaccine in an IMPACT contact note on January 10, 2022, as follows: "I talked to [J] and discussed DFPS would like to help you protect your health by providing you with COVID-19 vaccine, which is approved for your age.  She said she didn't want the shot.  She said, NO, NO, NO."

S was much more low-key in his refusal of the vaccine.  S is a six-year-old "handsome little boy that loves his Batman" and also "enjoys playing with his Legos."  S's caseworker documented a conversation with him on January 8, 2022: "The worker contacted [S] via telephone regarding the Covid vaccine.  The worker asked [S] about his day and how things had been going.  The worker explained to [S] that the worker was concerned about his health, and wanted to make sure that he stays healthy, and asked about him taking the Covid shot.  [S] told the worker that he did not want to get the shot.  The worker thanked [S] for his time, and explained to [S] that the worker would not force him to get the shot if this was not something that he wanted."

B, a kindergartener who turned six years old in September 2021, "enjoys playing catch and video games with his older brother."  B's caseworker called him on January 7, 2022: "The worker contacted [B] via telephone to speak with him about the Covid vaccine.  The worker was allowed to speak with [B] over the phone, and asked him if he knew what Covid was.  [B] told the worker that he knew what it was.  The worker explained that the worker wanted to make sure that he stayed healthy and safe, and that the Covid shot could help to keep him healthy and safe.  The worker asked [B] if he wanted to take the Covid shot.  [B] then said that he wanted to face time [sic] the worker, and began calling the worker on facetime.  The worker answered [B's] facetime call, and the worker continued the conversation with [B] and asked about him taking the vaccine.  [B] shook his head no, and told the worker, no, he did not want to take the shot."

A, a six-year-old in first grade, "is a healthy little girl who enjoys playing with her Kindle Fire, dolls, and her portable tent."  A was with her two-year-old sibling when their caseworker made a face-to-face visit with them on January 11, 2022.  IMPACT notes indicate that the caseworker had texted the children's caregiver about the vaccine earlier in the day, and said she planned to "discuss with [A] at this evening monthly [face-to-face] visit."  While A is listed in the data provided by DFPS as having refused the vaccine, the contact notes in IMPACT for the face-to-face visit appear to suggest that her two-year-old sibling refused the vaccine (though she is not eligible) and that A left the room before the caseworker asked her if she would like to receive it: "[A's sibling] was sitting in her high chair eating dinner which was soup when caseworker arrived in the dining area…[caseworker] asks if she wants to take the COVID-19 vaccine and she responds no."  For [A], the contact notes in IMPACT indicate: "[A] was sitting at the dining table eating dinner which was soup when caseworker arrived in the dining area.  She still had on her school uniform from school.  [A] does not talk much to [caseworker] but will smile.  She leaves the visit and goes into the room with [caregiver.]" Based on the notes in IMPACT, the caseworker does not

appear to have raised the COVID-19 vaccination in her conversation with the children's caregiver at all, discussing it only with the two-year-old child.

B, a six-year-old boy, "has a very bright smile and appears to enjoy playing with cars." Though he is described as "very shy, introverted," B "appears to be on target with his physical milestones," is "smart" and "willing to learn." His caseworker called him on January 7, 2022, to ask him if he wanted the COVID vaccine: "[Caseworker] called [B] to see if he wanted to get the COVID vaccine he stated that he didn't want it.  I informed him that he didn't have to get it the choice was his he said okay."

When seven-year-old R was asked by her caseworker about whether she wanted the vaccine during a December 13, 2021, face-to-face visit, she said she did not want it, but "would think about it and talk to her aunt."  K, also seven years old, was much more decisive in his conversation with his caseworker, reflecting a personality that his caregivers describe as "independent."  His caseworker called him on January 7, 2022: "The worker spoke with [K] via telephone.  The worker asked [K] if he knew what Covid was.  [K] told the worker that he knew what Covid was.  The worker discussed with [K] that the worker wanted to make sure that he stayed healthy and safe, and the vaccine could help him stay healthy and safe.  The worker asked [K] if he would like to take the Covid vaccine, and he told the worker 'noooooo, I do not want to take the Covid shot.'  The worker thanked [K] for his time and honesty."

