IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as | § | |
| Governor of the State of Texas, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

### <u>Update to the Court Regarding The Refuge for DMST</u>

On March 10, 2022, the Department of Family and Protective Services ("DFPS") informed the Monitors about "an urgent situation" concerning child safety at The Refuge for DMST ("The Refuge"), a Residential Treatment Center ("RTC").[1] DFPS wrote that on March 8, 2022, the department issued a child placement hold at The Refuge and "to ensure the youth's safety," deployed staff from its Child Protective Services ("CPS") and enlisted off-duty law enforcement to the facility; the following day, DFPS removed all DFPS-placed youth from the facility and placed eight of the nine children in less restrictive placements that specialize in serving victims of commercial sex trafficking. DFPS reported that it had received several reports between January 24, 2022 and March 4, 2022 alleging Sex Abuse, Exploitation, Neglectful Supervision, Physical Abuse, and Medical Neglect at this operation. DFPS' notice to the Monitors reported that the incidents potentially involved human trafficking of children residing at The Refuge by staff members, including selling nude photos of children and providing them with drugs. At the time that DFPS alerted the Monitors, five of the nine DFPS-placed children residing at The Refuge were in the Permanent Managing Conservatorship ("PMC") of Texas.

---

[1] DFPS, Letter from The Refuge, ECF. No. 1195 (March 10, 2022). Five minutes before DFPS General Counsel Vicki Kozikoujekian sent the letter to the Monitors via e-mail, Karl Neudorfer, an Assistant Attorney General representing DFPS, called Monitor Deborah Fowler and asked whether the Monitors could join the State via teleconference to be briefed on an unfolding situation at an operation.  Mr. Neudorfer declined to provide specific information, but asked that the Monitors join the State for the briefing within half an hour, which lent a sense of urgency to the request.  A teleconference was scheduled for later that day.

After the Monitors briefed the Court, a hearing was held the afternoon of March 10, 2022. At the hearing, the Court directed the Monitors to investigate the safety history of The Refuge and the allegations described in DFPS's communication.[2]

On March 10, 2022, Texas Governor Greg Abbott announced that he had "ordered an immediate investigation by the Texas Rangers into reports of child sex trafficking at The Refuge."[3] Just six days later, on March 16, 2022, a letter from Steven McCraw, Director and Colonel of the Texas Department of Public Safety, to Governor Abbott summarized DPS's "initial findings" that there was "no evidence that any of the residents at the Refuge shelter have every been sexually abused or trafficked while at the shelter" and "[t]here are no allegations or evidence that these residents were sexually abused or assaulted by anyone."[4]  McGraw said "a team of Texas Rangers conducted interviews of Refuge shelter residents, shelter employees and DFPS employees."[5]  Yet, the Monitors' review of IMPACT and CLASS records revealed that at least one child victim was not interviewed by a Texas Ranger until well after the DPS letter became public, and that the child was upset by the Rangers' conclusions.[6]  The evidence strongly suggests Col. McGraw's conclusion that there was no evidence of sexual abuse or trafficking at The Refuge was, at best, premature.[7]

---

[2] Official Amended Transcript of March 10, 2022 Status Conference (Via Zoom), ECR 1203.

[3] Office of the Texas Governor, Press Release: Governor Abbott Orders Texas Rangers To Investigate Reported Trafficking At State-Contracted Shelter for Children, March 10, 2022.

[4] Letter from Steven McCraw, Director and Colonel of the Texas Department of Public Safety, to Greg Abbott, Governor of Texas (March 16, 2022) (Publicly released and on file with the Monitors).

[5] Id.

[6] During child AA's March 23, 2022 interview with a DFPS investigator, AA was informed that "the Texas Rangers would be in contact with her regarding telling her story." AA responded that she had recently been contacted by the Texas Rangers "a couple days ago" and that she was cooperating with them. According to DFPS's investigative notes, AA said "she wanted her side of the story told and was upset when she learned that a Ranger report had stated that there were no findings. She said that she had proof." Monitor Deborah Fowler asked DFPS on March 21, 2022 which children from The Refuge had been interviewed by the Rangers. Email from Deborah Fowler to Jaime Masters, Commissioner, DFPS, March 21, 2022 (On file with the Monitors).  Karl Neudorfer, an Assistant Attorney General representing DFPS, informed the Monitors on March 28, 2022 by telephone conference that DFPS knew the answer, but was prohibited from disclosing the information to the Monitors.

[7] Under federal law, the creation and sale of certain kinds of materials that constitute "child pornography" is a prohibited form of human trafficking as defined under 18 U.S. Code § 2427, which is entitled "Inclusion of offenses relating to child pornography in definition of sexual activity for which any person can be charged with a criminal offense." Section 2427 states that "the term 'sexual activity for which any person can be charged with a criminal offense' includes the production of child pornography, as defined in section 2256(8)." [which defines sexually explicit content]. In addition, the Texas Penal Code's definition of trafficking is broad enough to include a scenario in which a perpetrator "entices" or "recruits" a child to "engage in, or become the victim of" possession or promotion of child pornography, or "'receives a benefit from participating in a venture that involves" possession or promotion of child pornography.  See Tex. Penal Code §§20A.01, 20A.02; Tex. Penal Code §43.26.  A person commits possession of child pornography if she knowingly or intentionally possesses, or knowingly or intentionally accesses with intent to view, visual material that visually depicts a child younger than 18 years of age engaging in "sexual conduct," the definition of which includes "lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola."  See Tex. Penal Code §43.26; Tex. Penal Code §43.25.  Though the Rangers apparently did not interview AA (one of the two children who were allegedly given drugs in exchange for nude photos) until March 23, 2022, during AA's January 26, 2022 interview with DFPS, AA told the investigators that when she used G's phone to take photos of herself, she took pictures of "everything."  BB, the other alleged child victim in that investigation, was interviewed the same day and when DFPS asked, "What kind of pictures did you take?" BB answered, "It was in

2

In response to the Court's March 10, 2022 order, the monitoring team reviewed thousands of documents, including The Refuge's licensing history; its history of minimum standards violations; records and documents associated with DFPS investigations of child abuse, neglect, and exploitation closed between January 1, 2021 and January 1, 2022; employee records from The Refuge requested by the Monitors; audio recordings and documents from Statewide Intake ("SWI") in 2021 and 2022; and documents and information related to pending investigations. The Monitors' review revealed ample evidence for DFPS to substantiate child Sex Abuse,[8] Exploitation,[9] Neglectful Supervision,[10] and Physical Abuse[11] based upon evidence that a Refuge staff member provided drugs to two children, AA and BB, in her care, and induced them to take and sell, or try to sell, naked photographs of themselves in exchange for drugs.[12] Furthermore, four staff at The Refuge were either involved in helping a child run away from The Refuge or had undisclosed contact with the child after she fled, and there is ample evidence to substantiate allegations of Neglectful Supervision by numerous caregivers at The Refuge. The records made available to the Monitors to date also include significant evidence of serious risks to child safety at The Refuge, including recurrent failures to provide 24/7 awake-night supervision of children in violation of Remedial Order A-7, managerial knowledge and awareness of awake-night staff sleeping during shifts and failing to properly report it; staff failures to maintain appropriate boundaries with children; and record-keeping failures that posed a risk of harm to children. Lastly, the Monitors found evidence that leaders at The Refuge failed to report to DFPS a child's outcry of alleged abuse and neglect by a staff member in 2021.

## Safety History of The Refuge

1. Licensing History and History of Minimum Standards Violations

---

a lewd manner." When the DFPS investigator asked her to explain what she meant, she said "It was..a selfie with my boobs out."

[8] Causing, permitting, encouraging, engaging in, or allowing the photographing, filming, or depicting of the child if the person knew or should have known that the resulting photograph, film, or depiction of the child is obscene as defined by §43.21, Penal Code, or pornographic, by a person responsible for a child's care, custody, or welfare. 40 TEX. ADMIN. CODE §707.791 (a)(4).

[9] Exploitation is a statutory definition that appear in Texas Family Code §261.001(3) and involves the illegal or improper use of a child or of the resources of a child for monetary or personal benefit, profit, or gain by an employee, volunteer, or other individual working under the auspices of a child care facility or program. 40 TEX. ADMIN. CODE §707.799

[10] A negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program, including failure to comply with an individual treatment plan, plan of care, or individualized services plan that causes or may cause substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy. 40 TEX. ADMIN. CODE §707.801(a).

[11] Causing, expressly permitting, or encouraging a child to use a controlled substance as defined by Chapter 481, Health and Safety Code, by a person responsible for a child's care, custody, or welfare. 40 TEX. ADMIN. CODE §707.789(a)(4)

[12] As the Monitors have previously written, when DFPS substantiates child maltreatment by a preponderance of the evidence (more likely than not), the agency describes the finding as "Reason to Believe" (RTB).

The Refuge for DMST, described on its website as a "place of rest and restoration for child survivors of sex trafficking," is licensed as an RTC to serve up to 24 girls aged 11 to 17.  It received its initial permit to operate from the Health and Human Services Commission's ("HHSC") Residential Child Care Regulation ("RCCR") on August 3, 2018, and a full license on February 1, 2019.  On March 11, 2022, in response to the safety concerns discussed above, RCCR issued an emergency suspension of the operation's license, which will expire on April 10, 2022.  In making the decision to suspend the operation's license, RCCR reasoned in CLASS: "DFPS initiated three [abuse, neglect, or exploitation investigations] and upon review, HHSC determined immediate risk to children.  Considering the threat factors found in 26 TAC 745.751(1), (2), (3), (11), and (12),[13] the severity and circumstances of the deficiencies and the risk of abuse, neglect, and or exploitation as well as the consideration of the vulnerability of the population that is served at this operation."

