# Exhibit 3

STATE OF TEXAS

SENATE COMMITTEE ON CHILD PROTECTIVE SERVICES,

SPECIAL


SENATE CHAMBER


MARCH 17, 2022


EXCERPTS OF THE COMMITTEE HEARING


TESTIMONY OF DEPARTMENT OF PUBLIC SAFETY DIRECTOR

COL. STEVEN MCCRAW

1          SENATOR KOLKHORST:  Members, we are

2   going to redirect our panels, and at this time I

3   would like to call Colonel Steven McCraw, director

4   of the Department of Public Safety.

5          And I think I saw -- yes, Director McCraw,

6   welcome.

7          Director, I had asked you to be present

8   today to talk about the specific case that created

9   the formation of this committee but -- and what you

10  can share in those details, but also processes of

11  when the DPS does become involved in these

12  particular issues.

13         And so I know yesterday you issued a

14  letter in the ongoing pursuit of what really

15  happened at The Refuge.  And so I will ask you to

16  testify to that.

17         COL. MCCRAW:  Madam Chair, Senators,

18  Steve McCraw, Director of Texas Department of Public

19  Safety first, thank you for the opportunity to

20  testify today.

21         First, it was March 10th, that the

22  Department was directed by the governor to conduct

23  an investigation to identify if there's any

24  instances of sexual abuse or sex trafficking at The

25  Refuge shelter, which is contracted by the

1   Department of Family and Protective Services.  We

2   dispatched a team of Texas Rangers to that location.

3            And without going into all the aspects of

4   it in terms of the interviews and documents and

5   stuff, there was clearly, you know, two instances of

6   employee misconduct that were obviously the most

7   disturbing.  One being the most egregious that was

8   reported initially on January 24th of 2022 involved,

9   you know, the sexual exploitation of two minors

10  specifically.  You know, they were recruited to

11  provide nude photos allegedly in exchange for money

12  and/or drugs.  That's under investigation right now.

13           When it was brought to the attention of

14  The Refuge, they reported it to the Department of

15  Family and Protective Services.  They also reported

16  to it the Bastrop County Sheriff's Department that's

17  conducting the investigation.

18           Although no arrests have been made at this

19  time, we anticipate that there will be prosecution.

20  We would expect it to be sexual exploitation of a

21  minor and also child pornography.  And that's up to

22  the prosecutor at the time, but they are an ongoing

23  investigation.  And the only thing that's

24  outstanding right now is digital evidence is what

25  they're waiting on at this particular point.

1        The second incident was reported on

2  February 20th.  It involved the escape of two

3  residents females at the location.  In that

4  instance, again, The Refuge identified the

5  employees -- and I say initially it was employees,

6  but it turned out to be an employee involved.

7  Confronted her, terminated her.  And she has been

8  arrested.  She was arrested for providing false

9  information to the Bastrop County Sheriff's

10 Department.

11        The Bastrop County Sheriff's Department

12 was also able to locate the first escapee, okay,

13 that evening and returned her to the facility.  The

14 second one returned the following day on her own

15 volition.

16        Further investigation by the -- well, they

17 did report it again to the sheriff's office, they

18 reported it to DFPS, and the -- and the institution

19 itself fired three additional employees, okay, and

20 not for this particular instance but for, as we

21 understand it, not being forthright on other

22 administrative allegations.  Were unable to identify

23 any instances where children outside of that were

24 involved and -- or had been exploited in terms of

25 sexual abuse or sex trafficking.

1          We are aware that there was reported to

2     the Court on May 10 -- March 10, it was reported to

3     the federal district judge and the court monitors, a

4     report that was written early in the morning or late

5     at night, whenever you want to look at it, at 1:00.

6     And that report discussed and referenced in terms of

7     seven children being victims of nine perpetrators.

8     So when we looked and scoured at all the particular

9     evidence to identify anything, any criminal conduct

10    whatsoever, and we were unable to identify it.

11          In review of the files, we determined that

12    one of the complaints, for example, what they would

13    call an outtake, involved -- were duplicative.  Or

14    actually, two were duplicative in the regard.  One

15    involved a medical complaint, neglect, a complaint

16    regarding negligence.  Another one, an employee

17    sleeping on the job.  And another had to do with

18    just neglect.  Those had nothing to do with sexual

19    trafficking, sexual abuse and certainly sexual

20    exploitation as we saw in the other instance in that

21    regard.

22          This information was documented in a DFPS

23    report, provided to the court monitors.  Before it

24    was, it went through DFPS general counsel, and there

25    was many adaptations on it and qualifiers, for

Steven McCraw - 3/17/2022

6

1  example, caveats that this information is

2  unverified, this information may have some

3  inaccuracies.  This is a summation of conjecture by

4  child protective service investigators or special

5  investigators.  So those caveats existed; however,

6  they were removed before they were forwarded to the

7  federal district judge's court monitors.  And, of

8  course, those were the basis of those reports

9  regarding sex allegations going unaddressed at

10 the -- at The Refuge.

11          That concludes my testimony.

12          SENATOR KOLKHORST:  Thank you,

13 Director McCraw.  Senator Perry.

14          SENATOR PERRY:  Thank you, Madam

15 Chair.

16          Real quick, to be clear, just so that I've

17 got a clear understanding, two employees are, I

18 guess, tied up in this issue?

19          COL. MCCRAW:  Yes, sir.  The first one

20 is sexual exploitation on January 24th, and the

21 second one, February 20th, involving the escape of

22 two.

23          SENATOR PERRY:  Escape.  And you don't

24 have to tell me if you're not supposed to, but did

25 you actually interview the girls or the kids at

Steven McCraw - 3/17/2022

7

1  the facility?

2          COL. MCCRAW:  Either we did or someone

3  else did through the crisis or the --

4          SENATOR PERRY:  So through the --

5          COL. MCCRAW:  -- child advocacy.  Yes.

6  Yes.

7          SENATOR PERRY:  All right.  Thank you.

8          COL. MCCRAW:  There's one -- there's

9  one outstanding, and she was a volunteer.  She

10 wasn't placed in there by DFPS.  We're still trying

11 to talk to her.  And there's one other interview we

12 would like to conclude that was -- would have been

13 involved in the phone conversation and monitored it,

14 or at least heard the phone conversation that

15 occurred, you know, between DFPS and the court

16 monitor.

17         SENATOR PERRY:  So no evidence that it

18 was pervasive 100 percent employee worked for some

19 staff or any of that?

20         COL. MCCRAW:  No, sir.

21         SENATOR PERRY:  Thank you.

22         SENATOR KOLKHORST:  Senator Huffman.

23         SENATOR HUFFMAN:  Yeah, just a couple

24 of questions.

25         Thank you for being here.  Thanks for the

1  work that DPS has done on this case.

2          I think you're a good person to ask this

3  question.  I know many people involved in these

4  types of cases know this, but I think it's important

5  to publicly state, and so people may not understand,

6  but victims of human trafficking very often are

7  similar to victims of domestic abuse.  Is that

8  correct?

9          COL. MCCRAW:  Yes, that is correct.

10          SENATOR HUFFMAN:  They have a --

11  sometimes have a very hard time adjusting to life

12  once they're removed from that situation.  Is that a

13  fair thing to say?

14          COL. MCCRAW:  Yes, ma'am.  Absolutely.

15          SENATOR HUFFMAN:  And it's not unusual

16  for victims, and sometimes the very young ones as

17  well, as we have -- we have here in The Refuge, to

18  be very confused about themselves, about their

19  lifestyle and actually want to revert back to the

20  lifestyle.

21          COL. MCCRAW:  Yes, ma'am.

22          SENATOR HUFFMAN:  Is that -- is that

23  correct?

24          COL. MCCRAW:  Absolutely.

25          SENATOR HUFFMAN:  So they are very

1   vulnerable, and they are very difficult sometimes to

2   keep in a very sheltered environment and to give

3   them the therapy and the help that they need.

4           And so would you agree -- and this goes to

5   Senator Miles' point, it's very important that

6   individuals who work in that system are very, very

7   attuned to the needs and the uniqueness of this

8   vulnerable victim population.  Is that fair to say?

9           COL. MCCRAW:  Absolutely.

10          SENATOR HUFFMAN:  Would you agree that

11  taking nude photos of a young female, a juvenile

12  female in a situation like that is just about one of

13  the worst things that you could do to a young woman

14  that we were trying to educate and give therapy to

15  and give her self-confidence and belief in herself

16  to make her be able to get rid of this chain of

17  being a victim, I mean, that's just about the worst

18  thing you can do is exploit her body, correct?

19          COL. MCCRAW:  It's despicable.

20          SENATOR HUFFMAN:  Despicable.

21          And helping one of these victims escape

22  back into the community and maybe -- you said one

23  came back and it worked out.  But would it be safe

24  to assume that it is very likely that if one of

25  these individuals or victims who if they wanted to

1  escape and they go out, that they will probably go

2  back to the very perpetrator or, you know, pervert

3  who had been exploiting them in the first place?

4            COL. MCCRAW:  Yeah, most -- most often

5  they do.  And they revert back, and they're very

6  susceptible at that point in time.  And that's why

7  we applaud the Bastrop County Sheriff's office

8  quickly located one and, you know, additionally, you

9  know, assisting in the recovery of the other one.

10            SENATOR HUFFMAN:  Okay.  I just wanted

11  to make that public and make sure that we think

12  about that as we go through these steps.

13        Thank you very much.

14            SENATOR KOLKHORST:  Back to Senator

15  Perry for a follow-up.

16            SENATOR PERRY:  Real quick.  You know,

17  I want to be real careful here, but -- and if you

18  can't address it, I get it.  But there was an

19  explanation given that one, if not -- I think one,

20  maybe both, one wanted to leave the facility out of

21  fear of safety because they were involved in some, I

22  guess, witness protection for lack a better term.

23  Are you aware of that?  And if so, have you stepped

24  up security on that level?  Because if evidently one

25  of the kids have been actively engaged in kind of

1  turning over some of their previous lifestyle

2  employers, if you will, for lack of a better term, I

3  mean, can you say anything to that, or --

4           COL. MCCRAW:  We're not aware of any

5  specific or credible threats on anybody at the

6  shelter.

7           SENATOR PERRY:  Okay.  Well, that's

8  inconsistent I think with some of the information

9  internally that is being said, that the excuse given

10 for leaving the facility was out of fear of safety

11 because they were afraid that their previous

12 association with those involved in human trafficking

13 were coming to get them.

14          COL. MCCRAW:  Yes, sir, exactly.

15          SENATOR PERRY:  And you're not aware

16 of any --

17          COL. MCCRAW:  I'm not aware, no, sir.

18          SENATOR PERRY:  Thank you.  But even

19 if you're not aware of it, is it something that we

20 as, I guess, you being you, and you've got plenty on

21 your plate, but should we address that with at a

22 minimum some additional security out there until

23 those issues could be --

24          COL. MCCRAW:  Before we answer that, I

25 prefer that we would actually do a threat -- a

Steven McCraw - 3/17/2022

12

1   technical threat -- physical threat assessment to be

2   able to answer the question.

3                    REPRESENTATIVE PAUL:   And I'm not in

4   your business, because you're the best at it, but

5   you need to talk to that facility and get that story

6   nailed down, because you and I and I think everybody

7   in this capitol understands the ruthlessness of the

8   cartel and some of those gang members that are

9   engaged in this activity, and there are no

10  boundaries and there is no -- there's no

11  reservation, I guess, if they feel compelled to

12  inflict harm.

13          So I would -- I would ask just as a

14  legislator, please follow up at every level that you

15  can and make sure that that doesn't demand

16  additional security over that facility specifically.

17                    COL. MCCRAW:   Yes, sir.   And we do

18  know that anyone can just walk away.   It's not --

19  this is not a -- there's -- no one is constrained

20  inside.   It's -- the only thing that limits it is

21  transportation.

22                    REPRESENTATIVE PAUL:   Sure.   Well, I

23  think that came up, and it was concerning to me.

24  And if someone felt compelled to do that, leave

25  based on that, then there has to be something that

1  drove that conversation or decision.

