# Exhibit 4

STATE OF TEXAS

SENATE COMMITTEE ON CHILD PROTECTIVE SERVICES,

SPECIAL


SENATE CHAMBER


MARCH 17, 2022


EXCERPTS OF THE COMMITTEE HEARING


TESTIMONY OF

DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES

JAIME MASTERS, STEPHEN BLACK, ROBERT RICHMAN AND

DENEEN DRYDEN

1          SENATOR KOLKHORST:  The Chair calls

2    Jaime Masters, the Commissioner of the Department of

3    Family and Protective Services.

4          And, Commissioner, I know that you have

5    some support staff with you.  I don't know if you

6    want to have them join you at your table.  Your

7    call.

8          MS. MASTERS:  I'm good right now.

9          SENATOR KOLKHORST:  Good afternoon.

10         MS. MASTERS:  Good afternoon.  Jaime

11   Masters, Commissioner DFPS.

12         SENATOR KOLKHORST:  Commissioner, you

13   have a presentation.  Members I know will have

14   several questions for the Commissioner, but if you

15   would, work us through the process.  I had asked you

16   to present what the process is for when you receive

17   a complaint, concerns, statewide reason to believe,

18   whatever it is it may be, that you could walk us

19   through, and then we'll hold our questions until the

20   end.

21         MS. MASTERS:  Yes, ma'am.  And so I

22   think when I was going to start to say, I might want

23   to bring Stephen and Rich up if you want to go

24   through those beginning slides before the timeline

25   with just an overview of the process.

```
 1              SENATOR KOLKHORST:  Yes.  Yes, we do.
 2  I think it's important for the committee.  Again,
 3  it's -- while we are looking at this case at hand,
 4  it brings to light our processes which, you know, we
 5  want to make sure are of the highest quality, and
 6  that's what really this committee will be working on
 7  in its interim.
 8              MS. MASTERS:  Yes, ma'am.
 9              SENATOR KOLKHORST:  If you would,
10  state your name for the record.
11              MR. BLACK:  I'm Stephen Black.  I'm
12  the associate commissioner for statewide intake at
13  DFPS.
14              SENATOR KOLKHORST:  Great.  Can you
15  pull your microphone just a little closer to you and
16  speak directly into it?
17              MR. BLACK:  Is that better?
18              SENATOR KOLKHORST:  Thank you.
19         Continue with your presentation.  How do
20  y'all want to do this?
21              MR. BLACK:  Okay.  So for statewide
22  intake, we receive referrals from multiple sources,
23  most commonly phone calls.  Also internet reports
24  and mail and fax even occasionally.  In the cases of
25  the reports that we received beginning on
```

1  January 24th, all of those were phone calls.

2        And so in those situations, our intake

3  specialist are going to ask the appropriate

4  questions to make the appropriate assessments and

5  then prioritize those as either a Priority 1 or a

6  Priority 2 intake.

7        Once those assessments are made for our

8  child care licensing investigation, they are then

9  forwarded on to a screener.  And the screener is

10  going to review the facility to make sure it is

11  indeed within our jurisdiction to investigate, and

12  also they're going to look to make sure that it's

13  not something that we have already received in the

14  past and have already completed an investigation on

15  it.

16        The screeners also are going to notify

17  caseworkers.  And so we notify the caseworker of any

18  child in care anytime we get a new intake on that

19  child through automatic notification, a manual

20  notification through IMPACT, and also an e-mail of

21  the screeners.  Once that is finished and the

22  screeners have confirmed that this is a case that

23  needs to move forward with an investigation, it is

24  then assigned to residential child care

25  investigations, which is when the investigator then

1  picks up the case.

2            SENATOR KOLKHORST:  All right.  So

3  let's slow down and back up a little bit.  And one

4  more time, pull that microphone a little closer.  I

5  don't hear that great.  Yeah, talk straight into it.

6            So on statewide intake, let's take an

7  example of when you say you receive a call.  To

8  clarify for the committee, are we talking about any

9  call on any abuse of a child, or are we talking

10  directly about facilities?

11            MR. BLACK:  Well, this particular

12  presentation is more focused on the facilities.

13            SENATOR KOLKHORST:  Great.  So let's

14  go from there.  You receive a call, and I didn't

15  quite hear, most often do you have the percentage of

16  is that within the facility or outside the facility?

17  What's most often that call where -- who -- a

18  worker?  What's most common?

19            MR. BLACK:  No, most commonly our

20  calls will come from either facility staff

21  themselves, or if the caseworker is already aware of

22  the abuse and neglect, the caseworker may call it

23  in.

24            SENATOR KOLKHORST:  So sometimes it's

25  the operator that calls you and says, "Look, this

1  incident has taken place," correct?

2              MR. BLACK:  Yes, ma'am.

3              SENATOR KOLKHORST:  And with

4  heightened monitoring, that's super important; is

5  that correct?

6              MR. BLACK:  That's correct.

7              SENATOR KOLKHORST:  All right.

8  Screeners, who are the screeners?

9              MR. BLACK:  The screeners are a group

10  of staff that take a secondary review of almost all

11  the child care investigation intakes.  And, again,

12  their function is to make sure that the facility is

13  indeed within our jurisdiction to investigate and to

14  make sure that it's not a matter that has already

15  been investigated by our agency before forwarding on

16  for investigation.

17       In addition to the review of the new case,

18  the screeners also are responsible for doing a

19  detailed history review of all closed cases on the

20  facility, to supplement that for the investigator.

21  And the screeners are also responsible for making a

22  number of notifications as well.

23              SENATOR KOLKHORST:  Priority 1 and

24  Priority 2, explain to the committee the difference

25  between those two, and who makes that determination

1  what is Priority 1 and Priority 2?

2              MR. BLACK:  The intake specialist is

3  going to make that initial assessment.

4          And so a Priority 1 is defined as a

5  situation where there's immediate risk of death,

6  serious injury or life-threatening abuse or neglect.

7  A Priority 2 is going to be where there's no

8  indication of immediate risk of death or substantial

9  harm.  So that initial decision is made by the

10 intake specialist that has taken the phone call.

11             SENATOR KOLKHORST:  And there is also

12 a Priority None; am I correct?

13             MR. BLACK:  Not for residential care

14 investigations, not at the intake stage.

15             SENATOR KOLKHORST:  So already

16 Priority 1 or Priority 2.

17             MR. BLACK:  Based on that phone call

18 or e-report, they're either taken Priority 1 or a

19 Priority 2.

20             SENATOR KOLKHORST:  Any phone call

21 will begin an investigation?

22             MR. BLACK:  That if -- if the

23 allegations meet our standards of abuse, neglect or

24 exploitation, yes.

25             SENATOR KOLKHORST:  Okay.  And so at

1   that point, give us some timelines.  Walk us through

2   your chart.  How quickly does that happen on a

3   Priority 1?

4                    MR. BLACK:  So the --

5                    SENATOR KOLKHORST:  There's immediate

6   threat of death.

7                    MR. BLACK:  So the process of an

8   intake from start to finish is usually less than

9   45 minutes.  You know, that's the intake specialist

10  handling the phone call, finishing the phone call,

11  writing up their report, and then assigned to get

12  out for the screener to review.

13          Screeners have 24 hours to do their review

14  in most cases.  However, if it is a Priority 1, that

15  investigation needs to start within 24 hours.  So

16  the timeline is going to be compressed for a

17  screener to get that information vetted, complete

18  their documentation searches, send out their alerts,

19  and get it done in enough time that the investigator

20  can start their investigation within 24 hours.

21                    SENATOR KOLKHORST:  Then what happens

22  if they -- if it's Priority 1 -- and let's just take

23  The Refuge.  Your first call on January the 24th, is

24  that Priority 1 or Priority 2?

25                    MR. BLACK:  The first call was a

9

 1   Priority 2.

 2              SENATOR KOLKHORST:  Okay.  So what

 3   happens on a Priority 2, how much time do you have?

 4              MR. BLACK:  It's the same time frames.

 5   Intake specialist still spends about 45 minutes on

 6   the phone call and the wrap up.  The screeners are

 7   still spending the same amount of time to get their

 8   part done and their alerts sent off.  And then it's

 9   sent to the -- to the investigator.  So for a

10   Priority 1 or Priority 2, most of the work we're

11   doing at statewide intake is all done in roughly the

12   same amount of time.

13              SENATOR KOLKHORST:  So after the

14   24 hours, what happens at that point?

15              MR. BLACK:  At that point, the intake

16   has now progressed to an investigation stage for an

17   investigator to handle.

18              SENATOR KOLKHORST:  And how quickly

19   does the investigator have to move?

20              MR. BLACK:  With a Priority 1, they

21   have 24 hours upon receiving the intake, and from

22   Priority 2, they have 72 hours.

23              SENATOR KOLKHORST:  So they go on to

24   the facility.  And then what happens?  They're doing

25   their investigation?

```
 1              MR. BLACK:  At that point, I think I
 2   would turn it over to Rich Richman who can explain
 3   the investigation side.
 4              SENATOR KOLKHORST:  Sure.  And what
 5   slide would we be on right now?  Is it -- are y'all
 6   following a slide, or am I just teasing this out of
 7   y'all?
 8              MR. RICHMAN:  Ten, ma'am.
 9              SENATOR KOLKHORST:  Let's go to slide
10   ten.
11              SENATOR PERRY:  Madam Chair, while we
12   are there, real quick, so under a Priority 1 where
13   immediate threat or danger, the screener would pass
14   that on, y'all would have an intake within 24 hours.
15   But if the screener said we believe there's
16   immediate harm at this point in time, do they
17   dispatch?  Do they call 911?  What do they do for
18   someone -- for a child, or in this case, a facility
19   has a situation?  So hopefully you would have
20   somebody on site dialing 911.  But assuming the
21   hotline is what was in their room and that's what
22   they went to, does the screener automatically refer
23   that immediately to emergency services and first
24   responder to get out there?
25              MR. BLACK:  They could have that
```

 1  option, but that's not typically how the process

 2  works.  So if the screener gets a Priority 2 and

 3  they feel it should be a Priority 1, they can and

 4  will make that change.

 5              SENATOR PERRY:  So I am going to risk

 6  being Captain Obvious here.  I have an immediate

 7  threat.  I have 24 hours according to agency

 8  protocols to have an intake.  If there's immediate

 9  threat, who do they contact, or how is a contact

10  made to have someone show up, i.e., typically

11  police, to make sure that the immediate threat is

12  mitigated and you can gauge -- who -- I understand

13  it's not your primary role, but is that a function

14  if the person is saying, "I didn't know who else to

15  call.  I called this 800 hotline.  I've got a

16  problem here and I think I'm going to get killed

17  today if someone doesn't show up," do they refer

18  that to first responders?

19              MR. BLACK:  Yes, that would happen at

20  the intake stage.  If that's necessary, the intake

21  specialist could and will occasionally dial 911 if

22  they feel they need to.

23              SENATOR PERRY:  Okay.  And I just want

24  to make sure -- and I have learned through state

25  agencies, if we're not very prescriptive, we cannot

Jaime Masters - 3/17/2022

12

1   assume common sense has left the building.  Are your

2   screeners educated, informed and independent enough

3   to make that call to 911 immediately without fear of

4   repercussions from the agency for not following

5   protocol?

6               MR. BLACK:  That would be correct,

7   there would be no fear of repercussion.

8               SENATOR PERRY:  Because I know that

9   sounds like a really strange question to ask, but

10  the more I'm around this agency, and all agencies

11  for that matter, common sense has left the room.

12              SENATOR KOLKHORST:  Senator Huffman.

13              SENATOR HUFFMAN:  Just briefly on this

14  same issue, because I know you want them to

15  complete, but you spoke about the -- and I missed it

16  somehow, but they have to send out alerts, the

17  screener, and those are standard.  So is that what

18  I'm looking at somebody's mailbox?

19              SENATOR KOLKHORST:  What page?

20              SENATOR HUFFMAN:  Three different

21  mailboxes, right?

22              MR. BLACK:  That's correct.  So

23  depending on the situation, we'll determine who gets

24  notified via e-mail.  And so anytime we get a new

25  intake in a child that's in conservatorship, each

Jaime Masters - 3/17/2022

13

1    caseworker and their supervisor are included on that

2    e-mail.

3                SENATOR HUFFMAN:  Okay.  Is there

4    anyone in the higher chain -- who's the highest

5    level person that receives notice?

6                MR. BLACK:  In those situations, it

7    would be the caseworker's supervisor.

8                SENATOR HUFFMAN:  The caseworker'S

9    supervisor.  So that would be someone in the

10   immediate area what of where the complaint is being

11   filed, correct?

12               MR. BLACK:  Not necessarily where the

13   complaint is being filed but where the child's

14   conservatorship case is based out of.

15               SENATOR HUFFMAN:  All right.  So in

16   this case, say, The Refuge case, that would have

17   been someone in the Bastrop area?

18               MR. BLACK:  Not necessarily.  For the

19   investigation, yes, it would have gone to the

20   Bastrop area.  But depending on where -- the child

21   could be anywhere in the state but placed at that

22   shelter, and so this e-mail notification going to

23   the child's caseworker is where the -- where their

24   case originated.

25               SENATOR HUFFMAN:  Okay.  And then I

1  guess we'll get into this later, and I don't want to

2  get into it too deeply, but then those people who

3  receive those alerts, they have some

4  responsibilities as well at that point, or is their

5  job just to wait to see what the investigation leads

6  to?

7             MR. BLACK:  There are some immediate

8  responsibilities that they will have to go through.

9  I mean, the -- our CPS resource witness can speak

10  probably better to that.  But, yes, it's a

11  combination of both.  They have some immediate

12  things they have to review, but, obviously, the

13  investigation has not been completed at that time.

14             SENATOR HUFFMAN:  So my point -- I

15  think that Senator Perry was getting to as well as

16  there was some immediacy, like, oh, my gosh, we have

17  got this complaint, is someone doing something about

18  this quickly?  Because a lot of these -- I mean, I

19  understand some are allegations and some are

20  probably -- the complaint's a little bit not clear,

21  garbled.  But many of it, including the one that

22  occurred at The Refuge, required immediate response

23  in my opinion.  So I just want to -- I'm trying to

24  figure out how the system is set up for immediacy.

25             SENATOR KOLKHORST:  And before we go

Jaime Masters - 3/17/2022

15

1   into investigations, I'm not sure who at the table

2   said that we don't investigate Priority None.  In

3   the last session we did give y'all investigators to

4   eliminate the majority of reclassifications of

5   intakes to Priority None.  I know that I kind of

6   fought that during the session a little bit, but in

7   the end -- and I didn't ask Julie this, but,

8   Members, there was an exceptional item that we did

9   not fund that was requested.  And so, you know I'll

10  follow up on that, that we don't Priority Nones that

11  I do think we follow up on.  That might be a result

12  of the court case or whatever.  But if anyone wants

13  to speak to that right now, you can.  The

14  investigator might want to.  And so if you would

15  state your name for the record.

16              MR. RICHMAN:  Thank you, Madam

17  Chairman.

18              My name is Robert "Rich" Richman.  I'm the

19  associate commissioner over child protective

20  investigations.

21              So with regard to your question about the

22  Priority None, based on these residential child care

23  cases, in combination with the foster care

24  litigation, we have chosen not to take any intakes

25  as a Priority None.  We have them as either a

1   Priority 1 or Priority 2.  Once they make it into

2   our -- I'm going to call the residential child care

3   investigators the RCCI.  Once it goes into the RCCI

4   screeners, once the supervisors look at the case,

5   they can determine that if it is a duplicate or

6   something of that sort, then they can deem that as

7   Priority None.

8            Our purpose behind it is to make sure that

9   we're investigating every single case and that we're

10  not clearing any of these without having gone

11  through the process.

12            SENATOR KOLKHORST:  Okay.  Now, let's

13  go into -- I just wanted to clarify that.

14            Let's go into from statewide intake to

15  you, what happens?  And I want to echo Senator

16  Huffman and Senator Perry.  When I look at this

17  chart, I see a lot of e-mails being sent out and

18  things like that, and maybe that's the way you go.

