IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, et al., | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

## Second Update to the Court Regarding The Refuge for DMST

On March 28, 2022, the Monitors sent the Court an update (Update) detailing their review of safety concerns and the evidence of abuse, neglect, and exploitation of children by staff employed by The Refuge for DMST (The Refuge), a Residential Treatment Center (RTC) licensed to treat child survivors of domestic sex trafficking.[1] The Court held a hearing on March 30, 2022,

---

[1] Deborah Fowler and Kevin Ryan, Update to the Court Regarding The Refuge for DMST, March 28, 2022, ECF 1218. The Health and Human Services' Residential Child Care Regulation (RCCR) division suspended The Refuge's license on March 11, 2022, and extended the suspension on April 10, 2022.

The Refuge is not the only licensed congregate care facility that served child victims of sex trafficking to have closed in the last year. In fact, the day after the Monitors were alerted to the pending investigations at The Refuge, DFPS notified the Monitors that the agency removed children from another operation, Freedom Place, that also served victims of trafficking. Freedom Place was under Heightened Monitoring. During the five-year period that preceded its placement under Heightened Monitoring, DFPS investigations resulted in five Reason to Believe findings for Sexual Abuse (all related to a single investigation), and RCCR investigations and inspections resulted in 139 citations for minimum standards deficiencies, 113 of which were weighted high, medium-high, or medium. The operation also completed a six-month voluntary Plan of Action prior to being placed under Heightened Monitoring and had received three monetary penalties associated with violations of minimum standards. The operation continued to receive a high number of deficiencies during the time that it was under a Plan of Action.

The Heightened Monitoring Plan for the operations stated:

> Freedom Place struggles with maintaining a licensed administrator which subsequently results in inconsistent and inadequate administrative oversight of the program and personnel. Consequently, a staff member engaged in inappropriate touching and communication with children in care; that resulted in confirmed abuse findings. The operation continues to receive employee prudent judgment deficiencies related to staff/child interactions. This operation serves children…who are

1

> victims of trafficking and while victims of trafficking may runaway at higher rates than other youth, the operation lacks an appropriate organizational plan to prevent the children from running away. Patterns of concern have been observed in the areas of serious incident reporting, discipline, prudent judgement, inadequate supervision, physical site conditions, and medication management. It appears the operation either does not develop effective systems designed to meet and maintain compliance, or the systems developed are ineffective, as deficiencies previously addressed continue to be re-cited.

Tex. Health & Hum. Svcs., Residential Child Care Regulation (RCCR) & DFPS, Heightened Monitoring Plan: Freedom Place, November 19, 2020 (on file with the Monitors). This pattern continued after the operation was placed under Heightened Monitoring; in March 2022 alone, the operation was cited for 10 minimum standards violations, all ranked medium or medium-high. When DFPS suspended placements to Freedom Place on March 11, 2022, the agency noted that it was doing so "due to concerns regarding supervision, quality of care provided to each child and the overall health, safety and well-being of children placed with this operation." Letter from Kason Vercher, Director of Residential Child Care Contracts, DFPS, to Scott Lundy, CEO, Arrow Child and Family Ministries DBA Arrow Freedom Place, Re: Arrow Child and Family Ministries dba Freedom Place Placement Suspension Contract #HHS000015800153, March 11, 2022 (on file with the Monitors). Freedom Place agreed to a voluntary suspension of its license on April 20, 2022.

Another operation, Upbring DMST (also known as "Nicole's Place"), received its initial permit from RCCR on July 15, 2020 and a full permit on January 15, 2021. The operation closed just over a year later, on February 16, 2022. Though the Monitors do not find any information related to or explaining the closure in the CLASS database, the operation was issued 14 citations for minimum standards violations in a very short period just before the operation closed. On January 31, 2022, the operation received six citations after an unannounced monitoring inspection. Less than two weeks later, a Priority 3 investigation of minimum standards violations resulted in eight citations being issued. The intake for that investigation was merged with two others. The February 4, 2022 allegations that spurred the RCCR investigation included that the program director had resigned a month earlier, and "there does not appear to be anyone in charge at the moment. The staff present do not have any sex trafficking training." The intake alleged that the owner of the property was living on the property with the children but had not had a background check. The intake also alleged that the children had access to cell phones and one of them had contacted her former trafficker, who picked her up at the facility. Another intake, reported to SWI three days later alleged that the operation was "due to shut down due to lack of staff" but that it continued to operate with less staff; the intake indicated only one staff per shift was available to supervise children. It again alleged that the owner of the property was living in one of the units and "did not have the experience for [the operation] to be licensed through her," and had not completed a background check, but "does not want the facility to close." A third intake, reported to SWI the next day, again alleged the owner was living on the property and that her friends visited the campus.

