IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, et al., | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

## Update to the Court Regarding Child Fatalities

After learning through the Monitors of the death of a child in the PMC General Class, the Court ordered on February 21, 2020:

*Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

Defendants have continued to provide notification to the Monitors of PMC child fatalities. As discussed in the First and Second Monitors' Reports, DFPS notified the Monitors that 23 children in the PMC General Class died between July 31, 2019 and April 10, 2021. These fatalities included six children whom DFPS determined were abused or neglected by their caregivers in connection with their deaths or their care prior to their deaths.

Since the Monitors' Second Report, DFPS reported that ten additional PMC children died between April 11, 2021 and December 31, 2021, bringing to 33 the number of PMC children who have died since July 31, 2019. Of the ten children who died during this report period, DFPS determined that none of their deaths involved abuse or neglect. These fatalities, discussed below,

1

involved one child who drowned, four children with severe medical conditions, two children killed in vehicle related incidents, and three teenagers who died from gun violence.

Finally, at the close of the last report period, DFPS's investigations into the deaths of six children remained open. DFPS has since closed these investigations and determined that five of the fatalities did not involve abuse or neglect: four of the deaths involved children with severe medical conditions and one involved a teenager who committed suicide. In the remaining child fatality, DFPS determined that the child's death was due to Physical Abuse by the caregiver in a kinship foster home. These six child fatalities are also described in more detail below.

1. Child Fatalities Involving Abuse and Neglect

<u>J.C., Born July 1, 2019; Died February 15, 2021</u>

The Monitors' Second Report detailed the circumstances surrounding J.C.'s death, but the CPI investigation into his death remained open at the close of the last report period. During this report period, DFPS closed the investigation and substantiated the allegation of Physical Abuse against J.C.'s relative kinship caregiver. At the time of his death, J.C., a one-year-old boy, had been placed in the kinship foster home for one year. On February 12, 2021, law enforcement received a report that J.C.'s caregiver found the baby unresponsive after waking from a nap together with the child in the caregiver's bed. Law enforcement transported J.C. to the hospital where lifesaving measures were performed on the baby for three days. Doctors found that J.C. had the following severe injuries: a non-depressed skull fracture and bilateral retinal hemorrhages with schisis cavities; they concluded that the injuries were highly indicative of Physical Abuse. On February 15, 2021, J.C. was pronounced dead.

For nearly a year, CPI investigated J.C.'s death in conjunction with law enforcement. DFPS and law enforcement requested and reviewed medical tests to supplement J.C.'s initial medical findings. In January 2022, the additional testing of J.C.'s body had been completed and analyzed by independent medical experts. Informed by the additional medical findings, law enforcement re-interviewed the kinship caregiver on January 20, 2022 and, during this interview, the caregiver confessed to law enforcement that she hit J.C.'s head with significant force against a door frame due to frustration. CPI's investigation into J.C.'s fatality thereby substantiated the allegation of Physical Abuse against the caregiver in connection with J.C.'s death. The criminal investigation of the relative caregiver was ongoing as of April 1, 2022.

2. Child Fatalities, No Abuse or Neglect Determined

<u>A.F., Born September 6, 2003; Died November 30, 2020</u>

The Monitors' Second Report detailed the circumstances of A.F.'s death; the CPI investigation into her death remained open at the close of the last report period. Seventeen-year-old A.F. died by an overdose of acetaminophen on November 30, 2020. At the time of her death, A.F. had been

on runaway status from a fictive kin caregiver for approximately three weeks. Two days prior to her death, A.F. reportedly met a 24-year-old male, F.D., on social media. According to F.D., A.F. told him that she did not presently have shelter; F.D. picked up A.F. at a hotel and drove her to his apartment. The next day, on November 29, 2020, F.D. saw that A.F. had taken over-the counter pills and was acting "out of it." She eventually vomited and, according to F.D., began to act normal again. He subsequently left for work at 2:00 p.m. that day and when he returned the following morning, November 30, 2020, he noticed that the window of his apartment was broken. When he entered the bedroom, he reported that he found A.F. unresponsive on the bed. He called 911 and when the authorities responded, A.F. was pronounced dead. The autopsy concluded that A.F. died by suicide by means of an overdose of acetaminophen.

