# Yes, Another Timeline

NOTE: The information contained in this Timeline regarding The Refuge Investigation is based on the documentation and information I had available to me prior to being placed on Desk Duty on 3/10/22 and through conversations I have had with people since my dismissal.

Created by Ashley Wisdom
RCCI Program Administrator for Regions 3, 4, 5 and 7 (11/8/21 – 3/17/22)
Dallas Children's Advocacy Center CPI Supervisor for Family/Home-of-Origin Investigations (2017-2022)
CPI Investigator for Family/Home-of-Origin Investigations (9/2013-2017)

# January 2022



# February 2022



CIA Consult Requested
2:20 am

Monthly Conference between PA &
Supervisor
2:00 am

8th Intake
11:38 pm

3rd Intake (2nd Investigation)
11:59 pm

Region 7 Case Audits
11:00 pm

7th Intake (4th Investigation)
11:00 am

Contact with Bastrop SO
1:38 pm

4th Intake
10:52 am

Region 7 Staffing Meeting
1:00 pm

Risk Assessment Completed
12:00 pm

DA Notified
2:00 pm

5th Intake
11:56 am

6th Intake (3rd Investigation)
12:47 pm

Risk Assessment Completed
12:00 pm

Child # 3 Interview
10:20 am

Region 7 Supervisors Meeting
11:00 am

CIA Staffing
11:00 am

Child # 3 Initiation
9:10 am

2022   02/02   02/05   02/08   02/11   02/14   02/17   02/20   02/23   02/26


January


March

# March 2022

11th Intake
8:59 pm
10th Intake
12:57 pm
CCI Director Lewis Notified of Placement Hold
4:00 pm
9th Intake
8:33 pm
Decision to Terminate RCCI Supervisor & Program Administrator was made
2:00 pm
Safety Plan Implemented at The Refuge
2:30 pm
CPS Director of Placement Contacted for Placement Hold
5:30 pm
FITS Meeting - w/HHSC
11:30 am
Internal Investigation Meeting with Joanna Golliday
1:00 pm
Executive Case Review and Decision to Terminate RCCI Supervisor and Program Administrator was made
8:00 am
DA Notified of Admin Allegation
4:00 pm
CIA Staffing
4:00 pm
Refuge Staffing
3:30 pm
House of Representatives Hearing –Human Services
12:00 pm
Special Senate Committee Meeting
12:00 pm
Risk Assessment Completed
11:30 am
FITS Meeting - DFPS Only
11:30 am
Desk Duty
6:45 pm
CCI Leadership Notified of Cases
9:00 am
CCI & CVS Leadership Staffing
3:00 pm
Tara Olah's Letter to Court Monitors
1:00 am
CCI Staff Terminated
9:00 am
2022
2022
03/01
03/04
03/07
03/10
03/13
03/16
03/19
January
February
Conclusion



# Conclusion

I began working for the Department of Family and Protective Services on September 1, 2013, as an Investigator working family/home-of-origin investigations until I was promoted to Investigations Supervisor in Spring of 2017. I promoted again in November 2021 as Program Administrator in the Child Care Investigations Division (RCCI, investigating allegations of abuse or neglect for children in care) managing 6 units in Regions 3, 4, 5 and 7. I was terminated on March 17, 2022, for a "failure to provide notification regarding child safety." However, I followed all policy and expectations. I had never received any negative feedback from anyone in the CCI Division up until I was placed on desk duty on March 10, 2022. I had been consistently told that I was doing a great job and if anything, I was told to not work too hard. Ultimately, I was scapegoated by an agency in crisis looking to shift blame and deflect attention away from the continued failings by its own executive team.

On February 25, 2022 at 2am, I first learned of this investigation (the first incident involving the phone/pictures involving a staff who had already been terminated) and immediately instructed Supervisor Klawinsky to request a Complex Investigation Analysis staffing (CIA, an internal consultation team to review highly concerning investigations). She sent the email requesting this at 2:20am. I made multiple attempts to speak with Division Administrator Brandon Winters throughout the day on February 25th. I finally spoke with him from 5pm-5:30pm and we covered several highly concerning topics in my area of coverage, however I am not confident enough to say I fully explored the allegations from The Refuge that were known at the time. I did, however, fully inform him on February 28th following the CIA staffing (where the second incident involving the runaway was first brought to my attention). On March 1, 2022, CCI Division Director Justin Lewis, Deputy Director Joanna Golliday, and DA Winters were sent an email summarizing the allegations and concerns about the Refuge investigation and did not escalate the information up their chain of command until March 9th, according to DFPS Commissioner Jaime Masters.

Additional CIA staffings were held and on March 8th it was decided that the remaining children placed at The Refuge would be removed due to the concerns (it was not specifically articulated, though I understood this to be out of an abundance of caution due to two serious incidents occurring in a short period of time). On March 9th, the children were removed. I was present in Bryan where some of the children were being forensically interviewed and then travelled to The Refuge in Bastrop to implement a Safety Plan for the children that had not yet been removed. On March 10th an Internal Investigation was initiated by DD Golliday. I have since learned from former CCI Division Director Lewis that DD Golliday reported to him that she regrets her handling of this investigation. It was also objectively inappropriate for her to conduct this investigation as she was informed on March 1st and did not escalate the case up the chain of command. Former CCI Division Director Lewis has also since noted that the decision for my termination was made on March 14th by Associate Commissioner Robert Richman with Commissioner Masters' approval, but it was agreed that I would not be told until March 17th, the day of the Special Senate Committee Meeting on CPS. Lewis



# 1ˢᵗ Intake
# Investigation 1

1/24/22: Allegations of sexual abuse and neglectful supervision were reported. It was reported Child 2 stated AP # 1 had been sending nude pictures of her and Child #1 via Snap Chat. It was further reported AP # 1 was receiving money through Cash App in exchange for the photos. It was reported AP # 1 would provide her phone to the children, which they would use to take nude photos of themselves on and would then give the phone back to AP # 1. It is unknown how much money AP # 1 was receiving for the photos. It was further alleged from October to November 2021, AP #1 brought ecstasy and "xanax bars" for both children.


Back

# 2nd Intake
# Investigation 1

1/25/22: This intake reported concerns for Child #1 and Child #2 being provided access to the AP's (#1) phone. The AP's phone contained nude photos that the children were able to view. The intake reported Child #1 took a nude photo of herself on the AP's phone, which she asked the AP to delete from her phone, however, the AP told her she would delete the picture herself. It is unknown if she did. It was also reported the AP had pictures of drugs on her phone. It was also reported the AP provided Child #2 with a cigar, which she smoked.


