# Lori Purifoy

| | |
|---|---|
| **From:** | ashleynwisdom@gmail.com |
| **Sent:** | Friday, April 15, 2022 12:40 PM |
| **To:** | jaime.masters@dfps.texas.gov |
| **Subject:** | Termination Rebuttal Part 2 - RCCI PA Ashley Wisdom |

Hello,

I am following up regarding the rebuttal letter I submitted on March 20, 2022, in reference to my termination on March 17, 2022. I have not received a response from Commissioner Masters, Associate Commissioner Richman, or Deputy Associate Commissioner Ward. I am writing again to lay out the information as thoroughly and clearly as possible.

On February 24, 2022, at 11pm until February 25, 2022 at 3am, Supervisor Klawinsky and I were conducting a monthly conference and discussing concerning cases (to explain, we were both staying at the same hotel and are both night owls- we were both eager to address issues in our still new positions). At approximately 2am, we discussed The Refuge case. I instructed her to request a CIA consult, which she did via email at 2:20am. The following morning, I made attempts to notify my supervisor of the case, not per policy or expectation but because I typically notify him of any concerning cases. Due to his lack of availability, we spoke briefly at about 5pm until about 5:30pm. I addressed a number of concerning issues with him, though I am not confident enough to say definitively that we covered this specific case.

On February 28, 2022, I attended the CIA consult along with Supervisor Klawinsky, two CCI Investigators, the SI, and the SI Program Director. It was during this consult that I learned an additional intake from The Refuge was received on February 22nd, routed on the 24th to the unit and initiated by the investigator on the 25th. In this intake regarding a second incident, four staff had been fired or were suspended pending investigation from The Refuge due to knowing and/or aiding two youth in running away. I fully informed my supervisor, Division Administrator Brandon Winters after the CIA consult about the investigation and the new intake.

On March 1, 2022, Division Director Justin Lewis, Deputy Director Joanna Golliday, and DA Winters were sent an email summarizing the allegations and concerns about the Refuge investigation. A follow-up CIA consult was scheduled for March 4th.

On March 4, 2022, the original participants attended (minus a secondary Investigator, SI and SI PD) in addition to DA Winters and Complex Investigation Division Administrator Cameron Garza. It was at this second consult that I was notified of an additional intake received on Wednesday March 2nd. The intake was assigned out by Supervisor McCollister to an investigator in her unit. I reviewed the intake and discovered most allegations were similar, however, there was now an allegation against the administrator. I discussed the intake with everyone on the staffing and informed them explicitly that the administrator was now listed as an alleged perpetrator. I was instructed to place a hold on any additional children being placed at The Refuge. I let DA Winters know that I didn't know who to contact, and he told me I needed to speak with Health and Human Services Commission (HHSC) and Contracts. He did not provide me with any names or numbers of specific people; however, I was able to use my own professional contacts to facilitate his request to suspend placement.

On Saturday, March 5, 2022, CCI Director Justin Lewis, called me with a work question and commented that I shouldn't work too hard. I let him know that I planned to do some work in preparation for The Refuge case and a third CIA consult. I also mentioned that I had successfully put a hold on placements at The Refuge. He asked,

1

"you did what?". I apologized and explained as I quickly understood he was not made aware by DA Winters. He let me know that his frustration was not directed at me, but towards DA Winters as this was not a decision DA Winters could make at his level without approval and that he alluded to a pattern emerging of information not being properly relayed to him.

On March 7, 2022, CCI Director Lewis scheduled a meeting with several DFPS Regional Directors, including all staff in the investigation. It was during this meeting that it was discussed placing a formal hold on placement and the possibility that the remaining children placed at The Refuge would be removed due to the concerns (it was not specifically articulated, though I understood this to be out of an abundance of caution due to two serious incidents occurring in a short period of time).

On March 8, 2022, a Facility Intervention Team Staffing (FITS) was held. The intakes received were discussed. It was discussed that a plan would be created to remove the children currently placed at The Refuge out of the operation. It was discussed a formal placement hold was implemented on The Refuge.

