UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CIVIL ACTION NO. 2:11-CV-00084

6-2-2022

M.D.; bnf STUKENBERG, *et al.,* Plaintiffs, v. GREG ABBOTT, *et al.,* Defendants.

Hon. Janis Graham Jack, Senior United States District Judge

## **Fourth Report of the Monitors: Remedial Orders 4, 12 to 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, A7, and A8**

Deborah Fowler and Kevin Ryan, Monitors

# Table of Contents

**Introduction and Executive Summary** ................................................................5

   Summary of Monitors' Findings ....................................................................... 8

   Summary of Findings by Remedial Order ........................................................11

**Demographics in PMC Care** ........................................................................ 18

   Age, Gender, and Race.....................................................................................18

   Living Arrangements and Length of Time in Care............................................ 20

   Out of State Placement ................................................................................... 23

   Level of Care ................................................................................................... 24

   Geographic location ........................................................................................ 24

   Single Source Continuum Contractor Presence and Placement Oversight ............25

**Preventing Sexual Abuse and Child-on-Child Sexual Aggression** ...............26

   Data Related to PMC Children Flagged with an Indicator for Sexual Aggression or Sexual Victimization ...........................................................................................26

      Number of PMC Children Flagged with a Sexual Characteristic Indicator ........... 26

      Number of Placements & Runaway Events for Children with a Sexual Characteristic Flag ...........................................................................................27

   Remedial Order 32: Policy Creation and Training of Staff Responsible for Making Determinations ................................................................................................ 28

      **Performance Validation**................................................................................ 29

      **Remedial Order 32 Summary** ..................................................................... 34

   Remedial Order 4: Caseworker and Caregiver Training on Sexual Abuse....................34

      **Background** ................................................................................................ 34

      **Caseworker Training Performance Validation Results**............................35

      **Caregiver Child Sexual Abuse Training** ........................................................37

   Remedial Orders 23, 24, 28, and 30: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression ...................................................................... 38

      **Background** ................................................................................................ 38

      **Performance Validation** ............................................................................. 39

      Case Review of Sexual Victimization History in RCCI Maltreatment in Care Investigations ................................................................................................. 39

      Trend Analysis ................................................................................................ 39

      Case Record Review of Children Flagged as Victims of Sexual Abuse or with an Indicator for Sexual Aggression ......................................................................41

      **Remedial Orders 23, 24, 28, and 30 Summary** ...........................................45

   Remedial Orders 25, 26, 27, 29 & 31: Caregiver Notification .....................................45

      **Background** ................................................................................................45

**Performance Validation**.................................................................... 46

Remedial Orders A7 and A8: Awake-Night Supervision...............................................58
**Background** ......................................................................................... 58
**Remedial Orders A7 and A8 Summary** ...............................................67

**Regulatory Monitoring and Oversight of Licensed Placements ................. 67**

Remedial Order 22: Consideration of Abuse or Neglect/Corporal Punishment and Obligation to Report Suspected Abuse or Neglect .......................................................67
**Background** ......................................................................................... 68
**Performance Validation** ..................................................................... 68
**Remedial Order 22 Summary** .............................................................81

Remedial Orders 12-19: Timeliness of Minimum Standards Investigations ..............81
**Background** .........................................................................................81
**Performance Validation (HHSC)** ....................................................... 82
**Remedial Orders 12-19 Summary** .....................................................91

Remedial Order 20: Heightened Monitoring ...............................................................92
**Overview of Operations Placed Under Heightened Monitoring**............ 92
Minimum Standards Deficiencies Cited, Findings of Abuse, Neglect, or Exploitation, and Enforcement Actions Prior to Being Placed Under Heightened Monitoring.................................................................................................. 95
Analysis of Problem Areas and Heightened Monitoring Plan Tasks ..................... 96
Minimum Standards Deficiencies Cited, and Abuse, Neglect and Exploitation Investigations After Being Placed Under Heightened Monitoring.......................103
Deficiencies Cited ...............................................................................104
Substantiated Abuse, Neglect, and Exploitation Findings.................................. 108
Review of Placements of PMC Children Made to Operations Under Heightened Monitoring, January 1, 2021 through December 31, 2021....................................110
Analysis of Waiver and Variance Requests made by Heightened Monitoring Operations ........................................................................................... 115
**In-depth Review of 19 Operations Under Heightened Monitoring** .......117
Review of Compliance History Prior to Placement on Heightened Monitoring ... 119
Analysis of Heightened Monitoring Quarterly Reports and Data ......................... 121
Minimum Standards Deficiencies Cited.................................................................126
Contract Violations...............................................................................127
Enforcement or Corrective Actions .....................................................................130
Consistency between Quarterly Reports and Other Information ..........................132
Annual Reviews ...................................................................................132
Placement Requests.............................................................................134
**Emerging Issues or Patterns in Implementation of Heightened Monitoring**................................................................................................134

Duplication of Tasks Between Heightened Monitoring and Other Enforcement Actions ........................................................................................................135

Lack of Meaningful Guidance or Technical Assistance ..............................140

Operations Allowed to Refuse Tasks or Change Tasks .............................143

Other Issues ....................................................................................................147

**Remedial Order 20 Summary**..................................................................150

Remedial Order 21: Revocation of Licenses ....................................................151

**Background** ................................................................................................ 151

**Agency Home Closures** .......................................................................... 151

Approved RCCR Closure Recommendations ........................................... 151

Pending Closure Recommendation.............................................................178

Denied Closure Recommendations ............................................................ 180

DFPS List of Disallowed Homes .................................................................185

Closure of Congregate Care Operations ...................................................186

**Updates on Prior Facility Closures**...................................................... 202

**Remedial Order 21 Summary** ............................................................... 203

# Introduction and Executive Summary

This is the Monitors' fourth comprehensive report to the United States District Court ("Court") in *M.D. by Stukenberg v. Abbott* following the mandate issued by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") implementing the Court's remedial orders.[1] The Plaintiffs are a certified class of children in the Permanent Managing Conservatorship ("PMC") of the Texas Department of Family and Protective Services ("DFPS") who sought injunctive relief against the State of Texas. At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and Human Services Commission ("HHSC").[2] DFPS is now an independent State agency reporting directly to the Governor.[3]

Following a bench trial in 2014, in December 2015 the Court published a Memorandum Opinion and Verdict finding that Texas had failed to protect PMC children from an unreasonable risk of harm.[4] The Court issued a Final Order on January 15, 2018, and following a stay order, the Fifth Circuit adopted in part and reversed in part modified the remedial orders, remanding to the Court, which issued a modified Order on November 20, 2018.[5] The Fifth Circuit again adopted in part and reversed in part the Court's Order and issued its Judgment as Mandate on July 31, 2019.[6] The Court's November 20, 2018 Order, as modified by the Fifth Circuit on July 8, 2019,[7] specifies numerous remedial orders that implement the Court's injunction as detailed below, charging the Monitors "to assess and report on Defendants' compliance with the terms of this Order."[8]

---

[1] *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626.

[2] Effective February 2021, HHSC changed the name of its child care regulation unit, Residential Child Care Licensing ("RCCL"), to Residential Child Care Regulation ("RCCR"). This report uses RCCR to describe this division of HHSC even when referring to historic work done by the unit under its previous name.

[3] The 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent state agency reporting directly to the Governor, H.B. 5 (TX 2017), 85th Leg., R.S.

[4] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[5] *Id.*

[6] *M.D. ex rel. Stukenberg,* 929 F.3d at 277; J. (5th Cir. 2019), ECF No. 626.

[7] *M.D. ex rel. Stukenberg*, 929 F.3d at 277.

[8] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 16 (S.D. Tex. Nov. 20, 2018), ECF No. 606. ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. In order to avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order. The Monitors shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order. The Monitors shall provide a written report to the Court every six months. The Monitors' reports shall set forth whether the Defendants have met the requirements of this Order. In

On June 16, 2020, the Monitors filed the first comprehensive report ("First Report") with the Court, concluding that "the Texas child welfare system continues to expose children in permanent managing conservatorship ('PMC') to an unreasonable risk of serious harm."

On July 2, 2020, Plaintiffs filed a Motion to Show Cause Why Defendants Should Not Be Held in Contempt for their failure to comply with Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, and B5 ("July 2, 2020, Show Cause Motion"). The State filed written objections to the Monitors' First Report on July 6, 2020[9] and a Response in Opposition to the Motion to Show Cause on July 24, 2020.

On September 3 and 4, 2020, the Court held a hearing on Plaintiffs' July 2, 2020, Show Cause Motion, and on December 18, 2020, found Defendants to be in contempt of Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37, and B5, but not in contempt of Remedial Orders 24, 28, or 30.[10]

On May 4, 2021, the Monitors filed the second comprehensive report ("Second Report") with the Court, concluding that the State made progress toward eliminating some of the "substantial threats to children's safety" that surfaced in the Monitors' First Report; but the Monitors also concluded the State's performance in some areas, including its oversight of the care of children by the Single Source Continuum Contractors ("SSCC") and certain general residential operations ("GRO"), was contrary to the Court's remedial orders.[11]

---

addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.") *Id.* at 17.

[9] Defendants' Verified Objections to Monitors' Report, ECF No. 903.

[10] The Court held: "Defendants are ORDERED to file with the Court a sworn certification of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 within thirty (30) days of the date of this Order. This sworn certification does not need to be verified by the Monitors prior to filing. Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with these Remedial Orders, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. Defendants are further ORDERED to appear at a compliance hearing before this Court, beginning at 9:00 a.m. on Wednesday, May 5, 2021 and continuing thereafter until the compliance hearing concludes. The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401. All of Defendants' supporting evidence of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 is subject to verification by the Monitors prior to the May compliance hearing. No sanctions will issue at this time, but, failing the Monitors' verification of compliance, any sanctions as to Defendants' performance of Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, or B5 will be revisited at the compliance hearing. To avoid additional future sanctions as to these findings of contempt, Defendants must comply with each of these Remedial Orders in the timeframe described. No retroactive sanctions will be imposed at the time of the compliance hearing."

[11] Deborah Fowler & Kevin Ryan, Second Report, ECF No. 1079.

Following discussions with the Court and parties in 2021, the Monitors developed a report schedule which divided the third report to the Court, filed on January 10, 2022 ("Third Report"), covering Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 35, 37, A1 to A4, A6, and B1 to B5, from this current report ("Fourth Report") assessing the balance of the Remedial Orders addressing Preventing Sexual Abuse and Child-on-Child Sexual Aggression, Remedial Orders 32, 4, 23, 24, 28, and 30, 25, 26, 27, 29, and 31, A7 and A8 and Regulatory Monitoring and Oversight of Licensed Placement, Remedial Orders 22, 12, 13, 14, 15, 16, 17, 18, and 19, 20, and 21.

In preparing this Fourth Report, the Monitors, and their staff ("the monitoring team") undertook a broad set of activities to validate the State's performance and adherence to the Remedial Orders. The Monitors requested data and information from both DFPS and HHSC to validate the agencies' compliance with the Court's remedial orders, as detailed in various sections of this report. In this Fourth Report, the Monitors adhered to the methodology for validating and reporting as set forth in Reports 1-3 unless otherwise noted in this section of the report.[12] The Monitors also requested data and information from the SSCCs with which DFPS contracts to provide case management and placement services to foster children in DFPS regions that have transitioned to the Community Based Care ("CBC") model.[13]

The monitoring team examined tens of thousands of documents and records, including data files; children's case records, both electronic and paper; investigations; critical incidents; restraint log entries; witness statements; interviews; policies; resource materials such as handbooks; plans; guidelines and field guidance; child abuse, neglect or exploitation referrals to Statewide Intake ("SWI"), including E-Reports and recorded phone calls when available; and an array of employee and caregiver human resources and training records and certifications.  The monitoring team made six site visits to licensed operations, four located in Texas and two located in Michigan. The monitoring

---

[12] On December 17, 2021, the Monitors sent the State a supplemental data and information request. E-mail from Deborah Fowler and Kevin Ryan, re: December 2021 Supplemental Data & Information Request, December 17, 2021 (on file with the Monitors). The Monitors requested data associated with gaps in reporting or data across several of the Court's remedial orders. After a conversation with the State about the data requested, the Monitors clarified their request and reached a preliminary agreement about the content and timing of additional data requested. Some data requested is still pending.

[13] CBC was formerly known as Foster Care Redesign. There are currently four regions that have transitioned to the CBC model (excluding the failed transition in Region 8a): Region 1 (Texas Panhandle); Region 2 (30 counties in North Texas); Region 3b (seven counties around Fort Worth); and, most recently effective October 2021, Region 8b (26 counties surrounding Bexar County). Region 8a, which previously was operating under the CBC model, has transitioned back to DFPS management. There are three stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services. The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families." DFPS, *Community-Based Care*, *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services. Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.* Two SSCCs – OCOK and 2INgage – moved to Stage II of the CBC model in 2020. Stage II includes shifting case management services from DFPS to the SSCC. Stage III involves performance assessment and financial incentives for achievement of permanency for children. *Id.*

team also made one-day visits to 13 operations that the State placed under Heightened Monitoring pursuant to Remedial Order 20.

## Summary of Monitors' Findings

The Court's Final Order enjoins the State "from placing children in the permanent managing conservatorship ("PMC") in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas' PMC foster children are free from an unreasonable risk of serious harm."[14]

The Monitors' investigation, analysis, interviews, and site visits in preparation for this report identified areas in which the State made progress toward eliminating "substantial threats to children's safety" by preventing sexual abuse and child-on-child sexual aggression, and through improved regulatory monitoring of licensed placements. The report also identified areas in which the State continues to struggle with implementation of the Court's remedial orders.

The findings related to preventing sexual abuse and child-on-child sexual aggression showed the following areas of progress and gaps in implementing the Court's remedial orders:

✦     The Monitors reviewed the State's implementation of the remedial orders requiring DFPS staff or caregivers to receive training in child sexual abuse or child-on-child sexual aggression. The State continued to maintain a high rate of compliance with Remedial Order 32 requirements related to child sexual aggression (CSA) training. Almost all the staff included in the data provided to the Monitors by DFPS (99%) had received CSA training. The two SSCCs (OCOK and 2INgage) in Stage 2 of the CBC model had a similarly high rate of compliance for staff that assist in making determinations related to child sexual aggression for children in their care. However, the quarterly training data provided by DFPS did not include some staff positions that DFPS policy requires to play a role in decisions surrounding child sexual aggression. Therefore, the Monitors cannot validate that all DFPS staff who make determinations regarding child sexual aggression have been trained, as required by Remedial Order 32. The Monitors' analysis also showed that more than one-third of DFPS staff involved in determining whether a child's behavior meets the definition of sexually aggressive did not receive updated training after DFPS updated its policies in 2020 and 2021.

The State improved on its already high rate of compliance with Remedial Order 4 requirements related to child sexual abuse and CSA training for caseworkers. However, due to data deficiencies, the Monitors still cannot validate that all or most caregivers completed the full child sexual abuse training required by Remedial Order 4. The monitoring team reviewed 53 staff records during site visits and found that most (38 or 72%) included documentation showing the caregiver completed CSA training.

---

[14] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 2 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

✦     The Monitors again encountered challenges associated with validating the State's compliance with the remedial orders associated with notifying caregivers of a child's history of sexual abuse or sexual aggression. The Monitors' case record reviews showed that more than 90 percent of the Common Applications reviewed included all the child's known history of sexual abuse or aggression; however, the State's method for updating and storing this document in IMPACT makes it difficult to associate a particular Common Application with a particular placement. And while the monitoring team frequently found a Placement Summary and Attachment A in the records reviewed, fewer than half included all of a child's known history of sexual abuse or aggression and were signed by the receiving caregiver on or before the child's placement date.

The monitoring team's site visits returned mixed results related to caregiver notification. Most administrators interviewed by the monitoring team during site visits (8 of 10 or 80%) said they always receive an Attachment A documenting a child's history of sexual abuse or aggression when a child is admitted, however only four (40%) reported that they always receive proper notice related to a child's history of sexual abuse or aggression prior to or upon a child's placement in their operation. Most direct caregivers interviewed (20 of 28 or 71%) said that when an Attachment A is provided for a child, they are always asked to sign it; however, a lower percentage of caregiver staff (55%) reported they received an Attachment A when supervising a child for the first time.

✦     DFPS reported significantly fewer violations of the Court's remedial orders related to awake-night supervision during the period reviewed for this report (January 1, 2021 through November 30, 2021) than the last (21 compared to 40). However, two of the monitoring team's six site visits raised concerns regarding sleeping staff. During one, the monitoring team found the staff person who was supposed to be providing awake-night supervision asleep on the couch, with the lights out. She was wearing pajamas.

The findings associated with the State's regulatory oversight and monitoring of licensed placements also revealed areas of progress and ongoing challenges:

✦     The Monitors' case record review showed that RCCR maintained a high rate of compliance with Remedial Order 22 in documenting Extended Compliance History Reviews (ECHRs) during inspections of licensed operations. The monitoring team also found that RCCR significantly improved the number of ECHRs completed for an investigation inspection that documented an identified pattern or trend in violations (from 43% in the Second Report to 74%). However, of the 189 investigation inspections involving a foster home that the monitoring team reviewed, only 80 (42%) included a discussion of the safety history of the home that was the subject of the investigation. There was also a significant number of ECHRs (292 of 650 or 45%) that did not document that a safety risk identified by the monitoring team was considered during the inspection.

✦     The Monitors also found the State improved its compliance with the second requirement of Remedial Order 22, related to violations associated with an operation's obligation to report abuse, neglect, or exploitation. In the Second Report, the Monitors found that RCCR was not reporting to DFPS any cited deficiencies associated with

violations of the obligation to report child-on-child sexual or physical abuse. RCCR began reporting those deficiencies to DFPS on May 4, 2021, and the Monitors found data for citations related to those minimum standards in the data analyzed for this report. This resulted in an increase in the number of reported deficiencies (from 19 to 46) associated with violation of a minimum standard requiring abuse, neglect, and exploitation to be reported. RCCR maintained a high rate of compliance with the Court's remedial orders associated with timely initiation and completion of investigations of minimum standards violations. Of the two Priority One minimum standards investigations initiated by RCCR during the review period, one was, and one was not, timely initiated with face-to-face contact with all alleged child victims.

✦   The State continues to close operations and agency foster homes that have a history of safety violations that have proven intransigent to improvement. RCCR inspectors recommended closure of 12 agency foster homes during the period reviewed for this report (March 16, 2021, through December 31, 2021). Of those recommendations, two were approved by RCCR, seven closed before RCCR decided on the recommendation, one recommendation is still pending, and RCCR denied two recommendations for closure. DFPS placed 34 homes on its list of foster homes that were disallowed for placement in 2021; of those, nine were also recommended for closure by RCCR. The Monitors reviewed CLASS records for the foster homes on the DFPS disallowed list and determined that almost all those homes (30) had either been voluntarily or involuntarily closed by the CPA. Two were listed as inactive, and the Monitors did not find CLASS records for two. In addition, since the Monitors' last update to the Court on closures, RCCR has revoked or denied a license to two more congregate care operations due to a history of safety violations.

✦   The Monitors' analysis of the State's implementation of Remedial Order 20 (Heightened Monitoring) showed significant improvement associated with DFPS' review and approval of placement requests for operations under Heightened Monitoring. The Monitors' case record reviews conducted for the Second Report found a placement approval in only 65% of placement requests reviewed; a case read conducted for this report found placement requests were approved by the appropriate DFPS staff in 88% of placements reviewed. And while only 68% were approved prior to or on the same day the child was placed, the timing of placement approval improved substantially over the course of 2021. In December 2021, 95% of placement requests were approved prior to or the same day the child was placed. However, placements were appropriately and timely approved and documented the justification for the placement (a requirement of the Court's orders) in only 38%. An in-depth review of 19 operations placed under Heightened Monitoring showed that for those 19 operations, only 66 of 1,838 placement requests (4%) were denied. Almost all placement requests (1,614 or 88%) resulted in placement; of the 66 placement requests that were denied, eight (12%) still resulted in placement in the operation.

✦   The Monitors' analysis of operations under Heightened Monitoring also revealed that many improved their performance over the course of Heightened Monitoring and moved to post-plan monitoring. The Monitors' analysis showed that of the operations

placed under Heightened Monitoring in 2020 or 2021 that have not since closed, the State determined that 22 improved enough to move to post-plan monitoring. Other operations under Heightened Monitoring continued to struggle; 10 agreed to a voluntary Plan of Action after being placed under Heightened Monitoring, and seven were placed on Probation by RCCR. Others were placed under a Corrective Action Plan by DFPS or were assessed liquidated damages due to contract violations.

✦   Analysis of the State's implementation of Heightened Monitoring raised several emerging areas of concern that the Monitors will continue to evaluate, including:

- inefficiencies associated with overlapping enforcement actions (a voluntary Plan of Action or Probation instituted by RCCR, or contract-related Corrective Action Plan instituted by DFPS);
- lack of meaningful guidance or technical assistance to operations placed on Heightened Monitoring; and
- operations allowed to refuse to undertake Tasks identified by the State, or revision of Tasks to make them easier to comply with.

## Summary of Findings by Remedial Order

### Preventing Sexual Abuse and Child-on-Child Sexual Aggression

**Remedial Order 32:** *Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child on child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child on child sexual abuse are trained on the policy.*

- Though almost all staff included in the data reported to the Monitors as requiring training pursuant to Remedial Order 32 had received training, certain staff titles associated with making determinations about what constitutes child-on-child abuse appeared to be missing from the data. Of the staff included in the data, many received training prior to recent policy changes associated with making determination regarding child-on-child sexual abuse; more than a third received training prior to November 2019. While the majority of OCOK and 2INgage supervisors had received CSA training, they received the training thirteen or more months before the end of quarter 1 FY 2022.

**Remedial Order 4:** *Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

- DFPS's data shows that 99% of workers who carried at least one case from June 1, 2021, to November 30, 2021, completed the training.

- Specifically, DFPS's data show that 99.8% of DFPS CVS caseworkers, 96.2% of OCOK caseworkers and 92.5% of 2INgage caseworkers listed in the caseload

data matched with the respective caseworkers listed in the child sexual abuse data sets.

- A random sample of 266 caseworkers interviewed by the monitoring team between February 2021 and December 2021 resulted in all the caseworkers confirming their completion of sexual abuse training.

- Due to data deficiencies, the Monitors cannot validate that all or most caregivers completed the full child sexual abuse training required by Remedial Order 4.

**Remedial Order 23:** *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order 24:** *Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order 28:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order 30:** *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

- In the case record review of children whose indicators were documented in 2021, 25% of children that DFPS identified as victims of sexual abuse, were victimized or re-victimized after entering foster care. Of children flagged with an indicator for sexual aggression, 39% were flagged because of an incident that occurred after entering foster care, and another 8% were noted to have engaged in an incident of sexual aggression both prior to and after entering care.

**Remedial Order 25:** *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

**Remedial Order 26:** *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order 27:** *Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

**Remedial Order 29:** *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form, and common application for placement.*

**Remedial Order 31:** *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

- The Common Applications included in the Monitors' case record review generally included a child's known history of sexual abuse or sexual aggression. However, the State's process for updating the child's Common Application between placements is inconsistent, making it difficult for the monitoring team to determine whether the Common Application found in IMPACT was associated with a particular placement. As a result, this method is a poor indicator for validating caregiver notification for a given placement. Conversely, the monitoring team could almost always locate a Placement Summary and Attachment A associated with a particular placement; however, these documents included both all a child's known history of victimization or aggression and the receiving caregiver's signature in fewer than half of the cases reviewed. The SSCCs had lower compliance rates than DFPS. Caregiver notification results improved in the second half of 2021.

- During six site visits, the monitoring team found a Common Application, Placement Summary, and Attachment A in most children's records. However, some of these records were missing from site records for children who were flagged with an indicator for sexual abuse or sexual aggression. During interviews, most caregivers said they were asked to sign an Attachment A when one was provided; but only 17 of 31 (55%) named the Attachment A as a document that they were given when supervising a child for the first time. Yet almost all of them reported that they were informed if a child in their care had a history of sexual abuse or sexual aggression.

**Remedial Order A7:** *The Defendants shall immediately cease placing PMC children in licensed foster care (LFC) placements housing more than 6 children, inclusive of all foster, biological, and adoptive children, that lack continuous 24-hour awake-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

**Remedial Order A8:** *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children*

- Though DFPS is routinely making unannounced awake-night visits to operations requiring awake-night supervision, some operations continue to struggle with compliance.

## Regulatory Monitoring and Oversight of Licensed Placements

**Remedial Order 22:** *Effective immediately, RCCL, and any successor entity charged with inspections of childcare placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment in the placements. During inspections, RCCL, and any successor entity charged with inspections of childcare placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of childcare placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

- The Monitors found the data elements reported by inspectors in Extended Compliance History Reviews (ECHRs) regarding abuse, neglect, and exploitation intakes and substantiated findings, and corporal punishment findings, to be largely consistent with the data provided by the State for the operation. The discrepancies for abuse, neglect, and exploitation intakes are likely explained by the timing of the inspection.

- However, the monitoring team's review of ECHRs revealed that the history of the foster home (as opposed to the CPA) was not discussed in ECHRs related to investigations of allegations involving foster homes in more than half of investigation inspections. A review of the quality of narratives in ECHRs and documentation of safety risks showed 31% of inspections did not document how the safety risk was considered, often because of insufficient documentation in the ECHR itself.

- Although RCCR made improvements to reports of daily deficiencies related to failure to report abuse, neglect, or exploitation, there remains a lack of alignment between the citations issued by RCCR, the notifications sent by RCCR to DFPS, and DFPS' report of the citations for which it received notifications.

- The Monitors' review of all 46 of the investigations or inspections in CLASS involving allegations that operations failed to report abuse, neglect, or exploitation revealed allegations that, in many cases, were substantiated after an investigation. In other cases, the operation was cited after failing to report child-on-child sexual contact.

**Remedial Order 12:** *Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff,*

14

*observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

- 50% (2) of Priority One RCCR investigations included face-to-fact contact with all alleged child victims within 24 hours of intake.

**Remedial Order 13:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

- 84% (163) of Priority Two RCCR investigations included face-to-face contact with all alleged child victims within 72 hours of intake.
- 6% (12) of Priority Two RCCR investigations did not conduct face-to-face contacts within 72 hours and data were not available for 10% (20) of investigations.

**Remedial Order 14:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

- 93% (186) of Priority One and Two RCCR investigations were completed within 30 days of intake.

**Remedial Order 15:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

- 97% (1,484) of Priority Three, Four, and Five RCCR investigations were completed within 60 days of intake.

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

- In 95% (189) of Priority One and Two RCCR investigations, documentation was completed on the same day the investigation was completed.

**Remedial Order 17:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

- In 96% (1,479) of Priority Three, Four, and Five RCCR investigations, documentation was completed within 60 days of intake.

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the*

*referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

- 94% (187) of Priority One and Two RCCR investigations included notification to the referent (or the referent was anonymous) and notification to the provider within five days of completion.
- 6% (12) of Priority One and Two RCCR investigations had an anonymous reporter.

**Remedial Order 19:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

- 95% (1,458) of Priority Three, Four, and Five RCCR investigations included notification to the referent (or the referent was anonymous) and to the provider within 60 days of intake.
- 4% (64) of Priority Three, Four, and Five RCCR investigations had an anonymous reporter.

**Remedial Order 20:** *Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions, and, as appropriate, other remedial actions under DFPS' enforcement framework.[15]*

The monitoring team's data analysis for Heightened Monitoring operations, site visits to 13 Heightened Monitoring operations, and in-depth analysis of documents, data, and information for 19 Heightened Monitoring operations revealed the following emerging issues or patterns:

- Inefficiencies and safety concerns associated with duplicative and overlapping enforcement actions. Ten Heightened Monitoring operations agreed to a voluntary Plan of Action, and RCCR placed seven on Probation, after Heightened Monitoring started. Others were placed on a Corrective Action Plan by DFPS as the result of a contract violation.

---

[15] Two subsequent orders further described the methodology for identifying operations subject to Heightened Monitoring, the method for developing a Heightened Monitoring plan and what is required to be included, the cadence of monitoring visits by the State, requirements for placement of PMC children in operations under Heightened Monitoring, the length of time operations are to stay on Heightened Monitoring and the requirements an operation must meet to exit Heightened Monitoring. Order, March 18, 2020, ECF 837; Order Modifying Order Regarding Heightened Monitoring, December 7, 2020, ECF 1012.

- A lack of meaningful guidance or Technical Assistance from the State. During interviews with the monitoring team, some administrators reported receiving helpful Technical Assistance related to Heightened Monitoring Tasks. However, others reported receiving little or no helpful assistance or guidance, particularly when they were drafting responses required by Plan Tasks. The monitoring team identified Technical Assistance included in some Heightened Monitoring Plans that provided little meaningful guidance. Over the course of the Monitors' work, the monitoring team has repeatedly observed that "Technical Assistance" given by RCCR in lieu of, or in addition to a citation, simply restated the minimum standard that was violated.

- Some operations were allowed to refuse Tasks identified by the State in Heightened Monitoring Plans, and others changed Tasks after the Plan started to make it easier to comply.

The Monitors also discovered that Technical Assistance for minimum standards violations and agency home sampling concerns are not considered by the State for purposes of determining Compliance with Heightened Monitoring Plans.

**Remedial Order 21:** *Effective immediately, RCCL and/or its successor entity shall have the right to directly suspend or revoke the license of a placement in order to protect the children in the PMC class.*

- Between April 1, 2021 and December 31, 2021, RCCR inspectors recommended closure for twelve foster homes. RCCR approved two foster homes for closure due to multiple investigations for violations of minimum standards and abuse and neglect, including medical neglect, improper discipline, failure to adhere to medication regimes, and home cleanliness violations, among other citations and violations. Seven foster homes were closed by their CPAs prior to final RCCR closure decisions. RCCR denied closure of two homes, despite multiple investigations and citations.  One recommendation for closure remained pending as of the Monitors' review.

- Since the Monitors last updated the Court on congregate care facility closures, RCCR revoked or denied a license for two congregate care facilities due to their histories of safety violations.

- As of March 15, 2022, DFPS' list of foster homes disallowed for placement included 56 homes; 34 of those homes were added to this list in 2021.  Nine of these homes were among the twelve that an RCCR inspector recommended for closure.   The Monitors reviewed CLASS records for the homes on the disallowed list and found records for all but two.   The other homes on the list were involuntarily or voluntarily closed by the CPA, closed when the CPA voluntarily closed or had its license revoked by RCCR, or were listed as inactive.

## Demographics in PMC Care

According to DFPS data, there were 9,397 children in PMC status as of December 31, 2021,[16] a decrease of 408 children since June 30, 2021.[17] Of the 9,397 children in PMC status on December 31, 2021, 2,742 (29%) children first entered PMC status after June 30, 2021. DFPS cared for 13,255 PMC children between July 1, 2021, to December 31, 2021. During this period, 3,103 children entered PMC status and 3,706 children exited PMC status.

### Age, Gender, and Race

As of December 31, 2021, 38% of children with PMC status were age zero to six years old (3,565); 22% were seven to 11 years old (2,037); and 40% were 12 to 17 years old (3,795).



Figure 1: Age of Children in PMC on December 31, 2021

n=9,397 children



---

[16] The point-in-time analyses in this section are based on DFPS data production of children in PMC during December 2021. *See* DFPS, *RO. Inj - List of Children in PMC Dec 2021 – 2-1-22_104940* (Feb. 3, 2022) (on file with the Monitors). Due to a lag in DFPS data entry, the Monitors conclude that the data in the monthly point-in-time analysis are accurate within a margin of error of two percent. The number of children who entered and exited PMC status and the number of all children in PMC status during the period is based on DFPS data production of children in PMC status from July 31, 2019, to December 31, 2021. *See* DFPS, *RO. Inj – Updated list of Children in PMC 073119_123121- 3-1-22-d105306* (March 2, 2022) (on file with the Monitors).

[17] *See* Deborah Fowler & Kevin Ryan, Third Report 17, ECF No. 1165.

Forty-eight percent of children in PMC status were reported as female and 52% were reported as male.

The race of non-Hispanic children in PMC status breaks down as follows: 27% (2,578) of children in PMC on December 31, 2021, were White; 25% (2,331) were Black/African American; <1% (18) were Native American; <1% (30) were Asian; and 6% (541) were categorized as "Other." Additionally, 42% (3,899) of children in PMC on December 31, 2021, were of Hispanic ethnicity. Non-Hispanic Black/African American children in PMC status appear to be disproportionately represented compared to the racial category totals for Texas's population of all children ages zero to 17 years in the 2020 census.

Table 1 : Race for Children in PMC on December 31, 2021, and Estimates of Total Child Population in Texas by Race, August 12, 2021 [18],[19]

| Race/Ethnicity | Children in PMC on December 31, 2021 | | Estimates of Total Population in Texas by Race | |
|---|---|---|---|---|
| | Frequency | Percent | Frequency | Percent |
| Non-Hispanic White | 2,578 | 27.4% | 11,584,597 | 40.2% |
| Non-Hispanic Black/African American | 2,331 | 24.8% | 3,444,712 | 12.0% |
| Non-Hispanic Other | 541 | 5.8% | 886,095 | 3.1% |
| Non-Hispanic Native American | 18 | 0.2% | 27,857 | 0.1% |
| Non-Hispanic Asian | 30 | 0.3% | 1,561,518 | 5.4% |
| Hispanic (of any race) | 3,899 | 41.5% | 11,441,717 | 39.7% |
| **Total** | **9,397** | **100%** | **28,803,616** | **100%** |

Note: Columns may not add to 100.0% due to rounding.

---

[18] *See* UNITED STATES CENSUS BUREAU, Table IDs P2 & P4, Product: 2020: DEC Redistricting Data (PL 94-171) (August 2021), available at https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity&tid=DECENNIALPL2020.P2, and https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity%20&tid=DECENNIALPL2020.P4. These totals were derived by subtracting Table P4 totals (population over 18) from Table P2 totals (total population). The categories used by the Census Bureau and Texas DFPS do not match exactly. The Census data were aggregated as follows: the Non-Hispanic Other category includes all children in the Non-Hispanic Other category with one race and all Non-Hispanic children with more than one race; the Non-Hispanic Native American totals combine the American Indian Alaska Native category with the Native Hawaiian and Pacific Islander category.

[19] The format of the data provided by DFPS to the Monitors does not provide the ability to identify the racial categories for any child of Hispanic ethnicity.

## Living Arrangements and Length of Time in Care

Based upon information provided by DFPS, 79% (7,419) of children in PMC on December 31, 2021, lived in family settings, including 26% (2,424) living with relatives or fictive kin and 3% (309) living in adoptive homes; 15% (1,409) of children in PMC lived in congregate care; and 530 (6%) children lived in other types of living arrangements. The remaining 39 (<1%) of PMC youth were without an authorized placement on December 31, 2021.

Figure 2: Living Arrangements for Children in PMC on December 31, 2021[20]

n=9,397



PMC children who were identified as either Black/African American or Hispanic were slightly more likely to live in family settings than those children identified as White. Of children identified as Hispanic, 80% lived in family settings; Black/African American children, 79%; and for White children, 76%.

---

[20] The 530 children in the "Other" living arrangement category in this figure includes those identified by DFPS as: "Unauthorized Placement" (2%, 145), "HCS Group 1-4" (1%, 101), "Runaway" (1%, 91), "Incarcerated" (1%, 81), "Own-home/Non-Custodial Care" (<1%, 24), "Psychiatric Hospital" (<1%, 20), "Independent Living" (<1%, 6), Data Entry Error (<1%, 1), and nine other living arrangement types (1%, 61). DFPS identified 39 children without placement for this date from the ongoing email notifications from DFPS to the Monitors about children without placements; the Monitors cross-referenced those children in the relevant December data report with living arrangements. Of the 39 children without placement, 38 were listed in the DFPS data report with a living arrangement of "DFPS Supervision" and one was with listed with a living arrangement of "runaway."

Table 2: Living Arrangement by Race, Children in PMC on December 31, 2021

| Race/Ethnicity | In Family Setting[21] | | | | |
|---|---|---|---|---|---|
| | No | % | Yes | % | Total |
| Non-Hispanic White | 609 | 24% | 1,969 | 76% | 2,578 |
| Non-Hispanic Black/African American | 481 | 21% | 1,850 | 79% | 2,331 |
| Non-Hispanic Other | 99 | 18% | 442 | 82% | 541 |
| Non-Hispanic Native American | 5 | 17% | 25 | 83% | 30 |
| Non-Hispanic Asian | 4 | 22% | 14 | 78% | 18 |
| Hispanic (of any race) | 780 | 20% | 3,119 | 80% | 3,899 |
| **Total** | **1,978** | **21%** | **7,419** | **79%** | **9,397** |

Table 3 : Living Arrangement by Race, Children in PMC on December 31, 2021

| Race/Ethnicity | Living Arrangement | | | | | |
|---|---|---|---|---|---|---|
| | Foster Home | Adoptive Home | Congregate Care | Relative/ Fictive Kin | Other | Total |
| Non-Hispanic White | 49% | 4% | 18% | 24% | 5% | 100% |
| Non-Hispanic Black/African American | 52% | 2% | 14% | 25% | 7% | 100% |
| Non-Hispanic Other | 51% | 4% | 14% | 27% | 4% | 100% |
| Non-Hispanic Native American | 53% | 7% | 17% | 23% | 0% | 100% |
| Non-Hispanic Asian | 61% | 0% | 17% | 17% | 6% | 100% |
| Hispanic (of any race) | 49% | 4% | 14% | 27% | 6% | 100% |
| **Total** | **50%** | **3%** | **15%** | **26%** | **6%** | **100%** |

Of the children in PMC status on December 31, 2021, 38% (3,575) were in care for one to two years; 25% (2,311) were in care for two to three years; 33% (3,135) were in care for more than three years; and 4% (357) were in care for less than one year. Additionally, for 19 children (<1%) the data did not include removal dates, thus the Monitors were unable to calculate their length of time in care.

---

[21] Family settings included placements in foster homes, adoptive homes, and with relatives/fictive kin.

### Figure 3: Length of Stay in Care of Children in PMC on December 31, 2021
#### n=9,397 children



Children exited from PMC status primarily through adoption; reunification with family; having custody transferred to relatives; or by aging out of care.[22] Of the 3,339 exits from PMC status of children that DFPS reported between July 1, 2021 to December 31, 2021, the most frequent reason for exit was adoption, with more adoptions by non-relatives (1,195) than relatives (1,053). The breakdown of exit reasons is as follows: 67% (2,248) of children were adopted; 15% (506) of children had custody transferred to a relative; and 14% (469) of children who exited were emancipated—or aged out—of foster care.[23] Finally, a small number were reunified with their families (3%, 99) or had other outcomes (1%, 17).[24]

---

[22] The exit analyses in this section are based on DFPS data production of children who exited from PMC each month. *See* DFPS, *RO.Inj - List of Children in PMC Jul 2021 – 9-1-21_103310* (Sept. 2, 2021); DFPS, *RO.Inj - List of Children in PMC Aug 2021 – 10-1-21_103690* (Oct. 5, 2021); DFPS, *RO. Inj - List of Children in PMC Sep 2021 – 11-1-21_104092* (Nov. 2, 2021); DFPS, *RO.Inj - List of Children in PMC Oct 2021 – 12-1-21_104381* (Dec. 2, 2021); *RO.Inj - List of Children in PMC Nov 2021 – 1-3-22_104626* (Jan. 3, 2022); *RO.Inj - List of Children in PMC Dec 2021 – 2-1-22_104940* (Feb. 3, 2022) (on file with the Monitors).

[23] The 3,339 exits include two children who reportedly exited care twice during the period from July 1, 2021 to December 31, 2021.

[24] Data reports that DFPS submitted to the Monitors entitled Gap Exit Analysis show that an additional 418 children exited from PMC status during the period but did not have an exit outcome listed. These children did not appear in the monthly data reports DFPS submitted to the Monitors due to data entry lag; future updated submissions that the Monitors requested from DFPS will provide the data points.

Table 4: Exits from PMC by Exit Outcome, July 1, 2021, to December 31, 2021

| Exit Outcome | Frequency | Percent |
|---|---|---|
| Adoption | 2,248 | 67% |
| Custody to Relative | 506 | 15% |
| Emancipation | 469 | 14% |
| Reunification | 99 | 3% |
| Other | 17 | 1% |
| **Total** | **3,339** | **100** |

## Out of State Placement

Of the 9,397 children in PMC status on December 31, 2021, 530 (6%) were placed in living arrangements that were located out of state. Of the children placed out of state, 377 (71%) lived in family settings, including 29% (155) living with relatives or fictive kin and 9% (50) living in adoptive homes; and 24% (126) of children in PMC lived in congregate care out of state, a 37% increase from June 30, 2021.

Table 5: Out of State PMC Youth by Living Arrangement Type,
June 30, 2021, and December 31, 2021

| Living Arrangement Type | June 30, 2021 | December 31, 2021 | Percent Change |
|---|---|---|---|
| Congregate Care | 92 | 126 | 37% |
| Foster Home | 135 | 172 | 27% |
| Relative/Fictive Kin | 162 | 155 | -4% |
| Adoptive Home | 70 | 50 | -29% |
| Other | 10 | 22 | 120% |
| Own Home/Non-Custodial Care | 1 | 2 | 100% |
| Data Entry Error | 3 | 0 | -100% |
| Independent Living | 0 | 2 | N/A |
| Incarcerated | 0 | 1 | N/A |
| **Total** | **473** | **530** | **12%** |

Of the 530 children who were placed out of state, 188 (35%) were White and 139 (26%) were Black/African American.

Table 6: Out of State PMC Youth by Race on December 31, 2021

| Race/Ethnicity | Frequency | Percent |
|---|---|---|
| Non-Hispanic White | 188 | 35% |
| Non-Hispanic Black/African American | 139 | 26% |
| Non-Hispanic Other | 38 | 7% |
| Non-Hispanic Native American | 2 | <1% |
| Non-Hispanic Asian | 2 | <1% |
| Hispanic (of any race) | 161 | 30% |
| **Total** | **530** | **100%** |

Note: Columns do not add to 100% due to rounding.

## Level of Care

Of the 9,397 children in PMC status on December 31, 2021, 5,558 (59%) children were in a Basic level of care. Of the remaining 3,821 PMC children, 1,486 (16%) were in a Specialized level of care; 1,230 (13%) were in a Moderate level of care; and 413 (4%) were in an Intense level of care. The data include 635 (7%) PMC children with no authorized level of care recorded.[25]

Table 7: Authorized Level of Care for Children in PMC as of December 31, 2021

| Authorized Level of Care | Frequency | Percent |
|---|---|---|
| Basic | 5,558 | 59% |
| Specialized | 1,486 | 16% |
| Moderate | 1,230 | 13% |
| No Authorized Level of Care Recorded | 635 | 7% |
| Intense | 413 | 4% |
| (TFC) Treatment Foster Care | 66 | 1% |
| Intense Plus | 4 | <1% |
| Psychiatric Transition | 5 | <1% |
| **Total** | **9,397** | **100%** |

## Geographic location

For 39% (3,629) of the 9,397 children with PMC status on December 31, 2021, the county of removal was one of five Texas counties: Bexar, Harris, Dallas, Tarrant, and Bell.

---

[25] The Monitors found that for most of those children lacking identification of an authorized level of care (565, or 89% of children with no authorized level of care recorded), the placement type in the data was identified as "kin only (non-licensed)."

Table 8: Top Five Counties of Removal for PMC Children on December 31, 2021[26]

| County Name | Frequency | Percent |
|---|---|---|
| Bexar | 1,156 | 12% |
| Harris | 924 | 10% |
| Dallas | 724 | 8% |
| Tarrant | 512 | 5% |
| Bell | 313 | 3% |

**Single Source Continuum Contractor Presence and Placement Oversight**

As of December 31, 2021, 24% (2,250) of children in PMC status were from[27] regions where SSCCs operated in the first two stages of implementation.

Table 9: PMC Children by Regions on December 31, 2021

| Regions | PMC Children | Percent |
|---|---|---|
| SSCC Regions | 2,250 | 24% |
| DFPS Regions | 7,147 | 76% |
| **All Regions** | **9,397** | **100%** |

As shown in the table below, Region 3b, where OCOK was responsible for placement, had the greatest number of PMC children residing in a region that has SSCC placement oversight.

Table 10: PMC Children from Regions with Single Source Continuum Contractor Presence by Region on December 31, 2021[28]

| SSCC Name | Legal Region | PMC Children | Percent |
|---|---|---|---|
| St. Francis Ministries | 1 | 662 | 29% |
| 2Ingage | 2 | 426 | 19% |
| Our Community Our Kids (OCOK) | 3b | 694 | 31% |

---

[26] These are the counties with jurisdiction over the child's removal case. DFPS describes these counties as the "legal" counties in the corresponding IMPACT data.

[27] DFPS reports to the Monitors both the Legal Region and the Placement Region of children; here, the Monitors are referring to Legal Region for ease of reference. However, the children may be placed in and therefore, currently living in another region.

[28] The 3b catchment area is comprised of Tarrant, Erath, Hood, Johnson, Palo Pinto, Parker, and Somervell counties in DFPS Region 3W. The 8b catchment area is comprised of all counties in DFPS Region 8 excluding Bexar County. See DFPS, *Quarterly Report on Community Based Care Implementation Status*, 4-5 (December 2021).

| Belong | 8b | 468 | 21% |
|---|---|---|---|
| **Total** | | **2,250** | **100%** |

# Preventing Sexual Abuse and Child-on-Child Sexual Aggression

This section discusses the remedial orders related to identifying, documenting, and notifying caregivers of a child's history of sexual abuse, sexual aggression, or sexual behavior issues, and to preventing child-on-child sexual abuse.

## Data Related to PMC Children Flagged with an Indicator for Sexual Aggression or Sexual Victimization

### Number of PMC Children Flagged with a Sexual Characteristic Indicator

As of December 31, 2021, the most recent point-in-time data analyzed by the Monitors, DFPS had identified 1,200 PMC children with a confirmed history of sexual abuse or an indicator for sexual aggression or both. These children represented approximately 13% of the 9,397 PMC children in placement on that day. An additional 147 children were flagged with an indicator for a sexual behavior problem, bringing the total to 1,347 children (or 14% of children in placement) with a sexual characteristic flag.

In 2021, the number of children flagged with either an indicator for sexual aggression or as a victim of sexual abuse on a given day remained constant. The number of children flagged as victims of sexual abuse decreased two percent (2%), from 1,047 on November 30, 2020, to 1,026 on December 31, 2021, while the number of children flagged with an indicator for sexual aggression increased nine percent (9%) during the same time period, from 219 on November 30, 2020, to 238 on December 31, 2021.

Figure 4: Children in PMC Placement with a Sexual Characteristic Flag (Aggressor or Victim), November 30, 2020, to December 31, 2021



Source: DFPS, PMC child placement data

26

### Number of Placements & Runaway Events for Children with a Sexual Characteristic Flag

Children with a history of sexual abuse or an indicator for sexual aggression were more likely to reside in a congregate care (GRO or RTC) placement than children with no sexual characteristic flag. Of the 1,200 children with a sexual characteristic flag in placement on December 31, 2021, 32% (379) were placed in congregate care and 34% (409) were placed in a foster home. By comparison, on the same date, 13% (1,030) of the 8,197 children with no sexual characteristic flag were placed in congregate care and 52% (4,277) were placed in a foster home.

Children flagged with an indicator for sexual aggression or as a victim of sexual abuse also changed placements more frequently than children who were not flagged with a sexual characteristic. Of the total 16,604 PMC children[29] in placements between January 1, 2021, and December 31, 2021, 1,654 (10%) were flagged as victims of sexual abuse, and 337 (2%) were flagged with an indicator for sexual aggression.[30] Children flagged with an indicator for sexual aggression had, on average, 3.58 placements during that time period compared to 2.98 placements for children flagged as victims of sexual abuse, and 1.81 placements for children with no flag for a sexual characteristic.

Figure 5: Number of Placements for PMC Children by Sexual Indicator Type, January to December 2021[31]

| Number of Placements | Sexual Abuse Indicator (n = 1,654) | | Sexual Aggression Indicator (n = 337) | | No Sexual Indicator (n = 14,716) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| One Placement | 641 | 39% | 99 | 29% | 7,849 | 53% |
| Two to Three | 643 | 39% | 125 | 37% | 5,878 | 40% |
| Four to Six | 209 | 13% | 62 | 18% | 722 | 5% |
| Seven or More | 161 | 10% | 51 | 15% | 267 | 2% |

In addition to more frequent placement moves, the data show that runaway incidents are more likely among children flagged with a sexual characteristic indicator. When all PMC children with runaway episodes are included in the analysis, 1,697 children were flagged

---

[29] Unduplicated count of children with a PMC placement in 2021 using the PMC placements data file.
[30] Runaway episodes are excluded: 129 children experienced a runaway episode without a subsequent placement during 2021. The PMC placements data file does not match exactly the PMC child data file. Approximately one percent of children identified in the PMC placements file were not identified in the PMC child file as having a placement in 2021. Children who were flagged for both sexual abuse and sexual aggression are counted in both categories.
[31] There are 103 children with both a sexual abuse and sexual aggression indicator. These children are included in both categories. Runaway events were excluded from the count of placements.

as victims of sexual abuse in 2021, and 187 (11%) of them had at least one runaway incident during 2021. Including in the analysis all PMC children with runaway episodes in 2021, 343 children were flagged with an indicator for sexual aggression, and 48 (14%) of them had at least one runaway incident. Of the 14,797 PMC children without a sexual characteristic flag in 2021, 336 (2%) had a runaway incident during 2021.[32]

Table 11: Number of Runaway Incidents for PMC Children by Sexual Indicator Type, January to December 2021

| Number of Runaway Incidents | Sexual Abuse Indicator (n = 1,697) | | Sexual Aggression Indicator (n = 343) | | No Sexual Indicator (n = 14,797) | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| One | 96 | 6% | 25 | 7% | 233 | 1.6% |
| Two or more | 91 | 5% | 23 | 7% | 103 | 0.7% |

## Remedial Order 32: Policy Creation and Training of Staff Responsible for Making Determinations

*Within 90 days of this Order, DFPS shall create a clear policy on what constitutes child-on-child sexual abuse. Within 6 months of the Court's Order, DFPS shall ensure that all staff who are responsible for making the determinations on what constitutes child-on-child sexual abuse are trained on the policy.*

### Background

As discussed in the Monitors' previous reports, DFPS policy sets a protocol for determining whether a child's behavior meets the definition of sexually aggressive. If the alleged sexual aggression occurred in an unlicensed setting, whether an incident meets the definition of sexually aggressive behavior is determined by the conservatorship (CVS) program administrator.[33] If the alleged behavior occurred in a licensed setting, the determination is made by the RCCI program administrator who confers with the CVS program administrator to reach consensus.[34] If there is no agreement, the decision is elevated to the RCCI division administrator and CPS regional director, and, if necessary, to the CCI director and CPS director of field.[35]

---

[32] All runaway events were included in the runaway analysis. Includes 129 children whose only placement during the period was runaway. Children who were flagged for both sexual abuse and sexual aggression are included in both categories.

[33] DFPS, *Child Sexual Aggression Resource Guide* (Updated December 2020) 8-10, 15-17, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Resource_Guides/Child_Sexual_Aggression_Resource_Guide.pdf

[34] *Id at* 11-14.

[35] *Id.* at 13.

The Monitors' Second Report noted that DFPS indicated an intent to incorporate some of the recommendations made by Praesidium[36] in an update of its CPD curriculum, and that the agency would "go live" with the updated training curriculum in March 2021. In an e-mail to CPS staff dated April 2, 2021, DFPS stated that "[c]hild sexual aggression training is required annually" and that a new "annual refresher" training module was available to CPS staff.[37] According to the e-mail, the new refresher training "focuses on the differentiation between the terms of child sexual abuse and sexual aggression, and informs participants of the protocols for identifying and documenting instances of child sexual aggression."[38] The e-mail also stated that staff would "learn what they can do to help with the prevention of sexual abuse, as well as the protocols for placement and recommending services and/or supports for the children involved."[39] Finally, the e-mail explained that the refresher training was to be completed once staff reach their one-year anniversary and every year thereafter, and said that staff would receive an e-mail notifying them of the required training and would be required to complete the refresher training within three days of the notification.[40]

To determine compliance with Remedial Order 32, the Monitors analyzed data produced quarterly to the Monitors by DFPS and the SSCCs in Stage Two of Community-Based Care. The data includes staff identified by the agencies as responsible for making determinations regarding child-on-child sexual aggression, and therefore subject to training requirements, and their most recent date of child sexual aggression (CSA) training. For this report, the Monitors analyzed DFPS, OCOK, and 2INgage data for the third and fourth quarters of fiscal year 2021, and for the first quarter of fiscal year 2022, covering the time period March 1, 2021, through November 30, 2021.[41]

## Performance Validation

The majority of staff included in the quarterly data provided to the Monitors by DFPS for Remedial Order 32 were CPS investigators. The quarterly data did not include special investigators and did not appear to include CCI program administrators, CPS regional directors, the CCI director, or the CPS director of field.[42]

---

[36] *See* Deborah Fowler & Kevin Ryan, Second Report at 180-81, ECF No. 1079. Praesidium is a Texas-based consulting firm that works with organizations to prevent the sexual abuse of children. At the Monitors' request, Praesidium analyzed the State's policies and training related to child-on-child abuse and provided a written report to the Monitors. *Id.* at 177.

[37] E-mail from DFPS CPS Communications to DDL DFPS CPS ALL, re: New Child Sexual Aggression CBT, April 2, 2021 (on file with the Monitors).

[38] *Id.*

[39] *Id.*

[40] *Id.* In addition, the "Training News" for the May 2021 CPS Meeting in a Box Agenda included, in a section titled "For All Staff," a bullet point related to CSA training, again noting that it was due annually, with "the initial requirement of Child Sexual Aggression FY19 0003805" and "CSA and Recognizing and Reporting Sexual Abuse Training Refresher 0003938, due yearly thereafter."

[41] The analysis is based on data as reported by DFPS, OCOK, and 2INgage, which provides the latest training module completed by the staff person but does not indicate the exact training module completed.

[42] One staff with the title "Director II" was included in the data. Data provided and analyzed in the Monitors' previous reports included CPS special investigators but did not include the CCI program

Table 12: Staff Included by DFPS as Those Responsible for Making Determinations of Child Sexual Aggression, Quarter 1 FY22

| Position Title | Number | Percent |
|---|---|---|
| CPS Alt Response Specialists | 451 | 12% |
| CPS Alt Response Supervisors | 74 | 2% |
| CPS CVS Supervisors | 338 | 9% |
| CPS Investigators | 2,232 | 60% |
| CPS Investigative Supervisors | 416 | 11% |
| CPS Master Investigators and Master Supervisors | 40 | 1% |
| CPS Investigative and CVS Program Administrators | 26 | 1% |
| Other Supervisor, Manager, or Director | 6 | 0% |
| RCCI Investigators and Supervisor | 121 | 3% |
| Other CPS Staff | 7 | 0% |
| **Total** | **3,711** | **100%** |

Of the staff included in the data provided by DFPS, for each of the quarters reviewed, more than 99% had received child sexual aggression training.[43]

---

administrators, CPS regional directors, CCI director or CPS director of field. The monitoring team asked DFPS why none of these staff appeared in the data related to Remedial Order 32. E-mail from Monica Benedict, Deputy Director of Research, monitoring team, to Ingrid Vogel, Program Specialist, Foster Care Litigation Compliance, DFPS, re: Data request, February 10, 2022 (on file with the Monitors). DFPS answered other questions related to the data, posed in the same e-mail, but did not answer the question related to the staff positions missing from the data. E-mail from Ingrid Vogel to Monica Benedict, re: Data request, February 28, 2022 (on file with the Monitors).

[43] Additional staff were in new hire training at the end of the quarter or had left the agency prior to completing training. These staff were not included in the analysis. Staff with CSA training dates occurring after the end of the quarter were considered to not have a training date for that quarter.

Figure 6: Child Sexual Aggression Training Record for DFPS Staff Working at Least One Day in the Quarter



Source: DFPS RO32 CSA Quarterly Training Data
n=10,899 records

Similarly, for each of the quarters reviewed by the Monitors, the majority of SSCC permanency supervisory staff had received child sexual aggression training.[44]

---

[44] Staff identified by the SSCCs as responsible for making determinations of child sexual aggression included permanency supervisors, directors of permanency services, and the vice present of permanency services for 2INgage, and permanency supervisors and directors of permanency for OCOK.

Figure 7: Percent of OCOK and 2INgage Staff Working at Least One Day

Source: OCOK and 2INgage RO32 CSA Quarterly Training Data
n = 122 2INgage and 89 OCOK records



The Monitors also reviewed the timing of training for the staff included in the data provided by the State. Across all the quarters reviewed, more than a third of DFPS staff involved in determining whether a child's behavior meets the definition of sexually aggressive last received training prior to November 2019, though several policy changes and updates to CSA training were made in 2020 and 2021.[45]

---

[45] For example, DFPS updated the Child Care Investigation Handbook section titled "Allegations Involving Child Sexual Aggression or Child-on-Child Physical Abuse" in August 2020. DFPS, Child Care Investigation Handbook (Handbook) §3140, available at 28: https://www.dfps.state.tx.us/handbooks/CCI/Files/CCI_pg_3000.asp#CCI_3140 DFPS updated the Child Sexual Aggression Resource Guide in December 2020. DFPS, Child Sexual Aggression Resource Guide, *available at* 28: *https://www.dfps.state.tx.us/handbooks/CPS/Resource_Guides/Child_Sexual_Aggression_Resource_Guide.pdf* The section in the Handbook related to documenting child sexual aggression was updated in March 2021. *See* Handbook §3141, *available at* *https://www.dfps.state.tx.us/handbooks/CCI/Files/CCI_pg_3000.asp#CCI_3141* And, as discussed *supra*, DFPS launched its CSA refresher training, and notified staff that it is required to be completed annually, in April 2021.

**Figure 8: Last Child Sexual Aggression Training for DFPS staff[46]**



Source: DFPS RO32 CSA Quarterly Training Data
n = 9,552 training records

Though DFPS requires all staff to complete CSA training on an annual basis, more than a year had passed since the last CSA training for the majority of staff responsible for making determinations regarding whether a child's behavior met the definition of sexually aggressive. As of November 30, 2021, only 41% of DFPS staff involved in making determinations regarding child sexual aggression had received CSA training in the previous twelve months. For 21% of DFPS staff involved in making determinations regarding a child's behavior, as of November 30, 2021, it had been three or more years since their last CSA training.

**Figure 9: Timing of Last Child Sexual Aggression Training for DFPS Staff Working as of the End of Quarter 1, FY 2022**



Source: DFPS RO32 CSA Quarter 1, FY22 Training Data
n = 3,146

---

[46] Includes only those staff who had received CSA training and were active with DFPS at the end of the quarter.

The majority of OCOK and 2INgage supervisors included in the quarterly data had received CSA training 13 or more months before the end of the quarter.

Figure 10: Timing of Last Child Sexual Aggression Training for OCOK and 2INgage Staff Working in Quarter 1, FY 2022



## Remedial Order 32 Summary

Though almost all staff included in the data reported to the Monitors as requiring training pursuant to Remedial Order 32 had received training, certain staff titles associated with making determinations about what constitutes child-on-child abuse appeared to be missing from the data. Of the staff included in the data, many received training prior to recent policy changes associated with making determination regarding child-on-child sexual abuse; more than a third received training prior to November 2019. While the majority of OCOK and 2INgage supervisors had received CSA training, they received the training thirteen or more months before the end of quarter 1, FY 2022.

## Remedial Order 4: Caseworker and Caregiver Training on Sexual Abuse

*Within 60 days, DFPS shall ensure that all caseworkers and caregivers are trained to recognize and report sexual abuse, including child-on-child sexual abuse.*

## Background

For its caseworkers, the State[47] implemented the child sexual abuse training requirement in Remedial Order 4 by providing a Child Sexual Aggression course and through pre-

---

[47] This reference to the State refers to DFPS and the SSCCs, 2Ingage and OCOK, administering case management in their respective regions.

service training for new caseworkers. As to the caregiver training requirement in Remedial Order 4, during the current reporting period, DFPS implemented a Provider Portal to administer its online training module and to address previous administrative deficiencies in the training delivery.[48] The State reported that this portal will allow it to track and report whether all caregivers have completed the child sexual abuse training as it was previously unable to do so.[49]

According to DPFS's website, the Provider Portal became operational on January 1, 2022.[50] DFPS instructed all providers to register all caregivers in the Provider Portal and to ensure that all caregivers completed the required training in the new Caregiver Training Hub. DFPS stated that it "has never had a comprehensive list of caregivers required to take the training and, thus, we have not been able to demonstrate compliance. For this reason, we developed the Training Hub for providers to identify each caregiver before they take of the training."[51] While information from the Provider Portal was not available for inclusion in this report, the Monitors analyzed information gathered during staff interviews and reviews of staff records conducted during site visits to congregate care facilities housing PMC children.

### Caseworker Training Performance Validation Results

The Monitors determined that between June 1, 2021, and November 30, 2021 there were 2,392 case-carrying caseworkers listed in the caseload data. Of those workers, 99.0% (2,367) completed the child sexual abuse training.[52] In the previous reporting period, 98.1% of caseworkers completed the training.[53]

---

[48] E-mail from Michelle Mattalino, Director of Project Management, DFPS, to Kevin Ryan, Deborah Fowler and Timothy Ross, Monitoring Team (November 10, 2021) (on file with the Monitors). The Second Report provides an in-depth discussion of the issues and deficiencies with caregiver training delivery and administration. *See* Deborah Fowler & Kevin Ryan, Second Report 191, ECF No. 1079.

[49] E-mail from Michelle Mattalino to Kevin Ryan, Deborah Fowler, and Timothy Ross (November 10, 2021) (on file with the Monitors).

[50] DFPS, *Caregiver Training,* available at https://www.dfps.state.tx.us/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Con tracts/Training.

[51] *Id*. DFPS's reporting on caregiver data through the portal commenced after the close of this reporting period.

[52] The Monitors used the data submissions received in this reporting period to validate caseworker training. DFPS, *RO4 2INgage CW Training Q4FY21_10-1-2021* (October 1, 2021); DFPS, *RO4 DFPS Caseworker Training Q4FY21_10-1-2021_102835* (October 1, 2021); DFPS, *RO4 OCOK Perm Specialists Sexual Aggression Training Q4FY21_10-1-21* (October 1, 2021); DFPS, *RO4 2INgage CW Training FY22Q1_1-3-2022* (January 3, 2022); DFPS, *RO4 DFPS Caseworker Training FY22Q1_1-3-2022_103733* (January 3, 2022; DFPS, *RO4 OCOK Perm Specialists Sexual Aggression Training* FY22Q1_01-03-22 (January 3, 2022) (on file with the Monitors).

[53] *See* Deborah Fowler & Kevin Ryan, Second Report 190, ECF No. 1079.

Table 13: Child Sexual Abuse Training Completion by Caseworker Type, June 1, 2021, to November 30, 2021

| Caseworker Type | Child Sexual Abuse Training Completion | | Total Caseworkers | Percent Compliant |
|---|---|---|---|---|
| | Completed | Not Completed | | |
| DFPS CVS[54] | 2,070[55] | 5 | 2,075 | 99.8% |
| OCOK[56] | 177[57] | 7 | 184 | 96.2% |
| 2INgage[58] | 120 | 13 | 133 | 90.2% |
| **Total** | **2,367** | **25** | **2,392** | **99.0%** |

The monitoring team compared the caseworkers listed in the data report provided by the State with caseloads for DFPS, OCOK, and 2INgage caseworkers between June 2021 and November 2021, with the list of DFPS, OCOK and 2INgage caseworkers in the data provided by the State regarding completion of child sexual abuse training.[59] Using the corresponding caseload files, the Monitors matched 99.8% (2,070 of 2,075) of DFPS CVS caseworkers listed in the caseload data with CVS caseworkers listed in the DFPS child

[54] Compliance was calculated for all 2,075 DFPS CVS caseworkers listed in the DFPS caseload data who carried at least one case between June 1, 2021 and November 30, 2021, and who had one of the following job titles in the caseload data: CPS CVS SPEC I - 5023X, CPS CVS SPEC II - 5024X, CPS CVS SPEC III - 5025X, CPS CVS SPEC IV - 5026X, CPS CVS SPEC V - 5027X, CPS CVS SPECIALIST V - 1574CX. The use of these job titles is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[55] This calculation includes 12 DFPS CVS caseworkers who became compliant after November 30, 2021, but who were included in the FY22Q1 DFPS child sexual abuse training source file. The dates on which these caseworkers became compliant ranged from December 1, 2021, to December 20, 2021. DFPS, *RO4 DFPS Caseworker Training FY22Q1_1-3-2022_103733* (January 3, 2022) (on file with the Monitors).

[56] Compliance was calculated for all 184 OCOK caseworkers listed in the OCOK caseload data who carried at least one case between June 1, 2021, and November 30, 2021, and who had the following job title in the caseload data: "OCOK Permanency Speclst." The use of this job title is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[57] This calculation includes one OCOK caseworker who became compliant after November 30, 2021 but who was included in the FY22Q1 source file. The date on which this caseworker became compliant was December 8, 2021. DFPS, *RO4 OCOK Perm Specialists Sexual Aggression Training* FY22Q1_01-03-22 (January 3, 2022) (on file with the Monitors).

[58] Compliance was calculated for all 133 2INgage caseworkers listed in the 2INgage caseload data who carried at least one case between June 1, 2021, and November 30, 2021, and who had the following job title in the caseload data: "PCM." The use of this job title is methodologically consistent with the Monitors' assessment of conformity to caseload standards.

[59] DFPS, RO2.1 CVS caseloads June 2021 8-2-2021 log102935 (August 2, 2021); DFPS, RO2.1 CVS caseloads July 2021 9-1-2021 log103324 (September 1, 2021); DFPS, RO2.1 CVS caseloads August 2021 10-1-2021 log103711 (October 1, 2021); DFPS, RO2.1 CVS caseloads September 2021 11-1-2021 log103989 (November 1, 2021); DFPS, RO2.1 CVS caseloads October 2021 12-1-2021 log104265 (December 1, 2021); DFPS, RO2.1 CVS caseloads November 2021, 1-3-2022 log104624 (January 3, 2022) (on file with the Monitors).

sexual abuse training data set; matched 96.2% (177 of 184) of OCOK caseworkers listed in the caseload data with the OCOK caseworkers listed in the child sexual abuse training data set; and matched 92.5% (123 of 133) of 2INgage caseworkers listed in the caseload data with 2INgage caseworkers listed in the child sexual abuse training dataset. If caseworkers were listed in the caseload data but were not listed in the child sexual abuse training data, the Monitors counted them as non-compliant with the training.

Finally, the Monitors interviewed a random sample of 266 caseworkers between February 2021 and December 2021 to further verify caseworker completion of sexual abuse training. Through individual interviews with each caseworker, the Monitors found that all 266 (100%) caseworkers reported having completed training about child sexual abuse.[60]

### Caregiver Child Sexual Abuse Training

As described in the Monitors' First and Second Reports, because the State was previously unable to produce a comprehensive list of all caregivers, the Monitors have been unable to validate the State's performance in this area. In the Monitors' next report, the Monitors will provide an update on the State's progress with the newly implemented portal.

During the monitoring team's site visits to four Texas congregate care facilities,[61] staff records were reviewed for (among other things) information related to child sexual aggression (CSA) training. Of the 53 staff records reviewed, 15 (28%) did not include documentation showing the staff person had completed the CSA training. Of these 15 staff, 11 were direct caregivers, three were supervisors for direct caregivers, and one was a case manager.

The monitoring team interviewed 31 staff members during the five site visits and questioned staff about completion of CSA training. Of those interviewed, 27 (87%) reported having completed CSA training, one (3%) reported not having completed CSA training, and three (10%) were unsure whether they had completed the CSA training.

Summary of Caseworker and Caregiver Sexual Abuse Training Performance Validation

- DFPS's data shows that 99% of workers who carried at least one case from June 1, 2021, to November 30, 2021, completed the training.

---

[60] In addition, each caseworker provided the dates on which they completed the child sexual abuse trainings. Of these 266 caseworkers, 92% provided the same date for completion of the computer-based component on child sexual aggression in their interview as was documented in the data file produced by the State for RO 4 training completion.

[61] The operations visited were Camp Worth RTC, Guiding Light RTC, Promise House GRO, Unity Children's Home – Girls RTC. Though the monitoring team also visited a facility for boys in Evart, Michigan and reviewed staff records during that site visit, the tool used to capture information during the review of staff files did not function correctly and failed to upload the results of the staff record reviews. Consequently, data from those record reviews were lost. The monitoring team also conducted an abbreviated visit to a girls' facility in Michigan, New Hope, that was operated by the same entity that operated Evart. However, due to time constraints, staff records were not reviewed.

- Specifically, DFPS's data show that 99.8% of DFPS CVS caseworkers, 96.2% of OCOK caseworkers and 92.5% of 2INgage caseworkers listed in the caseload data matched with the respective caseworkers listed in the child sexual abuse data sets.

- A random sample of 266 caseworkers interviewed by the monitoring team between February 2021 and December 2021 resulted in all the caseworkers confirming their completion of sexual abuse training.

- Due to data deficiencies, the Monitors cannot validate that all or most caregivers completed the full child sexual abuse training required by Remedial Order 4.

### Remedial Orders 23, 24, 28, and 30: Tracking and Documenting Sexual Abuse and Child-on-Child Sexual Aggression

**Remedial Order 23**: *Within 60 days, DFPS shall implement within the child's electronic case record a profile characteristic option for caseworkers or supervisors to designate PMC and TMC children as "sexually abused" in the record if the child has been confirmed to be sexually abused by an adult or another youth.*

**Remedial Order 24**: *Within 60 days, DFPS shall document in each child's records all confirmed allegations of sexual abuse in which the child is the victim.*

**Remedial Order 28:** *Effective immediately, DFPS shall ensure a child's electronic case record documents "child sexual aggression" and "sexual behavior problem" through the profile characteristic option when a youth has sexually abused another child or is at high risk for perpetrating sexual assault.*

**Remedial Order 30**: *Effective immediately, DFPS must also document in each child's records all confirmed allegations of sexual abuse involving the child as the aggressor.*

### Background

The Monitors' First Report validated the State's compliance with Remedial Orders 23 and 28, requiring the creation of profile characteristics in IMPACT that would allow DFPS to document a child's history of sexual abuse or an indicator for sexual aggression.[62] To validate the State's performance regarding Remedial Orders 24 and 30, the Monitors analyzed trends in identification for children flagged with an indicator for sexual victimization or sexual aggression. The Monitors also included questions in three case record reviews of 877 unique placements made in 2021 for a PMC child identified as a victim of sexual abuse or with an indicator for sexual aggression[63] to identify whether the

---

[62] *See* Deborah Fowler & Kevin Ryan, First Report 216, ECF No. 869.
[63] The Monitors' case read sampled placement data between January 1, 2021, and December 31, 2021, to collect information on children identified as victims of sexual abuse and sexual aggressors. The Monitors

sexual abuse, or incident resulting in the indicator for sexual aggression, occurred prior to or after the child entered foster care.

## Performance Validation

### Case Review of Sexual Victimization History in RCCI Maltreatment in Care Investigations

To validate performance associated with Remedial Order 24, the Monitors reviewed a random sample of 115 RCCI investigations with allegations of Sexual Abuse and/or Neglectful Supervision involving child-on-child sexual contact that were closed between June 1, 2021 and November 30, 2021. The Monitors assessed whether the sexual victimization history pages for the associated alleged victims should have been positively indicated consistent with DFPS policy when appropriate. Because DFPS is unable to separately identify which Neglectful Supervision investigations involve child-on-child sexual contact, the Monitors first reviewed 245 investigations with allegations of Neglectful Supervision to determine whether the allegations involved child-on-child contact. In all relevant investigations, they then reviewed the investigative record to examine the sexual aggression staffing conclusion and the associated documentation. (Remedial Orders 23 and 24).

Of the 115 investigations involving Sexual Abuse and/or Neglectful Supervision allegations that the monitoring team reviewed, 87 included allegations of Neglectful Supervision and 28 included allegations of Sexual Abuse only. The monitoring team reviewed the documentation in those investigations and found no instances of confirmed sexual victimization for which DFPS failed to appropriately indicate the child as a confirmed victim of sexual abuse on their sexual victimization history page in IMPACT.

### Trend Analysis

Using placement data for PMC children, the Monitors evaluated the trend for the number of PMC children placed who were newly flagged with an indicator for sexual aggression or sexual victimization between January 1, 2019, and December 31, 2021. The monthly number of PMC children placed who were newly flagged with an indicator for sexual victimization or sexual aggression increased in late 2019, reached a peak in early 2020, and declined in late 2020 and into 2021.[64] The number of PMC children placed who were newly flagged with an indicator for sexual aggression or sexual victimization has averaged three per month for sexual aggression and 11 per month for sexual victimization since June 2019 (when the State began to use the flag).

---

randomly selected 877 unique placements (with a confidence interval of 95%) involving 230 children flagged with an indicator for sexual aggression, and 647 children flagged as victims of sexual abuse.

[64] The rise in 2019 is consistent with the State's work to comply with the Court's remedial orders related to identifying children with a history of sexual aggression or sexual victimization once the 5th Circuit's mandate issued July 31, 2019.

Figure 11: Monthly Number of Newly Flagged Placements for Sexual Victimization or Aggression, CY 2021



Source: DFPS, PMC child placement data

As part of the analysis of trends, the monitoring team used point in time data and compared the number of children flagged with an indicator for sexual aggression or sexual victimization on January 31, 2021, to those flagged with an indicator in December 2021. There were 9,930 children in PMC during the month of December 2021.[65] Of these 9,930 PMC children, 5,092 were already in PMC on January 31, 2021. Of these PMC children:

- 615 of 663 (93%) flagged with an indicator for sexual victimization on January 31, 2021, were still flagged with an indicator for victimization in December 2021; however, 48 of the 663 (7%) were flagged with an indicator for victimization in January but not in December.
- 156 of 158 children (98%) flagged with an indicator for sexual aggression on January 31, 2021, were still flagged with an indicator in December 2021, but two of the 158 children (2%) were flagged with an indicator for sexual aggression in January but not in December.
- 38 of 44 children flagged with both an indicator for sexual aggression and victimization on January 31, 2021, maintained both flags through December; however, six (14%) of these children who had both flags in January were flagged only with an indicator for sexual aggression in December.
- 84 of 699 children (12%) were flagged with an indicator for sexual victimization in December 2021 who were not flagged with the indicator in January 2021, and 40

---

[65] This count includes unduplicated PMC children present at the beginning of the month, during the month, or on the last day of the month.

of 196 children (20%) were flagged with an indicator for sexual aggression in December who were not flagged with the indicator in January.

The Monitors will conduct a case record review for the next report analyzing the reasons for any change in children's flags for sexual characteristics.

Case Record Review of Children Flagged as Victims of Sexual Abuse or with an Indicator for Sexual Aggression

Children were newly victimized and revictimized while living in foster care. Of the children identified as victims of sexual abuse in 2021, 25% were victimized or re-victimized after entering foster care.[66] Of the 422 children identified as victims of sexual abuse in 2021, 315 (75%) were victimized prior to entering foster care. Another 42 (10%) were victimized prior to entering foster care, but re-victimized after entering care, and 65 (15%) were identified as victims of sexual abuse due to an incident that occurred after entering care.[67]

Figure 12: Abuse Incidents for Children with a Sexual Abuse Indicator, 2021



Source: Case review data
n=422

■ Abuse prior to entering care only

■ Abuse after entering care only

■ Abuse prior to and after entering care

Some children were victimized more than once after entering foster care: the 107 children identified during the Monitors' case read as having been victimized after entering care accounted for 147 incidents of abuse. Twenty-five percent (27 of 107) of children with a sexual abuse incident after entering care were victimized more than once while in care.

---

[66] This is a slight increase over the findings reported in the Monitors' Second Report. The case record review completed for that report indicated that, of the children included in the case read who had a flag for sexual abuse, 21% (63 of 304) had an abuse incident that occurred after the child entered foster care. Deborah Fowler & Kevin Ryan, Second Report, at 201, ECF No. 1079.

[67] The case read identified only those who had a confirmed sexual abuse incident, consistent with the definition used in the Sexual Victimization History tab in IMPACT. In November 2020, (using September 2020 data), the State began to include a variable in the PMC data provided to the Monitors labelled "Confirmed RCI Victim of Sexual Abuse/Sex Trafficking After Removal" which is separate from the flags for sexual victimization and sexual aggression. However, when the monitoring team compared the 107 PMC children identified during the case read as having been victimized after entering care to this data, only 10 of the 107 were flagged in the State's data.

Of these children, 20 were victimized twice after entering care; the remaining seven children experienced three-to-five incidents of sexual abuse after entering care.[68]

Almost half of the 147 sexual abuse incidents (70 of 147, or 48%) that occurred after the victim entered foster care occurred while a child was on runaway status; however, 36 percent (52 of 147) occurred while a child was placed in a licensed setting (foster home, RTC, or GRO).

Figure 13: Type of Placement Where Abuse Incident Occurred After Entering Care



Source: Case review data
n = 147

| Placement | Count |
|---|---|
| Runaway | 70 (48%) |
| Foster home | 26 (18%) |
| Congregate care | 26 (18%) |
| Kinship | 13 (9%) |
| Other | 5 (3%) |
| CWOP | 4 (2%) |
| Unauthorized | 3 (2%) |

While an equal proportion of sexual abuse incidents in care occurred in both foster homes and in congregate care, a much larger number of children are in foster homes than are in congregate care. On December 31, 2021, there were 4,686 PMC children in a foster home (50% of all PMC children in care as of that date) compared to 1,409 PMC children in congregate care (15% of all PMC children in care as of that date).

More than one perpetrator was involved in incidents of abuse: the 147 incidents of sexual abuse involved 153 perpetrators. More than half of the perpetrators (82 of 153, or 53%) were adults who were not associated with the child's placement. More than one-quarter of the perpetrators (40 of 153, or 26%) were other children, and 10% (16 of 153) of perpetrators were a staff person or volunteer in a congregate setting or a foster parent or home staff in a foster home.

---

[68] Includes unique children.

**Figure 14: Perpetrators Identified in Abuse Incidents Occurring After Child Entered Care**



Source: Case review data
n = 153

Of the 40 children who were described as perpetrators, 15 (38%) were in a foster home placement, 15 (38%) were in a congregate care (GRO or RTC) setting, 4 (10%) were on runaway status, 4 (10%) were in a kinship placement, one was in a CWOP Setting, and one was in an HCS Group Home at the time of the incident.

Of 142 children flagged with an indicator for sexual aggression in the case review sample, 55 (39%) were flagged with the indicator for an incident that occurred after the child entered care. More than half (75 of 142, or 53%) were flagged with an indicator for sexual aggression due to an incident that occurred prior to the child entering foster care, and another 12 (8%) were noted to have engaged in sexually aggressive behavior both prior to and after entering foster care.[69]

---

[69] These numbers are consistent with the Monitors' Second Report, though for the case record review completed for this report, the monitoring team documented a new category for children identified as having an incident of sexual aggression both prior to, and after entering, foster care. For the case read conducted for the Second Report, the monitoring team documented only two categories: children identified as having an incident prior to entering care, and children identified as having an incident of sexual aggression after entering care. The case read completed for the Second Report found that 52% (67 of 128) of children flagged with an indicator for sexual aggression were identified due to an incident that occurred prior to entering care, and 48% (61 of 127) who were flagged with an indicator for sexual aggression had an incident that occurred after entering care. Deborah Fowler & Kevin Ryan, Second Report, at 203, ECF No. 1079.

Figure 15: Sexual Aggression in Care for Children with a Sexual Aggression Indicator



Children experienced more than one incident of sexual aggression while in care: 67 children engaged in 79 sexual aggression incidents. A majority of sexual aggression incidents that occurred after a child entered care occurred in a licensed setting (foster home, RTC, or GRO).[70]

Figure 16: Type of Placement where Sexual Aggression Incidents Occurred after Entering Care



---

[70] Includes unique children.

44

## Remedial Orders 23, 24, 28, and 30 Summary

In the case record review of children whose indicators were documented in 2021, 25% of children that DFPS identified as victims of sexual abuse, were victimized or re-victimized after entering foster care. Of children flagged with an indicator for sexual aggression, 39% were flagged because of an incident that occurred after entering foster care, and another 8% were noted to have engaged in an incident of sexual aggression both prior to and after entering care.

## Remedial Orders 25, 26, 27, 29 & 31: Caregiver Notification

**Remedial Order 25**: *Effective immediately, all of a child's caregivers must be apprised of confirmed allegations at each present and subsequent placement.*

**Remedial Order 26:** *Effective immediately, if a child has been sexually abused by an adult or another youth, DFPS must ensure all information about sexual abuse is reflected in the child's placement summary form, and common application.*

**Remedial Order 27**: *Effective immediately, all of the child's caregivers must be apprised of confirmed allegations of sexual abuse of the child at each present and subsequent placement.*

**Remedial Order 29**: *Effective immediately, if sexually aggressive behavior is identified from a child, DFPS shall also ensure the information is reflected in the child's placement summary form and common application.*

**Remedial Order 31**: *Effective immediately, all of the child's caregivers must be apprised at each present and subsequent placement of confirmed allegations of sexual abuse involving the PMC child as the aggressor.*

### Background

After the Court held the State in contempt due, in part, to its failure to comply with Remedial Orders 25, 26, 27, 29, and 31, the State made a number of changes to its process for notifying caregivers of a child's history of sexual abuse or indicator for sexual aggression.[71] The changes clarified the definition of a "caregiver" and defined "apprised" so that, going forward, DFPS required notification of individual foster parents, and in GROs, the administrator, receiving intake staff, and child's case manager.[72] Through contract enforcement, DFPS is obligated to monitor contractual requirements and agency expectations that the information will be shared by GRO staff with all of a child's caregivers.[73] DFPS also changed its policy to require notification to caregivers in juvenile justice and hospital settings.[74]

---

[71] Deborah Fowler & Kevin Ryan, Second Report, 205 – 219, ECF No. 1079.
[72] *Id.* at 214.
[73] *Id.*
[74] *Id.*

The Monitors conducted three case record reviews to validate the State's compliance with the remedial orders related to caregiver notification. The Monitors' case record review sample for this period included juvenile justice and hospital placements as a placement type for the first time.[75]

The monitoring team also collected information related to caregiver notification through record reviews and interviews during six site visits to congregate care facilities in 2021 and early 2022. Four of these visits (discussed above) were to facilities in Texas; in addition to these, two site visits were made to two Michigan RTCs where Texas PMC children were placed. The first was made to Evart, a since-closed facility for boys, from December 2, 2021, through December 4, 2021. The second was an abbreviated visit to New Hope, a facility for girls operated by the same entity, on December 4, 2021.

## Performance Validation

### Case Record Reviews

The monitoring team analyzed 518 placements to assess the documentation of a child's sexual victimization history or history of sexual aggression on the Common Application.[76] The Common Applications reviewed contained the child's history of sexual abuse and sexual aggression for nearly all placements in the sample. Fewer than five percent of the Common Applications reviewed during the case read were missing all of a child's history of sexual abuse or aggression, and approximately five percent contained some, but not all, of a child's history of sexual abuse or aggression. The results of the Monitors' case record review are consistent with the State's findings in its own case record review.[77]

---

[75] This is the same case record review described in footnote 62, above. The sample includes all children with a sexual characteristic flag for sexual victimization or sexual aggression who started a placement requiring a Common Application or caregiver notification in the eight-month period sampled, between January 1, 2021 and December 31, 2021. Jail admissions were excluded from the sample. Some children who began more than one qualifying placement were included in the sample more than once: 537 unique children accounted for the 877 placements for which a case read was conducted. Similarly, some children flagged both with an indicator for sexual aggression and for sexual victimization were included in both the sexual aggression and sexual victimization samples: of the 537 children, 27 (5%) were included in both samples. Because a Common Application and Placement Summary are not required for juvenile justice and hospital placements, a subset of 221 juvenile justice and hospital placements were reviewed, and questions related to the Common Application and Placement Summary were excluded; the case record review for these placements only included questions related to provision of the "Attachment A" form.
[76] A Common Application is not required for kinship or adoptive placements (though a Placement Summary and Attachment A are required). Thus, though the total case record review sample, using a 95% confidence interval, consisted of 877 placements, only 518 of those placements required a Common Application.
[77] *See* DFPS, Child Sexual History Case Review Results, Quarter 2 – Fiscal Year 2021 (on file with the Monitors)(Common Application contained all known information regarding history of sexual abuse in 94% (214 of 226) of cases reviewed, and all known information regarding history of sexual aggression in 88% (56 of 64) of cases reviewed); DFPS, Child Sexual History Case Review Results, Quarter 3 – Fiscal Year 2021 (on file with the Monitors)(Common Application contained all known history of sexual abuse in 94% (222 of 236) of cases reviewed, and all known history of sexual aggression in 90% (54 of 60) of cases reviewed); DFPS, Child Sexual History Case Review Results, Quarter 4 – Fiscal Year 2021 (on file with the Monitors)(Common Application contained all known history of sexual abuse in 95% (166 of 175) of cases reviewed, and all known history of sexual aggression in 95% (54 of 57) of cases reviewed); DFPS, Child

46

## Figure 17: Completeness of Sexual History Information on the Common Application

Source: Case review data
n = 518



Of the Common Applications reviewed, just more than half were completed within 30 days prior to or after placement. The remainder were completed either more than 30 days after placement or more than 30 days prior to the child's placement.[78] As the Monitors noted in the Second Report,[79] this short timeline creates challenges for validating caregiver notification *via* the Common Application for the placement under review; a Common Application that was updated more than 30 days after the placement start date may have been updated to include information that was not documented at the time of the child's placement.

---

Sexual History Case Review Results, Quarter 1 – Fiscal Year 2021 (on file with the Monitors)(Common Application contained all known history of sexual abuse in 94% (225 of 239) of cases reviewed, and all known history of sexual aggression in 89% (56 of 63) of cases reviewed).

[78] A single Common Application for a child may be used across multiple placements and can be continually updated over several months or years. The Common Application is not uploaded to OneCase as is the Placement Summary and Attachment A, which means a "snapshot" of the Common Application at the time of a particular placement may not exist. With these limitations in mind, the monitoring team reviewed the Common Application with the closest date prior to or up to 14 days after the sampled placement start date. If the reviewer did not find a Common Application within that timeframe, the Common Application completed closest in time to the sampled placement start date was reviewed.

[79] *See* Deborah Fowler & Kevin Ryan, Second Report at 222-23, ECF No. 1079.

Figure 18: Timing of Common Application Last Updated Date in Relation to Placement Start Date



In addition to the Common Application, DFPS relies on the Placement Summary form and Attachment A to provide caregivers with information related to a child's history of sexual victimization or aggression. Of the 877 placements included in the case record review sample, 656 required that a Placement Summary and Attachment A be provided to the receiving caregiver at the time of the child's placement. [80] The monitoring team reviewed children's IMPACT records to determine whether a Placement Summary and Attachment A associated with the placement could be found in OneCase.

Overall, both a Placement Summary and Attachment A were found for 82% (134 of 163) of the placements involving a child with a history of sexual aggression, and 75% (370 of 493) of placements involving a child with a history of sexual abuse. [81]

---

[80] Though a Common Application is not provided to kinship, and adoptive placements, a Placement Summary and Attachment A are expected to be provided.

[81] Differences between DFPS case reads and the Monitors' case reads make the results difficult to compare related to the ability to find a Placement Summary and Attachment A. For example, DFPS considers whether a Placement Summary and Attachment A can be found independently. The Monitors review cases to determine whether both documents can be found for the placement being reviewed, since the Attachment A is an attachment to the Placement Summary.



Figure 19: Both Attachment A and Placement Summary Found by Time Period

Source: Case review data

The review revealed differences in results between placement types for children with history of sexual aggression vs. history of sexual abuse:[82]

- Reviews for placements involving children with a history of sexual aggression found a Placement Summary and Attachment A in 88% (85 of 97) of congregate care placements compared to 78% (28 of 36) of foster home placements and 70% (21 of 30) of kinship or adoptive placements.

- Reviews for placements involving children with a history of sexual abuse found a Placement Summary and Attachment A in 78% (183 of 235) of congregate care placements compared to 77% (115 of 150) of foster home placements and 67% (72 of 108) of kinship or adoptive placements.

Across all placement types, an Attachment A was included in the file more often than a Placement Summary. Though Remedial Orders 26, 27, and 29 refer to the Placement Summary, the State uses Attachment A to the Placement Summary as the primary vehicle for apprising placements of a child's history of sexual abuse or aggression.

---

[82] The August through December 2021 period includes only placements in August, October, and December.

**Figure 20: Percent of Records with Placement Summary and/or Attachment A Forms Found by Living Arrangement\***



\*Congregate care also includes children in intensive mental health placements.

Validated compliance rates for kinship and adoptive placements during the current reporting period showed significant improvement over validated compliance rates reported for adoptive and kinship placements in the Monitors' Second Report. For the period reviewed for the Second Report (March – October 2020), the Monitors found an Attachment A in only 50% of records reviewed involving a child flagged with a history of sexual aggression placed in an adoptive or kinship placement and in only 54% of records

reviewed involving a child with a history of sexual abuse placed in an adoptive or kinship placement.

Despite finding a Placement Summary and Attachment A in most of the records reviewed, the monitoring team determined those documents did not always include all known history of a child's sexual abuse or sexual aggression or a signature by the receiving caregiver. In placements involving a child with a history of sexual aggression, the monitoring team found a Placement Summary and Attachment A with the receiving caregiver's signature included on or before the placement start for only 45% (73 of 163) of placements reviewed. Similarly, reviewers found a Placement Summary and Attachment A with the receiving caregiver's signature included on or before the placement start date for only 41% (204 of 493) of placements involving a child with a history of sexual abuse.

Figure 21: Percent of Records with Placement Summary and Attachment A Forms Found with Complete History and Caregiver Signature on or Before Placement Start

Source: Case review data

n = 656



These results represent a slight improvement over those reported in the Monitors' Second Report: For the period reviewed for the Second Report (March – October 2020),[83] the monitoring team found a Placement Summary and Attachment A signed by the receiving caregiver on or before the placement start date in 40% (68 of 171) of cases involving a child with an indicator for sexual aggression, and in 30% (171 of 565) of cases involving a child with a history of sexual victimization.[84]

---

[83] Deborah Fowler & Kevin Ryan, Second Report, at 229-32, ECF No. 1079.
[84] *Id.*

Compared to DFPS, SSCCs had lower compliance rates for documenting caregiver notification with a signed Placement Summary and Attachment A with a child's complete history of sexual abuse or aggression, signed by caregivers. Though the Monitors' Second Report showed SSCCs outperformed DFPS, the results reported in that analysis did not include whether the forms included all of a child's known history of sexual abuse or aggression. When that piece was added to the case record reviews conducted for this report, the SSCCs' performance lagged behind DFPS's performance.

Figure 22: Records with Placement Summary and Attachment A Forms with Complete History and Caregiver Signature on or Before Placement Start by Placement Entity



In reviewing the timing of the signature on the signed forms, the monitoring team noticed that while most of the Attachment A forms were signed by caregivers on the day that the child was placed, in some cases, the forms were signed more than 14 days after placement. Of placements reviewed involving a child flagged with an indicator for sexual aggression, in 7 of 147 (5%) instances the Attachment A was signed more than 14 days after the child's placement start. Of children flagged as victims of sexual abuse whose placements were reviewed, in 19 of 426 (5%) instances the Attachment A was signed more than 14 days after the child's placement. The biggest gap between the placement start-date and the date the Attachment A was signed by the caregiver in a placement involving a child flagged with an indicator for sexual aggression was 71 days after placement. For placements

reviewed involving a child flagged as a victim of sexual abuse, the biggest gap between placement start-date and signature was 54 days after placement.[85]

Figure 23: Days from Date that Caregiver Signed Attachment A to Placement Start



A subset of placements – those in hospitals and juvenile justice settings – do not require the State to complete a Common Application or Placement Summary but do require an Attachment A to be provided to the receiving caregiver.[86] The Monitors' case record review included 67 of these types of placements for children flagged with an indicator for sexual aggression and 154 for children flagged with a history of sexual abuse. The monitoring team found an Attachment A associated with the placement in approximately half; however, as was the case for other types of placements, the percentage of placements for which the Attachment A included both the caregiver signature and all of a child's known history of aggression or abuse was lower.

---

[85] When a placement record is entered in IMPACT, the child's caseworker is also expected to enter the date that the caseworker provided the Attachment A to the receiving caregiver at the placement. In a few of the case records reviewed by the monitoring team, the caseworker failed to document the date the Attachment A was provided to the child's caregiver. Of the 147 cases reviewed involving a child flagged with an indicator for sexual aggression, no date was entered in 4. Of the 426 cases involving a child with a history of sexual abuse, no date was entered in 14. Similarly, when the monitoring team reviewed the Attachment A associated with the placement in OneCase, there were times when the date the document was signed did not match the date entered in the child's IMPACT records. In addition, the monitoring team found that in 13 – 16% of cases reviewed, the Attachment A was signed after it was reported in IMPACT as having been provided to the caregiver.

[86] *See* DFPS, CPS Handbook §4231.1, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_4000.asp#CPS_4231_1

53

Results for these placements improved in the second half of 2021, especially for children with a history of sexual abuse.

### Figure 25: Attachment A Forms Found for Children in Hospital and Juvenile Justice Placements



### Figure 24: Percent of Cases with Attachment A Found, Including Complete History, and Signed on or Before Placement Start



*August − December includes only placements in August, October, and December.

## Information Collected During Site Visits

At each of the six site visits made in 2021 and early 2022, the monitoring team reviewed records for all PMC children, and interviewed children and staff. The record reviews and interviews included a review of information related to a child's status as flagged with a sexual characteristic indicator. The monitoring team reviewed a total of 72 children's records across the six visits made in 2021 or early 2022, in addition to the 53 staff records reviewed. The monitoring team interviewed 41 staff members, and 52 children.

Most of the children's site records included a Common Application, Attachment A, and Placement Summary. Of children whose site records included the documents, the forms also were almost always signed by a Placement Administrator, receiving intake staff, case manager, or receiving caregiver.

**Figure 26: Forms Found in Children's Site Records, 2021 – 2022**



**Figure 27: Forms Found and Signed in Children's Site Records, 2021 – 2022**



The monitoring team reviewed the sexual history information in the Common Application, Placement Summary, and Attachment A forms found in the children's site records to determine whether the information in the forms was consistent with the information found in the sexual history page of the child's IMPACT records. The monitoring team determined:

- Consistent information was found in a Common Application in the site records for 71% (12 of 17) of children with a history of sexual abuse, and for 67% (four of six) of children flagged with an indicator for sexual aggression.
- Consistent information was found in a Placement Summary in the site records for 53% (9 of 17) of children with a confirmed history of sexual abuse and for 67% (four of six) of children flagged with an indicator for sexual aggression.
- Consistent information was found in an Attachment A in the site records for 59% (10 of 17) of children with a history of sexual abuse and for 100% (six of six) for children flagged with an indicator for sexual aggression.

Of the 72 child records reviewed during a site visit, 17 (24%) children had been identified by DFPS as victims of sexual abuse and six (8%) had been flagged with an indicator for sexual aggression. Of these children, the following records were missing from site records:

- a Common Application for one child identified as a victim of sexual abuse, and one child flagged with an indicator for sexual aggression;
- a Placement Summary for two children identified as victims of sexual abuse, and two children flagged with an indicator for sexual aggression; and
- an Attachment A for five children identified as victims of sexual abuse.

In addition, the monitoring team found information in the Common Application, Placement Summary, or Attachment A included in the site records for nine children (9 of 72, or 13%) that indicated the child was a confirmed victim of sexual abuse, though the child was not flagged with an indicator for sexual abuse. Similarly, the site records for two children (2 of 72, or 3%) included information indicating the child had a history of sexual aggression, but the child was not flagged with an indicator for sexual aggression.

The interview tools used during site visits included questions related to caregiver notification. The monitoring team interviewed 10 Program Administrators and 31 caregiver staff. The monitoring team asked Program Administrators whether they always received an Attachment A for children identified with a history of sexual abuse or an indicator for sexual aggression upon the child's placement in the operation, and if so, whether they sign the document. The monitoring team queried other staff whether they were asked to sign a child's Attachment A to document their review of a child's history of sexual abuse or sexual aggression.

Of the 10 Program Administrators interviewed, eight (80%) said they always receive an Attachment A documenting a child's history of sexual abuse or aggression when a child is admitted, and two (20%) said they sometimes receive the document. All 10 Program Administrators confirmed that they sign the document when one is received. Yet only 4

of 10 Program Administrators (40%) reported feeling they always receive proper notice prior to or upon entry to the program when a child has a history of sexual abuse or sexual aggression.[87]

Of the 31 caregiver staff interviewed, 28 were direct care staff or direct care staff supervisors. Of those 28, 20 (71%) reported that when an Attachment A is provided for a child, they are always asked to sign the document, and three (11%) reported that they are sometimes asked to sign. Five of the 28 (18%) reported they are not asked to sign the Attachment A form. The other three caregiver staff interviewed included a unit manager, a safety specialist, and a daytime supervisor. Of these three, none reported being asked to sign Attachment A.

The 31 caregiver staff also were asked what documents they are provided when supervising a child for the first time. Only seventeen of 31 (55%) reported that they receive the Attachment A, 10 of 31 staff (32%) reported that they receive the Common Application, and 5 of 31 (16%) reported that they receive the child's Placement Summary.



**Figure 28: Documents Caregiver Staff Report Receiving When Supervising a Child for the First Time**

Source: Monitoring team site visit data, Caregiver Interview
n = 31



- Common Application — 10 (32%)
- Attachment A — 17 (55%)
- Placement Summary — 5 (16%)

(0, 5, 10, 15, 20, 25, 30)

---

[87] Though data from the abbreviated site visits to Heightened Monitoring operations (discussed, *infra*) were not included in this analysis because an interview tool specific to Heightened Monitoring was used to collect data for those visits, an administrator for a Heightened Monitoring operation shared information relevant to the seemingly contradictory responses to these questions. The administrator said that the Common Application they reviewed prior to a child's placement and the copy they received when they child was placed were often different. He said that they reviewed information prior to a child's placement via an online system. The administrator noted that the version of the Common Application they reviewed online often appeared to be an outdated version, based on the version they received when the child was placed. He also noted that in one case, even the photo of the child in the online system was not a photo of the child eventually placed. The administrator said that the information reviewed online does not always indicate whether a child has a history of sexual abuse or an indicator for aggression, and that the Attachment A is not in the online system. According to the administrator, they do not receive the child's Attachment A until the child is placed.

Caregiver staff were asked whether they felt they were always informed if a child they supervised had been a victim of sexual abuse or had a history of sexual aggression. Twenty six of the 31 (84%) reported that they were always informed if a child had been a victim of sexual abuse and 27 of 31 (88%) said they were always informed if a child had a history of sexual aggression. Nine of the 10 Program Administrators (90%) reported that they always communicated a child's history of sexual abuse or sexual aggression to caregiver staff when it was provided. One did not know if the information was communicated.

### Summary: Remedial Orders 25, 26, 27, 29, 31

The Common Applications included in the Monitors' case record review generally included a child's known history of sexual abuse or sexual aggression. However, the State's process for updating the child's Common Application between placements is inconsistent, making it difficult for the monitoring team to determine whether the Common Application found in IMPACT was associated with a particular placement. As a result, this method is a poor indicator for validating caregiver notification for a given placement. Conversely, the monitoring team could almost always locate a Placement Summary and Attachment A associated with a particular placement; however, these documents included both all a child's known history of victimization or aggression and the receiving caregiver's signature in fewer than half of the cases reviewed. The SSCCs had lower compliance rates than DFPS. Caregiver notification results improved in the second half of 2021.

During six site visits, the monitoring team found a Common Application, Placement Summary, and Attachment A in most children's records. However, some of these records were missing from site records for children who were flagged with an indicator for sexual abuse or sexual aggression. During interviews, most caregivers said they were asked to sign an Attachment A when one was provided; but only 17 of 31 (55%) named the Attachment A as a document that they were given when supervising a child for the first time. Yet, almost all of them reported that they were informed if a child in their care had a history of sexual abuse or sexual aggression.

### Remedial Orders A7 and A8: Awake-Night Supervision

**Remedial Order A7:** *The Defendants shall immediately cease placing PMC children housing more than 6 children, inclusive of all foster, biological, and adoptive children, in licensed foster care (LFC) placements that lack continuous 24-hour awaken-night supervision. The continuous 24-hour awake-night supervision shall be designed to alleviate any unreasonable risk of serious harm.*

**Remedial Order A8:** *Within 60 days of this Court's Order, and on a quarterly basis thereafter, DFPS shall provide a detailed update and verification to the Monitors concerning the State's providing continuous 24-hour awake-night supervision in the operation of LFC placements that house more than 6 children, inclusive of all foster, biological, and adoptive children.*

### Background

58

Based on data provided by DFPS, a total of 302 unique operations required awake-night supervision at some point in 2021.[88] Of the 302 operations, 288 (95%) were congregate care facilities (GROs or RTCs) and 14 (5%) were group foster homes. Forty-nine locations (16%) were outside of Texas.

Table 14: Number of Operation Locations Requiring Awake-Night Supervision, January – December 2021

| Month | Operation Locations Requiring Awake-Night Supervision |
|---|---|
| January | 240 |
| February | 241 |
| March | 244 |
| April | 251 |
| May | 250 |
| June | 215 |
| July | 226 |
| August | 222 |
| September | 222 |
| October | 227 |
| November | 227 |
| December | 229 |

The Monitors reviewed 2,666 DFPS awake-night certifications[89] completed because of an unannounced visit by DFPS staff from January 2021 through December 2021, and found DFPS made overnight, unannounced visits to 85% to 99% of operations requiring awake-night supervision each month, and 68% of operations were visited in every month eligible.[90]

---

[88] Operations with multiple addresses were counted for each address. Operations providing different levels of care at the same address (e.g., emergency shelter and residential treatment) were only counted once. Operations requiring awake-night supervision include all in-state and out-of-state GROs and RTCs with which DFPS and the SSCCs had an active contract in the month and CPAs that had more than six children in a foster home.

[89] DFPS made a total of 2,776 unannounced awake-night visits during 2021, including operations in Texas and outside the state.

[90] DFPS also made visits to some operations that were not required to have awake-night supervision under remedial orders A7 and A8. Of those, the certification forms for some indicated that the operation did not house any PMC children on the date of the visit.

59

Figure 29: Number of Operation Locations Requiring Awake-Night Supervision Visited, January-December 2021

Source: DFPS 24-hr Elig Placements and Awake Night Verification Documents



Figure 30: Portion of Eligible Months with Visits When Required, 2021

Source: DFPS 24-hr Elig Placements and Awake Night Verification Documents
n = 302



DFPS may conduct multiple awake-night visits in a month at the same operation if no PMC children are present at the time of an unannounced visit (but are later placed in the operation) if DFPS staff have difficulty gaining access to the location to conduct the visit. Of the 2,666 visits reviewed, 64 had more than one visit to the location; nine of the 64

(14%) had multiple visits due to the inability of DFPS staff to gain access or inability to certify awake-night supervision during a previous visit. DFPS ultimately certified awake-night supervision during the repeat visit for eight of those nine operations. In addition, awake-night certification forms documented operation staff appeared to be asleep or were asleep upon DFPS' arrival in the narrative for two of the 2,666 visits. However, supervision was ultimately certified by DFPS for those two operations.

The Monitors also reviewed noncompliance incidents documented by DFPS residential contract managers or self-reported by operations and deficiencies cited by RCCR for violation of minimum standard requirements associated with awake-night supervision. Between January 2021 and November 2021, 21 incidents of noncompliance were reported either by DFPS residential contract managers or were self-reported by operations to DFPS related to awake-night supervision, and 12 citations were issued by RCCR related to violation of minimum standards associated with caregiver supervision for problems associated with awake-night supervision.

Figure 31: Infractions and Deficiencies Cited for Noncompliance with Requirements of 24-Hour Awake-Night Supervision, January-December, 2021



Source: DFPS Noncompliance Reports; HHSC Deficiencies Cited
n = 33

Of the 21 violations reported by DFPS, more than half did not result in a corrective action plan or technical assistance. Of the 13 violations that did not result in a corrective action plan or technical assistance, DFPS later found five operations complied (or did not require awake-night supervision) during a follow-up visit. Three operations had more than one violation between January and November 2021; two of these three were placed under a Corrective Action Plan (CAP) by DFPS.

Figure 32: Corrective Action Taken in Infractions Due to Noncompliance with Requirements of 24-Hour Awake-Night Supervision, January – November 2021



Source: DFPS Noncompliance Reports
n = 21

- No corrective action
- TA only
- CAP only

Of the 12 citations issued by RCCR for noncompliance with minimum standards associated with awake night supervision, only three involved sleeping staff. RCCR did not find a staff person sleeping at the remaining nine operations, however, the monitoring team noted significant supervision failures during overnight hours.

The three violations associated with staff found to have been sleeping include the following:

- A Priority 3 intake for Cal Farley's Boys Ranch, alleging that a 15-year-old girl and a 17-year-old boy engaged in consensual sexual contact during an off-campus, overnight event. RCCR found, "Children in care were not provided with appropriate supervision when at an off-campus activity and were able to leave hotel rooms without staff being aware and engaged in consensual sexual behavior."

- A Priority 2 Neglectful Supervision intake for The Lighthouse for the Betterment of Youth that resulted in an RTB and four minimum standards citations, based on findings that two residents ran away from the facility to "find" two other children who had run earlier in the evening, after one of these youth posted a picture of himself on social media with a gun belonging to the alleged perpetrator. The alleged perpetrator was the overnight staff tasked with supervising the four children. One of the children allegedly removed the gun from the alleged perpetrator's vehicle while it was parked at the facility. All four youths returned to the facility later in the night and one of the children returned the gun to another staff member; law enforcement arrested the child who posted the picture to social media. During its investigation for Neglectful Supervision, DFPS found that the children who obtained the gun, and all the children who ran away from the operation, were able to do so because the alleged perpetrator was asleep and did not see them leave the operation.

- A Priority 2 Neglectful Supervision intake for North Texas Youth Connection alleged that an awake-night staff was seen sleeping by a 10-year-old child who was a resident at the operation. Two collateral children interviewed during the

investigation also reported seeing the staff member asleep during his overnight shift. Neglectful Supervision was ruled out because "there was no report of abuse or neglect" having occurred while the staff member was sleeping. However, a citation was issued for violation of the minimum standards associated with caregiver responsibility because "an awake staff was sleeping while supervising children."

The citations associated with findings of inappropriate nighttime supervision, but did not find staff were sleeping, included:

- A Priority 2 Neglectful Supervision intake for Houston Serenity Place GRO, an operation that was under Heightened Monitoring at the time of the intake and has since closed. The intake alleged that a 14-year-old child (who was 13 years old at the time of the incident) made an outcry of what is characterized in the report to SWI as "consensual" sexual contact (oral sex) with a 17-year-old child who was also placed at the GRO.[91] The younger child alleged that the incident occurred at night while both children were housed upstairs, though in separate bedrooms. During the investigation, the administrator of the operation said that staff overheard the two girls acknowledge the consensual sexual contact during an argument that occurred the night of February 19, 2021, just before the 17-year-old ran away. Neglectful Supervision was ruled out because a perpetrator was not identified: The alleged victim did not remember the date the incident occurred or which staff were supervising the children on the night of the incident, and though one resident indicated staff sometimes slept at night, she refused to disclose which staff slept. However, the operation was issued a citation for violation of the minimum standard associated with caregiver responsibility, based on the finding that "[t]wo children in care were able to engage in sexual conduct, at night, without detection by staff."

- A Priority 2 intake for Neglectful Supervision for Carson Parke, shortly before HHSC revoked its license in May 2021, alleged a 13-year-old girl and a 15-year-old girl were able to engage in consensual sexual contact twice, once during the day and once at night, without staff being aware. Neglectful Supervision was ruled out because "the children did not do anything serious" and "[n]either child has history and [sic] were not on special supervision." However, a citation was issued for violation of the minimum standards associated with caregiver responsibility because "It was determined children were not adequately supervised during the nighttime and daytime hours, which resulted in children being able to sexually act out."

- A Priority 2 minimum standards violation intake related to allegations of improper restraints for Catholic Charities Shelter at Pearl Longbine Cottage. In addition to citing the operation for violation of the minimum standards associated with emergency behavior intervention, the operation received a citation for violation of

---

[91] Both children involved were confirmed victims of sexual abuse perpetrated by the same staff member during the children's earlier placement at Devereux – Texas Treatment Center in League City, TX.

minimum standards associated with caregiver responsibility, because "[c]hildren in care were able to leave the facility during overnight hours without staff being aware they were gone."

- A Priority 2 Neglectful Supervision intake for Option House, a GRO, that resulted in an RTB and two minimum standards violations after a 17-year-old female youth was able to obtain and drink alcohol, and when she was discovered to be missing during bed checks, was found by staff 75 minutes later, in bed with a 17-year-old male youth, and was not wearing any underwear.

- A Priority 2 minimum standards violation intake for Road to Wisdom LLC alleged that a 16-year-old resident reported to his mother that his roommate had a female resident in bed with him, and that they had sex. He reported that his roommate threatened him not to report this to staff. During his interview with RCCR, the youth reported that staff do not check on the youth during the night. Staff on duty the night of the incident reported that they were completing tasks "that may have kept them from performing timely and thorough checks on both children that were able to engage in sexual intercourse." One of them reported that she was cleaning a bathroom for an hour or more, without coming out to check on the residents. The other staff member said she was tending to a broken washing machine. Three of the six children interviewed reported both staff were asleep when the incident occurred. A citation was issued, based on RCCR's finding that the two staff "admitted to not performing timely and adequate checks of children during overnight hours resulting in two children, from two separate houses, engaging in sexual intercourse."

- A Priority 2 Neglectful Supervision intake for New Hope Christian Academy alleged one resident forced another resident to engage in sexual contact. When they were interviewed, the two alleged victims, who were roommates prior to one of the youths being discharged from the operation, acknowledged sexual contact occurred numerous times during overnight hours, but said it was consensual. The youth indicated that they were able to do so because they hung a blanket from the top bunk bed in their room so that staff could not see them when they were on the bottom bunk bed, and one of the staff walked the halls during his overnight shift but did not go inside the children's rooms. Neglectful Supervision was ruled out, but a citation was issued for violation of minimum standards associated with caregiver responsibility. The operation was also cited for failing to report the incident to licensing.

- A Priority 2 Neglectful Supervision intake for Kidz Safe Harbor RTC, which has since had its license revoked, was ruled out for Neglectful Supervision, but resulted in a citation for violation of minimum standards associated with caregiver responsibility based on the finding that "staff was unaware that multiple children were awake and moving about the home pouring water on other children."

On May 21, 2021, after the Monitors shared a draft of this report with the parties, DFPS emailed information related to five incidents of noncompliance with awake-night supervision. Three were identified because of an unannounced visit from DFPS, and two were self-reported by operations:[92]

- **Autistic Treatment Center:** Failure to provide supervision. On July 19, 2021, during the interview at the Waddesdon Bluff location DFPS discovered bed logs had not been completed for the entire night during an unannounced visit. Upon entry into the home DFPS discovered a bed pallet on the sofa. When Lauren Conn answered the door, she did not appear to have been awake or alert. When asked to see the bed check log Conn indicated that she only needed to document the 4:00 a.m. logs. However, after reviewing the bed logs DFPS found that none of the bed checks for her shift had been completed. Furthermore, DFPS discovered that the bed logs for July 17, 2021, had not been conducted at 4:00 a.m. and 6:00 a.m. There were also no entries on July 18, 2021, at 6:00 a.m. The original awake-night certification form received by the Monitors for this visit included only the problems with the bed check log and did not mention the bed pallet on the sofa or that the awake-night staff did not appear to be awake or alert.

- **Boysville, Inc., d/b/a Thompson Emergency Shelter:** On July 23, 2021, the DFPS observed the awake-night staff person sleeping on the sofa with a bed comforter as her cover. The Facility Administrator made several attempts to contact the awake-night staff person by phone and was unable to reach her. Love Lace Cottage had to be opened by another staff member from another cottage. Despite this, the original awake-night certification form received by the Monitors certified compliance with awake-night supervision.

- **Concho Valley Home for Girls:** Failure to provide supervision. During an unannounced visit, DFPS contacted the operation's Director as no one answered the front door after about five minutes. Director stated it was possible that the employee on shift was in the restroom in the back and perhaps could not hear and she would call her and call the DFPS staff back. After 10 minutes passed, and Ms. Jones called the DFPS staff back and reported that the awake-night staff person was not answering her cell, and Jones was concerned because she had been an employee for over nine years and nothing like this had happened before. The Director said that she would be on her way to the facility. The DFPS staff continued to knock on the door and ring the doorbell before returning to vehicle to wait for the Director. The Director arrived ten minutes after her phone call with DFPS staff (about 27 minutes from the time that DFPS staff initially began knocking on the door). The Director unlocked front door to the facility and the DFPS staff followed her into the living area where the awake-night staff person was observed sleeping on the couch. The Director

---

[92] Email from Ingrid Vogel to Deborah Fowler and Kevin Ryan, re: CY 2021 24-Hour Awake Night Infractions not reported to the Monitors, May 31, 2022 (on file with the Monitors).

announced to the awake-night staff person, "the state is here." The awake-night staff person sat up and stated that she had not been feeling well and took something and it must have made her fall asleep. The Director asked the awake-night staff to go home for the night and Director would remain as the person providing awake-night supervision. Concho Valley is one of the nine operations visited multiple times by DFPS staff due to an inability to certify awake-night supervision during a previous visit.

- Cumberland Presbyterian Children's Home: On October 12, 2021, a supervisor at the operation was doing live overnight camera checks and observed an awake-night staff member sleeping on her shift for approximately one hour beginning at 1:30 a.m. to 2:30 a.m. when the supervisor observed her on the camera and called her and woke her up. The supervisor lives on campus and went to the cottage and sent the awake-night staff person home and worked the remainder of the shift. The awake-night staff person's employment was terminated. This incident was self-reported by the operation.

- Texas Tranquility Estates: On October 13, 2021, at 4:00 a.m., the operation had an awake-night monitoring check. DFPS found the operation compliant with awake-night supervision during the monitoring visit. However, the operation later discovered that the awake-night staff on duty was asleep prior to CPS knocking on the door. The staff submitted her resignation the next morning. This incident was self-reported by the operation.

In addition to the violations detailed above, the Monitors identified other operations that struggled with compliance in recent intermediary filings. For example, the Monitors' recent report related to The Refuge for DMST, an RTC that serves survivors of sex trafficking, revealed multiple reports of more than one staff member sleeping at night.[93]

In addition, the monitoring team recently visited an operation, discovered awake-night staff to be sleeping, and filed a report with DFPS. During a visit to Camp Worth GRO that began with an awake-night check, the monitoring team knocked on the front door of the boys' residence. There was no immediate answer, but the monitoring team heard the door being unlocked. The monitoring team waited, but no one opened the door, so the team let themselves in. A female staff member, who was the day-shift caregiver and not obligated to be awake, was going back to sleep on a couch by the door. The members of the monitoring team introduced themselves to the day-shift staff person, who went back to sleep while the monitoring team walked around the house. The monitoring team noticed a child sleeping on a pad on the floor in the living room a few feet away from the day-shift staff member. The monitoring team walked down the hall and noticed that no staff were awake.

The monitoring team walked back to the living room to ask the day-shift staff if there was an awake-night staff member in the house. The day-shift staff member got up and led the monitoring team to another room where a second female staff member, who was wearing

---

[93] Deborah Fowler & Kevin Ryan, Update to the Court Regarding The Refuge for DMST, ECF 1218.

pajamas, was asleep on a couch with the room's lights turned off. The day-shift staff member woke up the sleeping awake-night staff member. The monitoring team interviewed the asleep-awake-night staff member, who had only been working there for two weeks; the staff member's responses to interview questions indicated that she had not had all the requisite training before caring for children. Moreover, the staff member had no prior experience taking care of children in a professional capacity. The monitoring team located the overnight log where awake-night staff are supposed to document room checks throughout the night and saw that the awake-night staff member had pre-filled the overnight log with entries.

During a visit to Guiding Light, another GRO, while the monitoring team did not witness awake-night staff sleeping, they had difficulty obtaining entry to one of the housing units during their late-night visit. The monitoring team arrived at Guiding Light RTC unannounced at approximately 1:30 a.m. Upon arrival, the monitoring team noticed that the upstairs lights were off in what they later learned was the boys' house, but the downstairs lights were on. The monitoring team knocked on the door of the boys' house and rang the doorbell, but nobody answered. After several tries, the monitoring team walked over to the girls' house and rang the doorbell. A female staff member answered the door and said she would call the staff at the boys' house. Soon after, the lights came on upstairs in the boys' house. When the monitoring team knocked once again on the door, a male staff member answered the door and allowed the monitoring team to come in.

### Remedial Orders A7 and A8 Summary

Though DFPS is routinely making unannounced awake-night visits to operations requiring awake-night supervision, some operations continue to struggle with compliance.

## Regulatory Monitoring and Oversight of Licensed Placements

### Remedial Order 22: Consideration of Abuse or Neglect/Corporal Punishment and Obligation to Report Suspected Abuse or Neglect

*Effective immediately, RCCL, and any successor entity charged with inspections of childcare placements, must consider during the placement inspection all referrals of, and in addition all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment in the placements.[94] During inspections, RCCL, and any*

---

[94] In response to the State's request for clarification regarding the timeframe for review and how to document RCCR's consideration of the required elements during inspections, on October 7, 2019, the Monitors advised HHSC that the Court, "directs with respect to the look-back period for consideration all referrals of, and in addition, all confirmed findings of, child abuse/neglect and all confirmed findings of corporal punishment, RCCL inspectors should assess the previous 5 years. With respect to the request for clarification about how to document that the inspectors have considered these referrals and findings, a check box is insufficient. The Court directs the agency to have inspectors document in CLASS (1) the

*successor entity charged with inspections of childcare placements, must monitor placement agencies' adherence to obligations to report suspected child abuse/neglect. When RCCL, and any successor entity charged with inspections of childcare placements, discovers a lapse in reporting, it shall refer the matter to DFPS, which shall immediately investigate to determine appropriate corrective action, up to and including termination or modification of a contract.*

## Background

Remedial Order 22 includes two distinct requirements: First, RCCR must consider referrals and confirmed findings of abuse or neglect and corporal punishment during inspections (which the State documents in CLASS in a field for "Extended Compliance History Reviews," or ECHRs). Second, RCCR must monitor and report to DFPS lapses in placements' obligations to report abuse or neglect.

As to the first requirement, the Monitors validated the State's compliance through independent case record reviews.[95] For the second requirement, the Monitors analyzed citations issued to operations by RCCR for violations of minimum standards associated with the reporting of abuse, neglect, or exploitation. The Monitors also reviewed and compared two reports provided by the State to the Monitors: (1) a list of deficiencies cited for failure to report abuse, neglect, or exploitation, provided each month to DFPS by RCCR; and (2) a DFPS report on the failure to report notifications the agency receives from RCCR in a given time period. The Monitors cross-matched these two reports with the data for citations issued due to failure to report. The Monitors also reviewed the circumstances leading to each of the citations issued during the period reviewed.

## Performance Validation

### Case Record Review of Extended Compliance History Reviews

Of the 943 inspections included in the Monitors' case record review sample, the majority were investigation inspections.

---

number of referrals of child abuse/neglect; (2) the number of confirmed findings of child abuse/neglect; (3) the number of confirmed findings of corporal punishment; and (4) a narrative description of how this data and information was considered." E-mail from Kevin Ryan and Deborah Fowler to Andrew Stephens, et al., re: Responses to State's Requests, October 7, 2019 (on file with the Monitors).

[95] Consistent with the methodology used in the Monitors' previous case record reviews for Remedial Order 22, the Monitors completed four case record reviews for a random sample of 943 inspections, with a 95/5 confidence interval. The first sample, consisting of 285 inspections, covered January 1, 2021, through March 31, 2021; the second sample, consisting of 253 inspections, covered April 1,2021 through May 31, 2021; the third sample, consisting of 242 inspections, covered August 2021 and October 2021 (just those two months); and the last sample, consisting of 163 inspections, covered December 2021. All RCCR inspections except for attempted, application, initial, follow-up, and sampling inspections were included in the sample.

Figure 33: Number of Inspections Sampled by Case Review Period and Inspection Type, 2021



Source: HHSC Inspections Data, Case review data
n = 943

More than half of the inspections in the sample were conducted at GROs (512 of 943, or 54%); the remainder were conducted at foster homes or CPAs (431 of 943, or 46%). Of the 431 inspections associated with a CPA, 38% (162 of 431) were conducted at large CPAs (with 40 or more verified foster homes), 25% (108 of 431) were at medium-sized CPAs (20 to 39 verified foster homes), and 31% (133 of 431) were at small CPAs (less than 20 verified foster homes). Three percent were conducted at CPAs with no verified foster homes (including two operations that are now closed, and two that are adoption agencies).

The monitoring team located an ECHR for all inspections included in the sample. All ECHRs were completed prior to the inspection, with most (882 of 943, or 93%) completed the same day, or the day before the inspection. The longest period between completion of the ECHR and the actual inspection was 28 days.[96] However, only 25 (3%) of the ECHRs reviewed were completed more than three days prior to the inspection.

---

[96] Completing an ECHR significantly in advance of an inspection may miss substantiated abuse, neglect, or exploitation findings or corporal punishment citations issued prior to the inspection.



**Figure 34: Days from ECHR Completion Data to Inspection Begin Date for Inspections with an ECHR, 2021**

Source: Case review data
n = 943

Data elements reported by inspectors in ECHRs regarding abuse, neglect, and exploitation intakes and substantiated findings, and corporal punishment findings, were found to be largely consistent with the data provided by the State to the Monitors for the operation. The discrepancies for abuse, neglect, and exploitation intakes are likely explained by the timing of the inspection.

Figure 35: Comparison of ANE/Corporal Punishment Data Found in ECHRs and State Aggregate Data as of the First Day of the Month, 2021



In nearly half of inspections included in the review sample, the ECHR documented 50 or more abuse, neglect, or exploitation intakes. In more than half, at least one substantiated abuse, neglect, or exploitation incident during the five-year review period was documented.

Figure 36: Number of ANE Intakes, Findings, and Corporal Punishment Citations Reported in the ECHRs, 2021



Of the inspections included in the sample reviewed by the monitoring team, 71% (673 of 943) of the operations had one or more substantiated findings of abuse, neglect, or exploitation or a citation for corporal punishment. Of those, 87% (585 of 673) of the ECHRs included a discussion of the findings or citations. Fifty-one percent of ECHRs (477 of 943) included discussion of an operation's history of corrective actions.[97]

Figure 37: Items Discussed by the Inspector in ECHRs, 2021*



Source: Case review data
n = 943

*More than one item may have been discussed by the inspector in the ECHR.

Of the 189 investigation inspections that involved a foster home in the Monitors' second, third, and fourth case record samples, covering the period of April 1, 2021, through December 31, 2021,[98] only 42% (80 of 189) of the ECHRs included a discussion of the history of the foster home that was the subject of the investigation.

---

[97] However, of the 326 inspections involving an operation that was under Heightened Monitoring, the ECHR often did not mention the operation's Heightened Monitoring status; in 42% (136 of 326) the ECHR did not mention that the operation was under Heightened Monitoring.

[98] The first case read, covering the period from January 1, 2021, through March 31, 2021, did not assess discussion of foster home history. Ninety-one of the 280 inspections at CPAs or foster homes were monitoring inspections of CPAs. These inspections were not included in the analysis of discussion of foster home history in the ECHR.

Figure 38: Discussion of Foster Home History in ECHR, 2021

Source: Case review data
n = 189

■ Yes   ■ No

80
42%

109
58%

In more than two-thirds of inspections (650 of 943), the monitoring team determined there was a safety risk to consider at the time of the inspection based on the information documented in the ECHR.[99] Of those, the monitoring team determined that the inspector documented how the operation's history or safety risk was taken into consideration in just over half (358 of 650, or 55%). In 292 of the inspections (45% of 650), the inspector did not document how the operation's history or safety risk was considered.

Figure 39: Inspector Documented How Operation's History was Taken into Consideration During Inspection, 2021



Source: Case review data
n = 943

■ Yes

■ No

■ No safety risk to consider

293
31%

358
38%

292
31%

---

[99] Determination of a safety risk was based on the operation's number of substantiated findings of abuse, neglect, or exploitation and corporal punishment citations, and active investigations, as well as the operation's status on Heightened Monitoring or corrective action, and its compliance history.

Over the course of 2021, inspectors' documentation of how an operation's history or safety risk was considered worsened.



Figure 40: Inspector Documented How Operation's History was Taken into Consideration During Inspection Where a Safety Risk was Present, 2021

*Includes inspections occurring in August and October.

Where the monitoring team determined a risk existed, but the inspector did not consider a risk in the inspection, there often appeared to be insufficient documentation in the ECHR, or the operation or foster home history was not considered.[100]



Figure 41: Inspectors' Consideration of Operation's History During Inspection, 2021

---

[100] Determination of how the operation's history was taken into consideration during inspection was based on information documented in the ECHR.

In 74% (121 of 164) of investigation inspections in the sample in which the monitoring team determined that the underlying allegation was similar to an identified pattern or trend, this similarity was discussed in the ECHR. This represents a significant improvement since the Monitors reviewed ECHRs for the Second Report: of the ECHR narratives reviewed for that report, only 43% discussed the similarity between the underlying allegation and the identified pattern or trend.[101]



### Analysis of Failure to Report Abuse, Neglect, or Exploitation

Between January 1, 2021, and December 31, 2021, RCCR issued 46 citations to operations related to minimum standards violations associated with licensed operations' failure to report abuse, neglect, or exploitation.[102] More than half (54%, or 25 of 46) of the citations were issued to GROs and RTCs; the remainder (21 of 46, or 46%) were issued to CPAs. Forty operations accounted for the 46 deficiencies cited; three CPAs and two GROs were cited twice.

The State-created process for complying with Remedial Order 22 begins with RCCR: when a deficiency is cited by RCCR and entered into CLASS, the deficiency is included on a daily report sent via e-mail to DFPS. DFPS reviews the citation and determines contract

---

[101] *See* Deborah Fowler & Kevin Ryan, Second Report at 261, ECF N. 1079.
[102] Standards included in this analysis include those related to reporting requirements for abuse, neglect, or exploitation allegations, as well as requirements associated with reporting child-on-child physical or sexual abuse. They include: 26 Tex. Admin. Code §§ 748.303(a)(3)(A), 748.303 (a)(4)(A), 748.303 (a)(5)(A), 749.503(a)(3)(A), 749.503(a)(4)(A), 749.503(a)(5)(A).

compliance. The Monitors cross-matched the citation data both with the reports sent to DFPS by RCCR and with a report DFPS sent to the Monitors, to determine the State's response, upon discovery of a lapse in reporting abuse, neglect, or exploitation. The Monitors' Second Report identified a gap in the State's reporting after conducting the cross-matching: at that time, RCCR did not include citations for failure to report child-on-child Physical or Sexual Abuse in its daily reports to DFPS.[103]

As of May 4, 2021, RCCR implemented changes to the daily deficiency reports to DFPS adding failure-to-report standards in the CLASS system associated with child-on-child Physical and Sexual Abuse.[104] Though there were still five failure-to-report citations issued to operations in 2021 related to child-on-child Physical or Sexual Abuse that did not appear in the data reported to DFPS by RCCR, those five citations were issued prior to the changes made to the CLASS system.

Despite the improvement to reports of daily deficiencies, there remains a lack of alignment between the citations issued, the notifications sent by RCCR to DFPS, and DFPS' report of the citations for which it received notifications. One citation appears on both the RCCR and DFPS reports but was not found in the deficiencies data; this discrepancy is likely explained by a reversal of the RCCR decision to cite the operation. One citation that appears in DFPS' report of citations but was not found in deficiency data or RCCR report was a citation that was reported to DFPS in error. The Monitors do not have an explanation for the remaining discrepancies.

---

[103] *See* Deborah Fowler & Kevin Ryan, Second Report at 265, ECF No. 1079.
[104] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: CLASS I.T. Update – RO 22: Failure to Report ANE Daily Report – Standards Added (May 7, 2021) (on file with the Monitors).



In addition to reviewing and analyzing the citation data, the RCCR report, and the DFPS report, the Monitors reviewed all 46 of the investigations or inspections in CLASS to identify the allegations that operations failed to report. The review revealed failures to report allegations of abuse, neglect, or exploitation that, in many cases, were substantiated after an investigation. In other cases, the operation was cited after failing to report child-on-child sexual contact. Examples of investigations of allegations that were not initially reported and resulted in a citation or substantiated finding of abuse, neglect, or exploitation include:

- DFPS substantiated a finding of Physical Abuse involving a staff member at Guiding Light RTC who punched a 16-year-old and a 17-year-old in the face, then, when police responded to the incident, claimed he was attacked by one of the youths. As a result, the youth was arrested. The operation reported the incident to SWI on September 18, 2021, the day that the incident occurred, but only reported one child's involvement, and said that the child assaulted the staff member. The case was initiated as a Priority 3 minimum standards investigation but was upgraded when RCCR interviewed one of the victims and the victim reported that, during a verbal argument with the staff member, the staff member pushed him onto his bed and hit him twice in the face. He reported that when the other child entered the room and asked why he allowed the staff member to hit him, the staff member came back into the room, pushed the second victim onto the bed and hit him twice in the face. A staff member who witnessed the incident and intervened

substantiated the children's allegations, and the case was upgraded to a Priority 2 investigation for Physical Abuse 10 days after the operation made the initial report. Though an incident report completed by staff at the operation the day the incident occurred was consistent with the youths' allegations, and documentation showed that the staff who punched the two children was fired the same day for violating the operation's youth discipline policy, the only penalty associated with the operation's failure to report the Physical Abuse was the citation issued by RCCR.

- DFPS substantiated findings of Sexual Abuse of two male youths by a female staff member at Kidz Safe Harbor Treatment Center. Both children alleged they made outcries to staff at the facility soon after the abuse began, weeks before a report was made to SWI. A safety plan and therapy notes substantiated their allegations. During interviews, collateral staff also reported having shared concerns about the staff member's inappropriate behavior days before it was reported. Despite this report, the only penalty assessed against the operation for failing to report the sexual abuse was the citation issued by RCCR. A review of CLASS showed the perpetrator in this case worked for at least three other RTCs.[105]

- DFPS substantiated a finding of Sexual Abuse of a male youth by a male staff member at Hill Country Youth Ranch (HCYR). The abuse occurred over a four-year period, starting when the child was 13 years old. A collateral staff person reported she raised concerns about inappropriate boundaries between the staff person and the child months before a report was made to SWI. Documentation substantiated her claim. An employer of the youth said that he had reported to staff at HCYR that he witnessed the child kiss a man who dropped him off at work. In addition, concerns of inappropriate boundaries between the perpetrator and other youth had been reported by the children's caseworkers to HCYR more than once. This was the second Sexual Abuse allegation investigated by DFPS involving the same perpetrator; in 2019 the perpetrator allegedly asked a child if he could take a nude photograph of the child. This first allegation was Ruled Out.

- RCCR issued a citation to Children of Diversity CPA, and Neglectful Supervision was Ruled Out, when a contractor responsible for reviewing the level of care for foster children found documentation related to child-on-child sexual contact in the CPA's files. The contractor asked if the allegations were reported to SWI and was told by the operation that the allegations had not been reported. The contractor also learned that no safety plan had been implemented. The contractor reported the incidents to SWI. The therapist notes indicated that one of the children made an outcry during therapy approximately one month before a report was made. The operation was cited for a total of six standards violations, including the standard

---

[105] While this investigation was conducted, another investigation (reported to SWI just two days later) involving allegations of Sexual Abuse of two other children by a different staff member was also being conducted. That investigation also resulted in substantiated findings of Sexual Abuse. The license of the facility was revoked on January 28, 2022, approximately three months after these two investigations were completed. Since then, another allegation of Sexual Abuse of a child by a staff member has been opened.

associated with requirements for reporting allegations of child-on-child sexual abuse.

- DFPS substantiated a finding of Neglectful Supervision by a staff member at Silver Lining RTC who, after being told that a child was masturbating, inappropriately restrained the child and required the child to pull his underwear down so that the staff member could examine him for evidence that he was masturbating. While he was examining the youth's genitals, the staff member touched the child's testicles. DFPS Ruled Out Physical and Sexual Abuse. During the investigation, it was determined that the child made an outcry to three staff at the operation, all of whom failed to report the allegations to SWI. An RCCR inspector/investigator reported the allegations to SWI after the child made an outcry during an interview for a different investigation involving improper restraints by the same staff member.[106] The only penalty associated with the operation's failure to report the abuse allegations was the citation issued by RCCR.

- DFPS substantiated a finding of Physical Abuse of a 12-year-old child by a staff member at Rob & Simon's Hawthorne House after the staff member placed his hand around the child's neck, pushed him backward into the bathroom, and leaned him backwards until the child hit his head on a counter, resulting in swelling, bruising and pain. Though several staff witnessed the incident, and one staff photographed the child's injuries, the operation did not report it; the incident was reported to SWI by the child's parent. Despite this finding, the only penalty associated with the failure to report the Physical Abuse was the citation issued by RCCR.

- RCCR issued a citation in a Priority 3 minimum standards investigation involving child-on-child sexual contact when it was discovered that staff at Fort Behavioral Health GRO were aware of several incidents of child-on-child sexual contact and failed to report them to SWI. A staff member at a subsequent placement reported the incidents. The operation was also cited for a violation of minimum standards associated with caregiver responsibility, based on RCCR's finding that "[c]hildren in care were allowed to have physical inappropriate contact with each other multiple times while being supervised." A child had consensual sexual intercourse with two different children at the operation. Both incidents occurred during daytime hours; the first occurred in the facility's game room, and the second in a bathroom.

- RCCR issued a citation to Houston Serenity Place GRO, and Neglectful Supervision was Ruled Out, in a case involving what is characterized by the investigators as "consensual" sexual contact between a child who would have been 13 years old at the time of the incident and another resident who was 17 years old. Though staff at

---

[106] The investigation contained notes that this staff member was investigated multiple times for similar allegations involving inappropriate restraints, but that the allegations were Ruled Out for each incident because the staff member always restrained the youth in the office of the facility, outside the view of other staff.

the operation overheard the younger child discuss the sexual contact, it was not reported to the hotline until the younger child made an outcry during an interview for another investigation. The operation was also cited for a violation of the minimum standard associated with caregiver responsibility due to RCCR's finding that "[t]wo children were able to engage in sexual conduct, at night, without detection by staff."

- DFPS substantiated allegations of Physical Abuse of a 14-year-old child by three staff members at Heartbridges RTC after a staff member punched the child multiple times, put him in a choke hold, and continued to punch him while a second staff member held him down. The child suffered the following injuries: bruising on his shoulder and body, a black eye, a bump on the back of his head described to be "the size of a tennis ball," fractured knuckles, and a busted lip. Another staff member overheard the incident and "felt the need to call 911" (the child reported that she opened the door during the beating and asked if she should call the police and the child answered, "yes!") but did not, resulting in a substantiated finding of Physical Abuse against that staff. Despite multiple staff witnessing (and photographing) the child's injuries the next morning, the incident was not reported to SWI until the nurse at the child's high school observed his injuries when the child was at school. The nurse also requested medical attention for the child, resulting in the discovery that his knuckles were fractured. In addition to receiving two citations associated with the operation's failure to report the incident to SWI, RCCR issued 18 citations associated with violation of minimum standards. The operation's license was revoked shortly after the investigation was completed.

- DFPS substantiated Neglectful Supervision against an unknown perpetrator at A New Day Foundation RTC when two children, aged 12 and 13 years old, were able to have sexual contact despite a service plan requiring one-to-one supervision for one of the children. The other child was placed on a "sexualized behavior safety plan" approximately one month prior to the intake. DFPS did not substantiate Neglectful Supervision against the staff member who was supervising the children when the incident occurred because she reported that she was not aware that one of the children required one-to-one supervision, and she was the only staff scheduled to watch four children during her shift. DFPS substantiated Neglectful Supervision against the unknown perpetrator because "[I]t is unknown who was supposed to be assigned to watch [the child] on 1:1 supervision...No one was assigned by the facility as per their work schedule that day, to supervise [the child] 1:1." A citation was issued for violation of the minimum standard associated with the operation's duty to report abuse, neglect, or exploitation because a serious incident report documented that staff observed the children "in a compromising position" but did not report the incident. The report was made to SWI when the caseworker for one of the children found the information in the incident report completed two months prior. This operation is currently under Heightened Monitoring.

80

- DFPS substantiated Neglectful Supervision against the foster parents of a child who went on a vacation for two days and left the 16-year-old foster child at home with the foster parents' adult son, who was not an approved caregiver. While the foster parents were gone, the foster child and adult son had a disagreement, and the adult son locked the foster child out of the house. The CPA learned of the incident, called the foster parents while they were still on vacation, and told them they could not leave the foster child alone without an approved caregiver, at which point the foster parents returned home. The CPA did not report the incident. The incident was reported to SWI after the foster child made a complaint to the Foster Care Ombudsman.

## Remedial Order 22 Summary

The Monitors found the data elements reported by inspectors in ECHRs regarding abuse, neglect, and exploitation intakes and substantiated findings, and corporal punishment findings, to be largely consistent with the data provided by the State for the operation. The discrepancies for abuse, neglect, and exploitation intakes are likely explained by the timing of the inspection.

However, the monitoring team's review of ECHRs revealed that the history of the foster home (as opposed to the CPA) was not discussed in ECHRs related to investigations of allegations involving foster homes in more than half of investigation samples. A review of the quality of narratives in ECHRs and documentation of safety risks showed 31% of inspections did not document how the safety risk was considered, often because of insufficient documentation in the ECHR itself.

Although RCCR made improvements to reports of daily deficiencies related to failure to report abuse, neglect, or exploitation, there remains a lack of alignment between the citations issued by RCCR, the notifications sent by RCCR to DFPS, and DFPS' report of the citations for which it received notifications.

The Monitors' review of all 46 of the investigations or inspections in CLASS involving allegations that operations failed to report abuse, neglect, or exploitation revealed allegations that, in many cases, were substantiated after an investigation. In other cases, the operation was cited after failing to report child-on-child sexual contact.

## Remedial Orders 12-19: Timeliness of Minimum Standards Investigations

### Background

HHSC is responsible for regulating child-care and child-placing activities in Texas and for creating and enforcing minimum standards. Each set of minimum standards is based on a specific chapter of the Health and Human Services title of the Texas Administrative Code. Title 26 Chapters 748 and 749 set forth the minimum standards for GROs and CPAs, including those that serve PMC children.[107] The minimum standards establish

---

[107] *See generally* 26 TEX. ADMIN. CODE §§ 748.1 –748.4767 and 749.1 - 749.4267.

basic requirements to protect the health and safety of children in care and are weighted by HHSC based on the agency's assessment of the risk that a violation of that standard presents to children. RCCR is responsible for inspecting child care operations for compliance with these minimum standards and investigating reports of standards violations. These investigations by RCCR, ordinarily known as minimum standards investigations, are classified as Priority One, Two, Three, Four, or Five.[108]

Regarding data and information updates for this period, the Monitors reviewed and incorporated HHSC's updated submissions with its reporting on Remedial Orders 12 and 13.[109]

## Performance Validation (HHSC)

To validate the timeliness of the State's performance associated with Remedial Orders 12 through 19, the Monitors assessed all 1,736 completed minimum standards investigations with an intake date between June 1, 2021, through November 30, 2021. Because HHSC reported it does not have the capacity to distinguish which investigations specifically involve PMC children and instead produced to the Monitors all its minimum standards investigations during the period, the Monitors evaluated all RCCR investigations included in the data HHSC produced with intake dates between June 1, 2021, and November 30, 2021.[110]

---

[108] *See generally* HHSC, *Child Care Licensing Policy and Procedures Handbook* § 6240 (2021) *available at* https://hhs.texas.gov/laws-regulations/handbooks/cclpph/6000-investigations#6240 [hereinafter *Child Care Licensing Policy and Procedures*]. More information about the definitions of the priorities is also included in the Monitors' First Report to the Court. *See also* Deborah Fowler and Kevin Ryan, First Report 273, ECF No. 869.

[109] As reported previously, this updated data delivery commenced in December 2020. Deborah Fowler & Kevin Ryan, Second Report 270, ECF No. 1079. There are no other material updates regarding data submissions from the State to the Monitors. The main data deficiency persists in that HHSC is unable to identify children's legal status (and in the context of referrals, they are not able to identify their names) as the Monitors have noted previously. According to HHSC: "[t]he agency is operations-centric not child centric. CLASS does not contain the PMC identifier of children involved in a referral [or investigation]; the PMC identifier is only associated with referrals of abuse or neglect in IMPACT." HHSC, Memorandum from Tex. Health & Human Servs. Comm'n to Kevin Ryan and Deborah Fowler, Monitors, at 5-6 (Dec. 6, 2019) (on file with the Monitors) (responding to the Monitors' Sept. 30, 2019, Data and Information Request). *See also,* Deborah Fowler and Kevin Ryan, First Report 275, ECF No. 869.

[110] The data files used for analysis for Remedial Orders 12 to 19 were the two sets of monthly files regularly submitted by HHSC to the Monitors listing the relevant information for all non-abuse/neglect investigations initiated by RCCR between June 1, 2021, and November 30, 2021. For this reporting period, this included separate submissions for Remedial Orders 12 and 13 for the first time. Therefore, the Monitors' methodology for Remedial Orders 12 and 13 are updated in the corresponding sections. For the remaining orders, the methodology is the same as in prior reporting periods.

Table 15: Priority of RCCR Investigations, June 1, 2021 to November 30, 2021
Source: HHSC RO12-RO19 data

| Priority | Number | Percent |
|---|---|---|
| Priority One | 4 | <1% |
| Priority Two | 195 | 11% |
| Priority Three | 1,035 | 60% |
| Priority Four | 2 | <1% |
| Priority Five | 500 | 29% |
| **Total** | 1,736 | **100%** |

**Remedial Order 12**: Timeliness of Observations or Interviews with Alleged Child Victims in Priority One Investigations

*Effective immediately, the State of Texas shall ensure the Residential Child Care Licensing ("RCCL") investigators, and any successor staff, observe or interview the alleged child victims in Priority One child abuse or neglect investigations within 24 hours of intake.*

HHSC reported four Priority One RCCR investigations with intake dates between June 1, 2021 and November 30, 2021. The data confirm that 50% (2) of RCCR's Priority One investigations included face-to-face contact with all alleged child victims within 24 hours of intake.[111,112] The rate of face-to-face contact within 24 hours of intake in the Second Report was 50% (one of two Priority One investigations examined in the Second Report).[113]

Of the two investigations that did not include face-to-face contact within 24 hours of intake, face-to-face contact for one investigation was conducted 50 hours late and did not include a reason for the delay, while the other investigation did not include face-to-face contact data due to the following stated reason, "Whereabouts of the victim were unknown during the entire course of the Investigation."

---

[111] For this reporting period, the Monitors updated the methodology to reflect the new data reports submitted by HHSC after the end of the prior reporting period. To measure timeliness of HHSC's face-to-face contact with all alleged child victims in Priority One investigations, the Monitors calculated performance using the data fields for intake date and time and "first face-to-face contact date and time" for each alleged victim as submitted in the updated data reports from HHSC reporting on Remedial Orders 12 and 13.

[112] Both victims were in TMC status during investigation timeframe.

[113] *See* Deborah Fowler & Kevin Ryan, Second Report 272, ECF No. 1079.

83

**Remedial Order 13**: Timeliness of Observation or Interviews with Alleged Child Victims in Priority Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, observe or interview the alleged child victims in Priority Two child abuse or neglect investigations within 72 hours of intake.*

HHSC reported 195 Priority Two RCCR investigations with an intake date between June 1, 2021, and November 30, 2021. The data indicate that 84% (163) of the investigations included face-to-face contact with all alleged child victims within 72 hours of intake; 6% (12) of investigations did not conduct face-to-face contacts within 72 hours; and data were not available for 10% (20) of investigations.[114] The rate of face-to-face contact within 72 hours increased from the rate in the Second Report when it was 41%.[115]

Of the investigations that did not include face-to-face contact with all alleged victims within 72 hours of intake, face-to-face contact was made in the following timeframes: up to 12 hours late (1), 12 to 24 hours late (2), 24 to 48 hours late (3), 96 to 120 hours late (2), more than 120 hours late (4), data not available (20).

Additionally, of the 12 investigations that did not include face-to-face contact within 72 hours, HHSC data documents the following reasons for untimely face-to-face contact: "victim was identified after the required timeframe for conducting FTF contacts with victim" (3), "whereabouts of the victim were unknown during the required timeframes for conducting FTF contacts" (1), "a valid exception does not apply" (8).[116]

---

[114] For this reporting period, the methodology was updated to reflect the new data reports submitted by HHSC: To measure timeliness of HHSC's face-to-face contact with all alleged child victims in Priority Two RCCR investigations, the Monitors calculated performance using the data fields for intake date and time and "first face-to-face contact date and time" for each alleged victim. Of the 20 RCCR investigations with no available data, 17 were included in the data reports for Remedial Orders 12 and 13 but were missing face-to-face contact data, while three RCCR investigations that opened during that period were not listed in the data reports for Remedial Orders 12 and 13.

[115] *See* Deborah Fowler & Kevin Ryan, Second Report 273, ECF No. 1079.

[116] In two of those eight instances, HHSC documented that child health issues precluded the opportunity for a timely interview.



Figure 42: Timeliness of Face-to-Face Contact with Alleged Child Victims in Priority Two HHSC Investigations

**Remedial Order 14**:  Completion of Priority One and Priority Two investigations within 30 days

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority One and Priority Two child abuse and neglect investigations within 30 days of intake, consistent with DFPS policy.*

HHSC reported 199 Priority One (4) and Priority Two (195) RCCR investigations with an intake date between June 1, 2021, and November 30, 2021. During this period, HHSC completed 93% (186) of investigations within 30 days of intake. HHSC's rate of completing Priority One and Priority Two minimum standards investigations within 30 days was lower than the rate in the Second Report (96%).[117]

---

[117] *See* Deborah Fowler & Kevin Ryan, Second Report 274, ECF No. 1079.

Figure 43: Completion of Priority One and Two Investigations within 30 Days



Source: HHSC RO12-19 data, June to November 2021
n=199 investigations

**Remedial Order 15**: Completion of Priority Three, Four, and Five Investigations within 60 Days of Intake

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete Priority Three, Priority Four and Priority Five investigations within 60 days of intake, consistent with DFPS policy.*

HHSC reported 1,537 Priority Three, Four, and Five RCCR investigations with an intake date between June 1, 2021, and November 30, 2021. The priorities of investigations broke down as follows: Priority Three (1,035); Priority Four (2); and Priority Five (500) investigations. During this period, HHSC completed 97% (1,484) of investigations within 60 days of intake. HHSC's rate of completing Priority Three, Four, and Five minimum standards investigations within 60 days was similar to the rate in the Second Report (98%).[118]

---

[118] *See* Deborah Fowler & Kevin Ryan, Second Report 274-275, ECF No. 1079.

Figure 44: Completion of Priority Three, Four, and Five Investigations within 60 Days of Intake



Source: HHSC RO12-19 data, June to November 2021
n=1,537 investigations

**Remedial Order 16**: Completion and Submission of Documentation on the Same Day the Investigation was Completed in Priority One and Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

HHSC reported 199 Priority One (4) and Priority Two (195) completed RCCR investigations with an intake date between June 1, 2021, and November 30, 2021. During this period, in 95% (189) of the investigations, the documentation was completed on the same day the investigation was completed. HHSC's rate of completing documentation on the same day the investigation was completed in Priority One and Priority Two investigations was higher than the rate in the Second Report (93%).[119]

---

[119] *Id.* at 276, ECF No. 1079.

**Figure 45: Completion of Documentation in Priority One and Priority Two Investigations**

Source: HHSC RO12-19 data, June to November 2021
n=199 investigations



Intake Month (number of investigations)

**Remedial Order 17**: Completion and Submission of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

HHSC reported completion of 1,537 Priority Three (1,035), Priority Four (2), and Priority Five (500) RCCR investigations with intake dates between June 1, 2021, and November 30, 2021. During this period, HHSC completed documentation within 60 days of the intake date in 96% (1,479) of the investigations. HHSC's rate of completing documentation within 60 days of intake in Priority Three, Priority Four, and Priority Five investigations was like the rate in the Second Report (97%).[120]

---

[120] *See* Deborah Fowler & Kevin Ryan, Second Report 277, ECF No. 1079.



**Figure 46:** Completion of Documentation within 60 Days of Intake in Priority Three, Four, and Five Investigations

**Remedial Order 18**: Notification Letters Sent within Five Days of Investigation Closure in Priority One and Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

HHSC reported completion by February 28, 2022, of 199 Priority One (4) and Two (195) RCCR investigations with intake dates between June 1, 2021 and November 30, 2021. Of those 199 RCCR investigations, 94% (187 investigations) included notification to the referent (or the referent was anonymous);[121] and notification to the provider within five days of completion of the minimum standards investigation.[122] HHSC's reported rate of notifying the referent and provider within five days of completion of Priority One and Priority Two minimum standards investigation was like the rate in the Second Report (93%).[123]

---

[121] The data indicated that no letter was required in 6% (12) of Priority One and Two investigations.
[122] In two Priority Two investigations, the data indicated that the notification to the referent was sent before the investigation was closed. These investigations were counted as non-compliant.
[123] *See* Deborah Fowler & Kevin Ryan, Second Report 278-279, ECF No. 1079.

**Figure 47: Notification Letters Sent within Five Days of Investigation Completion in Priority One and Two Investigations**



Source: HHSC RO12-19 data, June to November 2021
n=199 investigations

**Remedial Order 19**: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and Five Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent(s) and provider(s) in Priority Three, Priority Four and Priority Five investigations within 60 days of intake.*

HHSC reported completion by February 28, 2022, of 1,537 Priority Three (1,035), Priority Four (2), and Priority Five (500) RCCR investigations with intake dates between June 1, 2021, and November 30, 2021. Of the 1,537 investigations, 95% (1,458) of RCCR investigations included notification to the referent (or the referent was anonymous);[124] and to the provider within 60 days of intake. HHSC's rate of notifying the referent when required and provider within 60 days of intake of Priority Three, Priority Four, and Priority Five investigation was like the rate in the Second Report (96%).[125]

---

[124] In 4% (64) of Priority Three, Four, and Five RCCR investigations, the data reported that notification was not required.
[125] *See* Deborah Fowler & Kevin Ryan, Second Report 279-280, ECF No. 1079.

Figure 48: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and Five Investigations



Source: HHSC RO12-19 data, June to November 2021
n=1,537 investigations

## Remedial Orders 12-19 Summary

### Remedial Order 12

50% (2) of Priority One RCCR investigations included face-to-fact contact with all alleged child victims within 24 hours of intake.

### Remedial Order 13

- 84% (163) of Priority Two RCCR investigations included face-to-face contact with all alleged child victims within 72 hours of intake.
- 6% (12) of Priority Two RCCR investigations did not conduct face-to-face contacts within 72 hours and data were not available for 10% (20) of investigations.

### Remedial Order 14

93% (186) of Priority One and Two RCCR investigations were completed within 30 days of intake.

### Remedial Order 15

97% (1,484) of Priority Three, Four, and Five RCCR investigations were completed within 60 days of intake.

### Remedial Order 16

In 95% (189) of Priority One and Two RCCR investigations, documentation was completed on the same day the investigation was completed.

Remedial Order 17

In 96% (1,479) of Priority Three, Four, and Five RCCR investigations, documentation was completed within 60 days of intake.

Remedial Order 18

- 94% (187) of Priority One and Two RCCR investigations included notification to the referent (or the referent was anonymous) and notification to the provider within five days of completion.
- 6% (12) of Priority One and Two RCCR investigations had an anonymous reporter.

Remedial Order 19

- 95% (1,458) of Priority Three, Four, and Five RCCR investigations included notification to the referent (or the referent was anonymous) and to the provider within 60 days of intake.
- 4% (64) of Priority Three, Four, and Five RCCR investigations had an anonymous reporter.

## Remedial Order 20: Heightened Monitoring

**Remedial Order 20**: *Within 120 days, RCCL and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions, and, as appropriate, other remedial actions under DFPS' enforcement framework.*[126]

### Overview of Operations Placed Under Heightened Monitoring

Most operations serving PMC children are not subject to Heightened Monitoring by the State. In fact, of 485 total operations subject to the State's review, only 127 operations (26%) qualified for Heightened Monitoring in 2020 and 2021. Most of these 127 operations (90, or 71%) qualified in both 2020 and 2021, while 16 operations qualified

---

[126] Two subsequent orders further described the methodology for identifying operations subject to Heightened Monitoring, the method for developing a Heightened Monitoring plan and what is required to be included, the cadence of monitoring visits by the State, requirements for placement of PMC children in operations under Heightened Monitoring, the length of time operations are to stay on Heightened Monitoring and the requirements an operation must meet to exit Heightened Monitoring. Order, March 18, 2020, ECF 837; Order Modifying Order Regarding Heightened Monitoring, December 7, 2020, ECF 1012.

only in 2020 and 21 operations qualified only in 2021.[127] Ninety-eight of the 127 operations that qualified were placed on Heightened Monitoring; 29 operations closed prior to beginning Heightened Monitoring.[128]

As of March 1, 2022, 22 of the 98 operations that started Heightened Monitoring have since closed, leaving 76 operations that were active and on Heightened Monitoring as of that date.

Figure 49: Overview of Operations Qualifying for and Placed on Heightened Monitoring



---

[127] Consistent with the Court's definition and methodology for identifying a pattern of violations, *see* Order, ECF 837, operations qualified for Heightened Monitoring in 2020 based on their history of violations between 2016 and 2019; operations qualified for Heightened Monitoring in 2021 based on their history of violations between 2017 and 2020. Operations that qualified in both 2020 and 2021 were monitored by the State as if they qualified in 2020; there were no new expectations added to the Heightened Monitoring Plans for these operations in 2021.

[128] "Placed on Heightened Monitoring" includes all operations that were notified of Heightened Monitoring, had a plan developed and monitoring by the Heightened Monitoring Team began. Two operations were notified of Heightened Monitoring but closed prior to plan development, which are included in the 29 operations that qualified but closed prior to beginning monitoring. One operation placed on Heightened Monitoring, Fostering Life Youth Ranch, received an initial license in March 2021 and was placed on Heightened Monitoring because it was located at the same physical site and had the same controlling person/administrator as another GRO that qualified for Heightened Monitoring, Children's Hope Residential Treatment Center. The name changed when Foster Life Youth Ranch bought Children's Hope RTC.

Of the operations placed under Heightened Monitoring in 2020 or 2021, as of May 13, 2022, 22 had moved to post-plan monitoring. Operations are eligible to move to post-plan monitoring once they satisfy the conditions of their Heightened Monitoring Plan, and six months of unannounced, consecutive visits "indicate the operation is in compliance with the standards and contract requirements that led to heightened monitoring," and that "the operation is not out of compliance on any medium-high or high weighted licensing standards."[129] Post-plan monitoring requires the State to continue to monitor intakes for alleged minimum standards violations, or allegations of abuse, neglect, or exploitation associated with the operation.[130] It also requires three unannounced visits in the three months following the operation's release from Heightened Monitoring[131]

Figure 50: Heightened Monitoring Operations That Moved to Post-Plan Monitoring

| Operation | Type | Notification Date | Post Date |
|---|---|---|---|
| Ascension Child and Family Services | CPA | 10/19/2020 | 4/1/2022 |
| Assuring Love | CPA | 6/11/2020 | 9/20/2021 |
| Caregivers Youth and Transitional Living Services | CPA | 10/12/2020 | 5/2/2022 |
| Connections | GRO | 10/26/2020 | 12/21/2021 |
| Connections Individual and Family Services | GRO | 11/23/2020 | 12/21/2021 |
| Family Link Treatment Services | GRO | 11/16/2020 | 1/6/2022 |
| Harmony Family Services Inc., Emergency Shelter | GRO | 10/26/2020 | 1/3/2022 |
| Have Haven Child Placing Agency | CPA | 11/23/2020 | 5/2/2022 |
| Mission Road Development Center | GRO | 11/23/2020 | 12/30/2021 |
| Sunny Glen Children's Home | GRO | 10/26/2020 | 12/27/2021 |
| Embracing Destiny Foundation RTC | RTC | 11/23/2020 | 1/12/2022 |
| Renewed Strength | GRO | 11/16/2020 | 1/14/2022 |
| Azleway Valley View | GRO | 6/11/2020 | 1/7/2022 |
| House of Shiloh Family Services | CPA | 1/13/2021 | 3/8/2022 |
| Road to Wisdom | GRO | 1/13/2021 | 3/16/2022 |
| High Plains Children's Home | GRO | 11/16/2020 | 3/25/2022 |
| New Horizons CPA | CPA | 10/27/2020 | 2/16/2022 |
| Serving Children and Adults | GRO | 11/16/2020 | 1/3/2022 |
| Hands of Healing | GRO | 10/19/2020 | 3/16/2022 |

---

[129] Order, ECF 837, at 2.
[130] *Id. See also* HHSC & DFPS, Heightened Monitoring Process Overview (undated) (on file with the Monitors).
[131] *Id.*

### Minimum Standards Deficiencies Cited, Findings of Abuse, Neglect, or Exploitation, and Enforcement Actions Prior to Being Placed Under Heightened Monitoring

The Monitors discussed previously the high number of minimum standards deficiencies and substantiated findings of abuse, neglect, or exploitation accounted for by the relatively small number of operations that qualified for Heightened Monitoring in either 2020 or 2021.[132] The average number of minimum standards deficiencies cited between 2016 and 2020 for operations that qualified for Heightened Monitoring (119) was more than four times higher than the average number for operations that did not qualify (29).

Figure 51: Average Number of Deficiencies Per Operation Between 2016 and 2020, by Heightened Monitoring Status



Similarly, operations that qualified for Heightened Monitoring had a higher average number of substantiated findings of abuse, neglect, or exploitation than those that did not. In 2020, approximately 4% of all DFPS investigations of abuse, neglect, or exploitation resulted in a finding of Reason to Believe (RTB). Operations that qualified for Heightened Monitoring had an average of 2.4 RTBs in 2020 compared to an average of 1.6 RTBs per operation for those that did not qualify for Heightened Monitoring.

Seventy-one operations that qualified for Heightened Monitoring had a prior enforcement action of some type. These 71 operations accounted for a total of 286 enforcement actions between 2016 and 2020, including 40 voluntary Plans of Action (POAs), 24 corrective or adverse actions (Evaluation, Probation, or Revocation of License), and 222 monetary penalties.

---

[132] *See* Deborah Fowler & Kevin Ryan, The Court Monitors' Update to the Court Regarding Children Without a Placement Housed in CPS Offices, Hotels, and Other Unlicensed Settings 2-3, September 13, 2021, ECF No. 1132.

Figure 52: Annual Number of Enforcement Actions by Type for
Heightened Monitoring Operations, 2016 to 2020

Source: HHSC Enforcement Actions
n = 71

——— Corrective/Adverse Action    ——— Plan of Action    ——— Monetary Penalty

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Monetary Penalty | 17 | 39 | 52 | 67 | 47 |
| Plan of Action | 8 | 11 | 6 | 8 | 7 |
| Corrective/Adverse Action | 5 | 7 | 2 | 6 | 4 |

## Analysis of Problem Areas and Heightened Monitoring Plan Tasks

Heightened Monitoring Plans were analyzed for 91 of the 98 operations placed on Heightened Monitoring in 2020 and 2021. The seven operations excluded from the analysis include two that closed in 2020 (Prairie Harbor and Williams House) and five Phase I operations that closed or with which DFPS cancelled its contract (A Fresh Start RTC, A Fresh Start Treatment Center, Benchmark Family Services, Connections Inc. Emergency Shelter, and Gulf Coast Trades Center).

Figure 53: Operations Included in the Analysis of Heightened Monitoring Plan Problem Areas and Tasks



Each operation's Heightened Monitoring Plan had a list of problem areas identified by the Heightened Monitoring Team, based on the five-year pattern of violations that qualified the operation for Heightened Monitoring. The 91 operations reviewed had a total of 485 problem areas identified in their Heightened Monitoring Plans.

Medication management, including documentation of medication logs and medication storage, and physical site conditions were the most frequently cited problem areas in Heightened Monitoring Plans. Of the 485 problem areas identified in the Plans, medication management and physical environment made up 11% each (54 and 51 of 485), followed by supervision (47 of 485, or 10%) and discipline (47 of 485, or 10%).

**Figure 54: Problem Areas Identified in Heightened Monitoring Plans**



Source: Heightened Monitoring Documentation
n = 485

*Other includes annual inspections, appropriate leadership structure, awareness of minimum standards for CPA/foster homes, infant care, prudent judgement, runaway, unsupervised absences, leadership and employee responsibilities.

Operations had, on average, five problem areas identified in their Heightened Monitoring Plan, with a range of one to 14 problem areas. Nearly 80% of operations (72 of 91) had four or more problem areas identified, with 14% (13 of 91) having eight or more identified.

Figure 55: Number of Problem Areas Per Operation

Source: Heightened Monitoring Documentation
n = 91

| | |
|---|---|
| 3 or fewer | 19 (21%) |
| 4-5 | 29 (32%) |
| 6-7 | 30 (33%) |
| 8 or more | 13 (14%) |

The Heightened Monitoring Plan also includes Tasks (Plan Tasks or Tasks) related to the operation's problem areas that must be completed for the operation to comply and ultimately complete Heightened Monitoring. The 91 operations analyzed had a total of 456 Plan Tasks. Operations had, on average, five Plan Tasks with a range of two to ten Plan Tasks. Six of 91 operations (7%) had only two Tasks in the Heightened Monitoring Plan while 11 of 91 operations (12%) had eight to ten Tasks. Two of the six operations with two Plan Tasks (33%) had four to five problem areas identified while a majority of those with eight or more Tasks (9 of 11, or 82%) had six or more problem areas identified. Nearly one-quarter of operations (22 of 91 or 24%) had four Tasks in the Heightened Monitoring Plan. Half of operations with four Tasks (11 of 22) had six or more problem areas identified.

Figure 56: Number of Plan Tasks for Operations on Heightened Monitoring



Source: Heightened Monitoring Documentation
n = 91

| | |
|---|---|
| 3 or fewer | 23 (25%) |
| 4-5 | 32 (35%) |
| 6-7 | 25 (28%) |
| 8 or more | 11 (12%) |

The monitoring team reviewed and categorized Plan Tasks, assigning up to three different categories per Task.[133] The most common categories identified for Plan Tasks were supervision, administration, and training while the least common were staff turnover, child rights, and Sexual Abuse. More than 20% of Plan Tasks (98 of 456) were categorized as related to supervision and 17% of Tasks (79 of 456) were categorized as related to administration.

**Figure 57: Tasks by Category Identified by Monitoring Team**



Source: Heightened Monitoring Documentation
n = 456

Nearly two-thirds of operations on Heightened Monitoring (58 of 91) had Plan Tasks related to the supervision of children while just over half had Tasks related to training (47 of 91) and discipline (46 of 91).

---

[133] Task categories include Administration, Admission/Service/Discharge Planning, Child Rights, Criminal Background Checks, Discipline, EBI, Foster Home Screening, Health and Safety, Medical/Medications, Physical Plant, Records, Serious Incidents and Reporting, Sexual Abuse, Staff Oversight, Staff Turnover, Supervision, Supervisory Visits (to foster homes), and Training.

Figure 58: Operations with Task Categories Identified by Monitoring Team



Source: Heightened Monitoring Documentation

n = 91

| Category | Value |
|---|---|
| Supervision | 58 (64%) |
| Training | 47 (52%) |
| Discipline | 46 (51%) |
| Medical | 44 (48%) |
| Administration | 40 (44%) |
| Records | 39 (43%) |
| Physical Plant | 31 (34%) |
| Supervisory Visits | 29 (32%) |
| Admission/Svc Planning | 29 (32%) |
| Staff Oversight | 25 (27%) |
| FH Screening | 24 (26%) |
| EBI | 22 (24%) |
| SI Reporting | 21 (23%) |
| Background Checks | 21 (23%) |
| Health and Safety | 19 (21%) |
| Child Rights | 6 (7%) |
| Staff Turnover | 5 (5%) |
| Sexual Abuse | 1 (1%) |

The Court's March 18, 2020 Heightened Monitoring order requires a "specific and detailed" Heightened Monitoring Plan. The order requires the State's Facility Intervention Team Staffing (FITS) team, which consists of members from both DFPS and HHSC, to develop a Heightened Monitoring Plan that describes a detailed and specific plan addressing: the pattern of policy violations that led to Heightened Monitoring; any barriers to compliance identified during a review of previous corrective or enforcement actions or risk analyses; any technical assistance needed by the operation from DFPS, RCCL, or a third party; and the steps the operation must take to satisfy the plan. The State included this language in the Heightened Monitoring Process Overview Document that it created to guide implementation of the Court's order.[134]

The monitoring team assessed the quality of Tasks using several measures: whether each Task was specific, whether it related to the operation's historic pattern of compliance problems, whether it explicitly required the operation to take steps to follow minimum standards, and whether it would have a direct, positive impact on child safety.

The monitoring team found that nearly all Plan Tasks were specific in describing what the operation was to accomplish (431 of 456 Tasks, or 95%) and nearly 90% (408 of 456) of

---

[134] HHSC & DFPS, Heightened Monitoring Process Overview (undated) (on file with the Monitors).

Tasks were related to at least one of the operation's problem areas.[135] Nearly half of Tasks (204 of 456 or 45%) explicitly required operations to take steps to follow minimum standards.

Figure 59: Task Characteristics as Identified by Monitor's Staff



The monitoring team also identified the methods through which a Task was expected to be accomplished.[136] The most frequently cited methods for accomplishing Plan Tasks were as follows: development or revision of a plan or process, oversight or management, and policy development or revision. More than one-third of Tasks (166 of 456) involved development or revision of a plan or process.

Examples of Tasks requiring the development or revision of a plan or process include:

- CPA: Developing a plan to ensure that all foster home screenings are compliant with minimum standards.
- GRO: Creating a staff oversight and development plan for all shift team leaders and direct-care staff.
- GRO: Developing a plan for oversight of medication management to ensure all medication is being administered, documented, and stored correctly.

---

[135] Although Tasks were specific in describing what the operation was required to accomplish, they frequently lacked detail about how the Task should be implemented or accomplished.
[136] Task methods include Plan or Process Development/Revision, Oversight/Management, Policy Development/Revision, Training, Tool/Guide/Checklist Development, Planning Document, Records Management, Communication, Quality Assurance (CQI), and Maintenance/Repairs. Only one method was identified by the monitoring team for each Task, unless the Task had separate sub-Tasks, in which case up to three methods could be identified. For example, a Task that required the operation to develop a plan or process for maintaining accurate records would be coded as Plan or Process Development/Revision only, not both Plan or Process Development and Records Management.

- GRO: Developing a plan for direct care staff to maintain composure and boundaries when interacting with children that includes staff ability to step away from children when frustrated, while ensuring appropriate supervision.

Examples of Plan Tasks related to the operation's oversight or management include:

- CPA: Administrator, regional director, or management designee will begin to conduct monthly audits of supervisory visits to foster homes.
- CPA: The Administrator and/or Statewide Director will have an initial meeting to review the Heightened Monitoring Plan and on-going weekly meetings with all branches to discuss progress on HM plans, identify and discuss any obstacles to meeting plan requirements/Tasks, and develop plan to overcome identified obstacles.
- GRO: The Administrator will create a staff oversight and development plan for all team leaders and direct care staff. Plan must include a weekly sample review of video footage where EBI or serious incidents have occurred in which the administrator assesses employee and child interactions. Plan will also include employee and child feedback process which allows to anonymous feedback regarding the operation.

Examples of Plan Tasks requiring policy development or revision include:

- GRO: The Administrator will develop policy and procedure that will establish supervision requirements for children with high-risk behaviors. High-risk behaviors include, but are not limited to, the following: runaways, sexual behaviors, suicidal ideation, physical aggression. This policy and procedure will clearly define minimum supervision requirements and supervision strategies for each type of high-risk behavior. A copy of this policy and procedure will be kept on site so that staff are able to reference as needed.
- CPA: The operation will develop policies for monthly supervisory visits to ensure quality visits. This Plan Task included a list of elements the policies were required to include.
- GRO: The Administrator will review and update the current policies and procedures of medication management (administration and documentation) to ensure all medication is being administered and documented according to minimum standard requirements.

Figure 60: Methods for Accomplishing Tasks as Identified by Monitoring Team



Source: Heightened Monitoring Documentation
n = 456

### Minimum Standards Deficiencies Cited, and Abuse, Neglect and Exploitation Investigations After Being Placed Under Heightened Monitoring

The Monitors analyzed minimum standards deficiencies cited, abuse, neglect, and exploitation investigations opened, and substantiated findings of abuse, neglect, and exploitation for Heightened Monitoring operations at two different points:

- For operations that had been under Heightened Monitoring for a full year as of February 28, 2022, analysis of the number of deficiencies cited, abuse, neglect, and exploitation investigations opened, and substantiated findings of abuse, neglect, and exploitation in the year prior to and after the start of Heightened Monitoring.[137] The Monitors also compared the first and second six-month periods of Heightened Monitoring for these operations.

---

[137] Because Heightened Monitoring start dates varied, the data included a range from June 1, 2020 to February 28, 2022. Of the 98 operations placed under Heightened Monitoring in 2020 and 2021, as of February 28, 2022, 84 had been under Heightened Monitoring for at least six months, and 64 had been under Heightened Monitoring for at least one year. Nine of the 84 operations included in the six-month analysis closed more than six months after their Heightened Monitoring Plan start date, and one of the 64 operations included in the one-year analysis closed more than a year after starting Heightened Monitoring.

- For operations that had been under Heightened Monitoring at least six months as of February 28, 2022, an analysis of deficiencies cited, abuse, neglect, and exploitation investigations opened, and substantiated findings of abuse, neglect, and exploitation in the six months prior to and after the start of Heightened Monitoring.

## Deficiencies Cited

Operations placed under Heightened Monitoring received a higher number of citations for minimum standards violations in the year after starting Heightened Monitoring.

**Figure 61: Total Number of Deficiencies Cited in the Year Before and After Heightened Monitoring Plan Start Date**



Source: HHSC Deficiencies
n = 64

Before and after being placed under Heightened Monitoring, operations had, on average, a similar number of citations issued for minimum standards violations related to child discipline, emergency behavior interventions (EBI), and child supervision. However, after being placed under Heightened Monitoring, operations saw an increase in the number of deficiencies related to child rights and minimum standards associated with medical care or medication administration.



Figure 62: Average Number of Deficiencies Cited in the Year Before and After Heightened Monitoring Plan Start Date by Standard Category

However, trends in the number of citations issued to operations that did not qualify for Heightened Monitoring were like trends for operations under Heightened Monitoring – citations decreased for all operations in 2020 (likely due to cessation of inspections during the pandemic) and increased in 2021. However, while the 2021 increase for operations under Heightened Monitoring was consistent with 2019 numbers, citations to operations that were not under Heightened Monitoring increased by 27% in 2021 compared to 2019.



Figure 63: Total Number of Deficiencies at Heightened Monitoring and Non-Heightened Monitoring Operations, 2019 to 2021



While medium, medium-high, and high-weighted deficiencies increased for operations placed under Heightened Monitoring, they increased at a lower rate than at operations that were not under Heightened Monitoring. Medium, medium-high, and high weighted deficiencies increased by five percent (1,455 in 2019 to 1,522 in 2021) for operations under Heightened Monitoring; citations in these weighted categories increased by 32% (2,447 in 2019 to 3,223 in 2021) for operations that were not under Heightened Monitoring.[138]

In October 2021, RCCR updated the *Child Care Regulation Handbook* to clarify when deficiencies should be cited during Heightened Monitoring inspections.[139] According to the Handbook:

- Heightened Monitoring staff should cite deficiencies for all violations of high-weighted standards violations observed during an inspection.
- If a violation associated with a Plan Task is identified prior to the Plan Task due date, the inspector should consider whether technical assistance is appropriate in lieu of a deficiency if it is not a high weighted standard.
- If a violation associated with a Plan Task is identified after the Plan Task due date, the inspector should cite the deficiency.
- Heightened Monitoring staff should always provide technical assistance if the violation is related to records, a deficiency for the same standard was previously cited, and the compliance date for the cited deficiency has not yet passed.[140]

In addition to analyzing the number of minimum standards citations that operations placed under Heightened Monitoring received, the monitoring team analyzed administrative reviews for minimum standards deficiencies cited for calendar years 2019, 2020, and 2021. Across all operations, regardless of Heightened Monitoring status, the number of administrative reviews that operations requested increased substantially in 2020 and again in 2021. The rate of reversal upon administrative review in 2021 was also higher than in either of the previous two years.[141]  The percentage of citations that were

---

[138] Heightened Monitoring includes operations that started Heightened Monitoring in 2020 and 2021 that had at least six months prior to and after their Heightened Monitoring Plan Start Date. Both categories include operations that were open as of February 2022. Due to the COVID-19 pandemic, HHSC on-site inspections were largely suspended between April 3, 2020 and June 11, 2020.

[139] Inspectors visiting operations placed under Heightened Monitoring issue citations independent of monitoring and enforcement actions taken by the Heightened Monitoring staff. This policy affects only the decisions made by Heightened Monitoring staff during weekly inspections associated with Heightened Monitoring. Of the 1,611 deficiencies cited to operations in the year after they started Heightened Monitoring, 257 (16%) were the result of a Heightened Monitoring inspection.

[140] HHSC, RCCR, Child Care Regulation Handbook, § 11460 Citing Deficiencies During All Heightened Monitoring Inspections (October 2021), *available at* https://www.hhs.texas.gov/handbooks/child-care-regulation-handbook/11400-heightened-monitoring-inspections-visits#11460 The Monitors will analyze the impact of this change in policy on deficiencies cited to Heightened Monitoring operations in a future report.

[141] This does not include administrative reviews that were requested but for which a decision had not been entered. As of February 2022, 24% of administrative reviews in 2020 and 36% of reviews in 2021 had a "requested" status. The increase in the number of overturned citations reflects the overall increase in the number of administrative reviews requested.

overturned increased for both operations on Heightened Monitoring and operations that did not qualify for Heightened Monitoring.

Table 16: Outcome of Administrative Review for Requests with a Decision

| Year | Admin Review Decision | Non-HM Operations | | HM Operations | | Total |
|------|----------------------|--------|---------|--------|---------|-------|
| | | Number | Percent | Number | Percent | |
| 2019 | Overturned | 94 | 28% | 92 | 36% | 186 |
| | Upheld | 245 | 72% | 165 | 64% | 388 |
| | Total | 339 | | 257 | | 596 |
| 2020 | Overturned | 111 | 31% | 97 | 30% | 208 |
| | Upheld | 249 | 69% | 223 | 70% | 472 |
| | Total | 360 | | 320 | | 680 |
| 2021 | Overturned | 233 | 35% | 189 | 38% | 422 |
| | Upheld | 435 | 65% | 306 | 62% | 741 |
| | Total | 668 | | 495 | | 1163 |

## Abuse, Neglect, and Exploitation Investigations Opened

The average (mean) number of abuse, neglect, and exploitation investigations opened in operations under Heightened Monitoring also increased in the year after their Plan start date. The average number of ANE investigations opened in the year prior to being placed under Heightened Monitoring was 32. The average number opened in the year after being placed under Heightened Monitoring was 45.

Figure 64: Mean Number of ANE Investigations Opened in the Year Prior to and After Heightened Monitoring Plan Start



Source: RCI ANE Investigations Opened
n = 64

However, RCCI investigations also increased during this period at operations that did not qualify for Heightened Monitoring, and they increased at a higher rate: the number of abuse, neglect, and exploitation investigations opened at operations under Heightened Monitoring increased 93% between 2019 and 2021, compared to an increase of 177% during the same period at operations that were not under Heightened Monitoring.[142]

Figure 65: Number of ANE Investigations Opened at Heightened Monitoring and Non-Heightened Monitoring Operations, 2019 to 2021



Source: RCI ANE Investigations Opened

### Substantiated Abuse, Neglect, and Exploitation Findings

The number of substantiations for abuse, neglect, or exploitation also increased. The number of investigations disposed with a Reason to Believe finding between calendar years 2019 and 2021 almost doubled, both for operations under Heightened Monitoring and for those that did not qualify for Heightened Monitoring.[143]

---

[142] The increase is likely the result of the DFPS change in policy that eliminated secondary screening of intakes assigned to DFPS for investigation. *See* Deborah Fowler & Kevin Ryan, Second Report, at 51-52, ECF No. 1079.
[143] Heightened Monitoring operations include those operations starting Heightened Monitoring in 2020 and 2021 that were active at least six months prior to and after their Heightened Monitoring Plan start date and were open as of February 2022.

Figure 66: Number of Reason to Believe Findings at Heightened Monitoring and Non-Heightened Monitoring Operations, 2019 to 2021



However, half of the operations that had been under Heightened Monitoring for at least a year as of February 28, 2022, had the same number of Reason to Believe findings in the year prior to and after starting Heightened Monitoring.

Figure 67: Comparison of Number of Reason to Believe Findings at Heightened Monitoring Operations One Year Before and After Plan Start



### Review of Placements of PMC Children Made to Operations Under Heightened Monitoring, January 1, 2021 through December 31, 2021

During 2021, a total of 1,595 placements of PMC children were made to operations under Heightened Monitoring.[144]

### Figure 68: Number of PMC Placements After Notification of Heightened Monitoring, January 1, 2021, to December 31, 2021



Source: PMC placement data
n = 1,595

Placements of PMC children dropped after operations started Heightened Monitoring. To measure the impact of Heightened Monitoring on placement of PMC children in the operations, the Monitors analyzed placements at two points:

---

[144] Placements do not include placement changes that did not result in the child moving physical locations (i.e., kinship placements becoming licensed, service level changes, or a change from/to DFPS or SSCC).

The Monitors' analysis matched PMC placement data to DFPS Heightened Monitoring placement requests to determine whether the new placements made to Heightened Monitoring operations between January 1, 2021 and December 31, 2021 had an associated request and approval by appropriate staff prior to placement. The monitoring team then reviewed IMPACT records associated with the placement to determine whether the records included all required information.

The State's production of information related to placement requests for operations under Heightened Monitoring changed in mid-August 2021, due to a change in IMPACT functionality. Until then, documentation of placement requests in emails between DFPS staff were provided to the Monitors every month via uploads to the State's shared document database. Starting in mid-August, the change in IMPACT functionality allowed the State to pull the data related to placement requests, including placement requested, date of request and decision, into an Excel spreadsheet. Since then, the Monitors have received an Excel spreadsheet documenting placement requests, approvals, and denials monthly. The spreadsheet does not capture pending requests that have not been approved or denied.

- Six months prior to and after being placed under Heightened Monitoring; and
- One year prior to and after being placed under Heightened Monitoring. [145]

DFPS and SSCCs placed fewer PMC children in operations after the operations were placed under Heightened Monitoring.

**Figure 69: Average Number of PMC Placements Prior to and After Notification of Heightened Monitoring**



Source: PMC placement data

■ Prior to HM notification   ■ After HM notification

Though both CPAs and congregate care facilities experienced a drop in PMC child placements after being placed under Heightened Monitoring, the drop in the number of PMC placements was more significant for CPAs. Of the 63 operations that had been under Heightened Monitoring for at least a year as of February 28, 2022, DFPS and SSCCs made an average of 76 placements of PMC children to the CPA foster homes, and an average of 15 placements of PMC children to the congregate care facilities in the year before Heightened Monitoring started. In the year after Heightened Monitoring started, DFPS and SSCCs made an average of 45 placements of PMC children to the CPA foster homes, and an average of 12 placements of PMC children to the congregate care facilities.

The Monitors' Second Report, which included an in-depth analysis of Phase One Heightened Monitoring operations, revealed DFPS struggled to comply with requirements related to placement approvals.[146] The monitoring team conducted a case read of placement requests for the eight operations slated for Phase One of Heightened

---

[145] There were 98 operations that began Heightened Monitoring in 2020 and 2021. Twenty-one of 98 operations (21%) closed or ended their contract with DFPS after being placed under Heightened Monitoring. As of February 28, 2022, 74 operations had been under Heightened Monitoring for at least six months and were not under a placement suspension. Sixty-three operations had been under Heightened Monitoring for at least one year and were not under a placement suspension. One of 63 operations included in the analysis closed in 2022 (Life's Purpose RTC), more than one year after starting Heightened Monitoring.

[146] *See* Deborah Fowler & Kevin Ryan, Second Report at 314, ECF No. 1079.

Monitoring rollout, and could not find a placement approval for 65% (77 of 118) of the placement requests reviewed.[147]

The Monitors' review of placement approvals for this report shows substantial improvement. Of the 1,595 placements of PMC children made to Heightened Monitoring operations in 2021, 1,398 (88%) were determined to have been approved by a Regional Director, Director of Field, or CPS Associate Commissioner. Nine percent were approved by other supervisors, which is not consistent with the Court's orders related to Heightened Monitoring, and in 3%, the monitoring team could not find any approval in IMPACT or in data provided by the State.

The number of placement requests that were not approved prior to the child's placement was highest in July 2021; eight percent of requests did not have approval of any kind prior to placement in that month. The rate of placement requests that were not approved prior to placement did not vary significantly depending on whether DFPS or the SSCCs requested it. Three percent of placements (33 of 982) requested by DFPS staff were not approved, while two percent (12 of 613) of requests from SSCC staff were not approved.

Figure 70: PMC Placements at Heightened Monitoring Operations by Approval, January 1, 2021 to December 31, 2021



Source: PMC placement data, Placement authorization requests
n = 1,595

---

[147] *Id.* at 319. The order entered by the Court on March 18, 2020, required placements of PMC children to be approved by the Associate Commissioner of CPS. This requirement was modified by an agreed order entered by the Court on December 7, 2020; the modification allowed the Regional Director to approve placements, or if the Regional Director is unavailable, the Director of Field or CPS Associate Commissioner. Order, March 18, 2020, ECF 837; Order Modifying Order Regarding Heightened Monitoring, December 7, 2020, ECF 1012.

The approval was documented in IMPACT for 1,355 of 1,398 (97%) of the placements that were appropriately approved.[148] Of those 1,355 placements, the monitoring team determined that 682 (50%) were approved prior to the day that the child started the placement. Eighteen percent (241) were approved the same day the child was placed. Ten percent (131 of 1,355) were approved more than 40 days after the child started the placement. The Regional Director or Director of Field approved one percent (14), but the date of approval was not documented.[149]

Figure 71: Timing of Director Approval in IMPACT for PMC Placements at Heightened Monitoring Operations, January 1, 2021 to December 31, 2021



DFPS had a higher percentage of placements approved prior to the day the child started the placement than SSCCs.[150] Sixty percent (503 of 837) of DFPS placements were approved prior to the start of the child's placement, compared to 35% (179 of 518) of SSCC placements. Thirty-four percent (176 of 518) of SSCC placements of PMC children made to Heightened Monitoring operations in 2021 were approved up to 40 days after the child was placed.[151]

---

[148] The December 7, 2020, agreed order required DFPS to document approval of a PMC child's placement in a Heightened Monitoring operation in IMPACT. Before approving a placement into a Heightened Monitoring operation, the agreed order requires the Regional Director to consider the facility's five-year history, confirm in the documentation in IMPACT that the history was reviewed and considered, and document justification for the approval of the placement. Order Modifying Order, ECF 1012.

[149] "Approved by RD" includes placement approval by a Regional Director, Director of Field, or Associate Commissioner. Two of the 1,595 placements involved children placed in early 2021 but whose placement received approval by an Associate Commissioner in December 2020.

[150] Date of approval as documented in IMPACT or in email documentation. Directors may have given approval prior to placement but it was not documented correctly or accurately in IMPACT, in particular prior to the improved IMPACT functionality in mid-August 2021.

[151] The Court's orders related to Heightened Monitoring do not speak to the timing of placement approval. *See* Order, ECF 837, at 3; Order Modifying Order, ECF No. 1012. However, the Court's modified order, entered on the parties' joint motion, requires the staff reviewing a placement request to consider the

When all the requirements related to a placement approval for operations under Heightened Monitoring were considered in conjunction, however, DFPS and SSCC performance was significantly lower. Of the placements of PMC children made to operations under Heightened Monitoring in 2021, the monitoring team's review of IMPACT records determined that only 38% (602 of 1,595) of the placement records showed the placement was approved by the appropriate DFPS staff prior to the child's placement, documented the justification for the placement, and showed the operation's five-year history had been reviewed prior to placement.

Figure 72: Approval Documentation and Timing for All PMC Placements at Heightened Monitoring Operations

Source: PMC placement data, Placement authorization requests



DFPS again had a higher rate of compliance with the requirements for placement of children in Heightened Monitoring operations: 43% (425 of 982) of placements of PMC children made by DFPS to operations under Heightened Monitoring complied with the Court's requirements related to documenting approval of the placement, compared to 29% (177 of 613) of SSCC placements.

---

operation's five-year history of safety violations prior to approving a placement in an operation on Heightened Monitoring. Order Modifying Order, at 1-2, ECF No. 1012. To the extent that the purpose of the requirement was to ensure that child safety was considered prior to approving a placement, approving the placement after the child was placed undermines the purpose of the Court order.

### Analysis of Waiver and Variance Requests made by Heightened Monitoring Operations

In the Second Report, the Monitors analyzed minimum standard waivers and variances granted to Phase One Heightened Monitoring operations in 2020 by RCCR.[152] For this report, the Monitors analyzed waivers and variances requested in 2021 by all Heightened Monitoring operations.[153]

More than half of Heightened Monitoring operations (57 of 93, or 61%) made one or more requests for a minimum standard variance in 2021. None requested a waiver of a minimum standard.[154]

### Figure 73: Percent of Operations on Heightened Monitoring Requesting a Variance

Source: Waiver/Variance Requests, Operations on HM, 2021
n = 93



Just over half of the operations that requested a variance were CPAs (29 of 57, or 51%). GROs accounted for 35% (20 of 57) of variance requests, and RTCs accounted for 14% (8 of 57). Twenty-one percent of requests for variances made by operations on Heightened Monitoring (83 of 399) were either duplicate requests, or were no longer needed by the time a supervisor decision was to be made. Of the remaining requests, more than 80% were granted, a slightly lower approval rate than for operations that requested a variance that were not under Heightened Monitoring.

---

[152] *See* Deborah Fowler & Kevin Ryan, Second Report, at 324-27, ECF No. 1079.

[153] Of the 98 operations placed under Heightened Monitoring in 2020 or 2021, 93 were still active on Heightened Monitoring as of March 1, 2021. The Monitors used waiver and variance request data provided by RCCR through quarterly Tableau updates. Decision data was missing for 44 of 2,552 requests. Waiver/Variance information found in CLASS was reviewed in an attempt to complete decision data missing in Tableau files.

[154] An operation may request a waiver for a minimum standard only if "the economic impact of compliance with a minimum standard is great enough to make compliance impractical." 26 Tex. Admin. Code §745.8303. A variance may be requested "if there is good and just cause for [the operation] to meet the purpose of the minimum standard in a different way." *Id.*

Figure 74: Request for Waiver/Variance Decision by Heightened Monitoring Status



Of the 60 requests for a variance that were denied, denial was often based on the impact that a variance would have on children's health or safety.[155]

Figure 75: Reason Waiver/Variance Request was Denied for Operations on Heightened Monitoring

---

[155] No additional information or detail was provided in the waiver/variance data for the "other" denial reason category.

116

Most requests granted to Heightened Monitoring operations were related to placement extensions and physical plant issues.

**Figure 76: Standard Categories for Granted Variance Requests for Operations on Heightened Monitoring**

Source: Waiver/Variance Requests, 2021
n = 256



| Category | Value |
|---|---|
| Placement Extension | 111 (43%) |
| Physical Plant | 54 (21%) |
| Verification/Screening | 23 (9%) |
| Admin/Service Planning | 16 (6%) |
| Training | 15 (6%) |
| Administrative/Other | 14 (5%) |
| Respite | 12 (5%) |
| Ratios | 6 (2%) |
| Child Care | 3 (1%) |
| Medications | 2 (1%) |

Heightened Monitoring operations were not granted any variances in 2021 for the following categories:

- Child rights
- Discipline
- Emergency Behavioral Interventions (EBI)
- Supervision
- Safety/transportation
- Records
- Serious Incidents
- Criminal Background Checks

### In-depth Review of 19 Operations Under Heightened Monitoring

Nineteen operations were randomly selected by the monitoring team for an in-depth review, representing a sample of operations under Heightened Monitoring in 2021.

**Table 17: Standard Categories for Granted Variance Requests for Operations on Heightened Monitoring**

| Operation Name | Operation Type |
|---|---|
| Agape Manor Home | CPA |
| Ascension Child and Family Services | CPA |
| Assuring Love | CPA |
| Azleway Children's Services Tyler | CPA |
| Azleway Valley View | GRO |
| Beacon of Hope | CPA |
| Caring Hearts for Children | CPA |
| Children's Hope Residential Services | CPA |
| Circle of Living Hope | CPA |
| Connections ES – New Braunfels | GRO |
| Freedom Place | GRO |
| Girls' Haven | GRO |
| Hands of Healing | GRO |
| Therapeutic Family Life | CPA |
| Nothing Just Happens Inc. | GRO |
| Sunny Glen Children's Home | GRO |
| The Burke Foundation | CPA |
| The Burke Foundation – Pathfinders RTC | GRO |
| New Life Residential Treatment Center | GRO |

The monitoring team's in-depth review included extensive data analysis, a review of all Heightened Monitoring documentation associated with the operations through December 2021,[156] review of placement requests and approvals for the operations, and abbreviated site visits[157] to nine of the 19 operations. The monitoring team made site to the following operations:

---

[156] Review of documentation included a review of documents and information available in CLASS, and a review of Heightened Monitoring documents provided to the Monitors by the State through monthly uploads of information to their shared file databases.

[157] The purpose of these site visits was specific to the monitoring team's review of issues related to Heightened Monitoring. Due to time limitations and sensitivity to the number of visits the operations receive from Heightened Monitoring and other DFPS and RCCR staff, the monitoring team conducted one-day visits that allowed the monitoring team to tour the facility, interview the administrator(s), and observe children and staff interact. The monitoring team members made these site visits after having completed an exhaustive review of the operation's Heightened Monitoring Plan, data related to citations and substantiated allegations of abuse, neglect, or exploitation, and review of Heightened Monitoring documentation.

- Azleway Children's Services (March 28, 2022)
- Azleway Valley View (March 28, 2022)
- Beacon of Hope (April 6, 2022)
- Connections (April 5, 2022)
- Girls' Haven (March 23, 2022)
- Hands of Healing (March 24, 2022)
- New Life (February 22, 2022)
- The Burke Foundation CPA (March 9, 2022)
- The Burke Foundation – Pathfinders RTC (March 9, 2022)[158]

## Review of Compliance History Prior to Placement on Heightened Monitoring

The monitoring team reviewed four of the 19 operations (Assuring Love, Azleway Valley View, Beacon of Hope, and New Life Children's Treatment Center) in-depth as "Phase One" operations for the Second Report.[159]

Altogether, over the five-year period between 2016 and 2020, the remaining 15 operations accounted for 112 substantiated findings of child abuse or neglect (RTBs), and 2,557 citations for minimum standards deficiencies.[160] Broken out by operation:

- Agape Manor Home CPA had one RTB for Sexual Abuse during this period and 187 citations for minimum standards deficiencies.

- Ascension Child & Family Services had six RTBs (five for Physical Abuse and one for Sexual Abuse) and 84 citations for minimum standards deficiencies.

- Azleway Children's Services had 17 RTBs (12 for Neglectful Supervision, four for Physical Abuse, and one for Sexual Abuse), and 332 citations for minimum standards deficiencies.

- Caring Hearts for Children had 30 RTBs (13 for Neglectful Supervision, 13 for Physical Abuse, two for Emotional Abuse, and two for Physical Neglect), and 90 citations for minimum standards deficiencies.

- Children's Hope CPA had 12 RTBs (seven for Physical Abuse, two for Emotional Abuse, one each for Neglectful Supervision, Sexual Abuse, and Medical Neglect), and 393 citations for minimum standards deficiencies.

- Circle of Living Hope had 18 RTBs (nine for Physical Abuse and nine for Neglectful Supervision), and 296 citations for minimum standards deficiencies.

---

[158] In addition to visits to these nine operations, the monitoring team visited four other Heightened Monitoring operations that are not part of the in-depth analysis: Circle of Care CPA, Gulf Winds RTC, Boys Haven GRO, and Texas Hill Country School.

[159] See Deborah Fowler & Kevin Ryan, Second Report, 295-328, ECF No. 1079. The other four Phase One operations included in the Second Report analysis have since closed.

[160] This number includes citations for all minimum standards, without reference to weight.

- Connections Emergency Shelter – New Braunfels had two RTBs, both for Neglectful Supervision, and 92 citations for minimum standards deficiencies.

- Freedom Place had five RTBs, all for Sexual Abuse, and 140 citations for minimum standards deficiencies.

- Girls Haven had no RTBs and 84 citations for minimum standards deficiencies.

- Hands of Healing GRO had six RTBs (three for Physical Abuse and three for Neglectful Supervision), and 122 citations for minimum standards deficiencies.

- Nothing Just Happens Inc. had one RTB for Physical Abuse and 63 citations for minimum standards deficiencies.

- Sunny Glen Children's Home had two RTBs (one for Physical Abuse and one for Sexual Abuse), and 140 citations for minimum standards deficiencies.

- The Burke Foundation CPA had two RTBs (one for Physical Abuse and one for Neglectful Supervision), and 176 citations for minimum standards deficiencies.

- The Burke Foundation – Pathfinders RTC had four RTBs (three for Physical Abuse and one for Neglectful Supervision), and 51 citations for minimum standards deficiencies.

- Therapeutic Family Life had six RTBs (three for Physical Abuse, two for Neglectful Supervision, and one for Sexual Abuse), and 307 citations for minimum standards deficiencies.

The table below shows the five-year history (2016-2020) of enforcement actions for the 15 operations. Corrective actions include Probation and Evaluation.

Table 18: Enforcement Actions at In-Depth Heightened Monitoring Operations, 2016 to 2020

| Operation | Enforcement Actions | | |
| | Corrective Action | Plan of Action | Monetary Penalty |
| --- | --- | --- | --- |
| Agape Manor Home CPA | 1 | 0 | 7 |
| Ascension Child & Family Services | 0 | 1 | 1 |
| Azleway Children's Services | 1 | 0 | 4 |
| Caring Hearts for Children | 0 | 0 | 2 |
| Children's Hope CPA | 0 | 0 | 5 |
| Circle of Living Hope | 0 | 5 | 6 |

| | | | |
|---|---|---|---|
| Connections Emergency Shelter – New Braunfels | 0 | 0 | 0 |
| Freedom Place | 0 | 1 | 3 |
| Girls Haven | 0 | 0 | 5 |
| Hands of Healing GRO | 2 | 2 | 0 |
| Nothing Just Happens Inc. | 0 | 0 | 4 |
| Sunny Glen Children's Home | 1 | 1 | 1 |
| The Burke Foundation CPA | 0 | 0 | 2 |
| The Burke Foundation – Pathfinders RTC | 0 | 0 | 0 |
| Therapeutic Family Life | 0 | 0 | 6 |

## Analysis of Heightened Monitoring Quarterly Reports and Data

Operations placed under Heightened Monitoring are reviewed by the operation's Heightened Monitoring team on a quarterly basis to monitor the operation's progress.[161] A quarterly compliance status report is developed and reviewed to determine whether any modifications to the Heightened Monitoring plan are needed.[162] After the quarterly report is reviewed and approved by the Heightened Monitoring Directors, the lead Heightened Monitoring Director assigned to the operation meets with the operation leadership to discuss the quarterly report.[163]

The monitoring team reviewed quarterly reports for the 19 operations,[164] and captured data included in the reports for each of the following:
- Completion of Heightened Monitoring Tasks due during the quarter[165]
- Compliance with Heightened Monitoring Tasks[166]
- Deficiencies cited, findings of contract violations, and enforcement actions initiated after the operation was placed under Heightened Monitoring
- Comparison of the consistency between quarterly report documentation and monthly Heightened Monitoring documentation

---

[161] HHSC & DFPS, Heightened Monitoring Process Overview 6 (undated) (on file with the Monitors).
[162] *Id.*
[163] *Id.*
[164] The Monitors' quarterly review analysis includes data from all 19 operations. With the exception of Azleway Valley View, four quarterly reviews were analyzed for each of the operations, for a total of 75 quarterly review documents. The first and second quarter reports for Azleway Valley View were combined into a single document but information included on task consequences and compliance was provided for only quarter only. Compliance information for quarters one and two were verified through a review of FITS and other Heightened Monitoring documents for the quarter.
[165] A Task was considered completed when a Plan Task with a due date was approved by the Heightened Monitoring Team.
[166] Heightened Monitoring Team members document Task compliance during weekly visits.

- Heightened Monitoring status at the end of the fourth quarter

Many operations completed all Heightened Monitoring Plan (Plan) Tasks due during the quarter in their first two quarters of review.[167] Seventy-two percent (13 of 18)[168] of operations reviewed timely completed all the Tasks due in the first quarter, and 53% (10 of 19) timely completed all the Tasks due in the second quarter. By the third and fourth quarter, most operations (63%, or 12 of 19) had no Tasks due; those operations had progressed to the implementation phase of Heightened Monitoring and were being monitored for compliance with the Tasks outlined in their Plan.

Figure 77: Plan Tasks Due During Quarter were Completed



Some operations that were working on Tasks due in the third and fourth quarters may have had new Tasks added during the Heightened Monitoring process, or had an existing Task revised.

Most of the operations in the sample (68% or 13 of 19) were given a new Task or had an existing Task revised during the Heightened Monitoring process. Five of the operations in the sample had Tasks added to their Plans, and twelve operations had one or more Tasks revised.

---

[167] The Heightened Monitoring Plan Quarterly Review assesses the operation's completion of Tasks by the assigned due date. DFPS and RCCR created a quarterly review document that is used by the Heightened Monitoring staff to guide the review. The review document asks, "Have all plan tasks due during this quarterly review period been completed?" A response of "yes" from the Heightened Monitoring Team indicates that the operation submitted all Task elements due in the quarter in a timely manner and that submissions were sufficient to meet what was required for those Tasks. If an operation did not have any Tasks due in the quarter, the Heightened Monitoring Team answered, "no task requirement (not applicable)."
[168] The first and second quarterly reports for Azleway Valley View were combined into a single report. The single report did not provide full information for both quarters.

Figure 78: Percent of Operations with a Change in Plan Tasks During Heightened Monitoring[169]



Figure 79: Number and Timing of New and Revised Heightened Monitoring Tasks



Across the twelve operations that had Tasks revised, a total of 17 Tasks were revised. Twenty-nine percent (5 of 17) of the Tasks that were revised were changed to make them easier for the operation to accomplish.  Examples include:

- A Task that required an audit of children's medication logs was changed to require the audit once a week instead of twice a week.
- A Task that outlined several training requirements for staff was revised to remove training in EBI.

---

[169] It is possible that an operation had both a Task revised, and a Task added to the Heightened Monitoring Plan.

- A Task that required designated staff to conduct daily inspections of the entire operation was changed to require weekly inspections of two-to-three rooms.

The Heightened Monitoring quarterly review also includes an assessment of the operation's compliance with Plan Tasks during the quarter.[170] Of the 19 operations reviewed, 74% (14 of 19) were determined to be out of compliance with Plan Tasks in one or more quarters.

Compliance with Heightened Monitoring Plan Tasks does not mean that the operation had no minimum standards or contract violations during the quarter. The State's review of compliance is narrowly focused on the operation's efforts in implementing their Plan Tasks and how well the operation is meeting the expectations of their Plan. Consequently, an operation may be found to be compliant with Plan Tasks even if they continued to have investigation intakes, deficiencies cited, and findings of contract violations.

Table 19: Violations and Citations in Operations with Tasks Found to Comply During the Quarter

| When Found in Compliance with Heightened Monitoring: |
| --- |
| 78% of Operations were Cited for a Deficiency<br>Number of Deficiencies (range): 1 to 22<br>Average Deficiencies: 6.1 |
| 60% of Operations were Cited for a Deficiency Related to their Heightened Monitoring Plan Tasks<br>Number of Deficiencies related to HM Task (range): 1 to 15<br>Average Deficiencies Related to HM Task: 3 |
| 27% of Operations had a Contract Violation<br>Number of Violations (range): 1 to 5 |
| 10% of Operations had a Contract Violation Related to their Heighted Monitoring Plan Tasks |
| 18% of Operations had an Enforcement or Contract Action |

[170] The review document asks, "Based on weekly visits and/or desk reviews, did the operation implement the task requirements?" A response of "yes" from the Heightened Monitoring Team indicates that the operation was in compliance with all Task requirements in all months of the quarter.

**Figure 80: Number of Quarters the Operation was Found to be Out of Compliance with Plan Tasks**



Source: HM Quarterly Reviews
n = 19

Twenty-six percent of the operations reviewed (5 of 19) were in compliance with all the operation's Tasks in every quarter. Twenty-one percent (4 of 19) were out of compliance in every quarter. As might be expected, the number of operations that were not in compliance with one or more Tasks was highest in the first quarter.

**Figure 81: Number of Operations with Tasks Found to be Out of Compliance by Quarter**



Source: HM Quarterly Reviews
n = 19

## Minimum Standards Deficiencies Cited

Quarterly reviews capture the number of minimum standards citations that were issued to the operation during the quarter. A majority (15 of 19, or 79%) of the operations reviewed received one or more deficiencies in each of the four quarters of Heightened Monitoring. Four operations (21%) did not have any deficiencies cited in one or more quarters.

**Figure 82: Percent of Operations with Deficiencies and Number of Deficiencies by Quarter**



In the first four quarters of Heightened Monitoring, RCCR issued a total of 573 minimum standards violations to the 19 operations; 323 (56%) were directly related to one or more of the patterns that qualified the operation for Heightened Monitoring.[171] For ten of the operations reviewed (53%), during at least one of the quarters, all of the citations RCCR issued were related to Plan Tasks or the pattern that led to Heightened Monitoring.

---

[171] The Heightened Monitoring quarterly review document includes areas for the Heightened Monitoring Team to identify citations related to the operation's "pattern/trend" and the "HM Plan Task #."

126

**Figure 83: Number of Total and Heightened Monitoring Related Deficiencies by Quarter**



**Figure 84: Average Number of Total and Heightened Monitoring Related Deficiencies by Quarter**



## Contract Violations

The quarterly reports also capture DFPS findings that a contract violation occurred during the quarter. Thirteen of the 19 operations (68%) had one or more contract violations during their first four quarters of Heightened Monitoring. Most of those operations (10 of 13, or 77%) had a contract violation in only one of the four quarters.

127

Figure 85: Contract Violations During Four Quarters of Heightened Monitoring



Source: HM Quarterly Reviews
n=19

DFPS found contract violations related to the following issues:

- Requirements related to early and periodic screening, diagnosis, and treatment of foster children.
- Background checks
- EBI
- Home screening
- Record keeping and documentation
- Service planning and delivery
- Admission assessments, medication, and health care services

Heightened Monitoring staff indicate in the quarterly reviews whether the contract violation is related to a Plan Task, or the pattern that led the operation to be placed under Heightened Monitoring. Of the 39 contract violations recorded in quarterly reports reviewed by the monitoring team, 15 (38%) were related to one of the operation's Plan Tasks or the pattern that led the operation to be placed under Heightened Monitoring.

Figure 86: Contract Violations During Four Quarters of Heightened Monitoring

Source: HM Quarterly Reviews
n = 39



For four of the operations, none of the contract violations were related to Plan Tasks or the pattern that led to Heightened Monitoring.

Table 20: Operations with a Contract Violation and Number of Violations During Four Quarters of Heightened Monitoring

| Operation | Number of Quarters with a Contract Violation | Number of Contract Violations | Number Related to HM Task |
|---|---|---|---|
| Agape Manor Home CPA | 1 | 1 | 0 |
| Assuring Love | 3 | 4 | 1 |
| Azleway Children Services | 1 | 2 | 0 |
| Beacon of Hope | 1 | 3 | 2 |
| Burke Foundation CPA | 1 | 2 | 2 |
| Burke Foundation GRO | 1 | 1 | 1 |
| Caring Hearts for Children | 1 | 2 | 0 |
| Children's Hope | 3 | 10 | 4 |
| Circle of Living Hope | 2 | 10 | 2 |
| Connections | 1 | 1 | 1 |
| Freedom Place | 1 | 1 | 0 |
| Girls Haven | 1 | 1 | 1 |
| New Life Children's RTC | 1 | 1 | 1 |
| **Total** | **18** | **39** | **15** |

## Enforcement or Corrective Actions

Quarterly reports also capture information related to contract and licensing enforcement actions. DFPS or RCCR carried out 23 enforcement or corrective actions during the four quarters reviewed against 11 of the 19 (58%) of the operations.

**Figure 87: Operations on Heightened Monitoring with Enforcement Actions Identified in Quarterly Reviews**



The most common enforcement actions were contractual and were initiated by DFPS. DFPS initiated eight liquated damages enforcement actions and six contract Corrective Action Plans (CAPs) for operations under Heightened Monitoring. RCCR placed four Heightened Monitoring operations under Probation, two under a Plan of Action, and issued a monetary Administrative Penalty against three.

**Figure 88: Type of Enforcement or Corrective Action Identified in Quarterly Review**



Some operations were subject to multiple enforcement actions over the four quarters reviewed. DFPS and RCCR carried out nine enforcement actions during the four quarters against Children's Hope CPA.

Table 21: Operations with an Enforcement or Corrective Action

| Operation | Number of Actions | Type of Action |
|---|---|---|
| Agape Manor Home CPA | 1 | Plan of Action |
| Ascension Child & Family Services | 1 | Corrective Action Plan |
| Azleway Children Services | 1 | Liquidated Damages |
| Burke Foundation CPA | 2 | Liquidated Damages, Corrective Action Plan |
| Children's Hope | 9 | Liquidated Damages (6), Administrative Penalty (2), Probation |
| Circle of Living Hope | 2 | Administrative Penalty, Probation |
| Freedom Place | 1 | Corrective Action Plan |
| Girls Haven | 1 | Corrective Action Plan |
| Hands of Healing | 2 | Corrective Action Plan, Probation |
| New Life Children's RTC | 2 | Corrective Action Plan, Plan of Action |
| Therapeutic Family Life | 1 | Probation |
| **Total** | **23** | |

Enforcement actions were most often carried out in the second and third quarters of Heightened Monitoring.

Figure 89: Timing of Enforcement or Corrective Action



Source: HM Quarterly Reviews
n = 23

■ Quarter 1   ■ Quarter 2   ■ Quarter 3   ■ Quarter 4

131

## Consistency between Quarterly Reports and Other Information

The monitoring team also compared the 75 quarterly reports reviewed with other Heightened Monitoring documentation for consistency. The monitoring team found that 58 of the 75 quarterly reports (77%) were consistent with other Heightened Monitoring documentation for the operations reviewed.

**Figure 90: Comparison of Information in Quarterly Reviews and Other Heightened Monitoring Documents for the Quarter**



Source: HM Quarterly Reviews
n = 75

■ Consistent   ■ Not Consistent

When the quarterly report was determined to be inconsistent with other documentation, it was most often because issues or concerns documented in monthly Heightened Monitoring documents were not mentioned in the quarterly reports. This was true for 15 of the 17 (88%) quarterly reports that were found to be inconsistent with other documentation.

Examples of inconsistencies include:

- Failure to include issues related to runaways reported in the monthly reports
- Failure to include lack of compliance with a Plan Task documented in monthly reports
- Failure to include Liquidated Damages and Administrative Penalties assessed during the quarter
- Failure to include Technical Assistance provided to the operation

## Annual Reviews

After an operation has been under Heightened Monitoring for a year, the Heightened Monitoring Team holds an annual review to assess the operation's progress and

determine whether it has successfully completed its Plan.[172] Operations are eligible to be released from Heightened Monitoring if they have met all the Plan Tasks, have at least six months of successive unannounced visits that show the operation is in compliance with the standards and contract requirements that led to Heightened Monitoring, and the operation is not out-of-compliance with any medium-high or high weighted licensing standards.[173] If an operation is released from Heightened Monitoring, the operation moves to what the State refers to as "post-plan monitoring," or "Stage 2."[174]

After the operation's annual review, Heightened Monitoring was extended for most operations reviewed (16 of 19, or 84%). The length of the extension is determined by the Heightened Monitoring Team; for the 16 operations that were placed on an extension, the extensions ranged from one to six months.[175]

There are clear differences in performance between operations that moved into post-plan monitoring after the annual review, and those that continued under Heightened Monitoring.

**Table 22: Comparison of Operations Extended and Moved to Post-Plan Monitoring at Annual Review**

|  | Operations with HM Extended n=16 | Operations to Post Plan Monitoring n=3 |
|---|---|---|
| Percent of Quarters Compliant | 45% | 92% |
|  |  |  |
| Total Number of Deficiencies | 554 | 19 |
| Average Total Deficiencies | 34.6 | 6.3 |
| Average Quarterly Deficiencies | 8.8 | 1.6 |
| Range in Deficiencies Quarterly | 0-36 | 0-7 |
|  |  |  |
| Total Number of HM Deficiencies | 312 | 11 |
| Average HM Deficiencies | 4.9 | 3.7 |
| Range in HM Deficiencies Quarterly | 0-22 | 0-7 |
|  |  |  |
| Contract Violation | 75% | 33% |
| Contract Violation Related to HM | 50% | 33% |
| Enforcement Action | 69% | 0% |

---

[172] HHSC & DFPS, Heightened Monitoring Process Overview 6 (undated) (on file with the Monitors).
[173] Order at 2, ECF No. 837.
[174] The Court's order requires DFPS and RCCR to make at least three unannounced visits in the three months following release from the plan, and to continue to track intake data for six months to ensure that the operation does not lose progress made during Heightened Monitoring. *Id.*
[175] Operations may receive more than one extension.

133

Four of the operations placed on an extension have since moved into post-plan monitoring. The seven operations that moved into post-plan monitoring were:

- Assuring Love
- Ascension Child and Family Services
- Azleway Valley View
- Connections New Braunfels
- Hands of Healing
- Nothing Just Happens
- Sunny Glen Children's Home

## Placement Requests

In addition to the analysis of placements for all operations under Heightened Monitoring, discussed in the overview section above, the monitoring team reviewed placement requests for the 19 operations in the sample. The analysis the monitoring team completed for all operations matched placement data to placement request data – and therefore represents an analysis only for the children placed in an operation under Heightened Monitoring; however, for the operations in the sample, the monitoring team was able to review all placement requests for children related to the 19 operations, regardless of whether the child was ultimately placed in the operation.

For the most part, the results of the analysis were consistent with the analysis completed for all operations. However, there are a few interesting details revealed by the review of all placement requests for the 19 operations. First, almost all placement requests reviewed for the 19 operations were approved. Of 1,838 placement requests reviewed for the 19 operations, only 66 (4%) were denied. And of the approved placement requests, almost all resulted in placement of a child at the operation: of the 1,838 placement requests reviewed, 1,614 (88%) resulted in the child being placed at the operation.

However, of the 66 placement requests that were denied, eight (12%) still resulted in placement at the operation. The monitoring team could not find any explanation for this discrepancy.  In five of those cases, the placement was approved for the child's sibling, but not for the child placed.

## Emerging Issues or Patterns in Implementation of Heightened Monitoring

The monitoring team's data analysis for Heightened Monitoring operations, and in-depth analysis of documents, data, information, and site visits for the 19 randomly selected operations, revealed several recurring issues related to the State's implementation of Heightened Monitoring. Several of these issues were raised during interviews with the 13 administrators the monitoring team interviewed during one-day site visits to Heightened Monitoring operations; however, many of the administrators reported having positive experiences with the Heightened Monitoring process or Team assigned to their operation.

134

For example, of the 13 administrators interviewed, seven stated that all the Heightened Monitoring Tasks assigned to their operation were reasonable, and one stated "some" were reasonable. One shared that the areas for improvement identified by Heightened Monitoring were helpful. Another said that "it took Heightened Monitoring to turn things around" because someone was looking at the operation on a weekly basis. Another administrator shared that being required to undertake a root cause analysis of a pattern of problems with restraint implementation helped them identify staff strengths and weaknesses, and better focus on the needs of children they accepted for placement. Another administrator shared that while his guard was up after being placed on Heightened Monitoring, the operation found the Heightened Monitoring Team to be supportive. While the administrators who had a negative experience reported frustrations across all the areas about which the monitoring team inquired, twice as many administrators reported having a positive experience (8 or 67%) than reported having a negative experience (4 or 33%).[176]

## Duplication of Tasks Between Heightened Monitoring and Other Enforcement Actions

For operations that were placed on Heightened Monitoring after having completed a voluntary Plan of Action, an Evaluation, or Probation, the operation's Heightened Monitoring Plan often included Tasks that were almost identical to conditions included as part of the previous enforcement action[s]. Similarly, some operations under Heightened Monitoring were subsequently placed under a different type of enforcement action (Plan of Action, Probation, or a Contract Corrective Action Plan), and the subsequent enforcement action often included identical or overlapping tasks. Of all operations placed under Heightened Monitoring in 2020, as of January 31, 2022, 10 subsequently agreed to a voluntary Plan of Action, and seven were subsequently placed on Probation by RCCR. One operation that started Heightened Monitoring in 2021 agreed to a voluntary Plan of Action approximately five months after starting Heightened Monitoring.[177]

For some operations, including Tasks in the Heightened Monitoring Plan that are similar or identical to previously completed corrective action tasks may be appropriate. For example, Azleway Valley View GRO, which was placed under Heightened Monitoring on June 11, 2020, had previously completed an Evaluation. The Evaluation started February 8, 2019, and ended July 30, 2019. During the time the operation was under Evaluation, DFPS put a placement hold into effect, youth were moved out of the facility, and RCCR inspectors completed monthly inspections. Tasks completed during the operation's Evaluation were very similar to some of the Tasks later included in the Heightened

---

[176] Responses for one of the 13 administrators interviewed were not recorded in the interview tool used by the monitoring team.

[177] Of the 13 administrators interviewed by the monitoring team between March 8, 2022 and April 6, 2022, two stated they were not given credit for improvement made during a previous enforcement action, if they were placed on Heightened Monitoring soon after having completed another type of action; and

four reported they were "overwhelmed" by being placed on another type of enforcement action in addition to Heightened Monitoring, particularly by the number of visits from DFPS and RCCR staff related to the different enforcement actions.

Monitoring Plan.[178] The Heightened Monitoring Plan also included additional, specific Tasks targeting identified patterns for the operation.

While the operation had fewer minimum standards deficiencies cited in 2019 than in 2018 (particularly related to the operation's physical plant), the number of deficiencies cited increased again in 2020, prior to starting Heightened Monitoring. Including tasks that were part of the Evaluation may have been an effort by DFPS and RCCR to institutionalize practices that resulted in improvement between 2018 and 2019. Though Azleway Valley View's Heightened Monitoring Plan was extended (and a Task added) in August 2021 due to minimum standards violations cited in June 2021, the operation was determined to be eligible for post-plan monitoring in January 2022.

The monitoring team surfaced more significant concerns related to operations that were on some type of corrective action that continued after the operation was placed under Heightened Monitoring, or operations that were placed under another type of corrective action while on Heightened Monitoring, or both. For example, all six of the branches of Circle of Living Hope CPA were placed under a Corrective Action Plan (CAP) by DFPS Residential Contracts Monitoring (RCM) on July 16, 2020. On September 1, 2020, four of the CPA's six branch offices were placed on a voluntary Plan of Action by RCCR. On October 26, 2020, the operation was placed under Heightened Monitoring. Rather than discontinuing the Plan of Action and CAP and folding all of the requirements from those enforcement actions into the Heightened Monitoring Plan, the CAP and Plan of Action continued after the operation started Heightened Monitoring.

The CAP ended on January 12, 2021. On March 1, 2021, the Plan of Action was discontinued after RCCR found that none of the branches successfully completed it, and on May 24, 2021, Circle of Living Hope was placed on Probation by RCCR. The planned end date for the Probation is listed in CLASS as May 23, 2022. All the various enforcement actions for Circle of Living Hope included similar (or identical) tasks. The Probation, which again listed redundant tasks, also requires the operation to "comply with the HM plan." Though FITS documentation included in the Heightened Monitoring materials indicate that the "CAP was completed successfully," the Heightened Monitoring Plan and Probation include tasks directly related to the issues for which Circle of Living Hope was placed under the CAP.

---

[178] For example, the Evaluation included a Task requiring the Administrator or designee to spend time observing direct care staff during shifts and make unannounced visits during nighttime hours. The Heightened Monitoring Plan included a Task requiring the operation's "leadership" to make unannounced evening and weekend visits to the operation. The Evaluation required the Administrator to develop and evaluation a method "on how the operation will meet substantial compliance with Subchapter M (Discipline and Punishment) of the Minimum Standards" and the Heightened Monitoring Plan required the Administrator to "develop a process to review licensing citations and develop a plan to address deficiencies." The Evaluation required the operation to "develop a supervision tracking form for each cottage to be completed at the beginning of each shift by the direct care staff" and the Heightened Monitoring Plan required the operation to "demonstrate and provide evidence that supervision and admission policies are sufficient and in place."

Heightened Monitoring was extended for Circle of Living Hope on November 21, 2021, because the operation continued to receive deficiencies for minimum standards violations related to the patterns that resulted in the operation's placement on Heightened Monitoring (and the CAP, Plan of Action, and Probation), even after the operation was placed on Probation. The operation's branches managed five foster homes that each received an RTB for Physical Abuse after the operation started Heightened Monitoring. One of the foster homes also received RTBs for Medical Neglect and Neglectful Supervision. All but one of the investigations was opened after the start of at least one of the enforcement actions.[179] Four were reported to SWI after the operation had been under Heightened Monitoring for seven months to more than a year.[180] The Court's March 18, 2020 Heightened Monitoring order requires:

> If the operation does not come into compliance with the plan during the heightened monitoring period, DFPS and RCCL will identify one or more of the following penalties:
>
> - suspension of placements
> - imposition of fines
> - suspension or revocation of the facility or CPA's license
> - termination of the contract [181]

The State did not take any of these actions at the end of the operation's initial, one-year Heightened Monitoring period, opting instead to extend the Heightened Monitoring period. The operation remains under two enforcement actions (Heightened Monitoring and Probation). On April 11, 2022, DFPS notified the Monitors that Residential Contracts Monitoring had again requested a CAP for Circle of Living Hope, "due to foster parent inappropriate discipline."[182]

Another CPA, Beacon of Hope, was under Evaluation for 13 months; it successfully completed the Evaluation six months prior to being placed under Heightened Monitoring. While under Heightened Monitoring, Beacon of Hope was placed on Probation "due to the fact that the operation continues to receive citations in the areas of trends and patterns identified during Evaluation (2019-2020) and currently, during Heightened Monitoring." When the Probation decision was upheld on administrative review, the administrative review findings stated, "Concerns with the inability of this operation to maintain compliance with so few homes while receiving intensive assistance from Heightened Monitoring and their licensing representative resulted in the decision for Probation to be

---

[179] The intake date for the first investigation listed was April 13, 2020; the investigation was not completed until February 9, 2021.

[180] Intake dates for the four investigations were: June 14, 2021, October 2, 2021, October 4, 2021, and March 17, 2022.

[181] Order, ECF 837, at 2.

[182] E-mail from Lesley Castillo, DFPS Program Specialist, to Deborah Fowler and Kevin Ryan, re: March 2022 Suspensions, Contract Terminations and Disallowances (April 11, 2022) (on file with the Monitors).

upheld."[183] Rather than placing the operation under a duplicative Probation enforcement action, it might have been worthwhile to consider whether additional Technical Assistance, coaching, or changes to Heightened Monitoring Tasks could have instead led to improved compliance – or whether the operation's systemic problems were so deeply rooted that it was time to begin the process of license suspension or revocation. The operation is still under Heightened Monitoring; its Plan has been extended three times. Over the first four quarters of Heightened Monitoring, RCCR cited the operation 26 times for minimum standards deficiencies; 21 were weighted high or medium-high. Surprisingly, despite these problems, RCCR permitted the operation to absorb foster homes from a CPA (Benchmark) that closed due to a license revocation. One of these homes was recommended for closure by RCCR after being absorbed by Beacon of Hope.

The Monitors also note that at least one operation – Hands of Healing GRO – was still on Probation when it was moved to post-plan monitoring for Heightened Monitoring. Hands of Healing was placed under Probation on September 8, 2021 (almost a full year after starting Heightened Monitoring) after receiving five Reason to Believe findings associated with three DFPS investigations: two for Neglectful Supervision, two for Physical Abuse, and one for Medical Neglect. All of these were related to reports made to SWI in 2021, *after* the operation started Heightened Monitoring. After being placed on Probation, compliance with the Probation plan was added as a new Task to the operation's Heightened Monitoring Plan. Yet, the operation was moved to post-plan monitoring March 16, 2022, despite having at least five more months of Probation to complete.

The practice of placing Heightened Monitoring operations that continue to struggle with safety violations under an additional type of enforcement action raises concerns for safety of the PMC children in the care of these operations. For an operation to continue to have a high number of safety violations after being placed under Heightened Monitoring and receiving weekly visits from DFPS and RCCR staff raises questions about whether the operation is a safe placement for children consistent with the Court's injunction in this matter. However, this practice also raises concerns regarding the efficacy of enforcement action plans, duplicative DFPS and/or RCCR practices, and inefficiency. Assuming the operation is determined to be capable of continuing to safely care for children despite repeated violations, Tasks could be re-evaluated if an operation is not in compliance with Heightened Monitoring, rather than placing the operation on a different type of enforcement action.

Administrators also spoke of a lack of communication between the various staff overseeing the overlapping corrective actions, and the monitoring team found at least one instance in which the two teams conducting simultaneous corrective actions did not appear to agree. Agape Manor Home CPA, which has two branches, was placed under Heightened Monitoring on October 26, 2020, and agreed to a voluntary Plan of Action on June 10, 2021. The Plan of Action (adopted for both branches) included Tasks that were like those required for Heightened Monitoring. The Plan of Action was "successfully"

---

[183] The CPA's administrator expressed during the administrative review that she felt "they [were] being punished for the same thing. Evaluation, Heightened Monitoring, and now Probation…it is not fair as they are doing so much better and have had few citations in the last year and a half."

completed December 10, 2021, according to CLASS, though the Heightened Monitoring Team notes for a March 4, 2022 FITS meeting documented that "it was stated in the [Plan of Action] closing summary that the POA will end successfully, not because the operation was overwhelmingly successful at reducing deficiencies, but because the operation is stable and does not warrant corrective action." On November 22, 2021, less than a month before the operation's Plan of Action was ended, the Heightened Monitoring Team described the operation in the fourth quarter summary as "struggling to minimize deficiencies and abid[e] by their POA."

The practice of placing operations under duplicative enforcement actions also creates inefficiencies for the State. The monitoring team's conversations with providers at Heightened Monitoring operations revealed that the RCCR inspectors and DFPS staff carrying out Heightened Monitoring visits and Plans may not be the same staff implementing a Probation or CAP. Thus, at least in some cases, the State is devoting more than one staff or set of staff to monitoring multiple, overlapping enforcement actions usually comprised of related tasks.

Multiple, overlapping enforcement actions also result in what providers described as a constant and disruptive cycle of DFPS and RCCR staff through the operations. While a steady stream of DFPS and RCCR staff might be positive and necessary for operations like Circle of Living Hope, a CPA with 64 verified foster homes across six branches and ongoing problems related to abuse, neglect, or exploitation and minimum standards deficiencies, it may be more problematic for staff (and children) in smaller operations. At smaller operations with few staff, staff members reported feeling particularly overwhelmed.

Heightened Monitoring requires weekly visits, shared between RCCR and DFPS. Yet, the Monitors' review of visits to operations undergoing another type of enforcement action in addition to Heightened Monitoring showed that, in some cases, operations were being visited several times in a single week. This excludes visits being made by DFPS or RCCR related to open investigations, and excludes visits made by SSCC staff or other contractors. For example, one operation that was simultaneously under a Plan of Action and Heightened Monitoring, received back-to-back visits in December 2021 for a total of three in one week: first, on Monday, December 13, 2021 by the Heightened Monitoring staff and then by the inspector monitoring the Plan of Action on Tuesday, December 14, 2021. The Heightened Monitoring staff returned to the facility on Friday, December 17, 2021. A CPA branch office that was under a Plan of Action and Heightened Monitoring was visited by the inspector monitoring the Plan of Action on Tuesday, November 16, 2021, and Heightened Monitoring staff on Thursday, November 18, 2021. A review of other CPAs and GROs also revealed back-to-back visits related to Heightened Monitoring and other enforcement actions.

Several of the administrators at Heightened Monitoring operations interviewed by the monitoring team noted that on at least one day, staff from several different agencies

(RCCR, DFPS, SSCCs, or Youth for Tomorrow (YFT)[184]) were present. A GRO administrator for an operation that was under Heightened Monitoring and Probation reported that RCCR once had three staff on site to review compliance with Probation on the same day that two other staff were on site to review compliance with Heightened Monitoring.[185] Another GRO administrator complained that on a day that Heightened Monitoring staff and YFT staff were both on-site, they both insisted on reviewing the same set of files. One CPA administrator reported a decrease in foster homes because homes stopped accepting youth due to the increased presence of DFPS or RCCR staff in their homes. Another administrator noted that children were being interviewed so often that they began to decline interviews. One CPA reported that children were embarrassed by being pulled out of class at school to talk with DFPS and RCCR representatives so often.

## Lack of Meaningful Guidance or Technical Assistance

During the monitoring team's interviews during site visits to operations under Heightened Monitoring, operation administrators offered a mix of opinions on the quality of Technical Assistance and guidance provided by the State. Some providers were able to give very specific examples of concrete Technical Assistance that they were given after being placed under Heightened Monitoring. For example, one provider said the Heightened Monitoring Team gave the facility helpful assistance in creating some of the forms and logs that were necessitated by Plan Tasks.  Another operation administrator noted that the Heightened Monitoring Team gave them good feedback on children's service plans, and said the assistance resulted in more detailed plans. One administrator said that the Heightened Monitoring Team "sat down and not only pointed out what was wrong but gave recommendations that might make things easier." Another said that the DFPS Residential Contracts member of the Heightened Monitoring Team gave very good recommendations for improving serious incident reports that "really helped the program overall."

However, in conversations with other stakeholders, providers have expressed a desire for "assistance in making the changes necessary to demonstrate compliance and improvement," and complained of a lack of meaningful Technical Assistance from the

---

[184] Youth for Tomorrow is a non-profit that assists in monitoring services provided by operations that have contracts with DFPS. *See* Youth for Tomorrow, About Us, https://www.yft.org/about-us/

[185] This operation also has a troubling history of safety violations. Prior to being placed under Heightened Monitoring on October 20, 2020, the operation was under a voluntary Plan of Action twice (in 2016 and 2018) and Probation twice (in 2016 and 2018). After placing the operation under Heightened Monitoring, DFPS issued one "Unable to Determine" finding related to an investigation of allegations of Neglectful Supervision and Physical Abuse, and four Reason to Believe findings associated with two investigations for Physical Abuse (2 RTBs), Medical Neglect, and Neglectful Supervision. Consequently, the operation was placed on Probation on September 8, 2021. The planned end date for the Probation is August 30, 2022. Despite the RTBs, Probation, and citations weighted medium or medium-high issued January 14, 2022 and February 7, 2022, the operation was moved to post-plan Heightened Monitoring on March 16, 2022, after its Heightened Monitoring Plan was extended twice. Since being moved to post-plan monitoring, the operation has received three more citations for minimum standards violations weighted medium or medium-high.

State.[186] When administrators complained about a lack of guidance or Technical Assistance during the monitoring team's site visits, most focused on the process of developing their initial responses to the Plan Tasks. During one interview, an administrator complained that they had difficulty understanding what was required for one of the Plan Tasks. The operation's plan for meeting the required Plan Task was finally approved in the third quarter of Heightened Monitoring, after the State required the operation to repeatedly submit proposals to the Heightened Monitoring Team. Another administrator said that the operation had to resubmit its responses for some Tasks so many times that it was difficult to keep track of the documentation. Another administrator said the "worst part was at the beginning [of Heightened Monitoring] when they were trying to develop their plan and get approval." The administrator said the State "wouldn't say what they wanted." However, the same administrator said that once the plan was approved and established, the Heightened Monitoring Team tried to be helpful, that the administrator was able to call their Team contacts "anytime" and that they were very responsive.

The Monitors reviewed the Heightened Monitoring Plans and documentation for the 19 operations that were analyzed in-depth. In some cases, the monitoring team concluded that the "Technical Assistance" included in the Plan or other Heightened Monitoring documentation was a general recommendation that provided little meaningful guidance. Some plans simply suggested the operation reach out to other organizations for assistance. The following examples appeared in Heightened Monitoring documents for the sample operations:

- The Heightened Monitoring Team recommends that this operation hold meetings with staff and youth to address and identify any issues and grievances.
- The Heightened Monitoring Team recommends that this operation develop connections with experienced general residential operations who can provide ongoing support.
- The Heightened Monitoring Team recommends that this operation contact the Texas Alliance for Child and Family Services and/or The Texas Network of Youth Services and request assistance with connecting with leadership at other GROs to develop a support network that can assist with answering questions when needed.

In other cases, "Technical Assistance" included only a recommendation or requirement for training. In one example, training on the Heightened Monitoring requirements was the totality of the assistance offered:

- The HM team will provide the operation with a Heightened Monitoring 101 training to ensure that the operation is aware of all the requirements and had an opportunity to ask questions.

In some cases, the Heightened Monitoring documentation, particularly documentation of weekly visits, simply stated that the staff who visited the operation provided Technical

---

[186] Ann Stanley, et al., Recommendations for Improving Texas' Safe Placement and Services for Children, Youth, and Families 6-7 (January 10, 2022), ECF 1166.

Assistance for a particular issue, but the document did not describe the assistance provided.

In at least one case, the "Technical Assistance" listed was a promise that the Heightened Monitoring Team would provide the operation with minimum standards and contract requirements:

- The HM team will provide the operation with minimum standards and contract requirements regarding youth who runaway [sic] and who are absent from the operation without permission.

Over the course of the Monitors' work, the monitoring team has repeatedly observed that "Technical Assistance" given by RCCR in lieu of, or in addition to a citation, simply restates the minimum standard that was violated. One of the 19 operations reviewed, which was placed under Heightened Monitoring, in part, due to a pattern of problems related to medication management, was again issued a citation after starting Heightened Monitoring when a child received an extra dose of their medication. In addition to the citation, the following "TA" was given: "The purpose of this rule is to prevent harm to children due to inappropriate storage, preparation, or administration of medication." Just two months prior, the operation had been cited for problems associated with the medication counts included in logs, when the amount in the prescription bottle was not accurately reflected in the log. The TA given was: "The purpose of this rule is to prevent harm to children by ensuring that medications are properly administered. Recording the administration of medication may prevent a child being given an extra dose of a medication, or missing a needed dose of medication, or receiving medication at the wrong time."

Several months later, the Heightened Monitoring Team documented that during one of the Heightened Monitoring visits, the Task associated with creating appropriate processes and documentation for medication administration was not met. The operation did not receive a citation, but the following "TA" was given: "It was discovered youth may not be getting medications. It was suggested to use a paper [Medication Administration Record] for backup. TA: Find out if the medication was provided to the child from the night staff. Correct errors on the E-Mar and document medication error what occurred." Two months later, the operation was again cited for problems associated with medication administration, and the "TA" offered was recitation of the minimum standard.

Another operation repeatedly received Technical Assistance during Heightened Monitoring visits related to problems with children's service plans, one of the issues that led to Heightened Monitoring. The Technical Assistance was often documented as a "suggestion" or "recommendation" when the operation was missing information entirely from a child's service plan; in another instance, the Heightened Monitoring Team member "recommended...direct care staff...become familiar with child service plans," Technical Assistance almost identical to that given seven months earlier when an interview with direct care staff revealed caregivers were not familiar with children's service plans. For operations that repeatedly struggle to meet minimum standard

142

requirements, a recitation of the minimum standard alone will not bring the operation into compliance.

The monitoring team also interviewed administrators who acknowledged and described effective guidance and Technical Assistance from the operation's Heightened Monitoring Team, indicating the variable quality of engagement as the State continues to stand up its Heightened Monitoring oversight and support work.

## Operations Allowed to Refuse Tasks or Change Tasks

In some cases, operations placed on Heightened Monitoring have been allowed to refuse to comply with a Task developed by the Heightened Monitoring Team. Texas Hill Country School (THCS), one of the operations visited by the monitoring team (but not part of the in-depth data and document analysis conducted by the monitoring team) is an RTC that provides services to children with pervasive developmental, intellectual, and emotional disorders. THCS also runs a private day school for children on the autism spectrum, or who have a traumatic brain injury or other developmental or neurobiological disorder.

THCS was notified that it was being placed under Heightened Monitoring on November 9, 2020, and DFPS and HHSC sent THCS the original HM Plan (Plan) drafted by the agencies on December 18, 2020. The Plan identified a pattern of problems in the following areas:

- Physical site repairs/upkeep
- Restraints
- Discipline and punishment
- Record keeping/documentation

Specifically, the Plan noted, "Texas Hill Country School has had a high number of deficiencies related to physical restraints. Areas noted for growth are managing children's behavior, maintaining children's medical records and personnel records. In addition, the maintenance and upkeep of the physical site."

The Plan outlined four Tasks related to the patterns identified in the HM analysis:

1. The administrator/designee must conduct a weekly walk through of the physical site to ensure compliance with minimum standards, residential care contract and requirements to ensure child safety and wellbeing. The administrator/designee will create and use a checklist when completing walkthrough. The operation will also maintain a calendar and a log to help keep track of the walkthroughs, all maintenance requests identified and when requests were completed.

2. All current and future staff must receive training on appropriate discipline, punishment, and emergency behavior intervention. The Plan notes the training must be instructor-led and lists issues to be included in the training. It directs the

operation to submit the training schedule and curriculum to the HM team at least two weeks prior to the first training class for review, and requires any direct-care staff hired during the HM period to complete the training within 60 days of their employment. The Plan states "Please note that this is different from what is already required."

3.  Each week, the administrator or treatment director will conduct a conference with any staff involved in emergency behavior intervention during the week to discuss: Contra-indications to use of restraint; De-escalation techniques that were or were not attempted; Circumstances and specific behaviors that caused the EBI; Type of restraints and technique (including length of restraint, monitoring of restraint, and the release of child); It was an emergency situation requiring use of restraint after de-escalation failed; Any concerns regarding follow-up actions and/or the post discussion with the child be staff who administered the EBI. The Task required the admin or treatment director to give feedback to the staff and (if injuries or concerns are found in the use of EBI) to devise a developmental plan for the staff, and lists what should be considered/included in a developmental plan.

4.  The administrator must develop a plan to ensure that all records are maintained as per minimum standards and the residential child care contract. This includes the development of a check list for personnel files, child files, and children's medical records. The plan must include a timeline to review all current child, personnel, and medical records to ensure compliance with minimum standards.

After sending the Plan to TCHS, the Heightened Monitoring Team met with the operation's administrator. The administrator appeared opposed to most of the Tasks outlined in the Plan; in the amended Plan provided to the operation on December 31, 2020, the HM Team noted that the administrator indicated that the physical site issues targeted in the first Task "[had] been corrected for many months" and that she was "willing to provide [a] copy of the walkthrough charts upon request." The amended Plan noted that in discussing the second Task related to EBI training, the administrator said the "operation does not have current deficiencies and she personally oversees pre-service, monthly annual trainings and tracking" and said she would provide a copy of training certificates upon request. The third Task was eliminated from the final Plan. This action may have been in response to an e-mail she sent the HM Team on December 30, 2020, in which she said:

> In regards to the monitoring plan you made, its [sic] all things we are already doing with the exception of myself or the treatment director formally meeting with every staff member involved in an EBI. That would be redundant and inappropriate for our population that only serves children on an intense level. What we do, per minimum standards, is have a section on the report where each EBI is reviewed, there's a debriefing done by staff member/program supervisor. If the Supervisor notices anything

144

concerning/has recommendations, that information is relayed to myself and the treatment director, and we address by following normal counseling/corrective action/reporting (if necessary) protocol with additional training, etc. as needed.[187]

Finally, for the fourth Task, the amended Plan notes, "Per conversation with [the administrator] on 12/30/20, operation is already compliant with this task and will continue with current protocol in place. Operation has a team that reviews treatment and medical binders every 3 months." The Plan had a start date of December 18, 2020 and an anticipated end date of December 18, 2021. Due to non-compliance, Heightened Monitoring was extended on January 3, 2022. According to HM Team meeting notes entered in the CLASS database:

> Texas Hill Country School's time on HM will be extended due to the operation missing HM requirements by lacking a six-month compliance period as well as a pending investigation at the conclusion of quarter 4. In order to achieve six-months compliance from the most recent compliance status, HM would need to be extended to 4/28/2022. Leadership has maintained that should the operation's time on HM be extended, they will terminate their contract with DFPS. This would subsequently lead to the discharge of two children, whom have made extensive progress during their time at the operation. Heightened Monitoring looks forward to Texas Hill Country School's success with their plan and them continuing to service our children in the near future.[188]

---

[187] E-mail from Michelle Stires, Administrator, THCS, to Hector Ortiz, DFPS, re: Heightened Monitoring Plan (December 30, 2020) (on file with authors).

[188] Despite the administrator's claim that all the issues raised in the Heightened Monitoring Plan had been addressed, the operation received at least nine citations after being placed on Heightened Monitoring; most of these (four) were for violations of minimum standards associated with the physical site. However, the citations also included one for an incomplete medication log (a child's medication records did not include the time the medication was administered, and staff did not sign indicating they had issued the medication) and violation of a minimum standard requiring timely fire inspections. Citations also include two issued in abuse, neglect, or exploitation investigations that resulted in a "ruled out" finding.

The operation was recently cited for violation of a minimum standard associated with caregiver responsibilities in a Priority 5 intake reported to Statewide Intake (SWI) on March 17, 2022. The intake was described by the reporter (the administrator) as, "No concern of abuse or neglect. Just a self report." The administrator reported a student fell when he was jumping on his bed, and hit and cut his head, requiring staples to close the wound. The child's service plan indicated he required 1:1 supervision (much like the children whose files we reviewed, discussed below). When the staff person tasked with supervising the child at the time of the accident was interviewed, he said "no one actually witnessed" the child hit his head; he told the inspector/investigator that he was getting a clean blanket out of a closet when the child fell. When the inspector discussed the citation with the administrator, "she stated that [the child] is on Level 1 supervision which is line of sight and the child kept at arms [sic] length." The inspector/investigator noted that either way, the child was not in the staff person's line of sight.

After THCS was notified of the extension of HM, the operation reported that they would terminate their contract with DFPS and discharge the two remaining Texas foster youth placed at the facility. The last Texas child was discharged, and the operation cancelled its contract with DFPS on April 20, 2022. Just

Another operation, Connections, was allowed to request a change to two Plan Tasks related to unannounced visits by the operation's administrator. The Task originally required the administrator to conduct unannounced evening and weekend visits to the operation once a week during different shifts to observe interactions between children and staff. The administrator was required to document the visit and to include specific information related to the administrator's observations during the visit.

The change allowed any of the operation's leadership, rather than just the administrator, to conduct the unannounced visits. Prior to the change, only the administrator could conduct the visits and complete the required documentation.

Freedom Place, a recently closed GRO that served trafficking victims, was placed on Heightened Monitoring on October 20, 2020. On January 12, 2022, less than two months after Heightened Monitoring was extended (and almost two months before DFPS removed all the children from the operation), the GRO was allowed to alter two Plan Tasks. The two revised Tasks reduced the frequency of unannounced visits and review of serious incident reports. The operation was allowed to alter the Plan Task requiring weekly unannounced visits by the administrator to instead require unannounced visits twice per month. The operation also weakened a Task related to reviewing incident reports so that the review was required once per week rather than daily. The monitoring team did not find any information documenting the justification for the changes.

Girls Haven GRO was also allowed to change Tasks included in its Heightened Monitoring Plan. The GRO's Heightened Monitoring Plan was completed on November 19, 2020. A Task requiring the administrator "or management designee" to conduct a daily review of all serious incident report documentation to ensure the report was timely and accurate was changed to allow the on-duty shift supervisor to review the reports and forward them for review and signature to any of the operation's leadership (Program or Clinical Director or administrator). A Task requiring the administrator to conduct a weekly walk-through of the operation to address physical site issues was first changed to allow the walk-through by the Program Director or administrator, then revised a second time to allow the Program Director or administrator to select two to three bedrooms per week for a walk-through. A Task requiring an audit of residents' medication logs was changed twice. First, the cadence was changed to require the audit once per week rather than twice per week and the plan increased the number of staff allowed to review the audit results. The Task was changed a second time to require the audit to be completed by the Program or Clinical Director instead of direct care staff or supervisors. The operation has continued to struggle with compliance; Heightened Monitoring has been extended twice. However, during her interview with the monitoring team, the administrator was very positive about the operation's experience on Heightened Monitoring and credited it with helping "turn things around" because "someone was looking at the facility weekly."

---

after the operation cancelled its contract, allegations of Physical Abuse were substantiated against a staff member who had been investigated six times for inappropriate restraints.

  
## Other Issues

The monitoring team noticed other issues during the in-depth review of the 19 operations and site visits. These concerns include:

- **Struggling CPAs allowed to add new homes.** At least two CPAs that were placed on Heightened Monitoring due to problems associated with foster home screenings and verifications were allowed to absorb new homes from closed CPAs or verify new homes before they were determined to have improved in these areas. Beacon of Hope, discussed above, increased the number of homes it was overseeing from 18 in March 2021 to 22 in March 2022. Twelve of these were new homes. Agape Manor, also discussed above, had 49 agency homes when Heightened Monitoring started, and 58 by its fourth quarter of Heightened Monitoring. Agape Manor's Heightened Monitoring was extended on November 19, 2021 after receiving 15 citations for minimum standards deficiencies between its two branches in the fourth quarter alone. In addition, DFPS notified Agape Manner on May 6, 2022 that it substantiated allegations of Physical Abuse by one of the foster parents Agape Manor verified; the disposition calls into question whether Agape Manor will progress to post-plan monitoring once its extension ends on May 19, 2022.

- **Operations Drop Census to Achieve Compliance.** In contrast, some congregate care operations dropped their census to achieve compliance. For example, Azleway Valley View (a GRO) dropped its census during Heightened Monitoring, maintaining an average census of eight children. Another GRO, New Life, stopped accepting placements to reduce its population. Girls Haven GRO had only eight children in their care on May 5, 2022, but had a census of 20 children when they started Heightened Monitoring. Gulf Winds had only six children in its care on April 5, 2022, the day of the monitoring team's visit; the GRO was caring for nine children just before being placed on Heightened Monitoring in November 2020.[189]

  Other operations reported becoming more selective about the children they accepted for placement. Two reported that they stopped taking difficult to place children and children who had been without placement to reduce compliance violations.

  Similarly, some operations (both CPAs and congregate care facilities) noted that the Heightened Monitoring requirement for placement approval has reduced the number of children in their care. One CPA noted that families left the operation after the CPA was placed on Heightened Monitoring; prior to Heightened Monitoring, their foster homes care for 120 children, but since being placed on Heightened Monitoring, they were only caring for 60 children. The administrator for a GRO complained that they were losing $800 per day every additional day that it took for a placement to be approved.

---

[189] DFPS temporarily suspended placements to Gulf Winds in February 2021 during its investigation of a TMC child fatality, which was discussed in the Second Report. *See* Deborah Fowler & Kevin Ryan, Second Report at 288, FN 599, ECF No. 1079.

Reducing population – whether it is done voluntarily or via the placement approval process – may be positive and necessary for certain CPAs and GROs to operate safely.

- **Technical Assistance for Minimum Standards Violations and Agency Home Sampling Concerns Not Considered for Purposes of Compliance.** The monitoring team's review also raised concerns, which will be explored more fully in future reports, regarding the use of Technical Assistance in lieu of citations during the final months of Heightened Monitoring. The Court's March 18, 2020 order does not allow an operation to move off of Heightened Monitoring until "at least six months successive unannounced visits indicate the operation is in compliance with the standards and contract requirements that led to heightened monitoring" and "the operation is not out of compliance on any medium-high or high weighted licensing standards."[190] The State excludes Technical Assistance given for violation of minimum standards.[191] For example, Hands of Healing GRO, was placed under Heightened Monitoring, in part, due to problems associated with serious incident reporting. The operation received Technical Assistance related to minimum standards violations associated with serious incident reports on January 25, 2022

[190] Order, ECF 837, at 3. The monitoring team also reviewed information for one GRO, Connections, that received a citation related to a Heightened Monitoring Task (medication administration) on September 30, 2021 but was released to post-plan monitoring on December 21, 2021. The operation was also noted to have failed to meet a Task requirement during a Heightened Monitoring weekly visit on November 30, 2021 (daily walk-through checklist, required due to a pattern of physical site problems, was incomplete) but a citation was not issued because "there were no safety hazards for children." This raises questions about the State's understanding of the language in the Court order. The State's Heightened Monitoring Process Overview simply restates the language from the Court order. HHSC & DFPS, Heightened Monitoring Process Overview at 6-7. After being placed on post-plan monitoring, on March 16, 2022, Connections received another citation related to medication administration during a post-plan Heightened Monitoring visit because a "child's medication administration record documented that on two days medication was not given as prescribed. One day the PM medication dose was missed. On the second day, the AM medication dose was missed." The documentation related to the citation indicated that the administrator had stopped implementing the daily medication audits – one of the Plan Tasks – but would resume use of the audits. On May 10, 2022, the operation again received a citation associated with medication administration because "[i]n reviewing the medication record, it was observed that a child was given the wrong medication on two prescriptions. A healthcare professional was not contacted regarding the incident and how to respond."

[191] The Monitors asked RCCR whether, for purposes of the Court's Heightened Monitoring orders, when determining whether an operation was eligible to move to post-plan Heightened Monitoring, the agency considered Technical Assistance for minimum standards violations, Sampling Concerns, or citations for violation of minimum standards if an operation was subsequently determined to have achieved compliance during follow-up. E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, re: Question regarding Heightened Monitoring (May 16, 2022) (on file with the Monitors). RCCR answered, "All citations, sampling concerns, and TA issued would be considered when determining whether an operation is eligible to move to post-plan monitoring, but sampling concerns and TA do not expressly prohibit an operation from moving to post-plan monitoring. That said, Technical Assistance is a tool we would typically utilize with an operation early on in the HM period as a support. It would be unlikely for HHSC to issue TA in lieu of a citation for a minimum standard deficiency following the full implementation of all HM tasks and/or within the 6 months' compliance period." E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Question regarding Heightened Monitoring (May 17, 2022) (on file with the Monitors).

148

(several incident reports reviewed by Heightened Monitoring staff were not signed by the administrator) and February 7, 2022 (three serious incident reports "were not completed accurately"). In both cases, the "Technical Assistance" merely recited the purpose of the minimum standard.[192]

The State also excludes sampling concerns noted during RCCR sampling visits to CPA foster homes. Because RCCR licenses CPAs, and CPAs verify foster homes, RCCR does not issue citations to a foster home; if the inspector finds minimum standards violations during a sampling visit, rather than cite the foster home, the inspector documents them as "sampling concerns."[193] If the inspector finds a pattern of sampling concerns, the inspector may cite the CPA for violations of minimum standards associated with the sampling concerns.[194]

Some of the sampling concerns for foster homes verified by CPAs included in the sample of operations reviewed were for violations of high or medium-high-weighted minimum standards, or violations related to a Plan Task. For example, The Burke Foundation CPA was placed under Heightened Monitoring, in part, due to a pattern of violations of minimum standards with home studies for prospective foster homes. The fourth Task in the operation's Heightened Monitoring Plan required the administrator of the CPA to "develop a plan to ensure that all foster home screenings are compliant with minimum standards." Yet, on June 18,2021, approximately eight months after the CPA was placed under Heightened Monitoring, a visit to one of the foster homes verified by the agency resulted in a sampling concern because "Information on [a] prospective family's domestic violence history was not included in home screening documentation from [the] Agency." The same visit resulted in seven other sampling concerns, six of which were associated with violation of minimum standards related to foster home screening or verification, including a concern associated with a high-weighted minimum standard requiring CPAs to obtain law enforcement service call information associated with prospective foster homes. The inspector "found documentation from law enforcement was not included in the home screening documentation provided [by the] Agency." Another of the six sampling concerns found that the home screening for the foster home visited was completed on the same day that the home was verified by the CPA. The CPA was not issued any citations associated with these sampling concerns.

The Monitors will continue to review these issues, conduct a more exhaustive review of sampling concerns, and update the Court on findings in a future report.

---

[192] However, during an interview with the monitoring team, the administrator of Hands of Healing specifically noted how helpful the Technical Assistance around serious incident reporting was, and said she continued to follow the changes put into place for serious incident reporting as a result of Heightened Monitoring after the operation moved to post-plan monitoring. The operation has not received any citations since moving to post-plan monitoring.

[193] *See* RCCR, Child Care Regulation Handbook § 4435 et seq., *available at* https://www.hhs.texas.gov/handbooks/child-care-regulation-handbook/4400-additional-regulatory-activities-certain-types-operations

[194] *Id.*

## Remedial Order 20 Summary

Of the 485 operations that were assessed in 2020 or 2021, only 127 (26%) qualified for Heightened Monitoring. Twenty-nine of those operations closed before Heightened Monitoring began. Another 22 of the remaining 98 operations closed after starting Heightened Monitoring, leaving 76 operations on Heightened Monitoring as of March 1, 2022. As of May 13, 2022, 22 Heightened Monitoring operations had satisfied the conditions of their Plan and moved into post-plan monitoring.

The most frequently identified problem areas for operations placed under Heightened Monitoring were medication management, physical site conditions, supervision problems, and violations associated with discipline of children. Most operations had from four to seven problem areas identified in the Heightened Monitoring Plan. Nearly two-thirds of Heightened Monitoring operations were assigned a Heightened Monitoring Plan Task (Task) related to appropriate supervision of children.

The number of citations RCCR issued to operations placed under Heightened Monitoring increased after the operations started Heightened Monitoring. DFPS also opened and substantiated a higher number of abuse, neglect, and exploitation investigations. However, citations, investigations, and substantiations increased for all operations between 2019 and 2021, and the increase was far more significant for operations that were not placed under Heightened Monitoring than for operations placed under Heightened Monitoring.

The monitoring team's review of data related to placement requests for operations under Heightened Monitoring, and in-depth review of data and documents for 19 Heightened Monitoring operations revealed that DFPS almost always approved placement requests made for operations under Heightened Monitoring; however, only 38% of placement request approvals documented all the elements required by the Court's orders.

The monitoring team's data analysis for Heightened Monitoring operations, site visits to 13 Heightened Monitoring operations, and in-depth analysis of documents, data, and information for 19 Heightened Monitoring operations revealed the following emerging issues or patterns:

- Inefficiencies and safety concerns associated with duplicative and overlapping enforcement actions. Ten Heightened Monitoring operations agreed to a voluntary Plan of Action, and RCCR placed seven on Probation, after Heightened Monitoring started. Others were placed on a Corrective Action Plan by DFPS as the result of a contract violation.

- A lack of meaningful guidance or Technical Assistance from the State.  During interviews with the monitoring team, some administrators reported receiving helpful Technical Assistance related to Heightened Monitoring Tasks. However, others reported receiving little or no helpful assistance or guidance, particularly

when they were drafting responses required by Plan Tasks. The monitoring team identified Technical Assistance included in some Heightened Monitoring Plans that provided little meaningful guidance. Over the course of the Monitors' work, the monitoring team has repeatedly observed that "Technical Assistance" given by RCCR in lieu of, or in addition to a citation, simply restated the minimum standard that was violated.

- Some operations were allowed to refuse Tasks identified by the State in Heightened Monitoring Plans, and others changed Tasks after the Plan started to make it easier to comply.

The Monitors also discovered that Technical Assistance for minimum standards violations and agency home sampling concerns are not considered by the State for purposes of determining Compliance with Heightened Monitoring Plans.

## Remedial Order 21: Revocation of Licenses

**Remedial Order 21:** *Effective immediately, RCCL and/or its successor entity shall have the right to directly suspend or revoke the license of a placement in order to protect the children in the PMC class.*

### Background

Since the Monitors' last update to the Court regarding agency home closures and license revocations or denials for operations, RCCR recommended 12 agency homes for closure, and revoked or denied licenses for three operations due to a history of compliance problems. DFPS placed 34 foster homes on its list of disallowed placements in 2021; of those, nine were recommended for closure by RCCR.

## Agency Home Closures

Approved RCCR Closure Recommendations

### Home A
### Closed per RCCR Recommendation December 28, 2021

Foster home A was originally verified on August 24, 2017, by Children's Hope Residential Services Inc. CPA (Children's Hope), but involuntarily closed due to deficiencies by the CPA on July 16, 2021. The home was subsequently verified by Beacon of Hope CPA on August 2, 2021. Beacon of Hope is currently under Heightened Monitoring due to a history of safety violations.[195]

---

[195] The CPA was placed under Heightened Monitoring on August 26, 2020. The Heightened Monitoring Plan notes, "Overall this operation has not maintained consistent compliance in areas of foster home screenings and verifications, management of foster homes, and overall administrative responsibilities for both child placing management staff and licensed administrators. There are identified patterns of concern

During the almost four-year period that the home was licensed through Children's Hope, the foster home was the subject of five investigations, resulting in eight citations for minimum standards violations. Four of those investigations were opened in 2021; two of those four were opened in June of 2021, just prior to Children's Hope relinquishing the home.

All seven of the investigations are related to one or more of the same children in a sibling group of six foster children. The sibling group was first placed in the home in September of 2017, just after the foster home was verified by Children's Hope. The children remained in this foster parent's care, even after the foster parent was involuntarily relinquished by Children's Hope; the children's IMPACT records show a placement change corresponding with the date that Children's Hope relinquished the home, but that shows that DFPS simply recategorized the same foster parent as "fictive kin" after Children's Hope relinquished the home.

The first investigation was opened in 2018, when school staff reported to SWI that the child appeared to have an infected earlobe, and that the child said a friend of the foster parent's pierced her ears. At that time, four of the six siblings were living in the home. The foster parent acknowledged she had pierced the child's earlobes at home using a sewing needle; she said that when the school nurse told her about the redness and swelling of the child's earlobe, she took the child to the doctor. The doctor prescribed an antibiotic, which the foster parent reported having given the child for three days. The investigator discovered that the antibiotic should have been given for a week, and that the foster parent failed to log the medication for the child. Citations were issued for failure to appropriately log and give the prescribed medication, and for violation of the minimum standards associated caregiver responsibility based on the foster parent's decision to pierce the child's ears herself.

All six of the other investigations occurred in 2021. Four intakes were reported to SWI before the foster home was relinquished by Children's Hope:

- On January 8, 2021, a therapist reported to SWI that one of the children made an outcry that the foster parent slapped her on the leg and pulled her hair. The child said two of her siblings had also been hit, but they had not made an outcry to the therapist. The allegations were investigated as a Priority 2 minimum standards violation by RCCR. The allegations were not substantiated, and no citations were issued.

- On April 9, 2021, school staff reported to SWI that one of the children (the same child who alleged the foster parent slapped her leg and pulled her hair) said the foster parent was threatening to take her to a psychologist (which in the past resulted in hospitalization). The child also said the foster parent hit her sibling in

related to record keeping, required training, admissions, and service planning. Additionally, foster parents appear to lack knowledge and training in areas of supervision and acceptable discipline methods and practices." DFPS and RCCR, Heightened Monitoring Plan, Beacon of Hope (November 2, 2020).

the head with a hanger because the sibling hit another sibling. The school staff expressed concern that the child, who was taken to the psychologist by the foster parent the day the report was made, would be "hospitalized for no reason." The allegations were investigated as Priority 3 minimum standards violations by RCCR; the allegations were not substantiated. A citation was issued for violation of the minimum standards requiring the CPA to ensure a placement is appropriate because "there is concern [that the children's behavior] is too much" for the foster parent. The citation was overturned after an administrative review.

- On June 11, 2021, an RCCR inspector reported to SWI that a Heightened Monitoring visit to the home revealed concerns regarding the home's cleanliness. The RCCR inspector also stated that the oldest child pushed the foster parent onto the floor after the foster parent tried to redirect her, injuring the foster parent's hand, and bruising her knees, but that the foster parent did not report the incident. RCCR investigated the allegations as Priority 2 minimum standards violations and issued four citations due to concerns with supervision in the home. RCCR found "[t]here were…concerns with foster mom not being adequate to care for all the children. After interviewing [foster parent], it was determined that she is overwhelmed with the number of children in the home…When speaking to staff at Children's Hope, they agreed that there are too many children for [foster parent] to tend to. [The CPA] tried to speak to [foster parent] about removing some children but [foster parent] would always refuse. There are concerns for the youngest siblings being injured if [the oldest sibling] gets upset again. There was [sic] also concerns for the physical environment of the home. When the walk through was conducted…the home was found to be unkept…it was also observed that there was prescription medication in the refrigerator that was not in a locked container."

- On June 22, 2021, a CPS caseworker reported to SWI that one of the children made an outcry that his foster parent hit his hand and wrist with a broom causing pain. The foster parent indicated that "the siblings have all been fighting with one another and use hangers to hit each other." The allegations were investigated by DFPS for Physical Abuse and Neglectful Supervision, which DFPS Ruled Out, but RCCR issued a citation for the foster parent's violation of the children's service plans. The children and foster parent acknowledged that the children were allowed to play upstairs when the foster parent was downstairs. All the children's service plans indicated that the children should not be allowed to play together without adult supervision; four of the children's service plans indicated that they were at risk of sexually acting out.

The remaining two intakes were reported to SWI after the foster home was verified by Beacon of Hope:

- On August 7, 2021, a report to SWI alleged that the oldest child "went into a rage" when the foster parent disciplined her by taking her cell phone away. The child attacked her siblings, hitting them with her fists on their arms and backs, and then

with a clothes hanger. DFPS Ruled Out Neglectful Supervision. Five days after the report was made to SWI, CPS made the decision to move the children from the home.

- On August 20, 2021, a DFPS staff person reported to SWI that the foster parent was not administering four of the children's medications as prescribed. The medications included psychotropic medication. The intake said, "Medications were being given at incorrect times and incorrect dosages. Some medication[s] were not being given at all. Excess medication was found in the pill bottles indicating it had not been dispensed as directed. All 4 children have special needs and were required to take several crucial prescription medications daily." At the time of intake, the children had been removed from the home and were without placement. DFPS Ruled Out Medical Neglect, because the children either denied that the foster parent failed to give them medications, or said that if she did, they did not feel "strange or ill" or have behavioral issues. However, the investigator did note "several concerns with the medication logs" because the foster parent "created her own medication log with some dates being forged…Some medication was filled but not documented in the medication logs." RCCR issued a citation for violation of the minimum standard that requires medication to be given as prescribed, but the citation was overturned after an administrative review.

The narrative associated with the administrative review notes that the CPA said the home was closed "due to the children's behavior and recent deficiencies" but did not believe the deficiency was warranted "due to the children not being placed in the home by their agency…when the home was licensed…the children [had] been in the…home for 5 years with the previous CPA and the previous CPA wanted to put in a 30-day notice to have the children removed from the home due to their behavior and deficiencies the home was receiving for noncompliance." However, according to Beacon of Hope, "the caregiver did not want to have the children removed and began the transfer process to their agency…CPS did not remove the children from the home but instead kept the children in the home as a kinship placement." Beacon of Hope "felt that CPS dropped the ball by allowing the children to be in the home."

An RCCR inspector recommended closure of foster home A on September 29, 2021, based on the history of investigations and citations issued. In addition, RCCR noted a concern expressed during a February 25, 2019, sampling inspection that revealed medication records were not regularly updated. The RCCR inspector wrote, "Contact was made with [Beacon of Hope] regarding plans for this home and [they] reported [they are] going to see what the investigation reveals before [they] make a decision. This is concerning based on what the operation already knows about the home and…current situation."

The closure recommendation also noted that the branch of Beacon of Hope that verified this foster home had twice completed a Plan of Action, was under Evaluation from August

154

1, 2019, until February 1, 2020, and (at the time) was pending an administrative review of a decision to place the CPA on Probation.[196]

RCCR approved the closure recommendation on October 27, 2021 and issued a letter to Beacon of Hope recommending closure on December 9, 2021. CLASS records show the foster home was relinquished by Beacon of Hope due to the RCCR closure recommendation on December 28, 2021.

### Home B
### Involuntarily Closed with Deficiencies by CPA April 14, 2021

Foster home B was verified by Azleway Children's Services (Azleway) on July 25, 2018. Azleway is currently under Heightened Monitoring.[197] DFPS placed Azleway on a placement hold in April 2022.

After being verified, the foster home was the subject of four investigations:

- On March 21, 2019, school staff reported to SWI allegations that a five-year-old foster child placed in the home, "seems very sad a lot and often makes comments about how [his foster mother] tells him he is bad." RCCR opened a Priority 3 minimum standards investigation. The reporter said the child told her that he was not allowed to eat his own birthday cake and was told he did not receive any presents because "he was bad." A citation was issued for violation of the minimum standards associated with prohibited discipline, based on RCCR's finding that "[a] child in care is told that they are bad and is yelled at by their foster parent." A corrective action plan was conducted to review the standard with the foster parents and review the CPA's behavior management policy. The foster parents were required to complete a refresher course in trauma-informed care techniques.

- On September 9, 2020, a CPS caseworker reported to SWI that two of the three siblings (a six-year-old and five-year-old) said that the foster parents spanked them with a belt. RCCR opened a Priority 2 minimum standards investigation. Though both children were interviewed and said the foster parents used a belt for spankings, they each reported the other child was spanked with a belt, but they were not. The reports were not substantiated, and no citations were issued.

---

[196] The decision to place the operation on Probation was upheld and the operation was placed on Probation on February 8, 2022.

[197] This operation was placed under Heightened Monitoring on October 19, 2020. The HM Plan identified patterns in Physical Abuse, Neglectful Supervision, health and safety issues, issues with physical environment, problems with the CPA's supervisory visits and RTB findings. The HM Plan states, "Overall this operation has struggled with oversight of their foster home and ensuring compliance through supervisory visits. There appears to be a lack of appropriate supervision, appropriate discipline, and use of prohibited punishment in some foster homes. This operation has multiple Reason to Believe findings for NSUP and PHAB." DFPS and RCCR, Heightened Monitoring Plan, Azleway Children's Services Tyler (November 17, 2020). Heightened Monitoring was extended on January 18, 2022, because of "concern that the operation continues to receive deficiencies in trend/pattern areas that led the operation to being placed on HM."

- On December 22, 2020, just three months later, DFPS reported to SWI, that a different five-year-old child reported that the foster parents spanked him with a belt. The child also reported having television and toys removed for discipline. DFPS opened a Priority 2 investigation for Physical Abuse. The investigation Ruled Out Physical Abuse, but RCCR issued a citation for violation of minimum standards associated with corporal punishment after RCCR found "[i]t was determined a child in care was physically disciplined; spanked with a belt."

- On March 19, 2021, a report to SWI alleged that the foster parents failed to provide a child's prescribed medication to respite caregivers. DFPS opened a Priority 2 investigation for Medical Neglect. The investigation Ruled Out Medical Neglect, but RCCR issued a citation for violation of the minimum standards requiring a foster parent to provide prescription medication to the person to whom a child is discharged or transferred.

This home was placed on DFPS' list of disallowed homes on February 4, 2021.

An RCCR inspector recommended closure of the home on April 12, 2021. The inspector noted, "The CPA did a complete review of the home's history for one of their [sic] Heightened Monitoring Tasks. In reviewing the home screening, there are many components missing and contradictions regarding the date of marriage between [the foster parents] and the date they moved from Kansas to Texas. It appears the CPA failed to complete out of state central registry checks for both foster parents prior to verifying the home in 2018."

The recommendation for closure was approved by RCCR on April 14, 2021; the CPA relinquished the home, indicating it involuntarily closed the home with deficiencies on the same date.

Homes Closed by CPA Prior to Final RCCR Decision

**Home C**
**Home Listed as Inactive December 6, 2021**

Foster home C was first verified by Lonestar Social Services LLC (Lonestar) on March 22, 2018. Lonestar relinquished the home on March 13, 2019, due to "[n]oncompliances." The home was subsequently verified by Family Link Treatment Services (Family Link) on June 7, 2019. Family Link is currently under Heightened Monitoring.[198]

---

[198] Family Link was placed on Heightened Monitoring on November 9, 2020. The HM Plan for Family Link noted that the operation completed a Plan of Action in 2016 and an Evaluation in 2019, and states, "Over the last five years there have been multiple physical site citations in the areas of improper inspections of the home, smoke detectors, and homes not being cleaned. There are concerns related to foster home screenings and serious incident reporting. Caregiver responsibilities as related to prudent judgment, infant care, and medication are other areas of concern." Heightened Monitoring was extended on December 21, 2021. Family Link was notified of HHSC's intent to place the operation on Probation on January 7, 2022. The decision is pending administrative review.

Since being verified, the home has been the subject of seven investigations for abuse, neglect, or exploitation or minimum standards violations. As a result of the investigations, RCCR issued two citations for minimum standards violations, and DFPS substantiated allegations of Neglectful Supervision. However, DFPS reversed the RTB finding after the DFPS Complex Investigations Division reviewed the investigation.

Four investigations were opened after foster home C was licensed by Lonestar:

- On October 12, 2018, a school counselor reported to SWI that a five-year-old foster child, who had cerebral palsy and used a wheelchair, was often dirty and smelled like he had not showered. The counselor also shared concerns that the child was not receiving enough food. Though SWI suggested the allegation be investigated by DFPS as Priority 2 for Neglectful Supervision, the allegation was downgraded to a Priority 3 minimum standards investigation. RCCR did not substantiate the allegations; no citations were issued.

- On January 29, 2019, a teacher reported to SWI on January 29, 2019, that the child arrived at school with bruises that looked like hold marks or grab marks on her arms. When asked about the bruises, the foster parent said the child mentioned she was bitten by another child at school. When the teacher asked the child about the bruises, the child said a sibling pushed her. DFPS opened a Priority 2 investigation for Physical Abuse. During an interview with the child, the child again said the bruises were caused by another child biting her at school. The other children living in the home were non-verbal and could not be interviewed. The foster parents could not explain the bruising; the foster mother speculated that the child may have bitten herself, though she admitted she had never seen the child bite herself. The foster father later texted the child's caseworker and said the child disclosed that she had bitten herself, causing the bruises. While the investigation was pending, on February 7, 2019, the caseworker for the child reported to the investigator that the child was bitten by the family dog and treated for the bite.

Though a forensic assessment determined that the bruises were concerning for possible maltreatment or abuse, the allegations of Physical Abuse were Ruled Out. RCCR issued two citations for violation of minimum standards: one for violation of a standard related to supervision because the foster parent was unaware of what caused the bruising to the child's arm; and a second because the foster parents were caring for a Primary Medical Needs (PMN) child, and it was not clear that the CPA had assessed the home to ensure the foster parents were qualified for that type of service.

- On February 15, 2019, a child's caseworker reported to SWI on February 15, 2019, that three of the child's foster siblings were removed from the home "because they were coming up with frequent unexplained injuries," and that one of the children (who was the victim in the case involving the unexplained bruising to her arm) was bitten in the face by the foster parent's dog, "Tom." The child had three stitches in her face to close the wound. The reporter alleged the dog had previously bitten

157

another foster child, and that the foster parents lied about removing the dog after that incident. The reporter said the child who remained in the home (the same child victim in the first investigation, above), who is a PMN child and uses a wheelchair, "pretty much just lays on the floor," that the foster father once yanked the child up from the floor by his arm, and that the foster parents "seem to ignore him as the other kids are running around all over the place." Another intake, made the same day, was merged with this case, and alleged the PMN child made an outcry of Physical Abuse. DFPS opened a Priority 2 investigation for Physical Abuse and Neglectful Supervision. None of the allegations were substantiated; Physical Abuse and Neglectful Supervision were Ruled Out. The disposition indicated that the allegations related to the dog bite were investigated in the previous case (discussed above); however, while the bite was reported to the investigator in that case, nothing in the records associated with it show that any facts surrounding the dog bite were explored or investigated.[199]

During her interview for this investigation, the foster mother reported that the home was no longer with Lonestar because the agency "dropped her." She said that since the home was now fostering through Family Link, they planned to keep the dog that bit the child (which the child and others reported was named "Donnie," not "Tom"), but that the dog would be "an outside dog only."

Three investigations were opened after foster home C moved to Family Link:

- On November 1, 2020, a hospital nurse reported to SWI that a five-year-old child, previously in the foster parents' care, was brought to the ER because he had blisters on the tip of his penis. The hospital nurse reported that the child had been moved to another home approximately two weeks earlier. DFPS opened a Priority 2 investigation for Sexual Abuse. All the tests for STDs were negative, but the investigation findings do not explain the cause of the blisters. This child did not make an outcry during his interview, and Sexual Abuse was Ruled Out.

- On November 1, 2020, the foster mother reported to SWI on November 1, 2020, that the day before, the foster parent's adult daughter brought her dog, Donnie, to the home. The foster mother noted that Donnie had a history of having bitten another child two years earlier. In this intake, the foster mother reported that the dog bit a six-year-old foster child in the face. DFPS opened a Priority 2 investigation for Neglectful Supervision. The child's injuries required nine stitches in her face to close the wound.

---

[199] On February 7, 2019, a report was made to SWI regarding the dog bite. RCCR opened a Priority 3 minimum standards investigation. The investigation was administratively closed after the child and others were interviewed, with the note indicating that the allegations were addressed in the investigation of the bruise on the child's arm, discussed above.

This investigation was closed March 31, 2021.[200] The investigation resulted in an RTB finding for Neglectful Supervision and two citations for minimum standards violations related to supervision and children's rights. The findings included that the foster parents "by their own admission knew that the dog (Donnie) had bitten another child in Foster Care before but failed to keep the dog (Donnie) away from [the child in this case] which resulted in her getting bit on the face."

However, notes in the CLASS records state that the decision was "overturned prior to a SOAH after review by the Child Care Investigations Complex Investigation Division." There are no notes in CLASS or IMPACT that the Monitors could find related to this decision, however, the notes discussing the decision to reverse the citations, dated March 31, 2021, state:

It was noted that the RTB finding has been overturned on review. [The attorney representing the CPA] explained that the dog who bit the child, causing injury that required stitches, was not owned by the foster parents. The foster parents have an adult adopted daughter who brought her therapy dog over to the home for a birthday party. The dog became anxious when the adult daughter went outside the home and the dog was left inside the home. When the child who was injured came inside, she went to hug the dog, at which time the dog bit the child. [The attorney] noted that the foster parents had instructed the child not to touch the dog previously. Since this time, the foster parents have informed their daughter that she cannot bring her dog to the home. Documentation in the investigation noted that the dog came inside the home quickly when [the foster father] stepped briefly into another room. [The foster father] was able to quickly respond after the bite happened. The investigation documentation stated that this same dog had bitten a child two years prior, causing injuries requiring stitches. There is not documentation that this dog bite incident was ever investigated by DFPS or RCCR, so it is unclear if the child actually had stitches, the extent of the injury, or the circumstances of how this happened. The DFPS intake referencing the dog bite, states the foster parent's dog (Tom) bit a child so it appears that this might have been a different dog and not the dog involved in this investigation. When the previous dog bite happened, the foster home was licensed with a different agency. When the victim child was interviewed, they disclosed the home had a rule that you cannot hug the dog. Due to this information, both citations will be Overturned.

DFPS placed the home on its disallowance list on March 19, 2021.

RCCR made the recommendation to close the home on May 19, 2021. In making the recommendation to close the home, the RCCR inspector noted, "The concern is for the poor judgment the foster parents showed when allowing a dog into the home that had previously bitten another child in care. The home sustained an RTB due to this. Due to the lack of judgment and the severity of the injuries sustained, a home closure is recommended." However, the form used for the recommendation shows an approval date

---

[200] There was more than a two-month gap between an interim staffing held on November 5, 2020, and the next documentation in the CLASS chronology entered on February 27, 2021, by a special investigator assigned to the case.

of June 2, 2021, "pending due process for A/N." Because DFPS overturned the RTB, it appears that RCCR did not communicate the recommendation for closure to the CPA.

Meanwhile, a sampling inspection of the foster home, conducted on July 22, 2021, noted the following concerns:

- The foster home was verified by the agency prior to approval of the home screening.
- During the sampling inspection, it was reported that foster parent's adopted daughter and her five-month-old daughter had been residing in the residence for a few weeks. The foster parents disclosed that they had not told their foster care agency that she had moved in with them.
- The foster mother had failed to document new prescriptions for a child in the child's medication log.
- The foster family's dog was kept in the garage and was not cleaned after. During the walk through of the foster home, it was noted that there was a dog crate in the garage. The garage had urine stains and feces. There was a strong odor of urine and feces from the garage. It was also noted that in the back yard there are broken plastic pieces, broken toys, and a plastic bag.
- The foster family has a pet in the home and did not have pet vaccinations available.

In addition, DFPS staff reported to SWI another intake related to the home on July 28, 2021, by alleging that the foster parents' adult daughter (who was living in the home) was not abiding by a CPS-required safety plan related to visitation between her five-month-old child and the child's father. The safety plan required visitation to occur in public and supervised due to domestic violence, and the intake alleged the adult daughter was not abiding by the safety plan, putting the foster child living in the home at risk. The allegations related to the safety plan were not substantiated, and no citations were issued.

During the investigation, the investigator noted there was only one foster child in the home, whom the foster parents were in the process of adopting. When asked about the dog found living in the garage during the sampling inspection, the foster father said, "they removed the dog as of about a week ago" and the investigator noted that there was no dog in the garage. When the caseworker for the foster child was interviewed, she noted that the home "cannot have any other children in care placed in the home due to concerns" and said the foster child was court-ordered to the placement. The caseworker also noted that "she gets call[ed] either from [state office] or [Heightened Monitoring] every 2 weeks about this home b/c of concerns."

While the home is still listed in the CPA's agency home list, the CPA listed it as inactive on December 6, 2021.

160

**Home D**
**Closed by CPA (Reason for Closure not Listed) November 19, 2021**

Foster home D was verified as a foster home through Pathways Youth and Family Services Inc., (Pathways), on January 11, 2019. Between the time that it was verified and its closure, the home was the subject of six investigations for abuse, neglect, or exploitation or minimum standards violations.

Two of the investigations are related to medical care for children. These investigations include:

- On June 19, 2019, a child's caseworker reported to SWI that the foster parents and CPA failed to report a change in psychotropic medications for a six-year-old child. The child was prescribed ADHD medication, but after being placed with the foster parents, she was prescribed Abilify, a mood stabilizing medication, though she had not been diagnosed with a mood disorder. The CPA and foster parents failed to notify CPS or request medical consent prior to giving the child the medication. After the child's CASA notified CPS, DFPS held a medication evaluation meeting, and the child was taken off Abilify. RCCR opened a Priority 3 investigation for minimum standards violations. A citation was not issued, but RCCR provided Technical Assistance regarding the minimum standard associated with obtaining written, signed consent prior to administering new psychotropic medications.

- On August 18, 2020, two hospital staff independently made reports to SWI, which were merged. The reports alleged that a one-year-old child who had a traumatic brain injury that caused both a seizure disorder and Spastic Cerebral Palsy required hospitalization, but the foster parent would not cooperate. Eventually, the child was admitted to the hospital, but the intake alleged the foster parent did not keep previously scheduled medical appointments. DFPS opened a Priority 2 investigation for Medical Neglect. The allegations were not substantiated, and a "Ruled Out" disposition was entered on September 24, 2020, though RCCR issued a citation for violation of the minimum standards associated with medical care based on the finding that the child "was not taken to scheduled appointments on more than one occasion."

The Monitors reviewed the investigation for the Second Report to the Court and indicated disagreement with the decision. [201] DFPS reopened the investigation, and on June 15, 2021, notified the CPA that the allegations were substantiated against the foster mother, based on findings that she failed to keep or schedule medical appointments related to ongoing care for the child's seizure disorder. The foster mother also missed multiple appointments with the child's neurologist and ophthalmologist and did not take the child to occupational therapy. The foster mother requested administrative review, which still appears to be pending.

---

[201] *See* Deborah Fowler & Kevin Ryan, Second Report, Appendix 3.2 MIC Reviews, p. 64, ECF 1081-1 (May 4, 2021).

DFPS removed the baby from the home on May 6, 2021, and s/he was adopted by a different family.

Between the time this second investigation was reopened, and the substantiation of Medical Neglect allegations, SWI received two more intakes for the home:

- On March 30, 2021, a caseworker employed by another CPA reported to SWI that after three children were moved to another foster home, two of the children reported they were disciplined by being locked outside of the house when they lived in the home. DFPS opened a Priority 3 investigation for minimum standards violations. The allegations were not substantiated; no citations were issued.

- On May 8, 2021, a CASA worker reported to SWI that the foster parents neglected two other children placed in the home. The CASA worker alleged that the children did not receive sufficient or nutritious food, and that the foster home ignored the children's dental and "general hygiene." She alleged that the older child had a foot fungus due to wearing unclean socks, and the younger child was not provided with clean underwear. She also said that the foster parents "did not communicate with mandated therapists and refused to facilitate required treatment…failed to appear or appeared very late with the boys on several occasions for mandated parental visits" and were sent to respite care at least three times during their two-month stay in the home. Though the CASA reported that the children were moved to another home, an infant remained in the foster home. The CASA worker expressed concern "about the safety and well-being of [the infant] and any other children that might be placed" in the home. DFPS opened a Priority 2 investigation for Physical Neglect and Neglectful Supervision; neither allegation was substantiated, but a citation was issued due to the foster parent's failure to seek medical attention for the child's foot fungus.

DFPS placed the home on the disallowed list on June 4, 2021.

RCCR recommended closure based on the substantiated Medical Neglect allegation in the case that was reopened. However, the CPA closed the home on November 19, 2021, before a final decision was made on RCCR's recommendation.

### Home E
### Voluntarily Closed with Deficiencies October 25, 2021

Alliance Adolescent and Children Services originally verified foster home E on May 25, 2006. Less than a year later, DFPS opened an investigation for Physical Abuse when a family member of a child placed in the home complained that the child was burned with a cigarette. The child was no longer living in the home. Because the child was non-verbal, and the foster parent denied the allegations (though she acknowledged being a smoker), the Physical Abuse allegation was Ruled Out. However, the investigator noted that the child had a "small circle mark on his right arm…the size of [a] cigarette burn."

162

The foster parent changed CPAs, and was verified by South Bay Bright Future, Inc., (South Bay), from August 19, 2008, until its closure on October 23, 2021. South Bay is currently under Heightened Monitoring.[202] While the home was licensed by the two agencies, the foster parent cared for children who had significant intellectual or developmental delays, some of whom were non-verbal. While operating under South Bay's verification, the home was the subject of 18 abuse, neglect, or exploitation investigations or investigations of minimum standards violations. Though allegations of abuse, neglect, or exploitation were never substantiated, the CPA was cited for ten minimum standards deficiencies associated with this home. Investigated allegations included:

- Four investigations of allegations related to child-on-child sexual contact. Two were investigated by DFPS for Neglectful Supervision, and two were investigated by RCCR for minimum standards violations. The first two involved the same children; reports to SWI were made two months apart. The other two investigations involved different children. Two of these investigations resulted in a citation for failing to timely report the child-on-child contact to SWI.

Allegations of Neglectful Supervision were Ruled Out by DFPS in the two abuse, neglect, or exploitation investigations. However, one of the investigations resulted in a citation for violation of minimum standards associated with appropriate supervision, when it was determined that two siblings were left alone unsupervised multiple times despite notes in the service plan for the oldest of the siblings indicating he had a history of sexualized behaviors and needed to be always supervised and "continually monitor[ed]" at night. Service plans for the other two siblings noted that they may have been sexually abused by the older sibling and specifically instructed that they should not be left alone together without supervision. When she was interviewed, the foster parent was not able to describe the children's supervision requirements.

---

[202] The State placed the operation under Heightened Monitoring on November 2, 2020, due to a pattern of problems with background checks, foster home management, discipline and punishment, and general supervision and responsibility. The HM Plan stated that the operation "had difficulty maintaining compliance with requirements related [to] management and oversight of foster homes. Foster parents appear to lack knowledge and training in areas of supervision and acceptable discipline methods and practices." DFPS and RCCR, Heightened Monitoring Plan, South Bay Bright Future Inc. (November 3, 2020). Heightened Monitoring was extended in March 2022. According to notes in CLASS, though the CPA "has been making significant progress towards completion of their plan tasks," on January 5, 2021, "a foster home visit was made where it was determined that there were concerns for foster parent integrity. The children were moved from the home at the request of the family, and the agency took appropriate action by closing the home." Notes in CLASS also indicated concerns related to service planning: "On 2/2/2022 there were concerns for child service plans not containing the required information with limited attempts to obtain this information from caseworkers. Technical Assistance was provided and recommended contacting the caseworker several times to attempt to obtain needed information and reaching up the chain of command for assistance as needed. However, again on 2/28/2022, the inspector encountered the same concern of a child service plan not containing the required information. Additionally, this is the 5th concern related to child service plans that has arisen in the past 6 months."

- Five allegations involving unexplained injuries to children, and four involving inappropriate or harsh discipline. None resulted in substantiated findings of Physical Abuse or Neglectful Supervision. Injuries consisted of unexplained bruises or scratches. Two involved the same child; in the first of these two, staff at the child's school reported to SWI that he had a scratch mark and bruise (described by his school counselor as a "thin and linear" mark on his face). The child first said that the foster parent slapped him but then recanted. Six months later, during a home visit, the child reported that his foster mother hit him "up the side of his head" with a wooden spoon, and his mother reported the allegation to SWI. Both investigations Ruled Out Physical Abuse.

Two months later, another child placed in the home, who was nonverbal, was observed to have a bump on her temple "the size of a 50 cent [coin]" and a bruise under her left eye that "angle[d] out and downward, approximately 1 inch in length and ½ inch in width." The child was not able to answer questions about the cause of the injuries. The foster parent and other collateral adults noted that she did fall easily because of her difficulty walking. The foster parent acknowledged leaving the child sitting on the edge of a bed while she left the room; when she returned, she said the child was on the floor. This represented a violation of the supervision requirements outlined in the child's service plan, which required the foster parent to always maintain visual supervision, and RCCR issued a citation.

Nine months later, another child had unexplained bumps and bruises on his head. During that investigation, one of the foster children interviewed said the foster parent hit her and her sibling (who was the child with the injuries) on the head with a spatula. Three years later, another foster child living in the home was observed to have a bruise in the middle of his forehead, however, he was unable to answer questions and his sibling said that the bruise was accidental and not caused by the foster parent.

Another child reported the foster parent pulled his ear and scratched him. Most recently, an investigation was opened after a foster child alleged the foster parent hit him with a cord. During his interview, he also said the foster parent disciplined him by spanking him with a belt. Another child living in the home also reported that the foster parent disciplined them by spanking them with a belt. This investigation resulted in a citation for violation of the minimum standards associated with corporal punishment.

- Three investigations included allegations that the foster parent used abusive or profane language with children or belittled them. The first resulted in a citation for violation of the minimum standards associated with prohibited discipline after several children reported that the foster parent used profane language and called them names. Almost three years later, a report to SWI concerning unexplained injuries to a four-year-old child also indicated that the foster mother was overheard calling the children "dumb-ass kids" and making negative comments about them. The reporter worked at a store where the foster mother shopped with the children. The reporter also said that when she was asked about a child previously in her care, she said that she "sent his little retarded ass back." One of the children interviewed

confirmed that the foster parent used profanity, but no citations were given. A little more than a year later, a community service provider reported to SWI that the foster parent was "very blasé" about a six-year-old child running away from the camp; when the child was returned but would not get into the car with the foster parent, the reporter said that the foster mother encouraged the child to "Go ahead and run away."

In addition to the allegations above, an investigation resulted in a citation for violation of minimum standards associated with caregiver responsibilities when the foster mother left the hospital while a child was having an MRI and could not be located for more than an hour after the procedure was completed. Several problems were also noted, and technical assistance given during a February 25, 2020, sampling inspection of the home, including problems with storage of medication and medication logs. The inspection also determined that the foster parent had been smoking in the home and car around the children, an issue that had been reported multiple times during the 18 investigations of the home, but that the foster parent always denied. Similar issues were noted, and technical assistance given during a prior sampling inspection of the home.

In the recommendation for closure dated September 29, 2021, the RCCR inspector who made the recommendation indicated that inappropriate discipline and inadequate supervision were specific areas of concern. In the closure recommendation summary, the inspector noted:

1) I am concerned about the sheer volume of intakes received regarding the…home, specifically, there have been a total of 18 investigations, with 12 of those investigations being allegations of abuse and neglect. [Foster parent] has received 8 citations as the result of those investigations, as well as 3 sampling concerns conducted during a random sampling inspection.

2) [Foster parents'] investigation history focuses around the care of the children with allegations to include physical/inappropriate discipline, unexplained injuries, and scratches/marks/bruises. In addition to this pattern of investigations, there are ongoing concerns of her ability to provide appropriate supervision. Children in her care have not been supervised accordingly, resulting in children acting out sexually with each other, and a child with limited mobility falling off the bed. [Foster parent] has also exhibited a pattern of not reporting serious incidents to licensing in a timely manner.

3) To add to this, I am equally concerned about the agency's ability to provide proper oversight of the home and minimizing serious concerns. There has been limited action by the operation in ensuring treatment service children are being cared for appropriately. It appears to the benefit of the foster parent that many of the children involved in these investigations had communication and intellectual deficits. As of September 2021, the agency was asked to look closer into this foster home, and they did respond. The agency submitted a discharge notice on the placements in the…foster home and encouraged her to go on inactive status. The

165

agency is receptive to placing children with her again in the future, and will make adjustments to her license, if they deem it is appropriate.[203]

South Bay voluntarily closed the home on October 25, 2021.

## Home F
## Listed by CPA as Inactive June 4, 2021

Home F was originally verified as a foster home through Mesa Family Services on December 10, 2004. Verification was relinquished by Mesa Family Services on November 10, 2006, with no reason given for the relinquishment. While operating under the Mesa Family Services this home had only one investigation for minimum standards violations related to supervision, after two foster youth got into a fight and one youth threatened to kill another youth, and both threatened to run away. Concerns regarding supervision were not substantiated and no citations were issued.

The foster parent changed CPAs on November 11, 2006, and was verified by Therapeutic Life CPA, San Antonio Branch for specialized services. Therapeutic Life CPA is currently on Heightened Monitoring.[204] Between November 11, 2006, and November 19, 2019, this foster home was the subject of nine abuse, neglect, or exploitation or minimum standards investigations. In addition, between 2012 and 2019, CPI investigated five allegations of abuse, neglect, or exploitation involving three siblings who the foster parent had fostered and subsequently adopted. All but one of the abuse, neglect, or exploitation investigations had a disposition of Ruled Out; one had a disposition of Unable to Determine for Physical Abuse.

Across these investigations, patterns emerge related to Physical Abuse and Emotional Abuse. Eleven investigations alleging multiple counts of Physical Abuse were investigated. The allegations in these cases had several similarities: multiple children placed in the home at different times made outcries the foster parent hit, slapped, pulled hair, smacked, spanked, and dragged them down the stairs or across the floor.

---

[203] Miranda Bryant, RCCR Supervisor, Region 7, CCR Agency Home Closure Recommendation (undated). The Closure Recommendation Summary also stated, "I have included in my submission another home this operation had managed and the ongoing abuse that occurred to foster children in that placement. While the operation did close the home, it was with the strong encouragement and suggestion of the heightened monitoring team and was not the agency acting on their sole prudent judgment."

[204] This CPA was placed on Heightened Monitoring due to a pattern of problems with medication management, discipline and punishment, general supervision, physical environment, failure to report. According to CLASS, the operation was placed on Heightened Monitoring on November 24, 2021 and has been extended to May 22, 2022. The operation is also currently on probation, which began on May 18, 2021. Areas addressed in the probation include: training for caregivers and staff in child rights, health and safety, serious incident reported and supervision; quarterly visits to all foster homes in the Houston, Arlington and Temple branches by someone who meets the case manager qualifications but is not the assigned case manager; training by an outside consultant on how to properly conduct home screenings; and caregivers in the Temple and Arlington branches receive training on appropriate medication storage and develop a plan on how medication will be audited. According to the Heightened Monitoring Quarterly Report dated March 4, 2022, the operation has continued to receive citations for medication management, physical site, and discipline.

Four of the investigations included allegations of Emotional Abuse. Consistent outcries over the course of these investigations included children who reported having their hair cut for punishment, being called names, being yelled at by the foster parent, and told by the foster parent to lie.

In three investigations, children reported that the foster parent withheld food from them. In one case, school personnel reported that staff provided the children snacks before sending them home to ensure they had something to eat that day.

Examples of the allegations investigated include:

- On February 19, 2009, DFPS opened an investigation for Physical Abuse after a 7-year-old child reported to her caseworker that her previous foster mother slapped her and called her names. During the child's interview she reported she did not like her previous foster mother and that she would slap her when she made her bed wrong or did her chores wrong. She said the foster mother called her "bitch and stupid ass" and that she also called the other children names. The child then modified her statements and said it was the other children who were slapped. Other children in the home denied ever being or seeing any one slapped or called names. The foster mother also denied the allegations. The allegation of Physical Abuse was Ruled Out and the case was closed with no citations.

- On November 3, 2009, DFPS opened an investigation for Medical Neglect after school personnel reported the foster mother refused to get glasses for a 6-year-old foster child and that the foster mother has been "rude and "un-nurturing" towards the children. A second report was made by the child's caseworker who said the foster mother refuses to buy the child glasses and that the foster mother spanks the three children when they are in trouble. During the interview with the 6-year-old child, she said the foster mother told her: "When she grows up and has money, she can get her glasses with her own money," when asked about being spanked she said the foster mother "pats them on the leg three times and doesn't do it hard." The investigator interviewed the eight-year-old sibling who denied being spanked or seeing any spankings. The school staff person was also interviewed and described the foster parent as abrupt and said she appears to be cold toward the girls. The girls seem to be reserved around her. In the conclusion the investigator documented "the childrens' [sic] interviews reflected they like the foster mother and they're being adopted by her." Medical Neglect was Ruled Out and no citations were issued.

- On July 28, 2010, DFPS opened an investigation after SWI received a report that alleged the foster parent yelled at a foster child, drank excessive alcohol in the presence of the child, withheld food from the child and left the child in the care of other children. The two- year-old victim was observed in the home during the investigation and appeared to be bonded to the other children and did not appear fearful of the foster mother. Other children in the home denied that the foster

167

mother yelled, drank alcohol, or withheld food or treated the 2-year-old differently. The allegations of Emotional Abuse and Physical Abuse were Ruled Out and no citations were issued.

- On July 23, 2012, DFPS opened an investigation after a five-year-old child made an outcry during a parent visit that the foster mother pulled the child's hair and dragged her down the stairway and sat her on a chair. The five-year-old child was interviewed and denied all allegations and no marks or bruises were observed. The foster mother also denied the allegations but did report an incident where the child was coming down the stairs while having a tantrum. She reported that the child missed the last step and began to fall, the foster mother grabbed her to prevent her from falling and while doing so the child's hair got caught in her grip and her hair was pulled. None of the other children in the home were interviewed. The allegation of Physical Abuse was Ruled Out and there were no citations issues.

- On October 18, 2012, DFPS-CPI initiated an investigation after SWI received an allegation that an 11-year-old adopted child was afraid to go home from school because she got marks in her folder. The girl said: "my mom's going to hit me." It was also alleged the adoptive mother hit one of the other girls across her face several times. One was reportedly hit with a bag of candy across the face, and the adoptive mother allegedly cut her hair off because the girl got in trouble at school. Each of the three child victims made outcries of being slapped and hit or spanked by their adoptive mother. The adoptive mother denied physically disciplining the children and said that she will "smack them on the arm if they misbehave, but she does not spank them or leave bruises." The allegations of Physical Abuse were all Ruled Out.[205]

- On December 16, 2013, DFPS-CPI initiated an investigation after a report was made to SWI by school personnel that the 11-year-old adopted child was crying and upset and stated that her adoptive mother is mean and treats her and her sisters differently than her birth children. She alleged the adoptive mother told them that she will not buy them Christmas gifts and threw a shoe at her. The child reported that she made the adoptive mother a gift at school and when she gave it to her, her adoptive mother looked at it, picked it up, and threw it in the trash can. The child regularly arrived at school crying and would not talk about what was wrong. During the investigation a school staff person was interviewed and reported that prior to the adoption, many of the school staff members urged DFPS not to allow the foster mother to adopt the three children because of their outcries to staff. When the adoptive mother was interviewed, she denied the allegations of Physical Abuse but admitted ignoring the girls for about six days after CPS had initiated another

---

[205] The DFPS Child Care Investigations Complex Investigations Division, Analysis, May 10, 2021, states, "There should have been Reason to Believe for Physical Abuse of [child]," "There should have been a minimum of Unable to Determine for Physical Abuse of [2 children]," "Emotional abuse of [children] should have been added and ruled Unable to Determine at a minimum." "There should have been Reason to Believe for Physical abuse of [two children]" and "There should have been Reason to Believe for Physical Abuse of [child]."

investigation; she said she was upset the children spoke badly about her. In this case, the caseworker filed a Motion to Participate (MTP) with the court requesting that the adoptive mother be required to participate in services. The MTP was denied by the court. The allegation of Physical Abuse was Ruled Out and the Emotional Abuse was dispositioned as Unable to Determine.

- On October 27, 2014, DFPS-CPI opened an investigation after an allegation was reported to SWI that a 13-year-old adopted child had burn marks on the lower part of her arm that appeared to be possibly a year old. The child victim said that when her adoptive mother gets mad, or the child does not do something right, the adoptive mother burns her with a cigarette or slaps and hits her and throws things at her. It was also reported that the adoptive mother hits the two younger siblings. When interviewed the child victim reported the scars were the result of abuse that occurred when she lived with her birth family. She denied being spanked and denied her family needed help with anything. The other children were interviewed together in the home and denied being abused by their adoptive mother. The adoptive mother also denied the allegations. The allegations of Physical Abuse were Ruled Out.

- On May 17, 2016, DFPS opened an investigation after SWI received a report that two foster children, ages three and four years old, were dragged by their hair whenever they get into trouble and "thumping" could be heard as they were dragged. The reporter also alleged that the children were locked in the restroom to stop them from crying. An additional allegation was added to the investigation from a DFPS-CPI intake regarding the adopted children in the home. The additional allegation was that the unrelated adult adopted daughter yells at the foster children and covers their mouths when they cry. The reporter also alleged that one of the children slept in a play pen and the other slept on the floor of the foster mother's bedroom. When interviewed, the three adopted siblings all indicated that the foster mother dragged the two foster youth down the stairs by their arms multiple times and that the foster/adoptive mother physically disciplined the children by hitting their arms, hand, or head. They also reported that the foster mother forcefully sat the foster children down on the ground. All three adopted children reported that the adult adopted daughter put the foster children in the bathroom for time out and covered their mouths to stop them from crying. According to the investigator, the two foster children were observed and appeared happy and bonded to the foster mother. One of the children denied that she had been hit or hurt by anyone in the home. The foster mother denied the allegations and said that her adopted children wanted to see their birth family and to "venture out" on their own. The allegations of Physical Abuse and Emotional Abuse were Ruled Out and no citations were issued. Technical assistance was provided regarding sleeping arrangements for the foster children.[206]

---

[206] As discussed, *infra*, in response to the Monitors' disagreement with findings in another investigation of this home, the DFPS Child Care Investigations Complex Investigations Division reviewed this investigation as part of an Analysis published May 10, 2021 and concluded that "The children made valid and consistent outcries, yet the allegations were Ruled Out and the children were assumed to have had

- On May 20, 2016, DFPS-CPI initiated an investigation after SWI received reports that included multiple allegations regarding the three adopted sibling ages 15, 13, and 10. The allegations included: 10-year-old child came to school with a bruise on her arm and stated that her adoptive mother hit her because she wanted to bring a stuffed animal to school and she was not allowed to participate in school activities; the 15-year-old victim stated that on May 12, 2016, she and her 13-year-old sister were given a piece of toast for dinner because their adoptive mother was mad – the children were not being well fed and the 15-year-old resorted to shoplifting to try and feed them; the 15-year-old came downstairs and the adoptive mother "slapped her around"; the adoptive mother would verbally and physically abuse the children in the home and would pull their hair and smack them on their bodies without leaving bruises; the adoptive mother was locking the older child out of the house and threatening to call her probation officer to say she ran away; and the children are being yelled at, cursed at and degraded by the adoptive mother. During interviews with the children all three reported they are afraid of their adopted mother, all three reported that their adoptive mother hits or slaps them, withholds food, cuts their hair as punishment and calls them names. The adoptive mother denied all allegations. All allegations of Physical Abuse, Physical Neglect, and Emotional Abuse were Ruled Out.[207]

- On March 26, 2017, DFPS opened an investigation after a five-year-old foster child told her parents during a family visit that the foster mother "hurts her." She explained that the foster mother holds her down, drags her on the floor, and gives her medicine she should not have. At the time of the family visit the foster mother expressed concerns with the child's behavior and told the parents the child was using inappropriate language and was being physically aggressive towards her. When the child was interviewed, she recanted and said she had never had her hair pulled, never been pulled across the floor, spanked or slapped. The child confirmed that she told her parents the foster mother was mean because she hurt her, but could not remember how she was hurt and then said she kept pushing her off the couch. Interviewed school personnel said the child reported that her foster mother does not care for her and is mean to her, and that she was given pills belonging to the foster mother's grandchild, that she was kicked off the couch and that the foster mother threatened to poke her eyeballs out. The school staff reported that the child said that when she threatened to run away the foster mother responded, "I want you to run away." The child was removed from the home shortly after the allegation

---

motives to 'misrepresent' and 'collude.' It was documented that there was no 'evidence' to support their outcries, but their outcries coupled with history of similar allegations was sufficient cause for concern. It was highly inappropriate and not in line with our duty to advocate for children to disregard the outcries.... foster mother should have minimally been found Unable to Determine for Physical Abuse to both foster children and Reason to Believe for Neglectful Supervision."

[207] The DFPS Child Care Investigation Complex Investigations Division, Analysis, May 10, 2021, notes that "This investigation was extremely concerning. There were five intakes and numerous concerns from professionals in addition to the children making consistent outcries and one child having a bruising. Also noting that the Emotional Abuse should have been found RTB for all three children. They made outcries that she cuts their hair for punishment and called them names."

was made and hospitalized. When the child's therapist at the hospital was contacted, the therapist reported the child told her the foster mother was "hitting her all over the place" and pointed to her arms and leg. The foster mother denied all allegations. DFPS Ruled Out the allegations of Physical Abuse and Neglectful Supervision but RCCR issued three citations: one for violation of minimum standards associated with child rights, due to the foster child hearing the comments made to her birth parents by the foster mother; a second for violation of minimum standards associated with physical environment, because cleaning supplies were observed to have been left unsecured; and a third for violation of minimum standards associated with medication storage.[208]

- On January 29, 2018, DFPS-CPI opened an investigation after SWI received a report from hospital staff regarding a 14-year-old adopted child who was taken to the hospital for a pseudo-seizure. While at the hospital the child stated she is not living with adoptive mother but is staying with a friend because her adoptive mother "beats" her. When asked what "beats" means she said her adoptive mother uses her hands and fists and beats her. The child reported that she and one of her sisters had not lived in the home since June of 2016 and were living with a friend. The investigator determined that the allegations were old outcries and had been previously investigated and Ruled Out; therefore, the allegation of Physical Abuse was Ruled Out.[209]

- On November 20, 2019, DFPS opened an investigation after a DFPS staff reported to SWI that twin five-year-old siblings were overmedicated by their former foster home because the children were having nightmares, but in their current foster home, the children were not having any difficulty sleeping. It was also reported that one of the children disclosed the former foster mother shoved a towel down her throat so she would stop screaming. The child disclosed that she had not previously informed her caseworker of this information because she would have been denied treats from her foster mother. Interviews were conducted with both children, and in both interviews the children reported that the foster mother spanked them on the "booty" but did not remember why. Both children also reported that a towel or rag had been put into their mouths, one saying it made her "feel sad" and the other saying it made her "feel bad." The foster mother denied all allegations. The adoptive children in the home were not interviewed. The investigation determined that the medication for nightmares had been prescribed by a physician and the foster parent maintained appropriate documentation. The allegations of Medical Neglect and Physical Abuse were Ruled Out and no citations were issued.

---

[208] The DFPS Child Care Investigations Complex Investigations Division, Analysis, May 10, 2021, indicated that a finding of Unable to Determine would have been more appropriate.

[209] The DFPS Child Care Investigation Complex Investigations Division, Analysis, May 10, 2021, notes a Reason to Believe Disposition for the adoptive mother should have been considered as the Department failed to substantiate previous allegations, and the children were still making the same outcries.

The Monitors raised concerns about the quality and integrity of the November 20, 2019 investigation in the Second Report.[210] In response to the Monitors' concerns, the DFPS Child Care Investigations Complex Investigations Division conducted an analysis of the foster home's history of DFPS and CPI investigations. The analysis concluded:

While consistent outcries were made that spanned several years' worth of investigations, the children were not deemed as credible by CPI or DFPS staff and were left in an unsafe environment compromising their physical and mental well-being. Additionally, due to the failure to appropriately disposition [foster mother and her adult child] . . . numerous foster children were placed in the home and subjected to physical abuse, verbal beratement, emotional abuse, and possible administration of unprescribed medications by the [foster mother and adult daughter]. Additionally, despite objections from professionals, [the foster mother] was allowed to adopt three children, all of whom made numerous outcries regarding their treatment in [her] home. The Department has failed to protect [the] adopted children, two of which are now adults and one teenaged child that still appears to reside in the home as well as the foster children entrusted to her care.[211]

The DFPS analysis documented numerous concerns with deficiencies in 10 of the abuse, neglect and exploitation investigations involving this foster home. The DFPS analysis concluded that the entity should have found Reason to Believe (RTB) or Unable to Determine (UTB) dispositions in the cases listed below:

- 10/16/2012: (CPI investigation) Two UTBs for Physical Abuse and three UTBs for Emotional Abuse
- 5/17/2016: (CCI investigation) Two UTBs for Physical Abuse and two RTBs for Neglectful Supervision.
- 5/17/2016: (CPI investigation) Three RTBs for Emotional Abuse
- 3/26/2017: (CCI investigation) UTB; reason unclear.
- 1/18/2018: (CPI investigation) Required RTB disposition

After receiving the DFPS analysis of the foster home, RCCR conducted an inspection at Therapeutic Life, CPA related to the foster home, including a review of documents and information. The inspector found notes in the CPA's supervisory visit documentation for the home indicating that two adopted children made outcries of inappropriate discipline to the case manager, yet the case manager documented no current stressors or noncompliances in the home. The case manager further documented that the adopted children had stated there is never food in the house unless the case manager comes for a visit and that the two foster children sleep in the foster mother's room: a three-year-old in the crib and a four-year-old on the floor. The operation was aware of the outcries of the adopted children regarding inappropriate discipline yet documented no concerns and denied any wrongdoing on the foster mother's part.

---

[210] *See* Deborah Fowler & Kevin Ryan, Second Report, Appendix 3.2 MIC Reviews, p. 23, ECF 1081-1.
[211] DFPS, Child Care Investigations Complex Investigations Division (May 10, 2021) (on file with the Monitors).

An RCCR inspector recommended closure of the foster home on August 23, 2021, but the recommendation does not appear to have been approved by RCCR. Instead, the form notes that RCCR requested DFPS place the home its list of disallowed homes, and DFPS agreed. The foster home has not had a child placed in the home since April 22, 2020; CLASS shows the home was listed as inactive June 4, 2021. DFPS placed the home on the Disallowance List on September 17, 2021.

**Home G**
**Closed by CPA (Reason not Listed) May 21, 2021**

Benchmark Family Services CPA (Benchmark) verified the foster home G on March 31, 2017, and the home was closed on May 31, 2021, due to the CPA closing. Prior to Benchmark's closure, the CPA was under Heightened Monitoring. Foster home G was the subject of five abuse and neglect investigations and two investigations for minimum standards violations during the approximately four years this home was open.

During the time the home was open, DFPS opened three investigations into allegations involving inappropriate behavior or sexual abuse of foster children by the foster parents' adult son:

- On June 25, 2017, SWI received a report alleging that an 8-year-old foster child told her maternal grandfather that the foster parent's adult son, who lived in the home, had sexually assaulted her and that she had reported the assault to the foster father. DFPS opened a Priority 1 investigation for Sexual Abuse and Neglectful Supervision. During the investigation DFPS added the child's 6-year-old sibling as an additional alleged victim of sexual abuse. The Child Advocacy Center interviewed both foster children and neither child made an outcry. DFPS interviewed the maternal grandfather who denied that the child told him about any inappropriate touching. The foster father denied the children told him that the adult son touched them inappropriately; the adult son also denied the allegations of inappropriate touching. DFPS Ruled Out allegations of Sexual Abuse and Neglectful Supervision and issued no citations.

- On November 4, 2020, SWI received a report alleging a 9-year-old boy placed in respite care in the foster home, was viewing pornography on his school computer. DFPS opened a Priority 2 investigation for Sexual Abuse and Neglectful Supervision. The child said that an advertisement for a pornographic site came up while using his computer. He asked the foster parent's adult son what to do and the adult son told him to click on the advertisement and enter his email address. The child said he believed the foster parent's son wanted to get him in trouble. The foster parent's son denied giving the child instructions to click on the site. He said he saw the child watching inappropriate material, and that he reported this to his parents right away. Both foster parents denied seeing or catching the child watching inappropriate things; they said they were downstairs during the incident, and they could not see or hear what he was doing on his tablet. DFPS Ruled Out Sexual Abuse and Neglectful Supervision, but RCCR

173

issued two citations: one related to the foster parent's failure to follow through with an active safety plan related to the proper supervision of the child in care, and one for supervision because the foster parent did not properly supervise the child, resulting in the child engaging in inappropriate behavior.

- After the home's closure, on August 24, 2021 SWI received a report alleging that a 12-year-old child made an outcry that she watched pornography with her previous foster parent's adult son and that he forced her to touch each other's private areas and engage in oral sex. DFPS opened a Priority 2 investigation for Neglectful Supervision, but when DFPS interviewed the child, she recanted. The child said she watched a scary movie with a sex scene with the adult son, but he skipped that part of the movie. She also reported that the foster parent's mother was present at the time. Other children who were in the home at the time denied seeing any pornography or seeing the adult son touch anyone inappropriately. The foster parents also denied any knowledge of inappropriate activity. DFPS Ruled Out the allegation of Neglectful Supervision and no citations were issued.

The other investigations centered around allegations of improper supervision or neglect of children by the foster parents:

- On February 15, 2020, SWI received a report alleging that one of the foster children placed in the home was physically aggressive toward another foster child. The child who was the aggressor was placed in a behavioral hospital due to the incident. RCCR opened a Priority 3 minimum standards investigation to review supervision in the home, and determined it was not a problem on the day of the incident. However, RCCR issued one citation because the CPA did not document a change in the home's capacity after the foster parents adopted two children.

- On November 6, 2020, a report was made to SWI alleging that an 11-year-old girl who had previously been placed in the home made an outcry that she was not given enough to eat while she lived in the home, that the foster parent would leave the child in the car to calm down when the child was upset, and that the foster children were made to clean the house, including the adult son's bedroom. In addition, the child made an outcry that the adult son would walk into their bedroom when they were getting dressed. The reporter also alleged that when the foster child told the foster parent that she heard voices, the foster parent gave her an MP3 player rather than seek treatment for her. DFPS opened a Priority 2 investigation of Medical Neglect and Neglectful Supervision. The allegations were Ruled Out; no citations were issued.

- On March 23, 2021, SWI received another intake alleging problems with supervision in the foster home. The intake alleged that a seven-year-old foster child ran out of the home and into the middle of the road, causing a truck to make a sudden stop. RCCR opened a Priority 3 minimum standards investigation. A citation was not issued, but RCCR offered Technical Assistance related to

supervision, reminding the foster parent to follow the child's safety plan put in place because of this incident.

- On August 10, 2021, after the foster home became inactive, SWI received a report that a 12-year-old foster child made an outcry that child-on-child sexual abuse occurred during her placement in the home. DFPS opened a Priority 2 investigation for Neglectful Supervision. During her interview, the child said that she had sexual contact with two other children in the home. The other two children denied that they had sexual contact with the child; the foster parents stated that there was a baby monitor in the girls' room, and that the children were appropriately supervised. DFPS Ruled Out Neglectful Supervision, and no citations were issued.

The foster home was placed on the DFPS Disallowance list on May 10, 2021, and RCCR made a closure recommendation on May 25, 2021. RCCR's recommendation was based on the three abuse or neglect allegations of inappropriate behavior by the adult son of the foster parents who resided in the home. A decision on the closure recommendation was not finalized prior to the CPA's closure of the home on May 21, 2021.

## Home H
## Closed due to CPA's License Revocation April 16, 2021

FaithWorks Inc., CPA (FaithWorks) verified foster home H on July 7, 2014. The foster parents changed CPAs and the home was verified by Kingdom Kids CPA on April 12, 2018, but the foster parents switched back to FaithWorks on April 9, 2019. RCCR revoked the license of FaithWorks due to a history of safety violations on April 9, 2021.

Foster home H was the subject of four investigations over the almost seven years that it was licensed, with RCCR issuing four citations for violations of minimum standards. The first, reported to SWI on September 25, 2015 by the caseworker for another child, was opened by DFPS as a Priority 1 investigation of Neglectful Supervision and Medical Neglect. The foster parents were licensed to care for twelve children, and had nine placed in the home, including two children aged two years old, and one three-year-old. The caseworker reported that during a visit to the home two days earlier, a two-year-old child and a sibling ran out of a room into the living area, and the two-year-old had blood running out of his nose. His nose was swollen and "visibly injured…flat on his left nostril and twisted." The child was not taken to the doctor until two days later. The foster parents were unsure how the child's nose was injured, but a doctor indicated the injuries were consistent with a fall. DFPS Ruled Out Neglectful Supervision and Medical Neglect, but RCCR issued a citation for violation of a minimum standard associated with medical care because the foster parents did not take the child to the doctor for two days.

A second report involving the foster home was made to SWI on October 19, 2016. The reporter alleged that two children, a seven-year-old and a nine-year-old, made outcries of child-on-child sexual contact occurring "almost every night" in the home between the two

of them and a 13-year-old child. DFPS opened a Priority 2 investigation for Neglectful Supervision. At that point, the home was licensed to care for six children, and five were placed in the home. Both foster parents were interviewed and said they were unaware of the behavior. DFPS Ruled Out Neglectful Supervision and no citations were issued.

After the foster parents moved their licensure to Kingdom Kids, an investigation was opened based on a report to SWI on January 22, 2019, that a foster child alleged the foster mother hit him and pushed him into a wall when she was mad. RCCR opened a Priority 2 investigation of minimum standards violations associated with corporal punishment. The allegations were not substantiated.

The foster home returned to FaithWorks, and a few months later DFPS opened a Priority 1 investigation of Neglectful Supervision, after an October 20, 2020, report to SWI that a two-year-old child turned on the hot water while she was in the tub and had severe burns and blisters on both sides of her bottom. At this point, the foster parents were caring for five children: the child who was injured, a second two-year-old, and three school-aged children. The foster mother was at work when the incident occurred; the foster father said that he was dressing the other two-year old child, while the two-year old child who was injured was in the shower. The foster father said he ran into the bathroom when he heard the two-year-old screaming, saw the child was injured, and pulled the child out of the shower. However, the child's injuries were determined to be inconsistent with the foster parent's description of the cause of the injuries because the child's feet and legs were not burned. DFPS substantiated the allegations of Neglectful Supervision against the foster father. The investigation was not closed until March 2, 2021. DFPS added the home to its disallowed list on March 19, 2021.

In recommending the home for closure, the RCCR inspector said, "Given that a child in care sustained a severe injury and the home has been cited twice for failing to provide a child with medical treatment...this home will be submitted for a Recommended Home Closure." The CPA was notified of RCCR's intent to revoke its license on April 9, 2021, and the CPA closed the home on April 16, 2021, listing the relinquishment reason as "CPA Closed."

## Home I
## Voluntarily Closed with Deficiencies February 23, 2021

Foster home I was verified by Therapeutic Family Life, Temple Branch on October 16, 2018. Therapeutic Family Life is currently under Heightened Monitoring. The home's verification allowed for the provision of both basic and moderate services to children in care, as well as treatment services for pervasive developmental disorder, IDD services, and primary medical needs. At the time of the voluntary closure this home had been investigated twice by DFPS for abuse, neglect, or exploitation and by RCCR once for violation of minimum standards. One of the investigations was for a child fatality.

- On August 1, 2019, DFPS opened an investigation after an 11-year-old child in care was taken to the emergency room for evaluation and it was determined the

child had a fractured humerus. The child, who has acute chronic illnesses and is reported to have "drop seizures" and brittle bones, was walking assisted by two nurses and a gait belt when he dropped to the ground. At the time of the fall, he was assessed by a nurse and did not display any discomfort. The following morning the child exhibited pain and was taken to the emergency room for evaluation and it was determined he had a fractured humerus. The doctors reported that the only concern was that the child continually throws himself down to the floor and received a serious injury from doing so. The abuse allegations were downgraded during intake; RCCR did not issue any citations.

- On October 23, 2019, DFPS opened an investigation for Physical Abuse after an 11- year-old child was taken to the hospital, and it was discovered that he had a fractured femur. The foster parents reported that on October 11, 2019, the child began "guarding" his right leg and did not want to put weight on it, and the child's knee showed swelling, was warm to the touch and showed bruising. The primary care doctor was contacted and advised to rest the leg and ice it. The nurse practitioner saw the child on October 21, 2019 and recommended an x-ray. The child was taken to the Emergency Room, where the leg was x-rayed, and a fracture of the femur was diagnosed. The foster parents nor the nurses in the home could identify a specific fall that caused the injury as the child had fallen frequently due to an increase in his "drop seizures." The child is reported to have severe disabilities, and both medical records and other records document that the child has a history of easily fracturing bones and bruising. The orthopedic surgeon reported that the injury was consistent with the foster parents' explanation and that based on his experience and the way the foster parents reacted to the child's injury, he had no concerns with foster parents' care of the child. DFPS Ruled Out Physical Abuse and no citations were issued.

- On March 13, 2020, SWI received a child fatality intake. Based on the Medical Examiner's and forensic assessment findings, DFPS issued a disposition of RTB for Physical Abuse, but with an unknown perpetrator, and RTB for Neglect against both foster parents.

The foster parents relinquished their verification on February 23, 2021, and on May 10, 2021, DFPS placed the home on the DFPS list of disallowed homes. A child has not been placed in this home since February 15, 2019. According to the RCCR Closure Recommendation, "this Closure Recommendation was based on the Abuse and Neglect case which resulted in a child's death and the foster parents receiving an RTB finding." The CPA closed the home on February 23, 2021, before RCCR considered the recommendation.

Pending Closure Recommendation

## Home J
## Listed as Inactive by CPA February 12, 2021

Foster home J was verified on August 15, 2013, by Arrow Child and Family Ministries, Main Branch. The Foster Home relinquished verification on October 16, 2016, and was reverified on January 24, 2018, by the same CPA. Since reverification, the foster home was the subject of three abuse, neglect, or exploitation investigations and two standards investigations:

- On October 14, 2014, RCCR opened a Priority 3 minimum standards investigation after SWI received a report that a one-year-old child in care was injured due to a lack of supervision. According to the investigation the foster father was moving furniture and had a measuring tape; the child reached for the tape and slipped and fell, hitting his head on a knob on a dresser. When the child got up there was blood on his shirt from a cut on the back of his head. The foster parents immediately took the child to Urgent Care where a staple was applied to close the cut. The investigator concluded there was not enough evidence to validate a lack of supervision. No citations were issued.

- On May 26, 2015, DFPS opened a Priority 2 Neglectful Supervision investigation after a two-year-old child in care, was bitten by the foster family's 10-year-old Boston Terrier. The child was able to report that "sho sho bit me." The foster parents reported that the child ran around the corner and tripped and fell onto Joey, the dog, and the dog reacted by biting the child one time on the arm. The child was taken to the emergency room for treatment and received eight stitches. The allegation of Neglectful Supervision was Ruled Out and one citation was issued for violation of minimum standards related to reporting serious incidents because the incident was not reported timely.

- On September 18, 2015, RCCR opened a Priority 3 minimum standards investigation after the caseworker of two children in care reported she had been informed that the foster parents had a GoFundMe Me webpage with pictures of two foster children asking for donations from the public to hire an attorney and private investigator to follow the father of the children to prove he is doing illegal things. RCCR interviewed the foster parents, who acknowledged they put up the GoFundMe page in February but said the children's faces were covered in photos. At the time of the interview the foster father reported they took down the webpage about a month earlier. RCCR issued two citations for violation of minimum standards related to children's rights due to fundraising on the children's behalf without permission.

- On June 7, 2016, DFPS initiated a Priority 1 investigation for Physical Abuse after SWI received a report alleging that during a supervised visit, a family member observed a small purple bruise on the upper left part of a three-year-old foster

child's forehead. During the investigation the investigator observed that the child had a two-by-one-and-a-half-inch bruise on the left side of his forehead. The child reported during the interview that he fell off the bed, causing the injury to his head. The incident report completed on the day of the incident indicates the child was lying on his foster parent's bed and rolled off, hitting his head on the nightstand. He reportedly cried for a minute or so and the foster parents tried to ice the area before the child went back to playing. The foster father's account of the incident was documented in the incident report. The allegation for Neglectful Supervision was Ruled Out. Two citations were issued: one for violation of a minimum standard because the child's record was not available for review for the last year and one for violation of a minimum standard because the child's service plan was not updated timely.

- On November 20, 2017, DFPS-DFPS opened an investigation for Physical Abuse after school staff reported to SWI that a four-year-old child had severe bruising on his forearms. The reporter said that the bruising on one of the arms "looked as if someone grabbed him and left finger bruising marks" and that on one arm "his entire back forearm was bruised." The case was administratively closed because the foster parents had been given Joint Managing Conservatorship of the child a year earlier, and the foster home had closed. The notes in CLASS indicated that the case was re-entered for investigation by DFPS-CPI, but the Monitors' IMPACT search of the listed investigation number did not return a result, and the child's IMPACT case list does not include a CPI investigation.

- On September 23, 2020, DFPS opened an investigation for Physical Abuse and Neglectful Supervision after a medical staff reported that an 11-month-old foster child had an appointment scheduled with her pulmonologist the day before, and that during the appointment an x-ray was taken, and the results of the x-ray found a healing rib fracture. The next day the child was seen by the child injury team at the Texas Children's Hospital. The results of a skeletal survey confirmed the healing rib fracture and showed a right ulna fracture. The fractures were small and in non-accidental areas and described as concerning for abuse. The child injury team believed that the fractures occurred within the previous month. The foster parents had no explanation for the fractures. Both denied any knowledge of the child falling or being dropped. The investigation substantiated Physical Abuse for an unknown perpetrator, and Neglectful Supervision by the foster parents, since the child had no other caregivers, and the foster parents should have been aware of any accident that could have caused the injuries.

DFPS placed the foster home on the DFPS Disallowance List on May 28, 2021; no children have been in the home since April 2, 2020. RCCR staff made the closure recommendation due to the RTB and other incidents in the home involving child injuries. A decision on the Recommendation for Closure has not been made due to the foster parents appealing the RTB for Neglectful Supervision. The CPA listed the home as inactive as of February 12, 2021.

## Denied Closure Recommendations

Two foster homes remain open despite recommendations for closure.

### Home K

Foster home K was first verified on March 14, 2006, by Caring Family Network, CPA. Approximately a year-and-a-half later the foster parents changed CPAs, and the Bair Foundation, Tyler Branch verified the home on September 25, 2007. The Bair Foundation is currently under Heightened Monitoring. During the time the home was with Caring Family Network there were no allegations of abuse, neglect or exploitation or standards violations. Over the eleven-and-a-half years the home has been verified through the Bair Foundation, the home has had a total of seven investigations: two abuse and neglect investigations and five investigations for minimum standards violations.

- On May 24, 2008, DFPS opened an investigation after three sibling foster children reported during a family visit that the foster father drank, threatened the children with physical discipline and engaged in name calling. Interviews with the three boys were consistent; all reported that the foster father spanked one of the boys on the bottom for riding someone's bike, and that the foster father cussed in their presence. Two of the boys reported seeing the foster parents consume alcohol. The foster parents denied keeping alcohol in the home and reported they only drank alcohol when the children were not present. Physical Abuse was Ruled Out. RCCR cited two deficiencies: one for violation of a minimum standard associated with prohibited discipline for subjecting a child to abusive or profane language; and one for violation of the minimum standard prohibiting corporal punishment.

- On October 2, 2014, DFPS opened an investigation after an intake was received alleging the foster children were not being appropriately supervised and other children were being allowed to provide supervision. The foster children were being allowed to go to a neighborhood park to play unsupervised. It was discovered during the investigation that the foster parents' two adult children and the foster mother's mother, who frequently visited the home and supervised the youth, did not have the required background checks. RCCR issued two citations: one for violation of a minimum standard requiring background checks, and a second for violation of a minimum standard associated with appropriate supervision.

- On July 29, 2016, DFPS opened an investigation after the foster parent's adult son reported he had walked into a bedroom and observed the two foster children aged 11 and 12 years old with their pants down. The 12-year-old reported that the 11-year-old had touched him on two occasions and that he was afraid of the 11-year-old, who refused to discuss the incident. The investigation concluded that the boys were being supervised according to their service plans and that the foster parents checked on them frequently. No citations were issued.

180

- On August 11, 2021, DFPS opened an investigation for Physical Abuse after a four-year-old child reported to her caseworker that her foster mother hit her on the bottom with a belt when she got mad. The child victim was interviewed and during the interview she first said she had been spanked with a belt or hand but could not remember by who, then she said the foster mother and "paw-paw" spanked her 10 times, then she said 100 times. When interviewed, the foster mother admitted she had swatted the child on her bottom on two occasions. A 17-year-old foster child also lived in the home and was interviewed. He denied being physically disciplined or seeing the other child physically disciplined. He did say his foster mother had told him she had "swatted" the other child. The allegation of Physical Abuse was Ruled Out, but RCCR issued a citation for violation of the minimum standard prohibiting corporal punishment.

- On March 31, 2022, RCCR opened a Priority 3 investigation into minimum standards violations after a report was made to SWI that a child punched a brick wall and broke two fingers, requiring a cast. The report also alleged that a neighbor told the foster parent that the child was sneaking out of his window, that the child denied sneaking out, but then confronted the neighbor. The child claimed the neighbor slapped him, and that instead of hitting the neighbor, the child hit the brick wall. The neighbor called law enforcement and the child was given a Class C misdemeanor citation for trespassing. During his interview, the 17-year-old child acknowledged sneaking out of the house to "meet a woman" though he said that they did not have a sexual relationship, since she was 26 years old. He said he had been sneaking out of the house for about five months, usually left a little after midnight, returning about an hour later. When the woman was interviewed, she acknowledged having sex with the 17-year-old. The foster parents reported the child had been in the home for almost 12 years. The CPA Case Manager indicated there was a supervision plan in place for the child because he had sneaked out before; the plan required the home to have door and window alarms, and to conduct two random checks at night. When the inspector conducted a walk-through of the home, the foster mother showed the inspector "a loud decorative item on the child's window to alert them when he tries to open his window" and said that "they are working on ordering window alarms." RCCR did not find any concerns for supervision and no citation was issued.

In addition to these five investigations, two Priority 5 investigations for minimum standard violations were initiated. One was initiated after two children got into a physical altercation and one of the children slipped and hit her head on a bed frame. The other was initiated due to a foster child's attempt to self-harm at school after becoming upset with a teacher. Neither resulted in citations.

Since being verified, the foster home has had four Sampling Inspections, three of which resulted in the following concerns:

- February 11, 2010: The foster parents did not complete pre-service training requirements for caregivers caring for children younger than two years old. The one-week-old infant in the home was placed in a crib or baby seat while asleep and covered with blankets. Psychotropic medication training expired on January 17, 2010 for both foster parents.

- October 23, 2014: The foster home has three regular and frequent visitors to the home, who also provide childcare services in the home, but do not have required background checks.

- February 22, 2019: The home must post the current verification certificate or have it immediately available upon request.

The Heightened Monitoring Specialist submitted the RCCR recommendation for closure indicating concerns that inappropriate discipline occurred at the foster home. The Recommended Home Closure was denied noting "the operation has one recent deficiency of corporal punishment; last allegation/citation was in 2008. CPA is working with the family." The home remains open; two foster youth currently reside in the home.

## Home L

Foster home L was first verified by A World for Children CPA on November 16, 2012. The CPA closed, and the home was relinquished on January 14, 2013. The foster home was subsequently verified by Therapeutic Family Life CPA on February 26, 2013, and is licensed to care for basic and moderate level-of-care children, as well as those with pervasive developmental disorders, intellectual disabilities, primary medical needs (PMN), and those needing specialized services. The L home is licensed to care for up to six children. The foster mother is a registered nurse. Therapeutic Family Life is currently under Heightened Monitoring.[212]

Since it was first verified in 2013, the foster home has been the subject of 14 investigations for abuse, neglect, or exploitation or minimum standards violations. The first – and only – investigation opened while the foster home was licensed through A World for Children CPA investigated allegations of unfair business practices, after the foster mother asked to use a different home health care agency than the agency preferred by the CPA. The investigator determined that the foster mother was employed by the home health agency (Angels of Care) for which she stated a preference, and that the CPA's policy would not allow the foster home to use the agency due to its conflict of interest policy. The foster parents switched to Therapeutic Family Life because the agency allowed them to use the home health agency that employed the foster mother.[213]

---

[212] The operation was placed under Heightened Monitoring on October 19, 2020. Heightened Monitoring was extended on January 7, 2021, and again on March 23, 2022, when it was determined that the operation had not met the criteria to move to Post Plan Monitoring.

[213] Though the home was using Angels of Care at the time of the first investigation of a fatality in 2015, by 2016, a different home health agency was providing care to children in the home.

The remaining 13 investigations occurred after the foster parents switched to Therapeutic Family Life. DFPS opened three investigations because of child fatalities. All three children were PMN children who died from septic shock. Abuse was Ruled Out in all three cases.[214]

The other 10 investigations included two 2018 RCCR investigations of minimum standards violations, each of which resulted in a citation: The first citation was issued for violation of the minimum standards requiring serious incidents to be reported to licensing, after a child was admitted to the hospital for a medical issue and neither the foster parents nor the agency reported the incident to licensing. The second citation was issued for violation of minimum standards associated with supervision, when the foster mother got into an argument with a respite caregiver and fired the caregiver before arriving home, then engaged in an altercation with the respite caregiver (who was a friend of the foster parent's) when she returned home, leaving the children in the home with nurses, but without a caregiver, for approximately an hour.

The investigations also include four investigations of abuse, neglect, or exploitation opened in 2020:

- On June 25, 2020, DFPS opened an investigation for Neglectful Supervision due to a report that the foster parent was short staffed and left a child who required a feeding tube in the care of others (including the foster parents' 13-year-old grandchild) who did not know how to operate the child's feeding tube. The reporter also alleged that the foster parent "somehow finds out [when] a worker is coming to the home and has moved children around when [there] is an age violation for children sharing a room." Neglectful Supervision was Ruled Out, but six citations were issued for violations of minimum standards associated with training requirements for caregivers, requirements related to background checks, and for safety hazards in the home and a converted apartment where a foster child stayed. RCCR issued two citations after discovering that the foster parents were not living in the primary home where the children lived, but instead resided both in an apartment behind the home and at another location, resulting in the nurses acting in dual roles for the children to whom they were assigned: both as nurses and caregivers. A citation was also issued because the CPA branch that licensed the home was more than 150 miles from its location.[215]

---

[214] The second child to die in the foster home, who died on December 24, 2016, had several medical diagnoses, including brittle bone syndrome. A few days before he died, the child sustained a leg fracture; according to his caregivers, it occurred when he was being repositioned in bed on December 20, 2016. A little more than a week before his leg was fractured, an intake to SWI on December 12, 2016, alleged that a nurse was "rough" with the child. The reporter alleged the nurse was "using the CPT percussion vibrator and was hitting [the child] too hard and caused bruising." The reporter told the foster mother that she believed the percussion vibrator was causing bruising to the child, and the foster parent got rid of the percussion vibrator. The foster mother said the reporter was a disgruntled employee who was upset that the foster mother asked the agency not to send the nurse back to the home. The report was not substantiated.

[215] The home, which is in Kerrville, was initially licensed through the Temple branch of the CPA. As of March 2022, the home is listed with the main branch of the CPA, located in Austin.

- On July 27, 2020, DFPS opened an investigation for Medical Neglect and Neglectful Supervision after a report was made to SWI that the foster mother posted on social media that COVID-19 was a hoax and that she refused to wear a mask. This was merged with another report that the foster parents used marijuana on a regular basis and took care of the children while under the influence. The reporter also alleged that the foster mother did not stay in the home with the children, had an apartment behind the home where she slept and had a second home where she stayed on weekends. Neglectful Supervision was Ruled Out, and no citations were issued.

- On August 5, 2020, DFPS opened an investigation for Medical Neglect after three reports were made to SWI and merged. The three reporters alleged that when DFPS removed the alleged victims from the foster parents' care and placed them in a new foster home, one child's condition improved significantly, suggesting the foster parents had overmedicated her prior to the move. Another child had a rash on his face and arms, and blisters both on his chin and in his mouth that did not appear to have been adequately treated or diagnosed. One of the reports indicated that one of the children was wearing a diaper that was too small when he arrived in the new foster home, and stated the foster parents did not transfer medication and medical equipment with the child. DFPS Ruled Out Medical Neglect, but RCCR issued two citations. One citation was issued for violation of a minimum standard associated with medical treatment because a child had not had a follow-up appointment completed with a cardiologist despite being found to have irregular heartbeats. A second citation was issued for violation of a minimum standard associated with supervision because it was determined that there were times when neither a foster parent nor respite caregiver was supervising the children in the home.

- On August 19, 2020, DFPS opened a Medical Neglect and Neglectful Supervision investigation due to two merged reports to SWI that children in the home received inadequate medical care or were being overmedicated. The allegations were Ruled Out.

In the recommendation for closure, the RCCR inspector stated:

This agency home has had 14 investigations with 10 citations over a period of 9 years. The home has a pattern with allegations of improper care for PMN children in their care. There were 2 citations in 2020 related to failure to take a child for a follow up appointment (child had an irregular heartbeat) and supervision. Additional allegations didn't result in violations but are concerning for not abiding by Covid restrictions (attending gatherings without masks and denying covid) given the extreme medical sensitivities the children in care have. One investigation which alleged the [foster mother] leaving unqualified staff in charge of children in care received 6 deficiencies related to these allegations. There have been a total of 3 citations at this home for supervision, which is highly concerning given the medical needs of children in care.

There have been 3 fatalities at the home, which is not unusual for a foster home with children who have PMN, but 2 of the fatalities have concerning circumstances. One fatality was due to salmonella poisoning, which brings into question sanitation procedures of medical equipment. The second fatality was due to the child having extreme pain from a femur fracture and going into respiratory distress. None of the 3 fatalities had any violations associated with them.

[The inspector then listed the citations associated with the home, discussed above]

This agency home has had 5 sampling inspections in the 9 years they have been operating. They received a total of 3 sampling concerns regarding pool safety and an incomplete health inspection.

Because of the medically sensitive population this agency home serves, the concerns with supervision and concerning allegations regarding the ongoing pandemic, there will be a Recommendation for an Agency Home Closure.

In the section of the form where a decision date is required, the form states, "Sampling visit conducted 9/8/21; no concerns noted; therefore, recommendation will not move forward." However, the details for the sampling visit in CLASS indicate two concerns were found related to a lack of documentation for TB test results for children in the home.

As of April 2022, the most recent intake for the home was reported to SWI on January 19, 2022. The intake reported that a child was admitted to the hospital after discovering "an organism that was growing that could lead to sepsis." The allegation narrative clarified that the child had a urinary tract infection and noted that the child tested positive for COVID. The intake was administratively closed after determining that the report was a notification of a positive COVID test and did not require investigation.[216]

## DFPS List of Disallowed Homes

In addition to foster homes that RCCR considered for a closure recommendation, DFPS keeps a list of homes that are "disallowed" for placement of foster children. According to the CPS Handbook, a caseworker may recommend that a home be disallowed for placements if they have a "serious concern about child safety or well-being."[217] A caseworker who wishes to place a home on the disallowed list is required to "thoroughly

---

[216] The Monitors checked the most recent COVID vaccination data, provided by the State February 17, 2022. The child is listed as not having been vaccinated, but does not include a reason that the child is not vaccinated. In the comments section, the spreadsheet notes, "worker is on FMLA will follow up." The Monitors reviewed the child's IMPACT records and did not find any information related to vaccination status.

[217] DFPS, CPS Handbook §4222.1 Disallowing Placements into a Foster Home, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_4000.asp#CPS_4222_1

document the reasons" and submit the documentation to his or her direct supervisor.[218] The request "goes up the chain of command for consideration and approval."[219]

As of March 15, 2022, the DFPS list included 56 foster homes; 34 of the homes were added to this list in 2021. Of those 34 foster homes, RCCR also made a closure recommendation for only nine. The Monitors reviewed CLASS records for the 25 homes on the DFPS disallowed list that were not recommended for closure by RCCR. Nine were involuntarily closed by the CPA due to deficiencies. Two were involuntarily closed by the CPA, but were not noted to have closed due to deficiencies. Two voluntarily closed with deficiencies, and three voluntarily closed without deficiencies. Five closed when the CPA that licensed them closed. One closed due to a criminal history match for one of the foster parents, and two homes were listed as inactive. Two could not be found in CLASS: one was verified by a CPA that has since had its licensed revoked, and the other foster parent was not found in the agency home list for the CPA listed in the DFPS data.

## Closure of Congregate Care Operations

Since the Monitors' last update on closure of congregate care settings, two operations have closed due to denial of a license or license revocation. The monitoring and oversight history of the operations are outlined, below.

### Kidz Safe Harbor RTC, LLC (1660480)
### License Revoked, January 28, 2022 [220]

On July 24, 2017, Kidz Safe Harbor Treatment Center (Kidz Safe Harbor) operators applied for a permit to operate a licensed general residential operation located at 7202 Lark Ln in Richmond, Texas. On August 11, 2017, RCCR accepted the application as complete. On August 24, 2017, RCCR conducted an Unannounced Application Inspection to determine whether the operation complied with all applicable rules and minimum standards. Kidz Safe Harbor received no citations, and Kidz Safe Harbor received their initial permit on September 11, 2017.

RCCR licensed Kidz Safe Harbor for a total capacity of 30 males, ages 7-17 years. The program services included care for children experiencing emotional and pervasive development disorders. RCCR licensed Kidz Safe Harbor to use personal restraints.

During the initial permit period, between January and March 2018, RCCR conducted three unannounced initial inspections, testing minimum standards. Kidz Safe Harbor did not receive any citations during the initial inspection period. On March 19, 2018, RCCR issued a full permit to Kidz Safe Harbor.

---

[218] *Id.*
[219] *Id.*
[220] Email from Lesley Castillo, DFPS, to Deborah Fowler and Kevin Ryan, re: January 2022 – Suspensions, Contract Terminations, and Disallowances (February 9, 2022) (on file with Monitors).

On January 28, 2022, RCCR informed Kidz Safe Harbor about its intent to revoke the permit:

HHSC has determined that due to the failure of the operation to meet the terms of corrective action-probation, we cannot address risk by taking another type of enforcement action. Your operation has numerous confirmed cases of physical abuse and sexual abuse. In addition to the findings of abuse, the on-going pattern and repetition of serious deficiencies creates an immediate risk to the health and safety of children in care supporting revocation of the permit and making revocation otherwise necessary to address issues identified in 745.8605. [221]

On January 28, 2022, RCCR informed the Monitors that Kidz Safe Harbor license was revoked.[222]

### Investigation and Inspection History

Kidz Safe Harbor received RTB findings and deficiencies resulting from allegations reported to SWI for investigation or deficiencies resulting from monitoring inspections conducted by RCCR. Between January 1, 2017, and December 31, 2021, Kidz Safe Harbor received five RTB findings for Physical Abuse, two investigations resulted in RTBs for Sexual Abuse, and 122 deficiencies related to minimum standards violations.

### Sexual Abuse

On July 23, 2021, staff at the GRO reported to SWI that a child said that he had witnessed a staff member and another child having sexual relations in the game room. This intake was merged with a second allegation of sexual abuse involving another child. When interviewed, the female perpetrator admitted to allowing the 15-year-old male youth to fondle her vagina over her clothes and to performing oral sex on the child. The perpetrator also admitted to having sexual intercourse with the second victim, age 16, when the child was consoling her over the death of another staff member. The investigation conclusion resulted in two Reason to Believe finding for Sexual Abuse. Three citations were also issued by RCCR including: 1) Serious Incident Documentation; 2) Employee General Responsibilities -staff communicating with a child over social media; and 3) Children's Rights – to be free of abuse, neglect, and exploitation.

On July 21, 2021, an allegation was received by SWI after a child, age 14, made an outcry to staff that one of the staff had inappropriately tried to touch him. During a forensic interview the child, age 14, reported that the staff member sat on his bed and asked if he wanted to have sex with her. The staff member rubbed the child's penis over his clothing. The staff member then got on top of the child and the child told her to stop so they would not get into trouble, the staff member stopped and left the room. Two days late, while in

[221] Letter of Intent to Impose Adverse Action from HHSC to Kidz Safe Harbor, Dated January 28, 2022 (on file with Monitors).
[222] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Intent to Revoke Kidz Safe Harbor RTC (January 28, 2022) (on file with the Monitors).

his room sleeping with his two roommates, the staff member entered the child's room again and reportedly got on top of the child, the staff then pulled the child's shorts down and "sucked on his penis." During the investigation a second child, age 14, also disclosed the same staff member touched his genitals over his clothing and the staff member allowed the child to touch her genitals over her clothing. Other facility staff had also recently express concerns to a shift supervisor and to an Administrator regarding inappropriate behavior by the perpetrator that made them uncomfortable.

The investigation resulted in two RTB findings for Sexual Abuse. Two citations were issued by RCCR, one for Children's Rights to be free of abuse, neglect or exploitation and one Serious Incident Reporting - Report to Licensing as soon as aware of allegations or indications of abuse, neglect, or exploitation of a child.

## Physical Abuse

On June 7, 2020, an intake received by SWI after a child, age 13, received medical treatment for lacerations to his head needing four staples. The child reportedly became upset and punched the staff member. The staff member then used excessive force first by pushing the child and forcefully shoving the child's head into a 90-degree corner of a wall resulting in injuries to the child's head. The staff member reported he restrained the child, and the child began to hit his head on the wall causing the injuries. The allegation of Physical Abuse was determined to be Reason to Believe. Three citations were originally issued, two were overturned after an Administrative Review. A citation for Children's Rights - to be free of abuse, neglect, and exploitation was upheld.

On February 2, 2020, an intake was received by SWI alleging a child was inappropriately restrained resulting in an injury. The child, age 16 reported he was instructed to change rooms and that the staff was provoking him and made him flinch. The child became upset and, when he walked past the staff, the staff grabbed the child by the neck, pushed him onto the ground, and pressed his knees into the child's back and his elbow in the child's face. The child reported not being able to breathe for at least four seconds when the staff grabbed him around the throat and pushed him onto the ground. The child sustained a swollen lip and red marks on his neck and face. The allegation of Physical Abuse was determined to be Reason to Believe. Seven citations were issued as a result of the investigation: 1) EBI -staff conducted a restraint in a non-emergency situation; 2) EBI – Never used as punishment; 3) Short Personal Restraint – use minimal amount of reasonable and necessary physical force; 4) Short Personal Restraint-Caregiver may not use restraint that interferes with child's ability to communicate or vocalize distress; 5) Short Personal Restraint-Caregiver may not use restraint that impairs child's breathing by putting pressure on torso; 6) Short Personal Restraint-Caregiver may not use restraint that obstructs child's airways or impairs child's breathing; 7) Children's Rights - to be free of abuse, neglect, and exploitation.

On November 5, 2019, SWI received an intake that a child, who had been admitted to a juvenile justice facility, was inappropriately disciplined while at Kidz Safe Harbor and was having headaches because of the discipline. It was reported by the child that he and another child were fighting, a staff sent him upstairs and as he was trying to go up the

188

stairs the staff member pushed him down. It was stated that staff pushed him down at least twelve to fourteen times, causing the child to fall and hit his head on the side of the steps each time. The staff then directed the child to go to his room downstairs and grabbed the child by the back of his shirt and threw him into a chair in the hallway. The staff was reportedly yelling and spitting in the child's face. The child also reported the staff punched him in the face, which another child confirmed. The children did not know the name of the staff member who abused the child. As a result, the disposition of Physical Abuse was determined Reason to Believe for an unknown perpetrator. Two citations were issued 1) Children's rights-The right to be free from being subjected to or threatened with corporal punishment, including spanking or hitting; 2) Children's Rights to be free of abuse, neglect, or exploitation.

On September 04, 2019, SWI received an intake alleging that 15-year-old child was improperly restrained and physically disciplined, alleging the staff member tried to restrain the child by throwing him like a "football" after the child got mad and tried to walk out of the home. The child reports the staff threw him, forcing him onto the bed and punched him and slapped him, the staff was sitting on the child's stomach. Two other staff who were present intervened and the perpetrator left the room. The youth sustained a black eye, bruising near his left eyebrow, a scrape on his left elbow and four cuts in the palm of his hand. There was a 9-month gap in the investigation from the time it was reported until initiated on June 5, 2020. The investigation concluded with a Reason to Believe finding for Physical Abuse. DFPS issued for citations: 1) Short Personal Restraint – Caregiver may not use restraint that impairs child's breathing by putting pressure on torso; 2) Short Personal Restraint-Caregiver must minimize risk of physical discomfort, harm, or pain to child; 3) Corporal Punishment; and 4) Children's Rights to be free of abuse, neglect, or exploitation.

On May 13, 2019, a report was received by SWI, that a 13-year-old child sustained an injury during a containment. The child reported that he was restrained by a staff member because the child cursed and said he was going to kill himself. During the restraint, the staff bent the child's arm so far up the child's back that it popped. After the restraint the child reported that his arm hurt, and he was given an ice pack. The child was taken for medical treatment the following day and the doctor originally diagnosed a fracture to the child's arm, but an orthopedic doctor later determined the injury to be a sprain. The investigation determined excessive force was used during the restraint and the close was closed with a Reason to Believe for Physical Abuse. DFPS issued three citations 1) EBI – minimal amount of reasonable and necessary physical force; 2) Serious Incident-Report to Licensing no later than 24 hours after injury/illness; and 3) Children's Rights to be free of abuse, neglect, or exploitation.

## Citations

From January 1, 2017, to December 31, 2021, Kidz Safe Harbor received 120 deficiencies of which 47 were rated high and 44 medium high. resulting from monitoring inspections or intakes received at SWI and linked to monitoring inspections. The type of citations include:

- ▪ EBI: failure to properly use EBI only in emergency situations, failure to properly document the specific EBI administered, and failure to use the minimal amount of reasonable and necessary physical force

- ▪ Discipline: failure to use appropriate disciple measures by threatening corporal punishment; and causing physically or emotionally damage to a child

- ▪ Physical Site**:** failure to meet building codes; failure to keep bathrooms in good repair and kept clean; and failure to keep windows and doors in good repair

- ▪ Supervision: failure to provide the level of supervision necessary to ensure each child safety and well-being

- ▪ Child Rights**:** failure to ensure children are free of abuse, neglect or exploitation

- ▪ Medication: failure to properly store medications; failure to record distributed medications timely

### Light of the Pines (1710016)
### Denial of license, January 28, 2022

On August 3, 2020, Light of the Pines operators applied for a permit to operate a licensed general residential operation located at 3896 FM 2497 in Lufkin, Texas. On September 4, 2020, RCCR returned the application as incomplete.[223] On October 9, 2020, Light of Pines operators submitted a second application, which RCCR accepted.

On October 27, 2020, RCCR conducted an Announced Application Inspection to determine whether the operation complied with all applicable rules and minimum standards. RCCR issued one citation for three inconsistent areas regarding the abuse and neglect policy reporting requirements. Light of the Pines' administrator submitted a corrected abuse and neglect policy and procedure and revised acknowledgment form. Upon this correction, RCCR issued Light of the Pines an initial permit on November 05, 2020.

RCCR licensed Light of the Pines for a total capacity of 30 females, ages 14-17 years. The program services included childcare for children experiencing emotional disorders and victims of human trafficking. RCCR licensed Light of the Pines to use personal restraints as a behavioral intervention method.

Light of the Pines received its first child placement on January 7, 2021, and its second and third child placements on January 19 and 21, 2021.

---

[223] According to CLASS, the application was not complete. The application was missing the (1) franchise tax status statement; (2) F2960 Attachment C-Operational plan; (3) the floor plan information; and (4) bank statements. The Section C-Education Plan is vague and does not adequately address [an education plan]. The bank letters are [more than] 30 days old (June and July). The fiscal plan is missing significant anticipated expenses. The policies and procedures were restated verbatim the minimum standards.

Between February and July 2021, RCCR conducted three unannounced initial inspections, testing minimum standards. Light of the Pines received 11 citations after the first inspection, and 13 citations after the second inspection during the first initial permit period.

After the second initial inspection, RCCR conducted a staffing to determine whether a second initial permit should issue:

We have completed 2 of the three initial inspections. Both inspections had concerning deficiencies (11 def and 13 def). The operation provides services to trafficking victims and emotional disorder treatment services. To date, they have only maintained about four placements, all intense [levels of care] from SSCC providers. [Light of the Pines] does not have a DFPS contract, as they were not approved. [Light of the Pines] expressed they plan to reapply for the DFPS contract. Since accepting placements in January, they have struggled with getting the treatment program structured and in compliance. During this last inspection, it was found that the Treatment Director's Administrative Assistant had started completing case managing duties and plans and signing off as case manager; however, this individual is not qualified (education nor experience) to function as a PLSP. The [Licensed Child Care Administrator] is fully aware of the struggles of the treatment program as well as other areas that need improvement. The operation needs a 2nd initial period to fully establish the treatment program and demonstrate overall compliance. The 1st initial period expires 5/5/21. [Agency leadership] responded that he would agree that moving to a 2nd initial is appropriate.

On July 2, 2021, RCCR conducted a first initial unannounced monitoring inspection for the second initial permit period. Light of the Pines received two citations. On July 26, 2021, RCCR conducted a second initial unannounced monitoring inspection for the second initial permit period and issued Light of the Pines six citations.

On August 11, 2021, DFPS received an intake alleging Neglectful Supervision of children in care resulting in two children engaging in a sexual act. This intake resulted in an RTB finding for Neglectful Supervision.

According to CLASS, RCCR extended the initial permit period because Light of the Pines needed to complete its public hearing. On November 19, 2021, the Light of the Pines held a public hearing and:

Most attendees that spoke did so from written statements. Those in opposition focused mostly on the education aspect regarding students attending public school in Diboll ISD. The attendees provided statistical information on the negative impacts on the school district and significant strain on the already limited resources available if these youth were to attend public school. The Diboll ISD chief was present and spoke in opposition; juvenile probation was present and spoke in opposition due to the limited space available. Approximately 11 speakers opposed, one no stance, about seven speakers in support. Positive character references for [operator] were emailed to CCR and emails in opposition.

191

On December 1, 2021, DFPS received an intake alleging inappropriate discipline of a child in care. This intake resulted in an RTB finding of Physical Abuse.

On January 7, 2022, HHSC informed the Monitors of its intent to deny issuing a full license to Light of the Pines:

I wanted to let you know that HHSC intends to deny issuing a full license to a facility under the name Light of the Pines (#1710016). Light of the Pines is a GRO in Lufkin (Angelina County) that contracts with OCOK. The operation currently has six children in care. Their provisional license was issued on 11/5/2020. During their provisional license period, this operation has had two RTBs –NSUP from an investigation received in August 2021 and PHAB from an investigation received in December 2021 and recently completed.

Additionally, this operation was subject to a public hearing held on 11/19/2021. Based on all available information, HHSC has decided it is necessary to deny the issuance of the full license. HHSC has reached out to DFPS to notify OCOK of the denial and confirm when the children can be moved. HHSC will coordinate delivery of the Denial letter when all children have been moved." [224]

On January 28, 2022, HHSC notified the Monitors that all the children had been moved from the operation, and that Light of the Pines had requested to withdraw their application. HHSC agreed to accept the withdrawal in lieu of a license denial. [225]

## Investigation and Inspection History

Between January 1, 2017, and December 31, 2021, Light of the Pines received three RTB findings and 55 deficiencies. Of the 55 deficiencies cited, 48 resulted from monitoring inspections.

Light of the Pine's RTB findings and deficiency citations are as follows:

## Neglectful Supervision

On August 11, 2021, a staff reporter alleged that while three caregivers transported children in a 15-passenger van, one staff sat in the passenger seat and the other staff sat behind the passenger seat, which provided two children an opportunity to engage in inappropriate conversation and non-consensual sexual activity. DFPS completed its investigation on September 9, 2021, resulting in two RTB findings for Neglectful Supervision. RCCR issued two citations for violations of minimum standards: (1) child

---

[224] Email from Katy Gallagher to Deborah Fowler and Kevin Ryan, Re: License Denial - Light of the Pines (January 7, 2022) (on file with Monitors).
[225] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: License Denial – Light of the Pines, January 28, 2022 (on file with the Monitors).

rights-to be free from abuse, neglect, and exploitation; and (2) caregiver responsibility-being aware of and accountable for each child's ongoing activity.

On October 27 and 28, 2021, Light of the Pines and the two designated perpetrators requested an administrative review for the RTB finding and deficiencies cited. On November 8, 2021, the Administrative Review of Investigation Findings (ARIF) reviewer submitted a records request via *OneCase*. On January 5, 2022, the ARIF request was reassigned to another reviewer. On February 17, 2022, the newly assigned reviewer mailed redacted records to the two designated perpetrator's attorneys. There are no additional updates as of March 23, 2022. On February 17, 2022, the Administrative Review Officer upheld the child rights and caregiver responsibility citations, finding that "[t]wo children reported th[ey] were able to engage in a sexual act on the operations van while being transported back to the facility. Collateral children interviewed confirmed this incident took place. All children present on the van confirmed that they were not adequately supervising and did not intervene."

## Physical Abuse

On December 1, 2021, SWI received an intake alleging inappropriate discipline of children in care. A caregiver was observed, on camera, performing an emergency behavioral intervention (EBI) restraint on a child in care who was not harming herself, others, or destroying property. DFPS observed the caregiver on camera performing an inappropriate EBI restraint on a child in care. The caregiver pushed the child in care against a door and pressed on the child's neck. The caregiver impeded the child's breath when the caregiver placed her hand around the child's throat.

DFPS completed its investigation on December 29, 2021, resulting in one RTB finding for Physical Abuse. RCCR issued five citations for violation of minimum standards: (1) Children's rights-Adhere to the child's rights to be free of abuse, neglect, and exploitation; (2) Emergency Behavior Intervention-Basis for EBI is an emergency or to administer medication; (3) Personal Restraints Prohibited-Restraints that obstruct child's airway; (4) Personal Restraints Prohibited-Restraints that twist or place the child's limb(s) behind the child's back; (5) Emergency Behavior Intervention-Never used as retribution or retaliation.

On January 11, 2022, Light of the Pines and the designated perpetrator requested an administrative review for the RTB finding and the deficiencies cited. As of March 23, 2022, the administrative review request for the RTB finding is pending the assignment of an ARIF reviewer and review date. As of the date of request, the administrative review for the deficiencies cited is assigned and pending review.

## Citations

Between January 1, 2017, and December 31, 2021, Light of the Pines received 48 deficiencies resulting from monitoring inspections or intakes received at SWI and linked to monitoring inspections. The type of citations include:

- Administration: Failure to update abuse and neglect policies and procedures; failure to report EBI to license quarterly.

- Records**:** failure to obtain signed documentation that a volunteer will report child abuse and neglect to SWI & administrator; failure to document whether volunteers and staff completed required training; failure to document job description; failure to document required professional license or certificate for employment position; failure to document employee acknowledgment of policies and procedures; failure to document serious incidents; failure to properly and timely document child admission and discharge records; failure to maintain child medical record.

- Physical Site**:** failure to maintain bathroom in good repair and kept clean.

- Health And Safety**:** failure to place a thermometer in the freezers and refrigerator and store frozen food at 0-degrees and refrigerator food at 40-degree Fahrenheit or below.

- Child Rights**:** failure to ensure disciplinary measures are appropriate to the incident and severity of the behavior demonstrated.

### Life's Purpose RTC (1696069)
### License Revoked March 16, 2022

On August 6, 2019, Life's Purpose Residential Treatment Center (Life's Purpose) operators applied for a permit to operate a licensed general residential operation located at 1211 Lark Lane in Richmond, Texas. RCCR accepted the application as complete. Life's Purpose was connected to another operation, Carter's Kids, which was on Probation. The two operations were linked through their controlling persons.

On August 9, 2019, RCCR conducted an Unannounced Application Inspection to determine whether the operation complied with all applicable rules and minimum standards. RCCR did not issue any citations, and RCCR issued Life's Purpose its initial permit.

On August 30, 2019, RCCR met with the leadership of Life's Purpose and Carter's Kids to discuss the probation conditions for Carter's Kids:

[The operation's controlling person] was on the phone for a short time, and during that time, he stated he was relinquishing the license to Carter's Kids. Life's Purpose has received a contract from CPS effective 9-1-19 and will begin operating on that date. Carter's Kids will be officially closed on 8-31-19.

> I provided [the operation] with the compliance history for Carter's Kids for the past two years. I also provided the conditions for the Probation. We informed the [operators] that they are starting with a clean slate, but since they have the same staff and same administration, they may have the same

194

issues that Carter's Kids did. We informed the Carters that we could not impose the conditions on them, but they may want to review the conditions along with the compliance report and look for areas to be adjusted.

We discussed the operation and the plans for the new operation. They have a daily communication report and a regular handyman and expedite handyman on the payroll. [The operators] ... visit on the weekends, evenings, and nights to assess staff and ensure policies are complied with. [Life's Purpose administrator] has instructed staff to go to school with boys behaving badly and spending the day at school. Also, staff is expected not to send a child to school when they behave badly and wait until the child has calmed down or de-escalated before sending the child to school. [Life's Purpose administrator] has met with all the schools and now has a good relationship with them.

We instructed the operation that all of the children needed a discharge summary completed for Carter's Kids, and then the children needed to be admitted to Life's Purpose. This means a new admission assessment, a new 72-hour plan, a new service plan, new medical consenting documents, new placement agreements, etc. [The operators] ... stated they understood. The conditions for the Probation follow. While this operation does not have to implement any of the conditions, they stated they might want to. The conditions are being added here for RCCL convenience.

Between October 2019 and January 2020, RCCR conducted three initial unannounced monitoring inspections for the first permit period. Life's Purpose received nine total citations, with the bulk of the citations resulting from the third inspection from the first initial permit period. Although RCCR completed three initial inspections on February 5, 2020, RCCR issued Life's Purpose a second initial permit because the first initial permit expired due to the shelter-in-place mandates issued at the height of the pandemic.

On February 5, 2020, RCCR issued a second initial permit. RCCR did not conduct an initial inspection during the second initial permit period until August 4, 2020 and issued no citations. By August 20, 2020, RCCR issued Life's Purpose its full permit. Life's Purpose received its license to operate at a total capacity of 30 females, ages 14-17 years.

By January 5, 2022, HHSC informed the Monitors of its intent to revoke Life's Purpose license:

Life's Purpose was issued a license on 8/19/19 and placed on heightened monitoring on 12/22/20. HHSC is imposing Probation due to patterns of deficiencies related to background checks, medical care/medication, supervision, children's rights, and administrator responsibilities.

I have an update on Life's Purpose. The week of January 31, DFPS notified HHSC of its intent to terminate Life's Purpose contract. On February 7,

DFPS notified HHSC that Life's Purpose was informed of DFPS' decision to terminate the contract. The operation has asked DFPS to move all the children by tomorrow, but I understand that DFPS is trying to move all the children today. HHSC has been paying close attention to several concerning investigations at this operation. HHSC understands that DFPS intends to RTB the owner and administrator due to their involvement in a serious medical incident involving a child placed at the operation. HHSC plans to issue an Intent to Revoke letter to Life's Purpose once those RTBs are finalized and transferred to HHSC. While we do not yet have an estimated date for the delivery of the Intent to Revoke letter, we are preparing to move as swiftly as possible, and we will keep you posted as things develop.[226]

## Investigation and Inspection History

Life's Purpose received RTB findings and deficiencies resulting from allegations reported to SWI for investigation or deficiencies resulting from monitoring inspections conducted by RCCR. Between January 1, 2017, and December 31, 2021, Life's Purpose received an Unable-to-Determine finding for Physical Abuse, one RTB finding for Neglectful Supervision, and one Unable-to-Determine finding for Sexual Abuse. A finding for Physical Abuse was overturned after an administrative review. The operation received citations for 48 minimum standards deficiencies.

## Physical Abuse

On February 8, 2021, SWI received allegations that a caregiver performed an EBI restraint on a child in care who was not harming himself or others or destroying property. The intake alleged the caregiver used unnecessary force, causing the child to sustain injuries to his hand, arm and foot. DFPS completed its investigation on March 31, 2021, resulting in one RTB finding for Physical Abuse. RCCR issued four citations for violations of minimum standards: (1) EBI Implementation: caregiver must consider the permitted types of emergency behavior intervention; (2) EBI Implementation: caregiver must use the minimal amount of reasonable and necessary physical force; (3) EBI Implementation: must be an appropriate response to the behavior demonstrated, and de-escalation must have failed; and (4) Children's rights: adhere to the child's rights to be free of abuse, neglect, and exploitation.

On May 24, 2021, Life's Purpose requested an administrative review of the RTB finding and the deficiencies cited. On November 5, 2021, the Administrative Review Officer overturned the RTB finding.

---

[226] Email from Katy Gallagher to Kevin Ryan and Deborah Fowler (January 5, 2022) (on file with Monitors).

On December 1, 2021, RCCR Program Specialist conducted the administrative review related to RCCR's decision to cite one or more deficiencies due to the investigation. The Program Specialist overturned all four citations, finding there was not a preponderance of evidence to support the four citations.

On February 22, 2021, SWI received an intake alleging that a caregiver dragged a child out of bed and body-slammed the child on the ground for failure to follow an order. During the investigation DFPS learned that caregivers could hear the children upstairs jumping around and making noise. When the caregiver walked into the child's room, the child jumped off one bed and ran toward his bed. The caregiver observed the child fall after jumping from the bed. The caregiver picked the child up, looked the child over, and instructed the child to go to bed. The caregiver denied observing any injuries, and the child informed that his back hurt. The caregiver failed to write a serious incident report or seek medical care even after the child stated he was in pain.

DFPS completed its investigation on March 31, 2021, resulting in one UTD for Physical Abuse; however, DFPS issued an RTB finding for Neglectful Supervision. RCCR issued three citations for violations of minimum standards: (1) reasonable and prudent parent standard-must consider the surrounding circumstances, hazards, and risks of the activity because the caregiver failed to seek medical attention for a child after being informed about a possible injury; (2) caregiver responsibility: providing the level of supervision necessary to ensure each child's safety and well-being; (3) children's rights: adhere to the child's rights to be free of abuse, neglect, and exploitation. Life's Purpose waived its right to request an administrative review for the first and third citations above. On May 25, 2021, Life's Purpose requested an administrative review. The administrative review upheld the second citation on November 15, 2021, and Life's Purpose withdrew its request for an administrative review.

## Neglectful Supervision

On June 28, 2021, SWI received an intake alleging a caregiver failed to perform appropriate night checks during her shift on June 24, 2021, resulting in three residents absconding from the facility, shoplifting cough medicine and a soft drink from a convenience store, sneaking back into the facility, and consuming the stolen goods without the caregiver noticing they were gone.

DFPS completed its investigation on August 27, 2021, resulting in one RTB finding for Neglectful Supervision. RCCR issued three citations for violation of minimum standards: (1) medical care- a child in care must receive medical care as needed for injury, illness, and pain; (2) Serious Incident: report to Licensing no later than six hours after determining an unauthorized absence of a child 13 years old or older; and (3) children's rights: adhere to the child's rights to be free of abuse, neglect, and exploitation.

On September 17, 2021, Life's Purpose requested an administrative review of the RTB finding. The Administrative Review was reassigned on January 5, 2022; records are still pending as of March 28, 2022. On October 21, 2021, Life's Purpose requested an

administrative review for all RCCR citations. The Administrative Reviewer overturned citations one and two but upheld citation three.

## Sexual Abuse

On November 19, 2020, a juvenile probation officer reported that a child in care stated that while at Carter's Kids (the operation linked to Life's Purpose), another child sexually assaulted him. However, due to the child's adoptive parents' refusal to allow the child to cooperate in the investigation and forensic interview and the investigator's inability to obtain corroborating evidence from CPS records, Carter's Kids records, interview with a prior therapist, and a conflicting statement from the child's brother, the investigator was not able to reach a determination.

DFPS completed its investigation on March 2, 2021, resulting in a UTD finding for Neglectful Supervision. RCCR did not issue any citations.

On September 26, 2021, an intake was received by SWI after a 16 year old child with Type 1 Diabetes was admitted to the hospital in critical condition. On September 17, 2021, the child was placed at Life's Purpose after the child's medication requirements were confirmed with the facility administrator and the CVS worker. Just seven days after placement the child was taken to the hospital for nausea, vomiting and a blood sugar level of 436, he was diagnosed with Diabetic Ketoacidosis. The treating physician confirmed the staff at the facility did not have the proper education needed to care for the child and educational materials were provided when the child was release from the hospital.

That same day, the child was again transported to the hospital for nausea, vomiting and a blood glucose level of 621. The child was confirmed to be in Diabetic Ketoacidosis a second time and was admitted into the Pediatric Intensive Care Unit in critical condition.

When interviewed, the child said he had not felt well for three days and had reported this to staff. The child reported that his long-lasting insulin is locked up and when one of the staff who administer the medication is not at work, he doesn't receive his morning insulin. The FACN consult stated the child's medical crisis is consistent with missing several doses of his long-lasting insulin. The medical logs showed the child was not receiving all his insulin as prescribed.

The investigation also revealed that two staff members designated to distribute medications were each working on a provisional status and were to be restricted from administering medication. The Facility Administrator who was also the Primary Medical Consenter, admitted to not providing adequate training to staff on diabetic management for the child.

The investigation concluded with a Reason to Believe for Neglectful Supervision by the CEO of Life's Purpose for allowing the two staff members on provisional status to administer medications, a second Reason to Believe was issued for Medical Neglect by the facility administrator for failing to ensure formal training to the staff managing the child's

medical care, failure to oversee the child's 72-hour Service Plan, medical log, and staff responsible for medication distribution.

## Citations

Among the 48 citations for minimum standards deficiencies Life's Purpose received between January 1, 2017, to December 31, 2021, are these:

- Records: Failure to document the administration of medication and personnel records; failure to properly document EBI reports; failure to properly document admission assessment records; failure to properly complete initial assessment document; failure to document evacuation plan.

- Child Rights: Failure to prevent denial of food, sleep, a bathroom, mail, or family visits as punishment; failure to ensure fair treatment; failure to prevent harsh, cruel, unusual, unnecessary, demeaning, or humiliating treatment or punishment.

- Prohibited punishment: failure to prevent harsh, cruel, unusual, unnecessary, demeaning, or humiliating discipline/punishment.

- Caregiver Responsibility: failure to provide the level of supervision necessary to ensure each child's safety and well-being; failure to exercise prudent judgment.

- Training: failure to ensure training includes procedures to follow in emergencies and s steps to preventing the spread of infectious diseases.

- Safety: failure to properly stock first aid kits; failure to ensure required vaccination of personnel; failure to provide supplies and equipment to maintain hygiene; failure to ensure licensing requirement (fire inspection, operable fire extinguisher); failure to properly store hazardous products; failure to properly store medication.

- Physical Site: failure to ensure a hazard-free premise.

## Corrective or Adverse Action History

On September 8, 2021, RCCR held an internal meeting to discuss the compliance histories for Life's Purpose and Carter's Kids because the two operations are closely related and connected by overlapping controlling persons. The attendees' discussion was documented in CLASS as follows:

> The compliance reviewed was for the past five years combined. It was discussed that Life's Purpose has had 2 RTB findings for NSUP and PHAB, 2 UTD findings for SXAB/NSUP and PHAB. Carter's Kids had 1 RTB for NSUP.

Life's Purpose has one pending RTB for NSUP. Life's Purpose has received 50 citations in the past two years. Areas of concern are EBI, Discipline, Records, and Physical Site.

We discussed Corrective Action or Plan of Action (POA), and POA was agreed on

On September 22, 2021, RCCR held a Plan of Action meeting with the permit holders for Life's Purpose:

The POA was discussed, and the [operators] accepted it. The [operators] were provided with their 2-year compliance history report. [One of operators] inquired about them using part of their HM plan to address some of the areas of concern for their POA. He was informed he could do that and possibly add action items. [He] was informed if he has any questions, please reach out to CCR to discuss. [The operators] were informed that we're here to support them and want them to be successful.

[The operators] were provided with the POA form and were reminded the POA was due back to CCR within ten days of today's date

On October 15, 2021, RCCR rejected Life's Purpose's POA. Life's Purpose agreed to make the corrections and resubmit the corrections by October 18, 2021n December 30, 2021, RCCR held a virtual meeting with Life's Purpose to notify them that they were being placed on Probation. RCCR initially scheduled Life's Purpose Probation plan to begin on January 15, 2022, but it began on February 16, 2022, because Life's Purpose requested an administrative review. On February 16, 2022, the administrative reviewer upheld the Probation.

On February 16, 2022, RCCR initiated the Probation, scheduled to end on January 15, 2023.

## Administrative Penalty History

The operation has received four administrative penalties regarding background checks.

1. On December 30, 2020, RCCR issued two citations for failure to obtain a criminal background check on two employees. DFPS determined Life's Purpose permitted two different caregivers to work without receiving a clearance letter from the Central Background Check Unit (CBCU) during an abuse and neglect investigation. Life's Purpose waived the right to administrative review. On January 4, 2021, RCCR approved the recommendation of both administrative penalties, totaling $300.00, and notified Life's Purpose. On February 11, 2021, RCCR received the penalty payment.

2. On February 24, 2021, RCCR issued a citation for failing to restrict the duties of an employee who CBCU provisionally cleared with conditions. During, RCCR determined from interviewing a case manager that a direct care staff at the operation has a provisional background check that states that the staff cannot be the only staff responsible for supervising children. On November 15, 2021, RCCR held an administrative review of the citation for which it assessed a penalty. RCCR overturned the citation and stopped the penalty process.

3. On December 14, 2021, RCCR issued a citation for failing to restrict an employee's duties that CBCU provisionally cleared with conditions. During an abuse and neglect investigation, DFPS determined that two staff members did not follow the conditions on their provisional background checks when administering medication, and one staff transported a child. Life's Purpose waived its right to an administrative review. On February 8, 2022, RCCR approved the recommendation for the administrative penalty, totaling $150.00, and notified Life's Purpose. As of March 29, 2022, there is no record of payment of the administrative penalty.

4. On February 25, 2022, RCCR issued a citation for failure to administer medications according to instructions or a prescribing healthcare professional's order. During an abuse and neglect investigation, DFPS determined a child missed multiple insulin doses, leading to hospitalizations for diabetic ketoacidosis. On February 28, 2021, Life's Purpose requested an administrative review of the citation. On March 15, 2022, RCCR assigned the administrative review request

## Heightened Monitoring

The Heightened Monitoring Team identified Life's Purpose as an operation requiring increased monitoring:

This operation was previously known as Carter's Kids and has reopened as Life's Purpose under a new owner. The data shows consistencies in violations between the old and new operations. The history for both operations indicate a pattern of non-compliances in the 5-year data about serious incident reporting, physical site hazards, admissions, service plans, and discipline/ punishment. There have been repeated physical site safety hazards, including unrepaired holes within the walls, inoperable toilets in the lavatories, and broken windows/ window blinds. Multiple violations were not corrected within the required timeframes, and additional citations were issued for secondary non-compliances. Admissions and service planning issues were repeatedly cited, including non-compliances from Youth for Tomorrow (YFT) regarding missing items in youth records. There has also been a pattern of inappropriate discipline, including staff making threatening remarks, profanity, allowing youth to provide discipline to one another - resulting in injuries, failure to follow operational policies and procedures regarding discipline, and staff using corporal punishment resulting in injuries to youth.

On December 22, 2020, the Heightened Monitoring Team notified Life's Purpose it would begin Heightened Monitoring. The HM Plan began on January 28, 2021.

## Updates on Prior Facility Closures

Two operations that were closed prior to the filing of the Monitors' Second Report,[227] Brave Hearts Children Center and Willow Bend Center RTC, subsequently filed suit in state court for injunctive relief, asking that they be allowed to remain open pending an appeal to the State Office of Administrative Hearings.

### Brave Hearts

The Monitors received an email update on April 7, 2022, from RCCR noting that a hearing would be held on the status of the Brave Hearts facility on June 2, 2022:

> HHSC previously determined this operation to be unsafe for children and issued a notice of intent to revoke their license, however Bravehearts [sic] filed an application in a Harris County state district court requesting injunctive relief which, if granted, would allow them to continue to operate during the pendency of their administrative appeal. You may recall a T.I. hearing was started on 2/24/22 and then was set to continue 3/4/22 and then re-set to continue 4/8/22. As an update, we received the attached notice of setting and we understand Bravehearts' lawyers, on their own initiative, are now re-setting the continuation of the T.I. hearing (previously set for tomorrow, 4/8) for **June 2, 2022**. If we receive any additional updates on this or updated Zoom information, I will be happy to forward that. As a reminder, Bravehearts'[sic] request for a T.R.O. was denied on 2/11/22 and we understand Bravehearts [sic] remains closed at this time.[228]

### Willow Bend

In the same email message[229] RCCR updated the Monitors on the status of Willow Bend's appeal. On March 2, 2021,[230] RCCR notified Willow Bend of the intent to revoke its license based on ongoing patterns related to restraints, supervision, and recent reason to believe findings.[231]

> You may recall that HHSC also previously determined this operation to be unsafe for children and issued a notice of intent to revoke their license, however on July 2, 2021, a Smith County state district court issued an order for Temporary Injunction to allow Willow Bend to continue to operate during the pendency of their administrative appeal. HHSC appealed that state court order and, yesterday evening, we learned that the 12th Court of Appeals reversed and remanded the Smith County T.I. order. Please see the Memorandum Opinion and Judgment

---

[227] May 4, 2021.

[228] E-mail from Katy Gallagher to Kevin Ryan and Deborah Fowler, re: Update on Injunctive Matters: Bravehearts and Willow Bend, April 7, 2022 (on file with the Monitors).

[229] *Id.*

[230] *See* Deborah Fowler & Kevin Ryan, Second Report, 360, ECF No. 1079.

[231] *Id.* Details of the reasons for revocation are found in pages 361-364.

attached. We will continue to follow the remand as necessary and update you on any developments.[232]

The Memorandum Opinion and Judgment[233] reversed the injunction, permitting Willow Bend to amend its pleadings on administrative appeal:

> In its pleadings that include an original petition and two amended petitions, Willow Bend referenced Section 42.072 and stated that it gave the trial court jurisdiction over the case. However, it did not plead that Willow Bend does not pose a health or safety risk to children. Instead, it merely states that Section 42.072 permits it to seek an injunction so that it can continue to operate during the pendency of its administrative appeal. It references the Texas Administrative Code for its proposition that it can continue to operate during its appeal of HHS's revocation decision and cites to the Texas Constitution for its due process argument. When requesting both a temporary restraining order and temporary injunction, Willow Bend alleged that its application for injunctive relief is authorized by Section 42.072. It further explained the harm that failing to grant injunctive relief would cause Willow Bend, i.e., closing a private entity
> for a period of five years, which would be "career-ending." Willow Bend alleged that it considers the administrative appeal process "unfair and untimely," which it contends supports its request for a temporary injunction.
>
> To establish that a trial court has jurisdiction over a tort claim against a state agency, a plaintiff must allege consent to suit either by reference to a statute or express legislative permission and plead facts that fall within the scope of the waiver. **Wilson v. Tex. Workers' Compensation Comm'n**, No. 12-01-00337-CV, 2003 WL 22681793, at *4 (Tex. App.—Tyler Nov. 13, 2003, no pet.) (Mem. op.) (citing **Tex. Dep't of Transp. v. Jones**, 8 SW.3d 636, 638 (Tex. 1999) and **Tex. Dep't of Criminal Justice v. Miller**, 51 S.W.3d 583, 587 (Tex. 2001)). Section 42.072 states that the trial court has jurisdiction to impose an injunction if the childcare facility does not pose a risk to the health or safety of children. TEX. HUM. RES. CODE ANN. § 42.072. Willow Bend failed to plead that it did not pose a risk to the health or safety of children. Therefore, Willow Bend has not pleaded facts within the scope of the waiver, and it has not shown that sovereign immunity from suit has been waived. However, the petitions do not affirmatively demonstrate incurable defects in jurisdiction; therefore, Willow Bend should be afforded the opportunity to amend. *See* **Brown**, 80 S.W.3d at 555. Accordingly, we sustain HHS's first issue.

### Remedial Order 21 Summary

Between April 1, 2021 and December 31, 2021, RCCR inspectors recommended closure for twelve foster homes. RCCR approved two foster homes for closure due to multiple

---

[232] *Id.*
[233] Texas Health and Human Services Commission v. Willow Bend Center, No. 12-21-00147-CV (April 6, 2022).

investigations for violations of minimum standards and abuse and neglect, including medical neglect, improper discipline, failure to adhere to medication regimes, and home cleanliness violations, among other citations and violations. Seven foster homes were closed by their CPAs prior to final RCCR closure decisions. RCCR denied closure of two homes, despite multiple investigations and citations. One recommendation for closure remained pending as of the Monitors' review.

Since the Monitors last updated the Court on congregate care facility closures, RCCR revoked or denied a license for two congregate care facilities due to their histories of safety violations.

As of March 15, 2022, DFPS' list of foster homes disallowed for placement included 56 homes; 34 of those homes were added to this list in 2021. Nine of these homes were among the twelve that an RCCR inspector recommended for closure. The Monitors reviewed CLASS records for the homes on the disallowed list and found records for all but two. The other homes on the list were involuntarily or voluntarily closed by the CPA, closed when the CPA voluntarily closed or had its license revoked by RCCR, or were listed as inactive.

## List of Tables

Table 1 : Race for Children in PMC on December 31, 2021, and Estimates of Total Child Population in Texas by Race, August 12, 2021 ................................................................... 19

Table 2: Living Arrangement by Race, Children in PMC on December 31, 2021 ............ 21

Table 3 : Living Arrangement by Race, Children in PMC on December 31, 2021 ........... 21

Table 4: Exits from PMC by Exit Outcome, July 1, 2021, to December 31, 2021.............. 23

Table 5: Out of State PMC Youth by Living Arrangement Type, .................................... 23

Table 6: Out of State PMC Youth by Race on December 31, 2021 .................................... 24

Table 7: Authorized Level of Care for Children in PMC as of December 31, 2021........... 24

Table 8: Top Five Counties of Removal for PMC Children on December 31, 2021 .......... 25

Table 9: PMC Children by Regions on December 31, 2021................................................. 25

Table 10: PMC Children from Regions with Single Source Continuum Contractor Presence by Region on December 31, 2021 .................................................................... 25

Table 11: Number of Runaway Incidents for PMC Children by Sexual Indicator Type, January to December 2021 .................................................................................................... 28

Table 12: Staff Included by DFPS as Those Responsible for Making Determinations of Child Sexual Aggression, Quarter 1 FY22 .............................................................. 30

Table 13: Child Sexual Abuse Training Completion by Caseworker Type, June 1, 2021, to November 30, 2021........................................................................................................ 36

Table 14: Number of Operation Locations Requiring Awake-Night Supervision,............ 59

Table 15: Priority of RCCR Investigations, June 1, 2021 to November 30, 2021.............. 83

Table 16: Outcome of Administrative Review for Requests with a Decision.................. 107

Table 17: Standard Categories for Granted Variance Requests for Operations on Heightened Monitoring.......................................................................................................... 118

Table 18: Enforcement Actions at In-Depth Heightened Monitoring Operations, 2016 to 2020 ................................................................................................................................... 120

Table 19: Violations and Citations in Operations with Tasks Found to Comply During the Quarter............................................................................................................................ 124

Table 20: Operations with a Contract Violation and Number of Violations ................... 129

Table 21: Operations with an Enforcement or Corrective Action ..................................... 131

Table 22: Comparison of Operations Extended and Moved to Post-Plan Monitoring at Annual Review ..................................................................................................................... 133

## List of Figures

Figure 1: Age of Children in PMC on December 31, 2021 ..................................................... 18

Figure 2: Living Arrangements for Children in PMC on December 31, 2021................... 20

Figure 3: Length of Stay in Care of Children in PMC on December 31, 2021................... 22

Figure 4: Children in PMC Placement with a Sexual Characteristic Flag (Aggressor or Victim), November 30, 2020, to December 31, 2021........................................................... 26

Figure 5: Number of Placements for PMC Children by Sexual Indicator Type, January to December 2021 ........................................................................................................................ 27

Figure 6: Child Sexual Aggression Training Record for DFPS Staff Working at Least One Day in the Quarter........................................................................................................................ 31

Figure 7: Percent of OCOK and 2INgage Staff Working at Least One Day....................... 32

Figure 8: Last Child Sexual Aggression Training for DFPS staff ........................................ 33

Figure 9: Timing of Last Child Sexual Aggression Training for DFPS Staff Working as of the End of Quarter 1, FY 2022 ............................................................................................... 33

Figure 10: Timing of Last Child Sexual Aggression Training for OCOK and 2INgage Staff Working in Quarter 1, FY 2022 ............................................................................................... 34

Figure 11: Monthly Number of Newly Flagged Placements for Sexual Victimization or Aggression, CY 2021 ............................................................................................................... 40

Figure 12: Abuse Incidents for Children with a Sexual Abuse Indicator, 2021................ 41

Figure 13: Type of Placement Where Abuse Incident Occurred After Entering Care ...... 42

Figure 14: Perpetrators Identified in Abuse Incidents Occurring After Child Entered Care ...................................................................................................................................................... 43

Figure 15: Sexual Aggression in Care for Children with a Sexual Aggression Indicator.. 44

Figure 16: Type of Placement where Sexual Aggression Incidents Occurred after Entering Care ............................................................................................................................................ 44

Figure 17: Completeness of Sexual History Information on the Common Application... 47

Figure 18: Timing of Common Application Last Updated Date in Relation to Placement Start Date................................................................................................................................... 48

Figure 19: Both Attachment A and Placement Summary Found by Time Period ............ 49

Figure 20: Percent of Records with Placement Summary and/or Attachment A Forms Found by Living Arrangement* ................................................................................................ 50

Figure 21: Percent of Records with Placement Summary and Attachment A Forms Found with Complete History and Caregiver Signature on or Before Placement Start Source: Case review data .................................................................................................................................. 51

Figure 22: Records with Placement Summary and Attachment A Forms with Complete History and Caregiver Signature on or Before Placement Start by Placement Entity ..... 52

Figure 23: Days from Date that Caregiver Signed Attachment A to Placement Start...... 53

Figure 25: Percent of Cases with Attachment A Found, Including Complete History, and Signed on or Before Placement Start...................................................................................... 54

Figure 24: Attachment A Forms Found for Children in Hospital ....................................... 54

Figure 26: Forms Found in Children's Site Records, 2021 – 2022..................................... 55

Figure 27: Forms Found and Signed in Children's Site Records, 2021 – 2022 ................ 55

Figure 28: Documents Caregiver Staff Report Receiving ..................................................... 57
Figure 29: Number of Operation Locations Requiring Awake-Night Supervision Visited,
January-December 2021 ..................................................................................................... 60
Figure 30: Portion of Eligible Months with Visits When Required, 2021 ......................... 60
Figure 31: Infractions and Deficiencies Cited for Noncompliance with Requirements of
24-Hour Awake-Night Supervision, January-December, 2021 ......................................... 61
Figure 32: Corrective Action Taken in Infractions Due to Noncompliance with
Requirements of 24-Hour Awake-Night Supervision, January – November 2021 .......... 61
Figure 33: Number of Inspections Sampled by Case Review Period and Inspection Type,
2021 .................................................................................................................................... 69
Figure 34: Days from ECHR Completion Data to Inspection ............................................. 70
Figure 35: Comparison of ANE/Corporal Punishment Data Found in ECHRs and State
Aggregate Data as of the First Day of the Month, 2021 ..................................................... 71
Figure 36: Number of ANE Intakes, Findings, and Corporal Punishment Citations
Reported in the ECHRs, 2021 ........................................................................................... 71
Figure 37: Items Discussed by the Inspector in ECHRs, 2021* ......................................... 72
Figure 38: Discussion of Foster Home History in ECHR, 2021 ......................................... 73
Figure 39: Inspector Documented How Operation's History was Taken into Consideration
During Inspection, 2021 ..................................................................................................... 73
Figure 40: Inspector Documented How Operation's History was Taken into
Consideration During Inspection Where a Safety Risk was Present, 2021 ....................... 74
Figure 41: Inspectors' Consideration of Operation's History During Inspection, 2021 .. 74
Figure 42: Timeliness of Face-to-Face Contact with Alleged Child Victims in Priority Two
HHSC Investigations ......................................................................................................... 85
Figure 43: Completion of Priority One and Two Investigations within 30 Days .............. 86
Figure 44: Completion of Priority Three, Four, and Five Investigations within 60 Days of
Intake ................................................................................................................................. 87
Figure 45: Completion of Documentation in Priority One and Priority Two Investigations
............................................................................................................................................ 88
Figure 46: Completion of Documentation within 60 Days of Intake in Priority Three,
Four, and Five Investigations ........................................................................................... 89
Figure 47: Notification Letters Sent within Five Days of Investigation Completion in
Priority One and Two Investigations ................................................................................ 90
Figure 48: Notification Letters Sent within 60 Days of Intake in Priority Three, Four, and
Five Investigations ............................................................................................................ 91
Figure 49: Overview of Operations Qualifying for and Placed on Heightened Monitoring
............................................................................................................................................ 93
Figure 50: Heightened Monitoring Operations That Moved to Post-Plan Monitoring ... 94
Figure 51: Average Number of Deficiencies Per Operation ............................................... 95
Figure 52: Annual Number of Enforcement Actions by Type for ....................................... 96
Figure 53: Operations Included in the Analysis of Heightened Monitoring Plan Problem
Areas and Tasks ................................................................................................................. 96
Figure 54: Problem Areas Identified in Heightened Monitoring Plans ............................ 97

Figure 55: Number of Problem Areas Per Operation ............................................................. 98
Figure 56: Number of Plan Tasks for Operations on Heightened Monitoring ................. 98
Figure 57: Tasks by Category Identified by Monitoring Team ............................................ 99
Figure 58: Operations with Task Categories Identified by Monitoring Team ............... 100
Figure 59: Task Characteristics as Identified by Monitor's Staff ..................................... 101
Figure 60: Methods for Accomplishing Tasks as Identified by Monitoring Team ......... 103
Figure 61: Total Number of Deficiencies Cited in the Year Before and After Heightened
Monitoring Plan Start Date .................................................................................................. 104
Figure 62: Average Number of Deficiencies Cited in the Year Before and After Heightened
Monitoring Plan Start Date by Standard Category ............................................................ 105
Figure 63: Total Number of Deficiencies at Heightened Monitoring and Non-Heightened
Monitoring Operations, 2019 to 2021 .................................................................................. 105
Figure 64: Mean Number of ANE Investigations Opened in the Year Prior to and After
Heightened Monitoring Plan Start ....................................................................................... 107
Figure 65: Number of ANE Investigations Opened at Heightened Monitoring and Non-
Heightened Monitoring Operations, 2019 to 2021 ............................................................ 108
Figure 66: Number of Reason to Believe Findings at Heightened Monitoring and Non-
Heightened Monitoring Operations, 2019 to 2021 ............................................................ 109
Figure 67: Comparison of Number of Reason to Believe Findings at Heightened
Monitoring Operations One Year Before and After Plan Start .......................................... 109
Figure 68: Number of PMC Placements After Notification of Heightened Monitoring,
January 1, 2021, to December 31, 2021 .................................................................................. 110
Figure 69: Average Number of PMC Placements Prior to and After Notification of
Heightened Monitoring .......................................................................................................... 111
Figure 70: PMC Placements at Heightened Monitoring Operations by Approval, January
1, 2021 to December 31, 2021 ................................................................................................. 112
Figure 71: Timing of Director Approval in IMPACT for PMC Placements at Heightened
Monitoring Operations, January 1, 2021 to December 31, 2021 ....................................... 113
Figure 72: Approval Documentation and Timing for All PMC Placements at Heightened
Monitoring Operations ........................................................................................................... 114
Figure 73: Percent of Operations on Heightened Monitoring Requesting a Variance ... 115
Figure 74: Request for Waiver/Variance Decision by Heightened Monitoring Status .. 116
Figure 75: Reason Waiver/Variance Request was Denied for Operations on Heightened
Monitoring ............................................................................................................................... 116
Figure 76: Standard Categories for Granted Variance Requests for Operations on
Heightened Monitoring .......................................................................................................... 117
Figure 77: Plan Tasks Due During Quarter were Completed ............................................ 122
Figure 78: Percent of Operations with a Change in Plan Tasks During Heightened
Monitoring ............................................................................................................................... 123
Figure 79: Number and Timing of New and Revised Heightened Monitoring Tasks .... 123
Figure 80: Number of Quarters the Operation was Found to be Out of Compliance with
Plan Tasks ................................................................................................................................ 125

Figure 81: Number of Operations with Tasks Found to be Out of Compliance by Quarter ...................................................................................................................................... 125

Figure 82: Percent of Operations with Deficiencies and Number of Deficiencies by Quarter.................................................................................................................................. 126

Figure 83: Number of Total and Heightened Monitoring Related Deficiencies by Quarter ...................................................................................................................................... 127

Figure 84: Average Number of Total and Heightened Monitoring Related Deficiencies by Quarter.................................................................................................................................. 127

Figure 85: Contract Violations During Four Quarters of Heightened Monitoring ........ 128

Figure 86: Contract Violations During Four Quarters of Heightened Monitoring ........ 129

Figure 87: Operations on Heightened Monitoring with Enforcement Actions Identified in Quarterly Reviews .............................................................................................................. 130

Figure 88: Type of Enforcement or Corrective Action Identified in Quarterly Review . 130

Figure 89: Timing of Enforcement or Corrective Action................................................. 131

Figure 90: Comparison of Information in Quarterly Reviews and Other Heightened Monitoring Documents for the Quarter............................................................................ 132