Case 2:11-cv-00084   Document 1249   Filed on 06/02/22 in TXSD   Page 1 of 16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § |
| | § |
|     Plaintiffs, | § |
| v. | § |
| | §   Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, et al., | § |
| | § |
| | § |
|     Defendants. | § |

**Amended Third Update to the Court Regarding The Refuge for DMST**

    On March 28, 2022, the Monitors sent the Court an update (Update) detailing their review of safety concerns and evidence of abuse, neglect, and exploitation of children by staff employed by The Refuge for DMST (The Refuge), a Residential Treatment Center (RTC) that was licensed to treat child survivors of domestic sex trafficking.[1] The Court held a hearing on March 30, 2022, during which the status of the State's investigations and the Monitors' ongoing review of safety issues at The Refuge were discussed. At the hearing, the Court instructed the Department of Family and Protective Services (DFPS) to make available to the Monitors recordings of children's Child Advocacy Center (CAC) interviews, conducted in connection with investigations of The Refuge.[2] The Monitors provided a Second Update to the Court discussing the status of the Court's instruction regarding the CAC videos, and notifying the Court that the State failed to make one of

---

[1] Deborah Fowler & Kevin Ryan, Update to the Court Regarding The Refuge for DMST, March 28, 2022, ECF 1218. The Health and Human Services' Residential Child Care Regulation (RCCR) division suspended The Refuge's license on March 11, 2022, and extended the suspension on April 10, 2022.
[2] Transcript, Status Conference 19, March 30, 2022, ECF 1225.

1

the CAC videos available for the Monitors to view.[3] The report also updated the Court on the status of the State's ongoing investigations related to The Refuge.[4]

On May 17, 2022, the Monitors were copied on two e-mails from Representative Gina Hinojosa, Vice Chair of the Texas House Human Services Committee, to Director Steven McCraw, Executive Director of the Texas Department of Public Safety, and to Health and Human Services Commission (HHSC) Executive Commissioner Cecile Young, raising new allegations that a child who ran away from The Refuge on August 14, 2022, was assisted in running away by a staff member at The Refuge.[5] This update discusses the status of the State's response to these new allegations, and the State's ongoing investigations into abuse, neglect, and exploitation of children formerly in the care of The Refuge.[6]

---

[3] Deborah Fowler & Kevin Ryan, Second Update to the Court Regarding The Refuge for DMST, May 4, 2022, ECF 1236. The Court, through the Monitors, again instructed the State to make the CAC video available on May 24, 2022. E-mail from Deborah Fowler and Kevin Ryan to Karl Neudorfer, Assistant Attorney General, Administrative Law Division, re: CAC video, May 24, 2022 (on file with the Monitors). On May 27, 2022, DFPS, through its legal counsel, responded "DFPS has informed me that [the child] was never within DFPS' custody. Under Texas law, videos of forensic interviews conducted by a CAC are 'the property of the prosecuting attorney involved in the criminal prosecution of the case involving the child.' [Citation omitted]. The video of [the child's] interview is thus owned and controlled by the Bastrop County District Attorney; it is not the property of DFPS….DFPS first contacted the Bastrop CAC on April 21, 2022 to request that [the child's] CAC interview be made available to you. The Bastrop CAC responded by saying that the video is a 'record of the prosecuting office,' and that it would reach out to the Bastrop County DA's office to discuss the request. The Bastrop County DA's office did not respond to that request. Accordingly, this week DFPS' General Counsel called the Bastrop County DA's office to follow up on your request for authorization to view the recording of [the child's] CAC interview. The CAC interview is currently with the DA's felony prosecutor." E-mail from Karl Neudorfer, to Deborah Fowler and Kevin Ryan, re: CAC video, May 27, 2022 (on file with the Monitors).

The Monitors responded, pointing out that the same section of the Family Code cited by DFPS' counsel specifies, "The department shall be allowed access to electronic recordings of interviews of children or persons with a disability," and suggested that the Monitors view the video with the DFPS investigator assigned to the investigation. E-mail from Deborah Fowler and Kevin Ryan to Karl Neudorfer, re: CAC video, May 27, 2022 (on file with the Monitors). DFPS, through its legal counsel, responded that "[t]he fact that DFPS may have a right of access under section 264.408(e) would not give DFPS the right to grant others a right of access. Under section 264.408(d), the video remains the 'property of' the Bastrop County DA, and it is the Bastrop County DA who is determining whether you are authorized to view the video. DFPS has asked both the Bastrop CAC and the Bastrop DA's office that the Monitors be able to view the video, together with a representative from RCCI. The Das office has not yet responded to that request. We'll let you know as soon as we've heard back." E-mail from Karl Neudorfer, re: CAC video, June 1, 2022 (on file with the Monitors). DFPS reiterated its position that the summary of the interview, and a conversation with "its law enforcement partners" indicated that the subject matter of the CAC interview was outside of DFPS' jurisdiction because "it pertains to an incident that did not occur at a licensed facility, nor of a youth within the custody of DFPS." *Id*.

[4] *Id*.

