| | |
|---|---|
| **From:** | Lisa Drain |
| **To:** | Lori Purifoy |
| **Subject:** | Regarding AF |
| **Date:** | Monday, June 6, 2022 1:22:57 PM |

---

**CAUTION - EXTERNAL:**

I was the Child Protective Investigator assigned to investigate following AF's death. I am writing to answer two questions Judge Jack posed to DFPS that they were unable to answer. 1. There was no significant relationship between AF and her fictive kin (FK) caregiver prior to placement. The reason for this placement to be authorized is unclear. 2. FK told me that she did not report AF running away from her home due to concerns that AF would be removed from her care and experience further hardship in DFPS custody.

AF had been placed in a foster home near FK's home. FK's son (I believe he was 13-14yo) went to a birthday party at that foster home and interacted with a 14 year old girl in that foster home. FK later mentioned to me that she did not appreciate the attitude of the foster mother towards the children in her care.

AF ran away from that foster home placement along with the 14 year old girl from that placement with plans to travel to Houston. They had planned to join another youth in foster care also on runaway. Their plans to financially support themselves involved placing them at direct risk of being trafficking victims.

FK's minor child was concerned for the 14yo running away and decided to join both girls, making a statement later that he hoped to protect them. When FK's child was found to have left her home, FK and her adult children immediately took actions to locate him (I believe the family notified law enforcement in addition to driving around). This was FK's child's only runaway incident. The family found their child and the two girls the following morning. The girls ran off.

FK reached out to the girls who were still in possession of her child's phone. The girls agreed to meet up with the family to return the phone. During this meetup, FK spoke with AF and heard her story of being a child in DFPS custody with multiple placements and continued abuse/neglect. FK had plans to leave the state for the weekend though she was also reportedly concerned for the girls' safety. She paid for a hotel room for the girls to stay at and reportedly stayed in frequent contact by phone over the weekend and asked her friend's two adult sons to drive by the hotel to check in on the girls. She reportedly told the men to not go into the hotel room.

However, the men did go into the room. I did attempt to contact these men, though I left the Department prior to the completion of this investigation. In talking with FK and her adult children, I was told consistently that once FK learned the men did go into the room they all ceased any contact with the men and that FK is no longer friends with their mother.

When FK returned home 1-2 days later, she let the girls know she would need to report them to DFPS. The 14 year old left at this time while AF agreed to remain in the hopes that CPS would allow her to remain with FK. A worker came to the home and allowed AF to stay in the home in an unauthorized placement. FK reported that AF kept her running shoes on during this interaction in preparation to run if this placement was not authorized.

FK provided AF with her own room, purchased clothes/school supplies/art supplies for her, and a cell phone. AF attended a local high school and would independently walk to and from school. FK reported having difficulties getting assistance from DFPS in setting up therapy and other basic services for AF. FK went through the Kinship program, actually meeting with a Kinship worker the day after AF's disappearance.

FK's child returned home from school one day and AF was not there. He notified FK. FK reported that she did not contact CPS immediately because she believed AF to be staying with her high school boyfriend and did not want her runaway to result in her being removed from her home. She reported that she believed AF would return and did reach out to her.

FK reported (and also showed a number of texts to AF's cellphone) that she reached out to AF to encourage her return. At some point, AF had told her CASA worker and/or CPS worker who then questioned FK about AF running away. In text messages shown to me by FK, I recall seeing that FK was frustrated that AF made others aware of her being on runaway, but did offer to let AF return to her home without notifying CPS so long as she was alone. If I can recall correctly, AF had made it known she was in a relationship with a man she had met online and did not want to leave that relationship. FK reported that she suspected AF was either with this man or trying to make it to her biological family's home.

AF posted on Facebook and messaged her CASA worker and biological family members expressing suicidal ideation and that she had ingested pills. By this point, I believe she had met up with someone else online and was in this person's apartment at the time of her death.

I do want to note that FK had a history of mistrust with DFPS. When the 14 year old in her care was an infant, she began providing care to him. DFPS became involved for a short period of time, placing this child in FK's care with a Safety Plan due to concerns of drug use by the biological mother, however they then closed the investigation without any further resolution. She was advised to contact the Department if she needed anything. She reported that there was a period of time when the boy was young that she called DFPS for financial help and was told that they could remove him from her care. She declined this and made do.

When I interviewed this child, he was a remarkable young man. He was bright, confident, and well bonded with FK. In speaking with the school, local law enforcement, and friends of the family, there were no concerns for his care or caregiver. After interviewing this child at his school in my initial contact, FK expressed her frustration and concern for this contact without her prior notification. She then explained her history and views of the Department which, while they may be understandable, were very unfavorable. FK required a lot of rapport building to be developed between her, myself and the assigned Special Investigator in order to get her cooperation.

