UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CIVIL ACTION NO. 2:11-CV-00084

January 20, 2023

M.D.; bnf STUKENBERG, *et al.*, Plaintiffs, v. GREG ABBOTT, *et al.*, Defendants.

Hon. Janis Graham Jack, Senior United States District Judge

## FIFTH REPORT OF THE MONITORS: REMEDIAL ORDERS 1,2,3,5 to 11, 16, 18, 35, 36, A1 to A4, A6, AND B1 to B5

Deborah Fowler and Kevin Ryan, Monitors

# Table of Contents

**Introduction and Executive Summary**....................................................3

  Summary of the Monitors' Findings..................................................5

  Summary of Findings by Remedial Order.......................................7

    Screening, Intake and Investigation of Maltreatment in Care Allegations..............7

    Organizational Capacity ...........................................................14

**Demographics of Children in PMC Care** ..................................... 18

    Age, Gender and Race ............................................................. 19

    Living Arrangements and Length of Time in Care ................................20

    Out of State Placement............................................................ 23

    Level of Care ........................................................................24

    Geographic Location ...............................................................24

    Single Source Continuum Contractor Presence and Placement Oversight............ 25

**Screening, Intake and Investigation of Maltreatment in Care Allegations** . 26

  Remedial Order 3.................................................................... 26

    Background......................................................................... 26

    Statewide Intake Performance ................................................... 27

    Remedial Order 3: Screening and Intake Performance Validation....................... 33

    Remedial Order 3: Maltreatment in Care Investigations ....................... 37

    Summary of Performance for Receiving, Screening and Investigating Allegations of Maltreatment.......................................................................48

  Injunction............................................................................50

    Supervisory Challenges Creating Unreasonable Risk of Harm ...........................50

  Timeliness of RCCI Investigations: Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS)................................................... 55

    Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS) ..........56

    Summary ........................................................................... 69

  Remedial Order A6: Reporting Allegations....................................71

    Background.........................................................................71

    Performance Validation ........................................................... 72

    Summary ...........................................................................88

  Remedial Order B5: Communicating Allegations to Caseworkers ...........................89

    Background.........................................................................89

Performance Validation ................................................................................ 90

Summary ....................................................................................................... 99

Remedial Order 37 ........................................................................................... 99

Background ................................................................................................... 100

Performance Validation .............................................................................. 100

The State's Case Reads ............................................................................... 102

Summary ...................................................................................................... 102

**Organizational Capacity ............................................................... 103**

Remedial Order 1: CPS Professional Development ...................................... 103

Background ................................................................................................... 103

Performance Validation .............................................................................. 103

Summary ...................................................................................................... 110

Remedial Orders 35, A1, A2, A3, and A4: Caseworker Caseloads ............... 111

Background ................................................................................................... 112

Remedial Orders 35 and A4: Caseworker Caseloads Performance Validation Results ................................................................................................................. 113

Caseloads and Supervision of Children Without Placement ................... 122

Caseload Conformity and Workforce ....................................................... 124

Summary ...................................................................................................... 124

Remedial Orders B1-B4: RCCI and RCCR Investigator Caseloads ............ 125

Background ................................................................................................... 126

Performance Validation .............................................................................. 126

Summary ...................................................................................................... 138

Remedial Order 2: Graduated Caseloads ..................................................... 138

Background ................................................................................................... 138

Remedial Order 2 Graduated Caseloads Results and Performance Validation .... 139

Summary of Performance Validation ....................................................... 142

**Child Fatalities ............................................................................... 142**

Child Fatalities Involving Children in the PMC Class ................................ 143

Child Fatalities, No Abuse or Neglect Determined ................................. 143

PMC Child Fatality Investigations Pending ............................................. 149

## Introduction and Executive Summary

This is the Monitors' fifth comprehensive report (Fifth Report) to the United States District Court (Court) in *M.D. by Stukenberg v. Abbott* following the mandate issued by the United States Court of Appeals for the Fifth Circuit (Fifth Circuit) implementing the Court's remedial orders.[1] The Plaintiffs are a certified class of children in the Permanent Managing Conservatorship (PMC) of the Texas Department of Family and Protective Services (DFPS) who sought injunctive relief against the State of Texas. At the time Plaintiffs filed suit in 2011, DFPS was part of the Texas Health and Human Services Commission (HHSC).[2] Now DFPS is an independent State agency reporting directly to the Governor.[3]

Following a bench trial in 2014, the Court published a Memorandum Opinion and Verdict in December 2015 finding that Texas had failed to protect PMC children from an unreasonable risk of harm.[4] The Court issued a Final Order on January 15, 2018. Following a stay order, the Fifth Circuit adopted in part, reversed in part and modified in part the remedial orders. Upon remand, the Court issued a modified Order on November 20, 2018.[5] The Fifth Circuit again adopted in part and reversed in part the Court's Order and issued its Judgment as Mandate on July 31, 2019.[6] The Court's November 20, 2018 Order, as modified by the Fifth Circuit on July 8, 2019,[7] specifies numerous remedial orders that implement the Court's injunction as detailed below, charging the Monitors "to assess and report on Defendants' compliance with the terms of this Order."[8]

---

[1] *M.D. ex rel. Stukenberg v. Abbott*, 929 F.3d 272, 277 (5th Cir. 2019); J. (5th Cir. July 8, 2019), ECF No. 626.

[2] Effective February 2021, HHSC changed the name of its child care regulation unit, Residential Child Care Licensing (RCCL), to Residential Child Care Regulation (RCCR). This report uses RCCR to describe this division of HHSC even when referring to historic work done by the unit under its previous name.

[3] The 85th Texas Legislature passed House Bill 5, transforming DFPS into an independent State agency reporting directly to the Governor, H.B. 5 (TX 2017), 85th Leg., R.S.

[4] *M.D. ex rel. Stukenberg v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015).

[5] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. (S.D. Tex. Nov. 20, 2018), ECF No. 606.

[6] *M.D. ex rel. Stukenberg*, 929 F.3d at 277; J. (5th Cir. 2019), ECF No. 626.

[7] *M.D. ex rel. Stukenberg*, 929 F.3d at 277.

[8] *M.D. ex rel. Stukenberg*, No. 2:11-cv-84, slip. op. at 16, ECF No. 606. ("The Monitors' duties shall include to independently verify data reports and statistics provided pursuant to this Order. The Monitors shall have the authority to conduct, or cause to be conducted, such case record reviews, qualitative reviews, and audits as the Monitors reasonably deem necessary. In order to avoid duplication, DFPS shall provide the Monitors with copies of all state-issued data reports regarding topics covered by this Order. Notwithstanding the existence of state data, data analysis or reports, the Monitors shall have the authority to prepare new reports on all terms of this Order to the extent the Monitors deem necessary. The Monitors shall periodically conduct case record and qualitative reviews to monitor and evaluate the Defendants' performance with respect to this Order. The Monitors shall also review all plans and documents to be developed and produced by Defendants pursuant to this Order and report on Defendants' compliance in implementing the terms of this Order. The Monitors shall take into account the timeliness, appropriateness, and quality of the Defendants' performance with respect to the terms of this Order. The Monitors shall provide a written report to the Court every six months. The Monitors' reports shall set forth whether the Defendants have met the requirements of this Order. In addition, the Monitors' reports shall set forth the steps taken by Defendants, and the reasonableness of those efforts; the quality of the work done by Defendants in carrying

On June 16, 2020, the Monitors filed the first comprehensive report (First Report) with the Court, concluding that "the Texas child welfare system continues to expose children in permanent managing conservatorship (PMC) to an unreasonable risk of serious harm." On July 2, 2020, Plaintiffs filed a Motion to Show Cause Why Defendants Should Not Be Held in Contempt for their failure to comply with Remedial Orders 2, 3, 5, 7, 10, 22, 24, 25, 26, 27, 28, 29, 30, 31, 37, and B5 (July 2, 2020 Show Cause Motion). The State filed written objections to the Monitors' First Report on July 6, 2020[9] and a Response in Opposition to the Motion to Show Cause on July 24, 2020. On September 3 and 4, 2020, the Court held a hearing on Plaintiffs' July 2, 2020 Show Cause Motion, and on December 18, 2020, found Defendants to be in contempt of Remedial Orders 2, 3, 5, 7, 10, 22, 25, 26, 27, 29, 31, 37, and B5, but not in contempt of Remedial Orders 24, 28, or 30.[10]

On May 4, 2021, the Monitors filed the second comprehensive report (Second Report) with the Court, concluding that the State made progress toward eliminating some of the "substantial threats to children's safety" that surfaced in the Monitors' First Report; but the Monitors also concluded the State's performance in some areas, including its oversight of the care of children by the Single Source Continuum Contractors (SSCC) and certain general residential operations (GRO), was contrary to the Court's remedial orders.[11]

Following discussions with the Court and parties in 2021, the Monitors developed a report schedule which focused the third report (Third Report) to the Court, filed on January 10, 2022, on Remedial Orders 1, 2, 3, 5 to 11, 16, 18 (as to DFPS), 35, 37, A1 to A4, A6, and B1 to B5 and the fourth report (Fourth Report) to the Court on the balance of the remedial orders was filed on June 2, 2022.

In preparing this Fifth Report, the Monitors and their staff (the monitoring team) undertook a broad set of activities to validate the State's performance, as detailed

---

out those steps; and the extent to which that work is producing the intended effects and/or the likelihood that the work will produce the intended effects.") *Id.* at 17.

[9] Defendants' Verified Objections to Monitors' Report, ECF No. 903.

[10] The Court held: "Defendants are ORDERED to file with the Court a sworn certification of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 within thirty (30) days of the date of this Order. This sworn certification does not need to be verified by the Monitors prior to filing. Contemporaneously with this sworn certification, Defendants are ORDERED to submit to the Monitors for verification all supporting evidence relied on by Defendants to certify their sworn compliance with these Remedial Orders, including but not limited to documents, data, reports, conversations, studies, and extrapolations of any type. Defendants are further ORDERED to appear at a compliance hearing before this Court, beginning at 9:00 a.m. on Wednesday, May 5, 2021 and continuing thereafter until the compliance hearing concludes. The hearing will be held in-person in Courtroom 223 of the United States Courthouse at 1133 N. Shoreline Blvd., Corpus Christi, TX 78401. All of Defendants' supporting evidence of their compliance with Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, and B5 is subject to verification by the Monitors prior to the May compliance hearing. No sanctions will issue at this time, but, failing the Monitors' verification of compliance, any sanctions as to Defendants' performance of Remedial Orders 2, 3, 5, 7, 10, 25, 26, 27, 29, 31, 37, or B5 will be revisited at the compliance hearing. To avoid additional future sanctions as to these findings of contempt, Defendants must comply with each of these Remedial Orders in the timeframe described. No retroactive sanctions will be imposed at the time of the compliance hearing."

[11] Deborah Fowler & Kevin Ryan, Second Report, ECF No. 1079.

throughout this report. The Monitors requested data and information from both DFPS and HHSC to validate the agencies' compliance with the Court's remedial orders, as detailed in various sections of this report. The Monitors also requested data and information from the SSCCs with which DFPS contracts to provide case management and placement services to foster children in DFPS regions that have transitioned to the Community Based Care (CBC) model.[12]

The monitoring team examined tens of thousands of documents and records, including data files; children's case records, both electronic and paper; investigations; critical incidents; child fatality reports; medical examiner reports; restraint log entries; videos of critical incidents; witness statements; interviews; policies; resource materials, such as handbooks, plans, guidelines and field guidance; child abuse, neglect or exploitation referrals to Statewide Intake (SWI or hotline), including E-Reports and recorded phone calls when appropriate; and an array of employee and caregiver human resources and training records and certifications.

## Summary of the Monitors' Findings

The Court's Final Order enjoins the State "from placing children in the permanent managing conservatorship (PMC) in placements that create an unreasonable risk of serious harm. The Defendants SHALL implement the remedies herein to ensure that Texas' PMC foster children are free from an unreasonable risk of serious harm."[13]

The Monitors' investigation, analysis, interviews and site visits in preparation for this report identified areas in which the State made progress toward eliminating "substantial threats to children's safety" surfaced in prior reports and updates to the Court, including performance associated with Remedial Orders 2, 3 (Investigating), and 35.

- DFPS continued to improve its performance with respect to Remedial Order 3 (Investigating). With respect to investigations the Monitors reviewed in which DFPS's Residential Child Care Investigations (RCCI) did not substantiate any

---

[12] CBC was formerly known as Foster Care Redesign. There are currently four regions that have transitioned to the CBC model (excluding the failed transition in Region 8a): Region 1 (St. Francis, in the Texas Panhandle); Region 2 (2Ingage, in 30 counties in North Texas); Region 3b (OCOK, in seven counties around Fort Worth); and most recently, Region 8b (Belong, in 27 counties surrounding Bexar County). Region 8a, which previously was operating under the CBC model, has transitioned back to DFPS management. There are three stages to the transition to the CBC model: In Stage I, the SSCC "develops a network of services and provides placement services. The focus in Stage I is improving the overall well-being of children in foster care and keeping them closer to home and connected to their communities and families." DFPS, *Community-Based Care*, *available at* https://www.dfps.state.tx.us/Child_Protection/Foster_Care/Community-Based_Care/default.asp. According to DFPS, "In Stage II, the SSCC provides case management, kinship, and reunification services. Stage II expands the continuum of services to include services for families and to increase permanency outcomes for children." *Id.* Two SSCCs – OCOK and 2INgage – moved to Stage II of the CBC model in 2020. Stage II includes shifting case management services from DFPS to the SSCC. Stage III involves performance assessment and financial incentives for achievement of permanency for children. *Id.*
[13] *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-cv-84, slip. op. at 2 (S.D. Tex. Nov. 20, 2018), ECF No. 606.

allegations of abuse, neglect or exploitation,[14] the Monitors' rate of disagreement and findings of deficiencies declined from 14% in the prior reporting period (the Third Report) to 4.9%.[15]

- In the Monitors' review of maltreatment investigations performed by Child Protective Investigations (CPI), which was new for this reporting period, the Monitors' rate of disagreement and findings of deficiencies was 5.6%.

- DFPS's performance with respect to Remedial Order 2 was again strong during the period reviewed. Similar to the findings in the Third Report, nearly all (99%) of the caseworkers who became eligible for primary case management during the period, after July 1, 2021 and before June 30, 2022, had caseloads that conformed to the graduated caseload standard.

- With respect to Remedial Order 35, the overall performance also improved and by June 30, 2022, at the end of the reporting period, 1,343 caseworkers (85%) had primary caseloads within or below the standard of 17 children per worker. Specifically, among DFPS caseworkers, of the 1,271 caseworkers carrying at least one PMC child on their caseloads on January 31, 2022, 913 workers (72%) had primary caseloads within or below the standard of 17 children per worker and by June 30, 2022, the number increased to 1,102 of 1,283 workers (86%). Similarly, by June 30, 2022, two of the three SSCCs, Our Community Our Kids (OCOK) and 2Ingage, exceeded the performance of DFPS with 97% (116 of 120) and 92% (80 of 87) of their caseworkers within or below the standard, respectively.

- The State's performance associated with caseloads for both RCCI investigations and regulatory investigations by HHSC with respect to Remedial Orders B1 to B4 was also strong. The Monitors' review found that almost all RCCI investigators and most HHSC inspector caseloads were within the guidelines during each month of the period from July 2021 through June 2022.

- With respect to Remedial Order 1, the Monitors confirmed that a strong majority of caseworkers hired between September 1, 2021 and March 31, 2022 and subject to full or partial Child Protective Services (CPS) Professional Development (CPD) pre-service training completed the program. Overall, the monitoring team validated the completion of CPD training by July 31, 2022 for 485 of 526 caseworkers (92.2%) hired between September 1, 2021 and March 31, 2022.

---

[14] In these investigations, RCCI issued a disposition of Ruled Out, Unable to Determine or Administrative Closure.

[15] *See* Deborah Fowler & Kevin Ryan, Third Report 5, ECF No. 1165. In the First Report, the rate was 28%. Deborah Fowler & Kevin Ryan, First Report 25, ECF No. 869. In the Second Report, the Monitors disagreed or found deficiencies in 18% of investigations they reviewed where RCCI did not substantiate any allegations. Deborah Fowler & Kevin Ryan, Second Report 73, ECF No. 1079.

The State's performance in some areas is contrary to the Court's remedial orders and some gaps in DFPS's oversight of the SSCCs persisted. Specifically:

- With respect to the Court's Injunction, DFPS continues to expose some PMC children to risk of serious harm in unregulated sites without sufficiently trained caregivers to monitor children who are under DFPS Supervision (also known as Children Without Placement or CWOP).

- With respect to Remedial Order 3, DFPS's performance declined as it relates to receiving reports of alleged abuse, neglect and exploitation. Callers to SWI reporting allegations waited an average of 5.2 minutes before their calls were handled or abandoned, an increase of more than half a minute from the data reported in the Third Report.

- With respect to Remedial Order 35, the caseloads of St. Francis's caseworkers lagged behind DFPS and the other two SSCCs through June 30, 2022. Only 45 out of 85 workers (53%) with at least one PMC child on their caseloads had primary caseloads within or below the standard on June 30, 2022.

- The Monitors' evaluation of the State's system for notifying caseworkers of allegations of abuse, neglect or exploitation for purposes of Remedial Order B5 demonstrated ongoing gaps. The monitoring team reviewed allegations and the State's documented safety actions to determine whether the State took sufficient action to ensure the immediate safety of children after receiving intakes with maltreatment allegations. The monitoring team found an automated notice of allegations to the caseworker in 100% of the 387 RCCI intakes included in the case record review; however, for intakes that SWI referred for investigation to CPI or Provider Investigations (PI),[16] the Monitors found no notifications to caseworkers. Moreover, the monitoring team found relevant documentation showing that DFPS took appropriate action to ensure a child's safety after notification of alleged child maltreatment in only 42% of all intakes reviewed.

## Summary of Findings by Remedial Order

### Screening, Intake and Investigation of Maltreatment in Care Allegations

---

[16] Provider Investigations (PI) is a division of HHSC and its investigative authority includes HHSC state operated facilities, including state-supported living centers, state hospitals and Home and Community Based Services (HCS) residences; the HCS residences include three and four person residences and host home settings. HHSC has authority to investigate abuse, neglect and exploitation of an individual receiving HCS Medicaid waiver services (under Sec. 1915 of the Social Security Act) in an HCS host home setting from a person who contracts with a health and human services agency or managed care organization to provide home and community-based services. CPI (DFPS) also investigates allegations in certain HCS residences in instances when PI's jurisdiction does not apply.

*__Remedial Order 3:__ DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

## Receiving Allegations

- Between July 1, 2021 and June 30, 2022, SWI hotline staff received 735,938 calls. During the period analyzed, 22% (159,049) of calls were abandoned, similar to the rate of 20% observed in the previous report.[17]

- On average, callers waited for 5.2 minutes before their calls were handled or abandoned, an increase of more than half a minute from the data reported in the Third Report.[18] Forty-six percent (335,498) of callers waited on the queue for under one minute.

## Screening Allegations

- The Monitors reviewed 770 referrals to SWI from July 1, 2021 to June 30, 2022, which SWI did not send to RCCI for an investigation of child abuse, neglect or exploitation but instead sent directly to HHSC (and that HHSC then assigned for a minimum standards investigation). Of these 770 reports, the Monitors concurred with SWI's determination in 93.4% (719) of reports.

## Investigating Allegations

- Of the 1,604 RCCI investigations DFPS completed involving PMC children between May 1, 2021 and April 30, 2022, 93 investigations (5.8%) resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 1,511 investigations (94.2%) where RCCI issued a disposition of Ruled Out, Unable to Determine or which resulted in Administrative Closure, the Monitors evaluated 776 investigations.

- The Monitors found that, of the 753 investigations reviewed where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 716 (95%) cases; inappropriately in nine (1.2%) cases; and conducted investigations with such substantial

---

[17] *See* Deborah Fowler & Kevin Ryan, Third Report 32, ECF No. 1165.
[18] In the Third Report, the data demonstrated an average queue time of 4.6 minutes for calls placed from January 1, 2021 to June 30, 2021. *See* Deborah Fowler & Kevin Ryan, Third Report 30, ECF No. 1165.

deficiencies in 28 (3.7%) cases that the Monitors were prevented from reaching a conclusion.

- In addition to the 37 investigations that RCCI Ruled Out that were inappropriately resolved or had substantial deficiencies, the Monitors also identified one investigation, assigned a disposition of Unable to Determine, with such substantial deficiencies that the Monitors were prevented from reaching a conclusion.

- The Monitors found that of the 21 investigations with dispositions of Reason to Believe that RCCI later overturned during its Administrative Review and Appeals of Investigative Findings (ARIF) process during the period of review, RCCI did so appropriately in 17 investigations (81%) and inappropriately in four investigations (19%).

- In addition to the four investigations that RCCI inappropriately overturned during its ARIF process, the Monitors identified two other investigations that RCCI initially conducted with substantial deficiencies such that the Monitors agreed with RCCI's decision to overturn the disposition due to the investigative failure to gather a preponderance of evidence in support of the disposition.

- Of the 657 CPI investigations DFPS completed involving PMC children between September 1, 2021 and April 30, 2022, 78 (11.9%) investigations resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 579 (88.1%) investigations where CPI issued a disposition of Ruled Out, Unable to Determine or which resulted in Administrative Closure, the Monitors evaluated 178 investigations.

- The Monitors found that, of the 151 investigations reviewed where CPI Ruled Out all of the allegations, CPI did so appropriately in 142 (94%) investigations; inappropriately in one; and conducted investigations with such substantial deficiencies in eight investigations that the Monitors were prevented from reaching a conclusion.

- In addition to the nine investigations that CPI Ruled Out that were inappropriately resolved or had substantial deficiencies, the Monitors also identified one investigation, assigned a disposition of Unable to Determine, with such substantial deficiencies that the Monitors were prevented from reaching a disposition conclusion, resulting in ten (5.6%) investigations that the Monitors' review identified as having been inappropriately resolved or conducted with substantial deficiencies.

*Remedial Order 5: Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake.*

*(A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

- 79% (149) of Priority One RCCI investigations opened from July 1, 2021 to June 30, 2022 were initiated within 24 hours of intake; and

- 21% (39) of Priority One RCCI investigations opened from July 1, 2021 to June 30, 2022 were not initiated timely or did not have sufficient data to assess.

**Remedial Order 6:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

- 83% (1,131) of Priority Two RCCI investigations opened from July 1, 2021 to June 30, 2022 were initiated within 72 hours of intake; and

- 17% (235) of Priority Two RCCI investigations opened from July 1, 2021 to June 30, 2022 were not initiated timely or did not have sufficient data to assess.

**Remedial Order 7:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

- 79% (149) of Priority One RCCI investigations opened from July 1, 2021 to June 30, 2022 included initial face-to-face contact with all alleged victims within 24 hours of intake; and

- 21% (39) of Priority One RCCI investigations opened from July 1, 2021 to June 30, 2022 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess.

**Remedial Order 8:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

- 83% (1,131) of Priority Two RCCI investigations opened from July 1, 2021 to June 30, 2022 included initial face-to-face contact with all alleged victims within 72 hours of intake; and

10

- 17% (235) of Priority Two RCCI investigations opened from July 1, 2021 to June 30, 2022 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess.

***Remedial Order 9:*** *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

- Of 1,554 investigations opened by RCCI from July 1, 2021 to June 30, 2022 including both single and multi-alleged victim investigations, DFPS was able to track and report to the Monitors 92% of the time (1,431 investigations) whether face-to-face contact was made with each alleged child victim within an investigation and the date and time that contact occurred.

- Of the remaining 8% (123) of investigations, DFPS was not able to track and report to the Monitors whether face-to-face contact was made and the date and time that contact occurred.

***Remedial Order 10:*** *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

- Of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022, DFPS documented that 59% (922) were completed within 30 days of intake;

- Of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022, DFPS documented that 27% (420) of investigations were not completed timely; and

- Of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022, DFPS documented that 13% (197) of investigations had an approved extension and were completed within the extension timeframe.

- One percent (15) of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022 remained open with an active extension and, therefore, were not yet due at the time of analysis.

***Remedial Order 11:*** *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the*

*standard closure timeframe, and the reason for the extension, must be documented and tracked.*

- Of the 632 investigations that were opened by RCCI between July 1, 2021 and June 30, 2022 and were not completed within 30 days, DFPS data included extensions approved for 336 (53%) investigations with the dates the extensions were approved, the reasons for the extensions and the number of additional days approved by each of the extensions.

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

- *(Remedial Order 16 applies to both DFPS and HHSC. The Monitors report on DFPS's performance in this Fifth Report and on HHSC's performance in the upcoming Sixth Report.)* With respect to DFPS, the agency advised the Monitors it uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered complete when the documentation is finally submitted to the supervisor in compliance with this Order.

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

*(Remedial Order 18 applies to both DFPS and HHSC. The Monitors' report on DFPS's performance in this Fifth Report and on HHSC's performance in the upcoming Sixth Report.)* With respect to DFPS:

Notification to Referent:

- Of the 1,522 (out of 1,554) Priority One and Priority Two investigations opened by RCCI from July 1, 2021 to June 30, 2022 and documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 87% (1,329) of investigations.

- Of the remaining investigations, in 5% (69) of investigations, notification letters to the referents were not mailed timely; 3% (41) were mailed to the referent prior to supervisor approval; 2% (34) of investigations did not require notifications as the reporters were anonymous; and 3% (49) were unknown due to documentation deficiencies.

Notification to Provider:

- Of the 1,522 (out of 1,554) Priority One and Priority Two investigations opened by RCCI from July 1, 2021 to June 30, 2022 and documented as closed at the time of the Monitors' review, the notification letter to the provider was mailed within five days of closure in 83% (1,263) of investigations. Of the remaining cases, in 9% (140) of investigations, notification letters to the provider were not mailed timely; 3% (42) were mailed to the provider prior to supervisor approval; and 5% (77) were unknown due to documentation deficiencies.[19]

*Remedial Order A6: Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

- Nearly half of children who responded to all of the relevant questions (37 of 75 or 49%) reported having heard of the hotline, including four children who initially indicated they had not heard of the hotline, but changed their answer after a description was given.

- Among children interviewed, 41 of 76 (54%) had heard of the Foster Care Bill of Rights (Bill of Rights); 17 responded "yes" to having heard of it only after a description was offered by the interviewer.

- Fewer than half of children interviewed (31 of 76 or 41%) had heard of the Foster Care Ombudsman (Ombudsman); 11 of them responded "yes" after a description was given by the interviewer.

- Overall, less than a quarter (17 of 75 or 23%) of children had heard of all three–the Bill of Rights, Ombudsman and the hotline. The percentage of children who had heard of the Ombudsman and hotline varied significantly by operation. Young children were less likely to have knowledge about the Ombudsman and hotline than older children.

*Remedial Order B5: Effective immediately, DFPS shall ensure that RCCL, or any successor entity, promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigation, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

---

[19] The documentation deficiencies included blank cells.

13

- The monitoring team conducted case record reviews for a randomly selected sample of 387 RCCI, 312 CPI and 99 PI abuse, neglect and exploitation intakes received by SWI during the months of January, March and June 2022. The monitoring team ascertained that the time from SWI's receipt of an intake to the time that a staffing contact assessing child safety occurred varied across all three intake types (RCCI, CPI, PI). Some staffing contacts did not include any information except the information about the alleged abuse, neglect or exploitation. When the monitoring team determined that additional action should have been taken due to the allegations to ensure child safety, the necessary actions most often included: training of operation staff or foster parents, increased supervision for the child, development of a safety plan for the child, and ensuring there would be no contact between the child and alleged perpetrator. Overall, the monitoring team found a staffing contact that documented appropriate action to ensure the child's safety in 42% (335 of 798) of all intakes reviewed.

*Remedial Order 37: Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

- The Monitors' review of 22 intakes downgraded to Priority None (PN) involving PMC children between January 1, 2022 and June 30, 2022 revealed that none of the incidents occurred while any PMC child was placed in a verified foster home. The monitoring team also reviewed records associated with four Home History Reviews (HHRs) produced by the State between January 1, 2022 and June 30, 2022. The review raised concerns following two intakes that were downgraded. In the first, the Monitors found no evidence a required restaffing occurred. In the second, after a subsequent allegation was downgraded due to a previous investigation, DFPS's Complex Investigation Team reviewed the underlying investigation and determined that it was Ruled Out in error. A PMC child was still living in the foster home at the time that SWI received the intake that was later downgraded to PN. Though IMPACT records showed the caseworker and supervisor documented concerns during their HHR staffing based on the child's demeanor during the underlying investigation, the child remained in the home for weeks.

- The State conducted two case reads during the applicable period. Of the 13 reports made to SWI involving a PMC child placed in a foster home and later downgraded to PN, DFPS determined only one report required an HHR.

## Organizational Capacity

*Remedial Order 1: Within 60 days, the Texas Department of Family Protective Services (DFPS) shall ensure statewide implementation of the CPS Professional*

14

*Development (CPD) training model, which DFPS began to implement in November 2015.*

- Overall, DFPS, OCOK, 2Ingage and St. Francis hired 632 caseworkers between September 1, 2021 and March 31, 2022 who were subject to full or partial CPD training prior to being assigned cases. Of those 632 caseworkers, 106 (16.8%) caseworkers left the agencies prior to or during CPD training and were excluded from the Monitors' analysis, which tracked a total of 526 caseworkers. Overall, the monitoring team validated the completion of CPD training by July 31, 2022 for 485 (92.2%) of 526 caseworkers.

- Of 448 DFPS caseworkers newly hired between September 1, 2021 and March 31, 2022, and subject to completion of full or partial CPD training, 422 (94%) caseworkers completed the full or partial training by July 31, 2022.

- OCOK hired 31 Permanency Specialists (caseworkers) between September 2021 and March 2022. Twenty-five of the 31 (81%) were subject to full or partial CPD training while six (19%) of the 31 were exempt from training. Two (8%) of the 25 caseworkers hired who were subject to training left OCOK prior to or during training. The Monitors confirmed that 22 of the remaining 23 staff completed CPD training by July 31, 2021.

- 2INgage hired 18 Permanency Case Managers (caseworkers) between September 2021 and March 2022. All 18 caseworkers were subject to full or partial CPD training. Seven (39%) of the 18 caseworkers subject to training left 2INgage prior to or during training, leaving 11 employees required to complete CPD training. The Monitors confirmed that nine (81.8%) of the 11 caseworkers completed CPD training by July 31, 2021.

- Of 46 caseworkers newly hired by St. Francis between November 1, 2021 and March 31, 2022, and subject to completion of full or partial CPD training, 32 (72.7%) caseworkers completed the full or partial training by July 31, 2022.

**Remedial Order 2:** *Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

- For staff subject to graduated caseload standards between July 1, 2021 and June 30, 2022, caseloads conformed with the graduated caseload standards more than 99% of the time.

**Remedial Order 35:** *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC*

*class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

***Remedial Order A2:*** *Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

***Remedial Order A3:*** *Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly.*

***Remedial Order A4:*** *Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General Class. [The Court subsequently changed the effective date of this order to February 15, 2020.]*

- Upon agreement by the parties, the Court approved a workload standard of 14 to 17 children per Conservatorship (CVS) worker, pursuant to Remedial Order A3. To validate the State's performance, the Monitors reviewed and analyzed all relevant data provided by the State during the review period. The Monitors' analysis showed that as of June 30, 2022, 85% of all caseworkers (1,343 of 1,575), including those employed by OCOK, 2INgage and St. Francis had primary caseloads within or below the standard of 17 children per worker, which was the highest for the period from January 31, 2022 to June 30, 2022. Conformity with the standard was lowest on January 31, 2022 with 74% of all caseworkers (1,086 of 1,477) serving at least one PMC child within or below the standard.

- Supervisors carried only a small percentage of PMC cases; those who did rarely conformed with the workload standard. In the six months of caseload reports starting on January 31, 2022 and ending on June 30, 2022, conformity for supervisors managing at least one PMC child's case was lowest on March 30,2022, with 5% (1 of 21) of supervisors with one workload or less and highest on February 28, 2022, with 22% (7 of 32) of relevant supervisors with one workload or less. At the end of the period on June 30, 2022, conformity with the workload standard was 20% (5 of 25) of all supervisors carrying at least one PMC case.

- The Monitors found that conformity with the caseload standard varied among DFPS, OCOK, 2INgage and St. Francis. Of the 1,283 DFPS workers carrying at least one PMC case on June 30, 2022, 1,102 (86%) workers had primary caseloads within or below the standard of 17 children per worker. As of June 30, 2022, the three SSCCs that are undertaking case management, OCOK, 2INgage and St. Francis had 97%, 92% and 53% of their workers within or below the standard, respectively.

- Caseworkers reported significant CWOP shift work during interviews with the monitoring team, including workers whose caseloads did not conform to the caseload standards: 18 (17%) of the 106 workers interviewed who reported CWOP shift activity from January 2022 through June 2022 had caseloads that exceeded the caseload standard.

*Remedial Orders B1: Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

*Remedial Order B2: Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

*Remedial Order B3: Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

*Remedial Order B4: Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators, or successor staff.*

- On December 16, 2019, the Court approved an agreed motion submitted by the parties establishing as caseload guidelines a standard of 14-17 investigations per RCCI investigator and 14-17 tasks per RCCR (HHSC) inspector.

- Almost all RCCI investigators' caseloads and most RCCR (HHSC) inspectors' caseloads were within the guidelines during each month of the period from July 2021 through June 2022. Of RCCR supervisors who carried a caseload, however, fifty percent or more were assigned 18 or more tasks and/or administrative reviews in seven of the 12 months analyzed for this report.

## Demographics of Children in PMC Care

According to DFPS data, there were 10,124 children in PMC status as of June 30, 2022,[20] an increase of 445 children from the 9,679 children in PMC status on December 31, 2021 according to DFPS's corrected data.[21] DFPS cared for 13,208 PMC children between January 1, 2022 and June 30, 2022. During this period, 3,529 children entered PMC status and 3,084 children exited PMC status. Of the 10,124 children in PMC status on June 30, 2022, 3,327 (33%) children first entered PMC status after January 1, 2022.

[20] Analyses in this section for January 1, 2022 to June 30, 2022 are based on a comprehensive data file reflective of the reporting period. *See* DFPS, *RO.Inj_PMC_Children_List_010122_063022_log107017,* (Sept. 1, 2022) (on file with the Monitors). The Monitors became aware on July 6, 2022 that DFPS had previously misidentified the status of 339 children as Temporary Managing Conservatorship (TMC) instead of PMC. The Monitors were able to verify that the majority of those children (297 or 88%) were identified as PMC in the data received on September 1, 2022 and are included in this analysis. In addition, the Monitors removed 16 children who appeared twice in the data. These duplicate entries were often missing data or had other inconsistencies.

[21] In this reporting period, as noted above, DFPS provided to the Monitors a comprehensive data file reflective of the reporting period (January 1, 2022 to June 30, 2022) to address data lag issues that occurred in the monthly data reports. As a result, DFPS reported an additional 282 children were in PMC status but were not included in the data that DFPS submitted to the Monitors at the time of the Fourth Report. *See also* Deborah Fowler and Kevin Ryan, Fourth Report 18, ECF No. 1248.

18

## Age, Gender and Race

As of June 30, 2022, 39% of children with PMC status were age zero to six years old (3,986); 22% were seven to 11 years old (2,198); and 39% were 12 to 17 years old (3,940).

