

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity | § | |
| as Governor of the State of Texas, et | § | |
| al., | § | |
| | § | |
| Defendants. | | |

## **Update to the Court Regarding Site Visits**
## **Conducted between December 1, 2021, and December 31, 2022,**
## **and the Reopening of The Refuge for DMST**

### **Introduction**

Between December 13, 2021, and December 31, 2022, the *M.D. v. Abbott* monitoring team made 14 multi-day site visit inspections of the Texas Foster Care system General Residential Operations. These inspections, which occurred at various hours of the day and night, revealed that the State of Texas continues to place vulnerable children and youth in poorly supervised residential settings, exposing children to unreasonable risks of serious harm. The dangers include but are not limited to placing victims of sexual abuse in bedrooms alongside youth flagged for histories of sexual aggression; administering arrays of psychotropic medications to children and youth without regard to the State's protocols for psychological diagnosis and medical oversight; and deficient investigations of child abuse and neglect, which leave children residing in unsafe conditions.

**Table 1. Operations Visited by Monitoring Team,
December 2021 – December 2022**

| Operations Visited | Dates of Visit | PMC Child Files Reviewed | PMC Children Interviewed | Staff Records Reviewed | Staff Interviewed |
|---|---|---|---|---|---|
| Promise House GRO & TEP | 12/13/21-12/15/21 | 9 | 8 | 18 | 17 |
| Guiding Light RTC | 2/23/22-2/25/22 | 25 | 14 | 11 | 17 |
| Camp Worth | 3/15/22-3/17/22 | 10 | 7 | 11 | 15 |
| Gold Star Academy | 5/24/22-5/26/22 | 9 | 9 | 16 | 16 |
| Whispering Hills RTC | 6/21/22-6/22/22 | 4 | 4 | 9 | 11 |
| Roy Maas Youth Alternative GRO & RTC | 7/17/22-7/20/22 | 27 | 14 | 22 | 25 |
| DePelchin Children's Center | 7/19/22-7/20/22 | 9 | 9 | 20 | 13 |
| Silver Lining RTC | 8/16/22-8/19/22 | 9 | 9 | 12 | 11 |
| Helping Hand Home for Children | 8/22/22-8/25/22 | 19 | 12 | 69 | 21 |
| ACH Child and Family Services RTC | 9/6/22-9/8/22 | 10 | 9 | 23 | 22 |
| Paloma Place | 9/20/22-9/23/22 | 12 | 10 | 16 | 10 |
| Moving Forward RTC | 9/28/22-9/30/22 | 4 | 4 | 10 | 16 |
| Open Arms Open Heart RTC | 11/16/22-11/17/22 | 9 | 9 | 12 | 13 |
| Dallas Behavioral Health | 12/12/22-12/13/22 | 5 | 5 | 13 | 10 |
| **Total** | | **161** | **123** | **262** | **217** |

In addition to these multi-day visits, the monitoring team made awake-night visits to 19 congregate-care facilities over two nights, on October 20, 2022, and October 21, 2022.

**Table 2. Operations Visited by Monitoring Team During Awake-night Monitoring, October 20, 2022 – October 22, 2022**

| Operations Visited | Dates of Visit |
|---|---|
| Brownstone | 10/20/2022 – 10/21/2022 |
| Caring Heart Residential Care | 10/20/2022 – 10/21/2022 |
| Legacy Youth LLC | 10/20/2022 – 10/21/2022 |
| Pinecrest Emergency Care Services | 10/20/2022 – 10/21/2022 |
| Prime Residential Care | 10/20/2022 – 10/21/2022 |
| Promise Rose | 10/20/2022 – 10/21/2022 |
| Redicare | 10/20/2022 – 10/21/2022 |
| Renewed Strength East | 10/20/2022 – 10/21/2022 |
| Road to Wisdom | 10/20/2022 – 10/21/2022 |
| South Texas Rehabilitation | 10/20/2022 – 10/21/2022 |
| The Residence by Infinity Elite | 10/20/2022 – 10/21/2022 |
| **Total Operations Visited Night 1** | **11** |
| Dream RTC | 10/21/2022 – 10/22/2022 |
| Embracing Destiny GRO | 10/21/2022 – 10/22/2022 |
| Embracing Destiny RTC | 10/21/2022 – 10/22/2022 |
| Guardian Angels | 10/21/2022 – 10/22/2022 |
| Have Haven RTC | 10/21/2022 – 10/22/2022 |
| Kinder Emergency Shelter | 10/21/2022 – 10/22/2022 |
| Miracal's Place | 10/21/2022 – 10/22/2022 |
| Renewed Strength RTC | 10/21/2022 – 10/22/2022 |
| **Total Operations Visited Night 2** | **8** |

This report details and summarizes three recurring issues identified by the monitoring team during these visits:[1]

- Concerns related to psychotropic medication.
- Concerns related to DFPS's investigation of allegations of abuse, neglect, or exploitation reported to the hotline by the monitoring team.

---

[1] The 14 multi-day and 19 awake-night visits to the operations do not represent a statistically significant sample of the more than 200 congregate-care facilities that house PMC children in Texas. Moreover, the site visits were not made to randomly chosen operations, but rather to operations identified by the monitoring team as demonstrating risks to child safety using available data and HHSC and DFPS enforcement records, or that were proximate to other facilities being visited.

- Concerns related to supervision of children in facilities housing children flagged with an indicator for sexual aggression or victimization.

This Update also discusses additional concerns specific to some of the sites visited.  The report ends with an update regarding the reopening of The Refuge for DMST.

### I.      Concerns Regarding Psychotropic Medications

According to a 2021 report published by HHSC, since 2002 there has been a significant reduction in the percentage of Texas foster children receiving a single psychotropic medication for 60 days or more, from 29.5% of all foster children in 2004 to 17.9% in 2019.[2]  HHSC attributes this reduction in prescription psychotropics to the creation of an interagency group that developed and released utilization parameters for psychotropic drugs for foster children.[3]

The greatest reported reduction in the use of psychotropic medications was among children aged four to twelve years old.  Between 2002 and 2019, the percentage of foster children aged six to twelve years old taking psychotropic medications decreased from 44% to 28% while the percentage of foster children aged four to five years old prescribed and taking psychotropic medications decreased from 20% to 11%.[4]  Foster children aged 13 to 17 years old experienced the smallest decrease in psychotropic drug use between 2002 and 2019, from 47.5% children taking medications in 2002 to 43.5% in 2019.[5]

### Table XX:    Children in the Foster Care System Taking Psychotropic Medication Sixty or More Days in the Years, 2002 and 2019

| Age Group | 0-3 | | 4-5 | | 6-12 | | 13-17 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2002 | 2019 | 2002 | 2019 | 2002 | 2019 | 2002 | 2019 | 2002 | 2019 |
| Total Foster Children | 8,639 | 20,150 | 2,678 | 6,262 | 8,652 | 15,544 | 7,377 | 8,815 | 27,346 | 50,771 |
| Children Taking Meds 60+ days in Year | 247 | 286 | 527 | 663 | 3,795 | 4,289 | 3,503 | 3,834 | 8,072 | 9,072 |
| % Taking meds 60+ days in Year | 2.9% | 1.4% | 19.7% | 10.6% | 43.9% | 27.6% | 47.5% | 43.5% | 29.5% | 17.9% |

---

[2] HHSC, Update on the Use of Psychotropic Medications for Children in Texas Foster Care: State Fiscal Years 2002-2019 Data Report 4, *available at* https://www.hhs.texas.gov/sites/default/files/documents/laws-regulations/reports-presentations/2021/psychotropic-meds-tx-foster-care-fy2002-2019.pdf

[3] *Id.* at 3.

[4] During the same time, the number of children in the foster care system increased 86%, from 27,346 children in 2002 to 50,771 in 2019.  The largest increases were for children in the age groups of zero to three, which increased by 133%, and children in the age group of four to five, which increased 134%. In comparison, the number of children in the age group of 13 to 17 grew 19.5% between 2002 and 2019. Source needed.

[5] *Id.*

During site visits, the monitoring team reviewed records kept on site for each PMC child placed at the operation.  The monitoring team's record review includes documentation of children's prescription medications, a review of their medication logs and documentation of medication errors, a review of medical records found in site records (including psychiatric records and notes associated with individual and group therapy), and identification of the child's medical consenter for children prescribed psychotropics.

Across the 14 multi-day site visits[6] made between December 1, 2021, and December 31, 2022, the monitoring team documented the following concerns:

- PMC children prescribed psychotropics in contravention of the State's psychotropic medication utilization parameters, posing a risk to children's health and safety;
- Medication log errors; and
- Violations of DFPS policy related to medical consenters.

A. <u>Prescription of Medications in Contravention to the State's Own Parameters</u>

In 2004, HHSC and DFPS created an interagency committee to develop evidence-informed guidance on the use of psychotropic medication with children and parameters for utilization reviews.[7]  The workgroup's most recent update to the Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health (Medication Utilization Parameters) was published in 2019.[8]  In addition to identifying parameters for utilization reviews, the guidance includes a preferred list of medications and recommended dosages.[9]  Though the Medication Utilization Parameters state that the list of medications does not include all of those prescribed for children and adolescents, "[i]n general, medications not listed do not have adequate efficacy and safety information available to support a usual maximum dose recommendation."[10]

The Medication Utilization Parameters identify the following as criteria that indicate a need for further review of a child's clinical status:[11]

- Absence of a thorough assessment for the DSM-5 diagnosis(es) in the child's medical record.
- Four (4) or more psychotropic medications are prescribed concomitantly (side-effect medications are not included in this count).
- Prescribing of:

---

[6] The Monitors did not undertake a comprehensive review of children's records during the 19 awake-night visits conducted in October 2022.

[7] HHSC, Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health (6th Version), *available at* https://www.hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/facilities-regulation/psychiatric/psychotropic-medication-utilization-parameters.pdf

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

- o Two (2) or more concomitant stimulants
- o Two (2) or more concomitant alpha agonists[12]
- o Two (2) or more concomitant antidepressants
- o Two (2) or more concomitant antipsychotics
- o Three (3) or more concomitant mood stabilizers
- Failure to timely/appropriately overlap and cross-taper psychotropic medications when medications are switched.
- The prescribed medication is not consistent with appropriate care for the patient's diagnosed mental disorder or documented symptoms.
- Psychotropic polypharmacy (two or more medications) for a given mental disorder before utilizing psychotropic monotherapy.
- The psychotropic medication dose exceeds the usual recommended doses.
- Psychotropic medications are prescribed for children of very young age (with a list of specific guidelines based on medication type and age).[13]
- Prescribing by a primary care provider who has not documented previous specialty training for a diagnosis, excluding ADHD, uncomplicated anxiety disorders, and uncomplicated depression.
- Antipsychotic medication(s) prescribed continuously without appropriate monitoring of glucose and lipids at least every six months.

According to the CPS Handbook, a Psychotropic Medication Utilization Review (PMUR) "occurs when a child is prescribed medication that is outside" the guidelines, "or if there is a concern regarding the medication."[14]  A PMUR can be requested by a child's CASA, caregiver, medical consenter, an attorney, a residential child care provider "and other interested parties" any time they have concerns about a child's psychotropic medication regime.[15] When CPS staff request a PMUR, DFPS policy requires the staff person to request a written response from STAR Health Behavioral Health.[16]

Superior Healthplan's PMUR FAQ and Stakeholder Manual provide that a PMUR may also be activated through Superior's screening of automated pharmacy claims data.[17] Superior runs monthly screenings to identify foster children whose medication(s) fall outside the parameters.[18]  According to the FAQs, a PMUR may also be activated by a Health Screening if a Superior Service Manager identifies medication(s) prescribed for a

---

[12] The guidance specifies that prescribing a long-acting and immediate-release stimulant or alpha agonist of the same chemical entity does not constitute concomitant prescribing.  *Id.* at 12.

[13] The age-based criteria include: a child less than three year of age prescribed a stimulant; a child less than four years of age prescribed an alpha agonist; a child less than four years of age prescribed an antidepressant; a child less than four years of age prescribed a mood stabilizer; and a child less than five years of age prescribed an antipsychotic.

[14] DFPS, CPS Handbook § 11327.

[15] *Id.*

[16] *Id.*

[17] Superior Healthplan, Psychotropic Medication Utilization Review (PMUR) Process for STAR Health Members FAQ and Stakeholder Manual (July 2019), *available at* https://www.dfps.state.tx.us/Child_Protection/Medical_Services/documents/STAR_Health_English.pdf

[18] *Id.*

6

child that appears to be outside the parameters.[19]   However, Superior notes that not all PMURs will result in a formal PMUR report.  Superior explains:

> Superior wants CPS staff, medical consenters [,] and caregivers to contact the doctor to ask why a medication or dosage was prescribed. Only the doctor can answer this based on the foster child's problems and symptoms. The PMUR process can take 2-3 weeks to complete.  Waiting for the formal PMUR report can delay needed treatment or changes in medications.  The doctor should be made aware of any concerns about side effects to take any needed action.[20]

After completing the site visits, the monitoring team analyzed the reviews of children's site records.  The following concerns were noted:

- Numerous children at multiple sites were prescribed four or more psychotropics (excluding medications prescribed for side effects).  Of the 161 PMC children whose files were reviewed across 14 sites, 75 (47%) were prescribed four or more psychotropics.  Some of these children were prescribed two concomitant anti-depressants, stimulants, or antipsychotics.  Most of these children (41, or 55%) were teenagers.  Of the children who were under the age of 13, the youngest was eight years old.[21]
  - Of the 75 children, a Psychotropic Medication Utilization Review (PMUR) had been completed at some point for only 21 (28%).[22]  However, most of

---

[19] *Id.*

[20] *Id.*

[21] The children under age 13 included:
- an eight-year-old child
- six nine-year-old children
- seven 10-year-old children
- six 11-year-old children; and
- thirteen 12-year-old children.

[22] Multiple PMURs had been completed for 10 of the children.  Among the 21 children for whom the Monitors found a PMUR in Health Passport records, a total of 33 PMURs were found.  Though the PMUR form has changed slightly between 2014 (the earliest found during the Monitors' review) and 2022, the reviewer chooses from four differing findings:

- Medication regimen is within the parameters.
- Medication regimen is outside parameters.  Medications reviewed and found to be within standard of care.
- Medication regimen is outside parameters.  There are opportunities to reduce polypharmacy.
- Medication regimen is outside the parameters with risk or evidence of significant side effects.

The most common finding across the 33 PMURs was that the child's prescriptions were outside parameters but within the standard of care (22, or 67%).  Eight (24%) found the prescriptions were outside parameters and that there were "opportunities to reduce polypharmacy," two (6%) were found to be within the parameters, and the findings of one were unknown because the contents of the PMUR were not in Health Passport (see below).  None of the 33 PMURs found the medication was outside the parameters "with risk or evidence of significant side effects," even when the risk of significant side effects was noted (see below). The eight PMURs that found "opportunities to reduce polypharmacy" were completed for six children (two children had two PMURs that made this finding).  These eight PMURs outlined health risks associated with the drugs prescribed that included:

- Risk of serotonin syndrome and serotonin toxicity.
- Increased risk of central nervous system (CNS) depression, psychomotor impairment, and altered seizure threshold.
- Increased risk of hypotension, QT prolongation (an irregular heart rhythm), cardiac arrhythmias, and sudden cardiac death.
- Increased risk of hyponatremia and bleeding due to antiplatelet effects.
- Increased risk of orthostasis (low blood pressure on standing) and syncope (fainting).
- Short-term and long-term metabolic side effects including obesity, hypertension, and hyperglycemia.
- Risk of extrapyramidal symptoms and tardive dyskinesia.

One child's Health Passport records included five PMURs completed between April 16, 2014, and July 31, 2020. The first was completed two months after the child turned eight years old, with a second completed six months later. According to the child's first PMUR, he was diagnosed with bipolar disorder, ADHD combined type, and a sleep disorder. Both the first and second PMURs reviewed the same list of psychotropics prescribed to the eight-year-old (Intuniv and Focalin for ADHD, and Risperidone and Depakote for mood) and found that though the medications were outside parameters, they were within the standard of care. The first PMUR recommended attempting to discontinue one of the ADHD medications (Intuniv). The second PMUR did not indicate whether there had been any attempt to discontinue Intuniv. Almost a year after the child's first PMUR was completed, a third review was conducted. The child was taking the same medications, but the dosage of Intuniv had been increased. The medications were again determined to be outside parameters but within the standard of care. In 2019, a fourth PMUR was conducted. Diagnoses of anxiety disorder, a mild intellectual disability, autism, and disruptive mood dysregulation disorder had been added, the bipolar disorder diagnosis disappeared, and medications had changed to Vistaril for anxiety, Adderall XR for ADHD, Abilify for "irritability" and Clonidine for hyperactivity and impulsivity. The medications were found to be outside parameters but within the standard of care. In 2020, another PMUR was completed almost a year after the fourth. The child's diagnoses had grown to include persistent mood affective disorder, bipolar disorder again appeared in the list, and suicidal and homicidal ideations were noted. His medications still included a stimulant, as well as Clonidine, for ADHD, but an anti-psychotic (Ariprazole) had been added, along with Hydroxyzine and Trazadone to treat anxiety and insomnia. Vistaril and Abilify had been discontinued. The medications were found to be outside parameters but within the standard of care. The child's site records showed that when the monitoring team visited in February 2022, his medications had changed again, with Hydroxyzine administered "as needed," Trazadone discontinued, and Melatonin added for sleep. The child was still taking a stimulant and Clonidine for ADHD and Ariprazole, the anti-psychotic.

Health Passport records for a 10-year-old boy showed three PMURs had been completed between January 25, 2018, and March 30, 2022. The first was completed when the child was six years old and was triggered by a court order requesting the review. At that time, the child's diagnoses were as follows: bipolar with psychosis, ADHD, and neuro-developmental delays. The child was prescribed Risperidone for psychosis and mood instability, and Guanfacine for ADHD. The prescriptions were found to be outside parameters but within the standard of care. In September 2020, a second PMUR was conducted. However, his Health Passport records included only the cover pages for the PMUR; the Monitors do not have access to the substance of the review. A third PMUR was conducted in March 2022, after the monitoring team's site visit to the RTC (Guiding Light) where he was placed in February 2022. This PMUR listed the following diagnoses: ADHD, borderline intellectual functioning, and PTSD, and indicated sexual abuse and child neglect had been confirmed. His prescriptions included a stimulant and Guanfacine for ADHD, Risperidone, Oxcarbazepine, and Trazadone, and had not changed since the monitoring team's visit. The PMUR found the medications to be outside parameters and noted "opportunities to reduce polypharmacy," stating "It is unclear what the indication is for the antidepressant and antipsychotic medications based on the listed diagnoses in claims. There is no diagnosis of mood, anxiety, or psychotic disorder noted. There is no psychotropic medication indicated for the treatment of Conduct Disorder. Standard of practice would be the implementation of behavioral therapy, parent education, and support, Parent Management Training, and treatment of co-morbid conditions, such as ADHD, if present." The PMUR also noted duplicate

the PMURs had been completed a year or more before their placement at the operation visit and were completed while the children were taking a different set of medications than they were prescribed at the time of the visit. Of the 18 children with a PMUR that was completed before the monitoring team's visit, the PMUR reviewed a different set of medications than those prescribed at the time of the monitoring team's visit for 17. Only one child was taking the same set of medications reviewed by the PMUR.

o The PMUR for three children was conducted after the monitoring team's site visit occurred. All three of these children were placed at the same facility (Guiding Light RTC). The PMURs for all three found that the medication regimen reviewed was "outside parameters" and that there were "opportunities to reduce polypharmacy." The Monitors' review of the three children's Health Passport records showed that as of December 27, 2022, one child's medications had been reduced, one child's medications remained the same, and one child was still taking the medications reviewed by the PMUR, as well as an additional psychotropic medication that had been added.[23]

---

medications targeting mood stabilization and suggested continuing the medication that was most effective and discontinuing the less effective medication. It also noted potential adverse drug reactions or side effects, with a long list of very specific risks for multiple combinations of the drugs prescribed. The Monitors' review of the child's Health Passport records showed that as of December 27, 2022, the child's medications and dosages had not changed.

[23] The three children included a 10-year-old girl whose behavioral health diagnoses (according to the PMUR) included disruptive mood dysregulation disorder, autism, ADHD, conduct disorder, and a single episode of major depressive disorder. She was confirmed to be a victim of child neglect. When the monitoring team visited the operation in February 2022, she was prescribed Abilify (Aripiprazole), Clonidine, Depakote (Divalproex Sodium), and Methylphenidate (a stimulant used to treat ADHD). By the time the PMUR was conducted on July 12, 2022, almost five months after the site visit, Trazadone had been added to the child's prescriptions. The PMUR was triggered by the number of psychotropics prescribed and the prescription of two antidepressants. The PMUR recommended addressing the duplicate drug therapy, optimizing dosage to taper the child off duplicate therapies, and warned of potential adverse reactions or side effects, based on the drugs she was prescribed. The Monitors reviewed her Health Passport records on December 31, 2022; there had not been any change in the drugs she was prescribed. The children also included the 10-year-old boy whose three PMURs are described in footnote 22, above.

The third child, a 15-year-old boy, had behavioral health diagnoses of adjustment disorder with depressed mood, major depressive disorder (which was characterized as recurrent severe), intermittent explosive disorder, borderline intellectual functioning, ADHD (combined type), disruptive mood dysregulation disorder, and conduct disorder. He was noted to have a confirmed history of child neglect, and physical and sexual abuse. He was prescribed Aripiprazole, Prazosin (a blood pressure medication used off-label to treat trauma symptoms), Clonidine, Escitalopram, Trazadone, and Hydroxyzine. Four of the drugs had been prescribed by the same doctor (Aripiprazole, Prazosin, Clonidine, and Trazadone), but the Escitalopram had been prescribed by a different doctor, and the Hydroxyzine by a psychiatric nurse practitioner, but all were prescribed while the child was placed at Guiding Light. The PMUR, which was completed on March 3, 2022, was triggered by the number of psychotropics prescribed, by the prescription of two antidepressants, and by a court order. According to the PMUR, the child was hospitalized at the time. The PMUR stated that because it was "unknown what medications the [child] [would] discharge with," the PMUR recommendations might not be applicable after his discharge. The PMUR noted opportunities to reduce polypharmacy but did not make specific recommendations. It listed the risks and Black Box warnings associated with each of the drugs prescribed. The child's placement has changed several times since the monitoring team's visit to Guiding Light and the completion of the PMUR. After he was discharged from the hospitalization discussed in the PMUR, he did not return to Guiding Light. He moved

- At one RTC, Paloma Place, 7 of the 12 PMC children were prescribed from .5 to 2 milligrams (mg) of Risperidone to be given on an "as needed" basis, with instructions to administer the drug in conjunction with 50 mg of Hydroxyzine. One child's records indicated this cocktail should be administered as needed "for aggression."[24]  Another child's records indicated these medications should be given as needed for "severe agitation."  Prescribing Risperidone for use "as needed" is inconsistent with the guidelines.  Paloma Place was the only site where the monitoring team observed Risperidone prescribed on an "as needed" basis.
- Children at multiple sites were prescribed Oxcarbazepine, a mood stabilizer, which the utilization parameters indicate was "reviewed but not included/recommended" due to "insufficient evidence."[25]
- Children were prescribed Buspirone, an anxiolytic, which is not recommended in the utilization parameters.  HHSC's Medication Audit Criteria and Guidelines for Buspirone note that it was approved for adults in August 2020, but under "Age-Specific Considerations" stated the drug "[h]as been evaluated in placebo-controlled trials involving pediatric patients aged 6-17 years of age, but there were no significant differences found between Buspirone and placebo" and notes "no long-term safety or efficacy data in this population."[26]

---

between CWOP Settings, Temporary Emergency Placements (TEP), and psychiatric hospitals until November 29, 2022, when he was arrested and placed in a juvenile detention center.

The child's Health Passport records show that his medications changed several times after the hospitalization identified in the PMUR.  His prescriptions were reduced when he was discharged on March 11, 2022, and included Clonidine, Risperidone, Trazadone, and Depakote (based on his Health Passport records and IMPACT records, he was taking 750 mg of Depakote daily: 250 mg in the morning and 500 mg at bedtime).  His Health Passport and IMPACT records show that Prozac was added and Trazadone was discontinued after a subsequent hospitalization in July.  In September, Clonidine appears to have been discontinued, and the child was prescribed Doxepin, and Fluoxetine in addition to Risperidone and Depakote. The November CVS Monthly Evaluation in the child's IMPACT records document deteriorating behavioral health during his stay in a CWOP setting that month and note that on November 9, 2022, his psychiatrist again changed his medications, discontinuing Doxepin and doubling the Prozac dosage. His caseworker was attempting to schedule an appointment for him with a therapist that month before the child was moved from the CWOP Setting and placed at an emergency shelter on a child-specific contract.  The child was placed in the shelter before the intake with the therapist could be arranged.  The child was arrested for attempting to rob a gas station attendant after running away from the emergency shelter with another youth.

[24] Despite the prescription of Risperidone, both the Child's Plan in place at the time of the monitoring team's visit, and the most recent Child's Plan completed report that the child is not prescribed any psychotropic medications.

[25] *Id.* at 41.  HHSC's Medication Audit Criteria and Guidelines show that Oxcarbazepine was only approved by the HHSC's Psychiatric Executive Formulary Committee (PEFC) for adults in January 2021, and confirms that it was not included in the parameters for children and youth due to insufficient evidence. HHSC, Medication Audit Criteria and Guidelines, Oxcarbazepine, *available at* https://www.hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/facilities-regulation/psychiatric/criteria/oxcarbazepine-criteria.pdf

[26] HHSC, Medication Audit Criteria and Guidelines, Buspirone, *available at* https://www.hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/facilities-regulation/psychiatric/criteria/buspirone-criteria.pdf

- Children were prescribed tricyclic anti-depressants (Imipramine, Doxepin) though the utilization parameters do not recommend them.[27]

## B. Medication Errors and Medication Log Errors

In addition to concerns related to psychotropics that appear to have been prescribed to children in contravention of the parameters, the monitoring team reviewed the children's medication logs and documented concerns related to either medication errors or errors documenting the administration of medication.

For example:

- At Camp Worth RTC, two children were prescribed anxiety medications on an "as needed" basis.  Despite this, their medication logs showed that they were administered the medication every morning and evening without any documentation of the reason for administering the medication, in violation of minimum standards.[28]
- At DePelchin, one child's site records showed their doctor ordered that one psychotropic (Qelbree, prescribed for ADHD) be discontinued and another (Intuniv) started on June 21, 2022.  The child's medication logs showed that Qelbree was discontinued on June 21, 2022, but Intuniv was not started until July 1, 2022. Another child's records showed that Latuda was supposed to be discontinued on June 21, 2022, but medication logs showed that it was administered through the end of June.
- At Gold Star Academy, the PMC children's medication logs did not consistently document the time that the medication was administered.[29]
- Several problems were identified in children's records at Silver Lining RTC:
  - The medication log for a child showed that he was last given a dose of a prescribed ADHD medication (Vyvanse, a stimulant) four days before the monitoring team's visit, yet there was no documentation in his records indicating the medication had been discontinued.

---

[27] HHSC, *supra* note 7 at 22.

[28] 26 Tex. Admin. Code §748.2151(c)(8) (requiring medication records to include the reasons for administering PRN psychotropic medication, including the specific symptoms, condition, and/or injuries of the child).

[29] This facility was not using a medication log; instead, the facility was using photographs of the blister packs of the children's medications, with the staff person who administered documenting the date (and sometimes the time) that the medication was administered, and their initials.  Gold Star Academy had successfully completed a voluntary Plan of Action (POA) approximately two months prior to the monitoring team's visit; the POA addressed multiple problems associated with administering medication, including the failure to document the time that medications were administered to children.  The monitoring team also found the medications were not under double lock during the visit, in violation of minimum standards, another issue covered by the POA.  Though the door to the medication room was locked on the days that the monitoring team visited, the medication cabinet and refrigerator were not, and were easily opened each of the days that the monitoring team was on site.

- o Another child's medication logs appeared to indicate he had not received ADHD medication (Concerta, also a stimulant) for 10 days after the RTC ran out of the medication.[30]
- o Another child's records showed that the psychiatrist had decreased the dosage of a medication (Abilify, from 10 mg to 5 mg) in December 2021, but medication logs appeared to show the child continued to receive the higher dosage until March 2022.
- o Another child's records indicated he was supposed to receive a medication (Clonidine) in the morning and at noon; yet his medication logs showed the medication was being administered in the morning and at night.
- o Medication logs were prefilled with a staff member's signature, the date of administration, and pill count, and lacked only the time the medication was administered.   During staff interviews, staff confirmed that one staff member pre-filled all information except the time the medication was administered, and the staff who administered the medication filled in the time that it was administered.[31]

- At ACH RTC, the monitoring team's review of PMC children's records showed many documentation errors, including failure to timely refill medications, missed doses, miscounted medications, and failure to follow psychiatric orders.   The monitoring team's review of medication logs for nine of the 10 PMC children[32] showed that all had missed at least one dose of prescription medication in August 2022 because the RTC failed to refill the medications promptly. Examples include:
  - o A child whose August medication log showed they were not administered Seroquel and Zoloft for nine days.
  - o A child whose August medication log showed the medication count for Vistaril (used as a sedative) at "0" for nine days, and Lexapro (an antidepressant) at "0" for a week.
  - o A child whose August medication log showed they were not administered a morning dose of Qelbree, as prescribed, for nine days.

---

[30] When the monitoring team asked about the lapse in this medication, the Program Director said that the medication was on back-order at the pharmacy.  This was the subject of a call made to the hotline by the monitoring team, discussed below.

[31] When the monitoring team arrived for the daytime visit at approximately 9:30 a.m. on August 16, 2022, the binder that contained children's medication administration logs (MARS) was on the kitchen table.  The children's MARS from the evening of August 15, 2022, and the morning of August 16, 2022, did not document the time the medication was administered but were pre-filled with a staff member's signature, the date of administration, and the pill count. The staff member who signed the children's MARS was not working the shift during which the medication was administered.   During their interview with the monitoring team, a caregiver said that they administered the medication, but all the information, excluding the time the medication was administered, was pre-filled by a different staff member.  The staff member who pre-filled the medication logs confirmed this practice and said that though she signs and prefills most of the information in the MARS, the staff member who administers the medication fills in the time it was administered.   This is inconsistent with minimum standards, which require children's medication logs to be updated within two hours of administering medication and require medication logs to be signed by the person who administered the medication. 26 Tex. Admin. Code § 748.2151.

[32] ACH did not provide medication logs for one of the PMC children.

