IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity | ) | |
| as Governor of the State of Texas, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION TO SHOW CAUSE WHY
DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT**

"While courts are required to afford the State deference in administration of its state systems and 'the [first] opportunity to correct [its own] errors,' these principles are less applicable where, as here, the State has had ample opportunity to cure the system's deficiencies." *M.D. v. Abbott*, 907 F.3d 237, 272 (5th Cir. 2018) (*Stukenberg I*).

Nearly a decade has passed since the trial confirmed what the State long knew: its chronic systemic failures place Texas children at substantial risk of serious harm. Close supervision has resulted in improvements since then, but the State continues to defy orders issued by the Court and affirmed by the Fifth Circuit. This Court is "entitled to worry about the State's motivation to self-correct and [is] justified in doubting that it [will] achieve compliance independently." *Id.* As such, Plaintiff Children move for an order directing the State to show cause why defendants should not be held in contempt based on clear and convincing evidence that they have not complied with critical remedial orders, threatening the safety and wellbeing of innocent children.

Four years after the Fifth Circuit mandate, children remain at risk of harm from medical abuse and neglect, including from mismanagement of powerful psychotropic drugs. Meanwhile, their lifelines—primary caseworkers—cannot protect them because they are crushed with extra

(and uncounted) childcare duties caused by the ongoing crisis of hundreds of children in unlicensed placements. And children lack the information they need to report abuse/neglect when it happens to them. There can be no good excuse for these violations of multiple remedial orders.

GOVERNING LAW

In *Stukenberg I*, the Fifth Circuit affirmed the Court's finding that the State's dysfunctional foster care system violated PMC children's substantive due process rights. *Id.* at 287-88. In *Stukenberg II*, the appeals court affirmed most of the Court's remedial orders entered after remand; others went unchallenged on appeal. *See* 929 F.3d 272, 281 (5th Cir. 2019). The Fifth Circuit directed the Court "to begin implementing . . . the modified injunction." *Id.* Its mandate issued in July 2019. In *Stukenberg III*, the Fifth Circuit reiterated that its mandate governs implementation of the affirmed remedial orders imposed on the State. *See* 977 F.3d 479, 483 (5th Cir. 2020).

In implementing its injunction, a court is "not reduced to issuing injunctions against state officers and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). "Once issued, an injunction may be enforced." *Id*. Thus, a court has "inherent power to enforce compliance" with its affirmed remedial orders "through civil contempt." *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966).

This contempt power is recognized by statute. "A court of the United States shall have the power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other," as

> (1)     Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; . . . [and]
>
> (3)     Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. §401 (1988). The Supreme Court recognizes this authority of federal courts to impose civil contempt sanctions. *See, e.g.*, *Hicks v. Feiock*, 485 U.S. 624, 632 (1988); *Shillitani*, 384 U.S. at 370-71; *Gompers*, 221 U.S. at 441. A court has "inherent authority" to sanction parties for "a

full range of litigation abuses." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). This power derives from "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id*. at 43 (cite omitted).

A court's findings of fact in support of a contempt order are reviewed for clear error, with its underlying conclusions of law reviewed de novo. *See, e.g., Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir.1987); *U.S. v. City of Jackson, Miss*., 359 F.3d 727, 731 (5th Cir. 2004). And a decision based on "years of experience" overseeing reform litigation, and familiarity with a defendant's history of obstructing change, is entitled to "special deference." *Hutto*, 437 U.S. at 687-88:

> [T]he exercise of discretion in [a] case is entitled to special deference because of the trial judge's years of experience with the problem at hand [and] taking the long and unhappy history of the litigation into account, [a] court [is] justified in entering a comprehensive order to insure against the risk of inadequate compliance.

A movant for contempt has the burden to show three facts by clear and convincing proof: a court order was in effect, the order required certain conduct, and the party required to comply failed to do so. *See Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009); *Lyn-Lea Travel Corp. v. Am. Airlines, Inc*., 283 F.3d 282, 291 (5th Cir. 2002). Clear and convincing proof here is

> that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (cite/quote omitted). If a movant proves a prima facie case that an order was not complied with, the respondent then bears the burden to show mitigating circumstances, substantial compliance with the order, or every reasonable effort to comply, such that the court might withhold exercising its contempt power. *See Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987); *Petroleos Mexicanos*, 826 F.2d at 401.

In using civil contempt to ensure compliance with remedial orders, a court should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). Moreover, "while a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable," sanctions "may be warranted when a party acts in bad faith." *Taggart v. Lorenzen,* 139 S. Ct. 1795, 1802 (2019). Thus, a party's "record of continuing and persistent violations" and "contumacy" justifies placing the "burden of any uncertainty in the decree . . . on [the] shoulders" of the contemnor. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-93 (1949). *See also McPhaul v. U.S.*, 364 U.S. 372, 379 (1960) (proof "established a prima facie case of willful failure to comply with the subpoena").

As detailed below, numerous investigative findings of the Monitors establish a prima facie case of noncompliance with vital orders requiring specific conduct by the State. Persistent issues involving medical abuse/neglect stem from noncompliance with orders governing intake and investigation of abuse/neglect reports and requiring heightened monitoring and corrective actions at operations with a pattern of violations. Problems with management of psychotropic drugs pose crucial risks to children. The State is also out of compliance with orders on caseworker workloads, as the ongoing crisis strains caseworkers and the system to the breaking point. Nor is it meeting its mandate to ensure that children are adequately informed about reporting abuse/neglect.

## ARGUMENT AND AUTHORITIES

### 1.  Noncompliance with RO 3 and 20 Puts Children at Risk of Medical Abuse/Neglect.

The Monitors have documented serious, widespread, and persistent problems of medical abuse/neglect. Particularly disturbing is neglect involving mismanagement of powerful prescribed drugs for children. These dangers persist because of noncompliance with RO 3 and 20.

**Remedial Order 3** deals with the State's system for receiving, screening, and investigating reports of abuse and neglect, Dkt. 606 at 2:

> DFPS shall ensure that reported allegations of child abuse and neglect involving children in the PMC class are investigated; commenced and completed on time consistent with the Court's Order; and conducted taking into account at all times the child's safety needs. The Monitors shall periodically review the statewide system for appropriately receiving, screening, and investigating reports of abuse and neglect involving children in the PMC class to ensure the investigations of all reports are commenced and completed on time consistent with this Order and conducted taking into account at all times the child's safety needs.

RO 3 requires child neglect to be investigated. By law, child neglect includes medical neglect: "Failure to seek, to obtain, or to follow through with medical care for a child" by anyone "working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child" is per se neglect. 40 Tex. Admin. Code §745.8559(5).

Likewise, acts like causing "a child to use" a prescription drug classified as "a controlled substance . . . other than a prescription drug that is prescribed to the child and used as prescribed" can be abuse. *Id*. §745.8557(4)-(5). As the DFPS Associate Commissioner for Statewide Intake confirmed, "medication errors" and "abuse of not abiding by the possible standards" can be child abuse or neglect. Dkt. 1356 at 58-59 (Black) (May 1, 2023). "Over medicat[ion] would be abuse, under-medication could be a medical (indiscernible), it depends on the act." *Id. See also, e.g.*, Dkt. 1352-18 (Court Ex. 8), 1352-20 (Court Ex. 10), 1352-27 (Court Ex. 23).

Similarly, emotional abuse includes acts/omissions that mentally or emotionally injure a child, resulting "in an observable and material impairment in the child's growth, development, or psychological functioning." 40 Tex. Admin. Code §707.787. Medication or policy violations—including those involving psychotropic drugs—have obvious potential to inflict such injury.

