IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § § § | |
| Plaintiffs, | § | |
| v. | § § | |
| | § | Civil Action No. 2:11-CV-00084 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, et al., | § § § | |
| | § | |
| Defendants. | § | |

**Monitors' Update to the Court Regarding PMC Children Without a Licensed Placement**

A.  Background

The Department of Family and Protective Services (DFPS) reports the number of children in Permanent Managing Conservatorship (PMC) without licensed, regulated placements under DFPS Supervision to the Monitors on a weekly basis.[1] In its reports, DFPS provides information about all PMC children who were without licensed, regulated placements the prior week, including details about their individual characteristics (age, sex, level of care), their care team (caseworker, supervisor, region and county) and the period without a licensed, regulated placement (first night without, treatment needs and diagnoses, other characteristics and location of the children).[2]

B.  Overview

On average from April 1, 2022 through March 31, 2023, 58 PMC children were without a licensed, regulated placement on a given night, with a maximum of 81 PMC children (which occurred on June 20, 2022). The lowest number of PMC children without a licensed, regulated placement on a given night was 28 (which occurred on December 24, 2022 and December 25, 2022). At the

---

[1] In this report, all references are to data involving PMC children without placement housed in non-kin, unlicensed, unregulated settings. All references to unlicensed placements exclude kinship settings.

[2] DFPS often first reports children to the Monitors the day after their first night without licensed placement. Therefore, the number of children without placement reflected in the weekly reports tends to be lower than the actual number of children without licensed placement on a given night as calculated when using the data DFPS provided about a PMC child's first night without a licensed placement. Beginning in September 2021, DFPS started providing the Monitors the information in an updated format which typically includes more detailed information about the children; for example, the reports have more information about their medical needs and/or diagnosis than during the prior reporting period.

beginning of this reporting period in April 2022, an average of 60 PMC children were without a licensed, regulated placement per night and by March 2023, the average was slightly higher at 63 PMC children; that number fluctuated, with the highest monthly average at 70 PMC children per night in June 2022.

**Figure 1: PMC Children Without Licensed Placement
by Day (April 1, 2022 – March 31, 2023)**

Source: Analysis of DFPS CWOP data
n=614 unique children over 1,459 spells without licensed placement

The number of PMC children without licensed, regulated placements has fluctuated over time. Between November 2021 through March 2022, the average number of children without placement hovered around 60 per day; followed by an increase in May 2022 (an average of 70 PMC children per day) and a steady decrease from June 2022 (an average of 63 PMC children per day) until August 2022 (an average of 52 PMC children per day). After August 2022, the lowest monthly average number of PMC children without licensed, regulated placements (42) occurred in November 2022 and rose to an average of 67 PMC children per day without licensed, regulated placements in March 2023.



Figure 2: Average Number of PMC Children Without Licensed Placement by Month (October 2021 – March 2023)

From April 1, 2022, through March 31, 2023, 614 unique PMC children experienced at least one night without placement. More than half of those 614 PMC children (52%, 319) experienced a single spell without a licensed placement; 19% (119) had two spells without licensed placements; 10% (63) had three spells without licensed placements; 6% (36) had four spells without licensed placements; 4% (23) had five spells without licensed placement; 3% (17) had six spells without licensed placements; and 6% (37) had seven or more spells without licensed placements.[3]

---

[3] One PMC child (<1%) had 20 or more spells without licensed placement.

The average spell experienced by PMC children without licensed placements lasted 15 nights, with the longest spell lasting 204 nights, equal to the previous reporting period.[4,5] The average number of nights without licensed placement per PMC child (i.e., combining the length of all spells without licensed placement during the period) was 36 nights, with a maximum of 263 nights. Eighty percent of the PMC children without licensed placements during this period experienced more than seven total nights without a licensed placement (478, 80%) and 41% (249) experienced more than four weeks without a licensed placement.

**Figure 3: Total Nights Without Licensed Placements per Child (April 1, 2022 – March 31, 2023)**[6]



C. Profile of PMC children without licensed placement

*Demographics*

The majority (89%, 546) of PMC children without licensed placement during the period were teenagers. The youngest PMC child was six years old at the time a spell began and the oldest PMC

---

[4] This figure does not include the current spells for the 56 children without licensed placement on the last day of the period, March 31, 2023.
[5] In the previous report, covering an overlapping time period from January 1, 2022 to November 30, 2022, the average spell without licensed placement lasted 15 nights, with the longest spell lasting 204 nights. Deborah Fowler & Kevin Ryan, Monitors' Update to the Court Regarding Children Without Placement, ECF No. 1319 (January 24, 2023).
[6] This figure does not include the current spells for the 13 PMC children without a licensed placement on the last day of the period who did not have a previous spell.

