IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| M.D., b/n/f Sarah R. Stukenberg, et al., | § § § | |
| Plaintiffs, | § | |
| v. | § § | |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, et al., | § § § | Civil Action No. 2:11-CV-00084 |
| Defendants. | § | |

## **Update to the Court Regarding Child Fatalities**

After learning through the Monitors of the death of a child in the PMC General Class, the Court ordered on February 21, 2020:

*Within 24 hours of this order's time and date, Defendants are ordered to report to the Monitors the death of any PMC child occurring from July 31, 2019 forward until further order of this Court. Defendants are further ordered to provide to the Monitors all records that the Monitors deem necessary and relevant including, but not limited to, reports, interviews, witness statements, and investigations from any and all said deaths that have occurred from July 31, 2019 forward until further order of this Court.*

Defendants have continued to provide notification to the Monitors of PMC child fatalities. As discussed in prior reporting to the Court, DFPS notified the Monitors that 47 children in the PMC General Class died between July 31, 2019 and November 30, 2022. These fatalities included seven children whom DFPS determined were abused or neglected by their State approved caregivers in connection with their deaths or their care prior to their deaths.

DFPS reported that one additional PMC child died between December 1, 2022 and June 1, 2023, bringing the number of PMC children who have died in care since July 31, 2019 to 48. DFPS's investigation into this most recent child's death did not find evidence of abuse or neglect by the foster parent; the child passed away from severe medical complications.

At the close of the last report period on November 30, 2022, DFPS's investigations into the deaths of three children remained open. DFPS has since closed all three of these investigations and determined that two of the fatalities did not involve abuse or neglect: one of the deaths involved a child with severe medical conditions and one involved a child

who passed away from an acute illness. Regarding the third child fatality, DFPS entered a disposition of Unable to Determine for the allegation of Medical Neglect related to a caregiver's care of the child prior to his death and Ruled Out the allegation of Neglectful Supervision by the caregiver. These three child fatalities are described in more detail below.

### Child Fatalities, No Abuse or Neglect Determined

#### R.F., Born April 9, 2019; Died August 21, 2022

The Monitors' Fifth Report detailed the circumstances of R.F.'s death. During the current report period, DFPS closed its investigation into R.F.'s death. R.F., a three-year-old girl, passed away from an acute case of the stomach flu. From June 2021 until her death in August 2022, R.F. resided in a foster home with her younger sister. On August 20, 2022, a day prior to her death, R.F. told her foster parents that her stomach hurt and her foster parents found that R.F. had a mild fever (101°F). R.F.'s foster mother provided R.F. with Children's Tylenol to reduce the child's fever. Later that evening, when R.F.'s foster parents put her to bed, she was reportedly feeling better. The next morning, on August 21, 2022, the foster father went into R.F.'s bedroom and found R.F. unconscious and cold to the touch. The foster parents immediately called 911 and began administering lifesaving measures. Upon arrival to the home, First Aid Responders pronounced the child deceased. The child's autopsy found that R.F.'s cause of death was "acute gastroenteritis of probable viral etiology." When interviewed by the investigator, the Medical Examiner reported that R.F.'s condition was "acute and unrelated to any abuse." In its investigation into R.F.'s death, DFPS Residential Child Care Investigations (RCCI) found no evidence of maltreatment by R.F.'s foster parents. Following R.F.'s death, the foster parents continued to care for R.F.'s younger sister and eventually adopted her.

#### F.C., Born January 27, 2016; Died September 21, 2022

The Monitors' Fifth Report detailed the circumstances of F.C.'s death. During the current report period, DFPS closed its investigation into F.C.'s death. F.C., a six-year-old girl, passed away from significant medical complications. F.C. had the following diagnoses: autosomal recessive polycystic kidney disease, end stage kidney disease, a genetic chromosome disorder, cerebral palsy, epilepsy, anoxic brain damage, and global developmental delay. F.C. was non-verbal and immobile, used a feeding tube, and received peritoneal dialysis every night because her kidneys were removed at birth. At the time of her death, F.C. was subject to an active Do Not Resuscitate (DNR) order. After entering DFPS care in 2017, F.C. resided in the same foster home, approved to serve children with primary medical needs; in this foster home, F.C. received nursing care 24 hours a day. According to RCCI's investigation into F.C.'s death, two weeks prior to her death, F.C. developed a fever and her oxygen levels dropped. F.C.'s foster parent called 911 and First Aid Responders transported F.C. to the hospital. F.C. remained in the hospital on life support until her death two weeks later. F.C.'s death certificate listed the following causes of death: klebsiella pneumoniae sepsis and septic shock, acute respiratory distress syndrome, multi-organ failure, and rhinovirus infection. During an interview with the RCCI investigator, F.C.'s in-home nurse reported that F.C. had not

been expected to live past the age of two and that the foster home provided the child with appropriate care. F.C.'s physician reported that he did not have concerns about the care the foster parents or nursing staff provided to F.C. in the foster home. RCCI's investigation into F.C.'s death found no concern for maltreatment. Due to F.C.'s medical condition and DNR order, the county medical examiner did not perform an autopsy.