KM, his twin, and their two siblings aged 10 and 11 years-old, received a call from their caseworker on January 7, 2022.  The caseworker first spoke to KM's twin, then asked to speak with KM, then to KM's 10-year-old sibling (L), and finally, to KM's 11-year-old sibling.  The caseworker expressed her concern for each child's health and asked each if they wanted to receive the COVID vaccine.  None of the four children expressed a desire to get the shot.  L, the 10-year-old, was perhaps the most articulate in expressing his concerns: "Once [KM] was done speaking with the worker, [L] was put on the phone.  The worker asked [L] about his day and about school. [L] said that he had a good day and a good day at school.  The worker explained to [L] that Covid is still going around, and that the worker was concerned about his health.  The worker asked [L] if he would like to get the Covid vaccine to help him to stay healthy.  [L] told the worker that he did not want to take the vaccine because he was scared of it.  The worker asked what about the vaccine he was scared of, and he told the worker that he was just scared of it.  The worker told [L] that the worker has been vaccinated, and the worker didn't get sick from the vaccine, and the worker has not gotten Covid.  The worker explained to [L] that the worker understood being afraid of things, and that the worker is afraid of shots as well, but did take the vaccine to try to stay healthy.  [L] expressed again that he did not want to take the vaccine."

Several entries appear to reflect young children's general reluctance or fear of shots.[44]  N, who will turn eight years old on February 1, 2022, is "very active and smart;" her "verbal skills are excellent," as evidenced by her January 12, 2022, conversation with her caseworker about the COVID vaccine: "[Caseworker] called [caregiver] and asked to speak to [N].  I talked to her about COVID and COVID vaccine.  I asked her if she wanted to get the vaccine.  She said isn't it it a shot?

---

[44] In addition to those documented in these examples, one of the "other" notes indicates "Case manager reported she did not know younger kids in care could be vaccinated.  She will ask [child] if he wants to be vaccinated, but suspects he will say no as he hates shots."

I said yes, it is a shot, but it will help you stay healthy from getting sick with COVID.  I said you can say yes you will take the shot, or you can say no.  She said well if I get to choose, I say no.  I said OK that is fine.  You can change your mind in the future if you want to."  Eight-year-old G also declined the vaccine due to his distaste for shots.  When his caseworker called him on January 12, 2022 and asked if he would like the vaccine, "[G] said no he doesn't want it, needles hurt."  Two of his siblings also declined the shot after talking to the caseworker.  Similarly, when nine-year-old R declined the vaccine on January 10, 2022, she said "she did not want any shots."

Another caseworker documented that when she spoke with nine-year-old B and her sister, "The girls stated they did not want to get it because they are scared of needles."  The caseworker for E, a five-year-old documented as having refused vaccination, noted that "Foster parents would like [E] to be vaccinated but [E] is deathly afraid of needles."  The caseworker for a six-year-old who refused vaccination noted in an IMPACT contact, "[caseworker] texted [caregiver] concerning status of the kids Covid vaccine.  [Caregiver] stated [child and sibling} are refusing due to being scared of getting shots in general."

Another sibling group expressed fear based on their uncle's death from COVID, "[Sibling] and [child] feel that their uncle died from the COVID shot.  They are afraid of the shot and think COVID isn't that bad."  The caregiver said that she had "already tried to explain to them that [the vaccine] isn't what killed him.  He was diabetic with an infection in his foot along with supposedly having the flu and COVID.  The vaccine didn't kill him.  They don't believe me…I'm in a losing battle until the schools mandate the vaccine."  The caregiver did indicate to the caseworker that she would take the children to be vaccinated, but had to wait because they had all just tested positive for COVID.