According to RCCR, as of March 17, 2022, the operation had been cited 43 times for non-compliance with minimum standards over the course of the three years it has been operating.[14] HHSC provided the Monitors with the table, below, identifying the citations issued as of that date.[15]

| Row Labels | Count of Subchapter | Specific citations |
|---|---|---|
| Admission, Service Planning, Discharge | 4 | Preliminary service plan (2), Initial service plan, Admission |
| Background Checks - TAC 745 | 5 | AP BGC results (2), BGC Validation (2), BGC determination |
| Child Care | 4 | Tobacco (3), TB exam |
| Child/Caregiver Ratios | 2 | Ratio, Ratio |
| Children's Rights | 3 | Right to make complaints, Right to contact others, free from belittling remarks |
| Emergency Behavior Intervention | 2 | EBI documentation, Triggered review |
| Medication | 5 | Admin or Rx meds, Medication error, Medication docs (2), Med storage, |

---

[13] 26 TAC 745.751 lists the factors that RCCR considers when determining whether a person or an operation is a threat to the health or safety of children.  Those listed by RCCR include: (1) The severity of the deficiency, including abuse or neglect; (2) The circumstances surrounding the deficiency, including abuse or neglect; (3) The seriousness of injuries to children; (11) The current position, role, and responsibilities of the person; and (12) The degree and immediacy of the threat or danger.  *Id.*

[14] E-mail from Katy Gallagher, Attorney, Foster Care Litigation, HHSC, to Deborah Fowler and Kevin Ryan, re: Q re: citations for The Refuge, March 21, 2022 (on file with the Monitors).

[15] *Id.*

| Personnel | 10 | Judgment (2), Caregiver responsibility-supervision (2), LCCA Responsibilities (2), Caregiver responsibility-able to intervene (3), Caregiver responsibility-safe environment |
| Physical Site | 3 | Food prep (3) |
| Reports and Record Keeping | 4 | Report to RCCR, Records available (2), affidavit, |
| Safety and Emergency Practices | 1 | Disposal of bodily fluids |
| **Total** | **43** | |

Of these citations, more than half (25, or 58%) were associated with minimum standards ranked medium-high or high.[16]  As indicated by the table, the most often cited violations were associated with minimum standards for staff, caregiver, or licensed administrators' judgment, responsibility or supervision, or ability to maintain a safe environment for children.  Of these 10 citations, six[17] were issued by RCCR in connection with three reports of abuse, neglect, or exploitation made to SWI after January 24, 2022 (discussed below), though the DFPS investigations remain pending. Both of the citations associated with child-to-caregiver ratios are also associated with the pending abuse, neglect, or exploitation investigations and resulted from findings that awake-night staff slept during their shifts.[18]  The remaining citations are associated with Priority 3 RCCR licensing investigations or inspections. During testimony at a recent hearing of the Human Services Committee of the Texas House of Representatives, the Chief Policy and Regulatory Officer for HHSC indicated that more citations may be issued in pending investigations, depending on DFPS' findings.[19]

Two of the ten citations for standards violations at The Refuge are associated with Priority 3 RCCR investigations initiated after January 24, 2022.  One of these intakes, reported to SWI on January 26, 2022 by the child victim's caseworker, was reported after the caseworker noticed the odor of what she believed to be marijuana in the child's room during a face-to-face visit conducted

---

[16] Testimony of Jordan Dixon, Chief Policy and Regulatory Officer, HHSC, House Human Service Committee Hearing, March 21, 2022.
[17] The Refuge has requested an administrative review of all of the citations issued in association with investigations initiated on or after January 24, 2022, and the administrative review is still pending.
[18] When the employee records were reviewed, the Monitors found that a staff person was given an informal warning by The Refuge for sleeping during awake-night shifts.  The warning states, "On December 2, 2021, Supervisor…spoke with Connections Specialist [name omitted] regarding supervision issues during her overnight shift.  Over the phone with [senior leader T], [the staff person] stated that she fell asleep several times during multiple shifts.  [The staff person] has been vocal about moving to day shift to assist with her sleep schedule and Supervisor…and [T] have communicated that her temporary move to days will be for about two weeks in October before she temporarily moves back to overnight shifts until a permanent day spot opens.  [Staff person] has officially been moved to the day shift in December 2021."  The Refuge did not report this violation to RCCR or DFPS, despite being required to do so per policy.  RCCR also found this record, and reported the violation to SWI on March 25, 2022.  The resulting DFPS investigation is still pending
[19] Id.

on January 25, 2022.  The child victim in that investigation was BB, one of the two alleged victims in the January 24, 2022 abuse, neglect, and exploitation investigation discussed below.  This intake was merged with a February 10, 2022 report to SWI made by an RCCR inspector/investigator, who reported that during an interview for the January 26, 2022 Priority 3 investigation, BB said that during the time period when her cottage mate was isolated in another cottage with COVID, BB was given a walkie-talkie and left alone in the cottage without supervision, monitored only via camera and by staff who occasionally visited to check on her.  BB reported that she did not feel safe in the cottage by herself and that she had expressed feeling unsafe to staff at The Refuge.

During the investigation, BB reported that she could not have smoked marijuana in her cottage because the smell would have permeated the entire cottage, and staff would have noticed. AA, BB's roommate, agreed that staff would smell marijuana if smoked in the cottage.  M, the House Parent for the cottage where BB lived, said she never smelled marijuana. BB and AA reported that their rooms were searched twice after the January 24, 2022 intake reporting a staff member gave AA and BB drugs in exchange for nude photos, and nothing was found.  However, BB reported to the RCCR inspector/investigator that staff member G, the alleged perpetrator in the January 24, 2022 abuse, neglect and exploitation intake, offered BB and AA a "blunt."[20]  When RCCR interviewed BB's caseworker, she reported that during a forensic interview, BB "reported to the interviewer that she was given a Dab Cartridge" by G, the alleged perpetrator in the January 24, 2022 abuse, neglect, and exploitation investigation.  BB's caseworker explained that a Dab Cartridge "is THC oil and is very concentrated."  M, BB's House Parent, also stated that BB "admitted to her when she was leaving that she found a vape or a 'puff bar,'" though she said BB did not indicate it was marijuana.  The notes for BB's forensic interview,[21] included in the CLASS chronology for the January 24, 2022 abuse, neglect, and exploitation investigation, also indicate that BB "stated [G] got her a dab cartridge in January and she didn't tell the detective because she did not want to get drug tested."

During RCCR's investigation of the Priority 3 intake, BB reported that the first period during which she was left alone in the cottage, unsupervised (except by camera),[22] was "right after Christmas to a little after New Year's," and records reviewed for the investigation showed that AA

---

[20] A "blunt" is a cigar that has had tobacco removed and replaced with marijuana.  *See* Healthline, *What is a blunt, anyway?*, *available at* https://www.healthline.com/health/what-is-a-blunt#blunts A staffing for the investigation held on February 28, 2022 fails to note this, and instead says "[BB] reported staff…did bring drugs to she and [AA] but not marijuana."

[21] The recordings of the alleged victims' forensic interviews have not been made available to the Monitors.

[22] It is unclear how often BB was left on her cottage without supervision.  A second interview with RCCR on February 15, 2022 appears to indicate this was still occurring.  During that interview, "[BB] reported she did not have a walkie yesterday and believes someone on Cottage 8 was supervising her" and "[BB] reported they are short staffed and she believes this is why she's left with a walkie.  [BB] reported her staff has been moved to other cottages…with the new residents."  BB also told RCCR during this interview that they could only make calls from the phone in the cottage to numbers that had been pre-programmed into the phone and "she [did] not think the licensing or ombudsman number has been programmed into the phone."  By the time that T (the senior leader named as an alleged perpetrator in the pending investigations discussed, below) was interviewed on March 16, 2022, she reported that she was informed by an RCCI investigator that BB had voiced concerns about being in the cottage alone, and that a safety plan was subsequently implemented so that BB would not be left alone.  She also reported that the number for licensing was programmed into the phone on the cottage on February 15, 2022, the date of BB's second interview in this RCCR investigation.

was sick with COVID until January 7, 2022 (approximately two weeks prior to the caseworker's visit and the search of the children's bedrooms). T, the senior staff with The Refuge discussed in the pending investigations, below, confirmed that BB was allowed to be alone in her cottage during the day; she indicated that this was consistent with their policy for children who reach a certain level ("Level 3") within their behavioral system.[23] T, who was interviewed by RCCR on March 16, 2022 (almost two months after it was discovered that AA and BB had exchanged nude photos with G for drugs) "reported [BB] is not known to be one of the children that breaks the rules." T said that they did not understand this to be a violation of the minimum standards, and believed it promoted normalcy for children. She said that when a DFPS investigator who interviewed BB in connection with a pending investigation told staff at The Refuge that BB expressed discomfort with the lack of supervision, a safety plan was put in place that did not allow her to be alone in her cottage. The safety plan, dated February 17, 2022, was reviewed by RCCR as part of the investigation.

Though BB had awake-night staff even when she was in the cottage alone during the day, her awake-night staff during that time (and prior to her caseworker's visit on January 25, 2022) was G, who allegedly provided drugs to BB. Despite BB's acknowledgment that G offered or provided marijuana to her, RCCR did not issue a citation associated with the allegation that BB may have had marijuana.[24] Instead, RCCR issued two citations, one for violation of the minimum

---

[23] Despite this, other staff interviewed for the investigation expressed discomfort with the decision to allow BB to remain on her cottage alone. For example, BB's house parent, interviewed on March 24, 2022, reported to RCCR that "she had concerns about their behavior" and "was uneasy with the type of supervision for stage 3 residents" but "was told by supervisors that [BB] could be supervised by a camera." The house parent "reported she had concerns about that type of supervision because they are in treatment" but "reported the management staff told her it was appropriate because they were preparing [BB] to live independently." She also said "when [BB] moved up to level 3 her behaviors became problematic" and "started telling her supervisor that something is up" because BB's demeanor changed. The house parent said she told [a supervisor] about her concerns because "their behaviors were escalating and she had concerns" and also "told [T] that she refused to work on the cottage until things got under control." She said that she believed their behaviors escalated "due to a staff on the Cottage who worked overnight." The house parent reported that AA was also given a "walkie," suggesting that both AA and BB were left unsupervised in the cottage, and that she "had concerns because there were poor boundaries from other staff who worked in the Cottage with [AA] and [BB]." The house parent reported that [EE] was also "given a walkie and she had concerns after [EE] started staying at her job later when it became dark" and "reported again the girls are treatment service children and they should never be left alone."