2          You raise a good point, and I think that I

3  did not know it, but this is not your standard state

4  agency, if you will.  It's not a -- it's a for

5  profit that has all kinds of different referrals:

6  Private placement referrals, juvi referrals, county

7  referrals.  It's not like a traditional -- it's an

8  RTC license, which I even understand that's got a

9  little nuance to it that it doesn't fit in there.

10  But it is kind of a voluntary, in some ways.  It's

11  just different than what I think CPS and foster

12  care, in general, has.

13          So you raise a valid point and -- but I

14  would hate for us to miss an opportunity to secure a

15  spot based on a -- based on someone that said we

16  were fearful of it and we didn't follow up on it.

17  So I would just ask that you do follow up on it.

18          Thank you.

19              COL. MCCRAW:  And, you know, just

20  for -- just as an unsolicited editorial comment is

21  that what they do is God's work, you know,

22  protecting our kids.  It's tough.  Tough business.

23  And you see some nasty stuff, and so. . .

24              SENATOR KOLKHORST:  Senator Menéndez.

25              SENATOR MENÉNDEZ:  Thank you, Madam

1   Chair.

2          Col. McCraw, thank you for everything you

3   do every day to keep many Texans safe and running

4   the agency you do.

5          Director, you've mentioned that the charge

6   most likely will be sexual exploitation of a minor,

7   possibly child pornography, and that obviously this

8   will depend on the DA.  My understanding from

9   reviewing the Attorney General's website, that

10  sometimes these two things can actually tie into

11  trafficking.

12                  COL. MCCRAW:  Yes, sir.

13                  SENATOR MENÉNDEZ:  And so my thought

14  is, when the first call went into the sheriff's

15  office and DPS was made aware on January 24th

16  regarding the photographs that were taken -- and my

17  understanding is that an employee convinced, asked,

18  coerced, I don't know, I wasn't there, somehow got

19  one of these children to take images -- or two of

20  them to take images, then sold them and provided

21  drugs to the children.  Is that your understanding?

22                  COL. MCCRAW:  That's what's being

23  alleged, yes, sir.  And it was, you know, two

24  children.

25                  SENATOR MENÉNDEZ:  Yes.

```
 1              COL. MCCRAW:  Yes, two children.

 2              SENATOR MENÉNDEZ:  In your

 3   investigation, have you had an opportunity to look

 4   into the relationships between the staff?  My

 5   understanding is there's several members of the

 6   staff who are related and that there are at least

 7   three who are not related but live together.

 8              COL. MCCRAW:  Yes, sir.  That was that

 9   -- I referenced the second incident occurred on

10   February 20th involving the escape certainly.

11   There's one that was charged that we know, in fact,

12   you know, had knowledge of it, was involved in the

13   escape itself.  The other three are questionable.

14   But there were, as I understand it, relationships,

15   but they were terminated.  You know, two were

16   terminated, one -- one quit.  And I believe there

17   were, as I understand it, relationships that weren't

18   reported.

19              SENATOR MENÉNDEZ:  And my

20   understanding is that you were asked, I believe, it

21   was on March 10th, you said.

22              COL. MCCRAW:  March 10th, yes, sir.

23              SENATOR MENÉNDEZ:  And so in your

24   letter to the governor dated March 16th, I think, I

25   was reviewing it, it said something that you found
```

1  no initial findings.  Is that correct?

2            COL. MCCRAW:  That's correct.

3            SENATOR MENÉNDEZ:  I think that was

4  the --

5            COL. MCCRAW:  The sexual exploitation

6  and sex trafficking.  Or sex abuse and sex

7  trafficking, which is what we were asked to look at.

8  And except for the one instance that we referenced

9  in January 24th, it was already being addressed by

10 the Bastrop County Sheriff's office was sexual

11 exploitation of a child or a minor.

12           SENATOR MENÉNDEZ:  And because these

13 are initial findings, I guess the investigation is

14 still ongoing?

15           COL. MCCRAW:  Yes, sir.  Until we get

16 the last interview done, I don't want to say it's

17 final because that's -- every interview is

18 important.

19           SENATOR MENÉNDEZ:  Well, thank you for

20 your answers.  Thank you for being here.

21           COL. MCCRAW:  Thank you, sir.

22           SENATOR MENÉNDEZ:  And thank you for

23 getting us informed on this.  Thank you very much.

24       Thank you, Madam Chair.

25           SENATOR KOLKHORST:  Senator Miles.

```
 1              SENATOR MILES:  Thank you, Madam
 2  Chair.
 3          Col. McCraw, I want to also echo thank you
 4  for all that you do for the State of Texas.
 5              COL. MCCRAW:  Thank you, sir.
 6              SENATOR MILES:  I'm always
 7  comfortable, Madam Chair and colleagues, when I know
 8  that our DPS is involved in investigations, and I
 9  commend them across leadership.
10          I've just got three simple questions and
11  just for clarity for myself.
12              COL. MCCRAW:  Yes, sir.
13              SENATOR MILES:  I want to thank
14  Senator Menéndez for his line of questioning, which
15  kind of mirrors most of mine.  Three of them were
16  left out, and they're real simple.
17          And one of them is, how is law enforcement
18  notified of a reason or reason to believe
19  allegations, and how does the state agency notify
20  law enforcement?
21              COL. MCCRAW:  Well, in this instance,
22  they report it directly to the local law enforcement
23  agency.  Certainly, the State has -- you know, we
24  can certainly investigate, but our role is usually
25  supportive in that regard.  And, frankly, it's
```

1   always best to report that to local law enforcement.

2   And we found that they did in both instances, and

3   Bastrop County Sheriff's office is aware of these

4   instances.

5               SENATOR MILES:  So would you find it

6   fair to say that protocol was followed as far as --

7               COL. MCCRAW:  Yes, sir.  Yeah.  And

8   they also notified DFPS.

9         And if you really look at it, you know,

10  going that extra step with the DFPS, they also

11  forwarded a copy of the incident to the "JSIC,"

12  (phonetic) you know, so an analyst would have access

13  to that information as well.  So we could say even

14  the State had information beyond just DFPS.

15              SENATOR MILES:  Okay.  Col. McCraw, is

16  there any training of DFPS or HHSC investigators

17  done by DPS or any other law enforcement that you

18  know of?

19              COL. MCCRAW:  I think the only one we

20  have been involved is the Interdiction of the

21  Protection of Children, which is a -- which is a

22  curriculum that the Department developed to help

23  patrol officers, but others as well to identify

24  indications and indicators of sex trafficking of

25  children and be able to follow up on it.

1          SENATOR MILES:  So there is some

2    training that --

3          COL. MCCRAW:  I believe that we -- we

4    have some cross-training.  I know when they had, you

5    know, Commissioner Hank Whitman was there, we had

6    been involved in some dual training in that regard.

7    And so we benefitted from them, and I think they

8    benefitted from us.  And I'm not aware of anything

9    at this particular moment, but it would not surprise

10   me if there's -- that the IPC curriculum is still

11   ongoing.

12         SENATOR MILES:  I guess it's safe to

13   say based on your answer, that you don't -- you or

14   DPS, no one at DPS gets an opportunity to review the

15   training provided by DFPS or HHSC to their

16   investigators?

17         COL. MCCRAW:  No, sir, we haven't done

18   any -- we have not done that.

19         SENATOR MILES:  Is that something we

20   could consider in the future possibly?

21         COL. MCCRAW:  If requested,

22   absolutely.  Even by the agency.  We'll be glad to

23   help them.  As we have been asked in the past to

24   help them, we'll be glad to help them in the future.

25         SENATOR MILES:  I would like to see

1   something like that happen, Colleagues, that we get

2   our DPS and our Rangers under Col. McCraw's

3   leadership to assist in some training for DFPS and

4   Health and Human Services.  I think it would be a

5   move in the right direction for us to -- when we

6   talk about training.  Nobody to get it from better

7   than Commander McCraw and DPS and the Texas Rangers.

8                   COL. MCCRAW:  Yes, sir.

9                   SENATOR KOLKHORST:  Thank you.

10                  SENATOR MILES:  Thank you.

11                  SENATOR KOLKHORST:  I want to follow

12  up just a second on some questions, the line of

13  questioning of Senator Huffman.  And just on this

14  particular case, I think that you said it -- I don't

15  always hear well in this chamber, but there were

16  several workers in the facility that were related in

17  some way.  Am I correct?

18                  COL. MCCRAW:  It's my understanding

19  there are, yes, relations that were unreported.

20                  SENATOR KOLKHORST:  Okay.  And then I

21  want to ask just in general, when we look at

22  facilities, Senator Perry, there are certain

23  facilities that take only trafficked children.  It's

24  a very specialized treatment.  There were others

25  that take high acuity.  And we can get more into the

1  details with that agency.

2          When you look at trafficked children, much

3  to what Senator Huffman said -- and I'm sure she has

4  presided over some of these court proceedings --

5  it's a sophisticated ring.  Am I right on that?

6  It's very sophisticated?

7          COL. MCCRAW:  It can be, yes.  I'd

8  almost say it's too sophisticated, because certainly

9  we know gangs have been involved in exploitive

10 and -- we even know to the point that the centers

11 made here is that they'll set up in juvenile

12 facilities, you know, looking for opportunities to

13 exploit females.

14         SENATOR KOLKHORST:  And that's a

15 little bit of what I think I was getting to, is that

16 the vetting of people that work at these particular

17 facilities is ultimately important.  Am I correct?

18         COL. MCCRAW:  Absolutely.

19         SENATOR KOLKHORST:  And then the

20 vetting of the children that enter the facility, of

21 course, we want those placements, but then I have

22 been told that there are certain activities where

23 children would agree to go into facilities.

24 Potentially.  I'm saying hypothetically.  They're

25 kind of the recruiter in ways.  They're -- we know

22

1   that they infiltrate our high schools.  They

2   infiltrate other settings.

3          And so the importance of these particular

4   settings, when a girl, and unbelievably boys are

5   trafficked as well, are recovering.  And from what I

6   have talked about providers, much to what Senator

7   Huffman said, some of these behaviors are hard to

8   break and that it takes a long time, over a period

9   of time of therapy and working with the child to

10  change those behaviors.

11         And so I think just in your opinion and

12  your position and what I think the Texas Department

13  of Public Safety in my estimation is one of the

14  premier law enforcement agencies in the United

15  States, as we look at these facilities to look at

16  this case, but we're really looking at the

17  processes, there's a lot that needs to be considered

18  when you're dealing with these most fragile

19  children.  Is that correct?

20              COL. MCCRAW:  Yes, ma'am.

21              SENATOR KOLKHORST:  I think you have

22  said this, but the first notification of these

23  events at The Refuge that your department received,

24  was that March 10th when you were asked?

25              COL. MCCRAW:  Yes, ma'am.

1      SENATOR KOLKHORST:  Okay.  And prior

2  to that, local officials had not asked you to step

3  in?

4      COL. MCCRAW:  That's correct.

5      SENATOR KOLKHORST:  And that's fairly

6  normal when you have a facility that is either

7  located in a city or in a county and, you know, will

8  find this process from the agency, statewide intake,

9  there's a report, you know, all the different

10  procedures of DFPS to HHSC, they usually report to

11  the local law enforcement.  Is that correct?

12      COL. MCCRAW:  Yes.  And the Bastrop

13  County Sheriff's office believed it was an isolated

14  incident related to the January 24th event, and

15  there was -- they didn't ask for additional

16  assistance from the Department of Public Safety.

17      SENATOR KOLKHORST:  But agencies --

18  our law enforcement, local law enforcement agencies

19  do have the ability to ask for assistance when

20  needed?

21      COL. MCCRAW:  Absolutely.  And we'll

22  provide it to them upon request.

23      SENATOR KOLKHORST:  And per your

24  letter, what was first reported last week -- I

25  believe the story broke on Thursday afternoon,

1  Thursday evening, that there was an alleged, as you

2  said, seven children, nine perpetrators and sex

3  trafficking of the children happening.

4            COL. MCCRAW:  Yes, ma'am.

5            SENATOR KOLKHORST:  That particular

6  part of the story per your investigation did not

7  happen?