19  I would just ask, how many of these statewide

20  intake -- how many Priority 1s and 2s have -- do

21  y'all receive?  Maybe that's back to. . .

22            MR. RICHMAN:  Excuse me, let me look

23  for it because I know we have it here.  We have

24  several that receive. . .

25            Just if you take the entire program

1   overall, just to kind of give you an idea of how

2   many cases that we investigate a year, we had

3   256,000 cases that child protective investigations

4   -- that would be the overall, which includes child

5   investigations and all.  So with the P1s or the

6   Priority 1s, we have that statistic in here.

7           Okay.  Looking -- I'll give the statewide

8   numbers that we have.  So the timely actual

9   face-to-face P1s, those investigations we have, the

10  overall -- we look at it as percentages how many we

11  get there.  Let me see if I can get you the overall

12  numbers here.

13          MR. BLACK:  I want to ask, we're

14  talking about residential care investigations,

15  correct?  Those are the numbers that you're looking

16  for?

17          SENATOR KOLKHORST:  Yeah, define

18  residential here investigations.

19          MR. BLACK:  Yes, that's going to be a

20  much, much smaller number.  So we'll get that

21  information.

22          SENATOR KOLKHORST:  Right.  So when

23  you said 255,000, all of us down here kind of had a

24  little meltdown in general because that's every --

25  that could be a caregiver calling in about a parent,

1  that could be a teacher calling in.  Correct?

2              MR. BLACK:  Correct.

3              SENATOR KOLKHORST:  Okay.  And we're

4  focusing a little bit on the residential care, the

5  GROs.

6              Senator Perry.

7              SENATOR PERRY:  Well, I'm not going to

8  leave this one alone.  I don't know if you track it,

9  you should, and there's a record of it with 911.  I

10 would love to know how many Priority 1s have a 911

11 contact through your screeners, because you said

12 they have the authority and the ability.  That

13 didn't give me comfort that they were doing it, and

14 I have a hunch that there's opportunity they should

15 be doing it.  So I need something from your group,

16 not today.  That's not what y'all thought.  But it's

17 just a revelation that we always get through this

18 process that I think it's contrary.  If you track

19 it, great.  If you don't, spend a little time and

20 start tracking it now.  But look back and see how

21 many were immediate assessment deaths where a child

22 was in danger that y'all were the initial 911

23 contact.  I assume y'all probably get the referral

24 after a lot of 911 contact, but if this is the first

25 priority and you can't discern whether you're the

1  first or not, I would like to know if you're doing

2  it.

3             SENATOR KOLKHORST:  Senator Menéndez.

4             SENATOR MENÉNDEZ:  So following up on

5  the lines of my colleague, Senator Perry, if the

6  calls that y'all received about The Refuge had been

7  classified as a Priority 1, how much of the process

8  would have been handled differently?  I mean,

9  because my understanding is that it's -- it went

10  through a circuitous way.  It took a while.  And,

11  I mean, it appears that -- I think the -- does it

12  only change the initial time frame?  That's the

13  question.

14             MR. BLACK:  From the statewide intake

15  standpoint, yes, it just changes that initial time

16  frame.  Because as I mentioned, the notifications

17  that we make are going to be roughly in the same

18  amount of time regardless if it's a Priority 1 or a

19  Priority 2.  What it does do, it does give the

20  investigator a little bit more time to initiate that

21  investigation.

22        If there's any other changes between a

23  Priority 1 or Priority 2, that's something that Rich

24  could speak to.

25             SENATOR MENÉNDEZ:  When someone calls

 1  in to your intake, are those calls recorded?

 2             MR. BLACK:  Yes, they are.

 3             SENATOR MENÉNDEZ:  So would you be

 4  able to make those recordings or transcripts

 5  available to us?

 6             MR. BLACK:  I believe that would be

 7  possible, yes.

 8             SENATOR MENÉNDEZ:  I would like to see

 9  that because I would like to see what they -- the

10  calls were -- the callers were telling you was going

11  on and then match that up with what happened.

12        Thank you, Madam Chair.

13             SENATOR KOLKHORST:  Senator Huffman.

14             SENATOR HUFFMAN:  Just a couple of

15  questions.

16        One, how many Priority 1 calls did you

17  receive from a residential care facility last year?

18             MR. BLACK:  That's information we can

19  get you by the end of the day.

20             SENATOR HUFFMAN:  And Priority 2 as

21  well?

22             MR. BLACK:  Yes, ma'am.

23             SENATOR HUFFMAN:  Because I think we

24  need -- I'm surprised you don't have that number,

25  frankly, that you brought to us today because that

 1   goes to the whole heart of the problem is -- I don't
 2   even -- does anyone know how to guess?  I don't.  I
 3   mean, how you responded to this problem can be
 4   explained somewhat or need to know how many you're
 5   dealing with.  And if it's not that many, then --
 6   you know, I understand there has to be
 7   accountability, so you have a system in place where
 8   people have to do certain things.
 9          But, you know, I miss the times when
10   someone would pick up the phone and say, you know,
11   "We have a problem.  There's a kid in a facility
12   that's being abused.  Now get somebody down there
13   right now."  Why isn't that happening?  And I'm not
14   -- I'm not fussing at anyone.  It's just very
15   frustrating to sit here and look at these stupid
16   graphs, you know, and just wondering why someone
17   just didn't do something.  You know?
18          And if there's thousands and tens of
19   thousands of complaints, then you can understand,
20   well, okay, this is tough.  But if there's just a
21   couple of them coming in a day or whatever, then, by
22   God, do something more than what was done.
23          Thank you.
24                SENATOR KOLKHORST:  And thank you,
25   Senator Huffman.

1          I want to add to that.  I thought maybe I

2    was overreacting or having a bad day here when I

3    read the charts last night and I saw all these

4    e-mails and things about the severity.  If I know a

5    child is being raped in a facility, that's Priority

6    1 to me.  Okay?  I mean, like, that's get somebody

7    down there right now.

8          Now, again, if you're getting 2,000 of

9    those calls a day, which I don't think 2,000 times a

10   day is happening in a residential treatment center,

11   then we know there's a lot of false in that.  But

12   that's what we're trying to figure out, ferret out

13   for y'all, work with you to make this a better

14   system to keep our children safe.

15          So phone calls are important and

16   communication, lines of communication with these.  I

17   would ask this question:  I know through my research

18   we have had 1500 beds come off line.  How many

19   facilities, residential treatment centers and GROs

20   do we have in the state of Texas since we are

21   focusing on that today?  Do we know?

22               MS. MASTERS:  Hundreds.  I mean, we

23   may even have thousands of facilities.  Not all of

24   them do business with DFPS, though.  There are

25   numerous licensed facilities, but not all of them do

1  business with DFPS.

2          SENATOR KOLKHORST:  I would ask

3  HHSC -- I know you're in the room.  You license

4  these facilities.  I would like to know that number

5  on residential treatment centers.  Surely we know

6  how many we contract with and how many beds we have

7  available at this point.

8          And then, again, when I say we would like

9  a follow up, I would like a follow up in the 24-hour

10  period, by tomorrow afternoon, to know how many of

11  Priority 1s and Priority 2s we receive just from --

12  again, the general term is GRO, but, you know, we

13  know that there is kind of the GRO but then there's

14  the RTC.  You can split it out or not, but it would

15  give us a really good feel for where we are.

16          All right.  So we're at this point on --

17  there has been a phone call made.  There's been a

18  screen.  It has been Priority 1 or Priority 2.  And

19  at that point, Mr. Richman, I think you pick up from

20  here.

21          MR. RICHMAN:  Yes, ma'am.  And I

22  apologize, we'll get those numbers to you.

23          So from that point we're going to be on --

24  we're going to be on page 9 of that spreadsheet that

25  we have there called "Residential Child Care

1  Investigations."

2          So once we receive it, it goes to our RCCI

3  screener and we look for multiple referrals.  So as

4  it goes through this process, we look at the

5  multiple referrals.  If we have them multiple

6  referrals, it's then referred to our complex

7  investigation division, which is made up of senior

8  investigators that are used to working cases that

9  have multiple complexities to them, and they will

10  take a look at all of these and be able to put those

11  together based on how many referrals this one --

12  this one facility has.

13          If there isn't, the case assignment and

14  staffing goes, it goes to the supervisor as well as

15  the investigator.  They'll review the criminal

16  history and central registry and arrange for joint

17  investigations as needed.  Then they'll complete

18  notifications as required at the beginning of the

19  investigation.

20          So when they initiate the investigation,

21  the first thing they do is the supervisor and the

22  investigator will sit and meet and they will have a

23  strategy meeting about what they need to do in an

24  investigation, and they will lay out on paper

25  exactly the steps they need to take during the

1  initial investigation based on the initial intake.

2          SENATOR KOLKHORST:  At this point,

3  when have you notified the court monitors?

4          MR. RICHMAN:  So oftentimes, the court

5  monitors are not notified until we have the initial

6  contact and we have a good idea of what's going on

7  in the facility, because many times we will get

8  intakes of information that's partial information,

9  sometimes duplicate information.  So after they

10  start doing the initial investigation and have a

11  staffing with their supervisor based on what they

12  see.

13          SENATOR KOLKHORST:  Would that be the

14  middle line right here, "Initiate investigation" --

15          MR. RICHMAN:  Yes.  As we go through

16  this --

17          SENATOR KOLKHORST:  -- "interview

18  alleged victims"?

19          MR. RICHMAN:  Yes, ma'am.

20          SENATOR KOLKHORST:  So from the call

21  to the screening to the then Priority 1 and Priority

22  2, you step in.  When I get to "Initiate

23  investigation, interview alleged victims," what's

24  that time period from the call to that box?

25          MR. RICHMAN:  So when the clock starts

1  ticking, as soon as it comes in as an intake, we

2  have 24 hours to make that first -- and this is with

3  a Priority 1 -- we have 24 hours to make that first

4  contact.  So that time is relatively quick for

5  the -- if it's a Priority 1, we have -- we have

6  supervisors that are on call 24/7.  They'll receive

7  the call.  They'll call an on-call personnel

8  investigator.  They'll staff the case with that

9  investigator, and they'll come up with a strategy

10  immediately.  And then within 24 hours, they'll make

11  contact with the -- with the facility or with the

12  outcry, the victim.

13              SENATOR KOLKHORST:  So I know that I

14  have some residential treatment centers in Senate

15  District 18, and I am told by local law enforcement

16  that they often get 911 calls.  So how do y'all

17  handle that?  And when I say "often," it's into the

18  hundreds potentially.  And so if the local law

19  enforcement receives a 911 phone call and I -- you

20  know, it can vary all different kinds of things.

21  Do -- are y'all also notified?

22              I'll give you an example.  911 phone call,

23  we have a missing resident, a missing child.  Do

24  y'all also get that phone call, or does the sheriff

25  just go out and find the child and bring it back?

1   Can things happen where y'all don't even know it's

2   happening?

3               MR. BLACK:  Yeah, I can take that.

4          The facility itself should call statewide

5   intake whenever they have a child that's missing,

6   runaway.  So we would get that phone call not from

7   911 but frequently from the facility.

8               SENATOR KOLKHORST:  What about other

9   911 phone calls that are made by residents?  And,

10  again, I'm pretty close to my law enforcement, and

11  there are a lot.

12              MR. BLACK:  No, I mean, one of our

13  most common reporters is going to be local law

14  enforcement.  So if a 911 call goes out from a

15  facility, more than likely, depending on what is --

16  what is assessed to have happened upon that

17  immediate response, we're likely to get a phone call

18  at statewide intake.

19              SENATOR KOLKHORST:  Okay.  Thank you.

20          Okay.  Continue.  Are you still going down

21  your chart?

22              MR. RICHMAN:  Absolutely.  Anything

23  you need me to do.

24              SENATOR KOLKHORST:  Yeah, keep going.

25  So we were at I think that middle row, "Interview

1  alleged perpetrators."

2           MR. RICHMAN:  Yes, ma'am.  So we

3  interview the alleged perpetrators and the

4  collaterals, gather the additional information and

5  evidence as needed to make a finding.  This is the

6  entirety of the investigation when they're out there

7  actually doing the job investigating, talking to all

8  of the people, gathering evidence of whatnot.

9           They complete the disproportional or

10 extension, that is if they need additional time.

11 They ask their supervisors for additional time

12 because we have a 30-hour -- or a 30-day time frame

13 we want to complete these investigations in.

14 Whether it is allowed or not, it depends.  They have

15 another staffing about this to discuss whether they

16 need this, what exactly needs to be done on the

17 case.  And then they complete the documentation and

18 submit the investigation within 30 calendar days.

19 That's the time frame.

20           The supervisor will review the

21 investigation for approval.  If they approve it, it

22 will go down to the next round.  As you see on the

23 bottom, it will ask the question, "Does the

24 investigation require secondary approval?"

25           Now, the reasons for a secondary approval

```
 1   would be, say, that it's a fatality investigation or
 2   a near death, near fatality if it's a reason to
 3   believe that it is actually committed, and this is
 4   for any reason whatsoever, sexual abuse, serious
 5   injury, or unable to determine.  So if any of those
 6   are a yes, then we're going to send it back to the
 7   complex investigation division so that they can
 8   review it for secondary review of the investigation
 9   process.  If they approve it, then it goes into the,
10   "Notify applicable parties."  If they reject, it
11   goes back into the complex investigation team, they
12   do another staffing on this case, and they make sure
13   all of the answers to the questions have been --
14   have been completed.
15         Now, during this process, which I didn't
16   mention in this, is that anytime during this
17   investigation, if I find that there's criminal
18   allegations, we will also include our special
19   investigators which are made up of retired law
20   enforcement officers or former law enforcement
21   officers who are trained in child protective
22   investigations.
23         SENATOR KOLKHORST:  Senator Perry.
24         SENATOR PERRY:  Thank you, Madam
25   Chair.
```

1        Real quick, back to screeners.  Do you

2   know if there's a box on their intake form that asks

3   if 911 has been contacted?

4              MR. BLACK:  No, there's not.

5              SENATOR PERRY:  There's not?  So the

6   screener doesn't say, "Have you contacted 911?"

7              MR. BLACK:  The screener would not be

8   speaking directly to the reporter.  That's handled

9   initially by the intake specialist.

10             SENATOR PERRY:  No, I -- okay.  Back

11  up.  The intake specialist, is there a box on the

12  intake specialist's form -- we're splitting hairs

13  here I think, but you know where I'm going.  Is

14  there an inquiry, "Has 911 been contacted?"

15             MR. BLACK:  No, there is not.  In a

16  situation where the intake specialist is actually

17  advising the reporter to call 911 or the intake

18  specialist decides to call 911 themselves, that

19  information is typically noted in interior of the

20  intake.

21             SENATOR PERRY:  Wouldn't it be logical

22  that the first box on the front is:  Is this a 911

23  emergency, and have you contacted them?

24             MR. BLACK:  Most commonly, the

25  information that we receive are not going to be

```
 1   considered 911 emergencies.
 2              SENATOR PERRY:  You're missing the
 3   whole point, but we'll move on from that.
 4         Secondly.  So when you start an
 5   investigation -- and I'm going to make -- maybe I'm
 6   wrong on this.  This is basically the caseworker,
 7   right?  This is the one that's out there, the boots
 8   on ground in the home doing the investigation, the
 9   intakes, and that goes to you, correct?
10              MR. RICHMAN:  Yes, sir.
11              SENATOR PERRY:  And then from there it
12   goes up to supervisors and reviews and specialists
13   are called in if determined they need to be in, and
14   they look at the totality of all of the reports and
15   things that are going on.  And that makes -- you
16   said you contact the monitor, the court monitor,
17   which I'm assuming is required, but what is the
18   substance of their conversation?  What are they
19   looking for from the investigation side?  What is
20   their role?
21              MS. MASTERS:  I'll take that.
22         So it is not really a process in here
23   where it says at this point you contact the
24   monitors.  That is -- that is really dependent on
25   certain actions we're taking.  So for this case, it
```

1    was because we were removing the children, and it is

2    an expectation of the court that we notify them of

3    why we are doing things like that.  So it is not

4    something in the process.