The Monitors do not know why this investigation was opened as a Priority 3 minimum standards investigation, given the gravity of the allegations. The eight minimum standards violations that were cited were for: 1) failing to notify licensing that someone who meets the definition of a controlling person was present and working at the operation; 2) staff cursing in front of children at the operation; 3) allowing children to have access to staff and operation cell phones, which was determined to be inappropriate given the children's trafficking history; 4) failing to provide therapy for children for at least a month, after the therapist quit; 5) failing to provide appropriate supervision, which allowed a child to gain access to the internet, meet someone, and run away with that person; 6) allowing a person not employed by the operation and who had not completed a background check to have access to children, take them shopping, and sleep on site; and 7&8) failing to comply with requirements related to training. The operation has requested administrative review of four of the eight citations; the review is still pending.

This was not the first investigation into allegations that children were not appropriately supervised for Upbring DMST. A Priority 2 RCCR investigation opened in June 2021 resulted in a citation related to caregiver responsibility after RCCR found that a child was allowed access to a laptop, which she used to access a teen chatting/dating site without staff knowledge, and that the child may have used the laptop to access pornography and other inappropriate material. The operation waived administrative review of the citation.

2

at which time the Court addressed the status of the State's investigations and the Monitors' ongoing review of safety issues at The Refuge. The Court asked the Department of Family and Protective Services (DFPS) to make available to the Monitors recordings of children's Child Advocacy Center (CAC) interviews, conducted in connection with investigations of The Refuge.[2] This report serves as an update on the status of the Court's request, and of the State's investigations into abuse, neglect, and exploitation of children formerly in the care of The Refuge.[3]

### I.     CAC Interviews with Alleged Victims

During the hearing on March 30, 2022, the Court asked the State to make the recordings available to the Monitors to view at DFPS offices, in response to concerns expressed by the State regarding providing copies of the CAC recordings to the Court or Monitors. The following week, DFPS made eight videos available to Monitor Deborah Fowler to view on an inspector's laptop at a DFPS office; Ms. Fowler finished viewing the recordings on April 7, 2022.

Several weeks later, Ms. Fowler discovered a document in IMPACT summarizing a CAC interview that had not been made available by DFPS. According to the short summary, the CAC interviewed the child (referred to as "CC" in the Monitors' Update) [4] on January 31, 2022. The Monitors do not know what prompted the interview or who requested it. The document summarizing the interview shows that the administrator for The Refuge brought the child to the interview and lists the administrator and child as the clients. The "Advocate Summary" in the document states that CC was "brought to the CAC by. . . the residential administrator at the Refuge," who completed and signed an acknowledgment of services and caregiver questionnaire. The document further provides that CC "is reported to be tied to another active case," and refers to G, the staff who is the alleged perpetrator in the investigation of allegations involving nude photographs and drugs, reported to SWI on January 24, 2022, and still pending.[5]

The interview summary consists of two very short paragraphs and a sentence, which take up less than half a page on the document filed in IMPACT. The summary indicates that CC reported that G's boyfriend trafficked her at least two years prior to the interview, that G was also a trafficker, and that CC saw G "collecting money from young girls" in an area in Austin, Texas (Travis County) known for criminal activity.[6] CC said she was afraid that G and her boyfriend would retaliate against her for disclosing this information. The document noted that a law

---

The operation still appears to have a license. There is no license suspension noted. There is no information that the Monitors could find regarding any plan for reopening, nor any history of corrective action.

The Monitors plan to examine the safety history of operations treating victims of sexual abuse or sex trafficking, and of operations treating children with a history of sexual aggression, in a later report.

[2] Transcript, Status Conference 19, March 30, 2022, ECF 1225.
[3] Initials used for staff and children in this report are the same initials used for staff and children in the Update filed on March 28, 2022.
[4] Deborah Fowler and Kevin Ryan, *supra* note 1, at 18, footnote 47.
[5] *Id*. at 17-24.
[6] As discussed in the Monitors' Update, G appears to refer to a conversation between CC and another staff member at The Refuge about G's relationship with the man CC refers to in the CAC interview. *Id*. at FN 47.

enforcement officer with the Bastrop County Sheriff's Office (BCSO) was in the observation room during the interview. The same officer was also listed as the law enforcement contact on the form.

On April 13, 2022, the Monitors e-mailed DFPS, referred to the summary of the CAC interview for CC, requested a list of all children who had had a CAC interview associated with intakes for abuse, neglect, and exploitation related to The Refuge from January 24, 2022, forward, and asked that DFPS schedule a time for Ms. Fowler to view any CAC interviews, including CC's, that had not yet been made available to her to view.[7] DFPS, through its legal counsel, responded:

> I was informed by DFPS that RCCI confirmed [CC] participated in a CAC interview set up by law enforcement on allegations of abuse that allegedly occurred at a time other than while she was at the Refuge. These allegations were made prior to 1/24/22. Nonetheless, I have been told that RCCI asked for a copy of her CAC interview for you to review. According to DFPS, the Bastrop County Sheriff's Office denied the request because it is unrelated to what happened at the Refuge and is part of an ongoing criminal investigation.[8]

The response also included a list of the children who had CAC interviews. All the recordings for these interviews had previously been made available for Ms. Fowler to view.