DFPS's investigation into A.F.'s fatality included an allegation of Neglectful Supervision against A.F.'s fictive kin caregiver. According to the investigation, A.F. ran away from the foster home in early November 2020 and the caregiver did not timely report the child as a runaway. In its finding, CPI found no evidence to support the allegation of Neglectful Supervision, stating:

> [A.F.] is not here to speak for herself, however based upon the investigation there has been no evidence found to state that [the caregiver] was neglectful in her care of [A.F.]. [The caregiver's] delay in reporting [A.F.] as a runaway appears to have been based on her misunderstanding of the law, the fact that [A.F.] was seventeen, and [the caregiver's] belief that law enforcement would not consider [A.F.] a runaway at that age. There is insufficient evidence to support [the caregiver] was neglectful in her supervision due to the delay in reporting [A.F.] as a runaway.

DFPS's investigation also involved allegations of Sex Trafficking and Physical Abuse related to an incident that occurred approximately four months prior to A.F.'s death. According to the investigation, on August 4, 2020, the fictive kin caregiver, who was not yet approved as a caregiver for A.F., encountered A.F. and another child in DFPS's care, after they had run away from their placements. The caregiver told the children she would provide them with a place to stay. However, since she was departing for a trip out of state and did not want to leave the children alone in her home, she placed them in a hotel room until she could return. She reportedly asked two relatives, both age 27, to go to the hotel to check on the children. She stated that she instructed the relatives not to go into the hotel room. The caregiver said she learned later in August 2020 that the two men had entered the hotel room to which she sent them and had sex with the children that night. The caregiver allegedly showed the investigators documentation from her phone that she confronted the two men via text message and instructed the men that she did not want them coming to her home any longer.

In its findings, CPI administratively closed the allegations of Sex Trafficking and Physical Abuse against the caregiver stating:

> The Department does not have jurisdiction to investigate this allegation. [The caregiver] was not an approved caregiver at the time of the alleged incident and

3

was acting as a good samaritan [sic] when the decision was made to secure a hotel room for [A.F.]. Moreover, [the caregiver] had no duty or obligation to [A.F.] but acted to remove [A.F.] from risk of harm and provided shelter, food, and clothing.

D.H., Born May 17, 2006; Died January 30, 2021

The Monitors' Second Report detailed the circumstances of D.H.'s death, but the RCCI investigation into his death remained open at the close of the last report period. D.H., a 14-year-old boy, was unresponsive when his foster mother found him in her home upon her return from the restroom. D.H. resided in a foster home that cares for children with Primary Medical Needs (PMN). DH was placed in the foster home when he was an infant and, while doctors did not expect the infant to live past two years old, D.H. lived to be 14 years old. According to DFPS, D.H. was diagnosed with involuntary muscle movement, spastic quadriplegic cerebral palsy, seizure disorder, asthma, esophageal reflux, gastroesophageal reflux disease, tracheomalacia, reactive airway disease, bronchomalacia, osteoporosis, spasticity, epilepsy, and unspecified brain abnormality. D.H. was fed through a gastrostomy tube and required a wheelchair and specialized bed. In its investigation into D.H.'s death, RCCI found no evidence of maltreatment of D.H. by his foster mother. The child's autopsy documented that D.H.'s cause of death was "Complications of Cerebral Palsy." The investigator's interviews with the foster mother, other children in the home, CVS worker, case manager, and several of D.H.'s treating physicians showed that the foster mother was attentive and loving in her care of D.H.

J.R., Born January 31, 2004; Died March 18, 2021

The Monitors' Second Report detailed the circumstances of J.R.'s death; the investigation into his death remained open at the close of the last report period. At 17 years old, J.R. passed away from substantial medical complications in a foster home that had cared for him for most of his life. J.R. was diagnosed with intellectual development disorder, bi-polar disorder, autistic disorder, cerebral palsy, depression, seizure disorder, and attention deficit hyperactivity disorder. He was non-verbal and unable to walk. Because of J.R.'s developmental disabilities, he was placed in a specialized foster home, operated under the auspices of a home and community-based services (HCS) provider. On the day of his death, J.R.'s foster father found him unresponsive in his bedroom. The foster father called Emergency Medical Services (EMS) but the first responders' attempts to revive J.R. were unsuccessful. The child's autopsy found that J.R.'s death was caused by complications of multiple neurological development disorders and the manner of death was natural. HHSC's Provider Investigations Unit found no evidence of maltreatment of J.R. by his foster parents in connection with his death.