**Back**

# Investigation 1 Initiated
# by RCCI and SI Investigators

1/26/2022: Child #1 was interviewed and stated the AP brought her an "XO". She reported that is an "ecstasy pill". She stated AP # 1 would let her use her phone. She said she told the AP if she could get people to Cash App her some money, she could give it to her to bring her some stuff. Child 1 stated the goal was to send people some pictures and they could cash app her. She stated there were never any official transactions and nobody actually sent the AP any Cash App transactions. She stated she mainly used the phone to text friends. She stated she was really going to try to make some money and did take pics; a selfie with her boobs out, but she never sent the pics on Snap Chat. She said she only texted her friends. Child 1 stated the AP knew her intentions with the pictures and phone, but it was her and Child 2 that initiated the conversation about the pictures and money with the AP's phone. She repeated she did not end up doing it. She stated she did share the selfies with a friend of hers. She stated she was deleting the pics when the AP came to get her phone. She stated the AP told her she would delete any remaining pictures.

Child #2 was interviewed, and stated AP # 1 provided drugs to her twice. She stated she was not able to take nude pictures. She denied the AP ever asked them to take pictures. She stated the AP did allow her and Child 1 to use her phone, but the AP never took pictures of them or asked them to take pictures for her on her phone. Child 2 stated Child 1 did take nude pictures of herself on the AP's phone, but Child 1 deleted some of them. She wasn't sure if they were all deleted from the phone though. Child 2 denied being in the room when Child 1 took the pictures of herself. Child 2 later stated she did take pictures on the AP's phone. She denied the pictures were for the AP; they were for other people. She stated the AP provided her with her Cash App so she could send pics to different people. She then stated while she took pics of her private areas, she didn't send pictures of herself, she sent pictures of her friend instead. She denied the pictures had a face on them. She stated her pictures were not on the AP's phone and would not state where her pictures were saved at.



**Back**

# Risk Assessment Completed

2/2/22: Risk Assessment/Staffing was completed with RCCI Investigator and HHSC Inspector.

The overall risk for the operation rated High.

A safety plan was not requested for the investigation.

*Note: There was no policy in place requiring risk assessments to be staffed up based on overall risk finding. As of March 18th, HHSC is no longer making a risk finding during the risk assessment.*



**Back**

# 3rd Intake
# Investigation 2

2/8/2022: Child #3 reported staff member (AP #1) would take pictures of her and trade them for drugs. Staff member (AP 1) is no longer employed.

*The 3rd intake and 4th intake came in at the same time and were merged mistakenly into the same case by a worker or supervisor.*


Back

# 4th Intake
# Investigation 2

2/9/22: It was reported child #3 recently had bruises "all over" as a result of being restrained by an unidentified staff member (AP # 2). Child 3 was reportedly kicked out of the facility and was transported to a psychiatric facility after trying to fight a fellow resident and was in route to the Travis County Juvenile Detention Center. It was also reported than an unidentified female staff member (AP 1) was taking nude photographs of some of the residents in exchange for the staff member giving the participating residents drugs.

Intake 3, 4 and 5 were merged. *(After initiation, it was discovered that 3 staff members represented the Unknown AP; AP # 2, AP # 3 and AP # 4)*

The 3rd, 4th and 5th intakes should have been merged into the primary investigation (Intake 1), however, due to new staff and confusion with policy, they were not merged according to allegations/AP's because these intakes primarily concerned Child #3. As a result, these three intakes were merged into 1 case.



**Back**

# 5th Intake
# Investigation 2

2/9/22: It was reported Child 3 disclosed that staff members were taking nude photographs of girls in the placement in exchange for drugs. Child 3 identified that she was one of the girls and that "she did it in exchange for drugs". Child # 3 reported "she did it in exchange for drugs". Child #3 was reported to have a SANE exam.

*The 3rd intake and 4th intake came in at the same time and were merged mistakenly into the same case by a worker or supervisor, and this 5th intake should not have been merged into those two intakes.*



**Back**

# Investigation 2 Initiated
# Child #3

On 2/10, a virtual visit was completed with Child # 3 due to her being in a Detention Facility and in quarantine.

She stated she was aware of why contact was being made and advised the only injury she has is the scrapes to her hands. She reported the scrapes were obtained during a restraint while at The Refuge.

*An in person visit to complete a full interview was to be scheduled as soon as she was out of quarantine.*


**Back**

# Risk Assessment for Investigation 2

On 2/16/21, the Risk Assessment was completed by RCCI, Veronica Lopez, and HHSC Inspector, Sara Foshat.

It is documented that a safety plan was not requested for the investigation.

The operations compliance history, investigation history, type of care and services provided by the operation, characterizes of the children in care at the operation, characteristics of the caregivers and other staff employed by the operation, information obtained as a part of the current investigation and conditions of any safety plan that was implemented and the outcome of any safety plan, if applicable, were discussed.

The Overall Risk Assessment: The facility has a High risk to the children.

**Back**

# Investigation 2 Initiated
# Child #3's Interview

On 2/17, Child 3 was interviewed. She denied she was involved in the photos or drug exchange. She reported she only knows about it because Child 1 and 2 told her about it. She reported AP 1 brought Child 1 and 2 "Xanax and ecstasy" and "they gave her some of the pills".

Regarding the restraint incident, she stated she was banging on a cottage window and trying to run around to get in the back when AP 2 put her in a restraint. She was fighting the restraint and got away; it last about 5 minutes. She then ran to the house and AP 2 and AP 3 restrained her on the sidewalk. She admitted to fighting the restraint and they went to the ground. She got away after a little longer than 5 minutes. She then ran to the back, picked up a rock to throw at the window when she was restrained by AP 4. She reported AP 4 put her in the standing restraint but when she turned to the wall, AP 4 fell into a crack in the ground while still holding her. She said AP 4 landed on her ankle and she was still fighting. At that time, AP 3 took over the restraint. She stated AP 3 cannot restrain. She reported she got away again, and peers helped calm her down.

Later, staff noticed she was walking funny, so she was taken to the ER. She did not have a break, only a sprain. She said she didn't have any other injuries other than the scrapes to the palm of her hand.

**Back**

# 6th Intake
# Investigation 3

2/22/22: Child #4 and Child #5 ran away from the operation with the assistance of two staff members (AP # 5 and AP # 6). The intake stated two specific staff members were involved/assisted with Child #4's runaway from the facility. This allegation was made by a fellow resident, Child #5, who ran away with Child #4 but has since been returned by LE. It was reported AP 5 helped pack child #4 a bag. It was also reported the child contacted AP 5 after running away and stated she was tired of walking and still in Bastrop. It was reported AP 5 did not volunteer this information until several hours after being contacted by child #4. It was also reported AP 5 received a call from child #4 and that was not immediately reported. It was also noted a 4th staff member (Staff #1/AP #14) may also have been involved, however, has not been to work for 2 weeks due to an illness. It was also reported a 5th staff member (Staff # 2/AP # 9) was aware of communication between child #4 and other staff members about running away.

This investigation was *assigned* on 2/24/2022 and *initiated* on 2/25/2022.

*Staff #1 will become AP # 14 and Staff # 2 is also AP # 9.*



**Back**

# Investigation 2
# Contact with Bastrop County Sherriff's Office

Dt. Brown explained he received the intake regarding Child #3 and was already working other investigation involving Child 1 and 2. He said he has attempted contact with AP 1 by calling all of the known numbers, but they were not good. He said he will attempt email and then start looking into physical addresses.