On March 9, 2022, I was present in Bryan at Scotty's House (a Child Advocacy Center) where the children were being forensically interviewed following the removal from The Refuge. A second FITS meeting was held where HHSC was informed that CCI was removing the children from The Refuge. HHSC asked that case dispositions for the investigation be entered so that they could review the case and determine if any citations would need to be issued. I was directed by CCI Director, Justin Lewis, shortly after the FITS meeting to implement a safety plan immediately at The Refuge. I then went to The Refuge in Bastrop with Supervisor Klawinsky, to implement a Safety Plan pertaining to the children who were still in the process of being removed.

On March 10, 2022, District Court Judge Janis Graham Jack held a hearing to address concerns stemming from the understanding that continuous concerns of human trafficking had been received since January 24th and the Department failed to take any protective action for six weeks when all the children were being removed. Commissioner Masters reported that she did not know until the day prior and that several people would be losing their jobs as a result.

On March 10th at 12pm, DA Winters let me know that DD Golliday would be interviewing me the next day at 1pm as part of an Internal Investigation to gather a timeline. He assured me that I was not in any trouble and was "running point" for The Refuge investigation. Around 6 or 7 that evening, I received a call from DA Winters informing me that I was now on desk duty and not to speak with CCI Director Lewis (due to a conflict of interest, which was confusing as it gave the false impression that he and I had a personal connection) or members of my team. I also received an email from DA Winters with a memo attached detailing desk duty protocol. I was not provided any information regarding why I was on desk duty or why I was being investigated. Per DFPS policy regarding Desk Duty, a staff member is placed on desk duty if they are an alleged perpetrator on an investigation or if they have experienced a child fatality on an investigation. Neither of those incidents occurred. I also reviewed the Internal Investigation policy. I was not placed on administrative leave and was not informed of any "major offense" I had committed to warrant an internal investigation.

On March 11, 2022, at 1pm, I met with DD Golliday. She let me know that she was gathering information as it pertains to who knew what and when regarding The Refuge investigation. Throughout the interview, DD Golliday was combative and aggressive in her line of questioning. She used questions that implied I had been aware of *active* human trafficking and failed to notify higher ups timely or take any action. Towards the end of this meeting, I asked if I was going to lose my job and she said that she didn't know, but her non-verbal communication indicated that this was a very real possibility. Note: It was entirely inappropriate for DD Golliday to conduct the internal investigation in which she herself should have been scrutinized due to her own involvement, knowledge (beginning March 1st), and inaction related to this case.

On March 14, 2022, CCI Director Justin Lewis attended a meeting with Commissioner Jaime Masters, CPI Associate Commissioner Robert Richman, and others to review the case files and the information obtained from the Internal Investigation. I have since learned, through Former CCI Director Justin Lewis, during the course of that meeting, he was directed by Associate Commissioner Richman, with the approval of Commissioner Masters, to terminate me, along with Supervisor Klawinsky.

On March 15, 2022, I sent a 12-page document outlining my Timeline of events to Associate Commissioner Richman, Deputy Commissioner Tommy Ward, and DD Golliday.

On March 16, 2022, at about 5pm, I received a call from DD Golliday asking me to come to the Stemmons office in the morning at 9am for an hour meeting.

On March 17, 2022, I was notified that I was being terminated due to my "failure to provide notification regarding child safety." After being terminated, I called Deputy Commissioner Ward who reported he had been "left in the dark" about my dismissal but had questions of his own after reviewing the Timeline I had sent. He let me know he would get back with me but was parking at The Capitol. I then spoke briefly with Associate Commissioner Richman who said he would have to call me back because he had to "handle this mess" at the Special Senate Committee on Child Protective Services.

During the Special Senate Committee meeting, Commissioner Masters reported that "the supervisor and program director at DFPS staffed this on 3/3 and neither raised this up the chain as policy would have directed them to do." I was a Program Administrator (CCI does not have PDs), policy wouldn't have directed an escalation, I notified my manager on February 28th, and Director Lewis and DD Golliday were notified March 1st.