[5] E-mail from Gladys Acosta, Legislative Director for State Representative Gina Hinojosa, to Cecile Young, Exec. Commissioner, HHSC, re: Letter from Vice Chair Gina Hinojosa to HHSC re. The Refuge, May 17, 2022 (on file with the Monitors); E-mail from Gladys Acosta to Steven McCraw, Executive Director, Texas Dep't of Public Safety, re: Letter from Vice Chair Gina Hinojosa to DPS re. The Refuge, May 17, 2022 (on file with the Monitors).

[6] If a child or Refuge staff person discussed in this Third Update was discussed in one of the two previous Updates, the Monitors used the same initials used in the previous Updates.

I.   **New Allegation Related to The Refuge**

The e-mails sent to Director McCraw and Executive Commissioner Young relayed the same information:

> [RR], a 17 year old juvenile who allegedly played a role in the murder of [name omitted] in June 2020, was sent to The Refuge in May 2021, but in August 2021, she escaped while on an overnight visit with a family member. It is my understanding that the juvenile was able to plan her escape by allegedly using the assistance of a Refuge employee, who allowed [RR] to use the employee's phone to communicate with [RR's] mother, who ultimately helped her escape. [RR] was missing for two months, during that time she was allegedly trafficked again, until October 14, 2021, when the U.S. Marshals located her. As they were on their way to pick [RR] up, the U.S. Marshals were notified that she had been hit by a car and killed. It is alleged that [RR] died while she was supposed to be in the care, supervision, and custody of The Refuge.[7]

The letters included several attachments:

- the missing person notice for RR from the DPS website
- the Bastrop Police Department missing person incident report
- the Johnson County Emergency Service & Alvarado Fire Department incident reports related to the October 14, 2021 accident which killed RR, and
- the October 14, 2021 Burleson Public Safety Event Report regarding the accident.

The Burleson Public Safety Event Report (Event Report) shows that another former resident of The Refuge, referred to in the Monitors' first Refuge Update to the Court as "DD,"[8] was an occupant of one of the cars involved in the accident. DD, who was 17 years old at the time of the accident, also ran away from The Refuge, two weeks before the accident, and approximately six weeks after RR ran away from the facility, on September 29, 2022. DD was also taken to the hospital for injuries related to the accident but was released early the next morning. The Event Report indicates DD was released to CPS.

A.  RR's Contact with DFPS and Runaway Event

RR was never in foster care, though her family had contact with DFPS at several points both prior to and after RR's birth. In 2005, when RR was an infant, DFPS substantiated allegations of Neglectful Supervision of RR by her parents, due to their ongoing drug abuse and failure to cooperate with DFPS. Both of RR's parents tested positive for methamphetamines, amphetamines, and marijuana. RR's maternal grandmother also tested positive for methamphetamines. RR was noted to have been taken to Oklahoma by a parent to stay with her paternal grandmother, "X."

---

[7] Letter from Rep. Gina Hinojosa, Vice Chair, Texas House Human Services Cttee., to Steven McCraw, Executive Director, Texas Dep't of Public Safety, May 17, 2022; Letter from Rep. Gina Hinojosa to Cecile Young, Executive Commissioner, HHSC, May 17, 2022.

[8] DD was given a Black and Mild cigar by G, the Refuge staff person who allegedly provided drugs to two children and allowed them to post nude photographs to social media using her cell phone. *See* Deborah Fowler & Kevin Ryan, Update to the Court, ECF 1218, at 19-20.

On March 30, 2020, 16-year-old RR was taken to the emergency room "with concerning behaviors." RR was living with X at the time and had made suicidal statements in a note written ten days earlier. While she was at the hospital, she admitted to having used Xanax (which was not prescribed to her) and marijuana. IMPACT records suggest she may also have used methamphetamines. RR was admitted to a behavioral health hospital due to her drug use and suicidal ideation.

While she was hospitalized, RR made an outcry that she was sexually abused by her paternal great uncle, the husband of X's sister.[9] During a Child Advocacy Center (CAC) interview after the outcry, RR said that her great uncle raped her, gave her money and gifts in an effort to keep her from revealing the abuse, and video recorded at least one incident using his phone. During the investigation, RR and X both acknowledged occasional contact with RR's mother.

DFPS found a Reason to Believe RR had been sexually abused by her uncle from the time that she was eight years old until just a few months before she was hospitalized. The investigation was closed on June 2, 2020; DFPS recommended family counseling for X and RR, and individual counseling for RR, but found that all of RR's needs were being met by X and declined offering the family any services.

According to media reports, on June 24, 2020, RR, along with four men who ranged in age from 23 to 36, allegedly participated in the robbery of a young man. After he was robbed, the young man was murdered and left in a cornfield, where he was found approximately one month later; two of the men allegedly involved in the robbery also were charged with his murder.

RR was placed at The Refuge by the juvenile probation department on April 27, 2021, almost a year after she was arrested. RR was allowed an overnight visit with X on August 13, 2021. X and RR were staying at a motel in Bastrop, Texas. According to the Serious Incident Report completed by The Refuge, X said that she went to sleep at around 9:00 p.m. and woke at around midnight to find the motel door open. X went to the lobby to try to find RR but could not find her; she called the police department to file a report, then drove to The Refuge to alert them to RR's absence. X said RR took her cell phone when she left.