FK appeared to be genuinely grieving the loss of a child she cared for while also expressing frustration that she felt targeted in failing this child by a broken system. FK showed me diaries AF had kept at various placements. In these pages she described several highly concerning issues at licensed placements including excessive force/inappropriate restraints used by staff, inappropriate relationships between male staff and female youth, and general poor supervision and care in licensed facilities.

While her experiences in licensed facilities were highly concerning, AF should not have been placed in this "fictive kinship" home. There was no significant relationship between AF and

FK prior to placement. Her supervision and mental health care were unable to be appropriately supported. The caregiver was distrustful of DFPS and I find it difficult to believe that she could mask this for any significant period of time. Prior to AF's death, it was known to CPS that the men she had asked to check on the girls were alleged to have sexual contact with one or both girls. (Note: The incident with those men occurred prior to AF's placement with FK and while the girls were on runaway, making this an incident outside DFPS jurisdiction… though it is still highly concerning.)

While I cannot remember all of the specifics, I do recall a general lack of interest in collaborative efforts between Department divisions in the pursuit of information related to AF's prior placements, the youth in foster care the girls were supposed to meet up with in Houston, and the two men who were "checking in" on the girls at the hotel. These types of PMC/TMC investigations were new to me and my unit and little guidance was provided on how to approach these new issues.

Prior to working for the Department, I had worked with children in DFPS custody failed by the Department and grieved for children who have died (by suicide, murder, being runover while panhandling), been incarcerated, and who have gone on to experience DFPS as a parent themselves. As an Investigator, I had worked with children previously failed by DFPS interactions, and I also worked on previous child death investigations. I was able to do that work as long as I felt my role was more likely than not going to result in ensuring safety for children. However, AF's case highlighted the ongoing systemic failures with no signs of anything changing, and I no longer felt I was participating in keeping children safe.

There is an ongoing inability for stages of service (INV, FPR/FBSS, CVS, RCCI) to communicate and collaborate effectively for the children DFPS is meant to serve. There is also a big disconnect between the State Office and boots on the ground, leading to a perception that the Commissioner and her Executive Team are indifferent to the actual needs of the agency. That indifference has bled down to Regional Directors, Program Administrators, Program Directors, Supervisors, and workers across divisions throughout the state. While I can't speak to why turnover is so high, I can say that staff receive travel reimbursement; it is not the gas prices that results in staff turnover. If anyone is looking at the job market for someone with child welfare experience, they'll find less pay and fewer benefits than DFPS provides.

Prior to leaving DFPS in January 2021 I received an online exit survey when leaving the Department, please find below an excerpt of the response I provided.

**What was your primary reason for leaving DFPS?**

Having worked in child welfare for 15 years (9 working for agencies licensed by the Department), my primary goal has always been working to ensure child safety. I have become increasingly concerned and frustrated by the barriers and systemic issues that have worked against child safety. While the Department has trained staff to recognize and work to mitigate risks in households, it fails to do so internally too frequently for my current comfort level. When internal dangers are indicated, it is typically too late and the response is incredibly reactive without addressing the root issues.

Specifically, my concern grew exponentially when my unit was selected to work PMC/TMC cases and the poor implementation of this new system. We were given a vague timeframe for when it would begin, told that the three workers who would be working these cases would be

given a week or two to close cases, and were told we would be provided training. I specifically asked my supervisor who asked our PD to see if we could get an idea of the number of cases we could expect and we were told that this was not possible. I even suggested receiving raw data from the routers log to manually check a week or two of received cases to determine what we could expect. It is strange that three staff members were selected when the number of cases coming in were unknown, which I now believe to be a sign that this was a reactive implementation of a system as that was not an appropriate number of staff. While I was not told, even after asking, the rationale for moving PMC/TMC cases to our unit I imagine this is likely due to wanting tenured staff to manage these specific cases due to the scrutiny from the ongoing lawsuit.

We did not receive a training, we received the same two pages of information as everyone else in the Meeting in a Box. We were given three business days of notice, and the covering PD did not want to approve for myself and two other unit members to be off rotation for those three days to manage our workloads in preparation- fortunately the PA intervened and granted this. When we began receiving these cases I became very alarmed by the state of the conservatorship stages and child safety. In the PMC/TMC cases I was assigned I saw consistent patterns of high staff turnover, poor communication between staff and supervisors, poor documentation practice, caregivers unaware and unprepared to manage high risk behaviors of kids, children whom have been in care for months or years not receiving appropriate services, and caregivers with unaddressed risk factors. That was my tipping point.

My supervisor was incredibly understanding of my concerns and perspective, and was supportive when I provided her with doctor's notes writing me off for three weeks. During that time I saw a therapist and tried to rekindle my motivation to stay in this field I care so much about, but ultimately I came to the realization that was not realistic for me. My concerns for child safety and my lack of confidence in the agency's steps to address these concerns in a timely fashion led me to my decision to leave.

--
Lisa Drain

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.