Figure 1: Age of Children in PMC on June 30, 2022



*n=10,124 children*



Forty-eight percent of children in PMC status were reported as female and 52% were reported as male.

The race of non-Hispanic children in PMC status breaks down as follows: 27% (2,774) of children in PMC on June 30, 2022 were White; 23% (2,365) were Black/African American; <1% (38) were Asian; <1% (16) were Native American; and 6% (597) were categorized as "Other." Additionally, 43% (4,334) of children in PMC on June 30, 2022 were of Hispanic ethnicity. Non-Hispanic Black/African American children in PMC status appear to be disproportionately represented compared to the racial category totals for Texas's population of all children ages zero to 17 years in the 2020 census.

Table 1: Race for Children in PMC on June 30, 2022 and Estimates of Total Child
Population in Texas by Race, August 12, 2021[22],[23]

*n=10,124 children*

| Race/Ethnicity | Children in PMC on June 30, 2022 | | Estimates of Total Population in Texas by Race | |
|---|---|---|---|---|
| | **Frequency** | **Percent** | **Frequency** | **Percent** |
| Non-Hispanic White | 2,774 | 27.4% | 11,584,597 | 40.2% |
| Non-Hispanic Black/African American | 2,365 | 23.4% | 3,444,712 | 12.0% |
| Non-Hispanic Other | 597 | 5.9% | 886,095 | 3.1% |
| Non-Hispanic Native American | 16 | <1% | 27,857 | <1% |
| Non-Hispanic Asian | 38 | <1% | 1,561,518 | 5.4% |
| Hispanic (of any race) | 4,334 | 42.8% | 11,441,717 | 39.7% |
| **Total** | **10,124** | **100%** | **28,803,616** | **100%** |

Note: Columns may not add to 100.0% due to rounding.

## Living Arrangements and Length of Time in Care

Based upon information provided by DFPS, 80% (8,065) of children in PMC on June 30,
2022 lived in family settings, including 27% (2,780) living with relatives or fictive kin and
3% (334) living in adoptive homes; 15% (1,475) of children in PMC lived in congregate
care; and 520 (5%) children lived in other types of living arrangements.[24] The remaining
64 (<1%) PMC youth were without an authorized placement (also known as CWOP) on
June 30, 2022.

---

[22] *See* UNITED STATES CENSUS BUREAU, Table IDs P2 & P4, Product: 2020: DEC Redistricting Data (PL 94-
171) (August 2021), available at
https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity&tid=DECENNI
ALPL2020.P2, and
https://data.census.gov/cedsci/table?q=Texas%20race%20by%20hispanic%20ethnicity%20&tid=DECE
NNIALPL2020.P4. These totals were derived by subtracting Table P4 totals (population over 18) from
Table P2 totals (total population). The categories used by the Census Bureau and Texas DFPS do not
match exactly. The Census data were aggregated as follows: the Non-Hispanic Other category includes all
children in the Non-Hispanic Other category with one race and all non-Hispanic children with more than
one race; the Non-Hispanic Native American totals combine the American Indian Alaska Native category
with the Native Hawaiian and Pacific Islander category.
[23] The format of the data provided by DFPS to the Monitors does not provide the ability to identify the racial
categories for any child of Hispanic ethnicity.
[24] The 520 children in the "Other" living arrangement category in this figure include those identified by
DFPS as: "Unauthorized Placement" (28%, 143), "HCS Group 1-4" (18%, 93), "Runaway" (17%, 88),
"Incarcerated" (13%, 70), "Psychiatric Hospital" (6%, 30), "Own-home/Non-Custodial Care" (4%, 23),
"Independent Living" (1%, 5), Data Entry Error (1%, 5), and eight other living arrangement types (12%, 62).
DFPS identified 64 children without placement for this date from the ongoing e-mail notifications from
DFPS to the Monitors about children without placements; the Monitors cross-referenced those children in
the relevant June data report with living arrangements. Of the 64 children without placement, the Monitors
confirmed 62 in the DFPS data for June 30, 2022.

20



**Figure 2:  Living Arrangements for Children in PMC on June 30, 2022**

*n=10,124 children*



PMC children who were identified as either Black/African American or Hispanic were slightly more likely to live in family settings than those children identified as White. Of children identified as Hispanic, 82% lived in family settings; Black/African American children, 79%; and for White children, 76%.

**Table 2 : Living Arrangement by Race, Children in PMC on June 30, 2022**

*n=10,124 children*

| Race/Ethnicity | Living Arrangement | | | | | |
|---|---|---|---|---|---|---|
| | **Foster Home** | **Adoptive Home** | **Congregate Care** | **Relative / Fictive Kin** | **Other** | **Total** |
| Non-Hispanic White | 49% | 3% | 19% | 24% | 5% | 100% |
| | 1359 | 97 | 527 | 655 | 136 | 2774 |
| Non-Hispanic Black/African American | 49% | 3% | 14% | 27% | 7% | 100% |
| | 1167 | 76 | 329 | 633 | 160 | 2365 |
| Non-Hispanic Other | 56% | 3% | 12% | 24% | 4% | 100% |
| | 337 | 19 | 74 | 145 | 22 | 597 |
| Non-Hispanic Native American | 50% | 6% | 19% | 19% | 6% | 100% |
| | 8 | 1 | 3 | 3 | 1 | 16 |
| Non-Hispanic Asian | 47% | 0% | 21% | 21% | 11% | 100% |

| | 18 | 0 | 8 | 8 | 4 | 38 |
|---|---|---|---|---|---|---|
| Hispanic (of any race) | 48% | 3% | 12% | 31% | 6% | 100% |
| | 2062 | 141 | 534 | 1335 | 261 | 4333 |

Note: Columns may not add to 100% due to rounding.

Of the children in PMC status on June 30, 2022, 4% (366) were in care for less than one year, 42% (4,233) were in care for one to two years; 24% (2,389) were in care for two to three years; and 31% (3,110) were in care for more than three years. Additionally, for 26 children (<1%) the data did not include removal dates, thus the Monitors were unable to calculate their length of time in care.[25]

Figure 3: Length of Stay in Care of Children in PMC on June 30, 2022

*n=10,124 children*



Children exited from PMC status primarily through adoption; reunification with family; having custody transferred to relatives; or by aging out of care. Of the 3,084 children's exits from PMC status that DFPS reported between January 1, 2022 and June 30, 2022, the most frequent reason for exit was adoption, with more adoptions by non-relatives (1,101) than relatives (867). The breakdown of exit reasons is as follows: 64% (1,968) of children were adopted; 19% (589) of children had custody transferred to a relative; and

---

[25] Total does not add up to 100% due to rounding.

13% (414) of children who exited aged out of foster care. Finally, a small number of children were reunified with their families (3%, 82) or had other outcomes (1%, 31).

Table 3: Exits from PMC by Exit Outcome between January 1 and June 30, 2022

*n=3,084 exits from foster care*

| Exit Outcome | Frequency | Percent |
|---|---|---|
| Adoption | 1,968 | 64% |
| Custody to Relative | 589 | 19% |
| Emancipation | 414 | 13% |
| Reunification | 82 | 3% |
| Other | 31 | 1% |
| **Total** | **3,084** | **100%** |

## Out of State Placement

Of the 10,124 children in PMC status on June 30, 2022, 505 (5%) children were placed in living arrangements that were located out of state. Of the PMC children placed out of state, 374 (74%) lived in family settings, including 24% (120) living with relatives or fictive kin and 13% (68) living in adoptive homes; and 22% (110) of children in PMC lived in congregate care out of state, a 13% decrease from December 31, 2021.

Table 4: Out of State Living Arrangement Type for Children in PMC, December 31, 2021 and June 30, 2022

*n=530 children and 505 children respectively*

| Living Arrangement Type | December 31, 2021 | June 30, 2022 | Percent Change |
|---|---|---|---|
| Congregate Care | 126 | 110 | -13% |
| Foster Home | 172 | 186 | 8% |
| Relative/Fictive Kin | 155 | 120 | -23% |
| Adoptive Home | 50 | 68 | 36% |
| Other | 22 | 12 | -45% |
| Own Home/Non-Custodial Care | 2 | 3 | 50% |
| Data Entry Error | 0 | 5 | N/A |
| Independent Living | 2 | 0 | -100% |
| Incarcerated | 1 | 1 | 0% |
| **Total** | **530** | **505** | **-5%** |

Of the 505 children who were placed out of state, 175 (35%) were White and 111 (22%) were Black/African American.

Table 5: Children in PMC Placed Out of State by Race on June 30, 2022

*n = 505 children*

| Race/Ethnicity | Frequency | Percent |
|---|---|---|
| Non-Hispanic White | 175 | 35% |
| Non-Hispanic Black/African American | 111 | 22% |
| Non-Hispanic Other | 39 | 8% |
| Non-Hispanic Native American | 1 | <1% |
| Non-Hispanic Asian | 1 | <1% |
| Hispanic (of any race) | 178 | 35% |
| **Total** | **505** | **100%** |

Note: Columns may not add to 100% due to rounding

## Level of Care

Of the 10,124 children in PMC status on June 30, 2022, 6,056 (60%) children were in a Basic level of care. Of the remaining 4,068 PMC children, 1,448 (14%) were in a Specialized level of care; 1,201 (12%) were in a Moderate level of care; and 441 (4%) were in an Intense level of care. The data included 901 (9%) PMC children with no authorized level of care recorded.[26]

Table 6: Authorized Level of Care for Children in PMC as of June 30, 2022

*n=10,124 children*

| Authorized Level of Care | Frequency | Percent |
|---|---|---|
| Basic | 6,056 | 60% |
| Specialized | 1,448 | 14% |
| Moderate | 1,201 | 12% |
| No Authorized Level of Care Recorded | 901 | 9% |
| Intense | 441 | 4% |
| (TFC) Treatment Foster Care | 72 | 1% |
| Intense Plus | 3 | <1% |
| Psychiatric Transition | 2 | <1% |
| **Total** | **10,124** | **100%** |

## Geographic Location

For 38% (3,888) of the 10,124 children with PMC status on June 30, 2022, the county of removal was one of five Texas counties: Bexar, Harris, Dallas, Tarrant and Bell.

---

[26] The Monitors found that for most of those children lacking identification of an authorized level of care (773, or 86% of children with no authorized level of care recorded), the placement type in the data was identified as "kin only (non-licensed)."

24

Table 7: Top Five Counties of Removal for Children in PMC on June 30, 2022[27]

*n=3,888 PMC children of 10,124 PMC children in care*

| County Name | Frequency | Percent |
|---|---|---|
| Bexar | 1,273 | 13% |
| Harris | 984 | 10% |
| Dallas | 661 | 7% |
| Tarrant | 645 | 6% |
| Bell | 325 | 3% |
| **Total** | **3,888** | **38%** |

## Single Source Continuum Contractor Presence and Placement Oversight

As of June 30, 2022, 25% (2,519) of children in PMC status were from regions where SSCCs operated in the first two stages of implementation.[28]

Table 8: Children in PMC by Regions on June 30, 2022

*n=10,124 children*

| Regions | PMC Children | Percent |
|---|---|---|
| SSCC Regions | 2,519 | 25% |
| DFPS Regions | 7,605 | 75% |
| **All Regions** | **10,124** | **100%** |

As shown in the table below, Region 3b, where OCOK was responsible for placement, had the greatest number of PMC children from a region that has SSCC placement oversight.

Table 9: Children in PMC from Regions with Single Source Continuum Contractor Presence by Region on June 30, 2022[29]

*n=2,519 children*

| SSCC Name | Legal Region | PMC Children | Percent |
|---|---|---|---|
| St. Francis Ministries | 1 | 706 | 28% |

---

[27] These are the counties with jurisdiction over the child's removal case. DFPS describes these counties as the "legal" counties in the corresponding IMPACT data. Total does not equal 38% due to rounding.

[28] DFPS reports to the Monitors both the Legal Region and the Placement Region of children; here, the Monitors are referring to Legal Region for ease of reference. However, the children may be placed in and therefore, currently living in another region.

[29] The 3b catchment area is comprised of Tarrant, Erath, Hood, Johnson, Palo Pinto, Parker, and Somervell counties in DFPS Region 3W. The 8b catchment area is comprised of all counties in DFPS Region 8 excluding Bexar County. *See* DFPS, *Quarterly Report on Community Based Care Implementation Status*, 4-5 (December 2021). Total does not equal 100% due to rounding.

| 2Ingage | 2 | 537 | 21% |
|---------|-----|-------|------|
| OCOK | 3b | 840 | 33% |
| Belong | 8b | 436 | 17% |
| **Total** | | **2,519** | **100%** |

# Screening, Intake and Investigation of Maltreatment in Care Allegations

## Remedial Order 3

*Remedial Order 3: DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.*

To assess DFPS's performance with respect to Remedial Order 3, the Monitors gathered a wide range of data relating to the safety of PMC children for analysis and qualitative review. This section discusses the Monitors' assessment and review of the statewide system for appropriately receiving, screening and investigating reports of abuse, neglect and exploitation involving PMC children at several points, including referrals to SWI; the screening of those referrals to determine whether they should be investigated for child abuse, neglect or exploitation; and investigations of child maltreatment allegations.

## Background

SWI is expected to assign for an RCCI investigation those reports that allege abuse, neglect or exploitation of children in licensed residential operations.[30] The RCCI investigator is required to assess the immediate safety of involved children,[31] to evaluate the risk to the children during the investigation,[32] and to initiate the investigation timely based on the assigned priority–24 hours for Priority One and 72 hours for Priority Two.[33] The RCCI investigator is required to conduct interviews of children and collateral witnesses,[34] to collect evidence,[35] and to complete the investigation within 30 days for both Priority One and Priority Two cases.[36] RCCI's possible findings include:

---

[30] DFPS, *Child Care Investigations Handbook* § 6100, *available at* https://www.dfps.state.tx.us/handbooks/CCI/default.asp (*Child Care Investigations*).
[31] *Child Care Investigations* § 6330.
[32] *Child Care Investigations* § 6220.
[33] *Child Care Investigations* § 6361.1-2.
[34] *Child Care Investigations* § 6420.
[35] *Child Care Investigations* § 6440.
[36] *Child Care Investigations* § 6110.

Reason to Believe (RTB) – A preponderance of evidence indicates that abuse, neglect, or exploitation occurred. If the disposition for any allegation is Reason to Believe, the overall case disposition is Reason to Believe.

Ruled Out (R/O) – A preponderance of evidence indicates that abuse, neglect, or exploitation did not occur. If the dispositions for all allegations are Ruled Out, the overall case disposition is Ruled Out.

Unable to Determine (UTD) – A determination could not be made because of an inability to gather enough facts. The investigator concludes that:

- there is not a preponderance of the evidence that abuse or neglect occurred; but

- it is not reasonable to conclude that abuse or neglect did not occur.

If the disposition for any allegation is Unable to Determine and there is no allegation assigned a disposition of Reason to Believe, the overall case disposition is Unable to Determine.

Administrative Closure (ADM) – The operation is not subject to regulation; or the allegations do not meet the definition of abuse, neglect, or exploitation. If the dispositions for all allegations are Administrative Closure, the overall disposition is Administrative Closure.[37]

RCCI is charged with investigating allegations of abuse, neglect or exploitation of children in operations licensed by RCCR (HHSC), which includes foster homes and GROs.[38]

CPI is responsible for investigating abuse, neglect or exploitation of children in unlicensed placements, such as kinship foster homes and children under DFPS Supervision in CWOP Settings. CPI's scope of authority also includes investigating reports of child abuse or neglect alleged to have occurred prior to the child's entrance into DFPS custody.[39],[40]

## Statewide Intake Performance

---

[37] *Child Care Investigations* § 6622.3

[38] *Child Care Investigations* § 1142.

[39] DFPS, *Child Protective Services Handbook* § 2120, *available at* https://www.dfps.state.tx.us/handbooks/CPS/default.asp.

[40] The language in Remedial Order 3 specifically refers to the General Class, rather than limiting its application to children in licensed settings. In an advisory filed with the Court on September 21, 2021, Governor Greg Abbott advised that with respect to the scope of the Court's injunctions, "[A] General Class member should receive the same protections under the Court's remedial orders regardless of the licensed or unlicensed nature of the facility where the member is housed, unless the remedial order at issue specifies that it applies only to the [Licensed Foster Care] subclass or licensed or unlicensed facilities." Governor Greg Abbott's Advisory Concerning the Court's September 14, 2021 Inquiries 3, ECF No. 1137.

## Background

Calls to SWI are answered by an automated system that asks the caller a series of questions in order to determine the way the call is routed.[41] These questions include a caller's language preference; whether the caller is asking about the status of a case; and whether the caller wants to learn more about online reporting.[42] Depending upon the answers to these questions, the call is routed to one of 22 "call queues."[43] If an SWI staff member is not immediately available, the caller waits on the queue.[44] If a caller hangs up before an SWI staff member answers the call, the call is categorized as "abandoned."[45] If an SWI staff member speaks with the caller, the call is categorized as "handled." The automated system records the date and time that each call starts and ends; the call queue to which the call is routed; whether the call is handled or abandoned; the time the caller waits after being routed to a queue before speaking with an SWI staff member; and other information.[46]

During this reporting period, DFPS continued to produce data files containing monthly SWI call records of all hotline call made, pursuant to this Court's order; [47] the specific times of these calls to the hotline; and the wait time for each call, including, but not limited to, dropped and unanswered calls.[48]

## Statewide Intake Call Center Performance Analysis

The Monitors analyzed SWI's Avaya call data related to the 735,938 calls made to SWI from July 1, 2021 to June 30, 2022.[49] The analysis examined the distribution of calls by month, weekday, hour and call queue, the prevalence of handled and abandoned calls, and the amount of time callers waited before the call was answered by a staff person.

### *Volume of Calls to SWI*

---

[41] *See* DFPS, *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

[42] *Id.*

[43] *Id.*

[44] *See* DFPS, *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors).

[45] *Id.*

[46] DFPS, *RO3 3-13-20 Response FINAL* (Mar. 30, 2020) (on file with the Monitors); DFPS, *SWI Abuse Hotline Call Flow- AM 5-7-2019* (Mar. 30, 2020) (on file with the Monitors).

[47] On February 21, 2020, the Court ordered DFPS to provide the Monitors by February 26, 2020, and continuing thereafter until further order of the Court, the records of all SWI calls made, the specific times of all calls made to SWI, and the wait time for each SWI call including, but not limited to, dropped and unanswered SWI calls. *M.D. ex rel. Stukenberg v. Abbott*, No. 2:11-CV-84, slip. op. at 2 (S.D. Tex. Feb. 20, 2020), ECF No. 811 (ordering that starting February 26, 2020 and continuing thereafter in 24-hour increments until further order of the Court, the Defendants are to provide the Monitors with records of all Statewide Intake hotline calls made and the wait time for each call including, but not limited to, dropped and unanswered calls, and including the specific times of these calls to the Statewide Intake hotline).

[48] The Monitors received SWI call data in workbooks with titles in the following format: "export_[month]-[day]-[year].csv". The Monitors received individual files for each day during the reporting period.

[49] Two hundred duplicate calls were removed from the dataset. Calls were determined to be duplicates if the Call ID, UC ID, and call queue were all identical.

28

On average, the SWI data recorded over 61,000 calls a month. Average call volume increased by an average of 2,000 calls per month compared to the average reported in the Monitors' previous report.[50] The calls listed in the data are from the public as well as calls and transfers within SWI. Call volume fell by 15% from September 2021 (65,615 calls) to January 2022 (55,987 calls), before it rose to its highest point in April 2022 (68,739 calls).

Figure 4: Number of SWI Calls by Month



*Queue Times*

On average, callers waited for 5.2 minutes on the queue before their calls were handled or abandoned, 36 seconds longer than the wait time observed in the previous reporting period.[51] Forty-six percent (335,498) of callers waited on the queue for under one minute; 19% (143,330) waited for one to five minutes; 15% (107,169) waited five to ten minutes; 9% (67,692) waited ten to 15 minutes; 6% (42,590) waited 15 to 20 minutes; and 5% (39,659) waited more than 20 minutes.

Figure 5: Time Callers Waited before Calls were Handled or Abandoned

---

[50] The Third Report found an average of 59,000 calls per month from January 1, 2021 to June 30, 2021. *See* Deborah Fowler & Kevin Ryan, Third Report 29, ECF No. 1165.
[51] The Third Report found an average queue time of 4.6 minutes for calls placed between January 1, 2021 to June 30, 2021. *See* Deborah Fowler & Kevin Ryan, Third Report 30, ECF No. 1165.



## Handled Calls

Of 735,938 calls, 78% (576,826) were answered,[52] a decrease from 80% observed in the Third Report.[53] Handled calls had an average duration of 11.9 minutes. Four percent (23,103) of handled calls lasted under one minute; 19% (107,181) lasted one to five minutes; 27% (157,064) lasted five to ten minutes; 25% (144,400) lasted ten to 15 minutes; 13% (72,691) lasted 15 to 20 minutes; and 13% (72,387) lasted more than 20 minutes (percentages do not add to 100 due to rounding).[54]

Figure 6: Duration of Handled SWI Calls

---

[52] Handled calls were determined by the presence of a "Handled Flag." Sixty-three calls were not flagged as either handled or abandoned, an indicator of data quality issues.

[53] The Third Report found that 80% of calls were handled from January 1, 2021 to June 30, 2021. *See* Deborah Fowler & Kevin Ryan, Third Report 31, ECF No. 1165.

[54] Fewer than 1% (31) of handled calls had a duration of zero minutes, a potential indicator of data quality issues; calls that were answered should, by definition, have a duration. Calls with a duration of zero minutes were abandoned before the caller finished navigating the automated system.



There were 1,288 calls in the dataset with durations longer than two hours, which may be indicative of data system issues. Of these 1,288 calls, 693 (54%) lasted two to three hours; 301 (23%) lasted three to four hours; 186 (14%) lasted four to five hours; 64 (5%) lasted five to six hours; and 44 (3%) lasted more than six hours (percentages do not add to 100 due to rounding).

*Abandoned Calls*

During the period analyzed, 22% (159,049)[55] of calls were abandoned, similar to the last reporting period at 20%.[56] A total of 68% (108,735) of abandoned calls occurred after callers waited for up to five minutes, including 18% (28,855) of all abandoned calls that occurred before the caller finished navigating the automated system.

Of the 335,498 calls waiting on the queue for up to one minute, 15% (50,577) were abandoned and 85% (284,900) were handled. The highest number of abandoned calls occurred among those 143,330 calls waiting on the queue for one to five minutes, when 41% (58,158) of those calls were abandoned.

The figure below shows the queue time of abandoned calls and handled calls.

Figure 7: Queue Time of Abandoned and Handled SWI Calls[57]

---

[55] Abandoned calls were determined by the presence of a "Queue Abandoned Flag." Sixty-three calls were not flagged as either handled or abandoned, an indicator of data quality issues.
[56] *See* Deborah Fowler & Kevin Ryan, Third Report 32, ECF No. 1165.
[57] The number of calls in the figure does not include the 63 calls that were not flagged in the data as either handled or abandoned.

31



*Call Queues*

Calls were routed to 22 different queues in the reporting period. Of the 735,938 calls, the abuse queue received the majority of incoming calls (65%, 481,472). The next most common queues were calls from law enforcement (11%, 82,844); calls from intake staff to their supervisors (11%, 80,254); calls to support staff (3%, 25,500); and other general calls in English including calls pertaining to state hospitals and state supported living centers (3%, 19,616). These five queues represent 94%[58] (689,686) of all calls.

Four percent (3,249) of the 82,844 calls to the law enforcement queue were abandoned. In contrast, 27% (128,313) of 481,472 calls to the abuse queue were abandoned. On the law enforcement queue, 75% (61,903) of calls were handled or abandoned in the first minute and 95% (78,523) in the first five minutes. In contrast, 30% (144,732) of calls to the abuse queue were handled or abandoned in the first minute and 52% (250,480) were handled or abandoned in the first five minutes.

The rate of abandoned calls to the abuse queue increased from 25% in the previous reporting period to 27% between July 1, 2021 to June 30, 2022. The rate of calls handled or abandoned in the first five minutes decreased from 58% in the previous reporting period to 52% for the current reporting period.[59]

*Calls by Day of the Week and Time of Call*

SWI calls were higher in volume on weekdays than on weekends. The average weekday call volume (2,414 calls per day) was twice the average weekend call volume (1,018 calls

---

[58] This percentage is rounded to 94%.
[59] *See* Deborah Fowler & Kevin Ryan, Third Report 33, ECF No. 1165.

per day). On average, calls were abandoned at a slightly higher rate on weekdays (22%) as compared to weekends (19%). Average queue times were also two minutes longer on weekdays (5.4 minutes) as compared to weekends (3.5 minutes).

Figure 8: Number of SWI Calls Handled and Abandoned by Day of the Week[60]



Sixty-nine percent (507,199) of all calls were placed during typical work hours (9:00 a.m. through 6:00 p.m.), with a higher rate (72%) placed during work hours on weekdays as compared to weekends (52%). Calls were abandoned at a higher rate during the typical work week (Monday through Friday, 9:00 a.m. through 6:00 p.m.). On average, 25% of calls placed during the typical work week were abandoned, as compared to the overall average abandonment rate of 22%, a slight increase from the previous reporting period.[61]

## DFPS Intake Screening and Maltreatment in Care Investigations

The Monitors used the monthly data files as provided by DFPS and HHSC on an ongoing basis for purposes of monitoring performance associated with Remedial Order 3. For purposes of data related to SWI, the State—DFPS and HHSC together or separately— remains unable to provide the Monitors with a unified list of all referrals to SWI involving PMC children as an apparent result of a bifurcated system for processing and storing data associated with referrals to SWI.[62]

## Remedial Order 3: Screening and Intake Performance Validation

---

[60] The number of calls included is 735,875 because 63 of the total calls were not flagged in the data as either handled or abandoned.

[61] The Third Report found that 24% of calls were abandoned during the typical work week from January 1, 2021 to June 30, 2021. *See* Deborah Fowler & Kevin Ryan, Third Report 34, ECF No. 1165.

[62] *See* Deborah Fowler & Kevin Ryan, Second Report 61, ECF No. 1079.

## Overview of Allegations in Referrals for Maltreatment in Care

The Monitors analyzed maltreatment in care allegations for PMC children using data about intakes pertaining to PMC children received by SWI from July 1, 2021 to June 30, 2022.[63] From July 1, 2021 to June 30, 2022, DFPS reported 1,683 intakes for PMC children in licensed placements (RCCI) that were coded as allegations of abuse, neglect or exploitation by SWI intake specialists. In that same period, DFPS reported 1,429 intakes for PMC children living in unlicensed placements (CPI) that were coded as allegations of abuse, neglect or exploitation by SWI intake specialists for investigation by CPI.

During its secondary screening between July 1, 2021 and June 30, 2022, DFPS downgraded 53 of the 1,683 RCCI intakes (3%) involving a PMC child to PN and determined that RCCI would not conduct an abuse or neglect investigation.[64] In addition, secondary screeners downgraded 198 of 1,683 intakes (12%) from Priority One investigations to Priority Two investigations. The overall rate of downgrades to PN was minimal, reflecting the DFPS policy change discussed in the Monitors' Second Report and implemented in November 2020.[65]

During the secondary screening for CPI intakes between July 1, 2021 and June 30, 2022, DFPS downgraded 20 of the 1,429 CPI intakes (1%) involving a PMC child to PN and determined that CPI would not conduct an abuse or neglect investigation. In addition, DFPS downgraded 155 of 1,429 total intakes (11%) from Priority One investigations to Priority Two investigations.

The 1,683 RCCI intakes reported by DFPS involved 2,110 children in licensed placements between July 1, 2021 and June 30, 2022 and contained 2,332 allegations of child abuse, neglect or exploitation, an average of 194 allegations per month.[66] This represents a decrease of average monthly allegations of 99 (33%) per month from the Monitors' Third Report.[67] Among those 2,332 allegations, Neglectful Supervision was the most common allegation type, constituting 55% of all allegations (1,286), affecting 893 children; Physical Abuse allegations constituted 25% of allegations (590), affecting 467 children; and Sexual Abuse allegations constituted 9% of all allegations (205), affecting 164

---

[63] The Monitors used the regular monthly data reports relevant to this time period submitted by DFPS and HHSC and those reports are on file with the Monitors and with DFPS and HHSC. The CPI data, as provided to the Monitors by DFPS, includes all allegations and allegations are included based upon the child's living arrangement at the time of intake; therefore, they are not necessarily related to the current caregiver or time period. Therefore, for example, it can include allegations of maltreatment alleged to have occurred in the child's birth home or with another guardian prior to the child's entry in care.

[64] *Child Care Investigations Handbook* § 6211.1. An allegation can be assigned PN only due to lack of RCCI jurisdiction over the allegation or when the allegation has already been investigated. *Id.*

[65] Deborah Fowler & Kevin Ryan, Second Report 52-53, ECF No. 1079.

[66] Some intakes include more than one child and more than one allegation for each child. If a child was the subject of the same type of allegation in two separate intakes, that child is double counted in this analysis; the unique number of children is 1,337.

[67] Deborah Fowler & Kevin Ryan, Third Report 37, ECF No. 1165.

children.[68] The remaining 11% of allegation types included Medical Neglect, Emotional Abuse, Physical Neglect, Exploitation and Sex Trafficking. The data may underrepresent the prevalence of alleged sexual abuse victimization among PMC children due to the nature of Neglectful Supervision allegations. The Monitors have found during ongoing reviews of intakes and investigations that between one quarter and one third of allegations of Neglectful Supervision involve sexual contact among children in care.[69] DFPS's data does not identify the type of harm underlying Neglectful Supervision allegations.

Figure 9: Allegation Types for RCCI Intakes Involving PMC Children in Licensed Placements, July 1, 2021 to June 30, 2022



Note: Percentages do not add to 100% due to rounding.

In its monthly data reports to the Monitors, HHSC reported that 20,886 referrals were assigned to the agency by SWI between July 1, 2021 and June 30, 2022 to review and determine whether to conduct a minimum standards investigation (meaning they were not assigned to DFPS for an abuse, neglect or exploitation investigation). When the Monitors excluded the referrals related to facilities that did not house children in DFPS care, the total number of referrals was 15,925. Based upon ongoing monitoring and reporting, the monitoring team was able to determine that the rate of referrals assigned to HHSC involving PMC children was approximately 52% during this reporting period.[70]

---

[68] If a child was the subject of the same type of allegation in two separate intakes, that child would be double counted in this analysis.

[69] Deborah Fowler & Kevin Ryan, Third Report 37, ECF No, 1165; *see also*, Deborah Fowler and Kevin Ryan, Second Report 64-65, ECF No. 1079.

[70] This number is consistent with prior reporting but slightly higher. For example, in the Third Report, the Monitors found that 45.5% of referrals reviewed involved PMC children. *See* Deborah Fowler & Kevin Ryan, Third Report 40, ECF No. 1165. In the Second Report, the Monitors described that out of the 953

Therefore, from July 1, 2021 and June 30, 2022, it is estimated that out of the 15,925 relevant referrals SWI received and referred to HHSC, approximately 8,281 (52%) of these referrals would have involved PMC children.

## SWI Original Screening Validation Results for Referrals Assigned to HHSC

To evaluate DFPS's performance associated with Remedial Order 3 and assess the appropriateness of screening of referrals of abuse, neglect or exploitation involving PMC children, the monitoring team conducted a qualitative review of referrals received by SWI. The Monitors' review focused on whether SWI appropriately screened the referrals when it determined that they did not contain any allegations of abuse, neglect or exploitation.[71]

As the HHSC referral data does not provide child identifiers, the Monitors' methodology and analysis continued to require a preliminary two-step process to discern which referrals involved children in PMC status. The monitoring team first undertook the effort of reviewing each individual report to identify which child or children were the subject of the report. Next, the monitoring team searched the IMPACT records of each child or children identified in each report to determine whether it involved a child in PMC status by checking for the child's legal status on the date of the intake report. Of the 1,482 referrals the Monitors reviewed, 770 involved PMC children. The other referrals involved children reported to be in Temporary Managing Conservatorship (TMC) status or children who were not in DFPS custody and therefore, were not included in the Monitors' full review.

In the Monitors' sample of 1,482 SWI referrals from July 1, 2021 to June 30, 2022 sent directly to HHSC and assigned by HHSC for a minimum standards investigation, the Monitors identified 770 reports that involved a child(ren) with PMC status.[72] Of these 770 reports, the Monitors assessed that SWI appropriately determined 93.4% (719 referrals) did not contain an allegation of abuse or neglect of a PMC child and were properly assigned to HHSC to determine whether to conduct a minimum standards investigation.

 The Monitors found that SWI inappropriately referred 51 reports (6.6%) to HHSC instead of assigning them for an abuse, neglect or exploitation investigation. The Monitors concluded that these 51 reports contained allegations that warranted an investigation for

---

referrals selected for review, 441 (46%) involved children identified by DFPS as being in PMC status. *See* Deborah Fowler & Kevin Ryan, Second Report 68, ECF No. 1079.

[71] For this reporting period, for the reviews the Monitors conducted on referrals received by SWI for July 1, 2021 through December 31, 2021, the Monitors used the same methodology as reported in the Third Report. *See* Deborah Fowler & Kevin Ryan, Third Report 39, ECF No. 1165. For the reviews the Monitors conducted for referrals received by SWI in the second half of the reporting period for January 1, 2022 through June 30, 2022, the Monitors increased their sample and reviewed 50% of all referrals that SWI referred to HHSC and that were then assigned by HHSC for a minimum standards investigation, approximately doubling their monthly review sample for the second portion of the reporting period. For the full period, consistent with the Third Report, the Monitors excluded referrals that HHSC administratively closed due to the high rate of concurrence between the Monitors and the State regarding the disposition of that subset of referrals.

[72] The State reports that DFPS and HHSC are working together on an interface between the CLASS and IMPACT systems; as a result of the interface, the HHSC SWI data submissions will eventually identify the legal status of children subject to a referral but DFPS and HHSC do not have an anticipated date for completion of this legal status update feature at this time.

Case 2:11-cv-00084   Document 1318   Filed on 01/20/23 in TXSD   Page 38 of 156


abuse, neglect or exploitation to ensure the safety and well-being of a child(ren) with PMC status. In the Third Report, the Monitors determined that 92% of referrals reviewed (223) did not contain an allegation of maltreatment of a PMC child and were properly assigned to HHSC and that 8% (20) had been inappropriately screened by SWI.[73]

Of the 51 reports elevated by the Monitors as containing allegations of abuse, neglect or exploitation, the Monitors found that Physical Abuse was the most common type of alleged maltreatment that SWI intake specialists did not refer for investigation; 29 (57%) of the 51 reports contained such allegations, frequently involving outcries by a child alleging that a foster parent hit them with a hand or an implement or allegations that a staff member at a congregate care facility improperly restrained or used force on a child. The Monitors' summaries of these 51 referrals are located in the Appendices.

### Remedial Order 3: Maltreatment in Care Investigations

Overview of RCCI Maltreatment in Care Investigations Involving Children in Licensed Placements

RCCI opened 1,591 new investigations involving at least one PMC child between May 1, 2021 and April 30, 2022.[74] The number of investigations opened per month ranged from 104 to 172, with the highest number of investigations opened in March 2022 and the lowest number of investigations opened in July 2021.[75]

RCCI closed 1,604 investigations of maltreatment of a PMC child in licensed placements between May 1, 2021 and April 30, 2022. The number of investigations closed per month ranged from 108 to 161, with the highest number of investigations closed in June 2021 and the lowest number of investigations closed in September 2021.