- o A child whose August medication log showed the medication count for morning and evening doses of Depakote ER and Seroquel at "0" for five days.
- o A child whose August medication logs showed missed doses of Seroquel on five days, missed doses of Trileptal on eight days and missed doses of Zoloft on four days.
- o A child whose August medication logs showed they did not receive Zoloft for five days.[33]
- At ACH RTC, some children's medication logs had blanks with no information at all, but the children's records failed to document any reason for this (for example, a hospitalization, home visit, or refusal of medication). Others showed a miscount of medication, with no explanation. Medication logs also showed children were not being administered the medication as prescribed. Examples included:
  - o A child whose records indicated a morning dose of Seroquel was supposed to be discontinued after August 9, 2022, but who continued to receive the dose until the child was hospitalized on August 15, 2022, then continued to receive the dose after returning from the hospital on August 24, 2022.
  - o A child whose records showed Vistaril was prescribed on an "as needed" basis but whose medication logs showed they were receiving the medication every evening without any documentation of the reasons it was administered.
  - o A child whose medication logs documented pill counts for a Seroquel prescription for August 27 – 30 as: 9, 8, 6, 5.
  - o A child whose August medication logs showed the pill count for a Remeron prescription was 25 on August 20, then 28 on August 23, without documenting any reason or correction of an error.
  - o A child whose August medication logs showed the pill count for a Trileptol prescription was 23 on August 24, and 25, without documenting a reason.
  - o A child whose September medication logs had irregular counts for a prescription for Intuniv. The child's prescription specified a one-milligram pill be given twice daily. The evening count for September 1 – 6 read: 8, 6, 4, 27, 26, 25. The morning count for the same dates read: 8, 7, 6, 3, 32, 30, 29.
- At Paloma Place RTC, the monitoring team's review of medication error reports showed three children did not receive medication because they were waiting for a refill of a prescription.
- At Moving Forward RTC, a child's prescription for Seroquel was increased from 50 mg to 75 mg when the child was hospitalized. When the child returned to the RTC, the RTC continued to administer the medication at a lower dosage.

---

[33] During interviews, the monitoring team asks children if they are receiving their medications as prescribed. Eight of the nine children whose records documented that they were not receiving medications as prescribed were unaware of the problem. The errors in medication management at ACH RTC were not limited to psychotropic medications. For example, one child's records showed Naproxen was not being administered as prescribed. Another child's records showed she was supposed to receive an oral antibiotic twice daily for 10 days for a UTI, but it took 20 days to administer the 10-day regimen.

- At Helping Hand Home, the medication logs were prefilled and initialed and did not include medication counts, making it impossible to determine whether the medications were being administered as prescribed.
- During the monitoring team's awake-night visit at Open Arms, Open Hearts, a staff person reported that she distributed morning medications that are prepared for her by another staff person who completes the medication logs. During the review of children's site records, the monitoring team confirmed that the awake-night staff person's initials were not on the medication logs for children's morning medications.[34]

C. Violation of DFPS Policy for Medical Consenters and Documentation of Informed Consent

Finally, the monitoring team documented several instances in which the child's psychotropic medications had changed after being placed at the facility, but where the site records did not include the appropriate consent form. There were also some children whose site records or IMPACT records showed that a staff member at the RTC where the child was placed had been named as a medical consenter, contrary to DFPS published policy.[35]

- At Guiding Light RTC, site records for four of the PMC children were missing consent forms for psychotropic medications prescribed after the child was placed at the facility. One child's records showed the court voiced concerns that the child might be on too many medications, prompting the CPS caseworker to call the facility to express concern.  No medication changes were made after the caseworker's call, but this child was one of the three with a PMUR conducted after the monitoring team's site visit concluded.  The PMUR indicates that the review was triggered automatically because the child was prescribed six psychotropics, two of which were antidepressants, but also shows the court requested the PMUR.
- At Camp Worth RTC, site records for three PMC children whose medications changed after placement were missing signed medication consent forms.

---

[34] During the monitoring team's awake-night visit, the caregiver said that though she administered the children's morning prescription medications, she did not prepare or log the medications in the MARS. The awake-night caregiver reported that the medication logs were kept in the main office.  The medication was dispensed by an administrator or director into individual plastic bags with the children's names, taken to the living units, and locked up in the kitchen. After the medication was administered, the administrator or program director documented the medication count and time of administration and signed the medication logs. While the monitoring team did not document any medication errors during the visit, the practice or pre-pulling of the medication contradicted minimum standards and increased the potential for errors.

Similarly, though the monitoring team did not find medication errors in its review of records at Whispering Hills, the operation's director of nursing reported that medications are pulled in advance for the weekend and overnight staff.  Two different medication logs are kept at the facility:  on in the nurse's station and one in the children's houses on the other side of the campus.

[35] DFPS, Child Protective Services Handbook Section 11113.2 (Listing residential facility staff who are not eligible to be medical consenters, and explicitly stating that DFPS "must not" designate employees of GROs operating as residential treatment centers, or GROs offering intellectual disability or pervasive developmental disorder treatment services, as a child's medical consenter or backup medical consenter).

- At Gold Star Academy, site records for two of the PMC children were missing medication consent forms. In addition, placement records found in one PMC youth's site records showed DFPS designated an employee of the RTC as the child's backup medical consenter, in violation of DFPS policy.
- At DePelchin, psychotropic medications for two children changed after they were placed at the facility; their site records did not include a signed consent form for the new medication. One of these children had been prescribed a new antipsychotic medication, and the new medication was causing extrapyramidal symptoms (EPS) that her prior antipsychotic medication did not cause.
- At Silver Lining RTC, DFPS forms in the PMC children's site records showed DFPS appointed the RTC's administrator or another staff member as the children's primary and/or backup medical consenter.[36] In addition, though six of the PMC children had a medication change after being placed at Silver Lining, a psychotropic medication consent form was not in their site records.[37]
- At Moving Forward RTC, DFPS designated one of the facility's controlling persons as the primary medical consenter for two of the four PMC children. A DFPS form for a third PMC child was signed by DFPS staff as the primary and second primary medical consenters but was signed by the same controlling person for the facility as the backup consenter.
- At Open Arms, Open Hearts RTC, though the monitoring team found medication consent forms in all the PMC children's site records, the facility's director, and program director were named as second primary medical consenters for two of the PMC children. However, during interviews, both said they asked that DFPS be designated as both the primary and backup consenters, but that DFPS failed to respond.

## II.    Problems Associated with Intake or Investigation of Reports Made to SWI by a Member of the Monitoring Team

The monitoring team made a total of 10 reports to the Statewide Intake (SWI) hotline based on events either witnessed during site visits or for an event that a child or staff member reported to team members during an interview. The Monitors noted problems with intakes or investigations associated with all these reports, including the following:

- Failure to appropriately screen-in cases for an investigation of abuse, neglect, or exploitation. Of the 10 reports made by a monitoring team member (MTM) to SWI, three were screened out for an investigation of abuse, neglect, or exploitation by DFPS and were instead investigated by HHSC for minimum standards

---

[36] The Monitors also reviewed the children's IMPACT records and did not see this change in medical consenters consistently documented in IMPACT.

[37] Two children's site records included e-mails from their caseworkers communicating the caseworker's consent. However, one child's medications changed in February and March, but the e-mail was not sent by the child's caseworker until May. For the other child, the e-mail was sent the same day the medication was changed, but the child had a subsequent medication change, and there was no e-mail or other communication from the caseworker documenting consent in the child's records.

violations.  The Monitors disagree with the State's decision not to investigate these allegations for abuse, neglect, or exploitation in all three cases.

- Failure to appropriately investigate allegations that were screened in for investigation of abuse, neglect, or exploitation. The Monitors found the investigation was so substantially deficient that the disposition could not be validated in six of the seven cases.

The Monitors also noted significant discrepancies between the information conveyed to the DFPS investigators by alleged victims, collateral children or staff, or witnesses (including members of the monitoring team) and the summaries of these interviews found in IMPACT contact notes. In some cases, the misinformation included in the contact notes appears to have informed the disposition of the case.

Finally, DFPS ignored information and documentation provided by the MTM who made a report to SWI following the site visit to Silver Lining RTC.  The Monitors were able to inform HHSC that the evidence existed, resulting in an additional five citations for minimum standards violations, but DFPS did not reopen its investigation to consider the evidence.

A. Guiding Light RTC

HHSC issued a permit to Guiding Light in 2013.  Guiding Light was on probation at the time of the monitoring team's visit. The operation completed its probation approximately six months after the site visit, on August 3, 2022. The basis for the probation included violation of minimum standards associated with prohibited punishment, reporting, and documenting serious incidents, EBI implementation and documentation, supervision, and medication storage.

The operation is licensed to house 79 children.  The operation reduced its population over the course of the probation; when probation started in August 2021, the operation had 53 children in its care.   At the time of the monitoring team's visit, only 30 children lived at the facility.  The facility's census has increased since completing probation: as of February 9, 2023, the operation was caring for 37 children. DFPS suspended placements to Guiding Light on February 7, 2023.

CLASS Investigation ID: 2864284

On February 25, 2022, after completing the site visit to Guiding Light RTC, a member of the monitoring team reported to SWI that during an interview on February 23, 2022, a 16-year-old child at Guiding Light RTC made an outcry that six days earlier a staff person had restrained him by pushing him against a wall and twisting his arm behind his back.[38]

---

[38] Restraints that place a child's limb(s) behind the child's back are prohibited.  26 Tex. Admin. Code §748.2461.

The child said the restraint hurt and reported that he had scratches and bruises on his arm. The child showed the member of the monitoring team bruises on his arm. The member of the monitoring team reported to SWI that the bruising "looked like finger prints [sic]" and appeared to be bluish in color. The member of the monitoring team told SWI that she took a photograph of the bruising. The report was screened out for investigation of abuse, neglect, or exploitation by DFPS and opened as a Priority 2 investigation of minimum standards violations by HHSC.

The HHSC investigator interviewed the MTM who reported the incident on February 28, 2022. The MTM gave the investigator the name of the staff person who allegedly restrained the child. She repeated the allegations that she reported during the call to SWI and noted that the child reported to her that the restraint made him feel unsafe but told her that it had happened only one time. She sent the investigator the photograph she took of the bruise.

The same day, the investigator interviewed the child at his school. Though the child acknowledged having been recently placed in a "kind of restraint" that he "explained…was like a pre-restraint," he declined to provide the investigator with more details, stating that "he came from an operation that closed down after he spoke to licensing, and Guiding Light is not bad so he will prefer not to say anything bad about them." The child, "stated he didn't want to speak about the restraint but refused to explain why." he told the investigator "[h]e may have seen a restraint that was weird, but…will not give the names of staff or kids." He told the investigator that none of the other children witnessed the restraint and "no kids were around." He was wearing a long-sleeved hoodie, refused to show the investigator his arms, told the investigator he didn't want to discuss the restraint, and "stated again he is not going to say anything bad about Guiding Light."

The investigator visited the facility to complete the inspection and interview other children and staff on March 7, 2022, a week after he interviewed the alleged victim. None of the collateral children who were interviewed reported witnessing a restraint. The alleged perpetrator and a collateral staff person denied the restraint occurred, though they acknowledged the alleged perpetrator used a "body position" to prevent the child from leaving the operation. A Serious Incident Report, completed the same day the MTM

---

Guiding Light has a history of a high rate of restraint use. In 2020, the RTC reported having used a restraint 533 times. The operation reduced its restraint use in 2021 but reported using a restraint 191 times.

When the monitoring team interviewed children at the RTC, some children indicated that one of the things they would change about Guiding Light was the frequency in the use of restraints. In addition to the alleged victim in the report that the MTM made to SWI, two other youth described restraints that were painful and that involved having their arms twisted and lifted high behind their backs. Two children reported having been restrained on their beds. One of these children said the staff person pushed his head into the bed so that he couldn't breathe; the other child said she was also restrained on her bed on her stomach. Several children reported prone or supine restraints. Of the 12 children who completed a full interview with the monitoring team, eight reported having been restrained since coming to the RTC. In addition to documenting children's complaints regarding the way restraints were being conducted, the monitoring team documented that the RTC was not appropriately reporting restraint use. The monitoring team found several incident reports in children's site records that referred to an intervention that minimum standards describe as a restraint that did not have a corresponding restraint report.

interviewed the child (a week after the runaway attempt occurred), documented the incident the staff described during their interviews. The investigator obtained staffing lists confirming that the alleged perpetrator was the caregiver for the child the day the restraint allegedly occurred. The HHSC minimum standards investigation was closed on March 25, 2022. No citations were issued.

The Monitors' concerns include the following:

- The allegation that a staff member improperly restrained a child, causing pain and injury, meets the threshold for a Physical Abuse investigation, based on:

    Physical injury that results in substantial harm to the child or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the history or explanation given and excluding an accident, by a person responsible for a child's care, custody, or welfare. 40 TAC §707.789(a)(1).

HHSC later substantiated similar allegations made by other children. Six months after the investigation's completion, on September 29, 2022, a Priority 3 HHSC investigation was opened after a 10-year-old child complained that she "had her arm bent back in a restraint." During her interview with the investigator, the child said that "there were marks on her arm and stomach" after the restraint, and that "she was hurt, and she cried." Despite this, the investigation was not upgraded to an investigation for Physical Abuse. The operation was cited for prohibited personal restraints because "[f]ive of seven children interviewed identified various members of staff pulling children's arms behind their backs." The operation was re-cited during the follow-up inspection on November 3, 2022, because children again reported being restrained in this unsafe, prohibited way.

B. <u>Gold Star Academy</u>

Gold Star Academy began operating in July 2019 and received its full permit on January 7, 2020. Despite not having been licensed for long, when the monitoring team visited the operation in May 2022, the facility had recently completed a voluntary Plan of Action (POA). The POA included requirements targeting problems associated with minimum standards for reports and record keeping, medication administration, Emergency Behavior Intervention (EBI),[39] and physical site. The facility is licensed to house 15 children; when the monitoring team visited, the operation was serving 13 children.

1. CLASS Investigation ID: 2887905; IMPACT Investigation ID: 49177624

The monitoring team made two reports to SWI after visiting Gold Star Academy. The first was made using the abuse hotline's online reporting portal after a member of the monitoring team assisted a child (Child A) in reporting an allegation of child-on-child sexual abuse to a supervising caregiver at the operation. Child A made an outcry during his May 24, 2022, interview with two members of the monitoring team; he said that his

---

[39] Minimum standards related to EBI limit restraint (physical, chemical, and mechanical) and seclusion use in GROs. *See* 26 Tex. Admin. Code §748 Subchapter N.

roommate (Child B) had touched him sexually while he was sleeping.  Child A said that he wanted to report the alleged abuse to Staff 1 at the facility and make a report to SWI.

After completing the interview, the two members of the monitoring team accompanied Child A to make his outcry to Staff 1 and witnessed him tell the staff he wanted to report the allegations to SWI.  Staff 1 told Child A that she would let the administrator of the facility know.  While one member of the monitoring team waited with Child A, Staff 1 went into the administrator's office.  When Staff 1 emerged from the office, she did not offer Child A the opportunity to use the phone to make the report.  When the MTM eventually entered the administrator's office, he seemed unaware of Child A's request to be allowed to call SWI.

The intake narrative documents the time and the persistence it took for the MTM to secure a phone for the child to make the call to the hotline.  When the MTM was finally able to secure a phone that the child could use privately (the administrator indicated that children usually make calls from his office with a staff person in the room), the child waited 13 minutes for SWI to answer his call, and eventually decided to hang up because "he did not want to miss 'hygiene' or miss an opportunity to call his caseworker."  The MTM's report to SWI articulates concern for the staff's response to the child's outcry and request to use a phone to call the hotline; the length of time it took for SWI to answer when the child was finally able to place the call; and the allegations of Neglectful Supervision associated with the outcry itself.  Neither Staff 1 nor the administrator had made a report to SWI regarding the child's allegations when the MTM made the report on May 27, 2022 (the day after the site visit was completed).[40]

The member of the monitoring team reported to SWI, "I was deeply concerned at the observed response to his outcry and request to call the abuse and neglect hotline by both [Staff 1] …and [the administrator]. I am also concerned that the outcry includes potential neglectful supervision during overnight hours."  According to the intake narrative, the MTM reported that Child A "made an outcry that [Child B] has tried to become 'very sexual' with him and others in his room inappropriately on multiple occasions during late night hours in his bedroom and that it was done during the 15-minute periods between room checks."  The MTM said, "During a monitoring interview me and my colleague were

---

[40] The monitoring team also noted that Gold Star staff and administrators did not seem to be aware of which children in their care had been flagged by DFPS with an indicator for sexual aggression or as a victim of sexual abuse.  A room chart signed by the administrator listed only three youth as having a flag for a sexual characteristic, which was inaccurate.  The chart failed to identify two youth who were flagged as victims of sexual abuse.  The chart also showed a victim was rooming with children flagged with an indicator for sexual aggression.

Of the 12 staff interviewed, only one staff member (the administrator) could identify by name all the children who were flagged by DFPS as a victim or with an indicator for aggression. Meanwhile, *none* of the awake-night staff who were interviewed during the monitoring team's awake-night visit could name *any* of the children flagged with an indicator for aggression or victimization.   The monitoring team also noted during their review of children's site records that none of the caregivers had signed the child's Attachment A in two of the files reviewed.   A binder that should contain the Attachment A signature sheets for staff included only signatures, without the actual Attachment A information; even so, it did not include a signature for all the staff responsible for supervising children.

conducting with [Child A] he made an outcry to us stating that [Child B] is very sexual and has touched and tried to touch and do other things to him and others in the nighttime between room checks."

The intake narrative also states that the MTM reported that it was her understanding that a Safety Plan was in place requiring increased supervision of Child B based on another incident.[41]   The intake narrative states that the MTM reported to SWI that she did not witness one-to-one supervision of this child during the awake-night visit that the monitoring team made at the beginning of the site visit.[42]   DFPS opened a Priority 2 investigation of Neglectful Supervision.

DFPS ruled out Neglectful Supervision in this case and in the related investigation that resulted in the Safety Plan.   In this case, DFPS found:

> Based on information gathered during the investigation, the allegation of Neglectful Supervision of [the alleged victims] by an unknown [alleged perpetrator] cannot be validated because there is not enough preponderance of evidence that Neglectful Supervision occurred. Therefore, the disposition will be Ruled Out for Neglectful Supervision.   The evidence which led to this disposition is as follows:
>
> It was alleged that a resident ([Child A]) was inappropriately touched while in his sleep by another resident ([Child B]) while living at the facility.
>
> [Child A] reported that he was touched inappropriately while in his bed by his roommate [Child B].   [Child A] reported that he was unaware of the number of times and when it started.   [Child A] did not identify what staff was on duty during the incident.   [Child A] reported that there are 2 staff that supervises and checks on the residents at night.
>
> [The other alleged victims][43] all reported that they have not been inappropriately touch [sic] by another resident while in their beds.   All

---

[41] A review of CLASS and IMPACT showed that ten days before the MTM made this report to SWI, a CVS Courtesy Worker reported to SWI (CLASS Inv. ID 2884112, IMPACT Inv. ID 49162474) that during her visit to the facility, another child (Child C) told her that Child B made him uncomfortable because he had sexual contact with another youth at the facility.   She reported that Child C said he had reported this to staff, and that it "has been going for a while."   She reported that one of the children at the facility had complained to the administrator about Child B's behavior.   The intake narrative indicates that the Courtesy Worker said a Safety Plan was put in place on May 17, 2022 (the day of her report to SWI) requiring Child B, Child D, and Child F to "have 1:1 supervision" and for Child F to sleep in a separate room.   Child A was not named as an alleged victim in this investigation.   The two investigations were not linked, and were assigned by different DFPS investigators, despite the similarities in the allegations.

[42] The intake narrative states, "[I]t is my understanding…that there is a safety plan currently in place involving [Child B] as a result of a separate incident prior to our visit and I did not personally observe one to one supervision of [Child B] occurring during the nighttime (early AM) hours I was at the facility on 5/24/2022. Because I personally observed…that staff cannot directly see what is occurring in any of the bedrooms at any time between room checks."

[43] In addition to Child A and Child B, two other children were named as alleged victims.   The other two alleged victims were Child B's other roommates.

reported that they have not inappropriately touched another resident while at the facility nor seen another resident being inappropriately touched at night.   All reported that there are 2-3 staff present that checks on the residents at night by sitting in chairs in hallways near the bedroom doors. All reported that the staff can see the residents.

[Collateral Children] reported that there are 1-3 staff present overnight sitting in chairs in the hallway supervising the residents.  Both reported that the staff are able to hear and see the residents during the day and at night.

[The overnight supervisor] reported that there are 2 staff overnight that sit on opposite sides of the hallway in chairs that can see inside the bedrooms. [The staff person] reported that the staff checks [sic] on the residents every 10 minutes.

[A direct caregiver] reported that there are 3-4 staff present overnight sitting in chairs in the hallways and checks [sic] on the residents every 15 minutes.  [The caregiver] reported that if a resident gets out of bed the staff can hear them due to the plastic on the beds.

[The alleged victims' CVS caseworkers] all reported that the victims did not make any outcries regarding being inappropriately touched by another resident while in their beds.  All had no concerns regarding supervision of the victim children.

[The LPS caseworker] reported that she has not heard from [the alleged victims] making any outcries regarding being inappropriately touched by [Child B] nor has [Child B] made an outcry about being inappropriately touched by another resident.

[The children's therapist] reported that none of the victims has made [sic] any outcries about being touched by other residents while at the facility. [The therapist] reported that [the alleged victims] has not made [sic] any outcries about being touched in their sleep by [Child B].

Externals reviewed: All victims did not have any particular supervision restrictions. All victims service plans stated that staff may implement more restrictive supervision 1:1 or overnight accommodations when necessary by treatment team.

Both collateral staff reported that [Child B] wets the bed at night and does not want to get up to change clothes or to take a shower when the staff asks [Child B].  Both collateral staff reported that [Child B] sleeps the entire night and that [the alleged victims have not] made any outcries regarding [Child B] inappropriately touching them in their sleep.

HHSC did not issue any citations for minimum standards violations.

The Monitors find the DFPS investigation of child abuse, neglect, or exploitation deficient in the following respects:

- DFPS's findings in the case directly contradict some of the statements made during the investigator's interviews. For example, DFPS found that Child B's other two roommates "reported that they have not been inappropriately touch [sic] by another resident while in their beds." However, during his interview with the DFPS investigator, one of these children said Child B had also attempted to engage him in sexual activity and had rubbed his leg, but that he pushed Child B away. This child said that he reported the behavior to the same staff person to whom Child A made an outcry, but the staff person told him that "they can't take [the children's] word" for allegations of sexually inappropriate behavior because children had lied about it in the past. During her interview, the staff person acknowledged that Child A made an outcry to her but denied that the other child made an outcry.

  Even children who said Child B had not attempted to touch them described him as engaging in sexually inappropriate behavior. When asked to describe Child B, one of his roommates described him as "very sexual." When asked to explain what he meant, the alleged victim said, "Like he would do something to a kid, while he sleeps, like body parts." He said Child B had not attempted to touch him but reported having overheard Child A tell a staff person that Child B had touched him while he was sleeping. Later in the interview, the child again said Child B was "very sexual" and would make inappropriate sexual comments and would "twerk." Similarly, another child described Child B as "very sexual" during his interview with the investigator. Child A was consistent in his outcry.

  Similarly, DFPS found that two of the children reported "staff are able to hear and see the residents during the day and at night," but failed to note in its findings that one of these children reported that one of the awake-night staff slept during their shift. Child A and a collateral child interviewed for the investigation also reported the same awake-night staff person slept at night. The same child who reported that Child B attempted to touch him sexually reported that a different staff person slept at night and was only awake for the first three hours of their awake-night shift. And though the children reported that staff made periodic room checks,[44] Child A reported that Child B would approach him when staff moved away from the chair where they sat between the bedroom doorways. One of their roommates reported

---

[44] The children were not consistent in describing the frequency with which staff checked on them at night. One child reported that staff checked on them "every hour." Another child said staff checked on them every 30-to-45 minutes. One child confirmed that staff checked on them while they slept but did not know how often. Child A was not asked how often awake-night staff checked on the children. When staff was interviewed more than two weeks into the investigation, they said that they had increased nighttime checks and that they were occurring every four minutes. However, the IMPACT notes documenting the interviews with staff do not indicate whether they reported when the increased supervision started, though the named alleged perpetrator said that the increased supervision was due to a Safety Plan being put in place.

that staff would step away from the doorways to do other tasks, like getting the children's clothes ready for school the next day.[45]

It is also unclear whether the investigator considered the children's histories of sexual aggression and victimization in evaluating the children's supervision needs. The operation housed children who were flagged in IMPACT as victims of sexual abuse, and at least one child who was flagged with an indicator for sexual aggression. At the time of the investigation, at least one child who is flagged as a victim was rooming with a child who, at the time of the investigation, was flagged with an indicator for sexual aggression.

- The investigation failed to address all the allegations reported by the MTM. Though the MTM who made the report to SWI clearly articulated that Child A's outcry to facility staff was not reported by that staff to SWI and described the facility's barriers to the child's efforts to make a report to the hotline, the only allegations addressed by DFPS's findings are those regarding nighttime supervision. This omission is particularly concerning because one of Child B's roommates also reported during his interview with the investigator that he told the same staff person about Child B's behavior. Though this staff person was interviewed for both investigations and acknowledged Child A's outcry (but denied the other child made an outcry), she was not asked about her response to his outcry or why she did not make a report to SWI herself.[46] Contact notes in IMPACT indicate that when the investigator interviewed the Courtesy Worker who made the earlier report, the Courtesy Worker said that "residents have not reported anything due to residents not believing staff will do anything."

- The Monitors also note the failure of the investigator to accurately capture the conversation that the investigator had with the MTM who made the report to SWI.[47] The IMPACT contact notes indicate that the MTM told the investigator that

---

[45] During the monitoring team's awake-night visit, the team observed one of the two awake-night staff ironing children's clothes. The team observed this staff member conduct room checks every 15 minutes and return to the ironing board between room checks. The other staff member sat in a chair in between two of the bedrooms between 15-minute room checks. The named alleged perpetrator said that her duties during the overnight hours included "complet[ing] laundry, bathroom, putting up clothes, and supervising the residents."

[46] There is no recorded interview with the staff member in One Case for the investigation of the MTM's report, though contact notes in IMPACT document that an interview took place. The Monitors relied on the contact notes, but also listened to the audio of the interview with the staff person found in One Case for the investigation of the allegations reported by the Courtesy Worker on May 17, 2022. During her interview for the case reported by the Courtesy Worker, she was asked what they do when children engage in sexually inappropriate behavior. She reported that they, "sit down and we talk to them, and then, for the most part, we separate them from [their peer] … and probably maybe give them a packet [of work] based off those behaviors." The investigator did not follow up by asking whether they were reported to the hotline, or who was responsible for making reports to the hotline. She was asked whether Child B "ever made any of the other residents uncomfortable" and she answered, "Yes, sometimes." When the investigator asked how staff responded, she said that the staff redirected him or removed him to the "refocus" room.

[47] DFPS investigators do not regularly record their interviews with the person who makes a report to SWI. Usually, the only record of their interview is the investigator's summary of the interview notes entered into the IMPACT contact for the interview. For purposes of this Update, after the investigations were completed

Child A reported Child B touched "the side of his face and neck area." The MTM did not report what area of the body Child B touched because Child A did not reveal this to her.[48] The contact notes also state that the MTM, "reported that she has been at the facility overnight for monitoring and has not seen anything to raise concerns and have [sic] not witnessed any staff sleeping while at the facility overnight." While the MTM did not witness any staff sleeping, the statement that she did not see "anything to raise concerns" contradicts what she told the investigator, and what she reported to SWI. The MTM specifically reported to SWI that during his outcry, Child A said the alleged sexual abuse occurred in between room checks at night, that it was her understanding that a Safety Plan required Child B to be on one-to-one supervision and that she "personally observed how staff members remain either by the chair between bedrooms 3 and 4 or by rooms 1 & 2 between room checks that occur every 15 minutes" and "saw that staff cannot directly see what is occurring in any of the bedrooms at any time between room checks." During her interview with the investigator, the MTM told the investigator that, particularly given Child A's allegation that the contact occurred between the 15-minute room checks, the location of the staff during overnight supervision made it impossible for them to see into the children's bedrooms between 15-minute checks. She also again expressed concern that she did not witness one-to-one supervision of any of the children, based on her belief that a Safety Plan was in place requiring one-to-one supervision of several of the children, due to the earlier report of allegations of child-on-child sexual contact.[49] While the State's notes suggest she did not express concerns related to night-time supervision, her

---

for the reports made by an MTM to SWI, the Monitors asked the MTM to review the contact notes to determine whether they accurately reflected the information provided by the MTM during the interview.

[48] During his interview with the DFPS investigator, Child A did not want to name the area of his body that Child B touched. The investigator asked, "How did [Child B] inappropriately touch you and how did that all go down." Child A answered, "When I was trying to sleep, he kept coming over there by me and touched me inappropriately." The investigator asked, "Where did he touch you?" Child A answered, "I don't really want to say that." The investigator asked, "Can you say front, back, bottom, top?" Child A answered, "Front." The investigator asked, "Front, middle part?" Child A says, "mmhmm." The investigator then clarifies with Child A that the area that he is referring to is one of the parts of the body used to go to the bathroom and that is covered by a swimsuit.

[49] A copy of the Safety Plan is not in the CLASS, IMPACT, or One Case records associated with this case. A May 27, 2022 contact note in CLASS titled "Safety Plan" states that a Safety Plan was not executed for this case because Child B had been admitted to a psychiatric hospital. Child B's IMPACT records show he was admitted to the psychiatric hospital on May 26, 2022.

Notes in CLASS in the related case (reported to SWI by the Courtesy Worker) indicate that during a field staffing conducted on May 20, 2022, the DFPS investigator reported to an RCCI supervisor that the operation "has already implemented a Safety Plan – one on one supervision for [Child B and two other children]" on May 17, 2022. However, another contact note entered the same day shows the Safety Plan was modified. The only Safety Plan in One Case in this related investigation is unsigned but is consistent with the modified plan described in the CLASS notes. It listed the "Safety Plan Interventions" as "Close Observation, New Room Assignment IF Necessary." Under the heading, "What actions need to be taken right now to keep the child safe?" the Plan required Child B and another child to be in separate groups during the day in a low ratio, and to sleep in separate bedrooms at night. It also required another child to have his own room and to be in a separate group from the other two children during the day.

concerns were articulated both during her report to SWI and during the interview.[50]

- This investigation was part of a pattern of allegations of child-on-child sexual contact at the RTC; a subsequent investigation involving sexual contact between two different children substantiated allegations of Neglectful Supervision.[51] During forensic interviews, the alleged victims in this subsequent case described problems with supervision that were similar to the problems described by Child A and the other children interviewed in the investigation of the reports made by the MTM. For example, both alleged victims in the subsequent investigation said that most incidents occurred while they were in bed at night.  One child said that the staff checked on them every 15 minutes and that "they would do things in between the 15-minute breaks."  The other child said that the staff would move away from their bedrooms to fold clothes.  This child reported engaging in child-on-child sexual contact with several different children during his placement at Gold Star.[52]

---

[50] During her interview with the investigator, the MTM also discussed the allegations reported to SWI by the Courtesy Worker and her observations regarding supervision the night that she visited the facility. Contact Notes in CLASS and IMPACT show that she reported, "[F]rom the hallway you cannot see inside the bedrooms...The chair is against the wall and not in the center of the bedroom [door]...She said [one of the staff members] was ironing clothes, the uniforms for the next day... From the ironing board you can't see into any of the bedrooms."  She said that staff seemed unaware of any requirements for one-to-one supervision.

[51] On June 16, 2022, a subsequent, unrelated report was made to SWI by a DFPS investigator alleging that a child made an outcry that he had been sexually abused by another resident while they both lived at Gold Star; both children had been discharged from the RTC about a year prior to the report to SWI.  The DFPS investigation resulted in an RTB for an unknown perpetrator, and two citations for violations of minimum standards.  DFPS found:

> Based on the evidence gathered during the investigation there was a breach of duty by an unknown staff member of Gold Star Academy causing Neglectful Supervision of [the two children].  [The children] were forensically interviewed, and both admitted to sexually acting out with each other on several unknown dates.  According to the children's service plans both had histories of sexually acting out and had aggressive behaviors.  [One child's] service plan noted risk of sexually acting out and that a Safety Plan was put into place until [his] discharge from the facility.  The Safety Plan listed that [the child] would sleep in a room by himself and away from other residents, that [he] would be monitored at all times and redirected as needed, and that sexualized behaviors would be addressed with the LSTOP therapist. There is a breach of duty due to [the child] being allowed to sleep in a bedroom with other children, the unknown staff member should have realized or expected the children to be exposed to substantial emotional harm because of their documented previous sexualized behaviors in their service plans.  A breach of duty was reached when the unknown staff member failed to comply with [the child's] Service Plan which led to [the two children] being able to sexually act out with each other.  The unknown staff member failed to take an action that a reasonable person of the profession or caregiver should take in that same situation.