The DFPS Associate Commissioner for Statewide Intake expects "medication errors to be reported to SWI." Dkt. 1356 at 59 (Black) (May 1, 2023). SWI gets the referrals "to assess either

- 5 -

abuse or neglect, or abuse of not abiding by the possible standards and . . . take[s] the standards reports as well." *Id.* Similarly, failures "to seek, to obtain or follow through with medical care for a child by a person working under the auspices of an operation . . . are reportable events." *Id.*

The Monitors found grave deficiencies in investigations of medical abuse/neglect. *See, e.g.*, Dkt. 1352-27 (Court Ex. 23, listing intakes that the monitoring team identified as medical neglect yet not assigned to a medical neglect investigation by the State and describing poor investigations, including of mismanagement of psychotropic medication).

**Remedial Order 20** requires heightened monitoring of facilities with patterns of contract or policy violations. The State must address concerns at the facilities by taking corrective actions.

> Within 120 days, RCCL, and/or any successor entity charged with inspections of child care placements, will identify, track and address concerns at facilities that show a pattern of contract or policy violations. Such facilities must be subject to heightened monitoring by DFPS and any successor entity charged with inspections of child care placements and subject to more frequent inspections, corrective actions and, as appropriate, other remedial actions under DFPS' enforcement framework.

Dkt. 606 at 4-5.

RO 3 and 20 are interrelated. Properly receiving and investigating reports of abuse/neglect is integral to identifying and tracking safety concerns at operations. It is an element of the formula that subjects an operation to heightened monitoring. *See* Dkt. 837. Medical abuse/neglect can have severe and even catastrophic consequences. Whether the State complies with RO 3 in getting and investigating reports of medical abuse/neglect also redounds to its compliance with RO 20.[1]

---

[1] Deficiencies in reporting, receiving reports, investigating, and addressing medical abuse and neglect also may implicate RO 22. It requires the State, in inspecting childcare placements and placement agencies, to consider reports and confirmed findings of child abuse and neglect and to monitor adherence to obligations to report child abuse and neglect. Dkt. 606 at 5. When the State finds a lapse in such reporting, it immediately must investigate and determine corrective action. *Id.* Accordingly, referrals and findings of medical abuse/neglect must be considered during placement inspections, and lapses in reporting of such events must be addressed. Dkt. 606 at 5. And the State must monitor placement agency adherence to their duties to report medical abuse/neglect. *Id.*

Contract and policy violations involving children's medical care can trigger heightened monitoring under RO 20. Examples include misadministration and mismanagement of prescription drugs and medical records, which violate minimum standards policies and contract duties. Key minimum standards relate to psychotropic drugs.[2] And there are contract duties to the same effect.[3] Under RO 20, a pattern of "contract or policy violations" subjects operations to heightened monitoring and requires mandatory "corrective actions" to "address concerns." Dkt. 606 at 4-5. Indeed, at operations on heightened monitoring in 2020-22, "the number one concern and the most citations issued" are in the category of "Medical and medication management." May 1, 2023 Hearing Tr. 58; Dkt. 1352-18 (Court's Ex. 8). *It is the top concern.*

In reviewing compliance with RO 20, the Monitors have assessed factors like whether the State ensures that operations comply with contract requirements. These requirements include requiring a care provider to raise "concerns to DFPS and STAR Health if prescribed regimens are outside the Psychotropic Medication Utilization Parameters for Foster Children."[4] And they

---

[2] These include 26 Tex. Admin Code §748.1337, §748.1345, §748.1385, §748.2253, §748.2255, §748.2257, §748.2259, and §748.2261. For example, when a child is admitted to a general residential operation, the child's initial service plan must include "Medical needs" and "Therapeutic needs, including . . . the use of psychotropic medications." *Id.* §748.1337. "The roles of professional level service providers in service planning include," for children with emotional or autism spectrum disorders, reviewing "any medications prescribed for a child with special review of psychotropic medications." *Id.* §748.1345. And, when reviewing and updating a child's service plan, the operation must "Evaluate the possible effectiveness and side effects in the use of psychotropic medications prescribed for the child, any change in psychotropic medications during the period since the last review, and the behaviors and reactions of the child observed by caregivers, professional level service providers, and parents, if applicable." *Id.* §748.1385. Numerous other minimum standards relate to medication generally. *See, e.g., id.* §748.2001-2233.

[3] *See* DFPS Resid. Child Care Contracts, 24-Hour Resid. Child Care Requirements 55 (accessed May 23, 2023), at https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_ Care_ Contracts/ documents/24_Hour_RCC_Requirements.pdf; Comparison of Min. Standards, Resid. Contract Requirements, & Service Level Indicators, DFPS.texas.gov (accessed May 4, 2023), at https://dfps.texas. gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/comparison.asp.

[4] DFPS Comparison of Min. Standards, Resid. Contract Requirements, & Service Level Indicators, https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/co

include minimum standards like those relating to drug storage, maintaining records of prescribed medications dispensed to children, and properly administering medications according to "a prescribing health-care professional's orders." Dkt. 1352-18 at 4-10.

The unreported abuse/neglect, un-cited minimum standards violations, and unaddressed contract violations discovered by the Monitors are proof of noncompliance with RO 20. When the State turns a blind eye to policy and contract violations, it undermines RO 20, and operations that need heightened monitoring do not get it.

Without the Monitors' review of child records during site visits, the State would not have discovered serious unsafe conditions at congregate care facilities. *See, e.g.*, Dkt. 1352-3-8 (Court Ex. 5A-5F, examples of unsafe conditions found by the Monitors); Dkt. 1356 at 86-87 (Muth) (May 1, 2023) (admitting the agency took steps to ensure children in RTCs have valid medical consenters after Monitors uncovered improprieties). The State does not dispute the accuracy of the Monitor findings, and its inability to identify or failure to correct these serious risks is symptomatic of noncompliance with the Court's orders. *See, e.g.,* Dkt. 1337 at 4-15 (site visit report).

The Monitors have made numerous findings related to medical abuse and neglect that indicate noncompliance with RO 3 and 20.

### a.   Noncompliance with Remedial Order 3

RO 3 was born out of evidence at trial establishing that "faulty investigations" were putting children at an "unreasonable risk of harm." Dkt. 1017 at 70-76 (collecting evidence at trial). As the Court held in its contempt order, "simply checking the boxes of commencing and completing

---

mparison.asp (accessed May 26, 2023); *see also, e.g.*, Dkt. 1352-23 (Court Ex. 19, excerpt from HHS Psychotropic Med. Util. Parameters for Children and Youth in Tex. Public Behavioral Health (6th version)); DFPS 24-Hour Resid. Child Care Requirements, Resid. Contracts (RCC) at 55, at https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf (accessed May 26, 2023) (providers are required by contract to "follow[] the guidelines" in the State's PMU Parameters).

investigations by certain times is not sufficient for Defendants to implement this Remedial Order in a way that 'ensure[s] that Texas's PMC foster children are free from an unreasonable risk of harm,' as required by the Court's injunction." *Id*. at 77. Nevertheless, the State continues to check boxes while children suffer. Because the State is not properly investigating/substantiating alleged medical neglect at residential facilities, there is a risk that operations that should be identified for heightened monitoring will not be, and a substantial risk that children needing careful medical care will suffer irreparable harm.