4

children were 17 years old.[7] More than half (54%, 331) of the PMC children without licensed placement during the period were female – higher than the share of females in the broader PMC population (47% on March 31, 2023).[8] The vast majority of females (89%, 294) without a licensed placement were teenagers (ages 13 to 17) and 62% (206) were older teens aged 15-17. Male children without a licensed placement during this period were similarly aged: 89% (252) were teenagers and 70% (198) were older teens aged 15-17.

*Characteristics and Needs*

DFPS described multiple treatment needs and other characteristics for the PMC children it reported during this period.[9] These PMC children typically had experienced multiple placements; frequently PMC children's mental health needs and underlying trauma were not effectively addressed.[10]

The most common corresponding characteristics or treatment needs that DFPS identified were as follows: history of physical aggression (551 children, 90%); history of mental health diagnosis (526 children, 86%); history of psychiatric or mental health hospitalization (497 children, 81%); and cognitive delay and/or physical disability.[11] Nearly half of the children (299 or 49%) were identified as having all four of the most common treatment needs.

---

[7] This figure includes four PMC children who exited care on their 18th birthdays and one PMC child who exited the day after their 18th birthday.

[8] DFPS, *RO. Inj_PMC_Children_List_2023_03d2023_05_01_log109534* (May 2, 2023) (on file with the Monitors).

[9] DFPS included treatment needs and characteristics for all children without placement. Unless otherwise noted, percentages are calculated out of 614 children.

[10] *See* Deborah Fowler & Kevin Ryan, The Court Monitors' Report to the Court Regarding Maltreatment in Care and Unsafe Placements for Children Without a Placement 7-8, ECF No. 1066 (April 27, 2021); Deborah Fowler & Kevin Ryan, The Court Monitors' Update to the Court Regarding Conditions at Devereux – League City Residential Treatment Center, ECF No. 1027 (February 8, 2021) (detailing the experience of two children, A.A. and B.B.).

[11] The monitoring team coded the text descriptions provided by DFPS using categories derived from the Texas Common Application for Placement of Children in Residential Care as appropriate. As noted previously, DFPS updated their reporting as to treatment needs and characteristics of children in their data reports to the Monitors as of September 2021, resulting in more robust reporting of children's mental health diagnoses and cognitive and physical function.



Figure 4: Number of PMC Children with Corresponding Treatment Needs
(April 1, 2022 - March 31, 2023)

### D. Geography and Location

Over 50% of PMC children without licensed placement were reported from five counties: Bexar (19%, 119), Harris (15%, 91), Dallas (11%, 65), Bell (3%, 18), and Nueces (3%, 18). However, children experienced spells without licensed placements in 86 different counties.

The top two legal counties (Bexar and Harris) for PMC children without a licensed placement were the same as the top two legal counties among the broader PMC population. In addition, four of the top five counties with PMC children without licensed placement had a larger share of PMC children without licensed placements as compared to the population of PMC children who are from those counties (Bexar, Harris, Dallas, and Nueces).



Figure 5: Legal County for PMC Children Without Licensed Placement Compared to PMC Population

The majority of PMC children who experienced time without a licensed placement were under the care of DFPS (98%, 602), with 2% of PMC children under the care of an SSCC: OCOK (2%, 11), and St. Francis (<1%, 1).[12]

DFPS reports a PMC child's location prior to a spell without licensed placement. According to this data, 26% (374) of spells occurred after a stay in a psychiatric hospital; 20% (294) occurred after a child ran away from a placement;[13] 13% (192) occurred after a stay at a relative caregiver, kinship, or fictive kin placement; and 12% (173) occurred after a stay at a jail or juvenile detention center as shown below.

---

[12] Of the total population of 8,910 PMC children as of March 31, 2023, 25% (2,251) were under the care of SSCCs. Two SSCCs did not place any children in their care into these unlicensed settings during the period: 2INgage and Belong. The number does not add to 100% due to rounding.
[13] The data did not indicate from which type of placement a child ran away.