S.M., Born May 13, 2020; Died February 23, 2023

S.M., a two-year-old girl, passed away from significant medical complications. S.M. had the following diagnoses: suspected fetal alcohol syndrome, chronic respiratory failure with hypercapnia, chromosomal abnormality, cardiomegaly, congenital laryngomalacia, pulmonary heart disease, cleft palate and pulmonary hypertension. S.M. used a ventilator and a gastrostomy button and had a tracheostomy. On February 13, 2023, ten days prior to her death, S.M. was admitted to a hospital in order for hospital staff to train S.M.'s new pre-adoptive foster parent, a nurse, on her care prior to placement. On February 22, 2023, after the foster parent successfully completed the hospital's training, S.M. was transported to her new pre-adoptive home, which was approved to serve children with primary medical needs, via ambulance. The following morning, on February 23, 2023, S.M.'s oxygen levels dropped suddenly and she entered respiratory distress. The child's nurse administered respirations to S.M. using an Ambu bag while a Patient Care Assistant in the home called 911. While First Aid Responders transported her to the hospital, S.M. passed away. S.M.'s death certificate lists the following causes of death, which were documented as lifelong: chronic respiratory failure with tracheostomy dependence; pierre robin sequence; chromosomal anomaly; and suspected fetal alcohol syndrome. During her interview with the investigator, S.M.'s primary physician reported that S.M. was "very medically fragile" and that S.M. had prior instances when her oxygen levels dropped, her face changed color and her heart stopped. The physician stated that S.M.'s medical conditions led to her short life expectancy. RCCI's investigation into S.M.'s death found no concern for maltreatment by S.M.'s foster parent. According to the investigation report, the Medical Examiner did not perform an autopsy due to S.M.'s documented medical conditions. The Medical Examiner's office reported that while an autopsy was not conducted, the office completed a thorough examination of S.M.'s body and did not identify signs of abuse or neglect.

**Child Fatality, Unable to Determine Abuse or Neglect**

K.A., Born December 8, 2020; Died August 27, 2022

The Monitors' Fifth Report detailed the circumstances of K.A.'s death and during the current report period, DFPS closed its investigation into K.A.'s death. K.A., a one-year-old boy, passed away from pneumonia. After entering DFPS's care at six months old, K.A. resided in a court-ordered kinship foster home with his twin brother, who was the only other child placed in the home.[1] On the evening prior to the child's death, the kinship caregiver reported that K.A. refused to eat, which was not uncommon for the child. The

---

[1] Based upon K.A.'s medical records, at the time of K.A.'s placement in the kinship foster home, K.A. did not have any documented medical conditions and was a healthy weight.

caregiver assumed the child was teething and placed an over-the-counter medication on the child's gums and provided him with Pedialyte. During the night, K.A. vomited and the caregiver gave the child Motrin. According to the caregiver, K.A. appeared to feel better before he fell asleep and, when she checked on the child early the next morning (approximately 4:00 a.m.), K.A. was sleeping. However, when the caregiver next checked on K.A. between 11:00 a.m. and noon, she found him unconscious. She contacted 911; when the First Aid Responders arrived at the home, they determined K.A. was deceased.

The DFPS investigator requested and reviewed an autopsy of the child. The child's autopsy found that K.A.'s cause of death was "a result of acute bronchopneumonia associated with parainfluenza virus 3 infection, with failure to thrive of unknown etiology contributing to his death." The report findings further stated, "The nutritional state of the decedent at death is concerning; although the decedent had always been within the lower percentile for weight for his age in medical evaluations, he had lost weight since his 9-month well-child exam. However, the gastrointestinal tract was filled with digesting material and feces, indicating oral intake. Furthermore, circumstantial and investigational information further suggest a natural etiology for this weight loss, though the precise cause is currently unknown." The autopsy report documented that K.A.'s weight at the time of his death (16.16 pounds) was two pounds less than his last recorded weight (18.7 pounds) at his nine months well-visit appointment, ten months prior to his death.

The autopsy report also documented marks, scars and evidence of injury on K.A.'s body, including: scarring on the right ear (inner helix); three hyperpigmented linear scars on the left side of the neck measuring between an 1/8 and 3/8 of an inch each; two scars measuring 1/4 of an inch each on the lateral right thoracic back; and "a collection of four ill-defined, vague contusions measuring up to 3/8 x ½ inch" on the midline of the forehead. The autopsy report identified the following on the child's legs and ankles: "A collection of small abrasions measuring up to 1/16 inch occupy a 3/8-inch area on the posteromedial lower right leg. A 1/4-inch contusion is on the anterior medial lower right leg."