III.   VACCINATION STATUS AND MEDICAL AND BEHAVIORAL NEEDS OF ELIGIBLE PMC CHILDREN

A.  Medical Needs

Of the 486 PMC children five years or older who DFPS identified as having medical needs, 479 (99%) had information on their vaccination status. The vaccination status of these 479 children breaks down as follows: 233 (49%) were not vaccinated, 39 (8%) were partially vaccinated, and 207 (43%) were fully vaccinated.

**Figure 6: Vaccination Status of Children in PMC with Medical Needs**



As shown in the figure below, among the 233 children with medical needs who are eligible for vaccination and who are not vaccinated, DFPS indicated the reason for lack of vaccination as follows: 62 (27%) of the children refused the vaccine; for 14 children (6%), DFPS stated the parent refused the vaccine for the child; for 136 (58%) the reason was "other;" and for 21 (9%) children the data did not list a reason.

**Figure 7: Reason Eligible PMC Children with Medical Needs Not Vaccinated**



B. Behavioral Health Needs

Among the 2,042 PMC children aged five years or older and identified as having behavioral health needs, 1,996 (98%) had information on their vaccination status. As show in the figure below, the vaccination status of these 1,996 children breaks down as follows: 952 (47%) were not vaccinated; 131 (6%) were partially vaccinated; and 913 (46%) were fully vaccinated.

**Figure 8: Vaccination Status of Children in PMC with Behavioral Health Needs**



Among 952 children identified by DFPS with behavioral health needs who are eligible for vaccination and who are not vaccinated, DFPS indicated the reason for the lack of vaccination as follows: it stated that 375 (39%) of the children refused the vaccine; for 64 (7%) children, that the parent refused the vaccine for the child; for 442 (46%), it documented as "Other;" and for 71 (7%) children DFPS  did not list a reason.

**Figure 9: Reason Eligible Children with Behavioral Health Needs Not Vaccinated**



C.  Special Needs

Among the 304 PMC children aged five years or older identified by DFPS as having special needs, 300 (99%) had information on their vaccination status. The vaccination status of these 300 children breaks down as follows: 143 (48%) were not vaccinated; 29 (10%) were partially vaccinated; and 128 (43%) were fully vaccinated.

**Figure 10: Vaccination Status of PMC Children with Special Needs**



Among the 143 children with special needs who are eligible for vaccination and who are not vaccinated, the reason for the lack of vaccination is indicated as follows: it stated that 35 (24%) of the children refused the vaccine; for 12 (8%) children that the parent refused the vaccine for the child; for 87 (61%) the reason was "Other;" and for nine (6%) children, DFPS not list a reason.

**Figure 11: Reason Eligible Children with Special Needs Not Vaccinated**



26

IV.   VACCINATION STATUS OF ELIGIBLE PMC CHILDREN BY LIVING ARRANGEMENTS

Among the 7,012 PMC children in Texas foster care five years or older, DFPS included both vaccine status and living arrangement information in the data for 6,698 (96%) children. As shown in the figure below, the 1,503 children living in relative/fictive kin homes had the lowest rate of full vaccination (23%), while the 1,395 children living in congregate care had the highest rate at 49%. Slightly over one-third (36%) of the 3,051 children living in foster homes were fully vaccinated.

**Figure 12: Vaccination Status of Children in PMC by Living Arrangement[45]**



V.   THE STATE'S FEBRUARY DATA PRODUCTION

A.  Children Identified as Having a High Risk for Severe Illness

On February 16, 2022, in what the State described as an effort to more fully respond to the Court's interest in the vaccination status of PMC children at high risk for serious illness from COVID-19, the State produced a second dataset that included the vaccination status for children known to have a health condition identified by the CDC as placing them at high risk for severe COVID-19 illness.[46]   Though there is some overlap between the characteristics of children

---

[45] The "Other" living arrangement category includes children in their own home/non-custodial care (24), runaway (96), incarcerated (84), independent living (4) and other (377).