Similarly, another senior staff member interviewed on March 26, 2022 for the investigation asked T, a senior leader at The Refuge, about BB being left alone in the cottage and T "reported to her that they were short staffed" and that "licensing had been spoken to about this type of supervision and it was okay." However, the staff member said "she knew it was wrong that [BB] was left alone." She said "supervision was brought up to upper management [who] brushed it off." She reported that "[BB] was not okay about being left alone and she voiced that." She indicated BB was left in the cottage alone "for 4 days at one time and again left alone." She also reported another child was left alone in the cottage when they did not go to school, but did not identify which child. Though she did not believe BB would smoke marijuana in the cottage (despite ample evidence by the date of her interview that BB had used drugs given to her by G) she did believe G "could have brought her a vape pen or a cartridge because there were concerns that other residents were given vape pens by other staff."

[24] The three citations issued to The Refuge for violation of the minimum standards associated with prohibiting children in care from having tobacco products suggests that access to contraband may not have been unusual. Two of the citations are associated with the pending abuse, neglect, and exploitation investigations initiated on or after January 24, 2022, discussed below. The first was issued when it was discovered during the course of an abuse, neglect, or exploitation investigation (with an intake date of August 1, 2021), "it was found that on 7/17/21, two children in care shared and smoked a cigarette on campus that was given to one of the two children by a staff member." The finding

standards associated with a caregiver's responsibility for providing the level of supervision necessary to ensure a child's safety, and a second related to the failure to appropriately instruct caregivers about the level of supervision BB required in her initial service plan. The Refuge has requested administrative review of these citations.

Another citation related to caregiver or employee supervision or responsibilities resulted from an investigation of a February 3, 2022 report to SWI that two children locked staff out of a cottage and caused property destruction to the cottage. After investigating, RCCR cited the operation for violation of the minimum standards associated with caregiver responsibility, finding that the door to the cottage was supposed to be locked, but was "unlocked accidentally" by a staff person, allowing the children to gain access and barricade themselves in the cottage. RCCR also found that one of the children exited the cottage through a window while the other child engaged in the property damage, but when the child who left attempted to gain help from staff in the administration building and another cottage, no staff came to the youth's aid until law enforcement arrived. In addition, RCCR found that though the operation reported that the children were being monitored by camera during the time that they were barricaded in the cottage, there was a 10-minute period during which the cameras were not turned on. In the narrative associated with the citation, RCCR noted, "Staff were unable to provide proper supervision and de-escalation techniques to prevent this incident."[25]

Finally, the other two of the ten citations related to supervision resulted from Priority 3 investigations initiated and closed by RCCR prior to January 24, 2022. The first involved a December 26, 2021 intake alleging that a child who was "in an unauthorized relationship with another girl in the facility" was breaking things, starting fires, and threatening to hurt staff. She also tried to cut herself with a hairpin. This intake was merged with a report made on December 25, 2021, alleging that two children were physically aggressive toward staff and threatened staff with a butter knife. During the investigation inspection, RCCR cited the operation for violation of the minimum standard associated with a caregiver's responsibility for providing a safe environment after the inspector "observed…3 kitchen cutting knives and 1 razor were left in the unlocked houseparent's bedroom. It was also observed two bottles containing chemical substances

---

was made after The Refuge produced a serious incident report for one of the alleged victims that indicated that on July 17, 2021, "Youth [name omitted] asked [staff 1]…to take her to Cottage 6 so that she could find some artificial nail tips, upon entering the cottage youth [name omitted] turned on the stove and began lighting a cigarette which she had been given by [staff 2]. When youth [name omitted] got the cigarette lit she proceeded to walk out of the cottage and into cottage 4 to share the cigarette with her cottage peer…both youth then took a puff of the cigarette and proceeded out of the cottage and began walking towards the school. At this time [staff 3] joined the youth and [staff 1] and she was able to talk with the girls and get them to put the cigarette out."

[25] Another citation was issued in association with this investigation for violation of the minimum standard that requires records be made available to licensing; RCCR noted, "The operation was unable to provide records for this investigation immediately upon request by licensing. This inspector had to make several attempts by phone and email to remind the operation to provide the requested records on time and the operation only provided those records after they were reminded. Additionally, this inspector was unable to open one…record provided. It has been an on-going issue with the operation where the operation will delay sending records, state they've sent records, but nothing has been received, will send records that licensing is unable to open, and/or will send records after being requested several times." This citation is also pending administrative review.

were left unattended in a child's room." The same inspection also resulted in two of the five citations the operation has received related to violations of minimum standards associated with medication, because, according to CLASS records, "[t]here were at least 5 medication errors not completed on the medication prescribed to the 4 children reviewed," and "it was observed that the operation was not maintaining a cumulative record for at least 5 prescribed medications."

RCCR also has issued three citations to The Refuge for violations of minimum standards associated with children's rights. The first of these was issued as the result of RCCR's investigation of two Priority 3 intakes that occurred on March 17, 2020, and March 18, 2020. During the investigation of the unrelated allegations,[26] RCCR found "that staff persons used both derogatory language and inappropriate language around children in care" and that the behavior was "reported to have occurred on at least 2-3 different occasions around several children in care." The findings associated with one of the Priority 3 investigations elaborated, "a staff person used the 'n' word and the word 'nigga' or 'nigger' around children in care multiple times and also used the word 'fool' and another staff also used the word 'fool' around children in care." The other two citations associated with children's rights were issued in connection with a child's December 6, 2020 report to SWI that she was not allowed to call her CPS caseworker and reported "not feeling safe because the phone she used to make phone calls is recorded and not confidential." The child reporter in this case was AA, one of the child victims in the pending DFPS investigations discussed below. One of the citations was issued because RCCR found:

> [T]hat all calls made by residents from the cottages are supervised/monitored by staff. Sometimes calls to professionals/child's legal team are on speaker, all calls from the cottage are recorded and certain calls have been reviewed at a later tiem by a designated staff by them logging onto their recording system from their personal phone.

> The children were informed that they have the right to private calls by the operation, however staff are present during all calls, recorded, and at times reviewed including calls with their legal team. These screenings for telephone calls were reported for all residents at the operation, however justification for these screenings were not properly documented or approved on the 3 service plans reviewed with children involved. Restrictions were also not documented on their call list and/or the operation's policies/procedures.

The other citation was issued because during the inspection, "it was observed that the ombudsman posters were missing." This investigation and the inspection associated with it also resulted in a citation associated with medication records, because prescription medication administered to a resident was not documented on the medication log within the required timeframe. It also resulted in technical assistance associated with, among other things, caregiver responsibility ("Please ensure staff do not leave residents by themselves in the cottage for a period of time. If a child is in need of making a private call, the operation should have ways for them to go about this without

---

[26] One intake alleged that a child was injured when two children fought over a t.v. remote, and the other alleged that after staff became suspicious that a child was smoking in her cottage bedroom, she began having symptoms of a seizure.

violating residents' rights to privacy and confidentiality and without violating supervision requirements"), and child/caregiver ratios ("Please ensure that child/caregiver ratios are being met and that children in care are appropriately supervised at all times.").

Several citations were issued for violation of minimum standards associated with background checks. The Texas Administrative Code requires background checks to be conducted for the owners and operators of licensed operations, along with its employees.[27] Background checks are conducted by the Centralized Backgound Check Unit ("CBCU") of HHSC. RCCR policy dictates the type of background check required for prospective employees or caregivers in licensed operations, based on the type of operation, the person's role at the operation, and whether the person has lived out of state in the five years prior to the background check request.[28] All staff working in licensed facilities are required to have a fingerprint-based criminal history background check, in addition to a name-based search of the Texas Central Registry of reported cases of child abuse and neglect, and of the sex-offender registry.[29] Once the CBCU has completed the background check for a prospective caregiver or employee, the operation must keep the staff member "active" in HHSC's CLASS-based roster for the operation, so that background check information remains up-to-date, and operations receive an alert if there is any change in the staff member's eligibility to work in a licensed facility.[30]

Two of the five citations issued to The Refuge resulted from the operation's failure to timely inactivate roster entries for staff who no longer worked for the operation. The operation had previously received technical assistance from RCCR for the same minimum standard violation. Two other citations associated with violation of minimum standards related to background checks were for inactivating staff from the HHSC CLASS-based roster who continued to work at the facility. However, once this mistake was discovered and the employees were reactivated in the HHSC roster, background checks were again conducted, and determined that the staff were still eligible to work in a licensed operation.