8            COL. MCCRAW:  No, ma'am.  There was --

9  as I noted in the letter, there's some material

10 inaccuracies that weren't correct.  And review of

11 the documents, underlying documents would have

12 identified that easily, but certainly the follow-up

13 interview with the DFPS employees were able to

14 confirm that.

15            SENATOR KOLKHORST:  And then one more

16 question just so we understand the processes.

17       You mentioned in your testimony that from

18 DFPS there was a white paper, something created that

19 goes to the court monitors.  And I know that

20 Commissioner Masters will talk about we are required

21 to report things.  But that there were certain

22 footnotes deleted.  Did you say that?

23            COL. MCCRAW:  Well, there was

24 annotations, there was caveats that -- in terms of

25 that this information is summary information, this

1   information is conjecture by special investigators.

2   This is unvetted information.  In other words, it is

3   a draft document, and the author did not intend that

4   document as written to go to the court monitor

5   unless -- until it's -- those things had been

6   addressed.  Instead, what happened was the caveats

7   were removed and the document was forwarded.  Then

8   that's why the reports that we received and were

9   asked to investigate, we were able to determine what

10  we -- I just reported.

11          SENATOR KOLKHORST:  Thank you for your

12  clarification on that statement.

13      And let me just say in the end, that there

14  obviously was criminal activity in this facility,

15  and, again, any exploitation of any child in the

16  state of Texas is unacceptable.

17      Senator Menéndez.

18          SENATOR MENÉNDEZ:  Thank you, Madam

19  Chair.

20      I would like to ask a follow-up question.

21      Director McCraw, in your investigation,

22  did DPS review any of the infractions or issues that

23  have happened over the last year at The Refuge?

24  Let's say, have you gone through their file and seen

25  if --

1          COL. MCCRAW:  Yes, sir.  We went

2    through their files.  We -- for a year we looked at

3    their files.  We looked at the OIG files for DFPS.

4    We looked at the special investigator files.  And we

5    looked -- obviously looked at the case reports from

6    the Bastrop County Sheriff's office.

7          SENATOR MENÉNDEZ:  So following up on

8    my colleague's questions about vetting employees and

9    how imperative it is, it is my understanding that

10   the facilities had identified having multiple

11   background check infractions over the last year.

12   Did you find those?

13         COL. MCCRAW:  We didn't get involved

14   in the background checks in that regard in

15   individual employees, but we know that there were

16   weaknesses there that were identified by DFPS, and I

17   think by The Refuge itself.

18         SENATOR MENÉNDEZ:  Well, this might be

19   an example of how we need to improve the data

20   systems, because my understanding is that HHSC has

21   declared that one of the employees that was working

22   there was -- once gone through the background check

23   was not supposed to be working at this type of

24   facility at all.

25         COL. MCCRAW:  Yes, sir, I'm not aware

```
 1   of that.  But I would not -- I'm not -- I would not
 2   be surprised.
 3              SENATOR MENÉNDEZ:  Well, we'll be
 4   happy to help you provide -- connect those dots to
 5   see if that helps with anything else that's going
 6   on.
 7              You mentioned material inaccuracies.  Are
 8   you just specifically talking about the sex
 9   trafficking, or are there any --
10              COL. MCCRAW:  Yes, sir.  Yes, sir.
11   You can't -- it was alleged sex trafficking.  Some
12   of those things weren't sex trafficking at all.
13   Some of the incidents that were referenced, and when
14   you go back to look at the outtake, it had to do
15   with an employee sleeping on the job or a medical
16   neglect or another negligence report in that regard
17   that had nothing to do with sex trafficking or
18   sexual abuse.
19              SENATOR MENÉNDEZ:  I see.  All right.
20   Thank you, Director.
21              Thank you, Madam Chair.
22              SENATOR KOLKHORST:  Senator Creighton.
23              SENATOR CREIGHTON:  Thank you, Madam
24   Chair.
25              Director, good to have you here.
```

28

1          COL. MCCRAW:  Thank you, sir.

2          SENATOR CREIGHTON:  I appreciate your

3  input and always your work on behalf of the State.

4  Always very impressed with you.

5          I just -- I had a couple of questions

6  on -- from a report from the National Human

7  Trafficking Hotline data that's provided.  It's from

8  2020.  But it talks about during the lockdowns how

9  things have evolved over time where the proportion

10  of victims, trafficking victims from common

11  recruitment sites up to 2020, three of the most --

12  the highest propensity recruitment sites were from

13  strip clubs, foster homes and schools.  I was very

14  surprised that those three were at the top of the

15  list, or at least two of the three.

16          And then as a result of the lockdowns,

17  this report from the National Human Trafficking

18  Hotline, the data provided shows through an analysis

19  that the way things have evolved, recruitment from

20  2020 from strip clubs was down 46 percent, from

21  foster homes was down 70 percent, and from schools

22  was down 38 percent, but there was a 120 percent

23  increase on social media sites.

24          So I was just going to ask along those

25  lines, how has the Department modified its

1   investigation, strategies and priorities to shift

2   towards social media?  Or assuming for many years

3   you've had sort of a dual prioritization there on

4   top propensity recruitment sites, physical sites and

5   social media, how has that evolved over time, and

6   how do you handle things now for social media on

7   human trafficking?

8              COL. MCCRAW:  Well, our priorities

9   remain the same.  We have resources dedicated to sex

10  trafficking investigations and we do an ongoing

11  child sex trafficking investigations.  And the

12  criminal element just modifies their technique of

13  communicating, and social media is something even

14  the cartels are using right now to recruit, for

15  example, smugglers or drivers to support their

16  criminal operations.

17             So it's -- they used to do it different

18  ways.  They used to recruit our kids in the schools

19  in the Rio Grande Valley and along the border.  Now

20  they -- they simply use social media to reach out,

21  because they have run out of drivers to San Antonio,

22  Houston with the promise of lots of money.

23  Similarly, gangs are very adept at using social

24  media.  So it's a different platform to communicate,

25  and, of course, it provides an opportunity for those

1   that want to exploit children or others for sex

2   purposes to recruit individuals and identify

3   individuals to be recruited.  And so we're always

4   mindful of those things.

5            We've talked about it before, whether

6   we're talking about threats of life or threats to

7   our children when -- from sexual predators, we would

8   love to have a greater level of cooperation from the

9   social media companies simply because they're some

10  very smart people, have great capabilities, and

11  unlimited resources to be able to develop the type

12  of algorithms that would identify things that can

13  help law enforcement, one, identify potential

14  victims and rescue them, but also target criminal

15  networks that are exploiting social media and that

16  networks to be able to engage in criminal activity.

17           SENATOR CREIGHTON:  I appreciate

18  that -- I just -- I appreciate the explanation and

19  some of the insight into how priorities and

20  strategies and investigations by the Department

21  evolve, especially with the higher uptick on the

22  social media recruitment.

23           The schools component of the recruitment

24  was very surprising to me, probably not to you.

25           COL. MCCRAW:  Well, you no longer have

1  to stay around a playground, okay, or shopping malls

2  or schools or recruit when you can do it on social

3  media.  And that's the -- that's the insidious

4  nature of it and the concern that all parents ought

5  to have.

6          SENATOR CREIGHTON:  The second point

7  from the data provided in this analysis was that in

8  2020, the proportion of victims recruited by a

9  caregiver increased significantly from 21 percent of

10 all human trafficking victims in 2019 to 31 percent

11 in 2020, which was a 47 percent increase in one year

12 for caregivers to be leading in this recruitment for

13 human -- ultimately what would be a human

14 trafficking victim.

15          So with regard to The Refuge and with our

16 discussion today related to investigations in

17 general, we've talked about -- we've talked about

18 CPS and investigation priorities and the difference

19 between how we appropriate and direct by proxy and

20 then how they have substrategies within their agency

21 for the priorities and how they deploy funds for

22 those purposes.

23          My last question is, assuming that that

24 state agency does not have the skills or the

25 effectiveness in carrying out an investigation that

Steven McCraw - 3/17/2022

32

1  your department does, because you're the best of the

2  best, is there any collaboration, is there any -- is

3  there any upside to considering the training that

4  Senator Miles mentioned, looking into their

5  effectiveness as investigators compared to your

6  effectiveness as carrying out an investigation and

7  collaborating between the two?  Knowing that your

8  plate is full, but could there be someone available

9  to assist with that effort?

10              COL. MCCRAW:  Yeah, certainly training

11  is the -- we work with our local partners to assist

12  in training, and that's certainly an expectation.  I

13  think part of the public safety that has been levied

14  upon us by the state leadership and the legislature,

15  you expect us to be team players do that, and we

16  would be willing to do that.

17              SENATOR CREIGHTON:  Thank you.

18          Thank you, Madam Chair.  Thank you,

19  members.

20              SENATOR KOLKHORST:  Thank you,

21  Director McCraw.  We appreciate you being here

22  today.

23          Senator Eckhardt, one question.

24              SENATOR ECKHARDT:  Just one.  And

25  thank you so much for being here.

1          I was wondering, in the spirit of that

2    kind of collaboration that Senator Creighton was

3    mentioning, would you have any recommendations with

4    regard to vetting of employees for specific

5    populations such as sex trafficked foster children?

6    I understand that the usual background check, just

7    looking at previous criminal behavior, may not be

8    sufficient, and I was wondering if you had any

9    suggestion.

10          COL. MCCRAW:  Well, we use -- you

11    know, I know that people don't want to hear it, but

12    certainly, we do the fullback ground investigation,

13    we do the neighborhoods, we do the traditional

14    things you would expect, and certainly the

15    fingerprint biometric check along these lines,

16    but -- and I don't -- it's not a very popular thing

17    to say, but we use preemployment polygraphs.  And

18    there's a reason for it.  And I couldn't tell you

19    how many criminals that are -- that wouldn't --

20    would have been if not for, you know, the

21    preemployment polygraph that could be employed by

22    the Department of Public Safety.  And they were

23    criminals and they had engaged in some despicable

24    criminal activity.  But if not for, we wouldn't have

25    identified it.

1          So that's something that I throw out.

2    It's not easy to put a program in place, but if

3    you're a police department and not using such a

4    program, you become a magnet for those that failed

5    it elsewhere.

6          SENATOR KOLKHORST:  Thank you.

7          To end this, Colonel, working on this

8    particular subject matter with residential treatment

9    centers and the highest acuity rates are most

10   exceptional children, there has been a trend in the

11   past where we did not stop children from walking out

12   of a residential treatment center.  It was like we

13   couldn't touch them.  We would allow them to leave.

14   And some facility operators would say, "Well, they

15   might be gone for a day or two, but they'll come

16   back for a hot meal."  There is nothing good when we

17   don't know where a child is.  Would you agree?

18          COL. MCCRAW:  Oh, absolutely.  Too

19   many people that seek to exploit them.

20          SENATOR KOLKHORST:  So the importance

21   of keeping a child at a center -- and I know that

22   all of you look at me, like, could we really be

23   doing that.  There was a trend, there was a judge

24   one day that told our commissioner -- not this

25   commissioner -- that you could not lay a hand on the

1   child from leaving the facility.  Senator Menéndez

2   knows that.  And I just think that the importance of

3   us looking at how we keep children safe is that you

4   can't let them walk out of a facility either and not

5   know where they are.

6                   COL. MCCRAW:  Yeah, and I don't have

7   the core competence or expertise just except being a

8   father and grandfather, I would, you know, also

9   obviously feel strongly about that.  But as a

10  professional, I can't really comment from an expert

11  standpoint.

12                  SENATOR KOLKHORST:  Thank you.  We

13  appreciate you being here.  And thank you for the

14  work and the service of your agency.

15                  COL. MCCRAW:  Thank you.  Appreciate

16  it.

17                  (Concluded.)

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATION

2

3

4           I, CHRISTY R. SIEVERT, CSR, RPR, in

5  and for the State of Texas, hereby certify to the

6  following:

7           That the proceedings were transcribed by

8  me from audio recordings, and is a true record of

9  the proceedings had;

10          I further certify that I am neither

11 counsel for, related to, nor employed by any of the

12 parties or attorneys in the action in which this

13 proceeding was taken, and further that I am not

14 financially or otherwise interested in the outcome

15 of the action.

16          Subscribed and sworn to on this the 28th

17 day of March, 2022.