5              SENATOR PERRY:  All removals pretty

6    much are a communication with the monitor, and then

7    they can do what they want about it.  Do you know

8    what they're looking for or what their concerns are

9    or where they do focus on when you have that

10   communication?  I'm trying to get down to the point,

11   to be perfectly honest, and it's a conversation you

12   and I've had and other things, we have a

13   $1.3 million check going out to people that have a

14   real conflict because there's really no reason for

15   them to effectively get out of this, for lack of a

16   better term, scam because they're going to get a

17   $1.3 million check as long as we carry it, as long

18   as we can't show that we've made improvements

19   according to their judgment that the judge would

20   approve.  So I'm really trying to get down to what

21   role are the monitors serving today other than it's

22   a court order issue?

23              MS. MASTERS:  Data collection on what

24   we are doing.  I don't know that there's a -- I have

25   no idea what their -- what they would be looking for

 1   except for gathering the same information that --

 2               SENATOR PERRY:  So you're an

 3   investigator.  What's your communication with court

 4   monitor, if any?

 5               MR. RICHMAN:  So the investigators

 6   themselves are not going to have that direct

 7   communication.

 8               SENATOR PERRY:  But you would be as a

 9   supervisor, correct?

10               MR. RICHMAN:  As the supervisor, they

11   wouldn't either.  What they would do is they would

12   elevate it through the chain of command and they

13   would elevate it up to the state office, and that

14   would next be who is --

15               SENATOR PERRY:  So big picture here.

16   I'm trying to figure out what role they're serving

17   other than a communication link that the

18   Legislature -- I've always advocated if we can't get

19   it right, then the Legislature is going to be doing

20   the agency's work for them if we need to.  So we're

21   going to have some honest assessment of that

22   relationship and the judge's requirement to keep

23   spending 1.3 million a month.  It's close to

24   $36 million biannual that we could be using to

25   further psychiatric and mental health and other

 1   issues.

 2          It's kind of like we're on this circle

 3   that's -- Chairman Kolkhorst said it's kind of

 4   insanity that we're not getting the services done

 5   that we need to but are tied to a monitor that has

 6   no incentive to really quit monitoring us.

 7          So next -- so y'all don't have any

 8   communication that you're aware of directly with.

 9   It's kind of on an as need, but any removal would

10   require that.

11          So I talk to caseworkers.  I make it a

12   point to try not to shoot from the hip, even though

13   it may seem it, but I try to go to the people that

14   are responsible for doing the work of the agency at

15   a level that if they get it right, the processes

16   work; if they get it wrong, the processes don't

17   work.  And we put a lot of responsibility on these

18   caseworkers.

19          So, specifically, a temporary emergency

20   placement is 72 hours with a foster parent that's

21   met the licensing requirement, the way I understand

22   it.  You drop the kid off there.  Like, in a

23   Priority 1, you would move that child to a TEP, I

24   guess, a licensed foster care parent as long as

25   there's no medical issues.  I assume that's the

1   first leg of defense.  Right?  Is that true?  If you

2   remove a kid, you give them to the temporary

3   emergency placement; is that right?

4                   MR. RICHMAN:  Yes, as we go through,

5   if there's removal of a child, then the child is

6   placed --

7                   SENATOR PERRY:  So if they deem it's

8   emergency and you're going to take the kid out, you

9   send them to a licensed foster family.  That foster

10  family may be licensed to adopt additionally.

11  Second criteria.  But it's just a foster licensed

12  parent at that point, correct?

13                  MS. MASTERS:  Correct.

14                  MR. RICHMAN:  That's a 72-hour

15  arrangement, is it not?

16                  MS. MASTERS:  Yes.  Sometimes children

17  are placed, though, with kin when there's an

18  emergency movement, and so they may be placed with

19  family.  And they may stay there even after the

20  court hearing.

21                  SENATOR PERRY:  Let's set the kinship

22  aside.  If we're in the foster system -- and this is

23  important, and it's going to tie into all the

24  conversations we're going to continue to have today

25  until probably midnight.  In the foster parent

1  setting, if you're -- if you're licensed to be a

2  foster parent, you may be called on that day, "We

3  need you to take this child"?

4            MS. MASTERS:  Yes, sir.

5            SENATOR PERRY:  And that's a temporary

6  emergency placement?

7            MS. MASTERS:  Yes, sir.

8            SENATOR PERRY:  And that's for

9  72 hours?

10            MS. MASTERS:  I believe so.  But

11  Deneen may be able to speak to that further.

12            SENATOR PERRY:  So would it surprise

13  you that I have caseworkers that went under a TEP of

14  72 hours that ended up having the child there for

15  30 days?

16            MS. MASTERS:  It would not.

17            SENATOR PERRY:  Would it surprise you

18  that you're supposed to have interaction with the

19  caseworker that made that referral for the child to

20  be removed to the TEP process that has had no

21  communication with that caseworker for 30 days?

22            MS. MASTERS:  That would be very

23  concerning.

24            SENATOR PERRY:  But you think it

25  probably happens?

1          MS. MASTERS:  It is likely that it

2    might have happened.

3          SENATOR PERRY:  Okay.  So I'm going to

4    align the global picture here.  We're going to keep

5    coming back to it from when my questioning is.  We

6    don't seem to support the very people that we look

7    to to go out and get the job done so we have a basis

8    to make the right decision.

9          Additionally, talking to caseworkers, they

10   feel they have no voice in the process, that when

11   they go to court, they don't have the freedom to

12   actually advocate for the foster parent that would

13   be going to adopt that child, and that they're told

14   by supervisors and administration down:  This is

15   your narrative, and you will stay to it regardless

16   of what the facts may determine differently.  Do you

17   have an opinion that that is a fairly -- let me back

18   up.  You do have exit conferences with your

19   caseworkers, correct?

20         MS. MASTERS:  We do.

21         SENATOR PERRY:  And I think you have

22   disclosed to me that a major concern that you hear

23   over and over again, caseworkers do their job but

24   they feel like at the administrative level, the

25   supervisor level that have never met the family,

1  never met the child, are looking at these horrific

2  original reports, have a court actually rule in

3  favor of the foster parent, and then have

4  vindictiveness throughout the organization to come

5  back after that family and that caseworker.

6        So I sense there's a culture problem.  I

7  sense there's a bias, institutional cynicism.  And

8  if I was in that line of work for years, I can see

9  where I could get that way, but we are not treating

10  our caseworkers properly with the respect they

11  deserve and having a voice of the caseworker in the

12  court process that's real and legit.  And when you

13  do that, you short circuit the only system we can

14  rely on to get the -- to get it right.

15        If judges aren't getting true and accurate

16  information -- and I asked the question to you the

17  other day, are judges prohibited from asking

18  opinions of foster parents that have been in the

19  care of the child, and you said no.

20              MS. MASTERS:  Correct.

21              SENATOR PERRY:  I wish we had a family

22  court judge in here today that could confirm all of

23  this.

24        So here's my point.  I'm going on.  You're

25  the supervisor of the caseworker.  You're the lead

1  investigator on this at the administrative level.

2  Do the lead administrators ever actually have

3  conversations with the family or the children

4  involved?

5              MS. MASTERS:  I am sure there are

6  cases where they have, but they would not have the

7  intake that a caseworker -- or the relationship that

8  a caseworker would have.

9              SENATOR PERRY:  So when it goes to

10  court, and I would say the majority of the time

11  based on what I know -- and if I'm wrong, please

12  correct me now.  This is your opportunity to correct

13  me now -- that if a caseworker has made a

14  determination that the family was not as bad as we

15  first thought and that kid should stay in that

16  house, that's not really the narrative or what is

17  shared at the next advisory or supervisory levels,

18  and that's not the narrative they want out, and so,

19  therefore, it's overruled.  Is that decision more

20  often than not at the administrator and supervisor

21  level made without an interaction with the actual

22  family and the children involved and specifically a

23  foster parent that may have had custody of that

24  child for years?

25              MS. MASTERS:  That should not happen.

1    I cannot speak to how often something like that

2    would happen, but that is not how the system should

3    work.  And the judge should be asking to hear from

4    the caseworker.

5              SENATOR PERRY:  I think the judge asks

6    to hear from the caseworker.  They don't ask for

7    foster parenting involvement that may have had an

8    active role in protecting that child.  That's

9    disconcerting to me.

10         But the caseworker, at least the ones that

11   I have had communications with, tell me:  We are

12   told what to say regardless of what we believe to be

13   true.

14             MS. MASTERS:  That is problematic

15   because it should not be that way.  And I have met

16   with a group of foster families, and they have

17   expressed the same concerns, that their voice is not

18   heard.

19             SENATOR PERRY:  So therein lies the

20   problem.  You have met with foster parents and

21   caseworkers and had this relayed to you.  I have met

22   with foster parents and caseworkers and had this

23   issue relayed to me.  I think everybody -- I'm

24   seeing Senator Miles nod his head, that that's a

25   truism we can all believe is true.  If he's getting

```
 1  it in Harris County and I'm getting it in Lubbock

 2  County, those are not really what I would call

 3  similar communities.  Culturally different.

 4  Everything is different.  But if we're getting the

 5  same information from the folks that we rely on to

 6  do the hardest of the hardest of jobs in the state

 7  and then we treat them like a third class citizen

 8  and the parents that are willing to step out have no

 9  voice in this process and you're aware of it -- how

10  long have you been here?

11             MS. MASTERS:  Two years.

12             SENATOR PERRY:  What have you done to

13  change the culture and remove this issue so that our

14  caseworkers aren't leaving by droves because they're

15  frustrated not for the pay but because they have no

16  role when the final decision to remove permanently

17  or help some family that is legitimately in the best

18  interest of that child?

19             MS. MASTERS:  So, Senator, that is not

20  a comment that I often get from caseworkers.  And

21  caseworkers don't shy away from e-mailing me

22  directly about what their concerns are or raising

23  cases to me to intervene in.  And I do every time.

24  As well as members that bring them to me.  This is

25  not something that I hear often from caseworkers,
```

1  that they are directed what to say.  We would

2  address that at the time.

3          But I will tell you, HR, right now, is in

4  the process of doing a management review across the

5  board, because what I often hear is that middle

6  level management is the one that sets the culture,

7  and that's the one that I hear the most about.  And

8  so we are reviewing every single one of those

9  positions to see if they should remain.

10          And as far as the judges and the foster

11  parent's voice, I have no influence over who the

12  judge calls to testify in court.

13          SENATOR PERRY:  I think it is a

14  policy, if we made it a requirement that if the

15  child's been under foster care for some certain

16  amount of time, that justifies a bonding and

17  attachment, especially young kids, that that foster

18  parent can support and the ad litem agrees and CASA

19  agrees, that maybe we make it where the judge has to

20  have a communication with that group because

21  we're -- we're undermining the foster care system,

22  and we're not doing what's the best for the kids.

23          Back to my comment, that if you're going

24  to remove a kid permanently and it's an

25  administrative supervisory, pretty much, decision,

1   and the caseworker and other experts that we have

2   employed in the state say this is not the best

3   interest, I think if I'm a supervisor administrator

4   making this life-changing decision for that child or

5   that family, I'd kind of want to go visit with them.

6           MS. MASTERS:  Absolutely.  I will say,

7   Senator, that usually the guardian ad litem carries

8   the most weight with what the court decides to do.

9           SENATOR PERRY:  I think sometimes we

10  get in our bubble and we're sanitized, we're sitting

11  behind a desk and we get all these reports and the

12  first report was horrible, and as the case moves

13  through the system it may get better but you can't

14  get that vision of the first report out of your

15  mind, and we err on the safety of the child, and we

16  should, but I don't know how you -- I don't know how

17  you -- it's what I said earlier, there is no easy

18  answer.  And this is not to be a slam on the people

19  in the system, but we've got to exercise every

20  avenue.

21          And I think the only way -- back to my

22  original comment -- you've got to see one-on-one

23  people in this situation, or you just push the paper

24  down the side and say I've got another case pending

25  and I've got to move on.  It's human nature.

1          But I think the agency really needs to do

2    a deep dive.  And if you're getting a decision at

3    the top to permanently remove that child out of the

4    system at the expense of a foster parent that's

5    willing to adopt possibly or at the expense of the

6    biological parent that has shown capacity, because

7    you've only got 32 percent reunification, which that

8    says a lot about society, but I think if I was the

9    head of an agency that has that power and that

10   authority, I would want to know that the people

11   making that decision are personally invested in that

12   family.  I would say if it's a resource issue, shame

13   on you for not asking for it.

14          SENATOR KOLKHORST:  Senator Perry,

15   what I talked about, I think the committee will go

16   more into in future hearings as we look to work with

17   this agency to make it better.  As the lieutenant

18   governor talked about, we review our policies.

19   Certainly, we heard from the LBB, the amount of

20   resources that we have a poured into this agency has

21   been large.

22          Kind of back to this investigation stage.

23   I was able to look up just RTCs.  It's an

24   interesting trend.  In 2019, y'all had 1,181

25   allegations.  In 2020, 2,817.  And by 2021, 3,608.

1   That is threefold from 2019.  Your confirmed cases,

2   2019, out of 1,181 was 43.  Out of 2020 it was --

3   you had 2,817 allegations and you had 108 confirmed.

4   And in 2021, 3,608 allegations and 293 were

5   confirmed.

6        Those are kind of a trend that would be

7   alarming.  One would be the allegations have gone up

8   substantially, threefold.  Threefold.  300 percent

9   increase.  And along those lines you would expect,

10  and it's true to form, that your confirmations.  I

11  would assume these are all Priority 1s and Priority

12  2s, this is off your website, that we could glean

13  quickly.

14       What is the increase of these intakes to

15  screeners, screener to investigator?  What do you --

16  what do you pin that on?  Is it the darkness that I

17  mentioned in my opening remarks, is our society

18  becoming that dark?  Or is it heightened monitoring

19  that has led to more reports or initial calls to

20  statewide intake?

21       I would like to say after we looked at --

22  and let me set this very straight.  You know, 2014,

23  but really in 2015 on the amount of money, the

24  changes in statute, the reform bills, over and over

25  and over again, I would hope that this would be

1    trending the opposite direction but it's trending up

2    threefold, 300 percent.

3              What is -- does anybody know?  Are we

4    just. . .

5              MR. BLACK:  So I do know whenever

6    heightened monitoring began, at statewide intake

7    we -- as part of that budget package, we did get two

8    more intake specialists in anticipation that with

9    heightened monitoring there could be an increase in

10   the number of calls that we get.  I wouldn't say

11   that's the only factor, but that is probably part of

12   the picture.

13             The other thing I would say -- and this

14   doesn't date back to 2015, but at least until the

15   end of 2020, we talk about these PNs and how would

16   the RCCI, the residential care investigations -- we

17   no longer make something a PN.  So the screener

18   can't make a phone call and then close it without an

19   appropriate investigation.  Since the end of 2020,

20   any intake that we get for residential care

21   investigations that's not been previously

22   investigated that is within our jurisdiction, that

23   must be reported for a full investigation.  And so I

24   would expect to see an increase in those

25   investigations since the end of 2020.

```
 1              SENATOR KOLKHORST:  Any -- just a
 2  minute.
 3         Commissioner, anybody else want to comment
 4  to that?
 5              MS. MASTERS:  No, I think that is the
 6  case.  Removing PNs created a considerable increase
 7  in the workload.
 8              SENATOR KOLKHORST:  Senator Menéndez.
 9              SENATOR MENÉNDEZ:  I think I have a
10  possible answer.  We've seen -- I would love to see
11  in that same time frame the reduction in the number
12  of residential treatment centers, because we know
13  that at the same time people left the system.
14  Right?  And then if you recall, we started having --
15  it forced us to move children further and further
16  away from their home, and in some cases, out of
17  state.  And so --
18              SENATOR KOLKHORST:  Because we don't
19  have enough beds.
20              SENATOR MENÉNDEZ:  We don't have
21  enough beds.  So you don't have enough beds means
22  more concentration, it means fewer -- and so --
23              SENATOR KOLKHORST:  We've lost 1500
24  beds according to my research.
25              SENATOR MENÉNDEZ:  There you go.
```

 1          And so the system as a whole is worse.
 2  We've done something -- something has happened to
 3  create a system that is worse to be a part of, and
 4  so it doesn't surprise me that the complaints have
 5  gone up 300 percent at all.  It doesn't surprise me
 6  one bit.
 7          I would like to ask, Madam Chair, because
 8  I know that what prompted this committee's hearing
 9  was the three events, alleged events at The Refuge,
10  if possible for us to get back at some point to the
11  timeline because I wanted to ask --
12              SENATOR KOLKHORST:  We're going to get
13  to that.
14              SENATOR MENÉNDEZ:  Okay.  I just
15  wanted to ask them, you know, on the 24th, my
16  understanding is that CPI, CPS, the sheriff, DPS,
17  you were all notified.  Is that correct?
18              MS. MASTERS:  Yes.
19              SENATOR KOLKHORST:  Before we get
20  there, I want her to walk through that timeline
21  instead of us just asking questions.
22          So I'm still on the intake right now, the
23  process.  Okay.  And we'll get to that event.  This
24  is the process.  And the process today is focused
25  on, again, what we call our general residential

1  operations.  I know we had the number of 255,000.