The Monitors responded to DFPS' e-mail, noting that the summary of CC's CAC interview showed the date of the interview was January 31, 2022 (not "prior to 1/24/22"), that the only allegations that appeared to have been discussed were associated with CC's claim that G's boyfriend was her trafficker and that she saw G selling drugs in Austin, and that these allegations referred to activity that (if it occurred) occurred in Travis County, rather than Bastrop County.[9] Ms. Fowler asked how these allegations could (for BCSO purposes) be considered in connection with anything except the allegations involving G's time at The Refuge.[10] The Monitors also noted that T, a senior leader at The Refuge who had been interviewed extensively by DFPS and RCCR in connection with the numerous investigations opened since January 24, 2022, said during an interview with DFPS that the allegations CC referred to during the CAC interview were among those that had "come out" since that date.[11] The Monitors emphasized that if there were allegations made prior to January 24, 2022 that G's boyfriend trafficked CC, they would be interested in learning more about those allegations and the date that staff at The Refuge were made aware of them.[12]

The Monitors asked whether DFPS had been able to view the interview with CC, noting that her allegations appeared relevant to their investigations of abuse, neglect, and exploitation.

---

[7] E-mail from Deborah Fowler and Kevin Ryan to Corliss Lawson, Deputy Commissioner, DFPS, re: CAC interviews, April 13, 2022 (on file with the Monitors).
[8] E-mail from Karl Neudorfer, Assistant Attorney General, Administrative Law Division, Office of the Attorney General of Texas, to Deborah Fowler and Kevin Ryan, re: CAC interviews, April 14, 2022 (on file with the Monitors).
[9] E-mail from Deborah Fowler and Kevin Ryan to Karl Neudorfer, re: CAC interviews, April 15, 2022 (on file with the Monitors).
[10] *Id*.
[11] *Id*.
[12] *Id*.

Whether G previously engaged in precisely the type of behavior she is alleged to have engaged in during her tenure at The Refuge, and what CC may know about that, could have some bearing on DFPS' understanding of what occurred at The Refuge. In addition, during her interview with DFPS and BCSO, G indicated that she had supervised CC during at least two of her overnight shifts. G also appeared to confirm during her interview that CC had a conversation with another staff member at The Refuge, referred to in the Monitors' Update as "V",[13] about CC's connection to G's boyfriend. The Monitors asked whether DFPS shared BCSO's view that the interview was not relevant to investigations of the allegations related to The Refuge.

> DFPS (through its legal counsel) responded:
>
> With regards to your question as to whether DFPS considers [CC's] CAC interview to be relevant to its investigation: DFPS has advised me that yes, it did consider the interview to be relevant, which is why RCCI requested the summary of the interview from the CAC.[14]

In fact, a March 7, 2022 IMPACT contact note for the DFPS investigation opened February 9, 2022, naming CC as an alleged victim, states:

> [W]ith the multiple investigations being conducted at The Refuge it was determined that a forensic interview would need to be conducted with this victim as well regarding any information or involvement she may have in regards to these investigations at The Refuge.

The contact note indicates that one of the investigators would submit an extension request for the investigation to give time to schedule a forensic interview with CC. An extension request was subsequently submitted and approved, but a forensic interview with CC was never scheduled.[15]

> The summary that DFPS reviewed is a poor substitute for viewing the recording itself: the description of the information CC conveyed is less than half a page. The half-page document fails to include information related to anything CC may have conveyed as to who she made her outcry to at The Refuge (prompting The Refuge to schedule a CAC interview), and when she made the outcry. Both are critical for determining whether The Refuge, which does not appear to have reported the information to SWI, should have reported the outcry and if so, when. Further, DFPS investigators do not appear to have interviewed CC for any of the investigations related to The Refuge; RCCR interviewed her for a minimum standards investigation related to a restraint that she claimed left her bruised. During this February 8, 2022, interview (which was not recorded), CC again alleged that G's boyfriend was her former trafficker, and that she witnessed G selling drugs. But the Monitors could not find any contact notes in IMPACT or CLASS for an interview

---

[13] Deborah Fowler and Kevin Ryan, *supra* note 1, at footnote 50.
[14] E-mail from Karl Neudorfer to Deborah Fowler and Kevin Ryan, re: CAC interviews, April 22, 2022 (on file with the Monitors).
[15] The Monitors reviewed a contact note in IMPACT for a staffing that occurred March 4, 2022, that appears to refer to a conversation between a DFPS investigator and CC. However, the Monitors have not been able to find any notes associated with an interview with CC by DFPS in any of the investigations opened from January 24, 2022 forward. The only interview the Monitors have found was the interview conducted by RCCR as part of a standards investigation associated with a restraint that CC alleged was rough and caused her to be injured, discussed above.

with CC associated with DFPS' investigation of the January 24, 2022, allegations, or those that followed.