C.S., Born July 31, 2019; Died April 3, 2021

The Monitors' Second Report detailed the circumstances of C.S.'s death; the RCCI investigation into her death remained open at the close of the last report period. C.S. was 20 months old when she died. At birth, she was diagnosed with Zellweger syndrome, a rare and terminal

congenital disorder; infants with this disease usually do not live past their first year of life. In addition to Zellweger syndrome, C.S. had the following diagnoses: congenital malformation syndrome, failure to thrive, seizures, blindness, deafness, and global development delay. On April 3, 2021, C.S.'s foster parent noticed she was not breathing and was unresponsive. First responders unsuccessfully attempted to revive C.S. before transporting her to the hospital, where she was pronounced dead. In its investigation into C.S.'s death, RCCI Ruled Out Neglectful Supervision and Physical Neglect of C.S. by her foster parents. Interviews with C.S.'s physicians and a review of C.S.'s medical records raised no concerns for the level of care provided by the foster parents to the medically fragile infant. An autopsy was not performed due to the determination by the Justice of the Peace that C.S. was terminally ill with a life expectancy of six months.

E.T., Born December 13, 2015; Died April 8, 2021

The Monitors' Second Report detailed the circumstances of E.T.'s death; the RCCI investigation into her death remained open at the close of the last report period. E.T., a five-year-old girl, passed away at a hospital from complex medical needs. E.T. had the following diagnoses: an anoxic brain injury, feeding difficulty, failure to thrive, sleep apnea, hypertension, spastic quadriplegia, cerebral palsy, global developmental delay, premature cortical vision loss, dysphagia (difficulty swallowing), and dysplasia due to contractures, which was treated with surgery (tendon release). E.T was fed through a gastrostomy tube. Since entering DFPS custody at four years old, E.T. lived in a foster home which served children with special medical needs. On the morning of April 7, 2021, E.T. was having difficulty breathing and suction, a method used for her care, was not improving her condition. The foster mother and a nurse were both caring for E.T. at the time. The foster mother called 911 and EMS transported E.T. to the hospital. While at the hospital, E.T.'s health continued to decline, and she passed away the following morning on April 8, 2021. In its investigation, RCCI reported that the Dallas County Medical Examiner's Office stated that E.T. would not undergo an autopsy due to the child's documented medical issues and lack of suspicion of abuse or neglect. RCCI found no evidence of abuse or neglect of E.T. by her foster parents.

D.N., Born September 28, 2003; Died April 16, 2021

D.N., a 17-year-old boy, was struck and killed by a vehicle on April 16, 2021 at 10:51 p.m. On the day of his death, D.N. had run away from staff members at his RTC, Guiding Light Residential Treatment Center, LLC, when they attempted to pick him up from school and transport him back to the RTC. According to RCCI's investigation into D.N.'s fatality, RTC staff members attempted to retrieve D.N. from school twice. The RTC's transportation log documented that a staff member at the RTC made a first attempt to pick up D.N. from school at 4:35 p.m. and this individual remained at the school until 5:05 p.m. Another staff member from the RTC made a second attempt at 7:45 p.m. and this individual remained at the school until 9:10 p.m. According to both staff members who attempted to retrieve D.N. and child witnesses, D.N. refused to enter the RTC van both times. At approximately 6:30 p.m., D.N. was located by school law enforcement on the campus baseball field. D.N. reported to school law enforcement that he did not want to return to the RTC because he had been "beaten up." D.N. did not disclose any additional information about

this allegation. The school officer also reported that he observed D.N. refuse to get into the RTC van. A few hours later, while still on runaway status, D.N. ran and squatted down on a roadway to allegedly tend to an injured dog and, while he was in the roadway, a vehicle fatally struck him. D.N.'s autopsy found the cause of death to be "Blunt Force Chest Trauma."

On April 14, 2021, two days prior to D.N.'s death, a case manager at the RTC reported to SWI that staff members restrained D.N. and D.N. alleged that during the restraint a staff member punched him in the face. The reporter stated that following the restraint, D.N. was assessed by a doctor and cleared of any medical concerns. D.N. reportedly had an abrasion on his face; the reporter stated that the injury was due to D.N. resisting the restraint. SWI referred the allegations to HHSC and RCCR conducted a Priority 2 minimum standards investigation and concluded there was no minimum standards violation. Based on the allegations contained in the intake report, SWI should have assigned the intake report to a RCCI for a Physical Abuse investigation.