RCCI Lopez asked about the forensic interview completed for Child 3 on January 31, 2022, before her investigation came in. Dt. Brown advised that was about "her trafficker", who is supposedly the boyfriend of AP 1. Dt. Brown stated Child 3's timeline has discrepancies regarding her "trafficker", but he sent everything about it to Austin PD. He said during the forensic, Child 3 did not mention involvement of allegations with AP 1 at The Refuge.



Back

# Region 7 Case Audits

I requested a Case Audit from the CIA team to review Ruled Out cases without secondary approval from the month of January. Initially, DA Winters did not agree with the case review and stated he did not want a QA review of cases and did not want cases to have to be reopened because of the review. I expressed the importance of needing to understand what was occurring in Region 7 as both supervisors were new and the importance of addressing issues now instead of letting them continue to occur. Approval was given to proceed with the case review.

Issues Discovered:

- Lack of thoroughly addressing the allegations
- Failure to timely notify CVS/HHSC
- Not requesting CIA Consults
- Not obtaining sufficient collateral information
- Inaccurate Dispositions

Major Concern: A case was closed involving multiple PMN children with a R/O. The AP admitted to not meeting the children's needs. There was not a joint staffing with CVS or CIA. The case should be re-evaluated to ensure child safety.

- I notified DA Winters about this investigation after the Regional meeting on 2/24. I again mentioned this case to him on 2/25 when I informed him about discussing the supervisors monthly conference. I explained I would review the investigation with the supervisor and investigator since I only have a brief overview from CIA, however, based on that, I am significantly concerned about this case being closed with a R/O. I was not asked any further information or provided any other direction for handling this case.

**Back**

# Region 7 Supervisor Meeting

I met with the two Supervisors in Region 7 to discuss issues that have been occurring between the units due to rumors of one supervisor only requiring "meat and potatoes" and another being "policy plus."

An overview of the case review was discussed in this meeting to address commonalities found between all investigators. I advised I would address their specific cases in their Monthly Conferences.

The safety plan memo was discussed to ensure the Supervisors thoroughly understood the expectations for safety plans and the policy clarifications prior to explaining it to the investigators in the regional meeting.

Back

# Region 7 All Staff Training Meeting

An all staff meeting in Region 7 was conducted with DA Winters in attendance to address issues with policy and completing thorough investigations. A medical training and SI training was also scheduled. Due to unexpected Winter Weather, the Medical portion of the training was canceled.

- Addressed Safety plan and danger indicator policy. I created a memo to provide policy and clarify the inadequacies in the policy for better understanding.

- Discussed completing thorough investigations; recording children interviews at the start of the interview, building rapport, screening for abuse/neglect and addressing all allegations. Provided an example of audio found during the case audit that was only 4 minutes and 58 seconds long for a child interview, in which rapport was not built, allegations were not thoroughly addressed, the child reported staff sleeping and that was not reported to the supervisor or documented in the case and the investigator **informed** the child what oral sex was (completing an inappropriate sexual abuse screening).

- Discussed live documenting and ensuring timely documentation; no placeholder contacts. Advised if documentation is not updated by the 10- and 20-day staffing's, then their supervisor cannot appropriately staff the case. Missing documentation will be reported to the PA and then up to the DA.

- Discussed all interviews and information obtained needs to be staffed with their supervisor.



**Back**

# Monthly Conference between Program Administrator and Supervisor

Supervisor Klawinsky and I completed a monthly conference beginning on 2/24/22 around 11 PM and ended on 2/25/22 around 3 AM.

Around 2 AM, The Refuge case was discussed. I immediately instructed Supervisor Klawinsky to request a CIA consult due to the complexity of the case with the multiple referrals, allegations of sexual abuse and concerns of exploitation and allegations that the AP may be trafficking her own children, which resulted in a CPI case being called in on her.

The 6th intake regarding Investigation 3 was not discussed.



Back

# CIA Consult Requested

**From:** Klawinsky,Amanda K (DFPS) <Amanda.Klawinsky@dfps.texas.gov>
**Sent:** Friday, February 25, 2022 2:20 AM
**To:** Evans,Jennifer (DFPS) <Jennifer.Evans@dfps.texas.gov>
**Cc:** Jefferies-Buchanan,Irma (DFPS) <Irma.JefferiesBuchanan@dfps.texas.gov>; Lopez,Veronica (DFPS) <Veronica.Lopez@dfps.texas.gov>; WISDOM,ASHLEY.N (DFPS) <ASHLEY.WISDOM@dfps.texas.gov>; Pittman Jr, Kindale (DFPS) <Kindale.Pittmanjr@dfps.texas.gov>
**Subject:** The Refuge 48991337

Jennifer –

We have a case at The Refuge that we would like to get CIA involved in.  This is a case we should have probably had you involved in from the beginning, however below is a brief synopsis:

Two children at the facility were being allowed access to AP's phone to take nude photogarphs of themselves and post them on social media to obtain money so that the AP could purchase them pills and alcohol.  In speaking with the two victims they admitted to this occurring, but stated that this was not at the direction of the AP, just that the AP allowed them to use her phone, and the victims stated the AP knew what and why they were doing this.  Local law enforcement in Bastrop is involved on the case and it was last documented that he did have phone contact with the AP, but has not been able to get her to commit to interviewing at this point.

It is also believed that the AP may be possibly trafficking her own biological children.

Thanks,



**Back**

Amanda Klawinsky

Residential Child Care Investigations (RCCI) Supervisor

# 7th Intake
# Investigation 4

2/25/22: RCCI staff made this report due to policy for reporting staffing sleeping due to 24-hour awake protocols.

An allegation of Neglectful Supervision was listed for Child # 5 by an unknown alleged perpetrator (AP # 11).

AP should have been listed as AP # 1 due to Child 1 and Child 2 reporting this AP as sleeping during her shift multiple times. It is not known why this information was not relayed by the Investigator when making the report to Statewide Intake.

It should be noted there was a delay in making the report for this investigation due to a lack of policy training regarding reporting concerns for 24-hour awake supervision. This policy issue was addressed with DA Winters on 2/21/22. I provided training regarding reporting cases for 24-hour awake supervision to staff in Region 7 on 2/24/22, which resulted in the Investigator making this report on 2/25/22.

Back

# 8th Intake
# Investigation 1

2/26/22: A 3rd intake was received as a P1 alleging Exploitation on Child #1 and named 5 staff members as AP's (AP 1, AP 6, AP 7, AP 8 and AP 9) . It was reported a staff member (AP 1) at The Refuge was sex trafficking some of the children. It was reported the staff member (AP 1) was fired but a few members of their family still worked there, and the trafficking is ongoing. It was reported the AP's make the child record lewd videos and take lewd photos. The staff members then upload the videos to "Only Fans". In return, the staff members give the child dugs, alcohol and other things they couldn't normally get at The Refuge. One of the staff members was heard telling the residents to not say anything about the trafficking to the Board. Child 2 was living at The Refuge but is currently now with her father. It was reported Child 2 was sick for a month and not allowed to get medical attention when she had COVID and double pneumonia.