On March 20, 2022, CCI Director Lewis resigned from his position. In his resignation letter, he clarified that a lot of people in higher positions than my own knew of the allegations and did not escalate the matter up their chain of command. I also sent a rebuttal email refuting my dismissal to Commissioner Masters, Associate Commissioner Richman, and Deputy Commissioner Ward requesting I be reinstated and provided additional information to help aid them in making an informed decision regarding my employment.

On March 21, 2022, during the House of Representatives session Commissioner Masters clarified that while no policy was violated, expectations were. I have since learned she was referring to a Memo CCI Director Justin Lewis released in October 2021, prior to my onboarding into the division. Even using the Memo as the standard, I did not violate any expectations even though I only became aware of them after my termination.

The following is from the CCI Expectations written by Director Justin Lewis:

> *# 3 I expect you to keep me informed. Always. Notification should come up established chains of command.*
>
> 1. *High-profile cases or cases with media involvement*
> 2. *Intakes that have allegations against facility administrative staff*
> 3. *Any child death intakes*
> 4. *Family emergencies/deaths for our staff*
> 5. *Personnel issues that could elevate to discipline*

When The Refuge case was received, it did not meet A, B or C. Furthermore, when I was notified of the investigation on February 25th, it still did not meet A, B or C. I provided notification to my direct supervisor, DA Winters on February 28th regarding the runaway investigation due to the child being involved with the FBI, however, I have since been informed by Former CCI Director Lewis, that the case would not have been classified as "high profile" at that point either. On March 4th, when I discovered the new intake that was received regarding an administrator at The Refuge, I immediately notified DA Winters and DA Garza. DA

Winters and DA Garza did not provide additional notifications up the chain of command as directed in the expectations. I am the one who notified Director Lewis verbally on March 5th and provided my notes of the cases on March 6th.

While I may have been categorized as an at-will employee, according to the HR Manual, Chapter 11, section C, Disciplinary Actions:

1. *A supervisor follows the disciplinary action process to initiate a disciplinary action when an employee does either of the following:*
2. *Commits a major offense.*
3. *Fails to correct performance or conduct issues, either during or following a written warning period. See Chapter 10: Performance and Conduct Management.*

It is within Chapter 11, section D, that the disciplinary action notice and rebuttal process does not apply to at-will employees. The disciplinary action process still must be followed; it was not.

Chapter 11, Section D: Disciplinary Action Notice and Rebuttal Process specifically states:

1. *The policy for the disciplinary action notice and rebuttal process applies to all employees except the following:*
2. *Probationary employees.*
3. *Temporary employees.*
4. *At-will employees.*

*Although the process for disciplinary action notice and rebuttal is not required for these employees, a supervisor may choose to use this tool as approved by the appropriate associate commissioner, the deputy commissioner, or other executive staff member.*

This policy was updated recently to include that this process can be approved to be used for at-will employees.


I am also including additional information relevant to my short time in CCI:

During the hiring process for CCI, I was informed the division was struggling due to CCI Investigators lacking training, support, and development. It was discussed during that time that the Investigators were unaware of the Multi-Disciplinary Team approach (MDT, incorporating the perspectives from CPS, law enforcement, medical staff, Child Advocacy Center team members, and legal), were not consistently conducting joint investigations, and were not appropriately dispositioning cases. Additionally, I was told I did not need to print or read the handbook regarding policies due to the policies being outdated and needing to be updated.

Though new to my position in a division experiencing a crisis caused by unaddressed systemic failures (inexperienced leadership, undeveloped staff, poor access to quality training, outdated policies, and inadequate processes for maintaining and retrieving data that could provide a picture of improvement or areas needing attention), I was excelling and positioning my area of coverage for greatness.