RR was killed in the automobile accident just two months later; the accident occurred in in Alvarado, Texas, approximately 180 miles from Bastrop. RR was with her mother and maternal grandmother. RR's grandmother reported that they were at the location where the accident occurred to pick up RR and had pulled over to allow RR to get into the car; RR was standing next to the car when they were hit from behind. DD was a passenger in the car with RR's mother and grandmother. The address listed in the accident report for RR's maternal grandmother was in Fort Worth, Texas, approximately 25 miles from the site of the accident.

B. DD's Runaway Events

---

[9] It is not clear from IMPACT whether RR lived with X continually from the time that she was taken to Oklahoma as an infant through her 2020 contact with DFPS. RR's outcry, which was documented in a form she completed about her "life story" during her hospitalization (uploaded to IMPACT), states that her parents "abandoned" her when she was eight years old, at which point she began living with X.

Unlike RR, DD ran away from The Refuge several times during her stay. DD was placed in the State's Temporary Managing Conservatorship (TMC) on October 6, 2020, when she was 16 years old. She had a history of running away from her paternal grandparent's home, where she lived prior to entering care. She had a history of drug use and was a victim of sex trafficking; according to her IMPACT records, DD "was trafficked by multiple adult males" and "exchanged sexual acts for drugs and money." The paperwork associated with her removal from her grandparent's home stated that the home was not a safe placement for DD. DD had been sexually abused by her father "at a young age," according to her Common Application, but her father was no longer in the United States and her mother was incarcerated when DD entered care. DD began using drugs before she was 12 years old, and by the time she entered care, had a history of using marijuana, cocaine, methamphetamines, ecstasy, opioids, and Xanax. DD's mother was also reportedly trafficked and introduced DD to sex trafficking and drugs; IMPACT records suggest DFPS was also concerned that DD may also have been trafficked by another relative.

DD's first placement after entering care was a substance abuse program, however she ran away the same day she was placed. When she returned to care, she was taken to a hospital for drug detoxification, then was placed in a psychiatric hospital prior to being placed in a second substance abuse treatment program. She was placed at The Refuge on April 6, 2021, after successfully completing the substance abuse treatment program. According to her IMPACT records, she was living in Cottage One after being placed, the same cottage in which RR resided. However, by June 10, 2021, notes from her face-to-face visit with her caseworker indicate that DD had moved to a different cottage. During that visit, DD reported to the caseworker that she "ran from the property recently to the gas station and stole a beer and drank it and then…came back."[10]

The unauthorized absence log for The Refuge shows DD ran from the facility several times in September 2021:

- September 18, 2021 – DD was gone for almost a week, returning September 24, 2021.
- September 25, 2021 – DD was gone 24 hours.
- September 26, 2021 – DD was gone 5 hours.
- September 27, 2021 – DD was gone one hour.

The log does not include her last and final runaway event on September 29, 2021.

DD's IMPACT records indicate that she ran away on September 18, 2021, during an outing to the movies; she returned after she called her caseworker on September 24, 2021, "advised she was at a Dollar General Store in Alvarado,"[11] and wanted to return to foster care. Her caseworker arranged for her to have a CAC interview the same afternoon, in Johnson County. During her forensic interview, DD reported that "a female friend brought her to Alvarado." DD did not name the friend who took her to Alvarado, where she called her DFPS caseworker.

---

[10] This incident is not noted in the unauthorized absence log for The Refuge.
[11] According to Google Maps, there is a Dollar General store less than a mile from the scene of the accident where RR was killed.

The runaway events on September 26, 2021, and September 27, 2021 are not clearly documented in IMPACT, and a Serious Incident Report was not provided to the Monitors related to those events (perhaps because of their short duration). However, one or both occurred when DD was taken to the hospital for drug detoxification after returning to the facility from her previous absences. IMPACT captures only one (not two) runaway events: DD's records show she ran away from the hospital on September 26, 2021 at 6:00 pm, and returned September 27, 2021 at 9:15 pm. However, the facility's unauthorized absence log lists two separate, short events, as noted above.

Though the facility's unauthorized absence log does not include a listing for DD's September 29, 2021 run from the facility, the event was reported to SWI by The Refuge and the operation completed a Serious Incident Report for the event. Both records state that DD ran away from the facility twice that day but was returned the first time by law enforcement.

On October 8, 2021, DFPS non-suited DD's conservatorship case[12] via an agreed order while she was still on runaway status. DFPS notified DD's grandmother that responsibility for DD was returned to her.

The last entry in DD's IMPACT records indicates that on October 15, 2021, DFPS was notified that DD had been located and was at the hospital after having been involved in a car accident with another child. IMPACT shows that after being notified, the DFPS Special Investigator assigned to investigate DD's runaway event was told by DD's conservatorship caseworker that DD's grandmother had custody of DD "per the court from a decision last week." Therefore, the Special Investigator removed herself from the case.