Figure 10: Closed RCCI Investigations, May 1, 2021 to April 30, 2022

---

[73] *See* Deborah Fowler & Kevin Ryan, Third Report 40, ECF No. 1165. The Third Report review included only referrals with an intake priority of Minimum Standards One, Two, or Three upon referral to HHSC.

[74] The Monitors analyzed data about maltreatment in care investigations pertaining to PMC children in licensed facilities that were opened from May 1, 2021 to April 30, 2022 and that closed between May 1, 2021 and April 30, 2022 using monthly and biannual data reports submitted by DFPS during the relevant time period. DFPS, *RO3.2 RCI Investigations JUL  31 2019 -DEC 31 2021 105300 FCL 03* (Mar. 1, 2022) (on file with the Monitors); *RO3.2_RCI_Investigations_010122_063022d2022_09_01_log106898* (Sept. 1, 2022) (on file with the Monitors); *RO3.2_RCI_Investigations_2022_07d2022_09_01_log106834* (Sept. 1, 2022) (on file with the Monitors); *RO3.2_RCI_Investigations_2022_08d2022_10_03_log107126* (Oct. 3, 2022) (on file with the Monitors).

[75] Forty-six investigations that opened in this period were later Administratively Closed and those investigations were excluded from the investigations that the Monitors assessed for timeliness in relation to Remedial Orders 5 through 19.



Of the 1,604 investigations closed during this period, 5.8% (93) of the investigations resulted in a disposition of Reason to Believe, thereby substantiating at least one allegation as abuse, neglect or exploitation in each of these 93 investigations.

The rate of substantiation represents a significant decrease from the Third Report, which found that 11% (102 of 911) of RCCI investigations closed between January 1, 2021 and April 30, 2021 resulted in a disposition of Reason to Believe.[76] Additionally in the current period, RCCI Ruled Out 1,459 (91%) investigations, Administratively Closed 46 (3%) investigations, and closed six (<1%) investigations as Unable to Determine. The Monitors previously reported in the Third Report that among the 911 investigations closed between January 1, 2021 and April 30, 2021, RCCI had Ruled Out 778 (85%) investigations, Administratively Closed 19 (2%) investigations, and closed eleven (1%) investigations as Unable to Determine.

Figure 11: Reason to Believe Findings in Closed RCCI Investigations Involving PMC Children in Licensed Placements, May 1, 2021 to April 30, 2022

---

[76] Deborah Fowler & Kevin Ryan, Third Report 41, ECF No. 1165.



Institutional staff accounted for 1,865 (45%) of the 4,153 alleged perpetrators, which is striking because only 15% (1,475) of children in PMC on June 30, 2022 lived in congregate care settings.[77] Foster parents accounted for 1,631 (39%) of the alleged perpetrators; service providers accounted for 93 (2%); household members accounted for 63 (2%); parents and guardians accounted for 20 (<1%); other family members accounted for 47 (1%); and the alleged perpetrator was listed as unknown or not listed for 182 (4%) investigations. Of the alleged perpetrators, 252 (6%) were listed as other (175) or were identified as having some other relationship not already described above (77).[78]

Figure 12: Alleged Perpetrators in RCCI Allegations Involving PMC Children in Licensed Placements, May 1, 2021 to April 30, 2022

---

[77] The 1,591 RCCI investigations opened from May 1, 2021 to April 30, 2022 involved 4,153 allegations. In the data the Monitors received from DFPS, each allegation has a perpetrator category, but not a unique identifier for each perpetrator. As a result, it is possible that some perpetrators may be counted more than once in a single investigation or over time.
[78] Those perpetrators categorized as "other relationships not already described" include, for example, day care provider (25), babysitter (4), and parent's paramour (5).



Note: Percentages do not add to 100% due to rounding.

## Overview of CPI Maltreatment in Care Investigations Involving Children in Unlicensed Settings

CPI opened 775 new investigations involving at least one PMC child between September 1, 2021 and April 30, 2022.[79] The number of investigations opened per month ranged from 78 to 120, with the highest number of investigations opened in March 2022 and the lowest number of investigations opened in February 2022. As reported below, the data included investigations as provided by DFPS to the Monitors and included those that commenced while the child was living in an unlicensed placement regardless of the identity of the alleged perpetrator.

CPI closed 657 investigations of maltreatment of a PMC child between September 1, 2021 and April 30, 2022. The number of investigations closed per month ranged from 55 to 100, with the highest number of investigations closed in April 2022 and the lowest number of investigations closed in January 2022.

### Figure 13: Closed CPI Investigations Involving PMC Children, September 1, 2021 to April 30, 2022

---

[79] The Monitors analyzed data about maltreatment in care investigations pertaining to PMC children in unlicensed facilities and included it for the first time in this reporting period. For this report, the Monitors analyzed data about the CPI investigations involving PMC children that were opened and closed from September 1, 2021 to April 30, 2022 using the relevant data reports submitted by DFPS during that period.



Of the 657 investigations CPI closed during this period, 12% (78) of the investigations resulted in a disposition of Reason to Believe, thereby substantiating at least one allegation as abuse, neglect or exploitation in each of the 78 investigations. Additionally, CPI Ruled Out 407 (62%) investigations, Administratively Closed 89 (14%) investigations, closed 77 (12%) investigations as Unable to Determine, and closed five (<1%) investigations as Unable to Complete.[80]

---

[80] According to DFPS, Unable to Complete is the dispositional result "usually because the family could not be located to begin the investigation or the family was contacted but later moved and could not be located to complete the investigation or the family refused to cooperate with the investigation." DFPS, *Child Protective Investigations, available at* https://www.dfps.state.tx.us/Investigations/. *See also*, DFPS, *Child Protective Services Handbook* § 2281.4, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_2200.asp#CPS_2281_4. Separately, one investigation was listed in the data as closed with no Overall Disposition listed.

Figure 14: Reason to Believe Findings in Closed CPI Investigations Involving PMC Children, September 1, 2021 to April 30, 2022



Parents and guardians accounted for 485 (32%) of the alleged perpetrators; other family members accounted for 433 (28%) of the alleged perpetrators; DFPS staff (65), fictive kin (62),[81] school personnel (60), parent's paramours (60), and foster parents (55) each accounted for 4% of the alleged perpetrators; institutional staff (51) accounted for 3% of the alleged perpetrators; and the alleged perpetrator was listed as unknown or not listed for 145 (9%) of the alleged perpetrators. Of the alleged perpetrators, 117 (8%) were listed as other (64), or as having some other relationship not already described (53).[82,83]

---

[81] Fictive kin is defined as "someone who is not related to a child under DFPS conservatorship, but who has, or who once had, a prior longstanding relationship with the child or the child's sibling group. Teachers, coaches, family friends, godparents, and long-time neighbors are examples of people who may be fictive kin." DFPS, Definition of Terms, *Child Protective Services Handbook*, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPSDefinitions.asp.

[82] DFPS identifies alleged perpetrators based on their relationship to the oldest alleged victim in the investigation. Allegation information was unavailable in the data reports that DFPS submitted to the Monitors for 17 of 775 CPI investigations opened from September 2021 to April 2022. Those categorized as "some other relationship not already described" include, for example, unrelated household member (19), friend (6), and babysitter (4).

[83] The CPI investigations opened during September 2021 to April 2022 for which allegation data was available (758) involved 1,533 allegations. In the data reports that DFPS submitted to the Monitors, each allegation has a perpetrator category, but not a unique identifier for each perpetrator. As a result, it is possible that some perpetrators may be counted more than once in a single investigation or over time.

Figure 15: Alleged Perpetrators in CPI Allegations Involving PMC Children in
Unlicensed Placements, September 1, 2021 to April 30, 2022



*Information on alleged perpetrators was unavailable in the data reports that DFPS submitted to the Monitors for 17 of the 775 CPI Investigations opened between September 1, 2021 and April 30, 2022.

## Administrative Review of Substantiations

DFPS conducts administrative reviews pursuant to its ARIF process, which involves a reconsideration of the disposition by a DFPS division administrator or designee who was not involved in conducting the original investigation. The ARIF process occurs at the request of a designated perpetrator to determine whether DFPS's substantiated allegations are supported by a preponderance of evidence.[84]

From January 1, 2021 to December 31, 2021, DFPS conducted administrative reviews of 107 RCCI investigations involving PMC children that DFPS originally resolved with a disposition of Reason to Believe.[85],[86] In 12 of these 107 (11%) investigations, DFPS

---

[84] 40 TEX. ADMIN. CODE §§707.815-831. The designated perpetrator must make the request within 15 calendar days of DFPS's notification to them of their right to an administrative review. During the administrative review, a division administrator or designee reviews the investigation file and any additional information provided by the designated perpetrator; a review conference is optional. After completion of these tasks, the administrator or designee sends a written decision to the designated perpetrator within 30 calendar days of conducting a conference or within 60 days of the request for an administrative review if a conference was not held. The written decision specifies the administrative review's finding to uphold, reverse or alter the abuse, neglect or exploitation finding. *Id.*

[85] In this reporting period, DFPS began to provide to the Monitors on a monthly basis data reports identifying investigations subject to its administrative review process, including the outcome of the review.

[86] The Monitors analyzed data about investigations involving PMC children that were subject to DFPS administrative review from January 1, 2021 to April 30, 2022. DFPS,

overturned the final disposition and issued a new disposition of Ruled Out; in the remaining 95 (89%) investigations, DFPS upheld the disposition of Reason to Believe.[87]

Figure 16: Administrative Reviews of RCCI Investigations Involving PMC Children with a Disposition of Reason to Believe, January 1, 2021 to December 31, 2021



From January 1, 2022 to April 30, 2022, DFPS conducted administrative reviews of 66 RCCI investigations involving PMC children with a disposition of Reason to Believe.[88] In nine (14%) investigations, DFPS overturned the final disposition and issued a new disposition of Ruled Out; in the remaining 57 (86%) investigations, DFPS upheld the disposition of Reason to Believe.[89]

Figure 17: Administrative Reviews of RCCI Investigations Involving PMC Children with a Disposition of Reason to Believe, January 1, 2022 to April 30, 2022

---

*RO3_ARIF_PMC_Children_2022_08d2022_10_03_log107103_rev* (Oct. 13, 2022) (on file with the Monitors).

[87] In six of the 95 investigations, DFPS preserved the final disposition of Reason to Believe for the investigation but reversed the decision to substantiate one or more of the other allegations.

[88] The Monitors analyzed data about RCCI investigations involving PMC children that were subject to DFPS administrative review from January 1, 2021 to April 30, 2022. DFPS, *RO3_ARIF_PMC_Children_2022_08d2022_10_03_log107103_rev* (Oct. 13, 2022) (on file with the Monitors).

[89] In five investigations, DFPS preserved the final disposition of Reason to Believe for the investigation but reversed the decision to substantiate as to one or more of the other allegations.



### Remedial Order 3 Investigation Validation Results

To validate DFPS's performance associated with Remedial Order 3 and the appropriateness of its RCCI and CPI investigations of alleged maltreatment of PMC children, the monitoring team conducted:

- Reviews of all 21 RCCI investigations subject to DFPS's administrative review process which resulted in the reversal of an investigative disposition from Reason to Believe to Ruled Out between January 1, 2021 and April 30, 2022;

- Reviews of a randomly selected sample of 776 (out of 1,604) RCCI investigations closed between May 1, 2021 and April 30, 2022;[90] and

- Reviews of a randomly selected sample of 178 (out of 657) CPI investigations closed between September 1, 2021 and April 30, 2022.[91]

---

[90] To evaluate dispositional results for the investigations included in the sample, the Monitors designed an instrument for the case record review. To support consistency in scoring, both inter-rater reliability and secondary reviews were tested and used. The sample was drawn from monthly reports provided to the Monitors by DFPS during the reporting period. During this time period, RCCI closed 1,604 investigations, of which the Monitors reviewed a random sample of 776 investigations using a 95% confidence level by quarter; the Monitors excluded from the population investigations where RCCI substantiated any or all allegations with a disposition of Reason to Believe.

[91] The sample of CPI investigations was drawn from monthly reports DFPS provided to the Monitors during the reporting period. During this time period from September 1, 2021 to April 30, 2022, CPI closed 657 investigations, of which the Monitors created a random sample of 413 investigations using a 95% confidence level; the Monitors excluded from the population investigations where CPI substantiated any or all allegations with a disposition of Reason to Believe. Within the sample of 413 investigations, the Monitors

*RCCI Investigations*

Investigations Subject to ARIF

Among the 21 investigations subject to ARIF in which DFPS changed its original disposition of Reason to Believe to Ruled Out, the Monitors found that RCCI's decision to overturn was appropriate in 17 investigations (81%) and inappropriate in four investigations (19%). In the four investigations inappropriately overturned, the Monitors found that the original investigative record contained a preponderance of evidence that an alleged perpetrator(s) abused or neglected a child(ren). In two other investigations among the 17 in which the Monitors agree with DFPS's reversal, the Monitors found that due to deficiently conducted investigations, the investigative record did not support a disposition of Reason to Believe. If these investigations had been appropriately conducted, the record may have supported a disposition of Reason to Believe. In sum, the Monitors' review found that RCCI inappropriately resolved (4) or conducted deficient investigations (2) in six investigations (28.6%) subject to RCCI's administrative review process. The Monitors' summaries of these six investigations are located in the Appendices.

Review of RCCI Investigations in Licensed Placements

RCCI Ruled Out all the allegations in 753 of the 776 investigations reviewed by the Monitors. The Monitors found that RCCI did so appropriately in 716 cases (95%); inappropriately in nine cases (1.2%);[92] and conducted investigations with such substantial deficiencies in 28 cases (3.7%) that the Monitors were prevented from reaching a conclusion. To appropriately reach a final disposition in these deficient investigations, additional information would have been required to determine whether children were abused or neglected.

In addition, of the 776 RCCI investigations analyzed by the monitoring team, 21 were Administratively Closed, and the Monitors agreed with RCCI's closure decision. Two of the investigations reviewed by the Monitors resulted in a disposition of Unable to Determine, and the Monitors found one of these investigations was conducted with such substantial deficiencies the Monitors were unable to reach a conclusion.

In sum, of the 753 investigations that RCCI assigned a disposition of Ruled Out to all allegations during the reporting period, the Monitors identified 28 investigations (3.7%) that had substantial deficiencies and nine (1.2%) that were inappropriately Ruled Out. An additional investigation with a disposition of Unable to Determine was conducted with

---

then identified and reviewed the investigations (178) involving allegations associated with maltreatment by a caregiver assigned by DFPS or associated with the time period the child was under DFPS Supervision without an authorized placement. The Monitors excluded those investigations in the sample where the allegations were associated with the child's home and caregiver prior to entry into DFPS care.

[92] Of the nine investigations the Monitors identified as inappropriately resolved, eight investigations should have been assigned a disposition of Reason to Believe for abuse or neglect and one investigation should have been assigned a disposition of Unable to Determine.

such substantial deficiencies that the Monitors were prevented from reaching a conclusion; therefore, the Monitors determined a total of 38 (5%) investigations had substantial deficiencies or were inappropriately resolved. In the Third Report, the Monitors determined 14% of sampled investigations had substantial deficiencies or were inappropriately resolved.[93] The results for this period involving a large sample of investigations reflect significant, continued improvement in the State's implementation of this component of Remedial Order 3.

RCCI Investigations with Improved Quality and Remaining Deficiencies

As discussed above, the State's performance in relation to investigating allegations of abuse, neglect or exploitation of PMC children in licensed placements has measurably improved over time. The Monitors' review of investigations included in the current reporting period showed that RCCI conducted more thorough investigations that often resulted in an appropriate disposition. Among the investigations the Monitors identified as deficient this period, certain common factors frequently contributed to deficiency. As discussed in the relevant Appendix, in investigations that involved multiple allegations of abuse or neglect among multiple children, DFPS at times did not consistently and adequately investigate each allegation contained in an investigation. Given the complex scope of allegations included in some of these investigations, DFPS supervisors and other experienced investigators should closely review these investigations during investigative staffings and prior to closure to ensure that all allegations of abuse or neglect of a child have been appropriately investigated. In addition, some investigations were deficient because of a failure to adequately interview, or interview at all, relevant individuals about the allegations.

*CPI Investigations in Unlicensed Placements*

Of the 178 CPI investigations the Monitors reviewed, CPI Ruled Out all the allegations in 151 (85%) of the investigations. The Monitors found that CPI did so appropriately in 142 investigations (94%); inappropriately resolved one investigation; and conducted investigations with such substantial deficiencies in eight investigations (5%) that the Monitors were prevented from reaching a conclusion. To appropriately reach a final disposition in these investigations, additional information would have been required to determine whether children were subject to maltreatment.

In addition, of the 178 CPI investigations analyzed by the monitoring team, ten were Administratively Closed and the Monitors agreed with CPI's closure decisions. Seventeen investigations reviewed by the Monitors resulted in a disposition of Unable to Determine and the Monitors found one of these investigations was conducted with such substantial deficiencies the Monitors were unable to reach a conclusion, resulting in ten investigations, (5.6% of the total reviewed), identified by the Monitors as having been

---

[93] *See* Deborah Fowler & Kevin Ryan, Third Report 43, ECF No. 1165. In the First and Second Reports, the Monitors determined 28.6% and 18% of sampled investigations to which RCCI assigned a disposition of Ruled Out to all allegations, respectively, had substantial deficiencies or were inappropriately resolved. *See* Deborah Fowler & Kevin Ryan, Second Report 73, ECF No. 1079; Deborah Fowler & Kevin Ryan, First Report 25, ECF No. 869.

47

inappropriately conducted or resolved between September 1, 2021 and April 30, 2022. The Monitors' summaries of the ten inappropriately resolved and deficient CPI investigations are located in the Appendices.

Of the ten investigations that were inappropriately resolved or conducted with substantial deficiencies, half of them were investigations into allegations of child maltreatment for children under DFPS Supervision in CWOP settings. The Monitors' review found that these investigations and their challenges amplified the safety concerns and additional risk of harm that children face when they are under DFPS Supervision in CWOP settings.

## Summary of Performance for Receiving, Screening and Investigating Allegations of Maltreatment

Receiving Allegations

- Between July 1, 2021 and June 30, 2022, hotline staff received 735,938 calls. During the period analyzed, 22% (159,049) of calls were abandoned, similar to the rate of 20% observed in the previous report.[94]

- On average, callers waited for 5.2 minutes before their calls were handled or abandoned, an increase of more than half a minute from the data reported in the Third Report.[95] Forty-six percent (335,498) of callers waited on the queue for under one minute.

Screening Allegations

- The Monitors reviewed 770 referrals to SWI from July 1, 2021 to June 30, 2022, which SWI did not send to RCCI for an investigation of child abuse, neglect or exploitation but instead sent directly to HHSC (and that HHSC then assigned for a minimum standards investigation). Of these 770 reports, the Monitors concurred with SWI's determination in 93.4% (719) of reports.

Investigating Allegations

- Of the 1,604 RCCI investigations DFPS completed involving PMC children between May 1, 2021 and April 30, 2022, 93 investigations (5.8%) resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 1,511 investigations (94.2%) where RCCI issued a disposition of Ruled Out, Unable to Determine or which resulted in Administrative Closure, the Monitors evaluated 776 investigations.

---

[94] *See* Deborah Fowler & Kevin Ryan, Third Report 32, ECF No. 1165.
[95] In the Third Report, the data demonstrated an average queue time of 4.6 minutes for calls placed from January 1, 2021 to June 30, 2021. *See* Deborah Fowler & Kevin Ryan, Third Report 30, ECF No. 1165.

- The Monitors found that, of the 753 investigations reviewed where RCCI Ruled Out all of the allegations, RCCI did so appropriately in 716 (95%) cases; inappropriately in nine (1.2%) cases; and conducted investigations with such substantial deficiencies in 28 (3.7%) cases that the Monitors were prevented from reaching a conclusion.

- In addition to the 37 investigations that RCCI Ruled Out that were inappropriately resolved or had substantial deficiencies, the Monitors also identified one investigation, assigned a disposition of Unable to Determine, with such substantial deficiencies that the Monitors were prevented from reaching a conclusion.

- The Monitors found that, of the 21 investigations with dispositions of Reason to Believe that RCCI later overturned during its Administrative Review and Appeals of Investigative Findings (ARIF) process during the period under review, RCCI did so appropriately in 17 investigations (81%) and inappropriately in four investigations (19%).

- In addition to the four investigations that RCCI inappropriately overturned during its ARIF process, the Monitors identified two other investigations that RCCI initially conducted with substantial deficiencies such that the Monitors agreed with RCCI's decision to overturn the disposition due to the investigative failure to gather a preponderance of evidence in support of the disposition.

- Of the 657 CPI investigations DFPS completed involving PMC children between September 1, 2021 and April 30, 2022, 78 (11.9%) investigations resulted in the substantiation of at least one allegation with a disposition of Reason to Believe; of the remaining 579 (88.1%) investigations where CPI issued a disposition of Ruled Out, Unable to Determine or which resulted in Administrative Closure, the Monitors evaluated 178 investigations.

- The Monitors found that, of the 151 investigations reviewed where CPI Ruled Out all of the allegations, CPI did so appropriately in 142 (94%) investigations; inappropriately in one; and conducted investigations with such substantial deficiencies in eight investigations that the Monitors were prevented from reaching a conclusion.

- In addition to the nine investigations that CPI Ruled Out that were inappropriately resolved or had substantial deficiencies, the Monitors also identified one investigation, assigned a disposition of Unable to Determine, with such substantial deficiencies that the Monitors were prevented from reaching a disposition conclusion, resulting in ten (5.6%) investigations that the Monitors' review identified as having been inappropriately resolved or conducted with substantial deficiencies.

49

## Injunction

*The Court therefore enjoins the Defendants from placing children in permanent management conservatorship (PMC) in placements that create an unreasonable risk of serious harm. The Defendants shall implement the remedies herein to ensure that Texas's PMC foster children are free from an unreasonable risk of serious harm.*

Through the Monitors' validation of DFPS's performance related to Remedial Order 3, the Monitors continued to identify serious risks to the safety of children under DFPS Supervision in unlicensed CWOP settings. These investigations amplified the Monitors' concern regarding the presence of an unreasonable risk of serious harm to PMC children due to DFPS's use and reliance on this mode of care.

While reviewing these investigations of children who experienced a CWOP episode, the Monitors observed that the risk of serious harm exists in part because DFPS is relying on staff members who are not trained caregivers and are, therefore, unfamiliar with many of the standard protocols and guidelines that inform care for children with mental and behavioral health needs in congregate and foster home settings. The investigations provide examples of how the absence of trained caregivers and regulated settings creates safety risks for children.

In October 2022, the average number of PMC children in CWOP settings per night was 63, up from 52 in September 2022. DFPS has been unable to eliminate its use of this setting: From November 2021 to October 2022, the average number of children in CWOP settings per night has fluctuated between 72 and 52, rather than consistently decreasing. It was as high as 72 in November 2021 and 70, more recently in June 2002.

### Supervisory Challenges Creating Unreasonable Risk of Harm

The examples below highlight some of the safety risks inherent in caring for children in these unregulated environments. These include difficulty monitoring medication, lack of protocol and use of new and inexperienced staff members as caregivers, competing job responsibilities for staff members assigned to supervise children, and other challenges. Many of these issues may not be unexpected given that DFPS has assigned individuals to manage children's complicated behavioral and mental health needs as untrained caregivers in short shifts for children with whom they are not familiar.

#### Medication Monitoring

In one DFPS investigation, a child's caseworker reported an allegation of Neglectful Supervision of a child under DFPS Supervision at a CWOP location at a hotel in Dallas. Through the investigation, the investigator determined that when the child arrived to the CWOP location with her belongings, including prescription and over-the-counter pain medications, after a visit with her family, the staff member greeted the child and took her photograph and temperature as required. The staff member did not attempt to locate or

50

secure the child's medications from her belongings before leaving the child alone in the bedroom to unpack. Shortly thereafter, the child ingested her pills.

To assess whether the staff member was negligent in her care of the child, the investigator did not identify whether DFPS provided the staff member with training regarding any policies or protocols that stipulated that upon a child's arrival to a CWOP location, staff members must identity and secure any medications in the child's possession. In a congregate care setting, this is a typical standard of care for caregivers to follow. As such, should this incident have occurred in a GRO, RCCI would likely have found a preponderance of evidence that the staff member Neglectfully Supervised the child.

Next, the staff member reported to the investigator that she was unaware that the child's belongings stored her prescription medications and that she did not have a notification from the child's caseworker that the child traveled with her medication. The child's CWOP binder, a collection of crucial information about the child that DFPS requires staff members to review at the beginning of their shifts, enumerated the numerous medications the child was prescribed. It was unclear whether the staff member appropriately reviewed, or had time to review, the child's lengthy binder prior to her shift to learn this important information about the child. The supervising staff member was coming to the shift from a full-time set of responsibilities as a caseworker for DFPS into a physical setting that was not designed to serve children with serious emotional and behavioral health needs, and without the requisite training and supervision to protect child safety.

The limited question explored in the DFPS investigation was whether the staff member perpetrated abuse or neglect but given the position in which the staff person was placed by DFPS, the more urgent question is whether the agency is adequately protecting children from a serious risk of harm when it continues to house children in CWOP settings like the one described in this investigation. Based upon the Monitors' review of DFPS investigations of CWOP settings over the past 18 months, the answer frequently is no.

## Oversight of Trafficking Victims

In a second investigation, a DFPS staff member reported that a named staff member (Staff 1) allowed a child (age 17) to use her state-issued cell phone during a CWOP episode at a hotel. During the time the child had Staff 1's phone, she took nude photographs of herself. The child reportedly used a social media website to send the photograph(s) to an unknown individual. The child told Staff 1 that she needed to use Staff 1's cell phone to contact her parole officer and her advocate. Staff 1 was assigned to CWOP shifts from March 15 to 17, 2022; her shifts began at midnight and ended at 4:00 a.m. During these shifts, another staff member and child were also present in the hotel room.

The investigator determined that Staff 1 did not violate any policies when she allowed the child to use her state issued cell phone. The child was permitted to use Staff 1's cell phone to call or text an identified group of individuals, including the child's boyfriend, who Staff 1 presumed the child was texting. Although the staff member remained nearby while the child used the phone, the investigator found the child took at least three nude

photographs of herself using Staff 1's phone on March 17, 2022 in the early morning hours (1:00 a.m. approximately). The investigation found that given the position of the child on the hotel bed, Staff 1 "could not have seen the pictures being taken." The child sent the photographs to another individual by accessing Instagram on Staff 1's cell phone. (The child did not reveal to whom she sent the photographs and the investigation did not contain additional information regarding the recipient.)

The investigation raised the following child safety concerns: First, Staff 1 had another full-time set of responsibilities as a DFPS employee and did not have adequate guidance or training regarding how to supervise and care for a child who is a sex trafficking victim. The child had an extensive history of being trafficked but the child's binder did not include heightened supervision requirements for the child. Staff 1 reported "there were no time restrictions, [such as] watch out for this, sit next to her, only 8:00 a.m. to 5:00 p.m., nothing like that." Because the staff member did not have experience caring for a child victim of sex trafficking, she did not anticipate the safety risks that may arise from providing a child with her phone to use, even under close supervision. Monitoring this child's access to technology is informed by her history. The DFPS investigator asked Staff 1 what training she had received related to child sexual victimization/trafficking. Staff 1 reported that she took a training entitled "Be the One" in 2017 or 2018. She did not report any other trainings related to child sex trafficking and supervision.

Next, Staff 1 did not—and perhaps did not have time to—adequately review the child's Attachment A, which documents a child's sexual abuse history, including trafficking, or aggression history for caregivers in order to promote child safety from further sexual victimization. At the beginning of a CWOP shift, DFPS staff members are expected to review the child's binder, which includes the child's Attachment A. Staff 1 reported that she reviewed the child's Attachment A and was aware that the child had been determined by the State to be a confirmed victim of sex trafficking. However, Staff 1 reported that she did not closely review the child's Attachment A and was unaware of the severity of the child's trafficking history and that the confirmed trafficking had occurred only eight months prior to this supervision episode. The child's record documents four distinct, confirmed incidents of trafficking, beginning in 2020.[96]

---

[96] A stakeholder alerted the Monitors to another incident involving a PMC child that illustrates the difficulty caregivers experience in this setting appropriately supervising a child who needs therapeutic services in a licensed, needs-based placement. The child, a thirteen-year-old girl, was also a confirmed victim of sex trafficking: according to her IMPACT records, while she was on runaway status from a placement in late 2021, two men abducted her from a gas station, drugged, and sexually assaulted her. She had an extensive history of running away from her previous placements at RTCs and foster homes. The child's current service plan, dated September 20, 2022, was created while she was on runaway status from a different placement; it documented that "constant line of sight" supervision would be recommended for the child "once recovered." When the service plan was created, the child had been reported missing from a placement nine times since October 2021. The child was located on September 30, 2022. At that time, she was living with a woman who said she allowed the child to stay with her when a twenty-four-year-old man, who the child believed to be her "boyfriend," ended his relationship with her and moved out of the same apartment complex, leaving the child without a place to live. DFPS added the adult caregiver (neighbor) as an "unauthorized placement" in IMPACT when the child refused to leave the apartment.

On October 3, 2022, CPS removed the child from the unauthorized placement and placed her in a CWOP setting. When CPS removed the child, she threatened to run away if she was not returned to the

## Lack of Clear Training and Protocol

The Monitors also observed that DFPS assigned untrained and contract staff members as caregivers in CWOP settings and did not provide them with consistent and clear instruction to inform how staff members were expected to care for children.

For example, one investigation involved an allegation of Neglectful Supervision by a DFPS staff member (Staff 1) charged with supervising two children (ages 16 and 17) at a CWOP location in a hotel. During a CWOP shift (4:00 p.m. to 8:00 p.m.), a DFPS staff member (Staff 2) and a contract worker (Staff 3) took the two children to a nearby park to play basketball. At the end of the shift at 8:00 p.m., Staff 2 and Staff 3 told the children it was time to return to the hotel; the children refused to return to the hotel and eventually left the park. Staff 2 stayed on duty after her shift ended when she could not locate the children and searched for them while working overtime, eventually locating them while driving in her car to look for them.

The investigation raised the following concerns: First, Staff 2 had only worked with DFPS for four months at the time of her CWOP shift. Because of family events, she had not completed her new hire training and was not yet eligible to be assigned as a primary caseworker for a child. Staff 2 worked her shift with a contract worker who volunteered to cover the shift when the assigned staff member was unable to work the shift. However, the record indicates that contract workers and protégé caseworkers are not permitted to work together, though it in fact happened in this instance.[97] Further, contract workers appear to have reduced responsibilities related to caring for the children during CWOP shifts. These two individuals did not have sufficient training or experience to care for children placed in CWOP.

_____

unauthorized placement within ten days; IMPACT notes stated, "[s]he said she will run on day 11." The child ran away from the CWOP placement after three days but law enforcement located her immediately and brought her to the local juvenile detention facility. Four days later, she left detention and DFPS placed her in another CWOP setting. A week later, on October 17, 2022, the child ran away again from the CWOP location. According to IMPACT, that evening, at 12:23 a.m., the child reportedly went to her bedroom to go to sleep. When a DFPS staff member conducted a night check 25 minutes later, she observed that the child's window was open, and the child was no longer in her bedroom. DFPS contacted law enforcement to report the child as missing. Several hours later, law enforcement located the child. The child reported to law enforcement that a man sexually assaulted her in a motel room while she was on runaway status. According to a media article located by the Monitors, law enforcement charged the man with sexual assault of a minor.

It is not clear whether the caregivers at either CWOP location had been advised that the child's plan of service required line-of-sight supervision because DFPS did not open investigations following the runaway episodes from these settings. After law enforcement located her in mid-October, she was placed in a psychiatric hospital for more than two weeks. According to IMPACT, during her hospitalization, medical staff determined that she was approximately eight weeks pregnant; the child alleged that she was impregnated by her adult ex-boyfriend. At the time of the Monitors' most recent review of her record on January 12, 2023, the child was four months pregnant had been located after fleeing the foster home where she was placed following her discharge from the hospital. She was placed at a new foster home on January 5, 2023 and alleged that her previous foster home caregivers were emotionally and physically abusive; another child in the home also reported abuse in that home after the 13-year-old ran away.

[97] DFPS's refers to its newly hired conservatorship caseworkers as protégés.

53

Second, some staff members reported to the DFPS investigator a lack of consistency in the rules and protocols that they are expected to follow during CWOP shifts. As a result, they were reportedly unsure how to handle certain circumstances that may emerge during a shift. In this investigation, some staff members reported that they did not know whether they were required to stay with the children at the park after they refused to return to the hotel nor how to handle the children when they refused to leave the park.

- During her interview, "[Staff 2] repeatedly said that there was no consistency between the Program Directors when it came to following or not following the kids when they left without permission... Staff 2 said there is no consistency in dealing with these children."

- The investigator contacted an "Admin Tech" to gather "further information on CWOP procedures." The Admin Tech reported, "he worked a lot of CWOP and nothing is consistent." As a result, the investigator was unable to determine which policies may be pertinent for his assessment of whether staff members were negligent in their supervision of the children.

Yet another DFPS investigation involved an allegation of Neglectful Supervision by two DFPS staff members charged with supervising two children at another CWOP location. During the staff members' shift, the staff members allowed the two children to be in the bathroom at the same time and, during this time, the children allegedly engaged in inappropriate sexual contact.

According to the investigative record, an e-mail chain was developed between those DFPS staff members who worked in the county responsible for this CWOP location; the e-mail chain contained alerts and specific instructions about the children placed at the CWOP location. The DFPS investigator determined that one of those e-mail chains included documentation that the children involved in this investigation must be separated at all times, including in the bathroom. The investigator determined that because the two staff members involved in this investigation were from a different county, they were not included on the e-mail chain. Therefore, they had no information about this supervision requirement.

This investigation again raises serious concern that the two staff members responsible for the safety of two children were not informed about critical supervision requirements which resulted in the children engaging in alleged sexual contact while alone in the bathroom for approximately one minute.

## Competing Job Responsibilities

In another investigation, a DFPS staff member reported allegations of Neglectful Supervision of a child under DFPS Supervision at a CWOP location, a house in Lufkin. According to the reporter, a named caseworker was charged with supervision of a child (age 16) who required close supervision due to her behavioral health needs. Due to the caseworker's alleged failure to appropriately supervise the child, the child left the CWOP

location alone for an unknown duration of time. Staff members later found and returned the child to the CWOP location.

The record surfaced the following concerns related to DFPS supervision of children. First, the DFPS investigator gathered and reviewed the child's plan of service. The plan detailed the child's significant behavioral and mental health needs and history and stated that the child "needs 24-hour supervision because of her behaviors." Second, according to the CWOP location's documented rules, staff members must maintain "Line of Sight" supervision of the children to whom they are assigned for supervision. At the time of the incident, the named caseworker was charged with the child's supervision.

During her interview with the DFPS investigator, the child reported that she left the CWOP location "through the door at the side of the house when no one was looking." The named caseworker reported to the investigator that when the child departed, she had been reviewing e-mails on her state issued cell phone regarding a child on her caseload who had run away 12 hours earlier. This caseworker was a fulltime DFPS caseworker and was focusing on those responsibilities. When she looked up from reviewing her e-mails, the child was no longer in the living room with her. The investigator found that staff members located the child approximately 15 minutes later near the CWOP location.