[52] These allegations were the subject of two prior investigations, one by HHSC and one by DFPS, conducted in 2021.  In fact, DFPS had interviewed both alleged victims in March 2021, as part of a previous investigation of allegations of child-on-child sexual contact (including between the two victims in the case that resulted in an RTB), and though both children reported to the investigator that they were roommates, DFPS either failed to discover or failed to take any action related to the Safety Plan that was in place requiring one of the children to have his own room.

Though DFPS did not substantiate the allegations of Neglectful Supervision, before the closure of the investigation, Child B was flagged with an indicator for sexual aggression and Child A as a victim of sexual abuse because of the allegations made in the case.

2. CLASS Investigation ID: 2889320

A member of the monitoring team made a second report to SWI on May 27, 2022.  The MTM reported that she witnessed a 12-year-old PMC child being restrained by two staff in a prone position (on his stomach) "for at least 10 minutes."  She reported that there were no other staff or children in the room and that though the child was yelling that he wanted to kill another staff member, that person was not in the room with them. She reported that, based on what she witnessed, she believed he could have been released from the restraint without being a danger to himself or others.  She reported that she was not aware of any injuries to the child because of the restraint, but that she left before he was checked for injuries.

The case was screened out for investigation by DFPS and opened as a Priority 3 HHSC investigation of minimum standards violations. When he was interviewed, the child reported having been placed in a prone restraint.  The staff members denied the restraint occurred. HHSC found the child was improperly restrained and cited the operation for violation of the minimum standard that prohibits the use of prone or supine restraints.[53]

The Monitors disagree with the decision to open this investigation as a Priority 3 investigation of minimum standards violations.  Priority 3 investigations are appropriate in cases involving a "minor" violation of the law or minimum standards that involve "low risk to children."[54]  The dangers to child safety associated with prone restraints are well documented and are the reason that minimum standards restrict their use.[55] The member of the monitoring team reported the child was in the restraint "for at least 10 minutes," violating high-weighted minimum standards.[56]  Placing a child in a prone restraint carries significant risk.[57]  Though the MTM did not know of any injury to the child, the risk of

---

[53] *See* 26 Tex. Admin. Code §748.2461(b)(1).

[54] HHSC, Child Care Regulation Handbook §6241.

[55] Prone and supine restraints are allowed to be used only as a one-minute transitional hold. 26 Tex. Admin. Code §748.2553.  They are prohibited as a method of short personal restraint.  26 Tex. Admin. Code §748.2461. These minimum standards are both weighted "high."  HHSC, RCCR, Minimum Standards for General Residential Operations (December 2022), *available at* https://www.hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/protective-services/ccl/min-standards/chapter-748-gro.pdf

[56] *Id.*

[57] Prone restraints have been linked to injuries and fatalities. In 2021, an autistic student in a Texas public school died after a prone restraint.  Libby Seline and Matt Rocheleau, '*I hurt': Texas special education students face interventions that can be deadly*, San Antonio Express News, October 31, 2022.  A recent study of fatalities linked to restraints showed that of the 63 fatalities studied, 38 involved prone restraints. Michael A. Nunno, et al., *A 26-Year Study of Restraint Fatalities Among Children and Adolescents in the United States: A Failure of Organizational Structures and Processes*, Child Youth Care Forum 51, 661-680 (2022).  In 2009, the federal Government Accountability Office reported on deaths linked to seclusions and restraints that occurred in the nation's public schools and treatment centers.  GAO, SECLUSIONS AND RESTRAINTS SELECTED CASES OF DEATH AND ABUSE AT PUBLIC AND PRIVATE SCHOOLS AND TREATMENT CENTERS

injury is present whenever a prone restraint is used.  At the very least, this investigation should have been opened as a Priority 2 HHSC investigation for minimum standards violations associated with serious safety or health hazards.[58]

The Monitors also found inaccuracies between the information the MTM relayed to the investigator and the investigator's notes in CLASS:  The investigator's notes indicate that the member of the monitoring team said the child was "being restrained in a bedroom."  The monitoring team member told the investigator that the restraint occurred in the downstairs game room at the facility, not in a bedroom.[59]

### C.  Whispering Hills Achievement Center

1.  CLASS Investigation ID: 2899197; IMPACT Investigation ID: 49217128

Whispering Hills Achievement Center RTC provides services to children with emotional disorders and children with intellectual and developmental disabilities.  Whispering Hills is licensed to care for 20 children aged five-to-17 years old, but at the time of the monitoring team's visit, the facility housed only six male children.  Just before the site visit, the RTC housed 10 PMC children – six boys and four girls.  However, a few days prior to the site visit, the RTC discharged the four girls because two female direct caregivers quit abruptly, making it impossible for the RTC to staff the girls' unit appropriately.[60]  Since the site visit, the operation has hired additional female caregivers, and the operation is housing girls again.  As of February 7, 2023, the operation had a total of 10 children in its care.

One of the children interviewed by the monitoring team was a 14-year-old PMC child,[61] Child A, who has diagnoses of autism spectrum disorder and an intellectual disability with associated learning impairments, as well as ADHD (combined type), bipolar disorder, anxiety disorder, and disruptive impulse control and conduct disorder.   According to his current Child's Plan of Service (Child's Plan), Child A is "currently functioning intellectually in the mild to moderate range of intellectual disability, due to his Full Scale of 58."  Child A reads at a third-grade level.  At the time of the site visit, Child A had lived at Whispering Hills for just under two years.

---

(2009)(case studies include a Texas public school student who died after being placed in a prone restraint), *available at* https://www.gao.gov/assets/gao-09-719t.pdf

[58] HHSC, *supra* note 55.

[59] While the location of the restraint may seem a minor point, the operation raised the point during the administrative review arguing that there were inconsistencies between the child's report that he was restrained in the game room, and the monitoring team member's report during her interview that he was restrained in the bedroom. Despite the operation's argument, the citation was upheld.

[60] The facility's administrator made a report to SWI on June 13, 2022, that he was "down staff and was out of ratio."  According to the intake narrative, the administrator reported that two female staff members quit the day before and another did not show up for her shift that day.  The administrator said that he would contact DFPS to ask for a 72-hour removal due to the shortage of female staff.  During the HHSC investigation, the administrator and staff reported they were never out of ratio, because they had been able to cover the remaining shifts until the nine girls who were in the facility were removed on June 16, 2022.

[61] The child's IMPACT records show his legal status as "PMC/Rts Not Term" as of February 24, 2021.  However, his most recent Common Application indicates he is in Joint Managing Conservatorship (JMC).

During his interview with the two members of the monitoring team, Child A alleged that he had been inappropriately restrained two times.  He described a restraint that occurred at the on-site school, during which his arms were held behind his back by two caregivers (Staff 1 and Staff 2) while a third caregiver (Staff 3) "cracked" his knuckles into the back of Child A's neck.  Child A also described a second restraint, which occurred in his bedroom during "quiet time," during which Staff 2 grabbed the child's face and squeezed it. The child reported these restraints to SWI while the monitoring team was still on site. An MTM also made a report to SWI the day after the site visit ended.

    a.  Intake

The initial intake for the investigation resulted from a call made to the abuse and neglect hotline by Child A.  The two members of the monitoring team who interviewed Child A allowed him to use a cell phone to call the hotline.  When Child A could not answer a question about the address of the facility, he handed the phone to the MTM.[62]  The MTM answered the question, and when the intake worker asked her to explain what happened, the MTM noted that Child A wanted to tell SWI "in his own words."  Before she gave the phone back to Child A, she explained to the SWI worker that she was a mandated reporter and would later make a report regarding the same incidents.

When Child A returned to the phone, the SWI worker asked him to explain what happened.  Child A said, "A staff abused me, twisting my arm, and putting knuckles on my neck, and twisting my arm."  The intake worker responded, "Okay, I missed the first part, but you said a staff put their knuckles on your back and twisted your arm, is that correct?"  Child A said, "Two of them, one of them twisted my arm, and other one knuckles on neck."  When the SWI worker asks Child A for the names of the staff, the intake worker had difficulty understanding the child's answer (Child A has a slight speech impediment) and asked Child A to give the phone back to the MTM.

When the MTM returned to the call, she again told the SWI worker that she was a mandated reporter and planned to make a separate report.  The intake worker responded that he could list the MTM as a reporter for the intake and have her make her report to him rather than in a subsequent report.  The MTM agreed but noted that she did not have notes from the interview with Child A and would need to have her colleague pull up notes from the interview. When she described the restraints to the SWI worker, she appeared to be reading from notes, and stated that the first restraint happened "at night."  Later, when the SWI worker asks her where the two restraints occurred, she can be heard on the recording asking Child A.  She clarifies, after asking Child A, that the first restraint occurred at the on-campus school.  The SWI worker did not ask again about the time of day that it occurred.

The narrative summarizing the allegations for the first intake states that the first restraint "occurred in the school at the facility at night."  In all, Child A was on the phone with the SWI worker for approximately two minutes of the 14-minute phone call and reported very

---

[62] The Monitors listened to audio of both linked intakes in this case.

little of what was conveyed regarding the restraints but was listed as a reporter for the first intake.

The MTM called the hotline the next day to report the same incidents. In the audio recording of the intake, she can be heard telling the intake specialist the first restraint happened during school hours (which she identified as 8:00 a.m. to 1:00 p.m.) rather than at night.  However, the SWI screener did not include that detail in the allegation narrative associated with the second intake.  The MTM is listed in IMPACT both as a collateral contact and as a reporter.

b.  Deficiencies in Investigation

DFPS initiated a Priority 2 investigation for Physical Abuse on June 22, 2022.  Physical Abuse was Ruled Out and the investigation closed on August 11, 2022.  The Monitors find the DFPS investigation was so deficient that the appropriate disposition cannot be determined.

The inclusion of Child A as a reporter in the first intake, coupled with the failure of the SWI worker to document the MTM's report during the second intake that the school-based restraint occurred during school hours, led to confusion during the investigation that the investigator failed to identify and resolve.  The investigator interviewed the MTM before interviewing Child A, but the interview was not recorded.  The notes do not reflect that the investigator asked the MTM what time of day the school-based restraint allegedly occurred, and the MTM does not recall being asked by the investigator when it occurred.

The child clearly stated during his interview with the DFPS investigator that the restraint that he alleged occurred at the school took place during the day. During his interview with the alleged victim, the investigator asks, "Something happened at the school, at night, right?" and Child A immediately corrects him, "In the day." He clarifies that it was during lunchtime:

- Investigator:      In the day? And do you know when that was?
- Child A:      About…during lunch.
- Investigator:      It was during lunch?  Do you know what time lunch is?
- Child A:      At 11:30.

Child A's description of his restraints during his interview with the investigator is consistent with what he described to the members of the monitoring team, and what he described when he called SWI.  The only inconsistency – the time that the restraint occurred – resulted from the MTM's answer (not the child's) during the first intake.

The discrepancy between the timing included in the CLASS and IMPACT allegation narrative for the first intake (which stated that the school-based restraint happened at night) and Child A's report during his interview led the investigator to question the child's credibility early in the investigation.  An IMPACT contact note documenting a risk assessment conducted by the DFPS investigator and HHSC inspector on June 29, 2022 (five days after the investigation was initiated) states, "Overall Risk Assessment:

Interviews of involved staff and roommate of [Child A] are similar in the description and that is that they did not take place.[63] Based on the current staffing levels at the operation there would not be 3 staff members in one location for a meal time based on the second

---

[63] The only questions related to the allegations that the investigator asked Child A's roommate, who also has an intellectual disability, were as follows:

- Investigator: What do you guys do – so you have quiet time every day?
- Child: Yes.
- Investigator: What's quiet time?
- Child: Quiet time is…you have to sit in your room and be quiet.
- Investigator: Do you know what time that's at?
- Child: Yeah, it's at 3.
- Investigator: It's at 3?
- Child: Yeah.
- Investigator: Is everybody usually pretty good during quiet time?
- Child: Mmm…sometimes.
- Investigator: Sometimes? Okay. Have you ever seen…so you know [Staff 2]?
- Child: Yes.
- Investigator: Do you like [Staff 2]?
- Child: Yes.
- Investigator: He seems like a pretty nice guy.
- Child: Yes.
- Investigator: Uhm, have you ever seen him hurt anybody?
- Child: No.
- Investigator: Okay. Have you ever seen him do anything to anybody in your room? Anything like that?
- Child: No.
- Investigator Nothing to [Child A]? Nothing to your roommates, nobody else in the house?
- Child: No.
- Investigator: Okay.  Uhm. How about [Staff 1]. You know [Staff 1]?
- Child: Yes.
- Investigator: How is she, pretty decent?
- Child: Yes.
- Investigator: Have you ever seen her do anything to anybody?
- Child: No.
- Investigator: Okay. Uhm. And then…who else? [Staff 3]. You know [Staff 3]? He's a big guy, hunh? Is he a pretty decent guy?
- Child: No.
- Investigator: You don't like him?
- Child: No.
- Investigator: Does he make you follow the rules?
- Child: No…yes, yes.
- Investigator: Yes? Okay.  Have you ever seen him hurt anybody? I mean, I mean, or the three of them do anything to anybody?
- Child: He put his feet on here.
- Investigator: Okay, why?
- Child: I don't know, because I got restrained.
- Investigator: Okay.  All right.  But other than – never seen anybody do anything to anyone?
- Child: No.
- Investigator: Okay. What about at night?

At this point, the investigator changes the topic to nighttime supervision, without exploring the child's complaint regarding the restraint any further.

version of the allegation and the school is not open, unlocked, or used in the evening for residents based on the initial allegation." An IMPACT staffing contact dated June 30, 2022, provides: "This case was initiated with face-to-face contact at this operation with this child. The child gave several different stories."

In the audio of the interviews recorded with one of the alleged perpetrators, the investigator said, "at first he said it happened at night, and then in the midst of us talking, he said it happened during lunch…what happened is that he changed it from night to lunchtime." In an interview with another alleged perpetrator, after describing Child A's allegations regarding the way that he was restrained, the investigator says, "the way it was reported was that it happened in the evening time, at the school, but then – they wouldn't be in there at night."

Though he relied on the written allegation narrative as the basis for questioning Child A's credibility, the investigator either did not listen to the audio recordings for the two intakes or, if he did, did not ask the MTM about her initial report that the school-based restraint happened at night. Ultimately, in the disposition of the case, the DFPS investigator found that Child A "initially stated this occurred at night" but "now stated that it was during the day during lunch." Child A never stated that the incident occurred at night; the MTM mistakenly alleged it occurred at night, but correctly reported that the alleged incident occurred during the day in the second intake. Listening to the audio recordings for the two intake calls or asking the MTM when the incident occurred would have allowed the investigator to correct his misunderstanding of the initial report.

In addition, serious problems are evident in the investigator's interviews with the alleged victim and the collateral children, all of whom have an intellectual disability.[64] The investigator asked compound, "yes/no" questions in a rapid-fire manner, which contradicts best practices for interviewing children (or adults) who have an intellectual disability.[65] The investigator also asked leading questions, which are problematic with highly suggestible children. At times the investigator even ignored the children's answers. In addition, when the children did not immediately answer a question, the investigator suggested answers. He also suggested alternative answers when he believed the children he was interviewing answered incorrectly or were confused.[66] For example, when the

---

[64] The Monitors also identified problems with the method the investigator used to interview the alleged perpetrators. The investigator asked the perpetrators leading questions, suggested answers, and clearly conveyed to each that he did not believe the child's allegations.

[65] *See* Maureen D'Eath, *Guidelines for Researchers when Interviewing People with an Intellectual Disability* (2005); T.H. Aker and M.S. Johnson, *Interviewing alleged victims with mild and moderate intellectual disabilities and autism: A field study of police-investigated cases of physical and sexual abuse in a Norwegian national sample*, Journal of Intellectual Disability Research 64 (10), 782-792 (2020) (describing challenges and best practices associated with interviewing people who have an intellectual disability or autism). Ultimately, the interviews were inconsistent with best practices for interviewing *any* child about allegations of abuse, neglect, or exploitation, regardless of whether the child has an intellectual disability. *See* APSAC Taskforce, *Forensic Interviewing in Cases of Suspected Child Abuse* (2012); Jennifer Anderson et al, *The Cornerhouse Forensic Interview Protocol: RATAC*, 12 Thomas M. Cooley Journal of Practical and Clinical Law 193-331 (2010); NICHD, Revised Investigative Interview Protocol Version 2014 (2014).

[66] These problems do not appear to be limited to this investigation or this investigator. Child A was the alleged victim in a previous intake (reported to SWI on February 11, 2022) after he made an outcry that

investigator asked Child A if he has seen staff sleeping at night, the following exchange took place:

- Investigator:        How about at night, is there people that watch over at night?
- Child A:             Yes.
- Investigator:        Okay.  Have you ever seen them sleeping or anything?
- Child A:             Yes.
- Investigator:        You've seen them sleeping? Or – they're checking on everybody sleeping.
- Child A:             I've seen them sleep.
- Investigator:        When?
- Child A:             At night.
- Investigator:        Are they just walkin' around checkin' for people sleepin'?
- Child A:             I don't know.
- Investigator:        You don't know?  Okay.  Alright.[67]

---

another child placed at Whispering Hills touched him inappropriately.   The case manager for the facility reported the incident after Child A made an outcry during a psychological evaluation.  The child who allegedly touched him had been discharged from the facility three days before Child A made the outcry during the psychological evaluation.

When the investigator interviewed Child A, she also asked "yes/no" questions, compound questions, and leading questions.  An example of this improper method is that the investigator asked Child A what happens when he gets into trouble at the facility.  Child A answered that they get sent to their room, or they must go to the corner.  The investigator then asked, "and for how long do you have to stay in your room or in the corner." Child A answered, "for all night," but the child noted that they still get food.  The investigator asked a few unrelated questions and then said, "I want to go back to you saying that if you get into trouble you get sent to the corner, and you said you'll be there all night – did I hear that correctly?"  The child said they might stay in for 15 minutes, but that it was up to the staff how long they stand there.  The investigator failed to realize she asked first about what happened when children got sent to their room or the corner, but in the follow-up question, she asked only about how long a child could stay in the corner.  Nor did she seek to clarify whether there was a distinction between how long a child might be sent to their room versus the corner or what Child A meant when he said, "all night."  The child later said, "in my room sometimes it's all night."  She followed this by asking, "You sleep in your room at night?"  The child became frustrated and appeared to be trying to make a distinction between getting sent to his room for discipline and sleeping in his room.

The challenges the investigator had in interviewing the child appear to have informed her understanding of the case.  In her summary of the interview with Child A, the investigator noted, "For discipline, he has to go to his room or in the corner. He stated he has to stay in the corner all night. I asked him again about how long he has to stand in the corner and he said, it was up to staff. He said, he sleeps all night and then he said, he doesn't sleep at night and he reads books. What he was saying did not make a lot of sense."

Both staff that Child A allegedly told of the incident (who are also alleged perpetrators in the investigation that the MTM reported to SWI) denied that he told them the other child had touched him inappropriately.  Neglectful Supervision was Ruled Out.   Seven months later, the child who allegedly touched Child A inappropriately was flagged with an indicator for sexual aggression, due to an incident that occurred at a facility where he was placed after being discharged from Whispering Hills.

[67] The IMPACT summary notes incorrectly document that Child A, "stated that staff walk around and check on them at night" and "initially stated that he saw staff sleeping but then stated that he didn't know if they were just checking on them sleeping."

In addition to these concerns, the Monitors note the following:

- The audio recording for one of the interviews with a collateral child appears to have been stopped just after the child alleges staff is sometimes "mean" to the kids:

  - Investigator (0:41):      Ever seen any staff being not nice to the kids?
  - Child (0:45):      Yes.
  - Investigator (0:46):      Oh, why, what are – are the kids doing something wrong?
  - Child (0:47):      No.
  - Investigator (0:48):      Oh. What are they doing?
  - Child:      (Inaudible… recording appears to stop).
  - Investigator (0:51):      So, you like to go fishing?

- One of the collateral children says he saw Child A being restrained.  The collateral child said Child A "was, like, really puking mad and then they had to restrain him."  The investigator did not ask Child A or any of the alleged perpetrators about this child's claim that he witnessed a restraint involving Child A.  The same child said that if children are not quiet during quiet time, they are restrained.

- In addition, Child A's roommate reported that he did not like Staff 3 because "he put his feet on [him]."  When asked why Staff 3 did that, the child answered, "I don't know, because I got restrained."[68]  The investigator did not ask any of the staff about the restraint that Child A's roommate reported, nor did he ask Child A's roommate follow-up questions that would allow him to ascertain whether the child was hurt by the restraint.

- During interviews, the alleged perpetrators said they did not remember Child A ever being restrained while he was at Whispering Hills.  Child A's contact notes for Face-to-Face visits with LPS workers show that he reported being restrained at Whispering Hills during at least five Face-to-Face visits in 2021.  Child A did not report that the restraints were inappropriate, and when the worker asked him to demonstrate how he was restrained, he crossed his arms across his chest (which is consistent with the restraint method utilized at Whispering Hills) and said the restraints did not hurt.  The investigator does not appear to be aware of these reports, and therefore could not follow-up on Staff 1's claim that she was not aware of Child A ever being restrained.  The investigator contacted Child A's CVS caseworker but did not attempt to contact the LPS worker.

- While the investigator notes the many incident reports in Child A's file, he failed to note that some of the incident reports show that when the child acted out at school, one of the consequences was being sent to Staff 3's office (which is where the child alleges the first restraint occurred).  The child was sent to Staff 3's office at least twice in May 2022: once on May 25 at 1:18 p.m., as well as on May 18 at

---

[68] This exchange, documented in note 64, *supra*, is another example of the poorly executed interviews with children in this case.

12:45 pm. The investigator did not ask Child A or the alleged perpetrators about these incident reports, or the consequence of sending Child A to Staff 3's office when he acted out at school.

- There is a history of reports alleging Staff 3 physically abused or inappropriately disciplined children. Staff 3 was named as an alleged perpetrator in investigations of Physical Abuse or inappropriate discipline in nine investigations (excluding this one), across two facilities (Whispering Hills and A New Day Foundation). In eight of these investigations, the allegations related to inappropriate use of restraints. The other investigation alleged that Staff 3 pushed a child into a dresser when the child was acting out. In addition to these intakes, Staff 3 was named as an alleged perpetrator in two additional investigations of Neglectful Supervision, both alleging child-on-child sexual contact. All the investigations Ruled Out the allegations. However, the pattern of allegations related to inappropriate restraints is concerning.

D. DePelchin Children's Center

DePelchin Children's Center in Richmond, Texas has been operating since 2005 and is licensed to house 20 children. At the time of the monitoring team's visit, the facility housed 13 children. Approximately five months before the monitoring team's visit, on January 11, 2022, HHSC issued a warning letter to DePelchin due to an increase in intakes and concerns related to inappropriate restraints and supervision. The operation put a plan in place to provide additional training to staff, and to increase supervision.

Despite this warning, on May 19, 2022, HHSC held a meeting with DePelchin to again address an increase in intakes and outcries by children of inappropriate restraints. The operation again indicated that it would increase training for staff in restraints and increase staffing. The operation continued to receive citations and agreed to a voluntary Plan of Action (POA) which began on February 10, 2023, and is scheduled to end on August 10, 2023. The POA is intended to address a pattern of minimum standards violations associated with emergency behavior interventions (EBI), reports and record keeping, personnel, discipline and punishment, and organization and administration. The POA also addresses issues associated with medication administration and supervision.

1. CLASS Investigation ID: 2912156; IMPACT Investigation ID: 49250781

During an interview with the monitoring team on July 22, 2022, Child A made an outcry that his arm was fractured when a staff member[69] twisted his arm behind his back during a restraint. Child A did not remember when the restraint occurred, but the monitoring team reviewed site records and found documentation showing the child was treated for a

---

[69] During his interview with the monitoring team, Child A did not name the staff person who restrained him and caused the injury.

sprained arm on May 24, 2022. The MTM reported the allegations to SWI the same day the child was interviewed.

This intake was linked to a report made on August 2, 2022, by one of the alleged perpetrators. The restraint described in this second intake occurred July 20, 2022, and was not the same restraint that Child A described in his interview with the monitoring team. Staff 1 reported that the evening of this restraint, the facility was out of ratio. He reported that the child became upset after he was told to get off a phone call with his grandmother. According to Staff 1, Child A left the "designated area" and was "kicking doors and causing destruction to property" before Staff 1 caught up to him. According to the intake notes, Staff 1 reported he "took the 12 yo to the floor in a one person restraint. [Staff 1] was standing over the 12 yo, then got down on his knees and straddled the 12 yo who was kicking [Staff 1]. [Staff 1] then tried holding the 12 yo's hands to the ground." According to the intake, [Staff 1] alleged that "the incident would not have occurred if the facility was not out of ratio."

An investigation was opened as a Priority 2 investigation for Physical Abuse. The DFPS ruled out Physical Abuse after the investigation was complete:

> Based on the information gathered over the course of this investigation, the preponderance of the evidence does not support the Physical Abuse allegations of [Child A] by [Staff 1] and [Staff 2]. Therefore, the disposition will be ruled out for Physical Abuse. This determination was based on the following information:
>
> The victim child, [Child A], was originally interviewed reported he does not recall any details regarding the restraint from May due to it happening a while ago. A follow up forensic interview was conducted, and [Child A] reported his arm was bruised during a restraint due to them (Staff) putting his arms to [sic] far back.
>
> Collateral children were interviewed and denied witnessing [Child A] be hurt/injured in result [sic] of a restraint. The collateral children also denied [Staff 1] or [Staff 2] hurting any of the children in care.
>
> Collateral adults were interviewed and denied witnessing [Child A] being inappropriately restrained. They also denied having concerns regarding the way [Staff 1] or [Staff 2] perform restraints.
>
> [Staff 3], Qualified Mental Health Professional (QMHP), was interviewed and reported she was a witness [sic] to the incident between [Child A], [Staff 1] and [Staff 2]. She stated at one-point [Child A] fell towards the end of the restraint and [Staff 1] and [Staff 2] fell with him and as they were holding him that's when [Child A] started saying his arm hurt. She stated there was no anger or ill intent … they were just trying to get [Child A] to calm down.

[Staff 1], Alleged Perpetrator, was interviewed denied [sic] all allegation of physical abuse. Furthermore, [Staff 1] denied using more force than necessary...during the restraint with [Child A]. [Staff 1] denied restraining [Child A] with intent to harm him.

[Staff 2], Alleged Perpetrator, was interviewed denied [sic] all allegations of physical abuse. According to [Staff 2], [Child A's] arm was never placed behind his back, and when he complained about pain, they let him go. [Staff 2] denied using more force than what was necessary, and he never intended to hurt [Child A].

[Name omitted], LPS caseworker, was interviewed denied [sic] having any concerns with the operation. [LPS caseworker] also denied being aware of the restraint that happened back in May 2022 that resulted in [Child A's] arm/shoulder being sprained.

There was insufficient evidence to support the Physical Abuse allegations made towards [Staff 1] and [Staff 2].

The final determination was to rule out all allegations related to Physical Abuse as the information gathered throughout the course of this investigation did not meet the criteria of abuse/neglect as defined in the Texas Family Code Section 261.401 and further defined in the Texas Administrative Code TAC §787.801.

DFPS transferred the case to HHSC, and three citations were issued for violation of minimum standards as follows:

- A citation for violation of a minimum standard (748.303(a)(2)(B)) associated with serious incident reporting, because "During the investigation it was found that the agency failed to report a serious incident to parents/caseworker in a timely manner on several incidents involving the victim."
- A second citation for violation of a different minimum standard (748.303(a)(2)(A)) associated with serious incident reporting, because "During the investigation it was found that the agency failed to report a serious incident to licensing in a timely manner on several incidents involving the victim."
- A citation associated with violation of a minimum standard (748.2461(a)(1)) associated with short personal restraint, because "During the investigation of this standard was found [sic] to be deficient based on the statement of the victim and a collateral staff supporting he was in pain during the restraint and was treated after with an ice pack."

The Monitors find the DFPS investigation so deficient that the appropriate disposition cannot be determined. The Monitors identified several problems with the investigation:

- DFPS appears to have relied on statements from the two staff who restrained the child (Staff 1 and Staff 2) and a staff person (Staff 3) who witnessed the restraint, all who said that they did not intend to harm the child and did not use "more force than necessary."  DFPS also relied on statements from collateral staff who denied having concerns regarding the way the alleged perpetrators performed restraints. In doing so, DFPS appeared to overlook major discrepancies between the staff members' descriptions of the restraints they were trained to use, the restraints that Staff 1, Staff 2, and Staff 3 described, and inconsistencies between the descriptions of the restraint that resulted in Child A's injury.

  All staff interviewed by the investigator agreed that they were trained to use either a one-person body hug or two-person body hug restraint; both restraints are conducted with the child standing and do not involve placing a child's arms behind their back.  Interviewed staff indicated that if the child moves out of the proper restraint position (by falling, for example, or moving so that their arms are held behind their back), they were trained to release the child.  Though all staff were consistent in describing the type of restraints they were trained to use, significant inconsistencies emerged between Staff 1, Staff 2, and Staff 3 in their descriptions of the May 23, 2022, restraint that allegedly injured the child:

  - Staff 1 described a single restraint and said that Staff 2 first moved in to try to restrain the child. Staff 1 said he moved in to assist but that it was "hard to get a hold of [the child]."  He said they were struggling to hold him upright and that when the child "fell" to the floor, he started banging his head on the floor and they had to "cradle him" so that he wouldn't bang his head.  He said that the child complained later that evening that his arm hurt, but that he never complained during the restraint.  When he was asked why the operation's incident report did not document the child's complaint, Staff 1 said the child did not complain of pain until after it had been completed. Staff 1 said that they "never" restrain a child with their arms behind their back.
  - Staff 2 described a series of three restraints over the course of the incident.  He said that they first restrained the child when Staff 3 was entering the building because the child started to move toward her and the open door.  Staff 2 said that he had the child by his left side, and Staff 1 had him by his right side, and the staff members moved the child away from the door.  After that, Staff 2 said the child became very combative but also started hitting himself.  Staff 2 said the second time they restrained the child, the staff members held the child's arms down to prevent him from punching himself.  Staff 2 said that at this point, the child was on the ground.  Staff 2 said the child was restrained a third time while Staff 3 removed potentially harmful objects from the child's bedroom.  The staff members were holding the child's arms during this restraint, but Staff 2 said the child's arms were never behind his back.  However, Staff 2 then told the investigators that the child's arm may have been behind his back "once", but the child said it hurt, so they let him go. The child was standing during this restraint; Staff 2 said they were trying to get the child to sit down on his bed.  Staff 1 held the child

by the right arm and Staff 2 held the child by the left arm.  The investigators asked Staff 2 to show them how the child's arms were positioned and took a photograph, which was uploaded to One Case.  The photograph shows Staff 2 with his arms and hands positioned behind his back.