Mismanagement or misadministration of medication constitutes medical neglect. "Failure to seek, to obtain, or to follow through with medical care for a child" by "a person working under the auspices of an operation that causes or may cause substantial emotional harm or substantial physical injury to a child," is per se neglect. 40 Tex. Admin. Code §745.8559(5); *see also* Dkt. 1352-21 at 2. As the DFPS Associate Commissioner admits, "failure to seek, to obtain or follow through with medical care for a child by a person working under the auspices of an operation" must be investigated for abuse/neglect under RO 3 and for minimum standards under RO 20. Hr'g. Tr. at 58-59 (Black) (May 1, 2023). Yet his boss is unable to say whether mismanagement or misadministration of psychotropic drugs amounts to medical neglect/abuse. *See* Hr'g. Tr. at 65-66 (Muth) (May 1, 2023). This leadership lapse can only worsen an already dangerous situation.

Periodic reviews reveal chronic problems with the State's intake and investigation of medical neglect. The Monitors' First Report, Dkt. 869 (June 2020), identified problems existing from before the Fifth Circuit's 2019 mandate. Their later reports confirm the risks still exist. Time and again, investigations of medical neglect are found to be deficient,[5] and allegations of medical

---

[5] *See, e.g.*, Dkt. 1318 (Fifth Report) at 14 (Monitors could not determine the disposition of medical neglect due to deficient investigation); *id*. at 36-37 (same); Dkt. 1165-2 (Third Report) at 1-2 (same); *id*. at 10-11 (same); *id*. at 38-39 (same); Dkt. 1080-1 (Second Report) at 23-24 (same); *id*. at 60 (same); *id*. at 69 (same).

neglect are inappropriately downgraded or ruled out.[6] Their findings reveal an astounding practice of issuing citations for minimum standards violations yet ruling out medical neglect.[7]

---

[6] *See, e.g.*, Dkt. 869 (First Report) at 94, Dkt. 869-4 at 4-5 (ruling out medical neglect despite multiple reports by nurses that foster parents set the heart monitor too low for a 10-year-old nonverbal, medically fragile child on a ventilator because the monitor kept sounding and waking them up at night); Dkt. 869-4 at 5-6 (ruling out medical neglect against a foster parent with a history of medical neglect and a CPA administrator who both failed to obtain timely medical treatment for a 13-year-old child who tried to hang himself); *id.* at 50-51 (failing to code for medical neglect where a facility failed to give medical attention to 16-year-old attacked by another child); Dkt. 869-3 at 8-9 (downgrading a Priority 2 investigation for medical neglect to only minimum standards where the foster parent admitted to failing to administer medication to 9-year-old girl with severe autism, which disabled her balance, focus, attention, and writing skills); *id.* at 57-58 (downgrading Priority 2 investigation for medical neglect to only minimum standards where a facility likely overmedicated a 13-year-old child with ADHD and intellectual delays and was not responsive to concerns from school staff); Dkt. 1080 (Second Report Appendices) at 2-3 (failing to code for medical neglect where the facility failed to give timely medical attention to 11-year-old child who struck his head on a wall hard enough to cause a concussion); *id.* at 7-8 (downgrading Priority 2 investigation for medical neglect to only minimum standards where facility failed to give timely medical treatment to 15-year-old child who attempted suicide); *id.* at 19-20 (downgrading Priority 1 investigation for medical neglect to only minimum standards where foster parent failed to secure timely mental health treatment for 15-year-old child expressing suicidal and homicidal behaviors); *id.* at 42-43 (ruling out medical neglect where facility failed to give timely medical treatment to 16-year-old child with untreated injuries sustained during a restraint by RTC staff); *id.* at 44-45 (ruling out medical neglect where medication/treatment records at a GRO indicated that staff failed to dispense medicines as prescribed, to follow-up with medically recommended services, or to document the provision of therapies as required by children's treatment plans); Dkt. 1080-1 at 5-6 (failing to investigate/substantiate medical neglect where facility failed to give medical treatment to intellectually disabled youth who told staff she was anally penetrated by another youth); *id.* at 67-68 (ruling out medical neglect where a facility failed to refill psychotropic medication prescription for child and likely did not store or account for the medication properly).

[7] *See, e.g.*, Dkt. 1318 (Fifth Report) at 97-98 (issuing citation but ruling out medical neglect despite findings that "the child had missed a dose of the medication prescribed for 'Mood, anger, and aggression' prior to his hospitalization and that there were 'inconsistencies contained in the medication documentation'"); *id.* at 98 (issuing citation but ruling out medical neglect despite findings that RTC staff administered two psychotropic medications that were not prescribed to the 11-year-old child); Dkt. 1248 (Fourth Report) at 154 (issuing/overturning citation and ruling out medical neglect despite findings that foster parent forged dates on medical logs and medication was filled but not documented); *id.* at 156 (issuing citation but ruling out medical neglect where foster parents failed to provide a child's prescribed medication to respite caregivers); *id.* at 161 (issuing citation but ruling out medical neglect despite foster parents' failure to take 1-year-old with traumatic brain injury to medical appointments on more than one occasion); *id.* at 175 (issuing citation but ruling out medical neglect where foster parents failed to take 2-year-old to the doctor after a fall that flattened and bloodied his nose); *id.* at 184 (issuing citation but ruling out medical neglect because the child had had no follow-up cardiologist appointment despite having irregular heartbeats); Dkt. 1080-1 (Second Report Appendices) at 63-64 (issuing citation but ruling out medical neglect where the foster mother missed or failed to schedule medical appointments for infant's ongoing care for a seizure disorder in the months prior to infant's hospitalization).

The State's failures persist. The Monitors' site visit reports detail ongoing problems with intake/investigation of abuse, neglect, or exploitation reports, including those involving medical neglect. *See, e.g.,* Dkt. 1337 at 15-85. Of the ten reports the monitoring team made to SWI, three were improperly screened out, and investigations for the screened in cases were "so substantially deficient that the disposition could not be validated in six of the seven cases." *Id*. at 15-16.[8]

In their findings, the Monitors cited examples of "improperly plac[ing] the responsibility to request medical care on the child." Dkt. 1337 at 51.[9] A practice of relying on children to self-substantiate medical neglect makes it highly unlikely that DFPS ever will find medical neglect. Indeed, when the monitoring team asked the children if they were getting their medications as prescribed, "[e]ight of the nine children whose records documented that they were not receiving medications as prescribed were unaware of the problem." Dkt. 1337 at 13 n.33.

Accordingly, Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for failing to comply with the RO 3.

---

[8] For example, the monitoring team reported to SWI that a facility was misadministering and mismanaging prescription drugs. Dkt. 1337 at 43-44. The team supported its report with documentary evidence, which was emailed to the DFPS investigator. *Id* at 46. DFPS ruled out any medical neglect by the facility because the child "never asked to go to the doctor" and other children "did not make any outcries regarding any medical neglect." *Id*. at 47-48. DFPS closed its investigation and sent the case to HHSC. *Id*. at 46. HHSC initially cited the facility for minimum-standards violations related to medication destruction, storage, and administration. *Id*. at 48-49. It turns out that DFPS did not review the documentary evidence or forward it to HHSC. *Id*. at 49. After getting the evidence directly from the Monitors, HHSC issued more citations based on findings that a medical record was altered and another pre-filled before the child got medication. *Id*. at 49-50. HHSC apparently took no other enforcement action. It alerted DFPS to the monitoring team's findings, but "the documentation was never uploaded to One Case and there is nothing in the IMPACT records to suggest DFPS reviewed the documents and video or reconsidered its findings after HHSC alerted it to the information." *Id*. at 50. DFPS simply has ignored the evidence of medical neglect.

[9] *See, e.g.,* Dkt. 1337 at 42-48 (ruling out medical neglect since injured child "never asked to go to the doctor"); Dkt. 1248 (Fourth Report) at 154 (ruling out medical neglect "because the children either denied that the foster parent failed to give them medications, or said that if she did, they did not feel 'strange or ill' or have behavioral issues"); Dkt. 1165 (Third Report) at 5 (ruling out medical neglect because "child did not indicate that she was medically neglected or . . . that she was suffering from a headache").