**Figure 6: Child Location Prior to Spell Without Placement (April 1, 2022 – March 31, 2023)**



When PMC children experienced nights without a licensed, regulated placement, DFPS reported that PMC children were held at hotels (72%, 1,051); various foster care facilities (19%, 284); churches (5%, 76); and DFPS Child Protective Services (CPS) offices (<1%, 1).[14] After the Family Code was amended in June 2021 to prohibit the use of DFPS Offices to house children, hotels became the most frequent location instead of DFPS Offices.

---

[14] Effective June 14, 2021, DFPS may no longer allow a child to stay overnight in a department office. TEX. FAM. CODE §264.1071.

**Figure 7: PMC Child Location During Spell Without Licensed Placement (April 1, 2022 - March 31, 2023)[15]**



Source: Analysis of DFPS CWOP data
n=1,459 spells without placement

- Hotel, 1,051, 72%
- Foster Care Facility, 284, 19%
- Church, 76, 5%
- Office, 1, <1%
- Other, 47, 3%

E. Risk of Harm in Unregulated Settings

The monitoring team reviewed Serious Incident Reports (SIR) involving PMC children without licensed placement who were housed in unregulated settings from December 1, 2022 through January 31, 2023 to assess their safety and risk of harm. As the Monitors have previously discussed, DFPS continues to expose some PMC children to risk of serious harm in unregulated sites without sufficiently trained caregivers to monitor and care for children who are under DFPS Supervision.[16] Also as noted previously, the difficulty to maintain a safe environment may not be unexpected given that DFPS has assigned individuals to manage children's complicated behavioral and mental health needs as untrained caregivers in short shifts for children with whom they are not familiar.[17]

The risk is increased given that most PMC children without placement have a history of mental health diagnoses, one or more psychiatric or mental health hospitalizations, or cognitive delay and/or physical disability; often these treatment needs and characteristics are co-occurring. Due to these characteristics and needs, the unregulated settings are particularly challenging for this

---

[15] The category of "other" includes four residential addresses: Alamo Ranch House, Pink House, Verbena House, and Waxahachie House.
[16] Deborah Fowler & Kevin Ryan, Fifth Report 7, ECF No. 1318.
[17] Deborah Fowler & Kevin Ryan, Fifth Report 50, ECF No. 1318.

population. The incidents reported in the SIRs provide additional insight into how the absence of trained caregivers with relationships with the children and lack of regulations exacerbates the potential for harm.

The examples below from the SIRs further highlight safety risks inherent in caring for children in these unregulated, unlicensed environments without the availability of therapeutic and supportive services. In 14 of 94 Serious Incident Reports the monitoring team reviewed during this period, there were facts reporting that a security officer under contract with DFPS physically intervened and/or restrained the child. In some instances, the security officers restrained the child through chemical and mechanical means, such as pepper spray (1) and handcuffs (5). The Monitors also became aware of an incident where a security officer used a taser on a child.[18] Additionally, many of the instances detailed in the SIRs resulted in children under DFPS Supervision being arrested (again, most of whom have co-occurring mental health diagnoses and cognitive and/or physical disabilities): in 15 of the 94 SIRs, the incident culminated in the child's arrest and/or temporary detention. Sometimes the physical interaction with the security officer also led to the basis for arrest; other times, staff members supervising the children appeared to call law enforcement to the setting due to a lack of other available alternatives, such as the presence of additional caregivers and therapeutic or child-specific interventions.

The number of PMC children arrested and/or detained in juvenile detention during the two-month interval of reports from DFPS Supervision locations is noteworthy in comparison to the general population of PMC children: on December 31, 2022, DFPS reported a total of 60 PMC children housed in juvenile detention or other jail facility.