The investigator did not investigate the cause(s) of scarring and injury to K.A.'s body identified by the autopsy report; however, prior to receipt of the autopsy report five months after the death, the investigator addressed markings on the child's body that were included in the intake report at the time of the death. When DFPS initiated its investigation of K.A.'s death, a responding law enforcement officer reported to SWI that K.A. looked "very malnourished" and observed markings on K.A.'s ankles and peeling skin, like "burn marks," on his legs. During the investigation, the investigator interviewed a different responding officer, a Child Abuse Detective, regarding the marks observed on K.A.'s ankles and legs. The detective reported that she did not observe any "outward signs of abuse," such as open wounds or burn marks on K.A.'s body when she responded to the 911 call. The detective stated that she observed a mark on the child's ankle that was not concerning and a skin rash that appeared to be eczema. The investigator discussed with the caregiver the mark on K.A.'s leg and the caregiver responded that K.A. had a skin rash that was treated with a cream.

4

In addition to the child's autopsy report, DFPS's investigation of K.A.'s death included a Forensic Assessment Center Network (FACN) consult of the child's death. The FACN found:

> In reviewing the medical records provided and those available to me through [K.A.'s pediatrician's office], K.A. was last seen for a well child check on 9/30/21 at 9 months old. He had an evaluation for development delay in May 2022, at which time it was recommended he begin [speech] therapies. It does not appear these therapies were initiated, as there are several notes that "mother" (appears to be sister - guardian) cancelled several appointments and said she was unable to schedule due to "life is complicated."[2] He had several appointments scheduled with his pediatrician's office at the end of 2021 and through 2022? [sic] none of which he attended.[3] At his last pediatrician appointment, he weighed 8.562 kg (18 lb 14 oz). On autopsy it was noted that he weighed 7.33 kg (16.16 lbs) and had prominent bony outlines and signs of malnutrition and dehydration. He had lost 2 lbs since 9 months of age, when he should have weighed between 24 and 26 lbs at 20 months old based on his previous growth curve. And while it was documented that the guardian said he had feeding issues, he never started the therapies that were prescribed.[4] Based on the information available to me at this time, the medical findings are consistent with medical neglect occurring prior to his death. It is also very likely that his malnutrition contributed to his death, as a malnourished child does not have the reserves needed to fight an otherwise common viral infection.

During the investigator's interviews with the caregiver, the investigator asked the caregiver about K.A.'s malnourished body. The caregiver reported that K.A. was smaller than his twin brother, had been small since he was placed in her home and she did not know the cause of the child's death.[5] She reported that K.A. "led a healthy, normal life." Regarding K.A.'s eating, the caregiver reported that K.A.'s eating patterns were "random, unpredictable and all over the map" and that she did not "force" eating but instead attempted to make mealtimes "positive and pleasant;" the caregiver reported that if K.A. initially refused food at mealtime, he would likely return to the meal later. Based upon the investigative record, the investigator should have more thoroughly questioned the

---

[2] The investigative record documented that on June 13, 2022, K.A. had a Speech and Language Evaluation at the kinship caregiver's home. The caregiver scheduled the evaluation due to concerns that K.A. was developmentally delayed. Based upon the investigative record, the caregiver did not secure the recommended speech therapy appointments for K.A. during the summer of 2022. The caregiver reported that "life is very complicated now," she had a sick grandparent and she would "reach out" to schedule an appointment when things "quiet down."
[3] The investigative record documented that K.A.'s last medical appointment occurred on February 18, 2022.
[4] According to the investigative record, on October 26, 2021, the caregiver had a telephone consultation with one of K.A.'s pediatricians. The caregiver reported to the doctor that K.A. was consuming less formula and at daycare, K.A. consumed only "formula and baby food." The doctor's documentation of the call did not include any follow-up actions or recommendations to the caregiver regarding feeding.
[5] Interviews with the caregiver occurred prior to DFPS's receipt of the autopsy report; DFPS received the report five months after the investigation commenced.

caregiver about K.A.'s eating habits, diet and weight while the child was placed in her home.

The investigator interviewed a physician from K.A.'s pediatrician's office. The physician reported that after K.A.'s last appointment on February 18, 2022, K.A.'s medical records showed that the caregiver had cancelled or failed to attend "several" appointments. From the DFPS investigative record, it is unclear the number of appointments K.A. missed or the nature of these appointments.[6] The physician also reported that K.A. was updated on vaccines required through 12 months of age and that while K.A. was born small, he was "catching up developmentally" and his weight and height were not of concern at his last appointment. Lastly, the physician reported that his office canceled an appointment scheduled for K.A. on August 22, 2022, five days prior to his death, due to inclement weather and rescheduled the appointment for September 16, 2022, at which time K.A. was deceased.