[46] E-mail from Tara Olah to Deborah Fowler and Kevin Ryan, re: DFPS/DSHS data match for vaccines, February 16, 2022 (on file with the Monitors).  The State described the methodology for the new data: "The development of this report was an interagency effort between DFPS, HHSC and DSHS.  DFPS provided HHSC with a PMC child listing report as of 1/13/22, HHSC developed the methodology to identify children/youth on the report who are considered 'critically ill' (defined as being at high risk for severe COVID) and flagged those children/youth on the report, and

included in the medical, behavioral, and special needs analysis provided to the Monitors on January 14, 2022 (and analyzed above), the new analysis focused specifically on the risk factors identified by the CDC, many of which were not included in the medical, behavior, or special needs categories identified in the previous dataset.[47]

Of the PMC children eligible for vaccination (6,723 in this dataset),[48] a high number (5,199 or 77%) were determined by the State to have one or more of the risk factors that placed them at high risk for severe illness from COVID-19.  Of these 5,199 PMC children, 2451 (47%) are not vaccinated, 498 (10%) are partially vaccinated, and 2,250 (43%) are vaccinated.  The most common reason that these PMC children are not vaccinated, according to the State's data, is that the child refused vaccination (944 or 39%).  Another 37 (2%) of these children were still considering whether to get vaccinated.

A large percentage (26% or 629) of these unvaccinated PMC children had a vaccine appointment scheduled, or their caregiver indicated it would be scheduled.  However, caregivers refused vaccination for 14% (350) of the PMC children identified as being at high risk for severe illness; caregivers for 173 (7%) of these PMC children were still considering whether to have the child vaccinated.

Thirty-six children flagged as having an underlying condition that placed them at high risk for severe illness fell into the "other" category as the reason for being unvaccinated.  In one case, though the child has been diagnosed with a medical condition (sickle cell anemia) that the CDC list identifies as placing her at high risk of severe illness, the "other" notes in the February data indicate that the 10-year-old is not yet vaccinated because "vaccines [have] to be approved with her Hematologist because of her Sickle Cell Anemia….The [caseworker] and the caregiver has [sic] reached out to the Hematologist as of 01/11/22 seeking approval as to whether [child] can in fact receive the COVID-19 vaccines.  Once the [caseworker] receive[s] the documentation in writing the document will be uploaded in IMPACT."  The child was still listed as unvaccinated in

---

DSHS ran that list against the ImmTrac2 system and flagged all matches for COVID-19 vaccination."  The State's analysis included a list of the risk factors that were included in the data match, and that database or codes used to identify the PMC children who had one or more risk factors.  The list of risk factors includes IDD, Special needs, Cancer, Chronic kidney disease, COPD, Asthma (moderate-to-severe), Interstitial lung disease, cystic fibrosis, Diabetes (type 1 or type 2), Down syndrome, Trisomy 18 and Trisomy 13, Heart disease and hypertension, HIV, Immunocompromised state, Liver disease, Overweight and obesity (BMI>25), Pregnancy, Sickle cell disease, Thalassemia, Smoking, current or former, Solid organ or blood stem cell transplant, Cerebrovascular disease, Substance use disorders, Congenital Heart Disease, Chronic/long-term steroid use, Bronchopulmonary dysplasia (BPD) and chronic lung disease of prematurity, Mood disorders including depression, Schizophrenia spectrum disorders, Tuberculosis, Tumors or cancers of the blood, Organ Transplant, Stem Cell Transplant, High Does Steroids.  DFPS & HHSC, Excel Spreadsheet, Copy of Full List_PMC Vaccination Statuses_2.16.22 (on file with the Monitors).