The most concerning citation issued to The Refuge for violation of a minimum standard associated with background checks was issued after RCCR determined that a staff member whose background check resulted in a "Provisional" approval by CBCU had been allowed to have direct contact with children. Provisional approval allows a person to be present at an operation, but under specific conditions articulated by the CBCU.[31] The staff person, L (who is also the alleged perpetrator in one of the closed abuse, neglect, and exploitation investigations discussed, below), applied for a position with The Refuge in October 2019, and was notified on November 5, 2019 that the CBCU background check resulted in a Provisional approval, subject to seven conditions, including that she could never be alone with a child or group of children in the care of or enrolled in the operation, including during transportation. It also prohibited her from administering medication to children in the care of the operation. A letter was issued to both L and to the

---

[27] 26 Tex. Admin. Code §746.605.
[28] RCCR, Types of Background Checks, Child Care Regulation Handbook §10112..
[29] *Id*; RCCR, Types of Background Checks Required, Child Care Regulation Handbook §10310.
[30] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Perpetrators Background Information, March 14, 2022 (on file with the Monitors).
[31] RCCR, Types of Eligibility Determinations, Child Care Licensing Handbook §10510.

administrator of The Refuge outlining these restrictions.  A second letter was also issued to L (but not the administrator of The Refuge) describing the basis for the Provisional approval, indicating that in 2017, L had been investigated and found responsible for the Refusal to Accept Parental Responsibility of one of her adopted sons.[32]  The letter notified L of her due process rights and the procedure for requesting a review of the RTB determination.  Despite the provisional approval and limitations placed around her contact with residents, L's employee records for The Refuge indicate that she was hired on November 11, 2019 as an "Overnight Connection Specialist." The job responsibilities for an Overnight Connection Specialist include supervising youth in the home during the staff person's scheduled overnight shift, providing one-on-one crisis intervention when a youth requires emotional support during the overnight shift, and distributing psychotropic medications to youth.[33]

On January 2, 2020, the CBCU issued a letter to L indicating that, due to the RTB, an approved risk evaluation was required "in order for [her] to be present at the child care operation." It notified her of the process for requesting a risk evaluation.  However, according to RCCR, L failed to follow through with the steps required for a risk evaluation by the deadline.[34]  Finally, on February 24, 2020, the CBCU sent a letter to L and to the administrator of The Refuge indicating that L had been found ineligible to be present at the operation, and requiring The Refuge to confirm by March 2, 2020 that L was no longer present at the operation.

The Refuge's employee records for L include an e-mail from the operation's director of human resources to the administrator for The Refuge, and to T, one of the senior staff discussed in the review of pending abuse, neglect, and exploitation investigations, below. The e-mail notes, "I've received the attached DFPS notice a few minutes ago related to [L] and her change in status from 'Provisional' to 'Ineligible' to be at The Refuge Ranch in any capacity currently. I'm sure this causes problems with the Direct Care Staff's scheduling processes but until resolved, I don't believe we have any other way around this DFPS directive and certainly don't want to risk being found out of compliance with DFPS."  The human resources director further stated, "I need to talk directly with [L] to figure out what's going on, as she didn't disclose to me with any information she received from DFPS back in OCT/Nov 2019, related to this matter."[35]  He further advised, "I may 'resubmit' [L] into the DFPS system to re-start the DFPS checking which may produce another 'Provisional' status for [L]. If that happens, then [L] will be free to be at The Refuge Ranch

---

[32] A review of the IMPACT history in the case showed that L's oldest son (who is the adult son referenced in the discussion of the RCCI investigation, below) had been found to have sexually abused a younger sibling, and after completing sex offender treatment and being released from juvenile probation, and back into the care of L and her husband, L and her husband later relinquished custody to DFPS due to her concern that the older child would again reoffend with the younger sibling.  L's son entered TMC in 2017, and PMC in March 2019, but parental rights were not terminated.

[33] The Refuge, Overnight Connection Specialist Job Posting, *available at* https://therefugedmst.org/overnight-staff

[34] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Perpetrators Background Investigation, March 14, 2022 (on file with the Monitors).

[35] In fact, as part of the paperwork she completed when she was hired by The Refuge, despite the 2017 RTB, L signed an "Affidavit for Applicants for Employment with a Licensed Operation or Registered Child-Care Home," an RCCR form required by minimum standards, in which she swore "under penalty of perjury" that (among other things) she had not had a report of child abuse or neglect made and substantiated against her.

AND give her the opportunity to 'clear up' whatever the issues are within DFPS."  L was placed on administrative leave by the operation on February 24, 2020.

The Refuge resubmitted a request for a background check for L on February 26, 2020.[36] The Monitors' review of IMPACT and L's employment records from The Refuge indicate that L's child was returned to her care in October 2019, around the same time that she applied for the position with The Refuge. Her employment records for The Refuge include a letter from DFPS indicating that though L and her husband had RTB history with DFPS, "the Department felt they were able to work services…to alleviate any safety concerns in their home.  The initial immediate safety concerns for their youngest sons [sic] wellbeing which led them to RAPR…have been alleviated.  [The child] has now returned to their home." L's employment records also include an order dismissing the related case dated February 18, 2020, and a request by L and her husband for administrative review of the RTB dated February 24, 2020, as well as a February 26, 2020 e-mail from the HR director to L and the administrator for The Refuge, stating that in addition to re-activating the background check for L, the human resources director forwarded the favorable DFPS letter and the dismissal order to the operation's DFPS representative.  L's employee records include a letter dated March 3, 2020 notifying L and her husband that the administrative review resulted in a change in the findings from RTB to Ruled Out.  On March 10. 2020, L was found eligible to be present at The Refuge by the CBCU, and she returned to work.

In addition to being cited for violations associated with violation of minimum standards associated with background checks, The Refuge was assessed an administrative penalty of $150 on December 16, 2021.  The notes associated with the penalty state, "On 11/18/21, the operation informed licensing that a staff…who had been inactivated as of 8/31/21 by the operation, continued to work at the operation with direct access to children in care with an inactive background check. The operation was unable to provide a reason as to why this happened and were unsure how it happened."  It indicated that the staff person's background check was re-run on November 22, 2021 and the staff person was determined to be eligible to be present at the operation.[37]

2.  Remedial Order 3: RCCI Investigations Review January 1, 2021 to January 1, 2022

According to the most recent Extended Compliance History Review (ECHR) for The Refuge, completed by an RCCR inspector on March 22, 2022 for an investigation inspection, since The Refuge was first licensed in 2018, there have been 36 intakes for reports of abuse, neglect, or exploitation to SWI, with no confirmed findings by DFPS as of March 27, 2022.  In keeping with the Monitors' work to evaluate implementation of Remedial Order 3, the monitoring team undertook a review of eight abuse, neglect, or exploitation investigations of The Refuge that closed between January 1, 2021 and January 1, 2022. In its review, the monitoring team sought to determine whether RCCI conducted appropriate investigations and appropriately identified and responded to any child safety concerns surfaced during the investigations. All eight of the closed investigations reviewed by the monitoring team were assigned a disposition of Ruled Out by

---

[36] *Id*.

[37] The Refuge also received one citation during a monitoring inspection on December 18, 2019, for violation of the minimum standard that requires applicants to sign a notarized document affirming that they have not been convicted of certain crimes or had a report of child abuse or neglect made and substantiated against them.

DFPS. The monitoring team agreed with DFPS's determination to Rule Out the allegations in five of these investigations; however, in three investigations, the monitoring team determined that the investigation was deficient and therefore, a disposition could not be rendered. One of the three investigations surfaced serious concern regarding a senior leader's failure to report alleged child abuse or neglect to DFPS.

In the first deficient investigation, a child's adoptive father reported allegations of Neglectful Supervision on April 22, 2021. The father alleged that his daughter, KK, (age 17) was placed at The Refuge due to significant childhood trauma, including as a victim of sex trafficking. While placed at The Refuge, a staff member, L, allegedly introduced KK to her adult son (age alleged 18 or 19). The reporter alleged L allowed KK access to her telephone and allowed her to use it to text and call her adult son. Due to the child's access to and relationship with the son, the reporter alleged that the child's therapeutic progress at the RTC was interrupted and the RTC eventually discharged the child. At the time of the intake report, KK and the adult son were allegedly "on the run" together.

The monitoring team found that this investigation was deficient due to flawed and missing interviews with key individuals. Because the child refused to be interviewed, the investigator should have interviewed additional collateral children to probe whether they had knowledge of the allegations. The investigator interviewed two children, both of whom denied knowing of the allegations. AA, one of the alleged victims in the pending investigations discussed below, was not interviewed though she was KK's roommate before KK was discharged from The Refuge. The investigator documented that the program administrator at the RTC was present during both of the child interviews with RCCI; the investigator did not document why the children were not ensured a private interview as required by policy.

Lastly, the investigator did not adequately probe information provided by a former staff member (W, who worked in the operation's equine therapy program) about the child and the child's relationship with L's son, and W's termination from the RTC, which W suggested was related to the instant allegations. During a June 8, 2021 interview with RCCI, L denied having any knowledge of the relationship between KK and her oldest son, said that her son had moved out of her home when he turned 18 (which would have been on March 19, 2020) and she had very little contact with him after that, and noted that she believed KK was a lesbian because of the relationships she had with other residents of The Refuge. L reported being surprised to learn of the relationship between KK and her son. L acknowledged that she introduced KK to her son in the summer of 2020, when L and her children ran into KK, another resident of The Refuge, and a staff member at a local park. KK and the other resident played basketball with L's son and his brother. However, L claimed she was only made aware of a romantic relationship between KK and her son on Easter (April 4, 2021), when W called her and told her that KK and L's son were dating and that KK had run away from her placement in north Texas where she had been moved after discharge from The Refuge. W told L that KK had run from the placement to stay with L's son, who was living in Austin. L said that W told her that if L's son could bring KK to W's house, KK could stay with her. L called her son and her son confirmed that KK was on a bus to Austin, and that he planned to pick her up when she arrived. L said she told her son to take KK to W's house. L said that KK never used her phone to contact L's son (in fact, she claimed she did not have a good cell signal on her phone when she was at work), denied all the allegations related to

L's encouragement of a relationship between the two, and said she believed KK used W's cell phone to contact L's son.

During W's interview with RCCI, which took place on July 2, 2021, W said that she became close to KK during her stay at The Refuge. She indicated that KK confided to her about her relationship with L's son. W said that KK told her that L would bring her gifts from L's son. W did acknowledge that KK probably used her phone to contact L's son; she said she asked KK to download photos of residents of The Refuge taken by W on her cell phone during equine therapy, and that she did not monitor KK during the time that she had W's cell phone. KK also later asked to use W's cell phone to call L's son, but W did not allow her to use it. W stated that she reported what KK confided to her regarding her relationship with L's son, and The Refuge terminated her employment just after she made the report. W also said that she believed that staff searched KK's room and found and removed items that L's son had given KK. W's last day at The Refuge was January 28, 2021. KK was discharged from The Refuge on February 21, 2021.[38] DFPS did not re-interview L after W contradicted much of what L said during her interview.