18

19

20 _____
   CHRISTY R. SIEVERT, CSR, RPR
21 Texas CSR 8172
   Expiration Date:  4-30-2023
22

23

24

25

STATE OF TEXAS

THE HOUSE COMMITTEE ON HUMAN SERVICES


87TH LEGISLATURE


MARCH 21, 2022


EXCERPTS OF THE COMMITTEE HEARING


TESTIMONY OF DEPARTMENT OF PUBLIC SAFETY DIRECTOR

COL. STEVEN MCCRAW

```
 1              REPRESENTATIVE FRANK:  The Chair calls
 2   up Col. Steve McCraw, director of the Department of
 3   Public Safety.
 4              I know you're an expert at this, but
 5   please state your name and who you represent.
 6              COL. MCCRAW:  Chairman and
 7   Representatives, Steve McCraw, director of the Texas
 8   Department of Public Safety.  Thank you for the
 9   opportunity to testify before you today.
10              REPRESENTATIVE FRANK:  Thank you.
11   Thank you for being here today.
12              COL. MCCRAW:  The Department's
13   involvement began with the governor-directed action
14   back on March 10th.  He wanted to ensure that the
15   Department investigate fully all sex allegations or
16   reports of sex trafficking and sexual abuse at the
17   shelter Refuge center in Bastrop County, which was
18   contracted -- or the Department of Family and
19   Protected Services had contracted with to care for
20   children in their custody.
21              We sent a team of Texas Rangers
22   immediately to Bastrop County.  We set up a command
23   post and worked the allegations.  We interviewed the
24   victims at the -- and when I say "victims," victims
25   in the sense that they're there because they're
```

1   victims at the shelter, the residents.

2           We interviewed DFPS employees, certainly

3   and Refuge employees, and, of course, reviewed the

4   Bastrop County investigative files as we were going

5   through the course that were seen in terms of abuse

6   or any misconduct by Refuge employees in Bastrop

7   County.

8           I can tell you that the -- well, certainly

9   the sheriff's office has been very cooperative and

10  everyone has been cooperative of this particular

11  investigation.

12          We've noted there was two major instances

13  of misconduct.  Very disturbing.  Obviously, the

14  first, and I would say most disturbing -- all of

15  them are disturbing anytime you get any allegation

16  of misconduct by an employee that's overseeing

17  children.  And the first one was the idea that an

18  employee at The Refuge had taken or been involved in

19  the negotiation of getting nude photographs of two

20  of the residents, minor females at this location,

21  and was in the process or involved in exchanging

22  those nude photographs, okay, for money and/or

23  drugs.  That's alleged in the last part right now.

24          This employee was confronted immediately

25  when the outcry occurred by The Refuge.  She was

1  terminated at that point in time.  It was reported

2  in a timely manner to the Bastrop County Sheriff's

3  Department.  They have been conducting an

4  investigation since that date, which was

5  January 24th when the outcry occurred.

6          During the course of their investigation,

7  which we reviewed, clearly, there is -- there's

8  evidence and probable cause to believe that that

9  Refuge employee was involved in the sexual

10 exploitation of a child, two minors specifically.

11 Also that she provided, you know, false information

12 during the course of an official investigation.

13         So those things are being investigated

14 right now.  An arrest has not been made for that

15 violation.  And when I say "the violation," meaning

16 the sexual exploitation of a minor at this point.

17 They're awaiting some electronic information.  When

18 they get that back, there's an expectation -- and

19 we're working with Sheriff Maurice Cook as well to

20 provide whatever support that he may need on the

21 investigation to be able to charge that individual

22 with the sexual exploitation of a child and,

23 possibly, depending on the prosecuting attorney, you

24 know, child pornography.

25                 REPRESENTATIVE FRANK:  And so just to

1   be clear, this was reported by the agency, or is

2   this -- excuse me -- by The Refuge immediately, or

3   is this something you discovered during your

4   investigation?

5              COL. MCCRAW:  It was immediately

6   reported by The Refuge both -- both to DFPS and to

7   the Bastrop County Sheriff's Department as required

8   by law.

9              REPRESENTATIVE FRANK:  And the

10  employee -- and the employee was terminated, then?

11             COL. MCCRAW:  Immediately, yes, the

12  employee was terminated.

13             REPRESENTATIVE FRANK:  And this

14  surprised me, though, but this employee has not been

15  arrested yet?

16             COL. MCCRAW:  Correct.

17             REPRESENTATIVE FRANK:  The

18  investigation is still going on, but they have not

19  actually been --

20             COL. MCCRAW:  Well, there's -- yeah,

21  the one charge, you know, pending the employee --

22  what the employee was charged is providing a false

23  report to a police officer -- or to a law

24  enforcement agency.  So that is still outstanding.

25  Okay.  And, again, it goes back to, you know, the

1   agency feeling it has reached the necessary

2   information to prosecute the particular case and

3   justify that before the prosecuting attorney.  We're

4   confident that that person will be charged with the

5   two violations that I'm talking about as soon as

6   they add that last piece of --

7              REPRESENTATIVE FRANK:  Did y'all look

8   at whether or not the employee had been background

9   screened?  Did they ignore a background screen,

10  or. . .

11             COL. MCCRAW:  They have a background

12  screening process.  Okay.  So it was -- they use on

13  their employees.  We can all debate, well, that's

14  something that policy can -- certainly policy

15  professionals like yourself get to oversee and see

16  is it to the level that you deem appropriate for a

17  particular agency entrusted with children.

18             REPRESENTATIVE FRANK:  Okay.  Thank

19  you.

20             REPRESENTATIVE ROSE:  Chairman.

21             REPRESENTATIVE FRANK:  I'm sorry,

22  Representative Rose.

23             REPRESENTATIVE ROSE:  You opened it

24  up, so I just want to kind of piggyback on that,

25  because I'm really confused about the nonarrest.

1           COL. MCCRAW:  What now?  I'm sorry?

2           REPRESENTATIVE FRANK:  About the

3    nonarrest.

4           REPRESENTATIVE ROSE:  I'm confused

5    about the nonarrest.  And you said that you-all are

6    waiting.  I mean, if it's already been determined

7    and you have evidence that these things have

8    happened, I'm just really unclear about why this

9    person has not been arrested.

10          COL. MCCRAW:  Well, the last piece of

11   information, okay, which is important, is that

12   exchange that -- which will come with the electronic

13   data, the digital evidence.  So, you know, it's --

14   law enforcement can be -- you know, we're in a

15   position to make the case to the prosecuting

16   attorney, but in the end they get to decide when

17   charges can be filed or not.  And I'm quite

18   confident they will be, but we're waiting to the

19   return -- they're waiting for a return on the

20   subpoenas for the digital information that will

21   prove that, in fact, this person did exchange that

22   data, number one.  And also the paid part, that

23   there was money that was exchanged.  And that's the

24   requirement right now.

25          REPRESENTATIVE ROSE:  So, basically,

 1   you don't have the photo?

 2                 COL. MCCRAW:  No, I didn't say that.

 3   I didn't say that.

 4                 REPRESENTATIVE ROSE:  There was

 5   data -- well, you're saying digital, so that's

 6   why --

 7                 COL. MCCRAW:  I said digital evidence.

 8   There's not -- not just a photo is digital evidence.

 9   Also the method of payment, how the payment was

10   made.  There's a number of different things that are

11   outstanding right now.

12                 REPRESENTATIVE ROSE:  Okay.  I'm

13   still --

14                 COL. MCCRAW:  Just because an

15   investigative agency believes we have met the burden

16   of probable cause doesn't mean a prosecuting

17   attorney has.  I'm not saying that's the case in

18   this.  We get to present the evidence and try to

19   fulfill all the requirements that meet the

20   reasonable suspicion standpoint or probable cause

21   standard that all the elements of the offense in the

22   statute have been met.

23            And that's usually an ongoing situation,

24   and we understand that the -- it's -- where our

25   place in that role is.  And I'm not quite confident

 1  that evidence -- we'll be able to present the

 2  evidence that they need to be able to prosecute this

 3  case.  I'm quite confident.

 4            REPRESENTATIVE ROSE:  And I totally

 5  understand that, Colonel, but I guess when you look

 6  at any other cases where there's been some type of

 7  child exploitation, that, you know, people are

 8  arrested immediately.  And here we are, State

 9  agencies are involved with this, and this person is

10  still running -- I mean, are still out there and has

11  not been arrested when this offense has occurred.

12            COL. MCCRAW:  Yeah, well, like I said

13  before, is that we get to -- you know, we're one

14  part -- we're an important part of the criminal

15  justice system, but we're -- we don't decide on

16  what's prosecuted on.  We have a burden to be able

17  to provide the evidence --

18            REPRESENTATIVE ROSE:  I'm not

19  necessarily just talking about your office.  I mean,

20  you're the one who's presenting the information.  So

21  I'm just -- you know, just curious as to, again, why

22  this --

23            COL. MCCRAW:  I'm just saying the

24  sheriff's office --

25            REPRESENTATIVE ROSE:  -- person has

 1  not been arrested.

 2             COL. MCCRAW:  Yeah, well, the

 3  sheriff's office has the same standard that we do.

 4             REPRESENTATIVE ROSE:  So are y'all

 5  working together?

 6             COL. MCCRAW:  Well, we're supporting

 7  the sheriff in any way he needs, and we'll continue

 8  to help him on this case.  But quite frankly, the

 9  sheriff has investigators that have done a very good

10  job in responding, and they've done all the basic

11  investigative steps necessary to be able to identify

12  all the elements of the offense.  And I think they

13  have done a very good job in documenting that.  And

14  we're confident that that exists, that employee was

15  engaged in that misconduct, and that employee should

16  be charged and should be arrested and should face

17  trial for the two violations, at least the two

18  violations that I have talked about.

19             REPRESENTATIVE FRANK:

20  Representative --

21             REPRESENTATIVE ROSE:  I don't have

22  anymore.

23             REPRESENTATIVE FRANK:  Sure.

24        Representative Noble.

25             REPRESENTATIVE NOBLE:  Thank you,

1  Mr. Chairman.

2         Okay.  So this was -- the outcry was on

3  January 24th?

4              COL. MCCRAW:  Correct.

5              REPRESENTATIVE NOBLE:  And so here we

6  are, you know, a couple of months later.  Is there

7  anything that would keep this person from going and

8  getting a job with other children at this point if

9  there has not been an arrest?

10             COL. MCCRAW:  Well, it depends on the

11  agency.  I would imagine.  Each individual agency

12  has its own requirements.  But, certainly, I think

13  anybody that would conduct a background

14  investigation, even the most cursory one right now,

15  cursory background investigations would be able to

16  identify that this individual has been -- you know,

17  has not been arrested but this individual has been

18  identified as a subject of an ongoing investigation.

19  I think with the data that's available, there's

20  certainly that opportunity.  From a department

21  standpoint, if you're asking us from a policy

22  whether a department would hire anybody along those

23  lines, would we be able to detect it, I'm confident

24  that we would be able to.  Is it possible that

25  others would not?  Absolutely.

```
 1              REPRESENTATIVE NOBLE:  I'm just

 2   thinking of, you know, a daycare or something and

 3   not knowing, not --

 4              COL. MCCRAW:  Absolutely.  I don't --

 5   I don't disagree with that.

 6              REPRESENTATIVE NOBLE:  -- without an

 7   arrest on your -- okay.

 8              COL. MCCRAW:  And -- and quite

 9   frankly, you require, you know, bus drivers to get a

10   criminal fingerprint checked through the FBI, and we

11   do those.  So even -- you know, there's certain

12   positions that are given a position of trust, and a

13   background investigation is understandable and why

14   you would want that and why the Texas Legislature

15   has been insistent upon certain positions having

16   that requirement.

17              REPRESENTATIVE FRANK:  Okay.  Thank

18   you very much.

19         Yes, Representative Hull.

20              REPRESENTATIVE HULL:  What was the

21   date that y'all -- DPS got involved?

22              COL. MCCRAW:  March 10th.

23              REPRESENTATIVE HULL:  So prior to

24   that, it was just Bastrop County Sheriff?

25              COL. MCCRAW:  Correct.
```

```
 1              REPRESENTATIVE FRANK:  All right.

 2   Thank you.

 3              All right.  Go ahead.

 4              COL. MCCRAW:  The second concern that

 5   relates to misconduct occurred -- or was reported an

 6   outcry on February 20th.  It involved the escape or

 7   fleeing of two of the residents.  And the allegation

 8   was that a Refuge shelter employee assisted and

 9   facilitated that escape, and that, in fact, did

10   occur.  And there may be additional charges down the

11   road, but that there was one charge.  An arrest was

12   made for providing false information, okay, to the

13   Bastrop County Sheriff's Department.  That arrest

14   has been made, but, again, there may be additional

15   charges.  We're working with the Bastrop County

16   Sheriff's Office Department right now on that

17   particular.

18              There were a number of other allegations

19   that were made, and, of course, there was some

20   inaccuracy -- some of what we would call some

21   betrayal and inaccuracies that were reported in a --

22   just a document that was designed to be a summation

23   by someone that worked for the Department of Family

24   and Protective Services.  And that summation was

25   done late at night, and, arguably, there was some
```

1   unvetted information that was incorporated into it,

2   but there was -- it had many caveats in terms of

3   that's what this is, unvetted information, or more

4   follow up needs to be done or a draft.  And those

5   things, unfortunately, were removed, and it was

6   reported as the basis of fact, okay, a document to a

7   court monitor that reports to the federal judge that

8   oversees, okay, the Department of Family and

9   Protective Services and State programs as it relates

10   to children.