2  That has to do with, you know, of course custodial

3  and conservatorship and different things.

4        So let's stay on course.  I promise y'all

5  that we will have several meetings upcoming.  I know

6  all of our schedules are busy, but there's nothing

7  too busy that won't preclude us from meeting about

8  children.

9        So staying on that --

10        Just a second, Senator Perry.

11        -- does -- on your intake, Commissioner --

12  we've heard from the associate commissioners about

13  the processes.  I think most of this by rule making.

14  I don't think there's a ton of statutes that dictate

15  this.  Do you think we're responsive enough on those

16  intakes?  And, Senator Huffman, as you said, those

17  numbers, that's, you know 3,608 allegations last

18  year on just residential treatment centers.  Now,

19  that number is larger.  When we add child placement

20  agencies and so forth, it's a little over 4,000.

21  And, again, it's almost fourfold over the last three

22  years.

23        Commissioner, where are we?  Are we doing

24  a good enough job responding to that?  Can we ferret

25  through these thousands of allegations to really get

 1  to what I think -- I know y'all say it's a Priority

 2  2 out there at The Refuge, but I might have said

 3  that's a little more urgent.  But we're going to --

 4  we're going to work through that.  What's your

 5  opinion about that?

 6          MS. MASTERS:  I believe that our

 7  response time is doing very well.  I don't believe

 8  the number of intakes impact anything that happened

 9  here.

10          SENATOR KOLKHORST:  Because over the

11  period of time, we are increasing your budget and

12  FTEs.  I mean, we were adding those up just ourself,

13  and it's large.

14          MS. MASTERS:  Yes.  Yes.  But our

15  percentages on response time are doing very well,

16  that that is not the issue.

17          SENATOR KOLKHORST:  What is the issue?

18          MS. MASTERS:  People doing the job

19  that they have been assigned to do.

20          SENATOR KOLKHORST:  Is that an

21  internal us not training properly?  Not -- I mean, I

22  know everyone needs employees right now.  Is this --

23  is this manufactured out of Covid?  Is it -- what is

24  it?

25          MS. MASTERS:  No, we have the proper

1  processes in place.  People have to follow it.

2             SENATOR KOLKHORST:  And when you're

3  saying that -- is that the provider -- just a

4  second.  Is that the provider?  Is that the

5  residential treatment centers, or is that employees

6  in your -- in --

7             MS. MASTERS:  No, I'm talking about --

8  well, in this case, everybody dropped the ball

9  across the board.

10             SENATOR KOLKHORST:  Okay.  We're about

11  to have you walk through that timeline.

12             MS. MASTERS:  Yes.

13             SENATOR MILES:  Madam Chair.

14             SENATOR KOLKHORST:  Yeah, Senator

15  Miles.

16             SENATOR MILES:  Please, I must.  I

17  need a point of clarification.  The original report

18  at The Refuge was classified as a P2; is that

19  correct?

20             SENATOR KOLKHORST:  That is correct.

21             SENATOR MILES:  That is correct?

22  Thank you.

23             SENATOR KOLKHORST:  All right.  So,

24  Members, I think we're at the point where let's walk

25  through -- Senator Perry, do you have any follow-up

 1   about the process?

 2              SENATOR PERRY:  Real quick.

 3        First of all, I ask this as the

 4   investigator, because they are over the caseworkers,

 5   be it residential or otherwise, and that was the

 6   opportunity.  They may not -- as we move through

 7   this whole process, the caseworker is front and

 8   center.  They are the head of the front and center.

 9        Secondly, you keep referring to losing 300

10   beds.  We all understand that a lot of the providers

11   bailed out when they began the heightened

12   monitoring.  I'm told if you ask the heightened

13   monitors, it's because they were bad actors.  I

14   don't believe we had 1500 beds of bad actors.

15        Here's the question.  On the CWOP, CWOP

16   kids is kind of part of this conversation too,

17   because a lot of the RTC kids, if there was actual

18   RTC beds, would probably be where a lot of the CWOP

19   kids would be, if that's a fair statement.

20        So a question to, I guess, Commissioner,

21   is it fair -- I was given that there's 64 CWOP kids,

22   and I know that changes daily.  But is it fair to

23   say that had we not had the extent of the heightened

24   monitoring and we still had some of those providers,

25   would these CWOP kids be in those facilities?  Would

1 that -- were they the type of the facilities that

2 could handle the most challenging of the challenging

3 kids?

4            MS. MASTERS:  Yes.

5            SENATOR PERRY:  So we created a

6 problem from a dice that had well intentions but has

7 no idea what real world looks like?

8            MS. MASTERS:  Permission to flesh that

9 out some?

10            SENATOR PERRY:  Sure.

11            MS. MASTERS:  So I have, myself, sat

12 down with our providers because we are hovering at

13 this sort of 71 kids.  We were at 170 in July.

14 We're now -- or 191.  We now fluctuate between 50

15 and 70 every day.  And my conversations with them

16 are:  Tell me what it is.  No matter how hard it is,

17 is there something I'm not doing?  Is there

18 something you haven't put on the table?  What is it

19 that we can't get these children moved?  Because we

20 have beds.  We have beds.

21      But heightened monitoring, the providers

22 not asking for a pass to be bad actors.  They are

23 not asking for us to be lenient on them to mildly

24 abuse children that have high acuity needs.  What

25 they are asking for is another look at the

1    methodology that seems to sometimes sweep people up

2    into the heightened monitoring process.  And I'm not

3    the one to talk details about the methodology.  But

4    that's the -- that's all they're asking for.

5              Because when I talk with them -- for

6    instance, one of them stated, you know, "I'm on

7    heightened monitoring.  I'm almost off.  I have ten

8    things to do.  I've ticked off nine.  But I'm not

9    allowed to move those nine out of the way until I've

10   met all ten.  So if I mess up on ten, I'm back all

11   over again.  And I'm praying nobody leaves the lid

12   off their trash can and I start all over."

13             Now, I don't know if that's a legitimate

14   issue for heightened monitoring, but that's what the

15   providers say.  And they don't want to publicly come

16   out because they have boards and they have other

17   people that do not want to be called in front of the

18   federal judge.  And so that's hard for them, you

19   know.  But we're trying to work through that.

20             I think the other reason that they give

21   is -- you know, we talked about the funding.  It

22   isn't just simply funding.  You know, their comment

23   was if I staff up and I bring all these services in

24   and I bring the people in that are needed to

25   surround these children, will that funding be

1    ongoing?  Can I sustain what I do now going forward?

2           And then the last two are for both

3    agencies, RTCs and -- and when we did a survey, it

4    was we feel like Texas is the most overregulated

5    state compared to where else we do business.  Now,

6    again, I don't know if that's accurate or not

7    because I don't know what other states -- how they

8    regulate.  But these are the reasons that the

9    providers tell me directly.

10          SENATOR KOLKHORST:  Okay.  So

11   question, how many states are under a lawsuit?

12          MS. MASTERS:  Oh, my goodness, there's

13   probably ten or more.  Even more states.

14          SENATOR KOLKHORST:  I think it's over

15   30.  Okay.  How many of our GROs/RTCs are on

16   heightened monitoring?

17          MS. MASTERS:  We have 78 that are on

18   heightened monitoring.

19          SENATOR KOLKHORST:  How many have

20   completed and have been able to exit heightened

21   monitoring?

22          MS. MASTERS:  One.

23          SENATOR KOLKHORST:  How long do you

24   stay under heightened monitoring?

25          MS. MASTERS:  I'm not sure what the

1   time frame is.

2              SENATOR KOLKHORST:  It could be

3   forever if you don't. . .

4              MS. MASTERS:  You know, I don't know

5   if it's an indefinite amount of time.  It may be if

6   you don't meet, you know, whatever the metrics are

7   that you have to meet to come off.  I don't know if

8   that then moves into an issue of your license.  I

9   don't know.

10             SENATOR KOLKHORST:  Now, let me say

11  something.  Of the 1500 beds, and roughly that's

12  what my research has gleaned.  I might be off 100

13  beds.  I do believe some of those beds needed to

14  come off line.  And when I say that, I am the

15  senator from a district who had a residential

16  treatment center that had a death, 72 major

17  violations.  They allowed a child to exit the

18  facility, go across the pasture, it was in a rural

19  area, and burn the house down next to them to the

20  ground.  Burn it down to the ground.  And we still

21  didn't close it.

22             So those were pretty dark days.  It wasn't

23  that long ago.  And so I do think that we have made

24  strides, and there are necessary strides.  We have

25  purged ourselves of people that I don't think had

1    children first in their minds.  I think they had

2    bottom lines of private equity in their minds.  And

3    I think that that's something we all need to realize

4    here, is that these are businesses.  Just like our

5    nursing homes and others.

6            I have no problem with profits being made

7    or this particular facility, Senator Eckhardt, is a

8    nonprofit.  They have different rules, regulations.

9    But I do think that we are charged with finding

10   out -- as Senator Perry says, it's all related.

11   It's all related.

12           And, you know, so with that, you know,

13   I've spent some time with some operators this week,

14   and, you know, it's that fine line of looking at a

15   facility, which we're about to get to on your

16   timeline, and then we're going to have HHSC come up

17   and talk about how they license facilities and how

18   then they, you know, do their closures or

19   recommendations to y'all.

20           But this is important to understand, that

21   we try to prevent anything bad from happening.  We

22   do.  In a perfect world, that would happen.  I think

23   our charge here is if something bad happens, if evil

24   gets into a facility, how quickly can we act, and

25   what is the proper removal?

1          Now, the challenge that I've gone through
2     this week is, is there a history at this facility,
3     or is there one bad actor?  And I'll use schools as
4     an example.  We all know that occasionally there's a
5     teacher or a staffer who has an improper
6     relationship with a student.  We remove that
7     teacher, hopefully, and that process happens
8     swiftly, but we don't close the school.
9          The same thing can happen in hospitals
10    where a doctor or a nurse has improper behavior,
11    does harm to a patient.  There are processes, and we
12    remove that nurse, we remove that staffer or that
13    doctor, but we don't close the hospital.  So I think
14    there's a fine line.
15         Senator Eckhardt, this is in your current
16    district.  It won't be after January.
17         But, you know, was there a history here?
18    And that's what I want to segue into, as you go
19    through your timeline, we have a better
20    understanding, keeping in mind that our charge is to
21    make this system better.
22         Senator Perry, Governor Patrick told me,
23    "I want to work on adoptions.  I want to work on
24    kinship.  I want to work on keeping children out of
25    the system."  But there are special needs -- I mean,

1    children with high acuity.  I think we call it

2    exceptional care.  There are children that have been

3    trafficked that maybe a foster family can't quite

4    handle in the beginning.  As Senator Huffman said,

5    it is a process, and it is a long process in

6    changing the behavioral habits of that child.

7                    MS. MASTERS:  Yes.  And every child --

8                    SENATOR KOLKHORST:  So we are going to

9    have to have these facilities, and we're going to

10   have good ones, but we are going to have to have

11   enough of them.  I don't want to send kids out of

12   state.  I think Texas can take care of their own

13   children.  But we have to get to the bottom of why

14   people -- why facilities will refuse those children

15   in CWOP.  And you have told me that.  And providers

16   have told me that, "I can't take that child.  I

17   can't take that risk of going on heightened

18   monitoring," or, "I'm trying to get off of

19   heightened monitoring."

20            And this is a ying and a yang, a push and

21   a pull, and there is nothing difficult -- I mean --

22   nothing easy but extremely difficult about this.

23            So let's walk through this timeline and

24   see where we are.  And then I would like for you to

25   address any questions that the members have.

1              MS. MASTERS:  Yes, ma'am.

2              So on 1/24 is when we received our first

3   intake, and that was related to staff having nude

4   pictures of the girls selling them on a cash app and

5   trading the photos for drugs or money.  And I'll

6   only say this on the first one, and it's an

7   assumption throughout, that notifications were made

8   to DFPS, Bastrop County, SSCC, child advocacy

9   centers, and then into -- it was put into class so

10  that it would populate for HHSC as well.

11             SENATOR KOLKHORST:  Okay.  So when you

12  say SSCC, because they had placed a child there?

13             MS. MASTERS:  Yes, they had a child

14  there as well.

15             SENATOR KOLKHORST:  Just for

16  clarification.

17             MS. MASTERS:  Yes.

18             SENATOR KOLKHORST:  So both -- y'all

19  were notified, local authorities were notified, any

20  child that had placed -- any child placement agency

21  that had placed -- so --

22             MS. MASTERS:  Yes.

23             SENATOR KOLKHORST:  Placed the child

24  there were notified?

25             MS. MASTERS:  Everyone.  Even I think

1   guardian ad litem is notified, yes.

2               SENATOR KOLKHORST:  That would be

3   assumed throughout this timeline.

4               MS. MASTERS:  Throughout this

5   timeline, yes.

6         And the explanation for it being -- not

7   being acted on as I think it should have is they

8   thought the threat was neutralized because they were

9   told that this employee who this accusation was

10  against had been fired.

11        The next intake was on 1/25, and it was

12  for a cigar and, again, nude photos.  And these

13  are -- these allegations are for the same two

14  children, both on 1/24 and on 1/25.

15              SENATOR KOLKHORST:  Is it proper to

16  ask who made those phone accounts?  Was it within

17  the facility?  Can you answer that?

18              MS. MASTERS:  I know I can identify

19  the person, but I'm not sure if I can say --

20              MR. BLACK:  Not in a public setting.

21              SENATOR KOLKHORST:  Then don't.

22              MS. MASTERS:  Not in a public setting.

23        And this person confirmed that they -- the

24  alleged perpetrator had been terminated.

25              On 1/26, to me all bets were off on 1/26

1  because that's when we realized the alleged

2  perpetrator has multiple family -- multiple

3  relationships of people in upper management at this

4  facility, and so the thought that the threat is

5  neutralized is really over.  And at that point, this

6  should have been sent up the chain to be looked at.

7           On 2/1, we confirmed that the director of

8  the residential care was aware of all of these

9  accusations and did her own private investigation

10  and never reported this to statewide intake.

11           On 2/2, both our staff, jointly with HHSC,

12  did a risk assessment of the facility and determined

13  it was high risk for harm to children, and it was

14  not -- it was not sent up the chain to me or, I'm

15  assuming, it did not get sent up to the

16  commissioner, to the EC as well.

17           On 2/26, another intake for alleged sex

18  trafficking.

19           3/2 -- I will say if it helps, these

20  are -- I can tell you after the fact, you know,

21  who -- not -- they identify the person, but where

22  they were.  But these are -- the reporter would be

23  from, I'll say, the same area.  So -- but they are

24  different people.