During her interview with RCCR, CC asks whether her allegations related to G's boyfriend would be investigated. The notes in the CLASS contacts for the interview state:

> When asked why she went to [the hospital] she stated that she lost her temper. She stated recently finding out that one of the staff members boyfriend [sic] was her trafficker. She stated it was their (The Refuge) fault and stated they should've kicked her out. She stated she was taken in for a forensic interview on a Monday and was kicked out on Wednesday because there was a girl spreading her business…She stated she knows her legal team is upset with them because they didn't make her team aware they were taking [her] to the advocacy center…When asked if she had anything else to share, she stated she wanted to know if they would be looking into the issue with the staff and her trafficker.

While law enforcement, rather than DFPS, would investigate the underlying allegations related to CC's trafficker and whether G sold drugs in Austin, CC herself touched on an issue that DFPS could appropriately have investigated: whether information supported CC's claim that G's boyfriend (or someone associated with her boyfriend) was CC's trafficker and, if so, how The Refuge came to hire someone associated with a trafficker to supervise victims of trafficking. Interviewing CC – or, at the very least, viewing her CAC interview – would be critical to this inquiry.

In its response to the Monitors' question related to whether DFPS investigators had viewed the video, DFPS again noted that the video could not immediately be made available to the Monitors to view:

> With regards to the question of whether the video of [CC's] interview can be made available to you, DFPS also has advised me that it initially requested a copy of the video from the Bastrop County Sheriff's Office, which is in possession of it, but the BCSO denied that request. Therefore, DFPS reached out to the CAC to inquire whether arrangements could be made for you to view it. Earlier this afternoon, DFPS received a response from the CAC stating that because the Bastrop County DA's office is the custodian of the interview recording, it (the CAC) has sought the Bastrop County DA's guidance on the question of whether those arrangements can be made. The Bastrop County DA's office has not yet responded to that request. As soon as we have any further information, we'll let you know.[16]

Finally, the Monitors asked if DFPS had not viewed the CAC video, whether the agency knew if The Rangers had viewed the video as part of their investigation. DFPS (through its legal counsel) responded:

---

[16] E-mail from Karl Neudorfer, *supra* note 13.

> As you know, DFPS advised that it has not viewed the [CC] CAC interview, and so there was no joint review of it by the Rangers and DFPS. Nonetheless, DFPS cannot say whether the Rangers independently viewed the [CC] CAC interview.[17]

During his testimony before the House Human Services Committee on March 21, 2022, Colonel Steven McCraw, Director of the Texas Department of Public Safety, appeared to downplay CC's outcry:

> COL. MCCRAW: And, Vice Chair, you're probably referring to the girl who said she was trafficked by a boyfriend several years prior to and she was actually in jail.
>
> REPRESENTATIVE HINOJOSA: That's another one.
>
> COL. MCCRAW: Yeah, that was a different one. Well, that – that one, you know, we were able to go back and look at when the allegations were made and the individual the allegations were against, and this individual was in jail 80 percent of the time those allegations were made. So…
>
> REPRESENTATIVE HINOJOSA: So are you talking about --
>
> \*\*\*
>
> COL. MCCRAW: . . .There's another allegation about a resident that had been abused not while at the facility but prior to had been trafficked by a boyfriend of an employee at the location. And, of course, as it turned out, the time that that allegedly occurred, the boyfriend was in jail at the time. So those conflict with that happening, and that one even predates – predates the event.[18]

---

[17] E-mail from Karl Neudorfer to Deborah Fowler and Kevin Ryan, re: CAC interviews, April 26, 2022 (on file with the Monitors). At the hearing on March 30, 2022, during which the Monitors' access to the CAC videos was discussed, the Court asked counsel for DFPS to read aloud the access provisions related to the Monitors included in its November 20, 2018 Order. In addition to providing for "free and complete access" to records maintained by Defendants, the Court ordered the state to provide the Monitors with access to records maintained by "private agency partners." Order, ECF 606, at 17. The Order requires the State to "direct all employees and contract providers to cooperate fully with the Monitors" and to "provide the Monitors with free access to all documents, data, and premises it deems relevant to their work (including but not limited to documents and data from contract agencies and courts)." *Id*. As the Court pointed out in the Order, and at the hearing, the State did not challenge these provisions on appeal.