On April 16, 2021, during its minimum standards investigation, an RCCR inspector interviewed D.N. at his school regarding these allegations in the morning prior to his death. D.N. reported again that a staff member punched him during the alleged incident. In the course of its investigation, RCCR determined that two staff members (Staff 1 and Staff 2) restrained D.N. at approximately 1:30 p.m. on April 14, 2021. Prior to the restraint, D.N. had attempted to elope from his bedroom window after staff members denied him use of his laptop. Staff 1 reportedly intervened to prevent D.N. from eloping through his window. Staff 1 stated that D.N. then attempted to wrap a cord around his arm to harm himself. Staff 1 asked D.N. to provide him with the cord and D.N. refused and allegedly became aggressive toward Staff 1. D.N. reported to RCCR that he was upset at this time because Staff 1 took his laptop and cord.

The RCCR investigation report documented that Staff 1 and Staff 2 then placed D.N. in a "2 man hold" which consisted of each staff member on one side of D.N.'s body and holding D.N.'s arms. According to Staff 1, Staff 2, another staff member witness and two child witnesses who were present for part of the encounter, D.N. resisted the restraint and was kicking and biting. In his interview, D.N. reported that while in the "2 man hold," D.N. bit Staff 1 and then Staff 1 punched him in the left eye. Staff 1, Staff 2 and the staff witness denied that Staff 1 hit D.N. during the restraint. Staff 1 and Staff 2 then escorted D.N. from the living room to D.N.'s bedroom. In D.N.'s bedroom, Staff 1, Staff 2 and D.N. reported that D.N. calmed down and they released him from the restraint. D.N. reported that Staff 1 then told him, "All you have to do is ask and I'll give you space." The two child witnesses denied observing Staff 1 punch D.N. in the face; however, neither child observed staff members' actions in D.N.'s bedroom. One of the children reported that Staff 1 spoke to D.N. during the restraint and the other child reported that he did not think Staff 1 would hit D.N. He stated that Staff 1 does not like to restrain children. RCCR concluded that "there [was] not sufficient evidence to suggest that a staff member used inappropriate or excessive physical force during the incident in question."

6

In its investigation into D.N.'s death, RCCI Ruled Out Neglectful Supervision by staff members at the RTC, stating that the RTC adhered to appropriate procedures and protocols when D.N. refused to return to the RTC after school.[1] Regarding D.N.'s allegation to the school officer that he did not want to return to the RTC because he had been "beaten up" at the placement, RCCI reviewed D.N.'s daily progress notes, incident reports, runaway prevention plan, therapy notes, and service plan. This included a review of the circumstances around the April 14, 2021 restraint. The RCCI investigator spoke with Staff 1, Staff 2, the staff witness, and one of the children who witnessed part of the restraint; these individuals again denied that any staff member struck D.N. during the restraint. The RCCI investigator conferred with the RCCR inspector who had spoken to D.N. and noted the RCCR inspector's conclusion that there was not sufficient evidence to suggest that the restraint involved inappropriate force and as a result, the facility would not be cited for a minimum standards violation. The RCCI investigator also interviewed D.N.'s caseworker, CASA volunteer, therapist, and teachers; all denied any additional disclosure by D.N. of abuse or neglect at the RTC beyond D.N.'s statements to the school safety officer. RCCI concluded that it did not find evidence to corroborate D.N.'s allegation that he had been subject to abuse or neglect while placed at the RTC. The Monitors confirmed with DFPS that the facility does not employ video surveillance and, therefore, it was not possible to review footage of the event.

C.A, Born September 18, 2019; Died April 18, 2021

C.A., a one-year-old girl, passed away from significant medical needs. Born premature, C.A.'s doctor did not expect her to live beyond her first 24 hours. C.A. had the following diagnoses: neonatal abstinence syndrome, diffuse cystic leukomalacia, hypoxia, chronic lung disease, and seizure disorder. C.A. was fed through a gastrostomy tube. Her medical condition was irreversible and terminal. On April 13, 2021, five days before her death, C.A. began hospice care and, after her condition continued to worsen, C.A. was transported to a hospice facility, where she passed. RCCI's investigation into C.A.'s death found no evidence of maltreatment by the infant's foster family. Due to C.A.'s medical condition, the county medical examiner did not perform an autopsy.