This intake was sent to the On-Call supervisor as a P1. The on-call supervisor downgraded the case from a P1 to a P2 without notifying or staffing the case with the on-call PA and it was merged into Investigation 1. Supervisor Klawinsky and I were not notified of the additional intake received. Since this was a P1 re-referral, we should have been contacted.

**Back**

# CIA Staffing

2/28/22: Both Child 1 and Child 2 reported that they had borrowed the AP 1's phone to take photos and possibly send through Snap Chat, then once a response is received on SnapChat, they would receive money through Cash App so that the AP 1 could buy them items that they wanted her to buy (such as alcohol, cigarettes, etc.). RCCI Jefferies-Buchanan said that the hope was that people would want to see the photos and they would in turn get paid for the photos.

It was later discovered that the AP 1 allowed Child 1 and Child 2 to use their phone quite a bit to do things like get on social media and make phone calls. This was the first time they had reportedly asked about using the phone to take photos and both Child 1 and Child 2 identified that AP 1 did not initiate this, that they initiated the idea and AP 1 was not in the room when they took the photos. They got one person to initiate a deposit to Cash App to see if the process would work. Bastrop County Sheriff's Office is investigating.

CIA Evans asked about the allegations of providing drugs. It was reported AP 1 provided 1 Ecstasy pill and 1 Xanax bar, which they reported was a one-time thing. RCCI Lopez said that this is not in line with what Child 3 said, as she reported Child 1 and 2 shared with her. RCCI Jefferies-Buchanan stated that they did have some information about a previous resident being provided with a Black & Mild; the Victims denied being provided with things such as cigarettes. So far, there has been no information about this indicating where this information was received.



**Back**

# DA Brandon Winters Notified of The Refuge Case

2/28/22: I notified DA Winters about this case after the CIA staffing.

On 3/1/21, I received an email requesting a formal high risk staffing email summarizing the cases and was informed this should have been sent to him. I explained I was not aware of a high-risk staffing email being needed for a case outside of a child fatality and asked if there was a specific template needed. I was told, "no worries" and provided an example. The emails requesting the CIA and the email from CIA summarizing the investigations were sent to DA Winters. I was told to ensure he is on the next CIA staffing and was not asked any further information about the case.



**Back**

# CCI Leadership Notified

From: Garza,Cameron C (DFPS)
Sent: Tuesday, March 1, 2022 9:00 AM
To: Lewis,Justin P (DFPS) <Justin.Lewis@dfps.texas.gov>; Golliday,Joanna L (DFPS) <Joanna.Golliday@dfps.texas.gov>; Winters,Brandon A (DFPS) <Brandon.Winters@dfps.texas.gov>
Subject: FW: Refuge for DMST

Good morning,

I just wanted to be sure everyone was aware of this case since there is FBI involvement. It's in Amanda Klawinsky's unit being worked by Irma Jeffries-Buchanan, and the SI assigned is Kindale Pittman. I asked Jennifer to invite Brandon and me to the next staffing. Thanks!

**Cameron Garza**
**Division Administrator, Complex Investigation Division**
**Child Care Investigations**
**817-219-2546**

From: Evans,Jennifer (DFPS)
Sent: Tuesday, March 1, 2022 8:48 AM
To: Garza,Cameron C (DFPS) <Cameron.Garza@dfps.texas.gov>
Subject: RE: Refuge

The Refuge for Domestic Minor Sex Trafficking, ID 49033803

On 2/22/2022, an intake was received alleging the Neglectful Supervision of ███████. (Oldest Victim) by ████████ and ███████ (Institution Personnel). The intake stated that the identified staff members were involved in/assisted with OV ████ run away from the facility. This allegation was made by fellow resident ████████. (Other) who ran away with OV ████ but has since been returned by Law Enforcement. It was reported that IP ██████████ helped OV ████ pack a bag and that OV ████ contacted IP Ms. Mills after running away to state that she was tired of walking and was still in Bastrop. The intake stated that IP Ms. ████ did not volunteer this information until several hours after the contact from OV ████ and some of IP Ms. ████ items were located in a bag believed to have belonged to OV ████. It was reported that IP ████████ also received telephone contact from OV ████ that was not immediately reported and may have given OV ████ money and/or helped her find a place. It was additionally noted that another staff member, ██████, spoke to OV ████ about getting a hotel room; IP Ms. ████ had not been to work for 2 weeks at the time of intake due to illness. It was also identified that another staff member, ██████████, was aware of OV ████ communication with other staff members about running away.

It was later discovered that OV ████ was placed at The Refuge by ██████ Child Protective Services as a result of her involvement in a large, legal prostitution/sex


Back

# 9th Intake
# Investigation 1

3/2/22: A 4th intake was received alleging NSUP, Sex Trafficking and Physical Abuse on Child # 1 and Child #2 by AP 1. An additional allegation of NSUP was reported for Child #1 listing an Administrator, at The Refuge as an Alleged Perpetrator (AP # 10) . This intake also alleges medical neglect on a new victim, Child #7, by an Unknown Alleged Perpetrator (AP #12).

It was reported staff members are aware of ongoing incidents. The same incidents were reported regarding Child 1 and 2. It was reported the Administrator provided illegal and unethical directives to staff and allowed the AP's sister to work at the cottage the day she received the report from Child #2 about the AP (from the 1st intake). It was reported the sister (also now an AP) took "them" on an outing outside The Refuge by herself. It was reported Child #2 was scared for her life because she thought the AP/sister/staff member was going to take them to the other staff member's home (fired AP). It was reported it was a major conflict of interest in allowing four family members of the AP to be employed at this time and continue to work in direct contact with the youth the AP exploited.

Additionally, it was reported the Administrator was bribing children to not make reports to licensing. It was also reported she instructed staff to not seek medical care for a youth, Child #2, at the facility which resulted in her being taken to the hospital a month after remaining sick. It was reported she was diagnosed with COVID and double pneumonia. It was later discovered she spread COVID to 8 other children.

The intake also alleges an Unknown victim child was left alone in cottage 9 on the ranch for multiple weeks. It was reported the administrator advised they would monitor the child on the cameras in the cottage due to not having enough staffing members. Additionally, it was reported night shift workers are known to sleep during their shifts and more often than not, do not complete their bedroom checks as required. It was reported the records for bed checks are almost entirely falsified.

(This intake was routed to a different supervisor in Region 7. That supervisor did not notify supervisor Klawinsky in Region 7, her peer, or notify me of the new intake. She assigned the intake as a new investigation to an investigator in her unit. The investigator went out on 3/4 to initiate the case. This was discovered during the CIA staffing on 3/4/22.)

**Back**

# Risk Assessment Completed

3/3/22: High risk assessment/staff conducted between RCCI Investigator and HHSC Inspector.

The Current Risk for the investigation was determined to be Medium.

The Overall Risk for the operation was determined to be High.