The week of November 1, 2021, I received a week-long training for this new position within CCI, which included two days reviewing HR/FMLA policies standard throughout DFPS, and three days reviewing standard supervision training, brief training regarding the CLASS database, and reports specific to the CCI Division. On November 8, 2021, I was officially onboarded and began managing six supervisors (one with 1-2 years of tenure, two with nine months of tenure, and two of whom were new with start dates of 11/8 and 11/29) and three administrative assistant positions. Each supervisor heads a unit consisting of six workers.

During my time with CCI, I had a total for four weeks of vacation. This vacation had been pre-approved and scheduled so that I could use some of my accrued Comp Time, which would have otherwise expired. I completed the following items during my three active months in the division (this is not an exhaustive list):

1. I reached out to contacts I had with the Dallas Children's Advocacy Center to aid in CCI staff attending New Employee Orientation, discuss the MDT model, and receive training from a forensic interviewer on screening for sexual abuse.
2. I advocated that guidance be given to Supervisors and Investigators regarding Safety Plans, as well as training covering this and explaining danger indicators, which are used in assessing for safety.
3. I scheduled and coordinated an all-staff training for Region 3 with a Special Investigator (SI, DFPS Investigator with prior law enforcement background) and a REACH Medical Doctor to discuss the importance of utilizing law enforcement and medical resources collaboratively, as well as providing guidance and expectations.
4. I provided the same training for Region 7, though due to a winter weather advisory the scheduled Dell Medical Doctor cancelled.
5. I reached out to my professional contacts to secure trainers for a weeklong, Division-wide training planned for May 2022 in Galveston.
6. I implemented developmental plans for a supervisor and multiple workers in my area of coverage due to high staff turnover and an attempt to aid in their understanding of policies and completing thorough investigations.
7. I interviewed candidates for open positions for Supervisors, Investigators, and an administrative assistant within my areas of coverage over a course of multiple weeks.
8. I learned of an Investigator experiencing homelessness and collaborated with their supervisor and informed my chain of command to assist the employee in getting gift cards for food and a hotel so that they had a safe place to sleep during winter weather (they had secured a residence, but it had not yet become available).
9. I aided two of my supervisors in completing eleven field assessments with Investigators in a week.
10. I requested that Complex Investigation Analysis (CIA, an internal consultation team to review highly concerning investigations) conduct a review of closed cases in Region 7 with Rule Out dispositions. This was due to concerns with Investigations being completely thoroughly and consistently. However, my manager, DA Winters, advised against this due to his own concerns that this would cause Investigations to be re-opened. He eventually agreed for this to occur.
11. I implemented a formal conference template to document supervision between PA and Supervisors and a formal conference template to be used between Supervisors and Investigators, which was distributed for use throughout the Division.
12. I requested for a tracking report to determine how many cases have been received and closed each week due to this being a helpful and standard tool within family Investigations, though not yet available within the CCI Division. The report was created about a month after my request.
13. I created a courtesy request form to assist in ensuring children moved outside of the jurisdiction of the Investigation were seen and interviewed by a local CCI Investigator timely.
14. I wrote several Memos for distribution through Regions 3, 4, 5, 6, and 7 clarifying policy expectations. However, there were two memos that did not receive final approval for distribution by DA Winters prior to my dismissal.

I had never received any negative feedback from anyone in the CCI Division up until I was placed on desk duty on March 10, 2022. I had been consistently told that I was doing a great job and if anything, I was told to not work too hard. I was recently informed my promotion certificate was sent to the Stemmons Office in Dallas and was then forwarded to legal- that may be worth looking at as well.

While my eyes have always been opened to the Department's flaws, I nevertheless acted as a "change agent." Senator Perry's words may be worth reflecting on "at the risk of losing a lot of institutional knowledge that we can't replace tomorrow in some of these positions, sometimes it's not who you cut loose but who you keep is your biggest problem." I would appreciate a response to my rebuttal and to know what actions will be taken to rectify this situation.


Thank you for your prompt attention to this matter,


Ashley Wisdom
469-644-1802