C.   State's Response to the Allegations

After HHSC received the letter from Vice Chair Hinojosa, the Monitors raised the letter during a regularly scheduled call with HHSC. HHSC followed up on the conversation by sending the Monitors all of the Serious Incident Reports associated with RR's stay at The Refuge, including the report related to the August 14, 2021 runaway incident.[13] HHSC also sent a copy of the RTC's overnight visit policy.[14] HHSC noted, "Prior to receipt of Rep. Hinojosa's letter, HHSC had not previously received information that [RR] used a staff member's phone to plan her escape. HHSC will work with all appropriate entities to ensure this new information is appropriately investigated."[15] The Monitors responded and noted that DD was listed as a passenger in one of

---

[12] According to section 263.401 of the Texas Family Code, after a child is placed in the State's Temporary Managing Conservatorship, it has one year to commence a trial on the merits. 5 Tex. Fam. Code §263.401. The trial court may grant one six-month extension if extraordinary circumstances exist. 5 Tex. Fam. Code §263.401(b). If a trial on the merits has not commenced and an extension has not been granted, the trial court loses jurisdiction over the case. 5 Tex. Fam. Code §263.401(a). If the one-year mark is approaching, but the State is not yet ready to commence a trial on the merits, the parties may agree to non-suit – or dismiss – the case.
[13] E-mail from Katy Gallagher, Attorney – Foster Care Litigation, HHSC, to Deborah Fowler and Kevin Ryan, re: Letter from Vice Chair Hinojosa, May 18, 2022 (on file with the Monitors).
[14] *Id.*
[15] *Id.*

the cars at the scene of the accident, and asked HHSC for the incident reports associated with her run from The Refuge, which HHSC subsequently provided.[16]

On May 18, 2022, the State reported the allegations to SWI, and the intake was assigned to DFPS to investigate as a Priority 2 investigation of Neglectful Supervision. On May 22, 2022, the Monitors expressed concern to HHSC that when the incident was reported to SWI, there was no mention that DD, who ran away from The Refuge approximately six weeks after RR, was also at the scene of the accident where RR died, 180 miles away from The Refuge.[17] On May 23, 2022, the investigation was administratively closed. Notes in CLASS indicate that DFPS determined that the allegations were not subject to investigation:

> Case information was staffed with [names omitted] regarding the facts surrounding the child fatality notification of [RR].
>
> It was determined that [RR] was not in DFPS custody at any time she was placed at the refuge [sic] and was placed there by parole/probation. [RR] was interviewed by RCCI as a collateral in an investigation regarding The Refuge for DMST in June of 2021 [case number omitted]. She made no outcries of any abuse/neglect while at the refuge [sic] during that interview.
>
> The Texas Rangers were spoken too [sic] and confirmed that the child ran away on a home visit and was not under the care of the refuge [sic] at the time she ran away.
>
> There were concerns about staff allowing the child to use their phone, but it was unknown what staff. Should staff have allowed her to use their phone, this would fall under HHSC jurisdiction for a possible standards violation, and would not fall under RCCI jurisdiction.
>
> Case was approved from [sic] administrative closure as the incident that would need to be addressed would fall under HHSC.

The same day, the Monitors were copied on an e-mail from the Texas Department of Public Safety, that attached a letter from Director McCraw, responding to Vice Chair Hinojosa. The letter said that RR was transferred to The Refuge from a juvenile facility and noted that the RTC "is designed to treat female victims of sex trafficking and is not equipped or staffed to incarcerate juveniles."[18] The letter states:

> Victims at the Bastrop Refuge Shelter live in cottages with other girls and each cottage has a telephone that the girls are authorized to use. [RR] had access to the telephone in her cottage and she contacted [X], her fraternal [sic] grandmother, to arrange for a weekend visit. On August 14, 2021, [X] took [RR] to [a hotel] for an

---

[16] E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, re: Letter from Vice Chair Hinojosa, May 18, 2022 (on file with the Monitors).
[17] E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, re: Letter from Vice Chair Hinojosa, May 22, 2022 (on file with the Monitors).
[18] The Refuge has had contracts with other entities serving juvenile-justice involved youth; RR was not the only child on probation to have been placed at The Refuge.

7

> authorized weekend visit. At approximately 2100 hours, [RR] ran away, taking her fraternal [sic] grandmother's mobile phone and a $300 gift card. On August 15, 2021, [X] reported to the Bastrop Police Department that her granddaughter, [RR], had run away. A missing person report was filed, and later a…District Court issued a warrant for her arrest on a charge of robbery related to the homicide that occurred on June 24, 2020.

> The Texas Department of Public Safety (DPS) Human Trafficking Unit located an online sexual advertisement for [RR] who appeared to be in the North Texas area. The posting was referred to a DPS Special Agent in North Texas who attempted to locate and recover her by scheduling a meeting using the internet. The [department name omitted] Police Department enlisted the assistance of a United States Marshal's Service fugitive task force to locate her for the felony warrant in [omitted] County.

> On October 14, 2021, [RR] was with…her maternal grandmother…and was outside of her grandmother's vehicle when she was struck and killed by a passenger car.