This investigation illustrated the untenable position that DFPS staff members often occupy when they work a CWOP shift: They are simultaneously responsible for the children who are on their assigned caseloads and the child(ren) they are charged to supervise at a CWOP location. As this investigation showed, this caseworker was unable to fulfill both responsibilities, which resulted in an unsupervised child leaving a CWOP location alone.

## Timeliness of RCCI Investigations: Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS)

**Remedial Order 5:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within 24 hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

**Remedial Order 6:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within 72 hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

**Remedial Order 7:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than 24 hours after intake.*

**Remedial Order 8:** *Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than 72 hours after intake.*

**Remedial Order 9:** *Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

**Remedial Order 10:** *Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

**Remedial Order 11:** *Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

**Remedial Order 16:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed.*

**Remedial Order 18:** *Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation.*

**Remedial Orders 5 through 11; 16; and 18 Performance Validation (DFPS)**

For validation of orders measuring the timeliness of various aspects of RCCI investigations, the monitoring team reviewed the data provided by DFPS to validate performance for all 1,554 investigations opened by RCCI from July 1, 2021 to June 30,

56

2022.[98],[99] The monitoring team reviewed the 1,554 RCCI investigations for compliance with the Court's orders relating to timeliness using the methodologies described in prior reporting.[100]

**Remedial Order 5:** Initiation within 24 Hours in Priority One Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority One child abuse and neglect investigations involving children in the PMC class within twenty-four hours of intake. (A Priority One is by current policy assigned to an intake in which the children appear to face a safety threat of abuse or neglect that could result in death or serious harm.)*

The Monitors found that of 1,554 investigations opened by RCCI between July 1, 2021 and June 30, 2022, 188 (12%) were assigned Priority One, requiring that DFPS initiate the investigation within 24 hours of intake.[101] DFPS initiated 79% (149) of Priority One investigations within 24 hours of intake through face-to-face contact with all alleged victims. DFPS's rate of initiating Priority One investigations through face-to-face contact with each alleged victim within 24 hours in the Monitors' previous report was 81%.[102]

The remaining 39 investigations (21%) either did not include individual face-to-face contact with each alleged victim within 24 hours of intake (22) or did not have sufficient data to assess timeliness (17).

Figure 18: Initiation of Investigations within 24 Hours in Priority One Investigations

---

[98] To identify the investigations opened by DFPS and the corresponding data points, the Monitors used as source files monthly and bi-annual data files on open and closed investigations that DFPS submitted to the Monitors for the months corresponding with the investigations under review. In prior reporting periods, the Monitors performed case record reviews on every investigation reported in the data and were able to substantially validate the accuracy of the data reports; thus, the results in this report reflect the data as reported to the Monitors by DFPS. In this reporting period, the monitoring team independently performed case record reviews for all investigations opened from September 2021 through November 2021 in addition to random case record reviews on selected investigations opened during the remaining months in the reporting period to validate the data as reported by DFPS. Consistent with prior reporting periods, the Monitors were able to substantially validate the data.
[99] The DFPS data included 48 investigations that were administratively closed and were, therefore, excluded from the analysis.
[100] Deborah Fowler and Kevin Ryan, Third Report 52-53, ECF No. 1165.
[101] DFPS initiation occurs through face-to-face contact between the investigator and all alleged child victims. Deborah Fowler and Kevin Ryan, Third Report 52, ECF No. 1165.
[102] *See* Deborah Fowler and Kevin Ryan, Third Report 53, ECF No. 1165.



Of the 22 investigations where DFPS data provided evidence of untimely initiation, the late initiation was made in the following timeframes: up to one hour late (4), one to ten hours late (6), ten to 20 hours late (2), 20 to 24 hours late (2), and more than 24 hours late (8). In 17 instances, the data was insufficient to assess the timeframe.

The Monitors conducted case record reviews in those 22 instances where the DFPS data documented late initiation to identify documentation of the reasons for untimely face-to-face contact. In these 22 instances, the late contact was related to a child who was not initially listed as an alleged victim at intake but who was later added during the investigation (9); the child was located in another region, unit, or state and the investigator sent a courtesy request to an investigator in another location (2); the child was not present at the location where the investigator went to conduct the interview (2);[103] the contact was late due to child illness (1);[104] or the child was on runaway status (1). The record did not contain a reason or the reason for late contact was unclear in the remaining investigations (6); in most of those instances (5 of 6) where the record did not document a reason for late contact, the contact was late by one day or less. Finally, in one instance, it appears that the DFPS data documenting a late initiation may have contained an error as the Monitors' record review suggested that the initiation was timely.

Figure 19: Documented Reasons for Late Initiation in Priority One Investigations

---

[103] For example, in one instance, the child was not present at the facility at the time of the attempted face-to-face interview due to having been arrested prior to the investigator's arrival. The investigator rescheduled the interview once the child was released.

[104] In this instance, the child was ill at the time the investigator attempted to make face-to-face contact with the child, and the child's caseworker recommended that the investigator postpone the interview.



Note: Chart does not add up to 100% due to rounding.

**Remedial Order 6:** Initiation within 72 Hours in Priority Two Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with existing DFPS policies and administrative rules, initiate Priority Two child abuse and neglect investigations involving children in the PMC class within seventy-two hours of intake. (A Priority Two is assigned by current policy to any CPS intake in which the children appear to face a safety threat that could result in substantial harm.)*

There were 1,366 Priority Two investigations requiring DFPS initiation within 72 hours of intake. DFPS initiated 83% (1,131) of Priority Two investigations within 72 hours of intake through face-to-face contact with all alleged victims. DFPS's rate of initiating Priority Two investigations through face-to-face contact with each alleged victim within 72 hours in the Monitors' previous report was 88%.[105]

The remaining 235 investigations (17%) either did not include individual face-to-face contact with each alleged victim within 72 hours (129) or did not have sufficient data to assess timeliness (106).

Figure 20: Initiation of Investigations within 72 Hours in Priority Two Investigations

---

[105] *See* Deborah Fowler and Kevin Ryan, Third Report 54, ECF No. 1165.



Priority Two Investigations Opened
July 1, 2021 - June 30, 2022
*n=1,366 investigations opened*

235 , 17%

1,131 , 83%

■ 72 Hours   ■ Not Timely

Of the 129 investigations where DFPS data provided evidence of untimely initiation, the late initiation was made in the following timeframes: up to 12 hours late (20), 12 to 24 hours late (4), 24 to 48 hours late (16), 48 to 72 hours late (12), 72 to 96 hours late (8), 96 to 120 hours late (7), and more than 120 hours late (62). In 106 instances, the data was insufficient to assess the timeframe.

The Monitors conducted case record reviews in those 129 instances where the DFPS data documented late initiation to identify the reasons for untimely face-to-face contact. In these instances, the late contact was related to a child who was not initially listed as an alleged victim at intake but who was later added during the investigation (58); the child was not present at the location where the investigator went to conduct the interview (17);[106] the child was on runaway status (10); the child was located in another region, unit, or state and the investigator sent a courtesy request to an investigator in another location (6); the investigator was delayed locating the child due to the child aging out of care or experiencing a recent placement move (4); the face-to-face contact was late due to other circumstances, such as child illness (4);[107] or the child was on a vacation (2).  The record did not contain a reason or the reason for late contact was unclear in the remaining investigations (24); in most of those instances (15 of 24) where the record did not document a reason for late contact, the contact was late by one day or less. Finally, in four instances, it appears that the DFPS data documenting the late initiation may have contained an error as the Monitors' record review suggested that the initiation was timely.

---

[106] For example, in one instance, the child was not present at the facility due to attendance at an outing at the time of the investigator's attempted face-to-face contact, which caused a delay. In another investigation, the investigator attempted to make face-to-face contact with the child at her placement, but the child was on a home visit with her mother, which caused a delay.

[107] For example, in one investigation, the child was in quarantine due to being exposed to COVID-19, which caused a delay. In another instance, the investigator attempted to make face-to-face contact with the child, but his caregiver would not allow anyone from DFPS to interview him.

Figure 21: Documented Reasons for Late Initiation in Priority Two Investigations



Note: Chart does not add up to 100% due to rounding.

**Remedial Order 7:** Timeliness of initial face-to-face contact with the alleged victims in Priority One Investigations

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority One child abuse and neglect investigations involving PMC children as soon as possible but no later than twenty-four hours after intake.*

Of the 188 Priority One investigations opened by RCCI between July 1, 2021 and June 30, 2022, the Monitors found that 79% (149) of the investigations included initial face-to-face contact with each alleged child victim individually within 24 hours. DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority One investigations within 24 hours in the Monitors' previous report was 81%.[108]

The remaining 39 investigations (21%) either did not include individual face-to-face contact with each alleged victim within 24 hours of intake (22) or did not have sufficient data to assess timeliness (17).

Figure 22: Face-to-Face Contact within 24 Hours with All Alleged Child Victims in Priority One Investigations

---

[108] *See* Deborah Fowler and Kevin Ryan, Third Report 55, ECF No. 1165.



**Remedial Order 8:** Initial Face-to-Face Contact with All Alleged Victims in Priority Two Investigations within 72 Hours

*Within 60 days and ongoing thereafter, DFPS shall, in accordance with DFPS policies and administrative rules, complete required initial face-to-face contact with the alleged child victim(s) in Priority Two child abuse and neglect investigations involving PMC children as soon as possible but no later than seventy-two hours after intake.*

Of the 1,366 investigations assigned Priority Two, the Monitors' review found that 83% (1,131) of investigations included initial face-to-face contact with each alleged child victim within 72 hours of intake. DFPS's rate of completing initial face-to-face contact with each alleged victim in Priority Two investigations within 72 hours in the Monitors' previous report was 88%.[109]

The remaining 235 investigations (17%) either did not include individual face-to-face contact with each alleged victim within 72 hours (129) or did not have sufficient data to assess timeliness (106).

Figure 23: Face-to-Face Contact within 72 Hours with All Alleged Child Victims in Priority Two Investigations

---

[109] *See* Deborah Fowler and Kevin Ryan, Third Report 56, ECF No. 1165.



## Remedial Order 9: Tracking and Reporting Face-to-Face Contacts

*Within 60 days and ongoing thereafter, DFPS must track and report all child abuse and neglect investigations that are not initiated on time with face-to-face contacts with children in the PMC class, factoring in and reporting to the Monitors quarterly on all authorized and approved extensions to the deadline required for initial face-to-face contacts for child abuse and neglect investigations.*

Overall, in 92% (1,431) of all 1,554 investigations opened by RCCI from July 1, 2021 to June 30, 2022 (both single and multi-alleged victim investigations), DFPS was able to track and report in its submissions to the Monitors whether face-to-face contact was made with each alleged child victim within an investigation and the date and time that contact occurred for each child.[110] DFPS's rate of tracking and reporting whether face-to-face contact was made with each alleged child victim within an investigation and the date and time the contact occurred in the Monitors' previous report was 95%.[111]

In 96% (966) of the 1,005 investigations with one victim, DFPS was able to track and report in its data reports to the Monitors whether face-to-face contact was made with the alleged child victim within an investigation and the date and time the contact occurred. In investigations with one victim, DFPS's rate of tracking and reporting whether face-to-face contact was made with the alleged child victim and the date and time the contact occurred in the Monitors' previous report was 95%.[112]

In 85% (465) of the 549 investigations with more than one victim, DFPS was able to track and report in its submissions to the Monitors whether face-to-face contact was made with

---

[110] The Monitors did not consider data on initiation through face-to-face contact as valid if the recorded initiation date preceded the intake date, the initiation data fields were blank, or if the data did not contain unique time stamps for each alleged child victim.

[111] *See* Deborah Fowler and Kevin Ryan, Third Report 57, ECF No. 1165.

[112] *See* Deborah Fowler and Kevin Ryan, Third Report 57, ECF No. 1165.

each of the alleged child victims and the date and time the contacts occurred. In investigations with more than one victim, DFPS's rate of tracking and reporting whether face-to-face contact was made with each of the alleged child victims and the date and time the contact occurred in the Monitors' previous report was 93%.[113]

**Remedial Order 10:** Completion of Priority One and Priority Two Investigations within 30 Days

*Within 60 days, DFPS shall, in accordance with DFPS policies and administrative rules, complete Priority One and Priority Two child abuse and neglect investigations that involve children in the PMC class within 30 days of intake, unless an extension has been approved for good cause and documented in the investigative record. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

Of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022, DFPS documented that 27% (420) were not completed in a timely manner; of these, 19% (296) were not completed within 30 days of intake and 8% (124) had approved extensions but were not completed within the extension timeframe. Of the remaining investigations, 59% (922) were documented as completed within 30 days of intake and 13% (197) had approved extensions and were completed within the extension timeframe.[114] One percent (15) remained open with an active extension and, therefore, were not yet due at the time of analysis. DFPS's rate of completing Priority One and Two investigations within 30 days of intake in the Monitors' previous report was 63%.[115]

Of the 336 investigations with documented, approved extensions that were not completed within 30 days, as noted above, 197 of those investigations were completed within the approved timeframe allotted by the extension and 124 were not completed within the allotted extension timeframe.[116]

Figure 24: Completion of Priority One and Two Investigations within 30 Days

---

[113] *See* Deborah Fowler and Kevin Ryan, Third Report 58, ECF No. 1165.
[114] Three investigations had approved extensions but were still completed within 30 days.
[115] *See* Deborah Fowler and Kevin Ryan, Third Report 58, ECF No. 1165. An additional 9% had extensions. *Id.*
[116] Fifteen investigations that opened during this time period and had not yet closed as of August 31, 2022 had active extensions reported in the data from DFPS.



The percentage of investigations completed within 30 days increased from 58% in July 2021 to 73% in January 2022, before falling over the next three months. By the end of the review period, in June 2022, the rate had dropped to 50%, not including those investigations with extensions.

Figure 25: Completion of Priority One and Two Investigations within 30 Days over Time



**Remedial Order 11:** DFPS Track and Report Requirement

*Within 60 days and ongoing thereafter, DFPS must track and report monthly all child abuse and neglect investigations involving children in the PMC class that are not completed on time according to this Order. Approved extensions to the standard closure*

65

*timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.*

The Monitors reviewed data and information provided by DFPS in association with Remedial Order 11, which requires DFPS to track and report all investigations that are not completed on time. Approved extensions to the standard closure timeframe, and the reason for the extension, must be documented and tracked. If an investigation has been extended more than once, all extensions for good cause must be documented in the investigative record.

Of the 632 investigations that were opened by RCCI between July 1, 2021 and June 30, 2022 and were not completed within 30 days, DFPS data included extensions approved for 336 (53%) investigations with the dates the extensions were approved, the reasons for the extensions, and the number of additional days approved by each of the extensions.[117] (There were 339 investigations with extensions; however, three of those investigations were still completed within 30 days).

Of these 339 investigations that contained at least one extension, the extensions were approved for either seven, 14, 21, or 30 days each. Of those with extensions, 70% (238) included one extension, 20% (68) included two, 7% (25) included three extensions, 1% (4) included four extensions, <1% (1) included five extensions, and 1% (3) included six extensions. All extensions included documented approval dates; 25 were missing documented reasons for the extension.

Figure 26: Number of Extensions in Priority One and Two Investigations



---

[117] These data matched to the investigations' corresponding intake start date and original due date and therefore, the Monitors were able to determine the due dates associated with the extensions to assess timeliness of completion within the extension period.

The total number of extension days approved for an investigation ranged from seven to 180 days. Seventeen percent (58) of investigations with extensions were extended for seven-14 days; 55% (185) were extended for 15-30 days; 4% (15) were extended 31-50 days; and 24% (81) were extended for more than 50 days.

**Remedial Order 16:** Timeliness of Completion and Submission of Documentation in Priority One and Priority Two Investigations

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, complete and submit documentation in Priority One and Priority Two investigations on the same day the investigation is completed. (Remedial Order 16 applies to both DFPS and HHSC. The Monitors report on DFPS's performance in this Fifth Report and on HHSC's performance in the upcoming Sixth Report.)*

DFPS advised the Monitors that the agency uses the date the investigation was submitted to the supervisor as the investigation completion date. Therefore, according to DFPS, investigations are considered completed when the documentation is finally submitted to the supervisor in compliance with this Order.[118]

**Remedial Order 18:** Timeliness of Notification Letters to Referent and Provider

*Effective immediately, the State of Texas shall ensure RCCL investigators, and any successor staff, finalize and mail notification letters to the referent and provider(s) in Priority One and Priority Two investigations within five days of closing a child abuse and neglect investigation or completing a standards investigation. (Remedial Order 18 applies to both DFPS and HHSC. The Monitors report on DFPS's performance in this Fifth Report and on HHSC's performance in the upcoming Sixth Report.)*

For the referent letter, of the 1,522 (out of 1,554) Priority One and Priority Two investigations opened by RCCI from July 1, 2021 to June 30, 2022 and documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 87% (1,329) of investigations.[119] Of the remaining cases, in 5% (69) of investigations, notification letters to the referents were not mailed timely; 3%

---

[118] DFPS advised the Monitors, "When an investigator submits for closure an investigation in IMPACT, the supervisor may determine that the case needs additional work or documentation to ensure a quality investigation has occurred. If so, the supervisor will return the investigation and once the additional tasks have been completed, the caseworker will submit it again. Because the IMPACT date is captured in an automated way and the CLASS date is manually entered, the IMPACT date will provide a more accurate date and may ease verification and as the agency moves forward in its efforts to improve the quality of its investigations, it believes it's important to capture the final submission rather than initial submission date. Finally, the final date submitted for approval in IMPACT will also be used as the one date to determine compliance with Remedial Order 16 to 'submit and complete documentation in Priority One and Priority Two investigations on the same day the investigation is completed.' The date complete in CLASS will no longer be used to calculate compliance with any remedial order." E-mail from Heather Bugg, former Dir. of Project Management, DFPS, to Kevin Ryan and Deborah Fowler, Monitors (Jan. 4, 2021) (on file with the Monitors).

[119] Closure data was not yet available for 32 investigations that remained open. As noted above, 15 investigations had active extensions and 17 were overdue because either their extensions expired (15) or they had no extensions (2).

(41) were mailed to the referent prior to supervisor approval; 2% (34) of investigations had an anonymous reporter; and 3% (49) were unknown due to documentation deficiencies.[120] In the Monitors' previous report, the State's rate of mailing notification letters to referents within five days of investigation closure in Priority One and Two investigations was 74%.[121]

Figure 27: Notification Letter Sent to Referent within Five Days of Investigation Closure in Closed Priority One and Two Investigations



For the provider letter, of the 1,522 (out of 1,554) Priority One and Priority Two investigations opened by RCCI from July 1, 2021 to June 30, 2022 and documented as closed at the time of the Monitors' review, the notification letter to the provider was mailed within five days of closure in 83% (1,263) of investigations. Of the remaining cases, in 9% (140) of investigations, notification letters to the provider were not mailed timely; 3% (42) were mailed to the provider prior to supervisor approval; and 5% (77) were unknown due to documentation deficiencies.[122] The State's rate of mailing notification letters to providers within five days of investigation closure in Priority One and Two investigations in the Monitors' previous report was 51%.[123]

Figure 28: Notification Letter Sent to Provider within Five Days of Investigation Closure in Closed Priority One and Two Investigations

---

[120] The documentation deficiencies included blank cells.
[121] *See* Deborah Fowler and Kevin Ryan, Third Report 62, ECF No. 1165.
[122] The documentation deficiencies included blank cells.
[123] *See* Deborah Fowler and Kevin Ryan, Third Report 62, ECF No. 1165.



Of the 1,522 (out of 1,554) investigations opened by RCCI from July 1, 2021 to June 30, 2022 and documented as closed at the time of the Monitors' review, 73% (1,114) included evidence that notification to both the referent and provider occurred within five days of closure of the investigation as required by Remedial Order 18. DFPS's rate of mailing notification letters to the referents and providers within five days of investigation closure in the Monitors' previous report was 41%.[124]

## Summary

### Remedial Order 5:
- 79% (149) of Priority One RCCI investigations opened from July 1, 2021 to June 30, 2022 were initiated within 24 hours of intake; and

- 21% (39) of Priority One RCCI investigations opened from July 1, 2021 to June 30, 2022 were not initiated timely or did not have sufficient data to assess.

### Remedial Order 6:
- 83% (1,131) of Priority Two RCCI investigations opened from July 1, 2021 to June 30, 2022 were initiated within 72 hours of intake; and

- 17% (235) of Priority Two RCCI investigations opened from July 1, 2021 to June 30, 2022 were not initiated timely or did not have sufficient data to assess.

### Remedial Order 7:
- 79% (149) of Priority One RCCI investigations opened from July 1, 2021 to June 30, 2022 included initial face-to-face contact with all alleged victims within 24 hours of intake; and

---

[124] *See* Deborah Fowler & Kevin Ryan, Third Report 63, ECF No. 1165.

- 21% (39) of Priority One RCCI investigations opened from July 1, 2021 to June 30, 2022 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess.

### Remedial Order 8:

- 83% (1,131) of Priority Two RCCI investigations opened from July 1, 2021 to June 30, 2022 included initial face-to-face contact with all alleged victims within 72 hours of intake; and

- 17% (235) of Priority Two RCCI investigations opened from July 1, 2021 to June 30, 2022 did not have timely face-to-face contact with all alleged victims or did not have sufficient data to assess.

### Remedial Order 9:

- Of 1,554 investigations opened by RCCI from July 1, 2021 to June 30, 2022 including both single and multi-alleged victim investigations, DFPS was able to track and report to the Monitors 92% of the time (1,431 investigations) whether face-to-face contact was made with each alleged victim within an investigation and the date and time that contact occurred.

- In the remaining 8% (121) of investigations, DFPS was not able to track and report whether face-to-face contact was made with each alleged victim.

### Remedial Order 10:

- Of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022, DFPS documented that 59% (922) were documented as completed within 30 days of intake;

- Of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022, DFPS documented that 27% (420) of investigations were not completed timely; and

- Of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022, DFPS documented that 13% (197) of investigations had an approved extension and were completed within the extension timeframe.

- One percent (15) of the 1,554 Priority One and Priority Two investigations opened between July 1, 2021 and June 30, 2022 remained open with an active extension and, therefore, were not yet due at the time of analysis.

### Remedial Order 11:

- Of the 632 investigations that were opened by RCCI between July 1, 2021 and June 30, 2022 and were not completed within 30 days, DFPS data included extensions approved for 336 (53%) investigations with the dates the extensions were approved, the reasons for the extensions, and the number of additional days approved by each of the extensions.

Remedial Order 16:

- Investigation completion is measured by DFPS on the date the investigation is submitted for supervisor approval. Therefore, all investigations are completed on the same day as submission.

Remedial Order 18 (Notification to Referent):

Notification to Referent by DFPS:

- Of the 1,522 (out of 1,554) Priority One and Priority Two investigations opened by RCCI from July 1, 2021 to June 30, 2022 and documented as closed at the time of the Monitors' review, the notification letter to referents was mailed within five days of closure in 87% (1,329) of investigations.

- Of the remaining cases, in 5% (69) of investigations, notification letters to the referents were not mailed timely; 3% (41) were mailed to the referent prior to supervisor approval; 2% (34) of investigations did not require notifications as the reporters were anonymous; and 3% (49) were unknown due to documentation deficiencies.

Notification to Provider by DFPS:

- Of the 1,522 (out of 1,554) Priority One and Priority Two investigations opened by RCCI from July 1, 2021 to June 30, 2022 and documented as closed at the time of the Monitors' review, the notification letter to the provider was mailed within five days of closure in 83% (1,263) of investigations. Of the remaining cases, in 9% (140) of investigations, notification letters to the provider were not mailed timely; 3% (42) were mailed to the provider prior to supervisor approval; and 5% (77) were unknown due to documentation deficiencies.[125]

## Remedial Order A6: Reporting Allegations

*Remedial Order A6: Within 30 days of the Court's Order, DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of this information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

## Background

---

[125] The documentation deficiencies included blank cells.

The Monitors rely on information gathered during site visits to validate the State's compliance with Remedial Order A6. Since July 31, 2019, the monitoring team has visited more than 70 GROs, CWOP Settings, and operations subject to Heightened Monitoring[126] despite having to curtail visits during the height of the pandemic. While the percentage of youth interviewed who reported knowing about the SWI hotline improved between the Monitors' First and Third reports (from 60% to 75%),[127] many (45%) did not know how to call the hotline, and most children either did not know how to reach the Ombudsman (71%) or did not understand the Ombudsman's role (69%).[128] Even for children who reported understanding how to call the hotline or Ombudsman, some children indicated they were not guaranteed access to a phone as reported in the Monitors' First and Third reports.

For the Third Report, the Monitors analyzed data provided by the State that revealed, for the six-month period reviewed, 20 calls made by foster children to the Ombudsman were subsequently forwarded by Ombudsman staff to SWI, suggesting that although these children did not identify the hotline to be the appropriate resource for the problem they were reporting, they were able to utilize the Ombudsman as a resource.

## Performance Validation

The monitoring team conducted site visits at eight GROs between January 1, 2022, and August 31, 2022. The monitoring team visited Camp Worth, DePelchin Children's Center (DePelchin), Gold Star Academy, Guiding Light RTC, Helping Hand Home for Children (Helping Hand Home), Roy Maas Youth Alternatives–Girlsville Junction (GRO) and Meadowlands (RTC) (reported in combination as Roy Maas), Silver Lining, and Whispering Hills Achievement Center RTC. The table below shows the total number of children and staff interviewed and records reviewed across all eight visits.[129]

Table 10: Total Number of Children and Staff Interviewed

| Type of Data Collected at Site Visits | Number of Interviews/ Files Reviewed |
|---|---|
| Child Interviews | 78[130] |
| Direct Caregiver Interviews | 58 |

---

[126] Visits to operations under Heightened Monitoring were short and focused on the providers' experience with Heightened Monitoring. Interviews with children were not conducted during these shortened visits.

[127] Deborah Fowler & Kevin Ryan, First Report 123, ECF No. 869; Deborah Fowler & Kevin Ryan, Third Report 68, ECF No. 1165

[128] Deborah Fowler & Kevin Ryan, Third Report 68, ECF No. 1165.

[129] Participation in interviews was voluntary. Respondents were allowed to refuse any question or terminate the interview prior to completing. Sixty-eight of the 78 PMC children interviewed completed the entire interview. The denominator (N) for children interviewed in the charts and analysis reflects the number of children responding to a given question and can vary across questions.

[130] As noted above, not all 78 children answered every question during interviews with the monitoring team, which accounts for variations in the denominators discussed in this section.

| Case Manager Interviews | 8 |
|---|---|
| Program Administrator Interviews | 14 |
| **Total Interviews** | **158** |
| Child File Reviews | 112 |
| Direct Caregiver File Reviews | 156 |
| **Total File Reviews** | **268** |

## Foster Care Bill of Rights

During its reviews of children's files on site, the monitoring team determined that 87% of PMC children's files (97 of 112) contained a Bill of Rights signed by the child. Eight additional child files (7%) included a Bill of Rights, but the document was not signed by the child. Seven of 112 child files (6%) did not include a Bill of Rights. This result varied slightly across operations; in three of eight operations visited, all the PMC children's files contained a signed Bill of Rights.

Figure 29: Child File Contained Signed Bill of Rights



Figure 30: Percentage of Child Files by Operation Containing a Signed Bill of Rights



Of the eight case managers interviewed across five sites (Camp Worth, Guiding Light, Helping Hand Home, Roy Maas, and Whispering Hills), only half (4 of 8 or 50%) responded that they "always" (3 or 38%) or "sometimes" (1 of 8 or 12%) reviewed the Bill of Rights with children at intake/admission.[131]

Among children interviewed, 41 of 76 (54%) had heard of the Bill of Rights; 17 responded "yes" to having heard of it only after a description was offered by the interviewer. Thirty-five of 76 children interviewed (46%) had not heard of the Bill of Rights even after a description was given. The age of the child correlated with whether they were familiar with the Bill of Rights—69% of nine and ten-year-olds (11 of 16) had not heard of the Bill of Rights compared to 15% of 15 to 17-year-olds (2 of 13). Twenty-three of the 35 children (66%) who had not heard of the Bill of Rights were 12 years old or younger.

Figure 31: Percentage of Children Responding They Had Knowledge of the Bill of Rights

---

[131] The results of these interviews may explain why children's files contain a signed Bill of Rights, but few children reported having heard of the document. In addition, many of the children interviewed by the monitoring team reported having to sign so many documents at intake that the children did not always absorb the information relayed in documents signed during intake.



Of all children interviewed, 41 of the 76 (54%) reported having heard of the Bill of Rights. However, of the 41 children who reported having heard of the Bill of Rights, only 17% (7 of 41) had read the document, and 39% (16 of 41) said someone had explained the Bill of Rights to them.

Younger children were less likely to report having read the Bill of Rights or having the document explained to them: 45% (9 of 20) of children 12 years old or younger had never read nor had the Bill of Rights explained to them compared to 37% (7 of 19) of children over the age of 12.

**Figure 32: Children Reporting Having Read or Someone Else Explained the Bill of Rights**



**Foster Care Ombudsman**

Fewer than half of children interviewed (31 of 76 or 41%) had heard of the Ombudsman; 11 of them responded "yes" after a description was given by the interviewer. Forty-five of 76 (59%) children had not heard of the Ombudsman even after a description was given.

75

Three-quarters of nine and ten-year-old children (12 of 16 or 75%) had not heard of the Ombudsman compared to less than one-third of 15 to 17-year-olds (4 of 13 or 31%).

Figure 33: Children Reporting Knowledge of the Ombudsman



The 31 children who responded that they had heard of the Ombudsman were also asked if they knew how to contact the Ombudsman if they ever needed to do so. Of children who had heard of the office, 25 (81%) of 31 responded that they knew how to contact it. In total, 25 (33%) of 76 children interviewed knew how to contact the Ombudsman.

Figure 34: Children Reporting Knowledge of How to Reach the Ombudsman if Necessary



## SWI Hotline

Nearly half of children interviewed (37 of 75 or 49%) reported having heard of the hotline, including four children who initially indicated they had not heard of the hotline, but

changed their answer after a description was given. Thirty-eight of 75 children interviewed (51%) had not heard of the hotline even after a description was given.

Knowledge of the hotline varied greatly by age category. Nearly all 15 to 17-year-olds had heard of the hotline—ten of 13 (77%) had heard of it and another two (15%) reported having heard of it after a description was given; but 80% (12 of 15) of nine and ten-year-olds had not heard of the hotline even after a description was given.

Figure 35: Children Reporting Knowledge of the Hotline



The 37 children who responded that they had heard of the hotline were also asked if they knew how to call the hotline. Of the children who had heard of the hotline, 26 of 37 (70%) knew how to call the hotline.

In total, only 26 (35%) of 75 children interviewed knew how to call the hotline. However, 11 (85%) of 13 children ages 15 to 17 knew how to call the hotline while only two (12%) of 17 children ages nine and ten knew how to call the hotline.

Figure 36: Children Reporting Knowledge of How to Call the Hotline if Necessary to Report Abuse, Neglect and Exploitation



Children who reported having heard of the hotline were also asked if they had ever wanted to call the hotline while in their current placement and if so, whether they were able to call. Of the 74 children who responded to the question, eight children said that they wanted to call the hotline at some point during the placement, but only two reported having called the hotline.

Figure 37: Children Reporting a Need to Call the Hotline

Source: Monitoring team site visit data, Child Interview
n = 74

| | |
|---|---|
| Has not heard of hotline | 38 |
| No | 28 |
| Yes, and called | 2 |
| Yes, but did not call | 6 |

Figure 38: Children Reporting Knowledge of the Bill of Rights, Ombudsman, and Hotline

78



Children's responses to all these questions varied by facility visited. This variation may reflect differences between the age of children housed in the operations, particularly for Camp Worth, which houses older youth, but also raises questions about differences in practice between placements, as well as serious concerns regarding the ability of children in some facilities to reach out for help if they encounter safety risks.

Figure 39: Percentage of Children by Operation with Knowledge of the Bill of Rights, Ombudsman, and Hotline[132]

---

[132] Includes yes after description.



## Posting of Hotline and Ombudsman Numbers

Nearly all direct caregiver staff interviewed (57 of 58 or 98%) reported that both the hotline phone number and Ombudsman phone number are posted in the unit on site. The remaining caregiver reported that only the Ombudsman number is posted.

The monitoring team found that in three of the eight operations visited, the Ombudsman and hotline numbers were not consistently posted in every living unit. For example, in one operation, Camp Worth, the Ombudsman number was not posted in one unit and the hotline was posted in Spanish but not in English in another of the units. In another operation, Silver Lining, the hotline number was not posted in one of the houses, but the Ombudsman number was posted in both houses. In a third operation, Whispering Hills, the hotline was not posted at all.

## Phone Process

Children were asked about phone access and their ability to make calls, as well as the process for making phone calls. Almost all the children (66 of 71 or 93%) interviewed reported having access to a phone; five had never asked to use the phone. Just over half (38 of 71 or 54%) reported always being able to use a phone and 39% (28 of 71) reported sometimes, but not always, being able to use a phone.

80

While children reported a high degree of access to a phone, they frequently reported that others could overhear their phone conversations. Seventy-one children responded to the question whether they had access to a phone. Of those children, 38 (54%) reported they always had access, 28 (39%) said they sometimes had access and five (7%) were uncertain.

Figure 40: Children Reporting Ability to Use a Phone



Seventy children answered a question about the process for using a phone. Only ten of those 70 children (14%) reported being able to use the phone without other children or staff overhearing their conversation. Nearly half (34 of 70 or 49%) reported that other children or staff could always hear their conversation while 30% (21 of 70) said other children or staff could sometimes hear their conversations. This was consistent across the eight operations the monitoring team visited. Most of these 70 children (58 or 83%) across locations described having to gain caregiver approval before using a phone. Nearly one-third of children (22 of 70 or 31%) reported specific days or times of the day when phone use was allowed.

Figure 41: Children's Reported Process for Using a Phone[133]

---

[133] Multiple responses were allowed. Eight children did not answer.



Most caregivers also reported at least some restrictions on phone use. Two-thirds (39 of 58 or 67%) of direct care staff members interviewed reported restrictions on both when a child may make a call and who a child may call. Nearly three-quarters (43 of 58 or 74%) of staff members reported there were restrictions on when a child can make a call. Only five (9%) of 58 caregivers reported no call restrictions of any kind.

**Figure 42: Caregiver Reported Restrictions on Phone Use**



While most caregivers reported restrictions on phone use, 90% (52 of 58) said children could call the hotline whenever they wanted and 85% (49 of 58) said children could call the Ombudsman whenever they wanted to call. Staff members at three operations (Gold Star Academy, Silver Lining, and Whispering Hills RTC) said children could not call the hotline or Ombudsman whenever they wanted to call.

**Figure 43: Caregivers Reporting Ability of Children to Call the Hotline/Ombudsman**



### Child Grievances and General Safety

More than 85% of program administrators (12 of 14 or 86%) and case managers (7 of 8 or 88%) reported having a formal process to handle children's grievances, but just under 60% (34 of 58 or 59%) of direct care staff reported a formal process. Twenty-nine percent (17 of 58) of direct care staff reported not having a formal process and 12% (7 of 58) did not know whether there was a formal process for children's grievances.

One-third (23 of 69 or 33%) of children responding said they had wanted to report a grievance since coming to their current placement while two-thirds (46 of 69 or 67%) said they had not wanted to report a grievance. Of the 23 children who said they had wanted to report a grievance, 18 (78%) said they were able to report it and five (22%) said they were not able to report it.