- o   Staff 3 witnessed the restraint.  She said Staff 1 and Staff 2 restrained the child after the child started to hit them.  At one point the child said he was hurt, and she told them to stop the restraint, and they let him go. The child went to his bedroom and complained that his arm hurt.  She brought him some ice.  When asked to specifically describe how Staff 1 and Staff 2 were positioned when the child complained of pain, Staff 3 said that at one point during the restraint, the child fell to a sitting position, and Staff 1 and Staff 2 fell with him but were still holding him.  Staff 3 relayed that the child said, "It hurts, make it end, make it stop."  Staff 3 said the restraint started as a two-person body hug, but when the child fell the staff did not release him.

- •   These reports are also inconsistent with the "Client Behavior Report" that DePelchin used to document the restraint.  The document lists the type of restraint used as a "Two Person Restraint Side Body Hug" completed by Staff 1 and 2 and witnessed by Staff 3. The form says the child did not suffer a non-reportable or reportable injury because of the restraint.  It lists the "primary behavioral event" that triggered the restraint as property destruction, and the "Headline" (or "Most Critical") as "[The child] was destructive of property." The form describes what led to the restraint:

> 3:05 pm – [Child A] was upset because the tv in the boys dorm got turned off. One of [Child A's] other peers was having a meltdown, and [Child A] felt as though he was being punished for something he didn't do.  He asked if he could use a computer once the tv was turned off, and when staff told him he would have to wait he started to throw a tantrum. [Child A] started throwing Lego toys, and shoes out of his room one by one.  He started banging the walls with his fist, and also kicking his feet against the edge of his bed. [Child A] also walked into the restroom momentarily, and started pounding on the glass mirror. When staff provided suggestions on things that would be less harmful to hit, he threatened to punch staff in the face.  He was redirected into the dorm where he continued banging against the walls and door, and when he became aggressive towards staff he was restrained. [Child A] was consistently trying to bang his head against the floor while being restrained, he was spitting at staff, and was also biting himself.  He threatened to kill all staff who tried to help him during this ordeal, and was also trying to choke himself.

The form describes the child's response to the restraint, "[Child A] was unwilling to communicate with staff after numerous attempts, but after he was restrained, he went to his room to lay down in his bed. He took a short nap, and when he woke up, he assisted some of his peers in cleaning up the dorm."

The "Physical Restraint Report" documents the restraint as having lasted two minutes, from 3:05 pm to 3:07 pm.[70]

Neither form refers to the child's complaints of pain during the restraint, though when interviewed, Staff 2 and Staff 3 both said the child complained of pain during the restraint and immediately after the restraint. When asked why the form did not include that information, Staff 2 and 3 both suggested that the form was completed before the child complained. Yet, Staff 3 noted that she took the child ice before he took his nap, and the form refers to the nap and activities that he was part of after his nap ended. When pressed, Staff 3 agreed that the failure to include this information was probably an "oversight."

There are other inconsistent elements of the investigation that the DFPS findings appear to ignore that corroborate Child A's description of the use of inappropriate and prohibited restraints that cause pain. For example:

- The documents uploaded to One Case include three other forms documenting restraints involving Child A, including a form describing the restraint that was the subject of the linked intake. Two of these forms, including the form documenting the second restraint, reported to SWI by Staff 1, describe unsafe floor restraints at odds with the standing restraint methods described by staff.[71]   Staff 1 was also involved in these two restraints of Child A.

---

[70] Four forms in One Case describe four different incidents that resulted in a restraint. Every form indicates that the described restraint lasted exactly two minutes.

[71] A "Client Behavior Report" dated July 20, 2022, notes that a "Two Person Restraint Side Body Hug" was used to restrain the child, but describes "What Led to this Event" as:

> 8:10 pm – [The child] got upset with staff when it was time to get off of his phone call and start preparing for bed. Expectations were given to [the child] along with the rest of the boys 20 mins prior to the time of the incident.  He felt like he wasn't given the amount of time that he was entitled to on his call. After cursing out staff and refusing to do his chore, [the child] walked out of the dorm and started banging on one of the hallway doors until it was damaged.  He then walked towards the cafeteria, and repeatedly started kicking the door down there.  After a minute or two, he turned his frustration towards staff and aggressively tried to attack. **He was then taken to the floor by staff**, and he tried punching and scratching **while he was on the floor**. [The child] left many scratch marks on staff as he was being restrained, and there were a lot of small cuts on staffs [sic] hands after the incident.

[Emphasis added].

A "Client Behavior Report" dated May 9, 2022, also indicates that a "Two Person Standing Side Body Hug" was used to restrain the child, but describes the event as follows:

> 4:30 pm – [The child] was irritated with his peer QW.  [The child] was sitting on top of the boxing bag when QW walked by and pushed the bag slightly and almost tipped him over. [The child] reacted by slapping QW on the side of the face.  This action erupted into both of the boys going after each other before being separated. While staff had QW in the corner, [the child] used a pencil and punctured holes in QW's basketball.  This ultimately made his peer even more upset, and his other peer NH chimed in and started taunting him as well. This prompted [the child] to start going after NH, which was when staff interceded and

During Child A's interview with the DFPS investigator, he spent most of his time describing the restraint that was the subject of the second, linked intake, which was a supine restraint.   The investigator took a photograph of Child A demonstrating the supine restraint; the photograph is in One Case.[72]  He told the investigator that during that restraint, Staff 1 was standing over him holding his hands down over his head (consistent with the photograph).  He said another staff person was on top of his legs with her elbow on his chest.   He said her elbow was hitting his ribs and it hurt.  The investigator asked if he had trouble breathing, and Child A said that he did not have trouble breathing but that the restraint "really hurt bad."  Despite the linked intake and the child's report that the supine restraint caused him pain, these allegations do not appear to have been investigated by either HHSC or DFPS; the only allegations associated with the linked intake that appear to have been investigated are the allegations related to ratio.[73]

Child A reported that he did not recall much about the details related to the restraint that caused his arm injury.  However, when the investigator asked what type of restraints were used at the facility, Child A described "the chicken wing" restraint "where you have a fist and [they] push it up, it's like a wing" and another restraint that involved staff grabbing a child's hands, putting them behind the child's back, "stretch[ing] them," and activating a pressure point "so that it hurts and you don't want to move."

Though the audio for the interview is not in One Case, an IMPACT contact note summarizes a forensic interview conducted with Child A.  During the interview, Child A reported "he went to the doctor in May because they thought his arm was broken" and "stated his arm was bruised due to [staff] putting his arms to[o] far

---

**brought [the child] to the ground**.  **When he was brought to the ground**, he was still trying to get up to go after the other boys, but was also punching at staff in the process.  **While he was on the ground**, QW tried to hit [the child] with a broom.  NH also jumped into the altercation and kicked [the child] in the head **while he was still on the ground**.  The other 2 boys were moved out of the gym, but [the child] was still violently trying to go after them.  He grabbed NH's pillow, and ripped it.  He then tried to grab one of QW's Pokémon game cards before they were removed from his grasp.  He was then restrained after numerous attempts to try to get him to calm down.  He also spit in a staff member's face **while he was being held down**.

[Emphasis added]

[72] Supine restraints are restricted by minimum standards in the same way that prone restraints are restricted. Supine restraints are allowed only as a transitional hold that lasts no more than one minute. 26 Tex. Admin. Code §748.2553.

[73] During Staff 1's interview, he was told that another investigator would contact him about the allegations related to the July 20, 2022, restraint, and that the only allegations being investigated by the person who interviewed him were the allegations associated with the May 23, 2022 restraint. CLASS shows that on August 3, 2022, a separate intake was created for the allegations included in the linked intake related to ratio; a staffing note in CLASS entered by the investigator on August 17, 2022, notes, "I spoke with Supervisor...about this case and that I went out to initiate. To my findings that the case was already initiated by a [sic] abuse and neglect worker case #2912156.  She explained to me that the case she reported is concerning ratio with staff and residents not the EBI restraint."  The only minimum standard associated with the allegations investigated by HHSC was the minimum standard associated with child/caregiver ratio.

back."  According to the summary, Child A identified Staff 2 as the person who conducted the restraint and "explained his arm being placed behind his back (chicken position) then pushed up which caused bruising."

Documentation from the pediatrician's office related to the examination of Child A's arm was uploaded to One Case.  The patient visit note is dated May 24, 2022, and it lists the "chief complaint" as "arm pain since yesterday."  The "Assessment" indicates a sprain and left upper arm injury and lists "injuries of left shoulder and upper arm" for which the doctor prescribed 600 milligrams of ibuprofen.

- Two of the three collateral children interviewed described improper, unauthorized restraints, and though the licensing report states, "The collateral children also denied witnessing [the alleged perpetrators] hurting any of the children in care," one child said that he was hurt by Staff 2 during a restraint.

  o One of the children said he was hurt when Staff 2 restrained him;[74] he said that his pain lasted about two days. The child said that the pain was in his arm, in his elbow, because Staff 2 restrains children in a way that hurts their arms.  The child said that when Staff 2 restrains children, he places their hands behind their backs and pulls up.[75]  The child demonstrated the restraint but would not allow the investigator to take a photograph of him. He said he was last restrained this way the Friday before Halloween (in 2021).  The child said he told staff his arm hurt and was given ice.  The investigator does not appear to have confirmed whether this information was reported and investigated; the One Case records for the investigation do not include any restraint reports for this child.  The Monitors could not locate a report to SWI for this restraint.

  o Another child said that he thought restraints were done appropriately, but later said he was not sure what was considered an "appropriate" restraint. The child indicated that he had never been hurt but has had marks on his arms and wrists from a restraint that "go away."  When asked how he gets marks on his arms or wrists, the child said the marks were from "moving around on the bed when [he's] trying to get out of the restraint."  He later indicated that sometimes during a restraint, one person holds his arms while the other person holds his legs.  The investigator asked the child to demonstrate how his arms are held and took a photo of the child holding his arms extended out to his sides. When asked whether children get hurt during restraints at the facility, the child said he felt they were.  When the investigator asked him why he thought so, the child reported that he heard children yelling, "get off me." This child said he witnessed the restraint that the collateral child described, above, that occurred just before Halloween. The investigator did not follow up on this information by asking how Staff 2 was restraining the child.

---

[74] The child said he was not "injured" but then said he was hurt but that "it was temporary" with pain lasting about two days.
[75] This is consistent with Child A's description of one of the restraint methods used at the facility.

Since the monitoring team's visit and after this investigation, the operation received seven additional citations for violations of minimum standards associated with restraints. The allegations in these investigations were similar to the allegations the MTM reported:

- A Priority 3 investigation was initiated by HHSC after a DFPS investigator reported that a child she interviewed for another investigation reported having witnessed Staff 2 injure another child during a restraint. When the child was interviewed, he denied being hurt by the restraint, but remembered Staff 2 restraining him with his arms behind his back. HHSC found that the two collateral children who were interviewed also reported being restrained by Staff 2 with their arms behind their backs. One child reported during a prone restraint on his bed, Staff 2 "put more pressure on him to where he felt like he couldn't breath [sic]." The same child said Staff 2 would "restrain him with his hands crossed behind his back." One citation was issued for violation of minimum standards associated with prohibited restraints.

- A Priority 2 investigation of Neglectful Supervision was initiated by DFPS after a staff person reported another staff person allowed children to go outside to fight, failed to prevent the children from fighting once they were outside, then failed to prevent one of the children from climbing a fence to run away. DFPS ruled out Neglectful Supervision, but HHSC issued a citation for violation of a minimum standard associated with employee responsibilities, finding that a supervisor ordered staff to perform a restraint to get a child to comply with a directive or to discipline the child.

- A Priority 1 investigation of Physical Abuse was opened after two linked reports alleged a child had bruising to his face and neck due to an improper restraint. The second intake associated with the investigation alleged that the child had "[b]ruise marks that appear dark red on left side of face and lower jaw area. Scratches on the left neck area and behind his ear area." DFPS Ruled Out Physical Abuse, but HHSC issued five citations, finding that the documentation of the restraint did not reflect the video footage reviewed by investigators, which showed that a caregiver "restrained a child by dragging him by his feet while another staff member grabbed his arms immediately after the child had fallen several feet onto a hard floor." DFPS's reasoning in Ruling Out Physical Abuse was that "this investigation shows a plausibility that [the child's] injuries were an accident."

### E. Silver Lining RTC

Silver Lining RTC received its initial permit on May 23, 2016, and its full permit on December 4, 2017. The operation was under a voluntary Plan of Action (POA) from October 29, 2021, through April 29, 2022. The POA was established to address problems associated with restraints, reports and record keeping, serious incident reporting (including reports to SWI), and children's rights (particularly discipline techniques). The monitoring team's visit revealed ongoing problems associated with these issues. Shortly

after the monitoring team's visit, the operation was placed under Heightened Monitoring.[76]

CLASS Investigation ID: 2922602; IMPACT Investigation ID: 49285853

A member of the monitoring team made a report to SWI on August 19, 2022, raising the following allegations:

- A child diagnosed with ADHD was not given his prescribed medication for a two-week period; staff reported there was a "backlog" on his medication at the pharmacy. However, the monitoring team discovered that a staff person had the medication in her office and failed to place it in the medication room.
- A Safety Plan required Child A to be always supervised when he was with Child B, due to previous allegations of sexual abuse. The Safety Plan was not being followed.
- Child A punched something and bruised his hands and knuckles; staff did not take the child for x-rays and the child's hand was still injured.
- Child A also had an infection, and he was not taken to the doctor for a follow-up appointment, requested by the doctor, after he was prescribed antibiotics. The infection persisted.
- Awake-night staff sleep and do not do room checks.[77]

---

[76] The operation was placed on Heightened Monitoring on August 24, 2022; the Heightened Monitoring Plan was developed and started on September 23, 2022. Six of the Plan's tasks are focused on EBI (restraints), and two are focused on upkeep of the physical site.

[77] The RTC campus consists of two houses in a residential neighborhood. In addition to video evidence of sleeping staff that the monitoring team discovered during the visit, the team had concerns about the staff members who were responsible for awake-night supervision at the two houses during the team's unannounced awake-night visit. When the monitoring team arrived at the first house approximately 2:00 am, they rang the doorbell three times over approximately 12 minutes before the staff person finally answered the door. When the staff person answered, he appeared groggy as if he had just woken up. Almost all the lights were out in the house when the monitoring team arrived, except for a light in the kitchen downstairs. When asked where he sat during awake-night supervision, the staff member, who was the only staff in the house that night, reported that he sat upstairs in a chair between two of the bedrooms. When the monitoring team began their interview with the staff member, they asked what protocols he had to follow to supervise the children, and he answered that there were none and said he could sit at the dining room table downstairs to complete the interview, though the children's bedrooms were located upstairs. The monitoring team told the staff member that he could pause the interview at any time to conduct room checks for the children; he responded that it wasn't necessary. The interview lasted approximately 55 minutes; the staff member did not conduct room checks at any point during that time. When he was asked whether he kept a nighttime log, the staff member reported that a log was not required.

The monitoring team arrived at the second house at approximately 3:20 am. This house is a two-story home located across the street from the other house. The monitoring team rang the doorbell, looked through a window next to the front door, and saw someone who appeared to be sleeping on the couch in the downstairs living room. The person lifted a blanket, got up from the couch, walked over to the wall and turned off the lights in the living room, then went back to the couch and covered himself with a blanket. Six minutes later, the monitoring team again rang the doorbell. There was still no answer. The team shined a cellphone flashlight through the glass window and saw a hand lift the blanket covering the person on the couch, then let the blanket drop again. It was only after the monitoring team rang the doorbell for a fourth time that the person on the couch got up and opened the front door. The person who answered the door was later determined to be the Executive Director of the operation. Despite the monitoring team's observation of the Executive Director on the couch in the downstairs living room, he indicated that during awake-night

- Problems associated with medication logs and storage of medications.
- Children are not being given medications as prescribed.
- The operation is not complying with minimum standards associated with caregiver/child ratios.
- Staff are not following minimum standards associated with documenting restraints.
- Children are being inappropriately disciplined by being "grounded" and forced to sit at the kitchen table for extended periods of time.

The intake was assigned to DFPS for a Priority 2 investigation of Physical Abuse, Medical Neglect, and Neglectful Supervision.  DFPS initiated the investigation on August 22, 2022, by interviewing one of the alleged victims.

---

supervision he sat upstairs close to the children's bedrooms.  The Executive Director indicated that he filled in for direct care staff on a regular basis.  He was the only staff member in the house.  Like the staff person in the first house the team visited, when he was asked what protocols he followed during awake-night supervision, he answered there were not any and said he could sit at the dining table downstairs to complete the interview with the monitoring team. The team asked the Director for a copy of the awake-night log, and he said that it was kept in a computer, and he did not have access to it.

The staff member who was responsible for awake-night supervision at the first house visited by the monitoring team was the same staff person who was seen sleeping during an awake-night shift when DFPS reviewed video footage for a different investigation (CLASS Inv. 2876227, IMPACT Inv. 49115105).  According to a June 8, 2022, contact note in CLASS, in that video, this staff person was observed to be sleeping for more than four hours during his awake-night shift.  The DFPS investigator sent the video clip to HHSC.  A June 10, 2022, CLASS contact note for that investigation indicates that to address the issue, the Executive Director (who the monitoring team suspected was sleeping at the second house visited) "would discuss the importance of room checks" with the staff member and would "be remotely monitoring [the staff person] at random hours to ensure active supervision."  Despite the video, the citations issued by HHSC associated with that investigation did not include a citation related to supervision.

During the visit, to determine whether staff were sleeping during awake-night shifts, the monitoring team reviewed available video for the week-long period prior to the visit (the facility has cameras in only one of the two houses, and only retains video for one week).  The monitoring team downloaded a portion of the video.  The downloaded video shows a male staff sleeping on the downstairs couch, swaddled in a blanket, for five hours during his awake-night shift.  Even when the staff member was not sleeping on the couch, he did not check on children and instead spent time on his computer or nodding off in an upstairs chair.  The video also showed a daytime staff sleep for 13 minutes on the downstairs couch.

Prior to the site visit, the monitoring team reviewed the awake-night supervision monitoring forms for Silver Lining submitted by DFPS to the Monitors.  DFPS had certified awake-night supervision on each of the visits made, according to the forms.  In every awake-night certification submitted to the Monitors by DFPS for Silver Lining, including a form for an awake-night certification visit completed on August 2, 2022 (just two weeks prior to the monitoring team's visit), DFPS indicated that the awake-night staff provided logs showing bed checks at 15-minute intervals.  Yet, when the monitoring team was on-site in the early morning hours on August 16, 2022, neither the staff member nor the Executive Director could produce a log during the nighttime visit.  When asked if he could share a blank copy of the nighttime log, the Executive Director reported that the log form was in his computer, which he could not access.  Prior to completing the site visit, the monitoring team asked to see *any* completed nighttime logs.  The only log the Executive Director could produce was a log for the first night following the start of the monitoring team's site visit, the night after the monitoring team made its awake-night visit.

The member of the monitoring team who made the report was interviewed by the DFPS investigator on September 1, 2022. According to the contact narrative in IMPACT, during the interview, the MTM noted that the intake narrative was correct but was missing specifics; she provided information to the investigator that clarified some of the allegations. The contact narrative for the interview states:

> RCCI...conducted an interview with [the MTM] on 09/01/22 at 12:30 pm. [MTM] stated everything in the intake report was correct but was missing specifics and clarified the following.

> A safety plan was posted in the facility stated that [Child A] and [Child B] are to have no contact and be separated at all times. [MTM] explained that only 1 staff member knew about this. [MTM] said how the residents of both houses will spend the day together, and only go to assigned houses to sleep at night, leaving [Child A] and [Child B] an opportunity to have contact.[78]

> [MTM] explained there was video documentation of staff sleeping, and [the operation's CEO] seemed to not care. [MTM] said that video footage of staff supervision was being reviewed due to a previous instance of a staff...being asleep on the job, and [the CEO] was supposed to be monitoring videos more closely.

---

[78] The Safety Plan was associated with a report to SWI on July 4, 2022, alleging Child A agreed to engage in sexual contact with Child B in exchange for a Pokeman card. Neglectful Supervision was ruled out (though both children acknowledged the contact occurred, and despite DFPS's finding that "it [was] unclear how [Child B] got into [Child A's] room or what staff were supervising them") and the investigation was closed just before the monitoring team visited, on August 9, 2022. This investigation was not the first of child-on-child sexual activity at Silver Lining. In fact, just three months prior to this intake, Child A made an outcry during a face-to-face visit with a DFPS Courtesy Worker on April 18, 2022. This intake was linked to two others. The three intakes covered allegations of child-on-child sexual contact between Child A and Child D, and Child A and Child F, and between Child F and Child G. This investigation was completed on July 17, 2022, and DFPS ruled out Neglectful Supervision, finding that though "multiple residents reported sexual behavior from peers and roommates at Silver Lining" during forensic interviews, "[n]o residents made any outcries of acting out sexually to any of their peers." The findings are somewhat confusing, however, since they also state, "there was no evidence to support the allegation of neglectful supervision by staff" because "[a]ll witnesses stated that staff was nearby during all alleged incidents that occurred but that the residents were doing things when staff was not aware or did not hear." Despite the finding, Child A's sexual incident history page in IMPACT shows that he is a confirmed victim of sexual abuse, listing an incident on April 1, 2022, during which Child A was sexually abused by Child D, who "touched him on his butt and nuts" and dragged Child A into the closet "and did it." The description indicates that Child A said a Silver Lining staff member came in "and told them to stop." Child D's IMPACT sexual incident history page also lists this incident under "Sexual Aggression Incidents," noting that he was "determined to be sexually aggressive with a peer." Child D's IMPACT page lists an earlier incident of sexual aggression with another peer at Silver Lining, which is shown to have occurred on October 1, 2021. The description indicates his peer said that Child D "did inappropriate things to him while he was asleep." A review of CLASS investigations for Silver Lining also shows that allegations of child-on-child sexual contact involving Child B and Child F were investigated in 2018. Two linked intakes alleged the children were able to engage in sexual contact when they were in the bathroom together. Child B denied the contact, and Neglectful Supervision was ruled out.

[MTM] explained that on 08/18, both facilities were unlocked with the keys to the medication room sitting on the counter, and there were no staff or children present in either home.

[MTM] explained that when looking at [Child A's] hand, he had missing knuckles when he made a fist.

[MTM] said that another [child] was advised to get a medication dose decreased by a provider, however this [child] went three months without getting the decreased dosage.

[MTM] said that there were missing medication logs for the dates of 08/15, 08/16.

[MTM] said that a psychiatrist wanted a follow up appointment with a resident and did not receive an appointment in a timely manner.

[MTM] explained that grounding is an issue at the facility, and the children will sit at the table for a concerning amount of time.

[MTM] explained that there are 11 kids at the facility, and there was only 2 staff members at nighttime, even though the ratio is 1 to 5.

Though it is not documented in the contact narrative for the interview, the MTM also told the investigator that she had documents and video related to the allegations that she could send to the investigator via e-mail.

On September 18, 2022, the MTM sent an encrypted e-mail to the investigator that included a link to a folder containing video and photos taken during the monitoring team's visit that supported the allegations reported to the hotline.  A document describing the video, photos, and documents and referencing the allegations to which they were related was attached to the encrypted e-mail.[79]

The videos sent to the investigator included footage of both daytime and nighttime staff sleeping.  One video showed daytime staff sleeping for approximately 13 minutes. Another showed nighttime staff asleep downstairs for approximately four hours, while all the children were upstairs.  A third showed nighttime staff sleeping downstairs for approximately three hours while all the children were sleeping upstairs.  After sending the encrypted e-mail, the MTM did not receive a response or hear again from the investigator.

On October 10, 2022, DFPS closed its investigation and transferred the case to HHSC. DFPS ruled out all the allegations of abuse and neglect, finding:

---

[79] The redacted document is attached as Appendix A.

On August 19, 2022, DFPS abuse and neglect statewide intake received an intake. The intake stated there are eleven children residing at Silver Lining Treatment Center which is a close monitoring facility. There are reported issues of monitoring, medication issues, staff issues and documentation issues that is [sic] happening at the center.

Based on a preponderance of the information gathered there is not sufficient evidence to support the documented circumstances to meet the criteria of abuse/neglect as defined as Medical Neglect or Neglectful Supervision.

It was alleged that victim child…was Medically Neglected by Alleged Perpetrators… [Child A] was interviewed and stated he never went to the doctor for his hand, and never asked to go to the doctor for his hand and that it did not hurt.

Collateral children were interviewed and stated there were no supervision concerns regarding the facility. Collateral children did not make any outcries regarding any medical neglect. Collateral adults were interviewed and stated there was no issues with medication distribution at Silver Lining. Collateral adults stated the children are always supervised.

Alleged perpetrators…stated the reason why [Child A] did not receive his medication is because it was a delay at the pharmacy. [They] stated [Child A] did not make them aware that he injured his hand. [One of the alleged perpetrators] took [Child A] to the doctor after instructed to by RCCI…to have his hand checked and there were no concerns noted. [80]

It was also alleged that victim children, [Child A, Child B, Child C, Child D, and Child E] was [sic] inappropriately supervised by [alleged perpetrators]. [The children] were interviewed and did not make any outcries of any supervision concerns.

Collateral children were interviewed and stated there were no supervision concerns regarding the facility. Collateral children did not make any outcries regarding any medical neglect.

Collateral adults were interviewed and stated there were no supervision concerns regarding the facility. Collateral adults stated the children are always supervised by an adult.

---

[80] After the investigation was initiated, DFPS instructed the operation to take the child to the doctor to have his hand examined. The facility took him to an urgent care clinic and his hand was x-rayed. Staffing contact notes in IMPACT indicate the doctor found "no concerns" with the child's hand. However, the documentation from the urgent care clinic visit (included in One Case) noted a "Sprain of unspecified part of right wrist and hand" and indicated that if there was no improvement in two-to-three days, the child should have a follow-up visit with his primary care physician. During his interview with the monitoring team, the child indicated the injury resulted from punching a wall and he reported that it was painful.

[The alleged perpetrators] stated there is always an adult present with the children and the children are checked on regularly.

It was also alleged that... [Child C] was physically abused by [Staff 1].[81] [Staff 1] stated there was never a time where she held [Child C] in a restraint while he was on his stomach. [Staff 1] stated there was never a time when she had her knee in [Child C's] back.

The therapist stated no concerns for the facility.

The CVS workers stated no concerns.

Externals were reviewed and no concerns were observed.

LE was contacted but has not responded in regard to [sic] if there was going to be an open investigation.

At the conclusion of the investigation, based on the information obtained from the victims, Alleged Perpetrators, collateral children and collateral adults, the allegation of Medical Neglect will be Ruled Out.  There was no evidence to prove that caregivers failed to seek, to obtain or to follow through with medical care for [Child A].

The allegation of Neglectful Supervision will be Ruled Out.  There was not any evidence to prove that any injuries or harm was caused to [the children] as a result of neglectful supervision.

Based on the information gathered, the allegation of Physical Abuse will be Ruled Out.  There was not any evidence to prove that [Staff A] physically abused [Child C].

HHSC initially issued five citations related to the investigation as follows:

- A citation for violation of the minimum standard (748.1531(d)) related to medical care, based on the finding that a child "did not have a follow-up appointment as requested by the medical provider."

---

[81] This allegation was made by 11-year-old Child C during his interview, not by the MTM.  The child said that Staff 2 "softy slammed him down to the ground" on his stomach and that the staff person had his knee on the child's back and "he could barely breath." Child C said he told the staff person that he could not breathe, the staff person let him go briefly but then put him back in the prone restraint. The child reported having scratches on his chest from rug burn because he kept moving during the restraint.  He said the restraint lasted 10-to-20 minutes.  The child reported Staff 1 also put him in a prone restraint that lasted five-to-10 minutes.  Only one of these two staff appear to have been interviewed for the investigation; she denied the allegations.

48

- A citation for violation of the minimum standard (748.2103(b)) associated with medication destruction, based on the finding that "[a]n excessive amount of medication that is expired and no longer used is kept at the operation."
- A citation for violation of the minimum standard (748.2307(11)) associated with prohibited punishment, based on the finding that "[c]hildren were interviewed and reported having to sit at the table for long periods as a form of discipline."
- A citation for violation of the minimum standard (748.2101(2)) associated with medication storage, based on the finding that "[m]edication storage keys were left unsupervised, accessible to children."
- A citation for violation of the minimum standard (748.2003(b)(3)) associated with the administration of prescription medication, based on the finding that a "[c]hild did not receive medication as ordered due to medication being back ordered from the pharmacy."

According to a contact note in CLASS, HHSC held an exit interview with the operation on October 18, 2022, to explain the citations that were issued.

When the monitoring team reviewed the investigation in CLASS and IMPACT and realized that the photos, video, and documents that the MTM e-mailed to the investigator were never uploaded to One Case, the Monitors raised the investigation with HHSC during a videoconference meeting on October 21, 2022. During the meeting, the Monitors alerted HHSC to the additional information.  The Monitors sent a follow-up e-mail two days later, noting that the video "shows both daytime and nighttime staff sleeping, among other things" and offering to send the information to the HHSC investigator.[82]

On October 24, 2022, HHSC responded to the e-mail, noting:

> From emails forwarded to HHSC by DFPS, it appears that [the MTM] did indeed send an e-mail to DFPS on 9/18/22 with an encrypted link.  DFPS indicated to HHSC that neither the DFPS employee who received that email or her supervisor were successful in opening the link to access the encrypted content. This may be why the materials you reference are not available in One Case.  DFPS today forward[ed] [the MTM's] 9/18 with the encrypted link to HHSC.  Although the link was blocked for some HHSC employees, two of our employees have been able to access the encrypted content, which they noted appears to contain approximately 275 videos of varying lengths.[83]  Our staff are working to review the content.  In the meantime, if the Court Monitors would like to specifically identify any particular photos or videos (or portions of videos) from among the 275 in the encrypted link please let me know so we can be sure RCCR has received and carefully reviewed any concerning content in those items.[84]

---

[82] E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, Attorney, Foster Care Litigation, HHSC, Follow-up from Friday's call, October 23, 2022 (on file with the Monitors).

[83] Each video was approximately 40 seconds to just over one minute in length, and viewers were able to scroll through to avoid having to watch the entire video.

[84] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Follow-up from Friday's call, October 24, 2022 (on file with the Monitors).

The Monitors responded later that day, referring to the document that was sent with the encrypted e-mail that identified relevant photos and documents included in the shared file.[85]  In the body of the e-mail, the Monitors identified the videos (including time markers on the videos) showing the sleeping staff.[86]  The next day, HHSC confirmed that their staff were able to access the photos and video and were reviewing them.[87]  The additional information provided by the MTM resulted in five more citations:

- A citation for violation of the minimum standard (748.151(3)) associated with operational responsibilities, based on the finding that "[o]ne child's medical record was altered resulting in the child not receiving proper medical follow up."
- A citation for violation of the minimum standard (748.2151I (6)) associated with medication records, based on the finding that "[o]ne child['s] medication record was pre-filled prior to child receiving the medication."
- A citation for violation of the minimum standard (748.1003(a)) associated with child/caregiver ratio, based on the finding that the "[o]perations [sic] video cameras shown [sic] staff sleeping during wake and sleep hours."
- A citation for violation of the minimum standard (748.2855(a)) associated with EBI documentation, based on the finding that "[o]ne child's record did not include information regarding restraint performed."
- A citation for violation of the minimum standard (748.685(a)(4)) associated with caregiver responsibility, based on the finding that "[o]ne active safety plan was in place that required staff to closely monitor the children and ensure they were in separate groups at the time that staff were observed in video asleep."

According to CLASS contact notes, HHSC conducted a second exit interview on October 31, 2022, to explain the new citations to the operation's administrator.