### b.  Noncompliance with Remedial Order 20

RO 20 emerged from proof at trial that "DFPS continues to under-regulate facilities" which causes an unreasonable risk of harm. *M.D. v. Abbott*, 152 F.Supp.3d 684 (S.D. Tex. 2015). "The State had knowledge of these problems. Moreover, that . . . inadequate enforcement policies place children at a substantial risk of serious harm seems painfully obvious." *Stukenberg I*, 907 F.3d at 267. The State has had ample time to comply with RO 20, even as the Court has granted it leeway. *See* Dkt. 950.[10] But time and again, the Monitors have found a lack of meaningful enforcement. *See, e.g.,* Dkt. 832 (Update Re: RO 20); Dkt. 955 (Update Re: Heightened Monitoring); Dkt. 1079 (Second Report); Dkt. 1248 (Fourth Report); Dkt. 1337 (Site Visit Report). This under-regulation puts children at a substantial risk of serious harm, most notably for children with medical needs.

Especially concerning are failures to enforce policies and contract duties as to psychotropic medications. Defendants created the Psychotropic Medication Utilization Parameters for Children & Youth in Texas Public Behavioral Health as "a 'best practices' guide to ensure the proper use of psychotropic medication for the children in foster care." 2023 Ann. Prog. & Servs. Rpt., Targeted Plan B. Health Care Oversight & Coord. Plan, DFPS [2023 APSR], at 15. The Parameters are "in place overall to ensure safety of children." Hr'g Tr. at 58 (Muth) (Apr. 12, 2023).

The Parameters detail criteria that indicate a need for further review of a child's medication regimen. *See* Dkt. 1337 at 5-6; HHSC, Psychotropic Med. Util. Parameters for Children & Youth in Tex. Public Behavioral Health (6th ver.); DFPS, Med. Servs. Resources Guide (Apr. 2020), at 18. Yet, there is no State enforcement. As it admits, "there is not a specific person or group of

---

[10] Plaintiffs' second show cause motion alleged that the State failed "to implement a credible system of heightened monitoring of private providers with a pattern of violations." Dkt. 901 at 17. Due to the difficulty of complying with the heightened monitoring requirements during the pandemic, Plaintiffs agreed to omit RO 20 from its motion to show cause. The Court then extended the compliance deadline, permitting the State to rollout the remedy incrementally.

people that are necessarily in place to police the medication guidelines." Hr'g Tr. at 68 (Apr. 12, 2023). Instead, "there is a process in place to review the extent to which those guidelines are being followed . . . and that process is the [PMU Review] process," *id.*, done by a vendor.

PMU Review is handled by STAR Health, a state contractor tasked with "conduct[ing] ongoing oversight of the psychotropic medication regimens of children to ensure the medication practices are in compliance with the Parameters." 2023 APSR at 15. If a medication regimen does not appear to comply with the Parameters, the case should be referred to STAR Health for a PMU Review. CPS's Director of Services confirmed that this process is a "very important" safety issue. Hr'g Tr. at 69 (Kromrei) (Apr. 12, 2023). The State relies on this process to monitor psychotropic medication regimens of children. *See id.* at 68; 2023 APSR at 15.[11]

The State does not dispute the findings of serious safety concerns at residential facilities detailed in the Monitors' reports. These include that "children [were] prescribed psychotropics in contravention of the State's psychotropic medication utilization parameters, posing a risk to children's health and safety." Dkt. 1337 at 5. The issue here is not prescription decisions but rather the failure to oversee childcare facilities' compliance with related contract duties and state policies. The Monitors' findings indicate chronic noncompliance with contract duties to alert DFPS and STAR Health when prescribed regimens appear not to comply with the Parameters.[12]

---

[11] A case is referred for a PMU Review in one of four ways: request by a court; requests by CPS staff, CASAs, caregivers, attorneys, residential care providers, and other interested parties; request by an HHSC service manager; or an automated process that uses pharmacy data to identify when a child's medications are outside the Parameters. *See* Dkt. 1337 at 4-15; Superior Healthplan, Psych. Med. Util. Rev. (PMUR) Process for STAR Health Members FAQ and Stakeholder Manual (July 2019); DFPS, Med. Servs. Resources Guide (Apr. 2020), at 17. After a PMU Review is referred, a STAR Health Behavioral Health Service Manager (masters level clinician) does a preliminary screening. Then a STAR Health Behavioral Health Medical Director (a child psychiatrist) reviews the information. If indicated, the case is forwarded to a child psychiatry consultant for a formal review and peer to peer consultation with the prescribing physician. *See id.*, DFPS Resources Guide at 18-19; 2023 APSR at 15.

[12] *See* DFPS Comparison of Min. Standards, Resid. Contract Requirements, & Service Level Indicators, https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/

For example, many children at multiple sites were prescribed four or more psychotropics (excluding drugs prescribed for side effects) under circumstances that violate the Parameters. *Id*. at 7. But a PMU Review had been done for only 28% of the children. And most of those reviews were done a year or more before placement, when the children were taking a different set of drugs than those prescribed at the time of the site visits. *Id*. at 7-9.[13] Indeed, of 18 children for whom a PMU Review was done before monitoring team visits between December 2021 and December 2022, "[o]nly one child was taking the same set of medications reviewed." *Id.* at 9.

Errors in application/administration of medicine were legion. Some logs were prefilled and did not include medication counts, some did not consistently document when drugs were given, and others had blanks with no data at all. After hospitalization, children were medicated at a lower dosage than prescribed while hospitalized. When a doctor reduced the dosage of a drug, children continued to get a higher dosage. Children did not get prescribed medication because they needed a refill. Facilities had a practice of pre-pulling medication, they were named as medical consenters, and site records did not include the appropriate consent forms. *Id*. at 11-14.[14]

---

comparison.asp (accessed May 26, 2023); *see also, e.g.*, Dkt. 1352-23 (Court Ex. 19, excerpt from HHS Psych. Med. Util. Parameters for Children & Youth in Tex. Public Behaviorial Health (6th ver.)). Providers are required by contract to "follow[] the guidelines" in the State's PMU Parameters. DFPS 24-Hour Resid. Child Care Requirements, Resid. Contracts at 55, at https://dfps.texas.gov/Doing_Business /Purchased_ Client_Services/Residential_Child_Care_Contracts/documents/24_Hour_RCC_Requirements.pdf (accessed May 26, 2023).

[13] Under RO 20, based on contract and policy compliance, care providers are to refer cases for PMU Reviews, which is not happening. Beyond that, the PMU Review process itself appears to be ineffectual. In 2023, a shocking 93% of cases referred for a PMU Review were screened out. Of the 7% that advanced, only 1% of cases got a full review. *See* 2023 APSR at 18. The numbers were as bad in prior years. *See* 2022 APSR at 18 (94% screened out); 2021 APSR at 17 (86%).

[14] As the Associate Commissioner for CPS said, it is unsafe for facilities to act as medical consenters. They may be "prescribing something to the child that the worker hasn't been alerted to or doesn't understand." Hr'g Tr. at 65-66 (Banuelos) (Apr. 12, 2023).

Nevertheless, the State appears to take no meaningful action against violators of minimum standards or contract provisions related to psychotropic medications. Its inaction undermines and violates the requirements imposed by RO 20 for heightened monitoring of dangerous facilities.[15]

Both agencies have critical duties related to RO 20. HHSC is to regulate childcare and child-placing activities in Texas and create/enforce minimum standards. These standards establish basic requirements to protect the health and safety of children in care and are weighted by HHSC based on the agency's assessment of the risk that a violation presents to children. Minimum standards cover medications generally and psychotropic drugs specifically.