In a licensed child care operation in a residential setting, physical intervention and restraint practices are regulated by the Health and Human Services Commission (HHSC) and only caregivers qualified in emergency behavior intervention can administer any form of emergency behavior intervention (restraints) on children who are in the State's care, except for a short personal restraint which is time limited to less than a minute.[19] A large portion of mandatory caregiver training must focus on strategies and techniques for less restrictive interventions and is specific to working with minors.[20] Use of mechanisms such as pepper spray, handcuffs, and tasers by a staff member in a General Residential Operation is prohibited.[21]

DFPS contracts with a security company in order to deploy security officers on site at DFPS Supervision's unregulated settings. The contracts do not have the same parameters or regulations in place that apply at General Residential Operations. Therefore, children in crisis encounter a different response in unregulated, unlicensed settings than they would when challenges arise in the

---

[18] Although the child who endured being tasered was not in PMC status at the time of the event, there was a PMC child housed by DFPS at the same location being monitored by this security officer on the date of the incident.
[19] 26 TEX. ADMIN. CODE §748.2453.
[20] 26 TEX. ADMIN. CODE §748.889 (incorporating by reference §748.887).
[21] 26 TEX. ADMIN. CODE §§748.1119 & 748.2705 (1). The use of tasers is also prohibited in juvenile detention facilities by the Juvenile Justice Department. 37 TEX. ADMIN. CODE §343.804(10).

presence of trained caregivers in environments designed to provide intensive therapeutic and support services. The State contract provides that security officers must have a current certification with the Texas Commission on Law Enforcement and that the security officers will assist with de-escalation of the child or youth or intervene when necessary to protect staff, other children and youth or themselves. There are no additional requirements that are specific to youth, mental health, or youth in crisis for the operative contract in place through August 2023.

In its request for proposals (RFP) for future contracting with security officer services, the Health and Human Services Commission (HHSC) (on behalf of DFPS), has listed additional training and licensure requirements that are not currently in place.[22] One requires that officers will have completed de-escalation training for Peace Officers compliant with a regulatory provision under Public Safety and Corrections, Texas Administrative Code §37.218(c)(1) "with preferable mental health training included." The language does not require specific mental health focused training nor does it require youth-specific training. It does, however, appear to anticipate additional leveraging of security officers to perform law enforcement duties while working with caseworkers and other staff members supervising children in crisis: the RFP requires that security officers have the "ability to arrest or detain in the DFPS Region(s) that a Contractor is awarded a Contract to provide these services in a specific Region." It also requires that the security officers will "make reports to local law enforcement agencies on behalf of DFPS…". The projected amount of the contract under Historical Compensation is $17 million per fiscal year.[23]

Below are some examples of interactions between the security officers deployed by DFPS in unregulated, unlicensed settings that led to physical interactions with PMC children in DFPS care as reported in the SIRs. It is not always clear what tactics the officers used when a child was reportedly brought to the ground by the security officers. Moreover, some incidents included methods that are otherwise strictly prohibited in the regulated child care environment, such as a pepper spray and handcuffs.[24] At times, caseworkers noted the eventual arrest of the child after such incidents. In the final example below, the incident did not include physical intervention by a security officer as there were none deployed at the site; rather it highlights the negative consequences for children in these settings when law enforcement intervention appears to be the default option instead of therapeutic supports, thus making arrest more likely:

1. A DFPS staff member on duty reported in the SIR that a child (age 14) refused to take her medication and threatened to run away from the facility. The SIR stated that the worker advised her not to leave, attempted to redirect her, and a security officer blocked the door. At that point, the caseworker indicated that the child began throwing and kicking items on the floor, broke a glass, and attempted to cut her wrist with one of the pieces of glass. A

---

[22] HHSC notes, "When DFPS became a stand-alone agency, procurement stayed with HHSC and DFPS uses the services. Requirements outlined in the procurement is a decision DFPS made." *HHSC and DFPS, Defendants' Comments on the June 17, 2023 Drafts of the Monitors' Reports* (June 22, 2022).
[23] HHSC, *Request for Proposals for Peace, Licensed Personal Protection, or Licensed Security Officer Services* (March 15, 2023).
[24] The child on whom the DFPS-contracted security officer administered his taser was eventually arrested by local law enforcement and transported to juvenile detention.

security officer and caseworker attempted to take the glass from the child but were unsuccessful. The security officer then handcuffed the child while she was still holding the piece of glass. The caseworker reported that the child cut herself with the glass (possibly by accident), while resisting the security officer's attempt to handcuff her. Another security officer on site also came to assist with the intervention. A security officer then ultimately transported the child to a psychiatric hospital.