During the investigator's interview with K.A.'s caseworker, she reported that she conducted a visit with K.A. at his kinship home six days prior to K.A.'s death. The caseworker reported that when she arrived at the home for the visit, K.A. reportedly had just finished eating and was getting ready to go to bed. She stated that she did not observe anything of concern during the visit. Regarding K.A.'s size, the caseworker stated that K.A. had always been smaller than his twin brother. The caseworker reported to the investigator that in April 2022, four months prior to K.A.'s death, DFPS requested that the caregiver take K.A. for a routine medical appointment, however, the caregiver "gave excuses" as to why she was unable to take the child. The caseworker reported that the caregiver's "follow through [was] always terrible." The investigator asked the caseworker why DFPS continued to place K.A. and his brother with the caregiver since she appeared to exhibit a "pattern of uncooperativeness." The caseworker reported that DFPS had considered "alternative placements" for K.A. and his brother; however, the agency decided to continue to work with the kinship caregiver.[7]

The child's caseworker and her supervisor reported that they were unaware of K.A.'s growth delays despite the fact that the child lost two pounds over ten months. No one interviewed reported they had any sense that K.A. was unwell and failing to grow, despite the child's physical appearance.

---

[6] Based upon the American Academy of Pediatrics (AAP) recommendations, children should receive preventive care visits at the following sequence: 12 months, 15 months, and 18 months. While it is unclear whether K.A.'s pediatrician attempted to follow the APA's recommended visit schedule, the investigative record did not include evidence that K.A.'s kinship caregiver secured medical appointments for K.A. at 12, 15 and 18 months. The investigative record documented that K.A. attended his 9-month well-child visit on September 30, 2021 and attended an office visit on February 18, 2022 where he received routine childhood vaccinations and a tuberculosis screening. It is unclear from the evidence DFPS collected during the investigation whether K.A. received other medical services or assessments during the February 2022 visit.

[7] The CVS supervisor assigned to K.A.'s case reported that K.A. and his brother were clean, well-groomed and comfortable with the caregiver and that the caregiver was "in tune" with the children's likes and needs. When a judge asked whether DFPS had safety concerns for K.A. and the brother in the kinship home, the supervisor reported to the judge that DFPS did not have safety concerns, but there were concerns with the "attitude" of the caregiver. The supervisor reported that DFPS had to distinguish between concerns for a child's safety and a caregiver's difficult personality. The supervisor reported that she never had any concern for the safety of the children with the caregiver.

Because the child missed some medical appointments, K.A. was not routinely weighed to detect and record weight loss. His last recorded weight was at nine months old (September 2021) and that weight was healthy. K.A. went to the doctor in February 2022, but there was no weight recorded for that visit. K.A. had a dental appointment in April 2022 and an early intervention appointment in June 2022. No documentation from these visits indicates that the child looked too small.

These gaps in regular medical observation and care between October 2021 and K.A.'s death in August 2022, contributed to the absence of a medical record of K.A.'s weight loss and leave unanswered questions whether the weight loss was slow and gradual over time or rapid and compressed in time.

In its findings in support of a disposition of Unable to Determine for Medical Neglect by the kinship caregiver, DFPS documented:

> During the investigation [the kinship caregiver] never provided a clear explanation as to why she did not follow through with [K.A.'s] medical care and the doctor's recommendation for [K.A.] to receive therapy due to his developmental delays. It could not be proven and there was no evidence that [the kinship caregiver] was informed that her failure to follow through with medical care for [K.A.] could be detrimental to his health. During the home visits conducted by the department and other professionals prior to the fatality investigation there was never any noted concerns of observable impairment to the growth and functioning of [K.A.]. There is also no indication that [the kinship caregiver] was informed or aware that the lack of medical care could have led to a decline in [K.A.'s] health. There is also no evidence to support that [the kinship caregiver] was informed by [K.A.'s] doctor of the seriousness relating to [K.A.] not making his routine medical appointments. There was also no information found to support [the kinship caregiver] was aware the child was malnourished. A joint investigation was conducted with Child Protective Investigations and Law Enforcement. Law Enforcement is not pursuing any criminal charges at the closure of the case. Based on information gathered during the investigation, the disposition of the Medical Neglect of [K.A.] by [the kinship caregiver] is Unable to Determine due to it being unclear if [the kinship caregiver] was aware of the seriousness of the child's ongoing medical needs.