[47] The medical, behavioral health, and special needs categories included in the January 13, 2022 data set captured PMC children who had one or more of the following diagnoses or characteristics:  Reactive Attachment Disorder, Bipolar, Depression, Developmental Disability, Emotionally Disturbed – DSM, Emotionally Disturbed, Enuresis/encopresis, Failure to Thrive, Medically Complex, Hearing impaired, HIV positive/AIDS, Medically Fragile, Medicaid Waiver: Receiving MDCP/CLASS, Mobility impaired, Oppositional Defiant Disorder, Physically Disabled, Post-Traumatic Stress Syndrome, Psychotic Disorder, Sexually Transmitted Disease, Spina Bifida, Terminal Illness, Traumatic Brain Injury, Visual Impairment, Conduct Disorder, Mood Disorder.  DFPS & HHSC, Excel Spreadsheet, *supra* note 45.

[48] Because this data was produced approximately one month after the January 14, 2022 data, the number of PMC children eligible for vaccination changed slightly.

the February data, a little over a month after the caseworker indicates the child's doctor was contacted.

The February data documents another case involving a child who (according to the notes in the data) was unvaccinated "due to his age and because he does not have any underlying health issues," despite being among the children flagged in the data for an underlying condition placing them at heightened risk. According to IMPACT records, the six-year-old is considered obese.[49]  In another case, notes in the February data indicate that the child is unvaccinated because, "caregiver does not see the need to have child vaccinated due to child not going out in public often."  In another, the child's caregiver told the caseworker in January that she did not realize she was allowed to have the child vaccinated; the February data states, "Caregivers said that they just did not get [child] vaccinated.  Caregiver said she would if she has permission and worker…gave her permission.  She still hasn't been vaccinated and is not scheduled."

Two of the unvaccinated youth flagged as high risk are pregnant; a note in the February data for one of these teenagers indicates, "[c]hild is pregnant and has to wait until delivery of the child."  The other pregnant PMC child turned 18 years old on February 11, 2022; notes in the February data indicate that though she was about to age out, and did not intend to remain in extended care, the caseworker planned to ask "if she would like information about the vaccine."  While the notes also indicate that the child "was previously on runaway," her IMPACT records show that she returned to care in September 2021, and alerted her caseworker to her pregnancy (indicating she was 17 weeks pregnant) during a face-to-face visit in November 2021.  She had subsequent face-to-face visits with her caseworker in December 2021 and January 2022, but was not asked about vaccination.

In another case involving an unvaccinated child at high risk of severe illness, the notes in the February data indicate, "The child moves around frequently.  I always have to set and reset her medical psychiatric and counseling appointments when she goes from CWOP to a placement and to the psych hospital."  The child's IMPACT records indicate she is obese and has a history of asthma.  Similarly, the February data entry for another child at high-risk, whose placement information in IMPACT shows she has bounced between psychiatric hospitals and being without placement, states, "child willing but has not been stable to pick or attend appointments."

At least two of the children considered at high risk for severe illness are unvaccinated due to being placed in psychiatric hospitals.  One, an 11-year-old, has been at Terrell State Hospital since July 6, 2021.  Notes in the February data indicate that she is unvaccinated because "The hospital is out of the Pfizer vaccine and only has Maderna [sic] which is not authorized for children under 12.  Once Terrell State Hospital receives their new Pfizer doses, they will notify CPS."  IMPACT shows that the caseworker documented this on February 14, 2022, when she went to visit the child at the hospital.  In another case, the State's data indicates the caseworker reported that the child is

---

[49] The State includes obesity as one of the underlying conditions identified by the CDC as placing children at heightened risk for severe illness from COVID-19.  *See also* Ankit Agarwal, et al., *Obesity as a Risk Factor for Severe Illness From COVID-19 in the Pediatric Population*, May 3, 2021 ("With increasing pediatric infections due to COVID-19, risk factors for disease severity are becoming evident with obesity prevailing as a major risk for the pediatric population."), Cureus 2021 May 13(5), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8172012/

not vaccinated because he "has been in the psych hospital.  I reached out [to] the caregivers today in regard to getting him vaccinated.  I'm waiting to hear back from them.  They are also only doing vaccines…for 12 and up.  [Child] is only 10."  A review of the child's IMPACT records shows that he returned to an RTC (Sheltering Harbor) on January 7, 2022, and that after he returned, his caseworker asked the RTC to contact her when he had been vaccinated.  IMPACT does not show that the RTC ever contacted the caseworker with this information, and the February data still lists the child as unvaccinated.