DFPS also did not examine employee records for W,[39] despite her suggestion that she was fired in connection with the incidents involving KK and L's son. Through the monitoring team's review of The Refuge employee records for W, the Monitors learned that approximately three months prior to the initiation of this deficient investigation, staff members at The Refuge sent two internal emails (dated January 28, 2021 and January 29, 2021)[40] involving these

---

[38] W's account of her ongoing relationship with KK after her employment with The Refuge was terminated also raises concerns related to appropriate boundaries between staff and youth. W said that because she had a close relationship with KK, after KK was discharged from The Refuge, KK's parents asked W to assist with KK's transition to her new placement in north Texas. W reported being with the family for about a week in February 2021 to help with KKs transition to the new facility. After KK ran away from the facility, L's son brought her to W's house. KK's adoptive parents gave W temporary guardianship of KK, whose 18th birthday was in August 2021. W stated that while KK was living with her, L's son came to pick her up for a date one day and KK never returned to W's house. CLASS records indicate that on June 7, 2021, KK's adoptive father called the RCCI investigator and said that KK was living in Austin with L's son, and that they had called the police to notify them that she was no longer a runaway.

[39] It is not clear whether DFPS examined all of the employee records for L. The CLASS chronology for the investigation indicates that DFPS reviewed The Refuge's training logs for staff member L. The Monitors' review of L's employee records do not clearly indicate when she stopped working at The Refuge. There is a document in her employee records indicating L was not returning to work, dated February 22, 2021. A subsequent e-mail from L to the operation's human resources director asked the human resources director to provide her with a termination letter so that she could "turn in some paperwork to get some help." The human resources director responded, and listed her "DOT" as February 22, 2021, and noted, "As we agreed, during Monday's conversation, your last day with The Refuge would be Monday, February 22, 2021 moving from a Leave of Absence (LOA) status with The Refuge."

[40] The January 28, 2021 e-mail was sent by a staff member to T, the senior staff discussed in connection with the pending DFPS abuse, neglect, and exploitation investigations, and to the director of HR for The Refuge. It stated:

Tuesday morning when I walked into Cottage 2, [EE][note: EE is the alleged victim in the February 22, 2022 intake, discussed below] told me that she was feeling anxious and really needed to go on a walk. When I took her on the walk, she said, "[Staff name omitted], I have to tell you something, but you can't tell anyone at all." I told her she knew that was not something that I could do and that if it hurts someone or someone was in danger or rules were being broken, I'm obligated to report it, and she stated she understood and knew that. [EE] then said "Well I am going to tell you anyways because I think y'all need to know because it's really bad." So I asked her again what it was and she said "You know how [KK] was at the equine center all day yesterday?" And I told her "yes, why?" [EE] said "All day when she was there, she was on [W's] phone." I said, "Wait, what do

---

14

you mean?"  [EE] said "[KK] texted her boyfriend and was on snapchat all day long."  I said "who is her boyfriend?"  [EE] said "[L's] son, the Overnight."  I said "How on earth is she dating [L's] son?"  [EE] said "She's been dating him ever since she saw them at the park and he asked her out." Then [EE] said and you know the day [L] cam to say hi to us? I responded "yes."  [EE] said "Well that day [L] brought her Gucci perfume and a note from her son as a gift."  I responded, "Oh my gosh that makes me so upset, I can't believe that."

At that time staff from cottage 2 came over the walkie and said they needed support, so we started walking back towards the cottage.  [EE] then said…"please don't say anything because then [AA] will beat my ass, she told me not to tell a single soul."  I told [EE] not to worry that I would have to tell [T] but that I wouldn't have to tell [AA] anything."

After I helped at cottage 2 I wnet to report the information to [T].  Shortly after we began the Covid testing, and [W] pulled [AA] away from the basketball court where we were doing the testing.  [W] didn't know that I knew about the situation, and neither did [AA].  I walked past [W] and she stopped talking until I got past her then I texted [T] to ask if I should intervene and [AA] made eye contact with me and I asked her if she was okay.  [T] did tell me to intervene, I told [AA] her lunch was ready and she had to hurry and eat.  [W] wouldn't make eye contact.  They continued talking.  Later I asked [AA] if it made her uncomfortable and she told me yes and I apologized for not being upfront and telling [W] she couldn't talk to her about the incident anymore.

The January 29, 2021 e-mail was sent to the operation's HR director and to T by a senior staff member, and said:

I checked in with [KK] regarding the allegations made involving her and contacting someone from outside of here.  [KK] stated that [L] had been letting her speak to her 18 year old son…for a while. [KK] explained that [L] had allowed her to call [her son] every night [L] worked.  She said that [L] allowed her to call so she could have someon to talk to and a couple of weeks after they began talking on the phone, [KK] let [L] know that they were going on an outing to the park and encouraged [L] to go and [L] agreed and said she would bring her kids.  [KK] said that she and [L's son] talked in person then and that they were able to send text messages and notes through [L] back and forth while she was working.  [KK] said that she had talked to [L's son] on the phone every night until [L] got sick and wasn't in and she had asked a few staff to let her contact him and they all refused.  [KK] stated that [L] got sick and wasn't in and she had asked a few staff to let her contact him and they all refused.  [KK] stated that [L] came to visit once and brough Christmas presents from [L's son] to her that included a ring, necklace, perfume and body scrub.  She stated that when [L] came to visit she also allowed [KK] to call [L's son].  [KK] stated that she hadn't spoken to [L's son] since [L] last visited and tried to contact him through…[W's] phone on Monday night.  She stated that [W] asked her to help her download pictures so she can sent them to [another staff member at The Refuge] to print and [KK] had her phone.  [KK] said she took advantage of it and began texting [L] to contact [L's son] and she said she accidentally got ahold of [another staff member with the same first name]…[KK] said [W] didn't know she was on the phone talking to anyone…[KK] stated that [W] did not allow her to contact…[L] at any time and she did it without permission.

I checked in with [AA] later that evening and she stated that [W] "creeped me out" when she made her talk to her on the Cottage 3 porch.  She stated that [W] asked her if she knew how to delete things from her phone and [AA] said she told [W] she didn't remember.  She stated that while [W] was talking to her, [AA] was trying to make eye contact with staff around her because she felt uncomfortable.  [AA] said that [W] told her to tell her what supervisors were asking and saying. [AA] stated that she felt nervous about everything because she thought [W] would hold over her head that her dad had snuck in his phone so she could print pictures and [W] knew and let her know she wouldn't tell anyone.  I asked if [W] had said she would tell on her or hold it over her head and [AA] stated that she never said it, [AA] was just feeling paranoid.

15

allegations. T, a senior leader at The Refuge, was listed as a recipient of these emails. The emails included information regarding the alleged child victim's disclosure to staff members that the alleged perpetrator allowed the child to routinely telephone her son and provided the alleged victim with presents the son bought her.

During T's interview with DFPS on April 23, 2021, T failed to notify DFPS of the information contained in these emails. T reported to DFPS that the alleged victim did not make any outcries against L to her recollection. Based upon the information contained in the emails, T and other staff members failed to report the allegations made by the alleged victim in January 2021 to DFPS and T failed to fully and honestly report her knowledge of the allegations during the investigation.

The second deficient investigation involved allegations of Medical Neglect at the RTC. On January 19, 2021, a staff member at the RTC alleged that a child (age 15) injured her finger by giving herself a "stick-and-poke" tattoo and staff members failed to secure timely medical care for the child. In the absence of timely medical care, the child's finger allegedly worsened in condition. The monitoring team's review found that this investigation is deficient for the investigator's failure to determine whether staff members assisted the child in caring for her injury after she received initial medical treatment to prevent the injury from becoming infected. Further, the investigator failed to probe why the RTC's documentation related to the child's injury appeared incomplete; the documentation did not include medical/incident reports regarding the antibiotics the child was allegedly prescribed after the wound became infected. Finally, the investigator did not interview a staff member who allegedly assisted in caring for the child's injury.

In the third deficient investigation, a staff member at the RTC reported allegations of Neglectful Supervision on August 1, 2021. The reporter alleged that a child (age 17) drank a half cup of bleach and another cleaning product in an alleged self-harming incident. After the incident, staff members reportedly transported the child to the hospital. The reporter stated that the children are provided cleaning products when they clean their rooms; however, staff members are expected to monitor children during the time they are cleaning their rooms. The reporter stated she did not know how the child accessed the products. The monitoring team found that the investigation was deficient because the investigator failed to thoroughly probe how the child was able to store a cleaning product in her room without staff members' knowledge. In the absence of this information, the record does not resolve whether staff members appropriately supervised the child.

## Pending DFPS Investigations of Abuse, Neglect and Exploitation at The Refuge

Between January 24, 2022 and March 14, 2022, RCCI opened six investigations of alleged abuse, neglect or exploitation at The Refuge. During that time period, SWI received 15 reports of potential abuse, neglect, or exploitation related to The Refuge. Eight of the reports contained allegations of abuse, neglect and/or exploitation involving similar children and were eventually merged into two DFPS investigations that remained pending as of March 27, 2022. Two of the reports contained allegations of abuse, neglect and/or exploitation involving a different child and were eventually merged into a separate DFPS investigation that remained pending as of March 27, 2022. Four of the reports resulted in three distinct DFPS investigations for other allegations of

16

Neglectful Supervision by staff; and one report was referred to the Health and Human Services Commission ("HHSC") for a licensing standards investigation.