11           And so needlessly to say, when that was

12   reported on the 10th -- so the document was written

13   at 1:00 in the morning and reported to the court

14   monitors on the 10th, and the hearing happened on

15   the 10th.  So all of that quickly happened.  And, of

16   course, as you can imagine, there was many

17   allegations of ongoing sex trafficking, sexual abuse

18   of the residents out at The Refuge shelter.

19           And, of course, after a thorough and

20   exhaustive investigation and deconflicting three

21   different systems that DFPS has, CPS has, HHS has,

22   going through it, listening to recordings, which is

23   necessary to do because sometimes there's a -- you

24   know, what is reported as an allegation and it turns

25   out that it's not really an allegation of it, it's

1  an allegation of sleeping on the job versus sex

2  trafficking, big difference, it's important to get

3  the facts.  It's important to report back to you

4  some -- with a certain degree of certainty, that --

5  I can say that we identified no instances of --

6  outside what I've already mentioned, which was

7  sexual abuse of a minor, but no instances of sexual

8  assault or sex trafficking of residents or any

9  children at that location.

10           REPRESENTATIVE FRANK:  Yeah.  Oh, I'm

11  sorry.  Vice Chair.

12           REPRESENTATIVE HINOJOSA:  So director

13  I'm very confused because I listened to the -- I

14  have a timeline from DFPS and I watched the entirety

15  of the Senate hearing just a couple of days ago.

16  And -- well, for one, let me start with this.

17           In your letter you say there is, "No

18  evidence that any of the residents of The Refuge

19  have ever been sexually abused or trafficked while

20  at the shelter."

21           Is it not sexual abuse to take nude photos

22  of minors and sell those photos, traffic those

23  photos?  Is that not sexual abuse?

24           COL. MCCRAW:  I certainly consider it.

25  It's certainly the sexual abuse of a minor.  I would

1   say that the allegations as it relates to sexual

2   abuse is in the context of -- or rape or trafficking

3   or for pay or rape of the minors at the particular

4   facility.

5            REPRESENTATIVE HINOJOSA:  But it is a

6   form of sexual abuse to take --

7            COL. MCCRAW:  Absolutely.

8            REPRESENTATIVE HINOJOSA:  -- photos

9   and --

10            COL. MCCRAW:  It's -- misconduct is

11   the way the statute reads, but absolutely.

12            REPRESENTATIVE HINOJOSA:  And the

13   other thing, so we have a situation where there were

14   eleven kids at The Refuge.  We have outcries

15   according to the testimony from DFPS in the Senate

16   and according to the timeline provided to us from

17   DFPS, outcries from six children out of the 11, one

18   of whom said the boyfriend of the perpetrator who

19   took the nude photos had previously trafficked her.

20   Another who -- and this is a quote that I wrote down

21   from the Senate hearing.

22            So it was on 2/28.  There was an outcry

23   from a child.  And this is -- this came from

24   Commissioner Masters in the Senate hearing where --

25   and it's on our timeline, 2/28/22, where a child

1   reported being trafficked, being trafficked at the

2   time, and what was -- and who the trafficker was,

3   and asked the reporter what they were going to do

4   about it.

5           So we have -- that's an allegation of --

6   and so I would think that's evidence.  Certainly

7   more needs to be looked into there, but I'm hearing

8   a different conclusion from you than I'm hearing

9   from DFPS to agencies within our administration

10  here, and we're all just trying to assess out what

11  really is the case.

12          And the other thing that we heard from

13  our -- from the testimony is that on 2/1, the agency

14  confirm that the director of The Refuge was aware

15  and did her own private investigation and never

16  reported this to statewide intake.  That's at least

17  the way I understood it from the Senate hearing.

18  You testified that it was timely reported.

19          And so I'm trying to figure out what's up

20  with the discrepancies, and if you have reason to

21  doubt the investigation of DFPS, and, if so, if you

22  could share with us why.

23               COL. MCCRAW:  Well, we -- I'm not

24  going to -- I don't want to cast dispersions on any

25  agency, especially one that has such an important

1  mission and does such a tremendous job in so many

2  things and so many challenges, but we do investigate

3  for a living at Texas Department of Public Safety.

4  I'm quite confident when our Ranger team came up

5  with -- I can go down the timeline with you.  It

6  might be helpful.  I know that it was reported --

7  there was multiple sources that must be reviewed to

8  get an accurate picture of the allegations;

9  otherwise, you're just shooting from the hip.  And,

10  of course, there's three different systems that I

11  referred to.

12         You know, at DFPS, of course, certainly

13  call version 1.0 in terms of impact.  You know, 2.0,

14  1 and 2.1, they've got a version 2, and they've got

15  also a class database at HHSC.  And, of course, any

16  one of those could have intakes.  An intake to them

17  is like a complaint or someone who's alleged an

18  allegation in that regard.

19         After reviewing all of those records in

20  the above systems, you know, certainly from 1/24 to

21  3/10, we looked at the records from -- that we got

22  on the same date, and including the supporting

23  documentation.  And one thing you note is that Iesha

24  Greene was not immediately terminated.  Well, as

25  the -- when it was brought to their attention.

1   Well, actually, she was by telephone.  I mean, by

2   documents -- if you look at The Refuge documents, it

3   clearly documents that she was terminated by

4   telephone.  It wasn't -- it wasn't at the facility

5   when they -- the outcry came to the -- to the

6   attention of the representatives there, and she was

7   never let back on -- and she was banned from the

8   property in that regard.  So not just technically,

9   but actually she was terminated at the time.  So

10  that was an accurate statement.

11       The Refuge was aware of allegations that

12  allowed children to remain supervised by suspected

13  staff, thereby continuing to expose the children to

14  possible offenders and compromising their safety.

15  That's a serious concern, obviously.

16       And as explained above Iesha Greene was

17  terminated by phone the same day, and that all, you

18  know, of the five suspected to be involved in the,

19  we'll call the -- the incident that -- involving the

20  escape or fleeing of two -- of two individuals,

21  three were confirmed to be involved were terminated

22  or resigned.  And none of the suspected employees

23  had contact with the juvenile residents at The

24  Refuge after allegations were reported.

25       On February 26th, they have an intake

1  number, and we were advised that her report was not

2  accurate on DFPS intake record.  It was a

3  misrepresentation of what she was reporting.  And

4  also we're advised that -- in the interview that she

5  did not know if Greene's family was involved and

6  that no knowledge of continued abuse at The Refuge,

7  which was an allegation that was made.

8       And, of course, as a result of these

9  discrepancies that we were advised, that what was

10  entered onto the record was incorrect.  And, of

11  course, you know, we asked for and looked at

12  importantly, you know, audio recordings to be able

13  to able to listen to it to see, you know, what is

14  right, was -- is it the witness or is it the

15  document itself?  And, of course, the audio

16  recordings and the intakes made -- we reviewed

17  from -- and, of course, it supported the fact that

18  that did not occur.

19       The results of talk -- six intakes

20  involved in the alleged circulation of nude photos,

21  the juveniles, okay, were -- we looked at -- we

22  actually found eight intake reports, and two of

23  those were case entries referencing allegations of

24  nude photos, but it was the same incident.  It

25  wasn't a different incident.  It was the exact same

1   incident.

2           On February 26th, there's discussion of an

3   intake, an alleged fired staff member was involved

4   in sex trafficking of children.  It was a continued

5   abuse of children that was being reported by staff

6   related to the terminated employee, and the sick

7   child was not allowed medical attention.  If you

8   review the intake, the actual report that was

9   reported that was involved in posting nude photos,

10  it was the same one on the sex that we had -- I had

11  previously discussed.  When interviewed, the female

12  victims did not report the involvement of any other

13  staff other than the one individual that we talked

14  about before.

15          And on the 19th, we interviewed the former

16  employee, Elizabeth, who made the report to DFPS

17  intake, and according to her she doesn't have any

18  knowledge about Greene's family members being

19  involved or any allegations of continued abuse by

20  staff after the Greenes' termination of 1/24, which

21  is the date we talked about in terms of when the

22  outcry occurred.

23          According to -- at the time, the

24  Rangers -- the narrative in the intake was not

25  accurate when she said -- when she reported and when

1  she called on the hotline.  A supervisor and her

2  manager was reported, were terminated for ignoring

3  repeated alarms raised by a foster care abuse

4  investigator about the conditions of The Refuge.  We

5  have not been provided any information thus far to

6  support that statement.  We have a request for, you

7  know, additional information, but there's nothing to

8  support it at this particular time, none of the

9  interviews of all the individuals we have talked

10  about and -- or residents at the -- at the facility.

11         There was an allegation arose, was

12  reported, an allegation arose during the hearing

13  that one of the runaways ran from The Refuge because

14  she was afraid by retaliation of cartel members for

15  impending -- and this is for impending -- the

16  upcoming testimony she was going to be providing in

17  an FBI investigation.

18         She -- we did, in fact, have an

19  opportunity to interview her, and she did not

20  express fear of retaliation by cartel members.  She

21  just stated to the investigator that she was -- she

22  ran because she doesn't want to testify in the

23  upcoming trial, not that she was threatened by

24  Mexican cartels.  And there's no information to

25  support that she felt in fear of being attacked or

1   retaliated by cartel members or her family and

2   certainly not while she was at The Refuge.  So that

3   tracks the -- the timeline.  And I could certainly

4   go into more details if you would like.

5                REPRESENTATIVE HINOJOSA:  Well, I

6   would like to know specifically about the allegation

7   on 2/28 or the outcry from the minor that she was

8   being trafficked, who her trafficker was and what

9   were we going to do about it.  Can you specifically

10  speak to that one?

11               COL. MCCRAW:  The -- well, first of

12  all, I've got to make sure that we're talking about

13  the exact same one.  But right now what I can tell

14  you is that we did look at all of the intakes and --

15  including the one on the 26th that was -- it was

16  reported by an employee that this was occurring, and

17  according -- according to that employee did not

18  occur.

19               REPRESENTATIVE HINOJOSA:  I'm sorry,

20  according to the employee what?

21               COL. MCCRAW:  It didn't occur, that

22  she didn't report it that way, and it was a

23  misinterpretation of what she said, referring to the

24  family was involved.

25               REPRESENTATIVE HINOJOSA:  Okay.  But

24

1   I'm speaking of one on 2/8.

2               COL. MCCRAW:  2/8?

3               REPRESENTATIVE HINOJOSA:  Right.

4   February 8, 2022.

5               REPRESENTATIVE FRANK:  And y'all may

6   not be looking at the same --

7               COL. MCCRAW:  Yeah, we may be looking

8   at -- all I -- all I can tell you, Madam Vice Chair,

9   is this, is that we looked at every allegation,

10  intake and every report there was inconsistencies.