25           On 3/3, so in this case, I will say the

1  caseworker did their job.  The caseworker elevated

2  this to their supervisor.  The supervisor and the

3  program director at DFPS staffed this on 3/3 and

4  neither raised this up the chain as policy would

5  have directed them to do.  The -- I was told that

6  the supervisor stated she was disengaged.  The

7  program director stated it slipped her mind.  We

8  also have a note made by the program director at the

9  SSCC, and in the note it states, "I think

10  trafficking is going on under our nose."

11          On 3/11, again, staff did not report the

12  outcry.  And those are for Child 1 and Child 2.

13          Additional intakes were received for Child

14  2 and then also for Child 3 and Child 6.

15          On 2/8, this intake was called in.  It

16  said nude pictures and drugs.  We found additional

17  documentation that also said the child reported that

18  she was being trafficked, who was trafficking her,

19  and asked the reporter what they were going to do

20  about it.

21          On 2/9, that was a restraint that was done

22  on this child in the visit.  It was about the

23  bruises that were -- that were seen on the child

24  during her medical visit.  We did investigate, and

25  the child, you know, did report that she was

64

1  fighting while they were trying to restrain, they

2  slipped and fell, and she said that's how she

3  received those bruises.

4        On 2/10, investigators wanted to -- again,

5  no one is putting anything together to say there's a

6  pattern here, everyone is related, someone ring the

7  bell.  It just doesn't happen.

8        2/17, again, investigator and -- I'm sorry

9  -- HHSC and DFPS do a risk assessment, and, again,

10  it comes up as high very risk, not brought up the

11  chain.

12        On 3/2, it looks like investigator

13  notified CPI that Child 3 alleged that the same

14  alleged perpetrator who was giving her phone to the

15  kids to take naked pictures to be sold, that her

16  boyfriend trafficked her in the past.

17        On 3/11, another intake for drugs and

18  assisting the child who was placed there as an FBI

19  witness for another trafficking case was helped to

20  escape.

21        Then on the next page, this is Child 3 --

22  I'm sorry -- Child 4 and Child 5, intake for staff,

23  assisted youth to, again, escape.  And this child

24  was, as I said, a witness.  I think the one arrest

25  that people have heard of is this child called.  And

 1   said, "I'm tired of walking.  Can someone come and

 2   get me?"  And no one did.  And she called the

 3   facility, not a worker.  No one came to get her, and

 4   I believe the testimony to law enforcement is no one

 5   has talked with her.  And so she -- I believe her

 6   arrest was for lying to law enforcement.

 7           And then another intake for these children

 8   on 2/25, again, confirming the allegations.  Also a

 9   window not working so the children could escape.

10           And then finally for state office.  So

11   this was all put together when our placement team

12   was just doing a review of, I believe it was a

13   contract, and noticed all of these intakes.  At that

14   time they asked for the investigative staff and CPS

15   staff, I think, to put together a summary of what in

16   the world is going on.  When they saw the summary,

17   Associate Commissioner Dryden put a temporary hold

18   on the facility.

19           When it was brought to the full executive

20   team, we ordered an SI or staff to be in the

21   building until all children could be removed safely.

22   We even removed the children that weren't ours.

23   There was a TJJD child there.  There was a private

24   pay child there.  And, of course, the child that was

25   there as a witness.  The last child removed was the

66

1  private pay child, and her father wanted her to

2  stay.  We offered to put her on a plane, and he

3  said, no, the facility staff can do it.

4              SENATOR KOLKHORST:  Senator Menéndez.

5              SENATOR MENÉNDEZ:  Thank you, Madam

6  Chair.

7          Thank you for the detailed timeline.

8          Do we know how long the caseworker and --

9  everyone that touched this before it got sent up,

10 how long were they working for the Department?  Can

11 you get that to us?

12             MS. MASTERS:  So I do believe that --

13 and Rich will probably correct me, but I believe

14 these staff all had years of service.

15             SENATOR MENÉNDEZ:  Wow.  Okay.  So

16 it's not just -- well, interesting.

17         Do you -- in your opinion, was this a

18 failure of your process, or was this staff?  I think

19 I have a feeling for what your answer might be.

20             MS. MASTERS:  I do not think this was

21 a failure of process.  I mean -- and I heard clearly

22 no blaming.  So I'm not blaming.  None of us can be

23 everywhere at all times.  Everyone depends on

24 everyone up the chain to do what they are tasked

25 with doing.  And this is what did not happen here.

1  Policy was not followed.  I mean, naked pictures of

2  children in our care should have rang every bell.

3            SENATOR MENÉNDEZ:  The children that

4  were removed, you do know where they are?  Because

5  my concern is with the lack of an interoperable data

6  system, that, you know, we have to have an answer

7  where these children are today.

8            MS. MASTERS:  Absolutely.

9            SENATOR MENÉNDEZ:  Okay.  Very good.

10       So in the timeline, where do you feel the

11  most egregious mistakes were made?  Do you think --

12  you know, I think I know, but I would like to know

13  from you.

14            MS. MASTERS:  I think in the timeline

15  when you realized everyone was related, everything

16  was over at that point.  Because I think initially

17  everyone thought because the facility verified, hey,

18  it's just this one person, we fired them, everything

19  else is good.  Once we knew, no, she's got a sister,

20  an aunt, a cousin, two other -- and these are all

21  top level staff.  Two other people are roommates.

22  Then you have to assume everyone is lying.

23            SENATOR MENÉNDEZ:  My understanding

24  there were three people working there that were

25  roommates, and one of them was involved in it.  That

1   it was only when the sheriff's department showed up

2   to interview one of them that they found out, wait a

3   minute, you work there too.

4           MS. MASTERS:  Yes.  Staff did not -- I

5   don't think staff uncovered that.

6           SENATOR MENÉNDEZ:  So in the

7   background checks, is there not a question about

8   nepotism or anything like that when they do their

9   initial background checks to license them?  I mean,

10  I know you're not the person who licenses the

11  facility, but are we aware of that?

12          MS. MASTERS:  So I'm not sure what the

13  rules are for licensing a facility and

14  relationships.  I also -- if I am remembering

15  correctly, there was one group that was operating

16  this facility, and then maybe around November or

17  December, I believe, the operators may have changed.

18  And so I don't know what that looks like to be

19  notified, if they have to notify HHSC of those

20  changes, or the person that has the contract.  I'm

21  not sure.

22          SENATOR MENÉNDEZ:  You mentioned in

23  your timeline that an investigation of The Refuge

24  was conducted simultaneously by CPS and HHSC.  Can

25  you describe the coordination of your efforts?  How

```
 1  did -- what -- how did it look?  How did it take
 2  place?
 3                MS. MASTERS:  With the final when we
 4  realized what was going on?
 5                SENATOR MENÉNDEZ:  Uh-huh.
 6                MS. MASTERS:  I think at that time we
 7  called what we have as FITS.  And I know you're
 8  going to ask me what that means, and I'm not going
 9  to do a good job of telling you.
10                SENATOR MENÉNDEZ:  I guess my question
11  is, is there a process?
12                MS. MASTERS:  There is a process.  So
13  that should have been elevated.  HHSC and DFPS would
14  have come together and done what we call a FITS
15  where we staff the case together and make a decision
16  about what should happen.  And once it was elevated,
17  we had a FITS immediately, and that's when we had
18  the children gone within a day and a half.
19                SENATOR MENÉNDEZ:  Okay.
20                MR. RICHMAN:  The FITS stands for
21  "facility intervention team staffing."
22                SENATOR MENÉNDEZ:  Okay.  And when was
23  DFPS informed of the first statewide intake and any
24  actions that occurred afterwards?  What day was it?
25                MS. MASTERS:  1/24, I believe, is the
```

1  first intake that we received.

2              SENATOR MENÉNDEZ:  Was there ever a

3  situation before that that would have caused y'all

4  to take action sooner?

5              MS. MASTERS:  I can't speak to -- if

6  there were other intakes that didn't get routed to

7  us is what they're asking.  So Stephen would have

8  that.

9              MR. BLACK:  There have been I'm sure

10  other intakes on the facility, and also we would

11  also receive anything that doesn't rise to

12  abuse/neglect that we could send to licensing as a

13  possible standards.  So there have been reports that

14  we received on this facility in two months or so

15  prior but nothing that would have alluded to

16  anything like we saw in the intake on January 24th.

17              SENATOR MENÉNDEZ:  I have a big

18  concern about the -- the lack of knowledge in terms

19  of the relationships, the familial relationships

20  amongst the provider staff.  And so you -- because

21  it's licensing, it's not something that you would

22  bring up.  It's not something y'all would look into.

23  Because I understand that the background checks,

24  they had several discrepancies in there over the

25  last several months.

1          MS. MASTERS:  Yes, I'm not aware of

2   what those would be.

3          SENATOR MENÉNDEZ:  All right.  Thank

4   you.

5      Thank you, Madam Chair.

6          SENATOR KOLKHORST:  Members, any --

7   Senator Miles your light is on, I believe.

8          SENATOR MILES:  Thank you, Madam

9   Chair.  I've got -- I'm going to ask my colleagues

10  to be patient.  I've got a host of questions from

11  the timeline.

12          SENATOR KOLKHORST:  Speak in the

13  microphone.

14          SENATOR MILES:  I've got a host of

15  questions from the timeline to the history and the

16  systemic problem that we're having here in Texas.

17  So I'm going to -- I would rather defer my time to

18  last if it's at all possible, because I think

19  they're still going through the timeline at this

20  point.

21          SENATOR KOLKHORST:  Sure.

22      And, Members, any other questions?

23      You want to go last, or you want to go

24  now, Senator Miles?

25          SENATOR MILES:  Commissioner Masters,

72

 1  are y'all complete with your presentation?

 2                 MS. MASTERS:  We are finished going

 3  through the timeline, yes, sir.

 4                 SENATOR MILES:  Just with the

 5  timeline.  Are there any other questions from my

 6  colleagues?

 7                 SENATOR KOLKHORST:  Anybody have

 8  questions on the timeline?

 9            I have one quick follow-up.  You made the

10  statement that when the phone call came in on, I

11  believe, it was the 24th of January, and, you know,

12  I kind of circled the 26th because you said there

13  should -- this should have been elevated at that

14  point.  So we have initial intake on the 24th.  I

15  think your words were at that point that was a red

16  flag, or I'm not sure exactly what your words were.

17                 MS. MASTERS:  On 1/26 I think I said

18  all bets were off at that point when we knew that

19  everyone was related.

20                 SENATOR KOLKHORST:  Okay.  And so I

21  want to -- I just want to ask this question:  Then

22  you -- you also mentioned -- I circled 2/2, which --

23  and then I circled 3/3.  I mean, there's substantial

24  time lapse here.  It's weeks, months, a month and a

25  half.  So when -- I agree with you, when you

1  realize -- you know, I used the example one bad

2  actor, you remove them, you don't close the school

3  or you don't close the hospital.  But on 1/26, y'all

4  realize that there's relationships there.

5          One more time, why wasn't there action

6  taken?  I just don't understand that.

7              MS. MASTERS:  There is no good reason

8  why action wasn't taken.  Policy is in place that

9  would dictate that you should elevate this.  And the

10 caseworker did their job, and they elevated it to

11 their supervisor.  This supervisor stated that she

12 was disengaged.  And when she staffed --

13             SENATOR KOLKHORST:  The supervisor

14 herself?

15             MS. MASTERS:  Yes.

16             SENATOR KOLKHORST:  Is that the --

17 would you say -- okay.  So caseworker to supervisor.

18 I could go back to your org chart.  But the

19 caseworker -- I mean -- the supervisor themselves

20 said, "I was disengaged"?

21             MS. MASTERS:  Yes, when we talked with

22 her about how did you miss this?  And her full --

23 the full statement that I was given is not only was

24 she disengaged, but that her staff knew that if they

25 tell her too much, she will require a lot of work of

1   them.  So the culture that this supervisor had

2   created was unbelievable.

3              SENATOR KOLKHORST:  Can you define, if

4   we told her too much, or him, then it would require

5   a lot of work, what does that mean?

6              MS. MASTERS:  We still don't know what

7   that means.  Basically, the way I took it is if you

8   bother me a lot, you're going to pay for that.

9              SENATOR KOLKHORST:  Okay.  So

10  Commissioner Masters, this is something that I want

11  to say.  In talking to Governor Patrick many times

12  over the last few days, one of the things that we're

13  going to do is we're going to -- we don't want to be

14  a distraction.  Maybe I've heard that somewhere,

15  that the Legislature might be a distraction.  I

16  don't think we are.  We are accountable to the

17  people.  This is part of our job.  We create the

18  statutes that you have to then implement, and we

19  also budget your agency.

20             We are going to do at least quarterly

21  updates with some of these procedures because we

22  need to see progress.  I know you're reporting to

23  Judge Jack.  We're not going to be burdensome.

24  We're going to have some of the same oversight.  But

25  we are going to work to make this better because the

1   system, from what I'm hearing you say, was a

2   breakdown.

3              MS. MASTERS:  Yes.

4              SENATOR KOLKHORST:  And I've often

5   thought about this.  And this is Legacy, right?

6   This is not CBC.  This is Legacy.

7              MS. MASTERS:  It happened in both.

8   Both dropped the ball.

9              SENATOR KOLKHORST:  So you're saying

10  that CBC didn't elevate this to y'all?

11             MS. MASTERS:  Yes.  Their PD noted

12  that, "I think there's trafficking going on under my

13  nose," and they didn't elevate it either.

14             SENATOR KOLKHORST:  Was that on 1/26

15  as well?

16             MS. MASTERS:  That would be -- that

17  would be a summary of case notes from the caseworker

18  between 2/1 and, like, 2/24.  This is the PD.  This

19  is their. . .

20             SENATOR KOLKHORST:  So let's say on

21  1/26, a supervisor said, "I was disengaged," and it

22  didn't get reported.  So that is a human error,

23  correct?

24             MS. MASTERS:  Correct.  And that would

25  have -- on the 1/26, both DFPS and the SSCC would

1  have been notified because 1 and 2 is a Legacy child

2  and a SSCC child.

3            SENATOR KOLKHORST:  Before I go back

4  to Senator Miles, you can go through that whole

5  timeline with several questions, I just have to

6  wonder is it because it's so often that this happens

7  that we become callous to it, or is it just because

8  we're tired, we have Covid fog?  What is it?

9            MS. MASTERS:  I cannot make excuses

10 for this.  These allegations were significant.  And

11 so I really -- I can't blame this because you didn't

12 have to go look for it.  It's right there.

13            SENATOR KOLKHORST:  Okay.

14            SENATOR MILES:  Madam Chair.

15            SENATOR KOLKHORST:  Senator Miles.

16            SENATOR MILES:  I think it's

17 imperative right now at this particular point that

18 we get the elephant out of the room.

19        Was this supervisor part of the -- the

20 term "family" has been used several times today.

21 Was this supervisor part of the family, of the --

22 that we're having running down the operation?

23            MS. MASTERS:  No.

24            SENATOR MILES:  No.

25            SENATOR KOLKHORST:  Senator Perry and

77

1    Senator Menéndez, and then we'll come back to --

2                    SENATOR PERRY:  So -- and it's

3    Commissioner's credit that she's actually beginning

4    to have an open conversation about really hard

5    things.  Institutional bias cynicism.  And I'm going

6    to lay blame is.  Blame is on all of us at some

7    level, but let me put it a little bit to the press.

8    We are responsible for 24,000 kids in a system

9    today, I think, is kind of the number you gave me.

10   They're the hardest of the kids.  They're the kids

11   that have been mistreated.  We have bad people doing

12   bad things to kids.  And anytime one thing happens

13   that's bad, it's one time too many.

14            But guess what?  There's such an

15   unforgiving/obscure everybody involved from the

16   legislature to the first responders to the agency

17   workers to the caseworkers that we wonder why that

18   they don't want to not err on the side of public

19   safety.  So what makes that event so egregious is

20   they were just too lazy, didn't care, been there too

21   long, didn't want to address it.  It just wasn't one

22   of those issue that was going to be on the front

23   page if they did their job.