CACs fall within this language as "private agency partners" and "contract providers." The statutory provisions establishing and describing the role of the Children's Advocacy Centers are found in the chapter of the Family Code titled, "Child Welfare Services." *See* 5 Tex. Fam. Code § 264.001 *et seq*. This is the section of the Family Code that outlines foster care services. *Id*. at §264.101 *et seq*. It is the same chapter of the Family Code that describes Community-Based Care. *Id*. at §264.151 *et seq*. Establishment of a CAC requires "the department responsible for child abuse and neglect investigations" (DFPS) to be one of the parties included in a Memorandum of Understanding as part of the establishment of a CAC. *Id*. at §264.403(a)(1). Language related to establishment of a CAC governing board also requires it to include an executive officer or employee of DFPS. *Id*. at §264.404. The statute requires the State to contract with the statewide CAC organization (which the Code requires to be a 501(c)(3) nonprofit) tasked with providing training, technical assistance and funding to the CACs. *Id*. at §264.409.

[18] Transcript, House Committee on Human Services, 87th Tex. Leg., March 21, 2022, at 26-27, 47, ECF 1220-3.

Yet, DFPS cannot tell the Monitors, nor does anything in CLASS or IMPACT suggest, that the Rangers interviewed CC or viewed the recording of her CAC interview, or whether they (like DFPS), simply relied on the half-page summary of her CAC interview.[19]

## II.  Update on DFPS Investigations

A. Two Primary Investigations Discussed in the Monitors' Update

Of the two primary investigations outlined in the Monitors' Update that were still open at the time of filing, only one investigation (the February 22, 2022, investigation into allegations that staff assisted a youth in running away from the facility) has been closed.  That investigation resulted in four RTBs for Neglectful Supervision by the four staff found to have assisted one of the children, EE, in running away from The Refuge.

The January 24, 2022, investigation is still pending; another extension was approved April 14, 2022. The request for an extension says only, "[c]ase pending review for possible tasks needed for closure."  The Monitors do not find any contact notes in CLASS or IMPACT indicating what tasks DFPS is waiting to complete.

However, on April 21, 2022, a media outlet reported that G, the alleged perpetrator, was fired from a position as a "youth development coach" at a Texas Juvenile Justice Department (TJJD) state secure facility for behavior similar to the behavior she is alleged to have engaged in during her employment at The Refuge.[20]  According to the article, TJJD hired G in September 2019 to work at the Giddings facility, but launched an investigation into her conduct during a shift that she worked on February 23, 2020.[21]  The article states:

> The assigned investigator reviewed surveillance footage from that day and stated in a report that [G] allowed youths to use a staff phone and computer, against policy, where they accessed social media and pornography, some of which they printed via a staff printer.
>
> [G] also left boys unattended for 90 minutes that day, the report states, and several teens at the facility said [G] was "flirtatious" with them.  The report concluded [G] had acted inappropriately with the children in her care and that conduct had a "significant risk of causing substantial emotional harm" to them.[22]

The article notes that TJJD fired Green in April 2020 and "barred her from future employment there."[23]

---

[19] Though CC is not a foster child, the Monitors' review of IMPACT shows that DFPS had contact with CC's family in December 2019, and that CC (who was 14 years old at that time) was engaging in high-risk behavior, including smoking marijuana and running away from home, which interview notes suggest had happened more than once.

[20] Zach Despart & Reese Oxner, *Bastrop shelter caretaker accused of exploiting girls was fired from previous job for misconduct with children*, Tex. Tribune, April 21, 2022.
[21] *Id*.
[22] *Id*.
[23] *Id*.

8

The Monitors confirmed, through a conversation with TJJD's OIG staff, that the OIG substantiated findings of "sexual abuse – no contact" after an investigation of G's behavior. Yet, the background check conducted by HHSC, required before G could be hired by The Refuge, did not reveal any history of substantiated abuse, neglect, or exploitation findings.[24] HHSC returned a finding that G was eligible to be present at the operation in the role of staff or employee on September 11, 2021.[25]

When she was hired, G signed an affidavit, required by HHSC for anyone seeking employment in a licensed operation if the position involves direct interaction with or the opportunity to interact and associate with children.[26] The affidavit requires the affiant to "swear or affirm under penalty of perjury" that, among other things, they have not at any time had a report of child abuse or neglect made and substantiated against them.[27] G's signature on this form constitutes perjury, due to the finding of sexual abuse substantiated against her by the TJJD OIG. However, The Refuge spokespersons also acknowledged that they failed to call any of G's past employers during their review of her application; according to a media report, the spokesperson said,

> "Our experience with hiring over the past several years is that due to liability concerns, past employers will verify only the start and end dates of employment, without charactering [sic] their departure. With this in mind, we adhere to the state guidelines for background checks for the primary basis for hiring decisions; now we're going beyond that."[28]

The Monitors asked HHSC whether TJJD reports the OIG's substantiated findings of abuse, neglect, or exploitation to the child abuse registry, so that the findings will be picked up in a background check.[29] The Monitors also asked whether any minimum standard requires licensed operations to check references for applicants before offering them employment.[30] HHSC responded that there is no minimum standard requiring licensed operations to check references prior to hiring them.[31] HHSC also responded that, though its Criminal Background Check Unit (CBCU) is responsible for processing background check requests submitted by childcare operations and the background checks include a child abuse and neglect history check, the Texas