A.S., Born November 21, 2019; Died June 6, 2021

A.S., a one-year-old girl, passed away from significant medical needs. Born premature with an anoxic brain injury, A.S. passed away in a specialized foster home for children with medical needs. At the time of her death, A.S. was receiving hospice care in the foster home and was subject to an Out-of-Hospital Do-Not-Resuscitate order (DNR). RCCI's investigation into A.S.'s death found no concern for maltreatment and that A.S.'s foster home provided her with "comfort and care" as her health declined. Due to A.S.'s medical condition and DNR, the county medical examiner did not perform an autopsy.

---

[1] In the initial determination by SWI on April 17, 2021, the hotline report of the child's death was incorrectly referred to HHSC which assigned it for a minimum standards investigation; the report was then referred correctly to RCCI on April 19, 2021.

7

J.T, Born March 21, 2016; Died July 14, 2021

J.T., a five-year-old boy, drowned in a pool while attending a party with his foster family. According to RCCI's investigation into J.T.'s fatality, J.T.'s foster mother instructed J.T. and his brother to not go near the pool in the backyard as the children did not know how to swim. At this time, J.T.'s level of care was Basic, and his service plan stipulated that, when he was outside, a caregiver must remain within visual or auditory distance of him. The investigator created a timeline of the incident from information gathered from the 911 report, the home's security camera footage, and the police report. According to this information, at approximately 8:00 p.m., when the party was ending, J.T. was playing near a playground in the backyard while his foster mother and brother were nearby at a table. From 8:00 p.m. to 8:04 p.m., the camera footage showed that no one was in the pool. At 8:05 p.m., an attendee at the party and his infant were observed in the pool and then, at 8:07 p.m., the video showed that a crowd had formed around the north side of the pool, after the individual in the pool reportedly observed J.T. face down in the pool. The attendee at the party pulled J.T. out of the water and performed C.P.R. on him until law enforcement arrived. J.T. was transported to the hospital and pronounced dead at 8:45 p.m. The investigator's timeline of the incident found that J.T. must have fallen in the pool between 8:05 p.m. and 8:07 p.m. and that law enforcement concluded that the foster mother was not closely monitoring J.T. for approximately three to seven minutes. Individuals at the party and the foster family reported that no one heard or saw J.T. fall in the pool. The party reportedly did not involve loud music or alcohol. RCCI Ruled Out Neglectful Supervision by the foster mother, based upon her consistent presence in the backyard for the entirety of the party. The victim was a five-year-old boy who did not know how to swim. His service plan stipulated that, when outside, a caregiver must remain within visual or auditory distance of him. Law enforcement concluded that the foster mother was not closely monitoring him for approximately three to seven minutes when he fell in the pool and died. The determination there was not Neglectful Supervision is difficult to understand.

A.R, Born February 18, 2019; Died July 30, 2021

A.R., a two-year-old girl, passed away from significant medical needs. Her diagnoses included hydrocephalus, chromosome abnormality-Trisomy 5, anoxic brain damage, chronic respiratory failure with hypoxia and hypercapnia, cleft palate, bronchopulmonary dysplasia originating in perinatal period, epilepsy, and other specified trisomies and partial trisomies of autosomes. While in care, A.R. lived with a foster family who was interested in adopting her. On July 30, 2021, A.R.'s foster mother observed that A.R. was unusually lethargic and difficult to wake and showed lowered oxygen saturation levels. The foster parents transported A.R. to a hospital emergency room, where medical staff performed lifesaving measures on A.R. Shortly after arriving to the emergency room, A.R. passed away. The Medical Examiner found that A.R.'s cause of death was complications due to Trisomy 5, a chromosomal abnormality. RCCI's investigation into A.R.'s death found no concern for maltreatment. Multiple medical staff reported that A.R.'s foster parents were attentive and loving in their care of A.R.

B.B., Born October 14, 2003; Died August 9, 2021

B.B., a 17-year-old boy, died from gun violence while on runaway status from Journey to Dream – Kyle's Place, a GRO. On the night of his death, B.B. had been on runaway status for two months and his whereabouts were unknown to DFPS. On this night, at approximately 11:00 p.m., B.B. and two other individuals were reportedly sitting outside an apartment complex when two other individuals arrived with firearms. An altercation ensued and the two individuals with firearms fired their guns, killing B.B. and two other victims. There is a criminal investigation into the murder of B.B.

In its investigation, RCCI investigated whether the GRO took appropriate measures to prevent and respond to the runaway of B.B. and another child, who ran away with B.B., on June 8, 2021. RCCI found that staff members at the GRO appropriately conducted 15-minute checks prior to B.B. running away and correctly reported the runaway to law enforcement and SWI after it occurred. Staff members reported that B.B. had not previously run away from the GRO.