*Note: There is no policy in place about staffing risk assessments up the chain of command after they are completed in the CCI Division. There is also __no__ metrics being used and the determination is made by personal  judgement alone.*


**Back**

# 10th Intake
# Investigation 4

3/3/22: A 2nd intake regarding 24-hour awake concerns due to staff sleeping. Reported by RCCI staff. An allegation of Neglectful Supervision was made for Child # 7 by an Unknown Alleged Perpetrator (AP # 13).

This intake was merged with the 7th intake.



Back

# CIA Staffing

3/4/22: This CIA Staffing was primarily set up to staff the Restraint case (Investigation 2) with RCCI Veronica Lopez. However, DA Winters and DA Garza were both in attendance.

I learned of the 4th intake involving the 1st Investigation (photo case) which listed the Administrator as the AP during this staffing. The allegations were discussed. I discovered a new investigator had been assigned to this investigation and discussed I would be pulling her off this case in order for it to be merged appropriately with the main investigation. We discussed forensic interviews would be scheduled with the children to thoroughly address all allegations, the AP's would be re-interviewed with a SI and the Detective would be notified about the new intake.

I was instructed to contact HHSC and Contracts to place a hold on Placement by DA Winters.

*Note: According to Directives/Expectations - DA Winters was required to notify Director Lewis of the new intake regarding the Administrator being listed as an AP after I notified him, and the placement hold should have been discussed with Director Lewis for approval.*

**Back**

# DA Brandon Winters Notified of New Intake

3/4/22: DA Winters was on the CIA staffing call when it was discovered a new intake had been received regarding The Refuge which named an Administrator as the AP.

Per the CCI Director's expectations, it is to be staffed up the chain of command to report cases concerning allegations involving an administrator. DA Winters was notified and failed to notify Director Lewis once he became aware of the new intake received.

Director of Field - CCI Expectations



**Back**

# CPS Director of Placement Contacted

3/4/22: I contacted CPS Director of Placement, Jillian Bonacquisti, and informed her about the concerns and multiple intakes/cases at The Refuge. She informed me she had become aware of Child # 4 running away at The Refuge when she was looking into ICPC's.

I explained the information discussed in the CIA consulted and asked if a placement hold could be implemented on The Refuge. CPS Director of Placement Bonacquisti informed me that The Refuge was a Special Contracts facility, and she could implement an unofficial hold and not approve any placements over the weekend since we have a plan to conduct forensic interviews next week to address the new allegations and re-interview all staff members/APs. She requested an email summarizing the intake allegations and the case numbers.

**Back**

# 11th Intake
# Investigation 1

3/4/22: The 5th intake was received as an Unknown P2 investigation. The intake reported allegations of Medical Neglect, Sexual Abuse and Physical Abuse of 3 Unknown Victims (Child 8, Child 9, and Child 10 ) by 3 Unknown AP's (AP 14, AP 15, and AP 16).

*(These Unknown Victims and AP's could already be known, however, it is unknown at the time of intake who this is referring to specifically)*

It was reported multiple staff members are supplying multiple children at the facility with drugs and alcohol. It was reported one female staff member is forcing some of the children to pose and post on Only Fans, which is an account that is sexual in nature. It was additionally reported the facility did not seek medical attention or provide medical care for children when they became sick with COVID and required medical treatment. It was also reported the children do not have access to dental care



**Back**

# CCI Director Lewis Notified of Placement Hold

3/5/22: I received a call from CCI Director Lewis regarding an unrelated work situation. He then asked what I was doing. I let him know that I was taking a break from working on a "Tree" summarizing The Refuge investigations, which I would be sending the following day. He told me not to work too hard. I then mentioned I had successfully requested a placement hold as directed by DA Winters the day prior.

He expressed frustration he was not notified about this, however, assured me that his frustration was not at me, rather at DA Winters due to a pattern emerging of him failing to notify of situations.

He asked that I send him the "tree" once I finished it so he could review it Monday morning.

Back

# CCI & CVS Leadership Staffing

3/7/2022: Director, Justin Lewis, scheduled a meeting with Regional staff from the CVS, SI and CCI Division. Supervisor Klawinsky and I presented information concerning the investigation.
During this meeting, I learned Director Lewis disseminated the "Refuge Tree" I drafted over the weekend piecing together the intakes, the relationships of the staff members, recent updates and upcoming tasks.

It was discussed an informal placement hold was implemented on The Refuge as of 3/4/22. There was a discussion about implementing a formal placement hold.

It was discussed a FITS meeting would be scheduled for 3/8/22.



**Back**

# 1st Facility Intervention Team Staffing (FITS) Meeting with only DFPS

3/8/2022: A FITS meeting was conducted with Associate Commissioner Richman, CCI Leadership, CVS Regional Directors, SI Regional Directors and various other executive and regional staff within DFPS.

The intakes received were discussed. It was discussed that a plan would be created to remove the children currently placed at The Refuge out of the operation.

It was discussed a formal placement hold was implemented on The Refuge.



Back

# Refuge Staffing

3/8/22: A case reassignment staffing was scheduled to transfer the case to a new investigator due to the primary investigator resigning. Since there were 4 investigations opened in total and 3 were assigned to the investigator resigning, all cases were reassigned to a new investigator.

Bastrop SO Detective, DA Winters, Director Lewis, SI Pittman, SI PD Jarivs, SI RD Eakens, Supervisor Klawinsky, PA Wisdom, CIA Evans, CIA DA Garza and all three investigators were on the staffing to discuss plans for reassignment, interviews that had been conducted, interviews that were still needed and plans to schedule forensic interviews for the kids.

Director Lewis advised plans were being established by CVS leadership to have the kids removed from The Refuge in the morning. Forensic interviews were scheduled to be completed on 3/9/22 in Bryan, TX for all of the children being removed from The Refuge.

I traveled overnight to Bryan, TX following the meeting to be present when the children arrived for their forensic interviews and provide support to Supervisor Klawinsky.


**Back**

# 2nd Facility Intervention Team Staffing (FITS) Meeting with HHSC

3/9/2022: Associate Commissioner Richman attended the meeting with various high level staff members within DFPS and HHSC.
I presented a brief overview of the intakes received and provided an update about the scheduled forensic interviews.

CVS Regional Staff advised the children from The Refuge were being removed throughout the day. It was discussed there were DFPS staff on site at The Refuge, along with an off-duty police officer.

HHSC asked about possible RTB dispositions; I started to explain which dispositions would likely result in an RTB at this time, however, that explanation was interrupted. It was stated to HHSC that RCCI would likely have multiple RTB findings and should know by the following week.

**Back**

# Safety Plan Implemented at The Refuge

3/9/2022: Director Justin Lewis sent a Microsoft Teams message to me, in a group chat, stating a safety plan needed to be implemented at The Refuge immediately. There were concerns about staff at The Refuge trying to make DFPS staff leave the operation even though kids remained onsite.

Supervisor Klawinsky and I left Bryan, TX and traveled to Bastrop, TX to implement the safety plan. All alleged perpetrators named within the 11 intakes were listed on the safety plan. The safety plan stated the alleged perpetrators could not have access to any children at The Refuge and could not remain on the property. The CEO and Chief Operating Officer at The Refuge agreed to the safety plan.