> As previously noted, [RR] was placed at the Refuge Shelter by the…County District Attorney's Office and the…Juvenile Probation Department and was not a ward of [DFPS]. There is no evidence that [RR] was mistreated, abused or exploited while she was a resident at the Refuge Shelter. When [RR] ran away, she was in the care of her fraternal [sic] grandmother during an authorized weekend visit.[19]

On May 25, 2022, HHSC provided the Monitors with the following update:

> DFPS informed HHSC on 5/23/22 that DFPS believes it does not have jurisdiction to investigate the allegations in Rep. Hinojosa's letter stating, "We found that [RR] was on an approved family visit and was never in DFPS custody. At the time she ran away, she was 17 and LE will not take those cases. We have notified the Texas Rangers since they are continuing to investigate the case involving the Refuge (more for their awareness). However, since we do not have jurisdiction in this case we will not be conducting any further investigation."

> DFPS called the intake back into SWI to route the intake report to HHSC for investigation.[20]

The investigation was reopened on May 24, 2022, as a Priority 3 investigation of a minimum standards violation.

---

[19] Letter from Steven C. McCraw, Colonel/Director, Texas Department of Public Safety, to Gina Hinojosa, Representative, Texas House of Representatives, May 23, 2022 (on file with the Monitors).
[20] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Letter from Vice Chair Gina Hinojosa to HHSC re. The Refuge, May 25, 2022 (on file with the Monitors).

## II.     Update on Previously Discussed DFPS Investigations

The Monitors' Second Refuge Update discussed an investigation opened on March 21, 2021, after a child, "SS," alleged that staff "V" allowed her to use V's cell phone to log into her social media accounts and re-post nude or sexually suggestive photos already save in her account.  SS also alleged that V offered to help her run away from the facility in exchange for money, but that SS was discharged before they could execute the plan.  SS also alleged she used G's phone to take two topless photographs of herself, which she sent to her trafficker via social media.  SS, who is a PMC child, was moved to an RTC in Hawaii the day after she made this outcry to a Texas Ranger.  When the Monitors' Second Refuge Update was written, according to notes in CLASS, the Texas Rangers had concluded that there did not appear to be any criminal allegations associated with SS' outcry, but DFPS had opened a Priority 2 investigation of Neglectful Supervision.

The Monitors noted in the Second Refuge Update that DFPS had not yet interviewed SS, nor had they scheduled a CAC interview for SS.  On May 27, 2022, DFPS ruled out Neglectful Supervision without ever having interviewed SS.  A Staffing note in CLASS states, "We used the Rangers interview with the child in place of our own, as the child was moved to Hawaii the day the intake was called in.  We are also using a contact made by CVS with the child in which they discussed the allegations."  A contact note in IMPACT dated May 24, 2022, documents the child's conversation with the CVS caseworker:

> Caseworker spoke to [SS] on the phone.  Caseworker explained to [SS] that all the girls from her previous placement, The Refuge, had to be removed due to allegations of the girls being trafficked.  Caseworker asked [SS] if she had experienced any instances of that there.  [SS] stated that she did not experience that but that the staff would buy the girls cigarettes and that they allowed them to use their cell phones to get on Instagram and call people not on their call list.  She also stated that a staff member named [V] was going to help her run away before she got kicked out.  Caseworker asked if any of the staff had taken photos of her and she stated no.

In ruling out the allegations of Neglectful Supervision, DFPS found:

> [SS]…told the Texas Rangers and her CVS worker that she used [V] and [G's] cell phones in order to access her social media accounts and send sexual photographs, that she had previously taken, to people.  She further advised that [V] offered to help her runaway for $200-$300 when she was at risk of getting kicked out of the facility.

> [V] and [G] both have attorney's [sic] and refused to speak with the department.  The Rangers have advised they have found no criminal aspect at this time, as the photos were not taken with either [G] or [V's] phones.

> Based on the information obtained we do not have a preponderance of evidence to suggest that either perpetrator was aware of what [SS] was using their phone for.

[SS] admitted that the pictures that were sent were previously taken, prior to placement at the facility which the Rangers reviewed the photos and confirmed that the background did not match the Refuge. Although staff should not have allowed her to use their phone, [SS] stated it was to allow her access to her Instagram and snapchat not for exploitation purposes. Simply allowing a child to use your phone does not rise to the level of neglect. [SS] is also stating that [V] offered to help her runaway [sic] but as this never occurred, there is not enough to formulate a reason to believe.

### III. Gaps Related to Investigation of Allegations re: Runaway Incidents

DFPS's response, in both SS's case and RR's case, shows a lack of concern related to the allegations that staff may have allowed child victims of sex trafficking access to their personal cell phones, though both DFPS and The Refuge have adopted policies that acknowledge the specific dangers associated with this practice for child victims of sex trafficking. In addition, when DFPS faced challenges associated with a lack of information – in one case, because Vice Chair Hinojosa failed to name a specific staff person associated with the allegation that RR had been allowed access to a cell phone and in the other, because the alleged perpetrators refused to be interviewed – rather than continuing to investigate and pursuing other means to determine the veracity of the allegations, DFPS closed the investigations.