Figure 44: Children Reporting Wanting to Report a Grievance Since Being in Current Placement



Figure 45: Children Reporting Ability to Report a Grievance

83



When asked generally about feelings of safety, two-thirds (50 of 75 or 67%) of children said they "always" felt safe in their current placement and one-quarter (18 of 75 or 24%) said they "sometimes" felt safe. Seven children said they did not feel safe in the placement. Of the seven children who reported not feeling safe, all reported they were only "sometimes" able to use the phone. Of the eight operations visited, all children interviewed reported that they "always" felt safe in only one: Roy Maas.

Of 71 children who responded to a question asking whether they had been bullied in the past or were currently bullied, 21 (30%) reported currently being bullied and another eight (11%) children reported having been bullied in the past.

**Figure 46: Children Reporting Feeling Safe in Current Placement**



Just fewer than half (36 of 74 or 49%) of children responded that they always felt comfortable talking to staff members if they needed something, while 42% (31 of 74) said they "sometimes" felt comfortable talking to staff members. Seven children (9%) reported they did not feel comfortable talking to staff members.

Figure 47: Children Reporting Feeling Comfortable Talking to Staff about Needs



Of the 74 children who responded to both questions about whether they felt safe and whether they were always comfortable talking to staff members, 20 (27%) reported that they did not always feel safe and were not always comfortable talking to staff members. Eight (40%) of these 20 children were placed at Guiding Light RTC, the remaining twelve children were placed at Camp Worth (4), Silver Lining (3), DePelchin Children's Center (2), Gold Star Academy (2), and Helping Hand Home for Children (1).

A child's caseworker is required to report allegations of abuse, neglect and exploitation to the hotline if the child makes an outcry of maltreatment. However, only 27% (18 of 67) of children said that when they called or texted their caseworker, their caseworker "always" answered or responded later. More than half (36 of 67 or 54%) said their caseworker "sometimes" answered or responded and 19% (13 of 67) said their caseworker did not answer or respond when they called or texted.

Figure 48: Children Reporting Whether Their Caseworker Answers or Responds to Phone Calls or Texts



## Analysis of Abuse, Neglect and Exploitation Hotline Reporting, January to June 2022

The monthly hotline data submitted to the Monitors includes information detailing whether the alleged child victim was the reporter of the alleged abuse, neglect or exploitation. Between January 1, 2022 and June 30, 2022 there were 2,189 intakes to the hotline referred for investigation to RCCI, CPI, or PI for which the alleged victim was a PMC child[134] and the intake included information related to whether the reporter was the alleged victim or someone else.[135] A total of 27 of the 2,189 intakes (1%) were reported by the alleged victim.

### Figure 49: RCCI, CPI, and PI Intakes, January to June 2022



---

[134] According to data provided by the State, a total of 13,208 children had an active PMC status between January and June 2022.

[135] As discussed in the section for Remedial Order 3, RCCI's jurisdiction includes allegations in licensed residential settings, such as a GRO, RTC, or foster home. CPI's jurisdiction includes kinship or unlicensed placements. PI's jurisdiction includes state supported living centers, psychiatric or state hospitals, and private HCS homes. Intakes that did not include information allowing for a determination regarding the reporter were not included in the analysis.

Although intakes referred to PI were the smallest in number (172 of 2,189 or 8% of intakes), nearly half (13 or 48%) of the 27 intakes where the alleged victim was the reporter came from an intake referred to PI.[136] Overall, 13 (8%) of 172 of PI intakes were reported by the alleged victim compared to nine (0.8%) of 1,164 RCCI intakes and five (0.6%) of 853 CPI intakes.

Figure 50: Intakes by Investigation Type where Reporter is Alleged Victim



The Monitors reviewed the cases reported to the hotline by PMC children. Two of the investigations illustrate the importance of foster children understanding how to contact the hotline. One of them involved an 11-year-old child who was in a fictive kin placement at the time of the intake. The child reported that his foster father yelled at him, threatened to hit him, and pushed him, causing him to fall backward and hit his back on the stairs. The child reported that he was afraid of his foster father. During his interview, the child said that when his foster father pushed him down, he told him that "it was going to get worse for him," and that he called the hotline because he did not want that to happen. His foster father had reportedly broken his cell phone, but his foster mother allowed him to use her phone to call the hotline. The child was removed from the home, and CPI (DFPS) substantiated the allegations with a disposition of a Reason to Believe for Physical Abuse of the child by his foster father.

In another interview, a 17-year-old child who was in a court-ordered kinship placement with his aunt reported being pressured to use cocaine by his aunt and said he did not feel safe in the home.[137] The child called the hotline from a convenience store after running

---

[136] Of these 13 intakes, five were reported by one child, and six were reported by another child. DFPS Ruled Out all of the allegations in the investigations following the 11 reports. The Monitors reviewed the investigations and do not disagree with the findings. Both children were placed in State Supported Living Centers when the reports were made.

[137] During the court hearing that resulted in the child's placement, CPS expressed concern about the home, citing the aunt's history of substantiations for Physical Neglect of her own children due to unsanitary

away. The child was removed from the home. DFPS-CPI investigated and made an Unable to Determine finding for Physical Abuse. The same home has been the subject of two subsequent reports to SWI related to two other children living in the home.

The Monitors also receive monthly data on complaints, in the form of phone calls, made by children to the Ombudsman that are reported to SWI by the Ombudsman. Between January and June 2022, the Ombudsman staff made 25 hotline reports resulting from a child's complaint to the Ombudsman. Five of the 25 SWI reports, or 20%, were made by children in CWOP settings. The substance of the children's complaints included concerns related to inappropriate behavior, abuse or neglect by staff, Medical Neglect, and feeling unsafe. These numbers have remained relatively consistent over the course of the Monitors' reporting.

Figure 51: Youth Complaints to Foster Care Ombudsman Resulting in Notification to Statewide Intake



**Summary**

---

conditions in the home, including "feces on the wall, floor, and carpet." However, by the time of the hearing, the child had been cycling between CWOP settings and juvenile detention. According to a note in IMPACT, the Judge ordered the placement based on the child's wishes, age, and "to get him out of CWOP." When the caseworker brought the child to the placement, the aunt reported the household members were "in the middle of chores." The caseworker observed that the floor of the apartment "was very dirty with trash...and dog feces," noticed dirt on the walls in the living area "from about waist down," a bathroom sink with water standing in it (the child's aunt said they were having "sewage issues" and the landlord was supposed to come to fix it that day), and about "30 or more roaches" on the top of a door in the kitchen. In one of the back bedrooms, the caseworker observed several dogs in kennels and dog feces on the floor; according to the caseworker, there were six to eight large dogs, two small lap dogs, and seven to eight puppies living in the home.

- Nearly half of children who responded to all of the relevant questions (37 of 75 or 49%) reported having heard of the hotline, including four children who initially indicated they had not heard of the hotline, but changed their answer after a description was given.

- Among children interviewed, 41 of 76 (54%) had heard of the Bill of Rights; 17 responded "yes" to having heard of it only after a description was offered by the interviewer.

- Fewer than half of children interviewed (31 of 76 or 41%) had heard of the Ombudsman; 11 of them responded "yes" after a description was given by the interviewer for a total of 45 of 76 (59%) children.

- Overall, less than a quarter (17 of 75 or 23%) of children had heard of all three—the Bill of Rights, Ombudsman, and the hotline. The percentage of children who had heard of the Ombudsman and hotline varied significantly by operation. Young children were less likely to have knowledge about the Ombudsman and hotline than older children.

## Remedial Order B5: Communicating Allegations to Caseworkers

*Remedial Order B5: Effective immediately, DFPS shall ensure that RCCL or any successor entity promptly communicates allegations of abuse to the child's primary caseworker. In complying with this order, DFPS shall ensure that it maintains a system to receive, screen, and assign for investigations, reports of maltreatment of children in the General Class, taking into account at all times the safety needs of children.*

### Background

In its Contempt Order of December 18, 2020, The Court included specific instructions to the Monitors related to their validation of the State's compliance with Remedial Order B5:

> [T]he Court instructs the Monitors to assess Defendants' evidence and determine whether Defendants are "promptly communicat[ing] allegations of abuse to the child's primary caseworker." To implement the remedy to ensure that PMC children are free from an unreasonable risk of serious harm, compliance with Remedial Order B5 requires more than prompt communication to the caseworker of the existence of an allegation. It requires that caseworkers receive prompt communication of "allegations of abuse." Therefore, the Court instructs the Monitors that in their assessment of Defendants' compliance with this Remedial Order, they must assess whether Defendants "promptly communicate [ ]" the substance of the "allegations of abuse" to "the child's primary caseworker."

> Furthermore, Remedial Order B5 requires that Defendants "maintain [ ] a system to receive, screen, and assign for investigation, reports of

89

maltreatment of children in the General Class, taking into account at all times the safety needs of children." The Monitors are therefore instructed to continue to assess not just whether Defendants are maintaining a system for receiving, screening, and assigning for investigation allegations of child maltreatment, but also that it "takes into account at all times the safety needs of children."[138]

After entry, DFPS changed its policies to conform compliance to the requirements articulated in the Court's Order. However, as discussed in the Monitors' Third Report, the State struggled to implement the new policies, which require that caseworkers be notified of the substance of any allegations of abuse, neglect or exploitation for a child on their caseload in an "I&R Notification" in IMPACT.[139] The caseworker is required to document an "I&R Notification Staffing" contact (staffing contact) in IMPACT within one business day of receiving the notification.[140] DFPS requires the staffing contact to include: a copy of the notification, notes of the discussion between the caseworker, their supervisor, and program director, consideration of the child's safety needs, and any follow-up action identified during the staffing related to the child's safety.[141] If follow-up is required, the caseworker must document its execution and the results in a subsequent IMPACT contact.[142] In the Third Report, the Monitors reported on case record reviews, which showed that I&R Notification Staffings were absent in 38% (248 of 654) of the RCCI intakes included in the sample. Results were worse for the samples of CPI and PI intakes, where I&R Staffings were absent in 71% (263 of 373) of CPI intakes and 60% (70 of 117) of the PI intakes.

For this report, the monitoring team conducted case record reviews for a randomly selected sample of 387 RCCI, 312 CPI, and 99 PI intakes alleging child maltreatment received during the months of January, March, and June 2022. If the randomly selected sample included an intake for a child that DFPS linked to other intakes, all the linked intakes were included in the analysis.

## Performance Validation

### Review of Automated Notification for RCCI Intakes

The monitoring team's case record review included evaluation of the timing of the automated notification sent to caseworkers when a report of alleged maltreatment was made to SWI. The monitoring team found an automated notice to the caseworker in 100% of the 387 RCCI intakes included in the case record review. Most notifications (63% or 244 of 387) occurred on the same day as the intake; the remainder (37% or 143 of 387) occurred on the day after the intake. The average time from intake to system-generated notice to the caseworker was 0.37 days.

---

[138] Order 327, ECF No. 1017.
[139] Deborah Fowler & Kevin Ryan, Third Report 71, ECF No. 1165.
[140] *Id.*
[141] *Id.*
[142] *Id.* at 71-72.

The monitoring team did not find an automated notification to caseworkers in IMPACT for any of the CPI or PI intakes included in the case record review.

The monitoring team also compared the date of the automated notification included in the monthly RCCI intake data produced by the State with the information the monitoring team found in IMPACT. All the 387 RCCI intakes in the sample matched the notification date included in the monthly data.

The Monitors also evaluated the time between DFPS's receipt of the RCCI intake and the automated notification to the caseworker using the monthly SWI data produced by the State.[143] For RCCI intakes, the average time between intake and the system-generated notification to the caseworker was 11 hours and 17 minutes.

### Review of IMPACT Case Contacts for RCCI, CPI, and PI intakes for I&R Notification Staffing

After receiving notification of an intake alleging child maltreatment, a caseworker is required to review the intake, discuss the intake with their supervisor and/or program director, and contact the RCCI or CPI investigator for additional information. The caseworker is expected to create a staffing contact in the child's IMPACT record and to document the following in the contact: a copy of the I&R Notification (which includes the allegations) and notes related to the staffing with the caseworker's supervisor and/or program director, including consideration of the child's safety needs and any actions taken or plans for future action needed to ensure the child's safety.

During the case record review, the monitoring team identified a staffing contact for most RCCI and PI intakes but did not find a staffing contact for most of the CPI intakes.[144] Of the 387 RCCI intakes, the monitoring team found a staffing contact for 67% (260 of 387). Of the 99 PI intakes, the monitoring team found a staffing contact for 55% (54 of 99) and for 41% (128 of 312) of the CPI intakes.

Figure 52: Percentage of Intakes with a Case Contact Found by Intake Type

---

[143] This data included information related to the automated I&R Notification, and the timing of the I&R Notification Staffing for RCCI.

[144] Of the contacts found across all intake types, 84% (371 of 442) were documented using an I&R A/N Notification Staffing contact and 71 (16%) were documented using another type of contact. Monthly data produced by the State related to RCCI intakes include a data field titled, "Date of 1st A/N Notification Staffing Contact." During the case record review for RCCI intakes, when the monitoring team found an I&R Notification Staffing contact rather than another type of contact, the Monitors compared the date included in the data field for the monthly data with the date found in the IMPACT contact. In the 234 RCCI intakes where the contact found in IMPACT during the review was an I&R A/N Notification Staffing, the contact date in IMPACT matched in 91% (214 of 234). Of the remaining 20 intakes, the date did not match for 12 of the contacts, and eight of the 234 contacts found in IMPACT were not included in the monthly data produced by the State. Of the 153 RCCI intakes included in the case record review for which a contact documenting the I&R Notification Staffing was not found by the monitoring team, the monthly data included an I&R Notification Staffing date for 37% (57 of 153).



The percentage of case contacts found during the case read varied slightly by month.

Figure 53: Percentage of Intakes with a Case Contact Found by Type and Month



The time from intake to the staffing contact varied; however, across all three intake types (RCCI, CPI, PI), staffing contacts most frequently occurred the same day as the intake.

The average time between intake and the staffing contact was under two days across all three intake types.[145]

Table 11: Intakes with a Case Contact Found and Timing from Intake to Contact by Intake Type

| | RCCI Intakes (n=387) | | CPI Intakes (n=312) | | PI Intakes (n=99) | |
|---|---|---|---|---|---|---|
| Intake to Case Contact – Up to Two Days Prior | 1 | LT 1% | 3 | 2% | 1 | 2% |
| Intake to Case Contact-Same Day | 101 | 39% | 58 | 45% | 26 | 48% |
| Intake to Case Contact-Next Day | 80 | 31% | 24 | 19% | 16 | 30% |
| Intake to Case Contact-2+ Days | 78 | 30% | 43 | 34% | 11 | 20% |
| **Total Case Contact Found (#/%)** | **260** | | **128** | | **54** | |
| **Average Days–Intake to Case Contact** | **1.61 Days** | | **1.97 Days** | | **1.28 Days** | |

The monitoring team found that nearly all the staffing contacts across all intake types (RCCI, CPI, and PI) included information about the alleged abuse, neglect or exploitation.

Figure 54: Case Contacts with Incident Information



---

[145] The State produces monthly SWI data to the Monitors that also includes a field for the date and time the I&R Notification Staffing occurred. However, the Monitors' case record reviews have identified instances in which the caseworker documented the date of the staffing within the contact narrative, and this date was different from the date found in the contact detail. In addition, the monitoring team found instances in which the contact detail date entered by the caseworkers was weeks, and even months, before the system timestamp for the creation of the staffing contact. For this reason, the contact detail date in the SWI data cannot be used to validate the date that an I&R Staffing was held.

Some staffing contacts did not include any information except the information about the alleged abuse, neglect or exploitation: 34% (44 of 128) of staffing contacts related to CPI intakes did not contain any additional information, compared to 32% (17 of 54) of staffing contacts related to PI intakes, and 14% (36 of 260) of staffing contacts related to RCCI intakes.

Most of the contacts found across all intake types included notes describing a staffing between the caseworker, supervisor and/or program director.

Table 12: Case Contacts with a Staffing Documented by Intake Type and Month

| | RCCI Case Contacts (n=260) | | CPI Case Contacts (n=128) | | PI Case Contacts (n=54) | |
|---|---|---|---|---|---|---|
| **Total Case Contacts with Staffing Documented** | **209 (80%)** | | **74 (58%)** | | **30 (56%)** | |
| Staffing Documented-January | 57 | 74% | 18 | 47% | 7 | 41% |
| Staffing Documented-March | 86 | 88% | 26 | 53% | 16 | 76% |
| Staffing Documented-June | 66 | 78% | 30 | 73% | 7 | 44% |

When the monitoring team found a staffing contact, the contact documented that the caseworker planned to take some action to ensure the child's safety in more than half of the CPI and PI intakes and in almost three quarters of the RCCI intakes.

Figure 55: Case Contacts with Safety Action Documented



94

The staffing contact related to some intakes indicated that the caseworker planned to take more than one action to ensure the child's safety:

- Forty-six percent (87 of 190) of staffing contacts related to an RCCI intake that documented a safety action planned or taken included one safety action; 30% (56 of 190) included two; and 24% (47 of 190) included three or more.

- Forty-three percent (33 of 76) of staffing contacts related to a CPI intake that documented a safety action planned or taken included one safety action; 43% (33 of 76) included two; and 14% (10 of 76) included three or more.

- Sixty-nine percent (22 of 32) of staffing contacts related to a PI intake that documented a safety action planned or taken included one safety action; 22% (7 of 32) included two; and 9% (3 of 32) included three or more.

The most common safety action documented during the case record review across all intake types was continued monitoring and follow-up. The type of monitoring and follow-up found in staffing contact notes included: monitoring the outcome of the investigation, visiting the operation or foster home, and talking with children, staff, foster parents, law enforcement, the investigator on the case and others with information about the incident or the child.

Figure 56: Safety Actions Documented in RCCI, CPI, and PI Case Contacts



Source:  Case Read Data, RCCI, CPI, PI Intakes w/Safety Action
n=298

The monitoring team reviewed the allegations and documented safety actions included in the staffing contacts to determine whether sufficient action was taken to ensure the child's immediate safety. In most cases, the monitoring team determined that the documented safety action was sufficient.

Figure 57: Percentage of Documented Safety Actions that Adequately Ensured the Immediate Safety of the Child



When the monitoring team determined that additional action should have been taken, the actions that were most often needed included: training of operation staff or foster parents, increased supervision for the child, development of a safety plan for the child, and ensuring there would be no contact between the child and alleged perpetrator.

Of the 442 intakes for which the monitoring team found a corresponding staffing contact, 144 (33%) did not include any notes documenting that the caseworker planned to take some action to ensure the child's safety. Of these 144 intakes, the monitoring team determined some action should have been taken to ensure child safety in almost half of cases involving an RCCI or CPI intake and in over three-quarters of PI intakes.

Figure 58: Case Contact with No Safety Action Documented and Whether Action Was Needed



The staffing contacts that the monitoring team identified during the case read that did not document any action taken to ensure the child's safety included:

- A staffing contact for a March 12, 2022 intake involving a 16-year-old non-verbal PMC child with a developmental disability that documented allegations that the child was picked up by the local police after wandering away from his Home and Community-Based Services (HCS) group home. The contact indicated the child was found in a traffic median at the intersection of two busy highways during rush hour. The local police who reported the incident to SWI said that this was not the first time the police department had been in contact with the child; the law enforcement official who made the report to SWI said the child ran away from the home frequently and that police had picked him up multiple times.[146] The staffing contact did not document any action taken to determine whether a safety plan or some other step was needed to ensure the child's safety, despite the serious concerns presented by the report to SWI. As of October 28, 2022, the PI investigation does not appear to have been completed.

- A staffing contact for a January 19, 2022 intake involving a 16-year-old PMC child who is autistic and has a history of suicidal ideation and other mental health needs

---

[146] The child was first placed in the HCS group home in 2018. This child's most recent service plan indicates that he is diagnosed with autism spectrum disorder, speech impairment, moderate cognitive impairment, and attention-deficit/hyperactivity disorder (ADHD). It notes that the local My Health My Resources (MHMR) accepted him into services for ABA Therapy but that he was terminated in 2020 after missing two consecutive sessions. He was placed back onto the top of the waiting list "with the understanding that [the child] will attend sessions on a regular schedule." The service plan further notes that the MHMR "reached out in September 2021 to schedule an appointment but due to lack of communication [the child] was again taken off of the list to receive services." This note, in conjunction with the notes indicating the child frequently wanders from the HCS group home, raised serious concerns about whether the home can meet his needs. Yet, according to IMPACT, the child remains in the placement.

that documented allegations that the child was not given his medication because the facility, a Residential Treatment Center (RTC), "ran out of [the child's] meds and didn't realize it," and "forgot to fill [the child's] prescriptions." The staffing contact indicated the child required an emergency psychiatric hospitalization. The SSCC caseworker did not document any steps taken to ensure that the facility would be an appropriate setting for the child to return to, despite the serious allegations. A face-to-face visit between the child and a caseworker occurred six days after the staffing contact was entered into IMPACT; the caseworker who made the visit does not appear to have asked the child about the missed medication. The RCCI investigation was not completed until April 25, 2022, and while it did not result in a substantiated finding of Medical Neglect, the investigator found that the child had missed a dose of the medication prescribed for "Mood, anger, and aggression" prior to his hospitalization and that there were "inconsistencies contained in the medication documentation." The child remained in this placement until he was discharged approximately eight months later.

- A staffing contact for a March 29, 2022 intake involving a 13-year-old PMC child who told the caregiver in his HCS group home that, in a previous placement, he had acted out sexually with a younger child in the placement. The day before the intake, a caseworker made a face-to-face visit to the child's placement. The notes for the visit indicate that the child "still has behavior issues that need to be addressed. [The child] continues to get on the computer without permission and access web sites that are not appropriate." Despite the child's outcry and the notes made during the face-to-face visit the day before, there is nothing in the staffing contact indicating that the caseworker took steps to determine whether other children were placed in the home and to ensure that supervision in the home was appropriate.

- Four staffing contacts for a March 28, 2022 intake involving an 11-year-old child placed in an RTC who allegedly took two psychotropic medications that were not prescribed to him, rather than his own prescriptions. All four of the staffing contacts appear to be related to the same intake, though the contact notes indicate that subsequent blank I&R Notifications were received after the first. The second staffing contact indicates that the program director instructed the caseworker to follow up with the RCCI investigator and "stated if the placement becomes concerning after the follow up with the investigator, [they] may have to meet again and talk about moving the child." The caseworker said that she would be "sure to follow up" but the caseworker did not enter any subsequent contact notes indicating she had done so. The RCCI investigation did not result in a substantiated finding of Medical Neglect, but the operation received a citation for a minimum standards violation because "a staff gave a child another child's prescribed medication by mistake."

Overall, the monitoring team found an IMPACT staffing contact that documented appropriate action to ensure the child's safety in only 42% (335 of 798) of all intakes reviewed.

Figure 59: Whether Action Was Documented Ensuring Child Safety



## Summary

The monitoring team conducted case record reviews for a randomly selected sample of RCCI, CPI, and PI abuse, neglect and exploitation intakes received during the months of January, March, and June 2022. The monitoring team ascertained that the time from SWI's receipt of an intake to the staffing contact varied across all three intake types (RCCI, CPI, PI). Some staffing contacts did not include any information except the information about the alleged abuse, neglect or exploitation. When the monitoring team determined that additional action should have been taken, the actions most often necessary included: training of operation staff or foster parents, increased supervision for the child, development of a safety plan for the child, and ensuring there would be no contact between the child and alleged perpetrator. Overall, the monitoring team found an IMPACT staffing contact that documented appropriate action to ensure the child's safety in 42% of all intakes reviewed.

## Remedial Order 37

***Remedial Order 37:*** *Within 60 days, DFPS shall ensure that all abuse and neglect referrals regarding a foster home where any PMC child is placed, which are not referred for a child abuse and neglect investigation, are shared with the PMC child's caseworker*

99

*and the caseworker's supervisor within 48 hours of DFPS receiving the referral. Upon receipt of the information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.*

## Background

As discussed in the Monitors' Second and Third Reports, the State's restrictions around the practice of downgrading abuse, neglect and exploitation intakes for children in licensed placements dramatically reduced the number of downgraded intakes. DFPS's current protocol only permits these intakes to be downgraded to PN when the allegations were previously investigated or fall outside RCCI's jurisdiction to investigate. The Monitors' Third Report found that, for the five-month period reviewed, only three downgraded intakes required a Home History Review (HHR) and staffing, pursuant to Remedial Order 37, down from 129 that required an HHR and staffing for the seven-month period reviewed for the Monitors' Second Report.[147] Since the Monitors filed the Third Report, the only change to policy related to HHRs clarified the process for creating an HHR for downgraded intakes involving an out-of-state foster home.[148]

## Performance Validation

Based on data provided by the State, the Monitors identified 22 hotline intakes downgraded to PN between January 1, 2022 and June 30, 2022 that related to a PMC child placed in a foster home.[149] The monitoring team reviewed case records associated with the intakes and determined that none of the incidents occurred while the PMC child was placed in a foster home.

The monitoring team reviewed four HHRs completed and provided by the State between January 1, 2022 and June 30, 2022.[150] The monitoring team's review of these HHRs and the case records associated with the four downgraded intake reports found concerns in two of the four:

---

[147] Deborah Fowler & Kevin Ryan, Third Report 85, ECF No. 1165.
[148] DFPS, *Child Protective Services Handbook*, Redlined §4221.1 (Feb. 1, 2022) (on file with the Monitors).
[149] Between January 1, 2022 and June 30, 2022, the State reported 1,169 RCCI intakes to SWI involving a PMC child; 30 were subsequently downgraded to PN. The PN closure reason provided for these cases included "incident jurisdiction of other DFPS program," (19 or 63%), "incident addressed in previous case," (5 or 17%), and "incident responsibility of other agency/out-of-state," (6 or 20%).

SWI intake data includes a data field entitled "Private CPA or CPS acting as CPA," defined as "an indicator for whether the entity that the subject of the intake is a private Child Placing Agency (CPA) or Child Protective Services acting as a CPA (RCCI)." Of the 30 intakes downgraded to PN, 22 cases were identified as involving a PMC child in a foster home and had "CPS as CPA" or "Private CPA" indicated for the data field. None of these children were living in foster homes at the time of the incidents.
[150] All four HHRs identified a TMC child as the alleged victim named in the intake. However, DFPS documented a total of five other foster children living in the four homes under review, three of whom were identified in the HHRs as PMC children. The Monitors verified the legal status of each of the nine children identified in the reports and found that, at the time of the intake under review, two children misidentified in the HHRs as TMC were PMC children.

100

- On April 24, 2022, SWI received a report that a child said she had been sexually abused in a previous foster home. DFPS determined that the allegations had been investigated and Ruled Out in 2021. However, at the time of the intake, a PMC child was living in the foster home. While the child's IMPACT event list did not include a system-generated notification of the intake, the child's records indicated an HHR staffing between the caseworker and supervisor occurred on April 26, 2022. The contact contained the completed HHR and did not identify any safety concerns but identified several follow-up steps for the caseworker which included: obtaining the Home Study for the foster home from the CPA to identify males living in the home and asking the child to identify who frequented the home and who had access to her. After obtaining this information, the caseworker was supposed to restaff the case. No subsequent staffing contact was documented in the child's electronic record to evidence whether the caseworker took the steps assigned to her.

- On June 8, 2022, SWI received a report that a child placed in an emergency shelter told his CASA advocate that one of the other children living in the shelter had sexually assaulted his brother in a previous placement. The reporter said that the child expressed concern about being placed with the child who allegedly assaulted his brother. The sexual assault allegation was reported to SWI on April 1, 2022, and DFPS investigated and Ruled Out Neglectful Supervision. The June 8, 2022 intake was downgraded based on this prior investigation.

  At the time of the June 8, 2022 intake, an 11-year-old PMC child was living in the foster home where the sexual assault allegedly occurred. The monitoring team's review of the PMC child's IMPACT records found the event list contained a system-generated notification of the intake dated June 9, 2022, and documentation showing that an HHR staffing occurred on June 10, 2022. The IMPACT contact narrative for the staffing includes the completed HHR and reflects a staffing between the child's caseworker and supervisor. The caseworker and supervisor did not find that any immediate interventions were necessary. However, they expressed concerns that the 11-year-old would not speak to anyone during the investigation, and that when the child was interviewed by the long-time caseworker, the child "was not very verbal." The child's caseworker was to follow up with the child's therapist to determine whether the therapist had any concerns about the placement. The child was removed from this foster home at the end of June 2022.

  On July 19, 2022, the DFPS Complex Investigations Team reopened the original Neglectful Supervision investigation received on April 1, 2022, after the Conservatorship Quality Assurance Team determined that an incorrect disposition was assigned to the case. The disposition was changed to Reason to Believe after DFPS determined that the foster parents were "blatantly negligent in their supervision which led to the sexual abuse of children in their care."

  The monitoring team's review of CLASS records showed that this foster home had been verified since October 8, 2001 by three different CPAs. From 2021 until the

date of the home's closure, the State had opened 28 investigations of the home: ten for abuse, neglect or exploitation and 18 for minimum standards violations. Four of the investigations resulted in citations for minimum standards violations related to supervision. The foster home was closed on August 11, 2022.

## The State's Case Reads

The State conducted two case reads that overlapped with the period reviewed by the Monitors for this report: the first covered the second quarter of the Fiscal Year 2022, or December 1, 2021 through February 28, 2022.[151] Of the 13 reports of abuse, neglect or exploitation made to SWI that involved a PMC child placed in a foster home and later downgraded to PN, only one required an HHR. Of the remaining 12:

- Six involved an incident that did not occur in a licensed foster home;
- Three were called back into SWI for an investigation;
- One was for a foster home that was no longer open;
- One was for a home where no children were placed; and
- One already had an investigation open on the foster home.

In the case requiring an HHR, the State found that the HHR was completed 30 minutes outside of the 48-hour time frame required by DFPS policy. An accurate summary of the HHR was found in the narrative, as was the summary of the staffing with the supervisor, and details or actions taken by the caseworker or supervisor.

The State's second case read covered March 1, 2022 through May 31, 2022, or the third quarter of Fiscal Year 2022.[152] Of the 19 reports made to SWI involving a PMC child placed in a foster home that were downgraded to PN, none required an HHR. Of the 19 reports:

- Eighteen involved an incident that did not occur in a licensed foster home; and
- One was determined to have occurred years ago.

## Summary

The Monitors' review of 22 intakes downgraded to PN involving PMC children between January 1, 2022 and June 30, 2022 revealed that none of the incidents occurred while any PMC child was placed in a verified foster home. The monitoring team also reviewed records associated with four HHRs produced by the State between January 1, 2022 and June 30, 2022. The review raised concerns in two of them. In one, the Monitors found no evidence a required restaffing occurred. In another, after a subsequent allegation was downgraded to PN due to a previous investigation, DFPS's Complex Investigation Team reviewed the underlying investigation that preceded the downgrade and determined that it was Ruled Out in error. A PMC child was still living in the foster home at the time the

---

[151] DFPS, *Home History Case Review Results*, December 2021-February 2022 Review/Quarter 2-Fscal Year 2022 (undated) (on file with the Monitors).

[152] DFPS, *Home History Case Review Results*, March 2022-May 2022 Review/Quarter 3-Fiscal Year 2022 (undated) (on file with the Monitors).

intake was downgraded to PN and, thus, not investigated. Though IMPACT records showed the caseworker and supervisor documented concerns during their HHR staffing based on the child's demeanor during the investigation that preceded the downgraded intake, the child remained in the home for weeks.

The State conducted two case reads during the applicable period. Of the 13 reports made to SWI involving a PMC child placed in a foster home, later downgraded to PN status, DFPS determined only one report required an HHR.

# Organizational Capacity

## Remedial Order 1: CPS Professional Development

*Remedial Order 1: Within 60 days, the Texas Department of Family Protective Services (DFPS) shall ensure statewide implementation of the CPS Professional Development (CPD) training model, which DFPS began to implement in November 2015.*

### Background

As discussed in the Monitors' first three reports, the training model ordered in RO 1 is required both for DFPS caseworker training, as well as for SSCCs that enter Stage II of the CBC model, at which time DFPS transitions responsibility for casework services to the SSCCs. The Monitors' prior reports analyzed the training programs adopted by the first two SSCCs (OCOK and 2Ingage) to transition to Stage II. The Third Report confirmed that the abbreviated training that 2Ingage initially adopted was inconsistent with the CPD training model but noted that the SSCC transitioned to the full CPD training in March 2021. This analysis is the first for both the revised 2Ingage training program for the St. Francis training program, as St. Francis transitioned to Stage II after the Third Report was filed.[153]

### Performance Validation

#### Caseworkers Hired and Trained by DFPS

DFPS hired 562 caseworkers between September 1, 2021, and March 31, 2022.[154] Of those caseworkers hired, 543 (97%) were subject to full or partial CPD training prior to being

---

[153] The fourth SSCC, Belong, transitioned to Stage II in October 2022. The Monitors will assess their performance in future reporting.

[154] Data limitations discussed in the Monitors' previous reports still apply. *See* Deborah Fowler & Kevin Ryan, Third Report 92, ECF No. 1165. The analysis included in this report covers a cohort of all CVS caseworkers hired (including transfers and rehires) by either DFPS or an SSCC between September 2021 and March 2022. This cohort was tracked through July 31, 2022 to give adequate time for caseworkers hired in March to complete CPD training. The case assignable date is the date used as a proxy for training completion because DFPS and the SSCCs have not been able to provide actual training completion dates (OCOK provides a cohort completion date; but it is estimated, not actual).

assigned cases, while 19 (3%) staff, including 11 transfers and eight rehires, were exempt from training. Ninety-five (18%) of 543 caseworkers hired who were subject to CPD training left the agency prior to or during CPD training and were excluded from the Monitors' analysis, which tracked a total of 448 caseworkers.

Figure 60: DFPS Caseworkers Hired September 2021 – March 2022 and Included in CPD Training Completion Analysis



Four hundred forty-eight DFPS caseworkers were subject to the completion of full or partial CPD training, including 422 requiring full training (339 newly hired staff and 83 transferred and rehired staff) and 26 (6%) transferred and rehired caseworkers who were subject to partial CPD training. Of the 448 caseworkers subject to completion of full or partial CPD training, 422 (94%) caseworkers completed the training by July 31, 2022.

According to DFPS, CPD training takes an average of 13 weeks (91 days) to complete. Of the caseworkers subject to training, 398 of 422 (94%) had completed full CPD training and 24 of 26 (92%) had completed partial CPD training by July 31, 2022. The time to complete full CPD training ranged from 66 to 291 days,[155] with an average of 99 days.

Seven of the 398 caseworkers who completed full CPD training did so more than seven and up to 25 days earlier than expected given the DFPS timeline of 91 days to completion. DFPS did not provide an explanation for the early completion.

---

[155] One caseworker, a stipend student, was reported to have completed training (case assignable) prior to their cohort's training start date. Stipend students complete training prior to being hired as caseworkers. For caseworkers subject to partial CPD training, the average time taken to complete was 78 days.