Though HHSC alerted DFPS to the exchange with the Monitors related to the investigation and the documentation provided by the MTM, the documentation was never uploaded to One Case and there is nothing in the IMPACT records to suggest DFPS reviewed the documents and video or reconsidered its findings after HHSC alerted it to the information.

Furthermore, before closing its investigation, DFPS never contacted the MTM or the Monitors to let them know that its investigator and supervisor could not access the information that the MTM emailed to the investigator. There is no contact in IMPACT indicating that the investigator received the information from the MTM.  If an outside reviewer read the case, the reviewer would have no idea the information existed.

The Monitors identified additional problems related to inappropriate medical treatment, omissions in documentation, and inconsistency in reporting as follows:

---

[85] E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, re: Follow-up from Friday's call, October 24, 2022 (on file with the Monitors).
[86] *Id.*
[87] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Follow-up from Friday's call, October 25, 2022 (on file with the Monitors).

- DFPS's decision ruling out Medical Neglect related to Child A's hand injury appears to be based on the investigator's finding that "[the child] was interviewed and stated he never went to the doctor for his hand, and never asked to go to the doctor for his hand and that it did not hurt,"[88] and "[The alleged perpetrators] stated [Child A] did not make them aware that he injured his hand.  [One of the alleged perpetrators] took [Child A] to the doctor after [being] instructed to by RCCI…to have his hand checked and there were no concerns noted."

The Monitors identify two issues: First, this process improperly places the responsibility to request medical care on the child, rather than on the adult caregivers to determine whether care is needed after an event (like punching a wall repeatedly) that may result in injury.

Second, the finding of "no concerns" is contradicted by information provided by the MTM to DFPS, and information reviewed by DFPS over the course of the investigation.  Child A and the collateral children said that the child injured his hand by punching the wall.  One of the collateral children said that Child A's "whole hand was swollen" after he punched the wall and that the staff put ice on his hand.  Another collateral child also confirmed Child A's injury and said the child's knuckles were bruised.  A third child said the staff put "ointment" on Child A's hand.  These statements suggest that the staff were aware of an injury to the child.  During his interview, Child A said that he did not tell staff that his hand was injured because the "last time" they told him that they would not give him medicine if he punched a wall because they considered it self-harm.  The child reported that "they" gave him medicine later, but the injury was "still there but got worser."   The child's statement suggests that the child was discouraged from reporting an injury.

There were two incident reports in One Case documenting that the child punched a wall: one was dated April 22, 2022,[89] and the other was dated June 15, 2022.  The child's hand was visibly swollen and disfigured when the monitoring team visited the operation and interviewed the child on August 17, 2022.[90]  One of the knuckles on Child A's hand still appeared to be swollen on the day that DFPS interviewed him and took photos on August 22, 2022.[91]  There was nothing in One Case to document a more recent incident, and though the children who were interviewed could not remember exactly when the incident occurred, they reported it happened several weeks earlier.  This lag in documentation suggests that the caregivers ignored a visible injury to the child's hand for weeks (if not months).  When the child was finally taken to an urgent care clinic on September

---

[88] During his interview, Child A said he thought he broke his hand when he punched the wall, but it did not hurt.  When he was asked when he punched the wall, he said he punched it twice, with the same hand, in the same spot.

[89] This incident report specifically notes that the staff checked for an injury to Child A's hand and did not find one.

[90] The photos taken by the MTM are included in Appendix B.

[91] The photos taken by the investigator and uploaded to One Case are included in Appendix C.

7, 2022 (at the request of the DFPS investigator), the doctor determined the child's hand and wrist were sprained and noted that if the symptoms did not improve within two-to-three days, a follow-up appointment with the child's primary care physician should be made.

- The investigation findings included that, "Collateral children were interviewed and stated there were no supervision concerns regarding the facility." Three of the eight children interviewed reported that they had seen staff sleep at night. Two of these children reported witnessing the same staff person sleeping. This staff person was interviewed and denied sleeping. DFPS did not review the video provided by the MTM, which showed daytime and nighttime staff sleeping.

  DFPS stated, "Collateral children did not make any outcries regarding any medical neglect." Yet, on September 29, 2022, a collateral child reported to the investigator that he had "bumps that [were] spreading on his back, chest, and legs;" the child said that he had reported the bumps to one of the staff, who said he would schedule an appointment but never did. The child said, "when the bumps pop, he…is shedding tears because of the pain." The child said the staff person gave him a cream to put on the bumps, but they got bigger.[92] When DFPS told the Executive Director to take the child to the doctor for the bumps, he said the child did not tell him about them, but that he would schedule an appointment for the next morning. The Monitors reviewed the child's Health Passport records and did not find an appointment associated with the child's complaints; the only appointments listed are with the child's psychiatrist and therapist.

- DFPS's decision ruling out Medical Neglect associated with the failure to provide Child A with his ADHD medication[93] for more than a week was based on the finding that, "Alleged perpetrators…stated the reason why [Child A] did not receive his medication is because it was a delay at the pharmacy." This finding was contradicted both by information provided to DFPS by the MTM, and by Child A's Health Passport records. Child A's Health Passport records show the missed medication (Concerta) was refilled by the pharmacy and picked up by the operation on August 8, 2022,[94] consistent with the MTM's report to SWI and the investigator, and the date shown on the blister packets reviewed by the monitoring team. DFPS did not review the documentation provided by the MTM either related to these allegations or related to the allegations related to other children's missed

---

[92] The investigator told the child that she will take a photograph of the bumps and the child agreed, but the Monitors did not find any photographs in One Case.

[93] According to contact notes in IMPACT, during their interviews two other collateral children reported they had missed medication. One child said, "he missed his medication for about a week because the pharmacy was running late," and the other child said he only missed his medication "if it's not refilled."

[94] The Monitors asked HHSC whether the dates found in the Health Passport for filled prescriptions were the date the prescription or refill was requested, or the date that it was filled. E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, Question re: Health Passport, January 17, 2023 (on file with the Monitors). HHSC responded that medications or refills for existing prescriptions "will display in Health Passport after the medication is filled (picked up) and Superior's Pharmacy vendor sends them the data." E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Question re: Health Passport, January 20, 2023 (on file with the Monitors).

medication or medication errors.[95]  The information the MTM sent to DFPS after making the report to SWI included documentation showing that another child's medication logs indicated his last dose of Vyvanse was given on August 12, 2022, four days before the start of the monitoring team's visit. Because DFPS did not review the information sent by the MTM, this allegation was not investigated. The child's Health Passport records show the Vyvanse prescription was picked up on August 12, 2022, the day his last dose was administered. Two other collateral children interviewed by the investigator also reported missing medications because the facility reported that the pharmacy was delayed in refilling the prescriptions. One of the children reported being without his medication for a week.

- The DFPS findings do not specifically address the MTM's report regarding Child A's complaints concerning his infected, ingrown toenails, a condition for which he had first been treated before being placed at Silver Lining. When staff members were asked about the allegations by the DFPS investigator during interviews, they said that the child had seen the doctor and gone to follow-up appointments. However, one of the documents the MTM provided to DFPS was documentation for an appointment with a podiatrist on June 16, 2022, that indicated a follow-up appointment would be needed in one month to "check nails."[96]  The MTM reported to DFPS that Child A still had not had a follow-up appointment when the team

---

[95] The MTM reported to DFPS that a child was prescribed Vyvanse and his last documented dose was August 12, 2022, several days before the monitoring team's visit. DFPS does not appear to have investigated this allegation. The child's Health Passport records show that the Vyvanse prescription was filled on August 12, 2022. The MTM also reported that another child's site records showed that his psychiatrist reduced the dosage of Abilify that he was to receive from 10 mg daily to 5 mg daily on December 20, 2021. Yet, the medication logs for the child showed he continued to receive 10 mg until March 28, 2022. The child's Health Passport records inconsistently show a 5 mg Abilify prescription filled on December 20, 2021, January 15, 2022, and February 20, 2022, but also show a 10 mg Abilify prescription filled on December 28, 2021, January 23, 2022, and February 20, 2022. The DFPS investigator does not appear to have investigated this allegation (beyond asking the children interviewed whether they ever received twice their usual dose of medication), nor to have reviewed any of the children's Health Passport records.

[96] The child's site records showed that after being placed at Silver Lining on February 26, 2021, he was first prescribed medication to treat toenail fungus at his annual Texas Health Steps Medical Checkup on May 21, 2021. Child A's IMPACT records show he complained about his toenails to the Local Permanency Worker who completed his face-to-face visits on March 16, 2022, and April 18, 2022. The contact notes for the visits indicate that the caseworker told Child A that she would report his complaints to the operation's administrator. On May 19, 2022, he complained to the Local Permanency Worker who visited him "that his toes were still hurting him," and showed her his toenails. The caseworker "took a photo" and again said she would follow up with the administrator "in order to get an appointment scheduled for him." Finally, on May 23, 2022, Child A's site records show he was taken to the urgent care clinic, was prescribed medication for a toenail infection, and referred to a podiatrist. On June 16, 2022, Child A was taken to the podiatrist; the documentation associated with the visit indicated that the podiatrist prescribed a different topical treatment and requested a return visit in one month to check the child's nails. On July 28, 2022, the child again complained about his toenails during a face-to-face visit with the Local Permanency Worker. On August 23, 2022, the child reported to the Local Permanency Worker that his toes were still bothering him. On August 27, 2022, the child called his caseworker and told his CVS worker that his toenails were still infected; the caseworker said she would let the administrator know. Nothing in IMPACT or Health Passport shows that he was taken to the podiatrist before leaving Silver Lining for a different placement on September 12, 2022.

visited in mid-August 2022. The child's toenails were still visibly infected.[97]   The child's IMPACT records show that he continued to complain to DFPS caseworkers after the monitoring team was on-site. The child's Health Passport records do not show that a follow-up appointment with the podiatrist occurred.

The Monitors also disagree with DFPS's suggestion that to make a finding of Neglectful Supervision, there must be evidence of an actual injury.[98]   DFPS found, "The allegation of Neglectful supervision will be Ruled Out. There was not any evidence to prove that any injuries or harm was caused to [the children] as a result of neglectful supervision."   The definition of Neglect in the Texas Family Code and the Texas Administrative Code does not require an actual injury or harm, it requires the potential that the neglect could cause substantial harm or injury.

Neglect is defined in the relevant sections of the administrative rule as follows:

(a) Neglect for purposes of an investigation in a child care operation is further defined in TFC §261.001(4)(A)(iv) as a negligent act or omission by an employee, volunteer, or other individual working under the auspices of a facility or program, including failure to comply with an individual treatment plan, plan of care, or individualized services plan, that causes **or may cause** substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy.

(b) In this section, the following terms have the following meanings:

(1) "Negligent act or omission" means a breach of duty by an employee, volunteer, or other individual working under the auspices of a facility or program that causes **or may cause** substantial emotional harm or substantial physical injury to a child and includes the following:

(A) Failure to take an action that a reasonable member of that profession, reasonable caregiver, or reasonable person should take in the same situation; ***

---

[97] The photograph of the child's toenails taken by the MTM are included in Appendix D.

[98] The insistence on an actual injury to support a Reason to Believe is not limited to investigations involving allegations of neglect.  For example, during a case record review for an upcoming report, the monitoring team reviewed a case (CLASS Inv. ID: 2932194, IMPACT Inv. ID: 49324952) involving allegations of Physical Abuse and Neglectful Supervision.  The investigation substantiated allegations that the foster parent put a shock collar intended for dogs on a five-year-old PMC child and a seven-year-old PMC child, and intentionally shocked the children with the collar, because the foster parent "thought it was funny." Though DFPS RTB'd the foster parent for Neglectful Supervision (based on the finding that placing the collar on the children was negligent and caused substantial emotional harm), the allegations of Physical Abuse were Ruled Out because neither child reported the collar being placed on them as a form of discipline, and "no physical injury was sustained by the shock."  The administrative code provisions defining Physical Abuse state, "'Genuine threat of substantial harm from physical injury' means exposing the child to any risk of suffering a physical injury.  This does not require actual physical contact or injury."  40 Tex. Admin. Code §707.789.

(G) Placing a child in or failing to remove the child from a situation in which      a reasonable member of that profession, reasonable caregiver, or reasonable person should know **exposes the child to immediate danger** of sexual contact; ***

(K) Repeated (two or more) violations of any law, rule, or minimum standard, after notice and an opportunity to correct the violation, that **may cause** substantial emotional harm or physical injury to a child.

40 Tex. Admin. Code §707.801 (emphasis added).  Even the standard articulated in the Administrative Code that requires "blatant disregard" and "immediate danger" to the child's health or safety defines "immediate danger" to include situations in which the child may not have suffered an actual harm, but that "*would have* resulted in substantial emotional harm or substantial physical injury to the child."[99]

In this case, the pattern of allegations related to child-on-child sexual contact put the operation on notice of the need for heightened supervision, particularly at night.  The operation had been cited for staff sleeping during an awake-night shift during a prior investigation.  Two Safety Plans were posted at the facility when the monitoring team visited: the one described in footnote 79, *supra*, and a Safety Plan that has an effective date of April 20, 2022 (after Child A reported the incident involving Child D, described in footnote 83, above), and a "Revised" date of May 27, 2022.[100]  This Safety Plan states:

Allegations have been made by resident [Child A].  Reportedly, there are residents exposing themselves and being inappropriate.  For the safety of all residents, the perpetrators [Child F and Child D] will be roomed alone, without roommates at house 2418.  All children involved will be closely supervised by staff at all times. [Child A] will be roomed at house 2403 during night hours.

As of 5/27/22, [Child A], reportedly stated he does not feel safe due to the sexual gestures and alleged advances made by [Child F].  Additionally, [Child D] has allegedly "pulled down [Child A's pants and continues to physically assault him" according to [Child A].

Administrator…and Executive Director…will ensure this safety plan is followed as long as these residents remain at Silver Lining RTC.

All staff will be informed of the revised safety plan, it will be posted in the office for staff to view and all staff will be provided a copy of the Safety plan for reference by the end of today, 5/27/22.  All staff will ensure [Child A]

---

[99] 40 Tex. Admin. Code §707.801.
[100] Both Safety Plans are redacted and included in Appendix E.

will be at least 10 feet away from [Child F] and [Child D] at all times and when and if he is at 2418 for dinner/group/free time/outings...etc.

If the safety plan is not followed at any point in time, we will self-report immediately.

As discussed in footnote 79, *supra*, Child D's sexual incident history page lists two flags for aggression due to incidents that occurred with two different children at Silver Lining. When the monitoring team visited, there were at least two confirmed victims of sexual abuse residing at the facility whose abuse occurred before their placement at Silver Lining, and one child who was flagged as a victim due to Child D's sexually aggressive behavior. Though other children are not flagged as victims of sexual abuse or with an indicator for aggression, their sexual incident histories in IMPACT list allegations related to victimization or aggression in the "additional relevant information" section. The video obtained by the monitoring team during the visit to the facility revealed staff were sleeping during the day and nighttime shifts. An injury should not have been required to make a finding of Neglectful Supervision.

New allegations that Child B engaged in sexual activity with another child (who is flagged as a confirmed victim of sexual abuse) were reported to SWI on November 14, 2022. Child B acknowledged the behavior, but the other child denied that it occurred. Neglectful Supervision was again Ruled Out.

F. Paloma Place RTC

Paloma Place RTC, located in Corpus Christi, Texas, received its initial permit to operate on July 12, 2021, and its full permit on January 10, 2022.[101] The monitoring team visited the operation from September 20, 2002, through September 22, 2022. The operation was placed under a voluntary Plan of Action (POA) just before the visit, on August 16, 2022. The POA addressed issues related to the administration of medication and proper documentation in medication logs, and weekly meal audits, and identified steps to ensure children were given privacy when making phone calls. The POA also required the operation's administrator to ensure unauthorized personnel did not have access to files containing resident-related information, required the program manager and supervisors to inspect the physical site daily, required cooperation with investigations (and included adding a section to the employee handbook regarding investigation cooperation),[102]

---

[101] The permit carries with it a prohibition that the property owner cannot be present on the property, involved with daily operations, or act as a controlling person. The property owner was the CEO and a controlling person for Prairie Harbor RTC and The Landing; the revocation of Prairie Harbor's license and denial of The Landing's full permit make the property owner ineligible to receive a permit or serve as a controlling person for other operations. Some of the staff, including a supervisor, worked at The Landing prior to being hired to work at Paloma Place.

[102] During a DFPS investigation of an allegation of Physical Abuse, one of the children reported to the DFPS investigator that CEO of the facility "told him not to talk to the females because they would close this place down. [The CEO] also told him if other kids found out he talked; they would beat on his ass. [The child] said one of the boys at the facility also told him 'if this place shuts down and I have to start all over, I am going to beat your ass.'" The body camera video of the law enforcement officer who responded to the call related to the Physical Abuse captured what was believed to be the CEO's attempt to discourage one of the

training in trauma-informed care, a monthly review of employee training records, and daily documentation and review of children's service planning events.

1.  CLASS Investigation ID: 2934051

On September 23, 2022, an MTM reported to SWI that during an interview, Child A, "stated he was restrained by [Staff 1] and it hurt, [the staff person] put his arm behind his back and lifted his arm up.  [Child A] was given ibuprofen and ice."  The MTM also reported that Child A, "was…restrained by [Staff 1] …[who] has not had proper…training on how to restrain individuals. He is not a caregiver he is a cook in the facility."  A Priority 2 investigation of minimum standards violations was opened by HHSC on September 24, 2022.

When the MTM was interviewed by the HHSC investigator, she reported that the restraint, which occurred on September 10, 2022, was conducted by two staff – one of the cooks (Staff 1), who was not trained in restraints, and a caregiver (Staff 2).  The MTM told the investigator that Child A said that Staff 1 was one of the two staff who restrained him; since the MTM had reviewed staff records before the interview and did not recognize the name as a caregiver, she asked the child about Staff 1 and Child A told her that he was a cook at the facility.  Child A told the MTM that during the restraint his arms were lifted behind his back, that the restraint hurt, and that he was given an ice pack and ibuprofen afterward.  The MTM told the investigator that when she returned to the facility the next day, she again asked Child A about the restraint, and he confirmed that the cook was one of the two staff who restrained him.  Child A also mentioned that Child B had witnessed the restraint.  The MTM said she asked Child B if he had ever witnessed another child being restrained at the facility, and Child B said he had seen Child A restrained, and that Staff 1 was one of the two staff who restrained Child A.  During the interview, the MTM noted that another member of the monitoring team was part of the conversation with Child B.  The MTM noted that the documentation for the restraint did not include the cook as one of the staff who conducted the restraint.  The documentation of the incident instead indicated that the restraint was conducted by Staff 2.

---

children who witnessed the event from describing it to the law enforcement officer. Allegations of Physical Abuse were substantiated against a caregiver for slapping one child, and body slamming another child. Neglectful Supervision was ruled out for the CEO, because though the child alleged he was threatened and told not to cooperate with law enforcement during the investigation of the alleged Physical Abuse, the lack of audio on the officer's body camera made it impossible to corroborate the child's statement. The CEO denied threatening the child.  Though DFPS found the child's statements "credible," DFPS appears to base the decision to rule out Neglectful Supervision on their finding that the child did not suffer emotional or physical harm.  However, HHSC issued a citation for violation of the statute (Tex. Hum. Res. Code § 42.04412(a)) that prohibits interfering with an investigation or inspection of a facility or family home. HHSC found, "Permit holder told a child in care to not participate in interviews with investigators.  The child did not participate in two interview attempts."

DFPS issued an abeyance prohibiting the CEO from being on the campus while the local district attorney sought charges of witness tampering; when a grand jury declined to indict the CEO, the abeyance was lifted. DFPS's Residential Child Care Contracts Division determined during monitoring that after the abeyance was issued and before it was lifted, the CEO had access to children's files.

The investigator later called the MTM and asked for information about the other monitoring team member who spoke with Child B.  The MTM provided contact information; the investigator called the other member of the monitoring team, who told the investigator that Child B reported that "a staff member...helped [Staff 1] restrain [Child A] and [he] was in the quad when this occurred.... [Child B] stated, [Staff 1] was the person who started the restraint on [Child A]."

Child A was interviewed twice by different HHSC inspectors.  During the first interview, the child acknowledged having been restrained but did not recall what kind of restraint it was and "would not describe how he was held by staff."  He did not recall who restrained him and said no one witnessed the restraint.  He said that he thought the individual still worked at the facility but "he just can't remember who it was that restrained him.  The investigator noted that Child A "remained with his head down and made minimal eye contact."  Later, three HHSC inspectors were on site for a POA inspection.  Child A was interviewed by the three HHSC inspectors who were on site for the inspection.  When he was asked about restraints, Child A said he was restrained by Staff 1.  He said that when two other staff were attempting to restrain him but were having difficulty, Staff 1 "came behind him and held his arm back twisting his arm."  Child A said, "he pressed him, face forward against the wall and held his arm behind his back in a painful manner."  An inspector demonstrated and Child A confirmed the restraint method.  Child A said he was then "pushed to the ground, with his arm still behind his back" and "he was held in the restraint for 20 to 30 minutes and they were telling him to calm down."  Child A said he was later given ibuprofen for his pain.  Child A told the inspectors, "He did not want to say anything before because [Staff 2 and the other caregiver who attempted the restraint before Staff 1 joined] are his favorite staff members."

In addition to contact notes related to these two interviews in HHSC's CLASS database, the investigation chronology in CLASS includes a contact note describing a conversation between the HHSC investigator in this case, and the DFPS investigator assigned to an investigation of Physical Abuse initiated after a second report to SWI by an MTM related to the restraint of another child (described below: CLASS Inv. ID: 2934116, IMPACT Inv. ID: 49335119).   The DFPS investigator notified the HHSC investigator that she interviewed Child A in connection with the Physical Abuse investigation because when she asked, "another child" about restraints, "[Child A's] name was mentioned."  The contact note written by the HHSC investigator states:

> [The investigator] informs she spoke with [Child A] yesterday...She stated he said he was hitting his head on the wall and 3 staff members came to stop him from hurting himself.  He described the restraint as 2 individuals on the side holding his hands and another holding his feet as he was falling to the floor.  [The investigator] informs [Child A] admitted he was not pushed down and the restraint was only a few minutes to prevent him from hurting himself and calmed [sic] down.

> She adds that later when she was walking out of the facility.  [The facility CEO] walked her out and as they talked, he informed her [Child A] was very angry and had made a negative comment calling her a fucken bitch as he

thought she was trying to set him up for unknown reasons. [The investigator] informs she could understand his anger and concern since I interviewed [Child A] on Saturday and she did again yesterday. She reiterates she interviewed him only because his name was mentioned as someone being restrained by staff, by another peer during an interview. [The investigator] informs she was checking in to provide information for this case since both investigations are similar in regard to restraints and youth interviews.

An IMPACT contact note written by the DFPS investigator for the Physical Abuse investigation also describes this conversation:

> On September 28, 2022, at 5:37 pm, I [DFPS investigator name omitted] spoke with HHSC inspector [name omitted]. I apologized for not getting back to her yesterday.
>
> [The HHSC inspector] explained to me that when she went out to the Paloma Place on Saturday, she interviewed [Child A]. I informed her that I also interviewed him on 9/26/2022. I explained to her that I interviewed him as a collateral child and during my interview with him, he said, he had been placed in a restrain [sic] for hitting his head against the wall. [The HHSC inspector] said, that is why she was called out to the operation on Saturday. Her investigation was for staff putting [Child A] in the restraint and one of the staff members not having the proper training to restraint [sic]... [The HHSC inspector] said, [Child A] denied to her that he was in a restraint at all. I shared the information [Child A] shared with me and from the sounds of it, it sounded like the restraint was appropriate, primarily because [Child A] admitted to self-harm and he explained that one staff member had one arm and the other staff member had the other arm and one staff member had his legs. [Child A] denied any injuries, however he said, his arm hurt, and staff gave him an ibuprofen.

The contact note in IMPACT documenting the interview with Child A, written by the DFPS investigator for the Physical Abuse investigation, is inconsistent with these descriptions of the restraint. The DFPS investigator wrote:

> [Child A] said, he was in a restraint before because he got mad at another child, and he started hitting his own head against the wall. There were 3 staff members that came to stop him. Staff held him...against the wall, but he wouldn't calm down. He said, he kept hitting his head against the wall. When they were restraining him, he didn't feel anything, he said, he was too mad. After he was done, his arm hurt, and they gave him ibuprofen. The restraint lasted a while because they were trying to calm him down. Andy said the restraint did end up going to the ground and one staff was holding his legs and two other staff members were holding each arm. This restraint is being investigated by HHSC.

59

The Monitors listened to the audio recording of the interview conducted by the DFPS investigator, which was uploaded to One Case for the Physical Abuse investigation discussed below.  In the audio recording of the interview, Child A described the restraint in a way that is consistent with the description he provided to the members of the monitoring team who interviewed him.  He said he was restrained by three staff, who held his arms and legs and put him on the floor.  When the restraint started, they were holding him against the wall, then they put him on the floor.  Child A said his arm was a little sore because they "put pressure on the wrong place…they were, like, twisting my arm back."  He said he was standing up, they put him against the wall, and they twisted his arm back and pulled it up.  When they let him go, his arm was "real sore."  They gave him ibuprofen.  Though the investigator never asked Child A which staff restrained him, (which makes the investigation deficient in and of itself) the child described the one that twisted his arm behind his back as "a big one" because the other two staff were smaller and couldn't handle him by themselves.  Child A said the restraint lasted 20 to 25 minutes.

The HHSC investigator also failed to note – or the DFPS investigator did not reveal – that the other child who "mentioned" Child A's name when he was asked about restraints also described the restraint involving Child A.  The IMPACT contact notes related to this child's interview state:

> [Staff] put [Child A] in a restraint because he was hitting his head against the wall.  [Child A] was still squirming, and staff put him to the ground.  Three staff were holding him down.  Two staff members were holding his arms and the other one had his feet.  [Child A] told them; his arm hurt but they didn't move.[103]

All the staff who were interviewed denied the child was restrained by Staff 1; they said Staff 2 and another caregiver were the only staff involved in the restraint and that Staff 1 was in the room because he was giving the children snacks.  When Child B was interviewed, he denied witnessing any restraints.  Child B also reported that he would be leaving the facility in two or three months to live with his birth family and "he just want[s] to be with his family and not be locked up here."  The form documenting the restraint indicates it was conducted by Staff 2 and another caregiver; Staff 1 is not listed as having assisted.

HHSC issued seven citations for minimum standards violations as follows:

- A citation related to serious incident reporting (748.303(a)(2)(A)) based on the finding that "A child in care sustained a self-inflicted laceration to the head and injury to the hand.  Emergency medical treatment was obtained for the child on 8/24/22.  The incident was not reported to Licensing as required."[104]  The operation requested an administrative review, and the citation was upheld.

---

[103] Though this child was also interviewed by the HHSC inspector, the interview notes indicate that the child claimed not to have seen anyone in a restraint.
[104] This citation was for an incident that was unrelated to the allegations regarding Child A's restraint.

- A citation for violation of the minimum standard associated with prohibited personal restraints (748.2605(a)(5)) due to the finding that "[a]n untrained caregiver used a restraint hold where a child's arm was placed behind their back while held against a wall." The operation requested an administrative review, and the citation was overturned.[105]

- A citation for violation of the minimum standard (748.2453) which requires that only qualified caregivers may administer an emergency behavior intervention, based on the finding that, "A caregiver not trained in EBI was included in the implementation of a restraint of a child in care." The operation requested an administrative review, and the citation was upheld.

- A citation for violation of the minimum standard associated with child/caregiver ratio, based on the finding that a "[s]taff member left children under his care/ratio without direct supervision to assist with a restraint." The operation requested an administrative review, and the citation was upheld.

- A citation for violation of the minimum standard requiring a child's parent to be notified of an EBI, based on the finding that "[t]here was no documentation found in the child's file stating the child's parent was notified of an EBI." The operation requested an administrative review, and the citation was upheld.

- A citation for violation of the minimum standard requiring the name of the person who observed a child after a restraint is conducted, because "[t]he Incident Report did not include information on who observed the child after the restraint and after PRN medication was provided." The operation requested an administrative review, and the citation was upheld.

- A citation for violation of the minimum standard requiring documentation of a serious incident to include names of witnesses to the incident, because "[t]he Incident Report did not list all witnesses present during a restraint." The operation requested an administrative review, and the citation was upheld.

---

[105] According to CLASS records, during the administrative review the attorney for the operation said, "She [was] unsure who they were referencing here but has to call bull on this." She explained that it was only during a second interview with Child A that he made the claim and "the first interview was closer to the event and usually more details are remembered during the first interview." The attorney asked, "why would [Child A] say his favorites are [Staff 2 and the other caregiver] and then say [Staff 1] is the one that did this." The attorney also referred to an interview with the child's CVS worker, who told the investigator that Child A "is a big kid, strong and couldn't see this child having his arm twisted behind his back by the one staff." The attorney questioned how Staff 1 could have grabbed Child A's arm, because the restraint report stated that Staff 2 and the other caregiver had both the child's arms. The attorney suggested, "The child finally told the investigator what she wanted to hear in the second interview." During a subsequent videoconference, the inspectors explained to the HHSC staff conducting the administrative review that Staff 1 was "a larger guy" (this is also included in the CLASS contact notes for the investigation). The inspectors who conducted the second interview for the POA inspection said that "the cook [Staff 1] got involved because the other two staff were not able to restrain him." The explanation given for overturning the citation was, "The victim told the court monitor about a restraint that placed his arm behind his back. Another child, [Child B], was also interviewed by the same court monitor and a second monitor and confirmed the restraint by the unapproved caregiver/cook but did not confirm the arm being behind his back. The victim told CCR inspector and Supervisor about the same incident a few weeks later when he was being interviewed during a POA inspection. [Child B] denied seeing other children restrained during an interview with the CCR investigator."

First, the allegation should have been investigated by DFPS for Physical Abuse.  The allegation that a staff member improperly restrained a child, causing pain and injury, meets the threshold for a Physical Abuse investigation, based on:

> Physical injury that results in substantial harm to the child or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the history or explanation given and excluding an accident, by a person responsible for a child's care, custody, or welfare. 40 TAC §707.789(a)(1).

In addition, though HHSC issued citations related to the restraint described by Child A, the Monitors identified inconsistencies and gaps in the investigation that may have contributed to the decision to overturn the citation related to inappropriate restraint during the administrative review:

- The notes in CLASS and IMPACT about the conversation between the DFPS investigator and the HHSC investigator suggest the DFPS investigator did not describe what Child A told her in a way that was consistent with what Child A said.  The DFPS investigator's IMPACT notes regarding her interview with Child A are more consistent with Child A's interview but failed to include that during the interview, Child A said that the staff member holding his arm pulled it behind his back, pushed it up, and "put pressure on the wrong place," causing pain.
- The DFPS investigator failed to advise the HHSC inspector that the child who "mentioned" Child A also described the restraint that the HHSC inspector was investigating, during a recorded interview, in a way that was consistent with Child A's allegations.
- The HHSC inspector failed to request the audio recording of the DFPS investigator's interview with Child A and did not access One Case to review it.
- The DFPS investigator failed to ask Child A which staff restrained him during her interview with him.

Finally, the Monitors disagree with the decision to overturn the citation.  The HHSC staff person who conducted the administrative review appears to have ignored the notes related to the MTM's interview during which the MTM relayed Child A's description of the restraint, which was consistent with what Child A told the POA inspectors and the DFPS investigator.  The HHSC staff who conducted the review did not attempt to contact either of the members of the monitoring team who spoke to the investigator prior to overturning the citation.