In addition to being codified in Chapter 26 of the Texas Administrative Code, the current standards are published in Minimum Standards for General Residential Operations, Dec. 2022 (revised 2/24/23) (GRO Min. Standards).[16] GRO Min. Standards assigns ratings to each minimum

---

[15] After RO 20 issued, the State sought clarification of the meaning of the terms "pattern of contract or policy violations" and "heightened monitoring." The Court entered an order defining the terms. *See* Dkt. 837 (Mar. 18, 2020). A pattern is "a high rate of contract and standards violations for at least three of the last five years." *Id*. at 1. To identify patterns, each agency must "review data for the rate of contract and standards violations, including confirmed findings of abuse and neglect, for the last five years." *Id*. "If the operation's rate of violations rated medium, medium-high, or high is above the combined rate of violations rated medium, medium-high, or high for operations of similar size and service type for three of the last five years, then there is a pattern of violations." *Id*. "When an operation is identified for heightened monitoring, a Facility Intervention Team Staffing (FITS) is scheduled within 5 days. The intervention team is made up of staff from, at least, RCCL, DFPS CCI, DFPS Contracts, and CPS." *Id*. at 2. "If the review reveals events that implicate an ongoing concern for the health and safety of children, the intervention team will develop a safety plan and temporarily suspend placements until all concerns for children's health and safety have been addressed." *Id*. The FITS team must develop a "detailed and specific" heightened monitoring plan addressing the pattern of policy violations that led to heightened monitoring; any barriers to compliance identified during a review of previous corrective or enforcement actions or risk analyses; any technical assistance needed by the operation from DFPS, RCCL, or a third party; and the steps the operation must take to satisfy the plan. *Id*. at 2. "While an operation is on heightened monitoring, RCCL and DFPS will share responsibility for at least weekly unannounced visits to the operation, and any placements of PMC children must be directly approved by the Associate Commissioner of CPS." *Id*. Facilities that fail to correct contract and policy violations are subject to enforcement action, including suspension of placements, fines, suspension/revocation of the facility or CPA's license, and termination of the contract. *Id*.

[16] Available at https://www.hhs.texas.gov/sites/default/files/documents/doing-business-with-hhs/provider-portal/protective-services/ccl/min-standards/chapter-748-gro.pdf.

standards provision.  A "pattern" of violations triggering heightened monitoring is defined based on violations "rated medium, medium-high, or high."  Dkt. 837.

Minimum standards relating expressly to psychotropic medications and rated from medium to high, *see* GRO Min. Standards 148-49, 155, 159, 229-32, include:

- 26 Tex. Admin. Code §748.1337(b): "child's initial service plan . . . must include . . . "Therapeutic needs, including plans for psychiatric evaluation, psychological evaluation, psychosocial assessment or follow-up treatment, testing, and the use of psychotropic medications."

- 26 Tex. Admin. Code §748.1345: "roles of professional level service providers in service planning include . . . Reviewing any medications prescribed for a child with special review of psychotropic medications . . . ."

- 26 Tex. Admin. Code §748.1385: "To review and update a service plan, you must . . . Evaluate the possible effectiveness and side effects in the use of psychotropic medications prescribed for the child, any change in psychotropic medications during the period since the last review, and the behaviors and reactions of the child observed by caregivers, professional level service providers, and parents, if applicable."

- 26 Tex. Admin. Code §748.2253: "If my operation employs or contracts with a health-care professional who prescribes psychotropic medications to a child in care, what information must I provide the person legally authorized to give consent before requesting his consent for the child to be placed on psychotropic medication?"

- 26 Tex. Admin. Code §748.2255: "If my operation does not employ or contract with a health-care professional who prescribes psychotropic medications to a child in care, what information must I provide the person legally authorized to give medical consent prior to the health-care professional prescribing psychotropic medications to a child in care?"

- 26 Tex. Admin. Code §748.2257: "What are the requirements if a physician orders administration of a psychotropic medication to a child in an emergency?"

- 26 Tex. Admin. Code §748.2259: "What information must I document about a child's use of psychotropic medication?"

- 26 Tex. Admin. Code §748.2261: "If my operation employs or contracts with a health-care professional who prescribes psychotropic medications to a child in

care, what are the requirements for evaluating whether a child should continue taking a psychotropic medication? [17]

DFPS has its own duties. Its Residential Child Care contracts impose requirements with which child placing agencies and general residential operations must comply in providing services to children. *See* 24-Hour RCC Requirements.[18] Providers must "follow[] the guidelines" in the Parameters and "ensure[] that the Caregiver administers and documents the provision of psychotropic medication as prescribed, and in accordance with Minimum Standards." *Id*. at 55. The DFPS guide for licensing/contracting requires providers to be responsible for "[r]aising concerns to DFPS and STAR Health if prescribed regimens are outside" the Parameters and for "[e]nsuring evaluation for continued treatment by a physician in the STAR Health Network at least quarterly." Comp. of Min. Standards, Resid. Contract Requirements, & Serv. Level Indicators, DFPS.texas.gov (accessed May 4, 2023).[19]

---

[17] The Monitors documented many instances of likely violations of these psychotropic-specific standards. *E.g.*, Dkt. 1337 at 11-12 (medication errors and medication log errors relevant to multiple standards, including §§748.2259 and 748.2261), 14-15 (violations of standards regarding medical consenters and documentation of informed consent, including §§748.2253 and 748.2255). Minimum standards relating to medications generally that are rated from medium to high, *see* GRO Min. Standards 217-28, include:

- 26 Tex. Admin. Code §748.2001: "What consent must I obtain to administer medications?"
- *Id*. §748.2003: "What are the requirements for administering prescription medication?"
- *Id*. §748.2005: "May I accept verbal orders on the administration of medication?"
- *Id*. §748.2051: "What are the requirements for a self-medication program?"
- *Id*. §748.2053: "Who must record the medication dosage if a child is on a self-medication program?"
- *Id*. §748.2101: "What medication storage requirements must my operation meet?"
- *Id*. §748.2103: "What are the requirements for discontinued or expired medication?"
- *Id*. §748.2151: "What records must you maintain for each child receiving medication?"
- *Id*. §748.2203: "What must I do if I find a medication error?"
- *Id*. §748.2205: "What must I do if I find a medication label error?"
- *Id*. §748.2231: "What must I do if a child has an adverse reaction to a medication?"
- *Id*. §748.2233: "What must I do if a child experiences side effects from any medications?"

[18] Available at https: //dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/documents/ 24_Hour_RCC_Requirements.pdf.

[19] Available at https://dfps.texas.gov/Doing_Business/Purchased_Client_Services/Residential_Child_Care_Contracts/comparison.asp.

In fact, providers regularly violate these minimum standards and contract provisions. In 2020-21, 26% of operations qualified for heightened monitoring. *See* Dkt. 1248 at 92; Dkt. 1352-2 at 13. The most-cited problem in heightened monitoring plans, out of 485 problem areas listed, was medical neglect: "Medication management, including documentation of medication logs and medication storage." *Id*. at 97; Dkt. 1352-2 at 3. The DFPS corrective steps "frequently lacked detail about how the [steps] should be implemented or accomplished." Dkt. 1248 at 101 n.135; 1352-2 at 7. For example, a facility is to develop "a plan for oversight of medication management to ensure all medication is being administered, documented, and stored correctly"; or "review and update the current policies and procedures of medication management (administration and documentation) to ensure all medication is being administered and documented according to minimum standard requirements." Dkt. 1248 at 101-102; 1352-2 at 7-8.