2. A caseworker reported in the SIR that a child (age 15) got into an argument with a caseworker due to his use of a Nerf gun inside an unlicensed, unregulated house; the dispute eventually culminated in the on-site security officer using pepper spray on the child before arresting him and transporting him to juvenile detention. The child was at a psychiatric hospital prior to his discharge to DFPS Supervision and he is identified with an Intense level of care. The event precipitating the use of pepper spray and arrest of this child was reported as follows: The staff member stated in the SIR that the child had a Nerf gun but a caseworker told the child that "he could no longer have the [Nerf] gun until he gives up the [Nerf gun] bullet that he shot." The child argued that he did not have the bullet. The workers reportedly attempted to help the child find the Nerf gun bullet but stated he was not doing well with searching for it. At this point, a worker told the child that his "resistance" would be noted as "refusing to give up the [Nerf gun] bullet," which caused the child to become upset and to threaten and curse at the workers. A worker called a "program director" at the child's request and the child expressed his frustration with the situation to the program director. The program director reportedly "explained several times that he is just expected to follow rules and be respectful and warned [the child] that if he continued to yell, then she would end the call but [the child] continued to yell so [the program director] hung up." The caseworker further reported that the staff members tried to calm the child, but the incident escalated and the child punched a table and wall and yelled in the worker's face.

Reportedly, a security officer then intervened and grabbed the child's shoulders to bring him back to the couch to settle down. The worker "had already activated the safe signal at this point and was on the phone with law enforcement." The child continued yelling while walking towards the workers when the security officer stepped in front of the child and told him to go back to the couch. The child then shoved the security officer and the officer fell over a chair. When the security officer got up, he administered pepper spray on the child. Having been pepper sprayed, the child reportedly calmed down while waiting for additional law enforcement and paramedics to arrive. Paramedics transported the child to the hospital where he received medical attention for the pepper spray contact. The police arrested the child upon discharge from the hospital and advised him that they were taking him to juvenile detention.

3. A caseworker reported in the SIR that two security officers restrained and handcuffed a child (age 15) who was under DFPS Supervision at a hotel and police officers later arrested her. The child is identified with an Intense level of care. The child obtained scissors from the front desk of the hotel and reportedly threatened the security officer with the scissors. Two security officers intervened and the child "was taken to the floor in the hotel lobby by the [security] officers." The child relinquished the scissors and the security officers handcuffed her and called local law enforcement. The security officers then brought her outside to "sit on a bench" and await law enforcement. The child, however, ran away from the security officers who then "watched [her] walk handcuffed across the street" and into a restaurant parking lot. Reportedly, the child then picked up a hammer and a drill from the side of the restaurant while handcuffed when she saw the local law enforcement arrive. Law enforcement officers exited their vehicles with "guns drawn" on the handcuffed child while "several police cars continued arriv[ing] and drawing weapons" toward the child. The child eventually "laid down and officers arrested her."

4. A caseworker reported in the SIR that a child (age 17) entered a hotel used by DFPS to house children without a licensed placement in order to remove his makeup. The child is indicated with an Intense level of care. Reportedly, there was an unknown woman outside the hotel waiting for the child. Caseworkers and a security officer then followed the child to the restroom. When the child exited the restroom, he spoke to a caseworker and another child. At that point, the child reportedly touched or pushed the caseworker. The security officer admonished the child and told him that he needed to "keep his hands to himself." The caseworker further stated that the child became aggressive and cursed at the security officer. The security officer then "placed his hands in front of him to establish space between [the child]. [The child] continued to close the space between him and security until he touched security's hands." At that point, the officer "grabbed the child and wrestled him to the ground." A staff member then called the police; law enforcement officers arrived and reportedly assisted to de-escalate the situation. The child then returned to his room for the night.

5. A caseworker reported in the SIR an argument between two children (Child A, age 15 and Child B, age 11) that culminated in the 11-year-old child's arrest and transport to juvenile detention. The worker reported that the two children learned that staff members did not approve a request for them to go on an outing and they expressed disappointment due their good behavior. Child A then took Child B's paper and a colored pencil to write on it and then threw it on the floor. This led to an altercation between the two children, at which point a caseworker on duty "pushed Safe Signal" to summon law enforcement. The law enforcement officer arrived and placed Child A in handcuffs. He then conferred further with the caseworkers and apparently spoke with someone at a juvenile detention facility; he stated that because Child B "started the fight," he would instead arrest the 11-year-old

13

child and released Child A from the handcuffs. Law enforcement then transported Child B to juvenile detention. Child B's level of care is Intense and she is a sexual abuse victim.