B.  Differences Between the Two Data Sets

The February data also shows that many of the PMC children who were unvaccinated as of January 14, 2022, have since been vaccinated: of unvaccinated PMC children included in the original dataset, the February 16, 2022 data indicates 143 have been vaccinated, and another 327 are partially vaccinated.  However, the number and percentage of children shown to have refused vaccination appears to have increased: the January 14, 2022 data showed 1,025 of the 3,898 eligible, but unvaccinated PMC children had refused vaccination.  However, of the 3,453 eligible, but unvaccinated PMC children included in the February data, 1,130 were shown as having refused vaccination.  Another 41 PMC children were "still considering" whether to get vaccinated, according to the updated February data.  The differences may be the result of the State's work between January 14, 2022 and February 16, 20222 to better identify the reasons children are not vaccinated.  As discussed, above, the January data listed "other" as the reason that more than half of the children were unvaccinated; in the February data, this reason category was almost entirely eliminated and new categories were added.[50]

**Table 3. Reason Eligible PMC Children Not Vaccinated, February 16, 2022**

| Reason Child is Not Vaccinated | Frequency | Percent |
|---|---|---|
| Adopted/Not in Care | 13 | < 1 % |
| Caregiver Refused | 689 | 20 % |
| Caregiver Still Considering Whether to Get the Child Vaccinated | 265 | 7 % |
| Child Refused Vaccine | 1130 | 33 % |
| Child Still Considering | 41 | 1 % |
| Deceased | 3 | < 1 % |
| Dr Advised Against | 33 | 1% |
| Has Covid/Quarantined | 24 | < 1 % |
| In Detention/Jail | 10 | < 1 % |
| Other (See Explanation) | 52 | 2 % |

---

[50] Table 3 is based on the Monitors' analysis, which created additional categories not used by the State to reduce the "other" category still further.  The State's February data included 154 unvaccinated PMC children (4%) in the "other" category for the reason not vaccinated.

30

| | | |
|---|---|---|
| Out of State | 5 | < 1 % |
| Parent Refused Vaccine for Child | 268 | 8 % |
| Pregnant | 2 | < 1 % |
| Scheduling Appointment/Will Schedule | 861 | 25 % |
| Unauthorized Absence from Placement/Runaway | 57 | 2 % |
| **Total** | **3453** | **100 %** |

An examination of the reasons that eligible PMC children are not vaccinated by age group shows that the biggest increases in the numbers of children that the State documents as having refused the vaccines were in children aged 11-to-16 years old.  The February data added new categories, breaking out "parent refused" and "caregiver refused" and adding categories allowing caseworkers to document whether the caregiver (but not the parent) indicated they were still considering whether to have a child vaccinated.[51]  This resulted in a reduction in the number of cases in which a parent refused (from 413 in the January data to 268 in the February data), and a much larger number of cases (689) in which the child's caregiver refused vaccination.  While the Monitors review of IMPACT showed that in many of these cases, the caregiver expressed concern about whether the vaccine was safe for the child, it is notable that a doctor advised against vaccination in only one percent (33) of the cases involving an eligible, but unvaccinated, PMC child.