The most recent allegations surfaced and recurred over a seven-week period this winter:

| Allegation | Date of Intake Report |
|---|---|
| Nude Photographs and Drugs provided to children<br><br>Categories include: Sex Abuse, Neglectful Supervision, Physical Abuse, Exploitation, and Sex Trafficking | 1/24/2022 |
| | 1/25/2022 |
| | 2/8/2022 |
| | 2/9/2022 |
| | 2/9/2022 |
| | 3/2/2022 |
| | 3/11/2022 |
| | 3/11/2022 |
| | 3/14/2022[41] |

| Child Runaway with Staff Assistance<br><br>Category: Neglectful Supervision | 2/22/2022 |
|---|---|
| | 3/13/2022 |

3. **Ongoing January 24, 2022 Investigation: Allegations of Sex Trafficking and Sex Abuse**

*Allegations*

On January 24, 2022, an individual working at The Refuge reported allegations of Sex Trafficking, Neglectful Supervision, Sexual Abuse, Physical Abuse, Medical Neglect and Exploitation of two children AA and BB.[42] The reporter stated that a child disclosed that a staff member (G) posted nude photos of two children, both age 17, to a social media site, Snapchat. G allegedly received payment for the photographs through a mobile payment service called Cash App. AA reported that G provided her with G's telephone to take the nude photographs. The reporter stated that she did not know how much money G may have received for the photographs of the children. The reporter alleged G also had another youth (name unknown, age 18) take a nude photograph of herself and received five dollars in payment for the photograph. Lastly, the reporter

---

[41] This intake report, received by SWI on March 14, 2022, includes allegations of trafficking a different child victim who previously lived at The Refuge, reportedly during a different time period. However, the reporter did not provide the name of the alleged victim nor an alleged perpetrator and SWI instructed the reporter to call back with the additional information.

[42] Of the two children who are the subject of this investigation, AA was in PMC status until February 11, 2022, when she aged out of the foster care system and left The Refuge at that time.

alleged that in October or November 2021, G gave the drug Ecstasy to AA and BB. The reporter said they did not know whether the children ingested the drug. The reporter stated that an administrator at the facility notified law enforcement and G was in the process of being terminated.

After the DFPS investigation commenced, SWI received seven additional reports similar to the January 24th allegations. SWI also received additional separate allegations of human trafficking discussed below.

On January 25, 2022, a staff member at The Refuge alleged that G gave AA and BB a cigar and AA smoked the cigar. The reporter did not know the date of the event. The reporter also alleged that G allowed AA and BB access to her phone. The reporter alleged that G's phone had nude pictures of G and AA and BB were able to view them. Both children allegedly also saw pictures on the telephone of drugs that G had reportedly sold recently. The reporter alleged that BB took nude pictures of herself on G's phone. BB reportedly asked for G's phone to delete the pictures, but G said she would delete them. The reporter stated that she did not know whether G deleted the pictures.

On February 8, 2022 an RCCR inspector from HHSC reported that during an interview with a child (CC, age 16) at The Refuge, the child stated that G was "trafficking the girls," and was taking pictures of two children.[43] The reporter stated that G traded the pictures for drugs which she stated were "percs and Xanex." The reporter stated that the staff member no longer worked at the RTC.

On February 9, 2022, SWI received two additional reports with allegations related to a third child, CC. In the first intake, the reporter stated that CC made an outcry that she had bruises "all over" as a result of a restraint by an unidentified staff member and further stated that an unidentified female staff member was photographing some of the residents naked in exchange for drugs. That same day, another reporter contacted SWI with the same allegations disclosed by CC that one of the staff members at The Refuge was taking naked pictures of the girls in exchange for drugs.

Subsequently in March 2022, SWI received two additional related reports that SWI then merged with the instant investigation, one on March 2, 2022 and one on March 11, 2022. Both reports included allegations related to a staff member supplying drugs to the children at The Refuge; that a staff member or members assisted children to run away from The Refuge; and/or that a staff member was taking nude photographs of the children. The reporter on March 2, 2022 alleged that G purchased drugs for AA and BB. The reporter alleged that G first bought them Ecstasy but when the children complained that the Ecstasy was not strong enough, G brought them Xanax bars. AA reportedly stated that the bars were blue in color and that, therefore, G directed AA to text her to say "remember to bring your blue make-up bag" as the method to request the drugs. The reporter alleged that at some point, G told the children she could not bring more drugs unless they paid her. The reporter said the children indicated that, as a result, this led to selling their nude photos and nude photos of their friends online via G's Cash App account. The reporter also stated that there were "multiple staff who have been caught supplying drugs, alcohol and tobacco products to the youth over the past several years." The reporter noted additional concerns

---

[43] The monitoring team listened to the audiotape of the call, and the reporter does not describe the type of pictures.

that an individual working for The Refuge allegedly bribed children to prevent them from reporting incidents to the State, and required the children to use the recorded telephone line to make telephone calls so the administrators would know whether the children called the State. The reporter also made allegations about Medical Neglect unrelated to the other allegations in the intake.

On March 11, 2022, an advocate for an unidentified child at The Refuge alleged that an unnamed staff member gave drugs to the children. The child also said that that staff members would (or did) help "a girl or girls run away" from The Refuge.

On March 21, 2022, an individual reported that a youth (DD, age 18) said that she was previously placed at The Refuge in 2021 and that G told her that G previously "pimped out girls." DD reported that she was not trafficked by G. The reporter said that after DD departed from The Refuge, AA remained in placement at The Refuge, and approximately two weeks prior to the report, AA told DD that G had children send her nude photographs in exchange for G purchasing the children drugs and alcohol. These incidents reportedly occurred in November and December 2021.

As of March 25, 2022, DFPS's investigation into the above allegations remains open. The investigative record shows that The Refuge terminated G on January 24, 2022.

*Information from Child AA's and Child BB's interviews with DFPS on January 26, 2022:*

- At The Refuge, AA and BB lived in a two-person cottage. AA was placed at The Refuge on August 27, 2020 by Our Children Our Kids ("OCOK") and BB on June 8, 2021 by DFPS. G worked as an overnight staff member and was assigned to the children's cottage. The children's interactions with G were limited to nighttime hours.

- During their separate January 26, 2022 interviews with DFPS, AA and BB reported that G provided them with drugs twice; once in approximately October 2021, G provided both children with Ecstasy ("XO"), and a second time in November 2021, G provided AA with a Xanax bar. AA stated that G was aware that the children had a history of drug misuse.[44] One of the children stated that she had been sober for approximately two years and G knew this when she provided her with the drugs. The children said that prior to G providing Ecstasy to the children in approximately October 2021, G allegedly showed the children photographs on her telephone of different drugs. While looking at the photographs, BB

---

[44] According to AAs last Common Application, completed less than a month before she was placed at The Refuge, she "continue[d] to struggle with substance abuse issues." During the time that AA was trafficked, she was forced to use illicit drugs. The Common Application indicates AA first used alcohol, marijuana, and methamphetamines at the age of 12, but also started using cocaine when she was 14, and heroin when she was 15 years old. It notes, "[AA] has urges to use methamphetamine again." AA received treatment in an in-patient setting in 2020 and successfully completed the program, but relapsed in 2021, prior to being placed at The Refuge. BB's Common Application states that she was diagnosed with marijuana and stimulant abuse disorders, shows that BB used marijuana "daily" at the age of 12, and as of July 19, 2021 "it [was] suspected that youth may still be using." It also indicates BB had also used methamphetamine. It indicates that she overdosed on Xanax and Promethazine in an attempt to get high when she was 13 years old. BB's service plan indicates that she was to receive treatment for substance abuse through an outside program during her stay at The Refuge; her updated service plan indicates that this treatment is to continue.

reported that the children suggested that G bring them drugs. AA and BB said G then brought the children Ecstasy. AA stated that on G's first day of employment with The Refuge, she observed a former resident, DD, ask G for a "Black and Mild," and G allegedly brought the child the cigar. AA reported that after observing this, she "knew [G] was going to bring in contraband."

- The children said G told them that she would bring them drugs and other items, however, she required monetary payment for these items. To secure payment, AA and BB reported that they planned to sell nude photographs of themselves on social media (Snapchat) to people they knew using G's telephone. AA stated that G also provided the children her Cash App account to process any monetary payments the children received from their photographs in November 2021 or December 2021. Both children stated that G knew of the children's plan and reportedly told the children that "they have to have each other's backs" and that Child A and Child B could go to jail for these actions. The children said that G did not ask them to take nude photographs but she required money to buy them drugs, and they could not have completed such transactions without the use of G's phone.

- Both children reportedly used G's telephone to take nude photographs of themselves. However, BB said she did not identify anyone to whom she could sell the photographs. BB stated, "No one Cash App'd her [G]." AA reported that she posted a nude photograph on Snapchat; however, she stated that the photograph she posted did not depict her (but someone else). AA reported that an unnamed friend who previously resided at The Refuge assisted her in posting a nude photograph of another person (the photograph excluded the face) to Snapchat. AA stated that this friend paid five dollars through the Cash App for the photograph and this transaction was "enough proof for The Refuge" to terminate G.

- In their January 26, 2022 interviews with DFPS, both children reported that G failed to maintain appropriate boundaries between herself and the children. According to BB, G disclosed highly inappropriate and concerning information about herself to the children including that she used to "pimp out girls for her baby daddy." The children's interviews indicate that G's sharing about her personal life appeared to impact the children's decision-making. For example, AA reported she did not report G's actions earlier because G told AA she could lose her children and that the children could lose so much.[45] The children described this behavior by G as manipulative. The information G provided to the children about her personal life also appeared to scare the children. AA reported that "I am not scared of [G]; I am scared of who she knows. She [G] knows where I am… I feel helpless

---

[45] The information G provided to the children about her personal life also appeared to scare the children. AA reported that "I am not scared of [G]; I am scared of who she knows. She [G] knows where I am… I feel helpless in this situation." AA stated that G's "baby daddy" used to be a "hitman" and she worried this individual would harm her from her disclosures related to G.

in this situation." AA stated that G's "baby daddy" used to be a "hitman" and she worried this individual would harm her from her disclosures related to G.