11  Some were duplicative and some were

12  misrepresentations.  And all I can tell you is that

13  based upon our interviews of the, one, residents,

14  very important, okay, and, two, looking at all the

15  information, that there was no -- other than the two

16  incidents that I've talked about, those were the --

17  those are the instances in terms that have related

18  to the -- we'll call it the sexual abuse or

19  misconduct of children.

20          Now, granted the second one that was

21  relayed on February 20th was the escape of and

22  didn't involve, then, in the -- the two residents

23  that were eventually recovered, didn't report any

24  allegations of sexual assault or sexual abuse, why

25  they were -- why they escaped, fortunately.  But,

 1  you know, there is no other instance or information

 2  to support any allegation.

 3              REPRESENTATIVE HINOJOSA:  Yeah.

 4              COL. MCCRAW:  And I would -- we

 5  certainly will welcome anything that contradicts

 6  that and look at anything and any suspect, and I can

 7  assure you, if we find anybody that has in any way,

 8  shape or form abused, enticed, misused, sexually

 9  subdued or harmed a child in any way, shape or form

10  and there's evidence to support it, we'll make an

11  arrest.  Make no -- we do that routinely.  And we

12  have no qualms about it, I can assure you.

13              REPRESENTATIVE FRANK:  I was just

14  going to -- you have used the word -- Colonel, you

15  have used the word "escape" a number of times.

16  These are girl -- the girls are mostly here

17  voluntarily, are they not?  Or are they -- this is

18  not a prison, right?

19              COL. MCCRAW:  No.

20              REPRESENTATIVE FRANK:  So is there --

21  I'm trying to understand the word "escaped."

22              COL. MCCRAW:  Well, flee.  They were

23  put there by DFPS there.  Now, one of them wasn't.

24  One of them was there -- put there as a result of

25  the federal system, but still they --

```
 1              REPRESENTATIVE FRANK:  Okay.  So they

 2  were --

 3              COL. MCCRAW:  -- left the place

 4  without authorization.

 5              REPRESENTATIVE FRANK:  Okay.  Without

 6  their -- of their legal --

 7              COL. MCCRAW:  Exactly.

 8              REPRESENTATIVE FRANK:  It is -- it

 9  is -- okay.  I was just trying to make sure, because

10  some of the --

11              COL. MCCRAW:  They can't escape.  It's

12  not a prison facility, but I would say that, you

13  know, they fled the location.

14              REPRESENTATIVE FRANK:  And it was

15  assisted.  So that also. . .

16              COL. MCCRAW:  Yes.

17              REPRESENTATIVE FRANK:  I'm sorry, Vice

18  Chair, and then I'll get to you.

19              COL. MCCRAW:  And, Vice Chair, you're

20  probably referring to the girl who said she was

21  trafficked by a boyfriend several years prior to and

22  she was actually in jail.

23              REPRESENTATIVE HINOJOSA:  That's

24  another one.

25              COL. MCCRAW:  Yeah, that was a
```

1  different one.  Well, that -- that one, you know, we

2  were able to go back and look at when the

3  allegations were made and the individual the

4  allegations were against, and this individual was in

5  jail 80 percent of the time those allegations were

6  made.  So. . .

7            REPRESENTATIVE HINOJOSA:  So are you

8  talking about --

9            COL. MCCRAW:  But I'll be glad to look

10  at -- we'll look at -- like I said, we'll look at

11  anything, you know, and any -- at anytime, and I'm

12  quite confident that we'll -- we'll meet your

13  expectations in terms of resolving it.

14            REPRESENTATIVE HINOJOSA:

15  Specifically, if you -- and so let me understand the

16  extent of the Rangers' investigation.  We know the

17  Bastrop Sheriff's office -- we know DFPS has done an

18  investigation.  And let me say, I'm a lawyer.  I

19  know there's a different standard for criminal --

20  for a crime versus a determination made by DFPS.

21  And so maybe there's -- y'all are looking at a

22  different standard to prove up in court.

23       But there are two -- I heard from the

24  agency also that the perpetrator who sold the photos

25  of our girls naked, we trafficked those photos, that

1   her boyfriend, there was an outcry by one of the --

2   the minors that her boyfriend had trafficked her

3   supposedly in the past.

4              COL. MCCRAW:  Correct.

5              REPRESENTATIVE HINOJOSA:  In addition

6   to this other outcry of a minor who said, "I'm being

7   trafficked.  This is who did it.  What are you going

8   to do about it?"  And so did your office separately

9   interview employees and the minors, or are you

10  relying on the sheriff's interviews and you're

11  looking at the notes from the sheriff's interviews?

12  Or what does that look like?

13             COL. MCCRAW:  We do our actual own

14  interviews.

15             REPRESENTATIVE HINOJOSA:  Of the

16  minors as well?

17             COL. MCCRAW:  Minors as well.  So 23

18  employees we interviewed and the residents at the

19  facility.  If we didn't, there was one done.  Not

20  for us but on behalf of us in terms of a child

21  advocacy interview.  But -- so we've interviewed,

22  you know, near 28 people and reviewed the files and

23  supporting documentation.

24             REPRESENTATIVE HINOJOSA:  Was there

25  any evidence that you found that any of the child

 1   pornography was sold across state lines?

 2              COL. MCCRAW:  We're working that right

 3   now, but not -- as of yet, no.

 4              REPRESENTATIVE HINOJOSA:  No.  Okay.

 5              COL. MCCRAW:  But, again, that goes

 6   back to -- and the only reason that one person

 7   hadn't been charged is we can't prove the

 8   criminality until we get that back, until we get the

 9   digital evidence back.  And that's what we're

10   waiting.  And so I'm not saying there's anything

11   reluctant by the prosecution to go forward.  There's

12   none -- that's not the case at all.  I mean, the

13   prosecution, I've got no doubt, will go forward, and

14   they will be anxious to remedy this.  But as you

15   know well, from your experience, is that we can't --

16   we don't make arrests unless we meet the elements of

17   the offense.

18              REPRESENTATIVE HINOJOSA:  And so how

19   does your investigation deal with the information or

20   the evidence that DFPS has gathered?  Are you

21   working with them to understand how they're coming

22   to the conclusions that they're coming to and why

23   that may be different from the conclusions --

24              COL. MCCRAW:  Absolutely.

25              REPRESENTATIVE HINOJOSA:  -- you're

```
 1  coming to?
 2            COL. MCCRAW:  Absolutely.  Just
 3  like whether -- for example, a recording, if an
 4  audio recording is being reported on an intake is
 5  related to sexual abuse or ongoing sexual abuse, I
 6  mean, you've got to listen to that audio.  You need
 7  to go back and look at the source in that regard and
 8  interview the person that made the audio recording.
 9  Is that what she -- "Is this what you said?"  And,
10  of course, there's been on at least one occasion
11  where they, "No, that's not what I said."  And they
12  were able to -- and on review of the audio, it
13  was -- it didn't happen.
14            And keep in mind, I know DFPS has got --
15  you know, have got a number of different databases,
16  and they've got a number of different complaints,
17  and they've got an obligation to track or capture
18  every intake, what they call an intake.  It doesn't
19  matter whether it's correct or not.  You've got to
20  record it.  You've got to document it.  And then
21  you've got to act on it in that regard.  And just
22  because it says it's sexual abuse, it doesn't mean
23  it is.  And just because it says it may be
24  misconduct and not sexual abuse, it doesn't mean
25  it's not.  I mean, in the end someone's got to go in
```

1   and look at the information and fully investigate it

2   and appropriately so.

3          REPRESENTATIVE FRANK:  So if I may --

4   actually, Representative Hull.  Okay.

5          So to that point, this is the first time I

6   can remember that such a serious allegation was made

7   public before it was investigated.  Can you -- and

8   maybe -- maybe you're not the right person, I may

9   need to talk to the agency, but how do we get to the

10  point where such a -- I mean, obviously, there's

11  some things that were true.  But the most serious,

12  the most -- you know, the most -- I want to say the

13  right word -- what's that -- headline inducing was

14  allegations that apparently are false.  How does it

15  get to the point where that becomes public record

16  before the investigation?  Is it concerning?  I

17  mean, honestly, this could happen to anybody in

18  here, right, that --

19          COL. MCCRAW:  Yes, sir.

20          REPRESENTATIVE FRANK:  -- it -- if

21  we're going to make public information that is --

22  it's really astounding because now you have -- and,

23  honestly, you have moved -- you know, these girls

24  have all been moved from here because of an

25  allegation, right, that hasn't been -- and so how --

Steven McCraw - 3/21/2022

32

1  do you know how we got here?  And this may be more

2  for them.  I have an idea, but I would like to hear

3  it.

4              COL. MCCRAW:  Well, I mean, it --

5  just -- well, the whole reason that we're involved

6  in it is because of reports of ongoing sex

7  trafficking of children at this location.  And you

8  can imagine there was yourself, you've got the --

9              REPRESENTATIVE FRANK:  There's 800,000

10  intakes a year.

11              COL. MCCRAW:  -- you've got the

12  Lieutenant Governor.  I've got members calling,

13  what's going -- I mean, how -- in Texas, you don't

14  mistreat, you know, children in Texas.  That's --

15  it's a "no go."  Right?  And understandably,

16  including us, you know, who -- you know, there's got

17  to be something there, because otherwise why would

18  it be reported, you know, during a federal court

19  hearing in that regard as something -- just by

20  itself, we've got to get to the bottom of this.

21  Okay.  And that, again -- but as we got to the

22  bottom of it, the document that drove, of course,

23  the initial reports was -- was admittedly by its

24  author, okay, it was --

25              REPRESENTATIVE FRANK:  But how does

1   that -- how does that become public?  It's a

2   document between DFPS and a federal judge.  How does

3   that become public?

4           COL. MCCRAW:  Well, actually, it's

5   federal court monitors.  I don't know how that --

6   how that eventually became public, but it did become

7   public during a hearing that they had in federal

8   court.  And as a result of that, I think it was even

9   the -- I think -- if I'm not mistaken, I don't

10  believe the -- I believe the federal monitors

11  believed what was in that particular report.  I've

12  got no reason to believe otherwise.  And, certainly,

13  I don't believe why the -- why would the judge

14  believe otherwise as well if it was written in a

15  particular report?

16          REPRESENTATIVE FRANK:  Okay.

17          COL. MCCRAW:  But at the end of the

18  day, when you go through it, the author herself

19  admitted that this was -- and verified.  There was a

20  lot of inconsistencies in it.  And she knew that at

21  the time and wrote that, and she had a lot of

22  caveats, draft, unvetted, needs follow up.  So

23  there's -- and her notes were annotated, but,

24  unfortunately, the annotations, that would give the

25  reader pause and say, oh, this has not been verified

1  yet, this has not been investigated yet, okay, this

2  hasn't been -- this hasn't been reconciled yet.

3  That's not fact.  Okay.  In fact, it's -- you know,

4  it's -- right now it's something as a summation in

5  draft form, okay, but was released, okay, without

6  those annotations to the federal court monitor, and,

7  therefore, the federal district judge --

8              REPRESENTATIVE FRANK:  So does

9  everything that goes to the court monitor become

10  public, or is it a --

11              COL. MCCRAW:  I don't know.

12              REPRESENTATIVE FRANK:  -- choice of

13  the court monitor to say, hey, here's an allegation

14  let me make this public now?

15              COL. MCCRAW:  I don't know.  I don't

16  know that, sir.  I couldn't answer that.  I can't --

17              REPRESENTATIVE FRANK:  Maybe somebody

18  else can.

19              COL. MCCRAW:  I can't say because --

20  yeah.

21              REPRESENTATIVE FRANK:  Okay.  Thank

22  you.

23         Yeah, Vice Chair.

24              REPRESENTATIVE HINOJOSA:  Chairman,

25  just to be clear, two days we heard from the agency

1  in the Senate, these are their findings.  They don't

2  have an official release but -- that's why everybody

3  is confused because we have DPS saying one thing and

4  we have DFPS saying, no, here is a timeline that

5  they provided that's very concerning, alarming, and

6  they've made decisions based on their findings.  And

7  so it's not like some one person at 1:00 a.m. just

8  wrote a letter that hasn't been substantiated.  We

9  just heard two days ago in the Senate from this

10  agency that this is how they see it.