24            So I guess we've got a lot of soul

25   searching here to do.  And press has a relationship

1   and to report facts but not in a situation where

2   we're all guilty of not saving that one child that

3   we did everything we could.  But on this issue, to

4   your credit -- and we've had hard conversations,

5   right?

6                    MS. MASTERS:  Yes, sir.

7                    SENATOR PERRY:  I've pulled this from

8   you privately.  You've got to start talking about

9   culture shifts.  And at the risk of losing a lot of

10  institutional knowledge that we can't replace

11  tomorrow in some of these positions, sometimes it's

12  not who you cut loose but who you keep is your

13  biggest problem.  Thank you.

14                   SENATOR KOLKHORST:  Senator Menéndez.

15                   SENATOR MENÉNDEZ:  Thank you, Madam

16  Chair.

17                   Commissioner, now that you have observed

18  this problem, I'm assuming you're going to come up

19  with a process for when a caseworker who is here on

20  the front lines has reported something to their

21  supervisor, and the supervisor -- the problem that I

22  wonder is there has to be a transparent way for that

23  caseworker to know that something happened.  There

24  has to be some sort of check and balance to the

25  supervisor who otherwise has -- could have caused

Jaime Masters - 3/17/2022

79

1   something even much more horrible to occur.  One.

2   Please, let's work on that.

3            Number 2, do you participate in joint

4   staff meetings with DFPS to determine the level of

5   risk at a -- at a facility, at any particular

6   facility after reports of abuse or neglect?

7            MS. MASTERS:  So I do attend the FITS

8   meetings when they happen.  I'm not always available

9   to attend those, but, yes, executive level staff are

10  at those meetings.

11           SENATOR MENÉNDEZ:  And so when a high

12  risk determination is made, what happens?  What does

13  that trigger when that high risk -- as it was on

14  your timeline.

15           MS. MASTERS:  To have the FITS

16  meeting, the joint --

17           SENATOR MENÉNDEZ:  No, no.  Once the

18  high risk determination has been made, what happens

19  next?

20           MS. MASTERS:  Rich, do you want to --

21  so for that risk assessment when we're talking about

22  it determined it was a high risk?

23           SENATOR MILES:  Yes.

24           MS. MASTERS:  Yes.

25           MR. RICHMAN:  So when we're determine

1    that it's a high risk, that should be elevated to

2    the program director, which is the next level

3    supervisor.  So the way the structure is, you have

4    the investigator who was doing her job by telling

5    her supervisor.  Her supervisor was not doing her

6    job in providing that information to the next level

7    supervisor.  Within that, those investigator -- the

8    investigator along with the special investigator and

9    our HHSC counterpart worked on the -- they worked on

10   the information together to have the risk

11   assessment.  That's when it was discovered by our

12   staff that it hadn't been brought to our level at

13   state office, that that indicated we needed to do an

14   internal FITS.  And so at that time, that's when we

15   got together.  We took a look at everything.  We

16   took a look at the entire case and made the

17   determine after that -- determination after that in

18   our next process.

19            SENATOR MENÉNDEZ:  So when there's a

20   high risk determination made, it automatically

21   triggers that meeting, the --

22            MS. MASTERS:  Yes.  It should have

23   happened immediately when the first risk assessment

24   was done, but it didn't happen until a month later.

25            SENATOR MENÉNDEZ:  So now the

1   question, though, that should make all the sense in

2   the world to everybody is what's going to ensure

3   that the next time that happens?

4              MS. MASTERS:  That's the question.

5   Because when you have 13,000 staff here, probably

6   four times that at HHSC, you have to rely on people

7   doing their job because you can't be everywhere.

8   And if people choose not to do their job, then

9   children's lives are at risk.

10             SENATOR MENÉNDEZ:  Yeah, that's for

11  sure.

12       Okay.  So then what you're telling me is

13  that at two times it was the determined high risk

14  and it was not elevated, one on 2/2 and one on 2/17?

15             MS. MASTERS:  Correct.

16             SENATOR MENÉNDEZ:  Okay.  Here's the

17  question:  If there were a data system where someone

18  were to input and high risk was determined, it

19  would -- would it not be better if you could have an

20  automated response that would send the message and

21  you would haven't to rely on people?

22             MS. MASTERS:  Yes, if the risk

23  assessment was electronic and the moment that it

24  said high risk and some kind of alert to be sent,

25  that would make a difference.

 1              SENATOR MENÉNDEZ:  Okay.

 2              MS. MASTERS:  Yes.

 3              SENATOR MENÉNDEZ:  Well, yeah, because

 4    then we take the human element out of it at that

 5    point.

 6              MS. MASTERS:  Yes, you would.

 7              SENATOR MILES:  Thank you.

 8         Thank you, Madam Chair.

 9              SENATOR KOLKHORST:  I am going to go

10    to Senator Perry, and then we're going to go to

11    Senator Miles.

12              SENATOR PERRY:  What's the remedy or

13    disposition for those two supervisory mid-management

14    people?  I'll just tell you from an observation as a

15    business person, there's too many middle management

16    going on here.  But what is the disposition of these

17    two employees today?  Are they on administrative

18    leave?  Are they terminated?  Are they under review?

19    What's the process for them?

20              MS. MASTERS:  So the DFPS staff have

21    been released.

22              SENATOR PERRY:  So you terminated

23    them?

24              MS. MASTERS:  Yes.

25              SENATOR PERRY:  Thank you.

1          SENATOR KOLKHORST:  Members, Senator

2    Miles, I know you stated that you would ask the

3    committee's indulgence for a line of questioning,

4    and certainly that's what we're here for, Senator.

5          SENATOR MILES:  Yes, ma'am.  Thank

6    you.  I will ask my colleagues for indulgence as I

7    go through a few questions here, Madam Chair.

8          SENATOR KOLKHORST:  Yes, sir.

9          SENATOR MILES:  And let me thank you,

10   Commissioner Masters, and your staff for being here

11   today.  I've got a litany of questions here, so just

12   kind of roll with me and answer what you can for me

13   if you don't mind.

14          Commissioner Masters, you came -- you came

15   to Texas two years ago, and we got the chance to

16   spend some time together along with some of my other

17   colleagues, and we were excited about your presence

18   and you're coming in.  We considered you, and I

19   think you referred to yourself as the -- the

20   governor called you in as a "change agent."  Would

21   that be a correct statement you made a couple years

22   ago?

23          MS. MASTERS:  Yes, sir.

24          SENATOR MILES:  Yes.

25          And my colleague, Senator Perry, asked you

1   in his questioning earlier about change has been

2   made, and when we came -- let me back up a second.

3          We all agree that -- I think we can all

4   agree at this table that we brought you here to work

5   with us on a systemic problem that we have had for

6   some years in the state of Texas with our foster

7   care system.  And those of us that were here in some

8   part of the legislature in 2017, when we kind of

9   separated the baby, Madam Chair, when I say that, I

10  mean, we kind of separated DFPS and foster care from

11  HHSC.

12         And we were excited with your presence.

13  And going back to my colleague's question, he asked

14  in the two years that you have been here, he asked

15  you about the change.  Because we as legislators,

16  Madam Chair and colleagues, I think we have done our

17  part in trying to stay out of the way is what the

18  governor, the lieutenant governor asked us to do,

19  and not interfere.

20         But at the same time, we have been

21  stewards of the people's money, and we've given --

22  as I said earlier, we've given all the revenue and

23  all the resources that you've asked for .  But yet

24  here we are two years later, and we're facing what I

25  consider a nightmare for the State of Texas.  It's

1  not going to just make the front page, Madam Chair,

2  it's going to make MSNBC tonight.  MSNBC tonight.

3  There's a problem that we're having here in the

4  state of Texas, which is a sad thing.  A sad day for

5  us.

6           So I want to -- I want to ask you a few

7  questions.  I think my colleagues did a great job of

8  covering the timeline, unfortunately, as

9  disappointing as it was.  And I appreciate you being

10  straightforward and transparent to say that this is

11  a -- a mistake was made on the part of the

12  contractors that were employed by The Refuge.

13           But I've got some questions about how

14  we're going to not just fix and keep continuing to

15  provide resources.  But as I like to say where I'm

16  from, not just talk the talk but walk the walk,

17  Madam Chair.  So if you will allow me to just go

18  through some questions here.

19           The first one -- it's kind of difficult

20  for me.  My mother, I mean, I know was a juvenile

21  probation officer.  Spent time in Harris County as a

22  juvenile probation officer.  So I'm used to -- I

23  know some of the stories that some of these kids had

24  to deal with and actually had some of them in our

25  home for years.  As I was telling Commissioner Young

 1   last, it was always -- as a little kid it was always

 2   difficult for me because when they left our

 3   residence, it seemed like all my personal items left

 4   with them.  So I'm very familiar with some of these

 5   horror stories.

 6            But how much -- or do you still --

 7   Commissioner, do you still -- how do I put this?  Do

 8   you think the system is working, the separation from

 9   HHSC and DFPS?  The system that's in place now, that

10   we're responsible for and we take responsibility

11   for, do you believe that allowing DFPS to

12   investigate for abuse and HHSC to investigate for

13   child's rights standards, is that still working?  Do

14   you still believe and think it's effective, the

15   separation of those two?

16            MS. MASTERS:  So I came after the

17   separation.  I can't speak to how it was prior to.

18   I don't know what that relationship was like.

19            SENATOR MILES:  Could one of your

20   staff maybe?  Were they here to address --

21            MS. MASTERS:  Rich was not.

22            MR. RICHMAN:  No, I have only been

23   here six months.

24            SENATOR MILES:  Six months.

25            MS. MASTERS:  Yeah.  And Deneen came

1   after I did.  So. . .

2               SENATOR MILES:  For those who don't

3   remember, that's something that we did in the

4   legislature in separating the two.  And HHSC only

5   has the child's rights standards to work off of, and

6   DFPS has the investigation aspect of it.

7          Let me talk about some changes real quick

8   in the training.  Has there been any changes

9   instituted in your two years here that you've been

10  here for the last two years?

11              MS. MASTERS:  Yes.  Do you mean both

12  process and data changes?

13              SENATOR MILES:  Changes in training.

14              MS. MASTERS:  Changes in training?

15              SENATOR MILES:  Yes, ma'am.

16              MS. MASTERS:  No, I'm not aware of any

17  changes.  We have received further staff, but I'm

18  not aware of any enhanced training that has taken

19  place.

20              SENATOR MILES:  So in the two years

21  that you have been here and coming here as a "change

22  agent," there has been no training changes made with

23  DFPS?

24              MS. MASTERS:  No, the only training

25  changes that I have made is that our office of

1   accountability, I have asked them to bring

2   real-world scenarios to our training classes,

3   because I think that's one of the reasons for our

4   turnover, is that caseworkers don't actually

5   understand the severity or the weight of the job

6   that they are getting into.  And so I don't think

7   hypotheticals help.

8           I think what I've asked the accountability

9   team to do is here's a real case, de-identify it and

10  let the staff -- or let the trainers walk through

11  it, and then see what their outcome is based on the

12  actions they would have taken, and then to tell them

13  what actually happened.  And specifically with child

14  deaths so that they understand when we don't respond

15  the right way, when we don't connect the dots, this

16  is what the outcome should be -- or will be.

17          SENATOR MILES:  So outside child

18  deaths, there's been no additional training in the

19  last two years that you know of?  Is that what I

20  understand you're saying?

21          MS. MASTERS:  I'm sorry, Rich is

22  saying that there have been some in --

23          SENATOR MILES:  Richard, can you speak

24  to it, please?

25          MR. RICHMAN:  Yes, sir.  With respect

1    to training, especially since we're focusing on the

2    RCCI group, over the last year it went over a

3    complete supervisor/management change all the way

4    from the director field down.  And so some of the

5    things that we have instituted with that formalized

6    training is we have created a formalized mentor

7    program within that group itself to basically help

8    the new employees who are hired, to be able to

9    shadow them, to be able to provide them with the

10   tools necessary to do their investigations.

11           In addition to that, we revamped our basic

12   skills and development for the investigators as well

13   as for the -- as the supervisors.  So that's a block

14   of training that we were providing for both the

15   groups.  So they revamped it and they put a lot more

16   information in it so they could recognize the signs

17   of abuse better so that they could gather evidence

18   better.  As well we require two hours of continual

19   training each month for every personnel in RCCI.

20           So we have increased the amount of

21   training that we have done.  And we're constantly

22   looking for new things to be able to provide them

23   with more tools necessary to get more training,

24   because we understand it needs to be continual and

25   consistent.

90

```
 1              SENATOR MILES:  So, Mr. Richman, let
 2   me ask, has there been any -- let's speak about
 3   compliance and competency in training of the DFPS
 4   monitor investigators.  Can you speak specifically
 5   to any increased training?
 6              MR. RICHMAN:  Not to the monitors, no,
 7   sir.
 8              SENATOR MILES:  Sir?
 9              MR. RICHMAN:  Not with respect to the
10   monitors' training.  We don't train the monitors.
11              SENATOR MILES:  How about just
12   monitoring their compliance?
13              MR. RICHMAN:  I'm sorry, I'm having
14   trouble hearing you.
15              SENATOR MILES:  How about just
16   monitoring their compliance?   Do we -- how do we
17   monitor?
18              MR. RICHMAN:  We have discussions with
19   our staff about the monitors and about making sure
20   that everything they do is written, documented, and
21   done properly as if -- the whole goal is to make
22   sure that our investigators are doing their job in
23   an unbiased, thorough manner so that regardless of
24   monitoring, they're doing everything above the board
25   so that if something is looked at by the monitors,
```

1   they have everything they need to see that we're

2   doing thorough investigations and following our

3   processes in place.  Is that the question you were

4   asking, sir?

5              SENATOR MILES:  Not really.  I'm more

6   interested in how are we making sure they're in

7   compliance, our investigators, and have there been

8   any increase with the resources that we have given

9   you-all in the last two bienniums, has there been

10  any increase in training of these monitors?  And how

11  are we holding them in compliance?

12             MS. MASTERS:  I'm not sure that -- so

13  it's probably the word "monitor" that may be

14  tripping us up.  When we think monitors, we think

15  the federal lawsuit.  We don't have, per se,

16  monitors.

17             SENATOR MILES:  Let's take -- I agree

18  with you.  Let's talk about your investigators and

19  your caseworkers.

20             MR. RICHMAN:  Okay.  So with respect

21  to those that are looking over their work, is that

22  where we're talking about with the monitor?  Okay.

23      So we would call that complex

24  investigation division as well as our supervisors,

25  because the complex investigation division, the

1   complex investigator themselves -- or complex

2   investigation investigator, their job --

3                    SENATOR MILES:  If I could stop you

4   there.  Is that the group that investigates the

5   sexual offenses that you spoke about earlier?  Is

6   that what -- how you're referring to them?

7                    MR. RICHMAN:  All of my investigators

8   would investigate sexual assaults and things of that

9   sort, sexual abuse, in those facilities.

10                   SENATOR MILES:  Correct me if I'm

11  wrong, I thought I heard you say earlier that you

12  have a special type of retired law enforcement that

13  investigates sexual offenses.

14                   MR. RICHMAN:  Yeah, so to be clear, I

15  have a group, they're called my special

16  investigation group.  And what they are is they're

17  made up of retired and -- well, and formerly active

18  law enforcement, that have law enforcement

19  experience, such as myself -- I retired from the

20  Austin Police Department -- who have those skills

21  that they had gained while they were in law

22  enforcement.  We brought them over to DFPS, and we

23  trained them as child protective investigators.  So

24  they have both worlds.