---

[24] HHSC provided the Monitors with the letters reporting findings of the background checks conducted for the alleged perpetrators in the investigations of The Refuge.
[25] Letter from Centralized Background Check Unit, HHSC, to [senior leader T], The Refuge (September 11, 2021) (on file with the Monitors).
[26] The affidavit was included in employment records for G, provided to the Monitors by HHSC.
[27] *See* HHSC, Form 2985: Affidavit for Employment with a Licensed Operation or Registered Child-Care Home, *available at* https://www.hhs.texas.gov/sites/default/files/documents/laws-regulations/forms/2985/2985.pdf
[28] KXAN, *A closer look at background checks, amid exploitation investigation at Bastrop facility*, April 22, 2022, *available at* https://www.kxan.com/investigations/a-closer-look-at-background-checks-amid-exploitation-investigation-at-bastrop-facility/
[29] E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, Attorney, Foster Care Litigation, HHSC, re: new story about the Refuge, April 22, 2022 (on file with the Monitors).
[30] *Id*.
[31] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Q re: new story about the Refuge, April 22, 2022 (on file with the Monitors).

Child Abuse and Neglect Central Registry (Texas Registry) is maintained by DFPS.[32] HHSC referred the Monitors to DFPS for an answer to the question regarding whether TJJD reports substantiated findings of abuse to the Texas Registry.[33] The Monitors posed the question to DFPS, and DFPS responded that TJJD does not report findings of abuse to DFPS for inclusion in the Texas Registry.[34]

This is deeply concerning. On October 13, 2021, the United States Department of Justice (DOJ) announced that it had opened an investigation into TJJD's state secure facilities.[35] The announcement noted that the DOJ would investigate, "whether Texas provides children confined in the facilities reasonable protection from physical and sexual abuse by staff and other residents, excessive use of chemical restraints and excessive use of isolation."[36] According to annual reports from TJJD's Office of Inspector General (OIG), the office investigated more than 100 findings of abuse or excessive use of force by staff in state and county facilities each year between 2019 and 2021.[37] Because the agency does not report substantiated findings to the Texas Registry, a state or county juvenile justice employee who has abused a child in their care will only appear in the Texas Registry if they were also arrested or prosecuted for the abuse.[38]

In the Executive Summary for the FY 2021 annual report, the OIG states, "OIG . . . observed increases in the number of administrative sexual misconduct (ANE – Abuse, Neglect, and Exploitation) investigations opened as well as the number of sustained administrative inappropriate relationships/sexual misconduct investigations in three of the four quarters of FY 2021."[39] The OIG's quarterly reports, showing the total confirmed cases of abuse, neglect, or exploitation for the quarter, reveal that there were 50 confirmed findings in state secure facilities, and 53 for county probation functions across the four quarters of the fiscal year in 2021 alone.[40] The first quarter report for 2022 shows 17 confirmed findings of abuse, neglect, or exploitation during that quarter.[41]

The number of ANE findings delineated above are conservative, because the OIG reports for state secure facilities do not distinguish between confirmed allegations of child-on-child sexual

---

[32] *Id*.
[33] *Id*.
[34] E-mail from Karl Neudorfer to Deborah Fowler and Kevin Ryan, *supra* note 13.
[35] U.S. Dep't of Justice, Press Release: Justice Department Announces Investigation into Conditions at Five Juvenile Facilities in Texas, October 13, 2021, *available at* https://www.justice.gov/opa/pr/justice-department-announces-investigation-conditions-five-juvenile-facilities-texas
[36] *Id*.
[37] OIG, TJJD, Operations Summary FY 2021; OIG, TJJD, Operations Summary FY 2020; OIG, TJJD Operations Summary FY 2019, *available at* https://www.tjjd.texas.gov/index.php/doc-library/category/251-annual-reports
[38] *See* HHSC, Child Care Regulation Background Checks, *available at* https://www.hhs.texas.gov/providers/protective-services-providers/child-care-regulation/child-care-regulation-background-checks
[39] TJJD, OIG, Operations Summary FY 2021, *available at* https://www.tjjd.texas.gov/index.php/doc-library/send/251-annual-reports/3133-annual-report-fiscal-year-2021
[40] OIG, Fourth Quarter Report FY21 (undated); OIG, Third Quarter Report FY21 (undated); OIG, Second Quarter Report FY21 (undated); OIG, First Quarter Report FY 21 (undated), *available at* https://www.tjjd.texas.gov/index.php/inspector-general#reports
[41] OIG, First Quarter Report FY22 (undated), *available at* https://www.tjjd.texas.gov/index.php/doc-library/send/690-fiscal-year-2022/3132-fy22q1

abuse and confirmed allegations involving staff perpetrators. The Monitors did not include those numbers in the confirmed cases (discussed above) for that reason. The 2021 annual report shows six staff from state secure facilities were arrested in association with "sex cases."[42] And the first quarter report for 2022 states, "a recent trend shows a number of OIG investigations have resulted in affirmative findings of more staff involved in inappropriate relationship with juveniles in TJJD custody or under supervision, resulting in criminal and administrative consequences…the recent frequency of OIG arrests and/or adverse employment actions stemming from OIG investigations cannot be understated."[43]