A.R., Born February 9, 2005; Died October 17, 2021

A.R., a 16-year-old boy, was fatally shot during an altercation with another individual in a vehicle. At the time of his death, A.R. had been on runaway status from a kinship foster home for approximately a year and a half. While on runaway status, DFPS made efforts to locate A.R. and, through communication with A.R.'s family, determined that A.R. was living with and supported by family and was unwilling to return to DFPS care. CPI did not pursue an investigation into A.R.'s death, citing that A.R.'s death "is currently being investigated by [the San Antonio Police Department]. CPS lacks authority to investigate as this is not abuse or neglect related."

K.M., Born May 29, 2006; Died November 2, 2021

K.M., a 15-year-old boy, died from gun violence. On the day of his death, K.M. attended school. At school, a child notified school personnel that K.M. had a gun in his possession and, when school personnel attempted to search K.M.'s backpack, K.M. ran from school. Shortly thereafter, law enforcement observed K.M. drive and collide his vehicle into another vehicle, before exiting the vehicle on foot. Law enforcement pursued K.M. on foot. Reportedly, K.M. fired his gun at law enforcement, who responded with gun fire that fatally killed K.M. A criminal investigation into K.M.'s death is currently open.

At the time of his death, K.M. lived in a kinship foster home. CPI opened and administratively closed an abuse or neglect investigation into K.M.'s death, citing: "There is no information to suggestion [sic] that the death of [K.M.] was related to any abuse or neglect and is a criminal matter. The gun that [K.M.] had in his possession when fleeing and allegedly shooting at law enforcement did not come from his kinship caregiver's home and did not belong to the family. At this time it is unclear where the weapon came from or how [K.M.] came to posses [sic] it. [K.M.] has died as a result of his interaction with law enforcement. There is no indication of abuse or

neglect by others that warrant DFPS investigation, [K.M.'s] death is a law enforcement matter and law enforcement has the jurisdiction to investigate."

J.R., Born July 17, 2017; Died December 18, 2021

J.R., a four-year-old boy, died in a vehicle crash. On the day of his death, J.R. was traveling with his birth parents, grandmother and younger sister from his foster home to his parent's home. DFPS reported that J.R. and his sister were on a pre-placement visit with their family for the holidays. According to the law enforcement officer who responded to the fatal vehicle crash, J.R.'s father was driving during a storm and his car hydroplaned into a tractor trailer. J.R. and J.R.'s mother died on the scene of the crash. Law enforcement reported that there was no suspicion that J.R.'s father was under the influence of alcohol or drugs at the time of the crash. CPI administratively closed the abuse or neglect investigation, citing:

"An intake was received indicating [name removed] father, [name removed], mother, J.R., and [name removed] sibling, were in a car accident and both mother and [J.R.] passed away after their vehicle swerved into and hit a semi-truck. After further obtaining information throughout the current investigation, the incident that caused [J.R.'s] and [mother's] death appeared to have been accidental and does not appear to involve abuse or neglect. Information obtained from Trooper [named removed] who responded to the fatal car accident, indicated there was no suspicion of [father], driver, being under the influence of any drugs or mind altering substances. Furthermore, Trooper [name removed] stated both [J.R.] and his siblings [name removed] were found restrained in their car seat. …".

J.D., Born October 10, 2008; Died December 25, 2021

J.D., a 13-year-old girl, passed away from significant medical needs. Her diagnoses included: lissencephaly, seizures, cerebral palsy, asthma, gastroparesis, and scoliosis. Doctors reported that her condition was terminal. At the time of her death, J.D. resided in the therapeutic foster home she had lived in since 2018. According to the investigative record, on the evening of December 24, 2021, J.D. went into cardiac arrest. The foster mother and in-home nurse performed lifesaving measures on the child until EMS arrived at the home and transported the child to the hospital. Efforts by EMS to resuscitate the child were unsuccessful and the child was pronounced dead at the hospital. A Forensic Assessment Center Network (FACN) physician assessed J.D.'s death and found that J.D. had "several severe chronic life-threatening medical problems… [J.D.] had a near fatality event in September [2021] where she suddenly became unresponsive, but was able to be resuscitated. I found no indication that abuse or neglect was a factor in her death." RCCI's investigation into J.D.'s death found no concern for maltreatment. Due to J.D.'s medical condition, the county medical examiner did not perform an autopsy.