Back

# Tara Olah's Letter to Court Monitors

On March 10, 2022, Director of Implementation and Strategy Tara Olah, sent a one-and-a-half-page memo to the Court Monitors regarding The Refuge.

- The letter notes that 8 intakes were received "all alleging human trafficking by the former employee." This is inaccurate as there were 11 total intakes as of 3/10 and 2 of the intakes alleged sex trafficking.

- The letter notes that "RCCI discovered several additional staff still employed at the operation appeared to be involved, and that many of them were related to one another by blood or marriage and/or were cohabitating." While it is true that several additional staff were involved in other NSUP, PHAB, MDNG allegations, only one staff member had allegations of sex trafficking/exploitation/sexual abuse.

- The letter notes that "one staff member was arrested," though it was not clarified that this was related to that staff member lying to investigators regarding the girls who ran away from The Refuge.

- It is noted that on 3/4, DFPS began searching for new placements for the children, however this did not begin until after the weekend (possibly 3/7, more likely 3/8). It is also important to question why there was such a long delay in moving the children if the danger indicator was so high five days prior to the actual removal of the children.

Most importantly, the memo failed to include any caveats regarding the veracity of the allegations, or any information obtained from the CCI or law enforcement investigations. This resulted in District Court Judge Janis Graham Jack holding a hearing to address concerns stemming from the understanding that continuous concerns had been received since January 24th and the Department failed to take any protective action for six weeks. Judge Jack asked Commissioner Masters "What is your chain of command that you would not know until yesterday?" Masters responded, "There is no excuse for why I didn't know, which is why several people are losing their jobs."

I cannot speak to why those above me did not notify Commissioner Masters if that was their expectation, however I do know that I followed policy, met all expectations, and let my chain of command know what was going on.

**Back**

# Desk Duty

On March 10, 2022 at 12pm, DA Winters let me know that DD  Golliday would be interviewing me on Friday March 11th at 1pm as part of an Internal Investigation to gather a timeline. He assured me that I was not in any trouble and was "running point" for The Refuge investigation.

Around 7pm on March 10th, as the news was breaking about The Refuge, I received a call from DA Winters informing me that I was now on desk duty and not to speak with CCI Director Lewis (due to a conflict of interest, which is confusing as I have only known him in a professional capacity, though we have shared mutual friends) or members of my team. I was also informed I could not speak to any of my staff or peers at all, which I asked for clarification about as this was not a typical protocol for Desk Duty. I was informed this was to ensure that nothing would be "misconstrued."

I was not asked about any upcoming due dates, incoming new hires, concerning cases, pending CSA/CIA staffings, status of staff coverage, or anything else that would be necessary to ensure things would not fall through the cracks.

I also received an email from DA Winters with a memo attached detailing desk duty protocol; which only stated I could not conduct cases staffings. It did not specifically state I could not speak to anyone; however, I was scared and did not talk to my staff out of fear of getting into trouble. I felt very isolated. On March 11th and March 14th, I was left out of emails and Division wide staff meetings conducted by Associate Commissioner Richman, Deputy Commissioner Ward and CCI Director Lewis.



**Back**

# Internal Investigation Interview

3/11/2022: Supervisor Klawinsky and I were interviewed by DD Golliday.
Throughout my interview, DD Golliday was combative and aggressive in her line of questioning. DD Golliday displayed a bias towards a false narrative she had adopted: that *active* human trafficking was occurring, that I was aware of the active trafficking, and that I failed to report knowledge of this to DA Winters immediately (2/25/22 at 2am).

Ultimately, I did fully report to DA Winters following the CIA staffing on 2/28/22 and no meaningful action was taken by anyone up the chain of command until 3/9/22 when the children were removed, and the Executive Team was notified. Active trafficking was not known to me. What was known on 2/25/22 was that there were allegations that a terminated Refuge staff member provided drugs to two Refuge youth and allowed the youth to use her phone to take nude photographs of themselves to exchange that for money to purchase more drugs. It was reported to me that the children denied the AP instructed, forced, or coerced them into taking the pictures, they were not successful in selling any pictures and that only sent pictures to a friend.

*Note: DD Golliday should not have been leading this Internal Investigation as she was notified of the case on 3/1/22, but she herself took no meaningful action despite her position and did not notify the Executive Team.*



**Back**

# Executive Case Review

3/14/22: Commissioner Masters, CPI Associate Commissioner Robert Richman, CCI Director Lewis and others met for about 7 hours to review the facts of this case.

I later learned that it was on this day that the decision to terminate me and Supervisor Klawinsky was made. It may be of note that they were not fired until the morning before the Special Senate Committee Hearing.

I have since learned it was during this meeting the Executive Team learned Associate Commissioner for CPS, Deenen Dryden, was notified about The Refuge case on 3/7/22 by CPS Director of Placement, Jillian Bonacquisti, and failed to notify Commissioner Masters. It was also learned the CVS worker, supervisor and Program Director staffed the case involving their child (not known which child) up to their Regional Director and it did not go any further. (Staff names are not known at this time).



**Back**

# CCI Staff Terminated

3/17/2022 at 9am:
Supervisor Klawinsky met with DA Winters in Navasota, TX and was notified of her dismissal.

I met with DD Golliday in Dallas, TX and was notified of my termination.

The reason for dismissal on both of our letters was due to a "failure to provide notification regarding child safety."


Back

# Special Senate Committee Meeting on Child Protective Services

On March 17th, I watched the Special Senate Committee Meeting on live broadcast where Commissioner Jaime Master disparaged my reputation. She provided inaccurate, misleading, and demonstrably false information to the Senate Committee regarding this investigation. She reported that the situation at hand regarding The Refuge was due to two bad actors and was not the result of systemic failures.

- Commissioner Masters noted that I had been with the Department for years but failed to clarify I had only been in the CCI Division for four months.
- Associate Commissioner Richman reported cases are staffed with the CID division when cases come in meeting the MREF policy. This is inaccurate. The MREF report does not work and has never worked. There is nothing in place to catch multiple referrals. Supervisors do not staff with the CID division when multiple referrals are received. This is a *plan;* however, there is no current *practice/protocol* in place.
- Commissioner Masters advised policy was not followed, however, then changed her story during the House of Representatives Hearing where she clarified that "expectations" were not followed. However, I did meet the expectations she is referring to.
- Commissioner Masters and Associate Commissioner Richman both provided a distorted vision of the current state of training throughout the agency. Tamara Hanson is the Director of CLOE (Center for Learning and Organizational Excellence) and would be a good resource on any changes that may or may not have been implanted.
- On March 30, 2022, Judge Jack admonished Commissioner Masters for characterizing the purpose of the Court Monitors as data collection during Senate Committee Meeting.