A. Response to Vice Chair Hinojosa's letter

DFPS declined to investigate the allegation that a staff member of The Refuge assisted RR in running away by allowing RR to use their cell phone to contact her mother because Vice Chair Hinojosa did not name a specific staff person in her letter. DFPS reasoned that even if staff allowed RR to use their cell phone, "this would fall under HHSC jurisdiction for a possible standards violation, and would not fall under RCCI jurisdiction."

Nothing in CLASS or IMPACT indicates that DFPS made an effort to identify which staff might have supervised RR in the days leading up to her run from The Refuge, or whether any staff member might have allowed her to use their cellphone to arrange for her mother to pick her up from the hotel where she was scheduled to have an overnight visit with X. In fact, there is nothing in CLASS or IMPACT to indicate that DFPS made any effort to investigate the Neglectful Supervision claim arising out of the allegation that a staff member assisted her in running away, despite:

- Previously substantiated allegations of Neglectful Supervision, discussed in the initial Refuge Update to the Court, resulting from a DFPS investigation which found that four staff assisted another youth in running away from the facility.[21]
- Previously substantiated allegations of Neglectful Supervision, discussed in the Monitors' Second Refuge Update to the Court, resulting from a DFPS investigation that found that a

---

[21] Deborah Fowler and Kevin Ryan, Update to the Court Regarding the Refuge for DMST, *supra* note 1, at 24-27.

child ("II") who escaped through the same window was able to run away because overnight staff failed to properly supervise the child.[22]

- Repeated allegations that staff assisted more than one youth in running away, or offered to help youth run away, discussed in both Updates.[23]
- Multiple investigations, discussed in both of the updates to the Court, that involved harm to youth resulting from staff allowing youth to use the staff person's personal cellphone.

The Texas Administrative Code's definition of neglect for children placed in licensed settings indicates:

> For purposes of an investigation in a child care operation, neglect is defined in the Texas Family Code §261.001(4)(A)(iv) as a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program, including failure to comply with an individual treatment plan, plan of care, or individualized services plan that causes or may cause substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy.[24]

The Administrative Code defines a "negligent act or omission" as a "breach of duty by an employee, volunteer, or other individual working under the auspices of a facility or program that causes or may cause substantial emotional harm or substantial physical injury to a child."[25] The Code definition specifically includes the following as per se negligence:

> (B) Taking an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should not take in the same situation.
>
> \*\*\*
>
> (G) Placing a child or failing to remove the child from a situation in which a reasonable member of that profession, reasonable caregiver, or reasonable person should know exposes the child to the risk of sexual conduct;
>
> \*\*\*
>
> (J) A violation or deficiency of any law, rule, or minimum standard that causes substantial emotional harm or physical injury to a child;
>
> \*\*\*

---

[22] Deborah Fowler and Kevin Ryan, Second Update to the Court Regarding the Refuge for DMST, *supra* note 3, at 12-13.
[23] Deborah Fowler and Kevin Ryan, *supra* note 1, at 18-19, 24; Deborah Fowler and Kevin Ryan, *supra* note 3, at 13 (discussing the intake for the investigation of SS' allegations).
[24] 40 Tex. Admin. Code §707.801(a).
[25] 40 Tex. Admin. Code ß707.801(b).

> (L) Failure to comply with an individual treatment plan, plan of service, or individualized service plan that causes substantial emotional harm or physical injury to a child.[26]

Vice Chair Hinojosa's letter alleges RR was "able to plan her escape…by using the assistance of a Refuge employee, who allowed [RR] to use the employee's phone to communicate with [RR's] mother, who ultimately helped her escape." As Director McCraw notes (and as outlined in the Monitors' previous updates), children housed at The Refuge were allowed to use phones in their cottages to contact persons on an approved call list. The phones could only be used to call those persons; the phone numbers for approved persons were programmed into the phone, and the phone could not be used to call other phone numbers. In other investigations involving The Refuge, when children were allowed to use a staff person's cellphone, the phone was used to call a person who was not on the child's list of approved persons, or to access the internet, both ill-advised in a setting that treats child victims of sex trafficking, many of whom, like RR, struggled with drug addiction.

In this case, RR was not only a child sex trafficking victim who struggled with drug dependency – she was also under the supervision of a county's juvenile probation department due to her alleged participation in a violent crime. If a staff person allowed her to use their cell phone to contact a person not on her approved call list in contravention of the operation's policies, whether the staff person knew the purpose of the call or not, DFPS could find the staff person to have breached their duty of care. SS's experience, and that of AA and BB, the two girls who were able to use G's cell phone to take nude photos of themselves,[27] illustrate the dangers associated with staff allowing child sex trafficking victims to gain access to social media or to use cell phones to call persons not on their approved call lists. In fact, minimum standards for operations that treat child sex trafficking victims require the operations to develop written policies addressing, "[a]ppropriate safeguards with respect to a trafficking victim's access to forms of communication, including telephones, cell phones, computer, internet, mail, and visitors, which may pose a risk of further victimization of the child."[28] Placing this requirement in minimum standards recognizes the dangers associated with allowing a child who is receiving treatment for trauma associated with sex trafficking unrestricted access to a phone or the internet.