Figure 61: DFPS Caseworker CPD Training Completion by Training Level



The State did not provide data and information to validate completion of CPD training for 26 caseworkers (15 new hires and 11 transfers or rehires). Of these 26 caseworkers, four were identified as caseworkers with full caseloads before July 31, 2022.[156]

### Caseworkers Hired and Trained by OCOK

OCOK CPD training begins with a one-week agency orientation, followed by two to six weeks of field work while the staff person awaits the start of the next OCOK Permanency Academy training. The OCOK Permanency Academy training lasts eight weeks, consisting of 50% field work and 50% classroom time. The training alternates two weeks of classroom training with two weeks of training in the field. Time in training depends on the specialist's hire type and experience. In total, the expected time to complete OCOK CPD training is ten to 14 weeks (70 to 98 days). Once training is complete, the caseworker becomes case assignable and may begin working with children as a child's primary caseworker.

OCOK hired 31 caseworkers between September 2021 and March 2022. Twenty-five of the 31 (81%) were subject to full or partial CPD training while six of the 31 (19%) were exempt from training. Two (8%) of the 25 caseworkers hired who were subject to training left OCOK prior to or during training. The Monitors tracked a total of 23 OCOK employees for CPD training completion.

---

[156] The Monitors validate completion of CPD training through regular monthly data reports that DFPS provides to the Monitors with case assignable data and data on employee separations..  Once the information is provided by DFPS to the Monitors, DFPS does not update the data.  Errors or omissions in the data impact the Monitor's ability to validate caseworker completion of CPD training.

Figure 62: OCOK Caseworkers Hired September 2021 – March 2022 and Included in CPD Training Completion Analysis



Eighteen (78%) of 23 caseworkers were subject to full CPD training, while five (6%) were subject to partial CPD training.[157]

Of caseworkers subject to training, 17 of 18 (94%) completed full CPD training and all of the remaining five workers completed partial CPD training by July 31, 2022. For those subject to full training, the average time to complete training was 128 days, with a range in training time of 105 to 158 days.[158] All caseworkers required to complete full training completed training more than seven days after the expected completion date.

Figure 63: OCOK Caseworker CPD Training Completion by Training Level

---

[157] All caseworkers in the OCOK data were categorized as new hires. The Monitors could not validate whether those workers subject to partial training were staff with prior experience as a caseworker.
[158] The average time to complete training was 97 days for the five caseworkers who completed partial training.



The monitoring team could not validate completion of CPD training for one caseworker who was not identified in the full caseload data before July 31, 2022 and had an estimated case assignable date of June 20, 2022.

### Caseworkers Hired and Trained by 2Ingage

2Ingage policy requires all staff hired to perform the function of caseworker to complete the 2Ingage Academy training prior to being assigned to serve as the primary caseworker for children. In the Second Report, the Monitors reviewed the initial 2Ingage caseworker training and determined that it was designed as a six-week course, which is inconsistent with the CPD training model. 2Ingage reported receiving approval from DFPS to limit caseworker training to six weeks. However, after the Monitors raised concerns regarding the shorter period for SSCC training, particularly for 2Ingage, DFPS notified 2Ingage that it was required to revise its curriculum and lengthen its training period to 13 weeks.

In early 2021, 2Ingage lengthened the training curriculum to 13 weeks (91 days), the average length of time that DFPS reports it takes to complete CPD training. Staff hired after March 1, 2021 were required to complete the extended training program. The timing of the Third Report did not allow for an analysis of the revised training curriculum; the analysis confirmed that the initial training program fell short of the CPD model.

2Ingage hired 18 caseworkers between September 2021 and March 2022. All 18 caseworkers were subject to full or partial CPD training. Seven (39%) of the 18 caseworkers subject to training left 2Ingage prior to or during training, leaving 11 employees who the Monitors tracked for CPD training completion.

Figure 64: 2Ingage Caseworkers Hired September 2021 – March 2022 and Included in CPD Training Completion Analysis

107



Two of the 11 caseworkers subject to training had previous DFPS experience, but both required full training. Nine (82%) of 11 caseworkers completed full CPD training as of July 31, 2022. The average time to complete full training was 101 days, with a range in training time from 88 to 122 days. Only one caseworker completed the training more than seven days after the expected completion date.

Figure 65: 2Ingage Caseworker CPD Training Completion



Of the two caseworkers (both new hires) for whom the monitoring team could not validate completion of CPD training, one was identified as a caseworker in the full caseload data before July 31, 2022.[159]

## Caseworkers Hired and Trained by St. Francis

The CPD curriculum for caseworkers hired by St. Francis follows the same outline and trainings as the DFPS Individualized Training Plan (ITP) which is a combination of field and classroom experiences. New hires are required to complete two weeks of St. Francis-specific orientation training online prior to beginning CPD training. The St. Francis CPD training is 13 weeks (91 days) long, which does not include the time required for orientation. St. Francis transitioned to Stage II and employed case assignable caseworkers beginning in March 2022. St. Francis hired DFPS transfer staff (resource transfers), internally transferred staff, and new staff as caseworkers as early as November 2021.

Between November 2021 and March 2022, St. Francis hired 118 caseworkers, of which 93 (79%) were resource transfers from DFPS, 19 (16%) were internal transfers, and six (5%) were new hires. Forty-six of the 118 caseworkers (39%) were subject to full or partial CPD training.[160] Two of the 46 caseworkers subject to training left the agency prior to or during training. A total of 44 employees were tracked for CPD training completion.

Figure 66: St. Francis Caseworkers Hired November 2021 – March 2022 and Included in CPD Training Completion Analysis



---

[159] The other caseworker was not identified in the full caseload data.
[160] Twenty-one of 46 caseworkers hired were resource transfers from DFPS, of which all but one was subject to partial training (one was subject to full CPD training at the request of a supervisor).

Twenty-five of 44 caseworkers (57%) were subject to full CPD training, while 19 (43%) caseworkers were subject to partial CPD training.[161]

Of caseworkers subject to training, 23 (92%) of 25 completed full CPD training and nine (47%) of 19 completed partial CPD training by July 31, 2022. For those subject to full training, the average time to complete training was 98 days, with a range in training time of 85 to 129 days.[162] All caseworkers required to complete full training completed training within a week before or after the expected completion date.

Figure 67: St. Francis Caseworker CPD Training Completion by Training Level



Of the 12 caseworkers for whom the monitoring team could not validate completion of CPD training, they identified nine (75%) as caseworkers in the caseload data submitted by DFPS before July 31, 2022.

## Summary

DFPS hired 562 caseworkers between September 1, 2021 and March 31, 2022. Of these newly hired caseworkers, 448 were subject to the completion of full or partial CPD training, including 422 requiring full training (94%) and 26 (6%) caseworkers subject to partial CPD training. Of the 448 caseworkers subject to full or partial CPD training, 422 (94%) caseworkers completed training by July 31, 2022.

The monitoring team could not validate completion of CPD training for 26 (6.1%) caseworkers (15 new hires and 11 transfers or rehires).

---

[161] All 19 caseworkers subject to partial training were resource transfers from DFPS. Eighteen of the 25 employees subject to full training were internal transfers, one was a resource transfer, and six were new hires.
[162] Of the nine caseworkers who completed partial training, the average time to complete training was 44 days.

OCOK hired 31 caseworkers between September 2021 and March 2022. Twenty-five of the 31 (81%) were subject to full or partial CPD training while six of the 31 (19%) were exempt from training. Two (8%) of the 25 caseworkers hired who were subject to training left OCOK prior to or during training.  The Monitors confirmed that 22 of the remaining 23 staff completed CPD training.

In early 2021, 2Ingage lengthened its training curriculum to 13 weeks (91 days), the average length of time that DFPS reported it took to complete CPD training. Staff hired after March 1, 2021 were required to complete the extended training program.

2Ingage hired 18 caseworkers between September 2021 and March 2022. All 18 caseworkers were subject to full or partial CPD training. Seven (39%) of the 18 caseworkers subject to training left 2Ingage prior to or during training, leaving 11 employees required to complete CPD training. The Monitors confirmed nine of 11 did so.

Between November 2021 and March 2022, St. Francis hired 118 caseworkers, of whom 93 (79%) transferred from DFPS, 19 (16%) transferred within St. Francis and six (5%) were newly hired. Forty-six (39%) of the 118 caseworkers were subject to full or partial CPD training. Two of the 46 caseworkers subject to training left the agency prior to or during training. In total, 44 employees were required to complete CPD training; the Monitors confirmed that 32 (72%) of the 44 completed training.

## Remedial Orders 35, A1, A2, A3, and A4: Caseworker Caseloads

***Remedial Order 35:*** *Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS' reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

***Remedial Order A1:*** *Within 60 days of the Court's Order, DFPS, in consultation with and supervision of the Monitors, shall propose a workload study to generate reliable data regarding current caseloads and to determine how many children caseworkers are able to safely carry, for the establishment of appropriate guidelines for caseload ranges. The proposal shall include, but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

*Remedial Order A2: Within 120 days of the Court's Order, DFPS shall present the completed workload study submission to the Court, how many cases, on average, caseworkers are able to safely carry, and the data and information upon which the determination is based, for the establishment of appropriate guidelines for caseload ranges.*

*Remedial Order A3: Within 150 days of the Court's Order, DFPS shall establish internal caseload standards based on the findings of the DFPS workload study, and subject to the Court's approval. The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. In the policy established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be pro-rated accordingly.*

*Remedial Order A4: Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class. [The Court modified the effective date of this Remedial Order to February 15, 2020.[163]]*

## Background

On December 16, 2019, the Court approved an agreed motion submitted by the parties that, in lieu of conducting workload studies pursuant to Remedial Orders A1, A2, B1 and B2, DFPS and HHSC would use as caseload guidelines:

- 14-17 children per conservatorship caseworker, for the purpose of satisfying State obligations within Remedial Orders A2, A3 and A4;

- 14-17 investigations per RCCI investigator, for the purpose of satisfying State obligations within Remedial Orders B2, B3 and B4; and

- 14-17 tasks per RCCR (HHSC) inspector, for the purpose of satisfying State obligations within Remedial Orders B2, B3 and B4.

To assess the State's compliance with Remedial Order 35, the Monitors requested, and the State has provided point-in-time caseload data monthly to the Monitors. To validate the accuracy of the State's caseload data submissions, the Monitors randomly selected

---

[163] Order Regarding Workload Studies in the November 20, 2018 Order 1-2, *M.D. ex rel. Stukenberg v. Abbott, No. 2:11-CV-84*, slip. op. (S.D. Tex. Dec. 17, 2019), ECF No. 772.

and interviewed 178 caseworkers from 65 counties as described below. In advance of the monitoring team's interviews with caseworkers, DFPS provided caseload information from the State's INSIGHT reporting tool for each identified worker for a date selected by the Monitors;[164] for the SSCCs, DFPS provided the alternative workload reports that the respective SSCCs currently use as they do not use INSIGHT. On March 2, 2022, the SSCC responsible for Region 1, St. Francis, advanced into Stage II of the CBC model, undertaking casework responsibility; therefore, the Monitors included their performance for the relevant portion of this reporting period.[165]

### Remedial Orders 35 and A4: Caseworker Caseloads Performance Validation Results

*Remedial Order 35: Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS' reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.*

*Remedial Order A4: Within 180 days of the Court's Order, DFPS shall ensure that the generally applicable, internal caseload standards that are established are utilized to serve as guidance for supervisors who are handling caseload distribution and that its hiring goals for all staff are informed by the generally applicable, internal caseload standards that are established. This order shall be applicable to all DFPS supervisors, as well as anyone employed by private entities who is charged by DFPS to provide case management services to children in the General class. (The Court modified the effective date of this Remedial Order to February 15, 2020.)*

The Monitors cross-checked the monthly data files provided by the State for DFPS, OCOK, 2Ingage, and St. Francis caseworkers and found the number of children assigned to each

---

[164] DFPS describes INSIGHT as a tool to "manage critical case tasks and deadlines." DFPS, *IMPACT Modernization*, available at https://www.dfps.state.tx.us/Doing_Business/IMPACT_Modernization/default.asp.
[165] The Monitors excluded the first St. Francis point-in-time caseloads report for March 31, 2022 due to data quality concerns with the data provided to the Monitors by DFPS. When the Monitors notified DFPS of the inaccuracies in the data, DFPS reported that it is unable to extract and report the caseloads of St. Francis workers for Region 1 properly for March 2022 data due to limitations of IMPACT. For example, workers who were employed by DFPS on March 1, 2022 appeared on the caseload report as DFPS employees even if they worked for St. Francis as of March 31, 2022. Therefore, many workers' caseloads were not properly attributed under St. Francis.

worker in the listing table added to the number of children in the caseload table. To analyze caseloads, the Monitors used the total number of children assigned to CPS CVS Specialists (I-V) at DFPS, Permanency Specialists at OCOK and St. Francis, and Permanency Case Managers at 2Ingage.[166,167,168] The monitoring team also independently replicated caseload validation by interviewing 178 caseworkers, selected by the Monitors, about their caseloads and by conducting a comparison of the 178 workers' workload reports (INSIGHT or alternative reports used by SSCCs) with the State's caseload data report for the corresponding month.

On June 30, 2022, there were 1,575 caseworkers who managed at least one PMC child's case; the total includes caseworkers employed by DFPS (1,283), OCOK (120), 2Ingage (87), and St. Francis (85).[169] In the six months of caseload reports that the State submitted, representing caseloads from January 1, 2022 to June 30, 2022, the data revealed the highest number of caseworkers managing at least one PMC child's case on May 31, 2022 (1,576) and the lowest number on January 31, 2022 (1,477). From January 1, 2022 to June 30, 2022, the number of caseworkers managing at least one PMC case increased by 98 (7%).

Remedial Order A4 became effective on February 15, 2020, requiring DFPS to ensure that the caseload standard of 14 to 17 children is "utilized to serve as guidance for supervisors who are handling caseload distribution" and is used to inform "hiring goals for all staff." In six months of caseload reports starting on January 1, 2022 and ending on June 30,

---

[166] CVS Specialists I, II, III, IV, and V account for over 95% of all the staff listed by DFPS carrying at least one PMC child's case in each of the caseload reports the Monitors received from DFPS for the period January 2022 to June 2022. Supervisors account for most of the remaining case-carrying staff. For this report, the Monitors eliminated from the analysis staff with other titles because they account for a relatively small number of staff who carry a small number of PMC children, unless otherwise noted. On June 30, 2022, for example, of the 1,321 DFPS staff carrying at least one PMC case, 1,283 (97%) are CVS Specialists I-V and 21 (3%) are supervisors. Program specialists (7), master CVS specialists (7), and staff with other titles (4) account for the remaining 18 staff.

[167] The Monitors did not weight secondary assignments in their assessment of conformity with the caseload guidelines for this report and they continue to collect information in interviews with caseworkers and assess the appropriate methodology.

[168] Furthermore, since the State advised the Monitors that "the supervisor to staff ratio for CVS is 1:7," via E-mail from Tara Olah, former Director of Implementation and Strategy, DFPS, to Kevin Ryan and Deborah Fowler, on March 24, 2020, in order to assess conformance with standards for supervisors who carried cases, the Monitors calculated supervisors' workloads. The Monitors assigned a weight of 14.29% for each supervised caseworker (100% - a full workload - divided by seven) and 5.88% (100% - a full caseload - divided by the agreed-upon standard of 17 cases) for each PMC/TMC child's case that the supervisor managed directly. To assess a supervisor who supervises six caseworkers and is the primary case manager for one child, the supervisor dedicates 85.74% of their time to supervision (six workers x 14.29%) and 5.88% of their time to primary case management for one child, yielding 91.62% of a workload, which is below the supervisor's 100% availability and within the standard. If the supervisor supervises six caseworkers and serves as the primary case manager for four children, an additional 23.52% weight (5.88% x four) is added to their workload of six supervision assignments (85.74% + 23.52%) yielding 109.26% of a caseload, which is greater than 100% of their availability. *See* Deborah Fowler & Kevin Ryan, First Report 173, ECF No. 869.

[169] DFPS, RO2.1 CVS caseloads January 2022 3-1-2022 log105088 (Mar. 1, 2022); RO2.1 CVS caseloads February 2022 4-1-2022 log105441 (Apr. 1, 2022); RO2.1 CVS Caseloads March 2022 5-2-2022 log105887 (May 2, 2022); RO2.1_CVS_Caseloads_2022_04d2022_06_01_log106162 (June 1, 2022); RO2.1_CVS_Caseloads_2022_05d2022_07_01_log106397 (July 1, 2022); RO2.1_CVS_Caseloads_2022_06d2022_08_01_log106687 (Aug. 1, 2022) (on file with the Monitors).

2022, an average of 80% of all caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 20% of these caseworkers served 18 or more children. The highest rate of conformance with the guidelines among the six caseload reports occurred on June 30, 2022 (85%) and the lowest rate occurred on January 31, 2022 (74%). In the Monitors' prior Update to the Court Regarding RO 35 Caseload Performance (Update to the Court), the average rate of caseworkers managing at least one PMC child's case assigned to serve 17 or fewer children was 62%.[170]

As shown in the table below, on June 30, 2022, of the 1,575 caseworkers who managed at least one PMC child's case, 1,343 (85%) caseworkers had 17 or fewer children on their caseloads. One hundred thirty-seven (9%) carried 18 to 20 children on their caseloads. Seventy-eight (5%) carried 21 to 25 children on their caseloads. The remaining 17 workers (1%) carried more than 25 children on their caseloads, with one of those 17 workers carrying more than 30 children on their caseload. Ninety-five (6%) caseworkers carried 21 children or more on their caseloads on June 30, 2022.

Table 13: All Caseworkers Managing at Least One PMC Child, January 2022 to June 2022

| Month | Caseworkers Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2022 | 1,477 | 1,086 | 74% | 391 | 26% |
| February 2022 | 1,519 | 1,156 | 76% | 363 | 24% |
| March 2022 | 1,499 | 1,197 | 80% | 302 | 20% |
| April 2022 | 1,546 | 1,270 | 82% | 276 | 18% |
| May 2022 | 1,576 | 1,298 | 82% | 278 | 18% |
| June 2022 | 1,575 | 1,343 | 85% | 232 | 15% |
| **Average** | **1,532** | **1,225** | **80%** | **307** | **20%** |

On June 30, 2022, 25 supervisors managed at least one PMC child's case. The 25 supervisors reflect a decrease of 42% from the 43 supervisors managing at least one case on January 31, 2022. In the six months of caseload reports starting on January 31, 2022 to June 30, 2022, an average of 17% of supervisors managing at least one PMC child's case had one workload or less and an average of 83% had more than one full workload.

Table 14: All Supervisors Managing at Least One PMC Child and Total Workload, January 2022 to June 2022

| Month | Supervisors Serving at least one PMC Child | One Workload or Less | More Than One Workload |
|---|---|---|---|

---

[170] *See* Deborah Fowler & Kevin Ryan, Update to the Court Regarding RO 35 Caseload Performance 4, ECF No., 1244 (June 1, 2022).

| | No. | No. | % | No. | % |
|---|---|---|---|---|---|
| January 2022 | 43 | 9 | 21% | 34 | 79% |
| February 2022 | 32 | 7 | 22% | 25 | 78% |
| March 2022 | 30 | 5 | 17% | 25 | 83% |
| April 2022 | 21 | 1 | 5% | 20 | 95% |
| May 2022 | 17 | 2 | 12% | 15 | 88% |
| June 2022 | 25 | 5 | 20% | 20 | 80% |
| **Average** | **28** | **5** | **17%** | **23** | **83%** |

Note: The average number of supervisors in each column is rounded to the nearest integer. The average percentage sums the number of supervisors each month.

As of June 30, 2022, 1,283 (81%) of the 1,575 caseworkers managing at least one PMC child's case were employed by DFPS. The 1,283 caseworkers are an increase of 1% from the 1,271 DFPS caseworkers managing at least one PMC child on January 31, 2022. In the six months of caseload reports starting on January 31, 2022 and ending on June 30, 2022, an average of 79% of DFPS caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 21% of these caseworkers served 18 or more children. DFPS's highest rate of conforming to the guidelines among DFPS-only caseworkers in the six caseload reports occurred on June 30, 2022 (86%) and the lowest rate occurred on January 31, 2022 (72%). In the Monitors' prior Update to the Court, the average rate of DFPS caseworkers managing at least one PMC child's case assigned to serve 17 or fewer children was 61%.[171]

As shown in the table below, on June 30, 2022, of the 1,283 DFPS caseworkers who managed at least one PMC child's case, 1,102 (86%) caseworkers had 17 or fewer children on their caseload. Ninety-nine (8%) carried 18 to 20 children on their caseloads. Sixty-six (5%) carried 21 to 25 children on their caseloads. Sixteen DFPS caseworkers (1%) carried more than 25 children on their caseloads, including one of those 16 caseworkers who carried more than 30 children on their caseload.

Table 15: DFPS Caseworkers Managing at Least One PMC Child, January 2022 to June 2022

| Month | DFPS Caseworkers Serving at least one PMC Child | | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|---|
| | No. | | No. | % | No. | % |
| January 2022 | 1,271 | | 913 | 72% | 358 | 28% |
| February 2022 | 1,305 | | 965 | 74% | 340 | 26% |
| March 2022 | 1,291 | | 1,009 | 78% | 282 | 22% |
| April 2022 | 1,250 | | 1,030 | 82% | 220 | 18% |

---

[171] *See* Deborah Fowler & Kevin Ryan, Update to the Court Regarding RO 35 Caseload Performance 6, ECF No. 1244 (June 1, 2022).

| | | | | |
|---|---|---|---|---|
| May 2022 | 1,284 | 1,072 | 83% | 212 | 17% |
| June 2022 | 1,283 | 1,102 | 86% | 181 | 14% |
| **Average** | **1,281** | **1,015** | **79%** | **266** | **21%** |

On June 30, 2022, 21 DFPS supervisors managed at least one PMC child's case. The 21 supervisors are a decrease of 45% from the 38 DFPS supervisors managing at least one PMC child's case on January 31, 2022. In the six months of caseload reports starting on January 31, 2022 and ending on June 30, 2022, an average of 8% of DFPS supervisors managing at least one PMC child's case in an end of the month report had one workload or less and an average of 92% had more than one workload. The highest rate of conforming to the guidelines among the six caseload reports occurred on February 28, 2022 (15%) and the lowest rate, 0%, occurred on April 30, 2022 and May 31, 2022.

Table 16: DFPS Supervisors Managing at Least One PMC Child and Total Workload, January 2022 to June 2022

| Month | DFPS Supervisors Serving at least one PMC Child | One Workload or Less | | More Than One Workload | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2022 | 38 | 5 | 13% | 33 | 87% |
| February 2022 | 27 | 4 | 15% | 23 | 85% |
| March 2022 | 24 | 1 | 4% | 23 | 96% |
| April 2022 | 14 | 0 | 0% | 14 | 100% |
| May 2022 | 14 | 0 | 0% | 14 | 100% |
| June 2022 | 21 | 1 | 5% | 20 | 95% |
| **Average** | **23** | **2** | **8%** | **21** | **92%** |

Note: The average number of supervisors in each column is rounded to the nearest integer. The average percentage sums the number of supervisors each month.

As of June 30, 2022, 120 (8%) of the 1,575 caseworkers who managed at least one PMC child's case were employed by OCOK. The 120 OCOK caseworkers are an increase of 3% (4) from the 116 OCOK caseworkers managing at least one PMC child on January 31, 2022. In the six months of caseload reports starting on January 31, 2022 and ending on June 30, 2022, an average of 94% of OCOK caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 6% of these caseworkers served 18 or more children. OCOK's highest rate of conforming to the guidelines among the six caseload reports occurred on April 30, 2022 (98%) and the lowest rate occurred on January 31, 2022 (84%). In the Monitors' prior Update to the Court, the average rate of OCOK caseworkers managing at least one PMC child's case who had 17 or fewer children on their caseloads was 70%.[172]

---

[172] See Deborah Fowler & Kevin Ryan, Update to the Court Regarding RO 35 Caseload Performance 7, ECF No. 1244 (June 1, 2022).

As shown in the table below, on June 30, 2022, of the 120 OCOK caseworkers who managed at least one PMC child's case, 116 (97%) caseworkers had 17 or fewer children on their caseloads. Four caseworkers (3%) carried 18 to 20 children on their caseloads. No OCOK worker carried more than 20 children on their caseloads.[173]

Table 17: OCOK Caseworkers Managing at Least One PMC Child, January 2022 to June 2022

| Month | OCOK Caseworkers Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2022 | 116 | 97 | 84% | 19 | 16% |
| February 2022 | 125 | 117 | 94% | 8 | 6% |
| March 2022 | 121 | 113 | 93% | 8 | 7% |
| April 2022 | 123 | 121 | 98% | 2 | 2% |
| May 2022 | 122 | 117 | 96% | 5 | 4% |
| June 2022 | 120 | 116 | 97% | 4 | 3% |
| **Average** | **121** | **114** | **94%** | **8** | **6%** |

On June 30, 2022, no OCOK supervisor managed a PMC child's case. This is the same as January 31, 2022, when no supervisors managed any PMC children's cases.

Table 18: OCOK Supervisors Managing at Least One PMC Child and Total Workload, January 2022 to June 2022

| Month | OCOK Supervisors Serving at least one PMC Child | One Workload or Less | | More Than One Workload | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2022 | 0 | 0 | -- | 0 | -- |
| February 2022 | 1 | 0 | 0% | 1 | 100% |
| March 2022 | 2 | 0 | 0% | 2 | 100% |
| April 2022 | 1 | 0 | 0% | 1 | 100% |
| May 2022 | 1 | 0 | 0% | 1 | 100% |
| June 2022 | 0 | 0 | -- | 0 | -- |
| **Average** | **1** | **0** | **0%** | **1** | **100 %** |

Note: The average number of supervisors in each column is rounded to the nearest integer.

As of June 30, 2022, 87 (6%) of the 1,575 caseworkers managing at least one PMC child's case were employed by 2Ingage. The 87 2Ingage caseworkers managing at least one PMC

---

[173] By September 2022, OCOK's performance had decreased and of the 102 caseworkers who managed at least one PMC child's case, 61 (62%) had 17 or fewer children.

child are a decrease of 3% from the 90 caseworkers managing at least one PMC child on January 31, 2022. In the six months of caseload reports for 2Ingage starting on January 31, 2022 and ending on June 30, 2022, an average of 86% of 2Ingage caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 14% of these caseworkers served 18 or more children. 2Ingage's highest rate of conforming to the guidelines among the six caseload reports occurred on June 30, 2022 (92%) and the lowest rate, 83%, occurred on both February 28, 2022 and April 30, 2022. In the Monitors' prior Update to the Court, the average rate of 2Ingage caseworkers managing at least one PMC child's case who had 17 or fewer children on their caseloads was 73%.[174]

As shown in the table below, on June 30, 2022, of the 87 2Ingage caseworkers who managed at least one PMC child's case, 80 (92%) caseworkers had 17 or fewer children on their caseloads. Six caseworkers (7%) carried 18 to 20 children on their caseloads. One worker (1%) carried 21 to 25 children on their caseloads. No 2Ingage workers carried more than 25 children on their caseloads.

Table 19: 2Ingage Caseworkers Managing at Least One PMC Child, January 2022 to June 2022

| Month | 2Ingage Caseworkers Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2022 | 90 | 76 | 84% | 14 | 16% |
| February 2022 | 89 | 74 | 83% | 15 | 17% |
| March 2022 | 87 | 75 | 86% | 12 | 14% |
| April 2022 | 87 | 72 | 83% | 15 | 17% |
| May 2022 | 86 | 76 | 88% | 10 | 12% |
| June 2022 | 87 | 80 | 92% | 7 | 8% |
| Average | 88 | 76 | 86% | 12 | 14% |

On June 30, 2022, four 2Ingage supervisors managed at least one PMC child's case. The four supervisors are a decrease of 20% from the five supervisors managing at least one case on January 31, 2022. In the six months of caseload reports starting on January 31, 2022 and ending on June 30, 2022, an average of 90% of 2Ingage supervisors managing at least one PMC child's case had one workload or less and an average of 10% had more than one workload. The highest rate of conforming to the guidelines among the six caseload reports occurred in the March 31, 2022, April 30, 2022, May 31, 2022, and June 30, 2022 monthly reports (100%) and the lowest rate, 75%, occurred in the February 28, 2022 monthly report.

---

[174] See Deborah Fowler & Kevin Ryan, Update to the Court Regarding RO 35 Caseload Performance 8, ECF No.1244 (June 1, 2022).

Table 20: 2Ingage Supervisors Managing at Least One PMC Child and Total Workload,
January 2022 to June 2022

| Month | 2Ingage Supervisors Serving at least one PMC Child | One Workload or Less | | More Than One Workload | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| January 2022 | 5 | 4 | 80% | 1 | 20% |
| February 2022 | 4 | 3 | 75% | 1 | 25% |
| March 2022 | 4 | 4 | 100% | 0 | 0% |
| April 2022 | 1 | 1 | 100% | 0 | 0% |
| May 2022 | 2 | 2 | 100% | 0 | 0% |
| June 2022 | 4 | 4 | 100% | 0 | 0% |
| **Average** | **3** | **3** | **90%** | **0** | **10%** |

Note: The average number of supervisors in each column is rounded to the nearest integer. The average percentage sums the number of supervisors each month.

As of June 30, 2022, 85 (5%) of the 1,575 caseworkers managing at least one PMC child's case were employed by St. Francis. The 85 St. Francis caseworkers managing at least one PMC child are a decrease of 1% from the 86 caseworkers managing at least one PMC child on April 30, 2022. In the three months of caseload reports for St. Francis starting on April 30, 2022 and ending on June 30, 2022, an average of 49% of St. Francis caseworkers managing at least one PMC child's case were assigned to serve 17 or fewer children and an average of 51% of these caseworkers served 18 or more children. St. Francis's highest rate of conforming to the guidelines among the three caseload reports occurred on April 30, 2022 (55%) and the lowest rate occurred on May 31, 2022 (39%).[175]

As shown in the table below, on June 30, 2022, of the 85 St. Francis caseworkers who managed at least one PMC child's case, 45 (53%) caseworkers had 17 or fewer children on their caseload. Twenty-eight (33%) carried 18 to 20 children on their caseloads. Eleven workers (13%) carried 21 to 25 children on their caseloads. One St. Francis worker carried more than 25 children on their caseload.[176]

Table 21: St. Francis Caseworkers Managing at Least One PMC Child, April 2022 to
June 2022[177]

---

[175] The Monitors met by videoconference with DFPS and St. Francis leadership on September 19, 2022. The Monitors reviewed the Court's remedial orders with St. Francis's leaders, who expressed a commitment to comply with the orders and forecasted substantial improvement in the organization's caseload performance by November 30, 2022.

[176] By September 2022, St. Francis's performance had improved and of the 82 caseworkers who managed at least one PMC child's case, 56 (68%) had 17 or fewer children.

[177] As noted above, St. Francis commenced case management services on March 2, 2022 and, due to data quality concerns regarding the data the State submitted, the Monitors included St. Francis's performance starting with April 2022.

| Month | St. Francis Caseworkers Serving at least one PMC Child | 17 Children or Fewer | | 18 Children or More | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| April 2022 | 86 | 47 | 55% | 39 | 45% |
| May 2022 | 84 | 33 | 39% | 51 | 61% |
| June 2022 | 85 | 45 | 53% | 40 | 47% |
| **Average** | **85** | **42** | **49%** | **43** | **51%** |

On June 30, 2022, no St. Francis supervisor managed a PMC child's case. This is a 100% decrease from the five supervisors who managed at least one PMC child's case on April 30, 2022.

Table 22: St. Francis Supervisors Managing at Least One PMC Child and Total Workload, April 2022 to June 2022

| Month | St. Francis supervisors with PMC | One Workload or Less | | More Than One Workload | |
|---|---|---|---|---|---|
| | No. | No. | % | No. | % |
| April 2022 | 5 | 0 | 0% | 5 | 100% |
| May 2022 | 0 | 0 | -- | 0 | -- |
| June 2022 | 0 | 0 | -- | 0 | -- |
| **Average** | **2** | **0** | **0%** | **2** | **100%** |

Note: The average number of supervisors in each column is rounded to the nearest integer.

To validate the accuracy of the State's monthly caseload data submissions from its IMPACT system, which the Monitors received on a 30-day lag, the monitoring team examined the symmetry of the data within those reports with caseload data from the DFPS INSIGHT database and the SSCCs' data reports. The monitoring team remotely interviewed by videoconference 120 DFPS and 58 SSCC caseworkers[178] and their supervisors from 65 counties between February 3, 2022 and July 7, 2022 from a sample selected by the Monitors.[179,180] In preparation for these interviews, at the Monitors' request, DFPS provided caseload reports from DFPS's INSIGHT system for the final day of the month preceding the interview; the date of those reports corresponds with the data reports that DFPS submits to the Monitors to measure the State's conformance with

---

[178] The DFPS caseworkers in the sample had job titles of CPS CVS Specialist I, II, III, or IV. The OCOK and St. Francis caseworkers had a title of Permanency Specialist and the 2Ingage caseworkers had a title of Permanency Case Manager.

[179] One worker was interviewed at two points during the monitoring period. Data for each interview is reflected separately.

[180] Interview data includes 13 St. Francis caseworkers interviewed in April 2022 about their caseloads and activity in March 2022. Although the monitoring team noted quality concerns about the data reports for St. Francis in March 2022, DFPS provided sufficient data to validate the information received during the interview process for the workers the Monitors interviewed.

Remedial Order 35. For the interviews with the SSCC workers, DFPS provided the alternative workload reports utilized by the respective SSCCs. The monitoring team then reviewed the records with the caseworker, discussing each listed child, by name, and other work assignments, if any, to verify whether the caseworker's workload matched the DFPS and SSCC records.

The monitoring team compared the monthly caseload data from IMPACT submitted by DFPS with the results of the caseworker interviews to confirm the accuracy of the State's IMPACT caseload data. During cross-data validation of the workload and INSIGHT reports for 176 of the 178 workers interviewed with the monthly caseload data, the monitoring team found that 93% of primary case assignments were a perfect match and 98% were within one case in the caseloads reviewed.[181] The individual caseloads of the sample of interviewed caseworkers ranged from two to 30 children. The monitoring team found that 147 (84%) of the 176 workers were within the generally applicable caseload standards and 29 (16%) exceeded the caseload standards. Forty-one (28%) of the 147 workers meeting the standards were subject to Advancing Practice graduated caseloads.

## Caseloads and Supervision of Children Without Placement

The Monitors' interviews with caseworkers to validate the data DFPS submitted about caseloads provided additional insight into other major job responsibilities, over and above the duties associated with caseload management. Most notably, workers described being assigned CWOP shifts (both required and voluntary) to supervise children who are experiencing a lack of placement. During the interviews conducted with 120 DFPS and 58 SSCC caseworkers between February 3, 2022 to July 7, 2022, 60% (106) of the 178 caseworkers reported responsibility for CWOP shifts between January 2022 and June 2022.[182]

CWOP responsibility was reported by 96 (80%) of 120 DFPS workers and 11 (19%) of 58 SSCC workers. The highest levels of involvement were reported by 27 (90%) of 30 DFPS workers for April 2022, and 26 (87%) of 30 for February 2022. The lowest DFPS CWOP involvement reported was 19 (63%) of 30 workers in June 2022. SSCCs, by contrast, reported involvement of one (3%) of 29 workers in March 2022, and ten (34%) of 29 workers in May 2022.  SSCC CWOP work activity was high for OCOK, with ten (59%) of 17 workers reporting CWOP activity, compared with one (7%) of 14 2Ingage workers reporting CWOP activity. No St. Francis worker reported CWOP activity.