2.  CLASS Investigation ID: 2934116; IMPACT Investigation ID: 49335119

A second report was made to SWI by a MTM on September 23, 2022, also alleging that a Paloma Place staff person inappropriately restrained a child.  The intake narrative in CLASS reads as follows:

> Primary Concerns: Today (09/23/22) during a visit, [Child A] had attempted to run away from the RTC.  [A staff person in a management role], a female staff and [Child A] were in the car, believed [the manager and staff] had just picked up [Child

A] and arrived back at the facility.  [Child A] was in the back of the car.  There was a lot of car movement as [the CEO] and [Child A] were tussling over something. [The manager] and other staff were trying to get [Child A] out of the car.  [Child A] was finally taken out of the car by [the manager] picking up [Child A] off the floor with what was believed to be an inappropriate bear hug, as [Child A's] back was aggressively bent backwards.  [Child A] was moved toward the building.  [The manager] was not seen hitting [Child A] once outside the car, but it is unknown if he did when tussling inside the car.  [Child A] ended up with scrapes to his hands.

Once inside the gate [staff] were working on escorting [Child A] inside.  [A caregiver] put his leg in between [Child A's] legs, believed to be for preventing [Child A] from moving.  Once inside the building, [Child A] was still held in a restrain [sic] by [a staff member].  [Child A] stated [the manager] had touched his private parts, believed to be due to the tussling.  Once inside, [Child A] went back outside to get his shoe and…came back inside the building right away.

[The manager] was asked what was going on inside the car and stated [sic] he was trying to take a cell phone away from [Child A] as [Child A] is not supposed to have one.  There is a concern for [Child A] as it is believed [the manager] used excessive physical force in restraining [Child A].

According to contact notes in IMPACT,[106] when the investigator interviewed Child A, he clarified that the manager reached into Child A's pants to get the cell phone that Child A had tried to conceal.  Child A said that because he had been a victim of sexual abuse,[107] this movement triggered him, and Child A began to hit and punch the manager.  Child A said that the manager grabbed Child A's hands and arms and placed him on his back, inside the van.  Child A said he fell onto the van floor, and the manager pushed Child A onto the floor on his stomach and put his hand on Child A's back.  Child A said he had one arm to his chest, and the manager was pulling his other arm behind his back.[108]  Child A said they were tussling for almost 10 minutes.  At one point when Child A was on his

---

[106] The audio file in One Case labelled with Child A's name starts with a recording of an interview, conducted in Spanish, for an unrelated investigation.  The interview with Child A begins approximately 51 minutes into the recording.  The Monitors did not initially discover Child A's interview was part of the recording and asked DFPS to upload the audio recording of Child A's interview into One Case (believing it had mistakenly been omitted).  E-mail from Deborah Fowler & Kevin Ryan to Ora Chisom, Director, Foster Care Litigation Compliance, DFPS, Audio recordings of interviews, January 28, 2023 (on file with the Monitors).  DFPS responded that the interview with Child A was not recorded due to technical issues.  E-mail from Ora Chisom to Deborah Fowler & Kevin Ryan, re: Audio recordings of interviews, February 3, 2023 (on file with the Monitors).  The Monitors discovered the recording of Child A's interview in the audio file in IMPACT after this e-mail exchange occurred.

[107] Child A is not a confirmed victim of sexual abuse, according to his sexual incident history page in IMPACT.

[108] In the audio recording of the child's interview, Child A described an inappropriate, prone restraint during which his arm was pushed behind his back.  The child indicated this was painful and said at one point he had trouble breathing.  Child A said that this restraint lasted for five minutes.  The RCCI investigator asked Child A if she could take a photograph of him showing her how his arms were being held behind his back, and he consented.  Afterward, she asks to take a photograph of him standing without showing her how he was being restrained, and he agreed.  The only photograph of Child A in One Case is the photograph of him standing.

stomach, he told the manager he could not breath, and the manager switched his position. According to the investigator's notes, Child A reported that he did not receive any injuries and, at the time of the interview, was not in any pain.

Physical Abuse was Ruled Out by DFPS, but when the case was transferred to HHSC, five citations were issued:

- A citation for violation of a minimum standard (748.105(2)) associated with personnel policies, because "[t]he permit holder's job description does not include a description for acting as a caregiver nor a description of duties as a caregiver." An administrative review was held, and the citation was overturned.
- A citation for violation of a minimum standard (748.2463(3) associated with emergency behavior intervention, because "[a] child in care was restrained in order to comply with directives, to surrender a prohibited item (cell phone), and enter the operation." An administrative review was held, and the citation was upheld.
- A citation for violation of a minimum standard (748.151(3)) associated with operational responsibilities, because a "[s]erious incident report did not give an accurate account of what occurred regarding a restraint. Statements made by staff do not align with documentation in the report." An administrative review was held, and the citation was upheld.
- A citation for violation of a minimum standard (748.2551(b)(2)) associated with emergency behavior intervention implementation, because "[o]peration staff did not conduct an approved type of restraint on a child in care, when using a bear hug to hold and walking restraint." An administrative review was held, and the citation was overturned.
- A citation for violation of a minimum standard (748.2455(a)(2)) associated with emergency behavior intervention, because "[a] child in care was not displaying behaviors that required emergency intervention at the time of implementing the intervention or during continued interventions." An administrative review was held, and the citation was overturned.

Technical assistance was provided without a citation related to the following minimum standards violations:

- A minimum standard (748.2551(d)(1)) focused on emergency behavior intervention which requires making every effort to shield a child from onlookers during a restraint: "The intent of this rule is to protect the child's privacy. It is recommended that the operation limit the number of staff involved in the behavioral interview. Having onlookers can escalate the child's behavior, placing the child at risk of injury."
- A minimum standard (748.930(a)(2)) requiring 50 hours of training annually for caregivers at operations where 30% or more of their population receive treatment services: "The purpose of this standard is [that] any employee that will have direct care of children has the required minimum training hours to ensure the staff has knowledge and training to provide care for children. If any staff that directly cares for children does not have the minimum requirements for training, this represents

an immediate safety risk to children.  It is recommended for the operation to provide minimum required training if there is a possibility that the staff will intervene in any situation that places them in direct care for children."

- A minimum standard (748.2605(a)(5)) that prohibits use of personal restraints that twist or place a child's limbs behind the child's back: "The purpose of this standard is to ensure operations are using emergency behavior interventions that are approved and permitted by the operations policies.  If the operation does not follow emergency behavior intervention techniques that have been approved, as they prohibit any limbs of child being place behind their back, this can represent a physical harm to children in care.  It is recommended for the operation to review and practice approved emergency behavior intervention techniques, to avoid using similar techniques that places children's limbs behind their back."

The Monitors do not find this investigation deficient.  However, the audio recording of Child A's interview with the DFPS investigator (as well as the written notes summarizing the interview) revealed that he was the child who "mentioned" the name of the alleged victim in the minimum standards investigation described above, and that his description of the restraint investigated by HHSC was consistent with the alleged victim's.

The Monitors also disagree with the State's decision to overturn the two citations issued for violation of minimum standards associated with EBI (restraints).  Two members of the monitoring team were on site and witnessed the incident involving Child A's restraint.  The MTM who reported the incident to SWI noted that Child A's back was "aggressively bent backwards" during a restraint "believed to be an inappropriate bear hug" performed by the manager.  When the MTM who reported the incident was interviewed, she told the DFPS investigator that her colleague "observed [the manager] pick up [Child A] and place him in what looked like a 'bear hug' from behind."

When the DFPS investigator interviewed the MTM who witnessed the restraint, notes in IMPACT indicate that the MTM reported that she observed the manager "wrap his arms around [Child A] and pick him up and move forward with him.  [The manager] stopped and had to readjust and he wrapped his arms around him again."  The MTM also said that from what she observed, "she felt the restraint...appeared to be inappropriate because he put [Child A] in what appeared to be a 'bear hug' from behind and then walked forward with him, which possibly could [have] caused an injury to the child and himself.  [The manager] walked approximately 10 steps with [Child A] by himself."

According to the CLASS notes documenting the administrative review of the citation issued for the inappropriate restraint, the representatives for Paloma Place argued that the "bear hug term came from the CCR inspector when he asked [the manager] about their policies."  The operation's representatives said that none of their staff referred to the restraint that way during the investigation, and that the manager "stated the hold was not a bear hug, it was an approved children's control position (CCP)."  The manager said that the CCP is "outlined in their policies and procedures and it is how staff are trained."[109]

---

[109] The CCP restraint is one of the restraint techniques developed by the Crisis Prevention Institute (CPI).  The online CPI handbook and materials caution that the CCP restraint "is designed to be used with children"

The Paloma Place manager described the CCP hold, and said that when he restrained Child A, he held him "for just a bit until [the other staff person] came out to get his arms." The manager said that the CCP technique was "approved and has been evaluated by HHSC and DFPS." The CLASS notes also indicate that documentation obtained by DFPS during the investigation "shows that the operation's permitted EBI techniques does [sic] not include a technique referred to as a 'bear hug' restraint" but that they do include a description of the CCP method."[110] The reviewer concluded that the description of the CCP "is consistent with the accounts from staff and the child as to the type of EBI that was used" and overturned the citation for violation of the minimum standard associated with appropriate restraints (748. 748.2551(b)(2)).

The MTM who witnessed the restraint[111] and described it as an inappropriate "bear hug" was never contacted by the reviewer. Her interview is not discussed in the notes related to the administrative review; it is not clear that the reviewer had access to them or if they did, why they discounted them. The description of the restraint provided by the manager during the administrative review is inconsistent with the restraint witnessed by and described by the MTM. The manager claimed during the administrative review that he did not carry Child A during the restraint; the MTM said that he walked with him this way for approximately 10 steps.

HHSC also failed to refer to the inappropriate prone restraint (described in footnote 110, *supra*) in the original citation and did not raise it during the administrative review. The child described an improper prone restraint that he said lasted five minutes, during which his arm was painfully bent behind his back and he complained he couldn't breathe. The child's description is consistent with the struggle that the MTM's witnessed prior to the "bear hug" restraint, during which she saw the manager leaning into the vehicle and "tussling with" Child A.

---

and should only be used "with individuals considerably smaller than yourself." *See* CPI, Key Point Refresher Workbook, *available* at https://www.documentcloud.org/documents/4066269-CPI-Restraint-Handbook Child A is 16 years old, and according to his most recent Common Application, stands five-feet-seven-inches tall and weighs 140 pounds. He was approximately the same height as the manager who restrained him.

[110] The Monitors could not find this description in One Case. The policies and handbooks obtained by the monitoring team during the site visit do not show the CCP as one of the restraints used by the operation. The resident handbook included pictures of three other restraint types.

[111] The MTM who witnessed the restraint and referred to it as inappropriate was Linda Brooke. Ms. Brooke is familiar with restraint types and has been trained in the same restraint techniques (CPI) that the manager of Paloma Place claimed to use. Ms. Brooke has over 30 years of experience working in juvenile justice. She began her career working as a juvenile detention officer in a pre-adjudication detention facility and then as a juvenile probation officer, where CPI was the adopted restraint technique. Ms. Brooke maintained her CPI certification for approximately eight years. In 1992, she accepted a position with the Texas Juvenile Probation Commission (TJPC) as a Management Auditor. While in this position, she assisted in developing the agency's procedures for conducting monitoring processes and completed reviews of county juvenile probation departments and pre-and post-adjudication facilities for compliance with applicable standards and rules, including compliance with restraint certifications and practices. During her tenure with Texas Juvenile Probation Commission (TJPC), Ms. Brooke participated in the pre-and post-adjudication facilities' rule development and review process. In the late 2000s, TJPC updated rules related to the application of restraints requiring any restraint technique used in a pre-or post-adjudication facility to be preapproved by TJPC; upon adopting the rule change, Ms. Brooke initially participated in the review of each restraint technique.

HHSC also overturned the second citation for the restraint that was based on its finding that the child was restrained to obtain a cell phone. CLASS notes show the representatives for Paloma Place argued that the child was not restrained to retrieve the cell phone, but because the child "hit [the manager] two times in the face and.... got back in the vehicle." The manager claimed he had to put Child A "in the stand up hold position because he was assaulting him and was becoming a danger." The manager said, "The stand up hold allows staff to maintain a balance while walking with the child." His statements are at odds with the information provided by both MTMs who witnessed the event, and Child A. Neither MTMs were contacted during the administrative review process to confirm what they witnessed.

Both MTMs reported that they observed a "tussle" in the van prior to the child being removed from the van and placed in the "bear hug" restraint. During his DFPS interview, Child A said he did not hit the manager until after the manager placed his hand into Child A's pants to retrieve the phone. The MTM who reported the incident to SWI said the manager was leaning inside the van and she observed the van rocking and moving. She said that during the incident, she heard the child tell the manager, "You didn't have to hold on to my dick," which supports the child's claim that the manager put his hands inside Child A's pants and underwear to retrieve the phone, though the manager and the staff person who witnessed the incident denied that this occurred. During her interview with the DFPS investigator, the MTM who witnessed the "bear hug" restraint told the investigator that she believed the restraint could have been prevented if, instead of confronting Child A over the cell phone, they had waited for him to voluntarily exit the van and relinquish the phone or allowed him to reenter the campus prior to confronting him. These details were not included in the IMPACT contact notes for the interview, and the interview was not recorded.

### G. South Texas Adolescent Rehabilitation & Education Institute (STAREI)

The monitoring team visited South Texas Adolescent Rehabilitation & Education Institute (STAREI) at 2:15 a.m. on October 21, 2022, as part of the awake-night validation visits made to 19 facilities in the Houston area. STAREI received its full permit to operate on November 11, 2019, and is licensed to serve up to 15 male children. On the night of the visit, 13 children were in the operation's care.

A review of the operation's CLASS history showed that approximately two weeks prior to the awake-night visit, multiple reports to SWI alleging child-on-child sexual abuse[112] resulted in a Safety Plan requiring two staff to be on site to supervise the children during

---

[112] In two linked reports made to SWI on October 7, 2022, a facility staff person reported that two children, 15-year-old Child A and 14-year-old Child B alleged that the other child had forced him to have sex. During an October 10, 2022, interview for the investigation with 10-year-old Child C, Child C alleged he awoke one night to 11-year-old Child D sexually abusing him. Six days later, on October 13, 2022, two additional reports to SWI were made by a school counselor and a social worker at a hospital, alleging that Child A made an outcry alleging that Child B and Child D forcibly penetrated him.

the overnight hours.[113]  The Safety Plan was still in effect on the date of the monitoring team's visit.

Court Monitors Deborah Fowler and Kevin Ryan were with the other two members of the monitoring team during the awake-night visit to STAREI.  When the Monitors and their team arrived at the house and drove into the facility's driveway, another car was leaving.  The team knocked on the door, and Staff 1 allowed the team to enter the facility after identifying themselves.  The Monitors provided Staff 1 with a copy of the Court's access order and their state-issued identification.  The team asked Staff 1 how many staff were on-site, and she said that two staff were on site, but that the other staff member (Staff 2) was in the restroom.  The monitoring team conducted a walk-through of the facility.  Even after completing the walkthrough, Staff 2 still had not emerged from the restroom.  The monitoring team observed the restroom door to be slightly ajar; the room was dark.  After knocking, one of the members of the monitoring team confirmed that nobody was in the restroom.  The members of the monitoring team could hear Staff 1 calling someone from her cell phone.  When she began to walk toward a back door, the monitoring team followed, and observed Staff 2 enter the facility through the door.  The monitoring team divided into two groups and interviewed the two staff members.

Court Monitors Deborah Fowler and Kevin Ryan interviewed Staff 1.  During the interview, they asked to see any nighttime logs that were being used to document room checks.  Staff 1 produced a nighttime log that had been prefilled.  Staff 1 acknowledged that the log had been prefilled.  During their interview with Staff 1, the Monitors reminded Staff 1 that if she needed to do bedroom checks, she should do so and that the Monitors would pause the interview.  She got up to make bedroom checks at least twice.

During the other team members' interview with Staff 2, Staff 2 said that she lived down the street and left the facility to change clothes, because she had started her menstrual cycle.  When Staff 2 was asked about the prefilled logs, she initially claimed that the prefilled log was not the log being used that night and said the log she used was on her phone.  However, she was unable to pull up a log on her phone to show the monitoring team.  She also said that the prefilled log was an "example" she was using to teach her cousin, who was interested in working at STAREI, how to fill out a nighttime log.  During their interview with Staff 2, the members of the monitoring team reminded Staff 2 that if she needed to make bedroom checks, they could pause the interview.  She said she did not need to do so; she did not make any checks during the interview, which lasted approximately 45 minutes.  Staff 2 also reported being responsible for a child who was on one-to-one supervision (Child A).

CLASS Inv. #2942230, IMPACT Inv. #49379532

On October 24, 2022, the Monitors e-mailed HHSC and DFPS to alert the agencies to the problems observed at this facility and at an additional facility, Pinecrest Emergency Care

---

[113] The Safety Plan specifically was created on October 10, 2022 and required the operation to ensure Child A, Child B, Child C, and Child D were housed in separate rooms, and also required the operation to maintain two staff during the overnight hours "to ensure ongoing supervision for the above named children."  The Safety Plan was to remain in place until the investigation closed.

Services (Pinecrest), visited just prior to STAREI, and discussed below.[114]   The issues identified by the Monitors regarding the violation of awake-night, safety plan, and recordkeeping requirements at STAREI visit were summarized as follows:

> When we arrived, another car was pulling out of the parking lot.  STAREI is currently under a safety plan that requires two awake-night staff to be on site, though they have only 14 children at the facility.  The safety plan was put into place due to multiple intakes alleging child-on-child sexual aggression.  We were greeted at the operation by a single staff person; when we asked whether another staff person was on site, she told us that the other staff person was in the restroom.  We walked through the facility several times and the other staff person who was supposedly in the restroom never appeared.  When I saw a door marked "Staff Restroom," I asked whether it was the restroom that the staff person was supposedly in – I was told that it was, but I noticed that the room appeared dark and the door was slightly open. We could hear the staff person who greeted us calling someone on the phone and assumed it was the second staff person, but heard nothing from the restroom. We knocked on the restroom door, nobody responded, just as we did so, the second staff person entered the building through an outside entrance.  We determined that she was in the car that was leaving the operation as we arrived.  To compound our concerns related to supervision, when I reviewed the night time awake-night logs, I saw that they had been prefilled for every child. I confronted the staff person that Kevin and I interviewed ([Staff 1]) about this, and she acknowledged it.  The other two staff on our team interviewed the staff person who arrived after we did; she attempted to lie to us about the night-time logs, claiming that the "example" she showed us with that night's date was a "mistake" that she used "to show her cousin how to fill out the logs."  She said she was using her phone to keep track of the night-time checks, but then could not produce anything on her phone consistent with that claim.  I was witnessing the interview while this conversation took place, because Kevin and I had already finished interviewing [Staff 1].

After the Monitors made this report to HHSC and DFPS via e-mail, the DFPS staff person responded and indicated that if the Monitors could provide the names of the alleged victims, DFPS SWI staff would open intakes related to the concerns the Monitors expressed in the e-mail for STAREI and Pinecrest.[115]  The Monitors responded via e-mail with the information, and also indicated that they could provide documentation and photos supporting the concerns they expressed.[116]

---

[114] E-mail from Deborah Fowler & Kevin Ryan to Katy Gallagher, and Ora Chisom, Director, Foster Care Litigation Compliance, DFPS, Awake Night visits, October 24, 2022 (on file with the Monitors).
[115] E-mail from Ora Chisom to Deborah Fowler & Kevin Ryan, re: Awake Night visits, October 24, 2022 (on file with the Monitors).
[116] E-mail from Deborah Fowler & Kevin Ryan to Ora Chisom, re: Awake Night visits, October 24, 2022 (on file with the Monitors).

DFPS opened a Priority 2 investigation for Neglectful Supervision based on the information related to the STAREI visit. After an investigation that included interviews with the Court Monitors and the two members of the monitoring team, Neglectful Supervision was Ruled Out. DFPS found:

> On 10/20/2022, 4 court monitors made an unannounced visit to South Texas Adolescent Rehabilitation and Education – STARE. During the court monitors visit, there were concerns regarding staff not following a safety plan for investigation #2938017. The safety plan for this investigation required 2 staff to be present at the operation overnight, however, upon arriving to the operation the court monitors realized [Staff 1] was the only staff physically inside the operation. [Staff 1] and [Staff 2] were staff on shift during the court monitors visit but [Staff 2] was observed coming inside the operation after the court monitors arrived. [Staff 2] reported having issues with her menstrual cycle so she informed [Staff 1] she would have to change her clothing and went outside to grab her belongings. While [Staff 2] was outside grabbing her belongings, she reported the court monitors arrived at the same time. It was determined that while [Staff 2] was outside the operation, there were no incidents that occurred or any immediate risk to any children at the operation. All children at the operation were interviewed and confirmed there being 2 staff at night at all times. All children denied witnessing any staff leave the operation at night. Although there were not two staff present during the court monitors visit, the operation was still in ratio and in compliance with minimum standards. Due to [Staff 2] having an incident with her menstrual cycle causing her to seek immediate attention to her needs and there being no immediate risk to the children while [Staff 2] was away, there is no reason to believe [Staff 2] took an action that a reasonable caregiver should not have taken.

The case was transferred to HHSC and HHSC issued three citations for minimum standards violations:

- A citation for violation of a minimum standard (748.151(3)) associated with operational responsibilities because "logs to document the nightly checks that were required for the safety plan were pre-filled. One staff admitted that the logs were regularly pre-filled." Administrative review was waived.
- A citation for violation of a minimum standard (748.507(1)) related to employee responsibilities because "[b]oth staff were interviewed multiple times and continued to be inconsistent with their stories about the whereabouts of one of the staff." Administrative review was waived.
- A citation for violation of a minimum standard (748.685(a)(4)) associated with caregiver responsibility, because "[a] safety plan requiring two staff members to be present at night was not followed when there was only one staff member inside the operation for a period of time." Administrative review was waived.

DFPS also Ruled Out Neglectful Supervision in the related case (which resulted in the Safety Plan) investigating the allegations of child-on-child sexual aggression.[117] No citations were issued.  The Monitors find this investigation deficient.

The investigation findings failed to address the pattern of problems associated with awake-night supervision at the facility.  The Safety Plan requiring two staff to supervise children at night was the result of four children making outcries of child-on-child sexual aggression.  Despite the existence of the Safety Plan and the concerns that had already been raised regarding appropriate overnight supervision, the DFPS investigator appears to have ignored information gleaned during the investigation that evidences problems associated with overnight supervision. The investigator also ignored inconsistencies between the information reported by Staff 1 and Staff 2 that call their credibility into question.

As HHSC noted, Staff 1 and Staff 2 gave inconsistent interviews when they were asked about Staff 2's absence from the facility.  Staff 2 claimed that she did not leave the facility grounds, but simply went out to her car, which was parked behind the building, to get another pair of pants and feminine hygiene products.  She said it only took about five minutes.  She claimed she put a second pair of pants on over the pants she was wearing.  During a second interview, she acknowledged trying to sneak back into the facility because she did not want the monitoring team to see her coming into the facility.  During her interview, Staff 2 reported that she drove a red Jeep; however, in the IMPACT contact note for the interview with Staff 2, the investigator said that he "was able to confirm the vehicle [Staff 2] drives" and "ruled out" that she drove an SUV.

Staff 1 said that on the night of the awake-night visit, Staff 2 informed her that someone had brought her a change of clothes due to menstrual cycle problems.  Staff 1 "reported this person who brought the clothes was driving [a] red SUV."  Staff 1 claimed that Staff 2 never left the grounds, and only went outside to get the clothes from the driver of the red SUV and "was only gone for about 1 min[ute] and denied being more than 3 min[utes]."  Staff 1 said she thought Staff 2 had already returned to the house when the monitoring team arrived.

---

[117] In its findings, DFPS acknowledged that a staff member found Child B on top of Child A (the staff member said he found Child B on top of Child A when he switched on the light in their bedroom during nighttime checks, but that both children were fully clothed), but noted that they each blamed the other for being the aggressor.  DFPS did not appear to find credible Child A's claim that Child D sexually abused him.  DFPS noted that Child D denied the allegations and Child A did not provide "further details" during subsequent interviews.  DFPS also Ruled Out (just FYI, sometimes in the narrative the R and the O are not capitalized as here) the allegations related to Child C's claim that Child D touched him inappropriately because Child C "was inconsistent" and "he could not provide an approximate date of when the incident occurred and what staff was present."  DFPS did note, however, that an incident report documented a room change because Child C "told staff [Child D] allegedly tried kissing him."  However, DFPS found the child's outcry that was subject of this investigation to be inconsistent with the incident documented in the incident report. DFPS also noted that Child D denied the allegations of inappropriate touching. The investigation also Ruled Out allegations of Physical and Emotional Abuse.

Both staff acknowledged having pre-filled the nighttime logs.  However, Staff 2 said that the night of the awake-night visit was the first time they had done so, and Staff 1 said "that it was done previously a number of times."[118]

Both Court Monitors and the two members of the monitoring team reported to the investigator that Staff 2 was not on site when they arrived at the facility.  Kevin Ryan and a member of the monitoring team[119] reported to the investigator that Staff 2 admitted to having left the operation to go home (which she said was about five minutes away) to change clothes.  Despite the inconsistencies between the reports given by Staff 1 and Staff 2, and the consistency with which the Court Monitors and the members of the monitoring team reported that Staff 2 was absent (with Monitor Kevin Ryan reporting to the investigator that she was absent for about 15 to 20 minutes), DFPS found that Staff 2 never left the operation's grounds.

In addition to being inconsistent in their reports regarding the awake-night visit, Staff 1 and Staff 2 were inconsistent in describing the supervision requirements for the children in their care.  Though both Staff 1 and Staff 2 reported that Child A was on one-to-one supervision due to the allegations of child-on-child sexual aggression, Staff 1 reported that Child A was on one-to-one only at night and could interact with the children during the day.[120]  Staff 2 reported that Child A was on one-to-one supervision only during the day.  Neither staff seemed to be aware of what, precisely, the Safety Plan required, nor did either staff report that Child C's service plan also required him to be on one-to-one supervision.[121]   The facility administrator reported that Child A was on one-to-one

---

[118] The Monitors had to rely on the investigator's contact notes in IMPACT for a summary of the interview with Staff 1, because the audio recording of the interview that was labelled with her name in One Case was blank.

[119] The contact note in IMPACT for the investigator's interview with Court Monitor Kevin Ryan indicates Mr. Ryan told the investigator that Staff 2 "disclosed having issues with her menstrual cycle and going home."  In addition, one of the members of the monitoring team told the investigator that Staff 2 said she went home to change clothes and that she lived down the street.  However, the IMPACT contact note for this monitoring team member captures only part of what she told the investigator; the contact note states, "[The MTM] stated [Staff 2] disclosed she lived down the street and was having some 'issues.'"

[120] The Monitors are relying on the investigator's IMPACT notes, but she appears to confuse one-to-one supervision with the Safety Plan's requirements that the children who made outcries be housed in separate bedrooms.

[121] At the time of the investigation, Child C was also on a Safety Plan, because in early October 2022, he tested positive for THC during a stay at a psychiatric hospital.  The hospital reported his positive test to SWI on October 2, 2022.  Child C had been living at STAREI approximately four months when he was hospitalized.  The Safety Plan required Child C to be retested for drugs and required caregivers to be always in "close hearing and eyesight proximity" to Child C. The investigation Ruled Out Neglectful Supervision because though the child tested positive for THC, the child denied drug use, staff denied drug use, and it was "unclear as to how the child consumed the drug."  The disposition also stated that there was "no imminent danger to the child physical health or safety and no one was injured as a result."  Though the operation had previously been investigated by both HHSC and DFPS in July 2022 due to anonymously reported allegations that staff were abusing drugs, including marijuana, the operation reported that all staff tested negative for drugs.  The One Case records for the DFPS investigation of a July 20, 2022, anonymous report to SWI include photographs of home-test cup results for three staff that, according to STAREI forms that follow the photographs of the test kits, were completed the same day of the intake, and one staff whose test kit had an accompanying STAREI form dated July 21, 2022. The HHSC investigation was related to an anonymous report made just a week earlier, on July 13, 2022; though a CLASS contact note for the this investigation states, "drug screenings of the staff were observed: every staff member had a drug test at the

supervision due to a Safety Plan developed prior to his placement at the facility, "as a precaution for his history."

Staff 1 and Staff 2, and all the children interviewed, said that the staff sat in chairs in each of the two hallways where the children's bedrooms were located.  In this investigation and the related investigation regarding the allegations of child-on-child sexual aggression, the children who were interviewed repeatedly alleged that Staff 1 and Staff 2 slept at night. The investigator assigned to this case appeared to question children's reports that they saw staff sleeping or could hear staff snoring at night.  When one child said that he observed a nighttime staff asleep once but said that she opened her eyes when he spoke to her, the investigator suggested to the child that she was "just resting her eyes, not really asleep."  The investigator's notes in IMPACT state that this child "denied witnessing any staff asleep."  In the notes for another child's interview, the investigator recorded that the child "mentioned witnessing [Staff 1] dosing [sic] off to sleep at night but not actually sleep."   In notes for the interview with another child, the investigator noted that "He...could not state if staff are asleep at night.  He reported he has overheard staff snore but couldn't confirm they were asleep because staff's eyes were opened when coming out of the restroom."[122]  In fact, what the child said was that he had caught staff sleeping; he clarified that he could hear the staff person snoring, but as soon as he opened the door to the bathroom, her eyes opened.  One child, who had been in the facility for a little over a year, reported having witnessed staff asleep "multiple times."

Just after the Monitors' awake-night visit, the operation installed new technology that required staff to touch a wand to a button installed on the children's bedroom walls; when the wand touched the button, it recorded the date and time. The operation installed the technology to ensure that staff were making the required bedroom checks.  However, in an interview with the investigator on November 23, 2022, the facility administrator reported "glitches with the new technology."  He said that a staff member was "clocking in at a certain time but the data sheet would display different times on the date sheet." He suggested that they "may not have set up the device correctly."  The "Guard Tour System" printouts that the investigator uploaded to One Case (which shows the "Patrol time," and "Checkpoint" (which lists the names of the children's rooms)) show gaps of several hours throughout for the nights included on the printouts.

Potential gaps in supervision are particularly problematic for this facility, given the needs of the youth that the operation was serving at the time of the Monitors' visit. Child A was flagged with an indicator for sexual aggression.  He had received treatment at a facility that specializes in treatment for children with sexual behavior problems; during his time there, he acknowledged having touched his younger sister inappropriately.  He also admitted to having forced a younger cousin to touch his penis.   Child A's Child's Plan noted, "[Child A] should not be around younger children or children who can be vulnerable to him until deemed safe for everyone."

---

time of hiring and they even just recently received a random drug screening," the Monitors did not find any documentation associated with the investigation in HHSC's online file sharing site.
[122] After the child agreed that he "couldn't confirm," he asked the investigator what "confirm" meant.

However, Child A was not the only child placed at the facility who was flagged with a sexual characteristic indicator. Child E was flagged as a victim due to having been sexually abused by an older child at an RTC where he had been placed prior to STAREI. Child F was flagged as both a victim and with an indicator for sexual aggression. He had been sexually abused by a staff person at a prior placement, but also had a confirmed incident of aggression involving a younger sibling. His Child's Plan required, "[Child F] will be under close supervision for his safety and the safety of others." The Child's Plan for another child stated, "[Child G's] guardian claims [Child G] has a history of sexually acting out. [Child G's] behavior needs to be monitored." Child H was not flagged as a confirmed victim of sexual abuse, but his IMPACT sexual incident history page notes, "It is suspected [Child H] was molested by a neighbors [sic] stepchild when he was six years old."