The State has displayed a disturbing lack of meaningful enforcement to protect children from unreasonable risks of harm. Again, the Monitors findings show that deficiencies from before the Fifth Circuit's mandate persist such as scant penalties for violations.

For example, from mid-2016 to mid-2019, 2936 inspections of CPAs ended in a citation. Dkt. 832 at 5. A citation "is a determination that a violation of a minimum standard occurred"; it "does not, in and of itself, carry any penalty." *Id*. Of these instances, only 7% resulted in further involuntary enforcement action. *Id.* And of the 2778 inspections of GROs and RTCs that resulted in a citation, only 12% resulted in any other involuntary enforcement action. *Id*. SWI data shows similar results. In July-Nov. 2019, 1944 referrals resulted in RCCL opening a new investigation of an alleged minimum standards violation. "Of these, 81 resulted in at least one deficiency being cited, but <u>only 6</u> [1.0%] resulted in some action being taken beyond a citation." *Id*. at 6 (orig. emph.). Of the 12 Priority 1 investigations, in which a reported violation poses an immediate risk

of serious harm, none resulted in a citation or any corrective action. *Id.* at 7. Of 586 Priority 2 investigations, based on a reported injury or serious mistreatment of a child, 6% resulted in a citation, and "only 3 [0.5%] were the basis of some action beyond the citation." *Id.* (orig. emph.). During a five-year period of 2014-19, "*not a single license was revoked* for a GRO (including RTCs) or a CPA." *Id.* at 7 (orig. emph.). Stats for enforcement actions in 2016-20 reveal a startling lack of meaningful action beyond monetary penalties. *See* Dkt. 1248 at 96; Dkt. 1352-2 at 2.

After the Monitors provided the site visit report to the State, HHSC made more discoveries during surprise visits and issued citations for violations of minimum standards. *See* Letter from Monitors re: RO 20 & Medication Issues (Apr. 26, 2023). Yet, it appears that HHSC has taken no enforcement action beyond issuing citations. In short, little has changed since the Fifth Circuit called the State's enforcement practices "problematic." *Stukenberg I*, 907 F.3d at 267.

Lack of effective enforcement is due to confusion about which agency is responsible. As the DFPS Director of Contracts Division said, "We're just trying to work out the responsible agency. Whether it's DFPS or HHSC that would implement and impose those remedies . . . DFPS has the contract. HHSC would have the licenses and so we're trying to figure out whether it makes sense [as a] contract action or a licensing action." Hr'g Tr. at 263-64 (Walsh) (Apr. 12, 2023).

The State also fails to use its full array of enforcement remedies to ensure compliance. As HHSC's Chief Policy and Regulatory Officer testified, "we assessed $8600 of fines on 35 operations [in 2022]. That's the total for all 35." Hr'g Tr. at 265-67 (Dixon) (Apr. 12, 2023). This is an average penalty of $245. The Court aptly noted, "a simple fine of that amount is not going to touch . . . . their operation . . . Especially when you're giving them thousands of dollars every month." *Id.* at 266-67. Nevertheless, the State continues to use and license facilities that routinely mismanage medications and records, exposing the children to significant risk of harm.

Just as facilities that operate without fear of enforcement will continue to jeopardize the children, defendants that operate without fear of contempt will continue to violate court orders. The "'collaborative' approach to compliance was simply not working. This is evidenced by the fact that there is a very high rate of repeat violations, as licensees do not perceive that they will be held accountable for their malfeasance." *Stukenberg I*, 907 F.3d at 267. The State's ongoing failure to enforce its own contracts/policies puts children at serious risk of harm and violates RO 20.

Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for not complying with RO 3 and 20. Sanctions may include substantial monetary penalties assessed 30 days after the order unless the State implements meaningful remedies that cure the violations.

**2.  The Placement Crisis Overburdens Caseworkers and Puts All PMC Children at Risk.**

In late 2019, the State agreed to an order requiring it to adhere to caseload guidelines of 14-17 children per caseworker. *See* Dkt. 771. This was to remedy "the problem with excessive caseworker workloads." *Stukenberg I*, 907 F.3d at 255. The order binds the State. *See, e.g.*, *Spallone*, 493 U.S. at 276 (contempt sanctions were proper against city that failed to remedy unconstitutional public housing practices, despite its agreement by consent decree to do so); *In re Flechas & Assocs., P.A.*, 592 B.R. 639, 649 (Bankr. S.D. Miss. 2018) (agreed judgment "becomes a court judgment" and "binds the parties as fully as other judgments." (quotes omitted)).

The State-created crisis of children sleeping in unlicensed, unsafe placements has rendered supposed compliance with the Agreed Order's guidelines a farce. It puts a burden on caseworkers that poses a safety risk to all children in the system. In addition to their usual caseload, caseworkers are having to spend exhausting extra shifts trying to care for hundreds of children that the State puts into unlicensed, unsuitable, and dangerous settings each month. And they must shoulder these

- 20 -

extra care duties without proper training or resources. It is wishful thinking by the State to presume that caseworkers crushed with mandated double duty can keep any children safe for very long. The reality of the workload on caseworkers is that the State is not complying with the agreed workloads order. This lack of compliance implicates other remedial orders relating to workloads.

The caseload order requires the State to implement the "guidelines for determination of generally applicable internal caseload" to which it agreed: "14-17 children per caseworker for DFPS conservatorship caseworker caseloads." Dkt. 771 at 2. In lieu of doing the workload study required by affirmed RO A.1 and A.2, *see* Dkt. 606 at 8-9, the State must "use these guidelines to satisfy" its requirement "to establish generally applicable internal caseload standards." Dkt. 771 at 2; *see also* Dkt. 606 at 8-9 (RO A.3 and A.4 requiring use of internal caseload standards in distributing caseloads and informing hiring goals).

The order is clear that "Defendants' use and implementation of these guidelines will remain subject to supervision by the Monitors and approval of the Court, as explained in the November 20, 2018 order." Dkt. 771 at 2. The now-routine practice of making caseworkers pull extra shifts to care for children sleeping in hotels and other risky, unlicensed settings implicates the State's use/implementation of the caseload guidelines.

A caseworker who nominally has a 17-child caseload but also must spend dozens of hours monthly working extra shifts does not have a child caseload within the guidelines. *Cf.* Dkt. 606 at 9 (RO A.3: "The caseload standards that DFPS will establish shall ensure a flexible method of distributing caseloads that takes into account the following non-exhaustive criteria: the complexity of the cases; travel distances; language barriers; and the experience of the caseworker. . . .). Under RO A.3, "caseloads for staff who spend part-time in the work described by the caseload standard and part-time in other functions shall be prorated accordingly." *Id.* The State does no prorating of

caseloads for primary caseworkers whom it regularly requires to work in the "other function" as caregiver of children in unlicensed placements.

In addition to violating the caseload order and RO A.3 and A.4, overloading caseworkers due to the placement crisis may violate RO 35's requirements for caseload tracking and reporting:

> Effective immediately, DFPS shall report to the Monitors, on a quarterly basis, caseloads for all staff, including supervisors, who provide primary case management services to children in the PMC class, whether employed by a public or private entity, and whether full-time or part-time. Data reports shall show all staff who provide case management services to children in the PMC class and their caseloads. In addition, DFPS's reporting shall include the number and percent of staff with caseloads within, below and over the DFPS established guideline, by office, by county, by agency (if private) and statewide. Reports will include the identification number and location of individual staff and the number of PMC children and, if any, TMC children to whom they provide case management. Caseloads for staff, as defined above, who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.