---

[51] The "other" category shows that some caseworkers are still having difficulty reaching parents.  In one of the cases, the notes in the February 16, 2022 for the "other" category indicate, "Caseworker contacted…parents 1/13/22 and 1/25/22.  On 1/25/22 the phone was no longer in service.  I texted and visited the maternal grandmother…and asked for assistance with contacting the parents on 1/27/22.  She said she will ask the parents and let me know.  That was my last attempt."  IMPACT indicates that the fictive kin caregiver is the medical consenter for the six-and-seven-year-old unvaccinated siblings.  An older sibling who lives with a different relative is already vaccinated.  In another case involving a child flagged by the State as having a condition that places her at high risk for severe disease, IMPACT records note, "[Child] is not vaccinated for COVID 19 at this time.  It is unknown if parents would consent to the vaccine as they are not currently in contact with DFPS.  The judge is not making vaccination decisions at this time.  [Child] may receive the vaccine after [termination of parental rights] and if the foster parent wishes for her to be vaccinated."  In another case involving a child flagged as having a condition placing her at high risk for severe illness, the January data noted that DFPS attempted to call the child's mother to obtain permission for the vaccine; the February data still shows the child is unvaccinated and notes, "We have continued to try and contact the mother for permission; however, she is unresponsive and not able to be located.  Will be requesting court permission at next hearing given we cannot locate her for response."  A caregiver at the emergency shelter where the 10-year-old is placed is listed in IMPACT as her medical consenter.

31

**Table 4.  Reason Eligible PMC Children Not Vaccinated by Age Group, February 16, 2022**

| Reason Child is Not Vaccinated by Age Group | | | | | | |
|---|---|---|---|---|---|---|
| | Age Range | | | | | Total |
| Reason Child is Not Vaccinated | 5 to 7 | 8 to 10 | 11 to 13 | 14 to 16 | 17+ | |
| Adopted/Not in Care | 6 | 3 | 3 | 1 | 0 | 13 |
| Caregiver Refused | 284 | 214 | 126 | 52 | 13 | 689 |
| Caregiver Still Considering Whether to Get the Child Vaccinated | 108 | 80 | 51 | 22 | 4 | 265 |
| Child Refused Vaccine | 69 | 90 | 212 | 496 | 263 | 1130 |
| Child Still Considering | 2 | 6 | 9 | 13 | 11 | 41 |
| Deceased | 1 | 0 | 2 | 0 | 0 | 3 |
| Dr Advised Against | 11 | 9 | 7 | 3 | 3 | 33 |
| Has Covid/Quarantined | 7 | 10 | 3 | 3 | 1 | 24 |
| In Detention/Jail | 0 | 0 | 1 | 4 | 5 | 10 |
| Other (See Explanation) | 20 | 11 | 9 | 9 | 3 | 52 |
| Out of State | 0 | 2 | 3 | 0 | 0 | 5 |
| Parent Refused Vaccine for Child | 101 | 71 | 51 | 35 | 10 | 268 |
| Pregnant | 0 | 0 | 0 | 0 | 2 | 2 |
| Scheduling Appointment/Will Schedule | 262 | 248 | 195 | 127 | 29 | 861 |
| Unauthorized Absence from Placement/Runaway | 0 | 0 | 1 | 31 | 25 | 57 |
| **Total** | **871** | **744** | **673** | **796** | **369** | **3453** |

VI.   CONCLUSION

As the federal government updated its emergency use authorization to include younger children, DFPS issued updated guidance to its own staff regarding vaccination of children in the State's conservatorship.  The guidance changed to require parental notification if a parent's rights had not been terminated, without reference to whether the parent was a medical consenter for the child.  The guidance also appears to require the child's assent, even if the children have not been determined to have capacity to be their own medical consenters.  The Monitors' review of IMPACT shows the policies, particularly those related to a child's assent, may be confusing, with caseworkers querying even very young children as to whether they would agree to vaccination. This policy could be contributing to low vaccination rates for PMC youth: according to the data received by the Monitors on February 16, 2022, only 39% (2,636 of 6,723) of eligible PMC youth having received both doses of the vaccine, and an additional nine percent (633) of eligible PMC youth having received only one vaccine dose.