- BB reported that she gave G a $220 VISA gift card in exchange for G purchasing a few items for her, such as "cheap vodka." Allegedly, G did not provide BB with the requested items and another unnamed staff member assisted BB in getting the money returned to her from G. BB stated that this unnamed staff member was also allegedly aware that the children had taken Ecstasy. BB refused to provide the name of this unnamed staff member. BB alleged that G "will do anything to avoid getting in trouble." AA also alleged that G took several of her personal items (hair straightener). Based upon BB's interview, therefore, it appears that another staff member may have been aware that G was providing the children with drugs at some earlier point in time and did not report the allegation; it appears from the record that the identify of this staff person is M.

On March 23, 2022, DFPS conducted an additional interview with AA. During this interview, AA alleged that T, a senior leader at The Refuge, convinced her to disclose everything that had happened to her. AA reported that she disclosed to T the allegations regarding G and that this disclosure occurred "a few months ago." After she disclosed the allegation to T, AA alleged that T encouraged AA not to report the allegations to SWI, stating, "I'll take care of it." AA reported that she did not know whether T ever reported the allegations.[46] AA stated that T was a "liar." AA also informed DFPS that she had proof of G's wrong doings, including videos, texts and pictures. During the interview, a Texas Ranger contacted AA and reportedly gained access to AA's Snapchat account.

*Information from Alleged Perpetrator G's interview with law enforcement on March 14, 2022:*

- On March 14, 2022, law enforcement officers and DFPS interviewed G who denied the allegations that she provided children with her telephone and that she was involved in selling nude photographs of the children. When asked specific questions related to her Cash App account and profile and an alleged account that received five dollars for a photograph of AA, G reported that she did not know whether she had this specific Cash App. When law enforcement officers requested that G provide her telephone, G reported she did not have the telephone on her but stated she would provide it to law enforcement at a later time. AA's and BB's description of G's telephones matched with G's description of the telephones.[47]

---

[46] On January 24, 2022, an individual working at The Refuge reported allegations of Sex Trafficking, Neglectful Supervision, Sexual Abuse, Physical Abuse, Medical Neglect and Exploitation of AA and BB.

[47] During her interview, G was asked about an individual with whom she reportedly shares a child. This individual (K) appears to have been referenced by the children in their interviews as G's "baby daddy." G reported that she has known K since she was 14 years old. She reported that K "has been incarcerated a lot" and she does not stay in touch with him. CC alleged that K sex trafficked her, that G was a "pimp" as well, and that CC observed G "collecting money" from "girls" in an area where CC alleged G sold "crack." The record made available to the Monitors does not provide any additional corroboration for these allegations, nor the date of the interview with CC, and K is presently incarcerated on unrelated charges.

- During AA's interview, she alleged that G often slept during her nightshift. Another child also alleged that G slept during her night shift. A third child alleged that she observed a staff member sleep, however, she refused to provide the name of the staff member. In her interview, G reported that she informed The Refuge many times that during the day she provided care for her children and was unable to sleep during the day as a result. G stated that she also emailed management employees at The Refuge about her concerns working the night shift and not being able to stay awake. G reported that she knew the RTC had cameras and that the cameras documented her sleeping. G stated that unidentified persons employed at The Refuge told her that "everyone sleeps, and it was no big deal." On February 25, 2022, the Director of Residential Care reported to DFPS that The Refuge had installed QR codes that staff members must scan on children's doors when completing night checks, and a hired a night shift supervisor who is reportedly responsible for ensuring staff members are not sleeping in any of the cottages and responding to staffing issues.

- Separate from the instant allegation but related to sleeping staff, there were also two separate intake reports to SWI stemming from reports by HHSC supervisors alleging that staff members at The Refuge were sleeping during night supervision. On February 25, 2022, SWI received a report that a child stated a staff member was "always sleeping" at night; and on March 3, 2022 another allegation was reported by HHSC staff about staff sleeping. These two reports did not identify a specific staff person. As of March 27, 2022, DFPS' investigation into these allegations is pending.

- Additionally, on March 23, 2022, RCCR reported to SWI that in October 2021 a staff member, who had been assigned to the night shift, was advised that she would be switched to the day shift in December 2021. The staff member was "very vocal" to The Refuge leadership about changing her schedule to the day shift because she had fallen asleep during her assigned night shift. The staff member had been counseled by supervisors due to her falling asleep during multiple shifts. The reporter stated that there were "no known incidents" during the nights when the staff member was asleep during her shift. That self-report resulted in an additional DFPS investigation.

*Information learned from collateral interviews:*

- On February 1, 2022, RCCI interviewed T, a senior leader at The Refuge, who stated that AA disclosed the allegations regarding G to her and with the evidence provided by the child, T immediately terminated G on January 24, 2022. Regarding the allegations, AA reported to senior leader T that G gave the child her telephone and allowed AA to use Snapchat on the telephone. AA also reported that "recipients" sent money through the cash application to G. T stated that she asked AA for proof to support her allegation and AA then used T's phone and showed her some of the pictures posted on the phone app. T documented the time stamps of when the photographs were taken and verified on the RTC's camera footage that G's shift matched the times. T also made a copy of the

22

screenshot with G's snapshot attached. T said that AA also alleged the money the children received from the nude photographs was provided to G to purchase drugs for the children. T said G reportedly brought Ecstasy and Xanax bars for the children.

- Between March 9, 2022 and March 18, 2022, a Children's Advocacy Center conducted forensic interviews of other children who had placed at The Refuge. During the forensic interviews, one child reported a new allegation of maltreatment, alleging that she heard that a staff member at The Refuge inappropriately touched a child(ren). The child reported that she did not know the identity of the staff member who allegedly touched the child(ren). CPS reported the child's allegation to SWI and DFPS opened an investigation into the allegation on March 11, 2022.

- T stated when she terminated G, G did not say anything to her and the Human Resources representative during their meeting. She stated G did not ask any questions about her termination.

- On February 10, 2022, another staff member (M) reported to a DFPS investigator that AA informed her in January 2022 (prior to January 24, 2022) that G had not returned another child's $220 VISA gift card. AA told M that the child gave the money to G to purchase "cake bars" and "weed" for them. M allegedly told AA she would help the children retrieve the money from G. M reported that she telephoned G and inquired whether G had taken the child's money. G reportedly confirmed that she had taken the money. M asked whether G used the money for "weed," and G responded that she used the money for a weave, suggesting that M misunderstood AA or that AA misunderstood what G intended to buy. M told G she needed to return the money to the child, and G allegedly did so. The next day, M allegedly took AA to see her therapist. M said that she assumed that AA told the therapist all the information she disclosed to M and "everything had been handled." Reportedly, M learned a week or two later that there was an open investigation and she assumed it must be related to the information the child had shared with her. The monitoring team was unable to locate any record that M reported the allegations disclosed to her by the child to SWI. DFPS has identified M as an alleged perpetrator in another investigation for aiding the runaway of a separate child at The Refuge on February 20, 2022. Staff's involvement in that incident is discussed below.

In the course of the 2022 investigations, DFPS learned that various staff members at The Refuge had interconnected family and cohabitation relationships. Those relationships were identified by DFPS as follows: G, the alleged perpetrator in the January 24, 2022 investigation, has a sister, an aunt, a cousin and a cousin by marriage who were also employed at The Refuge. Two of these staff, and their housemate who was also employed by The Refuge, have been implicated in allegations that staff members assisted two children who ran away from the facility on February 22, 2022, as discussed below.

On March 17, 2022, the Senate Special Committee on Child Protective Services held a hearing on the allegations at The Refuge. Steven McCraw, Director and Colonel of the Texas Department of Public Safety, testified that the State expects to prosecute an individual involved in the allegations for sexual exploitation of minors and child pornography.[48] He stated that law enforcement officials were still awaiting digital evidence before making an arrest in relation to the exploitation of AA and BB, who McCraw stated were "recruited [by G] to provide nude photos."[49]

### 4. February 22, 2022 Investigation into Allegations of Neglectful Supervision and Exploitation

On February 22, 2022, T, a senior leader at The Refuge, reported that a child (EE, age 17) ran away from the placement with the assistance of two staff members. Allegedly, a staff member (M), who had earlier indicated that AA informed her that G had not returned a child's $220 VISA gift card, packed a runaway bag for EE and failed to promptly report that she received a telephone call from EE after the child had runaway. Another staff member (S) allegedly also spoke to EE after she fled The Refuge and did not report this communication for several hours. The senior leader alleged that S may have also provided EE with money to secure shelter after leaving The Refuge, and T suspended both staff, M and S, without pay. At the time of this February 22, 2022 intake report, the location of EE was unknown.

On March 13, 2022, SWI received an additional related report. The reporter described concerns about alleged inappropriate behavior by unnamed staff members during the time period of December 2021 through January 2022, including allegations that staff assisted girls in escaping from The Refuge and "returning to trafficking multiple times" and that management "did not act quickly enough or at all when it was discovered." The reporter also alleged inappropriate physical boundaries between staff and children and alleged that staff members lied and covered up the wrong doings.

The evidence in the record made available to the Monitors demonstrates:

- Child Protective Services from another state placed EE at The Refuge in October 2021. EE is a witness in a criminal sex trafficking prosecution. Due to EE's involvement in this criminal case, the Texas Rangers and the Federal Bureau of Investigation (FBI) are conducting investigations into EE's runaway.

- EE and another child (FF, age 16) ran away from The Refuge on the night of February 20, 2022. On February 21, 2022, staff members informed T, a senior leader at The Refuge, that they were involved in EE running away. On February 22, 2022, T reported the allegations to SWI. On March 3, 2022, RCCI documented that EE had been found and was currently placed in another setting in Texas.

---

[48] Director McCraw did not specify the intended charges under review.
[49] Texas Senate Special Committee on Child Protective Services Hearing, 87th Session Interim, (March 17, 2022) (statement of Seven McCraw, Director and Colonel, Texas Department of Public Safety).