11             COL. MCCRAW:  Well, if you -- if you

12  look at -- just for example, just when you have

13  intakes, they count intakes and you have those

14  and -- and some of those intakes are duplicative,

15  but sounds like there's more than one or three, and

16  then you get right down to it, what's happening is

17  they're talking about the same thing, as an example.

18        Or it's reported as sex trafficking and

19  you really look at it, and then it has to do with

20  misconduct, medical neglect.  Okay.  Well, it's not

21  sex trafficking.  It's two different things.

22        And, similarly, you know, misconduct is

23  rolled into the general allegation of sex

24  trafficking or sex abuse ongoing.  And, actually,

25  what it was, is that that one incident wasn't sex --

1  sex trafficking, it was an employee sleeping on the

2  job.  So that's why details matter ultimately.

3                    REPRESENTATIVE NEAVE:  Mr. Chairman.

4                    REPRESENTATIVE FRANK:  Yes.

5                    REPRESENTATIVE NEAVE:  Okay.  Thank

6  you.

7            And words matter, I agree with you.  And I

8  just heard the word "false" being used.  And that's

9  why I wanted to clarify, you're not stating that the

10 allegations are false, right?

11                   COL. MCCRAW:  No, I'm stating that

12 the -- all the allegations that were made that I

13 discussed, we had findings in two major misconduct

14 or employee misconduct, those things are absolutely

15 true.

16                   REPRESENTATIVE NEAVE:  Okay.  And the

17 reason I say words matter is because we already know

18 how difficult it is for survivors to come forward

19 when they are being trafficked or sexually assaulted

20 or sexually abused.  So that's why I have, you know,

21 concerns about broad statements such as the one in

22 this letter that says no evidence, that there's no

23 evidence of it, that I know that the vice chair

24 touched on because it's an ongoing investigation.

25                   So I wanted to ask you, Colonel, if you

37

1  could, sort of walk us through the part of the

2  investigation when you're interviewing -- or when

3  DPS interviews the children.  So I understand you

4  stated that you interviewed 28 people, 23 of those

5  were employees.  How many of those were the

6  children?

7                    COL. MCCRAW:  Five.

8                    REPRESENTATIVE NEAVE:  Okay.  Of the

9  five children, who interviewed the children?

10                    COL. MCCRAW:  I'll get back to you.

11  But we interviewed most of them ourselves, but I

12  think in one instance, the one that was there for

13  the FBI was interviewed by somebody else.

14                    REPRESENTATIVE NEAVE:  Okay.  And

15  whenever DPS interviews them, do they go in uniform?

16                    COL. MCCRAW:  No, not at all.  This is

17  Texas Rangers doing the interviews.

18                    REPRESENTATIVE NEAVE:  Or the,

19  apologies, Texas Rangers.

20                    COL. MCCRAW:  Sometimes we enlist the

21  support from advocacy centers that specialize in

22  interviewing children.

23                    REPRESENTATIVE NEAVE:  In the

24  circumstance of those five children that were

25  interviewed, were advocacy centers employed to

1  interview them?

2             COL. MCCRAW:  We do that routinely.  I

3  can't tell you which ones.  We may have used that in

4  this particular instance.

5             REPRESENTATIVE NEAVE:  So you're

6  not -- so we don't know specifically who interviewed

7  the five children in this circumstance?

8             COL. MCCRAW:  No, all five -- yeah, I

9  can't tell you which Ranger did which interview, but

10 I can tell you all of them interviewed.

11            REPRESENTATIVE NEAVE:  I understand

12 that they were interviewed, but I'm trying to find

13 out who interviewed the girls?  Was it the child

14 advocacy centers or the rangers?

15            COL. MCCRAW:  Yeah, and I'll give you

16 that information.

17            REPRESENTATIVE NEAVE:  And it's really

18 important, Colonel, because -- you know,

19 specifically, let's say that it was the rangers.

20 Can you talk to us about, do the rangers go through

21 trauma informed training whenever interviewing

22 survivors sexual assault or abuse?

23            COL. MCCRAW:  They're experts at

24 conducting those interviews, in fact, at conducting

25 these investigations.  In fact, we do these

```
1    routinely.  We even involve -- we even involve and
2    train our troopers how to -- how to treat children
3    in these situations, because, unfortunately, when
4    the -- when the sex, you know, trafficking and
5    exploitation of children is such that troopers are
6    exposed to it on the roadway and have an opportunity
7    to rescue young victims of sex trafficking.
8            So we make sure that this is a -- is not
9    just something, you know, a specialty within the
10   department of -- but it's ubiquitous -- it's
11   ubiquitous in terms of the skill level whether it's
12   in recruit school all the way through their career
13   that they're looking for this because it's a
14   priority, certainly, of the state legislature and
15   the -- and the people of Texas, but it's a priority
16   of the Department of Public Safety in terms of
17   conducting sex trafficking investigations.  In fact,
18   if anyone is an expert at doing those things, it's
19   the Department of Public Safety.
20           REPRESENTATIVE NEAVE:  And so the --
21   also with respect to sex trafficking, the sexual
22   abuse and other circumstances --
23           COL. MCCRAW:  Exactly.
24           REPRESENTATIVE NEAVE:  -- you're
25   saying you-all go through, like, specific training
```

 1  for that.

 2              COL. MCCRAW:  Absolutely.

 3              REPRESENTATIVE NEAVE:  Can you get --

 4              COL. MCCRAW:  And importantly, as you

 5  note, I mean, the child is -- the last thing you

 6  want to do is traumatize the child --

 7              REPRESENTATIVE NEAVE:  Right.  And

 8  that's my --

 9              COL. MCCRAW:  -- when you're doing an

10  interview.

11              REPRESENTATIVE NEAVE:  And that's my

12  concern.  And their willingness to open up to

13  whomever is going to talk to them and, you know, may

14  not, for example, want to open up to somebody in --

15  you know, that's wearing a uniform or may feel

16  comfortable if they're not.  And that's why I was --

17              COL. MCCRAW:  And that's why using --

18  sometimes it's appropriate to use child advocacy in

19  lieu of a uniformed officer or certainly -- or a

20  Texas Ranger, for that matter.

21              REPRESENTATIVE NEAVE:  But we're not

22  sure if they were used in this circumstance?

23              COL. MCCRAW:  No, I'll let you know

24  which one is which, exactly which children were

25  interviewed by Rangers -- I know at least two -- and

1  which ones we depended upon child advocacy to do the

2  interview for us.

3            REPRESENTATIVE NEAVE:  Okay.  And the

4  child advocacy organizations, I assume, would be

5  local in Bastrop County?

6            COL. MCCRAW:  I'll have to -- before I

7  answer that question, I'll make sure I have the

8  exact who did what.

9            REPRESENTATIVE NEAVE:  Okay.  Thank

10 you.

11            REPRESENTATIVE FRANK:  Representative

12 Hull.

13            REPRESENTATIVE HULL:  Hi there.  Thank

14 you.  You mentioned five children being interviewed,

15 but I know there were six that we're talking about,

16 you know, possible victims.  And then so where was

17 the sixth?  And then what about were -- why were not

18 all 11 children being interviewed?

19            COL. MCCRAW:  Well, the number of

20 residents change over a period of time.  Of course,

21 the ones we're -- we had access to the ones that the

22 DFPS put in that location.  And they think the one

23 that we didn't interview was, as I understand it, is

24 not -- was there as -- on volunteer purposes.  Was

25 not a placement, was there voluntarily.

42

1          REPRESENTATIVE HULL:  So all the 11

2  children, you're saying there weren't 11 children

3  there at the time?

4          COL. MCCRAW:  Well, at various

5  different times.  And I'll get back to you exactly

6  how many children we talked to and when they were

7  and what time they were.

8          REPRESENTATIVE HULL:  And I know going

9  back off of what Representative Neave was saying,

10  I'm also interested in dates of interviews,

11  forensic/nonforensic, locations, child advocacy --

12  was it at child advocacy center, all of those sorts

13  of things.

14          COL. MCCRAW:  Yeah.  And I'll provide

15  all that information and detail to you.

16          REPRESENTATIVE HULL:  Thank you.  A

17  couple more quick questions.

18      Does the -- did the facility have security

19  footage?

20          COL. MCCRAW:  We didn't see any

21  security footage that we're aware about.  I'll --

22  let me follow back up to see if they reviewed any

23  security footage.

24          REPRESENTATIVE HULL:  Okay.  And then

25  you had mentioned -- and I know it's kept being

43

1   talked about and in the Senate hearing, the alleged

2   perpetrator who was fired having roommates and

3   family members that worked -- and do they still work

4   at The Refuge?  What is -- what is the status there?

5   Because that is concerning.

6                  COL. MCCRAW:  They were -- they were

7   fired.  And it was five overall.  And I think three

8   initially were fired.  And one was involved with

9   the -- with the escape, and then another one was

10  implicated.  But because they were untruthful when

11  they were initially confronted, you know, all of

12  them were fired that were initially identified as

13  related.

14                 REPRESENTATIVE HULL:  So the -- on the

15  24th, the alleged perpetrator who -- the whole thing

16  with the pictures, that woman was fired?

17                 COL. MCCRAW:  Correct.

18                 REPRESENTATIVE HULL:  And then you're

19  saying that same day --

20                 COL. MCCRAW:  No, the next outcry

21  occurred on February 20th.  When that outcry

22  occurred, okay, and that dealt with -- February 20th

23  dealt with the escape -- or excuse me -- fleeing of

24  two, okay, residents, and they were facilitated or

25  assisted by a shelter employee.  Okay.  And that

1   shelter employee was terminated, okay, immediately.

2          And then during the course of The Refuge

3   investigation, okay, looking at employees, some

4   may -- were not involved necessarily in assisting

5   the child, okay, but because they were untruthful

6   when they were -- initially had the discussions with

7   them, they were terminated as well.

8          So right now, as I recall, there were two

9   individuals that -- one actually physically was

10  involved in terms of assisting the two minors, and

11  then another one, you know, that facilitated was

12  part of the conspiracy, if you will.

13          REPRESENTATIVE HULL:  But you said --

14  so three were -- and maybe I misheard you.  That

15  three were fired, and then there were you said

16  something about five?

17          COL. MCCRAW:  One was charged.  Okay.

18  And as I understand it, three have been terminated,

19  and another one, I'm not -- I'm not sure what -- the

20  last one.

21          REPRESENTATIVE HULL:  Okay.  So do you

22  know, does anyone still -- is still employed that is

23  a relative or roommate with any of those that

24  have -- that are the alleged?

25          COL. MCCRAW:  Not that I'm aware of.

 1                    REPRESENTATIVE HULL:   Thank you.

 2                    REPRESENTATIVE FRANK:   Representative

 3   Meza.

 4                    REPRESENTATIVE MEZA:   Thank you,

 5   Chair.

 6          So you had some criticism.  We have heard

 7   it, so you I'm sure you heard it, about releasing

 8   too soon, that there was no misconduct after about a

 9   week of investigating.  Would you attribute that to

10   what -- some that you have mentioned here, about the

11   difference between the use of the word "misconduct"

12   versus "abuse" versus other terms?  Is that why?  Or

13   would you like to have an opportunity to respond to

14   that criticism?

15                    COL. MCCRAW:   Yeah, there -- well,

16   there were allegations that were made.  Okay.  And

17   certainly every allegation is important, and every

18   report or what they would call an intake is

19   important and needs to be taken seriously.  But upon

20   investigation of each one of the allegations, okay,

21   we had determined that several of them were

22   duplicative.  They were the same -- they're talking

23   about the exact same one.

24          There's another allegation about a

25   resident that had been abused not while at the

1   facility but prior to had been trafficked by a

2   boyfriend of an employee at the location.  And, of

3   course, as it turned out, the time that that

4   allegedly occurred, the boyfriend was in jail at the

5   time.  So those conflict with that happening, and

6   that one even predates -- predates the event.

7          There was instances that was reported as

8   sex trafficking or related to sex trafficking on the

9   intakes, that when you look into the underlying

10  documentation, there was really employee misconduct.

11  You know, one had to do with medical neglect, and

12  another one had to do with an employee sleeping on

13  the job.  So you can't really track that.