25                   SENATOR MILES:  Who trains them?

```
 1              MR. RICHMAN:  That would be our CLOE,
 2   what we call our training division for DFPS.
 3              SENATOR MILES:  And describe to me
 4   CLOE and what they're made up of.
 5              MR. RICHMAN:  So I'm sorry about the
 6   acronym, but basically it is our training -- our
 7   training group that they spend full time in creating
 8   curriculum and making sure that each one of the
 9   lesson plans are solid and making sure that they
10   train our entire work group, whether it be child
11   protective investigations, whether it be CPS,
12   whether it be our special investigation group.
13          In addition to this, we also have training
14   programs within each one of these programs, whether
15   it be RCCI or the special investigation group, where
16   they will train.  A lot of my former law enforcement
17   are also TCOLE or TCOLE instructors, which is the
18   Texas Commission of Officers on Law Enforcement.
19              SENATOR MILES:  I'm a former police
20   officer.  So I'm familiar with it.
21              MR. RICHMAN:  So we utilize their
22   previous training as well to -- they work with CLOE
23   to ensure that they're bringing those tools
24   necessary to our entire work group for child
25   protective investigations.
```

1          SENATOR MILES:  And, Mr. Richman, is

2    it safe for me to say that you personally sat in

3    some of these training programs yourself?

4          MR. RICHMAN:  I have.  Since I've been

5    here, I've sat in some of the training.

6          SENATOR MILES:  And you have been here

7    six months?

8          MR. RICHMAN:  Yes, sir.

9          SENATOR MILES:  So that's not a long

10   time.  So how many of those training -- well, how do

11   you define "some of them" out of six months?

12         MR. RICHMAN:  So of those times -- I

13   asked my staff to let me know what's going on in the

14   local area and in addition to other areas, too.  So

15   we have -- they have -- each training group also has

16   training seminars that they conduct annually.

17         SENATOR MILES:  So in six months, can

18   you put a number to it, respectfully, Mr. Richman?

19         MR. RICHMAN:  I'm sorry, I didn't

20   understand your question.

21         SENATOR MILES:  In the six months that

22   you have been here, can you put a number to the time

23   that you have actually sat in on the training?

24         MR. RICHMAN:  Five times.

25         SENATOR MILES:  Thank you, sir.

1          Commissioner, I'm going to ask, have you

2   sat in any of those training programs?

3               MS. MASTERS:  Only once.

4               SENATOR MILES:  Not once?

5               MS. MASTERS:  Only once.

6               SENATOR MILES:  Only once in two

7   years?  Okay.

8          Do you think it's important -- how

9   important do you think training is of your

10  caseworkers and your investigators and things of

11  that nature?  How would you prioritize that in your

12  operation?

13              MS. MASTERS:  That is the first --

14  that's the priority is that they're trained well.

15              SENATOR MILES:  And during the last

16  two years, do you think we have given it the proper

17  priority, proper attention?  In the last two years,

18  do you think we have given it the proper attention?

19              MS. MASTERS:  I think we have.  I

20  think our training that is provided is very

21  thorough.

22              SENATOR MILES:  Okay.  Well, I'll ask

23  you the same question as I asked LBB.  Do you know

24  how much of your budget you think you're roughly,

25  you may be spending?

1          MS. MASTERS:  I don't know how much

2     our training budget is.

3               SENATOR MILES:  But you're going to

4     state --

5               MS. MASTERS:  I'm sorry?

6               SENATOR MILES:  -- that it's a

7     priority to you?  But you can't tell me --

8               MS. MASTERS:  Yes, our training is a

9     priority to us.

10              SENATOR MILES:  Okay.  I'm going to be

11    interested -- I think all of us are going to be

12    interested in seeing how much money we're actually

13    allocating to training, especially in the last two

14    bienniums.  I think that's going to be very

15    important for us.

16         Mr. Richman -- am I saying that right?

17    Richman?  That's a great name, Robert Richman.

18         What changes, if any, would you make or

19    recommend in your training programs seeing as how

20    you have only been here with us six months?  Have

21    you identified some changes and have any been made

22    in the short period of time that you have been here?

23              MR. RICHMAN:  So what I do when I sit

24    in these trainings, I look at each one of my

25    programs and each one of the divisions and what --

 1   the very first thing I'm doing is making sure --

 2               SENATOR MILES:  Let me -- I'm sorry.

 3   Let me ask first, do you think six months has been

 4   enough time for you to get a grip in the hands,

 5   especially where it relates to your investigators

 6   and your -- and your caseworkers?  I think that's a

 7   fair question for you first.

 8               MR. RICHMAN:  I would say that it

 9   was -- it's -- with the special investigation group,

10   absolutely, because that was my wheelhouse before.

11   The child protective investigators, I feel that

12   myself, I need some more time with them.  The

13   residential care investigators, I feel that I've got

14   a good grasp on their needs.

15         The CPI division, that's the child

16   protective investigators, that's my largest group of

17   folks.  They do some things that were out of my

18   personal wheelhouse that I am actually learning, and

19   that's a lot of the -- a lot of the things that have

20   to do with the wraparound services and other care

21   that they provide outside of the traditional law

22   enforcement type investigations.  And so I'm

23   bringing myself up to speed on all of the programs

24   so that we can make them better.

25               SENATOR MILES:  So it would be a fair

 1  question to ask you in six months if you've made any

 2  recommendations for training changes?  I'm trying to

 3  be fair as I possibly can because you've only been

 4  on the job for six months.

 5              MR. RICHMAN:  So, yes, there's some

 6  things that I took particular attention to.  One is

 7  the way that we do our fatal investigations and

 8  making sure that our evidence gathering, our

 9  photographs are -- everything that has to do with

10  that investigation is up to par with current

11  standards, not just within the standards of best

12  practices amongst other child protective agencies

13  within in -- in the nation, but also in making sure

14  that it's up to par with what we have going on with

15  our partners in law enforcement.  Because many times

16  the things that we gather end up being in a case

17  with law enforcement since they are our partners and

18  we work hand in hand.  So I focused on that.

19              I've also focused on our runaways and

20  making sure that we have special attention to those

21  runaways and that our special investigators are

22  provided with additional training to track them down

23  utilizing the resources they have.  So those are a

24  couple of the programs, but there are some others,

25  too, that I have been part of.

1      SENATOR MILES:  So let me -- let me

2  close you out with this particular line of

3  questions.

4      Do you think as it relates to The Refuge

5  incident that your investigators and everything was

6  handled properly?  Is there anything that you would

7  have like to have seen done differently as it

8  relates to the investigation and the case working

9  and the -- and the report being made?

10      MR. RICHMAN:  I feel like the

11  caseworker was identifying issues as she developed

12  her case and saw these.  I feel they could have done

13  a better job in ensuring that those were brought to

14  a higher level of attention.

15      SENATOR MILES:  When you say "they

16  could have," which would mean --

17      MR. RICHMAN:  That would be my entire

18  staff.

19      SENATOR MILES:  Your entire staff.

20      MR. RICHMAN:  My entire staff.  And I

21  would say that would be -- they belong to me.  I'm

22  responsible to the Commissioner.

23      The investigator, there was -- she was

24  developing these things.  The special investigator

25  was also looking at those items that had to do

1  with specifically to the photos, specifically to the

2  allegations of drugs being possibly distributed

3  within the facilities.

4        SENATOR MILES:  And let me stop you

5  right there.  The drugs that we were speaking about

6  all day today, were those drugs used by the staff,

7  or were they given to the clients?

8        MR. RICHMAN:  So the allegation was

9  that those were given to the children that were

10  there, the youths that were in there.  There's no

11  allegation that any of the drugs were being used by

12  staff.

13        SENATOR MILES:  Okay.  Well, I want to

14  thank you for those questions.

15        If you'll allow me to go further, Madam

16  Chair, I've got a few more questions here.

17        Commissioner, are you notified in

18  suspected reasons or to believe in cases when -- are

19  you immediately notified -- when do you personally

20  find out of a sexual allegation within your agency?

21  How long do you find out and what is the process for

22  you to find out?

23        MS. MASTERS:  For situations like what

24  we're talking about today?

25        SENATOR MILES:  Yes, ma'am.

101

 1                    MS. MASTERS:  When there is a FITS

 2    called.  So when that joint meeting is called

 3    between myself and HHSC, that is how I get notified.

 4                    SENATOR MILES:  When you say "joint

 5    meeting," can you talk -- speak on that a little bit

 6    further?

 7                    MS. MASTERS:  Yes.  So our FITS

 8    meetings is when HHSC and DFPS come together to

 9    staff a high risk case and to make a decision about

10    how we are going to move forward together on the

11    facility.  And so that is elevated to the executive

12    staff when that happens.

13         Now, case-by-case things are also brought

14    up randomly.  Anything that shows up in the news,

15    could potentially show up in the news, anything that

16    is abuse of a child that is in care is something

17    that I expect to know about.

18                    SENATOR MILES:  Okay.  So is there any

19    priority placed on allegations or claims when it --

20    as it relates to sex or as it relates to

21    life-threatening?  I mean, I'm trying to figure --

22    I'm trying to simply figure out how quickly are you

23    notified, you directly as commissioner?

24                    MS. MASTERS:  At the moment that these

25    guys are notified by their staff, they should be

 1  telling me immediately.

 2              SENATOR MILES:  Same day.  So same day

 3  they find out?

 4              MS. MASTERS:  Same day, yes.

 5              SENATOR MILES:  Same time they find

 6  out, same time you're going to find out.

 7              MS. MASTERS:  Absolutely.

 8              SENATOR MILES:  Okay.  Thank you for

 9  answering that for me, clarifying that.

10          This is kind of a difficult -- Madam

11  Chair, if I'm speaking out of turn because I'm going

12  to talk -- I'm going to speak about the court case.

13  I'm going to refer to the court case.  If that's

14  something that we're not. . .

15              SENATOR KOLKHORST:  The federal court

16  case?

17              SENATOR MILES:  Yes, ma'am.

18              SENATOR KOLKHORST:  Sure.

19              SENATOR MILES:  Commissioner Masters,

20  according to the court appointed experts hired by

21  you and the plaintiffs in the foster care lawsuit in

22  federal court, increase in payments of foster care

23  and placements with families could fix a lot of

24  problems.  We spoke about that earlier today.

25  18 percent of our children without placements are

1  from disruptive kinship placements.  Why wasn't that

2  an agency -- why was that agency increase rate

3  payment not considered when we gave you-all the

4  resources that we've given you over the past -- I

5  know you have only been here for two years, but why

6  was that not a consideration?

7          MS. MASTERS:  So I believe the last

8  session you-all did do some increases for kinship.

9  I think what they are recommending and what we

10  see -- and we have -- we actually have a work group

11  going on between both us, HHSC and our providers to

12  look at what that would look like to overhaul our

13  kinship program.

14      What they are saying is our kinship

15  providers should be paid the same as our regular

16  foster rate, and we are looking at also should there

17  have been an abbreviated --

18          SENATOR MILES:  That price is 11.55

19  per day, am I correct?

20          MS. MASTERS:  Yes.  And should there

21  be an abbreviated application.  And, again, that

22  gets into licensing.  And I can't speak totally to

23  that, but I think what we are seeing in other states

24  is if a kinship home, grandma, would not have to

25  jump through the same hoops that a GRO might have to

1    jump through, that they're -- that we've heard some

2    states -- like, Florida, I belive probably is a good

3    example, that has totally overhauled their kinship

4    program to increase the number of children placed in

5    with kin, because we all know that's less trauma for

6    a child.  Reunification is more likely.  It just --

7    it makes sense.

8                SENATOR MILES:  So overall you would

9    call it a success in the state of Florida?

10               MS. MASTERS:  What they have done with

11   their kinship program?  From what we have seen, yes.

12   We have met directly with them.

13               SENATOR MILES:  And to your knowledge,

14   and maybe one of my colleagues can answer that --

15   answer this question, is there anything in the

16   statute preventing you, your agency from increasing

17   that rate from 11.55 to --

18               MS. MASTERS:  Yes, I don't have the

19   authority to do that.

20               SENATOR MILES:  You don't have the

21   authority to do that?

22               MS. MASTERS:  I do not.

23               SENATOR KOLKHORST:  I have a follow-up

24   to that, Senator Miles.

25               If a kinship family chooses to go through

1  licensing, foster care licensing, they get the same

2  rate; is that correct?

3              MS. MASTERS:  Yes.  What we see and

4  what they see across the state is -- for instance,

5  if we keep using grandma, that's an overwhelming

6  process for her, or grandpa, to go through, and can

7  be intimidating.  And I think sometimes we

8  struggle -- even when I think we have staff to help

9  them kind of through that process, it still seems to

10  be a struggle for them to either finish it or want

11  to even take that on.  And, again, I know a little

12  bit about some of everything, and, you know, others

13  may be better able to speak to the details.

14              SENATOR KOLKHORST:  Do you have any

15  kinship navigators?  Do we have kinship navigators

16  in our system?

17              MS. MASTERS:  Yes, we do.

18         Deneen, do you want to speak to that?

19              SENATOR KOLKHORST:  Well, you don't

20  have to bring her up.

21              MS. MASTERS:  Okay.

22              SENATOR KOLKHORST: But we do have

23  kinship?

24              MS. MASTERS:  I believe that we do.

25  Again, I know we have talked about this quite a bit,

 1   whether or not we have --

 2                   SENATOR KOLKHORST:  We'll get into

 3   this in our next hearing.  We're staying, you know,

 4   in -- we've got two more panels, and so --

 5                   SENATOR MILES:  I've only got two more

 6   questions, Madam Chair.

 7                   SENATOR KOLKHORST:  Yes, sir.

 8                   SENATOR MILES:  Madam Chair, and I

 9   want you to know that when you and I, my first year

10   in the House, when you and I served together, as

11   well as Senator Menéndez and Senator Perry were all

12   in the House together, that was one of the first

13   bills I filed.

14                   SENATOR KOLKHORST:  Speak into that

15   mic.

16                   SENATOR MILES:  That was one of the

17   first bills I filed, kinship care back in 2007.  And

18   here we are today in 2022 discussing it.

19                   SENATOR KOLKHORST:  You missed my

20   opening remarks about --

21                   SENATOR MILES:  I did.  I'm sorry.

22                   SENATOR KOLKHORST:  -- the circle,

23   that we seem to keep going.

24                   SENATOR MILES:  Going in.  Okay.

25              And the last couple of questions, and

1  these are kind of difficult questions.  So just

2  follow with me.

3           When CPS investigators rely on court

4  documents rather than conduct their own fact

5  findings, fact findings, how does it affect the

6  separation of power that I spoke about earlier?  In

7  my office, constituents have made very strong

8  complaints and have had CPS dismiss allegations

9  using court documents that are years old instead of

10  using realtime reality of what's going on, and I'm

11  wondering if that separation that we did in 2017 is

12  the cause of that.  Do you understand?  Do you

13  follow me?

14           MS. MASTERS:  I don't think I'm sure

15  what. . .

16           MR. RICHMAN:  What documents are

17  you -- are you referring to what -- which program

18  would you be specific to?  For residential care

19  or --

20           SENATOR MILES:  That's going to go

21  back to the child's rights standards and -- the

22  child's rights standards.  When we separated that,

23  when we separated HHSC and DFPS, DFPS no longer has

24  to rely on those child's rights standards.  Are you

25  familiar with the child's rights standards?

1          MR. RICHMAN:  I'm not with regard to

2   child protective investigations.

3          SENATOR MILES:  Yeah, because you

4   haven't had to deal with it.

5          MS. MASTERS:  Any standards that are

6   in place for the rights of the children would not

7   have been void because of a split.  I'm not -- I'm

8   not sure if you can give much detail in this open

9   setting of what you're speaking to.

10          SENATOR MILES:  The problem is that

11   DFPS, Madam Chair, no longer has the right to

12   enforce those child standards.  It falls back,

13   Senator Perry, on Health and Human Services.

14          SENATOR KOLKHORST:  Which we are about

15   to hear from.

16          SENATOR MILES:  Okay.

17          SENATOR KOLKHORST:  You're talking

18   about the separation of licensing?

19          SENATOR MILES:  Yeah.  DFPS is working

20   with our children every day.

21          SENATOR KOLKHORST:  Speak into the

22   mic.

23          SENATOR MILES:  DFPS is working with

24   our children every day, but their rights are being

25   held Health and Human Services, HHSC.  I think that

1  we maybe have been the cause of that.

2           SENATOR KOLKHORST:  Well, I think how

3  it's separated is, DFPS is in charge of the child,

4  the wraparound services.  I would look at HHSC as in

5  charge of the physical buildings.