Though the OIG reports (annual or quarterly) do not indicate whether other perpetrators were arrested following substantiated, or "confirmed," findings of abuse, neglect, or exploitation, some of the descriptions of the "Significant Investigations" described in the quarterly reports that not all result in criminal prosecution, as was true of G. Examples include:

- An October 29, 2021, allegation of Sexual Abuse-Non Contact from a county facility. The OIG report states, "A former juvenile offender reported being shown digital images of a nude woman by a Juvenile Supervision Officer (JSO) at the facility. The OIG investigation, with assistance from [the local sheriff's office], determined the woman in the images was a former nurse at the facility who had been dating the JSO. The JSO had maintained the images on his cell phone and shown them to the juvenile offender. While incarcerated…the offender recognized the nurse at the adult jail as the woman in the photos. Although criminal charges were not pursued, the OIG investigation resulted in a 'Confirmed' finding and the JSO was terminated from his employment with [the county]. The case has been submitted to the TJJD Office of General Counsel for disciplinary action."[44]
- A February 25, 2021, allegation of Serious Physical Abuse from a contract facility. The OIG report states, "A female resident of the facility sustained a laceration to her chin during a restraint conducted by a staff. The incident occurred when the female resident walked away from the staff member and he responded by immediately grabbing her around the neck, pulled her around, grabbed her arms and pushed her into the door three times and ultimately landed on top of her on the floor. The female resident was taken to the local emergency room for medical treatment. It should be noted the only disciplinary action the staff member received was to be 're-trained' in Handle with Care, which coincidentally occurred on the date his re-certifications training was due. The Abuse, Neglect and Exploitation investigation concluded on March 26, 2021, resulted in a Confirmed finding. The case was referred to the Office of General Counsel on March 29, 2021."[45]

Other summaries of "Significant Investigations" included in the OIG quarterly reports indicate that a referral was made to a prosecutor's office, but do not indicate whether any charges were filed. As was true of G's substantiated OIG finding of sexual abuse, if the prosecutor did not

---

[42] OIG, Operations Summary FY 2021, *available at* https://www.tjjd.texas.gov/index.php/doc-library/send/251-annual-reports/3133-annual-report-fiscal-year-2021
[43] OIG, First Quarter Report FY22, at 4.
[44] *Id*. at
[45] OIG, Second Quarter Report FY21, at 8.

11

pursue charges, these would not appear on a background check completed as part of an application for employment in a facility housing foster children licensed by RCCR.

B.  Other Investigations Opened or Closed

In addition to the two primary investigations discussed in the Monitors' Update, the DFPS investigation (described in footnote 50 of the report) was closed with a substantiated finding of Neglectful Supervision. The investigation was opened after the Monitors' pointed the State to information in an employee record that suggested the child, "II," was able to run away because a staff person did not conduct routine overnight checks. II escaped through the same window that EE later used, when she was assisted in running away by staff.

DFPS' finding substantiating Neglectful Supervision against the overnight staff who was supervising II the night she ran away was based on the operation's knowledge of II's history of running away, II's service plan requirement for a high level of supervision, and the staff person's admission that she never checked to see if II was actually in her bed (she saw a lump in the bed from the doorway and assumed the child was under the covers), even after she had to unlock II's door to get inside the bedroom. The staff person was given a written disciplinary counseling by The Refuge because of the incident, for failing to do random checks of the children's rooms every 10 to 15 minutes per the operation's written policy; the staff person only completed and documented four checks during her overnight shift. The morning staff discovered II was missing, and after helping to look for her on campus, V reported her runaway to SWI. DFPS found:

> [The staff person] was negligent in her duties as she never physically checked to ensure that [II] was in the bed. It is believed that a reasonable person, after finding the door locked, would've checked to ensure that the child was actually in the room once the door was opened. As [the staff person] was written up for not completing checks that night, it is believed that the reason she didn't discover [II] gone or notice that…the bed only contained blankets and pillows was because she wasn't actually checking on the children. [The staff person's] failure to act in a reasonable manner resulted in [II] running away, and staff not looking for her the whole night and law enforcement not being notified for the whole night. The child is still on runaway and has likely returned to sex trafficking while on the run. [The staff person's] negligence has resulted in the child being placed in immediate harm and/or danger.