**Back**



**Texas Department of Family and Protective Services**

Coronavirus Resources | En Español

Search

● Report Abuse

▲ I am ▾   Child Investigations ▾   Child Services ▾   Adoption & Foster Care ▾   Prevention ▾   Adult Protection ▾   Doing Business ▾   Data & Reports ▾

## DFPS Training

DFPS Home > Training > This Page

## APS

- Guide to Reporting Suspected Abuse, Neglect or Financial Exploitation of Adults

## CPS

### English and Spanish

- Normalcy Training for Foster Parents
- Necesidad de normalidad: Entrenamiento para padres temporales
- Trauma Informed Care Training
- Medical Consent Training for Non-DFPS Employees
- Capacitación sobre el consentimiento médico
- Psychotropic Medications

### English Only

Reporting Suspected Abuse or Neglect of a Child: A Guide for Professionals

f Facebook          Twitter          YouTube          Email Updates



**Back**

**Child Care Investigations Division**
**Expectations from Director of Field**

1. I expect you to act professionally by always being respectful and courteous to clients, coworkers, community partners, and to yourself – and always conducting yourself with the utmost level of honesty and integrity when engaging in DFPS business.
2. I expect you to be prepared and on time to appointments and meetings and be fit for duty. Fit for duty includes being dressed and groomed according to current agency policy and being fit mentally and physically (if you are sick or need a break, please arrange for off time to take care of yourself).
3. I expect you to keep me informed. Always. Notification should come up established chains of command.
   a. High-profile cases or cases with media involvement
   b. Intakes that have allegations against facility administrative staff
   c. Any child death intakes
   d. Family emergencies/deaths for our staff
   e. Personnel issues that could elevate to discipline
4. I expect you to do your work completely and correctly – too much rides on what we do.
   a. Be thorough – it never hurts to go an extra step, but it always hurts to be lazy.
   b. Be objective – rely on fact to make determinations. Use words that relay objectivity and provable causation. Opinion and assumptions do not belong in our decisions or documentation.
   c. Take pride in your documentation – document facts fully, concisely, and accurately.
   d. Use common sense when analyzing information gathered in your investigations – does what your eyes see match what your ears hear? If it doesn't, we need to get subject matter expert clarification or ask more questions.
   e. Complete investigations in a timely manner. Investigators and supervisors must stay on top of workloads and deadlines to ensure that cases are fully documented and completed on time. Remember: merely submitting a case does not mean completion. The case is only complete when there are no tasks left to do or corrections to make.
   f. Do your work to a level so that the next set of eyes must only sign off on your work on a consistent basis – this will come with time and experience.
5. Travel is to be completed monthly.
6. I expect you to promote and foster a professional and safe work environment – put a stop to any rumor or gossip or unprofessional actions that you become aware of. I encourage CCI staff to work together across unit lines and to get to know each other. It is the duty of each person in this program to build and encourage teamwork amongst each other.
7. Staff meetings (program and unit) will be held on a regular and consistent basis.
8. Any DFPS Meetings in a Box and all CCI Blueprints for Quality Investigations read and discussed monthly in unit and program meetings.
9. Supervision/Managerial staff – I expect you to take care of each member of your respective teams. Make sure their needs are met as best we can as an agency. We are leaders, not just managers. Lead by example – be fair, equitable, and empathetic – but have high expectations of the work product produced by staff throughout the division.
10. Be accountable – to yourself, your coworkers, your supervisors, and the public that we serve.
11. Accountability must exist across all levels of this division – hold me accountable as well.
12. I expect you to know why you are here. Do you care about the children we are serving and the overall mission of this job?
    a. We are here to fulfil the mission of DFPS: *We promote safe and healthy families and protect children and vulnerable adults from abuse, neglect, and exploitation.*
    b. We are here to promote the vision of DFPS: *Improving the lives of those we serve.*
    c. We hold the values of DFPS true in our duties: *Accountable, Respectful, Diverse, Collaborative, and Professional.*



Note: These expectations were distributed prior to my onboarding in November 2021 and I did not receive these until after my termination.

# House of Representatives Public Hearing on Human Services

On March 21, 2022, I watched the House of Representatives session covering this case on live broadcast as well.

Commissioner Masters clarified that while no policy was violated, expectations were. I have since learned she is referring to a <u>Memo</u> CCI Director Justin Lewis released prior to my onboarding into the division. Even using the Memo as the standard, I did not violate any expectations.

Commissioner Masters also reported that two additional employees were fired and another one would be soon.

HHSC announced they would no longer be providing a rating of "low, medium or high" to an operation/facility during the "Risk Assessment" between DFPS and HHSC.



**Back**

 **Texas Department of Family and Protective Services**

Commissioner
Jaime Masters, MS, MFT

March 20, 2022

Associate Commissioner Robert Richman.

It is after great thought and reflection that I am writing this letter to you, resigning my position as Director of Child Care Investigations with DFPS. The events of the past three weeks have cemented in my head and heart what I feared most when I took this job a year ago – state office would not be a good long-term fit for me.

While I feel that the work that I have taken part in has brought great growth and improvement to the division, I cannot acquiesce to the political nature of the job. I can't even begin to say that I understand the political pressures associated with being in the top leadership – but as someone who generally abhors politics, it is something I can no longer deal with at the expense of my family, my health, and my self-worth.

When we gathered in the day-long meeting in the commissioner's conference room on 03/14 going day-by-day it was apparent that blame for the lack of upward movement of information came from multiple DFPS divisions (including high level regional staff, SSCC staff, and HHSC personnel. We spoke about the different levels of supervision in different division that had knowledge at multiple times in the investigation without elevating the alarm. There were also numerous mandatory reporters that failed to report alleged offenses against children.

Despite this, two of my staff were put on public display to the legislature, and consequently the media, while other divisions (with far more folks involved) were not mentioned. When Ms. Wisdom found out about the allegations and totality of the issues, she immediately called for a high-risk staffing with our complex investigation division and the assigned Special Investigation personnel and after that, a second one with her direct supervisor. While it is my expectation that certain cases be elevated up, there was no written DFPS policy requiring it prior to this situation. Though she did not successfully *immediately* elevate the concerns to her supervisor or myself, she tried and continued to direct the investigation – which is more than I can say about staff in other divisions. Yet staff in other divisions – the actual divisions responsible for the placement and movement of the children in our care – sit quietly in the shadows hiding while the public political flogging goes on. We talk about morale in the RCCI division often. What better way to kill morale of a group of hardworking individuals than for them to see this knowing that others failed as well with no mention.

Considering these things, I must step down from my position effective immediately to preserve my family, my health, and my own opinion of myself. One thing I told myself I would never do when I accepted this position is sacrifice my ideals while dealing with political pressures and throw any person "in front of the bus" and the way this has played out … well it just doesn't sit right in my gut.

I am, and will be, forever grateful for the opportunities and professional advancement and achievement that this position as presented me. This position has been my most proud professional accomplishment to date, and I have made friendships and connections that I hope will last a lifetime. But as a close friend whose opinion I value more than almost any other person outside my family pointed out to me – I have become a weekend father, sacrificed my physical and mental health, and seemingly started to sacrifice who "I" am for this position. Giving "myself" up for professional achievement is not, and has never been, worth it to me.