DD *was* in the State's TMC prior to her run from The Refuge and was injured in the same accident that killed RR. While Vice Chair Hinojosa's letter did not raise DD's presence at the accident or include allegations associated with her run from the facility, the mere fact that two children were able to run from the operation, six weeks apart, and later meet up after both returned to trafficking seems worthy of inquiry. Indeed, DD's IMPACT records reveal DD may well have spent time with RR (and possibly her mother and grandmother), during her run from the facility on September 18, 2021, since she returned to care after calling her caseworker from a Dollar Store in Alvarado, Texas, the same city where the accident occurred. The site of the accident is *less than a mile* from one of three Dollar Store locations in Alvarado, TX.

---

[26] *Id*.
[27] *See* Deborah Fowler and Kevin Ryan, *supra* note 1, at 17-24.
[28] 26 Tex. Admin. Code §748.4551.

Given the history of child safety lapses at The Refuge, DD's run from the facility merits inquiry, to determine how DD was able to run not once, but twice, and – both times – end up in the company of RR, 180 miles away from The Refuge. On at least one of those occasions, she was a passenger in a car driven by either RR's maternal grandmother or her mother.[29] While DFPS special investigators interviewed DD when she returned to care the first time, there was no investigation that examined whether any failures associated with DD's care at The Refuge may have contributed to her ability to run from the facility. In fact, the first time DD ran from the operation on September 18, 2021, she did so when a staff person allowed her to go to the restroom on her own at a movie theatre, despite the child having threatened to run away during the drive to the movie theater. A Serious Incident Report documents the run from care. In response to the question "Were there Precipitating Indicators/Behaviors?" the Serious Incident Report notes that DD had recently made "several statements that she wanted to run away." During the drive to the theatre, DD threatened to run away if the staff person did not buy her cigarettes. At the theatre, when DD asked to use the restroom, the staff person "gave [DD] a minute to leave" after she asked to go to the restroom "so as not to make the youth feel like she was being escorted to the bathroom." The Serious Incident Report says that the staff person followed DD "[a]pproximately two minutes later" and DD could not be found in the theatre.

A. Investigation of SS' allegations and systemic problems associated with runaway events

DFPS' response to SS' allegation that two staff persons allowed her to use her cell phone to access social media in order to re-post nude or sexually suggestive photos of herself is similarly troubling. DFPS' findings that "[a]lthough staff should not have allowed her to use their phone, [SS] stated it was to allow her access to her Instagram and snapchat not for exploitation purposes" and, "[s]imply allowing a child to use your phone does not rise to the level of neglect" minimizes the grave risks associated with allowing a child sex trafficking victim access to a cell phone, whether it is to access social media or to call persons not on the child's approved call list. DFPS' decision to close the case without thoroughly investigating SS' allegation that V offered to assist her in running away because V refused to be interviewed by DFPS is as problematic as DFPS' failure to investigate the allegation in Vice Chair Hinojosa's letter that a staff member assisted RR in running away. As discussed in the Monitors initial Refuge Update to the Court, at least two former Refuge employees alleged staff assisted youth in running away on multiple occasions.

---

[29] DD's presence at the scene of the same accident that killed RR may also have escaped Director McCraw's attention. While – as he and others have previously stated – assisting a child in running away from an RTC may not constitute a criminal offense, harboring a runaway does. *See* Tex. Penal Code §25.06. Despite DFPS' claim that law enforcement "will not take" cases involving 17-year-old runaways, the Penal Code statute that criminalizes harboring a runaway states that a person commits an offense if they knowingly harbor a child who is "younger than 18 years." *Id*. Whether RR's mother and grandmother harbored a runaway child, who was a child sex trafficking victim, and likely returned to trafficking after she ran, may be worthy of investigation. It could also lead to information related to RR and DD's traffickers, which could protect other children from harm.

It is possible that this has been investigated or will be investigated but was not mentioned in Director McCraw's letter because it is not related to criminal wrongdoing by staff employed by The Refuge.

13

Their allegations appear to have been dismissed as those of disgruntled former staff.[30] However, another reporter (also discussed in the initial Update), who was a CASA, does not appear to have ever been interviewed. Given the risks to child safety, DFPS should have re-interviewed the two former staff and interviewed the CASA to determine whether they had any information related to SS' allegation that V offered to help her (or any other child) run away, or related to RR's run from care.

DFPS also has failed to acknowledge or investigate what may be a systemic problem with children running from The Refuge, instead opting to treat each allegation associated with a child's run from the facility as an isolated event. Just as operations that treat victims of child sex trafficking are required to develop written policies that address their access to cell phones and social media, they also are required to develop written policies documenting how the operation will prevent and discourage trafficking victims from running away.[31]

According to the unauthorized absence log for The Refuge, which was provided to the Monitors by HHSC as part of its initial investigation of child II's run from the facility, runaway events at The Refuge increased dramatically between 2020 and 2021, though there does not appear to have been a corresponding increase in the number of children housed at the facility. In 2019, the unauthorized absence log documents 16 runaway incidents. In 2020, the log documents 10 runaway incidents; the Monitors found one incident in CLASS not included in the log, for a total of 11 incidents. However, in 2021, the unauthorized absence log documents more than 60 runaway incidents.