Seventeen percent (18) of the 106 workers interviewed who reported CWOP activity between January 2022 and June 2022 had caseloads that exceeded the caseload standard. Of those workers whose caseloads exceeded the caseload standard, eight (8%) carried 18-20 children on their caseloads, ten (9%) carried 21-25 children on their caseloads, and all were DFPS workers. Of the 87 (82%) caseworkers reporting CWOP activity who carried

---

[181] Two of the 178 workers are excluded as each had no PMC assignment as of the last date of the month under review, and thus were not included in the monthly IMPACT caseload data report for that month.
[182] As noted above, one worker was interviewed at two points during the monitoring period. Data for each interview is reflected separately.

caseloads meeting the standards, 29 were subject to graduated caseloads at the time they were interviewed because they were new to their positions.[183]

Workers continued to describe CWOP activity as a mix of required and voluntary shifts that varied in length, typically from four to eight hours and including activity during normal business hours, which was referred to as "Day Watch." Twenty-eight (29%) of 96 DFPS workers reported spending more than 35 hours in a month working CWOP shifts, while 45 (47%) reported spending between 12 and 35 hours working CWOP shifts. Twenty-two (23%) DFPS workers reported spending fewer than 12 hours a month working CWOP shifts. By contrast, ten (91%) of 11 SSCC workers with CWOP activity reported spending no more than nine hours a month working CWOP shifts.

DFPS now uses a CVS Tracker tool that provides a daily point-in-time count of unique children who are included as primary case assignments on each caseworker's caseload, as well as the aggregate average number of children on a caseload.[184] There is also a similar version of the tool for SSCC caseloads. Despite adjustments to content and functionality since its launch, the CVS and SSCC Trackers do not provide sufficient information to serve as stand-alone tools for assessing compliance with the Court's remedial orders on caseloads at this time.[185]

---

[183] Caseload data excludes one of the 106 workers, also subject to Advancing Practice, who did not have a PMC assignment as of the last date of the month under review, and thus was not included in the caseload data report submitted by DFPS to the Monitors for that month.

[184] The data reflects the caseloads as of midnight on the prior day. The fields provided are: Region, Unit, County, Personal Identification Number, Worker Name, Job Title, Graduated Caseload (GCL) status, and Child Count. A color-coded bar indicates compliance with caseload standards. Newer features include: a column chart of caseload sizes (≤5, 6-9, 10-12, 13-15, 16-18, 19-21, 22-29, 30+) to allow a view of workers by each category; keep/exclude options and drill-down capability across data fields; and the ability to view or download data. A separate version of the tool, the SSCC Caseload Tracker, contains fewer data fields and less functionality than the CVS Tracker described above. Specifically, the SSCC Tracker does not include Agency, Job Title, or GCL status fields. It also does not have the keep/exclude options and data view or download capabilities found in the CVS Tracker.

[185] For example, the Tracker categories in a column chart that allow for assessing compliance with the caseload guidelines do not align with the graduated caseload categories. Moreover, the descriptions in the tools state that the data do not align with other caseload reports. Neither tracker provides: the number of PMC children on a workload; the identities of children; the identity of the caseworker's supervisor; inclusion of supervisors carrying SUB/ADO cases; nor exceptions to graduated caseload standards. The structure of data based on worker and unit location versus child location obscures data for certain counties, especially in the version of the tool that is used for the SSCCs. Finally, the inability to view data over time and to view entire caseloads, including other primary and secondary assignments, also limits the usefulness of the tools in managing workloads and verifying compliance with the Court's orders. The Monitors reviewed CVS and SSCC Caseload Tracker data from January to June 2022 for 178 caseworkers interviewed between February and July 2022. The monitoring team conducted the review between four and seven days per month, for a total of 33 days during the monitoring period. One hundred seventy-three (97%) of the 178 interviewed workers appeared in either the CVS or SSCC Caseload Tracker at least one day during the data month under review. One hundred seventy-one (96%) of the workers appeared in their respective Caseload Tracker on the last day of the month. The Monitors compared the number of primary case assignments in the Caseload Trackers on the last day of the data month with the number of unique children contained on the INSIGHT and Workload reports used during caseworker interviews, as well as with the caseload data reports from IMPACT received on a 30-day lag to reflect caseloads as of the same date.

123

## Caseload Conformity and Workforce

Over the six monthly caseload reports submitted from January 31, 2022 to June 30, 2022, conformity with the caseload guidelines increased by 11%, from 74% to 85%. To learn more about these improvements, the Monitors conducted a separate analysis of the total number of caseworkers and children assigned to DFPS, OCOK, 2Ingage, and St. Francis.

The number of caseworkers assigned at least one child (of any legal status) increased slightly during the period from January 31, 2022 to June 30, 2022. There were 2,018 caseworkers assigned at least one child on June 30, 2022, an increase of 37 caseworkers (2%) from the 1,981 workers assigned at least one child on January 31, 2022.

The total number of children assigned to any worker managing at least one PMC child, in contrast, decreased over this same period.[186] The total number of children of any legal status assigned to any workers managing at least one PMC child decreased by 1,277 (6%) children from 22,023 on January 31, 2022 to 20,745 on June 30, 2022. This decrease occurred because of a large decline in TMC children assigned to workers with at least one PMC case. During this period, the number of PMC children assigned to workers managing at least one PMC child *increased* by 472 (5%), from 9,508 children on January 31, 2022 to 9,980 children on June 30, 2022. The number of TMC children decreased by 1,476 (14%) from 10,256 on January 31, 2022 to 8,780 on June 30, 2022. Overall, a smaller number of children were assigned to more caseworkers on June 30, 2022 compared to January 31, 2022, corresponding with improvements in conformity to caseload guidelines.

## Summary

- The parties agreed to, and the Court approved, a workload standard of 14 to 17 children per Conservatorship (CVS) worker, pursuant to Remedial Order A3. To validate the State's performance, the Monitors reviewed and analyzed all relevant data provided by the State during the review period. The Monitors' analysis showed that as of June 30, 2022, 85% of all caseworkers (1,343 of 1,575), including those employed by OCOK, 2INgage, and St. Francis had primary caseloads within or below the standard of 17 children per worker. From January 31, 2022 to June 30, 2022, conformity with the standard was 80% of all serving at least one PMC child.

---

Among all workers interviewed during the period, the Caseload Tracker case counts on the last day of the data month matched INSIGHT and Workload reports for 158 (89%) of the 178 workers. The Caseload Tracker case counts on the last day of the relevant month matched the caseload data reports from IMPACT for 160 (90%) of the 178 workers. Given the absence of child identifiers in Caseload Trackers, however, it was not possible to verify that the numbers in the Caseload Trackers represented the same children as those identified in the INSIGHT, Workload, and data reports from IMPACT.

[186] Any worker in this paragraph includes any staff member, including those staff members without caseworker titles.

- Supervisors carried only a small percentage of PMC cases; those who did rarely conformed with the workload standard. In the six months of caseload reports starting on January 31, 2022 and ending on June 30, 2022, conformity for supervisors managing at least one PMC child's case was lowest on March 30,2022, with 5% (1 of 21) of supervisors with one workload or less and highest on February 28, 2022, with 22% (7 of 32) of relevant supervisors with one workload or less. From January 31, 2022 to June 30, 2022, conformity with the standard decreased from 21% to 20% of all supervisors carrying at least one PMC case.

- The Monitors found that conformity with the caseload standard varied among DFPS, OCOK, 2INgage and St. Francis. Of the 1,283 DFPS workers carrying at least one PMC case on June 30, 2022, 1,102 (86%) workers had primary caseloads within or below the standard of 17 children per worker. As of June 30, 2022, the three SSCCs that are undertaking case management, OCOK, 2INgage, and St. Francis had 97%, 92%, and 53% of their workers within or below the standard, respectively.

- Caseworkers reported significant CWOP shift work during interviews with the monitoring team, including workers whose caseloads did not conform to the caseload standards: 18 (17%) of the 106 workers interviewed who reported CWOP shift activity from January 2022 through June 2022 had caseloads that exceeded the caseload standard.

## Remedial Orders B1-B4: RCCI and RCCR Investigator Caseloads

*Remedial Orders B1: Within 60 days of the Court's Order, DFPS, in consultation with and under the supervision of the Monitors, shall propose a workload study to: generate reliable data regarding current RCCL, or successor entity, investigation caseloads and to determine how much time RCCL investigators, or successor staff, need to adequately investigate allegations of child maltreatment, in order to inform the establishment of appropriate guidelines for caseload ranges; and to generate reliable data regarding current RCCL inspector, or successor staff, caseloads and to determine how much time RCCL inspectors, or successor staff, need to adequately and safely perform their prescribed duties, in order to inform the establishment of appropriate guidelines for caseload ranges. The proposal shall include but will not be limited to: the sampling criteria, timeframes, protocols, survey questions, pool sample, interpretation models, and the questions asked during the study. DFPS shall file this proposal with the Court within 60 days of the Court's Order, and the Court shall convene a hearing to review the proposal.*

*Remedial Order B2: Within 120 days of the Court's Order, DFPS shall present the completed workload study to the Court. DFPS shall include as a feature of their workload study submission to the Court, how many cases, on average, RCCL inspectors and investigators, or any successor staff, are able to safely carry, and the data and*

*information upon which that determination is based, for the establishment of appropriate guidelines for caseload ranges.*

**Remedial Order B3:** *Within 150 days of the Court's Order, DFPS, in consultation with the Monitors, shall establish internal guidelines for caseload ranges that RCCL investigators, or any successor staff, can safely manage based on the findings of the RCCL investigator workload study, including time spent in actual investigations. In the standard established by DFPS, caseloads for staff shall be prorated for those who are less than full-time. Additionally, caseloads for staff who spend part-time in the work described by the RCCL, or successor entity, standard and part-time in other functions shall be prorated accordingly.*

**Remedial Order B4:** *Within 180 days of this Order, DFPS shall ensure that the internal guidelines for caseload ranges and investigative timelines are based on the determination of the caseloads RCCL investigators, or any successor staff, can safely manage are utilized to serve as guidance for supervisors who are handling caseload distribution and that these guidelines inform DFPS hiring goals for all RCCL inspectors and investigators or successor staff.*

## Background

As discussed in the Monitors' prior reports, on December 16, 2019, the Court entered an agreed order requiring, in part, DFPS and HHSC to use standardized, statewide caseload guidelines of 14 to 17 investigations per RCCI investigator, and 14 to 17 tasks per RCCR (HHSC) inspector. On February 18, 2020, the State sent the Monitors the guidance developed for HHSC and DFPS staff related to the caseload guidelines.[187]

In the Third Report, the Monitors found that a majority of RCCI investigator caseloads were at or below the guidelines for the six-month period included in the analysis.[188] Most RCCR inspectors' caseloads were also within the guidelines in four of the six months analyzed for the Third Report.[189] However, in February 2021, only 47% of RCCR inspectors' caseloads were within the guidelines, and in March of 2021, half (50%) of inspectors' caseloads were within the guidelines.[190]

For this report, the Monitors analyzed caseloads for RCCI and RCCR for the 12-month period of July 2021 through June 2022, using point-in-time caseload data submitted by the State and validated through investigator and inspector interviews.

## Performance Validation

### RCCI Caseloads

---

[187] Deborah Fowler & Kevin Ryan, First Report 182-84, ECF No. 869.
[188] Deborah Fowler & Kevin Ryan, Third Report 114, ECF No. 1165.
[189] *Id.* at 120.
[190] *Id.*

The Monitors analyzed monthly caseload data for RCCI investigators, supervisors, and non-investigator RCCI staff working on RCCI investigations.[191] The total number of open RCCI investigations continued to decline through the end of 2021 and into January 2022, in keeping with the trend reported in the Monitors' Third Report,[192] but increased slightly each month from February 2022 through June 2022. However, even with the slight increase during those months, the number of investigations assigned to a caseload declined 24% between July 2021 and June 2022.

Figure 68: Number of RCCI Investigations by Month, July 2021 to June 2022



The number of RCCI investigators assigned to at least one investigation increased 30% between July 2021 and June 2022, from 64 to 83.[193] The majority of RCCI investigator caseloads were consistent with or below the guidelines between July 2021 and June 2022; all investigators' caseloads were within or below the guidelines in eight of the months studied.

Table 23: RCCI Investigators with Caseloads at or Below the Guidelines,[194] July 2021 to June 2022

| Month/Year | Investigators with at least one Investigation | 17 or Fewer Investigations |
|---|---|---|

---

[191] Each month, DFPS produces point-in-time caseload data for RCCI investigators, supervisors, and non-investigator staff assigned an investigation as of the last day of the month.

[192] *Id*. at 113-14.

[193] This reflects the number of investigators who were assigned at least one investigation as of the last day of the month.

[194] Includes only investigations assigned to investigators as of the last day of the month. Does not include investigations assigned to supervisors or non-investigators.

|  | No. | No. | % |
|---|---|---|---|
| July 2021 | 64 | 64 | 100% |
| August 2021 | 61 | 60 | 98% |
| September 2021 | 76 | 74 | 97% |
| October 2021 | 71 | 71 | 100% |
| November 2021 | 66 | 66 | 100% |
| December 2021 | 69 | 69 | 100% |
| January 2022 | 69 | 69 | 100% |
| February 2022 | 78 | 78 | 100% |
| March 2022 | 77 | 76 | 99% |
| April 2022 | 77 | 77 | 100% |
| May 2022 | 77 | 77 | 100% |
| June 2022 | 83 | 82 | 99% |

More than half of RCCI investigators had five or fewer cases on their caseload in ten of the 12 months analyzed.

Figure 69: RCCI Investigator Caseloads by Number of Investigations, July 2021 to June 2022



Between July 2021 and January 2022, the number of investigations closed outpaced the number of new investigations opened. This trend did not hold for the remaining months included in the analysis (February 2022 through June 2022), despite the increase in the number of investigators assigned a caseload.

Figure 70: Abuse, Neglect and Exploitation Investigations Opened and Closed by Month, July 2021 to June 2022



Supervisors of RCCI investigators were responsible for supervising up to six investigators, providing support on as many as 83 investigations a month during the period analyzed. RCCI supervisors assisted with cases as needed and approved completed cases. Each supervisor supervised four-to-six RCCI investigators and assisted with 14-to-32 investigations each month.

Table 24: Number of RCCI Supervisors[195], Average Investigators Supervised, Average RCCI Investigations Overseen, July 2021 to June 2022

| Month/Year | Number of RCCI Supervisors | Average RCCI Investigators per Supervisor | Average RCCI Investigations Overseen |
|---|---|---|---|
| July 2021 | 14 | 5 | 31 |
| August 2021 | 13 | 4 | 28 |
| September 2021 | 12 | 6 | 32 |

---

[195] Includes only those RCCI supervisors supervising an RCCI investigator with one or more investigations on their caseload as of the last day of the month.

| October 2021 | 13 | 5 | 30 |
| November 2021 | 16 | 4 | 21 |
| December 2021 | 18 | 4 | 17 |
| January 2022 | 18 | 4 | 14 |
| February 2022 | 16 | 5 | 15 |
| March 2022 | 15 | 5 | 20 |
| April 2022 | 17 | 5 | 20 |
| May 2022 | 15 | 5 | 21 |
| June 2022 | 16 | 5 | 21 |

As discussed in the Monitors' previous reports, RCCI supervisors sometimes act as the primary investigator in an investigation in addition to supervising staff.[196] Between July 2021 and June 2022, the number of supervisors working as the primary investigator in an investigation each month ranged from zero to four, and the total number of investigations assigned to supervisors each month ranged from zero to seven.

The monitoring team interviewed investigators to validate the data provided by the State related to caseloads.[197] While there were some inconsistencies between the investigators' responses to questions related to the number of cases on their caseloads and the data provided, and between the caseload reports provided for the interviews and the data, the differences were never greater than two cases and would not have affected caseloads for those investigators for purposes of the guidelines.

## RCCR (HHSC) Caseloads

RCCR caseloads consist of "tasks," including investigations referred from RCCI, minimum standard investigations, assigned operations, and sampling inspections in agency foster homes. According to the point-in-time caseload data provided by HHSC,

---

[196] Deborah Fowler & Kevin Ryan, Third Report 115, ECF No. 1165.

[197] The monitoring team conducted interviews with RCCI investigators and supervisors via videoconference on February 1, 2022, February 2, 2022, March 31, 2022, and August 1, 2022. A total of 44 RCCI staff were interviewed: 35 investigators and nine supervisors. The monitoring team randomly selected investigators and supervisors for interview from a list provided by DFPS of all staff working as RCCI investigators and supervisors. Staff previously interviewed, staff not yet case assignable, and staff who had been case assignable for 60 days or less were not eligible for interview. Staff were randomly selected from those eligible for interview. Prior to the interviews, the monitoring team requested caseload reports for RCCI staff selected for interview. DFPS provided a total of 48 investigator caseload reports. The caseload reports provided by DFPS included RCCI investigations assigned to the selected investigators the day of, or the day before (for investigators interviewed February 2, 2022), the interview. The Monitors compared data from the caseload reports to monthly RCCI caseload data received from DFPS to verify the accuracy of the State's monthly caseload data. RCCI investigators were asked about the number of investigations on their caseload reports as of the last day of the preceding month and as of the day of the interview. The monitoring team also compared State caseload reports to caseload information reported by investigators.

the total number of RCCR tasks assigned to RCCR caseloads[198] decreased 21% (from 1,491 to 1,171) between July 2021 and June 2022.[199]

Figure 71: Number of RCCR Tasks, July 2021 to June 2022



The decline in the number of tasks assigned to RCCR caseloads may be related to the decline in RCCI investigations opened (discussed above),[200] as well as increases in the number of RCCR Heightened Monitoring inspectors who were assigned tasks that were not associated with Heightened Monitoring.[201]

A comparison between the types of tasks assigned to caseloads shows that facility inspections (which include both regular inspections of assigned operations and sampling inspections of foster homes) consistently accounted for most tasks, ranging from 68% to

---

[198] The number of tasks does not include administrative reviews assigned to the caseload of RCCR supervisors or RCCR inspectors. RCCR inspectors are assigned administrative reviews after completion by the supervisor to ensure compliance and/or to close the investigation.

[199] Each month, HHSC produces point-in-time caseload data for RCCR inspectors and supervisors as of the first day of the month.

[200] Generally, once RCCI has completed an investigation of allegations of abuse, neglect or exploitation, the case is transferred to RCCR to investigate potential minimum standards violations. A decline in the number of RCCI investigations may therefore have resulted in fewer RCCR investigations.

[201] When HHSC developed policies and procedures associated with Heightened Monitoring, it created new positions for staff dedicated to operations under Heightened Monitoring. Heightened Monitoring inspectors have between five and eight Heightened Monitoring operations on their caseload. In March 2021, RCCR began assigning up to five Priority 5 investigations (which require only a desk review) to Heightened Monitoring inspectors. However, the number and type of non-Heightened Monitoring tasks assigned to these inspectors changed in February 2022. According to data produced to the Monitors by the State, the number of Heightened Monitoring inspectors assigned tasks increased from six in February 2022 to 21 in March 2022. Similarly, the number of non-Heightened Monitoring tasks assigned to Heightened Monitoring inspectors increased from 25 in February 2022 to 69 in March 2022. Recent changes associated with streamlining Heightened Monitoring may also affect the way tasks are assigned to Heightened Monitoring inspectors.

58% of tasks per month. Both facility and investigation tasks declined during the period, as did administrative reviews.[202]

Figure 72:  Number of Facility Inspections, Investigations, and Administrative Reviews, July 2021 to June 2022



The majority of RCCR inspectors' caseloads were within the guidelines throughout the review period;[203] the proportion of inspectors with caseloads within the guidelines increased as the total number of assigned tasks decreased.

Table 25: RCCR Inspectors with Caseloads at or Below Guidelines,[204] July 2021 to June 2022

| Month/Year | Inspectors with at Least One Task | 17 or Fewer Tasks | |
|---|---|---|---|
| | No. | No. | % |
| July 2021 | 95 | 75 | 79% |
| August 2021 | 89 | 60 | 67% |
| September 2021 | 88 | 72 | 82% |

---

[202] Administrative reviews are conducted by RCCR supervisors. An RCCR inspector receives an administrative review in order to ensure compliance and/or to close the investigation in CLASS after a determination has been made by the supervisor conducting the review. As of July 1, 2022 (which is outside the period reviewed for this report), the responsibility for conducting administrative reviews was shifted from RCCR to a different division within HHSC.

[203] RCCR inspector caseload calculations do not include administrative reviews assigned to an inspector as of the first day of the month.

[204] This calculation does not include administrative reviews assigned to inspectors to ensure compliance or to close the investigation nor does it include RCCR Heightened Monitoring inspectors or their assigned tasks.

| October 2021 | 88 | 71 | 81% |
| November 2021 | 92 | 83 | 90% |
| December 2021 | 90 | 82 | 91% |
| January 2022 | 89 | 76 | 85% |
| February 2022 | 90 | 77 | 86% |
| March 2022 | 92 | 87 | 95% |
| April 2022 | 95 | 91 | 96% |
| May 2022 | 93 | 87 | 94% |
| June 2022 | 91 | 84 | 92% |

However, for RCCR inspectors whose caseloads exceeded the guidelines, caseload highs were more than twice the guidelines in three of the months reviewed.

Figure 73: RCCR Inspector Caseload High and Low by Month, July 2021 to June 2022



RCCR supervisors managed an average of four inspectors and oversaw an average of 45 inspector tasks each month during the review period.[205]

Table 26: Number of RCCR Supervisors, Average Inspectors Supervised, Average Tasks Overseen, July 2021 to June 2022

---

[205] The average number of inspectors supervised includes only those with one or more assigned tasks as of the first of the month.

133

| Month/Year | Number of RCCR Supervisors | Average RCCR Inspectors per Supervisor | Average RCCR Tasks Overseen |
|---|---|---|---|
| July 2021 | 25 | 4 | 53 |
| August 2021 | 29 | 4 | 45 |
| September 2021 | 28 | 4 | 42 |
| October 2021 | 26 | 4 | 44 |
| November 2021 | 25 | 4 | 45 |
| December 2021 | 26 | 4 | 43 |
| January 2022 | 22 | 5 | 51 |
| February 2022 | 23 | 5 | 49 |
| March 2022 | 27 | 5 | 43 |
| April 2022 | 28 | 5 | 43 |
| May 2022 | 28 | 5 | 40 |
| June 2022 | 27 | 4 | 40 |

Administrative reviews kept some supervisors' caseloads high throughout the review period.

Figure 74: Tasks[206] and Administrative Reviews Assigned to RCCR Supervisors, July 2021 to June 2022

---

[206] Tasks assigned to RCCR supervisors included investigations, inspections of assigned operations, and sampling inspections in agency foster homes.



On average, 59% of RCCR supervisors were assigned one or more tasks and/or administrative reviews per month, in addition to supervising subordinates.[207] For supervisors with a caseload, between July 2021 and January 2022, the majority were assigned 18 or more tasks and/or reviews. In September, October, and November 2021, more than 40% (18 of 41) of supervisors with a caseload were assigned 26 or more tasks and/or reviews, with supervisor caseload highs in October 2021 and November 2021 reaching 44 tasks and/or reviews. In February 2022, supervisor caseloads began to decline; from February 2022 through June 2022, most supervisors who carried a caseload had 17 or fewer tasks and/or reviews on their caseloads.

Figure 75: RCCR Supervisor Caseload High and Low by Month,[208] July 2021 to June 2022

---

[207] Supervisors may be solely responsible for supervising inspectors or responsible for supervising inspectors as well as being assigned tasks and/or administrative reviews. As of July 1, 2022, the responsibility for conducting administrative reviews was shifted from RCCR to a different division within HHSC.

[208] Includes only supervisors assigned one or more task or administrative review in the month.



The monitoring team also interviewed RCCR inspectors and supervisors to validate the caseload data provided by the State.[209] All of the February 2022 caseload reports provided to the monitoring team prior to the interviews matched the monthly caseload data for those inspectors. The caseload reports provided to the monitoring team prior to the interviews conducted on April 1, 2022 and August 2, 2022 were pulled from the same data set that the State produces for the Monitors monthly. For this reason, the caseload data for these months could not be validated through the interview process.[210]

---

[209] The monitoring team conducted RCCR inspector and supervisor interviews via videoconference on February 3, 2022, February 4, 2022, April 1, 2022, and August 2, 2022. A total of 46 RCCR staff were interviewed: 32 inspectors and 14 supervisors. The monitoring team randomly selected inspectors and supervisors from a list provided by HHSC of all staff working as RCCR inspectors and supervisors as of January, March, and June 2022. Staff previously interviewed, staff not yet case assignable or who had been case assignable 60 days or less, and Heightened Monitoring inspectors and supervisors were not eligible for interview.

[210] In an e-mail from HHSC, the monitoring team was informed that the caseload reports for the inspectors who were scheduled to be interviewed in April 2022 were available on Tableau, and that the reports could be pulled by HHSC or by the monitoring team by accessing the monthly caseload data in Tableau and filtering for everyone to be interviewed. E-mail from Katy Gallagher, Counsel, HHSC, to Linda Brooke, Monitoring Team (Apr. 4, 2022) (on file with the Monitors). In this e-mail and in a subsequent call with HHSC staff on June 27, 2022, the monitoring team was informed that the caseload reports pulled prior to inspectors' interviews were generated from the same data source as caseload data provided monthly. HHSC continued to provide caseload reports to the monitoring team to assist with the interview process, though the caseload reports could not be used to validate the monthly data produced by the State. On October 25, 2022, the monitoring team had a second call with HHSC staff to discuss the methodology used to pull caseload reports and the purpose of the requested reports to verify monthly caseload data provided to the Monitors. HHSC indicated that CLASS did not allow for caseload reports to be generated and printed for individual inspectors in the same way that IMPACT allows caseload reports to be generated and printed for DFPS caseworkers and investigators. HHSC suggested that the Monitors could instead use a laptop to

Prior to the interviews, the monitoring team requested caseload reports for the RCCR inspectors selected for interviews. HHSC provided a total of 42 caseload reports for the selected inspectors showing tasks assigned to the inspectors one or two days (for those interviewed February 4, 2022) prior to the interview.

During interviews, inspectors reported differences between the number of tasks assigned and the number of tasks shown on caseload reports provided to the monitoring team prior to the interviews. Inspectors were asked for the number of tasks on their caseloads as of the first of the month. The number of operations and investigations on the caseload reports provided by HHSC did not match the reported number and type of task reported by inspectors for 17 of 32 (53%) inspectors interviewed.[211] However, of the inspectors who reported a difference in the number of tasks, only one inspector reported having a caseload over the guidelines; though the data produced by HHSC showed this inspector had 12 assigned tasks, the inspector reported having 19 tasks on their caseload.

Most inspectors also reported conducting team inspections and receiving secondary assignments that did not appear on their caseload reports: 97% (31 of 32) of inspectors interviewed said they had participated in a team inspection of an operation for which they were not the primary inspector. In addition, 59% of inspectors interviewed (19 of 32) reported being assigned as a "designee," or secondary, for an investigation.[212] Most of these inspectors (16) said that these investigations were not included on caseload reports.

Eighty-four percent of the RCCR inspectors interviewed reported job duties in addition to the tasks included in caseload reports.

Figure 76: Other Job Responsibilities Reported by RCCR Inspectors[213]

---

access and view an inspector's caseloads on CLASS during the inspector's interview, then compare the information in CLASS to the monthly data. The Monitors agreed to use this method going forward.

[211] The number of tasks assigned to inspectors may change daily. Differences in the caseload reports compared to the number of tasks reported by inspectors may be the result of changes in the inspectors' assignments not yet reflected in their caseload report.

[212] According to the Residential Child Care Regulation Handbook, a "CLASS designee" is assigned a specific task in a caseload belonging to another employee for a specified period. The Handbook also notes, "Designees may be assigned tasks not routinely associated with their job position (for example, serving as an acting supervisor while the actual supervisor is on leave)." HHSC-RCCR, *Child Care Regulation Handbook*, Definitions of Terms (May 2021), *available at* https://www.hhs.texas.gov/handbooks/child-care-regulation-handbook/definitions-terms.

[213] Each inspector interviewed was asked what other job responsibilities they were assigned, in addition to RCCR tasks. An inspector could have responded multiple times, one response for each job responsibility they had in addition to tasks.



Source:  RCCR Inspector Interviews, 2022
n=32

## Summary

Almost all RCCI investigator and most RCCR (HHSC) inspector caseloads were within the guidelines during each month of the period from July 2021 through June 2022.  Of RCCR supervisors who carried a caseload, however, most were assigned 18 or more tasks in seven of the 12 months analyzed for this report.

## Remedial Order 2: Graduated Caseloads

*Within 60 days, DFPS shall ensure statewide implementation of graduated caseloads for newly hired CVS caseworkers, and all other newly hired staff with the responsibility for primary case management services to children in the PMC class, whether employed by a public or private entity.*

## Background

Pursuant to the generally applicable, internal caseload standards, effective February 15, 2020, in the first month following a protégé worker's eligibility for primary case

assignment, per DFPS's policy, the protégé's caseload may not exceed six children.[214] In the second month of eligibility, the protégé's caseload may not exceed 12 children.[215] In the third month of eligibility, the protégé is eligible to be assigned a full caseload.[216]

DFPS provides monthly data reports to the Monitors for its caseworkers, along with dates associated with primary case assignment eligibility. In its monthly reports, DFPS includes compliance data reporting on caseloads for the 15th and 45th days after caseworkers' eligibility for primary case assignment.[217] DFPS provides the same information for caseworkers employed by the SSCCs responsible for case management in their respective regions.

## Remedial Order 2 Graduated Caseloads Results and Performance Validation

The Monitors evaluated the State's performance associated with Remedial Order 2 through analysis of the data provided by DFPS about its own caseworkers and the caseworkers employed by OCOK, 2Ingage, and St. Francis, the three SSCCs responsible for case management during this period consistent with prior reporting periods.[218, 219] To further validate the accuracy of the State's caseload data, the monitoring team also interviewed 42 randomly selected caseworkers during this reporting period who were subject to graduated caseloads and validated the data in the caseload reports.

For this report, the monitoring team examined the caseloads of caseworkers who became eligible for case assignment between July 1, 2021 to June 30, 2022. As in prior reporting, the Monitors verified the caseloads at three points in time.[220] The monitoring team identified 866 instances where caseworkers stayed in their positions for at least 15 days after they became eligible for case assignment between July 1, 2021 and June 30, 2022.

---

[214] DFPS, *Generally Applicable Caseload Standards – Guidelines for Conservatorship (CVS)*, at 8 (July 2020).

[215] *Id.*

[216] *Id.*

[217] DFPS reported in March 2020 that it was unlikely it could report on the daily compliance data for graduated caseloads in the near term as requested. *See* E-mail from Tara Olah to Kevin Ryan and Deborah Fowler (Mar. 24, 2020) (attaching DFPS response to Feb. 21, 2020 Data and Information Request).

[218] As previously identified and consistent with prior reporting, the Monitors used the relevant monthly data reports for the corresponding time period, along with a comprehensive file submitted by DFPS at the close of the reporting period, all on file with the Monitors and DFPS.

[219] As reported previously, DFPS informed the Monitors that the department did not have the capacity to report the total number of days during the month that new caseworkers' caseloads are not compliant with the graduated caseload standard. *See* Deborah Fowler & Kevin Ryan, First Report 163-164, ECF No. 869; E-mail from Andrew Stephens, Ass't Att'y Gen., Office of Att'y Gen. of Tex. to Kevin Ryan and Deborah Fowler (Oct. 18, 2019) (on file with the Monitors) (attaching DFPS Information and Data Request Proposal in response to the Monitors' Sept. 30, 2019 Data and Information request).

[220] The Monitors used the same methodology as reported in the Third Report. *See* Deborah Fowler & Kevin Ryan, Third Report 17, ECF No. 1165. The Monitors verified whether staff subject to graduated caseloads conformed to the graduated caseload standard at three points in time: the 15th day after eligibility, the 45th day after eligibility, and on the calendar date at the end of the month after the 15th day of eligibility. To assess performance associated with the graduated caseload standards, the monitoring team calculated the percentage of workers who carried a number of children on their caseloads that was at or below the allotted caseload limit by the total number of staff subject to graduated caseloads at each point in time.

Of these 866 instances, 738 were staff who worked for DFPS, 60 were staff who worked for OCOK, 39 were staff who worked for 2INgage and 29 were staff who worked for St. Francis. Most of the caseworkers subject to graduated caseloads who worked for DFPS had the job title CPS CVS Specialist I (649 of 738 or 88%). The other workers at DFPS subject to graduated caseloads had the job titles CPS CVS Specialist II (24 of 738 or 3%), III (26 of 738 or 4%), IV (37 of 738 or 5%) or CPS Program Specialist (2 of 738 or 0.002%). The caseworkers subject to graduated caseloads at 2INgage all had the title of Permanency Case Manager. The caseworkers subject to graduated caseloads at OCOK and St. Francis all had the title of Permanency Specialist.

As shown in the table below, on the 15th day after becoming case assignable, more than 99% (863 workers) of the 866 workers conformed to the graduated caseload standard of six or fewer case assignments. On the last day of the month following the 15th day, 99% (760 workers) of 768 workers who matched the monthly data were in conformance with the graduated caseload standard.[221] On the 45th day after becoming case assignable, more than 99% (794 workers) of the 797 workers still receiving case assignments and who had reached their 45th day after becoming case assignable conformed to the graduated caseload standard.

Table 27: Caseworkers Conforming to the Graduated Caseload Standards at Three Points in Time

| Month Case Assignable | New Caseworkers that reached 15th day | 15th Day | Last Day of Month Following 15th Day | 45th Day | Average conformity Rate |
|---|---|---|---|---|---|
| July 2021 | 52 | 98% | 94% | 100% | 97% |
| August 2021 | 48 | 100% | 100% | 98% | 99% |
| September 2021 | 50 | 100% | 98% | 100% | 99% |
| October 2021 | 87 | 99% | 100% | 100% | 100% |
| November 2021 | 104 | 100% | 100% | 99% | 100% |
| December 2021 | 74 | 100% | 99% | 99% | 99% |
| January 2022 | 125 | 100% | 99% | 100% | 100% |
| February 2022 | 45 | 100% | 100% | 100% | 100% |

---

[221] The standard the Monitors used on the last day of the month after the 15th day of case assignability was either six assignments or 12 assignments, depending on when the worker became eligible to accept cases. Thirty-six workers were not matched to the end of the month caseload data and had no termination date. Of these 36, 14 were St. Francis workers with case assignability dates in early March 2022 and did not match because the Monitors determined that the March 31, 2022 St. Francis caseload data were insufficient due to data quality concerns. All St. Francis workers who were subject to graduated caseloads and who had a last day of the month on April 30,2022 or later matched the last day of the month. Some workers subject to graduated caseloads are not assigned any cases on the last day of the month and thus do not appear in the monthly caseload reports received by the Monitors. Of the 17 DFPS workers who did not match on the last day of the month, for example, 15 had not been assigned any children on their 15th day after becoming case assignable. In other situations, workers subject to graduated caseloads were sent for retraining in a different casework specialty and no longer appear in the graduated caseload reports.

| | | | | | |
|---|---|---|---|---|---|
| March 2022 | 102 | 100% | 99% | 100% | 100% |
| April 2022 | 63 | 100% | 100% | 100% | 100% |
| May 2022 | 50 | 98% | 98% | 100% | 99% |
| June 2022 | 66 | 100% | 100% | 100% | 100% |
| **Total** | **866** | **100%** | **99%** | **100%** | **99%** |

On average over the three points in time, more than 99% of new caseworkers' caseloads were in conformance with the graduated caseload standard. The high correlation of rates of conformance on the last day of the month to the rates of conformance on the 15th and 45th days is important, as the end of month data were verified by the Monitors through interviews with caseworkers.