Finally, Child D – one of the children accused of sexual aggression by two other children in the related investigation -- was flagged with an indicator for a Sexual Behavior Problem at the time that he was placed at STAREI. In the foster home where he was placed just prior to STAREI, Child D was discovered sexually acting out with a younger sibling. During a forensic interview, the younger sibling stated that Child D penetrated him. While an Attachment A to a Placement Summary will not include information about a child's flag for a Sexual Behavior Problem, the Common Application in place when Child D was placed at STAREI described his sexualized behaviors and indicated both of Child D's siblings reported fearing Child D, who forced them to engage in sexual activity. Despite this, the Child's Plan in place at the time of Child D's placement at STAREI did not require any heightened supervision.

Despite DFPS's findings in the related investigation, which appeared to discredit the claims of the children who alleged Child D engaged in sexually aggressive behavior, Child D was flagged with an indicator for sexual aggression after both investigations were opened. The basis for Child D's flag was Child A's allegation that Child D, "forced his mouth open and forcefully inserted his penis into [Child A's] mouth. [Child A] also stated that [Child D] pinned him down and forcefully had sex with him. [Child A] stated [Child D] punched him, that he could not move, and that [Child D] flipped him over. [Child A] could not recall how many times this happened, but stated it happened every night and believes he was roommates with [Child D] for about a month." Child D is now placed at an RTC that specializes in treating children who have sexual behavior problems.

The investigator's conversation with Staff 2 reflected a misunderstanding of the standard for Neglectful Supervision outlined in the Texas Administrative Code. Staff 2 repeatedly asserted to the investigator that though she recognized she should not have prefilled the nighttime logs or gone outside, she felt she "did what she had to do" because of the concerns with her menstrual cycle. The investigator responded that he "understood" and said that he did not believe she would be RTB'd for Neglectful Supervision:

> [L]ike I said, there are concerns, definitely. But honestly, if I'm being
> transparent with you, due to there being no incident – if there was an
> incident on top of this...then it definitely would be...like say – worst case
> scenario, you go to your car because of this situation you're having, [Child]

was on one-on-one, gets out of his room, does something – hurts a child, whatever – assaults a child, whatever. Now, unfortunately, you can't use the excuse that you was [sic] on your menstrual cycle. As ugly as that sounds, they're gonna be like – well, okay, y'all should have spoke, talked between each other to figure something out, but you chose to just leave the child to go to your car. As fast as it may have been – 30 seconds, a minute, that's still enough time for something to happen, you know what I mean? So, from my perspective if there was something, an incident like that would have occurred – this investigation definitely would have been way more – you know - serious. It's still serious 'cause there's concerns, but you know, there's no concerns for the safety and health – immediate safety and health of the children. You know, they're all safety, they're all healthy, no concerns being reported by them. There is [sic] concerns that this slip-up happened.

After Staff 2 expressed concerns related to losing her job because of the investigation, the investigator reassured her:

Even if you was [sic] to RTB...Pretty much an RTB is definitely serious...but there's certain criteria that have to be made in order for you to be RTB'd, you know, so there's – I believe there's nine types of abuse and neglect that we label...all those definitions have criteria that has to be met under them. Just because in this case scenario, there's definitely concerns, those concerns have to meet that criteria under Neglectful Supervision... I can tell you, off the top of my head, one of the criteria has to be that there has to be a blatant disregard. Off the top, right now, I don't think there's a blatant disregard for their safety or wellbeing. I think it was a situation, there was a mistake, as of right now – unless I get some information that I was misled, or that something occurred that you didn't disclose, that makes me more on my tippy-toes, then that would be a different case.

The standard cited by the investigator – blatant disregard – is only one of the standards used in analyzing whether an employee of a child care operation[123] engaged in Neglect. The standard does not require actual injury, as the investigator seems to imply. The Texas Administrative Code defines Neglect for purposes of child care investigations as follows:

Neglect is defined in Texas Family Code (TFC) §261.001 as an act or failure to act by a person responsible for a child's care, custody, or welfare evidencing the person's blatant disregard for the consequences of the act or failure to act that results in harm to the child or that creates an immediate danger to the child's physical health or safety. **Neglect for purposes of an investigation in a child care operation is further defined in TFC §261.001(4)(A)(iv) as a negligent act or omission by an employee, volunteer, or other individual working under the**

---

[123] A "child care operation" is defined by the Code as "a facility, family home, or other entity that is subject to regulation by CCL under Chapter 42, Human Resources Code, regardless of whether the operation has received the necessary permit to provide the child care under that chapter." 40 Tex. Admin. Code §707.703(7). STAREI meets this definition.

> **auspices of a facility or program, including failure to comply with an individual treatment plan, plan of care, or individualized services plan that causes <u>or may cause</u> substantial emotional harm or physical injury to, or the death of, a child served by the facility or program as further described by rule or policy.**

40 Tex. Admin. Code §707.801 (emphasis added).

H. <u>Pinecrest Emergency Care Services (Pinecrest)</u>

The Monitors and two members of the monitoring team staff visited Pinecrest RTC, just before visiting STAREI. The awake-night visit started at approximately 12:10 a.m. on October 21, 2022. Pinecrest received its initial permit on March 18, 2021, and its full permit August 6, 2021, and is licensed to serve up to 16 male children. At the time of the Monitors' visit, the operation housed eight children, four of whom were in PMC. The census that the Monitors' reviewed prior to the visit showed that two children were victims of sexual abuse, and one (a TMC child) was flagged with an indicator for sexual aggression.

When the Monitors arrived at the facility, they were greeted by a staff person (Staff 1) who asked for identification. After providing a copy of the Court's access order and state-issued identification, Staff 1 allowed the Monitors and their staff to enter the facility. Staff 1 was the only staff person on duty; he stated that while there were usually two staff on duty during the overnight hours, one of them was not able to work that night. He said that though a supervisor would usually cover a shift when a staff person was not able to work, because the census was low, the supervisor did not cover the shift of the overnight staff person who called in that night.

Two members of the monitoring team conducted an interview with Staff 1 while the Monitors walked through the facility and reviewed records. The Monitors and members of the team walking through the facility noticed a lamp with a bare light bulb and no shade close to the front of a long hallway appearing to operate as a night light. Staff 1 indicated the children's bedrooms were located off the long hallway. An empty desk with a small, lighted lamp sat at the far end of the same hallway. Staff 1 said that when two staff were on duty, the other staff person sat at the desk and was responsible for two children who required one-to-one supervision. He confirmed that he did not sit at that desk when he was the only staff person on duty but checked all the children's rooms every 15 minutes. Nevertheless, when the monitoring team arrived at the facility after midnight, the nighttime log was current only through 11:30 p.m.

It appeared to the monitoring team that Staff 1 may have been playing a video game when the team arrived. The monitoring team observed a television turned on in the hallway,[124] and an office chair was positioned in a doorway in front of the television. A game controller lay on the chair, and the screen display showed a paused game.

---

[124] Photos of the hallway and television are included in Appendix F.

During his interview, Staff 1 periodically paused the interview to make 15-minute room checks.  Staff 1 reported that the two children who required one-to-one supervision were flagged with an indicator for sexual aggression.  Neither child was the TMC child who was on the census list that the monitoring team accessed from State records prior to the visit. Since the visit, the Monitors have had an opportunity to review the IMPACT records for the eight children who were housed at the operation at the time of the visit.   IMPACT shows:

- Two of the eight children are not flagged as a victim of sexual abuse or with an indicator for aggression.
- Three children are flagged as victims of sexual abuse; and
- Three children are flagged with an indicator for sexual aggression.

CLASS Inv. #2942116, IMPACT Inv. #49379472

The Monitors sent an email to DFPS and HHSC on October 24, 2022, describing concerns related to the awake-night visit to STAREI, and sharing concerns related to the visit to Pinecrest as follows:

> At Pinecrest…There was only one overnight staff, which would be sufficient to meet ratio, except that the staff person reported to us that more than one child at the operation was on 1:1 supervision because they are sexually aggressive.  The list of children we had prior to visiting the operation did show one TMC child who is flagged with an indicator for aggression (his service plan indicates that he is "a registered sex offender" who "has a history of perpetuating sexual acts on young children as well as soliciting younger children for sexual acts" – so it is somewhat concerning that he is sharing a room with another child).  Documentation at the operation showed he was supposed to be on 1:1. The other children that the awake-night reported were sexually aggressive (a JMC child and a PMC child) were not on our list and I've not confirmed that their service plans require 1:1 – but this is what the staff person reported to us.

> Though there was a desk stationed outside the room that the TMC child shared with another child (which was located at the end of the hall) when I asked if that was where the awake night staff person sat, he said it was not, that another staff person used the desk when they were on site.  When we arrived, though we did not witness the staff person playing video games, a tv was stationed across the chair up at the top of the hall, a video game was on the screen, and a chair was across from the tv with a game controller in the seat.

> An additional problem at the facility – the room where meds are stored was not locked, and the cabinet does not lock appropriately.  I could still open

the door to the cabinet when it was supposed to be locked.  Kevin has video of this if you need it.[125]

In response, DFPS opened a Priority 2 investigation for Neglectful Supervision.  After the investigation was opened, the DFPS investigator assigned to the case e-mailed the Monitors, and asked:

- What was the purpose for the overnight visit?
- Did you all have concerns with staff/ratio at the placement?
- How did you all make the determination for the specific 4 to be victim of NSUP?[126]

A member of the monitoring team who was on the site visit responded via e-mail:

> The monitoring team does unannounced visits to operations to ensure compliance with Remedial Orders because of the Foster Care Litigation.
>
> At **Pinecrest,** the child who is has a confirmed history of sexual aggression is a TMC child, **[Child A].** We saw documentation at the site indicating [Child A] is supposed to be on 1:1. There were two other children who were not on the placement list that we had prior to the visit that the awake-night staff person said were also on 1:1 because they had a history of sexual aggression.  The first, a PMC child (note: IMPACT lists him as PMC, but the Placement Summary in One Case lists him as JMC) **[Child B] ...**The second, a PMC child **[Child C].**
>
> [According to Child Bs] Attachment A...he does have a confirmed incident of sexual aggression and several unconfirmed incidents. The only Service Plan in IMPACT for [Child B] says he requires supervision "at all times."  [Child C's] Attachment A also confirms a history of sexual aggression, and the 10/05/22 Service Plan in IMPACT says he "has acted out sexually and made advances to other children" and that "[t]he caretakers must maintain a vigil on [Child C] to assure the safety of the other children in the placement."
>
> According to documentation that we reviewed on site [Child A] and [Child B] share the room at the very end of the hallway.  [Child C] shares a room with **[Child D].** [Child D] is listed as having a confirmed history of victimization in his Attachment A.
>
> We did witness the staff person make periodic room checks while we were there, but he was the only staff person in the operation that night.[127]

---

[125] E-mail, *supra* note 116.

[126] E-mail from Jennifer Norman, Residential Child Care Investigator, DFPS, to Deborah Fowler and Kevin Ryan, Pinecrest Emergency, October 26, 2022 (on file with the Monitors).

[127] E-mail from Shay Price, Senior Program Associate, M.D. v. Abbott Monitoring Team, Texas Appleseed, to Jennifer Norman, re: Pinecrest Emergency, October 28, 2022 (on file with the Monitors) (emphasis in the original).

The next day, Monitor Deborah Fowler responded to the investigator's e-mail by sending a photograph of the room assignment sheets (containing the children's initials but no other identifying information), taken when the monitoring team was on-site, and a video of the medicine cabinet door being opened.[128]   The e-mail noted:

> There were 8 children at the operation the night that we visited.   You probably saw during your visit that Pod 4 is the last bedroom at the very end of the hallway.   What I recall seeing in the two pods that show a line down the middle is a room divider that was not a full wall – in other words, these children do not have their own rooms, but rather share a room that has a middle wall dividing the room but that does not really fully separate the two areas into individual bedrooms with their own doors.
>
> I noticed that the photos uploaded to One Case include a photo showing the medicine cabinet "locked."' I'm attaching a video that Kevin Ryan took of me opening the medicine cabinet though it was "locked." [129]

After investigating, DFPS Ruled Out Neglectful Supervision.   DFPS found:

> On 10/24/2022, DFPS received an intake alleging Neglectful Supervision of [Child A, Child B, Child C, and Child D] and alleged perpetrator unknown.   On 10/21/2022 the court monitors arrived at the facility during the early morning hours and observed there were nine children at the facility with only one overnight staff present.   More than one child at the operation is on 1:1 supervision due to being sexually aggressive.   Several of the residents have confirmed and unconfirmed history of sexual aggression and sexual victimization.   There was also concern that four of the residents with sexual aggressive or sexual victimization history were observed to be sharing a room with a wall separating them instead of being in a single room as stating in their child placement contract.   Another concern observed was that the room where the medications are stored the cabinet was not locked and does not lock appropriately.   The direct care staff on duty was observed frequently checking on the residents.
>
> [Child A, Child B, and Child C] denied the allegations relating they are never left alone without adult supervision.   Each related they are frequently check

---

[128] This was done, in part, because after her initial visit to the facility, the investigator uploaded photos that did not appear to capture some of the problems that the Monitors raised.   For example, there was a picture of the medication cabinet and the caption stated, "medication cabinet locked."   However, when the Monitors visited the facility, they were able to open the medication cabinet even when it appeared to be locked.

Similarly, Child A, Child B, and Child C (who were all interviewed on October 26, 2022) reported that they had their own bedroom, and the photographs taken by the investigator of the children's bedrooms did not show that the wall dividing Child A and Child B's bedrooms did not extend to the shared doorway of the bedrooms.   The bedrooms for these children appeared to have originally been a single room, with a partial wall added to divide the rooms; the facility referred to these as "pods."   The children used a single door and entryway to access both bedrooms.   Because of the shared entry, if the children wanted to access the other child's bedroom, they could do so without entering the hallway.

[129] E-mail from Deborah Fowler to Jennifer Norman, re: Pinecrest Emergency, October 29, 2022 (on file with the Monitors).

[sic] during overnight with approximately 2 staff members on duty. Each denied having access to the medication cabinet stating it is kept locked at all times. [Oldest victim Child D] refused to be interviewed.

[Staff 1] denied the allegations, relating typically there are 2 direct care staff on duty. [Staff 1] continued, saying on the night the court monitors arrived at the facility he and [another staff person] were scheduled to work. [Staff 1] conveyed he arrived to work around 9:45 pm and [the other staff person] arrived around 9:52 pm. [Staff 1] reported [the other staff person] informed him he received a phone call informing him of a family emergency and needed to return home and check on things. [Staff 1] expressed [the other staff member] left but he assumed [the other staff member] would return back to work. [Staff 1] proclaimed [the other staff member] never communicated he wasn't returning back to work. [Staff 1] stated he didn't notify the administrative team and was unaware if [the other staff member] notified them. [Staff 1] disclosed the residents were never left without adult supervision as he frequently checks on them.

Collateral staff interviews were conducted.... Each related the residents are never left alone without adult supervision. [Three collateral staff] continued, saying the residents are rounded on every 15 minutes during sleep hours. Collateral children interviews were conducted…Each related they have never been left alone without adult supervision and staff are always present. Each continued, saying the staff frequently check on them at night. Each conveyed there are approximately 2-3 staff on duty for overnight.

[The facility administrator] immediately made the necessary modification to [Child A, Child B, Child C, and Child D's] bedroom converting them into single rooms. [The facility administrator] immediately had a new medication cabinet built and added a deadbolt. [The facility administrator] followed the safety plan of placing [Child A] on 24-hour 1:1 supervision as well as reaching out to state office to have [Child B] placed on 1:1 supervision during awake hours and in ratio during sleep hours. And lastly, [the facility administrator] made the necessary changes to have the appropriate number of staff at the facility during awake and sleep hours.

Based on the information gathered through the course of this investigation, the allegation of Neglectful Supervision by [Staff 1] will be Ruled Out because there is not a preponderance of evidence to support the documented circumstances to meet the criteria of abuse/neglect as defined in the Texas Code Section 261.001 and further defined in the Texas Administrative Code 707.801. The administrative team took immediate action to make the necessary modification to the bedroom and medication cabinet. When the supervision of [Child A] and [Child B] was brought to the administrative team, they took immediate action to have appropriate staff on duty as well as reaching out to state office to have [Child B] on 1:1 supervision during awake hours. [Staff 1] was seen by the court monitors

making periodic rounds on the residents.  Based on the interviews…the residents appear to be supervised at the facility and frequently checked on.

The case was transferred to HHSC and four citations for violations of minimum standards were issued as follows:

- A citation for violation of a minimum standard (748.507(1)) associated with employee responsibilities because, "[a] caregiver failed to inform the administration that his co-worker left the operation during the shift, and he was working alone. Another caregiver failed to inform the administration that he was leaving his shift early." Administrative review was waived.
- A citation for violation of a minimum standard (748.1009(2)) associated with child/caregiver ratio because, "Supervision needs for the group of children required a closer supervision for more than 3 of the children. Specifically, one child had a service plan which required a 1:5 ratio while sleeping. There were two other children whose ratio should have been elevated based on their history."  An administrative review was waived.
- A citation for violation of a minimum standard (748.2101(3)) associated with medication storage because, "During an after hours visit at the operation, the medicine cabinet was observed to be unlocked."  An administrative review was waived.
- A citation for violation of a minimum standard (748.685(a)(4) associated with caregiver responsibility because the "Operation was not in compliance with a child's supervision requirements."  An administrative review was waived.

The Monitors find the investigation to be so deficient that they cannot determine the appropriate disposition.  Significant inconsistencies exist between the contact notes for the children's interviews in IMPACT and audio recording of the children's interviews (the longest of which lasted just under six minutes), and the findings in the DFPS disposition.

For example:

- The disposition states: "[Child A, Child B, and Child C][130] denied the allegations relating they are never left alone without adult supervision.  Each related they are frequently check [sic] during overnight with approximately 2 staff members on duty."
- **Child A**: Though the IMPACT contact note summarizing his interview indicates that Child A "conveyed the staff can always see and hear what you are doing," the audio recording of his 5 minute and 54 second interview reveals that Child A reported that staff can always see them (and referred to the cameras that are used to monitor them), but "sometimes they can hear, and sometimes they can't."  The IMPACT notes state that Child A (who was supposed to be on 1:1 supervision) "expressed when they have 2 staff on duty overnight one of the staff members sit directly outside the bedrooms" but "proclaimed when they are short staff the staff member on duty watches them from the camera area and still completes their round."  In fact, the entire exchange was as follows:

---

[130] Child D refused an interview.

- Investigator: At nighttime do they frequently check on y'all?
- Child A:       Ah if there's a staff right by the side of the door then yes, but if there's only like one staff at night then they go into the camera room and…
- Investigator: And watch from there?
- Child A:       Yes.[131]

- **Child B**: Though the IMPACT contact note says that Child B "related they have never been left alone without adult supervision," the 3 minute and 38 second audio recording of the interview reveals that Child B reported he was left alone without supervision but doesn't remember when it was. The contact note in IMPACT also records answers to questions that Child B was never asked.

  **Child C**: Though the IMPACT contact note summarizing his interview indicates that Child C "expressed the staff frequently check on them at night," in fact the audio recording reveals that, during an interview that lasted 4 minutes and 37 seconds, Child C said he did not know how often staff checked on them at night because he was asleep. The contact note also states that Child C "proclaimed he had never witnessed any staff sleeping while on duty," but Child C was never asked whether he had witnessed staff sleeping while on duty.

- Two collateral children were also interviewed. The disposition states: "Collateral children interviews were conducted…Each related they have never been left alone without adult supervision and staff are always present. Each continued, saying the staff frequently check on them at night. Each conveyed there are approximately 2-3 staff on duty for overnight."

  - The IMPACT contact notes for one child indicates that he reported "the staff frequently check on them at night." However, the audio recording of his interview reveals that when he was asked, he said his "guess" was that they check on the children every hour.
  - The IMPACT notes summarizing the other collateral child's interview state, "In regards to supervision, [collateral child] related there was an incident where they were left in the cafeteria without adult supervision, stating the staff member step [sic] outside the area. [Collateral child] continued, staying the staff is always present. [Collateral child] conveyed the staff can always see and hear what you are doing." In fact, the child said that he almost got into a fight with another youth because the staff wasn't in the cafeteria with them, and another child told him to punch another resident.

---

[131] A photo of the camera room display, included in Appendix F, shows that children's rooms are not visible (and in fact, 26 Tex. Admin. Code §748.3353 forbids placing a camera in a child's bedroom unless a heightened supervision need requiring a camera in a bedroom is documented in the child's service plan). While the staff person would be able to see whether a child left their room at night, they would not be able to see into their rooms at night.

He punched the other resident and ran out of the room, and the child he punched chased him.  They almost had a fight, but the staff intervened.  The collateral child did not "continue" by saying that staff are always present or that staff can always see and hear what you are doing.  Though the contact notes state that the collateral child "proclaimed there are 3-4 on duty each shift," he actually said that there was only one staff on duty during overnight shifts.

In addition to the above detailed inconsistencies, the investigator considered only one staff person a potential perpetrator of Neglectful Supervision: the staff member on duty the night of the Monitors' awake-night visit.[132] The Monitors expressed concerns about both the quality of supervision on the night of the visit and the failure to appropriately staff the overnight shift given the staff member's report that three children were on one-to-one supervision. The Monitors raised further concerns about (1) housing two children in a shared bedroom, when they were supposed to be on one-to-one supervision due to histories of sexually acting out; and (2) housing a child flagged with a history of victimization (Child D) in the same bedroom with a child who had a history of sexually acting out (Child C). Staffing decisions and decisions about where to house children are not made by direct caregivers. Though he was interviewed and provided documentation related to the allegations, records indicate the administrator of the facility was never considered an alleged perpetrator.[133]

The IMPACT contact note detailing the investigator's initial interview with the facility administrator states that the administrator was aware of the sexual characteristic flags for each of the children. The notes state that the administrator "expressed they are [a] placement facility for CWOP children" and "proclaimed he does have 6 kids at the facility who are either perpetrators of sexual aggression or victims of sexual aggression."  Despite this knowledge, the findings of the investigation appear to suggest that heightened supervision was not occurring.

In addition to Child A and Child B, who both have very serious histories of sexual aggression and a clear need for heightened supervision, Child C has a history of sexual aggression in a previous placement that includes coercing a younger child to engage in sexual contact with him. It is not clear why Child C is not also on some form of heightened supervision, or why DFPS did not question the administrator's decision to house Child C

---

[132] Even the staff member who left the facility on the night of the Monitors' awake-night visit was not considered as an alleged perpetrator. Consequently, though he was interviewed, his interview was not recorded and available in One Case. During her interview with Staff 1, the investigator articulates a theory of the case that was not articulated by the Monitors.  The investigator told Staff 1, "Like I was telling you, the night the Court Monitors came and [Staff 2] called in, they are saying – even though they SAW you supervising kids – they are saying that you were neglectful in a sense because you should not have been there by yourself."  The IMPACT contact note for the investigator's initial conversation with the facility administrator "conveyed typically they have 2 direct care staff for overnight and a case manager who leaves later on 2nd shift."  However, based on Staff 1's representation that more than one child required one-to-one supervision, the operation would not be in ratio even with two staff.

[133] During her interview with Staff 1, which took place in what sounded like a very crowded and busy Starbucks (raising concerns given the sensitive, confidential information the investigator discussed with Staff 1), the investigator referred to the facility administrator as "good people" and shared with Staff 1 that when she was a child, she went to church with the administrator's grandparents.

in a shared space with a victim of sexual abuse.  The Child's Plan in place for Child C at the time of the investigation states that Child C "has reported sexual and physical trauma in his past.  He acts out on his sexual urges in an unhealthy way.  [Child C's] sexual aggression is triggered once he has a crush on someone."  Under supervision, the Child's Plan says, "[Child C] has acted out sexually and made advances to other children.  The caretakers must maintain a vigil on [Child C] to assure the safety of the other children in the placement."[134]

The investigation further reveals that the investigator failed to ask Staff 1, or the other caregivers interviewed about their knowledge of children's status as victims of sexual abuse or flagged for sexual aggression. When Staff 1 was interviewed by the monitoring team during the awake-night visit, he remembered signing only one child's Attachment A, though – as the facility administrator acknowledged – there were six children in the facility for whom an Attachment A should have been signed by all caregivers.  Based on the Monitors' review of information and audio recordings available in IMPACT and One Case, the investigator did not ask the caregivers who were interviewed whether they remembered signing an Attachment A for the six children in the operation's care who had a flag, or if they were otherwise aware of children's histories of victimization and aggression.

Even though DFPS failed to appropriately investigate or substantiate allegations of Neglectful Supervision, the operation appears to have made efforts to address the problems associated with safety and supervision. Based on photos uploaded to One Case, the operation appears to have built out the walls and created separate bedrooms for the four children[135] – Child A, Child B, Child C, and Child D – who were formerly in the bedrooms with a shared entryway.  In addition, a photo in One Case shows a modification to the medication cabinet that added a cabinet and doors; one of the doors appears to have a deadbolt lock.

The investigator also indicated in the investigation disposition that the administrator changed Child B's service plan to place him on one-to-one supervision, which was evidently contractually required.[136] DFPS also required the operation to put a Safety Plan in place during the investigation requiring one-to-one supervision for Child A.  It is not clear to the Monitors whether the operation was abiding by the requirements related to

---

[134] The Monitors accessed a Child's Plan in IMPACT that is dated October 5, 2022.  However, the contact notes in IMPACT for this investigation refer to a June 3, 2022 service plan that does not appear to have required heightened supervision. It is possible that this was a service plan created by Pinecrest; the Monitors did not have an opportunity to do an extensive review of children's records during the awake-night visits. However, the language quoted in this report is included in every Child's Plan for Child C in IMPACT dating back to 2019.

[135] The photos in One Case appear to show a new doorway for each bedroom and a wall that extends to each doorway.  The photos are labeled "room modification."

[136] Consequently, on November 7, 2022, the investigator told administrator that the overnight shift would need to be staffed with two caregivers and a supervisor, to ensure that the operation is in ratio given the one-to-one supervision required by two of the children.

heightened supervision for these two youth prior to the investigation, but heightened monitoring was certainly not in place on the night of the Monitors' visit to the facility.

## III.    Concerns Regarding Nighttime Supervision

Neither the Monitors nor any members of the monitoring team witnessed staff sleeping during the 19 awake-night visits to operations conducted in October 2022.   The monitoring team suspected staff may have been sleeping at two operations visited, however:

- **Renewed Strength East GRO**: the monitoring team arrived at the operation at approximately 1:30 a.m.  The only light observed through the operation's windows appeared to be coming from a television in the corner of the room.  The monitoring team rang the doorbell, and when there was no response, knocked on the door.  The lights in the living room were turned on, and after approximately five minutes, a staff member opened the door.  When the team entered the living room, they noticed a blanket and pillow on the couch.[137]   As the monitoring team left the operation, the lights in the home were again turned off.

- **Brownstone Residential Care**: The monitoring team arrived at Brownstone on October 21, 2022, at approximately 2:20 a.m.  Lights were on inside the house.  The monitoring team knocked on the door and did not receive a response, then walked to the back yard and peered through the windows to determine if anyone was awake.  Seeing no one through the windows, the monitoring team knocked on the door again, and again received no response.  Looking into the window a second time, the team spotted an individual on the couch.  The monitoring team knocked a third time, at which point, the staff member who was on the couch answered the door.  The staff member told the monitoring team that it took her so long (eight minutes) to answer the door because she had her headphones on and could not hear them knocking or ringing the doorbell.  The staff member indicated that the facility used nighttime logs to document room checks, but when she was asked for that evening's log, pulled a blank form out of her backpack.

  Even if she was awake, based on where she was sitting, the staff person would not have been able to see into any of the children's bedrooms and with headphones that were loud enough to prevent hearing the monitoring team knocking on the front door, would not be able to hear activity from the children's rooms.  On the date of the monitoring team's visit, a child who is flagged with an indicator for sexual aggression was residing at the facility.  The Child Plan that was in effect at that time said that he "will not be allowed to be in peers [sic] room and is not to be alone with them."  However, he was housed in a room with two roommates.

---

[137] There was a memorandum addressed to staff posted on the wall in the dining/kitchen area of the operation that indicated the operation had experienced challenges with staff sleeping during the 12:00 a.m. to 8:00 a.m. shift and requiring the staff who worked this shift to clock in every hour between 12:00 a.m. and 6:00 a.m.   The operation had also received a corrective action from DFPS's Residential Contracts division in 2021 for problems associated with awake-night staff sleeping during their shift.

The investigations discussed above reveal problems with staff failing to complete room checks, pre-filling nighttime logs, failing to abide by Safety Plans, and engaging in other activities that may have impaired their ability to appropriately supervise children's safety during awake-night supervision.   Staff members were often unaware of heightened supervision requirements; or if they were aware, could not describe what "one-to-one" or "close supervision" required. The monitoring team also observed some of these problems in facilities that were not the subject of a report to SWI by the Monitors or members of the monitoring team.  For example:

- At **Promise House**, when the monitoring team arrived at the TEP unit, the team observed two staff responsible for providing supervision looking at cellphones, talking to each other, and talking to one of the children who were still awake. From where the operation staff were sitting, they could not see into the children's bedrooms. The staff members' shift ended approximately one hour after the monitoring team arrived, but monitoring team did not witness these two staff making any room checks. When a staff member arrived (ten minutes late) to relieve the two and start her shift, she was interviewed by the monitoring team.  During her interview, she sat with her back to the children's bedrooms.  The MTM who was conducting the interview periodically reminded the staff person that the interview could be paused if she needed to check on the children, but the staff member declined and said she just wanted to finish the interview, which lasted 45 minutes.  She also did not start a nighttime log during that time; however, the next day, the nighttime logs were complete and showed consistent room checks, even for the time during which the staff person was being interviewed.  Promise House has closed since the monitoring team's visit.

- At **Guiding Light RTC**, at the Boys House, the awake-night staff member responsible for monitoring the children whose bedrooms were downstairs, also did not pause the 45-minute interview to conduct room checks despite being asked if he needed to do so.  A later check of his nighttime log showed he had reported that he completed all the 15-minute room checks, even those that should have been completed during the interview.  Though the staff person responsible for the upstairs bedrooms did pause the interview to conduct room checks every 15 minutes, when he was asked what staff do if they miss a 15-minute check, the staff person said that they "make up" the check later and do not have to indicate on the nighttime log that the room check was delayed.  At the Girls House, the awake-night staff member who was responsible for supervision was doing laundry when the team arrived.  The laundry room was on the opposite side of the house from the children's bedrooms and did not have a clear vantage point from which the staff member could see or hear activity from all the bedrooms. She did pause the interview to conduct room checks every 15 minutes, but when the monitoring team arrived, she was an hour behind in logging room checks on the nighttime log.  She updated the form to make it current while the monitoring team was interviewing her.

- At **Whispering Hills**, when the monitoring team entered the Boys Home, the staff person was folding laundry at the dining room table.  The television was on,

and there was a blanket and cellphone on the couch in front of the television. The living rooms does not provide a vantage point from which a caregiver can actively monitor the children's bedrooms or hear them if the television is on. When the team arrived at 2:00 a.m., the 15-minute nighttime logs had only been completed through 9:30 p.m. The log had been filled in when the monitoring team returned the next day.

- At both **Moving Forward RTC** and **Open Arms Open Hearts**, the awake-night staff were behind in documenting room checks on their nighttime logs. However, the next day when the monitoring team reviewed the logs, they were filled.