Dkt. 606 at 7.[20]

Child-only caseload tracking and reporting is illusory if each caseworker is responsible, in addition to a primary caseload, for directly supervising multiple other children every month. This is particularly true because the extra shifts tend to involve older children with significant mental health or behavioral needs and must be done without proper training/resources and in an ill-suited placement. This double duty is far more taxing on caseworkers. Again, these extra shifts are "other functions" that must be counted. *See id.* ("Caseloads for staff . . . who spend part-time in caseload carrying functions and part-time in other functions must be reported accordingly.").

---

[20] This RO also provides, "Effective immediately, DFPS shall track caseloads on a child-only basis, as ordered by the Court in December 2015. Dkt. 606 at 7. *See also* Dkt. 368 at 250 ("DFPS must track primary CVS caseworker caseloads on a child-only basis. The Special Master shall recommend whether tracking should be categorized separately for full-time and part-time primary CVS caseworkers, and how tracking should be categorized on a region and county-level. The State cannot include in the calculations secondary workers, workers in training, or fictive workers created out of overtime. The State is welcome to continue tracking caseloads by stages, but not in lieu of child-only tracking.")

"That a policy or practice of maintaining overburdened caseworkers directly causes all PMC children to be exposed to a serious risk of physical and psychological harm is adequately supported by the facts in the record." *Stukenberg I*, 907 F.3d at 264-65. Indeed, "the principle seems obvious: when workloads exceed caseworker bandwidth, caseworkers are not able to effectively safeguard children's health and well-being." *Id.* at 265. As the Fifth Circuit observed, high caseloads "are a direct cause of high turnover rates." *Id*. at 260. In holding that the State was "deliberately indifferent to the risks posed by its policies and practices toward caseload management," the court noted, the "combination of unmanageable caseloads and high caseworker turnover creates a 'cycle of crisis' that allows children to 'fall through the cracks.'" *Id*. at 258, 260.

Although the State agreed to the order requiring a 14-17 children caseload guideline, given the ongoing placement crisis, the State's "charitable" caseload calculations continue to "undersell the scope of the problem." *Id*. at 257. DFPS staff work overtime to supervise children in these risky, unlicensed settings in addition to their full-time responsibilities as caseworkers. *See* Dkt. 1318 (Fifth Report) at 50-55, 122-23. These competing job duties create significant safety risks. DFPS staff often fail to—because they do not have time to—review critical case information or adequately supervise children.

Simple math illustrates the problem. Caseworkers already work more than full-time. As the CPS Associate Commissioner said, "I know when I was a caseworker, I didn't work 40 hours. I worked a lot more than that . . . I would say in any given week, depending on whether I had emergencies or not, I would say at least 50 hours." Hr'g Tr. at 215 (Banuelos) (Apr. 12, 2023). Then, on top of those 50 hours/week working their normal workload, caseworkers work double time to care for children in unlicensed placements. Based on a survey of DFPS caseworkers, 80% reported having responsibility for children in unlicensed placements: 29% reported working >35

hours/month working these extra shifts; 47% worked 12-35 hours; and 23% worked <12 hours. *See* Dkt. 1318 at 123; Dkt. 1132 at 74 (in 2021, the average shift lasted 4-6 hours, not including "the time it took staff to travel to and from the [Unlicensed] Setting, which could be more than an hour each way, depending on the region where they worked."). The burden is obvious.

Beyond these alarming statistics, some of these caseworkers already had workloads beyond the guidelines. 17% of the workers doing the extra shifts had child caseloads that exceeded the agreed guidelines. *See* Dkt. 1318 at 122. Of those, 8% carried 18-20 children on their caseloads, 9% had 21-25 children on their caseloads, and all were DFPS workers. *Id*. 82% carried caseloads nominally meeting the agreed standards (not counting extra shifts), and 33% of those were subject to graduated caseloads because they were new to their positions. *Id*. at 122-23. Given all that, the State caps the extra shifts at 18 hours/week, *see* Hr'g Tr. at 224 (Banuelos) (Apr. 12, 2023), which is almost half of a full-time week for normal employees.

The math is daunting: 50+ hours/week working an assigned caseload plus 18 hours/week working these extra shifts. Caseworkers are working nearly 70 hours per week, every week. *See* Hr'g Tr. at 218 (Apr. 12, 2023). Not surprisingly, these crushing workloads are causing significant burnout among caseworkers, as evidenced by the State's caseworker turnover rate of 36%. *Id*. at 219. This "cycle of crisis," using the Fifth Circuit's words, caused by unmanageable workloads and caseworker turnover ripples into the PMC class at large. This is precisely the harm that the orders pertaining to child workloads were intended to remedy and stop.

The State's calculations do not reflect the true workload of caseworkers because these extra shifts are not factored into caseloads. *See* Dkt. 1136 at 14. DFPS admits that hours actually spent by its caseworkers trying to care for children in unsafe, unlicensed placements are *not* factored "in any caseload." Hr'g Tr. at 218 (Muth) (Apr. 12, 2023). This failure to account for these extra hours

"gives a false representation of the State's compliance with their agreement of 14 to 17 cases per caseworker." Hr'g Tr. at 224 (Apr. 12, 2023). Moreover, while caseloads are a useful proxy for workload, the Fifth Circuit understood that the constitutional violation stems from unmanageable workloads not merely caseloads. *See Stukenberg I*, 907 F.3d at 256-65 (emphasizing workloads). Deciding compliance with RO 35 based on caseloads alone is contrary to the Fifth Circuit holding.

The State is aware that nearly all DFPS workers may or must take on shifts, in addition to their full caseloads, to care for the many children it places in motels and other unlicensed settings. It knows that this practice causes low morale and high turnover. And it admits that unmanageable workloads and caseworker turnover results in a cascade of harms that place foster children at significant risk of irreparable harm. These facts are beyond dispute. "The State is well-aware that caseworkers have unmanageable workloads. It also knows that high caseloads—which are a direct cause of high turnover rates—have a negative impact on PMC children's welfare." *Stukenberg I.*, 907 F.3d at 260. *See also* Dkt. 1175 at 159-61 (Commissioner Masters).

Serious incidents during these double shifts illustrate that overloading DFPS workers puts all children in the system at risk. Vulnerable children in unsafe, unlicensed settings have ingested pills and used state-issued cell phones to send nude photos via social media sites. *See* Dkt. 1318 at 50-52. A child in need of "Line of Sight" supervision ran away from one unlicensed setting because the caseworker was reading emails on her phone about a child on her caseload who had run away just hours earlier. *Id*. at 54-55. A 13-year-old child—also in need of line-of-sight supervision— was sexually assaulted by a man in a motel room while she was on runaway status. *Id*. at 52 n.96. Working double-duty puts caseworkers in an untenable position: they are responsible for both the many children on their assigned caseloads and extra children in unlicensed, unsafe placements. They are simply unable to fulfill both responsibilities.

Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for not substantially complying with the Agreed Order (Dkt. 771) and RO A.3, A.4, and 35. Sanctions may include substantial monetary penalties assessed 30 days after the contempt order unless the State implements meaningful remedies that cure the violations.

### 3. Failure to Facilitate Reports of Abuse/Neglect Imperils Children and Violates RO A6.

Remedial Order A6 requires the State to ensure that caseworkers provide children with the appropriate point of contact for reporting abuse/neglect and information including about the Foster Care Bill of Rights and the Texas Health and Human Services Ombudsman:

> DFPS shall ensure that caseworkers provide children with the appropriate point of contact for reporting issues relating to abuse or neglect. In complying with this order, DFPS shall ensure that children in the General Class are apprised by their primary caseworkers of the appropriate point of contact for reporting issues, and appropriate methods of contact, to report abuse and neglect. This shall include a review of the Foster Care Bill of Rights and the number for the Texas Health and Human Services Ombudsman. Upon receipt of this information, the PMC child's caseworker will review the referral history of the home and assess if there are any concerns for the child's safety or well-being and document the same in the child's electronic case record.