- During her interview, T reported that on the night the children ran away, a staff member appropriately conducted 15-minute night checks and used the QR code to scan her night checks, and according to T, staff conducted a check at 12:37 p.m. and EE was present in her room. Staff then conducted a check at 12:51 p.m. and EE was not in her room and her window was open. Staff then reportedly contacted law enforcement according to T.

- FF reported that she ran away through the window in her room and that the alarm on her window sounded. FF stated that EE's alarm on her window was broken and did not sound when EE fled through the window. After exiting their windows, FF reported that the two children ran toward the fence at the perimeter of the campus and when the children were approximately halfway to the fence, a staff member attempted to retrieve the children, but was unable reach them. Law enforcement reportedly located FF on a freeway later that night and returned her to The Refuge. EE was not located by law enforcement that night.

- DFPS is currently investigating the conditions associated with the alleged broken alarm on EE's window. The investigation confirmed that the alarm on EE's window was broken. The RTC reported that the alarm had previously been broken by a different child[50] who

---

[50] The child, II, ran away December 30, 2021. The Monitors reviewed the serious incident report documenting the runaway event, which RCCR reviewed in connection with its investigation of reports of the December 26, 2022 Priority 3 intake, discussed above. II is the child who was in an "unauthorized relationship" with the resident who was behaving aggressively on December 25, 2021. A safety plan reviewed for this investigation indicated that II and the other resident were observed engaging in inappropriate sexual contact by a staff member. II gave conflicting reports as to whether the contact was consensual, but when II declined to continue a relationship with the other resident, the other resident became violent toward II and eventually had to be hospitalized for homicidal ideation. When RCCR attempted to interview II for the investigation, they were told that she had eloped on December 30, 2021. The serious incident report documenting II's runaway states, "Overnight Connection Specialist [B] came in for the overnight shift at around 9:20 pm. House parent…had begun room checks on youth [II] as she went to bed at 9 pm. [House parent] last saw [II] at 9:20 pm. Throughout the evening, [B] did overnight room checks and looked in from the doorway to be sure that each girl was in her room. Houseparent…went into [II's] room the next morning at around 9am and attempted to wake/move [II] when she realized that instead of [II] in bed, the pillows, blankets and different objects were adjusted to look as if [II] was in her bed. [Houseparent] immediately notified Shift Lead V who began a search of the property with staff for [II]. Bastrop County Sheriff's Department was notified immediately." The serious incident report also noted that before II went to bed, she was "gathering her makeup, wig and clothing from her room throughout the evening," and said, "While searching for [II], it was observed that the Cottage 8 alarm was not set up." This report is somewhat at odds with the report made to SWI by V, who reported to SWI that II "was last seen at 7AM.

The Monitors' review of employee records revealed an e-mail sent by M to a senior leader at The Refuge, T, and other leadership at The Refuge on February 23, 20222, after M was fired. In the e-mail, M said "[II] ran away, it was proven on camera that [B] never checked her throughout the entire night." In the same e-mail, in reference to EE's runaway event, M noted, "Throughout that entire day before [EE] ran, she had no staff over there. She could've done anything within that time frame to prepare to flee the way that she did." EE, like BB, was on Stage 3, and like BB, may have been allowed to be on the cottage during the day without staff supervising her. In fact, during the Priority 3 investigation of BB's lack of supervision (discussed in footnote 23) one of the staff interviewed indicated that EE had also been given a walkie-talkie in lieu of being appropriately supervised by staff. After the Monitors pointed out to HHSC M's claim regarding II's lack of supervision on the night that she ran, the Monitors asked RCCR whether they reviewed video footage for the night in question. RCCR confirmed that the video had not been reviewed, and made a report to SWI regarding M's e-mail; an investigation has been opened by DFPS.

fled through the same window two months earlier. The RTC reported that a new alarm was installed on the window after the child fled two months prior. The RTC stated that after EE ran away from The Refuge they reviewed the alarm on EE's window and found that someone had "tampered" with it.  However, during her interview with RCCI, FF reported that "everybody" knew that the alarm on EE's window did not work.  In addition, one of EE's cottage mates reported that a couple of days before EE ran away, a skunk had sprayed the house, requiring them to open the windows, and EE's window did not have an alarm on it because a previous resident had cut the wires on the alarm when she left out of the same window.  However, the child said that EE told the staff that the alarm was broken. Another child, JJ, reported during her interview that different child, II, broke the alarm on the window when she ran away and that EE remembered that incident and fled out the same window.[51]

- DFPS documented on March 14, 2022 that the Texas Rangers and the FBI determined that four staff at The Refuge were either involved in EE's runaway or had contact with EE while she was on runaway.

  o FF alleged that one of the staff knew EE planned to run away and assisted her in running away. On the night the children ran away, staff allegedly ensured that all the children at the RTC were in their bedrooms 30 minutes prior to bedtime. FF allegedly did not pack a runaway bag because a staff member planned to deliver a bag to the child once she was somewhere safe. The day after FF returned from the runaway, a staff member reportedly told the child not to disclose this information, stating "it's a deeper situation."

  o There is evidence that the day after EE ran away, another staff member disclosed that she picked up the child at a park, bought her food and drove her to downtown Austin where EE jumped out of the car. Law enforcement located the child shortly

---

After 15-year-old II (who was in TMC) ran away from The Refuge, and before she was found, DFPS non-suited her case rather than moving her into PMC.   When the Monitors asked DFPS why her case was dismissed, DFPS responded that II's "case was dismissed at the final trial on 1/31/22 due to her being on runaway status.  [II] ran numerous times while in care, and would elope for extended periods of time.  The trial was extended in the event she may return, but she did not.  [II's] permanency goal was family reunification; therefore PMC was not a favorable option.  The case was staffed with the Supervisor, Program Director, Legal and the child's attorney ad-litem and guardian ad-litem.  All parties agreed with the non-suit including the judge who granted it."  E-mail from Tara Olah to Deborah Fowler and Kevin Ryan, re: Medical and Mental Health Care, March 18, 2022 (on file with the Monitors). Notes in IMPACT show that on January 13, 2022, a mediation was held, and "It was determined at the time that a nonsuit would best suit this case or the department would take PMC of the youth if she returned.  If youth remained AWOL the department would request a nonsuit with the understanding if the youth was to return the department would facilitate a restart of the case."  Since the child had not returned by January 31, 2022, DFPS nonsuited the case. IMPACT contacts indicate that the Special Investigator assigned to II's runaway case was told that DFPS's responsibility had been terminated and there was "nothing else for [the investigator] to do on the case."
[51] When her caseworker picked her up from The Refuge on March 9, 2022, JJ also said that a staff member "did supply her with a vape and marijuana that did not have tsh."  During JJ's forensic interview, the child reported that a staff member gave her a vape.

thereafter at the Grey Hound bus station in Austin. FF alleged that Staff 4 planned to get a hotel room for EE.

   o   Two staff received and/or made telephone calls to EE while she was on runaway status.

   o   Two other staff spoke to EE twice while she was on runaway status.

- Law enforcement arrested one of The Refuge staff for making a false statement to the FBI about her involvement in the child's running away from the RTC. The Refuge terminated the employment of that individual and two others on February 24, 2022 and suspended the employment of a fourth staff because the staff members did not accurately relay information to their superiors and due to their actions around the children running away.

### 5.   March 14, 2022 and March 16, 2022: Sexual Trafficking Allegations

On March 14, 2022, the director of an agency who works with parents of sex trafficking victims called SWI to report a conversation with the mother of a child previously in the care of The Refuge. The reporter stated this individual thinks her child may have been a victim of sex trafficking while she was placed at The Refuge during some other time period (and that the child has since passed away after her departure from The Refuge). The reporter stated that the mother already called the Sheriff's Office and was awaiting a return call. The mother alleged to the reporter that there are patterns in the information about The Refuge now public with other former cases. The mother also alleged that staff gave drugs to her daughter; the reporter did not provide the names of the individual nor of the alleged victim and did not give an estimated time period of abuse. There was no referral written for investigation as the reporter stated the purpose of her call was to relay information to the mother about making the report directly. In processing the intake report, SWI contacted the reporter for additional information and learned that the alleged victim was placed at The Refuge approximately two and half years ago. SWI informed the reporter to have the mother call in a report to SWI with greater detail. The intake report was referred to HHSC.

On March 16, 2022, following a supervisor's review of the above allegations, SWI re-entered the above intake as an abuse, neglect or exploitation investigation. On March 17, 2022, SWI contacted the alleged victim's mother. The mother provided to SWI the name of her child and stated that a named staff member provided her child with "liquid marijuana" in 2019 and after this incident, the RTC terminated the staff member. The mother stated another incident occurred that involved an unnamed staff member who allegedly assaulted her child. The mother stated she contact law enforcement and attempted to press charges. The mother reported that her child has since passed away. On March 18, 2022, DFPS staffed the case and administratively closed the investigation, writing that there was insufficient information to conduct a full investigation. The Monitors disagree with DFPS's determination to administratively close this investigation prior to attempting to corroborate whether the alleged perpetrator was terminated for providing drugs to

the alleged victim. DFPS made no effort to review employee records and assess which, if any, Refuge staff were terminated during the relevant period, and whether any of the terminations were related to child maltreatment as alleged.

### Conclusion

The monitoring team's review revealed evidence that numerous children were denied a safe placement while at The Refuge in contravention of the Court's orders. There is ample evidence of violations of high and medium-high standards related to child safety, and of child abuse, neglect or exploitation. The evidence of serious risks to child safety at The Refuge includes, but is not limited to, a strong possibility of human trafficking based on staff's inducement of children to sell nude photographs in exchange for drugs. The managerial lapses at The Refuge which permitted serious risks to child safety to recur over time were not isolated and require a comprehensive, monitored plan to address safety threats and compliance with this Court's orders for safe placements.