14          So when you look at all the evidence,

15  okay, what really came forward was, okay, there was

16  two major incidents that occurred that -- involving

17  the children, the residents there.  And one there

18  was evidence of was certainly the -- we'll call it

19  the sexual abuse of a child, two minors, that

20  relates to the nude photos.  That occurred.  The

21  outcry occurred on January 24th.  It was immediately

22  reported to DFPS.  DFPS ensured it was immediately

23  reported to Bastrop County Sheriff's Department and

24  the appropriate authorities.  So they did their job

25  in terms of immediately referring it, and it's been

1  investigated criminally by Bastrop County Sheriff's

2  office.

3          We looked at everything we could.

4  Every -- is there anything that we could find that

5  would give us -- that any reason to believe that

6  any -- anyone was involved in the sexual abuse,

7  sexual neglect, sex trafficking of a child, and

8  there was nothing.  And right now is solicitation.

9  And so the only thing we have goes back to the

10 outcry that happened on January 24th, and it

11 absolutely happened.

12          And that person, I'm quite confident, is

13 going to be arrested and charged.  I just think it's

14 inappropriate for me to say when that's going to

15 happen because I know there's an expectation to meet

16 the final elements of the offense, that we have

17 underlying documentation, which is digital, and we

18 have to have it and we understand that.  But I think

19 that's going to happen.  There's nothing else.

20          REPRESENTATIVE MEZA:  That letter came

21 across kind of like, "Nothing to see here, move

22 along.  Nothing to see here."

23          COL. MCCRAW:  Well, if there was, I

24 guarantee you, we'd pursue it.  And there's nothing

25 more that we take firmly, you know, anybody that's

Steven McCraw - 3/21/2022

48

1  abused a child in any way, shape or form -- and I

2  won't say in particular, but the idea that someone

3  would -- has been entrusted to take care of girls

4  that have been already sexually trafficked and

5  abused would somehow abuse them is, you know,

6  unbelievable that that could occur.  And if we had

7  any evidence of it, I can assure you, we would

8  pursue it.  We keep the investigation open as long

9  as possible if the evidence suggests it, if it was

10  there.

11                 REPRESENTATIVE MEZA:  The interview of

12  the two victims about nude photos, did that happen

13  at The Refuge, or did the interviews happen anywhere

14  else?

15                 COL. MCCRAW:  The -- you're talking

16  about The Refuge employee that was terminated

17  that --

18                 REPRESENTATIVE MEZA:  The two victims

19  of the nude photos, were they interviewed at The

20  Refuge, or did those interviews happen somewhere

21  else?

22                 COL. MCCRAW:  I believe they -- those

23  happened -- I'll find out exactly where the

24  interviews occurred, and let you know.

25                 REPRESENTATIVE MEZA:  Well, I wasn't

Steven McCraw - 3/21/2022

49

1    so much interested in exactly where they occurred,

2    as the fact that they were no longer at Refuge,

3    right?  So the interviews didn't --

4                COL. MCCRAW:  That's correct.

5                REPRESENTATIVE MEZA:  -- actually

6    happen at The Refuge; they did happen somewhere

7    else?

8                COL. MCCRAW:  Correct.

9                REPRESENTATIVE MEZA:  Okay.

10               COL. MCCRAW:  Well, I don't want to

11   say that because I don't know that they didn't.  The

12   outcry occurred on January 24th.  It was reported to

13   Bastrop County Sheriff's Department on the 24th of

14   January.  So I'm not sure whether they -- they could

15   have interviewed them there at that location.  So

16   until I -- until I know that, I'm going to -- I'll

17   hold in abeyance my response.

18               REPRESENTATIVE MEZA:  The person that

19   was arrested for lying to law enforcement officers,

20   was that a result of lying to the FBI, and is DPS

21   collaborating with the FBI?

22               COL. MCCRAW:  Yeah, we're certainly

23   collaborating.  But Bastrop County, they lied to

24   Bastrop County Sheriff's Department and the law

25   enforcement agency.  The FBI was assisting in the

1  particular investigation.  So either/or and whether

2  you do it locally or federally, certainly, you can

3  if you're lying to a law enforcement agency.  So

4  that was what the person was -- and it had to do

5  with the child fleeing.

6              REPRESENTATIVE MEZA:  Okay.  Thank

7  you.

8              REPRESENTATIVE FRANK:  Ms. Neave.

9              REPRESENTATIVE NEAVE:  Thank you,

10  Mr. Chair.

11        Colonel, were any of the outcries or

12  reports from -- being made by people that were not

13  employees of The Refuge?

14              COL. MCCRAW:  I would have to go back

15  and review the timeline, but there's -- certainly

16  some of the intakes involved were audio and -- and

17  could very well be from outside.  But for the most

18  part, there were internal or, you know, residents.

19              REPRESENTATIVE NEAVE:  Okay.  And so

20  if -- and you stated that y'all interviewed only

21  employees of The Refuge and DPS and the children,

22  right?  So if --

23              COL. MCCRAW:  That's correct.

24              REPRESENTATIVE NEAVE:  So if any

25  reports were made by -- and, you know, I'll ask

Steven McCraw - 3/21/2022

51

1   DFPS, because I think from my understanding there

2   is.  If it's being made from an outside person

3   that's not, they weren't interviewed, then, by

4   you-all, right?

5              COL. MCCRAW:  Unless we could find

6   them.  Sometimes these are made anonymously and

7   we're unable to track down who that is.  But we

8   looked at -- every allegation that was made, we

9   looked at.

10             REPRESENTATIVE NEAVE:  But every

11   person that made an outcry, every person or

12   organization that made an outcry y'all spoke to?

13             COL. MCCRAW:  If it was anonymous,

14   there would be really no way to track that person

15   down.

16             REPRESENTATIVE NEAVE:  But if they

17   weren't anonymous.

18             COL. MCCRAW:  If they weren't

19   anonymous, yeah, absolutely.

20             REPRESENTATIVE NEAVE:  Okay.  Thank

21   you.

22             REPRESENTATIVE FRANK:  Thank you.

23        Yes, Representative Hull.

24             REPRESENTATIVE HULL:  Kind of what

25   Representative Noble asked earlier about the woman

1  who was fired being able to work with kids and the

2  one possibly, hopefully will be arrested, the other

3  people that were fired, is there anything that's

4  going to prevent them from being hired?  Again, the

5  same sort of question, but. . .

6          COL. MCCRAW:  Unless they have been

7  charged with a crime, I don't -- I don't know that

8  there's anything that would be.  And so it's -- you

9  know, again, I won't -- it's hard to -- what due

10 diligence an agency uses to ensure that their

11 employees, you know, have the character to be able

12 to handle those particular positions and don't have

13 anything in their background that could conflict

14 with, you know, I can't -- I can't comment on.

15         REPRESENTATIVE FRANK:  Again, I think

16 that's -- I think that's a question, if you'll

17 bookmark for DFPS, because that's -- just because

18 that's -- or HHSC, because those are really

19 internal -- you know, if there's -- if there's no

20 criminal record of it, it's pretty hard for you to

21 say.

22         COL. MCCRAW:  Exactly.  Well, even our

23 own, you know, our own process, I mean, we're all

24 always concerned about who we hire.  It matters very

25 much, you know, employees and who you can trust.  So

1   we can certainly say we know what we do, but what --

2   the due diligence that we do goes down -- and I know

3   people -- it's not very popular here, but we -- not

4   just in terms of the full criminal background check

5   and the rest that goes with it in terms when you

6   look at a background investigation on an employee,

7   but even -- even preemployment polygraphs for

8   positions of trust because, you know, in the end --

9   you know, they're certainly not sustainable in

10  court, but they have been very helpful in screening

11  out known criminals that have applied to become a

12  Texas state trooper.  So. . .

13                  REPRESENTATIVE HULL:  You had

14  mentioned the girls that were interviewed, and then

15  there were some that weren't.  Was every child that

16  had any interaction with those that were fired and

17  the ones that will hopefully be -- the one that will

18  hopefully be arrested, were all of those children

19  interviewed?

20                  COL. MCCRAW:  Yes.

21                  REPRESENTATIVE HULL:  Okay.  So the

22  ones that weren't had no interaction with these

23  employees?

24                  COL. MCCRAW:  Well, I won't say no

25  interaction.  I'm not sure that they may have

54

1   interacted with an employee that was -- you know, I

2   want to be careful about what I -- how do I

3   characterize it.  We interviewed everyone that there

4   was a related allegation.

5               REPRESENTATIVE HULL:  Okay.  Right,

6   the sixth.

7               COL. MCCRAW:  Except one.

8               REPRESENTATIVE HULL:  The sixth one.

9         And it was talked about the photos were

10  purchased and then the children in the pictures were

11  given drugs.  What were those drugs?  What kind and

12  how often?

13              COL. MCCRAW:  We don't know that

14  there's -- we don't know that that was even

15  consummated at that point.  So that's being alleged.

16  And that goes to why we're looking at the evidence

17  and why we need some of the evidence to back whether

18  there was consummated.  And, of course, we need to

19  be able to demonstrate not just in terms of that but

20  also of the cash exchange.

21              REPRESENTATIVE HULL:  Got it.  Thank

22  you.

23              COL. MCCRAW:  Sure.

24              REPRESENTATIVE FRANK:  Thank you.

25         Any other questions?  Any other comments?

1      COL. MCCRAW:  Well, I can tell you

2 this, that, hey, I don't care where it is, any given

3 time there's an allegation that a child has been

4 misused, trafficked in any way, shape or form, I'm

5 going to fully pursue it.  Period.  There's no

6 alibis.  There's no -- there's no opportunity for

7 sloppy work on along those lines.

8      But at the end of the day, evidence

9 matters, and we have got to prove it.  Okay.  I

10 mean, the last thing we want to do is, the last

11 thing is very important, you know, convictions are

12 important, but it's more important that it has the

13 right person getting convicted.  And we're

14 committed, you know, fully to being able to do as

15 you have charged us to do, and we'll continue to do

16 what we can to address this problem we face.

17      And I can tell you, there's no question

18 about it, anybody that has worked -- I don't care

19 what violations you have worked in life, if you've

20 ever worked sex trafficking of a child, there's

21 nothing more egregious and the depravity of mankind

22 just knows no bounds in that regard.

23      So thank you, Chairman.  And thank you for

24 all you do for the state of Texas.

25      REPRESENTATIVE FRANK:  I think one

Steven McCraw - 3/21/2022

56

1  more question from Representative Rose.

2            COL. MCCRAW:  Yes, ma'am.

3            REPRESENTATIVE ROSE:  Colonel, we just

4  have a copy of your timeline?

5            COL. MCCRAW:  Yes, ma'am.

6            REPRESENTATIVE ROSE:  And how -- are

7  you going to send to it the clerk?  Or how are we

8  going to get it?

9            COL. MCCRAW:  What I'm going to do,

10  I'm going to a Texas Ranger -- we'll put the report

11  together and send to it the clerk.

12            REPRESENTATIVE ROSE:  Okay.  Thank

13  you.

14            COL. MCCRAW:  So we won't just have

15  the timeline.  We'll have additional information,

16  some underlying documentation with it.

17            REPRESENTATIVE ROSE:  Thank you.

18            REPRESENTATIVE FRANK:  Thank you very

19  much.  All right.

20            (Concluded.)

21

22

23

24

25

57

```
 1                    REPORTER'S CERTIFICATION

 2

 3

 4             I, CHRISTY R. SIEVERT, CSR, RPR, in

 5   and for the State of Texas, hereby certify to the

 6   following:

 7             That the proceedings were transcribed by

 8   me from audio recordings, and is a true record of

 9   the proceedings had;

10             I further certify that I am neither

11   counsel for, related to, nor employed by any of the

12   parties or attorneys in the action in which this

13   proceeding was taken, and further that I am not

14   financially or otherwise interested in the outcome

15   of the action.

16             Subscribed and sworn to on this the 28th

17   day of March, 2022.

18

19

20   _____
     CHRISTY R. SIEVERT, CSR, RPR
21   Texas CSR 8172
     Expiration Date:  4-30-2023
22

23

24

25
```