6           SENATOR MILES:  That's correct.  And I

7  would venture to say that we should put those

8  child's rights back with DFPS because they're

9  dealing with the children.

10          SENATOR KOLKHORST:  There's been

11  deliberate debate on that, and we'll continue to

12  have that, and that's what this committee is for.

13          SENATOR MILES:  And last but not

14  least, when you audit your data, Commissioner, how

15  do you ensure that the investigators -- or you could

16  probably answer this, Mr. Richman as well -- that

17  the investigators upload all the evidence that they

18  suppose are current so that the particular case

19  enters your tracking system?  Are there any failsafe

20  mechanisms that ensure that all the data is being

21  entered into?  And do you know of any instances of

22  the files being deleted?  Or do you know of any of

23  this not being reported properly on investigators?

24          MR. RICHMAN:  Okay.  Let me answer the

25  last part first, which is do I know of any incidents

Jaime Masters - 3/17/2022

110

 1  of it being deleted.  No.

 2              SENATOR MILES:  Six months.

 3              MR. RICHMAN:  The first part, how do

 4  we ensure that they are being uploaded.  This goes

 5  back to the supervisor reviewing the work of the

 6  investigator to ensure that they're not just looking

 7  at -- they're not just having a verbal briefing but

 8  they're also doing case reads.  So they're looking

 9  over all the documentation that's loaded up into the

10  system.

11          Now, what's unique with these

12  investigations are is that they use two systems.

13  They use the HHSC class system, which helps us with

14  our collaborative investigation with HHSC, with our

15  partners there.  But we're also using Impact 2.0,

16  which is another system that we're using to put the

17  reports in as well.  So they are responsible for

18  reading the documentation out of both systems.

19              SENATOR MILES:  Which I'm glad you

20  brought up.  Do you see that as a problem in your

21  professional opinion?  We're using two different

22  systems when we're talking about the same case and

23  the same -- in this particular instance, we're

24  talking about the same kid or the same complaint.

25  But we're not communicating properly, I don't think,

1   with our other agencies that are also involved.  So

2   can you comment on that in your short period of

3   time, respectfully?

4             MR. RICHMAN:  I find that it poses

5   challenges with our ability to be able to do -- and

6   I'll take this from my personal perspective.  Is

7   when I reviewed these cases personally involving

8   this specific incident, I had to go to two different

9   systems to make sure that the timeline was

10  consistent, all the information was there, but it

11  made it a challenge.  So if it's a problem for me, I

12  would suspect it's a problem for my supervisors.  It

13  would be a problem for our investigator who loads

14  that information up.  So I think it's more of a

15  they're doing it and they're doing it well.  It's

16  just an additional step.  It's inefficient, in my

17  opinion.

18            SENATOR MILES:  And, Mr. Richman, I

19  want to thank you for your transparency in answering

20  that question.

21         I want to thank you, Madam Chair, for

22  allowing me the line of questions.  And I thank my

23  colleagues for giving me the time.

24            SENATOR KOLKHORST:  Thank you, Senator

25  Miles.  I know your passion in this area and

Jaime Masters - 3/17/2022

112

1   appreciate your leadership.

2           Senator Perry.

3                   SENATOR PERRY:  Thank you, Madam

4   Chair.

5           And this goes to Commissioner.  And so I'm

6   going to -- I'm going to ask our -- I'm going to set

7   the stage for things that I would hope to have

8   before we come back for the next hearing.  And I

9   think it's important, as I said in my opening

10  statement, this is your opportunity as an agency and

11  your personal opportunity to show bold, courageous

12  leadership, no areas of topic off limits, and say

13  what needs to be said and say it in a way that we

14  can respond to it as a legislature.

15                  MS. MASTERS:  Yes, sir.

16                  SENATOR PERRY:  We're all in this

17  together.

18          So I would like your opinion if the CBC

19  process is the right process.  Not today.  But

20  before you come back and possibly if you could do it

21  before the next hearing so we can come prepared to

22  ask direct questions.  Is the CBC process the right

23  process, and are we on the right track.  Problems

24  with it.  Things that we have done that have created

25  barriers.  Things that we could undo that would help

 1   it go further.  If it's the correct process.  So put

 2   that one on your list.  I need information on where

 3   we're at and is it the right process and what is the

 4   problem from doing it.

 5           Family reunification training.  So you

 6   made a comment you have -- and I think it's good

 7   that you would set a caseworker down with the

 8   outcome already redacted, basically, and say where

 9   would you come up on this.

10           MS. MASTERS:  Yes.

11           SENATOR PERRY:  I would only ask in

12   that that you don't focus on the kid that died only

13   because then you jade and you tarnish the learning

14   experience.  And you should have cases in there

15   where reunification in fostering occurred so that

16   people that have this mindset I've got to protect

17   the child at all costs and I can't make the wrong

18   decision here don't get jaded by your training.  So

19   make sure that the positive aspect of what your

20   agency does -- and I think that to be fair, we don't

21   always recognize all the good things that your

22   frontline workers do.  So make sure that's part of

23   your training.

24           CWOP kids.  I want an honest assessment

25   from you.  Those are the toughest of the toughest.

1  And if it were up to you or you thought you could,

2  and maybe you do it and you can answer this, do you

3  have juvenile referrals?  Do you refer them to JD

4  juvenile justice system?

5           MS. MASTERS:  It's actually the

6  reverse.  I think if there's something we could

7  change is that people wouldn't just be able to drop

8  kids off without us having an opportunity to find a

9  proper placement for them.  And a lot of times that

10 happens with our juvenile justice kids, the

11 time supports --

12          SENATOR PERRY:  So you're saying there

13 are kids going into juvi, that y'all could do a

14 better job under the CWOP issues?

15          MS. MASTERS:  We're sort of the --

16 we're sort of the fallback for everyone and often

17 without an ability to do our due diligence.

18          SENATOR PERRY:  When we come back

19 if -- and, Madam Chair, I'm not setting your agenda,

20 but I think these are important topics because we

21 have kids that are extremely disruptive to the

22 whole, arguably need very unique help.  And this

23 happens in our public school classrooms.  It's not

24 unique to you.  That we need to recognize that what

25 we are doing is not working, and if we continue down

115

```
 1   this path, we ruin the whole thing for everybody
 2   else.
 3          So CWOP specifically and what you see you.
 4   You've given me some ideas privately, and I won't
 5   disclose those because I don't know what was ready
 6   for primetime or not.  But this is your window to
 7   share.  And it kind of goes along with those
 8   wraparound services that we have spoke to in general
 9   and some other things.  So we may be spending all
10   this money, but we're not putting it to best use.
11          And then finally, and kind of the bigger
12   picture, if you were king for the day, and I'm
13   telling you this is your opportunity to show us what
14   you would think needs to be changed.  Because here's
15   what I'm at.  It's a sad commentary.  I don't have a
16   clue if what we are doing is right or wrong or the
17   best practices.  And we felled out of the system.
18   We split the baby.  We went down a privatization.  I
19   do have this specific question you may can answer.
20          We dropped 1,500 state employees that used
21   to be direct frontline child protective services
22   employees that were probably involved in fostering
23   and other features, actually, to the CBC process.
24   Are they required to have at least that many
25   replacements?  Because I don't think anybody will
```

1   ever make me believe that you can do it with less

2   people.

3              MS. MASTERS:  No, there should be --

4   there is a direct transfer of those resources.

5              SENATOR PERRY:  But does CBC get to

6   drop the staff ratio or the foster care ratio?

7              MS. MASTERS:  No.

8              SENATOR PERRY:  Okay.  So they have to

9   maintain.  Okay.  Good to know and I'm glad I asked

10   that.

11              SENATOR KOLKHORST:  I'm pulling it

12   back to today's hearing.  Stay on today's hearing.

13              SENATOR PERRY:  So -- but -- well,

14   this is setting up, as I said, for the next hearing.

15   Because if we come in here and we don't have this

16   information, it's going to be a third hearing and a

17   third hearing.  Honestly, I spent ten months with

18   you people last year, and I don't want to make this

19   my summer program.

20              SENATOR KOLKHORST:  I don't want to

21   see you back up here, but I will.

22              SENATOR PERRY:  So I would ask you to

23   give a white paper effectively that said if I could

24   make these changes, I can almost with some

25   certainty, at least a better certainty than what we

```
 1  have today, kids' lives would be changed, families
 2  could be put together, our foster system could
 3  flourish.  And that's what I'm looking for.
 4                  MS. MASTERS:  I can do that.
 5                  SENATOR MILES:  Clarification.  Point
 6  of clarification.
 7                  SENATOR KOLKHORST:  Senator Miles.
 8                  SENATOR MILES:  I just want to make
 9  sure I hear her answer correctly.
10          You didn't state to the Senator that
11  CWOP -- with the CWOP clients, you could do a better
12  job than our system, the juvenile detention system?
13  Is that what you -- that's not what you said?
14                  MS. MASTERS:  No, no, no.
15                  SENATOR MILES:  I just wanted to make
16  sure we had that clear.
17          And, Madam Chair, if I could.
18          We've had conversation, us people, that
19  our senator's referring to, we've had a conversation
20  about a military style -- more of a military style
21  CWOP program we thought was needed toward the end of
22  last session.  And I think that's something that you
23  should add to your list, Senator Perry, that we
24  should be looking at.
25                  SENATOR KOLKHORST:  We will be setting
```

1   up several hearings, and there will be topics that

2   we will stay to.  And today, again, specific to not

3   just this case but our processes of residential

4   treatment centers and GROs, and then we'll move into

5   other areas.

6         We're going to wrap this panel up.  So it

7   needs to be real urgent, Senator Menéndez.

8              SENATOR MENÉNDEZ:  Thank you, Madam

9   Chair.

10        So, Commissioner, as it relates, relative

11  to The Refuge, the way I see it, based on what I

12  have heard, an automated interagency alert system

13  that would have created a statewide notification to

14  your office when there was a high risk assessment

15  would have cut off weeks of time.  It would have

16  gotten you-all in there quicker.  Was that correct?

17             MS. MASTERS:  Yes.  At the time that

18  that risk assessment was done, yes.

19             SENATOR MENÉNDEZ:  Okay.  I also heard

20  Mr. Richman testify that he has to input the same

21  data in two different systems.  Is that correct?

22             MR. RICHMAN:  Similar data.

23             SENATOR MENÉNDEZ:  Similar data.

24             MS. MASTERS:  And it's actually

25  even -- even to put this timeline together, it took

1  us seven hours because we had to look in three

2  places to make sure we had all of the information.

3  Because if we would have shot from the hip from one

4  system, the other one would have told a different

5  story.

6          SENATOR MENÉNDEZ:  So clearly an

7  interoperable data system would make not only

8  everyone's job's easier, it would help you -- it

9  would help us keep children safer because it would

10 be realtime data, knowing exactly where they were;

11 is that correct?

12         MS. MASTERS:  It would have been

13 helpful.

14         SENATOR MENÉNDEZ:  So I would also

15 think that you need to have clearly defined nepotism

16 guidelines for contracting with DFPS and likely for

17 licensing on HHSC and clear guidelines for the

18 investigators so that they can get notified on the

19 action items that they have taken to their

20 supervisors.

21     And then the last question, Mr. Richman,

22 how much actual training do your investigators get?

23 There seems to be a little bit of a confusion.  Is

24 it in hours?  Weeks?  Days?  How do you measure it?

25         MR. RICHMAN:  Initially, it's in

1   weeks.  And I would have to get you the specific

2   timeline of how it's broken down.  And there's also,

3   with my child protective investigators, they have

4   different phases of accomplishments that they can

5   gather as they go to the next process and gather

6   more learning.

7         With the special investigators, it's the

8   same way.  We're constantly doing training within

9   and -- but I could get you a better answer later

10  that actually has a breakdown of it.

11         SENATOR MENÉNDEZ:  Commissioner, I

12  want to close with this.  I want to thank you for

13  recognizing that there are good people in this state

14  who would drop everything to take care of their

15  grandchildren or their loved ones and who can barely

16  afford basic repairs to their home or their cars

17  much less going through a licensing process.  But I

18  know for a fact that many children would be better

19  off if somehow their loved ones would be able -- but

20  they don't have cribs, they don't have formula, they

21  don't have diapers when they get the call in the

22  middle of the night.  And so many of them figure out

23  a way, but some just can't.  Thank you.

24         Thank you, Madam Chair.

25         SENATOR KOLKHORST:  Senator Eckhardt,

Jaime Masters - 3/17/2022

121

 1   do you have any follow-up?

 2                  SENATOR ECKHARDT:  No.  I wanted to

 3   thank any committee members.

 4                  SENATOR KOLKHORST:  Great.  Thank you,

 5   Senator Eckhardt.

 6          I will end it with -- I did have one

 7   question that wasn't asked.

 8          How many girls were on child specific

 9   contracts at The Refuge?  Do we know?

10                  MS. MASTERS:  Deneen, how many?

11                  SENATOR KOLKHORST:  Come and identify

12   yourself.

13                  MS. MASTERS:  How many Legacy kids

14   were there?

15                  MS. DRYDEN:  Six.

16                  MS. MASTERS:  Six.

17                  SENATOR KOLKHORST:  Why don't you come

18   to the table and state your name.

19          Again, how many children were on child

20   specific contracts at The Refuge?

21                  MS. DRYDEN:  I believe all were.

22                  SENATOR KOLKHORST:  Will you state

23   your name for the record?  State your name for the

24   record.

25                  MS. DRYDEN:  Deneen Dryden, associate

1    commissioner, Child Protective Services.

2                    SENATOR KOLKHORST:  Excellent.

3           The question again is how many girls were

4    on child specific contracts at The Refuge.

5                    MS. DRYDEN:  I believe the Legacy ones

6    were.

7                    MS. MASTERS:  Six.

8                    SENATOR KOLKHORST:  Six.  And do we --

9    how much are those contract daily rates?

10                   MS. DRYDEN:  When you do a child

11   specific contract, you look at that individual and

12   see what high acuity needs or what kind of services

13   needs to be -- that they need to participate in from

14   that residential.  And so that's the add-on.  So it

15   would be different.

16                   SENATOR KOLKHORST:  Give me a range.

17   I think the base rate starts at around $400 a day.

18                   MS. DRYDEN:  Yeah, it could be

19   anything up to -- if they have to have one-on-one

20   care because they're not safe to be around any other

21   kids because of child sexual aggression, that can go

22   up exponentially.

23                   SENATOR KOLKHORST:  To what?

24                   MS. DRYDEN:  Up to -- highest would

25   be, like, 800.  We have --

Jaime Masters - 3/17/2022

123

1           SENATOR KOLKHORST:  Per day?  Per day?

2           MS. MASTERS:  Yes.

3           SENATOR KOLKHORST:  Per day?

4           MS. DRYDEN:  Correct.

5           SENATOR KOLKHORST:  So, roughly, when

6  I looked at some of the rates, it's -- you know,

7  when you get to this acuity, 400-plus add-ons.  So

8  up to a range of $400 to $800 per child per day?

9           MS. DRYDEN:  Uh-huh.

10           SENATOR KOLKHORST:  Thank you.

11        Thank y'all for being here today, and I

12  appreciate your time.  I look forward to working

13  with you in the future.

14           MS. MASTERS:  Yes, ma'am.  Thank you.

15           (Concluded.)

16

17

18

19

20

21

22

23

24

25

124

1                    REPORTER'S CERTIFICATION

2

3

4              I, CHRISTY R. SIEVERT, CSR, RPR, in

5    and for the State of Texas, hereby certify to the

6    following:

7              That the proceedings were transcribed by

8    me from audio recordings, and is a true record of

9    the proceedings had;

10             I further certify that I am neither

11   counsel for, related to, nor employed by any of the

12   parties or attorneys in the action in which this

13   proceeding was taken, and further that I am not

14   financially or otherwise interested in the outcome

15   of the action.

16             Subscribed and sworn to on this the 29th

17   day of March, 2022.

18

19

20   _____

21   CHRISTY R. SIEVERT, CSR, RPR
     Texas CSR 8172
22   Expiration Date:  4-30-2023

23

24

25