As discussed in the Monitors' Update, DFPS non-suited II's conservatorship case while she was on runaway status.[46]

An administrative review of the RTB finding is pending. The operation received three citations as a result of the investigation, for violation of minimum standards associated with

---

[46] Deborah Fowler and Kevin Ryan, *supra* note 1, at footnote 50. Notes in II's IMPACT records indicate that during the nonsuit staffing, "the department would take PMC of the youth if she returned. If you remained AWOL the department would request a nonsuit with the understanding if the youth was to return the department would facilitate a restart of the case." However, because her case was nonsuited, the Special Investigator assigned to her runaway case was told that DFPS would not pursue an attempt to find II. II is 15 years old.

operational responsibilities, initial service planning, and children's rights. The operation has requested an administrative review of all three citations.

There is also a pending investigation, opened after the March 30, 2022, hearing, with allegations connected to the January 24, 2022, investigation. On April 1, 2022, a Texas Ranger, who interviewed a child during the Rangers' investigation of those allegations, made a new report to SWI. According to the intake, a PMC child, SS (who was discharged by The Refuge on December 28, 2021) alleged during an interview with the Ranger that the staff person referred to as "V" in the Monitors' Update allowed SS to use V's cell phone to log into SS's social media accounts and re-post nude or sexually suggestive photos already saved in her account. The Ranger reported that SS said V was not aware that SS was using her phone for this purpose. The Ranger reported that SS also alleged that V offered to help the child run away in exchange for 200 to 300 dollars, but that SS was discharged from the facility before the plan came to fruition. The Ranger said SS alleged that she also used G's cell phone to take two topless photographs, which she sent to her trafficker via social media. According to the reporter, SS said that G did not instruct her to do it and did not receive anything from G in exchange for doing it.

According to the brief notes in the CLASS chronology for the investigation, when DFPS spoke to the Texas Ranger who made the report, the Ranger said there did not appear to be any criminal allegations associated with SS's outcry. He said the Rangers did not intend to schedule a follow-up interview with the child. The CLASS chronology for the investigation includes more complete notes from the Ranger's interview with SS. During the interview, the Ranger asked SS to log into her social media accounts. When SS logged into her Instagram account, she noticed that II (with whom SS had sexual contact with during her stay at The Refuge) had sent SS a message via Instagram. The brief notes indicate that, during her interview with the Ranger, SS called II through Instagram, and the Ranger interviewed II. The notes say only that II "made no outcry of any type of abuse at the Refuge" but do not elaborate on the questions the Ranger asked. If the interview was recorded, the recording does not appear to have been shared with DFPS. During the interview, II alleged that another child used an unknown staff member's phone to take nude photographs and sell them; however (as noted by the Ranger in the interview notes), this child was previously interviewed and made no outcry. II also alleged staff would bring tobacco products into the facility for the residents, an allegation that has already been confirmed.

As he indicated when he made the report to SWI, the Ranger's interview notes state:

> Regarding criminal allegations surrounding this newfound information, the employee, [V], allowed the juvenile to utilize a cell phone to access her own social media account for the previously stated reasons. The employee did not obtain a pecuniary benefit and did not request, distribute, or receive the photography either. The matter of the discussion between the pair regarding running away was done verbally between the pair. [SS] made the allegation, but there is no evidence to prove or disprove its occurrence.

13

> There is no penal code offense for the allegations made against [V] or [G] regarding the access to the social media account. The same remains true regarding the discussion about assisting with the departure from the facility.

It is not clear from the interview notes that the Ranger explored whether SS reposted the photos to obtain the money needed to pay V to assist her in running away. It is also not clear whether the Ranger made any attempt to ask II where she was staying, whether she was safe, or whether she needed assistance in returning to a safe place if she was not safe.

Because SS was discharged and II ran away from The Refuge prior to the January 24, 2022, intake, DFPS did not interview either child in connection with its investigation of those allegations. SS has not been interviewed by DFPS, nor has SS had a forensic interview with a CAC since making her outcry to the Texas Ranger at the end of March. SS was moved to an RTC in Hawaii the day after her interview with the Ranger.[47] CLASS chronology notes indicate that DFPS has confirmed that G supervised SS during at least one overnight shift, just before SS was discharged from the facility. Attorneys for the alleged perpetrators (V and G) indicated that they both declined to be interviewed by DFPS. The investigator requested an extension for the investigation on April 28, 2022, because he was "awaiting documents for case closure," which was approved on April 30, 2022.

### III. Conclusion

Ongoing investigations reveal significant safety concerns related to care provided to children at The Refuge prior to the suspension of its license. There are troubling lapses in DFPS' investigation into those safety concerns, particularly associated with its failure to review CC's CAC video. The media's report of G's substantiated finding of sexual abuse during her tenure at a TJJD facility revealed gaps in reporting abuse, neglect, and exploitation to the Texas Register that pose a significant risk to foster children.

---

[47] The work to secure this placement for SS was started by DFPS prior to the interview. The Ranger who interviewed SS scheduled the interview immediately after learning that she would be moved to Hawaii.