My family needs me home and I needed to speak my mind in an attempt to "protect the unprotected" to be able to look at myself in the mirror each morning and not be unhappy with who I see looking back at me.

Sincerely,

Justin Lewis

701 W. 51st Street • P.O. Box 149030 • Austin, Texas 78714-9030 • 512-438-4800 • www.dfps.state.tx.us
*An Equal Opportunity Employer and Provider*


Back



**Texas Department of Family and Protective Services**

Commissioner
Jaime Masters, MS, MFT

March 20, 2022

To Whom it May Concern,

I am writing this letter of reference on behalf of Ms. Ashley Wisdom. I have known Ms. Wisdon since November 2016 when she was a DFPS Investigator working out of the Dallas Children's Advocacy Center (DCAC). I was working as a Special Investigator for DFPS and was temporarily assigned to the DCAC.

From 2016 until the fall of 2021, I watched Ms. Wisdom work as an investigator and then as a unit supervisor for several years. I have not met a DFPS investigator that was as invested in her work as Ms. Wisdom. She showed compassion to victims and worked with families to keep children safe while working on helping the families stay together, if possible. As a supervisor, she cared about her workers and would often put herself out in the field to assist her crew and worked late into the night in an attempt to stay afloat in a region that was consistently understaffed and overworked. It was because of this dedication to her trade and the people that worked with her that I recruited her to come work for me in the Child Care Investigations Division of DFPS in the fall of 2021.

Ms. Wisdom came into the division, managing four regions in Central, North Central, and East Texas, eager to learn and soaking up information like a sponge. She immediately tackled morale and supervision issues in one region while working on improving investigation quality and outcomes across all her area of responsibility. I could not have been happier with the job she was doing. Unfortunately, a bad case broke in early March 2022 that took place in one of the regions Ms. Wisdom covered. Intense media coverage ensued and the blame for a system-wide breakdown in communication was placed on the shoulders of Ms. Wisdom and one of the supervisors working under her. This total blame of two people for a system failure was unwarranted.

In short (and I can be contacted personally to answer any other questions you may have), Ms. Wisdom is a skilled investigator, good supervisor, and all-around good person. As I said above, you would be hard pressed to find someone who cares more about families and children – and the safety of both – than Ms. Wisdom.

Thank you for your time in reading this letter, and please consider Ms. Wisdom for this position. I have full confidence in her ability to succeed in anything she does. Please reach out to me if you have any questions or need other information. The contacts below are my personal contact numbers/email.

Thank you,

Justin Lewis
Director of Child Care Investigations (former)
Texas Department of Family and Protective Services
Cell: 972-268-1169
Email: lewis.justin3819@gmail.com

701 W. 51st Street • P.O. Box 149030 • Austin, Texas 78714-9030 • 512-438-4800 • www.dfps.state.tx.us
*An Equal Opportunity Employer and Provider*



**Additional Information Regarding My Time with CCI:**

During the hiring process for CCI, I was informed the division was struggling due to CCI Investigators lacking training, support, and development. It was discussed during that time that the Investigators were unaware of the Mult-Disciplinary Team approach (MDT, incorporating the perspectives from CPS, law enforcement, medical staff, Child Advocacy Center team members, and legal), were not consistently conducting joint investigations, and were not appropriately dispositioning cases. Additionally, I was told I did not need to print or read the handbook regarding policies due to the policies being outdated and needing to be updated.

Though new to my position in a division experiencing a crisis caused by unaddressed systemic failures (inexperienced leadership, undeveloped staff, poor access to quality training, outdated policies, and inadequate processes for maintaining and retrieving data that could provide a picture of improvement or areas needing attention), I was excelling and positioning my area of coverage for greatness.

The week of November 1, 2021, I received a week-long training for this new position within CCI, which included two days reviewing HR/FMLA policies standard throughout DFPS, and three days reviewing the CLASS database, reports, and various other information unique to the CCI division. On November 8, 2021, I was officially onboarded and began managing six supervisors (one with 1-2 years of tenure, two with nine months of tenure, and two of whom were new with start dates of 11/8 and 11/29) and three administrative assistant positions. Each supervisor heads a unit consisting of six workers.

During my time with CCI, I had a total for four weeks of vacation. This vacation had been pre-approved and scheduled so that I could use Comp Time, which would have otherwise expired.



Back

I completed the following items during my three active months in the division (this is not an exhaustive list):

- I reached out to contacts I had with the Dallas Children's Advocacy Center to aid in CCI staff attending New Employee Orientation, discuss the MDT model, and receive training from a forensic interviewer on screening for sexual abuse.
- I advocated that guidance be given to Supervisors and Investigators regarding Safety Plans, as well as training covering this and explaining danger indicators, which are used in assessing for safety.
- I scheduled and coordinated an all-staff training for Region 3 with a Special Investigator (SI, DFPS Investigator with prior law enforcement background) and a REACH Medical Doctor to discuss the importance of utilizing law enforcement and medical resources collaboratively, as well as providing guidance and expectations.
- I provided the same training for Region 7, though due to a winter weather advisory the scheduled Dell Medical Doctor cancelled.
- I reached out to my professional contacts to secure trainers for a weeklong, Division-wide training planned for May 2022 in Galveston.
- I implemented developmental plans for a supervisor and multiple workers in my area of coverage due to high staff turnover and an attempt to aid in their understanding of policies and completing thorough investigations.
- One of my Supervisors demoted to an Investigator, another took a position with HHSC, and another left the agency.
- I interviewed candidates for open positions for Supervisors, Investigators and an administrative assistant within my areas of coverage over a course of multiple weeks.
- I learned of an Investigator experiencing homelessness and collaborated with their Supervisor and informed my chain of command to assist the employee in getting gift cards for food and a hotel so that they had a safe place to sleep during winter weather (they had secured a residence, but it had not yet become available).
- I aided two of my Supervisors in completing eleven field assessments with Investigators in a week.
- I requested that Complex Investigation Analysis (CIA, an internal consultation team to review highly concerning investigations) conduct a review of closed cases in Region 7 with Rule Out dispositions. This was due to concerns with Investigations being completely thoroughly and consistently. However, my manager, DA Winters, advised against this due to his own concerns that this would cause Investigations to be re-opened. He eventually agreed for this to occur.
- I implemented a formal conference template to document supervision between PA and Supervisors and a formal conference template to be used between Supervisors and Investigators, which was distributed for use throughout the Division.
- I requested for a tracking report to determine how many cases have been received and closed each week due to this being a helpful and standard tool within family Investigations, though not yet available within the CCI Division. The report was created about a month after my request.
- I created a courtesy request form to assist in ensuring children moved outside of the jurisdiction of the Investigation were seen and interviewed by a local CCI Investigator timely.
- I wrote several Memos for distribution through Regions 3, 4, 5, 6, and 7 clarifying policy expectations. However, there were two memos that did not receive final approval for distribution by DA Winters prior to my dismissal.