More children who ran away also stayed away in 2021 than in previous years. According to the operation's unauthorized absence log, prior to 2021, only one child who ran from the facility was gone for more than a few hours. That child, a PMC youth who was also on probation, ran away on May 14, 2019, and was found two days later by the Bastrop County Sheriff's Office, "walking down a street, apparently intoxicated or otherwise impaired." Because the juvenile probation department had issued a warrant for violation of her probation, rather than being returned to The Refuge, she was taken to detention. When she was interviewed by DFPS four days later, she described her experience:

> She walked to the road and had her hand out for a ride. She got picked up by some random guy. They were doing drugs. He took her home with him and she stayed with him a couple of days. He was about 23 years old…they had sex. She got meth from [him], she snorted it…[He] took her to his friends [sic] house nothing happened there. They were just getting mad because [the man] didn't pick her up. They drove her back to [his] house but he was…working…The next day he took her back to his homeboys and left…She left the house because the cops came…She didn't want the homeboys to know that she was a run away…They kicked her out of the house….That's when she fell into the water and there were snakes in the

---

[30] The Monitors note that their interviews with DFPS do not appear to have been recorded, or if they were recorded, were not uploaded to IMPACT. Thus, the Monitors have only been able to review the notes for the interviews in CLASS.
[31] 26 Tex. Admin. Code §748.4551.

water. She was screaming for help but no one heard her. She passed out for a little bit. She slipped on a rock and fell again. She got out of the water and was walking on the street…A car passed her by and asked her if she was ok and a woman said that they were going to call the cops. She told the cops her real name.

All of the children who ran from their cottages or the facility in 2020 returned shortly after they left. In some cases, the children were simply hiding on the 50-acre campus and never left.[32] Yet, in 2021, several children were noted to have been gone for 24 hours or more, or not to have returned at all. This includes RR, DD, and II, all of whom returned to trafficking during their runs from the facility.

One child who ran from the operation on March 27, 2021 was found in a shack two days later, with (according to the intake to SWI in CLASS) a "technically homeless male who offered [the child] a place to stay." While she was staying with him, the man "plied [the child] with methamphetamines and marijuana and sexually abused her repeatedly until she was found." This event was not investigated by DFPS or HHSC because the "[r]unaway was timely reported and no indication of minimum standards violations." Another PMC child was located in Fort Worth after she ran away and acknowledged that she returned to trafficking during her run from the facility. She too was on probation when she ran and returned to detention rather than The Refuge when she was recovered.

Another 16-year-old PMC child who, like DD, ran from The Refuge more than once, was recovered by the Houston Police Department three weeks after her last run from the facility on August 5, 2021; she was a passenger in a car the officers pulled over, and she made an outcry to the police officer. The child described her experience to the DFPS special investigator who interviewed her after she was recovered:

> [The child] stated she has been prostituted by [her trafficker] since August 2020. [A] 12-year-old used to work for [her trafficker] and got her into the life. Last night he put her out on [street name omitted] [for] $100 30 min[utes] for oral or straight sex $200 for both. 5 johns last night, made 500 had to give all money to [her trafficker]. [The child] is bottom and recruits for [her trafficker]…She stated she was at the foster home for a few months then ran away from there and right away…got arrested, went back and then left the facility again…She stated [her trafficker] picks her up from the hotels and drops her off from 6 PM to 3 AM. She said every time she makes $300, she calls [her trafficker] to come pick up the money and she continues to work til 3 am. She stated after 3 AM, she goes back to the hotel, showers and sleeps and starts back over at 6 pm.

This significant uptick in runaway incidents, including an increase in runaway events lasting 24 hours or more (or that the child did not return from at all), preceded II's run from the facility on December 30, 2021 and EE's assisted run from the facility in February of 2022, both of which led to substantiated Neglectful Supervision findings by DFPS. The Monitors have not found anything in the investigations related to runaway incidents indicating that either agency appears to

---

[32] The Refuge is in a remote location, approximately eight miles from downtown Bastrop, the closest city.

have ever considered what appears to be a systemic problem associated with runaways at The Refuge, and systemic problems associated with violation of the operation's own cellphone policy, though runaway events and violations of the cellphone policy repeatedly led to harm to children in the operation's care.

### IV.     Conclusion

The State's response to Vice Chair Hinojosa's letters and to the allegations made by SS reveal a troubling failure to acknowledge the very serious safety concerns associated with an RTC staff person allowing a child victim of sex trafficking to use a cell phone to call persons not on their approved call list or access the internet or social media.  The response also reveals gaps in the investigations associated with both.  The significant uptick in runaway incidents at The Refuge between 2020 and 2021 warrants a systemic investigation of the problem; the experiences of the children who were able to run from the facility and fall back into trafficking show the dangers associated with failing to address what may be a systemic threat to child safety.