In general, almost all workers who became case assignable on or after July 1, 2021 received assignments that conformed to the graduated caseload standards. Assignments at the SSCCs (OCOK, 2Ingage, and St. Francis) were rarely above the applicable standards in the first and second months of case assignability.

The monitoring team interviewed 42 caseworkers assigned to 22 counties across the state who were subject to the graduated caseloads policy under Advancing Practice. Between May 4, 2022 and June 7, 2022, the monitoring team interviewed via videoconference a randomly selected sample of 30 caseworkers from DFPS and 12 caseworkers from the three SSCCs (OCOK, 2INgage, and St. Francis) responsible for case management during this reporting period. All were hired between November 8, 2021 and March 2, 2022 and became subject to graduated caseloads between March 17, 2022 and May 27, 2022. Twenty-two of the caseworkers in the sample had the job title CPS CVS Specialist I, two had the title CPS CVS Specialist II, three had the title CPS CVS Specialist III, and one was a CPS CVS Specialist IV. The SSCC workers included one Permanency Case Manager and 11 Permanency Specialists.

The monitoring team reviewed, with the workers interviewed in May 2022, their case assignment detail reports dated May 1, 2022 generated from the DFPS INSIGHT system. With the SSCC workers interviewed in June 2022, the monitoring team reviewed their case assignment workload reports dated June 1, 2022 and supplied by DFPS. The individual caseloads of 41 of the 42 caseworkers interviewed ranged from two to 11 children.[222] Twenty-four of the caseworkers were in the first month of eligibility for case assignment and 17 of the workers were in the second month of case assignability. One (2%) of the 41 caseworkers had a caseload that exceeded the caseload guidance during the first month of case assignability. The monitoring team compared the results of the interviews of these caseworkers with the corresponding monthly caseload data submitted by DFPS to confirm the accuracy of the graduated caseload data collected during caseworker interviews. During the Monitors' cross-data validation of the INSIGHT and workload reports of these 41 workers with the DFPS monthly caseload data, the

---

[222] One caseworker had no PMC assignment on the last day of the month under review; therefore, the worker was not included in the monthly caseload data reported by DFPS.

monitoring team found that 100% of the caseloads were a perfect match to those reported directly by caseworkers interviewed who were subject to graduated caseloads.[223]

## Summary of Performance Validation

For staff subject to graduated caseload standards between July 1, 2021 and June 30, 2022:

- On average, staff's caseloads conformed with the graduated caseload standards more than 99% of the time. This represents the average rate of conformance of the 866 workers assessed on their 15th day following case assignability; the 768 workers assessed on the last day of the month following the 15th day of case assignability; and the 797 workers assessed on their 45th day following case assignability.

- On the 15th day, more than 99% of workers conformed to the graduated caseload standard of six children.

- On the last day of the month following the 15th day of case assignability, 99% of workers conformed to the graduated caseload standard.

- On the 45th day, more than 99% of workers conformed to the graduated caseload standard of 12 children.

- The State's compliance with Remedial Order 2 exceeded 97% in each of the 12 months during the period.

- Rates of conformity did not vary significantly between DFPS and the SSCCs with case management responsibilities.

## Child Fatalities

After learning through the Monitors of the death of a child in the PMC General Class, the Court ordered on February 21, 2020:

*Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

Defendants have continued to provide notification to the Monitors of PMC child fatalities. As discussed in the First and Second Monitors' Reports and the April 2022 Update to the

---

[223] *Id.*

142

Court Regarding Child Fatalities, DFPS notified the Monitors that 33 children in the PMC General Class died between July 31, 2019 and December 31, 2021. These fatalities included seven children whom DFPS determined were abused or neglected by their caregivers in connection with their deaths or their care prior to their deaths.

Since the April 2022 Update to the Court, DFPS reported that 14 additional PMC children died between January 1, 2022 and December 1, 2022, bringing the number of PMC children who have died since July 31, 2019 to 47. Of the 14 children who died during this report period, DFPS or HHSC determined that 11 of these children's deaths did not involve abuse or neglect or determined that an investigation was not necessary. These 11 fatalities involved nine children with severe medical conditions and two teenagers who died from gun violence. As of November 15, 2022, DFPS's investigations into the remaining three children's deaths remained opened. The Monitors will review and discuss these children's deaths in the next report to the Court.

## Child Fatalities Involving Children in the PMC Class

### Child Fatalities, No Abuse or Neglect Determined

### S.P., Born January 29, 2010; Died January 2, 2022

S.P., an 11-year-old boy, passed away from significant medical complications. S.P. had the following diagnoses: cerebral palsy, chronic lung disease and congenital muscular dystrophy. S.P. was non-verbal, unable to walk and required the assistance of oxygen 24 hours a day. From 2016 until his death, S.P. resided in a therapeutic foster home that served Primary Medical Needs (PMN) children. According to RCCI's investigation into S.P.'s death, in the early hours of January 2, 2022, S.P.'s oxygen saturation and heart rate began to fall. S.P.'s in-home nurse called 911 while S.P.'s foster father and another in-home nurse performed lifesaving measures on the child until Emergency Medical Services (EMS) arrived at the home. The First Aid Responders' efforts to resuscitate S.P. were unsuccessful, and the child was pronounced dead 45 minutes later. In response to his death, S.P.'s primary care physician reported that S.P.'s congenital muscular dystrophy and weakness in his lungs were "just too much and it [S.P.'s respiratory system] gave out." The physician reported that she did not have concerns about the care the foster parents or nursing staff provided to S.P. in the foster home. During their interviews with the investigator, S.P.'s in-home nurses stated that the foster parents were "very caring" and S.P. received appropriate care in the foster home. RCCI's investigation into S.P.'s death found no concerns for maltreatment. Due to S.P.'s medical condition, the county medical examiner did not perform an autopsy.

### I.B., Born November 27, 2016; Died January 13, 2022

I.B., a five-year-old girl, passed away from significant medical complications. I.B. had the following diagnoses: spastic quadriplegic cerebral palsy, chronic obstructive pulmonary disease, static encephalopathy (permanent lack of brain function), epilepsy, developmental delays, catatonic, severe scoliosis, failure to thrive and oropharyngeal

143

dysphasia. I.B. was nonverbal and legally blind; she used a gastrostomy button and a wheelchair. At the time of her death, I.B. resided in a therapeutic foster home and received 24-hour nursing care in the home. Due to I.B.'s medical condition, I.B. was in hospice care and subject to an active Do Not Resuscitate (DNR) order. According to RCCI's investigation into I.B.'s death, on January 12, 2022, I.B. stopped eating, started retaining more body fluid and experienced fluctuating oxygen levels and heart rate. A hospice nurse advised the foster father that I.B. would soon pass away. Nurses provided I.B. with acetaminophen and, later, morphine to ease her pain. In the early hours of January 13, 2022, a hospice nurse pronounced I.B. as deceased. In its investigation into I.B.'s death, the RCCI investigator interviewed several of I.B.'s hospice nurses, her CPS caseworker, and her case manager; these individuals reported no concerns regarding the quality of care I.B. received in the foster home. Three of the child's nurses, as well as her caseworker, reported that due to I.B.'s medical condition, her doctors did not expect her to live much longer than she did. RCCI's investigation into I.B.'s death found no concerns for maltreatment. Due to I.B.'s medical condition and DNR order, the director of the funeral home confirmed that the county medical examiner did not perform an autopsy.

### E.B., Born July 13, 2017; Died January 18, 2022

E.B., a four-year-old boy, passed away from significant medical complications. E.B. had the following diagnoses: congenital heart disability, cerebral palsy, tracheomalacia, esophageal atresia (EA) repair, laryngomalacia, tracheoesophageal fistula, hypoxemia, dysphagia, hypertonia/hypotonia, epilepsy, sleep apnea, dystonia, encephalopathy, temperature irregularity, seizures, and neuro storming. He used a tracheostomy tube and a ventilator. At the time of his death, E.B. resided in a therapeutic foster home where he received 24-hour nursing care. Starting in August 2020, E.B. was subject to an active DNR order and, in December 2021, E.B. was placed in hospice care. According to the investigative record, the week prior to his death, E.B. stopped absorbing formula and urinating, his heart rate slowed, and his circulation worsened. On the day of his death, E.B.'s heart temporarily stopped twice, and the investigative record stated that his nurses knew the child would pass soon. E.B.'s nurses administered morphine to ensure E.B. was not in pain and, later that evening, at 6:45 p.m., E.B. passed away in his foster home. In its investigation into E.B.'s death, RCCI Ruled out Medical Neglect of E.B. by his foster parents. A Forensic Assessment Center Network (FACN) physician assessed E.B.'s death and found no concerns for abuse or neglect by E.B.'s foster parents. E.B.'s neurologist stated that E.B.'s "respiratory system could not keep up with the size of his body" and that his primary cause of death was respiratory failure. E.B.'s nurses reported that E.B.'s health significantly declined during the final six months of his life and that, as a result, his death was expected. In the investigative record, the investigator documented that, "due to the nature of [E.B.'s] passing while in hospice care, no autopsy was performed."

### C.B., Born July 22, 2007; Died March 6, 2022

C.B., a 14-year-old girl, passed away at a hospital from complex medical complications. C.B. had the following diagnoses: STAT 1 gain of function (GOF) disease, hypothyroidism, reactive airway disease, chronic mucocutaneous candidiasis, recurrent oral aphthae, congenital malformation syndrome, dysphagia, failure to thrive, and skin eruption. At the

time of her death, C.B. was under the care of a hospital where she had resided for the prior two months. According to C.B.'s record, C.B.'s cause of death was "adult respiratory distress from bone marrow transplant related to STAT 1 GOF [gain of function disease]." From December 2018 until her death, C.B.'s placement was in a specialized foster home, operated under the auspices of an HCS provider. According to the Texas Administrative Code, HHSC investigates the death of a child in an HCS placement when the child's death is suspected to be the result of abuse or neglect;[224]  HHSC did not pursue an investigation into C.B.'s death because the agency did not suspect abuse or neglect.[225]

### R.P., Born June 10, 2010; Died March 12, 2022

R.P., an 11-year-old boy, passed away from significant medical complications. R.P. had the following diagnoses: acute encephalitis with encephalopathy, epilepsy, seizures, contractures, focal dystonia, neuromuscular scoliosis, and dysphagia. He used a gastrostomy tube, oxygen, and a tracheostomy tube. R.P. was non-verbal and unable to walk. At the time of his death, R.P. was subject to an active DNR order.  For the four years prior to his death, R.P. resided in a therapeutic foster home that cared for PMN children. According to the investigative record, on January 24, 2022, R.P.'s foster mother, a registered nurse, identified that R.P.'s pulse rate was elevated and contacted EMS for the child to be transported to a hospital. While hospitalized, R.P.'s condition continued to deteriorate. On the day R.P. passed, R.P.'s birth family, foster family, CPS and hospital teams chose to remove R.P.'s lifesaving equipment and R.P. passed naturally. R.P.'s death certificate stated that the cause of death was "acute on chronic respiratory failure" due to chronic lung disease, chronic respiratory failure, and septic shock. RCCI's investigation into R.P.'s death found no concern for maltreatment by R.P.'s foster parents. When interviewed, R.P.'s virologist reported that R.P.'s passing was "the natural progression of his medical condition;" the physician expressed no concern for the care R.P. received in his foster home. R.P.'s death certificate documented that an autopsy was not requested due to R.P.'s active DNR order.

### A.W., Born July 6, 2006; Died March 24, 2022

A.W., a 15-year-old boy, died from gun violence while on runaway status from a one-night Child Without Placement (CWOP) episode at a DFPS office. At the time of his death, A.W., who had a history of running away, had been on runaway status for approximately one week, beginning on March 16, 2022. On this day, A.W.'s caseworker arrived to the CWOP location in the morning and brought A.W. to a friend's home to play basketball for the afternoon.[226] The caseworker did not possess or gather contact information about the friend. The caseworker knew the apartment building's address, but not the apartment number. During the day, A.W.'s caseworker reported that he was in contact with A.W., including that at 6:00 p.m., he called A.W. and A.W. informed him that he and his friend

---

[224] 40 TEX. ADMIN. CODE §9.175.
[225] When the Monitors inquired to HHSC and DFPS about the decision not to investigate and the policy underlying the decision, HHSC noted the above portion of the administrative code. E-mail from Katy Gallagher to Megan Annitto, Monitoring Team (Aug. 9, 2022).
[226] At this time, DFPS was considering A.W.'s friend's family as a placement option for A.W. DFPS had not yet undertaken a review of the friend's family, such as completing criminal and CPS background checks.

would like to go to a movie, which the caseworker allowed. The caseworker spoke to A.W. one more time that evening at 8:45 p.m. while A.W. was at the movies. Following this call, the caseworker made numerous attempts to contact A.W.; however, these attempts were unsuccessful.

According to A.W.'s case record, the caseworker did not promptly report A.W. as missing to law enforcement and DFPS; the caseworker made these reports the following morning on March 17, 2022, after the caseworker's supervisor instructed him to do so. The caseworker's supervisor also documented that the caseworker did not request her approval for A.W.'s visit with his friend.

While on runaway status for the week prior to his death, DFPS was unaware of A.W.'s whereabouts. On the night of March 23, 2022, A.W. was reportedly sleeping at a different friend's home when the friend fatally shot A.W. and another individual in the home. A.W. was pronounced as deceased on March 24, 2022 at 3:26 a.m. CPI did not pursue an investigation into A.W.'s death, citing that A.W.'s death "was not in the jurisdiction of CPI. [A.W]. ... had been on runaway status since March 16, 2022. [A.W.] was murdered, while on runaway status, by a 'friend,' not some [sic] who was responsible for his care... this person did not fit the definition of an alleged perpetrator."

While in DFPS care, A.W. experienced the following placements:

| Start Date | End Date | Placement |
|------------|----------|-----------|
| 03/16/2022 | 03/24/2022 | Runaway |
| 03/15/2022 | 03/16/2022 | DFPS Supervision (CWOP Setting): 503 Priest Dr. Office in Killeen |
| 03/07/2022 | 03/15/2022 | Runaway |
| 12/10/2021 | 03/07/2022 | St Peter - St Emergency Shelter |
| 05/22/2020 | 12/10/2021 | Kinship Home |

### D.S., Born September 30, 2005; Died March 29, 2022

D.S., a 16-year-old boy, passed away at a hospital from complex medical complications. D.S. had the following diagnoses: spastic diplegic cerebral palsy, epilepsy, microcephaly, seizure disorder, remote nephrolithiasis, developmental delay, gastroesophageal reflux disease (GERD), asthma, intellectual disability, sleep apnea, scoliosis, bilateral hip dislocation, and osteopenia (brittle bone disease). D.S. used a gastrostomy tube, oxygen, and a tracheostomy tube. At the time of his death, D.S. resided in a therapeutic foster home that served PMN children. In the foster home, D.S. received 24-hour nursing care. According to the investigative record, on March 27, 2022, two days prior to his death, D.S.'s in-home nurse observed that D.S.'s oxygen levels had dropped. When the nurse was unable to increase D.S.'s oxygen levels, the foster father called 911 and D.S. was

subsequently admitted to a hospital. On March 29, 2022, while hospitalized, D.S.'s health continued to decline and, despite medical personnel's sustained life saving measures, D.S. passed away that morning at 10:47 a.m. D.S.'s death certificate lists his causes of death as: pneumonia due to viral illness; respiratory failure secondary to pneumonia; and hypoxia leading to cardiac arrest. In its investigation of D.S.'s death, RCCI Ruled Out allegations of maltreatment by the foster parents. Interviews with D.S.'s in-home nurses raised no concerns about the level of care the medically fragile child received in the foster home. Due to D.S.'s medical condition, the county medical examiner did not perform an autopsy.

### T.A., Born December 9, 2020; Died April 1, 2022

T.A., a one-year-old boy, passed away from significant medical complications. T.A. had the following diagnoses: congenital heart disease, congenital eventration of right crus of diaphragm, facial dysmorphism with multiple malformations, fetal drug exposure, cleft palate and stickler's syndrome. He used a gastrostomy tube, oxygen, and a tracheostomy tube. At the time of his death, T.A. resided in a foster home that cared for PMN children; T.A. received 24-hour nursing care in the home. According to the investigative record, on April 1, 2022, T.A.'s registered nurse identified that T.A. had dislodged his tracheostomy tube. The nurse immediately re-inserted the tube; however, T.A.'s oxygen levels began to drop. When the nurse was unable to increase T.A.'s oxygen levels, the foster mother contacted 911. The First Aid Responders' efforts to resuscitate T.A. were unsuccessful, and the child was pronounced dead shortly thereafter at a hospital. T.A.'s death certificate listed the following causes of death: decannulation, tracheostomy and ventilator dependence, chronic respiratory failure and idiopathic. The death certificate also documented that the significant condition that contributed to T.A.'s death was: "medically complex child with repaired congenital heart defect." RCCI's investigation into T.A.'s death found no concerns for maltreatment. Due to T.A.'s medical condition, the county medical examiner did not perform an autopsy.

### T.S., Born July 25, 2004; Died June 13, 2022

T.S., a 17-year-old boy, was fatally shot by another individual during an altercation. At the time of his death, T.S. was on runaway status from a CWOP episode at a hotel for approximately seven weeks and his whereabouts were unknown to DFPS. On the day T.S. left the CWOP location, T.S.'s caseworker, a supervisor, CASA advocate, and a judge held a virtual meeting to discuss T.S.'s placement options; according to T.S.'s record, T.S. was unwilling to attend the virtual meeting. During the meeting, the judge ordered T.S. to a placement secured by T.S.'s caseworker. Following the meeting, T.S.'s caseworker informed T.S. of the judge's order, which T.S. promptly refused. Shortly thereafter, T.S. packed his belongings and left the CWOP location. T.S.'s caseworker timely reported to law enforcement that T.S. had run away.

While on runaway status, DFPS records indicate the agency made efforts to locate T.S. and, through intermittent contact with T.S., determined that T.S. was unwilling to provide his location or return to DFPS care. CPI did not pursue an investigation into T.S.'s death.

147

While in DFPS care, T.S. experienced the following placements:

| Start Date | End Date | Placement |
|---|---|---|
| 04/21/2022 | 06/13/2022 | Runaway |
| 04/03/2022 | 04/21/2022 | DFPS Supervision (CWOP Setting): La Quinta Inn |
| 03/31/2022 | 04/03/2022 | Grandma - Unauthorized Placement |
| 03/27/2022 | 03/31/2022 | DFPS Supervision (CWOP Setting): La Quinta Inn |
| 03/26/2022 | 03/27/2022 | Runaway |
| 02/07/2022 | 03/26/2022 | DFPS Supervision (CWOP Setting) |
| 02/02/2022 | 02/07/2022 | Foster home |
| 01/26/2022 | 02/02/2022 | DFPS Supervision (CWOP Setting): Baymont Hotel |
| 12/08/2021 | 01/26/2022 | Runaway |
| 07/16/2021 | 12/08/2021 | Foster Home |
| 07/03/2021 | 07/16/2021 | West Oaks Hosp Psychiatric Hospital |
| 05/12/2021 | 07/03/2021 | The Lighthouse Residential Treat |
| 08/14/2020 | 05/12/2021 | Placement with adult brother |
| 12/05/2019 | 08/14/2020 | Athletes For C Residential Treat |
| 07/29/2019 | 12/05/2019 | City Of Hope M Basic Child Care |
| 07/15/2019 | 07/29/2019 | Grandma - Unauthorized Placement |
| 03/05/2018 | 07/15/2019 | Athletes For C Residential Treat |
| 01/24/2018 | 03/05/2018 | Millwood Psychiatric Hospital |

K.A., Born May 18, 2021; Died July 5, 2022

K.A., a one-year-old boy, passed away from significant medical complications. K.A. had the following diagnoses: congenital hydrocephalus, cranial abnormalities, hydranencephaly, optic atrophy of both eyes, and seizures. K.A. used a gastrostomy tube and required the assistance of oxygen. As a newborn, K.A. entered DFPS custody and lived in the same therapeutic foster home for the duration of his life. K.A. received 24-hour nursing care in the foster home. At the time of his death, K.A. was subject to an active DNR order. On the day of K.A.'s death, K.A.'s foster father and nurse observed that K.A.'s heart rate and oxygen levels began to drop. When they were unable to increase K.A.'s levels, the foster mother contacted 911 and EMS transported the child to a hospital.

Despite medical personnel's efforts to stabilize K.A. at the hospital, a doctor pronounced K.A. as deceased at 6:31 p.m. on July 5, 2022. According to the child's autopsy report, K.A.'s cause of death was congenital abnormalities. The report documented that the child had experienced "multiple hospitalizations for chronic respiratory failure and respiratory acidosis." In its investigation into K.A.'s death, the RCCI investigator interviewed K.A.'s nurses, speech, physical and occupational therapists, and CASA advocate; these individuals reported no concerns regarding the quality of care K.A. received in the foster home.  RCCI's investigation into K.A.'s death found no concerns for maltreatment.

### D.G., Born June 10, 2007; Died September 9, 2022

D.G., a 15-year-old girl, appears to have passed away from significant medical complications. D.G. had the following diagnoses: cerebral palsy quadriplegic, gastrostomy malfunction, and global developmental delays. D.G. used a gastrostomy tube; she was non-verbal and blind. From February 2022 and until her death, D.G. was placed in an HCS foster home. On the morning of her death, D.G.'s caregiver reported that D.G.'s heart rate and oxygen levels began dropping. The caregiver contacted 911 and began administering life saving measures to D.G. After the ambulance arrived, the First Aid Responders resumed efforts to resuscitate D.G.; however, these efforts were unsuccessful, and the child was pronounced dead 30 minutes later in the foster home. According to the Texas Administrative Code, HHSC investigates the death of a child in an HCS placement when the child's death is suspected to be the result of abuse or neglect;[227] HHSC did not pursue an investigation into D.G.'s death because the agency did not suspect abuse or neglect.

## PMC Child Fatality Investigations Pending

### R.F., Born April 9, 2019; Died August 21, 2022

R.F., a three-year-old girl, passed away from an unknown cause(s). On August 20, 2022, the day prior to her death, R.F. and her foster family attended another child's birthday party. After the family returned home from the birthday party, R.F. complained to her foster parents that her stomach hurt; her foster parents took the child's temperature and found that she had a mild fever (101°F). R.F.'s foster mother administered Children's Tylenol to reduce the child's fever. Later that evening, R.F.'s foster parents put her to bed and she was reportedly feeling well. The next morning, on August 21, 2022, the foster father went into the child's bedroom and found R.F. unconscious and cold to the touch. As of November 28, 2022, the county medical examiner's office had not finalized R.F.'s autopsy results and RCCI's investigation into R.F.'s death remained open.

### K.A, Born December 8, 2020; Died August 27, 2022

---

[227] 40 TEX. ADMIN. CODE §9.175.

K.A., a one-year-old boy, passed away from an unknown cause(s). Since entering DFPS's care at six-months old, K.A. had resided in a court ordered kinship foster home with his twin brother. For approximately one week prior to the child's death, the child had experienced a fever. On August 27, 2022, in the mid-morning, the foster mother reportedly checked on K.A. and found him unconscious. She contacted 911; when the First Aid Responders arrived at the home, they determined K.A. was deceased. As of November 28, 2022, the county medical examiner's office had not finalized K.A.'s autopsy results and RCCI's investigation into K.A.'s death remained open.

### F.C., Born January 27, 2016; Died September 22, 2022

F.C., a six-year-old girl, appears to have passed away from significant medical complications. F.C. had the following diagnoses: autosomal recessive kidney disorder; cerebral palsy; and epilepsy and brain damage. F.C. required the assistance of dialysis daily. Starting in 2017, F.C. resided in a therapeutic foster home that served PMN children. In the foster home, F.C. received 24-hour nursing care. On September 4, 2022, F.C. was admitted to a hospital due to a drop in her blood pressure. In the hospital, F.C. was placed on life support as her health continued to decline. On September 22, 2022, F.C. passed away at the hospital. As of November 28, 2022, RCCI's investigation into F.C.'s death remained open. Based upon preliminary information in the investigation record, there does not appear to be concern for maltreatment in relation to F.C.'s death.

# List of Tables

Table 1: Race for Children in PMC on June 30, 2022 and Estimates of Total Child Population in Texas by Race, August 12, 2021·...................................................................20

Table 2 : Living Arrangement by Race, Children in PMC on June 30, 2022...................21

Table 3: Exits from PMC by Exit Outcome between January 1 and June 30, 2022 ........23

Table 4: Out of State Living Arrangement Type for Children in PMC, December 31, 2021 and June 30, 2022........................................................................................................23

Table 5: Children in PMC Placed Out of State by Race on June 30, 2022......................23

Table 6: Authorized Level of Care for Children in PMC as of June 30, 2022 .................24

Table 7: Top Five Counties of Removal for Children in PMC on June 30, 2022 .............25

Table 8: Children in PMC by Regions on June 30, 2022 .................................................25

Table 9: Children in PMC from Regions with Single Source Continuum Contractor Presence by Region on June 30, 2022 .............................................................................25

Table 10: Total Number of Children and Staff Interviewed .............................................72

Table 11: Intakes with a Case Contact Found and Timing from Intake to Contact by Intake Type ..................................................................................................................................93

Table 12: Case Contacts with a Staffing Documented by Intake Type and Month ..........94

Table 13: All Caseworkers Managing at Least One PMC Child, January 2022 to June 2022 ......................................................................................................................................115

Table 14: All Supervisors Managing at Least One PMC Child and Total Workload, January 2022 to June 2022 ........................................................................................................115

Table 15: DFPS Caseworkers Managing at Least One PMC Child, January 2022 to June 2022 ..............................................................................................................................116

Table 16: DFPS Supervisors Managing at Least One PMC Child and Total Workload, January 2022 to June 2022 ............................................................................................117

Table 17: OCOK Caseworkers Managing at Least One PMC Child, January 2022 to June 2022 ..............................................................................................................................118

Table 18: OCOK Supervisors Managing at Least One PMC Child and Total Workload, January 2022 to June 2022 ............................................................................................118

Table 19: 2Ingage Caseworkers Managing at Least One PMC Child, January 2022 to June 2022 ..............................................................................................................................119

Table 20: 2Ingage Supervisors Managing at Least One PMC Child and Total Workload, January 2022 to June 2022 ............................................................................................120

Table 21: St. Francis Caseworkers Managing at Least One PMC Child, April 2022 to June 2022 ..............................................................................................................................120

Table 22: St. Francis Supervisors Managing at Least One PMC Child and Total Workload, April 2022 to June 2022 ................................................................................................121

Table 23: RCCI Investigators with Caseloads at or Below the Guidelines, July 2021 to June 2022 ..............................................................................................................................127

Table 24: Number of RCCI Supervisors, Average Investigators Supervised, Average RCCI Investigations Overseen, July 2021 to June 2022........................................................129

Table 25: RCCR Inspectors with Caseloads at or Below Guidelines, July 2021 to June 2022 ......................................................................................................................................132

Table 26: Number of RCCR Supervisors, Average Inspectors Supervised, Average Tasks Overseen, July 2021 to June 2022 ................................................................................133

Table 27: Caseworkers Conforming to the Graduated Caseload Standards at Three Points in Time..................................................................................................................... 140

# List of Figures

Figure 1: Age of Children in PMC on June 30, 2022 ....................................................... 19
Figure 2:  Living Arrangements for Children in PMC on June 30, 2022......................... 21
Figure 3: Length of Stay in Care of Children in PMC on June 30, 2022 ........................ 22
Figure 4: Number of SWI Calls by Month ....................................................................... 29
Figure 5: Time Callers Waited before Calls were Handled or Abandoned ...................... 29
Figure 6: Duration of Handled SWI Calls ........................................................................ 30
Figure 7: Queue Time of Abandoned and Handled SWI Calls ........................................ 31
Figure 8: Number of SWI Calls Handled and Abandoned by Day of the Week.............. 33
Figure 9: Allegation Types for RCCI Intakes Involving PMC Children in Licensed
Placements, July 1, 2021 to June 30, 2022...................................................................... 35
Figure 10: Closed RCCI Investigations, May 1, 2021 to April 30, 2022 ......................... 37
Figure 11: Reason to Believe Findings in Closed RCCI Investigations Involving PMC
Children in Licensed Placements, May 1, 2021 to April 30, 2022 .................................. 38
Figure 12: Alleged Perpetrators in RCCI Allegations Involving PMC Children in Licensed
Placements, May 1, 2021 to April 30, 2022 ..................................................................... 39
Figure 13: Closed CPI Investigations Involving PMC Children, September 1, 2021 to April
30, 2022............................................................................................................................. 40
Figure 14: Reason to Believe Findings in Closed CPI Investigations Involving PMC
Children, September 1, 2021 to April 30, 2022 ................................................................ 42
Figure 15: Alleged Perpetrators in CPI Allegations Involving PMC Children in Unlicensed
Placements, September 1, 2021 to April 30, 2022............................................................ 43
Figure 16: Administrative Reviews of RCCI Investigations Involving PMC Children with a
Disposition of Reason to Believe, January 1, 2021 to December 31, 2021....................... 44
Figure 17: Administrative Reviews of RCCI Investigations Involving PMC Children with a
Disposition of Reason to Believe, January 1, 2022 to April 30, 2022.............................. 44
Figure 18: Initiation of Investigations within 24 Hours in Priority One Investigations . 57
Figure 19: Documented Reasons for Late Initiation in Priority One Investigations ....... 58
Figure 20: Initiation of Investigations within 72 Hours in Priority Two Investigations . 59
Figure 21: Documented Reasons for Late Initiation in Priority Two Investigations ....... 61
Figure 22: Face-to-Face Contact within 24 Hours with All Alleged Child Victims in
Priority One Investigations ............................................................................................... 61
Figure 23: Face-to-Face Contact within 72 Hours with All Alleged Child Victims in Priority
Two Investigations ............................................................................................................ 62
Figure 24: Completion of Priority One and Two Investigations within 30 Days............ 64
Figure 25: Completion of Priority One and Two Investigations within 30 Days over Time
........................................................................................................................................... 65
Figure 26: Number of Extensions in Priority One and Two Investigations.................... 66
Figure 27: Notification Letter Sent to Referent within Five Days of Investigation Closure
in Closed Priority One and Two Investigations ............................................................... 68
Figure 28: Notification Letter Sent to Provider within Five Days of Investigation Closure
in Closed Priority One and Two Investigations ............................................................... 68
Figure 29: Child File Contained Signed Bill of Rights.................................................... 73
Figure 30: Percentage of Child Files by Operation Containing a Signed Bill of Rights... 73
Figure 31: Percentage of Children Responding They Had Knowledge of the Bill of Rights
........................................................................................................................................... 74

Figure 32: Children Reporting Having Read or Someone Else Explained the Bill of Rights ...................................................................................................................................... 75
Figure 33: Children Reporting Knowledge of the Ombudsman...................................... 76
Figure 34: Children Reporting Knowledge of How to Reach the Ombudsman if Necessary ...................................................................................................................................... 76
Figure 35: Children Reporting Knowledge of where the Hotline........................................ 77
Figure 36: Children Reporting Knowledge of How to Call the Hotline if Necessary to Report Abuse, Neglect and Exploitation............................................................................ 77
Figure 37: Children Reporting a Need to Call the Hotline ............................................. 78
Figure 38: Children Reporting Knowledge of the Bill of Rights, Ombudsman, and Hotline ...................................................................................................................................... 78
Figure 39: Percentage of Children by Operation with Knowledge of the Bill of Rights, Ombudsman, and Hotline.............................................................................................. 79
Figure 40: Children Reporting Ability to Use a Phone .................................................. 81
Figure 41: Children's Reported Process for Using a Phone ........................................... 81
Figure 42: Caregiver Reported Restrictions on Phone Use............................................ 82
Figure 43: Caregivers Reporting Ability of Children to Call the Hotline/Ombudsman .. 82
Figure 44: Children Reporting Wanting to Report a Grievance Since Being in Current Placement ...................................................................................................................... 83
Figure 45: Children Reporting Ability to Report a Grievance.......................................... 83
Figure 46: Children Reporting Feeling Safe in Current Placement ................................ 84
Figure 47: Children Reporting Feeling Comfortable Talking to Staff about Needs......... 85
Figure 48: Children Reporting Whether Their Caseworker Answers or Responds to Phone Calls or Texts ................................................................................................................. 85
Figure 49: RCCI, CPI, and PI Intakes, January to June 2022 ........................................ 86
Figure 50: Intakes by Investigation Type where Reporter is Alleged Victim .................. 87
Figure 51: Youth Complaints to Foster Care Ombudsman Resulting in Notification to Statewide Intake ............................................................................................................ 88
Figure 52: Percentage of Intakes with a Case Contact Found by Intake Type................ 91
Figure 53: Percentage of Intakes with a Case Contact Found by Type and Month ......... 92
Figure 54: Case Contacts with Incident Information ..................................................... 93
Figure 55: Case Contacts with Safety Action Documented ........................................... 94
Figure 56: Safety Actions Documented in RCCI, CPI, and PI Case Contacts ................. 95
Figure 57: Percentage of Documented Safety Actions that Adequately Ensured the Immediate Safety of the Child....................................................................................... 96
Figure 58: Case Contact with No Safety Action Documented and Whether Action Was Needed............................................................................................................................ 96
Figure 59: Whether Action Was Documented Ensuring Child Safety ............................ 99
Figure 60: DFPS Caseworkers Hired September 2021 – March 2022 and Included in CPD Training Completion Analysis...................................................................................... 104
Figure 61: DFPS Caseworker CPD Training Completion by Training Level ................. 105
Figure 62: OCOK Caseworkers Hired September 2021 – March 2022 and Included in CPD Training Completion Analysis...................................................................................... 106
Figure 63: OCOK Caseworker CPD Training Completion by Training Level ............... 106
Figure 64: 2Ingage Caseworkers Hired September 2021 – March 2022 and Included in CPD Training Completion Analysis .............................................................................. 107
Figure 65: 2Ingage Caseworker CPD Training Completion ........................................... 108

Figure 66: St. Francis Caseworkers Hired November 2021 – March 2022 and Included in CPD Training Completion Analysis .................................................................................... 109
Figure 67: St. Francis Caseworker CPD Training Completion by Training Level...........110
Figure 68: Number of RCCI Investigations by Month, July 2021 to June 2022 ............127
Figure 69: RCCI Investigator Caseloads by Number of Investigations, July 2021 to June 2022....................................................................................................................................... 128
Figure 70: Abuse, Neglect and Exploitation Investigations Opened and Closed by Month, July 2021 to June 2022 .................................................................................................... 129
Figure 71: Number of RCCR Tasks, July 2021 to June 2022 ..........................................131
Figure 72:  Number of Facility Inspections, Investigations, and Administrative Reviews, July 2021 to June 2022 .................................................................................................... 132
Figure 73: RCCR Inspector Caseload High and Low by Month, July 2021 to June 2022 .................................................................................................................................................. 133
Figure 74: Tasks and Administrative Reviews Assigned to RCCR Supervisors, July 2021 to June 2022.................................................................................................................. 134
Figure 75: RCCR Supervisor Caseload High and Low by Month, July 2021 to June 2022 .................................................................................................................................................. 135
Figure 76: Other Job Responsibilities Reported by RCCR Inspectors...........................137