The monitoring team also encountered problems like those described, above, related to appropriate supervision of children who were supposed to be on one-to-one supervision:

- At **Promise House**, a child was on one-to-one supervision in a downstairs unit, but there was only one staff person supervising the unit during the time the monitoring team was on site.

- At **Camp Worth** in addition to the sleeping staff described in the Monitors' Fourth Report,[138] when the sleeping staff person was roused and interviewed, she reported that no youth were on heightened supervision, which was inaccurate. Camp Worth was placed on year-long probation by HHSC on August 5, 2022, and DFPS suspended placements to the operation on September 9, 2022. The probation includes a condition requiring the operation to "identify and address the individual supervision needs of each child" and "include the method in which a child's individual supervision plan will be communicated to caregivers" as well as "a process for the LCCA...to monitor staff's compliance."

- At **DePelchin Children's Center**, awake-night staff reported having to take clean laundry between houses, which left two children on one-to-one without heightened supervision.

- At **Open Arms, Open Hearts**, two children were on heightened supervision, but there was only one staff person on site during the awake-night visit.

These supervision failures were particularly concerning at facilities where the monitoring team found children who had been flagged with an indicator for aggression rooming with children flagged as victims of sexual abuse. Children flagged with an indicator for aggression should not share a bedroom with *any* child, but it is particularly problematic to house them in the same room with other children who have a flag for aggression or a history of sexual abuse, or a history of a sexual behavior problem.

## IV.    Site-Specific Concerns

---

[138] Deborah Fowler & Kevin Ryan, Fourth Report of the Monitors, ECF No. 1248.

In addition to the issues that the monitoring team identified across multiple sites visited, the team the following site-specific identified site-specific concerns:

- **Camp Worth RTC:** Approximately six months prior to the monitoring team's visit, Camp Worth RTC had successfully completed a POA focused, in part, on ensuring staff receive timely training across a range of issues. The monitoring team's review of ten randomly chosen staff files showed that seven records did not include documentation of training in child sexual aggression, four did not include documentation related to training in abuse, neglect, and exploitation in the preceding 12 months, and five did not document that the staff person had completed training in the restraint method (SAMA) utilized by the operation. Some of the interviews with staff, and the monitoring team's observation of supervision of youth, reflected a lack of knowledge in these areas.

- **ACH RTC:** The operation is licensed to care for children with a designation of "exceptional care." This should come with an expectation that the RTC staff are trained to handle the behavioral challenges exhibited by children who need "exceptional care." However, the monitoring team was concerned by the frequency with which the RTC was using police to gain child compliance with directives or to handle difficult behaviors. A review of PMC children's incident reports showed staff called police at least 43 times between January 2022 and August 2022. In many of these instances, the police refused to intervene. All 13 of the direct care staff interviewed said that the facility calls the police when youth are acting out; two of the staff interviewed said they had called the police five-to-six times within the last three months. ACH reportedly uses Trust-Based Relational Intervention (TBRI), but some staff appear to struggle with deescalating behavior.[139] The children also did not appear to understand how the facility's disciplinary system worked, which may contribute to behavioral challenges. Children reported that rules and consequences were inconsistent and depended on which staff were on shift. ACH did have a low rate of restraint use but appeared frequently to be relying on police in lieu of direct intervention to manage children's behavior.

- **Dallas Behavioral Health (DBH):** Our Community Our Kids (OCOK) entered into an agreement with DBH referred to in the contract as the "Intensive Transitions: the Acute Pre-Placement Program." This agreement allows DBH to admit or keep foster youth in the hospital "without medical necessity." Superior will not pay for bed days without a finding of medical necessity, thus OCOK has agreed to pay DBH a daily rate of $820 per bed, or double if the child is required to be housed in a room by themselves. This program keeps children in the hospital, though they do not meet medical necessity, for up to two months. Children in this program are integrated with the acute-care patients; in other words, these children are in the same locked inpatient hospital setting and are receiving the same programming as children who meet medical necessity for psychiatric hospitalization. In addition, though CPS does not have a contract with DBH for

---

[139] In fact, the facility had two riots in March 2022 that involved multiple children staging group rebellions that resulted in the facility calling the police.

this program, two of the PMC youth who were in the hospital when the monitoring team visited, and who were not placed by OCOK, no longer met medical necessity.

Psychiatric hospitals are not intended to be long-term treatment facilities. Long-term psychiatric hospitalization of children poses several problems: For example, children do not go on outings and remain locked in the hospital 23 hours per day – they are allowed only one hour of outside recreation each day. "School" is limited to one hour a day and is taught by a Dallas ISD general education teacher who is not special education certified, though three of the five children interviewed by the monitoring team were receiving special education services or other accommodations prior to their hospitalization. These children watch as new patients are admitted and discharged, which – as the children expressed -- exacerbates feelings of abandonment, loss, anxiety, anger, and powerlessness. When the CEO was interviewed by the monitoring team, he acknowledged this fact, noting that children who stay for long periods begin to show signs of behavioral and mental health regression.

The monitoring team reviewed the admission forms for all five of the PMC children who were in DBH at the time of the site visit. The three OCOK children who were placed per the SSCC's contract with DBH included:

- o **Child A**, a 14-year-old female child who was admitted to DBH after being discharged from Fort Worth Behavioral Hospital on December 2, 2022. She no longer met the "medical necessity" criteria for inpatient treatment when she was admitted to DBH. She stayed 40 days and was discharged January 12, 2023.
- o **Child B**, who was admitted on December 8, 2022, per the contract with OCOK. The psychiatric evaluation identified the "chief complaint" at the time of her admission that she was kicked out of her former placement. She stayed in the hospital for 33 days and was discharged January 11, 2023.
- o **Child C**, an eight-year-old child who was admitted to DBH on November 26, 2022, and discharged on December 22, 2022.

In addition to these three children who were placed by OCOK two foster children initially admitted due to suicidal ideation stayed well beyond the time they were ready for discharge because DFPS did not yet have a placement for them.

## V.    Update on The Refuge Investigations and Reopening

On June 2, 2022, the Monitors filed an Amended Third Update (Third Update) to the Court detailing safety concerns and DFPS and HHSC investigations related to The Refuge for DMST (The Refuge), an RTC that is licensed to treat child survivors of domestic trafficking.[140] The Third Update raised significant concerns related to systemic problems

---

[140] Deborah Fowler and Kevin Ryan, Amended Third Update to the Court Regarding The Refuge for DMST, ECF No. 1249.

associated with children running away from The Refuge, and with DFPS and HHSC investigations of runaway incidents.  It included new allegations raised by Vice Chair Gina Hinojosa of the Texas House Human Services Committee, related to two children, "RR" and "DD," who ran away from The Refuge and were subsequently involved in a car accident that killed RR and injured DD.  In addition to the investigation related to RR and DD, the Third Update described the experiences of:

- A child found intoxicated and wandering along a road by the Bastrop Police two days after running from the facility, who described having been sexually exploited by an adult who gave her drugs, then kicked her out of his home.
- A child who was found in a shack in Bastrop two days after running from the facility, with a man who "plied [her] with methamphetamines and marijuana and sexually abused her repeatedly until she was found."
- Two children who returned to their traffickers after running away from the facility.

The Third Update noted gaps in the DFPS investigation of these allegations and others, and noted the significant increase in the number of children who ran away from the facility between 2020 and 2021.  The new allegations and the significant increases in unauthorized absences led the Monitors to raise concerns about systemic problems associated children running away from the facility, particularly given the two DFPS investigations discussed in the Monitors' Second Update, which substantiated allegations of Neglectful Supervision after multiple staff assisted two children in running away and an awake-night staff person's failure to appropriately supervise a child resulted in the child's successful run from the facility.[141]

An advisory filed with the Court by The Refuge on June 6, 2022, which was stricken from the Court's record but later posted to the operation's blog, acknowledged an uptick in runaway events in 2021, and noted several instances in which children ran away from the facility multiple times.[142]  It referred to two children who each ran from the facility 14 times, suggesting that a small number of children were the reason for the uptick in runaway events.[143]  The same day, The Refuge also released a statement from its CEO in response to the Monitors' Third Update.  The CEO stated, in part:

> At issue is a report from a special court monitor that haphazardly paints with broad strokes an issue that requires fine detail: namely the difference between a child running away from a facility forever and the reports we file with regulators should a child leave our grounds without permission for any period of time. In February of this year, we filed sixteen such reports for episodes, most of which lasted for less than two hours, that involved five girls with a history of running from care facilities.

---

[141] Deborah Fowler & Kevin Ryan, Second Update to the Court Regarding The Refuge for DMST 8, 12-13, ECF No. 1236.

[142] Amended Second Advisory to the Court by *Amicus Curiae* The Refuge for DMST, June 2, 2022, *available at* https://therefugedmst.org/refuge-blog

[143] *Id.*

It's a well-documented, sad fact of life that running away is a default coping mechanism for children who have experienced trauma, so The Refuge has always applied prevailing best practices to predict and prevent it...In response to an uptick in runaway episodes in 2021, we updated our procedures, adopting a new standard approach to restraint known as "Handle with Care." With its stronger emphasis on de-escalation, the new standard helped us reduce incidents.[144]

On August 22, 2022, HHSC provided an update to the Monitors regarding the agency's investigation related to the two children who ran from the facility and were injured or killed in the car accident, which was still pending when the Third Update was filed.[145] HHSC issued three citations for violation of minimum standards and provided technical assistance for another minimum standard. HHSC found:

There is a preponderance of evidence that the operation did not follow their own policies and procedures. The operation's Visitation policy states: Beginning at intake, staff work in collaboration with managing conservators and other involved parties to develop and implement a plan for the youth that meets her needs and her permanency goals. Additionally, it states, when a youth returns to The Refuge, the shift leader on duty will meet with her and her parents and discuss the outcome of the visit. The shift leader will document this discussion via e-mail and send it to the Clinical Director, the youth's therapist, and case manager, and her house parent. The entire file for child in care, [RR] was provided, and this discussion was not documented in the file. Travis County Probation Department was not appropriately notified of a child's day and off-campus visits with that child's guardian. The child in care, [RR] was admitted on 4/27/2021. The operation provided RCCR with the court order signed by a judge on 5/11/2021 stating that the Probation Department must approve all off campus visits before they occur and had documented in the child's preliminary service plan dated 4/28/2021 that all trips out of The Refuge need[ed] to be pre-approved by probation. The operation stated that they would normally have sent the Probation Officer an e-mail asking for approval for offsite visitation, however, these emails or other documentation to the Probation Officer cannot be found for 3 offsite visits (6/13/21, 7/18/21, 7/19/21). This was determined by conducting interviews with the operation, the Probation officer, a review of the court order and a review of operation documentation. As a result, there will be a citation for 748.151(2) Operational responsibilities...Furthermore, after reviewing all requested documents along with statewide intakes and unauthorized absence log, it was found that a triggered review for unauthorized absence

[144] The Refuge, Statement from Brooke Crowder, Founder & CEO of The Refuge, June 6, 2022, *available at* https://therefugedmst.org/refuge-blog/category/Announcements The statement also referred to the Monitors' report as "inaccurate" and "clumsy." *Id.*

[145] E-mail from Katy Gallagher, Attorney – Foster Care Litigation, Litigation Dep't, HHSC, to Deborah Fowler and Kevin Ryan, re: Letter from Vice Chair Gina Hinojosa to HHSC re The Refuge, August 22, 2022 (on file with the Monitors).

was not conducted.  A child in care had five unauthorized absences and there was no triggered review.  The child in care, [DD], ran away on 9/18/2021, 9/25/2021, 9/26/2021, 9/27/2021, and 9/29/2021.  Technical assistance was provided for 748.457(a) Unauthorized Absence – Triggered Review of child's unauthorized absences must occur [as soon as possible], but no later than 30 days after third absence within 60 days.

It was found during the investigation that the juvenile probation office did not receive a copy of the service plan.  Additionally, the service plan provided by the operation does not have signatures from the probation officer or the child.  Information provided by The Refuge was unable to demonstrate that they sent the completed plan to [the juvenile probation officer].  Therefore, 748.1349(d) ...was cited, and technical assistance was given for 748.1349(b)(2).

Additionally, it was found through reviewing the child's file that a child in care's admission assessment was missing sections including the immediate goals of placement, the services the operation plans to provide to the child, and a determination of whether and how [the] operation [could] meet the needs of the child.  The admission assessment was for [RR], and she was admitted 4/27/2021.  Due to these missing sections, 748.1217(a)...is being cited.

In regards to the concerns that a child was able to runaway [sic] from the operation due to staff allowing this child to access phones at the operation, a preponderance of the evidence could not be obtained and therefore no citation will be issued. A staff member did change a social media password for a child in care but did not allow the child to use an electronic device.[146] This was reported to the administrator, and we have an email stating the staff who changed the password was provided with a verbal warning from the operation. A verbal warning is allowed in their policy.

The operation waived administrative review for the citations.   In response to HHSC's e-mail related to the closure of the investigation, the Monitors asked why the operation was given technical assistance in lieu of a citation for the minimum standard requiring a triggered for repeated unauthorized absences.[147]  The Monitors also asked whether HHSC looked into the operation's use of triggered reviews for unauthorized absences, given its own report that a few children were responsible for many of the runaway events that were

---

[146] After the investigation was closed, this finding was contradicted by a media report that stated that The Refuge confirmed in an e-mail that RR (not the staff member) used the staff member's phone to change her password.  The same article reports that former residents claimed RR used social media to contact someone who helped her plan her escape from the facility.  Paul Flahive, *Raped, abused, and trafficked but no one to blame? How Texas failed Shawna Rogers*, Texas Public Radio, September 28, 2022.

[147] E-mail from Deborah Fowler and Kevin Ryan to Katy Gallagher, re: Letter from Vice Chair Gina Hinojosa to HHSC re. The Refuge, August 22, 2022 (on file with the Monitors).  Triggered reviews include a review of the child's records documenting previous unauthorized absences and service plans and examining trauma-informed alternatives to minimize unauthorized absences and result in a written plan to reduce the child's unauthorized absences.  26 Tex. Admin. Code §748.461.

reported to HHSC.[148] HHSC responded that though the administrative rule related to triggered reviews would have been required for DD, the operation instead discharged the child after her last run from the facility.[149] HHSC also indicated that it would conduct an additional review of the operation's practices with regard to conducting triggered reviews.[150] As a consequence, two additional citations were issued:

- HHSC cited the operation for violation of a minimum standard (26 Tex. Admin. Code §748.461(2)) requiring a triggered review to include a review of service plan elements because "[d]uring an assessment of the operation's triggered reviews for years 2021 and 2022, three children's triggered reviews were found to be missing information. Two of the 3 triggered reviews were missing debriefing and service plan elements (including level of supervision, trauma triggers, plans to minimize risk of harm). One child's triggered review was missing a list of who participated in the triggered review."

  HHSC provided the following technical assistance associated with this standard: "A triggered review provides an opportunity for the operation to evaluate the unauthorized absences with a particular child and make [a] plan to reduce the unauthorized absences. Service plan elements and debriefing are important for staff to assess for possible increased supervision, assessment of trauma triggers and to create a plan to minimize harm and future unauthorized absences."

- HHSC cited the operation for violation of a minimum standard (26 Tex. Admin. Code §748.457(a)) related to when triggered reviews for unauthorized absences are required, because "[a]n assessment of triggered reviews was completed for years 2021 and 2022. There were two children that did not have the triggered review as soon as possible within the 30-day period following the child's third unauthorized absence within 60 days."

  HHSC provided the following technical assistance associated with this standard: "It is important for an operation to complete unauthorized absence triggered reviews, especially if a child continues to run away, to put quality interventions in place to reduce the number of unauthorized absences."

The DFPS investigation that was opened on January 24, 2022, regarding allegations that a former staff person (referred to as "G" in the Monitors' reports) supplied two girls in the facility with drugs in exchange for nude photos, was also still pending at the time of the Court's June 2, 2022, hearing. IMPACT records indicated that DFPS was waiting for the criminal investigation to be completed before closing its investigation of the allegations related to G.

---

[148] *Id.*

[149] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Letter from Vice Chair Gina Hinojosa to HHSC re. The Refuge, August 23, 2022 (on file with the Monitors).

[150] *Id.*

On September 29, 2022, a Bastrop grand jury declined to indict G for any criminal wrongdoing, finding it did not have sufficient evidence to support an indictment.[151]  On October 4, 2022, Texas Department of Public Safety Director Colonel Steven McCraw sent a letter to Governor Abbott outlining the findings from the Texas Ranger investigation.[152]  In the letter, Colonel McCraw stated that an investigation of the allegations related to G "determined the employee had not taken or procured lewd photographs of the juveniles and furthermore did not obtain a pecuniary benefit."[153]  The Colonel stated that 27 girls who were residing at the facility during the time that G worked at The Refuge were interviewed, and "the only two individuals alleging criminal misconduct were two juveniles who took nude photos of themselves while claiming that an employee aided them in selling the photos online."[154]  He identified the only children who were not interviewed as "four females who had run away…and were still listed as missing and one resident who died suddenly in a vehicle crash while on release."[155]  Colonel McCraw concluded, "The Texas Ranger investigation did not identify any evidence that a Refuge employee engaged in criminal neglectful supervision, physical abuse, sexual abuse, promotion/possession of child pornography, or human trafficking of any child."[156]

On December 21, 2022, DFPS closed its investigation, almost a year after it was opened. DFPS made RTB findings for Neglectful Supervision, Physical Abuse (based on findings that G supplied the girls' illegal drugs), and Sexual Abuse by G (based on findings that G allowed the girls to use her phone and "cash app" so that nude photos taken with the phone could be exchanged for money). DFPS found:

> [G] allowed children whom she was aware had previous sexual trauma, based upon their placement at The Refuge, to participate in taking sexually explicit photographs in various stages of undress to include photographs in bras, revealing tops, and exposed breasts.  Although the girls both advised that the photos were never for [G], they stated that [G] allowed them to use her phone.  They advised that [G] knew what was going on and that [G] had previously told them that she couldn't keep bringing them drugs without payment.  [G] allowed them to participate in sexual conduct that was

---

[151] See Sneha Dey, *Bastrop grand jury declines to indict caretaker at center of The Refuge abuse scandal*, Texas Tribune, September 29, 2022.

[152] Letter from Colonel Steven C. McCraw, Director, Texas Department of Public Safety, to The Honorable Greg Abbott, Governor of Texas, October 4, 2022, published in Appendix 1 to the TEXAS SENATE SPECIAL COMMITTEE ON CHILD PROTECTIVE SERVICES, REPORT TO THE 88TH LEGISLATURE (December 2022), *available at* https://senate.texas.gov/cmtes/87/c522/c522_InterimReport_2022.pdf

[153] Id.

[154] Id.

[155] Id.

[156] Id.  According to Colonel McCraw, the Rangers met with the FBI in April 2022, and the FBI "advised that there was no evidence of a federal offense being committed at the Refuge and recommended a meeting with the U.S. Attorney's Office for the Western District of Texas."  On June 28, 2022, the Rangers and the FBI agents met with the U.S. Attorneys from Austin and Waco "to discuss an investigative partnership with the FBI."  Id.  The letter notes that the Monitors were also interviewed, but incorrectly states that the Court Monitors' statements "were based upon the third-party information provided to them in the March 10, 2022, DFPS letter."  In fact, the Monitors' reports to the Court were based on an exhaustive review of all information about the investigations and regulatory history of The Refuge available in the State's databases or made available by the State.

harmful to their emotional and mental welfare.  [G] as the responsible adult, and the caregiver responsible for their well-being at the time, should not have allowed them to engage in this behavior or encouraged it.

DFPS Ruled Out allegations that G engaged in Exploitation, finding there was no proof of any exchange of money after the photographs were taken, or that G received any monetary or personal benefit.  This decision was based on DFPS's finding that the only transaction on G's "cash app" was from a former resident of the operation, who sent five dollars to the app "to ensure it was working."  DFPS also noted that "law enforcement was unable to obtain the phones used in the allegations or retrieve any electronic data."  DFPS found that this also prevented a Reason to Believe finding for Trafficking:

> DFPS is unable to show a preponderance of the evidence that the photographs were viewed or distributed by [G].  It was learned that law enforcement was unable to obtain her phones, and all photographs found were a result of the girls saving them in their own social media accounts, not [G's].  We are unable to show that [G] had access to the photos after they were taken.  Although it has been reported that the phones in the pictures did belong to [G] we are unable to prove that at this time or to show that she distributed the photos in any manner.

> Additionally, we are unable to show a preponderance of evidence that [G] compelled or encouraged them to complete the acts.  Although, the Department believes there is enough evidence to show [G] was fully aware of what was going on and allowed the children to use her phones, despite them advising they were using them to take inappropriate photos which is addressed via the Reason to Believe findings on [G] for Sexual Abuse, Physical Abuse, and Neglectful Supervision, we are unable to show, at this time, whether she distributed the photos or compelled the girls to participate [in] sexual conduct or if she possessed or had further access to the photographs taken.  Furthermore, we are unable to show through a preponderance of evidence that the photos meet the definition established by the Texas Penal Code of child pornography.

The IMPACT records for the investigation show that the Bastrop County Sheriff's office did not schedule an interview with G until March 14, 2022, almost two months after DFPS initiated its investigation and discussed the allegations with the Sheriff's office,[157] and four

---

[157] CLASS and IMPACT contact notes show that the DFPS investigator spoke with a Bastrop sheriff's office investigator on January 26, 2022.  The Bastrop investigator stated that he was unable to locate G but would "continue to try to find [G] for an interview."  On February 1, 2022, a contact note shows that the DFPS investigator had met with the investigator for the Bastrop sheriff's office, that he asked DFPS to refrain from interviewing G due to the criminal investigations and said that he would allow DFPS to monitor his interview with G when it was scheduled.  During a staffing on February 8, 2022, the DFPS investigator said she had "reached out to law enforcement and [was] waiting [on] a response as to whether or not they [had] been able to interview the alleged perpetrator."  A February 16, 2022, a contact note indicates that the Bastrop sheriff's office investigator called the DFPS investigator and said he had attempted to reach G on all of her known phone numbers but "the numbers are not good" and "said he [would] attempt e-mail and then start looking into physical addresses."  Meanwhile, contact notes show that on February 1, 2022, DFPS had interviewed one of G's relatives who also worked at The Refuge, and that she told the DFPS investigator

days after the suspension of the facility's license was widely reported by news media.  The CLASS and IMPACT notes related to the interview indicate that G told the investigator that she had obtained a new phone number in January.  G said prior to that she had two phones – an iPhone with a case that had flowers on it and a dark blue Android phone.[158]  During the interview with law enforcement, G said that she no longer had the iPhone because it broke and that she had lost the other phone.

After DFPS closed the investigation, HHSC issued an additional citation (for a total of eight citations associated with the investigation) for violation of the minimum standard associated with a child's right to be free from abuse, neglect, and exploitation, finding:

> A direct care staff person permitted, encouraged and supplied children in care with illegal drugs knowing the children's substance abuse history. This direct care staff allowed children in care with known sexual trauma to participate in taking sexually explicit photos with the staff person's personal cell phone knowing the plan was to sell these photos for cash in order to buy illegal drugs from the same staff person. This direct care staff failed to appropriately supervise children they were responsible for by falling asleep and allowing the residents to use their personal cell phone.

In all, once this investigation closed, three of the DFPS investigations opened in 2022 related to allegations of abuse, neglect, or exploitation resulted in 11 Reason to Believe findings for six different Refuge staff and four different children.   These three investigations also resulted in The Refuge receiving a total of 15 citations from HHSC for minimum standards violations.   During the same period, investigations initiated by HHSC related to alleged minimum standards violations, or in which DFPS ruled out abuse, neglect, or exploitation and transferred the investigation to HHSC, resulted in an additional eleven minimum standards citations.

When the Monitors' Third Update was filed, the Refuge was in the process of pursuing a State Office of Administrative Hearings (SOAH) review of HHSC's decision to involuntarily suspend the operation's license.   On October 27, 2022, HHSC notified the Monitors that HHSC was participating in discussions with The Refuge in an attempt to reach an informal resolution of the request for SOAH review.[159]  On January 24, 2023, the Monitors were notified that HHSC and The Refuge entered into a settlement agreement.[160]   As part of the agreement, The Refuge agreed to a one-year probation period, with a list of robust probation conditions.  The probation period began on January

---

that she had been in contact with G but had not discussed the investigation with her, suggesting her relatives knew how to contact G.

[158] There are two different phones visible in the photographs stored in One Case, which were "selfies" taken by the two victims in the bathroom mirror at The Refuge: an iPhone in a case with flowers on it and a blue phone.

[159] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: Refuge and scheduling of next HHSC – Monitors Check-in meeting, October 27, 2022 (on file with the Monitors).

[160] E-mail from Katy Gallagher to Deborah Fowler and Kevin Ryan, re: The Refuge for DMST 1677522- inv 2851677 update, January 24, 2023 (on file with the Monitors).

31, 2023, and will end on the same date in 2024. Monthly inspections will be completed by HHSC to evaluate compliance with the probation terms.

The probation conditions include:

- That the operation's board of directors and CEO will be accountable for implementing all components of the operation's reopening plan, including that youth may not be admitted into the operation until an HR Director has been hired, contracts are reinstated with consultants hired to assist or advise The Refuge in screening job applicants, a policy and procedure manual is finalized, and all current, rehired, and new employees have been trained according to training conditions included in the probation conditions.
- That the operation's leadership meet monthly to review the implementation and effectiveness of the reopening plan, review implementation of the probation conditions, evaluate inspection and investigation findings, assess progress of ongoing compliance with minimum standard violations that were the basis for the probation, and identify and develop additional strategies for continued improvements.  The condition requires meeting notes to be available for review by HHSC.
- That the CEO, in consultation with Praesidium (one of the contractors), develop and implement a screening and selection process for hiring new employees and returning employees at all levels.  The screening and selection process must be defined for each employee type and include all phases of the hiring process – application, interviewing, reference checks, background checks, employment history verification, selection criteria, and utilization of a risk management screening tool.  For rehires, the process must include a comprehensive assessment of previous performance. Current employees are also subject to the comprehensive assessment.  A member of the executive team must review and approve all hires of new or returning employees.  The screening and selection process must be submitted to HHSC for review within 60 days of hiring a new Human Resources Director and before other employees are hired.  Documentation related to screening and selection must also be made available to HHSC.
- That the operation follows specific requirements related to verification of past employment for all job applicants, including the content of verification questions.  If a former employer refuses to provide information or does not respond, the probation conditions require this to be documented.  The Refuge is required to make "diligent efforts" to contact former employers and its efforts must include more than one attempt by varying contact methods.
- That reference checks for job applicants include at least two individuals unrelated to the applicant who can answer questions about the applicant's suitability to work with or around children.
- That numerous specified trainings are completed by all employees before admitting any youth into care. The training topics include: appropriate supervision of children; making healthy connections with children and maintaining appropriate professional boundaries; understanding human trafficking and caring for survivors of human trafficking in a therapeutic environment; and medication

management (with a detailed list of requirements related to medication management).

- That a team leader or overnight shift leader be present during all hours of operation, and that the team leader or overnight shift leader meet with caregivers at the start of their shifts, to discuss any changes to children's service plans or supervision requirements, or any incidents that occurred during the previous shift. Every two weeks, the team leader and overnight shift leader are also required to complete and document unannounced observations of caregivers lasting at least 30 minutes. The team leader and overnight shift leader are required to meet with the facility leadership monthly to discuss the observations of caregivers.

- That a work group is formed that includes treatment staff, the administrator, team leaders, and youth. The work group is required to meet twice a month to discuss a range of issues, including triggers for unauthorized absences and how to support youth who are experiencing challenges with unauthorized absences, and any recommendations for changes.

- That a formalized reporting process is created for caregivers to report serious incidents that occur during their shift. The facility administrator must develop a curriculum to train staff on serious incident reporting requirements and documentation. The training must be completed before a staff person can have direct access to youth. Team leaders must review completed incident reports to ensure that all the required information has been documented. Once a month, a multi-disciplinary team must meet to review and discuss serious incidents and runaways from the previous month and document any action plans developed to address problems.

- That The Refuge update its policy addressing supervision to ensure compliance with minimum standards. The policy is required to include definitions and how to implement different types of supervision, how to identify and address the individual supervision needs of youth, and a plan to increase supervision and manage high-risk behaviors. The policy must also include how each youth's individual supervision plan will be disseminated to staff, how to assign youth staff, and how to identify and address any concerns related to implementation of supervision plans. The updated policy is due to HHSC within 60 days of the start of probation (March 31, 2023) and before any youth are admitted.

- That all new admissions are reviewed utilizing the admissions checklist and that service planning meetings be held no later than 30 days after the youth is admitted.

On February 10, 2023, The Refuge issued a statement announcing the facility's reopening "after a year of intensive scrutiny," "exoneration of the serious allegations first put forth in a report from [DFPS] in March of 2022," and investigations by local, state, and federal agencies "none of which found evidence of criminal wrongdoing by The Refuge Ranch."[161]

---

[161] This statement is misleading, since there were never any allegations that The Refuge had engaged in criminal wrongdoing; the criminal investigations focused on individual caregivers employed by the operation. As noted, above, the operation itself was found to have violated numerous minimum standards and six staff were found to have abused or neglected multiple children in their care.

On February 16, 2023, HHSC completed its initial probation inspection. The operation received four citations for minimum standard violations: three medium-weighted and one high-weighted; all associated with personnel records. However, notes in CLASS acknowledge that the files that were reviewed were compiled prior to the suspension of the operation's license, and that the facility was in the process of hiring an HR director.

On March 17, 2023, HHSC posted proposed administrative rule changes related to minimum standards for the pre-employment screening of applicants for employment at GROs.[162] The proposed rules would require GROs to obtain a five-year employment history from job applicants and attempt to verify[163] whether the applicant was employed as described in the history.[164] The proposed rules will not become final until the rulemaking process is complete.[165]

## Conclusion

This report details the concerns revealed during the Monitors' site visits, including awake-night inspections, which exposed and documented problematic issues related to children's prescriptions for psychotropic medication; inappropriate intake classification and inadequate DFPS investigations for allegations of abuse, neglect, or exploitation reported to the hotline; and serious concerns related to supervision of children, particularly children flagged with an indicator for sexual aggression or victimization. The report also raises concerns specific to several of the sites. The Monitors' site inspections reveal that Texas continues to expose children to an unreasonable risk of serious harm in foster care and congregate settings.

This report also provides an update to the Court on the reopening of The Refuge for DMST, which has been placed on a one-year probation by HHSC, effective January 31, 2023. The decision followed the closure of the last pending DFPS investigation, which resulted in substantiated findings of Neglectful Supervision, Physical Abuse, and Sexual Abuse for both victims.

---

[162] 48 Tex. Reg. 1531 et seq., March 17, 2023. The "Background and Purpose" section of the proposed rules refer to HHSC's agreement at the Court's June 6, 2022, status hearing to initiate rulemaking requiring operations to contact all applicant's job references prior to their hire. *Id.* at 1531.

[163] If the rules are adopted, they would require GROs to verify the applicant's employment history by making "diligent efforts" to contact each employer. *Id.* at 1535. "Diligent efforts…must include more than one attempt to contact the employer, unless the employer is permanently unreachable." *Id.* If the person is hired, their personnel files would have to include documentation of the contact with a previous employer and a description of the efforts made to contact the employer. *Id.* The proposed rules would also require two reference checks from unrelated individuals who are able to speak to the applicant's suitability to work with or around children.

[164] *Id.* at 1535.

[165] *See* Texas Administrative Procedure Act, 10 Gov't Code §2001.001 et seq.