Dkt. 606 at 11.

Nearly four years after the Fifth Circuit's mandate, the Monitors report "serious concerns regarding the ability of children in some facilities to reach out for help if they encounter safety risks." Dkt. 1318 (Fifth Report) at 80. The State's failure to ensure that children are provided an appropriate point of contact to report abuse places children at serious risk of harm and undermines the basis of the Fifth Circuit's decision. *See id.* at 71-89.

According to the Fifth Report, only 54% of the children interviewed had heard of the Foster Care Bill of Rights, and 46% had not heard of it even after a description was given. *Id.* at 75. (Knowledge varied by age: 69% of 9 and 10-year-olds had not heard of the Bill of Rights compared to 15% of 15 to 17-year-olds; 66% of children 12 years or younger had not heard of the Bill of

Rights. *See id*. at 75.) Of those who reported hearing about the Bill of Rights, only 17% had read the document, and only 39% said someone had explained it to them. *Id*. at 76. Younger children were even less likely to report having read the Bill of Rights or having the document explained to them. *Id*. Over half (51%) of children interviewed had not heard of the SWI hotline even after a description was given. *Id*. at 77-78.[21] In total, only 35% of children knew how to call the hotline. *Id*. at 78.[22] Many (59%) had never heard of the Ombudsman even after a description was given, and most (67%) did not know how to reach the Ombudsman. *Id*. at 76-77.[23]

While nearly all respondents (93%) reported having access to a phone, phone use was highly regulated: 83% needed caregiver approval before using a phone, and 31% reported specific days or times of the day when phone use was allowed. *Id*. at 81-82. 74% of interviewed caregivers reported restrictions on when a child can make a call, 67% reported restrictions on both when a child may make a call and who a child may call; only 9% of caregivers reported no call restrictions. *Id*. at 83. Even when children knew how to call the SWI hotline or Ombudsman, nearly half (49%) reported that children or staff could always hear their conversation, while 30% said others could sometimes hear their conversation. *Id*. Only 14% percent reported being able to use the phone without children or staff overhearing their conversation. *Id*.

A child's caseworker is required to report outcries of maltreatment. *Id*. at 86. But over half of youth interviewed (57%) said that caseworkers only "sometimes" answered or responded, and

---

[21] Knowledge of the hotline varied by age: nearly all 15 to 17-year-olds had heard of the hotline (77%) and another 15% reported having heard of it after a description was given, but 80% of 9 and 10-year-olds had not heard of the hotline even after a description was given. *See* Dkt. 1318 at 78.

[22] Knowledge of how to call the hotline varied by age: 85% of children ages 15 to 17 knew how to call the hotline while only 12% children aged 9 and 10 knew how to call the hotline. *See* Dkt. 1318 at 78.

[23] 75% of 9 and 10-year-old children had not heard of the Ombudsman compared to 31% of 15 to 17-year-olds. *See* Dkt. 1318 at 77.

19% of youth interviewed reported that their caseworker did not answer or respond when they called or texted. *Id*. Only 27% said their caseworker "always" answered or responded. *Id*.

In the years since the mandate issued, the State has neither developed nor implemented an effective plan to ensure that children know about available reporting mechanisms or that reporting mechanisms are accessible to children. As the CPS Director of Permanency recently testified:

> MR. HENSARLING: … So we worked with our provider network to communicate out that children and youth should have access and are allowed to have access to phones.
>
> THE COURT: Are you documenting it with each child?
>
> MR. HENSARLING: So they're provided that information through their Foster Care Bill of Rights, the rights of youth and children in foster care.
>
> THE COURT: What if they don't have the Foster Care Bill of Rights?
>
> MR. HENSARLING: We're working on a plan to make sure that there -- one, it's posted in every operation. So we also sent another reminder communication out to operations to ensure. We did some spot-checking as well to make sure that it was posted out. And we do regularly check that. And we're also working on some plans to be able to provide more communication methods for youth to have access to that information, that they can have it at all times.
>
> THE COURT: Do you know how many years it's been since this order was in place?
>
> MR. HENSARLING: Yes, ma'am.

Hr'g Tr. at 31-32 (Hensarling) (Jan. 27, 2023).

Nearly four years after the mandate issued, the State is still "working on some plans." And these purported plans are woefully insufficient. Ensuring that facilities post a Foster Care Bill of Rights somewhere in the facility will neither effectively inform children of reporting mechanisms nor ensure that facilities permit access to reporting mechanisms. Indeed, even when facilities post the SWI hotline and Ombudsman phone numbers on site—which nearly all (98%) do, *see* Dkt. 1318 at 81—most children still lack the knowledge about whom and how to contact, and those who do

lack adequate access to those reporting mechanisms. This plan is manifestly ineffective. Moreover, the vague "plans to be able to provide more communication methods" stretches the definition of "plan" into absurdity.

"Inability to report facilitates abuse." *Stukenberg I*, 907 F.3d at 302-03. The State's failure to maintain an appropriate point of contact places children at significant risk of serious harm. The State's failure increases the risk that operations that should be identified for heightened monitoring will not be (RO 20), and the risk that operations that should be investigated for abuse/neglect will not be (RO 3). The State displays little sense of urgency or concern about the harms related to the inability to report abuse.

Accordingly, Plaintiffs request an order directing the State to show cause why defendants should not be held in contempt and sanctioned for failing to comply with RO A6. Sanctions may include substantial monetary penalties assessed 30 days after the contempt order unless the State implements meaningful remedies that cure the violations.

### PRAYER

For these reasons, plaintiffs respectfully pray that the Court order the State to show cause why defendants should not be held in contempt and sanctioned for failing to comply with court orders and for such further relief to which plaintiffs are justly entitled.

Dated:  June 20, 2023                              Respectfully submitted,

                                                   _R. Paul Yetter_____

Samantha Bartosz (*pro hac vice*)                  R. Paul Yetter
Stephen Dixon (*pro hac vice*)                     State Bar No. 22154200
CHILDREN'S RIGHTS                                  Christian J. Ward
88 Pine Street, Suite 800                          State Bar No. 24033434
New York, New York 10005                           YETTER COLEMAN LLP
(212) 683-2210                                     811 Main Street, Suite 4100
sbartosz@childrensrights.org                       Houston, Texas 77002
                                                   (713) 632-8000
                                                   pyetter@yettercoleman.com
Marcia Robinson Lowry (*pro hac vice*)
A BETTER CHILDHOOD, INC.
355 Lexington Avenue, Floor 16                      Barry F. McNeil
New York, New York 10017                           State Bar No. 13829500
(646) 795-4456                                     HAYNES AND BOONE, LLP
mlowry@ABetterChildhood.org                        2323 Victory Ave., Suite 700
                                                   Dallas, Texas 75219
                                                   (214) 651-5000
                                                   barry.mcneil@haynesboone.com

                                                   ATTORNEYS FOR PLAINTIFFS AND
                                                   THE GENERAL CLASS AND SUBCLASSES

## CERTIFICATE OF SERVICE

I certify that on the 20th day of June, 2023, a true and correct copy of this document was served on all counsel of record using the Court's CM/ECF e-file system.

                                                   _/s/ R. Paul Yetter_____
                                                   R. Paul Yetter

- 30 -